```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
 2

 3   IN RE: EPIPEN                       Docket No. 17-md-2785
     (Epinephrine Injection, USP)
 4   Marketing, Sales Practices
     and Antitrust Litigation
 5                                       Kansas City, Kansas
                                         Date:  9/07/2017
 6

 7   .........................

              TRANSCRIPT OF INITIAL SCHEDULING CONFERENCE
 8
                            BEFORE
 9
             THE HONORABLE DANIEL D. CRABTREE
10            UNITED STATES DISTRICT COURT JUDGE

11            THE HONORABLE TERESA J. JAMES
              UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     For the Plaintiffs:
14
     Sharon S. Almonrode            Eric S. Hochstadt
15   Ben Barnow                     Ryan C. Hudson
     William Biel                   Duane Loft
16   Reagan Bradford                David Oliver
     Yehuda Buchweitz               Brian O'Mara
17   Warren T. Burns                Damien Marshall
     Gretchen Freeman Cappio        Elizabeth C. Pritzker
18   Spencer Cox                    Lynn L. Sarko
     Isaac Diel                     Joseph G. Sauder
19   Stephen Fearon                 Erich P. Schork
     Barbara Frankland              Rex A. Sharp
20   Paul Geller                    Mark Ram
     Scott Goodger                  Rosemary Rivas
21   Archie Grubb                   William Wright

22
     For the Defendants:
23
     Brian Fries                    Joseph M. Rebein
24   Bryan Gant                     Jeffrey Soos
     Adam K. Levin                  Edward Thrasher
25   James Moloney                  Mitchell E. Zamoff
```

```
 1                    (Court called to order.)
 2                    THE COURT:  All right.  We're on the record
 3    in Case No. 17-md-2785.  It's captioned In re: EpiPen,
 4    Marketing, Sales Practices and Antitrust Litigation.
 5                    Good afternoon, everyone.  Welcome to Kansas.
 6    Welcome specifically to Kansas City, Kansas, my
 7    hometown.  If you like the weather, it's like this every
 8    day here year round.
 9                    So just real briefly I probably -- you can
10    probably figure out which one of us is Dan Crabtree and
11    which is Teresa James, but this is Judge James, my
12    colleague from the bench.
13                    I want to introduce you to two other people who
14    will feature prominently in the management of the
15    action.  First of all, seated below me is Megan Garrett.
16    Ms. Garrett is the deputy clerk who is assigned to our
17    chambers and our courtroom.  She serves as the courtroom
18    deputy in all the cases assigned to me.  Judge James has
19    a counterpart seated over in the jury box, Carol Kuhl,
20    who -- these two people, nothing good happens, in at
21    least my chambers and courtroom, without their
22    involvement, and so I wanted you to know who they are.
23                    I thank you first for the prehearing submissions
24    that you all assembled on short notice.  I thought they
25    were not only timely but they were thoughtful and they
```

1    were very helpful.  In most -- I assume in most MDLs,

2    like almost all standalone lawsuits that we draw, at

3    least at the outset and probably for the life of the

4    case the lawyers know far more about the disputes and

5    the legal issues than the judges do or even two judges

6    can know at this stage.  So it is very helpful to get

7    submissions as carefully prepared as yours were.  Both

8    Judge James and I have reviewed those carefully.  And I

9    think, speaking for myself, they provided helpful

10   understanding of the overarching issues in the cases and

11   I think will enable us to catch up with you some time

12   soon.

13           Not that long ago both Judge James and I were

14   members of the practicing trial bar.  I know my memory

15   is good enough, on this score at least, and I think

16   Judge James too is as well, to remember what happens

17   when a case gets assigned or reassigned to a new judge

18   or judges and what happens when the JPML forms a new MDL

19   and assigns it to a particular court and a particular

20   set of judges.  So I'm willing to guess that perhaps

21   some of you have devoted a few minutes over the last

22   month to fascinating subjects like who the heck are

23   these people, what are they like, what is going to be

24   their approach to that -- to this situation.

25           I suspect too that someone uncovered during that

 1    research that this is the first time an MDL proceeding

 2    has been assigned to me as a judge; and that's correct,

 3    it is.  It is not my first MDL, however, and it's not

 4    Judge James'.  I have been involved in enough of them to

 5    say that I have seen in them some of the best lawyering

 6    I've ever seen performed in a courtroom and I have seen

 7    some that wasn't so good.  And on the other side of the

 8    ledger, to be fair, I've seen some really good judging

 9    and some judging that I didn't think was so good.

10         I think my combined takeaway from those

11    experiences is that no matter which side of the aisle or

12    the caption your client occupies, I suspect Judge James

13    and I are going to make some decisions over the course

14    of this effort that you will agree with and some that

15    you are not likely to agree with.

16         I want to go ahead and announce one decision and

17    get it over with and kind of break us all in, and I hope

18    that you will agree with it because it's a principle

19    that I believe strongly in.  I think it will guide our

20    approach to this set of cases.  I hope you agree with

21    it.  This is not going to be the MDL proceeding that

22    turns into a black hole where claims and defenses go to

23    die without even a decent burial.  I believe in Rule 1.

24    I believe that what it says is what the court's

25    commission is, that it is in everyone's interests,

```
 1    especially the interests of those clients whose names
 2    appear in the captions, are best served by moving cases
 3    forward toward resolution as quickly as the interests of
 4    justice will permit.
 5          As things stand right now, I have no idea what
 6    the outcome of these cases will be.  And even more
 7    basically than that, I don't know whether the resolution
 8    of them will come about by motion practice, trial,
 9    trials, remands, settlements.  I have no idea about any
10    of that.  But I do believe that with the talent that's
11    assembled here, and I've been reading about over the
12    last couple of weeks, that there is plenty of
13    brainpower, plenty of ability and plenty of depth to
14    keep these captions advancing toward the finish line, or
15    lines as the case may be, so that we can all figure out
16    together what the just outcome is.
17          This belief is the reason Judge James and I moved
18    so quickly to issue the preliminary practice and
19    procedure order asking you and your talents -- asking
20    you to apply your talents to an agenda on short notice.
21    You responded to that very well.  I, as I said, outlined
22    an agenda that I thought was carefully considered and
23    thoughtful and ambitious in its own right.  And,
24    frankly, this view that I hold is the reason that I
25    decided earlier this week not to postpone this hearing.
```

```
 1   I get it, there are some unknowns right now and I
 2   suspect that will remain true for at least some period
 3   of time and maybe for the entirety of the case.  But
 4   we've got to start somewhere and that is why I wanted to
 5   hold to our schedule today.
 6           After I read your submissions, I concluded that
 7   we have plenty of lifting to do today and the best
 8   course of action for today's work was to concentrate on
 9   the critically important task of organizing counsel and
10   getting all the information that I could get from you to
11   make decisions about designated counsel roles.
12           Those decisions of course are, as the manual
13   says, the functional equivalent of selecting
14   fiduciaries.  And the lawyers who are appointed to those
15   roles will have to serve various and sometimes
16   contradictory masters and approaches to solving a common
17   set of problems that share at least a common thread.
18           I also get it that counsel selection decisions
19   can have significant financial consequences for the
20   lawyers who are affected by them.  So I ask you, please,
21   to know that I understand those are important decisions
22   and I take no aspect of those decisions lightly.
23           So sort of looking ahead to today's aims, while I
24   want to focus primarily on getting a better feel for who
25   you all are and what skills you bring to the endeavors
```

 1   that are before us, I don't want to disregard kind of

 2   the back half of the agenda; scheduling, planning and

 3   the like.  I think my goal for those topics in the back

 4   half of the agenda is to hear enough information from

 5   you so that I can start to understand and figure out a

 6   way to help Judge James tackle those issues.

 7        I approach this judging craft no differently than

 8   I approached the craft of lawyer.  As a lawyer I was an

 9   incremental learner.  I didn't get suddenly smarter

10   because I got this job, and so I have to learn

11   incrementally in that.  And so for me to get a peek

12   ahead at the topics that will be the primary focus of

13   the hearing on September 27th I think would be -- it

14   would help me a great deal.

15        I'm interested to hear from you at least

16   primarily about the thoughts you've already shared on

17   structuring the litigation track or tracks and the

18   discovery arrangements and sort of what are ambitious

19   but realistic goals for hitting those decisive moments

20   in the case and how to schedule the case accordingly.

21        In the discussions I hope the designated counsel

22   will have in the months -- in the weeks between now and

23   September 27th, I hope counsel will focus carefully on a

24   schedule that will permit us to get early resolution

25   issues, things like the motion to dismiss issues, and if

1    the cases survive class certification, get our arms

2    around when those to be decided.  Because sooner than

3    later I want to have a target date for remanding the

4    cases back to their home districts if that is the

5    outcome of the discussions.  And I would view those

6    dates for a remand date as the equivalent in our

7    district of a trial date.

8          Just to clue you in, we listen to counsel very

9    thoughtfully and carefully at the beginning of a case

10   about what the case needs and what trial day it can

11   realistically accommodate.  But once we fix a trial

12   date, somebody better be on the way to the hospital or

13   having a baby, that trial date will hold.  So that is

14   how I view those increments and how I hope you will help

15   us get the case scheduled.

16         I do plan to issue a counsel appointment order

17   promptly.  Early next week is my ambition.  I married an

18   Irish woman.  Sometimes we refer to that kind of stuff

19   as whisky talk at my house, where, you know, you feel

20   invincible at eleven o'clock at night.  I hope this

21   doesn't turn into whiskey talk.  But that is my aim and

22   I hope that order will pave the way for you all to have

23   the kind of focused and decisive discussions I've just

24   described.

25         One last subject before we get on with today's

1    work, you might be wondering how it is Crabtree and

2    James plan to divide up the work from the judging end of

3    the case, and I think that's a fair question to have in

4    your mind.  And so here's what, in general terms, that

5    will look like and it will replicate the approach that

6    we commonly use in this district for civil cases.

7          We divide them between dispositive issues which

8    become the -- fall to the ambit of the district judge

9    assigned to the case.  Class certification is included

10   as one of those outcome deciders.  So the dispositive

11   issues will be my responsibility.  And on the -- on the

12   non-dispositive issues, things like discovery

13   management, planning, and scheduling, those will be the

14   bailiwick for Judge James.

15         It's been an effective model in the district.  I

16   think the lawyers who are local lawyers can provide you

17   an additional insight.  I know we're not the only

18   district in the country to work it that way, so I don't

19   mean to suggest that we have split the atom in a new way

20   here, but that's how we plan to divide things here.

21         I will remain involved and responsible for

22   ultimately control of the case's progress, but I do plan

23   to delegate a good many of the day-to-day problems that

24   lawyers encounter to Judge James.  And there's a pretty

25   simple reason for that; she's better at it than I am.

1    It's what she does every day and every week in her cases

2    and in her chambers.  She has significant experience

3    both as a judge and as a lawyer in complex litigation.

4    I feel very lucky that she is a member of our bench.

5    You should feel lucky she's been assigned to your case.

6    And I plan to make full use of her talents and get her

7    good advice even on subjects that might be a little bit

8    of a hybrid or a crossover.

9           So that's the plan.  That's plenty of prologue

10   for me, maybe too much.  What I'd like to do is to turn

11   to the designated counsel discussion and the various

12   materials that you've submitted.  As I -- as I read the

13   materials, this was my takeaway, right or wrong, that

14   there was a lot to hear about from the plaintiffs' side

15   of the captions and there was less to discuss with the

16   defendants' side of the captions.  So I suppose that's

17   fairly common but I don't want to suggest that the

18   defendants' counsel won't get their turn at the lectern.

19   They will.

20          What I'd like to do is I'd like to hear from the

21   plaintiffs' group on the proposals they've made.  I'm

22   going to ask -- I've seen the check-in list and the

23   people who have identified themselves as speakers at

24   this hearing and those -- those that have kindly

25   indicated they're willing to talk if called upon or if

1    need be but don't necessarily have to have a turn in the

2    spotlight.  So thank you for that discipline.

3         I think what I'd like to do is I'd like to -- I'd

4    like to start by hearing from the plaintiffs' group.

5    You know, there -- as I counted it up, really the

6    presenters on the plaintiffs' side kind of fell into

7    four groups and I -- what I have come to call the Kansas

8    plaintiffs, I think they -- I think they identified

9    themselves as the Consensus plaintiffs.  Is that the way

10   it was?

11        MR. BURNS:  That's correct, Your Honor.

12        JUDGE CRABTREE:  Yeah.  We were -- it was

13   almost a little Marco moment, you know.  So I'm going to

14   use the tags that are in there just to have -- keep

15   track of which teams correspond to my notes.

16        And because of kind of the -- I guess the -- just

17   the head count, I think I'm inclined to hear from that

18   Kansas sentry group first on their proposal.  From that

19   group I saw that -- and I'm not sure I'll get these

20   names right.  I do like to call people by name and I

21   like to pronounce it correctly, so I ask you make sure I

22   know how to pronounce it.  And until our court reporter

23   gets more familiar with you, I'd ask you, of course, to

24   remind us of your name when you speak even on an *ad hoc*

25   basis from one of the chairs.

1          So from that Kansas sentry Group, I know Mr. --

2    is it Barrow?  Is that how it's pronounced?  Barnow.  I

3    can't read my own writing.  Is it Barnow?

4               MR. BARNOW:  Your Honor --

5               JUDGE CRABTREE:  Yes.  I'm so sorry.

6               MR. BARNOW:  -- I am Ben Barnow and I do

7    believe in consensus but I'm not part of the Kansas

8    group.  All of us have --

9               JUDGE CRABTREE:  I wrote you down in the

10   wrong column.  You belong over with the *Aggarwal*; right?

11              MR. BARNOW:  That's correct.

12              JUDGE CRABTREE:  I am so sorry.

13              MR. BARNOW:  I believe I think I belong with

14   everybody, but that's up to the court.

15              JUDGE CRABTREE:  I'm sorry, I didn't hear

16   you.

17              MR. BARNOW:  I believe I belong with

18   everybody, but that's up to the court.

19              JUDGE CRABTREE:  Well, I get it and I'm

20   sorry I wrote you down in the wrong column.  Not a great

21   start for me.  So let me check the signals then.

22        From the plaintiffs that submitted together,

23   Mr. Burns, right, you wanted to speak?

24              MR. BURNS:  That's correct, Your Honor.

25              JUDGE CRABTREE:  And then from -- sort of

1   from the same group from you is also Mr. Loft; is that

2   right?

3               MR. BURNS:  No, it would -- I am going -- if

4   I can simplify it for Your Honor.  I'm --

5               JUDGE CRABTREE:  I'm in favor of that.

6               MR. BURNS:  I will speak to the leadership

7   issues on behalf of that Kansas group.

8               JUDGE CRABTREE:  Okay.

9               MR. BURNS:  Not to get too much --

10              JUDGE CRABTREE:  You can use "consensus."

11  It's okay.  I got a chuckle out of it.

12              MR. BURNS:  Well, I was going to tell you,

13  not to get too much into the sausage making, but

14  actually I think the initial draft did refer to us as

15  the Kansas plaintiffs but somewhere in the mix it got

16  changed to Consensus plaintiffs.

17              JUDGE CRABTREE:  All right.  So, Mr. Burns,

18  what I've asked for you -- and I don't know whether --

19  there were roughly 13 of you from the plaintiffs' side

20  of the caption who asked to speak today.  So I kind of

21  suggest 10 minutes for you.  But if one of the people in

22  the group is going to concede their time to you, then

23  you can extend and revise your remarks.

24              MR. BURNS:  Well, what we had in mind, Your

25  Honor, if it's amenable to the court, was I was going to

 1   address the common leadership issues for our group.

 2             JUDGE CRABTREE:  All right.

 3             MR. BURNS:  I would introduce -- I would

 4   like to introduce some of the other members of the group

 5   just so that you can attach names to faces --

 6             JUDGE CRABTREE:  That would be wonderful.

 7             MR. BURNS:  -- on the common issues, I'll go

 8   ahead and get started.

 9             JUDGE CRABTREE:  All right.

10             MR. BURNS:  My name is Warren Burns.  I'm

11   with the law firm of Burns Charest down in Dallas,

12   Texas.  It's good to be back in Kansas City.  I think

13   you might have noticed that I tried my first case in

14   front of Judge Lungstrum years ago.

15             JUDGE CRABTREE:  I did.

16             MR. BURNS:  So it's always a pleasure to

17   come back here.  As you probably were able to tell from

18   our submissions, we have proposed a structure that's not

19   uncommon I think in MDLs.  We have co-leads, four in

20   this case proposed to the court.  We have a liaison

21   counsel who really serves as one of the co-lead counsel

22   but will perform those duties that the court has

23   indicated it wants to direct.  We also have a special

24   trial counsel that we have proposed and an executive

25   committee.  Special trial counsel will serve on the

1  executive committee.

2       So in terms of introductions, I'd just like to

3  briefly point to some of those members and the proposed

4  co-leads I would ask to come up a little bit later and

5  they can tell you a little bit about themselves.

6            JUDGE CRABTREE:  All right.

7            MR. BURNS:  So for the proposed co-leads,

8  it's myself, Mr. Paul Geller from Robbins Geller,

9  Mr. Lynn Sarko from Keller Rohrback, and Rex Sharp from

10  the Sharp Firm.  Our special trial counsel -- proposed

11  special trial counsel is Mark Lanier.  I think the court

12  is aware he's was unable to attend today.

13            JUDGE CRABTREE:  I did read.  And let me say

14  my apologies to Mr. Lanier.  I sort of threw a dart at

15  this.  I knew if I waited for a date when everyone was

16  available I would be in senior status by then.  So I

17  just -- I just threw a dart.  I'm sorry for the casualty

18  to fall to him but --

19            MR. BURNS:  Fair enough.

20            JUDGE CRABTREE:  -- it will hit somebody

21  else next time.

