**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>**This Document Relates To Consumer Class Cases** | 2:17-md-2785<br>MDL 2785 |

**THE MYLAN DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 5

STANDARD OF REVIEW ..... 8

ARGUMENT ..... 9

I. PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM. ..... 9

A. Plaintiffs Fail to State a Tying Claim Regarding the EpiPen "Two-Pack." ..... 10

B. Plaintiffs Fail to State an Antitrust Claim Under Section 3 of Clayton Act. ..... 12

1. Plaintiffs' Allegations Regarding PBM Rebates Fail to State a Claim. ..... 13

2. Plaintiffs' EpiPen4Schools Allegations Fail to State a Claim. ..... 19

C. Plaintiffs Fail To Allege Causation For Their Antitrust Claims Regarding Patent Settlements. ..... 20

1. Plaintiffs Concede That Teva and Sandoz Did Not and Do Not Have FDA Approval to Launch a Generic EpiPen Auto-Injector. ..... 21

2. Plaintiffs Concede the Patents for EpiPen Auto-Injectors Do Not Expire Until 2025 ..... 23

D. Plaintiffs Fail to Allege a Plausible Conspiracy Between Mylan and Pfizer ..... 24

E. Plaintiffs Fail to Allege Unlawful "Reverse" Patent Settlements, and Their Reverse Payment Claims Are Time-Barred in Any Event. ..... 28

F. Mylan's Citizen Petition to the FDA Could Not Have Prevented Teva's Entry and Is Immune From the Antitrust Laws. ..... 28

G. Plaintiffs Fail to State an Antitrust Claim Regarding Allegedly "Misleading" Statements. ..... 32

1. Plaintiffs' Allegations About Mylan's Supposed Statements About Auvi-Q Do Not Overcome the *De Minimis* Presumption. .................... 33

2. Plaintiffs' Allegations About Physician Statements Do Not Overcome the *De Minimis* Presumption. .................... 35

H. Plaintiffs Fail to State a Claim Under Various State Antitrust Laws. ...... 36

II. PLAINTIFFS FAIL TO STATE A RICO CLAIM. .................... 38

A. The Complaint Fails to Allege the Existence of a RICO Enterprise. ........ 39

B. The Complaint Does Not Adequately Allege that Defendants Conducted the Affairs of the Alleged RICO Enterprise. .................... 43

C. Plaintiffs Do Not Allege a Pattern of Racketeering Activity. .................... 45

D. Plaintiffs Fail to Plead RICO Causation. .................... 46

E. The Complaint Does Not Adequately Allege Racketeering Activity. ...... 48

F. Plaintiffs Lack Standing to Bring a RICO Claim. .................... 50

G. Plaintiffs Fail to Plead a RICO Conspiracy. .................... 51

H. Naming Ms. Bresch as a Defendant Is Malicious and Improper. ............. 52

III. PLAINTIFFS' CONSUMER PROTECTION CLAIMS (COUNT VIII) FAIL. .................... 53

A. Plaintiffs Lack Standing to Bring Consumer Protection Claims. ............. 53

1. Plaintiffs Have Not Adequately Pled an Injury-in-Fact. ............... 54

2. Plaintiffs Also Fail to Satisfy the "Fairly Traceable" Element. .... 56

B. Plaintiffs' Consumer Protection Claims Are Preempted by Federal Patent Law. .................... 58

C. Plaintiffs Fail to Plead the Elements of Their Consumer Protection Claims. .................... 60

1. Plaintiffs Fail to Allege Deceptive or Misleading Conduct. ......... 60

a. Alleged Misrepresentations About Pricing and Packaging. ...... 61

b. Other Alleged Misstatements and Omissions. .................... 64

2. Plaintiffs Fail to Plead Unfair or Unconscionable Conduct.......... 66

3. Plaintiffs Fail to Plead Actual Loss. ............................................ 70

4. Plaintiffs Do Not Plead Reliance or Causation............................ 70

5. Plaintiffs Fail to Plead Their Claims with Particularity................ 72

6. Plaintiffs' Claims Under Certain State Laws Fail Because Those Laws Do Not Permit Class Actions and For Other State-Specific Reasons................................................................ 72

IV. PLAINTIFFS' UNJUST ENRICHMENT CLAIM (COUNT IX) FAILS. .......... 74

CONCLUSION.......................................................................................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013)....20

*In re Actos End-Payor Antitrust Litig.*,
848 F.3d 89 (2d. Cir. 2017)....20

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014)....23

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*,
592 F.3d 991 (9th Cir. 2010)....16

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)....70

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,
323 F.3d 366 (6th Cir. 2003)....34

*Am. Freedom Law Ctr. v. Obama*,
821 F.3d 44 (D.C. Cir. 2016)....57

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*,
108 F.3d 1147 (9th Cir. 1997)....33

*In re Am. Express Co. S'holder Litig.*,
39 F.3d 395 (2d Cir. 1994)....47

*Anderson v. Hannaford Bros. Co.*,
659 F.3d 151 (1st Cir. 2011)....67

*Anderson v. Kimberly-Clark Corp.*,
570 F. App'x 927 (Fed. Cir. 2014)....5

*Andrx Pharm., Inc. v. Biovail Corp. Int'l.*,
256 F. 3d 799 (D.C. Cir. 2001)....21

*Anheuser-Busch, Inc. v. Abrams*,
520 N.E.2d 535 (N.Y. 1988)....36

*Antonson v. Robertson*,
141 F.R.D. 501 (D. Kan. 1991)....75

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016)....................................................................................29, 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................8, 41

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)...................................................................................................14

*Avanzo v. Rhode Island Dep't of Human Servs.*,
625 A.2d 208 (R.I. 1993) ..........................................................................................34

*Azim v. Tortoise Capital Advisors, LLC*,
No. 13-2267, 2014 WL 707235 (D. Kan. Feb. 24, 2014)...........................................20

*Balthazar v. Verizon Hawaii, Inc.*,
109 Haw. 69, 123 P.3d 194 (2005) (Hawaii HUPUCA) ...........................................67

*BancOklahoma Mortg. Corp. v. Capital Title Co.*,
194 F.3d 1089 (10th Cir. 1999) ..........................................................................38, 43, 45

*Baptist Health v. Murphy*,
365 Ark. 115, 226 S.W.3d 800 (2006).......................................................................68

*Barr Lab. v. Quantum Pharmics, Inc.*,
No. 90-CV-4406, 1994 WL 1743983 (E.D.N.Y. Feb. 7, 1994) ..................................24

*Barry Wright Corp. v. ITT Grinnell Corp.*,
724 F.2d 227 (1st Cir. 1983).......................................................................................16

*Belk, Inc. v. Meyer Corp., U.S.*,
679 F.3d 146 (4th Cir. 2012) ......................................................................................67

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................ *passim*

*Bergstrom v. Noah*,
974 P.2d 520 (Kan. 1999)...........................................................................................36

*Berneike v. CitiMortgage, Inc.*,
708 F.3d 1141 (10th. Cir. 2013) .................................................................................21

*Biotech. Indus. Org. v. Dist. of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007).....................................................................58, 59, 60, 70

*Bixler v. Foster*,
596 F.3d 751 (10th Cir. 2010) ....................................................................................38

*Blough v. Holland Realty, Inc.*,
574 F.3d 1084 (9th Cir. 2009) ....................10, 12

*Bonito Boats, Inc. v. Thunder Craft Boats Inc.*,
489 U.S. 141 (1989)....................59

*Boyle v. United States*,
556 U.S. 938 (2009)....................39

*Brannon v. Boatmen's First Nat. Bank of Oklahoma*,
153 F.3d 1144 (10th Cir. 1998) ....................40

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)....................47

*Bristol-Myers Squibb Co. v. IVAX Corp.*,
77 F. Supp. 2d 606 (D.N.J. 2000) ....................13

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................14, 16

*Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*,
No. Civ. A.03-232, 2004 WL 1427136 (E.D. Pa. June 21, 2004) ....................22

*Brown v. Buhman*,
822 F.3d 1151 (10th Cir. 2016) ....................53

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) ....................11

*Campfield v. State Farm Mut. Auto Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008) ....................11

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ....................13

*Cayman Expl. Corp. v. United Gas Pipe Line Co.*,
873 F.2d 1357 (10th Cir. 1989) ....................27

*CBC Cos. v. Equifax, Inc.*,
561 F.3d 569 (6th Cir. 2009) ....................24

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001)....................39, 40

*Cel-Tech Commc'ns., Inc. v. L.A. Cell. Tel. Co.*,
20 Cal. 4th 163 (1999) ....................68

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) ....................................................46

*Christie v. Dalmig, Inc.*,
136 Vt. 597 (Vt. 1979)....................................................67

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) ....................................................9

*Ciardi v. F. Hoffman-La Roche, Ltd.*,
762 N.E. 2d 303 (Mass. 2002) ....................................................37

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ....................................................27

*City of Pittsburgh v. W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998)....................................................17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................................................53

*In re ClassicStar Mare Lease Litig.*,
727 F.3d 473 (6th Cir. 2013) ....................................................40

*Cloverdale Equip. Co. v. Simon Aerials, Inc.*,
869 F.2d 934 (6th Cir. 1989) ....................................................75

*Colorado Outfitters Ass'n v. Hickenlooper*,
823 F.3d 537 (10th Cir. 2016) ....................................................56

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)....................................................28

*Crawford v. Franklin Credit Mgmt. Corp.*,
758 F.3d 473 (2d Cir. 2014)....................................................48

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) ....................................................44

*Damon v. Groteboer*,
937 F. Supp. 2d 1048 (D. Minn. 2013)....................................................71

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ....................................................60, 70

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012)....................................................37

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)....................37

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986), *amended on other grounds*, 810 F.2d 1517 (9th Cir. 1987) (California) ....................38

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
784 F. Supp. 2d 508 (D.N.J. 2011) ....................51

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) ....................38

*Duspiva v. Fillmore*,
154 Idaho 27 (2013)....................68

*Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s*,
998 S.W.2d 821 (Mo. Ct. App. 1999)....................37

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961).................... *passim*

*Eike v. Allergan, Inc.*,
850 F.3d 315 (7th Cir. 2017) (en banc), *reh'g denied* ....................2, 55

*Eisai v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016)....................14, 15, 17

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC*,
No. 08-cv-4168, 2014 WL 1343254 (D.N.J. Mar. 28, 2014) ....................15, 34

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC*,
No. 08-cv-4168 (D.N.J. Aug. 18, 2008) ....................15

*Eli Lilly Co. v. Zenith Goldline Pharm., Inc.*,
172 F. Supp. 2d 1060 (S.D. Ind. 2001) ....................23

*Estate of Hicks ex rel. Summers v. Urban E., Inc.*,
92 P.3d 88 (Okla. 2004)....................67

*Estate of Lockett v. Fallin*,
841 F.3d 1098 ....................8

*Ferrari v. Mercedes-Benz USA, LLC*,
No. 15-CV-04379-YGR, 2016 WL 7188030 (N.D. Cal. Dec. 12, 2016)....................52, 53

*Fiala v. Wasco Sanitary Dist.*,
No. 10 C 2895, 2012 WL 917851 (N.D. Ill. 2012) ....................50

*Fitzgerald v. Chrysler Corp.*,
116 F.3d 225 (7th Cir. 1997) ....................................................................................40

*In re Flonase Antitrust Litig.*,
692 F. Supp. 2d 524 (E.D. Pa. Jan. 21, 2010)...........................................................37

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
582 F.3d 1216 (10th Cir. 2009) ..................................................................................32

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*,
Civ. No. 12-cv-02432, 2015 WL 8479746 (D. Colo. Dec. 10, 2015) ......................73

*F.T.C. v. Actavis, Inc.*,
570 U.S. 136 (2013)....................................................................................................25

*F.T.C. v. Freecom Commc'ns, Inc.*,
401 F.3d 1192 (10th Cir. 2005) ............................................................................61, 62

*Gallegos v. LVNV Funding LLC*,
169 F. Supp. 3d 1235 (D. Utah 2016).......................................................................68

*Gallup Med Flight, LLC v. Builders Tr. of New Mexico*,
240 F. Supp. 3d 1161 (D.N.M. 2017) .......................................................................17

*Garshman v. Universal Res. Holding, Inc.*,
625 F. Supp. 737 (D.N.J. 1986) ................................................................................13

*Gasoline Sales, Inc. v. Aero Oil Co.*,
39 F.3d 70 (3d Cir. 1994)...........................................................................................52

*Gen. Gases & Supplies Corp. v. Shoring Forming Syts.*,
2001 TSPR 54 (P.R. Apr. 18, 2001) .........................................................................36

*George v. Al Hoyt & Sons, Inc.*,
27 A.3d 697 (N.H. 2011) ...........................................................................................68

*George v. Urban Settlement Servs.*,
833 F.3d 1242 (10th Cir. 2016) ............................................................................40, 48

*Gonzalez v. Bank of Am.*,
No. H-09-2946, 2011 U.S. Dist. LEXIS 16963 (S.D. Tex. Feb. 20, 2011) ..............40

*Gross v. Waywell*,
628 F. Supp. 2d 475 (S.D.N.Y. 2009)...................................................................38, 52

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
68 F. Supp. 2d 1064 (D. Minn. 1999).......................................................................62

*Gunderson v. Univ. of Alaska, Fairbanks*,
902 P.2d 323 (Alaska 1995)....................36

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ....................74

*Hale v. Stryker Orthopaedics*,
No. 08-3367 (WJM), 2009 WL 321579 (D.N.J. Feb. 9, 2009)....................51

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015)....................13

*Hanrahran v. Specialized Loan Servicing, LLC*,
54 F. Supp. 3d 149 (D. Mass. 2014) ....................67

*Harte v. Bd. of Comm'rs of Cty. of Johnston Cty., Kan.*,
No. 13-2586-JWL, 2014 WL 5089410 (D. Kan. Oct. 9, 2014) ....................8

*Hemi Grp., LLC v. City of New York*,
N.Y., 559 U.S. 1 (2010) ....................47, 48

*Hendricks v. DSW Shoe Warehouse Inc.*,
444 F. Supp. 2d 775 (W.D. Mich. 2006) ....................64

*Hibdon v. Safeguard Properties, LLC*,
No. CIV. PJM 14-591, 2015 WL 4249525 (D. Md. July 9, 2015) ....................67

*Hines v. Davidowitz*,
312 U.S. 52 (1941)....................58

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)....................45

*Holland v. Tandem Computers Inc.*,
49 F.3d 1287 (8th Cir. 1995) ....................75

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992)....................20

*Howard v. Turnbull*,
316 S.W.3d 431 (Mo. Ct. App. 2010)....................74

*Hucke v. Kubra Data Transfer, Corp.*,
160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015) ....................67

*Hunnicutt v. Zeneca, Inc.*,
No. 10-CV-708, 2012 WL 4321392 (N.D. Okla. Sep. 19, 2012) ....................37

*Ideal Plumbing Co. v. Benco, Inc.*,
382 F. Supp. 1161 (W.D. Ark. 1974), *aff'd*, 529 F.2d 972 (8th Cir. 1976)....36

*Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*,
760 F.2d 607 (5th Cir. 1985)....13

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....9, 26

*J.S. McCarthy Co. v. Brausse Diecutting & Converting Equip., Inc.*,
No. CIV. 04-107-B-W, 2005 WL 946318 (D. Me. Apr. 22, 2005)....71

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
407 F.3d 1027 (9th Cir. 2005)....28

*James River Ins. Co. v. Rapid Funding, LLC*,
658 F.3d 1207 (10th Cir. 2011)....74

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)....10, 11, 17

*Johnson v. Microsoft Corp.*,
834 N.E. 2d 791 (Ohio 2005)....68, 69

*Kessel v. Monongalia Cty. Gen. Hosp. Co.*,
648 S.E.2d 366 (W. Va. 2007)....36, 37

*Key Fin. Planning Corp. v. ITT Life Ins. Corp.*,
828 F.2d 635 (10th Cir. 1987)....25

*Kim v. Carter's Inc.*,
598 F.3d 362 (7th Cir. 2010)....70

*Kimble v. Marvel Entm't, LLC*,
135 S. Ct. 2401 (2015)....26, 27

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
No. 06-cv-1797, 2014 WL 2813312 (E.D. Pa. June 23, 2014)....27

*Lenox MacLaren Surgical Corp v. Medtronic, Inc.*,
762 F.3d 1114 (10th Cir. 2014).... *passim*

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
847 F.3d 1221 (10th Cir. 2017)....28

*Levi Case Co. v. ATS Prod., Inc.*,
788 F. Supp. 428 (N.D. Cal. 1992)....28

*Lighthouse Grp., LLC v. Strauss*,
No. 9:15-CV-02463-DCN, 2016 WL 562100 (D.S.C. Feb. 12, 2016)....................................67

*In re Lidoderm Antitrust Litig.*,
103 F. Supp. 3d 1155, 1163 (N.D. Cal. 2015) ........................................................................37

*In re Lipitor Antitrust Litig.*,
No. 3:12-cv-2389 (PGS), 2013 WL 4780496 (D.N.J. Sept. 5, 2013)................................30, 31

*Longmont United Hosp. v. Saint Barnabas Corp.*,
No. 06 - 2802, 2007 WL 1850881 (D.N.J. June 26, 2007).......................................................24

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007)...................................................................................................36

*Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*,
No. 07 Civ. 7343 (HB), 2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009) .................................30

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..........................................................................................................54, 56

*M.T. v. Saum*,
7 F. Supp. 3d 701 (W.D. Ky. 2014) ...........................................................................................68

*Mack v. Bristol-Myers Squibb Co.*,
673 So. 2d 100 (Fla. 1st Dist. Ct. App. 1996)...........................................................................36

*Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*,
896 F. Supp. 2d 650 (E.D. Mich. 2012)......................................................................................50

*Marrone v. Philip Morris USA, Inc.*,
850 N.E.2d 31 (Ohio 2006).........................................................................................................73

*In re Mastercard Int'l Inc.*,
132 F. Supp. 2d 468 (E.D. La. 2001) ..........................................................................................40

*McCarthy v. Recordex Serv., Inc.*,
80 F.3d 842 (3d Cir. 1996)...........................................................................................................50

*McKinney v. Bayer Corp.*,
744 F. Supp. 2d 733 (N.D. Ohio 2010)........................................................................................74

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
859 F.3d 408 (7th Cir. 2017) ........................................................................................................18

*Metromedia Broad. Corp. v. MGM/UA Entm't Co.*,
611 F. Supp. 415 (C.D. Cal. 1985) ..............................................................................................11

*Midwest Grinding Co. v. Spitz*,
976 F.2d 1016 (7th Cir. 1992) ....................45, 49

*Mink v. Suthers*,
482 F.3d 1244 (10th Cir. 2007) ....................56

*Monsanto Co. v. Scruggs*,
342 F. Supp. 2d 568 (N.D. Miss. 2004)....................36

*Monus v. Colo. Baseball 1993, Inc.*,
No. 95-1099, 1996 WL 723338 (10th Cir. Dec. 17, 1996)....................75

*Moran v. Prime Healthcare Mgmt.*, Inc.,
208 Cal. Rptr. 3d 303 (Ct. App. 2016) ....................70

*Morrison v. Viacom, Inc.*,
66 Cal. App. 4th 534 (Cal. Ct. App. 1998) ....................36

*N. Ala. Fabricating Co., Inc. v. Bedeschi Mid-W. Conveyor Co.*,
No. 16-2740-DDC-TJJ, 2017 WL 1836973 (D. Kan. May 8, 2017)....................8

*N. Am. Safety Valve Indus., Inc. v. Wolgast*,
Civ. A. No. 85-2575, 1986 WL 15792 (D. Kan. Nov. 13, 1986) ....................56

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
54 F. Supp. 3d 1189, 1245 (D.N.M. 2014) ....................50, 71

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958)....................10

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
850 F.2d 904 (2d Cir. 1988)....................33

*Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*,
546 F.3d 1288 (10th Cir. 2008) ....................25

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016)....................23

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) (en banc) ....................15

*Nova Health Sys. v. Gandy*,
416 F.3d 1149 (10th Cir. 2005) ....................56

*Novartis Corp. v. F.T.C.*,
223 F.3d 783 (D.C. Cir. 2000)....................61

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ....................................................................................33

*Omega Envt'l, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ......................................................................................16

*Onat v. Penobscot Bay Med. Ctr.*,
574 A.2d 872 (Me. 1990).............................................................................................36

*Pac. Bell Tel. Co. v. Linkline Commcn's, Inc.*,
555 U.S. 438 (2009).....................................................................................................14

*Paltre v. Gen. Motors Corp.*,
26 A.D.3d 481 (N.Y. App. Div. 2006) ..........................................................................62

*Paul v. Pulitzer Pub. Co.*,
No. 74-327C(A), 1974 WL 887 (E.D. Mo. May 24, 1974) ..........................................11

*In re Pharm. Indus. Average Wholesale Price Litig.*,
263 F. Supp. 2d 172 (D. Mass. 2003) ...........................................................................43

*In re Plavix Indirect Purchaser Antitrust Litig.*,
No. 1:06-cv-226, 2011 WL 335034 (S.D. Ohio Jan. 31, 2011).....................................70

*In re Pool Prods. Dist. Market Antitrust Litig.*,
946 F. Supp. 2d 554 (E.D. La. 2013)............................................................................37

*Prager v. LaFaver*,
180 F.3d 1185 (10th Cir. 1999) ....................................................................................63

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus. Inc.*,
508 U.S. 49 (1993)...................................................................................................29, 30

*Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*,
144 So. 3d 1011 (La. 2014) ..........................................................................................67

*Quigley v. Esquire Deposition Servs., LLC*,
975 A.2d 1042 (N.J. Super. Ct. App. Div. 2009)..........................................................68

*Rail-Trailer Co. v. ACF Indus., Inc.*,
358 F.2d 15 (7th Cir. 1966) ..........................................................................................26

*Read v. Med. X-Ray Ctr., P.C.*,
110 F.3d 543 (8th Cir. 1997) ........................................................................................17

*Reid v. Unilever U.S., Inc.*,
964 F. Supp. 2d 893 (N.D. Ill. 2013) ...........................................................................71

*In re Relafen Antitrust Litig.*,
221 F.R.D. 260 (D. Mass. 2004) (Kansas)....................................................................38

*Resolution Trust Corp. v. Stone*,
998 F.2d 1534 (10th Cir. 1993) ...........................................................................................45

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
842 F.3d 883 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1349 (2017).......................................33

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)...........................................................................................................43, 45

*Ex parte Rice*,
67 So.2d 825 (Ala. 1953)..........................................................................................................36

*Rivera v. Wyeth-Ayerst Lab.*,
283 F.3d 315 (5th Cir. 2002) ...................................................................................................54

*RJR Nabisco, Inc. v. European Cmty.*,
136 S. Ct. 2090 (2016)..............................................................................................................40

*Robins v. Glob. Fitness Holdings, LLC*,
838 F. Supp. 2d 631 (N.D. Ohio 2012).....................................................................................40

*Rocha v. CCCF Admin.*,
408 F. App'x 141 (10th Cir. 2011) ..............................................................................................8

*Rodriguez v. Chase Home Fin., LLC*,
No. 10 C 05876CH, 2011 WL 5076346 (N.D. Ill. Oct. 25, 2011) .........................................67

*Rose v. Vulcan Materials Co.*,
194 S.E.2d 521 (N.C. 1973)......................................................................................................36

*Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
72 Cal. App. 4th 861 (1999) ......................................................................................................66

*Sands v. Ticketmaster-N.Y., Inc.*,
616 N.Y.S.2d 362 (N.Y. App. Div. 1994) ...................................................................................66

*Sanofi-Aventis U.S. LLC v. Mylan Inc.*,
No. 2:17-cv-02452-DDC-TJJ (D. Kan. Apr. 24, 2017)..........................................................17

*Sanofi-Aventis U.S. LLC v. Mylan Inc.*,
No. 2:17-cv-02452-DDC-TJJ (D. Kan. Jul. 28, 2017)............................................................15

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006)...........................................................................................58, 69

*Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*,
401 F.3d 123 (3d Cir. 2005)....................................................................................35

*Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*,
710 F.2d 87 (2d Cir. 1983) (New York) ................................................................38

*SCFC ILC, Inc. v. Visa USA, Inc.*,
36 F.3d 958 (10th Cir. 1994) ..................................................................................12

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
870 F.2d 397 (7th Cir. 1989) ..................................................................................34

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009) ...............................51

*Schrag v. Dinges*,
788 F. Supp. 1543 (D. Kan. 1992)..........................................................................46

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) (Stevens, J., concurring)........................................................73

*Sharp v. United Airlines, Inc.*,
967 F. 2d 404 (10th Cir. 1992) ...............................................................................20

*Shepard v. DineEquity, Inc.*,
No. CIV. A. 08-2416-KHV, 2009 WL 8518288 (D. Kan. Sept. 25, 2009)............48

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
No. 10-cv-1077, 2011 WL 2174499 (D. Del. May 26, 2011) ................................28

*Silverstein v. Procter & Gamble Mfg. Co.*,
No. CV 108-003, 2008 WL 4889677 (S.D. Ga. Nov. 12, 2008) ............................71

*Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*,
836 S.W.2d 907 (Ky. Ct. App. 1992) .....................................................................74

*Smith v. Smith & Nephew, Inc.*,
5 F. Supp. 3d 930, 932 (S.D. Ohio 2014) ...............................................................74

*In re Solodyn (Minocylcine Hydrochloride) Antitrust Litig.*,
No. 14-MD-02503-DJC, 2015 WL 5458570 (D. Mass. Sept. 16, 2015)...........................22, 30

*Southeastern Pa. Transp. Auth. v. Gilead Scis., Inc.*,
102 F. Supp. 3d 688 (E.D. Pa. 2015).......................................................59, 60, 70

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)............................................................................................54

*Sports Racing Servs., Inc. v. Sports Car Club of America, Inc.*,
131 F.3d 874 (10th Cir. 1997) ....................10

*Sprint Nextel Corp. v. Middle Man, Inc.*,
No. 12-2159-JTM, 2013 WL 1197137 (D. Kan. Mar. 25, 2013) ....................10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-md-01819 CW, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2013)....................37

*Stolz v. Fage Dairy Processing Indus., S.A.*,
No. 14-CV-3826, 2015 WL 5579872 (E.D.N.Y. Sept. 22, 2015) ....................75

*State ex rel. Leech v. Levi Strauss & Co.*,
No. 79-722-III, 1980 WL 4696 (Tenn. Ch. Sept. 25, 1980) ....................36

*State ex rel. Stovall v. DVM Enterprises, Inc.*,
62 P.3d 653 (Kan. 2003)....................68

*State v. Waste Mgmt. of Wis., Inc.*,
261 N.W.2d 147 (Wis. 1978)....................36

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
No. 13- MD-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017) ....................35

*Sutliff, Inc. v. Donovan Companies,Inc.*,
727 F.2d 648 (7th Cir. 1984) ....................13

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
963 F. Supp. 2d 1212 (D. Kan. 2013)....................25, 27, 28

*Switzer v. Coan*,
261 F.3d 985 (10th Cir. 2001) ....................43

*In re Syngenta AG MIR 162 Corn Litig.*,
131 F. Supp. 3d 1177 (D. Kan. 2015)....................73

