**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | **2:17-md-2785**<br>**MDL 2785** |
| -------------------------------------------------- | |
| SANOFI-AVENTIS US, LLC,<br>                              Plaintiff | **2:17-cv-2452** |
| v. | |
| MYLAN INC., *et al.*,<br>                              Defendants. | **DEMAND FOR JURY TRIAL** |
| This document applies to the *Sanofi* case. | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
## OF MYLAN INC. AND MYLAN SPECIALTY L.P.

Defendants Mylan Inc. and Mylan Specialty L.P. (collectively, "Mylan"), by and through their attorneys, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, hereby answer the Complaint as follows:

### PRELIMINARY STATEMENT

A.     Mylan N.V., through its subsidiaries, is one of the world's leading manufacturers of generic drugs.  Since its founding in 1961, Mylan's success has been built on three principles: producing high quality medicines, significantly expanding access to those medicines, and helping to lower health care costs.

B.     In the United States, Mylan sells billions of doses annually of 635 products across all of its specialty and generic products, including the EpiPen® and EpiPen Jr® (collectively,

1

"EpiPen") Auto-Injectors.  In the developing world, for example, approximately half of all patients receiving treatment for HIV depend on a Mylan antiretroviral medication every day. Today, Mylan supplies more than 10% of the generic drugs used by U.S. patients—products that play a vital role in lowering the costs of prescription drugs in the U.S. healthcare system.  In short, access to medicine is at the core of Mylan's mission.

C.      In 2007, Mylan acquired the predecessor to Mylan Specialty, Dey Pharma L.P., which had the rights to market EpiPen products.  In 2013, Plaintiff Sanofi-Aventis U.S. LLC ("Plaintiff" or "Sanofi") began marketing a competing epinephrine auto-injector called Auvi-Q® ("Auvi-Q").

D.      During the time Sanofi marketed the product, Auvi-Q was a failure.  In fact, Sanofi was forced to withdraw the product from the market entirely in 2015 because of defects that caused potentially inaccurate dosage delivery, including failure to deliver the drug at all—a potentially catastrophic defect that Sanofi acknowledged could result in "significant health consequences, including death[.]"[1]

E.      Auvi-Q also failed because of Sanofi's pricing strategy.  Rather than price Auvi-Q at a low price in order to gain market share as a new entrant, Sanofi sold Auvi-Q at a Wholesale Acquisition Cost ("WAC") that was ***higher*** than the price of EpiPen products and pursued aggressive price increases throughout the time it marketed Auvi-Q.

F.      Yet, instead of taking responsibility for the shortcomings in its product and pricing strategy, Sanofi has undertaken an aggressive campaign to wrongly blame Mylan for its own failures.  Sanofi's Complaint against Mylan in this case is a prime example.  The claims

---

[1]      *Updated: Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q Due to Potential Inaccurate Dosage Delivery* (Oct. 30, 2015), http://www.news.sanofi.us/2015-10-28-Sanofi-US-Issues-Voluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery.

Sanofi asserts in its Complaint are baseless.  And Sanofi's depiction of itself as a helpless victim of Mylan Specialty's alleged "PBM rebating" is wholly counterfactual.

G.     Sanofi bases its claims on supposedly "unprecedented" rebates that Mylan Specialty allegedly offered and/or paid to Pharmacy Benefit Managers ("PBMs"), claiming that Mylan offered "extremely large rebates" in the "30% or higher" range that "were conditioned on exclusivity."  The irony of Sanofi's allegations against Mylan is difficult to overstate.  In a recent Credit Suisse report examining the rebating practices of 25 leading pharmaceutical manufacturers, *Sanofi* was named as one of four companies with "the highest levels of rebating in 2015, all >49%."[2]  In fact, Sanofi itself recently argued in another case, *Eisai, Inc. v. Sanofi Aventis U.S. LLC*, 821 F.3d 394 (3d Cir. 2016), that rebates like those Sanofi now complains of are pro-competitive.  And Sanofi is currently being sued by diabetes patients in the District of New Jersey for the very same conduct of which it complains here: allegedly providing "steep rebates" to PBMs "in exchange for preferred formulary positions" on three Sanofi products – Lantus, Apidra, and Toujeo.

H.     Sanofi's Complaint fails as a matter of law, is demonstrably false, and should be summarily dismissed on the merits.  And contrary to the tale that Sanofi tries to spin, it is Sanofi that engaged in unfair competition when marketing Auvi-Q.  Mylan therefore states the following Answer, Affirmative Defenses, and Counterclaims to Sanofi's Complaint.

## NATURE OF ACTION

1.     Mylan admits that Plaintiff purports to bring a suit against Mylan for damages, trebled under United States antitrust law, but denies that Plaintiff is entitled to any relief.  Mylan admits that Mylan Specialty L.P. sells epinephrine auto-injector ("EAI") drug devices in the

---

[2]     Credit Suisse, *Equity Research Global Pharmaceuticals & Biotechnology* (May 17, 2016) at 2.  Sanofi's average rebates in 2014 were similarly high, at 43%.  *Id.*

United States and that Plaintiff began selling a product known as Auvi-Q in 2013. Mylan denies the remaining allegations contained in Paragraph 1 of the Complaint.

2.       Mylan admits the first three sentences of Paragraph 2.  Mylan denies the remaining allegations contained in Paragraph 2 as stated.  Mylan avers that intramuscular epinephrine is the first-line therapy for anaphylaxis, as designated by the National Institute of Allergy and Infectious Diseases ("NIAID").  Mylan further avers that doctors recommend that patients known to be at risk for anaphylaxis carry epinephrine auto-injector devices and be trained in their use.

3.       Mylan admits that on or around December 18, 2012, Mylan issued a press release and states that the content of the press release speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 3 of the Complaint.

4.       Mylan denies that Auvi-Q represented a novel and advanced EAI drug device. Mylan admits that Auvi-Q included voice instructions.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 4 of the Complaint, and therefore denies the same.

5.       Mylan denies the allegations contained in Paragraph 5 of the Complaint.

6.       Mylan denies the allegations contained in Paragraph 6 of the Complaint.

7.       Mylan denies the allegations contained in Paragraph 7 of the Complaint.

8.       Mylan admits that the March 1, 2017 Annual Report of Mylan N.V. exists and states that the content of the Annual Report speaks for itself.  Mylan admits that its Chief Executive Officer, Heather Bresch, testified before the U.S. Congress about EpiPen devices. Mylan denies the remaining allegations contained in Paragraph 8 of the Complaint.

9.      Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 9 of the Complaint relating to Auvi-Q's market share when it was "on formulary at similar co-pay terms to the EpiPen," or on formularies with "open access," and therefore denies the same.  Mylan denies the remaining allegations contained in Paragraph 9 of the Complaint.

10.      Mylan admits that Plaintiff sold Auvi-Q in the United States from January 2013 until October 2015.  Mylan admits that Plaintiff seeks damages, and attorney's fees and costs, for bringing this action, but denies that Plaintiff is entitled to any relief.  Mylan denies the remaining allegations contained in Paragraph 10 of the Complaint.

## THE PARTIES

11.      Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 11 of the Complaint, and therefore denies the same.

12.      Mylan admits that Mylan Inc. is an indirect wholly owned subsidiary of Mylan N.V., that Mylan N.V.'s principal executive offices are located in Hatfield, Hertfordshire, England, and that Mylan N.V.'s global headquarters are located in Canonsburg, Pennsylvania.  Mylan denies the remaining allegations contained in Paragraph 12 of the Complaint.

13.      Mylan denies the allegations contained in Paragraph 13 of the Complaint.

14.      Mylan denies the allegations contained in Paragraph 14 of the Complaint.

## JURISDICTION AND VENUE

15.      Paragraph 15 of the Complaint contains legal assertions relating to jurisdiction as to which no response is required.  To the extent a response is required, Mylan admits that this Court has jurisdiction over claims asserted under the Sherman Act.

16.     Paragraph 16 of the Complaint contains legal assertions relating to venue as to which no response is required.  To the extent a response is required, Mylan admits that this case is properly before the United States District Court for the District of Kansas pursuant to the Transfer Order entered by the United States Judicial Panel on Multidistrict Litigation on August 4, 2017.  *See* Transfer Order (ECF No. 38).  Mylan denies the remaining allegations contained in Paragraph 16 of the Complaint.

## INTERSTATE COMMERCE

17.     Mylan admits that EpiPen devices are marketed and sold in interstate commerce.

## FACTUAL BACKGROUND

### A.  Anaphylaxis is a Life-Threatening Medical Condition[3]

18.     Mylan admits the allegations contained in Paragraph 18 of the Complaint.

19.     Mylan admits that the articles, "Anaphylaxis in America: The Prevalence and Characteristics of Anaphylaxis in the United States" and "Epidemiology of Anaphylaxis" exist and states that the content of the articles speaks for itself.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 19 of the Complaint, and therefore denies the same.

20.     Mylan admits that on or around October 17, 2012, Mylan issued a press release stating that anaphylaxis causes an estimated 1,500 deaths each year.  Mylan admits that it has stated that 43 million patients are at risk of anaphylaxis.  Mylan admits that a September 8, 2016 letter from Mylan to Senator Charles E. Grassley states that "1 in 13 children [are] affected by food allergies."

---

[3]     The allegations contained in the heading for Part A of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan admits that anaphylaxis is a life-threatening medical condition.

**B. EAI Drug Devices are a Relevant Product Market as the Recognized First-Line Treatment for Anaphylaxis[4]**

21.    Mylan denies the first two sentences of Paragraph 21 as stated, but avers that intramuscular epinephrine is the first-line therapy for anaphylaxis, as designated by NIAID. Mylan further avers that "Guidelines for the Diagnosis and Management of Food Allergy in the United States: Report of the NIAID-Sponsored Expert Panel" exists and states that the document speaks for itself.   Mylan admits the remaining allegations contained in Paragraph 21 of the Complaint.

