# UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>This Document Relates To:<br>**CONSUMER CLASS CASES** | No. 2:17-md-02785-DDC-TJJ<br>(MDL No: 2785)<br><br>**CLASS PLAINTIFFS' AMENDED OMNIBUS RESPONSE TO MOTIONS TO DISMISS** |

In re EPIPEN (EPINEPHRINE ⟩
INJECTION, USP) MARKETING, ⟩
SALES PRACTICES AND ANTITRUST ⟩
LITIGATION ⟩
⟩
This Document Relates To: ⟩
**CONSUMER CLASS CASES** ⟩
—————————————————— ⟩
⟩
(1) Local 282 Welfare Trust Fund, (2) Rosetta ⟩
Serrano, (3) Lesley Huston, (4) Kenneth Evans,⟩
(5) Cassandra Bredek, (6) Christopher Rippy, ⟩
(7) Nikitia Marshall, (8) Liz Huelsman, ⟩
(9) Kimberly Corcoran, (10) Stacee Svites, ⟩
(11) Lauren Coale, (12) Rachel Fernandez, ⟩
(13) Raymond Buchta III, (14) Lee Seltzer, ⟩
(15) Kimberly Dollander, (16) Linda Wagner, ⟩
(17) Denya Anderson, (18) Vishal Aggarwal, ⟩
(19) Erin Korte-Lamparter, (20) Alene ⟩
McDaniel, (21) Joy Shepard, (22) Eileen ⟩
Montet, (23) Lorraine Wight, (24) Teia Amell, ⟩
(25) Todd Beaulieu, (26) Anastasia Johnston, ⟩
(27) Annette Sutorik, (28) Heather DeStefano, ⟩
(29) Elizabeth Williamson, (30) Shannon ⟩
Clements, (31) Mark Kovarik, (32) Miriam ⟩
Clarke, (33) Laura Chapin, (34) Maria ⟩
Giurland, (35) Michael Gill, (36) Suzanne ⟩
Harwood, (37) Donna Wemple, (38) Cassandra ⟩
Cobb, (39) Sonya North, (40) Christina James, ⟩
(41) David H. Smith, (42) Lori Collins, ⟩
(43) Jae Jones, (44) Jennifer Walton, (45) April⟩
Sumner, (46) Meredith Krimmel, (47) Landon ⟩
Ipson, (48) Kenneth Steinhauser, (49) John ⟩
Dodge, (50) Amie Vialet De Montbel, ⟩
—————————————————— ⟩

[Caption continued on following page]

(51) Donna Anne Dvorak, (52) Connie )
Stafford, (53) Francis Myers, (54) Heather )
Ruland, (55) Curt Palmer, (56) Angie )
Nordstrum, and (57) Carly Bowersock, )
Individually and on Behalf of All Others )
Similarly Situated, )
               )
               Plaintiffs, )
               )
     vs. )
               )
(1) Mylan N.V., (2) Mylan Specialty L.P., )
(3) Mylan Pharmaceuticals, Inc., (4) Heather )
Bresch, (5) Pfizer, Inc., (6) King )
Pharmaceuticals, Inc., and (7) Meridian )
Medical Technologies, Inc., )
               )
               Defendants. )
               )

_____

## CLASS PLAINTIFFS' AMENDED OMNIBUS RESPONSE TO MOTIONS TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... vii

INTRODUCTION ..............................................................................................................1

FACTUAL BACKGROUD ...............................................................................................5

LEGAL STANDARD .......................................................................................................28

ARGUMENT ....................................................................................................................28

I.      THE COMPLAINT PLAUSIBLY PLEADS ANTITRUST VIOLATIONS. .......28

       A.     The Complaint Adequately Pleads Claims Based on Mylan's Exclusive Dealing Contracts with Pharmacy Benefit Managers and Schools. ..........30

           1.     The price-cost test does not apply to Plaintiffs' exclusive dealing claims. ..........................................................................................31

           2.     The Complaint pleads that Mylan's exclusionary contracts foreclosed competition in a substantial share of the EAI market. .32

           3.     The Complaint adequately pleads causation with respect to the effect of Mylan's anticompetitive exclusive dealing contracts......34

           4.     Mylan's exclusive dealing contracts harmed competition. ...........34

           5.     Mylan's exclusive dealing contracts with state-based Medicaid programs are not immune from scrutiny .......................................35

       B.     Mylan's Misrepresentations and Deceptions are Valid Bases for Liability .................................................................................................37

       C.     Mylan's Sham Citizen's Petition and Supplement Study are not Immune. .................................................................................................39

       D.     Defendants' Conspiracy is Plausibly Inferred from the Complaint's Allegations. ...............................................................................................42

       E.     The Complaint Sufficiently Alleges Unlawful Pay-For-Delay Settlements. ..............................................................................................46

           1.     The Teva Settlement. ....................................................................48

           2.     The Intelliject Settlement. .............................................................50

3.      The Sandoz "Stay-and-Delay" Agreement. ....................................51

F.      The Complaint Plausibly Alleges Causation with Regard to the Unlawful
        Pay-For-Delay Settlements. ........................................................................52

        1.      But for Defendants' conduct, competitors would have obtained
                FDA approval sooner......................................................................53

        2.      Defendants' assertion of valid patent rights cannot defeat causation
                at the pleadings stage. ....................................................................55

G.      Plaintiffs Adequately Plead a Tying Claim with Regard to the EpiPen 2-
        Pak...................................................................................................................56

H.      Defendants' Attacks on Plaintiffs' Claims Under Individual State Antitrust
        Laws are Off-Target.......................................................................................60

        1.      States not represented by a named plaintiff. ...................................60

        2.      Indirect purchaser claims may proceed under the laws of Arkansas,
                Illinois, Massachusetts, Missouri, Puerto Rico, Rhode Island, and
                West Virginia. .................................................................................61

        3.      California, Kansas, and Tennessee allow unilateral-conduct
                claims. .............................................................................................62

II.     THE COMPLAINT PLEADS A PLAUSIBLE RICO CLAIM ............................63

A.      The Limited Applicability of Rule 9(b) to Civil RICO ..............................65

B.      The Complaint Sets Forth a Valid RICO Claim Against the Defendants..69

        1.      "Racketeering"................................................................................70

                a.      Mail & Wire Fraud.............................................................70

                b.      Corruptly Influencing an Official Proceeding ..................75

        2.      "Pattern of" .....................................................................................76

        3.      "Enterprise".....................................................................................77

        4.      "Conduct or Participate in, Directly or Indirectly".........................78

                a.      Pfizer's Role in the Enterprise ...........................................79

           b.      Heather Bresch's Role in the Enterprise ...........................85

      5.      Causation & Standing ................................................87

  C.      In the Alternative, Plaintiffs Have Stated a Claim Against the Pfizer Defendants and Heather Bresch Under § 1962(d). ...................................90

III.      PLAINTIFFS' COMPETITIVE DELAY CLAIMS ARE TIMELY....................91

  A.      Plaintiffs' Claims Accrued on Each Overcharge. .......................................91

  B.      The Continuing-Violation Doctrine Applies. .............................................92

  C.      The Discovery Rule, Fraudulent Concealment, and Equitable Tolling Apply...........................................................................................................94

IV.      PLAINTIFFS ADEQUATELY PLEAD THEIR STATE LAW CONSUMER PROTECTION CLAIMS. .......................................................................................95

  A.      Plaintiffs Have Article III Standing. .........................................................95

  B.      Plaintiffs' Consumer Protection Claims are Not Preempted by Federal Law. ............................................................................................................98

  C.      Plaintiffs Have Sufficiently Pled their Consumer Protection Claims......100

      1.      Defendants Have Engaged in Unfair Practices in Violation of State Consumer Protection Laws. ........................................................101

           a.      The 'Substantial Injury' Test Factors .............................103

           b.      The 'Cigarette Test' Factors ...........................................105

      2.      Defendants Have Engaged in Deceptive and Misleading Practices in Violation of State Consumer Protection Law. .........................107

           a.      Defendants' Conduct Has a Substantial and Material Effect on Consumer Choice and Purchasing Decisions. ............110

           b.      Defendants' Monopolistic and Excessive Pricing. ..........112

           c.      Defendants' Force the Purchase of EpiPens in a Two Pack, and Defend the 'Hard Switch' through Deceptive and Misleading Advertising...................................................114

        d.    Defendants' Disparagement of Competitor Devices and Other Misrepresentations....................................................116

    3.    Defendants Have Engaged in 'Unlawful' Practices in Violation of California's Unfair Competition Law...........................................117

D.    Where Necessary, Plaintiffs Have Sufficiently Pled Reliance ...............118

    1.    Plaintiffs' Complaint Meets the Tenth Circuit's Standard for Pleading Reliance..........................................................................118

    2.    Plaintiffs Need Not Establish Reliance for the Majority of their State Consumer Protection Claims ................................................119

E.    Where Necessary, Plaintiffs Have Sufficiently Pled Causation. ............121

F.    Plaintiffs' Consumer Protection Claims are Alleged with Sufficient Particularity..............................................................................................122

G.    Defendants' Assertions Regarding State-Law Class Action Prohibitions are Premature and Without Merit. .........................................................124

V.    UNJUST ENRICHMENT ..................................................................................126

# TABLE OF AUTHORITIES

## Cases

*A&W Sheet Metal, Inc. v. Berg Mechanical, Inc.*,
  653 So.2d 158 (La. Ct. App. 1995).................................................................... 105

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ......................................................................... 69

*Advanced Optics Elecs., Inc. v. Robins*,
  633 F. Supp. 2d 1237 (D.N.M. 2008)................................................................. 67

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)......................................................................................... 121

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
  483 U.S. 143 (1987)........................................................................................... 73

*AKH Co. v. Universal Underwriters Ins. Co.*, No. CIV.A. 13-2003-JAR,
  2015 WL 1809157 (D. Kan. Apr. 21, 2015)..................................................... 123

*Aldrich v. McCulloch Properties, Inc.*,
  627 F.2d 1036 (10th Cir. 1980) ........................................................................ 95

*Allied Tube & Conduit Corp. v. Indian Head*,
  486 U.S. 492 (1988)........................................................................................... 36

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,
  323 F.3d 366 (6th Cir. 2003) ....................................................................... 38, 39

*Am. Fin. Servs. Ass'n v. F.T.C.*,
  767 F.2d 957 (D.C. Cir. 1985)......................................................................... 104

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997)...................................................................... 38, 39

*Anapoell v. Am. Express Bus. Fin. Corp.*,
  2007 WL 4270548 (D. Utah Nov. 30, 2007) .................................................... 105

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) .......................................................................... 54

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................... 34

*Auraria Student Housing at the Regency LLC v. Campus Village Apartments, LLC*,
  843 F.3d 1225 (10th Cir. 2016) ........................................................................ 93

*Baggett v. Hewlett-Packard Co.*,
  582 F. Supp. 2d 1261 (C.D. Cal.2007) ............................................................ 123

*Baldwin v. Priem's Pride Motel, Inc.*,
  580 P.2d 1326 (Kan. 1978) ............................................................................. 100

*BancOklahoma Mortg. Corp. v. Capital Title Co.*,
    194 F.3d 1089 (10th Cir. 1999) .................................................................. 71

*Bank One v. Abbe*,
    916 F.2d 1067 (6th Cir. 1990) ................................................................... 65

*Beck v. Prupis*,
    529 U.S. 494 (2000) .................................................................................... 90

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................. 28, 42

*Bennett v. Sprint Nextl Corp.*, No. 09-2122-EFM,
    2011 WL 43087 (D. Kan. Jan. 6, 2011) ................................................... 69

*Berkey Photo v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ...................................................................... 91

*Boyle v. United States*,
    556 U.S. 950 (2009) ........................................................................... passim

*Brannon v. Boatmen's First Nat'l Bank*,
    153 F.3d 1144 (10th Cir. 1998) ................................................................ 83

*Brannon v. Munn*,
    2003 OK CIV APP 33, 68 P.3d 224 (Okla. Civ. App. 2002) ................. 101

*Bridge v. Phoenix Bond & Indemnity Co.*,
    553 U.S. 659 (2008) ........................................................................... passim

*Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*,
    2004 WL 1427136 (E.D. Pa. June 21, 2004) ........................................... 55

*Brown v. Buhman*,
    822 F.3d 1151 (10th Cir. 2016) ................................................................ 97

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
    846 F.3d 1297 (10th Cir. 2017) .......................................................... 58, 59

*Burnett v. Mortg. Elec. Registration Sys., Inc.*,
    706 F.3d 1231 (10th Cir. 2013) ................................................................ 28

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) .................................................................................... 40

*Carpenter v. United States*,
    484 U.S. 19 (1987) ...................................................................................... 72

Cayman Exploration Corp. v. United Gas Pipe Line Co.,
    873 F.2d 1357 (10th Cir.1989) .................................................................. 67

*Cedric Kushner Prom., Ltd. v. King*,
    533 U.S. 158 (2001) .................................................................................... 64

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) .................................................................................... 85

*CGC Holding Co., LLC v. Broad & Cassel*,
 773 F.3d 1076 (10th Cir. 2014) ........................................................ 65, 74, 88

*Champagne Metals v. Ken-Mac Metals, Inc.*,
 458 F.3d 1073 (10th Cir. 2006) .................................................................. 43

*Ciardi v. F. Hoffman-La Roche Ltd.*,
 436 Mass. 53 (2002) .................................................................................. 62

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
 690 F.2d 1240 (9th Cir. 1982) .................................................................. 40

*Cloverdale Equip. Co. v. Simon Aerials, Inc.*,
 869 F.2d 934 (6th Cir. 1989) .................................................................. 127

*Cohlmia v. St. John Med. Ctr.*,
 693 F.3d 1269 (10th Cir. 2012) .......................................................... 35, 43

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
 370 U.S. 690 (1962)............................................................................ 29, 33

*Copperweld Corp. v. Independence Tube Corp.*,
 467 U.S. 752 (1984).................................................................................. 43

*Cowell v. Palmer Twp.*,
 263 F.3d 286 (3d Cir. 2001)...................................................................... 92

Danvers *Motor Co. v. Ford Motor Co.*,
 432 F.3d 286 (3d Cir. 2005)................................................................. 96, 97

*deBondt v. Carlton Motor Cars, Inc.*,
 536 S.E.2d 399 (S.C. Ct. App. 2000)....................................................... 105

*Deck v. Engineered Laminates*,
 349 F.3d 1253 (10th Cir. 2003) ................................................................ 69

*DuMont v.* Litton *Loan Servicing, LP*, No. 12 CIV. 2677 ER,
 2015 WL 1061138 (S.D.N.Y. Mar. 11, 2015) ....................................... 123

*Durell v. Sharp Healthcare*,
 183 Cal. App. 4th 1350, 108 Cal. Rptr. 3d 682 (2010)......................... 121

*Durland v. United States*,
 161 U.S. 306 (1896).................................................................................. 70

*E. J. Delaney Corp. v. Bonnie Bell, Inc.*,
 525 F.2d 296 (10th Cir. 1975) .................................................................. 42

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
 504 U.S. 451 (1992)........................................................................ 57, 58, 60

*Edmonds v. John L. Scott Real Estate, Inc.*,
 87 Wash. App. 834, 850, 942 P.2d 1072 (1997)..................................... 101

*Ehrlich v. BMW of N. Am., LLC*,
 801 F. Supp. 2d 908 (C.D. Cal. 2010) ................................................... 121

*Eike v. Allergan, Inc.*, No. 3:12-CV-01141-DRH-DGW,
2014 WL 1040728 (S.D. Ill. Mar. 18, 2014) ................................................................ 105

*Eisai Inc. v. Sanofi-Aventus U.S., LLC*, No. 08-4168,
2014 WL 1343254 (D.N.J. March 28, 2014) .............................................................. 38, 39

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
172 F. Supp. 2d 1060 (S.D. Ind. 2001) ........................................................................ 55

*Empress Casino Joliet Corp. v. Johnston*,
763 F.3d 723 (7th Cir. 2014) ........................................................................................ 90

*Energy Consumption Auditing Servs., LLC v. Brightergy, LLC*,
49 F. Supp. 3d 890 (D. Kan. 2014) .............................................................................. 85

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) .......................................................................................... 46

*F.T.C. v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ...................................................................................... 104

*F.T.C. v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ...................................................................................................... 105

*Fagerstrom v. Amazon.com, Inc.*,
141 F. Supp. 3d 1051 (S.D. Cal. 2015) ........................................................................ 106

*FDIC v. Schuchmann*,
224 F. Supp. 2d 1332 (D.N.M. 2002) .......................................................................... 94

*Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*, Case No. 09-CV-00852,
2012 WL 3841397 (E.D. Wis. Sep. 5, 2012) ............................................................... 61

*Four Corners Nephrology Assocs., P.C. v. Mercy Medical Center of Durango*,
582 F.3d 1216 (10th Cir. 2009) ................................................................................... 39

*Franklin v. State*,
631 S.W.2d 519 (Tex. App. 1982) ................................................................................ 101

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*, Civ. No. 12-cv-02432,
2015 WL 8479746 (D. Colo. Dec. 10, 2015) ...................................................... 125, 126

*FTC v. Actavis, Inc.*,
570 U.S. (2013 ................................................................................................... passim

*Full Draw Prods. v. Easton Sports, Inc.*,
182 F.3d 745 (10th Cir. 1999) ..................................................................................... 46

*Gillmor v. Thomas*,
490 F.3d 791 (10th Cir. 2007) ..................................................................................... 87

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ....................................................................................... 96

*Gonzalez v. Pepsico*,
489 F. Supp. 2d 1233 (D. Kan. May 24, 2007) ....................................................... 96, 97

x

*Greene v. Gerber Prod. Co.*,
  262 F. Supp. 3d 38 (E.D.N.Y. 2017) ................................................................. 110

*Griffin v. Sec. Pac. Automotive Fin. Servs. Corp.*,
  33 F. Supp. 2d 926 (D. Kan. Nov. 18, 1998) ..................................................... 106

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ............................................................................ 125

*Hanover Shoe, Inc. v. United Shoe Machinery Corp*,
  392 U.S. 481 (1968) ........................................................................................... 92

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
  527 F. Supp. 2d 1257 (D. Kan. 2007) ................................................................. 46

*Hemi Grp., LLC v. City of NY*,
  559 U.S. 1 (2010) ............................................................................................... 89

*Herron v. Best Buy Co. Inc.*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013) ..................................................... 113, 116

*Hershey v. ExxonMobil Oil Corp.*,
  278 F.R.D. 617 (D. Kan. 2011) ......................................................................... 125

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ............................................................................ 97

*Holland v. Tandem Computers Inc.*,
  49 F.3d 1287 (8th Cir. 1995) ............................................................................ 127

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992) ........................................................................................... 87

*Howard v. Turnbull*,
  316 S.W.3d 431 (Mo. Ct. App. 2010) ............................................................... 127

*Hunter Douglas v. Harmonic Design, Inc.*,
  153 F.3d 1318 (Fed. Cir. 1998) .......................................................................... 98

*Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*,
  282 N.J. Super. 140, 659 A.2d 904 (App. Div. 1995) ....................................... 106

*Illinois Brick Co. v. Illinois*,
  431 U.S. (1977) ....................................................................................... 61, 62, 89

*Image Tech. Servs. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ............................................................................ 99

*In People ex rel. Hartigan v. Knecht Servs.*,
  575 N.E.2d 1378 (Ill. App. Ct. 1991) ............................................................... 114

*In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883,
  2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ....................................................... 61

*In re Aggrenox*,
  94 F. Supp. 3d 244 (2015) ....................................................................... 47, 61, 92

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 JG VVP,
2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ................................................. 93

*In re Asacol Antitrust Litig.*,
2016 WL 4083333 (D. Mass. July 20, 2016)................................................ 62, 63

*In re Automotive Parts Antitrust Litigation*,
50 F. Supp. 3d 836 (E.D. Mich. 2014)............................................................ 62

In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.,
804 F.3d 633 (3d Cir. 2015)..................................................................... 74, 88

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*,
701 F. Supp. 2d 356 (E.D.N.Y. 2010) .......................................................... 61

*In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*, No. MDL 05-01699 CRB,
2007 WL 2028408 (N.D. Cal. July 10, 2007)................................................ 105

*In re Broiler Chicken Antitrust Litigation*, No. 16 C 8637,
2017 WL 5574376 (N.D. Ill. Nov. 20, 2017) ................................................ 61

*In re Buspirone Patent Litig.*,
185 F. Supp. 2d 363 (S.D.N.Y. 2002) .......................................................... 92

*In re Cast Iron Soil Pipe and Fittings Antitrust Litigation*, Case No. 1:14-md-2508,
2015 WL 5166014 (E.D. Tenn. June 24, 2015)............................................... 62

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) .......................................................... 61

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................................ 62

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ,
2017 WL 6524839 (D. Kan. Dec. 21, 2017).................................................... 5

*In re Flonase Antitrust Litig.*,
798 F. Supp. 2d 619 (E.D. Pa. 2011) ........................................................ 54, 55

*In re Google AdWords Litig.*, No. 5:08-CV-3369-EJD,
2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ................................................... 121

*In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06-md-1739,
2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006)................................................... 61

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
299 F.R.D. 648 (S.D. Cal. 2014) ............................................................... 125

*In re K-Dur Antitrust Litig.*,
338 F. Supp. 2d 517 (D.N.J. 2004) .............................................................. 92

*In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ................................................. 74

*In re Lipitor Antitrust Litig.*, MDL No. 2332,
2013 WL 4780496 (D.N.J. Sep. 5, 2013) ..................................................... 40

*In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420,
2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)................................................................. 61

*In re Loestrin 24 Fe Antitrust Litig.*,
814 F.3d 538 (1st Cir. 2016) ...................................................................... passim

*In re Motor Fuel Temperature Sales Practices Litig.*,
292 F.R.D. 652 (D. Kan. 2013)............................................................... 96, 121

*In re Neurontin Mktg. & Sales Practices Litig.*,
712 F.3d 21 (1st Cir. 2013) ..................................................................... 74, 88

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016)..................................................................... 55, 91

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ................................................. 52, 56, 91, 92

*In re NorVergence, Inc.*,
424 B.R. 663 (Bankr. D.N.J. 2010) ......................................................... 123

*In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS,
2012 WL 1366718 (N.D. Cal., Apr. 19, 2012) ................................................ 125

*In re Pharma Industry AWP*,
582 F.3d 156 (1st Cir. 2009) ......................................................... 99, 104, 114

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
946 F. Supp. 2d 554 (E.D. La. 2013) ........................................................ 62

*In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343,
2013 WL 2181185 (E.D. Tenn. May 20, 2013)................................................ 92

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, Case No. 14-md-02503,
2015 WL 5458570 (D. Mass. Sep. 16, 2015) ................................................ 62

*In re Syngenta AG MIR 162 Corn Litig.*,
131 F. Supp. 3d 1177 (D. Kan. 2015) ....................................................... 125

*In re Tamoxifen Citrate Antitrust Litig.*,
277 F. Supp. 2d 121 (E.D.N.Y. 2003) ...................................................... 55

*In re Terazosin Hydrochloride Antitrust Litig.*,
160 F. Supp. 2d 1365 (S.D. Fla. 2001) ...................................................... 63

*In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*,
159 F. Supp. 3d 898 (N.D. Ill. 2016) ....................................................... 74

*In re Universal Serv. Fund Tel. Billing*,
300 F. Supp. 2d 1107 (D. Kan. 2003) ....................................................... 68

*In re Urethane Antitrust Litig.*,
913 F. Supp. 2d 1145 (D. Kan. 2012) .................................................... 46, 94

*In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765 (JLL),
2017 WL 1902160 (D.N.J. May 8, 2017) ................................................... 125

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
  868 F.3d 132 (3d Cir. 2017) ................................................................. 55

*In re Wernly*,
  91 B.R. 702 (Bankr. E.D. Pa. 1988) ...................................................... 114

*In the Matter of Bristol-Meyers Squibb Co.*,
  FTC Dkt. No. C-4076 (2003) ................................................................ 40

*Ipock v. Manor Care of Tulsa OK, LLC*, No. 17-CV-0106-CVE-TLW,
  2017 WL 1289865 (N.D. Okla. Apr. 4, 2017) ...................................... 126

*Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*,
  634 F.3d 1352 (11th Cir. 2011) ............................................................ 74

*Jefferson Parish Hosp. v. Hyde*,
  466 U.S. 2 (1984) ............................................................................ 56, 60

*JetAway Aviation, LLC v. Board of County Com'rs of County of Montrose, Colo.*,
  754 F.3d 824 (10th Cir. 2014) .............................................................. 96

*Johnson v. Beverly-Hanks & Assoc*s.,
  400 S.E.2d 38 (N.C. 1991) .................................................................. 105

*Kaatz v. Hyland's Inc.*, Case No. 16 CV 237,
  2016 WL 3676697 (S.D.N.Y. July 6, 2016) .......................................... 61

*Katz v. Live Nation, Inc.*, No. 09 Civ. 3740 (MLC),
  2010 WL 2539686 (D.N.J. June 17, 2010) .......................................... 123

*Khalik v. United Air Lines*,
  671 F.3d 1188 (10th Cir. 2012) ............................................................ 28

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) .............................................................................. 93

*Koch v. Koch Indus., Inc.*,
  203 F.3d 1202 (10th Cir. 2000) .......................................................... 118

*Korea Supply Co. v. Lockheed Martin Corp.*,
  131 Cal.Rptr.2d 29 (2003) .................................................................. 118

*Kraft, Inc. v. F.T.C.*,
  970 F.2d 311 (7th Cir. 1992) ....................................................... 112, 116

*Lenox v. MacLaren Surgical Corp. v. Medtronic, Inc.*,
  762 F.3d 1114 (10th Cir. 2014) ..................................................... 38, 39

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ......................................................................... 96

*Lisk v. Lumber One Wood Preserving, LLC*,
  792 F.3d 1331 (11th Cir. 2015) .......................................................... 125

*Lobato v. Pay Less Drug Stores, Inc.*,
  261 F.2d 406 (10th Cir. 1958) .............................................................. 85

*Locke-O'Dell v. Glob. Client Sols., LLC*, No. 12-2009-CM,
    2012 WL 1033624 (D. Kan. Mar. 27, 2012) ................................................ 106

*Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*,
    2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009) ............................................... 40

*Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07 Civ. 7343,
    2008 WL 169362 (S.D.N.Y. Jan. 18, 2008) ............................................. 40, 41

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 97

*MacArthur v. San Juan Cty.*
    416 F. Supp. 2d 1098 (D. Utah June 13, 2005) ........................................ 106

*Markie v. Red Wolf Broad. Corp.*, No. CV136018648,
    2014 WL 3805654 (Conn. Super. Ct. June 26, 2014)................................ 106

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................... 43

*Mattos v. Eli Lilly & Co.*, No. 12–1014–JWL,
    2012 WL 1893551 (D. Kan. May 23, 2012) ............................................. 118

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) .................................................................... 96

*Mayfield v. Asta Funding, Inc.*,
    95 F. Supp. 3d 685 (S.D.N.Y. 2015) ........................................................... 85

*McKinney v. Bayer Corp.*,
    744 F. Supp. 2d 733 (N.D. Ohio 2010)..................................................... 125

*McLaughlin Ford, Inc. v. Ford Motor Co.*,
    192 Conn. 558, 473 A.2d 1185 (1984) ..................................................... 105

*Medrazo v. Honda of N. Hollywood*,
    205 Cal. App. 4th 1, 140 Cal. Rptr. 3d 20 (2 Dist. 2012).................... 121

*Menzies v. Seyfarth Shaw LLP*,
    197 F. Supp. 3d 1076 (N.D. Ill. 2016) ...................................................... 65

*Mohawk Ind., Inc. v. Williams*,
    126 S.Ct. 2016 (2006) ................................................................................ 81

*Monetary Funding Group, Inc. v. Pluchino*,
    867 A.2d 841 (Conn. App. Ct. 2005)................................................ 100, 114

*Monus v. Colorado Baseball 1993, Inc.*,
    103 F.3d 145 (10th Cir. 1996) .................................................................. 127

*Moran v. Prime Healthcare Mgmt., Inc.*,
    208 Cal. Rptr. 3d 303 (Ct. App. 2016)..................................................... 117

*Morris v. Mack's Used Cars*,
    824 S.W.2d 538 (Tenn. 1992).................................................................... 101

*Morrison v. Toys "R" Us, Inc.*,
    806 N.E.2d 388 (Mass. 2004) ..................................................................... 105

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*,
    63 F.3d 1540 (10th Cir. 1995) ................................................................ 59, 60

*Murphy v. McNamara*,
    416 A.2d 170 (Conn. Super. Ct. 1979) .................................................... 114

*Mylan Pharm, Inc. v. Warner Chilcott Public Ltd. Co.*,
    2015 WL 5665735 (3d Cir. Sept. 21, 2015) ........................................ 73, 74

*N. Am. Safety Valve Indus., Inc. v. Wolgast*, Civ. A. No. 85-2575,
    1986 WL 15792 (D. Kan. Nov. 13, 1986) .................................................. 97

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs*,
    850 F.2d 904 (2d Cir. 1988)................................................................... 38, 39

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984)....................................................................................... 35

*Near v. Crivello*,
    673 F.Supp.2d 1265 (D. Kan. 2009)................................................ 119, 123

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .................................................................. 39

*Nw H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 248 (1989)................................................................................ 64, 76

*Palmer v. United States*,
    229 F.2d 861 (10th Cir. 1955) ................................................................... 73

*Paul v. Pulitzer Pub. Co.*, No. 74-327C(A),
    1974 WL 887 (E.D. Mo. May, 24 1974) .................................................... 59

*Perry H. Bacon Tr. v. Transition Partners, Ltd.*,
    298 F. Supp. 2d 1182 (D. Kan. 2004) ........................................................ 94

*Pfizer, Inc. v. Shalala*,
    1 F. Supp. 2d 38 (D.D.C. 1998) ............................................................... 106

*Pierce v. McMullen*,
    156 Idaho 465, 328 P.3d 445 (Idaho 2014) ............................................. 101

*Plains Res., Inc. v. Gable*,
    782 F.2d 883 (10th Cir. 1986) ................................................................... 64

*Plascencia v. Lending 1st Mortg.,*,
    259 F.R.D. 437 (N.D. Cal. 2009)............................................................... 120

*Premier Tech. Sales, Inc. v. Digital Equip. Corp.*,
    11 F. Supp. 2d 1156 (N.D. Cal. 1998) ..................................................... 106

*Price v. Long Realty, Inc.*,
    199 Mich. App. 461, 502 N.W.2d 337 (1993).......................................... 101

*Prof. Real Estate Investors, Inc. v. Columbia Pictures Indust., Inc.*,
    508 U.S. 49 (1993) ............................................................................................... 40

*Quinn v. Walgreen Co.*,
    958 F. Supp. 2d 533 (S.D.N.Y. 2013) ............................................................... 110

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
    899 F.2d 951 (10th Cir. 1990) ...................................................................... 96, 97

*Resolution Trust Corp. v. Stone*,
    998 F.2d 1534 (10th Cir. 1993) ..................................................................... 76, 79

*Rivera v. Wyeth-Ayerst Lab.*,
    283 F.3d 315 (5th Cir. 2002) .............................................................................. 97

*Rivera-Muniz v. Horizon Lines Inc.*,
    737 F. Supp. 2d 57 (D. P.R. 2010) ...................................................................... 62

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) .......................................................................... 28

*Robert L. Kroenlein Trust v. Kirchhefer*,
    764 F.3d 1268 (10th Cir. 2014) .......................................................................... 64

*Robins v. Glob. Fitness Holdings, LLC*,
    838 F. Supp. 2d 631 (N.D. Ohio 2012) ............................................................... 82

*Roxane Labs., Inc. v. SmithKline Beecham Corp.*, No. CIV.A. 09-CV-1638,
    2010 WL 331704 (E.D. Pa. Jan. 26, 2010) ......................................................... 55

*Russo v. Ballard Med. Prods.*,
    550 F.3d 1004 (10th Cir. 2008) .......................................................................... 98

*Safe Streets Alliance v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) ..................................................................... passim

*Salinas v. United States*,
    522 U.S. 52 (1997) .............................................................................................. 90

*Sanders v. Francis*,
    561 P.2d 1003 (Or. 1971) .................................................................................. 121

*SAS v. Puerto Rico Tel. Co.*,
    48 F.3d 39 (1st Cir.1995) ................................................................................... 96

*Schachar v. Am. Academy of Ophthalmology, Inc.*,
    870 F.2d 397 (6th Cir. 1989) .............................................................................. 39

*Schmuck v. United States*,
    489 U.S. 705 (1989) ............................................................................................ 72

*Schneider v. City of Grand Junction Police Dep't*,
    717 F.3d 760 (10th Cir. 2013) ............................................................................ 87

*Schwartz v. Celestial Seasonings, Inc.*,
    124 F.3d 1246 (10th Cir. 1997) .......................................................................... 68

*Scott v. Honeywell Int'l Inc.*, No. 14-cv-00157-PAB-MJW,
   2015 WL 1517527 (D. Colo. March 30, 2015)................................................. 125

*Seabron v. Amer. Family Mut. Ins. Co.*, No. 11-cv-01096-WJM, KMT,
   2012 WL 1520156 (D. Colo. April 20, 2012)................................................... 125

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 499 (1985)............................................................................... 64, 65

Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP,
   806 F.3d 71 (2d Cir. 2015)........................................................................... 74

*Shearson/Am. Exp., Inc. v. McMahon*,
   482 U.S. 220 (1987).................................................................................... 65

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F.Supp.2d 380 (E.D.Pa.2010) ................................................................ 118

*Shifrin v. Associated Banc Corp*, No. 3:12-CV-00839-JPG,
   2013 WL 1192766 (S.D. Ill. Mar. 22, 2013) ................................................. 123

*Solevo v. Aldens, Inc.*,
   395 F. Supp. 861 (D. Conn. 1975)............................................................... 106

*Spectators' Commun. Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ....................................................................... 43

*Sports Racing Servs., Inc. v. Sports Racing Car Club of Amer., Inc.*,
   131 F.3d 874 (10th Cir. 1997) ...................................................................... 59

*Sprint v. Middle Man, Inc.*, No. 12-2159-JTM,
   2013 WL 1197137 (D. Kan. Mar. 25, 2013) ................................................... 57

*Stalker v. MBS Direct, LLC*, No. 10-11355,
   2011 WL 797981 (E.D. Mich. Mar. 1, 2011) ................................................ 114

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)......................................................................... 33

*State ex rel. Stephan v. Bhd. Bank & Tr. Co.*,
   8 Kan. App. 2d 57 P.2d 419 (1982) ............................................................ 101

*State v. Cottman Transmissions Sys., Inc.*,
   86 Md. App. 714, 587 A.2d 1190 (Md. 1991) ............................................... 101

*Suture Express, Inc. v. Cardinal Health 200, LLC*,
   963 F. Supp. 2d 1212 (D. Kan. 2013)................................................. 32, 42, 56

*Switzer v. Coan*,
   261 F.3d 985 (10th Cir. 2001) ...................................................................... 83

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006) ............................................................... 28, 64

*Tampa Elec. Co. v. Nashville Coal. Co.*,
   365 U.S. 320 (1961)................................................................................ 32, 33

*Tawfilis v. Allergan, Inc.*,
   157 F. Supp. 3d 853 (C.D. Cal. 2015) ................................................................. 96

