```
 1                UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2

 3   IN RE:  EPIPEN                 Docket No. 17-md-2785
     (Epinephrine Injection, USP)
 4   Marketing, Sales Practices
     and Antitrust Litigation
 5                                  Kansas City, Kansas
                                    Date:  2/28/2018
 6

 7   . . . . . . . . . . . . . . . . . . . . . . . . .

 8                TRANSCRIPT OF STATUS CONFERENCE

 9                          BEFORE

10            THE HONORABLE TERESA J. JAMES
              UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Class Plaintiffs:

14   Ryan C. Hudson              Gretchen F. Cappio
     Rex A. Sharp, PA            Keller Rohrback
15   5301 W. 75th Street         1201 3rd Avenue
     Prairie Village, KS 66208   Suite 3200
16                               Seattle, WA 98101

17   For Sanofi-Aventis US, LLC Plaintiffs:

18   Eric S. Hochstadt
     Yehuda L. Buchweitz -(via Skype)
19   Nathan White - Dallas, TX
     Weil, Gotshal & Manges, LLP
20   767 Fifth Avenue
     New York, NY 10153
21
     Christopher Liwski - Sanofi-Aventis In-House Counsel
22
     For Local 282 Welfare Trust Fund Plaintiffs:
23
     Stuart A. Davidson
24   Lea M. Bays - San Diego, CA
     Robbins Geller Rudman & Dowd LLP
25   120 East Pametto Park Road
     Suite 500
     Boca Raton, FL 33432
```

17-md-2785   In re: EpiPen   2.28.18

```
 1   APPEARANCES (continued):

 2   For the Mylan Defendants:

 3   Brian C. Fries
     James Moloney
 4   Lathrop & Gage, L.C.
     2345 Grand Boulevard
 5   Suite 2800
     Kansas City, MO 64108
 6
     Adam K. Levin
 7   David M. Foster
     Jon M. Tolatta - McLean, VA
 8   Hogan Lovells US LLP
     555 Thirteenth Street, NW
 9   Washington, DC 20004

10   Kathryn S. Zecca
     Philip A. Sechler
11   Robbins, Russell, Englert, Orseck, Untereiner
      & Sauber LLP
12   1801 K Street, N.W.
     Suite 411L
13   Washington, D.C. 20006

14   For the King Pharmaceuticals, Inc., Meridian Medical
     Technologies, Inc. and Pfizer Defendants:
15
     Raj Gandesha
16   White & Case LLP
     1221 Avenue of the
17   Americas
     New York, NY 10020
18
     Joseph M. Rebein
19   Shook, Hardy & Bacon LLP
     2555 Grand Boulevard
20   Kansas City, MO 64108

21

22

23

24

25
```

```
 1                  (Court called to order.)
 2            THE COURT:  Good afternoon, everyone.  Good
 3   to have you all here.
 4            I'm going to ask for appearances and I'm
 5   mindful that some of you just entered the case I think
 6   this year and have not appeared in this court, at least
 7   not in this case.  So I would like all of you to stand
 8   up and identify yourselves and enter your appearances.
 9            Let's go ahead and do that now and we'll
10   start with class plaintiffs' counsel.  Maybe, Ryan, if
11   you'll head things off, then we'll just go around the
12   room.
13            MR. HUDSON:  Thank you.  Good morning, Your
14   Honor, Ryan Hudson for class plaintiffs.
15            MR. DAVIDSON:  Good afternoon, Your Honor,
16   Stuart Davidson of Robbins Geller on behalf of class
17   plaintiffs.
18            MS. BAYS:  Lea Bays of Robbins Geller on
19   behalf of the plaintiffs.
20            MS. CAPPIO:  Good afternoon, Your Honor,
21   Gretchen Cappio of Keller Rohrback.  I'm the partner of
22   Lynn Sarko on behalf of class plaintiffs.  Thank you.
23            THE COURT:  Good afternoon, everyone.
24            MR. LIWSKI:  Good morning, Your Honor, Chris
25   Liwski, in-house counsel of Sanofi-Aventis.
```

1            MR. HOCHSTADT:  Good afternoon, Your Honor.

2  Eric Hochstadt on behalf of Sanofi-Aventis, and with me

3  via life stream Yehuda Buchweitz.

4            MR. BUCHWEITZ:  Hello.  Good afternoon, Your

5  Honor.

6            THE COURT:  Glad to have you with us so we

7  can see you too.

8            MR. BUCHWEITZ:  Thank you for the

9  accommodations.  I really appreciate it.

10            THE COURT:  No problem.

11            MR. WHITE:  Good afternoon, Your Honor,

12  Nathan White for Sanofi.

13            THE COURT:  Say that again.

14            MR. WHITE:  Nathan White for Sanofi.

15            THE COURT:  Okay.  Thank you.

16            MR. LEVIN:  Good afternoon, Your Honor, Adam

17  Levin from Hogan Lovells on behalf of the defendants for

18  Mylan.

19            THE COURT:  Thank you.

20            MR. FOSTER:  Good afternoon, Your Honor,

21  David Foster from Hogan Lovells for Mylan.

22            MS. ZECCA:  Good afternoon, Your Honor,

23  Kathryn Zecca from Robbins Russell for Mylan, Inc. and

24  Mylan Specialty.

25            MR. SECHLER:  Hello, Your Honor.  Phil

1   Sechler from Robbins Russel on behalf of Mylan, Inc. and

2   Mylan Specialty.

3              MR. FRIES:  Good afternoon, Your Honor,

4   Brian Fries from Lathrop & Gage for Mylan.

5              MR. GANDESHA:  Good afternoon, Your Honor,

6   Raj Gandesha of White & Case on behalf of Pfizer

7   defendants.

8              MR. REBEIN:  Hello, judge.  Joe Rebein,

9   Shook, Hardy & Bacon, on behalf of Pfizer.

10             THE COURT:  All right.  Did we miss anyone?

11             MR. TALOTTA:  Good afternoon, Your Honor,

12   Jon Talotta from Hogan Lovells on behalf of Mylan.

13             MR. MOLONEY:  James Moloney, Lathrop & Gage,

14   on behalf of Mylan.

15             THE COURT:  Anyone else?

16             All right.  Well, thank you all for coming

17   in today.  I know it's -- it can be a hassle in getting

18   here in the Midwest to join for court.  But I think it's

19   helpful for us to sit down together and talk and see

20   each other face-to-face and put names with faces and see

21   what we can accomplish.  I do have a lot I want to get

22   through today, so I ask you all to work with me and be

23   succinct and let's try and work through as much as we

24   can today.

25             I apologize, last time we spoke over the

1    phone I had to cut it short because of a criminal matter

2    that I had to handle.  That will not happen today.  You

3    have my undivided attention for the entire afternoon if

4    we need it, so we will accomplish as much as we can.

5             To kind of recap, following our last

6    discovery status conference which took place on February

7    15th by phone, I set a deadline for motions to compel on

8    outstanding discovery disputes.  That deadline was

9    February 23rd and I think all of the parties; class

10   plaintiffs, Sanofi and Mylan have filed briefs on

11   motions to compel.  It sounds like maybe things with

12   Pfizer are maybe simmering for now anyway, and we set an

13   expedited briefing schedule as to those motions.

14            I also ordered counsel to appear at this

15   hearing to discuss ESI issues and mainly custodians and

16   search terms, and I wanted to do that because I don't

17   want us to get hung up on those issues and have that

18   delay discovery.  I want to keep things moving.

19            I am going to give you advance notice you

20   can start planning ahead right now that probably as soon

21   as we get through some discussion about -- and my

22   comments about custodians and search terms, I'm

23   anticipating and planning that we will break and I'm

24   going to make you all sit down together and spend some

25   time talking about some issues today while you're all

1  here.  So keep that in mind and stay tuned for that yet

2  later this afternoon.

3            We do need to deal with one housekeeping

4  issue before we move on and this is something that

5  probably none of you were expecting and don't -- don't

6  be nervous.  It has to do with the filing of sealed

7  documents in this case and in this MDL in particular.

8            In ruling on motions that many of you have

9  filed in this case seeking leave to file them under

10  seal, I had granted -- entered orders granting counsel

11  of record electronic access to those sealed documents.

12  I have decided, after hearing from Marla Gonzales who

13  works in our clerk's office, and my law clerk Terese

14  Schuele, who is also here sitting over on the side, and

15  their thoughts, which are very helpful and they know a

16  lot more about actual mechanical filing practices than I

17  do, I've decided to withdraw that access to protect

18  against possible inadvertent violations of the amended

19  stipulated protective order in this case.

20            So I will be entering an order which I am in

21  part reading from right now overruling my orders dated

22  February 23rd and 26 that directed the clerk to grant

23  sealed access to counsel of record in a number of docket

24  entries.  Instead we will have -- if a filing party is

25  granted leave to file a document under seal, it shall

1    file the document under seal and then provide a copy to

2    plaintiffs' and defendants' liaison counsel.  It will

3    then be the responsibility of plaintiffs' and

4    defendants' liaison counsel to provide a copy of the

5    sealed document to all counsel of record.  So that will

6    be the procedure in this case, which I think it behooves

7    us all to follow to avoid any confidentiality concerns

8    in this case.

9              We do have Marla Gonzales here from the

10   clerk's office.  If you have any questions you'd like to

11   ask her about the procedure or mechanics of accessing

12   those documents or filing sealed documents, now is the

13   time.  Marla's prepared and ready to answer your

14   questions.  Any -- any questions from any counsel?

15             MS. GONZALEZ:  Counsel, any questions about

16   how the procedures work for sealed documents?

17             THE COURT:  Oh, come on.

18             MR. FRIES:  I need my assistant here.

19             MS. GONZALEZ:  Just to give you -- maybe

20   this will pose some questions.  As it stands in civil

21   cases in our court and this MDL, if sealed access is

22   granted, which it -- at this point I believe the order

23   as entered has been counsel of record or counsel who

24   are -- appear on the docket sheet would be able to,

25   through their e-mails, go in, click on the document

1    number.  They would have to then identify themselves or

2    log in so the system identifies, yes, they are counsel

3    of record in this case and they would be able to see

4    that document.

5           If we remove the sealed access, anyone,

6    including the attorneys on the case, if they were to

7    click on that document number would simply get a notice

8    that they don't have access to that.  That's basically

9    the way it works.  It's not something the clerk's office

10   can say this document we can do.  It's all or nothing.

11   If you can see one sealed document, you can see all

12   sealed documents.  If it's one attorney, it's all

13   attorneys kind of thing.  So I think that is the purpose

14   of removing the sealed access.

15          Can you think of anything else that you

16   can -- questions that you might have?

17          THE COURT:  All right.

18          MS. GONZALEZ:  I believe in the order that

19   maybe they have my name and contact information.  If you

20   or your staff have any questions, feel free to please

21   contact me and I should be able to help you out with any

22   questions you may have.

23          MR. DAVIDSON:  Thank you.

24          MR. HOCHSTADT:  Thank you.

25          MS. GONZALEZ:  Your Honor, if I have your

1    leave, I have some other duties.

2                 THE COURT:  Certainly.

3                 MS. GONZALEZ:  Attorney training.  Thank you

4    so much.

5                 THE COURT:  Thank you, Marla.  Thank you.

6                 All right.  Well, I appreciate all of your

7    indulgence on that issue and this will be important for

8    liaison counsel to be sure that other counsel get copies

9    of sealed documents without having to try and access

10   those on-line.

11                All right.  Well, let's get on into the

12   substance of things.  I have reviewed all of the

13   briefing to-date.  The briefs were filed -- motions that

14   were filed on February 23rd, I know we have a response

15   deadline impending that you're all anxious to get back

16   and finish your briefing on I'm sure.  I'm hoping even

17   today we may help to minimize some of those issues.  I

18   don't know if that will be possible but we're going to

19   address some of those issues.

