1                UNITED STATES DISTRICT COURT
                     DISTRICT OF KANSAS
2

3  IN RE: EPIPEN                    Docket No. 17-md-2785
   (Epinephrine Injection, USP)
4  Marketing, Sales Practices
   and Antitrust Litigation
5                                   Kansas City, Kansas
                                    Date:  04/04/2018
6
   ........................
7                           REDACTED

8     TRANSCRIPT OF DISCOVERY STATUS CONFERENCE

9                        BEFORE

10      THE HONORABLE DANIEL D. CRABTREE
        UNITED STATES DISTRICT COURT JUDGE
11
        THE HONORABLE TERESA J. JAMES
12       UNITED STATES MAGISTRATE JUDGE

13
   APPEARANCES:
14
   For the Class Plaintiffs:
15
   Ryan C. Hudson              Michael Meredith
16  Rex A. Sharp               Keller Rohrback
   Rex A. Sharp, PA            1201 3rd Avenue
17  5301 W. 75th Street        Suite 3200
   Prairie Village, KS 66208   Seattle, WA 98101
18
   Warren T. Burns
19  Burns Charest LLP
   900 Jackson Street
20  Suite 500
   Dallas, TX 75202
21
   For Sanofi-Aventis US, LLC Plaintiffs:
22
   Yehuda L. Buchweitz
23  Eric S. Hochstadt
   Weil, Gotshal & Manges, LLP
24  767 Fifth Avenue
   New York, NY 10153
25
   Christopher Liwski - Sanofi-Aventis In-House Counsel

```
 1    APPEARANCES (continued):

 2    For Local 282 Welfare Trust Fund Plaintiffs:

 3
      Stuart A. Davidson
 4    Brian O. O'Mara - DC
      Robbins Geller Rudman & Dowd LLP
 5    120 East Palmetto Park Road
      Suite 500
 6    Boca Raton, FL 33432

 7    Matthew S. Tripolitsiotis
      Boies, Schiller & Flexner, LLP
 8    333 Main Street
      Armonk, NY 10504
 9
      Duane L. Loft
10    Boies, Schiller & Flexner, LLP
      575 Lexington Avenue, Seventh Floor
11    New York, NY 10022

12    For the Mylan Defendants:

13    James Moloney              Adam K. Levin
      Lathrop & Gage, L.C.       David M. Foster
14    2345 Grand Boulevard       Hogan Lovells US LLP
      Suite 2800                 555 Thirteenth Street, NW
15    Kansas City, MO 64108      Washington, DC 20004

16    Philip A. Sechler
      Kathryn Zecca
17    Robbins, Russell, Englert, Orseck, Untereiner
       & Sauber LLP
18    1801 K Street, N.W.
      Suite 411L
19    Washington, D.C. 20006

20    Brian Cuthbertson - Mylan In-House Counsel

21    For the King Pharmaceuticals, Inc., Meridian Medical
      Technologies, Inc. and Pfizer Defendants:
22
      Raj Gandesha              Angela D. Mitchell
23    (telephonically)          Shook, Hardy & Bacon LLP
      White & Case LLP          2555 Grand Boulevard
24    1221 Avenue of the        Kansas City, MO 64108
        Americas
25    New York, NY 10020
```

```
 1                 (1:32 p.m., proceedings commenced).

 2                 JUDGE CRABTREE:  Good afternoon everyone.

 3      Please be seated.  All right.  We're here in Case

 4      No. 17-400-- that's the wrong case number, Dan.  Case

 5      No. 17-2785, which is captioned In Re: EpiPen Marketing,

 6      Sales Practices and Antitrust Litigation.

 7                 Good afternoon everyone.  Thank you for

 8      being here and timely.  And this is a hearing that in

 9      large measure Judge James is going to have the helm, so

10      I'll be quiet at this point and cede the control to you.

11                 JUDGE JAMES:  All right.  Well, thank you

12      all for being here, I didn't expect such a packed

13      courtroom.  We do have a list of everyone who is here I

14      think, a checklist.  But I-- I guess I would like if we

15      could have a representative of each party stand up and--

16      and identify yourself and say who-- who's here for your

17      client.

18                 So why don't we start with plaintiffs.  And

19      whoever wants to lead off.

20                 MR. BURNS:  Good morning, Your Honor.  This

21      is Warren Burns with Burns Charest.  I represent the

22      class plaintiffs.  There will be several of us speaking

23      today.  I obviously have Rex Sharp here to my left.  But

24      several of us will be speaking on different issues and

25      it might make sense to have folks introduce themselves
```

1    as they come up.

2              We were going to sort of beg the Court-- the

3    Court's favor.  I have a hearing tomorrow in

4    Philadelphia and actually have to catch a flight later

5    today.  So we were hoping-- I'm going to be covering

6    deposition issues.  We were wondering if we could do

7    those first, and Mr. Levin had indicated that would be

8    fine.

9              JUDGE JAMES:  That's my plan.  So we will--

10   we will just for you, Mr. Burns.

11             MR. BURNS:  Well, I'm glad that worked with

12   your plan, Your Honor.

13             JUDGE JAMES:  What time do you need to get

14   out of here, Mr. Burns?

15             MR. BURNS:  The flight is at 4:40 now.  It

16   was at 4:00, it's moving, so-- but we should be fine.

17             JUDGE JAMES:  All right.  Thank you.  Good

18   to see you again.

19             MR. BURNS:  Good to see you, Your Honor.

20             MR. BUCHWEITZ:  Good afternoon, Your Honor,

21   Yehudah Buchwetiz, Weil, Gotshal & Manges for Sanofi.

22   With me is my partner Eric Hochstadt and our client,

23   Chris Liwski.  Good afternoon.

24             JUDGE JAMES:  All right.  Good to see you

25   again.  Next.

1           MR. MOLONEY:  Good afternoon, Your Honor.

2    James Moloney.  I'm here in Brian Fries' place as the

3    liaison today.  With me we have Phil Sechler, Kathryn

4    Zecca, Adam Levin, David Foster.  And for Mylan, Brian

5    Cuthbertson.

6           JUDGE JAMES:  All right.  Thank you.

7    Welcome everyone.  Yes.

8           MS. MITCHELL:  And, Your Honor, for the

9    Pfizer defendants, Angel Mitchell with Shook, Hardy &

10   Bacon here today.  Also with me by phone participating

11   is Raj Gandesha with White & Case in New York.

12          JUDGE JAMES:  All right.  Thank you.

13   Welcome.  Who else?

14          Okay.  All right.  Well, we will get started

15   then.  I do appreciate the status reports that each of

16   you submitted; Sanofi, Mylan and class plaintiffs.  I

17   have reviewed all of them extensively and in detail, as

18   well as all of the pending motions to compel.

19          I spent a lot of time with the complaints of

20   Sanofi and of class plaintiffs and becoming more and

21   more familiar with the claims and the defenses and

22   allegations in the case, although clearly all of you are

23   much more expert on those items than I am.

24          But I know Judge Crabtree and I and my very

25   able law clerk, Therese Schuele, have been very intent

1    upon understanding your positions and trying to address

2    them to the extent we can.

3         I am prepared to proceed through I think

4    nearly every issue raised in the status reports.  I'm

5    going to rule on those and get us on down the road on

6    most of them today.  And at Mr. Burns' request, I will

7    start with the issues regarding the deposition protocol.

8         As for deposition location, the plaintiffs--

9    class plaintiffs and Sanofi contend that class

10   plaintiffs should be deposed near their individual

11   residences.  Mylan, on the other hand, contends that all

12   plaintiffs should come to the District of Kansas for

13   their depositions in this case.

14        The Court is ready to rule on that issue and

15   I will rule as follows:  Class plaintiffs shall come to

16   the District of Kansas for their depositions.  The

17   well-established general rule in this district is that

18   plaintiffs are expected to make themselves available for

19   deposition in the district where they filed suit.

20        Although this general rule may be less

21   compelling in MDL or class action cases, here the

22   majority of the plaintiffs chose to file suit in this

23   district or their cases were transferred here before the

24   MDL was created.  The mere fact that this is an MDL with

25   a relatively large number of plaintiffs scattered around

1   the country does not establish an "undue burden" to

2   plaintiffs justifying a departure from the general rule.

3          Additionally, in keeping with Rule 1, it may

4   actually be more efficient in this case to have all

5   plaintiffs come to a single location in or near Kansas

6   City for their depositions.  And with that-- in that

7   regard, I note Judge Vratil's *TXO* [sic] case which both

8   sides have cited.

9          As in the *TJX* case, though, the Court

10  recognizes that some cost shifting is appropriate, given

11  that nearly every one of plaintiffs will be traveling

12  from outside the state of Kansas to here for their

13  depositions and also given the benefits and cost savings

14  to defendants of not being required to travel to take

15  the depositions of each of the plaintiffs near their

16  residences.

17          Accordingly, the Court will require

18  defendants to pay the reasonable travel expenses of the

19  plaintiffs to come to Kansas City for the depositions.

20  And by that I mean the travel expenses only, not

21  accommodations.  Additionally, if there are individual

22  plaintiffs for whom it may-- may be an undue burden to

23  come to KC for the depositions because of their unique

24  physical or financial problems or issues, then any such

25  plaintiff can, of course, file a motion seeking a

1    protective order requesting that their particular

2    deposition location be changed to a place near the

3    plaintiffs' residence.

4              Any questions about my ruling on that issue?

5              All right.  I do have a couple of questions

6    for Mylan.  Did Mylan notice up plaintiffs' depositions

7    without conferring with plaintiffs in advance?

8              MR. LEVIN:  The short answer is no.  We sent

9    notices of deposition but we accompanied-- as

10   placeholders, but we accompanied those notices of

11   deposition with a cover letter that made clear to the

12   plaintiffs that we understood we were still conferring

13   on the location of all the depositions and that we would

14   continue those discussions and, of course, would-- would

15   re-notice the depositions or make them more formal or

16   finalized once we had actually settled on the final

17   location.

18             So it was solely as an administrative

19   placeholder to pick dates and-- and talk about the-- the

20   general time frames we were talking about.  But I mean,

21   it was-- it was haphazard.  We did it alphabetically, we

22   picked random dates and we made very clear in our cover

23   note that this was just a placeholder and, of course,

24   consistent with the local rule we would be conferring

25   further about location time and date.

1           JUDGE JAMES:  All right.  Thanks, Mr. Levin.

2    I just do want to re-enforce that obviously that is in

3    the deposition guidelines in this district.  And this

4    Court in particular requires conferring, talking to each

5    other before noticing depositions.  So keep that in mind

6    for future purposes.

7           Also I noticed from I think it's class

8    plaintiffs' status reports that they indicated the

9    notices had been for Kansas City, Missouri, as opposed

10   to the District of Kansas.  And you're aware of the

11   distinction.  Correct?

12          MR. LEVIN:  I am aware.  And actually, I

13   would need to check on that, I think that's incorrect.

14   I thought we noticed them for the District of Kansas

15   specifically because we are in the District of Kansas.

16          JUDGE JAMES:  Yes.

17          MR. LEVIN:  But I remember having a distinct

18   conversation with Mr. Fries about that very point before

19   we sent anything out.

20          JUDGE JAMES:  And that's good, I just want

21   to make sure you were all clear on that.

22          MR. LEVIN:  Yes.  I think what happened was

23   in the cover letter what we said was we have noticed

24   them for the District of Kansas, but by agreement if

25   you'd like-- if you would agree to do them in Kansas

1   City, Missouri, for the convenience of the parties and

2   the witnesses, we would be amenable to doing that.

3              JUDGE JAMES:  Okay.  And that's fine, I just

4   want the parties to be aware of that important

5   distinction.

6              All right.  All right.  Next, number of

7   depositions.  As to coordinated depositions as that term

8   has been used in this case; as to Mylan, class

9   plaintiffs propose 15 coordinated depositions taken with

10  Sanofi.  Mylan agrees to 15 such depositions but wants

11  to restrict-- a restriction permitting its witnesses to

12  be deposed only once.

13             And the class plaintiffs have countered that

14  re-depositions, if allowed, could be limited to

15  three-and-a-half hours and count as only one-half

16  deposition.

17             The Court will rule that class plaintiffs

18  and Sanofi collectively will be allowed up to 15

19  coordinated fact depositions of Mylan witnesses in this

20  case.  There will be no re-depositions absent

21  stipulation of counsel or by order of the Court upon a

22  showing of good cause.

23             Number of depositions non-coordinated; class

24  plaintiffs want to take ten non-coordinated depositions

25  of Mylan witnesses.  Mylan wants to limit that to five

1    and, again, wants each witness to be deposed only once.

