```
 1                 UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
 2

 3   IN RE:  EPIPEN                      Docket No. 17-md-2785
     (Epinephrine Injection, USP)
 4   Marketing, Sales Practices
     and Antitrust Litigation
 5                                       Kansas City, Kansas
                                         Date:  5/9/2018
 6
     . . . . . . . . . . . . . . . . . . . . . . . . .
 7
                 TRANSCRIPT OF STATUS CONFERENCE
 8
                             BEFORE
 9
             THE HONORABLE DANIEL D. CRABTREE
10           UNITED STATES DISTRICT COURT JUDGE

11              THE HONORABLE TERESA J. JAMES
             UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Class Plaintiffs:

15   Rex A. Sharp                 Gretchen F. Cappio
     Ryan C. Hudson               Keller Rohrback
16   Rex A. Sharp, PA             1201 3rd Avenue
     5301 W. 75th Street          Suite 3200
17   Prairie Village, KS 66208    Seattle, WA 98101

18   Matthew Tripolitsiotis
     Boies, Schiller &
19   Flexner, LLP
     333 Main Street
20   Armonk, NY 10504

21   For Local 282 Welfare Trust Fund Plaintiffs:

22   Stuart A. Davidson
     Brian O. O'Mara - DC
23   Robins Geller Rudman & Dowd LLP
     120 East Palmetto Park Road
24   Suite 500
     Boca Raton, FL 33432

25
```

1    APPEARANCES (continued):

2    For Sanofi-Aventis US, LLC Plaintiffs:

3    Yehuda L. Buchweitz
     Eric S. Hochstadt
4    Weil, Gotshal & Manges, LLP
     767 Fifth Avenue
5    New York, NY 10153

6    For the Mylan Defendants:

7    Brian C. Fries
     James Moloney
8    Lathrop & Gage, L.C.
     2345 Grand Boulevard
9    Suite 2800
     Kansas City, MO 64108
10
     Adam K. Levin
11   David M. Foster
     Kathryn M. Ali
12   Hogan Lovells US LLP
     555 Thirteenth Street, NW
13   Washington, DC 20004

14   Philip A. Sechler
     Robbins, Russell, Englert, Orseck, Untereiner
15    & Sauber LLP
     1801 K Street, N.W.
16   Suite 411L
     Washington, D.C. 20006

17

18   For the King Pharmaceuticals, Inc., Meridian Medical
     Technologies, Inc. and Pfizer Defendants:
19
     Raj Gandesha
20   White & Case LLP
     1221 Avenue of the
21   Americas
     New York, NY 10020
22
     Angel Mitchell
23   Shook, Hardy & Bacon LLP
     2555 Grand Boulevard
24   Kansas City, MO 64108

25

```
 1                  (Court called to order.)

 2              JUDGE CRABTREE:  All right.  We're on the

 3   record in Case No. 17-2785.  This is the In re:  EpiPen

 4   MDL.  Let me just get a little structure for our court

 5   reporter's sanity and for mine, too.  So I'd like to

 6   hear the appearances just to make sure I know where

 7   people are situated.  I'm starting to remember you,

 8   which maybe is good, maybe is bad.  I'm trying to

 9   remember you.

10              So I'm going to start over with the Sanofi

11   lawyers, and let me just ask you to say who you are if

12   you're planning to speak today.  This does not have a

13   preclusive effect.  So if you decide later on you're

14   dying to talk and you didn't stand up now, we'll figure

15   it out.

16              All right.  Mr. Buchweitz.

17              MR. BUCHWEITZ:  Yehuda Buchweitz, Weil,

18   Gotshal & Manges for Sanofi.  Good afternoon, Your

19   Honors.

20              JUDGE CRABTREE:  Good afternoon to the two

21   of you.

22              MR. BUCHWEITZ:  And I plan to speak.

23              MR. HOCHSTADT:  Good afternoon, Your Honors.

24   Eric Hochstadt from Weil, Gotshal & Manges on behalf of

25   Sanofi and I plan to speak.
```

```
 1              JUDGE CRABTREE:  Very well.  And then
 2   continuing with the class plaintiffs.  Mr. Sharp, I
 3   don't know if you're going to talk today but --
 4              MR. SHARP:  Your Honor, I can't help myself.
 5   Rex Sharp on behalf of plaintiffs.  So I probably will
 6   speak but I'm going to let some of these other attorneys
 7   carry the load.
 8              JUDGE CRABTREE:  All right.  Nice to see
 9   you.  And then continuing for the class plaintiffs.
10              MR. O'MARA:  Good afternoon, Your Honors.
11   Brian O'Mara of Robbins Geller Rudman & Dowd on behalf
12   of the plaintiffs.
13              JUDGE CRABTREE:  Good afternoon, Mr. O'Mara.
14              Mr. Davidson, right?
15              MR. DAVIDSON:  How are you this afternoon?
16              JUDGE CRABTREE:  Nice to see you.
17              MR. DAVIDSON:  Nice to see you, too.  Good
18   afternoon, Your Honors.
19              JUDGE JAMES:  Good afternoon.
20              MR. DAVIDSON:  Stuart Davidson from Robbins
21   Geller on behalf of the plaintiffs, and I also plan to
22   speak today.
23              JUDGE CRABTREE:  All right, very well.  And
24   those who didn't get box seats, do any of you plan to
25   speak today?
```

1          MR. TRIPOLITSIOTIS:  Yes, Your Honor.  Matt

2    Tripolitsiotis from Boies, Schiller & Flexner.  I'll

3    probably be speaking very briefly today.

4          JUDGE CRABTREE:  All right.  Good afternoon.

5          MS. CAPPIO:  Good afternoon, Your Honors,

6    Gretchen Freeman Cappio from Keller Rohrback on behalf

7    of class plaintiffs and I intend to speak.

8          JUDGE CRABTREE:  Very well.  Good afternoon.

9    Last call from the right half of the room.

10          All right.  So we'll move and let's start

11    with, of course, the Mylan defendants and I'll let you

12    all choose your sequence and your style.

13          MR. FRIES:  Good afternoon, Your Honors.

14    Brian Fries from Lathrop Gage.

15          JUDGE CRABTREE:  I had you over there a

16    minute ago.

17          MR. FRIES:  Pfizer showed up, so we switched

18    ends of the table.

19          JUDGE CRABTREE:  Try not to take it

20    personally.  Good afternoon, Mr. Fries.

21          MR. SECHLER:  Good afternoon, Your Honor.

22    Phil Sechler from Robbins Russell here on behalf of

23    Mylan.

24          JUDGE CRABTREE:  You were supposed to be

25    there but that -- we'll make this -- we'll make this

```
 1   work.  Good afternoon, Mr. Sechler.

 2              MR. FOSTER:  Good afternoon, Your Honors,

 3   David Foster from Hogan Lovells for Mylan.

 4              JUDGE CRABTREE:  Mr. Foster, good afternoon.

 5              MR. LEVIN:  Good afternoon, Your Honor, Adam

 6   Levin also from Hogan Lovells on behalf of the Mylan

 7   defendants.

 8              JUDGE CRABTREE:  Good afternoon, Mr. Levin.

 9              MR. LEVIN:  Good afternoon.

10              MS. ALI:  Good afternoon, Your Honors, Katie

11   Ali from Hogan Lovells also on behalf of Mylan

12   defendants.

13              JUDGE CRABTREE:  Ms. Ali, good afternoon.

14   And then I --

15              MS. MITCHELL:  Your Honor --

16              JUDGE CRABTREE:  You're the one that

17   rearranged everything.  That's just the scouting report,

18   so have at it.

19              MS. MITCHELL:  I've got to have my moment.

20   So I probably won't be speaking much today, but Angel

21   Mitchell here today on behalf of the Pfizer defendants.

22   And also with me today...

23              MR. GANDESHA:  Raj Gandesha from White &

24   Case.

25              JUDGE CRABTREE:  All right.  Good afternoon
```

1   to the both of you.

2            And you're Mr. Moloney; right?

3            MR. MOLONEY:  Yes, Your Honor, I am.

4            JUDGE CRABTREE:  And you're planning to bite

5   your tongue today?

6            MR. MOLONEY:  I am, yes.

7            JUDGE CRABTREE:  All right.  Fair enough.

8   Thank you all very much.  So here's -- here's what my

9   working plan is for today's conference --

10            First of all, thank you very much for

11   working cooperatively to compose a schedule and get it

12   to us.  It's a great help to us as we try to structure

13   our work in preparation.  So kudos for that.

14            We're simply going to go in the order that

15   you nominated things.  I don't know how you resolved to

16   get it in that order, but you did and so we're going to

17   stick with it, and so we're going to start with the

18   privilege log subject and Judge James is going to lead

19   our work on that front.  So Judge James.

20            JUDGE JAMES:  Thank you.  Good afternoon,

21   everyone.

22            ALL COUNSEL:  Good afternoon.

23            JUDGE JAMES:  Well, I am prepared to discuss

24   with you the proposed privilege log protocols.  I have

25   reviewed all of them, all of the versions I think in

 1   excruciating detail, and it's been fascinating and I
 2   expect to be able to rule today from the bench on what
 3   we're going to do in that regard.  I don't feel like I
 4   need to hear a lot today from counsel on the remaining
 5   issues but I do want to give you all opportunities to
 6   speak and talk to the various issues.
 7           My plan -- I'd kind of like to start off
 8   with the easier -- what I think are the easier parts --
 9   issues with regard to the proposed privilege log
10   protocol and start, if it's all right with all of you,
11   you didn't put it in great detail on the agenda as far
12   as how you wanted to deal with the privilege log
13   protocol, but maybe starting with the e-mail strings
14   issue and how those will be listed on the privilege log.
15   It looks to me like maybe that issue has been resolved.
16           MR. DAVIDSON:  It has, Your Honor.  Stuart
17   Davidson on behalf of the class plaintiffs.  That issue
18   has been resolved recently via e-mail with Mr. Foster,
19   so that can be taken off the --
20           JUDGE JAMES:  Excellent.
21           MR. DAVIDSON:  -- disputed issues.
22           JUDGE JAMES:  Very good.  We always like to
23   hear that.  And is the resolution what is in Mylan's red
24   line, the last version that -- I -- I mean for ease of
25   reference today I think I'm going to be referring to

1   Exhibit D to plaintiffs' May 4th letter.  And I only do

2   that -- I mean, it appears other places, but plaintiffs'

3   May 4th letter attached I think the versions and end up

4   with Exhibit D, which I think is the red line of

5   plaintiffs' last response.

6           MR. FOSTER:  Your Honor, that's correct.

7           JUDGE JAMES:  Okay.  So the string e-mail

8   provision will be as stated in Section 2.2.1.

9           MR. FOSTER:  So, Your Honor, as I understand

10  it, there have been a few additional edits back and

11  forth between the parties, and so we will need to submit

12  a revised red line.  Nothing -- nothing too substantial

13  but some little things that were caught as we went

14  through it.  And Pfizer, by the way, has been involved

15  in this in some detail as well.  So...

16          JUDGE JAMES:  Very good.  All right.  Well,

17  if you don't mind, if, after this hearing later today or

18  by Friday, you could e-mail my chambers that language.

19  I think what I'm going to do, if things go as I think

20  they will today, is we -- my able clerk, Therese

21  Schuele, will put together the final privilege log

22  protocol.  So we'll need your language, to the extent

23  you've agreed to revised language.

24          MR. DAVIDSON:  Not a problem.

25          JUDGE JAMES:  So if one of you would send

1    that by the end of the week, I would appreciate it.

2                MR. FOSTER:  No problem.  Thank you.

3                JUDGE JAMES:  Okay.  Thank you.  Well,

4    that's easy.  Let's keep going in that fashion.

5                The next issue then is this family e-mails

6    or parent-child e-mails, whatever you want to call it.

7    Has there been any resolution to that issue?

8                MR. O'MARA:  No, Your Honor.  It's kind of

9    tied in with the -- the whole categorical issue.

