UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>*This Document Relates to All Cases.* | Case No. 2:17-MD-02785-DDC-TJJ<br>(MDL No. 2785) |

NOTICE OF RULE 30(b)(6) DEPOSITION OF
PLAINTIFF/COUNTERCLAIM-DFENDANT SANOFI-AVENTIS U.S. LLC

PLEASE TAKE NOTICE THAT Defendant Mylan Inc. and Defendant/Counterclaim-Plaintiff Mylan Specialty L.P. (collectively, "Mylan"), through undersigned counsel, will take the deposition of Plaintiff/Counterclaim-Defendant Sanofi-Aventis U.S. LLC ("Sanofi") at the following date, time, and place before a court reporter and videographer, and that said deposition will continue from day to day until completed.

Date & Time:         June 28, 2018, at 9:00 a.m.

Place:               Drinker Biddle & Reath
                     600 Campus Dr.
                     Florham Park, NJ 07932

Method of Recording: Stenograph and Videotape

The matters on which examination of Sanofi is requested are set forth below. Sanofi is hereby advised of its duty under Rule 30(b)(6) of the Federal Rules of Civil Procedure to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, to testify as to these matters as known or reasonably available to the organization.

1

This deposition is being taken for purposes of all coordinated actions in this MDL No. 2785, and for the purpose of discovery, use at trial, and all purposes permitted under Federal Rules of Civil Procedure, the Federal Rules of Evidence, and any other applicable rule.

**<u>Definitions and Instructions</u>**

In addition to the definitions below and those set forth in Rules 26 and 34 of the Federal Rules of Civil Procedure, Mylan hereby incorporates by reference all the definitions contained in Mylan's First Set of Document Requests to Plaintiff Sanofi-Aventis U.S. LLC, dated November 21, 2017. Those definitions apply as if set forth herein.

The term "Auvi-Q" shall mean all forms of the Auvi-Q® epinephrine auto-injector device, including without limitation Auvi-Q®, e-Cue™, and Allerject® epinephrine auto-injector devices, and any predecessors or successors to those products.

The term "discounts" shall mean any reduction from the wholesale acquisition cost or list price of a drug not related to the drug's formulary position, sales or prescription volume, market share, or other measure of market performance.

The term "external statements" shall mean any communication directed, sent, or received, in whole or in part, to persons outside of Sanofi, its directors, employees, or agents.

The term "formulary" shall mean the mechanism by which PBMs or other Payors including Medicaid determine insurance coverage, copayment, control, tier options, and preferred drug status for various drugs. It shall include but not be limited to the reimbursement requirements, organization of copayment tiers, preferred drug lists, prior authorization requirements, step edits, step therapy, "not covered" or "NC" status, exclusion lists, and other exclusions from coverage.

The term "including" shall mean "including without limitation."

The term "kaleo" shall mean shall mean kaleo, Inc. and each and all of its former and present officers, directors, shareholders, employees, agents, and representatives including Eric Edwards and Evan Edwards; and their former and present divisions, subdivisions, departments, parents, subsidiaries, successors, and predecessors including but not limited to Intelliject, Inc., whether incorporated or not and doing business under any name.

The term "marketing" shall include all forms of marketing, advertising, and direct and indirect promotion to any person, entity, group, or audience, including live presentations, conferences, distribution of reprints.

The term "Payor" shall mean any private, public, or governmental entity, excluding patients, that finance or reimburse the costs of pharmaceutical products or administer pharmaceutical benefits on behalf of their clients, including employer health plan sponsors, union health plan sponsors, Medicare, Medicaid programs, Pharmacy Benefit Managers ("PBMs"), or commercial health insurance companies.

The term "rebates" shall mean any reduction from the wholesale acquisition cost or list price of a drug related to the drug's formulary position, sales or prescription volume, market share, or other measure of market performance.

The terms "wholesale acquisition cost" or "WAC" shall mean the list price paid to drug manufacturers by wholesalers or direct purchasers without including any rebates, discounts, or any other form of price reduction.

## Relevant Time Period

Unless otherwise stated, examination on the matters below is requested regarding the period from January 1, 2009, through the date on which this Rule 30(b)(6) notice was served.

