1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
2

3    IN RE: EPIPEN                        Docket No. 17-md-2785
     (Epinephrine Injection, USP)
4    Marketing, Sales Practices
     and Antitrust Litigation
5                                         Kansas City, Kansas
                                          Date:  9/13/2018
6
     . . . . . . . . . . . . . . . . . . . . . . . . .
7
                    TRANSCRIPT OF STATUS CONFERENCE
8
                              BEFORE
9
               THE HONORABLE DANIEL D. CRABTREE
10             UNITED STATES DISTRICT COURT JUDGE

11               THE HONORABLE TERESA J. JAMES
               UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Class Plaintiffs:

15   Rex A. Sharp                   Lynn L. Sarko
     Ryan C. Hudson                 Gretchen F. Cappio
16   Rex A. Sharp, PA               Keller Rohrback
     5301 W. 75th Street            1201 3rd Avenue
17   Prairie Village, KS 66208      Suite 3200
                                    Seattle, WA 98101
18   Warren Burns
     Amanda Klevorn - LA
19   Burns Charest, LLP
     900 Jackson Street
20   Suite 500
     Dallas, TX 75202
21

22

23

24

25

```
 1  │  APPEARANCES (continued):

 2  │  For Sanofi-Aventis US, LLC Plaintiffs:

 3  │  Yehuda L. Buchweitz
    │  Eric S. Hochstadt
 4  │  Weil, Gotshal & Manges, LLP
    │  767 Fifth Avenue
 5  │  New York, NY 10153

 6  │  For Local 282 Welfare Trust Fund Plaintiffs:

 7  │  Stuart A. Davidson
    │  Brian O. O'Mara - DC
 8  │  Robbins Geller Rudman & Dowd LLP
    │  120 East Palmetto Park Road
 9  │  Suite 500
    │  Boca Raton, FL 33432

10  │

11  │  For the Mylan Defendants:

12  │  Brian C. Fries                  Adam K. Levin
    │  James Moloney                   David M. Foster
13  │  Lathrop & Gage, L.C.            Carolyn A. DeLone
    │  2345 Grand Boulevard            Kathryn M. Ali
14  │  Suite 2800                      Hogan Lovells US LLP
    │  Kansas City, MO 64108           555 Thirteenth Street, NW
15  │                                  Washington, DC 20004

16  │  Philip A. Sechler
    │  Ralph C. Mayrell
17  │  Robbins, Russell, Englert, Orseck, Untereiner
    │   & Sauber LLP
18  │  1801 K Street, N.W.
    │  Suite 411L
19  │  Washington, D.C. 20006

20  │
    │  For the King Pharmaceuticals, Inc., Meridian Medical
21  │  Technologies, Inc. and Pfizer Defendants:

22  │  Raj Gandesha                    Devan Rittler
    │  White & Case LLP                Shook, Hardy & Bacon LLP
23  │  1221 Avenue of the              2555 Grand Boulevard
    │  Americas                        Kansas City, MO 64108
24  │  New York, NY 10020

25  │
```

INDEX OF AGENDA ITEMS

1

2        Item 4                                    7

3        Item 1                                    8

4        Item 3                                   27

5        Item 5                                   47

6        Item 6                                   47

7        Item 7                                   64

8        Item 8                                   68

9        Item 2                                   74

10       Item 9                                   89

11       Item 10                                  95

12       Item 11                                 106

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Court called to order.)

2              JUDGE CRABTREE:  All right.  We're on the

3     record in Case No. 17-M -- I'm sorry, 17-2785.  It's

4     captioned *In re: EpiPen*, *Marketing Sales Practice and*

5     *Antitrust Litigation*.  This is noticed as a status

6     conference in the case.  I know for a fact Judge James

7     and I both have received and reviewed your status

8     reports carefully because we've talked at length about

9     them.  So we've done our homework.

10             Here's my thought for the day -- and as you all

11    know, I asked the courtroom deputy, who is stuck with

12    me, to share with you all some additional points that I

13    would like to visit with you all about in front of

14    Judge James.  So my thought is we'd start with the

15    agenda that you proposed.  I think I'd like to -- here's

16    the first audible of the day, let's defer the discussion

17    of the expert schedule for the Sanofi case to the back

18    end, I think it may fit more logically there, and not

19    interrupt your discussion.

20             It would help me if I could just get some -- I

21    don't see you guys as frequently as Judge James does and

22    I'd like to get reoriented again.  So let me just get

23    identification of the counsel who plan to speak today or

24    who is here in a leadership appointed role starting with

25    the class plaintiffs.

1            MR. BURNS:  Warren Burns with Burns Charest

2    for the class plaintiffs, Your Honor.

3            MR. SARKO:  Lynn Sarko from Keller Rohrback

4    for the class plaintiffs.

5            MS. CAPPIO:  Hi, Your Honors.  Gretchen

6    Cappio from Keller Rohrback for the class plaintiffs.

7            MR. SHARP:  Rex Sharp for plaintiffs.

8            JUDGE CRABTREE:  All right.  One more.

9            MR. O'MARA:  Good afternoon, Your Honor,

10   Brian O'Mara from Robbins, Geller, Rudman and Dowd.

11           MR. DAVIDSON:  Good morning, Your Honor,

12   Stuart Davidson, Robbins Geller on behalf of class

13   plaintiffs.

14           MS. KLEVORN:  Amanda Klevorn from Burns

15   Charest on behalf of the class plaintiffs.

16           JUDGE CRABTREE:  All right.  Good afternoon.

17   Thanks very much.

18       And then for the Sanofi plaintiff.

19           MR. BUCHWEITZ:  Good afternoon, Your Honors.

20   Yehuda Buchweitz, Weil, Gotshal & Manges for Sanofi.

21   With me Eric Hochstadt also from Weil; and Chris Liwski,

22   our client.

23           JUDGE CRABTREE:  Good afternoon to the two

24   of you.

25       And switching over to the defendants' side of the

17-md-2785   In re: EpiPen  9.13.18                    6

1    aisle starting with the Mylan defendants.

2              MR. SECHLER:  Good afternoon, Your Honor.

3    Phil Sechler from Robbins Russell here on behalf of the

4    Mylan defendants.

5              MR. LEVIN:  Good afternoon, Your Honors.

6    Adam Levin from Hogan Lovells here also on behalf of the

7    Mylan defendants.

8              MS. ALI:  Good afternoon, Kathryn Ali from

9    Hogan Lovells also on behalf of the Mylan defendants.

10             MR. FRIES:  Good afternoon, Your Honor.

11   Brian Fries from Lathrop & Gage on behalf of the Mylan

12   defendants.

13             MS. DELONE:  Good afternoon.  Carrie Delone

14   from Hogan Lovells on behalf of the Mylan defendants.

15             MR. FOSTER:  Good afternoon, Your Honors.

16   David Foster from Hogan Lovells also on behalf of the

17   Mylan defendants.

18             MR. MAYRELL:  Ralph Mayrell from Robbins

19   Russell on behalf of Mylan.

20             JUDGE CRABTREE:  All right.  Good afternoon

21   to all of you.

22         And then the Pfizer people, did they give you a

23   table?

24             MR. GANDESHA:  We get --

25             JUDGE CRABTREE:  I used to get this table at

17-md-2785    In re: EpiPen   9.13.18                    7

1   the holidays in my house.

2           MR. GANDESHA:  We didn't want to take away

3   space from others who might be more of a speaking role

4   today.  Good afternoon, Your Honors.  Raj Gandesha of

5   White & Case on behalf of the Pfizer defendants.

6           MR. RITTLER:  I'm Devon Rittler from Shook,

7   Hardy & Bacon with the Pfizer defendants.

8           JUDGE CRABTREE:  Good afternoon, everyone.

9   So, as my practice, I'm going to get out of Judge James'

10  way and turn the proceedings over to you, Your Honor.

11          JUDGE JAMES:  Thank you.  Good afternoon,

12  everyone.  It's good to see you all again and thanks for

13  traveling in for again another one of these status

14  conferences.  We will follow the agenda -- with the

15  exception that Judge Crabtree noted -- this afternoon

16  with one exception, and that is there is one issue that

17  we can get out of the way and that is Item 4 on the

18  agenda and I'm ready to rule on that.  That is noted in

19  the agenda as Mylan's objections and response to Request

20  for Admission No. 56.  The court is ready to rule.

21          MS. DELONE:  Your Honor, my apologies for

22  interrupting you, but the parties had actually reached

23  an agreement on that issue before we got here.

24          JUDGE JAMES:  All right.

25          MS. DELONE:  And so we've -- yeah.

17-md-2785   In re: EpiPen  9.13.18

1          MR. HOCHSTADT:  Your Honor, on behalf of the

2    plaintiffs, I can, please, report that issue has been

3    resolved by the parties.

4          JUDGE JAMES:  All right.  You stole my

5    thunder, but okay.  All right.  Very good.  Well,

6    that's one off of the agenda.

7          JUDGE CRABTREE:  Don't you want to know what

8    she was going to rule?

9          MR. HOCHSTADT:  It depends.

10         JUDGE JAMES:  Okay.  Let's go back up to the

11   top of the agenda and the first issue is Mylan's

12   discovery issues with class plaintiffs.  And the first

13   issue has to do with local -- the Local 282 deposition

14   and production/fact sheet deficiencies.  We have read

15   your reports and I know that there has been -- Mylan has

16   filed its motion to compel and the response is due I

17   think on September 21st would be the response deadline.

18   Anybody want to update me on the status of that?  Can we

19   expedite that response deadline?  Do you have this one

20   resolved too or...

21         MS. ALI:  Unfortunately -- well, we've

22   resolved a few of the issues raised here, Your Honor.

23   So we -- you know, as Your Honor is aware, we have filed

24   a brief on this issue.  But with respect to the -- and

25   that brief deals with a few different issues.  One is

17-md-2785   In re: EpiPen   9.13.18

1   things that happened at the deposition, and those are

2   sort of bifurcated into two issues, one being the

3   conduct of Local 282's general counsel and the second

4   being the witness's lack of preparedness for the

5   deposition.  And the second set of issues are

6   deficiencies that we identified in Local 282's document

7   production and plaintiff fact sheet response that we

8   became aware of at that deposition.

9         With respect to the latter set of issues, those

10  have mostly been resolved, at least tentatively for now,

11  Your Honor, and I'll get to that.

12        On the deposition conduct and preparedness

13  issues, while we have filed a brief on that, we think

14  the transcript really speaks for itself here.  And this

15  is not an issue that requires a lot of complex legal

16  analysis.  And, in fact, these kind of issues are often

17  dealt with on the fly at the deposition by calling the

18  court.  And in hindsight perhaps that would have been a

19  more efficient way to deal with this, but we perhaps

20  were overly optimistic that we would have -- we could

21  reach some kind of resolution without needing to do

22  that.

23        And just briefly, Your Honor, I won't belabor the

24  point, we put a lot of this in our brief, but the fact

25  of the matter was at that deposition Local 282's general

 1    counsel, who is not -- not entered an appearance in this

 2    case, was not defending the deposition and therefore

 3    really shouldn't have been speaking on the record or

 4    making objections at all, interrupted that deposition at

 5    least a dozen times.  And it wasn't just the frequency

 6    of those interruptions but also their tone and

 7    substance.

 8            These were lengthy speaking objections.  He

 9    became irate on several occasions.  He interjected to

10    coach the witness before the witness answered several

11    questions from defendants, which I don't need to tell

12    Your Honors directly contravenes the District of

13    Kansas's deposition guidelines, not to mention the

14    federal rules, on these.  And I think the examples that

15    we and Pfizer provided in our joint motion sort of give

16    a pretty good flavor for what was going on during that

17    deposition.

18            And ultimately this conduct not only delayed and

19    disrupted the deposition but it really changed the whole

20    tenor of the deposition and created an atmosphere where

21    the witness was not free to freely answer and fully

22    answer the questions being asked by defense counsel.

23            In combination with the other issue, which was

24    the witness was not prepared to testify as to at least

25    half a dozen topics, just completely frustrated the

1    defendants' ability to take a useful and efficient

2    deposition.  And this is, again, all laid out in our

3    motion, so I won't belabor the point.

4         But suffice it to say the gaps in knowledge of

5    this witness were not on small points.  We noticed -- he

6    was noticed on a lot of topics.  We don't expect him to

7    be prepared to answer every question about minutia on

8    every topic, but these were major issues, including, for

9    example, the 30(b)(6) designee Mr. Bulding didn't know

10   what epinephrine auto-injectors were covered on

11   Local 282's formulary at any point in time despite the

12   fact that that issue is really central to this case, but

13   it was also expressly within one of the topics on which

14   he was noticed.  And, in fact, at one point the witness

15   testified that he didn't even know if the formulary

16   status of epinephrine auto-injectors was an issue in the

17   case.

18        And, frankly, Your Honor, that's astounding to

19   us.  It's not only absolutely central to the plaintiffs'

20   allegations, that issue is mentioned over a hundred

21   times in plaintiffs' complaint, but it was one of the

22   topics on which he was designated which read "the

23   formulary applicable to health benefit plans offered by

24   Local 282 and negotiations regarding the same."

25             JUDGE JAMES:  Excuse me.  Have counsel

17-md-2785   In re: EpiPen  9.13.18                    12

 1    conferred about these issues?  Is there some resolution

 2    that's been proposed?

 3           MS. ALI:  We have conferred, Your Honor.  At

 4    this point there's no resolution.  Plaintiffs' counsel

 5    has suggested that perhaps we could issue written

 6    interrogatories on some of these issues.  Of course

 7    we're willing.

 8           JUDGE JAMES:  If I could turn to plaintiffs'

 9    counsel and plaintiffs' counsel who was present for this

10    deposition.

11           MR. O'MARA:  Yes, Your Honor.

12           JUDGE JAMES:  Is this an accurate

13    representation about the -- representations about the

14    conduct of the general counsel?

15           MR. O'MARA:  No, I don't believe it's

16    accurate, Your Honor, and I'm happy to address.

17           JUDGE JAMES:  Were you present for the

18    deposition?

19           MR. O'MARA:  Yeah.  In fact, of the people

20    in this courtroom, I'm the only one who was present at

21    that deposition.

22           JUDGE JAMES:  All right.

23           MR. O'MARA:  It is not accurate.  It is

24    accurate that he spoke.  I find it hard to believe

25    counsel's representation he interrupted 12 times.  He

1    may have spoke 12 times during the deposition.  I don't

2    believe he interrupted 12 times.  And, you know, if I

3    can -- if I can address counsel's points --

4              JUDGE JAMES:  Well, I don't want to spend

5    too much time on this.

6              MR. O'MARA:  Yeah.

7              JUDGE JAMES:  For one thing, I wasn't

8    provided the context of the deposition questions and the

9    objections.  But I will say to you some of those lengthy

10   talking objections seem very inconsistent with our

11   deposition guidelines in this district, and it did

12   appear to be coaching and argumentative and a whole lot

13   of problems with some of those lengthy spoken

14   objections.  Do you --

15             MR. O'MARA:  I understand, but I don't agree

16   with the characterization of this.  There were -- there

17   were two or three instances where there were -- there

18   were exchanges between plaintiffs' counsel and the

19   counsel taking the deposition.  One of those was

20   initiated by defense counsel.  Two of them were

21   initiated by us where we felt that either the questioner

22   was badgering the witness on documents that, first of

23   all, that the witness didn't know if they should have

24   been produced, and was badgering the witness on whether

25   or not they had been produced, why they hadn't been

1   produced.  And all of that -- all of that, the

2   production issues, were worked out among counsel many,

3   many, many months ago.

4            JUDGE JAMES:  All right.  Well, before we

5   get into arguing about how all that ended, which I don't

6   want to get into today --

7            MR. O'MARA:  Sure.

8            JUDGE JAMES:  I don't mean to cut you off.

9            MR. O'MARA:  That's fine, Your Honor.

10            JUDGE JAMES:  There is a response deadline

11   coming up.  I'd like to expedite that and I'd also like

12   to encourage counsel to talk about how this might be

13   resolved.  We are at a point in this case where this

14   needs to be dealt with quickly.  If there's going to be

15   some follow-up discovery done, whether it's deposition

16   or written interrogatories or whatever, clearly this

17   needs to be dealt with.

