# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| IN RE: EpiPen (Epinephrine Injection, USP) | ) | |
| Marketing Sales Practices and Antitrust | ) | Case No. 17-md-2785-DDC-TJJ |
| Litigation | ) | |
| | ) | |
| | ) | |
| | ) | |

**Expert Report of**

**Professor Einer Elhauge**

**In Support of Class Certification**

*Einer Elhauge*

December 7, 2018

**HIGHLY CONFIDENTIAL:  SUBJECT TO PROTECTIVE ORDER**

Highly Confidential: Subject to Protective Order

## Table of Contents

Executive Summary ...................................................................................1

Qualifications .............................................................................................2

I. EAI Market Definition and Power...........................................................4

  A. Market Definition............................................................................4

    1. The Relevant Product Market Is EAIs .......................................4

    2. The Relevant Geographic Market Is the United States ...............10

  B. Market Power and Monopoly Power ...............................................11

    1. High Market Shares Coupled With High Barriers to Entry and Expansion 11

    2. Power over Price ......................................................................12

    3. Power to Exclude Rivals ...........................................................12

II. Reverse Payments.................................................................................13

  A. Economics of Reverse Payments ...................................................13

    1. Reverse Payments Can Anticompetitively Harm Consumers by Dividing Markets over Time ......................................................................13

    2. Why Entry Can Be Expected Despite an Issued Patent................19

    3. The Expected Rival Exclusion Merited by the Patent .................20

    4. How to Determine Whether the Reverse-Payment Settlement Excludes Competition for Longer than the Expected Rival Exclusion...........................22

    5. Reverse Payments Are Large Enough to Anticompetitively Delay Entry Whenever They Exceed the Patent Holder's Avoided Litigation Costs .........23

    6. Reverse-Payment Settlements Do Not Encourage Optimal Innovation......28

  B. The Classwide Methodology for Calculating the Entry Delay Caused by the Reverse-Payment Settlement ...............................................................29

  C. How the Classwide Methodology Could Be Used to Calculate the Delay In Generic Entry in the EpiPens Market from the Nuvigil Reverse Payment .........34

    1. Teva Settlement........................................................................34

  D. Commonly Alleged Justifications for Reverse Payments Are Common to The Class ..................................................................................................43

    1. Avoided Litigation Costs ..........................................................44

    2. Risk Aversion...........................................................................45

Highly Confidential: Subject to Protective Order

III. Foreclosure ........................................................................................... 48

    A. The Classwide Methodology for Calculating Share and Price Impacts From Exclusionary Contracts with PBMs .................................................... 52

    B. The Classwide Methodology for Calculating Share and Price Impacts From EpiPens4Schools Program ......................................................................... 63

    C. The Classwide Methodology for Calculating Share and Price Impacts from Deterrence of Auvi-Q Post-Recall Re-Entry ......................................... 68

Appendix A: State Antitrust and Consumer Protection Damages Resulting from Foreclosure ................................................................................................. 72

Exhibit A: Einer R. Elhauge CV ................................................................. 76

Exhibit B: Statement of Publications, Prior Trial and Deposition Testimony, & Compensation .......................................................................................... 89

Exhibit C: Materials Considered ................................................................. 90

Highly Confidential: Subject to Protective Order

### EXECUTIVE SUMMARY

1.      I demonstrate, using a classwide methodology that the relevant product market in this case is the market for Epinephrine auto-injectors ("EAIs") and that the relevant geographic market is the United States. This conclusion is applicable to the entire class and is based on the Hypothetical Monopolist Test, as well as other classwide evidence regarding medical differences between EAIs and other products, pricing trends, and Defendants' self-characterization of the market. I also demonstrate that Mylan had monopoly power throughout the relevant time period for this case, with a market share consistently in excess of 80%. If this case had been brought as individual cases, each of those individual cases would involve using precisely the same evidence and methods to arrive at the same conclusions about market definition and market power.

2.      I demonstrate how reverse payments in patent settlements can facilitate a form of market division over time by extending the length of exclusion a patent holder enjoys beyond that merited by the patent itself. Such reverse payment patent settlements injure competition across the market (and thus across the class) when they result in generic entry dates that are later than the entry date that would have occurred without that payment in a no-payment settlement. I demonstrate how one can, from the parties' actual settlement, profit projections, and estimates about the patent litigation and reverse payment value, calculate their actual bargaining strength and then use that information to determine the generic entry date in a no-payment settlement that would have been economically rational given their actual bargaining power. This methodology is common to the class, uses evidence common to the class, and predicts the same no-payment settlement entry date across the entire class. I illustrate this classwide methodology, showing that with a $100 million reverse payment amount, the no-payment settlement entry date that would have been economically rational given their actual bargaining power would have been March 13, 2014, 15.3 months earlier than the entry date in the actual settlement. I further demonstrate how this classwide methodology can predict the entry delay caused by the reverse payment for varying estimates of the reverse payment amounts and patent strength. I also show that the reverse-payment settlement cannot be justified by avoided litigation costs or risk aversion for several reasons, and that, even if they could be, these purported justifications would necessarily apply across the class. If this case had been brought as individual cases, each of those individual cases would involve using precisely the same evidence and methods to arrive at the same conclusions about the estimated entry delay and lack of procompetitive justifications.

Highly Confidential: Subject to Protective Order

3.     Finally, I show Mylan's exclusionary contracts with PBMs and its EpiPens4Schools program harmed the entire class by foreclosing a part of the market to Auvi-Q, which reduced Auvi-Q sales and competition with Mylan and thus reduced Mylan's incentives to lower its prices across the market and thus across the class.  I show how Mylan leveraged its market power by offering rebates to PBMs conditioned on placing Auvi-Q in restrictive formulary positions.  I show, using classwide evidence and a classwide methodology, that Mylan succeeded in reducing Auvi-Q's share amongst customers placed on those formularies.  I then use a classwide methodology to estimate the share and price impact of the foreclosure caused by this foreclosure and conclude that it resulted in overcharges of $52,421,355.  I also estimate, using Mylan's own analysis of how much the EpiPens4Schools program reduced Auvi-Q's market share, which applies classwide, the foreclosure impact of the EpiPens4Schools program and conclude that it resulted in overcharges of $73,739,919.  Finally, I explain how Sanofi's reduced profits on Auvi-Q as a result of this foreclosure could have deterred its re-entry into the market following its voluntary recall.  Whether and when Sanofi would have re-entered the market absent Mylan's anticompetitive conduct are questions that apply to the class as a whole.  I estimate, using a classwide methodology based on classwide evidence that if Sanofi would have re-entered the market in September 2016 absent the foreclosure resulting from Mylan's conduct, its deterred re-entry resulted in overcharges of $31,491,907 through June 2018.  If this case had been brought as individual cases, each of those individual cases would involve using precisely the same evidence and methods to arrive at the same conclusions about the foreclosing effect and price impact of the PBM foreclosure, the EpiPens4Schools program, and the deterrence of Sanofi's re-entry into the market.  I also demonstrate how damages from each of these sources of exclusionary effects can be allocated across states under state antitrust and consumer protection statutes.

## QUALIFICATIONS

4.     I am the Petrie Professor of Law at Harvard University, where I teach and write about the economic analysis of antitrust law, health policy, and various other subjects.  I am the author of various books, including *U.S. Antitrust Law & Economics*; co-author of *Global Antitrust Law & Economics*, *Global Competition Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*; and editor of *The Research Handbook On The Economics Of Antitrust Law* and *The Fragmentation Of U.S. Health Care*.  I am also the author of numerous articles on various topics involving the economic analysis of antitrust and other legal issues, including articles on monopolization, bundled discounts, loyalty discounts, and

Highly Confidential: Subject to Protective Order

reverse-payment settlements.   My CV (attached as Exhibit A) lists all my publications, including all those in the past ten years.   Exhibit B to this report describes my compensation and the cases in which I have testified at trial or in a deposition in the past four years.  I am being compensated at a rate of $███ per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $████ per hour for the work of my staff on this report.  None of my compensation in this case is contingent upon the outcome of the case or any aspect of the case.

5.      I am also President of Legal Economics, LLC, which provides expert witnesses and support work on legal cases.  I myself have testified as an expert witness on antitrust economics in dozens of federal cases, and I have been qualified as an expert in antitrust economics by all seventeen of the seventeen courts to rule on that question.  I have also served as an expert witness on antitrust economics before Congress, arbitration panels, and competition agencies in the US, EC, Korea, and Brazil.  My testimony as an economics expert has spanned a wide range of topics, including reverse-payment settlements, other horizontal agreements, vertical agreements, mergers, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics.  My clients have included leading corporations, law firms, and the United States government.  I have been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*.

6.      I am a Member of Advisory Boards for the Journal of Competition Law & Economics, the Social Sciences Research Network on Antitrust Law & Policy, and the Social Sciences Research Network on Telecommunications & Regulated Industries.  I have taken courses in economics, statistics, antitrust, and economic analysis of law, and I regularly read and use economic literature on antitrust economics, including books on industrial organization.   I also regularly attend workshops on those and other topics regarding the economic analysis of law.  I routinely use and teach economic analysis in my classes, including those that I regularly offer on antitrust law and economics and health law policy.

Highly Confidential: Subject to Protective Order

# I. EAI MARKET DEFINITION AND POWER

7.     The relevant product market in this case is the market for Epinephrine auto-injectors ("EAIs").  EAIs are devices that can automatically inject epinephrine into patients experiencing anaphylaxis.  These include the EpiPen, Auvi-Q, Twinject, and Adrenaclick.  The relevant geographic market is the US market. Mylan had monopoly power throughout the United States during the entire relevant time period.  These conclusions are all classwide since they are all either true or not for the entire class.  Even if the market definition were narrower or broader than I describe here, the proper market definition is a fact that applies equally to all class members.  Likewise, even if Mylan had more or less market power than I conclude, the degree of market power that Myaln had is a fact that applies equally to all class members.  Further, as detailed below, the methodologies used to support these conclusions on market definition and market power are all classwide and are all based on common classwide evidence.

## A. Market Definition

### 1. The Relevant Product Market Is EAIs

8.     Economists often use the "hypothetical monopolist test" to determine whether a posited market is sufficiently broad.  The hypothetical monopolist test asks whether a hypothetical 100% monopolist in a posited market could profitably raise prices at least 5% above the competitive level.  In other words, it asks whether such a price increase would cause enough buyers in that market to switch to substitutes outside that market to make the price increase unprofitable.[1]  If a hypothetical monopolist could profitably raise prices 5% above the competitive level, then the market definition is proper because impairing competition between competitors in that posited market alone could cause significant harm to consumers. In contrast, if even turning the market into a 100% monopoly could not cause prices to increase by 5% above the competitive level, then the posited market definition would be too narrow because impairing competition in the posited market would not suffice to significantly harm consumers. The joint DOJ/FTC guidelines on market definition also explain that when both a narrower and a broader market would satisfy the hypothetical monopolist test, market shares in the narrower market will more accurately estimate the extent of market power.[2]

---

[1] DOJ/FTC Horizontal Merger Guidelines §4 (2010).
[2] *Id.* at §4.1.1 (agencies usually use "the smallest relevant market satisfying the hypothetical monopolist test.").

Highly Confidential: Subject to Protective Order

9.     For example, suppose the defendant sold "hand-churned" chocolate ice cream.  Suppose the closest substitute to the defendant's product is another type of hand-churned chocolate ice cream, the next closest substitute is machine-churned chocolate ice cream, and the next closest is vanilla ice cream.  Antitrust economics would start with the smallest possible market: just "hand-churned" chocolate ice cream, and ask whether it passed the Hypothetical Monopolist Test.  A posited market for just "hand-churned" chocolate ice cream would probably fail the hypothetical monopolist test because so few people care about whether their ice cream is "hand-churned" that, if even a 100% monopolist in hand-churned chocolate ice cream tried to raise prices by 5% or more over the competitive level, so many customers would switch to machine-churned chocolate ice cream that the price increase would not be profitable.  That tells the economist directly that impairing competition in just the hand-churned chocolate ice cream market could not significantly harm consumers, and thus that using a hand-churned ice cream market would not be useful for competition analysis. The economist's next step would then be to add the next closest substitute to the market (machine-churned chocolate ice cream), and test whether this slightly broader market satisfied the hypothetical monopolist test.  A posited market for "all chocolate ice cream" (both hand-churned and machine-churned) would probably pass the hypothetical monopolist test because many people have strong preferences for chocolate or vanilla ice cream, and consequently if a hypothetical 100% monopolist in chocolate ice cream raised prices by 5% above competitive levels, not enough customers would switch to vanilla ice cream to make the price increase unprofitable.  This would directly indicate that impairing competition solely between chocolate ice cream suppliers could cause significant harm to consumers, and thus that a chocolate ice cream market is useful for competition analysis.

10.     Markets defined using the hypothetical monopolist test usually "exclude some substitutes to which some customers might turn" in response to a price increase for the products in the relevant market.[3]  Economists generally define

---

[3] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes.  As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of the price increase even if such substitutes provide alternatives for those customers."); *id.* §4.1.1 ("Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose.").  Relatedly, official commentary to the Merger Guidelines explains that "Even when no readily apparent gap exists in

Highly Confidential: Subject to Protective Order

markets narrowly to focus only on close substitutes because "defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares" that overstate the importance of distant substitutes.[4] This means that the mere fact that some customers substitute between Products A and B does not necessarily mean that Products A and B are in the same market.  Indeed, "[t]he hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group."[5]

11.     Rather, the percentage of customers who would switch to other products in response to a price increase of 5% or more must be sufficiently high that that price increase would not be profitable.  For example, suppose a hypothetical monopolist in a posited market with a competitive price of $100, cost of $95/unit, and sales of 1000 units would lose 40% of customers to other markets if it raised prices by 5%.  That price increase would still be profitable because profits with the price increase = ($105-$95)(.6)(1000) = $6,000, whereas profits at the competitive price were ($100-$95)(1000) = $5,000.  Thus, it would be a relevant market even though a substantial percentage (40%) of customers would switch in response to a 5% price increase because that percentage is not sufficiently high to deter the price increase from occurring.

12.     The Hypothetical Monopolist test shows here that a market limited to only EAIs is sufficiently broad, and thus is a properly defined relevant market.  As I explained above, a posited market is sufficiently broad under the Hypothetical Monopolist test if it would be profitable for a 100% monopolist in that market to raise prices by 5% or more above the competitive level.  In this case we have a clear example where prices of other EAIs in the market increased by more than 5% upon the exit of a significant market participant, indicating that it was profitable for

---

the chain of substitutes, drawing a market boundary within the chain may be entirely appropriate when a hypothetical monopolist over just a segment of the chain of substitutes would raise prices significantly." DOJ/FTC, Commentary on the Horizontal Merger Guidelines 15 (2006).  The Merger Guidelines likewise explain that "relevant markets need not have precise metes and bounds."  DOJ/FTC Horizontal Merger Guidelines §4 (2010).

[4] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares.  This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market.  Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance").

[5] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010).

Highly Confidential: Subject to Protective Order

remaining market participants to increase prices by more than 5% even in response to a less extreme change in level of competition than going from a fully competitive level to a 100% monopolist situation. Figure 1 illustrates the market shares for participants in the proposed EAI market from 2012 to 2016 and Figure 2 illustrates the average net price increase over the previous year for EpiPens from 2013 to 2016.

**Figure 1: EAI Market Share by Year (2012 to 2016)**



**Figure 2: EpiPens Average Net Price Increase Over Previous Year (2013 to 2016)**



13.    Together, Figures 1 and 2 show that, when a competitor left the EAI market, the dominant market participant, Mylan, was able to increase its prices by

Highly Confidential: Subject to Protective Order

more than 5% more than it typically increased prices while it faced this competition. This demonstrates that it was profitable for a monopolist to increase prices by more than 5% when some competition was eliminated, and that therefore a hypothetical complete monopolist would have also found it profitable to increase prices by more than 5% above fully competitive levels. As a result, a market limited to EAIs is sufficiently broad to pass the Hypothetical Monopolist test and is therefore a properly defined relevant market.

14.    In particular, this test indicates that it is not necessary to include more distant substitutes, such as antihistamines or allergy medicine like Benadryl in order to reach a properly defined antitrust market. If Benadryl constrained Mylan's prices sufficiently that it was necessary to include it in a properly defined antitrust market, then it would have made it not profitable for Mylan to increase its prices by more than 5% in response to the exit of a market participant in Auvi-Q.

15.    In addition to the Hypothetical Monopolist Test, there are other factors in this case that further suggest that the EAI market is a relevant antitrust market.

16.    **a. Medical Differences.**  I understand that Dr. Jay Portnoy will opine that EAIs are medically equivalent to each other, while other proposed alternatives such as Benadryl are not appropriate for treatment of acute anaphylaxis.[6]

17.    **b. Price Trends for EAI Products were Similar Over the Relevant Time Period.**  The economic literature indicates that price trends can be useful evidence on market definition. "If Products A and B are in the same economic market, then their prices should tend to move closely together."[7]  In contrast, "The absence of close price relationships among products presumptively indicates that they are in separate markets. . . .   When the prices of two products (or of the same product in two regions) change in the same direction and by similar amounts over a substantial period of time, they are presumptively in the same market."[8]  Evidence on price trends is presumptive and not conclusive because a common price trend could instead reflect common costs and a diverging price trend could instead reflect diverging costs where one of the products was already priced at cost and thus could go no lower in price in response to a drop in the price of a substitute.[9]  However, absent evidence of such an alternative explanation for price trends, parallel price

---

[6] Portnoy Report.

[7] CARLTON & PERLOFF, MODERN INDUSTRIAL ORGANIZATION 614 (3rd ed. 2000).

[8] IIA AREEDA, HOVENKAMP & SOLOW, ANTITRUST LAW ¶534, at 180, 182 (1995).

[9] EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 237-38 (3d ed. 2018)

Highly Confidential: Subject to Protective Order

trends do indicate a common market while diverging price trends indicate separate markets.

18.     In the EAI market, as shown in Figure 3 below, the price trends for EAI products are very similar across the relevant time period.  In contrast to the steadily observed price increases observed among EAIs at this time, prices for Diphenhydramine (the generic name for Benadryl) decreased from 2012 to 2015.[10] This presumptively indicates that EAI products are all in the same product market, and that Diphenhydramine/Benadryl is in a separate product market form EAI products.  Coupled with the other evidence in this case, such price trend evidence supports defining EAI products as a relevant market.

