## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |

| | |
|---|---|
| SANOFI-AVENTIS U.S., LLC,<br><br>Plaintiff,<br>v.<br>MYLAN INC., et al.,<br><br>Defendants.<br><br>*This Document Relates to the* Sanofi *case.* | CASE NO. 2:17-CV-02452-DDC-TJJ<br><br>*Document Filed Electronically*<br><br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MYLAN'S MOTION FOR SUMMARY JUDGMENT

Philip A. Sechler
Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510

*Counsel for Defendant Mylan Inc. and
Defendant/Counterclaim Plaintiff Mylan
Specialty L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... v

INTRODUCTION ...................................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE ................................... 4

I.    MYLAN'S SALE AND DISTRIBUTION OF THE EPIPEN® AUTO-INJECTOR ......... 4

II.   SANOFI'S AUVI-Q® ......................................................................................... 5

III.  THE DISTRIBUTION AND PRICING OF BRANDED PRESCRIPTION DRUG
      PRODUCTS ...................................................................................................... 7

      A.    Commercial Distribution, Managed Care, And PBMs ........................... 7

      B.    Prescription Drug Formularies ............................................................ 9

      C.    Utilization Management Techniques .................................................. 10

      D.    Manufacturer Rebates And Price Protection ...................................... 12

      E.    The Contracting Process ................................................................... 14

      F.    Impact Of Competition On Formulary Coverage And Rebates ............ 17

IV.   SANOFI'S LAUNCH OF AUVI-Q IN 2013 ...................................................... 18

      A.    Environment At Launch: Increasing Utilization Management ............. 18

      B.    Sanofi's Pricing Strategy For Auvi-Q ............................................... 21

      C.    Sanofi's Launch Strategy ................................................................ 22

      D.    Payors' Response To Launch Of Competitive Product In EAI Class ..... 24

V.    2013 AND 2014 COVERAGE FOR AUVI-Q AND EPIPEN .............................. 26

      A.    Express Scripts ("ESI") ................................................................... 29

      B.    CVS Caremark ................................................................................ 31

      C.    OptumRx/United ............................................................................. 32

      D.    Prime Therapeutics ......................................................................... 34

i

**TABLE OF CONTENTS—Continued**

Page

| | | | |
|---|---|---|---|
| E. | MedImpact | 36 |
| F. | Aetna | 38 |
| G. | Cigna | 39 |
| H. | Other PBMs And Health Plans | 40 |

VI. SANOFI'S SUCCESSFUL NEGOTIATIONS IMPROVED AUVI-Q'S 2015 FORMULARY COVERAGE ............. 41

VII. ROLE OF MARKET SHARE AND CONTESTABILITY OF EAI DEMAND ............. 46

    A. Power To Move Share ............. 46

    B. When EpiPen Was Excluded, Market Share Did Move To Auvi-Q ............. 48

VIII. IMPACT OF REBATE NEGOTIATIONS ............. 49

IX. EPIPEN4SCHOOLS® PROGRAM ............. 50

X. SANOFI'S OWN DRUG REBATES FOR POSITIONING AND EXCLUSIVITY ............. 50

XI. THE COMPLETE CLASS I RECALL OF AUVI-Q AND SANOFI'S RETURN OF RIGHTS ............. 52

STANDARD OF DECISION ............. 54

ARGUMENT ............. 55

I. MYLAN DID NOT ACT ANTICOMPETITIVELY ............. 55

    A. Mylan's Agreements Pass The Price-Cost Test, Which Ends This Case ............. 55

        1. Price Was The Clearly Predominant Mechanism Of Exclusion ............. 56

        2. It Is Uncontested That Mylan's Per-Unit Prices Were Above Cost ............. 60

    B. No Aspect Of Existing Antitrust Law Condemns Mylan's Agreements ............. 61

        1. Mylan's Contracts Were Short-Term And Easily Terminable, And They Did Not Prevent Payors From Making Formulary Changes ............. 62

        2. Mylan Did Not Coerce Any Customer Into Accepting An Exclusive Deal ............. 65

## TABLE OF CONTENTS—Continued

Page

      3.     Rebate Offers Like Mylan's Were Common Throughout The Industry ...................................................................................... 69

      4.     Sanofi Has Not Shown The Necessary Foreclosure ................................ 71

      5.     Intent To Harm A Rival Cannot Separate Competitive Conduct From Anticompetitive Conduct ................................................................ 74

  C.     This Court Should Not Accept Sanofi's Unsupported, Unprecedented, And Anticompetitive Theory Of Liability ........................................................ 75

      1.     No Court Applying the Sherman Act Has Credited This Novel Theory ..................................................................................................... 76

      2.     The Supposedly "Incontestable" Share Here Is Nothing But Ephemeral Customer Preference, Which Does Not Suffice To Show Incontestability ...................................................................................... 77

      3.     The Evidence For Any Incontestable Share In This Case Is Weak .......... 79

      4.     Any Incontestable Share's Potential To Foreclose Should Be Evaluated Under The Incremental Cost Test, Which Shows Mylan Did Not Price Any Contestable Portion Of Demand Below Its Costs ...................................................................................................... 80

  D.     Mylan's Other Conduct Did Not Violate The Antitrust Laws.............................. 84

      1.     Mylan's Allegedly Deceptive Communications Were True And Easily Neutralizable ............................................................................... 85

      2.     Mylan's EpiPen4Schools Program Was Procompetitive.......................... 88

II.     SANOFI HAS NOT SUFFERED ANTITRUST INJURY ............................................. 88

  A.     Sanofi Has Not Shown That Mylan's Conduct Caused Higher Prices Or Reduced Output ........................................................................................ 89

  B.     Mylan Did Not Deprive Consumers Of A Superior Product................................ 91

  C.     Reduced Innovation Is Not A Cognizable Antitrust Harm, And In Any Event Sanofi Has Not Shown It ........................................................................ 92

  D.     The Selection Of An Exclusive Dealer Does Not Injure Consumers ................... 94

III.    SANOFI'S CLAIM FOR DAMAGES FAILS AS A MATTER OF LAW .................... 95

**TABLE OF CONTENTS—Continued**

**Page**

    A.      Sanofi's Failure To Disaggregate Damages Is Fatal...............................................96

    B.      Sanofi's Claim For Post-Recall Damages Should Be Rejected...........................98

CONCLUSION ......................................................................................................................... 100

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.A. Poultry Farms, Inc.* v. *Rose Acre Farms,*
881 F.2d 1396 (7th Cir. 1989) ..........................................................................3, 74

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP,*
592 F.3d 991 (9th Cir. 2010) ...........................................................................63, 64

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of
Podiatric Surgery, Inc.,*
323 F.3d 366 (6th Cir. 2003) ...........................................................................85, 87

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
Publ'ns, Inc.,*
108 F.3d 1147 (9th Cir. 1997) .........................................................................85, 87

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).........................................................................................54, 55

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,*
729 F. 2d 1050 (6th Cir. 1984) ..............................................................................90

*Avaya Inc., RP v. Telecom Labs, Inc.,*
838 F.3d 354 (3d Cir. 2016)...................................................................................97

*Balaklaw v. Lovell,*
14 F.3d 793 (2d Cir. 1994)............................................................................63, 64

*Barry Wright Corp. v. ITT Grinnell Corp.,*
724 F.2d 227 (1st Cir. 1983) ...........................................................63, 74, 83, 94

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979)..................................................................................85

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993).................................................................................77, 84, 91

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977).....................................................................................88, 90

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
996 F.2d 537 (2d Cir. 1993)..................................................................................89

*Cargill, Inc. v. Monfort of Colo.,*
479 U.S. 104 (1986)..................................................................................1, 90

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Cascade Health Sols. v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) ........................................................................ *passim*

*Castro v. Sanofi Pasteur, Inc.,*
    Civ. No. 11–7178 (JMV)(MAH), 2017 WL 4776626 (D.N.J. Oct. 23, 2017) ......................59

*City of Vernon v. S. Calif. Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ......................................................................96, 97

*Cohlmia v. St. John Med. Ctr.,*
    693 F.3d 1269 (10th Cir. 2012) ....................................................................89, 92

*Collins Inkjet Corp. v. Eastman Kodak Co.,*
    781 F.3d 264 (6th Cir. 2015) ...................................................................80, 82, 83

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)........................................................................................98

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ......................................................................63, 71

*Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.,*
    672 F. Supp. 1489 (D.S.C. 1987)........................................................................58

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n,*
    357 F.3d 1 (1st Cir. 2004)...........................................................................61, 63

*Eisai Inc. v. Sanofi-Aventis U.S., LLC,*
    No. 08-4168 (MLC), 2014 WL 1343254 (D.N.J. Mar. 28, 2014) .................................. *passim*

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
    821 F.3d 394 (3d Cir. 2016)........................................................................ *passim*

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.,*
    786 F.2d 1342 (9th Cir. 1985) ...........................................................................96

*FTC v. Qualcomm, Inc.,*
    No. 17-CV-00220-LHK, 2018 WL 6615050 (N.D. Cal. Dec. 17, 2018) ...............................91

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) ...........................................................................97

*Indeck Energy Servs., Inc. v. Consumers Energy Co.,*
    250 F.3d 972 (6th Cir. 2000) .................................................................63, 65, 94, 95

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Inline Packaging LLC v. Graphic Packaging International, LLC,*
    351 F. Supp. 3d 1187 (D. Minn. 2018) ......................................................................79, 80, 83

*In re Indep. Serv. Orgs. Antitrust Litig.,*
    85 F. Supp. 2d 1130 (D. Kan. 2000) .....................................................................................97

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
    762 F.3d 1114 (10th Cir. 2014) ......................................................................................85, 87

*LePage's, Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) (en banc) .............................................................................60, 67

*Los Angeles Land Co. v. Brunswick Corp.,*
    6 F.3d 1422 (9th Cir. 1993) .................................................................................................62

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) .............................................................................................................69

*MCI Commc'ns Corp. v. Am. Tel. and Tel. Co.,*
    708 F.2d 1081 (7th Cir. 1983) .............................................................................................96

*McWane, Inc. v. FTC,*
    783 F.3d 814 (11th Cir. 2015) ........................................................................................66, 71

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.,*
    354 F.3d 661 (7th Cir. 2004) ..........................................................................................61, 69

*Mercatus Grp., LLC v. Lake Forest Hosp.,*
    641 F.3d 834 (7th Cir. 2011) ...............................................................................................85

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.,*
    859 F.3d 408 (7th Cir. 2017) ..........................................................................................63, 64

*Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.,*
    850 F.2d 904 (2d Cir. 1988) .................................................................................................85

*NicSand, Inc. v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007) (en banc) ...................................................................67, 91, 95

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2016) ...........................................................................................85

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
    127 F.3d 1157 (9th Cir. 1997) ....................................................................................62, 63, 64

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.,*
103 F.3d 42 (7th Cir. 1996) ...................................................................................64

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,*
614 F.3d 57 (3d Cir. 2010) ............................................................................. *passim*

*In re Remicade Antitrust Litigation,*
345 F. Supp. 3d 566 (E.D. Pa. 2018) ....................................................................78

*Sanderson v. Culligan Int'l Co.,*
415 F.3d 620 (7th Cir. 2005) ................................................................................87

*SCFC ILC, Inc. v. Visa USA, Inc.,*
36 F.3d 958 (10th Cir. 1994) ................................................................................74

*Schachar v. Am. Acad. of Ophthalmology, Inc.,*
870 F.2d 397 (7th Cir. 1989) ................................................................................89

*Stearns Airport Equip. Co., Inc. v. FMC Corp.,*
170 F.3d 518 (5th Cir. 1999) ................................................................................66

*Sterling Merch., Inc. v. Nestlé, S.A.,*
656 F.3d 112 (1st Cir. 2011) ...........................................................................89, 90

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
373 F.3d 57 (1st Cir. 2004) ...................................................................................73

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.,*
851 F.3d 1029 (10th Cir. 2017) ..............................................................................3

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.,*
No. 12-cv-2760-DDC-KGS, 2016 WL 1377342 (D. Kan. April 7, 2016) ..................... *passim*

*Tampa Elec. Co. v. Nashville Coal Co.,*
365 U.S. 320 (1961) ..............................................................................................61

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,*
305 F.3d 1124 (10th Cir. 2002) ............................................................................99

*Trace X Chem., Inc. v. Canadian Indus., Ltd.,*
738 F.2d 261 (8th Cir. 1984) ................................................................................71

*Trainor v. Apollo Metal Specialties, Inc.,*
318 F.3d 976 (10th Cir. 2002) ..............................................................................54

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*United States v. Alcoa,*
    148 F.2d 416 (2d Cir. 1945)...................................................................................1

*United States v. Dentsply International, Inc.,*
    399 F.3d 181 (3d Cir. 2005)................................................................................66

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................................................71

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.,*
    No. 14 cv 00804, 2015 WL 225328 (N.D. Ill. Jan. 15, 2015) ...............................92

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004).............................................................................................69

*Webb v. Utah Tour Brokers Association,*
    568 F.2d 670 (10th Cir. 1977) ............................................................................99

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (1971).............................................................................................99

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3d Cir. 2012)....................................................................... *passim*

**Rules**

Fed R. Civ. P. 56.....................................................................................................54, 96

**Other Authorities**

1 ABA Section of Antitrust Law, *Antitrust Law Devs.* § 9C5 (8th ed. 2018) ..............................96

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2018) .......................... *passim*

Brief of Appellees Sanofi-Aventis U.S. LLC and Sanofi US Services Inc., *Eisai,
    Inc. v. Sanofi-Aventis U.S. LLC*, No. 14-2017 (3d Cir. Oct. 2, 2014) ....................71

Sean Durkin, *The Competitive Effects of Loyalty Discounts in a Model of
    Competition Implied by the Discount Attribution Test*, 81 Antitrust L.J. 475
    (2017)...................................................................................................................81

Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1 (1984) ....................89

Herbert Hovenkamp, *The Federal Trade Commission and the Sherman Act*, 62
    Fla. L. Rev. 871 (2010).......................................................................................78

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70 Antitrust L.J. 311 (2002).......................................................................................71

Fiona M. Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 Antitrust L.J. 777 (2017)................................................83

Sanofi Pasteur Inc.'s Motion for Summary Judgment, *Castro et al. v. Sanofi Pasteur Inc.*, No. 2:11-cv-07178-JMV-MAH (D.N.J. Sept. 16, 2016) ............................80, 84

Edward A. Snyder & Thomas E. Kauper, *Misuse of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich. L. Rev. 551 (1991) ..................................................89

Richard M. Steuer, *Musthavedness*, 81 Antitrust L.J. 447 (2017)..........................................77, 78

# INTRODUCTION

Sanofi's Sherman Act claims against Mylan should be rejected in their entirety. Sanofi attacks conduct that the antitrust laws *encourage*—competition on the merits. When Sanofi—a global powerhouse with an income statement dwarfing Mylan's—chose not to compete with Mylan on price, it had only limited success selling its new epinephrine auto-injector Auvi-Q®. When Sanofi decided to ███████ with ██████████████ to commercial payors, however, it won unrestricted coverage from leading health plans—a turnaround that led Sanofi to become ████████████████████████████████████████████ Ex. 16 (Guenter) Dep. at 328. This satisfaction abruptly ended 33 months after launch when Sanofi completely recalled Auvi-Q and suspended manufacturing operations due to a potentially fatal defect that had prompted a surprise FDA inspection. These were rare and devastating events, so rather than remediate and relaunch the product, Sanofi quickly terminated its license agreement with Auvi-Q's inventor, relinquished the rights to sell the device, and devised a theory about how it was all Mylan's fault.

As this Court recognized in *Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, No. 12-cv-2760-DDC-KGS, 2016 WL 1377342, at *26 (D. Kan. April 7, 2016), *aff'd*, 851 F.3d 1029 (10th Cir. 2017), antitrust law protects *competition*, not competitors. Competition is a process of constantly trying to beat rivals, old or new. For that reason, as Judge Learned Hand observed long ago, "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Alcoa*, 148 F.2d 416, 430 (2d Cir. 1945). Courts must not mistake hard competition for exclusionary conduct, lest they penalize the very conduct the antitrust laws were designed to promote. *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 121 n.17 (1986). And, where the record shows nothing but hard competition, summary judgment has "particular importance in the area of antitrust law, because it helps to avoid wasteful trials … that may have a chilling effect

on pro-competitive market forces." *Suture Express*, 2016 WL 1377342, at *14.

The fully developed record shows that Sanofi's antitrust claims cannot prevail. The challenged conduct was pricing conduct, as Sanofi's then-CEO acknowledged when he testified that ███████████████████████████████████████████████ Ex. 30 (Viehbacher Dep.) at 122. For much of the time it sold Auvi-Q, Sanofi was unwilling to compete on price for fear of ███████████████████████████████████████████ ██████████ *Id.* at 75. But a competitor's disappointment at not being able to charge higher prices is the opposite of an antitrust violation, and *not once* was Sanofi excluded from or restricted on a formulary after underbidding Mylan. Sanofi's turnaround in 2015—when it obtained more favorable coverage *after reducing its net price*—confirms that the conduct at issue was price competition.

Because Mylan's pricing is at issue, and Sanofi does not and cannot allege that Mylan priced EpiPen below cost, this case should end. But Sanofi's claims fail for additional reasons. Although some of Mylan's rebate offers to pharmacy benefit managers ("PBMs"), health insurers, or health plans (collectively, "Payors") offered lower prices for exclusivity, Sanofi has no evidence of the kind of persistent exclusive dealing, causing major foreclosure of distribution channels, that might violate the antitrust laws. First, there was *zero* foreclosure: The relevant Mylan agreements, exclusive or not, generally were short in duration, easily terminable, and permitted Payors to reconfigure their formularies at any time. Second, Mylan's offers were not "all-or-nothing" exclusive deals; Mylan regularly offered a range of rebate options, leaving the Payor free to choose larger rebates in exchange for greater formulary restrictions, or vice versa. Third, Payors, far from being "coerced," used formulary restrictions to obtain greater rebates from both Mylan *and* Sanofi, and often solicited rebates conditioned on exclusivity. Indeed, PBMs are among the most powerful

actors in the U.S. healthcare system, and the record conclusively shows that not a single Payor was intimidated by Mylan into restricting Auvi-Q.

