# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ<br><br>Hon. Daniel D. Crabtree<br><br>Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC,<br><br>        Plaintiff-Counterclaim<br>        Defendant,<br><br>   v.<br><br>MYLAN Inc., *et al.*,<br><br>        Defendants-Counterclaim<br>        Plaintiffs.<br><br>**This Document Relates to the *Sanofi* Case**. | CASE NO.: 2:17-CV-02452-DDC-TJJ<br><br><br><br>*Document Filed Electronically* |

## SANOFI-AVENTIS U.S. LLC'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 4

I.     CASE BACKGROUND ........................................................................................... 4

     A.     Parties ............................................................................................................ 4

     B.     Procedural History ...................................................................................... 5

II.     U.S. EAI DRUG DEVICES ARE THE RELEVANT MARKET ..................................... 6

     A.     EAI Drug Devices Are the Approved Standard Treatment for Anaphylaxis .......... 6

     B.     EpiPen Competes With EAI Drug Devices Only .................................. 8

     C.     Only FDA-Approved EAI Drug Devices Can Be Sold in the United States ........ 11

III.     MYLAN'S MONOPOLY POWER IN THE U.S. EAI DRUG DEVICE MARKET ........................................................................................................ 12

     A.     Mylan's EpiPen Dominated the Market For Many Years with Market Share Exceeding 95% ........................................................................... 12

     B.     EpiPen Took Advantage of the Minimal Competition and High Barriers for Entry in the EAI Drug Device Market ............................................. 16

IV.     MYLAN'S DOMINANT POSITION IN THE U.S. EAI DRUG DEVICE MARKET ........................................................................................................ 19

     A.     Mylan Did Not Operate in a Competitive Market and Took Incessant Price Increases Without Losing Sales or Profits ......................................... 19

     B.     Facing its First Real Threat, Mylan Implemented a Company-Wide Scheme to Exlcude Auvi-Q From the EAI Drug Device Market. ....................... 22

     C.     Mylan's Conduct Following Auvi-Q's Voluntary Recall ................................... 24

V.     SANOFI'S MARKETING OF AUVI-Q ...................................................................... 26

     A.     Sanofi Launches Auvi-Q ............................................................................ 26

     B.     Auvi-Q's Unique Features Filled an Unmet Need in the Market ........................ 27

     C.     Sanofi's Promotional Materials for Auvi-Q ...................................................... 30

     D.     Mylan's Counterclaims Against Sanofi ........................................................ 34

LEGAL STANDARD ...................................................................................................... 38

ARGUMENT ................................................................................................................. 40

I.      SANOFI IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE
        RELEVANT MARKET AND MYLAN'S MONOPOLY POWER ..............................40

        A.      It is Undisputed that the Relevant Market is EAI Drug Devices in the
                United States.................................................................................................40

                1.      The Relevant Product Market is EAI Drug Devices ................................41

                        a.      There Are No "Reasonably Interchangeable" Substitutes ...........40

                        b.      Real-World Evidence Confirms the Relevant Product
                                Market ......................................................................................41

                        c.      Mylan Admits Unequivocally that it Competes in the
                                Relevant Market.......................................................................42

                2.      The Relevant Geographic Market is the United States ...........................44

        B.      Mylan Irrefutably Had Monopoly Power in the U.S. EAI Drug Device
                Market .................................................................................................45

                1.      There is Uncontroverted Indirect Evidence of Mylan's Monopoly
                        Power in the U.S. EAI Drug Device Market ...........................................46

                        a.      Mylan's EpiPen Market Share Ranged from 80% to
                                Virtually 100% .........................................................................46

                        b.      Mylan Encountered Few to No Competitors for EAI Drug
                                Devices .....................................................................................50

                        c.      Barriers to Entry in EAI Drug Devices Are High.........................50

                2.      There is Uncontroverted Direct Evidence that Mylan Actually
                        Exercised its Monopoly Power in the U.S. EAI Drug Device
                        Market..................................................................................................52

                        a.      Mylan Exercised its Monopoly Power by Excluding Auvi-
                                Q and Eliminating Competition without Having to Innovate .......52

                        b.      Mylan's EpiPen Pricing Was Unconstrained In a Market
                                With Minimal Competition ........................................................54

II.     SANOFI IS ENTITLED TO SUMMARY JUDGMENT ON MYLAN'S
        COUNTERCLAIMS ..................................................................................60

        A.      Mylan Cannot Prove That Sanofi Violated the Lanham Act Through False
                Advertising ........................................................................................61

                1.      Mylan Cannot Prove that Sanofi Made False or Misleading
                        Statements in its Promotion of Auvi-Q ...................................................60

                        a.      Mylan Lacks Proof that Sanofi Made the Challenged
                                Statements ................................................................................60

                        b.      Mylan Relies Exclusively on Inadmissible Evidence..................61

                2.      Mylan Cannot Show that the Challenged Statements Were
                        Literally False or Misleading ..................................................................64

a.      Mylan Cannot Prove that Sanofi's Promotions Were Literally False .............................................................................. 64

b.      Mylan Cannot Prove that Sanofi's Promotions Were Misleading Because It Has No Extrinsic Evidence of Consumer Deception .................................................................. 66

3.      Mylan Cannot Show that the Challenged Statements Were Sufficiently Disseminated To Constitute Commercial Advertising .......... 69

4.      Mylan Cannot Show That It Was Harmed By Any Allegedly False Advertising ............................................................................ 72

B.      Mylan's Common Law Unfair Competition Claim Fails As a Matter of Law ........................................................................................... 75

CONCLUSION .......................................................................................... 80

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Prods. Corp. v. Procter & Gamble Co.*,
  871 F. Supp. 739 (D.N.J. 1994) .....................................................................69

*Ameritox, Ltd. v. Millennium Labs., Inc.*,
  803 F.3d 518 (11th Cir. 2015) .......................................................................76

*Andy's Towing, Inc. v. Bulldog Bldg. Sys., Inc.*,
  No. 10-2354, 2011 WL 2433679 (D. Kan. June 14, 2011) ..................................39

*Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*,
  328 F. Supp. 2d 980 (D. Minn. 2004) .............................................................72

*Avis Rent A Car Sys., Inc. v. Hertz Corp.*,
  782 F.2d 381 (2d Cir. 1986) ..........................................................................68

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) (Wolfson, J.) .............................. 62, 69, 70, 77

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ..............................................................................40, 43

*Buetow v. A.L.S. Enters., Inc.*,
  650 F.3d 1178 (8th Cir. 2011) .......................................................................64

*Castrol Inc. v. Pennzoil Co.*,
  987 F.2d 939 (3d Cir. 1993) ..........................................................................66

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .....................................................................................38

*Cottrell, Ltd. v. Biotrol Int'l, Inc.*,
  191 F.3d 1248 (10th Cir. 1999)......................................................................59

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) .................................................................62

*Defiance Hosp. v. Fauster-Cameron, Inc.*
  344 F. Supp. 2d 1097 (N.D. Ohio 2004) ..................................................*passim*

*Design Res., Inc. v. Leather Indus. of Am.*,
  789 F.3d 495 (4th Cir. 2015) .........................................................................65

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992) ................................................................................. 39, 41, 54

*Fashion Boutique of Short Hills Inc. v. Fendi USA, Inc.*,
    314 F.3d 48 (2d Cir. 2003) ....................................................................... 70, 71, 72

*Franklin v. Thompson*,
    981 F.2d 1168 (10th Cir. 1992)................................................................................39

*FTC v. AbbVie Inc.*,
    329 F. Supp. 3d 98 (E.D. Pa. 2018) .................................................... 42, 43, 45, 51

*FTC v. Qualcomm Inc.*,
    No. 17–00220, 2019 WL 2206013 (N.D. Cal. May 21 2019),
    *appeal filed,* No. 19–16122 (9th Cir. June 3, 2019)................................... 41, 43, 44

*Garland Co. v. Ecology Roof Sys. Corp.*,
    895 F. Supp. 274 (D. Kan. 1995) ........................................................................71

*Gen. Steel Domestic Sales, LLC v. Chumley*,
    129 F. Supp. 3d 1158 (D. Colo. 2015) ............................................................ 71, 72

*Gen. Steel Domestic Sales, LLC v. Chumley*,
    627 F. App'x 682 (10th Cir. 2015) (unpublished) (Gorsuch, J.) ............................59

*Goddard, Inc. v. Henry's Foods, Inc.*,
    291 F. Supp. 2d 1021 (D. Minn. 2003) .............................................................76

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*
    258 F. Supp. 2d 1197 (D. Kan. 2003) ............................................................ 65, 68

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
    638 F. App'x 778 (10th Cir. 2016) (unpublished) ......................................... 64, 66

*Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992) ...............................................................................67

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*,
    19 F.3d 125 (3d Cir. 1994) .................................................................................69

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
    829 F.2d 1171 (D.C. Cir. 1987)..........................................................................45

*Law Co. v. Mohawk Constr. & Supply Co.*,
    577 F.3d 1164 (10th Cir. 2009)..........................................................................62

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ......................................................................54

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...................................................................... 72, 73, 74

*Lorain Journal Co. v. United States,*
    342 U.S. 143 (1951) ....................................................................................1

*Manildra Milling Corp. v. Ogilvie Mills, Inc.,*
    723 F. Supp. 567 (D. Kan. 1989),
    *partial reconsideration granted,* 746 F. Supp. 40 (D. Kan. 1990) ........................................76

*Mylan Pharm. Inc. v. Warner Chilcott PLC,*
    838 F.3d 421 (3d Cir. 2016) ................................................... 45, 52, 53

*Mylan Pharm. Inc. v. Warner Chilcott PLC,*
    No. 12–03824, 2014 WL 1013026 (E.D. Pa. Mar. 17, 2014)..........................................46, 51

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.
    Co.,* 290 F.3d 578 (3d Cir. 2002) ........................................................64

*Palmer v. Shawnee Mission Med. Ctr., Inc.,*
    355 F. Supp. 3d 1003 (D. Kan. 2018) (Crabtree, J.) ...........................................63

*Pelt v. Utah,*
    539 F.3d 1271 (10th Cir. 2008).................................................................69

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*
    227 F.3d 489 (5th Cir. 2000) ........................................................... 65, 66

*Proctor & Gamble Co. v. Haugen,*
    222 F.3d 1262 (10th Cir. 2000)................................................................70

*Re/Max Int'l, Inc. v. Realty One, Inc.,*
    173 F.3d 995 (6th Cir. 1999) ...................................................................40

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.,*
    899 F.2d 951 (10th Cir. 1990) ...................................................................*passim*

*Sally Beauty Co. v. Beautyco, Inc.,*
    304 F.3d 964 (10th Cir. 2002) .................................................................59

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,*
    902 F.2d 222 (3d Cir. 1990) ....................................................................69

*Schutz Container Sys., Inc. v. Mauser Corp.,*
    No. 09–3609, 2012 WL 1073153 (N.D. Ga. Mar. 28, 2012) ...............................................72

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ................................................................... 64, 67, 68

*Sports Unlimited, Inc. v. Lankford Enters., Inc.*,
    275 F.3d 996 (10th Cir. 2002) ....................................................................... 71, 72

*In re Syngenta AG MIR 162 Corn Litig.*,
    249 F. Supp. 3d 1224 (D. Kan. 2017) ...................................................... 73, 74, 75

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ............................................................................................40

*Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*,
    713 F. Supp. 2d 1267 (D. Kan. 2010) ...............................................................76

*Tris Pharma, Inc. v. UCB Mfg., Inc.*,
    No. 5808-13T3, 2016 WL 4506129 (N.J. Super. Ct. App. Div. Aug. 29, 2016)...................77

*United Indus. Corp. v. Clorox Co.*,
    140 F.3d 1175 (8th Cir. 1998) ............................................................... 64, 66, 67

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) (Hand, J.) ................................................... 46, 49, 50

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017),
    *aff'd on other grounds*, 855 F.3d 345 (D.C. Cir. 2017) .......................................48

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ............................................................ 46, 50, 54, 58

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ....................................................................................*passim*

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc)..................................................... 2, 52, 58

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ................................................................. 73, 74, 75

*Vincent v. Utah Plastic Surgery Soc'y*,
    621 F. App'x 546 (10th Cir. 2015) ............................................................. 67, 68

*Vivint, Inc. v. NorthStar Alarm Servs., LLC*,
    No. 16–00106, 2019 WL 1098986 (D. Utah Mar. 8, 2019) ...................... 70, 71, 72

*Water Techs. Corp. v. Calco, Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988)...........................................................................75

*White & White, Inc. v. Am. Hosp. Supply Corp.*,
   723 F.2d 495 (6th Cir. 1983) .............................................................................................40

*White Motor Co. v. United States*,
   372 U.S. 253 (1963) ..........................................................................................................38

**Statutes**

Lanham Act, 15 U.S.C. § 1125(a) .......................................................................*passim*

Sherman Act, 15 U.S.C. §2 ................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 1.................................................................................................................38

Fed. R. Civ. P. 56.......................................................................................................38, 63

Fed. R. Evid. 901......................................................................................................62, 63

## PRELIMINARY STATEMENT

This case challenges Mylan Inc. and Mylan Specialty, L.P.'s (collectively, "Mylan") anticompetitive scheme to maintain its EpiPen® monopoly. For over thirty years, EpiPen® has been the ***dominant*** epinephrine auto-injector ("EAI") drug device for the treatment of anaphylaxis with market share reaching ***99.6%*** at times.

Mylan is mainly a generic drug company. As a general business model, generic companies copy products developed by branded (*i.e.*, patent-protected) drug innovators and sell them at substantially lower prices. But in 2007, Mylan acquired the U.S. marketing rights to the powerful branded EpiPen® EAI drug device ("EpiPen"). Recognizing that EpiPen was the standard treatment option for a life-threatening condition yet faced virtually no competition, Mylan dramatically increased the price of EpiPen, turning the product into Mylan's one billion dollar crown jewel enterprise. Mylan's EpiPen cash cow was threatened, however, when a new and innovative EAI drug device—Auvi-Q® ("Auvi-Q")—was launched by Sanofi-Aventis U.S., LLC ("Sanofi") in 2013. Faced with real competition for the first time, Mylan embarked on a range of anticompetitive conduct to crush the nascent competitive threat posed by Auvi-Q, the first and only EAI device to provide audio visual cues to patients and caregivers during an emergency situation. Mylan's exclusionary conduct paid off when Sanofi was forced to exit the U.S. EAI drug device market, which Mylan had a stranglehold over for nearly a decade.

Sanofi brought this lawsuit in April 2017 against Mylan for its unlawful monopolization of the U.S. EAI drug device market. It is well-settled that monopolists are governed by a special set of competition rules. "[B]old, relentless, and predatory commercial behavior" by a monopolist designed solely to "destroy threatened competition" is illegal. *Lorain Journal Co. v. United States*, 342 U.S. 143, 149, 154 (1951). Indeed, it is "inimical to the purpose of the Sherman Act to allow

monopolists free reign to squash nascent, albeit unproven, competitors at will." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc). There are two elements for proving monopolization under Section 2 of the Sherman Act, 15 U.S.C. §2: (1) possession of "monopoly power" in a "relevant market" and (2) acquisition or maintenance of that monopoly power through exclusionary or unlawful conduct. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Because Mylan has refused repeatedly to admit the basic contours of the relevant market and its monopoly power with EpiPen, Sanofi is forced to seek partial summary judgment from the Court on this first element in order to streamline this case for a jury trial. Sanofi looks forward to proving the second element at trial.

As set forth below, there is no genuine dispute that the relevant market consists of EAI drug devices in the United States or that Mylan possessed, and exercised, monopoly power in that market. In 2012, Mylan's former Chief Financial Officer summed up the state of "competition" on a public earnings call: "***we are the market for anaphylactic shock with over 98% market share***."[1] Discovery has now borne out this sentiment in virtually every Mylan internal document, the testimony of all Mylan fact and expert witnesses, and numerous third party documents and witness testimony. Tellingly, after 21 depositions, not a single Mylan witness or expert offered an alternative market definition or disputed that Mylan had market share ranging from 80% to 99% before, during, and after Sanofi sold Auvi-Q. Additionally Mylan profitably raised EpiPen's price ***over 500%*** from 2009 through 2016—all while maintaining its dominant share and engaging in anticompetitive conduct to exclude Auvi-Q from the U.S. EAI drug device market. Sanofi respectfully submits that Mylan has no legitimate basis to dispute the relevant market and monopoly power aspects of Sanofi's Section 2 claims, and partial summary judgment is warranted.

---

[1] *See* Sanofi Statement of Undisputed Material Facts (hereinafter, "56.1"), ¶ 31.