22            MR. BURNS:  Thank you, Your Honor.  And for

23  our proposed executive committee we have Sharon

24  Almonrode to serve as chair.

25            JUDGE CRABTREE:  Good afternoon.

1              MR. BURNS:  Reagan Bradford who is

2   Mr. Lanier's partner.  Gretchen Freeman Cappio from

3   Keller Rohrback.  Isaac Diel, a local Kansas attorney.

4   Steve Fearon right there.

5              MR. DIEL:  Good afternoon.

6              JUDGE CRABTREE:  Good afternoon.

7              MR. BURNS:  Ryan Hudson also from the Sharp

8   Firm.  Damien Marshall from Boise, Schiller.

9              JUDGE CRABTREE:  How are you, sir.

10             MR. BURNS:  Elizabeth Pritzker.

11             MS. PRITZKER:  Good afternoon, Your Honor.

12             JUDGE CRABTREE:  Good afternoon,

13   Ms. Pritzker.

14             MR. BURNS:  Joe Sauder.

15             MR. SAUDER:  Good afternoon, Your Honor.

16             JUDGE CRABTREE:  How are you, sir.

17             MR. BURNS:  And one other absentee, Steve

18   Williams, who were joined by his colleague Mark Ram

19   today.

20             JUDGE CRABTREE:  All right.  Where are you,

21   Mr. Ram?

22             MR. RAM:  I'm here, Your Honor.

23             JUDGE CRABTREE:  All right.  So, please,

24   give my apologies to Mr. Williams.  Tell him I'll hit

25   somebody else next time.

1          MR. BURNS:  Your Honor, I thought it best to

2    sort of touch the particular topics you mentioned in

3    your -- in the agenda, address those first and then I

4    can circle back to our proposal.

5          One of the questions that the court presented to

6    us was the description of the types of plaintiffs that

7    we represent in this case.  So for the Kansas group or

8    the Consensus group, we are -- we have proposed a class

9    of indirect purchasers.  And that class is composed, or

10   will be composed once a transfer occurs, of both

11   indirect purchasers or consumers at the bottom of that

12   distribution chain.  And these are people who have

13   either purchased EpiPens for themselves or they've

14   purchased them in conjunction with their insurance and

15   paid co-pays of varying amounts.  We represent about 50

16   of the 60 consumers that are represented currently in

17   the cases before the court.

18         And as the court is also aware, subsequent to the

19   JPML panel's transfer order, my colleague, Mr. Geller,

20   filed a case up in New Jersey on behalf of a third-party

21   payer.  I believe it was Local -- what was it?  282?

22         JUDGE CRABTREE:  282.

23         MR. BURNS:  And this is a health plan.  We

24   believe this is -- it is important to include these

25   third-party payers into the mix of plaintiffs who are

```
 1   represented here, because among the indirect purchasers
 2   they play an important role in this distribution chain.
 3   Now, Mr. Geller will speak a little bit more to the
 4   status of that case and its procedural posture in just a
 5   few minutes.
 6            So those are the plaintiffs that we -- that we
 7   represent in this case and I'm happy to discuss any of
 8   them or any particular questions on those.
 9            Another area that the court inquired of counsel
10   was how we perceived an executive committee functioning
11   in this case.  And I, like many of my colleagues, have
12   served both as co-lead counsel or lead counsel in
13   various cases as well as on executive committees from
14   time to time and we've had a great deal of experience in
15   how to manage that group and I think frankly how to pool
16   the best out of our united abilities.
17            The executive committee we have proposed in this
18   case is composed of about ten people and it is a large
19   group and we think it's a large group, frankly, by
20   design.  I have -- and many of my colleagues will tell
21   you that we've been in leadership in cases around the
22   country.  I am very impressed with the individuals that
23   have agreed to serve on this committee.  I think they
24   have enormous talents and skills in a wide range of
25   litigation types and special knowledge with respect to
```

1   many of the individual types of claims we have brought

2   in this case.

3          So by design it was designed to be a fairly large

4   group that we could take advantage of the strengths of

5   counsel.  But also by design it was not intended to be a

6   rigidly composed executive committee structure, and I

7   think that's very important in this case and it's been

8   important in my experience in leadership in other cases.

9          We want to have the flexibility to make

10  assignments -- for co-lead counsel to make assignments,

11  to compose task forces or individual teams to work on

12  particular areas.  And I just wanted to -- to tell the

13  court that I think the -- really the easiest way to

14  explain how this would function is to point to our

15  efforts in responding to the motion to dismiss before

16  this MDL grew up and the case was transferred here.

17         At that time essentially the structure was

18  largely in place.  We have -- Mr. Geller has joined us

19  and Mr. Marshall has joined us.  But at that time we had

20  about nine folks on the executive committee.  The way

21  that worked out, we got the defendants' motion to

22  dismiss and then we were able to focus on what

23  particular defenses or issues were in play.

24         Immediately we -- we structured three teams

25  composed of both executive committee members and co-lead

1    counsel as well as individuals who are not represented

2    in either leadership group but were also present and

3    active in the case.  Those three groups broke down into

4    largely an antitrust group which I led, a RICO group

5    which Mr. Sharp led, and then a consumer claims group or

6    consumer protection claim group that Mr. Sarko led in

7    that capacity.  We then worked with the individual

8    members that had been assigned from the executive

9    committee to those teams.

10         And I think if they were to get up here and

11   speak, they would tell you that we worked very closely

12   to get drafts ready to vet the issues and our best

13   responses to them.  We incorporated counsel that were

14   outside the leadership structure that wanted to work on

15   the case.  This all, you know, frankly, worked

16   incredibly well.  I will say this is about the first

17   time I've seen a very -- a draft ready to file, if you

18   will, a week before the deadline giving us plenty of

19   time to even further fine tune it.

20         But that is I think the real test of this group

21   that we have put together is to see how they work on the

22   ground and in that experience.  And I think, you know,

23   I'm proud to have been associated with this group and to

24   be a part of that process.

25         So we think the structure that we have proposed

1   will work well in this case going forward on any number

2   of issues.  And having an executive committee like we

3   have gives us the opportunity, you know, to further

4   address potential teams for individual defendants, to

5   compose briefing teams on various issues that will come

6   before the court.  We think we have that structure in

7   place and it's a good one.

8          The next area that the court inquired of was our

9   willingness to work with others.  Your Honors, I and

10  everyone on our team is mindful that this case is not

11  about us.  It's about our clients and it's very, very

12  important to every single one of our clients who feel

13  they have been injured in this case.  And I think to a

14  man and woman, we keep that thought close to our heart

15  and that's how we're approaching this case.

16         Now, I think a true indication of how we can work

17  well together again goes back to how we worked

18  throughout this case when it was a single case

19  matriculating before Judge Lungstrum.  Realistically, as

20  I just described in a briefing issue on the motion to

21  dismiss, we worked well with each other but more

22  importantly we really reached out and went beyond sort

23  of the individuals that I've called by name here to make

24  sure that we had consensus in the plaintiffs' group.

25         There's another local lawyer here, Greg Wright,

```
 1   who was one of the earliest plaintiffs on file in this
 2   -- in the original cases.  But Mr. Wright nevertheless
 3   decided that he would be -- that he could serve his
 4   clients' interests and the interest of the case as a
 5   whole not by sitting on an executive committee but by
 6   supporting leadership and providing his skills.  We
 7   worked with Mr. Wright during that process and he
 8   provided valuable input and information.
 9           The same is true, and I'm sure everyone actually
10   who is actually on the plaintiffs' side of the "V" in
11   this courtroom will get up here and tell you, and I
12   think it's largely true, that if the court decides to go
13   in a different direction, if the court -- whatever
14   action the court takes, the plaintiffs are going to work
15   to best represent the interests of our clients and that
16   means we're going to work with each other we're going to
17   move this case forward.
18           We think that the structure we have proposed and
19   the individual members who are part of that structure
20   are the best way forward in our judgment.  And that
21   sometimes means you have to make hard decisions about,
22   you know, who serves in a leadership position and who
23   does not when you're proposing that type of agreement to
24   the court, and we -- we've certainly had to deal with
25   those issues here, especially given the number and size
```

1    of many of the firms that are present in this action.

2         But our ultimate goal was to present a structure

3    and to present team members who can best move this case

4    forward for our clients and that's what we've attempted

5    to do.  We are certainly willing to work with everyone

6    in this courtroom.  We have demonstrated that.

7         We've also demonstrated an ability and

8    willingness to work with the defendants on the other

9    side of the aisle, too.  And I am pleased to tell you

10   that during this process of responding to the court's

11   initial order that went very well.  I worked very

12   closely with defense counsel as did all on our team and,

13   you know, everyone's committed to moving this case

14   forward and to do it in a way that makes sense.

15        Another question the court had was with respect

16   to litigation funders.  That's a real easy one.  There

17   aren't any.  There are no such agreements on the

18   plaintiffs' side in our Consensus group and there aren't

19   going to be any.  So I think that we're pretty -- will

20   pretty quickly resolve that issue.

21        Beyond that, I think that what I'd like to do

22   now, unless Your Honors have particular questions, is

23   introduce the other proposed co-lead counsel and let

24   them say a few words about themselves and their

25   commitment to this case.

1            JUDGE CRABTREE:  I am interested in hearing

2    from them.  I want to ask a couple of questions drawing

3    on your experience, and the others certainly can address

4    the question.  My initial reaction to the executive

5    committee you proposed was it seems like a lot of people

6    and -- I promised you a question.  So how come?  Why

7    does -- why does an MDL of this dimension, which doesn't

8    have 6,000 cases in there, why does it need 10 or 11?

9    I'm a little worried that you guys will start to

10   resemble other large groups that sometimes don't get

11   along.

12           MR. BURNS:  So I'm going to unpack that

13   question, if you will, Your Honor.  I think there's some

14   very good elements to it -- or sub-elements to it that I

15   want to make sure we address.

16       So, first of all, as to the number, in my

17   experience, having been in a number of MDLs, including

18   the auto parts MDL, obviously a big sprawling case, but

19   also mass tort cases, to be honest with Your Honors, I

20   don't think there's a magic number.  It's not five.

21   It's not three.  It's not seven.  It's not 20.  I think

22   it really comes down to the strengths of the people that

23   you have in your group and how you envision using those

24   -- those strengths.

25       In this case I can tell you what we did when we

1    looked at how to compose an executive committee in -- in

2    our proposal, and this goes back to the original

3    formation of the Kansas case as well, we wanted to make

4    sure that we had diversity of experience in terms of the

5    legal claims that were present in the case.  And I think

6    you'll see, in looking through the bios, that we have

7    largely accomplished that.

8         My background in my previous firm, I was at

9    Susman Godfrey for 10 years and then I went out on my

10   own.  My background has largely been centered in the

11   antitrust world and that's the world I know best.  And

12   there are several other firms in this group who have had

13   a similar experience.  We want to make sure they were

14   represented on the executive committee.  Cotchett Pitre,

15   for instance, comes to mind.  Boies, Schiller obviously.

16   We also wanted to do the same with respect to the

17   consumer claims and the RICO claims to make sure that we

18   had people who knew how to do those claims.  So that was

19   the first -- first real criteria in looking at this

20   group.  And I think if you look at the breakdown, you

21   know, it splits up pretty evenly in terms of experience.

22         The second thing we wanted to do is really

23   provide some diversity in terms of the voices that were

24   on that committee in terms of their own experience and

25   what they brought to the table.  And so we thought it

1   was important to include some younger -- some younger

2   lawyers, and that includes Mr. Hudson, Miss Freeman

3   Cappio, and that's in no way to denigrate their

4   experience.  They're all experienced lawyers but they're

5   all a little bit younger than me and Rex Sharp and Paul

6   and Lynn.  But we thought that was important and we

7   wanted to make sure they got the experience and that

8   they were able to participate in moving this case

9   forward.

10        In putting this executive committee group

11  together, we were also very mindful of concerns that

12  judges throughout the country have expressed with, you

13  know, letting this animal grow out of control, too many

14  heads on this hydra.  We took action very early on in

15  the Kansas case to really control that.  And so we sent

16  out clear guidelines to everyone on the case, both the

17  executive committee and other associated firms, in terms

18  of how we were going to deal with billing, how we were

19  dealing with assignments.  We were very clear that,

20  look, if a lawyer's going to ultimately get paid in the

21  case if we ultimately succeed, because we're all working

22  on contingent fees, then they're only going to get paid

23  for work that the co-lead counsel has assigned.  And we

24  thought that was the clearest way to really, you know,

25  prevent the type of overruns that I think the court is,

1    you know, justly concerned with.

2         We have other requirements.  And if we were

3    appointed to lead in this case, we'll institute a

4    similar regime, but other requirements with respect to

5    expenses and the types of issues, billing increments

6    that you would expect to see in a case of this size and

7    we want to make sure we got that in.

8              JUDGE CRABTREE:  Those -- that was by

9    agreement.  I'm somewhat familiar with the work that

10   Judge Lungstrum did before I was bequeathed this case,

11   but I didn't remember him adopting an order on that

12   subject.

13             MR. BURNS:  We never got to that point.  He

14   didn't ask for it.  We did it ourselves.

15             JUDGE CRABTREE:  Okay.

16             MR. BURNS:  In fact, we may have even done

17   it before he had appointed leadership in the case

18   because we thought it, frankly, was so important.

19        The other thing that I -- you know, I hear this

20   concern from the bench quite a bit and I am very

21   sensitive to it because we have responsibilities to our

22   clients, and the thing I hate more than anything is

23   overworking -- overworking a case.  But to give you some

24   of the plaintiffs' perspective on this issue, we are

25   facing a very organized defense on a very complex case.

1   It's a defense that has hired some of the best lawyers

2   in the country and I've met and talked with them,

3   respect them all.  We need to have resources on the

4   plaintiffs' side that can meet those folks toe to toe.

5        And I think what plaintiffs typically do and what

6   we have done in this case is focus on getting, you know,

7   our power hitters there who can provide those resources

8   both in terms of financial resources to move the case

9   forward but experience to move it forward.  And that's

10   why I don't think there is a magic number.

11        I think that the executive committee that we have

12   proposed was composed with a mind to all those factors

13   I've described.  And we are comfortable that with that

14   group we can move this case forward and represent our

15   clients' interests in the best way we can.

16        JUDGE CRABTREE:  I think I have one last

17   question for you and I got some targeted questions, then

18   I'll give you back the control of the agenda while we

19   finish up your presentation.  I read about Mr. Lanier.

20   I just -- I guess I wonder whether that is -- whether it

21   makes sense to appoint trial counsel at this point.

22        MR. BURNS:  I'll say this, Your Honor:

23   We've also asked that Mr. Lanier be appointed to the

24   executive committee in this case and I think there are a

25   couple of real reasons to do so.  First of all,

 1   Mr. Lanier individually represents probably the majority

 2   of the plaintiffs in this case.  Many of them were his

 3   preexisting clients.  As you know, he has a pretty

 4   wide-reaching practice.

 5         The second thing I would say is that Mr. Lanier

 6   and his firm bring those valuable resources beyond his

 7   representation of plaintiffs.  As he detailed in his

 8   submission and Mr. Bradford detailed in his submission,

 9   it's a large firm with a lot of experience trying

10   complex cases and we thought it was important that they

11   have a seat at the table and that they were involved in

12   the mix.

13         I will say this:  Mark has -- I've never

14   witnessed Mark at trial.  He obviously has a stellar

15   reputation.  I've worked with him in other cases in a

16   pretrial setting.  But he is a person who does a good

17   job of building consensus among teams.  He is truly a

18   team player and tends to be in this case.

19         I think the manual envisions that it may be

20   appropriate in certain cases to appoint special trial

21   counsel.  When that happens, I think it is up to the

22   court's discretion.  But we wanted to be up front with

23   the court in terms of how we envisioned Mark and his

24   particular talents being used in this case.  And that is

25   not to say that other counsel will not be involved.

 1              JUDGE CRABTREE:  Yeah, I didn't assume he

 2      could try this case by himself.

 3              MR. BURNS:  That's true.  But to be honest

 4      with you, I -- you know, and not to be too flip about

 5      it, but, you know, if you had a race horse like Mark

 6      Lanier, I think you'd want to ride it at a race.

 7              JUDGE CRABTREE:  Here's my last question for

 8      you.  I noticed that you all did not propose, in fact, I

 9      don't think any of the plaintiffs' submissions proposed

10      an appointment in an interim class counsel role and I --

11      and I was curious about that omission.  I doubt you

12      overlooked it, so I'd like to know your thinking about

13      it.

14              MR. BURNS:  Well, actually, Your Honor, it's

15      a fair question.  I think the -- and maybe we just,

16      frankly, missed it because most of the -- most of us are

17      used to having appointments at this point in the case as

18      interim co-lead counsel until ultimately class

19      certification is decided and -- and the court appoints

20      co-lead counsel.  So from our group's perspective, you

21      know, frankly, I don't know if we have too much of a

22      difference there.  That's what we envisioned the court

23      would do.

24              JUDGE CRABTREE:  All right.  Thank you very

25      much.  And I'll return to let you introduce --

```
 1                MR. BURNS:  If I may.  So first I'll call up
 2     Mr. Geller from Robbins Geller.
 3                JUDGE CRABTREE:  Good afternoon, Mr. Geller.
 4                MR. GELLER:  Good afternoon.  Thank you,
 5     Your Honors.  I'm sorry I have to kind of squeeze around
 6     the podium.
 7                JUDGE CRABTREE:  We booked a room for a much
 8     bigger crowd, so...
 9                MR. GELLER:  Thank you very, very much for
10     having us and for the opportunity to tell you and I'll
11     try and keep it quick.  But I wanted to remind myself to
12     say this:  I don't know how long this hearing is going
13     to go, but I wanted to ask both of you, I live in south
14     Florida and my wife and kids are there and they're going
15     to be closing --
16                JUDGE CRABTREE:  You've been paying
17     attention to the weather.
18                MR. GELLER:  I have a flight.  So I would
19     never be disrespectful to the court and leave early
20     but --
21                JUDGE CRABTREE:  You got to go take care of
22     your family.
23                MR. GELLER:  -- if we start getting closer
24     to the afternoon, then I may -- I may have to just --
25                JUDGE CRABTREE:  I won't take it personally.
```

1    You got to go take care of your family.  And if I'm in

2    the middle of a question and you need to leave, you go

3    ahead.

4            MR. GELLER:  I won't in the middle of a

5    question, I promise you that, but thank you so much.

6            JUDGE JAMES:  Absolutely.

7            MR. GELLER:  Thank you.

8         So a couple of things:  I think it's important to

9    note Mr. Burns was talking about the Kansas group that

10   Judge Lungstrum appointed on an interim basis and the

11   name went from Kansas to Consensus.  I was not part of

12   the original Kansas group but I -- I think what they did

13   in Kansas first was exactly what they should have done.