*Tal v. Hogan*,
453 F.3d 1244 (10th Cir. 2006) .................... *passim*

*In re Tamoxifen Citrate Antitrust Litig.*,
277 F. Supp. 2d 121 (E.D.N.Y. 2003) ....................23

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961)....................19

*Thomas v. Metro. Life Ins. Co.*,
540 F. Supp. 2d 1212 (W.D. Okla. 2008) ....................36, 75

*Thompson v. Allergan USA, Inc.*,
993 F. Supp. 2d 1007 (E.D. Mo. 2014)....................71

*Times-Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953)....................10

*Trollinger v. Tyson Foods, Inc.*,
370 F.3d 602 (6th Cir. 2004)....................50

*Tufts v. Newmar Corp.*,
53 F. Supp. 2d 1171 (D. Kan. 1999)....................61

*Tungate v. MacLean-Stevens Studios, Inc.*,
714 A.2d 792 (Me. 1998)....................69

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
964 F.2d 1022 (10th Cir. 1992)....................11, 25

*Ulbrich v. Groth*,
78 A.3d 76 (Conn. 2013)....................67

*United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*,
719 F.3d 849 (7th Cir. 2013)....................45

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965)....................19

*United States v. AMR Corp.*,
140 F. Supp. 2d 1141 (D. Kan. 2001), *aff'd* 335 F.3d 1109 (10th Cir. 2003)....................15, 16

*United States v. Gen. Elec. Co.*,
272 U.S. 476 (1926)....................26

*United States v. Gordon*,
710 F.3d 1124 (10th Cir. 2013)....................50

*United States v. Hutchinson*,
573 F.3d 1011(10th Cir. 2009)....................40

*United States v. Phillips*,
583 F.3d 1261 (10th Cir. 2009)....................50

*Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*,
996 F.2d 1534 (3d Cir. 1993)....................44

*U.S. v. Grinnell Corp.*,
384 U.S. 563 (1966)....................10

*U.S. ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*,
232 F.3d 902, 2000 WL 1595976 (10th Cir. 2000) ....................72

*Van Woudenberg ex rel. Foor v. Gibson*,
211 F.3d 560 (10th Cir. 2000) ....................17

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................10

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
257 F.3d 256 (2d Cir. 2001)....................16

*In re Weaver*,
No. 07-10411, 2015 WL 4722615 (Bankr. D. Vt. Aug. 7, 2015)....................67

*In re Wellbutrin SR Antitrust Litig.*,
Nos. 04-5525, 04-5898, 05-396, 2006 WL 616292 (E.D. Pa. Mar. 9, 2006) ....................19

*In re Wellbutrin XL Antitrust Litig*.,
868 F.3d 132 (3d. Cir. 2017)....................22, 233, 24

*In re Wellbutrin XL Antitrust Litig*.,
Civ. No. 08-2431, 08-2433, 2012 WL 1657734 (E.D. Pa. May 11, 2012)....................29

*In re Zagg Secs. Litig*.,
797 F.3d 1194 (10th Cir. 2015) ....................21

*Zenith Radio Corp. v. Hazeltine Research, Inc*.,
395 U.S. 100 (1969)....................18

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)....................12, 14, 15, 18

**Statutes**

15 O.S. § 753 ....................60

15 U.S.C. § 14....................12

15 U.S.C. § 15(a) ....................17

18 U.S.C. § 1341....................48

18 U.S.C. § 1343....................48

18 U.S.C. § 1512....................48

18 U.S.C. § 1512(c)(2)....................49, 50

18 U.S.C. § 1961(1) ........................................ 45

18 U.S.C. § 1961(4) ........................................ 39

18 U.S.C. § 1961(5) ........................................ 45

18 U.S.C. § 1962(a) ........................................ 51

18 U.S.C. § 1962(c) ........................................ *passim*

18 U.S.C. § 1964(c) ........................................ 38, 47, 48

21 U.S.C. § 355(a) ........................................ 21

21 U.S.C. § 355(q)(1)(A) ........................................ 29

21 U.S.C. § 355(q)(1)(E) ........................................ 29

21 U.S.C. § 355(q)(1)(F) ........................................ 29

21 U.S.C. § 355 (j)(4)(C)(i) ........................................ 30

21 U.S.C. § 355 (j)(2)(A)(iii) ........................................ 30

21 U.S.C. § 355 (j)(2)(A)(v) ........................................ 30

35 U.S.C. § 261 ........................................ 26

42 U.S.C. § 1396r-8(b)(1)(A) ........................................ 65

Ala. Code § 8-19-5 ........................................ 60, 66

Ala. Code § 8-19-10 ........................................ 73

Alabama Deceptive Trade Practices Act ........................................ 72, 74

Ariz. Rev. Stat. Ann. § 44-1412 ........................................ 36

Ariz. Rev. Stat. Ann. § 44-1522 ........................................ 60

Ark. Code Ann. § 4-75-212(b) ........................................ 37

Ark. Code Ann. § 4-88-107 ........................................ 60, 66

Ark. Code Ann. § 4-88-108 ........................................ 60, 66

Arkansas Deceptive Trade Practices Act ........................................ 68

Arkansas Unfair Practices Act ........................................ 37

Cal. Bus. & Prof. Code § 17200 ....................60, 66, 68, 70

Cal. Bus. & Prof. Code § 17500 ....................60, 66

Cal. Civ. Code § 1770....................60

California Unfair Competition Law....................59, 67, 70

Clayton Act ....................8, 10, 12

Colo. Rev. Stat. Ann. § 6-1-105....................60

Colo. Rev. Stat. Ann. § 6-1-113....................73

Colorado Consumer Protection Act ....................72, 73, 74

Conn. Gen. Stat. Ann. § 42-110b....................60

Connecticut Unfair Trade Practices Act ....................67

D.C. Code Ann. § 28-4515 ....................36

6 Del. Code § 2513 ....................60

Fla. Stat. § 501.204 ....................60, 66

Ga. Code Ann. § 10-1-370....................70, 71

Ga. Code Ann. § 10-1-374....................74

Ga. Code Ann. § 10-1-393....................60, 66

Ga. Code Ann. § 10-1-372....................60

Ga. Code Ann § 10-1-399(a) ....................73

Georgia Fair Business Practices Act....................72, 73, 74

Georgia Uniform Deceptive Trade Practices Act ....................70, 71

Haw. Rev. Stat. Ann. § 480-2 ....................60, 66

Haw. Rev. Stat. Ann. § 480-3 ....................36

Idaho Code § 48-603....................60, 66

740 Ill. Comp. Stat. 10/7(2) ....................37

740 Ill. Comp. Stat. 10/11....................36

815 Ill. Comp. Stat. Ann. 505/2 ........ 60, 66

815 Ill. Comp. Stat. Ann. 510/2 ........ 60, 70, 74

Illinois Antitrust Act ........ 37

Illinois Consumer Fraud Act ........ 67, 70

Illinois Uniform Deceptive Trade Practices Act ........ 70, 71

Ind. Code Ann. § 24-5-0.5-3 ........ 60

Iowa Code Ann. § 553.2 ........ 36

Kan. Stat. Ann. § 50-626 ........ 60 ,66

Ky. Rev. Stat. Ann. § 367.170 ........ 60 ,66

Kentucky Consumer Protection Act ........ 68

La. Rev. Stat. § 51:1405 ........ 60 ,66, 73

Louisiana Unfair Trade Practices Act ........ 73, 74

Maine Unfair Trade Practices Act ........ 67

Maine Uniform Deceptive Trade Practices Act. ........ 70, 71

Mass. Gen. Laws Ann. ch. 93, § 1 ........ 36, 37

Mass. Gen. Laws Ann. ch. 93A, § 2 ........ 60 ,66

Massachusetts Consumer Protection Act ........ 67

Md. Code Ann., Com. Law § 13-301 ........ 60 ,66

Me. Rev. Stat. tit. 5, § 207 ........ 60 ,66

Me. Rev. Stat. tit. 10, § 1212 ........ 60

Mich. Comp. Laws § 445.784(1)–(2) ........ 36

Mich. Comp. Laws Ann. § 445.903 ........ 60 ,66, 68

Mich. Comp. Laws § 445.903(1) ........ 60

Minn. Stat. Ann. § 325D.43-48 ........ 70, 71

Minn. Stat. Ann. § 325D.44 ........ 60

Minn. Stat. Ann. § 325F.69....................60

Minnesota Uniform Deceptive Trade Practices Act....................70, 71

Miss. Code Ann. § 75-24-5....................60 ,66

Miss. Code. Ann. § 75-24-15....................73

Mississippi Consumer Protection Act....................73, 74

Missouri Merchandising Practices Act....................67

Mo. Ann. Stat. § 416.141....................36

North Carolina Unfair Deceptive Trade Practices Act....................67

N.C. Gen. Stat. Ann. § 75-1.1....................60 ,66

Neb. Rev. Stat. Ann. § 59-829....................36

Neb. Rev. Stat. Ann. § 59-1602....................60 ,66

Nev. Rev. Stat. Ann. § 598.0915....................60

Nev. Rev. Stat. Ann. § 598A.050....................36

N.H. Rev. Stat. Ann. § 358-A:2....................60 ,66

N.H. Rev. Stat. Ann. § 356:14....................36

New Jersey Consumer Fraud Act....................68, 69

N.J. Stat. Ann. § 56:8-2....................60 ,66, 68

New Mexico Unfair Trade Practices Act....................70, 71

N.M. Stat. Ann. § 57-1-15....................36

N.M. Stat. Ann. § 57-12-2....................60 ,66

N.M. Stat. Ann. § 57-12-2-D....................68

N.M. Stat. Ann. § 57-12-10....................70, 71

N.Y. Gen. Bus. Law § 349....................61

Ohio Consumer Sales Practices Act....................68, 69, 73

Ohio Deceptive Trade Practices Act....................70, 71, 74

Ohio Rev. Code Ann. § 4165.01, et seq. ....................70, 71

Ohio Rev. Code Ann. § 1345.02 ....................60 ,66

Ohio Rev. Code Ann. § 4165.02 ....................61

Ohio Rev. Code Ann. § 4165.03(2) ....................71

Ohio Rev. Code Ann. § 4165.03(A)(1) ....................71

Okla. Stat. Ann. tit. 15, § 753 ....................60 ,66

Or. Rev. Stat. Ann. § 646.608 ....................61, 66, 68

Or. Rev. Stat. Ann. § 646.715(2) ....................36

Oregon Unlawful Trade Practices Act ....................68

P.R. Laws Ann. §§ 257-76 (2005) ....................37

Pennsylvania Unfair Trade Practices and Consumer Protection Law ....................68

73 Pa. Stat. Ann. § 201-2 ....................61, 66, 68

Racketeer Influenced and Corrupt Organizations Act .................... *passim*

R.I. Gen. Laws Ann. § 6-36-2(b) ....................36

Robinson–Patman Act ....................12

S.C. Code Ann. § 39-5-20 ....................61, 66, 73

S.C. Code Ann. § 39-5-140 ....................73

S.D. Codified Laws § 37-1-22 ....................36

Sherman Act .................... *passim*

South Carolina Unfair Trade Practices Act ....................67, 73

Tenn. Code Ann. § 47-18-104 ....................61, 66, 68

Tenn. Code Ann. § 47-18-104(b) ....................73

Tenn. Code Ann. § 47-18-109 ....................73

Tennessee Consumer Protection Act ....................68, 73

Tex. Bus. & Com. Code § 17.45 ....................67, 68

Tex. Bus. & Com. Code § 17.46(b) ....................61

U.S. Food, Drug, and Cosmetic Act ....................30, 74

Utah Code Ann. § 76-10-3118 ....................36

Utah Code Ann. § 13-11-4 ....................61

Utah Code Ann. § 13-11-5 ....................67

Va. Code Ann. § 59.1-200 ....................61

Vt. Stat. Ann. tit. 9, § 2453 ....................60, 66

Vt. Stat. Ann. tit. 9, § 2453(b) ....................36

W. Va. Code Ann. § 46A-6-104 ....................60, 66

W. Va. Code Ann. § 47-18-16 ....................37

West Virginia Consumer Credit and Protection Act ....................68

West Virginia Antitrust Act ....................37

Wash. Rev. Code Ann. § 19.86.020 ....................60 ,66

Wis. Stat. Ann. § 100.18 ....................61

Wyo. Stat. Ann. § 40-12-105 ....................60 ,66

**RULES:**

Fed. R. Civ. P. 9(b) .................... *passim*

Fed. R. Civ. P. 12(b)(6) .................... *passim*

Fed. R. Civ. P. 12(c) ....................74

**REGULATIONS:**

Mo. Code Regs. Ann. Title 15, § 60-8.020 ....................66, 67

**Other Authorities**

5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1327 (2d ed. 1990) ....................17

15 O.S. § 753 ....................60

35 Op. N.D. Att'y Gen. 76 (1981) ....................36

American Academy of Pediatrics, *Guidance on Completing a Written Allergy and Anaphylaxis Emergency Plan* (Feb. 13, 2017)....................6

Allan Coukell, Chuck Shih, & Emily Reese, *Beyond EpiPen: Prices of Lifesaving Epinephrine Products Soar*, THE PEW CHARITABLE TRUSTS, Increasing Price of Epinephrine Auto-Injectors (Sept. 22, 2016)....................17

Ed Silverman, *How Mylan Tried to Keep Teva from Selling a Generic EpiPen*, STAT (Aug. 31, 2016), https://www.statnews.com/pharmalot/2016/08/31/mylan-teva-generic-epipen/)....................21

Gillian Mohney and Kavita Vakharia, *EpiPen Users Have Few Options for Generic or Alternate Drugs*, ABC News (Aug. 26, 2016) ....................6

Increasing Price of Epinephrine Auto-Injectors (Sept. 22, 2016), http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/09/22/beyond-epipen-prices-of-lifesaving-epinephrine-products-soar (last visited July 26, 2017) ....................17

Julie Wang and Scott H. Sicherer, *Guidance on Completing a Written Allergy and Anaphylaxis Emergency Plan* ....................56

Open Payments Data for Eli Meltzer, CMS, available at https://openpaymentsdata.cms.gov /physician/262707/payment-information....................31

PHILLIP E. AREEDA & HERBERT HOVENKAMP, Antitrust Law (3d ed. 2008)....................32

Ransdell Pierson and Deena Beasley, *Teva says aims to launch EpiPen-like device by 2018 in U.S.*, REUTERS (Sept. 9, 2016) ....................6

Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q Due to Potential Inaccurate Dosage Delivery, available at http://www.multivu.com/players/English/7673951-sanofi-auto-injector-recall/ (last visited Dec. 1, 2017) ....................65

Why Drug Costs Keep Rising—and What You Can Do About It (May 16, 2017)....................57

U.S. Dep't of Justice, *Antitrust Guidelines for the Licensing of Intellectual Property* § 3.4 (2017)....................27

# INTRODUCTION

This lawsuit is an inappropriate effort to capitalize on publicity surrounding the EpiPen® ("EpiPen") Auto-Injector and to misuse antitrust, RICO, and state consumer protection laws in the pursuit of class action litigation. This ever-evolving case began as a consumer protection suit based on allegations that the price of EpiPen products was too high. Over time, Plaintiffs have added a bevy of antitrust claims and that familiar refuge for large class action litigation: claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act involving numerous alleged co-conspirators in a kitchen-sink complaint. Following centralization of their cases into this MDL, Plaintiffs then combined efforts to produce a Consolidated Class Action Complaint ("Complaint" or "CAC").

Plaintiffs now contend that by increasing the price of EpiPen devices beyond what they consider to be fair and reasonable, selling EpiPen devices exclusively in two-packs, and entering into routine business agreements with third-party payors, Mylan[1] violated antitrust and consumer protection laws and unjustly enriched itself at Plaintiffs' expense. Plaintiffs also claim that Mylan and its CEO (together, the "Mylan Defendants"), along with Pfizer,[2] engaged in conduct that delayed competition for EpiPen products, including conduct involving patent litigation and related settlement agreements. And, in their latest Complaint, Plaintiffs have added allegations that Mylan conspired with pharmacy benefit managers ("PBMs") to increase the price of EpiPen devices. But regardless of whether Plaintiffs dress up their allegations as antitrust, RICO, or consumer protection claims, their essential allegation is the same, and it fails for the same reason this lawsuit has been doomed from the start: Plaintiffs are alleging that they paid more than they think they should have for EpiPen devices, which is a theory that does not give rise to any legally cognizable claims. As the en banc Seventh Circuit held earlier this year, "[t]he fact that a seller

[1] Mylan Pharmaceuticals Inc., Mylan Specialty L.P., and Mylan N.V. are referred to collectively in this brief as "Mylan."

[2] Pfizer Inc., King Pharmaceuticals LLC, and Meridian Medical Technologies Inc. are referred to collectively in this brief as "Pfizer." Together with the Mylan Defendants, they are referred to as "Defendants."

does not sell the product that you want, or at the price you'd like to pay, is not an actionable injury." *Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017) (en banc), reh'g denied. The Complaint is deficient as a matter of law and should be dismissed.

***Antitrust claims.*** Plaintiffs' antitrust claims are defective because, among other reasons, they have not plausibly alleged an unlawful tying arrangement, anticompetitive conduct, or a conspiracy to restrain trade. Plaintiffs assert, for example, that Mylan's practice of selling EpiPen devices in two-packs is an unlawful tying scheme, but they fail to allege the most basic element of any tying claim: the existence of two separate and distinct products. This alone is fatal to their two-pack based claims. Plaintiffs' claims regarding Mylan's offers of rebates and discounts to PBMs and free EpiPen devices to schools fare no better. The law is settled that offering a discount is not a violation of the antitrust laws except in extreme circumstances where the prices offered are below cost. Plaintiffs' PBM-related allegations do not come close to meeting this requirement. As for their allegations about the schools program, Plaintiffs fail to plausibly allege that Mylan foreclosed competitors from a substantial share of the market, which bars any claim based on those allegations.

Plaintiffs also claim that Mylan conspired with Pfizer to bring patent infringement litigation to block the entry of competing epinephrine auto-injectors and then settled those cases by offering "reverse payments" to delay entry. Plaintiffs' "reverse payment" claims fail as a matter of law because Plaintiffs do not—and cannot—plead causation linked to injury (here, delayed competitive entry). Even based on the Complaint's allegations, Teva has not been delayed because of that settlement. Rather, Teva has been delayed because it still has not gained FDA approval to market its generic EpiPen—over two years after Teva was permitted to enter under its settlement with Pfizer. Plaintiffs' "reverse payment"-based claims also fail for the independent reasons that Plaintiffs allege no facts connecting Mylan (who was not a party to those cases) and Pfizer in a conspiracy, Plaintiffs fail to plausibly plead the existence of a reverse payment, and because such claims are time-barred.

The bulk of Plaintiffs' antitrust claims also fail because Plaintiffs fundamentally fail to allege any conduct by Mylan that *caused* competitive harm. Rather, the alleged facts demonstrate that (1) a competing product was never approved by the FDA (Teva's and Sandoz's respective proposed generics to EpiPen Auto-Injector), (2) a competitor independently chose not to compete on the terms preferred by customers before its product was recalled from the market (Sanofi's Auvi-Q®), or (3) it was otherwise impossible for the conduct alleged to have resulted in delayed entry by competitors (as with Mylan's citizen petition).

***RICO claim.*** Plaintiffs' RICO claim depends on the implausible premise that Mylan, Pfizer, and the PBMs—all sophisticated corporations with distinct, individual business interests—somehow conspired to defraud the American public about the price of EpiPen devices. Whatever this case may be, it decidedly is not a RICO action, and Plaintiffs fail to plead even a single element of their RICO claim. To begin with, Plaintiffs fail to allege the existence of a RICO enterprise that is distinct from the alleged participants. Nor do Plaintiffs allege that Mylan or anyone else conducted the affairs of a separate RICO enterprise, committed mail or wire fraud, engaged in any pattern of racketeering activity, or that any of the alleged conduct caused supposed injuries. Plaintiffs' entire RICO claim is based on the flawed premise that because Defendants do business with one another, they necessarily form part of a conspiracy. Plaintiffs' RICO allegations against Mylan's CEO fail for many of the same reasons, are even more baseless and designed solely for harassment, and allege nothing more than a CEO acting in her capacity as the leader of a corporate defendant. The Court should not impose the burdens of discovery, class certification, and summary judgment practice on such baseless and conclusory allegations. In short, "[t]he boundaries of RICO simply do not encompass the oversize capacity or elasticity to accommodate the many ill-fitting suits with which plaintiffs seek to outfit the statute." *Gross v. Waywell*, 628 F. Supp. 2d 475, 480 & 482-83 (S.D.N.Y. 2009) (finding that plaintiffs "c[a]me away with a total loss" in 98 percent of RICO cases surveyed). This is one such ill-fitting suit.

***Consumer protection claims.*** Plaintiffs' consumer protection and common law claims fare no better. As a threshold matter, Plaintiffs lack Article III standing because they have not been injured in any actionable way. Spending more than one wishes for a product does not give rise to a legally-cognizable injury. Moreover, any claimed injury stemming from Mylan's sale of EpiPen products in two-packs is inherently speculative and fails to demonstrate injury-in-fact; after all, some EpiPen users (approximately 20% of those who suffer a severe allergic reaction) will need to use two EpiPen devices, and there is no way to know in advance who those users will be. In addition, because EpiPen Auto-Injector is a patented pharmaceutical product, any state law claims challenging Mylan's pricing of EpiPen devices are preempted by federal patent law.

Plaintiffs also do not allege any fraudulent or deceptive conduct by Mylan, nor do they allege that they suffered any actual losses as a result of Mylan's alleged conduct. For these reasons and many others, Plaintiffs' consumer protection and unjust enrichment claims are fatally flawed.

* * * * *

Neither the length of the Complaint nor Plaintiffs' reliance on gratuitous rhetoric and hyperbole can mask the problem at the core of Plaintiffs' case: The law does not allow consumers to sue merely because they think the price they paid for a product was too high. Try as they might, Plaintiffs cannot shoehorn that theory into actionable claims. There are incurable legal problems with Plaintiffs' Complaint, including issues such as standing, preemption, and basic proscriptive limitations of antitrust and RICO law. For all of these reasons and those below, the Court should dismiss the Complaint in its entirety. *See* Exhibit A, Summary of Grounds for Dismissal. And because Plaintiffs have already made multiple attempts to amend their pleadings, and any further amendment would be futile, the Court should do so with prejudice.

## BACKGROUND[3]

EpiPen Auto-Injectors are used for the emergency treatment of severe allergic reactions (including anaphylaxis) caused by insect bites or stings, medicines, foods, or other substances. CAC ¶¶ 86-88, 90. The devices allow a patient to quickly and safely self-administer a prescribed amount of epinephrine, a drug designed to counteract the effects of anaphylaxis, through a spring-loaded needle. Pfizer manufactures EpiPen Auto-Injectors while Mylan Specialty L.P., formerly known as Dey Pharma, L.P., has the exclusive right and license to market, distribute, and sell EpiPen products, which are protected by several United States patents that expire in 2025.[4] *Id.* ¶¶ 96-97, 100, 470. No court has ever found that any of these patents is invalid or unenforceable.

This litigation originated from a series of separate lawsuits filed across the country. Plaintiffs in eight matters coordinated their efforts, culminating in the filing of *In re EpiPen Auto-Injector Litigation*, Case No. 2:16-cv-0271 (D. Kan.) ("*In re EpiPen*"). Additional suits followed, including six putative class actions and a suit by a competitor, Sanofi-Aventis U.S. LLC ("Sanofi"). All of these cases were ultimately centralized in this MDL.

In the latest iteration of their Complaint, Plaintiffs assert that they are the victims of "an illegal scheme to monopolize the market for epinephrine auto-injector devices." CAC ¶ 4. According to the Complaint, this "scheme" consisted of three prongs.

***First***, Plaintiffs allege that the prices of EpiPen devices are too high due to price increases and/or because Mylan decided to sell EpiPen devices in two-packs (rather than selling single devices)—a decision that followed the publication of National Institute of Allergy and Infectious Diseases ("NIAID") guidelines recommending that doctors prescribe two doses of

---

[3] Mylan denies the allegations in the Complaint but, unless otherwise noted, assumes the truth of those allegations solely for purposes of moving to dismiss under Rule 12(b)(6).

[4] The patents on the EpiPen Auto-Injector device include U.S. Patent numbers 7,449,012; 7,794,432; 8,048,035; and 8,870,827, of which the court may take judicial notice. *See Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 (Fed. Cir. 2014). Meridian Medical Technologies, Inc. owns the patents related to EpiPen devices, and has granted Mylan Specialty L.P. the exclusive rights to market, distribute, and sell EpiPen products.

epinephrine in the interests of patient safety. CAC ¶¶ 335-36. Mylan publicly stated that this change in packaging "aligns with these [NIAID] guidelines, as well as with the 2011 World Allergy Organization (WAO) anaphylaxis guidelines." *Id.* ¶ 337. Plaintiffs nevertheless allege that "[t]here is no medical reason" for "forcing" customers to purchase two-packs instead of individual EpiPen devices, and that doing so causes consumers to pay an "inflated price" for EpiPen devices.[5] *Id.* ¶¶ 326, 347.

***Second***, Plaintiffs allege that Defendants engaged in anticompetitive conduct to increase Mylan's market share and restrain generic competition. Plaintiffs allege, for example, that Mylan harmed competition by lobbying for increased access to epinephrine auto-injectors, entering into contracts for the EpiPen4Schools® ("EpiPen4Schools") Program (which has provided more than one million free EpiPen devices to tens of thousands of schools across the U.S.), pursuing patent infringement lawsuits against potential generic rivals, and filing citizen petitions to delay competitor products. *Id.* ¶¶ 237, 248, 263, 298, 302, 311. Plaintiffs make these allegations despite the fact that there are, and have been throughout the relevant time period, competing epinephrine auto-injectors available to consumers.[6] Plaintiffs also admit that other potential competitors have been delayed by their independent failure to obtain or maintain the requisite FDA approvals. And while Plaintiffs concede that Mylan has distributed hundreds of thousands of free EpiPen devices to schools through the EpiPen4Schools program, *see In re*

---

[5] On February 13, 2017, the American Academy of Pediatrics updated its epinephrine guidelines, cautioning that "[t]wo epinephrine autoinjectors should be available at all times, because a second administration may be needed if there is not a quick or adequate response to the first dose of epinephrine." American Academy of Pediatrics, *Guidance on Completing a Written Allergy and Anaphylaxis Emergency Plan* at 4 (Feb. 13, 2017), *available at* http://pediatrics.aappublications.org/content/pediatrics/early/2017/02/09/peds.2016-4005.full.pdf.

[6] Plaintiffs seek to blame Defendants for the absence of more competitors while acknowledging in the Complaint that potential competitors have faced a host of issues having nothing to do with Defendants. CAC ¶¶ 313, 315, 322; *see also* Ransdell Pierson and Deena Beasley, *Teva says aims to launch EpiPen-like device by 2018 in U.S.*, REUTERS (Sept. 9, 2016), https://www.reuters.com/article/us-teva-pharm-ind-epipen/teva-says-aims-to-launch-epipen-like-device-by-2018-in-u-s-idUSKCN11F25K. And Sanofi pulled Auvi-Q, its epinephrine auto-injector, from the market entirely in October 2015 due to safety issues. Likewise, Impax has faced supply issues for its auto-injector, Adrenaclick. *See* Gillian Mohney and Kavita Vakharia, *EpiPen Users Have Few Options for Generic or Alternate Drugs*, ABC News (Aug. 26, 2016), http://abcnews.go.com/Health/epipen-users-options-generic-alternate-drugs/story?id=41667390.