22.    Mylan denies the last sentence of Paragraph 22 as stated, but avers that doctors recommend patients known to be at risk for anaphylaxis carry epinephrine auto-injector devices and be trained in their use.  Mylan admits the remaining allegations contained in Paragraph 22 of the Complaint.

23.    Mylan denies the second sentence of Paragraph 23.  Mylan admits the remaining allegations contained in Paragraph 23 of the Complaint.

**C. Regulatory and Other Barriers to Entry Exist for EAI Drug Devices[5]**

24.    Mylan denies the allegations contained in Paragraph 24 of the Complaint.

25.    The allegations in Paragraph 25 of the Complaint state legal conclusions as to which no response is required.   To the extent a response is required, Mylan admits that epinephrine auto-injectors must be prescribed by a medical professional and may not be sold in

---

[4]    The allegations contained in the heading for Part B of the Factual Background of the Complaint state a legal conclusion as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

[5]    The allegations contained in the heading for Part C of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

the United States absent FDA approval.  However, Mylan denies any legal conclusions based on the FDA approval requirements for purposes of antitrust law or this matter.

26.     Mylan admits that proper training in how to use EpiPen products is important and that many caregivers and physicians are trained to use EpiPen products.  Mylan denies the remaining allegations contained in Paragraph 26 of the Complaint.

27.     Mylan admits that there have been other competitors to EpiPen products, which have been sold at various times.  Mylan denies the remaining allegations contained in Paragraph 27 of the Complaint.

28.     Mylan admits that Teva has not launched a generic epinephrine auto-injector device, but denies that a patent infringement lawsuit delayed its launch.  Mylan admits that Teva has not obtained FDA approval for a generic epinephrine auto-injector device.  Mylan admits that its CEO, Heather Bresch, made statements during Mylan Inc.'s August 1, 2013 Investor Day presentation but denies Plaintiff's characterization of those statements.  Mylan admits that on or around January 16, 2015, Mylan filed a citizen petition with the FDA and states that the content of the petition speaks for itself.  Mylan admits that on or around June 15, 2015, the FDA issued a letter in response to Mylan's citizen petition and states that the content of the letter speaks for itself.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 28 of the Complaint, and therefore denies the same.

### D. The Overwhelming Majority of U.S. EAI Drug Device Sales are Made to Patients with Coverage from Third-Party Payors[6]

---

[6]     The allegations contained in the heading for Part D of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

29.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 29 of the Complaint, and therefore denies the same.

30.     Mylan denies the allegations contained in Paragraph 30 as stated.  Mylan avers that PBMs, among other things, administer pharmaceutical benefits on behalf of their clients, which may include health plans.  Mylan further avers that commercial health insurance providers typically provide pharmaceutical benefits to their customers, which may include health plans or individuals.

31.     Mylan admits that the article, "Trends in Employer-Provided Prescription-Drug Coverage" exists and states that the content of the article speaks for itself.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 31 of the Complaint, and therefore denies the same.

32.     The allegations contained in Paragraph 32 of the Complaint relate to a claim that has been dismissed pursuant to the Court's December 21, 2017 Order granting in part Defendants' motion to dismiss, and therefore no response is required.  ECF No. 98 at 23 ("The court thus dismisses Sanofi's exclusive dealing claims based on discounts or rebates provided to state-based Medicaid agencies because they are barred by the *Noerr-Pennington* doctrine.").  To the extent a response is required, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 32 of the Complaint, and therefore denies the same.

33.     Mylan admits that many patients receive health insurance coverage through employer-sponsored plans.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 33 of the Complaint, and therefore denies the same.

### E. Third-Party Payors Drive EAI Drug Device Sales in the United States Based on Their Formularies[7]

34.     Mylan admits that the U.S. Department of Justice ("DOJ") and Federal Trade Commission ("FTC") report, "Improving Health Care: A Dose of Competition" exists and states that the content of the report speaks for itself.

35.     The allegations in Paragraph 35 of the Complaint relate to a claim that has been dismissed, and therefore, no response is required.  *See supra* Paragraph 32.  To the extent a response is required, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations as stated in Paragraph 35 of the Complaint, and therefore denies the same.

36.     Mylan admits that the U.S. General Accounting Office ("GAO") report, "Effects of Using Pharmacy Benefit Managers ("PBMs") on Health Plans, Enrollees, and Pharmacies" exists and states that the content of the report speaks for itself.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 36 of the Complaint, and therefore denies the same.

37.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 37 of the Complaint, and therefore denies the same.

### F. Mylan's EAI Drug Device $1 Billion Monopoly[8]

38.     Mylan denies the allegations contained in Paragraph 38 of the Complaint as stated.  Mylan avers that EpiPen Auto-Injector was first sold in or around 1980.  Mylan further

---

[7]     The allegations contained in the heading for Part E of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

[8]     The allegations contained in the heading for Part F of the Factual Background of the Complaint involve introductory material, and state a legal conclusion, as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

avers that Mylan Specialty L.P. and/or its predecessors have marketed EpiPen Auto-Injectors in the United States since 2007.

39.     Mylan admits the allegations in the first sentence in Paragraph 39 of the Complaint.  Mylan denies the allegations contained in the second sentence in Paragraph 39 of the Complaint.  Mylan admits that on or around December 18, 2012, it issued a press release and states that the content of the press release speaks for itself.  Mylan admits that on or around August 1, 2013, it made a presentation to investors and states that the content of the presentation speaks for itself.

40.     As to the first sentence of Paragraph 40 of the Complaint, it states a legal conclusion as to which no response is required.  To the extent a response is required, Mylan denies the allegations.  Mylan denies the remaining allegations contained in Paragraph 40 of the Complaint.

41.     Mylan admits that the March 1, 2017 Annual Report of Mylan N.V. exists and states that the content of the Annual Report speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 41 of the Complaint.

### G.  Other EAI Drug Devices Never Threatened Mylan's Monopoly[9]

42.     Mylan admits that there have been other competitors to EpiPen products, which have been sold at various times.  Mylan denies the remaining allegations contained in Paragraph 42 of the Complaint.

---

[9]     The allegations contained in the heading for Part G of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

**H.  Auvi-Q Was an Innovative EAI Drug Device That Threatened Mylan's Monopoly[10]**

43.     Mylan admits that the February 1, 2013 article, "Brothers Develop New Device to Halt Allergy Attacks" exists and states that the content of the article speaks for itself.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 43 of the Complaint, and therefore denies the same.

44.     Mylan admits that Mylan Specialty L.P. had communications with Intelliject concerning the potential licensing of a predecessor to Auvi-Q.  Mylan further admits that Intelliject licensed Auvi-Q to Plaintiff.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 44 of the Complaint, and therefore denies the same.

45.     Mylan admits that Auvi-Q is an epinephrine auto-injector device with voice instructions.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 45 of the Complaint, and therefore denies the same.

46.     Mylan admits that the image from the website "Amazing and Atopic" exists and states that the content of the image speaks for itself.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 46 of the Complaint, and therefore denies the same.

47.     Mylan admits that the February 1, 2013 article, "Brothers Develop New Device to Halt Allergy Attacks" exists and states that the content of the article speaks for itself.  Mylan admits that Auvi-Q included audio instructions.   Mylan lacks knowledge or information

---

[10]     The allegations contained in the heading for Part H of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 47 of the Complaint, and therefore denies the same.

48.     Mylan admits the June 7, 2012 FDA Memorandum for NDA No. 201739 exists and states that the content of the Memorandum speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 48 of the Complaint.

49.     Mylan admits that the February 1, 2013 article, "Brothers Develop New Device to Halt Allergy Attacks" exists and states that the content of the article speaks for itself.  Mylan admits that the article, "Auvi-Q Versus EpiPen: Preferences of Adults, Caregivers, and Children" exists and states that the content of the article speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 49 of the Complaint.

50.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 50 of the Complaint, and therefore denies the same.

51.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 51 of the Complaint, and therefore denies the same.

52.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 52 of the Complaint, and therefore denies the same.

53.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 53 of the Complaint, and therefore denies the same.

## I.   Mylan Engaged in Anticompetitive Behavior to Maintain its Monopoly[11]

54.     Mylan denies the allegations contained in Paragraph 54 of the Complaint.

---

[11]      The allegations contained in the heading for Part I of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

55.     As to the first two sentences of Paragraph 55 of the Complaint, Mylan admits that providing rebates to third-party payors is common in the pharmaceutical industry, that rebates are often solicited by payors, and that rebates are a form of price competition that helps to lower prices.  As to the third sentence, Mylan admits that such rebates are not "unheard of," but lacks knowledge or information sufficient to form a belief concerning the truth of the allegations as stated, and therefore denies the same.  The remaining allegations in Paragraph 55 of the Complaint state a legal conclusion as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

56.     Mylan denies the allegations contained in Paragraph 56 of the Complaint.

57.     Mylan denies the allegations contained in Paragraph 57 of the Complaint.

58.     Mylan denies the allegations contained in Paragraph 58 of the Complaint.

59.     Mylan denies the allegations contained in Paragraph 59 of the Complaint.

60.     Mylan denies the allegations contained in Paragraph 60 of the Complaint.

61.     Mylan denies the allegations contained in Paragraph 61 of the Complaint.

62.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 62 of the Complaint, and therefore denies the same.

63.     The allegations in Paragraph 63 of the Complaint relate to a claim that has been dismissed, and therefore, no response is required.  *See supra* Paragraph 32.  To the extent a response is required, Mylan denies the allegations.

64.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 64 of the Complaint, and therefore denies the same.

65.     Mylan denies the allegations that it engaged in "exclusionary conduct" and provided "never before made financial offers."  Mylan lacks knowledge or information sufficient

to form a belief concerning the truth of the remaining allegations in Paragraph 65 of the Complaint, and therefore denies the same.

66.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 66 of the Complaint, and therefore denies the same.

67.     To the extent the allegations in Paragraph 67 of the Complaint relate to a claim that has been dismissed, no response is required.  *See supra* Paragraph 32.  Mylan denies the remaining allegations contained in Paragraph 67 of the Complaint.