*Thompson Med. Co. v. F.T.C.*,
   791 F.2d 189 (D.C. Cir. 1986) ......................................................................... 110

*Times-Picayune Pub. Co. v. U.S.*,
   345 U.S. 594 (1953) .......................................................................................... 59

*Transamerica Oil Corp. v. Lynes, Inc.*,
   723 F.2d 758 (10th Cir. 1983) ......................................................................... 107

*Trollinger v. Tyson Foods, Inc.*,
   370 F.3d 602 (6th Cir. 2004) ............................................................................ 90

*Tufts v. Newmar Corp.*,
   53 F. Supp. 2d. 1171 (D. Kan. May 27, 1999) ......................................... 107, 110

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.D.C. 2001) ............................................................................... 60

*United States v. Wenger*,
   427 F.3d 840 (10th Cir. 2005) ......................................................................... 106

*United States v. Burge*,
   711 F.3d 803 (7th Cir. 2013) ............................................................................ 75

*United States v. Capra*,
   652 F. App'x 632 (10th Cir. 2016) .................................................................... 71

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) .............................................................................. 34

*United States v. Gallant*,
   537 F.3d 1202 (10th Cir. 2008) ........................................................................ 87

*United States v. Gordon*,
   710 F.3d 1124 (10th Cir. 2013) ........................................................................ 75

*United States v. Harkonen*,
   510 Fed. App'x. 633 (9th Cir. 2013) ................................................................ 72

*United States v. Harris*,
   695 F.3d 1125 (10th Cir. 2012) ........................................................ 78, 80, 84, 90

*United States v. Hutchinson*,
   573 F.3d 1011 (10th Cir. 2009) ................................................................. passim

*United States v. Kamahele*,
   748 F.3d 984 (10th Cir. 2014) .......................................................................... 80

*United States v. Kennedy*,
   64 F.3d 1465 (10th Cir. 1995) .......................................................................... 73

*United States v. Killip*,
   819 F.2d 1542 (10th Cir. 1987) ........................................................................ 80

*United States v. Nat'l Ass'n of Sec. Dealers, Inc.*,
 422 U.S. 694 (1975) ................................................................................. 37

*United States v. Philip Morris USA Inc.*,
 566 F.3d 1095 (D.C. Cir. 2009) ............................................................... 72

*United States v. Rahseparian*,
 231 F.3d 1267 (10th Cir. 2000) ............................................................... 71

*United States v. Reich*,
 479 F.3d 179 (2d Cir. 2007) .................................................................... 75

*United States v. Ring*,
 628 F. Supp. 2d 195 (D.D.C. 2009) ......................................................... 75

*United States v. Sharp*,
 749 F.3d 1267 (10th Cir. 2014) ............................................................... 73

*United States v. Stewart*,
 872 F.2d 957 (10th Cir. 1989) ....................................................... 70, 73, 75

*United States v. Turkette*,
 452 U.S. 576 (1981) ................................................................................. 64

*United States v. v. Lawrence*,
 405 F.3d 888 (10th Cir. 2005) ................................................................. 73

*United States v. Washington*,
 634 F.3d 1180 (10th Cir. 2011) ............................................................... 72

*United States v. Welch*,
 327 F.3d 1081 (10th Cir. 2003) ......................................................... 70, 71

*United States v. Zander*,
 794 F.3d 1220 (10th Cir. 2015) ......................................................... 71, 72

*VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*,
 29 F. Supp. 2d 1253 (D. Kan. 1998) ....................................................... 68

*Votto v. Am. Car Rental, Inc.*,
 273 Conn. 478, 871 A.2d 981 (2005) ..................................................... 107

*Wallace v. Midwest Fin. & Mort. Servs., Inc.*,
 714 F.3d 414 (6th Circ. 2013) ................................................................. 88

*Wayman v. Amoco Oil Co.*,
 923 F. Supp. 1322 (D. Kan. 1996) ......................................................... 107

*Williams v. Duke Energy Int'l, Inc.*,
 681 F.3d 788 (6th Cir. 2012) ................................................................... 68

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969) ........................................................................... 34, 91

*ZF Meritor, LLC v. Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012) ............................................................. 31, 34

*Zobrist v. Coal-X, Inc.*,
708 F.2d 1511 (10th Cir. 1983) ......................................................................... 121

## Statutes

15 U.S.C. § 45(n) ........................................................................................................ 104

18 U.S.C. § 1341 ........................................................................................................... 70

18 U.S.C. § 1512(c) ...................................................................................................... 75

18 U.S.C. § 1515(1)(B) ................................................................................................. 75

18 U.S.C. § 1961(1) ...................................................................................................... 70

18 U.S.C. § 1961(5) ...................................................................................................... 76

18 U.S.C. § 1962(c) ...................................................................................................... 65

18 U.S.C. § 371............................................................................................................. 90

## Other Authorities

Ben Popken, *Industry Insiders Estimate EpiPen Costs No More Than $30*, NBC News, Sept. 6,
2016 (http://www.nbcnews.com/business/consumer/industry-insiders-estimateepipen-costs-
no-more-30-n642091) ................................................................................................ 8

Boyce, *et al., Guidelines for the Diagnosis and Management of Food Allergy in the United
States*: *Report of the NIAID-Sponsored Expert Panel*, 126 J. Allergy Clin. Imunol. 6, S19
(Dec. 2010) ............................................................................................................. 115

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure § 1300* (3d ed. 2004)
................................................................................................................................. 124

Charles Duhigg, *Outcry Over EpiPen Prices Hasn't Made Them Lower*, <u>New York Times</u>, June
4, 2017, available at: https://www.nytimes.com/2017/06/04/business/angry-about-epipen-
prices-executive-dont-care-much.html ......................................................... 86, 100

Dey Pharma, L.P., *Dey Pharma to Offer EpiPen 2-Pak and EpiPen Jr 2-Pak Exclusively*, PR
NEWSWIRE (Aug. 24, 2011), http://www.prnewswire.com/news-releases/dey-pharma-to-
offer-epipen-2-pak-and-epipen-jr-2-pak-exclusively-128306923.html .............................. 115

*Dosage and Administration*, MYLAN SPECIALTY L.P. (2016),
https://www.epipen.com/en/hcp/about-epipen/dosage-and-administration............................ 58

*Product Market Definition in Pharmaceutical Antitrust Cases: Evaluating Cross-Price Elasticity
of Demand*, 2011 Colum. Bus. L. Rev. 586 .......................................................... 59

## Rules

Fed. R. Civ. P. 9(b) ...................................................................................................... 68

## INTRODUCTION

This is an antitrust, civil RICO, and consumer protection class action brought by Plaintiffs and others in the United States who purchased or used the EpiPen, an epinephrine auto-injector ("EAI").[1] Since Mylan acquired the rights to the EpiPen in 2007, the Defendants[2] have manufactured, marketed, distributed, and sold the EpiPen in the United States. Pfizer manufacturers the EpiPen and reaps several hundred million dollars of revenue every year for doing so. Mylan sells, markets, and distributes the EpiPen in the U.S. Only in the U.S. do Mylan and Pfizer force consumers to purchase the EpiPen in a 2-Pak or not at all; beginning in August 2011 when Mylan and Pfizer imposed a "hard switch" to the 2-Pak on U.S. consumers using the fraudulent pretext that it was medically necessary.

Since 2009, the Defendants have faced competition from other EAI makers, as well as other potential generic competitors eyeing the market. This case is *not* about Defendants charging high prices because of a monopoly resulting from a drug patent; indeed, Defendants have patents only on one of many possible *delivery devices* for epinephrine (the drug delivered by the EpiPen), not epinephrine itself. Thus, but for their fraudulent and anti-competitive behavior, Mylan's price increases would have been undercut by competitors in an efficient, free market. Only because Mylan and Pfizer artificially restrained competition—and deceptively marketed the EpiPen 2-Pak

---

[1] "EpiPen" refers to EpiPen©, EpiPen 2-Pak©, EpiPen Jr. ©, EpiPen Jr. 2-Pak©, My EpiPen©, LIFE HAPPENS©, EpiPen4Schools©, Never-See-Needle©, and Be Prepared© (collectively or individually, the "EpiPen").

[2] Plaintiffs name as Defendants Mylan, N.V.; related entities Mylan Specialty L.P. and Mylan Pharmaceuticals, Inc. (collectively referred to as "Mylan"); and Pfizer, Inc; King Pharmaceuticals, Inc. ("King"); and Meridian Medical Technologies, Inc. ("Meridian") (collectively referred to as "Pfizer" or the "Pfizer Defendants"), which develop and manufacture the EpiPens sold by Mylan. Plaintiffs have also named as a Defendant Heather Bresch, who became President of Mylan N.V. in 2009 and Chief Executive Officer in 2012. Consolidated Class Action Complaint ("Compl.") (Doc. 60) ¶¶ 67-82.

as medically necessary—were they able to hike the price of the EpiPen 2-Pak and have U.S. consumers buy it. As Plaintiffs set forth in the Complaint, Defendants deployed their EpiPen price increases on the heels of their fraudulent and anti-competitive scheme. As a result, the methodically escalated price for the EpiPen from 2009 to 2016 is Plaintiffs' damages model, not—as Defendants insist—the only basis for this lawsuit.

Due to Defendants' unfair, anticompetitive, and deceptive conduct, the vast majority of Americans suffering from severe allergies have no choice in EAI devices—the only EAI device available to them is EpiPen. And not only do these consumers have no choice but to purchase an EpiPen, but they have no choice but to purchase a two-pack of EpiPens, at a grossly inflated supracompetitive price. Notably, this conduct is ongoing: Defendants' practices have not changed in the face of public outcry or this litigation.

The Complaint details how the Defendants have engaged in a coordinated pattern of anticompetitive, deceptive, and anti-consumer business practices to gain control of the EAI market. Plaintiffs' claims fall into one of three areas of law: Antitrust, RICO, and Consumer Protection.

The Complaint alleges that through a series of anticompetitive actions, Defendants protected and exploited their market power over life-saving EAI devices thereby enabling them to increase the price of their products six-fold from 2007 to 2016. As detailed below, these anticompetitive actions included exclusionary dealing with Pharmacy Benefit Managers, schools, and state-based Medicaid programs; reverse payments to potential generic competitors; sham filings with the FDA; extensive and questionable lobbying efforts; misrepresentations to medical providers; and buying favorable opinions from influential medical experts to deceptively remove consumers' ability to buy only one EpiPen. To remedy Defendants' wrongdoing, Plaintiffs bring six causes of action for violations of federal and state competition laws.

The RICO claim is based on the EpiPen Pricing Enterprise and a scheme to defraud U.S. consumers into paying an inflated price for the EpiPen, which climbed in price over 500%. The EpiPen Pricing Scheme was devised by the Mylan Defendants and implemented with Mylan and Pfizer working in tandem alongside the PBM Conspirators. As a generics company, Mylan typically makes low margins on high volumes of drug sales. The EpiPen, a specialty branded drug, therefore represented a unique, highly-profitable product. Recognizing this opportunity, Ms. Bresch and other executives decided to exploit the EpiPen to generate billions of dollars in fraudulent revenue for Mylan. Each member of the EpiPen Pricing Scheme shared in the financial windfall generated by the enterprise, and each RICO Defendant shared in the common purpose of forcing consumers to purchase the EpiPen at an inflated price and only in a 2-Pak.

Finally, the Complaint alleges conduct by Defendants that constitutes: (1) unfair, (2) deceptive, and (3) unlawful conduct, in violation of state consumer protection laws. Defendants, acting in concert and through a multi-pronged scheme, have exploited their dominant position in the market for EAIs to increase the price of the EpiPen, aggressively and repeatedly, to an extraordinary level that bears no reasonable relationship to the cost of development or production. The victims of Defendants' exploitive scheme are consumers suffering from a physical infirmity with life-threatening consequences. Many of those being taken advantage of, moreover, are children and their parents. Here, Defendants' misrepresentations and unfair practices were conducted in concert and towards a single end: securing a monopolistic increase in the price of EpiPen products.

Plaintiffs bring the Complaint on behalf of themselves and other consumers who purchased or acquired an EpiPen since January 1, 2009, and bring a number of related claims, including:

COUNT I.        Violations of Sherman Act §§ 1 and 2;

COUNT II.       Violation of the Clayton Act § 3;

COUNT III.      Violation of State Antitrust Statutes: Conspiracy;

COUNT IV.       Violation of State Antitrust Statutes: Monopolization;

COUNT V.        Violation of State Antitrust Statutes: Attempted Monopolization;

COUNT VI.       Violation of State Antitrust Statutes: Tying;

COUNT VII.      Violation of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962;

COUNT VIII.     Violation of state consumer protection laws; and

COUNT IX.       Unjust Enrichment (Count IX).

# FACTUAL BACKGROUD

Millions of Americans are at risk of experiencing anaphylaxis—a severe, rapid-onset and potentially deadly allergic reaction to a number of triggers, including, *inter alia*, insect stings, certain foods and food additives, certain biological and man-made agents, and medications.[3] The only recommended first-line anaphylaxis treatment is epinephrine, a synthetic adrenaline.[4] Upon onset of anaphylaxis, often non-medical personnel must deliver an intramuscular injection of epinephrine quickly, on the spot.[5] Access to and delivery of a controlled epinephrine dose in such cases is facilitated by portable ("EAIs").[6] Patients at risk for anaphylaxis are advised to carry an EAI at all times.[7]

Mylan acquired the exclusive right to market the EpiPen in 2007.[8] Pfizer is the exclusive supplier of EpiPens to Mylan through two of its wholly owned subsidiaries—King and Meridian—who manufacture the epinephrine and hold the EpiPen patents.[9] Since Mylan acquired the exclusive right to market the EpiPen in 2007, EpiPen's share of the EAI market has

---

[3] Compl. ¶¶ 2, 4, 8, 87-90; *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2017 WL 6524839, at *1 (D. Kan. Dec. 21, 2017) ("*Sanofi Order*"). Where Sanofi's allegations mirror the Complaint's here, Class Plaintiffs cite the Court's December 21, 2017 Memorandum and Order ("*Sanofi Order*") for ease of reference.

[4] *Id.* ¶ 95; *Sanofi Order* at 1. The actual cost of the drug epinephrine itself, which is not subject to patent, is roughly $1 per dose. Compl. ¶236.

[5] *Id.* ¶¶ 91-92.

[6] Id. ¶ 2; *Sanofi Order* at *1. In addition to EpiPen, other EAIs developed or marketed for sale, or for which FDA NDA or ANDA approval has been sought, include, but are not limited to, Adrenaclick, and Auvi-Q/e-cue, as well as generic forms thereof.

[7] Compl. ¶ 93; *Sanofi Order* at *1.

[8] Compl. ¶ 97.

[9] *Id.* ¶ 79. Pfizer also participates in the EAI market through its generic division Greenstone's distribution of the Adrenaclick generic EAI. *Id.* ¶ 101 n.16. Thus, Pfizer is also able to control a portion of the *de minimus* number of EAI competitor devices there are.

remained above 80% and, for years during the conspiracy alleged herein, has ranged from around 90% to just below 100% of the market.[10] During that same time and while the actual cost of epinephrine remained virtually unchanged, Defendants relentlessly hiked EpiPen prices over 600%, from $100 in 2007 to over $600 in 2016.[11] In 2015, Mylan announced that EpiPen was then generating net sales exceeding $1 billion annually for a second consecutive year, up from $200 million in annual EpiPen revenue in 2007.[12]

In order to maintain the EpiPen monopoly and the exorbitant revenues derived therefrom, Mylan and Pfizer engaged in a coordinated and multifaceted campaign to erect artificial anticompetitive barriers to EAI competition and mislead lawmakers, medical community members and anaphylaxis victims. Defendants accomplished this through several means.

### A.      Defendants Paid PBMs to Exclude Competition

During the Class Period, Defendants exploited their monopoly power by providing aggressive rebates and incentives to Pharmacy Benefit Managers ("PBMs") to exclude EpiPen competitors from their drug formularies (i.e., the list of prescription drugs covered by insurance at various pricing "tiers").[13] PBMs—third-party prescription drug program administrators for commercial health plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program, and state government employee plans—are the

---

[10] *Id.* ¶¶ 462-65; *see also Sanofi Order* at *2.

[11] Compl. ¶¶ 5, 348-64.

[12] *Id.* ¶¶ 388-89.

[13] *Id.* ¶¶ 152-98. Significantly, Mylan subsidized defendants rebate scheme, in part, by illegally classifying the EpiPen as a "generic" under federal Medicaid rebate requirements and, thereby, paying significantly lower Medicaid rebates than the law required. *Id.* ¶¶ 135-38, 187-89. Mylan then used those savings to pay anticompetitive exclusionary rebates to PBMs. *Id.*

"gatekeeper" between drug and medical supply manufacturers on the one hand, and health insurers and patients on the other.[14]

Assuming no other illegal (or legal) barriers to entry, market access and, thus, an EAI's success, is based almost entirely on drug formulary coverage, as set by PBMs.[15] Taking undue advantage of its market power during the Class Period, upon potential encroachment on Defendants' EpiPen market share, Mylan offered extremely high and unprecedented rebates and discounts to PBMs conditioned on EpiPen receiving exclusive or preferred placement on PBM formularies.[16] In short, Mylan paid to keep competitors out. A prominent example of how Defendants' rebate scheme excluded and harmed competition involves Sanofi's Auvi-Q EAI. As detailed in the Complaint and recently explained by the Court in upholding Sanofi's complaint:

> [S]hortly after Sanofi launched Auvi-Q®, Mylan began to offer large rebates (30% or higher) to third-party payors [such as commercial insurance companies, PBMs and state-based Medicaid agencies]. But, Mylan expressly conditioned the rebates on exclusivity. That is, Mylan required the third-party payors to exclude Auvi-Q® from the formularies and only offer EpiPen® to their enrollees. Using its monopoly market share and these large rebates, Mylan successfully coerced third-party payors to accept huge rebates in exchange for offering EpiPen® exclusively instead of foregoing those rebates and allowing Auvi-Q® to compete in the market.[17]

---

[14] Compl. ¶¶ 153, 155. As explained by the American Pharmacists Association, "PBMs are primarily responsible for developing and maintaining the formulary, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims." *Id.* ¶¶156, 153. PBMs determine the formulary for the vast majority of patients receiving benefits through a third-party payor. *Id.* ¶¶157. During 2013 to 2015, e.g., 71% of the U.S. EAI market consisted of patients covered by commercial third-party payors. *Id.*; see also *Sanofi Order* at *2.

[15] Compl. ¶¶ 1 58; *see also Sanofi Order* at *2.

[16] Compl. ¶¶ 165-68. Prior to the launch of Sanofi-Aventis LLC's ("Sanofi") EpiPen alternative, Auvi-Q, Mylan did not typically offer EpiPen-related rebates and when it had, they were low, often below 10%. *Id.* ¶ 176. In getting PBMs to exclude Auvi-Q from drug formularies, for example, Mylan increased rebate payments at least 100-200% more than paid prior to Auvi-Q's launch, if EpiPen-related rebates had been offered at all. *Id.* ¶ 177.

[17] *Sanofi Order* at *3 (footnote omitted); accord Compl. ¶¶ 169-87.

Adrenaclick—whose market share has ranged from only 2% in 2013 to 8% in 2016[18]—also was directly and adversely targeted by these anticompetitive rebate payments. As with the Auvi-Q and for the same reasons, the price of Adrenaclick likewise could not be increased such that margins could be inflated sufficiently to offer PBMs rebates or discounts similar to Mylan's.[19] For example, in at least 2014 and 2015, CVS Caremark added Adrenaclick to its Formulary Drug *Removals* list—thus effectively removing Adrenaclick as an EpiPen alternative for a significant portion of the market.[20] As at least one pharmaceutical industry analyst explains, "This meant that if your insurance company was their [the PBM's] customer, you would not be able to get the EpiPen alternative without paying full retail price."[21] Mylan admits to undertaking the aggressive EpiPen rebate scheme. As stated by Mylan CEO Heather Bresch ("Bresch") in a 2015 analyst call, "[W]e are maintaining [EpiPen] market share … [and] to do so, that required aggressive rebating…."[22]

At bottom, Defendants' conduct deprives patients of a fair price for epinephrine auto-injectors—a price that would result from the operation of normal market forces.[23] While Defendants maintain the ability to sell EpiPen products to the millions of Americans who depend on them, without having to lower "real" net prices to gain market share via formulary inclusion, instead, they bargain for that market share by providing ever-larger and unprecedented rebates

---

[18] Compl. ¶ 101.

[19] *Id.* ¶ 167.

[20] *Id.* ¶ 168.

[21] *Id.* ¶ 189 (citing Ben Popken, *Industry Insiders Estimate EpiPen Costs No More Than $30*, NBC News, Sept. 6, 2016 (http://www.nbcnews.com/business/consumer/industry-insiders-estimateepipen-costs-no-more-30-n642091).

[22] *Id.* ¶ 193.

[23] *Id.* ¶ 197.

and other kickbacks to PBMs and entering into exclusive relationships with those PBMs, inflating the prices paid by consumers for EpiPens in order to preserve their net realized price and sales volumes.[24] Mylan's "aggressive" EpiPen positioning within the dominant formularies is facilitated only by EpiPen's monopoly power which allows Defendants to charge consumers higher EpiPen prices, which it then shares with the formulary-creating PBMs through substantially enhanced rebates in exchange for excluding insurance coverage for rival products.[25] The net effect of this conduct is to harm the competitive process to the detriment of competitors and consumers alike, who are entitled to the benefits of robust and fair competition.[26]

> **B.     Defendants Entered into an Exclusive School Access Scheme**.

As a second unlawful undertaking, Defendants created an important EAI sub-market in American public schools and then, leveraging EpiPen's illegally maintained dominant market position, Defendants foreclosed competition in this submarket with Mylan's filling school EAI needs with free or discounted stock ***in exchange for entering into exclusive dealing contracts with those schools***.[27] During the Class Period, Mylan significantly upped its federal lobbying efforts with its primary objective being to gain access to parents, educators and medical professionals in public schools.[28] As part of that lobbying effort, Mylan spent a reported $4

---

[24] *Id.*

[25] *Id.* ¶ 198.

[26] *Id.*

[27] *Id.* ¶¶ 199-228; *see also Sanofi Order* at *3, 15.

[28] Compl. ¶¶ 202-04. While spending less than $2 million in lobbying for the prior six years combined, in 2008—just after acquiring exclusive EpiPen marketing rights and joining forces with Pfizer—Mylan raised its federal lobbying budget to $1.2 million annually and, excluding considerable state government lobbying expenses over this same time, has since spent nearly $12 million lobbying Capitol Hill alone. *Id.* ¶ 203.

million specifically (and successfully) lobbying for enactment of the School Access to Emergency Epinephrine Act, which gave federal funding priority to schools that stockpile EAIs.[29] The Act became law in 2013.[30] The lobbying efforts were enormously successful and—given EpiPen's market position—did not simply result in EAI access to schools but made the EpiPen virtually mandatory for schools in many states.[31]

Having secured the EAI stockpiling requirement, Mylan acted quickly to exclude competing EAIs from this valuable submarket.[32] As part of Defendants' scheme, Mylan launched the "EpiPen4Schools" program, in which it gave away free and discounted EpiPens to school districts that, under the law, now were required to (or were strongly encouraged to) stockpile the devices.[33] But, Mylan's free and discounted EpiPens were **_conditioned on_** each schools' entry into illegal exclusive dealing agreements with Mylan.[34] The purpose of these exclusive dealing agreements was singular in nature—to prevent competitor EAIs from accessing schools.[35] Later, when these illegal exclusive-dealing arrangements were exposed by

---

[29] _Id._ ¶ 207.

[30] _Id._

[31] _Id._ ¶¶ 205-06.

[32] _Id._ ¶ 213.

[33] _Id._ ¶¶ 213-14. The provision of discounted or free EpiPens may "sound like a generous thing" but, as concluded by at least one analyst, "we predict that Mylan is simply seeding the schools for automatic replenishment when the product expires." _Id._ ¶ 216.

[34] _Id._ ¶ 215. Schools taking part in the discounted EpiPen program had to certify in writing that the school "will not purchase any products that are competitive products to EpiPen® Auto-Injectors." _Id._

[35] _Id._ ¶ 222; _Sanofi Order_ at *3.

New York's Attorney General and members of the U.S. Senate announced investigations into the EpiPen4Schools program's anticompetitive terms, they were eliminated.[36]

### C.    Defendants' Worked Hand-in-Hand to Abuse the Judicial and Regulatory System for the Protection of their Monopoly.

Mylan and Pfizer have a unified interest in protecting the EpiPen monopoly.[37] Pfizer owns the patents protecting the EpiPen and is the contract supplier of the product.[38] Mylan owns the trademarked brand names, controls the worldwide EpiPen marketing and sales, and, as of 2014, took over from EpiPen patent owner Meridian EpiPen's Orange Book applicant sponsorship.[39] Their divided EpiPen intellectual property ownership and licensing agreements have caused the two companies to work in concert to enhance the product's sales volume and profitability.[40] Defendants' EpiPen-related revenues rise (or fall) together.[41] If the EpiPen patents are invalidated, or if other competitors gain market share, both stand to lose, and so they have stood together to fend off competitors and protect the EpiPen patents.[42] Thus, Mylan and Pfizer, working, as one industry commentator concluded, "hand-in-hand," undertook to use both patent litigation and the FDA regulatory process to erect barriers and delay EAI competition.[43]

**The Additional Questionable Patents:** Following Mylan's acquisition of exclusive EpiPen distribution rights in 2007, Defendants worked together to add to the already patented

---

[36] Compl. ¶¶ 221-24; *Sanofi Order* at *3.

[37] Compl. ¶ 241.

[38] *Id.*

[39] *Id.* ¶¶ 241, 247, 314.

[40] *Id.* ¶ 241.

[41] *Id.*

[42] *Id.*

[43] *Id.* ¶ 314.

EpiPen numerous additional—and questionable—patents designed not to enhance the product but to block generic competition.[44] Mylan CEO Bresch publicly admitted that Mylan and Pfizer were working together to obtain additional patents to act as an artificial "barrier" and "hurdle" to generic competition.[45]

With their additional patents in place—one of which, U.S. Patent No. 7,794,432, having been sought on a rushed basis upon announcement of Sanofi's providing financial support to Intelliject and having been obtained less than three weeks before Intelliject filed its e-Cue (i.e., Auvi-Q) New Drug Application ("NDA") with the Food & Drug Administration ("FDA")[46]—Defendants worked together to stop generic competition with Pfizer filing patent infringement lawsuits against the manufacturers of three generic EpiPen rivals (Sandoz, Teva and Intelliject) and then staying or entering into pay-for-delay settlements thereof.[47]

**The Teva Settlement:** In December 2008, Teva filed an Abbreviated New Drug Application ("ANDA") for FDA approval to market a generic EpiPen.[48] In August 2009, Pfizer, through its subsidiaries, sued Teva for infringing U.S. Patent No. 7,449,012.[49] The claim was amended in November 2010 to include alleged infringement of the '432 patent while, subsequent

---

[44] *Id.* ¶¶ 237-39.

[45] *Id.* ¶ 238 (stressing that **Mylan** was adding yet another patent to the already-patented EpiPen device in order to "put in another barrier to entry" and acknowledging the collective nature of EpiPen's patents and other intellectual property—EpiPen is a "drug of which **we** [i.e., Mylan and Pfizer] have IP and stuff around.")

[46] *Id.* ¶¶ 287-95.

[47] *Id.* ¶¶ 248-50.

[48] *Id.* ¶ 252.

[49] *Id.* ¶ 253 (*King Pharm., Inc., et al, v. Teva Parenteral Med., Inc., et al.*, No. 1:09-cv-00652 (D. Del. Aug. 8, 2009).

to that, Pfizer dropped all claims that Teva's generic EpiPen violated the '012 patent.[50]

Following discovery and a bench trial in March 2012, in which the questionable validity of the '432 patent was apparent, Defendants and Teva entered into a pay-for-delay settlement of the Teva litigation in April 2012 by which, Teva agreed to delay launch of its generic EAI for three years, until June 2015, in exchange for significant consideration, incentives and benefits.[51] Facts surrounding the settlement further support that it involved a substantial "reverse payment" to convince Teva to delay bringing its generic EAI to market, including:

- The Teva Court's *Markman* rulings on the interpretation of the '432 patent were favorable to Teva;[52]

- At the time of a settlement, a full bench trial had been conducted and further anticipated litigation expenses would have been marginal compared to expenses already incurred at the time of the settlement;[53]

- No rational economic actor with a viable product (and who had spent millions of dollars developing it) would refrain from entering a lucrative "blockbuster" market for 36 months unless it received monetary compensation in exchange for non-entry;[54]

- In 2012, the Federal Trade Commission ("FTC") reporting seeing "a record number of settlements involv[ing] potential pay-for-delay settlements" that year, and specifically that a majority of the settlements involving a "first filer," like Teva and its EAI generic, included payment of explicit compensation in return for delayed entry;[55]

---

[50] *Id.* ¶¶ 253-54.

[51] *Id.* ¶¶ 258-260, 263.

[52] *Id.* ¶ 265.

[53] *Id.*

[54] *Id.*

[55] *Id.* ¶¶ 267-69. Importantly, the FTC's findings concerning settlements that restricted generic entry and included explicit compensation therefor to the generic manufacturer are limited to that. That is, the FTC did ***not*** find that in similar settlements without "explicit compensation" that there was, in fact, no significant compensation or benefits exchanged to induce the entry delay. *Id.* ¶ 268, fn. 71.

- On the same day as the settlement, Mylan issued a joint announcement of the Teva settlement on both its own and Pfizer's behalf;[56]

- In a "surprise" development, according to at least some financial analysts following Teva, just four days after the Teva settlement announcement, Mylan and Teva announced the settlement of similar pending litigation in which Teva accused Mylan of infringing Teva's patents in conjunction with Mylan's ANDA to market a generic form the Teva's drug Nuvigil, by which Mylan would delay entry into the Nuvigil market until mid-2016. Procuring exchanged delayed generic market entry for EpiPen and Nuvigil—both of which see annual sales hovering around $1 billion—was an extremely lucrative result for both monopolies and valuable protection against generic competition;[57]

- The Teva settlement is under Congressional scrutiny as an illegal pay-for-delay settlement.[58]

Just as Defendants intended, the Teva settlement was strategically aimed at foreclosing all generic competition during the pendency of the Teva delay, given Teva's post-market-entry six-month exclusivity award under the Hatch-Waxman Act as the first generic challenger to EpiPen.[59] Because Teva's exclusivity period would not begin for at least three years after the settlement, Defendants effectively eliminated all generic competition during this same period and ensured the Pfizer and Mylan would continue to share millions of dollars in unlawful monopoly profits.[60] While also admitting Mylan's participation in the Teva settlement, Mylan CEO Bresch put it this way to analysts in July 2012: "[T]he runway [is now] absolutely clear for us through 2015, though *our* [i.e., Mylan and Pfizer's] settlement with Teva….,"[61]

---

[56] *Id.* ¶ 270.

[57] *Id.* ¶¶ 272-76.

[58] *Id.* ¶ 280.

[59] *Id.* ¶ 261.

[60] *Id.* ¶¶ 261-62.

[61] *Id.* ¶ 277.

**The Intelliject Settlement:** Similarly, when faced with another challenge to EpiPen's EAI market dominance, this time by a newly developed EAI by Intelliject, Defendants had Pfizer subsidiary King again initiate patent litigation against a competitor.[62] Intelliject was a company founded for a single purpose—to create a unique EAI to compete in that market, dubbed the e-cue (later, Auvi-Q).[63] In 2009, Sanofi announced it would be providing financial and marketing support to Intelliject in its continuing development of and acquisition of FDA NDA approval for the e-cue.[64]

In its action, Pfizer claimed that Intelliject's e-cue infringed the '432 patent, despite that the '432 patent was not obtained until September 24, 2010, well over a year after Intelliject began e-cue development and only two weeks before Intelliject filed its NDA, and despite the significant differences between the two devices.[65] Less than eight months after commencement of the Intelliject litigation, the FDA announced that it had given the e-cue tentative final approval, pending resolution of the patent litigation initiated by Pfizer.[66] This meant that except for the existence of the litigation, FDA's e-cue review was complete the e-cue NDA met FDA requirements to be approved.[67] The FDA tentative approval notwithstanding, the litigation continued for another six months before a settlement was announced—again, announced by

---

[62] *Id.* ¶¶ 285-93.

[63] *Id.* ¶¶ 286, 289.

[64] *Id.* ¶ 287. Given that the e-cue and EpiPen devices are substantially different in both shape and function, Intelliject did not pursue the more streamlined ANDA generic process. *Id.* ¶¶ 290-92. Instead, Intelliject submitted a New Drug Application (NDA) to the FDA on September 29, 2010, long after the e-cue's development had become public knowledge. *Id.* ¶ 289.

[65] *Id.* ¶ 294.

[66] *Id.* ¶ 296.

[67] *Id.*

Mylan jointly for Mylan and Pfizer.[68] Under the terms of the settlement, in exchange for

valuable consideration, Intelliject and Sanofi agreed to delay market entry for another nine

months, until November 2012.[69] Thus, Defendants litigation strategy blocked competition from

this potential competitor for almost two years.[70]

**The Sandoz "Stay-and-Delay" Agreement**: In 2010, another EAI competitor, Sandoz,

Inc. ("Sandoz") sought to enter the EAI market by filing an ANDA for its own generic EpiPen

alternative.[71] Consistent with their pattern when facing potential Teva and Intelliject

competition, Pfizer initiated patent litigation. The approach there, however, was to stall Sandoz's

ANDA by staying the action and, therefore, FDA approval and any definitive ruling on the

EpiPen patents, as of this date, indefinitely.[72] As in the other matters, Plaintiffs allege that Pfizer

obtained the stay in exchange for valuable consideration to Sandoz.[73] Then, with Teva's generic

EAI entry into the market looming, Defendants' took yet another anticompetitive step to stifle

generic competition even longer than they already had by misusing the FDA's Citizen Petition

process.

**FDA Citizen Petition Process Abuse**: As observed by leading antitrust scholar and

Rutgers University Professor Michael Carrier, "[t]he lifecycle of EpiPen reveals how Mylan used

citizen petitions along with settlements to delay generic [EAI] entry."[74] In 2015, Teva's EAI

---

[68] *Id.* ¶¶ 297-98, 301.

[69] *Id.* ¶¶ 298-99.

[70] *Id.* ¶ 300.

[71] *Id.* ¶ 302.

[72] *Id.* ¶¶ 302-03.

[73] *Id.* ¶ 303.