20                I'd like to begin by addressing and I intend

21   to rule today on the custodians issue.  So I do want to

22   hear from counsel.  I want you to answer some questions

23   I have.  So I want to begin talking about the custodians

24   or proposed custodians that are in dispute.

25                I know from reading Exhibit 11 to class

1    plaintiffs' motion to compel there's a February 15th,

2    2018 letter from Mylan's counsel, Mr. Foster, to

3    plaintiffs' liaison counsel, Mr. Hudson, which

4    identifies 15 custodians that Mylan includes in its

5    protection plan.

6              And in their motion to compel, class

7    plaintiffs and Sanofi argue there are additional

8    custodians with relevant information who should be

9    included with respect to ESI in this case.  Class

10   plaintiffs have identified two additional custodians

11   that they contend should be added to Mylan's list of

12   custodians, and then Sanofi and plaintiffs' class --

13   class plaintiffs join in requesting eight additional

14   custodians be added to Mylan's list.

15             So I'd like to start with the request by

16   plaintiffs and the two additional custodians that

17   plaintiffs have requested.  I'd like to hear from Mylan

18   first and as to those two proposed additional custodians

19   which are Dr. Frank Casty or Casty and Minaski Bhatt.

20   Does Mylan still object to those two as additional

21   custodians?

22             MR. LEVIN:  Good afternoon, Your Honor.

23   We --

24             THE COURT:  Good afternoon.

25             MR. LEVIN:  We do object to Mr. Coury being

1  a custodian and we're glad to present argument about

2  that.

3          THE COURT:  Mr. -- is it Casey?

4          MR. LEVIN:  Oh, Casty and Bhatt were not

5  objected to.  I'm sorry, we only have -- I'm trying to

6  cut right to the chase.  We only have one remaining

7  objection, and that to Robert Coury being a custodian;

8  otherwise, we have an agreement with the class

9  plaintiffs on the custodian.  That's the only one left.

10         MR. DAVIDSON:  Your Honor, if I could be

11 heard.  I think it would be helpful to very briefly lay

12 out where we are on ESI generally with Mylan which

13 dovetails into the custodian issue and I think narrows

14 the custodian issue, as Mr. Levin pointed out, down to

15 the former CEO Robert Coury, which Mr. Buchweitz is

16 prepared to argue and Mr. Levin obviously as well.

17         THE COURT:  Let me ask you --

18         MR. DAVIDSON:  Sure.

19         THE COURT:  I don't want to interrupt you.

20         MR. DAVIDSON:  That's okay.

21         THE COURT:  Just for purposes of my outline

22 for today and to keep us going how I want to, could we

23 be clear on the record -- maybe I should go through the

24 list and I want to be sure we're clear on who's being

25 added.

1               MR. DAVIDSON:  Sure.

2               THE COURT:  I know that may seem anal but

3    that's how I am.

4               MR. DAVIDSON:  That's how I am too, Your

5    Honor.

6               THE COURT:  All right.  So the additional

7    custodians that I have gleaned from the briefing are in

8    dispute -- are or were in dispute at the time of

9    briefing were Dr. Frank Casty.  Is Mylan withdrawing its

10   objection to him as a custodian?

11              MR. LEVIN:  We are.

12              THE COURT:  Thank you.  Minaski Bhatt?

13              MR. LEVIN:  Withdrawn.

14              THE COURT:  Very good.  Then as to the

15   additional -- let's see, which -- both plaintiffs' class

16   and Sanofi.  Are you objecting to Mike Stout?

17              MR. LEVIN:  Withdrawn.

18              THE COURT:  Patrick Jones?

19              MR. LEVIN:  Withdrawn.

20              THE COURT:  Nicole Willing?

21              MR. LEVIN:  Withdrawn.

22              THE COURT:  Thomas Theiss?

23              MR. LEVIN:  Withdrawn.

24              THE COURT:  Margaret Wooddell?

25              MR. LEVIN:  Withdrawn.

1           THE COURT:  Robert Coury?

2           MR. LEVIN:  Still objecting.

3           THE COURT:  Okay.  Tom Hadley?

4           MR. LEVIN:  Withdrawn.

5           THE COURT:  And Robert Deem?

6           MR. LEVIN:  Withdrawn.

7           THE COURT:  All right.  Thank you.  Very

8    good.  So then I guess we have the original as to 15

9    custodians plus these additional -- is it eight or nine

10   I guess?  Nine.

11          MR. LEVIN:  Nine.

12          THE COURT:  Yeah.  Okay.  All right.  Well,

13   then I guess if you would like to proceed with your

14   recap, but I'd ask that you keep it brief.

15          MR. DAVIDSON:  I will and -- I will.  And

16   what my intention is, is not to make argument in any

17   way.  I don't want to get into arguments on any issue.

18   And I would encourage Mr. Foster to, if I misstate

19   something, I would encourage my opposing counsel to tell

20   me that.

21          THE COURT:  Throw something at you.

22          MR. DAVIDSON:  Exactly.  So, first of all,

23   Stuart Davidson from Robbins Geller.

24          THE COURT:  Thank you, Mr. Davidson.  Go

25   right ahead.

1          MR. DAVIDSON:  Sure.  So I think what's

2   important for the court to understand is when we had

3   that telephonic conference with Your Honor a couple

4   weeks ago, I think everybody took to heart Your Honor's

5   consistent statements that we needed to get to work on

6   both sides and narrow issues so that we weren't

7   burdening the court and we were actually able to get --

8   move on with discovery.  And I think I can speak for all

9   the plaintiffs and Mylan to say that we've all worked

10  very hard to get to that point.  There may be some

11  remaining ESI issues, some search term issues.  But as

12  Your Honor just heard, we were able to significantly

13  narrow the custodian issue down to one.

14          THE COURT:  You have and I appreciate that.

15  Thank you, counsel.

16          MR. DAVIDSON:  And that's on behalf of

17  everybody.  So we have exchanged -- since the last

18  conference with Your Honor, we have exchanged new

19  proposed search terms with each other.  If Your Honor

20  would recall, we started out with Mylan proposing search

21  terms that led to about 95,000 documents.  We made

22  counter proposals that led to approximately 1.1 million

23  documents and if not more.  And we have gone back and

24  forth and yesterday we received kind of what they call a

25  hit report on class -- on all plaintiffs' proposed

1    search terms -- revised search terms and I would -- you

2    know, we've worked very hard on the plaintiffs' side to

3    try to ensure that we're getting only relevant documents

4    and our -- but, you know, suffice it to say, we do have

5    certain concerns that we're going to miss a bunch of

6    documents.

7              But we have worked very hard to come up with

8    what I think is the best compromise we can.  Yesterday

9    we got a hit report on those from Mr. Foster that

10   brought their documents down from about 1.1 million to

11   about 765,000.  About 185,000 of those documents are

12   documents that I don't believe that they're going to

13   produce because they concern a issue that has been teed

14   up for a motion to compel by Sanofi on what I would call

15   the Medicaid reclassification.  Is that not correct,

16   Mr. Foster?

17             MR. FOSTER:  No, I don't think that's

18   accurate.  So there was a search term I think that was

19   geared towards that issue.  There was a search term that

20   was geared towards that issue, but I believe the number

21   of unique documents that it pulled in was only

22   something, like, a single digit thousands.  I can find

23   the number.

24             MR. DAVIDSON:  Okay.  We'll look at it.

25             THE COURT:  Is that no longer in dispute

1  then?

2              MR. DAVIDSON:  No, it is I think.

3              THE COURT:  Sure.

4              MR. DAVIDSON:  It's just a question whether

5  that encompasses -- the 765,000 documents encompasses

6  those documents that are in dispute or not.

7              MR. FOSTER:  It's not a terribly material

8  question in terms of the volumes of documents.  It's

9  not, right.

10             MR. DAVIDSON:  So we have made significant

11 progress.  And the class plaintiffs and I brought Lea

12 Bays with me who is my colleague at Robbins Geller whose

13 done the Sedona conference and as proficient in ESI as I

14 presume Mr. Foster is on their side as well.  So we'll

15 be able to address any nitty-gritty things.  But I would

16 hope we would be able to use that -- yesterday's hit

17 reports and the search terms and really narrow down on

18 to what issues remain with that.

19             THE COURT:  Are you able to tell me as to

20 some of the issues that were raised in the briefing

21 whether those search terms are still at issue; for

22 example, variations of the term epi or EpiPen?

23             MR. DAVIDSON:  Correct.

24             THE COURT:  Have those been resolved?

25             MR. DAVIDSON:  They have been.  Let me say

1   this:  I think they have been.  We don't have, like, an

2   agreement to say these are the search terms that are

3   going to be used yet.  We haven't heard what their

4   position is yet on these search terms since they sent us

5   the -- the current report.

6            So but I can tell you that they've run these

7   search terms that include the "epi," that include

8   certain other words.  There are some words that we

9   thought were necessary that they have taken out because

10  they were I think hitting on too many miss hits.  And

11  we're not really going to argue with them over that

12  because we tend to agree that the number of miss hits is

13  probably going to make that a little burdensome.

14           But it seems to me that the principal

15  question at hand, the issue that the court may have to

16  address deals mostly with proximity limiters, how many

17  words within a certain sentence or paragraph must

18  another word fit.  And we can -- we're prepared to

19  address those.  But as I kind of said before, I really

20  think we're at a point where, you know, we've come down

21  about 200-something-thousand documents and we're really

22  concerned on the plaintiffs' side that if we just start

23  cutting documents down for the sake of volume alone that

24  we're going to miss out on a lot.

25           And, again, I didn't want to get into

 1    argument, that's just kind of where -- where we are on

 2    the plaintiffs' side.

 3              THE COURT:  All right.  Is -- do you think

 4    it would be helpful if -- if the parties sat down

 5    together today and went through the list of disputed

 6    terms and talked about it this afternoon?

 7              MR. DAVIDSON:  I actually do.

 8              THE COURT:  Okay.

 9              MR. DAVIDSON:  And but I think that might

10    be --

11              THE COURT:  I want to hear from both

12    sides -- or all sides.  So --

13              MR. FOSTER:  Right.  We agree with that,

14    Your Honor.  We think it would be productive.  In fact,

15    I think it would be more productive for us to sit down

16    and do that first.  And we would have done that but for

17    the fact that the search strings came in fairly late

18    last night, so...

19              THE COURT:  Okay.  Well, I would have

20    expected you to stay up all night working on it.

21              MR. DAVIDSON:  And miss the enjoyment of

22    Kansas City?

23              THE COURT:  That's true.  That's true.

24    Well, I'm happy to have you do that and we have room.

25    So if you need to break apart and talk separately, you

1    can do that.  I -- I do have a view on the proximity

2    limiters if you want to hear that, or talk first and try

3    and work it out yourselves, I'll hold my thoughts.

4                    MR. DAVIDSON:  I'd like to talk with

5    Mr. Foster and Miss Bays and see where we can get.

6                    THE COURT:  Okay.  Does Sanofi have a -- are

7    you still there, Mr. Buchweitz?

8                    MR. BUCHWEITZ:  I'm here.

9                    THE COURT:  He's muted us.

10                   MR. BUCHWEITZ:  I'm here, Your Honor.

11                   THE COURT:  Okay.  Does Sanofi have a

12   position on that or are you in the court?

13                   MR. HOCHSTADT:  Your Honor, this is Eric

14   Hochstadt from Weil.  I would echo on the search term

15   front separate from the custodian, where there's been a

16   lot of progress, search terms we seem to be coalescing

17   towards a proportional range.  We're sort of in the

18   700,000 universe.  I think there's probably more

19   discussion to be had to see if we all can agree that's a

20   proportional universe respectfully for Mylan and Sanofi.

21   So I certainly think that a lot of progress has been

22   made.  I think we should speak with Mylan to see if we

23   have their agreement on sort of where the last search

24   term hit report is.