2              Again, the Court will order that class

3    plaintiffs will not be allowed to re-depose witnesses

4    absent stipulation of counsel or by order of the Court

5    upon a showing of good cause.  And the Court will allow

6    up to ten non-coordinated fact deposition-- depositions

7    of Mylan witnesses.

8              As to third-party depositions, plaintiffs

9    proposed 25 per side.  Mylan proposed 15 per side.  And

10   if more than one party were to notice a third-party

11   deposition, then Mylan would limit the deposition to

12   three-and-a-half hours per side.

13             I'm not clear as to plaintiffs' position on

14   the issue.  According to my notes, Sanofi indicated

15   plaintiffs offered a compromise of 20 third-party

16   depositions per side.  And then Mylan states in its

17   status report I think that plaintiffs are requesting 30

18   third-party depositions, 20 coordinated and ten

19   non-coordinated.

20             So what-- what is plaintiffs' position on

21   third-party depositions?

22             MR. BURNS:  I haven't spoken to Sanofi on

23   this.  There was a discrepancy in the actual status

24   report that-- that were submitted by the parties.  But

25   the last offer, if you will, that we had made was 25 per

1  side.  And we had split that up - that is the plaintiffs

2  on the whole - Sanofi and the class plaintiffs would

3  take 25 depositions.  The defendants would take-- would

4  have up to 25 depositions as well.

5           JUDGE JAMES:  I'm sorry, Mr. Burns, did you

6  say Sanofi and class plaintiffs each would do 25?

7           MR. BURNS:  Not each, Your Honor,

8  collectively.

9           JUDGE JAMES:  Total.  Okay.

10           MR. BURNS:  That's right.  And so 25 was the

11  number with the idea being 15 coordinated and ten

12  non-coordinated potentially.

13           Your Honor, in consultation with our group

14  this morning, one idea that we had - and if it makes it

15  a little easier for you, I'll throw this out there - is

16  that-- and I had mentioned this previously to defendants

17  in various meet-and-confers.  But ultimately, we think

18  that the third parties have the ability to come into

19  court and protect their own interests.

20           So if it relieves the Court of having to

21  decide on this issue, we are comfortable with

22  negotiating with third parties, both on depositions, the

23  length of those depositions, the amount of time devoted

24  to each party, and allow that to play out as it

25  ordinarily would, because we do think that the third

1    parties ultimately have the ability to come into this

2    court and seek protection if they can't reach agreement.

3           JUDGE JAMES:  Well, it's thoughtful of us

4    all while the third parties are not here to look out for

5    their interests.  But I think Mr. Burns makes a good

6    point and, I mean, does Mylan have any objection to us

7    kind of letting you all see if you can work out the

8    number of third-party depositions?

9           MR. LEVIN:  I fear that's a recipe for

10   disaster, Your Honor, candidly.  There are close to 100

11   third-party subpoenas out there.

12          JUDGE JAMES:  We're well aware of that.

13          MR. LEVIN:  As your chambers is very well

14   aware.  And by-- you know, look, for each third party,

15   their interest is only their interest.  Right?  So

16   they're only going to be looking out for their own hide

17   in deciding whether or not their deposition should go

18   forward.  They're not thinking about the bigger picture

19   about, oh, well, this will be the 65th deposition that's

20   gone on in the MDL and so, therefore, we should oppose

21   it.

22          We think that to protect the parties'

23   interest and candidly for efficiency, given the schedule

24   that we have that the Court has set for coordinated and

25   non-coordinated discovery, the Court should impose

1   limits for third-party discovery and we've suggested

2   some in our status report.

3             I mean, there are 131 depositions as it is.

4   If we're adding more depositions, I-- I'm just really

5   concerned about even being able to finish them by the

6   deadline.  So I think from a case management

7   perspective, there should be a global way to address

8   that and not on an ad hoc basis dependent on third

9   parties.

10            JUDGE JAMES:  All right.  Mr. Burns, did

11  plaintiffs come-- offer to compromise to 20 third-party

12  depositions collectively?

13            MR. BURNS:  I don't recall the 20

14  compromise.

15            MR. BUCHWEITZ:  Your Honor, Yehudah

16  Buchweitz.  So we initially had said 25 depositions and

17  then we were going to come down to 20, the way-- what we

18  thought of as coordinated, which are the ones we're

19  involved in and we care about.  So we viewed that as a

20  compromise.  There were also the non-coordinated

21  depositions that the class plaintiffs were including.

22            I concede that it probably should've been

23  more clear in our status report and I apologize for

24  that.  But from our perspective, we were going from 25

25  to 20.

1            JUDGE JAMES:  Total.

2            MR. BUCHWEITZ:  Well, we were going from 25

3    to 20 of the coordinated depositions.  I-- I guess I was

4    not aware of and overlooked the fact that they had the

5    non-coordinated ones they were focused on because,

6    frankly, they're not things we're focused on, not part

7    of our case.

8            JUDGE JAMES:  All right.  Thank you.

9            MR. BURNS:  Your Honor, if I could just add

10   one thing on the third-party depositions.  We think that

11   there's-- it's really difficult to actually have a

12   cookie cutter approach, if you will, to these

13   depositions.

14            Now, as the Court is well aware, there have

15   been 90 or more subpoenas already to date both from

16   defendants and from the plaintiffs and from-- both sides

17   of the plaintiffs.  Establishing sort of a protocol at

18   this point is going to be very difficult, particularly

19   with respect to time limits.  And, you know, there's a

20   dispute obviously between the sides on this

21   three-and-a-half hour issue, but I think it really

22   highlights that it's so difficult at this point with the

23   third parties to address that issue.

24            I think invariably both sides may be

25   cross-noticing subpoenas, but obviously some witnesses

1   are going to be more important to class plaintiffs or to

2   Sanofi or even to the defendants and others.  And I

3   think it's very difficult to establish that rigid rule

4   at the outset.

5            So, again, we would urge the Court to

6   consider just allowing that practice to play out and we

7   think that through negotiations with the third parties

8   we could-- we can certainly reach an agreement.

9            JUDGE JAMES:  All right.  Well, thank you.

10  I-- having heard both sides--

11           MR. DAVIDSON:  Your Honor, if I may.  I

12  apologize.

13           JUDGE JAMES:  Sure, go ahead.

14           MR. DAVIDSON:  If the Court would beg my

15  indulgence, since I'm a little far I think I'll come up

16  to the podium if that's okay.

17           JUDGE JAMES:  Sure.

18           MR. DAVIDSON:  So Stuart Davidson on behalf

19  of the class plaintiffs.  The only point that I would

20  like to make kind of bolstering what Mr. Burns was

21  saying is a concern that we have, and maybe even Mylan

22  has, is a party using this ability to cross-notice to

23  limit the deposition time that we may have for a third

24  party.

25           So if-- if Your Honor orders that each side

1    is able to get three-and-a-half hours, then if we have a

2    witness that we think is critically important for us but

3    may not be all that important to Mylan's defenses, Mylan

4    could just as easily cross-notice that deposition and

5    take up half that day.  So I think that's kind of what

6    Mr. Burns is saying.

7              Similarly, if Mylan notices a deposition of

8    Sanofi, critically important to Mylan's defenses

9    obviously, they have a counterclaim, Sanofi is a third

10   party in one-- in our case as well.  And we would be

11   prepared and have already discussed internally

12   cross-noticing some of those depositions.

13             So essentially now Mylan is stuck, and I'm

14   not sure Mylan would want this, with three-and-a-half

15   hours to depose a third party in our case.  And so

16   that's kind of on this one issue a concern that I have

17   about this three-and-a-half-hour time frame if people

18   cross-notice.

19             And I understand it's not an easy issue and

20   I think what we're all wrestling with here is the fact

21   that we're limited to seven hours and how do we deal

22   with that issue.  But those are-- that's kind of the

23   reality that I think we're dealing with here.  But thank

24   you for your time.

25             JUDGE JAMES:  Sure.  All right.  Well, it is

1    difficult when we really know-- don't know what we're

2    going to be dealing with here as far as third parties.

3    And I mean, I suppose all three parties could notice a

4    third party up for deposition, so then maybe everybody

5    gets 2.3 hours on a deposition.

6              Obviously I can't foresee all of those

7    things today and I sure can't rule on them.  But I also

8    think there's some merit to Mr. Levin's point that I

9    don't-- with maybe 100 third parties at issue out there,

10   I don't want to just leave it open-ended.  So for lack

11   of any better guidance or way to go today, I am going to

12   go ahead and set a limit of 20 per side as to

13   third-party-- third-party depositions.

14             And what I'm going to say as far as time

15   limit is, for now I'm going to limit each one to a total

16   of seven hours.  With regard to a particular third-party

17   witness, once we know how many people have noticed them,

18   if any party wants to file a motion requesting that more

19   time be allowed in toto for that witness and wants to

20   propose how that time should be allocated-- or even

21   better, if you all can agree amongst yourselves on how

22   to do that, please do.  But I'm not going to rule on

23   that and limit individual parties' deposition time

24   beyond the standard rule of seven hours for a deposition

25   typically that applies here.

```
1              So you all can evaluate each case as it

2    comes up and, if appropriate, discuss it amongst

3    yourselves.  And if you can't resolve it, file a motion

4    and we'll address length of deposition and amount of

5    time for each side.  Any questions regarding that?

6              MR. BURNS:  Your Honor, just question

7    actually going back to the party depositions.  Mr.

8    Davidson reminded me, there was some dispute over-- over

9    a proposal from Sanofi on extended time limits, but I'm

10   assuming that your order was for standard time limits to

11   apply to non-coordinated and coordinated-- and

12   coordinated depositions?

13             JUDGE JAMES:  I'm just getting to that.

14             MR. BURNS:  Okay.

15             JUDGE JAMES:  You're a step ahead of me, Mr.

16   Burns.

17             MR. BURNS:  All right.  I'm sorry, Your

18   Honor.

19             JUDGE JAMES:  No, that's fine.  All right.

20   As to deposition length then, moving on to that point,

21   plaintiffs have suggested that each side be allowed to

22   depose four witnesses of their choice for 12 hours

23   rather than the limit under Rule 30 of seven hours,

24   which is our typical deposition time limit.  Defendants

25   object to the 12-hour limit for any witnesses.
```

1            Again, the Court orders that depositions

2    will be limited to seven hours in accordance with

3    Rule 30.  I'm not in a position right now and we don't

4    even have specific witnesses identified who that 12-hour

5    limit would be applied to and I'm not going to make that

6    ruling at this point.  So for our purposes now, all

7    deposition times will be limited to seven hours.

8            Of course, if for a particular witness a

9    party feels additional time will be needed, you can

10   always file a motion and request additional deposition

11   time or you all can agree amongst yourselves that a

12   party or a witness can be deposed for longer than the

13   seven hours.

14           All right.  I think I've covered all of the

15   issues with regard to the deposition protocol.  Mr.

16   Buchweitz.

17           MR. BUCHWEITZ:  Yeah, I just have a question

18   about that.  So I just want to make sure I'm clear.  So

19   if there's a witness who is a coordinated witness and a

20   non-coordinated witness, is a Mylan witness who's

21   important on coordinated topics as well as topics that

22   are only of interest to the class, is your ruling that

23   they could be deposed twice or for two times-- two

24   depositions, one right after the other or right at the

25   same time - one would count as coordinated, one would

1    count as non-coordinated - or are we supposed to jam the

2    class topics into our deposition day?

3              JUDGE JAMES:  Right.  No re-depositions

4    absent a motion--

5              MR. BUCHWEITZ:  Okay.

6              JUDGE JAMES:  -- and order on showing of

7    good cause.  And each deposition will be limited to

8    seven hours, absent filing a motion and requesting

9    additional time.  Seven hours total deposition time.

10             MR. BUCHWEITZ:  So the ten-- I'm sorry.  So

11   the ten coordinated is ten different people than the 15

12   people who will be in the coordinated depositions?

13             JUDGE JAMES:  Yes.

14             MR. BUCHWEITZ:  Okay.  I understand.  Thank

15   you.

16             JUDGE JAMES:  Okay.  Any-- any other

17   questions?  Mr. Davidson.

18             MR. DAVIDSON:  I'm sorry, Your Honor.  Just

19   as far as-- just a little request on the depo locations.