10                JUDGE JAMES:  All right.  Well, maybe we can

11    talk about it initially and this will give you a pretty

12    good idea of where I'm headed.  On the disputed language

13    with regard to family members, which I believe is in

14    Section 2.2.2 of Exhibit D, I think I understand

15    plaintiffs' concerns about the family member proposal.

16                And I'm -- I'm going to suggest to you and

17    ask if your concerns -- plaintiffs' concerns would be

18    alleviated if we added to the language of 2.2.2 adding

19    to the last sentence that "not only the privilege log

20    description shall clearly reflect that the entry relates

21    to more than one document (e.g, e-mail attaching

22    memorandum)," but also add "and shall provide sufficient

23    information to satisfy Federal Rule of Civil Procedure

24    26(b)(5)(A) as to all attachments."  And I've taken that

25    language from the -- what I'll call the *Bair Hugger*

1    language in the privilege log which was attached as

2    Exhibit C to Pfizer's May 4th letter.

3               It seems to me that adding that language

4    should address concerns about the attachments, the

5    plaintiffs' not being able to evaluate whether the

6    attachments should be classified as privileged or not.

7               MR. O'MARA:  And that's at page 4,

8    paragraph F or section F; is that right?

9               JUDGE JAMES:  Are you talking about the *Bair*

10   *Hugger* opinion -- or privilege log?

11              MR. O'MARA:  I believe so.

12              JUDGE JAMES:  Yes, page 4 at the end of

13   paragraph F.

14              MR. O'MARA:  Yes, I think that would satisfy

15   our concerns, Your Honor.

16              JUDGE JAMES:  All right.  Any objection to

17   that from Mylan or Pfizer?

18              MR. FOSTER:  Your Honor, can we have just a

19   moment to confer about this between Mylan and Pfizer?

20              JUDGE JAMES:  Sure.

21              MR. FOSTER:  Your Honor, that will work for

22   us.

23              JUDGE JAMES:  Very good.  All right then.

24   Then we will incorporate into the privilege log --

25   privilege log protocol that's ultimately docketed the

1    additional language I just read into the record at the

2    end of Section 2.2.2 of Exhibit D.

3              Anything further then on the issue of parent

4    or family documents?

5              MR. O'MARA:  Not with respect to that

6    provision, Your Honor.

7              JUDGE JAMES:  All right.  Very good.  Gosh,

8    at this rate we'll be out of here by two o'clock.

9              JUDGE CRABTREE:  I thought it would take a

10   couple hours.

11             JUDGE JAMES:  All right.  Then moving on to

12   the categorical nature of the privilege log that is

13   strongly encouraged by Mylan, obviously that's a

14   significant issue.  I want to broach some questions with

15   regard to that with both sides, and I'll start with

16   Mylan first.

17             I want to be sure, running through some

18   questions with you, that I understand how this would

19   work with your categorical privilege log.  And I'm

20   looking at your example of a categorical log on page 8

21   of Exhibit D to plaintiffs' letter of May 4.  Under

22   Section 2.1 on page 8 you list a column for "senders,

23   recipients and copyees."  Do you see that, Mr. Foster?

24             MR. FOSTER:  Yes.

25             JUDGE JAMES:  Let me ask you a series of

```
 1   questions about how that works.  I think I understand
 2   but I want to make sure that I understand.  Under that
 3   column with regard to -- let's take the example you used
 4   there.  For Category X you would identify each document
 5   that falls within Category X for that six -- or
 6   three-month period it looks like; is that right?
 7              MR. FOSTER:  That one is a three-month
 8   period.  It could be up to six months under the
 9   protocol.
10              JUDGE JAMES:  Okay.  For documents -- for
11   example, under the column senders, recipients and
12   copyees, that could be any sort of e-mail or document,
13   for example, from an employee to in-house counsel?
14              MR. FOSTER:  Correct.
15              JUDGE JAMES:  Or from an employee to
16   out-house counsel --
17              MR. FOSTER:  Correct.
18              JUDGE JAMES:  -- outside counsel.
19              Or it could be any e-mail between in-house
20   and outside counsel?
21              MR. FOSTER:  That's also correct.
22              JUDGE JAMES:  Or it could be an e-mail
23   between an employee and in-house counsel?
24              MR. FOSTER:  That's correct.
25              JUDGE JAMES:  Or it could be an e-mail
```

1    between an employee -- not an employee -- between

2    in-house counsel and a third-party consultant?

3            MR. FOSTER:  If that communication did not

4    break privilege based on applicable law, yes.

5            JUDGE JAMES:  And to the extent you had all

6    of those different scenarios of senders and recipients

7    and they were Category X documents, then they would not

8    be further specified or described, they would be

9    included in the 325 documents withheld under that

10   category; correct?

11           MR. FOSTER:  That is correct, Your Honor.

12   Although I think the point that I would make there is

13   that we view the privilege log as sort of a starting

14   point of a conversation, which is something that

15   Mr. Gandesha -- I said that during a meet and confer

16   that we had and I think it's a very apt way to put it.

17           Because if there are names that raise

18   questions or the plaintiffs have reason to question the

19   privilege log, we of course could provide additional

20   information through more meet and confers and there may

21   be sampling and that type of thing that takes place

22   beyond that.  But for that particular point in time on

23   that initial privilege log, it would be lumped together

24   in a category.

25           JUDGE JAMES:  As your answer seemed to imply

1   initially about one of my questions, you see my concern

2   that I'm telegraphing about an e-mail, for example,

3   between in-house counsel and a consultant and that that

4   might not appear privileged to your friends on

5   plaintiffs' side of the aisle --

6               MR. FOSTER:  That's understandable, Your

7   Honor.

8               JUDGE JAMES:  -- correct?

9               And if all you have is the categorical

10  privilege log as is set out here in your example log,

11  plaintiffs' or any -- or the court, in evaluating any

12  dispute, would not have any record there indicating how

13  many of those documents -- which or how many of those

14  documents are between in-house counsel and a consultant;

15  correct?

16              MR. FOSTER:  That's correct, Your Honor.

17  And I think this is -- this is a -- something that, as

18  we have said throughout the meet and confer process, we

19  are open to considering ways to modify this to make it

20  work for all the parties.  And so if there's a way to

21  create a subcategory that would have, you know, sort of

22  like how we've broken the privilege log up by months,

23  right, so there would be six-month periods.  Originally

24  that was not in our first draft.  The plaintiffs

25  expressed the concern about the length of time.  And so

1   we tried to address that by shrinking the amount of time

2   down to six months.

3           I think this is another example of something

4   that would be relatively easy for us to break out into

5   different subcategory entries or maybe even just make

6   them -- make a rule that the categories can't include

7   any third parties at all.  So either one of those

8   solutions I think could address that issue.

9           JUDGE JAMES:  Has that possibly been

10  discussed -- have you conferred about that?

11          MR. FOSTER:  It -- I don't believe it has,

12  Your Honor.

13          MR. DAVIDSON:  The answer to that is no.

14  Respectfully, the -- we have a fundamental concern,

15  which I don't want to get into just yet unless Your

16  Honor wants to hear from me, about this idea in general.

17          A category is not a description of a

18  document in detail.  Just isn't.  And this would become

19  a side show and we would have, as Mylan has complained

20  on other -- in other circumstances, a -- us taking

21  discovery on discovery problem because they will present

22  to us a category with 325 documents with a myriad of

23  people in different roles on this category.  And I can

24  tell you right now we would say that doesn't provide us

25  enough information to even determine whether the

1  assertion privilege was correct, and so you need to give
2  us more information.
3          I think we're -- we need to remove that step
4  because it doesn't make any practical sense.  I
5  understand that there are cases -- there may be special
6  cases in which a categorical log may be appropriate.
7  This is not one of them.
8          And if you look at the category -- the 25
9  categories they have listed, the vast majority go to the
10 seminal issues in this case from EpiPen pricing to
11 EpiPen4Schools to the citizen petition to EpiPen
12 marketing.  And if they have a category, just think
13 about it, practically speaking --
14         JUDGE JAMES:  I'm on your point.  I'm on
15 your point.
16         MR. DAVIDSON:  So I don't want to -- but
17 that's our concern.  So the answer is we haven't had
18 this meet and confer because we have a problem with the
19 idea in general.
20         JUDGE JAMES:  All right.  And, Mr. Foster,
21 have you -- has Mylan to-date been segregating
22 attorney-client privilege for work product documents by
23 the categories you've listed?
24         MR. FOSTER:  We are in the process of doing
25 that, Your Honor.  So the answer to that is yes.

1          JUDGE JAMES:  All right.  And so given that,

2   let's take a couple of them.  How many documents have

3   you identified to-date that would be in Category 12?

4          MR. FOSTER:  Your Honor, I do not know -- I

5   would have to check the answer to that question.

6          JUDGE JAMES:  Do you have that information

7   here?

8          MR. FOSTER:  I could -- I could consult with

9   someone to get that information.  I think our -- the

10  process that we've used here, Your Honor, is, as we did

11  our document review to make our substantial completion

12  production on April 30th, we obviously set privilege

13  documents aside and then have gone back -- started going

14  back through those for privilege logging purposes.  And

15  so we are several thousand documents through that

16  process but it's -- it's in its beginning stages still

17  so -- not at the beginning stages but roughly 10,000

18  documents or so that have been looked at.  So I could

19  find out the answer.

20          JUDGE JAMES:  Do you have any idea how many

21  documents are in any of these categories you've listed?

22          MR. FOSTER:  I could -- I don't want to

23  speak off the cuff about that but I could provide that

24  information to you.

25          JUDGE JAMES:  All right.  Let me be clear on

1   what you are attempting to accomplish.  Now -- go ahead.

2            MR. FOSTER:  I realize you may have been

3   asking something different than what I thought you were

4   asking.  If your question is about specific categories,

5   that I -- I don't know the answer standing here as to

6   specific categories.  But overall as to documents that

7   fit within a category, it's a very high number of

8   documents.  It's something like 90 percent of the

9   documents fit in one or more categories so far.

10           JUDGE JAMES:  So I guess what I'm trying to

11  get at is, as to the categories you've listed, are we

12  talking about hundreds or thousands or 10,000 documents

13  under certain categories?

14           MR. FOSTER:  I think there could be

15  thousands of documents in those categories, Your Honor,

16  yes.  Of course part --

17           JUDGE JAMES:  You understand plaintiffs'

18  concern about that then when all they have is a general

19  category description and a date range and a whole series

20  of senders and receivers and copyees and 5,000

21  documents?

22           How do you, if you're a third party or the

23  court trying to evaluate a concern or a question about

24  whether there's a privilege, how do you do that when you

25  don't have specific information, you don't know which

1  documents are -- involve a third party or involve an

2  outside consultant?

3              MR. FOSTER:  Right.  So as to the third

4  party question, I think that's an easy problem to solve

5  through modifying the protocol to make those documents

6  be broken out separately.  I think that there should be

7  few enough of those documents on the log that those

8  could be added to the individual log.

9              In terms of sort of the overall process and

10  the way that this would work -- and I -- I hear

11  plaintiffs' overall concern is how are we going to

12  dispute the privilege log entries if they're logged

13  categorically.  And there's a very good answer to that

14  question in a recent case that took place in this court.

15              In fact, if you look at the class

16  plaintiffs' brief -- I'm sorry, not their brief but

17  their status report, at the top of page 2 the class

18  plaintiffs cited to the *Syngenta* case.  And it was kind

19  of a curious cite that was in the class plaintiffs'

20  status report because it cited not to an order of the

21  court or an opinion by a judge but to the plaintiffs'

22  motion to compel in that case.

23              And what the class plaintiffs said about

24  that was that this shows this would create a side show.