**Matters Upon Which Examination Is Requested**

The deponent(s) shall be prepared to testify as to the following matters and all efforts taken to discover these matters as known by or reasonably available to Sanofi:

1. The process by which Sanofi decided to and did license rights to Auvi-Q, including (a) all persons, groups, or entities involved in evaluating the opportunity or making or approving the decision; (b) all documents generated or received in the course of such evaluation or decision; (c) all bases upon which the decision to license was made or approved and all factors and information considered; (d) all financial returns that Sanofi projected from its investment in Auvi-Q, and all cost, sales, market share, and profit assumptions upon which such projections were based; (e) all communications and agreements with kaleo or anyone involved in the negotiation of Sanofi's license of rights to Auvi-Q; and (f) all terms under which Sanofi licensed rights to Auvi-Q.

2. The efforts undertaken to develop, commercialize, manufacture, distribute, and prepare to launch Auvi-Q, including (a) all plans made, research conducted, and steps taken in the course of such efforts; (b) all persons, groups, or entities involved in such efforts; (c) all documents, presentations and reports generated or received in the course of such efforts; (d) all costs incurred by Sanofi in such efforts; (e) all steps to obtain any regulatory approval or review and all communications related to those steps; and (f) Sanofi's manufacturing, production, or distribution capacity for Auvi-Q at launch and any changes in those capacities until the recall.

3. Sanofi's pricing (including without limitation WAC, rebates, discounts and co-pay coupons) of Auvi-Q, including (a) all persons, groups, or entities involved in recommending or approving such pricing; (b) all documents generated or received relating to such pricing; (c) all factors and information considered in recommending or approving such pricing; (d) all

studies, research, projections or other documents concerning any estimated, possible, or actual effect of pricing on Auvi-Q's coverage by formularies; (e) all communications with pricing services (e.g., First Data Bank, MediSpan, RedBook) and consultancies related to Auvi-Q; (f) all forecasts or pricing of Auvi-Q leading up to and at the time of launch and the bases and assumptions underlying those forecasts or pricing; (g) all changes made to the pricing of Auvi-Q after its launch (and up until its recall from the market) and the reasons for those changes; (h) all evaluations of the effectiveness of Sanofi's pricing of Auvi-Q; (i) Sanofi's pricing data; (j) whether Auvi-Q was sold in 1-pack and/or 2-pack units, and the respective pricing for each, upon and after launch; and (k) any copayment assistance plan implemented by Sanofi.

4. Complaints or concerns relating to Sanofi's pricing, marketing or other conduct in connection with Auvi-Q, whether internal or external, including (a) the individuals, groups, or departments responsible for receiving, supervising, or responding to any such complaints or concerns; (b) each current or former employee, consultant or agent who at any time expressed any such complaints or concerns, including complaints or concerns raised with Christopher Viehbacher, Olivier Brandicourt, or any member of Sanofi's Board of Directors; and (c) the extent, nature, and content of all such complaints and concerns expressed by kaleo.

5. Sanofi's communications with PBMs and Payors regarding Auvi-Q, including (a) all persons, groups, or entities involved in conducting or supervising such communications; and (b) all documents constituting or relating to such communications.

6. Sanofi's rebates on Auvi-Q offered to PBMs and other Payors, including (a) the timing, size, and nature of rebate offers made on Auvi-Q and the extent to which such offers were conditioned on anything, including formulary status; (b) all factors and information (including studies, research, and internal models) considered before making those rebate offers;

(c) the process by which Sanofi secured internal approval for rebate offers; (d) the individuals, groups, or departments that had authority to approve rebate offers, and the extent to which Sanofi was prepared to provide rebates larger than what was offered; (e) portfolio contracts or multi-product rebates that included Auvi-Q; and (f) rebates, discounts, or offers on other Sanofi products bundled with or in any way related to Auvi-Q.

7. Information that Sanofi generated or received concerning any comparisons between Auvi-Q and other EAI Devices, including (a) the extent of bioequivalence, therapeutic equivalence, or substitutability; (b) shelf-life and durability; and (c) methods and ease of use.

8. Auvi-Q's availability, position, and/or restrictions (together, "coverage") on commercial, government and other formularies, including (a) all persons, groups, or entities involved in monitoring or reporting on such coverage; (b) all documents generated or received relating to such coverage; (c) all formularies on which Sanofi sought coverage of Auvi-Q and the efforts made by Sanofi to obtain such coverage; (d) the level of coverage secured at the launch of Auvi-Q and any changes in coverage for each PBM or formulary on which Sanofi sought coverage; (e) the terms of coverage (e.g., exclusivity, status as a preferred drug, rebates paid, price protection); (f) all steps taken in response to information received on such coverage; and (g) all analyses or other communications commenting on factors affecting such coverage.