18        If something like this happens in the future,

19   please try and call chambers.  Because if there was bad

20   conduct going on, you know, unfortunately, magistrate

21   judges, we get these calls not infrequently.  And it's

22   -- I mean, I understand your position, both sides, when

23   you're dealing with these issues and there's grousing

24   and people are unhappy and it's chaos.  I've been there

25   and I understand that.  If it's a difficult situation,

1    better to try and get it addressed at the time and get

2    the behavior corralled and agree it's okay.  And I'm not

3    prejudging general counsel's conduct here other than to

4    say some of what I saw in the transcript or the quoted

5    language from the deposition I don't look favorably on.

6                MR. O'MARA:  I understand, Your Honor.

7                JUDGE JAMES:  So let's -- I want you all to

8    confer seriously about this.  And, Mr. O'Mara, I think

9    you should be involved since you were at the deposition.

10               MR. O'MARA:  I --

11               JUDGE JAMES:  People who were at the

12   deposition on both sides should be involved in these

13   discussions.  See if you can get it resolved.  According

14   to my notes, your response would be due September 21st.

15               MR. O'MARA:  That would be a week from

16   tomorrow, Your Honor.

17               JUDGE JAMES:  Tomorrow?

18               MR. O'MARA:  A week from tomorrow is the

19   21st.

20               JUDGE JAMES:  How soon can you do that?

21               MR. O'MARA:  How about next Wednesday?

22               JUDGE JAMES:  Let's see, that would be the

23   19th?

24               MR. O'MARA:  Yes, Your Honor.

25               JUDGE JAMES:  Your response will be

1    expedited to September 19th and then we will give -- if

2    there's a reply to be filed, we'll give you until the

3    24th to file your reply.

4         Please, I really encourage you all to talk about

5    how this issue or these issues can be resolved without

6    -- without me interjecting.

7         MR. O'MARA:  Thank you, Your Honor.  Just

8    can I make a couple points?  One -- one, I was involved

9    in the conversation with Ms. Ali yesterday, so I am

10   involved in the discussions on this matter.

11        A second point was there was a discussion with --

12   with counsel on whether or not to call chambers and he

13   elected not to call chambers and get chambers involved.

14        And then, three, the totality of the complaints

15   that counsel has in the deposition total less than

16   10 minutes.  It's like 9 minutes and 40 seconds.  So I

17   just want to put that in context of what we're dealing

18   with here.

19        There was no -- there was no effort to impede a

20   fair examination of the witness.  If you -- if you read

21   the transcript, you can see that the witness was not

22   prevented from asking -- or answering any of the

23   questions that were there.  He was fully prepared for

24   his deposition.  This is -- this entire motion is -- has

25   been taken out of context.  It's not well-founded, and

1    there's no reason why they insisted on putting this

2    first on the agenda today.

3            JUDGE JAMES:  Let me say this:  I encourage

4    all of you who are involved in taking depositions or

5    defending depositions in this case, even if you have in

6    the past, go back and review our deposition guidelines,

7    and maybe take a look at a case or two which talks about

8    what's inappropriate coaching of witnesses or

9    interrupting witnesses.  And our jurisdiction takes that

10   pretty seriously.  So that's word to the wise for all of

11   you on all sides.

12           MR. O'MARA:  Thank you, Your Honor.  And I

13   take it seriously as well.  And I will ask for and would

14   hope that the court would indulge me and have oral

15   argument on this if it's so inclined.  Thank you, Your

16   Honor.

17           JUDGE JAMES:  Thank you.

18           JUDGE CRABTREE:  If Judge James is not

19   available for one of those calls, I will be available.

20           JUDGE JAMES:  In fact, ask for him first.

21   All right.  Anything further on that?  You're standing

22   for a reason I guess.

23           MS. ALI:  Nothing further on the deposition

24   conduct issue.  But on the local -- on the document

25   issues, the parties have successfully, I think, resolved

1   most of those issues at least at this time.  We've

2   reached agreement with plaintiffs that they are going to

3   produce the documents we identified and amend the fact

4   sheet.  We did -- we said this in our motion -- the

5   reason we included this in our motion is we haven't yet

6   received those productions and wanted to make sure that

7   we preserved the issue.  There is one issue with

8   respect --

9           JUDGE JAMES:  When are those documents to be

10  produced?  I'm sorry to interrupt you.

11          JUDGE CRABTREE:  This is the second request

12  for production documents?

13          MS. ALI:  This is separate than that, Your

14  Honor.  These are documents that we identified that the

15  30(b)(6) witness testified to during the deposition.

16          JUDGE JAMES:  With regard to the Local 282?

17          MS. ALI:  Correct.

18          JUDGE CRABTREE:  Thank you.

19          MR. O'MARA:  Your Honor, some of them have

20  been produced and they -- and the representation -- the

21  agreement was that we would look for these documents.

22  To the extent that they were responsive and existed,

23  then we will produce them.

24          JUDGE JAMES:  Is there a deadline by which

25  you agree to provide any of these additional documents?

1          MR. O'MARA:  We're looking for them now.

2   There is no -- there's no hard, fast deadline.  I

3   represented that I would get them to counsel as soon as

4   -- as soon as possible -- as soon as possible date.  So

5   we're working expeditiously.  I know the client is

6   looking for them as we speak.

7          JUDGE JAMES:  Okay.

8          MR. O'MARA:  Maybe not this minute but this

9   week and last week.

10          JUDGE JAMES:  All right.  We'll give you

11   until Friday.

12          MR. O'MARA:  Tomorrow morning?

13          JUDGE JAMES:  Monday.  Monday.

14          MR. O'MARA:  I don't think that that's going

15   to be possible to complete production of all these

16   documents.

17          JUDGE JAMES:  Okay.  Your response is due

18   next Wednesday, so they'll need to be produced by then.

19          MR. O'MARA:  Okay.  We'll do our best, Your

20   Honor.

21          JUDGE JAMES:  Thank you.

22          MS. ALI:  Thank you, Your Honor.

23      So there is one pretty narrow issue with the fact

24   sheet response that we've not been able to reach

25   resolution on, and that is to questions 4J through M on

17-md-2785    In re: EpiPen  9.13.18                          20

1   the plaintiff fact sheet which all seek information

2   regarding rebates and other discounts that Local 282

3   received from its PBMs for epinephrine auto-injectors.

4   Local 282 responded to these questions in its fact sheet

5   response in a similar way that it responded to lots of

6   questions in the fact sheet responses which was to say

7   that this information was housed with its PBM and that

8   it did not have that information itself.  On these

9   particular questions, Local 282 also said that Local 282

10  receives rebate information from the PBMs only in the

11  aggregate and not for individual epinephrine

12  auto-injector products.

13       On the first -- on the first point here, when

14  asked at his deposition whether Local 282 could have

15  obtained that information necessary to answer these

16  questions, Local 282's designee testified that they

17  could, and more generally really they could have asked

18  the PBM for any information that had been requested of

19  them.

20       To the extent -- on the second piece of this,

21  which is that Local 282's represented that it doesn't --

22  that this information doesn't exist in the form that we

23  asked for it, and we hear that if that's in fact the

24  case.  But all we're looking for here is an equal

25  playing field where, if they are going to use data from

1   their PBMs about rebates that they received with respect

2   to EpiPen products or other epinephrine auto-injector

3   products and to give that to their experts, that, of

4   course, also we should have access to information to

5   give to our experts.  So it's not entirely clear to me

6   from our conversations what they do and don't have, what

7   they plan to use or not plan to use.  And that's where

8   we are looking for guidance from the court on.

9        Of course, Local 282 has made claims in this case

10   that they overpaid for EpiPen products.  They've also

11   made claims that my -- our client engaged in

12   anti-competitive behavior by paying rebate -- paying

13   high rebates.  These -- both of these are at issue here

14   with respect to this issue.  So to the extent that that

15   data exists, that they are intending to use the rebate

16   data, we, of course, think that we're also entitled to

17   that.

18             JUDGE JAMES:  Well, I -- they will have to

19   respond in good faith.  To the extent they have the

20   documentation, it's in your custody, possession or

21   control, obviously it has to be produced.

22             MR. O'MARA:  Thank you, Your Honor.

23             JUDGE JAMES:  All right.  Okay.  Are we next

24   ready for the second subpoint, which is class

25   plaintiffs' responses to the second request for

1   production?

2           MS. ALI:  Good afternoon again, Your Honor.

3           JUDGE JAMES:  All right.

4           MS. ALI:  So --

5           JUDGE JAMES:  Let me just kind of recap what

6   I think the situation is.

7           MS. ALI:  Sure.

8           JUDGE JAMES:  Mylan filed its motion to

9   compel on September 4th.  Plaintiffs' response was just

10  filed on 9/11.  And the reply then would be due

11  September 25th.  I'd like to expedite that reply

12  deadline.  Can you -- how soon can you file your reply?

13          MS. ALI:  Just looking at the calendar, Your

14  Honor.

15          JUDGE JAMES:  All right.

16          MS. ALI:  The 21st, Your Honor, next Friday,

17  the week from tomorrow.

18          JUDGE JAMES:  Let's see, all right, will

19  that -- will that work, 9/21, for the reply?  Okay.  All

20  right.  I don't think I need to hear argument on that

21  unless there's something not in the briefs that you'd

22  like to enlighten me with.

23          MS. CAPPIO:  Your Honor, Gretchen Cappio for

24  class plaintiffs.  One thing I would just mention is

25  none of the co-lead counsel in this case have ever

17-md-2785   In re: EpiPen  9.13.18                          23

1    received RFPs like that in any MDL or any other setting.

2    So one thing I'd just like to underline, as you're

3    reading all the briefing, is this is a very unusual set

4    of requests and we consider it pretty over the top.

5         We've carefully read the *GM* case.  We're very

6    familiar with Top Class Actions.  We don't use it.

7    There's a very ample record of correspondence.  And I

8    know you probably may not have read all the back and

9    forth yet, but I would refer you to my August 31st

10   letter where it's attached as Exhibit I to my

11   declaration and we made it very clear to the other side

12   that we are willing to go back.  We've gathered all the

13   documents that you ordered us to go find according to

14   the ESI search terms.  We have not yet run them against

15   these RFPs.  And we stand ready, willing, and able to do

16   that should Your Honor ask us to do it.

17            JUDGE JAMES:  All right.  Thank you.

18            MS. ALI:  I understand the court doesn't

19   want to hear argument on this, so I'll be very, very

20   brief.  We have -- we've had several meet and confers

21   with plaintiffs' counsel on this.  We've really -- what

22   we said in our brief is really all that we're asking

23   for.  And I think being clear what we're asking for

24   might help guide the court in how to decide this issue,

25   so -- and what we're not asking for.

1         Really what we're after here is the
2    advertisements that class counsel ran in order to
3    attract potential named plaintiffs in this lawsuit.
4    It's -- it's really not clear to us what the problem is
5    with producing those documents.  I understand that those
6    are documents that are in class counsels' files but
7    they're not privileged.  They're not -- we're not
8    seeking communications that they had with the named
9    plaintiffs or any other -- any prospective plaintiff.
10   We're seeking advertisements that were run on the
11   Internet, on social media platforms that were used to
12   solicit plaintiffs.
13        And the reason we're seeking that is because at
14   least 15 plaintiffs have testified in this case that
15   that's how they got involved in the litigation.  And
16   they have -- these plaintiffs have also testified that
17   they didn't see the two-pack press release.  They didn't
18   see this supposedly deceptive communications that they
19   allege in the complaint.  A lot of them didn't pay
20   anything or paid very little for EpiPens.  So it's clear
21   they didn't suffer some of the harms that are alleged in
22   the complaint.  And so we think we are entitled to know
23   what motivated them to file this lawsuit.  And the
24   advertisements that we're asking for go directly to that
25   -- potentially go directly to that question.  These are

1   public documents --

2            JUDGE JAMES:  Okay.  Do you understand

3   that's -- they are limiting their request to that,

4   Ms. Cappio?

5            MS. CAPPIO:  I am confused because it's

6   different from what their requests state.

7            JUDGE JAMES:  All right.  This is why you

8   all need to confer.  I mean, it sounds kind of like two

9   ships passing in the night.  So let's be clear on what

10  the dispute is and what's at issue, what's requested,

11  what's not.

12           MS. ALI:  Ms. Cappio is right our requests

13  are broader than that.

14           JUDGE JAMES:  Broader.

15           MS. ALI:  We have had several meet and

16  confers since then where we have made very clear what

17  we're seeking.  In our briefs that they have now

18  responded to already makes clear what we're seeking.

19           JUDGE JAMES:  So has your position changed

20  at all, lessened or narrowed your request at all from

21  what you expressed in your brief?

22           MS. ALI:  No, Your Honor, I think what we

23  say on the first page of the brief is we're looking for

24  advertisements and looking for any communications that

25  class counsel had with -- not with plaintiffs but with

1    the websites or social media platforms that may have

2    posted those advertisements.

3         MS. CAPPIO:  Your Honor, I've just got a

4    couple things.  There's nothing in the record to suggest

5    there's any impropriety here.  So this feels a little

6    like a fishing expedition or harassment.  Number two,

7    please read their *GM* case very clearly.  Again, it's the

8    *Top Class Actions* case.  And there were two kinds of

9    documents that the defendants requested in that case.

10        Number one, they requested the forms, these forms

11   the people filled out after they visited the social

12   media site.  It's just like the form on the Hogan

13   Lovells site.  And that's in our August 31st letter that

14   I mentioned.  Plaintiffs' counsel used the same kind of

15   forms.  They're not third-party forms back and forth.

16        The second thing is in that case Judge Furman in

17   the Southern District of New York specifically ruled

18   that defendants could not have the back and forth

19   between Top Class Actions and the plaintiffs' law firm

20   in that case.  It was considered work product.

21        So I would just really encourage and underline

22   the fact that we're not on all fours with that case.

23   That's their leading case.  They don't have anything in

24   the Tenth Circuit.  And even in that case, which is

25   their best case, they don't get what they're asking for

1  here.

2              JUDGE JAMES:  Okay.

3              MS. CAPPIO:  Thank you.

4              JUDGE JAMES:  All right.  Thank you both.

5              MS. ALI:  Thank you, Your Honor.

6              JUDGE JAMES:  All right.  Very good.  Well,

7  the next item on the agenda is the expert's schedule in

8  the Sanofi case, which we are moving to later on the

9  agenda.  And then the next item on the agenda is the

10  privilege logs, first beginning with Mylan's privilege

11  log.  Several things here I -- again, we don't have time

12  for me to hear detailed oral argument today on these.

13  These -- this has not been fully briefed yet, so I want

14  to talk about expediting the briefing schedule.

15         And then also plaintiffs' note in their status

16  report there are a couple of things they're requesting

17  from Mylan.  One is the Pfizer -- documents that were

18  reflected apparently on Pfizer's privilege log but not

19  noted or mentioned or identified by Mylan.  So I want to

20  take up those requests, that was one of them.

21         And the other was a request that Mylan address

22  some partial redactions in documents that were produced.

23         So first for Mylan -- and not to ignore you --

24  but first for Mylan, are you willing and agreeable to

25  respond with the information they've requested, those

1   two requests?

2           MR. FOSTER:  May I approach the podium, Your

3   Honor?

4           JUDGE JAMES:  Sure, come on up --

5           MR. FOSTER:  I'm on the back row today.

6           JUDGE JAMES:  -- Mr. Foster.  Go right

7   ahead.

8           MR. FOSTER:  Thank you.  I'll start with the

9   partial redactions, that's a meet and confer we had with

10  Ms. Klevorn.  And there I think we've reached an

11  agreement whereby we are going to provide the

12  information they want.  I think there are some

13  redactions we'll describe in more detail to them in a

14  conversation that I believe will occur next week.  So I

15  think we have a framework for moving forward on that and

16  we are willing to provide the information that they

17  requested.

18          JUDGE JAMES:  Okay.  That's a correct

19  response.

20          MR. FOSTER:  So on the Pfizer -- the Pfizer

21  log issue, Your Honor, is a tougher issue for us and,

22  frankly, it's an issue that -- that the plaintiffs have

23  used in their brief to paint us with allegations of bad

24  faith conduct.  They describe it as "very alarming" that

25  we have not logged or produced these documents that are

1   reflected on Pfizer's log, and even say that it calls

2   into question the entire integrity of our document

3   collection and privilege log process, and this could not

4   be further from the truth, Your Honor.