**Figure 3: EAI Average Net Prices by Year from 2012 to 2016**



19.     **c. Self-Characterization of the Relevant Market.**  Internally, and in its contracts, Mylan repeatedly characterized EAIs as a relevant market.  For example, its rebate agreements contain a "▮▮▮▮▮▮▮▮▮" including products characterized within the therapeutic class of "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[11] Internal Mylan market landscape assessment presentations describe the current market as the EAI market and list key competitors as Auvi-Q, Adrenaclick,

---

[10]   Diphenhydramine, International Drug Price Indicator Guide, available at http://mshpriceguide.org/en/single-drug-information/?DMFId=273&searchYear=2014.
[11] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Highly Confidential: Subject to Protective Order

Adrenaclick AG, and the potential Teva generic.[12] Mylan also repeatedly tracked its market share within this EAI market. For example, a September 2010 Mylan management presentation noted that the EpiPen auto-injector was the "#1 prescribed epinephrine auto-injector treatment for anaphylaxis" with "█% U.S. market share".[13] A July 2012 Mylan presentation slide graphed the "EpiPen Market Share" as somewhere between █% and █% for the time period of February 2010 through July 2012, and noted that the "YTD Market Share" was █%.[14] Similarly, a January 2013 Mylan draft presentation slide graphed the EpiPen market share as somewhere between █% and █% for the time period of July 2010 through December 2012, and noted that the "YTD Market Share" was █%.[15] A 2014 Mylan presentation slide noted that the "EPIPEN Actual . . . Market Share[]," also known as "its stake of the EAI Market," was █% for the week ending April 4, 2014.[16] A June 2015 Mylan presentation slide noted that "EpiPen Retains Leadership Position" and graphed "EpiPen Market Shares" as somewhere between █% and █% for the time period of April 2014 through April 2015; it also graphed, for the time period of January 2014 through March 2015, the much smaller "AUVI-Q Market Shares" as somewhere between █% and █%, and the even smaller "AG [Adrenaclick Generic] Market Shares" as somewhere between █% and █%.[17]

### 2. The Relevant Geographic Market Is the United States

20.     In addition to identifying a relevant antitrust product market, I also consider the geographic scope of the market. I conclude that a relevant geographic antitrust market is the United States. The Hypothetical Monopolist test performed in Section I.A.1 was performed with a geographic market defined as the United States, and therefore demonstrates that a geographic market limited to the United States is sufficiently broad to be a properly defined relevant market. This finding that the United States is a properly defined relevant geographic market is further supported by additional factors. First, the sale of prescription drugs in the United States is subject to substantial FDA regulation, and the purchase of prescription drugs is controlled and limited by the FDA.[18] This inability of purchasers to import

---

[12] MYEP01150974_0028; MYEP00093052.

[13] MYEP011902060.

[14] MYEP00332421 at 3.

[15] MYEP00148638.

[16] MYEP01361846 at 4.

[17] MYEP00093944.

[18] "Is it legal for me to personally import drugs?", U.S. Food & Drug Administration, available at https://www.fda.gov/aboutfda/transparency/basics/ucm194904.htm

Highly Confidential: Subject to Protective Order

product from cheaper countries explains the generally observed fact that drug prices are often persistently higher in the United States than in other countries.[19] Second, as noted above, market participants themselves analyzed their competitiveness in terms of US, rather than global market shares.[20]   At any rate, the evidence demonstrating that the United States is a relevant geographic antitrust market is common to the proposed class as whole.

## B. Market Power and Monopoly Power

21.     Mylan had both market power and monopoly power (a higher degree of market power) throughout the United States during the entire relevant time period. Three independently sufficient bases confirm Mylan's market power and monopoly power: (1) high market shares (greater than 50%) coupled with high barriers to entry and expansion; (2) direct evidence that Mylan has the power to raise prices above competitive levels; and (3) direct evidence that Mylan has the power to exclude rivals.  All three bases use a classwide methodology and are based on classwide evidence to produce a conclusion about market power that is common to the class.

### 1. High Market Shares Coupled With High Barriers to Entry and Expansion

22.     A high market share indicates that a firm has significant market power when the market also exhibits high barriers to the entry of new rivals and the expansion of existing rivals.  Here, as seen in Figure 1, which is calculated using IQVIA data, Mylan had dominant market shares in excess of 80% throughout the relevant time period.  Mylan's high market shares (coupled with entry and expansion barriers) indicate market power and monopoly power because they make Mylan more likely to have power over price.  Mylan's high market shares also indicate that: (1) it controls enough of this market to restrain substantial shares; and (2) it will profit from a successful exclusionary scheme more than firms with smaller market shares would.[21]

---

[19] See, e.g., Langreth, Migliozzi, Gokhale, "The U.S. Pays a Lot More for Top Drugs than Other Countries," Bloomberg, 12/18/14, available at https://www.bloomberg.com/graphics/2015-drug-prices/;

[20] *E.g.* MYEP011902060; MYEP00332421; MYEP00148638; MYEP01361846; MYEP00093944

[21] Einer R. Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 335 (2003).

Highly Confidential: Subject to Protective Order

23.     Mylan's patents combined with the lengthy and extensive FDA approval process for medical devices create a barrier to entry for new devices, while patient familiarity and risk aversion with respect to a potentially life saving product create a barrier to expansion of existing rivals.[22]  These high entry and expansion barriers are confirmed by the inability of new firms such as Sanofi and Impax to gain substantial share despite Mylan's persistently high profit margins.[23]

### 2. Power over Price

24.     Mylan has been able to price persistently above cost for a substantial length of time, indicating that it has power over price.  Mylan's EpiPens profit and loss statement indicates that its gross margins increased over time from ██% in 2008 to ██% in 2014, while its adjusted operating income margin increased from ██% to ██% over this same time period.[24]  These consistently high and increasing margins are indicative of Mylan's ability to persistently maintain prices above competitive levels, which is indicative of market power.

### 3. Power to Exclude Rivals

25.     Evidence that a firm has been able to successfully exclude rivals directly proves that the firm has market power because only firms with market power can profitably exclude rivals.  Here, neither Mylan's exclusionary rebate program nor its EpiPens4School program would have been economically rational for Mylan to engage in if it did not have market power.

---

[22] MYEP00195938 at 44 (█████████████████████████████████████████
████████████████████████████████████).

[23] MYEP0016434.

[24] MYEP0016434.

Highly Confidential: Subject to Protective Order

## II. Reverse Payments

### A. Economics of Reverse Payments

#### 1. Reverse Payments Can Anticompetitively Harm Consumers by Dividing Markets over Time

26.    Reverse-payment settlements that delay competitive entry raise complicated issues because they involve an agreement to divide a market over time in exchange for a transfer payment. A transfer payment is a transfer of value from one entity to another.[25] To make those complications more understandable, I will introduce the underlying concepts one at a time. First, I explain how classic territorial market divisions, whereby each firm agrees not to compete in the other's territory, create anticompetitive profits that are split between the firms along territorial lines. Second, I explain how territorial market divisions can instead involve an agreement by one firm not to compete in an area, in exchange for transfer payments that allow the non-competing firm to share the anticompetitive profits the other firm gets in that area. Third, I explain how firms can divide a market over time by agreeing to delay entry in a way that creates anticompetitive profits that are split using transfer payments. Fourth, I explain how reverse-payment settlements can divide markets over time by delaying entry beyond what would otherwise be expected in a way that creates anticompetitive profits that are split using the reverse payment.

27.    To explain these concepts, consider the following simplified situation: Firm A has been the only firm making a certain drug in the United States. Firm B plans to enter the market and compete with Firm A throughout the United States. Firm A would get $10 billion in profits if Firm B stays out of the market, whereas if Firms A and B compete with each other, prices would decrease substantially and each firm would only get $1 billion in profits. If Firms A and B could agree not to compete and split the profits from maintaining a monopoly in the market, they would each be better off because their joint profits are much higher without competition ($10 billion) than with competition ($2 billion). But their anticompetitive profits

---

[25] While transfer payments are often in cash, they can also take many noncash forms. Transfer payments can also, whether in cash or not, be exchanged for return consideration that might itself come in cash or noncash forms. The amount of a transfer payment equals the net value of what is transferred to the entrant: that is, the value of any goods, services, business agreements, or cash payments given to the entrant minus the value of any goods, services, business agreements, or cash payments (such as royalties) the entrant provides in return

Highly Confidential: Subject to Protective Order

would come at the expense of consumers who have to pay $8 billion more for the drug due to such an agreement.  There are several ways Firms A and B might agree to anticompetitively divide the market to create and split monopoly profits.

28.    **1. Classic territorial market division.**   A classic territorial market division would be created if the firms agree that Firm A will stop selling in the Western U.S. in exchange for entering Firm B agreeing not to compete in the Eastern U.S.  In this example, Firm A continues to make monopoly profits in the East, while Firm B makes monopoly profits in the West.  If the two regions are equally profitable, then each firm would get $5 billion with this market division, which is substantially more than the $1 billion they would each have earned if they competed across the entire nation.  The $8 billion in anticompetitive profits would thus be split between them along territorial lines, with each extracting $4 billion in additional anticompetitive profits in its territory.  These additional profits come entirely from the higher prices that the firms are able to charge customers because of their market division agreement.  Consumers are harmed even though the market division does not increase prices above the monopoly levels that prevailed before Firm B could have entered.  The harm to consumers is that the market division prevents a competitive price drop that would otherwise occur.  This example of geographic market division is illustrated below in Figure 3.

**Figure 3. Classic Territorial Market Division Where the Territorial Lines Split the Anticompetitive Profits**



Highly Confidential: Subject to Protective Order

29.   **2. Territorial market division with transfer payment.**  A territorial market division can instead involve an agreement by one firm not to compete in the territory of the other firm in exchange for a transfer payment.  For example, suppose the firms agreed that Firm B will not enter the East if Firm A pays Firm B $1 billion.  However, Firms A and B will compete in the West.  This example of geographic market division is illustrated below in Figure 4.

**Figure 4. Territorial Market Division Where a Transfer Payment Splits the Anticompetitive Profits**



30.   In this case, Firm A would get $4.5 billion with the agreement because it would get $5 billion in monopoly profits in the East and earn $500 million from competing in the West, and it would have to pay Firm B $1 billion.  Firm B would get $1.5 billion with the agreement because it would earn $500 million from competing in the West and receive a $1 billion payment from Firm A.  Without the agreement, Firms A and B would each have made $1 billion from competing throughout the nation.   Thus, the agreement gives Firm A $3.5 billion in anticompetitive profits and Firm B $500 million in anticompetitive profits.  Consumers are harmed by $4 billion even though the market division does not increase prices above the past monopoly levels, because the market division prevents a competitive price drop in the East that would otherwise occur.

31.   **3. Product market division.** A product market division would be created if the firms agree that Firm A will not sell any product that would compete with Firm B's product and in exchange Firm B will not sell any product that would

Highly Confidential: Subject to Protective Order

compete with Firm A's separate product.  In this example, each firm makes monopoly profits on the product assigned to it.  Suppose monopoly profits in each product market would be $5 billion, but that if each firm entered the other's market, competitive profits would be only $1 billion per firm in each product market.  In this case each firm would get $5 billion with this product market division, which is substantially more than the $2 billion they would each have earned if they competed in both product markets.  The $6 billion in anticompetitive profits would thus be split between them among product markets, with each extracting $3 billion in additional anticompetitive profits.  These additional profits come entirely from the higher prices that the firms are able to charge customers because of their market division agreement.  Consumers are harmed even though the market division does not increase prices above the monopoly levels that prevailed before each firm could have entered the other's market.  The harm to consumers is that the market division prevents a competitive price drop that would otherwise occur.  The allegation that Mylan and Teva agreed to delay entry in each other's drug markets (EpiPens and Nuvigil respectively) is a form of product market division.

32.   **4. Temporal market division with transfer payment.** Temporal market divisions instead involve an agreement by one firm not to compete with the other firm during a certain time period.  For example, consider the time period from 2005 to 2015, and suppose 2005 was the year in which Firm B planned to enter the market.  The firms agree that Firm B will not enter until 2010 if Firm A pays Firm B $1 billion.  Suppose further that Firm A would reap $1 billion in monopoly profits for each year that Firm B stays out of the market, and that each firm would earn $100 million per year if they competed and charged competitive prices.

33.   In this case, Firm A would get $4.5 billion with the agreement because it would get $5 billion in monopoly profits from 2005 to 2010 and earn $500 million in competitive profits from 2010 to 2015, and would have to pay Firm B $1 billion.  Firm B would get $1.5 billion with the agreement because it would earn $500 million in competitive profits from 2010 to 2015 and would receive a $1 billion payment from Firm A.  Without the agreement, Firms A and B would each have earned $1 billion from competing from 2005 to 2015.  Thus, just like the prior territorial market division, this temporal market division gives Firm A $3.5 billion in anticompetitive profits and Firm B $500 million in anticompetitive profits.  Consumers are harmed by $4 billion, even though the market division does not increase prices above the past monopoly levels, because the market division prevents a competitive price drop that otherwise would have occurred from 2005 to 2010.  This example of temporal market division is illustrated below in Figure 5.

Highly Confidential: Subject to Protective Order

**Figure 5. Temporal Market Division with Transfer Payment to Split the Anticompetitive Profits**



34.   **4. Temporal market division from a reverse-payment patent settlement that delays entry.**   Suppose that Firms A and B have the same potential monopoly and competitive profits as in the last example.  Firm A has a patent with 10 years remaining that has only a 10% chance of being held valid.  On the eve of a 2004 trial that alleges Firm B would infringe the patent, the parties agree to a settlement whereby the patent claims are dismissed and Firm B agrees to enter at some point in the future.  Suppose further that, without any reverse payment, the settlement would reflect the patent merits by providing that Firm B would enter in one year, in 2005.  Instead, Firm A agrees to a reverse-payment settlement in which Firm A pays Firm B $1 billion and Firm B agrees not to enter until 2010.  Firm A would get $4.5 billion with the reverse-payment settlement because it would get $5 billion in monopoly profits from 2005 to 2010 and earn $500 million in competitive profits from 2010 to 2015, and would have to pay Firm B $1 billion.  Firm B would get $1.5 billion with the reverse-payment settlement because it would earn $500 million in competitive profits from 2010 to 2015 and receive a $1 billion payment from Firm A. With a no-payment settlement, Firms A and B would each have earned $1 billion from competing from 2005 to 2015.  Thus, just like the prior temporal market division without a patent, this temporal market division from a reverse-payment settlement gives Firm A $3.5 billion in anticompetitive profits and Firm B $500 million in anticompetitive profits.  Consumers are harmed by $4 billion, even though the market division does not increase prices above the past monopoly levels, because the market division prevents a competitive price drop that would otherwise have occurred from 2005 to 2010.  This example is illustrated below in Figure 6.

17

Highly Confidential: Subject to Protective Order

**Figure 6. Temporal Market Division from Reverse Payment Patent Settlement That Delays Entry**



### SETTLEMENT WITHOUT REVERSE PAYMENT

**Competition ($1 billion each)**

### SETTLEMENT WITH REVERSE PAYMENT

**Monopoly
A profits $5 billion
A pays B $1 billion**

**Competition
($500 million each)**

**2005**          **2010**          **2015**

35.     In addition to showing the conceptual connection between market divisions and reverse-payment patent settlements that delay entry, these examples have a few general lessons.  First, market divisions between an incumbent monopoly firm and a potential entrant, whether geographic, product, or temporal, impose anticompetitive harm on consumers even when they do not cause prices to increase above past levels.   The anticompetitive harm is that they prevent a price drop that competition otherwise would have created in the areas or time periods in which the entrant agrees not to compete.  For a geographic market division, the larger the area where monopoly is extended by preventing competitive entry into that territory, the larger the consumer harm.  For a product market division, the larger the product market where monopoly is being extended by preventing entry into that product market, the larger the consumer harm.  For temporal market division, the longer the monopoly is extended by delaying competitive entry into the market, the larger the consumer harm.

36.     Second, market divisions, whether geographic, product, or temporal, are anticompetitive even though they make both of the firms better off.  Their anticompetitive harm is that they prevent the firms from competing with each other in some areas or time periods, which benefits the firms but harms consumers.  Even if the monopoly is extended for only one firm, in only one area or time period, both firms can always profit from the market division by using transfer payments to split the anticompetitive profits.  The market division will make both firms better off so long as the transfer payment amount is less than the anticompetitive profits received

18

Highly Confidential: Subject to Protective Order

by the extended monopolist but larger than the profits the entrant could make by competing in the restrained areas or time periods.

37.     Third, the anticompetitive harm created by market division agreements does not turn on whether we call the agreement a contract, a conspiracy, or a settlement.  The anticompetitive harm flows from the fact that, whatever their agreement is called, it involves an agreement by the firms not to compete in some areas or time periods.

### 2. Why Entry Can Be Expected Despite an Issued Patent

38.     The fact that the Patent and Trademark Office (PTO) has issued a patent does not mean the patent will ultimately be held valid and infringed when contested in a court of law.  Empirically, many issued patents are not upheld by the courts.[26] This empirical reality could reflect the fact that the PTO issues patents based on the filings of only the patent applicant, whereas courts use an adversarial process that allows excluded rivals to contest issued patents and raise non-infringement defenses that cannot be raised before the PTO.  Or it could reflect the fact that, as economic studies indicate, the PTO has incentives to grant too many invalid patents because doing so saves the PTO scarce time on patent examinations and gains the PTO fees on the issuance and maintenance of patents.[27]  Whatever the underlying cause, the reality is that there is a significant probability that a PTO-issued patent will not be held valid and infringed by a potential entrant.

---

[26] *See* Federal Trade Commission, GENERIC DRUG ENTRY PRIOR TO PATENT EXPIRATION: AN FTC STUDY, at vi (2002), available at: https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf ("Generic applicants have prevailed in 73 percent of the cases in which a court has resolved the patent dispute.").

[27] Frakes & Wasserman, *Does Agency Funding Affect Decisionmaking?: An Empirical Assessment of the PTO's Granting Patterns*, 66 VAND. L. REV. 67 (2013); Frakes & Wasserman, *The Failed Promise of User Fees: Empirical Evidence from the U.S. Patent and Trademark Office,* 11 J. EMPIRICAL LEGAL STUD. 4 (2014); Frakes & Wasserman,*Does the U.S. Patent and Trademark Office Grant Too Many Bad Patents?: Evidence from a Quasi-Experiment*, 67 STAN. L. REV. 613 (2015); Frakes & Wasserman, *Is the Time Allocated to Review Patent Applications Inducing Examiners to Grant Invalid Patents?: Evidence from Micro-Level Application Data*, REV. ECON. STAT.  Vol. 99 No. 3 (2017).

Highly Confidential: Subject to Protective Order

39.    Accordingly, modern economic literature now recognizes that, until issues of validity and infringement are resolved in litigation, a PTO-issued patent is a "probabilistic" property right. Thus:

> [T]he patent holder is not "entitled" to obtain the same level of profits, or the same rights to exclude rivals, as would the owner of the fictionalized ironclad patent. Therefore, the patent holder is not "entitled" to negotiate a monopoly outcome, just because the patent holder asserts that its patent is valid and infringed by a particular rival. Rather, the patent holder's rights are calibrated according to the likelihood that the patent holder would win the patent litigation, and the extent of exclusion that such a victory would permit.[28]

In other words, the PTO's issuance of a patent does not grant its holder an absolute right to exclude competitors, but merely a probabilistic one, which can be tested through litigation.[29]

40.    Because a PTO-issued patent is a probabilistic property right, generic entry can be expected during the patent term with some probability for two reasons. First, because there is some probability that the generic will win the patent litigation, entry will occur with that probability after the patent litigation.   Second, the probability that the generic will lose can be low enough that the patent damages a generic expects to pay from entering during litigation can be lower than the profits from such entry.   In such cases, the generic can be expected to enter during the patent litigation, which is often called "at risk" entry because the generic enters despite some risk it might have to pay patent infringement damages as a result.   For both reasons, the expected entry date thus turns on the odds that the patent will be held valid and infringed.