This mode of bargaining is, as Sanofi acknowledged in another federal court, "how the entire branded pharmaceutical industry functions" and "entirely rational and lawful." Ex. 49 at 2-4. Sanofi knew how to compete with rebates. It repeatedly offered them on Lantus, its blockbuster diabetes drug. Those rebates were deep and conditioned on exclusivity. And Sanofi offered them to avoid becoming ███████████████████████ Ex. 30 (Viehbacher Dep.) at 197. Sanofi's current CEO recently told Congress that Sanofi pays "high rebates"—in 2018, 55% of gross sales, including $7.3 billion in discretionary rebates—to get "preferred position" for its own products. And, in federal litigation where it is defending its insulin rebates, Sanofi describes "rebates to PBMs" as the way "it is competing … for inclusion and preferred placement on PBMs' formularies." Ex. 49 at 39. In sum, Sanofi failed to price Auvi-Q competitively and so suffered commercial losses; it now in this Court attacks the same ordinary business practices it regularly pursues and vigorously defends. To bolster that attack, Sanofi pushes a pseudo-economic theory never adopted by any American court, spiced with salacious but stray remarks by Mylan employees indicating a desire to defeat Sanofi in the marketplace—remarks that cannot separate competitive from anticompetitive conduct. *See A.A. Poultry Farms, Inc.* v. *Rose Acre Farms*, 881 F.2d 1396, 1401-02 (7th Cir. 1989) (Easterbrook, J.) ("[I]ntent plays no useful role in this kind of litigation. Firms 'intend' to do all the business they can, to crush their rivals if they can…. [U]s[ing] the vigorous, nasty pursuit of sales as evidence of a forbidden 'intent' … risk[s] … penalizing … competition.").

Independent of all those points, Sanofi cannot prevail because—as in *Suture Express*—it cannot show antitrust injury. *See* 851 F.3d at 1045 (affirming based on lack of antitrust injury).

Sanofi has not shown that Mylan's conduct caused higher prices, reduced output, or a decline in product quality; deprived consumers of choice; or injured consumers in any way.

And there is one more ground justifying summary judgment: Sanofi's exorbitant claim for ▮▮▮▮▮ in pre-trebled damages is legally and factually indefensible. First, Sanofi has not even tried to disaggregate losses it suffered due to lawful conduct from losses due to allegedly unlawful conduct, a fatal failure. Second, more than ▮▮▮ of the alleged damages arise *after* Sanofi completely recalled Auvi-Q—a disaster that prompted Sanofi to cancel its plans for ▮▮▮▮▮ ▮▮▮▮▮ Ex. 19 (Harr Dep.) at 314, and return rights to the inventor. Sanofi's attempt to recover damages for what it claims it feared Mylan *might* do in the future—▮▮▮▮▮ ▮▮▮▮▮—is speculative and improper. This anticompetitive lawsuit fails on multiple grounds, and this Court should not allow it to proceed any further.

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

**I.    Mylan's Sale And Distribution Of The EpiPen® Auto-Injector**

1.    Defendant Mylan Inc. is a global healthcare company whose affiliates develop and market branded and generic prescription drugs. Mylan supplies approximately 10% of the generic drugs used by U.S. patients—products that play a vital role in lowering the costs of prescription drugs in the U.S. healthcare system.[1] Defendant Mylan Specialty L.P. is a subsidiary of Mylan Inc. that develops, manufactures, and markets branded specialty prescription drug products.

2.    In 2007, Mylan acquired the predecessor to Mylan Specialty, Dey Pharma L.P., which owned the rights to market EpiPen® and EpiPen Jr.® Auto-Injectors (collectively "EpiPen"). Meridian Medical Technologies, Inc. ("Meridian"), a subsidiary of Pfizer, manufactures EpiPen.

---

[1] *See* Mylan, *Built to Last* Presentation, Nov. 6, 2017, https://bit.ly/2WKvH1G, at Slide 17.

Pursuant to the Amended and Restated Supply Agreement ("Supply Agreement") with Meridian, Mylan has the exclusive right to market, distribute, and sell EpiPen in the United States.[2]

3.      EpiPen was the first epinephrine auto-injector ("EAI" or "EAI device"), introduced in the 1980s. Epinephrine is used for the emergency treatment of severe allergic reactions (including anaphylaxis) caused by insect bites or stings, medicines, foods, or other substances. EpiPen is shaped like a pen. It is administered by removing a cap and swinging it against the thigh, which causes the needle to come out and inject epinephrine. After three seconds, the patient removes the device and a plastic shield covers the needle.[3]

4.      When Mylan acquired EpiPen in 2007, there was low public awareness of the risks and treatment of anaphylaxis. Mylan invested substantial sums to increase awareness and enhance access and training related to EAIs. Mylan also worked with various advocacy partners and legislators to remove barriers to access to epinephrine for children in schools.[4]

5.



## II.    Sanofi's Auvi-Q®

6.      Sanofi is one of the largest pharmaceutical companies in the world, headquartered in Paris, France. In 2013, Sanofi had $44 billion in net sales revenue and a market capitalization



of more than $140 billion.[7] Sanofi is a much larger company than Mylan: Mylan's sales revenue in 2013 was less than one fifth of Sanofi's.[8] In 2013, Mylan employed approximately 370 sales employees compared to Sanofi's U.S. sales force of more than 4,700 representatives.[9] Sanofi reported profits in 2013 that were nearly eight times as great as the profits reported by Mylan.[10] Plaintiff Sanofi-Aventis U.S. LLC (hereinafter "Sanofi") is Sanofi's U.S. subsidiary.

7.  In 2009, Sanofi obtained a license to market and sell Auvi-Q®, an EAI device developed by Intelliject.



Chris Viehbacher, the former Sanofi CEO who authorized the company's license of Auvi-Q, testified

8.  Auvi-Q treats the same condition as EpiPen (anaphylaxis) using the same active ingredient (epinephrine) through the same delivery mechanism (an auto-injector device). The device itself has differences, including that it is smaller than EpiPen (the thickness of a smart phone and size of a credit card) and has a different shape (rectangular), a needle that retracts (as opposed to one covered before and after injection), and audio instructions.[13] Auvi-Q is administered by

---

[7] Sanofi 2013 Form 20-F, at 2 (Mar. 7, 2014), https://bit.ly/2MRzf2q (calculated using average exchange rate for 2013 at p.3); Ex. 30 (Viehbacher Dep.) at 11; *5 Stocks Underperforming Today in the Drugs Industry*, TheStreet (May 20, 2013), https://bit.ly/2IStiNx.

[8] *Compare* Sanofi 2013 Form 20-F, at 2 (Mar. 7, 2014), https://bit.ly/2MRzf2q ($44 billion, calculated using average exchange rate for 2013 at p.3), *with* Mylan 2013 Form 10-K, at 46 (Feb. 27, 2014), https://bit.ly/2IqwGQR ("Total revenues": $6.9 billion)

[9] Sanofi 2013 Form 20-F (Mar. 7, 2014) at 50, https://bit.ly/2MRzf2q; Mylan 2013 Form 10-K (Feb. 27, 2014) at 20, https://bit.ly/2IqwGQR.

[10] *Compare* Sanofi 2013 Form 20-F (Mar. 7, 2014), https://bit.ly/2MRzf2q ("operating income attributable to equity holders of Sanofi:" $4.9 billion (at p.3 exch. rate)) *with* Mylan 2013 Form 10-K (Feb. 27, 2014), https://bit.ly/2IqwGQR ("Net earnings attributable to Mylan Inc. common shareholders": $623 million).

[11]

[12]                                                                                                      .

[13] Ex. 42 (Bloomberg Article, Jan. 28, 2013, *Sanofi Introduces Auvi-Q Amid Plan to Grow in Devices*);

removing a cover, and listening to recorded instructions. When a patient presses the device against the leg, the needle fires, injecting epinephrine, and then the needle automatically retracts.[14]

9.      Auvi-Q is not AB-rated to EpiPen—i.e. it is not a generic—and there are no clinical data demonstrating its superior safety or efficacy over EpiPen for the treatment of anaphylaxis.[15]

10.     Sanofi launched Auvi-Q in the U.S. in January 2013 and sold it until October 28, 2015, when Sanofi recalled all Auvi-Q devices due to "potentially … inaccurate dosage delivery, which may include failure to deliver drug."[16] Sanofi never re-launched Auvi-Q after the recall, electing instead in the Fall of 2015 to return its rights to the product to Intelliject (which in 2014 changed its name to kaléo, Inc.).[17]

11.     Other EAI devices were sold in the U.S. while EpiPen and Auvi-Q were on the market. Adrenaclick®, another EAI, was launched as a branded product and authorized generic in 2010, discontinued in March 2012, and re-launched in June 2013. Twinject®, an EAI containing two doses of epinephrine, was launched in 2005 but discontinued in March 2012.[18] Mylan also released an authorized generic to its EpiPen in 2016.[19]

## III.    The Distribution And Pricing Of Branded Prescription Drug Products

### A.    Commercial Distribution, Managed Care, And PBMs

12.     Pharmaceutical manufacturers sell prescription drug products to patients through a multi-step commercial distribution chain from manufacturer to wholesaler to pharmacy to patient.

---

[14] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[15] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[16] *Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q® Due to Potential Inaccurate Dosage Delivery*, Sanofi, Oct. 30, 2015, https://bit.ly/1OZMo3f.

[17] *Intelliject, Inc. announces name change to kaléo*, kaléo, Jan. 6, 2014, https://bit.ly/2ZJW2i9

[18] ▮▮▮▮ The generic to Adrenaclick is now the preferred EAI for CVS Pharmacies. *CVS Health Offers Patients Lowest Cash Price in the Market for Generic Epinephrine Auto-injector to Treat Allergic Reactions*, CVS (Jan. 12, 2017), https://bit.ly/2jpJlVn.

[19] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Patient cost is determined by the pharmacy and the terms of the patient's insurance: An uninsured patient will pay the price set by the pharmacy; an insured patient may make a copayment (fixed dollar amount), make a coinsurance payment (a percentage of the medicine's full price) or pay full price, depending on the terms of the patient's insurance. For insured patients paying a co-pay or co-insurance, insurance covers the balance.[20] The pharmacy reimbursement rate typically is negotiated with the insurer based on a publicly available Average Wholesale Price ("AWP").[21]

13. "Managed care" refers to health insurance plans that control, or "manage," patients' access to medicine to reduce costs, including access to providers, medical procedures, and prescription drugs. Managed care health plans—which include health maintenance organizations (HMOs), preferred provider organizations (PPOs), and point-of-service (POS) plans—are the principal forms of commercial health insurance in the United States.[22]

14. Patients have access to commercial health plans through private health insurance companies ("health insurers") that sell prescription drug benefits to patients, either directly, or indirectly through employers, unions, or schools that sponsor health benefits for their employees, members, or students ("plan sponsors").[23]

15. Some large health insurers develop and manage their own prescription drug benefits, but most retain PBMs to do so on their behalf.[24]

16. Full-service PBMs emerged in the 1980s.[25] Since that time, the PBM industry has become "highly consolidated."[26] The number of patients enrolled in a particular health insurance

---

[20] ▮▮▮▮▮▮▮▮▮▮▮.

[21] PhRMA, *Follow the Dollar* Report, Nov. 2017, https://onphr.ma/2MTiXWT.

[22] ▮▮▮▮▮▮▮▮▮▮▮▮

[23] PhRMA, *Follow the Dollar* Report, Nov. 2017, https://onphr.ma/2MTiXWT.

[24] ▮▮▮▮▮▮▮▮▮▮▮▮

[25] ▮▮▮▮▮▮▮▮▮▮▮▮

[26] PhRMA, *Follow the Dollar* Report, Nov. 2017, https://onphr.ma/2MTiXWT.

plan is often referred to as the number of "covered lives."[27] Sanofi's expert economist, Fiona M. Scott Morton, Ph.D., estimates that, as of January 2015, seven of the largest PBMs and health insurers managed prescription drug benefits for 86% of covered commercial lives: Express Scripts (PBM) (38%), CVS/Caremark (PBM) (20%), OptumRx (PBM) (10%), Prime Therapeutics (PBM) (7%), MedImpact (PBM) (6%), Cigna (health insurer) (4%), and Aetna (health insurer) (1%).[28]

17.    Dr. Scott Morton further estimated that by May 2017 "just three firms (CVS Caremark, OptumRx, and Express Scripts) control[led] between 80 and 85 percent of the prescription benefit covered lives in the U.S. market."[29]

### B.    Prescription Drug Formularies

18.    "Formulary" generally refers to the list of prescription drugs that a health plan covers. PBMs and health insurers create a variety of formularies for their health-plan clients.[30]

19.    Payors are not required to cover every drug available in the U.S.[31] Some formularies offer a wide choice of covered drugs to treat the same conditions, at a premium cost, while others restrict the number of covered drugs to facilitate cost savings.[32]

20.    Formularies also have different levels of "control," which refers to how strictly the list of covered drugs is enforced. Under an "open" or "low control" plan design, a health plan typically covers many (sometimes all) drugs on formulary, or covers at least some portion of the cost of drugs that are not included on formulary. Under a "closed" or "high control" plan design,

---

[27] ████████████████████████████████████████████

[28] ████████████████████████████ 2. ████████████████

[29] Ex. 44 (Scott Morton, *Enabling Competition in Pharmaceutical Markets*, May 2017) at 21.

[30] ██████████████████████████████████████████████████ es). ███████████████████

[31] ████████████ ███████████████████████████████████████

[32] ██████████████████████████████████████████████████
████████████████████████████████████████████

a health plan typically only covers the products listed on formulary.[33] As Viehbacher, Sanofi's former CEO, testified, ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ █

21.     In addition to developing standard formularies from which their clients can choose, some Payors allow health-plan and large-employer clients to customize drug formularies for their unique needs.[35] Some of the largest PBMs maintain hundreds or thousands of formularies.[36]

22.     When selecting or designing a formulary, health plans consider the extent to which their members prioritize cost versus choice.[37] As Sanofi's expert economist has testified, plans "offer different kinds of formularies," which she opined is a "nice way" of "getting cost savings to people who want cost savings, and allowing some choice for people who care about that choice."[38]

### C.     Utilization Management Techniques

23.     Payors use what they call utilization management ("UM") techniques to drive members to use their preferred products, *i.e.*, to incentivize the use of one drug over another.[39] Payors use UM techniques to encourage patients to use more cost-effective products,



33 ████████████████████████████████████████████████

34 ████████████████████████████████████

35 ████████████████████████████████████████.

36 ████████████████████████████████████████████████
formularies"); Ex. 1 (Anderson (CVS) Dep.) at 35-36 (describing CVS's "wide array" of formularies).

37 ████████████████████████████████████████████████

38 Ex. 46 (Scott Morton Congressional Testimony, Jan. 11, 2017) at 27-28.

39 ████████████████████████████████████████████████
████████████████████████

and to negotiate better pricing from manufacturers.[40] The following UM techniques are among those commonly used by Payors:

24.     <u>Copayments and Tiering</u>. Payors often require patients to pay a portion of the cost for a prescription drug, either a fixed-dollar copayment or a percent coinsurance. The most common formularies have at least 3 "tiers" with increasing copayments: Tier 1 ("T1") (lowest copayment, typically for generics); Tier 2 ("T2") (higher copayment than T1, typically for preferred branded products); Tier 3 ("T3") (higher copayment than T2, typically for non-preferred branded products).[41] Copayment differentials encourage patients to use the lower tier drugs, e.g., to purchase the preferred T2 brand over the non-preferred T3 brand.[42] Manufacturers generally want their drugs to be on the lowest tier possible, because a lower co-pay leads to more use of a product. Thus, manufacturers regularly discount products to be listed on a lower tier.[43]

25.     <u>Step Edit</u>. A "step edit" or "step therapy" requirement ("SE or "ST") most commonly requires an insured patient to use—or at least fill a prescription for—a preferred drug before a branded alternative will be eligible for reimbursement. A Step Edit might require, for example, that a patient fill a prescription for a T1 generic or T2 preferred branded drug before a T3 non-preferred drug will be covered.[44]

26.     <u>Prior Authorization</u>. A prescription drug with a Prior Authorization ("PA") requirement can be obtained only if a patient's physician formally requests that a Payor approve coverage. Each Payor determines the approval criteria. If a T3 drug has a PA requirement, the patient would



need to obtain the PA and then pay the T3 copayment upon filling the prescription.[45]

27.   <u>Benefit Exclusion</u>. Since 2012, Payors increasingly have excluded drugs from coverage altogether (rather than covering them on a higher copay tier) to reduce costs, sometimes covering only one branded product per therapeutic class of drugs.[46] Patients can often still purchase excluded drugs, but generally they must pursue a medical exception approval to gain coverage, or else pay out-of-pocket in an uninsured transaction.[47] Excluded drugs are sometimes referred to as not-covered ("NC") or as subject to a National Drug Code ("NDC") block.[48]

28.   Payors deploy management tools at the request of their plan clients that want more restrictive coverage to save costs. As James Borneman, Sanofi's Vice President for Strategic Pricing and Contracts from 2014 to 2017, explained, ██████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████ Sanofi's expert economist agrees, stating that "you can save money by being willing to be restricted. If you do not like being restricted, you have to pay more."[50] Therapeutic drug classes where UM controls are used are commonly called "managed" classes.[51]

### D.   Manufacturer Rebates And Price Protection

29.   Payors' ability to influence prescription drug use gives them leverage to negotiate price concessions ("rebates") with branded drug manufacturers in exchange for preferred



[45] ████████████████████████████████████████████████████████

[46] ████████████████████████████████████████████████
[47] ████████████████████████████████████████████████████████

[48] ████████████████████████████████████████████████████████

[49] ██████████████████████████████
[50] Ex. 46 (Scott Morton Congressional Testimony) at 27.
[51] ████████████████████████████

formulary positions, *i.e.*, for placement on the preferred tier, or to avoid restrictions or benefit exclusion.[52] Brand manufacturers offer rebates as a percentage off a drug's published list price, called the Wholesale Acquisition Cost ("WAC").[53]

30.     As explained by Sanofi's expert economist, "[I]nsurers and PBMs extract these rebates from the manufacturers in return for giving preferred formulary positions to the manufacturers' products…. By controlling the formularies, insurers and PBMs can extract rebates from manufacturers in return for formulary position, prior authorization requirements applied to competing products," etc.[54] She further explained: "The threat of exclusion, and the resulting loss of sales, may induce a manufacturer to lower its price in order to be retained on the formulary."[55]

31.     In a lawsuit challenging its rebates for insulin products, Sanofi defended the rebates as "how the entire branded pharmaceutical industry functions." "The use of formularies," said Sanofi, "gives the PBMs enormous powers to extract rebates from manufacturers." Sanofi called it "entirely rational and lawful for manufacturers to discount their products (through the payment of rebates) in exchange for having their products appear on formularies that insurers use to make coverage decisions for the vast majority of patients." Sanofi was thereby "competing against other [manufacturers] for inclusion and preferred placement on PBMs' formularies."[56] Sanofi has also declared publicly that its insulin product, Lantus, provides "an excellent example of how list prices do not reflect the actual prices paid by insurance companies" because "Sanofi offers substantial discounts in the form of rebates to insurance companies, often through their [PBMs.]"[57]

---

[52] Ex. 48 (Scott Morton, *An Orientation to the Acquisition of and Reimbursement for Prescription Drugs*, Dec. 3, 2004) at 50-51.
[53] ██████████████████████████████████ .
[54] Ex. 48 (Scott Morton, *An Orientation to the Acquisition and Reimbursement for Prescription Drugs*, Dec. 3, 2004) at 50-51.
[55] Ex. 44 (Scott Morton, *Enabling Competition in Pharmaceutical Markets*, May 2017) at 19.
[56] Ex. 49 (*In re Insulin Pricing Litigation,* ECF No. 109-1, No. 17-cv-699 (D.N.J.)) at 2-4, 39.
[57] Ex. 50 (Sanofi, *Prescription Medicine Pricing, Our Principles and Perspective*) at 8.