Sanofi is also entitled to summary judgment on Mylan's counterclaims, which allege that Sanofi injured Mylan by even attempting to compete in the EAI space. Though it refuses to admit its own monopoly power, Mylan claims that its market share would have been ***100%*** of the EAI drug device market had Sanofi not taken EpiPen sales through allegedly false advertising and unfair sales practices. As discussed below, there is not even a scintilla of evidence in the record to support these allegations, let alone evidence sufficient to create a genuine dispute of material fact. Sanofi is therefore entitled to summary judgment as a matter of law.

First, there is no admissible evidence that Sanofi ever even made the handful of claims that Mylan challenges, let alone that Sanofi "attacked the EpiPen . . . through a campaign of false and misleading statements." Counterclaim Compl. (ECF No. 112) ¶ 5. Nothing in the record supports Mylan's allegations that Sanofi flooded the market with false or misleading misrepresentations about Auvi-Q or EpiPen. On the contrary, the record overwhelmingly demonstrates that Sanofi's marketing strategy focused on—and accurately characterized—Auvi-Q's unique product features and the three patient preference claims that were adequately supported by a Sanofi-sponsored study.

Second, Mylan cannot show that, if any of the alleged claims had been made, they would have been false or misleading. Mylan has already admitted that a number of the claims it challenges are literally true and that it cannot show that any of the other challenged claims constitute facially false representations of fact. Mylan also cannot show that any of Sanofi's actual advertisements were misleading. Mylan elected not to introduce any consumer survey evidence to support its allegations that Sanofi's advertising statements sowed confusion in the marketplace or were likely to deceive physicians and consumers about the relative attributes and merits of EpiPen and Auvi-

Q—an evidentiary failure that makes it impossible as a matter of law for Mylan to demonstrate at trial that any Sanofi promotion misled consumers.

Third, Mylan cannot show that any of the challenged claims were sufficiently disseminated to constitute commercial advertising within the meaning of the Lanham Act. There is no evidence in the record that any of the alleged statements reached a significant portion of the relevant audience or was ever part of an organized Sanofi advertising campaign.

Fourth, Mylan did not adduce an iota of evidence—factual or expert—that any Sanofi advertisement caused Mylan to suffer any harm, let alone "substantial harm" or the claimed hundreds of millions in lost EpiPen profits. *Id.* ¶ 75. In fact, both of Mylan's counterclaim experts conceded during depositions that they had ***no opinions*** about the potential causal relationship between Sanofi's advertising and Mylan's alleged harm. And two days before the deadline for summary judgment, Mylan's counterclaim damages expert essentially recanted his testimony because the advice he received from legal counsel on Mylan's burden under the Lanham Act had changed. It is therefore impossible for Mylan to prove that its claimed EpiPen losses flowed directly from the challenged advertisements.

Accordingly, as explained below, Sanofi's Motion for Summary Judgment should be granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. CASE BACKGROUND

### A. Parties

1. Mylan has marketed EpiPen in the United States since 2007. *See* Ex. 2 No. 14.[2]

2. Sanofi marketed Auvi-Q, a competing EAI device to EpiPen, in the United States

---

[2] All references to Exhibits herein refer to the exhibits appended to the Declaration of Eric Hochstadt in support of this Motion.

from January 2013 until October 2015. *See* Exs. 3, 4.

## B. Procedural History

3.      On November 21, 2017, Plaintiffs served coordinated Requests for Admission on Mylan. *See* Ex. 5. Request No. 7 requested an admission that EAI Drug Devices are the relevant product market in this case. *Id.* No. 7. Request No. 13 requested an admission that the relevant geographic market in this case is the United States. *Id.* No. 13 Request No. 17 requested an admission that between 2007–2015, Mylan had monopoly power in the U.S. EAI Drug Device market. *Id.* No. 17. On January 4, 2018, ██████████████████████████

████████. *See id.* On February 14, 2018, Mylan served amended responses and objections to Plaintiffs' Requests for Admission, ████████████████████████. *See* Ex. 6 No. 7, 13, 17. On February 23, 2018, Sanofi filed a motion to compel discovery, seeking, among other relief, an order compelling Mylan to amend its deficient responses to these Requests. *See* ECF No. 281. On April 30, 2018, Mylan filed its Second Amended Responses and Objections to Plaintiffs' Requests for Admission. *See* Ex. 2. ████████████████████████

████████████████████████████████████████

████████████████. *Id.* No. 7, 13, 17. Sanofi took the position that Mylan's denials were baseless, flagging this forthcoming dispute at a status conference. *See* Ex. 7 at 66:6-9.

4.      On June 3, 2019, following the close of expert discovery and after Mylan's experts devoted virtually no attention to these points, Sanofi sent Mylan a letter giving Mylan one last chance to admit (1) EAI devices are the relevant product market; (2) the United States is the relevant geographic market; and (3) Mylan had monopoly power in the relevant market between 2007 and 2015. *See* Ex. 8.

5.      On June 20, 2019, Mylan responded to Sanofi's letter. *See* Ex. 9. Mylan again

refused to admit that the EAI device market is the relevant product market, and refused to admit that Mylan had monopoly power in the U.S. EAI device market between 2007 and 2015. *Id.* While Mylan admitted that the United States is the relevant geographic market, it did so "subject only to the qualification that some PBMs and third-party payors do not do business throughout the United States and therefore, to the extent the relevant product market is determined on a customer-by-customer basis, the relevant geographic market for such customers is narrower than the entire United States." *Id.*

## II.   U.S. EAI DRUG DEVICES ARE THE RELEVANT MARKET

### A.   EAI Drug Devices Are the Approved Standard Treatment for Anaphylaxis

6.   Anaphylaxis is a serious, life-threatening medical condition that can result from exposure to allergens. *See* Mylan Answer (ECF No. 112) ¶ 2 (admitting that "[a]naphylaxis is a serious allergic reaction that has a rapid onset and may cause death").

7.   Epinephrine is the recognized first-line treatment for anaphylaxis. *See* Ex. 2 No. 1 ████████████████████████████████████████████████████████; *see also* Ex. 10 § 5.4.

8.   There is no substitute for epinephrine to treat an anaphylactic episode. *See* Ex. 2 No. 2 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████; *see also* Ex. 10 § 5.4.

9.   Benadryl and other antihistamines are neither indicated for nor approved for the treatment of anaphylaxis. *See* Ex. 2; Ex. 11 at 2 (marketing material posted on Mylan's website noting, "Antihistamines are not indicated to treat the life-threatening symptoms of anaphylaxis. Antihistamines are useful for relieving itching and hives. They do not relieve shortness of breath,

wheezing, gastrointestinal symptoms or shock. Therefore, antihistamines should be considered adjunctive therapy and should not be substituted for epinephrine."); Ex. 12 at -193 ("[P]atients using Benadryl to treat systemic allergies should also carry an EpiPen… Benadryl + EpiPen = Complete Protection."); Ex. 12 at -376 ████████████████████████████████ ███████████████████████████████████████████████. Mylan's medical expert, Dr. Blaiss, stated that "treatment with antihistamines does not relieve or prevent all of the pathophysiological symptoms of anaphylaxis, including the more serious complications such as airway obstruction, hypotension, and shock." Ex. 10 § 5.4.

10.     Heather Bresch, the Chief Executive Officer of Mylan, ████████████████████ ████████████████████████████████████████████████████. *See* Ex. 13 at 246:4-23 ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████.



11.     The active ingredient in all EAI drug devices is epinephrine, and it is the same in all EAI drug devices. *See* Ex. 14 at 271:4–272:25; Ex. 10 § 5.1 ("An epinephrine auto-injector (EAI) is a medical device for injecting a fixed dose of epinephrine through a spring-activated needle."). Mylan's pharmaceutical industry expert, Gary Zieziula, testified that pharmacy benefit managers ("PBMs") or national insurers did not choose to cover EpiPen over Auvi-Q for clinical reasons, since both EpiPen and Auvi-Q "have the same amount of epinephrine and deemed bioequivalent by the FDA." Ex. 15 at 25:24–26:20.

12.     Doctors prescribe EAI drug devices to patients at risk for anaphylaxis. *See* Ex. 2

No. 4 (admitting that ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████); *see generally* Ex. 10 § 5.1.

13.     Doctors recommend that patients at risk for anaphylaxis carry an EAI drug device at all times. *See* Mylan Answer (ECF No. 112) ¶ 2 ("[D]octors recommend that patients known to be at risk for anaphylaxis carry epinephrine auto-injector devices and be trained in their use.").

14.     While epinephrine may be administered through pre-filled syringes or vials and syringes, these other methods are not preferred for a number of reasons, including the fact that epinephrine often is administered by a layperson with no medical training. *See* Ex. 16 ¶ 24.

15.     Mylan's medical expert, Dr. Blaiss, stated that "it is not practical or recommended for a patient to self-administer epinephrine using vials and syringes during anaphylaxis." *See* Ex. 10 § 5.2.3. In addition to being impractical, the use of vials and syringes can result in an incorrect dosage because syringes do not automatically dispense the drug, as EAI drug devices do. *See* Ex. 16 ¶ 24 ("[S]yringes do not automatically dispense the medication, and there is a chance that the full dose of medication will not be injected.").

## B.     EpiPen Competes With EAI Drug Devices Only

16.     Mylan's public filings and its comments to investors refer to the "defined auto-injector market." *See* Ex. 17 at 8; *see also* Ex. 18 at 5 (noting for a public earnings call that the EpiPen had 98% share in the "auto-injector market in the U.S.").

17.     Mylan's internal business documents refer to the "epinephrine autoinjector market" or the "EAI market." Ex. 19 at -591; Ex. 20 at -959 (██████████████████████████);
Ex. 21 at -134 (██████████████████████████); Ex. 22 at -836 (██████
██████████████████████████████████████████████); Ex. 23 at -421

(████████████████████████████████████████████████████████████

████████). Mylan similarly referred to the "US Auto-Injector Market." *See, e.g.*, Ex. 24 at -

767 (████████████████████████████████████████████████████████

████████████████████).

18.    Mylan evaluated EpiPen's performance by ████████████████████

████████████████. *See* Ex. 25 at Slide 5 (████████████████████████

████████████████████████████); Ex. 26 at -425-26 (████████████████

████████████████████); Ex. 27 at -591

████████████); Ex. 24 at -767 (████████████████████████████████

████████████████████████████████████████████████); Ex. 28

(████████████████████████████████████████).

19.    ████████████████████████████████████████████████████

████████████████████████. *See* Ex. 29 at Slides 7–8 (████████████████

████████████████████████████████████████████████████████); Ex.

14 at 165:23–168:8 (████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████); Ex. 30 at Slide 9 ████████████████

████████████████████; Ex. 31 at Slide 11 (████████████████████

████████████████████████████); Ex. 32 at Slide 2 (████████

████████████████████████████).

20.    Ron Graybill, Vice President of Managed Markets for Mylan, testified that ████

████████████████████████. Ex. 33 at 63:25–64:3 ████████████████

████████████████████████████.

21.     Harry Jordan, former Senior Director of National Accounts at Mylan, also testified that EpiPen competes in the EAI drug device market. Ex. 34 at 38:10-17 ("Q. What market did EpiPen compete in? . . . Was it the epinephrine auto-injector market? . . . THE WITNESS: Correct.").

22.     Mylan's counterclaim damages expert, Dr. Thomas Varner, testified at his deposition that he made the "reasonable assumption" for purposes of his economic analysis that if Auvi-Q was not available, Auvi-Q's sales would have been diverted only to other EAI drug devices. *See* Ex. 35 at 60:15-18 ("[In] a but-for world in which Auvi-Q is not in the market, it seemed like a reasonable assumption to make that a consumer would have selected another EAI device."); Ex. 36 ¶ 36, Ex. 6.3.

23.     Mylan's economic expert, Professor Robert Willig, did not propose an alternative relevant market definition besides the U.S. EAI drug device market. *See* Ex. 37 (Willig Dep. Tr.) at 113:4-16 (Q. "As I understand it, you're not giving an affirmative opinion that the product market is something other than epinephrine auto-injector devices? A. Yeah, I have not given an affirmative opinion to the contrary. . . . I am accepting EAI as a product category for the sake of analysis and argument."). Professor Willig stated that there are differences among PBMs and payors, which could necessitate individual PBM or payor-specific markets, but he could not identify a single case or enforcement action to support his view. *See* Ex. 37 at 113:8–115:9.

24.     Mylan entered into agreements with PBMs and third party payors that defined the therapeutic class for EAI drug devices. *See* Ex. 38 at 170:9–172:11; Ex. 39 at -247 (███████ ████████████████████████████████████████████████████). Jeff May, Mylan's 30(b)(6) designee who managed the payor negotiations for Mylan, testified at his deposition that ████████████████████████████████████████████

████████████████████████████████████████████████████. Ex. 38 at 174:2-

5 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

25.     Mylan characterized EpiPen as a member of the "EAI therapeutic class" when it sought to enjoin the implementation of revisions to the West Virginia Medicaid Pharmacy Program's preferred drug list that "would remove EpiPen® and EpiPen Jr.® epinephrine auto-injectors from the 'preferred' category of the epinephrine auto-injector therapeutic class and replace them with Auvi-Q®." Ex. 40 at 28. Mylan Specialty President Roger Graham testified that Mylan would "experience harm to its reputation and loss of goodwill among patients and medical professionals," if "EpiPen® is removed from the 'preferred' category of the EAI therapeutic class on the West Virginia preferred drug list." *Id.* at Ex. C ¶ 11; *id.* at Ex. B ¶ 14 ("EAIs, for example, are part of an epinephrine auto-injector therapeutic class, meaning that they are intended for the treatment of anaphylaxis.")

**C.     Only FDA-Approved EAI Drug Devices Can Be Sold in the United States**

26.     The Food & Drug Administration ("FDA") ████████████████████████

████████████████████████████████████████████████████████████████

████████ Ex. 2 Nos. 10, 11.

27.     EAI drug devices manufactured in other countries cannot be imported and sold in the U.S. unless they have received FDA approval. *See* Ex. 2 No. 11; Ex. 41 at 31:16-18; 185:7-15 (corporate representative for Pfizer Canada explaining that Pfizer Canada sells the EpiPen in Canada, but it is illegal for Pfizer Canada to export EpiPen to the United States).

## III.   MYLAN'S MONOPOLY POWER IN THE U.S. EAI DRUG DEVICE MARKET

### A.   Mylan's EpiPen Dominated the Market For Many Years with Market Share Exceeding 95%

28.   Mylan admitted in this case that ███████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████ Ex. 2 No. 16. Mylan further admitted that ███████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ *Id.* No. 15.

29.   Sanofi's antitrust expert, Professor Fiona Scott Morton, the former Deputy Assistant Attorney General for Economics Analysis at the Department of Justice from 2011 to 2012, calculated Mylan's EpiPen market share ranging from 80% to 98% of the EAI drug device market from at least 2011 through 2017. *See* Ex. 42 at Figure 7 (calculating EpiPen's share of EAI drug device market based upon IQVIA National Sales Perspectives Data).



30.   Prior to Auvi-Q's launch in 2013, EpiPen's market share was 99% of the EAI drug device market. *See* Ex. 43 at -290 (referring to ████████████████████████



█████); Ex. 26 at -428, 32 (noting that ████████████████████

██████████████████████████████████); Ex. 25 at Slide 5

(calculating ████████████████████████████); Ex. 44 at -441

(calculating ████████████████████████); Ex. 45 at -219 (referring to

EpiPen's "100% market share" in 2012); Ex 46 at Slide 16 (████████████

██████████████); Ex. 47 at -852 ████████████████████████

████████████████████████████; Ex. 48 at Slide 2 ████████████

██████████████; Ex. 26 at -425 ████████████████████████

██████████████; Ex. 49 at -781 ████████████████████████

██████████████; Ex. 50 at Slide 18 ████████████████████████

█████.

31.     At an April 26, 2012 earnings call, Mylan's Chief Financial Officer, John Sheehan, stated in reference to the EpiPen, "we are the market for anaphylactic shock with over 98% market share." Ex. 1 at 15. Mylan's now CEO similarly reported on a Q3 2011 analyst call: "[O]ur market share has returned to 98%. We don't see this momentum stopping." Ex. 18 at 5.

32.     Mylan's pharmaceutical industry expert in this case, Gary Zieziula, explained, "[i]n the several years leading up to the launch of Auvi-Q, the EpiPen auto-injector had established itself as the market leader in the EAI category." Ex. 51 at 7. Mylan's economist expert, Professor Willig, did not even dispute that EpiPen had an overall market share exceeding 80% or 90%. Ex. 37 at 122:4–124:17.