14   They found consensus.  They organized.  Then when this

15   became larger and there were cases filed elsewhere, it

16   became an MDL.  I spoke to them and I think it's a

17   combination.  They looked at the qualifications that I

18   bring and that my firm brings as well as the clients

19   that we have and they wanted me to join, and I'm pretty

20   sure it was my co-counsel to join, and I want to tell

21   you just quickly about those qualifications.

22        So I believe we're the largest plaintiffs' side

23   class action firm in all of these areas that Mr. Burns

24   mentioned.  Antitrust, we have achieved some of the

25   largest antitrust victories ever on a class basis.

1          Largest consumer:  I had the pleasure of working

2     with Mr. Sarko and Ms. Cappio as well as Damien Marshall

3     from Boies, Schiller on the *Volkswagen* case.  We worked

4     very, very closely.  And that's the largest consumer

5     case ever.

6          Civil RICO is a very difficult claim to survive.

7     We've gotten several of them, including the *Trump*

8     *University* case, which we did it on a pro bono basis,

9     achieved a 25 million result.  Didn't take a fee.  That

10    was a RICO case.  We've sued big Pharma, including

11    Pfizer.  As lead counsel, we settled for $400 million

12    involving misrepresentations.  So we have the

13    qualifications.

14          And the clients that we bring, and Mr. Burns

15    alluded to this, is a local fund, Local 282.  It's a

16    fund that has purchased EpiPens in 10 states on behalf

17    of thousands of participants.  They've spent hundreds of

18    thousands of dollars.  So not at all to take away from

19    the individual consumers who we also represent who may

20    be having a $20 co-pay that perhaps should have been

21    less had it not been for the alleged anti-competitive

22    conduct, that our client, these funds, they spend if not

23    $20 but maybe $600 on an EpiPen.  And so we think that

24    these third-party payers are very, very important

25    clients.  And I think beyond my qualifications, they

1    also add to the MDL and are an important component, and

2    that there has been a CTO entered on August 28th so that

3    case will be here.

4         I think it's also worth noting that I have the

5    support not just of the Kansas groups -- group but even

6    the other lawyers who aren't in this case particular

7    case part of the consensus.  Mr. Barnow, Ms. Rivas,

8    Mr. Blood, who's with them, I know them all very well

9    and I like them all very much and I've worked with them

10   successfully.  And I think if they were asked if I ought

11   to be a co-lead counsel here, even though they're not in

12   my group here, I think the answer would be, yeah,

13   Mr. Geller should.  I believe in consensus.

14        I think we -- you know, you asked about size.

15   I've been involved in some of the largest -- you know,

16   22 firms in the *Volkswagen* case and have been sole lead

17   counsel in many, many cases.  I think that the size --

18   it's really important that the lead counsel, the co-lead

19   counsel manage it properly.  And whether the executive

20   committee is 8 members, 10 members or 12 members, I

21   think so long as the protocols that Mr. Burns alluded to

22   are followed diligently and it's managed properly, I

23   think the court would be very, very pleased with the way

24   the case worked from the plaintiffs' standpoint.

25        I'm happy to answer any questions if either of

1   you have any.  Otherwise, I'd be honored to serve in

2   this capacity.

3               JUDGE CRABTREE:  Do you have any questions?

4               JUDGE JAMES:  I don't.

5               JUDGE CRABTREE:  Can I flash forward, so

6   knowing you may have to make a dash to our airport, this

7   was a question I was going to talk about at the back end

8   but it seems to me to be appropriate for you.  There was

9   this reference in the filings to sort of being three

10  lanes or leagues of plaintiff types and one of them is

11  described as the ERISA plaintiffs.

12              MR. GELLER:  Yes.

13              JUDGE CRABTREE:  And it occurs to me that a

14  plan such as the one you filed your case for falls in

15  that category.  And yet I look at your complaint and I

16  look at the complaint in the Kansas case that's not yet

17  -- it's assigned to me but it's not part of this house

18  and note that they're pretty different legal theories.

19  So I'm just trying to understand the reach of the term

20  "ERISA plaintiffs" as you all use.

21              MR. GELLER:  So actually, Your Honor, the

22  Local 282 claim is -- is actually not an ERISA claim.

23  That's part -- that's in the consumer lane.  So they're

24  a third-party payer very similarly situated to the

25  individuals that most of us also represented.  They paid

1    -- alleged that they paid too much for the EpiPen.

2         The ERISA case, which is -- I agree with the

3    terminology to call it a different lane, is not the 282.

4    That's where the defendants are these PBMs.  And I know

5    Mr. Sarko was planning on addressing that with the

6    court.  But there was enough overlap so that I think it

7    makes perfect sense to be part of the MDL but also

8    perfect sense to be on a separate track.

9         There's -- it's almost like the *Sanofi* case.  We

10   know that Sanofi will be speaking.  It makes sense to be

11   on a separate track.  There's some overlap, no question.

12   And I think we should take advantage of the overlap and

13   work efficiently.  But there's also -- you know, if

14   there were a Venn diagram, there's areas that aren't

15   overlap and that shouldn't slow down the rest of the

16   case.  So I think -- I see sort of the Sanofi track, the

17   ERISA track, and within the consumer track I would

18   include both the third-party payers and the second-party

19   payers, the patient payers.

20        JUDGE CRABTREE:  All right.  Thank you very

21   much.

22        MR. GELLER:  One more thing before I leave.

23   I bring one other perspective which I wasn't going to

24   mention but I want to.  I talked about my family back in

25   Florida I'm going to go see.  One of my sons is severely

1  allergic and I know a lot more about the EpiPen than I

2  wish I did.  I've had to use it and I -- I've seen my

3  son in an anaphylactic reaction.  I've hit him with the

4  EpiPen, called 911 hoping that the ambulance would get

5  there in time.

6        And so to me it's not just this sort of

7  theoretical case where, hey, did they charge too much

8  money for this product.  I know how important this

9  product is.  I know how important it is for us and for

10  the clients that we're privileged to represent.  They

11  need this.  They'll pay whatever they have to pay to

12  have it because they're talking about their kids' lives.

13  So it's an important case to me and I just want Your

14  Honors to be aware of that.

15              JUDGE CRABTREE:  All right.  Thank you so

16  much and we'll trust you to take your leave when you

17  need to.

18              MR. GELLER:  Thank you.

19              JUDGE CRABTREE:  Safe travels to you.  I

20  hope for the best over the next few days.

21              MR. GELLER:  Thank you very much.

22              MR. SARKO:  Good afternoon.  Lynn Sarko from

23  Keller Rohrback.

24              JUDGE CRABTREE:  Good afternoon.

25              MR. SARKO:  Your Honor, I'm going to jump

1   around and just kind of streamline and get to a couple

2   of questions.  I have been -- I started my career as a

3   federal prosecutor and then have worked at a firm

4   handling class actions for decades now.  I've also

5   served as a managing partner for -- since 1991.

6          I will say one of the things that we as lead

7   counsel --

8              JUDGE CRABTREE:  I feel like I ought to say

9   I'm so very sorry.

10             MR. SARKO:  Yeah, well, they can't find

11  anyone else.

12         But one of the jobs that I think we have as lead

13  counsel or as co-lead counsel is we are in essence like

14  the general counsel of the plaintiffs.  We're putting

15  together a law firm.  And you asked about why there are

16  so many people; we did not -- we purposefully did not

17  put law firms' names on there.  We actually chose

18  people.

19         And what's interesting about this case is, even

20  though we have this hearing, there is not that much

21  jockeying.  When the case started before

22  Judge Lungstrum, these case orders were filed in

23  different places.  And through consensus people have

24  agreed to come here.  People have agreed on a case

25  management structure.  And I have to say that we

1   actually slotted individuals of different expertise,

2   different ages.  You don't want everyone who's writers.

3   You don't want everyone who wants to speak all the time.

4   You need deposition-takers.  We actually looked and put

5   together a team; and so that's issue number one.

6        Issue number two is -- and it's a promise to

7   you -- we have to deliver the case on time on budget.

8   And we promise that we will put in place the procedures

9   so that we keep track of what we're spending on

10  different things, that we keep track and make sure that

11  there is not overbilling, that there is not

12  overcharging.

13       I will also be willing to wager at the end of the

14  case that -- the defendants parade before here, you

15  don't see all the teams they have behind them.  I am

16  willing to bet at the end of the case that their

17  lodestar is going to be bigger than our lodestar, but

18  we'll see.

19       But the point is we don't have litigation

20  funders.  We are going to pay for this case and fund it

21  as a promise to you.  So at the end you won't have a

22  problem.  There are no side agreements that will not be

23  disclosed to the court.  You have people that have been

24  into enough cases that you will not be embarrassed and

25  we will not be embarrassed at the end of the case.  So

1   that's issue number one.

2        As far as backgrounds, it's important to have

3   people who have different experiences, because there are

4   -- these are class actions and they're somewhat

5   different groups that overlap.  And to the extent there

6   are tensions, we actually want people to argue and

7   present different views that we have to synthesize

8   before we present them to you.  We have to talk what the

9   right timing is, how we're going to get through it,

10  which defendants we're going to go after.  And we have

11  to have enough people, because even though I would

12  love -- I like Kansas, a great place.  I cannot move

13  here and spend the next three years.

14       You know, we actually are going to have people

15  and have enough staffing so that if we have to

16  single-track, double-track, triple-track depositions we

17  can.  We want to take as few as possible but we have

18  that expertise.  We have people who have been -- who

19  have pharmacy expertise.  You know, we have done a lot

20  of drug cases.  We've done antitrust.  We've done other

21  things.

22       But the ERISA cases are something you asked

23  about, and we don't have to get into it today because

24  there was a filing, there was an ERISA case that was

25  tagged, *Brannon* was here.  The *Klein* case from Minnesota

is tagged. And the MDL will decide. They will decide whether they're going to send it here or not. But even if they don't send it here, those ERISA issues are going to be intertwined with some of the discovery that's going on in this case.

I will say that my firm is probably the largest class action ERISA firm in the nation. We've done *Enron*, *WorldCom*, all kinds of other cases. In fact, I was getting e-mails today from some of the ERISA defense lawyers who are going to show up here saying, "See you." But that is something that we all know each other and we know what people's talents are and not, and that is what we're going to bring to you I think. And I can promise you that this will be the number one case for this group here and they are able to handle this case as well as their other commitments.

I will say in *Volkswagen* there were 21 people on the executive committee. In the *Fiat* case that Judge Chen has, I think there were 12. And I think that is a trend you find in these newer cases now that judges are saying I don't want a firm's name on there; I want a lawyer and I want specific people who can be chosen. And now with technology, once you put together this law firm for this case, they are just like they're in the next office. We can work efficiently.

 1          Thank you.

 2              JUDGE CRABTREE:  All right.  Thank you very

 3    much.

 4              MR. SHARP:  Your Honor, Rex Sharp.

 5              JUDGE CRABTREE:  Good morning.

 6              MR. SHARP:  We've litigated against each

 7    other and so hopefully my conduct during that litigation

 8    speaks volumes about my professionalism and my tenacity

 9    and --

10              JUDGE CRABTREE:  I've got the scars to prove

11    it.

12              MR. SHARP:  I didn't recall it that way,

13    Your Honor.  I thought it might have been the other way

14    around.

15          I wanted to address a couple of things.  We have

16    some expertise in my office, not just myself, but

17    Barbara Franklin and Ryan Hudson and Larkin Walsh and

18    Scott Goodger.  We all do class actions every day.

19    That's all I've done for the last 15 years.  And we do

20    RICO and antitrust and consumer class actions across the

21    country but primarily in the Tenth Circuit and in this

22    judicial district.  I've had the honor of being

23    appointed as class counsel before the District of Kansas

24    judges and almost all of the judges that are sitting

25    before the -- in the District of Kansas and I've been

1    before the Tenth Circuit.  I want to address that in

2    particular.

3         The issue of whether there's too many lawyers

4    here for the co-leads or the executive counsel, I don't

5    think there are for this particular case.  But this case

6    isn't going to be over-lawyered because there's

7    something the Tenth Circuit does in particular that

8    prevents that from ever becoming an issue, and that is

9    attorney's fees in the Tenth Circuit are determined by a

10   percentage of the fund.  It does us no good to

11   over-lawyer the case and it doesn't advance the ball if

12   we over-lawyer the case.  So we will not be doing that.

13        But we will do a fantastic job as all of us I

14   think that have been to this lectern already -- have

15   already indicated we've done time and time before and we

16   intend to do it here.  We've worked well together.  I

17   was fortunate enough to be able to work with all of

18   these guys before and I'm looking forward to doing it

19   again.

20        If the court has any questions, I'll be happy to

21   answer them but I think the court knows me pretty well.

22             JUDGE CRABTREE:  Yeah, I do have one and

23   it's -- you're right, I do know you well and I

24   appreciate your efficiency this afternoon.  I guess my

25   question for you is, is this team proposing to spread

17-md-2785    In re: EpiPen    9/7/17                               44

1    you too thin?

2              MR. SHARP:  No, I don't think so at all.

3    With this team, I think this team --

4              JUDGE CRABTREE:  I guess really the bottom

5    -- the real question at the nub of this is:  Are you

6    sure you want to be liaison counsel with all the other

7    responsibilities you're taking on?

8              MR. SHARP:  Oh, absolutely, Your Honor.

9    With the electronic filing, I don't think it's going to

10   be nearly the burden that it used to be.  We communicate

11   on a regular basis with our team anyway, so I don't

12   think that's going to present a problem, with the

13   additional fact that of course I have a great team

14   behind me in my office that have infinite more knowledge

15   about the inner-workings and workings of D-KAN in

16   particular, I think we'll be in a very good position to

17   do liaison counsel as well.

18             JUDGE CRABTREE:  All right.  I appreciate

19   it, Mr. Sharp.

20        Anything that --

21             JUDGE JAMES:  No.  I know Mr. Sharp, too,

22   and appreciate those same qualities.  Thank you.

23             JUDGE CRABTREE:  All right.  Thank you so

24   much.

25        All right.  Mr. Burns, are you about to close up

1    the presentation from your side?

2              MR. BURNS:  That was exactly what I was

3    going to do, Your Honor, and also note that I don't

4    think we've ever thought of Rex as being spread too thin

5    on our side, so...

6              JUDGE CRABTREE:  When I litigated against

7    him, I wondered if he ever slept.

8              MR. BURNS:  So do we actually but he's been

9    an invaluable member and a lot of fun to work with over

10   the years.  I've worked with him both in this context

11   and other cases.

12       But thank you, Your Honors, for your

13   consideration.  This obviously is an important case and

14   we intend to treat it that way.  It is going to be our

15   top priority.  And if the court is -- is willing and

16   sees fit, we're willing to serve.  Thank you.

17             JUDGE CRABTREE:  Thank you very much.

18       Mr. Barnow, why don't we turn to you; is that

19   fair?

20             MR. BARNOW:  I think it is.

21             JUDGE CRABTREE:  I want to start by

22   apologizing.  I should put my glasses on before I read

23   my notes and I put you in the wrong column and I'm sorry

24   to start off on that way.  So fish me out of this and

25   take your time and make -- help me understand your

1   proposal and the group that you offer.

2          MR. BARNOW:  Thank you very much, Your

3   Honors, and for the opportunity to be here today.  This

4   is an important case.  Most of the lawyers in this room,

5   probably all of the lawyers, whether they're defendants'

6   counsel or plaintiffs' counsel, have for decades now

7   been dealing with important cases.  And the room is full

8   of great lawyers, lawyers that have a lot of experience.

9   I've worked with a lot of them.  I think when you're, I

10  guess, visually crossways you don't want to say that

11  much about the other side, but nobody in this room is

12  crossways as far as I'm concerned.

13         I've talked to a number of attorneys over there

14  in this case.  There's no question that some words were

15  said that you kind of scratch your head, you know, but

16  nobody ever had a sharp word.  And when Rex talked, I

17  didn't think that kind of a word.  It was -- no feathers

18  ever got ruffled.  And, quite frankly, however this

19  comes out, I don't think any will be ruffled.

20         I have a long history of doing large class

21  actions, complex cases.  My people tell me periodically

22  it's over 40.  Quite frankly, I'm more interested

23  usually in what's ahead of me as opposed to behind.  The

24  first time they told me that I thought, well, you got to

25  be kidding me.  It's got to be eight or ten.  Well, it

1   is over 40 and they're all pretty big.  And I will say I

2   take great pride in what I have done and what I can do

3   particularly for this case.

4          People's health issues are high on the list of

5   anybody that cares about class actions and remedies and

6   juris prudence.

7          In terms of dealing with people, you know, I -- I

8   have it in the papers but this is to a degree you

9   suspend humility here, assuming I have any, I think I

10   do, turns into kind of a brag-a-thon.  So for that, I

11   apologize.  But, for instance, in *AOL On-Line Litigation*

12   there were about 120 cases filed.  I organized I believe

13   it was 58 firms.  Led them to a settlement.  I actually

14   at that point had some lawyers come in to object.  Many

15   of them are my friends today I wound up doing class

16   actions with and there were no appeals.

17          In terms of being able to litigate and carry a

18   case, I filed a Chicago flood case which was my entry

19   into class action solely.  What happened, I had about

20   20-some years of -- 22 or 23 of mainly defense work,

21   banks.  I was general counsel for the world's largest

22   public relations firm, other interesting things.  And

23   then that company got bought out.  I had a number of

24   people, about 14, and I took a day off and turned on the

25   radio at two minutes to 12:00 and they said Chicago Loop

1    had flooded.  So I thought, well, you know, maybe I'd
2    like to do some of that stuff.  So I filed that case
3    number five out of 20-some.
4         Quite frankly, I worked everybody down to the
5    ground.  In six months' time, I had more time in the
6    case than the other 20-some firms.  There was an FY8
7    request and they were worried about where you going to
8    store it.  So I said, "I'll pay for the storage and send
9    it all to my office."  Well, you know, knowledge is
10   power.  I took it all the way to the U.S. Supreme Court.
11   It was an interesting experience.  The fellow who argued
12   against me has done a little better than me.  He's now
13   Chief Justice John Roberts.  And that case took
14   13 years.
15        I never -- I've never borrowed a dime to run my
16   firm or for any case.  I've litigated against Microsoft.
17   I'm proud to state, and I think anybody that was in that
18   case would openly admit, that the -- every settlement
19   that happened in Microsoft on the consumer end, the
20   civil antitrust, was patterned after a proposal that I
21   initiated when I first filed my case.  Even though by
22   that time I only had a few lawyers with me, I think two
23   or three, I developed a practice which I'll get into
24   shortly.
25        I got the first certified class in the country.