*EpiPen Auto-Injector Litigation*, Case No. 2:16-cv-2711, 2d Am. Class Action Compl. ¶¶ 170-72 (D. Kan. Feb. 3, 2017), Plaintiffs nevertheless assert that a "massive lobbying effort" relating to the schools program should subject Mylan to punishment because (they claim) it allowed Mylan to increase its share of the auto-injector market. CAC ¶¶ 163, 175.

***Third***, Plaintiffs allege that Mylan worked with PBMs and state-based Medicaid plans to exclude competitor epinephrine auto-injectors from the market, to inflate the list price of EpiPen products, and to reap excessive profits. *Id.* ¶¶ 154, 164-66, 178. Plaintiffs claim that in response to competition from Auvi-Q, Mylan paid large rebates to PBMs to obtain preferential coverage. *Id*. ¶ 193. Yet Plaintiffs concede that Sanofi also paid rebates to PBMs in exchange for preferred status, *id.* ¶ 182, that these PBMs "leveraged the competition between EpiPen and Auvi-Q to earn additional discounts for [their] clients," *id*. ¶ 190, and that not only PBMs, but also third-party payors—*i.e.*, insurers that paid for EpiPen products (including state-based Medicaid formularies)—obtained lower prices because of these discounts, *id.* ¶ 182.

Plaintiffs throw a host of other alleged conduct against the wall, hoping something will stick: They point to Mylan's allegedly false certification to "federal officials" that the EpiPen device was a non-innovator product, *id.* ¶ 417; they allege false testimony by Mylan's CEO to Congress, *id.* ¶¶ 422-23; they contend that Mylan's offers of coupons and rebates for EpiPen devices were "'wolves in sheep's clothing'" because even with these coupons and rebates, Mylan's pricing of EpiPen devices resulted in higher costs to consumers through insurance premiums, *id.* ¶ 406; and they even resort to pinning their hopes on a settlement between Mylan and the Federal Trade Commission in 2000 that had absolutely nothing to do with EpiPen products (and in fact preceded Mylan's acquisition of the EpiPen product by 7 years), *id.* ¶¶ 130-33. To support these baseless allegations, Plaintiffs selectively quote from news stories, blog posts, and the public testimony of a Mylan executive. *See id.* ¶¶ 133, 383-84, 392, 406, 418, 423-25. But they do not explain how any of these materials relate to Plaintiffs or other consumers, or what support they provide for their purported claims. That omission is not surprising; no such connection exists. Ultimately, although the Complaint includes a laundry list

of allegations and legal theories, the root of all of Plaintiffs' claims is that the price charged by Mylan for EpiPen devices was more than they wanted to pay. *See, e.g.*, *id.* ¶¶ 4-5.[7]

**STANDARD OF REVIEW**

To survive a motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The purpose of a Rule 12(b)(6) motion to dismiss is to allow a defendant to "test the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Rocha v. CCCF Admin.*, 408 F. App'x 141, 144 (10th Cir. 2011) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Iqbal*, 556 U.S. at 678; *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016 ("mere 'labels and conclusions'" are insufficient and "we need not accept legal conclusions contained in the complaint as true"). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harte v. Bd. of Comm'rs of Cty. of Johnston Cty., Kan.*, No. 13-2586-JWL, 2014 WL 5089410, at *1 (D. Kan. Oct. 9, 2014) (citation omitted) (Lungstrum, J.). And those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In addition, claims sounding in fraud are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint "must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements, and the consequences thereof.'" *N. Ala. Fabricating Co., Inc. v. Bedeschi Mid-W. Conveyor Co.*, No.

[7] Plaintiffs assert nine counts against Mylan: violation of the Sherman Act (Count I); violation of the Clayton Act (Count II); conspiracy in violation of state laws (Count III); monopolization in violation of state laws (Count IV); attempted monopolization in violation of state laws (Count V); tying in violation of state laws (Count VI), violation of the federal RICO statute, 18 U.S.C. § 1962 (Count VII); violation of state consumer protection laws (Count VIII); and unjust enrichment (Count IX). Plaintiffs seek "to recover damages and overpayments from at least 2009 through the present," as well as injunctive relief. CAC ¶ 9.

16-2740-DDC-TJJ, 2017 WL 1836973, at *10 (D. Kan. May 8, 2017) (Crabtree, J.) (citation omitted). In other words, the complaint must set forth "the who, what, when, where, and how of the alleged fraud." *Id.* at *10 (citation omitted).

Moreover, where antitrust and RICO claims have been alleged, courts must be particularly rigorous in assessing whether the claims as pled satisfy the applicable pleading standard. As the Supreme Court specifically cautioned in *Twombly* (an antitrust case), "proceeding to antitrust discovery can be expensive," so "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." 550 U.S. at 558-59 (citation omitted) (collecting cases and other authorities lamenting the high costs of discovery, and specifically antitrust discovery). The Tenth Circuit and others have heeded this charge. *See, e.g.*, *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (affirming dismissal of antitrust claims and noting that "[w]hen, in *Twombly*, the Supreme Court emphasized the need for plausibility in the complaint . . . it warned particularly of the high costs and frequent abuses associated with antitrust discovery"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) ("RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim.").

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM.

Plaintiffs cannot square their factual allegations with the elements required to state an antitrust claim. While Plaintiffs spend many pages of their Complaint attempting to disparage Mylan for increasing prices of EpiPen devices, the law is settled that:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Regardless of Plaintiffs' views of the propriety of Mylan's pricing decisions, those decisions alone cannot constitute anticompetitive conduct.[8] While Plaintiffs make a variety of factual allegations, none is sufficient to state an antitrust claim under federal or state law.

### A. Plaintiffs Fail to State a Tying Claim Regarding the EpiPen "Two-Pack."

Plaintiffs assert that Mylan's practice of selling two identical EpiPen devices in one package is an unlawful tying scheme, CAC ¶ 574, but they fail to allege the most basic component of any tying claim: the existence of two distinct products, and therefore Count VI should be dismissed.[9] A tying arrangement is "an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). It is fundamental that "a tying arrangement cannot exist unless two separate product markets have been linked." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984); *see also Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 614 (1953) (rejecting tying claim because "the products are identical and the market the same"). Here, while the EpiPen devices sold in two-packs are

[8] Anticompetitive conduct is an essential element of *all* of Plaintiffs' antitrust claims. For example, to state a claim for monopolization under Section 2 of the Sherman Act and state law (Counts I and IV), Plaintiffs must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). To state a claim for attempted monopolization under Section 2 of the Sherman Act and state law (Count V), Plaintiffs must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Id*. The legal standards for agreement in restraint of trade (Counts I and III) under Section 1 of the Sherman Act and state laws, for exclusive dealing (Count II) under Section 3 of the Clayton Act and state laws, and for tying (Count VI) are discussed separately below.

[9] To state a tying claim, Plaintiffs must plausibly allege that (1) there are two separate products or services; (2) the sale of one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a substantial amount of commerce is affected in the tied product market. *Sports Racing Servs., Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874, 886 (10th Cir. 1997); *see also Sprint Nextel Corp. v. Middle Man, Inc.*, No. 12-2159-JTM, 2013 WL 1197137, *5 (D. Kan. Mar. 25, 2013). Because Plaintiffs fail to allege two separate products, they also fail as a matter of law to allege an impact on competition in the tied product market. *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1090 (9th Cir. 2009) ("Without a market for the tied product, there can be no *per se* unlawful tying arrangement because there is 'zero foreclosure' of competition.") (internal quotations in original).

*indistinguishable*, Plaintiffs designate one as "the primary device" and the other as "the back-up device." *See* CAC ¶ 576. This makes no sense. Whether two distinct products exist "turns not on the functional relation between them, but rather on the character of the demand for the two items," and the products must be "distinguishable in the eyes of the buyers." *Jefferson Parish*, 466 U.S. at 19-21. Calling the same product two different things does not transform them into two distinct products. *See, e.g.*, *Metromedia Broad. Corp. v. MGM/UA Entm't Co.*, 611 F. Supp. 415, 422-24 (C.D. Cal. 1985) ("syndicated first runs" and "reruns" of same TV series not separate products); *see also Paul v. Pulitzer Pub. Co.*, No. 74-327C(A), 1974 WL 887, *5 (E.D. Mo. May 24, 1974) (weekday and weekend issues of the same newspaper not distinct products).

Plaintiffs also fail to allege two distinct product markets. To plead a tying claim, Plaintiffs must show that Mylan "foreclosed competition on the merits in a product market *distinct from* the market for the tying item." *Jefferson Parish*, 466 U.S. at 21 (emphasis added). Here, Plaintiffs allege facts in support of only one market: "the market for the epinephrine injector devices." CAC ¶ 449. Plaintiffs allege zero facts to support the existence of a distinct market for "back-up" injector devices.[10] Indeed, there are no allegations relating to the rule of reasonable interchangeability or cross-elasticity of demand. *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017) ("[T]he plaintiff must justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand.") (quotations omitted). This is fatal to Plaintiffs' claim. *See, e.g.*, *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (failure to allege a product market with reference to these principles is grounds for dismissal under Rule 12(b)(6)); *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025

[10] "A plaintiff cannot arbitrarily choose the product market relevant to its claims; instead, the plaintiff must justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Id.* Failure to allege a product market with reference to these principles is grounds for dismissal. *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008).

(10th Cir. 1992) (dismissing antitrust claim because "the relevant market as defined in the amended complaint is defective as a matter of law").

Moreover, it is implausible that "primary" and "back-up" injectors belong to separate markets. "The relevant product market in any given case 'is composed of products that have reasonable interchangeability for the purposes for which they are produced – price, use and qualities considered.'" *Gunnison Energy Corp.*, 846 F.3d at 1313 (10th Cir. 2017) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994)). By definition, so-called "back-up" injectors must be interchangeable with "primary" injectors—otherwise, they would have no utility as "back-ups." Plaintiffs' allegations also confirm that the two are interchangeable. Plaintiffs describe "back-up" injectors as "cheaper generic" alternatives to EpiPen devices. CAC ¶ 576. As Plaintiffs allege throughout the Complaint, generic injectors compete with EpiPen devices in the same market. *See, e.g.*, *id.* ¶ 462 (Table 2) (attributing market share to generics in same market as EpiPen); *see also id.* ¶¶ 101, 109, 116, 189, 463. Indeed, Plaintiffs' central allegation is that Mylan prevented cheaper, generic alternatives from entering the market to compete with EpiPen devices. *See, e.g.*, *id.* ¶¶ 109-110, 527, 537, 546, 557. Accordingly, Plaintiffs' tying claim is baseless and should be dismissed.

### B. Plaintiffs Fail to State an Antitrust Claim Under Section 3 of the Clayton Act.

In Count II, Plaintiffs allege that Mylan violated Section 3 of the Clayton Act, 15 U.S.C. § 14, by providing (i) rebates and discounts to PBMs for EpiPen devices and (ii) free EpiPen devices to schools.[11] CAC ¶ 537. These claims fail because (1) Plaintiffs do not allege that the rebates resulted in Mylan selling EpiPen devices at prices below Mylan's cost of production, and (2) Plaintiffs cannot allege that the EpiPen4Schools program foreclosed competitors from a

[11] "[E]xclusive dealing claims are cognizable under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and evaluated under the same rule of reason." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012); *see also id.* at n. 9 ("[T]he Supreme Court has held that the price-cost test is not confined to any one antitrust statute, and applies to pricing practices claims under the Sherman Act, the Clayton Act, and the Robinson–Patman Act.") (citations omitted).

substantial share of the relevant market.[12] Counts I through V should be dismissed to the extent that Plaintiffs' claims are based on this alleged conduct.

### 1. Plaintiffs' Allegations Regarding PBM Rebates Fail to State a Claim.

The antitrust laws protect competition. They protect consumers by *promoting* lower prices; they do not protect competitors by *punishing* lower prices. Rebates and discounts are therefore presumptively lawful unless the discounts result in prices that are below the defendant's cost of production. Here, Plaintiffs do not—and cannot—allege that Mylan's EpiPen device prices are below Mylan's cost of production and therefore all claims based on PBM rebates should be dismissed.[13]

Plaintiffs allege that Mylan responded to competition from Auvi-Q (a competing epinephrine auto-injector sold by Sanofi) by increasing the discounts it offered to PBMs for EpiPen devices. CAC ¶ 174. Accordingly, PBMs allegedly gave EpiPen devices preferred position on drug formularies, reducing Auvi-Q's sales. *Id*. Plaintiffs' claim boils down to an assertion that Sanofi was harmed because Mylan charged lower prices in the form of rebates and discounts. If that sounds backwards, it is: "Low prices benefit consumers regardless of how

[12] While not referenced in relation to any of its claims, Plaintiffs also allege that Mylan had "misclassif[ied] the EpiPen as a 'non-innovator' drug in the Medicare and State-based Medicaid space" and as a result, Mylan had "a war chest from which it could pay exceedingly large discounts to Pharmacy Benefit Managers." CAC ¶¶ 134, 186. Plaintiffs do not allege that this conduct is predatory or exclusionary, nor do the allegations relate to an element of any of Plaintiffs' claims and therefore Plaintiffs have not stated a claim with respect to these allegations. *Garshman v. Universal Res. Holding, Inc.*, 625 F. Supp. 737, 741 (D.N.J. 1986) ("[I]f he claims an antitrust violation, but the facts he narrates do not at least outline or adumbrate such a violation, he will get nowhere merely by dressing them up in the language of antitrust.") (quoting *Sutliff, Inc. v. Donovan Co.*, 727 F.2d 648, 654 (7th Cir. 1984); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (same)).

[13] In addition to PBMs, Plaintiffs allege that Mylan provided rebates to "state-based Medicaid formularies" and was "successful in having Auvi-Q excluded from coverage in many states due to these rebates." CAC. ¶ 179. These claims fail for the additional reason that Mylan's alleged requests to state-run Medicaid programs for exclusive formulary placement in exchange for rebates are immune under the *Noerr-Pennington* doctrine. *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015); *cert. denied*, 136 S. Ct. 2451 (2016). Mylan's alleged attempts to influence these Medicaid agencies' policies and coverage decisions are precisely the sort of core First Amendment activity and government petitioning that *Noerr-Pennington* protects, and any harm is the result of government action—specifically, the decision of the state Medicaid agencies to grant exclusive status. *See e.g., E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 612-13 (5th Cir. 1985); *Bristol-Myers Squibb Co. v. IVAX Corp.*, 77 F. Supp. 2d 606, 612-15 (D.N.J. 2000).

those prices are set." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (citation omitted). According to the Supreme Court, low prices do not threaten competition "so long as they are above predatory levels" because "the exclusionary effect of prices above a relevant measure of cost . . . reflects the lower cost structure of the alleged predator, and so represents competition on the merits . . . ." *Id.*; *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990) ("When a firm . . . lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence . . . ."). Moreover, "mistaken inferences" in cases "seeking to impose antitrust liability for prices that are too low," "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Pac. Bell Tel. Co. v. Linkline Commcn's, Inc.*, 555 U.S. 438, 451 (2009) (internal quotations omitted).

Thus, rebates or discounts only violate the antitrust laws where the defendant engages in "predatory pricing." To state such a claim, a plaintiff must plead (1) that defendant set prices below cost and (2) a "dangerous probability" that defendant could recoup its losses once the plaintiff is excluded from the market. *Brooke Grp.*, 509 U.S. at 222-24; *see also Eisai Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 408 (3d Cir. 2016) (to state a claim, a plaintiff must show that "a firm reduce[d] its prices to below-cost levels to drive competitors out of the market and, once competition [was] eliminated, reduce[d] output and raise[d] its prices to supracompetitive levels"). This test—known as the "price-cost" test—is necessary to distinguish exclusionary pricing practices that threaten competition from situations where "an equally efficient competitor can match" those prices "and the firms can compete on the merits." *Eisai*, 821 F.3d at 409; *see also e.g., Brooke Grp.*, 509 U.S. at 233 (same); *Atl. Richfield Co.*, 495 U.S. at 337 (same). Where a plaintiff fails to satisfy the price-cost test, claims based on alleged rebates or discounts should be dismissed at the pleading stage. *Linkline Commc'ns*, 555 U.S. at 451-52 (dismissing claim).

This price-cost test applies even where the rebate or discount is tied to exclusivity, so long as price is the means of exclusion, as Plaintiffs allege here. *See ZF Meritor, LLC v. Eaton*

*Corp.*, 696 F.3d 254, 274-75 (3d Cir. 2012) (where "price is the clearly predominant mechanism of exclusion," the price-cost test is used as a "specific application of the rule of reason'") (citation omitted). For example, Sanofi—the company that sold Auvi-Q and was allegedly harmed by the PBM rebates—previously faced similar allegations to those made against Mylan in this case. In *Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-cv-4168 (D.N.J. Aug. 18, 2008), Eisai alleged that Sanofi prevented it from selling its anticoagulant drug because Sanofi offered hospitals discounts to purchase its drug instead. Sanofi filed a motion to dismiss, arguing that price discounts and rebates are "the very essence of competition" and that "courts are extremely reluctant to condemn any form of discount as anticompetitive." Dkt. No. 28-1 at 10. Sanofi argued that finding discounts unlawful "would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Id.* (quotation omitted). Sanofi further argued that its discount program was "nothing more than lawful, procompetitive price competition" that saved customers "millions of dollars." *Id.* at 9, 29. At oral argument, Sanofi argued that:

> Using discounts to win business simply to increase sales is a procompetitive outcome. It's perfectly lawful . . . *even when done by companies in a so-called dominant position in the market.* There is nothing about having a successful product or a large market share that prohibits a company from going to customers and saying I'm going to give you an even bigger discount if you buy more from me.[14]

The court dismissed Eisai's claims. *Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-cv-4168, 2014 WL 1343254, at *1 (D.N.J. Mar. 28, 2014). The Third Circuit affirmed, finding that "what Eisai call[ed] 'payoffs' were, in reality, discounts offered by Sanofi to its customers," 821 F.3d at 399, and that the discount program had neither harmed competition nor substantially foreclosed the relevant market, *id.* at 403-08. Numerous courts, including this one, have reached the same result when applying the price-cost test.[15] *See United States v. AMR Corp.*, 140 F.

---

[14] A copy of this transcript may be found at *Sanofi-Aventis U.S. LLC v. Mylan Inc.*, No. 2:17-cv-02452-DDC-TJJ, Mot. to Dismiss, Calmann Decl. Ex. A at 6, (D. Kan. Jul. 28, 2017), Dkt. 36 (emphasis added).

[15] *See also NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452-53 (6th Cir. 2007) (en banc) (affirming Rule 12(b)(6) dismissal of complaint alleging anticompetitive "up-front payments," i.e., rebates, in exchange for "the exclusive right to supply a set of stores" because "[t]hat [the defendant] offered greater discounts, though still nonpredatory

Supp. 2d 1141, 1193-94 (D. Kan. 2001), *aff'd* 335 F.3d 1109 (10th Cir. 2003) (rejecting "the government's attempt . . . to re-characterize the present action as one grounded[] not on 'predatory pricing' . . . [in order to] evade the [price-]cost analysis mandatory under *Brooke Group*").

Here, Plaintiffs have not alleged—and cannot allege—that Mylan priced EpiPen Auto-Injectors below Mylan's cost of producing those devices, much less that Mylan would be able to recoup any losses from below-cost pricing after Auvi-Q left the market. Indeed, the above-cost rebates alleged by Plaintiffs are not just presumed under the antitrust laws to be "legitimate," CAC ¶ 178, but are the very *essence* of vigorous competition and are therefore beyond the reach of the antitrust laws. Moreover, Plaintiffs clearly allege that price was the primary means of exclusion by explicitly alleging that Auvi-Q was placed at disadvantaged formulary positions "in exchange for [Mylan's] increased rebates and discounts." CAC ¶ 168; *see also e.g., id.* ¶ 152 ("Mylan . . . offer[ed] aggressive rebates and incentives to certain Pharmacy Benefit Managers to exclude competitors from their Preferred Drug Lists . . . ."). Plaintiffs allege no facts that Mylan otherwise coerced customers or did anything besides offering them a better price.

In these circumstances, competitors like Sanofi cannot be unlawfully foreclosed from the market because they "need only offer a better product or a better deal to acquire" the business of the PBMs and payers. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*, 592 F.3d 991, 997 (9th Cir. 2010) (quoting *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997)). Plaintiffs allege no facts explaining why Sanofi could not compete for exclusive status. CAC ¶¶ 176-77.[16] Mylan's above-cost rebates are presumptively lawful, and Plaintiffs' claims should be dismissed.

---

discounts, to win the retailers' business does not offend the antitrust laws, much less undermine the competitive environment those laws were designed to foster" (quotation omitted)); *accord Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001) (affirming judgment in favor of defendant by applying price-cost test); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983) (same).

[16] Plaintiffs allege that Mylan's "already-dominant market share" somehow prevented Sanofi from matching the rebates offered by Mylan. CAC ¶ 182. This argument assumes that the market shares of the EpiPen Auto-Injector and Auvi-Q were fixed and that therefore any discount offered on Auvi-Q would need to be much greater because of

Plaintiffs' claims about PBM rebates suffer from additional fatal flaws. *First*, Plaintiffs cannot show that Mylan's rebates and discounts harmed them because Sanofi's failure to compete resulted from factors unrelated to Mylan. Under the Sherman Act, a plaintiff must show that its injury was caused "by reason of" the defendant's anticompetitive conduct. 15 U.S.C. § 15(a). When an injury "[i]s attributable to . . . other factors independent of" the challenged conduct, a plaintiff has "not . . . met its burden." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126-27 (1969). Here, Sanofi conceded that, as of October 2015, it "undertook voluntary recall of Auvi-Q following reports of manufacturing issues." *Sanofi-Aventis U.S. LLC v. Mylan Inc.*, No. 2:17-cv-02452-DDC-TJJ, Compl. ¶ 110 (D. Kan. Apr. 24, 2017), Dkt. 1 ("Sanofi Complaint"). Plaintiffs cannot blame Mylan for Sanofi's own decision to end competition by recalling Auvi-Q devices. *See, e.g.*, *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998) (affirming dismissal of complaint when "any injury suffered by the [plaintiff] did not flow from the defendants' conduct"); *Read v. Med. X-Ray Ctr., P.C.*, 110 F.3d 543, 546 (8th Cir. 1997) (defendant did not cause plaintiff's injuries when plaintiff failed to "take reasonable steps to compete head-to-head").

*Second*, Plaintiffs' PBM rebate claims do not allege harm to competition. To establish harm to competition, a plaintiff must show "reduced output, increased price, or reduced quality in goods or services." *Eisai*, 821 F.3d at 403. "Without a showing of actual adverse effect on competition, [the plaintiff] cannot make out a case under the antitrust laws." *Jefferson Parish*,

Auvi-Q's smaller market share at the time. Plaintiffs, however, allege no facts as to why Sanofi could not grow its market share by offering a better product at a better price. Moreover, Plaintiffs' argument is based on an implausible and incorrect premise that Mylan's competitors "could not raise prices" and therefore "could not offer PBMs" comparable rebates and discounts. CAC ¶ 167. Indeed, Sanofi increased prices in parallel with, or higher than, Mylan. *See* Allan Coukell, Chuck Shih, & Emily Reese, *Beyond EpiPen: Prices of Lifesaving Epinephrine Products Soar*, THE PEW CHARITABLE TRUSTS, at Fig. 1 – Increasing Price of Epinephrine Auto-Injectors (Sept. 22, 2016), http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/09/22/beyond-epipen-prices-of-lifesaving-epinephrine-products-soar (last visited July 26, 2017). Information regarding Sanofi's relative pricing of Auvi-Q—which is integral to the allegations in Plaintiffs' Complaint—can be considered on a motion to dismiss. *See, e.g.*, *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000) ("[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."); *Gallup Med Flight, LLC v. Builders Tr. of New Mexico*, 240 F. Supp. 3d 1161, 1199 (D.N.M. 2017); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1327, at 762-63 (2d ed. 1990).

466 U.S. at 31. At bottom, Plaintiffs allege that (1) Mylan competed aggressively on price when it faced competition, and (2) PBMs gave EpiPen devices more advantageous formulary positions when Mylan offered lower prices. CAC ¶¶ 176-77. These allegations do not describe harm to competition; they describe the very *essence* of competition.

While Plaintiffs allege that Mylan raised the price of EpiPen products, *id.* ¶ 178, Plaintiffs do not allege that it was the exclusion of competition that enabled Mylan to do so. Nor do Plaintiffs plausibly allege that competitors could not compete with Mylan. For example, while Plaintiffs claim that Sanofi could not match Mylan's rebates due to the market share of EpiPen devices and Mylan's PBM rebates, *id.* ¶ 182, Plaintiffs do not, and cannot, allege that Sanofi could not have matched those rebates had they been willing to compete for exclusive formulary position with the PBMs. Sanofi has asserted that it "had no intention of trying to make similar offers to exclude the EpiPen from patients' coverage." *Sanofi* Complaint ¶ 66. Plaintiffs cannot blame Mylan for Sanofi's own unilateral business decision not to compete. The fact that competition for some customers allegedly involved competing to serve as an "exclusive" supplier is not only lawful, but is a "vital form of rivalry" encouraged under the antitrust laws. *ZF Meritor, LLC*, 696 F.3d at 270. Indeed, the Seventh Circuit recently rejected a similar antitrust claim based on allegedly exclusive agreements, holding that "competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 411 (7th Cir. 2017) (Posner, J.) (citation omitted). There, the plaintiff hospital challenged allegedly exclusive agreements between the defendant hospital and health insurers. *Id*. at 409. The court found that the agreements did not violate the antitrust laws, observing that such arrangements can result in benefits for the insurer and its members because "an insurance company may get better rates from a hospital in exchange for agreeing to an exclusive contract . . . ." *Id*. at 410. So too here, as Plaintiffs concede that Mylan engaged in aggressive rebating to compete for business, CAC ¶ 193, and that PBMs were able to leverage competition between EpiPen and Auvi-Q to achieve benefits for both health insurers and patients. *See e.g.*, *id.* ¶ 190 (explaining that Express Scripts

"leveraged the competition between EpiPen and Auvi-Q to earn additional discounts for our clients"). Plaintiffs' claims should be dismissed.

**2. Plaintiffs' EpiPen4Schools Allegations Fail to State a Claim.**

Plaintiffs allege that Mylan's successful EpiPen4Schools program—*which has provided over one million free EpiPen devices to schools*—is a mere ruse to increase Mylan's profits. Indeed, Plaintiffs equate Mylan with a dealer of illegal addictive drugs, claiming that Mylan sought to "hook consumers on its product." *Id.* ¶ 200. Plaintiffs do not allege, nor can they, that using free EpiPen devices provided by the EpiPen4Schools program to save a child's life somehow begets epinephrine addiction, much less dependency on EpiPen Auto-Injectors in particular. At best, Plaintiffs allege that Mylan engaged in legitimate state and federal lobbying efforts to allow schools to participate in the program, *id.* ¶¶ 201-207, which under these circumstances is immune from the antitrust laws under the *Noerr-Pennington* doctrine. *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961) ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws."); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *In re Wellbutrin SR Antitrust Litig.*, Nos. 04-5525, 04-5898, 05-396, 2006 WL 616292, at *5 (E.D. Pa. Mar. 9, 2006).