68.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 68 relating to patient access to Auvi-Q, and therefore denies the same.  Mylan denies the remaining allegations contained in Paragraph 68 of the Complaint.

69.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 69 of the Complaint, and therefore denies the same.  Mylan further states that the graph depicted in Paragraph 69 of the Complaint is intentionally and materially misleading.

70.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 70 of the Complaint, and therefore denies the same.

71.     Mylan admits that in 2013 it announced a co-pay assistance program.  As to the allegations concerning the terms of any Sanofi co-pay assistance program, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  Mylan denies the remaining allegations contained in Paragraph 71 of the Complaint.

**J.  Mylan Specifically Intended to Squash the Competitive Threat from Auvi-Q[12]**

72.     Mylan admits that its CEO, Heather Bresch, made statements during Mylan Inc.'s October 31, 2013 earnings call.  However, Mylan denies Plaintiff's characterization of those statements.  Mylan denies the remaining allegations contained in Paragraph 72 of the Complaint.

73.     Mylan admits that its CEO, Heather Bresch, made statements during Mylan Inc.'s August 7, 2014 earnings call.  However, Mylan denies Plaintiff's characterization of those statements.

74.     Mylan denies the allegations contained in Paragraph 74 of the Complaint.

**a.  Mylan's Rebates Were Designed to be Impossible for Auvi-Q to Match[13]**

75.     The allegations in Paragraph 75 of the Complaint state a legal conclusion regarding monopoly power, as to which no response is required.  To the extent a response is required, Mylan denies the allegations.  Mylan denies the remaining allegations contained in Paragraph 75 of the Complaint.

76.     Mylan denies the allegations contained in Paragraph 76 of the Complaint.

**b.  Mylan's Strong Arming of Schools[14]**

77.     Mylan admits that the January 13, 2012 article, "Girl, 7, Ate Peanut Before Dying of Allergic Reaction at School" exists and states that the content of the article speaks for itself. Mylan admits that certain state legislatures passed laws to allow school personnel to access undesignated epinephrine auto-injectors for use in emergency situations. Mylan admits that in

---

[12]     The allegations contained in the heading for Part J of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

[13]     The allegations contained in the heading for Part J(a) of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

[14]     The allegations contained in the heading for Part J(b) of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

2013, then-President Obama signed into law the School Access to Emergency Epinephrine Act. Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 77 of the Complaint, and therefore denies the same.

78.     Mylan admits that the articles, "Mylan's EpiPen School Sales Trigger N.Y. Antitrust Probe," "Behind the EpiPen Monopoly: Lobbying Muscle, Flailing Competition, Tragic Deaths," and "Family Matters: EpiPen Had High-Level Help Getting Into Schools" exist and states that the content of the articles speak for themselves.  Mylan denies the last sentence of Paragraph 78 of the Complaint.

79.     Mylan admits that the August 1, 2013 Mylan Investor Day presentation, "Seeing is Believing" exists and states that the content of the presentation speaks for itself.

80.     Mylan admits that it had a program to provide free or discounted epinephrine auto-injector devices to schools.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of any allegations regarding Plaintiff's schools program as stated in Paragraph 80 of the Complaint, and therefore denies the same.  Mylan denies the remaining allegations contained in Paragraph 80 of the Complaint.

81.     Mylan denies the allegations contained in Paragraph 81 of the Complaint.

82.     Mylan lacks knowledge or information sufficient to form a belief concerning the truth of Plaintiff's vague allegations regarding "EpiPen laws," as stated in Paragraph 82 of the Complaint, and therefore denies the same.  Mylan denies the remaining allegations contained in Paragraph 82 of the Complaint.

83.     Mylan denies the allegations contained in Paragraph 83 of the Complaint.

84.     Mylan denies the allegations contained in Paragraph 84 of the Complaint.

85.     Mylan denies the allegations contained in Paragraph 85 of the Complaint.

### c.   Mylan Underpaid EpiPen Rebates to Medicaid Which Increased Funds for Steep EpiPen Rebates to Commercial Third-Party Payors[15]

86.     To the extent the allegations in Paragraph 86 of the Complaint relate to a claim that has been dismissed, no response is required.  *See supra* Paragraph 32.  Moreover, the Court recognized that "Sanofi's antitrust claims are not based on Mylan's alleged misrepresentations about the EpiPen®'s drug classification."  Mem. & Order (ECF No. 98) at 23.  To the extent a response is required, Mylan admits that the October 7, 2016 article, "Mylan to Settle EpiPen Overpricing Case for $465 million" exists and states that the content of the article speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 86 of the Complaint, including specifically the allegation that it "misclassfi[ed]" EpiPen products as a non-innovator drug.

87.     The allegations in Paragraph 87 of the Complaint relate to a claim that has been dismissed, and therefore, no response is required.  *See supra* Paragraph 32.  Moreover, the Court recognized that "Sanofi's antitrust claims are not based on Mylan's alleged misrepresentations about the EpiPen®'s drug classification."  Mem. & Order (ECF No. 98) at 23.  The allegations in Paragraph 87 also state legal conclusions as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

88.     Mylan denies the allegations contained in Paragraph 88 of the Complaint. Moreover, the Court recognized that "Sanofi's antitrust claims are not based on Mylan's alleged misrepresentations about the EpiPen®'s drug classification."  Mem. & Order (ECF No. 98) at 23.

89.     Mylan denies the allegations contained in Paragraph 89 of the Complaint.

---

[15]     The allegations contained in the heading for Part J(c) of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

90.     Mylan admits that the October 21, 2016 letter from Senator Elizabeth Warren to Attorney General Loretta Lynch exists and states that the content of the letter speaks for itself. Mylan denies the remaining allegations contained in Paragraph 90 of the Complaint.

### d. Mylan Sharply Raised the Price of EpiPen to Absorb Deep Rebates to Commercial Payors[16]

91.     Mylan admits that the WAC for EpiPen has increased since 2007, but denies the allegations as stated in Paragraph 91 of the Complaint.

92.     Mylan denies the allegations contained in Paragraph 92 of the Complaint.

### e. Mylan Engaged in Misleading Advertising and Other Promotional Activities to Harm Auvi-Q's Reputation[17]

93.     Mylan admits that the June 7, 2012 FDA Memorandum for NDA No. 201739 exists and states that the content of the Memorandum speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 93 of the Complaint.

94.     As to the second sentence of Paragraph 94 of the Complaint, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of such allegations, and therefore denies the same.  As to the third sentence of Paragraph 94, Mylan admits that the referenced correspondence exists and states that the content of the correspondence speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 94 of the Complaint.

95.     Mylan admits that a newspaper article contains quotations, including the language excerpted in Paragraph 95 of the Complaint, that are attributed to Mylan CEO, Heather Bresch. However, Mylan denies Plaintiff's characterization of the statements referenced in Paragraph 95

---

[16] The allegations contained in the heading for Part J(d) of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

[17] The allegations contained in the heading for Part J(e) of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

of the Complaint.  Mylan denies the remaining allegations contained in Paragraph 95 of the Complaint.

96.     Mylan admits that its sales force used promotional materials that contained the language stated in Paragraph 96 of the Complaint; Mylan, however, denies Plaintiffs' characterization of these marketing materials, from which Plaintiffs have taken selected language out of context.  Mylan denies the remaining allegations contained in Paragraph 96 of the Complaint.

97.     Mylan admits that its sales force used promotional materials that contained the language stated in Paragraph 97 of the Complaint; Mylan, however, denies Plaintiffs' characterization of these marketing materials, from which Plaintiffs have taken selected language out of context.  Mylan denies the remaining allegations contained in Paragraph 97 of the Complaint.

98.     Mylan admits that its sales force used promotional materials that contained the language stated in Paragraph 98 of the Complaint; Mylan, however, denies Plaintiffs' characterization of these marketing materials, from which Plaintiffs have taken selected language out of context.  Mylan denies the remaining allegations contained in Paragraph 98 of the Complaint.

99.     Mylan denies the allegations contained in Paragraph 99 of the Complaint.

100.     Mylan denies the allegation contained in Paragraph 100 of the Complaint that Mylan engaged in "efforts to spread negative coverage about Auvi-Q."  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 100 of the Complaint, and therefore denies the same.

## K.  Mylan's Conduct Harmed Sanofi[18]

101.    Mylan denies the allegations contained in Paragraph 101 of the Complaint.

102.    Mylan denies the allegations contained in Paragraph 102 of the Complaint.

103.    Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 103 of the Complaint, and therefore denies the same.

104.    Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 104 of the Complaint, and therefore denies the same.

105.    Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 105 of the Complaint, and therefore denies the same.

106.    The first and second sentences of Paragraph 106 of the Complaint contain legal conclusions as to which no response is required.  To the extent a response is required, Mylan denies the allegations.  Mylan specifically denies the allegations contained in Paragraph 106 of the Complaint that "Mylan injured Sanofi" and engaged in "anti-competitive conduct."  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 106 of the Complaint, and therefore denies the same.

107.    Mylan denies the allegations contained in the first sentence of Paragraph 107 of the Complaint.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in the second sentence of Paragraph 107 of the Complaint, and therefore denies the same.  As for the graph depicted in Paragraph 107 of the Complaint, Mylan denies the allegation contained therein that Mylan engaged in "anticompetitive conduct."   Mylan further states that the graph depicted in Paragraph 107 of the Complaint is intentionally and materially misleading.

---

[18] The allegations contained in the heading for Part K of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

108.    Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 108 of the Complaint concerning Sanofi's conduct, and therefore denies the same.  Mylan denies the remaining allegations contained in Paragraph 108 of the Complaint.

109.    Mylan denies the allegations contained in Paragraph 109 of the Complaint.

110.    Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 110 of the Complaint, and therefore denies the same.

**L.  Mylan's Conduct Harmed U.S. Consumers[19]**

111.    Mylan denies the allegations contained in Paragraph 111 of the Complaint.

112.    Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 112 of the Complaint, and therefore denies the same.