[74] *Id.* ¶ 310.

market entry was looming.[75] The years since the Teva pay-for-delay settlement, however, had proved by that time to be enormously profitable for Defendants. Indeed, it is reported that "'[f]or a billion-dollar drug product like the EpiPen, each day of delay mean[s] an extra $3 million.'"[76] Defendants now needed to create even more delay. Thus, it was decided that Mylan would upend the Teva ANDA application by filing a questionable Citizen's Petition with the FDA, raising purported problems with the Teva device.[77] A citizen's petition's purpose is to provide the public with a means of expressing perceived safety concerns with the FDA—not as a means of blocking generic competition.[78] But a citizen petition in this case by Mylan would guarantee additional delay, ensuring hundreds of millions of dollars in EpiPen-related sales for Defendants, and would come at relatively little cost given that there are no real adverse consequences to filing.[79]

As explained by Professor Carrier, Mylan filed a citizen petition on January 16, 2015, "a mere six months before Teva was scheduled (pursuant to the settlement) to enter the market":

> In its petition, Mylan contended that Teva should be required to demonstrate that its product was the 'same as' Mylan's EpiPen. In other words, even though the parties had already agreed through settlement to delay Teva's generic entry for more than three years, Mylan sought to *further* delay the entry of Teva's generic through its citizen petition.
>
> In addition to its January 2015 petition, the company waited almost *five months* after filing and only weeks before the FDA was required to respond, until May 2015, to supplement its petition with a 48-page independent study purportedly showing that patients would not use Teva's generic product correctly.
>
> Given that Teva's generic product had been in development for at least *six years* before the petition's filing, this late-filing of a supplemental study implicates

---

[75] *Id.* ¶ 304.

[76] *Id.*

[77] *Id.* ¶¶ 304-24.

[78] *Id.* ¶ 305.

[79] *Id.* ¶ 307.

significant timing questions. Why would such a study be submitted only weeks before the FDA was required to respond under the FDA's 150-day clock?[80]

Mylan's submissions to the FDA rested on fundamentally flawed studies and the medical opinions of a biased doctor who had previously received close to $100,000 in fees from Mylan— payments that were not disclosed.[81]

Regardless of when Teva would enter the EAI market, but for Defendants' anticompetitive litigation and regulatory process tactics, Teva would have entered the market much sooner, addressing any FDA concerns and obtaining FDA approval.[82] Moreover, as discussed above, Defendants achieved their intended goal of not only deterring Teva but also preventing numerous other potential generics companies from developing and launching competing products from 2009 to present.[83]

### D.    The Defendants Implement the EpiPen Pricing Scheme

The RICO claim is based on the EpiPen Pricing Enterprise and the scheme to defraud U.S. consumers into paying an inflated price for the EpiPen, which climbed in price over 500%.[84] The EpiPen Pricing Scheme was devised by the Mylan Defendants and implemented with Mylan and Pfizer working in tandem alongside the PBM Conspirators. As a generics company, Mylan typically makes low margins on high volumes of drug sales. The EpiPen, a specialty branded drug, therefore represented a unique, highly-profitable product.[85] Recognizing this opportunity, Ms.

---

[80] *Id.* (emphasis in original).

[81] *Id.* ¶¶ 312-13, 316-18.

[82] *Id.* ¶ 322.

[83] *Id.* ¶ 324.

[84] *Id.* ¶ 600.

[85] *Id.* ¶¶ 391, 610.

Bresch and other executives decided to exploit the EpiPen to generate billions of dollars in fraudulent revenue for Mylan.[86] Each member of the EpiPen Pricing Scheme "shared in the financial windfall generated by the enterprise, and each RICO Defendant shared in the common purpose of forcing consumers to purchase the EpiPen at an inflated price and only in a 2-Pak."[87]

The EpiPen Pricing Enterprise defrauded U.S. consumers into overpaying for the EpiPen. The Complaint sets forth numerous instances of mail fraud and wire fraud when Mylan launched the 2-Pak and when Ms. Bresch falsely testified before the U.S. Congress on September 21, 2016 (which also involved the corruption of an official proceeding, a separate RICO predicate act).[88] Among numerous false statements described with particularity, each mailing of the EpiPen 2-Pak in interstate commerce is a separate act of mail fraud.[89]

As alleged in the Complaint, Mylan's "scorched earth approach" involved a multi-pronged attack: "Mylan threatened, slandered, sued, and paid off its competitors; flooded the market with medically-unnecessary 2-Paks; fleeced Medicaid and the American public for hundreds of millions of dollars by lying to the government that its product was generic (while simultaneously enforcing its patent against competitors and reaping patent-level profits from the public); paid kickbacks to PBMs to secure preferred and exclusive placements on formularies, the lists of products covered by health insurance plans; and lobbied Congress to allow it sell the EpiPen to schools under

---

[86] *Id.* ¶ 610.

[87] *Id.* ¶ 644; see also id. at ¶ 648 ("Through the EpiPen Pricing Enterprise, the RICO Defendants and its members functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.").

[88] *Id.* ¶ 655, 659.

[89] I*d.*

contracts that expressly forbade the schools from purchasing products from its competitors."[90] Further, the RICO Defendants and the PBM Conspirators launched a campaign of false and misleading statements and actions to distract consumers and regulators from the reality that the RICO Defendants were raising the price of the EpiPen from $100 to $600.[91]

**The "Hard Switch" to the EpiPen 2-Pak:** A substantial part of the EpiPen Pricing Scheme hinged on the "hard switch" from selling a single EpiPen to forcing U.S. consumers to purchase the EpiPen 2-Pak or nothing at all.[92] Overnight, from August 24, 2011, to the next day, Mylan doubled EpiPen its revenues by forcing all consumers to buy two EpiPens instead of one, at double the price.[93] At the time, Bresch referred to the "hard switch" to the 2-Pak (among other things) as "big events that we've started to capitalize on."[94]

In doing so, Mylan usurped control from doctors and patients by forcing them to switch to buy the 2-Pak, even though individual EpiPens had been prescribed and sold in the U.S. without incident from 1987 to 2011,[95] and even though EpiPens must be replaced annually and nearly all of them expire without being used.[96] The EpiPen 2-Pak is just two individual EpiPens literally tied together with a grey piece of cheap plastic.[97] Mylan deceptively suggested that the 2-Pak was medically required, but this was a false pretext because: [1] the FDA did not require Mylan to sell

---

[90] *Id.* ¶ 656.

[91] *Id.* ¶¶ 655, 659.

[92] *Id.* ¶¶ 325-47, 662-671.

[93] *Id.* ¶ 669.

[94] *Id.* ¶ 334.

[95] *Id.* ¶¶ 325, 339.

[96] *Id.* ¶¶ 341, 671.

[97] *Id.* ¶ 666.

the 2-Pak; [2] no FDA guidelines accompanied the "hard switch" to the 2-Pak; [3] individual EpiPens are sold in every other country but the U.S.;[98] and [4] Mylan offers no medical instructions or guidelines in the packaging for patients to know if or when to administer the second back-up EpiPen.[99] On April 25, 2013, Mylan announced the 25th Anniversary of the FDA approval of the EpiPen, but it never listed any FDA approval of the EpiPen 2-Pak or provided any medical instructions on administering the back-up EpiPen in the 2-Pak.[100]

Profits, not medicine, drove the "hard switch." Mylan and Pfizer wanted to double their revenue, so that top executives would capture tens of millions in bonuses.[101] In fact, Mylan's top five executives paid themselves $82 million in secret bonuses and pillaged the company for over $300 million in "compensation" during the 2-Pak Scheme.[102] As Ms. Bresch orchestrated the EpiPen 2-Pak Scheme, her own salary jumped by 671%—from $2.5 million in 2007 to nearly $19 million in 2015—virtually lockstep with the soaring percentage increase in the price of EpiPen.[103]

In furtherance of the "hard switch" to the 2-Pak, Mylan engaged in an ongoing scheme to defraud that included numerous instances of mail fraud and wire fraud, detailed below.[104]

In the aftermath of the EpiPen Pricing Scheme, Mylan raised the price of the EpiPen. Without any concern of being undercut, Mylan was free to force consumers to purchase the 2-

---

[98] *Id.* ¶ 328-33, 337-39.

[99] *Id.* ¶ 330.

[100] *Id.* ¶ 667.

[101] *Id.* ¶ 668.

[102] *Id.* ¶¶ 387, 392.

[103] *Id.* ¶ 387.

[104] *Id.* ¶ 655.

Pak.[105] In October 2011, Mylan increased the price to $181.[106] By May 2016, the price jumped to $608.[107] Mylan's CEO, Heather Bresch, was quoted in the *New York Times* on August 27, 2016, as saying that the decisions surrounding the price of the EpiPen are "unconscionable."[108] She said, "I am a for-profit business. I am not hiding from that."[109] The RICO claim seeks to hold her to that statement.

### E.  Misrepresentations Pervade Defendants' Anticompetitive Conduct.

Throughout the Class Period, Defendants have inundated the public and government proceedings with false and misleading statements, and material omissions, in order to damage competing products and conceal the true nature of their anticompetitive conspiracy.

Seeking to impede competition, Defendants spread affirmatively false and misleading information about competing EAI devices. After having impeded competitor entry into the EAI market for years through unlawful means, Mylan engaged in a public misinformation campaign through presentations for key allergy advocacy groups, doctors, patients and caregivers designed to create the false impression that:

- The epinephrine in the Auvi-Q was not bioequivalent with that in the EpiPen, though the FDA had made that precise determination;

- EpiPen was the "preferred brand" for major health plans that do not cover, or provide limited coverage for Auvi-Q, despite that Mylan secretly paid anticompetitive rebates and provided other discounts to PBMs for exclusion or lesser positioning of Auvi-Q on PBM formularies; and

---

[105] *Id.* ¶ 354.

[106] *Id.* ¶ 355.

[107] *Id.* ¶ 360.

[108] *Id.* ¶ 371.

[109] *Id.* ¶ 372.

- Auvi-Q's formulary exclusion or positioning by PBMs was based on clinical recommendations rather than substantial conditional rebate payments.[110]

Defendants also made a number of false and misleading statements surround the "hard switch" to the EpiPen 2-Pak.

First, on August 24, 2011, Mylan issued from Basking Ridge, NJ, a press release entitled, "Dey Pharma to Offer EpiPen 2-Pak and EpiPen Jr 2-Pak Exclusively" with the sub headline: "Decision aligns with recent clinical guidelines for patients at risk for or who have experienced anaphylaxis to have immediate access to two doses of epinephrine."[111] As Plaintiffs allege, this press release (quoted in the Complaint and hyperlink provided at ¶ 336, n.94)—taken as a whole in context by reasonable persons—was fraudulent, misleading, or fraud by half-truth, because:

a. The NIAID study Mylan cited did not apply the general population. It applied only to a narrow subset: allergy sufferers who had already (1) been hospitalized for (2) a food allergy.

b. Despite purporting to rely on the WAO global standard, Mylan did not impose a forced sale of the EpiPen 2-Pak globally. In the same August 24, 2011 press release, in fact, Mylan stated: "The single EpiPen Auto-Injector package configuration will continue to be available outside of the U.S." Thus, the suggestion that the EpiPen 2-Pak was medically required was a fraudulent pretext.

c. Patients and their doctors already had "access to two doses of epinephrine."[112] Doctors could and often did write a prescription for two EpiPens. There was no need to mandate something patients could already purchase.

d. The medical guideline recited by Mylan did not state that only two doses of epinephrine should be sold. Instead, as a fraudulent pretext, Mylan used the vague statement by the allergy association (which it had already tainted by paying the members to endorse the 2-Pak) to provide a false pretext for selling only the 2-Pak.

e. Nothing mandated that Mylan sell the EpiPen exclusively as a 2-Pak or not at all.

f. No medical studies support the decision to sell the EpiPen exclusively as a 2-Pak.

---

[110] *Id.* ¶ 233.

[111] *Id.* ¶ 336.

[112] *Id.*

g.  From 1987 until 2011, the EpiPen was sold individually without incident, and nothing suddenly changed in 2011 that required Mylan to only sell the 2-Pak.

h.  When Mylan switched to the 2-Pak in 2011, it did not order a recall or insist that all U.S. EpiPen patients immediately go buy a second EpiPen. If, in fact, the second EpiPen was so critical for medical reasons, it would have done so.

i.  Mylan's global sales and marketing for the EpiPen prove the medical need was a false pretext. Even though Mylan's 2011 interstate wire relied on the World Health Organization, and there are over 190 countries in the world, in only one—the United States—did Mylan force customers to purchase a 2-Pak of the EpiPen.

j.  According to a study conducted by the American Academy of Allergy, Asthma & Immunology, only a "small number of patients . . . require a second dose" and "the device is mainly sold in packs of two due to imperfect product design" causing "14 percent of parents [to] . . . accidentally stick the needle in their own thumb instead of in their child's leg, as compared to zero percent of parents using" a competitor's product.

k.  Mylan offers no medical guidelines or instructions to EpiPen 2-Pak consumers within the EpiPen packaging or on the device regarding how or when to use or even how to store the second EpiPen in the 2-Pak.

l.  Mylan's evidence that between 1-20% of patients might need a second device makes no scientific sense. The margin of 1-20% is so wide as to be meaningless, and further evidences that Mylan stretched the facts to provide a false justification for the hard switch to the 2-Pak.[113]

Second, in its press release on August 24, 2011, Mylan deceptively suggested that its abrupt requirement that all U.S. consumers buy the 2-Pak was in line with the NIAID December 2010 report. Reading the whole report, however, exposes that Mylan flagrantly misrepresented the NIAID findings to manufacture a fraudulent pretext for the "hard switch." The NIAID's guidelines apply only to patients who have already suffered food allergy-induced anaphylaxis requiring hospital treatment. That is a tiny fraction of the patient population. The guidelines do

---

[113] *Id.* ¶ 339.

not support Mylan's imposition of a "hard switch" to the 2-Pak upon the *entire* U.S. population.[114]

Third, the NIAID panel relied on by Mylan to justify the "hard switch" to the 2-Pak was tainted by Mylan's financial contributions, which were made either via wire or mail. In the August 24, 2011 press release, Mylan quoted Dr. Phil Lieberman as insisting that "up to 20%" of patients need two as justification to mandate that all 100% of patients be forced to purchase a 2-Pak or nothing.[115] Thus, Mylan forces "up to" 80-99% of patients to purchase an unneeded back-up device that expires annually and costs an extra $300. Nor does Dr. Lieberman explain why all patients should be forced to buy a 2-Pak rather than just "a prescription which allows two doses."[116] Mylan paid for his pro-Mylan statements, which Plaintiffs uncovered.[117] At the time of the press release on August 24, 2011, Mylan and Dr. Lieberman concealed these payments.[118] This was deceptive.[119] Further discovery is necessary to uncover other financial contributions made by Mylan to the other members of the NIAID panel.

Fourth, each shipment and sale of the EpiPen 2-Pak (since August 24, 2011) constitutes a separate act of mail fraud because it is a use of the mails in furtherance of a scheme to defraud.[120]

---

[114] *Id.* ¶ 338.

[115] *Id.* ¶¶ 340-43.

[116] *Id.*

[117] *Id.* ¶ 344.

[118] *Id.* ¶¶ 345-46.

[119] *Id.*

[120] *Id.* ¶ 655(i).

**False Statements Regarding Coupons, Rebates, and Generics:** The Defendants also furthered the EpiPen Pricing Scheme and engaged in mail and wire fraud by making false statements about the coupons, rebates, and generic alternative to the EpiPen.[121]

**False Statements to Congress Under Oath:** To further the EpiPen Pricing Scheme, the Defendants also made numerous false statements to help cover up their fraud and deceive the public regarding the outrageous price increases of the EpiPen. These false statements (which constituted wire fraud and corruption of an official proceeding) confused the public regarding the EpiPen Pricing Scheme.[122]

Mylan's CEO Heather Bresch gave knowingly false testimony to Congress on September 21, 2016, to conceal the ongoing scheme to defraud perpetuated by Mylan and Pfizer—another predicate act. In doing so, she made repeated false statements under oath to Congress in order to corruptly influence the proceeding, conceal the ongoing EpiPen Pricing Scheme, and hinder Congress' investigation into the scheme to defraud. Before Ms. Bresch testified, she was required to sign a "Truth in Testimony" form.[123] In that form, she certified the veracity of her statements to Congress:

2. Please list any entity you are testifying on behalf of and briefly describe your relationship with these entities.

I am testifying for Mylan, N.V., for which I am the Chief Executive Officer, and testifying for Mylan, N.V.'s subsidiary, Mylan Specialty, L.P., which markets and sells the EpiPen® Auto-Injector.

… [portion of form regarding federal grants received omitted]

I certify that the above information is true and correct.
Signature:                                            Date: 19 SEP 15

---

[121] *Id.* ¶¶ 401-16.

[122] *Id.* ¶¶ 421, 432.

[123] *Id.* ¶ 419.

On September 21, 2016, in Washington D.C., before the United States Congress, she provided knowingly false testimony on several material issues. The Complaint catalogues the who, what, when, where, and how of the false statements made by Ms. Bresch when she was under oath at this official proceeding.[124] In sum, she:

- Misrepresented Mylan's profit off the EpiPen as only $50 per device when, in fact, the profit by Mylan is at least 60% higher.[125]

- Misrepresented that Mylan had invested over $1B in the EpiPen when, in fact, Mylan acquired the EpiPen in 2007 without conducting any research and development expenses.[126]

- Misrepresented that Mylan provided free EpiPens to over 66,000 schools "with no strings attached" when, in fact, Mylan attached anticompetitive strings that restricted schools from purchasing competitors' devices.[127]

- Misrepresented that Mylan has saved the U.S. $180B in health care costs.[128]

- Misrepresented that 85% of insured patients pay "nothing" for the EpiPen.[129]

Viewed collectively, the detailed allegations in Plaintiffs' Complaint make clear that they have plausibly alleged a decade-long scheme to monopolize the EAI market, and deceive consumers, regulators, and legislators, all in the name of pure greed.

---

[124] *Id.* ¶¶ 419, 421, 422-32, 442-47, 448

[125] *Id.* ¶¶ 422-27, 442-47.

[126] *Id.* ¶¶ 428-32.

[127] *Id.* ¶¶ 226-27.

[128] *Id.* ¶ 428-32.

[129] *Id.*

## LEGAL STANDARD

In resolving a Rule 12(b)(6) motion to dismiss, five rules govern the plausibility standard:

1.   The Court "accept[s] as true" the factual allegations alleged by plaintiffs.[130]

2.   All facts are viewed "in the light most favorable" to the plaintiffs.[131]

3.   "[A]ll reasonable inferences are indulged in favor of the plaintiffs."[132]

4.   Rule 8(a) "still lives" so "specific facts are not necessary" and plaintiffs "need only give the defendant fair notice of what the claim is and the grounds upon which it rests."[133]

5.   In the *Iqbal/Twombly* era, it remains a "bedrock principle" that a district court "must accept all allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven true."[134] The term "plausible" does not and cannot mean "'likely to be true.'"[135] To the contrary, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"[136]

## ARGUMENT

**I.     The Complaint Plausibly Pleads Antitrust Violations.**

Through a series of anticompetitive actions, Defendants protected and exploited their market power over life-saving EAI devices thereby enabling them to increase the price of their products six-fold from 2007 to 2016. These anticompetitive actions included exclusionary dealing with Pharmacy Benefit Managers, schools, and state-based Medicaid programs; reverse payments to potential generic competitors; sham filings with the FDA; extensive and

---

[130] *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

[131] *Id.*

[132] *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006).

[133] *Id.*; *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting Erickson v. Pardus, 551 U.S. 89 (2007).

[134] *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

[135] *Id.*

[136] *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

questionable lobbying efforts; misrepresentations to medical providers; and buying favorable opinions from influential medical experts to deceptively remove consumers' ability to buy only one EpiPen.[137] Plaintiffs bring six counts for violations of federal and state competition laws.[138]

In their motion to dismiss, Defendants pick at discrete allegations of the overarching antitrust violations. This is improper and "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."[139] And while Defendants' imply a heightened standard of review, the Court evaluates antitrust claims no differently than other claims: "[A]ntitrust cases are not subject to a standard requiring 'heightened fact pleading of specifics.' Instead, an antitrust Complaint must allege 'only enough facts to state a claim to relief that is plausible on its face' sufficient to "nudge[ ] the [ ] claims across the line from conceivable to plausible.'"[140] Other courts, too, have "cautioned against converting *Twombly*'s mandates into a requirement that antitrust plaintiffs provide evidentiary support or set forth other 'plus factors' to demonstrate the plausibility of their Sherman Act claims."[141]

Moreover, as detailed below, each of Defendants' attempts to evade liability is without merit—particularly in light of this Court's ruling in the *Sanofi* matter. Many of the arguments

---

[137] *See, e.g.*, Compl. ¶ 148.

[138] Plaintiffs bring claims for Violations of Sherman Act §§ 1 and 2 (Count I); Clayton Act § 3 (Count II); State Antitrust Statutes: Conspiracy (Count III); State Antitrust Statutes: Monopolization (Count IV); State Antitrust Statutes: Attempted Monopolization (Count V); and State Antitrust Statutes: Tying (Count VI).

[139] *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

[140] *Sanofi Order*, 2017 WL 6524839, at *4 (internal quotations omitted)

[141] *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549 (1st Cir. 2016) (internal quotations omitted).

Defendants make here were found unpersuasive in that coordinated matter, such as its exclusive dealing contracts with Pharmacy Benefit Managers are an insufficient basis to support a claim, Defendants' deceptive speech is an insufficient basis to support a claim, and Defendants were not the cause of Sanofi's inability to enter the market.[142] Defendants' other arguments are based on incorrect statements of law or "merely foreshadow factual disputes that the court cannot resolve on a motion to dismiss."[143]

### A. The Complaint Adequately Pleads Claims Based on Mylan's Exclusive Dealing Contracts with Pharmacy Benefit Managers and Schools.

Mylan makes four primary arguments in seeking to avoid liability based on its exclusive dealing contracts with Pharmacy Benefit Managers and schools: (1) that Plaintiffs' claims fail the "price-cost" test; (2) that Plaintiffs have not properly alleged that Mylan's EpiPen4Schools contracts foreclosed a substantial share of the market; (3) that Mylan's conduct did not cause Sanofi's exit from the market; and (4) that Plaintiffs have not properly alleged harm to competition. These arguments should be familiar—each was considered and rejected by the Court in its Order on Mylan's motion to dismiss the *Sanofi* Complaint.[144] Accordingly, the doctrine of issue preclusion bars Mylan from successfully seeking dismissal of Class Plaintiffs' Complaint.[145] But even without preclusion, there is no reason to reach a different result here.

---

[142] *Sanofi Order*, 2017 WL 6524839, at *19.

[143] *Id.*

[144] *Id.* at *14-19.

[145] "Issue preclusion bars reconsideration of an issue that has been previously decided in an earlier action when the following elements are met: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *Martinez v. Hooker*, 601 F. App'x 644, 647 (10th Cir. 2015) (internal quotation omitted).

1.      **The price-cost test does not apply to Plaintiffs' exclusive dealing claims.**

In *Sanofi*, this Court correctly noted that the price-cost test applies to an exclusive dealing claim only when "price is the clearly predominant mechanism of exclusion . . . ."[146] In finding that the price-cost did not apply since the *Sanofi* Complaint did not rely "solely on the exclusionary effect" of Mylan's pricing to support its claims based on Mylan's rebates to PBMs, the Court identified numerous important factual allegations that are also present in Plaintiffs' Complaint.[147] For example, as in *Sanofi*, the Complaint here alleges that:

- Mylan leveraged its 90%+ market share by offering extreme rebates to PBMs in return for excluding Sanofi's competing product, the Auvi-Q. ¶ 177.

- Mylan specifically targeted the Auvi-Q for complete exclusion from formularies. ¶¶ 178-79.

- No legitimate business reason existed for Mylan's conditional rebates other than its intent to block Auvi-Q from the EAI market. ¶ 178.

- Mylan prevented competitors from accessing the formularies of two PBMs, Express Scripts and CVS Caremark, that together covered more than 50% of the nationwide PBM market for EAI drug devices. ¶¶ 162, 168.

- Due to the Auvi-Q's less-favored formulary position (where it was even able to gain formulary access), Mylan's rebates to PBMs unlawfully increased Sanofi's cost to enter the EAI market if it wanted to match Mylan's $0 co-pay coupons. ¶ 172.

- Once Mylan's exclusive dealing contracts were in place, it sent misleading statements to physicians describing the EpiPen as "preferred" for 99% of patients whereas Auvi-Q was "preferred" for only 2%; although Mylan framed these preferences as based on quality, they were in fact due to its rebates. ¶ 232-35.

Based on these allegations, the Court rightfully concluded that the price-cost test did not apply to Sanofi's exclusive dealing claims.[148] There is no reason to reach a different result here.

---

[146] *Sanofi Order*, 2017 WL 6524839, at *6 (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)).

[147] *Sanofi Order*, 2017 WL 6524839, at *7.

[148] *Id.*

### 2. The Complaint pleads that Mylan's exclusionary contracts foreclosed competition in a substantial share of the EAI market.

An exclusive dealing claim requires a plaintiff to allege facts sufficient to support a finding that "performance of the contract will foreclose competition in a substantial share of the line of commerce affected."[149] The Complaint alleges that Mylan's exclusionary rebates to PBMs prevented competitors from accessing the formularies of PBMs covering at least 50% of the market.[150] And, as the Court has already recognized, "One plausibly could infer from the facts alleged that Mylan intentionally and successfully prevented Auvi-Q from developing a 'critical mass' of customers that would allow them to compete against Mylan—the dominant player in the market with a market share that exceeded 90%."[151] It is equally plausible to infer that Mylan's exclusive dealing contracts with schools—giving it access to an influential customer demographic—foreclosed competition in a substantial share of the relevant market.[152] Mylan's arguments to the contrary should be rejected for three reasons:

First, "[t]he question whether the alleged exclusive dealing arrangements foreclosed a substantial share of the market requires the court to weigh various factors, and that is not a proper function for the pleading stage."[153] The Supreme Court requires that substantiality be determined by "weigh[ing] the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of

---

[149] *Tampa Elec. Co. v. Nashville Coal. Co.*, 365 U.S. 320, 327 (1961).

[150] Compl. ¶¶ 162, 168.

[151] *Sanofi Order*, 2017 WL 6524839, at *10.

[152] Mylan does not argue in its brief that the Complaint fails to allege foreclosure of competition in a substantial share of the market with respect to Mylan's rebates to PBMs.

[153] *Id.* at 10 (citing *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1229 (D. Kan. 2013)).

commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein."[154]

  Second, Mylan's argument asks the Court to evaluate the share of the market foreclosed through its school contracts separately from the share of the market foreclosed through its PBM contracts. Doing so is improper where the conduct challenged—extreme rebates in return for exclusivity—is effectively the same. Instead, what matters is the total share of the market foreclosed by all of Mylan's exclusive dealing contracts, and not the particular share attributable to any one sub-set of purchases.[155]

  Third, in any event, the Complaint includes sufficient allegations from which substantial market foreclosure can be inferred. Access to schools was critical for any potential competitor that sought, or might seek, to introduce its own epinephrine auto-injectors and Mylan gave hundreds of thousands of "free" EpiPens to over 60,000 schools to control the market.[156] It is also reasonable to infer that each additional school that participated resulted in more consumers (i.e., parents) brought under the EpiPen umbrella—meaning that share of the market foreclosed extended beyond just the schools themselves. It is no surprise, then, that the New York Attorney is investigating Mylan's EpiPen 4 Schools practices.[157]

---

[154] *Tampa Elec.*, 365 U.S. at 329.

[155] *Cf. Continental Ore*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

[156] Compl. ¶¶ 201-26. Mylan reports it sent schools "over one million" EpiPens. Mylan Br. 19.

[157] Compl. ¶ 222. Allegations concerning of the existence of ongoing governmental investigations are regularly considered in determining whether plaintiffs have plausibly alleged a claim for relief. *See, e.g.*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010).

"Exclusive dealing arrangements are of special concern when imposed by a monopolist."[158] Where there are disputes as to both the size and substantiality of the share of the market foreclosed by a monopolist's exclusive dealings, they should be resolved in favor of the plaintiff—especially so at the motion to dismiss stage.

### 3.    The Complaint adequately pleads causation with respect to the effect of Mylan's anticompetitive exclusive dealing contracts.

Mylan next argues that Plaintiffs' claims fail because "Sanofi's failure to compete resulted from factors unrelated to Mylan."[159] Citing the *Sanofi* Complaint, Mylan contends that Sanofi's voluntary recall of the Auvi-Q in October 2015 for manufacturing issues is the real reason that competition between the EpiPen and Auvi-Q ended. But, as the Court is aware, Sanofi alleges otherwise.[160] The law does not require a plaintiff to show that the defendant's conduct is the only cause of harm to competition.[161] Mylan's competing factual reason for the cause "merely foreshadow[s] factual disputes that the court cannot resolve on a motion to dismiss."[162] The Court rejected Mylan's argument once before, and it should do so again.

### 4.    Mylan's exclusive dealing contracts harmed competition.

Similarly, Mylan also argues—as it did in *Sanofi*—that Plaintiffs have not adequately alleged harm to competition. To survive a motion to dismiss, an antitrust plaintiff must allege that the defendant's challenged conduct "produced increased prices, reduced output, or otherwise

---

[158] *ZF Meritor*, 696 F.3d at 271 (citing *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005)).

[159] Mylan Br. 17.

[160] *See Sanofi Order*, 2017 WL 6524839, at *4.

[161] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden . . . .").

[162] *Sanofi Order*, 2017 WL 6524839, at *19 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

affected the quantity or quality of the product."[163] <u>First</u>, the Complaint alleges that in

conjunction with and as a result of its anticompetitive activities, Mylan was able to raise the

price of the EpiPen from approximately $100 for two EpiPens in 2007 to over $600 in 2016.[164]

These price increases, once implemented, allowed Mylan to share its monopoly profits with

PBMs through larger rebates for excluding rival products.[165] <u>Second</u>, Mylan's conduct reduced

consumer choice and the quality of EAI devices on the market because consumers in a

substantial share of the market were unable to access the Auvi-Q and other EpiPen

competitors.[166] Allegations that a defendant prevented a competing product from reaching

consumers alone is sufficient to constitute harm to competition.[167]

### 5.   Mylan's exclusive dealing contracts with state-based Medicaid programs are not immune from scrutiny.

The Complaint also alleges that Mylan violated antitrust law by offering steep rebates to

Medicaid in return for removing a competing EAI (the Auvi-Q) from their formularies.[168] Mylan

argues that its exclusive dealing contracts with state-based Medicaid providers are entitled to

*Noerr-Pennington* immunity.[169] Although the Court found *Noerr-Penning* applicable in *Sanofi*

on the basis of its allegations, the differences in the Complaint here require a different result.

---

[163] *Id.* at *15 (citing *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984); *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012)).

[164] Compl. ¶¶ 349-60.

[165] *Id.* ¶¶ 165-66.

[166] *Id.* ¶¶ 168, 491.

[167] *Sanofi Order*, 2017 WL 6524839, at *16, n.8

[168] *Id.* ¶¶ 179-181.

[169] Mylan Br. 13, n.13.

<u>First</u>, there is a factual question as to whether the misrepresentation exception to *Noerr-Pennington* immunity applies. In its *Sanofi* Order, the Court found that the *Sanofi* complaint did not link the misclassification scheme to states' decisions to exclude the Auvi-Q.[170] But here, the Class Plaintiffs' Complaint <u>does</u> allege that Mylan's misclassification of the EpiPen as a non-innovator drug (which allowed Mylan to underpay rebates to states) influenced state-based Medicaid agencies' decision to agree to exclude the Auvi-Q in exchange for rebates.[171] Although the misclassification subsidized Mylan's higher rebates offered in return for exclusivity (by making those rebates possible), state benefit managers mistakenly expected that they would be able to get both rebates once Mylan was forced to classify the EpiPen correctly. Thus, "the outstanding underpaid rebates led benefit managers to continue favoring the EpiPen over competitors in the expectation of receiving a large make-up payment if and when Mylan was forced to classify the EpiPen as a brand."[172]

<u>Second</u>, because Mylan's conduct had little to do with furthering First Amendment goals or promoting informed government decision-making, allowing immunity is not in alignment with *Noerr's* core principles. "[G]iven the context and nature of the conduct, it can more aptly be characterized as commercial activity with a political impact. . . [;] the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact."[173] Mylan simply leveraged its monopoly power and ill-gotten misclassification

---

[170] *Sanofi Order*, 2017 WL 6524839, at *12 ("Sanofi never asserts that Mylan's alleged misclassification of the EpiPen influenced a government agency's decision to agree to exclude Auvi-Q in exchange for the rebates, or that the alleged misclassification otherwise affected a governmental agency's decision to participate in the exclusive rebate program.")

[171] *See* Compl. ¶¶ 185-88.

[172] *Id.* ¶ 188.

[173] *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 507 (1988).

savings to strong-arm a group of buyers in the marketplace. That is commercial activity—not the "political activity" that *Noerr* protects.

Third, after discovery, the Court may determine that the facts are such that Mylan's conduct with respect to state-based Medicaid programs is in fact entitled to immunity. But the Complaint alleges facts sufficient to show otherwise. Because exemptions from antitrust liability are narrowly construed,[174] this early stage is not the appropriate time for such a decision.

### B.     Mylan's Misrepresentations and Deceptions are Valid Bases for Liability.

Mylan contends—as it did in opposing the Sanofi Complaint—that Plaintiffs' assertions regarding Mylan's deceptive statements to physicians, the public, governmental agencies, and Congress regarding the bioequivalence and efficacy of competing EAI drug devices cannot give rise to antitrust liability.[175] This Court denied Mylan's prior motion to dismiss the Sanofi Complaint on these grounds, and its arguments should be rejected here as well.[176]

Mylan's first argument, that "allegedly deceptive speech . . . almost never provides a basis for an antitrust claim" is squarely wrong.[177] As this Court has held, many "courts have recognized that deceptive speech can support Sherman Act claims."[178] Mylan's misrepresentations included: (1) funding and promoting a misleading study intended to undermine the FDA's conclusion that Auvi-Q demonstrated bioequivalence to the epinephrine in EpiPen; and (2) making misleading statements to physicians touting EpiPen as the "preferred"

---

[174] *See United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 737 (1975).

[175] *See, e.g.*, Compl. ¶¶ 6, 229, 232-35 (setting forth false and deceptive statements).

[176] *See Sanofi Order*, 2017 WL 6524839, at *14.

[177] Mylan Br. 32.

[178] *Sanofi Order*, 2017 WL 6524839, at *12 (internal quotations omitted) (referencing cases).

brand and promoting Auvi-Q's status as "Not Covered," deceptively suggesting that the decision

to exclude Auvi-Q from formularies was based on clinical recommendations and not on Mylan's

conditional rebate offers. Mylan similarly gave the misimpression that the EpiPen was the only

safe and effective EAI drug device design in citizen petition proceedings before the FDA. These

are precisely the types of misrepresentations that support antitrust claims.

Mylan also contends that the Complaint's allegations are insufficient to "overcome a

presumption that the[ir] effect on competition…was *de minimis*.[179] There are two problems with

this argument. <u>First</u>, the cases on which Mylan relies involve businesses bringing suit against

their competitors, all claiming they lost business as a result of the misrepresentations.[180] Not one

case applies the presumption or the rebuttal test to consumer antitrust claims. This is not

surprising: the rebuttal test requires evidence that the competitor could not have successfully

combatted the false statements—evidence that only a competitor, and not a consumer, would

possess.[181] The presumption is thus not appropriate in the consumer-plaintiff context.

<u>Second</u>, to the extent a *de minimis* presumption does apply, whether Plaintiffs can rebut

that presumption requires a consideration of evidence that cannot be undertaken on motion to

dismiss. Plaintiffs, if required to rebut any asserted presumption in this case, "should be allowed

to go forward with the discovery process to substantiate [their] claim[s]."[182]

---

[179] *See* Mylan Br. 33.