25                    And on the Sanofi side, I can just tell you

1   that we've been working hard.  We've been on the other

2   end.  We've come down from, you know, close to a million

3   documents down towards a hit report that just came in

4   that I shared with counsel from Mylan that puts it in

5   the 700,000 range with additional custodians that we've

6   agreed to collect still not coming in yet.  So we don't

7   know how large that will pop our universe.

8              Unfortunately, this is not -- ESI is not a

9   perfect science, as Your Honor knows, and we probably

10  won't get down to a -- we all have the same number of

11  documents to actually review when we apply the search

12  terms, but I think we are working very hard and getting

13  towards a place that is proportional for this case.

14              THE COURT:  Yes.

15              MR. SECHLER:  Your Honor, Phil Sechler for

16  Mylan.  I want to flag for Your Honor one other issue

17  you didn't flag for custodians.  Mylan believes there

18  are two individuals who should be added to Sanofi's

19  custodian list.  We've made good progress since our

20  status report agreeing on most issues relating to Sanofi

21  custodians, but Christopher Viehbacher and Olivier

22  Brandicourt are two individuals we believe should be

23  added.  So we would like an opportunity to discuss our

24  respective views on those two men.

25              THE COURT:  Do you mean discuss them today

1    with counsel or argue about it here to me?

2            MR. SECHLER:  I think we're at an impasse.

3    We talked about it frequently between ourselves and we

4    cannot agree.  So I think, Your Honor, it would be great

5    if we could have an opportunity to present that issue to

6    Your Honor.

7            MR. HOCHSTADT:  Your Honor, my partner,

8    Mr. Buchweitz is prepared to argue that.

9            THE COURT:  All right.  I don't think I have

10   seen these names.  Has that been included in any of the

11   briefing?

12           MR. SECHLER:  It wasn't in the briefing,

13   Your Honor, and let me explain why.  We understood after

14   the conference that there were going to be -- there was

15   going to be a conference today on search terms and

16   custodians and we would come and talk and hopefully

17   resolve all them either before or at the hearing.

18           And then separately we were going to brief

19   issues that were going to be the subject of a motion,

20   opposition and reply and hopefully an opportunity to

21   present argument on that down the road.

22           THE COURT:  I understand that.  I noticed it

23   was conspicuously absent from your briefing, the ESI

24   issues.

25           MR. SECHLER:  So we didn't include ESI or

1   custodian issues in the motion.  We didn't think they

2   would be briefed by today.  But we did include it in the

3   status report, flagged it.  We made great progress with

4   Sanofi on those issues since then but there's still some

5   remaining.

6                MR. HOCHSTADT:  For the court's perspective,

7   I would just echo the point about progress.  Sanofi

8   initially had ten custodians.  We've agreed, based on

9   Mylan's request, to add 12 custodians to our list more

10  than doubling the list.

11               THE COURT:  Okay.  So there's these two that

12  are still outstanding?

13               MR. HOCHSTADT:  Former CEO and current CEO,

14  Your Honor.

15               THE COURT:  Okay.  All right.  Why don't we

16  do this:  I'm going to talk about a couple other things,

17  then you can break.  You all can talk about -- see what

18  you can negotiate.  That will give me some time to look

19  at what information I have about these two individuals.

20  And if there's anything else either side wants to submit

21  to me to look at in writing about that dispute about the

22  two additional custodians, I'll look at it while you all

23  are meeting and then we'll take that up when we come

24  back after the break.  All right.

25               MR. HOCHSTADT:  Sounds good, Your Honor.

1              MS. ZECCA:  Your Honor, Kathryn Zecca on

2     behalf of Mylan Specialty and Mylan, Inc.  I agree it

3     makes sense for the parties and we think some more

4     progress can be made on search terms.

5              I just wanted to respond to one thing that

6     Mr. Hochstadt said.  He said he thinks the parties are

7     coalescing around 700,000.  I'm not sure that's right.

8     I know it is correct that plaintiffs' last proposed set

9     of search terms to Mylan was around 750,000.  I think

10    Mylan's proposed search terms came in around 530,000.

11    So there was a gap between Mylan's last proposal and

12    plaintiffs' last proposal.

13             On the Sanofi side it's been a little bit of

14    a different process in the sense that normally it is the

15    requesting party that is asking for broader search terms

16    and the receiving party -- and the producing party who

17    says they have to be narrower.  With us and with Sanofi

18    we started at a different place.

19             For Sanofi's production they had proposed

20    some very broad search terms and some very limited

21    custodians.  And we said we think these search terms are

22    overly broad.  We think they should be more targeted.

23    In exchange, we'd want more custodians and a broader

24    date range.  And we have made a lot of progress on that

25    as Mr. Hochstadt said.

1             But it turns out over the last few weeks

2    there's been confusion how Sanofi's running its search

3    hit reports and we are the ones who proposed the

4    narrowest list of search terms.  That number came in to

5    me an hour before the conference at 716,000.  I am -- we

6    are probably willing to narrow those search terms down

7    some more and see where we come out to try to reduce the

8    range as part of a global issue.

9             And that's something we will talk about, but

10   I just wanted to let the court know that I don't think

11   there's an agreement that somewhere around 700,000 is

12   the right number.  The agreement might be closer to

13   500,000.  I think the parties are on the same page in

14   terms of the fact it has to be proportional.

15             THE COURT:  All right.

16             MR. HOCHSTADT:  Your Honor, briefly I would

17   just say that I think we should at some point discuss --

18   because I think we do have a disconnect in terms of how

19   we're counting documents with families.  Because my

20   understanding we are coalescing around 700,000.  We

21   should discuss that.  And this is the first time in my

22   career as a plaintiff I was told that you're collecting

23   too much information.  So obviously we think the

24   defendant should collect more than the plaintiff, but

25   we're working hard to be proportional here, Your Honor.

1           THE COURT:  Yeah, in the good old days we

2    called that sending somebody to a warehouse to just look

3    at all the file cabinets.

4           All right.  All right.  Well, I started a

5    list here and it sounds like when you all go off to talk

6    maybe -- maybe Sanofi and Mylan need to talk separately

7    from class plaintiffs -- at some point from class

8    plaintiffs and Mylan.  But I want you all to talk about

9    the issue we started off with about the additional

10   custodian that's still in dispute of Mylan.  I want you

11   to talk about the Sanofi debate or dispute with Mylan

12   about search terms and also about the two custodians at

13   issue.

14           When you come back in, to the extent there's

15   still a dispute, I want each side to be prepared to

16   argue to me your position and I hope I'll be able to

17   rule today and we'll get those issues decided and move

18   on down the road.  That would be my goal anyway.

19           So I -- seriously I want you to discuss

20   these, get as far as you can and then come back in and

21   be prepared to present your case to me and hopefully

22   I'll be able to rule today so we can get those issues

23   resolved.  Any questions about that?

24           MR. HOCHSTADT:  No, Your Honor.

25           MR. DAVIDSON:  No.

1           THE COURT:  I do appreciate the work that

2    the parties actually apparently have been doing.  It

3    looks like you've made progress and that's good.  To the

4    extent you all can agree and I don't have to rule on

5    anything, I'm happy to have that happen.  So keep that

6    up.

7           I -- you know, I know we're not here for a

8    hearing today on issues raised in the motions to compel

9    aside from ESI, but one issue of maybe low hanging fruit

10   that I do want to hear about today, and I think I may be

11   able to give you some guidance on, is this issue, and

12   I'll hear from Mylan first.  It's an issue raised in

13   your motion to compel about plaintiff fact sheets.  Is

14   there still an issue here about some of the plaintiffs

15   who you're claiming are not providing fact sheet

16   information that they agreed to provide?

17          MR. LEVIN:  There is, Your Honor, and we had

18   a meet and confer with the plaintiffs about that last

19   Friday.  We sent them a letter.  The parties are

20   continuing our discussions about that issue.  But we

21   believe that the fact sheets have not been properly

22   responded to.

23          And I guess I should also add we're shifting

24   around from the ESI discussion into the motion to compel

25   issues.  The other issue that we respectfully believe

1   needs to be on the agenda today that we've been having

2   extensive discussions with the plaintiffs about is the

3   class plaintiffs' position on production of ESI by the

4   individual named plaintiffs.

5           For the first time in this case we heard on

6   Monday afternoon in a meet and confer with the

7   plaintiffs' liaison counsel and others that the class

8   plaintiffs are not intending to review or produce ESI

9   for the individual named plaintiffs in this litigation

10  on the grounds it is too burdensome to make named

11  plaintiffs in a class action produce electronically

12  stored information.

13          That's obviously a problem.  We have a lot

14  of thoughts about that and the disproportionate effects

15  of us having to do all this free ESI and plaintiffs not

16  doing any.  And we're happy to continue those

17  discussions with the plaintiffs when we get together on

18  the other issues, but I want to let the court know that

19  issue is also out there.  It's an ESI issue that we've

20  been talking about and continue talking about as

21  recently as Monday.

22          That issue on the fact sheets, yes, we still

23  have this one issue and we're continuing our

24  discussions.

25          THE COURT:  And the issue on the fact sheets

1   is -- is an insurance coverage time frame issue?

2        MR. LEVIN:  That was just one example, Your

3   Honor, that we provided in the briefing.  The larger

4   issue is the number of responses -- a number of

5   questions were not responded to in the fact sheets.  And

6   so the confusion that we had, in just seeing a blank for

7   example on the fact sheet, is were they not responded to

8   because they don't know the answer or they're not

9   responded to because they're refusing to provide an

10  answer?

11       And so class plaintiffs' counsel have agreed

12  to go back to their own clients and we believe clarify

13  that issue as to each of the blanks.  If they don't know

14  the information, that's fine, they don't know the

15  information and we can all move on.  If they're refusing

16  to provide the information, that's fine too.  We just

17  want to understand where they are on these issues so

18  that we can appropriately proceed with discovery, know

19  what questions need to be asked in depositions and

20  present any -- any issues to the court.

21       THE COURT:  Okay.  Thank you.  On behalf --

22  behalf of class plaintiffs, is that a correct

23  representation that you're going back to the individual

24  plaintiffs and asking them to fill in the blanks about

25  why questions weren't answered?

1          MS. CAPPIO:  Yes, Your Honor.  Gretchen

2    Cappio from Keller Rohrback.  First of all, our

3    understanding on the plaintiff fact sheets is that, to

4    the extent they overlap with written discovery, the

5    plaintiff fact sheets cover those topics.  So we don't

6    have to go back through burdensome discovery of requests

7    for production, request for admission or interrogatories

8    as to those subject matters.

9          We are doggedly trying to get answers to

10   Mylan for all of the topics.  As you can image with so

11   many named plaintiffs, it is quite time-consuming but we

12   are endeavoring to do just what you heard and in an

13   expeditious fashion and we anticipate substantial

14   production in line with the April deadline that you have

15   set.

16          THE COURT:  Okay.  And I -- I will say this

17   is the part where I give you my guidance.  It seems to

18   me the fact sheets are just like answers to discovery

19   requests and you need to -- they do need to indicate, if

20   there's a blank left, is it -- is it because there are

21   no responsive documents or is it because you're

22   objecting based upon some privilege or some other basis.

23   So just a blank is not sufficient.  Okay?

24          MS. CAPPIO:  Yes, Your Honor.

25          THE COURT:  And you will comply with the

1   substantial compliance deadline for getting that

2   information to them.

3               MS. CAPPIO:  That's right, Your Honor.  Yes.

4               THE COURT:  All right.  Very good.  All

5   right.  Anything else on the issues we touched upon so

6   far before I move on to one other thing before we take a

7   break?  Okay.

8               All right.  I think the only other thing I

9   have in my notes, aside from hearing you after you've

10  conferred with each other, is that before we leave today

11  I do want to set another hearing date for about a month

12  from today.  I'll tell you how I expect that to work.