20   Do I understand Your Honor's ruling to be that the class

21   plaintiffs-- that all of them, whether they filed in the

22   District of Kansas or filed elsewhere-- like our client,

23   Local 282, is a health and welfare fund on Long Island.

24   They filed in New Jersey.  Are they now going to have to

25   come to Kansas to be deposed?  Not that we don't love

1    Kansas, but I just wanted some clarification on that.

2              And if the-- and a follow-up question is:

3    If efficiency and the like is part of the reason why

4    folks are coming to Kansas, does that also apply to the

5    defendants?  Do their witnesses also have to come to

6    Kansas so we can do them back-to-back-to-back like

7    they're doing with the class plaintiffs?  That's--

8              JUDGE JAMES:  Well, the only issue, as I

9    understand it, raised in the status reports was location

10   for plaintiffs' depositions.  Am I incorrect about that?

11             MR. DAVIDSON:  No, that's correct.

12             JUDGE JAMES:  Okay.  So I expect you all to

13   work out how defendants' depositions are handled or

14   bring that issue to the Court.

15             MR. DAVIDSON:  Okay.

16             JUDGE JAMES:  Now, you raise a good question

17   about the union and defendant.  Frankly, to be totally

18   honest, I had not thought about the-- my ruling really

19   applies to the individual class plaintiffs, individual

20   plaintiffs.

21             As to the union, I-- I still think they

22   should probably come to Kansas, but I encourage you all

23   to discuss that amongst yourselves and see if there's an

24   agreement about location.

25             MR. DAVIDSON:  Okay.  If not, we'll file a

1   motion showing undue burden if that applies.

2             JUDGE JAMES:  Yes.

3             MR. DAVIDSON:  Thank you, Your Honor.

4             MR. BUCHWEITZ:  Sorry, Your Honor.

5             JUDGE JAMES:  Yes, Mr. Buchweitz.

6             MR. BUCHWEITZ:  One quick point just because

7   I want to make sure the record is clear because you

8   referred to plaintiffs.  I think you just after that

9   said that the location was with respect to the

10  individual class plaintiffs.

11            The only motion that was part of the status

12  report with respect to location was as to the individual

13  class plaintiffs.  Sanofi and Mylan and Pfizer had

14  agreed on I think three locations each, central

15  locations, where their depositions could take place.  So

16  the Kansas ruling only applies to individual class

17  plaintiffs, right, Your Honor?

18            JUDGE JAMES:  That was my point, I think--

19            MR. BUCHWEITZ:  Thank you, Your Honor.

20            JUDGE JAMES:  -- that I was saying that-- I

21  thought that was the only--

22            MR. BUCHWEITZ:  That's correct.

23            THE COURT:  -- the only matter at issue for

24  this hearing.

25            MR. BUCHWEITZ:  That's correct.  Thank you,

1    Your Honor.

2           JUDGE JAMES:  All right.  Any other

3    questions or clarifications with regard to the

4    deposition protocol?

5           MR. BURNS:  No, Your Honor.

6           JUDGE JAMES:  Okay.  All right.

7           Now, as far as administratively handling

8    that, I know I've seen originals and red-lines of the

9    deposition protocols that you all have exchanged.  They

10   deal with additional issues that you all had agreed

11   upon, so I would suggest somebody be a scrivener and

12   incorporate my rulings into a deposition protocol and

13   you all submit it.

14          MR. BURNS:  We're happy to take a crack at

15   it, Your Honor.

16          JUDGE JAMES:  All right.  Thank you, Mr.

17   Burns.

18          All right.  Then moving on.  Anything you'd

19   like to add, Judge Crabtree?

20          JUDGE CRABTREE:  I think you're doing great.

21          JUDGE JAMES:  All right.  All right.  Then

22   moving on to things that are a little more substantive.

23   The first additional issue outside the deposition

24   protocol that I'd like to deal with is this issue of

25   dispute over discovery regarding rebates on Sanofi

1    products.

2            Mylan's motion to compel that is Docket

3    Entry 285 seeks to compel Sanofi-- seeks to compel

4    Sanofi to produce information regarding rebates on

5    Sanofi products.  Sanofi's complaint does include

6    multiple allegations of Mylan's "unprecedented" rebates

7    to PBMs.

8            Sanofi opened the door at least to some

9    extent to rebates not just of Mylan but of others in the

10   industry.  However, Mylan's initial discovery requests

11   were overbroad requesting documents regarding Sanofi

12   rebates on all Sanofi products.

13           On April 2nd I entered an order, Docket

14   Entry 435, granting in part Mylan's motion to compel

15   rebate information limited to the four drugs identified

16   by Mylan that are currently subject to government

17   investigations for the period 2012 to 2016.  The order

18   intentionally left vague the term "rebate information,"

19   which Sanofi was ordered to produce by April 30th.

20           So the only thing, additional thing I would

21   note with regard to this issue is that if counsel are

22   unable to agree upon "rebate information" that Mylan

23   must produce for the four drugs specified in my recent

24   order, then counsel shall e-mail me, my chambers, no

25   more than three pages per side with their respective

1    positions on that issue on or before April 13th and then

2    I'll decide the issue.

3         I'm hoping you all can agree on what is

4    rebate information to which my order will apply.  But if

5    you can't, again, each side may e-mail me three-- no

6    more than three pages as to what your position is

7    concerning what is rebate information subject to the

8    order.

9         And as the order indicates, the production

10   will then be due April 30th of information subject to

11   that order.  Any questions regarding my order, 435?

12        MR. SECHLER:  No, Your Honor.  Thank you.

13   And Mr. Hochstadt and I will talk and report to the

14   Court after we have that discussion.

15        JUDGE JAMES:  Very good.

16        MR. HOCHSTADT:  We'll confer, Your Honor.

17   Thank you.

18        JUDGE JAMES:  All right.  Thank you.

19        Next then is the issue of Sanofi ESI

20   custodians for Mylan's counterclaims.  Mylan sent a

21   letter to the Court dated March 22nd, 2018, requesting

22   six additional Sanofi custodians be designated.  Sanofi

23   sent a letter objecting to that request the same day.

24        After our orders, Docket Nos. 303 and 397,

25   were entered ruling on the parties' disagreements over

1    ESI custodians, Sanofi served timely responses to Mylan

2    interrogatories identifying 39 individuals from Sanofi's

3    sales force and training units.  Mylan claims they are

4    likely to have information bearing on Mylan's

5    counterclaims.

6            Mylan requested six of these individuals

7    who-- consisting of five regional sales directors and

8    one sales trainer, be designated as additional ESI

9    custodians in this case.  Mylan claims it had no way of

10   knowing of these individuals until Sanofi served its

11   interrogatory response after my ESI orders were entered.

12           Sanofi objects to Mylan's request as

13   untimely and improper.  Sanofi also argues that Mylan

14   has not met its burden to show that the additional

15   custodians are necessary.

16           Sanofi had previously designated its Senior

17   Director of U.S. Regulatory Affairs for products

18   including Auvi-Q to address Sanofi's counterclaims.

19   Sanofi also notes that it is already applying the search

20   terms proposed by Mylan to the documents collected from

21   17 custodians, including the core Auvi-Q brand team who

22   oversaw saw the Auvi-Q sales force which also includes

23   the six proposed additional custodians.

24           Based upon the information provided by Mylan

25   and Sanofi, Mylan's request for additional custodians is

1    denied as untimely.  Mylan knew of Sanofi's

2    counterclaims yet failed to raise any concerns regarding

3    the custodian Sanofi designated with knowledge of those

4    counterclaims until weeks after the hearing and rulings

5    on the ESI custodians.

6           Additionally, Sanofi's Senior Director of

7    U.S. Regulatory Affairs is an appropriate custodian

8    relative to Sanofi's counterclaims.

9           MR. BURNS:  Your Honor, I'll take my leave.

10   Sorry to interrupt.

11          JUDGE JAMES:  Safe travels, Mr. Burns.

12   Thank you.

13          MR. BURNS:  Thank you.

14          MR. DAVIDSON:  I'll take his warm chair.

15          JUDGE JAMES:  All right.  All right.  Next

16   then a couple of easy ones; class plaintiffs' discovery

17   requests to Pfizer defendants.  It's my understanding

18   from Pfizer's one-page brief report that Pfizer has no

19   issues requiring Court involvement at this time.

20          Ms. Mitchell, do you want to address that or

21   Mr.-- is Mr. Gandesha on the phone?

22          MR. GANDESHA:  It's Gandesha, Your Honor.

23          JUDGE JAMES:  Yes, go ahead.

24          MR. GANDESHA:  Yes, that's right.  I think

25   as the status report submitted by Pfizer and-- and I

1    believe also by the class plaintiffs indicates, you

2    know, the parties are continuing to meet and confer

3    and-- and I think making good progress on resolving

4    issues.

5            Pfizer has agreed to amend certain of its

6    responses.  The plaintiffs have agreed to clarify

7    certain of their requests.  And that process is

8    continuing to play out.

9            So at this point from our perspective there

10   isn't an issue that requires Court-- Court intervention

11   or guidance.

12           JUDGE JAMES:  All right.  Thank you.

13           Well, that's good.  And we will note that

14   there are no outstanding issues requiring Court

15   resolution at this time with regard to Pfizer.

16           I do want to remind you, though, that to--

17   to keep in mind our Local Rule 37.1, that if you do have

18   issues arise to be sure and file any discovery motion,

19   motion to compel or whatever, within 30 days of-- of any

20   disputed response.  All right.  Thank you.

21           MR. GANDESHA:  Thank you.

22           JUDGE JAMES:  Next, Mylan's discovery

23   request to class plaintiffs.  Again, it appears that

24   there are no issues requiring Court involvement as to

25   those discovery requests by Mylan to the class

1    plaintiffs.  Correct?

2            (No response).

3            JUDGE JAMES:  All right.

4            MR. FOSTER:  That is correct, Your Honor.

5            JUDGE JAMES:  All right.  Very good.

6            A brief note on the voluminous, many

7    third-party motions to compel of third-party subpoenas.

8    We are well aware of all those.  We've granted a number

9    of extensions and we'll see how some of those things

10   shake out.  So stay tuned to the extent rulings are

11   necessary.  You will get them, but I'm not prepared to

12   rule today obviously on any of those, especially since

13   we don't have any of those third parties here, so...

14           All right.  Next, class plaintiffs' motion

15   to compel certain discovery responses from Mylan.  And I

16   am prepared to rule on all of those outstanding

17   discovery requests.

18           With regard to class plaintiffs' motion to

19   compel Mylan's discovery responses, that is Docket Entry

20   277, the Court has reviewed class plaintiffs' motion,

21   Mylan's response, which is Docket Entry 314, and the

22   class plaintiffs' reply, Docket Entry 369, and the

23   request for production in dispute.  The Court is

24   prepared to rule.

25           Class plaintiffs' motion to compel is

1    granted and Mylan's objections are overruled as to

2    Request For Production 6, requesting all communications

3    with Pfizer concerning any patents included in the

4    orange book relating to the EpiPen.  Also, class

5    plaintiffs' motion to compel is granted and Mylan's

6    objections are overruled with respect to Request For

7    Production 40, 41, 42, and 44, all with regard to the

8    Epi two-pack.  Mylan is ordered to produce all documents

9    responsive to RFP 6, 40, 41, 42, and 44 by April 30th.

10              Class plaintiffs' motion to compel is denied

11   and Mylan's objections sustained relative to Request For

12   Production 18 to 20 insofar as they request documents

13   regarding "potential design changes."

14              Turning to the remaining RFPs in dispute,

15   the Court will order that those specific requests for--

16   for production I'm about to discuss be limited as I will

17   set out in a few minutes.

18              Specifically with regard to Request For

19   Production 5, there was mention of a proposed wording

20   change or revision of the RFP that the parties might be

21   able to agree upon.  I think it had to do with changing

22   the word "concerning" to "discussing."  Has the dispute

23   over RFP 5 been resolved?

24              MR. FOSTER:  Your Honor, we have made that

25   change and amended the response.

1           MR. MEREDITH:  Yes, Your Honor, for class

2   plaintiffs as well.  That change will eliminate

3   disagreement between the parties with respect to RFP 5.

4           JUDGE JAMES:  All right.  So-- so the issues

5   with regard to the dispute over Request For Production 5

6   have been resolved?

7           MR. FOSTER:  That is correct, Your Honor.

8           JUDGE JAMES:  Okay.  Very good.  And-- and

9   it's my understanding then that the language of the

10  request has been changed to those documents concerning--

11  the word "concerning" has been changed to "discussing."

12          MR. FOSTER:  Correct, Your Honor.  We

13  changed our response so that it frames that, yes.