25  And we tried to look at that motion to compel and we

1    couldn't find it.  And the reason we couldn't find it
2    was because that document is on the docket under seal.
3    So we have no idea what that brief says.
4              But what we could find, Your Honor, was the
5    order that Magistrate Judge O'Hara issued in response to
6    that motion to compel.  And I have a copy of that order
7    with me which I would like to distribute to the room if
8    I could have the court's indulgence.
9              JUDGE JAMES:  And what is the docket number
10   on that order?
11             MR. FOSTER:  The docket number of the order
12   is oddly not printed on top of my order that I have, but
13   it was entered on May 5th, 2017.  So just about one year
14   ago in the *Syngenta MDL*.  And I have the number for that
15   if you like.  It's the -- the -- it's MDL No. 2591, Case
16   No. 14-md-2591.
17             JUDGE JAMES:  Yeah, you can go ahead and
18   distribute that if you'd like.  I think I've reviewed
19   that.  And but if you give me a copy, I'll take a look
20   at it again.
21             MR. FOSTER:  Okay.  Sure.  Your Honor, the
22   relevant portion of this opinion is on page 3, and I've
23   highlighted the relevant language here.
24             What Magistrate Judge O'Hara says here is
25   that a categorical log -- of course, *Syngenta* was a huge

1    case with tons of documents much like this one.  It

2    says, "The categorical log was a commendable approach in

3    cases like this involving a large number of documents."

4    And Magistrate Judge O'Hara goes on to say, "The

5    categorical privilege assertions are, without a doubt, a

6    useful starting point to decrease discovery burden and

7    expense and to focus the parties' attention on what

8    documents truly need to be reviewed by attorney eyes."

9           And so to understand what Magistrate Judge

10   O'Hara meant by that, I think we need to put this order

11   in context.  What had happened in the *Syngenta* case was

12   that the parties agreed to a categorical log in the

13   first place.  And the plaintiffs then disputed some of

14   the log entries.

15          Meet and confers took place.  The parties

16   exchanged additional information about the documents.

17   And ultimately what happened was the dispute boiled down

18   to a dispute about 441 documents.  The court looked at

19   that dispute and said I have time to review 10 percent

20   of these.  And then Magistrate Judge O'Hara told the

21   parties go figure out which 10 percent you can review so

22   that they could be exemplar documents that will enable

23   the parties to understand what my ruling is as to

24   everything.

25          So presumably Magistrate Judge O'Hara

1   reviewed about, you know, 40 -- 40-something documents

2   and disseminated the information that way and that

3   resolved the privilege dispute.  Now --

4            JUDGE JAMES:  Do you know, Mr. Foster --

5   sorry, I didn't mean to interrupt you.  Do you know how

6   many categories there were in the categorical log?

7            MR. FOSTER:  I do not know that, Your Honor.

8            JUDGE JAMES:  Yeah, I couldn't find that

9   either and I'm wondering whether or how analogous that

10  *Syngenta* case is to this case.  I mean, there the

11  parties agreed to a categorical log.  Here you haven't

12  been able to get an agreement.  And here you have 25

13  listed categories.  I'm wondering whether there were

14  that many in the *Syngenta* case and whether it was a more

15  manageable number that both sides could agree to.  I

16  don't know the answer to that.  If you know the answer

17  to that, that might be helpful.

18           MR. FOSTER:  I don't, Your Honor.  But I

19  think you could envision ways of moving a dispute about

20  categories forward.  For example, if there are

21  particular people whose names show up that the

22  plaintiffs are interested in, we could do an individual

23  log for a subset of those documents.  We could do a

24  random sampling of documents.  There are all kinds of

25  ways to move this forward that would involve less burden

 1   on the parties than simply logging tens of thousands of

 2   documents.  And --

 3              JUDGE JAMES:  And why weren't these things

 4   discussed before we got here to court?

 5              MR. FOSTER:  Well, Your Honor, I think the

 6   plaintiffs' position, as Mr. Davidson said before, is

 7   that categorical logging is not appropriate in any event

 8   and we disagree with that.  And so I think we reached

 9   the point we were at an impasse about this because the

10   plaintiffs wouldn't engage with us on these particular

11   entries.

12              JUDGE JAMES:  All right.  I'm coming to you,

13   Mr. Davidson, in a few minutes.

14              MR. DAVIDSON:  No problem.  Okay.  Then I

15   will rest my legs.

16              JUDGE CRABTREE:  I think that's what she

17   meant.

18              MR. DAVIDSON:  I know.

19              MR. FOSTER:  So may I just add one more

20   point about the practicality of a privilege dispute and

21   a privilege review.  So, as we mention in our brief, one

22   of the -- one of the courts that has adopted categorical

23   logging as a presumptive appropriate choice is the

24   Southern District of New York, which, of course, is no

25   stranger to big, complex cases.

1           And the Southern District of New York

2    Advisory Committee comments that the -- one of the

3    reasons why they want to use categorical logs

4    presumptively is not only that they're expensive to the

5    parties but that the documents -- a document-by-document

6    privilege log in a big case is not really informative --

7    this is a quote, "It's not really informative to

8    opposing counsel and the court."

9           And I think this case perfectly illustrates

10   why that's the case.  If you look at Pfizer's brief,

11   Pfizer says that at present they're between 17,000 and

12   and 31,000 documents on their privilege queue for -- for

13   potential privilege logging based on where things are

14   currently.  And I can tell you Mylan is in roughly the

15   same ballpark as that based on our review.

16          And so if you imagine what the privilege log

17   like that would look like -- and I realize the family

18   ruling you just made may shrink it somewhat -- but if

19   you have a privilege log with 15 entries per page and

20   31,000 entries, that is a 2,000 page long privilege log.

21   And if you picture four reams of copier paper, that's

22   literally what you're talking about is an enormous log,

23   which, frankly, in my view, would not be useful to

24   anyone.  It certainly is not going to streamline the

25   litigation.

 1                Whereas if we provide categories and use

 2     random sampling and other targeted ways to discuss this,

 3     I think you could end up with an outcome like what

 4     happened in *Syngenta* where the parties are able to focus

 5     down the issues that they're talking about on privilege

 6     to the relevant documents that really matter.  Just like

 7     Judge O'Hara said, "Categorical privilege assertions

 8     are, without a doubt, a useful starting point to

 9     decrease discovery burden and expense and to focus the

10     parties' attention on what documents truly need to be

11     reviewed by attorney eyes."

12                JUDGE JAMES:  Let me ask you if another way

13     to pare this down would be to limit the number of

14     categories that are treated categorically in your

15     privilege log?

16                MR. FOSTER:  It absolutely would, Your

17     Honor.  I think --

18                JUDGE JAMES:  And let me ask you this --

19     sorry, I keep interrupting you.  I'm anxious.

20                MR. FOSTER:  No.

21                JUDGE JAMES:  I'm wondering to myself -- in

22     looking at your long list of categories you've proposed,

23     I wonder whether there are any discovery topics for this

24     case that you know of that aren't included in one of the

25     categories that you're proposing.

1           MR. FOSTER:  I would have to think about

2    that, Your Honor.  Our intent was -- was to -- was to

3    cover the landscape to the best of our ability and, you

4    know, in looking at what discovery requests were out

5    there and just thinking about the categories of

6    documents that are likely to exist.  So I'm not aware

7    off the top of my head of something, but it's certainly

8    possible.

9           JUDGE JAMES:  And would you agree with me

10   that in this case and with the subject matter of this

11   case there could be a number of e-mails or documents

12   listed in the privilege log that there would be a debate

13   over whether they are -- should really be classified as

14   privileged or instead are business advice that would not

15   be privileged -- a privileged communication?

16          MR. FOSTER:  Your Honor, yes.  I think in

17   any case like this that's one of the hardest privilege

18   issues that lawyers face is to define what the

19   difference is between, you know, a business -- piece of

20   business advice and a piece of legal advice because the

21   line can be pretty blurry there.

22          But what I will say about that is I think

23   there's -- I don't understand, and the plaintiffs

24   haven't explained this to me, how a categorical log is

25   any worse than a traditional privilege log in terms of

```
 1    sussing that type of thing out.

 2              And, for example, what a categorical log

 3    will have on it is a description of the type of

 4    documents, it will have the senders and recipients,

 5    although in categorical fashion.  An individual

 6    document-by-document entry would have a similar

 7    description and similar types of information.

 8              And so I think the question isn't are we

 9    going to really take this type of privilege issue

10    seriously because I think all the lawyers here will.

11    And, of course, in creating a log we have professional

12    obligations to only withhold documents that we, in our

13    good faith judgment as -- as officers of the court,

14    believe to be privileged, right.

15              JUDGE JAMES:  Right.  And I'm not doubting

16    your good faith.

17              MR. FOSTER:  Of course.

18              JUDGE JAMES:  But what I am raising is that

19    to me it seems this case is especially apt to disputes

20    over what's attorney-client privilege or work product

21    versus what is business advice or communications that

22    aren't privileged.

23              MR. FOSTER:  And so I think -- I think those

24    are -- I think you've put your finger on what I think

25    the privilege disputes in this case are likely to be.
```

1   And I think the question then becomes what is the most
2   efficient way for the court and the parties to achieve a
3   speedy, just, inexpensive resolution of the case.  And
4   what I would submit, Your Honor, is that a privilege log
5   that is 2,000 pages long and goes through 30,000
6   documents is not going to be speedy.  It's not going to
7   be inexpensive certainly.
8            However, a categorical log, as happened in
9   *Syngenta*, is a way to focus down, right, and maybe that
10  we can create a categorical log.  And the class
11  plaintiffs look at the log and say, well, we don't
12  really care about these 15 now that we see the
13  categorical log.  But this one we're really concerned
14  about.
15           And then if that's the case, then I think
16  it's a completely different discussion if we're talking
17  about, okay, well, maybe we'll generate a sample of a
18  hundred or 500 documents from that log or documents that
19  have this custodian on them or this copyee.  And that
20  can streamline the dispute and we can just handle it
21  that way as opposed to just sort of the brute force of
22  that initial 2,000 -- 2,000-page long log.
23           JUDGE JAMES:  All right.  Let me move from
24  the general to the specific, and I have a question about
25  one of your specific categories -- or several of your

1    specific categories of privileged items.  And if you'll

2    look at, for example, Item No. 1 on your list on page 21

3    of Exhibit D --

4              MR. FOSTER:  Yeah.

5              JUDGE JAMES:  -- attorney-client

6    communications or attorney work product concerning the

7    *King Pharm, Inc., et all v. Teva* case, patent

8    litigation, can you -- can you help me out here?  Then

9    if I look at No. 4 on your list it's the same thing but

10   limited to those documents concerning settlement of that

11   case.

12             MR. FOSTER:  Correct.

13             JUDGE JAMES:  Isn't four just a subset of

14   one?  And, if so, why do you list them both?

15             MR. FOSTER:  Four is intended to be a subset

16   of one.  And I think -- the instructions here I think

17   would be -- and the way that this would work is that the

18   documents would be listed in each category to which they

19   apply.

20             So, in other words, if -- if a document fits

21   in five different categories, it would be hard for us as

22   attorneys to think, well, which one of these will we use

23   as a description.  We should use all of them because it

24   provides the most information I think about -- about

25   that document and how many documents fit in each

1    category.  So ultimately at the end of the day there

2    would be some documents that would be in multiple

3    categories.  And so --

4            JUDGE JAMES:  So why would you even include

5    a separate category for those limited to the settlement?

6    Is there something I'm missing there?

7            MR. FOSTER:  Well, honestly, Your Honor, it

8    was -- we included that in order to provide more

9    information to the plaintiffs.  The original draft I

10   think that we were kicking around had just the

11   litigation.  And then we thought, well, what we -- we

12   want to provide them a meaningful log that -- and the

13   settlement, of course, of the litigation is really the

14   crux of what's at issue about that litigation in this

15   case, right, the allegation being that the settlement

16   was anticompetitive.  And so if we're able to give them

17   a more narrow set of documents for that, it should help

18   them make -- it should make this a more meaningful

19   process.