9. Competition for EAI Devices, including (a) all research, focus group results, and surveys regarding consumer and physician preferences for Auvi-Q and other EAI Devices; (b) all research, data, and other information concerning managed markets, formularies, and the effect of pricing and rebates on Auvi-Q and other EAI Device formulary position; (c) all communications with physicians, consumers, advocacy groups, or others regarding consumer or physician preferences for EAI Devices; (d) all competitive intelligence concerning EAI Device

competitors; and (e) all competitive analyses and simulations (e.g., competitive war games, pressure testing) concerning EAI Devices.

10.     Sanofi's knowledge of Mylan's activities regarding the EpiPen® Autoinjector and the EpiPen® Jr. Autoinjector, including (a) Mylan's pricing of these products; (b) Mylan's sales and marketing practices for these products; (c) Mylan's rebating practices for these products; (d) the formulary coverage obtained by Mylan for these products; (e) Mylan's agreements with PBMs and other Payors for coverage of these products; and (f) the total sales, prescription volume, revenue, market share, or other indicators of market performance of these products.

11.     The September 20, 2013 letter from Allison Gassaro, Sanofi's Associate General Counsel, to Joseph Haggerty of Mylan, including (a) all factual bases and documents relied upon for the claims made in the letter; (b) all drafts and internal documents relating to the claims made and discussions referred to in the letter; (c) all communications relating to the letter and any response to the letter; and (d) Sanofi's decision not to file a lawsuit at that time in connection with the claims made in that letter.

12.     The prevalence in the pharmaceutical industry of rebates offered by pharmaceutical manufacturers to PBMs and other Payors, including (a) the degree to which manufacturers have offered such rebates, the amount of such rebates, and the extent to which they are tied to formulary position; (b) the degree to which Sanofi has offered such rebates, the amount of such rebates, and the extent to which they are tied to formulary position; (c) the procompetitive reasons why Sanofi and other drug manufacturers have offered rebates to PBMs and other Payors; (d) the extent to which Sanofi and other drug manufacturers have offered rebates on products in which they were the market leader, when they faced a new competitor, or when they faced generic competition; (e) the history of and market forces driving rebates offered

to PBMs and other Payors; (f) the use of formulary access and position by PBMs and other Payors to obtain rebates from manufacturers; and (g) the bases for Sanofi's allegations in its Complaint concerning rebates in the pharmaceutical industry and the "unprecedented" nature of Mylan's rebates.

13. Sanofi's strategies for marketing Auvi-Q, including (a) including the consumers, health-care professionals, PBMs, and other Payors that Sanofi identified as likely customers for Auvi-Q prior to launch; (b) the nature, extent, and cost of Sanofi's advertising and promotion to consumers or consumer groups; (c) the nature, extent, and cost of Sanofi's advertising and promotion to physicians or health-care professionals; (d) any involvement by Sanofi or kaleo in funding, sponsoring or participating in any studies involving Auvi-Q; (e) the nature, extent, and cost of Sanofi's advertising and promotion to managed care, health plans, PBMs, and Payors; (f) the persons involved in developing, approving, and implementing Sanofi's marketing strategies for Auvi-Q; (g) the nature, extent, and cost of Sanofi's efforts to introduce Auvi-Q into schools, including the terms and conditions of any programs; (h) the decision to sell Auvi-Q in two-device packs; (i) all changes made to those strategies from the launch of Auvi-Q until its recall from the market; (j) all evaluations of the effectiveness of such strategies; and (k) all complaints or concerns expressed relating to such strategies.

14. The structure and compensation of Sanofi's sales force as it pertained to Auvi-Q, including (a) the roles and responsibilities of Regional Sales Directors, District Sales Managers, Sales Representatives, and District Sales Trainer, and the impact of Auvi-Q sales on the compensation paid to any of them; (b) the recruitment, qualifications, and experience of the Auvi-Q sales force and all bonuses received by any of them based on Auvi-Q sales; and (c)

Sanofi's practices and procedures for reporting and investigating complaints or allegations of misconduct regarding its sales force.

15. The marketing and promotional activities of Sanofi's Auvi-Q sales force, including (a) the development and content of Auvi-Q marketing materials; (b) the persons involved in developing, approving, and implementing those materials; (c) the development of training materials related to Auvi-Q for use in training the sales force; and (d) all comparisons between Auvi-Q and the EpiPen Auto-Injector; (e) all instances in which Sanofi representatives paid or offered cash or other forms of consideration for Auvi-Q prescriptions; and (f) all complaints or concerns about Sanofi's marketing or promotion of Auvi-Q and the actions taken by Sanofi to investigate and respond to those complaints and concerns.