5        First of all, this is an issue that the class

6   plaintiffs raised 48 hours before they filed their

7   motion to compel.  They sent us two days before a list,

8   a highlighted version of Pfizer's privilege log, that

9   highlighted documents that had Mylan employees listed on

10  them that apparently, according to the class plaintiffs,

11  weren't logged by us and weren't produced by us.

12       And what I will submit to Your Honors is that

13  that fact is really a meaningless fact in this case.

14  Out of Pfizer's entire log, which goes on for thousands

15  of pages, there are only 206 documents that were

16  identified as fitting into this category.  And we have

17  looked at the Pfizer log entries at issue, Your Honor,

18  and 132 of those entries do not have a Mylan custodian

19  on them at all.  True there are Mylan employees listed

20  on these documents, but they're not custodians that we

21  were required to search for through our process that we

22  agreed to back in March.  So the fact that we have not

23  logged documents that only were received by custodians

24  who were not part of our ESI search process isn't

25  surprising.  It's not a deficiency.

1                    JUDGE JAMES:  Okay.

2                    MR. FOSTER:  It shouldn't require any

3      further explanation.

4                    JUDGE JAMES:  You have completed a review of

5      the questionable -- the Pfizer entries --

6                    MR. FOSTER:  Your Honor --

7                    JUDGE JAMES:  -- documents that have not

8      been identified by Mylan?

9                    MR. FOSTER:  Yes, Your Honor.  What I can

10     tell you is that 132 of them that don't have a custodian

11     at all.

12                    JUDGE JAMES:  Okay.

13                    MR. FOSTER:  And just to be clear, the class

14     plaintiffs could not have known this because they filed

15     this motion without meeting and conferring with us about

16     this issue.  They never gave us a chance to explain what

17     was on the Pfizer log, what the issues were to look into

18     this in any meaningful way before they filed a motion

19     that, frankly, accused us of bad faith for not producing

20     or logging these documents.

21          And so having looked at -- looked into it now --

22     so there are 74 documents on that log they highlighted,

23     or at least on the documents that was provided to us.  I

24     don't believe they filed it with the court.  There are

25     74 documents that do include Mylan custodians, right.

1   Of those documents, 40 are from 2009; 24 are from 2010.

2   So 86.49 percent of those documents are from 2009 or

3   2010.  And I think the fact that there are 74 documents

4   that Pfizer had that Mylan apparently didn't have or at

5   least didn't hit on Mylan's search terms -- which by the

6   way were different from Pfizer search terms -- isn't

7   surprising at all.  There was certainly no document

8   preservation obligations in place in 2009 and 2010,

9   almost a decade before this lawsuit.

10           JUDGE JAMES:  So how many did you say?

11   Forty from 2009.  And how many from 2010?

12           MR. FOSTER:  Twenty-four from 2010.

13           JUDGE JAMES:  So 64 of the 72 remaining were

14   old?

15           MR. FOSTER:  Correct.

16           JUDGE JAMES:  What about the other eight?

17           MR. FOSTER:  There were two from 2012, there

18   were two from 2013, and six documents from 2016.

19           JUDGE JAMES:  Okay.  So how are you dealing

20   with those?

21           MR. FOSTER:  Well, Your Honor, for those,

22   that narrow set of documents, I would be happy to talk

23   to Pfizer and look into whether we have those documents

24   or not and what happened to those.

25           JUDGE JAMES:  Okay.

17-md-2785   In re: EpiPen  9.13.18                    32

1          MR. FOSTER:  Frankly, I don't know if they

2     hit on our search terms.  So keep in mind we had

3     different search terms than Pfizer.  We had different

4     documents requests than Pfizer.  We have a different set

5     of documents that we're searching against than Pfizer.

6     To say there's some sort of hint of bad faith based on

7     this supposed discrepancy plaintiffs trumpet in their

8     motion is really -- is really beyond the pale.

9          JUDGE JAMES:  All right.  Thank you for the

10    clarification.  I understand it looks like you've gone

11    back and tried to identify those documents and that's

12    good and appropriate, so I appreciate that.  And if

13    plaintiffs have not -- did not confer before filing the

14    motion --

15          Well, I'll hear from you, Ms. Klevorn.

16          MS. KLEVORN:  Thank you, Your Honor.

17          JUDGE JAMES:  Thank you, Mr. Foster.

18          MS. KLEVORN:  Good afternoon, Your Honor.

19          JUDGE JAMES:  Good afternoon.

20          MS. KLEVORN:  We did discuss this issue with

21    the Mylan defendants on August 28th I believe.  So it

22    was a few days before the motion was filed.  In

23    recognition of the fact this was an issue that we

24    brought up with Mylan shortly before the motion was

25    filed, as the court will note, we did not request relief

1   on this particular issue in the motion but it was

2   something that we wanted to put on the court's radar.

3   It was yet another issue that we identified that from

4   our position calls into question the overall adequacy of

5   Mylan's search for relevant documents in this case,

6   production of relevant documents and/or logging of

7   documents.  And so what Mr. Foster just explained to you

8   is really all -- the explanation that we were looking

9   for.  We were simply --

10          JUDGE JAMES:  You hadn't heard this back on

11  August 28th, Ms. Klevorn?

12          MS. KLEVORN:  No.

13          JUDGE JAMES:  Was that the only conversation

14  you had with him?

15          MS. KLEVORN:  Yes.  Yes, Your Honor.

16          JUDGE JAMES:  That one conversation?  All

17  right.  You all need to talk.

18          MS. KLEVORN:  Yes, Your Honor.

19          JUDGE JAMES:  Obviously it sounds like

20  certainly the field of documents at issue can be

21  narrowed --

22          MS. KLEVORN:  Yes.

23          JUDGE JAMES:  -- it sounds like, based on

24  what Mr. Foster has said, if that's accurate, and I have

25  every reason to believe that it is.

17-md-2785   In re: EpiPen  9.13.18                     34

1          MS. KLEVORN:  Yes.

2          JUDGE JAMES:  So you all need to talk and

3   then maybe this can be resolved.  I mean, it doesn't

4   sound like a huge volume of documents.  So I want you

5   all to confer about the specific issue that's raised

6   here in Item 3.b on the agenda.  And then your reply,

7   Ms. Klevorn, is currently due 9/25.  I'd like you to

8   file it before then.

9          MS. KLEVORN:  Certainly.

10          JUDGE JAMES:  But I want you to confer

11   before you file anything and maybe you won't need to

12   file anything.  So can we move that up to, say -- your

13   reply to the 21st?

14          MS. KLEVORN:  Yes, certainly.

15          JUDGE JAMES:  Okay.  All right.  Did you

16   want to say anything else?  I kind of butt in on you

17   there.

18          MS. KLEVORN:  I will keep it brief and I

19   certainly -- I wanted to just say, particularly after

20   having reviewed the Mylan defendant's opposition to our

21   motion here, that I certainly recognize that the process

22   of putting a privilege log together in litigation of

23   this scale is a hefty task and I certainly understand

24   people can review similar or the same documents and make

25   different judgment calls about whether a privilege

1   applies and those judgment calls can be made in absolute

2   good faith.

3        I think it's clear in our motion that we did not

4   file here because the privilege log wasn't perfect to

5   begin with or because Mylan was working to review the

6   log but was reviewing it too slowly.  The real issue is

7   the timeline which I think we laid out fairly well

8   paired with the results that we ultimately got but only

9   as a result of this court's order on August 9th.  And so

10  we now know that approximately 20 percent of the

11  documents that were originally included in Mylan's

12  privilege log are, in fact, not privileged.

13       And so the documents that remain at issue bear

14  the same characteristics that we have been addressing or

15  trying to address with Mylan from the beginning.

16  They're still those business-oriented documents with 10

17  to 20 people involved in the communication, very few

18  attorneys involved.  And we just -- we feel that, based

19  on the timeline here and the results we have at this

20  point, it is not unfair for us to ask for some

21  additional form of relief at this point so that we can

22  get whatever other documents we are entitled to as soon

23  as possible because important depositions are ongoing,

24  particularly the Heather Bresch deposition, the Robert

25  Coury depositions.  They're coming up very soon and

1    those are two people whose names appear repeatedly in

2    this privilege log.  And so that's -- I will leave the

3    rest to the reply brief.

4            JUDGE JAMES:  All right.  Thank you,

5    Ms. Klevorn.

6            Let me just say, with regard to the privilege

7    logs, these issues have been going on -- this is the

8    third status conference I've heard argument and

9    discussion and aspersions about privilege logs.  And I

10   appreciate working on privilege logs is tedious and

11   tiresome and unpleasant and we don't like doing it and

12   sometimes it gets schlepped off on people low on the

13   totem pole, and that just complicates things and things

14   get missed.

15           And I'm not suggesting there's any attempted or

16   intentional bad faith here.  But come on, folks, this

17   has been going on a long time and there shouldn't still

18   be on privilege logs documents listed where there's no

19   attorney or on the list, and there shouldn't be these

20   situations where you can't tell the basis of the alleged

21   privilege.

22           The last time we met I told you to review the

23   seminal case from Kansas on the issue of what you have

24   to include in a privilege log.  And you are some of the

25   best lawyers around the country and you know what the

1   rules are.  Now, if you delegate the responsibility to

2   people with not nearly as much experience, you know, the

3   buck still stops with you.  And we're getting very late

4   in fact discovery in the main part of this case and we

5   should be beyond this point with privilege logs that

6   don't provide sufficient information.

7       So I just plead with you all to get high behind

8   it.  And, you know, if somebody more senior needs to

9   step in and say this is -- this needs to be on this

10  privilege log, now's the time.  In fact, it was a month

11  ago.  So let's -- let's do better about this.

12      I mean, I still see entries that are the subject

13  of some of the briefing where it looks to me like the

14  privilege log is not adequate.  And I'm not speaking to

15  specific categories of things and whether those -- the

16  way you've broken them down is proper or not.  I'm

17  talking about specific entries where it looks like the

18  information provided doesn't -- doesn't provide

19  sufficient information so that a reader can tell whether

20  it should be classified as privileged or work product.

21      And you know who bears the burden.  So we're

22  reaching a point where if you're the party that has the

23  privilege log that doesn't reflect why the document is

24  on the privilege log, you're probably going to be

25  waiving your privilege if you can't support it.  So...

17-md-2785    In re: EpiPen    9.13.18                           38

1              MR. FOSTER:  May I respond briefly, Your

2     Honor?

3              JUDGE JAMES:  Sure, Mr. Foster, very

4     briefly.

5              MR. FOSTER:  So based on your comments, Your

6     Honor, and -- and the comments of our colleague, I think

7     that it would be helpful to enlighten you a bit about

8     how we went about doing our privilege log amendment.

9          So there was a period of time before the last

10    status conference which I think the plaintiffs paint

11    with a broad brush as though we delayed for a long time

12    in getting back to them.  In fact, there were many meet

13    and confers.  We were trying to narrow the scope of the

14    dispute.

15         We got to the status conference on August 9th and

16    we heard you loud and clear.  We heard you say read the

17    *Hopkins* case.  We heard you say get on the stick and by

18    next week I want you to either amend your log and fix

19    all the problems if there are problems, and/or file a

20    motion for protective order.  And that's exactly what we

21    did, Your Honor.

22         What we did was we took our team of -- our core

23    team of people at Hogan Lovells who are working on this

24    case.  We were not using contract attorneys.  We are not

25    using people who were low on the totem pole.  In fact, I

1   will tell you that I spent the entire weekend after that

2   status conference -- and, Mylan, I didn't bill you for

3   this time -- but I spent the entire weekend reviewing

4   documents that are on the privilege log.  I personally

5   reviewed hundreds of entries.  Carry Delone reviewed

6   hundreds of entries.  Katie Ali reviewed hundreds of

7   entries.  The people that you are seeing in this court

8   are the people doing the work.  And there were times I

9   was at the office at that week at one o'clock in the

10  morning and there were multiple people there.  And there

11  were times I was up at three o'clock in the morning

12  checking this log.

13       We have done the work, Your Honor, to make sure

14  -- no one's perfect, but I'm not sure what else we can

15  do on this privilege log to -- what resource we could

16  throw at it to do it right.  We are committed to getting

17  it right.  And I think it speaks volumes that in their

18  entire brief, the entire motion to compel the plaintiffs

19  filed, they don't quote a single entry from our log.

20  There's never a time in the log where they say this is

21  what their entry said and look how bad it is.

22       The two cases that they cite, there's the *Taser*

23  case and *Vioxx* case where there were privilege waivers,

24  in those cases there were hundreds of thousands of

25  entries that didn't identify a sender or recipient.

1    They were massively defective.

2         In this case I don't think we have any issues --

3    at least I don't hear the plaintiffs saying there are

4    any issues about there not being attorneys on the

5    entries.  I think there are either attorneys on the

6    entries or in the descriptions.  I'm not aware of that

7    being an issue.  If the class plaintiffs think it's an

8    issue, they can raise it with us.  Sanofi isn't raising

9    any issues with Mylan about its privilege log about the

10   business issue, right.

11        And so I think we have done our level best to get

12   this to where it needs to be.  We're committed to moving

13   this forward.  We're not dragging our feet and we're

14   putting our money where our mouth is.  And the cost

15   we're paying for that is how angry my wife is at me when

16   I spend the whole weekend reviewing privilege log

17   entries instead of taking my kids to their baseball

18   game.  So, thank you, Your Honor.

19             JUDGE JAMES:  All right.  Anything else?

20        Sanofi's motion for protective order, let's see,

21   that is just now fully briefed and I think Sanofi filed

22   their brief at 10:30 -- was it last night or night

23   before?  So I will take judicial notice that you all

24   have been very industrious.  All of you are working

25   hard, I know that.  I don't -- I'm not prepared to rule

1    on this today.  And in part I thought I might be able to

2    rule on the Sanofi motion because it is fully briefed,

3    whereas class plaintiffs' motion to compel is not yet

4    fully briefed.

5          So I -- after receiving your brief, the reply, I

6    read it and I was focusing on trying to be able to rule

7    today.  I don't think I can do that because of the way

8    the arguments in class plaintiffs' motion and in the

9    Sanofi motion stack up and how one will affect the

10   other, or the same rules are going to apply on the

11   privilege log issues.  So I don't want to make a ruling

12   on the Sanofi motion that then may -- I may wish I ruled

13   differently because of the class plaintiffs' situation.

14         So I'm going to wait and read all the briefing,

15   which is now complete on the Sanofi motion, and then

16   after the reply is filed on the class plaintiffs'

17   motion, and then we'll issue orders on both that

18   hopefully are consistent.  They should be.  The same

19   rules apply.

20              MR. HOCHSTADT:  Thank you, Your Honor.

21              MR. MAYRELL:  If I may, I want to raise two

22   points.

23              JUDGE JAMES:  Very briefly.

24              MR. MAYRELL:  Very briefly.  I'm Ralph

25   Mayrell.

1            JUDGE JAMES:  Like I said, I'm not ready to

2  hear argument on this.

3            MR. MAYRELL:  I understand.  I'll keep it

4  very brief.  The first issue is that Mylan did file a

5  cross-motion which addresses documents that relate to

6  certain third parties, and in particular kaléo, and we

7  have not had a chance to file our reply in support of

8  the cross-motion.  So we would ask that we be able to

9  file our reply on that cross-motion by next Friday.

10            JUDGE JAMES:  You know, it's confusing the

11  way these things are entered in the docket, and I think

12  at least one of them was -- maybe the docket entry was

13  odd so I had trouble piecing together what was

14  responding to what on each of these, and maybe that's

15  just that I'm slow.

16            MR. MAYRELL:  I can clarify for you, Your

17  Honor.

18            JUDGE JAMES:  Yeah, what docket number are

19  you referring to that you can reply to?

20            MR. MAYRELL:  So, Your Honor, may I -- I

21  don't have the docket number in front of me now, but I

22  can tell you the order of events here is that on, I

23  believe it was, August 17th Sanofi moved for protection

24  regarding its privilege log and it moved with respect to

25  certain common issues that are the ones that you said

 1    you were going to be treating similarly for both cases,

 2    and it also moved with respect to two objections that

 3    Mylan had raised regarding documents where we noted that

 4    it looked as if attorneys were receiving underlying

 5    factual information.