### 3. The Expected Rival Exclusion Merited by the Patent

41.    Because of the probabilistic nature of issued patents, assessing the effects of a reverse-payment settlement thus requires inquiry into what the expected result would have been without such a settlement.   To understand the meaning of an

---

[28] Carl Shapiro, *Antitrust Limits to Patent Settlements*, 34 RAND J. ECON. 391, 395 (2003).

[29] *See* Lemley & Shapiro, *Probabilistic Patents*, 19 J. ECON. PERSPECTIVES 75 (2005); Carl Shapiro, *Antitrust Limits to Patent Settlements*, 34 RAND J. ECON. 391, 395 (2003) ("Nothing in the patent grant guarantees that the patent will be declared valid, or that the defendant in the patent suit will be found to have infringed.   In other words, all real patents are less strong than the idealized patent grant usually imagined in economic theory.").

Highly Confidential: Subject to Protective Order

expected value, take the following example.  Suppose you have 10 lottery tickets. Each lottery ticket has a 1 in 10 odds of winning $10.  On average, you should expect to win once, so the 10 lottery tickets have an expected value of $10.  Thus, the "expected" value of one lottery ticket is $1.  To express this mathematically, the expected value = (odds of winning) x (gains if win).  Thus, here the expected value = (1/10) x ($10) = $1.  We can also express any odds as probability.  For example, 1 in 10 odds is the same as a 10% probability of winning.  Thus, the expected value of a lottery ticket is 10% of $10 = $1.

42.     The concept of expected value can also be used to determine a patent's expected exclusion of rivals.  Suppose that a patent has a 10% chance of being upheld, in which case it will exclude competitors for the remaining patent term of 10 years.  If the patent litigation were instantaneous, the expected rival exclusion would be (1/10)x(10 years) = 1 year.

43.     Of course, real litigation is not instantaneous, which introduces another complication: the expected rival exclusion also turns on the expected length of that litigation and on whether the entrant is likely to enter during the patent litigation. Suppose the patent litigation is expected to last two more years and that, if the patent holder wins, it will exclude competitors for the next ten years after the end of the litigation, reflecting a total remaining patent term of 12 years.  If the entrant would enter during litigation, then competition will occur during the first two years of litigation with certainty and rival exclusion will occur during the next ten years with 10% odds.  Thus, the expected rival exclusion is 1 year.  If the entrant would not enter during litigation, then competition will also fail to occur during the two years of litigation.  Thus, in this case, the expected rival exclusion would be 3 years. Figure 7 below illustrates the expected exclusion with and without entry during the patent litigation.

Highly Confidential: Subject to Protective Order

**Figure 7.  Expected Rival Exclusion Given Patent Litigation Length**



### 4. How to Determine Whether the Reverse-Payment Settlement Excludes Competition for Longer than the Expected Rival Exclusion

44.    A reverse-payment settlement that excludes entry for longer than the expected rival exclusion[30] prevents competition for longer than deserved by the patent merits and divides the market over time in a way that keeps prices from falling and harms consumers.  For example, suppose the expected rival exclusion is 1 year. The incumbent monopolist agrees to pay the entrant $1 billion in exchange for their agreeing not to enter for 6 years.  Such a settlement excludes competition for 5 years longer than the expected rival exclusion that was merited by the patent.  This is illustrated by Figure 8.

---

[30] As I show in the following Section, reverse-payment settlements exclude entry for longer than expected rival exclusion whenever the reverse payment amounts are larger than the patent holder's avoided litigation costs.

Highly Confidential: Subject to Protective Order

**Figure 8. How Reverse-Payment Settlements Can Exclude Competition for Longer than Expected from Patent Merits**



45.     The size of a reverse payment can be used to determine whether the settlement exclusion exceeded the exclusion expected from litigation. As I show in the next Section, a reverse payment is large enough to anticompetitively delay entry whenever the payment amount exceeds the litigation costs the patent holder avoided by settling.[31] This method does not require any estimate of the patent strength, so it is especially useful when the patent strength is disputed. It also holds regardless of litigation length, at-risk entry, or the business profits the patent holder or entrant would make with and without entry. Increasing the reverse payment size increases the length of time by which the settlement exclusion exceeds the exclusion expected from litigation.

### *5. Reverse Payments Are Large Enough to Anticompetitively Delay Entry Whenever They Exceed the Patent Holder's Avoided Litigation Costs*

46.     A reverse payment that exceeds the litigation costs the patent holder avoids by settling is always large enough to anticompetitively delay entry. Elsewhere, I have provided a proof that details all the payoffs with and without entry during the patent litigation.[32] But the point can also be proven more simply. A

---

[31] The converse of this statement is not true. A reverse payment that is less than avoided litigation costs does not mean that the settlement did not cause excess exclusion. It simply means that, when the reverse payment is less than avoided litigation costs, excess exclusion cannot be inferred from the reverse payment size alone.

[32] *See* Einer Elhauge & Alex Krueger, *Solving the Patent Settlement Puzzle*, 91 TEX. L. REV. 283, 290–92, 297–312 (2012).

Highly Confidential: Subject to Protective Order

patent holder can always litigate rather than settle, so it will never accept a settlement unless the profits from doing so leave it better off than the expected result with litigation. With a reverse-payment settlement, the patent holder gets the profits from the settlement exclusion minus the reverse payment. With litigation, the patent holder gets the profits from expected litigation exclusion plus expected damages (if the entrant enters during litigation) minus the litigation costs it incurs. This is true regardless of the patent strength, litigation length and costs, and the likelihood and timing of entry during litigation, because those factors are all reflected in those expected profits and damages. Thus, the patent holder will agree to a reverse-payment settlement only if (profits from the reverse-payment settlement exclusion) – (reverse payment) > (profits from expected litigation exclusion) + (expected damages) – (litigation costs). Rearranging, this means it must be true that (profits from the reverse-payment settlement exclusion) – (profits from expected litigation exclusion) > (reverse payment) – (litigation costs) + (expected damages).

47.     If the patent holder is certain the entrant will not enter during litigation, then expected damages are zero and this formula simplifies to (profits from the reverse-payment settlement exclusion) – (profits from expected litigation exclusion) > (reverse payment) – (litigation costs). If the reverse payment exceeds litigation costs, then the right side of this inequality is positive, and therefore the profits from the settlement exclusion must exceed the profits from expected litigation exclusion. This can be true only if the settlement exclusion period is longer than the expected litigation exclusion period. Further, the larger the difference between the reverse payment and the avoided litigation costs, the more the settlement exclusion must exceed expected litigation exclusion to compensate. This point is illustrated in Figure 9.

Highly Confidential: Subject to Protective Order

**Figure 9. Reverse Payment > Avoided Patent Holder Litigation Cost Means Settlement Exclusion > Expected Exclusion**

**Litigation**



**If Settlement Exclusion ≤ Expected Exclusion, Patent Holder Would Reject Settlement**



**Patent Holder Would Agree to Settlement Only if Settlement Exclusion > Expected Exclusion**



48. To whatever extent the patent holder thinks it is likely that the entrant will enter during litigation, then as noted above the inequality is instead: (profits from the reverse-payment settlement exclusion) – (profits from expected litigation exclusion) > (reverse payment) – (litigation costs) + (expected damages). There will be some positive expected damages as long as the patent strength is not zero, which makes the right side of the inequality larger, requiring an even larger difference

Highly Confidential: Subject to Protective Order

between settlement exclusion and litigation exclusion for the patent holder to rationally agree to the settlement. Thus, the more likely it is that the entrant would have entered during litigation, the larger the difference between the settlement exclusion and the expected litigation exclusion.

49.    Therefore, a reverse-payment settlement always increases the exclusion of competition whenever the reverse payment exceeds the patent holder's avoided litigation costs.    The amount by which a reverse-payment settlement delays competition increases as: (a) the size of the reverse payment increases; and (b) the likelihood of at-risk entry increases.

50.    This result does not change if the parties have different perceptions of the patent strength.  As explained above, if the reverse payment exceeds the patent holder's avoided litigation costs, then the settlement exclusion must exceed the patent holder's estimate of expected litigation exclusion.  If the entrant has a different perception of the patent strength, there are two possibilities: the entrant thinks the patent strength is either weaker or stronger than the patent holder thinks.

51.    If the entrant thinks the patent strength is weaker than the patent holder thinks, then the entrant must think the expected exclusion is even lower than the patent holder thinks.  Thus, the entrant must think the settlement exclusion exceeds the expected exclusion by even longer than the patent holder thinks.  Accordingly, under this possibility, both the entrant and patent holder must think the reverse-payment settlement delays entry; but the entrant thinks it delays entry even more than the patent holder thinks.  This reasoning is displayed in Figure 10 below.

### Figure 10. Entrant Think Patent Strength Is Lower



52.    If the entrant thinks the patent strength is higher than the patent holder thinks, then the entrant believes the expected exclusion from litigation is longer than the patent holder thinks.  Thus, under this possibility, they could always settle

Highly Confidential: Subject to Protective Order

without any reverse payment by agreeing to a settlement exclusion period that is shorter than the entrant's expected exclusion period but longer than the patent holder's expected exclusion period. Such a no-payment settlement would make both sides better off because the patent holder gets monopoly profits for longer than it otherwise expected and the entrant gets profits from market entry for longer than it otherwise expected, plus both sides avoid litigation costs. The settlement exclusion period would also be shorter with a no-payment settlement than with a reverse-payment settlement because making a reverse payment necessarily increases the settlement exclusion that a patent holder would demand and an entrant would accept. Accordingly, under this possibility, a reverse payment would not be necessary to reach a settlement and would necessarily delay entry compared to the no-payment settlement they otherwise would have reached. This is illustrated in Figure 11 below.

**Figure 11. Entrant Thinks Patent Strength Is Higher**



53.     Therefore, regardless of whether the entrant's perception of patent strength is lower, higher, or equal to the patent holder's perception, a settlement with a reverse payment that exceeds the patent holder's avoided litigation costs increases the exclusion of competition. Such a reverse-payment settlement necessarily excludes competition for longer than either (1) what both parties expected from litigation or (2) the settlement exclusion both parties would have accepted without any reverse payment.

Highly Confidential: Subject to Protective Order

### 6. Reverse-Payment Settlements Do Not Encourage Optimal Innovation

54.    It might wrongly be thought that, even if a reverse-payment settlement reduces short run consumer welfare, this harm is offset because it encourages innovation that increases long-term consumer welfare.  But that is not the case because there are limits to the length of patent exclusion that is socially optimal, and a settlement that extends the patent exclusion beyond the optimal length of patent exclusion actually produces suboptimal innovation.  To begin with, the patent system has to trade off the benefits of encouraging innovation against the harm of reducing the use of those innovations, where both those benefits and harms result to the extent that patents allow monopoly pricing.[33]  If designed optimally, the patent system will maximize overall consumer welfare by giving patent holders the optimal fraction of *ex post* total surplus created by their innovations.[34] Accordingly, if the settlement exclusion exceeds the optimal patent exclusion, it leads to excess investment in innovation, which reduces welfare compared to optimal investment in innovation.  Furthermore, a settlement that provides excessive patent protection can produce a net reduction in innovation by precluding subsequent innovations by others.[35]  Finally, reverse-payment settlements that create a longer exclusion than merited by the patent increase patent holder profits *more* for less-deserving weak patents than for more-deserving strong patents, because the latter have a longer

---

[33] *See* John H. Barton, *Patents and Antitrust: A Rethinking in Light of Patent Breadth and Sequential Innovation,* 65 ANTITRUST L. J. 449, 450 (1997). ("The patent-antitrust analysis has always had to take into account and balance benefit to consumers by maintaining the competitive structure of existing markets against benefits to consumers by permitting the intellectual property rights system to provide an incentive for research toward new and improved products.").

[34] *See* SUZANNE SCOTCHMER, INNOVATION AND INCENTIVES 100–03 (2004); Partha Dasgupta & Joseph Stiglitz, *Uncertainty, Industrial Structure, and the Speed of R&D*, 11 BELL J. ECON. 1, 18 (1980); Pankaj Tandon, *Rivalry and the Excessive Allocation of Resources to Research*, 14 BELL J. ECON. 152, 152, 156–57 (1983).  Such a system will also maximize overall *total* welfare because competing innovators will keep spending on *ex ante* investments until their investment costs equal their expected *ex post* profits, so that the profits to patent holders wash out *ex ante*.

[35] *See* K. Levine, *A Model of Discovery*, 99 AM. ECON. REV. 337 (2009). For empirical work showing that expanding patent protections have had net negative effects on patent filings and suppressed later innovations, *see generally* Josh Lerner, *The Empirical Impact of Intellectual Property Rights on Innovation: Puzzles and Clues*, 99 AM. ECON. REV. 343 (2009); Fiona Murray et al., *Of Mice and Academics: Examining the Effect of Openness on Innovation* (Nat'l Bureau of Econ. Research, Working Paper No. 14819, 2009); Heidi L. Williams, *Intellectual Property Rights and Innovation: Evidence from the Human Genome* (Nat'l Bureau of Econ. Research, Working Paper No. 16213, 2010).

Highly Confidential: Subject to Protective Order

expected exclusion period without any reverse-payment settlement.[36]  Because weak patents are more likely to reflect pseudo-innovation and strong patents are more likely to reflect true innovation, such reverse-payment settlements would thus distort investment choices away from true innovation towards pseudo-innovations, by reducing the net reward for investing in true innovation rather than pseudo-innovation.

55.    Patent law presumably has been designed to produce the socially optimal patent exclusion period.  If that is so, then a settlement with a reverse payment that exceeds avoided litigation costs will produce a settlement exclusion that also exceeds the optimal patent exclusion.[37]

## B. The Classwide Methodology for Calculating the Entry Delay Caused by the Reverse-Payment Settlement

56.    In this Part, I describe a methodology to calculate what entry date would have been economically rational for the parties to have agreed to in a no-payment settlement had they been prevented from reaching a reverse-payment settlement. This rational but-for settlement entry date would have permitted earlier licensed entry by competitors to the EpiPen than was allowed under the actual settlements. This earlier generic entry would be a common factor applicable to all class members. Further, all of the evidence that would be used under this methodology to predict the rational no-payment settlement entry date is common to all class members.  This is the same methodology that I have used in other cases to estimate the economically rational but-for entry dates with no-payment settlements.[38]  In Section III below, I illustrate how this approach would be applied to the alleged Teva-Mylan reverse payment settlement.  The other reverse payment settlements alleged by plaintiffs could be analyzed in similar fashion, with the analysis being equally applicable on a classwide basis.

---

[36] *See* Elhauge & Krueger, *supra* note 32, at 294–95.

[37] This was proven in Einer Elhauge & Alex Krueger, *Solving the Patent Settlement Puzzle*, 91 Tex. L. Rev. 283, 290–92, 297–312 (2012).

[38] *See United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA (Lidoderm)*, 296 F. Supp. 3d 1142, 1162-64, 1186-88 (N.D. Cal. Nov. 3, 2017); *In re Namenda Direct Purchaser Antitrust Litigation*, 2018 WL 3970674, at *6-8 (S.D.N.Y. 2018); *In re Androgel Antitrust Litigation (No. II)*, 2018 WL 2984873, at *15-17 (N.D. Ga. 2018).

Highly Confidential: Subject to Protective Order

57.     Parties rationally agree to a settlement if they think it makes them better off, so for each party its settlement payoff must exceed its litigation payoff. Their settlement payoffs are determined by the settlement entry dates, their expected profits with and without entry, and the size of any reverse payment. Their expected litigation payoffs are determined by many factors, including their perceptions of patent strength (i.e., the likelihood the patent holder would have won the patent litigation in a way that prevented entry), of the likelihood and timing of entry during litigation, of expected future litigation length and costs, and of their expected profits with and without entry. Each party's individual gain from settlement is the difference between its settlement payoff and expected litigation payoff. The sum of their individual gains from settlement are the joint gains of settlement.

58.     For decades economists have recognized that how negotiating parties split potential joint gains may be affected by many factors, including differences in personality, culture, concern for bargaining reputation, perceptions of fairness, negotiating skill, negotiator interests, incentives and emotions (including managerial risk tolerance), information available to the parties, ability to bluff or mask reservation values, and credibility in threatening to walk away from a deal.[39] Economists recognize that the aggregate effect of those factors is reflected by how the parties split the joint gains created from a deal.[40] Each party's ability to obtain

---

[39] *See* generally Fisher, Roger, William Ury, and Bruce Patton. *Getting to Yes: Negotiating Agreement without Giving in* (New York, NY: Penguin, 2d ed. 1991), accessed at http://www.fd.unl.pt/docentes_docs/ma/AGON_MA_25849.pdf; Wheeler, Michael A. "Negotiation Analysis: An Introduction." Harvard Business School Background Note 801-156, August 2000 (Revised December 2014); Daye. Thomas A., ABA Section of Litigation Corporate Counsel CLE Seminar, Winning The Settlement – Keys to Negotiation Strategy (February 11-14, 2010); Albert Choi & George Triantis, *The Effect of Bargaining Power on Contract Design*, 98 VA. L. REV. 1665, 1675-1676 (2012).

[40] *E.g.* Abhinay Muthoo, *A Non-Technical Introduction to Bargaining Theory*, 1 World Econ. 145, 151 (2000) (describing a party's bargaining power "as captured, in general, by [their] share of the surplus"); Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, Harvard Law School John M. Olin Center for Studies in Law, Economics, and Public Policy Working Papers, Paper 275, 15 (2003) (same); J. Gregory Sidak, *Bargaining Power and Patent Damages*, 19 Stan. Tech. L. Rev. 1, 12 (2015) ("It is a fundamental principle of bargaining theory that, in a negotiation, the buyer and seller divide the surplus between themselves based upon the relative bargaining power of each party."); Kip Viscusi, *Product Liability Litigation With Risk Aversion*, 17 J. Legal Stud. 101, 102, 107-08 (1988) (explaining that where two parties will ultimately settle in a given negotiating range will depend on the parties' bargaining power and setting out a formula to determine the parties' respective bargaining power based on actual settlement results); Bruce Hay & Kathryn Spier, *Litigation and Settlement*, Harvard Law School John M. Olin Center for Law, Economics and Business Discussion Paper Series, Paper

30

Highly Confidential: Subject to Protective Order

its portion of the joint gains is referred to as its "bargaining power," which is defined and measured simply as the percentage of the joint gains from the deal that a party is able to achieve.[41]  For example, if a party is able to obtain 60% of the joint gains from a deal, then the party had 60% of the bargaining power in the context of that particular negotiation.  In a settlement, bargaining power reflects how the parties split the joint gains from the settlement.

59.   Although all the above factors affect bargaining power, it would be difficult to use these factors to predict from scratch the amount of bargaining power. However, in this case, we do not need to predict bargaining power from scratch because we can use the actual settlements to calculate the parties' ***actual*** bargaining power levels, which tells us what the aggregate effect of all these (and any other) factors actually was on their bargaining power.  In other words, in this case, we know the actual settlements, and from that actual negotiation outcome we can calculate the settlement gains of each party, which tells us their share of joint gains, i.e., their bargaining power.  Using the actual bargaining power thus not only affirmatively accounts for all the factors that might affect bargaining power, but is the most reliable method for accounting for all those factors.[42]

60.   The parties' actual bargaining power when negotiating the actual settlement with a reverse payment would also be their bargaining power in a but-for settlement without a reverse payment.  This follows by definition from the fact that the but-for world is one in which ***everything other than*** the challenged conduct (here, the reverse payment) is the same as it was in the actual world.[43]  Thus, the

218, 14 (1997) (a factor affecting settlement terms is "the parties' relative bargaining power in dividing the surplus from settlement")

[41] *See* sources cited in preceding footnote.