32. Another form of discount commonly negotiated by Payors, "price protection," insulates Payors from list (or WAC) price increases. Price protection terms do not forbid manufacturers from raising the WAC but require them to pay additional rebates to the Payor to negate a portion of future WAC increases.[58] For example, 6% price protection would mean that a Payor would receive additional rebates if the product's WAC increase exceeds 6% over the baseline WAC (which is also the subject of negotiation). Because the percentage number in price protection defines a maximum price increase, the lower the percentage, the more protection it affords.[59]

### E. The Contracting Process

33. Payors solicit from brand manufacturers rebates that align with their benefit design goals. A health plan that intends to offer members a closed formulary with only one covered product per therapeutic class would solicit rebates from manufacturers for an exclusive formulary position. A large PBM that develops hundreds of formularies with varying levels of control would solicit a menu of rebates to offer clients a variety of formulary options. Such a menu, for example, might include one rebate for preferred (*e.g.*, T2) coverage alongside other therapeutic alternatives ("1 of many" or "equal access"), another rebate for preferred coverage alongside only one other product ("1 of 2" or "co-preferred"), another for exclusive preferred coverage with other products on the non-preferred tier ("1 of 1" or "exclusive preferred"), and another for exclusive coverage with other products restricted by a PA or ST or excluded from formulary altogether.[60]

---

[58] ████████████████████████████████████████████████████

[59] ████████████████████████████████████████████████████

[60] ███████████████████████ *infra*, SMF §§ IV(D), V, VI (describing Payors' bid solicitations). The term "exclusive" can have different meanings when describing formulary control: sometimes it refers to one drug product being the only—or "exclusive"—preferred product (*i.e.*, the only product on T2), with other branded products placed on higher tiers, *e.g.*, ████ and other times it refers to the "exclusive" drug being the only covered branded drug with others excluded from coverage altogether, *see, e.g.*, ████

34.     To solicit these menus of options, some large Payors send manufacturers "bid grids": tables with many cells, each corresponding to a different level of formulary management and level of formulary control. Manufacturers fill in the bid grid to offer different rebates depending on formulary placement and the level of control. During the relevant time, the two largest PBMs, Express Scripts and CVS, used bid grids to solicit rebate offers from manufacturers.[61] Other Payors solicit a variety of rebate options from manufacturers without using a formal bid grid.[62]

35.     As CVS Caremark recently explained in a federal court filing, "a manufacturer will offer a better rebate if, on any formulary, they are provided 'one of one' status—that means the manufacturer's product would be the one preferred drug on the formulary in a particular competitive category…." CVS elaborated that manufacturers offer "different, smaller rebate[s]" for "one of two" or "'one of three'" status, and so on.[63]

36.     At the end of the negotiation process, Payors and manufacturers enter rebate agreements that memorialize the conditions on which manufacturers will pay agreed-upon rebates. Most of these agreements do not include only one single rebate offer. Most often, the agreements contain an entire menu of rebate options—or an entire "bid grid"—from which particular health plans can choose—such as by selecting a standard formulary, adopting an open or closed benefit control, and/or establishing their own custom formulary.[64] Payors thereafter submit claims for rebates to manufacturers based on the number of prescriptions filled by insured customers whose health plans meet the requirements of a particular rebate category.[65]

---

[61] ████████████████████████████

[62] ████████████████████████████

[63] Ex. 55 (*U.S. v. CVS Health Corp., et al.*, ECF No. 118-1, No. 18-cv-02340-RJL (D.D.C. June 20, 2019)).

[64] ████████████████████████████

[65] ████████████████████████████

37.     If there are multiple drugs in a therapeutic class, Payors often sign rebate agreements with multiple manufacturers. For example, ███████████████████████████████

████████████████████████████████████████████████████████████████

38.     Manufacturers must pay the rebate when a health plan covers the drug in the specified formulary position and a patient with that coverage fills a prescription. But Payors generally reserve the right to alter their commercial formularies at any time, and the *only* consequence is that the Payor or its clients might not be eligible for the specified rebate.[67]

39.     Mylan's rebate agreements with Payors generally contained a variation of this provision: ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

40.     Rebate agreements are short in duration: Most bind the manufacturer to pay the agreed-upon rebates for a period of ████████████ (although, as stated above, ███████████

██████████████████████████). Rebate agreements are also frequently renegotiated during the contract term, most often at the instigation of Payors seeking better rebates.[69]

---

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
[66] ███████████████████████████████████████████████.
[67] ███████████████████████████████████████████████████
[68] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
[69] ███████████████████████████████████████████████

Consistent with industry practice, Mylan's rebate agreements with Payors typically specified a

contract term of ███████████████ and most were renegotiated at least annually, and sometimes

more frequently.[70] Sanofi's rebate agreements also typically ███████████████ and some-

times were renegotiated midterm.[71]

    41.    Most of Mylan's and Sanofi's rebate agreements with Payors provided for

███████████████████████████████████

### F.    Impact Of Competition On Formulary Coverage And Rebates

    42.    When a new drug enters the market, Payors first make a clinical determination

whether it must, may, or should not be covered on formulary.[73] Such clinical determinations are

made by a Payor's Pharmacy & Therapeutics (P&T) Committee of independent physicians and

other health-care professionals.[74] Some unique drugs are considered "must add" products, while

drugs with safety concerns may be deemed "do not add" products. If a drug enters the market in a

therapeutic class that already has therapeutic alternatives on formulary, the P&T Committee may

conclude it is "optional" to cover the new drug, at which point the Payor considers the financial

implications of adding it to formulary.[75] According to Sanofi's former Vice President, U.S.

Managed Markets, Sandy Loreaux, ███████████████████████



███████████████████████████████████ *see also, infra*
SMF §§ V-VI (describing Mylan's and Sanofi's frequent renegotiation of EAI rebate agreements in 2013-
2015).



43.     Payors view competition in a therapeutic class as an opportunity to encourage manufacturers to compete on price to obtain desirable formulary coverage.

44.     As Sanofi's expert economist has stated, "the way you get low prices in the pharmaceutical industry is by the ability to exclude drugs.… You identify a few therapeutic substitutes and you essentially hold an auction.… Whoever gives me the best price is the one I am going to buy from, and everybody else gets none of my business. When you can do that, you force price competition."[79]

## IV.     Sanofi's Launch Of Auvi-Q In 2013

### A.     Environment At Launch: Increasing Utilization Management

45.     At the time of Auvi-Q's launch, Payors were seeking opportunities to manage therapeutic classes to reduce costs for clients and patients. Sanofi's market research firm, Payer Sciences, flagged for Sanofi in its Auvi-Q launch proposal that payors,



[76]

[77]

[78]

[79] Ex. 46 (Scott Morton Congressional Testimony) at 13.



Peter Guenter, Sanofi's Executive Vice President for Global Commercial Operations from July 2013 to August 2017, testified that one reason ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████

46.    Exclusion lists—which identified drugs that would not be covered—were becoming prominent in the industry at this time. CVS removed 34 brand drugs from its standard formulary effective January 1, 2012. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ Citing CVS's exclusion list, Sanofi recognized in an internal whitepaper that Payors had begun to ███████████████████████████ Peter Guenter, in a January 2014 cover email ██████████████████████████████

███████████████████████████████████████████

████████████████████████████

47.    ESI followed suit in 2014, excluding drugs in 20 therapeutic categories. Another internal Sanofi whitepaper circulated to its Pricing Review Board in April 2014 flagged that





The whitepaper reports that, after observing that

48.     Sanofi's whitepaper highlights the following key aspects of the evolving environment across therapeutic categories:[87]



49.     ESI's Chief Medical Officer, Steve Miller, explained ESI's approach to exclusion lists in 2015: "So we went to the companies, and we told them, 'We're going to be pitting you all against each other. Who is going to give us the best price? If you give us the best price, we will move the market share to you. We will move it effectively. We'll exclude the other products.'"[88]

50.     This move towards tighter controls and exclusion lists was not limited to ESI or CVS. Indeed, after ESI came out with its exclusion list,

---

86 ████████████
87 ████████████
88 Ex. 73 (*A Conversation With Steve Miller, MD: Come in and Talk With Us, Pharma*, Apr. 5, 2015).
89 ██████

51.    During this same period, to reduce client costs, Payors also focused on obtaining

price protection from brand manufacturers for commercial accounts.[90] ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████

**B.    Sanofi's Pricing Strategy For Auvi-Q**

52.    Sanofi's pricing strategy for Auvi-Q ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ Sanofi's strategy was to ███████████████████ which, as Sanofi's then-CEO

explained, is where ████████████████████████████████████████████

███████████████████████████████████████████

53.    As shown below, Sanofi took ████████████████████████████████



marketed Auvi-Q, maintaining a WAC price premium over EpiPen for most of the period.



### C.   Sanofi's Launch Strategy

54.   When launching Auvi-Q, Sanofi was not prepared to offer Payors deep discounts for formulary position, even when Payors planned to cover just one EAI device.[98] As then-CEO Viehbacher testified:



55.   Indeed, three months *before* Auvi-Q's launch, Sanofi considered ██████████ ██████████████████████████████████████████████████████████ ████████████████████████████ Sanofi decided that, if Mylan pursued

---

[97] Ex. 75.
[98] ███████████████████████████████████████████████████
[99] █████████████████████████████
[100] ████████████

such a strategy, Sanofi would not ██████████████████ but rather would "██████
███████████████████████████████████████████████████████████
██████████████████████████████ ██

56.     Because Sanofi wanted to compete on product attributes rather than price, it initially

sought a ███████████████████████ Auvi-Q's brand lead at the time, Brian

Downey, testified that Sanofi was ████████████████████████████████

████████████████████ Patrick Barry, head of Sanofi's allergy division at the

time, agreed Sanofi was ███████████████████████████ And Sanofi's

former Head of North America Anne Whitaker testified that Sanofi's strategy for Auvi-Q was to

███████████████████████████████████████████████████

57.     The contracting guidelines that Sanofi initially adopted for Auvi-Q authorized re-

bates that were—as Sanofi's 30(b)(6) witness on rebates put ████████████████████

███████████████████████████████████████████████████

█████████[6] Sanofi's account executives reported that payors were ███████████████

███████████████████████████

58.     Within a few months of launch, the Auvi-Q team questioned whether Sanofi was

███████████████████ Downey noted, █████████████████████████████

███████████████████████████████████████████████████ In



response, Sanofi's pricing director Herve Hubert replied: ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

    59.    Sanofi remained concerned during Auvi-Q's launch year that aggressive rebates

would result in a ████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

    60.    When asked about Sanofi's contracting strategy for Auvi-Q as of September 2013,

former CEO Viehbacher testified:



**D.    Payors' Response To Launch Of Competitive Product In EAI Class**

    61.    When Auvi-Q launched in 2013, most ██████████████████████████

████████████████████████████  Instead, the major PBMs and largest commercial

insurers determined ███████████████████████████████████
██████ ████████ █████████████ ██████ █ ████████████ ████
█████ ██████ █ █ ███████████████████████████████████████
██████████████████████████████████████ the

manufacturers against one another, and obtain better pricing for clients and consumers.[122]

    62.    Sanofi's internal emails reflect that ██████████████████████





63.     Mylan's internal emails confirm

64.     ESI's representative testified:

## V.    2013 And 2014 Coverage For Auvi-Q And EpiPen

65.     When Auvi-Q launched in January 2013, ESI, CVS Caremark, Prime Therapeutics, Aetna, and Cigna, among others, treated Auvi-Q by default as covered on T3 before formal review by their P&T Committees.[132] United,

did not cover



126
127
128
129
130
131                                                5.
132

Auvi-Q at launch.[133] Throughout 2013, Mylan and Sanofi each negotiated rebate agreements with Payors that would go into effect, depending on the Payor, in the second half of 2013 or early 2014.

66.     Payors made a range of coverage decisions for EpiPen and Auvi-Q in 2014: Some managed the EAI class through tier differentials, placing one device on T2 preferred and others on T3 non-preferred. Others imposed restrictions (step edits, prior authorization requirements) on the T3 non-preferred product(s). Still others went with an exclusive EAI on formulary, excluding others from coverage. These coverage decisions varied among PBMs, health plans, and custom clients, and changed over time, including throughout 2014.[134]

67.     In all negotiations, Payors gave *both* Mylan and Sanofi the opportunity to compete through rebates and price protection, often soliciting higher rebates from both companies in exchange for preferred formulary coverage.[135]

68.     Ultimately, after negotiations with both Mylan *and* Sanofi, each Payor made its own independent coverage determination for the EAI class, based on the interests of their clients

---

[133] ████████████████████████████████████.
[134] *Infra*, SMF ¶¶ 72-74, 113, 117-20 (summarizing varying coverage decisions made by Payors).
[135] ████████████████████████████████████████████████████).
[136] ████████████████████████████████████████████████.
[137] ████████████████████████████████████████████████.
[138]

and/or members.[139] Not a single Payor testified that it was intimidated or threatened by Mylan to exclude or restrict Auvi-Q, or that Mylan threatened to cut off supply of EpiPen to Payors who would not exclude Auvi-Q. Mylan still paid rebates to Payors who covered Auvi-Q.[140]

69.    █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

70.    █████████████████████████████████

███████████████████████

71.    █████████████████████████████████

███████████████████████████████████████

████████████████████

72.    According to Sanofi's expert, seven Payors made up 86% of the commercial market from 2013-2015, as shown below.[146] Auvi-Q's coverage on the primary national formularies for each such Payor from 2013-2015 is shown alongside its commercial market share:[147]





73.     Only four of these Payors—ESI, Aetna, OptumRx, and MedImpact—excluded or restricted Auvi-Q in 2014. And two of those four—ESI and Aetna—removed those restrictions in 2015, on terms described in section IV, below.

74.     Three major Payors—CVS, Prime, and Cigna—never restricted or excluded Auvi-Q at all, covering it on T2 or T3 without restriction. As explained above (at ¶ 56), █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

75.     The negotiations for these seven large Payors are described below, in order of size.

**A.      Express Scripts ("ESI")**

76.     Consistent with Sanofi's initial strategy to ████████████████████████

████████████████████████████████████████████████████████████

████████████ However, in early 2013, ESI told Sanofi ████████████████

██████████████████████████████[150] Shortly thereafter, in March 2013, ███

████████████████████████████████████████████████████

77.     Sanofi partially responded to ESI's message, ████████████████████

---

148 ████████████████████████████████████████████████████████

149 ████████████████████████████████████████████████).

150 ████████████████████████████████

151 ████████████████

███████████████████████████████████████████████████

███████████████████ Although ESI also requested that Sanofi ███████████████

███████████████ █████████████████████ And, notably, Sanofi failed to ███████

█████████████ ████ though Sanofi's Head of U.S. Market Access had recognized ████

█████████████████████████

78.    At the same time it negotiated with Sanofi, ESI also negotiated with Mylan. Mylan

offered █████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ Critically, Mylan also offered ████████████████████

79.    Shortly before ESI announced its 2014 formularies, Sanofi submitted a ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ ████████████████████████████████████████

████████████████████████ As ESI's corporate designee testified, ESI chose EpiPen

over Auvi-Q because it was ███████████████████████████████

████ On August 29, 2013, ESI announced that EpiPen would be the only EAI device on ESI's

---

152 ███████████████████████████████████████████
153 █
154 ███
155 █
156 █.
157 ████████████████████
158 █
159 █
160 ██████████████████████████████. ███████████
161 ████████████████████

2014 National Preferred and High Performance formularies.[162]

80.     Auvi-Q was by no means the only product that ESI excluded from its standard formularies for 2014. In 2014, ESI launched a new exclusion list, under which it covered only one product—and excluded all others—in 19 different therapeutic categories.[163] EAI devices was one of those categories. Fast-acting insulins was another, and Sanofi's fast-acting insulin product with a minority share in that class—Apidra—was on the exclusions list.[164]

81.     ████████████████████████████████   For employers "not adopting the Exclusion Formulary," non-preferred products such as Auvi-Q remained covered on T3. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

**B.     CVS Caremark**

82.     ████████████████████████████████   CVS invited both Sanofi and Mylan to ████████████████████████████████████████



83.     Both Mylan and Sanofi filled in ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████   ██████████████████████████████████ Neither

company  responded  to  CVS's  invitation  to  ████████████████████████

████████████████████   On its national formulary, CVS covered both products, placing

EpiPen on T2 and Auvi-Q on T3 from July 1, 2013, to July 1, 2014.[170]

### C.     OptumRx/United

84.     OptumRx provides PBM services to United and other plans ("external clients").

85.     In February 2013, OptumRx requested that Mylan offer ███████████████

████████████████████████████████████████████████████████████████

████████████████   When OptumRx *again* requested that Mylan make an offer to

████████████████████████   Mylan offered ████████████████████████

██████████████████████████████   OptumRx rejected that bid,

telling Mylan that, ███████████████████████████████████████████████

███████████████  █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ OptumRx

and United told Mylan to ██████████████████████████████████████████



168 ████████████████████████████████████████████████████████
169 ████████████████████████████████████████████████████████
170 ██████████████████████████████████████████
171 ████████  4.
172 ████████████████████████████
173 █████████████████████
174 ██████████████
175 ███

██████ Mylan had reason to believe United would move against EpiPen, as it had done so before. United had preferred another EAI device, Twinject, over EpiPen from 2008 until 2010 ████████████████████████████████████████████████ ██

86.     OptumRx and United had separate negotiations with Sanofi. Again consistent with its initial rebating strategy, Sanofi offered ██████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ ██ █████████████████████████

███████████████████████████████████████████ ██

87.     Mylan submitted a revised bid █████████████████. Mylan presented to United █████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

88.     Sanofi submitted a revised bid ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

89.     ██████████████████████████████████████████

██████████ ██ ██████████████████████████████████████

176 ████ █.
177 ████████████████████████████████████████████ █.
178 ████████████████████████████████████████████████
179 ████████ 9.
180 ████████████████████████████████████
181 ████████████████
182 █████████████████████ █.



OptumRx told Sanofi that its offer

90. ——Sanofi submitted

91.