33.     Even after Auvi-Q's 2013 launch, EpiPen maintained market share near or at 90% of the EAI drug device market. *See* Ex. 52 at -907 ████████████████████████

██████████████████████; Ex. 53 at -474 ████████████████

███████████████████████████████████████████████████

███████████████████████████████; Ex. 21 at -134 █████████████

███████████████████████; Ex. 54 at -570 ██████████████████

███████████████████████████████████████████████████

███████████████████████; Ex. 40 at Ex. C ¶ 9 ("Nationally, approximately 9 of every 10 scripts for an epinephrine auto-injector ("EAI") are written for EpiPen®").

34.     EpiPen maintained its ████████████ in the U.S. EAI drug device market as the ██████████ *See* Ex. 55 at -356 (referring to █████████████████████); Ex. 45 at -219 ███████████████████████████████; Ex. 56 at -143 ██████ ███████████████████████████████; Ex. 23 at -421 ██████████████ ███████████████████████████████████████████████████ ███████████████████████.

35.     Each of the following Mylan employees (current and former) deposed in this case testified at his or her deposition that EpiPen was the market leader and/or had market share surpassing 80% to 90% of the EAI drug device market.

| Mylan Employee | Position | Deposition Testimony |
|---|---|---|
| Heather Bresch | Chief Executive Officer | ███████████████████████████████████████ ███████████████████████████ ████████████████████████████ ████████████████████████████ ███████████████████████ Ex. 13 at 268:10-269:4 |
| Bruce Foster | Senior Director of National Accounts | ████████████████████████████████████ █████████████████ ██████████████ |

| Mylan Employee | Position | Deposition Testimony |
|---|---|---|
| | | ███████ <br> Ex. 57 at 119:14-19 |
| Roger Graham | President of Mylan Specialty | ████████████████████ <br> Ex. 58 at 56:5-7 |
| Thomas Hadley | Former Executive Director of Global Marketing | **Q.** "Do you recall what EpiPen's market share was at that time?" <br> **A.** "I don't recall but it had to be above 80%." <br> Ex. 59 at 36:16-19 |
| Patrick Jones | Former Director of National Accounts | ██████████████████████ <br> Ex. 60 at 54:25-55:12 |
| Harry Jordan | Former Senior Director of National Accounts | ██████████████████ <br> Ex. 34 at 38:18-22 |
| Jeff May | Head of Market Access & Managed Markets | ██████████████████████ <br> Ex. 38 at 277:6-10 |
| Pranay Patel | Senior Product Director – Marketing | ████████████████████ <br> Ex. 61 at 20:19-22 |
| Scott Sussman | Senior Director of National Accounts | ████████████████████ <br> Ex. 62 at 315:3-5, 316:1-8 |
| Nicole Willing | Former Director of National Accounts | ████████████████████ |

| Mylan Employee | Position | Deposition Testimony |
|---|---|---|
|  |  | ███████████████████████████████ |
|  |  | Ex. 63 at 45:19-25 |

**B.      EpiPen Took Advantage of the Minimal Competition and High Barriers for Entry in the EAI Drug Device Market**

36.      Mylan's pharmaceutical industry expert, Gary Zieziula, acknowledged that there was no "meaningful competition" in the U.S. EAI drug device market before Sanofi launched Auvi-Q. Ex. 51 at 8.

37.      The need for FDA approval presents barriers to entry into the EAI drug device market. *See* Ex. Mylan Answer (ECF No. 112) ¶ 25; ECF No. 95 at 2 ("Teva has not been delayed because of that settlement. Rather, Teva has been delayed because it still has not gained FDA approval to market its generic EpiPen—over two years after Teva was permitted to enter under its settlement with Pfizer."); *id.* at 20 ("[T]wo independent barriers prevented Teva, Intelliject, and/or Sandoz from entering the market with a competing epinephrine auto-injector unrelated to the respective litigations and/or settlements: (1) Teva's and Sandoz's inability to obtain FDA approval (which they still lack to this day) for their respective epinephrine auto-injectors; and (2) Pfizer's EpiPen device patents, which do not expire until 2025.").

38.      Even if an EAI drug device gains FDA approval, there are significant hurdles in obtaining formulary placement from PBMs and third-party payors in order to access patients. *See* Ex. 27 at Slide 23 █████████████████████████████████████

███████████████████████████).

39.      Mylan recognized that PBMs and payors were ██████████████████████

████████████████████████████████████████████████████.

Ex. 38 at 237:21–238:23 ███████████████



██████; Ex. 52 at -912 █████████████████████████████████████

██████████████; Ex. 64 at -705 ████████████████████ Ex. 34 at 133:5-

11 ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ex. 45 at -219 ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████.

40.     Mylan publicly recognized that it would be difficult for EAI drug device competitors to take market share from EpiPen. *See* Ex. 65 at 7 ("We believe that given the brand equity, given the fact that you only renew a script for EpiPen one time per year, not every single month, given the importance of the product for it being used in a life-saving situation, we don't believe that even in a situation where a competitor was to receive a generic approval that the uptake would be anything near let's say a typical oral solid dose product generic uptake. We would see the uptake being slow and ramp up slowly over time. And I think you'd measure that time over a period of years as opposed to a period of months."); *see also* Ex. 66 at 10 ("I've been pretty vocal about the fact that I think the bar to get an AB-rated substitutable product is very high."); ECF No. 1623 at 3 (noting that "patients already comfortable with the EpiPen device may be reluctant to switch to a generic that does not operate in exactly the same manner"); *id.* at 6 ("'[I]f patients are comfortable with and trained on a particular EAI device' they logically may prefer that device.");

*id.* at 7 ("Dr. Blaiss has seen patients reluctant to switch from one EAI to another 'numerous times in practice.' . . . 'most of them felt very comfortable with their EpiPen and that the school's trained and the grandparents are trained, etc., and they didn't want to switch.'"). Based upon Mylan's documents and quantitative evidence, Professor Scott Morton calculated that EpiPen had between a 50% to 70% share that would still stick with EpiPen regardless of any new competitor that entered the EAI drug device market (referred to as "non-contestable share"). *See* Ex. 42 ¶ 152.

41.     Several competing EAI drug devices (besides Auvi-Q) launched over the years, but they never gained much traction or share of the EAI drug device market. Ex. 67 at -366 ███



; Ex. 68 at 314:3-5 ████

; Ex. 69 ¶ 30 (noting that Adrenaclick was a "weak competitor" to the EpiPen); Ex. 37 at 161:2-4 (stating "it's certainly not a head-on comparable situation to say Adrenaclick or to Twinject being the objective choice against EpiPen."); Ex. 10 § 5.1.7 ("I never prescribed the Twinject due to the fact that the second dose uses a syringe and needle, which I felt was too difficult for patients to use during a life-threatening anaphylactic reaction.").

42.     Due to the visual, physical, and operating differences in all EAI drug devices, patient safety concerns arise when substituting a new EAI drug device. *See* Ex. 40 Ex. B ¶ 28 (Mylan's Senior Director, Global Medical Affairs: "Because each of the distinct currently-marketed EAIs is visually and physically different, and presents distinct user operating principles, substitution of one EAI for another presents a distinct concern for patient safety: that a patient or caregiver will not receive instruction and retaining on the newly-prescribed EAI and will accordingly fail to properly administer the product during an emergency situation.").

## IV.  MYLAN'S DOMINANT POSITION IN THE U.S. EAI DRUG DEVICE MARKET

### A.  Mylan Did Not Operate in a Competitive Market and Took Incessant Price Increases Without Losing Sales or Profits

43.     Between 2009 and 2016, Mylan raised the price of EpiPen by over 500%. Mylan raised the price approximately 20% to 30% each year from 2010 through 2016—primarily through a strategy of taking **_at least_** two semi-annual price increases of 9.9% or 14.9%. EpiPen cost $98.57 in 2008 and its price increased each year, reaching $608.61 in 2016. *See* Ex. 70 ("Epinephrine Auto-Injectors Class Price History"); *see also* Ex. 71. Mylan's CEO, Heather Bresch, was called to testify in front of Congress in 2016 regarding Mylan's EpiPen price increases. *See* Ex. 152.

44.     ███████████████████████████████████████. *See* Ex. 72 at Slide 2 ███████████████████████

███████████████████████████████████████████████████

████████

45.     Mylan also strategically raised the price of EpiPen several times in anticipation of Sanofi's launch of Auvi-Q, implementing three price increases in 2012 alone. *See id.* at 6; Ex. 73 at 53:3–54:16 ████████████████████████████████

████████; *see also* Ex. 70; Ex. 71.

46.     ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████. *See* Ex. 42 ¶ 87 ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████. As Sanofi's economic expert, Professor Scott Morton explained, "while Mylan used the inducements of conditional discounts . . . to exclude Auvi-Q from formularies, because

Mylan continued to raise its list price, the net price it ultimately offered did not actually drop, as would be expected in a competitive market, once a new innovative product – Auvi-Q – came onto the market." *See* Ex. 42 ¶ 184.

47.     Even the largest PBMs and payors could not escape Mylan's price increases. 

*See* Ex. 74

48.

. *See* Ex. 75

49.

. *See* Ex. 76 (

).

50.

. *See* Ex. 77 at -017

██████████████████████████████████████████████████████████

████████  *see also* Ex. 78 at 164:12–14  ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████  Ex. 79

████████████████████████████████████ .

51.     As illustrated in the "U.S. EpiPen Profitability Analysis" that Mylan submitted to Congress for its Congressional Hearing, Mylan's EpiPen sales and revenues increased from 2009 through 2015. *See* Ex. 80. Mylan's EpiPen sales increased from 4.5 million pens and $200 million in gross sales for 2009 to 8.3 million pens and $912 million in gross sales for 2015. *Se id.* EpiPen's total revenues relatedly grew at an annual rate of 14% per year from 2002 through 2008 (prior to when Mylan acquired EpiPen), and then 33% per year between 2009 and 2014. *See* Ex. 81 at -427.

52.     Mylan's gross profit margins on EpiPen also rose from 56% per pen in 2010 to 72% per pen in 2015 (according to the U.S. EpiPen Profitability Analysis that Mylan submitted to Congress). *See* Ex. 80.

53.     As calculated by Sanofi's expert Professor Scott Morton based upon the financials that Mylan submitted to Congress, Mylan's profitability increased substantially from 2013 to 2015 while Auvi-Q was in the market. *See* Ex. 151 ¶ 39. Mylan's "profits per pen throughout 2013-2015 were far above what Mylan earned in 2012" on EpiPen. *Id.* And "from 2013 to 2015, while Auvi-Q was in the market, Mylan earned $219 million, $313 million, and $312 million respectively, or $30, $40, and $38 on a per-pen basis. Across these three years, annual profits increased by 80% relative to 2012, or 67% on a per-pen basis." *Id.*

54.     ████████████████████████████████████████████████

████████ . *See* Ex. 82 at -399 (███████████████████████████████

███████████████████████████████████████. In fact, "EpiPen's U.S. operating profits were 34.6% of [Mylan's] global operating profits" in 2013 rising to "38.8% of operating profits" in 2014, as calculated by Professor Scott Morton. *See* Ex. 42 ¶ 22.

55.    Mylan Director of National Accounts Bruce Foster explained, ████████████ ████████████████████████████████████████████████████████████████████ ████████████ Ex. 83 at -597.

**B.    Facing its First Real Threat, Mylan Implemented a Company-Wide Scheme to Exclude Auvi-Q From the EAI Drug Device Market**

56.    Pharmaceutical firms typically offer rebates to PBMs and third-party payors in exchange for placement on the PBM's formulary. Before Sanofi's launch of Auvi-Q, ████ ███████████████████████████████. *See* Ex. 57 at 212:17–213:2 ███████████ ████████████████████████████████; *see also* Ex.45 at -219 ██████████ █████████████████████████████████████████████████████████████████ ████████████████████████.

57.    Prior to the launch of Auvi-Q, Robert Coury, Mylan's former CEO and now Chairman of the Board, ██████████████████████████████████████████████████ ████████████████████ Ex. 150.

58.    According to a Mylan 2013 presentation, ████████████████████████ ███████████████████████ Ex. 84 at -684. Another Mylan presentation stated, ██████ ████████████████████████████████ Ex. 85 at -505.

59.    ████████████████████████████████████████████████████████ █████████████████████████████████. As Alexander Falto, Manager of Market Access Strategies at Mylan, explained: ███████████████████████████ ████████████████████████████████████████████████████████████████████

████████████ Ex. 86 at -562.

60.    Harry Jordan, Director of National Accounts at Mylan, stated in December 2011,

████████████████████████████████████████████████████████████

*See* Ex. 87 at -159. Mylan then began to execute a strategy to ████████████████████

███████████████████████████████████████████ Ex. 88 at -194, -228.

Mylan's negotiating strategy involved ██████████████████████████████████

████████████████████████████████ Ex. 89.

61.    Mylan's dominant position in the U.S. EAI device market gave Mylan significant

negotiating leverage with payors and PBMs, ████████████████████████████████

████████████████████████ Ex. 90 at -406.

62.    Mylan carefully negotiated terms with payors and PBMs to disadvantage Auvi-Q's

formulary position. *See, e.g.*, Ex. 91 at -406 █████████████████████████████

████████████████████.

63.    Mylan tracked the number of lives (*i.e.*, patients under a given insurance provider)

that were unable to access Auvi-Q as a result of Mylan's exclusive contracts with PBMs and

payors, and celebrated its success in getting Auvi-Q excluded or disadvantaged on a multitude of

formularies, as the following illustrative Mylan documents show:

| Date | Mylan Document | Excerpt |
|------|----------------|---------|
| February 2013 | Ex. 92 at -721 | ████████████████████████████████████ |
| August 2013 | Ex. 93 at -262 | ████████████████████ (emphasis added) |

23

| Date | Mylan Document | Excerpt |
|---|---|---|
| September 2013 | Ex. 94 at -874 | <br><br><br>(emphasis added). |
| October 2013 | Ex. 95 at -266, Slide 21 | (emphasis added). |
| November 2013 | Ex. 96 | (emphasis added). |
| December 2013 | Ex. 97 at -599, Slide 40 | (emphasis added). |

64.     Prior to Auvi-Q's launch, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 48 at Slide 22.

65.     As explained by Professor Fiona Scott Morton, if Auvi-Q had been able to compete on a level playing field, EAI drug device output would have been higher—*i.e.*, more individuals would have consumed EAI drug devices because there would have been greater choice and differentiation between the products. And while EAI output generally increased as compared to before Auvi-Q launched, output was lower than it should have been absent Mylan's exclusionary conduct. *See* Ex. 98 at 242:2-16. As Professor Morton explained, "when the product is differentiated as Auvi-Q is, it's going to appeal to a whole other set of people and that's going to also expand the market further." *Id.* at 245:11-14.

## C.     Mylan's Conduct Following Auvi-Q's Voluntary Recall

66.     After Sanofi voluntarily recalled Auvi-Q from the market in late October 2015, because of manufacturing issues, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████; *see also* Ex. 100 at 123:11-14

("[W]hen Auvi-Q was withdrawn from the market, the pricing of EpiPen brand jacked up.").



Ex. 101.

███████████████████████████████, as the documents and deposition

testimony in the following chart show:

| Document or Testimony | Excerpt |
|---|---|
| Ex. 102 | ███████████████████████████ |
| Ex. 103 at -072 | ███████████████████████████ |
| Ex. 104 | ███████████████████████████ |
| Ex. 105 at -076 | ███████████████████████████ |
| Ex. 57 at 375:20–380:7 | ███████████████████████████ |

| Document or Testimony | Excerpt |
|---|---|
| Ex. 63 at 243:10–19 | ███████████████████████████████ |
| Ex. 106 at -870 | ███████████████████████████████ |

69.     No longer facing any competition, Mylan ████████████████████ *See* Ex. 57 at 76:15–78:17.

## V.     SANOFI'S MARKETING OF AUVI-Q

### A.     Sanofi Launches Auvi-Q

70.     In January 2013, Sanofi launched Auvi-Q, the first and only EAI drug device with audio-visual cues to guide patients through administering epinephrine. *See* Ex. 3.

71.     Auvi-Q was the first EAI drug device that was not shaped like a pen and was smaller than the EpiPen. *See* Ex. 10 § 5.0 ("EpiPen products are pen-shaped"; "The Adrenaclick is a pen-shaped EAI device."); Ex. 51 at 5 ("The Auvi-Q device was smaller than the EpiPen device, with audio cues to walk patients through the injection process"). Auvi-Q is also the only EAI device that does not require users to administer an injection with a "swing and jab" motion. Ex. 16 ¶ 26 ("It is the only EAI device that is not shaped like a pen and that does not require users to 'swing and jab' the device."). Auvi-Q is also the first and only EAI device with a retractable needle mechanism. *See* Ex. 15 at 55:10–56:14 ("Do you think the AUVI-Q™ has a [retractable] needle? A. Yes. . . . To my knowledge, it is the only [retractable] needle in the category.").