1   Frankly, not so much unlike like this case, I was not

2   invited into the group that said they had a lot of

3   plaintiffs lawyers.  And so but when I -- and when I got

4   the first class certified, which was Michigan, my phone

5   rang off the wall and I was made a national lead by

6   agreement.  Great attorneys.  They're household names in

7   the legal profession.  I was one of four national

8   settlement counsel.

9        Which, when they wanted me in it, I said, "Well,

10  the *quid pro quo* is going to be I believe in settlement,

11  getting a remedy to the consumer and doing it as soon as

12  possible."  It doesn't mean you quit.  It means you work

13  harder to get all that done.  And I was part of that

14  committee.

15       Unfortunately, that settlement was not approved

16  and so we all went back to our particular states.  It

17  was first filed, six states.  I litigated six states.  I

18  won four, including Kansas, and unfortunately lost two

19  in Wisconsin.  It's in my papers.  I take great pride in

20  that.

21       I also think that one of the reasons that I can

22  settle a case -- well, there's a couple reasons.  I

23  think the first one is, is that I gather up a consensus

24  of lawyers.  It's really quite easy to do.

25       When Mr. Geller's firm was actually opposing me

```
 1   and I was opposing him more or less, we were all vying

 2   to be a lead in the MP3 Power case, a class action

 3   against Gillette, and I was proposing a -- structured

 4   settlements with these -- whatever counsel over here are

 5   doing now, leadership and executive committee.  And

 6   Judge Whitlock said, "Well, Mr. Barnow, isn't what

 7   you're proposing kind of like Iraq?"

 8           I said, "No, not really, judge."

 9           He said, "Why not?"

10           And I said, "Well, see, in Iraq you have at least

11   three ideologies where these people -- it will be

12   hundreds of years before they ever, ever agree.  But in

13   this case you got a lot of fine lawyers that right now

14   are acting predominantly on self-interest.  Do they all

15   want to do a good job?  You bet, but they want to be the

16   one that does it because the reality is they have bills

17   to pay, they have families, on and on."  I said, "But as

18   soon as the appointment order gets entered, they're --

19   they're joined by one common ideology and that is to do

20   a good job and meet your professionalism."

21           His next words were to me, he said, "Now,

22   Mr. Barnow, that's fine."

23           And at the end of that hearing with a lot of

24   people applying, he picked Mr. Geller's firm and me and

25   we ran the case, settled it fairly promptly actually,
```

1   and take great pride in it.

2        The other case that I was actually in with

3   Mr. Geller and five other firms, including Mr. Blood

4   and, as I said, five other firms, was a different

5   structure and again it was a competitive process not

6   dissimilar to this.  If my recollection serves me, I

7   think there were about 68 filings in the case, 65 to 70.

8   And Judge Battaglia wanted everybody to apply and was

9   looking to -- wound up doing a plaintiffs' steering

10  committee.  But he did something that taught me a great

11  lesson, one of these situations where you learn from a

12  win more than you do from a loss, which is not always

13  the case.  But what Judge Battaglia did is he had his

14  office call up each person that was applying to be a

15  lead and the question was, "If you are appointed, will

16  you be the lawyer in your firm working on that case?"

17       Now, that's a pretty easy question for me to

18  answer because I run -- I have three colleagues with me.

19  One is here today, Eric Schork, tremendous attorney.

20  Comes up two victories in the Third Circuit and the

21  Sixth Circuit.  And I said, "Absolutely."

22       And Mr. Geller prior to that had a separate

23  pleading who was with a couple other firms.  He was

24  appointed.  He and I and five others, including

25  Mr. Blood, went -- we went arm-and-arm and it worked out

1   great.  There were some problems with it, I will say,

2   although Mr. Blood was the -- was -- what's the right

3   phrase or word?  He was also liaison as well as on the

4   plaintiffs' steering committee.  So it added some

5   direction for all of us and some harmony.

6          Really no fights.  Were there disagreements?  You

7   bet.  But disagreements are good because the different

8   views creat a synergism.  And believe me, after years of

9   being general counsel for the world's largest public

10  relations firm, if I took no other lesson away from them

11  than synergism is a great value.  You get together.  You

12  flesh -- put your views out there, et cetera.  And it

13  worked there.  So that's the situation we really didn't

14  have a lead.

15         Frankly, I've always run with the idea that the

16  -- the tight leadership at the top, the two or three --

17  two is tough because then what do you do when you have a

18  dispute?  But two, three, four, maybe even five -- five

19  is a little heavy duty -- but that's when lawyers that

20  need it because somebody won't step back.  I think three

21  is about right.  But then there's other variations on

22  that theme.

23         And with an executive committee -- now, I've

24  listened all through -- of course I've listened to

25  everything the court said today and my learned

1   colleagues.  There's nothing unique about a structure

2   with lead counsel and the executive committee.  There's

3   nothing unique about having one lead and a plaintiffs'

4   steering committee in all the variations that anybody in

5   this room can think of.  We all know about that.

6        The key is the value of the people you put in

7   place and what path they take.  It's not how many people

8   on the path but what path they take.  So in -- in this

9   particular situation, one of the items we mentioned in

10  our papers -- I don't say that as a negative because I

11  know everybody means well.  And there's nothing here

12  today that I disagree with and there's nothing here that

13  was said today that I couldn't talk out or somebody

14  couldn't talk out with me, because we've had some of

15  those conversations today -- to-date, and I think it's

16  resulted in some of the things that were put before Your

17  Honor today in a positive manner.

18       But one of the things I've always felt very

19  strongly about is the reason for an executive committee.

20  And I think the reason a court wants to have an

21  executive committee -- and I say "a reason" because I've

22  never been a judge.  I'm never going to be a judge.

23  It's what I think of the situation is that there's an

24  interdependence.  There's that synergism.  It's getting

25  those ideas in.

1        Now, I heard the comment about, well, we want to

2   give some younger lawyers a chance.  Absolutely.  But to

3   me there's a hop and a skip between saying that and

4   saying you have an executive committee that has

5   duplication.  Because when I hear duplication what I

6   hear is the lack of another idea.  Less synergism.

7        So even though -- I've been over every resume

8   that was put in there.  As I said earlier, isn't

9   anything but fine lawyers being presented.  And in some

10  situation -- I'm not going to say it here, because I

11  wouldn't -- but there's some people that are listed on

12  the -- their proposal to the executive committee that I

13  have no problem with their being leads and he or she

14  deserved that, but that's not -- that's their pick,

15  not -- it's really your pick.

16       So one criticism I would make in the area of the

17  structure is I would not allow duplication because it

18  steals away from the reason you have the executive

19  committee.  Sure the lead counsel is in control and all

20  that but they're obligated to take those ideas in.  And

21  it's those ideas that make the thing better.

22            JUDGE CRABTREE:  I'm not sure I understand.

23  When you say "duplication," are you talking about not

24  more than one person from the same firm or are you

25  talking about really discrete people being in the lead

1    counsel role and the executive committee role?

2         MR. BARNOW:  Not one person from the -- you

3    shouldn't have more than one person from the same firm.

4    In other words, if you have -- if you have Partner A --

5         JUDGE CRABTREE:  Yeah, I got you.

6         MR. BARNOW:  Thank you.  I think that's a

7    serious flaw.  Quite frankly, in their structure, if you

8    took three of those people out from that duplicate role,

9    there might be three spaces for -- maybe for Mr. Grubb,

10   for Ms. Rivas, for Mr. Blood.  So that would give more

11   diversity and they would get the kind of thing they say

12   they want, I know they want, but they also have other

13   obligations.  These people work for them.

14        But, on the other hand, these people are going to

15   be on the file anyways and you're going to have the

16   ideas anyways, so why burn what's available for the

17   class.  Your goal is not to satisfy your employees that

18   way.  Your goal is to get the best result for the class.

19   They're going to do the work and they're going to have

20   good ideas but you're going to miss out on the other

21   ideas.

22        In terms of the actual sweeping -- what I

23   consider sweeping application that I see in their

24   approach, I've organized plenty of cases from the

25   beginning and I've organized a settlement before an MDL,

1    and I'm not going to bore the court with the stories.  I

2    might like telling them over a beer so -- although I

3    stopped drinking while back, but they're decent stories.

4         But the problem with -- with that kind of a

5    situation is, when you have as many people as they have

6    all coming from one side, it just doesn't -- it doesn't

7    really work out.  But -- but it's when you do it -- and

8    one of the comments made at the MDL is that, "Well,

9    they've been organizing here.  They organized."  And I

10   said, "Well, I've organized plenty of them, cases, and I

11   take my hat off to the guys that did it."

12        But here's their problem:  The ball started

13   rolling a little too early.  What they organized was not

14   this case.  What they organized was that original Kansas

15   case.  They did not organize this MDL.  It gets a little

16   worse really for the situation, not them.  I repeat

17   they're fine lawyers and they just have a slightly

18   different view on this, I guess.  Except they'd done

19   that already.  And so when you're in your own box, it

20   might be hard to see out.

21        I'm outside that box for whatever reason and so

22   I'll give you this observation if I could.  The -- when

23   they organized, they did not have some of the cases that

24   are here.  They didn't have Mr. Geller's case, which,

25   quite frankly, I applaud him for and he's right on the

1   money because that scenario's going to represent a lot

2   of -- a lot of possibility for recovery for victims that

3   have serious numbers.  And I know his client.  I've

4   worked with Mr. Geller.  Tremendous lawyer.  He knows

5   me.  I know him.  I know his firm.  We've done a number

6   of cases.  Win some.  Lose some.  But the situation

7   where they now have an ERISA case, this is after --

8   there's no umbrage.  And, as I was told, the room is

9   closed.  Well, after you say the room is closed, you

10  know, filed the ERISA case.

11       What I really found heartening actually and very

12  positive from Mr. Sarko's presentation -- I've known

13  Mr. Sarko for years.  He's been on my executive

14  committees and -- and he was in *Microsoft* in significant

15  roles.  But when he -- when he stood up and explained

16  his expertise in ERISA, I thought that was fantastic,

17  but I may have thought it was fantastic for a different

18  reason.  The reason I thought it was fantastic, we have

19  somebody here, who, after these cases are being

20  generated and filed and whatever, has the expertise to

21  bring it.

22       But here's the problem with that, and I know he

23  knows this, the cause of action in that is dramatically

24  different than these -- the other cases, the consumer

25  case.  It's based on a breach of a fiduciary duty.  The

1    timeline is dramatically different.  I'll get to that in

2    a second.  The defendants are different.  I don't know

3    if those defendants are ever going to agree to come in

4    here and put it all together.

5         But if you have your eye on the prize, the prize

6    is getting the best result from the people you choose to

7    represent, that's all the class members in this case.

8    Which one does that ERISA group have their eye on the

9    prize on?

10        And when the ERISA group represents the other

11   group, which eye -- they're going to get cross-eyed,

12   because in the one scenario you have a case with

13   consumer cases, antitrust, and RICO pretty much moving

14   on a relatively fast track with same -- same or similar

15   defendants with same or similar cause of action, same or

16   similar facts.  You don't have the fiduciary breach

17   that's involved in ERISA and the timeline is

18   dramatically different.  Here is why --

19             JUDGE CRABTREE:  I may ask you to wrap up,

20   just because from a time management I want to hear from

21   Ms. Rivas.  I want to also hear from the other

22   plaintiffs' group.

23             MR. BARNOW:  Fair enough, Your Honor.

24             JUDGE CRABTREE:  So I -- I think you are --

25   honestly, you've probably exceeded my depth on the

1    understanding of the case at this stage, but I do

2    appreciate the points you've made.

3            MR. BARNOW:  May I continue for a few

4    minutes?

5            JUDGE CRABTREE:  Yes.  Just to wrap up if

6    you would.

7            MR. BARNOW:  I will.  On a timeline, if

8    you're going to wait for the MDL to either bring over

9    the tag-a-long case or not, you're going to delay the

10   consumer case.

11       Another point I would make is -- we put it in our

12   papers is that we should go right to a consolidated --

13   consolidated complaint.  Because if you're going to mess

14   around with a motion to dismiss on a case, you're

15   basically putting the court's time into doing what is an

16   advisory opinion.  It's a mistake.  It's a delay.  It

17   could take 6-8 months.  The court shouldn't have to be

18   bum's rushed and it shouldn't have to deal with this

19   sort of advisory opinion.

20       Overall, Your Honor, I think the cases that I

21   have done over the years, the leadership that I have

22   started and the cooperativeness that my various cases

23   have indicated and the results show that I will do a

24   good job here.  I'm committed to doing that.  And I also

25   think that the path that I would facilitate and

1    encourage and have arguments and discussions and

2    hopefully resolutions with the other lawyers will bring

3    this to the type prompt resolution that the class

4    deserves and I know the court wants.

5              JUDGE CRABTREE:  Thank you very much,

6    Mr. Barnow.

7         And then I think also from your group, Ms. Rivas,

8    did you want to speak briefly?

9              MS. RIVAS:  Yes, Your Honor, very briefly.

10             JUDGE CRABTREE:  Please.

11             MS. RIVAS:  Rosemary Rivas of Levi &

12   Korsinsky on behalf of Plaintiff Aggarwal.  I would like

13   to just briefly talk about my commitment to the case and

14   my experience.  My firm has three clients in Tennessee,

15   Virginia, and Illinois.  They all have significant

16   out-of-pocket expenses.  One of them is a mother.  She's

17   a part of the No Nuts Moms Group.  There's 20,000

18   members in that group.  And the impact of the

19   allegations in this case, the anti-competitive conduct,

20   the unfair pricing, that all impacts them greatly and

21   they are all very concerned about it.  If the court

22   selects me to represent the class members, I would be

23   very committed to working on their behalf.

24        In terms of my experience, I've just opened up a

25   San Francisco office for the law firm of Levi &

1    Korsinsky.  Before that I managed the San Francisco

2    office for the law firm of Finkelstein Thompson.  I did

3    that for 10 years.  This new office that I've opened up,

4    we're starting a consumer practice.  I have lawyers in

5    New York.  I have lawyers in San Francisco at my

6    disposal.  We have offices in Connecticut and

7    Washington, D.C.

8             And in terms of the cases that I've worked on,

9    I've represented consumers my entire career.  In the

10   *BAR/BRI* case, we -- not only did we attain a significant

11   amount of relief, we also broke up an illegal marketing

12   division agreement.  We broke up what we thought was a

13   monopoly in the *BAR/BRI* market.  I've litigated against

14   *Allergan*.  I'm familiar with the preemption issues that

15   the defendants raise here.  And I've worked on several

16   consumer cases, Your Honor.  I was appointed to the

17   *Volkswagen* case by Judge Breyer.  That was a 22-member

18   case.

19            In terms of the size of the structure, I will say

20   *Volkswagen* had 22 law firms -- lawyers who were

21   appointed to the PSC in that case.  And I think what was

22   important about it, Your Honor -- or, Your Honors, is

23   that the cases were filed in September.  Appointments

24   were made -- September 2015.  Appointments were made in

25   January.  And the first of three settlements was reached

1   in June.  The second and the third were reached and

2   finally approved earlier this year.

3         So I think with a large -- although we don't need

4   a 22-member group, I do think a larger group will be

5   beneficial in this case because it will allow the

6   parties to really stay on top of deadlines, commit all

7   the resources that are available.  And I think that it

8   -- the structure can include lawyers from all of the

9   firms that have filed, I think at least one.

10         And unless the court has any questions, that's

11   all.

12         JUDGE CRABTREE:  I do not.  Thank you very

13   much for your presentation.

14         MS. RIVAS:  Thank you.

15         JUDGE CRABTREE:  So what I'd like to do,

16   just for kind of planning purposes here, I'd like to

17   hear from Mr. Grubb, and I have not forgotten about

18   Sanofi plaintiffs.  I think I'd like to take a brief

19   break, let the court reporter rest her brain and her

20   hands, take a rest, come back.  Then we'll take them up

21   and I want to hear from the defendants.  And then maybe

22   we can catch those non-designated counsel issues at the

23   back end of the day.

24         But, Mr. Grubb, I want to hear you before we take

25   our break, so please.

1              MR. GRUBB:  Very good, Your Honor.  Thank

2     you.  My name is Archie Grubb.  I'm a partner with the

3     Beasley Allen firm.  We have offices in Montgomery,

4     Alabama and Atlanta, Georgia.  I will try not to rehash

5     too much what was already in my written submission or

6     what has been said here today already.  I'm seeking an

7     appointment to an executive-committee-type role, not a

8     lead or co-lead position.

9              We represent the plaintiff Kenneth Evans who was

10    initially filed in the Southern District of Alabama.  I

11    have a statewide class under the Alabama Deceptive Trade

12    Practices Act.

13             I think we agree with the consensus that the

14    litigation probably should proceed on three tracks; a

15    consumer-type track, the Sanofi competitor claims on a

16    separate track, and the ERISA claims on a third track

17    with all tracks working in concert for discovery

18    purposes.

19             And I envision an executive committee along the

20    lines of what has already been discussed today.  I don't

21    think there's too much disagreement there with two to

22    three co-leads and maybe 8 to 12 executive committee

23    members.

24             I know the *Volkswagen* case has been referenced a

25    couple of times, Mr. Sarko and Ms. Rivas discussed that.

1   And I think that is appropriate to note that there were

2   22 lawyers appointed to that PSC.  In that case it is

3   different from this case in that there were hundreds of

4   consumer complaints filed and here we just have a

5   handful.  But when you look at the size of the class or

6   the ability and resources of defendants, this case is

7   very comparable to the *Volkswagen* case.  And that level

8   of complexity, complexity of the legal issues I think

9   will have a larger class than the 600,000 or so

10  *Volkswagen* owners.