Plaintiffs also allege that schools receiving free EpiPen devices had to agree to not to purchase epinephrine auto-injectors from Mylan's competitors. CAC ¶¶ 213-215. Even if this allegation were true (and it most certainly is not), Plaintiffs fail to allege that any competition foreclosed by such agreements "constitutes a substantial share of the relevant market" for a sufficient period of time. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). Put simply, Plaintiffs allege no facts showing that sales to schools under the EpiPen4Schools program constituted such a large share of the overall alleged market for epinephrine auto-injectors that other auto-injectors were unable to compete. Plaintiffs' EpiPen4Schools-related claims should be dismissed.

### C. Plaintiffs Fail To Allege Causation For Their Antitrust Claims Regarding Patent Settlements.

To have standing under both the federal and state antitrust laws, a private antitrust plaintiff must show, among other factors, a "causal connection between the antitrust violation and the plaintiff's injury." *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406, 410 (10th Cir. 1992); *see also Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). Failure to plead sufficient facts to establish causation mandates dismissal on a Rule 12(b)(6) motion. *Sharp*, 967 F.2d at 407; *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 99 (2d. Cir. 2017) ("We cannot sustain plaintiffs' antitrust claims on the basis of wishful thinking. Plaintiffs are due all reasonable inferences, but they must allege some factual basis from which to make those inferences. . . . In the absence of such facts, plaintiffs' theory of causation must fail."); *A.G. v. Elsevier, Inc.*, 732 F.3d 77, 82 (1st Cir. 2013) ("The superficiality of the causation allegation, coupled with the speculative nature of the claim as a whole, makes manifest that the plaintiffs have failed to plead a plausible cause of action.").[17] Here, Plaintiffs have not plausibly alleged that Defendants caused any delay in the sale of any potential competitors' epinephrine auto-injector products.[18] Instead, two independent barriers prevented Teva, Intelliject, and/or Sandoz from entering the market with a competing epinephrine auto-injector unrelated to the respective litigations and/or settlements: (1) Teva's and Sandoz's inability to obtain FDA approval (which they still lack to this day) for their respective epinephrine auto-injectors; and (2) Pfizer's EpiPen device patents, which do not expire until 2025. Therefore, Plaintiffs do not have antitrust standing for their claims related to generic or competitive delay. *Sharp*, 967 F.2d at 409 (affirming dismissal of antitrust claim for lack of standing).

[17] The standard is just as exacting for a RICO claim, which requires the alleged pattern of racketeering activity to be the but-for and *proximate* cause of plaintiff's injury. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992); *see also Azim v. Tortoise Capital Advisors, LLC*, No. 13-2267, 2014 WL 707235, at *4 (D. Kan. Feb. 24, 2014); *see also infra* Section II.D.

[18] Plaintiffs do not allege that Mylan was a party to or otherwise participated in any of these litigations, nor could they. Without any facts connecting Mylan to any delay in Teva's, Intelliject's, or Sandoz's entry, Plaintiffs have no standing to sue Mylan under the antitrust laws.

### 1. Plaintiffs Concede That Teva and Sandoz Did Not and Do Not Have FDA Approval to Launch a Generic EpiPen Auto-Injector.

"In the pharmaceutical industry, FDA approval is a prerequisite to enter *any* drug market." *Andrx Pharm., Inc. v. Biovail Corp. Int'l.*, 256 F. 3d 799, 807 (D.C. Cir. 2001) (emphasis in original); *see also* 21 U.S.C. § 355(a). Under the terms of the Teva Settlement, Teva was provided a license to enter the market with its epinephrine auto-injector on June 22, 2015. CAC ¶ 260. As Plaintiffs concede, Teva has struggled to obtain FDA approval for its generic version of EpiPen, and to date has not gained approval—over two years after it was permitted to enter the market under the Teva Settlement. Plaintiffs admit that even in February 2016, well after Teva was permitted to enter the market under its settlement with Pfizer, the FDA rejected Teva's ANDA due to "deficiencies." CAC ¶¶ 260, 319, 322;[19] *see also* Teva Form 6-K (Feb. 29, 2016), attached hereto as Exhibit D (noting that "Teva received a complete response letter on February 23, 2016 relating to its epinephrine ANDA in which the *FDA identified certain major deficiencies* . . . . Due to the major nature of the CRL, *Teva expects that its epinephrine product will be significantly delayed and that any launch will not take place before 2017*") (emphasis added).[20]

Lack of FDA approval is a regulatory barrier to Teva's entry that is totally independent of any actions taken by Pfizer in prosecuting or settling patent litigation (or by Mylan, which was

[19] Ed Silverman, *How Mylan Tried to Keep Teva from Selling a Generic EpiPen*, STAT (Aug. 31, 2016), https://www.statnews.com/pharmalot/2016/08/31/mylan-teva-generic-epipen/) (relied on by Plaintiffs at CAC ¶¶ 313, 315 & nn.85, 87-89).

[20] This Court may take judicial notice of such documents. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th. Cir. 2013) (district court may properly consider on a motion to dismiss: "documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and 'matters of which a court may take judicial notice'") (internal citation omitted); *In re Zagg Secs. Litig*., 797 F.3d 1194, 1200 (10th Cir. 2015) (affirming district court's 12(b)(6) dismissal of action where district court took "judicial notice of several publicly available documents, including ZAGG press releases, SEC forms, transcripts of earnings conference calls, and ZAGG stock prices during the class period"); *see also* CAC ¶ 248 (citing Pfizer earnings calls); *id.* ¶¶ 253, 294-95, 470 (citing Pfizer's EpiPen device Patents and the Teva Patent Litigation); *id.* ¶ 270 (citing press release announcing the Teva Settlement); *id.* ¶¶ 246, 248, 302 & n.67 (citing Pfizer's SEC filings and financial statements regarding EpiPen); *id.* ¶ 293 (citing the Intelliject Litigation); *id.* ¶ 302 & n.76 (citing the Sandoz Litigation and the Stay Order from that case).

not a party to the litigations).[21] Thus, Plaintiffs' naked assertion that "[b]ut for the illegal [Teva Settlement], Teva would have begun marketing generic versions of the EpiPen well before the 2015 delayed entry date it agreed to," CAC ¶ 546, is nothing more than a speculative (and in fact impossible) conclusion. Indeed, Plaintiffs do not (and cannot) identify what an earlier entry date would have been under their theory. Instead, Plaintiffs offer only speculation, without any factual basis, that Teva "*may*" somehow have cured the "problems" with its ANDA raised by FDA if Pfizer had not sued Teva for patent infringement. CAC ¶ 319 (emphasis added). According to Plaintiffs' own theory, however, tens of millions of dollars stood to be gained by any competitor entering the epinephrine auto-injector market, and thus Teva had every incentive, before and after its settlement with Pfizer, to obtain approval as quickly as possible. Yet Plaintiffs fail to allege any facts showing Teva's "intent and preparedness" to actually obtain FDA approval. Such wild speculation is insufficient to meet Plaintiffs' burden to plausibly plead causation. *See Andrx Pharm.*, 256 F. 3d at 807; *Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136, at *6 (E.D. Pa. June 21, 2004). These regulatory hurdles thus break the chain of causation, and warrant dismissal of Plaintiffs' Teva-related claims. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 165 (3d Cir. 2017) ("That a regulatory or legislative bar can break the chain of causation in an antitrust case is beyond fair dispute.").

In *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, the court dismissed an alleged reverse payment claim under the same circumstances. No. 14-md-02503, 2015 WL 5458570, at *9-10 (D. Mass. Aug. 14, 2015). There, the generic and brand firms settled and agreed to a licensed entry date of November 26, 2011, but the generic firm did not receive the FDA approval necessary to launch the generic product until November 30, 2011. *Id.* at *10. Accordingly, the court dismissed those claims where plaintiffs had not established "a plausible

---

[21] Nor was it the result of Mylan's citizen petition relating to Teva's proposed generic product, as explained further below. *Infra* Section I.F.

allegation of delay caused by Defendants" because it was the FDA's lack of approval, and not any settlement agreement, that was the "limiting factor" on the generic's ability to bring its product to market. *Id.* at 41; *see also In re fTamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 137 (E.D.N.Y. 2003) (dismissing complaint because plaintiffs' injuries could not flow from the settlement agreement where "no generic manufacturer ever obtained FDA approval to bring the drug to market"); *Eli Lilly Co. v. Zenith Goldline Pharm., Inc.*, 172 F. Supp. 2d 1060, 1078-79 (S.D. Ind. 2001) (plaintiffs' injuries could not be attributed to defendants' conduct where FDA's delay in approving ANDA was for reasons unrelated to defendants' conduct).

Plaintiffs also concede that Sandoz has never received tentative, let alone final, FDA approval for its epinephrine auto-injector. *See* CAC ¶¶ 302-03. Sandoz could have received tentative approval at *any* time and final approval as early as July 2013—over four years ago—when the Hatch-Waxman 30-month stay of FDA approval expired. *See* Pfizer Br. at 6. The Complaint contains no plausible allegation that Sandoz's failure to obtain regulatory approval was the result of any conduct by Defendants. Plaintiffs' Sandoz-related claim, therefore, fails for the same reasons discussed regarding the Teva Settlement.

**2. Plaintiffs Concede the Patents for EpiPen Auto-Injectors Do Not Expire Until 2025.**

Plaintiffs' competitive delay claims should also be dismissed for lack of causation because Plaintiffs do not allege any facts that Teva, Intelliject, or Sandoz (or any other potential competitor) could have lawfully entered the market without infringing Pfizer's patents, which constituted independent barriers to such entry. *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) ("a patent is an exception to the general rule against monopolies and to the right to access to a free and open market") (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945)). The First Circuit and the Third Circuit have recently held in cases involving reverse payment claims that in order to meet its burden to prove causation, a plaintiff must show that no valid patent would have blocked generic entry. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63 (1st Cir. 2016); *Wellbutrin XL*, 868 F.3d

at 165 ("The problem with [Plaintiffs' argument], however, is that it does not take into account [the brand company's] blocking patent. It is not enough for the Appellants to show that [the generic firm] wanted to launch its drug; they must also show that the launch would have been legal.").

Here, Pfizer's EpiPen device patents do not expire until 2025. Absent a license, those patents would prohibit infringing competitors from entering the market prior to that date. *See* CAC ¶¶ 248, 470. Plaintiffs allege no facts that any potential competitor could have entered without infringing the EpiPen device patents. Nor do Plaintiffs offer any factual support for their conclusory assertions that the EpiPen device patents are invalid.

Absent any allegations to the contrary, Pfizer's EpiPen device patents were a legal and independent barrier to generic entry by Teva, Sandoz, and Intelliject, cutting off the chain of causation leading to Plaintiffs' alleged injury. *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (dismissing antitrust claim because "[n]o cognizable antitrust injury exists where the alleged injury is a 'by-product of the regulatory scheme' or federal law rather than of the defendant's business practices") (citation omitted).[22]

### D. Plaintiffs Fail to Allege a Plausible Conspiracy Between Mylan and Pfizer.

Counts I and III allege an unlawful agreement between Mylan and Pfizer "to prevent the sale of a generic version of the EpiPen in the United States." CAC ¶¶ 542-55 (Count III, state law); *id.* ¶¶ 525-35 (Count I, federal law). As an initial matter, Plaintiffs assert that this supposed agreement is "a per se violation of § 1 of the Sherman Act." *Id.* ¶ 530. None of the alleged conduct, however, could possibly constitute a per se antitrust violation as a matter of law.

[22] *See also City of W. Penn Power Co.*, 147 F.3d at 267-68 (need for regulatory approval "cut[] the causal chain and convert[ed] what might have been deemed antitrust injury in a free market into only a speculative exercise"); *Barr Lab. v. Quantum Pharmics, Inc.*, No. 90-CV-4406, 1994 WL 1743983, at *4 (E.D.N.Y. Feb. 2, 1994) ("[B]ecause of the number of intervening acts (e.g., consumer choice, FDA approval), Barr is an indirect victim of the alleged predicate acts and hence cannot sustain a claim for violation of the RICO statute."); *Longmont United Hosp. v. Saint Barnabas Corp.*, No. 06 - 2802, 2007 WL 1850881, at *4 (D.N.J. June 26, 2007) ("Where a government body is an intervening actor between an alleged RICO violation and the alleged harm, courts in this Circuit and others uniformly dismiss the claims for lack of proximate cause.").

Among other things, the Supreme Court expressly declined to apply a per se standard to the evaluation of patent settlement agreements of the sort at issue here. *See, e.g.*, *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) (applying "rule of reason" rather than per se rule to reverse payment patent settlement claims); *see also Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 640 (10th Cir. 1987) ("The Supreme Court has applied the rule of per se illegality only to particular types of concerted behavior, including horizontal and vertical price-fixing agreements, and group boycotts.") (citations omitted). Therefore, to the extent Plaintiffs attempt to allege per se unlawful conspiracy claims in Counts I and III, these claims should be dismissed.

The conspiracy allegations in Counts I and III also fail because Plaintiffs have failed to allege any agreement or conspiracy between Mylan and Pfizer to exclude competing epinephrine auto-injectors. Section 1 of the Sherman Act prohibits a "contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. To state a Section 1 claim, a plaintiff must plausibly allege facts showing that the defendants "entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." *Turner Network Television, Inc.*, 964 F.2d at 1027 (10th Cir. 1992); *see also Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1297 (10th Cir. 2008); *Tal*, 453 F.3d at 1261.[23] The question is whether the allegations support a plausible inference that "there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223 (D. Kan. 2013) (citation omitted). A "bare bones accusation of conspiracy without any supporting facts is insufficient to state an antitrust claim." *Turner Network Television*, 964 F.2d at 1026 (quotations and citation omitted). Rather, a plaintiff must allege "direct or circumstantial evidence" of conspiracy. *Suture Express, Inc.*, 963 F. Supp. 2d at 1223–24 (quotations omitted) (dismissing conspiracy claim). In this case, Plaintiffs do no such thing.

---

[23] If Plaintiffs' allegations regarding their federal antitrust claims are found to be insufficient, then Plaintiffs' state law antitrust conspiracy claims (Count III) also fail because state antitrust law is interpreted harmoniously with its federal counterpart. *Infra* 36 n.33.

*First*, Plaintiffs fail to plausibly allege *direct* evidence of a conspiracy between Mylan and Pfizer to exclude competing epinephrine auto-injectors. Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23 (citation omitted). The only actual agreement Plaintiffs allege is that Pfizer provided Mylan with a license to sell the EpiPen devices that Pfizer manufactures—an agreement that has nothing to do with competing epinephrine auto-injectors. *See, e.g.*, CAC ¶¶ 97, 100. As a matter of law, this type of patent license cannot violate the antitrust laws because the Patent Act grants patentees the exclusive right to license their patents, 35 U.S.C. § 261, and a patent license agreement "arises from the patent grant and a lawful transfer of a part of the rights to which that grant [is] attached." *Rail-Trailer Co. v. ACF Indus., Inc.*, 358 F.2d 15, 16–17 (7th Cir. 1966); *accord United States v. Gen. Elec. Co.*, 272 U.S. 476, 488 (1926); *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2406-07 (2015) ("Patents endow their holders with certain superpowers" including the power to license the patented article).

*Second*, Plaintiffs fail to plausibly allege *circumstantial* evidence of a conspiracy between Mylan and Pfizer to exclude competing epinephrine auto-injectors. Plaintiffs appear to base their conspiracy allegations on four separate patent litigations and/or settlements between (i) Pfizer and Teva, (ii) Pfizer and Intelliject, (iii) Pfizer and Sandoz, and (iv) Mylan and Teva. At most, these allegations amount to loosely parallel conduct by Pfizer and Mylan, which is insufficient to state a conspiracy claim. *Twombly*, 550 U.S. at 556 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."); *see also Seneca-Cayuga Tobacco Co.*, 546 F.3d at 1298 (same). That Pfizer sued Teva, Intelliject, and Sandoz to protect its EpiPen device patents and then settled those claims says nothing about Mylan's participation in any conspiracy with Pfizer. CAC ¶¶ 251-84 (Teva); *id.* ¶¶ 285-301 (Intelliject); *id*. ¶¶ 302-03 (Sandoz). Indeed, Plaintiffs do not and cannot allege that Mylan was a party to any of those litigations. Moreover, that Cephalon (later acquired by Teva) sued Mylan to protect its *Nuvigil* patents, and then settled those claims, says nothing about Pfizer's participation in an EpiPen-related conspiracy with Mylan. *Id*. ¶¶ 271-84. Such "discrete, bilateral understandings . . . rather than a horizontal

agreement amongst the defendants" are "lawful conduct." *In re Citric Acid Litig.*, 191 F.3d 1090, 1095 (9th Cir. 1999) (quotations omitted). Plaintiffs have alleged nothing more than *different* lawsuits concerning *different* patents and *different* parties – in some instances even *different products*.

Moreover, there is no basis to infer a conspiracy from, at best, ambiguous circumstantial evidence here because Mylan and Pfizer did not act "contrary to their economic interests absent an agreement." *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) (affirming dismissal); *cf. King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-cv-1797, 2014 WL 2813312, at *13 (E.D. Pa. June 23, 2014) ("bilateral settlements" did not "contravene[]" defendants' self-interests, precluding conspiracy inference). Plaintiffs' own allegations make clear that Mylan and Pfizer are *not* competitors for epinephrine auto-injectors and share the same *unilateral* incentive to sell the same EpiPen products. According to Plaintiffs, "Mylan and [the] Pfizer defendants have a unified interest" in those devices and the patents that protect them. CAC ¶ 241. The companies must "work collaboratively to enhance the products [sic] sales volume and profitability," and their "EpiPen-related revenues rise (or fall) together." *Id.* ¶ 241; *accord id.* ¶¶ 242-46. Indeed, such patent-licensing agreements are common, and they "more often increase than inhibit competition, both before and after the patent expires." *Kimble,* 135 S. Ct. at 2412; *accord* U.S. Dep't of Justice, *Antitrust Guidelines for the Licensing of Intellectual Property* § 3.4 (2017). Mylan's decision to issue joint press releases with Pfizer does not suggest otherwise. CAC ¶¶ 270, 298. Issuing press releases stating that the settlements would permit Teva and Intelliject to introduce competing products is entirely consistent with Mylan's independent business interest and in no way "raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. A conspiracy cannot be inferred under these circumstances. *Id.* at 556 n.4 ("independent responses to common stimuli" not enough for plausible conspiracy allegation).

Plaintiffs have alleged no facts showing that Mylan and Pfizer had a "conscious commitment to a common scheme" to block competing epinephrine auto-injectors. *Suture*

*Express, Inc.*, 963 F. Supp. 2d at 1223.[24] Plaintiffs' conspiracy claims in Counts I and III should therefore be dismissed.[25]

**E. Plaintiffs Fail to Allege Unlawful "Reverse" Patent Settlements, and Their Reverse Payment Claims Are Time-Barred in Any Event.**

Mylan was not a party to the lawsuits at issue in Plaintiffs' reverse payment allegations; only Pfizer was. As Pfizer explains in Section I.B of its brief, which Mylan incorporates herein by reference to avoid repeating the same arguments, Plaintiffs have failed to plead that any "reverse payment" took place—let alone one that was "large" and "unexplained" as required by controlling Supreme Court precedent—and any claims based on patent settlements are time-barred in any event.

**F. Mylan's Citizen Petition to the FDA Could Not Have Prevented Teva's Entry and Is Immune From the Antitrust Laws.**

Plaintiffs also allege that Mylan used the FDA citizen petition process to delay entry of generic competitors to the market. CAC ¶ 304. This claim fails for several reasons.

*First*, Mylan's petition could not have prevented Teva from launching an auto-injector because, as discussed above, the FDA denied Teva's application. *Id.* ¶ 319. Additionally, the Complaint fails to allege that Mylan's petition caused any delay in the FDA approval process.

---

[24] Plaintiffs' allegations about an alleged "stay-and-delay" agreement between Sandoz and the Pfizer Defendants are similarly deficient. CAC ¶¶ 302-03. Mylan was not a party to that litigation, and Plaintiffs have alleged no facts showing that Mylan had anything to do with the alleged court order staying and administratively closing that case.

[25] Plaintiffs' conspiracy claims also are barred under the "*Copperweld* doctrine," which provides that "parties with unified interests, such as a patent holder and licensee, are incapable of conspiring" for purposes of the antitrust laws. *Shionogi Pharma, Inc. v. Mylan, Inc.*, No. 10-cv-1077, 2011 WL 2174499, at *5 (D. Del. May 26, 2011); *see Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984); *see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* ("*Lenox II*"), 847 F.3d 1221, 1233 (10th Cir. 2017) (*Copperweld* applies "to a broader variety of economic relationships") (quoting *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (*Copperweld* may apply to a principal and its agent, a franchisor and its franchisee, and a patent holder and its patent licensee)). Here, Defendants are not "separate economic actors pursuing separate economic interests" with respect to the EpiPen auto-injector patent license agreement. *Copperweld*, 467 U.S. at 769. A license-related agreement among them therefore does not "deprive[] the marketplace of . . . independent centers of decisionmaking" and cannot violate the antitrust laws. *Id*. Indeed, "it strains credibility" to claim that "any concerted activity the [licensor and licensee] might take with regard to the patent would coalesce economic power previously directed at disparate goals." *Levi Case Co. v. ATS Prod., Inc.*, 788 F. Supp. 428, 432 (N.D. Cal. 1992). Plaintiffs' conspiracy claims should be dismissed for this independent reason as well.

As an initial matter, the FDA cannot delay approval of an ANDA based on a citizen petition, unless the FDA determines that "a delay is necessary to protect the public health." 21 U.S.C. 355(q)(1)(A) ("The Secretary ***shall not*** delay approval of a pending application . . ."). Further, Mylan allegedly submitted its petition "six months before Teva was scheduled (pursuant to the settlement) to enter the market." CAC ¶ 311 (quotations omitted). But the FDA is required to "take final agency action on a petition not later than 150 days [i.e., *five* months] after the date on which the petition is submitted." 21 U.S.C. 355(q)(1)(F).[26] While Plaintiffs allege that Mylan "waited until just before the FDA's response was due to submit a supplemental 'study' from a consulting firm," CAC ¶ 313, this makes no difference. Under FDA regulations, the five-month period cannot be extended "for any reason," including the submission of "supplemental information supplied by the petitioner." 21 U.S.C. 355(q)(1)(F). Thus, Mylan's citizen petition could not have caused delay as a matter of law. *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 61 (2d Cir. 2016) (dismissing citizen petition claim in light of FDA guidance regarding timing of resolution of citizen petition); *see also In re Wellbutrin XL Antitrust Litig.*, Civ. No. 08-2431, 08-2433, 2012 WL 1657734, at *28 (E.D. Pa. May 11, 2012) (dismissing citizen petition claim where plaintiffs failed to show that citizen petition "actually delayed" FDA approval of ANDA).[27]

*Second*, Mylan's citizen petition falls within the *Noerr-Pennington* doctrine, which "exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition." *Tal*, 453 F.3d at 1259 (citation omitted); *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 56 (1993) ("[T]hose who petition government for redress are generally immune from antitrust liability."). The *Noerr-*

[26] Plaintiffs acknowledge this fact in their Complaint, noting that "Congress specifically addressed these petitions when it passed a law requiring the FDA to resolve them in an expedient manner *to avoid generic delay*." CAC ¶ 308 (internal quotations omitted) (emphasis added).

[27] The FDA may also deny a citizen petition if it "determines that a petition . . . was submitted with the primary purpose of delaying the approval of an application and the petition does not on its face raise valid scientific or regulatory issues." 21 U.S.C. 355(q)(1)(E). Plaintiffs do not allege that that happened here.

*Pennington* doctrine immunizes government petitioning unless the petition is (1) "objectively baseless" and (2) uses "the governmental *process*—as opposed the *outcome* of that process—as an anticompetitive weapon." *Id.* at 60-61; *see also In re Solodyn (Minocylcine Hydrochloride) Antitrust Litig.*, No. 14-MD-02503-DJC, 2015 WL 5458570, at *12 (D. Mass. Sept. 16, 2015) (applying two-part inquiry in *Prof'l Real Estate Investors* to evaluate alleged "sham" citizen petition); *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07 Civ. 7343 (HB), 2009 WL 2708110, at *4 (S.D.N.Y. Aug. 28, 2009) (same).

With respect to the first element, Plaintiffs make general allegations about the use of citizen petitions, *see, e.g.*, CAC ¶¶ 305-309, but do not (and cannot) allege, as required, that the petition filed by Mylan was objectively baseless. A citizen petition is only "objectively baseless" when "no reasonable pharmaceutical manufacturer could have realistically expected the FDA to grant the relief sought." *In re Lipitor Antitrust Litig.*, No. 3:12-cv-2389 (PGS), 2013 WL 4780496, at *22 (D.N.J. Sept. 5, 2013) (quotations and citation omitted); *see also Louisiana Wholesale Drug Co.*, 2009 WL 2708110, at *4. Plaintiffs suggest it was inappropriate for Mylan to ask that Teva be required "to demonstrate that its product was the *same as* Mylan's EpiPen." *Id.* ¶ 311 (internal quotations omitted) (emphasis added); *see also id.* ¶ 315. But under Section 505(j) of the U.S. Food, Drug, and Cosmetic Act ("FDCA"), an ANDA must meet certain requirements to be approved, including providing information to show that the "active ingredient" or ingredients are "the *same as* that of the listed drug," 21 U.S.C. § 355 (J)(4)(C)(i) (emphasis added). Applicants must also show "that the route of administration, the dosage form, and the strength of the new drug are the *same as* those of the listed drug," *id.* § 355(j)(2)(A)(iii) (emphasis added), and "that the labeling proposed for the new drug is the *same as* the labeling approved for the listed drug," *id.* § 355(j)(2)(A)(v) (emphasis added). The Complaint says nothing about these FDA requirements, much less how Mylan's citizen petition could be objectively unreasonable in light of them. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at *12 (D. Mass. Sept. 16, 2015) (dismissing citizen petition claim where "direct purchasers have not adequately alleged that no

reasonable manufacturer could have realistically expected to prevail on this petition"); *see also In re Lipitor Antitrust Litig.*, 2013 WL 4780496, at *22 (dismissing citizen petition claim where plaintiffs failed to show that citizen petition was objectively baseless).[28]

Plaintiffs' assertion that the supplemental study submitted by Mylan "had numerous flaws," CAC ¶ 313, similarly fails to show that Mylan's petition was objectively baseless. Plaintiffs fail to allege any facts showing that the conclusion of the study was incorrect—i.e., that "Teva's device would not be effective." *Id.*; *see also Apotex*, 823 F.3d at 61 (allegations showing that plaintiff merely "disagreed with the arguments [defendant] advanced in its citizen petition" insufficient to state a claim). Notably, the "FDA ultimately rejected Teva's generic product when it was under review."[29] *Id.* ¶ 319. Because Mylan's citizen petition did not prevent or delay Teva's entry, and because it is immune under the *Noerr-Pennington* doctrine in any event, Plaintiffs' citizen petition-related claims should be dismissed.[30]

With respect to the second element, Plaintiffs' allegations are insufficient to show that Mylan used the citizen petition *process*, as opposed to the *outcome* of that process, to exclude Teva, or any other generic, from the market. The Supreme Court has long recognized that "[i]t is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." *Noerr*, 365 U.S. at

[28] Plaintiffs allege that citizen petitions "by brand drug manufacturers are almost always (92%) denied." CAC ¶ 305. To the extent Plaintiffs are using this statistic to suggest that Mylan's citizen petition was objectively baseless, this inference is unjustified, as it would mean that *every* citizen petition is objectively baseless. There is no support in the law for such a conclusion.