113.    Mylan denies the allegations contained in Paragraph 113 of the Complaint.

114.    Mylan denies the allegations contained in Paragraph 114 of the Complaint.

115.    Mylan denies the allegations contained in Paragraph 115 of the Complaint.

## MARKET DEFINITION ALLEGATIONS

116.    The allegations in Paragraph 116 of the Complaint state a legal conclusion as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

---

[19]    The allegations contained in the heading for Part L of the Factual Background of the Complaint involve introductory material as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

117.     The allegations in Paragraph 117 of the Complaint state a legal conclusion as to which no response is required.   To the extent a response is required, Mylan denies the allegations.

118.     Mylan admits that EpiPen products are sold throughout the United States and that people who suffer from anaphylaxis live across the country.   Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 118 of the Complaint, and therefore denies the same.

119.     Mylan admits that intramuscular epinephrine is the first-line therapy for anaphylaxis, as designated by the NIAID.   Mylan admits that epinephrine auto-injector devices are approved for use by patients and caregivers to treat anaphylaxis and are prescribed by healthcare providers for that use by patients at risk for anaphylaxis.   Mylan admits that patients known to be at risk for anaphylaxis are recommended to carry epinephrine auto-injector devices. Mylan denies the allegations contained in the last three sentences of Paragraph 119 as stated. Mylan avers that the FDA does not evaluate whether "epinephrine," without reference to any specific product, is interchangeable or substitutable for any particular product.   Further, the FDA does not evaluate "EAI Drug Devices" as a category for "interchangeability" with other "drug devices."   Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 119 of the Complaint, and therefore denies the same.

120.     Mylan admits that its former CFO, John Sheehan, made statements during Mylan Inc.'s April 26, 2012 earnings call; however, Mylan denies Plaintiff's characterization of the statements referenced in Paragraph 120 of the Complaint. Mylan further denies that any statement of its former CFO John Sheehan determines or acknowledges the "relevant product

market" for purposes of antitrust law or this matter.  Mylan denies the remaining allegations contained in Paragraph 120 of the Complaint.

121.    Mylan admits that Plaintiff sold Auvi-Q in the United States from January 2013 until October 2015.  Mylan denies the remaining factual allegations contained in Paragraph 121 of the Complaint, and states that the remaining allegations in that Paragraph state legal conclusions as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

## MONOPOLY POWER

122.    Mylan denies the allegations contained in Paragraph 122 in the Complaint.

123.    Mylan admits that its former CFO, John Sheehan, was quoted during Mylan Inc.'s April 26, 2012 earnings call.  However, Mylan denies Plaintiff's characterization of the referenced statements.  Mylan admits that the August 1, 2013 Mylan Investor Day presentation, "Seeing is Believing," referenced in Paragraph 123 of the Complaint, exists and states that the content of the presentation speaks for itself.  Mylan denies the remaining allegations contained in Paragraph 123 of the Complaint.

124.    The allegations in Paragraph 124 of the Complaint state a legal conclusion as to which no response is required.  To the extent a response is required, Mylan denies the allegations contained in Paragraph 124 of the Complaint.

125.    Mylan admits that the WAC for EpiPen has increased since 2007, but denies the allegations as stated in Paragraph 125 of the Complaint.

## BARRIERS TO ENTRY

126.    Mylan denies the allegations contained in Paragraph 126 of the Complaint.

127.     Mylan admits that there have been other competitors to EpiPen products, which have been sold at various times.  Mylan admits that Twinject® is no longer sold.  Mylan admits that Teva has not obtained FDA approval for a generic epinephrine auto-injector device.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 127 of the Complaint, and therefore denies the same.

128.     The allegations in Paragraph 128 of the Complaint state legal conclusions as to which no response is required.   To the extent a response is required, Mylan admits that epinephrine auto-injectors must be prescribed by a professional and may not be sold in the United States absent FDA approval.  However, Mylan denies any legal conclusions based on the FDA approval requirements for purposes of antitrust law or this matter.  Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegation that demonstrating bioequivalence "is a crucial hurdle for a new entrant to convince EpiPen customers to switch to a new EAI drug device," and therefore denies the same.

129.     Mylan denies that "prescriptions for EAI drug devices are infrequently filled." Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in Paragraph 129 of the Complaint, and therefore denies the same.

130.     Mylan admits that its former CFO, John Sheehan, made statements during Mylan Inc.'s March 4, 2014 earnings call.  However, Mylan denies Plaintiff's characterization of the statements referenced in Paragraph 130 of the Complaint.   Mylan denies the remaining allegations contained in Paragraph 130 of the Complaint.

131.     Mylan admits that lawsuits have been filed related to the EpiPen patent.  Mylan denies the remaining allegations contained in Paragraph 131 of the Complaint.

132.    Mylan admits that the February 16, 2012 Press Release, "Mylan Inc., Mylan and Pfizer Announce Epinephrine Auto-Injector Settlement Agreement," referenced in Paragraph 132 of the Complaint, exists and states that the content of the Press Release speaks for itself. The remaining allegations in Paragraph 132 of the Complaint state legal conclusions as to which no response is required.  To the extent a response is required, Mylan lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  Mylan denies the remaining factual allegations contained in Paragraph 132 of the Complaint.

133.    Mylan admits that a lawsuit was filed against Teva in connection with the EpiPen patent.  Mylan admits that the lawsuit was settled.  Mylan admits that it filed a citizen petition with the FDA regarding Teva's proposed generic epinephrine auto-injector.  Mylan admits that its CEO, Heather Bresch, made statements during Mylan Inc.'s August 1, 2013 Investor Day presentation.  However, Mylan denies Plaintiff's characterization of the statements referenced in Paragraph 133 of the Complaint.  Mylan denies the remaining allegations contained in Paragraph 133 of the Complaint.

134.    Mylan denies the allegations contained in Paragraph 134 of the Complaint.

**FIRST CLAIM FOR RELIEF: MYLAN'S EXCLUSIVE DEALING IN THE U.S. EAI DRUG DEVICE MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT[20]**

135.    In response to Paragraph 135 of the Complaint, Mylan incorporates its responses to the allegations of Paragraphs 1 through 134 as if fully set forth herein.

136.    Mylan denies the allegations contained in Paragraph 136 of the Complaint.

137.    Mylan denies the allegations contained in Paragraph 137 of the Complaint.

---

[20]    The First Claim for Relief in the Complaint states a legal conclusion, as to which no response is required. To the extent a response is required, Mylan denies the allegations.

**SECOND CLAIM FOR RELIEF**: **MYLAN'S DECEPTIVE CONDUCT TO FURTHER ITS MONOPOLIZATION OF THE U.S. EAI DRUG DEVICE MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT[21]**

138.    In response to Paragraph 138 of the Complaint, Mylan incorporates its responses to the allegations of Paragraphs 1 through 137 as if fully set forth herein.

139.    Mylan denies the allegations contained in Paragraph 139 of the Complaint.

140.    Mylan denies the allegations contained in Paragraph 140 of the Complaint.

**THIRD CLAIM FOR RELIEF: MYLAN'S OVERALL SCHEME TO MONOPOLIZE THE U.S. EAI DRUG DEVICE MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT[22]**

141.    In response to Paragraph 141 of the Complaint, Mylan incorporates its responses to the allegations of Paragraphs 1 through 140 as if fully set forth herein.

142.    Mylan denies the allegations contained in Paragraph 142 of the Complaint.

143.    Mylan denies the allegations contained in Paragraph 143 of the Complaint.  The allegations in Paragraph 143 of the Complaint state legal conclusions as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

**RELIEF REQUESTED**

Mylan denies that Plaintiff is entitled to any relief.  To the extent Mylan has not specifically admitted any allegation herein, it is denied.  Further, Mylan states that it is entitled to any relief that this Court may deem just or appropriate, in equity or at law.

144.    Mylan denies that Plaintiff is entitled to the relief requested.

145.    Mylan denies that Plaintiff is entitled to the relief requested.

146.    Mylan denies that Plaintiff is entitled to the relief requested.

---

[21]    The Second Claim for Relief in the Complaint states a legal conclusion, as to which no response is required.  To the extent a response is required, Mylan denies the allegations.

[22]    The Third Claim for Relief in the Complaint states a legal conclusion, as to which no response is required. To the extent a response is required, Mylan denies the allegations.

147.    Mylan denies that Plaintiff is entitled to the relief requested.

## AFFIRMATIVE DEFENSES

In further response to Plaintiff's Complaint, subject to discovery, based on information and belief, and without assuming the burden of proof on any issue for which Plaintiff bears the burden of proof, Mylan asserts the following additional affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

The Complaint fails to state a claim upon which relief can be granted against Mylan under Section 2 of the Sherman Act to the extent that, among other things: (1) Plaintiff fails to allege any facts showing that Mylan's rebates were below-cost; (2) Mylan's rebates to state-based Medicaid agencies are protected from antitrust liability under the *Noerr-Pennington* doctrine; (3) allegedly deceptive marketing is not actionable under the Sherman Act; (4) Plaintiffs fail to allege substantial foreclosure in a relevant antitrust market; (5) Plaintiff fails to allege harm to competition; and (6) Plaintiff fails to allege injuries that were caused by Mylan's alleged conduct. The Court already dismissed "Sanofi's exclusive dealing claims based on discounts or rebates provided to state-based Medicaid agencies because they are barred by the *Noerr-Pennington* doctrine."  Order (ECF No. 98) at 23.

## SECOND AFFIRMATIVE DEFENSE

### (Procompetitive Benefits)

The procompetitive benefits of Mylan's alleged conduct substantially outweigh its purportedly anticompetitive effects.

### THIRD AFFIRMATIVE DEFENSE

(Price-Cost Test)

To the extent Plaintiff's Sherman Act claims are based on Mylan's rebates, these claims fail because Plaintiff cannot show that Mylan priced its rebates below its costs. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 408 (3d Cir. 2016).

### FOURTH AFFIRMATIVE DEFENSE

(*Noerr-Pennington* Immunity)

To the extent any of Plaintiff's claims are based on government petitioning activity by Mylan, Mylan is immune from antitrust liability under the *Noerr-Pennington* doctrine. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–60 (1993).