[180] *See Lenox v. MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114 (10th Cir. 2014); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 371 (6th Cir. 2003); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997); *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs*, 850 F.2d 904, 916 (2d Cir. 1988); *Eisai Inc. v. Sanofi-Aventus U.S., LLC*, No. 08-4168, 2014 WL 1343254 (D.N.J. March 28, 2014).

[181] *See, e.g.*, *Lenox*, 762 F.3d at 1127.

[182] *Sanofi Order*, 2017 WL 6524839 at *13 (citation omitted); *see also Ayerst Labs*, 850 F.2d at 916-17 (plaintiffs should be given the opportunity to develop their evidence; satisfaction of the

Finally, to the extent Plaintiffs are required to overcome any asserted presumption, they have done so here. Plaintiffs allege that Mylan's misleading statements to physicians and to the public in press releases and before Congress are clearly false and material, and were not readily subject to offset by competitors, since Mylan's tactics successfully blocked all competitors to the EpiPen;[183] were likely to induce reasonable reliance by buyers who did not have knowledge of the subject matter;[184] and continued for prolonged periods.[185] These allegations are sufficient to overcome any asserted presumption at the pleading stage.[186]

### C.  Mylan's Sham Citizen's Petition and Supplement Study are not Immune.

Mylan also raises the *Noerr-Pennington* doctrine in an effort to immunize its citizen's petition that delayed entry of competitors' devices into the market. However, *Noerr-Pennington* does not apply where activity "if the purported effort to influence or obtain government action is in fact only an attempt to interfere with the business relationships of a competitor."[187] This "sham exception" also covers a systematic pattern or "overall course of conduct" that includes

---

test cannot be decided on a motion to dismiss). Indeed, all of the cases Mylan relies upon were decided at the summary judgment stage or on post-trial motions. *See Am. Council of Certified Podiatric Physicians*, 323 F.3d at 371 (summary judgment); *Eisai*, 2014 WL 1343254, at *1 (summary judgment); *Four Corners Nephrology Assocs., P.C. v. Mercy Medical Center of Durango*, 582 F.3d 1216, 1220 (10th Cir. 2009) (summary judgment); *Harcourt*, 108 F.3d at 1151 (after jury trial); *Lenox*, 762 F.3d at 1126-27 (summary judgment reversed and remanded); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) (appeal after 8 week jury trial); *Schachar v. Am. Academy of Ophthalmology, Inc.*, 870 F.2d 397, 400 (6th Cir. 1989) (jury verdict after "a month of trial").

[183] Compl. ¶¶ 6, 137-139, 142, 147-347, 411-415, 450-452.

[184] *Id.* ¶¶ 127, 229-235, 258, 264, 298, 318, 336-347, 358, 401-403, 417-457, 502-514.

[185] *Id.* ¶¶ 165, 174, 322-324, 350.

[186] *See Ayerst*, 850 F.2d at 916; *Sanofi Order*, 2017 WL 6524839, at *13-14.

[187] *Sanofi Order*, 2017 WL 6524839, at *11 (citation omitted).

anticompetitive misuse of the government process.[188] Similarly, misrepresentations or efforts to

mislead decision-makers in an attempt to secure government action also lack *Noerr*

protection.[189]

"A meritless [citizen's] petition, submitted to impose undue delay and expense on a rival,

will subject a defendant to antitrust liability."[190] To achieve delay and block competition, Mylan

filed a Citizen Petition with the FDA against Teva's generic EAI drug device in January 2015—

just six months before Teva was scheduled (pursuant to the parties' pay-for-delay settlement) to

enter the market.[191] The timing of Mylan's Citizen Petition reveals its sham nature. Despite

being fully aware of the specifications and operation of the Teva device through its patent

infringement litigation, Mylan waited over two years until January 16, 2015, to submit its Citizen

---

[188] *See In the Matter of Bristol-Meyers Squibb Co.*, FTC Dkt. No. C-4076 (2003) (analysis to aid public comment), available at https://www.ftc.gov/sites/default/files/documents/cases/2003/03/bristol myersanalysis.htm ("[R]epeated filing of patents on the Orange Book without regard to their validity, enforceability, or listability; repeated filing of recklessly or deliberately false statements with government agencies; and filing of lawsuits brought with or without regard to the merits, also cause the actions challenged here to fall outside the scope of *Noerr*'s protection").

[189] *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."); *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) (a misrepresentation or omission "threatens the fair and impartial functioning" of the proceeding and "does not deserve immunity from the antitrust laws").

[190] *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07 Civ. 7343, 2008 WL 169362, *4 (S.D.N.Y. Jan. 18, 2008). Mylan overlooks this motion to dismiss ruling, and instead cites to a less-relevant (for pleading purposes) post-jury trial opinion from the same court. *See* Mylan Br., at 30 (citing *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, 2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009). Defendants' other cited authorities are distinguishable as well. *In re Lipitor Antitrust Litig.*, MDL No. 2332, 2013 WL 4780496, at * 22 (D.N.J. Sep. 5, 2013), relied on volumes of materials indicating that the citizen petition at issue was supported by scientific evidence and was duly considered on its merits by the FDA. 2013 WL 4780496, at * 22 (D.N.J. Sep. 5, 2013). *Prof. Real Estate Investors, Inc., v. Columbia Pictures Indust., Inc.*, 508 U.S. 49, 60-61 (1993), was decided at summary judgment.

[191] Compl. ¶¶ 304, 311.

Petition.[192] By gaming the citizen petition process and its timelines, Mylan disrupted Teva's

trajectory toward FDA approval and improperly gained an extended monopoly in which Mylan

could raise prices on consumers without fear of increased generic competition.[193]

Then, after submitting its petition in January 2015, Mylan waited another five months

until the eve of the 150-day period upon which Teva could begin marketing its device to

supplement its petition with a 48-page report purportedly showing that patients would not use

Teva's generic product correctly.[194] By filing the supplement when it did, Mylan hoped to

further extend the time the FDA would need to review its entire petition.[195] The "supplemental

study," moreover, was deficient and flawed, and also a sham.[196] Further demonstrating Mylan's

improper use of the Citizen Petition process, the petition relied on a medical statement from a

captive and biased medical professional, Dr. Eli Meltzer, who was paid approximately $95,000

in fees in 2014 and 2015 by Mylan.

These facts plausibly allege that Mylan's Citizen Petition was both (1) objectively

baseless and (2) a concealed attempt by Mylan to interfere directly with a competitor's business

relationships by using the FDA citizen petition process.[197] Here, moreover, Mylan's petition

activities arose in a context that involved numerous other anticompetitive actions, *i.e.* its repeated

efforts to spread misinformation about the efficacy and bioequivalence of competing EAI drug

---

[192] *Id.* ¶ 311

[193] *Id.* ¶ 322.

[194] *Id.* ¶ 311.

[195] *Id.* ¶¶ 313, 314, nn.85, 86.

[196] *Id.* ¶ 313. Among other things, the "study" lacked a control group; did not use Teva's actual device in the study; study participants were not given the proper instructions for the device; and study participants did not actually use the device. *Id.* ¶¶ 316, 317.

[197] *See Louisiana Wholesale Drug*, 2008 WL 169362, at *3-4.

devices. Mylan imbued its Citizen Petition with similar misinformation, purposefully misrepresenting the efficacy of competing devices. Mylan's alleged misuse of the citizen petition *process*—rather than its *outcome*—was timed with one overarching goal in mind: to block and delay competitors from entering the EAI drug device market. Accordingly, the Court should deny Mylan's motion to dismiss.

### D.  Defendants' Conspiracy is Plausibly Inferred from the Complaint's Allegations.

Plaintiffs plausibly allege a conspiracy between Mylan and Pfizer that allowed the maintenance of supra-competitive EpiPen pricing. The Complaint is replete with allegations from which a plausible inference can be drawn that Defendants had "a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme."[198] At the motion to dismiss stage, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement…; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[199]

In the Tenth Circuit, "[t]he character and effect of a conspiracy is not to be judged by viewing its separate parts, but only by looking at it as a whole."[200] "[T]he more economically rational a conspiracy is in a given situation, the broader the range of inference that can be drawn

---

[198] *Suture Express*, 963 F. Supp. 2d at 1223.

[199] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[200] *E. J. Delaney Corp. v. Bonnie Bell, Inc.*, 525 F.2d 296, 301 (10th Cir. 1975).

from the evidence."[201] Only where "defendants 'had *no* rational economic motive to conspire…'" is a conspiracy inference impermissible.[202]

Notwithstanding these well-accepted principles in this Circuit, Defendants assert the Complaint contains no fact allegations from which a conspiracy between Pfizer and Mylan can be plausibly inferred. First, they ignore and recast Plaintiffs' actual allegations—that Mylan and Pfizer conspired to and did engage in a multi-faceted, multi-layered and carefully coordinated illegal antitrust scheme—suggesting instead that the Complaint's conspiracy allegations are limited to those pertaining to the pay-for-delay competitor settlements.[203] Defendants even suggest that, other than owning the patents for and manufacturing EpiPens, Pfizer has no involvement in the EAI market, stating that the Complaint alleges that Pfizer and Mylan are not competitors in that market.[204] On these bases, Defendants conclude the Complaint only supports an inference that Mylan and Pfizer engaged in "loosely parallel" and independent conduct.

---

[201] *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006).

[202] *Cohlmia*, 693 F.3d at 1284 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986)).

[203] Defendants' position that a reverse settlement can never give rise to a *per se* violation here rests on carefully crafted sleight of hand. While an individual reverse settlement, in and of itself, is analyzed under the rule-of-reason standard, the individual settlements cannot be viewed in isolation and are not the totality of the conspiratorial agreement and concerted action between Mylan and Pfizer that Plaintiffs challenge.

[204] Mylan Br. 27. This assertion is demonstrably false as Pfizer actually is able to control a portion of the small amount of the EpiPen's competition. *See* note **Error! Bookmark not defined.**, bove; Compl. ¶101 n.16. But even if Pfizer had no EAI market presence of its own outside of the EpiPen, that fact alone would be unavailing. *See Spectators' Commun. Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act"). Moreover, the fact of Pfizer's direct market involvement at times during the relevant period also disposes with Mylan's "*Copperweld* doctrine" argument. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) holds that a corporate parent and its wholly owned subsidiary cannot be conspirators under antitrust law. *Id.* at 771 (parent and wholly owned subsidiary are

In truth, the Complaint is replete with allegations of concerted activity.[205] For example, the Complaint alleges that Pfizer acted in concert with Mylan in the scheme to block competition by obtaining additional—and questionable—EpiPen patents. As detailed above, the Defendants admitted working together to add the patents and decrease competition.[206] Indeed, Mylan and Pfizer worked hand-in-hand in connection with the EpiPen; Mylan took over Pfizer's subsidiary Meridian's Orange Book sponsorship of its EpiPen drug application in 2014 pursuant to undisclosed terms[207] and Defendants collaborated to divide EpiPen intellectual property ownership for the specific purpose of continuing to secure their collective entanglement with each other and commitment to the EpiPen monopoly.[208]

The Complaint also alleges Mylan and Pfizer's joint targeting of rival EAIs through patent litigation, entering into illegal pay-for-delay settlements thereof, and misuse of the FDA

---

independent sources of economic power and lack separate interests). While the doctrine has been stretched by some courts based on a case's specific facts to include similarly indistinct actors, here, at a minimum, it is plausibly inferred from the Complaint's allegations that the Pfizer and Mylan defendants are independent actors with distinct market interests that acted in concert to control the EAI market through anticompetitive means.

[205] *See, e.g.*, Compl. ¶ 6 (outline of concerted activities); ¶ 668 ("Profits, not medicine, drone the 'hard switch.' Mylan and Pfizer wanted to double their revenues …."); ¶ 241 (Mylan and Pfizer revenues rise and fall together); 246 (Pfizer's revenue increases on EpiPen sales); ¶¶ 390-91 (annual net EpiPen sales reach $1 billion in both 2014 and 2015).

[206] Compl. ¶¶ 238-239. ("Ms. Bresch stressed that *Mylan* was adding yet another patent to the already-patented EpiPen device that 'will also put in another barrier to entry because that now that market preferential would be the needle protected device and drug of which *we* [i.e., Mylan and Pfizer] have IP and stuff around."). Consistent with Bresch's explanation, three of the four EpiPen patents were filed soon after Mylan acquired EpiPen (Patents 7,794,432 (filed 2007), 8,048,035 (filed 2008) and 8,870,827 (filed 2010) for which Mylan seeks judicial notice. See Mylan Br. 5, n.4.

[207] Compl. ¶¶ 247, 314.

[208] *Id.* ¶ 241 ("[W]hile Pfizer and its subsidiaries own the patents protecting the EpiPen and is the contract supplier of the product, Mylan owns the trademarked brand names and controls the worldwide marketing and sale of the products.").

Citizen's Petition process.[209] While Mylan was not technically a "Party" to the underlying lawsuits, the fact that Mylan announced the settlement of the Teva and Intelliject litigations on both Mylan and Pfizer's behalf further infers its participation. Mylan's Bresch publicly admitted Mylan's participation, referring to Pfizer's settlement with Teva as "our" settlement with Teva.[210] Bresch's admission, given the importance of each of these lawsuits in maintaining and prolonging the EpiPen monopoly underscores the significance from a pleading standpoint of Mylan and Pfizer's having jointly announced the subject settlements.[211]

Defendants' coordinated abuse of the judicial system followed by the strategically timed FDA Citizen Petition submission also supports a conspiracy inference. Indeed, leading antitrust scholar Michael Carrier of Rutgers Law School made that conclusion based on the same coordinated conduct laid out in the Complaint, finding: "At the time (and to this day), Mylan was working hand-in-hand with Meridian/King, with the former taking over Orange Book sponsorship of the drug application and the latter targeting rivals in litigation."[212]

Significantly, the Complaint also alleges how this same evidence concerning Defendants' misuse of the judicial system and their anticompetitive conspiracy was sufficient to convince Congress to initiate an investigation thereof. Indeed, the Teva settlement, at a minimum, is under scrutiny by the U.S. Senate over illegal pay-for-delay concerns—including being directed at Mylan despite Defendants' pretending that Mylan was not involved.[213]

---

[209] *Id.* ¶¶ 236-324.

[210] *Id.* ¶ 277.

[211] *Id.* ¶¶ 270, 298.

[212] *Id.* ¶ 314; *see also id.* ¶ 632.

[213] *See id.* ¶ 280 n.74.

Taken together, the Complaint's allegations here easily meet Plaintiffs' conspiracy plausibility pleading burden for their Section One and state antitrust claims.[214]

### E.     The Complaint Sufficiently Alleges Unlawful Pay-For-Delay Settlements.

In the pay-for-delay context, plaintiffs must plead facts "sufficient to infer" that a "large and otherwise unjustified reverse-payment was made as part of the settlement in order to shore up some perceived risk" of the patent's invalidity."[215] Defendants argue that Plaintiffs "failed to plead that any 'reverse payment' took place—let alone one that was 'large' and 'unexplained' as required by controlling Supreme Court precedent."[216] This conclusion requires turning that precedent on its head, ignoring the fact-intensive nature of the rule-of-reason analysis, failing to account for the fact that the relevant information to support such a claim is wholly within the possession of the Defendants, and ignoring the significant circumstantial allegations of pay-for-delay settlements in the Complaint.

In *F.T.C. v. Actavis*, the Supreme Court found that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects. . . ."[217] Defendants,

---

[214] *See Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013) ("While each of Evergreen's allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim."). Similar evidence has also been found sufficient to withstand a summary judgment motion. *See, e.g.*, *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1151 (D. Kan. 2012); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1322 (D. Kan. 2007). The Defendants do not directly address the conspiracy allegations with regard to Section Two; however, the same allegations support the plausible inference of that Mylan and Pfizer conspired to monopolize. *See Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (district court's dismissal of Sherman Act §2 conspiracy to monopolize claim reversed where Complaint alleged "'conspiracy, specific intent to monopolize, and overt acts in furtherance of the conspiracy.'")

[215] *Aggrenox*, 94 F. Supp. 3d at 240.

[216] Mylan Br. 28; *see* Pfizer Br. 9.

[217] 133 S. Ct. 2223, 2237 (2013).

however, mischaracterize the thrust of *Actavis* as a "limited exception" to favoring settlements.[218] While the "Supreme Court acknowledged the 'general legal policy' in favor of settlements, [it] determined that 'five sets of considerations' *weighed in favor of subjecting reverse payment settlements to antitrust scrutiny*."[219] As the *Actavis* Court explained, the fact-intensive, rule-of-reason analysis appropriately takes place ***after*** the motion-to-dismiss stage:

> Where a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement. In such cases, the parties may have provided for a reverse payment without having sought or brought about the anticompetitive consequences we mentioned above. ***But that possibility does not justify dismissing the FTC's Complaint.*** An antitrust defendant may show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason.[220]

Thus, the Supreme Court expressly recognized that even where there is the possibility of justified reverse payments, dismissal is not warranted. Rather, the defendants must "show" that the "legitimate justifications are present" in the course of the "antitrust proceeding."[221]

As the *Aggrenox* court explained, it is "clear that very precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants, as well as expert analysis, and that these issues are sufficiently factual to require discovery."[222] Whether "plaintiffs can substantiate those allegations may be an

---

[218] Pfizer Br. 8. *See FTC v. Actavis, Inc.*, 570 U.S. (2013).

[219] *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 544 (1st Cir. 2016) (emphasis added) (citing *Actavis*, 133 S. Ct. at 2234-37); *see also Actavis*, 133 S. Ct. at 2237 (finding Circuit Court incorrectly gave settling desirability weight, leading it "to provide near-automatic antitrust immunity to reverse payment settlements").

[220] *Actavis*, 133 S. Ct. at 2236 (emphasis added) (citations omitted).

[221] *Id*.

[222] *In re Aggrenox*, 94 F. Supp. 3d at 244 (2015); *see also Loestrin*, 814 F.3d at 552 (quoting *Actavis*, 133 S. Ct. at 2236).

issue for summary judgment or trial, but for purposes of the motions to dismiss, [the court] must accept the allegations as true and draw all reasonable inferences in the plaintiffs' favor."[223] Here, there are sufficient allegations to infer that large reverse payments took place.

### 1.    The Teva Settlement.

Plaintiffs allege a multitude of "actual facts" supporting the inference that a large and unjustified reverse payment was made in connection with the Teva Settlement. For instance, Plaintiffs allege (1) that "[t]he Teva Court's *Markman* rulings on the interpretation of the '432 patent were favorable to Teva"; (2) that "[a]t the time of a settlement, a full bench trial had been conducted and further anticipated litigation expenses would have been marginal compared to expenses already incurred"; and (3) that "[n]o rational economic actor with a viable product (and who had spent millions of dollars developing it) would refrain from entering a lucrative 'blockbuster' market for 36 months unless it received monetary compensation in exchange."[224]

Moreover, Plaintiffs are not required to provide the precise amount or terms of the Teva Settlement at the pleading stage: "Consistent with *Twombly*, which declined to 'require heightened fact pleading of specifics,' we do not require that the plaintiffs provide precise figures and calculations at the pleading stage" because "[r]equiring such a high burden would impose a nearly insurmountable bar for plaintiffs at the pleading stage."[225] The actual Teva Settlement specifics are "confidential and ha[ve] not been made public, which prevents Plaintiffs (as well as the United States Senate) from probing the terms or illegality of the settlement," and

---

[223] *Aggrenox*, 94 F. Supp. 3d at 245.

[224] Compl. ¶ 265; Compl. ¶¶ 251-84 & nn.69-74.

[225] *Loestrin*, 814 F.3d at 552 (citations omitted); *Aggrenox*, 94 F. Supp. 3d at 244-45.

"because the settlement terms have been kept confidential, the public has been unable to determine the amount of the reverse payment."[226]

Defendants' additional arguments concerning the sufficiency of the Teva Settlement allegations are also without merit. <u>First</u>, Defendants' argument that the Teva Settlement seemed rational relates not to the sufficiency of Plaintiffs' allegations, but rather to the fact-intensive, rule-of-reason analysis that takes place after the motion-to-dismiss stage. The possibility of a defendant presenting justifications at a later stage "does not justify dismissing" a complaint.[227]

<u>Second</u>, Defendants' assertion that "Plaintiffs allege no facts" in connection with the 2012 FTC Report is false. To the contrary, to support the inference of compensation in exchange for delay, Plaintiffs allege that FTC reported that "2012—when the Teva settlement was submitted to the FTC for review—saw 'a record number of settlements involved potential pay-for-delay agreements'" and the fact that "the FTC found that in patent settlements involving a 'first-filer,' as Teva was here, a majority of the settlements *did* involve explicit compensation in return for delayed entry."[228]

<u>Third</u>, Defendants' assertion that "Plaintiffs allege no facts" linking Teva's EpiPen and Nuvigil settlements is also false. Plaintiffs already allege a conspiracy involving the Mylan Defendants and the Pfizer Defendants, which are to be taken together with the factual allegations regarding the Nuvigil settlement.[229] These facts—including the fact that Teva announced a settlement of the Nuvigil litigation "four days after they announced the settlement of the EpiPen

---

[226] Compl. ¶¶ 258, 264.

[227] *Actavis*, 133 S. Ct. at 2236.

[228] Compl. ¶¶ 267-70 & nn.70-72.

[229] *Id.* ¶¶ 271-84.

litigation" and the fact that "both Teva and Mylan exchang[ed] highly valuable delayed entries (in addition to other settlement consideration that is not publicly available) to settle their respective cases and protect their valuable monopolies"[230]—further support the inference that large and unjustified reverse payment was provided in connection with the Teva Settlement.

## 2.    The Intelliject Settlement.

Plaintiffs have similarly pleaded facts sufficient to infer that a large and unjustified reverse payment was made in connection with the Intelliject Settlement. For example, Plaintiffs allege (1) that "Mylan and Pifzer (again jointly) announced they had reached a settlement with Intelliject over their patent litigation," (2) that "the agreement prevented Intelliject and Sanofi from launching their e-cue device for another nine months" which "likely indicates the strength of Intelliject's defenses to the patent litigation," and (3) that "Intelliject and Sanofi agreed not to enter the market until November 15, 2012 in exchange for valuable consideration."[231] Again, Plaintiffs are not required to provide the precise amount or terms of the settlement at the pleading stage.[232] And as with the Teva Settlement, "the terms of [the Intelliject] deal are confidential."[233] Finally, the Pfizer Defendants' argument that the Intelliject Settlement was "a traditional agreement" again relates not to the sufficiency of Plaintiffs' allegations, but rather to the fact-intensive analysis that appropriately takes place after the motion-to-dismiss stage.[234]

---

[230] Compl. ¶ 274.

[231] *Id.* ¶¶ 298-99.

[232] *See Loestrin*, 814 F.3d at 552.

[233] Compl. ¶ 298.

[234] *See Actavis*, 133 S. Ct. at 2236.

### 3.    The Sandoz "Stay-and-Delay" Agreement.

Finally, Plaintiffs have pleaded facts sufficient to infer that a large and unjustified reverse payment was made in connection with the Sandoz "Stay-and-Delay" Agreement. Plaintiffs allege: (1) that in 2010 Sandoz "made a similar attempt to enter the market through a generic alternative to EpiPen"; (2) that, "[a]s with Teva, defendants conspired to have King file a patent infringement suit against Sandoz in response to its ANDA filing"; (3) that, according to a 2016 Pfizer SEC Form 10-Q, "Sandoz's ANDA is ongoing and the litigation is stalled with the court entering an order staying the FDA process and administratively terminating the action"; (4) that "[n]o party has reopened the case"; (5) that "[s]taying the litigation also stays any definitive ruling on a challenge to the EpiPen patents"; and (6) that "Defendants entered into an agreement with Sandoz to stay the case indefinitely in exchange for valuable consideration to Sandoz."[235]

In particular, Plaintiffs support these factual allegations with citations to multiple sources—the Pfizer securities filing and the Sandoz litigation court order—that are fully incorporated by reference.[236]

Defendants incorrectly assert that "Plaintiffs also insinuate, vaguely and without any supporting facts, that Pfizer somehow acted improperly by obtaining patents for EpiPen devices."[237] Plaintiffs' allegations in this regard support their claims that Defendants made unjustified reverse payments under *Actavis*—which do not require Plaintiffs to allege fraud before the Patent and Trademark Office nor the improper filing of patents in the Orange Book, as

---

[235] Compl. ¶¶ 302-03 & nn.75-76.

[236] *See* Compl. nn.75-76. Once more, precise settlement terms are not required at the pleading stage, particularly where in the exclusive control of the defendants, and all inferences are drawn in the plaintiffs' favor. *Loestrin*, 814 F.3d at 552.

[237] Pfizer Br. 13.

the Pfizer Defendants suggest. Plaintiffs simply have to plead facts sufficient to infer that large and unjustified reverse payments were made—and Plaintiffs have done so here.[238]

### F.      The Complaint Plausibly Alleges Causation with Regard to the Unlawful Pay-For-Delay Settlements.

Defendants do not dispute causation with regard to the vast majority of allegations in the Complaint, instead focusing on only two fronts. First, as discussed above, they attack causation with regard to the exclusionary conduct aimed at keeping Sanofi out of the market. Second, Defendants single out the Complaint's allegations of "pay for delay" settlements—just one instance in a broad pattern of exclusionary conduct—and, as they attempted with Sanofi's Complaint, posit alternative theories for the competitive harm alleged.

In this instance, Defendants ask the Court to reach a factual determination that delay in entry by generic rivals was not because of the reverse-payment settlements, but instead because: (1) the would-be generic competitors, Teva and Sandoz, never obtained FDA approval for their products, and (2) Defendants have unexpired patent rights that they can use to exclude generics.[239] Not only are Defendants' "alternative facts" inappropriate for resolution on a motion to dismiss,[240] they are demonstrably wrong. First, it was Defendants themselves who hindered and delayed any required FDA approval. The factual allegations plausibly establish that generic

---

[238] *See* Compl. ¶¶ 236-303 & nn.63-76.

[239] Mylan Br. 20-24; Pfizer Br. 6-7.

[240] Issues regarding antitrust injury (including causation) are classically "ill-suited" for a motion to dismiss, given that they require a complex factual determination in weighing various potential causes for the injuries alleged. *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 757 (E.D. Pa. 2014) ("antitrust injury 'involves complex questions of fact,' ill-suited for resolution on a motion to dismiss"). Indeed, courts are even more reluctant to resolve antitrust injury at the pleading stage when, as here, the Complaint alleges delayed entry of generic pharmaceuticals. *Niaspan*, 42 F. Supp. 3d at 757 n.19 ("Citing this principle, numerous courts, when faced with similar allegations of delayed generic entry, have refused to accept the argument that antitrust injury was inadequately pleaded.") (collecting cases).

manufacturers Teva and Sandoz intended and were prepared to obtain FDA approval for competition to the EpiPen and that, but for Defendants' unlawful, reverse-payment settlements, they would have obtained such approval much sooner. <u>Second</u>, Defendants cannot rely on their patent rights to contest causation, given the Complaint's well-pleaded factual allegations that Defendants' patents were likely to be found invalid and that, even if the patents were valid, the generic products likely would not have been infringing. Were it not for Defendants' anticompetitive, reverse-payment settlements, Defendants' patent rights plausibly would have proved no barrier to entry by generic competitors.[241]

1.    **But for Defendants' conduct, competitors would have obtained FDA approval sooner.**

The Complaint plausibly establishes the intent and preparedness of generic competitors to enter the market, and that those competitors would have entered the market sooner but for Defendants' exclusionary conduct. Plaintiffs allege that, prior to Defendants' lawsuit leading to the reverse-payment settlement, Teva was ready to enter the market and had filed with the FDA the necessary ANDA.[242] Defendants rely heavily on the fact that the FDA later rejected Teva's initial application, but that in no way forecloses eventual FDA approval. Drugs commonly go through several rejections prior to approval, and indeed the Teva securities filing Defendants cite only underscores Teva's commitment to resolving all FDA concerns.[243] As the Complaint alleges, "Teva may have been able to fix those problems if the patent lawsuit had not delayed its

---

[241] The Mylan Defendants' argument that they cannot have liability related to the patent settlements because they were not party to the settled litigations also misses the mark because the Mylan and Pfizer Defendants worked together as part of a coordinated pay-for-delay scheme. Compl. ¶¶ 236-50. *See supra*, Part I.D.

[242] Compl. ¶¶ 251-284.

[243] Mylan Br. Ex. D at 2 ("Teva is evaluating the [FDA notice] and intends to submit a response.").

ability to enter the market."[244] And, "[b]y sidelining Teva from 2012 to 2015, Mylan, King, and

Meridian disrupted Teva's trajectory toward FDA approval and also gained a three-year

guaranteed monopoly period in which Mylan could raise prices on consumers without any fear of

generic competition from Teva."[245]

In the case of Sandoz, its drug never even received a rejection from the FDA—the

Defendants' litigation resulted in "an order staying the FDA process and administratively

terminating the action."[246] Intelliject ultimately received FDA approval of its NDA "but pursuant

to the settlement consumers would not have access to the e-cue until November 2012," and

accordingly the settlement delayed the entry of Intelliject as a potential competitor.[247]

These allegations are sufficient under the relevant authority, which recognizes that lack

of FDA approval does not defeat causation where, as here, delay in approval "was a foreseeable

consequence of the original antitrust violation."[248] Defendants cite authority for the obvious

proposition that a generic needs FDA approval to enter the market,[249] but even that authority

makes clear that allegations of a generic's "intent and preparedness to enter the market from

which it alleges it was excluded" can plausibly establish causation.[250] Here, Plaintiffs have

---

[244] Compl. ¶ 319; *see also id.* ¶ 322 ("But for Mylan's anti-competitive assault campaign, Teva would have entered the market much sooner and fixed the deficiencies that led to the FDA's rejection of Teva's generic.").

[245] *Id.* ¶ 322.

[246] *Id.* ¶ 302.

[247] Compl. ¶ 300.

[248] *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 629 (E.D. Pa. 2011).

[249] Mylan Br. 21.

[250] *See Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807 (D.C. Cir. 2001) (remanding for grant of leave to replead to allow Plaintiff to offer allegations regarding "its intent and preparedness to enter the market from which it alleges it was excluded"); *Roxane Labs., Inc. v. SmithKline Beecham Corp.*, No. CIV.A. 09-CV-1638, 2010 WL 331704, at *3 (E.D. Pa. Jan. 26,

plausibly alleged that delay in FDA approval was the "foreseeable consequence of the original antitrust violation"—*i.e.*, of Defendants' lawsuits and subsequent reverse-payment settlements. "Whether intervening conduct was proximately caused by or was the foreseeable consequence of a defendant's actions is a question of fact that can be addressed as a matter of law only where the outcome is clear or when highly extraordinary events or conduct take place."[251]

2. **Defendants' assertion of valid patent rights cannot defeat causation at the pleadings stage.**

Defendants claim to have valid patent rights that would exclude generic rivals. However, as a matter of law, that cannot immunize their reverse-payment settlements. Indeed, those settlements would have not have been necessary if Defendants' patent rights were sufficient to exclude generic competition. The reality is that, without the settlements, Defendants faced a high probability of generic competition, not only because Defendants' patents could be proven invalid

---

2010) ("the *Andrx* court does not declare that a specific allegation regarding probability of FDA approval is an absolute requirement of the intent and preparedness standard").

[251] *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d at 629. A number of Defendants' cases are inapposite for the simple reason that they were decided at summary judgment (or even *after trial*) where the parties had the benefit of discovery and a factual record. *See, e.g.*, *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 166 (3d Cir. 2017) (deciding issues of fact on motion for summary judgment that included a discussion of the challenged settlements); *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 172 F. Supp. 2d 1060, 1078 (S.D. Ind. 2001) (same); *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 64-65 (1st Cir. 2016) (decision following jury verdict). Defendants rely on *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 137 (E.D.N.Y. 2003), but the Second Circuit's affirmance of that decision was abrogated by *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013). Defendants' other cases from the FDA context lacked the critical facts alleged here: that the reverse-payment settlements not only caused competitors to delay entering the market, but they also caused them to delay seeking the FDA approval that they otherwise were ready and prepared to undertake. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, CV 14-MD-02503-DJC, 2015 WL 5458570, at *9 (D. Mass. Sept. 16, 2015) (complaint was inadequate where it was "[w]ithout a plausible allegation of Delay caused by Defendants"); *Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, 2004 WL 1427136, at *6 (E.D. Pa. June 21, 2004) ("The Amended Complaint simply alleges that such approval must be obtained and that RenalTech is seeking such regulatory approval from the FDA.").

in the underlying litigation, but also because the generics had strong arguments of non-infringement. The Teva Court, for example, issued *Markman* rulings favorable to Teva and at the time of the Defendants' settlement a full bench trial had already been completed; given these facts it was "no great leap to infer that, had the parties waited for a decision, the '432 patent would have been found inval*id*."[252] These allegations are sufficient dismiss.[253]

## G.     Plaintiffs Adequately Plead a Tying Claim with Regard to the EpiPen 2-Pak.

A tying claim comes in two flavors: (a) *per se* violation; and, (b) rule of reason. Although both types require similar elements,[254] Mylan challenges only one: whether there are separate products involved in the tying.[255] But as the Supreme Court explained, the separateness element is not really about separate *products*, but about separate *markets*.[256] In *Jefferson Parish*, the Court addressed a tying agreement in which a hospital conditioned surgical care at its facility on the purchase of anesthesia services from an affiliate medical group.[257] The Court applied a separate-market test that is both practical and fact-laden: whether sufficient consumer demand

---

[252] Compl. ¶¶ 265, 284.

[253] *See In re Niaspan*, 42 F. Supp. 3d at 755 (concluding Plaintiffs adequately alleged causation where "Plaintiffs have plausibly alleged that, but for the anticompetitive settlement agreements, Barr would have prevailed in the underlying patent litigation against Kos.").

[254] *Suture Express, Inc. v. Owens & Minor Distrib.*, 851 F.3d 1029, 1037,1038 (10th Cir. 2017) (finding case law on the rule of reason "amazingly sparse" but the two types were "mainly different in degree, not necessarily in kind").

[255] The other three elements were alleged: (a) the sale of one EpiPen is conditioned on the purchase of another, i.e. 2-Pak, Compl. ¶¶ 325-347; (b) Mylan has 85+% of the primary EAI device market, ¶¶ 106, 465; and (c) a substantial effect on commerce in the secondary EAI device market, ¶¶ 579-585.

[256] *See* Mylan Br. 37 (citing *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 21 (1984) (mentioning "market"). *See also id.* at 38 where, ironically, Defendants proffer their back-up argument that there must be two separate "markets" (citing and quoting *Jefferson Parish*, 466 U.S. at 21).