13              If the parties are working together and

14  things are going swimmingly, then I won't require you to

15  come back in.  But if there are problems, we're having

16  issues and disputes, that will be an in-person setting

17  again.  And we'll continue this procedure with monthly

18  hearings, whether or not they're in person or not being

19  contingent upon how well things are going.  So I love

20  seeing you all and I'm happy to have you come in.  But

21  if you can resolve your differences, we aren't going to

22  make you go through that exercise.

23              So when you -- during our break check your

24  calendars and all of you let me know what date of the

25  following works best for the next, and you better set

 1    aside time as if you're going to come in person in case

 2    that's necessary.  All of these are a little more than

 3    30 days because we have the Easter holiday in there, but

 4    the morning of April 3rd, either the morning or

 5    afternoon of April 4th, or the afternoon of April 5th.

 6    Any of those are clear on my calendar and I can

 7    accommodate you all on those times.  So hopefully you

 8    all can agree on which of those is better for the

 9    biggest -- largest number of you while we're breaking

10    and let me know that when we come back.

11            I will also ask a week prior to that hearing

12    date that each party submit to me an e-mail no more than

13    two or three pages letting me know what issues are in

14    dispute that you'd like to take up during that

15    conference or if there are none let me know that and

16    that will guide whether we have you come in or not.  All

17    right.  Questions about that?

18            MR. DAVIDSON:  No, Your Honor.

19            THE COURT:  All right.  Well, then let's

20    break and I'd like you to discuss the issues we've -- I

21    have mentioned so far and see what you can get done.

22    It's a little after 1:30 now.  What do you think, come

23    back at 3:00 or do you think you need that much time?

24            MR. DAVIDSON:  I think we'll know where we

25    are --

1        THE COURT:  2:30.  Carol says you can just

2    let her know when you're ready but let's make it at the

3    outside 2:45.  Okay.  And if you're ready before that,

4    let Carol know and we'll come back in.  You're all

5    welcome to meet in here together or go off into a

6    corners if you need to.  We also have my jury room and

7    another jury room down the hall.  So if you need to

8    break apart and have separate confidential meetings with

9    your clients, feel free to do that.  Again, just let

10   Carol know and she can direct you to where to go.  All

11   right.  Thank you.  I'll be back in a bit.

12        (Recess.)

13        THE COURT:  All right.  Are we all friends

14   now?

15        MR. HOCHSTADT:  Close, Your Honor.  Your

16   Honor, on one issue on the subject of the outstanding

17   custodians that are in dispute, Sanofi and Mylan have

18   been discussing that issue and we -- we think another

19   day would be very helpful to see if a resolution can be

20   reached.  And if not, we'd be prepared to, you know,

21   have a quick teleconference with Your Honor at a time

22   convenient to argue it, but we think another day would

23   be beneficial for that.

24        MR. SECHLER:  And, Your Honor, the reason

25   for the day is simply because there are people we needed

1    to contact back that aren't here that we couldn't and

2    because of conflicts and the discussion continued.

3    We've had these discussions for several weeks and today

4    we had another discussion but we just can't conclude it

5    today despite best effort.

6                    THE COURT:  Does this just apply to the

7    custodians?

8                    MR. HOCHSTADT:  Yes, just the custodians.

9    The one Mr. Coury and the two -- former Sanofi CEO and

10   current Sanofi CEO.

11                   MR. SECHLER:  Yeah, Mr. Coury,

12   Mr. Viehbacher and Mr. Brandicourt.

13                   THE COURT:  What about the search term

14   issues between Mylan?

15                   MR. HOCHSTADT:  I'll leave that to others to

16   take the podium on.

17                   THE COURT:  I'll give you the additional day

18   you'd like but I -- I want you to e-mail or call me

19   tomorrow.  And if it's not resolved, we will set a phone

20   conference very soon to get that resolved.

21                   MR. HOCHSTADT:  Yes, Your Honor.

22                   MR. SECHLER:  That sounds great.  Thank you,

23   Your Honor.

24                   THE COURT:  Uh-huh.  Next.

25                   MR. FOSTER:  Good afternoon.  This is David

 1   Foster.

 2              THE COURT:  Yes.

 3              MR. FOSTER:  So far in our discussions, as

 4   Mr. Davidson said before, we've got a lot closer in

 5   terms of the search terms over the course of the last

 6   week or so really and we feel after meeting that it is

 7   productive to continue discussing these -- these search

 8   strings.  We can't exactly reach agreement or move at

 9   this point because we have to run search strings with

10   vendors and get hit counts and additional reports.  And

11   we also discussed that for some of the search strings it

12   would be helpful to do some sampling now that we have a

13   defining of the universe of things that we're looking

14   at.

15              So the solution that we have come up with is

16   that we would begin reviewing the documents that are

17   part of search strings that everyone agrees on.  And

18   then for the rest of them we will do some sampling,

19   exchange lists of ones we want to talk about further and

20   then try to reach agreement as to the rest of it.

21              THE COURT:  How many search strings are in

22   dispute?

23              MR. DAVIDSON:  So there are -- so we think

24   it's going to -- I think it's going to be less than

25   half.  I'm hopeful it's less than half but that gives

1   half that we have an agreement that Mylan will begin

2   batching them and reviewing them internally and then

3   producing them.

4           So it kind of takes a little bit of the time

5   crunch pressure off of us, but that's not to say that we

6   don't want to move as expeditiously as possible on this.

7   I think that if we get these reports and the additional

8   sampling information within the -- within the -- within

9   a week or so, I think we'll be able to move fairly

10  expeditiously through that.

11          One of the -- kind of the critical points

12  for us is that if we're going to be negotiating to

13  reduce the number of documents, it needs to be based

14  upon a reason other than just volume, right.  Volume

15  doesn't necessarily mean anything.  It's really whether

16  you are hitting on relevant or irrelevant documents.

17          And so if Mylan is able to provide us with

18  examples and sampling to show that the search strings

19  that we have currently proposed are hitting on too many

20  irrelevant documents, then that would give us reason to

21  agree with them on certain modifications.  But what

22  plaintiffs are not able to do is simply say this is too

23  many documents, therefore let's agree to reduce the

24  proximity limiter to from 100 to 50 or something like

25  that.

1          So from our standpoint we're willing to have

2     these discussions with Mylan provided that we have the

3     information necessary to have a fulsome kind of

4     transparent discussion.

5          THE COURT:  When you say half are at issue,

6     are you saying half of all these that are in your

7     Exhibit 1 to plaintiffs' motion, the long -- very long

8     list?

9          MR. DAVIDSON:  It is a fairly long list.

10         THE COURT:  And you say half of those are

11    still in debate?

12         MR. DAVIDSON:  I really don't know that

13    that's going to -- it's going to be that many.  It --

14    you know, unfortunately, we weren't able to go through

15    each one one at a time during the time that we had in

16    the -- in the jury room.  So I'm hopeful it's not that

17    many.

18         But to be completely candid and transparent

19    with Your Honor, there are a couple, after we received

20    the hit reports from Mylan, we have concerns about and

21    we want to modify those as well.

22         So it's on both sides I guess that we want

23    to go and take another look at some of these strings.

24    We've received information that certain terms of art are

25    used internally at pharmaceutical companies to refer to

1   the EpiPen that are not included in the search terms.

2   And so we have asked Mylan to go back and speak with

3   their custodians about whether the term "pen," for

4   example, or the term "EP" should be used instead of just

5   EpiPen.  You know, do people internally at Mylan say we

6   need to have a meeting about the market share of EpiPen

7   or do they talk internally and say we need to have a

8   meeting about the pen?

9           And so we've asked Mylan to go back and talk

10  to their custodians about that because we want to make

11  sure that we're using terms that are used in e-mail

12  conversation not just terms that we as lay people may

13  call these products.

14          THE COURT:  Are you open to going back to

15  ask about this issue about using the terms as pen?

16          MR. FOSTER:  We can discuss that with our

17  clients, certainly, Your Honor.

18          THE COURT:  That seems really broad to me.

19  If you put in the search term "pen," you're going to get

20  millions of documents.

21          MR. DAVIDSON:  I don't know how many e-mails

22  they sent they say, hey, I got a couple big new pens to

23  write on.  So --

24          THE COURT:  Listen guys, we need to get to

25  work on this.  Did you resolve any of the -- any of the

1   search terms on the -- on the Exhibit 1 during the

2   meeting we just had?

3           MR. FOSTER:  Well, we didn't -- I think our

4   view is that these can't be viewed in a vacuum because

5   if you make a change to one string, it may affect your

6   willingness to agree to different strings if you take

7   out a string that has information that's important in it

8   but another string covers it or you can expand another

9   one.  So I think we view it holistically, although we

10  did discuss sampling for probably about five or six

11  specific strings.

12          And I think what I would suggest is that

13  there are probably about seven key issues that are all

14  boiled down throughout the whole thing.  So if I am to

15  give you a sense of the trajectory here, Your Honor, I

16  think on Sunday the parties, in terms of the number of

17  documents, were north of 500 -- like half a million

18  documents apart in terms of the delta of what we were

19  talking about.

20          At this point we're down below close to 200,

21  250, something like that.  So we're quickly getting

22  closer together.  We just need a little bit more time to

23  -- to do a more rigorous job of thinking about some of

24  the strings that really just got floated yesterday.

25          THE COURT:  Has Mylan come around on this

1   issue about searching for the term just "epi"?

2          MR. FOSTER:  That -- that is fine, Your

3   Honor.  I think I am -- I share your concern about the

4   word pen because it is a word that can refer to a lot of

5   different things.  But we have modified I think for most

6   of these strings to add epi with a star after it so

7   we're pulling in --

8          THE COURT:  Good.

9          MR. FOSTER:  Yeah.

10         THE COURT:  Because I was going to tell you

11  that would be my ruling.  I would require that as a

12  search term.

13         MR. FOSTER:  Right.

14         THE COURT:  Let's have that.  That will be

15  ordered if not agreed to.  It sounds like you're

16  agreeing to that.

17         MR. FOSTER:  I think -- I think that the

18  vast majority of these have that in it.  And if they

19  don't, we don't have an objection to doing that.

20         THE COURT:  Okay.  Well, that would be my

21  ruling.  So it should be incorporated in any agreement

22  the parties reach.

23         Proximity locators, are plaintiffs still at

24  a hundred -- within a hundred and Mylan is at 25?

25         MR. DAVIDSON:  So it's -- you know, each

1    string is different and they have different proximity

2    limiters and, you know, some of the strings we've agreed

3    to already.  We don't know exactly what that list is

4    going to be until we talk again to see what is it,

5    50 percent, 60 percent that we've agreed to and

6    therefore the proximity limiters aren't in issue.

7              Certain strings we do have a dispute over

8    whether a word should be within the same sentence or

9    within the same paragraph or and we just -- it may be a

10   fundamental issue.  But I really am hopeful that we can

11   -- when we walk through these, we can come to an

12   agreement and that's what the sampling is geared to

13   doing.

14             When we've done our testing internally,

15   we've pulled documents and we actually literally count

16   on our screen how many words apart are certain things.

17   We don't want to get the court involved in doing that

18   and so we've asked Mylan to do essentially the same

19   thing to be able to say show us why they think that, you

20   know, within 15, which is generally a sentence, is

21   appropriate as opposed to within the same paragraph or

22   so.  So I think, you know, at this point in order for us

23   to move, we need to see some type of testing done.

24             THE COURT:  What's Mylan's position on

25   proximity locators?

1          MR. FOSTER:  I don't think we have a general

2    position on proximity locators.  We used within 25

3    proximity locators.  I think in the last volley we

4    exchanged we agreed to one within 100 because we thought

5    it was a string that would benefit from a broader one.