14          JUDGE JAMES:  Okay.  Very good.  All right.

15  And those documents will be produced as of April-- by

16  April 30th.  Correct?

17          MR. FOSTER:  Yes, Your Honor.

18          JUDGE JAMES:  All right.  Very good.

19          Then next with regard to Request For

20  Production 16 and 17 having to do with the NIAID.  The

21  Court finds the requests are overly broad.

22          RFP 16 actually manages to include the

23  phrase "relating to" not once but twice, requesting all

24  documents and communications relating to certain items,

25  relating to epinephrine delivery.

1          The request is clearly overly broad and the

2     Court will limit Request For Production 16 as follows:

3     All documents and communications referencing or

4     discussing the NIAID guidelines and recommendations that

5     are the subject of class plaintiffs' complaint at

6     Paragraphs 336 through 347.  Did you get that?  Do I

7     need to repeat it?  All right.

8          As to Request For Production 17, it also is

9     overbroad and the Court will limit it as follows:  All

10    documents and communications between Mylan and the

11    author or authors of the NIAID guidelines and

12    recommendations, including bills, receipts and other

13    documentation of compensation to such authors.

14          And, of course, Mylan shall produce all

15    documents responsive to Request For Production 16 and 17

16    as limited by April 30th.

17          I see I skipped over two here.  With regard

18    to Request For Production 28 and 29 regarding the

19    "birthday party ad," the Court finds that-- the Court

20    denies the motion to compel and sustains Mylan's

21    relevancy objections to those requests.

22          Wait a minute.  I'm going to withdraw that

23    ruling.  I-- I see that I had additional notes.  I do

24    want to hear from plaintiffs regarding how those

25    requests for production regarding the birthday party ad

1    are relevant to their claims in this case.

2            MR. MEREDITH:  Do you mind if I approach?

3            JUDGE JAMES:  Could you come on up to the

4    microphone so we can hear you?

5            MR. MEREDITH:  I apologize.

6            JUDGE JAMES:  No problem.  Go right ahead.

7            MR. MEREDITH:  Class plaintiffs understand

8    the birthday party ad or the Max's birthday ad to be

9    relevant to three claims in the plaintiffs' complaint.

10            The first is the simple notion that at the

11   core of every single one of plaintiffs' consumer

12   protection claims and false advertising claims is the

13   allegation that Mylan did and is willing to make false

14   or misleading statements in its advertisements or its

15   statements to the public generally.  The documents

16   requested by RFP 28 and 29 weigh on and provide evidence

17   for that allegation.

18            Second, it reflects Mylan's intent and level

19   of culpability regarding any misleading statements that

20   are put out into the public through their advertisements

21   or other statements.

22            It would reveal, for example, whether Mylan

23   had knowledge of whether the statements were misleading

24   before they let the birthday party ad out of Mylan

25   headquarters or if they had any mechanisms in place to

1  prevent misleading advertisements like the birthday

2  party ad from leaving Mylan headquarters.

3           Third, it's relevant to plaintiffs' claims

4  that are referenced throughout the complaint but in

5  particular Paragraphs 1 through 6 and Paragraph 623 that

6  Defendant Bresch installed the culture in Mylan with

7  respect to the EpiPen of profits over people.  It's

8  alleged at 623 that she overrode the wishes of her

9  colleagues and overrode the traditional safeguards in

10  place to prevent misleading advertisements like that ad

11  from reaching the public.

12           So it's those three general principles that

13  are asserted throughout plaintiffs' complaint that the

14  documents requested in 28 and 29 plaintiffs believe are

15  relevant.

16           JUDGE JAMES:  And what is the alleged

17  misstatement or misrepresentation in the ad?

18           MR. MEREDITH:  The ad indicated that any

19  EpiPen customer could safely eat the foods that they're

20  allergic to just so long as they had an EpiPen available

21  to them.  And that is clearly not the case and there are

22  dangers associated with eating your allergen even if you

23  have an EpiPen available.

24           JUDGE JAMES:  All right.  Thank you.  Mylan

25  care to respond?

1                MR. FOSTER:  Yes, Your Honor.  I think that

2    you have it exactly right when you asked what the

3    alleged misrepresentation was, because the plaintiffs in

4    this case-- none of them claims to have been misled that

5    they could eat anything they wanted and then use an

6    EpiPen and everything would be okay.  That's just simply

7    not what this case is about.

8                And under Rule 26, in order for a subject

9    matter to be discoverable it has to relate to the actual

10   claims that are being pled.  And that's defined by what

11   harms and claims the plaintiffs are actually seeking

12   recompense for.

13               This allegation is a throw-away allegation

14   that's in a part of the complaint called the Mylan

15   defendants.  And none of the subject matter that's being

16   discussed here relates to the actual claims as they're

17   pled if you look at the counts that are in the

18   complaint.

19               And that's why I think Your Honor had it

20   right in concluding that this-- this ad has nothing to

21   do with the actual claims that the plaintiffs have made.

22               JUDGE JAMES:  Are-- are there claims in the

23   complaint that could be actionable without showing

24   reliance?

25               MR. FOSTER:  I'm not sure I know the answer

1   to that, Your Honor.  I could-- we could consult on

2   that.

3           But I think the issue is the harms that the

4   plaintiffs are claiming.  For example, if you look at

5   the paragraphs in the complaint where the plaintiffs

6   list all of the things that their complaints are based

7   on in the consumer protection allegations, for example

8   Paragraphs 684a through bb, there are 28 incidences of

9   alleged conduct that support the consumer protection

10  allegations.  And the Max's birthday ad doesn't show up

11  anywhere there.

12          What those claims are all about is about the

13  allegations concerning two-packs, concerning pricing,

14  concerning the alleged anti-competitive conduct.

15  There's no one who claims to have been harmed based on

16  seeing an advertisement.  No one claims to have seen an

17  advertisement.

18          The type of misrepresentation that's alleged

19  and was just described, it doesn't bear even a family

20  resemblance to any of the claims that are at issue in

21  the actual counts that have been pled.  And what

22  plaintiffs are asking for, Your Honor, is all documents

23  related to this ad, which-- which just opens a whole new

24  avenue of discovery about-- of overbroad discovery

25  relating to an ad that really has nothing to do with the

 1   case.

 2              And that-- that, frankly, in a situation

 3   where we're already reviewing 720,000 documents over the

 4   course of just a couple of months really-- you know, if

 5   we start going down rabbit holes like this, it's going

 6   to put all of that in jeopardy.

 7              JUDGE JAMES:  I'm going to give plaintiffs a

 8   chance to respond.  But just a moment here, I want to

 9   look at something.

10              Well, I will say to plaintiffs that I've

11   reviewed the allegations in the complaint and there's no

12   specific tie that I see between the allegation about the

13   "birthday party ad" and a specific claim.  There is the

14   reference to the birthday party ad and then a reference

15   to state Consumer Protection Act claims, but I-- I don't

16   see a clear segue between the two, so to speak.

17              How do class plaintiffs respond to Mylan's

18   argument that, one, there's no reliance shown basically

19   that anybody-- any damages that are alleged in the

20   complaint are tied to that ad, or two, that those

21   allegations about the birthday party ad tie to any

22   specific count of the complaint?

23              MR. MEREDITH:  With respect to the question

24   of reliance, the majority of the consumer protection

25   claims alleged in plaintiffs' consolidated amended

1    complaint do not have a specific reliance requirement.

2    And indeed in cases such as this where omissions are

3    asserted as the false representation, reliance is

4    presumed in a majority of cases.

5              So each of those Consumer Protection Act

6    claims would be allowed to proceed, generally speaking,

7    without any showing of reliance whatsoever.

8              The same is true of plaintiffs' RICO

9    allegations which do not borrow the same reliance

10   requirements of traditional fraud allegations.

11             Regarding the connection between the

12   birthday party ad and allegations in plaintiffs'

13   complaint, in addition to the specific reference as you

14   mentioned at 624, the claim is that Mylan failed to make

15   and take sufficient precautions to prevent false and

16   misleading advertisements from exiting Mylan

17   headquarters.  And the allegations surrounding the

18   birthday party ad provide evidence that that was indeed

19   the case.

20             When concerns were raised, they were

21   overruled by the CEO of Mylan.  When there were

22   objections from potential whistleblowers, the ad went

23   out anyway.  That's the claim that these documents are

24   able to support and have been alleged throughout.

25             JUDGE JAMES:  All right.  Thank you.

1           All right.  Well, after further reflection

2   and hearing arguments of counsel, the Court's earlier

3   ruling stands as I previously ruled, and so the motion

4   to compel will be denied as to Request For Production 28

5   and 29.

6           JUDGE CRABTREE:  Let me interject just long

7   enough here to make this deep substantive contribution;

8   to remind the people who are listening in over the

9   telephone to please mute their phones.  It rattles and

10  makes it difficult for the court reporter.

11          JUDGE JAMES:  Thank you, Judge Crabtree.

12          MS. REPORTER:  Thank you, Judge Crabtree.

13          JUDGE JAMES:  All right.  Then I think we

14  have one left on-- one item left on class plaintiffs'

15  motion to compel Mylan, and that is Request For

16  Production 43.

17          I will say this, I read Request For

18  Production 43 and it seemed vague and overbroad to me.

19  And I'm trying to-- I would be willing to limit the

20  request, but I'm not even certain what it is exactly

21  plaintiffs are trying to glean through their request for

22  production.

23          So can you-- can you be more specific about

24  what Request For Production 43 is seeking to obtain?

25          MR. MEREDITH:  I certainly can.  But I also

1   have some developments that may be able to resolve this

2   issue without the Court's interaction.

3            Following the plaintiffs' motion to compel,

4   the parties reached agreement for a protocol regarding

5   RFP 43 in which the defendants would give certain

6   advertisements to plaintiffs and then we would provide

7   follow-up questions regarding what documents and

8   communications are necessary surrounding that

9   advertisement.

10           So the parties have resolved this issue and

11  it doesn't require the Court's ruling any further at

12  this time.

13           JUDGE JAMES:  Does Mylan agree that the

14  issue has been resolved?

15           MR. FOSTER:  Yes, Your Honor.

16           JUDGE JAMES:  All right.

17           MR. MEREDITH:  Thank you.

18           JUDGE JAMES:  Very good.  Then the Court

19  will not address the Request For Production 43 any

20  further than I already have.

21           All right.  I think that covers all of the

22  issues in class plaintiffs' motion to compel Mylan.

23  Anything I've overlooked or any questions?

24           MR. MEREDITH:  No, Your Honor.

25           JUDGE JAMES:  All right.  Then moving on to

1   Sanofi's motion to compel Mylan's discovery requests,

2   that is Docket Entry 293.  That's the sealed entry.  I'm

3   sorry, I don't have the original filing docket number,

4   but the sealed Docket Entry 293.

5               Sanofi's motion to compel is granted and

6   Mylan's objections are overruled with regard to Request

7   For Admissions 2 and 5, Request For Admissions 7, 13,

8   and 17.

9               And the Court notes that the objections to

10  the effect that the request calls for a legal conclusion

11  or application of law to the facts are not valid

12  objections in this district.  Many of my magistrate

13  judge colleagues from this court, from this district

14  have ruled on this issue.  So I would expect any future

15  responses to request for production not to see an

16  objection that the request is requesting a legal

17  conclusion or application of law to the facts.  Not a

18  valid objection in this court.

19              Likewise, the motion to compel is granted as

20  to Request For Admission 54.  Mylan must admit or deny

21  whether Heather Bresch made the quoted statement.  Mylan

22  shall amend and serve its responses to those requests

23  for admissions by April 30th.

24              As for Request For Admissions 35, 36, and 37

25  regarding the MDRP classification, the motion to compel

1  is denied.

2              The motion to compel is also denied and

3  objection sustained as to Request For Admissions 19

4  through 22, 31 and 48, but Mylan must supplement its

5  responses as appropriate as additional information

6  becomes available.

7              Interrogatories 1 and 3 of the-- in the

8  motion to compel are also denied, but Mylan again will

9  have a duty to supplement those interrogatory responses

10  as appropriate as more information becomes available.

11             And I think that addresses all of the issues

12  with regard to Sanofi's motion to compel Mylan.  Is

13  there anything else with regard to that motion?  All

14  right.

15             MR. BUCHWEITZ:  Well, there's-- Your Honor,

16  there were also Roman II, which was a misclassification.

17  You ruled with respect to the RFAs, but there wasn't a

18  ruling on the matters from Pages 4 through 7 of our

19  motion to compel--

20             JUDGE JAMES:  All right.  Hang on.

21             MR. BUCHWEITZ:  -- Item 2, as well as the

22  last item, Item 5.