20           Now, we could also do a carve-out, right,

21   for documents that were -- you know, to carve all those

22   documents out of the other category.  That would be very

23   easy to do.

24           JUDGE JAMES:  All right.  All right.  Well,

25   I understand Mylan's position.  Does Pfizer want to

 1    speak separately to the categorical privilege log

 2    question?

 3              MR. GANDESHA:  No, Your Honor.  I don't

 4    think we have a separate perspective.  I think

 5    Mr. Foster has spoken well for both defendants.

 6              JUDGE JAMES:  All right.  Okay.  Thank you,

 7    Mr. Foster.

 8              MR. FOSTER:  Yeah.

 9              JUDGE JAMES:  And it's good to have Pfizer

10    involved here.  Thank you for your -- thank you for your

11    brief.

12              All right.  Mr. Davidson, it's your turn.

13              MR. DAVIDSON:  Thank you, Your Honor.

14              JUDGE JAMES:  And let me direct you with

15    questions as well.

16              MR. DAVIDSON:  Please.

17              JUDGE JAMES:  I think class plaintiffs have

18    taken a strict line one way just as Mylan has the other

19    way, and that is you've strictly refused to consider any

20    categorical privilege log categories; is that correct?

21              MR. DAVIDSON:  That is correct.  I think --

22              JUDGE JAMES:  And would you -- would you

23    agree with me that -- well, I'll just ask you:  Are

24    there any of the 25 categories that -- that Mylan has

25    listed that you would agree would be proper, sufficient

1   and detailed enough that you could work with them in

2   terms of a privilege log?

3               MR. DAVIDSON:  So I was speaking with

4   Mr. Buchweitz and Mr. Hochstadt earlier today about

5   this, and I would point out at the outset that, you know

6   -- let me see.  So Sanofi has produced 437,000

7   documents.  Mylan has produced about 270,000 documents,

8   so heck of a lot more.  And Sanofi doesn't think it's

9   overly burdensome to log these documents individually

10  and I think that's important.

11              And I had thought -- and, Raj, you can

12  correct me if I'm wrong, but I thought that in a

13  discussion I had with Mr. Gandesha that he indicated

14  that of the between the 17,000 to 33,000 privileged

15  documents that they were -- that Pfizer was not opposed

16  to putting them on an individual log.  So but I don't

17  want to misstate our conversation.  So...

18              JUDGE JAMES:  Yeah, go ahead.  Go ahead.

19              MR. GANDESHA:  You're right, we're not

20  opposed to it.  Obviously if the court orders us to do

21  it, we'll do it.  And, I mean, I think ultimately what

22  Mr. Foster was indicating is that for certain categories

23  that may be where we end up.

24              But we do support the principle of allowing

25  the parties the option to use categories as a way of

1   initiating and providing initial information to the

2   other side in order to structure a discussion targeted

3   to specific documents that are -- that are most of

4   interest.

5          But we, of course, as we do in all cases, if

6   we -- if, you know, where we end up is providing

7   individual document-by-document entries, that's what

8   we'll do.

9          JUDGE JAMES:  Thanks.

10          MR. DAVIDSON:  So I think it's important for

11   the court -- and just on a slight tangent is that Mylan

12   keeps saying we produced 3 million pages of documents

13   and this is so burdensome.  You don't log pages, Your

14   Honor.  You log documents.  So let's kind of move away

15   from the number of pages that have been produced and

16   focus on the number of documents.  I think that would be

17   appropriate.

18          JUDGE JAMES:  So the answer to my question?

19          MR. DAVIDSON:  Is that there are -- we

20   looked -- we talked today and there are three that we

21   thought would be -- could be appropriate.

22          JUDGE JAMES:  Okay.  And what are those?

23          MR. DAVIDSON:  Numbers 21, 22 and 23.  And,

24   Your Honor, I would point out that one category that the

25   plaintiffs did already agree to was post-litigation

1   materials that be --

2           JUDGE JAMES:  Right.

3           MR. DAVIDSON:  -- lumped together.  So

4   that's our --

5           JUDGE JAMES:  I think it's pretty much a

6   given in all these cases; right?  Yeah.  I appreciate

7   that.  That's fine.  All right.

8           MR. DAVIDSON:  So those three, Your Honor,

9   we looked at and found during our discussions that those

10  were not categories that were so inextricably

11  intertwined with the merits of the case that perhaps

12  those might be appropriate categories.  But -- and I

13  think that is probably a distinction.  And I say

14  probably because I haven't seen the privilege protocol

15  in *Syngenta* either.  But there was an agreement, which

16  is not what we have here.  I cannot imagine that in

17  *Syngenta* the documents that there was a privilege log --

18  there needed to be a privilege log were inextricably

19  intertwined with the merits of the case like this.

20          These litigations, I get it.  Most

21  litigations there's going to be privileged materials.

22  But it's our allegation that these settlements were

23  essentially collusive to try to block competitors.

24  So -- which is a business question, not a legal

25  question.

1           So the -- while I can see facially why you

2    might want a category of litigation when -- when it's so

3    ingrained with the merits of this case and the discovery

4    that we are seeking here, we need what Judge Sebelius

5    said in *Kannaday versus Ball*, which is you need a

6    detailed description of the documents, not a description

7    of a category.  And now we're hearing that, well, if a

8    document falls into one or more categories, we're going

9    to lump them all in together.  And what does that do for

10   us and what does that do for the court?

11          So I think that if the court follows the --

12   the *Kannaday* principle from Judge Sebelius that they

13   have an evidentiary burden to prove before they log this

14   on the privilege log that this document is, in fact,

15   privileged, there's a lot of items of information that

16   need to be included.

17          And Your Honor cited to -- or was looking at

18   the *Bair Hugger* decision.  And one of the items of

19   metadata that was required was the subject of the

20   document.  And usually for e-mails the subject is what's

21   in the subject line, right.

22          JUDGE JAMES:  Well, Mr. Davidson, let me ask

23   you -- again I'm interrupting you too, so I'm fair to

24   both sides.

25          MR. DAVIDSON:  You're the judge.

1              JUDGE JAMES:  You didn't object though, you

2    being class plaintiffs, did you, to the -- to the topics

3    except -- except for wanting parent members identified,

4    you didn't object -- add things to the list of what's

5    supposed to be included in the privilege log, did you,

6    or am I missing something?

7              MR. DAVIDSON:  Are you talking about 2.2.1?

8              JUDGE JAMES:  Yes.

9              MR. DAVIDSON:  Right, that is correct.  And

10   if Your Honor looks on the end of 2.2.1, it talks about

11   a brief description of the subject matter of the

12   document.  And the title of the document -- or the

13   subject/re line, right, those are -- how do we get that

14   from a -- a category description?

15             JUDGE JAMES:  Oh, I see what you're saying.

16   Are you suggesting that should be in the categorical

17   privilege log?

18             MR. DAVIDSON:  I'm saying that you can't do

19   a categorical privilege log and include that

20   information.

21             JUDGE JAMES:  All right.  But all sides are

22   agreeing to -- that all of these items being included in

23   the privilege log as to the document-by-document

24   production --

25             MR. DAVIDSON:  Yes.

```
 1                 JUDGE JAMES:  -- correct?

 2                 MR. DAVIDSON:  I believe so.

 3                 JUDGE JAMES:  And you're not suggesting

 4     there should be anything more than what is included

 5     there; correct?

 6                 MR. DAVIDSON:  No.

 7                 JUDGE JAMES:  Okay.  Very good.  Let me ask

 8     you one other question while I'm thinking about it.  On

 9     2.2.1 there's been this kind of back and forth where I

10     think class plaintiffs keep putting back in

11     identification of parent documents and Mylan takes it

12     out.

13                 And my question is it looks like that's in

14     -- well, in (c) above that family relationship Mylan

15     puts parenthetically identification of parent e-mails

16     and all attachments.  So can you explain to me why

17     plaintiffs continue to put in identification of parent

18     document when it appears to be included?

19                 MR. DAVIDSON:  I think we can have one

20     without the other, Your Honor, so...

21                 JUDGE JAMES:  Okay.  So you're agreeing that

22     identification of parent document could be taken out?

23                 MR. DAVIDSON:  As long as it's included in

24     the prior one, yes.

25                 JUDGE JAMES:  Okay.  Let me ask you further
```

1    on this issue about what categories plaintiffs might be

2    willing to agree to on a categorical log.  In one of

3    your communications -- and, I'm sorry, I can't tell you

4    which one -- you indicated -- actually, it was an April

5    11th e-mail to Mylan attorneys that you were willing to

6    discuss with defendants a very narrow list of document

7    types related to patent litigation that may be

8    categorized.

9              MR. DAVIDSON:  Sure.

10             JUDGE JAMES:  Do Items 1 through 6 --

11             MR. DAVIDSON:  So what we were --

12             JUDGE JAMES:   -- not constitute such items?

13             MR. DAVIDSON:  Not as what we were

14   considering.  What we were considering was e-mails with

15   outside counsel concerning drafts of pleadings, that was

16   what we were going to be willing to consider but it was

17   nothing broader than that.

18             JUDGE JAMES:  All right.  So anything

19   other -- that you were considering other than those

20   three items you already identified for me?

21             MR. DAVIDSON:  No, Your Honor.

22             JUDGE JAMES:  All right.  Well, I guess I

23   kind of have to be critical of both sides here for not

24   negotiating before today, you know, not focusing in on

25   certain categories before we got here today.  It sounds

1   like both sides kind of want to have further discussions
2   but we all know we need to move things along here, and
3   so I'm -- I'm not sure why these variations weren't
4   discussed previously.
5           As for class plaintiffs, why -- why the
6   refusal to discuss certain categories that might be
7   acceptable or limitations on those categories?
8           MR. DAVIDSON:  Because, Your Honor, frankly,
9   they -- when we took them out, they took put them all --
10  they put them all back in.  And so we felt like there
11  was a -- that Mylan was going to come in and make the
12  argument that, well, plaintiffs agreed to the concept of
13  categories and therefore all -- the entire notion of a
14  categorical privilege log was therefore fair game.  And
15  I just have a fundamental problem with that in this
16  case.  I'm not saying that it's not appropriate in some
17  cases, but in this case I have that problem.
18          And I just don't think that it is practical
19  to say here's -- to go back to Mr. Foster and say, okay,
20  you gave us a category -- you gave us a batch of
21  documents that are lumped into four different
22  categories.  All we know are the broad group of senders,
23  receivers, recipients, et cetera, and the types -- and
24  multiple different types of documents and we need more
25  information on that entitle -- entire category.  That

1    doesn't make any sense to me.

2            You get -- when you challenge privilege --

3    privilege claims, you look at the senders and the

4    recipients and you look at the type -- the subject

5    matter of that document.  And I don't think that that is

6    in this case going -- a workable solution.

7            So I apologize for not going to Mr. Foster

8    and saying we have these three that we would agree to.

9    Quite frankly, that was just something I agreed to with

10   Mr. Buchweitz this morning.  I said, "Are there anything

11   you would consider?"  And we looked at these three and

12   we said, "These ones might work."  But so I -- until

13   today I hadn't been willing to agree to it.

14           JUDGE JAMES:  All right.  Thank you.

15   Mr. Buchweitz or --

16           MR. BUCKWEITZ:  Just very briefly, Your

17   Honor.  You know, I think you know my main concern here,

18   which is moving everything along and continuing.  It's

19   been the same since we got here last year.  You know, we

20   need to keep this case moving despite Mylan's best

21   efforts to the contrary.  We're trying to get into

22   depositions.  You know, we need to get this -- this --

23   this progress -- this process started.

24           On the categories themselves, the vast

25   majority of these categories have nothing to do with our

1    case.  A lot of them are really irrelevant.  The ones

2    that I'm most concerned about that I'm most focused on,

3    frankly, you hit the first one right on the head when

4    you said it, there's no way we can agree to Category 12.