16. The projected and actual sales volume and market share (together, "Sales") for Auvi-Q, including (a) all persons, groups, or entities involved in projecting or reporting on Auvi-Q Sales; (b) all methods for projecting or determining Auvi-Q Sales; (c) all documents generated or received relating to projected or actual Auvi-Q Sales; (d) all factors and information considered in projecting Auvi-Q Sales; (e) all projections of Auvi-Q Sales and the reasons for any changes in those projections; and (f) all analyses or other communications commenting on factors affecting projected or actual Sales.

17. The safety and efficacy of Auvi-Q, including (a) all communications with regulators, PBMs, other Payors, physicians, consumers, pharmacists, and other third parties concerning the efficacy or safety of Auvi-Q; (b) all communications with regulators, PBMs, other Payors, physicians, consumers, pharmacists, and other third parties concerning any potential or reported malfunction, defect or injury possibly caused by Auvi-Q; (c) all consumer complaints received by Sanofi related to the efficacy or safety of Auvi-Q; (d) the persons, groups

9

or entities responsible for handling or reporting such communications and complaints; (e) all steps taken by Sanofi or anyone else in response to such communications; (f) all analyses or communications expressing concerns about the safety or efficacy of Auvi-Q; (g) all documents or communications considering any effect of safety and efficacy on sales or formulary coverage of Auvi-Q; and (h) all lawsuits alleging a failure of, or an injury caused by, Auvi-Q.

18. The recalls of Auvi-Q and Allerject from the market in the United States and Canada, including (a) all persons, groups or entities involved in the recalls; (b) all documents generated or received relating to the recalls; (c) all communications with FDA or other regulatory body relating to the recalls; (d) all reasons for such recalls and all steps taken to remedy any such issues; (e) all claims, lawsuits, or complaints relating to such recalls; (f) all agreements or payments made by Sanofi to compensate anyone for such recalls; (g) all projected, estimated or actual losses sustained by Sanofi as the result of such recalls; and (h) all claims made or coverage or compensation received by Sanofi relating to the recalls.

19. The sales, marketing, and pricing of Allerject in Canada or elsewhere, including (a) the organizational and reporting structure of the persons, groups, or entities involved with Allerject; (b) the projected and actual sales volume and market share for Allerject, and the reasons for any changes in the projections; (c) the financial performance of Allerject, including all sales, revenue and profit attributable to Allerject; (d) the pricing Allerject and competing products; (e) marketing strategies and activities for Allerject and the extent to which those were coordinated with the marketing strategies and activities for Auvi-Q; and (f) coverage of Allerject on commercial, government or other formularies and all steps taken to affect such coverage.

20. The corporate organization of Sanofi, its parent, and any affiliate with a role or responsibility relating to the sale, marketing, pricing, contracting, development, manufacture or

distribution of Auvi-Q, including (a) all departments responsible for those aspects and the reporting relationships within those departments; and (b) the extent to which the Board of Directors, Chief Executive Officer, or other officers of Sanofi's parent entity made, reviewed, or approved decisions concerning Auvi-Q or made public or external statements relating to Auvi-Q.

21. The financial performance of Auvi-Q, including (a) all persons, group or entities involved in analyzing and reporting on such performance; (b) all documents and financial reports containing information on such performance; (c) all sales, revenue and profit attributable to Auvi-Q; (d) all direct and indirect costs charged or attributable to Auvi-Q; and (e) all evaluations or analyses of the factors underlying Auvi-Q's financial performance.

22. The damages that Sanofi claims it sustained as a result of Mylan's alleged conduct, including any lost sales or income, "spillover effect" as alleged in paragraph 103 of Sanofi's Complaint, or higher costs; the amount of any such damages; and the methods by which Sanofi measured such damages and determined they were because of Mylan's alleged conduct.

23. Sanofi's relationship with kaleo, including (a) all persons, groups or entities involved in communicating with kaleo; (b) the nature and frequency of such communications; (c) all responsibilities retained by kaleo during the period of Sanofi's license of Auvi-Q; (d) any threats or other assertions of possible claims/disputes; (e) resolution of such disputes; and (f) the extent to which kaleo stands to benefit from any judgment entered in this action.

24. The "new strategic roadmap over the next five years" that Olivier Brandicourt announced for Sanofi in the Fall of 2015, including (a) all persons, groups or entities involved in the development and adoption of that roadmap; (b) all documents generated or received relating to that roadmap; (c) the information and factors considered in adopting and announcing that roadmap; (d) all differences between Sanofi's prior strategies and the strategies in that roadmap;

(e) the products on which Sanofi would be focused under that roadmap; and (f) the relationship between Auvi-Q and that roadmap.