 6              JUDGE JAMES:  Right.

 7              MR. MAYRELL:  Also with respect to an

 8    overall form issue with their log that it contains, for

 9    documents where attorneys don't appear in the metadata,

10    so, "to," "from," "cc" fields, their privilege log

11    doesn't explain the role of an attorney.  It just lists

12    an attorney.

13              JUDGE JAMES:  Right.

14              MR. MAYRELL:  For those two issues briefing

15    is complete.

16         But on August 31st, we moved to compel -- we

17    cross moved to compel.  We cross moved to compel on

18    those common issues.  We could understand why you think

19    briefing is complete on those common issues.

20              JUDGE JAMES:  That was -- that was a

21    pleading styled "response and cross-motion."

22              MR. MAYRELL:  That's right.

23              JUDGE JAMES:  And I think that was Docket

24    Entry 945 to which Sanofi filed their reply 1001, which

25    you get the award, Sanofi for going over the thousand

```
 1    mark in this case.  Am I right about that?
 2               MR. HOCHSTADT:  That sounds right to me.  I
 3    may have been in the air technically when that was
 4    filed, but yes.  And we also submitted separately an
 5    opposition to Mylan's cross-motion.
 6               JUDGE JAMES:  That's what you're waiting to
 7    reply to?
 8               MR. MAYRELL:  Yes.  Our reply brief would be
 9    regarding the third-party waiver issues that we think
10    are important and that we would ask to file a reply on
11    next Friday.
12               JUDGE JAMES:  What day?
13               MR. MAYRELL:  I believe the 21st.
14               JUDGE JAMES:  9/21.
15               MR. MAYRELL:  That's Friday.
16               JUDGE JAMES:  We'll allow you to file that
17    by Friday.
18               MR. MAYRELL:  Just because this issue -- the
19    issue regarding kaléo and CVS, which is the two -- the
20    two most important third parties, it can be a little --
21           So with respect to CVS, Sanofi has stated that
22    they will re-review the documents.  There's only six
23    documents.  And we first flagged these at the status
24    conference and, again, on the meet and confer on August
25    13th.  So it's hard for us to understand why they
```

17-md-2785    In re: EpiPen   9.13.18                          45

1    weren't able to either provide a specific explanation in

2    their opposition to our cross-motion or for why these

3    documents are privileged or produce them.  I just wanted

4    to flag that.

5         And then the second issue is I wanted to discuss

6    very briefly kaléo.  So the documents we're asking

7    for -- the documents we believe should be produced

8    regarding kaléo are documents that were exchanged

9    between kaléo, and Sanofi on or after the October 28th,

10   2015 recall of Auvi-Q.  Sanofi's taken the position that

11   they share a common interest with kaléo for documents in

12   that period.  We disagree that there's a common interest

13   here.

14        And the reason we don't think there's a common

15   interest is because after the recall Sanofi is having to

16   protect itself.  It's worried about its own interests

17   and what exposures it has to kaléo even though then a

18   week later Sanofi made the decision to return rights to

19   Auvi-Q to kaléo.  And so even though kaléo may not yet

20   have been aware that Sanofi intended to return rights,

21   it knew that -- Sanofi knew that it had exposures to

22   kaléo and kaléo must have known that it probably had

23   some claims against Sanofi.

24        And we've done some searching now where we've

25   been able to locate now where Sanofi has produced

1   versions of the same documents -- some of the same

2   documents that are on their log.  And I can provide them

3   to you now, Your Honor, or I can submit them along with

4   our reply.

5            JUDGE JAMES:  With your reply.

6            MR. MAYRELL:  With our reply.  The documents

7   show the tone between the parties was not one of

8   cooperation but rather Sanofi was, from the time when it

9   decided to return rights to kaléo -- actually, from the

10  time of the recall for several weeks after the recall

11  Sanofi was not open in communicating with kaléo.  And

12  there's complaints from the CEO of kaléo to Sanofi that

13  Sanofi's not sharing information.  And then --

14           JUDGE JAMES:  So this is your common

15  interest argument?

16           MR. MAYRELL:  That's our common interest.

17           JUDGE JAMES:  I'll look forward to reading

18  your brief on that.

19           MR. MAYRELL:  Thank you, Your Honor.

20           MR. HOCHSTADT:  Your Honor, if I may respond

21  briefly?  I took your comments to mean you didn't want

22  argument on that.

23           JUDGE JAMES:  Yeah, I don't really need to

24  hear it.  I think I know what the issues are.  It's not

25  going to prejudice you.

```
 1              MR. HOCHSTADT:  Thank you, Your Honor.
 2              JUDGE JAMES:  All right.  Okay.  I've ruled
 3   on four.
 4         Item 5 on the agenda is August 15th discovery
 5   briefs.  I have to apologize to all of you here.  I
 6   think I promised you a ruling in our last status
 7   conference that I would rule before a deposition you had
 8   scheduled that passed and this fell off my radar screen.
 9   So I apologize to counsel that I didn't get a ruling out
10   on this issue before now.  I'm even further embarrassed
11   to say that it has fallen so far off my radar screen
12   that I'm not ready to rule on it today and I apologize
13   for that, but we will -- we will move this up on our
14   priority list and give you a ruling soon.
15              Again, this is one where the briefing is a little
16   hard to follow in the docket but I think it's fully --
17   these are fully briefed; correct?  Okay.
18              MR. HOCHSTADT:  Yes, Your Honor.  It was
19   simultaneous submissions.
20              JUDGE JAMES:  All right.  With my apologies,
21   we will get you a ruling on these issues pretty quickly.
22              MR. HOCHSTADT:  Thank you, Your Honor.
23              JUDGE JAMES:  Six -- we're moving right
24   along.
25              JUDGE CRABTREE:  Congratulations.
```

17-md-2785   In re: EpiPen   9.13.18                          48

1            JUDGE JAMES:  Six is class plaintiffs'
2   discovery issues with Mylan.  And the first part of that
3   is the Nuvigil settlement.  Some questions for Mylan
4   with regard to that:  In the briefing there's this
5   indication that Mylan's counsel represented that the
6   settlement agreement -- settlement agreement "might be
7   non-existent."  Is that true?
8            MS. DELONE:  Yes, Your Honor.  So I can
9   explain.
10            JUDGE JAMES:  Does Mylan not know if there's
11   a written settlement agreement with Nuvigil?
12            MS. DELONE:  Sure.  So this issue actually
13   -- honestly, we were a little confused that it was
14   raised in the status report because we had a meet and
15   confer on this two weeks or so ago and explained to
16   plaintiffs exactly what happened.
17        So there is a settlement and there is an executed
18   binding term sheet that we produced.  It's our
19   understanding from having done a review -- and this was
20   I think what plaintiffs were asking for despite us
21   having already explained to them what search we did.
22   It's our understanding that that binding term sheet is
23   what exists.  So --
24            JUDGE JAMES:  Has Mylan completed its review
25   and determined that there is no written settlement

1   agreement?

2           MS. DELONE:  Yeah.  So I can tell you that

3   we talked to multiple people.  I was actually at Mylan's

4   office last week and looked in the location where they

5   keep all of their final settlement agreements.  And in

6   that location the only agreement that was there was the

7   binding term sheet that we have produced.

8           JUDGE JAMES:  All right.  So is it your

9   understanding and you would represent it as an officer

10   of the court that Mylan has produced whatever there is

11   documenting Mylan's settlement agreement with Nuvigil?

12          MS. DELONE:  Yes, that is our understanding.

13   Can I a hundred percent guarantee that in the next, you

14   know, six months of non-coordinated discovery that we

15   won't find something else?  That's a hard guarantee to

16   make.  But as everything that we know right now, that is

17   true.

18          JUDGE CRABTREE:  Does the binding term sheet

19   specify the financial considerations that are at the

20   heart of the agreement?

21          MS. DELONE:  I would have to go back and

22   look at the specific terms of it.  My understanding is

23   that the binding term sheet includes all of the terms

24   that were at issue in the settlement agreement.

25          JUDGE JAMES:  Have you -- has Mylan produced

1    other documents with regard to Nuvigil that do show the

2    dollars and the settlement conditions?

3            MS. DELONE:  We have up to this point, Your

4    Honor, produced all of the documents that we have

5    related to our ESI search and the settlement agreement

6    itself.  I don't believe any of those specifically set

7    out the financial value, but we also -- I'm not aware at

8    this point of other documents that we haven't produced

9    that have that information.

10        We've produced the -- you know, per the court's

11   order at the last status conference, we did a review of

12   about 3,000 documents across all of our custodians.

13   We've ran the search terms just for Nuvigil and produced

14   everything that was not responsive -- or that was

15   responsive and not privileged relating to the settlement

16   agreement.

17           JUDGE JAMES:  And Mylan is not claiming that

18   the settlement agreement is privileged and therefore

19   you're not producing it?

20           MS. DELONE:  No, certainly not.

21           JUDGE JAMES:  You're claiming there is no

22   such settlement agreement?

23           MS. DELONE:  We have a binding term sheet

24   that was executed by the parties.  To our knowledge,

25   there's not a -- not a separate --

1              JUDGE CRABTREE:  The binding term sheet

2     contains signatures of human beings?

3              MS. DELONE:  It does, yeah.  It says -- it's

4     actually a signed document.

5              JUDGE JAMES:  Okay.  All right.  Well, I

6     mean, for class plaintiffs, I mean, they can't produce

7     something they don't have and they'll be bound by their

8     representations.  So, Mr. Burns, I don't know if

9     plaintiffs have some response they want to make but --

10             MR. BURNS:  Well, two responses.  One on the

11    microlevel to this issue -- and good afternoon, Your

12    Honor.

13             JUDGE JAMES:  Good afternoon.

14             MR. BURNS:  It's good to see you again.

15        So first on this issue -- and I participated in

16    the meet and confer -- and actually let me step back

17    broadly.  Obviously we have class certification coming

18    up in relatively quick order.  We are being as -- as

19    efficient and as careful and we can be to make sure that

20    we have all the information that we need for that

21    process.  And so that has prompted -- and we are

22    reaching out quickly on any issues that come up in

23    discovery, including on this Nuvigil issue as it

24    pertains to both Mylan and Teva.

25             So after their initial production, which was

1  relatively small as we detailed in the -- in the status

2  report, we reached out, had a meet and confer.  We

3  discussed the need for a privilege log.  They committed

4  to producing that on September 19th.  So I think we'll

5  see that next week.

6         And then this issue came up about, look, we

7  looked through the documents.  There's no final

8  settlement agreement.  There's a term sheet.  And we

9  heard much the same thing that counsel represented here

10  today.  And it is not my practice, never has been my

11  practice to demand that counsel certify an answer

12  they're giving me in discovery.  But what we are

13  searching for are creative ways to kind of quickly deal

14  with things we shouldn't be fighting about because we

15  don't want to waste your time, I don't want to waste my

16  time, or Mylan's, frankly.

17         So really on this particular issue, if it doesn't

18  exist, it doesn't exist.  But one thing that could help

19  clarify that for us would be some sort of representation

20  from Mylan itself, not its attorneys, that, look, we've

21  gone back.  We've talked to the people involved.  We

22  understand they searched one custodian on this issue.

23  And we may have issues with that in the future.  I'm not

24  sure.  We're going through that process now too.

25         But if there's a way to quickly resolve this

1   issue, it seems that if Mylan were to let us know we've

2   talked to all the relevant people, we've searched all

3   the relevant files, we don't think there's a final

4   settlement agreement, that would put it to rest.

5          And it would be nice to have that, frankly, as I

6   told Mylan's counsel, before we get into depositions, so

7   we're not sort of surprised by information and bits of

8   information that are coming in this late.

9          The second thing I would say is -- and this

10  doesn't directly relate to Mylan but it's why this

11  topic --

12              JUDGE CRABTREE:  Can I just stop you?

13              MR. BURNS:  Yes, Your Honor.

14              JUDGE CRABTREE:  Is the Mylan

15  representative, the human who signed it for Mylan, is

16  that person scheduled for a deposition?

17              MR. BURNS:  We are working on dates.  We

18  requested dates for the deposition.  So we will get to

19  -- get to some of that information.  Obviously we'd like

20  it before we start asking those questions.

21          More broadly, on the issue in this report, we

22  have a fight looming with Teva.  They refuse to produce

23  essentially anything except for essentially FDA

24  correspondence, and we're not getting discovery from the

25  other end of that settlement that would help potentially

1  resolve these issues.  So it's why it's in here.  That

2  was filed yesterday I believe -- or sorry, two days ago.

3  And Teva, I'm sure, will respond.  I've been in touch

4  with their counsel several times since the initial meet

5  and confer.  We aren't making any headway but we'll see

6  where that ends up.

7            JUDGE JAMES:  Excuse me.  Can I ask you a

8  question?  Doesn't this come up in the context of a

9  request for production?

10            MR. BURNS:  Yes, Your Honor.

11            JUDGE JAMES:  So if they respond to the

12  request for production saying they've conducted a good

13  faith search and they found no written settlement

14  agreement other than this term sheet, doesn't that

15  provide you -- that combined with statements of counsel,

16  which as an officer of the court here today that -- this

17  is in the record, and I don't have any reason not to

18  trust --

19            MR. BURNS:  Sure, Your Honor.

20            JUDGE JAMES:  -- what counsel's saying plus

21  the fact you're going to be deposing a person or a

22  person who signed a document, doesn't that give you --

23            MR. BURNS:  That type of response would be

24  sufficient I think for us, Your Honor.  And, again, I

25  don't want to put meaningless fights before the court.

1    We're just trying to be careful and we're under -- we're

2    all under a tight time frame.  I understand and I

3    sympathize with Mr. Foster, but we're all working late

4    nights and all working the hours to get to where we want

5    to be.

6              JUDGE JAMES:  I understand.

7              MR. BURNS:  Thank you, Your Honor.

8              JUDGE JAMES:  Just to run this to the

9    ground, I will order Mylan's response to the request for

10   production that you set out what you've told me today,

11   which is that you've made a good -- Mylan has made a

12   good faith effort the best it can to track down any

13   written settlement agreement, that none has been found,

14   and that the term sheet is the best representation

15   you've found as to what the terms of the settlement are,

16   and put that in your response to the request for

17   production.  And that combined with your representations

18   here today I think should be sufficient.

19             MR. BURNS:  Thank you, Your Honor.  And

20   thank you to Mylan's counsel as well.

21             MS. DELONE:  Yes.  And those requests -- or

22   responses were served a while ago.  We'll be happy to

23   amend the response and add that.  Just to clarify, we

24   searched across 25 different custodians.  This isn't

25   just coming from one person.

17-md-2785   In re: EpiPen  9.13.18                    56

```
 1              JUDGE JAMES:  Why don't you put that in your
 2  response.
 3              MS. DELONE:  We will do that.
 4              JUDGE JAMES:  File an amended -- or serve an
 5  amended response that sets out what you've done and
 6  confirms what you've said here in court.
 7              MS. DELONE:  Yes, we're happy to do that.
 8              JUDGE JAMES:  Thank you.
 9              MR. BURNS:  Thank you, Your Honor.
10              JUDGE JAMES:  All right.  Next on the list
11  is the proverbial references -- are the proverbial
12  references to Mr. Coury, Ms. Bresch, and Mylan documents
13  and that I think relates to the ESI searches and related
14  issues.  My notes indicate that plaintiffs filed their
15  motion to compel with regard to Bresch and Coury on
16  August 27th.  Mylan filed its response on September 5th.
17  That would make the reply due shortly on September 19th.
18  I'm going to wait and rule after that reply.  But I take
19  it from your standing, Ms. Cappio, there's something
20  you'd like to tell me about the situation.
21              MS. CAPPIO:  Yes, Your Honor.  We would just
22  hit on a couple of short points.  We've looked -- we
23  take it very seriously that we have these depositions
24  coming up.  And when we first brought this to Mylan's
25  attention, we were told, you know, that can't be right,
```

17-md-2785   In re: EpiPen   9.13.18                          57

1   Ms. Bresch produced 9,500 e-mails and Mr. Coury a whole

2   raft as well.  Now, we drilled down on that and learned

3   that it was -- the true number was about one-tenth of

4   that because the vast majority of the e-mails were from

5   a "do not reply" account.