[42] To draw an analogy, consumer demand for products is affected by a myriad of psychological factors that might affect the utility they derive from purchasing those products.  Each consumer's demand for chocolate ice cream may be affected by biological taste buds, their childhood, the packaging, the brand name, and so on.  However, there is no reliable method for using those psychological factors to predict from scratch the utility functions of each consumer for chocolate ice cream.  Instead, economics uses consumers' ***actual*** purchase decisions in order to determine their revealed preferences, which tells us what the aggregate effect of those (and any other) factors are on consumer demand.

[43] *E.g.*, ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 54-55 (2d ed. 2010) ("To isolate the effect of the violation . . . it is important to modify the defendants' conduct in the but-for world only to the extent necessary to comply with the law.") Likewise, standard antitrust economics uses actual purchase decisions to derive revealed preferences and consumer demand curves, which are then used in analysis of the but-for world without the alleged anticompetitive conduct.

Highly Confidential: Subject to Protective Order

parties' bargaining power in the but-for world is the same as in the actual world. This makes economic sense because all the things that affect bargaining power would be the same in the but-for world. The but-for settlement would involve a negotiation about precisely the same patents, at precisely the same time, and between precisely the same parties, with precisely the same bargaining abilities and weaknesses (such as tactical tendencies, bluffing ability, reputational effects, psychological factors, or emotions, credibility to threaten to walk away from the deal, and other intangibles that might affect bargaining power), precisely the same estimates of the patent strength, litigation length and costs, and the timing of generic entry, and with precisely the same estimates about what the other party thought about any of these issues.

61.    To calculate each side's bargaining power (i.e., how much of the joint gains from the actual settlement each party was able to capture for itself), I will calculate each parties' settlement payoff from the actual settlement and its expected litigation payoff. From those, it is easy to calculate its individual settlement gain (the difference between those two payoffs), the joint settlement gain (the sum of those individual settlement gains), and its bargaining power (its individual settlement gain divided by those joint gains). I then use that actual bargaining power to calculate what the economically rational but-for settlement entry date would have been with no payment.

62.    Nothing in the calculation of actual bargaining power depends on any assumption about the extent to which each party accurately perceived the estimates and litigation payoffs of the other party. The individual gains from settlement are all calculated relative to each party's own perceptions of its settlement and litigation payoffs, and the joint gains are simply the sum of those individual gains. Thus, none of the components to calculating actual bargaining power depends at all on what each party believed the other party believed. To be sure, each party's beliefs about the other side's beliefs, and any incomplete information either side may have on each other's beliefs, might well bear on their bargaining power to obtain a share of joint gains. For example, a party that can make the other party think its litigation payoff is higher than it actually is may well be able to bargain for a higher share of joint gains. But any effect such beliefs might have on actual bargaining power will already be reflected in the actual settlement they reached. And from that actual settlement, one can calculate the actual bargaining power without making any assumption about the extent to which each party accurately perceived each other's estimates and what effect that might have on their bargain.

Highly Confidential: Subject to Protective Order

63.    To determine the bargaining power revealed by the actual settlement, I would calculate both Mylan and Teva's expected payoffs from the actual settlement (including the reverse payment) and their expected payoffs from continuing litigation.  The gains for each party from the combined settlements would then be equal to each party's actual settlement payoff minus its expected litigation payoff. The joint gains from settlement would equal the sum of each party's individual gains from settlement.  The share of the joint gains obtained by Teva, the potential entrant in the EpiPens market would then be a measure of its bargaining power in the actual settlement.

64.    To determine the economically rational but-for entry date in a standalone no-payment EpiPens patent settlement in which the parties would have had the same bargaining power as they had in the actual world, I would calculate the profits each would expect to earn for all possible entry dates between the first date Teva was expected to be able to enter the market and the end of the patent term.  I would then calculate the amount each side would gain from a no-payment settlement with each entry date, given their litigation payoffs.  From that, I would calculate their share of settlement gains for each possible no-payment settlement entry date.  The no-payment settlement entry date that would be most consistent with the parties' actual bargaining power revealed by the actual settlement would be the entry date that equates the share of gains obtained by each party in the but-for settlement to that they obtained in the actual settlement.

65.    In Section III, I demonstrate that it was not economically rational for Teva to have accepted the actual EpiPens patent settlement unless it received a reverse payment.  My analysis further shows that the Nuvigil patent settlement must have conferred a reverse payment of at least ██████████  minus the litigation costs that Teva avoided by the Nuvigil patent settlement.  The exact reverse payment amount remains to be determined at the merits stage, but any assessment of that amount would be based on evidence that would apply to entire class and produce a conclusion that would be the same for the entire class.  In Section III, I illustrate how my method would apply for an illustrative reverse payment amount of $100 million. Given that assumption, I show that Mylan obtained ████ % of the joint gains from the actual reverse payment settlement, and I find that the economically rational but-for entry date in a no-payment settlement of the EpiPens litigation would have been March 13, 2014, 15.3 months earlier than the actual entry date.

66.    As I show in Section III, all the inputs to this method are based on classwide evidence and the method produces a but-for generic entry date that is common to the class.  If any individual class member were to bring a claim, precisely

Highly Confidential: Subject to Protective Order

the same analysis would have to be done.  Further, with my method, I can also calculate the sensitivity of the but-for entry date to different estimates of the inputs used in its calculation.  Thus, to the extent the defense disputes, for example, the estimates I used for patent strength, reverse payment size, litigation length, or litigation costs, I can demonstrate what the but-for settlement entry date would be under alternative estimates.   Any alternative estimates used in sensitivity calculations would be based on common evidence relating to the entire class and the sensitivity analysis would produce conclusions about the but-for entry date that are common to the class.

### C. How the Classwide Methodology Could Be Used to Calculate the Delay In Generic Entry in the EpiPens Market from the Nuvigil Reverse Payment

#### 1. Teva Settlement

67.     Plaintiffs allege that Teva and Mylan exchanged a patent settlement that delayed Teva's entry into Mylan's EpiPen monopoly in return for a patent settlement that delayed Mylan's entry into Teva's Nuvigil monopoly.

68.     In the EpiPen patent litigation, King and Meridian, holders of the EpiPen patents, brought a lawsuit on August 28, 2009, against Teva for infringement of the EpiPen patents.[44]  Mylan owns the rights to market and sell the EpiPen, giving it an interest in the settlement, which it signed off on and publicly announced when completed.[45]   Under the supply agreement, ███████████████████████████████ ████████████████████████████████ As first filer, Teva received 180 days of exclusivity, creating a bottleneck effect that prevented other generics from entering until after Teva did. ████████████ ██████████████████████████████████ However, at the time of settlement, Teva did not yet have FDA approval to launch and therefore was not yet able to launch at risk.  On March 7, 2012, the trial began, and on April

---

[44] Teva_Epi_000001.
[45] PFE_EPIPEN_AT00007925 at 52; "Mylan and Pfizer Announce Epinephrine Auto-Injector Settlement Agreement with Teva", PR Newswire, April 26, 2012, available at http://newsroom.mylan.com/press-releases?item=123144.
[46] MYEP00474084 at 109 (Supply Agreement §11.b).
[47] MYEP00909764, MYEP00470314.

34

Highly Confidential: Subject to Protective Order

26, 2012, Mylan announced that Meridian had agreed to an EpiPens patent settlement that delayed entry by Teva for three years, until June 22, 2015.[48]

69.   In the Nuvigil litigation, the situations were reversed, with Teva holding the patent, and Mylan challenging it.



70.   By settling the two patent litigations at the same time, plaintiffs allege that Mylan and Teva exchanged delayed entries into each other's monopoly drug. As detailed below, based on the parties' profit projections and the patent strength estimated by Mr. Torrance, the EpiPens settlement was not economically rational for Teva on a standalone basis.[51]  It would thus not have been economically rational for Teva to have agreed to the EpiPens settlement unless it received compensation through the Nuvigil settlement.  Settling the Nuvigil patent litigation under terms that delayed Mylan entry more than would have occurred under a standalone Nuvigil settlement would inflict lost profits on Mylan and conferred higher profits on Teva. Mylan's sacrifice of Nuvigil profits to confer additional Nuvigil profits on Teva thus would constitute a reverse payment from Mylan to Teva that helped induce the EpiPens patent settlement that delayed Teva's entry into the EpiPens market.  To be sure, Mylan may well dispute that neither patent settlement was economically rational standing alone or that they were exchanged for each other, but any resolution of those issues would be based on classwide evidence and produce a conclusion that is common to the class.

71.   ***The EpiPens Settlement Was Profitable for Mylan But Not for Teva on a Standalone Basis.***  In March 10, 2012, Teva predicted that it would launch generic EpiPens in ▮▮▮▮▮▮▮▮▮▮[52]  Given that the trial had just started and that the

---

[48] "Mylan and Pfizer Announce Epinephrine Auto-Injector Settlement Agreement with Teva", PR Newswire, April 26, 2012, available at http://newsroom.mylan.com/press-releases?item=123144.

[49] MYEP00470314.

[50] MYEP01361499 at 500.

[51] Rev Pmt Model.xlsm (Tab "Teva Payoff Calcs" Cell B25, showing Teva's gains from the EpiPens settlement on a standalone basis to be negative).

[52] Teva-Epi_002003.

Highly Confidential: Subject to Protective Order

remaining litigation could be expected to last 1.1-1.3 years,[53] this prediction meant Teva ████████████████████. As discussed below, this expectation was consistent with its projected profits and expected damages given the odds of losing the patent litigation.[54]  Likewise, the most recent pre-settlement equity market analyst report, on February 23, 2012, predicted Teva would launch in January 2013.[55]  The most recent Mylan pre-settlement financial model was updated ████████████.[56]  In it, Mylan projected ████████████████████████████████████████████████[57]  Mylan projected that ████████████████████████████████[58]

72.    Because Mylan projected that ████████████████████████████████████████████ I estimate that Mylan would have expected to launch an AG and therefore use their projection of what would happen with an AG launch.  In this projection, Mylan projected that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[59] Mylan expected the share of the EpiPen market not retained by the brand to be ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[60]  This forecast also projected that ████████████████████████████████████████████████████████████████[61]

In order to calculate the present value of profits that Mylan expected to earn with and without the EpiPen patent settlement, I also need to estimate Mylan's COGS and discount rate, ████████████████████████████ Absent pre-settlement forecasts, I would look to other Mylan

---

[53] Torrance Report.
[54] *See infra* ¶78.
[55] MYEP00824750.
[56] MYEP01207989 and MYEP00262837.
[57] MYEP01207989 and MYEP00262837.
[58] MYEP01207989 and MYEP00262837.
[59] MYEP01207989.
[60] MYEP01207989.
[61] MYEP01207989.

Highly Confidential: Subject to Protective Order

projections near the time of settlement for these figures. █████████
████████████████████████████████████████████████████
████████████████████████████████████████████[3]   With these Mylan projections for market size,
branded share, AG share, AG pricing, COGS, and discount rate, I can calculate
Mylan's pre-settlement expectations of what it would earn on EpiPens with and
without generic entry if there were no settlement, as well as with generic entry
occurring at the date agreed upon under the actual settlement.

73.    With these estimates, I calculate that if, without a settlement, Mylan
won the EpiPens patent litigation and therefore was able to maintain its monopoly
throughout the remaining patent term, then Mylan expected to obtain a present value
of $██████████ in EpiPens profits between when Teva expected it could first enter
the market, ██████████, and the patent expiration date of September 11, 2025.[64]
In contrast, if Mylan lost the EpiPens patent litigation and Teva thus entered the
market, Mylan expected to earn a present value of only $█████████ of EpiPens
profits during this time period.[65]  With generic entry occurring on June 22, 2015,
under the actual EpiPens settlement agreement, I calculate that Mylan expected to
earn a present value of ██████████ in EpiPens profits during this time period.[66]
Mylan may well dispute these calculations of expected profits, but they are based on
Mylan profit projections that constitute evidence common to the class and reflect
conclusions about expected profits that are also common to the class.

74.    For the purpose of illustrating the effect of tying the patent litigations
together, I will use a reverse payment amount of $100 million.  This means that in
this illustration, I assume Teva obtained a settlement in the Nuvigil patent litigation
that was worth $100 million more to it than the result it could have obtained in the
Nuvigil litigation and that Mylan obtained a settlement in the Nuvigil litigation that
was worth $100 million less to it than the result it could have obtained in the Nuvigil
litigation.  The actual amount of the reverse payment amount remains to be
determined at the merits stage, but any such determination would be based on
classwide evidence and reflect a conclusion about that amount that is common to the
class.  I use $100 million in my illustration just to demonstrate how the method

---

[62] MYEP01036549 at 53.

[63] MYEP00266842 at slide 8.

[64] Rev Pmt Model.xlsm (Tab "Mylan Payoff Calcs" Cell B11).

[65] Rev Pmt Model.xlsm (Tab "Mylan Payoff Calcs" Cell B22).

[66] Rev Pmt Model.xlsm (Tab "Mylan Payoff Calcs" Cell B37).

Highly Confidential: Subject to Protective Order

would convert any conclusion about the reverse payment amount into a conclusion about the but-for entry date, and to show that this method would be classwide and based on classwide evidence.  Given the illustrative assumption of a $100 million reverse payment, Mylan's payoff from the EpiPens settlement would be $█████ - $100 million = $███████.

75.    Patent expert Andrew Torrance opines that reasonable litigants at the time of settlement would have expected that there was more than a 70% chance that Teva would win the EpiPens patent litigation against Mylan.[67]  He also estimates that the EpiPens patent litigation would have been expected to last between 1.1 and 1.3 years longer after the settlement date, and that the parties would each have expected to save between $2.13 and $3.44 million in litigation costs by settling the EpiPens patent litigation.[68]   I use the midpoint of these ranges (i.e., 85% odds of patent victory, 1.2 years of litigation length, and $2.8 million in litigation costs) to calculate the parties' expected payoffs from the EpiPens patent litigation.  Again, while Mylan may dispute all these estimated expectations about the EpiPens patent litigation, they are all based on classwide evidence and reflect conclusions that are common to the class.

76.    Given the above estimates, Mylan's expected litigation payoff in the EpiPens patent litigation was 15%*$███████ + 85%*$███████ - $████ = $██████.  Comparing this to Mylan's expected payoff from the actual settlement of $███████ shows that Mylan expected to gain a present value of $███████ from the EpiPens settlement.

77.    Next, to calculate Teva's expected settlement and litigation payoffs on EpiPens, I use Teva's most recent pre-settlement projection, which was updated March 10, 2012.[69]  It projected EpiPens market size at launch, monthly generic substitution and pricing and Teva share, and COGS.[70]  In this document, Teva projected EpiPens generic penetration by month starting █████ in the first month and then ranging from ████ to ████ in months 2 through 36.[71]  Teva projected that it would obtain ████ of the EpiPens generic market and price ████ below the brand, at ████ per unit, through the entire projection period.[72]  Teva also projected that its

---

[67] Torrance Report.
[68] Torrance Report.
[69] Teva-Epi_002003.
[70] Teva-Epi_002003.
[71] Teva-Epi_002003.
[72] Teva-Epi_002003.

Highly Confidential: Subject to Protective Order

COGS per unit would be ███, and that the total EpiPens market size would be ███████████ units per year.[73]  I have been unable to locate any Teva documents that describe its discount rate for the EpiPens product, and therefore estimate that Teva would have used the same ███% discount rate as Mylan.

78.     Using Teva's forecasts I calculate that, without settlement, Teva would have expected to enter the EpiPens market on January 1, 2013, and (unless it lost the patent litigation) to earn generic EpiPens profits with a present value of ███████ between then and the patent expiration.[74]  I calculate that Teva would have expected to pay damages of ███████████ if it lost the litigation, but would have earned ███████████ in profits during its time on the market if it entered at risk and lost the patent litigation.[75]  Given these expectations and the expectation that Teva was 15% likely to lose the patent litigation, entry at risk was economically rational because the gains were ███████████ in profits during the litigation while the expected losses were (15%)*███████████.  Since the gains from entry at risk were nearly triple the expected losses, entry at risk would have been economically rational.  I calculate Teva's expected litigation payoff, if it entered at risk to thus be its profits if it won the patent litigation multiplied by the probability that it would win, minus its net losses if it lost the patent litigation (i.e., damages minus profits during litigation) multiplied by the probability it would lose, less the litigation costs it would incur.  I therefore calculate Teva's expected litigation payoff from entering at risk to be ███████████ * 85% - ███████████)*15% - $███████████.

79.     Using the same forecasts, I calculate the present value of profits Teva would expect to earn with the June 22, 2015 entry date specified in the settlement to be $███████.[76]  This means that the EpiPens settlement did not make economic sense for Teva on a standalone basis, as it lost $███████ as a result of accepting the actual settlement as compared to continuing the litigation.  Again, Mylan may well dispute the inputs used to derive these calculations, but those inputs all reflect classwide conclusions that are based on classwide evidence.

80.     Given the above estimates, without any linking of the settlements, Teva would have rationally preferred to continue the EpiPens litigation, rather than accept

---

[73] Teva-Epi_002003.

[74]  Rev Pmt Model.xlsm.

[75]  Rev Pmt Model.xlsm (Tab "Teva Payoff Calcs" Cells B11 and B12.  Expected damages calculated as the difference between the total profits Teva would expect Mylan to obtain with 100% market share and the profits it would expect to obtain with generic entry).

[76] Rev Pmt Model.xlsm

Highly Confidential: Subject to Protective Order

a June 22, 2015 entry date in a no-payment standalone settlement.  If, however, Teva received at least $███████ in value from settling the Nuvigil litigation with a delayed entry date, then it would rationally have accepted the actual EpiPens settlement entry date.  This analysis thus indicates that Teva would not have accepted the EpiPens settlement unless the Nuvigil settlement benefited Teva by at least ██████ compared to continued litigation.  Although settling the Nuvigil patent litigation did benefit Teva by avoiding litigation costs, it is not plausible that those avoided litigation costs would have been as large ██████.  Thus, the above analysis confirms that the Nuvigil settlement must have constituted a substantial reverse payment to Teva that induced Teva to accept the EpiPens settlement and that the amount of that reverse payment was at least $███████ minus the litigation costs Teva avoided with the Nuvigil patent settlement.  The exact amount of the reverse payment remains to be determined at the merits stage, but as noted above, for illustrative purposes I will assume it was $100 million.

81.    ***Estimating Bargaining Power from the Actual Settlement.***    As discussed above, Mylan expected to gain $██████ from the actual EpiPens settlement relative to continued litigation if it paid a $100 million reverse payment as part of the settlement.   Teva expected to lose $██████ from the EpiPens settlement on a standalone basis and thus would not rationally have accepted the actual settlement with no reverse payment.  If it received a reverse payment of $100 million, however, then Teva's actual settlement payoff would be $100 million - $██████ = $██████.