United excluded Auvi-Q from its formularies for about ████████████ for the second half of 2013 through the first half of 2015,[189] and OptumRx restricted Auvi-Q with a step edit or prior authorization on its 2014 standard national formularies for external clients.[190]

### D.   Prime Therapeutics

92.   From 2013 to 2015, Prime Therapeutics recommended to its members—primarily Blue Cross Blue Shield plans—a national formulary from which they could base their own formulary decisions.[191]

93.   At the time of Auvi-Q's launch, Mylan offered Prime



---

183
184
185
186
187
188
189
190
191
192

94. Prime gave Sanofi the opportunity to offer rebates in early 2013 but informed Sanofi ████████████████████████████████████████████████████ ████████████████████████████████████ Sanofi's account executive told Prime that ████████████████████████████████████████████████████ ████████████████████████ █████████████████████████████████ ██████████████████████████

95. ███████████████████████████████████ In early 2014, Prime renegotiated its EpiPen rebate agreement with Mylan. Prime had been ███████ ██████████████████████ ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████

96. Prime chose not to ██████████████████████████████ ████████████████████████████████████ Mylan responded by ██████████████████████ ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

---

193 ████████
194 ████████
195 ████████████████████
196 ████████████████████████████████████████████████████████
      ████████████████████████████████████████████ .
197 █
198 █
199 █
200 █
201 ██████████████████████████

97.     Sanofi offered Prime a ████████████████████████

████████████████████████████████████████████ Sanofi chose

███████████████████████████ Prime continued to place EpiPen as the exclusive

EAI device on T2 of its national formulary in 2014, with Auvi-Q on T3 without restrictions.[204]

98.     Prime's clients ████████████████████████ did not all follow Prime's

national formulary recommendation for the EAI class. For example, from 2013 to 2015 Horizon

Blue Cross Blue Shield of New Jersey covered both Auvi-Q and EpiPen on T2 (co-preferred).[205]

**E.     MedImpact**

99.     Upon Auvi-Q's launch, ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

100.     Before Auvi-Q's launch, Mylan was paying MedImpact ████████████

████████████████████████████ In January 2013, Mylan offered MedImpact a ██████

███████████████████████████████████████████████

███████████████████████████ MedImpact not only asked Mylan ████████████████

███████████████████████████████████████████████



[202] ████
[203] ████████████████████████████
[204] ████████████████████ 0.
[205] ████████████████████████████████
[206] ████████████████████
[207] ██ 5.
[208] ██

██████████████████████████████████████████████████████████████

████████████████████████████████

101.    MedImpact also ███████████████████████████, explaining that it ████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████ Sanofi responded by offering

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

102.    Both parties submitted revised bids █████████████████████████

████████████████████████████████████████████████████████████

Sanofi offered ██████████████████████████████████████████████████

103.    MedImpact told Mylan ████████████████████████████████ In

response, Mylan responded with a final offer: ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███  ██████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

209 ███████████.
210 ███████████.
211 █████████████████████████████
212 █
213 ██████████████████████████████████
214 █
215 █
216 ██
217 ████████████████████████████████████████████████████ ██████████
██████████████████████████████████████████

104.   MedImpact ███████████████████████████ selected EpiPen as
the exclusive EAI device on the preferred tier, ████████████████████████████
████████ MedImpact reached this decision because ██████████████████████████
█████████████████████████████████████████

105.   ████████████████████████████████████████████████ ██

███████████████████████████ Sanofi negotiated with MedImpact to ████

█████████████████████████████████████ ████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

██ ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ MedImpact client University of Michigan, for

example, added Auvi-Q to its formulary in a T2 position.[224] In addition, on open plans—██

████████████████—Auvi-Q had equal preferred positioning with EpiPen.[225]

**F.     Aetna**

107.   On May 21, 2013, Aetna created an ████████████████████████████

████████████████████████████████████████████████"[226]

Mylan subsequently offered ████████████████████████████████████████

---

218  ██████
219  ████████
220  ███
221  ███.
222  ███████████████████████████████ee.
223  ███
224  ███
225  ███
226  ████

██████████████████████████████████████████████████

█████ ███████████████████████████████████████████████

██████████████████████████████████████████

108.   Aetna simultaneously negotiated with Sanofi, ████████████████

█████████████████████████████████████████████████████

109.   Aetna announced in ██████████ that it would place a step edit on Auvi-Q on its national formulary in 2014.[230] In March 2014, Aetna offered to █████████████████

██████████████████████████████████████████████████

██████[1] Sanofi's corporate representative on the topic of Auvi-Q rebates testified that Sanofi was ███████████████ and so the restriction at Aetna stayed in place for the rest of 2014.[232]

### G.   Cigna

110.   Cigna never excluded or restricted Auvi-Q: It covered EpiPen as the preferred brand (T2) and Auvi-Q as the non-preferred brand (T3) on its main national formularies from Auvi's launch in 2013 through Auvi-Q's recall in 2015.[233]

111.   Cigna requested a rebate offer from Mylan days before Auvi-Q's launch for █████████████████████████ Mylan responded with a l████████████████████ ████████████████████████ Cigna responded by asking whether there was any ████████████████████████████████████████████████



227 █.
228 ████████████████████████████████████
229 ██████████████████████████████████████████████████████
230 ███████
231 ████
232 ██████████.
233 █████████3.
234 ████████████
235 ██████████████



████████████████████████████████  In June 2013, Mylan offered a ████████

112.   At the same time, Sanofi offered Cigna a ████████████████████

████████ Sanofi then offered ██████████████████████████

████████████████████  Auvi-Q remained on T3 with no rebate agreement.[242]

## H.   Other PBMs And Health Plans

113.   Other Payors made decisions for 2014 similar to those described above: some covered both products on the preferred brand tier;[243] some covered EpiPen on the preferred tier, and Auvi-Q as non-preferred;[244] others covered Auvi-Q on the preferred tier and EpiPen as non-preferred;[245] some covered EpiPen as the preferred brand and placed a restriction on Auvi-Q;[246]



other chose to cover only one device and selected EpiPen;[247] and at least one restricted EpiPen in favor of Auvi-Q.[248] As with the largest Payors described above, each made its own independent coverage decision based on the benefit goals of its members.

## VI. Sanofi's Successful Negotiations Improved Auvi-Q's 2015 Formulary Coverage

114.    Sanofi changed tacks for the 2015 cycle. Sanofi embarked on a plan to ████████ ████████████████████████████████████████ which meant ████████████████████ ████████████████████ As Sanofi's corporate designee on the topic of Auvi-Q rebates explained, ████████████████████████████████████████

115.    Sanofi's former CEO Viehbacher testified that it was time for Sanofi to respond with ████████████████████████████████████████████████████████ ████[1] Thus, in early 2014, Viehbacher proposed ████████████████████████████ ████████████████████████████████████ Sanofi's Head of North America agreed that Sanofi should ████████████

116.    As described in more detail below, when ████████████████████ it won access on accounts that had restricted Auvi-Q for 2014. Indeed, on some formularies, Auvi-Q became the only listed EAI device and EpiPen was excluded. Sanofi's senior executives celebrated their



247
248
249
250
251
252
253

success. In the words of Sanofi's CEO, ███████████████████ With its new strategy,

Sanofi was ████████████████████████████████████████████

████████████████████████████████████████████████

117.    First, Sanofi succeeded in reversing its exclusion from ESI's national formulary.

Sanofi's North American management got approval to ██████████████████████████

████████████████ For the first time, Sanofi offered ████████████.[257] Further, █

████████████████████████ Sanofi made a ████████████████████

█████████████████████████████████████████████████

██████████████████████████ ████████████████████████

█████████████████████████████████████████████████

████████████████████ According to Viehbacher, ████████████████████

████████████████████████████████████ Initially, ESI decided

to ██████████████████████████████ On further analysis, ESI con-

cluded that it could ██████████████████████████████████████

████████ and decided to cover both products on its national formularies but exclude EpiPen on

its High Performance formulary in favor of Auvi-Q.[262] ████████████████ testified ESI's

representative, ████████████████████████████████████████

254 ████
255 ████████████
256 ████
257 ████████████████████████████
258 ████████████████████████
259 ████████████████████
260 ████████████
261 ████
262 ████████████████████████████████████

████████████████████



118.   Next, Sanofi offered Aetna a ████████████████████████████████ ████████████████████████████████████████████ In response, Aetna ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████ Aetna then ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████ Aetna then made EpiPen and Auvi-Q co-preferred on its value and premier formularies effective January 1, 2015.[268]

119.   Sanofi's success was not limited to ESI and Aetna. Sanofi also improved its coverage at CVS by offering ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████   ████████████████████████████████ ██████████████████ Through this competitive offer, Sanofi not only secured co-preferred T2 formulary coverage for Auvi-Q on CVS's Preferred Drug List, but also became the sole preferred drug (with EpiPen excluded) on CVS's Value Based Formulary beginning July



1, 2014, and CVS's Advanced Control Formulary beginning October 1, 2014.[271] CVS also

██████████████████████████████████████████████████████████████

████████████████████████  ████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████  ████████████████████████████████████████████

████████████████████████████████  EpiPen remained excluded until early

November 2015, after Auvi-Q was completely recalled from the market.[275]

    120.   In 2015, Sanofi also maintained the coverage it had secured at Prime and Cigna,

among others. ████████████████████████████████████████████████

██████████████████████████████████████████████████



    121.   In 2015, Sanofi failed to obtain favorable coverage only when ████████████

██████████████  For example, Sanofi was ████████████████████████████████

██████████████████████████████████████████████████████████████

271 ████████████████████████████████.
272 ████████████████████████████████████████████████████
    ████████
273 ████████████████████████████████.
274 ████████████████
275 ████████████████████.
276 ██████████████████████████████████████  ████████████
████████████████████████

███████████████████████████████████████████ Sanofi refused

███████████████████ offering instead █████████████████████

███████████████████████████████ ██████, by contrast,

offered ████████████████████████████, and maintained its

position as the exclusive EAI on formulary.[279]

122.  Similarly, when Sanofi asked MedImpact in ████████████████

████████████████████ MedImpact told Sanofi ████████████

█████████████████████████████████████████

██████████████████████████████

123.  Other Payors continued to leverage the competition in 2015 to secure deeper dis-

counts from Mylan. For example, after Sanofi ████████████████████

Prime reminded Mylan ███████ it was seeking █████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████ Prime asked that Mylan

█████████████████████████████████████████

███████[3] In response to this pressure, Mylan offered ████████████

124.  In April 2015, after seeing that Auvi-Q had regained ████████████



277
278 ████ 8.
279 ██████████████████████████
280 ██████
281 ████ .
282 █████████ ).
283 ████
284 ████████████████████

45

█████████ Sanofi's newly appointed CEO, Dr. Olivier Brandicourt, asked the U.S. team to prepare an ███████████████████████████ ████████ ███████████ The team developed and Paris senior leadership approved a plan providing for ██████████████████

125.    Sanofi's Complaint includes a graph depicting Auvi-Q's market share losses in 2014—but Sanofi includes the shaded portion only, omitting the second half below that shows ████████████████████████████████████



## VII.   Role Of Market Share And Contestability Of EAI Demand

126.    Although market share is one of many factors Payors consider in making coverage determinations, *no Payor* testified that the size of EpiPen's market share prevented it from adding Auvi-Q to its formularies, or from excluding EpiPen in favor of Auvi-Q.

### A.   Power To Move Share

127.    Many Payors testified ████████████████████████████ ████████████████████████████████ ██████████████████



285 ████████████
286 ████████████
287 ████████████████
288 ████████
289 *Compare* ECF No. 1, ¶ 69 ██████████



128.    ESI has used its drug exclusions list to exclude numerous popular products with high market shares, including GlaxoSmithKline's leading asthma medication, Advair, and Gilead's leading Hepatitis C treatment, Sovaldi.

129.    Sandy Loreaux, Sanofi's former VP, U.S. Managed Markets, conceded this is how PBMs operate:

Sanofi's market access and payor research consultant from Payer Sciences



agreed that PBMs are ████████████████████████████████████

████████████████ He also agreed that Payors were ███████████████████████ █

**B.     When EpiPen Was Excluded, Market Share Did Move To Auvi-Q**

130.    Where Payors did exclude EpiPen, patients shifted to Auvi-Q. For example, CVS

Caremark excluded EpiPen in 2014 from its Advanced Control Formulary ("ACF") and █████████

████████████████████████████████████████████████████████████████ CVS

Caremark also told Mylan it ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Mylan confirmed that ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

CVS projected that, ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

131.    ESI's corporate representative testified █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Sanofi, too,

assumed in crafting its 2015 commercial bid for ██████████████████████████████



██████████████████████████████████████████████████

And when ESI ultimately excluded EpiPen from its High Performance Formulary, ████████

██████████████████████████████████████████████████

████████████████████████████████████

## VIII.   Impact Of Rebate Negotiations

132.   Total output of EAI devices in the U.S. increased every year from 2008 to 2015.[306]

133.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

134.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

135.   ████████████████████████████████████

██████████████████████████████████████████████████



304 ██████████████████████████████████████████████
305 ███████████████████████████████████
306 ████████████████████████████
307 █████████████████████████████████
308 ███████████████████████████████
309 ████████████████████████
310 ████████████████████████████████████████

██████ ██  ███████████████████████████████████████████████

███████████████████████████████████████

## IX.   EpiPen4Schools® Program

136.   In 2012, Mylan Specialty launched its EpiPen4Schools® program to donate four free EpiPens to any school that wanted them, no strings attached. Mylan also replaced used or expired EpiPens. Through that program, Mylan has given away more than 1,000,000 free EpiPen products to schools.[312] Mylan offered a discount for schools that wanted more than the four free EpiPens on site, with two discount levels available: a discount with no conditions relating to competing products, and a *greater* discount if the school certified it would purchase only EpiPen products and not competing products for twelve months.[313] Mylan eliminated the certification requirement for the deeper discounts in or around June 2016.[314] As of September 2016, Mylan had sold just under 45,000 EpiPens to schools through the discount program (both levels combined).[315] Sanofi never implemented a program to donate Auvi-Q devices to schools.[316]

## X.   Sanofi's Own Drug Rebates For Positioning And Exclusivity

137.   Sanofi's CEO, Dr. Brandicourt, recently testified before the Senate Finance Committee that "manufacturers pay significant rebates as a percentage of the list price … in an effort to improve access for patients" and that those rebates "lower net prices."[317] Dr. Brandicourt elaborated that Sanofi pays "high rebates" to get "preferred position" for its drugs.[318] In 2018, for



example, Sanofi paid out 55% of its gross sales in rebates, including $4.5 billion in mandated rebates to government payors, and $7.3 billion in "discretionary rebates."[319]

138.    As shown from the rebate negotiations described above, Sanofi's rebating practices are not new: Sanofi routinely offered ███████████████████████████████████████

███████████████████████████████████████████

139.    During that same time period, when Sanofi's own market-leading drug, Lantus—which had an estimated ██████████████████████████—faced a competitive threat from Novo Nordisk's Levemir, Sanofi defended Lantus's formulary coverage by offering ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

140.    Just as they did when Auvi-Q launched, Payors leveraged the competitive environment in the insulin market to extract deeper rebates from Sanofi, including for exclusivity. Anne Whitaker reported to Sanofi's European leadership in November 2013: ██████████████████

██████████████████████████████████████ Peter Guenter testified that, ████████████████████████████████████████████

████████████████████████████████████████████████





Guenter explained that,

[325] When asked why Sanofi would bid for an exclusive position when it had 80% market share, Sanofi's former CEO explained

If Levemir had

obtained                                              testified Guenter,

Thus, Sanofi offered

141.    Sanofi succeeded in securing exclusive formulary placement for Lantus on certain formularies, resulting in the restriction or exclusion of competitive products.[329]

She wrote in September 2015:

## XI.    The Complete Class I Recall Of Auvi-Q And Sanofi's Return Of Rights

142.    Auvi-Q's upward 2015 trajectory was abruptly halted when Sanofi learned of multiple manufacturing defects in the device and completely recalled Auvi-Q from the market.



324
325
326
328
329
330

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

143.    On the first day of the Bridgewater inspection, the FDA informed Sanofi that ████

███████████████████████████████████████████████████

███████████████████████████████████████████ A Class I recall is "a

situation in which there is a reasonable probability that the use of … a violative product will cause

serious adverse health consequences or death."[334]

144.    █████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

145.    On October 26, Sanofi decided to effect a voluntary Class I recall of all Auvi-Q

devices in U.S. and Canada. Sanofi also discontinued Auvi-Q manufacturing operations. In a letter

to FDA, Sanofi explained that this recall was █████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Sanofi publicly announced the recall on October 28, 2015.[337]

146.    On December 5, 2015, the head of Auvi-Q, Patrick Barry, received an updated slide

deck in connection with ████████████████████████████████████████.

---

[332] ███████████████████████████████████████████████

██████████████████████████████████████████████████

[333] ███████████████████████████████████████

[334] FDA Website, Recalls Background and Definitions, https://bit.ly/2KSY1wC.

[335] ████

[336] ███████████

[337] *Auvi-Q (epinephrine injection, USP) Recall*, Sanofi, Oct. 28, 2015, https://bit.ly/2xhRrYE.

This slide deck projected that 

147.

Sanofi's then-Head of Global Commercial Operations testified that

## STANDARD OF DECISION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party can carry its initial burden of demonstrating a lack of genuine dispute in two ways: "either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

"[S]ummary judgment is not a disfavored procedural shortcut. Instead, it is an important procedure designed to secure the just, speedy and inexpensive determination of every action." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, No. 12-cv-2760-DDC-KGS, 2016 WL

---

338
339
340
341

1377342, at *14 (D. Kan. Apr. 7, 2016), *aff'd*, 851 F.3d 1029 (10th Cir. 2017).[342] "[S]ummary judgment has particular importance in the area of antitrust law, because it helps to avoid wasteful trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces." *Id.*

## ARGUMENT

No "reasonable jury," *Anderson*, 477 U.S. at 248, could find that Mylan engaged in anti-competitive conduct. The undisputed fact that Mylan never priced below its costs alone suffices to defeat Sanofi's claim challenging Mylan's discounting practices. And all other arguably applicable tests also demonstrate as a matter of law that Sanofi was not unlawfully foreclosed from competing. Nor can Sanofi demonstrate antitrust injury or that it is entitled to damages.

## I.     Mylan Did Not Act Anticompetitively

Mylan's agreements with Payors were proper under existing antitrust law, as they pass the price-cost test and bear none of the hallmarks of anticompetitive agreements condemned under other rubrics such as "exclusive dealing." The Court should reject Sanofi's attempt to avoid these principles by extending antitrust law in an unprecedented way. And Sanofi's other claims, over Mylan's supposedly deceptive advertising and its EpiPen4Schools program, are equally baseless.

### A.     Mylan's Agreements Pass The Price-Cost Test, Which Ends This Case

In its decision on Mylan's motion to dismiss Sanofi's complaint, this Court rightly applied the Third Circuit's test for challenges to pricing behavior: "[W]hen price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects." ECF No. 98, at 11-15 (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d

---

[342] All internal quotation marks and citations are omitted unless otherwise noted.

254, 275 (3d Cir. 2012)). Discovery has proved that price was the clearly predominant mechanism of exclusion. Because Mylan always priced EpiPen above cost, summary judgment should follow.