72.     Auvi-Q was developed by twin brothers Eric and Evan Edwards, who both suffered from severe allergies, but were dissatisfied with the EpiPen's design. Ex. 107. Inspired by their own experiences, the brothers created the Auvi-Q as a "slimmer device shaped like a smartphone"

to address their needs and the patient needs of other EpiPen users. *Id.*

73.    Mylan's Director of National Accounts, Bruce Foster, testified that the "size of the [Auvi-Q] device was an advantage" and that it looked "sleek." *See* Ex. 57 at 142:22–144:9.

## B.    Auvi-Q's Unique Features Filled an Unmet Need in the Market

74.    Over the last two decades, a rise in food-related allergies and increasing prevalence of anaphylaxis created an increased need for access to EAI drug devices. *See* Ex. 10 § 4.0 ("Evidence suggests that food-related allergies have increased in the past 20 years, with a concomitant increase in the risk for anaphylaxis."); *id.* ("Anaphylaxis prevalence has increased within the last few years.").

75.    Many patients at risk for anaphylaxis fail to carry EAI drug devices at all times. *See* Ex. 15 at 419:7-12 (Q. "Do you think this statement, patients don't always carry their EAI devices as recommended is a false statement? A. No. I think there's data to support that it's a true statement."); Ex. 16 ¶ 22.

76.    Both Sanofi and Mylan therefore recognized that there was an unmet need in the treatment of anaphylaxis. Ex. 108 at -525 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 109 at 24:17-22 ("Auvi-Q is an innovation in regards to Epinephrine auto-injectors, it fills a critical unmet need in terms of a patient's willingness to carry devices as well as addressing some of the adverse events that prior generations of auto-injectors had included."). Mylan CEO Heather Bresch testified that when Mylan acquired the EpiPen, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 13 at 124:8-18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *Id.* at 245:24–246:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████████████

████████████████████████████ ).

77.     Prior to the introduction of Auvi-Q, there was virtually no innovation in the EAI drug device market. Ex. 16 ¶ 27; Ex. 14 at 21:20–22:3 ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████. During its lifecycle, Mylan and its partner the Pfizer EpiPen Manufacturer have only redesigned the EpiPen once, in 2009, to include a needle cover and a smoother shape. Ex. 14 at 25:20-22 █████████████████████████████████████████████

██████.

78.     In 2008, █████████████████████████████████████████████████████

█████████████████████████████████. *See* Ex. 78 at 32:14–33:6 ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████.

79.     █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Ex. 110 (emphasis in original).

28

80. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████. *See* Ex. 111 at Slide 2 (█████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████).

81. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████. Ex. 78 at 100:20–101:19.

82. However, ████████████████████████████████████████████

████████████████████████ *See* Ex. 112 ██████████████████████████

████████████████████████████████████████████████████████.

██████████████████████████████. *See* Ex. 78 at 94:20–95:6 ███████████████

████████████████████████████████████████████████████████

██████████████████████████████. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Ex. 113 at Slide 8. ████████████████

██████████████████████████ Ex. 78 at 108:10-19. Mylan's CEO, Heather

Bresch, ████████████████████████████████████████████████

████████████████████████████. *See* Ex. 112; Ex. 78 at 95:13–100:9.

83. ████████████████████████████████████████████████

████████████████████. *See* Ex. 78 at 102:1-9. ████████████████████████.

*See* Ex. 14 at 25:20-22 (███████████████████████████████████████████████).

**C.     Sanofi's Promotional Materials for Auvi-Q**

84.     Prior to Auvi-Q's launch, █████████████████████████████████████████

███████████████████████. *See* Ex. 114 at -593, Table 2; Ex. 115 at 13; Ex. 116 (████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████, Ex. 117 at -496 (█████████████████████

██████████████████████████████████████).

85.     ██████████████████████████████████████████████████████████

██████████████████████████████████████████. Ex.  118  at  -814

(█████████████████████████████████████████████████████████████████

██████████████████████████████████████████); *see also* Ex. 119 at -852

(█████████████████████████████████████████████████████████████████

██████████████████████████████████████).

86.     Sanofi launched marketing campaigns that highlighted these particular attributes of

the Auvi-Q:




Sanofi advertisements highlighted the features that most attracted patients. Ex. 120 (Auvi-Q "I talk" consumer advertisement stating "'Press-and-Hold Injection'"); Ex. 121 ("Word is Out" Auvi-Q ad stating "Audio & visual cues" and "Unique compact size and shape"); Ex. 122 (Meet Auvi-Q ad); Ex. 123 ("Have You Heard" Auvi-Q ad); Ex. 124 ("Let Me Introduce Myself" Auvi-Q ad).

87.     Sanofi also sponsored a study in 2011 entitled "Auvi-Q Versus EpiPen: Preferences of Adults, Caregivers, and Children" to "evaluate whether adults, caregivers, and children in the United States with and without experience of using and EAI device have a preference for the current design of Auvi-Q compared with the current design of Epipen." *See* Ex. 125.

88.     The results of this study showed that participants preferred Auvi-Q for its "method of instruction," "size of device" and "shape of device" as compared with EpiPen. *Id*. The study was published in a leading, peer-reviewed medical journal.

89.     Prior to conducting the study, Sanofi sent its research proposal to FDA for feedback on the study's design and specifically requested guidance on "the level of evidence needed to make comparative patient preference claims." Ex. 126.

90.     Initially, the study's design used EAI trainer devices that had the same look and feel as the actual products, but did not contain needles or drug product. Ex. 127.

91.     Sanofi revised the design of the study based on FDA's feedback to pursue only patient preference claims that FDA agreed could be supported through the simulated study Sanofi originally proposed and added a "no preference" survey response option. *See* Ex. 128; Ex. 129.

92.     Sanofi eliminated the portions of the study that would have required "use of the devices in real-life settings[,]" as Sanofi would have needed to test participants through "actual use of the product" based on FDA requirements. *See* Ex. 130; Ex. 128. In other words, it would have required that study participants, including children, be injected with a placebo. According to

Mylan's own medical expert, Dr. Blaiss, such studies "are not possible due to ethical constraints." Ex. 10 § 5.0.

93.     Sanofi developed marketing and training materials to promote Auvi-Q based on the results of the study. The study showed that, among experienced and inexperienced users of EAI devices, 77% preferred Auvi-Q's method of instruction, 85% preferred Auvi-Q's size, and 65% preferred Auvi-Q's shape over EpiPen.



**Ex. 131 at Slide 8**

94.     Sanofi materials used to train its sales representative about the study emphasize that claims can "only be made on the preference results shown above" and that the study does not allow sales representatives to make "an overall preference claim." Ex. 132 at -245.

95.     Sanofi's internal Review Committee vetted advertisements to ensure "compliance with FDA and company regulations and policies regarding the promotion of prescription drug products." Ex. 133 at 8:23–9:4 ("Q: With respect to -- you said you were responsible for advertising and promotion. What -- what were your responsibilities? A. To ensure through review, compliance with FDA and company regulations and policies regarding the promotion of prescription drug products as a member of the Review Committee."); *id* at 14:18–15:4 ("Q. And I

think you said, and correct me if I'm wrong, that your specific role was to look at whether these advertising or promotional materials complied with FDA guidance and Sanofi internal policy. Is that right? A. FDA regulations, FDA's guidance and internal Sanofi policies, yes. Q. Okay. And what -- what kinds of internal Sanofi policies were these? A. Internal policies in terms of appropriate characterization of claims and support, and things like that.").

96.     Internal policies at Sanofi required that advertisements contain "appropriate characterization" and "support" for the claims made. *Id.* at 15.

97.     The Review Committee was comprised of representatives from the Regulatory, Medical, Legal, and Marketing departments at Sanofi. *Id.* at 9:10–22 ("Q. What was the Review Committee during the 2010 to 2015 time period? A. The Review Committee was a group of individuals at Sanofi whose responsibility was to review and approve or not prescription drug advertising and promotion for specific products. Q. Okay. And who -- who was on the Review Committee from the 2010 to 2015 time period? A. Well, in general there's -- each -- each product that was promoted had a Review Committee, and it was -- consisted of a Regulatory representative, a Medical representative, a Legal representative and a Marketing representative.").

98.     While Auvi-Q was on the market, the Review Committee met weekly to review promotional materials and advertisements. *Id.* at 13.

99.     The Review Committee also reviewed future advertising ideas or proposals to "give [an] opinion on the concepts [and the] likelihood that they would be approved or not[,]" and reviewed internal promotional materials prior to their disbursement to sales forces or use at trainings. *Id.* at 13–14.

100.     If sales representatives engaged in unauthorized actions or did not comply with sales force training guidance, Sanofi disciplined those sales representatives. Ex 134.

101.    Sanofi voluntarily recalled Auvi-Q in October 2015. *See* Ex. 4.

102.    Sanofi did not make a profit from Auvi-Q at any point while it marketed the product. *See* Ex. 135 ¶¶ 83–84, Table 1 ("Sanofi's operating profit margin on Auvi-Q sales was negative in every year of production.").

**D.    Mylan's Counterclaims Against Sanofi**

103.    Mylan filed counterclaims against Sanofi on January 16, 2018, relating to Sanofi's Auvi-Q promotional messaging. *See* Mylan Answer ECF No. 112. Mylan's claims relate to six allegedly false or misleading statements, and one allegation that a Sanofi sales representative gave kickbacks. *Id.* There is no documentary evidence to support these allegations.

104.    Mylan claims that Sanofi advertised that "Auvi-Q is the 'new EpiPen,' or Auvi-Q is replacing the EpiPen Auto-Injector," based on one copy of a ███████████████████████ ███████████████████████████ (which Mylan admits may not have been written by a Sanofi employee), *see* Ex. 136 at -803, and ████████████████████████ ████ . *See id.* at -798 (███████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████ *id.* at -800 (declaration averring that an Auvi-Q sales representative told a medical assistant at the same Arizona allergy clinic that "Auvi-Q was going to replace the EpiPen and that it was going to be like the new EpiPen"); Ex. 137 at 16:2-7 ("Q. Whose handwriting was on the business card? A. I'm not sure. Q. Is it possible that someone else at the office wrote "new EpiPen" on the card? A. I'm not sure."); Ex. 15 at 455:19-24. ████████████████████████ ██████████████████████████████████████████ . *See* Ex. 138 (████ ████████████████████████████████████████████

███████████████████████████████ (emphasis added)); Ex. 139 at -787 (████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ ).

105.    Mylan admits that it has no documentary evidence to support its allegation that Sanofi made statements that "the EpiPen Auto-Injector and Auvi-Q are bioequivalent, therapeutically equivalent, or interchangeable." *See* Ex. 137 at 9:17–25 ("Q. Are there any documents relating to Mylan's claims that Sanofi claimed that EpiPen and AUVI-Q are interchangeable? A. Not -- not to my knowledge. Q. Are there any -- does Mylan have any e-mails or reporting forms reporting on these incidents? A. Specifically on the bioequivalence and therapeutic equivalence, not to my knowledge."). Mylan's medical and pharmaceutical industry experts also admit that the products are equivalent. *See* Ex. 140 at 197:14-25, 199:1-2 (testifying that he alternated between Auvi-Q and EpiPen "on whim" when prescribing because he did not "think that one was superior to the other."); *id.* at 214:5-8 ("it's my feeling that -- that these devices have equal clinical effectiveness. They have equal safety."); Ex. 15 at 26:17-20 ("[B]oth products have the same amount of epinephrine and deemed bioequivalent by the FDA.").

106.    Mylan claims that Sanofi promoted Auvi-Q as "superior to and preferred by more physicians and patients than the EpiPen Auto-Injector" based on a handwritten note stating that "overwhelming majority of patients given the choice by their clinician prefer Auvi-Q," Ex. 141 at -390, and an internal Sanofi email. Ex. 142 (internal Sanofi email exchange where one employee inquires whether the phrase "patients overwhelmingly prefer Auvi-Q over other EAIs" could be used in a slide deck). Sanofi's internal policies explicitly stated that "employees may not under any circumstances create homemade promotional materials . . . or alter existing approved

promotional materials in any way" and that employees who violate said policy are subjected to "appropriate disciplinary action." Ex. 134 at -135–36; Ex. 131 at -245 (Sanofi sales training talking points explaining that only approved preference claims can be made).

107.    Mylan claims Sanofi advertised that "patients did not carry and/or know how to use their epinephrine auto-injectors." But Mylan's pharmaceutical industry expert conceded there is "data to support that" true statement. Ex. 15 at 419:7-12 (Q. "Do you think this statement, patients don't always carry their EAI devices as recommended is a false statement? A. No. I think there's data to support that it's a true statement.").

108.    Mylan has admitted that the statement "Auvi-Q is the first and only EAI . . . with a retractable needle mechanism designed to help prevent accidental needle sticks" is literally true. Counterclaim Compl. (ECF No. 112) ¶¶ 50–51 (acknowledging that messages stating that "Auvi-Q is the first and only EAI . . . with a retractable needle mechanism designed to help prevent accidental needle sticks" are "literally true"); *See* Ex. 15 at 55:10–56:14 ("Do you think the AUVI-Q™ has a [retractable] needle? A. Yes. . . . To my knowledge, it is the only retractable needle in the category.").

109.    Mylan claims that Sanofi advertised that . Ex. 143 at Slide 20

110.    Mylan also claims that Sanofi engaged in "other unfair and unlawful conduct" in the form of offering "kickbacks to increase sales of Auvi-Q." Counterclaim Compl. (ECF No. 112)

¶¶ 57–63. ████████████████████████████████████████████████

█████████████████████████████████████████████████████████. Ex. 144

(███████████████████████████████████████████████████); Ex. 145

at 12; Ex. 146 at 9.

111.    Both of Mylan's counterclaim experts stated during their depositions that they had no opinions about a causal relationship between Sanofi's advertising and Mylan's alleged harm, and that they had simply assumed a causal link in their expert reports. *See* Ex. 145 at 4; Ex. 15 at 403:22–404:21, 405:11-25; Ex. 35 at 89:11-14. And Mylan's pharmaceutical industry expert conceded that many of the statements Mylan challenges were not literally false and were not shown to be misleading by survey of the relevant audience. *See* Ex. 15 at 35:17-22, 49:23–50:4, 67:6-12, 420:16–421:2; *see also* Ex. 147 at 1 n.2. Mylan's 30(b)(6) witness on this topic—Jay York—similarly admitted that Mylan had no basis to claim that Mylan was harmed by the alleged false and misleading Sanofi promotions. *See* Ex. 137. at 11:9-14 (Q. How does Mylan know that any AUVI-Q sales were a result of the alleged misleading claims by Sanofi? A. That's out of my -- my scope in terms of how they would know that -- how we would know that.); *id.* at 19:1-7 (Q. Can you say for sure that this statement about AUVI-Q replacing EpiPen caused physicians to prescribe fewer EpiPens? A. That's Mylan's allegation. Q. What's -- is there any -- are there any documents supporting that allegation? A. Not to my knowledge.)

112.    Two days before the deadline to move for summary judgment, Mylan's counterclaim damages expert, Dr. Thomas Varner, served a supplemental expert disclosure, in which he stated that his prior reports were based on incorrect legal instructions from Mylan's counsel. *See* Ex. 148. Dr. Varner stated that Mylan's "[c]ounsel ha[d] recently provided [him] with a revised legal instruction with respect to the claim for Mylan's 'damages sustained,'" which

clarified that it was Mylan's burden (rather than Sanofi's) under the Lanham Act "to apportion Mylan's lost profits." *Id.* ¶¶ 2–3. Though he conceded that he had not conducted such an analysis, Dr. Varner stated that his prior opinions could nonetheless serve as "a benchmark for the maximum potential recovery of Mylan's 'damages sustained'" and that a "jury, relying on evidence presented by counsel through fact witnesses at trial, can determine what percentage of Mylan's lost profits are attributable to" Sanofi's alleged conduct. *Id.* ¶ 5.

113.    Mylan's claims do not primarily relate to Sanofi's authorized promotional materials. *See* Ex. 146 at 2 ("[M]y February 4 Report primarily addresses the promotional *messaging* deployed by Sanofi, not just Sanofi's written promotional materials) (emphasis in original); Ex. 15 at 186:24–187:23, 187:25–188:8, 188:9-16. The evidence Mylan relies on to support its claims does not come from Sanofi's widely disseminated approved messaging for Auvi-Q. *See* Ex. 142; Ex. 141; Ex.149; Ex. 136.