11       So I think this case would merit an appointment

12  of ten or more lawyers to a steering committee.  And I

13  think the court could very easily appoint a committee

14  composed of the members proposed by Kansas counsel and

15  also incorporate one or two members from the *Aggarwal*

16  case, from our case to easily accomplish that task.

17       If the court was concerned that the committee was

18  getting too large, I think one thing the court could do

19  is look at the -- as Mr. Barnow stated, the redundancy

20  factor there where you do have some firms in the Kansas

21  group that have multiple attorneys involved in the

22  executive committee.  But inviting all parties to the

23  table will ensure that a diversity of perspective is

24  taken into account, and I think we would all be valuable

25  contributors to the team.  I know my firm has worked

1   cooperatively with many of these firms in the past.

2        All these lawyers are outstanding lawyers.  I

3   can't say that I should be appointed ahead of any lawyer

4   in this case.  Everyone has impeccable credentials here.

5   I do think I am qualified to join the team and be a

6   productive member of the team.

7        Unless you have any questions, Your Honor, that's

8   all I have.

9             JUDGE CRABTREE:  I just have one and then

10  we'll hear whether Ms. James -- or Judge James does.  So

11  you have been at Beasley Allen since '09.  Is that --

12  did I read that right?

13            MR. GRUBB:  That's correct.

14            JUDGE CRABTREE:  And so you had a segment in

15  your career before that.  What did you do in that

16  period?

17            MR. GRUBB:  I started off in a small town

18  law practice.  My father was a small town practitioner.

19  I worked for him for several years.  Then I went -- did

20  defense work with a defense firm in Atlanta, Georgia;

21  Carlock, Copeland firm, has probably a hundred

22  attorneys, and went to Beasley Allen in 2009.  Have been

23  there doing consumer class cases since 2009 with --

24  primarily with D. Miles who a number of these people

25  have worked with on various steering committees.

```
 1              JUDGE CRABTREE:  Question, Judge James?

 2              JUDGE JAMES:  No, thank you.

 3              JUDGE CRABTREE:  All right.  Thanks so much.

 4    All right.  I think what I'll do -- let me just get an

 5    understanding.  I've -- from the -- and I always have

 6    said it Sanofi.  Is that the right --

 7              MR. HOCHSTADT:  Yes, Your Honor.

 8              JUDGE CRABTREE:  Okay.  So from your side of

 9    the fence who will I be hearing from?

10              MR. HOCHSTADT:  Your Honor, this is Eric

11    Hochstadt and my partner, Yehuda Buchweitz, and also

12    with me is Chris Liwski.  Mr. Buchweitz and I have

13    divided up the topics on the agenda.  On the leadership

14    piece of it, you will hear from myself.  As to the

15    discovery and the motion to dismiss schedule, you will

16    also hear from me.  Mr. Buchweitz is going to address

17    the issues of remand and the separate track for the

18    Sanofi case.

19              JUDGE CRABTREE:  So it sounds like we'll

20    come back to you and you'll get your to turn later --

21              MR. HOCHSTADT:  If it's efficient, Your

22    Honor, when I'm done with the leadership remarks, turn

23    it over to Mr. Buchweitz to address that?

24              JUDGE CRABTREE:  Yeah, I think I want -- let

25    me think about it, but I think I want to postpone the
```

1  discussion of kind of how these cases ought to fit

2  together and how many lanes there ought to be and so

3  forth because I don't want my head to explode.  I want

4  it to stay a happy place.  Right now I'm just trying to

5  understand how from the plaintiffs' side of the caption

6  the cases.  But I certainly will hear from both of you

7  before we go.  All right.

8              MR. HOCHSTADT:  Okay.  Thank you.

9              JUDGE CRABTREE:  All right.  So it's

10  2:27-ish in the middle of the country.  Why don't we

11  take 15 minutes and plan to be back and we'll pick up

12  the discussion there hearing from the Sanofi people and

13  then we'll move across to the defendants' side of the

14  caption.  All right.  Thanks very much.

15              (Recess.)

16              JUDGE CRABTREE:  All right.  Thank you for

17  your indulgence there on the recess.  And so I'd like to

18  turn now to hear from the Sanofi-Aventis line in the

19  case and principally focused on sort of the way your

20  case should be or shouldn't be integrated into the

21  plaintiffs' side counsel team.  And I do want to talk

22  some more if we have time today about how your case

23  aligns and doesn't align.  I'm clear on your position

24  and respect it.  I understand it.  So, please.

25              MR. HOCHSTADT:  Thank you and good

1    afternoon, Your Honors.  In interest of time, I've cut

2    this down to five points which I think will address Your

3    Honor's question.  I mean, I think everyone knows we

4    kind of are unique in the group.  We're the only ones

5    with a competitor case.  My client is Sanofi-Aventis, a

6    global pharmaceuticals company that from 2013 to 2015

7    marketed a rival product to the EpiPen known as the

8    Auvi-Q.

9         Our case is a straight monopolization case under

10   Section 2 of the Sherman Act and we're seeking trebled

11   damages due to lost sales on Sanofi's products.  There's

12   no RICO claims.  There's no ERISA claims.  There's no

13   consumer class action claims and attendant allegation

14   and so forth.  That's the first point.

15        The second point is that all the other plaintiffs

16   support Sanofi having a leadership role at the table,

17   and I'll get to sort of the reasons why, but that's --

18   there's unanimity in that regard on the plaintiffs' side

19   of the ledger broadly speaking for the plaintiffs.

20        The third point is the role that we seek at the

21   leadership table is a very narrow.  We're not looking to

22   represent classes of indirect purchasers, unions,

23   third-party payers or the like.  Our client is

24   Sanofi-Aventis in this case and our only interest in

25   seeking a leadership role is to ensure that on areas of

1    common fact discovery such as exclusive dealing

2    contracts between Mylan and the large third-party

3    payers, right, that we'd have a seat at the table before

4    decision-making is made as to those sorts of common fact

5    discovery issues.  That's the limited extent of the

6    role.

7         And to address a question that's come up a couple

8    times, if it eases the court, I, Eric Hochstadt, I'm

9    sort of the one on the team that is sort of the

10   antitrust expertise.  I'd be the one who would be on the

11   seat.  So you could just limit it to myself and I'll

12   keep my partners, Yehuda Buchweitz and Diane Sullivan,

13   up to speed.  That's the third point.

14        The fourth point is just our team's experience.

15   Both Yehuda and I have had a number of multi-party

16   cases.  We play well in the sandbox.  Heading into this

17   initial pretrial conference, hopefully it was apparent

18   to Your Honors, but we coordinated well with a number of

19   the plaintiffs' counsel in advance on those submissions,

20   Warren Burns and others.  So we know how to do that.

21        We also have done both plaintiff and defense side

22   cases.  So we've -- we've -- I typically have been, you

23   know, not following a number of class action plaintiffs'

24   lawyers.  This is my first leadership submission

25   presentation.  So we've been on the defense side and no

1   surprise maybe many of the cases that we pointed out to

2   Your Honors in our briefing, particularly when it gets

3   to discovery, which we may get to afterwards, we've been

4   on the other side of those cases.  So we know how some

5   of that turns out.

6          We also have a lot of pharmaceutical experience.

7   Yehuda Buchweitz, my partner, has had a number of cases

8   for Sanofi over the years.  Diane Sullivan has had cases

9   for Sanofi over the years.  And just in trial

10  experience, she was the lead lawyer for Merck in the

11  *Vioxx* litigation.  She's sort of a renowned trial

12  lawyer, which is important because you've got to be able

13  to litigate these cases not as a fishing expedition but

14  we're preparing for trial.  We have no interest in

15  wasting our client's time and money in this case.  We

16  want to move efficiently, consistent with -- Your Honor

17  points it out -- Federal Rule of Civil Procedure 1.

18         The last point is Sanofi's role.  The reason why

19  they should have a leadership seat at the table is

20  they're a large pharmaceutical company.  Like Mylan,

21  they know how the products are marketed.  They know

22  where to seek the discovery from.  This will not be a

23  fishing expedition.  And most importantly, and hopefully

24  this is apparent in our papers and obviously mentioned

25  in the news, Sanofi was the first to file a lawsuit

1    related to EpiPen issues.  It was confidential as a

2    *qui tam* whistleblower action in the summer of last year

3    asserting that, on behalf of the United States

4    government, that Mylan underpaid rebates to Medicaid for

5    decades.  And as a result, as you may have seen, Mylan

6    agreed to pay a $465 million fine.

7          That complaint -- whistleblower complaint of --

8    that seal was lifted last month so it's public.  The

9    U.S. Attorney's Office put out a press release crediting

10   the allegations in Sanofi's complaint and commending

11   them for coming forward in this enforcement action that

12   they then intervened in to keep a level playing field in

13   the pharmaceutical industry.  Our antitrust case is

14   about efforts that Mylan took to create an uneven

15   playing field in the marketplace.

16         And in particular Chris Liwski is here.  He was

17   at the forefront of those efforts for the last three to

18   four years.  So by having us in a leadership role, you

19   bring that experience to the table on the front end

20   rather than on the back end after decisions have been

21   made on common fact discovery issues.

22         So unless Your Honors have any further questions

23   for me, I'd be happy and honored to serve in a very

24   narrow leadership role in this case.

25              JUDGE CRABTREE:  I just wondered, and this

1    -- this sort of looks ahead to the second half of the

2    discussion, but I can't wait so I'll go ahead and talk

3    about it now I just -- is what you -- if you got your

4    way for your client in this collection of cases, would

5    you have in effect a separate pleading case within the

6    MDL where there would just be cases about your

7    complaint?

8                MR. HOCHSTADT:  That's absolutely correct,

9    Your Honor.  We'd keep it as a separate track and we

10   point out a number of MDL transferor courts --

11   transferee courts that had done that with a competitor

12   case.  We have our separate pleading.  We have no reason

13   to amend.  We didn't amend when Mylan filed their motion

14   to dismiss.  We filed our motion to dismiss opposition.

15   As I think Your Honor saw, you know, we proposed that

16   Mylan file its reply.  We go forward with discovery.

17        And on common issues that are relevant to the

18   class cases like the exclusive dealing contracts with

19   the big PBMs, pharmaceutical benefit managers, we'd

20   obviously coordinate discovery.  And discovery that was

21   produced in our case be deemed produced in the class

22   cases.  That's how we'd envision it.

23                JUDGE JAMES:  And also jumping ahead a

24   bit --

25                MR. HOCHSTADT:  Yes.

```
 1              JUDGE JAMES:  -- as far as in that -- in
 2   that scenario where you -- you have your separate track
 3   case but you perceive or anticipate common fact
 4   discovery, how big a part of the case do you think that
 5   common fact discovery is as to Sanofi's issues versus
 6   other unrelated discovery?
 7              MR. HOCHSTADT:  I don't think it's a lot of
 8   overlap with -- with the class cases.  You know, it's --
 9   to the consumer fraud issues and the like, that's not an
10   issue in our case.  Sanofi sold Auvi-Q as a two-pack,
11   all right.  We're not alleging that selling a EAI drug
12   device as a two-pack is somehow improper in any way, all
13   right, so we're not going to be seeking discovery on
14   that.
15        The RICO aspects, that's -- we're suing Mylan and
16   Mylan only as an alleged monopolist in this case.  We're
17   not suing anybody else.
18         As to the antitrust even, there's a large portion
19   of the antitrust piece of the -- of the consumer class
20   actions that relates to patent infringement settlements
21   and issues about product topping, evergreening, you
22   know, issues that are sort of the cutting edge of
23   antitrust intellectual property law.  We're not
24   re-litigating any patent lawsuits or anything like that
25   in our case.
```

1          Our case is kind of laser-focused on a --

2    exclusionary conduct by Mylan under Section 2 of the

3    Sherman Act, exclusive dealing contracts with

4    third-party payers, the underpayments of rebates to

5    Medicaid that then funded the ability to give massive

6    discounts to third-party payers to block us from that --

7    that marketplace locking up schools as well as deceptive

8    marketing to doctors.  Once they then got Auvi-Q kicked

9    off of, what we'll discuss more, formulary status so

10   that patients couldn't get reimbursement, and no

11   doctor's going to prescribe it on that basis.

12          And I'm stealing a little bit of my partner's

13   thunder since he was -- he was going to address some of

14   this but we're a team.

15             JUDGE JAMES:  Thank you.

16             JUDGE CRABTREE:  Thank you very much.  I

17   appreciate it.  Thank you.

18             All right.  So let me just -- and let me say

19   one thing before we transition to the other side of the

20   caption.  There have been some references today to the

21   *Brannon* case that's pending in this court and then the

22   Minnesota case, I'm going from memory.  Is it *Klein*?  Do

23   I have the name right?  Yeah.  I get it.  *Brannon* is

24   assigned to me.  The defendants haven't appeared in that

25   case.  That case isn't teed up today.  The Minnesota

1   case is not mine.  I don't make that decision.  I'm

2   simply trying to understand the backdrop here.  And so

3   my references in the agenda, and I think some stray

4   references today, just trying to understand what is out

5   there beyond reading about it as I have.

6          All right.  So maybe we could move over to the

7   defendants' side of the caption.  And I know -- I've

8   lost my score sheet.  Mr. Fries, you have lawyers here

9   from Mylan and it seems like somebody from your side

10  ought to talk about -- I said earlier that I thought

11  your dog in the designated counsel roles was -- was a

12  smaller piece of the fight because obviously Mylan gets

13  to hire the lawyers it wants to hire.  But I think that

14  from a liaison counsel standpoint and from a standpoint

15  of how you might coordinate with Pfizer, I'd be

16  interested in your perspective on that.  So I don't mean

17  to pick who the speaker is.

18          MR. FRIES:  Thank you, Your Honor.

19          JUDGE CRABTREE:  But why don't you

20  introduce --

21          MR. FRIES:  I'm going to let Mr. Zamoff

22  speak.

23          JUDGE CRABTREE:  All right.  Thank you very

24  much.

25          Mr. Zamoff, good afternoon.

1              MR. ZAMOFF:  Good afternoon, Your Honor,

2    Your Honor.

3         Mitch Zamoff, Hogan Lovels on behalf of the Mylan

4    defendants accompanied by my partner Adam Levin also of

5    Hogan Lovels on behalf of the Mylan defendants.  Good

6    afternoon.

7              JUDGE CRABTREE:  Good afternoon.

8              MR. ZAMOFF:  Of course it hurts us to even

9    talk about these leadership issues because we sincerely

10   hope this is going to be the shortest MDL in the history

11   of America.  We think we have some very strong dismissal

12   arguments and we really think there are some fundamental

13   defects in the complaints that can't be fixed.  But,

14   nonetheless, in the alternative we will address these --

15   these leadership issues without prejudice of course.

16             JUDGE CRABTREE:  This is not a happy day for

17   you.  You don't waive anything.  I get it.

18             MR. ZAMOFF:  Thank you.  Thank you.  So I

19   guess with respect to the plaintiffs' side of the house

20   I characterize our position as supporting leadership as

21   a general concept but we're agnostic as to who the

22   leaders are on the plaintiffs' side.  We're optimistic

23   about our ability to work with whoever the court

24   designates as -- as lead counsel and defer to the

25   judgment of the court with respect to matters like the

1   executive committee and the composition of that

2   committee.

3         Let me just make four comments in response to

4   what I've heard here during the portion of the hearing

5   relating to that issue.  First we oppose any separate

6   tracks as I think the court is aware.  And so we do not

7   think that any separate tracks should be a basis for

8   deciding how the leadership structure is set up and

9   would be happy to address that issue in whatever length

10  the court would like me to do so.

11        Second, we also oppose the inclusion of these

12  ERISA cases into this MDL.  So again the idea that there

13  would be leadership positions allocated on that basis is

14  something we also object to and at the appropriate time

15  we'd be happy to address that.  In fact, we'll be

16  submitting our objection to that today pursuant to the

17  court's order.

18        Third, I respectfully disagree just for the

19  record about some of the comments that my colleague on

20  behalf of Sanofi made with respect to Mylan's settlement

21  concerning EpiPen.  Again, I just don't want my silence

22  to be misinterpreted as agreeing with what he said about

23  that settlement because he made some misstatements about

24  it.

25        And, finally, we don't see the need to appoint

1    trial counsel.  Your Honor, you had mentioned that

2    earlier.  Certainly you have the discretion to do so,

3    but we think at this stage in the game it's premature

4    and may not even be necessary for a variety of reasons.

5         So that -- that would be kind of our short

6    commentary on the plaintiffs' side of the house.

7         I think with respect to the defense side of the

8    house, we have, you know, a consensus nominee for, you

9    know --

10             JUDGE CRABTREE:  It still happens in

11    America.

12             MR. ZAMOFF:  We have a smaller group in

13    fairness, but we would nominate, you know, Mr. Fries as

14    our liaison counsel with the court.  Mr. Levin from my

15    firm who has much more expertise in matters like

16    E-filing than I do would be a good partner for Mr. Fries

17    to work with to make sure we're coordinated across all

18    the defendants.  But they would be happy and eager to

19    serve in that role if the court wants to appoint

20    somebody like that from the defense side.

21             JUDGE CRABTREE:  And just I -- I'm starting

22    to figure out who plays what position --

23             MR. ZAMOFF:  Yes.

24             JUDGE CRABTREE:  -- and what teams they play

25    for.  So is it Saiber?  Is that how it's pronounced?

1          MR. ZAMOFF:  Saiber is a New Jersey law firm

2     that is counsel of record on two of the cases that have

3     been brought into the MDL, the *Nordstrum* case and the

4     *Sanofi* case.  And they're represented and Mr. Soos from

5     the Saiber firm is here today.

6          MR. SOOS:  Good afternoon, Your Honor.

7          JUDGE CRABTREE:  All right.  Very well.

8          MR. ZAMOFF:  And I should for -- for

9     completeness of the cast of characters, we do have

10    attorneys from White & Case who are representing the

11    Pfizer defendants.  I don't know if they want to stand

12    up and introduce themselves.

13         JUDGE CRABTREE:  Yeah, I'll turn to them in

14    a minute --

15         MR. ZAMOFF:  Yeah.

16         JUDGE CRABTREE:  -- to maybe get their

17    consent on Mr. Fries proceeding by acclamation but --

18         MR. ZAMOFF:  I got it in the bathroom and

19    you should confirm, Your Honor.