[29] The FDA denied the application for "unspecified deficiencies." *See* CAC ¶ 319 n. 89. Plaintiffs do not allege that the FDA got it wrong (nor could they). Instead, Plaintiffs claim that Professor Carrier said it was "likely" that Teva could have addressed these issues "if the patent lawsuit had not delayed its ability to enter the market," but as Professor Carrier acknowledged, this was "speculat[ion]." *Id.* Nor, in any case, does this show how Mylan's citizen petition prevented Teva from entering the market.

[30] Plaintiffs' purported concerns over the fees Mylan paid to one of the doctors quoted in its citizen petition, CAC ¶ 317, are irrelevant to whether the petitioning activity is immune. These allegations also fail to support Plaintiffs' assertions. The doctor in question has received fees from various pharmaceutical companies over the years, including from Teva. According to the Open Payments federal database, cited by Plaintiffs in the Complaint, *id.*, Dr. Meltzer received more than $60,000 in fees from Teva between 2014 and 2015. Open Payments Data for Eli Meltzer, CMS, *available at* https://openpaymentsdata.cms.gov /physician/262707/payment-information.

139. According to Plaintiffs, Mylan filed its citizen petition to ensure that "*no other competing device design should ever be approved*," unless it was "an exact replica." CAC ¶ 315 (emphasis in original). In other words, Mylan allegedly sought to use the *outcome* of its citizen petition to exclude potential generic manufacturers, not the process itself. Such a petition falls squarely within *Noerr-Pennington* immunity. *See Noerr*, 365 U.S. at 139-140 ("[I]nsofar as [defendant's] campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had.").

### G. Plaintiffs Fail to State an Antitrust Claim Regarding Allegedly "Misleading" Statements.

Commercial speech, even allegedly deceptive speech, almost never provides a basis for an antitrust claim, and this case is not one of the rare exceptions where it could. Plaintiffs make much of Mylan's supposedly deceptive statements about Auvi-Q, CAC ¶¶ 229-35, and its alleged failure to disclose the "bought-and-paid-for" nature of statements by physicians supporting the EpiPen two-pack, *id.* ¶¶ 325-47. But the case law makes clear that alleged "deception . . . can be of no consequence so far as the Sherman Act is concerned." *Noerr*, 365 U.S. at 145. Plaintiffs' allegations about Mylan's speech do not show or support an inference that Mylan violated the antitrust laws, and therefore Counts I, III, IV, and V should be dismissed.

"[I]t is the 'protection of competition or prevention of monopoly which is plainly the concern of the Sherman Act,' not the vindication of general 'notions of fair dealing,' which are the subject of many other laws at both the federal and state level." *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009) (Gorsuch, J.) (quoting PHILLIP E. AREEDA & HERBERT HOVENKAMP, Antitrust Law ¶ 770 (3d ed. 2008)). The Tenth Circuit has held that courts must presume that allegedly false speech or advertising "bears only a *de minimis* effect on competition." *Lenox MacLaren Surgical Corp v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014).[31]

[31] Other circuits have held similarly. *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003) ("An antitrust claim premised primarily on advertising or

This presumption is difficult to overcome. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079-80 (10th Cir. 2013) (Gorsuch, J.) (alleged "acts of fraud" give rise to antitrust liability only when they "are so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors"); *accord Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1349 (2017) ("[F]alse advertising alone hardly ever operates in practice to threaten competition" and thus hardly ever supplies the basis for an antitrust claim (citation omitted)). A Section 2 plaintiff may rebut the presumption only "by satisfying a six-factor test, showing that the disparagement was: (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Lenox*, 762 F.3d at 1127.[32] Plaintiffs allege two categories of supposedly deceptive speech: (1) Mylan's statements about Auvi-Q and (2) Mylan's alleged failure to disclose the "bought-and-paid-for" nature of statements by physicians supporting the EpiPen two-pack. Plaintiffs cannot satisfy the six factors required to overcome the presumption that this allegedly deceptive speech has only a *de minimis* effect on competition.

#### 1. Plaintiffs' Allegations About Mylan's Supposed Statements About Auvi-Q Do Not Overcome the *De Minimis* Presumption.

Plaintiffs allege that Mylan "created and spread misinformation about Auvi-Q and its bioequivalence to EpiPen." CAC ¶ 229. They allege that Mylan used a "misleading title" for a study that was "not intended for legitimate scientific debate," but was instead aimed at

speech must overcome a presumption that such advertising or speech had a *de minimis* effect on competition"); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (same); *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988) ("[A] plaintiff asserting a monopolization claim based on misleading advertising must 'overcome a presumption that the effect on competition of such a practice was *de minimis*'" (citation omitted)).

[32] The Tenth Circuit has not yet decided "whether a plaintiff must satisfy all six factors to overcome the *de minimis* presumption." *Lenox*, 762 F.3d at 1128 n.9; *compare with Harcourt*, 108 F.3d at 1152 (all six "elements" required). This Court need not answer that question, however, because Plaintiffs have not alleged facts satisfying *any* of these six factors, much less some combination of them.

influencing "the opinions of key thought leaders in the allergy field . . . ." *Id.* ¶¶ 229-30. Plaintiffs also point to public statements and statements to physicians that they contend were "misleading." *Id.* ¶¶ 231-32. They claim that, through this alleged conduct, Mylan "suggested that the decision [by PBMs] to exclude Auvi-Q from formulary was based on clinical recommendation, rather than on Mylan's huge, conditional rebate offers," and that "Mylan was the 'Preferred' [epinephrine auto-injector] device for 99% of patients . . . ." *Id.* ¶¶ 233-34. They further claim that Ms. Bresch misled doctors and patients "to combat competition from Auvi-Q." *Id.* ¶ 231.

Plaintiffs' allegations do not even make it past the first factor. Even if Mylan's statements were misleading or debatable—a proposition Mylan denies and will disprove if this litigation proceeds—the case law requires that the statements be "*clearly false*." *Lenox*, 762 F.3d at 1127 (emphasis added). Plaintiffs have not alleged clear falsity; neither the title of the scientific study that Mylan funded nor Mylan's constitutionally protected speech touting its own product were allegedly untrue. CAC ¶ 229 ("misleading" title); *id.* ¶ 231 (misleading "fear mongering"); *id.* ¶ 232 ("misleading" statements); *id.* ¶ 233 (misleading "suggest[ion]"). That ends the matter. *Am. Council of Certified Podiatric Physicians & Surgeons*, 323 F.3d at 371 (to rebut *de minimis* presumption, plaintiff must show at least that "the advertising was clearly false" rather than misleading); *cf. Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) (Easterbrook, J.) ("[T]he remedy is not antitrust litigation, but more speech—the marketplace of ideas.").

Indeed, Sanofi—the alleged target of the supposedly misleading statements related to Auvi-Q—prevailed on precisely this argument in *Eisai*, in which the plaintiff alleged that Sanofi's deceptive marketing practices violated federal antitrust laws. 2014 WL 1343254, at *36-37. At Sanofi's invitation, the court rejected this theory. The court reasoned that, "[w]hile it is theoretically possible that 'false statements about a rival to potential investors and customers' can be a form of anticompetitive conduct, it would be a rare case in which such false statements in and-of themselves would be sufficient to support an antitrust violation." *Id.* at *37 (citing

*Santana, Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132 (3d Cir. 2005)). This is not one of those "rare" cases, as none of Plaintiffs' allegations "warrant deviating from the general rule that deception is not actionable as an antitrust violation." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13- MD-2445, 2017 WL 36371, at *8 n.7 (E.D. Pa. Jan. 4, 2017).

### 2. Plaintiffs' Allegations About Physician Statements Do Not Overcome the *De Minimis* Presumption.

Plaintiffs also wrongly claim that Mylan's alleged "fail[ure] to disclose the 'bought-and-paid-for' nature" of statements by physicians supporting the EpiPen two-pack constituted anticompetitive conduct. CAC ¶ 346; *accord id.* ¶¶ 335-47. Just like Plaintiffs' claims about Mylan's Auvi-Q statements, these speech-related allegations cannot overcome the *de minimis* presumption and do not support an antitrust claim.

As a threshold matter, Plaintiffs are not complaining about *Mylan's* statements; rather, they complain that Mylan failed to make disclosures about *physicians'* statements. The antitrust laws do not compel Mylan to speak or otherwise disclose its relationship to third parties that make statements about its products. Plaintiffs allege that Mylan paid Dr. Lieberman of the NIAID to make "pro-Mylan statements," for example, that up to 20 percent of patients may require two doses of epinephrine to avoid serious complications from anaphylaxis, including death. *Id.* ¶¶ 340, 344. Even if he made such statements in exchange for payments from Mylan—an allegation that Mylan assumes as true only for purposes of moving to dismiss, *see supra* note 3—this allegation is irrelevant. *Id.* ¶ 344. The only question is whether Plaintiffs have plausibly alleged facts to overcome the *de minimis* presumption. They have not.

Regardless of the source of these statements, they did not, in fact, disparage Mylan's competitors, and are not clearly false, clearly material, or clearly likely to induce reasonable reliance, as they must be to overcome the presumption. *Lenox*, 762 F.3d at 1127. Indeed, statements about the efficacy of a single dose of epinephrine applied just as much to Mylan as they did to any of its competitors. The statements also fail to support an antitrust claim for an

independent reason: They were "readily susceptible to neutralization or other offset by rivals." *Lenox*, 762 F.3d at 1127. Competing epinephrine auto-injector sellers were free to respond to these statements by, for example, (1) packaging their products exclusively in two-packs as well, thus neutralizing any effect of the statements on competition, or (2) continuing to package their products in single-packs and promoting their packaging as a cost-saving option to Mylan's two-pack.

Plaintiffs' allegations regarding Mylan's statements about Auvi-Q and its alleged failure to disclose the "bought-and-paid-for nature" of physician statements cannot support their antitrust claims as a matter of law.

### H. Plaintiffs Fail to State a Claim Under Various State Antitrust Laws.

All of Plaintiffs' antitrust claims—state and federal—fail for the reasons set forth above.[33] Plaintiffs' antitrust claims in Counts III, IV, and V under particular state laws also fail for one or more of the following independent reasons:

- Plaintiffs fail to include a Named Plaintiff in Alaska, the District of Columbia, Iowa, New Mexico, North Dakota, Puerto Rico, Rhode Island, and South Dakota. *Thomas v. Metro. Life Ins. Co.*, 540 F. Supp. 2d 1212, 1226 (W.D. Okla. 2008) ("In short, the court's analysis requires dismissal of any state law claims alleged under the laws of any states where a particular named plaintiff is not a resident.");

[33] Although Plaintiffs also bring antitrust claims under state law, state antitrust laws are generally interpreted to mirror their federal counterparts, subject to few exceptions discussed in this Section. *See Ex parte Rice*, 67 So.2d 825, 829 (Ala. 1953) (per curiam); *Gunderson v. Univ. of Alaska, Fairbanks*, 902 P.2d 323, 327–30 (Alaska 1995); Ariz. Rev. Stat. Ann. § 44-1412; *Ideal Plumbing Co. v. Benco, Inc.*, 382 F. Supp. 1161, 1168 (W.D. Ark. 1974), *aff'd*, 529 F.2d 972 (8th Cir. 1976); *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541 n.2 (Cal. Ct. App. 1998); D.C. Code § 28-4515; *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st Dist. Ct. App. 1996); Haw. Rev. Stat. § 480-3; 740 Ill. Comp. Stat. 10/11; Iowa Code § 553.2; *Bergstrom v. Noah*, 974 P.2d 520, 530–31 (Kan. 1999); Mass. Gen. Laws Ann. ch. 93, § 1; *Onat v. Penobscot Bay Med. Ctr.*, 574 A.2d 872, 875 (Me. 1990); Mich. Comp. Laws § 445.784(1)–(2); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007); *Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 583–84 (N.D. Miss. 2004); Mo. Ann. Stat. § 416.141; Neb. Rev. Stat. Ann. § 59-829; Nev. Rev. Stat. § 598A.050; N.H. Rev. Stat. § 356:14; N.M. Stat. Ann. § 57-1-15; *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988); *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973); 35 Op. N.D. Att'y Gen. 76, 108 (1981); Or. Rev. Stat. Ann. § 646.715(2); *Gen. Gases & Supplies Corp. v. Shoring Forming Sys.*, 2001 TSPR 54 (P.R. 2001); R.I. Gen. Laws § 6-36-2(b); S.D. Codified Laws § 37-1-22; *Tennessee ex rel. Leech v. Levi Strauss & Co.*, No. 79-722, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Ct. 1980); Utah Code Ann. § 76-10-3118;Vt. Stat. Ann. tit. 9, § 2453(b); *Kessel v. Monongalia Cty. Gen. Hosp. Co.*, 648 S.E.2d 366, 380–81 (W. Va. 2007); *State v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 153 n.12 (Wis. 1978).

*Hunnicutt v. Zeneca, Inc.*, No. 10-CV-708, 2012 WL 4321392, at *5 (N.D. Okla. Sep. 19, 2012) ("[N]amed plaintiffs generally lack standing to assert class-wide claims under laws of states with which they have no connection."); *see also infra* 75 n.80.

- Plaintiffs are indirect purchasers of EpiPen devices to whom "[w]holesalers and retailers passed on" allegedly "inflated prices," CAC ¶ 494, and therefore cannot state a claim under Alaska,[34] Arkansas,[35] Illinois,[36] Massachusetts,[37] Missouri,[38] Puerto Rico,[39] and Rhode Island,[40] and West Virginia antitrust laws,[41] which do not permit indirect purchaser damages claims.

[34] *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1163 (N.D. Cal. 2015) (the "clear intent" of the Alaska antitrust statute was to "reserv[e] to the Alaska Attorney General the ability to seek damages on behalf of indirect purchasers").

[35] Plaintiffs sue under Ark. Code Ann. § 4-75-212(b), which provides that the *Attorney General* may sue on behalf of persons injured "directly or indirectly." By its terms, however, this provision does not apply to private plaintiffs. And although the Arkansas legislature amended the Arkansas Unfair Practices Act in 2003 to provide for such relief, it has not otherwise statutorily abrogated the *Illinois Brick* rule.

[36] The Illinois Antitrust Act bars indirect purchaser class actions. 740 Ill. Comp. Stat. 10/7(2) (limiting indirect purchasers class action solely to those brought by the Attorney General under her parens patriae authority); *see also In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 538 (E.D. Pa. Jan. 21, 2010).

[37] Mass. Gen. Laws ch. 93, § 1 (2006) (requiring Massachusetts antitrust laws to be "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable"); *Ciardi v. F. Hoffman-La Roche, Ltd.*, 762 N.E. 2d 303, 308 (Mass. 2002) ("*Illinois Brick* [] would apply with equal force to preclude claims brought under G.L. c. 93 by indirect purchasers in Massachusetts.").

[38] *Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s*, 998 S.W.2d 821, 825 (Mo. Ct. App. 1999); *see also In re Pool Prods. Dist. Market Antitrust Litig.*, 946 F. Supp. 2d 554, 570–71 (E.D. La. 2013) (Missouri antitrust law does not support indirect-purchaser claims).

[39] 10 P.R. Laws Ann. §§ 257-76 (2005); *Aggrenox*, 94 F. Supp. 3d at 252; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07–md–01819 CW, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2013); *cf. In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) (recognizing Puerto Rico as applying *Illinois Brick*).

[40] Rhode Island did not pass a so-called *Illinois Brick* repealer statute until July 15, 2013. The statute does not apply retroactively. *Avanzo v. Rhode Island Dep't of Human Servs.*, 625 A.2d 208, 211 (R.I. 1993) ("As a general rule statutes operate prospectively from and after the effective date of the statute."). Thus, Plaintiffs are barred from bringing a claim under the antitrust statute of Rhode Island for conduct and sales that took place prior to the repealer statute. *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 232-33 (S.D.N.Y. 2012).

[41] The West Virginia Antitrust Act states that courts must construe it "in harmony with ruling judicial interpretations of comparable federal antitrust statutes." W. Va. Code Ann. § 47-18-16. The West Virginia legislature enacted this provision just one year after *Illinois Brick* was decided, and it has not statutorily abrogated the *Illinois Brick* rule. The clear inference is that the legislature intended *Illinois Brick* to apply. *See Kessel*, 648 S.E.2d at 376 (courts "presume that the Legislature knew the scope of federal antitrust law and the terms of art utilized therein at the time it enacted the [West Virginia Antitrust Act] and directed its construction in harmony with federal law").

- Plaintiffs cannot state unilateral conduct claims under state antitrust laws (Counts IV, V, and VI) that do not recognize unilateral conduct claims, as is the case in California, Kansas, New York, and Tennessee.[42]

## II. PLAINTIFFS FAIL TO STATE A RICO CLAIM.

Plaintiffs' RICO claim is a misplaced attempt to cast routine business activities as a scheme to "fraudulently mislead and deceive American consumers." CAC ¶ 600. Plaintiffs' allegations are patently false, but even for purposes of a motion to dismiss, the conduct Plaintiffs have alleged is a far cry from the sort of conduct the RICO statute was meant to curb—i.e., racketeering behavior by organized criminals. Thus, "Plaintiffs, as [have] so many other claimants enticed by the charm of a RICO verdict, chose to try again to fit insufficient factual allegations into RICO's complex pleading standards." *Gross*, 628 F. Supp. 2d at 479. The Court should dismiss their claim.

RICO makes it illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To survive dismissal, Plaintiffs must allege that Defendants "(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1100 (10th Cir. 1999). Plaintiffs must also plead that their injuries were "proximately caused by the RICO violation." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010); *see also* 18 U.S.C. § 1964(c). And they must satisfy the heightened pleading requirements of Rule 9(b) for any underlying claims of fraud. *See Tal*, 453 F.3d at 1263-66.

Despite the Complaint's length and overheated rhetoric, Plaintiffs assert nothing more than a corporation, its CEO, its licensor, and certain of its customers engaging in arm's-length

---

[42] *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986), *amended on other grounds*, 810 F.2d 1517 (9th Cir. 1987) (California); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 283 (D. Mass. 2004) (Kansas); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (New York); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1109 (N.D. Cal. 2007) (Tennessee).

business activities. Plaintiffs fail to allege any of the required elements of a RICO claim, and they also lack standing to pursue this claim as explained below.

**A. The Complaint Fails to Allege the Existence of a RICO Enterprise.**

To establish liability under Section 1962(c), Plaintiffs "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).[43] Here, Plaintiffs attempt to allege an "association-in-fact" enterprise—the "EpiPen Pricing Enterprise"—consisting of Mylan Specialty, Mylan N.V., Mylan CEO Heather Bresch, Pfizer and two of its subsidiaries, and four PBMs.[44] *See* CAC ¶ 604. To plead an association-in-fact enterprise, a plaintiff must plead facts sufficient to show the existence of a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (citation omitted). The group "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. While this definition does not depend on fixed roles or a hierarchical structure, Plaintiffs nevertheless must plead the existence of a "continuing unit" that shares a "common purpose." *Id.* at 948.

Thus, to survive this Motion, Plaintiffs must plead facts sufficient to show that Defendants and the PBMs shared the *common* purpose on which Plaintiffs rely for their RICO claim—namely, to "mislead and deceive American consumers to purchase the EpiPen at an inflated price, to purchase the EpiPen as a 2-Pak only, and to cause consumers to pay an artificially inflated price for EpiPens." CAC ¶ 600. Plaintiffs have not come close to meeting

---

[43] The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009).

[44] Plaintiffs refer to Mylan and Pfizer as the "RICO Defendants" and the PBMs as "the PBM Conspirators." CAC ¶¶ 594, 599.

this burden. On the contrary, they fail to allege that any combination of the three "conspirator" groups—Mylan, Pfizer, and the PBMs—"share[d] the common purpose of engaging in [this] course of conduct." *U.S. v. Hutchinson*, 573 F.3d 1011, 1021 (internal quotation and citation omitted).

For starters, the Mylan Defendants alone cannot constitute a RICO enterprise. It is black-letter law that "a single person cannot be both the RICO enterprise and the RICO defendant." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2104 (2016) (citing *Cedric Kushner Promotions*, 533 U.S. at 162). Furthermore, "a defendant corporation, acting through its subsidiaries, agents, or employees typically can't be both the RICO 'person' and the RICO 'enterprise.'" *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1249 (10th Cir. 2016); *see also In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997). Thus, Plaintiffs' RICO claim depends entirely on the inclusion of some non-Mylan entity in the alleged enterprise: either Pfizer or the PBMs.

Adding Pfizer to the mix will not suffice. Pfizer is alleged to be part of the enterprise because it defended its patent rights and provided Mylan with products subject to a routine commercial arrangement. *See* CAC ¶¶ 626-32, 655(c). Plaintiffs' assertion that this equals an association-in-fact enterprise fails the straight-face test because "routine business relationships, without more, are insufficient to establish a RICO claim." *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 652-53 (N.D. Ohio 2012) (collecting cases); *accord Brannon v. Boatmen's First Nat. Bank of Oklahoma*, 153 F.3d 1144, 1148 (10th Cir. 1998) (dismissing RICO claims where the "allegations do nothing more than define a legitimate corporate and financial relationship between [defendant] and its holding company"); *see also In re Mastercard Int'l Inc.*, 132 F. Supp. 2d 468, 487 (E.D. La. 2001) ("[T]here can be no finding of a hierarchal or consensual decision making structure, or an ongoing organization when each party conducts its own affairs which include certain contracts for services with others.") (citation and quotation omitted); *Gonzalez v. Bank of Am.*, No. H-09-2946, 2011 U.S. Dist. LEXIS 16963, at *20 (S.D.

Tex. Feb. 20, 2011) (rejecting RICO claim where plaintiff "[a]t most . . . accused the defendants of engaging in their normal course of business").

To be sure, Plaintiffs make "[t]hreadbare recitals" that Pfizer was part of a RICO enterprise. *Iqbal*, 556 U.S. at 678; *see, e.g.*, CAC ¶¶ 601, 604. But these allegations are not "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In the few instances where Plaintiffs do allege facts relating to Pfizer, those allegations simply describe routine business between Mylan and its suppliers about the products that form the basis of their business relationship. *See, e.g.*, CAC ¶ 628 ("Mylan and the Pfizer Defendants are in regular and constant communication regarding the EpiPen, and the two Pfizer subsidiaries have done more than simply manufacture the EpiPen product for Mylan."); *id.* ¶ 647. Indeed, the only specific allegation with respect to the alleged enterprise is that the two businesses supposedly "worked together to stop generic competition" to the patented pharmaceutical product that—again—formed the basis of their normal business relationship. *Id*. ¶¶ 629-631; *see also id*. ¶¶ 236-303 (describing litigation and settlement history related to EpiPen products). These allegations fall far short of the mark.

Plaintiffs' allegations about the PBMs' supposed participation in the "enterprise" are also deficient. *See, e.g.*, CAC ¶¶ 635-641. In attempting to assert a "fraudulent scheme and common course of conduct" between the PBMs and Mylan, *id.* ¶ 602, the alleged facts paint the exact opposite picture: They depict a relationship between Mylan and the PBMs that was the epitome of arm's-length. According to the Complaint, the PBMs took advantage of their role as "gatekeepers" in the pharmaceutical supply chain in order to "extract[] hundreds of millions of dollars in the form of 'discounts' or 'rebate' payments from drug manufacturers." *Id.* ¶¶ 153, 636. In particular, Plaintiffs allege that the PBMs "leveraged their dominant position in the prescription drug insurance market to *demand* that drug manufacturers" pay substantial rebates in order to have their products included on formularies. *Id.* ¶ 640 (emphasis added). The PBMs, Plaintiffs say, threatened to exclude drugs from their formularies "as a negotiation tool to leverage greater discounts and rebates for drugs." *Id.* ¶¶ 163-64.

What does that describe? A commercial negotiation, where the parties have their own independent business interests and one party demands higher rebates and lower prices from the other. Indeed, according to Plaintiffs' own allegations, the PBMs "leveraged the competition between EpiPen and Auvi-Q to earn additional discounts for [their] clients." *Id.* ¶ 190. And Sanofi, one of the alleged "victims" of this "scheme," also offered significant rebates in return for formulary placement for its Auvi-Q product. *See id.* ¶ 182 (alleging that "Sanofi tried to match Mylan's rebates"). The fact that Mylan allegedly outbid Sanofi does not transform Mylan's business relationship with the PBMs into a RICO enterprise any more than Sanofi would have been part of a RICO enterprise if it had offered the lower price. Instead, according to Plaintiffs, PBM rebating is simply how branded pharmaceutical products compete.

The Complaint thus does not allege a distinct association-in-fact "enterprise" of entities acting with a common purpose to commit illicit acts. To recognize a RICO enterprise here would be tantamount to holding that negotiating strategies by PBMs, insurers, state Medicaid agencies, and other healthcare payors throughout the U.S. amount to organized criminal conduct—which obviously cannot be, and is not, the law. *See, e.g.*, CAC ¶¶ 155-157 (describing role of PBMs in "negotiating discounts and rebates" on behalf of payors throughout healthcare system); *see also id.* ¶ 182 (alleging that "the third-party payors [the PBMs] represent" obtained value from the rebates the PBMs negotiated on EpiPen products).[45]

Moreover, the Complaint includes no allegations whatsoever to connect the various PBMs to each other in any kind of enterprise. For example, it includes no facts suggesting any coordination, communication, or common plan among the various PBMs. Nor does it allege any

[45] This is not to say that the U.S. healthcare system's reliance on PBM rebates to reduce drug costs is perfect. In fact, the Complaint asserts that Mylan and its CEO have been outspoken in highlighting the role that PBMs and PBM rebates play in the pharmaceutical supply chain and in advocating for an improved system. *See, e.g.*, CAC ¶¶ 194-197, 426, 433. Mylan and Ms. Bresch, however, have never suggested that PBM rebates are *illegal*, and their critiques of the system cannot support Plaintiffs' claims. Quite the opposite: Plaintiffs' allegations that Mylan has criticized PBM rebates powerfully undercut the plausibility of Plaintiffs' allegation that Mylan and the PBMs were somehow in cahoots as part of a RICO enterprise.

facts to undermine the most plausible assumption—namely, that the PBMs compete with one another to maximize rebates in their own independent interest.