### FIFTH AFFIRMATIVE DEFENSE

(State Action Immunity)

To the extent any of Plaintiff's claims are based on conduct that was taken pursuant to a "clearly articulated and affirmatively expressed . . . state policy" that is "'actively supervised' by the State itself," Mylan is immune from antitrust liability under the state action doctrine. *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (citation omitted).

### SIXTH AFFIRMATIVE DEFENSE

(Article III Standing)

Plaintiff has suffered no injury and does not have standing to assert a Sherman Act claim.

## SEVENTH AFFIRMATIVE DEFENSE

### (Antitrust Standing)

Plaintiff lacks standing to bring an antitrust claim because it has not suffered "injury of the type of the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

## EIGHTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

To the extent any of Plaintiff's Sherman Act allegations exceed four years from the date of the filing of the Complaint, such claims or allegations are barred by the four-year statute of limitations under the Clayton Act, 15 U.S.C. § 15b.

## NINTH AFFIRMATIVE DEFENSE

### (Judicial Estoppel)

Plaintiff is barred from taking a position or asserting a claim that is contrary to the positions it took in *Eisai, Inc. v. Sanofi-Aventis, U.S., LLC*, No. 08-CV-04168 (D.N.J.), or any other cases where it has asserted positions inconsistent with the positions that it asserts in its Complaint, because (1) Plaintiff's position in this case is "clearly inconsistent with its earlier position"; (2) Plaintiff "succeeded in persuading a court to accept [its] earlier position"; and (3) Plaintiff "would derive an unfair advantage or impose an unfair detriment [on Mylan] if not estopped." *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005) (internal quotations omitted).   In *Eisai*, the court accepted Plaintiff's prior positions, and yet now Plaintiff is playing fast and loose with the judicial system by taking a clearly inconsistent position in this case.

## TENTH AFFIRMATIVE DEFENSE

(Failure to Mitigate Damages)

If Plaintiff recovers any damages, such award must be reduced by all damages attributable to Plaintiff's failure to take appropriate action and mitigate damages prior to and subsequent to the institution of this action.

## ELEVENTH AFFIRMATIVE DEFENSE

(No Duplicative Relief)

To the extent any relief sought by Plaintiff would be duplicative of relief sought by Plaintiff or other plaintiffs in other lawsuits, subjecting Mylan to the possibility of multiple recoveries, such recovery is barred by the Fifth and Eighth Amendments of the United States Constitution.

## TWELVTH AFFIRMATIVE DEFNESE

(Proportional Allocation of Fault)

Any damage, loss, or liability sustained by Plaintiff must be reduced, diminished, and/or barred in proportion to the wrongful conduct of persons or entities other than Mylan, including third parties, under the principle of equitable allocation, recoupment, set-off, proportionate responsibility, and/or comparative fault.

## THIRTEENTH AFFIRMATIVE DEFENSE

(Settlement Credits)

In the event that a settlement is reached between Plaintiff and any other person or entity for conduct related to this action, Mylan is entitled to any settlement credits permitted by law.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Waiver, Laches, Estoppel)

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, laches, and estoppel.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Res Judicata/Collateral Estoppel)

To the extent Plaintiff's claims or the issues raised by Plaintiff's claims have been previously litigated, Plaintiff's claims are barred, in whole or in part, from any recovery under the doctrines of res judicata and/or collateral estoppel.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Release)

Plaintiff's claims are barred to the extent they have been released through settlement in any prior litigation, including without limitation the settlement of the qui tam action that Plaintiff brought against Mylan for alleged underpayment of rebates pursuant to the Medicaid Drug Rebate Program.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Due Process)

Plaintiff's claims are barred to the extent Plaintiff seeks excessive statutory or punitive damages in violation of the Due Process Clause.

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff Mylan Specialty L.P. ("Mylan Specialty") for its Counterclaims against Plaintiff and Counterclaim-Defendant Sanofi-Aventis U.S. LLC ("Sanofi") alleges as follows:

## INTRODUCTION

1.      In 2007, Mylan acquired the predecessor to Mylan Specialty, Dey Pharma L.P., which had the rights to market EpiPen products.  When Mylan Specialty acquired the EpiPen Auto-Injector, awareness among the general public of anaphylaxis risk and treatment was low, and those vulnerable to life-threatening allergic reactions were likely to be unprepared for an emergency.  Additionally, numerous obstacles hindered access to epinephrine as a first line treatment: physicians often encouraged the use of products ineffective for the treatment of anaphylaxis; parents and caregivers often lacked the confidence to timely administer the auto-injector; and federal and local laws did not permit trained people at public venues, such as nurses at schools, the latitude to administer "undesignated" epinephrine auto-injectors—i.e., epinephrine auto-injectors not prescribed to a particular individual—to, for instance, a student or school visitor unexpectedly suffering from anaphylaxis.

2.      To address these issues, Mylan Specialty invested substantial sums to increase awareness of anaphylaxis risk and enhance access and training related to epinephrine auto-injectors.  Mylan also worked with various advocacy partners and concerned federal and state legislators to remove barriers to access to epinephrine starting with the most vulnerable population: children in schools.  As a result, 48 states now permit "undesignated" epinephrine in schools.  Additionally, in 2012, Mylan Specialty launched its EpiPen4Schools® program, through which it has donated more than one million free EpiPen devices to schools.  As of

October 2017, epinephrine auto-injectors provided through the schools program had been used more than 2,000 times to treat anaphylaxis in the school setting since 2014.

3.     There can be no doubt that Mylan Specialty's investment in access to epinephrine has benefited those at risk for anaphylaxis—both those who know they are at risk and those who do not.  Mylan Specialty's investment also has created valuable brand recognition.

4.     The value of the EpiPen brand that Mylan Specialty created through its substantial investment and effort has withstood the test of time, even though EpiPen products have had competitors.  In 2013, Sanofi introduced one such competitor product called Auvi-Q.

5.     From the moment Sanofi launched Auvi-Q, it attempted to sow—and did sow—confusion in the marketplace about whether the EpiPen Auto-Injector and Auvi-Q were equivalent products, when it is clear that they are not.  For example, Sanofi widely promoted Auvi-Q as the "new EpiPen," which implied that Auvi-Q was equivalent to, and would be replacing, EpiPen.  Sanofi also attacked the EpiPen Auto-Injector through a campaign of false and misleading statements that suggested Auvi-Q was a superior product.  And to top it off, Sanofi competed unfairly by offering illegal cash payments to healthcare providers in exchange for prescriptions and sales of Auvi-Q.

6.     Through its course of conduct, Sanofi violated the Lanham Act, 15 U.S.C. § 1125(a), and committed common law unfair competition.  Mylan Specialty brings these Counterclaims to hold Sanofi accountable for this misconduct.  As a result of Sanofi's illegal scheme, Mylan Specialty has suffered damages by: (i) having its brand image, reputation, and goodwill damaged and (ii) losing sales and customers.  Mylan Specialty seeks to recover these damages and other remedies available at law through these Counterclaims.

## PARTIES

7.     Counterclaim-Plaintiff Mylan Specialty is a limited partnership registered in the State of Delaware that specializes in the development and distribution of prescription drugs for the treatment of medical conditions.   Mylan Specialty L.P. markets and distributes EpiPen products in the United States.

8.     Counterclaim-Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its principal place of business located in Bridgewater, New Jersey.  From 2009 to 2016, Sanofi licensed Auvi-Q from Intelliject (now known as kaléo, Inc. ("kaléo")) and marketed it in North America from 2013 until Sanofi issued a total recall of Auvi-Q in October 2015.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over Mylan Specialty's claims pursuant to 28 U.S.C. § 1367 because they are compulsory and therefore fall within the ancillary jurisdiction of the court, and pursuant to 28 U.S.C. § 1331 because one or more of Mylan Specialty's claims arises under federal law.

10.     Venue is proper in this District with respect to this counterclaim pursuant to 15 U.S.C. § 1391 and 28 U.S.C. § 1407.

## FACTUAL ALLEGATIONS

### Anaphylaxis and Epinephrine Auto-Injectors

11.     Anaphylaxis is an acute systemic reaction with serious effects that can occur within minutes of exposure to a triggering allergen (typically a food, insect sting, or medication). Epinephrine is considered the first-line medication in treating anaphylaxis and, when administered immediately following a triggering event, may help relieve symptoms and signs of an allergic reaction.

12.     Because epinephrine auto-injectors are designed to be used in emergencies, it is critically important that patients know how to correctly use their auto-injectors.  As the FDA has explained: "[u]nder high stress levels, the user is distracted and will have less time to make decisions, consider multiple device outputs, follow complex operating logic, or physically manipulate device components."[23]  Thus, it is imperative that auto-injector products are not only appropriately designed, but also that patients and caregivers are familiar with, and well trained in using, the auto-injectors they are prescribed.  Grave consequences can result if one auto-injector is substituted for another without proper instructions and preparation.

### The EpiPen Auto-Injector

13.     The EpiPen Auto-Injector is an epinephrine auto-injector that allows patients to quickly and safely self-administer a prescribed amount of epinephrine through a spring-loaded needle.

14.     Before Mylan Specialty acquired the EpiPen Auto-Injector, public awareness of anaphylaxis, its effects, and its treatment was very poor.  Recognizing that this lack of awareness and training put millions of Americans at risk of serious harm or even death in the event of an anaphylactic event, Mylan Specialty embarked on a massive—and costly—endeavor to increase awareness of anaphylaxis risk and access and training related to epinephrine auto-injectors.