[257] 466 U.S.at 19-21.

for the purchase of the tied product separate from that of the tying product exists so that it is efficient to offer the tied product separately from the tying product.[258]

Here, Plaintiffs plausibly allege there are separate markets for a primary and spare EAI device. The EpiPen was prescribed and sold individually from 1987 to 2011 before Mylan imposed the "hard switch" to the 2-Pak in August 2011.[259] For decades, U.S. consumers had the choice to buy a single EpiPen, the choice not to buy a "spare" EpiPen, or, if a "spare" was needed or wanted, the choice to buy a cheaper or an EAI device other than the EpiPen.[260] During this 24-year era, "[t]here was sufficient independent demand for some patients to either not purchase a second EpiPen at all or to purchase an EpiPen and a cheaper, alternative back-up."[261]

Mylan set out to change that with the 2-Pak, which forces customers to purchase two separate devices despite "that each EpiPen expires annually and the vast majority of EpiPens expire before they can be used."[262] Through the 2-Pak, Mylan took away the choice for American consumers to buy (or not buy) in the "spare" auto-injector market. Specifically, Mylan

---

[258] *Id.* at 21-22; *see also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 462 (1992) (finding separate products where there is "sufficient consumer demand so that it is efficient for a firm to provide service separately"); *Sprint v. Middle Man, Inc.*, No. 12-2159-JTM, 2013 WL 1197137, at *5 (D. Kan. Mar. 25, 2013) (applying a practical test and finding the two products could be purchased separately, so they were not tied at all).

[259] Compl. ¶¶ 325; 339(g), 665.

[260] *Id.* ¶¶ 575-579.

[261] *Id.* ¶ 577.

[262] *Id.* By way of example, consider that NBA teams pay different amounts for a starting vs. a back-up center. They are separate markets. Cars have OEM parts and spare parts. Many people have cars with four regular tires and a spare, and some don't have a spare tire at all. It is not implausible as a matter of law that there is consumer demand for a cheaper, alternative "spare" injector, and, thus, that markets for primary and spare auto-injectors differ.

prevented (a) the choice to purchase a cheaper generic spare; (b) the choice to purchase only one EpiPen; and (c) even the choice to purchase an odd number of EpiPens.[263]

The problem with this is shown whenever a patient needs to use an EpiPen. Taking Mylan's claim that consumers should always have two EpiPen's on hand at face value (which Plaintiffs do not), when a consumer uses the primary EpiPen they need to purchase one EpiPen to replace the one they used (in order to bring their supply back to two). But, that is impossible due to the Defendants' tying. Now, the person who used the EpiPen will be left with three EpiPens—more than required even under Mylan's guidance—because of the illegal tying.

Although Defendants boldly assert that "Plaintiffs allege zero facts to support the existence of a distinct market for "back-up" injector devices,"[264] the spare injector market did not suddenly disappear. Indeed, Mylan markets to and sells into that "spare" market to this day when it encourages doctors to prescribe and consumers to buy multiple 2-Paks at a time.[265] If there were no market for spare EAI, there would be no need for a 2-Pak.[266]

In the motion to dismiss, Mylan mixes and matches different legal concepts by citing the product market definition for a monopoly case,[267] by citing to cases applying the summary

---

[263] *See Eastman Kodak*, 504 U.S. at 464 n.9 (1992) (improper tying "force[s] the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms").

[264] Mylan Br. 38.

[265] *See Dosage and Administration for EpiPen*, MYLAN SPECIALTY L.P. (2018), https://www.epipen.com/en/hcp/about-epipen/dosage-and-administration (last visited January 19, 2018), referenced in Compl. ¶ 331, n.92.

[266] *See also* Compl. ¶ 34 (MA Plaintiff buys spares).

[267] Mylan Br. 37-38 (citing *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1314 (10th Cir. 2017)).

judgment rather than the motion to dismiss standard,[268] and by arguing about economic expert opinions on "interchangeability and cross-elasticity of demand."[269] Mylan also relies on *Metromedia* and *Paul*—both non-Tenth Circuit cases with distinguishable facts and based on actual record evidence in denying a preliminary injunction. *Paul*, for example, was about a Saturday newspaper and a M-F newspaper, which clearly different markets today.[270] All of this misses the point: tying claims are judged by market practicalities, which entail factual questions that cannot be resolved on a motion to dismiss.[271]

By 2015, Mylan gained at least an 85% share of the EAI market,[272] covering both the primary and spare markets. Direct evidence of an illegal tying arrangement will come from whether consumers, if given the choice, would have purchased the tied good (spare EAI device) from the tying good maker (Mylan), purchased a spare device from other firms, or foregone

---

[268] Mylan Br. 10-11 (citing *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 612-14 (1953); *Buccaneer Energy*, 846 F.3d at 1314; *Sports Racing Servs., Inc. v. Sports Racing Car Club of Amer., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997); and *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)).

[269] While the cross-elasticity of demand concept may work fine for summary judgment based on economic expert opinions, it is not the practical notice pleading standard under *Twombly*. Besides, "[i]n contrast to typical consumer goods--for which the end user typically identifies goods capable of satisfying a need or want, selects among the alternatives, pays for, and uses the good--prescription pharmaceutical products require the input of some combination of the end user, physicians, health plans, and even employers. As a result, courts must be careful in defining markets based on cross elasticity of demand, as it is not immediately clear whose demand is economically most relevant." Note, *Product Market Definition in Pharmaceutical Antitrust Cases: Evaluating Cross-Price Elasticity of Demand*, 2011 Colum. Bus. L. Rev. 586, 596-97.

[270] *Paul v. Pulitzer Pub. Co.*, No. 74-327C(A), 1974 WL 887 (E.D. Mo. May, 24 1974).

[271] *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 63 F.3d 1540, 1546-48 (10th Cir. 1995)

[272] Compl. ¶ 106.

purchasing a spare device altogether.[273] Indirect evidence of an illegal tying arrangement will

come from the behavior of firms without market power in the tying goods market.[274] Tellingly,

separate primary and spare auto-injector markets exist just across the border in Canada (and in

every country except the U.S.) where EAI devices, including EpiPens, are sold individually.[275]

"The Supreme Court has made clear that the test for determining whether two

components are separate products turns not on their function, but on the nature of any consumer

demand for them. For two items at issue to be considered distinct products, "there must be

sufficient consumer demand so that it is efficient for a firm to provide [one] separate from [the

other]."[276] Whether the existence of separate markets can be proven factually remains for

another day.[277] Count VI should not be dismissed.

### H.   Defendants' Attacks on Plaintiffs' Claims Under Individual State Antitrust Laws are Off-Target.

#### 1.   States not represented by a named plaintiff.

Defendants assert that Plaintiffs lack standing to sue under the antitrust laws of Alaska,

the District of Columbia, Iowa, New Mexico, North Dakota, Puerto Rico, Rhode Island, and

South Dakota because there are currently no named plaintiffs that reside in those states. But, a

---

[273] *U.S. v. Microsoft Corp.*, 253 F.3d 34, 86 (D.D.C. 2001) (citing *Jefferson Parish*, 466 U.S. 2 at 22) (taking note of testimony that patients and surgeons often requested specific anesthesiologists not associated with a hospital).

[274] *Microsoft Corp.*, 253 F.3d at 86 (citing *Jefferson Parish*, 466 U.S. 2 at 22 n.36). Because supply follows demand, the goods are a single product only if competitive firms always bundled the tying and tied goods. *Id.*

[275] Compl. ¶ 328.

[276] *Multistate Legal Studies*, 63F.3d at 1547 (quoting *Kodak*, 504 U.S. at 462, and citing *Jefferson Parish*, 466 U.S. at 19).

[277] *See, e.g., id.* at 1546-1548 (material fact issue existed whether full-service and supplemental bar review courses were separate product markets given separate consumer demand, as shown by evidence similar to the facts alleged herein).

number of courts have refused to dismiss antitrust state law claims at the motion to dismiss stage simply because there is no named plaintiff from that state.[278] In fact, "there is a 'growing consensus among district courts that class certification is "logically antecedent," where its outcome will affect the Article III standing determination, and the weight of authority holds that in general class certification should come first.'"[279] "In other words, when 'class certification is the <u>source</u> of the potential standing problems, class certification should precede the standing inquiry.'"[280] However, if the Court deems the inquiry necessary, Plaintiffs respectfully request leave to cure the absence of certain states' representatives by amending the Complaint.

### 2. Indirect purchaser claims may proceed under the laws of Arkansas, Illinois, Massachusetts, Missouri, Puerto Rico, Rhode Island, and West Virginia.

Arkansas, Illinois, Massachusetts, Missouri, Puerto Rico, Rhode Island, and West Virginia all permit indirect purchaser claims for violation of antitrust or competition laws:[281]

- Arkansas has statutorily rejected *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *See* Ark Code Ann. 4-75-315(b). *See also Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*, Case No. 09-CV-00852, 2012 WL 3841397, at *4-7 (E.D. Wis. Sep. 5, 2012) ("No Arkansas statute or case law prohibits claims by indirect purchasers.").

- Under Illinois law, multiple courts have allowed indirect purchasers to bring class actions. *See In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014); *In re Aggrenox*, 2016 WL 4204478, at *5-6; *In re Broiler Chicken Antitrust Litigation*, No. 16 C 8637, 2017 WL 5574376, at *29-30 (N.D. Ill. Nov. 20, 2017).

---

[278] *See, e.g.*, *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010); *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5, 2009); *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06-md-1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006).

[279] *Kaatz v. Hyland's Inc.*, Case No. 16 CV 237, 2016 WL 3676697, at *4 (S.D.N.Y. July 6, 2016).

[280] *Id.* (quoting *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011)).

[281] Plaintiffs concede that Alaska does not permit indirect purchasers to bring claims.

- Massachusetts law also allows for indirect purchaser claims. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, Case No. 14-md-02503, 2015 WL 5458570, at *16 (D. Mass. Sep. 16, 2015) ("The end payors, however, state a claim for relief under the law[] of … Massachusetts, which ha[s] been interpreted to permit claims by indirect purchaser plaintiffs… Similarly, indirect purchasers 'can assert claims for price fixing or other anticompetitive conduct' under Massachusetts law.") (citing *Ciardi v. F. Hoffman-La Roche Ltd.*, 436 Mass. 53, 55 (2002)).

- Indirect purchaser claims are cognizable under Missouri's Merchandising Practices Act, Mo. Ann. Stat. § 407.020. *See In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 571 (E.D. La. 2013) (concluding that the "MMPA suit is not barred under *Illinois Brick*"); *see also In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *12 (D. Mass. July 20, 2016) (same).

- The same is true under Puerto Rico law. *See Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D. P.R. 2010) ("Because Puerto Rico liberally construes its standing requirements in private antitrust cases, it is immaterial whether Plaintiffs are direct or indirect purchasers…").

- Rhode Island law expressly rejects *Illinois Brick*. *See* R.I. Gen. Laws § 6-36-12(g). Plaintiffs concede that the statute applies only prospectively from its enactment and governs any claims and allegations that occurred after July 15, 2013. *See In re Cast Iron Soil Pipe and Fittings Antitrust Litigation*, Case No. 1:14-md-2508, 2015 WL 5166014, at *22 (E.D. Tenn. June 24, 2015).

- West Virginia also allows indirect purchaser suits. *See* W. Va. Code R. § 142-9-2 ("Any Person who is by reason of a violation of the West Virginia Antitrust Act . . . may bring an action for damages . . . ."). Consequently, "indirect purchaser . . . claim[s] pursuant to West Virginia's state antitrust statute [are] not barred by . . . the *Illinois Brick* doctrine . . . ." *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 516 F. Supp. 2d 1072, 1096-97 (N.D. Cal. 2007); *accord In re Automotive Parts Antitrust Litigation*, 50 F. Supp. 3d 836, 858 (E.D. Mich. 2014) (upholding indirect purchasers' claims under West Virginia law).

### 3.   California, Kansas, and Tennessee allow unilateral-conduct claims.

California, Kansas, and Tennessee allow the unilateral conduct claims brought in Counts IV-VI.[282] California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, is "sweeping" in scope, "governs anticompetitive business practices as well as injuries to consumers," and

---

[282] Plaintiffs concede that these counts are not viable under New York law and abandon them.

permits claims for unilateral monopolization.[283] <u>Kansas</u> law permits indirect purchasers to recover if "damaged or injured by any agreement, *monopoly*, trust, conspiracy, or combination . . . ." K.S.A. § 50-161(b) (emphasis added). Unilateral monopolization claims are also appropriate under <u>Tennessee</u> law.[284] Accordingly, Defendants' motion should be denied.

## II.   The Complaint Pleads a Plausible RICO Claim

Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO")[285] claim is based on the EpiPen Pricing Enterprise and the scheme to defraud U.S. consumers into paying an inflated price for the EpiPen 2-Pak. The RICO claim identifies the RICO Defendants as three Mylan Defendants (Mylan N.V., Mylan Specialty, LLP, and CEO Heather Bresch) and three Pfizer Defendants (two Pfizer subsidiaries and Pfizer).[286] The PBM Conspirators are not named as defendants, but their role in the EpiPen Pricing Enterprise is described in detail to explain how the pricing scheme worked.[287]

Defendants repeatedly misstate the factual allegations in the Complaint and ignore the Tenth Circuit's rejuvenation of civil RICO claims following *Boyle* (2009) and *Bridge* (2008).

---

[283] *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1379 (S.D. Fla. 2001).

[284] *See In re Asacol Antitrust Litig.*, No. 15-cv-12730-DJC, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) (refusing to dismiss the Tennessee unilateral monopolization claim "because Tennessee state courts appear to treat monopolization claims as viable under the [Tennessee Trade Practices Act]") (Tennessee case citations omitted).

[285] 18 U.S.C. §§ 1961-68.

[286] Compl. ¶ 594.

[287] *Id.* ¶¶ 599, 633-41, 651.

Tenth Circuit law on RICO is often unique.[288] And whatever can be said about RICO in the 1990s or 2000s in other Circuits, Tenth Circuit law in 2018 is decidedly pro-plaintiff.[289]

Defendants contend that RICO was intended only to reach the mafia, but this pinched reading of RICO was obliterated decades ago, and numerous times since then.[290] In fact, the Supreme Court alone has held *seven times* that RICO must be given the full orbit of its plain—and expansive—language.[291] Today it is well settled that Congress "drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways."[292] Thus, "RICO is to be

---

[288] *See United States v. Hutchinson*, 573 F.3d 1011, 1034 (10th Cir. 2009) (Gorsuch, J.) (explaining that the Tenth Circuit reads "RICO's requirements" differently than other Circuits, especially on the enterprise element).

[289] Pfizer relies primarily on obsolescent and out-of-Circuit lower court decisions. When it does cite Tenth Circuit law, it frames its arguments on *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006), and argues that Plaintiffs fail to set forth the "nine elements" of a fraud claim. Pfizer Br. 15. But after *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653 (2008), these nine elements don't apply.

[290] *See, e.g.*, *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. at 499-500 (1985) (noting that the statute also encompasses legitimate enterprises); *Nw H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. at 248-49 (1989) (same); *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 659-60 (2008) (same); *Robert L. Kroenlein Trust v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014) (stressing that "normal businesses can also fall under RICO's broad criminal and civil rubric."); *Plains Res., Inc. v. Gable*, 782 F.2d 883, 887 (10th Cir. 1986) (same).

[291] *United States v. Turkette*, 452 U.S. 576, 580 (1981) (rejecting limitation to "illegitimate" or "criminal" enterprises); *Sedima*, 473 U.S. at 499-500 (rejecting limitation on organized crime or criminal conviction); *H.J. Inc.*, 492 U.S. at 248 (rejecting limitation to organized crime); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (rejecting limitation against single-employee enterprise); *Bridge*, 533 U.S. at 659-60 (rejecting requirement of first-party reliance for fraud); *Boyle*, 556 U.S. at 950 (2009) (rejecting limitation on enterprise element).

[292] *H.J. Inc.*, 492 U.S. at 248-49.

read broadly"[293] and "liberally construed to effectuate its remedial purposes[.]"[294] And RICO's "'remedial purposes' are nowhere more evident than" in § 1962(c).[295]

### A.     The Limited Applicability of Rule 9(b) to Civil RICO

To state a civil claim under RICO, a plaintiff must allege that the defendant violated RICO's substantive liability section, § 1962.[296] Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise…to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"[297]

RICO imposes both criminal penalties, *see* 18 U.S.C. § 1963, and civil liability, *see* 18 U.S.C. § 1964(c), and the statute is applied "the same way" for both, making civil and criminal RICO case law interchangeable.[298] But no criminal conviction is required to bring a civil RICO claim,[299] which is judged under the civil "preponderance of the evidence" standard.[300]

Defendants cite general fraud cases to challenge the RICO claim. But because RICO targets racketeering and not common law fraud, these cases (all were issued before 2008) don't

---

[293] *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (quoting *Sedima*, 473 U.S. at 497).

[294] *Sedima*, 473 U.S. at 497-98; *see also Gable*, 782 F.2d 883, 887 (10th Cir. 1986) ("'RICO is to be read broadly,' and is to 'be liberally construed to effectuate its remedial purposes.'").

[295] *Sedima*, 473 U.S. at 498.

[296] *See*, 833 F.3d at 1248.

[297] 18 U.S.C. § 1962(c).

[298] *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1097 (N.D. Ill. 2016) (citing *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 239 (1987); *see also Sedima*, 473 U.S. at 491 (rejecting civil/criminal RICO distinction); *Bank One v. Abbe*, 916 F.2d 1067, 1070-71 (6th Cir. 1990) (same).

[299] *See Sedima,* 473 U.S. at 488 (explaining that civil RICO does not require prior conviction).

[300] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1093 (10th Cir. 2014).

apply.[301] In *Bridge* (2008), the Supreme Court clarified that "the indictable act under § 1341 [the mail fraud statute] is not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud."[302] In other words, reliance is not an element of a civil RICO claim premised on mail or wire fraud: "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."[303] If the two claims are compared, five factors distinguish a RICO claim (predicated upon mail or wire fraud) from a common law fraud claim asserted under state law:

| | FACTOR | Mail and Wire Fraud | Fraud Claim |
|---|---|---|---|
| 1 | Type of claim? | ▪ Criminal | ▪ Civil |
| 2 | Legal source? | ▪ 18 U.S.C. §§ 1341, 1343 | ▪ Common law |
| 3 | State v. federal? | ▪ Federal law | ▪ State law |
| 4 | Reliance is an element? | ▪ No | ▪ Yes |
| 5 | Applies to promises re: future? | ▪ Yes | ▪ No |

Ultimately, to prevail on a civil RICO claim involving mail or wire fraud, the plaintiff is required to show only "that the defendant violated § 1962" and that the defendant's violation caused an injury to the "plaintiff's business or property."[304]

The general pleading standard under Rule 8(a) applies to a civil RICO claim, and a district court must draw all inferences in favor of the RICO plaintiff.[305] Only if mail or wire

---

[301] *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 652-53 (2008).

[302] *Id.* at 652; *see also id.* at 655 ("[T]he predicate act here is not common-law fraud but mail fraud.").

[303] *Id.* at 649.

[304] *Safe Streets Alliance*, 859 F.3d at 881.

[305] *See id.* at 886 ("But that was error, *inter alia*, because the [plaintiff's] claims were only at the pleading stage.") (citing *George*, 833 F.3d at 1247 (requiring that courts accept all factual allegations as true and draw reasonable inferences in a plaintiff's favor at the pleading stage)).

fraud is alleged does the heightened standard of Rule 9(b) apply.[306] And even then, Rule 9(b) applies only to the allegations of mail or wire fraud.[307] All of the other elements are reviewed under the general pleading standard.[308]

Defendants contend that RICO claims are "particularly scrutinized"[309] and judged under "complex pleading standards."[310] But Tenth Circuit law is exactly the opposite. In a trilogy of cases—*Robbins*, *George*, and *Safe Streets*—the Tenth Circuit has reversed RICO 12(b)(6) dismissals and cautioned against following the path marked by Defendants. In *Robbins*, the Tenth Circuit admonished that RICO claims should not be decided under a heightened pleading standard.[311] In *George*, the Tenth Circuit reversed the dismissal of a complicated mail fraud case based on the district court's misreading of the RICO elements.[312] And in *Safe Streets*, the Tenth Circuit again reversed the 12(b)(6) dismissal because the district court had misapplied the pleading standard and failed to construe RICO "broadly" when applying it to the novel RICO

---

[306] *Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (reversing order granting motion to dismiss and explaining that "Defendants confuse the requirement to plead with particularity RICO acts predicated upon fraud pursuant to Rule 9(b) with Rule 8's more general notice pleading typically required of all litigants.").

[307] *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1362 (10th Cir.1989).

[308] *See Robbins*, 300 F.3d at 1211 (reversing dismissal and instructing that Rule 8 governs all elements of a RICO claim except the allegations of mail and wire fraud) (collecting cases); *George*, 833 F.3d at 1247-49 (analyzing only the wire and mail fraud allegations under 9(b)); *see also Advanced Optics Elecs., Inc. v. Robins*, 633 F. Supp. 2d 1237, 1254 (D.N.M. 2008) ("In other areas of RICO, however, the standard, more generous requirements of rule 8 apply.").

[309] Mylan Br. 48.

[310] *Id.* at 38.

[311] *Robbins*, 300 F.3d at 1211 ("Defendants confuse the requirement to plead with particularity RICO acts predicated upon fraud pursuant to Rule 9(b) with Rule 8's more general notice pleading typically required of all litigants.").

[312] *George*, 833 F.3d at 1248-53.

theory alleged by the plaintiff.[313] Rather than being disfavored or strictly construed, RICO is still "liberally construed to effectuate its remedial purposes."[314]

As for Rule 9(b), its purpose is simply to afford a defendant fair notice of the claims against it and the factual grounds for those claims. The language of Rule 9(b) "must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct.'"[315] Rule 9(b) itself states that "intent [and] knowledge…may be alleged generally."[316] In complex cases, Rule 9(b) is generally relaxed where, as here, the alleged fraud unfolded over several years.[317] And in applying Rule 9(b), "courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control."[318] Mylan suggests that Plaintiffs somehow concede plausibility by saying that the documents and other evidence are in the exclusive possession of Mylan. That's not an admission that the claims are not plausible. As *George* explained, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."[319]

---

[313] *See Safe Streets,* 859 F.3d at 881-85 (analyzing lower court's failure to evaluate RICO allegations under appropriate law as to each element); *see also CGC Holding Co.*, 773 F.3d at 1099 (affirming RICO class certification for mail fraud claim and explaining that a RICO plaintiff is not required to negate defenses).

[314] *Sedima*, 473 U.S. at 498.

[315] *In re Universal Serv. Fund Tel. Billing Pracs Litig.*, 300 F. Supp. 2d 1107, 1149-51 (D. Kan. 2003) (quoting *Schwartz v. Celestial Seasonings, Inc*., 124 F.3d 1246, 1252 (10th Cir. 1997)).

[316] Fed. R. Civ. P. 9(b).

[317] *VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*, 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998) ((citing *Hurd v. Monsanto Co.*, 908 F. Supp. 604, 614 (S.D. Ind. 1995)).

[318] *George*, 833 F.3d at 1255 (reversing order granting motion to dismiss complex mail fraud civil RICO claim).

[319] *Id.* at 1257 (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)).

### B.    The Complaint Sets Forth a Valid RICO Claim Against the Defendants

Section 1962(c) imposes liability against any person[320] who [1] conducts or participates in, directly or indirectly, the conduct [2] of an enterprise [3] through a pattern of [4] racketeering activity.[321] Causation and damages are also elements of a civil RICO claim, but reliance is not.[322]

Plaintiffs have satisfied the Tenth Circuit's recent decisions in *George* and *Safe Streets*. In evaluating a fraud claim, courts "evaluate the facts alleged as a whole…."[323] Defendants continually "cherry-pick" certain allegations and "ignore[] countless others" pled throughout the Complaint. That tactic fails.[324] The Tenth Circuit in *George* recognized the limits of the particularity standard when a plaintiff alleges a multi-year, complex scheme to defraud involving multiple defendants. Repeatedly, *George* stressed that RICO's mail and wire fraud predicates focus on "a scheme to defraud" and that a plaintiff should be allowed some leeway if not able to plead every detail or phone call or step in the plot.[325] *George* ultimately concluded—even though many of the allegations were "sparse"—that the allegations were sufficient once the court reviewed the "entire complaint" and considered all of the facts.[326] Against this backdrop,

---

[320] A "person" within the meaning of § 1962(c) includes not only people but also corporations and nearly all other possible entities. *See George*, 833 F.3d at 1247 n.2.

[321] *Deck v. Engineered Laminates*, 349 F.3d 1253, 1256-57 (10th Cir. 2003); *see also CGC Holding Co. v. Broad*, 773 F.3d at 1088.

[322] *See Bridge*, 553 U.S. at 647 ("RICO's text provides no basis for imposing a first-party reliance requirement.").

[323] *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102-03 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003); *see also Bennett v. Sprint Nextl Corp.*, No. 09-2122-EFM, 2011 WL 43087, at *3 (D. Kan. Jan. 6, 2011) (denying motion to dismiss fraud claim under 9(b) after viewing the pleading allegations "as a whole").

[324] *Id.* at 1257 (rejecting defendants' Rule 9(b) arguments and reversing order granting to dismiss after "[r]eviewing the plaintiffs' entire complaint taking all of their allegations as true").

[325] *Id.* at 1255-57.

[326] *Id.* at 1256-7.

Plaintiffs analyze each of the RICO elements as applied to the allegations as a whole made in the Complaint. In doing so, Plaintiffs incorporate the factual allegations set forth above.

### 1.      "Racketeering"

RICO targets "racketeering"—a term that the statute defines to include "dozens of state and federal offenses, known in RICO parlance as predicates."[327] The Complaint alleges three types of RICO predicates: mail fraud, wire fraud, and corruption of an official proceeding.[328]

Defendants wave off their long-term, billion-dollar scheme to defraud as a garden-variety tort. But this case presents a quintessential fraud scheme under RICO: an ongoing, long-term scheme (at least 2011 to present), involving distinct and major corporate entities (Pfizer and Mylan) and their executives working together toward the common purpose of defrauding unsophisticated consumers, harming hundreds of thousands of victims every year in all 50 states, and annually draining hundreds of millions of dollars from the economy through fraud.

### a.      Mail & Wire Fraud

"Congress intended" the mail and wire fraud statutes "to reach a wide variety of fraudulent activity."[329] The mail fraud statute applies to "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future."[330] The statute "prohibits the use of the mails to further any scheme or artifice to defraud."[331]

To establish mail fraud, 18 U.S.C. § 1341, a plaintiff must point to "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations,

---

[327] *Safe Streets*, 859 F.3d at 882.

[328] Compl. ¶ 654; *compare* 18 U.S.C. § 1961(1) (listing predicates); 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1512(c)(2) (corruption of an official proceeding).

[329] *United States v. Welch,* 327 F.3d 1081, 1105-06 (10th Cir. 2003).

[330] *Durland v. United States*, 161 U.S. 306, 313 (1896).

[331] *United States v. Stewart*, 872 F.2d 957, 959 (10th Cir. 1989).

or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme."[332] "The first and second elements of federal mail and wire fraud are identical."[333] As a result, wire and mail fraud case law is interchangeable.[334] Wire fraud simply "require[s] that the defendant 'use interstate wire, radio or television communications in furtherance of the scheme to defraud.'"[335]

Mylan argues that Plaintiffs' fraud claims are "not premised on any allegedly fraudulent *communications*" and that "Plaintiffs have failed to plead that Defendants made *any* false or misleading statements."[336] This is wrong both factually and legally. Factually, Plaintiffs allege in detail that Mylan and Heather Bresch made numerous factual misstatements in 2011 (the 2-Pak press release) and in 2016 (the false testimony to Congress), which are catalogued above in the facts section at pages 23-27. Legally, mail and wire fraud do not depend on false communications: "Schemes to defraud . . . may come within the scope of the statute *even absent an affirmative misrepresentation*."[337] Thus, "[i]t is "sufficient" if the mail[338] or wire is merely

---

[332] *Welch,* 327 F.3d at 1104.

[333] *Id.*

[334] *See United States v. Zander*, 794 F.3d 1220, 1229 n.4 (10th Cir. 2015).

[335] *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991)).

[336] Mylan Br. 48-49 (emphasis in original).

[337] *United States v. Capra*, 652 F. App'x 632, 639 (10th Cir. 2016) (emphasis added) (quoting *United States v. Cronic*, 900 F.2d 1511-1513-14 (10th Cir. 1990); *see also Bridge*, 553 U.S. at 647 ("The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information[.]'").

[338] Mail fraud stretches beyond the official U.S. Postal Service to include any "commercial interstate carrier[.]" *United States v. Rahseparian*, 231 F.3d 1267, 1271 (10th Cir. 2000). Thus, if Mylan uses UPS or FedEx to ship the EpiPen 2-Pak, that act is still mail fraud.

"incident to an essential part of the scheme or a step in the plot.'"[339] Nor must the defendant use the mails or wires herself.[340]

In short, the scheme to defraud element (first element) is entirely distinct from the mail or wire element (third element).[341] And, thus, mail fraud covers "any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,'" and that is true "even if the mailing itself 'contain[s] no false information[.]'"[342]

The mail and wire statutes reach fraudulent press releases or public statements regarding the safety or medical necessity of a drug or product.[343] A pharmaceutical press release can be fraudulent "even if [it is] not 'literally false.'"[344] Materiality of the press release does not require that the press release have caused anyone to use the product;[345] the press release merely needs to

---

[339] *United States v. Washington,* 634 F.3d 1180, 1183 (10th Cir. 2011) (quoting *Schmuck v. United States,* 489 U.S. 705, 710-11 (1989)).

[340] *Washington,* 634 F.3d at 1183-84; *see also Zander*, 794 F.3d at 1226 ("A reasonable person in Defendant's position could have foreseen that his scheme, if successful, would result in the use of the mails, and this is enough to satisfy the foreseeability requirement.").

[341] *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 28 (1987) (affirming that even "routine mailings"—even the mere circulation of the *Wall Street Journal*—can suffice for the mail element of a mail fraud case).

[342] *Bridge*, 553 U.S. at 647 (quoting *Schmuck*, 489 U.S. at 712, 715); *see also. Zander*, 794 F.3d at 1227 (explaining that "the mail fraud statute does not require a direct connection between fraudulent misrepresentations and the use of the mails. Rather, '[i]t is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot.'").

[343] *See, e.g.*, *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1121 (D.C. Cir. 2009) (explaining that press releases regarding false medical safety claims can constitute wire or mail fraud predicates sufficient for civil RICO liability).

[344] *United States v. Harkonen*, 510 Fed. App'x. 633, 636 (9th Cir. 2013) (quoting *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003)).

[345] *Philip Morris*, 566 F.3d at 1121-23 ("Materiality does not require proof that any specific person (or number of people) purchased cigarettes as a result of the false statements. Nor does it require Defendants' false statements to be the cause, reason, or sufficient condition of any person's decision to purchase cigarettes. Moreover, no subjective evidence regarding any particular person is required; the test is only whether a reasonable person would consider the matter to be of importance regarding the transaction.").

be capable of influencing doctors or patients.[346] For materiality, the test is "whether it has a natural tendency to influence, or is capable of influencing a decision or action by another. The question of whether a statement is material is a question of fact for the jury to decide."[347] Mylan's own recent briefing—when it was a pharmaceutical plaintiff—confirms that the 2-Pak hard switch it imposed on U.S. consumers was a scheme to defraud:

- the "safety claims are belied by Defendants' own statements to regulators and conduct in marketing [the drug] outside of the U.S.";

- "Defendants have offered no justification for depriving doctors and patients of the opportunity to purchase the older versions" of the drug; and

- "Perhaps the most telling rebuttal of Defendants' safety claims is the fact that the U.S. market was the *sole market* in which Defendants launched [the new drug]."[348]

All three of Mylan's points apply with full force to the 2-Pak "hard switch." The majority of civil RICO claims involve mail or wire fraud,[349] and, as in *Bridge*, "RICO's plain terms give [Plaintiffs] a private right of action for treble damages."[350] The statute "clearly prohibits the use of the mails to further any scheme or artifice to defraud,"[351] and "each separate use of the mails in the execution of a scheme to defraud constitutes a separate offense."[352]

---

[346] *Harkonen*, 510 Fed. App'x. at 636.

[347] *United States v. v. Lawrence*, 405 F.3d 888, 901 (10th Cir. 2005) (internal citations omitted); *see also United States v. Sharp*, 749 F.3d 1267, 1279-80 (10th Cir. 2014) (jury could have found materiality where defendant "lulled" the victims into believing the scheme).

[348] *See* Brief for Appellant, *Mylan Pharm., Inc. v. Warner Chilcott Public Ltd. Co.*, 2015 WL 5665735, *14 (3d Cir. Sept. 21, 2015) (emphasis in original).

[349] *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 149 (1987) (observing that "the large majority of civil RICO complaints use mail fraud, wire fraud or securities fraud as the required predicate offenses") (citing ABA Report).

[350] *Bridge*, 553 U.S. at 648.

[351] *United States v. Stewart*, 872 F.2d 957, 959 (10th Cir. 1989).

[352] *Palmer v. United States*, 229 F.2d 861, 867 (10th Cir. 1955); *see also United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995) (same).

Numerous courts have held that RICO claims may be asserted pharmaceutical racketeers engaged in wire and mail fraud. Pfizer was tagged as a pharmaceutical racketeer in three 2013 decisions alone.[353] Those cases involved the drug Neurontin, which Pfizer had acquired after it had been developed. To rapidly boost sales, Pfizer and its predecessor began "to develop strategies to market Neurontin for off-label conditions."[354] Using the scheme to defraud, Pfizer spiked sales to $2 billion.[355] Mylan has also acted as a *RICO plaintiff*, filing civil RICO claims against pharmaceutical competitors *and their top executives*.[356]

The First, Second, and Third Circuits have all concluded that pharmaceutical marketing fraud falls within the scope of civil RICO.[357] And the Tenth Circuit has approvingly cited one the First Circuit's three RICO pharma decisions against Pfizer.[358] The Tenth Circuit has also recognized that a scheme to defraud involving pharmaceutical sales is "clearly within the purview of" the mail fraud statute, and that neither "actual reliance upon the defendant's

---

[353] *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51 (1st Cir. 2013); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60 (1st Cir. 2013).

[354] *In re Neurontin*, 712 F.3d at 27-28.

[355] *Id.*

[356] *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1132-33 (4th Cir. 1993) (explaining that Mylan filed suit against several pharmaceutical manufacturers and their officers, as well as officials of the FDA, for "a global conspiracy" related to pharmaceutical drug approvals and asserted RICO and antitrust claims).

[357] *See In re Neurontin*, 712 F.3d at 34-41; *Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP, 806 F.3d 71, 97 (2d Cir. 2015); In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 641 (3d Cir. 2015); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *22 n.32 (N.D. Cal. Feb. 21, 2017) (noting that the Eleventh Circuit's decision in *Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, 634 F.3d 1352 (11th Cir. 2011), is the minority view and is rejected repeatedly by "more recent cases"); *see also In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 920 (N.D. Ill. 2016) (discussing the numerous flaws in the Eleventh Circuit's reasoning in *Ironworkers*).