6    If we had some we would expect words to be very close

7    together, we used it within five.  There are others we

8    used within 50.

9          But in general I think we already have a

10   universe of documents and this -- and the current Mylan

11   proposal is north of 530,000 documents and, of course,

12   that's just the e-mail search that we're doing.  And so

13   we're -- we're very confident that a very healthy,

14   robust set of responsive documents is going to come from

15   that.  And so I feel like the more we expand those

16   proximity locators, the -- the irrelevant stuff is going

17   to get pulled into the mix.

18          MR. DAVIDSON:  That's what I think the

19   testing will have to show.

20          THE COURT:  Well, I'm going to give you my

21   view.

22          MR. DAVIDSON:  Please.

23          THE COURT:  This is where the guidance comes

24   in, which is strong telegraphing how things are going to

25   go.  I cannot imagine a case -- a situation where I'm

1   going to order within 100.  I think that's -- that's

2   excessive.  And you're going to get a lot of false

3   positives in response to search -- within 100.  So I

4   think plaintiffs need to move on that, and generally

5   speaking, you know, significantly less than within 100.

6   You can do other limitations but proximity limiter of

7   within 100 I think is excessive.  So that's my guidance.

8                MR. DAVIDSON:  I appreciate that.

9                THE COURT:  Guys, well, I had hoped we would

10  get further in our discussions with the break.  I

11  understand you need to go back and do some runs and talk

12  to people.  So I will give you some time but not very

13  much time.

14                Let's do name that tune.  What's the

15  shortest amount of time you think you can either have

16  everything resolved or give me a list of the remaining

17  search terms in dispute?

18                MR. FOSTER:  So what we just discussed, Your

19  Honor, was two weeks.  It would give us a week to do the

20  testing and then another week to try to renegotiate the

21  search strings.

22                And I would point out, in connection with

23  that request, that we already have a very healthy -- we

24  have more documents to review than we can possibly get

25  through during those two weeks.  So this will not delay

1    anything to get that time in place.  I think it will

2    allow an orderly process so that we can have a

3    meaningful discussion about the remaining search

4    strings.

5              MR. DAVIDSON:  I agree, judge.  If anything

6    has come out of this hearing -- which we do appreciate

7    and I know, doing a lot of MDLs, I for one really

8    appreciate having monthly or semi regular status

9    conferences in person because I really do think it helps

10   the parties.  The guidance is tremendously helpful

11   obviously.  So I appreciate Your Honor's willingness to

12   hold those -- those conferences.

13             I -- one of the things that I think came out

14   of this is the fact that we -- you know, we have an

15   agreement on certain search terms.  We'll find out

16   exactly which ones those are probably within the next

17   day or so and then we can -- they can get going on those

18   and therefore the two weeks that we're asking for now

19   shouldn't delay anything.

20             THE COURT:  Do you agree with that,

21   Mr. Foster?

22             MR. FOSTER:  I do.

23             THE COURT:  Well, it's against my better

24   judgment but I am -- I will give you the two weeks you

25   want until March 14th.  It's going to be in March

1   Madness.  We'll have to --

2               MR. DAVIDSON:  Is Kansas going to be in it?

3               THE COURT:  Well, of course.  I'll give you

4   until March 14th but here are the parameters.

5               MR. DAVIDSON:  Please.

6               THE COURT:  I want by e-mail by the end of

7   business, that's five o'clock Central Time, on the 14th

8   either a message indicating you've reached agreement and

9   notifying me of what the agreed search terms are, or

10  providing me the list of all that are still in dispute.

11  And it better be a short list after I give you this

12  additional time.  I've given you some guidance.  I think

13  you know what I feel appropriate and not appropriate.

14  You have a sense of that.  So I expect it to be short on

15  March 14th.  You're capable parties.  You can compromise

16  and negotiate.  I presume you have your IT people

17  involved.  They better be.

18               MR. DAVIDSON:  That's Miss Bays.

19               THE COURT:  That's good.  I'm looking

20  forward to you helping these people through this.

21               MS. BAYS:  I will do the best that I can.

22  Thank you.

23               THE COURT:  Are you Mylan's -- are you the

24  IT authority, Mr. Foster, for Mylan?

25               MR. FOSTER:  I couldn't say yes to that and

 1    satisfy my duty of candor to the court.

 2              THE COURT:  Do you have your IT person

 3    involved?

 4              MR. FOSTER:  We have plenty of IT people.

 5              THE COURT:  All right.  Well, I expect they

 6    can help you.  Mylan said you all can work on that and

 7    get to a good conclusion.

 8              So once that happens, if there are issues in

 9    dispute, expect for me to set -- possibly to set

10    something before our next in-person meeting.  So I feel

11    strongly we need to get these search terms and

12    custodians resolved.  I mean, otherwise it's going to

13    hold up everything --

14              MR. DAVIDSON:  Yep.

15              THE COURT:  -- so we need to keep moving.

16              MR. DAVIDSON:  Absolutely.

17              THE COURT:  Anything else then on search

18    terms?

19              MR. DAVIDSON:  I don't believe so.

20              THE COURT:  Or custodians?

21              MR. FOSTER:  No.  Thank you, Your Honor.

22              MS. ZECCA:  Thank you, Your Honor, that was

23    Mylan's production.

24              On Sanofi's production, I'm going to speak

25    to Mr. Hochstadt.  Let me know if I'm wrong, we -- as I

1   mentioned earlier, we just got a hit report today from

2   Sanofi.  I think it's a little higher than we were

3   expecting but there's some narrowing we can do on the

4   search terms.  I've spotted an issue with one custodian

5   who seems to have an awful lot of documents.

6   Mr. Hochstadt and I talked at the break, do some

7   sampling on that custodian and figure out what's going

8   on there and whether there's stuff we need to pull out.

9           There's also eight of their custodians who

10  are still being loaded up but we've proposed very narrow

11  search terms for them and we each have an expectation

12  that that shouldn't produce very much.

13          But my suggestion would be, say, the March

14  14th control date you just gave on the Mylan production,

15  I'll be surprised if we have issues, but if we do, we

16  need to let the court know by March 14th.

17          THE COURT:  Mr. Hochstadt.

18          MR. HOCHSTADT:  Eric Hochstadt for Sanofi.

19  I'm optimistic there won't be any issues.  And if there

20  are, it will be a very short list, Your Honor.

21          THE COURT:  And we have an agreement as to

22  the -- the custodian -- the additional two custodians

23  for Sanofi that's going to be resolved tomorrow,

24  correct, with the report back to me?

25          MR. HOCHSTADT:  Correct, that's going to be

 1   discussed tomorrow.

 2              THE COURT:  Resolved or reported back to me.

 3              MR. HOCHSTADT:  That's correct, Your Honor.

 4              THE COURT:  I will -- in fairness I will

 5   allow you all until -- under the same parameters until

 6   March 14th to try and resolve your search term issues,

 7   Sanofi.  Okay.  Questions about that?

 8              MS. ZECCA:  None, Your Honor.

 9              MR. HOCHSTADT:  Thank you, Your Honor.

10              THE COURT:  If you get it resolved before

11   March the 14th, shoot us an e-mail before that.  Let us

12   know as soon as it's resolved.

13              MS. ZECCA:  We promise not to keep you in

14   suspense.

15              THE COURT:  Okay.  Thank you.  All right.

16              The next thing I have on my list is this

17   production of ESI by plaintiffs issue.  I want to go

18   ahead and talk about that today and I'll hear from --

19   from Mylan.  I mean, I've already heard a bit from you

20   and then I'll give class plaintiffs a chance to respond.

21              MR. LEVIN:  Thank you, Your Honor.  If I

22   could -- I think I can set the table, sort of a five- to

23   seven-minute overview, where we are and then discuss

24   hopefully how to move forward.

25              I do have a binder that I think will --

1   because we did not brief this issue for the reason

2   Mr. Sechler said, I do have a binder that I think will

3   help us walk through this if I may approach the court,

4   Your Honor, and provide a copy to the bench --

5           THE COURT:  Yes.

6           MR. LEVIN:  -- also of course to the

7   plaintiffs.  And I promise we're not going to go through

8   this entire binder.  Three copies for the court.  One

9   for Your Honor and two for the clerks.

10          If, Your Honor, will turn to Tab A of the

11  binder, it's a brief timeline I think sets out how we

12  got to where we are.  And the timeline begins in

13  November last year when the court, as Your Honor's

14  aware, entered the ESI protocol which applied to all

15  parties and required the parties to meet and confer

16  about ESI issues, including the use of any search terms

17  to produce ESI.  We served RFPs, requests for

18  production, after that time.  And on January 4th of 2018

19  the class plaintiffs responded to those requests for

20  production.

21          Now, as Your Honor knows, we have some

22  concerns about their -- about their responses but the

23  key point for this purpose is they did not object in

24  those responses to producing electronically stored

25  information.  Our position is, frankly, under Your

1  Honor's prior rulings and the case law in this court,

2  that's a waiver of that issue as between the ESI

3  protocol and the responses to the requests for

4  production.  They had taken the position as of January

5  4th, 2018 that, as one would expect, ESI sources would

6  be searched and ESI would be produced for the named

7  plaintiffs.

8            On January 10th plaintiffs sent us a letter

9  informing us that they did not intend to use search

10 terms or other methodologies with respect to the review

11 and production of ESI.  Now, we took that to mean we're

12 going to somehow still review and produce ESI, we're

13 just not going to use search terms and we're telling you

14 that.  And the reason they did that is because there's a

15 provision in the ESI protocol that says if you're going

16 to use search terms, you have to meet and confer.  So

17 they were telling us, well, we're not using search

18 terms, so there's no reason to meet and confer.  And a

19 copy of that letter is -- is attached in this binder for

20 the court's convenience at Tab B.  It's the January 10th

21 letter.

22           We responded to that and we ultimately had a

23 meet and confer on January the 26th -- sorry, on January

24 31st following our letter of January 26th, a copy of

25 which is at Tab C, where we said, look, we need to meet

1    and confer on potentially relevant ESI that could be

2    discovered through search terms.  We had that meet and

3    confer.  At the end of that meet and confer the

4    plaintiffs agreed to clarify exactly what they were

5    doing to review and produce ESI.

6              And on February 5th, in response to a call

7    that I had from plaintiffs' liaison counsel requesting

8    that we put in writing what our questions were, I sent a

9    letter to the plaintiffs, which is in the binder at

10   Tab D, with a series of very basic follow-up questions

11   about the plaintiffs' ESI approach as part of the meet

12   and confer process.

13             I asked questions like:  Are you using

14   search terms to review the plaintiffs' -- named

15   plaintiffs' ESI?  If you're not, how else are you

16   reviewing electronically stored information so we can

17   just get an understanding and make sure we're in

18   compliance with the ESI protocol.

19             One day later the plaintiffs filed their

20   status report asking for the court's guidance on this

21   ESI issue.  We also flagged this issue in our status

22   report.  And then we met and conferred again at our

23   request this past Monday, February the 26th, to try and

24   resolve the issues that basically had been frozen since

25   the filing of the status reports and in anticipation of

1   us being before Your Honor this afternoon to talk about

2   ESI search terms and custodians.

3           Candidly, we went into that conversation on

4   Monday believing we were talking about ESI search terms

5   and custodians.  But plaintiffs told us, as I said

6   earlier today, for the first time that electronically

7   stored information for the named plaintiffs in their

8   view has no bearing on the case and that they are not

9   going to search it or produce it in some kind of

10  systematic way at all.

11          We asked them what the legal authority was

12  for the position that named plaintiffs in a class action

13  do not need to review and produce electronically stored

14  information or comply with the ESI protocol in this

15  case.  They didn't send us any of that legal authority,

16  and I strongly suspect that's because there is none.

17          There is no reason, Your Honor, to state the

18  obvious, that individual named plaintiffs are exempt

19  from ESI requirements of this court -- of this court's

20  local rules or of the Federal Rules of Civil Procedure.