23             JUDGE JAMES:  Yes.  As to Status Report

24  Topic 5, my intent in denying the motion to compel as to

25  the request for admissions having to do with MDRP

1   misclassification would be also to deny the requests

2   with regard to that Status Report Topic 5 beginning on

3   Page 4 and continuing through Page 7 of the status

4   report.  Does that answer your question, Mr. Buchweitz?

5            MR. BUCHWEITZ:  That answers part of it.

6   The last part of the question is just the-- the last

7   topic, Topic 5, which is on Page 9 through 10 of our

8   motion to compel, as well as Page 5 of our reply brief,

9   which is the alleged facts at issue objection.  That was

10  where they re-characterized our complaint and decided

11  what they wanted to produce.

12           JUDGE JAMES:  All right.  I-- for some

13  reason I thought that last alleged facts at issue

14  objection had been resolved.  Is that not correct?

15           MR. BUCHWEITZ:  Well, not in our view it

16  wasn't, Your Honor.  I'm sorry.  In our reply brief we

17  said that they had expanded, they didn't-- they did

18  provide an amended response, they did expand what they

19  claim were the alleged facts at issue, but they're still

20  not all of the alleged facts at issue.

21           JUDGE JAMES:  All right.  And Mylan, remind

22  me-- I'm sorry, I thought this had been resolved.  So

23  what's-- what is Mylan's current position with regard to

24  the alleged facts at issue objection?

25           MR. FOSTER:  So, Your Honor, we think this

1    should be resolved.  And the way that this worked was

2    the plaintiffs served certain requests.  I think at this

3    point there are four requests at issue, it's Request 7

4    and then 11 through 13.

5            And those requests I-- I believe and Mylan

6    believes are facially overbroad requests.  And so what

7    we did in trying to respond to them was to frame exactly

8    what we would produce to narrow the request.  And so we

9    created-- we said we would give you the responsive

10   documents to the extent they related to certain things

11   that capture the-- the core elements of the plaintiffs'

12   claim and not irrelevant materials.

13           And so each of those responses has a very

14   carefully drafted response that defines very precisely

15   what-- what Mylan is willing to produce.

16           And we have offered in letters and

17   meet-and-confers for plaintiffs to explain to us-- just

18   even give us one example of some type of relevant

19   document that would not be included in what we have

20   given them.  And, in fact, we have written letters to

21   them.  I believe as long ago as Valentine's Day we sent

22   a letter to the plaintiffs and said, if you have a

23   problem with what's in our list, please tell us.  And

24   the only response that we've gotten back is, well, you

25   can't re-characterize our complaint.

1           And so to this day, and including in all of

2    their briefing, the plaintiffs have not provided any

3    topic that's relevant that's not incorporated in our

4    responses.  And, frankly, I-- in our position,

5    plaintiffs have-- have waived their ability to raise

6    deficiencies on this in that they have-- they have filed

7    a brief that claims to be raising issues but doesn't

8    actually explain what the basis of their problem with

9    our objection is-- or our response is.

10          JUDGE JAMES:  All right.  Well, I am going

11   to have to go back and look at this one further.  So the

12   Court will reserve ruling on the Request For Production

13   7 and 11 through 13 set out on Pages 9 and 10 of

14   Sanofi's brief in support of its motion to compel.

15          MR. BUCHWEITZ:  Okay.  Thank you, Your

16   Honor.  It may be that there was-- there was a sixth--

17   or a fifth request that was on the table, which was the

18   government production, which they also limited to

19   alleged facts at issue and they decided they were going

20   to give us all of that, not the alleged facts at issue.

21   So maybe that's what you thought had been resolved.  The

22   other matters are still open.  Thank you, Your Honor.

23          JUDGE JAMES:  All right.  Well, thank you

24   for bringing it to my attention and I will get back to

25   counsel on that one remaining issue with regard to

1    Sanofi's motion to compel Mylan's responses.

2              All right.  I think then I have addressed

3    all of the issues in the status reports unless somebody

4    has something I've overlooked.

5              MR. SECHLER:  Yes, Your Honor.  I think

6    there's one issue that was raised in the status reports

7    on which the parties are at an impasse, and that's

8    Mylan's request for documents relating to government

9    investigations on Sanofi's rebating practices.  That was

10   Request No. 24 in our third set of requests for

11   production.

12             Both Sanofi and Mylan raised that issue in

13   connection with the other products' issues.  So it kind

14   of relates to Your Honor's ruling from Monday, but it is

15   a different request and a different set of materials.

16             JUDGE JAMES:  Is that one ripe yet?  Is that

17   the subject of a pending motion?

18             MR. SECHLER:  There's been no motion filed

19   on it.  And, you know, I don't know, I-- I believe we're

20   at an impasse, but Mr. Hochstadt can tell me if we're

21   not.

22             MR. HOCHSTADT:  Your Honor, I candidly

23   thought it was addressed in Your Honor's ruling since

24   both parties put this request that Mr. Sechler is

25   raising in both of our respective status reports, and

1    the Court referenced specifically this request in its

2    ruling.

3           So I don't know if this is a request for

4    reconsideration of the Court's order or what.  I'm happy

5    to discuss it with Mr. Sechler as part of the discussion

6    about, as Your Honor mentioned, what rebate information

7    is.  But if this is an attempt at a second bite at the

8    apple, no motion for reconsideration has been filed.

9           JUDGE JAMES:  Yeah, is-- I mean, I did rule

10   on the issue about rebates on Sanofi products.

11          MR. SECHLER:  Correct.  Yes, Your Honor.

12   I'm not talking about any other products.  But you, Your

13   Honor, allowed discovery into Sanofi's rebating

14   practices on Soliqua, Apidra, Lantus and Toujeo, four

15   drugs.

16          There was another request that I do not

17   think Your Honor addressed in the opinion that asked for

18   documents submitted to the government relating to three

19   investigations on those drugs.  Your Honor referenced--

20          JUDGE JAMES:  Oh, I see what you're--

21          MR. SECHLER:  -- that request-- those kind

22   of were actually-- I think that's what Your Honor relied

23   upon to discern the reasons for those drugs being

24   included in the list of 12, but the actual request for

25   those government documents was not addressed by Your

1   Honor I don't believe and wasn't really briefed by the

2   parties.

3           JUDGE JAMES:  All right.  Are the government

4   investigations investigations of the four drugs that

5   I've granted the discovery on?

6           MR. SECHLER:  Correct.

7           JUDGE JAMES:  All right.  Then this gets to

8   the issue that I said you all are going to have to

9   discuss, my big ruling on rebate information.  To the

10  extent that-- well, I will let you all haggle over

11  whether those government investigations as to those four

12  drugs are rebate information subject to my order.  And

13  if you can't agree on that, you'll need to come back to

14  me.

15          But my earlier ruling was intended to

16  encompass that whole issue, but I'm going to leave it to

17  you guys to try and figure out how broad that rebate

18  information requirement is.

19          MR. HOCHSTADT:  That was our understanding,

20  Your Honor.

21          JUDGE JAMES:  And, in fact, maybe you could

22  do that here today and come back and report to us before

23  you all leave.

24          MR. SECHLER:  We would be happy to do that,

25  Your Honor.

1          JUDGE JAMES:  All right.  That's it.  Yeah,

2   I think we're ready to take a break if there's-- if

3   there's nothing else.  I've gone through my whole list.

4   There's an issue or two Judge Crabtree wants to take up

5   with you.  That, and then if you'll report back to me

6   and maybe you can resolve this issue about the breadth

7   of the rebate information subject to my order.  We'll

8   come back and address those issues and anything else you

9   all think of while we're on break.

10          MR. DAVIDSON:  Your Honor, I do have one

11   other issue.  I don't know if it's ripe to discuss, but

12   we have had a disagreement with defense counsel over the

13   form of the privilege log and as well as the deadline

14   for-- for finalizing privilege logs and serving those.

15          I'm-- we're prepared to discuss that with

16   Your Honor today if Your Honor would permit.  Otherwise

17   we can, of course, submit a briefing.

18          THE COURT:  When is the deadline, I don't

19   know it off the top of my head, for submitting your--

20          MR. DAVIDSON:  I don't think there is a

21   current deadline that's been set by the Court for

22   submission or serving of final privilege logs.  We had

23   proposed June 1st, which we thought was appropriate

24   given the October 31st deadline.  But we have just a

25   fundamental disagreement about the-- whether you should

1    be able to do categorical privilege logs or you have to

2    comply with Rule 26 that requires itemization of each

3    document.

4            JUDGE JAMES:  All right.  Is Mylan prepared

5    to talk about that now?

6            MR. FOSTER:  We are-- we could talk about

7    it, Your Honor.  In our view, this issue isn't quite

8    ripe yet.  The plaintiffs provided a draft privilege log

9    protocol to us last week.  We had a meet-and-confer last

10   Tuesday about it and we shared some ideas about how

11   things could work.

12           And the defendants have been working hard to

13   come up with a proposed protocol that will have detailed

14   lists of categories of documents, some of which can be

15   logged on a categorical basis, others of which would

16   have to be logged on an individual basis.  And to-- to

17   do that, we had hoped to-- to turn that around before

18   this hearing.

19           But in order to do that, we had to confer

20   with quite a few people to get that nailed down.  So--

21   so Pfizer is looking at it, Mylan is looking at it.

22   We've had to talk to our vendors about whether it's

23   technologically feasible to do what we want to do.

24           But the idea will be that we will have a log

25   in which certain categories of documents can be-- can be

1   grouped together, along with all the usual information

2   that privilege logs contain, including the senders and

3   recipients and-- and just very detailed information,

4   which I think in a case like this where there are

5   possibly literally hundreds of thousands of documents

6   that could be privileged, and particularly-- you know,

7   Pfizer has a whole set of custodians, all of whom are

8   lawyers or at least almost all of whom are lawyers, my

9   understanding.  Mylan has an attorney custodian.  We

10  have in our collection hundreds of thousands of

11  documents that have attorneys copied on them.

12          So it's-- the privilege log is a really big

13  deal in this case.  And we respectfully I guess would

14  request that the Court allow that opportunity to play

15  out with us in negotiating a potential privilege log and

16  at least sharing our proposal with the plaintiffs so

17  that we can have a meaningful back and forth and then

18  discuss the date for privileged logs being due in the

19  context of what exactly the log will entail because the

20  log--

21          JUDGE JAMES:  All right.  Sorry to

22  interrupt.

23          MR. FOSTER:  No, go ahead.

24          JUDGE JAMES:  This item wasn't included in

25  the status reports and so I'm-- I'm going to have the

1  parties continue to discuss that.

2              I will tell you, though, it needs to happen

3  soon.  I mean, you all have been exchanging documents.

4  A privilege log is in order already.  So I expect those

5  discussions to happen post-haste.  So get on it and if

6  there's a dispute, I want to hear about it right way.

7              MR. FOSTER:  We understand, Your Honor.

8  Thank you.

9              MR. DAVIDSON:  Appreciate it, Your Honor.

10  Thank you.

11             JUDGE JAMES:  Okay.  With that, then we will

12  take a-- be back at five 'til 4:00-- five 'til 3:00,

13  sorry.  2:55.  And we'll be in recess until then.  Thank

14  you.

15             (Recess).

16             JUDGE JAMES:  I think that I am done with

17  everything I had to cover.  Thank you all for your time

18  and input.  And Judge Crabtree.

19             JUDGE CRABTREE:  On the discussion about the

20  privilege log, is there-- is there any more to report?

21             MR. BUCHWEITZ:  On the privilege log or on

22  the rebate information?

23             JUDGE CRABTREE:  I'm sorry, on the-- yes,

24  the rebate.  Forgive me.

25             MR. BUCHWEITZ:  What we have to report is

1    there's not an agreement.  We're happy to argue it now

2    if you'd like.

3            JUDGE JAMES:  Are you prepared to argue it

4    or do you want to-- okay.

5            MR. SECHLER:  Your Honor, I think there are

6    two issues.  One has to do with the kinds of business

7    documents that would be produced with respect to these

8    other four drugs; offers, proposals, contracts, things

9    like that.  And then the second has to do with the

10    government investigation materials.

11            On the first, I think we may be able to

12    reach agreement if we had more time to discuss it.  We

13    couldn't reach agreement right now.  It's not clear to

14    me whether we would.

15            But in the second, I think it's pretty clear

16    the parties are at an impasse and that government

17    communications-- communications with government

18    investigators will not be produced.  And so we could

19    argue that now if Your Honor would like or we could

20    submit something in writing, whatever Your Honor's

21    preference is.

22            MR. BUCHWEITZ:  I don't agree with what he

23    said, but I am ready to go forward.  I think this would

24    only take a few minutes.  I don't think this is that

25    complex.