5    I mean, it's absurd.  Attorney-client communication

6    concerning the pricing of EpiPen.  We'll never be able

7    to agree to that.  I can give you a number that -- you

8    know, that we would never agree to.  Everything else for

9    us, frankly, would be on the table.  But a lot of it's

10   totally irrelevant to our case and it's really more

11   their call.

12            We would -- we think that it's -- would be

13   inappropriate to have categories for 12, 13, 14, 16, 17,

14   20 and 24.

15            JUDGE JAMES:  All right.  Thank you.

16            MR. BUCHWEITZ:  Thank you.

17            JUDGE JAMES:  All right.  I'll give Mylan

18   one last -- any further response, Mr. Foster?

19            MR. FOSTER:  Yes, Your Honor.  I think one

20   thing I'd like to push back on somewhat is the refrain,

21   first of all, that Mylan has been delaying the case,

22   which we hear over -- every time Sanofi says anything

23   they talk about you how Mylan is delaying the case.

24            It's just not true.  We have been working

25   extremely hard.  We have proposed actually the earliest

1   deadline of anyone for the privilege log.  You'll note

2   in our brief we proposed a May 31st deadline that we

3   think with the categorical approach we can get it done

4   by then.  We want to keep the case moving.

5          They asked us for depositions in May before

6   -- when they knew the privilege logs would not be

7   finished because their proposed deadline was June 1st.

8   And, frankly, the idea that we're trying to delay

9   depositions or do any sort of improper delay is really

10  just way off the mark.

11         Another point that was made, Mr. Davidson

12  mentioned that Mylan had produced fewer documents than

13  Sanofi, and I need to correct the record on that as

14  well.  In fact, the parties -- Mylan and Sanofi did one

15  thing different in the way they produced their documents

16  and that is that Mylan did not extract embedded files

17  when it produced documents.  We informed all the parties

18  that we didn't extract embedded files.  Sanofi did that,

19  which is fine.  But the result of that is that a lot of

20  meaningless little bits of information gets sort of

21  spooled out into separate documents.

22         If you -- if you subtract the number of

23  embedded files within their production, we're about

24  10,000 documents of each other in terms of production.

25  So this idea that Sanofi is willing to do all this stuff

17-md-2785    In re: EpiPen    5.9.2018          44

1    that Mylan isn't is just not -- we just have to correct

2    the record on that.

3          And I -- and I also -- you know, we would

4    have loved to have met and conferred, frankly, about

5    these categories.  Our main interest here is moving the

6    case along, having a privilege log that's meaningful

7    that we can have further discussions based on and --

8    and, frankly, that saves us cost, right.

9          The privilege log entries -- we actually did

10   an experiment in our firm where we did a sample

11   privilege log that didn't involve looking at any

12   documents.  It was just basically taking the initial

13   privilege calls at face value, spitting out the data

14   from our database and having our attorneys do the work

15   that's required to sort of make the log look right and

16   make sure the entries made sense on their face without

17   even checking because we're going to do the same

18   checking no matter whether we have a categorical log or

19   not.

20          And the result of that, Your Honor, was that

21   our estimate is that the cost to Mylan of doing a

22   categorical log -- sorry -- of doing a

23   document-by-document log as opposed to doing the hybrid

24   categorical approach that we've proposed is on the order

25   of $350,000.  That is real money to Mylan.  And,

1   frankly, in our point of view, the output of that

2   process is no more useful to the plaintiffs.  It's

3   certainly more burdensome to Mylan but it's not more

4   useful to the plaintiffs.  Because what we will do is

5   create a log that's focused that allows for disputes to

6   be raised efficiently just as happened in *Syngenta*.

7            JUDGE JAMES:  All right.  Thank you.  All

8   right.  We will take a break later and then I'll come

9   back and issue my ruling on the privilege log protocol.

10           JUDGE CRABTREE:  Very well.  Let's move to

11  Item 2 on your agenda, let me just check.  We'll take a

12  break here, give the court reporter a chance to rest her

13  hands and brain, but let's try to knock out some of

14  these other topics which I hope are not one-hour

15  projects.

16           So Item 2 is the scheduling of the Mylan and

17  plaintiffs' -- class plaintiff depositions.  Let me

18  start on class plaintiff front, the scheduling of those

19  depositions.  I didn't see much on that front that was

20  really ripe for me to do anything.

21           MR. TRIPOLITSIOTIS:  I don't think there is,

22  Your Honor.  We scheduled 28 depositions.  There's 15

23  more.  We're waiting -- we're working with the other

24  side.  And three plaintiffs will be withdrawing from the

25  case.  So everything has been moving along.

```
 1              JUDGE CRABTREE:  You have more you want to
 2   say on that from this other --
 3              MR. LEVIN:  No.  I agree with what he said.
 4              JUDGE CRABTREE:  Perfect.  Let's then go to
 5   what seems to be mostly a Sanofi beef with the process
 6   and progress or lack of progress of scheduling
 7   depositions of Mylan representatives.  I've read what
 8   each side has submitted on this.  Have there been any
 9   new developments, Mr. Buchweitz, since you submitted
10   your report?
11              MR. BUCHWEITZ:  The afternoon after we
12   submitted our report on May 2nd, we got a letter from
13   Mylan providing some dates for some of the witnesses and
14   indicating whether they represent some of the people.
15              They objected to at least one deposition,
16   which we're going to discuss at a later date.  But, in
17   the meantime, you know, our main beef, Your Honor, is
18   just that, you know, we're supposed to -- we're trying
19   to follow the rules and say here are the witnesses that
20   we want to take, please give us dates.  We just want to
21   get dates sooner and we want to get indications --
22   there's a lot of former employees in this.
23              A lot of the conduct in these cases happened
24   six years ago, five years ago.  In this industry people
25   move fast, so we need to know whether they're
```

1    representing people or not.  And we've sent the letter

2    on March 28th and they still haven't told us whether

3    they're representing some of them.

4            And I just think that it would be helpful,

5    frankly, Your Honor, if we had an order that said that

6    if either side, us or them, asked for a date for a

7    witness and whether they represent that witness because

8    they're a former employee and whether that person's

9    going to cover any 30(b)(6) topics that the answer is

10   delivered within a week.  I think that's fair.

11           JUDGE CRABTREE:  Well, I knew there was a

12   factual dispute from the Mylan side of this.  And I'll

13   tell you I'll hear -- I'll listen to what you want to

14   say.  I'm not -- I mean, there's always going to be

15   factual disputes about how these dust-ups get on an

16   agenda and how we get here.  And if we had unlimited

17   time and resources we could conduct evidentiary hearings

18   and scrub it to death.  But I'm not sure we need to.

19   But since I let him talk, I'm going to let you talk,

20   Mr. Levin.

21           MR. LEVIN:  I'll be very brief.  The short

22   answer is we're working cooperatively with the

23   plaintiffs on the Mylan depositions.  We have proposed I

24   think -- I may have my numbers off -- 10 or 11 dates.

25   Basically comports with the exact same order of the

1   schedule they have requested.  Mr. Buchweitz is talking

2   about us not getting back to them about representation

3   of witnesses.  Five minutes before the hearing he asked

4   me that same question.  I'll tell the court what I told

5   him, which is that there are only two people on his list

6   that are in that situation.  Both of them have been

7   traveling out of the country and we have not been able

8   to reach them to nail that down.  What we told him was

9   we would get back to him as soon as possible about that

10  and that is our intent.

11           JUDGE CRABTREE:  Yeah, I don't think -- I

12  don't see this one as -- I'm not sure I'm going to give

13  you the order you proposed, Mr. Buchweitz, but I'm going

14  to give you some rules of the road going forward.

15           The deposition guidelines say what they say.

16  We mean it here.  We expect lawyers who litigate in this

17  court to confer with one another and try to agree on

18  when and where a deposition will be conducted.  Here's

19  the truth:  You all are going to want to take vacations.

20  You're all going to have fancy -- family

21  responsibilities.  You're all going to have witnesses

22  with timing problems.  There's something in this for

23  everybody.

24           I can't tell you how to run your careers.  I

25  can tell you from the rear -- in the rearview of my

1   career, you'll live longer, you'll be happier, your

2   family will like you better if you work through these

3   problems.  If you don't, I can't make you.  And I don't

4   -- I don't have -- I don't have, she doesn't have the

5   time to micromanage scheduling a deposition.

6          So here's the way it works:  You are to

7   confer as the deposition guidelines require.  If after a

8   reasonable period of time -- and I think reasonable,

9   unfortunately, is too fact specific to give you a

10  seven-day yardstick that applies -- to mix my metaphors,

11  a seven-day yardstick that applies to all requests

12  because a witness may be traveling out of the country

13  and unreachable, or it may be a simpler matter in a

14  particular case.  But if you don't hear back in a

15  reasonable time, if you feel like either side you're

16  getting a stiff arm from the other, I mean, Rule 30 says

17  you can issue a notice of deposition.  And I hope it

18  won't come to that because you won't be as happy.  Your

19  family won't like you as much.  Your client will get a

20  bigger bill.  The interest of Rule 1 will not be served

21  as fully.

22          But the deposition guidelines do not make

23  you -- they do not disarm you in the tactics of how

24  depositions get scheduled.  But again, point one, if I

25  were you, I'd work -- I'd work it out.  But if you

1   can't, then you do.  And if there's a dispute at that

2   level that you bring it to judge -- bring to the court,

3   Judge James or I will deal with it.  That enough

4   guidance for now?

5            MR. BUCHWEITZ:  Yes.  Thank you, Your Honor.

6            MR. LEVIN:  It is.  And I may order the

7   transcript and share it with my family just to confirm

8   -- to confirm what the guidelines are.

9            May I just make one clarifying point?

10  Because I think I heard -- as I was standing up I didn't

11  hear something but my colleagues at the table did.  And

12  so I want to clarify something that may be breaking news

13  to us.  Did you say that three plaintiffs were dropping

14  out of the case?

15           MR. TRIPOLITSIOTIS:  Yeah, three plaintiffs

16  intend to withdraw from the case and we'll be filing

17  those withdrawals.

18           MR. LEVIN:  Thank you.

19           JUDGE CRABTREE:  You won three cases this

20  afternoon.

21           MR. BUCHWEITZ:  None of those three are

22  Sanofi-Aventis, U.S. LLC.

23           JUDGE CRABTREE:  I had a hunch.

24           All right.  I'm moving on to Item No. 3

25  which is Sanofi's initial objections to Mylan's fourth

1   request for production of documents.  I -- I have read

2   -- I read this one pretty carefully and I'm -- I think I

3   understand your positions.  I don't -- I don't need to

4   hear from you on this one.  I'm going to go ahead and

5   rule.

6           Sanofi, nice try, I'm overruling your

7   position.  I did not -- I'm the dude that signed the

8   scheduling order in the case.  I did not view the -- and

9   she's the other dude who signed the April 30th

10  substantial compliance deadline.  Neither of us intended

11  that to be some sort of interim deadline for the

12  exchange of requests for production.

13          It certainly was intended to apply to the

14  requests that were at issue when that deadline was

15  established.  I always assume in a case of this measure

16  you're going to hear a witness make a reference to

17  something or a -- some document that you've never

18  thought of before or never thought to ask and you would

19  want it.  And so the thought that the window on Rule 34

20  RFPs closed on April 30th, that's not the rule of the

21  road, so you need to respond to that request for

22  production on a timely basis.  So that's No. 3.

23          Before -- you know, kind of going, going,

24  gone, does anybody want to say anything or have any

25  questions?  All right.

1           You got one more in you on the fact sheet

2    responses?

3           JUDGE JAMES:  Yes.

4           JUDGE CRABTREE:  Judge James.

5           JUDGE JAMES:  I'll take the plaintiff fact

6    sheet responses issue.  Does Mylan still have issues

7    with regard to plaintiffs' fact sheets?