25. Sanofi's decision to return to kaleo its rights to Auvi-Q, including (a) the timing of that decision and all steps and communications leading up to it; (b) the persons, groups or entities involved in making or approving that decision; (c) the information and factors considered in making or approving that decision; and (d) the documents and presentations generated or received relating to that decision.

26. Documents, presentations, submissions, responses, statements, and communications between Sanofi and any governmental, investigative, legislative or regulatory official, department, agency or body regarding Auvi-Q, the EpiPen Auto-Injector, Lantus, Toujeo, Apidra, Soliqua, contracting with PBMs and Payors, pharmaceutical rebates, and formulary coverage including all such items for the following investigations: (i) the U.S. Department of Justice's investigation concerning contracts with, services performed by, and payments to PBMs regarding Lantus and Apidra; (ii) the Washington State Attorney General's investigation relating to pricing and trade practices for Lantus, Toujeo, Apidra, and Soliqua; (iii) the Minnesota State Attorney General's investigation concerning Sanofi's pricing and trade practices with respect to Lantus and Toujeo; and (iv) any state or federal government investigations relating to the pricing of EAI Drug Devices, contracting with PBMs or third-party payors for EAI Drug Devices, or competition between manufacturers of EAI Drug Devices

27. Sanofi's communications with PBMs and Payors regarding Lantus, Toujeo, Apidra, and Soliqua, including (a) all persons, groups, or entities involved in conducting or supervising such communications; (b) all documents constituting or relating to such communications; (c) the timing, size, and nature of rebate offers made on Auvi-Q and the extent

to which such offers were conditioned on anything, including formulary status; (d) all factors and information considered before making those rebate offers; (e) the process by which Sanofi secured internal approval for rebate offers; (f) the individuals, groups, or departments that had authority to approve rebate offers, and the extent to which Sanofi was prepared to provide rebates larger than what was offered; and (g) rebates, discounts, or offers on other Sanofi products bundled with or in any way related to Auvi-Q.

28.     The factual bases for the allegations in Sanofi's Complaint and for the admissions, denials, responses, and Affirmative Defenses in Sanofi's Answer to Mylan Specialty L.P.'s Counterclaims.

Date:  June 4, 2018

Philip A. Sechler
Kathryn S. Zecca
Lee Turner Friedman
Jessica Arden Ettinger
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street NW, Suite 411-L
Washington, District of Columbia 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510
psechler@robbinsrussell.com
kzecca@robbinsrussell.com
lfriedman@robbinsrussell.com
jettinger@robbinsrussell.com

*Counsel for Mylan Inc. and
Mylan Specialty L.P.*

**CERTIFICATE OF SERVICE OF NOTICE OF RULE 30(b)(6) DEPOSITION OF PLAINTIFF/COUNTERCLAIM DEFENDANT SANOFI-AVENTIS U.S., LLC**

Defendant Mylan Inc. and Defendant/Counterclaim-Plaintiff Mylan Specialty L.P., by and through undersigned counsel, hereby certify that a true and correct copy of their notice of Rule 30(b)(6) deposition of Plaintiff/Counterclaim Defendant Sanofi-Aventis U.S., LLC was served upon the following counsel in this matter, by email, on June 4, 2018.

Ryan C. Hudson
Rex A. Sharp
REX A. SHARP, PA
5301 W. 75th Street
Prairie Village, Kansas 66208
rhudson@midwest-law.com
rsharp@midwest-law.com

*Liaison Counsel for Plaintiffs*

Raj Gandesha
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
rgandesha@whitecase.com

Joseph M. Rebein
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, Missouri 64108
jrebein@shb.com

*Counsel for Pfizer, Inc., Meridian Medical Technologies, Inc., and King Pharmaceuticals, Inc.*

Brian C. Fries
James Moloney
LATHROP & GAGE LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
bfries@lathropgage.com
jmoloney@lathropgage.com

Eric S. Hochstadt
Yehudah L. Buchweitz
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
eric.hochstadt@weil.com
yehudah.buchweitz@weil.com

*Counsel for Sanofi-Aventis U.S., LLC*

14

Dated: June 4, 2018

s/ *Philip A. Sechler*
Philip A. Sechler
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
1801 K Street NW, Suite 411-L
Washington, District of Columbia 20006
Telephone: (202) 775-4492
Fax: (202) 775-4510
psechler@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim-Plaintiff Mylan Specialty L.P.*