6        And so obviously with Ms. Bresch's deposition

7   coming up in less than a month, we're under tremendous

8   time pressure and we have the disadvantage of limited

9   information here.  So I think we've asked for something

10  very circumscribed and I would just clarify that we're

11  asking for two things.

12       Number one, hit counts on the initial search

13  terms as to those two custodians, and that should be a

14  very simple thing because Mylan has already done the

15  search term hit count for us in the aggregate, so I

16  think the burden is extremely low on that request.

17       And the second is the court will be happy to hear

18  we have narrowed the number of search terms that we're

19  asking for Mylan to run now just down to the three

20  epi-related ones.  The epi with the star, meaning the

21  root expander, the word epinephrine, and EAI.  So we

22  would really like the documents from those two

23  custodians that hit on those terms.  And we think it's a

24  very simple request and will help us be in a much better

25  position to adequately examine those two witnesses.  And

1   I don't need to tell Your Honor how important they are.

2                JUDGE JAMES:  All right.  Looks like

3   Mr. Levin is ready for this one.

4                MR. LEVIN:  Good afternoon, Your Honor.  I

5   know Your Honor said you don't want to hear full

6   argument on this and you're going to wait for the

7   briefing to be complete, but just a brief response to

8   what Ms. Cappio has said, if I may.

9        I think the problem with this, Your Honor, from

10  our perspective is that what this issue comes down to,

11  if you read their entire brief, is, frankly, a lack of

12  trust in counsel for Mylan and Mylan as a client in

13  saying that what we have produced all the documents

14  responsive to the search terms that the parties

15  painstakingly negotiated and agreed to over three months

16  earlier this year.

17       We told them all along that Ms. Bresch and

18  Mr. Coury, as senior executives, do not author lots of

19  e-mails, and that's exactly what our production showed.

20  And by the way, just as a data point, you know, if you

21  look at, for example, the chief executive productions

22  for Sanofi in this case, we've produced more than 15

23  times the amount of e-mails authored by our chief

24  executives than they did.  Now, I'm not casting

25  aspersions on them.  I'm just pointing that out as a

1   data point chief executives by and large in these kinds

2   of companies don't write lots of e-mails and that's what

3   this is all about at the end of the day.

4              JUDGE JAMES:  Could you clarify for me, I'm

5   sorry, I don't remember or know this, are the three

6   search terms that you're -- the EpiPen search terms that

7   you're talking about, they were included in the original

8   set of search terms obviously and how many -- how many

9   were in the original set of search terms?

10              MR. LEVIN:  So Ms. Cappio's correct we're

11  down to three.  The reason we're down to three is

12  because three of the six they requested in their motion

13  were in the original set and that was Auvi, Auvi-Q and

14  Adrenaclick.  The three new search terms they're seeking

15  to have us run with respect to these two custodians are

16  epi with an asterisk, epinephrine, and EAI.

17              JUDGE JAMES:  I don't understand that,

18  sorry.  So you have not run searches for these last

19  three?

20              MR. LEVIN:  That is correct because we

21  spent, you know, two months negotiating search terms.

22  These were not a part of the search terms the parties

23  agreed to after exchanging something, like, 15 different

24  search term proposals.  And we all agreed these were the

25  search terms we were going to use for all custodians

1   going forward.

2                   JUDGE JAMES:   Is that true, Ms. Cappio?

3                   MS. CAPPIO:   Your Honor, I wasn't on those.

4   Mr. Fierro is on the call right now.  He's dialed in and

5   he's the ESI custodian -- or sorry, ESI expert in this

6   case on the plaintiffs' side.

7           But I would just offer this:  We went back --

8   when we realized there was a gap, we went back to the

9   District of Kansas ESI guidelines.  I've heard Your

10  Honor refer us to the deposition guidelines.  We take

11  that very seriously.  We know it's supposed to be a

12  cooperative process.  We know it's supposed to be an

13  iterative process.  And attached to Exhibit A the first

14  two questions are what are the main issues in the case

15  and who has that information.  And it's hard to come up

16  with any better example of Ms. Bresch and Mr. Coury for

17  having that information.

18          And so when we went back and we put under a

19  microscope what could be causing this, again, we're at

20  an information disadvantage, perhaps, for example,

21  Ms. Bresch abbreviates EpiPen in a way we're not

22  expecting.  That's why we want the wild card there to

23  make sure we're capturing everything.  In fact, I have

24  an e-mail I would be happy to hand up to Your Honor that

25  shows sometimes when she spells epi it comes out epic,

1    e-p-i-c, and therefore the auto-correct must be making

2    that, and that's a reason why, for example, we could be

3    missing some of those search terms.

4         So -- and I would be happy if Your Honor would

5    indulge me just a second to explain the initial search

6    terms.  And --

7              JUDGE JAMES:  Very quickly.

8              MS. CAPPIO:  -- how the funneling worked was

9    these three words we're asking for -- or terms we're

10   asking for, they were part of the initial search terms

11   list.  And then there was a final search term list at

12   the bottom of the funnel and were words that were

13   boolean search terms, both of them were boolean, that

14   somehow they shielded out some of the important e-mails

15   we would expect to find for such vital witnesses in this

16   case, especially people who were involved with the

17   day-to-day pricing decisions at the heart of this

18   matter.

19             JUDGE JAMES:  Okay.

20             MS. CAPPIO:  The last thing I would just add

21   for the board documents, we're finding some pretty

22   severe redactions.  I won't belabor it.  It's in our

23   brief but I do have some examples if Your Honor is

24   interested to see those as well.

25             JUDGE JAMES:  Okay.  So, Mr. Levin, how -- I

1   mean, how much time would it take to run these

2   additional three terms?

3           MR. LEVIN:  I -- I don't know.  I need to

4   talk to the vendor to see how long it would take.

5        I will say the reason, of course, we didn't run

6   these three terms -- Ms. Cappio's correct, they were on

7   this initial list.  The reason we didn't run these three

8   terms is the same reason Sanofi didn't just run Auvi-Q

9   or we just didn't run EpiPen without something else.

10  They're incredibly broad terms.  One of them is epi with

11  an asterisk.  Just by way of example, Mylan makes an

12  epilepsy drug.  So using epi with an asterisk is going

13  to bring in all sorts of other irrelevant documents,

14  particularly at this late stage of the case.

15       That's why we had 15 different proposals and we

16  said, you know, we're not going to use these very broad

17  terms.  We're going to put search connectors around them

18  and all the rest.  And we went back and forth and

19  ultimately agreed.

20       At the end of the day, Your Honor, our position

21  on this is that just saying that you think there must be

22  something there because you think there must be

23  something there is not a discovery argument.  There's

24  not a single case they cite.  There's not a single fact

25  they cite that would suggest otherwise.  They cite their

17-md-2785   In re: EpiPen  9.13.18                   63

1  complaint.  That's not good enough.  They cite newspaper

2  articles about our executives' compensation.  That

3  obviously doesn't do it.  And they cite eight documents

4  from the production in this case.  I'm not aware of this

5  e-mail just now, which are tellingly buried in footnote

6  21 of their brief, where are the references from the

7  seven depositions they're taking.  If there's so much

8  evidence showing how key these custodians are, where is

9  it?  Just saying it's not good enough, doesn't get it

10  there.

11          JUDGE JAMES:  Okay.

12          MS. CAPPIO:  Your Honor, I would just say

13  Mylan chose one witness to testify before Congress.  It

14  was Ms. Bresch.  The topic was EpiPens.  I think enough

15  said.

16          JUDGE JAMES:  All right.  Thank you,

17  counsel.

18          MR. LEVIN:  Just because Ms. Cappio

19  mentioned the board documents, needless to say we

20  disagree.  I actually have an example here as well.  I

21  don't know if the court wants to get into that today.

22  It seems like not.  But suffice it to say we think, when

23  the court looks at those redactions, the context is very

24  clear as to what's going on.  The parties had an

25  agreement.  We abided by it.  We did what we said we

1    would do and we think those redactions are appropriate

2    for the company's single most sensitive documents on

3    totally irrelevant issues.

4              JUDGE JAMES:  All right.  If each of you

5    have a few pages you want to give me, I'm happy to look

6    at them now.

7              MS. CAPPIO:  I would add one more point,

8    Your Honor.  To the extent you're not inclined -- I

9    certainly hope you're inclined to give us the documents.

10   But to the extent you're not, we really need the hit

11   count so we can understand what we don't know.

12             JUDGE JAMES:  Thank you.  All right.  Then

13   we have these third parties.  Item 7 is class

14   plaintiffs' motions to compel (a) Prime and Teva.

15   Again, I want to expedite the briefing on these.  These

16   are ones that the briefing is -- they're not fully

17   briefed yet.  It looks like on the Prime motion to

18   compel the response was filed on 9/11.  So the reply

19   would be due on September 25th.  I want to move that up.

20   How quickly can you have the reply filed?

21             MR. DAVIDSON:  Your Honor, Stuart Davidson

22   on behalf of the class plaintiffs.  Can we have until

23   Friday?

24             JUDGE JAMES:  9/21.  That's fine.

25             MR. DAVIDSON:  Thank you, Your Honor.

17-md-2785   In re: EpiPen  9.13.18                        65

```
 1              JUDGE JAMES:  And then, likewise, the --
 2   we're not as far along on the Teva briefing I think.  I
 3   think the response is due on 9/25.  Mr. Burns.
 4              MR. BURNS:  The response is due on 9/25, I
 5   believe that's right.  Obviously Teva isn't represented
 6   here today, but I can promise you we'll give you any
 7   reply within three days.
 8              JUDGE JAMES:  For the reply?
 9              MR. BURNS:  Yep.
10              JUDGE JAMES:  Good.
11              MR. SECHLER:  Your Honor, because Prime was
12   mentioned, I do have a related point I just want --
13              THE COURT:  Hello, Mr. Sechler.
14              MR. SECHLER:  Hello, Your Honor.
15              JUDGE JAMES:  You've been very quiet today.
16              MR. SECHLER:  I've been trying.  Thank you,
17   Your Honor.
18         So there are going to be at least 12 and up to 20
19   depositions of PBMs and payors in this case.  All the
20   parties are going to take them and notice them and we've
21   been talking cooperatively to try and figure out how
22   we're going to do it, notice them and split the time,
23   and that's all going well.  None -- none have happened
24   yet and only four have been scheduled in October.  Seven
25   PBMs haven't produced -- haven't finished producing
```

1    documents yet.

2          So I just wanted to bring to the court's

3    attention that we are trying very hard to get all this

4    done by October 31st.  We know that's the court's

5    deadline.  I have talked with plaintiffs' counsel about

6    whether it might not happen.  I don't want to

7    necessarily suggest it won't happen yet, Your Honor, but

8    I did want to let the court know that we're working very

9    hard to schedule a lot of depositions and it may be that

10   we come back to the court cooperatively hopefully to ask

11   for a little relief from that October 31st deadline just

12   to finish the PBM depositions.  We believe these

13   depositions could be the most important depositions in

14   the case given the allegations that have been made.

15          JUDGE JAMES:  Thank you.  And I am mindful

16   that we've kind of passed the ball on down the road on

17   several of these, you know, about motion to compel

18   deadlines and I realize that deadline is looming, so I

19   understand what you're saying.

20          MR. SECHLER:  Thank you, Your Honor.

21          JUDGE JAMES:  And this is a good segue into

22   some of the scheduling and related issues that

23   Judge Crabtree would like to discuss.

24          JUDGE CRABTREE:  I think what I'd like to do

25   is give the court reporter a break and you guys too.

1    Let me just -- this is something I thought while I was

2    reading the reports this time.  The truth is I thought

3    it last time.  When I listened to the conference call by

4    phone, and though I didn't speak up at that time, I

5    don't -- there's a lot of material in the status report

6    filings, there's a lot of words that are devoted to

7    we're winning; no, we're winning.  And beyond that kind

8    of categorical assertion there's some detail given to

9    fact.

10        I don't know if any of you ever walked in on the

11   middle of a trial that you're not involved in, watched a

12   cross examination process and not had any idea whether

13   the examiner is killing the witness or not.  That was --

14   that's kind of the impression I come away with when I

15   read your arguments about why you're winning and why

16   you're winning.

17        And I -- you know, it's not sanctionable.  It's

18   not morally wrong.  It's just a waste of your words and

19   I would just counsel you that -- and it really doesn't

20   affect me a whole lot because -- well, because two

21   things are true.  Over some period of time you become

22   reasonably adept in this job at figuring out what you

23   don't need to know and decide now and you develop a

24   skill to skip to the point of the brief where that

25   commercial is over.  But it does -- it does rob you of

1    Judge James' attention.  And I just encourage you to

2    knock it off.  It really is not helpful to anything.  If

3    it makes you feel better to write it, your client wants

4    to see it in there, go ahead and submit it.  We'll wade

5    through it.  But it's really not useful to the

6    enterprise that you come to us for and I'd suggest that

7    for your consideration.

8         All right.  Let's take a recess.  We'll come back

9    and talk about -- I think what's left are the

10   supplemental agenda items.  I don't envision this being

11   a long session.  Nonetheless, we need to come back, I

12   think I would like to take up sort of 8 through 11 and

13   then have the discussion about the experts on the Sanofi

14   case in the context of Item 12, the longer term

15   discussion about settling.  I'm not sure anything's

16   going to get decided today but I think it's time that we

17   have a talk among friends about some of those subjects.

18        So let's take a -- let's see, it's almost

19   three o'clock.  We'll come back at 3:15 and pick up

20   things there.  Thank you very much.

21             (Recess.)

22             JUDGE CRABTREE:  All right.  We're back on

23   the record after a recess in the presence of counsel who

24   were previously identified.  So let's turn to Item 8,

25   which is the briefing timeline on the motion to request

1  -- set in process the motion for a remand of the Sanofi

2  case.

3       Mr. Buchweitz, I don't know who from your table

4  wants to talk about that.  I think we had established in

5  the scheduling order, as I read it, a deadline for that

6  of November 30th.  You, I think, have suggested we may

7  not wait until then.

8            MR. BUCHWEITZ:  Yes, Your Honor.

9            JUDGE CRABTREE:  And I just want to be clear

10 what we're talking about in this process.  This is a

11 process where you would be moving, asking to try to

12 convince this court as the transferee court to suggest a

13 remand to the JPML.

14           MR. BUCHWEITZ:  That's correct, Your Honor.

15 Make an application for Your Honor to do a suggestion of

16 remand to the JPML.

17           JUDGE CRABTREE:  And I have -- I can benefit

18 actually from a discussion of your experience when that

19 -- when that process kicks off with the JPML.  How

20 quickly in your experience has it turned out?

21           MR. BUCHWEITZ:  Once there's a suggestion of

22 remand -- actually, when Your Honor -- if Your Honor

23 were to issue a suggestion of remand, immediately the

24 clerk of the JPML issues what's called a conditional

25 remand order.  And within seven days of the conditional

1    remand order, if there's an opposition to it, they have

2    to file a notice of opposition.  And once they file a

3    notice of opposition, if there is one, then there's

4    14 days to file a brief setting out what's the

5    opposition.  If there is no opposition, it's remanded.

6    It's done.  The conditional remand order becomes a final

7    remand order.  It's done.

8         Within 21 days after the opposition that's filed

9    to the conditional remand order, we would be able to

10   file a response to it saying why we believe remand is

11   appropriate at this time.  And then once that's briefed,

12   the JPML then sets the hearing -- sets it for the next

13   hearing, the next available hearing to -- for oral

14   argument on that issue.

15        As I think Your Honor knows, I'm sure he knows,

16   is that the JPML only meets every two months.  So the

17   November date we're never going to be on.  They have not

18   published the dates yet for 2019.  But if patterns hold,

19   we expect there to be a date at the end of January and

20   then end of March and then at the end of April.  We

21   would very much like to be on the January one if we can

22   or the March one if necessary.  We would really not want

23   to be on the May one because that puts us off quite a

24   bit, which is why we plan to make our motion requesting

25   a suggestion of remand on November 1, the day after

1   coordinated fact discovery closes in this case.