82.    This means that the total joint gains from the actual settlement were ████████████████. Mylan obtained $██████ = 86.9% of these joint gains, thus indicating its bargaining power was 86.9%.  I calculate that the standalone no-payment EpiPens settlement entry date that would give Mylan this same share of the joint gains as in the actual combined settlement would be March 13, 2014.[77]  This no-payment settlement would have been profitable for both parties, conferring expected profits of ██████ to Mylan and ██████ to Teva that would have exceeded their expected profits from continuing the EpiPens patent litigation, which were ██████ for Mylan and ██████ for Teva.[78]  Thus, in the but-for world with the same bargaining power, it would have been economically rational for Mylan and Teva to have agreed on a no-payment

[77] Rev Pmt Model.xlsm (Tab "No Pmt Entry Dates" showing the split of the joint gains from settlement at all possible no settlement entry dates.  The date that gives Mylan the split closest to ██% is March 13, 2014).

[78] Rev Pmt Model.xlsm (Tab "No Pmt Stlmt Payoffs").

Highly Confidential: Subject to Protective Order

EpiPens settlement entry date of March 13, 2014, which is 15.3 months earlier than the entry date agreed to under the actual reverse-payment settlement.

83.    To be sure, the above analysis had to use some assumptions about the amount of the reverse payment, which has yet to be proven.  But whatever the amount of the reverse payment is, it will constitute classwide evidence  that can then be inputted at the merits stage into the above classwide methodology to calculate a but-for entry date for an EpiPens generic that would be common to the class. Likewise, while Mylan may dispute my estimate of other inputs used in the above methodology, their resolution will create estimates that will constitute classwide evidence and can be used in the above classwide methodology to calculate at but-for entry date for an EpiPens generic that would be common to the class.

84.    Further, this methodology is not dependent on the particular estimates. Rather, with this method, I can easily calculate the sensitivity of the but-for entry date to different estimates of all these inputs.

85.    For example, this methodology can estimate the but-for entry date across a wide range of estimated reverse payment amounts.  In Figure 12 below, I show the effect of varying the reverse payment size on predicted but-for no payment settlement entry date.

Highly Confidential: Subject to Protective Order

**Figure 12. Effect of Varying Reverse Payment Size on But-For Settlement Entry Date**[79]



86.     Likewise, this methodology can also estimate delay across a range of patent strengths (i.e., across a range of estimates of the likelihood that Mylan would have won the EpiPens patent litigation).  In Figure 13 below, I show the effect of varying the patent strength up to as high as it could possibly have been while still

---

[79] Rev Pmt Model.xlsm (Tab "Rev Pmt").

Highly Confidential: Subject to Protective Order

being consistent with Mylan having rationally accepted the actual settlement and paid the illustrative $100 million reverse payment amount.

**Figure 13. Effect of Varying Reverse Patent Strength on But-For Settlement Entry Date[80]**



87.     The same methodology could be used (as I have done in other cases) to consider the possibility that the parties had different perceptions from each other about the patent strength, to consider other estimates of the avoided costs or length of the EpiPens patent litigation, to consider other estimates of the timing of generic entry or the likelihood of entry during the EpiPens patent litigation, or to consider any combination of alternative estimates of these inputs that would be consistent with the parties having agreed to the actual EpiPens patent settlement.  Whatever estimate of any of these inputs that might be used would be common to the class, be based on evidence that is common to the class, and result in a but-for entry date estimate that was common to the class.

### D. Commonly Alleged Justifications for Reverse Payments Are Common to The Class

88.     Defendants in reverse payment cases often allege that their use of reverse payments was justified in their case.  In this Section, I discuss two commonly alleged potential justifications and discuss how their application to this case would depend on common class-wide evidence.

---

[80] Rev Pmt Model.xlsm (Tab "Patent Strengths")

Highly Confidential: Subject to Protective Order

## 1. Avoided Litigation Costs

89.     Defendants in reverse payment cases often allege that the avoidance of patent litigation costs is a procompetitive efficiency that justifies the use of the reverse payment.  For at least three reasons, all of which are equally applicable across the class, avoidance of litigation costs typically cannot justify the use of reverse payments.

90.     First, defendants cannot claim avoided litigation costs as a justification for the reverse payment if the reverse payment was not in fact necessary for avoiding litigation costs.  In this case, I have identified a date which made a no-payment settlement more profitable to both parties than continued litigation, indicating that no reverse payment was necessary in order for the parties to be able to rationally reach a no-payment settlement.[81]  Further, whether such a no-payment settlement was possible is a fact that applies commonly across the class. Such a no-payment settlement is a less-restrictive alternative to a reverse-payment settlement that can equally avoid litigation costs, resulting in a shorter settlement exclusion period and thus less harm to competition.

91.     Second, even if the reverse payment were necessary to avoid the patent litigation costs in this case, these avoided litigation costs would need to be passed on to consumers in order to constitute a cognizable procompetitive justification for using a reverse payment.  Because avoiding litigation costs lowers a fixed cost rather than a marginal cost, it is unlikely to lower prices in a way that gets passed on to consumers at all.  Further, where the reverse payment amount exceeds the patentholder's avoided litigation costs, which would be the case here for any reverse payment that exceeds $2.8 million, the reverse-payment settlement actually raises, rather than lowers the patentholder's fixed costs.  Therefore, even if these costs were passed through to customers, the combined effect of the cost of the reverse payment and the avoided litigation costs would be in fact to raise, rather than lower, the prices that consumers paid.  Again, these facts might be disputed by Mylan, but any resolution of them would be based on classwide evidence and result in conclusions common to the class.

92.     Third, even if the avoided litigation costs were passed through to consumers in a way that (considered in isolation) lowered prices paid by them, such a pass through would have to be large enough to offset the total overcharge that

---

[81] See supra ¶82.

Highly Confidential: Subject to Protective Order

results from delaying entry.  Given the small amount of avoided litigation costs ($2.8 million over 1.2 years[82]) as a percentage of EpiPens revenue (projected at ███),[83] even a very small overcharge over a short period of time could not possibly be offset by any lowered prices resulting from saved litigation costs passed through to customers.   Regardless of the exact overcharge and saved litigation cost numbers used in this comparison, the comparison itself applies on a classwide basis and can establish a sufficient condition for rebutting avoided litigation costs as a procompetitive justification for the reverse payment.

### 2. Risk Aversion

93.     Defendants in reverse-payment cases often argue that reverse-payment settlements are justified by managerial risk aversion.   This justification is inapplicable for several reasons.  Also, whether defendants were risk averse, how much so, and how it impacted their decision to enter into the actual settlements are all classwide issues that turn on common evidence.

94.     First, the evidence does not indicate that the defendants were risk averse.   All the defendants were publicly traded companies with large market capitalizations at the time of the settlement.  Active capital markets for large publicly traded companies should generally enforce profit-maximizing behavior by management on behalf of shareholders, which would deter managers from acting on this form of risk aversion because such action decreases shareholder profits. [84]  The fact that large publicly-held corporations act risk neutrally can be observed from the fact that they generally use captive insurers or otherwise self-insure risks that one would expect them to insure with third-party insurance if they were risk averse.  Over 90% of Fortune 500 companies have captive insurers.[85]  Likewise, 82.1% of firms with at least 500 employees provide health insurance for their employees by self-

---

[82] Torrance Report.
[83] *See* Teva-Epi 002003 ████████████████████████████████
████████████████████████████ .
[84] *See* Elhauge & Krueger, *supra* note 32, at 312.
[85] Christine Hall, Why Companies Are Opting For Captive Insurance Arrangements, Forbes     (January     28,     2013),     available     at https://www.forbes.com/sites/bmoharrisbank/2013/01/28/why-companies-are-opting-for-captive-insurance-arrangements/#1f55b5c1787d.

Highly Confidential: Subject to Protective Order

insuring, rather than by using outside insurance companies.[86]  Because such large publicly-held corporations have shareholders who can easily diversify, this pattern is consistent with my point that managers generally act in the interests of shareholders by maximizing expected gains without aversion to firm-specific risks that shareholders can diversify.  Because the defendants here are both large publicly-held corporations, this evidence supports an assumption of risk neutrality.

95.    Second, even if the parties were risk averse, a reverse payment would not be necessary to achieve any risk reduction associated with settlement, because a no-payment settlement would also allow the parties to avoid any litigation risk.[87] Whether the parties could have reached such a no-payment settlement is a classwide issue.  Risk aversion can only increase the likelihood of a no-payment settlement by lowering the litigation payoffs to both sides.  Such a no-payment settlement is thus a less-restrictive alternative to a reverse-payment settlement that can equally achieve risk reduction, resulting in a shorter settlement exclusion period and thus less harm to competition.  The claimed justification of averting risk is thus not actually attributable to the reverse payment.

96.    Third, even if the settling parties were risk averse *and* would not have agreed to a settlement without the reverse payment, risk aversion could cause Mylan's managers to accept a reverse-payment settlement that provided for less exclusion of competition than expected from continued litigation only if the settlement reduced expected profits.  Mylan's managers would have to be *sufficiently* risk averse that, contrary to the interests of their shareholders, the managers would have their firm both make a reverse payment that exceeded avoided litigation costs and agree to a settlement that provides less than expected patent protection, even though that would clearly lower Mylan's expected profits.  Whether or not the actual settlements lowered Mylan's expected profits in this way is a classwide issue determinable by evidence common to the class.

97.    Fourth, even if the settling parties were risk averse *and* would not have agreed to a settlement without the reverse payment *and* the reverse-payment settlement excluded entry for less than the expected litigation exclusion, reverse payments that foster such risk-averse decisions lower shareholder returns and thus

[86] Report to Congress on a Study of the Large Group Market, U.S. Department of Health and Human Services, p3, available at https://aspe.hhs.gov/system/files/pdf/76181/index.pdf.

[87] *See* Aaron Edlin et al., Actavis *and Error Costs: A Reply to Critics,* ANTITRUST SOURCE, Oct. 2014, at 1, 4–7; Aaron Edlin et al., Activating Actavis, ANTITRUST, Fall 2013, at 18-20.

Highly Confidential: Subject to Protective Order

inefficiently reduce incentives to invest in innovation.[88]   That would make the reverse-payment settlement affirmatively inefficient rather than show a procompetitive efficiency.

98.   Finally, even if the parties were risk averse in their settlement, incorporating risk aversion into the model would not change the fact that the reverse payment caused substantial entry delay. If one wished to credit risk aversion, the impact of any risk aversion on the part of the parties can be incorporated into the model through an adjustment to their perceptions of the patent strength.  To see this, consider a risk-averse patent holder, who gets an amount X if it wins the patent litigation (with perceived probability $\Theta_P$) and a lower amount Y if it loses the patent litigation (with perceived probability 1 - $\Theta_P$). The additional amount that the patent holder actually receives if it wins is X-Y.  If the patent holder were risk averse with respect to the litigation, then it would value this additional payoff from winning at something less than 100% of its full dollar value.  Let's call its risk-adjusted valuation of this additional payoff $\alpha(X - Y)$ with $0 < \alpha < 1$.  Its risk-adjusted expected value of this additional amount is then $\Theta_P\alpha(X - Y)$.  When stated this way, it is clear that the risk-adjustment factor, $\alpha$, can be applied to either the probability or the value that it derives from the additional payoffs, and achieve the same risk-adjusted expected value.  So it is equivalent to say that it values X - Y fully, but to then apply the risk adjustment to its perceived probability of winning.  Its risk-adjusted perceived probability of patent victory is thus $\alpha\Theta_P$, which is less than the true perceived probability of patent victory.  In order to account for risk aversion then, it is only necessary to substitute this lower risk-adjusted patent holder perception of the patent strength for the true patent holder perception of the patent strength in the formulas.  The result is the reverse for an entrant: its risk-adjusted perception of the patent strength is higher than its true perception of that strength.  So the effect of incorporating risk aversion into the model is to increase the entrant's patent strength perception ($\Theta_E$) and decrease the patent holder's patent strength perception ($\Theta_P$), which creates a wider range of possible no-payment settlements.  Whatever impact any risk aversion had on the actual settlement, and whatever effect it would have on an alternative no-payment settlement would reflect classwide evidence via a classwide methodology and produce a classwide result.

---

[88] *See* Elhauge & Krueger, *supra* note 32, at 312.

Highly Confidential: Subject to Protective Order

## III. FORECLOSURE

99.     In response to Auvi-Q's entry into the EAI market, Mylan engaged in exclusionary contracts with PBMs in order to maintain its monopoly even in the face of competition with Auvi-Q.  In particular, Mylan offered rebates to PBMs that were conditional on exclusionary conditions that required Auvi-Q to be placed in a less favorable formulary position than EpiPen in order for PBMs to receive the highest rebates.[89]  These conditions had a significant impact on the share of EAI doses that EpiPen and Auvi-Q sold within each PBM.

100.



The share impact that I estimate in Part III.B is conservative relative to both of Mylan and Sanofi's estimates.

101.   Through its conditional rebating strategy, Mylan was able to restrict a substantial portion of the market.  A June 30, 2014 internal Mylan presentation notes that ███ and shows that ███[92]  Sanofi data confirms that Mylan was successful in its effort to force Auvi-Q into restricted formulary positions.[93]  Figure X below shows the percentage of lives across all formularies that were either not covered, or restricted with requirements for prior authorization or step therapy.  "Not Covered" restricts coverage because if a drug is not covered on a plan's formulary, the patient cannot get reimbursed for the drug unless he or she is able to obtain an exception from the plan.  Prior authorization

---



[89] ███

[90] MYEP00527619.
[91] PS0236464 at 67

[92] MYEP00520928 at slides 7 and 41.
[93] SAN-EPI-0002613.

Highly Confidential: Subject to Protective Order

(PA) restricts coverage because it requires that physicians obtain approval from the plan prior to prescribing it in order for the plan to reimburse that drug. Step therapy (ST) restricts coverage because it requires patients try a different drug and show that it failed to help them prior to being eligible to be reimbursed for the drug being restricted via a step therapy requirement. The Covered (PA/ST) and Preferred (PA/ST) statuses mean that these formularies require at least one of prior authorization or step therapy.[94]  As the Figure 14 shows, ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████  While Mylan may dispute this foreclosure share calculation, the method of calculating it is common to the class, based on classwide evidence, and produces a conclusion about the foreclosure share that is common to the class.

**Figure 14. % of Formulary Lives Restricting Auvi-Q from January 2013 through October 2015**



102.   Mylan was able to achieve these restrictive positions by offering larger rebates to PBMs in exchange for these exclusive positions. In doing so, Mylan was able to leverage its existing market share to exclude Auvi-Q. While Sanofi did increase its rebates in an effort to compete for share, it could not effectively compete for formulary positions via rebates due to EpiPen's high market share. This high

---

[94] The difference between Covered and Preferred is the applicable tier status for patients who overcome the prior authorization and/or step therapy restrictions. Tier status on formularies determine the amount of patient copays when filling their prescriptions.

Highly Confidential: Subject to Protective Order

market share meant that Auvi-Q would have to offer much larger percentage rebates to simply match the cost difference to PBMs from smaller Mylan conditional rebates. Sanofi recognized this issue and concluded that "Epi-Pen's high market share coupled with a high discount creates an obstacle that cannot be overcome via discounting."[95] This analysis showed the percentage rebate that Auvi-Q would have to offer in order to make an offer to a PBM equivalent to a ███████████████

███████████████[96] At a 10% market share, the analysis showed that it would simply be impossible for Auvi-Q to offer a contract that would be financially equivalent to Mylan's as it would require greater than 100% discounting.

103. In fact, Auvi-Q's total market share never reached even as high as 15% in the actual world, demonstrating that it was not feasible for Sanofi to effectively compete with Mylan's conditional rebate offers, specifically because of EpiPen's high market share. This analysis clearly demonstrates how Mylan could leverage its existing market power through rebates conditioned on formulary restrictions in order to impede rivals. Mylan recognized this advantage, noting that even in the face of "████████████ Auvi-Q discounting, "████████████

█████████[97] It also recognized that ████████████ " which provides an advantage to the incumbent with the higher market share when engaging in a conditional rebating strategy, since the same rebate reduces overall net spend by a greater amount the higher the market share.[98] A higher but-for market share absent foreclosure would have allowed Sanofi to achieve economies of scale, lowering Sanofi's marginal costs and therefore could have changed the price it would have charged in the but-for world. Sanofi forecasted that its COGS would ████████████████████████[99]

104. The analysis in the next section also provides direct evidence of the foreclosing effect of Mylan's exclusionary contracts with PBM as well as direct evidence that this effect significantly raised market prices. Again, Mylan may dispute the calculations below about the foreclosing effect on Sanofi sales and the

[95] PS0236464 at 71.
[96] PS0236464 at 71.
[97] MYEP00213252 at 55 (EpiPen Pricing and Strategy Brainstorming Session Summary June 24, 2014)
[98] *Id.*
[99] SAN-EPI-0326335 at slide 30.

Highly Confidential: Subject to Protective Order

market price inflation, but the method of calculating it is common to the class, based on classwide evidence, and produces conclusions about the foreclosing effect and market price inflation that are common to the class.

105.   Mylan's contemporaneous business documents on its exclusionary contracts with PBMs focus on their restraining effect on Sanofi sales and do not indicate that those exclusionary contracts had any procompetitive justifications.  If those exclusionary contracts created some efficiencies that lowered costs in a way that was necessary to offer the rebates, one would expect to see Mylan's contemporaneous business documents discuss and quantify those efficiencies in order to decide what level of rebate to offer for the exclusionary conditions.  But I am unable to find such a discussion and quantification in Mylan's contemporaneous business documents.

106.   Nor do the rebates themselves constitute a procompetitive justification, for two reasons.  First, absent evidence that the exclusionary conditions produced a cost reduction necessary to offer those rebates, the less restrictive alternative would be to offer those rebates without the exclusionary condition.  As empirically demonstrated in the next section, that would have been less restraining on rival competition, because the empirical analysis shows that the effect on rival sales from the exclusionary conditions was over and above the effect on rival sales from the net prices after rebates.  Second, as shown below, even with the rebates, the average net prices to customers were higher than they would have been without the exclusionary conditions.  Thus, any procompetitive benefit from the rebates did not suffice to offset the anticompetitive effect and was not sufficiently passed on to buyers that it improved consumer welfare.

107.   Again, Mylan may dispute these conclusions about the nonexistence of any procompetitive justification, the lack of any less restrictive alternative, and the lack of evidence that any procompetitive benefits offset the anticompetitive effects. But the methods for reaching these conclusions are all common to the class, all based on classwide evidence, and all result in conclusions that are common to the class.

108.   In addition to Mylan's exclusionary contracts with PBMs, Mylan engaged in exclusive contracts with schools under its EpiPen4Schools program, offering free or discounted product to schools in exchange for those schools agreeing to exclusively stock EpiPens.  In addition to foreclosing this part of the market from competition, monopolizing the school segment of the market had spillover effects that translated to increased market share in other areas.  Mylan's own documents indicate that ███████████████████████████████████████████████████

Highly Confidential: Subject to Protective Order

 [100] Mylan's statistical analysis of the program found that

[101] This is consistent with Mylan having leveraged its high market share to foreclose a key portion of the market that drives sales in other parts of the market.   While Mylan may dispute

, whether and how much foreclosure through the EpiPens4Schools program reduced Auvi-Q share are conclusions that are common to the class, based on classwide evidence.