### 1.    Price Was The Clearly Predominant Mechanism Of Exclusion

Price is the "clearly predominant mechanism of exclusion" when it serves as the paramount motivator for customer decisionmaking. In *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. 08-4168 (MLC), 2014 WL 1343254 (D.N.J. Mar. 28, 2014), a case in which Sanofi was sued under the Sherman Act for offering market-share discounts on the anticoagulant Lovenox, the district court found price to be the "clearly predominant mechanism of exclusion." The court held that the "only leverage" Sanofi (the defendant in that case) had to get hospitals to accept its discounts "was price, specifically the loss of the steep discounts." *Id.* at *26-29.[343] So too here. The only "leverage" that Mylan used to seek and obtain a preferred formulary position over Auvi-Q "was price," specifically the offer of "steep discounts." *Id.* at *26. As the court held in *Eisai*, relabeling Mylan's conditional rebates as "penalties" or "taxes" would be merely a "matter of semantics," and "[t]he label given does not change the nature of [Sanofi]'s claim." *Id.* at *28.

The *Eisai* court contrasted its facts with *ZF Meritor*, in which price was held not to be the predominant method of exclusion. In *ZF Meritor*, a manufacturer of truck transmissions threatened to stop supplying original equipment manufacturers ("OEMs") if they did not enter into exclusive agreements. *ZF Meritor*, 696 F.3d at 277-78. Here, as in *Eisai*, Mylan "did not threaten to cut off its customers' supply, and there is no evidence that [Payors] feared the loss of [Mylan] as a supplier by buying rival drugs." 2014 WL 1343254, at *26; SMF ¶ 68.

This case is unlike *ZF Meritor* for additional reasons. First, Mylan's agreements with

---

[343] In affirming the district court, the Third Circuit did not decide whether price was the predominant method of exclusion, reasoning that, because "Eisai's claims [were] not substantiated and … fail[ed] a rule of reason analysis," it did not matter whether price predominated. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016).

Payors were short and easily terminable, SMF ¶¶ 40-41; that was not so in *ZF Meritor*. 606 F.3d at 277. Second, in *ZF Meritor* several OEM officials testified that exclusive agreements were "not a common practice in the industry and, in fact,… probably detrimental to customers." *Id.* Here, many Payors sought these agreements, *e.g.*, SMF ¶¶ 45-50, 67, 82, 85, 100, and Sanofi, Mylan, their experts, and the Payors all agree that formulary exclusion, step-edits, and prior authorizations are common in the industry, *id.* ¶¶ 23-28. ███████████████████████████

████████████████████████████████████████████████████████████████████████

Fundamentally, the reason Sanofi was disadvantaged on some (but not all) formularies in 2014 was price—Auvi-Q cost more. For most of the time Sanofi sold Auvi-Q, it priced Auvi-Q at a premium to EpiPen. █████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Sanofi's documents show that Sanofi ██████████████████████████████████████████████

████████████████████████████████████ Sanofi was not a lower-priced entrant seeking to take share from a higher-priced incumbent through price competition.

Auvi-Q's per-unit net cost to Payors—*i.e.*, WAC minus rebates—was also higher than EpiPen's. The four largest exclusions and restrictions that Auvi-Q suffered were the step-edits by MedImpact (July 1, 2013) and Aetna (January 1, 2014), and the benefit exclusions by ESI (January 1, 2014) and United (July 1, 2013). *Id.* ¶ 73.[344] Those decisions to exclude or restrict Auvi-Q were made only after each Payor considered competing bids. *Id.* ¶¶ 67-70, 76-81, 84-91, 99-109.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████   ██████████████████████████████████████████████

---

[344] These four Payors "accounted for 89.7% of the commercial lives covered by plans that put Auvi-Q on [prior authorization/step edit] or 'Not Covered' status" as of the third quarter of 2014. Ex. 39 ¶ 73.



Such a result "is understandably not to the liking of plaintiffs," but "it is precisely the result which a competitive bidding process is expected to yield: the contract was awarded to the lowest bidder." *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1516 (D.S.C. 1987).

Sanofi's executives could not name **one occasion** when Sanofi had offered a lower per-unit price and still had been excluded from a formulary or subjected to a prior authorization or step-edit. SMF ¶ 69. Sanofi's CEO for 2013 and 2014 attributed Auvi-Q's exclusions from certain formularies to Mylan's "████████████████████" Ex. 30 (Viehbacher Dep.) at 122. And Sanofi's expert, Dr. Scott Morton, could not identify any instance when Sanofi offered a lower net price for Auvi-Q and was restricted. She did not look at net price, or indeed Payor testimony, at all:

> Q:   Can you identify a single instance in which Sanofi offered a lower net price per unit than Mylan and was still excluded or restricted from a formulary?...
>
> A:   The net price doesn't – is not the thing that the plan is paying attention to. The plan is paying attention to their total cost, okay? Their total cost is not determined by the number of pens times the net price. That's how we buy apples, but that's not how we buy pens in this – under the contract established by Mylan....
>
> Q:   So you understand that a number of PBMs were deposed in this case?
>
> A:   Yes....

Q:      Did you read the testimony?

A:      I don't recall reading PBM depositions, no.

Q:      Do you know whether ... any PBM representative testified in a way that supports what you just said about the PBM decision-making process? …

A:      I don't – I haven't read them so I don't recall. I don't know. Ex. 26 (Scott Morton Dep.) at 148-49; 157-58.

Sanofi's turnaround in 2015 reinforces the conclusion that price competition was the clearly predominant mechanism of Auvi-Q's exclusion. Sanofi's leadership decided to "███████" with "███████" rebate offers, SMF ¶¶ 115-16; in other words, Sanofi lowered the per-unit cost for Auvi-Q. When it did so, Sanofi gained placement on Tier 2 on the national formularies for two of the major Payors discussed above—ESI and Aetna—that had previously excluded Auvi-Q. *Id.* ¶¶ 117-18. All that changed from 2014 to 2015 was the price Sanofi offered: it offered deep rebates on Auvi-Q to both ESI and Aetna and ████████████████████████ ████████████████████ *Id.* And Sanofi's decision to compete on price led to even lower prices for Payors. For 2015, Mylan ended up discounting more deeply than Sanofi did for access to Aetna's formulary; it paid a ███████████████████ *Id.* ¶ 118. Moreover, Sanofi's successes as a result of reducing Auvi-Q's price in 2015 were not limited to regaining coverage; it secured preferred coverage at CVS; maintained coverage on all formularies that had covered Auvi-Q before 2015; and was able to convince ESI and CVS to disadvantage EpiPen on several value formularies. *Id.* ¶¶ 117-20.

Even Dr. Scott Morton's report shows that price was the clearly predominant mechanism. As discussed further below, Dr. Scott Morton's novel theory applies antitrust concepts developed in multi-product bundling cases to allegations related to the sales of a single product. The traditional multi-product bundling case features a "bundle" of two or more separate products—for example, the two types of vaccines at issue in *Castro v. Sanofi Pasteur, Inc.*, Civ. No. 11–7178

(JMV)(MAH), 2017 WL 4776626, at *1 (D.N.J. Oct. 23, 2017). "Significantly," however, Sanofi "does not claim that [Mylan] conditioned discounts on purchases across various product lines, but on different types of demand for the same product. Such conduct does not present the same anti-trust concerns as in *LePage's*, [*Inc. v. 3M*, 324 F.3d 141, 158-59 (3d Cir. 2003) (en banc),] and we are aware of no court that has credited this novel theory." *Eisai*, 821 F.3d at 405-06.[345]

Unlike the traditional bundling case, Mylan's conduct at issue bears on only one product—the EpiPen. In Dr. Scott Morton's view, there were two types of demand for EAI devices: contest-able demand, which was up for grabs between competing EAIs; and incontestable demand, which only EpiPen could satisfy. *See* Ex. 35 ¶ 76. As she tells it, because Mylan offered the highest rebates in exchange for exclusivity, and because only Mylan could fulfill the "incontestable" por-tion of demand for EAIs, Payors had to accept exclusivity if they wanted the highest rebates. *Id.* ¶¶ 175-78. But, even if the Court were to accept Dr. Scott Morton's contentions (which fly in the face of undisputed evidence), it remains clear that price was the clearly predominant mechanism of exclusion. Under her theory, Payors accepted Mylan's rebate offers because they wanted to pay the lowest possible price for the EpiPen devices they were going to buy anyway.

Auvi-Q's formulary positions were always based on Payors' desire to pay the lowest possible price. In such circumstances, price was the only—not just the clearly predominant—mechanism of exclusion, and the price-cost test precludes antitrust liability.

### 2.      It Is Uncontested That Mylan's Per-Unit Prices Were Above Cost

The second part of the *ZF Meritor* test is simple: "[W]hen price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the

---

[345] The paragraph from which these two sentences are quoted rejects the analysis of Professor Einer Elhauge, an expert for the plaintiff in that case against Sanofi. Having successfully shown the flaws in Elhauge's analysis in *Eisai*, Sanofi now turns around and, as a plaintiff against Mylan, relies on the same flawed analysis, presented by the same expert in the class case and by Dr. Scott Morton in this case.

procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects." 696 F.3d at 275. Here, it is undisputed that Mylan priced above cost. Dr. Willig conducted a price-cost test. SMF ¶ 71; Ex. 39 at Exs. 7a-b. All of Mylan's contracts pass it. *Id.* Sanofi does not contest those findings. SMF ¶ 71; Ex. 36 ¶¶ 127-31. The analysis ends here, and this Court should grant summary judgment to Mylan.

### B. No Aspect Of Existing Antitrust Law Condemns Mylan's Agreements

Even if the Court analyzed Mylan's conduct as "exclusive dealing" rather than price competition, summary judgment would be appropriate. "Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor*, 696 F.3d at 270; *see also, e.g.*, *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2004) ("[I]n many circumstances [exclusive dealing agreements] may be highly efficient … and pose no competitive threat at all."). What is more, "competition for [an exclusive] contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004). "[E]xclusive supply contracts or exclusive dealing agreements have been frequently upheld when challenged on antitrust grounds." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010).

Because exclusive dealing is often procompetitive, courts evaluate it under the rule of reason. *See, e.g.*, *Eisai*, 821 F.3d at 403; *cf.* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1807b (2018) [hereinafter Areeda & Hovenkamp] ("A discount conditioned on exclusivity should generally be treated as no different from an orthodox exclusive-dealing arrangement."). The Supreme Court's standard for evaluating exclusive dealing has not changed since 1961: A contract violates the antitrust laws only if it "foreclose[s] competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

Since *Tampa Electric*, lower courts have considered several factors in evaluating whether an exclusive deal violates the Sherman Act. *ZF Meritor* lists them: (i) whether the defendant has "significant market power"; (ii) "substantial foreclosure"; (iii) "contracts of sufficient duration to prevent meaningful competition by rivals"; (iv) "an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects"; (v) "whether … the dominant firm engaged in coercive behavior"; (vi) "the ability of customers to terminate the agreements"; and (vii) "[t]he use of exclusive dealing by competitors of the defendant." *ZF Meritor*, 696 F.3d at 271-72. When judged under those factors, the offers Mylan made to Payors in no way resemble the exclusive deals that courts have found to violate the antitrust laws.[346]

### 1.  Mylan's Contracts Were Short-Term And Easily Terminable, And They Did Not Prevent Payors From Making Formulary Changes

"Discounts conditioned on exclusivity in relatively short-term contracts are rarely problematic," Areeda & Hovenkamp ¶ 1807b1, because, though "a dominant firm's ongoing policy of offering discounts in exchange for exclusivity gives buyers incentives to stay with the same firm[,] … any above-cost discount can be matched by an equally efficient firm." *Id.* "Even an exclusive-dealing contract covering a dominant share of a relevant market need have no adverse consequences if the contract is let out for frequent rebidding." *Id.* ¶ 1802g2.

Therefore, "the short duration and easy terminability of [exclusive dealing] agreements negate substantially their potential to foreclose competition." *Omega Envtl., Inc. v. Gilbarco, Inc.*,

---

[346] Because Sanofi cannot show anticompetitive foreclosure as a matter of law, Mylan has not moved for summary judgment on the issue of market power. This is not a concession that market power exists or even that there is a genuine dispute of material fact about Mylan's lack of market power. Dr. Willig explains in his expert report why Sanofi has failed to meet its burden of proof to show either a relevant market or market power. Ex. 39 ¶¶ 307-39. *See, e.g.*, *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425-29 (9th Cir. 1993) (reversing jury verdict for plaintiff in Section 2 case with instructions to enter judgment for defendant because, in absence of proof of power to control price or exclude competition, no reasonable jury could find monopoly power even though defendant had 100% share of the relevant market).

127 F.3d 1157, 1163 (9th Cir. 1997); *see also, e.g.*, *Methodist Health Servs. Corp. v. OSF Health-care Sys.*, 859 F.3d 408, 410-11 (7th Cir. 2017); *ZF Meritor*, 696 F.3d at 286-87; *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977-78 (6th Cir. 2000); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (Breyer, J.). Instead, "[t]he best example of a possible threat to competition exists where a market is already heavily concentrated and *long-term exclusive dealing contracts* … foreclose so large a percentage of the available supply or outlets that entry into the concentrated market is unreasonably constricted." *E. Food Servs.*, 357 F.3d at 8 (emphasis added). That is not this case.

Three cases show the rationale. In *Methodist Health*, there was "no evidence that [the de-fendant]'s exclusive contracts [had] a significant exclusionary effect, since most of the contracts expire[d] every year or two, giving other hospitals … a shot at obtaining the next contract by outbidding [the defendant]." 859 F.3d at 410 (affirming summary judgment for defendant). When the contracts "terminate[d], the insurance companies [were] free to strike deals with other hospitals—with [plaintiff], for example." *Id. Omega Environmental* overturned a jury verdict using similar reasoning. The defendant's agreements had "an initial term of one year" and were "thereafter expressly terminable by either party, without cause and without penalty, on 60 days notice." 127 F.3d at 1160. Those terms "negate[d] substantially" any potential foreclosure of competition. *Id.* at 1163. "Because *all* of [the defendant]'s distributors are available within one year, and *most* (90% according to the plaintiffs) are available on 60 days notice, a competing manufacturer need only offer a better product or a better deal to acquire their services." *Id.* at 1164. And in *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, it was "significant that the market-share discount and sole-source agreements … did not contractually obligate Tyco's

customers to purchase anything from Tyco. Rather, the agreements provided only for substantial discounts to customers that actually purchased a high percentage of their sensor requirements from Tyco." 592 F.3d 991, 996 (9th Cir. 2010) (affirming summary judgment for defendant).

Mylan's agreements with Payors were universally short in duration. SMF ¶ 40. They lacked any sort of onerous termination provisions. *Id.* ¶ 41. They did not obligate anyone to buy anything. *See id.* ¶¶ 38-39. And Payors were generally free to remove EpiPen from formulary *at any time*. *E.g.,* Ex. 66 § 3.B ███████████████████████████████████████████████ ████████████████████████████████████████████████████ SMF ¶¶ 38-39. These rebate agreements embodied *all* the virtues identified in *Methodist Health*, *Omega Environmental*, and *Tyco*—indeed, as a general matter, Payors were free to remove EpiPen from formulary *at any time* As in *Methodist Health*, "[i]f [Sanofi] can't outbid [Mylan]—if a [Payor] prefers to contract with [Mylan], the logical inference is that [Mylan] offered the [Payor] a better deal...." 859 F.3d at 410-11; *see also Omega Envtl.*, 127 F.3d at 1164 (noting that because of easy terminability customers "need[ed] only offer ... a better deal" to win business). Offering a better deal is the competition the Sherman Act *encourages*, not a basis for treble damages.

Short-term and easily terminable agreements like these are good for consumers. "Such a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing [sellers] have a strong incentive continually to improve the [products] and prices they offer in order to secure the exclusive positions." *Balaklaw*, 14 F.3d at 799; *see also Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996) (with short-term exclusive contracts, "competition for the contract makes it possible to have the benefits of exclusivity and rivalry simultaneously"). Payors ██████████████████████████████████████ ███████████████████████████████████ until safety problems led to Auvi-Q's recall. *E.g.,*

SMF ¶¶ 42, 61, 99. This is the quintessence of competition, not a Sherman Act violation.

### 2.     Mylan Did Not Coerce Any Customer Into Accepting An Exclusive Deal

"Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and *there is some element of coercion present*." *ZF Meritor*, 696 F.3d at 284 (emphasis added); *see also, e.g.*, *Race Tires*, 614 F.3d at 77 (coercion "has played a key, if sometimes unexplored, role in the relevant case law, especially in the Section 2 context"). Here, all Mylan did to induce Payors to exclude Auvi-Q was offer discounts—often at the Payors' request.

Courts have held that such conduct is not inherently coercive. In *Race Tires*, for example, the plaintiff was a tire supplier. 614 F.3d at 62. The defendant sanctioning body adopted a "single tire rule" allowing only the use of one supplier's tires in the races it sanctioned; the defendant supplier won those contracts, and the plaintiff supplier lost and sued under Section 2. *Id.* at 62-69, 72-73. The "standard form contract" the defendant supplier offered "provide[d] for payments to the sanctioning body, last[ed] for a lengthy period of time, contain[ed] an automatic renewal provision, and allegedly provide[d] that, if the sanctioning body exercised its right not to renew, the remaining financial contribution to the sanctioning body would be forfeited." *Id.* at 78. The court held that those terms did not subject the supplier to antitrust liability; "the sanctioning organization or promoter ultimately decides whether or not to enter into a contract with [the defendant supplier] requiring [exclusivity] … in their own best interest" and "it appears clear that the major sanctioning bodies themselves generally prefer the single tire and, at least sometimes, desire a [defendant supplier]-only rule." *Id.* The court rejected the idea that offering a payment in exchange for exclusivity was inherently coercive, holding it "no more an act of coercion … than it is for … suppliers to offer the lowest tire prices." *Id.* at 79. *See also Indeck*, 250 F.3d at 978

(emphasizing "voluntar[y]" nature of customers' choice to enter into exclusive contract); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir. 1999).

By contrast, the Third Circuit found enough evidence of coercion to support a verdict for the plaintiff in *ZF Meritor*: "there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering" exclusive deals, as "[p]laintiffs presented testimony from OEM officials that many of the terms ... were unfavorable to the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton's transmissions, the OEMs would be unable to satisfy customer demand." 696 F.3d at 285. And in *United States v. Dentsply International, Inc.*, the court condemned an "exclusivity policy imposed by a manu-facturer" of artificial teeth, 399 F.3d 181, 184 (3d Cir. 2005); coercion existed because, when the tooth dealers tried to add other lines of artificial teeth "because of customers' demand, Dentsply threatened to sever access not only to its teeth, but to other dental products as well." *Id.* at 190.[347]

These holdings are logical and consistent with economic theory and common experience. It is not unusual, for example, for a law firm's client to decide that it can get better service from one law firm than from two or more, and to ask a firm to offer it a substantial discount in exchange for all the client's business. To call such an arrangement "anticompetitive" would be absurd, for-getting entirely the Sherman Act's purpose to protect consumers by encouraging competition.