## LEGAL STANDARD

Summary judgment must be granted if the evidence demonstrates that there is "no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). It is particularly appropriate in antitrust cases because "[s]ome of the law in this area is so well developed that where [] the gist of the case turns on documentary evidence, the rule at times can be divined without a trial." *White Motor Co. v. United States*, 372 U.S. 253, 259 (1963). Summary judgment is not a "disfavored procedural shortcut;" rather it is an "integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1).

Courts can also grant judgment on part of a claim or defense. *See* FED. R. CIV. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—*or the part of each*

*claim or defense*—on which summary judgment is sought.") (emphasis added); *see also Andy's Towing, Inc. v. Bulldog Bldg. Sys., Inc.*, No. 10-2354, 2011 WL 2433679, at *6 (D. Kan. June 14, 2011) (granting plaintiff's motion for partial summary judgment). Courts decide motions for partial summary judgment pursuant to the same standards as motions for summary judgment under Rule 56. *See Franklin v. Thompson*, 981 F.2d 1168, 1169 (10th Cir. 1992).

## ARGUMENT

## I. SANOFI IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE RELEVANT MARKET AND MYLAN'S MONOPOLY POWER

To prevail on its monopolization claims under Section 2, Sanofi must show that the defendant (1) possessed monopoly power in a relevant market and (2) acquired or maintained that power through exclusionary conduct. *Grinnell*, 384 U.S. at 570–71. With respect to the first element, there is uncontroverted evidence in this case that the relevant market is defined as EAI drug devices in the United States and that Mylan possessed monopoly power in that market for nearly a decade. Sanofi therefore moves for partial summary judgment. *See Defiance Hosp. v. Fauster-Cameron, Inc.* 344 F. Supp. 2d 1097, 1115 (N.D. Ohio 2004) (granting affirmative summary judgment on relevant market and monopoly power).

### A. It is Undisputed that the Relevant Market is EAI Drug Devices in the United States

The relevant product market consists of all substitutes that are "reasonably interchangeable" with the product at issue. *Grinnell*, 384 U.S. at 571. Reasonable interchangeability is determined by considering product uses, *i.e.*, whether substitute products can perform the same function, and cross-elasticity of demand, *i.e.*, "the extent to which consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992). Other practical indicia include "industry or public recognition," "peculiar characteristics and uses," "distinct customers," and

"distinct prices." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

A geographic market is "an area of effective competition." *Defiance Hosp.,* 344 F. Supp. 2d at 1108–09 (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999)). The relevant geographic market is limited to "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 501 (6th Cir. 1983) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

1.   The Relevant Product Market is EAI Drug Devices

   a.   **There Are No "Reasonably Interchangeable" Substitutes**

The proper market definition in this case can be determined after a factual inquiry into the "commercial realities" faced by consumers. *Grinnell Corp.*, 384 U. S. at 572. As such, there can be no dispute that the relevant product market is EAI drug devices. ████████████

██████████████████████████████████████████

████████████████████. *See* 56.1 Stmt. ¶¶ 7-8, 11-13.

Although epinephrine can technically be administered through vials and syringes, these products are not reasonably interchangeable with EAI drug devices. *See* 56.1 Stmt. ¶ 8. Vials and syringes do not share the same qualities as EAI drug devices and are not practical substitutes. *See* 56.1 Stmt. ¶¶ 14-15. Since epinephrine is often administered by a layperson with no medical training (usually the patient or a caregiver, parent, teacher, or coach) in a life-threatening situation, the method for administration must be quick and simple. *See id.* Vials and syringes are inferior because they contain exposed needles, which can slow down the process and increase the difficulty even amongst trained medical professionals. *Id.* Using vials and syringes can also result in an incorrect dosage because syringes do not automatically dispense the drug. *Id.* Therefore, both parties' medical experts agree that they are not practical substitutes for EAI drug devices:

<u>Mylan's medical expert, Dr. Michael Blaiss</u>: "[I]t is not practical or recommended for a patient to self-administer epinephrine using vials or syringes during anaphylaxis."

<u>Sanofi's medical expert, Dr. Mary Ann Michelis</u>: "While epinephrine may be administered . . . through pre-filled syringes of epinephrine or vials and syringes, these methods are not preferred for a number of reasons." *Id.*

Other products, like anti-histamines, are also not reasonably interchangeable with EAI drug devices. *See* 56.1 Stmt. ¶¶ 7-8. Anti-histamines are neither approved for nor indicated for the treatment of anaphylaxis and do not have the same use. *Id.* at ¶ 9. As explained by Mylan,

███████████████████████████████████████████████████████████████████

███████████████████████ *Id.* Indeed, Mylan warned against substituting anti-histamines for EAI drug devices on its own website:

> Antihistamines are not indicated to treat the life-threatening symptoms of anaphylaxis. Antihistamines are useful for relieving itching and hives. They do not relieve shortness of breath, wheezing, gastrointestinal symptoms or shock. Therefore, antihistamines should be considered adjunctive therapy and should not be substituted for epinephrine.

*Id.* Mylan's Chief Executive Officer Heather Bresch, among others, also testified that █████████ ████████████████████████████████████████████████████████████████████████████.

*See id.* at ¶ 10. Thus, there are no functional or practical substitutes for EAI drug devices, as Mylan, Sanofi, and the entire medical community recognize.

### b.   *Real-World Evidence Confirms the Relevant Product Market*

Courts measure cross-elasticity by analyzing the rate at which consumers will switch to one product in response to a price increase in another product. *Kodak*, 504 U.S. at 469. One practical method is to apply the "hypothetical monopolist test," which asks "whether a monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase" ("SSNIP"), typically 5%, without losing too many sales. *FTC v. Qualcomm Inc.*, No. 17–00220, 2019 WL 2206013, at *14 (N.D. Cal. May 21 2019), *appeal filed,* No. 19–16122 (9th

Cir. June 3, 2019). If the monopolist can profitably do so, then "the market is correctly defined because products outside the candidate market are not effective price constraints." *FTC v. AbbVie Inc.,* 329 F. Supp. 3d 98, 129 (E.D. Pa. 2018).

In this case, there is no need for a "hypothetical" test because the factual record is replete with evidence of Mylan's actual monopolistic conduct. Mylan profitably raised the price of EpiPen by over 500% from 2009 to 2016 without sacrificing sales. *See* 56.1 Stmt. ¶ 43. In fact, Mylan's EpiPen sales ***increased*** each year and ██████████████████████████████████. *Id.* at ¶¶ 51, 54-55. Despite twice-annual (and sometimes more frequent) price increases of 9.9% or 14.9%—increases exceeding the 5% proxy—Mylan's EpiPen sales skyrocketed from 4.5 million pens and $200 million in sales for 2009 to 8.3 million pens and $912 million in sales for 2015. *Id.* at ¶ 51. Regardless of Mylan's price hikes, EpiPen's sales never diverted to alternative products precisely because there are no substitutes. Mylan's real-world example of the hypothetical monopolist test thus provides irrefutable evidence that the relevant product market is EAI drug devices.

### c.   *Mylan Admits Unequivocally that it Competes in the Relevant Market*

Instructively, Mylan's own documents define the EAI drug device market. In public filings, Mylan discussed the competitive landscape for EAI drug devices and touted its share in the "***defined auto-injector market***." 56.1 Stmt. ¶ 16. ███████████████████████████████ ███████████████████████████████████████████████████████. *Id.* at ¶¶ 17-18. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████. *Id.* at ¶¶ 18-19. *See AbbVie*, 329 F. Supp. 3d at 133 (excluding other drugs from the relevant market: "AbbVie documents show that while the company tracked injectable sales, it did not consider [them] as direct competition[.]").

Additionally, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████. *See* 56.1 Stmt. ¶ 24. Tellingly, Mylan's 30(b)(6) corporate witness could

not identify a single occasion in which an EpiPen contract referred to anything other than EAI drug

devices. *Id.* And in correspondence with Sanofi in 2013, ████████████████████████████

████████████████████████ *Id.* at ¶ 17. Thus, there is public and private recognition of the EAI

drug device market by Mylan and the entire industry. *See Brown Shoe*, 370 U.S. at 325 (explaining

that practical indicia of a product market include "industry or public recognition" of that market);

*Qualcomm,* 2019 WL 2206013, at *16 ("Qualcomm documents reflect 'industry or public

recognition' of the CDMA modem chip market as a distinct product market.").

Mylan's deposition testimony, from its fact and expert witnesses, also bolsters what is

rampant in its documents. When explicitly asked, two former Mylan employees—Ron Graybill,

former Vice President of Managed Markets, and Harry Jordan, former Senior Director of National

Accounts—both testified under oath that EpiPen competed in the EAI drug device market.

| Mylan Employee | Position | Testimony |
|---|---|---|
| Ron Graybill | Vice President of Managed Markets | ████████████████████████████████████ |
| Harry Jordan | Senior Director of National Accounts | **Q.** "What market did EpiPen compete in? . . . Was it the epinephrine auto-injector market?" **A.** "Correct." |

56.1 Stmt. ¶¶ 20-21. Tellingly, Mylan's primary antitrust expert, Professor Robert Willig, did not

even bother to offer an alternative market definition than EAI drug devices. *Id.* at ¶ 23. Professor

Willig instead presented a half-hearted argument that there are "important differences" among

PBMs and payors, which could necessitate individual markets. *Id.* Such an argument would lead

to hundreds—if not thousands—of individual customer-specific (and geographic-specific) markets

for each and every PBM or payor in the United States. This claim is wrong as a matter of fact and law. First, all PBMs and payors are subject to the same negotiation process with Mylan. Second, Professor Willig could not identify a single case or enforcement action to support this radical market definition. *Id.* To the contrary, numerous court cases and antitrust agency enforcement actions have involved PBM and pharmaceutical mergers, including Mylan's recent acquisition of Meda AB, yet the market has ***never once*** been narrowed to drug products reimbursed by one specific PBM. *See, e.g., In the Matter of MYLAN N.V.*, No. C–4590, Compl. (July 26, 2016). This case presents no exception.

The complete factual record—including Mylan's own testimony and documents—therefore demonstrates that there can be no genuine issue of material fact that the product market is defined as EAI drug devices.

2.   The Relevant Geographic Market is the United States

As for the geographic market, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *See* 56.1 Stmt. ¶¶ 26-27. ██████████

████████████████████████████████████████████████████████

██████████. *Id.* at ¶ 27. Mylan ***finally admitted*** that "the relevant geographic market is the United States" subject only to a meritless qualification.[3] The geographic market for any drug product is typically defined as the United States, and there can be no genuine dispute that this definition

---

[3] Mylan admitted that the United States is the relevant geographic market "subject only to the qualification that some PBMs and third-party payors do not do business throughout the United States, and therefore, to the extent the relevant product market is determined on a customer-by-customer basis, the relevant geographic market for such customers is narrower than the entire United States." *See id.* at ¶ 5. Because of this meritless qualification, Sanofi must move for summary judgment on what should be an uncontroversial point. For the reasons discussed above in Section I.A, Mylan's attempts to take such a radical view of the product and geographic market in this pharmaceutical case should be rejected outright.

applies here as well. *See Mylan Pharm. Inc. v. Warner Chilcott PLC*, 838 F.3d 421, 435 n.57 (3d Cir. 2016) (defining the market for a drug product: "Mylan's expert's conclusion [is] that the relevant geographic market is the United States.");[4] *AbbVie*, 329 F. Supp. 3d at 128 (finding that "[t]here is no dispute here that the relevant geographic market encompasses the United States" in an antitrust pharmaceutical case).

**B.    Mylan Irrefutably Had Monopoly Power in the U.S. EAI Drug Device Market**

Monopoly power is "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571 (internal quotations omitted). Sanofi can prove Mylan's monopoly power through either direct or indirect evidence. In this case, there is uncontroverted direct and indirect evidence that Mylan did not operate in a competitive marketplace, faced no competition from fringe rival products before the launch of Auvi-Q, and had durable monopoly power with EpiPen in the EAI drug device market.

1.    There is Uncontroverted Indirect Evidence of Mylan's Monopoly Power in the U.S. EAI Drug Device Market

To determine whether monopoly power exists indirectly, courts consider whether a firm has a dominant share in a defined market along with "various market characteristics, including the existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in the market, and market trends." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 967 (10th Cir. 1990). Of all the circumstantial factors, "the size of market share is a primary determinant of whether monopoly power exists." *AbbVie*, 329 F. Supp. 3d at 128. As a starting point, "[ninety percent] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-

---

[4] This Court has previously stated that it "closely considers the law of the Third Circuit (where the *Sanofi* case originated)" and will ultimately be tried by a jury. *See* Memo. and Order on Mylan's Mot. to Dismiss (ECF No. 98) (citing *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987)).

four percent would be enough; and certainly thirty-three per cent is not." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.).

<strong>a.        <em>Mylan's EpiPen Market Share Ranged from 80% to Virtually 100%</em></strong>

Mylan's monopoly power can be inferred through its durable share of 80% to 99% of the U.S. EAI drug device market—a market with high barriers to entry, no real innovation, and minimal competition. As the Supreme Court explained over 50 years ago, "[t]he existence of [monopoly] power ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571 (internal quotations committed). Although the Court did not specify a share, "lower courts generally require a minimum market share of between 70% and 80%." *Reazin*, 899 F.2d at 967 (internal quotations omitted). Mylan itself has argued that "courts have routinely held a market share of two-thirds or more to be dominant." *Mylan Pharm. Inc. v. Warner Chilcott PLC*, Mylan Memo. in Support of Mot. for Summary Judgment, No. 12–03824, 2014 WL 1013026 (E.D. Pa. Mar. 17, 2014) (hereinafter, "Mylan Warner Motion"). Mylan's EpiPen market share unquestionably exceeded this range. *See United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 188 (3d Cir. 2005) (holding that 75% to 80% market share is "more than adequate to establish a prima facie case of power"); *Reazin,* 899 F.2d at 969–72 (holding "that sufficient evidence supports the jury's findings of monopoly and market power" where a monopolist possessed market share of between 47% and 62%); *Defiance Hosp.*, 344 F. Supp. 2d at 1113–14 (granting affirmative summary judgment on monopoly power where defendant averaged over 60% market share).

There can be no genuine issue of material fact given that Mylan's employees, documents, and testimony have all confirmed EpiPen's dominance in the U.S. EAI drug device market. Nearly every Mylan employee deposed in this case (current and former) testified that EpiPen was the unchallenged market leader with share surpassing 80% to 90%. To highlight just a few examples:

| Mylan Employee | Position | Testimony |
|---|---|---|
| Heather Bresch | Chief Executive Officer | |
| Bruce Foster | Senior Director Managed Care & Channel Strategy | |
| Roger Graham | President of Mylan Specialty | |
| Thomas Hadley | Former Executive Director of Global Marketing | **Q.** "Do you recall what EpiPen's market share was at that time?" **A.** "I don't recall but it had to be above 80%." |
| Patrick Jones | Former Director of National Accounts | **Q.** "[W]hat percentage of the epinephrine auto-injector market did Mylan have with the EpiPen?" **A.** "It was typically always in the mid to high 90 percent." **Q.** "[ . . . ] So it's fair to say that Mylan pretty much dominated that market?" **A.** "They had a high market share, yes." |
| Harry Jordan | Former Senior Director of National Accounts | |
| Jeff May | Head of Market Access & Managed Markets | |
| Pranay Patel | Senior Product Director – Marketing | |
| Scott Sussman | Senior Director of National Accounts | |

| Mylan Employee | Position | Testimony |
|---|---|---|
| | | **Q.** "Okay. And you own 80 to 90 percent of the market, right? **A.** That is what I said, uh-huh." |
| Nicole Willing | Former Director of National Accounts | ███████████████████████████████████████████████ |

56.1 Stmt. ¶ 35. Mylan's own antitrust expert, Professor Willig, did not even dispute that EpiPen had an overall market share for years exceeding 80% or 90% at times. *See id.* at ¶ 32.[5] And tellingly, in ***nine hours*** of deposition testimony of Sanofi's antitrust expert, Professor Scott Morton, Mylan's counsel did not bother to ask ***a single question*** regarding Mylan's monopoly power in the U.S. EAI drug device market. Put simply, Mylan made virtually ***no*** attempt to challenge its monopoly power in this case because it cannot do so.