20         JUDGE CRABTREE:  I suspect our court

21    reporter wasn't in there.  So, in any event, I

22    appreciate you all working through that.

23         And just to peek ahead, I can't seem to

24    discipline myself on the case management issues, I'm

25    sort of -- I guess flummoxed is the word -- with your

1    opposition to there being more than one track.  I get it

2    why a defendant would have that view.

3              MR. ZAMOFF:  Right.

4              JUDGE CRABTREE:  While I can imagine that

5    the class plaintiffs may or may not all get together and

6    get in the same boat on a consolidated amended

7    complaint, I suspect Sanofi would tell me we own our

8    cause of action; we don't have to plead it in that.  And

9    even -- even starting with the JPML, there was a

10   recognition that these -- these two things weren't

11   exactly like one another.  I guess I'm trying to

12   understand just from a -- what's the gravamen of your

13   opposition to that, why?

14             MR. ZAMOFF:  Well, we think it would

15   actually create more inefficiencies than efficiencies if

16   I had to boil it down.  We think there are more common

17   issues than uncommon issues.  If you look at their

18   submissions, the plaintiffs' submissions with respect to

19   statement of facts and Sanofi's submission with respect

20   to their case management order and we look at the legal

21   issues that they've identified, they're the same legal

22   issues; whether Mylan has monopoly power, whether Mylan

23   engaged in exclusionary conduct, what the relevant

24   market is for antitrust purposes.

25             And so with respect to pleading and motions

1   practice, which I think is really where the action is on

2   consolidation, because we can coordinate discovery, I

3   suppose, if we have one track or two tracks, but on

4   those key legal issues, the issues as far as I can tell

5   are just about exactly the same.

6        I would flip the question a little bit, judge,

7   and just ask -- we were trying to figure out what's the

8   point of having two tracks?  We only have six cases in

9   this MDL.  This isn't a-hundred-case MDL.  All we can

10  see it doing is it causes multiple rounds of pleading,

11  which means we have to respond multiple times to

12  pleadings.  It causes multiple rounds of motion

13  practice, which means we have to respond to multiple

14  rounds of motions.  And we have to, I guess, coordinate

15  across two tracks instead of across a single track.

16       And so the only -- the only differences that we

17  really could see that might impact this was one's a

18  class -- one's not a class case, right, and the others

19  are class cases.  And Sanofi has different damages kinds

20  of requests than the other plaintiffs do, but it wasn't

21  clear to us why they couldn't put their damages requests

22  into the same complaint, you know, as the other parties.

23  And the court is well familiar with complex cases where

24  a motion relates to some parties rather than all

25  parties.  That happens all the time.

```
 1              And so I guess on balance, we saw there being
 2      more problems in manufacturing a separate track for a
 3      single plaintiff here when the common issues that were
 4      going to need to be decided basically touched all the
 5      cases.
 6              I mean, if you look at these six cases, four out
 7      of the six of them have antitrust claims in them and
 8      three of the six have federal antitrust claims in them.
 9      So it's not like -- and they all have allegations -- you
10      know, they have common allegations relating to these PBM
11      issues.   There are common allegations relating to these
12      school issues.   There are common allegations relating to
13      these price increase issues.   So again I don't think we
14      have to spin what's in what case.   The court can
15      obviously look at the different complaints and make its
16      own decision there.
17              But I found it interesting to review their own
18      submissions and to match up the summary of allegations
19      from matter to matter.   And it was, I thought, pretty
20      compelling justification for putting these together on
21      one track.
22              I just think it would be kind of needless
23      inefficiency and extra burden on us in that category.
24      Maybe that informs their request.   I don't mean to be so
25      cynical as to say that, but I just don't think it's
```

1   necessary or appropriate in light of -- the case is

2   quite manageable with the six cases in front of the

3   court, I would submit.

4                JUDGE CRABTREE:  All right.  Anything else?

5                JUDGE JAMES:  Not for now.  Thank you.

6                JUDGE CRABTREE:  All right.  We reserve our

right to come back to that because --

                MR. ZAMOFF:  All rights reserved.

                JUDGE CRABTREE:  -- I cheated ahead to next

season --

                MR. ZAMOFF:  Understood.

                JUDGE CRABTREE:  -- so we may be back.

Thank you very much.

                MR. ZAMOFF:  Thank you, Your Honor.

                JUDGE CRABTREE:  All right.  Then from the

Pfizer defendants, I don't know, Mr. Rebein, I don't

know who from -- you don't have to talk.

                MR. REBEIN:  I'll merely just say that it's

a pleasure to be in front of both judges here and my

colleagues from White & Case will address the issues.

We did agree, however, that Mr. Fries makes an excellent

candidate for the role in which he was described.

                MR. FRIES:  I'm flattered.

                JUDGE CRABTREE:  Maybe you want to be heard

on that subject.

MR. FRIES:  Can I step out?

JUDGE CRABTREE:  All right.  So that part's taken care of.  And then from your standpoint why don't you introduce who is with you today.

MR. REBEIN:  Yes.  This is Bryan Gant.  He's from White & Case.  He'll be the principal spokesperson for us.  And Edward Thrasher, also known as Ned Thrasher, he's with that firm as well.

JUDGE CRABTREE:  What a great name for a lawyer.

MR. THRASHER:  Thank you very much.

JUDGE CRABTREE:  All right.  So, gentlemen, I'll defer to you to talk about any of the designated counsel.  Primarily I think you've already answered the big question.

MR. GANT:  I think that's right, Your Honor.

JUDGE CRABTREE:  Can I ask you to introduce yourself.

MR. GANT:  I'm sorry.  Bryan Gant from White & Case on behalf of the Pfizer defendants.  I think that's right, I frankly don't have very much to say here.  As to the plaintiff's side, we do think -- we agree the idea that there are too many cooks in the kitchen, that may be a problem, but, frankly, we defer to -- to Your Honor in terms of what you think is best

on that side.  We have no -- no strong feelings about
it.

        Obviously agree on the idea of the liaison on the
defense side.

        With respect to the issue of trial counsel, we
agree with Mylan on the idea we think it's a little bit
premature.

        But that's, you know, I think pretty much all
that I have to say.

                JUDGE CRABTREE:  All right.

                MR. GANT:  But I of course want to answer
any questions that Your Honors may have.

                JUDGE CRABTREE:  I knew your discussion from
your side of the caption would be shorter and I know
we're going to come back and talk a little bit about
sort of some of the preview on the case management
stuff.  Do you have questions before we turn?

                JUDGE JAMES:  It's always nice when people
admit they don't have anything to say.  Thanks.

                JUDGE CRABTREE:  Yeah.  You might get a
standing ovation.  All right.  Thank you very much.

        And, Mr. Thrasher, you defer any comments to
later, I take it?

                MR. THRASHER:  I will.  Thank you.

                JUDGE CRABTREE:  All right.  All right.  So

thank you very much for a very enlightening discussion
on that -- on those subjects.  I still think this is --
you know, one of the -- one of the hot discussions among
judges on counsel appointment issues is, well, maybe you
ought to appoint for a year at a time and almost treat
it as -- no surprise to you, you've heard this
discussion.  And I don't plan to do that because I think
this is a longer haul than a year and, frankly, there
are parts of designated counsel's performance that's
pretty hard to evaluate.  Sometimes you can see -- I'm
told you can see some things but sometimes you can't.

          And so I guess I would say this:  That I still
aim to get the appointment order out next week with the
idea of having a much more fulsome discussion on the
27th near the end of the month about how this case gets
put together or how these cases get put together.  And
while there won't be term limits as such, I certainly
would view the court to retain the discretion to
supplement those appointments or to replace them if
circumstances convinced me that there needed to be
changes.

          So that's kind of my thinking going forward.
Last chance on any of those counsel roles, anybody have
something to say that I've overlooked?  Mr. Sarko.

                    MR. SARKO:  Just one issue.  You talked

about tracks as it relates to counsel.

          JUDGE CRABTREE:  Yes.

          MR. SARKO:  I just want to tell the court,
you know, in a lot of cases, *Enron* which I was involved
in, *WorldCom*, there were separate tracks.  There was a
securities track.  There was a derivative track.  There
was an ERISA track.  And one of the things the court
realized were some of those have ebbs and flows and some
would be faster than others.  And even though there were
three tracks in those cases, actually for discovery
purposes they worked together but they allowed the court
the flexibility to deal with it separately.

          I'll also note something we can talk about later
whenever you wish, that there are in this case some
motions to dismiss that are already briefed.  So one of
the issues about separate tracks, the courts have the
ability to glue the tracks back together whenever they
wish.  I know you know this, but you all are king.

          JUDGE CRABTREE:  Well, it doesn't -- it
doesn't hurt to remind us of what we know and on the
chance that we don't know it yet it won't -- it
certainly won't hurt.

          All right.  So let me get my notes rearranged and
maybe we can turn to the second half of the agenda which
really -- really starts -- we've talked about -- I'm

looking at page 2 of Document 14 which was the agenda
for this hearing.  I think we've talked in a very
enlightening way on the subjects that run through what
are referenced there as, on page 2, the newly filed
cases.  And I've said my piece about *Brannon* and the
Minnesota case.

          I think I'd like to talk briefly in a more
organized way about the track proposals because I know I
skipped ahead to this, but maybe I could turn back to
you, Mr. Zamoff, and start with you because I do have
some questions that really originate from -- and this --
this really -- goodness sakes, nothing's going to get
decided today on this.  This is a effort at incremental
education of the judges that you now have.  And I guess
the -- the hard part for me is I want to start with
what's listed there on page 2 is your proposal that
there be a single consolidated amended complaint.  And I
guess I'm just curious how would that work?

          MR. ZAMOFF:  Well, I suppose we would --
again, we're just talking about putting one other
plaintiffs' claims into the complaint; right?  The
consolidated complaint we're talking about right now
incorporates every single claim except for Sanofi's.  So
it would just be a question of taking their Section 2
claims and incorporating it to the complaint.  There

already are Section 2 claims in that complaint that are
brought on behalf of other plaintiffs.

          Sanofi has a different angle because it is a
competitor rather than a consumer.  So they would have
to articulate those differences in the complaint that
would allow us to do consolidated motion to dismiss
briefing as to that single complaint.  It would allow us
to do consolidated briefing on other issues as we move
down the road.  So I don't -- I don't view it as
especially difficult or different for them.  They're
asserting claims that are being otherwise asserted in
the case.

          I was -- you know, I was looking back at Sanofi's
proposed case management order and they -- they say in
that order that all of these cases relate to Mylan's
conduct to eliminate competition -- they forgot to put
"allegedly" but I guess they were on a word count or
something -- relate to Mylan's conduct to eliminate
competition in the EAI drug device market and that all
cases involve common issues, including rebates to
third-party payers, efforts to obtain coverage on drug
formularies, decisions to engage in repeated increases
in the price of EpiPen, implementing that decision, the
EpiPen4Schools program, they have the same antitrust
legal issues that need to be decided both in its case

and in the other case.  And so I'm struggling to see the
efficiencies in having them proceed separately.

          JUDGE CRABTREE:  I -- and I think -- look,
when I came to this job, I promised myself I wasn't
going to pretend to understand things I didn't
understand.  And here's what I don't understand, and
just to be direct about it, Sanofi owns the cause of
action they have asserted against your company.  And if
they want to assert it in their name, whether there's a
class certified or not, can't they do that?

          MR. ZAMOFF:  Well, presumably they are a
named plaintiff in the consolidated complaint and
presumably there are causes of action particular to
Sanofi, right.  I mean, in many --

          JUDGE CRABTREE:  I can't force them to join
in a consolidated complaint, can I?

          MR. ZAMOFF:  Well, I think in many MDLs
there are parties that might prefer to have their own
complaint but they're forced --

          JUDGE CRABTREE:  Let's say they don't.

          MR. ZAMOFF:  I think as a case management --
a case management tool the court does have discretion to
order consolidated complaints.  I think many plaintiffs
would rather each say their complaint in exactly their
own way but the court will require a consolidated

complaint to be filed so that the case is manageable.

And I guess, you know, the question is, is this case more manageable in a single complaint, single track or is it more manageable, right, from a case management perspective dealing with two separate complaints, two separate sets of motions and whatever coordination needs to happen across those tracks? That to me is the question.

I presume they would have the same content in a single complaint as they would have in their own complaint. They wouldn't be precluded from saying what they want to say.

JUDGE CRABTREE: Well, that's been the rock in my shoe in trying to understand where you worked from because I just didn't quite understand that the authority here reached as far as you just described it.

MR. ZAMOFF: I think just an incremental burden to deal with two different tracks when the causes of action and the facts are similar enough that they lend themselves to one track.

Of course the other cases, Your Honor, that are in this consolidated complaint, right, all of the other -- the other five cases, which really might be thought of as 14 other cases, because the *In re: EpiPen* case that was in Kansas is really a -- a collection of nine

cases that came, you know, before the MDL proceedings initiated that were voluntarily consolidated --

            JUDGE CRABTREE:  Right.

            MR. ZAMOFF:  -- and so, you know, there you have 14 different complaints that were all different that are consolidated in a complaint.

        So I think it's just the question is incrementally do we take this one other complaint, which we submit is actually similar in material respects to the other 14, and just ask it to be added to that one case for -- for case management purposes.

            JUDGE CRABTREE:  Do you have anything you want to ask?

            JUDGE JAMES:  I guess I -- I'll just show my ignorance and that is there -- has this issue been decided by a court you can point us to where some -- Sanofi has been required to come into a case such as this when they have a separate case and preferred not to be?

            MR. ZAMOFF:  Well, we could cite for the court I think many MDL proceedings where courts ordered consolidated complaints to be filed when many different cases were brought into the MDL.  There are cases that have set up separate tracks in these kind of situations. There are cases that haven't.  I think it's sort of in

17-md-2785   In re: EpiPen   9/7/17                    93

the discretion of the court to decide how to manage the
case from a tracking perspective.

I would submit there probably aren't many MDLs
with only six cases where we have three separate tracks.
That is a bit unusual in my experience.  But again that
doesn't mean it's unheard of or unprecedented to do
that.  It's just I think more of a discretionary thing.

I'm not -- we could research that question and
make submission to the court about whether that argument
has been had about "I don't want to participate in a
consolidated complaint that the court is asking me to
submit for, you know, purposes of case management," but
I don't have those citations, you know, off the top of
my head today.

JUDGE CRABTREE:  I mean, I get it in the --
in the class setting where a danger to a -- an
individual who sued is a putative class representative
that their class, because they're not first filed or
whatever, that it might be consumed by some other case.
But here I assume that if there were ever a class
certified that included Sanofi's claims, that Sanofi
would opt out.  You think I'm thinking about this wrong
and I -- you --

MR. ZAMOFF:  I would support them opting out
of the class, that part I think I understood.  But I --

I -- I guess I would think of class certification as an
issue that would apply to the class plaintiffs.  And
whether we have one track or two tracks, right, the
court's going to make whatever decision if we reach that
point on class certification.  And that just wouldn't
apply to Sanofi because it doesn't have a class case.  I
don't think Sanofi is a putative class member in any of
the cases.  Its case would just be sort of a straight --

          JUDGE CRABTREE:  No, I get that.  That's why
I think -- that's why I guess I'm stuck with the idea
that I have to think about -- we have to think about
them differently.

          MR. ZAMOFF:  Right.  Well, they would like
you to think of them differently.  I guess our position
is that the nature of their claims and the nature of the
legal issues, you'll be deciding the same -- according
to them, you'll be deciding the same issues on track one
and track two.  You'll be deciding what's the relevant
market.  You'll be deciding whether Mylan has monopoly
power.  I'm just quoting from both their things.  You'll
be deciding whether Mylan engaged in exclusionary
conduct.

          And so in the tracks they talk about where you
have securities cases and fiduciary cases, you're
deciding different issues usually.  But here, because of

the overlapping antitrust claims, I'm just not sure I
see the efficiency in breaking this up into different
tracks.  I guess you could make the same duplicative
decisions in different decisions in response to
different motions but I'm not sure that's usually
efficient.

        JUDGE CRABTREE:  Okay.  Thank you very much.

        MR. ZAMOFF:  Thank you.

        JUDGE CRABTREE:  I -- do you want to take up
this issue because I'm just trying to -- look, I'm not
going to decide anything today, but I think both
Judge James and I -- you all have been at this party for
a while.  We just got here and we're just trying to get
our mind around sort of the -- the -- what our reach
here is and isn't.

        MR. BUCHWEITZ:  Thank you, Your Honor.
Yehuda Buchweitz, Weil, Gotshal for Sanofi.  Your Honor,
there's a lot to respond to in what Mr. Zamoff has said.
But I think the most important thing is from the first
day that we filed our case back in April, the --
everything that they've done in this case has been to
try to lump Sanofi in with the class in some way.  They
moved under 1404 in New Jersey before Judge Wolfson.
That was resoundingly rejected after an hour-long
hearing.  They went to the JPML with the position where

they objected to the formation of an MDL.  But then once Judge Wolfson rejected their 1404 they switched but only sort of switched because they wanted an MDL if we were a part of it but they didn't want an MDL if we're not part of it.  And now we're here and they're trying to eviscerate our complaint and lump it in with our colleagues here on the class side.

The answer to your question, Your Honor, is you will have to look no further than the cases that were cited in the JPML proceedings, the very few cases that were cited in the JPML proceedings for saying that a competitor case which is fundamentally different from a purchaser case could even be in the same part of the MDL.  And in all three of those cases that were cited in many of the JPML papers, every single one of them had a separate pleading track at the -- in the MDL.  Okay.

We're talking about the *Warfarin Sodium Antitrust Litigation* where DuPont was the target of -- of the antitrust claims.  There was a bunch of class cases. There was one competitor case.  The competitor case said, no, no, don't include us in the MDL just like we did.  They were included.  Nine months after they went -- they had a separate pleading.  Nine months after they went to the MDL there was a suggestion of remand back to the originating court.

Two years later, two years later the consolidated
amended complaint was finally filed after everything
was -- went through the mix.  And six years later the
class cases end.  So in 1998 the -- the competitor of
DuPont was sent to the MDL.  1999 sent back.  2005 the
litigation was ended.