In short, there is nothing connecting the PBMs to Mylan, to Pfizer, or to each other in any type of enterprise. This alone is fatal to Plaintiffs' RICO claim.[46] Simply labeling the PBMs as "the PBM Conspirators" or describing rebates as "kickbacks" does not transform them into members of a criminal enterprise. The "enterprise" Plaintiffs have attempted to allege adds up to nothing more than "simply the group of individual defendants accused of engaging in the racketeering," which is not enough. *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001); *see also King*, 533 U.S. 158.

**B. The Complaint Does Not Adequately Allege that Defendants Conducted the Affairs of the Alleged RICO Enterprise.**

Even if the Court were to accept that Plaintiffs allege a distinct enterprise, the RICO claim still fails because Plaintiffs do not allege that Defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of [that] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Kushner Promotions*, 533 U.S. at 163 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (emphasis in original). This distinction is critical; a RICO plaintiff must allege that each defendant engaged in the operation or management of the *enterprise itself* through the pattern of racketeering activity. Here, therefore, Plaintiffs must allege that Defendants did more than simply conduct their own corporate business, provide their regular services, or negotiate contracts at an arm's length. *See BancOklahoma*, 194 F.3d at 1101-02 (RICO claim failed because defendants "did nothing more than provide their regular services," including activities

[46] Plaintiffs' allegations do not fit any recognized pattern of conspiracy or RICO enterprise. Even if Plaintiffs were to attempt to assert RICO allegations based on a so-called "hub and spoke" conspiracy—which they do not even attempt to do—Plaintiffs' failure to allege any facts to connect the PBMs together into a single enterprise would be fatal to their claim. That is because "[m]ost courts have found that complaints alleging hub-and-spoke enterprises fail to satisfy the RICO enterprise requirement." *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183 (D. Mass. 2003) (collecting cases).

"performed in their normal course of business in dealing with all [customers]"); *see also Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO.").

Plaintiffs cannot possibly meet this test. The Complaint alleges vague "corporate ties, contractual relationships, financial ties, and continuing coordination of activities," CAC ¶ 647, but never describes more than corporate parties pursuing routine, arm's-length commercial dealings. *See, e.g.*, *id.* ¶ 645 ("The EpiPen Pricing Enterprise engaged in . . . commercial activities . . . such as the marketing, promotion, advertisement and sale or lease of the EpiPen throughout the country, and the receipt of monies from the sale of the same."); *id.* ¶ 611 ("Mylan N.V. . . . was directly involved in nearly all of the sales, pricing, and marketing decisions regarding EpiPens"); *id.* ¶ 612 ("Mylan Specialty, LP, is the primary entity that markets, distributes, and sells the EpiPen"). The supposedly false statements Plaintiffs allege are merely instances of a company and its CEO engaging in routine, appropriate public engagement: discussing business challenges on an earnings call, putting out news releases about product developments and the resolution of legal proceedings, distributing information about an access program for schools, and negotiating discounts and rebates in contentious, arm's-length interactions. *See id.* ¶¶ 461-464; 640. Indeed, Plaintiffs all but admit that they cannot allege any plausible way in which Defendants conducted the affairs of the enterprise. *See id.* ¶ 650 ("The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' exclusive control.").

Thus, Plaintiffs "ha[ve] done no more than describe the ordinary operation of . . . garden-variety . . . arrangement[s] between [Defendants]. . . . This is not what RICO penalizes." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009). Plaintiffs' allegations support the conclusion that Defendants—along with their alleged co-conspirators—were doing what all companies do: conducting their own affairs, marketing their products, and contracting

with other companies for goods and services. *See United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co*., 719 F.3d 849, 854–56 (7th Cir. 2013) ("The allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy, and without such an indication, we cannot find a basis for inferring that [defendants] were conducting the enterprise's affairs."). RICO liability requires much more; Plaintiffs must establish that each defendant "participated in the *operation or management* of the enterprise itself." *Reves*, 507 U.S. at 183 (emphasis added). Plaintiffs' RICO claim thus cannot survive a motion to dismiss. *See BancOklahoma*, 194 F.3d at 1101-02.

### C. Plaintiffs Do Not Allege a Pattern of Racketeering Activity.

At the base of any valid RICO claim must be, first and foremost, racketeering activity.[47] Liability under Section 1962(c) requires Plaintiffs to plead a "pattern of racketeering activity," which "requires at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5); *see also* 18 U.S.C. § 1961(1) (listing acts that constitute "racketeering activity"). But "proof of two or more predicate acts [is] not sufficient to prove a pattern unless there is a *relationship* between the predicate acts and a threat of continuing activity." *Tal*, 453 F.3d at 1267-68 (emphasis added) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). This requires Plaintiffs to demonstrate "a relationship between the predicates and the threat of continuing activity—that is, continuity plus relationship." *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (internal quotations and ellipses omitted). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time" or "open-ended continuity" based on a showing that "the predicates are a regular way of conducting the defendant's ongoing legitimate business or the RICO enterprise." *Id.* (citing *H.J. Inc.*, 492 U.S. at 242-43).

---

[47] The Complaint purports to allege predicate acts of mail fraud, wire fraud, and obstruction of justice. CAC ¶ 654; *see also id.* ¶ 652-53. Plaintiffs' failure to adequately plead these predicate acts is discussed below in Section II.E.

Here, the Complaint merely alleges a conclusory "pattern" of unrelated actions that does nothing more than re-state the element itself. *See, e.g.*, CAC ¶¶ 677, 679 ("As described herein, the RICO Defendants and the PBM Conspirators engaged in a pattern of related and continuous predicate acts for years."). Plaintiffs never allege how the alleged predicate acts are *related*. The Complaint has no answer, for example, to how a 2009 quarterly earnings call mentioning additional patent protections relates to a 2015 press release promoting the three-year anniversary of the EpiPen4Schools program, or how either of those relates to 2016 testimony about research-and-development costs. *See id.* ¶ 655. And Plaintiffs never explain how any of those discrete "predicates" can be viewed as part of a years-long concerted effort to "generat[e] fraudulent and deceptive sales of the EpiPen 2-Pak" or "restrain competition from generic competitors," s*ee id.* ¶ 679, much less a "campaign of false and misleading statements and actions to distract consumers and regulators from the reality that the RICO Defendants were raising the price of the EpiPen from $100 to $600," *id.* ¶ 659. Nor do Plaintiffs explain how any of these predicate acts relates to any purported collusion with the PBMs, whose interactions with Mylan are alleged to have consisted of arm's-length negotiations in which each side pursued its own independent interests.

The only thing that even arguably connects the disparate alleged predicate acts is that they involve Mylan and EpiPen products. The statements differ, however, as to context, target audience, and topic. Plaintiffs thus simply fail to show that these "isolated events" are based on "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *Schrag v. Dinges*, 788 F. Supp. 1543, 1552 (D. Kan. 1992) (citation omitted). Without some thread that ties all of these allegedly improper communications together, Plaintiffs have alleged nothing more than that Mylan and its executives communicate about a product they sell. RICO requires much more.

**D. Plaintiffs Fail to Plead RICO Causation.**

"Sufficiently establishing the element of causation—both actual and proximate—is crucial to proving any violation of RICO." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d

1076, 1088 (10th Cir. 2014) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656–60 (2008)); *see also* 18 U.S.C. § 1964(c). Once again, Plaintiffs do not come close to pleading these elements.

Plaintiffs allege that, as "a direct and proximate result of their fraudulent scheme and common course of conduct, the RICO Defendants and the PBMs illegally extracted revenues of millions or billions of dollars from Plaintiffs and the Class." CAC ¶ 602; *see also id.* ¶ 679 ("But for the Defendants' fraudulent scheme and racketeering, Plaintiffs and the Class would not have accepted, acquired, and purchased the EpiPen 2-Pak."); *id.* ¶ 682. But conclusory allegations of injury "need not be accepted as true for the purposes of ruling on a motion to dismiss." *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 n.3 (2d Cir. 1994) (rejecting RICO claim where the complaint "cursorily assert[ed]" that the alleged misconduct proximately caused plaintiff's injuries). But that is all Plaintiffs offer here, as they fail to allege how the supposed predicate offenses of mail fraud, wire fraud, or corruption of an official proceeding asserted in the Complaint were but-for *or* proximate causes of their supposed harm of paying an "inflated price" for EpiPen products. None of the alleged predicates can be traced to Plaintiffs' alleged harms, and Plaintiffs make no showing that absent those predicates any harm would have been averted. Nor do Plaintiffs articulate a theory for how any allegedly fraudulent communications were the proximate cause of their purchases at a higher price than they feel is fair. Plaintiffs do not explain, for example, how Ms. Bresch's comments on an earnings call in April 2009 induced purchases that would not otherwise have been made, or how such comments caused higher prices. *See* CAC ¶ 655(a). Nor do they allege how Defendants' communications announcing the settlements with Teva or Intelliject caused (or could have caused) them harm, *see id.* ¶ 655(c), *supra* I.C, or how Ms. Bresch's statements before Congress about PBMs and other topics were proximately related to their alleged purchases, *see id.* ¶ 655(g). Plaintiffs' theory therefore falters on the black-letter rule that RICO "requires some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York*, N.Y., 559 U.S. 1, 9 (2010) (internal quotation and citation omitted).

At root, Plaintiffs' theory of harm is not premised on any allegedly fraudulent *communication* about how the EpiPen is priced, how any profits are divvied up, or the identities of the parties who may directly or indirectly have benefitted from EpiPen product sales; instead Plaintiffs' theory of harm relates to EpiPen products' *pricing* alone. *Accord* Section III.A *infra*. Plaintiffs cannot credibly claim that but for these communications they would not have been injured. And they certainly cannot claim, as they must, that the prices they paid for EpiPen products—or the fact that they purchased the products in packages of two—are the direct and proximate result of the communications they have alleged. Their RICO claim thus fails. *See* 18 U.S.C. § 1964(c); *Hemi Group*, 559 U.S. at 9.

**E. The Complaint Does Not Adequately Allege Racketeering Activity.**

To make a RICO claim, Plaintiffs also must adequately plead that Defendants committed "predicate acts." Here, Plaintiffs attempt to allege three predicate acts: mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and obstruction of justice (18 U.S.C. § 1512). But they do not plead any of these acts with the requisite particularity or plausibility, providing yet another independent reason why their RICO claim fails.

To establish the predicate act of mail or wire fraud, Plaintiffs must allege "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations or promises; (2) an intent to defraud; and (3) use of the mails [or interstate wire or radio communications] to execute the scheme." *Shepard v. DineEquity, Inc.*, No. CIV. A. 08-2416-KHV, 2009 WL 8518288, at *5 (D. Kan. Sept. 25, 2009); *see also Tal*, 453 F.3d at 1263. Because Rule 9(b) "requires a plaintiff to plead mail and wire fraud with particularity," Plaintiffs "must set forth the time, place and contents of the false representation, the identity of the party making the false statements *and the consequences thereof*." *George*, 833 F.3d at 1254 (internal quotation and citation omitted) (emphasis added). And because of the widespread abuses associated with RICO litigation, courts are especially strict in applying Rule 9(b) in this context and routinely recognize that "RICO claims premised on mail or wire fraud must be particularly scrutinized." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014).

Plaintiffs broadly allege "thousands of individual communications," but these vague and conclusory allegations do not satisfy Rule 9(b). CAC ¶ 655. As detailed in Section III.C.1 below, Plaintiffs have failed to plead that Defendants made *any* false or misleading statements, let alone with the particularity required by Rule 9(b). For all of the alleged "misstatements" identified in their RICO count, Plaintiffs offer no explanation for how the communications could possibly have been part of a "pharmaceutical-grade [sic] scheme to defraud U.S. consumers to pay much higher prices for the EpiPen than is reasonable or would be charged in a fair marketplace." *Id.* ¶ 658. For example:

- Plaintiffs claim that Mylan executed its scheme to defraud consumers by issuing a press release regarding a patent settlement. *See* CAC ¶ 655(c). Plaintiffs fail to explain how any consumer could possibly be misled by the accurate announcement that a patent suit had, in fact, settled—or how sharing this piece of public information could further a scheme to defraud consumers into paying "inflated" prices for EpiPen products.

- Plaintiffs claim Mylan's announcement of the third anniversary of the EpiPen4Schools Program was used to execute a fraudulent scheme. *See* CAC ¶ 655(e). Absent from the Complaint, however, is any explanation of how this press release was used to execute the scheme or who was deceived by the scheme.

- Plaintiffs allege that Ms. Bresch's testimony before Congress constitutes wire fraud because news media—and Congress itself—broadcast the hearing. *See* CAC ¶ 655(g)(iv). But once again, Plaintiffs fail to explain the particulars of how the testimony advanced a scheme to defraud.

Indeed, none of Plaintiffs' allegations states *with particularity* how any specific communications connect to the alleged "scheme to defraud U.S. consumers to pay much higher prices for the EpiPen than is reasonable or would be charged in a fair marketplace." *Id.* ¶ 658; *see also* Section III.C.5, *infra*. That is fatal to Plaintiffs' claims and also makes this case a prime example of the "widespread abuse of civil RICO [that] stems from the fact that all modern business transactions entail use of the mails or wires." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992). Plaintiffs' mail and wire fraud claims do not withstand scrutiny.

Plaintiffs similarly fail to plead obstruction of justice. "Under § 1512(c)(2), any person who 'corruptly . . . obstructs, influences, or impedes any official proceeding or attempts to do so, shall be fined under this title or imprisoned not more than 20 years or both.'" *United States v.*

*Gordon*, 710 F.3d 1124, 1149 (10th Cir. 2013) (quoting *United States v. Phillips*, 583 F.3d 1261, 1263 (10th Cir. 2009)). Plaintiffs allege Ms. Bresch corruptly influenced an official proceeding by "provid[ing] knowingly false testimony on several material issues" during her September 21, 2016 testimony before Congress.[48] CAC ¶ 655. Plaintiffs provide no evidence to support their bald assertions that Ms. Bresch's testimony was false—nor could they. But even more fundamentally, Plaintiffs' theory represents an unprecedented and unwarranted extension of Section 1512(c)(2). The notion that Plaintiffs' disagreement with certain statements Ms. Bresch made during the hearing somehow means that Ms. Bresch "obstructed," "influenced" or "impeded" the hearing is simply absurd.

**F. Plaintiffs Lack Standing to Bring a RICO Claim.**

Plaintiffs lack standing to bring a RICO claim for two reasons. *First*, Plaintiffs are not permitted to end-run their lack of standing under the federal antitrust laws by casting their claim as a RICO violation. Plaintiffs, as indirect purchasers, do not have standing under *Illinois Brick* to bring damages claims under the federal antitrust laws. Because Plaintiffs purport to bring RICO claims based on allegedly anticompetitive conduct, "[t]he precepts taught by *Illinois Brick* . . . apply to [Plaintiffs'] RICO claims, thereby denying [them] RICO standing." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("Significantly, antitrust standing principles apply equally to allegations of RICO violations."); *see also, e.g., N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs*., 54 F. Supp. 3d 1189, 1245 (D.N.M. 2014); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("indirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen") (citations omitted); *Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*, 896 F. Supp. 2d 650, 668 (E.D. Mich. 2012) ("The antitrust-standing analysis also bars [plaintiff] from establishing standing to assert its RICO claim."); *Fiala v. Wasco Sanitary*

[48] Plaintiffs purport to assert that Ms. Bresch gave misleading testimony as to (1) Mylan's profits per EpiPen product sold, (2) the scope of Mylan's research and development efforts, (3) the nature of the EpiPen4Schools program, and (4) the role of PBMs in the pharmaceutical market. *See* CAC ¶ 655.

*Dist.*, No. 10 C 2895, 2012 WL 917851 (N.D. Ill. Mar. 6, 2012) (barring indirect purchasers' RICO claims for lack of standing); *Hale v. Stryker Orthopaedics*, No. 08-3367 (WJM), 2009 UWL 321579, at *3 (D.N.J. Feb. 9, 2009) (holding that indirect purchasers of joint implants did not have standing under *Illinois Brick* to bring RICO claims against manufacturers). This case should join the long line of cases that have failed for precisely this reason.

*Second*, because Plaintiffs' RICO claims are founded on the core allegation that prices for EpiPen products were too high, Plaintiffs independently lack standing to bring these claims based on the "many well-reasoned decisions in which courts have held that purchasers of pharmaceutical products have no private cause of action where they receive the benefit of their bargain in the form of effective drugs." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *10 (D.N.J. July 10, 2009). As explained below with respect to Plaintiffs' consumer protection claims, courts routinely have held that plaintiffs suffer no legally cognizable harm when their alleged harm simply consists of paying "too much" for a pharmaceutical product that works as intended. *See infra* Section III.A.1. This same principle applies with full force in the context of RICO claims based on purported mail and wire fraud. *See, e.g.*, *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 519 (D.N.J. 2011) (claimed injury of overpayment for a drug is not a recognized injury under RICO unless the drug purchased was "on some level inferior and therefore worth less than what Plaintiffs paid for it") (internal quotation and emphasis omitted). Because Plaintiffs do not allege that they were misled into purchasing products that were inadequate, harmful, or failed to perform as advertised, they lack standing, and their RICO claims should be dismissed for this reason alone.

**G. Plaintiffs Fail to Plead a RICO Conspiracy.**

Because Plaintiffs have failed to adequately plead an independent violation of Section 1962(c), Plaintiffs' RICO conspiracy claim, CAC ¶ 678, also should be dismissed. *See, e.g., Tal*, 453 F.3d at 1270 ("If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law.").

### H. Naming Ms. Bresch as a Defendant Is Malicious and Improper.

Plaintiffs' decision to name Ms. Bresch, Mylan N.V.'s CEO, as a Defendant is malicious and improper, and their claim against her fails for all of the reasons described above.[49]

Taken to their logical conclusion, Plaintiffs' allegations with respect to Ms. Bresch would mean "that any CEO could be a proper RICO 'person' if the corporation is [alleged to be] engaged in fraudulent conduct that involves the use of the wires or mail. Even a liberal reading of the RICO pleading requirements is stretched to the breaking point with such a theory." *Ferrari v. Mercedes-Benz USA, LLC*, No. 15-CV-04379-YGR, 2016 WL 7188030, at *3 (N.D. Cal. Dec. 12, 2016). Even if Plaintiffs' allegations regarding Mylan's fraudulent behavior were true (and they are not), they would be insufficient to establish liability as to Ms. Bresch. "Where the employees merely participate in the corporation's own fraud by acting as corporate agents . . . the employees may not be sued under section 1962(c)." *Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 73 (3d Cir. 1994).

Plaintiffs have included Ms. Bresch as a defendant here for no reason other than harassment and out of an apparent personal vendetta for what they believe to be her role in the pricing of EpiPen products. *See Gross*, 628 F. Supp. 2d at 480 ("For plaintiffs seeking to score a tactical edge or to deal the heaviest possible vengeful blow to the defendant's personal reputation, shocking RICO accusations may serve to strengthen their hand or induce sooner capitulation in any settlement discussions."). The Complaint is rife with strident language that crosses the line in attempting to smear Ms. Bresch without underlying factual support. *See, e.g.*, CAC ¶¶ 228, 325, 335, 378-382, 387, 392, 401, 418, 432, 443-48, 610-11, 615-622, 624.

While Plaintiffs claim that Ms. Bresch directed the "EpiPen Pricing scheme," all they really allege is that she was the CEO of a company they claim to be a central participant in that enterprise. *See, e.g.*, CAC ¶¶ 611, 613, 655(g)–(h). As CEO, she obviously was involved in the

[49] To the extent Plaintiffs intended to name Ms. Bresch as a defendant for the claims articulated in Counts I and II, which both reference "All Defendants," those claims are equally improper with respect to Ms. Bresch for the reasons articulated here.

company's decision-making and strategic planning—that is the *job* of a corporation's chief executive. *See id.* ¶ 611 (alleging that "Mylan N.V., through its CEO Heather Bresch, was directly involved in nearly all of the sales, pricing, and marketing decisions regarding EpiPens, as catalogued above."). It is the job of the CEO to speak to investors about the company's financial outlook and strategy on earnings calls. *See id.* ¶ 655(a). Additionally, it is the CEO's responsibility to speak for the company before Congress and to deliver official corporate statements to the media. *See id.* ¶¶ 613, 655(f), (g). None of Plaintiffs' allegations, however, suggests that Ms. Bresch did anything that was not on the company's behalf, or that she was doing anything other than working to advance the company's legitimate interests.

Because none of Plaintiff's claims hinges on Ms. Bresch's involvement, there is no reason for her to be named as a defendant other than harassment. Plaintiffs' conclusory statement that Ms. Bresch is "personally liable for the EpiPen scheme and all causes of action that flow from it," CAC ¶ 625, does not make it so. Every action attributed to Ms. Bresch in the Complaint was done on behalf of the company or in her role as CEO. Her inclusion as a defendant serves no legitimate purpose, and Ms. Bresch should be dismissed from this case. *See Ferrari*, 2016 WL 7188030, at *3 (dismissing RICO claims against corporate executives where, as here, plaintiffs did "little more" than conclusorily allege that the executives "'corruptly influenced' the corporate enterprise").

## III. PLAINTIFFS' CONSUMER PROTECTION CLAIMS (COUNT VIII) FAIL.

### A. Plaintiffs Lack Standing to Bring Consumer Protection Claims.

"'[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016) (quoting *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1146 (2013)). To establish Article III standing, Plaintiffs must plead facts sufficient to show "(1) an injury in fact, [and] (2) a sufficient causal connection between the injury and the conduct complained of." *Brown*, 822 F.3d at 1164 (internal quotations and citations omitted). Plaintiffs bear the burden of establishing each of these

elements at the pleading stage by "'clearly . . . alleg[ing] facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Plaintiffs have failed to meet that burden.

### 1. Plaintiffs Have Not Adequately Pled an Injury-in-Fact.

Regarding their consumer protection claims, Plaintiffs have not pled the "'[f]irst and foremost' of standing's three elements": injury-in-fact. *Spokeo*, 136 S. Ct. at 1547 (citation omitted). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual and imminent,' not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).

Here, the crux of Plaintiffs' consumer protection claims is that EpiPen devices cost too much, and the supposed harm is that Plaintiffs paid more for EpiPen devices than they would have liked. *See, e.g.*, CAC ¶¶ 4-5. As a matter of law, however, paying more than one wishes for a product does not give rise to Article III injury. To the contrary, where a consumer receives the product she expected, and the product performs as expected, the consumer has suffered no injury at all. *See Rivera v. Wyeth-Ayerst Lab.*, 283 F.3d 315, 320 (5th Cir. 2002) (plaintiffs' allegation that they wanted their money back did not establish injury-in-fact where plaintiffs did not claim that the purchased drug harmed them or was ineffective).

That is exactly the situation here. According to the Complaint, Plaintiffs purchased EpiPen devices and received exactly what they paid for: EpiPen devices. Plaintiffs have not alleged that those products were different than expected, that they were deceived about some quality or feature of the products they purchased, or that, absent some misrepresentation, they would not have purchased an epinephrine auto-injector or would have purchased another product instead. They simply complain that the products cost too much.[50] To hold that consumers suffer

[50] *See, e.g.*, CAC ¶¶ 4-5, 104-05, 152, 165-66, 198, 348-53, 355-60, 362-64, 368-69, 373-74, 376, 383, 387-88, 392, 407, 409-10, 413, 450-52, 459, 491-93, 500-01, 684-85, 690, 700, 710, 725, 743, 769, 784, 801, 815, 830, 843, 858, 873, 888, 905, 920, 936, 951, 966, 981, 996, 1010, 1031, 1045, 1058, 1071, 1095, 1110, 1122, 1136, 1150, 1163, 1178, 1191, 1206, 1220, 1234, 1248, 1262, 1276, 1291, 1307, 1323, 1338, 1352, 1367, 1381, 1396, 1411, 1142.

injury-in-fact whenever they pay (or even overpay) for a product at a given price and received the product they paid for would render every business liable to consumers who decide, after the fact, that they would have preferred to acquire the product for less. That is not, and cannot be, the law. *See Eike*, 850 F.3d at 318 ("The fact that a seller does not sell the product that you want, or at the price you'd like to pay, is not an actionable injury.").

Plaintiffs' theory that they were somehow harmed because EpiPen devices are sold in two-packs also does not establish an injury-in-fact. *See* CAC ¶ 341. Even assuming that packaging decisions could give rise to a claim for relief, to allege an injury from the purchase of two EpiPen devices, rather than one, each Plaintiff would need to allege that she only *needed* one EpiPen device. But none of the fifty-seven individual Plaintiffs—not one—makes this allegation. In fact, thirty-three Plaintiffs *chose* to purchase more than one two-pack per year. *See* CAC ¶¶ 14, 15, 17-21, 23, 26, 28-29, 32-34, 36-37, 40, 46-47, 49-50, 54-56, 58-66.[51]

The reason why no Plaintiff claims she only needed one device is obvious: Such an allegation cannot truthfully be made. Unless and until each Plaintiff suffers a severe allergic reaction and uses the EpiPen products she bought, it is pure conjecture whether she would medically need both devices in the package or only one. And even then, if any Plaintiff only used one of the two devices (or none) during an allergy attack, she would not have suffered any "injury" from her purchase, because there would have been no way to know *at the time of purchase* how many EpiPen Auto-Injectors would later be required. More than one epinephrine injection is needed in up to 23% of adults receiving an epinephrine injection for anaphylaxis. *See* NIAID, Guidelines for the Diagnosis and Management of Food Allergy in the United States (the "NIAID Guidelines"), attached hereto as Exhibit E, at § 6.3.1.1, p. S40; *see also* WAO, Guidelines for the Assessment and Management of Anaphylaxis (the "WAO Guidelines")

[51] Only three Plaintiffs allege that they *ever* purchased just one EpiPen device per year, even prior to the two-pack switch. *See* CAC ¶¶ 17, 49, 61.

attached hereto as Exhibit F, at 593.e18, Table 9, n. (a).[52] Thus, there is no way to establish any injury-in-fact beyond one that improperly relies on the sort of "'some day' speculations [that] are insufficient to establish an injury-in-fact for purposes of Article III standing." *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016) (citation omitted); *see also Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) ("Allegations of possible future injury do not satisfy the injury in fact requirement." (internal quotation and citation omitted)).

Consider, for example, a consumer who purchases car insurance but never has an accident during the policy period. The consumer could not claim that she was injured by having spent money purchasing insurance, just because she did not need to use it. So too here. At the time of purchase, Plaintiffs had no way to know whether they would need zero, one, two, or more EpiPen devices. Thus, no Plaintiff could have suffered concrete harm arising from the purchase of a two-pack alone. *N. Am. Safety Valve Indus., Inc. v. Wolgast*, Civ. A. No. 85-2575, 1986 WL 15792, at *3 (D. Kan. Nov. 13, 1986) ("[B]ecause the threat of injury is merely hypothetical, plaintiff has no standing to make the claim.").