15.     As a result of Mylan Specialty's efforts, millions more patients have access to, and know how to properly use, epinephrine auto-injectors.  And, through its EpiPen4Schools® program, Mylan Specialty has donated more than one million free EpiPen Auto-Injectors to more than 73,000 participating schools, helping to ensure that they are prepared in the event of an emergency.  Mylan Specialty, through its schools program, provides these EpiPen devices free of

---

[23]     *Guidance for Industry and FDA Premarket and Design Control Reviewers:  Medical Device Use-Safety: Incorporating Human Factors Engineering into Risk Management* (July 18, 2000) at 10.

charge to any requesting school, thereby helping to ensure access to this important product. Hundreds if not thousands of free EpiPen devices provided through the Mylan program have been used during incidents of anaphylaxis in schools.   Given that 25% of the reported anaphylaxis events occur in individuals with no previously known allergies, ensuring access to epinephrine auto-injectors in public places is critically important.

16.     Mylan Specialty's success in increasing awareness of anaphylaxis and building brand recognition of the EpiPen Auto-Injector took years and came at significant expense to Mylan Specialty.

## Auvi-Q & Sanofi's Sales Strategy

17.     In January 2013, Sanofi launched Auvi-Q, an epinephrine auto-injector device used for the treatment of anaphylaxis, in the United States.   Auvi-Q differed from the EpiPen Auto-Injector because, among other things, it had a different design and used voice instructions.

18.     When the FDA approved Auvi-Q for sale in the United States, it assigned Auvi-Q a "BX" rating in the "Orange Book,"[24] a publication in which FDA identifies approved drug products and provides information about whether those products have "therapeutic equivalents." A BX rating reflects the FDA's determination that the listed drug is not considered to be therapeutically equivalent to other products—meaning that, in general, the products cannot be substituted for one another.   In assigning Auvi-Q a BX rating, the FDA clearly communicated that Auvi-Q and the EpiPen Auto-Injector products are not clinically comparable or equivalent in order to prevent confusion and medication errors.

19.     At the time Sanofi launched Auvi-Q, the EpiPen Auto-Injector had a three decade-long track record and history in the United States.   Accordingly, and largely as a result of

---

[24]     The Orange Book is formally titled "*Approved Drug Products with Therapeutic Equivalence Evaluations*."

Mylan Specialty's investments, the EpiPen Auto-Injector had built up a widespread reputation of being reliable and trusted.

20.     Rather than trying to compete on the merits of its product, Sanofi launched a massive campaign to confuse and mislead consumers and doctors about the EpiPen Auto-Injector and to promote Auvi-Q by any means necessary.  As detailed below, these unfair and unlawful tactics took a number of forms.

21.     First, Sanofi made false and misleading representations about the EpiPen Auto-Injector and Auvi-Q, including but not limited to representing that Auvi-Q was the "new EpiPen" and that Auvi-Q was superior to the EpiPen Auto-Injector in a number of respects.  These types of misrepresentations would be actionable in any industry.  But they are especially problematic in the context of pharmaceutical sales.  The FDA has repeatedly emphasized that the only acceptable basis for comparative claims between two products is a head-to-head study of the products being compared.  No such head-to-head consumer preference or safety study of Auvi-Q and the EpiPen Auto-Injector exists, and so Sanofi's comparative claims are necessarily baseless and unlawful.

22.     Sanofi also made claims of patient preference, which implied at least equivalent safety and efficacy—and in some cases *superior* efficacy—as between Auvi-Q and the EpiPen Auto-Injector.  To be proper, such claims must be substantiated by clinical data and evidence, and supported by a validated methodology.  Here, they were not.

23.     Sanofi's comparative claims further created a substantial risk of confusion, which also makes them improper.  Most physicians—let alone patients—are unlikely to understand the important differences among bioequivalence, therapeutic equivalence, and interchangeability.  They are likely to believe that "bioequivalent" means "interchangeable"—a false belief  and

precisely the confusion with which Sanofi intended to sow in a vulnerable population.  When physicians believe products are interchangeable, they may not ensure that the same patient always obtains the same product.  But indiscriminate switching of products could be dangerous when the products are so different.  If medical professionals start prescribing Auvi-Q to EpiPen product users believing that Auvi-Q is simply an updated version of the EpiPen Auto-Injector, patients may not appreciate the differences between the products or think that the required training is unnecessary.  That is enormously problematic given that epinephrine auto-injectors are used when patients or their caregivers are under extreme stress and time pressure.

24.    Additionally, Sanofi offered illegal cash payments to physicians' offices in exchange for increased prescriptions and sales of Auvi-Q.  This kind of kickback also constitutes unfair competition.

<u>**Sanofi Makes False and Misleading Representations<br>About the EpiPen Auto-Injector and Auvi-Q**</u>

25.    In an effort to convince physicians and patients at risk for anaphylaxis to choose Auvi-Q instead of EpiPen products, and to increase sales of Auvi-Q at Mylan Specialty's expense, Sanofi undertook a widespread scheme to disseminate false and/or misleading information about both products.  In the course of aggressively marketing and promoting Auvi-Q, Sanofi made false and misleading claims that (i) Auvi-Q is bioequivalent and therapeutically equivalent to, and therefore interchangeable with or a substitute for, the EpiPen Auto-Injector, and (ii) were intended to denigrate the EpiPen Auto-Injector and harm its reputation in order to convert EpiPen Auto-Injector customers to Auvi-Q.  Sanofi's multi-pronged, systemic, and unlawful campaign caused Mylan Specialty to lose customers and damaged the strong brand reputation that Mylan Specialty had spent years and many millions of dollars creating.

A. False and Misleading Statements That Auvi-Q is Equivalent to the EpiPen Auto-Injector.

26.     Sanofi engaged in a large-scale campaign to position Auvi-Q as the "new EpiPen" in order to mislead potential prescribers into believing that Auvi-Q was equivalent to the EpiPen Auto-Injector.  In furtherance of this coordinated campaign, Sanofi sales representatives made false and misleading statements to physicians' offices that:  the EpiPen Auto-Injector was "no more"; Auvi-Q was replacing the EpiPen Auto-Injector; and Auvi-Q was the "new EpiPen," *i.e.* the updated replacement product for EpiPen.

27.     For the reasons described above, these misrepresentations not only harmed Mylan Specialty, but also caused a substantial risk of confusion and harm to patients.

28.     Notwithstanding these significant risks, Sanofi sales representatives repeatedly made misleading statements suggesting that Auvi-Q and the EpiPen Auto-Injector were therapeutically interchangeable.

29.     For example, in January 2013, an Auvi-Q sales representative told an administrative assistant at the Allergy, Ear, Nose & Throat Center, Ltd. in Arizona that, among other things, Auvi-Q was replacing the EpiPen, that EpiPen was no more, and that Auvi-Q was the new up-and-coming EpiPen.  Likewise, in January 2013, an Auvi-Q sales representative told a medical assistant at the same practice that, among other things, Auvi-Q was going to replace the EpiPen Auto-Injector and that it would be like the new EpiPen.

30.     Further, another Auvi-Q sales representative left a business card at a different physician's office with the words "new EpiPen" handwritten on it.

31.     On information and belief, the conduct described herein was not the isolated conduct of rogue sales representatives, but rather was part of a widespread and continuous pattern of Sanofi sales representatives promoting and disseminating similar misleading messages

to physicians' offices across the country in an effort to pump up Auvi-Q sales by damaging the reputation and goodwill associated with EpiPen products.

32.     Sanofi's statements regarding Auvi-Q's supposed equivalence with the EpiPen Auto-Injector were false.  As discussed above, when the FDA approved Auvi-Q for sale in the United States, it assigned Auvi-Q a "BX" rating in its "Orange Book," clearly communicating that Auvi-Q was not clinically equivalent to or interchangeable with the EpiPen Auto-Injector.

33.     Sanofi's statements regarding Auvi-Q's supposed interchangeability with the EpiPen Auto-Injector were not only false, they also were improper comparative claims.

34.     Sanofi's statements were designed to mislead, and did mislead, medical personnel and patients into believing that the EpiPen Auto-Injector was being replaced by Auvi-Q. Medical staff were deceived into believing that the EpiPen Auto-Injector had been phased out and that their EpiPen Auto-Injector patients needed to be switched to Auvi-Q.  Indeed, some practitioners' offices reported that, after discussion with Sanofi sales representatives, they believed that the EpiPen Auto-Injector was no longer being marketed or sold.

35.     Further, during the 2013–2014 time period, Sanofi—through its website— promoted Auvi-Q using a question and answer format designed to misleadingly suggest that Auvi-Q and the EpiPen Auto-Injector were bioequivalent and therefore interchangeable.  These statements, like those made by Sanofi's sales force, were misleading and created a substantial risk of confusion among healthcare providers, caregivers, and patients, and a substantial risk of harm to patients.  They also were improper comparative claims.

B.  Unsubstantiated and Misleading Claims Designed to Disparage the EpiPen-Auto Injector and Harm its Reputation.

36.     In addition to trying to mislead physicians and patients into thinking that Auvi-Q was the "new EpiPen," Sanofi engaged in a broad effort to denigrate the EpiPen Auto-Injector

and tarnish the strong brand recognition and reputation that Mylan Specialty worked so hard to create. Sanofi's illegal conduct on this front consisted of, among other things, widely spreading false information through promotional press releases and statements by sales representatives that: (i) prior to Auvi-Q, patients did not carry or know how to use their epinephrine auto-injectors; (ii) Auvi-Q is more "patient friendly" than the EpiPen Auto-Injector; (iii) only Auvi-Q has a retractable needle, falsely implying that Auvi-Q is the only auto-injector with needlestick protection; and (iv) Auvi-Q can withstand higher temperatures than the EpiPen Auto-Injector.

        i.   <u>Misrepresentations that patients do not carry or know how to use their auto-injectors</u>.

37. One unlawful tactic that Sanofi used to try to convert physicians and patients to Auvi-Q was to spread false and misleading information suggesting that there was a significant problem of patients and caregivers failing to carry their EpiPen Auto-Injectors and/or not knowing how to properly use their auto-injectors.