[358] *CGC Holding*, 773 F.3d at 1091 (citing approvingly *In re Neurontin*, 712 F.3d at 58).

misrepresentations" nor proof "that the victim suffered actual pecuniary losses from the scheme" are required.[359]

### b.    Corruptly Influencing an Official Proceeding

An additional RICO predicate is corruptly obstructing, influencing, or impeding an official proceeding, or attempting to do so.[360] This includes false testimony to Congress.[361] Section 1512(c)(2) reaches the conduct of "any person who corruptly . . . obstructs, influences, or impedes any official proceeding or attempts to do so" so long as that person acts "with the intent that [her] actions will influence a[n applicable] proceeding."[362] Whether those actions actually succeed in obstructing, influencing, or impeding the proceeding is immaterial.[363]

Here, Mylan's and Ms. Bresch's conduct falls within the plain language of § 1512(c)(2). As alleged in the Complaint, and as discussed *supra*, Ms. Bresch purposefully testified falsely before Congress on September 21, 2016, in an attempt to conceal Mylan's ongoing scheme to defraud. She gave repeatedly false testimony on a range of topics. By knowingly providing false testimony to Congress, Ms. Bresch not only committed wire fraud (because she acted to conceal the ongoing scheme to defraud and it was foreseeable that her false testimony would be broadcast over interstate wires), she also violated § 1512(c)(2).

---

[359] *Stewart*, 872 F.2d at 960-61.

[360] 18 U.S.C. § 1512(c).

[361] 18 U.S.C. § 1515(a)(1)(B); *see also United States v. Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) ("The term 'official proceeding' includes proceedings before … Congress.")

[362] *United States v. Gordon*, 710 F.3d 1124, 1149 (10th Cir. 2013) (collecting cases).

[363] *See United States v. Reich*, 479 F.3d 179, 186-87 (2d Cir. 2007) (explaining that the plain language of § 1512 clearly "encompasses all actions that 'corruptly ... influence[ ]' a proceeding—or even attempt to do so—not merely those that affect its ultimate outcome."); *see also United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (explaining that § 1512(c)(2) "operates as a catch-all").

### 2. "Pattern of"

A "pattern of racketeering activity" requires two related predicate acts of racketeering activity occurring within a ten-year period.[364] This generally requires that the racketeering predicates must be "related, and that they amount to or pose a threat of continued criminal activity."[365] Related acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."[366] Continued criminal activity can either be closed-ended, *i.e.*, "a closed period of repeated conduct," or open-ended.[367]

Resolving the "pattern" element at the 12(b)(6) stage is difficult: "[w]hether a pattern exists is a question of fact for the jury to determine."[368] In *Resolution Trust*, the Tenth Circuit held that a scheme lasting only "seven or eight months to perhaps as many as eighteen months" was sufficient to show continuity under the pattern element, especially because of "the large number of sales."[369] Here, as in *Resolution Trust*, the Complaint easily satisfies the pattern element. All of the predicate acts (set forth above) are related and hinge upon the EpiPen Pricing Scheme. The victims are the same, the participants are the same, and the common purpose was the same: to force or convince consumers to pay an inflated price for the EpiPen. As for continuity, the ongoing scheme has occurred from 2011 to present (over 6 years); tens of thousands of victims are involved nationwide; several different entities and individuals are involved; and billions of dollars are reaped by the racketeers.

---

[364] *See* 18 U.S.C. § 1961(5).

[365] *H.J. Inc.*, 492 U.S. at 239.

[366] *Id.* at 240.

[367] *Id.* at 241.

[368] *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993).

[369] *Id.* at 1544.

### 3.    "Enterprise"

Unique to RICO, the "obviously broad"[370] term "enterprise" includes "'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"[371] Two types of enterprises exist: [1] a corporate entity used to commit racketeering; and [2] several corporate entities or individuals (or both) combined as "an association-in-fact" enterprise.[372] Not every member must be a defendant.[373]

Here, Plaintiffs pursue an association-in-fact enterprise involving the Mylan Defendants and the Pfizer Defendants alongside the PBM Conspirators (who are not named as Defendants). *George* reversed a RICO dismissal on the enterprise element and confirmed the sea change in RICO caused by *Boyle* (2009). *Boyle* redefined the association-in-fact enterprise.[374] *Boyle* clarified that the enterprise element, like RICO overall, must be liberally construed and that "the very concept of an association in fact enterprise is expansive."[375] As a result, "an association-in-fact enterprise" requires "no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity."[376] Only three structural features are needed: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's

---

[370] *Boyle*, 556 U.S. at 944 (explaining why the term "enterprise" is so broadly construed).

[371] *George*, 833 F.3d at 1248 (quoting 18 U.S.C. § 1961(4)).

[372] *See id.* at 1248-49 (citing *Boyle*, 556 U.S. at 946).

[373] *See id.* at 1248, n.3.

[374] *Boyle*, 556 U.S. at 947-49 (explaining why structural requirements are contrary to plain language of RICO); *see also United States v. Harris*, 695 F.3d 1125, 1135 (10th Cir. 2012) (same).

[375] *Boyle*, 556 U.S. at 944; *see also Hutchinson*, 573 F.3d at 1021-22 (explaining in depth how much *Boyle* changed RICO).

[376] *Hutchinson*, 573 F.3d at 1020-21.

purpose.[377] In essence, an enterprise "simply a continuing unit that functions with a common purpose."[378] "After *Boyle,* no more is required."[379] Here, the Complaint satisfies the three elements. The common purpose was (and is) to overcharge consumers for the EpiPen to enrich the Defendants, and the relationships (Pfizer and Mylan working together) and long-term nature (from 2009 or 2011 to present) are set forth in detail.

In every post-*Boyle* Tenth Circuit RICO case (*George*, *Safe Streets*, *Harris*, and *Hutchinson*),[380] the Tenth Circuit has ruled that the enterprise element was sufficiently alleged under the new *Boyle* standard. So too here.

### 4. "Conduct or Participate in, Directly or Indirectly"

Defendants primarily attack the enterprise element by claiming that Pfizer and Mylan merely engaged in a routine business relationship. And Ms. Bresch contends she merely acted in the course and scope of her duties. None of these challenges has merit.

The "conduct or participate in" element is controlled by *Reves v. Ernst & Young,* 507 U.S. 170 (1993). Under the *Reves* test, to show that a defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs," as § 1962(c) requires, the plaintiff must show that the defendant "participated in the operation or management of the enterprise."[381] The Tenth Circuit interprets *Reves* more broadly than other Circuits.[382]

---

[377] *Boyle*, 556 U.S. at 946.

[378] *Id*. at 948; *see also id*. at 949 (emphasizing "the breadth of the 'enterprise' concept").

[379] *Hutchinson*, 573 F.3d at 1022.

[380] *Safe Streets*, 859 F.3d at 883; *George*, 833 F.3d at 1250-51; *Harris*, 695 F.3d at 1135; *Hutchinson*, 573 F.3d at 1021-22.

[381] *Hutchinson*, 833 F.3d at 1022 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)).

[382] *Hutchinson*, 833 F.3d at 1033-34 (cautioning that other circuits have reached "different conclusions on how best to read *Reves*").

"[A] plaintiff can easily satisfy *Reves*' operation and management test by showing that an enterprise member played some part—*even a bit part*—in conducting the enterprise's affairs."[383] Courts should not make premature rulings on which role each defendant played because "the discovery stage" is needed to "flesh[] out" the facts.[384]

### a.        Pfizer's Role in the Enterprise

Pfizer incorrectly insists the conduct element requires that *each defendant* (not just the enterprise) directly commit two predicate acts. The "relevant inquiry"[385] under § 1962(c) is whether each defendant acted "*to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity."[386] "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required."[387]

Here, it is reasonable to infer that Pfizer played more than a "bit part" in the enterprise. *First*, it is the exclusive supplier of the EpiPen 2-Pak.[388] Pfizer's role in the drug supply chain is similar to the role of defendants in other RICO drug supply chain cases, who were subjected to

---

[383] *George*, 833 F.3d at 1252 (emphasis added).

[384] *See id.* at 1253.

[385] "The relevant inquiry is thus whether [the defendant] participated, directly or indirectly, in the operation or management of the RICO enterprise." *Resolution*, 998 F.2d at 1542.

[386] *Id.* at 1541 & n.5 (emphasis in original); *see also id.* at n.5 (analyzing whether the defendant participated in affairs of enterprise, not whether each defendant committed two predicate acts).

[387] *Id.* at 1541 (quoting *Reves*, 507 U.S. at 179).

[388] Compl. ¶¶ 203, 240, 243.

liability for affording the enterprise a source of supply.[389] The EpiPen might require a prescription, but the conduct of those in the enterprise follows the same RICO path. The Tenth Circuit already made this exact comparison in *George* (a mortgage fraud case), when it invoked *Hutchinson* (a drug supply case). The analogy here is certainly less provocative than in *George*, which involved home mortgages and not injectable drugs.

    *Second*, not only does Pfizer manufacture every EpiPen 2-Pak, but Mylan and Pfizer force consumers to purchase the EpiPen as a 2-Pak only in the United States. There are 192 countries in the world, and in only one is the EpiPen sold only as a 2-Pak, so this cannot be deemed "business as usual." Also, the EpiPen 2-Pak is not required by the FDA and the EpiPen was sold in single doses without incident from 1987 to 2011.[390] Thus, it is plausible that Pfizer

---

[389] *Hutchinson*, 573 F.3d at 1016-18; *Harris*, 695 F.3d at 1134; *see also United States v. Kamahele*, 748 F.3d 984, 1003-04 (10th Cir. 2014) (drug distribution gang satisfied RICO enterprise test) (citing *United States v. Killip*, 819 F.2d 1542, 1544-46, 1549-50 (10th Cir. 1987) (same)).

[390] Compl. ¶¶ 325, 328-333.

knew or had reason to know that it was (and to this day, is) participating in the enterprise because it supplies EpiPens differently in the U.S. than anywhere else in the world.[391]

_Third_, Pfizer's knowledge is cemented by its patent infringement campaign in which it worked jointly with Mylan to suppress all of the rival competitors to the EpiPen. Plaintiffs allege the actions taken by Pfizer, all of the lawsuits filed by Pfizer, and all of the joint Mylan/Pfizer press releases issued.[392]

---

[391] Pfizer diverts from its usual business processes and manufactures the EpiPen 2-Pak for sale only in the United States, and nowhere else. Its conduct therefore fits this analogy:

> By way of analogy, suppose that a seemingly legitimate pharmaceutical company diverted a portion of its manufacturing capacity to the illicit production of methamphetamine. If the company entered into an ongoing arrangement with another entity, which agreed to furnish the raw materials for methamphetamine production on a continuing basis in order to facilitate the company's unlawful practices, the government could properly charge the pharmaceutical company under 18 U.S.C. 1962(c), on the theory that the two entities were constituent members of a RICO associated-in-fact enterprise. The defendant in those circumstances could not avoid prosecution by arguing that the manufacture of drugs is a "core corporate function" of a pharmaceutical company, and that the government therefore had alleged nothing more than unlawful conduct of the company's 'own business[.]'

Brief for the United States as Amicus Curiae, 2006 WL 680358, at *16-18, _Mohawk Indus., Inc. v. Williams,_ 126 S.Ct. 2016 (2006).

[392] Compl. ¶¶ 248-324.

*Fourth*, as Plaintiffs alleged, Pfizer and Mylan have a unified and interlocking common interest in advancing the EpiPen intellectual property.[393] This is confirmed by the unusual decision for Pfizer to transfer sponsorship of the EpiPen patents in the Orange Book to Mylan.[394]

*Fifth*, Pfizer earned over $339M from EpiPen sales in 2015 alone, and for every dollar that the EpiPen Pricing Enterprise brings in, Pfizer is paid a proportionate share.[395]

Mylan downplays Pfizer's role as "business as usual," and it relies on a string of district court cases from outside the Tenth Circuit, beginning with *Robins v. Glob. Fitness Holdings, LLC*, which involved several payment processors that simply "provided ordinary wire transfers to [the defendant], ignorant of any fraudulent scheme[.]"[396] Such cases are inapt. Unlike Pfizer, the defendants in those cases did not knowingly fund fraudulent schemes, pursue lawsuits to stifle competitive threats to the enterprise, or share dollar-for-dollar in the profits repeated by the fraudulent scheme.

---

[393] Compl. ¶ 241 ("The Mylan and Pfizer defendants have a unified interest in protecting the EpiPen monopoly. That is because while Pfizer and its subsidiaries owned the patents protecting the EpiPen and is the contract supplier of the product, Mylan owns the trademarked brand names and controls the worldwide marketing and sale of the products. Their divided intellectual property ownership of the EpiPen and their licensing agreements for it have caused the two companies to work collaboratively to enhance the products sales volume and profitability. Defendants' EpiPen-related revenues rise (or fall) together. If the EpiPen patents are invalidated, or if other competitors gain market share, both stand to lose, and so they have stood together to fend off competitors and protect the EpiPen patents.").

[394] *Id.* ¶ 247. ("In 2014, Mylan Specialty LP took over as the sponsor of the EpiPen patents in the Orange Book. Meridian had been the prior sponsor of those patents. It is unclear exactly why Mylan took over sponsorship of the patents, or what consideration may have been exchanged between Mylan and Pfizer related to that change. The change in sponsorship does, however, continue to show concerted action by Mylan and Pfizer to share the burdens and rewards of their EpiPen monopoly.").

[395] *Id.* ¶ 245-46.

[396] *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 652 (N.D. Ohio 2012).

Instead, Mylan quotes these cases to emphasize the banks were not part of the enterprise because there was "no finding of a hierarchal or consensual decisionmaking" to form an enterprise.[397] Mylan also cites two Tenth Circuit cases, beginning with *Brannon*.[398] The district court in *George*, however, was reversed for relying on *Brannon*.[399] And Mylan concludes with a *pro se* prisoner case (*Switzer*)[400] in which the Tenth Circuit held that an enterprise must include more than "simply the group of individual defendants accused of engaging in the racketeering,"[401] which Mylan argues is "not enough."[402]

But in the post-*Boyle* world, that is enough. *Switzer*—and every other case Mylan cites—was decided under a pre-*Boyle* standard. The law changed "after *Boyle*," and it is now settled that "an association-in-fact enterprise need have no formal hierarchy or means for decision-making[.]"[403] Resolving a Circuit split, *Boyle* held that an enterprise can have a common purpose that is nothing more than the commission of the predicate acts: "a group that does nothing but engage in extortion…may fall squarely within the statute's reach."[404] To this end, *Boyle* instructed that "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure."[405] As then-Judge Gorsuch explained, the structural requirements for an enterprise

---

[397] Mylan Br. 40.

[398] *Brannon v. Boatmen's First Nat'l Bank*, 153 F.3d 1144 (10th Cir. 1998).

[399] *George*, 833 F.3d at 1250.

[400] In *Switzer*, the *pro se* plaintiff "insist[ed] he did the best he could" while litigating in prison and suing a string of defendants. The case was dominated by the *Bivens* discussion; the RICO claim received two summary paragraphs. *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001).

[401] *Id.* at 992.

[402] Mylan Br. 43.

[403] *Hutchinson*, 573 F.3d at 1021 (10th Cir. 2009).

[404] *Boyle*, 556 U.S. at 948.

[405] *Id.* at 942 n.1.

post-*Boyle* are "modest" and must be under RICO's plain language: "'The term 'any' ensures that the definition has a wide reach, … and the very concept of an association in fact is expansive.'"[406] And, again, the term "enterprise" is "obviously broad" and, like RICO in general, is "liberally construed."[407]

Plus, RICO liability can attach even if "'the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'"[408] In *George*, one of the defendants argued that he had "merely provided its regular services" and thus could not be liable.[409] But the defendant was alleged to have knowingly facilitated the enterprise's goals.[410] As *George* explained, a defendant is liable if he "knowingly" participates in the enterprise, even if he is at the lowest rung of the scheme or even reluctantly participates.[411] This knowledge element acts as a limiting principle on RICO liability—one that must be "fleshed out" in discovery.[412]

At bottom, Plaintiffs have plausibly alleged that Pfizer knowingly participated in the enterprise based on the unique circumstances of the 2-Pak (sold only in the United States) and Pfizer's involvement in the pay-for-delay and patent lawsuit campaigns. Thus, Plaintiffs have alleged enough to show that discovery should proceed regarding Pfizer's role in the enterprise.

---

[406] *Hutchinson*, 573 F.3d at 1020-22 (quoting *Boyle*, 556 U.S. at 944); *see also Harris*, 695 F.3d at 1134-36 (reaffirming *Hutchinson*).

[407] *Boyle*, 556 U.S. at 944 (collecting cases regarding the broad scope of the enterprise element).

[408] *Safe Streets*, 859 F.3d at 884 (quoting *H.J. Inc..*, 492 U.S. at 249).

[409] *George*, 833 F.3d at 1252.

[410] *Id.*

[411] *Id.* at 1252-53.

[412] *Id.* at 1253.

### b.    Heather Bresch's Role in the Enterprise

Defendant Heather Bresch argues that she was improperly named as a Defendant. She

argues that all of her actions were done "on the company's behalf," but that is immaterial. In

*Cedric Kushner*, a case Defendants cite, the Supreme Court held that a CEO can be liable under

RICO even if she acts on behalf of the company in the course of her duties.[413]

To be clear, Plaintiffs do not argue that Bresch is liable as an agent or simply because she

is the CEO of Mylan, N.V. Rather, she is liable for directly and personally committing the

actions alleged in the Complaint.[414] Defendants ignore not only the controlling law, but also

nearly all of the factual allegations tying Bresch directly and personally to the scheme to defraud.

The Complaint makes numerous factual allegations plausibly showing that Ms. Bresch "actually

knew about and participated in the tortious conduct"[415] at issue:

- She testified to Congress on Sept. 21, 2016, and made numerous material misrepresentations designed to conceal the ongoing scheme to defraud.[416]

- She personally enriched herself with massive bonuses and her compensation rose in near perfect lockstep to the EpiPen price increases.[417]

---

[413] *Cedric Kushner*, 533 U.S. at 165 ( (2001) (ruling that making a distinction "between employees acting within the scope of corporate authority and those acting outside that authority" under RICO "is inconsistent with [RICO's] basic statutory purpose [and] would immunize from RICO liability many of those at whom [the Supreme Court] has said RICO directly aims….") (internal citations omitted).

[414] *Lobato v. Pay Less Drug Stores, Inc.*, 261 F.2d 406, 408-09 (10th Cir. 1958) (""It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom.").

[415] *Compare Energy Consumption Auditing Servs., LLC v. Brightergy, LLC,* 49 F. Supp. 3d 890, 896 (D. Kan. 2014) (denying motion to dismiss against CEO because the CEO directly committed the alleged harm); *see also Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 701 (S.D.N.Y. 2015) ("A corporate employee or officer who himself 'participates in a tort, even if it is in the course of his duties, may be held individually responsible.'").

[416] Compl. ¶¶ 226-28, 419-448.

[417] *Id.* ¶ 668.

- She rose through Mylan's ranks with unusual speed on the back of the EpiPen.[418]

- She referred to the EpiPen as her "baby."[419]

- She spearheaded the public denial campaign in 2016 by appearing before Congress on Sept 21, 2016 and the Forbes Health Summit on Dec 1, 2016.[420]

- She was a primary speaker in almost every Mylan news release issued from 2011 to present regarding the EpiPen, including the most deceptive quote in the Aug 24, 2011 release.[421]

- She personally overruled numerous Mylan executives who challenged the EpiPen price increases, as revealed in a 2017 New York Times article.[422]

- In a video of a December 1, 2016, interview of Ms. Bresch from the Forbes Summit, Ms. Bresch nods in agreement with the statement that the decision to increase the price of the EpiPen is "wholly [her] decision and responsibility."[423]

Thus, taking her at her word, Ms. Bresch is personally responsible and therefore liable.

And she acted in her own self-interest—not in the best interests of the any of the Mylan entities. Ms. Bresch is *not* the CEO of Mylan Specialty, LP, the defendant that sells, markets, and distributes the EpiPen. Instead, she is the CEO of Mylan, N.V., the parent company incorporated in the Netherlands.[424] She has no corporate title at Mylan Specialty, as confirmed by her certification to Congress when she testified on September 21, 2016.[425] The motive for her

---

[418] *Id.* ¶ 615.

[419] *Id.* ¶ 616.

[420] *Id.* ¶¶ 380-83, 617. This is reminiscent of the Big Tobacco denial or cover-up campaign resulting in civil RICO liability. *See Philip Morris USA Inc.*, 566 F.3d at 1122 ("The fact that Defendants continually denied any link between smoking and cancer suggests they themselves considered the matter material.").

[421] *Id.* ¶ 619.

[422] *Id.* ¶ 622 (quoting Charles Duhigg, *Outcry Over EpiPen Prices Hasn't Made Them Lower*, New York Times, June 4, 2017, available at: https://www.nytimes.com/2017/06/04/business/angry-about-epipen-prices-executive-dont-care-much.html (attached as Exhibit C to Complaint).

[423] *Id.* ¶ 383.

[424] Compl. ¶¶ 613, 614.

[425] *Id.* ("Thus, it was unusual for her, as the CEO of Mylan N.V. (the Mylan holding company based in the Netherlands), to interject herself into the daily affairs of the EpiPen business.").

infiltration of Mylan to commit a scheme to defraud is clear: Mylan is primarily a generics company that makes low margins on high volumes, and thus the EpiPen generates 40% of the company's profit.[426] A reasonable inference is that Ms. Bresch was personally driven to engineer the EpiPen Pricing Scheme to advance her own position in the company (she vaulted from being a low-level employee to the CEO on the back of the EpiPen) and to enrich herself (she took her salary from $2.5M to $19M off of EpiPen sales, plus the $82M in special bonuses she and a handful of Mylan executives paid themselves solely off of EpiPen sales).[427] By leading the EpiPen Pricing Scheme to defraud and the concealment and denial campaign throughout 2016, Ms. Bresch's "conduct went well beyond non-actionable nondisclosure and became 'deceitful concealment of material facts,' thus implicating [her] in the wire [and mail] fraud scheme."[428]

In sum, Plaintiffs have plausibly alleged that both Pfizer and Ms. Bresch participated, directly or indirectly, in the affairs of the enterprise.

### 5.    Causation & Standing

Causation is an essential element of a claim under § 1962(c) because of the phrase "by reason of[.]"[429] Even in cases where causation is "nebulous," dismissal at the 12(b)(6) stage is ill-advised because courts take a "liberal" view of RICO causation, which only requires a "casual connection" early in the case.[430] Beyond RICO, "[c]ausation is generally a question of fact for the jury."[431]

---

[426] *Id.* ¶ 391.

[427] *Id.* ¶¶ 392, 668.

[428] *United States v. Gallant*, 537 F.3d 1202, 1228-29 (10th Cir. 2008).

[429] *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-68 (1992).

[430] *Gillmor v. Thomas*, 490 F.3d 791, 798 n.4 (10th Cir. 2007).

[431] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013).

As already set forth, *Bridge* clarified that first-party reliance is not a § 1962(c) element: "[A] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations."[432] Applying *Bridge*, courts have rejected the argument that the chain of causation in pharmaceutical fraud cases is too attenuated or complicated.[433] Other courts, too, have disposed of the argument that the misrepresentations were not material because the RICO victims would have purchased the product anyway[434]—a determination that the Tenth Circuit has instructed is especially improper to make early in a RICO case.[435]

So, too, with standing, which is intertwined with causation.[436] Here, standing depends on Mylan's fraud in forcing U.S. customers to purchase the EpiPen 2-Pak at an inflated price, not on the EpiPen's effectiveness.[437]

Mylan proposes that the indirect purchaser concept of *Illinois Brick* should apply to RICO, but this reading defies the Tenth Circuit's most recent guidance on RICO standing and causation.[438] Importing *Illinois Brick* into RICO is also contrary to *Bridge* and its express

---

[432] *Bridge,* 553 U.S. at 649.

[433] *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 36-37 (1st Cir. 2013); *In re Avandia*, 804 F.3d at 644.

[434] *Wallace v. Midwest Fin. & Mort. Servs., Inc.*, 714 F.3d 414, 419-20 ((6th Cir. 2013).

[435] *CGC Holding*, 773 F.3d at 1099 n.15 ("As a threshold matter, however, these arguments of proximate causation do not divest plaintiffs of standing to bring their well-pleaded RICO claims."); *see also id.* at 1099 ("[P]laintiffs have a viable theory of causation that is adequate to confer *standing* under RICO at this stage in the litigation.").

[436] *Id.*

[437] *In re Avandia*, 804 F.3d at 640 (explaining this point).

[438] *CGC Holding*, 773 F.3d at 1099 n.15; *see also Safe Streets*, 859 F.3d at 886-88 (discussing standing requirements under RICO and not adopting *Illinois Brick*).

rejection that privity or first-party reliance is required for RICO causation.[439] If *Illinois Brick* applied to RICO, the Supreme Court would have said so in *Bridge*. But it didn't.

Here, there is no reasonable dispute that the economic injury to the EpiPen end-users was foreseeable, which is a critical component—along with directness—of the causation equation.[440] All that is required is "*some* direct relation between the injury asserted and the injurious conduct alleged."[441] There is more than "some direct relation" between the "hard switch" to the 2-Pak and Plaintiffs' damages: but-for the "hard switch" to the 2-Pak, Mylan's scheme to defraud could not have succeeded. Plaintiffs are not required to show that the communications caused the loss to consumers; they are required to plausibly allege that they scheme to defraud caused the loss. Here, they have done so. The EpiPen Pricing Scheme directly targeted the consumers and third-party payors, and Plaintiffs have alleged a reliable method to prove it: by comparing the data and history of EpiPen purchases from 1987-2011 (pre-hard switch to the 2-Pak) and after 2011 (post-hard switch). This data will prove whether or not the EpiPen Pricing Scheme (including the hard switch to the 2-Pak) caused consumers and third-party payors to overpay.[442]

Also, as Plaintiffs allege, "[b]ecause Mylan sets the list price for the EpiPen, Mylan dictates the price paid by the end purchaser, *i.e.*, the consumer."[443] Likewise, as Plaintiffs allege, in a poster displayed by Heather Bresch to Congress on September 21, 2016, Mylan confirmed

---

[439] *Bridge*, 553 U.S. at 660 ("RICO's text provides no basis for imposing a first-party reliance requirement.").

[440] *See Bridge*, 553 U.S. at 657-58 (concluding that the plaintiffs' injury was "the direct result" of the defendants' fraud because "[i]t was a foreseeable and natural consequence" of the defendants' scheme); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 58 (1st Cir. 2013) (same).

[441] *Hemi Grp., LLC v. City of NY*, 559 U.S. 1, 9 (2010) (emphasis added).

[442] Compl. ¶ 670.

[443] *Id.* ¶ 374.

that it controls the list price paid by the end-user."[444] The causation standard requires only that the Defendants' RICO violations were a "substantial factor in the sequence of responsible causation."[445] And "we must bear in mind that a 'proximate cause is not . . . the same thing as a sole cause.'"[446] Here, the connection between the 2-Pak Scheme and the economic injury to Plaintiffs "is not so indirect, unforeseeable, or illogical that the defendants must prevail as a matter of law."[447]

### C.    In the Alternative, Plaintiffs Have Stated a Claim Against the Pfizer Defendants and Heather Bresch Under § 1962(d).

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of the RICO statute."[448] A RICO conspiracy "may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil[.]"[449] A § 1962(d) claim does not require an enterprise, and "§ 1962(d) requires no overt act, unlike the general criminal conspiracy statute, 18 U.S.C. § 371, which does."[450] Thus, even if the Pfizer Defendants or Ms. Bresch did not participate in the affairs of the enterprise, the allegations suffice to show they joined a RICO conspiracy under § 1962(d).

---

[444] *Id.* ¶ 426.

[445] *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 422 (6th Cir. 2013).

[446] *Id.* (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir);; *see also Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 732-33 (7th Cir. 2014) ("RICO claims sound in tort. The alleged bribery here was an intentional tort. Like an arsonist who burns down a cabin the day before a natural forest fire, the Racetracks may be 'jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct,' regardless of innocent alternative causes.") (internal citations omitted); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 620 (6th Cir. 2004) ("[Plaintiffs] need show only that the conduct was a substantial cause.").

[447] *Wallace*, 714 F.3d at 420-22.

[448] *Beck v. Prupis*, 529 U.S. 494, 506-07 (2000).

[449] *Salinas v. United States*, 522 U.S. 52, 65 (1997).

[450] *Harris*, 695 F.3d at 1132.

III.    **Plaintiffs' Competitive Delay Claims Are Timely.**

Defendants incorrectly assert that the "majority" of Plaintiffs' competitive delay claims—both antitrust and RICO—are time-barred based on the April 26, 2012 settlement with Teva, arguing that it is the last overt act triggering the commencement of the statute of limitations. That argument has been rejected in similar cases[451] and ignores the rules of accrual.

A.    **Plaintiffs' Claims Accrued on Each Overcharge.**

In the pay-for-delay context, a purchaser plaintiff's cause of action accrues when he or she actually pays an overcharge because the injury does not occur until "the monopolist actually sets an inflated price and its customers determine the amount of their purchases."[452] The Second Circuit expressly held "that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."[453] Indeed, "[e]very court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug."[454] These courts recognize that "[s]o long as a monopolist continues to use [that] power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide."[455]

---

[451] *In re K-Dur Antitrust Litig.*, 338 F.Supp.2d 517, 551 (D.N.J. 2004); *In re Nexium*, 968 F. Supp. 2d at 399 (same); *see also Zenith*, 401 U.S. at 338 (1971) ("cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.")..

[452] *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 295-96 (2d Cir. 1979).

[453] *Id.* at 296; *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("[A]ntitrust injury occurs the moment the purchaser incurs an overcharge."[453])

[454] *In re Niaspan Antitrust Litig.*, 42 F.Supp.3d 735, 746-747 (E.D. Pa. Sept. 5, 2014) (case citations omitted).

[455] *In re Nexium*, 968 F. Supp. 2d at 400; *see also Berkey Photo*, 603 F.2d at 295 (2d. Cir. 1979); *Zenith Radio*, 401 U.S. at 340 ("[O]therwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary

Accordingly, "a new claim accrues with each alleged overcharge. Claims are therefore not time-barred that stem from alleged overcharges incurred within the relevant statutory period, whatever that period may be for a particular statute, measured backward from the filing of the claims."[456] Directly contrary to the Pfizer Defendants' argument that this "would mean, absurdly, that statutes of limitations could in effect run in perpetuity," Pfizer Br. 20, "the rule of *Berkey Photo* extends the statute of limitations no more endlessly than the monopolist extends the excessive price. . . . So long as the anticompetitive pricing remains, there can be no guarantee of repose from purchaser actions."[457] Because Plaintiffs' claims stem from overcharges incurred within the relevant statutory period, their claims are therefore timely.

## B.     The Continuing-Violation Doctrine Applies.

The "argument that an allegedly anticompetitive agreement must have occurred within the limitations period for the continuing-violation doctrine to apply" has been "specifically rejected."[458] Rather, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."[459]

---

to the congressional purpose that private actions serve as a 'bulwark of antitrust enforcement' (internal citation omitted)."); *Hanover Shoe, Inc. v. United Shoe Machinery Corp*, 392 U.S. 481, 489 (1968) ("As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows"); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2013 WL 2181185, *29 (E.D. Tenn. May 20, 2013); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 549; *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002).

[456] *Aggrenox*, 94 F. Supp. 3d at 248.

[457] *In re Aggrenox*, 2015 WL 4459607, at *6 (citing *Berkey Photo*, 603 F.2d at 296).

[458] *In re Niaspan*, 42 F. Supp. 3d at 746-47.

[459] *Id.* at 476 (citing *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)).

Here, Plaintiffs' Complaint sets forth sufficient facts that the unlawful actions giving rise to Plaintiffs claims continued late into 2016, if not beyond. Defendants used their monopoly power to institute successive price increases for the EpiPen from July 2013 until at least late November 2015 and continued to work to exclude competitors from the market throughout 2016 to the detriment of consumers who rely on the EpiPen to stay alive.[460] Defendants' ongoing multi-faceted scheme to maintain its monopolistic power, which continued well into 2016, also triggers the continuing conspiracy exception.[461]

Separately, Defendants' ongoing overcharging also constitutes a continuing violation. As the Supreme Court has explicitly stated, "in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' **e.g., each sale to the plaintiff**, 'starts the statutory period running again, **regardless of the plaintiff's knowledge** of the alleged illegality at much earlier times.'"[462] Pfizer's argument requires turning this standard on its head and ignores that each sale to the plaintiff was an overt act that harmed plaintiffs. These sales at supracompetitive prices were the result of the Defendants' conspiracy and, thus, the continuing violation exception applies.[463]

---

[460] Compl. ¶¶ 165, 174 (scheme to use rebates to oust competitor commencing in May 2013); see *also id.* ¶¶ 380, 381, 403, and 502-514.

[461] *Auraria Student Housing at the Regency LLC v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1248 (10th Cir. 2016). Compl. ¶¶ 6, 134-142, 147-347, 411-415 (describing multiple contemporaneous unlawful schemes to prevent having to pay rebates to lower costs, to block competitors from entering the market, to be the sole provider of EpiPens in schools, to require the purchase of 2-Paks, etc.; schemes which are alleged to have continued well into 2016).

[462] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (emphasis added) (citations omitted).

[463] See *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 JG VVP, 2010 WL 10947344, at *15 (E.D.N.Y. Sept. 22, 2010) (applying continuing violation where conspiracy was in place and the defendants continued to sell at rates that were fixed or artificially inflated).

### C.   The Discovery Rule, Fraudulent Concealment, and Equitable Tolling Apply.

The doctrines of the discovery rule, fraudulent concealment, and equitable tolling further toll the applicable statutes of limitations. Plaintiffs plainly make numerous factual allegations in the Complaint that are sufficient to invoke these doctrines.[464]

The basis for the application of these doctrines is set for in the Complaint. For instance, for the discovery rule, Plaintiffs allege that, as consumers and third party payors, they had no knowledge of facts sufficient to put them on notice until Congress announced its investigations."[465] For fraudulent concealment, Plaintiffs allege that not only did they not know about the conspiracy, but it was both "wrongfully concealed" and "inherently self-concealing."[466] This includes CEO Heather Bresch's misstatements and misrepresentations to numerous media outlets and before Congress in September 2016, her refusal to testify before the Senate in November 2016, as well as misrepresentations made at the Forbes Health Summit in December 2016, and on Mylan's website through at least 2016.[467] If governmental agencies like the Centers for Medicare and Medicaid and the U.S. Congress had difficulty investigating and getting to the bottom of Defendants' fraud and subterfuge at the end of 2016 and thereafter, members of the public cannot be expected to have discovered more information any earlier.

---

[464] *See* Compl. ¶¶ 502-14. Notably, none of the case opinions cited by Defendants regarding these doctrines were district-court opinions rendering decisions at the motion-to-dismiss stage. Rather, almost all were district-court opinions rendering decisions at the summary-judgment stage. *See, e.g.*, *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1159-60; *Perry H. Bacon Tr. v. Transition Partners, Ltd.*, 298 F. Supp. 2d 1182, 1189 (D. Kan. 2004); *FDIC v. Schuchmann*, 224 F. Supp. 2d 1332, 1343 (D.N.M. 2002).

[465] Compl. ¶¶ 502-06.

[466] *Id.* ¶¶ 507-13.

[467] *Id.* ¶¶ 380, 371, 403, 417-48; *see also id.* ¶¶ 417-448, at 424 (describing Mylan's repeated false statements to federal officials and the media, provoking pharmacist and U.S. Representative Buddy Carter to describe EpiPen's years of pricing tactics a "shell game").