21          And there may be some context here that is

22  worth mentioning, Your Honor.  The court may be aware of

23  this, but I think it's important to understand,

24  20 percent of the named plaintiffs in this case have

25  already dropped out of the case because they were

1   unwilling to produce discovery.  They didn't want to

2   respond to fact sheets and plaintiffs' counsel told us

3   they didn't want to engage in the burdens of discovery

4   and they couldn't even get in contact with their own

5   clients.  So 20 percent of those plaintiffs have already

6   dropped out for that reason.

7           Now, I say that, Your Honor, because we just

8   spent the last two hours talking about all the hundreds

9   of thousands of documents that our client and everybody

10  else in this case is going to have to review all by

11  April the 30th, electronically stored information.

12  That's on the one hand.  On the other hand are named

13  plaintiffs who are telling us they are not going to

14  engage in the ESI protocols at all.  And, unfortunately,

15  Your Honor, that's why we felt the need to raise this

16  issue with the court today.

17          We're not asking for a lot.  What I'm asking

18  for is basically two things; first, a confirmation that,

19  as should be self-evident, named plaintiffs in this

20  case, as in all cases, are required to search for and to

21  produce relevant ESI.  I mean, I shouldn't have to cite

22  this, but even the court's own ESI guideline, Guideline

23  24(b), makes clear that after receiving requests for

24  production, parties shall search their ESI.  So we just

25  need to sort of level set that and make sure everyone

1    understands they are searching ESI.

2          What I mean by this are things like e-mails,

3    right, like, individual plaintiffs have e-mail accounts.

4    They have Gmail.  They have Yahoo.  And those need to be

5    searched for potentially relevant information.  Social

6    media posts, especially because we're dealing with

7    individual named plaintiffs, those are Facebook posts,

8    Twitter.  Those are also the kinds of things that may

9    have potentially relevant information.  So we want to

10   get that confirmation.

11          And then assuming we can level set there,

12   the second request order the named plaintiffs to comply

13   with the ESI protocol by responding to the questions in

14   my February 5th letter.  What I mean by that is how are

15   they planning to do this?  If they're going to search a

16   named plaintiff's e-mail box, they're going to have to

17   use search terms.  They told us on January 10th they're

18   not using search terms.  So something's got to give.

19   Either they're going to look at every single e-mail in a

20   plaintiff's e-mail box -- which is impossible, believe

21   me -- or they're going to do searches.

22          Going to come up with keywords words.

23   They're going to put them in a search box in Gmail and

24   they're going to have people look for them and then

25   they're going to produce relevant information.  So just

1    like when somebody asks me to search my Gmail box to

2    search for EpiPen, I would type in EpiPen in the search

3    box and I'd get a return.

4         We're not asking for much more than that but

5    the plaintiffs thus far have been unwilling to even

6    agree with us to that approach or meet and confer with

7    us on what those keywords or search parameters should

8    be.  That's the nature of the issue, Your Honor, I think

9    it's actually fairly simple.

10        I will say that the plaintiffs have told me

11   in meet and confer discussions today that they don't

12   believe we requested ESI from them.  I think that's,

13   needless to say, quite an untenable position.  Whether

14   it's by virtue of the questions they were required to

15   respond to in the plaintiff fact sheets by February the

16   1st or whether it's because of the request for

17   production that they did respond to by January the 4th,

18   we have outstanding document requests that cover every

19   issue in this case; pricing, two-packs, patent

20   litigation, use of an epinephrine auto-injector.

21        People send e-mails.  People post to social

22   media about this stuff.  If there are named plaintiffs

23   out there that have e-mails talking about the price of

24   EpiPen, the use of the EpiPen, or any of the other

25   myriad of issues that are in this case, plainly, Your

1    Honor, we are entitled to that discovery we believe

2    under the rules of this court and the ESI protocol

3    that's in place.

4              THE COURT:  I'm looking here at your -- the

5    plaintiffs' fact sheet form.  What specific questions on

6    that are you claiming would require a search of ESI?

7              MR. LEVIN:  Well, there is a -- I don't have

8    the form in front of me, Your Honor.  My recollection is

9    a Section B that says to produce all the documents

10   related to the answers of the foregoing questions.  And

11   documents, of course, in 2018 has to be defined as

12   electronically stored information.  So that's -- that

13   would be our -- our first contention as to fact sheets.

14             In addition, there are these requests for

15   production that I talked about the timeline before that

16   we served before the new year and that we responded to

17   on January 4th which covered the waterfront of issues in

18   this case; pricing issues, use of your epinephrine

19   auto-injector, patent litigation.  I just -- I just

20   skimmed them a minute ago and they're all -- all those

21   issues are in there.  It's basically anything about the

22   allegations in your complaint.  And if the plaintiffs

23   have documents that relate to those allegations, then we

24   believe it's plain under the rules they have to be

25   produced.

1        I mean, I think a better way to look at it
2   is why wouldn't they produce them?  In other words, why
3   are named plaintiffs in a class action somehow exempt
4   from having to produce electronically stored
5   information?  I'm not aware of any legal authority to
6   that point in a case where plaintiffs are asserting
7   hundreds of millions if not billions of dollars against
8   our clients.  We think it's only fair they have to abide
9   by the exact same protocol this court entered back in
10  November.  There's no exception in that protocol for the
11  plaintiffs.  It applies to all parties.
12        THE COURT:  Do you have a copy of the
13  request for production you served on class plaintiffs
14  with you?
15        MR. LEVIN:  I do.
16        MR. HOCHSTADT:  Your Honor, this is Eric
17  Hochstadt for Sanofi if I just may.  I don't have an
18  issue with this dispute but there are exhibits in this
19  binder that relate to a Sanofi dispute.  If this is
20  going to be part of the record for this hearing, I ask
21  those be taken out.  And for the record, they're
22  Exhibits I, J, K, and I think they include Exhibit F,
23  which is the search, the ESI search strings between the
24  parties.
25        Is that right, Mr. Levin?

1          MR. SECHLER:  Your Honor, the last four tabs

2   were included so in case we argued the custodian point

3   we're going to get back to Your Honor tomorrow on, you

4   would have those documents in front of you.  So it may

5   be worthwhile for the court just to hang on to those in

6   case we don't resolve things because I think at least

7   Mylan's presentation would include a reference to those

8   four tabs but hopefully we would resolve it and then we

9   won't --

10         THE COURT:  Let me be sure.  Did you say H,

11  I, J and K?

12         MR. HOCHSTADT:  H, I, J and K, Your Honor,

13  for the Sanofi documents.  And I'm just saying, so the

14  record can be clear, because if this is going to be part

15  of the record or not, if the issue is resolved, then are

16  we going to take it out afterwards?  I would rather say

17  let's take it out now.  If there is a dispute to be

18  argued, we can provide that.  I would assume Mylan can

19  provide that information easily.

20         THE COURT:  That's fine.  Is there any

21  objection to that?

22         MR. SECHLER:  No.  Well --

23         THE COURT:  We will take it out of the

24  notebook, that won't be in the record.

25         MR. HOCHSTADT:  The other Exhibit F, ESI

1    comparative search reports between the coordinated

2    plaintiffs and the Mylan search terms --

3                MR. LEVIN:  E too.

4                MR. HOCHSTADT:  E and F would be removed as

5    well, Your Honor.  It sounds like it's not germane to

6    the issue that Mr. Levin is discussing.

7                MR. LEVIN:  That's correct.

8                THE COURT:  My notebook doesn't have

9    anything behind F.  It's blank.

10               MR. FOSTER:  Your Honor, that's probably

11   because we took it out to discuss back there.  So

12   it's --

13               COURTROOM DEPUTY:  Here it is.

14               MR. FOSTER:  It's okay.

15               MR. HOCHSTADT:  Exhibit F in the book I

16   have, Summary Statistics for Mylan, Plaintiff Proposed

17   Searches.

18               THE COURT:  So E and F, how do --

19               MR. HOCHSTADT:  Our position, we would ask

20   that be taken out of the binder.  I don't think that's

21   relevant to the dispute between Mylan and class

22   plaintiffs.

23               MR. SECHLER:  That's fine, Your Honor.

24               MR. FRIES:  Yeah.  May I retrieve those,

25   Your Honor?

1        MR. HOCHSTADT:  Thank you, Your Honor.

2        THE COURT:  Here are E and F and I'm going

3   to hang on to those.  No, we'll give them back.  We'll

4   take out E, F, H, I, J and K.

5        MR. FRIES:  We can e-mail them if we need

6   them.

7        THE COURT:  That's fine.  Here let me -- so

8   we don't screw this up, let me give you these out of

9   this notebook, too.

10       Who wants to respond for class plaintiffs?

11       MR. LEVIN:  Your Honor, just before we did

12  that, Your Honor asked for a copy of the document

13  request.  I do have a copy to pass on.

14       THE COURT:  Okay.  Thank you.

15       MR. LEVIN:  And just to finish up on -- just

16  to highlight that, if the court looks, for example, at

17  Request for Production 43, that's our request for

18  production.  I'm not going to go through all

19  70-something of them.  But 43 talks about all documents

20  relating to your allegations about two-packs.  You'll

21  see that in 44 as well.  I believe, for example, if you

22  look at No. 50 -- court's indulgence -- 56, 57 requests

23  before that are all talking about price hikes, for

24  example.  You know, I mean, these are -- these are basic

25  requests for production about price hikes, two-packs,

1   everything that's in the complaint and we believe they

2   require the production of ESI.

3          THE COURT:  Thank you.  Mr. Hudson.

4          MR. HUDSON:  Thank you, Your Honor.  I don't

5   have a binder.  We haven't seen this binder until today.

6   You've heard a lot about waiver.  They didn't file a

7   motion to compel.  This wasn't in their motion to

8   compel.  We're certainly happy to address this today but

9   -- and I'm not going to discuss the timeline because I

10  don't think it's all that important.  We've continually

11  told them that we don't view the class plaintiffs as on

12  the same level as Mylan.

13          In contrast, Local 282, which as -- as a

14  class plaintiff has engaged in robust ESI efforts.  And

15  there's a clear distinction between individuals who have

16  $600 EpiPens and companies like Mylan that make billions

17  of dollars from selling those products.  That's a very

18  clear threshold issue.

19          As we put in our status report, we do think

20  that plaintiffs are going to continue to be stifled.

21  This is an access to justice issue in the same way that

22  voter ID laws and poll taxes stifle people from voting.

23  If you shake down plaintiffs and make them engage in

24  excessive efforts, they're not going to continue in

25  lawsuits.  And we do have plaintiffs that are committed

 1   to this case that do believe in this case but we have to

 2   be pragmatic and realistic.  That's why we have sought

 3   guidance from the court.  We haven't said there's no ESI

 4   obligation.  What we've said is we want to get it

 5   clarified.

 6           So with that background, let me jump in.

 7   The first point would be our view is that the issue is

 8   the PFSs, and in the Dukes -- the Duke MDL report I

 9   think it's evidenced in the *Syngenta* case, which I

10   defended, PFSs are a substitute for RFPs and

11   interrogatories.  So that has been our position.  That's

12   our position today.  And you've heard 46 out of 46 of

13   those PFSs were produced.  Of course there's some

14   dispute about how -- how much information was provided.

15   But to have all 46 out of 46, I would submit, is a gold

16   star effort.  Certainly that didn't happen in *Syngenta*.

17   And those PFSs included document requests.

18           The second point Your Honor zoomed in on,

19   which exact request are you claiming you don't have

20   information on.  Mr. Levin's argument, he mentioned, you

21   know, patent litigation as though these consumers are

22   going to have e-mails about Mylan 's patent litigation.