1           JUDGE JAMES:  All right.  I'll go ahead and

2   hear argument from both counsel.  I may not rule, I may

3   ask for more information or written submissions, but

4   I'll hear what you have to say now.

5           MR. BUCHWEITZ:  Your Honor--

6           MR. SECHLER:  May I begin?

7           MR. BUCHWEITZ:  Can I begin?

8           JUDGE JAMES:  Let's see.  This comes up in

9   the context of Sanofi's motion to compel Mylan.

10  Correct?

11          MR. SECHLER:  It was Mylan's motion to

12  compel Sanofi's documents.

13          JUDGE JAMES:  Okay.  Well, then if it's your

14  motion, go forward.

15          MR. SECHLER:  Thank you, Your Honor.  And,

16  Your Honor, I do have a notebook of materials that were

17  attached to the motion that may be helpful.

18          JUDGE JAMES:  That would be helpful, yes.

19          MR. SECHLER:  And if I may approach, Your

20  Honor.

21          JUDGE JAMES:  Yes, please.

22          MR. SECHLER:  Here are three copies.

23          JUDGE JAMES:  All right.  So this is Mylan's

24  motion to compel, Docket Entry 285.  Right?

25          MR. SECHLER:  Correct, Your Honor.

1          JUDGE JAMES:  Now I'm with you.  Okay.  All

2     right.

3          MR. SECHLER:  Thank you, Your Honor.  So on

4     the first-- I really see this as two issues.  The first

5     has to do with what kind of business information should

6     be produced in connection with the Court's order of

7     April 2nd allowing Mylan to have additional discovery on

8     four Sanofi drugs.  And then the second has to do with

9     Mylan's request for materials shared with the government

10    in connection with investigations of those four drugs.

11         We believe that the production of documents

12    relating to the four drugs that the Court allowed

13    discovery into should be the same document-- the same

14    rebate information that the parties are currently

15    producing with respect to the EpiPen and the Auvi-Q.

16         So, Your Honor, that would include

17    contracts, but obviously it goes far beyond contracts.

18    It goes into the proposals that Sanofi made to the PBMs

19    and the payors regarding rebates because, of course,

20    proposals sometimes get accepted and sometimes they

21    don't.

22         If you read the parties' papers in

23    connection with this issue, proposed rebates and the

24    terms were very much part of the argument that the

25    parties had on whether additional discovery would be

1    had.







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Then there were two in the interrogatory

24  answers that Sanofi provided.  I guess there are three

25  things you need to know.  This is interrogatory

1    responses 5 and 4 of the interrogatories.

2            First, negotiations with the PBMs are

3    through account executives at Sanofi.  They are the ones

4    who make the offers on something called a term sheet.

5    Sometimes if they want to go really high with the rebate

6    offer, they need to go to the Pricing Review Board or to

7    the U.S. Pricing Committee.  Those are two entities

8    within Sanofi who approve variations from the limits.

9            So what we believe would be appropriate

10   discovery for these limited four products-- of course we

11   were hoping for more, we understand the Court's ruling.

12   But to get a fair picture of what competition looks like

13   on those four products, we need more than the contract

14   agreements.  We need the offers that were made by the

15   account executives to the PBMs.  We need the

16   presentations made to the Pricing Committee and the

17   Pricing Review Board and, of course, their decisions.

18   And then we need the white papers like the kind that we

19   just saw here, Your Honor.

20           Now, we believe that there's really--

21   shouldn't be an issue here.  Because if you look at the

22   way that Sanofi responded to our request for this

23   information, they didn't limit it by the kind of

24   document.  Now, this is Tab 6, Your Honor.  And Tab 6,

25   if you go to Page 18, this is the requested issue in the

1   motion to compel, Request No. 24.

2           So Request No. 24 in Tab 6, Your Honor, is

3   our request for this rebate information.  They didn't

4   object in terms of what kinds of documents.  They said,

5   we will produce documents concerning bids, offers,

6   rebates for Auvi-Q.  So we had an entire discussion with

7   the Court, an entire briefing about whether other

8   products which we requested here would also be included.

9   The Court ordered that four other products would be

10  included.

11          So there's no, I don't think, objection

12  preserved in this response to the kinds of documents

13  that should be produced, first of all.  Second, the

14  Court noted in its ruling at Page 7 that Mylan-- I'm

15  sorry, Sanofi has abandoned all its objections besides

16  relevance and proportionality, so it can't have a burden

17  argument.  And furthermore, the Court ordered at Page 10

18  of its ruling that documents relating to rebates all

19  should be produced.

20          So we believe, Your Honor, that the kinds of

21  documents that have been produced already with respect

22  to Auvi-Q, which I just outlined, should be produced and

23  are very important to show what true competition looks

24  like, what competitive factors are considered by the

25  company, what amount of rebate was approved by the

1    committee, and also how it's connected to formulary

2    position.  And you can see in that white paper the issue

3    of formulary position was very important.

4              So, Your Honor, now I'll go to the second

5    part of this issue which has to do with government

6    investigations.  So we know-- this is Request No. 24 in

7    Mylan's third set of RFPs, Your Honor.  And the only

8    three investigations we know of deal with the four drugs

9    that Your Honor's order mentioned; Lantus, Toujeo,

10   Apidra and Soliqua.  Those were disclosed in Sanofi's

11   SEC filings.

12             And we believe these materials; that is,

13   communications with the government about these

14   investigations are important because not only will they

15   show what the business practice is, as we just

16   discussed, they will show that Sanofi knows what the

17   business practice is and has admitted it and has said it

18   and now is taking a different position here.

19             And if I could ask Your Honor to turn to

20   Tab 3.  Your Honor noted in the ruling of Monday that

21   the four drugs that the Court allowed discovery on were

22   the issue-- were the subjects of investigations and also

23   the subject of a class action alleging that rebates were

24   unlawful, a case filed against Sanofi in New Jersey.

25             This is a motion to dismiss that case that

1  Sanofi filed, as it happens on the same day that Mylan

2  filed its reply on the motion to compel.  And I just

3  want to direct your attention to four very brief

4  statements that are in this document that we believe

5  again directly rebut the position that Sanofi has taken

6  here.

7           If you go to Page 2 of this document and,

8  Your Honor, for convenience I'll refer to the page

9  number actually in the top right-hand corner since there

10 are a number of different page numbers.  But Page 17 of

11 247.

12          If you go to 17 of 247, you'll see at the

13 very bottom the statement which we've highlighted, "It

14 is also entirely rational and lawful for manufacturers

15 to discount their products through the payment of

16 rebates in exchange for having their products appear on

17 formularies that insurers use to make coverage decisions

18 for the vast majority of patients," we believe a

19 statement that directly rebuts Sanofi's contention here

20 that these rebates are artificial barriers to

21 competition.

22          If you go to the bottom of Page 3, Your

23 Honor.  As plaintiffs recognize, manufacturer rebate

24 payments to PBMs are not unique to the sales of insulin,

25 it is how the entire branded pharmaceutical industry

1  functions.  And this is a defense of very high rebates

2  conditioned upon exclusive formulary status.  We believe

3  this statement rebuts the allegation that Mylan's

4  rebates were new and unprecedented.

5          Over on Page 29 of 247--

6          JUDGE JAMES:  Well, excuse me for a moment.

7          MR. SECHLER:  I'm sorry, Your Honor.  Sure.

8          JUDGE JAMES:  But the argument is not that

9  their rebates are unprecedented but that large exclusive

10  rebates are unprecedented.  Correct?

11          MR. SECHLER:  Exactly right, Your Honor.

12  And that--

13          JUDGE JAMES:  And this doesn't talk about--

14  this just talks about rebates generally.  Correct?

15          MR. SECHLER:  Well, in the context of the

16  allegations in this case and the rebates that were paid

17  on Lantus.  So that is exactly why, Your Honor,

18  discovery into this is so important, because we do need

19  discovery into the rebates that were paid on Lantus and

20  offered and the terms, including exclusivity, like the

21  document we just looked at.

22          And by the way, Your Honor, none of this

23  information is publicly available, which is why it's

24  been filed under seal.  All the information you can get

25  in rebates is aggregated at a very high level.  So you

1    never-- you can't find publicly-available information on

2    products' specific rebates.

3              So, Your Honor, turning to Page 18 and 19 of

4    247-- oh, I'm sorry, we covered that.

5              Page 29 of 247.  The highlighted sentence,

6    "The use of formularies, thus, gives the PBMs enormous

7    power to extract rebates from manufacturers."  And we

8    believe that is directly inconsistent with the

9    allegations that the rebates were artificial barriers

10   erected by Mylan, which is what Sanofi alleges in

11   Paragraph 6 of its complaint.

12             And finally, Your Honor, turning to Page 54

13   of 247, you can see the highlighted sentence.  "Instead,

14   each defendant offers rebates to PBMs because it is

15   competing against other defendants for inclusion and

16   preferred placement on PBMs' formularies."

17             So, Your Honor, rather than the allegation

18   made here that rebates blocked Sanofi from competing,

19   this is a statement that that is how the pharmaceutical

20   manufacturers compete.  And as we looked at on the big

21   grid, it's all about rebates.  That is how they compete

22   in terms of price.

23             So, Your Honor, we think that the kinds of

24   statements we just saw are very important and relevant

25   because they show Sanofi's knowledge of what true

1    competition in the industry looks like, they directly

2    rebut what's been said here, and I would submit they

3    undermine Sanofi's credibility because they're saying

4    two different things in two different places at the same

5    time.

6              So they are defending rebates made on the

7    four drugs that Your Honor allowed discovery into in

8    three investigations.  They have made statements to

9    those investigators, and we believe those statements

10   will be important for the same reason that the

11   statements we just looked at are.

12             We also believe that communications with the

13   investigators about those four drugs will further

14   provide factual information on the competitive

15   circumstances of the industry and the level of rebating

16   that Sanofi provides on those drugs, the position of the

17   customers and PBMs and also the effect on competition.

18             So for the same reasons that the Court ruled

19   that discovery into rebate information; that is, the

20   actual rebates that were considered by the Pricing

21   Committee, offered to customers and then ultimately

22   contracted, for the same reason that's relevant, we

23   believe communications with the government investigators

24   on those four drugs are relevant.

25             And finally, Your Honor, let me just say a

1    couple things about what Sanofi might say.

2              JUDGE JAMES:  Before you do that--

3              MR. SECHLER:  Sure.

4              JUDGE JAMES:  -- define for me-- when you

5    say "government investigation documents," what sort of

6    documents are you talking about?  I mean, you're quoting

7    here and referencing a district court filing.

8              MR. SECHLER:  Yep, Your Honor, that's a

9    great question.

10             JUDGE JAMES:  Is that a government

11   investigation document?

12             MR. SECHLER:  Yeah.  So if you-- Tab 7 is

13   our request so that you can just see it, how it's

14   worded.  And it's on Page 9 of Tab 7.  And you can see

15   it says, "All documents, materials, presentations, et

16   cetera, made to the government or presented to the

17   government."

18             And the reason I included Tab 8, Your Honor,

19   this is important, we got this language from Sanofi.

20   Because if you look at Tab 8, you can see their request

21   on Page 10 of Tab 8, their RFP No. 2, exact same

22   wording.  What did Mylan say?  We'll produce the

23   documents with no conditional objection, Your Honor.

24   So-- so we got the language from Sanofi.

25             The only investigations we know of are the

1    four drugs that Your Honor has already ordered in

2    discovery.  There's no request for other drugs or

3    anything else.  It's highly proportional in a case where

4    Sanofi is claiming three-- seeking $3 billion from Mylan

5    on allegations of rebates being artificial barriers to

6    competition.  We think this would be highly proportional

7    to the needs of the case.

8             JUDGE JAMES:  I'm sorry, can you clarify?

9    I'm not seeing the language you said you took from

10   Sanofi.

11            MR. SECHLER:  Sure.

12            JUDGE JAMES:  I'm looking behind Tab 8.  And

13   where did you say?

14            MR. SECHLER:  So Page 10 of Tab 8, Request

15   For Production No. 2, "All documents, materials,

16   presentations, et cetera, exchanged with, produced by,

17   or made accessible to Federal Trade Commission, New York

18   Attorney General, West Virginia Attorney General

19   relating to Mylan's commercial practices regarding

20   EpiPen."

21            So we basically took the same wording, we

22   changed obviously the name of the investigator, we also

23   identified the investigations that we knew of, which is

24   why it's longer, but it asks for the same documents.

25   And that is-- which is what Mylan is already producing,

1   what materials were shared with the government and what

2   communications have been exchanged with the government

3   with respect to these four drugs and those

4   investigations.