8           MS. ALI:  We do, unfortunately, Your Honor.

9    So just to level set just to provide a quick refresher

10   of where things stand on the fact sheets, the parties

11   agreed to the questions on the fact sheets in November.

12   Plaintiffs submitted their initial round of responses in

13   February.

14          And as we raised at the February 28th

15   hearing, there were several significant issues with the

16   responses.  One of the main ones was that for many

17   questions or subparts of questions plaintiffs just

18   didn't answer them and just left them blank.  And so we

19   were left guessing as to whether the reason a plaintiff

20   didn't answer the question was because he or she didn't

21   have the information, they were refusing to answer, they

22   weren't asked the question.

23          And so we went over all this at the February

24   28th hearing and Your Honor ordered counsel for

25   plaintiffs to go back to their clients and to fill in

1    the blanks.  And what Your Honor specifically said --

2    and I'm quoting here -- is "the fact sheets are just

3    like answers to discovery requests and they need to

4    indicate, if there's a blank left, is it because there

5    are no responsive documents or they don't have the

6    information or is it because you're objecting based on

7    some privilege or other basis.  Just a blank is not

8    sufficient."

9            So after that hearing on March 8th, we sent

10   a letter to the plaintiffs in which we identified every

11   deficiency that we had found in each of the plaintiff's

12   fact sheet responses.  Unfortunately, despite that and

13   despite the court's clear instructions, the supplemental

14   fact sheet responses that plaintiffs produced on April

15   30th just still contain a lot of the deficiencies that

16   we identified back in March.

17           So to give just a few examples, plaintiffs

18   didn't submit revised fact sheets at all for 11 of the

19   plaintiffs for which we identified deficiencies.

20   Thirty-four out of the 45 individual named plaintiffs

21   still have one or more of the deficiencies that we'd

22   identified in our March 8th letter.

23           And to give a specific example, Plaintiff

24   Nordstrum -- and her deposition is scheduled in two

25   weeks, in less than two weeks on May 22nd -- states in

1    response to question 5(b) that she's received government

2    assistance since 2017 but leaves every other part of the

3    question blank.  So doesn't provide the member ID, her

4    annual deductible, co-insurance limits for that plan.

5    It's left blank.

6              Obviously we don't expect every one of the

7    named plaintiffs to have the information responsive to

8    all these questions.  We know that they're individuals.

9    So it's fine if she doesn't have it.

10             But based on the way that the forms have

11   been filled -- the fact sheets have been filled out, we

12   don't know whether they don't have the information,

13   they're refusing, or whether they weren't asked that

14   question by their counsel.  And so that's sort of our

15   fundamental overarching issue with the way that the fact

16   sheets have been filled out.

17             JUDGE JAMES:  Are there others besides

18   Nordstrum have blanks unexplained?

19             MS. ALI:  Yes.  So yesterday we sent

20   plaintiffs a very detailed list of every -- you know,

21   every deficiency that we'd identified in -- I think

22   there are 34 fact sheets that we still see a lot of the

23   same.  And every issue we identified yesterday was one

24   that we had also identified back in March that hadn't

25   been cured.  Not all of those are completely left blank

1    but subparts of many of the questions were not answered.

2            JUDGE JAMES:  All right.  Thank you.  Yes.

3            MS. CAPPIO:  Hi, Your Honors, Gretchen

4    Cappio for plaintiffs.  And with your indulgence, I have

5    a show and tell, because I want to drill down on what

6    some of these questions are and why there might be

7    blanks, including a question that is unartfully drafted

8    that was just highlighted by Miss Ali where there's an

9    and/or issue.  And I also want to explain a little bit

10   about how Medicaid works and why that question might not

11   have an answer; in other words, you don't have certain

12   payments if you are getting Medicaid benefits.

13           So if that's all right, I'll bring up a

14   couple.

15           JUDGE JAMES:  Go right ahead.

16           MS. CAPPIO:  Your Honors, I should also say

17   at the outset that this is a Herculean task.  We have

18   over 40 plaintiffs.  There are over 40 questions.  As

19   you know, a lot of these questions have subparts that

20   require for each year specific benefit information.  So

21   we're really doing our best.  We believe we've complied

22   fully with the substantial completion deadline and it's

23   been a lot of work.  So we call it the team that wears

24   the halos, the people who are tracking down every last

25   answer here.

1              So the reason I chose these two -- and I

2     really more or less chose them at random last night when

3     we got the letter on the plane over.  I chose

4     Miss Corcoran's because, as you'll see, we've tagged

5     question 6(g) for her, and that's the question that asks

6     for the dollar amount paid.

7              And the reason we think defendants keep

8     saying this is a deficient answer is because she's

9     attached the exact document -- I've also tagged it.

10    It's the very last document on her PFSs -- that gives,

11    under the member payment column, the exact amount she

12    paid.

13             So I don't know if defendants are hoping

14    that we'll copy and paste that or what.  But all I'm

15    saying is we fully, fully complied.  We've provided the

16    data and this is literally one of the deficiencies that

17    we are getting harangued about.

18             And, you know, I'm fine if the job is to

19    take screenshots of the attachments.  That's just what's

20    good for the goose is good for the gander and that's

21    what we're going to want for interrogatory answers too.

22             JUDGE JAMES:  Let me ask Mylan, is there

23    something inadequate about the attachment?

24             MS. ALI:  So I'm not prepared to talk about

25    all the individual ones.  My understanding with this

1    one, this attachment, yes, provides information for some

2    of the purchases listed but not every one of the

3    purchases listed in the chart.  So we're not asking you

4    to -- if the documents speak to the answer and you can

5    easily go to the document and find the answer, we are

6    not asking plaintiffs to pull out that information and

7    put it in the chart.

8              But for many, many of the plaintiffs what

9    they say is "refer to documents," "go to the document."

10   You don't find the information that's responsive to the

11   question.  So that's our fundamental problem with the

12   questions that ask for particular information.  And the

13   response is to leave the question blank or "see

14   documents."  You don't find the interim documents.

15             MS. CAPPIO:  Respectfully, I didn't go

16   cherry-picking on these plaintiff fact sheets, so I

17   think I have a slight difference of opinion.  Literally

18   a third of the deficiencies fall into this category on

19   6(g).  So we're not oversimplifying it.  It's a chunk

20   and it -- go ahead.

21             JUDGE JAMES:  Is it your position that the

22   attachment you provided is exhaustive, provides a

23   complete answer to 6(g)?

24             MS. CAPPIO:  Yes, Your Honor.

25             JUDGE JAMES:  All right.  You know, folks,

1    what I can say to you is if this is a dispute over the

2    sufficiency or adequacy of the information provided, if

3    plaintiffs say this is it, I mean, they're going to be

4    bound by that response.

5              I mean, the deadline, is there any -- is

6    there any fact sheet that you, plaintiffs, believe you

7    still have information that you want to provide that you

8    haven't provided, or is your response we provided you

9    everything we have and we're going to stand on that?

10             MS. CAPPIO:  Your Honor, it's a little

11   tricky because as co-lead counsel -- I don't know if

12   you've ever been a camp director or something, but it's,

13   like, I'm not in the bunkhouse for every single

14   plaintiff, like the camp counselors, that their

15   individual lawyers, are.  So I'm taking people's word

16   for it to some extent.  That's just an inherent aspect

17   of what's going on.

18             But to my knowledge to the extent that

19   anybody has blanks that still need to be filled in, they

20   are tracking them down.  I don't, as I stand here, know

21   of many.  I just heard Miss Nordstrum might have a

22   couple blanks.  If we need to shuffle the deposition

23   date for her, understood.  But we are doggedly tracking

24   everything down.

25             JUDGE JAMES:  All right.  Here's what we are

1   going to do, because I'm not going to deal with all

2   these little issues that you guys need to talk to people

3   at your places about.

4            Plaintiffs will have as of the date of the

5   currently scheduled deposition of the plaintiff or

6   10 days from now, whichever is earlier, to provide

7   whatever information they have in response to these fact

8   sheets.  Anything that's not provided, they're going to

9   be bound by what they provide to you by the -- by those

10  deadlines.

11           MS. ALI:  Thank you, Your Honor.  If I could

12  just ask that we get the information, you know, two days

13  in advance of the deposition so that it's -- actually

14  we're able -- I think what I heard you say is 10 days

15  from now or on the date of the deposition.  And if -- if

16  for Ms. Nordstrum, for example, I don't know if it's

17  exactly 10 days, but if we could make sure to get the

18  information sufficiently in advance -- you know, two

19  days in advance of the deposition.

20           JUDGE JAMES:  When is the first deposition

21  scheduled?

22           MS. ALI:  The first deposition scheduled for

23  February 15th -- May 15th next Tuesday.

24           JUDGE JAMES:  Whoa, sorry.

25           MS. ALI:  Next Tuesday.  I think that that

1   is Mr. Gill who we don't have an issue with his fact

2   sheets.  I think that's fine.  I think Miss Nordstrum is

3   the next deposition which is -- I believe is the 22nd

4   but I don't have the dates right in front of me.

5              JUDGE JAMES:  All right.  Well, all right,

6   the day before the deposition or 10 days from now,

7   whichever is first.

8              MS. ALI:  Thank you, Your Honor.  There is a

9   related issue to the fact sheets that we wanted to

10  raise, which is that part two of the plaintiff fact

11  sheets required plaintiffs to produce documents that

12  relate to their claims.  And as Your Honor, of course,

13  knows, class plaintiffs were also required to search ESI

14  for each of the named plaintiffs, and specifically to

15  search a set of 16 agreed upon search terms.

16             Only 12 of the 45 named plaintiffs here have

17  produced any, if at all.  Again, as I said before, we're

18  not expecting that every single plaintiff has answers to

19  all the questions or has responsive ESI, but what we

20  don't know right now whether that means they searched

21  all 45 and only 12 had responsive ESI or not.

22             And during a meet and confer with plaintiffs

23  earlier this week we asked them that question.  We asked

24  them specifically to confirm whether they had searched

25  ESI for all 45 plaintiffs, to the extent those

1    plaintiffs had ESI, and specifically whether they

2    searched all of the agreed upon search terms that the

3    court had ordered them to search.  They said that they

4    were not prepared to answer that question because the

5    meet and confer was ostensibly about fact sheet

6    responses and not ESI.

7              So we sent a follow-up communication to

8    plaintiffs asking them to confirm that they had taken

9    those steps.  They responded on Monday to say that they

10   needed to talk with other members of their team.  And we

11   still have not gotten a response.

12             And so we asked just before this hearing and

13   Miss Cappio represented that they had substantially --

14   fully complied with their April 30th substantial

15   completion deadline.

16             And when we pressed and asked them to say

17   did you search ESI for all 45 named plaintiffs and did

18   you -- were those named plaintiffs that were in

19   possession of ESI, did you search the 16 agreed upon

20   search terms and she represented that they had, but this

21   was the first time that we've gotten that

22   representation.  And so prior to that we had real

23   concerns about this, particularly given the depositions

24   are scheduled to start next week.  So I would just ask

25   that we get that confirmation on the record that that

1    has, in fact, happened.

2              JUDGE JAMES:  Miss Cappio.

3              MS. CAPPIO:  Yes, I would just say that

4    specifically as to the fact sheets it says, "Produce all

5    documents relating to or supporting any of your answers

6    to the questions in Part A."  So it's a slightly

7    different topic.

8              But I would just say that, yes, we believe

9    that we have substantially complied with the production

10   deadline as set out in ECF No. 318.

11             And to the extent to that the other side is

12   asking very specific questions, I don't have the e-mail

13   in front of me, but I'm very comfortable saying that

14   we've complied with a substantial production deadline.

15             I'm not sure I'm comfortable saying that

16   every single person searched their e-mail, for example,

17   because some people don't have e-mail to search.  So

18   we're doing the best we can to abide by the spirit of

19   the court's order.