2        And, by the way, Your Honor, the scheduling that

3   I set out, it's based on my experience but also based on

4   JPML Rule 10-something, 10.2 or 10.4.

5        JUDGE CRABTREE:  My -- and I'll hear -- and

6   I'll hear from the other side of the caption in a moment

7   on this.  My recollection in reading -- it's not just a

8   recollection.  I couldn't remember this if I tried.  But

9   I went back and looked and couldn't find it.  So the

10  scheduling order that's in place today addresses a

11  deadline which you're not going to wait for but doesn't

12  specify any timeline for briefing that's aimed at me.

13       MR. BUCHWEITZ:  Correct, Your Honor.  So our

14  assumption has always been that it would be under the

15  regular Kansas rules, 6.1, 14 days for an opposition,

16  14 days for a reply.  Obviously, you know, if Your Honor

17  is inclined to issue a schedule on that, which we would

18  be very happy to have, we would take a shorter reply.

19  We're fine giving them the 14 days.  We don't want them

20  to have more than that because, like I said, we want to

21  keep this moving.  And if Your Honor would order that,

22  we would take seven days on the reply.

23       JUDGE CRABTREE:  So that's where I was

24  headed is I assumed that the parties either anticipated,

25  maybe even have discussed that this would proceed under

```
 1    our Rule 6 on the 14 and 14 and naturally there's
 2    nothing requiring a party to use all of their time.
 3              MR. BUCHWEITZ:  Right.  So Mr. Sechler and I
 4    did discuss just now he would like more time than the
 5    14 days and he can explain why.  My -- my view is the 14
 6    should be enough.  But I don't think he wants a
 7    tremendous amount more than that but he would like more
 8    than that.
 9              JUDGE CRABTREE:  All right.  Let me hear
10    from you, Mr. Sechler.
11              MR. SECHLER:  Thank you, Your Honor.  Yes,
12    our understanding, after talking to Mr. Buchweitz, is
13    they want to file early.  They're suggesting November
14    1st.  We do think it would be important to have a date
15    certain by which the filing would be made so that we can
16    do some planning in terms of when during the calendar we
17    would be preparing an opposition.
18              In terms of the amount of time we need, we would
19    suggest 30 days rather than two weeks, Your Honor.  They
20    have had basically a year preparing for this motion, and
21    it's an important motion.  It's going to affect the
22    workload not just of this court but of another federal
23    district court, and so we would like time to put
24    together a presentation for the court as to what the
25    best way to manage the Sanofi case is in the context of
```

1   this MDL and whether or not expert discovery and summary

2   judgment is adjudicated here, which certainly it can be,

3   or whether the court suggests to the JPML it be remanded

4   back to New Jersey.  So we would like -- it's a

5   complicated set of issues, an important set of issues.

6   We think 30 days may be appropriate.

7        And I think it's very ambitious for Mr. Buchweitz

8   to suggest a January JPML calendar.  In our experience

9   it's not necessarily the case you would go on the next

10  calendar.  It depends how early you get everything in

11  for it to be calendared with the JPML on the January

12  setting or bumped maybe to the March session.

13            JUDGE CRABTREE:  Implicit in all this is I

14  anticipate you're opposing at least at this time a

15  suggestion of remand.

16            MR. SECHLER:  Correct, Your Honor.

17            JUDGE CRABTREE:  I'm going to give Sanofi

18  the last word on this in just a second.  But really the

19  -- the thing I wanted to start thinking about and

20  starting to hear some thoughts about, and I know this is

21  a preview of coming attractions, but there -- there --

22  all the work won't be done by November 1st or even by

23  November 30th.  I've read about your discussions on

24  expert disclosures for that track of the -- of the MDL

25  and about the discovery work that will be done there.

1    It seems like the big ticket items for consideration are

2    the expert issues and the summary judgment process.

3         Tell me just this -- and I know you'll address

4    this fully -- what's your perspective, at least today,

5    on how those two topics, summary judgment and expert

6    discovery, are going to connect with one another, or

7    maybe they're not going to.

8         MR. SECHLER:  I do think there is

9    substantial overlap on the expert issues between the

10   Sanofi case and class actions.  Many of -- actually, the

11   class plaintiffs make the same claims with respect to

12   rebates, with respect to Sanofi's market share and

13   Mylan's market share and the impossibility of Sanofi

14   matching Mylan's rebates.  With respect to the

15   EpiPen4Schools program, with respect to the Sherman Act,

16   all of those claims which Sanofi makes are also made by

17   the class plaintiffs.

18        So the experts in the Sanofi case and the experts

19   in the class cases will address many of the same issues,

20   including, Your Honor, the definition of the market for

21   the sale of EAI devices, the prevalence of rebates in

22   the pharmaceutical industry, the manner in which drug

23   manufacturers compete on price, the degree to which

24   rebates are driven by customers as opposed to

25   manufacturers, whether rebates carry procompetitive

1    efficiencies, and the extent to which Sanofi's

2    foreclosure from the market, which I think Mr. Buchweitz

3    is probably going to talk about when he shows you his

4    chart, was caused by price competition or something not

5    other than price competition.  Those are the issues.

6          And it probably is no surprise to the court that

7    for Mylan at least it's going to be the same experts.

8    We're going to have the same experts in the class case

9    as in the Sanofi case.  Obviously they'll have different

10   experts, but we're going to have the same.

11         So when you think about expert discovery alone,

12   you have expert disclosures.  Then I think the court set

13   a 14-day period for objections.  Then you have document

14   production by the experts.  Then you have depositions.

15   And then you have *Daubert* motions, which, by the way,

16   certainly are decided by transferee courts in MDLs.

17         So all those components if -- and I'm not taking

18   -- making argument on remand.  This is really more an

19   argument on the second issue which is --

20         JUDGE CRABTREE:  I want you guys to have a

21   chance to get warmed up on this.

22         MR. SECHLER:  Appreciate that, Your Honor.

23         JUDGE CRABTREE:  Frankly, get me warmed up.

24   We talked about it in the beginning.  It went away.  I

25   thought about a lot of other things and a lot of other

1    cases.  I thought it would be helpful to hear from you

2    guys.

3              MR. SECHLER:  I appreciate your attention on

4    this and it is important.  I think, whether or not the

5    court decides to remand the case back to New Jersey or

6    not, what I just said is important because the expert

7    deadlines ought to be the same.  It makes no sense for

8    the experts for Mylan to give disclosures, to be

9    deposed, to have *Daubert* motions decided and then to go

10   all over again through the same process in another case

11   that raises the exact same issues.  So that kind of is

12   an argument I think -- or the points I made really apply

13   whether or not the court remands the case to New Jersey.

14            And then, of course, you have summary judgment.

15   And as you know, Your Honor, from the orders that you've

16   issued on the motions to dismiss, there are a lot of

17   issues, a lot of overlap on the liability issues.  They

18   like to focus on the damages issues.  On the liability

19   issues, there's a lot of overlap, and so those will have

20   to be considered by somebody in the Sanofi case whether

21   it's this court or another court.

22            So that's kind of our take on what's going to be

23   happening post the court's decision on the motion for

24   remand, and that -- but because of the importance of

25   these issues, Your Honor, we would like 30 days to

1   present our view on Sanofi's motion to remand.

2              JUDGE CRABTREE:  Let me just ask a couple of

3   things before I turn the floor back over to

4   Mr. Buchweitz.

5              MR. SECHLER:  Sure.

6              JUDGE CRABTREE:  I think you've gotten your

7   -- your planning date.  In my experience if they say

8   they're going to file it on the 1st, they're going to

9   file it.  They have a deadline that exists now.  I think

10  the question is whether they're going to quick pitch

11  you.

12             MR. SECHLER:  Exactly right.  I would --

13  especially given October is going to be very busy, Your

14  Honor.  So that's why --

15             JUDGE CRABTREE:  And that's where I was --

16  that's where I was headed.  So you alerted Judge James

17  to some emerging positions about PBM depositions and the

18  run-up to those.  Does that affect this discussion at

19  least directly?  It obviously has some -- anything that

20  affects the calendar and the devotion of counsel's time

21  to one task or another.  But does that change what you

22  came to say today?

23             MR. SECHLER:  Well, I do think the testimony

24  that will be elicited in those depositions will be

25  important to the court's determination on the motion for

1    remand.  I think both the class plaintiffs and Sanofi

2    will be interested in certain testimony from the PBMs.

3    So we certainly would want to feature the depositions in

4    our opposition to their motion.

5           So, yes, I think they're probably -- I don't know

6    if we're going to be in November for those depositions.

7    It seems to me quite likely.  I think that probably is

8    another reason why it would make sense for at least our

9    opposition to be filed after the month -- the end of

10   November, December 1st I would ask for, Your Honor,

11   because then we could incorporate the testimony in our

12   presentation.

13          JUDGE CRABTREE:  Mr. Buchweitz, you want to

14   close -- close up this discussion, and --

15          MR. BUCHWEITZ:  Yes, Your Honor.

16          JUDGE CRABTREE:  -- I'm not going to even

17   try to direct the conversation.  You know what I'm

18   interested in and I think you know what to do with it.

19          MR. BUCHWEITZ:  Thank you, Your Honor.

20       First with respect to the third-party

21   depositions, I know that the parties have been working

22   very hard to schedule them and I see no reason at this

23   time why they shouldn't be completed by October 31st.

24   If there's some particular issue with the third party

25   being intransigent, I'm sure that the court would be

1   receptive to helping if necessary.

2        I think that, you know, there's a lot of teams

3   here.  We have a senior associate taking one of their

4   executives' depositions today while Mr. Hochstadt and I

5   are here, and I think everyone's got a big enough team

6   they can get all these depositions done before October

7   31st.  And we don't think at this time at least that

8   there's any reason why any coordinated discovery should

9   be going on in November.

10       A brief observation about today:  You know, it's

11  now 3:30.  The first 90 minutes had nothing to do with

12  us and I think what that's emblematic of is the case has

13  already started to move on to the non-coordinated stuff.

14  The discovery disputes are all related to things that

15  have nothing to do with us.  You know, we've already got

16  our discovery disputes primarily done.  We have way more

17  than half of the party depositions.  Most of the

18  30(b)(6) hours are burned.  And we've spent a lot of

19  time, with the help of Judge James and you, and I think

20  we're getting to the close of coordinated discovery.

21       We've heard about Local 282, the fact sheets, the

22  advertisements, class certification, Teva, Nuvigil.

23  Nothing to do with us.  We're getting to the point where

24  we don't really need to be part of this case.  And I

25  think that we're getting to the point where it's

1   important, just like Your Honor thought September 7th,

2   2017, a year ago when we were sitting in the other

3   courtroom, that this is the point in time where we start

4   to split off.

5          It's -- you know, we've -- it's been a great year

6   and we've appreciated your help with that.  But we do

7   think it's time to move on.  The way we started thinking

8   about the expert discovery and the remand schedule and

9   all of it and how it will all fit together, we started

10  thinking about this a long time ago, as you know, and we

11  raised it as an issue at the last status conference and

12  we proposed an expert schedule to the other side.

13          JUDGE CRABTREE:  Can I just -- can I just

14  stop you a second --

15          MR. BUCHWEITZ:  Yes.

16          JUDGE CRABTREE:  -- and say I commend you

17  all for talking about the issue.  That's what needs to

18  happen.  Thank you for doing it.

19          MR. BUCHWEITZ:  Always happy to, Your Honor.

20  And what we -- the way we see it working is basically

21  there's two parallel paths.  The schedule that you and I

22  went through five minutes ago on remand with the

23  suggestion of remand and the JPML, we knew it would take

24  a while.  And you know what we thought, we thought

25  that's a perfect time to get expert discovery done in

1   the Sanofi case.  And the way we've -- we've proposed

2   the schedule is it would be completed basically at the

3   time when we believe the JPML would issue a ruling

4   following the March hearing.

5       I would love to be on the January setting.  If

6   they're going to oppose here and they're going to oppose

7   again at the JPML, it's not going to happen.  But we

8   really have a good chance of getting on the March

9   setting and we'd love to get on the March setting.

10      And if we could get on the March setting and we

11  can do the expert discovery in the Sanofi case as we've

12  set out in our proposal, it starts in December and it

13  ends in April, then we'll be done with both expert

14  discovery and the remand proceedings at about the same

15  time and ready to -- assuming that Your Honor agrees and

16  the JPML agrees -- ready to give the case back to

17  Judge Wolfson with a bow at that time.

18      We -- you know, what we've done -- what we think

19  we've done there is we keep the process moving and

20  there's -- you know, and the expert schedule that we've

21  put forward, Your Honor, has no prejudice to remand.

22  Okay.  It keeps things moving.  And whether you disagree

23  with us or the JPML disagrees with us, we still get our

24  expert discovery done and moving at the same pace that

25  this whole case has been going all along.

1        About the differences in the expert and starting

2    to go back to the same issues that we argued last year

3    and I argued last summer -- or at the JPML, in New

4    Jersey, with you, and again and again obviously we

5    disagree, we think the issues are very different.  I

6    think that what we heard today the first 90 minutes

7    shows the issues are very different.  Our chart shows

8    the issues are very different.

9        Our case is about what Sanofi -- where Sanofi

10   would have been had Mylan's conduct not -- not been

11   there.  Okay.  And the places where we have a "but for"

12   world are places where there's equal access.  And we put

13   this in our -- in our complaint, you know, way back

14   April of last year saying, you know, Canada's a place

15   where there's equal access and look what happened.  We

16   gave another example, a place where there was equal

17   access, a PBM where -- which happened to not take

18   Mylan's proposals to exclude us from the market and you

19   see what happened.

20       I have also brought this chart -- and I hate --

21   I'm not trying to say we win.  I heard you loud and

22   clear.  But they did say that I was misleading the court

23   in their status report and they put in a -- a line which

24   is the red line there and said, oh, no, this is the

25   truth.  See, here's the truth.  The red line here is the

1    truth and the green and the blue line as well.  So our

2    case is about where Sanofi would have been had Mylan not

3    committed its misconduct.

4         The class case at its base is what's the

5    overcharge, you know, what was the price that the

6    consumer should have paid as opposed to what we paid?

7    And they can tell you, you know, how they view it.

8         But to me that's the simplest, you know, part of

9    the world there.  We're the competitor.  We think we

10   could have gotten ourselves up to 30 percent just like

11   we did in these other places within a couple of years.

12   And that's the delta on the damages and that's what the

13   expert is going to talk about.

14        Their expert's going to talk about what the

15   consumer should have paid as opposed to what they did

16   pay.  Those are two different things, two different

17   paths.

18        I can tell you our expert is not the same as

19   their expert.  We're not meeting together.  We're not --

20   you know, we get along very, very well and we're having

21   a great time during coordinated discovery but we've

22   already started to talk about how it's over and, you

23   know, they're going to be on their path for their

24   experts and on our path for our experts.

25        Respectfully what Mr. Sechler is proposing would

17-md-2785    In re: EpiPen  9.13.18                    84

1   be to have us sitting on our hands doing nothing after

2   going at a breakneck pace for a year, which I have --

3   I'm -- I have to say I think that this is a case that

4   will be written about in the *Manual For Complex*

5   *Litigation*.  Seriously, I do.  And then to just --

6                    JUDGE CRABTREE:  In a nice way?

7                    MR. BUCHWEITZ:  In a very nice way.  I'm

8   going to -- I'm going to suggest a chapter on the status

9   reports, not the "we win" part but everything else.

10           The -- the -- you have this breakneck pace for a

11   year.  You do it exactly right, exactly as you guys set

12   it out in the second amended scheduling order, and all

13   of a sudden we sit back.  We do nothing.  We watch them

14   do non-coordinated discovery, have some fights about

15   Nuvigil, fight with Teva, talk about fact sheets and we

16   sit around, Eric and I, and do nothing.

17           And then, you know, four months later all of a

18   sudden we put in our expert report that says something

19   completely different than the class expert report -- and

20   they're going to have lots of reports on all their other

21   claims too because they've got state claims.  They've

22   got patent settlements, RICO.  All this stuff has

23   nothing to do with us.  And then we come back and say,

24   hi, guys, we're back four months later.  I don't think

25   that's how this case was set out.

1      I think that's not how this case should be set

2    out.  I think that the inefficiencies that Your Honor

3    talked about in the order that followed the September

4    7th hearing are exactly the kind of things that would --

5    that would -- that would be seen.

6      If we go down that road I think that we should

7    follow the path that we started on non--- coordinated

8    discovery ends.  Non-coordinated discovery continues.