109.   Plaintiffs also allege that the foreclosure of Auvi-Q through exclusionary contracts and the EpiPen4Schools program deterred Sanofi from re-entering the market following its relaunch.   Sanofi prepared analysis

 [02]   As a result,

Whether and when Sanofi would have re-entered the market in the but for world are questions of fact that are equally applicable for all class members.

## A. The Classwide Methodology for Calculating Share and Price Impacts From Exclusionary Contracts with PBMs

110.   To demonstrate a classwide methodology for estimating the effect of the PBM coverage restrictions, I analyzed data on Auvi-Q's market share over the time it was on the market, from January 2013 through October 2015, for 6 PBMs

---

[100] *E.g.* 

.

[101] PFE_EPIPEN_AT00540538, Handel Exhibit #25 at slide 34.
[102] SAN-EPI-0377375.

Highly Confidential: Subject to Protective Order

covering 70% of the market for EAIs.[103]  For assessing coverage restrictions, I use
Sanofi data



Patients on formularies with any
of these restricted statuses are thus strongly discouraged from using Auvi-Q.

111.   To estimate the share Auvi-Q obtained within each PBM each month,
I use IQVIA data and calculate Auvi-Q share within each PBM each month as the
sum of Auvi-Q doses sold that month with that PBM divided by the sum of all EAI
doses sold that month with that PBM.  I also calculate net prices (i.e., prices net of
rebates) for EpiPen and Auvi-Q for each month at each PBM by using the gross
prices for each brand during that time period in the IQVIA data, and then reducing
the gross prices by the average rebate % for that brand at that PBM during that time
period.  For Sanofi's rebates, I use Sanofi data that tracked rebates by PBM-quarter
to calculate the average Auvi-Q rebate by PBM-quarter.  For Mylan rebates, I use
Mylan annual rebate summary documents that showed average annual rebates by
PBM.  While the IQVIA, formulary coverage, and rebate data sources have differing
names for PBMs, I was able to match ▮ PBMs representing ▮% of the market.

112.   I then estimate the average effect of the formulary restrictions using the
following weighted least squares regression, with the total market doses that PBM-
month as the weights.  The regression is:

$$s_{i,t} = \alpha * r_{i,t} + \gamma \left( \frac{AQp_{i,t}}{EPp_{i,t}} - 1 \right) + \sum_{j=1}^{34} \beta_j D_{j,t} + \varepsilon_{i,t}$$

In this regression, $s_{i,t}$ is Auvi-Q's share of doses sold to PBM $i$ in month $t$, $r_{i,t}$ is the
percentage of lives that faced coverage restrictions PBM $i$ in month $t$, $AQp_{i,t}$ is the

---

[103] ▮ These were the PBMs for which I was able to match
information across all three data sources: IQVIA, rebate data, and formulary restrictions.  The
IQVIA data show that these PBMs account for ▮% of the market during the relevant period.
[104] SAN-EPI-0002613

53

Highly Confidential: Subject to Protective Order

average net price for Auvi-Q at PBM $i$ in month $t$, and $EPp_{i,t}$ is the average net price for EpiPen at PBM $i$ in month $t$. $D_{j,t}$ are time fixed-effect variables that equal 1 when $j = t$ and 0 otherwise. $\varepsilon_{i,t}$ are the residuals from the regression. The regression finds the coefficients that minimize the weighted sum of residuals, that is, those that minimize $\sum doses_{i,t}\varepsilon_{i,t}{}^2$. $Doses_{i,t}$ is the number of EAI doses sold to PBM $i$ in month $t$. The effect of this weighting is to give importance to each PBM-month corresponding to the total number of doses sold in that PBM-month, rather than equally weighting them, which would give unwarranted importance to less economically significant PBMs. The coefficients $\beta_j$ on each of these time indicator variables represent the predicted share that Auvi-Q would obtain each of the 34 months that Auvi-Q was on the market with equal net prices in the absence of formulary coverage restrictions. $\gamma$ represents the predicted share effect of the Auvi-Q's net price percentage premium relative to EpiPen (i.e. the ratio of Auvi-Q to EpiPen net prices minus 1). I use this percentage price difference rather than dollar price differences because it allows for better comparison of the difference in price over time, since net prices were increasing over the time period analyzed. Subtracting 1 from the ratio makes the contribution of this term in the regression equal zero when net prices are the same for Auvi-Q and EpiPen. $\alpha$ represents the predicted share effect of the coverage restrictions, controlling for prices, which are captured by $\gamma$. So, if 50% of lives in a PBM-month faced coverage restrictions, that would be predicted to reduce Auvi-Q share by 50%*$\alpha$ for that PBM-month compared to a world where Auvi-Q faced no coverage restrictions and net prices were the same.

113.    Using this regression, I estimate that $\alpha$ = - 0.0336083. With this value, I can now estimate the total impact of the restrictive PBM formulary positions on the quantity of pens Sanofi was able to sell each month that it was on the market. In each month, the exclusionary contracts' foreclosures impact on Auvi-q's share is $-\alpha r_t$. If we call $Q_t$ the total market quantity sold each month, then $-\alpha r_t Q_t$ equals the reduced Sanofi quantity sold each month as a result of PBM foreclosure, which I will call $f_t$. Thus, $f_t = -\alpha r_t Q_t$. Table 1 below shows the percentage of total number of doses, percentage of lives that were restricted, and total quantity impact of PBM foreclosure for each month that Auvi-Q was on the market.

Highly Confidential: Subject to Protective Order

| TABLE 1: QUANTITY IMPACT OF PBM FORECLOSURE BY MONTH (JANUARY 2013 – OCTOBER 2015) | | | |
|---|---|---|---|
| **Month** | **Market Quantity Sold** $(q_t)$ | **Percentage of Lives Restricted** $(r_t)$ | **Quantity Impact of Foreclosure** $(f_t = \alpha q_t r_t)$ |
| January 2013 | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Highly Confidential: Subject to Protective Order

114.   Foreclosing a portion of the market to Auvi-Q with these coverage restrictions also increased the prices Mylan would set as a rational profit-maximizer. In choosing what price at which to sell EpiPens at, Mylan faces a tradeoff where increased prices result in increased revenue per unit, but lower units sold.  One way to represent this relationship between quantity and price is with a simple linear relationship, that is $q = a - bp$.  Mylan's profit, $\pi$, equals the quantity it sells multiplied by the margin it earns per unit, which equals the price it sets minus its per unit costs.   Algebraically, this means $\pi = (p - c)(a - bp)$.   The price that maximizes Mylan's profits, $p^*$, is the value of p that sets the derivative of Mylan's profits with respect to its price equal to 0.  The derivate of Mylan's profits with respect to its price is $\frac{d\pi}{dp} = a - bp - b(p - c)$, which simplifies to $\frac{d\pi}{dp} = a - 2bp + bc$.  Setting to 0 to solve for the profit maximizing price, $p^*$, I get $0 = a - 2bp^* + bc$.  The second derivative is -2b, confirming that this is a maximum rather than a minimum.   Rearranging, I find the profit-maximizing price for Mylan is $p^* = \frac{a+bc}{2b}$. Having determined the profit-maximizing price for Mylan as a function of $a$, $b$, and $c$, I can now determine how this profit-maximizing price would change in response to a change in $a$ that results from foreclosure.  To do this, I take the derivative of $p^*$ with respect to $a$, which is $\frac{dp^*}{da} = \frac{1}{2b}$.  This means that an increase in quantity, $f$, as a result of Mylan's exclusionary contracts, results in an increase in prices of $f/2b$.

115.   The variable b represents Mylan's own-price elasticity of demand, which is the amount by which the quantity it sold would decrease if it increased its price by $1.  There are two reasons why quantity could decrease from higher EpiPen prices: (1) higher prices causing patients to switch from EpiPen to Auvi-Q; and (2) higher prices causing patients to drop out of the market altogether.  This price elasticity of demand therefore has two components: a cross-elasticity of demand ($b_X$) resulting from patients switching to another EAI product in response to higher prices, and a market elasticity of demand ($b_M$) resulting from patients dropping out of the EAI market altogether in response to higher prices.  I estimate these two components separately, and then add them together to get the total elasticity of demand for Mylan.  Represented algebraically, $b = b_X + b_M$.

116.   In preparation for launch, Sanofi hired Analysis Group to do a pricing study which found that, ███████████████████████████████████████

Highly Confidential: Subject to Protective Order



117.   For the market elasticity of demand, I assume that the marketwide demand function is linear, with marketwide quantity $Q$ a function of marketwide weighted price for EAIs, $P$. Here $P$ is weighted by market share, so $P = s_{AQ}p_{AQ} + s_{EP}p_{EP}$ where $s_{AQ}$ and $s_{EP}$ are Auvi-Q and EpiPen market shares respectively and $p_{AQ}$ and $p_{EP}$ are average net prices for Auvi-Q and EpiPen respectively. Algebraically, $Q = A - BP$. Prior to Auvi-Q's entry, this simplifies to $q = A - Bp$. I can use this simplification to estimate the marketwide parameter B from Mylan's pricing behavior immediately prior to Auvi-Q's entry. Mylan's profit in the absence of competition from Auvi-Q at that time was equal to $\pi_M = (p - c)q = (p - c)(A - Bp)$. Taking the derivative with respect to p, I get $\frac{d\pi_M}{dp} = A - Bp - B(p - c)$, which simplifies to $\frac{d\pi_M}{dp} = A - 2Bp + Bc$. Setting to 0 to solve for the profit maximizing price, p*, I get $0 = A - 2Bp^* + Bc$. Because the profit maximizing quantity is $Q^* = A - Bp^*$, this is the same as $0 = Q^* - Bp^* + Bc$. Rearranging, the profit-maximizing price for Mylan is thus $p^* = \frac{Q^*}{B} + c$. Assuming that Mylan was a rational profit-maximizer at this time, I can rearrange this formula to isolate B in terms of the observed prices, quantities, and costs from this time. Doing so, I obtain $B = \frac{Q^*}{p^* - c}$.

118.   From IQVIA data and Mylan rebate summary documents, I estimate that the quantity of doses sold in the last year prior to Auvi-Q's entry at ███ million, at an average net price of $ ████.[106]  I estimate Mylan's costs to be $ ███ per unit based on a forecast Mylan prepared in anticipation of Teva generic entry.[107] I therefore estimate B = █████████████████████ units per year per $ change in price.  Because I estimate the impact of foreclosure on a monthly basis,

[105] SAN-EPI-0326335 at slide 19 (Analysis Group Pricing Analysis).
[106] Quantities and average gross prices come from IQVIA data. Total EpiPen rebates paid in 2012 were ████████ (MYEP00552688 Tab ("MCO") Cell P29 + Cell P30)). This represents ██% of the total dollar value of EpiPen gross sales in 2012 drawn from the IQVIA data. I therefore reduced the average gross price from the IQVIA data by ██% to get the average net price of ████.
[107] MYEP00323919 (Tab "Inputs" Cell B15).

Highly Confidential: Subject to Protective Order

I convert this to an equivalent ▮▮▮▮ units per month per \$ change in price. Mylan's firm specific market elasticity of demand, $b_M$, is simply equal to this constant multiplied by Mylan's share of the market. Thus, $b_M = $ ▮▮▮▮ $* s_{EP}$.

119.   The table below illustrates Mylan's total price elasticity, $b = b_X + b_M$, over the course of time that Auvi-Q was on the market.

Highly Confidential: Subject to Protective Order

| TABLE 2: MYLAN PRICE ELASTICITY BY MONTH (JANUARY 2013 – OCTOBER 2015) | | | | |
|---|---|---|---|---|
| Month | Mylan Market Share (s) | bX | bM (=B*s) | b (=bX+bM) |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ 4 | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |
| ██████ | | █ | █ | █ |

59

Highly Confidential: Subject to Protective Order

120.    Now that I have estimated the quantity Mylan obtained from Sanofi due to the exclusionary PBM formulary positions (Table 1), and Mylan's price elasticity (Table 2), I can use the formula calculated in paragraph 114 to calculate the price change due to PBM foreclosure, $\Delta p = f/2b$. I show the results of this calculation in Table 3 below. This price impact of PBM foreclosure can then be multiplied by the quantity of Mylan's actual sales each month to determine the total amount of overcharge caused by PBM foreclosure, which is shown in Table 4 below. The total overcharge caused by Mylan's PBM foreclosure during the period of time that Auvi-Q was on the market is $52,421,355.[108]

---

[108] This national overcharge amount can be allocated to states in proportion to their number of pens sold for purposes of calculating damages under state antitrust and consumer protection statutes. Appendix A details these calculations.

Highly Confidential: Subject to Protective Order

| TABLE 3: IMPACT ON MYLAN PRICES OF PBM FORECLOSURE (JANUARY 2013 – OCTOBER 2015) | | | |
|---|---|---|---|
| Month | Quantity Impact of Foreclosure (f$_t$) | Mylan Price Elasticity (b$_t$) | Price Impact of Foreclosure (Δp = f/2b) |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |
| ▮▮▮▮ | | ▮ | ▮ |

61

Highly Confidential: Subject to Protective Order

| TABLE 4: OVERCHARGES RESULTING FROM PBM FORECLOSURE (JANUARY 2013 – OCTOBER 2015) | | | |
|---|---|---|---|
| Month | Price Impact of Foreclosure ($\Delta p = f/2b$) | Mylan Quantity ($q_t$) | Overcharge ($=\Delta p * q_t$) |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Highly Confidential: Subject to Protective Order

## B. The Classwide Methodology for Calculating Share and Price Impacts From EpiPens4Schools Program

121.   To demonstrate a classwide methodology for estimating the effect of the EpiPens4Schools program, I begin by estimating the share impact of the EpiPens4Schools program.   One can estimate the share impact of the EpiPens4Schools program by using a regression to calculate the share difference between test and control areas where the EpiPens4Schools program was implemented versus not implemented.  In this case,

%.[109]  Mylan also estimated

%.[110]  This analysis analyzed

, which corresponds to an early portion of the time that Auvi-Q was initially on the market, January 2013 to October 2015.

[111]  As a result of this increase in school coverage, one might reasonably expect the effect of the EpiPens4Schools program on Auvi-Q's market share to be increasing over time.  However, in illustrating the impact of the EpiPens4Schools foreclosure in this report, I make the conservative assumption that the impact of the program on Auvi-Q's share remained constant at ▮%, rather than increasing over the time period that Auvi-Q was on the market. Table 5 below shows the quantity of Auvi-Q pens foreclosed by month.

---

[109] PFE_EPIPEN_AT00540538, Handel Exhibit #25 at slide 34.
[110] *Id.*
[111] MYEP01040995 at slide 5

Highly Confidential: Subject to Protective Order

| TABLE 5: QUANTITY IMPACT FROM EPIPEN4SCHOOLS PROGRAM BY MONTH (JANUARY 2013 – OCTOBER 2015) | | | |
|---|---|---|---|
| **Month** | **Market Quantity Sold** | **Decrease in Auvi-Q share** | **Quantity Impact of Foreclosure** |
| ▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | | |
| 3 | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| 4 | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | | |
| ▮▮ | ▮ | ▮ | ▮ |
| 5 | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮ |
| ▮▮ | ▮ | ▮ | ▮ |

64

Highly Confidential: Subject to Protective Order

122.    Now that I have estimated the quantity Mylan obtained from Sanofi due to the EpiPens4Schools program (Table 5), and Mylan's price elasticity (Table 2), I can use the formula calculated in paragraph 114 to calculate the price change due to EpiPens4Schools foreclosure, $\Delta p = f/2b$. I show the results of this calculation in Table 6 below.  This price impact of EpiPens4Schools foreclosure can then be multiplied by the quantity of Mylan's actual sales each month to determine the overcharge caused by EpiPens4Schools foreclosure, which is shown in Table 7 below.  The total overcharge caused by the EpiPens4Schools program during the period of time that Auvi-Q was on the market is $73,739,919.[112]

---

[112] This national overcharge amount can be allocated to states in proportion to their number of pens sold for purposes of calculating damages under state antitrust and consumer protection statutes.  Appendix A details these calculations.

Highly Confidential: Subject to Protective Order

| TABLE 6: IMPACT ON MYLAN PRICES OF EPIPENS4SCHOOLS PROGRAM (JANUARY 2013 – OCTOBER 2015) | | | |
|---|---|---|---|
| Month | Quantity Impact of Foreclosure (f$_t$) | Mylan Price Elasticity (b$_t$) | Price Impact of Foreclosure ($\Delta p = f/2b$) |
| ███ | ██ | ██ | ██ |
| ███ | | | |
| ███ | | | |
| ███ | | | |
| | | | |
| | | | |
| ███ | | | |
| | | | |
| ███ | | | ██ |
| ███ | | | |
| ███ | | | |
| ███ | | | |
| | | | |
| | | | |
| ███ | | | |
| | | | |
| | | | |
| ███ | | | |
| | | | |
| | | | |
| ███ | | | |
| | | | |
| ███ | | | |
| ███ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| ███ | | | |
| ███ | | | ██ |
| ███ | | | |

Highly Confidential: Subject to Protective Order

| TABLE 7: OVERCHARGES RESULTING FROM EPIPENS4SCHOOLS PROGRAM (JANUARY 2013 – OCTOBER 2015) | | | |
|---|---|---|---|
| Month | Price Impact of Foreclosure ($\Delta p = f/2b$) | Mylan Quantity ($q_t$) | Overcharge ($=\Delta p * q_t$) |
| ██████ | ██ | ██ | ██ |
| ██████ | | ██ | ██ |
| ██████ | | ██ | |
| | ██ | ██ | ██ |
| | ██ | ██ | ██ |
| ██ | | ██ | |
| ███ | | | |
| ████ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ███ | | | |
| ██ | | | |
| ██ | ██ | ██ | ██ |
| ██ | | ██ | ██ |
| ██ | | ██ | |
| ██ | | ██ | |
| ██ | ██ | ██ | ██ |

Highly Confidential: Subject to Protective Order

### C. The Classwide Methodology for Calculating Share and Price Impacts from Deterrence of Auvi-Q Post-Recall Re-Entry

123.    Plaintiffs allege that Mylan's conduct deterred Sanofi from re-entering the market following its voluntary recall of Auvi-Q in October 2015.  Whether Sanofi would have re-entered the market in the but for world and when it would have been able to do are questions of fact that are equally applicable for all class members. In this section, I demonstrate a classwide methodology for estimating the market share that Sanofi would have obtained when it relaunched in the but-for world.

124.    For purposes of my analysis, I assume that at the merits stage plaintiffs will succeed in proving that the Mylan's conduct deterred re-entry that otherwise would have occurred.  I also assume, for the purposes of illustrating this classwide methodology, that the date of re-entry in the but-for world would have been Sept 2016.   The defense may well dispute whether and when re-entry would have occurred in the but-for world, but however those issues are resolved at the merits stage, that resolution would result in a conclusions re-entry that are common to the class. In October 2015, Sanofi estimated [113]

Sanofi calculated



.[114]

Applying this multiple to Sanofi's projected monthly shares post-relaunch, I estimate the monthly but-for Sanofi market shares and volume post-relaunch shown in Table 8 below.