The evidence reveals no coercion by Mylan. Some Payors decided they only wanted one EAI device on formulary and asked for Mylan and Sanofi's best offers, *e.g.*, SMF ¶¶ 61-63, 67,

---

[347] The *ZF Meritor* court's reading of *Dentsply* was that it held exclusive dealing illegal "where the defendant threatened to refuse to continue dealing with customers if customers purchased rival's products, and no customer could stay in business without the defendant's products." *ZF Meritor*, 696 F.3d at 278; *see also, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 834, 838 (11th Cir. 2015) (condemning requirement, backed up by threat of cutting off supply, that customers buy all pipe fittings from McWane because it was "unilaterally imposed by fiat" and "made it infeasible for distributors to drop the monopolist McWane and switch to" competitor).

101, 113, while others sent out general bid request forms (or "bid grids") that requested bids for exclusivity among other requested formulary position bids, *id.* ¶¶ 76, 82. Mylan also took the initiative to offer certain Payors bids for exclusivity. *Id.* ¶ 67. Mylan cannot be condemned for bidding for exclusivity *when customers requested it*. *See, e.g.*, *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007) (en banc) (court cannot "ignore the demands of the marketplace in which these agreements arose" and, "[i]f *retailers* have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against a *supplier* for acquiescing to that requirement"). Even where Mylan initiated the discussion of exclusivity, Mylan never threatened to cut off supply of EpiPen or any other Mylan products, and paid rebates to Payors who covered Auvi-Q on formulary. SMF ¶ 68. The Payors "ultimately decide[d] whether or not to enter into a contract with [the defendant supplier] requiring [exclusivity] … in their own best interest." *Race Tires*, 614 F.3d at 78. If anyone had "coercive" power, it was the Payors, ███████████████████████████████████████ ████████████████████████████████

Nor did Mylan make "all-or-nothing" discount offers like those condemned in *LePage's, Inc. v. 3M*, 324 F.3d 141, 158-59 (3d Cir. 2003) (en banc). There, 3M offered no discounts unless customers excluded its rival, whereas here Mylan ████████████████████████████████ ████████████████████████ *E.g.*, SMF ¶¶ 78, 83, 87, 95, 102, 111, 113. Moreover, many individual plans who maintained custom formularies made different choices than the Payor made for its primary formulary, confirming the lack of any coercion. *E.g.*, SMF ¶¶ 81, 106. As one example, a Sanofi internal document showed that ██████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████. Finally, two of the largest Payors to restrict Auvi-Q on formulary in 2014—ESI and Aetna—returned it to

formulary in 2015. *Id.* ¶¶ 117-18. A coerced customer would be unable to do such a thing.

Even apart from the lack of basis for any such argument, Sanofi's position demonstrates the contradiction at the heart of its case. When Sanofi was excluded, Mylan had offered lower prices. Nobody needs to be coerced into accepting a lower price, as the court held in *Eisai*.

Sanofi (there, the defendant) was accused of using discounts to foreclose the market to a new entrant. Sanofi's Lovenox was the dominant anticoagulant, while Eisai's new drug Fragmin struggled to gain market share. Eisai sued because it had failed to compete successfully. *Eisai*, 821 F.3d at 399. When Eisai entered, Sanofi put in place loyalty discounts ranging "from 9% to 30% of the wholesale price." *Id.* at 400. Discounts began at 75% market share, but the consequence of not obtaining 75% market share was that a customer would receive only a 1% base discount. If a customer terminated the contract, it was required to give thirty days' notice and could still purchase Lovenox "off contract" at the wholesale price. *Id.* Eisai accused Sanofi of "bundling each custo-mer's contestable demand for Lovenox … with the customer's incontestable demand for Love-nox," so that "customers occupying a certain spectrum of market share would not save money by partially switching to a rival drug, even if the rival drug was cheaper than Lovenox." *Id.* at 401.

Though the Third Circuit noted that "no court … ha[d] credited" Eisai's (now Sanofi's) theory, it had no need to decide its validity. *Id.* at 406. Instead, it simply stated that, "[e]ven if bundling of different types of demand for the same product could, in the abstract, foreclose com-petition, nothing in the record indicates that an equally efficient competitor was unable to compete with Sanofi" because the only consequence if customers didn't meet the market-share targets was a lost discount. *Id.* "[T]he threat of a lost discount [was] a far cry from the anticompetitive conduct at issue in *ZF Meritor*." *Id.* at 407. The mere "threat of a lost discount" left customers "free to switch to a different product in the marketplace," and thus no customers "were foreclosed from

purchasing competing drugs as a result of Sanofi's conduct." *Id.* at 403, 407.

As Sanofi did in *Eisai*, Mylan offered varying discounts for varying degrees of exclusivity. SMF ¶¶ 33-36, 78, 83, 87, 95, 102, 111, 113. As in *Eisai*, the only "penalty" for including Auvi-Q on formulary was a lower discount. As in *Eisai*, "nothing in the record demonstrates that a [Payor]'s supply of [EpiPen] would be jeopardized in any way." *Eisai*, 821 F.3d at 407. The *Eisai* court's insight was that "the threat of a lost discount" was not a severe enough consequence to "'break the competitive mechanism and deprive customers of the ability to make a meaningful choice.'" *Id.* at 404, 407 (quoting *ZF Meritor*, 696 F.3d at 285). Here, customers had that same meaningful choice: a certain discount if EpiPen was exclusive or a lesser discount if the customer chose to include more than one device.

"That retailers and manufacturers *like* exclusive deals implies that they serve [their] interests…. When the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of practice promotes rather than undermines competition, for what helps consumers often harms other producers." *Menasha*, 354 F.3d at 663. No Payors complained about Mylan's exclusive offers, and many actively solicited them. SMF ¶¶ 61-63, 67-68, 101, 113. Just as in *Menasha*, the Payors liked what Mylan offered, and were not coerced into anything.

### 3.    Rebate Offers Like Mylan's Were Common Throughout The Industry

"Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (claims of anticompetitive conduct "ha[ve] to be evaluated in [their] factual context"). Courts have accordingly examined the use of exclusive dealing by "competitors of the defendant" in determining whether a course of conduct was anticompetitive. *ZF Meritor*, 696 F.3d at 272. In *Race Tires*, for example, the record "clearly establish[d] the existence of *competition* on the part

of … suppliers for the valuable right to serve as an exclusive provider of tires," and "[the plaintiff] ha[d] continued to respond to RFPs from the various sanctioning bodies" and "ha[d] had some success in this market … [in that] it ha[d] served as the exclusive tire supplier for a number of sanctioning bodies." 614 F.3d at 83. The similarity of conduct between the plaintiff and the defendant militated against finding the conduct anticompetitive.

The pharmaceutical industry underwent a shift toward increased formulary management, including the use of exclusive formulary position for lower prices on branded drug products, right as Auvi-Q was coming to market. Sanofi itself noted that Payors were ███████████ ████████████████████████████████████████████████████████████████ █████████████████████ SMF ¶ 48. The industrywide shift took place in many drug classes where Mylan did not even have a product. *Id.* ¶¶ 46-47. And Sanofi repeatedly ██████████ █████████████████████████████████████████████████████████████████ ██████. ¶¶ 137-41. Indeed, in 2018, Sanofi paid out a whopping 55% of its gross sales in the form of rebates. *Id.* ¶ 137. Sanofi's former CEO admitted that █████████████████████ ██████████████████████████████████████████████████████████████████ ██████ Ex. 30 (Viehbacher Dep.) at 197. Sanofi is attempting to punish Mylan for responding to the same incentives—the industrywide shift towards increased formulary management—in the same way: by offering rebates for preferred formulary positions. The court in *Race Tires* rightly faulted the plaintiff for a similarly hypocritical argument. 614 F.3d at 83.

The branded pharmaceutical industry functions through a tradeoff between cost and choice. SMF ¶¶ 18-22. Sanofi's expert herself has testified that "the way you get low prices in the pharma-ceutical industry is by the ability to exclude drugs." *Id.* ¶ 44. Many Payors shifted toward choosing lower cost to broad choice just as Sanofi launched Auvi-Q. *Id.* ¶¶ 45-51. Mylan understood this

and attempted to secure formulary access and sell more of its product by offering discounts. That Sanofi offered discounts—█████████████████████████—on its own products like Lantus in response to the same incentives "confirm[s] that such a practice was a normal competitive tool within the [pharmaceutical] industry." *Concord Boat*, 207 F.3d at 1062. "Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2." *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984); *see also, e.g.*, Brief of Appellees Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. at 54, *Eisai, Inc. v. Sanofi-Aventis U.S. LLC*, No. 14-2017 (3d Cir. Oct. 2, 2014) (making same argument). Mylan understood customer incentives and acted procompetitively by offering discounts.

### 4.      Sanofi Has Not Shown The Necessary Foreclosure

"Traditionally a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases." *McWane*, 783 F.3d at 837; *see also, e.g.*, Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70 Antitrust L.J. 311, 362 (2002) ("The recent decisions uniformly favor defendants where foreclosure levels are 40 percent or less, and so it is fair to say that foreclosure in excess of that amount is a threshold requirement where foreclosure is the asserted basis of the antitrust violation.").[348] And the duration of a given contract is also relevant in assessing foreclosure, even if not dispositive. As the leading treatise explains (Areeda & Hovenkamp ¶ 1802g2):

> The relevant question is always what percentage of the market is effectively "unrestricted" during a specific time period. The unrestricted set includes (a) those dealers who are not

---

[348] Some courts have suggested in *dicta*, however, that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc). (The statement was *dicta* because in that case Microsoft had exclusive contracts with "fourteen of the top fifteen access providers in North America, which account[ed] for a large majority of all Internet access subscriptions in this part of the world." *Id.* at 71.)

bound by exclusive-dealing arrangements at all; plus (b) those dealers whose contracts will expire during that time period in any event; and (c) those dealers whose contracts have termination clauses permitting them to sever existing arrangements during that time period and who realistically can do so.

The amount of foreclosure Sanofi attempts to show is inadequate as a matter of law. The highest foreclosure percentage Dr. Scott Morton finds is ███████████████ in December 2013 and March 2014. Ex. 35 ¶ 104. That is simply not a high enough percentage. Given the short duration and easy terminability of the agreements at issue, any static foreclosure percentage *over*states any disadvantage Sanofi faced. Areeda and Hovenkamp counsel that the "unrestricted," or not foreclosed, portion of the market must take into account those customers who can realistically terminate their contracts. Areeda & Hovenkamp ¶ 1802g2. That describes every single Payor. SMF ¶¶ 38-41. In that sense, Sanofi was not foreclosed from anything at any point.



Indeed, Sanofi's CEO said that Sanofi's goal was ████████████████████ Ex. 30 (Viehbacher Dep.) at 270.

The foreclosure measure is fatally flawed in other ways as well. As stated above, Dr. Scott Morton did not independently calculate foreclosure; instead, she ███████████████

 The unreliability of that method should be

but this Court dismissed Sanofi's claims concerning Medicaid, *see* ECF No. 98 at 20-23, and its Complaint does not include Medicare in its reference to "third-party payors," ECF No. 1 ¶ 9. Dr. Scott Morton's foreclosure measure tells the court nothing about what percentage of the commercial insurance market Mylan's conduct "foreclosed" to Auvi-Q.

Those glaring and fatal defects aside, Sanofi has skipped a crucial step. The goal of anti-competitive foreclosure is to remove a rival from the market; the theory is that foreclosing a rival from a high enough percentage of the available customers will prevent it from obtaining the economies of scale necessary to compete, so its costs will rise to the point where remaining in the market will become impossible. But, if the foreclosure does not deny a rival the economies of scale necessary to achieve minimum efficient scale, then the rival can remain in the market at will. *See, e.g.*, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("[h]ow much of the market must remain open to support decent competition depends on scale economies" and "high [foreclosure] numbers do not automatically condemn, but only encourage closer scrutiny" based on scale economies and other factors); Areeda & Hovenkamp ¶ 1807d ("Importantly, the exclusionary power of loyalty and related discounts is critically dependent on scale economies."); *id.* ¶ 768b4 ("Are there any circumstances in which an above-cost single-item discount is anticompetitive? Perhaps. One can imagine situations in which a discount increases the

dominant firm's sales so much that it denies rivals economies of scale ….").

Sanofi has not tried to show that Mylan's conduct denied it economies of scale. Dr. Scott Morton did not try to measure them—"I have not examined Auvi-Q for signs of economies of scale." Ex. 26 (Scott Morton Dep.) at 181. Without any proof that Auvi-Q's disadvantaged position on some formularies deprived Sanofi of economies of scale, Auvi-Q's supposed "foreclosure" was in truth no handicap. Sanofi could continue selling Auvi-Q and continue competing with Mylan indefinitely, and it did, until Sanofi's own manufacturing failures caused it to totally recall Auvi-Q from the market. *See* SMF ¶¶ 142-47. In such circumstances, Sanofi is simply blaming Mylan for competing effectively, and no reasonable jury could find anticompetitive foreclosure.

### 5. Intent To Harm A Rival Cannot Separate Competitive Conduct From Anticompetitive Conduct

Lacking evidence that Mylan's agreements with PBMs caused harm to competition under any established test or economic theory, Sanofi (through its expert) falls back on what it claims is evidence of Mylan's anticompetitive intent. But courts rightly dismiss evidence of intent to harm a competitor because it obscures far more than it illuminates. The Tenth Circuit has observed that "intent to harm a rival, protect and maximize profits, or do all the business if they can is neither actionable nor sanctioned by the antitrust laws." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969 (10th Cir. 1994). Justice Breyer said the same before joining the Supreme Court: "'[I]ntent to harm' without more offers too vague a standard in a world where executives may think no further than 'Let's get more business ….' Thus, most courts now find their standard … in the relation of … price to the firm's costs." *Barry Wright*, 724 F.2d at 232. Other courts of appeals regularly issue similar warnings against abusing "intent" evidence. *E.g.*, *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401-02 (7th Cir. 1989) ("Firms 'intend' to do all the business they can, to crush their rivals if they can…. Rivalry is harsh, and consumers gain the most when firms

slash costs to the bone and pare price down to cost …. Intent does not help to separate competition from attempted monopolization.").

Sanofi can point to ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███ But "[t]he document calling for 'hitting,' 'getting,' 'targeting,' or even 'smashing' rivals may merely call for competition…. [C]ompetition is the process of trying to prevail over rivals, even to the point of destroying them. An aggressive state of mind is fully consistent with antitrust objectives when the behavior is proper …." Areeda & Hovenkamp ¶ 1506. Courts must use extreme caution in inferring *anticompetitive* intent from aggressive, competitive language: "declarations respecting the intent behind [actions] are almost always useless to the knowledgeable and misleading to the unsophisticated." *Id.* ¶ 113. And that is why this Court dismissed the relevance of evidence of intent in *Suture Express*. 2016 WL 1377342, at \*23 ("[I]ntent is not dispositive…. The Court cannot find market power from defendants' intent to protect its suture and endo business from Suture Express' rival business model."). It should do the same here, rather than countenance Sanofi's tactic of substituting internal commentary for real economic inquiry into the actual contract negotiations with Payors.

## C. This Court Should Not Accept Sanofi's Unsupported, Unprecedented, And Anticompetitive Theory Of Liability

To avoid the well-settled case law discussed above, Sanofi relies on cases involving monopolists that bundle together multiple products to harm rivals who are not able to sell the same "bundle." This case, however, involves only one product, so Dr. Scott Morton has creatively theorized that Mylan somehow managed to "bundle" the contestable and incontestable demand for EpiPen together such that Payors had no choice but to cover EpiPen and exclude Auvi-Q. But no court applying the Sherman Act has accepted such a theory as a basis for liability. The courts that

have considered and rejected it have been presented with stronger grounds for dividing demand into contestable and incontestable portions than the mere ephemeral customer preference that Sanofi offers here. And the evidence advanced to support the existence of an incontestable share for EpiPen is feeble. Finally, Sanofi has chosen the wrong test to identify anticompetitive bundling; applying the proper test shows that Mylan's supposed "bundling" did not violate the antitrust laws.

### 1.      No Court Applying the Sherman Act Has Credited This Novel Theory

In a typical bundling arrangement, a defendant that sells multiple products (for example, primary, secondary, and tertiary hospital care) offers a better price if a customer buys all the products together than if the customer buys the products separately. Such a practice could possibly exclude an equally efficient competitor if the competitor cannot offer all the products the defendant bundles. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894-97 (9th Cir. 2008).

Sanofi does not advance such a claim. The alleged bundling here is not of two separate products or services, like two separate types of health care; it is "bundling" of two types of demand for the same product. Sanofi argues that Mylan bundled incontestable demand—"demand that the entrant cannot satisfy *immediately* upon entering the market," Ex. 26 (Scott Morton Dep.) 70 (emphasis added)—with the contestable demand in the EAI market. Sanofi "does not claim that [Mylan] conditioned discounts on purchases across various product lines, but on different types of demand for the same product." *Eisai*, 821 F.3d at 405. Confronting an identical claim *against* Sanofi in 2016, the *Eisai* court was "aware of no court that ha[d] credited this novel theory." *Id.* at 406. That remains true: *No court has accepted single-product bundling as a basis for liability under the Sherman Act.*

This case is a poor candidate to be the first such decision. Dr. Scott Morton's theory is far outside the mainstream of antitrust law. It tells the Court nothing about whether Mylan's agreements pass a price-cost test. And it offers no guidance to the Court on whether Sanofi can

show the elements of its claim under established traditional exclusive dealing jurisprudence.

### 2. The Supposedly "Incontestable" Share Here Is Nothing But Ephemeral Customer Preference, Which Does Not Suffice To Show Incontestability

The Supreme Court discourages adoption of tests that would deter firms from cutting prices based on unproven standards that cannot be consistently enforced. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (creating safe harbor for above-cost prices because any anticompetitive "exclusionary effect" of them "is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting"). But Sanofi here advances such a theory. It depends on a finding of incontestable demand for EpiPen but cannot show that the supposed "incontestable" demand was based on anything other than ephemeral customer preference. Dr. Scott Morton identified three factors that contribute to EpiPen's supposed incontestable share: (i) EpiPen's status as an emergency-use, lifesaving device, Ex. 36 ¶ 73, (ii) "patient preferences" for the size and shape of EpiPen, *id.* ¶ 74 and (iii) EpiPen's "broad familiarity and comfort among caregivers, patients, and [healthcare providers]," *id.* ¶ 75. In other words, patients knew and liked EpiPen. But Auvi-Q and EpiPen treat the same condition in the same way; ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ SMF ¶ 61. Accordingly, there was no clearly identifiable portion of EAI demand for which Sanofi could not compete. This case is in no way comparable to *Eisai*, for example, where Sanofi's drug and Eisai's drug were indicated for different conditions, and therefore Eisai's drug absolutely could not satisfy some portion of the demand for Sanofi's drug. *Eisai*, 821 F.3d at 399.