Instead, Mylan's public announcements and voluminous internal documents repeatedly and consistently confirm what is indisputable—EpiPen's share neared or exceeded a dominant share of 90% in a market that was not competitive. 56.1 Stmt. ¶¶ 28, 30-31, 33. Prior to Auvi-Q's launch in 2013, EpiPen's market share actually hovered close to 100%. *See id.* ¶ 30. As explained by Mylan's own expert, Mr. Gary Zieziula, "in the several years leading up to Auvi-Q's launch, the EpiPen auto-injector had established itself as the market leader in the EAI category." *Id.* at ¶

---

[5] Professor Willig offers another radical view that Mylan's overall market share does not provide evidence of monopoly power in this case. This claim undeniably contradicts Supreme Court precedent explicitly holding that monopoly power can be "inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571. *See supra* Section I.B.1. Professor Willig's claim also contradicts Mylan's own view as Mylan repeatedly measured its dominant market share on average of EAI drug devices across all PBMs and payers. Tellingly, Professor Willig has been criticized for similarly reaching opinions on market definition and market power that contradict the ordinary course documents in the files of the party he represents. *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 210 (D.D.C. 2017) ("[T]he refutation of the defense expert's criticisms can be found in Anthem's own files."), *aff'd on other grounds*, 855 F.3d 345 (D.C. Cir. 2017) (2-1 decision).

32. Mylan's public and private documents corroborate EpiPen's "dominant market position." *Id.* at ¶ 30.

| Year | Mylan Documents |
|------|-----------------|
| 2011 | • ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████ |
| 2012 | • **[W]e are the market** for anaphylactic shock with **over 98%** market share."<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████ |
| 2013 | • ████████████████████████████████████████<br>• ████████████████████████████████████████<br>• ████████████████████████████████████████ |

*Id.* at ¶¶ 30-31, 33-34. Mylan has, in fact, admitted that EpiPen "accounted for *at least 90%* of epinephrine auto-injector prescriptions in the United States for each year between 2007 and 2012." *Id.* at ¶ 28 (emphasis added). *See Alcoa*, 148 F. 2d at 424 (finding that 90% "is enough to constitute a monopoly").

Even after Auvi-Q's 2013 launch, EpiPen maintained its "dominant share of the market." *Id.* at ¶ 33. Later that year, the President of Mylan Specialty publicly touted to investors that EpiPen held onto a "93.3% market share." *Id.* And internally, Mylan recognized that they ████████ ████████████████████████████████████████ *Id.* Even after Auvi-Q had been on the market for a few years, ████████████████████████████████ ████████████████████████ *Id.* Sanofi expert Professor Scott Morton's diagram shows that

EpiPen's share remained steady in the 80% to 98% range from at least 2011 through 2017. *Id.* at ¶ 29. Mylan's share never fell below 83% while Sanofi sold Auvi-Q, and it shot back up to 95% after Auvi-Q's voluntary recall. *Id.* Mylan's uncontroverted and durable market share is thus "more than adequate to establish a prima facie case of power." *Dentsply*, 399 F.3d at 188.

### b.    *Mylan Encountered Few to No Competitors for EAI Drug Devices*

Relatedly, it is indisputable that EpiPen was a drug device product that  56.1 Stmt. ¶ 36. In addition to market share, courts in this Circuit consider "the number of firms in the market" and "market trends" when determining monopoly power. *Reazin*, 899 F.2d at 967. Here, Auvi-Q represented the first real threat as a distinct and innovative device,

56.1 Stmt. ¶ 58. There were minor competitors for varying periods of time, but

*Id.* at ¶ 28. Mylan's experts similarly viewed Twinject and Adrenaclick AG as weak EAI drug device competitors. *See id.* at ¶ 41. Thus, EpiPen faced little to no competition in EAI drug devices, and even after Auvi-Q launched, "the fact remains that no other entrant remotely approached [Mylan's] domination of the market." *Reazin*, 899 F.2d at 971 (affirming jury finding of monopoly power).

### c.    *Barriers to Entry in EAI Drug Devices Are High*

There is no dispute that barriers to entry are extremely high for the EAI drug device market, as Mylan itself recognized. As explained by the Tenth Circuit, "[e]ntry barriers are particular characteristics of a market which impede entry by new firms into that market." *Reazin*, 899 F.2d at 968. These barriers include "high capital costs," "regulatory or legal requirements," and "entrenched buyer preferences." *Id.* (internal citation omitted). Mylan itself has stated that "*[i]t is*

***nearly universally recognized that pharmaceutical markets are characterized by high technical and regulatory barriers to entry***." Mylan Warner Motion (emphasis added); *see also* 56.1 Stmt. ¶ 37 (stringent federal regulatory requirements to obtain approval serve as "independent barriers prevent[ing]" or hampering entry). As one court summed up, "[i]n short, a prospective entrant to the pharmaceutical market . . . has significant capital, technical, regulatory, and legal barriers to overcome . . . . [T]his is a far cry from entry into a market to sell an ordinary consumer product." *Abbvie*, 329 F.Supp.3d at 135-36. The EAI drug device market was no different; barriers to entry were high if not higher because of the complexity of these life-saving medical devices.

Entrenched customer preference also functions as a barrier to entry. Mylan's Senior Director, Global Medical Affairs stated in a public filing in support of a preliminary injunction that "substitution of one EAI for another presents a distinct concern for patient safety" "[b]ecause each of the distinct currently-market EAIs is visually and physically different," and they are used in stressful emergency situations. *See* 56.1 Stmt. ¶ 42. Additionally, given that EpiPen was the only game in town for decades, ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████. *Id.* at ¶ 40. In fact, Mylan has acknowledged that "patients already comfortable with the EpiPen device may be reluctant to switch"—even to a generic. 56.1 Stmt. ¶¶ 38-40. That is, even if an EAI drug device gains access to patients through PBMs and payors (*i.e.*, formulary access), it must still convince physicians and patients to switch life-saving devices. This entrenched customer preference served as another significant barrier to entry. *See Defiance Hosp.*, 344 F. Supp. 2d at 1113-14 (granting partial summary judgment: "Prior to plaintiffs' entry into the market, defendants faced no competition and had erected a significant barrier to entry – control over customer access.").

Given Mylan's (i) undisputedly high and entrenched market share, (ii) the lack of competition from rivals before Auvi-Q, and (iii) the significant and costly barriers to entry, there is no genuine issue of material fact that Mylan had monopoly power in the unique EAI drug device market. Summary judgment should be granted.

2.    There is Uncontroverted Direct Evidence that Mylan Actually Exercised its Monopoly Power in the U.S. EAI Drug Device Market

A plaintiff can also prove monopoly power directly by showing that the defendant "profitably raise[d] prices substantially above the competitive level," *Microsoft*, 253 F.3d at 51, and through evidence of "actual exclusion of competitors." *Defiance Hosp.*, 344 F. Supp. 2d at 1112. While direct evidence of market power is "rarely available," *Mylan Pharm.*, 838 F.3d at 434, this is the unusual case where such evidence plainly exists. There is uncontroverted evidence that Mylan directly exercised monopoly power throughout the relevant period by excluding Auvi-Q, failing to innovate for the benefit of patients and consumers, and profitably raising prices absent any competitive constraints.

a.    ***Mylan Exercised its Monopoly Power by Excluding Auvi-Q and Eliminating Competition without Having to Innovate***

Before Auvi-Q's launch, Robert Coury, Mylan's then-CEO and now Chairman of the Board, instructed employees to "take this time to pre-empt any new market entry." 56.1 Stmt. ¶ 57. And that is precisely what Mylan did.

Mylan unleashed its power over PBMs and payors in the U.S. EAI drug device market to exclude Auvi-Q from formularies, preventing a nascent competitor from challenging its dominance. Mylan dramatically changed its contracting strategy. As explained by Mylan, ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

*Id.* at ¶ 59. ▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



*Id.* at ¶ 60.

Moreover, ███████████████████████████████████████████

███████████████████████████████████████ *Id.* ████████

███████████████████████████████████████████████

████████████████████████████ *Id.* at ¶ 61 (emphasis added). As one Mylan employee

succinctly asked rhetorically, ████████████████████████████ *Id.* at ¶ 34.

Mylan then celebrated its success in excluding competition, ██████████████

████████████████████████████████████████████████

███████████████████████████ *Id.* at ¶ 63 (emphasis added). ████████

████████████████████████████████████████████

██████████████████████████ *Id*. Mylan's ability to leverage its dominant

position over PBMs and payors to exclude Auvi-Q and other EAI drug devices serves as further

evidence of its monopoly power.

Moreover, through this direct exercise of monopoly power, Mylan was able to hamper

innovation and restrict the growth of the EAI drug device market (*i.e.*, output). Auvi-Q represented

the first real innovation in the EAI drug device market since EpiPen's launch in 1987. *See* 56.1

Stmt. ¶¶ 76-77. And as explained by Professor Scott Morton, "when the product is differentiated

as Auvi-Q is, it's going to appeal to a whole other set of people and that's going to also expand

the market further." *Id.* at ¶ 65. Rather than innovating EpiPen to compete with Auvi-Q on the

merits of the product and technology for the benefit of consumers, Mylan exercised its monopoly

power to exclude Auvi-Q. *Id.* at ¶¶ 78-83. Mylan foreclosed Auvi-Q from insurance formularies,

essentially blocking patients' access to this innovative EAI drug device and ultimately limiting

growth in the EAI drug device market. As summarized by Professor Scott Morton, absent Mylan's

anticompetitive conduct, "we would have [had] all the output expansion that would [have] been generated by Auvi-Q." *Id.* at ¶ 65. Mylan, however, thwarted this expansion.

Mylan's exclusion of competition and failure to complete on the merits through innovation for the benefit of consumers provides direct evidence of monopoly power. *See Kodak,* 504 U.S. at 477 ("It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so."); *Dentsply*, 399 F.3d at 190 (affirming the district court's finding that Dentsply's ability "to exclude competitors from the dealers' network" constitutes strong evidence of its monopoly power); *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("[E]ven the foreclosure of 'one significant competitor' from the market may lead to higher prices and reduced output."); *Reazin,* 899 F.2d at 970–71 (holding "that sufficient evidence supports the jury's findings of monopoly and market power," and citing favorably to expert: "Because Blue Cross was in a position to use its leverage over hospitals to exclude or slow down the development of alternative delivery systems, it thereby had power to exclude competition.").

### b. *Mylan's EpiPen Pricing Was Unconstrained In a Market With Minimal Competition*

In addition to excluding Auvi-Q and failing to innovate, Mylan increased the price of EpiPen by over 500% since acquiring the product in 2007—all without any regard to the competitive dynamics in the U.S. EAI drug device market. *See* 56.1 Stmt. ¶ 43. Mylan raised the price approximately 20% to 30% each year from 2010 through 2016, primarily through a strategy of taking at least two semi-annual price increases of 9.9% or 14.9%. *Id.* Notably, many of Mylan's price increases, especially the largest ones in 2012, were taken in full anticipation of Auvi-Q's launch in 2013 as part of Mylan's anticompetitive scheme to exclude Auvi-Q from the U.S. EAI drug device market. *Id.* at ¶¶ 43, 45. The result of those price increases was that a pair of EpiPen

costing under $100 in 2008 cost over $600 in 2016. *Id.* at ¶ 43.

Notably, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* at ¶ 47. As ████████████ explained:



*Id.* (emphasis added). ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████. *Id.* Similarly, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. *Id.* at ¶ 48.[6]

It is undisputed that EpiPen's net price—*i.e.*, the actual cost to PBMs and payors after rebates paid on negotiated terms and conditions—also rose in tandem with EpiPen's price. Before Auvi-Q entered the market, ████████████████████████████████████████████████

████████████ *See id.* at ¶ 56. Thus, PBMs and payers were forced to pay more for consumer purchases

---

[6] *See id.* at ¶ 62 ("Terms were carefully negotiated [with Kaiser] to ensure Auvi-Q was non formulary"); *id.* at ¶ 48 ("I was able to raise the price of EPIPEN 6% which means an additional $1MM based on current volume (not factoring in future price increases).").

of EpiPen every time Mylan increased its list price. After Auvi-Q entered, Mylan began offering
higher discounts to PBMs and payors in exchange for excluding Auvi-Q. But these higher
discounts still did not result in lower net prices. As explained by expert Professor Scott Morton:

> While Mylan used the inducements of conditional discounts . . . to exclude Auvi-Q
> from formularies, because Mylan continued to raise its list price, the net price it
> ultimately offered did not actually drop, as would be expected in a competitive
> market, once a new innovative product – Auvi-Q – came onto the market.



*Id.* at ¶ 46. In fact, ███████████████████████████████████████████████
██████████████████████████████████████████. *Id.* Thus, even Auvi-Q's entry
could not constrain Mylan's pricing power.

Tellingly, EpiPen's price increases did not result from innovating EpiPen to compete with
Auvi-Q (as described above) or higher costs. Mylan's own supplier, the Pfizer EpiPen
Manufacturer, recognized that the increases were not related to the transfer price—*i.e.*, the cost for
Mylan to buy EpiPen from Pfizer. ██████████████████████████████████████
█████████████████████████████████████████████. *See*
*id.* at ¶ 44. ████████████████████████████████████████████████████
████████████████████████████████████████████████. *See id.*
at ¶ 50 (President of the Pfizer EpiPen Manufacturer: █████████████████████
█████████████████████████████████████.[7] Given these unsupported yet persistent
increases, the Pfizer EpiPen Manufacturer ███████████████████████████████
████████████████████l. *Id.* at ¶ 50.

As further evidence of monopoly power, Mylan increased EpiPen's price immediately after

---

[7] PBMs and payors similarly recognized that Mylan's EpiPen price increases were not justified by
innovation or rising costs. *See id.* at ¶ 49 ("EpiPen's price has jumped 488 percent in the last four
years, despite the fact that epinephrine is not a new drug.").

Sanofi voluntarily recalled Auvi-Q in late 2015. First, Mylan "took a 14.9% [price] increase on 11/21/15, increasing the [price]/pen to $264.85" within weeks of the recall. 56.1 Stmt. ¶ 66. Mylan also took this increase despite the fact that it gained virtually all of Auvi-Q's recalled volume, and that EpiPen's share had jumped back up to 95%. *Id.* at ¶ 29. 

*Id.* at ¶ 67. As Mylan itself explained,

*Id.* Once again,

*Id.* at ¶ 68. The net price of EpiPen subsequently

. *Id.* at ¶ 43. Devoid of any meaningful competition,

*Id.* at ¶ 69 (emphasis added).

EpiPen's price increases only halted when Mylan's CEO, Heather Bresch, was ultimately hauled in front of Congress to defend EpiPen's $600 price tag, and Mylan launched an authorized generic of EpiPen at half the price years before the expiration of its patent protection on the EAI drug device. *See id.* at ¶ 152. As one Mylan employee lamented,

*Id.* at ¶ 55 (emphasis added).

As explained by Professor Scott Morton, "Mylan's ability to substantially increase its profitability despite the entry of Auvi-Q is evidence of Mylan's monopoly power." *See id.* at ¶ 53. With these prices increases, EpiPen grew to be a significant portion of Mylan's revenues and profits across its entire generics and global businesses. The single EpiPen product represented 30% to 40% of all of Mylan's profits as a company. *Id.* at ¶ 54. And, compared to 2012, the year before

Auvi-Q launched, Mylan's annual EpiPen profits increased by 80%, or 67% on a per-pen basis, across the 2013 to 2015 period. *Id.* at ¶ 53. The financial statements that Mylan submitted to Congress plainly show that EpiPen's sales, revenues, gross profits, and profit margins all ***grew substantially*** during this period—at the same time that Mylan exercised its monopoly power to exclude Auvi-Q. *Id.* at ¶¶ 51-54.

In sum, there is irrefutable evidence that Mylan "maintained its dominance" without any competitive constraints—even Auvi-Q—while taking 20% to 30% EpiPen price increases for almost a decade. *See Reazin*, 899 F.2d at 970 (affirming jury finding on direct evidence of monopoly power: "[D]espite Blue Cross' average annual rate increase of 23.75% from 1980 through 1983, Blue Cross still maintained its dominance."); *see also Dentsply,* 399 F.3d at 191 ("The picture is one of a manufacturer that set prices with little concern for its competitors, 'something a firm without a monopoly would have been unable to do.'"); *Microsoft,* 253 F.3d at 51 ( "Where evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear.").

## II.   SANOFI IS ENTITLED TO SUMMARY JUDGMENT ON MYLAN'S COUNTERCLAIMS

Not satisfied with having maintained its monopoly by driving Auvi-Q out of the U.S. EAI drug device market—and desperate to deflect the spotlight on its own actions—Mylan filed a Counterclaim Complaint, alleging, in sum and substance, that its EpiPen monopoly power would have been ***even greater*** had Sanofi not engaged in alleged unfair competition and false advertising when marketing Auvi-Q.