The other two cases that were cited in various
MDL papers which we've cited to you are *McCormick* and
*Keurig.*  Both *McCormick* and *Keurig* were both cases where
a competitor was included in an MDL proceeding with a
class case.  In both of those cases there was a separate
pleading and a separate motion to dismiss and then
common discovery and those cases both continue on today.

Everyone on the plaintiffs' side agrees that we
should have a separate pleading.  And I think maybe what
we're getting caught up in is what does it mean to be
have a separate track.  Okay.  And to me really all it
means is that we get to keep our complaint.  We get to
be exactly what you said:  We get to be the master of
our -- of our complaint, which by the way Mylan moved to
dismiss on July 28th, okay, and we opposed it on August
17th and their reply needs to be filed at some point.

So the notion that taking our complaint, which is
already done which we don't need to amend and which has
already been moved against and responded to would

somehow make this case more efficient by mushing it in together with all of their case -- with all their class allegations is -- frankly is just absurd and it's unprecedented.   Okay.

You've heard it, Your Honor, in this court today a number of the people here involved in the *Volkswagen* case.   I had no involvement in the *Volkswagen* case but I know that in that case there's separate, you know, competitor groups and -- and class groups.   And, frankly, that's the way these kinds of antitrust cases go when there is a competitor case and a purchaser group.

Nobody wants a separate pleading -- a separate -- a combined track other than Mylan.   Everyone else in this room thinks that Sanofi's case belongs separately going through the motion to dismiss phase.   Let us do some great discovery of Mylan as we have shown we can do from other stuff on behalf of class and then let us go on back to Judge Wolfson when you're done with us.   And we think that the right moment, Your Honor, is at the end of common fact discovery and that we should go back to New Jersey for expert, summary judgment and trial if they don't capitulate.

The last point -- the last point -- two last points, Your Honor, just two more.   One is you've

pressed Mylan's counsel for, you know, what's their
authority for this.  They don't have any cases.  And by
the way, if you look at Federal Rule of Civil Procedure
23, as well as local Rule 23-1 in the District of
Kansas, there is a binary question that's put to the
court with respect to class.  It's are you certifying
the action or are you not certifying the action.  What
happens to us there?

       You certify the action, we're not part of the
class.  We can even opt out.  It's different than the
kind of antitrust cases where you're -- where you have
slews of purchasers that opt out.  We're not a member of
any class that's been defined by anybody.  We have our
product and we're competing against them.  So there's no
support in the rules.  There's no support in the law.

       And then finally, Your Honor, you know, Mylan's
counsel is looking at this, I would argue, the wrong way
when they're talking about overlapping legal issues.  I
have a mark-up that my team did of their statement of
factual and legal issues and we've colored in purple all
of the points that have absolutely nothing to do with
our case.  And guess what, there's a lot of purple here.

       You have the legal issues.  All right.  There are
three things.  There's consumer protection which goes on
for a page.  Nothing to do with us.  RICO which goes on

for half a page.  Nothing to do with us.  And then on the antitrust issues, half the stuff that they include has nothing to do with us either.  We don't have -- as my colleague said, we don't have any arguments that some of these patent cases that were brought are antitrust violations.  The only thing we say about patent cases at all is that they're part of the evidence that they're barriers to entry.  But, frankly, I don't think that's really a contested issue.  So the cross-over in the class folks cases to our case is pretty minimal.

        And, frankly, you know, between having to argue this issue before Judge Wolfson and then having to argue it again before the JPML and coming here again, I can't imagine having to go through the list of all the reasons why it's separate, but I'll tell you that we've put it in the papers.  Our cases are different.  Everyone recognizes they're different.  Most importantly the panel that sent you here -- that sent us here recognizes they're different.

        I'll just quote for you a couple of the -- very briefly the points within the paragraph that they wrote especially about us, the JPML.  It says, "Sanofi which opposes inclusion into the MDL is correct that there are differences in the actions."  And it later says, "They are unique claims presented by Sanofi."  And then it

says, "To the extent Sanofi presents unique factual and

legal issues, the transferee judge has the discretion to

address those issues through the use of appropriate

pretrial devices such as separate tracks for discovery

and motion practice.  Additionally, the transferee judge

may recommend 1407 remand to Sanofi in advance of other

actions if he deems it appropriate," and cites the

*McCormick* case.

            And, Your Honor, that's all we're asking.  We

recognize that there is common discovery.  We had hoped

that we could deal with that through coordination

between Judge Wolfson and Your Honor.  But we're here

and that's fine and we're ready to go and we're ready to

do all the common discovery and then we're ready to move

on.

            So we have our complaint.  It's already been

moved against.  They've told you, by the way, in their

statement that they believe that their motion to dismiss

is a winner.  So I'm not sure why they'd want to redo

it.

            And -- and we have -- you know, we'll work with

these guys.  We've worked with them already on the

common discovery and then we should be sent out on our

suggestion of remand.

                    JUDGE CRABTREE:  Your fundamental message is

let's get the briefing on the motion to dismiss ripened up and get a ruling.

          MR. BUCHWEITZ:  That's right.

          JUDGE CRABTREE:  Okay.  Thanks.  That helps my understanding of it.  As I said I'm not going to -- I think I want to sleep on it, but my inclination, as I sit here today, Mr. Zamoff, is to give you a date to reply, get that briefing closed on that motion.  And at the very worst it would help to be informative in some way of at least the thinking on that case.  I don't know whether it offers insights to different cases or not but that's my inclination.

     Do you have questions before we turn the table maybe to hear from the plaintiffs on any of these consolidated complaint issues?

          JUDGE JAMES:  I think they've been addressed.  Thank you.

          JUDGE CRABTREE:  All right.  Thank you very much.

     So let me turn maybe, Mr. Burns, back to you on -- I just -- or one of you.  I don't mean to pick for you.  I am apparently obsessed with this consolidated amended complaint and so you all have a group of putative class plaintiffs in tow.  Tell me -- tell me how getting to a consolidated complaint will work?

MR. BURNS:  Okay.  So two issues, I couldn't
disagree with Mr. Zamoff more in terms of --

JUDGE CRABTREE:  I get that.

MR. BURNS:  -- trying to weave that in.  I
think it would be grossly inefficient.

So and I want to make sure I understand the
court's question.  Are you asking how we would work
towards a consolidated complaint on the plaintiffs'
side?

JUDGE CRABTREE:  Yeah.

MR. BURNS:  There is a difference of opinion
between some of the leadership groups on how we should
proceed with the consolidated complaint.  And speaking
on behalf of the Kansas or Consensus plaintiffs, let me
march you through the history of this case.

So obviously we had the initial consolidation
before Judge Lungstrum.  Subsequent cases, including the
*Aggarwal* case, were filed thereafter.  Until we get to
really the *482* (sic) case, the *Local 482* case, the
allegations in most of these plaintiffs' cases are very
similar.  New Jersey cases have a couple different
wrinkles but the allegations on RICO, consumer
protection, and antitrust allegations were remarkably
similar.

We had, for instance, in our consolidated

complaint -- complaint before Judge Lungstrum, we had
asserted a claim under the Illinois Consumer Protection
Act. So that issue was already within the mix of the
existing complaint.

        Our leaning at this time, our position at this
time, is that the court should proceed on those briefed
issues; RICO, consumer protection, and antitrust,
because at this point we think that those issues have
been fully alleged within the complaints and they've
been fully briefed by the parties and most importantly a
decision on those issues will help narrow this case or
narrow the issues remaining for the plaintiffs to
address down the road.

        Now, what does that "down the road" look like?
After that decision on those contested issues; the RICO,
antitrust, and consumer protection, I think it's fair to
say we will have to amend the complaint to address the
third-party payer allegations. But the truth of the
matter is that once the court decides those issues on
the front end, if the court's willing to do that, I
think that the issues that might arise on the
third-party payer complaint will probably be minimal.

        I can't speak for the defendants. I'm sure
they'll to tell you that they're going to have to brief
the heck out of it, but the truth of the matter is we

may not see a few -- we may not see additional motion
practice on that issue.

         Now, for all the cases that have come in, we're
going to listen to counsel and make sure we're not
missing anything, but the fundamental aspects of this
case have already been briefed and they're ready to be
decided.  So that's our position with respect to
consolidated amended complaint.

         We would ask that the court proceed to decide the
fully briefed motion from the *In re:  EpiPens* case that
was on file before the MDL.  And if there is a need to
amend after the court's decision on that motion to
dismiss, then we can address it at that time.

         JUDGE CRABTREE:  It feels like I'm going to
end up doing the same work twice.

         MR. BURNS:  Well, and I understand the
court's concern.  But from our perspective the court
really won't be asked to do that because fundamentally
what we are saying, in looking at all the complaints out
there and all the allegations with respect to the
antitrust actions, the consumer protection actions,
separate from antitrust and the RICO case, that those
are -- the allegations there are fully formed and the
court can address those issues now.  If there's anything
remaining after that decision, it's going to be very

minor and we can address it at that time.

JUDGE CRABTREE:  Yeah and I -- and I wonder
if I didn't go that way, let's just say I didn't, I
concluded that I didn't -- I didn't think it was the
most efficient route from here to be.  And so the
appointment of counsel order comes out.  People are in
their defined roles.  Is it at that point that there
would be a discussion among the class plaintiffs about
getting inside one amended consolidated complaint?

MR. BURNS:  Yes, Your Honor, absolutely.
That's -- yeah, that's our understanding as well.
Basically, as these leadership proposals have gone
forward, I mean, all but two of the -- all but two of
the plaintiffs' complaints that are before the court are
agreeing that you should go ahead and decide it.

JUDGE CRABTREE:  The *Aggarwal* and the
Alabama *Evans* complaint?

MR. BURNS:  That's right.  But if the court
decided to go a different way or said, listen, you guys,
you knuckleheads, you need to get together and think
about this some more, we're happy to do that and discuss
it with counsel.

JUDGE CRABTREE:  Okay.  Thank you very much.
Mr. Barnow, we've been talking about your
complaint, so I get it this is kind of a free-range

discussion but I couldn't get -- I couldn't get this --
my mind around this and I wanted to start with it.
So --

MR. BARNOW:  Well, I appreciate the
opportunity to speak again and particularly on this
issue.  I believe Mr. Grubb's filing also raised the
issue about it.  I've been in a lot of MDLs, so are
these lawyers.  I don't want to use the word absurd
because it's not quite the level of absurd.  It's to go
ahead and rule on a pending motion to dismiss when it
was -- I can see an iota of thinking in it, but the
thinking really isn't all that good for the class.

One, I still believe, and it's really in the
court's view more than mine, every court's time is
precious.  Why would you go ahead and do a dry run, the
phrase I used before, on a motion to dismiss, which,
quite frankly while I'm plaintiffs' counsel, you're not
going to -- I know whatever we say here today it doesn't
bind on us or whatever -- but the defendants have filed
one heck of a motion to dismiss.  Some of the things
they pointed out are things that can be corrected.  If
-- if you see the targets on the wall, why wouldn't you
take them off before you wind up hitting yourself in the
eyeball?

We now know the flaws that are seen by the

defendants in the pending complaint, a complaint that
was put together before this MDL was created, a
complaint that was put together before the very cases
that are here.

One of the things that the defendants point
out -- and I'm just saying they point it out -- is that
other 46 or 50 plaintiffs, whatever they are listed in
that Consensus complaint, 80 percent of them -- of the
plaintiffs don't allege damages.  Now, when you have an
access to other plaintiffs such as Aggarwal and the
other two that Ms. Rivas, Mr. Blood and I have that have
actual damages, why wouldn't you go back and want to
amend that as opposed to have a court spend time on a
plaintiff who has claimed -- and the pleadings speaks
loudly -- haven't alleged damages.  The other thing is
there's a supposition or a statement that everything
that they put in that complaint covers the waterfront.
It doesn't even cover a pond.

First of all, on the consumer fraud cases,
judge --

JUDGE CRABTREE:  You're -- you're at too
smart a level for me at this stage.

MR. BARNOW:  Let me -- let me make it a
little clearer for myself too, okay.  I apologize.

JUDGE CRABTREE:  Okay.

MR. BARNOW:  They just told you that that
complaint that they have covers all the issues that are
out there in the other cases.  Not really.  Maybe with
gossamer but nothing heavy and thick and deep.  For
instance, the consumer fraud cases I think Mr. Grubb
mentioned in his papers, it's like a stepchild to them.
It's a second thought.  And their whole drive and their
pleading, the way I read it and I think the way the
defendants read it, certainly the way the defendants
read it, has to do with the two-pen packaging.  Yes,
there's no question they mentioned consumer fraud
statutes in other states but they do it on different
theories.

For instance, our pleading and the ones we would
file and -- when we get a chance to add our other two
plaintiffs will deal with the unconscionable pricing
which is also available under these consumer fraud
statutes as opposed to their fraud theory.  They don't
put forth the theories that other cases have pending
which are serious, serious theories.

Another issue, how could you -- how could you go
ahead with that?  Why would a court when you have
Mr. Geller's case, which is a powerful pleading and is
not going to be included in that -- I just heard that
maybe some of the issues will survive.  I don't want to

make a misstatement.  But the reality is that is an

important ingredient in this case that every plaintiff

here agrees that Mr. Geller's Local 282, or whatever it

was, third-party payer case, will be included.  That's

another reason you shouldn't piecemeal it.

        The other thing is the time --

            JUDGE CRABTREE:  Let me ask -- let me ask

this, this is really where I'm coming to:  If we finish

today and everybody goes back to their homes,

appointment of counsel order issues.  You like it.  You

don't like it.  Whatever the outcome of it is, for the

*Aggarwal* plaintiff -- I'm trying -- it's one plaintiff

is it or is it more than one in your case?

            MR. BARNOW:  In that case there is one.  We

have two others we haven't filed on.

            JUDGE CRABTREE:  For the plaintiff you have

actually filed suit, you are prepared to join an amended

-- a consolidated complaint?

            MR. BARNOW:  Absolutely, I'll direct it.

I'll join in a group to direct it and I'll get it done

in short -- in short time.  These are good lawyers.  You

roll up your sleeves, this is not a complicated deal.

        The other big issue, judge, this product lasted

allegedly for 18 months.  That's another issue.  But on

the manufacturer suggested date for this product of use

is 18 months.  That's a whole different issue.

        If we're going to sit around and expect a busy
court -- which all federal courts are.  Last time I
checked a judge, he had 800 cases on his call.  I
haven't checked with this court.  But you guys are busy
and you know better than I do.

        And let's say it takes on the short end four to
six months, maybe eight months get a decision on a very
complicated set of pleadings.  It isn't easy.  We just
went through one.  I think it took five or six months on
that, and it doesn't compare to the complexity of this,
with hard-working judges and with hard-working clerks.

        So one-third of that 18 months is going to be
burned on what is basically going to turn out to be an
advisory opinion so lawyers who have the defendants'
objections, the defendants' objections of the pending
defects on the pending complaint are smart guys, them
included and I think me too and my colleagues, can go
through it now and patch all those holes so when you and
Magistrate James looks at it, it's no dry run.  It's no
advisory opinion.  It's no waste of time.  It moves the
case forward dramatically and in the interest of juris
prudence and the consumers who are burning up that
product with another six months.  There's just no reason
to it.

There is one reason I can think of and I want to
diffuse it right now.  I don't think they're thinking
that.  I don't.  But I scratched my head hard, and I got
a bald spot up here but not from that.  But the only
reason I can think of somebody would want to go ahead
with that -- and I mean it as no disparagement, I
don't because I've been in a lot of cases -- is to
preserve the work you've done to date to that point.
But the reality is that work done to this date is still
there.  You don't need a ruling on that to say, hey, I
raised these issues before.

And to the extent anybody would think -- and I
don't think this quality group would -- that because
it's pre-MDL time they wouldn't get paid for it, no.
Payment is a directive of this court at the end of the
day and any contribution that is made.  So there's no
real reason whatsoever to make a court issue what is
basically a premature and an advisory opinion.  It's a
waste of time.

JUDGE CRABTREE:  All right.  Thank you very
much.  I think I understand where you are.  Before I
come back to anyone else, Mr. Grubb, I -- sort of the
same question for the plaintiff you represent.  You go
back down to where the home team football team went to
all the games they play, the appointment of counsel

order comes out, you like it, you don't like it, does

your -- does your client get on board with a

consolidated amended complaint?

        MR. GRUBB:  Certainly, Your Honor.

        JUDGE CRABTREE:  Okay.  And, Mr. Marshall --

is Mr. Marshall still here?  There you are.

        MR. MARSHALL:  Yes.

        JUDGE CRABTREE:  Good afternoon, sir.  I

think Mr. Geller had to leave, if I'm understanding it

right.  I think I know the answer from your standpoint

because you probably agree with what I've been told that

you prefer to have a ruling on the pending motion to

dismiss.  But your Local 282, your claim for that --

that group, is it inside a consolidated amended

complaint or is it not?

        MR. MARSHALL:  Eventually it would be inside

a consolidated complaint.

        JUDGE CRABTREE:  You wanted to say something

else and then we'll close and move to another subject.

        MR. BURNS:  Yes, Your Honor, just briefly.

Mr. Barnow and the Consensus plaintiffs obviously have

divergent views on what's in and without the complaint

and that's fine.

        JUDGE CRABTREE:  Smart people disagree.

        MR. BURNS:  I agree.  But I did just want to

114

touch on something just briefly because it does address
efficiency.  Mr. Barnow raised the issue of Local 282.
You heard that Local 282 supports our approach.  The
reason it does is that we have product indirect
purchaser claims in our suit.  Local 282 is on a
different position in the chain of distribution but its
fundamental claims are the same as the consumer claims.
So there's -- the efficiency here is that the
fundamental allegations have already been made in the
original pleading.

        If the court decided that original pleading, yes,
we would absolutely add the plaintiff from Local 282.
At that point though, if the fundamental allegations
have already survived -- and I don't want to presume but
we assume they will because they're well pleaded -- if
those fundamental allegations survive, I doubt if you're
going to see from the defendants a new round of motion
to dismiss briefing solely to address a new plaintiff in
a chain of distribution.

                JUDGE CRABTREE:  All right.

                MR. BARNOW:  Your Honor, if I might.

                JUDGE CRABTREE:  Yes.