### 2. Plaintiffs Also Fail to Satisfy the "Fairly Traceable" Element.

To establish Article III standing, an alleged injury also must be "'fairly traceable' to the defendant, and not the result of the independent action of some third party." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005) (quoting *Lujan*, 504 U.S. at 560-61). Plaintiffs fall short here too, because they suffered no conceivable injury that is "fairly traceable" to Mylan's alleged conduct. As an initial matter, a majority of the allegations Plaintiffs have thrown into the consumer-protection compartment of their kitchen sink have nothing to do with consumers at all. Instead, they comprise allegations about the classification of EpiPen devices for purposes of the Medicaid Drug Rebate Program, Mylan's lobbying efforts aimed at expanding access to

---

[52] Earlier this year, the American Academy of Pediatrics published a study stating that "[t]wo epinephrine autoinjectors should be available at all times, because a second administration may be needed if there is not a quick or adequate response to the first dose of epinephrine." *See* Julie Wang and Scott H. Sicherer, *Guidance on Completing a Written Allergy and Anaphylaxis Emergency Plan*, 138 Pediatrics e1, e4 (2017).

epinephrine auto-injectors, Mylan's distribution of free and discounted EpiPen devices to schools, and a Mylan executive's testimony at a Congressional hearing. *See, e.g.*, 700(b), (c), (h), (r). Plaintiffs cannot claim that there is any connection—let alone a "fairly traceable" one—between these allegations and any harm they could have suffered.

Moreover, one of the ways in which Plaintiffs claim to have paid too much is independently deficient under the "fairly traceable" test—namely, Plaintiffs' claim that EpiPen products somehow caused their insurance premiums to increase. *See* CAC ¶¶ 687-88 (alleging that, "[w]hether insurance has paid some or all of the full list price is immaterial to a consumer protection violation . . . because [Plaintiffs'] insurance premiums were raised as a result of Mylan's price increases of the EpiPen"). On its face, Plaintiffs' theory that any increase in their insurance premiums was fairly traceable to the pricing of one pharmaceutical product is far too attenuated, and involves too many intervening independent factors, to meet the fairly traceable test. *See, e.g.*, *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 50 (D.C. Cir. 2016) (holding that plaintiffs lacked standing to challenge federal policy that allegedly caused higher insurance premiums in the absence of evidence that the policy was a "substantial factor motivating" premium increases).[53] Health insurance covers a multitude of drugs, and premiums are driven by many different factors, including the cost of physician and hospital treatment, administrative costs, the costs of other prescription drugs, and the voluminous laws and government regulations that govern the health insurance industry.[54] In fact, at least one of the Plaintiffs, Plaintiff Corcoran, alleges that she can bring suit even though she admits she paid *nothing at all* for EpiPen products. *See* CAC ¶ 18 (alleging that Corcoran "is concerned about the effect her need for an EpiPen has had on her insurance premiums").

---

[53] In fact, Plaintiffs assert that some of the conduct alleged in the Complaint actually *lowered* insurance costs. *See, e.g.*, CAC ¶ 182 (alleging that "PBMs *and the third-party payors* they represent" received the benefit of rebates paid by Mylan) (emphasis added).

[54] *See, e.g.*, Consumer Reports, Why Drug Costs Keep Rising—and What You Can Do About It (May 16, 2017), *available at* https://www.consumerreports.org/drug-prices/why-drug-costs-keep-rising-what-you-can-do-about-it/ (citing high-priced drugs such as "Humira (retail price: about $4,500 per month) or the multiple sclerosis drug Copaxone (also $4,500 per month)" as factors that "can push up costs for everyone in an insurance plan").

In addition, Mylan's decision to sell EpiPen devices in two-packs does not—and cannot—be traced to any harm to Plaintiffs. If Plaintiffs did not use both EpiPen devices in the two-pack, that would be the result of independent factors having nothing to do with Mylan's decision to package the product in a certain way. Rather, it would be the result of Plaintiffs being fortunate enough not to have suffered an allergic reaction that caused them to need both of the EpiPen devices they purchased. Indeed, the alleged injury—unused EpiPen devices—does not result from the purchase of a two-pack of EpiPen devices or Mylan's decision to sell EpiPen devices in two-packs, but rather from whether there ultimately was a need for those EpiPen devices. And that, in turn, is due to independent factors such as the severity of the allergic reaction, the allergen to which the person is exposed, or whether a third party served a particular food when told not to. Plaintiffs may hope to never need to use any of their EpiPen devices, but regardless, whether or not they do is not "fairly traceable" to the challenged conduct; whether they will require a second dose is even more attenuated.

**B. Plaintiffs' Consumer Protection Claims Are Preempted by Federal Patent Law.**

All of Plaintiffs' consumer protection claims also are preempted by federal patent law because they seek to use state law to challenge Mylan's pricing of the EpiPen Auto-Injector, which is covered by several patents governed by federal law.

It is well established that state law must yield to federal law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Biotech. Indus. Org. v. Dist. of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007) ("*Biotech*") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). In the context at issue here, courts have "long acknowledged the importance of the patent system in encouraging innovation. Indeed, the encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (internal quotations and citations omitted); *see also Biotech.*, 496 F.3d at 1373-74 (recognizing that Congress is "the promulgator of patent policy," and that federal patent law

reflects the results of Congress's deliberations regarding "the proper balance between innovators' profit and consumer access to medication").

In *Biotech*, the Federal Circuit determined that a District of Columbia statute regulating the cost of patented drugs was preempted by federal patent law. The court reasoned that the "underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make[.] . . . [W]here it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." 496 F.3d at 1374 (citing *Bonito Boats, Inc. v. Thunder Craft Boats Inc.*, 489 U.S. 141, 152 (1989)) (internal quotations omitted). As the court noted, the patent system creates "an incentive for innovation" through "economic rewards during the period of exclusivity," subject only to the "dictates of the marketplace." *Id.* at 1372 (internal quotation and citation omitted).[55] *Biotech* thus establishes a clear rule: State law may not undermine the balance struck by Congress between patent-holders' rights to charge what they wish for their products and consumers' desire to pay prices based on a competitive marketplace.

In this vein, courts routinely hold that state-law challenges to the pricing of patented pharmaceutical products are preempted by federal patent law. The recent decision in *Southeastern Pa. Transp. Auth. v. Gilead Scis., Inc.* ("*SEPTA*"), 102 F. Supp. 3d 688 (E.D. Pa. 2015), is instructive. There, the *SEPTA* plaintiffs alleged that the defendant had violated California's Unfair Competition Law—one of the laws that Plaintiffs allege here (*see* Count VIII.F)—by charging excessive prices for two patented drugs. *Id.* at 695-96. But the court held that the claims were preempted by federal law to the extent plaintiffs sought "to use state law to challenge Gilead's exercise of its exclusive patent rights to make pricing decisions." *Id.* at 703.

[55] Plaintiffs' contention that Mylan did not develop and patent the EpiPen device is immaterial. *See* CAC ¶ 94. Mylan holds a license for the rights to the patents at issue and has exclusive worldwide rights to market and sell EpiPen devices. *See* CAC ¶¶ 100, 242. Mylan compensated the patent holder for the right to benefit from the economic incentives that accompany the patents—a valid choice by the patent holder on how best to benefit from its exclusive rights.

Here, Plaintiffs attempt to use state consumer protection laws to challenge Mylan's pricing decisions regarding patented EpiPen devices, which Mylan has the exclusive right to market, distribute, and sell. Though Plaintiffs pad their Complaint with a litany of red herring allegations, the heart of this suit is Plaintiffs' belief that Mylan sold EpiPen products at an "inflated" price. CAC ¶ 347. Indeed, the only injury Plaintiffs assert is that Mylan's prices for EpiPen products were allegedly too high.[56] Such a claim is legally barred. As in *SEPTA*, Plaintiffs cannot use state consumer protection law to lower Mylan's prices or to force Mylan to disgorge its profits. That is the exclusive province of Congressional decisions inherent in federal patent law. *Biotech*, 496 F.3d at 1374. Accordingly, Plaintiffs' consumer protection claims conflict with—and are preempted by—federal patent law and should be dismissed.

### C. Plaintiffs Fail to Plead the Elements of Their Consumer Protection Claims.

Plaintiffs' consumer protection claims also fail because Plaintiffs have failed to plead any deceptive, misleading, or unfair conduct by Mylan that could give rise to a viable consumer protection claim. Attached as Exhibit B is a chart showing the required elements for each of the consumer protection counts that Plaintiffs assert. As described below, every one of those claims is deficient and should be dismissed.

#### 1. Plaintiffs Fail to Allege Deceptive or Misleading Conduct.

All of Plaintiffs' consumer protection claims are premised on pleading that Defendants made some misleading or deceptive statement, or otherwise engaged in deceptive conduct.[57]

---

[56] *See, e.g.*, CAC ¶¶ 4-5, 104-05, 152, 165-66, 198, 348-53, 355-60, 362-64, 368-69, 373-74, 376, 383, 387-88, 392, 407, 409-10, 413, 450-52, 459, 491-93, 500-01, 684-85, 690, 700, 710, 725, 743, 769, 784, 801, 815, 830, 843, 858, 873, 888, 905, 920, 936, 951, 966, 981, 996, 1010, 1031, 1045, 1058, 1071, 1095, 1110, 1122, 1136, 1150, 1163, 1178, 1191, 1206, 1220, 1234, 1248, 1262, 1276, 1291, 1307, 1323, 1338, 1352, 1367, 1381, 1396, 1411, 1142.

[57] *See generally* Ala. Code § 8-19-5; Ariz. Rev. Stat. Ann. § 44-1522; Ark. Code Ann. § 4-88-107, 4-88-108; Cal. Civ. Code. § 1770; Cal. Bus. & Prof. Code § 17500; Cal. Bus. & Prof. Code § 17200; Colo. Rev. Stat. Ann. § 6-1-105; Conn. Gen. Stat. § 42-110b; 6 Del. Code § 2513; Fla. Stat. § 501.204; Ga. Code Ann. § 10-1-393; Ga. Code Ann. § 10-1-372; Haw. Rev. Stat. Ann. § 480-2; Idaho Code § 48-603; 815 Ill. Comp. Stat. Ann. 505/2; 815 Ill. Comp. Stat. Ann. 510/2; Ind. Code § 24-5-0.5-3; Kan. Stat. Ann. § 50-626; Ky. Rev. Stat. Ann. § 367.170; La. Rev. Stat. § 51:1405; 15 O.S. § 753; Me. Rev. Stat. tit. 5, § 207; Me. Rev. Stat. tit. 10, § 1212; Md. Code Ann., Com. Law § 13-301; Mich. Comp. Laws Ann. § 445.903; Mass. Gen. Laws Ann. ch. 93A, § 2; Mich. Comp. Laws § 445.903(1); Minn. Stat. § 325F.69; Minn. Stat. § 325D.44; Miss. Code Ann. § 75-24-5; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. Ann. § 598.0915; N.H. Rev. Stat. Ann. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. § 57-

Yet, in addition to the myriad other defects in Plaintiffs' claims discussed herein, none of the alleged conduct amounts to deception, and so none can be the basis for liability.

In addition, Plaintiffs fail to identify a single alleged misrepresentation that any consumer could have relied upon in deciding whether to purchase EpiPen devices. A statement can only support a consumer protection claim if it relates to a material fact—that is, a fact "to which a reasonable person would attach importance in determining his or her choice of action in the transaction involved." *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1178 (D. Kan. 1999) (internal quotations omitted); *accord F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) (the misrepresentation must be "likely to mislead ordinary consumers to their detriment."); *Novartis Corp. v. F.T.C.*, 223 F.3d 783, 786 (D.C. Cir. 2000) ("[A] material claim is one that involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product" (internal quotations omitted)). As discussed below, none of the alleged misrepresentations constitutes the type of information that would affect consumers' purchasing decisions, much less mislead them into purchasing EpiPen devices.

While Plaintiffs' 200-plus page consumer protection count may give the impression that Plaintiffs have alleged 200-plus pages worth of facts to support their claim, that impression is false: The vast majority of the text consists of the same list of factual allegations copied and pasted over and over again under each state's statute. But, as demonstrated below, none of the alleged conduct on which Plaintiffs base their consumer protection claims is actionable.

#### a. Alleged Misrepresentations About Pricing and Packaging.

Plaintiffs allege that Mylan made misrepresentations about the pricing and packaging of EpiPen devices, including regarding "Mylan's reasons for increasing the price of the EpiPen from 2009 to the present," "improvements that Defendants made to the EpiPen that justified

---

12-2; N.Y. Gen. Bus. Law. § 349; N.C. Gen. Stat. § 75-1.1; Ohio Rev. Code Ann. § 1345.02; Ohio Rev. Code Ann. § 4165.02; Okla. Stat. Ann. tit. 15, § 753; Or. Rev. Stat. Ann. § 646.608; 73 Pa. Stat. Ann. § 201-2; S.C. Code Ann. § 39-5-20; Tenn. Code Ann. § 47-18-104; Tex. Bus. & Com. Code § 17.46(b); Utah Code § 13-11-4; Vt. Stat. Ann. tit. 9, § 2453; Va. Code Ann. § 59.1-200; Wash. Rev. Code Ann. § 19.86.020; W. Va. Code Ann. § 46A-6-104; Wis. Stat. § 100.18; Wyo. Stat. Ann. § 40-12-105.

Mylan's price increases," "Mylan's role in setting the price of the EpiPen and/or the price paid by consumers," "the true cost of [ ] EpiPen products," "savings to consumers through its EpiPen rebates, EpiPen coupons, and the generic EpiPen," and "the reason the EpiPen is sold only as a 2-Pak in the United States." *See, e.g.*, CAC ¶¶ 700(a)-(b), 700(d) 700(i)-(k), 700(n). But Plaintiffs do not identify any actual material misrepresentation that could form the basis of a consumer protection claim.

With respect to their pricing-related allegations, Plaintiffs rely on alleged statements made after questions emerged about the pricing of EpiPen products in August 2016, and after the vast majority of Plaintiffs' purchases of EpiPen products had occurred.[58] For example, Plaintiffs assert that Mylan's CEO, in her testimony to Congress, "neglected to emphasize . . . that it is Mylan that sets the price for EpiPens." *Id.* ¶ 194. With respect to the improvements made to EpiPen devices, Plaintiffs merely state that Mylan engaged in misleading conduct by "suggest[ing] it [had] invested money in improving the product," without providing any factual basis for that assertion. *Id.* ¶ 385.

None of these alleged statements could have misled consumers about the price or the nature of the product they were receiving, none could have misled customers to their detriment, and none can support a consumer protection claim. *See Freecom Commc'ns*, 401 F.3d at 1203. Compounding these defects, as a matter of law, Mylan's statements to Congress or other non-consumer entities are not actionable because they were not made to consumers. *See, e.g.*, *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1070 (D. Minn. 1999) ("Defendant's statements to Congress [could not] be considered statements which were disseminated to the relevant purchasing public."); *Paltre v. Gen. Motors Corp.*, 26 A.D.3d 481, 483 (N.Y. App. Div. 2006) (finding no deceptive practices claim under New York law where any alleged misrepresentations were not directed at consumers). Unsurprisingly, not a single

[58] While the Complaint does not specify when each Plaintiff began purchasing EpiPen devices, most Plaintiffs allege that they purchased EpiPen devices for several years before this suit. CAC ¶¶ 11-66.

Plaintiff alleges that he or she was aware of, let alone relied on, any of these statements prior to purchasing EpiPen devices.

Likewise, Plaintiffs fail to allege how Mylan's alleged statements regarding cost savings to patients were misleading or deceptive. Indeed, Plaintiffs describe only one example of allegedly deceptive conduct relating to these topics, contending that Mylan stated on its website and elsewhere that "80% of consumers with insurance pay nothing for the EpiPen," which they allege is "at best a half-truth" because "[e]very time Mylan charges insurance companies for the EpiPen, consumers everywhere are harmed by increased premiums and higher co-pays." CAC ¶¶ 403-04. Plaintiffs do not assert that Mylan's statement was in fact false; instead, they complain that it did not address the process by which insurance companies set premiums. This is absurd: A statement about the percentage of insured consumers paying out-of-pocket costs for EpiPen devices cannot reasonably be understood to mislead consumers about the process by which insurance companies set premiums. Moreover, Plaintiffs fail to allege how such a statement could possibly have misled consumers into purchasing EpiPen devices.[59]

As for their packaging-related allegations, Plaintiffs rely on an August 2011 Mylan press release (the "Press Release") that Plaintiffs claim misled consumers about the reasons EpiPen devices are sold in packages of two, and the benefits of that packaging. *See id.* ¶¶ 336-39. Yet the Press Release—which is attached as Exhibit G hereto—does nothing of the sort.[60] To the contrary, it states that Mylan's decision to package EpiPen devices in two-packs aligned with the NIAID and WAO Guidelines, which is completely accurate.[61] Attached as Exhibit H is a

[59] To the extent Plaintiffs contend that they rely on some statement or omission not specifically alleged in the Complaint, Plaintiffs' claim fails to meet the heightened pleadings standard of Rule 9(b) and therefore fails to state a consumer protection act violation. *See infra* at Section III.C.5.

[60] The Press Release is publicly available at http://investor.mylan.com/press-releases?item=123046. The Court may properly consider the Press Release in relation to Mylan's Rule 12(b)(6) motion, because it is quoted in and integral to the allegations of the Complaint. *See Prager v. LaFaver*, 180 F.3d 1185, 1188–89 (10th Cir. 1999); *see also* CAC ¶¶ 336-40.

[61] Plaintiffs' assertion that Mylan "fail[ed] to disclose and/or conceal[ed] from the public that Mylan tainted the testimony of the doctors and panelists" who produced the NIAID Guidelines, *see, e.g.*, CAC ¶ 700(e), also cannot support their two-pack-based consumer protection claims. The only "fact" Plaintiffs offer in support of this conclusory allegation is a claim that one of the doctors on the NIAID Guidelines expert panel was paid to speak by

comparison of every relevant statement in the Press Release with the related statement in the Guidelines. As this Exhibit makes clear, the Press Release contains no deceptive or misleading statements. For example, the Press Release states that in up to approximately twenty percent of patients experiencing anaphylaxis, repeat dosing of epinephrine may be necessary every five to fifteen minutes. Ex. G at 1. That is exactly what the Guidelines say. *See* Ex. E §§ 6.3.1, 6.3.1.1, Table VI; Ex. F at 22, 23, 38, 30. The same is true of every other statement in the Press Release. *See* Exs. E-G. While not every person experiencing anaphylaxis will require two doses of epinephrine to stop the reaction, some sub-population that is impossible to identify pre-reaction will. Plaintiffs do not dispute this. In fact, Plaintiffs acknowledge that many purchasers of EpiPen devices—including at least thirty-three of the Plaintiffs themselves—*choose* to purchase *more* than two devices per year. *See* CAC ¶¶ 14, 15, 17-21, 23, 26, 28-29, 32-34, 36-37, 40, 46-47, 49-50, 54-56, 58-66. Thus, the statements in the Press Release cannot possibly be considered deceptive, and Plaintiffs do not even attempt to assert that they were deceived about what product they were buying or the price they were paying for it.[62]

**b. Other Alleged Misstatements and Omissions.**

Plaintiffs include a grab-bag of additional allegations that they claim support their consumer protection claims. But none supports any cognizable claim for relief.

***Supposed misstatements about Auvi-Q.*** Plaintiffs allege, for example, that Mylan made misstatements about "the effectiveness and safety of products developed by Mylan's

Mylan Specialty in 2015—four years after the NIAID Guidelines were published. *See id.* ¶ 344. Plaintiffs do not, and cannot, allege that Mylan had a duty to publicize such information or that Mylan hid any such information from consumers. *See Hendricks v. DSW Shoe Warehouse Inc.*, 444 F. Supp. 2d 775, 782 (W.D. Mich. 2006) (rejecting consumer protection claims based on failure to disclose where defendant had no affirmative disclosure duty).

[62] Nor can the fact that Mylan sold EpiPen devices "exclusively as a 2-Pak in the United States," CAC ¶ 700(g), plausibly be alleged to be deceptive. Plaintiffs do not allege, for example, that the nature of the EpiPen two-pack product was misrepresented, or that they were deceived into purchasing a product different from what they thought they were buying. To the contrary, there is no dispute that Plaintiffs were aware of all the essential elements of the transaction—the cost, quantity, and qualities of the product—when they made the purchases alleged in the Complaint. While Plaintiffs may have preferred to purchase EpiPen devices in single doses—though no Plaintiff actually alleges this—they do not claim that they somehow were *deceived* by the sale of EpiPen devices in two-packs, nor could they.

competitors," particularly Auvi-Q. CAC ¶ 700(p). To support this assertion, Plaintiffs cite a statement by Mylan's CEO that an EpiPen device would not be "easily confused with a Blackberry or your phone in your purse or your backpack," *id.* ¶ 231, marketing materials stating that EpiPen was the "preferred brand" under several major health plans, *id.* ¶ 233, and a study about a lack of bioequivalence of EpiPen and Auvi-Q devices, *id.* ¶ 230. Plaintiffs have made no allegations to explain why these statements were actually false or how they were directed at, or material to, consumers. But these allegations suffer from an even more fundamental problem: They necessarily depend on the theory that consumers were deceived into purchasing EpiPen devices rather than Auvi-Q. But nowhere do Plaintiffs assert that Auvi-Q was a superior product, or that Auvi-Q would have been less expensive than EpiPen products. Nor could they: In October 2015, Sanofi recalled "all Auvi-Q currently on the market" because "[t]he products have been found to potentially have inaccurate dosage delivery" that could result in "significant health consequences, including death." Sanofi Press Release (Oct. 30, 2015).[63] Moreover, Sanofi itself has alleged that Auvi-Q was released "at price parity" with EpiPen products. *See* CAC ¶ 172.

***Medicaid rebates.*** Plaintiffs' claims based on allegations that Mylan "falsely certif[ied] to federal officials that the EpiPen was a . . . non-innovator product and otherwise manipulating the Medicaid Medical Drug Rebate Program ("MDRP") to extract higher payments in order to fund payments of rebates and/or discounts," *id.* ¶ 700(r), is baseless. The MDRP requires drug manufacturers to pay rebates *to state Medicaid agencies*. *See* 42 U.S.C. § 1396r-8(b)(1)(A). Thus, to the extent that EpiPen products ever were "misclassified"—which they were not—the effect would have been to reduce Mylan's rebate obligations *to government entities*, which are excluded from the class. *See* CAC ¶ 516.

[63] Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q Due to Potential Inaccurate Dosage Delivery, available at http://www.multivu.com/players/English/7673951-sanofi-auto-injector-recall/ (last visited Dec. 1, 2017).

***Various other alleged misconduct.*** Plaintiffs' allegations regarding Mylan's supposed failure to disclose rebates offered by Defendants to state-based Medicaid programs and/or PBMs, CAC ¶ 700(l)-(m), information regarding "the extent of Defendants' lobbying efforts," *id.* ¶ 700(c), and "the true anti-competitive and unfair purposes of the EpiPen4Schools program," *id.* ¶¶ 700(h), 213, are likewise baseless. As with their other allegations, Plaintiffs do not identify any actual misrepresentations by Mylan on these topics, do not explain how Mylan could have had a duty to disclose such information, and do not allege that (or how) this information factored into any consumers' decisions—including Plaintiffs' own decisions—to purchase EpiPen devices. Nor could they. Mylan's lobbying efforts and the EpiPen4Schools program were aimed at government authorities and schools, respectively and information about Mylan's lobbying is publicly available, which is how Plaintiffs cite the information in the Complaint. *See, e.g., Id.* ¶ 203 (detailing Mylan's lobbying expenses).[64]

### 2. Plaintiffs Fail to Plead Unfair or Unconscionable Conduct.

Plaintiffs also contend that Mylan violated state consumer protection laws by engaging in unfair or unconscionable conduct.[65] These claims appear to be based on three of the same allegations discussed above: (i) Mylan "exploited" its alleged market power to increase the price

[64] In addition, Plaintiffs' attempts to repurpose their allegations of anticompetitive conduct into consumer protection claims, *see, e.g., id.* ¶¶ 700(f), 700(o), 700(q), also fail. Despite Plaintiffs' conclusory statement that Mylan engaged in "misleading, false, unfair and/or deceptive acts or practices," there is nothing *deceptive* about Mylan's alleged market power, the patents on EpiPen devices, or any of Defendants' litigation settlements or citizens' petitions. As noted above, Plaintiffs knew what they were paying and received exactly the product they expected. Thus, there is no element of deceptive conduct that could give rise to a claim for relief. *See, e.g., Sands v. Ticketmaster-N.Y., Inc.*, 616 N.Y.S.2d 362, 363 (N.Y. App. Div. 1994) ("Although plaintiff contends defendant's fees are 'excessive', there is no dispute that such fees are always disclosed by Ticketmaster. Therefore, the 'challenged business practices' do not 'violate the prohibition against deceptive business practices.'").

[65] *See* Ala. Code § 8-19-5; Ark. Code Ann. § 4-88-107, 4-88-108; Cal. Bus. & Prof. Code § 17500; Cal. Bus. & Prof. Code § 17200; Fla. Stat. § 501.204; Ga. Code Ann. § 10-1-393; Haw. Rev. Stat. Ann. § 480-2; Idaho Code § 48-603; 815 Ill. Comp. Stat. Ann. 505/2; Kan. Stat. Ann. § 50-626; Ky. Rev. Stat. Ann. § 367.170; La. Rev. Stat. § 51:1405; Me. Rev. Stat. tit. 5, § 207; Md. Code Ann., Com. Law § 13-301; Mass. Gen. Laws Ann. ch. 93A, § 2; Mich. Comp. Laws Ann. § 445.903; Miss. Code Ann. § 75-24-5; Mo. Code Regs. Ann. tit. 15, § 60-8.020; N.H. Rev. Stat. Ann. § 358-A:2; Neb. Rev. Stat. § 59-1602; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. § 57-12-2; N.C. Gen. Stat. § 75-1.1; Ohio Rev. Code Ann. § 1345.02; Okla. Stat. Ann. tit. 15, § 753; Or. Rev. Stat. Ann. § 646.608; 73 Pa. Stat. Ann. § 201-2; S.C. Code Ann. § 39-5-20; Tenn. Code Ann. § 47-18-104; Tex. Bus. & Com. Code § 17.45; Utah Code § 13-11-5; Vt. Stat. Ann. tit. 9, § 2453; Wash. Rev. Code Ann. § 19.86.020; W. Va. Code Ann. § 46A-6-104; Wyo. Stat. Ann. § 40-12-105.

of EpiPen devices; (ii) Mylan engaged in anticompetitive practices including patent misuse, reverse "pay-for-delay" settlements, and sham citizens' petitions; and (iii) Mylan sold EpiPen devices in packages of two. *See, e.g.*, CAC ¶ 700(f), (g), & (o). Courts have developed various tests to define unfair and unconscionable conduct. Regardless of which standard applies, however, the result is the same: Plaintiffs have failed to allege actionable unfair or unconscionable behavior under the meaning of any state statute.

In determining whether conduct qualifies as unfair, courts typically look to whether (1) the practice offends public policy; (2) it is immoral, unethical, oppressive, or unscrupulous; and (3) it causes substantial injury to consumers.[66] Some states apply an "avoidable injury" test, defining an unfair practice as one that (a) results in a substantial injury, (b) is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (c) is not of the type of injury that a consumer reasonably could have avoided.[67] Some states

[66] *Ulbrich v. Groth*, 78 A.3d 76, 100 (Conn. 2013) (applying test to Connecticut Unfair Trade Practices Act); *Hucke v. Kubra Data Transfer, Corp.*, 160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015) (Florida Deceptive and Unfair Trade Practices Act); *Balthazar v. Verizon Hawaii, Inc.*, 109 Haw. 69, 77, 123 P.3d 194, 202 (2005) (Hawaii HUPUCA); *Rodriguez v. Chase Home Fin., LLC*, No. 10 C 05876CH, 2011 WL 5076346 (N.D. Ill. Oct. 25, 2011) (Illinois Consumer Fraud Act); *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, 144 So. 3d 1011, 1025 (La. 2014) (Louisiana Unfair Trade Practices Act); *Hanrahran v. Specialized Loan Servicing, LLC*, 54 F. Supp. 3d 149, 154 (D. Mass. 2014) (Massachusetts Consumer Protection Act); Mo. Code Regs. Ann. tit. 15, § 60-8.020 (defining "unfair" practices under the Missouri Merchandising Practices Act); *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 164 (4th Cir. 2012), as amended (May 9, 2012) (North Carolina Unfair Deceptive Trade Practices Act); *Estate of Hicks ex rel. Summers v. Urban E., Inc.*, 92 P.3d 88, 94 (Okla. 2004) (Oklahoma Consumer Protection Act); *Lighthouse Grp., LLC v. Strauss*, No. 9:15-CV-02463-DCN, 2016 WL 562100, at *4 (D.S.C. Feb. 12, 2016) (South Carolina Unfair Trade Practices Act); *In re Weaver*, No. 07-10411, 2015 WL 4722615, at *6 (Bankr. D. Vt. Aug. 7, 2015) (citing *Christie v. Dalmig, Inc.*, 136 Vt. 597 (Vt. 1979) (Vermont Consumer Protection Act).

[67] *Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 159–60 (1st Cir. 2011) (noting that to determine whether an act is unfair under the Maine Unfair Trade Practices Act, Maine courts look to whether it causes substantial injury to consumers that is not reasonably avoidable, and also consider established public policy considerations); *Hibdon v. Safeguard Properties, LLC*, No. CIV. PJM 14-591, 2015 WL 4249525, at *5 (D. Md. July 9, 2015) ("To be considered 'unfair' under the MCPA, a 'trade practice' must result in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided."). Still other courts have developed slightly varying tests that are broadly similar to these two tests. In determining whether conduct is unfair in the context of a California Unfair Competition Law claim, California courts have applied two tests. The *South Bay* test involves examining the allegedly unfair practice's "impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999)). The *Cel-Tech* test requires that "any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Davis*, 691 F.3d at 1169-70 (quoting *Cel-Tech Commc'ns., Inc. v. L.A. Cell. Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999)). New Hampshire

prohibit "unconscionable" conduct or define unfair conduct as conduct that is unconscionable.[68] Finally, certain state statutes define "unfair" conduct as conduct that is deceptive or misleading in some way, which Plaintiffs have failed to allege for all the reasons explained above.[69]

Plaintiffs' claims do not meet any test for unfair or unconscionable acts. Plaintiffs allege that Mylan unfairly increased the price of EpiPen devices and sold them in two-packs, "doubl[ing] the already-inflated price paid by every consumer." CAC ¶ 684(g). But several courts have explicitly held that charging an allegedly high price for a product does not constitute unfair or unconscionable conduct under various state consumer protection statutes. *See, e.g.*, *Quigley v. Esquire Deposition Servs., LLC*, 975 A.2d 1042, 1048 (N.J. Super. Ct. App. Div. 2009) (finding no valid New Jersey Consumer Fraud Act claim where alleged misconduct involved inflated prices); *Johnson v. Microsoft Corp.*, 834 N.E. 2d 791, 801 (Ohio 2005) ("[A] complaint that alleges a violation of the Ohio Consumer Sales Practices Act predicated upon

---

courts apply the "rascality test," under which the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *George v. Al Hoyt & Sons, Inc.*, 27 A.3d 697, 705 (N.H. 2011).

[68] *See, e.g.*, *Baptist Health v. Murphy*, 365 Ark. 115, 128, 226 S.W.3d 800, 811 (2006) (noting that the Arkansas Deceptive Trade Practices Act prohibits unconscionable trade practices, and defining an "unconscionable" act as an act that "affront[s] the sense of justice, decency, or reasonableness."); *State ex rel. Stovall v. DVM Enterprises, Inc.*, 62 P.3d 653, 657 (Kan. 2003) ("The KCPA prohibits sellers from engaging in unconscionable acts or practices."); *M.T. v. Saum*, 7 F. Supp. 3d 701, 704 (W.D. Ky. 2014) (explaining that under the Kentucky Consumer Protection Act, "unfair shall be construed to mean unconscionable"); N.J. Stat. Ann. § 56:8-2 (West) (New Jersey Consumer Fraud Act prohibits unconscionable conduct); *Johnson v. Microsoft Corp.*, 834 N.E. 2d 791, 800 (Ohio 2005) (stating that the Ohio Consumer Sales Practices Act prohibits unconscionable practices, which are those that "relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue"); Tex. Bus. & Com. Code Ann. § 17.45 ("'Unconscionable action or course of action' means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree"); *Gallegos v. LVNV Funding LLC*, 169 F. Supp. 3d 1235, 1244 (D. Utah 2016) (Utah Consumer Sales Practices Act prohibits unconscionable conduct).

[69] *See Duspiva v. Fillmore*, 154 Idaho 27, 32 (2013) (defining an unfair practice under the ICPA as a deceptive practice). Several state statutes effectively define an unfair practice as one that deceives consumers. Mich. Comp. Laws. § 445.903 (defining unfair and unconscionable acts as deceptive acts, with no catch-all provision); Miss. Code Ann. 75-24-5 (same); N.M. Stat. Ann. § 57-12-2-D (same); *Johnson v. Microsoft Corp.*, 834 N.E. 2d 791, 800 (Ohio 2005) (stating that under the Ohio Consumer Sales Practices Act, unfair or deceptive practices are those that mislead consumers about the nature of the product); Or. Rev. Stat. Ann. § 646.608 (enumerating unfair practices under the Oregon Unlawful Trade Practices Act, all of which involve deceptive conduct); 73 Pa. Stat. Ann. § 201-2 (defining unfair acts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law as fraudulent or deceptive acts); Tenn. Code Ann. § 47-18-104 (listing unfair acts under the Tennessee Consumer Protection Act, all of which involve deceptive conduct); W. Va. Code. § 46A–6-102 (enumerating unfair acts or practices under the West Virginia Consumer Credit and Protection Act, all of which involve deceptive conduct).

monopolistic pricing practices does not state a claim upon which relief can be granted"); *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998) ("In pricing cases under the [Maine Unfair Trade Practices] Act the inquiry is whether the price has the effect of deceiving the consumer, or inducing her to purchase something that she would not otherwise purchase.").

This case underscores why the preceding decisions are correct. It would be dangerous legal precedent to find that merely charging a price higher than consumers want to pay, or selecting the quantity of goods to put in a package, amounts to a state consumer protection law claim. Plaintiffs state in conclusory fashion that Mylan's conduct "offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantial[ly] injurious to consumers." CAC ¶ 1012. But Plaintiffs need to plead something more than "labels and conclusions," which they have not done. *Twombly*, 550 U.S. at 555. Plaintiffs also have not demonstrated substantial injury, which is a requirement for unfairness in several states. *See supra* 67 n. 66. Nor do Plaintiffs identify any established public policy, standard of conduct, or guideline for how this Court is to determine whether a price—freely set by a company and in violation of no law, regulation, or established public policy—is "unfair."

In fact, Mylan's freedom to price and package EpiPen devices is *supported* by important public policy considerations. As discussed above, under the EpiPen device patents that are licensed to it, Mylan has the exclusive right to market, distribute, and sell those devices. Courts have "long acknowledged the importance of the patent system in encouraging innovation." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (internal quotations and citations omitted). That is why courts routinely have recognized that patent holders have the freedom to set prices for their products for the duration of the patent exclusivity period. *See Biotech*, *SEPTA*, *supra* Section III.B. This Court should not break new ground on this issue.[70]

[70] Moreover, to the extent that Plaintiffs' claims of unfairness are premised on allegations of anticompetitive conduct, they should be dismissed because their underlying antitrust claims fail for the reasons stated in Section I above. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of consumer protection claims where plaintiffs "fail to demonstrate why any of these claims should survive if the antitrust claims are dismissed"); *In re Plavix Indirect Purchaser Antitrust Litig.*, No. 1:06-cv-226,

**3. Plaintiffs Fail to Plead Actual Loss.**

Plaintiffs' consumer protection claims also fail because Plaintiffs have not pled—and cannot plead—that they suffered actual injury or ascertainable loss.[71] The injury requirement is crucial to all of Plaintiffs' consumer protection claims that offer damages as a remedy,[72] and Plaintiffs thus must plead a real injury or loss suffered as a result of the defendant's conduct.[73] For all of the reasons discussed above in Section III.A.1 (lack of standing), Plaintiffs have failed to allege this essential element of their claims. The Court should therefore dismiss their claims, as courts routinely have done when confronted with similar claims. *See, e.g., Kim v. Carter's Inc.*, 598 F.3d 362, 365-66 (7th Cir. 2010) (affirming dismissal of Illinois Consumer Fraud Act claim where plaintiff paid the purchase price for defendant's products, which were not alleged to be defective, and therefore received "the benefit of their bargain and suffered no pecuniary harm"); *Thompson v. Allergan USA, Inc*., 993 F. Supp. 2d 1007, 1012 (E.D. Mo. 2014) (allegation that plaintiff paid purchase price insufficient to support claim under the MMPA).

**4. Plaintiffs Do Not Plead Reliance or Causation.**

Plaintiffs also fail to plead that any supposed injuries were caused by Mylan's alleged conduct. In addition to forming part of the "irreducible minimum" justiciability standards under

2011 WL 335034, at *5 (S.D. Ohio Jan. 31, 2011) (dismissing state and federal antitrust claims along with consumer protection claims "premised wholly on the same underlying alleged anticompetitive behavior and antitrust injury"). Plaintiffs also fail to plead a consumer protection claim based on unlawful conduct. Plaintiffs' only claim for "unlawful" conduct is pled under California's Unfair Competition Law ("UCL"), Section 17200. That prong requires a demonstration that some other law has been violated, which Plaintiffs do not allege. *See Moran v. Prime Healthcare Mgmt.*, Inc., 208 Cal. Rptr. 3d 303, 311 (Ct. App. 2016) ("[V]iolation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."). Accordingly, Plaintiffs' UCL "unlawful" claim must be dismissed. *See Davis*, 691 F.3d at 1168-69.

[71] *See* Pleading Requirements for State Consumer Protection Claims at Exhibit B.

[72] Six of Plaintiffs' state law claims do not require proof of injury (Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, et seq.; Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/2 et seq.; Maine Uniform Deceptive Trade Practices Act, 5 M.R.S.A. § 1211 et seq.; Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48; New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-10; Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.01, et seq.), and each of them offers only injunctive relief as a remedy. In addition, as discussed below, these state law claims have additional pleading requirements that Plaintiffs fail to satisfy.

[73] *See* Pleading Requirements for State Consumer Protection Claims at Exhibit B, summarizing the injury requirements of each state statute under which Plaintiffs have asserted a claim.

Article III, either reliance[74] or causation[75] is expressly required as an element for all of Plaintiffs' state-specific statutory claims that offer damages as a remedy. Yet none of the Plaintiffs have alleged that they saw any of the allegedly misleading statements, or that any allegedly "unfair" practices induced them to purchase EpiPen devices that they otherwise would not have purchased. Plaintiffs also do not allege any conduct connecting Mylan to the out-of-pocket costs they allegedly incurred, and therefore, this cannot serve as a basis for showing harm. Nor could they. Plaintiffs' allegations prove that the so-called "list price" set by Mylan is not the ultimate retail price paid by consumers: The prices the individual Plaintiffs paid for EpiPen devices are not uniform, but rather are all over the map. *See* CAC ¶¶ 11-15, 17, 19, 21-31, 33-34, 36-38, 40, 42-44, 47-49, 52, 54-56, 58-66. The reason for this is obvious: Plaintiffs did not buy EpiPen devices directly from Mylan; instead, they bought from retailers, which in turn bought from wholesalers as part of a complex supply chain, which also includes PBMs and insurers—entities that, according to Plaintiffs own allegations—received substantial discounts from the "list price." *See, e.g.*, CAC ¶ 182. There is simply no direct or proximate causation alleged between the actions stated in the Complaint and the prices that Plaintiffs claim to have paid.

As for their two-pack claims, Plaintiffs likewise have not pled any theory showing that they suffered economic harm because of Mylan's alleged conduct, which centers on Mylan's announcement in 2011 that it would sell EpiPen products only in packages of two. CAC ¶¶ 335-

[74] *See* Pleading Requirements for State Consumer Protection Claims at Exhibit B, summarizing the reliance and causation requirements of each state statute under which Plaintiffs have asserted a claim.

[75] Only six of Plaintiffs' state law causes of action do not require causation (Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, et seq.; Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/2 et seq.; Maine Uniform Deceptive Trade Practices Act, 5 M.R.S.A. § 1211 et seq.; Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48; New Mexico Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-10; Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.01, et seq.), and each of them only offers injunctive relief as a remedy. The Ohio Deceptive Trade Practices Act offers damages as a remedy, but only if causation is shown. *See* Ohio Rev. Code Ann. § 4165.03(2). In addition, these state law claims require a plaintiff to show that she is likely to be damaged *in the future* by some deceptive trade practice of the defendant. *Silverstein v. Procter & Gamble Mfg. Co.*, No. CV 108-003, 2008 WL 4889677, at *2 (S.D. Ga. Nov. 12, 2008); *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 918 (N.D. Ill. 2013); *J.S. McCarthy Co. v. Brausse Diecutting & Converting Equip., Inc.*, No. CIV. 04-107-B-W, 2005 WL 946318, at *8 (D. Me. Apr. 22, 2005); *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1071 (D. Minn. 2013); Ohio Rev. Code Ann. § 4165.03(A)(1).

36. But Plaintiffs do not allege that they even were aware of that announcement, or that it affected their purchasing decisions. And whether Plaintiffs "needed" a second EpiPen device necessarily depended on factors beyond Mylan's control. *See* Section III.A *supra*.

**5. Plaintiffs Fail to Plead Their Claims with Particularity.**

Nearly all of Plaintiffs' consumer protection claims also should be dismissed because they have failed to plead those claims with particularity under Fed. R. Civ. P. 9(b), which requires Plaintiffs to plead, at minimum, "the time, place, and contents of the false representations."[76] *U.S. ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, 232 F.3d 902, 2000 WL 1595976, at *3 (10th Cir. 2000). Plaintiffs do not come close to meeting this burden for their deception-based claims. Instead, they fail to identify (i) any specific misrepresentation that Mylan supposedly made to Plaintiffs or other consumers, (ii) the dates when any of the named Plaintiffs became aware of any such misrepresentations, and (iii) nexus between the alleged wrongful acts and any supposed harm suffered by Plaintiffs as a result.

**6. Plaintiffs' Claims Under Certain State Laws Fail Because Those Laws Do Not Permit Class Actions and For Other State-Specific Reasons.**

Plaintiffs' consumer protection claims also should be dismissed for multiple and varied reasons that are specific to each State's law. In particular, Plaintiffs' class claims under the Alabama Deceptive Trade Practices Act ("ADTPA"), Colorado Consumer Protection Act ("CCPA"), Georgia Fair Business Practices Act ("GFBPA"), Louisiana Unfair Trade Practices Act ("LUTPA"), Mississippi Consumer Protection Act ("Mississippi CPA"), South Carolina Unfair Trade Practices Act ("SCUTPA"), and Tennessee Consumer Protection Act ("TCPA") fail because those statutes bar class actions.[77] Similarly, the Ohio Consumer Sales Practices Act

[76] Thirty of Plaintiffs' forty-seven consumer protection claims are subject to Rule 9(b)'s heightened pleading standard due to state law requirements. *See* Pleading Requirements for State Consumer Protection Claims at Exhibit B (listing claims that are subject to dismissal for Plaintiffs' failure to plead them with particularity).

[77] Ala. Code § 8-19-10(f) ("A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class. The limitation in this subsection is a substantive limitation and allowing a consumer or other person to bring a class action or other representative action for a violation of this chapter would abridge, enlarge, or modify the substantive rights created by this chapter."); Colo. Rev. Stat. Ann. § 6-1-113 ("Except in a class action or a case brought for a violation of section 6-1-709, any person who, in a private civil action, is found to have engaged in or caused another to engage in any deceptive trade practice listed in this article shall be

("OCSPA") permits class actions only in very narrow circumstances, which are not present here. *See Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 33 (Ohio 2006) (to bring a class action under the OCSPA, a plaintiff must allege specific conduct declared unlawful in Ohio prior to the filing of the complaint, either by a rule adopted by the Attorney General or a publicly available court decision (citing Ohio Rev. Code § 1345.09)); *see also* CAC ¶¶ 1200-14.

It is well established that state statutory prohibitions on class actions are controlling in federal courts whenever the prohibition is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 424 (2010) (Stevens, J., concurring). Thus, courts routinely enforce class action prohibitions in the consumer protection context. *See, e.g., In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1235 (D. Kan. 2015) (dismissing CCPA class claims due to class action restriction); *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, Civ. No. 12-cv-02432, 2015 WL 8479746, at *3-5 (D. Colo. Dec. 10, 2015) (finding CCPA class action restriction enforceable, following the reasoning of *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011)); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003) (discussing enforcement of SCUTPA class action prohibition); *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 749 (N.D. Ohio 2010) (dismissing OCSPA claim due to plaintiff's failure to meet statutory pleading requirement). This Court should follow these

liable . . . ."); Ga. Code § 10-1-399(a) (The GFBPA authorizes consumers to sue only individually, not in a "representative capacity"); La. Rev. Stat. § 51:1405 ("Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages."); Miss. Code. Ann. § 75-24-15 ("Nothing in this chapter shall be construed to permit any class action or suit, but every private action must be maintained in the name of and for the sole use and benefit of the individual person."); S.C. Code Ann. § 39-5-140 ("Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, but not in a representative capacity, to recover actual damages."); Tenn. Code Ann. § 47-18-109 ("Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages.").

precedents and dismiss Plaintiffs' class claims under the ADTPA, CCPA, GFBPA, LUTPA, Mississippi CPA, SCUTPA, TCPA, and OCSPA (Counts VIII.A, VIII.G, VIII.K, VIII.S, VIII.Z, VIII.NN, VIII.OO, and VIII.II).

These are not the only state-specific grounds for dismissing certain of Plaintiffs' consumer protection claims. In the interest of judicial economy, the Court need not confront all of these issues at this time.[78] Mylan reserves the right to address these additional defenses fully in a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) or otherwise to the extent that any such claims remain pending after the resolution of this Motion.

## IV. PLAINTIFFS' UNJUST ENRICHMENT CLAIM (COUNT IX) FAILS.

Plaintiffs do not come close to asserting an actionable unjust enrichment claim under any state's common law.[79] The reason for this is simple: "[T]here can be no unjust enrichment if the parties receive what they intended to obtain." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). That is precisely what happened here. Plaintiffs received exactly what they paid for—EpiPen devices. Plaintiffs allege that Mylan "unjustly" obtained financial benefits by receiving Plaintiffs' payments for those devices. CAC ¶¶ 1424-27. But the mere fact that Plaintiffs think the prices Mylan charged were "unjust" does not give rise to an unjust enrichment claim. *See, e.g.*, *Holland v. Tandem Computers Inc.*, 49 F.3d 1287, 1289 (8th Cir. 1995) (plaintiffs were not unjustly enriched where they received the agreed-upon product or service in exchange for payment); *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 939-40 (6th Cir. 1989) (no unjust enrichment where plaintiff received expected product in return

[78] To give just a few examples, some states require privity of contract between Plaintiffs and Defendants, which is absent here. *See, e.g.*, *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992) (discussing Kentucky law). Other states statutes have "regulatory exemptions" that bar claims if the conduct at issue, as in this case, is regulated by an authority such as the U.S. Food and Drug Administration ("FDA"). *See, e.g.*, Ga. Code Ann. § 10-1-374. Some states' laws only permit injunctive relief and thus require Plaintiffs to plead a risk of continuing harm, which Plaintiffs cannot plead here. *See, e.g.*, Ill. Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/2 *et seq*. And still others do not allow a private right of action for consumers. *See, e.g.*, *Smith v. Smith & Nephew, Inc.*, 5 F. Supp. 3d 930, 932 (S.D. Ohio 2014) (dismissing Ohio Deceptive Trade Practices Act claim because plaintiffs, who were consumers, lacked standing).

[79] *See* Pleading Requirements for Unjust Enrichment Claims at Exhibit C, summarizing the standard for pleading an unjust enrichment claim under the laws of each of the states in which Plaintiffs reside.

for payment); *Monus v. Colo. Baseball 1993, Inc.*, No. 95-1099, 1996 WL 723338, at *15 (10th Cir. Dec. 17, 1996) (rejecting unjust enrichment claim where plaintiff "received the benefit of the bargain he agreed to"). Thus, Plaintiffs have failed to state a claim for unjust enrichment.[80]

## CONCLUSION

For these reasons, Mylan respectfully requests that the Court dismiss Plaintiffs' Consolidated Class Action Complaint with prejudice.

[80] Moreover, Plaintiffs plead their unjust enrichment claim generically "under the common law of all 50 states and territories." CAC ¶ 1422. But Plaintiffs lack standing to assert common law claims under the laws of states where they do not reside or did not suffer injury. *See, e.g.*, *Thomas v. Metro. Life Ins. Co.*, 540 F. Supp. 2d 1212, 1224-26 (W.D. Okla. 2008); *Antonson v. Robertson*, 141 F.R.D. 501, 507 (D. Kan. 1991). There are no named plaintiffs for the following States in the Complaint: Alaska, the District of Columbia, Iowa, Montana, New Mexico, North Dakota, Rhode Island, and South Dakota. Therefore, the unjust enrichment claims for these States must be dismissed. *See Thomas*, 540 F. Supp. 2d at 1226 (dismissing for lack of standing claims asserted under laws of states in which no plaintiff resided or suffered injury); *Stolz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *13 (E.D.N.Y. Sept. 22, 2015) (same).

Dated: December 15, 2017

LATHROP & GAGE LLP

By: /s/ Brian C. Fries

Brian C. Fries (15889)
James Moloney (23786)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Telecopier: (816) 292-2001
Email: bfries@lathropgage.com
Email: jmoloney@lathropgage.com

Mitchell E. Zamoff*
Adam K. Levin*
David M. Foster*
Kathryn M. Ali*
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Telecopier: (202) 637-5910
Email: mitch.zamoff@hoganlovells.com
Email: adam.levin@hoganlovells.com
Email: david.foster@hoganlovells.com
Email: kathryn.ali@hoganlovells.com

ATTORNEYS FOR MYLAN SPECIALTY L.P., MYLAN PHARMACEUTICALS INC., MYLAN N.V., AND HEATHER BRESCH

* Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 15th day of December, 2017 the foregoing was filed via CM-ECF which will automatically forward an electronic copy to the following:

- **Kathryn M. Ali**
  kathryn.ali@hoganlovells.com

- **Sharon S. Almonrode**
  ssa@millerlawpc.com

- **Ben Barnow**
  b.barnow@barnowlaw.com

- **William D. Beil**
  billb@germanmay.com

- **Timothy Gordon Blood**
  tblood@bholaw.com

- **Reagan E. Bradford**
  reagan.bradford@lanierlawfirm.com

- **Yehudah L. Buchweitz**
  mco.ecf@weil.com

- **Warren T. Burns**
  wburns@burnscharest.com

- **Arnold B. Calmann**
  abc@saiber.com,js@saiber.com

- **Gretchen Freeman Cappio**
  gcappio@kellerrohrback.com

- **Spencer Cox**
  scox@burnscharest.com

- **Stuart A. Davidson**
  sdavidson@rgrdlaw.com

- **Cristina R. Delise**
  cristina.delise@lanierlawfirm.com

- **Isaac L. Diel**
  idiel@sharpmcqueen.com

- **Dimitrios Drivas**
  ddrivas@whitecase.com

- **Stephen J. Fearon, Jr**
  stephen@sfclasslaw.com

- **David M. Foster**
  david.foster@hoganlovells.com

- **Susan E. Foster**
  sfoster@perkinscoie.com

- **Brian C. Fries**
  bfries@lathropgage.com

- **Raj Gandesha**
  rgandesha@whitecase.com

- **Paul J. Geller**
  pgeller@rgrdlaw.com

- **Sheryn George**
  sheryn.george@whitecase.com

- **Scott B. Goodger**
  sgoodger@midwest-law.com

- **Archie Grubb, II**
  archie.grubb@beasleyallen.com

- **Mitchell L. Herren**
  mherren@hinklaw.com,dpalomino@hinklaw.com

- **Eric Shaun Hochstadt**
  eric.hochstadt@weil.com

- **Ryan C. Hudson**
  rhudson@midwest-law.com

- **W. Mark Lanier**
  wml@lanierlawfirm.com

- **Adam K. Levin**
  adam.levin@hoganlovells.com

- **Jonathan K. Levine**
  jkl@pritzkerlevine.com

- **Dennis Lienhardt, Jr**
  dal@millerlawpc.com

- **Derek William Loeser**
  dloeser@kellerrohrback.com

- **Duane L. Loft**
  dloft@bsfllp.com

- **Jeffrey N. Luthi**
  panelmdl@jpml.uscourts.gov

- **Damien J. Marshall**
  dmarshall@bsfllp.com

- **Michael W. Meredith**
  mmeredith@kellerrohrback.com

- **W. Daniel Miles , III**
  dee.miles@beasleyallen.com

- **Arthur R. Miller**
  arthur.miller@lanierlawfirm.com

- **E. Powell Miller**
  epm@millerlawpc.com

- **Robert Milne**
  rmilne@whitecase.com

- **Angela (Angel) D. Mitchell**
  amitchell@shb.com

- **James Moloney**
  jmoloney@lathropgage.com

- **Brian Murphy**
  brian@braswellmurphy.com

- **Brian D. Penny**
  penny@lawgsp.com

- **Elizabeth C. Pritzker**
  ecp@pritzkerlevine.com

- **Joseph M. Rebein**
  jrebein@shb.com

- **Rosemary Medellin Rivas**
  rrivas@zlk.com

- **Lynn Lincoln Sarko**
  lsarko@kellerrohrback.com

- **Joseph G. Sauder**
  jgs@mccunewright.com

- **Charles T. Schimmel**
  chuck@wrightschimmel.com

- **Bradley Joseph Schlozman**
  bschlozman@hinklaw.com

- **Erich Paul Schork**
  e.schork@barnowlaw.com

- **Rex A. Sharp**
  rsharp@midwest-law.com

- **Diane P. Sullivan**
  diane.sullivan@weil.com

- **Kathryn Swisher**
  kathryn.swisher@whitecase.com

- **Edward Thrasher**
  ethrasher@whitecase.com

- **Steven N. Williams**
  swilliams@cpmlegal.com

- **Brendan Woodard**
  bwoodard@whitecase.com

- **W. Greg Wright**
  greg@wrightschimmel.com

- **Mitchell E. Zamoff**
  mitch.zamoff@hoganlovells.com

/s/ *Brian C. Fries*
An Attorney for the Mylan Defendants