38. For example, on January 28, 2013, Sanofi issued and widely disseminated a promotional press release titled "*Sanofi Announces Auvi-Q, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.*" (the "Press Release"). In the Press Release, Sanofi asserted that many patients and caregivers do not carry their epinephrine auto-injectors as recommended and that there is concern that epinephrine auto-injectors may not be used correctly during an emergency. Sanofi, through its Press Release, implied that these failures put patients at risk of death. Specifically, Sanofi stated: "two large surveys . . . show that two-thirds of patients and caregivers do not carry their epinephrine auto-injectors as recommended, and nearly half worry that others will not know how to use their or their child's epinephrine auto-injector correctly during an emergency. Multiple studies have found an association between delay in epinephrine administration and death from anaphylaxis."

42

39.     The obvious and intended implication of these claims is that EpiPen products are deficient because they are difficult to carry and use, and therefore put patients at risk of death. That is false.  There is no data to support these claims.  The only published survey addressing this issue was funded by Sanofi and suffers from a number of limitations, including failure to use validated measures.  Importantly, this Sanofi-funded survey concludes that "[w]hether the observed preference for Auvi-Q will result in patients carrying and correctly administering the device will need to be determined in further studies."

40.     Moreover, if there was any doubt about Sanofi's intention to denigrate EpiPen products when it made the statements in its Press Release, later statements by Sanofi sales representatives put that doubt to rest.  To take just a few examples of statements made in furtherance of Sanofi's false advertising campaign:

- In 2013, an Auvi-Q sales representative left a handwritten note in a physician's office stating that a "Recent [Journal of Allergy and Clinical Immunology in Practice] survey showed 71% do not always carry Epi . . . and over half had usage challenges.  Auvi-Q is easy to carry & easy to use!"  On information and belief, Auvi-Q sales representatives left similar notes in physicians' offices across the country.

- Sanofi sales representatives made the false and misleading claims that, before Auvi-Q, 58% of at-risk adults did not always carry their epinephrine auto-injectors, that 71% of caregivers of at-risk children did not always carry their epinephrine auto-injectors, and that nearly half of at-risk adults worried that others would not know how to use their epinephrine auto-injectors.

- Sanofi sales representatives told healthcare providers that EpiPen Auto-Injector patients carry around training devices mistakenly thinking they are live units, but that with Auvi-Q there will be no mistake because the trainer is grayed out.

- Sanofi sales representatives distributed documents to providers' offices to explain how doctors could utilize medical necessity forms to bypass prior authorization requirements related to Auvi-Q.  Among the bogus reasons the Sanofi representatives fed to physicians' offices as to why Auvi-Q was "necessary" were that patients failed to properly use their EpiPen Auto-Injectors, that patients failed to carry their EpiPen Auto-Injectors, and that patients were afraid to use their EpiPen Auto-Injectors.

41.     These claims are false.  Sanofi had no basis, and can offer no substantiation, for its representations that a substantial number of patients were put at risk of death by failing to carry their EpiPen Auto-Injectors, or that patients and caregivers were concerned about the EpiPen Auto-Injector's ease of use.

ii.     Misrepresentations about patient satisfaction with Auvi-Q.

42.     Another illegal tactic that Sanofi employed in furtherance of its coordinated campaign was to spread unsubstantiated and misleading claims that patients were uniquely satisfied with Auvi-Q, or preferred Auvi-Q over the EpiPen Auto-Injector.

43.     Sanofi's Press Release, for example, touted Auvi-Q's design, terming Auvi-Q a "breakthrough in auto-injector device design" and emphasized attributes suggesting that Auvi-Q's design made it convenient to carry and use.  Thus, Sanofi not only disparaged the EpiPen Auto-Injector, but also implied that Auvi-Q was a superior product.

44.     Lest any potential customer fail to understand that the purpose of these statements or that Sanofi's intent in making them was to disparage the EpiPen Auto-Injector, on the day the Press Release was issued, Anne Whitaker, Sanofi's then-President of North American Pharmaceutical Operations, stated expressly: "The device, about the size of a credit card, fits in pockets and purses, and *is more patient friendly than Mylan Inc.'s rival product EpiPen*" (emphasis added).  Ms. Whitaker further stated that she gave her own 14-year old niece a "trainer[] to carry around" and that "[s]he thought it was just cool," as compared to patient reluctance to carry other epinephrine auto-injectors "because of the stigma of having to use an injection."

45.     In addition to being unsubstantiated and misleading, Sanofi's statements in the Press Release and through Ms. Whitaker were also improper comparative claims.

46.     Additionally, Auvi-Q sales representatives left Auvi-Q sales aids at physicians' offices stating, among other things that: (i) "the parents/patients have really been satisfied with this new device!"; (ii) there has been "[w]onderful patient response on Auvi-Q"; "[t]he overwhelming majority of patients . . . prefer Auvi-Q as evidenced by clinical experience and peer reviewed surveys"; and Auvi-Q is "[p]referred on All Kids."  There is no data to support these claims.  On information and belief, Auvi-Q sales representatives left these and similar notes in physicians' offices across the country.

47.     In 2013, at the time Auvi-Q sales representatives left these sales aids in these physicians' offices, Auvi-Q had only been on the market for a few months and it was likely that few (if any) patients or parents had used Auvi-Q devices in an emergency.  Accordingly, it is virtually impossible that these patient satisfaction claims could have been substantiated. Moreover, regardless of whether the "wonderful patient response" claim meant a patient "clinical" response or patient "satisfaction" response, this claim is not capable of being substantiated.

48.     Ultimately, there is no basis or substantiation for the representations that Auvi-Q is superior to the EpiPen Auto-Injector or that Auvi-Q is more patient-friendly than the EpiPen Auto-Injector.  These claims are false.

       iii.     Misleading claims regarding needlestick protection

49.     Sanofi also spread misleading information suggesting that only Auvi-Q had needlestick protection and false information to the effect that patients were accidentally being stuck with needles while using the EpiPen Auto-Injector.

50.     For example, Sanofi issued and widely disseminated a sales aid stating that Auvi-Q is "the first and only EAI with . . . [a r]etractable needle mechanism designed to help prevent accidental needle sticks."

51.     Sanofi's Press Release similarly touted that "Auvi-Q also features an automatic retractable needle mechanism to help prevent accidental needle sticks."

52.     Although these statements are literally true, they misleadingly suggest that Auvi-Q is the first or only epinephrine auto-injector with needlestick protection and/or that accidental needle sticks are a common occurrence with other epinephrine auto-injectors.  The EpiPen Auto-Injector, however, also offers needlestick protection.  It does so not by means of a retractable needle, but by means of a design ensuring that the needle is covered at all times except at the moment the injection is being given.  Because the means by which needlestick protection is provided is far less important to consumers than the fact of needlestick protection, Sanofi's statements likely confused consumers or led them to believe that Auvi-Q is the first epinephrine auto-injector with needlestick protection.   Accordingly, Sanofi's statements were false and misleading.

53.     Upon information and belief, Sanofi sales representatives also widely promoted a misleading and unsubstantiated study about EpiPen devices supposedly causing lacerations in patients—particularly children—that was designed to make patients fearful of using their EpiPen Auto-Injectors.   Moreover, upon information and belief, Sanofi sales representatives disseminated false and unsubstantiated statements about providers "accidentally" injecting EpiPen Auto-Injectors into their thumbs or hands while demonstrating how to use EpiPen Auto-Injectors.

54.     Sanofi's false and misleading statements were intended to have the effect, and did have the effect, of implying that Auvi-Q is the only auto-injector with needlestick protection.

iv.     Misleading statements regarding heat tolerance

55.     Sanofi sales representatives also falsely represented that Auvi-Q could withstand higher temperatures than other epinephrine auto-injectors.   For example, a Sanofi sales representative in Texas boasted that Auvi-Q is perfect for hot Texas summers because it can withstand high temperatures.

56.     This claim is false; there is no basis or substantiation for it, as the storage temperature range for Auvi-Q is the same as that of the EpiPen Auto-Injector (68 to 77 degrees Fahrenheit).   This claim also misleadingly implies that only Auvi-Q is suitable for use in warm weather locations, which is false.

**Sanofi Engaged in Other Unfair and Unlawful Conduct**

57.     In addition to making the false and misleading statements set forth above, Sanofi engaged in other unfair and unlawful tactics designed to promote Auvi-Q at the expense of the EpiPen Auto-Injector.

58.     In physicians' offices around the country, Sanofi threw EpiPen Auto-Injector informational and promotional materials in the garbage and replaced those materials with Auvi-Q promotional materials.

59.     Sanofi also offered kickbacks to increase sales of Auvi-Q.   Sanofi has a long history of offering kickbacks to increase sales of its products.   For example, in 2012, it agreed to pay $109 million to the DOJ to settle claims that Sanofi violated the False Claims Act by

offering kickbacks to physicians to induce them to prescribe one of its products in an attempt to gain market share over a more affordable competitor product.[25]

60.     True to form, Sanofi used similar tactics here to obtain an illegal edge over Mylan Specialty by offering illicit remuneration to health care providers in the form of cash payments—the most naked kickback imaginable.

61.     Specifically, at least one Sanofi sales representative offered to make cash payments to healthcare providers in exchange for their writing of Auvi-Q prescriptions.  There is no more naked or obvious example of a kickback than this—a bald exchange of money for prescriptions of a pharmaceutical product.  Upon information and belief, Sanofi was aware of this conduct but did not remove the sales representative from the Auvi-Q sales force, choosing instead to shift the representative to another territory.  Sanofi's failure to dismiss the representative immediately gives rise to an inference that the conduct was not only acceptable to Sanofi but more widespread, as Mylan Specialty expects to demonstrate through discovery.

62.     Sanofi's actions constituted unfair competition and have damaged Mylan Specialty.  Sanofi's actions were part of a uniform nationwide scheme that was designed to unlawfully thwart open and fair competition in all states in which it marketed Auvi-Q, which caused harm to Mylan Specialty and others.

63.     Auvi-Q could not compete head-to-head with the EpiPen Auto-Injector.  Thus, Sanofi tried every trick in the book to inflate utilization of its product, including by offering illegal financial incentives—that is, until Sanofi had to withdraw Auvi-Q from the market because of a defect.

---

[25]     *See* Department of Justice, *Sanofi U.S. Agrees to Pay $109 Million to Resolve False Claims Act Allegations of Free Product Kickbacks to Physicians* (Dec. 19, 2012), https://archives.fbi.gov/archives/boston/press-releases/2012/sanofi-u.s.-agrees-to-pay-109-million-to-resolve-false-claims-act-allegations-of-free-product-kickbacks-to-physicians.

**Sanofi's Illegal Actions Damaged Mylan Specialty**

64.     That Sanofi's marketing and sale of Auvi-Q was an unmitigated failure, and that Sanofi recalled Auvi-Q for safety reasons less than two years after launching the product, does not mean that Sanofi's unfair and illegal conduct did not damage Mylan Specialty.

65.     To the contrary, Mylan Specialty suffered, and continues to suffer, harm to its brand image and reputation due to Sanofi's willingness to engage in illegal activities to convert EpiPen Auto-Injector customers to Auvi-Q customers, to gain preferred formulary status, and to increase sales of Auvi-Q at Mylan Specialty's expense.  As a result of Sanofi's unfair and unlawful conduct, Mylan Specialty also suffered damages in the form of lost sales and business opportunities.  Sanofi's unfair and unlawful conduct also forced Mylan Specialty to offer higher rebates and discounts to PBMs and payors than it otherwise would have, further damaging Mylan Specialty.

66.     Sanofi's actions discussed above were deliberate, willful, and wanton, and done with full knowledge that its assertions constitute illegal actions.  Sanofi engaged in these illegal activities throughout the United States.

**FIRST CLAIM FOR RELIEF**

**Commercial Disparagement and False Advertising Under
the Lanham Act, 15 U.S.C. § 1125(a)**

67.     Mylan Specialty realleges and incorporates by reference the allegations in Paragraphs 1 through 66 of the Counterclaims as set forth above as if fully set forth herein.

68.     Sanofi and its representatives and agents made false and misleading statements, including but not limited to direct communications to physicians' offices and through written promotional materials, about the nature and quality of Mylan Specialty's EpiPen Auto-Injector product and Auvi-Q, including that: (i) the EpiPen Auto-Injector is no longer on the market,

Auvi-Q is the "new EpiPen," or Auvi-Q is replacing the EpiPen Auto-Injector; (ii) the EpiPen Auto-Injector and Auvi-Q are bioequivalent and/or therapeutically interchangeable; (iii) Auvi-Q is superior to and preferred by more physicians and patients than the EpiPen Auto-Injector; (iv) prior to Auvi-Q, patients did not carry and/or know how to use their epinephrine auto-injectors; (v) Auvi-Q is the only epinephrine auto-injector to have needlestick protection or that patients feared injection with the EpiPen Auto-Injector; and (vi) Auvi-Q can withstand higher temperatures than the EpiPen Auto-Injector.   These statements are literally false and/or misleading commercial speech in violation of the Lanham Act, 15 U.S.C. § 1125(a).

69.     Sanofi's false and misleading statements were made in interstate commerce, and in the context of commercial promotion, insofar as they were made for the purpose of converting EpiPen Auto-Injector patients to Auvi-Q patients and of harming Mylan Specialty's and the EpiPen Auto-Injector's reputation in the marketplace.

70.     Sanofi's false and misleading statements have caused substantial harm to Mylan Specialty in the marketplace, and constitute commercial disparagement actionable under the Lanham Act, 15 U.S.C. § 1125(a), as false and misleading descriptions or representations about a competitor's products.   Mylan Specialty is entitled to all relief available for such false and misleading statements, including but not limited to disgorgement of Sanofi's ill-gotten profits and treble damages. *See id.* § 1117(a).

71.     Sanofi's false and misleading advertising statements likely deceived physicians and consumers about whether: the EpiPen Auto-Injector is still on the market; Auvi-Q has replaced the EpiPen Auto-Injector; the EpiPen Auto-Injector and Auvi-Q are bioequivalent, therapeutically equivalent, or interchangeable; patients carried their EpiPen Auto-Injectors; patients knew how to use their EpiPen Auto-Injectors; Auvi-Q is superior to and preferred by

more physicians and patients than the EpiPen Auto-Injector; EpiPen Auto-Injectors have needlestick protection; patients are or should be afraid of using EpiPen Auto-Injectors; and Auvi-Q can withstand higher temperatures than the EpiPen Auto-Injector.

72.     Sanofi's false and misleading advertising statements were made with the purpose of influencing, and in fact have influenced, the prescribing and purchasing decisions of physicians and consumers.

73.     Sanofi has offered, advertised, and promoted Auvi-Q to physicians and patients across the United States.  Sanofi's false and misleading statements have been disseminated and used throughout the country as part of its common scheme and plan, having effects that are widespread and not inhibited by any particular submarket or state line, thus causing widespread and significant harm throughout the United States.  Consequently, Sanofi's false and misleading statements impact interstate commerce.

74.     Sanofi made its false and misleading statements knowingly or recklessly to physicians and patients.

75.     Mylan Specialty has suffered substantial harm as a result of these false and misleading statements.  Mylan Specialty has incurred actual damages as a result of Sanofi's conduct as it has suffered harm to the goodwill and reputation of its brand and that of the EpiPen Auto-Injector through Sanofi's false and misleading statements.  Mylan Specialty is entitled to treble damages and disgorgement of ill-gotten profits gained from Sanofi's unlawful conduct, as well as enhanced damages in accordance with 15 U.S.C. § 1117.

## SECOND CLAIM FOR RELIEF

### Common Law Unfair Competition

76.     Mylan Specialty realleges and incorporates by reference the allegations in Paragraphs 1 through 66 of the Counterclaims as set forth above as if fully set forth herein.

77.     Sanofi and its representatives and agents made false and misleading statements about the nature and quality of Mylan Specialty's EpiPen Auto-Injector product and Auvi-Q, including that: (i) the EpiPen Auto-Injector is no longer on the market, Auvi-Q is the "new EpiPen," or Auvi-Q is replacing the EpiPen Auto-Injector; (ii) the EpiPen Auto-Injector and Auvi-Q are bioequivalent, therapeutically equivalent, or interchangeable; (iii) Auvi-Q is superior to and preferred by more physicians and patients than the EpiPen Auto-Injector; (iv) prior to Auvi-Q, patients did not carry and/or know how to use their epinephrine auto-injectors; (v) Auvi-Q is the only epinephrine auto-injector to have needlestick protection or that patients feared injection with the EpiPen Auto-Injector; and (vi) Auvi-Q can withstand higher temperatures than the EpiPen Auto-Injector.

78.     These statements are literally false and/or misleading commercial speech that were intended to cause, and did cause, confusion among prescribing physicians and consumers about whether the EpiPen Auto-Injector is still on the market; Auvi-Q has replaced the EpiPen Auto-Injector; the EpiPen Auto-Injector and Auvi-Q are equivalent; patients carried their EpiPen Auto-Injectors; patients knew how to use their EpiPen Auto-Injectors; Auvi-Q is superior to and preferred by more physicians and patients than the EpiPen Auto-Injector; EpiPen Auto-Injectors have needlestick protection; patients are or should be afraid of using EpiPen Auto-Injectors; and Auvi-Q can withstand higher temperatures than the EpiPen Auto-Injector.

79. These statements were made in the context of commercial promotion, insofar as they were made for the purpose of converting EpiPen Auto-Injector patients to Auvi-Q patients and of harming Mylan Specialty's and the EpiPen Auto-Injector's reputation in the marketplace.

80. Sanofi's false and misleading advertising statements were made with the purpose of influencing, and in fact have influenced, the prescribing and purchasing decisions of physicians and consumers.

81. Sanofi made its false and misleading statements knowingly or recklessly to physicians and patients.

82. Sanofi also competed unfairly by offering illicit cash payments to physicians, which were intended to influence prescribing and purchasing decisions by health care customers, and to cause Mylan Specialty harm in the market where it directly competed with Sanofi.

83. Mylan Specialty has suffered substantial harm as a result of Sanofi's unfair sales and marketing tactics and is entitled to damages from Sanofi as well as all other remedies provided under law, as set forth in the Prayer for Relief below.

**PRAYER FOR RELIEF**

84. Mylan Specialty repeats and realleges the allegations contained in each and every preceding paragraph of its counterclaim.

85. With respect to its counterclaim, Mylan Specialty requests that the Court grant the following relief:

      a.    Judgment in favor of Mylan Specialty and against Sanofi;

      b.    An appropriate amount of monetary damages as determined at trial, including, but not limited to, Mylan Specialty's lost business and profits,

Sanofi's ill-gotten and unjustly derived revenues, and Mylan Specialty's expenditures in repairing its goodwill with physicians and consumers;

c.      Disgorgement of ill-gotten profits gained from Sanofi's unlawful conduct;

d.      Punitive and/or exemplary damages;

e.      Pre- and post-judgment interest on all monetary damages, as permitted by law;

f.      Costs of suit herein, including expert witness fees, as permitted by law;

g.      Attorneys' fees, as permitted by law;

h.      Statutory damages, including multipliers and equitable enhancements, as permitted by law; and

i.      Any such further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Mylan Specialty demands a trial by jury of the counterclaims asserted.

DATED: January 16, 2018                     Respectfully submitted,

/s/ Philip A. Sechler

Philip A. Sechler
Kathryn S. Zecca
Lee Turner Friedman
Jessica Arden Ettinger
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP
1801 K Street, N.W.
Suite 411 L
Washington, D.C. 20006
(202) 775-4492
psechler@robbinsrussell.com

*Attorneys for Defendants Mylan Inc.
and Mylan Specialty L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 16, 2018, I electronically filed the foregoing Answer, Affirmative Defenses, and Counterclaims of Mylan Inc. and Mylan Specialty L.P.with the Clerk of Court for the United States District Court, District of Kansas by using the Court's CM/ECF system, which will serve electronic notification of this filing to all counsel of record.


  /s/ Philip A. Sechler
  Philip A. Sechler