Finally, Plaintiffs also allege that "Defendants are estopped from relying on any statute of limitations defense because their illegal, deceptive, and fraudulent practices as alleged herein, which are continuing, have created continuing and repeated injuries to Plaintiffs and the Class."[468] Defendants claim that Plaintiffs could have reasonably discovered the unlawful conduct through the mere fact that the patent litigations and their settlements existed.[469] This incorrectly assumes that the settlements—in a vacuum—would give Plaintiffs knowledge of their claims. They did not and the Court must accept the allegations in the Complaint as true where Plaintiffs sufficiently allege—as described above—that they were consumers with no means to discover Defendants' unlawful conduct until August 2016. Ultimately, the question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law.[470] Given that evidence is not considered at the motion to dismiss stage, "[p]laintiffs' allegations, asserting affirmative conduct to conceal the fraud, are sufficient to invoke the doctrine of equitable tolling at this [motion to dismiss] stage in the proceeding…."[471] For all of these reasons, the Court should deny Pfizer's motion to dismiss Plaintiffs' claims as untimely.

## IV.  Plaintiffs Adequately Plead Their State Law Consumer Protection Claims.

### A.  Plaintiffs Have Article III Standing.

The Complaint pleads facts sufficient to establish case or controversy under Article III: (1) that plaintiffs suffered an "injury in fact" and (2) that the injury is "fairly traceable" to the

---

[468] *Id.* ¶ 514.

[469] *See, e.g.*, Pfizer Br. 18-19.

[470] *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1042 (10th Cir. 1980).

[471] *Id.*

defendants' misconduct.[472] <u>First</u>, the Complaint alleges "a paradigmatic form of injury-in-fact":

economic harm to consumers.[473] This Court has already ruled that Sanofi sufficiently pleaded an

"antitrust injury"—that Mylan's anticompetitive conduct resulted in increased prices to

consumers and reduced quality of EAI drug devices available to consumers in the market.[474] The

consumer plaintiffs make these same allegations,[475] and "[c]onsumers in the market where trade

is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."[476] Such

"antitrust injury" is, by definition, an "injury in fact" sufficient to confer Article III standing.[477]

Contrary to Defendants' characterization, the injury alleged here is not simply "paying

---

[472] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *see also Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 294 (3d Cir. 2005) ("The contours of the injury-in-fact requirement … are very generous, requiring only that claimant allege some specific identifiable *trifle* of injury").

[473] *Gonzalez v. Pepsico*, 489 F. Supp. 2d 1233, 1240 (D. Kan. May 24, 2007); *see also Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 293 (3d Cir. 2005) (Alito, J.) (monetary harm is the "paradigmatic," "classic" injury-in-fact); *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) (paying more for something than it is worth is "quintessential injury-in-fact").

[474] *Sanofi Order*, 2017 WL 6524839 at *17.

[475] *See* Compl. ¶¶ 717, 732, 749, 790, 807, 821, 836, 849, 846, 879, 894, 911, 926, 942, 957, 972, 987, 1002, 1019, 1037, 1051, 1064, 1077, 1102, 1116, 1128, 1142, 1156, 1169, 1184, 1197, 1212, 1226, 1240, 1254, 1286, 1282, 1297, 1313, 1329, 1344, 1358, 1373, 1387, 1402, 1417.

[476] *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (internal quotation marks omitted) (citing *SAS v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44–45 (1st Cir.1995) ("The presumptively proper plaintiff is a customer who obtains services in the threatened market"); *see also In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 662-63 (D. Kan. 2013).*In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 662-63 (D. Kan. 2013).

[477] *JetAway Aviation, LLC v. Board of County Com'rs of County of Montrose, Colo.*, 754 F.3d 824, 832 (10th Cir. 2014) (per curiam) ("The requirements of antitrust standing 'are more rigorous than [those] of the Constitution.'"); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 962 (10th Cir. 1990); *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 863 (C.D. Cal. 2015) (noting that because Article III imposes a lower bar than antitrust standing, a plaintiff with antitrust standing also meets the requirements for Article III standing).

more than one wishes."[478] Plaintiffs allege that they "would not have accepted, acquired, and purchased the EpiPen" and would not have lost money in the process *"[b]ut for the Defendants' fraudulent scheme."*[479] "There is no difficulty" finding Article III standing where, as here, Plaintiffs allege that they bought a product they otherwise would not have or "paid more for [it] than they otherwise would have paid" *because of* conduct that is alleged to be unlawful.[480] Plaintiffs also suffered unique and separate economic injury as a result of Defendants' "hard switch" to the EpiPen 2-Pak, which forced Plaintiffs to purchase two devices instead of one, for a product that usually expires before it can be used. Courts have consistently upheld consumer claims regarding forced additional purchases, explaining that when plaintiffs allege that defendants "forced them to spend money against their will," that allegation is "sufficient to confer Article III standing."[481]

*Second*, the Complaint pleads facts sufficient to establish that Plaintiffs' injury is "fairly traceable" to Defendants' misconduct. Defendants ignore what the Complaint actually alleges: a

---

[478] Mylan Br. 54.

[479] Compl. ¶ 679 (emphasis added).

[480] *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013); *see also Gonzalez*, 489 F. Supp. 2d at 1240; *Reazin*, 899 F.2d at 962 (noting, in the context of a consumer anti-trust claim, that "an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury"); *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. at 662-63.

[481] *Danvers*, 432 F.3d at 293 (3d Cir. 2005). None of the standing cases cited by Defendants involved anything close to the allegations here. *See Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016) (polygamist family challenging constitutionality of Utah's bigamy statute); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (environmental groups failed to establish standing where their members had not visited the sites inhabited by endangered species); *Rivera v. Wyeth-Ayerst Lab.*, 283 F.3d 315, 320 (5th Cir. 2002) (drug buyer lacked standing where, but for defendant's conduct, "the plaintiffs would be in the same position they occupy now"); *N. Am. Safety Valve Indus., Inc. v. Wolgast*, Civ. A. No. 85-2575, 1986 WL 15792, at *3 (D. Kan. Nov. 13, 1986) (claims of substantive due process relating to composition of the Kansas Boiler Advisory Board).

campaign of anticompetitive and unfair practices that resulted in increased prices for consumers. Plaintiffs allege that, but for this misconduct, they would have paid lower prices, experienced greater consumer choice, and enjoyed better quality products. That satisfies the "fairly traceable" element. Defendants single out the allegations about increased insurance premiums (Mylan Br. 57), but this a factual dispute—not a standing issue—and inappropriate for resolution on a motion to dismiss.[482]

### B.    Plaintiffs' Consumer Protection Claims are Not Preempted by Federal Law.

Defendants are incorrect in arguing that the federal Patent Act preempts Plaintiffs' state-law consumer protection claims. Defendants do not and cannot argue that the Patent Act contains any express preemption clause. Nor do Defendants contend (because they cannot) that there is general "field" preemption under the Patent Act. Instead, Defendants are left to argue that Plaintiffs' assertion of state law claims—which challenge anticompetitive, unfair, and deceptive practices—somehow "stands as an obstacle to the accomplishment and execution" of the Patent Act.[483] Defendants are wrong.

Federal patent law will preempt a state-law remedy only if it is based on "conduct that is protected or governed by federal patent law."[484] For example, federal patent law bars the imposition of liability for a certain conduct before the Patent & Trademark Office.[485] Here, the

---

[482] Defendants' final traceability argument—that Plaintiffs were harmed from buying two packs, not because of Defendants' misconduct, but because they had only one allergic reaction (Mylan Br. 58)—borders on the absurd. Plaintiffs bought the EpiPen in two-packs because Defendants' unlawful monopoly drove out competition and left consumers with no other choice.

[483] Mylan Br. 58.

[484] *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998); *see also Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1011(10th Cir. 2008) (reasoning that federal patent law did not preempt state trade secret law).

[485] *See Douglas,* 153 F.3d at 1335-36.

conduct alleged is not protected by the Patent Act or any other federal law. As much as Defendants would like to restyle this case as the lawful exploitation of patent rights, that is not what Plaintiffs allege: the Complaint alleges a scheme to raise prices through the systematic elimination of competition via unlawful means. Defendants would have this Court hold that Congress, in enacting the patent laws, intended to give sweeping protection to the alleged misconduct. That is not the law. To the contrary, consumer protection is an area where the federal government has not asserted an exclusive interest and where states have maintained a traditional regulatory presence.[486]

Defendants cite no authority—and we are aware of none—holding that the federal patent laws permit a patent holder to engage in anticompetitive, unfair, and deceptive practices. To the contrary, "neither patent nor copyright holders are immune from antitrust liability."[487]

Defendants rely on cases where patent law was held to preempt state-law attempts at price regulation.[488] But this is not a case about price regulation. Rather, the Complaint is clear: the conduct at issue is Defendants' unlawful acquisition and maintenance of monopoly power, which has allowed them to extract excessive prices, through anticompetitive, unfair, and deceptive means. Federal law does not preempt a state-law remedy for that misconduct.

---

[486] *See In re Pharm. Indus. Average Wholesale Price Litig*, 582 F.3d 156, 190-91 (1st Cir. 2009).

[487] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1215 (9th Cir. 1997). In fact, the Supreme Court recently went so far as to suggest that patent and antitrust policies and law are complementary of one another. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 133 S. Ct. 2223, 2231 (2013).

[488] Mylan Br. 58-60.

### C.     Plaintiffs Have Sufficiently Pled their Consumer Protection Claims.

For patients with severe allergies, access to epinephrine at all times is not optional.[489] In
the event of an allergic reaction, an EAI device can mean the difference between life and death.
Due to Defendants' unfair, anticompetitive, and deceptive conduct, the vast majority of
Americans suffering from severe allergies have no choice in EAI device—the only EAI device
available to them is EpiPen. And not only do these consumers have no choice but to purchase an
EpiPen, but they have no choice but to purchase a two pack of EpiPens, at a grossly inflated
monopolistic price. Notably, this conduct is ongoing: Defendants' practices have not changed in
the face of public outcry or this litigation.[490]

The Complaint alleges that Defendants, acting in concert and through a multi-pronged
scheme, have exploited their dominant position in the market for epinephrine auto-injectors to
increase the price of the EpiPen, aggressively and repeatedly, to an extraordinary level that bears
no reasonable relationship to the cost of development or production. The victims of Defendants'
exploitive scheme are consumers suffering from a physical infirmity with life-threatening
consequences. Many of those being taken advantage of, moreover, are children and their parents.

As with the antitrust claims, Defendants attack some (but not all) of Plaintiffs' claims of
deception and unfairness piecemeal, seeking to deprive the Court of necessary context. But
whether conduct falls within the ambit of consumer protection statute requires consideration of
"the totality of the circumstances."[491] State consumer protection statutes, moreover, are remedial

---

[489] Compl. ¶ 2.

[490] *See* Charles Duhigg, *Outcry Over EpiPen Prices Hasn't Made Them Lower*, New York Times,
June 4, 2017, *available at:* https://www.nytimes.com/2017/06/04/business/angry-about-epipen-prices-executive-dont-care-much.html

[491] *See Baldwin v. Priem's Pride Motel, Inc.*, 580 P.2d 1326, 1329 (Kan. 1978); *see also Monetary
Funding Group, Inc. v. Pluchino*, 867 A.2d 841, 847 n.4 (Conn. App. Ct. 2005).

legislation meant to be liberally construed to protect the public and to foster competition.[492]

Here, Defendants' misrepresentations and unfair practices were conducted in concert and towards a single end: securing a monopolistic increase in the price of EpiPen products. Considered together, Plaintiffs have plainly pleaded conduct by Defendants that constitutes: (1) unfair, (2) deceptive, and (3) unlawful conduct, in violation of state laws. Defendants' misguided arguments fail to cast any serious doubt on the adequacy of Plaintiffs' pleading.

>    **1.    Defendants Have Engaged in Unfair Practices in Violation of State Consumer Protection Laws.**

Defendants attempt to recast Plaintiffs' unfair practices claims as mere complaints about inflated prices, arguing that they have "freedom to price and package" EpiPens as they see fit.[493] This elides the true basis of the claim. It is the unfair practices that allowed Defendants to charge the inflated prices that are at the core of these claims—not the inflated prices in and of themselves. Defendants' conduct has forced parents to choose between purchasing life-saving medication for their children and food to feed their families; Defendants' conduct has forced allergy-sufferers to play Russian roulette with their lives by going without treatment for their disease or relying on an expired device. Defendants obtained their ability to charge these prices not through honest market competition but monopolistic strong-arm tactics. It is precisely this type of extreme corporate exploitation of vulnerable consumers that motivated Congress and 28 states to pass consumer protection legislation proscribing unfair acts or practices. These state

---

[492] *See, e.g.*, *Edmonds v. John L. Scott Real Estate, Inc.*, 942 P.2d 1072, 1081 (Wash. Ct. App. 1997); *State ex rel. Stephan v. Bhd. Bank & Tr. Co.*, 649 P.2d 419, 422 (Kan. Ct. App. 1982); *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992); *Franklin v. State*, 631 S.W.2d 519, 521 (Tex. App. 1982); *Brannon v. Munn*, 68 P.3d 224, 227 (Okla. Civ. App. 2002); *State v. Cottman Transmissions Sys., Inc.*, 587 A.2d 1190, 1204 (Md. 1991); *Price v. Long Realty, Inc.*, 502 N.W.2d 337, 342 (Mich. Ct. App.1993); *Pierce v. McMullen*, 328 P.3d 445, 454 (Idaho 2014).
[493] Mylan Br. 68, 69.

rules are summarized at Exhibit A. What constitutes 'unfairness' within the meaning of those

laws is left deliberately vague to respond to new and unexpected methods of corporate

malfeasance. These laws, however, can be divided into two useful analytic categories:



Roughly half of the 28 states with unfairness laws have adopted unfairness tests that are based on an approach used by the Federal Trade Commission in 1964 called the "cigarette test" (because it arose in the context of a cigarette-labeling matter). In 1980, the FTC issued a policy statement, later made into law, that shifted the focus of the federal test primarily to the substantial consumer injury component. Five states[494] have expressly adopted the newer FTC unfairness standard.

The unfair trade practice acts of nearly all states provide that their courts shall be "guided by the interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act;"[495] that "due consideration" should be given to the federal interpretations;[496] or that the state statute shall be interpreted in a way "consistent" with federal interpretations.[497] As detailed below, under any standard, Defendants have engaged in unfair practices in violation of state statutes.

### a.    The 'Substantial Injury' Test Factors

The FTC unfairness test (sometimes called the "substantial injury" test) focuses on the harm to the consumer and requires:

---

[494] Iowa, Maine, Maryland, Ohio, and Tennessee.

[495] Conn. Gen. Stat. § 42-110b(a) (2006); Me. Rev. Stat. tit. 5, § 207 (1) (2006); Mass. Gen. Laws. ch. 93a § 2(a) (2006); Miss. Code § 75-24-5(1) (2006); N.H. Rev. Stat. § 358a:13 (2006); S.C. Code § 39-5-20(a) (2006); Vt. Stat. tit. 9, § 2453(b) (2006); Wash. Rev. Code § 19.86.920 (2006); W. Va. Code § 46A-6-104 (2006).

[496] Alaska Stat. § 45.50.545 (2006); Fla. Stat. § 501.204(2) (2006); Haw. Rev. Stat. § 480-2(b) (2006); Ill. Comp. Stat. Ch. 815 § 505/2 (2006); Mont. Code § 30-14-104(1) (2006); Ohio Rev. Code § 1345.02(a) (2006); R.I. Gen. Laws § 6-131.1-2 (2006).

[497] Ga. Code § 10-1-391(b) (2006); Tenn. Code § 47-18-115 (2006).

> (1) substantial injury to consumers; (2) which cannot be reasonably avoided by consumers; and (3) the injury must not be outweighed by countervailing benefits to consumers or competition.[498]

The 'substantial injury' factors are easily met in the present case.

First, it is beyond serious dispute that Defendants' excessively high prices harm consumers. Reports of families being forced to choose between purchasing potentially life-saving medications and other necessities are legion. The First Circuit has expressly recognized the "real injury" that comes along with paying an inflated price for medication.[499]

Second, this harm cannot reasonably be avoided by consumers. "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice."[500] This test recognizes that while "we rely on consumer choice … to govern the market … certain types of seller conduct or market imperfections may unjustifiably hinder consumers' free market decisions and prevent the forces of supply and demand from maximizing benefits and minimizing costs."[501] That is the case here. Mylan has restrained the entry of competitors into the market and secured a monopolistic position, increasing costs and restraining consumer choice to two unsavory options: pay Mylan's excessive prices or go without lifesaving treatment. As such, "consumers are not, as a practical matter, able to shop and bargain over alternative[s]," fulfilling the second 'substantial harm' factor.[502]

Third, even Defendants do not allege that Mylan's anticompetitive, deceptive conduct

---

[498] See 15 U.S.C. § 45(n).

[499] In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d at 190-91.

[500] F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1158 (9th Cir. 2010), as amended (June 15, 2010), amended, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010).

[501] Am. Fin. Servs. Ass'n v. F.T.C., 767 F.2d 957, 976 (D.C. Cir. 1985).

[502] Id.

and excessive pricing benefits either consumers or competition; it clearly and directly harms both. The thrust of Mylan's Motion—that Defendants are without liability because Plaintiffs got what they paid for—is wholly inapplicable to claims of unfair conduct.[503]

### b.    The 'Cigarette Test' Factors

The cigarette test lays out three factors to be considered when assessing whether an act or practice should be considered "unfair."[504] These factors are as follows:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).[505]

"All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the extent to which it meets one of the criteria or because to a lesser extent it meets all three."[506] Even so, all are readily met, here.

---

[503] *Eike v. Allergan, Inc.*, No. 3:12–cv–01141–DRH–DGW, 2014 WL 1040728, at *3 (S.D. Ill. Mar. 18, 2014) ("The benefit-of-the-bargain rule does not apply in this case. Plaintiffs are not asserting a misrepresentation but instead an unfair practice") (citation omitted); *In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*, No. MDL 05-01699 CRB, 2007 WL 2028408, at *5, (N.D. Cal. July 10, 2007) (rejecting argument that plaintiffs lacked injury because "[they] received exactly what they paid for").

[504] *See* Exh. A.

[505] *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972) (citations omitted).

[506] *McLaughlin Ford, Inc. v. Ford Motor Co.*, 473 A.2d 1185, 1192 n.15 (Conn. App. 1984) (quoting Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchises and Business Opportunity Ventures, 43 Fed. Reg. 59614, 59635 (1978); but holding that the plaintiff had satisfied none of the Cigarette Rule criteria); *see, e.g., Morrison v. Toys "R" Us, Inc.*, 806 N.E.2d 388, 392 (Mass. 2004); *Johnson v. Beverly-Hanks & Assocs., Inc.*, 400 S.E.2d 38, 42 (N.C. 1991); *deBondt v. Carlton Motor Cars, Inc.*, 536 S.E.2d 399, 407 (S.C. Ct. App. 2000); *A&W Sheet Metal, Inc. v. Berg Mech., Inc.,* 653 So.2d 158, 164 (La. Ct. App. 1995). *See also* Okla. Stat. § 15-752.14 (2006); *Anapoell v. Am. Express Bus. Fin. Corp.*, 2007 WL 4270548 (D. Utah Nov. 30, 2007).

**Defendants Acted in Violation of Public Policy:** Defendants' conduct, as alleged in the Complaint, contravenes numerous well-established principles of public policy including: fraud prevention;[507] the principle that "consumers be able to vindicate their right to be free of unfair and deceptive practices in consumer transactions;"[508] the public policy against unfair competition;[509] and the "public policy in favor of the protection of consumers."[510] Defendants assert that these societal goals must yield to a contravening public policy in favor of encouraging innovation by protecting patent-holders. Defendants have overstated the case for patent-holders. As noted above, Congress did not intend for drug manufacturers to be free from public policy concerns. Indeed, there is a "strong public policy. . . of making more low cost generic drugs available to the public as generic copies of pioneer off-patent drugs."[511] And while there is an undeniable societal interest in favor of encouraging innovation, its force is at its lowest ebb when, as here, it is asserted by an entity that engaged in no research or development and merely purchased the patent to a product that was developed decades ago.

---

[507] *U.S. v. Wenger*, 427 F.3d 840, 850 (10th Cir. 2005) (government has an interest "in protecting consumers from being misled"); *Markie v. Red Wolf Broad. Corp.*, No. CV136018648, 2014 WL 3805654, at *3 (Conn. Super. Ct. June 26, 2014) (fraud prevention an "important public policy").

[508] *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1063 (S.D. Cal. 2015); *see also Locke-O'Dell v. Glob. Client Sols., LLC*, No. 12-2009-CM, 2012 WL 1033624, at *4 (D. Kan. Mar. 27, 2012) (public policy to protect citizens from "misleading, deceptive, unconscionable" acts).

[509] *MacArthur v. San Juan Cty..* 416 F. Supp. 2d 1098, 1179 n.88 (D. Utah June 13, 2005); *see also Premier Tech. Sales, Inc. v. Digital Equip. Corp.*, 11 F. Supp. 2d 1156, 1167 (N.D. Cal. 1998); *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 920 (N.J. Sup. Ct. App. Div. 1995) (noting "public policy in favor of competition").

[510] *Griffin v. Sec. Pac. Auto. Fin. Servs. Corp.*, 33 F. Supp. 2d 926, 929 (D. Kan. Nov. 18, 1998) ("[a] purpose of the KCPA is 'to protect consumers from suppliers who commit deceptive and unconscionable practices…'"); *Solevo v. Aldens, Inc.*, 395 F. Supp. 861, 865 (D. Conn. 1975).

[511] *Pfizer, Inc. v. Shalala*, 1 F. Supp. 2d 38 (D.D.C. 1998), *judgment aff'd in part, rev'd in part*, 182 F.3d 975 (D.C. Cir. 1999).

**Defendants Engaged in Immoral, Unethical, Oppressive, and Unscrupulous Conduct:** The second prong of the cigarette test prohibits immoral, unethical, oppressive, and unscrupulous conduct, defined as: a "trade practice that is undertaken to maximize the defendant's profit at the expense of the plaintiff's rights."[512] It is well-recognized that charging excessive prices is an infringement upon the property rights of consumers.[513] These rights should hold even greater weight here, where health and safety are at stake.

### 2. Defendants Have Engaged in Deceptive and Misleading Practices in Violation of State Consumer Protection Law.

State consumer protection acts prohibiting deceptive practices can be meaningfully divided into two categories: (a) states that have modeled their law on the Uniform Deceptive Trade Practices Act and/or the Uniform Consumer Sales Practices Acts (the 'UDTPA states'); and (b) states that modeled their law on the Federal Trade Commission Act or independently developed 'consumer fraud' statutes that codify common law protections (the 'FTC states').

The majority of states are UDTPA jurisdictions.[514] These acts list certain prohibited practices—Colorado, for example, lists forty-three categories of prohibited activities—resulting in some variation between states. These states have several relevant provisions in common:

---

[512] *Votto v. Am. Car Rental, Inc.*, 871 A.2d 981, 985 (Conn. 2005).

[513] *Id.*; *see also generally Tufts v. Newmar Corp.,* 53 F. Supp. 2d. 1171, 1182 (D. Kan. May 27, 1999) (identifying "ten general factors for courts to use in determining unconscionability," one of which is "a significant cost-price disparity or excessive price")); *Wayman v. Amoco Oil Co.,* 923 F. Supp. 1322, 1342 (D. Kan. 1996) (same); *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 764 (10th Cir. 1983) ("[T]he purpose of the concept [of unconscionability] is to prevent oppression," such as "a significant cost-price disparity or excessive price").

[514] Alabama, Alaska, Arkansas, California, Colorado, Delaware, the District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Maine, Maryland, Michigan, Mississippi, Nebraska, New Hampshire, Oregon, Pennsylvania, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, and Wyoming.

- **Misleading Certifications:** Prohibitions on "causing confusion or misunderstanding as to the source, sponsorship, or approval or another person's affiliation, connection or association with or certification of goods or services;"

- **Disparagement:** Prohibitions on "disparaging the goods, services, or business of another by false or misleading representation of fact;"

- **Concealing Material Facts:** Prohibitions on the "concealment, suppression, or omission of material facts" in connection with the sale or advertisement of goods or services;

- **Creating False Necessity:** Prohibitions on "representing that a service, replacement, or repair is necessary when it is not;"

- **Statements Regarding Rebates:** Prohibitions on "making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions;" and

- **Catch-all Provisions:** Prohibitions on "any other unconscionable, false, misleading or deceptive act or practice in the conduct of trade or commerce."

These provisions are summarized in the chart attached as Exhibit B.

Seventeen states—the FTC jurisdictions—have adopted statutes modeled on the Federal Trade Commission Act.[515] The laws in these seventeen states contain language substantially similar to the following: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." Nine other states have adopted consumer fraud statutes with similarly broad language.[516]

---

[515] Connecticut, Florida, Georgia, Hawaii, Louisiana, Maine, Massachusetts, Montana, Nebraska, New York, North Carolina, Ohio, Rhode Island, South Carolina, Vermont, and Washington. California has provisions similar to both the UDTPA and the FTC.

[516] The Arizona, Delaware, Illinois, Iowa, Minnesota, Missouri, New Jersey, North Dakota and South Dakota statues contain the following similarly broad language: "The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."

Defendants baldly assert that Plaintiffs fail to plead any conduct that "amounts to deception."[517] Contrary to Defendants' unsubstantiated assertion, the Complaint pleads, in detail, a pattern of deceptive, misleading, and fraudulent conduct by Defendants, including by paying PBMs to exclude competition,[518] forcing schools into exclusive dealing contracts,[519] restraining competition through patent litigation and pay-for-delay settlements,[520] stalling competitor EAI devices through abuse of the FDA citizen petition process,[521] and deceptive marketing. That deceptive marketing included quietly paying doctors and committees to endorse the launch of the 2-Pak and misrepresenting the 'hard switch' to the 2-Pak as medically necessary,[522] disparaging competitor devices through false and misleading claims designed to question their efficacy and safety,[523] and misrepresentations regarding the pricing of the EpiPen and consumer cost to purchase it.[524] This conduct violates state consumer protection laws—whether of the UDTPA or FTC variety.

---

[517] Mylan Br. 61.

[518] Compl. ¶¶ 153-198.

[519] *Id.* ¶¶ 199-228.

[520] *Id.* ¶¶ 236-303.

[521] *Id.* ¶¶ 304-312. Mylan's abuse of the citizen petition process included submission of a flawed study shortly before the FDA's response to its citizen petition, *Id.* ¶¶ 313-316, and reliance on statements from doctors who had received substantial payments from Mylan, *id.* ¶¶ 317-318.

[522] *Id.* ¶¶ 325-347.

[523] *Id.* ¶¶ 229-230 (misrepresentations regarding bioequivalence); ¶ 231 (statements designed to impugn Auvi-Q as unsafe); ¶¶ 232-235 (false and misleading representations regarding EpiPen's preferred status).

[524] *Id.* ¶¶ 375, 384-86 (false statement that Mylan had invested $1 billion in in creating "access and awareness and improving" the EpiPen); ¶¶ 403-404 (misleading statements to the effect that most people with commercial insurance pay nothing for an EpiPen); ¶¶ 422-442 (false and misleading statements by Ms. Bresch to Congress).

In any event, as a case cited by Defendants notes, "[w]hether an act is a deceptive practice … is a question of fact for the jury"[525] and Defendants' argument to the contrary seek to prematurely litigate matters of fact.

    a.    **Defendants' Conduct Has a Substantial and Material Effect on Consumer Choice and Purchasing Decisions.**

A centerpiece of Defendants' Motion is the assertion that their misrepresentations do not violate consumer protection laws because they are immaterial. Specifically, Defendants assert that their deceptive conduct is not material because it could not "affect consumers' purchasing decisions," and because no "reasonable person" would attach importance to it.[526] Defendants essentially argue that their scheme worked so well to limit consumer choice and information about a necessary product for which there is relatively inelastic consumer demand, that their conduct—including material misrepresentations about the true properties of EpiPens—could not violate consumer protection statutes. Their circular argument distorts the facts and law.

Defendants' materiality arguments ignore the pertinent allegations of the Complaint. The Complaint alleges that Plaintiffs would not have purchased the EpiPen "[b]ut for Defendants' fraudulent scheme."[527] The Complaint alleges, furthermore, that Defendants' scheme forced consumers to pay excessively for the EpiPen, required consumers to purchase EpiPens in a 2-Pak, and decreased both the range and quality of EAI devices on the market.

---

[525] *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1177-78 (D. Kan. 1999) (internal quotation marks and citations omitted). *See also, e.g.*, *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) ("whether a particular act or practice is deceptive is usually a question of fact"); *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 69 (E.D.N.Y. 2017) (declining to resolve comparison between two products, infant formula, on motion to dismiss). In addition, whether a statement has a tendency to deceive is "determined by the net impression it is likely to make upon the viewing public." *Thompson Med. Co. v. F.T.C.*, 791 F.2d 189, 197 (D.C. Cir. 1986).

[526] Mylan Br. 61.

[527] Compl. ¶ 679.

Defendants' materiality argument is also misguided on a fundamental level. Defendants' argument appears to be that, because their stranglehold on the American market for EAI devices has eliminated competition and denied consumers any meaningful choice between devices, they cannot be held to account for their deceptive and misleading conduct. Under this line of reasoning, because Defendants have successfully eliminated the ability of consumers to choose between competing products, Mylan and Pfizer cannot be held to account for deceptive and misleading conduct (including deceptive and misleading conduct in pursuit of that monopoly) under state consumer protection laws.

This is an astonishing proposition. Defendants' conduct has had the ultimate "affect [on] consumers' purchasing decisions."[528] It has eliminated any choice through misrepresentations and deception. And not only were these consumers left with no choice to purchase an EpiPen, but they were left with no choice but to purchase a two-pack of EpiPens at a monopolistic price.

Plaintiffs' claims are not, however, limited to the elimination of consumer choice. The Complaint describes a variety of deceptive marketing by Defendants in pursuit of their anti-competitive scheme, including the disparagement of competitors, misrepresentations regarding the necessity of the 2-Pak, and misrepresentations relating to the pricing and cost to consumers of the EpiPen.[529] Health and pricing-relating claims such as these are presumptively material to

---

[528] Mylan Br. 61.

[529] *See, e.g.*, Compl. ¶¶ 152-198 (using monopoly power and payment of rebates to exclude competitor devices from formulary coverage and misrepresentations regarding the scheme); ¶¶ 229-231 (misrepresentations regarding the Auvi-Q and its bioequivalence to the EpiPen, among other misinformation spread by Mylan relating to the Auvi-Q); ¶¶ 232-235 (misleading and deceptive statements regarding the EpiPen being "preferred" and exclusion of Auvi-Q from formularies as being based on clinical recommendations); *Id.* ¶¶ 325-347 (false representations relating to the medical necessity of the 2-Pak); ¶¶ 375, 384-86 (false statement that Mylan had invested $1 billion in in creating "access and awareness and improving" the EpiPen); ¶¶ 403-404

consumers.  This is demonstrated by Defendants' own authority, which in fact establishes the presumptive materiality of the Plaintiffs' allegations. *Novartis Corp. v. FTC* affirmed an FTC determination that certain analgesics had been deceptively marketed, noting that a presumption of materiality attaches to certain categories of claims, including those that "significantly involve health, safety, or other areas with which the reasonable consumer would be concerned," including a claim that "concerns the purpose, safety, efficacy, or cost of the product or service."[530] The misrepresentations pled in the Complaint, centering on concerns of health and product price, are of the sort presumably material to consumer purchasing decisions.

### b.  Defendants' Monopolistic and Excessive Pricing.

Defendants also assert that their statements relating to the pricing of the EpiPen are not actionable because they were not made to consumers or could not have mislead consumers "about the price or the nature of the product they were receiving."[531] These arguments again miss the mark; there are several reasons.

<u>First</u>, the Complaint pleads statements made by Mylan aimed directly at consumers including the misleading claim that "80 percent of consumers" pay nothing for their EpiPen, a statement falsely implying a rebate or discount.[532] The Complaint further pleads statements by Mylan, published nationally in *Forbes* magazine, intended to give the impression that Mylan had made substantial investments in "improving the product [the EpiPen]."[533] Both statements—to

---

(misleading statements to the effect that most people with commercial insurance pay nothing for an EpiPen); ¶¶ 422-442 (false and misleading statements by Ms. Bresch to Congress).

[530] 223 F.3d 783, 786 (D.C. Cir. 2000); *see also Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 322-23 (7th Cir. 1992).

[531] Mylan Br. 61-63.

[532] Compl. ¶¶ 403-407.

[533] Compl. ¶¶ 375, 384-85.

say nothing of the numerous other misleading statements, discussed above—go directly to the price and the nature of the product.

Second, where, as here, a defendant "makes partial representations but also suppresses some material facts,"[534] a duty to provide a full context arises. Defendants, relying on *Group Health Plan, Inc. v. Philip Morris, Inc.*,[535] allege that their misstatements in *Forbes* and to Congress were not directed at consumers and therefore not actionable. *Group Health* is distinguishable. That case concerned a Lanham Act claim which expressly requires that commercial speech be "disseminated . . . to the relevant purchasing public." In the majority of states, however, the level to which a deceptive statement has been disseminated is of no moment. Several states expressly provide that "[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged;"[536] many more states do not require reliance at all.[537] Even if dissemination were a relevant consideration, Defendants' statements to Congress and *Forbes* were disseminated on national television and through a nationally syndicated magazine. That fact distinguishes the present case from *Paltre v. General Motors Corp.*,[538] which concerned statements made privately between two automobile manufacturers.

Third, Defendants' monopolistic pricing is independently a violation of state consumer protection law. Many UDTPA states include provisions expressly proscribing Defendants'

---

[534] *See, e.g., Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1174 (E.D. Cal. 2013).

[535] 68 F. Supp. 2d 1064, 1070 (D. Minn. 1999).

[536] Del. Code tit. 6, §§ 2532; Del. Code tit. 6, §§ 2532(b); O.C.G.A. 10-1-372(b); Haw. Rev. Stat. § 481A-3; 815 Ill. Comp. Stat. 510/2(b); Me. Rev. Stat. tit. 10, § 1212 (2).

[537] *See infra* Part IV.D.

[538] 26 A.D.3d 481, 483, 810 N.Y.S.2d 496 (2006).

pricing conduct.[539] Excessive pricing is also prohibited in the FTC jurisdictions, as several courts have found that those prohibitions proscribe monopolistic pricing behavior.[540]

> **c.    Defendants' Force the Purchase of EpiPens in a Two Pack, and Defend the 'Hard Switch' through Deceptive and Misleading Advertising**

Defendants assert that the 'hard switch'—*i.e.* selling the EpiPen exclusively in a '2-Pak' or nothing at all—cannot form the basis consumer protection act liability, casting this conduct as merely a dispute over "packaging."[541] In implementing the 'hard switch,' however, Mylan represented to consumers that its decision to sell EpiPens exclusively in a '2-Pak' was made out of medical necessity and was supported by medical professionals such as Dr. Phillip Lieberman and medical organizations like the NIAID and the WAO.[542] These statements were deceptive.

Mylan seeks to defend its statements concerning the hard-switch through the inclusion of Exhibit H. Defendants' chart is a premature attempt to litigate whether Mylan's statements were deceptive as a factual matter; Defendants' chart also grossly misinterprets and de-contextualizes the statements it quotes from the NIAID and WAO publications. Plaintiffs' allegations do not rely on the applicability or non-applicability of any specific diagnostic principle included in the NIAID or WAO publications. Rather, they are premised on undeniable fact that Mylan's public

---

[539] **New Hampshire:** N.H. Code § 358-A:2 (XIV); **Michigan:** Mich. Code § 445.903(1)(z); *see also Stalker v. MBS Direct, LLC*, No. 10-11355, 2011 WL 797981, at *6 (E.D. Mich. Mar. 1, 2011); **D.C.:** D.C. Code Ann. § 28-3904; **Kansas:** Kan. Stat. § 50-627(b)(2); **Illinois:** *In People ex rel. Hartigan v. Knecht Servs.*, 575 N.E.2d 1378 (Ill. App. Ct. 1991); **Pennsylvania:** *In re Wernly*, 91 B.R. 702 (Bankr. E.D. Pa. 1988).

[540] *See In re Pharma Industry AWP*, 491 F. Supp.2d 20, 102-109 (D. Mass. 2007); *see also Monetary Funding Group, Inc. v. Pluchino*, 867 A.2d 841 (Conn. App. Ct. 2005); *Murphy v. McNamara*, 416 A.2d 170 (Conn. Super. Ct. 1979).

[541] Mylan Br. 63.

[542] Compl. ¶¶ 335-347.

statements aver and/or imply that Dr. Lieberman, the NIAID, and/or the WAO sponsor, approve and/or certify Defendants' decision to engage in a 'hard-switch' to the "2-Pak" as medically necessary, when, in fact, they do no such thing. At no point in the NIAID or WAO publications, or Defendants' chart, can a recommendation be found that auto-injectors must be or even should be sold exclusively in a two-pack, or that it would be beneficial to do so. Nevertheless, when Mylan announced its decision, it explained "the decision to exclusively offer the EpiPen 2-Pak . . . aligns with [the NIAID] guidelines, as well as the 2011 [WAO] anaphylaxis guidelines."[543]

Moreover, in its press releases surrounding the 'hard switch,' Mylan omitted material facts, rendering them independently in violation of state law.

First, Mylan fails to mention that the NIAID and WAO guidelines are directed to *patients who have already suffered anaphylaxis at least once in the past*.[544] In 2010, following a lobbying effort by Mylan to expand its market, the U.S. Food and Drug Administration changed its labeling rules to allow for the EpiPen to be marketed to anyone who was merely at risk of anaphylaxis rather those who had already been diagnosed with a food allergy because they had previously experienced an anaphylaxis reaction. A similar policy has not been adopted by the NIAID or the WAO; as such, including statements from those bodies in support of a 'hard-switch' for *all* allergy-sufferers in the United States is misleading.[545] This distinction is even

---

[543] Dey Pharma, L.P., *Dey Pharma to Offer EpiPen 2-Pak and EpiPen Jr 2-Pak Exclusively*, PR NEWSWIRE (Aug. 24, 2011), http://www.prnewswire.com/news-releases/dey-pharma-to-offer-epipen-2-pak-and-epipen-jr-2-pak-exclusively-128306923.html, (last visited January 14, 2018).

[544] Boyce, *et al., Guidelines for the Diagnosis and Management of Food Allergy in the United States*: *Report of the NIAID-Sponsored Expert Panel*, 126 J. Allergy Clin. Imunol. 6, S19 (Dec. 2010).

[545] The preface of the NIAID publication, relied upon by Defendants, indicates "[t]he Guidelines focus on diseases that are defined as "FA" (food allergies) and, as detailed in Section 4 of the NIAID report, the diagnostic criteria for "FA" includes: "**presenting with anaphylaxis** or any combination of symptoms listed in Table IV that occur within minutes to hours of ingesting food,

clearer upon consideration of the quotes included in Defendants' chart from the NIAID report. Viewed in context, it is clear that the NIAID guidelines are not generally applicable to the entire population of allergy sufferers. Nevertheless, Mylan misleadingly touted the NIAID as supporting its 'hard-switch' for every allergy-sufferer in the U.S.[546]

Second, Defendants also omitted material facts regarding their financial support of Dr. Lieberman, who is quoted in Mylan's press release in support of the hard switch. Defendants do not dispute, nor could they, that Dr. Lieberman is a paid "advisor or consultant" for Mylan.[547] Instead, they assert only that Mylan had no obligation to "publicize" its compensation of Dr. Lieberman. This is wrong: it is well established that "even literally true statements can have misleading implications"[548] and, as here, when defendants "make partial representations but also suppresses some material facts,"[549] a duty to provide a full context arises.

### d. Defendants' Disparagement of Competitor Devices and Other Misrepresentations.

The Complaint alleges that Defendants disparaged competing products, such as the Auvi-Q, as part of their anti-competitive scheme. The Complaint alleges, for example, that Defendants made false and misleading statements implying that the Auvi-Q was not bioequivalent to the

---

especially in young children and/or if symptoms have followed the ingestion of a specific food **on more than 1 occasion**." Boyce, *et al., Guidelines for the Diagnosis and Management of Food Allergy in the United States*: *Report of the NIAID-Sponsored Expert Panel*, 126 J. Allergy Clin. Imunol. 6, S19 (Dec. 2010) (emphasis added)

[546] Notably, NIAID report refers to an "auto-injector", not auto-injector[s]. The alternative is a 2-dose prescription of epinephrine—which would be delivered by a usual syringe. The NIAID report never recommends 2 auto-injectors even for people who have already experienced food induced anaphylaxis and are being discharged from the hospital, let alone for people who have not yet experienced anaphylaxis and are not being discharged from the hospital.

[547] Compl. ¶344; *cf.* Mylan Br. n.61.

[548] *Kraft*, 970 F.2d at 322.

[549] *Herron v. Best Buy Co. Inc.,* 924 F. Supp. 2d 1161, 1174 (E.D. Cal. 2013).

EpiPen; that the Auvi-Q was unsafe because it was likely to be confused for a cellphone or other device; and that the EpiPen was "preferred" over the Auvi-Q for medical reasons.

Defendants assert that these disparaging statements are not relevant to Plaintiffs' consumer protection claims because the Auvi-Q was recalled in October 2015 and therefore not a "superior product" or "less expensive" [550] But Defendants again misconstrue Plaintiffs' allegations and ignore the context of these allegations, *i.e.* as part of Defendants' larger anticompetitive campaign to restrain competition. Perhaps more importantly, whether the Auvi-Q's failure to gain traction in the United States market is due to Sanofi's marketing decisions of Mylan's conduct—and whether Sanofi's decision to exit the American EAI device market was due to manufacturing issues or Mylan's conduct—are issues of fact that cannot be resolved on a motion to dismiss. Indeed, this Court has already weighed Mylan's recall-based arguments in connection with Mylan's motion to dismiss Sanofi's competitor action, finding it foreshadowed a question of fact that could not be resolved on a motion to dismiss. [551]

### 3.   Defendants Have Engaged in 'Unlawful' Practices in Violation of California's Unfair Competition Law

California's Unfair Competition Law ("UCL"), provides a cause of action for consumers upon a showing that any other law has been violated. [552] Defendants assert that Plaintiffs' 'unlawful' claim should be dismissed because Plaintiffs do not allege any such violation. But

---

[550] Mylan Br. 65.

[551] *Sanofi Order*, 2017 WL 6524839 at *19.

[552] *See Moran v. Prime Healthcare Mgmt., Inc.*, 208 Cal. Rptr. 3d 303, 311 (Ct. App. 2016).

Plaintiffs' complaint is replete with allegations of unlawful behavior, each of which have been found sufficient to confer standing under the UCL.[553]

### D.      Where Necessary, Plaintiffs Have Sufficiently Pled Reliance

Defendants insist—in less than a single page, and without citation to authority—that Plaintiffs have not sufficiently pled reliance.[554] But the majority of state consumer protection laws do not require Plaintiffs to plead individual reliance on specific misrepresentations, and even those laws requiring reliance include an exception for the fraud by omission and unfair conduct alleged here. And Plaintiffs have met all potentially applicable pleading standards.

### 1.      Plaintiffs' Complaint Meets the Tenth Circuit's Standard for Pleading Reliance

The Tenth Circuit does not impose a stringent pleading requirement upon Plaintiffs seeking to establish reliance in a multi-state class action. As Judge Lungstrum explained in *In re Syngenta AG MIR Corn Litig.*, "details" concerning reliance are unnecessary and when, as here, a Plaintiff "has alleged that it relied on the alleged misrepresentations," "the Tenth Circuit's standard does not require more."[555] Going further, Judge Lungstrum specifically rejected Defendants' claims that Plaintiffs failed to plead where they saw or how they learned of Defendants' misrepresentations:

> A plaintiff need not plead every fact that supports its claim of fraud, and such facts concerning [Plaintiff]'s receipt of the statements are readily obtained in discovery. Trans Coastal does allege that it relied on the misrepresentations,

---

[553] *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 406 (E.D. Pa. 2010); *Korea Supply Co. v. Lockheed Martin Corp.*, 131 Cal.Rptr.2d 29, 63 P.3d at 943 (2003).

[554] *See* Mylan Br. 71.

[555] 131 F. Supp. 3d 1177, 1228 (D. Kan. 2015) (citing *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1236 (10th Cir. 2000); *Mattos v. Eli Lilly & Co.*, No. 12–1014–JWL,  2012 WL 1893551, at *7 n. 7 (D. Kan. May 23, 2012) (Lungstrum, J.)).

which creates the reasonable inference that [Plaintiff] did learn of the statements.[556]

The Tenth Circuit is not unique; most jurisdictions do not require Plaintiffs to allege reliance on specific misstatements.[557]

>    **2.**    **Plaintiffs Need Not Establish Reliance for the Majority of their State Consumer Protection Claims**

The majority of state consumer protection laws do not require Plaintiffs to allege

---

[556] *In re Syngenta AG MIR Corn Litig.*, 131 F. Supp. 3d at 1228 (citing *Near v. Crivello,* 673 F. Supp. 2d 1265, 1285 (D. Kan. 2009) (Lungstrum, J.)).

[557] *See, e.g.,* **Arizona:** *Siemer v. Assocs. First Capital Corp.*, No. CV97-281TUCJMRJCC, 2001 WL 35948712, at *4 (D. Ariz. 2001); **California:** *In re Sony Gaming*, 996 F. Supp. 2d 942, 991, 1000 (S.D. Cal. 2014); **Colorado:** *Hall v. Walter*, 969 P.2d 224, 321 (Colo. 1998); **Connecticut:** *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 617 (1981); **Delaware:** *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); **Florida:** *Turner Greenberg Assocs., Inc. v. Pathman*, 885 So. 2d 1004, 1009 (Fla. Dist. Ct. App. 2004); **Idaho:** *State ex rel. Kidwell v. Master Distribs., Inc.*, 101 Idaho 447, 454 (1980) (Idaho); **Iowa:** *State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 29-31 (Iowa 2013); **Illinois:** *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501 (1996) (Illinois); **Kentucky:** *Corder v. Ford Motor Co.*, 869 F. Supp. 2d 835, 839 (W.D. Ky. 2012); **Maine:** *State v. Weinschenk*, 868 A.2d 200, 206 (Me. 2005); **Massachusetts:** *Fraser Eng'g Co. v. Desmond*, 524 N.E. 2d 110, 113 (Mass. 1988); **Michigan:** *Dix v. Am. Bankers Life Assur. Co. of Fla.*, 429 Mich. 410, 418 (1987); **Minnesota:** *Wiegand v. Walser Auto. Groups, Inc.*, 683 N.W.2d 807, 811 (Minn. 2004); **Mississippi:** *Mayberry v. Bristol-Myers Squibb Co.*, Civ. A. No. 07-942 (FLW), 2009 WL 5216968, at *8-9 (D.N.J. Dec. 30, 2009); **Missouri:** *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W. 3d 758, 774 (Mo. 2007) (Missouri); **Nevada:** *Copper Sands Homeowners Ass'n, Inc. v. Copper Sands Realty, LLC*, No. 2:10-cv-00510-GMN-NJK, 2013 WL 3270430, at *13 (D. Nev. June 26, 2013); **New Jersey:** *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007); **New Mexico:** *Lohman v. DaimlerChrysler Corp.*, 166 P.3d 1091, 1098 (N.M. 2007); **New York:** *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y. 2d 20 (N.Y. 1995); **North Dakota:** N.D. Cent. Code § 51-15-02; **Ohio:** *Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827, 835 (S.D. Ohio 2003); **Oregon:** *Sanders v. Francis*, 277 Or. 593, 598 (1977); *Wright v. Kia Motors Am. Inc.*, No. Civ. 06-6212-AA, 2007 WL 316351, *3 (D. Or. Jan. 29, 2007); **South Dakota:** *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W. 2d 184, 197 n.13 (S.D. 2007); **Tennessee:** *Fleming v. Murphy*, No. W2006-00701-COA-R3-CV, 2007 WL 2050930, *7 (Tenn. Ct. App. July 19, 2007); **Vermont:** Vt. Stat. Ann. tit. 9, § 2461(b) (Vermont: reliance not required); **Washington:** *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 83 (2007) (Washington); **Wisconsin:** *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, 802 (Wis. 2007).

reliance.[558] Even in those states that do require reliance, exceptions are made where, as here, a

plaintiff pleads: (i) claims of fraud by omission; and (ii) claims of unfairness or

unconscionability.

Plaintiffs need not plead reliance where, as here, they allege fraud by omission,

concealment, or failure to disclose material facts. "[C]ourts have recognized that this element,

which is often phrased in terms of reliance or causation, may be presumed in the case of a

material fraudulent omission."[559] The Supreme Court has held that, in cases "involving primarily

---

[558] **Alaska**: *Odom v. Fairbanks Memorial Hosp.*, 999 P.2d 123, 132 (Alaska 2000); **Arizona**: *Siemer v. Assocs. First Capital Corp*, 2001 WL 35948712 (D. Ariz. 2001); **Arkansas:** *Frelin v. Oakwood Homes Corp.*, 2002 WL 31863487 (Ark. Cir. Nov. 25, 2002); **Colorado:** *Hall v. Walter*, 969 P.2d 224 (Colo. 1998); **Connecticut:** *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810 (Conn. 1981); **D.C.:** *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1 (D.D.C. 2002); **Delaware:** *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983); **Florida:** *Davis v. Powertel, Inc.*, 776 So.2d 971 (Fla. Dist. Ct. App. 2000); **Hawaii:** *Courbat v. Dahana Ranch, Inc.*, 141 P.3d 427, 435 (Hawaiʻi, 2006); **Illinois:** *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584 (Ill. 1996); **Kansas:** Kan. Stat. § 50-626(b)(1); **Kentucky:** *Telcom Directories, Inc. v. Commonwealth ex rel. Cowan*, 833 S.W.2d 848, 850 (Ky. App. 1991); **Maine:** *Tungate v. MacLean-Stevens Studios*, 714 A.2d 792, 797 (Me. 1998); **Maryland:** Md. Code Comm. Law § 13-302; **Massachusetts:** *Heller Fin. v. INA*, 573 N.E.2d 8 (Mass. 1991); **Michigan**: *Evans v. Ameriquest Mortg. Co.*, 2003 WL 734169, at *3 (Mich. App. 2003); **Minnesota:** *Wiegand v. Walser Automotive Groups, Inc.*, 683 N.W.2d 807, 811 (Minn. 2004); **Missouri:** *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758 (Mo. 2007); **New Hampshire:** *Mulligan v. Choice Mortgage Corp.*, 1998 WL 544431 (D.N.H. 1998); **New Jersey:** *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997); **New Mexico:** *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1098 (N.M. App. 2007); **New York:** *Oswego Laborers' Local 214 Pension Fund v.Marine Midland Bank*, 647 N.Y.S.2d 20 (N.Y.1995); **North Carolina:** *Pearce v. American Defender Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986); **Ohio:** *Delahunt v. Cytodyne Techn.*, 241 F. Supp. 2d 827 (S.D. Ohio 2003); **South Carolina:** *Charleston, SC v. Hotels.com, LP*, 487 F. Supp. 2d 676 (D.S.C. 2007); **South Dakota:** *Nygaard v. Sioux Valley Hospitals & Health System*, 731 N.W.2d 184, 196 (S.D. 2007); **Tennessee:** *Fleming v. Murphy*, 2007 WL 2050930 (Tenn. Ct. App. 2007); **Utah:** *Andreason v. Felsted*, 137 P.3d 1, 4 (Utah App. 2006); **Vermont:** Vt. Stat. Ann. tit. 9, § 2461(b); **Washington:** *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10 (Wash. 2007); **West Virginia:** W. Va. Code § 46A-6-102(7)(M).

[559] *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 447 (N.D. Cal. 2009).

a failure to disclose," "positive proof of reliance is not a prerequisite to recovery."[560] Instead,

'[a]ll that is necessary is that the facts withheld be material,' in the sense that a reasonable person

'might have considered them important' in making his or her decision."[561] Plaintiffs have

sufficiently pled that Defendants' omissions were material and, as such, a presumption of

reliance is warranted in this case.[562]

The same is true of Plaintiffs' claims for unfairness or unconscionability, which do not

require a showing of reliance. As courts in this district have noted, "[t]he 'concept of reliance ...

has no application' in suits involving 'many types of unfair business practices,'" including those

alleged by Plaintiffs here.[563]

### E.  Where Necessary, Plaintiffs Have Sufficiently Pled Causation.

Defendants assert that because "retailers" and "wholesalers"—in addition to drug

manufactures like Mylan—influence the ultimate price that consumers pay for the EpiPen,

---

[560] *Id.* at 447 (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153 (1972)). S*ee also, e.g., Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 919-20 (C.D. Cal. 2010) ("[a]ctual reliance is presumed (or at least inferred)" in the case of material omissions.); *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. at  663 n.5 (D. Kan. 2013) ("actual reliance is presumed given [Defendants'] material misrepresentations and/or omissions"); *Sanders v. Francis*, 561 P.2d 1003 (Or. 1971) (actual reliance is not required in cases of nondisclosure).

[561] *Plascencia,* 259 F.R.D. at 447 (quoting *Affiliated Ute Citizens of Utah,* 406 U.S. at 153-54).

[562] *See, e.g.,* Compl. ¶679; *id.* at ¶¶ 716-1416. *See also In re Google AdWords Litig.,* No. 5:08-CV-3369-EJD, 2012 WL 28068, at *9 (N.D. Cal. Jan. 5, 2012) (named plaintiffs allegations that defendant's omissions were material sufficient to establish reliance); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, *1519* (10th Cir. 1983) ("[T]he law infers that the plaintiffs would have relied upon facts which are shown to be material and are intentionally withheld.")

[563] *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. at 663; *see also Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1364, 108 Cal. Rptr. 3d 682, 694 (2010) ("the 'unfair' prong of the UCL is not fraud-based, and thus [Plaintiff] is not required to plead reliance"); *Medrazo v. Honda of N. Hollywood,* 205 Cal. App. 4th 1, 140 Cal. Rptr. 3d 20, 29 (2 Dist. 2012).

Plaintiffs cannot establish causation.[564] This claim strains credulity. Defendants *concede* that the "list price" for the EpiPen is "set by Mylan." Although drug-industry middle-men like retailers and wholesalers may further mark-up that list price, the more Mylan charges, the more consumers pay. Defendants' arguments go only to the *extent* of Plaintiffs' injuries, not their cause, and should be rejected.[565] Moreover, as Defendants concede, the consumer protection laws of several states do not require Plaintiffs to make a showing of causation at all.[566]

### F.   Plaintiffs' Consumer Protection Claims are Alleged with Sufficient Particularity.

Defendants allege that Plaintiffs' consumer protection allegations should be dismissed for failure to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). Defendants are wrong for four reasons:

<u>First</u>, at least 15 states[567] require only Rule 8 notice pleading to state a claim for violation of their consumer protection laws, and Rule 9(b) does not require heightened pleading when underlying state law does not.

---

[564] Mylan Br. 71.

[565] *See Sanofi Order,* 2017 WL 6524839, at *17 (noting, in antitrust context, defendant's conduct need not be the "exclusive clause" of plaintiff's injury).

[566] *See* Mylan Br. 71.

[567] **Alabama:** *Lisk v. Lumber One Wood Preserving, LLC,* 792 F.3d 1331, 1334 (11th Cir. 2015); **Connecticut:** *Bruce v. Home Depot, U.S.A., Inc.,* 308 F. Supp. 2d 72, 77 (D. Conn. 2004); **Delaware:** *State ex rel. Brady v. Publishers Clearing House,* 787 A.2d 111, 116 (Del. Ch. 2001); **Florida:** *Fla. v. Tenet Healthcare Corp.,* 420 F. Supp. 2d 1288, 1309 (S.D. Fla. 2005); **Massachusetts:** *U.S. Funding, Inc. of Am. v. Bank of Boston Corp.,* 551 N.E.2d 922, 925 (Mass. App. Ct. 1990); **Nevada:** *Greystone Nev., L.L.C. v. Anthem Highlands Cmty. Ass'n,* No. 2:11-cv-01424-RCJ-CWH, 2012 WL 2782603, at *7 (D. Nev. July 9, 2012); **New Mexico:** *Greene v. Bank of Am., N.A.,* No. 1:13-cv-00937-JAP/KBM, 2014 WL 11497812, at *6 (D.N.M. Jan. 15, 2014); **New York:** *Greene v. Gerber Prods. Co.,* No. 16-cv-1153 (MKB), 2017 WL 3327583, at *19 (E.D.N.Y. Aug. 2, 2017); **Ohio:** *Ferron v. Dish Network, L.L.C.,* 195 Ohio App. 3d 686, 694 (2011); **Oklahoma:** *In re Gen. Motors Corp.,* No. MDL 04-1600, 2005 WL 1924335, at *3 (W.D. Okla. Aug. 8, 2005); **Oregon:** *McKie v. Sears Prot. Co.,* No. CV 10-1531-PK, 2011 WL 1587112,

Second, no state applies Rule 9(b)'s stringent pleading requirements to allegations of fraud by omission or concealment, as alleged here. "[A]llegations of concealment, as opposed to an affirmative act, do not require the same level of specificity because often it is impossible to know of the exact 'who, when, and where' in relation to an omission."[568] Requiring Plaintiff to identify "the precise time, place, and content of an event that (by definition) did not occur would effectively gut state laws prohibiting fraud-by-omission."[569]

Third, Rule 9(b)'s pleading requirements are not applicable to Plaintiffs' claims for unfairness and unconscionability. "Unconscionable commercial practice claims are distinct from [consumer protection] claims sounding in fraud," as such "the heightened pleading standard of Rule 9(b) does not apply."[570]

Fourth, to the extent Rule 9(b) is applicable, Plaintiffs' claims are alleged with sufficient particularity. Plaintiffs' allegations concerning Mylan's misleading justifications for the high

---

at *3 (D. Or. Feb. 22, 2011); **Pennsylvania:** *Clark v. Allstate Ins. Co.*, No. 13-0271, 2013 WL 1905147 (E.D. Pa. May 7, 2013); **Vermont:** *Nashef v. AADCO Med., Inc.*, 947 F. Supp. 2d 413, 424 (D. Vt. 2013); **Virginia:** *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535, 553 (E.D. Va. 2001); **Washington:** *Kreidler v. Pixler*, No. C06-0697RSL, 2006 WL 3539005 (W.D. Wash. Dec. 7, 2006).

[568] *AKH Co. v. Universal Underwriters Ins. Co.*, No. CIV.A. 13-2003-JAR, 2015 WL 1809157, at *13 (D. Kan. Apr. 21, 2015) (citing *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal.2007); *Near v. Crivello,* 673 F. Supp. 2d 1265, 1280 (D. Kan. 2009)).

[569] *Shifrin v. Associated Banc Corp*, No. 3:12-CV-00839-JPG, 2013 WL 1192766, at *3 (S.D. Ill. Mar. 22, 2013).

[570] *DuMont v. Litton Loan Servicing, LP*, No. 12 CIV. 2677 ER, 2015 WL 1061138, at *13 (S.D.N.Y. Mar. 11, 2015); *see also Katz v. Live Nation, Inc.,* No. 09 Civ. 3740(MLC), 2010 WL 2539686, at *5 (D.N.J. June 17, 2010) ("unconscionable commercial practices are categorized as 'affirmative acts,' as opposed to knowing omissions" and therefore, do not require a "showing of 'intent to deceive' or 'knowledge of the falsity of the representation.'" (citation omitted); *In re NorVergence, Inc.*, 424 B.R. 663, 692 (Bankr. D.N.J. 2010) ("as a claimant alleges unconscionability, not fraud, Rule 9(b) is of no consequence").

123

price of the EpiPen,[571] Mylan's false assertions surrounding Mylan's decision to sell the EpiPen

exclusively in a two-pack,[572] and Mylan's disparaging statements towards its competitors'

products[573] all set forth the 'who, what, where, and when' of Defendants' fraud.[574]

### G. Defendants' Assertions Regarding State-Law Class Action Prohibitions are Premature and Without Merit.

Defendants assert that the consumer protection laws of eight states prohibit private

plaintiffs from pursuing consumer-protection class actions, except in "very narrow

circumstances." [575] Defendants assert, further, that even Plaintiffs' *individual* consumer

protection claims proceeding in *federal* court should be dismissed based on those state-law class

action prohibitions. Defendants assertions are both premature and without merit.

---

[571] *See, e.g.,* Compl. ¶¶ 417-48 (**Who:** Mylan CEO Heather Bresch; **When:** September 21, 2016; **Where:** United States Congress Committee on Oversight and Government Reform; **What:** false and misleading statements regarding "Mylan's profit from the EpiPen," that "Mylan has saved America over $180 billion over a decade," that "Mylan had to raise the price of EpiPens … to recoup the more than one billion dollars … invested" in the product). Ms. Bresch made similar statements in: (1) a January 27, 2017 CBS News interview; (2) a June 9, 2017 LA Times interview, and (3) a December 1, 2016 Forbes Summit interview, *see* Compl. ¶¶ 195, 375.

[572] *See, e.g.,* Compl. ¶¶ 336 (**Who:** Mylan N.V.; **When:** August 24, 2011; **Where:** A news release issued from Basking Ridge, New Jersey entitled "Dey Pharma to Offer EpiPen 2-Pak and EpiPen Jr 2-Pak Exclusively"; **What:** Misleading statements regarding NIAID & WAO guidelines).

[573] *See, e.g.* Compl. ¶¶ 336 (**Who:** Mylan N.V.; **When:** 2013-2014; **Where:** A marketing distributed to physicians nation-wide; **What:** statements indicating that the EpiPen is the "preferred brand" for major health plans covering 95 million patients). Ms. Bresch made similar statements in a 2013 statement to the New York Times and Mylan N.V. made similar statements in a January 16, 2015 citizens' petition submitted to FDA, *see* Compl. ¶¶ 231.

[574] Even if Defendants were correct, the appropriate remedy for a violation of Rule 9(b) is leave to amend not dismissal. *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure § 1300* (3d ed. 2004).

[575] Alabama, Colorado, Georgia, Louisiana, Mississippi, South Carolina, Tennessee, and Ohio. *See* Mylan Br. 72-73.

Prior to class certification, "claims under [the state statutes cited by Defendants] are not subject to dismissal notwithstanding a limitation on class actions in the state statute."[576] Defendants' arguments "can be raised at the class certification [stage]" and—at that time—will be fully briefed and ripe for the court's consideration. They are not, however, relevant to whether the named Plaintiffs' *individual* consumer protection claims should be allowed to proceed.[577]

Federal courts routinely permit putative class claims for violations of the exact consumer protection laws at issue here, despite the statutes noted in Defendants' motion.[578] And, even when appropriately raised upon a motion for class certification, Defendants' arguments should be rejected. As the Eleventh Circuit held in *Lisk v. Lumber One Wood Preserving, LLC*, that state "statute[s] restricting class actions, like the New York statute," and those cited by Defendants

---

[576] *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2012 WL 1366718, at *8 (N.D. Cal., Apr. 19, 2012); *Hershey v. ExxonMobil Oil Corp.*, 278 F.R.D. 617, 622 (D. Kan. 2011).

[577] *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765 (JLL), 2017 WL 1902160, at *24 (D.N.J. May 8, 2017) (permitting Colorado, Georgia, and South Carolina putative class claims to proceed). The case-law cited by Defendants is inapposite as it does not concern a motion to dismiss filed prior to class certification. *See Friedman v. Dollar Thrifty Auto. Grp., Inc.*, Civ. No. 12-cv-02432, 2015 WL 8479746, at *3-5 (D. Colo. Dec. 10, 2015) (motion for reconsideration of an order denying class certification); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003) (interlocutory appeal of an order granting in part and denying in part class certification). And those that do are readily distinguishable. *See In re Syngenta*, 131 F. Supp. 3d at 1235 (D. Kan. 2015) (dismissing a Colorado consumer protection claim because Plaintiffs sought *only* damages and not injunctive relief, unlike the Plaintiffs here); *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 743 (N.D. Ohio 2010) (discussing the OCSPA, which does not include a class action bar; as noted by the Court, the "OCSPA permits both individual and class action claims").

[578] *See, e.g.*, *Lisk*, 792 F.3d 1331 (allowing Alabama putative class claims to proceed, despite a state class action bar); *Scott v. Honeywell Int'l Inc.*, No. 14-cv-00157-PAB-MJW, 2015 WL 1517527, *12 (D. Colo. March 30, 2015) (allowing Colorado putative class claims to proceed, despite state class action bar); *Seabron v. Amer. Family Mut. Ins. Co.*, No. 11-cv-01096-WJM, KMT, 2012 WL 1520156, *3-4 (D. Colo. April 20, 2012) (same); *In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 652-54 (S.D. Cal. 2014) (allowing Georgia, Louisiana, South Carolina, and Tennessee putative class claims to proceed).

here "did not apply in federal court."[579] While "[t]here is no definitive guidance on this issue from the Tenth Circuit,"[580] the Eleventh Circuit's reasoning is sound and persuasive.

## V.    Unjust Enrichment

Plaintiffs properly plead unjust enrichment, which requires essentially three elements: (1) Plaintiff lost something (here, money associated with overcharges); (2) Mylan Defendants gained something (here, the overcharged money); and, (3) it would be unjust (here, for Mylan to keep the overcharged money).[581] Defendants claim that there can be no unjust enrichment because the parties received what they intended to obtain.[582] As with Defendants' other arguments, this is a recasting of Plaintiffs claims that turns a willful blind eye to the Defendants' wrongdoing that

---

[579] *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-CV-02432-WYD-KMT, 2015 WL 8479746, at *3 (D. Colo. Dec. 10, 2015) (citing *Lisk,* 792 F.3d at 1331).

[580] *Id.* at *3. An Oklahoma district court addressing a related issue—whether Federal Rules of Civil Procedure 8 and 9 supersede Oklahoma's conflicting state pleading requirements—noted that "the most recently published Tenth Circuit opinion on the issue [*Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187 (10th Cir. 2012)] uses Justice Scalia's test" to determine whether state law pleading restrictions should apply in federal court; that test concerns itself not with "the substantive or procedural nature of the Federal Rule" at issue and, if the federal rule is procedural, it read to supersede conflicting state law. *Ipock v. Manor Care of Tulsa OK, LLC*, No. 17-CV-0106-CVE-TLW, 2017 WL 1289865, at *4 (N.D. Okla. Apr. 4, 2017). Applying Scalia's test here produces an obvious result: Federal Rule of Civil *Procedure* 23 permitting class actions supersedes conflicting state law prohibitions on the same subject.

[581] These 3 elements are set forth even by Mylan's Exhibit on Unjust Enrichment, Doc. 95-4.

[582] Mylan Br. 74.

allowed them to unjustly procure excess funds from Plaintiffs.[583] Accordingly, their motion

should be denied.[584]

---

[583] Defendants' cases are inapposite. *See Howard v. Turnbull*, 316 S.W.3d 431, 438 (Mo. Ct. App. 2010) (declining to find unjust enrichment *after a bench trial* based on premise that a "venture voluntarily entered into, with known risks and with the expectation of a profit, cannot be compensated for via a claim for unjust enrichment"); *Holland v. Tandem Computers Inc.*, 49 F.3d 1287, 1289 (8th Cir. 1995) (plaintiff had an unambiguous compensation agreement and alleged only that he was not paid a reasonable amount); *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 940 (6th Cir. 1989) (determining *on summary judgment* that plaintiff failed to provide evidence in support of his unjust enrichment claim); *Monus v. Colorado Baseball 1993, Inc.*, 103 F.3d 145 (10th Cir. 1996) (plaintiff failed to meet the unjust prong where he received a substantial benefit, which he had agreed to).

[584] Plaintiffs have pleaded Article III standing. *George v. Urban Settlement Servs*, No. 13-CV-01819-PAB-KLM, 2017 WL 4222620, at *2 (D. Colo. Sept. 21, 2017). Whether any of those plaintiffs can assert a sufficiently similar unjust enrichment claims in Alaska, D.C, Iowa, New Mexico, North Dakota, Rhode Island, or South Dakota (Mylan Br. 102 n.80), cannot be decided now. At the time of class certification, the Court will determine if any plaintiff is adequate to cover those states (not to mention that a tag-along plaintiff in this MDL may be added at any time by the JPML).

Respectfully submitted,


/s/ *Ryan C. Hudson*


*Co-Lead Counsel for Consolidated Plaintiffs*

Rex A. Sharp KA #51205
REX A. SHARP, PA
5301 W. 75th Street
Prairie Village, KS 66208
Tel: (913) 901-0505
Fax: (913) 901-0419
Email: rharp@midwest-law.com

Warren T. Burns
BURNS CHAREST LLP
900 Jackson, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
Email: wburns@burnscharest.com

Paul J. Geller
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000
Fax: (561) 750-3364
Email: pgeller@rgrdlaw.com

Lynn Lincoln Sarko
KELLER ROHRBACK
1201 3rd Ave. - Ste. 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384
Email: lsarko@kellerrohrback.com

*Liaison Counsel*

Ryan C. Hudson KA #22986
REX A. SHARP, PA
5301 W. 75th Street
Prairie Village, KS 66208
Tel: (913) 901-0505
Fax: (913) 901-0419
rhudson@midwest-law.com

*Plaintiff Steering Committee*

Elizabeth C. Pritzker (Chair)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Tel: (415)692-0772
Fax: (415)366-6110
Email: ecp@pritzkerlevine.com

Sharon S. Almonrode
THE MILLER LAW FIRM, P.C.
950 West University Drive Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
Email: ssa@millerlawpc.com

Eric Hochstadt
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8538
Email: eric.hochstadt@weil.com

W. Mark Lanier
THE LANIER LAW FIRM, P.C.
6810 FM 1960 West
Houston, TX 77069
Tel: (713) 659-5200
Fax: (713) 659-2204
Email: wml@lanierlawfirm.com

Damien Marshall
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Tel: (212) 446-2350
Fax: (212) 446-2350
Email: dmarshall@bsfllp.com

Rosemary Rivas
LEVI & KORSINKSY, LLP
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel: (415) 291-2420
Fax: (415) 484-1294
Email: rrivas@zlk.com

Steven N. Williams
1478 Cortez Avenue
Burlingame CA 94010
415-260-7909
Email: snwlaw@outlook.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of January 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to parties and attorneys who are filing users.

*/s/ Ryan C. Hudson*