23   I don't find that to be all that likely.

24           He then referenced Request No. 43 but that

25   doesn't relate to the -- to the claims and defenses of

1    the individual plaintiffs the best that we can tell.  In

2    our view, the issue is are you a consumer.  Are you a

3    consumer that uses an EpiPen.  And certainly anything in

4    the PFS that they submitted captures that we would -- we

5    would agree with them that's going to be inclusive of

6    what's required.

7              And I think that we are reasonable and

8    pragmatic and we would be willing to entertain some

9    search terms on e-mail as long as it's in conjunction

10   with the PFSs.  But our view is these requests for

11   production, almost all of them relate to attorney work

12   product that we as the lawyers filing the case filed,

13   like, support all of your allegations about things,

14   like, patent litigation that these individuals would not

15   have.

16             We also -- it's important to know we don't

17   want to do this twice and so we don't want to

18   continually get hit with RFPs for these individual

19   plaintiffs.  Again, this is very burdensome.  It's not

20   burdensome for Mylan in the same way.  I'm not saying

21   that it's not burdensome but it's not burdensome in the

22   same way it is for these individual plaintiffs.

23             So I guess I would conclude by saying we are

24   willing to entertain some sort of a compromise on this

25   but we -- we take the view that individual RFPs to the

 1   named plaintiffs are duplicative and that this issue is

 2   not teed up via motion to compel today.

 3            And so with that I would entertain any

 4   questions.

 5            THE COURT:  Mr. Hudson, in connection with

 6   the responses to the RFPs from Mylan, were the

 7   individual plaintiffs contacted and asked for

 8   information to respond to these RFPs?

 9            MR. HUDSON:  I would need to confirm with my

10   co-counsel on that.  If I could have a second, I could

11   do that.

12            THE COURT:  Go right ahead.  And while

13   you're at it, was -- was any request made of plaintiffs

14   in responding to the fact sheets to search their e-mail

15   or their social media accounts?

16            MR. HUDSON:  One second if I may, Your

17   Honor.

18            THE COURT:  Thank you.  All right.  Go

19   ahead, Mr. Hudson.

20            MR. HUDSON:  Thank you, Your Honor.  So as

21   to the RFPs we have not talked to the clients about

22   individual requests.  Again, on several of these we have

23   objected that they are duplicative of the PFSs.  And as

24   to the fact sheets, we did not instruct them or not

25   instruct them not to search e-mail.  We gave them the

1    subject matters of these are -- these are the issues.

2    And I think also to that end there is -- to my reading

3    there isn't a specific PFS question that would require

4    them to go specifically search their e-mails.  But if,

5    for instance, they had documents that were responsive, I

6    think, you know, myself included, several of us would

7    save a lot of e-mails that have relevant documents;

8    financial, medical, whatever that may be, if those

9    documents were in their e-mail, presumably that's where

10   they got them.  So we didn't -- to be clear, we did not

11   specifically tell -- tell them to go search their

12   e-mail.

13              THE COURT:  And prior to responding to the

14   request for production from Mylan, did plaintiffs'

15   counsel have discussions with Mylan about this issue

16   informing them that you were not consulting with

17   individual plaintiffs in responding to the RFPs?

18              MR. HUDSON:  No.  I -- no.  We objected to

19   -- to numerous of these RFPs on the basis that they're

20   duplicative of the PFSs.  And, again, my reading of the

21   vast majority of these would be that they don't relate

22   to a claim or defense in the case.  By "vast majority" I

23   mean the whole.

24              THE COURT:  And is it -- is it class

25   plaintiffs' position then, as I think you've indicated,

1    that, in responding to any request for production from

2    Mylan, you do not feel any obligation to ask questions

3    of the individual plaintiffs in responding to requests

4    for production or other discovery requests?

5             MR. HUDSON:  Right.  Our view is that this

6    PFS that's agreed upon is extremely detailed and frankly

7    burdensome.  Our view when we were negotiating this --

8    this was not me personally -- but our view was as in

9    every other case and as the Duke MDL paper suggests, in

10   this case this substitutes for discovery.  We would have

11   never agreed to do a highly burdensome PFS with -- with

12   Part B which includes document production only to then

13   have to go answer 75 RFPs when there's no reason why we

14   would ever -- why would you do both, or I should say why

15   would you agree to do both?

16            THE COURT:  Okay.  Hold that thought.

17            Mr. Levin, I'd like you to respond to that.

18   Was -- was it your understanding that the plaintiffs'

19   fact sheets were to be in lieu of individual plaintiffs'

20   responding to other discovery requests?

21            MR. LEVIN:  Absolutely not.  The

22   understanding that we had negotiating with the

23   plaintiffs was that the requests were not to be

24   duplicative.  In other words, that if there was

25   information that we'd requested through the fact sheets,

1   we would not then go and request the same information

2   through the request for production or other discovery

3   requests that we made in the case.

4           The requests that we have -- we served and

5   that the plaintiffs responded to on January 4th were not

6   duplicative.  They asked things like what's the basis

7   for your allegations that the EpiPen is priced too high?

8   What's the basis for your allegation that the EpiPen

9   should be sold as a single pen?

10          And, frankly, Your Honor, the answers that

11  we just heard in open court about the way that the class

12  plaintiffs' counsel went about discharging their

13  obligation in responding to those RFPs are really pretty

14  stunning.  They didn't talk to their plaintiffs before

15  responding to a request for production.  They never came

16  to us and said before January 4th that they weren't

17  going to answer the RFPs because they were doing the

18  fact sheets.  They never raised that issue with the

19  court.  They never, in their responses to the RFPs, said

20  that they wouldn't respond because they were already

21  doing the fact sheets.

22          And, Your Honor, when plaintiffs keep

23  complaining about the burden of the fact sheets, they

24  agreed to them and the court entered them as a -- a way

25  to facilitate discovery and avoid duplicative discovery.

1          THE COURT:  Well, in class plaintiffs'

2     defense, many of these requests for production do look

3     like they were targeted not at the individual

4     plaintiffs.  Would you agree with that?

5          MR. LEVIN:  They are targeted at whatever

6     information the individual plaintiffs and their counsel

7     have to support the claims and we discussed that with

8     the plaintiffs.  In the very first phone call we had in

9     January I remember very clearly saying to Mr. Davidson

10    who was on the phone, I said, "Look, I get it.  I know

11    how class action litigation works.  I know that

12    Miss Serrano as a plaintiff is not going to have a file

13    about the Teva and Intelliject patent litigation, but

14    you might.  And you might have documents as counsel

15    you're intending to prosecute your claims with.  And so

16    those requests are directed at you and whatever

17    information you have that is not otherwise work product

18    or privileged because you need to give us both the good

19    and the bad that relates to your allegations, whether

20    they're in the possession of your individual clients or

21    otherwise."

22          That's not what I'm arguing about.  I'm not

23    here today, Your Honor, to say that individual

24    plaintiffs I expect to search for patent litigation

25    documents.  But, I mean, look at request I think it was

1    52 or 53 that I mentioned before.  Fifty-two I think it

2    was, it's all allegations regarding in -- all documents

3    relating to your allegations about the pricing of EpiPen

4    products.  It's clearly a possibility that individual

5    named plaintiffs are e-mailing or posting on social

6    media about their experiences with the EpiPen, about the

7    price being too high, about how it saved their life,

8    about how Auvi-Q is a bad product and got recalled.

9              THE COURT:  I understand that but -- and I

10   apologize, I don't mean to interrupt you.

11             MR. LEVIN:  No, no, please.

12             THE COURT:  I want to wrap this up.  And, I

13   mean, wouldn't you agree with me that a lot of these,

14   maybe the majority of the requests for production are

15   not requesting information that the individual

16   plaintiffs would have?

17             MR. LEVIN:  I'd have to look back before I

18   agree to the majority.  But, yes, I do.

19             THE COURT:  A lot of them?

20             MR. LEVIN:  A lot of them and, again, we

21   agree with that and we made that clear to the

22   plaintiffs, but a lot of them do.

23             THE COURT:  And then, Mr. Levin, these

24   responses were served January 4th?

25             MR. LEVIN:  The responses were served on

1    January the 4th.  We put this in our status report as an

2    issue for -- for the parties to discuss at the status

3    conference two weeks ago.  And then as Mr. Sechler said

4    before, we understood we'd be here today to discuss

5    search terms and custodians around the issues that were

6    in the parties' status reports.

7              And then this issue morphed, Your Honor,

8    candidly on Monday after the motion to compel deadline.

9    We were informed for the first time that they would not

10   be producing ESI at all.  That was a different position

11   than they had taken completely up until February 26th.

12   Before that time we were just talking about what terms

13   they would use to -- to do it.

14             THE COURT:  All right.  All right.  Well, I

15   will take under advisement the issue with regard to the

16   responses to Mylan's request for production.

17             I do find that individual plaintiffs, in

18   responding to the fact sheet, do have a responsibility

19   to search to determine whether they have ESI that would

20   be responsive to the questions in the fact sheet.  And

21   just because they're individual plaintiffs does not

22   allow them to escape that obligation to do the same sort

23   of investigation that a plaintiff would do of -- of

24   questions on a fact sheet that are directed specifically

25   to them.

1           Now, having said that, many of these
2   questions on the fact sheet, if not most or all of them,
3   I -- I question whether they're the sort of things that
4   plaintiffs would have e-mails or social media addressing
5   those issues.
6           So what I'm saying to class plaintiffs is
7   the individual plaintiffs have a duty and an obligation
8   to search for ESI, whether it's social media or e-mails,
9   responsive to these questions.  But having said that, if
10  -- if -- if after inquiry the individual plaintiffs
11  indicate, you know, they don't use e-mail or that they
12  would not have addressed any of these issues in e-mail
13  or on social media, I think that's a legitimate
14  response.  But that doesn't relieve the individual
15  plaintiffs of the obligation as plaintiffs in this
16  lawsuit to search whatever ESI they have or may have for
17  responsive information.
18           So I expect that to happen posthaste.  So
19  within two weeks, March 14th, plaintiffs shall
20  supplement the fact sheets after having contacted the
21  individual plaintiffs with responsive information and
22  documents to the fact sheets.
23           All right.  As I said, we will -- you will
24  hear more from us about this -- the related issues as to
25  whether individual plaintiffs have any obligation to

1 respond to the request for production that's

2 outstanding. All right.

3 MR. LEVIN: May I be heard on one?

4 THE COURT: Very briefly.

5 MR. LEVIN: Very, very briefly. Actually,

6 potentially a compromise I'm hoping will address the

7 court's last question to me and the purpose of going

8 through this. You're right there are going to be

9 requests there I'm not expecting the individual

10 plaintiffs to have information about.

11 It may offer -- for the help of the court,

12 would it be -- would it be helpful if we provided the

13 court with the RFP numbers, say, by the close of

14 business tomorrow or the day after, but the RFP numbers

15 we believe the named plaintiffs should or may have

16 responsive information for and should be searching their

17 ESI for, or the court just prefer to look at all the

18 requests and deal with it that way?

19 THE COURT: If you can narrow down our work,

20 that would be appreciated.

21 MR. LEVIN: Sure. I'll do that.

22 THE COURT: How soon can you do that?

23 MR. LEVIN: As soon as the court wants. We

24 can do it tomorrow.

25 THE COURT: Okay. That would be great. By

1  end of business Friday would be good.

2            MR. LEVIN:  Okay.  Thank you.

3            THE COURT:  Mr. Hudson, I didn't let you

4  finish.  I said you could stay up here.  Did you have

5  any other comments on that issue?

6            MR. HUDSON:  No, thank you, Your Honor.

7            THE COURT:  Let's see.  I think the

8  remaining issue is did all you of agree on a date that

9  would be best for us to reconvene?

10           MR. FRIES:  Your Honor, I can't say that all

11 of us have agreed but at least some of us talked about

12 it and looking at the April 5th date was --

13           MR. DAVIDSON:  That does not work for

14 Mr. Hochstadt.  I wanted that date, too.

15           MR. FRIES:  Okay.

16           MR. HOCHSTADT:  Your Honor, the only reason

17 why, I start a jury trial April 9th.  Our final pretrial

18 conference is the morning of the 6th, so that's the

19 issue combined with the Passover holiday.

20           THE COURT:  Could you participate by Skype

21 or Mr. Buchweitz participate by Skype?

22           MR. HOCHSTADT:  Yehuda, are you able to?

23           MR. BUCHWEITZ:  Your Honor, Passover begins

24 on the 5th.  The next part of the holiday -- Passover

25 begins on sundown on the 5th.  I don't know why the 3rd

1    and 4th.

2              THE COURT:  What did he say?

3              MR. HOCHSTADT:  He said he didn't know why

4    the 3rd or 4th don't work.

5              MR. DAVIDSON:  They don't.

6              THE COURT:  All right.

7              MR. BUCHWEITZ:  If both Mr. Hochstadt and I

8    can't be there, that's the problem.

9              MR. HOCHSTADT:  For him he can't do the 5th

10   and I got to be at a final pretrial conference.

11             THE COURT:  And others can't be available on

12   the 3rd or 4th, is that --

13             MR. DAVIDSON:  I could be here on the 4th.

14   But what about Mr. Fries?

15             MR. FRIES:  I cannot.  I will be in Walnut

16   Ridge, Arkansas if anybody's interested but there may be

17   other members that could be here.

18             THE COURT:  I think Sanofi is a bit unique

19   in that they only have two counsel involved and we have

20   a sleigh of counsel from Mylan.  So, Mr. Foster, can you

21   and Mr. Levin be available on which date?

22             MR. DAVIDSON:  4th.

23             MR. BUCHWEITZ:  3rd or the 4th.

24             MR. FRIES:  4th would be preferable, Your

25   Honor.

```
 1                MR. HOCHSTADT:  May 4th.

 2                THE COURT:  Does anybody have an

 3  unavoidable --

 4                MR. HOCHSTADT:  Sanofi will make the 4th

 5  work.

 6                THE COURT:  Sorry, Brian.

 7                MR. FRIES:  That's okay, Your Honor.

 8                THE COURT:  Let's do April 4th and let's

 9  see, did we say morning or afternoon on that day?

10                MR. DAVIDSON:  You said either, Your Honor.

11                THE COURT:  Do you have a reference?

12                MR. FRIES:  Afternoon.

13                THE COURT:  Do you prefer afternoon?

14                MR. FRIES:  Yeah, I think for travel

15  purposes.

16                THE COURT:  We will honor that wish for you.

17                MR. FRIES:  Thank you.

18                THE COURT:  We'll convene again at April

19  4th, one o'clock back here.  Again, you'll have a report

20  to me due by e-mail two or three pages maximum a week

21  prior letting me know what issues are outstanding you'd

22  like to take up on the 4th.  Or if they all shake out

23  and everything is resolved, let me know that.

24                MR. FRIES:  Your Honor, if I might suggest,

25  I think by the 4th we should have all the briefing
```

1   completed on the various motions to compel and perhaps

2   that would be a good time for us to address those issues

3   orally with the court.

4            THE COURT:  Yes.  I -- that will be my plan.

5   If there are issues that have not been resolved and if

6   we have questions, my very capable law clerk

7   Miss Schuele, if we aren't prepared to issue an order

8   without having some questions answered, we will take

9   them up on the 4th.  You may get an order before the

10  4th.

11           MR. HOCHSTADT:  Your Honor, Eric Hochstadt

12  for Sanofi.  One of the issues that may be in dispute,

13  as Your Honor heard at the last teleconference related

14  to Sanofi -- Mylan's request to Sanofi for non-Auvi-Q

15  product information, as Your Honor knows Sanofi's

16  position is those requests are way too broad, a

17  sentiment Your Honor reflected at the end of that

18  conference.

19           One of the issues I wrote Your Honor about

20  that Mr. Sechler has written about as well is after that

21  conference Mylan issued nine more subpoenas to third

22  parties, including those very same overbroad for us.

23  We've asked Mylan to tell those third parties that at

24  least those -- those other product requests should be

25  deferred or stayed because it's an issue between the

1   parties and the court and it may be subject to the

2   court's further ruling.

3           So that's something we'd ask Your Honor to

4   order Mylan to -- to communicate with those third

5   parties so as to make sure that discovery for third

6   parties is certainly proportional to discovery for

7   parties.

8           MR. SECHLER:  Your Honor, Phil Sechler on

9   behalf of Mylan.  First of all, you should know that we

10  did narrow the request from the requests that we

11  submitted and that they addressed in their status

12  report.  So rather than seeking information on all

13  Sanofi products, the requests seek information about

14  products -- prescription branded products sold during

15  the relevant time period on which Sanofi paid rebates to

16  pharmacy benefit managers and third-party payors.

17  Currently it's about 50 products.  I think if you go

18  back in time, many of the products were approved in

19  2015.  It would be less than that.  I have asked

20  Mr. Hochstadt how many products there are from the

21  relevant time period.  I have not gotten an answer to

22  that question.

23          Be that as it may, in terms of the third

24  party subpoenas, Your Honor, we did address that in a

25  letter to Your Honor.  We do not believe that Sanofi has

1  standing.  They certainly haven't demonstrated it
2  to-date to move to quash or otherwise limit subpoenas
3  that have been served and served with privilege, and
4  there may certainly be a different result no matter how
5  the court rules on this pending motion.
6              That said, we would be amenable to reaching
7  some kind of accommodation to address Sanofi's concerns
8  pending the court's consideration of the motion that was
9  filed by Mylan last week.
10             And one thing we could do, so with respect
11  to the protective order, we amended it so that the
12  parties had an opportunity after third parties produced
13  documents to designate documents highly confidential
14  under the protective order.  The original protective
15  order didn't have that.  And so one thing we might do is
16  to have that same 10-day period after a third party
17  produces documents to allow a party to designate
18  documents they feel are at issue and could potentially
19  be affected by the court's ruling on the pending motion
20  to compel.  We would dispute that those documents would
21  be affected by the court's ruling but we certainly would
22  agree not to do anything with them until the court
23  resolves that.
24             That said, the one concern -- the one thing
25  we don't want to do is slow down third party discovery.

1    It is -- it is a whole different thing, as you can tell,

2    Your Honor, from all the motions filed to extend the

3    deadline.  So we're trying our best to get these third

4    parties to give us documents and have discussions.  It's

5    complicated.  And to have them not produce certain

6    documents I think would be efficiency lost, Your Honor.

7              THE COURT:  Mr. Hochstadt, how does Sanofi

8    have standing to raise these issues here?

9              MR. HOCHSTADT:  Your Honor, the issue isn't

10   one of standing; it's of proportionality.

11             THE COURT:  But I haven't ruled.  I said it

12   was overly broad.  I haven't ruled on what the

13   appropriate scope is; correct?

14             MR. HOCHSTADT:  And that's correct, Your

15   Honor.  What we're saying is Mylan can't have it both

16   ways.  They want the information from Sanofi.  We've

17   objected saying it's way too broad, right.  And yet

18   they're going out to the third-party payors to say, give

19   us all this information on 50 products.  Then if that's

20   the case, why do you need it from us?

21             THE COURT:  Isn't that the proper subject of

22   a motion to quash the subpoena?

23             MR. HOCHSTADT:  If that's -- if that's

24   what's necessary, Your Honor.  We were trying obviously

25   to expedite to, you know, obviously work things out in a

1   more expeditious fashion.  And, you know, to

2   Mr. Sechler's point that it's going to take a long time

3   for these third parties to produce anyway, then what's

4   the harm in preserving the status quo pending a briefing

5   schedule that's on short order?  We'll put it in our

6   opposition this Friday.  There will be a reply and

7   either we'll have a ruling or oral argument on the 3rd

8   -- on the 3rd.  So, you know, if it's going to take a

9   long time for theses to third parties to produce, what's

10  the harm in telling them, at least on those request,

11  await the court's ruling?

12          THE COURT:  I'm not going to rule today.  I

13  don't think it's proper for me to rule on that issue at

14  this point and I won't say anything more than that at

15  this point.

16          MR. HOCHSTADT:  Thank you, Your Honor.

17          MR. SECHLER:  Thank you, Your Honor.

18          THE COURT:  Thank you.  All right.  Okay.

19  So we will reconvene on April 4th at one o'clock.  In

20  the interim, I'll be expecting your e-mails by end of

21  business on March 14th as to the outstanding ESI search

22  term and custodian issues.

23          All right.  Anything then further for class

24  plaintiffs for today?

25          MR. DAVIDSON:  No, Your Honor, but thank

1   you.

2              THE COURT:  For Mylan?

3              MR. FOSTER:  Yes, Your Honor, one thing.  So

4   our opposition brief to the class plaintiffs and

5   Sanofi's motion to compel is due on Friday, and one of

6   the topics in there is the search terms issue.  And I

7   would submit that between the time that the class

8   plaintiffs wrote their brief, specifically on the search

9   terms issue and now, the universe has sort of shifted to

10  where most of the issues that are being discussed there

11  really aren't at issue anymore and we're really trying

12  to focus down on a few specific things we can deal with

13  through the process we sat today on this two-week track.

14             And so I guess I would respectfully submit,

15  Your Honor, that it would make sense for us to hold off

16  on substantively responding to the arguments, which I

17  think most of which are now moot, and addressing that

18  with Your Honor once we've had the opportunity to go

19  through the process that we discussed.

20             THE COURT:  Plaintiffs object?

21             MR. DAVIDSON:  We do not object.  I think

22  that would be appropriate and would give them leave not

23  to respond to my -- our -- our motion on that issue.

24             THE COURT:  Mr. Hudson, you look like you

25  have something you'd like to add?

1          MR. HUDSON:  I do.  I think Mylan just

2    inspired a decent idea.  If they're going to be

3    submitting the RFPs to the court that they think are

4    specifically relevant to the individual plaintiffs,

5    would there be any opportunity for us to review those

6    before the court and see if we can reach an agreement?

7    Because today we haven't been provided specific RFPs.

8    If the court would entertain it, we might be able to

9    reach a compromise on that if it was very narrowly

10   tailored.

11         THE COURT:  We'll go ahead and send the RFPs

12   to class plaintiffs, the specific ones you think are

13   pertinent and should be responded to, at the same time

14   you send them to us.  If you quickly look at them and

15   you all reach an agreement, great.  It will probably be

16   a few days before we rule, so you'll have a little time

17   to try and resolve something again.  That's great.

18         MR. HUDSON:  Thank you very much.

19         THE COURT:  On this briefing issue, I can

20   see it's probably not very efficient to have you, Mylan,

21   briefing the issue when the game has changed, the issues

22   have changed.  And besides, I want you to be discussing

23   and doing runs and figuring out how you can resolve the

24   issues.  So I will defer that briefing, that response,

25   in lieu of the procedure we've set up.  But this makes

1  all the more important that you all conscientiously get

2  all your issues resolved or almost all resolved.  And I

3  expect, if not totally resolved, a precise list of

4  search terms still in dispute and your positions on

5  those and then I will rule quickly on anything left in

6  dispute.

7          MR. DAVIDSON:  Okay.

8          MR. FOSTER:  Thank you, Your Honor.

9          THE COURT:  Now, anything else for today?

10  All right then.  Well, thank you all.  Safe travels back

11  home.  We'll be in touch.  Thank you.

12          (Proceedings adjourned.)

13

14                  CERTIFICATE

15      I certify that the foregoing is a correct

16  transcript from the record of proceedings in the

17  above-entitled matter.

18      DATE:  March 2, 2018

19

20          /s/Kimberly R. Greiner
            KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
            United States Court Reporter

21

22

23

24

25