5              THE COURT:  All right.  Thank you.

6              MR. SECHLER:  Thank you, Your Honor.

7              MR. BUCHWEITZ:  Your Honor, I've been

8   arguing from here, but he went up there.  Where would

9   you like me to go?

10              JUDGE JAMES:  We could probably hear you

11   better if you come up here if you don't mind.

12              MR. BUCHWEITZ:  All right.  I'll have to

13   bring all my stuff and potentially my colleague, but not

14   a problem.

15              Your Honor, your ruling was to allow limited

16   additional discovery into Sanofi rebate practices beyond

17   what Sanofi has produced.  What Mr. Sechler has

18   described is far beyond anything limited but, in fact,

19   is actually-- would be opening up four additional

20   litigations that they're not a party to and try to make

21   this case, which is already one where remarkably us as

22   plaintiff are reviewing and producing more documents

23   than the defendants, and one where it's going to be

24   infinitely more.

25              There are so many issues that I need to go

1    through based on what he said, but I-- I need to start

2    with explaining what this is all about.  Okay?  In the

3    industry we talk-- we call this market access.  Access.

4    You heard him say access.  Okay?

5           All pharmaceutical companies, as we said in

6    Paragraph 55 of our complaint, use rebates and

7    agreements with payors to get market access.  What Mylan

8    did is exclusion.  And that's when it crosses the line

9    and that's what we're talking about.

10          The document that they've pointed to in

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████

14   █████████████████████████████████████████████████

15   ███████████████████████████████████████████

16        ██████████████████████████████████████████████

17   █████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████

21   █████████████████████████████████████

22        █████████████████████████████████████████████

23   █████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████

25   ███████████████

1           So you have pharmaceutical companies who are

2    trying to get access to the market and-- versus someone

3    who has monopoly power, using that power to exclude a

4    new entrant.  There's nothing about Auvi-Q that they

5    should've been concerned about.  These people had 90,

6    99 percent.  All they did was they used their power,

7    their monopoly power in order to overpay to these--

8    these payors in order to get Auvi-Q off the market.

9           And how do we know that they did that?  As

10   soon as Auvi-Q was off the market for a period of time

11   because of a manufacturing issue, they pulled everything

12   back.  They said, nope, no more rebates.  We don't want

13   to do this anymore.

14           Paragraph 55 of our complaint explains this

15   best.  It says, "Providing rebates to third-party payors

16   is common in the pharmaceutical industry.  In some

17   circumstances, rebates can be a form of price

18   competition that ultimately helps to lower prices for

19   end consumers," okay, "both when they pay for

20   prescription drugs and when they pay health insurance

21   premiums.  Even rebates for exclusive coverage on a

22   given third-party payor's drug formulary are not unheard

23   of, though they are often solicited by payors."  Here,

24   we know that Mylan was asking for exclusive positions,

25   opposite the document they showed you.

1                "But," and this is the last sentence,

2       "pharmaceutical companies with monopolies for a given

3       drug product do not, and under U.S. antitrust law

4       cannot, condition large rebates to block new-arrival

5       drugs from key access to the markets."

6                But, you know, all of this is the relevance

7       question.  Okay?  We accept your ruling.  You've said

8       that they're going to get documents on these four

9       products.  And the question today is what should they

10      get?  And our answer is, what they asked us for

11      initially.

12               On February 7th, 2018, when we were in the

13      throes of our search term request, we got a request from

14      them to say, okay, we want these seven products within

15      50 of rebate.  And we said no, because we thought they

16      shouldn't get anything about the other products.  But

17      here we are now and we've offered them, we'll give you

18      these four products within 50 of rebate.  That's what

19      you asked for, that's what you should get.  And we could

20      do that within all the custodians we're already looking

21      at and we'll even look in the government productions

22      that they're talking about.

23               Now, we have to talk about these government

24      productions because this is a real-- a real big

25      difference between what's happening with Mylan.

1          The investigations that are going on in the

2    insulin industry were prompted by one senator who sent a

3    letter to all of the insulin companies saying, we want

4    to know how you price.  And a bunch of attorney generals

5    after that sent out subpoenas to all of the insulin

6    companies, not just Sanofi, asking how they price and

7    producing documents pursuant to those, as any good

8    corporate citizen would.

9          The investigations into Mylan that they're

10   trying to equate this to are investigations of just

11   Mylan into its various practices with respect to the

12   EpiPen.

13          Here-- and the other issue is, okay, this

14   Request 24, this came in their supplemental request.  We

15   didn't get this in their initial requests, and it came

16   months later and over a year after we disclosed these

17   investigations.  These investigations were disclosed in

18   the annual report from Sanofi put out after 2016.

19          They issued document requests about other

20   products, about this, about that, for-- we had motions

21   to compel on it.  And then only subsequently do we get

22   these subsequent requests, Request No. 24 that they're

23   talking about here, that they supposedly now need these

24   investigations so badly over a year later, the

25   investigations into the industry.

1          And our objections on these-- by the way,

2     Your Honor, I'll be clear, we did not do conditional

3     objections I'm proud to say.  We objected and we said

4     that we-- we objected on all of the bases; unduly

5     burdensome, seeking information not relevant or

6     proportional to the needs of the case.  We have not

7     waived any objections with respect to that through a

8     motion to compel practice because it hasn't even been

9     the subject of a motion to compel practice.

10          What they're trying to do here is turn a win

11     that they got in a-- in a discovery dispute into a huge

12     sideshow that will be incredibly burdensome and totally

13     unnecessary in the context of this case.

14          We have agreed to make available to them the

15     rebate agreements with respect to these four products

16     from the 2012 to 2016 period that Your Honors have ruled

17     on.  And we're willing to do-- give them the exact

18     request that they asked for, product-- these four

19     products within 50 of rebate.  And we think that-- we

20     think that's too much, but we're willing to do it and we

21     think that it should end there.

22          JUDGE JAMES:  Okay.  Thank you.

23          MR. SECHLER:  Thank you, Your Honor.  Just a

24     few quick points in response to Mr. Buchweitz' comments.

25     First of all, you know, the argument that this discovery

1   would make-- turn this case into a sideshow is I think

2   the argument that the Court has already rejected.  This

3   discovery is relevant not only because of the

4   allegations in the complaint but also because of the

5   law.

6            We cited in our brief 14 cases, federal

7   antitrust cases - including the Court's December 21st

8   ruling on our motion to dismiss - that make it clear

9   that industry practice is important and particularly

10  when it's the practice of the party challenging the

11  conduct.  That's No. 1.

12           No. 2, in the notebook I provided Your Honor

13  at Tab 4 is the declaration of Janusz Ordover, a former

14  chief economist of the Department of Justice, who

15  indicates why this information is important.  As the

16  Court has already found, it's going to be important to

17  see what true competition in the industry looks like.

18           So Mr. Buchweitz' proposal just to provide

19  contracts excludes offers.  It excludes proposals that

20  were made to PBMs that ultimately decided not to take

21  them up on it.  And-- and the problem with that, Your

22  Honor, is their competition sometimes wasn't that great

23  and sometimes the fact they got rejected would cause

24  them to-- to offer higher rebates.

25           Furthermore, it's very important, Your

1  Honor, to look at the entire structure of competition

2  because these rebates do not lock in the PBMs and the

3  payors.  They can often change rebates, change their

4  formularies even in the middle of a year, and they've

5  done it.  And therefore, we want the whole history of

6  competition on rebates for these products to show what

7  it looks like.

8          What we're asking for is not difficult.  The

9  U.S. Pricing Committee and the Pricing Review Board,

10 those documents were produced not through a Boolean

11 search but were just given to us regarding Auvi-Q pulled

12 directly.  Furthermore, the documents that were provided

13 to the government, you wouldn't need to find them from

14 doing a search, you would just have them and produce

15 them.  So those would not be a burden.

16         With respect to the search that Mr.

17 Buchweitz said they would do with-- on the drugs, that

18 makes sense to do that as long as the custodians are the

19 account executives who interacted with the PBMs on these

20 insulin drugs, the diabetes drugs.  And we don't know

21 that to be true.  We don't know if the current

22 production included account executives who dealt with

23 Lantus, Toujeo, Soliqua or Apidra.  So, therefore, we do

24 think it would be important to have the account

25 executives who actually made the offers to the PBMs and

1    the payors.

2            JUDGE JAMES:  Okay.  Thank you.

3            MR. SECHLER:  Thank you, Your Honor.

4            MR. BUCHWEITZ:  Sorry, Your Honor, just two

5    minutes?

6            JUDGE JAMES:  I think we're done.

7            MR. BUCHWEITZ:  One minute?

8            JUDGE JAMES:  This has to end somewhere and

9    they get the last word so-- I'll give you a minute.

10            MR. BUCHWEITZ:  Thank you, Your Honor.

11   First thing is back to custodians again, I can't believe

12   that we're there again.  I mean, we've already gone over

13   this repeatedly again and again and again.  We were

14   here, they knew this was an issue, they didn't raise it.

15   We were in court multiple times.  There's no more

16   custodians.  I mean, the time for that has passed.

17            And, you know, we're not saying they

18   shouldn't get anything.  Got the four products, we're

19   willing to give them the contracts on it.  We're willing

20   to give them within 50 of it.  And that's where we think

21   it should stand.

22            JUDGE JAMES:  Thank you.  All right.  We

23   both agree we'll reserve ruling.  Thank you for your

24   arguments, both of you.

25            JUDGE CRABTREE:  All right.  Thank you,

1    Judge James, for doing almost all the work at this

2    hearing or moving-- I did quiet the phone noise, so I

3    note that.

4            I do just want to direct a question to--

5    toward the defendant's table and really more at Mylan.

6    I-- I noticed that there was-- in a recent filing there

7    was a reference to, Mr. Sechler, your firm's entry into

8    the case, as I was reported, was because the Hogan firm

9    had a conflict of sorts.  And you-- you didn't go into

10   detail about what the conflict was, but there was a

11   reference there that Mr. Moloney's firm was signing on

12   behalf solely of-- on behalf-- on Mylan's behalf in the

13   class plaintiffs case and your firm was signing on the

14   Sanofi complaint.

15           And that reference to a conflict caught my

16   eye, and it caught my eye because I appointed Mr. Fries

17   to be liaison counsel.  And it wasn't clear to me

18   whether the reference to the conflict was one that was

19   limited to the Hogan Lovells firm or it also extended to

20   Mr. Fries.  If it extends to Mr. Fries, it concerns me

21   because he is serving in a liaison role.  So I wanted to

22   raise that.

23           It's a bit of a pop quiz with you all.  And

24   if you're not prepared to address it today, then I get

25   that.  But I do want to make sure that I'm not asleep

1   while sort of an embedded conflict is operating to work

2   there that I ought to address.  So tell me who can

3   address that.  And maybe the looks on your face suggests

4   that I'm out borrowing trouble and this is very easily

5   dealt with.  And hooray for that.

6              MR. MOLONEY:  Your Honor, I would need to

7   speak with Mr. Fries more directly, so I don't believe

8   we're prepared to address that today.

9              JUDGE CRABTREE:  All right.  So what I--

10             MR. BUCHWEITZ:  I think I can address that,

11   Your Honor.  We-- we have no-- Sanofi does not use Mr.

12   Fries, there's no conflict with Mr. Fries or his firm.

13             JUDGE CRABTREE:  All right.  So there is

14   not-- I guess what I want to make sure is I want to--

15   both wings of the Mylan house to consult and file

16   something that tells me whether I need to be concerned

17   about Mr. Fries in his appointment as liaison counsel.

18             I think it's one thing if Mr. Fries simply

19   does not represent Mylan in the Sanofi case.  I think

20   it's another thing if he has a conflict and I've put him

21   in that liaison role.  If it's not a problem, that's

22   great news.  If it is a problem, I've got to figure out

23   what to do.  Make sense to you all?

24             MR. MOLONEY:  It does.  And I'd like to

25   follow up internally.

1          JUDGE CRABTREE:  I get it.

2          MR. MOLONEY:  Just-- we don't want to

3    mislead the Court.

4          JUDGE CRABTREE:  You can tell Mr. Fries he

5    picked a good day not to be here, but if you can get

6    something done on that.  And how about ten days' time?

7    Does that leave you enough time?

8          MR. MOLONEY:  That's more than enough time.

9          JUDGE CRABTREE:  So I'll look for a filing

10   for-- from both sides of the Mylan house on that,

11   explaining the position on that.

12          And then just to address-- Mr. Levin, I

13   think I would like to make sure that the record in the

14   case reflects that your firm is no longer representing

15   Mylan, the Mylan defendants in the Sanofi-- on the

16   Sanofi complaint as opposed to kind of the informal

17   state of affairs we have now.

18          So I would suggest it looks like something--

19   a motion to withdraw in that representation, but you may

20   have a better, simpler solution and I don't mean to

21   foreclose it.

22          MR. LEVIN:  We've never entered an

23   appearance in the Sanofi complaint, so I think that's

24   the elegant solution.  There's nothing to withdraw from.

25          JUDGE CRABTREE:  I guess-- I guess I was

1    thinking of the-- the motion to dismiss.

2              MR. LEVIN:  Was on the class plaintiff-- for

3    the class plaintiff motion to dismiss, that's-- we are

4    on the signature block for that, of course.

5              JUDGE CRABTREE:  Weren't you on the

6    signature block for the motion to dismiss the Sanofi

7    complaint?

8              MR. LEVIN:  We were not.

9              JUDGE CRABTREE:  Oh, it was the other firm.

10             MR. LEVIN:  Correct.

11             JUDGE CRABTREE:  I got it.

12             MR. LEVIN:  It was the New Jersey firm that

13   was the predecessor firm to Robbins, Russell.

14             JUDGE CRABTREE:  And now I'm-- I didn't

15   realize I had commingled those things.  All right.  Then

16   I'll stop worrying about that but watch for your filing

17   to confirm what you've told me today.

18             Listen, on the business of traveling to

19   Kansas City for once monthly status conferences; if you

20   love that idea, that-- you know, give her all the

21   credit.  If you really hate it, I'm the one to blame on

22   that.

23             I'll be really direct about this.  There was

24   a period of time in the case when I saw the number of

25   disputes and some of them were reminiscent to me at

1    least of Doctor Kissinger's comments about faculty

2    politics.

3              I didn't think they were the biggest

4    disputes in the world and I thought it would do counsel

5    good to be in the same hallway, in the courtroom on a

6    more regular basis.  And that's why with Judge James'

7    approval at least I suggested for the short term that we

8    ought to-- we ought to be in the same space together at

9    least once a month.

10             I think-- I hear reports, I read reports

11   about progress being made on a number of issues.  I

12   commend you on that.  I think for the short term I'd

13   like to keep-- keep us on this pattern.  See you again

14   here May 9th at 1:30 for our monthly gathering and hope

15   it produces some more productive movement.

16             MR. DAVIDSON:  Your Honor, Stuart Davidson

17   on behalf of the class plaintiffs.  If I could just be

18   heard on that, and I think I speak on everybody's

19   behalf, that we do appreciate these in-person status

20   conferences.

21             JUDGE CRABTREE:  Well, then credit her.

22             MR. DAVIDSON:  Both of you-- and we do.  And

23   it definitely keeps our feet to the fire and it keeps us

24   moving along.

25             One thing that I have spoken with my

1    colleagues on my side about and with Mr. Levin and Mr.
2    Foster about is right now we have an order usually to
3    provide status reports to Your Honor, three pages,
4    before.  And we think--
5              JUDGE CRABTREE:  A week before, as I recall,
6    is the convention.
7              MR. DAVIDSON:  Correct.  And we believe,
8    subject to Your Honor's approval, that it might be
9    helpful if two days in advance of these status
10   conferences we present to Your Honors a joint agenda, a
11   proposed agenda if you will, that just lays out without
12   any argument just the-- the issues to be decided.  So
13   that we've basically taken all the issues that are in
14   the status reports and listed them.  And we can kind of
15   just check them off as we go during the status
16   conference.
17             JUDGE JAMES:  And so that would be in
18   addition to the status reports so we can--
19             MR. DAVIDSON:  Right.  We would-- we would
20   see each other's status reports and then we'd be able to
21   confer with each other about a one-page, one, two-word
22   lines of what issues are on the table.
23             For example, Your Honor mentioned that the
24   privilege log issue you hadn't seen it in the status
25   reports.  And I conferred with Mr. Buchweitz and it was

1  actually raised in Sanofi's status report and Mylan had

2  issued a-- had included a footnote on the privilege log

3  in their status report.  So I think it would just keep

4  us all able to kind of check off all the issues in the

5  status reports without worrying about missing anything.

6            JUDGE JAMES:  I'm fine with that.  I think

7  that's a good idea.

8            MR. DAVIDSON:  Okay.  Thank you.

9            JUDGE JAMES:  All right.  So we will do

10  that.

11            JUDGE CRABTREE:  So May 9th, and whatever

12  two days is before May 9th.  I think it's the-- I think

13  May 9th is a Wednesday, as I recall it.

14            JUDGE JAMES:  It is, yes.

15            JUDGE CRABTREE:  So I think you would-- I

16  think Judge James would be grateful since she, as you

17  have figured out, does most of the work in this case, if

18  that were-- if that was in her chamber's e-mail account

19  and mine too when-- when we arrive on Monday morning.

20  So if you want to work-- if you want to work through

21  Sunday night on it, that's your choice.

22            But really, I know from experience that she

23  turns to these issues and spends a good part of the 48

24  hours before these gatherings commence on them.  So if

25  you could arrange to do it that way.  I think it's a

1    good suggestion.  Thanks for coming up with it.

2                MR. DAVIDSON:  Of course.

3                JUDGE CRABTREE:  All right.  Anything else

4    from you?

5                JUDGE JAMES:  Not from me.

6                JUDGE CRABTREE:  All right.  Thanks very

7    much.  You had something else?

8                MR. DAVIDSON:  I did, Your Honors, just a

9    point of clarification.

10               JUDGE CRABTREE:  We're that close to a clean

11   getaway.

12               MR. DAVIDSON:  I'm sorry.  And I know people

13   have planes probably to get to, so I will only be about

14   45 minutes or so.

15               JUDGE CRABTREE:  We'll clear out.  You can

16   have all the time you want.

17               MR. DAVIDSON:  I appreciate that.  As long

18   as it's being recorded, I'm good.

19               So getting back to the one issue I think

20   that has been concerning to most of the class

21   plaintiffs, which is the deposition protocol.  And we

22   just wanted a little bit more clarification, which we

23   spoke about during the break and some people just

24   weren't sure exactly where we were on a couple of

25   issues.

1          So the first thing deals with the notice of

2     deposition.  Mr. Levin had said that it was just an

3     informality, if you will, it didn't mean that it was a

4     formal notice of deposition.  My understanding is that

5     was actually-- the notice of deposition of the class

6     plaintiffs was actually filed via ECF either through a

7     certificate of service or the actual notice.

8          So there actually is a formal notice of

9     deposition that is pending, and I just want some

10    clarification as to whether that's been withdrawn in

11    light of the statements made today.

12          MR. LEVIN:  The notice itself is not

13    withdrawn but, of course, the location now has been

14    settled as-- as Kansas City.  And the date and the time

15    we'll meet and confer about and we'll reissue the

16    notices with the dates and times for each witness that

17    we settle on, like we do in a lot of cases.

18          MR. DAVIDSON:  I'm not sure that follows the

19    local rule about us meeting and conferring, so--

20          MR. LEVIN:  To be completely clear; of

21    course we're not expecting your clients to show up on

22    the dates that were noticed as placeholders.  We will

23    meet and confer with the plaintiffs, Your Honor.  We'll

24    agree on dates and times, we'll reissue the notices with

25    the agreed-upon dates and times.

1          JUDGE JAMES: Well, Mr. Levin, that sounds

2    different from what I understood you to say earlier.

3    When you file a notice with the Court, that's different

4    than sending it as I understood you earlier.

5          I expect no more notices to be filed prior

6    to conferring and talking to each other. So I don't

7    want that happening. That's not how we do things in

8    this district. Is that understood?

9          MR. LEVIN: Absolutely, Your Honor, and I

10   apologize.

11          JUDGE JAMES: So those should be withdrawn

12   and you will refile them after you've conferred.

13          MR. LEVIN: Sure. We'll do that.

14          MR. DAVIDSON: Your Honor, moving on. Is

15   there any cap on-- we talked about caps on Mylan

16   witnesses but not on the class plaintiffs' side. So

17   right now there's kind of a disproportionate number of

18   depositions. Right now Mylan is entitled to about 60

19   depositions in this case, they plan on taking every--

20          JUDGE JAMES: Yeah, I don't think that was

21   raised so I have not set any limits. Did I miss that

22   too?

23          MR. DAVIDSON: No. But-- I mean, it was

24   part and parcel of our arguments in the deposition

25   protocol about proportionality. So I think we did raise

1    it throughout that.  We noticed that they had served

2    this notice, that they were seeking 45, 46 depositions

3    of class plaintiffs.  And we were seeking 25 at the time

4    depositions of Mylan witnesses collectively.  And we did

5    note the proportionality concerns.

6              JUDGE JAMES:  Have you all conferred about

7    that, setting a limit on plaintiffs'-- depositions of

8    plaintiffs?

9              MR. DAVIDSON:  I don't know that to be the

10   case, Your Honor.

11             JUDGE JAMES:  All right.

12             MR. TRIPOLITSIOTIS:  It was in one of our

13   original proposals, Your Honor, a cap.

14             JUDGE JAMES:  All right.  Well--

15             MR. DAVIDSON:  That's right, we did.

16             JUDGE JAMES:  -- why don't you all confer

17   about that.  I'm not opposed to setting a limit, but I

18   don't know that I can do that today.  And I'm hoping you

19   all can work it out now that-- now that you have

20   guidance on-- or now that there is an order in effect

21   limiting Mylan-- depositions of Mylan witnesses, maybe

22   you all can agree as far as plaintiffs.

23             MR. DAVIDSON:  I appreciate the guidance,

24   Your Honor.

25             MR. LEVIN:  Your Honor, may I just correct

1    the record?  Their last proposal did not red-line out

2    the number of named plaintiff depositions.  Prior to

3    walking in here, I believe we had agreement that all the

4    plaintiffs would be deposed in this case.  They're all

5    named plaintiffs, they're all parties in the case.  So

6    the defendants' position is that everyone who's a party

7    should be deposed.

8              JUDGE JAMES:  I don't remember that being

9    red-lined in the deposition protocols that I saw, so I'm

10   not sure this has been teed up really.

11             MR. DAVIDSON:  Okay.

12             JUDGE JAMES:  And I mean, if it's an issue

13   and if you all have a dispute, then bring it to me and

14   we'll address it.

15             MR. DAVIDSON:  We'll do so, Your Honor.

16             As far as the-- the order goes requiring

17   class plaintiffs to come to the District of Kansas for

18   that-- for their deposition, will that order also allow

19   the parties to have some wiggle room?  So, for example,

20   if there are a few witnesses or class plaintiffs who are

21   in the Denver area that we could have an agreement that

22   Denver would be a good-- a better hub than--

23             JUDGE JAMES:  Sure.

24             MR. DAVIDSON:  -- Kansas--

25             JUDGE JAMES:  And I thought that I covered

1    that by saying absent a stipulation of the parties or

2    order of the Court.  So, yes, if you all agree on doing

3    some plaintiffs' depositions in other locations,

4    whatever you agree to is fine, if you can agree on

5    something other than coming to Kansas City.

6              MR. DAVIDSON:  And the last question I have

7    for Your Honor is:  Absent an agreement between the

8    class plaintiffs and Sanofi on coordinated Mylan

9    witnesses, is the ruling-- is the Court's ruling that

10   each party will get three-and-a-half hours to-- to

11   depose that witness or is there any other type of time

12   limits that the-- that Your Honor was considering?

13             JUDGE JAMES:  I haven't at this point, no.

14   If that's-- if you perceive an issue is going to arise

15   with that, then bring it back to me.

16             MR. DAVIDSON:  We'll raise it.  Thank you,

17   Your Honor.

18             JUDGE JAMES:  All right.

19             JUDGE CRABTREE:  All right.  Thanks very

20   much for traveling here.  We'll try to get warmer

21   weather for our next gathering.  Safe travels to you

22   all.  We'll be in recess.

23             JUDGE JAMES:  Yes, thank you.

24             (3:47 p.m., proceedings recessed).

25

1                    C E R T I F I C A T E

2

3

4       I, Kelli Stewart, a Certified Shorthand Reporter and

5    the regularly appointed, qualified and acting official

6    reporter of the United States District Court for the

7    District of Kansas, do hereby certify that as such

8    official reporter, I was present at and reported in

9    machine shorthand the above and foregoing proceedings.

10       I further certify that the foregoing transcript,

11    consisting of 90 pages, is a full, true, and correct

12    reproduction of my shorthand notes as reflected by this

13    transcript.

14       SIGNED April 6, 2018.

15

16

17

18            /s/ Kelli Stewart

19            Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25