20             JUDGE JAMES:  All right.  I appreciate that,

21   but let's close the loop on that, Miss Cappio.  You need

22   to certify in writing both parts of what you just said

23   that --

24             MS. CAPPIO:  I'm happy to.

25             JUDGE JAMES:   -- you complied with the order

1    and that your clients have searched all that they were

2    supposed to to the extent they have the ability to do

3    so.  And if they didn't have the ability to do so, you

4    need to say who is not.

5              MS. CAPPIO:  And in response to their

6    e-mail, an e-mail has been circulating on our side

7    seeking just that confirmation.  Literally as we speak I

8    was e-mailing people back.

9              JUDGE JAMES:  How soon can you certify in

10   writing to defendants at this point?

11             MS. CAPPIO:  I'm hoping this time next week.

12   I think a couple counsel might be out of pocket, but I

13   don't expect it to take longer than a week from now.

14             JUDGE JAMES:  All right.  Well, it needs to

15   happen fast --

16             MS. CAPPIO:  I understand.

17             JUDGE JAMES:  -- so a week from today will

18   be your deadline.

19             And same ruling, I mean, if -- you know, if

20   they try and produce something at trial or later after

21   the deadline I've just set of next week on -- on ESI, if

22   they try and come forward with something later and they

23   haven't identified it by next Thursday, you'll have an

24   objection at trial.

25             MS. ALI:  Thank you, Your Honor.  Just so we

 1    do have a deposition scheduled for next Tuesday.  So

 2    even if they can't certify as to all plaintiffs before

 3    that, it would be -- I think we need a certification

 4    that they've searched and produced ESI to the extent

 5    again we had -- this plaintiff has ESI for Mr. Gill

 6    who's scheduled to be deposed on Tuesday.

 7             JUDGE JAMES:  All right.  Well, I trust you

 8    will take that up at Mr. Gill's deposition and his

 9    counsel better be able to respond to that issue for

10    Mr. Gill.

11             All right.  Okay.  Anything further about

12    plaintiffs' fact sheets?

13             MS. CAPPIO:  Thank you, Your Honor.

14             JUDGE JAMES:  Thank you.

15             JUDGE CRABTREE:  All right.  Let's move to

16    topic five, try to knock off one more topic before we

17    take a recess.  This is the fifth item on your agenda.

18    It's labeled Mylan's amended responses to the

19    plaintiffs' requests for admission.  I read the relevant

20    portions of the parties' status report.

21             Mr. Buchweitz, I didn't -- Mr. Hochstadt, I

22    didn't give you all a chance to talk last time before I

23    ruled.  I'm going to be more patient this time.

24             MR. HOCHSTADT:  Thank you, Your Honor.  May

25    I just approach?  I lost my voice on the plane.  Quickly

1    here.

2              JUDGE CRABTREE:  Sure.

3              MR. HOCHSTADT:  I'll try to keep us moving

4    along.  This is more for the record, Your Honor.  In

5    response to the court's order that Mylan amend some of

6    its R-phase, to my amazement they have denied that the

7    relevant product market is epinephrine auto-injector

8    devices, that the relevant geographic market is the

9    United States, that they had monopoly power in that

10   market during the relevant period of time.

11             So it's clear for the record, whether it's

12   before Your Honors or elsewhere, come summary judgment

13   we'll be revisiting those denials as there is no

14   reasonable ground for those denials based on their

15   document productions.  There will be truckloads of

16   documents to support that.  So there's no unfair

17   surprise, that's being noted for the record.

18             We will also be working with Mylan on the

19   30(b)(6) timing because we will now need to spend time

20   on these topics, which I would have thought would have

21   been undisputed which is the purpose of Rule 36 to

22   narrow issues for trial.  So we'll work with Mylan on

23   that but we may need to approach Your Honors for an

24   application for additional time to deal with some of

25   those what I'll say are unfounded denials.  And I'll

1    just leave it at that.

2            JUDGE CRABTREE:  Yeah, I -- thank you very

3    much.  Mr. Foster, Mr. Levin, Miss Ali, I'm not sure who

4    is going to speak to this.  I took this as a shot across

5    your bow.  That's the way I read it.  You're

6    sophisticated lawyers.  You can recognize a cannonball

7    in the air.  I think it's up there.  So there's nothing

8    really for us to rule at this point and I'm sure one of

9    us will look forward to motion traffic on this subject.

10           And if you're -- if you're -- you've

11   withheld admission of things you should admit, then I

12   suspect we'll hear from them.  And if they haven't, I

13   suspect we've spent more time on this than I should have

14   devoted to it.

15           All right.  Let me suggest that we take our

16   mid conference break here.  We're kind of halfway

17   through.  That will give Judge James a chance to think

18   about what she's going to give you on the privilege log

19   and then we'll come back and we'll pick up our

20   discussion maybe with a ruling on the privilege log

21   issue and move quickly to Item 6 on the agenda.  Fair

22   enough.  So let's aim for 15 minutes and we'll be back

23   then.

24           (Recess.)

25           JUDGE JAMES:  All right.  We're back on the

1    record and I think the next item is No. 6, Mylan's

2    production of materials produced by third parties

3    subpoenaed by Mylan.  Who wants to speak to that?

4              MR. HOCHSTADT:  Your Honor, if I may

5    approach again?

6              JUDGE JAMES:  Yes.  Go right ahead.

7              MR. HOCHSTADT:  And, Your Honor, taking the

8    court's guidance, I think I have some good news to

9    report.  We tried to use our 15 minutes productively.

10             So we had an issue with the timing by which

11   a party that issued a third-party subpoena by which they

12   reproduced that material to everybody else in the case.

13   Not going into any of that.

14             Moving forward and what I think the parties

15   have reached an agreement upon, and people will correct

16   me if I've misspoken, is that going forward within two

17   business -- the default rule will be within two business

18   days of receipt of material from a third party in

19   response to a subpoena that will be reproduced to all

20   the parties in the case.

21             If, for example, the material that comes in

22   is going to take a little bit longer, there will be a

23   communication out to the parties so that everyone knows

24   it will take a little bit longer than the two business

25   day default rule.  But that way nobody will -- no party

1   will be holding on to third-party material and

2   everybody -- and people won't be feeling they are being

3   unfairly treated and the like.  We'll leave it at that.

4           Another piece of that -- condition of that

5   is that the material that comes in from the third party

6   from the time that party gets it and gets reproduced out

7   to other parties in the case, the protective order

8   confidentiality provision applies where there's a

9   default window of 30 days where any party in the case

10  can designate materials confidential if they have a good

11  faith basis to do so because it's maybe their material

12  or in part their material that's been produced by that

13  third party and not designated confidential or at the

14  appropriate confidential level.

15          Conceptually I have agreement among the

16  parties on that where there remains an issue, it's just

17  an amendment to the protective order on that 30-day

18  window of confidentiality, which I'm hopeful we all can

19  square away in very short order, certainly within the

20  next week, to propose an amendment to the protective

21  order to take care of that issue by all parties.  But

22  conceptually I think we have an agreement on that timing

23  and the 30-day confidentiality.

24          I'm going to stop there and see if anybody

25  disagrees with me.

```
 1              MR. SECHLER:  Yeah.
 2              JUDGE CRABTREE:  You got the class
 3    plaintiffs.  I think you won their hearts.
 4              MR. SECHLER:  Your Honor, Mr. Hochstadt's
 5    correct, we're going to try to work together on this
 6    issue.  And I think also we're going to try to
 7    communicate more frequently on the ESI issues some of
 8    these third party productions present when they're not
 9    as motivated as we are to provide metadata, overlays and
10    other things that we think are important.  So we're --
11    yes, going forward hopefully this won't be an issue.
12              JUDGE JAMES:  Good.
13              MR. HOCHSTADT:  I'm on tap for the next
14    issue, Your Honor --
15              JUDGE JAMES:  Well, keep going you're doing
16    great.
17              MR. HOCHSTADT:  -- if you'd like me to stay
18    here.
19              JUDGE CRABTREE:  You did great on that one.
20              JUDGE JAMES:  Yeah, that was really good.
21              MR. BUCKWEITZ:  You're going to like this
22    one even better.
23              MR. HOCHSTADT:  I'm going to one-up myself.
24              So on the FOIA issue, in having a productive
25    conversation with Mr. Sechler, I think we should be able
```

1   to square that issue away or certainly narrow it.  So I

2   think with some further conversation between Sanofi,

3   Mylan and the class plaintiffs on that issue, we'll

4   hopefully resolve that FOIA confidentiality dispute.

5              JUDGE JAMES:  All right.  Then I guess --

6              JUDGE CRABTREE:  That's a "table it for

7   now"?

8              MR. HOCHSTADT:  Table it for now.

9              JUDGE JAMES:  And I guess you're all aware

10  of the procedures in the protective order if a party

11  wants to challenge a confidentiality designation?

12             MR. HOCHSTADT:  Yes, Your Honor.

13             JUDGE JAMES:  Okay.  All right.  Okay.

14             MR. HOCHSTADT:  With that I think I can sit

15  down as the next topic is a class plaintiff issue.

16             JUDGE JAMES:  Thank you.

17             JUDGE CRABTREE:  My score sheet has us

18  jumping to eight next.

19             MR. O'MARA:  That's right, Your Honor.  And

20  I can probably continue with my colleague's good news.

21             We had a dispute on -- on the ROG response

22  to No. 2.  We didn't believe that Mylan had provided the

23  information that they were required to provide.  Met and

24  conferred.  Mylan's position was they didn't need to

25  give us any additional information in response to No. 2.

```
 1              Given the court's guidance on the discovery
 2    deadline and -- and what the parties can do, we can take
 3    this off the agenda and we'll just issue an additional
 4    request to get the detail that we're looking for.
 5              So we can move on to No. 9 -- was it nine
 6    and report, that we can take that one off as well?  We
 7    received Pfizer's responses to the class plaintiff
 8    discovery last night.
 9              JUDGE CRABTREE:  Sounds like --
10              JUDGE JAMES:  We should have taken a
11    break --
12              JUDGE CRABTREE:  Terrible judging.  We
13    should have taken a break earlier.  Well done.
14              JUDGE JAMES:  Yes, thank you.
15              JUDGE CRABTREE:  Thank you all.
16              MR. O'MARA:  Thank you, Your Honors.
17              JUDGE CRABTREE:  I show Roman numeral X,
18    third-party discovery being --
19              JUDGE JAMES:  I can address that, yes.
20              JUDGE CRABTREE:  Have at it.
21              JUDGE JAMES:  We are working on those issues
22    and so you'll be getting a ruling not in the -- in the
23    not too distant future.  I can't be more precise than
24    that.  So stay tuned on that.
25              I do want to say I know you're resolving
```

1   some of these and so we've granted a lot of motions to

2   extend motion to compel deadlines and giving you

3   additional time.  I just want to put you on notice that

4   that's going to stop here pretty quickly because, you

5   know, we're going to have to get these resolved.

6           So try and work through those things and

7   hopefully not have to request many more extensions of

8   motions to compel deadlines and those sorts of things

9   having to do with those third-party subpoenas.  All

10  right.

11          JUDGE CRABTREE:  That's all for No. 10.

12          JUDGE JAMES:  Yes.

13          JUDGE CRABTREE:  So that, by my count,

14  leaves three things.  There is the ruling on the

15  privilege log controversy, the discussion about liaison

16  counsel, and then a mystery topic we'll save until the

17  end.  You want to return to the privilege log?

18          JUDGE JAMES:  Yes.  The court is ready to

19  rule on the letter briefs and status report issues

20  regarding privilege log protocol.  I appreciate all of

21  counsel's briefing and comments and arguments here today

22  which have all been helpful.

23          The court finds that due to the magnitude

24  and large number of documents at issue in this case,

25  based upon Rule 26 proportionality and Rule 1 objectives

1    of just, speedy, and inexpensive determination of every

2    cause of action, that to some extent a categorical

3    privilege log is in order.  However, the burden is on

4    defendants to show that its proposed categorical

5    privilege log would include sufficient detail and

6    specific information to enable other parties to assess

7    the claim of privilege and/or work product and to enable

8    the court to determine each element of any asserted

9    objection is satisfied.

10           The court has listened to and understands

11   and appreciates Mylan's suggestion that essentially we

12   allow a categorical -- broad categorical protective

13   order -- or privilege log initially and that then things

14   would coalesce and that would be more efficient.  The

15   court is not persuaded by that argument, however.

16           The court is mindful of well-established law

17   in this district, notably -- and I'll paraphrase -- that

18   not every communication between an attorney and client

19   is privileged, only confidential communications which

20   involve the requesting or giving of legal advice.

21           There must be a connection between the

22   subject of the communication and the rendering of legal

23   advice for the attorney-client privilege to shield the

24   communication from disclosure.  Legal advice must be

25   predominant for the communication to be protected.  The

1  privilege does not apply where the legal advice is

2  merely incidental to business advice.

3          And then with respect to work product, the

4  in anticipation of litigation element of the work

5  product doctrine focuses upon the motivating purpose

6  behind creating the document.  To invoke the doctrine, a

7  party must show that the document was prepared

8  principally or exclusively to assist in anticipated or

9  ongoing litigation.

10         And I have been paraphrasing from the case

11 the parties have cited *Universal Service Fund Telephone*

12 *Billing Practices Litigation*, 232 F.R.D. 669.

13         The court has reviewed defendant's proposed

14 categories of documents, those that it proposes be

15 logged categorically rather than on a

16 document-by-document basis.  The defendants' list

17 includes 25 such categories and a 26th place holder

18 category for additional possible categories.  The court

19 has concerns that most of those categories deal with

20 issues that are -- lend themselves to topics that would

21 likely involve business advice and/or are topics or

22 categories that are so broad and would involve so many

23 documents that it would be unwieldy to have categories

24 such as that.

25         So the court rejects the suggestion by Mylan

1   of including a broad categorical privilege log with the

2   26 categories Mylan has proposed.

3           The court does find though that there are

4   certain categories that the court will allow a

5   categorical privilege log and those are specifically the

6   following from Mylan's proposed protective order

7   Exhibit D, and they are categories 1, 2 and 3, exclusive

8   however of the settlement-related documents with respect

9   to those litigations.  So, in other words, categorical

10  privilege log will be allowed as to Items 1, 2 and 3 on

11  the list excepting out the settlement documents with

12  regard to those cases.

13          And then additionally a categorical

14  privilege log will be allowed with regard to Items 21,

15  22 and 23 which plaintiffs acknowledged during the oral

16  argument they could live with.

17          With the exception of those categories then,

18  a document-by-document log will be required with the

19  provisions set out in Exhibit D as we've discussed.

20          Then dealing with other specific issues that

21  have been raised with regard to the privilege log

22  protocol, the court does find that the parties did reach

23  agreement with regard to the e-mail string treatment and

24  so that understanding and the language that you've

25  provided we will incorporate into the privilege log

1    protocol.

2              Under Section 2.2.1 of the proposed

3    privilege log, which is Exhibit D, and I think with the

4    understanding and agreement of plaintiffs, their

5    suggestion that the list of columns in the privilege log

6    include identification of parent document that will be

7    deleted because it's included in subsection (c) under

8    2.2.1 as part of the family relationship description.

9              As to 2.2.1, also the language that's

10   included that has been added, as I mentioned, we will

11   incorporate the language that you all have said you

12   agreed upon and we will include that language.

13             Under 2.2.2 on page 27 of Exhibit D, we will

14   add the language at the end of that statement as I had

15   discussed with counsel and I think counsel were

16   agreeable to adding that "and shall provide sufficient

17   information to satisfy Federal Rule of Civil Procedure

18   26(b)(5)(A) as to all attachments."

19             As for timing, the court will require --

20   will impose a June 8th deadline with respect to Mylan.

21   I intended to ask plaintiffs earlier.  Pfizer had

22   requested that it be allowed as to its privilege log

23   items until June 30th.  Do plaintiffs object to that?

24             MR. DAVIDSON:  We do not, Your Honor.

25             JUDGE JAMES:  All right.  Then Pfizer your

1    request to be allowed until June 30th will be allowed.

2                   MR. GANDESHA:  Thank you.

3                   JUDGE JAMES:  All right.  I think I have

4    covered all of the issues that were in dispute in the

5    privilege log protocol.  Have I -- have I overlooked

6    anything, anyone?

7                   MR. DAVIDSON:  Nothing from the class

8    plaintiffs' side.

9                   MR. FOSTER:  Same here, Your Honor.

10                  JUDGE JAMES:  All right.  And as I said

11   earlier, we will issue -- we will put together the

12   privilege log protocol containing these provisions and

13   we will docket that and enter it in the case so you

14   don't have to submit anything plaintiff.  I think that's

15   it.

16                  JUDGE CRABTREE:  All right.  That leaves

17   Item 11 on the agenda, the discussion of the defendants'

18   liaison counsel.  The order that the court entered on

19   April 30th really asked three questions of the

20   defendants' group.  And just to remind you:  Should the

21   court appoint liaison -- new liaison counsel for the

22   defendants?  I read Mr. Fries submission to say, no,

23   it's not necessary.

24                  Second, if I -- if the court concluded it

25   should do so anyway, who should that be?  Mr. Sechler, I

 1    see, took the -- took the fall as the nominee on that

 2    front.

 3              And then last the question I asked was,

 4    well, in light of the experience in the case, should the

 5    role of defense liaison counsel be expanded?  And at

 6    least the way I read Mr. Fries letter, he kind of took a

 7    pass on that question.  Maybe that's an appropriate

 8    response given that you didn't think that such a person

 9    with such a job was needed.

10              I know there was a reference in one of the

11    status reports, it may have been in a Pfizer report,

12    that you were still discussing this.  Are there new

13    developments that I should pause and hear?

14              MR. GANDESHA:  No, Your Honor.  I think we

15    submitted the status report prior to our discussion.  So

16    I'm not aware of anything.

17              JUDGE CRABTREE:  That's what I gathered from

18    it but I wanted to be sure.  I will be just direct with

19    you all on this, I'm of two minds about this.  On one

20    hand I'm reluctant to impose, as a client would say,

21    more overhead than the case warrants because I have not

22    sensed great dissidence or controversy between the fence

23    lanes in the case.  So that's the part of me that thinks

24    that isn't necessary.

25              The other side of me appreciates very much

1   the work that Mr. Fries brought to the task and that is

2   someone who knows in experiential and intuitive sense

3   how this court works.  And I suppose this is always a

4   bit of a tension in any MDL where the lawyering is

5   national and the judging is localized.  And, frankly,

6   it's probably good for us all to work with people from

7   different parts of the country and be exposed to

8   different ways of doing things.

9           I guess before I kind of close this subject,

10  Mr. Sechler, since you took -- you took the -- you

11  accepted your party -- you accepted your parties'

12  reluctant nomination, I'm interested in your thoughts on

13  why you don't think this is necessary.  I know Mr. Fries

14  signed the letter but I bet you had input on it.

15          MR. SECHLER:  Well, Your Honor, first of

16  all, I'd be honored to serve as liaison counsel if the

17  court thinks it's appropriate.  But I do think that the

18  defense team actually works together quite well in terms

19  of communications and knowing what each other is doing.

20  And so to the extent a liaison is the person who

21  facilitates communication among those components, I

22  think that's happening even after Mr. Fries stepped

23  down.  So I don't believe we do need that.

24          On the other hand, given what I'm already

25  doing, all of us are doing, I'm sure it would be a huge

1    overhead problem either.  And if there needs to be

2    somebody where the buck stops to make sure something's

3    going to happen, I'm happy to do that.

4              JUDGE CRABTREE:  Okay.  I -- this is a topic

5    that obviously looks at the left half of the room.  Were

6    there any reservations from the plaintiffs' side of the

7    room about there being a absence of liaison counsel?

8    You don't have to talk.  But if there's some perspective

9    I'm not hearing, this is your chance to.

10             MR. BUCHWEITZ:  From our perspective -- for

11   Sanofi's perspective there isn't an issue as long as

12   Mr. Sechler -- who's, you know, our adversary in our

13   case, will make sure that we get whatever communications

14   need to come to us and whatever communications -- you

15   know, we want him to get around to everybody that would

16   go through him.

17             The reality is at some point we believe with

18   Your Honor's help that there will be a remand and

19   Mr. Sechler won't be here anymore and at that point, you

20   know, the group could go back to the way it was before.

21             So in the meantime I think, you know,

22   effectively Mr. Sechler for our purposes, for Sanofi's

23   purposes, was acting as liaison anyway because he's the

24   only one on that side of the table that doesn't

25   represent Sanofi.  So from our perspective it's not --

1   it's really no different.

2          JUDGE CRABTREE:  Well, I want to sleep on

3   this one.  I -- as I said, I'm of two minds and I

4   appreciate very much your candid response and your

5   willingness to take the assignment if that's where I

6   come down.  So let me -- let me think on that one and

7   I'll issue an order.  If you're going to get stuck with

8   a gig, it will certainly be documented in an order.

9   I'll probably issue an order either way.

10         All right.  Last topic I have is the mystery

11  topic and that was the next version of these.  Last time

12  when we talked at the conclusion of the conference about

13  a month ago there seemed to be some enthusiasm in the

14  room for continuing to have these.

15         I sat and listened to you today and there

16  was a part of me that thought, well, they're getting

17  stuff done but then I realized you're getting stuff done

18  because we're kind of on the eve of getting here.  So

19  I'm inclined to continue with these for the short-term.

20         To those of you who are paying for lawyers

21  by the hour, I recognize it comes with an increased

22  cost, but I think at this stage it's demonstrated enough

23  value that we ought to continue it.

24         So our usual approach, I'm going to ask

25  Judge James to set it.  My availability to attend and

17-md-2785    In re: EpiPen    5.9.2018                          82

1   participate depends on the whims of the criminal docket,

2   so I want to make sure she is available.  I think she

3   has picked a date.  So...

4               JUDGE JAMES:  Yes, I am looking a little

5   more than a month out at the afternoon of June 14th if

6   that is workable for most of you.  Maybe at 1:30 again.

7               MR. LEVIN:  Unfortunately, we have locked in

8   two depositions.  That's -- one of them is the 14th.  If

9   there's a way to bump it to the following week that

10  would be better.

11              JUDGE JAMES:  So the following week are

12  there any days that you're in depositions?

13              MR. TRIPOLITSIOTIS:  We have plaintiff

14  depositions all week but that shouldn't stop this

15  hearing.

16              MR. BUCHWEITZ:  Any chance we could do the

17  19th?

18              JUDGE JAMES:  Yes.  Would the afternoon of

19  the 19th work for everyone?

20              MR. BUCHWEITZ:  I spoke too fast.  Is there

21  any chance we could do the 21st?  I'm sorry.

22              JUDGE CRABTREE:  Good fake.

23              MR. BUCHWEITZ:  I apologize.

24              JUDGE JAMES:  Would the morning of the 21st

25  work?

1          MR. BUCHWEITZ:  Fine for us.

2          MR. O'MARA:  Yes, Your Honor.

3          JUDGE JAMES:  Why don't we do, say,

4    nine o'clock on June 21st.  Any problem with that?  All

5    right.  Nine o'clock back here on June 21st then.

6          I think that's it.  Anything else?

7          JUDGE CRABTREE:  Last call.

8          MR. HOCHSTADT:  No, thank you, Your Honor.

9          MR. DAVIDSON:  No, thank you.

10          (Proceedings adjourned.)

11

12                    CERTIFICATE

13      I certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16      DATE:  May 10, 2018

17
                    /s/Kimberly R. Greiner
18                    KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
19

20

21

22

23

24

25