9    Class continues.  Their expert stuff continues.  And

10   then we continue on this other path doing the experts,

11   motion for remand.  And whatever the outcome is, we

12   either end up in New Jersey before summary judgment or

13   end up in New Jersey after summary judgment, and either

14   way is fine, but it's time to get the experts in our

15   case adjudicated, exchanged, discovered, and to have the

16   remand papers resolved during that same period.

17             JUDGE CRABTREE:  Okay.  Here's -- thank you

18   very much, both of you.  It's very helpful to look into

19   the future.

20      What I'm going to do is I'm going to issue --

21   after I have some time to talk with my colleague here,

22   I'm going to issue a supplemental scheduling order that

23   addresses quickly that sets deadlines for the -- for the

24   remand briefing process here.  And I take it you're --

25   you're going to file November 1st whether there's PBM

1    noise going on or not?

2                MR. BUCHWEITZ:  Yes, Your Honor.

3                JUDGE CRABTREE:  Can I give you a deadline

4    of November 1?

5                MR. BUCHWEITZ:  Absolutely.

6                JUDGE CRABTREE:  There's your answer.  And

7    the only question is whether you're going to be filing

8    on November 15th or November 30th or December 1st.

9                MR. SECHLER:  Thank you, Your Honor.

10               JUDGE CRABTREE:  All right.  So we

11   accomplished that at least.

12        On the expert front, let me just ask this

13   question:  Have you said -- I mean, I read about it.  I

14   charted the dates.  I've been thinking about it some.

15   Have you said what you want me to say before I crack

16   that nut or do you want to talk about it more?

17               MR. SECHLER:  I do have a couple additional

18   points beyond what I said already, Your Honor.  The

19   first is, when they raise this issue in the status

20   reports, it seemed to us premature because the court

21   asked for a recommendation on November 30th with the

22   remand motion.  But more than that, it seemed like that

23   was the reason for the courts having set up the expert

24   disclosure proposal and the remand motion at the same

25   time, because they relate to each other.  I feel like

1  their proposal --

2          JUDGE CRABTREE:  I was glad you could remind

3  me what it was.

4          MR. SECHLER:  Thank you, Your Honor.  It

5  does seem like the proposal to separate out experts

6  presupposes the court's ruling on the motion for remand.

7  Because if the court -- it's going to be up to the court

8  to decide whether or not the purposes of the MDL statute

9  are served by continued management of expert discovery

10  and the summary judgment adjudication.

11          And, by the way, I do think it makes sense for

12  this court -- whatever court manages both phases should

13  manage both phases.  That is whatever court decides the

14  expert *Daubert* motions should be the court that does the

15  summary judgment, whether it's New Jersey or the

16  District of Kansas.

17          So I think that by now deciding to separate out

18  the expert schedules almost makes it seem like the

19  court's decided they shouldn't be coordinated together.

20  If the court decides that expert discovery ought to be

21  coordinated in this district, then -- because of the

22  overlap on the issues, then the dates should be the same

23  because it makes no sense for the parties to do the same

24  things twice, for the court to do the same thing twice.

25  And one of the purposes for the MDL statute is for the

 1   convenience of witnesses.  And it makes no sense for the

 2   same experts for Mylan to have initial disclosures on

 3   the very same issues, be deposed, serve disclosures

 4   again and be deposed again.  And that's what happens

 5   under the proposal Sanofi submitted.

 6        The final point I would make:  There is not a

 7   substantial difference between the proposal they made

 8   and the proposal we made.  This is three months.  Of

 9   course during that three-month time, as Mr. Buchweitz

10   noted, there will be briefing on the remand issues and

11   other things for the parties to tackle.  But a

12   three-month difference is certainly a far less burden on

13   the parties overall than doing everything twice,

14   particularly if the court decides after it considers the

15   remand motion it ought to be coordinated, which is

16   something the court will decide when it gets the motion.

17        JUDGE CRABTREE:  Here's my last question on

18   this subject:  Do you really want your response period

19   to include the Thanksgiving holiday?  Because that's the

20   way it lines up for you now.

21        MR. SECHLER:  I know, Your Honor, but

22   Thanksgiving thankfully is on the 22nd.  So we would

23   have an additional week beyond that.  So actually that

24   might actually help us to have an additional week after

25   Thanksgiving.

1          JUDGE CRABTREE:  All right.  Thank you very

2     much, a helpful discussion.

3          MR. DAVIDSON:  Your Honor, if I could just

4     be heard on behalf of the class plaintiffs since

5     coordination of expert discovery was discussed between

6     these other parties that we haven't had an opportunity

7     to just let Your Honor know what our concern is on our

8     side, and we kind of think this may be intentional on

9     Mylan's behalf.  Not saying bad faith.

10         But if there is a coordinated discovery period

11    where we only get to depose their expert for three and a

12    half hours on multiple non-overlapping issues, I foresee

13    that to be a tremendous problem on the class plaintiffs'

14    side.  We have class certification.  We have consumer

15    protection claims.  We have RICO claims.  We have -- we

16    may be using the same expert on the RICO claims as we

17    use on antitrust claims on damages.  We don't know if

18    their expert's going to be the same.  But to tie our

19    hands with three and a half hours on their expert I

20    think would be tremendously prejudicial to the class

21    plaintiffs.  And I just wanted that on the record.

22         JUDGE CRABTREE:  All right.  Thank you for

23    turning that light on for me.

24         All right.  To No. 9, looking ahead on this one,

25    I think you get to idle again, Mr. Buchweitz, the class

1   certification proceedings, it's -- it's set for April

2   24th.  I think it's just set for one day.  And so my

3   question is, Mr. Sharp, are two-fold:  One day plenty

4   and, secondly, what are you going to do that day?

5   Because I'll just -- let me just be up front.  I'll

6   listen to long arguments.  A day full of you all talking

7   is a lot.  But if I need to hear it, I'll hear it.

8           MR. SHARP:  Your Honor, I'm sensitive to

9   that and I'm going to propose a half day.  And the

10  reason for that --

11          JUDGE CRABTREE:  It is -- this is not a --

12  you're not going to present -- you're not anticipating

13  at this moment that there will be testimony or summary

14  testimony?

15          MR. SHARP:  I'm not, Your Honor.  And the

16  reason for it is class certification, being a procedural

17  motion in the District of Kansas, has long held that you

18  don't weigh evidence, you don't resolve a battle of the

19  experts.  So it really does little good to try to judge

20  credibility of witnesses and have live testimony.  That

21  kind of thing just clutters the record and doesn't help

22  the court.  So that's been the policy of really the

23  District of Kansas for many, many years.  And the U.S.

24  Supreme Court in *Tyson Foods* basically endorsed that by

25  adopting the -- the *prima facie* showing test in the

1    recent case.

2        So given that, we don't anticipate anything being

3    live testimony.  We're going to present our experts with

4    our opening brief.  We'll present rebuttal experts with

5    our reply brief.  It will be our job, of course, to

6    carry that burden of proof, that *prima facie* showing,

7    and we intend to do that.

8        We think we can get by with easily a half day of

9    argument split 50 percent to us and 50 percent to the

10   defendants, and that will be plenty.  As the court

11   knows, there's no -- there's no requirement that you

12   even have a hearing at all.  In fact, most of the class

13   certifications that I've experienced in the District of

14   Kansas have occurred without any hearing whatsoever.

15   But we would ask the court to give us an hour and a half

16   or so of -- of argument.

17           JUDGE CRABTREE:  You still view April 29th

18   -- April 24th as a real date for it?

19           MR. SHARP:  I do, Your Honor.

20           JUDGE CRABTREE:  Okay.  Thank you very much.

21       Mr. Levin, I thought you might want to talk about

22   this one.

23           MR. LEVIN:  Good afternoon, Your Honor,

24   again.

25           JUDGE CRABTREE:  Good afternoon.

1          MR. LEVIN:  So, look, at the end of the day

2     we'll take as much time as the court will allow us to

3     take.  I don't think anybody on this side wants to stand

4     here for an entire today and listen to us drone on about

5     legal arguments.  But suffice it to say that I have a

6     different view of the law than Rex does and also a

7     different view of how this actually might proceed.

8          So it's actually quite common, as the court

9     knows, to present live testimony at class certification

10    hearings.  While -- while what we're talking about here

11    though necessarily does not need to include fact

12    testimony, you could have experts, for example, who are

13    testifying to help explain to the court the basis for

14    their positions and help answer any questions that Your

15    Honor may have in this case.

16          With all due respect to what Rex is saying, we

17    just heard his colleague stand up and talk about how

18    complicated this case is.  There's RICO.  There's

19    antitrust.  There's consumer fraud.  We agree it is very

20    complicated and that's among the reasons we think it's

21    impossible to certify a class on this -- on this broad

22    of a case.  And all of those issues will need to be

23    addressed at a class certification hearing by multiple

24    experts and all the rest.

25          So at the end of the day where we get is, Your

17-md-2785    In re: EpiPen  9.13.18                        93

1    Honor, we are certainly amenable to live testimony and

2    evidentiary hearing if that's what the court would like,

3    and we think it would benefit the court from hearing

4    from experts or others.  We think the court probably

5    ought to set aside two days just in the interest of

6    being safe for that hearing.  If it goes a day, fine.  I

7    think we'll all be happy with that.  If it goes two,

8    we've got it built into the schedule.

9         The only caveat that I would say is this:  I

10   wonder if maybe what we ought to do is set aside those

11   two days now just to park them but then perhaps revisit

12   this issue and have a more fulsome discussion about it

13   after the class plaintiffs have filed their motion for

14   class certification.  I say that because we don't know

15   yet what experts they're going to have, what issues

16   they're going to be talking, about how many experts

17   they're going to have.  And all that may just play into

18   the ultimate consideration.

19        So I would say park those two days now and then

20   let's come back, you know, end of November, December,

21   talk about whether we actually want to use that and the

22   court, of course, will have the benefit of their brief

23   as well and decide ultimately what we want to do.

24        If I may, Your Honor, just to make one scheduling

25   note I guess as well, and I talked to Mr. Burns about

 1   this during the break, when I was going back to look at

 2   the schedule again, I think April 24th is the date that

 3   we currently have set for the class certification

 4   hearing.

 5              JUDGE CRABTREE:  Please tell me that's not a

 6   weekend.

 7              MR. LEVIN:  It's not a weekend.  We're good

 8   there.  But picking up on Your Honor's admonition to

 9   Mr. Sechler about do we really want to put this near a

10   holiday and Thanksgiving.  April 24th is only three

11   business days after Easter, and the week before that is

12   spring break where probably 90 percent of the lawyers in

13   this room have kids, and it's also the Passover holiday

14   that week.  So I just want to flag that.  If we need to

15   do the 24th of April, that's fine.  But if we could push

16   it back even a week or two and find two open days on the

17   court's calendar, I think a lot of us, including

18   Mr. Foster's wife, would appreciate that.

19              JUDGE CRABTREE:  What are the Passover and

20   Easter dates?

21              MR. LEVIN:  Easter is the Sunday -- I

22   believe Easter is the Sunday before that.

23              JUDGE CRABTREE:  April 21.

24              MR. LEVIN:  April 21.  And Passover is April

25   20th through the 27th.

1          JUDGE CRABTREE:  Thank you.  All right.

2   Leave it at the 24th for now.  I just want to get you

3   warmed up on this.

4          MR. SHARP:  I can go a lot longer, but

5   there's no need for it, Your Honor.

6          JUDGE CRABTREE:  Yeah, I get it.  I'm not

7   going to move the date off the 24th today.  I kind of

8   want -- I do a lot better about these things when I

9   think about them.

10         MR. SHARP:  Thank you for raising it, Your

11   Honor.  Just to raise another quick issue:  I will talk

12   with Adam and meet and confer on the briefing aspect of

13   how many pages of argument each side will get.  We'll

14   try to knock that out here pretty soon.

15         JUDGE CRABTREE:  Okay.  Thank you.  Let's

16   move to bullet point 10 which is a little bit of a

17   connected issue to what I talked about before.  To-date

18   I've had the luxury of only having to decide whether

19   things were plausible.  But the stakes get a little

20   higher from this point on and I wanted to talk with you

21   and hear your ideas about whether it's appropriate to do

22   some activity that's devoted to educating the court,

23   what you think that ought to look like.  I'll be candid

24   with you, I have no -- I'm no different than I was as a

25   lawyer.  I was an incremental learner then and I think I

 1   still am.  And so I think suddenly to move to the

 2   brilliance that will be required to understand your

 3   experts and the arguments you make on them simply

 4   because now you've filed extensive papers is a little

 5   much to hope for.  So I'm going to throw this to the

 6   plaintiffs' side of the -- the room.  I'm not sure who

 7   has this issue.  And so, Mr. Sarko, it looks like it's

 8   you.

 9            MR. SARKO:  Yes, Your Honor, it's me.  I

10   guess I have just a couple thoughts.  You know, a lot of

11   courts recently have what they call education days,

12   science days, technology days.

13            JUDGE CRABTREE:  Hot topic days.

14            MR. SARKO:  Hot topic.  In fact, the Federal

15   Judicial Center just sent around a 20-page pamphlet to

16   all the courts -- I don't know if you got yours yet --

17   and it sort of talks about the education days.

18            I will say the pluses and minuses of those after

19   having been involved in some.  Unfortunately for lawyers

20   on all sides of the bar here, I think having an

21   education day that is neutral and that might not impact

22   the case doesn't happen.  So it is controversial.

23            I think they work really well for certain topics.

24   This isn't -- you know, for example, if you had the

25   opioid case and a question about some science issues and

1   certain other things, those are, like, no-brainers.  In

2   this case I think the real issue is to not -- what

3   you're really trying to find are neutral topics that you

4   can be educated about that everyone's going to agree on.

5        So I think one of the issues is it's great by the

6   court teeing it up.  Usually the way this works are the

7   parties get together and say are there any topics that

8   we think can be discussed in that neutral fashion.

9        And then the second issue is the timing.  A lot

10  of the times it is a problem to have these things done

11  before discovery is done or how does that weave in with

12  the expert, you know, reports.

13       But usually the way they are done are that

14  people -- you close the courtroom and people each have

15  one of their experts show up, maybe have an hour and a

16  half, talk to the court.  The agreement is no cross

17  examinations.  The court can have some questions.  No

18  one can be impeached by anything they say.

19            JUDGE CRABTREE:  No record.

20            MR. SARKO:  No record.  Some judges have

21  done it where they actually -- judges who are not good

22  note-takers, they actually videotaped it and used it

23  only for themselves with the promise that within two

24  weeks they'll erase the tape.

25       I mean, there's all kinds of different things

1    that are done.  But in every single one of those cases

2    it is something that the parties on this side have all

3    negotiated and agreed to and said, you know, we think

4    this will work.

5          But I think the big issue, at least for us and

6    for everyone here, is there an issue as to timing,

7    clients have to sign off on it, there's "what are the

8    narrow issues" that -- that maybe we think the court

9    should be educated on.  So I think while it's doable,

10   the devil's in the details.

11              JUDGE CRABTREE:  Thank you very much.

12         Sanofi, anything you want to add anything to

13   this?

14              MR. BUCHWEITZ:  The only thing to add, Your

15   Honor, is that I spoke to my client before this and he's

16   had a number of cases -- been through a number of cases

17   with Judge Wolfson before.  And our understanding is, on

18   all major cases, she has one of these.  So our concern

19   is we just -- if we're going to be there for trial,

20   she's going to want to do it.  We don't want to do it

21   twice.  It's very expensive to do.  It's a lot of

22   preparation.  Just prefer not to have to do it twice.

23              JUDGE CRABTREE:  How about from Mylan and

24   Pfizer, I largely ignored, but I know you're not shy.

25              MR. LEVIN:  Good afternoon, again, Your

 1    Honor.  So a couple of points.  First of all, you stole

 2    my hot-tubbing joke.  That was the Australian way they

 3    talk about that.

 4         I agree with much of what Mr. Sarko says.  The

 5    key is finding if there is some way to present this to

 6    Your Honor in a way that is truly neutral.  And, look,

 7    we are certainly, from the Mylan perspective, amenable

 8    to doing this.  We want to help Your Honor out as much

 9    as you think you need help to be able to decide the

10    important issues that are coming up.  But our major

11    concern here, we have seen it in other cases, this

12    cannot turn into a free-for-all or some kind of

13    miniature trial or mock jury or preview of the summary

14    judgment arguments because that's when it, in our view,

15    loses really the educational purpose that Your Honor is

16    trying to achieve.

17         And we, you know, shouldn't try to dirty each

18    other up introducing the worst documents, and making

19    lots of legal arguments and showing video clips of

20    depositions.  I've seen that done in other cases in

21    these education days and I can tell you it devolves and

22    the court -- it ends up being a miniature trial and the

23    court doesn't get the educational benefit out of it that

24    it once tried to achieve.  Plus which, of course, you

25    don't -- because it's off the record and because the

1    courtroom is closed, we don't have the usual protections

2    that the court would have if we were actually arguing

3    about the merits.  So there's no Federal Rules of

4    Evidence that would apply, no cross examination.  People

5    are free to say what they will if -- if evidence is

6    permitted.

7            So with all those considerations in mind, Your

8    Honor, again, we are amenable to doing this.  We do

9    think there are potential topics here that would benefit

10   the court hearing from us about.  And one that just

11   obviously comes to mind is the central coordinated issue

12   in both of these cases which is how the drug pricing

13   system works, what is a PBM, what is the role of a

14   health insurance company, how is it that when Mylan

15   charges a WACC of a certain number it ends up the

16   consumers at the pharmacy counter pay something else.

17   All of those factors not intuitive to the federal

18   judiciary unless you've done a case like this before.

19   And that's just an example of something I think the

20   court could benefit from subject to all the

21   considerations that I just said.

22           So if I may, Your Honor, let me just list a

23   couple of -- I don't want to call them suggestions but

24   ideas for us to consider as we go down the --

25   potentially go down this path.

1       First of all, I do think the court should

2  consider whether, if it does this, either side should be

3  allowed to use or cite any evidence from the case record

4  itself.  What I mean by that is I have seen this devolve

5  into a circus and I've also seen it done where the court

6  does not even allow the parties to use evidence from the

7  case or deposition testimony from the case and it really

8  is just an education session about what the issues are,

9  and that is a potential way to protect us against this

10  from devolving into a miniature trial.

11       Second, we would concur with Mr. Sarko and with

12  Your Honor this should be completely off the record if

13  it is done.  And so what that means is no transcript,

14  although, again, like Mr. Sarko said, we've seen it done

15  where the courts use video or they get a transcript.

16  It's just for their purposes and it's sealed.  It

17  doesn't go out to the parties.  And I think Your Honor

18  used the word immunity in the status report.  I assume

19  what you mean by that is nothing that is said within the

20  four walls of that room can then be used for evidentiary

21  or other purposes.

22              JUDGE CRABTREE:  That's exactly what I

23  meant.

24              MR. LEVIN:  Of course we would

25  wholeheartedly agree with that.

1         Number three, I would suggest we try and limit

2    the number of speakers to some reasonable -- or

3    witnesses to some reasonable amount.  I'll throw the

4    number one to three, one to four out there.  But

5    obviously that is subject to whatever the agenda is, you

6    know, maybe experts, maybe a company witness, whoever

7    the parties want to choose.  It will depend, I think, in

8    part on what topics the court addresses.

9         Fourth, I would urge the court to think about

10   whether it wants to place any limits on what the lawyers

11   can do.  And I say that as one of the lawyers in this

12   case.  We all like to talk.  We all like to make our

13   presentations.  But the court, I assume, does not want

14   to hear three hours of argument from each of us about

15   why we win.  And so, you know, we can emcee.  We can do

16   direct examinations of witnesses but I wouldn't do cross

17   examination.  I'd think pretty hard about whether the

18   court wants to hear legal argument or really just

19   factual instruction about the underlying issues, again,

20   sort of to -- to try and prevent this from becoming a

21   free-for-all.

22        In terms of timing, Your Honor, this one's a

23   little tough and I think it in part is based on the

24   topic that I said, drug pricing and PBMs, and all the

25   rest may depend what the court does with the coordinated

1  schedule and the remand briefing schedule and experts

2  and all the rest.

3          I think based on what we heard today that, for

4  example, December might be a good time to do this.  It

5  would be after the plaintiffs have filed their motion

6  for class certification.  It would be prior to a ruling

7  on any motion for remand in which these kinds of merits

8  issues are going to be addressed because this is

9  coordinated discovery.

10          The only reason I hesitate to say that, because

11  the time period between November and February is really,

12  really truncated for all the stuff we have to do with

13  *Daubert* motions and expert discovery and, you know,

14  class cert opposition and all the rest.  But, again,

15  we're here to assist the court in any way we can.  And

16  if we need to do it then because that's the most

17  efficient way to do it, we'll get it done.

18          My sort of second choice would be some time after

19  class certification briefing is complete but before the

20  class certification hearing.  And, again, that would

21  work well for all of us, but I think it will depend on

22  where the court lands with the remand schedule and

23  briefing and coordinated issues and all the rest.

24          JUDGE CRABTREE:  All right.

25          MR. LEVIN:  Those are our thoughts on timing

1   issues.

2          MR. SARKO:  Your Honor, I just want to give

3   you a couple of pluses and minuses from experience.  I

4   would say, number one, in my experience it only works

5   well when the parties agree to a stipulated order.  On

6   most of the cases, it's two pages.  It ends up with

7   them -- all of these issues making sure they agree on it

8   so the court isn't caught in the cross fire.

9          JUDGE CRABTREE:  There would -- there would

10  have to be some ground rules.

11         MR. SARKO:  The other problem, it usually is

12  a problem in what I've seen, is if it's done in sort of

13  a halfway through the expert reports -- because what

14  happens is you don't want one side to be able to get an

15  advantage or disadvantage, so there are times it gets

16  used when expert reports are done and then, you know,

17  before the court's going to rule on certain things.

18        But I think a lot of those things should be

19  negotiated and I think the court has raised it, and I

20  would like to volunteer that we go back and discuss it,

21  see if we can come up with some agreed upon suggestion.

22         JUDGE CRABTREE:  I think that's -- I think

23  that's the right outcome of this.  I don't -- I think

24  that the ability of the people in this room to discuss

25  and guide this kind of procedure -- I mean, the beauty

1   of it is we're playing outside the rule book, and so you

2   can make it fit the case and the issues in the case and

3   the personality of the lawyers, the appetite of the

4   clients, the patience level of your judges.  So I think

5   I would -- I would ask the lead counsel from both sides

6   of the captions to have that discussion because I think

7   your wisdom will exceed mine on it.  I really think it's

8   something that might benefit us, benefit the court.  But

9   I don't have a particular ideology about when, what,

10  what style.

11       Let me endorse -- let me endorse something that

12  was said that I do take to heart and hope you will is I

13  get a lot -- we get a lot of exposures to you,

14  Judge James more than me.  And I think that I am not

15  looking for argument -- more argument in my life.  I'm

16  really looking for understanding that either

17  knowledgeable industry experts, business leaders, expert

18  witnesses, economists can bring to the subject.  So I'm

19  going to commission that.

20       I know you have plenty of other things going.

21  I'm not going to put a deadline on it.  I know you'll

22  move it forward.  I'll be interested in a report.  And

23  if you all could keep it on the list, and when you agree

24  if we're ready to submit a status report and this is

25  what we think, here's our draft of the ground rules for

1    this game in the District of Kansas, submit it to

2    chambers and we'll get to reading on it.

3            MR. SARKO:   Thank you, Your Honor.

4            JUDGE CRABTREE:   Thank you all very much.  I

5    don't know exactly what it was that made me worry about

6    this, but I just want to remind -- and it really only

7    goes, I guess, to class counsel, to remember your

8    responsibility to maximize your -- the efficient use of

9    your hours.  I don't -- I don't know that we'll -- I

10   don't know at this point whether we'll ever get to the

11   point where the court's required to adjudicate a fee

12   application, but I would ask you to be mindful of that.

13   I trust you have.  I saw something that I can't even

14   remember what it was, it's not been in my preparation

15   for this conference, that concerned me a little bit.

16   I'm not -- I don't view that as a free load up your

17   lodestar work and I trust you are not, but just a

18   reminder of that.

19        Long-term scheduling, I think we've talked about

20   the issues that.

21            MR. LEVIN:   Your Honor, may I be heard just

22   before we move on?  I know I'm not a lawyer from the

23   class plaintiffs.  I do want to preview an issue for the

24   court.

25            JUDGE CRABTREE:   All right.

 1          MR. LEVIN:  Mr. Hudson and I were speaking

 2   in the hallway prior to this hearing that is forthcoming

 3   for the court's guidance.  We received an e-mail from

 4   the class plaintiffs a week or so -- actually plaintiffs

 5   a week or so ago requesting that we confirm, for

 6   purposes of Heather Bresch's, Mylan's CEO's, deposition

 7   on October 9th, that we have enough space in the

 8   deposition room to accommodate the attendance by ten

 9   lawyers from the class plaintiffs who would be at that

10   deposition, and also that we ensure there's enough space

11   to have three cameras for purposes of that deposition,

12   one that would be on the witness, one that would be on

13   the examined lawyer, and one that would be, we were

14   told, for an Elmo for evidence presentation.

15          We went back and forth on the e-mails.  I'm

16   pleased to report that as of 10:30 this morning it

17   appears that plaintiffs have indicated they do not

18   intend now to bring more than six lawyers in total,

19   three for Sanofi, including client representatives, and

20   three from the class plaintiffs, and four or six, I

21   think that's fine.  It's not going to be a problem.  We

22   don't want this to turn into an entertainment spectacle,

23   but we do not have -- not have an agreement currently on

24   the three cameras issue.

25          And, Judge James, I'm quite cognizant of what you

1  said earlier, which is everybody in this case should

2  really read and adhere to this court's deposition

3  guidelines.  And as Your Honor is fully aware more than

4  I, those guidelines actually are fairly unique in the

5  federal judiciary in having a specific provision,

6  Section 8, all about standards for videotape

7  depositions.  And in particular Section 8.d makes clear

8  that only the deponent and any demonstrative materials

9  used during the deposition shall be videotaped, meaning

10  there's not going to be a third camera for the examining

11  lawyer under the plain language of the court's

12  deposition guidelines.

13       I spoke about this with Mr. Hudson.  He's

14  indicated that the plaintiffs may be making application

15  to the court to provide an exception to that Guideline

16  8.d.  In addition, they may make an application to the

17  court to allow, what I'll call loosely, camera tricks,

18  zooming and all the rest, they want to use for the jury

19  because they think it will be more entertaining for the

20  jury.

21       I just want to lay down the marker right now that

22  the deposition of Heather Bresch is a very serious

23  matter.  The CEO of Mylan should not be subjected to

24  what the plaintiffs would like to do to entertain the

25  jury.  And we're going to very strongly ask the court to

1    adhere to the deposition guidelines in Section 8 of this

2    court's procedures.

3              JUDGE CRABTREE:  Thanks for the advisory of

4    coming attractions.  And if you have a dispute, I assume

5    you'll tee it up.

6              MR. BURNS:  Your Honor, may I respond just

7    very briefly, Your Honor?

8              JUDGE CRABTREE:  Key words in that "very

9    briefly."

10             MR. BURNS:  Thank you for those two words 20

11   times today.  This issue is in no way ripe.  I jumped

12   into this foray today along with Mr. Hudson.  We said --

13   they pointed out the rule.  We said we'll go back and

14   talk to Mark Lanier.  He has used this process in other

15   courts and other courts have sanctioned it.  I don't

16   know where we'll end up on that, but I told Mylan's

17   counsel we'd get back to them next week if there's an

18   issue.

19             I also heard them complain about the number of

20   opponents.  We don't want overstaffed depos.  This is an

21   important depo and there are a lot of people and issues

22   involved.  But, you know, I -- at the end of the day I

23   don't think there's a dispute there.  And I said there

24   will be far fewer than ten people at the deposition.  So

25   I realize it's a free potshot at us, fine, but --

17-md-2785   In re: EpiPen  9.13.18

1           JUDGE CRABTREE:  You're right.  It's not

2      ripe.  My reference to "head count" didn't mean to open

3      the door to it.  Look, there are depositions in a case

4      that are more important than others and I get it why

5      you'd want to have more than one deposition -- or one

6      lawyer from a party at a deposition of that kind.  But

7      if you -- if you have a -- if you have a census dispute

8      or a camera dispute, we'll watch for your filing on it.

9      I'm not -- I'm not of a mood to jump into it today --

10          MR. BURNS:  Thank you, Your Honor.

11          JUDGE CRABTREE:  -- particularly when

12     Judge James can jump into it.

13        Mr. Buchweitz.

14          MR. BUCHWEITZ:  Thirty seconds, Your Honor.

15          MR. LEVIN:  Your Honor, just so I can

16     clarify for the record because I don't want to

17     misrepresent anything to the court.  Warren, you and I

18     apparently had the same understanding.  Mr. Hudson and I

19     did have an express conversation about this and reached

20     an impasse, which is the only reason I decided to raise

21     the cameras.

22          JUDGE CRABTREE:  The good news is it seems

23     like the impasse is over and so there's opportunity for

24     more discussion.  Well done.

25          MR. BUCHWEITZ:  Very, very briefly, Your

1  Honor.  Sorry, they keep saying "plaintiffs."  I just

2  want to -- I know you say "class plaintiffs" or

3  "Sanofi."  I just want to be clear, again, this is not

4  our ship.  It's going to be me or Eric, one of our

5  associates and Mr. Liwski.  And we're okay with one

6  camera for our part of the deposition.  Again, sort of

7  this all shows a lot of tussling over there that has not

8  anything to do with us.  And we're happy to --

9                JUDGE CRABTREE:  And that was your point.

10               MR. BUCHWEITZ:  That was my point.

11               JUDGE CRABTREE:  All right.  I got it.

12       I think the last topic is when we get together

13  again and I think at the rate of increased work, I

14  talked with Judge James about this very topic, I may be

15  in trial, so why don't you take over this part of it.

16               JUDGE JAMES:  All right.  Well, we -- we

17  have looked at dates a little less than a month out

18  given that your impending deadline for fact discovery

19  we've been referring to.  So let me throw out either the

20  morning or afternoon of October 10th back here.

21  Mr. Levin, looks pained by that.

22               MR. LEVIN:  No, I'm only saying that because

23  we're all going to be together for Heather Bresch's

24  deposition on the 9th in Pittsburgh.  So it might be

25  difficult travel-wise.  Although, if we do it in the

17-md-2785   In re: EpiPen   9.13.18                    112

```
 1   afternoon, that's possible.

 2             JUDGE JAMES:  My second option either

 3   morning or afternoon on October 11th.

 4             MR. BUCHWEITZ:  For us either day is fine.

 5             JUDGE JAMES:  You're very cooperative today,

 6   Mr. Buchweitz.

 7             MR. BUCHWEITZ:  Do I get a gold star?

 8             JUDGE JAMES:  We'll reserve ruling on it.

 9             MR. SARKO:  Your Honor, I might point out if

10   you do it on the 10th fewer people will go to the

11   deposition.

12             JUDGE JAMES:  That is a practical

13   suggestion.

14             MR. LEVIN:  Touché.  We could do it in the

15   afternoon on the 10th.  Mr. Sechler has a conflict on

16   the 11th.  If we travel here in the morning on the 10th,

17   then afternoon of the 10th.

18             JUDGE JAMES:  Any objections to the

19   afternoon of October 10th?

20             MR. BURNS:  None, Your Honor.

21             JUDGE JAMES:  All right.  Then we will --

22   let's make it 1:30 on the afternoon of October 10th back

23   here and we will plan to do that in person.  I'm

24   suspecting we will need that.  All right.

25             JUDGE CRABTREE:  That's it for me.  Thank
```

1    you all very much.  I come back to what I was told at

2    the beginning of this:  One of the reasons to get

3    yourself involved in a case like this is the excellent

4    quality of lawyers, and today is another example of all

5    that.  Thank you very much.  All done.  See you soon.

6              (Proceedings adjourned.)

7

8                        CERTIFICATE

9         I certify that the foregoing is a correct

10   transcript from the record of proceedings in the

11   above-entitled matter.

12      DATE:  September 14, 2018

13
                    /s/Kimberly R. Greiner
14                  KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
15

16

17

18

19

20

21

22

23

24

25