---

[113] SAN-EPI-0377375.
[114] SAN-EPI-0377375

Highly Confidential: Subject to Protective Order

| TABLE 8: SANOFI BUT-FOR VOLUMES POST-RELAUNCH (SEPTEMBER 2016 – JUNE 2018) | | | | |
|---|---|---|---|---|
| Month | Sanofi Projected Market Share | But-For Market Share | Market Quantity | But-For Sanofi Volume |
| ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | | |
| ███ | ███ | ███ | | |

125.   I can now estimate the quantity of sales that Mylan maintained as a result of deterring Sanofi's re-entry by estimating that Sanofi's sales would have come at the expense of other EAI market participants in proportion to their market share at the time.  Then, I can use this estimate of the Mylan quantity obtained by deterring Sanofi re-entry to estimate the price change due to re-entry foreclosure, $\Delta p = f/2b$.  I show the results of this calculation in Table 9 below.  This price impact of re-entry foreclosure can then be multiplied by the quantity of Mylan's actual sales each month to determine the total amount of overcharge caused by deterring Sanofi's re-entry, which is shown in Table 10 below.  The total overcharge caused by deterring Sanofi's re-entry from September 2016 through June 2018 is

Highly Confidential: Subject to Protective Order

$31,491,907.[115]   Auvi-Q re-entry could also reasonably be expected to have continued share and price effects beyond June 2018, but I have so far limited my analysis to this time range because this is the end point for the market share data that I have.

| TABLE 9: MYLAN PRICE IMPACT OF DETERRING AUVI-Q RELAUNCH (SEPTEMBER 2016 – JUNE 2018) | | | | |
|---|---|---|---|---|
| Month | But-For Sanofi Volume | Mylan Market Share | Reduction in Mylan Volume | Price Impact of Deterred Re-Entry |
| ██████ | ███ | ███ | ███ | ███ |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | | | | |
| ██████ | ███ | ███ | ███ | ███ |

[115] This national overcharge amount can be allocated to states in proportion to their number of pens sold for purposes of calculating damages under state antitrust and consumer protection statutes.  Appendix A details these calculations.

Highly Confidential: Subject to Protective Order

| TABLE 10: OVERCHARGES RESULTING FROM DETERRED AUVI-Q REENTRY (SEPTEMBER 2016 – JUNE 2018) | | | |
|---|---|---|---|
| Month | Price Impact of Foreclosure | Mylan Quantity | Overcharge |
| ███████ | | ███ | ███ |
| ███████ | | ███ | ███ |
| ███████ | | ███ | ███ |
| ███████ | | ███ | ███ |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| ███████ | | ███ | |
| **Total** | | | **$31,491,907** |

Highly Confidential: Subject to Protective Order

## APPENDIX A: STATE ANTITRUST AND CONSUMER PROTECTION DAMAGES RESULTING FROM FORECLOSURE

I have been instructed by counsel that damages are available under state antitrust and consumer protection statutes in the states listed in the tables below. The damages are calculated by state for three sources; Foreclosure of Auvi-Q through PBM contracts; foreclosure of Auvi-Q through the EpiPens4Schools program; and the deterrence of Auvi-Q's re-entry into the market. With the exception of certain state statutes noted below that counsel has instructed me allow for separate or additional statutory damages apart from overcharge damages, these figures represent the national overcharge amounts noted for each source in my report multiplied by each state's percentage of total pens sold during the relevant time period (January 2013 through October 2015 for the foreclosure sources and September 2016 through June 2018 for the deterred re-entry).

Based on instruction from counsel,

1. I calculate Alabama and Mississippi's antitrust damages as their proportional share of overcharge damages plus $500 per Rx during the relevant time periods.
2. I calculate New Hampshire's antitrust damages as the greater of its proportional share of overcharge damages or $1000 per Rx during the relevant time period.
3. I calculate Alaska's consumer protection damages as the greater of 3x their proportional share of overcharge damages or $500 per Rx during the relevant time period.
4. I calculate DC's consumer protection damages as the greater of 3x their proportional share of overcharge damages or $1,500 per Rx during the relevant time period.
5. I calculate Massachusetts's consumer protection damages as the greater of their proportional share of overcharge damages or $25 per Rx during the relevant time period.
6. I calculate Montana's consumer protection damages as the greater of their proportional share of overcharge damages or $500 per Rx during the relevant time period.
7. I calculate New Hampshire's consumer protection damages as the greater of their proportional share of overcharge damages or $1,000 per Rx during the relevant time period.
8. I calculate New Mexico's consumer protection damages as the greater of their proportional share of overcharge damages or $100 per Rx during the relevant time period.

72

Highly Confidential: Subject to Protective Order

9. I calculate Rhode Island's consumer protection damages as the greater of their proportional share of overcharge damages or $200 per Rx during the relevant time period.

10. I calculate West Virginia's consumer protection damages as their proportional share of overcharge damages plus $1,000 per Rx during the relevant time period.

Highly Confidential: Subject to Protective Order

| DAMAGES BY STATE ANTITRUST STATUTE | | | |
|---|---|---|---|
| **State** | **PBM Foreclosure** | **EpiPens4Schools** | **Deterred Re-Entry** |
| Alabama | $50,810,222 | $51,049,167 | $29,389,490 |
| Arizona | $925,381 | $1,301,712 | $550,079 |
| California | $3,617,529 | $5,088,695 | $2,317,470 |
| DC | $186,924 | $262,942 | $125,500 |
| Florida | $2,474,019 | $3,480,146 | $1,574,980 |
| Hawaii | $164,121 | $230,865 | $113,151 |
| Illinois | $2,060,297 | $2,898,172 | $1,295,592 |
| Iowa | $355,961 | $500,723 | $203,754 |
| Kansas | $374,455 | $526,738 | $237,803 |
| Maine | $306,032 | $430,488 | $144,446 |
| Michigan | $1,807,564 | $2,542,658 | $923,981 |
| Minnesota | $1,018,957 | $1,433,343 | $515,584 |
| Mississippi | $32,103,124 | $32,248,508 | $18,871,785 |
| Nebraska | $234,604 | $330,012 | $153,001 |
| Nevada | $343,881 | $483,730 | $224,250 |
| New Hampshire | $57,116,593 | $57,116,593 | $28,716,065 |
| New Mexico | $221,643 | $311,780 | $141,063 |
| New York | $4,212,714 | $5,925,929 | $2,886,114 |
| North Carolina | $2,238,940 | $3,149,465 | $1,278,070 |
| North Dakota | $91,979 | $129,384 | $47,227 |
| Oregon | $466,098 | $655,649 | $213,709 |
| Rhode Island | $345,171 | $485,544 | $183,390 |
| South Dakota | $98,688 | $138,823 | $54,942 |
| Tennessee | $1,181,960 | $1,662,636 | $646,899 |
| Utah | $326,856 | $459,781 | $162,744 |
| Vermont | $137,593 | $193,549 | $70,117 |
| West Virginia | $315,365 | $443,616 | $175,221 |
| Wisconsin | $1,058,896 | $1,489,525 | $526,730 |

74

Highly Confidential: Subject to Protective Order

| DAMAGES BY STATE CONSUMER PROTECTION STATUTE | | | |
|---|---|---|---|
| State | PBM Foreclosure | EpiPens4Schools | Deterred Re-Entry |
| Alabama | $50,810,222 | $51,049,167 | $29,389,490 |
| Arizona | $925,381 | $1,301,712 | $550,079 |
| California | $3,617,529 | $5,088,695 | $2,317,470 |
| DC | $186,924 | $262,942 | $125,500 |
| Florida | $2,474,019 | $3,480,146 | $1,574,980 |
| Hawaii | $164,121 | $230,865 | $113,151 |
| Illinois | $2,060,297 | $2,898,172 | $1,295,592 |
| Iowa | $355,961 | $500,723 | $203,754 |
| Kansas | $374,455 | $526,738 | $237,803 |
| Maine | $306,032 | $430,488 | $144,446 |
| Michigan | $1,807,564 | $2,542,658 | $923,981 |
| Minnesota | $1,018,957 | $1,433,343 | $515,584 |
| Mississippi | $32,103,124 | $32,248,508 | $18,871,785 |
| Nebraska | $234,604 | $330,012 | $153,001 |
| Nevada | $343,881 | $483,730 | $224,250 |
| New Hampshire | $57,116,593 | $57,116,593 | $28,716,065 |
| New Mexico | $221,643 | $311,780 | $141,063 |
| New York | $4,212,714 | $5,925,929 | $2,886,114 |
| North Carolina | $2,238,940 | $3,149,465 | $1,278,070 |
| North Dakota | $91,979 | $129,384 | $47,227 |
| Oregon | $466,098 | $655,649 | $213,709 |
| Rhode Island | $345,171 | $485,544 | $183,390 |
| South Dakota | $98,688 | $138,823 | $54,942 |
| Tennessee | $1,181,960 | $1,662,636 | $646,899 |
| Utah | $326,856 | $459,781 | $162,744 |
| Vermont | $137,593 | $193,549 | $70,117 |
| West Virginia | $315,365 | $443,616 | $175,221 |
| Wisconsin | $1,058,896 | $1,489,525 | $526,730 |

Highly Confidential: Subject to Protective Order

## Exhibit A: Einer R. Elhauge CV

**Einer Richard Elhauge**
**Harvard Law School**
**1575 Massachusetts Ave.**
**Cambridge, Ma 02138**

**Tel: (617) 496-0860**                                    **Hauser Hall 502**
**Fax: (617) 496-0861**                              **elhauge@law.harvard.edu**

### EMPLOYMENT

**Petrie Professor of Law, Harvard University**

Subjects: Antitrust, Contracts, Health Law Policy, Statutory Interpretation.

Founding Director, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics.

Member, ABA Antitrust Section Transition Task Force 2012.

Chair, Obama Campaign's Antitrust Advisory Committee

Co-Chair, Obama Campaign's Blogs and Op-eds Committee

Member, Obama Campaign's Health Policy Advisory Committees.

Member, Editorial Board for Competition Policy International

Member, Advisory Board for the Journal of Competition Law & Economics.

Member, Advisory Board for the Social Sciences Research Network on Antitrust Law & Policy.

Member, Advisory Board for the Social Sciences Research Network on Telecommunications &
Regulated Industries.

FTC Special Employee on Antitrust Issues.

Recipient, 2010 Jerry S. Cohen Memorial Fund Writing Award, for "Tying, Bundled Discounts,
and the Death of the Single Monopoly Profit Theory"

Recipient, Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards, for
"Robust Exclusion and Market Division Through Loyalty Discounts"

Recipient, 2016, Award for being one of the top 10 corporate and securities articles of the year,

76

Highly Confidential: Subject to Protective Order

for "Horizontal Shareholding"

Recipient, 2017 Jerry S. Cohen Memorial Fund Writing Award, for "Horizontal Shareholding"

Recipient, 2017, Society of Investment Law Prize for best investment law scholarship, for "Horizontal Shareholding"

Books

ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (3d ed. 2018) (Foundation Press: 2d ed. 2011; 1st ed. 2008).

ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS (3d ed. 2018) (Foundation Press: 2d ed. 2011; 1st ed. 2007)

ELHAUGE, ED., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (Edward Elgar Publishing Ltd. 2013).

ELHAUGE, OBAMACARE ON TRIAL (2012), available at www.amazon.com

ELHAUGE & GERADIN, GLOBAL COMPETITION LAW & ECONOMICS (2D ED. HART PUBLISHING 2011; 1ST ED. 2007).

ELHAUGE, ED., THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS (Oxford University Press 2010).

ELHAUGE, STATUTORY DEFAULT RULES (Harvard University Press 2008).

AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW (Little, Brown 1996).

Academic Articles

Elhauge, *How Horizontal Shareholding Harms Our Economy—And Why Antitrust Law Can Fix It* (Dec. 2018), https://ssrn.com/abstract_id=3293822

Brito, Elhauge, Ribeiro, and Vasconcelos, M*odeling Horizontal Shareholding With Ownership Dispersion* (Nov. 2018), http://ssrn.com/abstract=3264113

Elhauge, *New Evidence, Proofs, and Legal Theories on Horizontal Shareholding* (Jan. 11, 2018),

Highly Confidential: Subject to Protective Order

https://ssrn.com/abstract=3096812

Elhauge, *The Growing Problem of Horizontal Shareholding,* 3 ANTITRUST CHRONICLE 1 (June 2017)

Elhauge & Nalebuff, *The Welfare Effects of Metering Ties,* 33 JOURNAL OF LAW, ECONOMICS & ORGANIZATION 68 (2017)

Elhauge, *Contrived Threats v. Uncontrived Warnings: A General Solution to the Puzzles of Contractual Duress, Unconstitutional Conditions, and Blackmail,* 83 U. CHICAGO LAW REVIEW 503 (2016)

Elhauge, *Horizontal Shareholding*, 129 HARVARD LAW REVIEW 1267 (2016) (Awarded the Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article, the Society of Investment Law Prize for best investment law scholarship, and an Award for being one of top ten corporate and securities articles of the year)

Elhauge*, Rehabilitating Jefferson Parish: Why Ties Without a Substantial Foreclosure Share Should Not Be Per Se Legal*, 80 ANTITRUST LAW JOURNAL 463 (2016)

McGuire, Drake, Elhauge, Hartman & Starr, *Resolving Reverse-Payment Settlements With The Smoking Gun Of Stock Price Movements*, 101 IOWA L. REV. 1581 (2016)

Elhauge & Wickelgren, *Robust Exclusion and Market Division Through Loyalty Discounts,* 43 INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 111 (2015) (Awarded Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards)

Elhauge*, How* Italian Colors *Guts Private Antitrust Enforcement by Replacing It With Ineffective Forms Of Arbitration,* 38 FORDHAM INT'L LAW JOURNAL 771 (2015)

Elhauge, *Obamacare and the Theory of the Firm,* in THE FUTURE OF HEALTH CARE REFORM (Malani and Schill, eds., U. Chicago Press 2015)

Elhauge, *Treating RAND Commitments Neutrally,* 11 JOURNAL OF COMPETITION LAW & ECONOMICS 1 (2015)

Elhauge, *I'm Not Quite Dead Yet—And Other Health Care Observations*, 49 TULSA L. REV. 607

78

Highly Confidential: Subject to Protective Order

(2014).

Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics*, in Research Handbook on the Economics of Antitrust Law (Edward Elgar Publishing Ltd. 2013).

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEXAS LAW REVIEW 283 (2012)

Elhauge, *The Irrelevance of the Broccoli Argument Against the Insurance Mandate,* NEW ENGLAND JOURNAL OF MEDICINE (Dec 21, 2011)

Elhauge, *Why the Google Books Settlement Is Procompetitive*, 2(1) JOURNAL OF LEGAL ANALYSIS 1 (2010).

Elhauge, *The Failed Resurrection of the Single Monopoly Profit Theory*, 6(1) COMPETITION POLICY INTERNATIONAL 155 (Spring 2010).

Elhauge, *Why We Should Care about Health Care Fragmentation and How to Fix It,* in THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS 1 (Oxford University Press 2010).

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397 (2009).   (Awarded 2010 Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article).

Elhauge, *Framing the Antitrust Issues in the Google Books Settlement*, GLOBAL COMPETITION POL'Y, (October 2009 Release 2).

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009)

Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST LAW JOURNAL 79 (2009).

Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?,* 4 JOURNAL OF COMPETITION LAW & ECONOMICS 535 (2008)

Elhauge, *How Should Competition Law Be Taught?*, 4(1) COMPETITION POLICY INTERNATIONAL 267 (Spring 2008)

Elhauge, *Harvard, Not Chicago: Which Antitrust School Drives Recent Supreme Court*

79

Highly Confidential: Subject to Protective Order

*Decisions*?, 3(2)  COMPETITION POLICY INTERNATIONAL 59 (Autumn 2007)

Elhauge, *Can Health Law Become a Coherent Field of Law?*, 41 WAKE FOREST L. REV. 365 (2006).

Elhauge, *Sacrificing Corporate Profits in the Public Interest,* 80 N.Y.U. LAW REVIEW 733 (2005)

Elhauge, *Corporate Manager's Operational Discretion to Sacrifice Corporate Profits in the Public Interest*, in ENVIRONMENTAL PROTECTION AND THE SOCIAL RESPONSIBILITY OF FIRMS 13-76  (Bruce Hay, Robert Stavins, & Richard Vietor eds., 2005)

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs,* 112 YALE LAW JOURNAL 681 (2003)

Elhauge, *Preference-Estimating Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2027 (2002)

Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2162 (2002)

Elhauge, *The Lessons of Florida 2000*, 110 POLICY REVIEW 15 (Dec 2001 -Jan 2002).

Elhauge, *What Term Limits Do That Ordinary Voting Cannot*, CATO POLICY ANALYSIS, No. 328 (Dec. 16, 1998).

Elhauge, *Are Term Limits Undemocratic?*, 64 U. CHIC. L. REV. 83 (1997).

Elhauge, Lott & Manning, *How Term Limits Enhance the Expression Of Democratic Preferences*, 5 SUPREME COURT ECON. REV. 59 (1997)

Elhauge, *The Limited Regulatory Potential of Medical Technology Assessment*, 82 VA. L. REV. 1525 (1996).

Elhauge, *Allocating Health Care Morally*, 82 CALIF. L. REV. 1449 (1994)

Elhauge, *Toward a European Sale of Control Doctrine*, 41 AM. J. COMP. LAW 627 (1993)

Bundy & Elhauge, *Knowledge About Legal Sanctions*, 92 MICH. L. REV. 261 (1993)

Highly Confidential: Subject to Protective Order

Elhauge, *The Triggering Function of Sale of Control Doctrine*, 59 U. CHIC. L. REV. 1465 (1992)

Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 CALIF. L. REV. 1177 (1992)

Bundy & Elhauge, *Do Lawyers Improve the Adversary System?  A General Theory of Litigation
        Advice and Its Regulation*, 79 CALIF. L. REV. 313 (1991)

Elhauge, *Does Interest Group Theory Justify More Intrusive Judicial Review?*, 101 YALE L.J. 31
(1991)

Elhauge, *The Scope of Antitrust Process*, 104 HARV. L. REV. 667 (1991)


Media Publications

"Donald Trump: The Protector," The Atlantic (March 2, 2016)

"Ted Cruz Is Not Eligible to Run for President," Salon (Jan. 20, 2016)

"The Best Way to Reform Health Care—and Cut the Deficit," The Daily Beast (January 6, 2013)

"Roberts' Real Long Game?," The Atlantic (July 20, 2012)

"The Fatal Flaw In John Roberts' Analysis Of The Commerce Clause," The New Republic (July
        1, 2012)

"The Killer Precedent For Today's Decision," The New Republic (June 28, 2012)

 "Even The Most Conservative Supreme Court Justices Have Already Declared Mandates
        Constitutional," The New Republic (June 21, 2012) (with Emily Bass)

"What a Nobel Prize-Winning Economist Can Teach Us About Obamacare," The Atlantic (May
        23, 2012) (with Kevin Caves)

"A Further Response to Critics on the Founding Fathers and Insurance Mandates", The New
        Republic (April 21, 2012)

"A Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic
        (April 19, 2012)

"It's Not About Broccoli!: The False Case Against Health Care," The Atlantic (April 16, 2012)

"If Health Insurance Mandates Are Unconstitutional, Why Did the Founding Fathers Back Them?"

81

Highly Confidential: Subject to Protective Order

The New Republic (April 13, 2012)

"Commentary: The Roberts-Kagan Compromise on Obamacare?:, The National Law Journal (March 28, 2012)

"Don't Blame Verrilli for Supreme Court Health-Care Stumble," The Daily Beast (March 28, 2012)

"Economists Argue Over the Cost of Caring for the Uninsured," The Daily Beast (March 26, 2012)

"The Broccoli Test," New York Times (Nov. 16, 2011)

"Coverage vs Coercion," The Huffington Post (March 3, 2008)

"Rewire This Circuit," The Wall Street Journal, A26 (Sept. 17, 2003)

"Soft on Microsoft," The Weekly Standard (March 25, 2002)

"Despite What the Critics Say, it Wasn't a Bag Job," Boston Globe (March 3, 2002)

"Florida 2000: Bush Wins Again!," Weekly Standard (November 26, 2001 )

"State Made The Right Call On Microsoft," The Hartford Courant (Nov. 9, 2001)

"States Should Seek More From Microsoft," San Francisco Chronicle (Nov. 6, 2001)

"A Smart Move on Microsoft," Boston Globe (Sept. 11, 2001)

"Competition Wins in Court," New York Times, (June 30, 2001)

"Bush v. Florida," New York Times, A31 (Nov. 20, 2000)

"Florida's Vote Wasn't 'Irregular,'" Wall Street Journal (Nov. 13, 2000)

"The New 'New Property'," San Francisco Chronicle (Nov. 6, 2000)

"The Real Problem with Independent Counsels," The Washington Times, A19 (Jun 30, 1999)

"Foul Smoke," The Washington Post, A15 (August 4, 1998)

"The Court Failed My Test," The Washington Times, A-19 (July 10, 1998)

"Microsoft Gets an Undeserved Break," The New York Times,A21 (June 29, 1998)

"Medi-Choice," The New Republic, 24 (November 13,1995)

"Term Limits: Voters Aren't Schizophrenic," Wall Street Journal, A-16 (March 14, 1995)

Highly Confidential: Subject to Protective Order

<u>Harvard Committees</u>

Chair, Harvard Law School Lateral Appointments Committee (1998-99), Member (2003-05, 2011-2014).

Member, Harvard Law School Entry Level Appointments Committee (2009-2011).

Member, Harvard University Standing Committee on the Degree of Doctor of Philosophy in Health Policy (1996-99, 2006-07).

Member, Harvard University Internal Advisory Board for the Interfaculty Initiative in Health Policy (1996-99).

Member, Harvard Law School Lecturers and Visitors Committee (1996-98).


**Past Academic Positions**

| | |
|---|---|
| 1988-95 | Professor of Law, Boalt Hall, University of California at Berkeley |
| 1995 | Visiting Professor of Law, Univ. of Chicago Law School |
| 1994 | Visiting Professor of Law, Harvard Law School |
| 1993 | Visiting Olin Faculty Fellow, Yale Law School |
| 1991-92 | Visiting Scholar in Europe at the Karolinska Institute, the Centre for Health Economics, the Rockefeller Foundation Study Center, Cambridge University, the European University Institute and the University of Florence |

**Clerkships**

| | |
|---|---|
| 1987-88 | Clerk for Justice William J. Brennan, Jr., United States Supreme Court |
| 1986-87 | Clerk for Judge William A. Norris, U.S. Court of Appeals for the Ninth Circuit |
| 1986 | Clerk for U.S. Solicitor General's Office, Washington, D.C. |


**Bar Admissions**: Massachusetts (2000); Pennsylvania (1986); United States Courts of Appeals for the Fourth (1997), Sixth (2008), and Ninth Circuits (1987); Supreme Court of the United States

Highly Confidential: Subject to Protective Order

(1997).

## ECONOMICS EXPERT WORK

President, Legal Economics LLC, 2007 to present.

Senior Expert at Criterion Economics LLC, 2004-2007

Recipient, 2016 AAI award for Outstanding Antitrust Litigation Achievement in Economics.

Named One of World's Leading Competition Economists in the *International Who's Who of Competition Lawyers and Economists*.

Testifying Expert in *Roxul USA Inc. v. Armstrong World Industries, Inc.¸* a case alleging exclusionary conduct involving ceiling tiles.

Testifying Expert in *Sitts v. Dairy Farmers of America, Inc.¸* a case alleging a conspiracy to suppress raw milk prices.

Testifying Expert in *In Re Qualcomm Antitrust Litigation*, a case alleging tying and exclusive dealing involving modem chipsets and cellular standard essential patents.

Testifying Expert in *In Re Niaspan Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In Re Lamictal Direct Purchaser Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In re Namenda Antitrust Litigation*, a case alleging a reverse payment patent settlement and product hop.

Testifying Expert in *In re Lidoderm Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *Valassis Communications v. News Corp,* a case alleging anticompetitive bundling and other exclusionary conduct.

Testifying Expert in *GN Netcom v. Plantronics,* a case alleging exclusive dealing in the distribution of contact center and office headsets.

Highly Confidential: Subject to Protective Order

Testifying Expert in *Louisiana Wholesale Drug v. Unimed Pharmaceuticals (Androgel case),* a case alleging a reverse payment patent settlement.

Testifying Expert in *Garber v. Office of the Commissioner of Baseball,* a case alleging horizontal territorial restraints on broadcasting baseball games.

Testifying Expert in *Suture Express v. Cardinal Health*, a case alleging tying and bundled loyalty contracts in medical distribution.

Testifying Expert in *Savant v. Crestron*, a case alleging exclusive dealing in the high-end home control system market

Testifying Expert in *Castro et. al. vs Sanofi Pasteur*, a case alleging anticompetitive bundled loyalty contracts in the vaccines industry.

Testifying Expert in *In re Mushroom Direct Purchaser Antitrust Litigation*, a case alleging price-fixing in the fresh mushroom market.

Testifying Expert in *It's My Party, Inc. v. Live Nation, Inc.*, a case alleging anticompetitive conduct in markets for promotion and amphitheaters.

Testifying Expert in *Retractable Technologies v. Becton Dickinson*, a case alleging exclusionary contracts in syringe and IV catheter markets.

Testifying Expert in *Caldon v. Westinghouse Electric*, a case alleging attempted monopolization.

Testifying Expert in *King Drug v. Cephalon*, a case alleging that a reverse payment settlement of a patent dispute delayed entry and restrained competition in a pharmaceutical market.

Testifying Expert for the United States in *United States v. Wyeth*, a case involving claims of bundled sales and bundled discounts in a pharmaceutical market, which resulted in a $784 million settlement for the United States.

Testifying Expert in *BAE Holdings AH v. ArmorWorks Enterprises*, a case alleging price discrimination by a ceramic tile manufacturer resulting in harm to downstream competition.

Highly Confidential: Subject to Protective Order

Testifying Expert in *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, a case alleging securities violations from failure to disclose bid steering.

Testifying Expert in *Tessera Technologies v. Hynix Semiconductor*, a case alleging conspiracy to exclude outside technologies from semiconductor markets.

Testifying Expert in *American Steel Erectors v. Local Union No. 7*, a case alleging boycott claims related to steel erection and labor markets.

Testifying Expert in *BP America v. Repsol*, an arbitration.

.   Testifying Expert in *Food Lion v. Dean Foods Company*, a class action alleging conspiracies to restrict and foreclose competition in milk markets.

Testifying Expert in *Eisai Inc. v. Sanofi-Aventis U.S. LLC*, a case by a rival alleging foreclosure in anticoagulant pharmaceutical markets.

Testifying Expert in *Daniels v. Tyco*, a case by a rival alleging foreclosure from sharps containers and GPO markets.

Testifying Expert in *Natchitoches Parish Hospital v. Tyco*, a class action concerning medical sharps containers and GPO markets.

Testifying Expert in *Amgen v. F. Hoffman La Roche*, concerning erythropoietin-simulating agents (ESAs) and white blood cell simulators (WBCs) pharmaceutical markets.

Testifying Expert in *White v. NCAA*, concerning markets for athletic and educational services.

Testifying Expert in *Applied Medical Resources v.  Ethicon, Inc,* concerning sutures, trocars, and GPO markets.

Testifying Expert in *Masimo Corp. v. Tyco Health Care Group*, concerning oximetry products and GPO markets.

Testifying Expert in *Rochester Medical v. Bard*, concerning catheter and GPO markets.

Testifying Expert in *Retractable Technologies, Inc. v. Becton Dickinson*, concerning syringes and GPO markets.

Highly Confidential: Subject to Protective Order

Testifying Expert in *Spartanburg v. Hill-Rom*, a class action concerning hospital beds and GPO markets.

Testifying Expert in *Mountain Area Realty v. Wintergreen Partners,* concerning conduct in the real estate brokerage services market.

Testifying Expert in *Louisiana Municipal Police Employees' Retirement System v. Crawford,* concerning merger in the pharmacy benefit manager market.

Testifying Expert in *Capital Credit Alliance v. National Automated Clearing House Association,* concerning electronic checks market.

Testifying Expert for Intel before EC and Korean antitrust authorities on microprocessor markets.

Testifying Expert for AmBev before the EC and Brazilian antitrust authorities on beer market.

Testifying Expert for 1-800-Contacts before the FTC on OSI-CooperVision merger and agreements restraining distribution by nonprescribing retailers.

Testifying Expert in *In Re Cardizem CD Antitrust Litigation*, concerning patents and pharmaceuticals.

Testifying Expert regarding the *B.F. Goodrich-Coltec* Merger, concerning the aerospace industry.

Testifying Expert regarding the *Alcoa-Reynolds* Merger, concerning the aluminum industry

Expert Consultant to National Cable Television Association on Internet Access Bills before Congress and Interactive Television Inquiry before FCC.

Expert for Royal Caribbean for proposed mergers of Princess with Royal Caribbean and Carnival, concerning the cruise industry.

Expert for the Medical Device Manufacturers Association, producing Report to U.S. Senate and Statement to FTC/DOJ regarding exclusionary agreements between medical device suppliers and Group Purchasing Organizations and their hospitals.

Highly Confidential: Subject to Protective Order

## EDUCATION

**Harvard Law School**                    J.D., June 1986

### *Awards*

Fay Diploma -- for graduating first in class

Sears Prize -- Second Year -- to top two students in class

Sears Prize -- First Year -- to top two students in class

### *Activities*

Harvard Law Review, Articles Office Co-Chair

Class Marshal

Author: *Modes of Analysis: The Theories and Justifications of Privileged Communications*,
98 HARV. L. REV. 1471-1500 (1985).


**Harvard College**                    B.A., June 1982

Graduated in three years, majoring in Biochemical Sciences.  GPA 3.9


## PERSONAL

Born of Argentinian immigrants in New York City.  First language was Spanish.  Live with wife
and 3 children in Newton, Massachusetts.

Highly Confidential: Subject to Protective Order

## EXHIBIT B: STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION TESTIMONY, & COMPENSATION

### I. Publications

My publications from the last 10 years are listed on my CV, which is attached as Exhibit A.

### II. Trial and Deposition Testimony

Within the past four years, I have provided deposition testimony in *Suture Express v. Cardinal Health* on May 5, 2015; *Castro v. Sanofi* on July 13, 2016; *Louisiana Wholesale Drug v. Unimed Pharmaceuticals (Androgel case)* on October 14, 2016 and August 10, 2017; *GN Netcom v. Plantronics* on December 1-2, 2016; *In re Lidoderm Antitrust Litigation* on June 6, 2017; *In re Namenda Antitrust Litigation* on September 29, 2017 and November 10, 2017; and *In re Lamictal Direct Purchaser Antitrust Litigation* on June 7, 2018; *In Re Qualcomm Antitrust Litigation* on August 1, 2018; and *Sitts v. Dairy Farmers of America, Inc.* on November 6, 2018.

Within the past four years, I have also testified at trial in *GN Netcom v. Plantronics* on October 13 and 17, 2017.  Other cases in which I have filed expert reports in the last four years are listed in my CV, which is attached as Exhibit A.

### III. Compensation

I am being compensated at a rate of $███ per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $█████ per hour for the work of my staff on this report.

89

Highly Confidential: Subject to Protective Order

## EXHIBIT C: MATERIALS CONSIDERED

**Academic and Industry Literature:**

Aaron Edlin et al., Actavis *and Error Costs: A Reply to Critics,* ANTITRUST SOURCE, Oct. 2014

Aaron Edlin et al., Activating Actavis, ANTITRUST, Fall 2013

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* (2d ed. 2010)

Abhinay Muthoo, *A Non-Technical Introduction to Bargaining Theory*, 1 World Econ. 145 (2000)

Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, Harvard Law School John M. Olin Center for Studies in Law, Economics, and Public Policy Working Papers, Paper 275 (2003)

Albert Choi & George Triantis, *The Effect of Bargaining Power on Contract Design*, 98 VA. L. REV. 1665 (2012)

AREEDA, HOVENKAMP & SOLOW, ANTITRUST LAW (1995)

Bruce Hay & Kathryn Spier, *Litigation and Settlement*, Harvard Law School John M. Olin Center for Law, Economics and Business Discussion Paper Series, Paper 218 (1997)

Carl Shapiro, *Antitrust Limits to Patent Settlements*, 34 RAND J. ECON. 391 (2003)

CARLTON & PERLOFF, MODERN INDUSTRIAL ORGANIZATION  (3rd ed. 2000)

Daye. Thomas A., ABA Section of Litigation Corporate Counsel CLE Seminar, Winning The Settlement – Keys to Negotiation Strategy (February 11-14, 2010)

DOJ/FTC Horizontal Merger Guidelines (2010)

DOJ/FTC, Commentary on the Horizontal Merger Guidelines (2006)

Highly Confidential: Subject to Protective Order

Einer Elhauge & Alex Krueger, *Solving the Patent Settlement Puzzle*, 91 TEX. L. REV. 283 (2012)

EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (3d ed. 2018)

Einer R. Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253 (2003)

Federal Trade Commission, GENERIC DRUG ENTRY PRIOR TO PATENT EXPIRATION: AN FTC STUDY, at vi (2002), available at: https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf

Fiona Murray et al., *Of Mice and Academics: Examining the Effect of Openness on Innovation* (Nat'l Bureau of Econ. Research, Working Paper No. 14819, 2009)

Fisher, Roger, William Ury, and Bruce Patton. *Getting to Yes: Negotiating Agreement without Giving in* (New York, NY: Penguin, 2d ed. 1991), accessed at http://www.fd.unl.pt/docentes_docs/ma/AGON_MA_25849.pdf

Frakes & Wasserman, *Does Agency Funding Affect Decisionmaking?: An Empirical Assessment of the PTO's Granting Patterns*, 66 VAND. L. REV. 67 (2013)

Frakes & Wasserman, *Is the Time Allocated to Review Patent Applications Inducing Examiners to Grant Invalid Patents?: Evidence from Micro-Level Application Data*, REV. ECON. STAT.  Vol. 99 No. 3 (2017)

Frakes & Wasserman, *The Failed Promise of User Fees: Empirical Evidence from the U.S. Patent and Trademark Office,* 11 J. EMPIRICAL LEGAL STUD. 4 (2014)

Frakes & Wasserman, *Does the U.S. Patent and Trademark Office Grant Too Many Bad Patents?: Evidence from a Quasi-Experiment*, 67 STAN. L. REV. 613 (2015)

Heidi L. Williams, *Intellectual Property Rights and Innovation: Evidence from the Human Genome* (Nat'l Bureau of Econ. Research, Working Paper No. 16213, 2010)

J. Gregory Sidak, *Bargaining Power and Patent Damages*, 19 Stan. Tech. L. Rev. 1 (2015)

Highly Confidential: Subject to Protective Order

John H. Barton, *Patents and Antitrust: A Rethinking in Light of Patent Breadth and Sequential Innovation,* 65 ANTITRUST L. J. 449 (1997)

Josh Lerner, *The Empirical Impact of Intellectual Property Rights on Innovation: Puzzles and Clues*, 99 AM. ECON. REV. 343 (2009)

K. Levine, *A Model of Discovery*, 99 AM. ECON. REV. 337 (2009)

Kip Viscusi, *Product Liability Litigation With Risk Aversion*, 17 J. Legal Stud. 101 (1988)

Lemley & Shapiro, *Probabilistic Patents*, 19 J. ECON. PERSPECTIVES 75 (2005)
Pankaj Tandon, *Rivalry and the Excessive Allocation of Resources to Research*, 14 BELL J. ECON. 152 (1983)

SUZANNE SCOTCHMER, INNOVATION AND INCENTIVES 100–03 (2004); Partha Dasgupta & Joseph Stiglitz, *Uncertainty, Industrial Structure, and the Speed of R&D*, 11 BELL J. ECON. 1 (1980)

Wheeler, Michael A. "Negotiation Analysis: An Introduction." Harvard Business School Background Note 801-156, August 2000 (Revised December 2014)

**Expert Reports:**

Portnoy Report
Torrance Report

**Bates Numbered Documents:**

HUM004253
HUM004283
MYEP00000614
MYEP00093052
MYEP00093944
MYEP00148638
MYEP0016434
MYEP00195938
MYEP00213252
MYEP00262837
MYEP00266842

Highly Confidential: Subject to Protective Order

MYEP00323919
MYEP00332421
MYEP00470314
MYEP00474084
MYEP00520928
MYEP00527619
MYEP00552688
MYEP00645800
MYEP00679530
MYEP00814369
MYEP00824750
MYEP00909764
MYEP01036549
MYEP01040995
MYEP01150974_0028
MYEP011902060
MYEP01207989
MYEP01361499
MYEP01361846
PFE_EPIPEN_AT00007925
PFE_EPIPEN_AT00540538
PS0236464
SAN-EPI-0002613
SAN-EPI-0326335
SAN-EPI-0377375
Teva_Epi_000001
Teva-Epi_002003

**Misc:**

Christine Hall, Why Companies Are Opting For Captive Insurance Arrangements,
Forbes        (January        28,        2013),        available        at
https://www.forbes.com/sites/bmoharrisbank/2013/01/28/why-companies-are-
opting-for-captive-insurance-arrangements/#1f55b5c1787d.

Diphenhydramine, International Drug Price Indicator Guide, available at
http://mshpriceguide.org/en/single-drug-
information/?DMFId=273&searchYear=2014.

Highly Confidential: Subject to Protective Order

"Is it legal for me to personally import drugs?", U.S. Food & Drug Administration, available at https://www.fda.gov/aboutfda/transparency/basics/ucm194904.htm

*In re Androgel Antitrust Litigation (No. II),* 2018 WL 2984873, at \*15-17 (N.D. Ga. 2018)

*In re Namenda Direct Purchaser Antitrust Litigation*, 2018 WL 3970674, at \*6-8 (S.D.N.Y. 2018)

IQVIA National Sales Perspective Data

IQVIA Xponent Data

Langreth, Migliozzi, Gokhale, "The U.S. Pays a Lot More for Top Drugs than Other Countries," Bloomberg, 12/18/14, available at https://www.bloomberg.com/graphics/2015-drug-prices/

"Mylan and Pfizer Announce Epinephrine Auto-Injector Settlement Agreement with Teva", PR Newswire, April 26, 2012, available at http://newsroom.mylan.com/press-releases?item=123144

Report to Congress on a Study of the Large Group Market, U.S. Department of Health and Human Services, available at https://aspe.hhs.gov/system/files/pdf/76181/index.pdf

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA (Lidoderm)*, 296 F. Supp. 3d 1142, 1162-64, 1186-88 (N.D. Cal. Nov. 3, 2017)