Commentators have noted the difference between incontestable share based on "customer taste and preference" and incontestable share based on "indisputable necessity." *See, e.g.*, Richard M. Steuer, *Musthavedness*, 81 Antitrust L.J. 447, 460-61 (2017) (distinguishing those two situa-

tions and noting that "some patients can be cured with a particular antibiotic[,] [s]ome machines can be repaired with a unique part[, and] [i]f a municipality's RFP specifies domestic pipe fittings only, no other pipe fittings may be substituted"). Professor Hovenkamp questioned *any* connection between customer preference and contestability in a 2010 article, pointing out, in the context of an FTC complaint against Intel, that "the question whether any output is contestable is very sensitive to price" and that "Intel cannot charge an infinitely high price even for the noncontestable portion of its output; rather, it is contestable only in the sense that at a given price the computer manu-facturer has a strong preference for Intel chips over the alternatives." Herbert Hovenkamp, *The Federal Trade Commission and the Sherman Act*, 62 Fla. L. Rev. 871, 892 (2010); *see also* Steuer, 81 Antitrust L.J. at 460-61 ("[p]reference is notoriously difficult to measure and often very fickle" and of doubtful relevance if economic decisionmakers "are able to ignore individual preferences"). Even Dr. Scott Morton admits that demand based on customer preference may be "incontestable" at a small price differential but contestable when the differential grows. *See* Ex. 36 ¶ 91.

Because of this fickleness, ephemeral customer preference cannot be enough. Sanofi's theory would hold defendants liable for implementing price cuts in exchange for guaranteed vol-ume based on a measure that depends upon ever-changeable and difficult-to-measure customer preference that is, in turn, dependent on the price for a given product. Functionally, Sanofi wants the Court to ignore the dictates of *Brooke Group* and its progeny.

This Court should not do so. Courts presented with Sanofi's theory have uniformly rejected it as a basis for liability.[349] The *Eisai* court refused to credit a theory of single-product bundling, instead holding that the threat of a lost discount is a "far cry" from any anticompetitive conduct.

---

[349] In *In re Remicade Antitrust Litigation*, 345 F. Supp. 3d 566, 579-80 (E.D. Pa. 2018), the court at the pleading stage accepted a single-product bundling theory to deny a motion to dismiss. But the biologics at issue were complex molecules on which patients were already stable. Here, by contrast, EpiPen and Auvi-Q are not used on any sort of regular basis, so patient stability would be much less of a factor.

*Eisai*, 821 F.3d at 407. And the court in *Inline Packaging LLC v. Graphic Packaging International, LLC* (a multi-product bundling case) rejected a "contestable share variation of the discount attribution test" with the contestable share based on buyers' "unwilling[ness] to put all of their eggs in the basket" of a new manufacturer: "Although the contestable share method might, in some instances, identify discount bundles that are capable of excluding an equally efficient rival …, the method is prone to error, would increase enforcement and litigation costs, and would chill procompetitive price cuts." 351 F. Supp. 3d 1187, 1211 (D. Minn. 2018). That ruling should be followed here.

### 3.    The Evidence For Any Incontestable Share In This Case Is Weak

Any evidence of incontestable share in this case is lacking, even if mere customer preference suffices. To prove the existence and extent of incontestable share, Sanofi relies on only a few pieces of evidence out of the hundreds of thousands of documents produced in this case. None is convincing. First, Sanofi relies on a claim in ██████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████ *See* Ex. 35 ¶ 80. The employee's comment ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████ *See* Ex. 39 ¶ 210. Sanofi has also pointed to an internal MedImpact document ████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████. Ex. 247. Sanofi's other example is a statement ████████████████ ████████, *see* Ex. 35 ¶ 82, and in any event ████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████

79

Sanofi's quantitative evidence—market share measurements of three formularies where some plans excluded EpiPen—is no more convincing, and no reasonable jury could accept it. Mylan's share ███████████████████████████████████████████ ██████ SMF ¶ 130. CVS's Value Formulary mixed plans that did and did not exclude EpiPen; ████████████████████████████████████████████████████████████ *Id.* ESI's High Performance Formulary also mixed plans that did and did not exclude EpiPen; those plans that excluded Mylan in favor of Auvi-Q ██████████████. *Id.* ¶ 131.

The data show no real incontestable share. ██████████████████████████ ██████ Dr. Willig noted that there was no clearly identifiable portion of demand that was incontestable, *see* Ex. 39 ¶ 142, but that if there was any it was small, no more than 10%, *id.* ¶ 157. No reasonable jury could credit the paucity of evidence in favor of Dr. Scott Morton's view.

### 4. Any Incontestable Share's Potential To Foreclose Should Be Evaluated Under The Incremental Cost Test, Which Shows Mylan Did Not Price Any Contestable Portion Of Demand Below Its Costs

All those errors aside, Sanofi still relies on the wrong test to ascertain whether Mylan's actions were anticompetitive. The test the Court should apply if it reaches this point is the discount attribution test. Mylan's discounts pass that test easily. Ex. 39 ¶¶ 168-69, 215-20.[350]

As this Court observed in *Suture Express*, many courts have applied the discount attribution test to bundled discounts. 2016 WL 1377342, at *19 (citing *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 275 (6th Cir. 2015), and *PeaceHealth*, 515 F.3d at 906); *see also, e.g.*, *Inline Packaging*, 351 F. Supp. 3d at 1210-12. Sanofi, too, has argued for that standard. *See* Sanofi Pasteur Inc.'s Motion for Summary Judgment, *Castro et al. v. Sanofi Pasteur Inc.*, No. 2:11-cv-07178-JMV-MAH (Sanofi *Castro* MSJ), at 6 (D.N.J. Sept. 16, 2016), ECF No. 469-1 ("[P]laintiffs

---

[350] Dr. Willig also refers to this test as the "incremental cost" test. Ex. 39 ¶ 169 n.211.

cannot satisfy the 'discount attribution' test. This test, which plaintiffs should be required to meet, mathematically describes when a bundled discount is exclusionary."); *id.* at 42 ("[B]undling cannot exclude an equally efficient rival if the defendant's prices are above cost, after properly allocating the discounts, under what is known as the discount-attribution test ….").

Under the traditional discount attribution test, "the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost," then the bundling could violate Section 2. *PeaceHealth*, 515 F.3d at 906. Because, in this case, the challenged conduct pertains only to a single product, one cannot "allocate" all the discount to the competitive product. Dr. Willig nevertheless accepts Sanofi's premises and allocates all discounts to the part of EAI demand that Sanofi says it *can* compete for—the contestable share. Ex. 39 ¶ 215. This is equivalent to the discount attribution test: all discounts are allocated to the portion of the alleged "bundle" for which all parties can compete. *See generally* Sean Durkin, *The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test*, 81 Antitrust L.J. 475, 479 (2017) ("[L]oyalty discounts cannot exclude an equally efficient competitor unless a seller offering loyalty discounts fails the discount attribution test.").

Applying this modified version of the discount attribution test, Dr. Willig calculated that all of Mylan's agreements with Payors pass, so long as a ███████████████████████████████ ███████████████. Ex. 39 ¶ 217. And, though price protection is difficult to value (because future WAC price raises are not known), all of Mylan's agreements with Payors pass—even as adjusted for price protection—██████████████████████████████████████████. *Id.* As stated above (*see* § I.B.3), the available data show that, at a minimum, ██████████████████████ ████████████████████████████████████████████████████

81

There is no material dispute that Dr. Willig's analysis is correct. Dr. Scott Morton instead puts forth an alternative calculation, ███████████████████████████████████ ███████████████████████████████ Dr. Scott Morton also opines that Dr. Willig should not have used *Mylan's* incremental cost to conduct the discount attribution test, and that instead he should have used Sanofi's incremental cost as his baseline. Ex. 36 ¶ 156. No authority exists for the proposition that a price-cost test should measure the *defendant's* prices against the *plaintiff's* costs. *See Collins Inkjet*, 781 F.3d at 274-75 (noting that using plaintiffs' costs would "make[] no sense" and "produce an unclear standard that might permit anticompetitive conduct"). Competition as a whole can be injured only by practices that would foreclose an equally efficient competitor; that can occur only when the defendant prices below *its own* cost. Antitrust law promotes efficient competition; if Mylan can manufacture and sell its product more cheaply than its rival, that is good for competition and consumers.

Although Sanofi has advocated use of the discount attribution test in other litigation (*see supra* pp. 80-81), it offers a different test here. Through Dr. Scott Morton, it puts forth an "effective entrant burden" (EEB) test, which is intended to measure how much of a rebate an entrant must offer to overcome the rebate or discount an incumbent offers. As Dr. Scott Morton applies it, EEB depends on just three variables: multiply the incremental rebate offered for exclusion ("R") by the share achieved with exclusion ("S") and divide the result by the contestable share in the EAI market ("C"). Ex. 35 ¶ 161. Therefore, if Mylan's discount for exclusivity is 30% greater than any other discount it offers, if EpiPen gains an 100% share when Auvi-Q is excluded, and if the contestable share is 50%, one multiplies 30% by 100% and then divides by 50% to get an EEB of 60%. *Id.* Table 3. Dr. Scott Morton has not provided an EEB threshold above which liability should be found, though in the paper in which she introduced the EEB measure, she did hint that "liability

for discounting practices accompanies effective entrant burdens above 10%." *See* Fiona M. Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 Antitrust L.J. 777, 825 (2017). She also opined in an appendix that *Suture Express* and *Eisai* were both wrongly decided because the EEBs in those cases were above that level. *Id.* at 827-31.

EEB takes no account of the absolute price for either EpiPen or Auvi-Q. By focusing exclusively on the incremental rebate offered for exclusivity, the test would produce the same result, assuming the same contestable share, in the following scenarios: (i) WAC price of $12,000 discounted to $10,000 in exchange for exclusivity and (ii) WAC price of $12 discounted to $10 in exchange for exclusivity. In both scenarios, R would be the same—16.66%. But of course such a difference in overall price is enormously important; few Payors would have chosen EpiPen over Auvi-Q in scenario (i), and few Payors would have covered Auvi-Q at all in scenario (ii).

EEB's flaws do not end there. The question in bundling cases is whether bundled discounts could exclude an *equally efficient* rival. *See PeaceHealth*, 515 F.3d at 906 (adopting standard that "makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a *hypothetical* equally efficient producer of the competitive product"); *Collins Inkjet*, 781 F.3d at 273 (quoting *PeaceHealth*); *Inline Packaging*, 351 F. Supp. 3d at 1207 (same); *Suture Express*, 2016 WL 1377342, at *24 (bundle-to-bundle competition cannot exclude "equally efficient firm" unless "overall price [of bundle] is below its costs"). Cases outside of the bundling context also focus on whether a given set of practices could exclude an equally efficient rival. *See, e.g.*, *Eisai*, 821 F.3d at 406 ("[N]othing in the record indicates that an equally efficient competitor was unable to compete with Sanofi."); *Barry Wright*, 724 F.2d at 232 (using price-cost test to see if requirements contracts can "exclude or eliminate equally efficient competitors"). "Actionable exclusion

[through bundling discounts] requires a showing not merely that a particular rival cannot compete effectively, but that no equally efficient rival can." Areeda & Hovenkamp ¶ 749a.[351]

Dr. Scott Morton's EEB, however, says nothing about this key inquiry because it does not relate Mylan's price to its costs. Dr. Scott Morton's test would condemn Mylan's pricing decisions without ever determining whether Mylan priced below *any* measure of cost. That runs afoul of established antitrust doctrine. *See, e.g.*, *Brooke Grp.*, 509 U.S. at 223; *PeaceHealth*, 515 F.3d at 906; Areeda & Hovenkamp ¶ 749a ("[W]hen a discount is offered on a single product, such as a quantity or market-share discount, the discount is ordinarily lawful if the price after all discounts are taken into account exceeds the defendant's marginal cost or average variable cost."). Thus, even if the Court credits Sanofi's unprecedented theory of single product bundling, it should reject the EEB and apply the universally accepted discount attribution test. Mylan easily passes that test (*see supra* p. 81), just as it easily passes the traditional price-cost test.

### D.    Mylan's Other Conduct Did Not Violate The Antitrust Laws

Sanofi alleges that two other pieces of Mylan's conduct violated the Sherman Act and formed part of an overall scheme to foreclose Sanofi from competing: (i) a smattering of marketing communications that Sanofi says constituted deceptive conduct in violation of Section 2; and (ii) Mylan's EpiPen4Schools program, which gave away more than 1,000,000 pens to schools for free, with no strings attached. Mylan's marketing statements were not false or deceptive, and Sanofi cannot overcome the presumption that such speech has a *de minimis* effect on competition.

---

[351] Sanofi has also endorsed the equally efficient rival test. *See* Sanofi *Castro* MSJ at 4 ("Rivals are substantially foreclosed when … there is foreclosure, meaning that the conduct prevents an equally-efficient rival from competing for the business …."); *id.* at 5 ("[The measure of foreclosure in *Eisai*] was irrelevant because it did not distinguish between customers beyond the reach of an equally efficient competitor and customers that simply chose not to switch to the rival."); *id.* at 42 ("Sanofi's contracts do not exclude an equally efficient rival. The 'equally-efficient' rival test is thoroughly embedded in antitrust jurisprudence.").

And there was nothing anticompetitive about giving schools a million free pens.

1.    **Mylan's Allegedly Deceptive Communications Were True And Easily Neutralizable**

"[I]n its advertising, a producer is ordinarily permitted … to bathe his cause in the best light possible." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287 (2d Cir. 1979). Advertisements thus must be clearly false to be deemed deceptive under the antitrust laws. *See, e.g.*, *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988). Moreover, federal courts presume that even false and misleading advertising has a *de minimis* effect upon competition. *See, e.g.*, *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011); *Am. Council of Certified Podiatric Physicians and Surgeons* (*ACCPPS*) *v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003); *Am. Prof'l Testing Serv., Inc.* (*APTS*) *v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997); *Ayerst Labs.*, 850 F.2d at 916; *cf. Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014) (applying *de minimis* test without holding it applies in the Tenth Circuit). As articulated in *Lenox*, deceptive conduct cannot violate the Sherman Act unless it is: "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Id.*; *accord, e.g.*, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079-80 (10th Cir. 2016) (Gorsuch, J.) (holding that only deceptive actions that are "widespread and longstanding and practically incapable of refutation" can injure competition).

Sanofi charges Mylan with making four anticompetitive marketing statements, none of which was false or misleading, let alone "clearly false," and none of which was used in a way likely to induce reliance by physicians, consumers, or, especially, Payors. *Lenox*, 762 F.3d at 1127.

This Court previously noted that Sanofi's "Complaint does not allege facts capable of supporting all of the factors required to overcome the *de minimis* presumption" but permitted this claim to go forward so that Sanofi could substantiate its claims. ECF No. 98 at 27-28. It has failed to do so.

First, Sanofi complains that Mylan funded and promoted a study that was titled in a way that called into question the FDA's determination that the epinephrine in Auvi-Q was equivalent to the epinephrine in EpiPen. ECF No. 1, ¶¶ 93-94. Even if the title could be considered false (a proposition that is highly debatable), tellingly, Sanofi does not allege that the study itself was false. *Id.* And Sanofi alleges only that this study was shared in a presentation to "key thought leaders" in the allergy field—as though key thought leaders would read only the supposedly confusing title, not the study itself. *Id.* There is no evidence in the record that the scientific study was shared beyond that specific audience.

Second, Sanofi complains that Mylan CEO Heather Bresch stated that "EpiPen ha[d] been tried and true for 25 years" and was "not easily confused with a Blackberry or your phone in your purse or your backpack." ECF No. 1, ¶ 95. Sanofi cannot contend that this statement is false, *i.e.*, that someone might mistake a cylindrical EpiPen for a Blackberry. And it is disingenuous to complain that Ms. Bresch compared Auvi-Q to a cell phone, when Sanofi's North American President said publicly at launch that "When people see [Auvi-Q], they think it's a cell phone." Ex. 42.

Third, Sanofi takes issue with Mylan's distribution to physicians of marketing materials that highlighted its favored formulary coverage and stated that health plans make coverage decisions "based on internal clinical and financial recommendations." ECF No. 1, ¶ 97. This is true: as described above, plans *absolutely* base coverage decisions on "clinical and financial recommendations." SMF §§ V-VI. Sanofi has no evidence supporting its claim that these statements implied that Auvi-Q had been excluded from formularies because of clinical concerns, not price.

Fourth, Sanofi alleges that Mylan sent similar ██████████████████████████ ████████████████████████████████████████████████████████████ No. 1, ¶¶ 93-98. Sanofi claims that Mylan's marketing based on formulary coverage made physicians think EpiPen "was the only realistic choice for their patients." *Id.* ¶ 99. But Sanofi does not allege that the statements about coverage in the email were false.

Even if any of these statements could be viewed as potentially deceptive, Sanofi could have easily neutralized the allegedly disparaging statements. "False statements about a rival's goods do not curtail output in either the short or the long run. They just set the stage for competition in a different venue: the advertising market." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005). The study could have been neutralized by highlighting the FDA's finding of bioequivalence. *See* ECF No. 1, ¶ 93. The marketing materials, too, could have been rebutted by effective detailing by Sanofi's hundreds of Auvi-Q sales representatives (*see* SMF ¶ 6), who could explain Auvi-Q's coverage. *See ACCPPS*, 323 F.3d at 372 (noting that "plaintiff was able to send mailings to the health care community to counter the mailings sent forth by defendant"). Sanofi is a global pharmaceutical giant, with net pharmaceutical sales and profits far exceeding Mylan's. *See* SMF ¶ 6. Rebuttal was more than possible. *See APTS*, 108 F.3d at 1152 ("The argument that [the plaintiff's] neutralization efforts were not completely successful is unavailing; the test refers to 'susceptible to neutralization' not 'successful in neutralization.'").

Sanofi cannot satisfy any of the other factors mentioned in *Lenox*. Sanofi has not specified when the statements were made, much less suggested they were continuous and prolonged. And these statements were made to physicians and consumers, whereas the foreclosure Sanofi complains of is from Payors, making the disparagement immaterial. In short, Sanofi has failed to uncover sufficient evidence to support its claims based on allegedly deceptive marketing.

## 2. Mylan's EpiPen4Schools Program Was Procompetitive

Sanofi alleges that Mylan used the EpiPen4Schools program to lock schools into stocking EpiPens exclusively. ECF No. 1, ¶¶ 80-85. Mylan is unaware of a case imposing antitrust liability for giving away a product for free. Here, schools were not required to stock EpiPens exclusively to qualify for four free (and freely replaceable) pens, to reject donations of other EAI devices to qualify for the four free (and freely replaceable) pens, or to stock EpiPen exclusively to purchase additional pens at a discount—exclusivity applied only if a school wanted to purchase even larger quantities of pens at an even greater discount. Fewer than 45,000 pens were purchased at a discount, whereas more than 1,000,000 were given away to schools for free. SMF ¶ 136.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ As stated above, the EpiPen4Schools program primarily gave away free pens, the donation of which were not conditioned on exclusivity—or anything else, for that matter. In any event, even if one were to credit Dr. Scott Morton's cynical characterization of the program, this is a complaint about competition on the merits. If Sanofi felt disadvantaged in the marketplace by children's familiarity with the EpiPen, it could have given schools free Auvi-Q devices. It did not. *See* SMF ¶ 136. Mylan's endeavor to expand access to lifesaving EAI devices should not be punished simply because Sanofi chose not to compete in kind.

## II. Sanofi Has Not Suffered Antitrust Injury

Sanofi "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "[T]he antitrust laws are not designed to protect competitors like [Sanofi]; instead, those laws were enacted to promote competition so that market participants could decide who had 'a better mousetrap.'" *Suture*

*Express*, 2016 WL 1377342, at *26. "Thus, [Sanofi] must show harm to competition, not just harm to [Sanofi]." *Id.* It must show "that [the] challenged conduct affected the prices, quantity or quality of goods or services, not just [its] own welfare." *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012); *see also Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) ("Injury to competition is usually measured by a *reduction in output* and an *increase in prices* in the relevant market.").

The requirement of antitrust injury helps courts identify lawsuits that seek to punish rather than promote competition. "[U]nlike consumers, competitors have incentives to bring antitrust suits for purposes which are anti-competitive, for example to induce the defendant competitor to moderate their competition." *Sterling*, 656 F.3d at 121; *see also* Edward A. Snyder & Thomas E. Kauper, *Misuse of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich. L. Rev. 551 (1991); Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 33-39 (1984). Without the requirement, "routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the [Sherman] Act." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).

### A.  Sanofi Has Not Shown That Mylan's Conduct Caused Higher Prices Or Reduced Output

"The Supreme Court has described raised prices and reduced output as the hallmarks of anticompetitive behavior." *Suture Express*, 2016 WL 1377342, at *26; *accord, e.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989). Here, Sanofi has admitted that there was no reduction in EAI output while Auvi-Q was on the market; Dr. Scott Morton admits that "total output did increase in the U.S. EAI market from 2008 through 2015." Ex. 36 ¶ 40. At her deposition, Dr. Scott Morton avowed that she determined the level of output only "directionally." Ex. 26 (Scott Morton Dep.) at 244. Based on that directional, non-quantitative

determination, she claimed that "output would have been higher" but for Mylan's conduct. *Id.* No reasonable jury could accept such a speculative and inexact hunch as a substitute for data.

That hunch stands in contrast to Dr. Willig's approach on the question of EpiPen's price.



> To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition."

*Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 116 (1986) (quoting *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F. 2d 1050, 1057 (6th Cir. 1984)).

Dr. Scott Morton purports to correct Dr. Willig's analysis in her reply report. Ex. 36 ¶¶ 31-37. But the "corrections" tell the Court nothing useful; at deposition she admitted that her corrections merely "model[ed] … the price without Auvi-Q's entry," *not* the price without Mylan's alleged anticompetitive conduct. Ex. 26 (Scott Morton Dep.) at 475. Her "correction" of Dr. Willig does not, therefore, show that *Mylan's conduct* caused prices to rise; instead, it shows her counter-intuitive view that Auvi-Q's entry caused a rise in price. But Sanofi must show that any price increases "were the result of antitrust violations." *Sterling*, 656 F.3d at 123; *see also Brunswick Corp.*, 429 U.S. at 489 (plaintiff must show injury "that flows from that which makes defendants' acts unlawful"). Showing that *Auvi-Q's entry* caused prices to rise, even if somehow true, does not meet that burden.

Dr. Scott Morton also baldly asserts that Mylan █████████████████████████████ ████████████████████████████████████ Ex. 36 ¶ 32, but she admitted at deposition that she had seen no documents supporting that hypothesis, Ex. 26 (Scott Morton Dep.) at 495-96. At this stage, such unadorned factual assertions are not enough. Sanofi must point to record evidence to support its views, not merely its expert's say-so. *See Brooke Grp.*, 509 U.S. at 242 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law,… it cannot support a jury's verdict."). The lack of specific evidence showing that Mylan's supposedly anticompetitive conduct caused prices to rise is fatal to Sanofi's case.

### B. Mylan Did Not Deprive Consumers Of A Superior Product

Sanofi and Dr. Scott Morton also allege that Mylan caused harm to competition by depriving consumers of an allegedly superior product in Auvi-Q. Ex. 35 ¶¶ 190-93. An assertion that one product is better than another is not enough to show antitrust injury. *See NicSand*, 507 F.3d at 456 (if this were true "every competitor could proceed to discovery (and avoid showing a true antitrust injury) by asserting an unelaborated claim that it provides better service than its competitors"). ███████████████████████████████████████████████████████ ███████████████████████████████████ Ex. 39 ¶ 143; SMF ¶ 61. And no data in the record shows better clinical outcomes with Auvi-Q instead of EpiPen. *Id.* ¶ 9.

All Sanofi cites are ███████████████████████████████████████ ████████ but no reasonable jury could accept ████████████ standing alone; Sanofi has not, for example, attempted to quantify Auvi-Q's supposed superiority by establishing that it had a better quality-adjusted price than EpiPen. *See, e.g.*, *FTC v. Qualcomm, Inc.*, No. 17-CV-00220-LHK, 2018 WL 6615050, at *5 (N.D. Cal. Dec. 17, 2018) (finding expert's opinion helpful because it referenced "metrics measuring … quality-adjusted prices"). Moreover, that a subset of customers preferred Auvi-Q does not show that Auvi-Q was a superior product, just as consumer preference

for EpiPen would not prove that EpiPen was superior. Finally, Auvi-Q had to be completely recalled from the market because it failed to deliver epinephrine properly. SMF ¶¶ 142-47. It would be ironic—and contrary to the purpose of the antitrust laws—if Sanofi could show antitrust injury because consumers could not access its supposedly "higher-quality" product that, it turns out, had an unacceptable risk of failing to perform during a life-threatening emergency.

More fundamentally, Mylan never deprived consumers of access to anything. The only time Auvi-Q was unavailable to consumers between its launch and today was when it was recalled. Consumers who wanted Auvi-Q could acquire it before recall and after relaunch. *Id.* ¶ 27.

### C.   Reduced Innovation Is Not A Cognizable Antitrust Harm, And In Any Event Sanofi Has Not Shown It

Sanofi and Dr. Scott Morton also allege that consumers were harmed by Mylan's failure to innovate. But "failure to innovate" has no place in the Tenth Circuit's antitrust injury standard; a plaintiff must "prove that challenged conduct affected the prices, quantity or quality of goods or services." *Suture Express*, 2016 WL 1377342, at *26 (quoting *Cohlmia*, 693 F.3d at 1281). There is no mention of supposed harm to innovation; this is yet another instance of Sanofi asking this Court to move beyond established antitrust law. Mylan is aware of no court that has accepted harm to innovation as the sole underpinning of an antitrust injury; the one court that was asked to do so refused. *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14 cv 00804, 2015 WL 225328, at *5 (N.D. Ill. Jan. 15, 2015) ("[A] lack of innovation is not a cognizable antitrust injury.").

The reasons why lack of innovation should not suffice to show antitrust injury are evident from Dr. Scott Morton's report. She argues ███████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████



And, as usual, Dr. Scott Morton ignores evidence bearing on the matter at hand, even when she cites the same document. She relies on a Mylan presentation for purposes of her foreclosure analysis, ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ No reasonable jury could call that anything but attempted innovation, even if the innovation itself was never implemented.

More broadly, there would be no way to tell whether Mylan's supposed failure to innovate harmed competition even if a failure to innovate were to be proven. Prices and output are quantitative; they rose, fell, or stayed the same. Even deprivation of choice, flawed a theory of harm as it is, is susceptible to ascertainment by a court; consumers either have access to a product or service (as they did in this case), or they do not. How is a court, or anyone, to tell whether any supposed failure to innovate harmed competition in this case? Would consumers have been better served by a smaller EpiPen than they were by Mylan's price cutting? Sanofi and Dr. Scott Morton have no idea; they have not done the first thing to quantify or otherwise assess any alleged harm, and without any such quantification or evaluation they are just asking the Court to guess in their favor.

The Court should decline their invitation; accepting such an open-ended and standard-less inquiry risks chilling procompetitive behavior based on nothing more than a plaintiff's vague idea that an incumbent could have improved its product. *See Barry Wright*, 724 F.2d at 234 (Breyer, J.) ("[U]nlike economics, law is an administrative system the effects of which depend upon the content of rules and precedents only as they are applied by judges and juries in courts and by lawyers advising their clients. Rules that seek to embody every economic complexity and qualification may well, through the vagaries of administration, prove counter-productive ….").

### D.   The Selection Of An Exclusive Dealer Does Not Injure Consumers

Sanofi complains that Mylan underbid it for exclusive contracts with various formularies. The plaintiff in *Indeck* brought a similar claim; it alleged that the exclusive "contracts entered into by [the defendant] with 17 other large power consumers in eastern Michigan … violated antitrust laws by effectively preempting 87% of the … market." 250 F.3d at 977. But the court noted that the plaintiff had failed to prove "it could have served as a true lower-cost alternative" to the defendant; in other words, the plaintiff could not show injury to competition when it was not a lower-cost alternative, "especially in light of the discounted rates offered to the customers, in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other power generators at the conclusion of the contracts." *Id.* at 977-78. Short-term exclusive contracts secured by underbidding a competitor did not injure competition.

The court in *Race Tires*, too, held that the loser in competition for exclusive contracts does not suffer antitrust injury. Despite losing some competitions, the plaintiff "ha[d] continued to respond to RFPs [for exclusive contracts] from the various sanctioning bodies, and it ha[d] also attempted to win an exclusive contract even in the absence of a formal proposal from the sanctioning body itself." *Race Tires*, 614 F.3d at 83. The court concluded that, because the plaintiff "has had the clear opportunity to compete and did compete, sometimes successfully, for the

exclusive tire contracts," it "never suffered the kind of injury that gives rise to an antitrust claim." *Id.* at 84. And in *NicSand*, the Sixth Circuit *en banc* concluded that NicSand, an incumbent supplier of automotive sandpaper, had not suffered an antitrust injury in being replaced as an exclusive dealer by 3M because "NicSand had the opportunity to compete for each of the [exclusive] contracts," and "[w]hen one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury." 507 F.3d at 456.

Where buyers hold an auction to select the exclusive supplier, the loser of that competition cannot then bring an antitrust claim. That is exactly what Sanofi has done. ████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████ Sanofi "had the clear opportunity to compete" for those contracts. *Race Tires*, 614 F.3d at 84; *e.g.*, SMF ¶¶ 62-63, 85, 100. ███████████████████████████ ████████████████████████████████████████████████ there is not a single instance in the record of Auvi-Q's being excluded without Sanofi having the opportunity to bid. Like the plaintiff in *Race Tires*, Sanofi continued to respond to requests for bids from Payors, and indeed was successful in gaining unrestricted formulary coverage with some frequency. *E.g.* SMF ¶¶ 74, 83, 97, 110, 117-20. The maximum percentage of the market that Sanofi's expert has ever alleged it was excluded from is ████████████████████ That is far less than the 87% foreclosure present in *Indeck*, for example. 250 F.3d at 977. Plaintiffs cannot claim antitrust injury when they are the higher-priced option in a competition for the contract; that is all Sanofi was here.

### III.   Sanofi's Claim For Damages Fails As A Matter of Law

Finally, Sanofi's case for damages is just as flawed as its liability case. Sanofi's damages model cannot disaggregate damages between procompetitive and anticompetitive conduct. As such, it cannot support any damages, and therefore summary judgment should be granted on that

ground. And, in any event, the Court should award partial summary judgment to Mylan under Rule 56 on Sanofi's post-recall damages claim, which is both legally improper and far too speculative.

### A.       Sanofi's Failure To Disaggregate Damages Is Fatal

"If a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws." *MCI Commc'ns Corp. v. Am. Tel. and Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983). This straightforward point leads to a straightforward requirement: a damages study must be capable of "segregati[ng] between damages attributable to lawful competition and that attributable to the unlawful scheme." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985); *see also, e.g.*, Areeda & Hovenkamp ¶ 657b ("If the plaintiff's expert's damages study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study."); 1 ABA Section of Antitrust Law, *Antitrust Law Devs.* § 9C5 (8th ed. 2018) ("Antitrust plaintiffs may recover only damages caused by the alleged antitrust violation(s). Accordingly, they must distinguish between losses attributable to the defendants' antitrust violations and losses attributable to other factors.").

Dr. Scott Morton's model fails that requirement.   At her deposition, she confirmed that her model could not disaggregate, stating that "[t]he reason it's not disaggregated is because it's a package." Ex. 26 (Scott Morton Dep.) at 263.

The inability to disaggregate renders Dr. Scott Morton's model useless. In *City of Vernon*

*v. Southern California Edison Co.*, the Ninth Circuit affirmed summary judgment because the plaintiff's damages "study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were," even though the plaintiff affirmed it "would not or could not do so." 955 F.2d 1361, 1372 (9th Cir. 1992). Similarly, in this District, Judge Vratil granted summary judgment to a defendant on a "service market monopolization claim" because the plaintiff had not met its "burden … to disaggregate damages which are attributable to lawful conduct." *In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1153-57 (D. Kan. 2000).

Moreover, if the Court finds any single element of Mylan's conduct to be procompetitive, then Dr. Scott Morton's model becomes actively misleading. Sanofi claims that multiple separate actions Mylan took were anticompetitive: it challenges Mylan's agreements with Payors, its advertising, and its EpiPen4Schools program. But Sanofi's model cannot, for example, disaggregate losses suffered from the EpiPen4Schools program from losses suffered from Mylan's advertising. And Sanofi's burden is to prove that each of Mylan's agreements with a Payor was anticompetitive. The Court should find that none of them were, but if the Court were to find that Mylan cannot be held liable for bidding for exclusivity or a restriction on Auvi-Q when a Payor specifically solicited such a bid (as ▇▇▇▇ did), or when a Payor sends out a bid grid with slots for exclusive coverage (as did ▇▇▇▇▇▇▇▇ or when the Payor does not even accept rebates (like ▇▇▇▇▇ then Sanofi's damages model would be entirely incapable of separating out any difference between Sanofi's forecast and its real-world earnings attributable to those Payors.

Courts have repeatedly disallowed damages for this reason. *See, e.g.*, *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 409 (3d Cir. 2016) (failure to disaggregate damages between valid and invalid theories "independently requires vacatur of the damages award"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997) ("The [plaintiffs] must

segregate damages attributable to lawful competition from damages attributable to Kodak's monopolizing conduct."). Indeed, the Supreme Court recently held class certification impermissible because a class expert's damage study could not separate damages resulting from lawful competition from those flowing from unlawful conduct. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). If the Court concludes that a single portion of Mylan's conduct did not violate the antitrust laws, then Sanofi's damages model becomes useless, and summary judgment should be entered.

### B.     Sanofi's Claim For Post-Recall Damages Should Be Rejected

Sanofi recalled Auvi-Q in late 2015 because it could potentially fail to deliver the correct dose of epinephrine. SMF ¶¶ 142-47. After the recall, Sanofi returned the rights to Auvi-Q to kaléo, *id.* ¶ 147, and that return of rights is the direct reason why Sanofi does not sell Auvi-Q today. But that does not deter Sanofi from claiming damages on the theory that it would have retained the rights to Auvi-Q, reentered the market, and made ███████████████████ Ex. 35 ¶ 212-25. An enormous amount of Sanofi's damages claim depends on these speculative, post-recall damages; more than ███ of the damages Sanofi now claims through Dr. Scott Morton are post-recall damages. Ex. 249. Sanofi seeks to blame Mylan for its decision to return the rights to Auvi-Q, and its rationale is that it was afraid ███████████████████████████

███████████████████████████████████

Antitrust damages to compensate for decisions made in fear of possible future misconduct are unheard of. In the closest case of which Mylan is aware, "[b]oth parties agree[d] that, in an

---

[352] No contemporary document supports this rationale, and Sanofi's then-Head of Global Operations testified that ███████████████████████ SMF ¶ 147. The Court would thus be justified in concluding that Mylan's conduct had nothing to do with the return of rights and denying post-recall damages on that ground. If the Court were to find a dispute of material fact about the rationale for the return of rights, however, then any award of post-recall damages would be legally improper and unduly speculative for the reasons explained here.

antitrust case, future damages may be recovered for past misconduct but not for future miscon-duct," and the court focused on whether "future enforcement of past contracts" was future or past misconduct. *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1142-45 (10th Cir. 2002).

Moreover, damages cannot be recovered if "the fact of their accrual is speculative." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971). Illustrative is *Webb v. Utah Tour Brokers Association*. Plaintiffs claimed damages for both the eleven bus tours that past misconduct had prevented them from providing and eight tours they had planned in the future. 568 F.2d 670, 677 (10th Cir. 1977). Even though the plaintiffs claimed that the defendant's *past* misconduct rendered them unable to conduct the *future* tours, the court denied damages for the future tours, reasoning that "the lost profits on projected tours are more speculative than real." *Id.*

Here, Sanofi does not contend that Mylan's past conduct disabled it from relaunching Auvi-Q; rather, it attributes its decision *to fear that Mylan would compete aggressively on price again*. ████████████████████████████████████████████████████████████
████████████████ █████████████████████████████████████████████████
████████████████████████████████████████████████████ And Dr. Scott Morton's report states that "Sanofi was convinced that had it relaunched the product, Mylan would have engaged in the same anticompetitive activity," and that Sanofi "return[ed] the rights to kaléo" for that reason. Ex. 35 ¶ 213. So Sanofi's damages are even more speculative than those claimed in *Webb*; the damages in *Webb* were based on past misconduct, not hypothesized future actions.

Indeed, Sanofi's post-recall damages claim goes beyond rampant speculation and into counterfactual assumptions. ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ Second, Mylan

introduced a generic EpiPen in 2016, near the time when Dr. Scott Morton projects Auvi-Q would have returned to the market. SMF ¶ 11. Generics are usually covered on lower tiers of formularies than brands, *see* SMF ¶ 24. Inasmuch as competition for branded formulary placement influenced Mylan's decision to offer deep rebates in exchange for disadvantaging Auvi-Q, that incentive would have lessened with the introduction of its own generic, which Sanofi might not have predicted in 2015. These events would have occurred regardless of any of Mylan's challenged conduct, and both drive home that permitting post-recall damages would award a windfall based upon Sanofi's inevitably speculative assumptions about Mylan's future actions. The Court should therefore enter partial summary judgment on Sanofi's post-recall damages claims.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in Mylan's favor on Sanofi's Sherman Act claims.

Dated: June 28, 2019

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510
psechler@robbinsrussell.com
kzecca@robbinsrussell.com
lfriedman@robbinsrussell.com
rmayrell@robbinsrussell.com
jettinger@robbinsrussell.com
jgoerlich@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and*
*Defendant/Counterclaim Plaintiff Mylan*
*Specialty L.P.*

**CERTIFICATE OF SERVICE**

On this 28th day of June, 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each attorney registered for ECF notification to the counsel of record in this case.

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4492
Fax: (202) 775 4510
psechler@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*