Mylan's counterclaims turn the facts of this case (and the antitrust laws) on their head. Sanofi never seeded the marketplace with misinformation through false advertising, as Mylan baselessly claims. In reality, Sanofi executed a carefully-crafted marketing strategy based on FDA

guidance that focused on—and accurately characterized—Auvi-Q's unique product features and the three patient preference claims (size, shape, and method of instruction) that Mylan admits Sanofi had complete authority to use. Further, Mylan is not—and has never been—the injured party here. Monopolists do not get to recover damages from the new entrants they keep out of the market. And, as much as Mylan might now like to recast itself from villain to victim, this case is about the anticompetitive actions Mylan took to keep a new, innovative product from gaining a foothold in the market, not about the potential impact of a few Auvi-Q advertisements that Mylan either admits are true or is wholly incapable of proving false.

Given that Mylan's counterclaims are completely meritless, it is not surprising that there is nothing in the record to support them. Because Mylan has not—and cannot—meet its burden of proof, Sanofi is entitled to summary judgment as a matter of law.

**A.      Mylan Cannot Prove That Sanofi Violated the Lanham Act Through False Advertising**

Section 43(a) of the Lanham Act protects persons engaged in commerce against unfair competition by, among other things, creating a cause of action for false advertising. *See* 15 U.S.C. § 1125 (a); *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 683 (10th Cir. 2015) (unpublished) (Gorsuch, J.) (explaining that the Lanham Act "step[s] in" when "advertising crosses the line from harmless hyperbole into underhanded deception with material commercial consequences"). To win a false advertising claim under the Lanham Act, a plaintiff must prove "(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002) (quoting *Cottrell, Ltd. v. Biotrol*

*Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999)). As explained below, Mylan cannot meet this burden here because it cannot show that (1) Mylan made the challenged statements; (2) the challenged statements constitute false or misleading representations of fact; (3) the challenged statements were sufficiently disseminated to constitute commercial advertising; and (4) the challenged statements injured Mylan.

1.   <u>Mylan Cannot Prove that Sanofi Made False or Misleading Statements in its Promotion of Auvi-Q</u>

a.   ***Mylan Lacks Proof that Sanofi Made the Challenged Statements***

Mylan's claims suffer from a fundamental failure of proof rarely seen in false-advertising cases: a complete lack of evidence that Sanofi ever even made the challenged statements or engaged in the alleged conduct. Mylan bases its claims on allegations that Sanofi made a host of "false and misleading statements" to physicians' offices, including statements that (1) Auvi-Q is the "new EpiPen" or "talking EpiPen"; (2) the EpiPen and Auvi-Q are bioequivalent and/or therapeutically interchangeable; (3) Auvi-Q is superior to and preferred by more physicians and patients than EpiPen; and (4) Auvi-Q can withstand higher temperatures than the EpiPen Auto-Injector. *See* Counterclaim Compl. ¶¶ 26, 68. Mylan also claims that Sanofi engaged in "other unfair and unlawful conduct" in the form of offering "kickbacks to increase sales of Auvi-Q." *Id.* at ¶¶ 57–63. Yet, after a full opportunity to engage in discovery—which involved the production of millions of documents and over 65 depositions—Mylan has not adduced any admissible evidence showing that Sanofi ever made these statements while advertising Auvi-Q or offered financial kickbacks to anyone in exchange for Auvi-Q prescriptions.

 Not one of the over 65 witnesses deposed in this case testified on personal knowledge that a Sanofi employee or sales representative ever made, directed, or approved these statements or offered kickbacks of any kind. And not a single document in the record indicates that Sanofi ever

used any of these claims in its Auvi-Q marketing materials. Sanofi never ran a print or internet advertisement touting itself as the "new EpiPen" or the "talking EpiPen." No Sanofi pamphlet or brochure lauds Auvi-Q's ability to "withstand higher temperatures than EpiPen" or claims bioequivalence or therapeutic interchangeability. And Sanofi's Auvi-Q commercial does not so much as reference EpiPen, much less claim superiority over it. Instead, the record demonstrates that Sanofi's promotional materials focused on the game-changing Auvi-Q features that both Sanofi's and Mylan's pre-market research confirmed consumers were looking for, like Auvi-Q's compact size, state-of-the-art audio and visual instructions, and retractable needle. *See* 56.1 Stmt. ¶ 86 (Auvi-Q "I talk" consumer ad); *id.* at ¶ 86 ("Word is Out" Auvi-Q ad); *id* at ¶ 86 (Meet Auvi-Q ad); *id.* at ¶ 86 ("Have You Heard" Auvi-Q ad); *id.* at ¶ 86 ("Let Me Introduce Myself" Auvi-Q ad).[8]

### b. *Mylan Relies Exclusively on Inadmissible Evidence*

Lacking both documentary evidence and testimony showing that Sanofi ever made any of these claims while advertising Auvi-Q, Mylan's putative expert was forced to rely on evidence that is either hearsay or otherwise inadmissible. The only "evidence" Mylan's purported expert cites are (1) documents showing that some of the challenged statements may have been used, or considered for use, *internally* at Sanofi, (2) documents showing that *other* unspecified entities and individuals allegedly made some of the challenged statements on a handful of occasions, and (3) documents containing unauthenticated and unattributed handwritten notes. *See, e.g.*, *id.* at ¶ 104

███████████████████████████████████████████████

---

[8] *See also id.* at ¶ 85 at 814 (███████████████████████████████

████████████████████████████████████████████████

███████████████ ).

(emphasis added)); *id.* at ¶ 106 (internal Sanofi email exchange where one employee inquires whether phrase "patients overwhelmingly prefer Auvi-Q over other EAIs" could be used in a slide deck).

Internal discussions are not as a matter of law actionable under the Lanham Act, and statements by third parties do not raise a genuine issue of fact as to the representations *Sanofi* actually made. *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 459 (D.N.J. 2009) (Wolfson, J.) (explaining that internal documents that were never publicly disseminated in the United States are not actionable).

Likewise, Mylan cannot prove that Sanofi ever made the challenged statements by having its expert point to a handful of *Mylan* documents that are layered with hearsay.[9] *See Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) (explaining that experts may not be used "as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony"). For example, the only proof cited by Mylan's expert related to the claim that a Sanofi representative ever offered anyone kickbacks comes from *a Mylan* document that ███████████████████████ ████████████████████████████████████[10]

Mylan also cannot rely on unauthenticated and unattributed handwritten notes to prove that Sanofi sales representatives made certain statements. *See* Fed. R. Evid. 901(a); *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (acknowledging that evidence must

---

[9] *See* 56.1 Stmt. ¶ 104 (███████████████████████████████████████████████ █████████████████████████████████████); *id.* at ¶ 109 at 20 (██████████ ████████████████████████████████████████████████ ███████████████████████████); *id.* at ¶ 104 ████████████████████████████████████████████

[10] *See id.* at ¶ 110 (█████████████████████████████████████████████████ █████████████████████████████████████████).

be sufficiently authenticated under Federal Rule of Evidence 901 to be considered on summary judgment). For example, Mylan cannot cite as evidence (1) , *see* 56.1 Stmt. ¶ 104 at -803; or (2) ▮ see id. at ¶ 113 at -509. The record reflects that neither Mylan nor Sanofi was able to confirm that these documents were authored by Sanofi sales professionals. *See id.* ¶ 113 at 795 ( ); *id.* at ¶ 106 (Sanofi August 2015 Letter to FDA representing that Sanofi could not identify "any Sanofi employees or representatives by the name of 'Rachel' who have called on a 'Dr. Zeffren'" and, therefore, could not confirm that a Sanofi employee authored the Zeffren note). Even Mylan's own expert admitted that he had no basis to conclude that these notes were by anyone at Sanofi. *See id.* at ¶ 104 Zieziula Dep. 455:19-24 ("Q. How [do] you know the handwritten notes were written by Sanofi people? A. I don't."). Accordingly, Mylan should not be allowed to cite or rely on these documents at summary judgment. *See Palmer v. Shawnee Mission Med. Ctr., Inc.*, 355 F. Supp. 3d 1003, 1008-09 (D. Kan. 2018) (Crabtree, J.) (refusing to consider unauthenticated documents at summary judgment).

It is well-settled that Mylan cannot prevail by relying solely on inadmissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Palmer*, 355 F. Supp. 3d at 1008 ("For the court to consider . . . evidence on summary judgment, plaintiffs must establish that the content and substance of the evidence is admissible."). Because no admissible evidence in the record supports Mylan's contention that Sanofi made these challenged statements or offered financial kickbacks, Sanofi is entitled to summary judgment on these claims.

2.      Mylan Cannot Show that the Challenged Statements Were Literally False or Misleading

Mylan's Lanham Act claim suffers from another fatal flaw—even if Mylan could show Sanofi actually made any of the challenged statements, Mylan could not show that the statements were false. A Lanham Act plaintiff must prove that the defendant's advertisements were either "literally false" or, if not literally false, "literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002); *accord Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 785 (10th Cir. 2016) (unpublished). Mylan cannot make either showing here.

a.      *Mylan Cannot Prove that Sanofi's Promotions Were Literally False*

"The standard for proving literal falsity is rigorous." *Buetow v. A.L.S. Enters., Inc.,* 650 F.3d 1178, 1185 (8th Cir. 2011). A literal-falsity argument necessarily fails if a challenged advertisement is literally true or can "reasonably be understood as conveying different messages." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002); *see Novartis*, 290 F.3d at 587 ("[O]nly an *unambiguous* message can be literally false.") (emphasis in original). Accordingly, when faced with a literal-falsity argument, "a court must determine, first, the unambiguous claims made by the advertisement or product name, and second, whether those claims are false." *Novartis*, 290 F.3d at 586. In so doing, the court must look to the full context of the advertisement, recognizing that the "greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion . . . the less likely it is that a finding of literal falsity will be supported." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998); *see Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.* 258 F. Supp. 2d 1197, 1208–09 (D. Kan. 2003).

Mylan cannot show that the Sanofi statements it challenges are literally false and, indeed, has already admitted that a number of them are *literally true*. *See, e.g.*, Counterclaim Compl. ¶¶ 50-51 (acknowledging that messages stating that "Auvi-Q is the first and only EAI . . . with a retractable needle mechanism designed to help prevent accidental needle sticks" or that Auvi-Q also features an automatic retractable needle mechanism to help prevent accidental needle sticks" are "literally true"); 56.1 Stmt. ¶ 107 at 419:7-12 (Q. "Do you think this statement, patients don't always carry their EAI devices as recommended is a false statement? A. No. I think there's data to support that it's a true statement."); *id.* at ¶ 113 at 420:16–421:2 ("Q. But just as to the truth or falsity, it is true that Auvi-Q had audio visual cues, right? A. To the best of my knowledge that is true. Q. And it's also true that it is the first and only epinephrine auto-injector with audio and visual cues? A. To the best of my knowledge that's true."); *id.* at ¶ 105 at 26:17-20 (testifying that EpiPen and Auvi-Q "have the same amount of epinephrine and [are] deemed bioequivalent by the FDA").

To the extent Mylan has not already admitted the truthfulness of any of the challenged statements, Mylan still cannot demonstrate that the challenged statements were false representations of fact. To do so, Mylan would have to be able to show not only that each challenged statement was a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact" but also that each statement was, in fact, demonstrably false on its face when made. *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 502 (4th Cir. 2015) (quoting *Pizza Hut, Inc. v. Papa John's Int'l, Inc.* 227 F.3d 489, 496 (5th Cir. 2000)); *see Pizza Hut*, 227 F.3d at 496 (explaining that a statement of fact is one that "admits of being adjudged true or false in a way that . . . admits of empirical verification").

General claims like "Auvi-Q is going to replace the EpiPen" and "Auvi-Q will be like the new EpiPen" are certainly not objective statements of fact. *See Pizza Hut*, 227 F.3d at 495–96

(statements of general opinion are not actionable under section 43(a)). They cannot be proven "true" or "false" through empirical verification. *Id.* Indeed, they are nothing more than non-actionable sales puffery. *See Intermountain Stroke*, 638 F. App'x at 790–91 (acknowledging that puffery typically consists of forward-looking statements of corporate optimism that are not capable of objective verification); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993) (explaining that "sales talk, or puffing, as it is commonly called, is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer"). The same is true for Mylan's claims that Sanofi ever promoted on the general "superiority" of Auvi-Q to EpiPen. *See* Counterclaim Compl. ¶¶ 5, 48; *United Indus.*, 140 F.3d at 1180 ("Nonactionable puffery includes representations of product superiority that are vague or highly subjective.").

Accordingly, insofar as Mylan still asserts any literal-falsity claims, Sanofi is entitled to summary judgment on them.

### b. *Mylan Cannot Prove that Sanofi's Promotions Were Misleading Because It Has No Extrinsic Evidence of Consumer Deception*

Mylan essentially conceded that its Lanham Act claim was based on allegedly *misleading* statements (rather than literally false statements) in its Counterclaim Complaint, in which Mylan made clear that it took issue with the *implications* and *inferences* in Sanofi's promotions. *See, e.g.*, Counterclaim Compl. ¶ 5 (alleging that the term "new EpiPen" "*implied* that Auvi-Q was equivalent to, and would be replacing, EpiPen (emphasis added)); *id.* at ¶ 22 (alleging that Sanofi's claims of patient preference "*implied* at least equivalent safety and efficacy—and in some cases superior efficacy—as between Auvi-Q and the EpiPen Auto-Injector" (emphasis added)); *id.* at ¶ 38 (alleging that Sanofi assertion that "many patients and caregivers do not carry their epinephrine auto-injectors recommended" "*implied* that these failures put patients at risk of death"

(emphasis added)); *id.* at ¶ 43 (alleging that Sanofi statement that Auvi-Q was a "breakthrough in auto-injector device design" and statements emphasizing Auvi-Q attributes "***suggest[ed]*** that Auvi-Q's designed made it convenient to carry and use" and "implied that Auvi-Q was a superior product").[11] Mylan's industry expert, Gary Zieziula, reiterated this point during his deposition, when he admitted that he was not of the opinion that every challenged Sanofi message was literally false. 56.1 Stmt. ¶ 111 (Zieziula Dep. Tr. at 35:17-22) ("Q. And you made a number of opinions in this case about things that are misleading even if they are not necessarily false, right? Isn't that true? A. That's true.").[12]

Where a plaintiff contends that a claim is misleading even though it is not literally false, it is plaintiff's burden to show that a "statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Vincent v. Utah Plastic Surgery Soc'y*, 621 F. App'x 546, 550 (10th Cir. 2015); *see Scotts Co.*, 315 F.3d at 273 ("[I]f a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged advertisements tend to mislead or confuse consumers."). This showing is made by surveying the relevant audience to see how they understand the claim. *See Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey."); *Scotts Co.*, 315 F.3d at 276 ("Consumer confusion 'is most often proved by consumer survey data.'"); *Hill's Pet*, 258 F. Supp. 2d at 1211 ("Consumer surveys are normally used to satisfy this additional requirement."). The

---

[11] *See United Indus*, 140 F.3d at 1181 ("Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.").

[12] Mr. Zieziula's testimony was consistent with the report of another Mylan expert, who characterized the entirety of Mylan's claim as alleging that Sanofi made six "misleading" statements. *Id.* at ¶ 111.

law is clear that a court cannot rely on "the court's own findings." *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir. 1986); *see Johnson & Johnson*, 960 F.2d at 297–98 (explaining that, with respect to claims that are literally true but allegedly misleading, it "is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive" since "*the question in such cases is—what does the person to whom the advertisement is addressed find to be the message?*"). Rather, the plaintiff must come forward with extrinsic evidence of consumer deception. *See Vincent*, 621 F. App'x at 550.

Mylan did not even attempt to prove out its claims with a consumer survey. *See* 56.1 Stmt. ¶ 111 (Zieziula Dep. Tr.) at 49:23–50:4 (Q. You didn't do any surveys in this case, no? A. No. Q. And you are not qualified to do a survey, right? A. No.); *id.* at 67:6-12 (Q. You didn't do a survey of anyone to see if they saw the same implication with respect to the statement about first and only retractable needle that you testified to a moment ago, right? A. I have not.). Instead, Mylan chose to rely solely on the uninformed opinion of its industry expert, Gary Zieziula, who is neither a physician nor an EAI consumer and who admitted during deposition that he did nothing to substantiate his subjective belief that physicians, payors, and consumers may have found certain Sanofi statements misleading. *See id.* at ¶ 111 (Feb. 4, 2019 Zieziula Report) at 4 (claiming— without a basis—both that Sanofi's messaging was "misleading" and that misleading messaging "can have a significant impact on payers, prescribing physicians, and consumers' purchasing decisions").

For reasons explained in the accompanying *Daubert* motion, all counterclaim-related testimony from Gary Zieziula, Mylan's proffered industry expert, should be excluded. But, even assuming its admissibility, Mr. Zieziula's opinions are not sufficient to carry Mylan's burden to prove that Sanofi's advertising was ***misleading***. An expert's "personal opinion is not the legal

standard by which the courts must determine whether consumers were misled." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 136 (3d Cir. 1994); *see Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir. 1990) ("A Lanham Act plaintiff, on the other hand, is not entitled to the luxury of deference to its judgment. . . . Hence, it cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."). And, in any event, as explained in Sanofi's accompanying *Daubert* motion, Mr. Zieziula is not even qualified to offer these opinions, much less qualified to carry Mylan's burden of persuasion at trial. *See* Zieziula Daubert Mot. at I.A; *Bracco*, 627 F. Supp. 2d at 440 (holding that an industry expert's opinion "as to the falsity of messages" was "unsupported" and "irrelevant to the issue of customers' understanding and reaction to the advertisements"); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (moving party may carry its summary judgment burden "by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial").

Without survey evidence, Mylan cannot raise a genuine issue of material fact on falsity— an essential element of its Lanham Act claim. *See Am. Home Prods. Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739, 756 (D.N.J. 1994) (holding that plaintiffs' could not show that claims were misleading because there was "no consumer survey establishing that the public has been misled by this claim"). Accordingly, Sanofi is entitled to summary judgment as a matter of law.

### 3.   Mylan Cannot Show that the Challenged Statements Were Sufficiently Disseminated To Constitute Commercial Advertising

Not all forms of commercial speech are protected by the Lanham Act's false-advertising provisions. *See Fashion Boutique of Short Hills Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2003). To be actionable, a defendant's speech must constitute "commercial advertising or promotion," that is, it must be "part of an organized campaign to penetrate the relevant market."

*Id.* In order to prove that a defendant's representations constitute commercial advertising, a Lanham Act plaintiff must show, among other things, that the contested representations were "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000); *see Vivint, Inc. v. NorthStar Alarm Servs., LLC*, No. 16–00106, 2019 WL 1098986, at *7 (D. Utah Mar. 8, 2019) (explaining that when challenged representations are "not part of a traditional advertising campaign," courts must "evaluate the extent of distribution to determine if the conduct reaches the level necessary to constitute advertising or promotion").

As discussed, Mylan cannot prove that Sanofi even made false representations, let alone that it did so to the degree necessary to "constitute 'advertising' or 'promotion' within the industry." *Bracco*, 627 F. Supp. 2d at 459. At best, all Mylan could possibly demonstrate is that a few Sanofi sales representatives made unsanctioned, off-book statements to a handful of healthcare professionals.[13] But Mylan cannot make-out a Lanham Act false-advertising claim by stringing together a couple of isolated instances. *See Fashion Boutique*, 314 F.3d at 57 ("[B]usinesses harmed by isolated disparaging statements do not have redress under the Lanham Act"); *Garland Co. v. Ecology Roof Sys. Corp.*, 895 F. Supp. 274, 279 (D. Kan. 1995) (Lanham Act coverage does

---

[13] *See* 56.1 Stmt. ¶ 104 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *id.* at ¶ 104 (████████████████████████████████████████████████████████████████████████████████████████████████); *id.* at ¶ 106 (handwritten note to a Dr. Flynn stating that "overwhelming majority of patients given the choice by their clinician prefer Auvi-Q as evidenced by clinical experience + peer reviewed surveys"); *see also id.* at ¶ 106 (Sanofi August 2015 Letter to FDA explaining Sanofi policy that "employees may not under any circumstances create homemade promotional materials . . . or alter existing approved promotional materials in any way" and that employees who violate said policy are subjected to "appropriate disciplinary action"); *id.* at ¶ 106 at 245 (Sanofi sales training talking points explaining that only approved preference claims can be made).

not extend "to every isolated alleged misrepresentation made to a potential customer by a business competitor"). Rather, Mylan must come forward with proof of *widespread* dissemination, through either direct evidence or a "statistical analysis of the number of alleged incidents in comparison to the relevant market." *Vivint, Inc.*, 2019 WL 1098986, at \*9; *see Gen. Steel Domestic Sales, LLC v. Chumley*, 129 F. Supp. 3d 1158, 1175 (D. Colo. 2015) (explaining that under Tenth Circuit law, "publication of information does not become 'advertising' until it reaches an audience of sufficient size").

Mylan has no evidence—direct or statistical—that the challenged statements reached an audience of sufficient size to constitute commercial advertising within the meaning of the Lanham Act. There can be no genuine dispute that the relevant audience for Auvi-Q advertising constitutes thousands of physicians (and their staff), hundreds of PBMs, payors, and insurance plans, and countless anaphylaxis patients (and their parents). Yet, with the full-benefit of discovery, Mylan continues to focus only on the same few incidents that it complained about to the FDA years ago, to no avail, because it simply has *no other admissible evidence*. The Tenth Circuit has made clear that such limited evidence cannot sustain a Lanham Act claim, particularly in a large market. *See Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1004–05 (10th Cir. 2002) (holding that evidence of distribution to two persons associated with the same project was insufficient to defeat summary judgment motion).

Mylan comes nowhere close to matching the evidence of dissemination proffered—and rejected—in other cases. Applying *Sports Unlimited*, another court in this Circuit recently held that not even evidence of *216 incidents* rose "to the level of widespread dissemination of false statements" required under the Lanham Act. *Vivint, Inc.*, 2019 WL 1098986, at \*9. Other courts

have similarly disallowed false advertising claims based on little (or no) evidence of widespread distribution, including where:

- Only "twenty-seven oral statements regarding plaintiff's products" were made in "a marketplace of thousands of customers," *Fashion Boutique*, 314 F.3d at 58;

- The "record is vague as to how many human beings might have encountered the material published by" plaintiff, *Gen. Steel*, 129 F. Supp. 3d at 1175;

- The challenged statements were only disseminated to two people or only distributed outside the relevant audience, *Schutz Container Sys., Inc. v. Mauser Corp.*, No. 09–3609, 2012 WL 1073153, at *31 (N.D. Ga. Mar. 28, 2012);

- "The complained-of representations consist, at best, of three statements . . . to three customers in a marketplace of hundreds of customers," *Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*, 328 F. Supp. 2d 980, 1019–20 (D. Minn. 2004).

Because Mylan lacks evidence that the statements were disseminated widely, Sanofi is entitled to summary judgment as a matter of law.

### 4. Mylan Cannot Show That It Was Harmed By Any Allegedly False Advertising

Mylan also fails to prove another other essential element of a Lanham Act false advertising claim—causation in fact. The Supreme Court has made clear that evidence of causation is a prerequisite to recovery under the Lanham Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."); *see Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299–300 (4th Cir. 2017) (explaining that causation requirement "is not a minor or technical element of a Lanham Act claim" but, rather, a "core requirement" that assures Article III standing). Interpreting *Lexmark*, this Court recently held that, to withstand summary judgment, a Lanham Act plaintiff must be able to prove that its "injuries were caused by

the alleged misrepresentations." *In re Syngenta AG MIR 162 Corn Litig.*, 249 F. Supp. 3d 1224, 1230 (D. Kan. 2017).

To meet its burden on causation, Mylan must be able to prove that the relevant audience— physicians, payers, and consumers—"were influenced by" Sanofi's promotions and that the impact caused Mylan's alleged harm. *Id.* Both of Mylan's affirmative counterclaim experts admitted that they did not undertake any analysis to figure out what, if any, harm Sanofi's promotional messages actually caused Mylan or, for that matter, the relative impact of Sanofi's challenged and unchallenged advertising:

### Deposition of Gary Zieziula

**Q.** And you didn't undertake any analysis to parse out the portion of Auvi-Q sales that were supposedly attributable to the promotional claims that you thought were false or misleading?

**A.** *I did not attempt to do that.*

**Q.** So you are not here offering any opinions about the percentage of Auvi-Q sales that were affected by the promotional claims that you take issue with in your report?

**A.** *I am not here to offer any estimates of the impact of those false promotional claims.*

### Deposition of Thomas Varner

**Q.** . . . . So you did not do any economic analysis to determine that all sales were related to the alleged false and misleading conduct, correct?

**A.** *Correct.*

*See* 56.1 Stmt. ¶ 111 (Zieziula Dep. Tr.) 403:22–404:21, 405:11-25; *id.* (Varner Dep. Tr.) at 89:11-14.[14] And Mylan's 30(b)(6) witness on this topic—Jay York—similarly admitted that Mylan had

---

[14] Mr. Zieziula also admitted that he was not challenging *all* of Sanofi's Auvi-Q advertising and that he "would have no problem" with any sales Sanofi achieved as a result of approved messaging. *See id.* at ¶ 113 (Zieziula Dep. Tr.) at 186:24–187:23. Mr. Zieziula also testified that it would be "very difficult" to figure out which sales were the result of approved Sanofi messaging, false or misleading Sanofi messaging, or no messaging at all. *See id.* at 187:25–188:8. Mylan's inability

no basis to claim that Mylan was harmed by the alleged false and misleading Sanofi promotions. *See id.* at ¶ 111 (York 30(b)(6) Tr. at 11:9-14) (Q. How does Mylan know that any AUVI-Q sales were a result of the alleged misleading claims by Sanofi? A. That's out of my -- my scope in terms of how they would know that -- how we would know that.); *id.* at 19:1-7 (Q. Can you say for sure that this statement about AUVI-Q replacing EpiPen caused physicians to prescribe fewer EpiPens? A. That's Mylan's allegation. Q. What's -- is there any -- are there any documents supporting that allegation? A. Not to my knowledge.) In other words, Mylan has not adduced a single witness or document proving—as it must—that it "suffered an injury flowing directly from the challenged statements." *Verisign*, 848 F.3d at 299.[15]

The Fourth Circuit's recent decision in *Verisign, Inc. v. XYZ.Com*, is instructive. There, plaintiff Verisign alleged that defendant's false advertising diverted sales away from Verisign and to defendant XYZ. *See Verisign*, 848 F.3d at 300. In support of its claim, Verisign offered the testimony of an expert witness, who "opined that XYZ's statements sapped Verisign's profits by redirecting registrations away from Verisign." *Id.* The district court excluded the expert's report under *Daubert*, finding that the expert's methods were questionable and that her analysis "failed to distinguish between 'correlation' and 'causation.'" *Id.* The Fourth Circuit affirmed both the

---

to "tease out which specific message drove a precise dollar figure of revenue" is fatal to its Lanham Act claim. *Id.* at 188:9-16.

[15] Mylan's failure of proof is not surprising given that Mylan's counsel only realized that Mylan bore the burden to prove causation after the close of expert discovery. *See* 56.1 Stmt. ¶ 112. In a last-ditch effort to save Mr. Varner's opinions and testimony, Mylan submitted an untimely and procedurally improper "supplemental expert disclosure" just two days before this Court's deadline for summary judgment and *Daubert* motions. In the disclosure, Dr. Varner admits that the reports and opinions he submitted in this case were based on improper legal instructions regarding Mylan's burdens under the Lanham Act but, nevertheless, claims that his calculations can somehow still provide a reliable benchmark for a jury to calculate the maximum potential recovery of Mylan's damage's sustained. As explained in Sanofi's accompanying *Daubert* motion, Dr. Varner's opinions and testimony should be wholly excluded, as he offers no expertise or assistance to the jury.

exclusion of the expert's testimony as well as the district court's summary judgment award to XYZ, concluding that Verisign's expert analysis suffered from a "'fatal flaw' in calculating Lanham Act damages"—assuming, rather than demonstrating, that every registration during the relevant time period was the result of the defendant's allegedly false statements. *Id.* at 300–01. As a result, the Fourth Circuit agreed with the district Court that Verisign's expert failed to establish the necessary "causal link between actual damages and the defendant's actions," and, accordingly, that Verisign could not prevail on its Lanham Act claim. *Id.* at 301.

Mylan's claim suffers from the ***exact*** same defects that Verisign's did: It has no admissible evidence establishing causation. Accordingly, the Court should enter summary judgment in favor of Sanofi. *See Syngenta*, 249 F. Supp. 3d at 1230–31 (awarding summary judgment in favor of defense on Lanham Act claims because plaintiffs failed to offer an "expert opinion that sales attributable to [defendant's conduct] were such that plaintiffs' injuries would not have occurred otherwise" and lacked evidence "that the alleged misrepresentations caused any increase in sales").

## B.   Mylan's Common Law Unfair Competition Claim Fails As a Matter of Law

Mylan's second counterclaim for common law unfair competition also fails. There is no federal common law of unfair competition. *See Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 670 (Fed. Cir. 1988) (explaining that because there "is no federal common law of unfair competition," a plaintiff must "rest on a federal statute which defines and provides relief for this type of tort"); *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 524 n.7 (11th Cir. 2015) (finding that federal common law of unfair competition is a "non-existent claim"); *see also Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1035 (D. Minn. 2003) (collecting cases). And Mylan has no grounds to assert an unfair competition claim under either Kansas or New Jersey common law.

An unfair competition claim under Kansas common law would be time-barred. *See* Kan. Stat. Ann. § 60-513; *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 723 F. Supp. 567, 569 (D. Kan. 1989) (acknowledging that two-year limitation period would apply to unfair competition claim), *partial reconsideration granted*, 746 F. Supp. 40 (D. Kan. 1990). Mylan's counterclaims are based on alleged conduct occurring between September 2012 and 2014. *See, e.g.*, Counterclaim Compl. ¶¶ 29, 35, 38, 40, 43–47; *see* 56.1 Stmt. ¶ 110 (February 4, 2019 Zieziula Report) at 12 (claiming a Sanofi represented offered nurses $100 for 50 prescriptions of Auvi-Q in September 2012). The record is undisputed that Mylan knew about—and complained about—much of the challenged conduct as early as March 2013 and all of the challenged conduct by March 2015. *See* 56.1 Stmt. ¶ 113 (March 12, 2013 Mylan Letter to FDA); *id.* ¶ 113 (March 28, 2013 Mylan Letter to FDA); *id.* at ¶ 110 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮); *id.* at ¶ 106 (March 23, 2015 Letter from Mylan's Counsel to Sanofi's Counsel). Accordingly, *at the very latest*, Mylan's claim expired by March 2017, almost a year before Mylan filed its counterclaims against Sanofi.

Even if not time-barred, an unfair competition claim under Kansas common law would fail for the same reasons as Mylan's Lanham Act claim. *See Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1286 (D. Kan. 2010) ("In Kansas, unfair competition under the common law requires the same elements as under Section 43(a) of the Lanham Act"). Simply put, Mylan cannot demonstrate that Sanofi ever engaged in a campaign of false or misleading commercial advertising or that any Sanofi advertisement caused Mylan to suffer any harm whatsoever.

New Jersey common law would be even more inhospitable to Mylan's claim since it does not even encompass false-advertising. *See Tris Pharma, Inc. v. UCB Mfg., Inc.*, No. A-5808-13T3,

2016 WL 4506129, at *5 (N.J. Super. Ct. App. Div. Aug. 29, 2016) (holding that common law unfair competition claim cannot be based on false advertising). To the extent Mylan's unfair competition claim is based on anything other than false advertising (such as the single allege kickback offer), the claim would fail for the same reasons as Mylan's Lanham Act claim—Mylan simply has no admissible evidence that Sanofi ever engaged in the alleged conduct and, accordingly, cannot raise a genuine issue of fact on this claim. *See Bracco*, 627 F. Supp. 2d at 454 ("[U]nfair competition claims under New Jersey statutory and common law generally parallel those under § 43(a) of the Lanham Act").

## CONCLUSION

For the foregoing reasons, Sanofi respectfully requests that the Court grant its (i) Motion for partial summary judgment on Sanofi's antitrust claims and (ii) Motion for summary judgment on Mylan's counterclaims.

DATED: June 28, 2019                    Respectfully submitted,

                                        */s/ Eric S. Hochstadt*

**WEIL, GOTSHAL & MANGES LLP**          **WEIL, GOTSHAL & MANGES LLP**
Diane L. Sullivan                       Yehudah L. Buchweitz
diane.sullivan@weil.com                 yehudah.buchweitz@weil.com
17 Hulfish St., Suite 201               Eric S. Hochstadt
Princeton, NJ 08542                     eric.hochstadt@weil.com
T: (609) 986-1120                       Randi W. Singer
F: (212) 310-8007                       randi.singer@weil.com
                                        767 Fifth Avenue
                                        New York, NY 10153
                                        T: (212) 310-8000
                                        F: (212) 310-8007

*Attorneys for Plaintiff and Counterclaim-
Defendant Sanofi-Aventis U.S. LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2019, the foregoing was filed via CM-ECF and by e-mail to all counsel of record.

*/s/ Eric S. Hochstadt*
Eric Hochstadt