                MR. BARNOW:  Briefly.  If a motion to
dismiss comes out adverse in the consumer cases with a
position that a number of consumers have taken and

should be taken in that case, to say that the defendants

will not come ahead and -- and pursue further arguments,

that doesn't make any sense to me.  I -- the *Aggarwal*

and those types of unfair pricing approaches are not

covered by that complaint.

One other point, and this I'm going to take a

little stab in the dark.  My recollection is, and

Mr. Burns can help me, is that their complaint does not

presently have a Sherman Act count in it whereas

Mr. Geller's does.  If that's true, then that's another

example of that being a piecemeal step.  But, in any --

either event it's a premature step.

JUDGE CRABTREE:  All right.  Well, let's --

MR. ZAMOFF:  Your Honor, may we be heard

briefly on this issue of consolidation?

JUDGE CRABTREE:  Why not.  I'm the one --

I'm the one that's obsessed with it, so...

MR. ZAMOFF:  I'm going to ask my partner

Mr. Levin to speak to it.

JUDGE CRABTREE:  How are you, Mr. Levin?

MR. LEVIN:  Very well.  Thank you, Your

Honor.  Thank you, Your Honor.  Good afternoon.  I hope

this isn't the last time we get to say this but we

actually fully agree with Mr. Barnow and the positions

that he's advocated in the terms of the consolidated

complaint.  And Your Honor has said it exactly right,
you're going to end up doing the same work twice if we
end up going down this path.

        It is simply not true that the motion to dismiss,
while I agree it's one heck of a motion to dismiss,
covers every single claim that's currently at issue in
the case.  The best example of that, Your Honor, is the
Geller -- Boies, Schiller complaint, the *Nordstrum*
complaint.  The allegation in that case is like the
*Sanofi* claim, that Mylan worked with PBMs in violation
of the antitrust laws and increased prices and entered
into exclusive dealing contracts.  That PBM allegation
does not appear in the *In re: EpiPen* complaint and
therefore it's not part of our motion to dismiss the
*In re: EpiPen* complaint.

        Which means that if there is not a consolidated
complaint, we absolutely will have a second round of
briefing because we think that claim fails as a matter
of law under the binding guidance of this circuit and
others under Section 2 of the Sherman Act.

        So, I mean, this happens all the time in MDLs.
This is exactly what the MDL wants, what the JPML wants
when it forms a MDL; case efficiencies, set level, start
fresh and get a consolidated complaint and then move the
case forward.

Two other quick points, Your Honor, if I may.
First we have suggested a schedule in our case
management order for doing this.  And I think as Your
Honor will see, that schedule is actually pretty quick.
It would result in an amended complaint within 30 to
45 days or so of today's hearing with motion to dismiss
briefing which is on the exact same timetable that
Judge Lungstrum held us to when we briefed the
*In re: EpiPen* motion to dismiss.  So that would be, you
know, 45 days for a motion and 45 days for a response
and so on.  So we're not seeking to delay the case.
We're actually quite the opposite trying to embrace
Rule 1 and do this in the most efficient way and that's
why we support going -- going down this path.

Your Honor, if I may, one other point just while
we're talking about scheduling issues and I don't want
to lose this thread, counsel on behalf of Sanofi said at
the end of their presentation that their motion to
dismiss should just get going and Your Honor sort of
summarized their position, let's just file the reply and
get going.

JUDGE CRABTREE:  That's what I heard him say
they wanted.

MR. LEVIN:  Well, there's a problem with
that.

JUDGE CRABTREE:  Okay.

MR. LEVIN:  We're not in the Third Circuit
anymore.  When the case is transferred by the JPML from
the Third Circuit to the Tenth Circuit, the governing
law becomes Tenth Circuit law.  That's what
Judge Lungstrum held in the *Syngenta* case and it's what
the vast majority of circuits have held in the context
of an MDL.

We briefed our motion to dismiss and, yes, we
think it's a very, very strong motion to dismiss
because, among other reasons, Sanofi made the exact
opposite argument and won it in a case of theirs in the
Third Circuit a couple of years ago.

But putting all that aside, it makes sense to
level set with that motion to dismiss as well.  And so
our suggestion with the Sanofi motion to dismiss is give
us some time, not long, 30 days or so, to rebrief our
motion to dismiss in the context that it would have been
briefed had we been in the District of Kansas from day
one all along.

They cited Tenth Circuit case law in opposition.
We didn't have the chance to do that because when we
filed our motion to dismiss we were in New Jersey.  So
we would respectfully suggest, Your Honor, 30 days for
Mylan to refile its motion to dismiss against Sanofi.

If -- this assumes it's on a separate track.  Obviously
we have our positions on that.  And Sanofi can have
30 days to rebrief its opposition.  We can have 21 days
to file our reply.  By Thanksgiving the motion is
briefed up.  Your law clerks won't have to deal with
various briefs that, you know, are based on two
different sets of law and it can be -- it can be in a
nice package for the court to decide again if the court
wants to put that case on its own track.

            JUDGE CRABTREE:  All right.  Thank you so
much.  I suppose you want to talk about the Tenth
Circuit and the Third Circuit.

            MR. BUCHWEITZ:  Just a couple of minutes on
that.  Sorry.  So first what Mylan said -- and, rather,
defendants said in their brief statement of factual
issues was -- on page 4 -- "as shown by the motions to
dismiss filed by Mylan and Pfizer to-date, plaintiffs
failed to state a claim for at least the following
reasons."  The only motion to dismiss filed to-date are
the one in Warren's case and the one in my case.  So
they must think that their motion to dismiss was good
enough.

       Second, they cited three Tenth Circuit decisions
in their case in their Third Circuit briefing in the
cases before Judge Wolfson.

Third, while we put in the support saying the transferee court under the *In re: Korea, Air Litigation* there is binding, it's still -- there's deference given to the transferor court, especially here where we know we're going back to Judge Wolfson in the Third Circuit at some point.

The -- the other point, Your Honor, is that, you know, I'm a little surprised to hear Mr. Levin saying that he's going to file a reply brief or a new motion to dismiss as to us. You know, Saiber LLC's counsel for Mylan in our case, Saiber's the one that argued the transfer motion. Saiber's the one that filed the motion to dismiss. I mean, there's a reason for that. Hogan Lovels is Sanofi's counsel in other matters. And, you know, Sanofi has never given Hogan consent to be adverse to us in this case. So that's another reason to keep these cases separate so that we can have our separate complaint continuing on the track with Saiber as our adversary.

And that's all I have to say for now.

JUDGE CRABTREE: That seems like plenty. Did you have a question before? You looked like you were getting ready to say something.

JUDGE JAMES: I have a number of questions. Why don't you go on down your plan.

JUDGE CRABTREE:  I was trying to add the
Tenth and Third Circuit together and get an average to
apply the law in the Sixth and a Half Circuit.

So before we leave this subject, because I do
want to go -- leave a little time for you to talk about
discovery and scheduling plan.

JUDGE JAMES:  Well, I want to go back to
the -- Mr. Barnow's argument, this issue about the
difference --

MR. BUCHWEITZ:  Should I sit down?

JUDGE JAMES:  -- in positions.  I may need
to go to another counsel, but my questions go to this
issue of amending the complaint and whether that's
necessary or not.  And one of my -- I mean, these issues
come up not just in MDLs but in any complex case.  It
seems like we always have issues after a motion to
dismiss is filed of folks wanting to amend their
complaint and then there's this issue about efficiency
should we allow them to amend the complaint or should we
decide the motion to dismiss.  I mean, that's not
unusual.

As to this issue about amending the complaint to
overcome the deficiencies that are the basis for the
motion to dismiss, I'm presuming that all of the motion
to dismiss issues could not be resolved by amending the

pleadings; is that correct?  In other words, the --

            JUDGE CRABTREE:  You're talking to
Mr. Barnow.

            JUDGE JAMES:  Yes.  In other words, the
motion to dismiss presumably might decide issues that --
or finding that you couldn't just amend your pleadings
to correct the problem.

            MR. BARNOW:  That is -- that's the harm that
could be done.  First -- yeah, first of all, there's
different rules that deal with how many times you can
amend a pleading.

            JUDGE JAMES:  Right.

            MR. BARNOW:  But even if what you're saying
is correct, what transcends all of that is the waste of
time in doing it, particularly as I mentioned earlier
how precious time is in a case with a product that has a
18-month life.  I know I'm going a little bit off course
here but you're correct.  That statement's correct.  And
they don't even have -- they don't represent some counts
the way they're represented in other situations.

            The easiest way to look at it, as I see it, is
that was put together before the playing field was
designed.  It's -- I'm not going to say it's premature.
At the point it was prepared, that's what existed but
it's no longer the deal that's easily emphasized by

Mr. Geller's case, let alone this problem with --
separation issue with ERISA which is a whole different
thing altogether, issue.  So, yeah, it's just
ineffective.  It doesn't conclude issues and it wastes
everybody's time, including the class's and the court.

JUDGE JAMES:  It looks like Mr. Burns wants
to say something.

MR. BARNOW:  Before he pushes me over here,
I better sit down.

MR. BURNS:  Mr. Barnow strategically placed
me so I could catch the sun's rays there for a while.

So, no, in fairness, again, we do have
disagreement on apparently what's unalleged -- what's
alleged in our complaint.  If I heard Your Honor correct
though I think the answer to your question is certainly
the defendants' position is that you can amend until the
cows come home and there are issues we're going to let
on regardless.  And I think that is their position.  And
it points actually to the efficiency of proceeding in
the way we have advanced to the court.

I think it's telling that the opposition to
proceeding this way keeps going back to Mr. Geller's
cases.  Obviously Mr. Geller is not here, his co-counsel
is.  They support proceeding in this fashion because
they know that these issues if resolved now are going to

narrow anything that comes afterwards.  All right.  So
fundamentally that is -- that is where we're at and
that's why we're advancing this position.

    We have no desire to make the court engage in
duplicative work, we simply don't because we know that
will go down against us.  But we think there are great
efficiencies to be gained by addressing these issues
that have been fully briefed and will remain in the case
and the allegations will not change.  Those allegations
should be addressed at this point.

    JUDGE CRABTREE:  All right.  Let's maybe
move to our last subject of the day and I don't
anticipate that we can get a lot done here, but on
page 3 there are -- following the discussions of the
motion to dismiss, Judge James, the agenda wanders into
your territory, discovery and scheduling.  So your
airplane.

    JUDGE JAMES:  All right.  Thank you,
Judge Crabtree.  And, first of all, I just want to
reiterate from my standpoint what Judge Crabtree has
said for himself so far and that is I'm also a rookie at
presiding in a MDL action but I'm delighted to be here
and have the opportunity to work with what are obviously
great lawyers who are very capable and skilled in these
sorts of matters.  And I also am delighted to be at the

task with Judge Crabtree who you can probably already
tell is not only bright but a good personality and I
look forward to working with him in this case.

As he said, I don't know that we can really do
anything with regard to discovery today but I will just
tell you that my task here in this case will be to keep
the case moving.  And in the interest of Rule 1, keep
the case expedited and efficient and try and resolve the
issues as quickly and efficiently as possible.

There are some issues listed in the agenda that I
just might give you a heads up and you all probably do
these things and would do this even if we didn't say
anything about it, but the -- the agenda you were given
talks about under case management orders things like
protective orders, ESI protocol, document preservation.
I hope you all will be talking and conferring amongst
yourselves.  I don't know but I'm wondering whether,
regardless of whether there's one track, two tracks or
three tracks, the same protective order could be entered
to govern all of the cases even if there are separate
tracks.  So I hope those sorts of things you counsel
will be talking about amongst yourselves.

If you haven't already done it, I will direct you
to our ESI guidelines on the District of Kansas website.
I think those are very good.  They're probably longer

than what you really need.  I think the guidelines are
12 or 15 pages long but they provide a lot of helpful
information and a long list of questions that you should
think about in terms of trying to establish your ESI
protocol.  So please be mindful of that.

     Also of course we always talk early on in
scheduling about document preservation and how that
looks and being sure that you're talking to your clients
about those important issues, especially in a complex
case such as this.

     So I am not going to get into specifics but I
will tell you that although the District of Kansas,
we're not like our friends across the river in the
Western District of Missouri, we do not have a local
rule that requires that before you file a discovery
motion, a motion to compel that you contact the court
and request a conference before you file such a motion.
We don't require that but I will tell you that it is my
practice to encourage counsel, let them know that not
only is it okay but I encourage you to contact my
chambers by phone or e-mail before you haul off and file
a motion and let us try and help narrow the issues at
least before anybody starts briefing.

     Also along that line our local rule does require
that you meet and confer in good faith, as I think all

jurisdictions do now, before you file a motion to
compel.  I have a special footnote to that rule which is
to me "conferring" means you actually have to talk to
each other.  So don't just give me an e-mail string with
a motion to compel.  I want -- I'm old and old-fashioned
and I think you need to talk to each other.

So, as I said, I look forward to working with all
of you in the case.  And, you know, I think Judge
Crabtree and I both view this -- our jobs as trying to
make your jobs easier to make the prosecution of the
case go as smoothly as possible and so we'll do what we
can to make that happen.  Back to you.

JUDGE CRABTREE:  Let me turn to just some --
thank you very much -- preview of coming attractions.
There will be much work to do but let's get -- let's get
some structure to the case and let us make some of these
threshold determinations and get that order issued and
make I think more sense to try to have that discussion.

And I -- just on the final subjects that are on
the agenda, there is a entry there on page 4.  I don't
remember who suggested it but the initial discovery
regarding requests for immediate production and then the
timing of Rule 26 disclosures, the stay will remain in
effect until we get a schedule going.  I understand.
Don't get used to this.  This won't happen often.  But

until we get a structure that we can hold the case in,
the stay that's entered will continue.  And certainly as
part of the comprehensive scheduling effort, the Rule 26
disclosures will get done.  I'd encourage you all to
think about, particularly from the plaintiffs' side,
whether fact sheets and the things like that can shorten
the work for everybody, but that's premature.

On the -- on the plaintiff -- there was an entry
the plaintiffs' right to reserve -- request to reserve
rights to seek remand for the class in the *Sanofi* cases,
I don't know that you have to reserve it but you've made
it clear and I -- I know there's case law, including
recently from our *Syngenta* MDL about what you can do to
give that up, but I get it.  I heard you loud and clear
and message received.

On the *pro hac vice* front, it's suspended.  You
do not have to retain local counsel.  Certainly I know
some of you have decided to do that.  That's your choice
but you don't need to.  You don't need to do that.  You
don't need to process a *pro hac*.  If you choose to,
that's your right.

The ECF registration is a different matter.  I
think we -- I addressed that in the initial Document 2
order.  And if you haven't gotten yourself registered,
you won't have any idea what's going on so you ought to

get registered.  If you have difficulties, by all means
let Ms. Garrett or Ms. Kuhl know that or we -- we can --
we have a very helpful clerk's office and they will help
you get across any impediments you encounter.

        And last on the entry of the plaintiffs'
preference to waive the 30-day time limit under our
local Rule 37.1, I think we'll save that discussion for
another day.  With your permission, it's your orbit.

            JUDGE JAMES:  Yes.  I think that's fine.
And we deal with this issue a lot in cases like this
where there's rolling productions, so we talk about how
all that will work.

            JUDGE CRABTREE:  And I'll just say, this is
just free advice as a practitioner, one of the joys of
practicing in the District of Kansas is you can actually
call your magistrate judge.  You will be heard.  There
may be an informal discussion that will enable the
magistrate judge to determine what she needs to know to
get her arms around the issue and give you an efficient
ruling that will keep the case moving.  We try not to
let issues that can be resolved quickly slow everyone
down.  So you heard it, we don't have a local rule that
requires.  Just privately, you're crazy if you don't.
So that's my free advice for the day.

            Thank you very much.  I found it a very -- well,

I'll be honest with you, when I got called about this, I said -- I thought to myself I have 185 criminal defendants. Why do I need another multi-level game of chess. And one of my colleague said, "You don't get it. These are the best lawyers in the country. They present the issues in a way that's just really fun. You will enjoy yourself."

Well, I hope this is a preview of the remainder of the case. It was -- it was a lot -- a lot and I at times thought I was going to hurt myself trying to drink from the -- from the fire hydrant but I think I came out of it unscathed. Certainly you advanced my understanding of the problems and the issues. We'll go to work on getting our next installment to you but I'm really grateful for your preparation and your appearance here today.

To those of you who are traveling -- I guess you're all traveling in some sense, travel safely. And I'll look forward to seeing you again at the end of the month. Anything else before we ring the bell and all go home?

MR. ZAMOFF:  Your Honor --

JUDGE CRABTREE:  You're the last thing between us and a clean get away.

MR. ZAMOFF:  I'm Zamoff, I'm used to coming

at the end.

JUDGE CRABTREE:  All right.  I'll bet you
are.

MR. ZAMOFF:  Just scheduling issue, judge,
you mentioned that you were throwing a couple darts on
the scheduling front.  The dart for the 27th has hit
both me and Mr. Levin.  We have conflicting court
appearances at the time you've set for the 27th.  We're
working on trying to fix those or trying to move those.
But if you have another dart in your arsenal and there's
another time that would be convenient to folks to do it,
it would -- it would alleviate that burden on us.  But
we're in a position right now where neither of us could
attend.

JUDGE CRABTREE:  Well, I'm sorry for that.
I actually threw two darts, you -- as you correctly
pointed out.  Here's my view of this:  I'll never be
able to hit a day that's perfect.  But when I get the --
when I get the order out on the designated counsel
roles, I'm not -- I'm not a nut job about this.  If you
all want to talk and find a solution that -- that is
within reasonable reach of the date that I've selected,
I'll entertainment that.  I'll tell you don't pick any
Mondays.  I've got a criminal docket every Monday.  I'm
already spoken for.  But if there is a solution that can

be made that can be imposed, we'll try to find a way
around that and work with you on those sorts of things.

        MR. ZAMOFF:  Okay.  Thank you.  We'll work
with counsel on that.  Thank you very much.

        JUDGE CRABTREE:  Anything else anyone?  All
right.  Safe travels everyone.  Thank you very much.

        (Proceedings adjourned.)

                    CERTIFICATE

    I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.

    DATE:  September 11, 2017


                    /s/Kimberly R. Greiner
                    KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter