# Exhibit 42
# (Filed Under Seal)

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# EXPERT REPORT OF DR. FIONA M. SCOTT MORTON

**February 4, 2019**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# TABLE OF CONTENTS

I. Introduction .................................................................................................................. 1

   A. Qualifications ....................................................................................................... 1

   B. Assignment .......................................................................................................... 2

   C. Materials considered ........................................................................................... 2

   D. Summary of main conclusions ........................................................................... 3

II. Pharmaceutical Industry Background ........................................................................ 6

III. The Market for Epinephrine Auto Injectors ............................................................. 9

   A. Overview of Epinephrine Auto Injectors .......................................................... 9

      1. Anaphylaxis and treatments ........................................................................ 9

   B. Epinephrine Auto Injector products and history ............................................. 11

      1. EpiPen .......................................................................................................... 13

      2. Adrenaclick and Twinject ........................................................................... 15

      3. Auvi-Q ......................................................................................................... 16

      4. Generic EpiPen ............................................................................................ 17

   C. Epinephrine Auto Injector market trends ........................................................ 18

      1. Size of EAI market and growth over time ................................................ 18

      2. EAI market by type of insurance ............................................................... 22

IV. Competition in Pharmaceutical Markets ................................................................ 26

   A. Competition in price and quality ..................................................................... 27

   B. The impact of competitive forces on consumer decision-making ................. 31

V. Mylan has Entrenched Monopoly Power in the U.S. Market for EAI Devices .... 34

   A. The relevant market .......................................................................................... 34

      1. The relevant product market ...................................................................... 36

      2. The relevant geographic market ................................................................ 42

   B. Monopoly power ............................................................................................... 43

      1. Market share ................................................................................................ 44

      2. Barriers to entry .......................................................................................... 51

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

3.    Direct evidence of Mylan's monopoly power ............................................................. 52

VI.   The Threat of Entry from Auvi-Q ............................................................................................. 57

A.    Mylan's efforts to license or acquire Auvi-Q ............................................................. 59

B.    Mylan's efforts to develop a smaller more innovative EpiPen ................................... 61

C.    Mylan developed a plan to block competition from Auvi-Q ....................................... 62

VII.  Mylan's Anticompetitive Strategy to Eliminate Competition from Auvi-Q .......................... 65

A.    Identifying exclusionary conduct ............................................................................... 66

B.    Mylan's use of exclusionary rebates .......................................................................... 70

1.    Characteristics of exclusionary rebates ........................................................ 70

2.    Mylan intended for its PBM contracts to be exclusionary ............................. 73

3.    Negotiation of Auvi-Q exclusion rather than disadvantaged formulary placement ............ 77

4.    All-or-nothing offers to PBMs ....................................................................... 78

5.    Bundled discounts across plans ..................................................................... 79

C.    Mylan implemented numerous strategies to block Auvi-Q by increasing the share of non-contestable demand .......................................................................................................... 80

1.    Mylan exploited spillover effects to increase its entrenched market share ............ 80

2.    Empirical evidence of spillover effects ......................................................... 82

3.    Messaging to HCPs ....................................................................................... 83

4.    Deceptive marketing to HCPs ....................................................................... 85

5.    Spillover effects from exclusives with government programs to commercial plans ............ 86

6.    Co-pay coupons .............................................................................................. 87

7.    Exclusionary restrictions in the EpiPen4Schools program ............................ 89

D.    Mylan's entrenched share of the EAI market was between ███████ ...................... 91

VIII. Mylan Successfully Foreclosed Competition from Auvi-Q .................................................... 92

A.    Mylan offered exclusionary rebates that Sanofi could not realistically overcome .................... 92

B.    Mylan's anticompetitive course of conduct was successful ....................................... 99

IX.   Mylan's Conduct is Not Competition on the Merits ............................................................. 102

A.    Exploiting entrenched market share through exclusionary rebates ............................ 102

B.    Mylan's conduct did not result in lower prices ......................................................... 104

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

C.    Sacrificing profits for exclusive formulary status...................................................................... 106

X.    Effects of Mylan's Exclusionary Conduct on Consumers and the Competitive Process ............. 108

XI.   Estimating the Antitrust Injury Suffered by Sanofi...................................................................... 112

A.    Damages for 2013-2015............................................................................................................ 113

B.    Damages for 2017-2029............................................................................................................ 121

C.    Total damages ........................................................................................................................... 128

Appendix .................................................................................................................................................. 129

A.    Summary.................................................................................................................................... 129

B.    Data........................................................................................................................................... 129

C.    Model......................................................................................................................................... 131

D.    Results ....................................................................................................................................... 133

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# I. INTRODUCTION

## A. QUALIFICATIONS

1.      My name is Fiona Scott Morton.  I am the Theodore Nierenberg Professor of Economics at the Yale School of Management, where I have taught since 1999.  Between 2006 and 2010, I served as the Senior Associate Dean for Faculty Development at Yale School of Management.  In addition to my time at Yale, I have also taught at the business schools of Stanford University and the University of Chicago.  I received a Ph.D. in Economics from MIT in 1994.

2.      At Yale University, I teach courses in the area of competitive strategy and competition economics and policy.  My research is in the area of empirical Industrial Organization, the sub-field of microeconomics that includes competition economics and the study of firm behavior.  I have authored or co-authored almost 50 scholarly articles in a variety of areas of economics and law.  Those articles have been published in leading scholarly and professional journals, including the American Economic Review, the RAND Journal of Economics, the Journal of Industrial Economics, the Quarterly Journal of Economics, the Antitrust Law Journal, and the Yale Law Journal. A particular focus of my research has been on the use of vertical contractual provisions, including the circumstances when such provisions can be anticompetitive.

3.      From May 2011 through December 2012, I had the honor of serving as the Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the U.S. Department of Justice.  In this position, I was the highest-ranking economist in the Department of Justice.  As the chief economist in the Antitrust Division, I advised the Assistant Attorney General for Antitrust on a wide range of enforcement matters and competition policy issues.  I supervised approximately 50 Ph.D. economists in conducting investigations of mergers and non-merger cases.  I also played a leading role in formulating the Antitrust Division's position on a wide range of competition policy issues.

4.      In addition to my academic work, I have served as an economic consultant for private clients and the Federal Trade Commission, providing both consulting and expert testimony.  I have been qualified as an economic expert and have provided testimony before the International Trade Commission, in federal court, in state courts, and a variety of other venues.

5.      While my academic and consulting work has involved a wide range of industries, a particular area of focus has been on pharmaceutical markets.  I have published papers on

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

innovation, entry, and branding decisions of pharmaceutical firms, the response of pharmaceutical companies to Medicaid Most-Favored-Customer provisions, and analyses of the Medicaid and Medicare programs on pharmaceutical pricing and access.  I have testified about the Medicare prescription drug program before committees of both the U.S. House and Senate, and have testified as an economic expert in numerous proceedings involving pharmaceutical pricing, innovation, and marketing practices in federal and state courts.  I also provided educational materials to assist the court in the Pharmaceutical Industry Average Wholesale Price litigation.

6.        My qualifications, along with a list of the matters in which I have provided testimony, are set forth in greater detail in my CV, which is attached as Exhibit 1.

7.        I am being compensated for my work on this case at a rate of ███ per hour.  This compensation is not dependent in any way on the opinions I express or the outcome of this matter.  My work in this case has been supported by Charles River Associates ("CRA"), a consulting firm at which I am a Senior Consultant.  I also receive compensation from CRA based on CRA's staff billings on this case.

## B. Assignment

8.        I have been asked by counsel for Sanofi-Aventis U.S. LLC ("Sanofi") to: (1) provide an overview of the economics of competition in the pharmaceutical industry generally, and in the Epinephrine Auto-Injector ("EAI") market more specifically; (2) determine the appropriate relevant market within which to assess the extent of Mylan's market power arising from its marketing and sale of the EpiPen along with the competitive consequences of its actions; (3) assess Mylan's market power in that market; (4) assess the competitive consequences of Mylan's actions on consumers and the competitive process in that market; (5) evaluate the extent to which procompetitive benefits (if any) outweigh any competitive harm caused by Mylan's actions; and (6) quantify the injury suffered by Sanofi (if any) from Mylan's anticompetitive conduct.

## C. Materials considered

9.        In undertaking my economic analysis, I and those under my direct supervision have reviewed court filings, case law, deposition testimony, documents and data produced in this proceeding (to which we had complete access), publicly available documents and data, and the relevant economic literature.  In addition, I have had conversations with a current and a former

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Sanofi employee.[1]  My work in this matter is ongoing. I understand that expert discovery is not complete.  As new information warrants, I may update my conclusions.  A listing of the materials that I have considered to date in forming my opinions is attached as Exhibit 2.

## D. SUMMARY OF MAIN CONCLUSIONS

10.      Based on my review of the evidence in this case developed through discovery, my understanding of the pharmaceutical industry, and my economic expertise, I am of the opinion that Mylan successfully engaged in exclusionary anticompetitive conduct so as to maintain its monopoly in the EAI market. In doing so, Mylan ensured that Sanofi's competing product – Auvi-Q – would never have a chance to gain a foothold in the U.S. EAI market, thereby preventing it from obtaining significant market share and placing a meaningful competitive constraint on the EpiPen.  As a result of its actions, Mylan harmed consumers, the competitive process, and Sanofi.  Consumers were harmed by being deprived of choice between differentiated EAI devices and by being deprived of innovation that likely would have occurred but for Mylan's conduct. Sanofi was harmed, as Auvi-Q was never able to become the significant player in the $1 billion annual EAI market that everyone – including Mylan before it designed its anticompetitive course of conduct – believe it would be.  As a result of Mylan's actions, Sanofi incurred damages of between ███████████████████  These conclusions are based on the following key findings:

a.   The appropriate relevant market for purposes of antitrust analysis is the market for EAI devices in the United States.

b.   All throughout the relevant time-period, Mylan had monopoly power in the U.S. EAI market. Mylan maintained a dominant market share and was able to control and raise prices and exclude competitors, all without losing meaningful market share.

c.   In addition to having a dominant share of the U.S. EAI market, Mylan also benefited from the fact that, as a result of Mylan's longstanding dominance of the EAI market and the nature of EAIs and anaphylaxis, a significant percentage of EpiPen consumers will not switch away from EpiPen in the short run, even in the presence of new innovative products.  As a result, Mylan's monopoly power was entrenched.

d.   When faced with the potential entry of Auvi-Q, the first meaningful competitive threat ever encountered by EpiPen, Mylan first sought to either purchase or license the new innovative

---

[1] Specifically, I spoke with Dr. Phillip Huang and Mr. Bryan Downey.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

product. Unsuccessful there, Mylan, with its manufacturing partner Meridian, tried to innovate and develop a smaller EpiPen that it believed would be more competitive with Auvi-Q.  Mylan was similarly unsuccessful. At this point, recognizing the dramatic impact that Auvi-Q would have on its bottom line if given the opportunity to compete on the merits, Mylan dramatically changed its contracting practices with pharmacy benefit managers and other third-party payors ("PBMs") – adopting anticompetitive exclusionary practices.

e.   The intent and effect of Mylan's conduct was to ███████████████████ by tilting the playing field dramatically in Mylan's favor, so that Auvi-Q would never have a chance of gaining a significant foothold in the market. Preventing the growth of Auvi-Q would relegate it to niche status – or cause exit – so that Mylan would maintain its monopoly in the U.S. EAI market.

f.   The crux of Mylan's anticompetitive conduct was the leveraging of its entrenched market power to secure exclusionary contracts with PBMs – agreements that provided significant financial payments to the PBM if the PBM agreed to severely restrict or outright block Auvi-Q from its formulary. These agreements were intentionally structured to ensure both that PBMs had little choice but to accept Mylan's exclusionary offers and to ensure that it would be prohibitively expensive for Sanofi to overcome them.

g.   To further ensure that its course of conduct would work, Mylan undertook numerous efforts to increase the percentage of EpiPen users that would not switch away from EpiPen in the shorter term.  These included Mylan's: (i) exploitation of so-called "spillover" effects to leverage the exclusionary restrictions it secured at some of the largest PBMs and in government programs and use them to foreclose patients that use other PBMs from procuring an Auvi-Q; (ii) marketing efforts to health care providers (HCPs) that flaunted the differences in formulary coverage of EpiPen and Auvi-Q (resulting from the exclusionary contracts Mylan secured), so as to convince HCPs that the path of least resistance is to stick with EpiPen and not even attempt to prescribe Auvi-Q; (iii)  deceptive marketing campaign that implied – falsely – that large PBMs were excluding Auvi-Q, at least in part, because of concerns about its efficacy or safety relative to EpiPen; (iv) use of co-pay coupons to further entrench Mylan's market share by increasing the cost to PBMs of rejecting an exclusionary offer from Mylan; and (v) use of the EpiPen4Schools program – a program designed in part to  lock in parents and caregivers to EpiPen by curtailing availability of Auvi-Q at their children's schools.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

h.  By leveraging its entrenched market share and through its use of exclusionary contracts, Mylan was able to effectively impose a significant tax on Auvi-Q that did not apply to EpiPen. As a result, Sanofi would have to offer Auvi-Q at dramatically lower prices than the EpiPen (and in some cases take a loss) just to make it worthwhile for PBMs to even consider not excluding Auvi-Q. EpiPen did not bear such a burden. This effective tax dramatically tilted the playing field in EpiPen's favor and resulted in Auvi-Q never standing a chance to compete on the merits in the U.S. EAI market.

i.  The relevant tools identified in the economics literature to ascertain whether exclusionary conduct such as that undertaken by Mylan rises to the level of being anticompetitive all point in the same direction – Mylan's conduct is plainly anticompetitive.

  o  Perhaps of most relevance is whether the contracts at issue –Mylan's contacts with PBMs – reference rivals. As the economics literature demonstrates, contracts used by a monopolist that reference rivals are far more suspect than contracts that do not. Here, Mylan modified its contracting strategy shortly before the launch of Auvi-Q to change from contracts that do not reference rivals, and only speak to the treatment of EpiPen, to those that do reference rivals, explicitly speaking to how the PBM must treat not just EpiPen, but also Auvi-Q, in order to receive rebates.

  o  A second tool that economists use is assessing whether the conduct at issue is anticompetitive is whether the conduct is undertaken on a one-off basis, customer by customer, or whether it applies more broadly across the market. Here, it is clear that Mylan was not simply competing for business patient by patient and PBM by PBM. Rather, Mylan used its entrenched market share, and the small initial share of Auvi-Q, to impede Sanofi from expanding its footprint in the overall marketplace.

  o  Third, economists often look to the strategic intent of a party that has engaged in questionable conduct. Here, it is abundantly clear that the intent throughout Mylan – including that of some of its most senior executives – was not to compete on the merits but rather, was to ensure that Auvi-Q would never gain a foothold in the marketplace.

  o  A final tool of relevance is the "profit sacrifice" or "no economic sense" test.  While not necessary to demonstrate that Mylan's behavior was anticompetitive, it is informative that, for the largest PBM (and its clients), Mylan was willing to accept lower profits by entering into an exclusionary contract rather than earn higher

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



profits from a non-exclusionary contract.   This behavior only makes sense if Mylan takes into account the exclusionary effect that the exclusive offer would have on Auvi-Q's ability to compete market-wide.

j.   There are no pro-competitive justifications for Mylan's actions. This is most plainly demonstrated by the fact that, despite its claims that it was engaging in price competition by offering higher rebates than it previously had offered, these higher rebates, which were conditioned on securing exclusivity, ███████████████████████████ ████████████████████████████████████████████████. And, Mylan had available to it many ways to its lower prices (for example, simply lowering the price per pen) that do not place a tax on rivals.

k.   As a result of Mylan's actions, Sanofi was harmed. It was foreclosed from selling a product that everyone – including Mylan – believed would be popular and successful. Had Auvi-Q performed as expected, as it did in areas where Mylan was not able to fully exploit its market power, Sanofi would have earned ███████████ in profits during the period when Auvi-Q was on the market. In present value terms, this amounts to ███████████ Had Sanofi relaunched Auvi-Q after its voluntary recall, as Sanofi's senior executives made clear it surely would have done absent Mylan's conduct, and as Mylan itself anticipated, Sanofi would have continued to earn substantial profits through the life of the Auvi-Q patent. In total, damages for this period amount to between ████████████████████ in present value terms.  When combined with the damages for the earlier period, the total harm to Sanofi in present value terms resulting from Mylan's conduct currently amounts to between approximately ███████████████████.

## II.   Pharmaceutical Industry Background

11.   There are a number of attributes of pharmaceutical drug markets that together make them somewhat unique.  One such attribute is the considerable fixed costs that are associated with developing new products, getting regulatory approval to sell those products, and promoting those products to health care professionals and consumers.  The high costs associated with the research and development of new drugs have been well documented.[2]  The costs of negotiating the regulatory approval process generally are also sizeable.  An indication of this cost is provided by

---

[2] Joseph A. DiMasi and Henry G. Grabowski, "The Cost of Biopharmaceutical R&D: Is Biotech Different?," 28 *Managerial and Decision Sciences* 469 (2007).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

one study that observed that of the prescription drugs sold in one of the seven countries with the largest pharmaceutical markets, only one third were sold in all seven countries, implying that there is a substantial incremental cost of obtaining regulatory approval in each country, even for products that have been found to be safe and efficacious by other regulators.[3]  With regard to promotional expenses, another study found that pharmaceutical companies spend as much on promoting their products as they do on R&D.[4]  The large fixed costs associated with the research, development, regulatory approval, and promotion of pharmaceutical products generate considerable scale economies in the sale of prescription drugs.  In order to recover their fixed costs, firms must sell at a price that is substantially above their marginal costs.  One consequence of this cost structure is that shifts in market share have a considerable impact on the profitability of pharmaceutical firms, providing strong incentives for pharmaceutical firms to protect the market shares of their successful products.

12.     A second distinctive characteristic of pharmaceutical markets is the prominent role played by generic drugs in pricing and competition for drugs that are no longer under patent protection.[5]  Several regulatory features of the U.S. market contribute to the strong role of generic drugs in fostering competition, as compared to competition between branded drugs in the same therapeutic class.  Generic drugs have a lower regulatory hurdle for approval, since generic manufacturers need only demonstrate that they are bioequivalent to the branded drug, and do not need to repeat the clinical trials showing safety and efficacy that had to be undertaken before the branded product could secure approval.[6]  Moreover, under certain circumstances pharmacists are free to (and in some states, required or encouraged to) substitute generic drugs on a prescription for a branded pharmaceutical, whereas pharmacists cannot substitute one branded product for another, even when such substitution would be beneficial for the patient.[7]  Given these features of the regulatory

---

[3] Margaret Kyle, "Pharmaceutical Price Controls and Entry Strategies," 89 *The Review of Economics and Statistics* 88 (2007).

[4] Marc-André Gagnon and Joel Lexchin, "The Cost of Pushing Pills: A New Estimate of Pharmaceutical Promotion Expenditures in the United States," 5 *PLoS Medicine* 29 (2008).

[5] Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," in *Handbook of Health Economics,* Volume 2 (Mark V. Pauly, Thomas G. McGuire, and Pedro P. Barros, eds., Elsevier B.V. 2012) at 766.

[6] Scott Morton and Kyle (2012) at 774.

[7] See Scott Morton and Kyle (2012) at 769. Ohio recently passed a law allowing pharmacists to substitute a less expensive but equivalent generic or brand-name alternative to the EpiPen, so long as they receive the consent of the prescribing doctor and the patient.  FDAnews, "Ohio Passes Law Allowing EpiPen Alternatives" (Jan. 14, 2019), https://www.fdanews.com/articles/189849-ohio-passes-law-allowing-epipen-alternatives.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

environment, generic competition often leads to a steep decline for the price available for a drug (in its generic form) when the drug comes off patent.[8]  Conversely, drugs without generic competition can be subject to significant market power.

13.     A third distinctive characteristic of pharmaceutical products is that those deciding whether to use a prescription drug and, if so, which drug to buy – typically health care professionals and their patients – are distinct from the organizations that pay for those pharmaceuticals, typically insurers and government agencies.  This creates a potential moral hazard issue, since health care professionals and patients may not fully internalize the cost of different treatments.  This characteristic, by itself, would tend to give pharmaceutical firms significant ability to raise prices, since HCPs and patients are not fully incentivized to switch away from higher priced products.

14.     In response to this seller market power, insurers and government agencies have increasingly turned to PBMs in an effort to help control pharmaceutical prices by creating countervailing buyer power.[9]  PBMs negotiate with pharmaceutical firms on behalf of insurers and government agencies, taking advantage of the scale of large buyers to exert leverage on prices for pharmaceuticals.  PBMs also can take advantage of their informational advantage about product prices and alternatives to influence choices made by less well informed HCPs and patients.  One important tool used by PBMs to influence patient choice and mitigate supplier bargaining power is the creation of formularies.  A formulary is a list of covered drugs that may be used by patients, typically with different tiers corresponding to different levels of patient co-payments.[10]

15.     The flow of pharmaceutical products through the supply chain from manufacturer to patient generally follows the following relatively straight-forward path: pharmaceutical firms supply the product to wholesale distributors, who distribute to pharmacies, who dispense the product to patients after those patients have secured a prescription from a health care provider.  However, the flow of money is far more complicated, and reflects negotiated prices and discounts at every step of the way.  As noted, patients typically pay a co-pay to the pharmacy that is governed by the formulary associated with the patient's health care plan.  The pharmacy purchases from a wholesaler at close to list price, while the wholesaler in turn purchases from the manufacturer at a

---

[8] Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," 6 *Journal of Economics & Management Strategy* 75 (1997).

[9] See Ernst R. Berndt, Thomas G. McGuire, and Joseph P. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets" (National Bureau of Economic Research Working Paper No. 16879, 2011); Sara Fisher Ellison and Christopher M. Snyder, "Countervailing Power in Wholesale Pharmaceuticals," 58 *The Journal of Industrial Economics* 32 (2010).

[10] Berndt, McGuire, and Newhouse (2011).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

small discount off list price.  Typically, a patient's PBM pays the drugstore the difference between its costs and the patient co-payment plus a dispensing fee.  However, the PBM negotiates a discounted price with the manufacturer and settles up separately by receiving a rebate from the manufacturer.  The multiple decision-makers in this market, each with imperfect incentives, create several opportunities for the exercise of market power.  As will be discussed, the various levels of pricing and non-aligned incentives can be manipulated to make it difficult for an entrant with a new drug to gain a foothold in the market when facing an incumbent with entrenched market power.

## III.   THE MARKET FOR EPINEPHRINE AUTO INJECTORS

### A.   OVERVIEW OF EPINEPHRINE AUTO INJECTORS

#### 1. Anaphylaxis and treatments

16.    Anaphylaxis is a serious, life-threatening emergency condition that requires immediate treatment.[11]  Anaphylaxis can occur as a result of exposure to allergens such as peanuts, shellfish, eggs, insect stings, latex, and other medication.  Symptoms vary but include hives, itching, and swelling of the lips, tongue, and airways.  Anaphylaxis also can have effects on the gastrointestinal system, cardiovascular system, or central nervous system.[12]  Anaphylactic reactions are not uncommon: medical studies have estimated that as many as 27 million Americans have experienced

---

[11] T.T. Song, M. Worm, and P. Lieberman, "Anaphylaxis Treatment: Current Barriers to Adrenaline Auto-Injector Use," 69 *Allergy* 983 (2014) ("There is universal expert agreement that rapid intramuscular injection of adrenaline is life-saving and constitutes the first-line treatment of anaphylaxis."); see also Bresch Dep. at 123-25.

[12] EpiPen, "Frequently Asked Questions: What are the symptoms of anaphylaxis?," https://www.epipen.com/about-epipen-and-generic/faq (accessed Feb. 2, 2019); Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 11.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

an anaphylactic reaction,[13] and up to 43 million people in the United States are at risk of life-threatening allergic reactions,[14] including one in 13 children with food allergies.[15]

17.     The medical establishment has accepted that rapid injection of epinephrine (also known as adrenaline) is the "first-line" treatment for anaphylaxis.[16]  Doctors today recommend epinephrine auto-injectors ("EAIs") to deliver epinephrine to anaphylactic patients, and they recommend that patients with life-threatening allergies always carry an EAI.[17]  EAIs are prescription medical devices that allow a pre-set dosage of epinephrine to be quickly injected within a few seconds, at the correct dosage, and with relative ease compared to syringes.[18]  When an EAI is used properly, the

---

[13] Phil Lieberman, Carlos A. Camargo, Jr, Kari Bohlke, Hershel Jick, Rachel L. Miller, Aziz Sheikh, and F. Estelle R. Simons, "Epidemiology of Anaphylaxis: Findings of the American College of Allergy, Asthma and Immunology Epidemiology of Anaphylaxis Working Group," 97 *Annals of Allergy, Asthma & Immunology* 596 (November 2006); F. Estelle R. Simons, "Anaphylaxis: Recent Advances in Assessment and Treatment," 124 *The Journal of Allergy and Clinical Immunology* 625 (2009).

[14] Alfred I. Neugut, Anita T. Ghatak, and Rachel L. Miller, "Anaphylaxis in the United States: An Investigation Into Its Epidemiology," 161 *Archives of Internal Medicine* 15, 19 (2001) ("This chart (Table 3) now suggests that 3.3 to 43 million Americans may actually experience anaphylaxis, which is a narrower band than the one listed above. These values, we believe, are a better representation of the magnitude of anaphylaxis in the United States, as they are based solely on estimates presented by researchers in past epidemiologic studies of anaphylaxis (and not allergy).").

[15] Mylan, "Mylan On Location," http://www.mylan.com/en/mylan-on-location-featuring-epipen (accessed Feb. 2, 2019) ("Up to 43 million people in the U.S. are at risk for anaphylaxis, a potentially severe or life-threatening allergic reaction, due to sensitivities to foods, insect venom and other allergens. That includes an estimated one in 13 children with food allergies, a common cause of anaphylaxis.").

[16] American College of Allergy, Asthma & Immunology, "Epinephrine Auto-injector" (Feb. 1, 2018), https://acaai.org/allergies/allergy-treatment/epinephrine-auto-injector ("The first-line treatment for anaphylaxis is epinephrine (adrenaline)."); Joshua A. Boyce, et al., "Guidelines for the Diagnosis and Management of Food Allergy in the United States: Report of the NIAID-Sponsored Expert Panel," 126 *The Journal of Allergy and Clinical Immunology* S1 (2010); Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶¶ 14, 19.

[17] American College of Allergy, Asthma & Immunology, "Anaphylaxis" (Jan. 29, 2018), https://acaai.org/allergies/anaphylaxis ("An anaphylactic reaction should be treated immediately with an injection of epinephrine (adrenaline). Doses, available by prescription, come in an auto-injector that should be kept with you at all times."); American College of Allergy, Asthma & Immunology, "Epinephrine Auto-injector" (Feb. 1, 2018), https://acaai.org/allergies/allergy-treatment/epinephrine-auto-injector ("Allergists advise that *all* patients who have food allergies carry their epinephrine auto injector with them at all times."); Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 19.

[18] F. Estelle R. Simons, "Anaphylaxis: Recent Advances in Assessment and Treatment," 124 *The Journal of Allergy and Clinical Immunology* 625, 632 (2009) ("Only 2 fixed doses of epinephrine, 0.15 mg and 0.3mg, are available in autoinjector formulations."); Larry S. Posner and Carlos A. Camargo, Jr, "Update on the Usage and Safety of Epinephrine Auto-Injectors, 2017," 9 *Drug, Healthcare and Patient Safety* 9, 15 (2017) ("Very recently, the prescribing information for the EpiPen Auto-Injector was changed to shorten the time of insertion to 3 s and to massage the injection site for an additional 10 s. Epinephrine absorption should not be affected by this recommendation, as suggested by a study that used EAIs to inject epinephrine into beef. This study indicated that there may not be an increase in epinephrine absorbed or dispensed past 1 s of injection.").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

epinephrine is injected into the thigh muscle.[19]  Because time is of the essence in treating
anaphylaxis, patients suffering the condition need rapid access to epinephrine, and oftentimes will
not be able to get to an emergency room or other urgent care center for treatment.[20]  Until the
1980s, epinephrine was delivered into the patient's body mainly with manual syringes and vials.[21]
In 1987, Survival Technology obtained approval from the Food and Drug Administration for the
first epinephrine auto-injector and entered the market.[22] Industry participants recognize the
improvement in treatment speed, reliability, and efficacy enabled by EAI devices.[23]

> ### B.   EPINEPHRINE AUTO INJECTOR PRODUCTS AND HISTORY

18.      As noted above, the EpiPen first came onto the market in 1987.  Widely accepted as a
dramatic improvement over the previously available treatment for anaphylaxis – vials of
epinephrine along with syringes – the EpiPen became the standard treatment for anaphylaxis.[24]
Over the years, other branded EAIs became available in the United States including Twinject (first
launched in 2005) and Adrenaclick (launched in 2010 and then again in 2013).  While different
from the EpiPen, these two competitor devices were similar in look and use to the EpiPen.  In 2013,

---

[19] Song, et al. (2014) at 987 ("There are five different commercial AAIs [adrenaline auto-injectors] currently available and licensed in Europe and/or the United States (Europe: Anapen, EpiPen and Jext; US: Adrenaclick, Auvi-Q and EpiPen). They each aim to deliver an *im* dose of adrenaline into the vastus lateralis muscle of the thigh.").

[20] Mayo Clinic Staff, "Anaphylaxis: Overview" (Jan. 5, 2018), https://www.mayoclinic.org/diseases-conditions/anaphylaxis/symptoms-causes/syc-20351468; Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 22.

[21] Stephen D. Lockey, Sr, "A New Method of Administering Aqueous Epinephrine: The EpiPen, an Automatic Syringe," 17 *The Journal of Asthma Research* 153 (1980); see Jan Dep. at 118-19 (Q: "Prior to the introduction of the Auvi-Q, what other products were available to deliver epinephrine, to your knowledge? A: Those were the injectables that you would take, you know, draw the thing from the vial, and that's not patient friendly to really do it in an emergency and stuff.  So that was the only – and we really – it was very – utilization was minimum.  So EpiPen was the standard of care.").

[22] U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=019430 (accessed Feb. 2, 2019) (click on Approval Date(s) and History, Letters, Labels, Reviews for NDA 019430); Center for Drug Evaluation and Research, "Approval Package for Application Number: 019430Orig1s001," https://www.accessdata.fda.gov/drugsatfda_docs/nda/pre96/019430Orig1s001.pdf (accessed Feb. 2, 2019) (showing Survival Technology, Inc. as the applicant).

[23] See Jan Dep. at 118-19 (Q: "Prior to the introduction of the Auvi-Q, what other products were available to deliver epinephrine, to your knowledge? A: Those were the injectables that you would take, you know, draw the thing from the vial, and that's not patient friendly to really do it in an emergency and stuff.  So that was the only – and we really – it was very – utilization was minimum.  So EpiPen was the standard of care."); see also Janet Goldman, "Syringe & Vial or Epi-Pen?" (Sept. 7, 2016), https://allergyadvocacyassociation.org/index.php/in-the-news/470-syringe-vial-or-epi-pen-2-itn.

[24] Jan Dep. at 118-19.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a third branded EAI competitor – Auvi-Q – was launched.  Unlike Twinject and Adrenaclick, Auvi-Q had a different shape than the EpiPen, and included different features.[25]

19.      In addition to branded competitors, there have also been several generic EAI products that have launched in the United States, including a generic to the Adrenaclick (launched in 2013), an EpiPen authorized generic offered by Mylan (launched in December 2016), and, most recently, in November 2018, Teva launched its own generic to the EpiPen.[26]  These generic products also look similar to the EpiPen and offer similar features.  Table 1 lists these EAI products, and notes their entry dates, and their manufacturers and distributors since 2008.  The next sections discuss these EAI products in more detail.

---

[25] Handel Dep. at 30-32  For a side-by-side comparison of EpiPen and Auvi-Q, see Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 20.

[26] Colin Kellaher, "Teva Releases Generic EpiPen in Limited Doses in the U.S.," Wall Street Journal, Nov. 27, 2018, available at https://www.wsj.com/articles/teva-releases-generic-epipen-in-limited-doses-in-the-u-s-1543336473. An authorized generic version is the same drug product as the branded product but with different labeling.   U.S. Food and Drug Administration, "FDA List of Authorized Generic Drugs" (Dec. 27, 2018), https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approval applications/abbreviatednewdrugapplicationandagenerics/ucm126389.htm ("Is an Authorized Generic Drug the Same Thing as a Generic Drug? No. The term 'authorized generic' drug is most commonly used to describe an approved brand name drug that is marketed without the brand name on its label. Other than the fact that it does not have the brand name on its label, it is the exact same drug product as the branded product. An authorized generic may be marketed by the brand name drug company, or another company with the brand company's permission. In some cases, even though it is the same as the brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug.").

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Table 1: EAI Products and Entry Dates in the United States**

| EAI Product | Entry Date | Exit Date | Re-Entry Date |
|---|---|---|---|
| EpiPen, EpiPen Jr[27] | Dec. 22, 1987* | | |
| EpiPen 2-Pak, EpiPen Jr 2-Pak[28] | Apr. 3, 2001 | -- | |
| EpiPen Authorized Generic[29] | Dec. 16, 2016 | | |
| Twinject[30] | Aug. 16, 2005 | Mar. 30, 2012 | N/A |
| Adrenaclick[31] | Jan. 7, 2010 | Mar. 30, 2012 | Jun. 14, 2013 |
| Adrenaclick Authorized Generic [32] | Mar. 31, 2010 | 2012 | Jun. 14, 2013 |
| Auvi-Q[33] | Jan. 28, 2013 | Oct. 28, 2015 | Feb. 14, 2017 |
| Generic EpiPen (Teva)[34] | Nov. 27, 2018 | -- | |

Note:  * denotes date approved by FDA.

      1. EpiPen

20.     The oldest of the EAI drug devices is the EpiPen.  Survival Technology (later Meridian Medical Technologies) adapted auto-injector technology that was originally developed as a

---

[27] U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=019430 (click on Approval Date(s) and History, Letters, Labels, Reviews for NDA 019430) (accessed Jan.11, 2019).

[28] PeanutAllergy.com, "Meridian Announces Launch of New EpiPen 2-PAK" (April 3, 2001), https://www.peanutallergy.com/boards/meridian-announces-launch-of-new-epipen-2-pak.

[29] Mylan, "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized Generic" (Dec. 16, 2016), http://newsroom.mylan.com/2016-12-16-Mylan-Launches-the-First-Generic-for-EpiPen-epinephrine-injection-USP-Auto-Injector-as-an-Authorized-Generic.

[30] Verus Pharmaceuticals, "Verus Pharmaceuticals Announces U.S. Launch of Twinject for Anaphylaxis" (Aug. 16, 2005), https://web.archive.org/web/20051222104426/http://www.veruspharm.com/news_releases_08_16_2005.htm; Doug Roe, Med Device Online, "Keeping it Simple: One Startup's Plan To Upend The Epinephrine Delivery Market" (March 29, 2016), https://www.meddeviceonline.com/doc/one-start-up-s-plan-to-upend-the-epinephrine-delivery-market-0001.

[31] MPR, "Adrenaclick Auto-injector launched for anaphylaxis" (Jan. 7, 2010), https://www.empr.com/news/adrenaclick-auto-injector-launched-for-anaphylaxis/article/160817/; MPR, "Adrenaclick Auto-Injector Available Again for Anaphylaxis" (June 17, 2013), https://www.empr.com/news/adrenaclick-auto-injector-available-again-for-anaphylaxis/article/298979/; Amedra Pharmaceuticals LLC, "Amedra Pharmaceuticals Markets Adrenaclick® Auto-Injector," PR Newswire, June 14, 2013, available at https://www.prnewswire.com/news-releases/amedra-pharmaceuticals-markets-adrenaclick-auto-injector-211586831.html.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

battlefield device to counteract nerve agents, and developed the EpiPen, which received FDA approval in 1987.[35] As an epinephrine auto-injector, the EpiPen features a spring-loaded needle that injects a fixed dose of epinephrine intramuscularly, through the patient's skin.[36] EpiPen is intended to be easy to use by individuals without extensive medical expertise, although users should be trained before administering it.[37]  Reflecting its name, EpiPen is shaped like a large felt-tip marker pen. EpiPen is available in regular and junior dosages, and is currently sold in 2-Paks, or packages consisting of two pens.[38]

21.      In 1997, Dey Pharma obtained exclusive distribution rights to EpiPen from Meridian.[39] Mylan obtained the marketing and distribution rights in 2007 and continues to sell and distribute

---

[32] NIH, "EPINEPHRINE injection [Greenstone LLC]," https://web.archive.org/web/20100516130646/http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=16934 (accessed Jan. 14, 2019); Brice Labruzzo Mohundro and Michael Marlan Mohundro, "Important Considerations When Dispensing Epinephrine Auto-Injector Devices" (Sept. 22, 2010), https://www.pharmacytimes.com/p2p/p2pepinephrine-0910); Paul A. Greenberger, Dana V. Wallace, Phillip L. Lieberman, and Sean M. Gregory, "Contemporary Issues in Anaphylaxis and the Evolution of Epinephrine Autoinjectors," 119 *Annals of Allergy, Asthma, & Immunology* 333, 336 (Table 1) (2017); Lineage Therapeutics Inc., "Lineage Therapeutics Markets Authorized Generic Epinephrine Auto-Injector," PR Newswire, June 14, 2013, available at https://www.prnewswire.com/news-releases/lineage-therapeutics-markets-authorized-generic-epinephrine-auto-injector-211585371.html.

[33] Sanofi, "Sanofi Announces Auvi-Q™, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.," PR Newswire, Jan. 28, 2013, available at https://www.prnewswire.com/news-releases/sanofi-announces-auvi-q-the-first-and-only-voice-guided-epinephrine-auto-injector-is-now-available-in-the-us-188651061.html; Sanofi, "Auvi-Q (epinephrine injection, USP) Recall," https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall (accessed Jan. 14, 2019); Tammie Smith, "Richmond-based Kaleo's Auvi-Q epinephrine injector returning to market Feb. 14," Richmond Times-Dispatch, Jan. 19, 2017, available at https://www.richmond.com/business/local/richmond-based-kaleo-s-auvi-q-epinephrine-injector-returning-to/article_04442c78-220d-53bd-ac2e-fb4a222889e3.html.

[34] Colin Kellaher, "Teva Releases Generic EpiPen in Limited Doses in the U.S.," Wall Street Journal, Nov. 27, 2018, available at https://www.wsj.com/articles/teva-releases-generic-epipen-in-limited-doses-in-the-u-s-1543336473.

[35] U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=019430 (accessed Feb. 2, 2019) (click on "Approval Date(s) and History, Letter, Labels, Reviews for NDA 019430"); see also SAN-EPI-0766016 at 023.

[36] Stephen F. Kemp and Richard F. Lockey, "Anaphylaxis: A Review of Causes and Mechanisms," *110 The Journal of Allergy and Clinical Immunology* 341, 346 (2002), at 346 ("Spring-loaded, automatic epinephrine syringes administered intramuscularly and intramuscular epinephrine injections in the thigh in adults provide dose-equivalent plasma levels.").

[37] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 23.

[38] Bresch Dep. at 204 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[39] Supply Agreement between Meridian Medical Technologies and Dey (Jan. 1, 2001), Securities and Exchange Commission Exhibit 10.42,

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EpiPens today.[40] On the manufacturing side, Meridian Medical Technologies, which is now a Pfizer

company, continues to manufacture EpiPen as well as EpiPen's authorized generic version.[41] Mylan

began selling EpiPen's authorized generic version in 2016.[42]

22.      EpiPens have been a very profitable product for Mylan, and despite it being but one of

thousands of products offered by Mylan, it constitutes a significant portion of Mylan's revenues and

profits. In 2013, EpiPen sales in the U.S. were ▮▮▮ of Mylan's global sales and ▮▮▮ of Mylan's

U.S. sales, and EpiPen U.S. operating profits were ▮▮▮ of its global operating profits.[43]  The

corresponding numbers for 2014 were ▮▮▮ of global revenues and ▮▮▮ of U.S. revenues and

▮▮▮ of operating profits.[44]

### 2. Adrenaclick and Twinject

23.      Adrenaclick, its authorized generic, and Twinject are EAI devices that, like EpiPen, are

shaped like large felt-tip marker pens.  While similar in look and feel, these products are not

---

https://www.sec.gov/Archives/edgar/containers/fix071/95676/000095013301501482/w49983ex10-42.txt.

[40]  Mylan Inc., *Transition Report* (*Form 10-K/A*) (March 7, 2008) at 3, 50.

[41] Meridian Medical Technologies manufactured EpiPen until it was acquired by King Pharmaceuticals in 2003, which Pfizer acquired in 2011.  See Keith T. Reed, "Meridian Medical Technologies sold," Baltimore Business Journal, Jan. 9, 2003, available at
https://www.bizjournals.com/baltimore/stories/2003/01/06/daily35.html; Pfizer, "Pfizer Completes Acquisition of King Pharmaceuticals, Inc." (March 1, 2011),
https://archive.is/20130630050306/http://www.pfizer.com/news/press_releases/pfizer_press_release_archive.jsp?guid=20110301006102en&source=2011&page=14.

[42] EpiPen, "EpiPen Supply Information," https://www.epipen.com/about-epipen-and-generic/supply-information (accessed Feb. 2, 2019) ("Meridian Medical Technologies, a Pfizer company, manufactures EpiPen 0.3 mg and EpiPen Jr 0.15 mg Auto-Injectors, and the authorized generic versions of these strengths.").  Mylan, "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized Generic" (Dec. 16, 2016), http://newsroom.mylan.com/2016-12-16-Mylan-Launches-the-First-Generic-for-EpiPen-epinephrine-injection-USP-Auto-Injector-as-an-Authorized-Generic.

[43] See MYEP00249596 at 600▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. 2013 EpiPen U.S. sales out of 2013 Mylan global sales = ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 2013 EpiPen U.S. sales out of 2013 Mylan U.S. sales = ▮▮▮▮▮▮▮▮ Bresch Dep. Ex. 17 at p.1 (U.S. EpiPen operating profits were $393 million in 2013); Mylan, *Annual Report (Form 10-K)* (Mar. 2, 2015) at 50 (Mylan's global earnings from operations in 2013 were $1,135,500,000).  2013 EpiPen U.S. operating profits out of 2013 Mylan global operating profits = $393 million/$1135.5 million = 34.6%.

[44] See MYEP00249596 at 600▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bresch Dep. Ex. 17 at p.1 (U.S, operating profits were $525 million in 2014); Mylan, *Annual Report (Form 10-K)* (Mar. 2, 2015) at 50 (Mylan's global earnings from operations in 2014 were $1352.6 million);▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

identical to the EpiPen – they have a slightly different design and instructions from EpiPen's.[45]  In 2012, Shionogi discontinued both Adrenaclick and Twinject.[46]  The branded and authorized generic versions of Adrenaclick were reintroduced to the U.S. market in 2013 and they remain on the market today.[47]

### 3. Auvi-Q

24.     In January 2013, Sanofi launched Auvi-Q, a new EAI drug device, in the United States.[48] Auvi-Q is smaller in size than EpiPen, shaped like a smartphone, and provides recorded step-by-step voice instructions that guide patients and caregivers through the injection process."[49]  Auvi-Q offers an auto-retractable needle, which injects epinephrine and retracts the needle back into the device within seconds.[50]

25.     Auvi-Q was the brainchild of twin brothers, Evan and Eric Edwards, who grew up with life-threatening allergies and had a goal of designing a better EAI device.[51] In 2004, the brothers founded the company Intelliject Inc. (which changed its name to Kaléo in 2014), through which they

---

[45] "Anaphylaxis and Insect Stings and Bites," 318 *Journal of the American Medical Association* 86 (2017).

[46] Twinject was a pen-shaped EAI that Verus Pharmaceuticals launched in 2005. Verus Pharamceuticals, "Verus Pharmaceuticals Announces U.S. Launch of Twinject for Anaphylaxis," (Aug. 16, 2005), https://web.archive.org/web/20051222104426/http://www.veruspharm.com/news_releases_08_16_2005.htm; Doug Roe, Med Device Online, "Keeping it Simple: One Startup's Plan To Upend The Epinephrine Delivery Market" (March 29, 2016), https://www.meddeviceonline.com/doc/one-start-up-s-plan-to-upend-the-epinephrine-delivery-market-0001.

[47] MPR, "Adrenaclick Auto-Injector Available Again for Anaphylaxis," (June 17, 2013) http://www.empr.com/news/adrenaclick-auto-injector-available-again-for-anaphylaxis/article/298979/

[48] Sanofi, "Sanofi Announces Auvi-Q™, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.," PR Newswire, Jan. 28, 2013, available at https://www.prnewswire.com/news-releases/sanofi-announces-auvi-q-the-first-and-only-voice-guided-epinephrine-auto-injector-is-now-available-in-the-us-188651061.html.

[49] Auvi-Q, "About Auvi-Q," https://www.auvi-q.com/about-auvi-q (accessed Feb. 2, 2019).

[50] Auvi-Q, "About Auvi-Q," https://www.auvi-q.com/about-auvi-q (accessed Feb. 2, 2019); Kaléo, "Kaléo Confirms U.S. Availability of AUVI-Q (epinephrine injection, USP) Auto-injector for Back-to-School Season" (Aug. 14, 2018), https://kaleo.com/press-release/kaleo-confirms-u-s-availability-of-auvi-q-epinephrine-injection-usp-auto-injector-for-back-to-school-season.  The EpiPen's needle is covered after being withdrawn from the skin, while the Adrenaclick's needle remains visible after use.  Consultants in Allergy & Asthma Care, "Epinephrine Choices in 2017; So Many, And What To Do?" (June 30, 2017), https://allergyasthmacare-doctor.com/epinephrine-choices-in-2017-so-many-and-what-to-do.

[51] Katie Thomas, "Brothers Develop New Device to Halt Allergy Attacks," New York Times, Feb. 1, 2013, available at https://nytimes.com/2013/02/02/business/auvi-q-challenges-epipen-with-a-new-shape-and-size.html.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

developed Auvi-Q.[52] In 2009, Intelliject licensed Auvi-Q exclusively to Sanofi to market in the U.S. and Canada, selling the product as "Allerject" in Canada.[53]

26.      Auvi-Q received final FDA approval in 2012.[54] Auvi-Q was sold in the U.S. from 2013 until October 2015, when Sanofi conducted a voluntary recall of Auvi-Q due to reports of potential manufacturing issues.[55] In February 2016, Sanofi returned its Auvi-Q rights to **Kaléo. Shortly thereafter, on February 14, 2017, Kaléo reintroduced Auvi-Q to the market.** Kaléo continues to manufacture and market Auvi-Q today.[56]

### 4. Generic EpiPen

27.      Teva Pharmaceuticals, which does not produce a branded EAI, first began the process of getting approval for a generic EpiPen product in 2009. A patent infringement lawsuit between Teva and Mylan was settled in April 2012.[57] According to Mylan's press release at the time of the settlement, the settlement set the earliest date that Teva could launch a generic EpiPen device at June 2015. Mylan filed a citizen's petition to block approval of Teva's generic in 2015, and the FDA rejected the Teva application in February 2016.[58]

---

[52] John Reid Blackwell, "Medical products maker Intelliject changes name to Kaleo," Richmond Times-Dispatch, Jan. 7, 2014, available at https://www.richmond.com/business/medical-products-maker-intelliject-changes-name-to-kaleo/article_1133fd4a-c6b2-5a76-b867-ccb0aafecbdc.html.

[53] Katie Thomas, "Brothers Develop New Device to Halt Allergy Attacks," New York Times, Feb. 1, 2013, available at https://nytimes.com/2013/02/02/business/auvi-q-challenges-epipen-with-a-new-shape-and-size.html; Kaléo, "AUVI-Q (epinephrine injection, USP) Available in Canada Starting September 7" (Aug. 29, 2018), https://kaleo.com/press-release/auvi-q-epinephrine-injection-usp-available-in-canada-starting-september-7.

[54] Center for Drug Evaluation and Research, "Approval Package for Application Number: 201739Orig1s000," https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000Approv.pdf (accessed Feb. 3, 2019). Before launch, Auvi-Q was known as E-Cue, and it is referred to by that name in both Mylan and Sanofi documents. See, e.g., Graybill Dep. Ex. 6 at p. 7 (internal presentation slide titled "Strategic Response: 2012 Sanofi E-Cue Launch"); SAN-EPI-0326335.ppt at slides 1, 3 (analyst presentation for Sanofi title "E-cue Pricing Study Integrated Findings").

[55] Sanofi, "UPDATED: Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q® Due to Potential Inaccurate Dosage Delivery" (Oct. 30, 2015), http://www.news.sanofi.us/2015-10-28-Sanofi-US-Issues-Voluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery.

[56] Sanofi, "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo" (Feb. 23, 2016), http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o; Kaléo, "Kaléo Announces U.S. Availability and Pricing to Patients of Auvi-Q® (Epinephrine Injection, USP) Auto-Injector, For Life-Threatening Allergic Reactions" (Jan. 19, 2017), https://kaleo.com/press-release/kaleo-announces-u-s-availability-and-pricing-to-patients-of-auvi-q-epinephrine-injection-usp-auto-injector-for-life-threatening-allergic-reactions/.

[57] Mylan, "Mylan and Pfizer Announce Epinephrine Auto-injector Settlement Agreement with Teva" (April 26, 2012), http://newsroom.mylan.com/press-releases?item=123144.

[58] See Ed Silverman, Pharmalot "How Mylan tried to keep Teva from selling a generic EpiPen" (Aug. 31, 2016), https://www.statnews.com/pharmalot/2016/08/31/mylan-teva-generic-epipen/.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

28.    Mylan introduced its own generic version of EpiPen in September 2016, the same month that its CEO, Heather Bresch, was called before Congress to testify about the skyrocketing price for EpiPens in the U.S.[59]

29.    As of the writing of this report, Teva represents the most recent entrant in the EAI market. Teva obtained FDA approval in August 2018 to market "the first generic version of EpiPen and EpiPen Jr (epinephrine) auto-injector."[60] On November 27, 2018, Teva announced the release of its generic EpiPen in limited supply in the United States.[61]

### C.    EPINEPHRINE AUTO INJECTOR MARKET TRENDS

#### 1. Size of EAI market and growth over time

30.    The EAI market has grown significantly since Mylan acquired distribution rights in 2007. Figure 1, Panel A shows the increase in the number of EAI wholesale units sold in the United States between 2008 and 2016. In 2008, over 4 million EAI units were sold. The growth is pronounced after 2011, increasing to nearly 8 million units in 2013 and reaching around 9 million in 2016, or a doubling in units sold between 2008 and 2016.  Figure 2 shows that these unit increases are consistent with growth in the retail market when measured in the total number of EAI prescriptions filled. For example, 3.3 million total prescriptions were filled in 2013, reaching 4.0 million prescriptions in 2016, where a prescription can be for a single dose as well as a two-pack.

31.    Panel B of Figure 1 shows the EAI market in wholesale dollar revenues since 2008. Total EAI revenues have increased more quickly than unit growth. In 2008, total EAI revenues were about $200 million. Total EAI revenues grew to nearly $1 billion in 2013 and reached over $2 billion in 2016, a dramatic tenfold increase from 2008 revenue amounts.  EpiPen accounts for much of the EAI market growth. Mylan has reported the EpiPen to hold market shares of over 95% from

---

[59] Mylan, "Mylan to Launch First Generic to EpiPen® Auto-Injector at a List Price of $300 per Two-Pack Carton, a More than 50% Discount to the Brand Product" (Aug. 29, 2016), http://newsroom.mylan.com/2016-08-29-Mylan-to-Launch-First-Generic-to-EpiPen-Auto-Injector-at-a-List-Price-of-300-per-Two-Pack-Carton-a-More-than-50-Discount-to-the-Brand-Product; Linette Lopez and Lydia Ramsey, Business Insider, "'YOU ASKED FOR IT' – Congress railed on the maker of EpiPen" (Sept. 21, 2016), https://www.businessinsider.com/mylan-ceo-heather-bresch-house-oversight-committee-hearing-epipen-2016-9.

[60] U.S. Food & Drug Administration, "FDA approves first generic version of EpiPen" (Aug. 16, 2018), https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm617173.htm.

[61] Colin Kellaher, "Teva Releases Generic EpiPen in Limited Doses in the U.S.," Wall Street Journal, Nov. 28, 2018, available at https://www.wsj.com/articles/teva-releases-generic-epipen-in-limited-doses-in-the-u-s-1543336473.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2008 to 2011, rising to in excess of 99% by the end of 2012 with the exit of competing products.[62] EpiPen's share fell with competition from Auvi-Q and the Adrenaclick authorized generic in 2013, but remained over 84% through midyear, 2015.[63]

---

[62] In annual reports from 2008 to 2011, Mylan reported that it had over 95% market share in the United States. See, e.g., Mylan, *Annual Report (Form 10-K)* (Feb. 21, 2012) at 8 ("The EpiPen Auto-Injector is the number one prescribed epinephrine auto-injector with more than 95% market share in the U.S. and more than 90% market share worldwide in the defined auto-injector market during 2011.").
[63] MYEP00487195 at slide 112.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### Figure 1: EAIs Sold in the United States, 2008-2016

#### A. EAI units (number of pens or devices, wholesale)



#### B. EAI revenues (wholesale)



Notes:  EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other (0.15MG/0.15ML) dosages, and two-packs as well as single packs. EAI products are identified by product names and NDC numbers.

Sources: IQVIA National Sales Perspectives Data; see Appendix Part B notes

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 2: EAI Prescriptions Filled in the United States, 2008-2017**



Notes: A unit (prescription) can be for a single dose, or two doses (two pens). Total prescriptions (TRx) include new prescriptions as well as refills. EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other (0.15MG/0.15ML) dosages, and two-packs as well as single packs.  EAI products are identified by product names and NDC numbers.

Sources: IQVIA Xponent Plantrak; see Appendix Part B notes

32.     Much of the growth in EAI revenues has been due to higher prices. ███████████ ████████████████████████████████████████████████████████████████████████████████████ ███████████████[64] The remainder is due to various drivers of increased sales of devices.  Some of that is simply due to growth in the at-risk population ██████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████ The remaining volume growth can be attributed to efforts to expand demand for EAI devices.

33.     A number of regulations and medical guidelines issued between 2010 and 2013 are factors in the expansion of EAI demand during this time period. In December 2010, the National Institute of



---

[64] MYEP00435396 at slide 3.

[65] *Id.* ████████████████████████████████████████████████████████████████████ ███████████████████████████ See also MYEP00491274 at slide 8 █████████████████████████ ████████████████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Allergy and Infectious Diseases (NIAID) issued guidelines that promoted EAIs as the "first-line therapy" for anaphylaxis.  The NIAID's guidelines also recommended the sale of EAIs in packages of two doses (e.g., EpiPen 2-Paks) instead of one dose.  During this period, the FDA allowed marketing EAIs to expand to anyone at risk of an anaphylaxis reaction, while it had previously allowed marketing only to patients who had already experienced a reaction.  Finally, in November 2013, Congress passed the School Access to Emergency Epinephrine Act.  The 2013 legislation, which followed successful lobbying efforts by Mylan, encouraged states to require or recommend that schools stock EAIs for students with allergic reactions.  The timing of these regulatory actions appears consistent with the heightened growth of the EAI market.

### 2. *EAI market by type of insurance*

34.      The large majority of the population in the United States is enrolled in insurance plans that provide coverage of at least some EAI treatments.  Figure 3 shows the population breakdown by insurance channel as of January, 2014. Commercial (private) insurers covering EAIs are dominant, with over two-thirds of the U.S. population ("lives") enrolled.  About 7 percent of U.S. lives were enrolled in Medicare plans covering EAIs, and 15 percent were enrolled in Medicaid plans covering EAIs.  About 10 percent of U.S. lives do not have any EAI coverage, including people who were uninsured.  Figure 4 shows similar proportions for total EAI prescriptions in the United States.  According to retail pharmacy sales data, 70% of EAI total prescriptions filled are covered by commercial plans, 6% by Medicare plans, and 18% by Medicaid plans.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3: Share of Lives by EAI Coverage in the United States**

**January 2014**



Notes:

[1] The analysis shows lives covered in the 50 states and Washington, D.C.

[2] "EAI Not Covered" include uninsured persons, and persons in Commercial, Medicare, and Medicaid plans that do not cover EAI products, i.e., if the formulary statuses for all EAIs are "Not Listed" or "Unknown" for the plan in that month.  EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other (0.15MG/0.15ML) dosages, and two-packs as well as single packs.

[3] Commercial plans are identified by "Commercial" or "Health Exchange" in the MMIT data.

Sources:

[1] MMIT Data

[2] "Health Insurance Coverage of the Total Population." The Henry J. Kaiser Family Foundation, https://www.kff.org/other/state-indicator/total-population/?dataView=1&currentTimeframe=3&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (accessed Jan. 15, 2019)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 4: Share of Total EAI Prescriptions Filled by Channel in the United States**

**January 2014**



Notes:

[1] The analysis shows total prescriptions filled (TRx) in the 50 states and Washington, D.C.

[2] EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other (0.15MG/0.15ML) dosages, and two-packs as well as single packs. EAI products are identified by product names and NDC numbers.

[3] Commercial channels are identified by "Commercial" or "Health Exchange" in the MMIT data. Medicaid channels include "State Medicaid" and "Managed Medicaid."

Sources:

[1] IQVIA Xponent Plantrak

[2] MMIT Data

[3] Sanofi Bridge Files

[4] See Appendix Part B notes

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

35.    ███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████    That disparity is consistent with specialists (allergists in this case) tending to be early adopters of new, innovative products.[67]  The same study ██████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████████
██████████  █████████████████████████████████  Moreover, as seen in Figure 5, Auvi-Q and EpiPen prescriptions differ in their shares by payer type.  In 2015, 83% of Auvi-Q prescriptions were covered by commercial plans, compared to 67% of EpiPen prescriptions; 22% of EpiPens prescriptions were covered by Medicaid payers, while 9% of Auvi-Q prescriptions had Medicaid payers.

---

[66] MYEP00487195 at slide 16.
[67] See Rocheleau Dep. at 148 ████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████
[68] MYEP00487195 at slide 38, 145.
[69] MYEP00487195 at slide 38, 135.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 5: EpiPen and Auvi-Q Distributions of Prescription Volume by Payer Type**

Jan. 2013 – Oct. 2015



Notes: "EpiPen" products include EpiPen, EpiPen Jr., EpiPen 2-Pak, and EpiPen Jr. 2-Pak. Auvi-Q products include 0.15mg and 0.30mg dosages. Analysis includes 50 U.S. states and Washington, DC only. "2015" shows sales from January 2015 to October 2015. "Medicaid" includes State Medicaid, CHIP, and Managed Medicaid programs. Dual eligible Medicaid and Medicare plans are coded as "Medicaid." "Commercial" plans include Commercial and Health Exchange plans. EAI products are identified by product names and NDC numbers.

Sources: IQVIA Xponent Plantrak; MMIT Data; Sanofi Bridge Files; see Appendix Part B notes

## IV.   COMPETITION IN PHARMACEUTICAL MARKETS

36.     As with most markets, competition between rival pharmaceutical products can take place along multiple dimensions – the most common of which are competition on price and competition on quality.  As is also common across markets, the degree to which competitive forces take hold will depend on a wide variety of factors, including the number of market players, their relative sizes, the degree to which their competing products are differentiated from each other, demand characteristics (such as frequency of use and perceived need of the products), differences in prices, the particular structure of the market, along with many other factors.  I address the impact that these, and other factors, have on the EAI market throughout this report.

37.     While, for ease of exposition, I discuss at times competition on price and competition on quality separately, it is worth emphasizing at the outset that the two forms of competition are very much intertwined.  The quality and appeal of a product have a direct impact on the price that the product can command.  Moreover, both dimensions of competition impact the choices made along

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the supply chain starting with the pharmaceutical manufacturer and going all the way down to the end consumer.

### A. COMPETITION IN PRICE AND QUALITY

38.     At a high level of generality, in competitive markets, price competition occurs when one manufacturer offers a reduction in price in an effort to sell more of its goods.  This, in turn, might cause rival manufacturers to also reduce their prices, either in an effort to mitigate the damage to their sales done by the initial price cut or in an effort to take sales away from rival sellers.  The precise form that price competition takes will vary depending on the degree of competition in a market and the specifics of the market structure.  As I now discuss, there are a number of particularities in pharmaceutical markets that shape the precise form that price competition takes between rival pharmaceutical manufacturers that are competing with each other in a competitive market.

39.     One key distinction between pharmaceutical markets and other markets is that the ultimate consumer – the individual in need of the treatment – does not typically pay the full price of the treatment.  The end consumer's health insurance typically covers at least a portion of the cost, with the end consumer paying a co-pay that is determined by their insurance provider. As a result, the decision making of end consumers does not fully account for the benefits that arise from price competition between rival pharmaceutical manufacturers. Lower prices from competition accrue directly to the PBM and indirectly to consumers and health plans through lower pharmaceutical costs and lower premiums.

40.     As noted above, PBMs typically negotiate and contract directly with pharmaceutical manufacturers on behalf of health care providers (and ultimately end consumers).  PBMs are able to create at least some degree of price competition among drug manufacturers through the creation of tiered formularies, which are lists of covered drugs that are available to end consumers, typically with different tiers corresponding to different levels of end-consumer co-payments.[70] A PBM can influence choices among treatments by only including some treatments on the formulary or by putting different treatment options on different tiers. Generic drugs – generally the lowest cost drugs to the PBMs – are often placed on the lowest tier (Tier 1), with the branded counterpart on a higher (less preferred) tier.[71] There may also be multiple tiers for branded drugs, with the

---

[70] Scott Morton and Kyle (2012) at 791.
[71] Scott Morton and Kyle (2012) at 810.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"preferred" brand product placed on a lower tier (typically Tier 2) and the less preferred, but still available, option placed in a higher tier (typically Tier 3) with a higher patient co-payment.  In the case where there is a generic drug, a preferred brand drug, and a second, non-preferred brand drug on the formulary, the end consumer will have the option of paying a relatively low (or, in some cases, no) co-pay for the generic drug, a higher co-pay for the preferred brand, and a still higher co-pay for the non-preferred brand drug. [72]  Under these circumstances, all three treatments will be available to the end consumer, but the PBM creates incentives to the end consumers in the form of differences in co-pays to steer the end consumer to the PBM's preferred option. The larger the share of patients who change drugs in response to the incentives created by the PBM, the larger the incentive is for a manufacturer to offer a lower price to be included on a favorable tier.  The effectiveness of such steering depends, among other things, on the price sensitivity of the end consumer to co-pay differentials, the willingness of the end consumer to consider different treatments, the ease with which the end consumer can switch between competing treatments, the familiarity of the HCP with competing treatments, and the willingness of the HCP to prescribe competing treatments.

41.    In addition to the use of formulary tiers, PBMs have other tools that they can use in an effort to steer end consumers to particular treatments.  PBMs are able to omit particular treatments from their formularies altogether, or can list them as requiring prior authorization from a HCP, or as a step therapy, which requires the patient to first try the payer's preferred alternative and only receive reimbursement for the treatment listed as a step therapy if the alternative is found to be inadequate.  Research has shown that formulary placement can be effective at steering end consumers to particular treatments.[73]  The degree to which efforts at such steering are effective impacts PBM bargaining power, and ultimately the size of any negotiated price savings.

---

[72] See MYEP00495211, at 211-12: 

[73] Frank Limbrock, "Pecuniary and Non-Pecuniary Incentives in Prescription Pharmaceuticals: The Case of Statins," 11 *The B.E. Journal of Economic Analysis & Policy (Advances)*, (2011); David B. Ridley, "Payments, Promotion and the Purple Pill," 24 *Health Economics* 86 (2015).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

42.      Of course, PBMs do not always go to the trouble of managing drug classes.  For certain drug classes – particularly those with only one choice of drug, relatively low cost drugs, or drugs that are used infrequently – the benefits to be gained from managing a class can be relatively small, and may be outweighed by the costs of doing so.[74]  When PBMs do not manage a class, their formularies may include all competing products on the same tier or there may be one tier for generics and a second tier for branded drugs.  There typically will not be an exclusive branded drug with all other competing products blocked from the formulary.  For example, prior to the launch of Auvi-Q, most formularies did minimal or no management of the EAI drug class.[75]  As Mylan's corporate designee on its negotiations with PBMs testified,

43.      When PBMs do manage drug classes, they use formularies as a means to create at least some degree of price competition between sellers of substitutable treatments by incentivizing pharmaceutical firms to offer rebates off their list (or WAC) prices in exchange for better placement on the formulary.



As Mr. Foster – Mylan's National Account Manager – explained,                    [78]  Later, after the launch of Auvi-Q, the rebates offered by Mylan took a different – and far more problematic – form, as Mylan offered significantly higher rebates (along with price protection) that were conditioned not only on EpiPen getting preferred placement on the formulary, but also on Auvi-Q being placed at a significant disadvantage to the EpiPen – either by being excluded altogether or through the imposition of a step edit or prior authorization.  I discuss this aspect of Mylan's conduct in greater detail below.

---

[74] See, for example, Works Dep. Ex. 2 at p. 24

[75] See, for example, Works Dep. at 213-214

true."); see also Works Dep. Ex. 2 at p. 24 and Ex. 10 at p. 12.
[76] May Dep. at 292-93.
[77] May Dep. at 30, 55.
[78] Foster Dep. at 212-213.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

44.     The negotiations between pharmaceutical firms and PBMs (or other buyers, such as hospitals) gives rise to a distinction between the list price (or WAC) for a drug and the net price actually paid, since PBMs negotiate discounts tied to the placement of a drug on a formulary. While the list price for a drug is publicly available, the discounts are proprietary and differ across products and PBMs.[79] As a result, patients and HCPs make their decisions among therapeutic options without knowing the actual price paid for the product they select or the actual price of alternative treatments.[80] What the end-consumer does see is the co-pay that they pay for the selected option.

45.     In addition to competing on price along the lines discussed above, pharmaceutical firms also compete with each other on quality.  Competing firms invest (through organic development, licensing transactions, or acquisitions) in innovations that provide a superior product, at least in the mind of consumers, to capture their patronage.  Indeed, competition on quality even takes place between products that are therapeutically equivalent, as even in such circumstances, end consumers and HCPs may still have a preference for one treatment over another.

46.     Accordingly, pharmaceutical firms do not just compete with each other through price and through negotiations that offer improved formulary placement in return for discounts. They also compete by offering more innovative and higher quality products that, they hope, end consumers will prefer.  In more formal economic terms, competing treatments are differentiated from each other.  As with other differentiated products, certain consumers will like the attributes of one product while others may have a preference for a different competing product. In the case of EAI devices, as is elaborated upon elsewhere in this report, certain end consumers and HCPs valued the innovation that Auvi-Q brought with respect to its shape, size, method of use, and digital voice instructions. On the other hand, certain consumers have grown accustomed to the EpiPen over the years and have little interest in moving away from a device that they have familiarity with, have been trained on, and has proven to work for them.

47.     These competitive forces not only can give rise to new innovative products, but can also spur manufacturers of incumbent products to improve their existing treatments – all for the betterment of consumers.  For example, when Mylan first became aware that the size and shape of Auvi-Q was of genuine interest to HCPs and end-consumers, and was viewed as a significant innovation over the features offered by the older EpiPen, Mylan began to explore whether it too

---

[79] Scott Morton and Kyle (2012) at 790, 810.
[80] Judith K. Hellerstein, "The Importance of the Physician in the Generic versus Trade-Name Prescription Decision," 29 *The RAND Journal of Economics* 108, 111 (1998).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

could manufacture a better, more compact EAI device (essentially a smaller version of the EpiPen) and whether it could do so before Auvi-Q was able to get traction in the marketplace.  As I discuss below, ultimately Mylan, working with Meridian (the manufacturer of the EpiPen), was not able to successfully create a new improved smaller EpiPen, and instead of competing on the merits, it resorted to anticompetitive behavior to ensure that Auvi-Q would not be able to expand its footprint in the marketplace.  As a result, not only were many consumers deprived of the benefits of Auvi-Q, but they were also deprived of the benefits that would have come from a new improved EpiPen.

## B. THE IMPACT OF COMPETITIVE FORCES ON CONSUMER DECISION-MAKING

48.     The ultimate decision of which treatment to select is made by the end-consumer and their HCP.  This decision is informed, in significant part, by the competitive forces discussed above.  As noted, competition may lead to different treatments being offered at different co-pay levels.  All else equal, a consumer that is indifferent between the available options will select the one available at the lowest co-pay level.  But, of course, all else is not equal, and patients (or caregivers) and HCPs are guided not just by differences in co-pays, but also by differences in their personal preferences for one treatment or another.[81]  When two or more treatments are available on a formulary, patient (or caregiver) and HCP preference can play a meaningful role in determining which treatment will ultimately be selected.[82]

49.     In addition to price and personal preferences, there are a host of other factors that inform the decision-making process. Two other factors that come into play are: (i) HCP and patient (or caregiver) awareness of the available treatment options; and (ii) HCP knowledge of what drugs are covered by the patient's insurance (and at what co-pay levels and with what restrictions, if any). For certain treatments, such as EAIs, there are additional factors as well. Most notably, because EAI devices consist of not only a drug but also a delivery mechanism, the patient (or their caregiver) needs be trained on how to properly use the device.[83]  The need for such training, and the

---

[81] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 37 ("Offering a choice enables patients to assess each EAI devices' advantages and shortcomings and ultimately select the right device for their lifestyle. Choice increases the likelihood that my patients will carry their EAI device consistently and have it readily accessible in the event of an anaphylactic reaction.").

[82] See, for example, Works Dep. Ex. 11.

[83] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 23; Shia Dep. at 96 ██████████████ ███████████████████████████████████████████████ ██████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

differences in usage across devices, make it more difficult for a patient to switch between one EAI device and another.[84]  As a result, patient (or caregiver) and HCP familiarity with the use of the device is another factor that can play a significant role when selecting among EAI devices.

50.    These additional factors give rise to other forms of competition between pharmaceutical manufacturers.  Specifically, pharmaceutical firms will market directly to HCPs and to the general public in an effort to promote awareness of their products and influence the decision making process.  Along similar lines, pharmaceutical firms will often send sales representatives to meet with HCPs to discuss their products, with a focus on the benefits of their products as compared to those of competitors.[85]  In the case of EpiPen, after the launch of Auvi-Q, Mylan sent its sales representatives out to meet with HCPs with a focused message: to inform HCPs that the EpiPen had preferred coverage at virtually all formularies across the country while Auvi-Q had far more limited coverage.[86]  This was done (amongst other reasons) in an effort to reassure HCPs that they had nothing to worry about should they prescribe EpiPen, but that patients were likely to run into trouble at the pharmacy should the HCP prescribe Auvi-Q, as it was not likely to be covered by their insurance plan.  For similar reasons, Mylan also alerted PBMs with which it had ongoing negotiations to the fact that EpiPen had secured far better coverage from other PBMs than that secured by Auvi-Q.[87]  This messaging was intended to assure PBMs that EpiPen's high market share

---



[84] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 23, 38; Stein Dep. at 302 ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

[85] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 47; see also Sussman Dep. Ex. 11 ██████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████

[86] See, for example, Jones Dep. at 41-42; Jones Dep. Ex. 19; Jordan Dep. Ex. 19, 21; Korczynski Dep. Ex. 5 ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████

[87] See, for example, Minton Dep. Ex. 19 ██████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████ Foster 30(b)(1) Dep. Ex. 16 ███████████████████████████████████████████████████████ ██████████████████████████████████ Templeton

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

was likely to remain in place and, as a result, the PBM should be more inclined to accept a rebate offer from Mylan that was conditioned on both making EpiPen the exclusive EAI product on formulary and on placing a significant disadvantage on Auvi-Q.[88]  A third form of marketing outreach done by Mylan shortly after the announcement of Auvi-Q was what became known as the EpiPen4Schools program, one of the goals of which was to make sure that it was EpiPens, and not other EAI devices, that were kept in schools across the country.[89]  The significance of these strategies is discussed in greater detail below.

51.     The interaction between pharmaceutical firms, PBM formularies, HCPs, and patient (or caregiver) preferences has led to another tactic devised by pharmaceutical firms to influence choice – the use of co-pay coupons for branded pharmaceuticals.[90]  When patients use these coupons, pharmaceutical firms pay some or all of their co-pay directly to the pharmacy, thus lessening or removing the financial incentive of the patient to choose a competing medication with lower out of pocket costs.[91]  In this way, firms selling branded pharmaceuticals pay to absorb a cost the PBM has designed to shift share to lower cost medications.

52.     All told, the interactions between regulations, HCPs, patients, PBMs, and pharmaceutical firms result in a mesh of factors that influence the choice between competing drugs. HCPs prescribe a particular drug based at least in part on patient (or caregiver) preferences and financial incentives and PBM formulary decisions. Pharmaceutical firms influence the choice among drugs at every step of the way: they spend large sums marketing to HCPs through detailing and other



Dep. Ex. 25 (Agenda for meeting between Mylan and Wellcare with the following topic: "Over 95MM lives in the United States have blocked Auvi-Q (with either a Prior Author Step Edit): United Healthcare, Express Scripts, Aetna, Coventry, Humana, etc."); Foster Dep. Ex. 9 ████████████████████████████████████████████████████████████████████████████████

[88] See, for example, Jordan Dep. at 133 ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

[89] See, for example, Ayers Dep. Ex. 28 ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

[90] Scott Morton and Kyle (2012) at 815.
[91] See MYEP00624286 at slide 5 ████████████████████████████████
████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

channels.[92] They also market directly to consumers, both to expand the market for their products and to influence HCP choices through patient preferences.[93] Pharmaceutical firms negotiate with PBMs over net prices (discounts) and formulary placement, engage in pull-through marketing to influence payer formulary choices, and use co-pay coupons to try to neutralize the impact of PBM and payer formulary decisions.  As a result, when assessing whether the behavior of a pharmaceutical firm is anticompetitive, careful consideration must be given to the various economic forces that are at play.  In the next several sections, I undertake such an analysis of the actions Mylan undertook to maintain its monopoly over the EAI market in the face of a significant competitive threat posed by the launch of Auvi-Q.

# V.   MYLAN HAS ENTRENCHED MONOPOLY POWER IN THE U.S. MARKET FOR EAI DEVICES

53.     In undertaking an analysis to determine whether a firm has engaged in anticompetitive behavior, it is standard practice to engage in a multi-step analysis. The first step is to assess whether the firm has market power. To answer this question, it is necessary to define the relevant market for antitrust analysis. I undertake such an analysis in Section V.A below, and conclude that the relevant market here is the market for EAI devices in the United States. Once a relevant market has been defined, the next step is to assess whether the firm in question has market power in that relevant market. In this case, as I detail in Section V.B below, the answer is unquestionably yes – Mylan had monopoly power in the U.S. EAI market throughout the period in question. The last step is then to evaluate the behavior of the firm in question to determine whether the actions it has taken in the relevant market were anticompetitive.  As I discuss in Sections VI-IX below, the answer to this question is also clearly yes.

## A.  THE RELEVANT MARKET

54.     As noted, the first step in determining whether a firm has engaged in anticompetitive conduct is to properly define the relevant antitrust market in which the questioned conduct is taking place.  Market definition for antitrust purposes assesses the ability of customers to substitute

---

[92] Scott H. Podolsky and Jeremy A. Greene, "A Historical Perspective of Pharmaceutical Promotion and Physician Education," 300 *JAMA: The Journal of the American Medical Association* 831 (2008).
[93] Scott Morton and Kyle (2012) at 818; Toshiaka Iizuka & Ginger Z. Jin, "The Effects of Prescription Drug Advertising on Doctor Visits," 14 *Journal of Economics and Management Strategy* 701 (2005).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

among alternative products.[94] A relevant antitrust market has two dimensions: the relevant product market and the relevant geographic market.  Each dimension of the relevant antitrust market looks at a different aspect of customer substitution.  The relevant product market hinges on whether products are sufficiently plausible alternatives for customers to pose a significant competitive constraint on one another.  The relevant geographic market asks whether sources of supply located in different geographic areas are sufficiently plausible alternatives to pose a significant competitive constraint on each other.

55.     For both the relevant product market and the relevant geographic market, the analytical tool commonly used to identify the appropriate market boundaries is the hypothetical monopolist test.[95]  This test asks whether a single firm with control over all of the products in the hypothesized market would be able to profitably impose a "small but significant non-transitory increase in price" (a "SSNIP"). If so, then the hypothesized market is a relevant antitrust market.  In effect, a relevant antitrust market (reflecting both the product and geographic dimensions) is a set of products that can be monopolized.

56.     This analytical technique is noteworthy for several reasons. First, the focus is on the extent of consumer substitution in response to a price increase, because it is that substitution that constrains the ability of firms to exercise market power.[96] The relevant market represents a set of products for which a single entity with sufficient control over the products in the market could exercise market power in the form of an increase in prices.  As identified by the various components of the "SSNIP" acronym, the degree of potential market power is such that there could be a small but significant increase in price (often taken to be a 5% increase, though that can vary depending on product characteristics).[97] The hypothetical price increase is non-transitory, since the pertinent question is how customers will respond to what is expected to be a permanent change in relevant prices.  And the SSNIP should be profitable for the hypothetical monopolist; a firm can always choose to raise its prices, but the question is whether sufficiently few customers would stop

---

[94] See, for example, Jonathan B. Baker and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power" in *Handbook of Antitrust Economics* (Paolo Buccirossi ed., The MIT Press 2008); Jonathan B. Baker, Market Definition: An Analytical Overview," 74 *Antitrust Law Journal* 129 (2007).

[95] Baker (2007) at 132-3.

[96] U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines* (Aug. 19, 2010) at § 4.1.1.

[97] For example, in a distribution market in which the cost of distribution is bundled with the product price and represents a small component of the overall price, a 5% increase in the implicit price for distribution may translate into a much smaller percentage of the overall product price.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

buying the products in the relevant market such that the gains to the hypothetical monopolist from higher prices outweighs the loss in sales. The relevant market is typically considered to be the smallest set of products that include the product(s) of interest and that satisfies the hypothetical monopolist test.[98] If a hypothesized set of products does not satisfy the hypothetical monopolist test, then the set of products is expanded to include the next closest substitute(s), with the process continuing until the hypothetical monopolist test is satisfied.[99]

### 1. The relevant product market

57.     I have concluded that the market for EAI devices constitutes a relevant antitrust product market. This market definition encompasses all available EAI devices – the EpiPen, generic versions of the EpiPen (whether sold by Mylan or other companies), Auvi-Q, and other EAI devices along with their authorized generics – but nothing more. The reason for limiting the market to just EAI devices is intuitively simple, as other potential alternatives that a consumer might turn to in place of securing an EAI device are not close enough substitutes to impose any meaningful competitive constraint on EAI devices.  The available evidence – including the relevant economic evidence and the views of market participants – all supports such a market definition.

58.     From an economic perspective, direct evidence of whether a relevant product market is properly defined reflects whether there are significant numbers of consumers turning to alternatives when the price of EAI devices increases.  If so, then the proposed product market likely has been drawn too narrowly and these additional substitute products should be included. If we do not see such switching, then one can conclude with confidence that the market is not too broad.  In the instant setting, we have ample evidence along these lines that confirms the appropriateness of the product market definition that I have adopted. Specifically, since the time that Mylan acquired the rights to sell the EpiPen, it has imposed numerous significant price increases, and there is no evidence that I am aware of demonstrating that consumers have turned to other non-EAI products when faced with these price increases. I include other EAI products in my market definition though they have a very small market share for the entire period at issue.  It is highly informative that when EpiPen prices rise sharply on particular dates there is no decline in the prescriptions for EAI devices, as one would expect if consumers were willing to substitute to another product in the face of a 5-10% price increase.  In Figure 6 below, I show the growth in overall EAI prescriptions along with the growth in the average wholesale price for EAI devices.  As the figure demonstrates, prices

---

[98] *Merger Guidelines* at § 4.1.1.
[99] Baker (2007) at 144-5.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

for EAI devices increased by 433% over the period 2008 to 2016.[100] The price increases taken over this period were typically 5% or more each year and were clearly non-transitory yet, as is also shown, the number of EAI prescriptions did not decline with each increase.  One would not expect to see this pattern were there meaningful non-EAI alternatives that could be turned to in place of EAI devices.  Stated differently, this pattern strongly suggests that there are no alternative non-EAI products that are meaningfully constraining the ability of pharmaceutical firms to raise the price of EAI devices. This evidence strongly supports the relevant product market definition I have adopted.

**Figure 6: Total EAI Prescriptions and EAI Average Net Wholesale Price per Device Over Time**



Notes:

EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other (0.15MG/0.15ML) dosages, and two-packs as well as single packs.  EAI products are identified by product names and NDC numbers. Total Prescriptions (TRx) include new and refill prescriptions dispensed at the retail level.  The Average Net Wholesale Price is calculated using the IQVIA National Sales Perspectives Data's total revenue divided by the total "eaches" (number of EAI devices). The IQVIA National Sales Perspectives Data show wholesale revenues to manufacturers net of some discounts and do not include discounts or coupons fulfilled at other parts of the distribution chain.

Sources: IQVIA Xponent Plantrak; IQVIA National Sales Perspectives Data; see Appendix Part B notes

---

[100] (2016 price – 2008 price)/2008 price = ($261 - $49)/$49 = 433% increase between 2008 and 2016.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59.     Along similar lines, Mylan's rebating practices further support the definition of the product market that I have adopted.  Mylan's rebates have changed over time, but only in the presence of competition from EAI devices, and never in response to the presence of more distant potential substitutes such as epinephrine in a vial or syringe, over-the-counter antihistamines, or visits to emergency rooms or other urgent care facilities.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  But, after the launch of Auvi-Q, when Mylan faced a meaningful competitive threat from an EAI device for the first time, ████████

████████████████████████████████████  When Auvi-Q was no longer on the market, ████████████████████████████████████████████

████████████████████████  This behavior is fully consistent with the relevant product market that I have adopted and makes clear that these more distant alternative treatments have little to no impact on the pricing of EAI devices.  As a result, these more distant potential competitors should not be included within the relevant product market.

60.     The product market definition I have adopted is also consistent with the way that Mylan itself views the market.  When undertaking assessments of the EpiPen, including its future prospects, its historical success, and the like, Mylan regularly confines its analysis to the EAI market – consistent with the definition I adopt here.  For example, for purposes of updating the Mylan Board of Directors on the current status of EpiPen, Roger Graham, the President of Mylan Specialty, provided Heather Bresch, Mylan's CEO, with a slide deck analyzing how EpiPen and its competitors were doing, along with an assessment of the overall "market."  For purposes of this analysis, the "market" was defined as including only EAI devices and the competitors considered were all EAI devices.[104]  This is consistent with Mylan's public statements.  For example, in its 2011 10-K, Mylan noted that "[t]he EpiPen Auto-Injector is the number one prescribed epinephrine auto-injector with more than 95% market share in the U.S. and more than 90% market share worldwide in the defined

---

[101] MYEP00603858 at slides 4-5; May Dep. Ex. 6, at slide 5; May Dep. at 64-65.

[102] MYEP00271605 at 606; MYEP00491274 at 12; Foster Dep. at 233, 237; Willing Dep. Ex. 2.

[103] Foster Dep. at 377-79; Zinn 30(b)(1) Dep. at 165-66; Willing Dep. Ex. 28; CIGNA_01532; Jan Dep. at 121-123.

[104] Graham 30(b)(1) Dep. Ex. 12;  see also Graham 30(b)(1) Dep. at 146 ("Q. and slide 1 is referring to the EAI market, is that correct? A. It is. Q. Is that how you refer to it in Mylan? A. Yeah, the slide would indicate that."); Korczynski Dep. Ex. 31 at slides 8 (assessing growth in the EAI market), 10 ████████████████████████
████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

auto-injector market during 2011.[105]  Similarly, in its Brand Plans for the EpiPen, Mylan regularly includes an assessment on the state of the EAI market, and, when assessing the "competitive landscape" faced by EpiPen, Mylan typically confines its discussion only to other EAI devices.[106] Along similar lines, when making decisions about price increases for the EpiPen, Mylan regularly compares EpiPen pricing to the prices of other EAI devices, but nothing else.  For example, in a February 23, 2012 Pricing Committee Review presentation, the products included on a slide setting forth "competitor pricing" were limited to other EAI devices.[107]

61.    Mylan's sales force also views EpiPen as competing only with other EAI devices.  When asked directly "what market did EpiPen compete in," Mr. Jordan, a former Sr. Director of National Accounts at Mylan Specialty, testified that the EpiPen competed in the epinephrine auto-injector market.[108] The testimony of senior Mylan executives is in accord.  For example, Mr. Graybill, the former Vice President of Managed Markets for Mylan Specialty, when asked "what market did EpiPen compete in" testified ███████████████████████████████████████



███████████████████████ ███ Ms. Bresch – Mylan's CEO – testified ████████████ ██████████████████████████████████████████████████████.[110]

Along the same lines, Mylan CFO John Sheehan stated ████████████████████████ ███████████████████████████████████████████

---

[105] Mylan N.V., *Annual Report (Form 10-K)* (Feb. 21, 2012),
https://www.sec.gov/Archives/edgar/data/69499/000119312512070508/d258059d10k.htm; see also
MYEP01325857 ████████████████████████████████████████████

[106] See, e.g., Graham 30(b)(6) Dep. Ex. 42 at slides 10-11 ████████████████████
████████████████████████████████████████

[107] Graham 30(b)(6) Dep. Ex. 24 ███████████████
██████████████████████████; see also Graham 30(b)(6) Dep. at 165-68
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ Graham
30(b)(6) Dep. Ex. 26 at slide 11 ████████████████████
████████████████████████████ Graham 30(b)(6) Dep. Ex.
23 at slide 8 (Price Adjustment Analysis giving consideration to the pricing history of other EAI devices, and
nothing else); MYEP00362749 at slide 2 (EpiPen pricing strategy deck comparing EpiPen pricing to that of
other EAI devices).
[108] Jordan Dep. at 38.
[109] Graybill Dep. at 63-64.
[110]  Bresch Dep. at 246.
[111] MYEP00463728 at 41-42.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

62.　　Other pharmaceutical industry participants are also in agreement with the relevant product market definition that I have adopted.  For example, contracts between PBMs and pharmaceutical manufacturers typically contain a defined "therapeutic class" which includes the list of drugs that are competing for formulary placement along with the drug that is the subject of the contract.  In the case of EpiPen, the therapeutic class is limited to other EAI devices.[112]  In fact, when asked about what is typically included in these "therapeutic classes" in Mylan's contracts with PBMs covering EpiPens, Mylan's corporate designee on its negotiations with PBMs ██████████████████

████████████████████████████████████████████████ ██

63.　　Despite all of the evidence discussed above, out of an abundance of caution, I have given specific consideration to whether certain treatments that Mylan witnesses have identified as competitors to EAI devices should also be included in the relevant market.  Specifically, certain Mylan witnesses have suggested that over-the-counter antihistamines such as Benadryl, epinephrine sold in a vial or pre-loaded syringe, and trips to the emergency room or other urgent care centers also may compete with the EpiPen.  While none of these witnesses have claimed to have considered whether, from an economic perspective, such treatments are appropriately included in the relevant market, I nevertheless consider that question here.

64.　　Over-the-counter antihistamines such as Benadryl are plainly not alternatives that customers of EAI devices would turn to in response to a SSNIP on EAI products.  Most fundamentally, this is because, as Ms. Bresch acknowledged, antihistamines are not treatments for someone that has gone into anaphylactic shock.[114]  Mr. Graham agreed, stating that Benadryl is a "completely inappropriate therapy" for anaphylaxis.[115]  In fact, Mylan's own website contains a presentation on anaphylaxis and explicitly notes that "[a]ntihistamines are not indicated to treat the life-threatening symptoms of anaphylaxis.  Antihistamines are useful for relieving itching and hives. They do not relieve shortness of breath, wheezing, gastrointestinal symptoms or shock.

---

[112] See, for example, May Dep. Ex. 19, at Ex. B-2 ████████████████████████
████████████████████████████

[113] May Dep. at 172-174.

[114] See Bresch Dep. at 246 ("Q. But outside the hospital setting, an epinephrine auto-injector is the right way to go, right? A. Yes. Q. Not Benadryl? A. Correct."); Graham 30(b)(1) Dep. at 133-134 █████████████
██████████████████████████████████████████████

Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 16 ("While antihistamines, such as Benadryl®, may relieve itching symptoms or hives, these drugs are not a substitute for epinephrine because they are inadequate to treat shortness of breath, wheezing, gastrointestinal symptoms or shock.").

[115] Graham Dep. at 34.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Therefore, antihistamines should be considered adjunctive therapy and should not be substituted for epinephrine."[116]  The EpiPen 2011 Strategic Plan makes the same point.  It states that "patients using Benadryl to treat systemic allergies should also carry an EpiPen... Benadryl + EpiPen = Complete Protection."[117]  In short, according to Mylan, antihistamines are complements to, and are not substitutes for, EAI devices.  As a result, it would be a serious error to include them in the relevant product market.

65.      In addition, there is a significant price disparity between EAI devices and over-the-counter antihistamines, which tends to mean that they do not compete in the same product market.  Customers who have already chosen to procure EAI products (and bear the associated monetary and non-monetary costs of doing so) are unlikely to turn to over-the-counter alternatives in response to a SSNIP on EAI products.  As would be expected under such circumstances, antihistamines such as Benadryl ██████████████████████████████████████ ████████████████████████  This is yet another reason that such products should not be included in the relevant product market.

66.      With respect to epinephrine sold either in a vial or in a pre-filled syringe, there is not sufficient demand substitution from these products to constrain pricing of EAI products.[119]  I am not aware of any evidence that any meaningful number of patients have turned to vials or syringes in response to EAI price increases.  Were pre-filled syringes or vials of epinephrine meaningful substitutes for EAI devices, this should have happened at some point over the last decade – a period during which the prices of EAI devices increased dramatically.  The reason such substitution has not happened is straightforward and intuitive.  As a general matter, non-medically trained members of the population are (and should be) reluctant to use a syringe to inject epinephrine into themselves or those around them in any situation, let alone in an emergency life-threating situation.[120]  And HCPs are understandably reluctant to ask their patients to take on such a

---

[116] Graham 30(b)(6) Dep. Ex. 41; see also Graham 30(b)(6) Dep. at 289-90 (noting that the quote contained in the text is an accurate statement of Mylan's position).
[117] PFE_EPIPEN_00011059, at slide 135.
[118] Graham 30(b)(6) Dep. at 288-89 ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████  Graham 30(b)(6) Dep. at 167-68.
[120] See Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 23 (discussing importance of ease of use for persons without a medical background); ¶ 39 (describing incident where patient panicked during anaphylactic reaction and removed her EpiPen from her thigh too quickly, and causing the epinephrine to

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

responsibility.  Indeed, as noted above, when the EpiPen was first introduced, it was viewed as a dramatic improvement over the use of such products, and effectively wiped out any continued use of vials of epinephrine and prefilled syringes.  While I understand that a recently approved pre-filled syringe is expected to come to market in the near future,[121] I have seen no evidence that suggests that it will provide a meaningful competitive constraint on EAI devices anytime soon (if at all).  Moreover, and more to the point, there is no evidence of which I am aware that suggests that any previously available vials or syringes have had any impact on the pricing or sales of EAI devices whatsoever.

67.      For similar reasons, it is unlikely that any significant number of EAI users would cease to rely on EAI devices in response to a SSNIP and instead hope that they will successfully be treated at an emergency room or other urgent care facility in the event of an anaphylactic episode.  As Mylan's own website publication makes clear, anaphylaxis "is a life-threatening allergic reaction that is rapid in onset and may cause death…."[122]  For most at risk patients, there is simply not time to get to an urgent care center or emergency room should they go into shock.  As a result, it is highly unlikely that someone who previously secured an EAI device would decide to take the risk in response to a price increase that they will be near an emergency room or urgent care center should they go into anaphylactic shock.  Moreover, despite all of the EAI device price increases over the last decade, I am not aware of any evidence suggesting that patients have abandoned EAI devices and instead rely on proximity to emergency rooms and urgent care centers should they need treatment.  Accordingly, and for all of the reasons set forth in this sub-section, I conclude that the relevant product market for purposes of antitrust analysis is the market for EAI devices.

### 2. The relevant geographic market

68.      With the relevant product market now defined, I next turn to an assessment of the relevant geographic market.  For the reasons discussed below, I have concluded that the relevant geographic

---

drip down her leg); Jan Dep. at 118-119 ("Q: Prior to the introduction of the Auvi-Q, what other products were available to deliver epinephrine, to your knowledge? A: Those were the injectables that you would take, you know, draw the thing from the vial, and that's not patient friendly to really do it in an emergency…. [U]tilization was minimum.  So EpiPen was the standard of care.").

[121] Sandoz: A Novartis Division, "Update on Launch Plans for Symjepi (epinephrine) in the US" (Dec. 6, 2018), https://www.us.sandoz.com/news/media-releases/update-launch-plans-symjepi-epinephrine-us. As of January 16, 2019, this product was released in institutional settings (hospitals, clinics, and doctor offices), but has not yet been made available in retail settings (pharmacies). Allergic Living, "Symjepi Epinephrine Syringe Launched in U.S. Clinics" (Jan. 17, 2019) https://www.allergicliving.com/2019/01/17/symjepi-epinephrine-syringe-launched-in-u-s-clinics.

[122] Mylan, "Anaphylaxis" (2014), https://www.mylan.com/-/media/mylancom/files/patient-materials/myguide_anaphylaxis.pdf (accessed Feb. 2, 2019).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

market is the United States. This reflects the crucial role that the FDA approval process plays for pharmaceutical products.  Only EAI devices that have received FDA approval can be sold in the U.S.[123] There may be alternative devices sold in other countries, but they will not impact pricing in the U.S. market unless they have approval to be sold in the U.S.  At the same time, any EAI device that does have FDA approval to be sold in the U.S. can be sold anywhere in the U.S., and can therefore have a competitive impact on other EAI devices sold throughout the United States.

69.     As Mr. Rocheleau – the corporate representative for Pfizer Canada – explained, importing EAI devices from other countries into the United States is not an option.  Pfizer Canada, for its part, has never even tried to export EAI devices from Canada into the United States, because it would be illegal to do so.[124]  According to Mr. Rocheleau, because of the governing regulations, Pfizer Canada is "not allowed to sell" EAI products outside of Canada.[125]  Similarly, pharmaceutical firms in the United States are not allowed to export their products to other countries.[126] As a result, EAI devices available outside of the United States place no competitive constraint on EAI devices in the U.S.  This reality is fully supportive of a relevant geographic market that is limited to the United States.

70.     At the same time, while there are regulations that prohibit the sale of pharmaceutical products from outside of the U.S. into the U.S., there are no similar regulations that prohibit the sale of pharmaceutical products, for example, across state lines.  Accordingly, there is no reason to believe that the relevant geographic market should be more narrow than the United States.

## B. MONOPOLY POWER

71.     Having identified EAI devices sold in the U.S. as the relevant antitrust market, I now turn to the question of whether Mylan had monopoly power in that market over the relevant time period. I have concluded that Mylan had monopoly power in the sale of EAI devices in the U.S. both before and during the entire period when Sanofi was selling Auvi-Q.  Moreover, Mylan continued to have monopoly power after Auvi-Q was voluntarily recalled from the market.

---

[123] See Mylan's Second Amended Responses and Objections to Plaintiffs' First Set of Coordinated RFAs, RFA Response No. 11 (admitting "that epinephrine autoinjectors may not be sold in the United States absent FDA approval").

[124] Rocheleau Dep. at 31.

[125] Rocheleau Dep. at 185.

[126] Rocheleau Dep. at 185-86.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

72.     Monopoly power has been defined as "the power to control prices or exclude competition."[127] It can be identified indirectly by examining structural indicators like market share and entry barriers within a well-defined antitrust market.  Other indirect indicators include documents or statements from market participants referring to dominance or a lack of competition in the market.  Although less common, monopoly power can also be identified by direct evidence of the power to control prices or to exclude competitors.  In this case, Mylan's monopoly power in the market for EAI devices is manifested by all of these types of evidence, and there is no evidence of which I am aware that suggests that Mylan did not have monopoly power in the U.S. EAI market.

    *1.  Market share*

73.     As is common in assessing market power, I begin with an examination of Mylan's share of the relevant market.  If a firm controls a large share of a properly defined antitrust market, that suggests that the firm is likely to be able to control prices of those products to some degree, since substitution to products outside the relevant market in response to a price increase, is, by definition, limited. As illustrated in Figure 7 Panel A, Mylan unquestionably held a dominant share of the EAI market over the period shown.  This figure measures EpiPen's market shares in the United States in wholesale revenues.  Prior to the launch of Auvi-Q in 2013, EpiPen held a share of over 98%.[128]  Even after the launch of Auvi-Q, EpiPen continued to hold a dominant share.  During the period when Auvi-Q was on the market (January 2013 – October 2015), EpiPen's revenue share never dipped below 83% and ended up at 84% in October 2015 – the month prior to the voluntary recall of Auvi-Q.  Moreover, EpiPen's market share rebounded quickly after Auvi-Q exited the market in 2015, jumping back up to 95% in 2016.  Mylan has remained dominant with around 80% share of EAI revenues in 2017, after Mylan's introduction of EpiPen's authorized generic in December 2016, which featured a lower price than the branded version of EpiPen, and with Kaléo's re-introduction of Auvi-Q in February 2017.  Panel B of Figure 7 shows similar dominance when EpiPen's market share is calculated in units (number of EAI devices). Mylan's market share throughout this period provides strong evidence that it had monopoly power.

---

[127] See George A. Hay, "Market Power in Antitrust," 60 *Antitrust Law Journal* 807 (1991) at 819; Gregory J. Werden, "The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm," 71 *Antitrust Law Journal* 253, 254 (2003); United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).

[128] ███████████████████████████████████████████. See MYEP00491274 at slide 8; MYEP00459611 at slide 7.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Figure 7: Mylan EAI Shares in the United States, 2011-2017

### A. EpiPen Share of Wholesale Revenues



### B. EpiPen Share of Wholesale Units (Number of Devices)



45

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Notes:

EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other dosages (0.15MG/0.15ML; 0.1MG/0.1ML), and two-packs as well as single packs. Eaches are equivalent to package quantity, or number of pens. EAI products are identified by product names and NDC numbers.

Sources: IQVIA National Sales Perspectives Data; see Appendix Part B notes

74.     Mylan's own statements provide further confirmation of Mylan's dominant market share. ███████████████████████████████ ████████████████████████████████████████ Along the same lines, ████ █████████████████████████████████████████████ A number of other Mylan employees and former employees, ██████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████

75.     Mylan's internal documents tell the same story. ███████████████ ████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████ ███████████████████████ ████████████████████████████████████████████ ████████████████████ The same document ███████████████████████

<hr/>

[129] Bresch Dep. at 268-269.
[130] MYEP00463728 at 41-42; see also MYEP00481178-79 ████████████████ ████████████████████████████ ████████████████████████████████████
[131] Hadley Dep. at 36 █████████████████████████████ Jones Dep. at 54-55 ███████████████████████████████████████ ███████████████████████████████ ██████████████████ May Dep. at 163, 277 ████████ ████ Patel Dep. at 20 █████████████ Willing Dep. at 45 ███████ ████████████████████████████████████████ ███████████ See also Mylan's Response to RFA No. 15 ████████████████ ████████████████████████████████████
[132] Graham 30(b)(1) Dep. Ex. 5, at slide 8.
[133] Korczynski Dep. Ex. 31, at slide 13.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████ More recently, ███████████████

████████████████████████████████████████████████████

███████████ This evidence further confirms that Mylan has monopoly power in the relevant

market.

76.      Mylan's EpiPen did not just have exceptionally high market shares in the U.S. EAI market.  It

also benefited from having a committed customer base that would not easily switch away from the

EpiPen.  In the economics literature, this is often referred to as non-contestable demand – the

portion of the market that – even in the face of entry of an alternative – will not switch away from

the incumbent's product, at least in the shorter term.[136]  Less formally, this can be referred to as

"sticky" demand.  It is because of this non-contestable demand for the EpiPen that I refer to Mylan

as having entrenched market power. Even when faced with competition from an innovative

product, and even were there not significant barriers to entry (which, as noted below, there are)

Mylan would still be able to keep a significant portion of the market, at least in the shorter term.[137]

For the reasons I discuss, this non-contestable demand gives Mylan even greater market power

than its share would otherwise indicate, as firms offering alternatives to the EpiPen could only

reasonably expect to be competing for the portion of the U.S. EAI market that is contestable.

77.      Mylan's entrenched market power arises for a number of reasons.  Most fundamentally, it is

because EAIs are life-saving devices that are only used infrequently (if at all) and require the

patient (or their caregiver) to be trained in their use.  Once a patient or their caregiver has become

familiar with a product and is confident that they will be able to administer it in a life-threatening

situation, that individual will be reluctant to switch away from what they know.  And, because

EpiPen was the dominant EAI device (and for many years, the only device), a very large portion of

the at-risk population that uses an EAI device is already familiar with and trained to use the

EpiPen.[138]  A second reason for Mylan's entrenched market power is because of HCP familiarity and

---

[134] Korczynski Dep. Ex. 31, at slide 17.

[135] Zinn 30(b)(6) Dep. Ex. 14.

[136] See Patrick DeGraba, "Naked Exclusion by a Dominant Supplier: Exclusive Contracting and Loyalty
Discounts," 31 *International Journal of Industrial Organization* 516 (2013); Joshua D. Wright, "Simple but
Wrong or Complex but More Accurate? The Case for an Exclusive Dealing-Based Approach to Evaluating
Loyalty Discounts," Remarks at the Bates White 10th Annual Antitrust Conference (June 3, 2013) at 18,
available at https://www.ftc.gov/sites/default/files/documents/public_statements/simple-wrong-or-
complex-more-accurate-case-exclusive-dealing-based-approach-evaluating-loyalty/130603bateswhite.pdf.

[137] In a competitive market free of anticompetitive activity, one would expect the share of overall demand that
is non-contestable to decline over time in the presence of superior products.

[138] See, for example, Shia Dep. at 97-98 ████████████████████
████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

comfort.  It is not just patients that need to be trained on the use of an EAI device, but also HCPs. While specialists such as allergists are likely to be up to date and trained on new innovative products, generalists are less likely to be up to date across the wide variety of issues they confront. As a result, they are far more likely to default to what they know and have grown comfortable with over the years.[139]

78.     The aforementioned EAI characteristics – training, familiarity, and crisis use – also create a network effect that contributes to Mylan's entrenched market power.  When a patient, and particularly a child, goes into anaphylactic shock, the EAI device may be administered by another person who may not be familiar with the EAI device carried by the patient.[140]  This creates a benefit from using an EAI device that has a large share within a geographic region, since there is more likely to be familiarity with how to administer the device in a crisis situation. This is particularly true in a school setting, where school personnel may have access to and familiarity with EpiPen, which creates a benefit (or at least a perceived benefit) to carrying EpiPen rather than Auvi-Q or another EAI device.[141]  Of course, there is no reason that school personnel and other caretakers cannot be familiar with multiple EAI devices – EAI devices are not natural monopolies.  These network effects only came about as a result of there being a long-standing dominant firm in the EAI market.

79.      There is ample evidence – both qualitative and quantitative – that plainly demonstrates that there is non-contestable demand for EpiPen, that it is significant, and that Mylan was well aware of it.  On the qualitative side, Mylan repeatedly notes the power of its brand.  ███████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ████████████████     Along similar lines, ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████

─────────────────────

[139] See Brown Dep. at 48-49 ("physicians are familiar with, with the product, EpiPen, because it had been in the market by Dey for at least in the late '90s.  There is a lot of familiarity with the product.  And because of familiarity, doctors are very comfortable with the product when they write for that.  New products to the market, the Impax product, Auvi-Q, and others, they are a little different.  And sometimes it is easier to just go with what you know than to, than to use a new product and train someone on a newer, on a newer device.").

[140] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 24.

[141] In Section VII below, I discuss Mylan's use of the EpiPen4Schools Program and other similar efforts to increase the percentage of the demand that was non-contestable, thereby further entrenching its market power.

[142] Graham 30(b)(1) Dep. Ex. 29, at MYEP00213255.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

████████████ ██████████████████████████████████████████████████████

████████████████████████████ As Mr. May, Mylan's corporate designee on its negotiations with

PBMs, put it: ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██ ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

80.     Mr. Foster, Mylan's former director of national accounts, made similar points during his

negotiations with PBMs.  Specifically, as part of his negotiations with MedImpact, Mr. Foster ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██ ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

    ▪ ████████████████████████████████████████████
       ████████████████████████████

    ▪ ████████████████████████████████████████████████
       ████████████████████████████████████████
       ████████████████████████████████████

    ▪ ████████████████████████████████████████████
       ██████████████████████████████████

    ▪ ████████████████████████████████████████████
       ████████████████████████████████████████████

---

[143] MYEP00214360 at 363.

[144] Jordan Dep. Ex. 13 ████████████████████████████████████████

████████████████████████ see also Jordan Dep. at 133 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

[145] May Dep. at 163, 237-38.

[146] MYEP00245085 at 117; see also MYEP00619261 ██████████████████████

██████████████████████████████████████████████

[147] Foster Dep. Ex. 4

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- ███████████████████████████████████
- ██████████████████████████████████
  ████████████████████████████████████████
  ██████
- ████████████████████████████████████
  ████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████████████████
  ██████

81.     The common theme throughout each of these points raised by Mr. Foster is that because of the nature of anaphylaxis and EpiPen's long history in the market, a significant portion of the market will simply not switch away from EpiPen.  Indeed, as is shown in the last bullet above, Mr. Foster went so far to put a number on it.  According to him, ████████████ of the market is non-contestable.  This estimate is fully consistent with the quantitative evidence.  As discussed in greater detail below, in the few instances in which Auvi-Q was able to secure an exclusive position with EpiPen not covered on formulary, EpiPen nevertheless maintained a significant market share.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████  As I
detail in Section VII below, in these other situations, EpiPen was also able to maintain significant market shares, providing further support for Mr. Foster's assertion ████████████████████████
██████████████████████.  Moreover, as I discuss in detail later, Mylan undertook significant efforts to increase the portion of the market that was non-contestable.

82.     Finally, the issue of whether, and the degree to which, there is non-contestable demand in the EAI market was confronted directly at the state of Florida's June 2014 Pharmacy and Therapeutics Committee meeting.  ██████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████

---

[148] MYEP00531461.  As is noted, there is variation amongst the individual plans that use this formulary, with some plans showing higher EpiPen market shares and some lower.  What is most relevant here is the average across the plans that have adopted the formulary.
[149] May Dep. at 250-52.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ The assessment of this committee is fully consistent with the evidence discussed above, further confirming that Mylan has entrenched monopoly power resulting from its dominant position and the significant presence of non-contestable demand.

### 2. Barriers to entry

83.     When a firm has persistent monopoly power, there generally will be significant barriers to entry into the relevant market.  Otherwise, the supracompetitive profits earned by the monopolist will attract new entrants that will tend to erode the firm's market power over time. There are substantial barriers to entry in the U.S. EAI market that help protect Mylan's dominant position.  As noted above, the development of pharmaceuticals generally and EAI devices specifically requires a significant R&D investment.  There are also substantial and costly regulatory hurdles in getting approval to sell pharmaceuticals in the U.S. market that must be overcome before a product can be put on the market.[151]  In addition, significant investments are required to market new products to HCPs and prospective patients in order to get traction in the market.

84.     Sanofi's expenditures covering R&D, regulatory approval, and marketing give a good indication of the barriers to entry in the EAI device market.[152] ███████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████[153] Sanofi's budget prior to the launch of Auvi-Q called for sales and marketing expenditures totalling ██████████ from 2013 through 2015, or about ███████████ per year.[154] █████████████████████████████████████

██████████████████████████████ And Sanofi paid nearly ███████████ to a PR firm for media

---

[150] Brown Dep. Ex. 6, at EPI-FL-0322016-18.

[151] See, for example, Mylan's Second Amended Responses and Objections to Plaintiffs' First Set of Coordinated RFAs, RFA Response No. 10 (admitting "the FDA regulates EAI Drug Devices in the United States"), RFA Response No. 11 (admitting "that epinephrine autoinjectors may not be sold in the United States absent FDA approval").

[152] The expenditures for developing a generic product are somewhat different, but, as reflected in Teva's experience in bringing to market a generic version of EpiPen, as described in Section III, those expenditures are also substantial.

[153] SAN-EPI-0013253 at slide 22.

[154] SAN-EPI-0171591 at 593.

[155] SAN-EPI-0013253 at slide 22.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

communications and as part of the FDA approval process.[156] These substantial fixed costs would deter all but the most committed entrant from trying to compete against EpiPen in the U.S. EAI market.

85.     Mylan's own documents acknowledge these barriers. ████████████████████ ██████████████████████████████████████████████████ The same document goes on to note that ████ ████████████████████████████████████

### 3. Direct evidence of Mylan's monopoly power

86.     In addition to these indirect indicia of Mylan's monopoly power in the EAI market, there is also ample direct evidence of Mylan's ability to control prices. ██████████████████████ ████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████ ████████████████████████ ████████████████████[160] For example, after concluding its negotiations with Express Scripts (ESI) – the largest U.S. PBM – over 2014 formulary placement, Mylan increased the EpiPen price just before the new contract, which included price protection, was to go into effect. As Express Scripts explained, ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ In September 2016, the CEO of Mylan, Heather Bresch, was called before the U.S. House Committee on Oversight and Government Reform to account for why Mylan had raised the EpiPen price from around $100 for a pair of

---

[156] SAN-EPI-0525843 at 851.

[157] Zinn 30(b)(6) Dep. Ex. 10, at slide 23; Mylan Inc. Q1 2009 Earnings Call Transcript (May 1, 2009) (Heather Bresch stating "[Adding another patent to the already-patented EpiPen device] will also put in another barrier to entry because . . . now that market preferential would be the needle protected device and drug of which we have IP and stuff around. So I just think it is a very, very difficult hurdle to get through, and so feel confident that EpiPen is in good shape.").

[158] Zinn 30(b)(6) Dep. Ex. 10, at slide 24.

[159] MYEP00835717 at slide 6. ████████████████████████████████████ ██████████████████████████████████ See also Graham 30(b)(6) Dep. Ex. 22 (Epinephrine Auto-Injectors Class Price History).

[160] Graham 30(b)(6) Dep. Ex. 22 ██████████████████████████████████ ████████████████████████

[161] Kautzner Dep. Ex. 18.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

devices in 2008 to over $600 in 2016.[162] These price increases had a dramatic impact on EpiPen total revenues. ▮

▮

▮ This pattern of price increases demonstrates an ability to control price for EpiPen without competitive constraints – providing strong evidence of Mylan's monopoly power in the EAI market.

87.     To be sure, Mylan was not just increasing WAC prices over this period. It was also able to charge higher net prices to PBMs while Auvi-Q was on the market than it was prior to Auvi-Q's entry. In Figure 8 below, I depict EpiPen's net price over time, based on Mylan's invoice data for commercial transactions of eight PBMs that comprised 86% of covered lives in 2015.[164] Table 2 below shows that these PBMs are among the top PBMs in the number of covered lives in commercial plans as of January 2015.[165] ▮

▮

▮

▮ These data are consistent with the U.S. EpiPen profitability analysis that Mylan submitted with Ms. Bresch's Congressional testimony.[166] That document

[162] See Jonathan D. Rockoff, Louise Radnofsky and Daniela Hernandez, "Mylan CEO Faces Tough Questioning in Congressional EpiPen Hearing," *Wall Street Journal* (September 22, 2016), https://www.wsj.com/articles/mylan-ceo-to-shift-blame-on-epipen-pricing-at-house-hearing-1474466910. The article reports that prices were increased 17 times between 2007 and 2016, for a total price increase of 548%.

[163] MYEP00244409 at 427. Similarly, the ▮

▮ MYEP00491274 at slide 8.

[164] The PBMs are Express Scripts, CVS/Caremark, Prime, OptumRx, Cigna, MedImpact, Aetna, and MedCo. These PBMs also ▮

▮ (MYEP030A). Given the high volume of transactions covered by the top PBMs, net prices are similar when including the remaining PBMs. Mylan's invoice data on PBM transactions are used to calculate net prices, as they provide information on rebates, administrative fees, and price protection; Mylan's chargeback dataset (MYEP030) and IQVIA's National Sales Perspectives data do not provide sufficient information on rebate amounts to PBMs.

[165] From Table 2, the share of lives for Express Scripts, CVS Caremark, OptumRx, Prime Therapeutics, MedImpact, Cigna, and Aetna was 38% + 20% + 10% + 7% + 6% + 4% +1% = 86%. DST Pharmacy Solutions and Catamaran commercial (non-Medicare, non-Medicaid) plans were not found in Mylan's transaction data. Medco, not shown separately in the table, was acquired by Express Scripts in 2012. E.B. Solomont, St. Louis Business Journal, "Express Scripts, Medco complete $29 billion merger" (April 2, 2012), https://www.bizjournals.com/stlouis/blog/2012/04/express-scripts-medco-complete-29.html.

[166] U.S. Securities and Exchange Commission, U.S. EpiPen Profitability Analysis, https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d265624dex991.htm.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

indicates that in the years before Auvi-Q entry, ██████████████████████████
████████████████████████████████████████████████████████████████████████████
█████████████████████████ These net price increases, particularly when coupled with EpiPen's consistent dominant market shares in the relevant market, plainly demonstrate that Mylan had monopoly power.

---

[167] Average revenues per pen is a measure of average net price taking into account discounts offered throughout the distribution chain as well as directly to patients. As such, it is not directly comparable to the measure of net price to PBMs in Figure 8.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 8: EpiPen and Auvi-Q List Prices and Net Prices per Pen Over Time**

Commercial Plans



Notes:

[1] Commercial transactions from eight PBMs are included in the data: ESI, CVS/Caremark, Prime, OptumRx, Cigna, MedImpact, Aetna, and Medco. Medicaid and Managed Medicaid transactions are excluded from the sample.

[2] Mylan EpiPens include the EpiPen, EpiPen Jr, EpiPen 2-Pak, and EpiPen Jr 2-Pak.

[3] List Price is the average WAC price per dosage unit (pen).  Net Price is the average list price per dosage unit net of any rebates, administrative fees, and price protection. Average prices are quantity weighted. WAC prices from Graham 30(b)(6) Dep. Ex. 22 (page 3) were used when the transaction data did not provide a WAC price.

Sources:

[1] MYEP030A, Mylan Transactional Data

[2] SANOFI0_10659_00002872, Sanofi Managed Care Transactional Data

[3] Graham 30(b)(6) Dep. Ex. 22 at page 3

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table 2: Top PBMs by Share of Covered Lives, Commercial Plans**

| PBM Name | Share of Lives | | |
|---|---|---|---|
| | Jan. 2013 | Jan. 2014 | Jan. 2015 |
| Express Scripts | 42% | 36% | 38% |
| CVS Caremark | 11% | 11% | 20% |
| OptumRx | 4% | 13% | 10% |
| Prime Therapeutics | 10% | 6% | 7% |
| MedImpact | 8% | 4% | 6% |
| CIGNA | 6% | 3% | 4% |
| DST Pharmacy Solutions | 6% | 3% | 2% |
| Catamaran | 3% | 2% | 1% |
| Aetna | | 4% | 1% |
| WellDyneRx | | 2% | 0% |
| Other | 7% | 7% | 3% |
| Unknown | 2% | 10% | 7% |

Notes:

Top PBMs (excluding entries for which the PBM name is unknown) are determined by the average number of lives for commercial channels across January 2013, January 2014, and January 2015. PBMs outside of those in the "Top 10" and outside those for which the PBM name is unknown are aggregated as "Other." The analysis includes the 50 states, Washington, D.C., and U.S. territories; entries for which the state or territory is not given are excluded. "Commercial" is defined as entries whose channel is "Commercial" or "Health Exchange."

Source:

MMIT Data

88.     In addition to all of the foregoing, Mylan's actions after Auvi-Q was voluntarily recalled from the market further confirm that Mylan had monopoly power.  Mylan documents indicate that some EpiPen rebates and price concessions that had been negotiated in 2015 were rescinded following Auvi-Q's voluntary withdrawal from the market.  As Ms. Willing, Mylan's former Director of National Accounts, told Cigna during ongoing negotiation: ██████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ This was not merely a threat – ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

---

[168] Willing Dep. Ex. 28 at CIGNA_01462; see also Willing Dep. at 243 ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



██████████████████████████████████████████████ ████████████

██████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ More generally, Robert Coury, Mylan's chairman, ████████████████

████████████████████████████████████████████████████████████

███████████████████████████████[1] █████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████ I discuss these price increases further in Section IX.  For present purposes, this is further strong evidence of Mylan's monopoly power in the U.S. EAI market.

89.     In addition to direct evidence on Mylan's ability to control pricing, there is also direct evidence that Mylan has been able to exclude competition from other EAI products.  I discuss this at length in Section VII.

## VI.   THE THREAT OF ENTRY FROM AUVI-Q

90.     Mylan was aware of the impending entry of Auvi-Q well before it came to market.[172] ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ Mylan also recognized that Auvi-Q would be a far

---

[169] See PHP 0001498.
[170] TXSTATE_00000065; see also MYEP01228538████████████████████████████████████
████████████████████████ Brown Dep. Ex. 11 ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
[171] Coury Dep. Ex. 27.
[172] For example, ████████████████████████████████████████████████████
MYEP00088189 at 194, 196. The manufacturer of EpiPen had filed patent infringement litigation against the developers of Auvi-Q in January, 2011. King Pharmaceuticals, Inc. and Meridian Medical Technologies, Inc. v. Intelliject, Inc. U.S. District of Delaware, Case 1:11-cv-00065-UNA, filed Jan. 19, 2011. The litigation settled in 2012. ████████████████████████████████████████████████████
████████████████████ MYEP00219825 at 828.
[173] PFE_EPIPEN_AT00648955 (Pfizer email dated Aug. 12, 2008). Even at this early stage, the potential threat to EpiPen from this new technology was recognized: ████████████████████████████████
████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

more formidable competitor than existing and prior products in the EAI market, such as Twinject, Adrenaclick, and the Adrenaclick authorized generic.[174] ██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████ █████████████████████████████████████████

██████████████████████████████████████████████████████████ The document then discusses ████████████████████████████████████████████

███████████████████████████████████████████

91.     Recognizing the impending threat of a new innovative EAI device, Mylan moved forward on a number of fronts.  First, Mylan (along with its partner Meridian) explored the possibility of

---

██████████████████████████████████████████████████████████████████████████

[174] PFE_EPIPEN_AT00011449 at 505 (EpiPen 2011 Strategic Plan (December, 2010)) ████████████████
████████████████████████████████████████████████ See also Foster Dep. at 186; Jones Dep. at 89-90█

[175] Foster Dep. at 79-80, 141-43; MYEP01198247. █████████████████████████████████
██████████████████████████ MYEP00118416 at 432. See also MYEP00723817 at slides 10-12, ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

[176] ████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████ MYEP00140812 at 814.  See also MYEP00119242 at 246 █████████████████████████ MYEP00740408 at slides 3-4 ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ MYEP00275501 ████████████████████████████████████████████ MYEP00275852 ████████

████████████████████████████████████████████ MYEP01033504 at 505 ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

[177] MYEP00140812 at 824.

[178] MYEP00140812 at 824; see also Patel Dep. Ex. 12 at MYEP00193064 █████████████████
████████████████████████████████████████████████████████████████████

████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

licensing or purchasing the product that ultimately became Auvi-Q.  Second, recognizing that Auvi-Q's smaller size was viewed as a considerable advantage to EpiPen, Mylan attempted to compete to develop a smaller EpiPen that, it hoped, consumers would find sufficiently appealing so that they would remain EpiPen customers rather than switching over to Auvi-Q.  Finally, unsuccessful in both of these efforts, Mylan, instead of competing on the merits, developed an anticompetitive exclusionary strategy, aimed at ensuring that Auvi-Q would be unable to expand its foothold in the market, thereby preventing it from becoming a meaningful competitor.

92.      In the remainder of this section, I discuss Mylan's efforts to license or acquire Auvi-Q (Section VI.A) and its efforts to innovate so as to offer a better EpiPen (Section VI.B).  I conclude with a discussion of Mylan's intent in embarking on an exclusionary strategy (Section VI.C).  In Sections VII-IX, I discuss the specifics of the exclusionary strategy and evaluate whether it constitutes an anticompetitive restraint on the EAI market.

### A. MYLAN'S EFFORTS TO LICENSE OR ACQUIRE AUVI-Q



93.      As the Intelliject technology was winding its way through FDA approval, ███████

███████████████████████████████████████████████████████████████████████

███████ ██████████████████████████████████████████████████████████████████

█████████████████████████████████████████ ██████ ████████████████████████████

████████████████████████████████████████████████ In discussing ████

████████████████████████████████████████████████████████ Thomas

Handel, who was Senior Vice President for Commercial Pharmaceuticals, observed, ████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████ Moreover, ████████████████████████████████████████-

---

[179] Handel Dep. at 32-33 █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████

[180] Handel Dep. at 42-43 ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

[181] Graham 30(b)(6) Dep. at 66.

[182] Handel Dep. at 30.  Mr. Handel goes on to explain the value of complementary EAI device technologies:

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

94. ████████████████████████████████████████████████████████

95.     But Mylan did not give up. Later, in 2014, after Mylan had already embarked on its anticompetitive campaign to exclude Auvi-Q from the market, ████████████████████ ████████████████████████ ████████████████████████████ While I cannot state with certainty the reasons for Mylan's renewed interest ████████████████ at that time, the only economically rational explanation for this behavior that I am aware of is that Mylan was looking for a shortcut to return to the days of having no meaningful competitive threat. In other words, Mylan was contemplating ████████████████ in an effort to avoid having to continue to spend the time and incur the expense associated with its anticompetitive exclusionary campaign.



Handel Dep. at 31-33.

[183] Handel Dep. Ex. 5 (emphasis in original).  See also Handel Dep. at 56-57.
[184] Handel Dep. Ex. 5.
[185] Handel Dep. at 67-69; Handel Dep. Ex. 6 (term sheet).
[186] Handel Dep. at 70-71 ████████████████████████████████

[187] Graham 30(b)(1) Dep. Ex. 23

Graham 30(b)(1) Dep. At 236

[188] Id.; see Graham 30(b)(1) Dep. at 235-36

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## B. Mylan's efforts to develop a smaller more innovative EpiPen

96.     Later, after Mylan and Meridian efforts to license or acquire the Intelliject technology failed, Mylan and Meridian launched a research initiative to develop a similar product.  This was a direct response to the impending launch of Auvi-Q.[189] ███████████████████████████
███████████████████████████ ██ ███████████████████████████
███████████████████████ ██ ███████████████
███████████████████████████████████████
███████████████ ² Mylan's CEO, Heather Bresch, ███████████████████
███████████████████████████████████████
███████ ██ ████████████████████████████
██████████████████████ ██ ██████████████



---

[189] See, for example, Hadley Dep. Ex. 9 at slide 27 (listing as "strategic response" to Auvi-Q to ███████
███████████████ see also Hadley Dep. at 155-59 ("Which features of the EpiPen did the marketplace find un-cool? A. That is was long.").

[190] Handel Dep. at 100-02.

[191] Handel Dep. Ex. 12, at p. 4.

[192] Handel Dep. at 94-95 ███████████████████████████
███████████████████████████████████████
███████████████████████████████████████

[193] PFE_EPIPEN_AT00611245 (August, 2011 email from Tom Handel stating, ███████████████
███████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████ ; Handel Dep. at 112
███████████████████████████████

[194] PFE_EPI PEN_AT00546952 at slide 8 █████████████████████
█████
█ ███████████████████████
█ ███████████████████
█ █████████████████████████████
█ ██████████████████
███████████████████████████████████████
███████ ██
█████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████
████████████████████████████

### C. MYLAN DEVELOPED A PLAN TO BLOCK COMPETITION FROM AUVI-Q

97.     Unsuccessful in its efforts to acquire or license Auvi-Q, and unable to successfully innovate and thereby compete with Auvi-Q on the merits, Mylan pivoted and instead developed a plan to block Auvi-Q from the market.

98.     In 2010, Mylan projected how the entry of Auvi-Q would impact the EAI market and Mylan's own profits. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

99.     Mylan was also aware of, ████████████, the substantial marketing resources available to a pharmaceutical company as large as Sanofi.[198] The executive summary of an October, 2012 Auvi-Q market research project states, ███████████████████████████████████████████████████████████████████████████████████████████████████████

100.    At this time, Mylan's existing contracts with PBMs ██████████████████████████████████████████████████████████████████████

---

[195] Handel Dep. at 94-95; Graham 30(b)(6) Dep. at 25 ██████████████████████████████

[196] MYEP01209503; MYEP01209505.

[197] MYEP00140812 at 814. ███████████████████████████
▪ ███████████████████████████████████
███████████████
▪ ████████████████████████████████
▪ █████████████████████████████████████

[198] Foster Dep. at 212 ████████████████████████████████ see also Willing Dep. at 252-54; Jordan Dep. at 48; Sussman Dep. at 98.

[199] MYEP00603647 at 648; see also Zinn 30(b)(6) Dep. at 11 ███████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

█████████  ██████████████████████████████████████████████████
████████████████████████████

101.     Toward the end of 2011, Mylan began to intentionally map out a new, aggressive strategy to curtail the impact of Auvi-Q entry on EpiPen profitability.  This strategy did not involve Mylan outcompeting Sanofi, but rather Mylan hamstringing Auvi-Q so that it could not compete effectively against EpiPen.  An early indication of this shift in strategy is in an email sent by Harry Jordan, Mylan's Director for National Accounts.  In discussing ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Mylan looked for opportunities to negotiate contracts with PBMs that either put Auvi-Q on a less favorable tier of the formulary, or to exclude Auvi-Q entirely. The November 2011 Global Brand Plan recommended this strategy for commercial payers: ██████████████████████████████████████ ███████████████████████████████████████████████████

102.     These strategies to blunt the competitive threat from Sanofi so that Mylan would not have to compete on the merits were discussed and developed in a series of meetings and strategy sessions in December 2011. One email ████████████████████████████████████



---

[200] See MYEP01208377 at slide 3  (Feb. 2011) ████████████████████ MYEP00262009 (March 2011) ████████████████████████████ MYEP00491274 at slide 12 ████████████████████████████████████ ; May Dep. at 30-31.
[201] See, for example, MYEP00264796 at 797-798 ████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████ Jones Dep. at 80-81 ███████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████ ; Cunico Dep. at 24-25 ████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████
[202] MYEP00720503 at 504.
[203] MYEP00088189, at 194, 228.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████ ██

Another email ████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ ██ █████████████████████████

███████████████████████████████████ [206] Another email ██████████

██████████████████████████████████████████████████

█████████████████████████ [207] As later explained in another internal Mylan email, ████████

████████████████████████████████████

103.     Once Auvi-Q launched in early 2013, Mylan tracked its success in getting Auvi-Q excluded from large payers as it negotiated contracts for 2014.  This was against a backdrop of Auvi-Q gaining market share during 2013 █████████████████████████████ After the February, 2013 signing of the first large exclusionary contract with Coventry Health that made EpiPen the exclusive EAI device on formulary, internal Mylan emails proclaimed, ████████████████████████

_____

[204] MYEP01033592 at 593.
[205]  MYEP00723398; see also MYEP01336372, at 380 ███████████████████████████
██████████████████████████
███████████████ █████
[206] MYEP00723818 at slide 32 ███████████████████████████
███████████████ MYEP00825394 at slide 2 ██████████████████████
████████████ Graybill Dep. Ex. 6. ████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████
[207] MYEP01032076.
[208] Foster Dep. Ex. 20.
[209] For example, ████████████████████████████████
███████████████ MYEP00402298 at slide 1.  See also
MYEP00074543 ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

64

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



████████████████████████████████████ Along the way, Mylan appears to have adjusted its contract restrictions to target Auvi-Q and other branded products, rather than all other EAI devices.[211] An email from September 2013 ██████████████████████████████

████████████████████████████████████████████

████████████ An October, 2013 presentation states, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ A November 2013 email ████████████████

████████████████████████████████████████ And a December, 2013

presentation ███████████████████████████████████████████████████

██████████████████████████████████████████████ A

December 2014 EpiPen presentation for top Mylan management ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Mylan did not measure success by how much it expanded the overall EAI market or even by how much it expanded its own sales. Rather, success was measured by how well Mylan fulfilled its goal of blocking customers' access to a competitive product.

# VII.  MYLAN'S ANTICOMPETITIVE STRATEGY TO ELIMINATE COMPETITION FROM AUVI-Q

104.     In this section I first discuss the characteristics of anticompetitive exclusionary conduct and how anticompetitive conduct is distinguished from competition on the merits, focusing on the defining characteristic of the rebates offered by Mylan: the rebates were conditional on



[210] MYEP00723729 ██████████████████ Later in the email thread ██████████████████

████████████████ MYEP00882371.

[211] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ MYEP00074543.

[212] MYEP00892874.

[213] MYEP00142246 at 266.

[214] MYEP00604738.

[215] MYEP00194704 at 707.  See also Jones Dep. at 236 ██████████████████████

[216] MYEP0024409 at 416. ████████████████████████████████████████

██████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

disadvantaging or excluding Auvi-Q, and thus fall into the category of contracts that reference rivals. I then describe in detail the structure of the contracts between Mylan and PBMs that effectively foreclosed Auvi-Q from much of the EAI market. I also describe Mylan's additional strategies to increase the entrenched share of EpiPen in the marketplace and strengthen the exclusionary impact of Mylan's rebate contracts with PBMs. The section concludes with a discussion of the magnitude of EpiPen's entrenched share, which is an important determinant of the competitive effects from Mylan's conduct, as discussed in subsequent sections of the report.

### A.  IDENTIFYING EXCLUSIONARY CONDUCT

105.     It is commonplace for firms to enter into contractual relationships with firms located upstream or downstream in the supply chain. These relationships can foster efficient vertical relationships by, for example, promoting relationship specific investments and lowering costs. However, vertical market restrictions can also be used as an anticompetitive tool to exclude competitors, resulting in harm to competition and to consumers.[217]

106.     For vertical contracting practices used by a single firm to be anticompetitive, two conditions are necessary. First, the firm must have monopoly power in a relevant antitrust market and use the practices to gain or maintain monopoly power.[218] Second, the practices must have an exclusionary effect or facilitate controlling prices.[219] I have already demonstrated that Mylan has monopoly power in the U.S. EAI market.  In this section, I focus on the exclusionary effect of Mylan's actions on competition in the U.S. market for EAI devices.

107.     In general, exclusionary conduct engaged in by a dominant firm makes it more difficult for rival firms to compete, whether by increasing the costs incurred by the rival firm in competing in the market or by reducing the access of the rival firm to customers (or both).  The result of such actions is that the rival firm becomes less of a competitive constraint on the dominant firm than it

---

[217] For a general discussion of the theory of vertical contracting, see Michael L. Katz, "Vertical Contractual Relations," in *Handbook of Industrial Organization*, Volume I (Richard Schmalensee and Robert D. Willig, eds., Elsevier Ltd. 1989). For a discussion of the possible procompetitive and anticompetitive impacts of vertical restrictions, see Paul L. Joskow, "Vertical Integration," in *ABA Section of Antitrust Law, Issues in Competition Law and Policy,* Volume I (W. Dale Collins, ed., American Bar Association 2008).

[218] *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 100 L. Ed. 1264, 76 S. Ct. 994 (1956). Exclusionary practices may also have an anticompetitive effect by fostering collusion among several firms, no one of which is dominant, but I do not discuss those uses of vertical restraints here.  See Fiona M. Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," 81 *Antitrust Law Journal* 777 at 790 (2017).

[219] *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

would be, but for the exclusionary conduct.  Many instances of exclusionary conduct fall under the rubric of raising rivals costs: the dominant firm makes it more costly for rival firms to compete by taking actions that, for example, limit access to a scarce resource or reduce rival firms' economies of scale by limiting their market share.[220]  Other instances of exclusionary conduct can be categorized as foreclosure strategies.[221] These strategies, as a general matter, limit access of rival firms to customers, which directly forestalls competition for some customers and can reduce the incentive of rival firms to compete for others by limiting the size of the target market.  But within these broad categories are a wide range of conduct and contractual restrictions that can have an exclusionary effect on rival firms.

108.    Firms can have both a static and dynamic incentive to engage in exclusionary conduct.[222] The static incentive is based on the current impact on share and profits.  The dynamic effect seeks to limit the foothold a competitor gains in the market in order to prevent it from getting the scale and market presence that will allow it to become a more formidable competitor in the future, when it would be able to erode the dominant firm's market power.  In both cases, the dominant firm takes actions that make it more difficult for rivals to compete, and the dominant firm reaps the rewards of diminished competition in the form of higher prices and increased share, whether now or in the future.

109.    Pro-competitive uses of vertical restraints, to the extent that they result in more efficient vertical relationships, can also have the effect of making it more difficult for rivals to compete and reducing their share. The key to distinguishing between anti-competitive and pro-competitive uses of vertical restraints is understanding whether firms are competing on the merits, which is pro-competitive, or whether the dominant firm is instead using its market power to tilt the competitive playing field in a way that disadvantages new entrants or rivals with a smaller market share. There are no blanket rules that distinguish pro-competitive and anti-competitive uses of vertical restraints. Rather, each instance must be evaluated on its merits.[223]

---

[220] See Thomas G. Krattenmaker and Steven C. Salop, "Anticompetitive Exclusion: Raising Rivals' Costs To Achieve Power Over Price," 96 *Yale Law Journal* 209 (1986).

[221] See Jonathan B. Baker, "Exclusion as a Core Competition Concern," 78 *Antitrust Law Journal* 527 (2013) at 539-40; Philippe Aghion and Patrick Bolton, "Contracts as a Barrier to Entry," 77 *American Economic Review* 388 (1987).

[222] Scott Morton and Abrahamson (2017) at 780.

[223] See Baker (2013) at 548; Fiona M. Scott Morton, "Contracts that Reference Rivals," in 27 *Antitrust* 72, 72 (2013); Jonathan M. Jacobson & Daniel P. Weick, "Contracts that Reference Rivals as an Antitrust Category, *The Antitrust Source* )April 2012(.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

110.    One consideration that can help differentiate between competitive and exclusionary conduct by a monopolist is whether the monopolist uses contracts that references rivals. In these contracts, the terms of purchases from the dominant firm depend on whether, and how much, the customer buys from the *rival* of the dominant firm.[224] For example, a contract that provides a discount once a manufacturer reaches a certain volume of sales with a customer does not reference rivals, but a contract that provides a discount if the customer buys none or only a small percentage of its needs from the rival, is.  In that case, the discount the customer receives from the monopolist depends not only on its purchases from the monopolist, but also on its purchases from competing manufacturers.  In the instant setting, a contact between a PBM and a pharmaceutical firm that calls for discounts provided that the pharmaceutical firm's product is placed on the highest formulary tier for branded drugs does not reference rivals.  But, a contract that calls for rebates only if the products of competing firms are excluded from the formulary, is a contract that references rivals.

111.    Contracts that reference rivals such as those used by Mylan raise concerns because they directly raise the costs of rivals by "taxing" transactions between the monopolist's customers and the rival and make them more expensive for the customer.  Many (if not all) of the pro-competitive aspects of contractual restrictions can be achieved through contracts that do not reference rivals such as volume discounts.[225]

112.    Prior to the launch of Auvi-Q, contracts between Mylan and PBMs typically did not reference rivals, as the rebates offered were only contingent on the treatment of EpiPen, and there were no restrictions on the treatment of other, competing EAI devices.  For example, in the sixth amendment to Mylan's agreement with Aetna, an amendment that was finalized in October 2012 prior to the launch of Auvi-Q, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████   In short, ████████████████████████████████████

████████████████████████████████████████████████████   The rebate

---

[224] Scott Morton (2013) at 72; Jacobson and Weick (2012).
[225] Scott Morton and Abrahamson (2017) at 782.
[226] May Dep. Ex. 18.
[227] May Dep. at 168-70.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

conditions negotiated in 2013 – after the launch of Auvi-Q – changed dramatically.  Using the same example, ██████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████    ██████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████

113.    To be sure, this shift from contracts that do not reference rivals to those that do was not unique to Aetna.  After the launch of Auvi-Q, it became explicit Mylan policy for contracts between Mylan and PBMs to reference rivals – placing strict conditions on the treatment of Auvi-Q and other EAI devices in order to secure the contracted-for EpiPen rebates. These contracts that reference rivals provide a strong indication that Mylan's actions were not competition on the merits, but rather, were intended to tilt the playing field such that Auvi-Q would not be able to compete effectively. I now assess these contracts in greater detail.

114.    While my focus for identifying exclusionary conduct is the structure of Mylan's formulary contracts with PBMs, there are other aspects of Mylan conduct, discussed throughout my report that also provide indicia of the exclusionary nature of Mylan's conduct. As already discussed, it is clear that when Auvi-Q was about to enter and later while Auvi-Q was in the market, Mylan's intent in developing its strategy was not to expand the overall EAI market, to make EpiPen a better product, or even primarily to expand EpiPen sales. Rather, the goal was explicitly to foreclose Auvi-Q from the market. To further its exclusionary goal, Mylan embarked on a number of strategies which together served to effectively foreclose Sanofi as an effective competitor. Moreover, Mylan's documents make it clear that its competitive strategies were not just designed to win individual PBM customers, but to broadly foreclose Sanofi from the market, taking advantage of the impact of excluding Auvi-Q at large PBMs to reduce the competitive impact of Auvi-Q market-wide. As part of that broader goal, Mylan was willing to follow a less profitable exclusionary strategy with at least one PBM customer in order to further the overall goal of foreclosing Auvi-Q.

---

[228] May Dep. Ex. 19. ██████████████████████████████████████
██████████████
[229] May Dep. at 171-72 ████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## B. MYLAN'S USE OF EXCLUSIONARY REBATES

### 1. Characteristics of exclusionary rebates

115.    By linking its offered rebate level to formulary status for EpiPen as well as Auvi-Q, Mylan effectively made the rebate contingent on the share of EpiPen purchases through the formulary. Mylan provided higher rebates in exchange for the PBM adopting formulary restrictions that lowered share for Auvi-Q.  As a result, the rebates offered by Mylan are analogous to loyalty rebates that explicitly make the rebate paid contingent on achieving a specified share of EAI purchases. The PBM only gets the maximum rebate by placing Auvi-Q in a disadvantaged formulary position that restricts Auvi-Q sales and inflates the EpiPen market share. Thus, rebates enable Mylan to exploit its monopoly power and manipulate PBM formulary agreements to reduce the competitive impact of Auvi-Q, to the disadvantage of both Auvi-Q and customers.

116.     As discussed in the economics literature on loyalty rebates, there are three aspects of Mylan's exclusionary rebates that make them effective as an exclusionary device.[230] First, the rebates were contingent on a preferred or exclusive formulary position for EpiPen that gave EpiPen a larger share than it would have secured through competition on the merits if each EAI device had equal formulary status.  The rebate acts as an inducement to the PBM to structure its formulary so that EpiPen receives an increased share of sales.

117.    Second, Mylan's contracts effectively set a high share threshold before the PBM could receive a rebate. Mylan required a PBM to exclude Auvi-Q from at least the most favorable formulary tier and oftentimes from the formulary entirely (or place restrictions on Auvi-Q that had the effect of treating it as if it was not on the formulary), meaning that EpiPen would typically obtain more than a 90% share.  The rebate was then applied to this volume of purchases. If the PBM did not agree to the formulary restrictions on Auvi-Q, it could not get the maximum rebate from Mylan. As a result, each EpiPen sale would be relatively expensive, since the PBM would not get the rebate (and other favorable terms such as price protection) that it would get had it accepted Mylan's exclusionary rebate offer.

118.    Third, the effectiveness of Mylan's exclusionary rebates hinged on Mylan having an entrenched share of the EAI market. The exclusionary rebates offered by Mylan could not be matched by Sanofi because switching all or nearly all consumers from EpiPen to Auvi-Q was not

---

[230] Scott Morton and Abrahamson (2017) at 783; DeGraba (2013); Nicholas Economides, "Loyalty/Requirement Rebates and the Antitrust Modernization Commission: What is the Appropriate Liability Standard?," 54 *Antitrust Bulletin* 259 (2009) at 260, 273.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

possible.  As discussed above, demand for the EpiPen was entrenched and plans knew that if EpiPen were excluded, there would be significant patient disruption and a substantial percentage of customers would continue to demand EpiPen anyway – which the PBM would then be buying on unfavorable terms.  Therefore, the PBM faced a choice between agreeing to the exclusive rebate offered by Mylan and receiving the large discount off of the EpiPen list price (along with other benefits such as price protection) for the overwhelming majority of its EAI purchases, or placing Auvi-Q on an equal or preferred formulary position to EpiPen.  Were the PBM to place Auvi-Q on an equal or preferred formulary position, the PBM would receive a large discount for each of its Auvi-Q purchases, but, because of the significant percentage of the market that is non-contestable, many patients would still demand EpiPen, and the PBM would receive no (or a significantly smaller) rebate for each of these EpiPen purchases. Consequently, Mylan was able to structure its rebate offers such that Sanofi was not able to compete head-to-head with Mylan on the merits; the large lump-sum loss that PBMs knew they would face if they included Auvi-Q on the formulary was too large.

119.    This played out repeatedly in the marketplace. Sanofi was generally unable to counteract Mylan's exclusionary rebates and overcome the large lump-sum loss that PBMs would incur were they to add Auvi-Q to their formularies, and where Sanofi was able to get Auvi-Q on formulary, it often had to go to extraordinary measures to do so – including offering rebates on other products just to get Auvi-Q taken off the exclusion list.[231]  If discounts had instead been applied to each EAI purchase without regard to what the customer was purchasing from the rival, Sanofi could have lowered price to gain share.  But because of EpiPen's substantial entrenched (non-contestable) market share, which Sanofi could not compete for, Sanofi could not offer sufficient inducements on sales of contestable EAI devices to make it in the PBM's interest to reject Mylan's offer and give

---

[231] In order to get off of the Express Scripts exclusion list, Sanofi had to offer not just significant rebates for Auvi-Q, but also rebates on ███████ – one of Sanofi's most successful products at the time.  These additional points offered ██████████ were far more valuable to PBMs than any rebate Sanofi could offer for Auvi-Q. Borneman 30(b)(1) Dep. at 139 █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ Kautzner Dep. at 168 ██████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

preferential formulary position to Sanofi.  In short, the loss of discounts on all EpiPen sales served as a substantial incentive for the PBM to give preference to EpiPen and exclude Auvi-Q entirely.

120.    Mr. Foster – Mylan's former director of national accounts – captured this exact concept when negotiating with MedImpact.  ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ It is for this very reason that PBMs felt that they had no choice but to accept Mylan's exclusionary rebate offers.

121.    The impact of Mylan's exclusionary rebates can be seen in Figure 9, which is taken from Scott Morton and Abrahamson (2017).[233] Mylan offers an incremental rebate, $d$, that is contingent on the PBM adopting formulary restrictions on EpiPen competitors that give EpiPen a threshold share $h$ of EAI sales. Agreeing to those formulary restrictions increased the total rebate amount flowing to the PBM by $h \times d$.  Mylan had a large entrenched share of the EAI market, which meant that Auvi-Q (and other EAI devices) were competing for the residual contestable share $s$ of the EAI market.  The contestable share $s$ is the maximum share Auvi-Q could hope to attract if it tried to compete with a rebate of its own.  This limits the total revenues that could be captured by Auvi-Q. The incremental EpiPen rebate in exchange for exclusivity was large relative to the revenues that Auvi-Q could capture even if it attracted the entire contestable share, making it difficult for Auvi-Q to offer rebates that would induce the PBM to forego the rebate offered by Mylan.  In Section VIII, I explain in more detail, with real world examples, how EpiPen's entrenched share made it unrealistic for a PBM to consider foregoing the Mylan rebate offer and give preferential formulary position to Auvi-Q.

---

[232] Foster Dep. Ex. 4.
[233] Scott Morton and Abrahamson (2017) at 836, Figure 1.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 9: A Graphical Representation of an Exclusionary Rebate**



### 2. Mylan intended for its PBM contracts to be exclusionary

122.    There is little doubt that Mylan structured its PBM contracts with the intent that they be exclusionary.  Mylan documents, and the testimony of its current and former employees, make it abundantly clear that the largest discounts offered on EpiPen were contingent on the PBM agreeing to formulary restrictions on Auvi-Q so as to prevent Auvi-Q from gaining a foothold in the market. For example,  Along similar lines, Mr. Jordan, Mylan's former director of national accounts, ███████████████████████████████████████

---

[234] MYEP00624286 at slide 7. ████████████████████████████████ May Dep. Ex. 4.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



In 2014, Mr. Potter – Mylan's Senior Vice President for National Accounts – stated

123.　As part of his negotiations with Prime, Mr. Foster stated Mr. Foster expressed the same to Anthem – offering significantly enhanced rebates on the condition that Anthem In discussing the rebates agreed to with Express Scripts, Mr. Foster noted that As Ms. Minton of Anthem (an ESI client) explained, this was done because

[1]

. In short,

---

[235] Jones Dep. Ex. 12; see also Jones Dep. at 290 Willing Dep. at 108-09 Willing Dep. at 121-122

[236] Willing Dep. at 63-64.  See also Willing Dep. Ex. 2

[237] MYEP00412405-06.

[238] Foster Dep. at 232-33

[239] Minton Dep. at 197 Graham 30(b)(1) Dep. Ex. 21 .

[240] Minton Dep. at 201.

[241] Minton Dep. at 201.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████████

████████████████████████████████ ██████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

124.     In addition, in the instances in which the PBM decided that it preferred to make Auvi-Q available (either in an unrestricted tier 2 or tier 3 position), Mylan would nevertheless go back to those payers in an effort to get them to reconsider imposing restrictions on competing EAI products in exchange for additional rebates.  For example, ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ The same was true of Mylan's negotiations with Humana. ██████████████████

████████████████████████████████████████████████████████

██████████████████ ███████████████████████████████████

███████████████████████ As another example, Mr. Jordan testified ███████

████████████████████████████████████████████████████████

---

[242] May Dep. Ex. 15; see also Minton Dep. Ex. 16 ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

[243] Byrne Dep. Ex. 3, at PS0077863.
[244] Willing Dep. at 73-75. ████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ Willing Dep. Ex. 3 ██████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ . See also MYEP00304697
████████████████████████████████████████████
███████████ HUM006208 (Oct. 9, 2012 email from Harry Jordan, National Account Director for Mylan, to Bethanie Stein of Humana, in which Jordan writes, ████████████████████████
████████████████████████████████████████████ SAN-EPI_A-0041389 ████████████████████████████████████████████████████████
█████████████████████████████████████████████████

[245] Humana004351.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████

███████████████████ Similarly, Mr. Jordan ████████████████████████

███████████████████████████████████████████████████████

███████████████████ As yet another example, after Auvi-Q became co-preferred with EpiPen on CVS's commercial performance drug list in July 2014, ████████████████

███████████████████████████████████████████████████████

██████████████████████████████

125.    As an additional financial inducement, Mylan would offer price protection against future EpiPen price increases if PBMs would place restrictions on Auvi-Q.  Payers recognized that given the history of regular, sizeable list price increases for EpiPen (which continued through 2016) the net price for EpiPen would keep rising, whatever the negotiated discount rate, unless the payer negotiated a limitation on future price increases. Price protection gave payers a contractual cap on EpiPen price increases for their covered lives.[249] ██████████████████████████████

████████████████████████████████ Price protection is costly for Mylan since it decreases the revenue flowing from list price increases. ████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████ As part of his negotiations with Prime, Mr. Foster explained that ████████████

███████████████████████████████████████████████████████

██████████████████████████ Thus price protection augmented the impact of Mylan's exclusionary rebates: the PBM would get an additional reduction in the total payments for EpiPen, but only if they agreed to formulary restrictions.  Because Auvi-Q could not attract the non-

---

[246] Jordan Dep. at 205-09; Jordan Dep. Ex. 26.
[247] Jordan Dep. Ex. 29.
[248] Anderson Dep. Exs. 12 and 13.
[249] Foster Dep. at 90-91 ████████████████████████████████████████

[250] MYEP00603858 at slide 5 ██████████████████████████████████████

[251] Foster Dep. at 92 ███████████████████████████████████████████

██████████████████ see also Foster Dep. at 236-38 █████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
[252] MYEP00602480 at 481; see also Foster Dep. at 233 ████████████████
██████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

contestable share of the EAI market, Sanofi could not effectively counter the financial inducement from Mylan's price protection offer with price protection of its own.

### 3. Negotiation of Auvi-Q exclusion rather than disadvantaged formulary placement

126.    A key element of Mylan's exclusionary strategy was to not simply negotiate preferred formulary positioning for EpiPen, but to negotiate exclusive formulary coverage for EpiPen with Auvi-Q left off the formulary entirely or restricted through prior authorization and step therapy restrictions.  In the EAI market, step therapy is effectively equivalent to exclusion, as EAI devices do not lend themselves to that therapeutic approach.  Unlike therapies for chronic conditions, where a patient can try one product, and then the patient and HCP can switch to another product if the first is not working, EAI devices are only used in emergency situations, where it is meaningless to talk about a progression of therapies.[253]  This assessment was expressed ███████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████[254] As quoted in one internal Mylan email, ████████████████████████████████████████████████ ████████████████████████████████████ And yet, despite industry participants seeing little sense in requiring step therapy for EAI products, Mylan nevertheless used step restrictions to limit access to Auvi-Q.  While patients could in principle still get Auvi-Q even with these restrictions in place, ████████████████████████████████████████ ███████████████████████████████████ ██ █████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

127.    By making the rebate conditional on Auvi-Q being excluded from the formulary, rather than being relegated to a higher co-pay tier of the formulary, Mylan increased the threshold share for its exclusionary rebate offer. My empirical analysis of Auvi-Q shares at different health plans and in

[253] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 38.
[254] SAN-EPI-0545367.
[255] Korczynski Dep. Ex. 17.
[256] MYEP00275501; see also MYEP00367121 █████████████████████████████████ ████████████████████████████████████ █████████████████
[257] See Barry 30(b)(1) Dep. at 370-71; MYEP01250453, at slide 12 ████████████████ ██████████████████████████████; Jan Dep. at 115-16; AG00000800, at slide 10 ("[a]bout 85 percent of patients would be willing to pay more for [Auvi-Q] over their current EAI."); Patel Dep. Ex. 12.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

different states, which is discussed in the Appendix, confirms that stricter formulary restrictions on Auvi-Q led to a lower Auvi-Q share of prescriptions.  This had the impact of not only moving more share to Mylan, but also of increasing the incremental rebate dollars offered by Mylan for accepting the restrictions on Auvi-Q.  That in turn made it harder for Sanofi to counter the Mylan offer with inducements of its own.

128.    In negotiating exclusives, Mylan took advantage of the vulnerability of a new product to exclusionary strategies by a dominant firm before it has an opportunity to get established in the marketplace. Because the new product does not have an installed base of users and often is not immediately added to PBM formularies as soon as it is first available in the marketplace, the administrative cost to the PBM of not putting the new product on the formulary is relatively small. In contrast, the administrative cost of excluding EpiPen was significantly larger, given EpiPen's installed base and the number of patients who would try to continue to get EpiPen through, for example, prior authorizations. As noted in one internal Mylan email ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████

> *4. All-or-nothing offers to PBMs*

129.    In some cases, Mylan not only offered higher discounts for restrictions on Auvi-Q, but declined to offer significant discounts for any formulary positioning other than one that required the complete exclusion Auvi-Q.  In effect, Mylan was offering these PBMs an all-or-nothing choice: place Auvi-Q in a severely disadvantaged formulary position, or else pay full list price for EpiPen. For example, in September, 2013 Mylan signed an amended rebate agreement with Express Scripts, the largest PBM, effective January 1, 2014, ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Thus the only options Express Script had were to agree to make EpiPen exclusive or to buy EpiPens at the full list price.[260] As stated in a July 2014 internal Mylan email:

---

[258] MYEP01099685.
[259] MYEP00000926 at 928-9.
[260] See May Dep. at 150 ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████ Along similar lines, when negotiating with MedImpact, which was evaluating competing offers from Mylan and Sanofi for its high control plan, ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████

130.     By giving PBMs an all-or nothing choice, Mylan augmented the exclusionary effect of its rebate offer. With an all-or-nothing offer, the entire rebate—not just the incremental rebate above the offer for equal formulary position—provides an inducement to exclude Auvi-Q. This increases the rebate dollars that the PBM stands to lose by keeping Auvi-Q on formulary, and makes it harder for Sanofi to overcome the exclusionary contract offered by Mylan.

### 5. Bundled discounts across plans

131.     The negotiations with Prime exhibit one additional tactic Mylan used to augment the exclusionary impact of its discounts. Prime operated as the PBM for a number of non-profit Blue Cross Blue Shield plans. In negotiations with Prime in December, 2013, ████████████ ████████████████████████████████████ ████████████████████ ████████████████ ████████████████████████████████████ ████████████████████████[264] Thus Mylan was leveraging its dominant share across BCBS plans in order to try to extract additional exclusivity and further foreclose Auvi-Q from the marketplace, while making it correspondingly harder for Sanofi to match the discounts offered by Mylan.

---

[261] MYEP00412405 at 406.
[262] MYEP00254218 at 219.
[263] See MYEP00602480 at 481 ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ██████████████
[264] MYEP00620009 ████████████████████████ ████████████████████████████████ ████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### C. MYLAN IMPLEMENTED NUMEROUS STRATEGIES TO BLOCK AUVI-Q BY INCREASING THE SHARE OF NON-CONTESTABLE DEMAND

132.    An additional consideration that has been used to determine whether conduct by a monopolist is anticompetitive is looking at the full range of conduct taken by the monopolist to determine whether the combined set of strategies, taken as a whole, is anticompetitive. Consistent with the economic literature, courts have found that a combination of actions can constitute exclusionary conduct even though each alleged anticompetitive practice, if viewed in isolation, might not have an exclusionary effect.[265] In particular, in a case such as at issue here where the primary means of exclusion is not price but a collection of strategies which together are alleged to foreclose competition, the question is whether those practices in their entirety "improperly foreclosed a substantial share of the market, and thereby harmed competition."[266] As part of its exclusionary course of conduct, Mylan implemented a number of strategies that were designed to increase the entrenched share for EpiPen market-wide, thus making it more difficult for Sanofi to gain share and overcome the exclusionary discounts offered by Mylan.

### 1. Mylan exploited spillover effects to increase its entrenched market share

133.    A crucial element of Mylan's strategy was its understanding that in blocking Sanofi's access to formularies it would not simply be competing for business patient by patient and PBM by PBM. Rather, Mylan would use its entrenched market share, and the small initial share for Auvi-Q, to impede Sanofi from expanding its footprint in the marketplace. The overriding goal was not to win access at individual PBMs, but to block access to the marketplace as a whole by teaching physicians, consumers, and plans that Auvi-Q was not a realistic option.  Several years after Harry Jordan articulated the strategy of blocking further competition, another Mylan executive summarized

███████████████████████████████████████████████████

---

[265] See B. Douglas Bernheim and Randal Heeb, (2014). "Framework for the economic analysis of exclusionary conduct," in *The Oxford Handbook of International Antitrust Economics* (R. D. Blair & D. D. Sokol eds., Oxford University Press 2014), at 28; LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together. As the Supreme Court recognized in Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962), the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation. The Court stated, 'in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it.'").

[266] ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 269 (3rd Cir. 2012).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

134.     To secure this market-wide lockout, Mylan took advantage of so-called "spillover" effects. These effects arise because Mylan was able to leverage the exclusionary restrictions it secured at some of the largest PBMs and use them to foreclose patients that used other PBMs in the same geographic region from procuring an Auvi-Q.[268] The net effect of doing so was to increase Mylan's entrenched share throughout the market.

135.     There are several factors that contribute to this spillover effect, but perhaps the most important is that HCPs write prescriptions based in part on what products they know are available to all of their patients. Since patients are insured by a multitude of plans, it is a challenge for HCPs to take into account the formulary options for each patient when prescribing an EAI. ██████████ ████████████████████████████████████████████████ As a result, if one or more large plans in a region have excluded Auvi-Q and only make EpiPen available, HCPs will tend to prescribe EpiPen to other patients in the region, even if the health plans for those patients provide equal or even preferred access to Auvi-Q (or other competing EAIs).

136.     Mylan was well aware of the importance of these spillover effects.  As explained by Bruce Foster, the National Account Director for Mylan, ████████████████████████████ ████████████████████████████████████████████████████ Stated in more formal economic terms, this spillover effect creates an externality in which negotiating a preferred position at one large PBM will tend to increase sales made through other

---

[267] MYEP00304665.

[268] See MYEP00257151 ████████████████████████████████████ ███████████████████████████████████████████████████████

[269] MYEP00892918 at 919; Byrne Dep. at 244 ("So I've seen spillover discussed in the negative context of if a product is restricted on a number of plans or not covered by a number of plans, then prescribers might prescribe the product that is covered rather than try to deal with the coverage determination for the one that is not covered."); Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) at ¶ 45.

[270] Foster Dep. at 278. See also MYEP00100131 at 136 ████████████████████████████ ████████████ MYEP00623587 at 588 ████████████████████████████████████████ █████████████████████████████████████; MYEP00119242 at 246 ████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PBMs in a region.[271] One Mylan document ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ As described by one

Mylan Regional Account Manager, ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

137.    The spillover effect operates in part because formulary decisions are observed both by

physicians and other PBMs.[274] As Mr. Foster observes, █████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ This contributes to the tendency for physicians to prescribe the products that

have exclusive positions at the largest PBMs in a region. █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ All told, these spill-over effects serve to discourage HCPs from

learning about new competitive products, as they continue to default to what they know is widely

available.  And once HCPs are conditioned to stick with the entrenched product (and avoid new

products), the window for widespread adoption of new products quickly closes.

### 2. Empirical evidence of spillover effects

138.    To ascertain whether, in fact, these spillover effects were significant, I performed an

empirical analysis.  Using industry standard data from MMIT and IQVIA detailing prescription

volumes by plan and formulary status from January 2013 to October 2015 (the period during which

---

[271] For example, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ MYEP00464046.

[272] MYEP00140812 at 838.

[273] MYEP00611547.

[274] Foster Dep. at 60. ██████████████████████████████████████████

[275] Foster Dep. at 289.

[276] Willing Dep. at 185-86; see also MYEP00256575 at 579, ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Auvi-Q was on the market), I statistically analyzed whether the Auvi-Q shares for one plan in a state depend on the statewide Auvi-Q Commercial and Medicare/Medicaid prescription shares of all EAI prescriptions in the previous month. This regression accounts for a plan's EpiPen and Auvi-Q formulary statuses, the state in which the plan operates, the PBM that the plan belongs to, and changes over time.  Comparing plans across states while holding other determinants fixed allows me to ascertain whether a plan in a state with a higher lagged state-level Auvi-Q share has a higher Auvi-Q share than similar plans in other states.  On average, among commercial plans, a 10 percentage point increase in the lagged state-level Auvi-Q share generates around a 6 to 9 percentage point increase in plan-level Auvi-Q shares.  These results are statistically significant. The Appendix discusses the methodology and results in more detail.  This result demonstrates that in states where Mylan was able to restrict access to Auvi-Q at the leading PBMs in the state, the Auvi-Q share fell on average across PBMs in the state.

### 3. Messaging to HCPs

139.    As part of its efforts to increase non-contestable demand,



The same document

This strategy was put into practice.  For example, after successfully excluding Auvi-Q from the United Healthcare formulary,

---

[277] MYEP00252719

[278] MYEP00100131 at 144.
[279] MYEP00100131 at 137.
[280] MYEP00756222 at 224.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



140.    This messaging had its intended effect.

141.

281 MYEP00451143.
282 MYEP00892918 at 919.
283 MYEP00100131 at 146. See also MYEP00613820

.
284 MYEP01099685.
See also
Jones Dep. at 42

Jones Dep. at 215-16

MYEP00604317

MYEP00239355

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

███████████████████████ Mylan thought this message would be the best way to counter what its market research showed were favorable physician reactions to Auvi-Q attributes.[286]

142.    As an example of the effectiveness of these formulary tools for communicating with HCPs that was shared among EpiPen's management team, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ ██████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ █████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

*4.  Deceptive marketing to HCPs*

143.    Mylan did not only tout its superior formulary placement to HCPs in an effort to further entrench EpiPen's market share, but it also ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████ Mylan had no basis for making this claim, ██████████████████

---

[285] MYEP00548252 at 256 (slide 9).
[286] See MYEP00734988 ██████████████████████

████████████████████████████████████████████████

██████████████████████████████████

[287] MYEP00667337 at 338.
[288] *Id.*
  MYEP01206017 at slide 2-3; MYEP00162485, at slide 2.
[289] MYEP00667337.
[290] MYEP00305511. See also MYEP00253140 ██████████████████

████████████████████████████████ MYEP00892918 ███

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ MYEP00252719 ████████████████████

████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████ This deceptive marketing messaging helped to ensure that HCPs would be reluctant to write Auvi-Q prescriptions once prominent PBMs started giving preferential formulary placement to EpiPen.  After observing the decline in Auvi-Q share in the beginning of 2014 due to the exclusionary formulary restrictions noted above, one Mylan regional sales manager relayed the news to his sales team: ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ This concern about HCPs interpreting lack of access as evidence of concerns about safety or efficacy was noted by Mylan in its opposition to West Virginia excluding EpiPen from its Medicaid formulary, yet it had no qualms about taking advantage of these effects when it stood to benefit from them.[293]

     *5.  Spillover effects from exclusives with government programs to commercial plans*

144.    In order to generate additional spillover effects that increased EpiPen's entrenched market share in commercial plans and prevented Auvi-Q from getting established in the market, Mylan sought to have Auvi-Q excluded from Medicaid and Medicare Part D formularies.[294] This strategy recognized that there are spillovers from government program coverage to commercial coverage: to the extent that Auvi-Q was not available for Medicaid and Medicare enrollees, that would make HCPs less likely to prescribe Auvi-Q for all their patients, and in particular for commercial patients. As Tim Miller, a Mylan Vice President of Sales and Commercial Operations, explained ████████████

---

[291] Korczynski Dep. at 81-82 ████████████████████████████████████
████████████████████ Graham 30(b)(1) Dep. at 178-79 ████████████████████████████
████████████████████████████

[292] MYEP00450839.

[293] Bresch Dep. Ex. 47 (Graham Affidavit at ¶12) ("Additionally, if EpiPen® is removed from the "preferred" category of the EAI therapeutic class on the West Virginia preferred drug list, I believe that some medical professionals, absent sufficient explanation to the contrary, will erroneously presume that its replacement in the "preferred" category, Auvi-Q®, is safer or more effective than EpiPen®. This presumption would result in substantial harm to Mylan Specialty's reputation and goodwill.").

[294] Because of the misclassification of the EpiPen, Mylan was able to further tilt the playing field in its favor when negotiating with government programs (as Auvi-Q was not misclassified), making it even easier for Mylan to obtain an exclusive position, generating further spillover effects to commercial plans. MYEP00082769 ████████████████████████████████████████████
████████████████████████████████████████████████████ Brown Dep. Ex. 19 ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████████████

████████████████████████ As with its deceptive marketing tactics, Mylan once again cited this spillover effect to commercial customers when opposing West Virginia's attempt to get EpiPen excluded from its Medicaid formulary, yet, once again, it had no qualms about taking advantage of the effects when it stood to benefit from them.[296]  My empirical analysis of Auvi-Q's share across plans and states, as discussed in detail in the Appendix, demonstrates that there was in fact a spillover effect from exclusion on Medicaid/Medicare formularies that reduced Auvi-Q's share on commercial plans in the same state.

145.     Two characteristics of the government programs made exclusivity a particularly effective tool to foreclose Auvi-Q.  First, patients enrolled in Medicaid and Medicare could not use co-pay coupons to reduce their out-of-pocket cost; coupons are an illegal kickback in that context.[297]  Thus those patients would bear the full cost of higher co-pays from Auvi-Q being in a disadvantaged formulary position.  As Mylan's National Account Director wrote in an internal email, ████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████[8]  He goes on to say, ████████████████████ ████████████████████████████████████████████ In addition, being excluded from Medicaid is particularly significant given that about half of Medicaid enrollees are children.[300] As Mylan recognized when designing and implementing its school program, young anaphylaxis patients who are first trained and equipped with EpiPens are more likely to continue to use EpiPens rather than competing products.

### 6. Co-pay coupons

146.     In a further effort to expand the degree to which there is non-contestable demand, Mylan began to use $0 co-pay coupons, which eliminated the cost to patients of buying EpiPen on the

---

[295] MYEP00610781 at 782-83.
[296] Bresch Dep. Ex. 47 (Graham Affidavit at ¶13) ("I further believe that EpiPen® will lose market share among other West Virginia users of EAIs as a result of changes to EpiPen's® status on the West Virginia preferred drug list.").
[297] Office of Inspector General, "Pharmaceutical Manufacturer Copayment Coupons," Department of Health and Human Services (September 2014), https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/sab_copayment_coupons.pdf.
[298] MYEP00624305.
[299] Id.
[300] See Medicaid.gov, "October 2018 Medicaid & CHIP Enrollment Data Highlights," https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

preferred formulary tier.  The timing of the launch of this program was no coincidence – the coupons were first made available in April 2013, a few months after the launch of Auvi-Q.[301] Mylan had not used $0 co-pay coupons for EpiPen previously.[302]  These coupons served to further entrench EpiPen's market share by increasing the cost to PBMs from rejecting an all-or-nothing offer from Mylan. If the PBM refused to exclude Auvi-Q, and, as a result would not be able to offer EpiPens, then customers who had been using Mylan's $0 co-pay coupon would no longer be able to get free (to the patient) EpiPens. As described by Mylan in its communication to its sales team



Mylan's strategy shows how the deployment of coupons for the end consumer allows a manufacturer to defeat the PBM's attempts to create price competition with a rival treatment.

147.    In addition to further entrenching Mylan's market share, the $0 co-pay coupon program also served to raise Sanofi's costs.  These co-pay coupons put Sanofi at a cost disadvantage relative to Mylan, given Mylan's success in getting preferred formulary positioning for EpiPen.  Sanofi could (and eventually did) offer its own $0 co-pay coupon, but because Auvi-Q was often on a higher formulary tier, the cost to Sanofi from the $0 coupon program was substantially higher per customer than the cost to Mylan.[304] Moreover, because of Mylan's strategy of getting PBMs to agree to exclude Auvi-Q, rather than just putting Auvi-Q on a less preferred tier, Sanofi was often not able to get around the impact of formulary positioning with its own co-pay coupon.

[301] Mylan, "Mylan Specialty L.P. Announces 25th Anniversary Celebration of EpiPen® (epinephrine) Auto-Injector" (April 25, 2013), http://newsroom.mylan.com/press-releases?item=122761; Graham 30(b)(1) Dep. at 185. ███████████████████; see Graham 30(b)(6) Dep. at 245.

[302] Mylan's Second Amended Responses and Objections to Plaintiffs' First Set of Coordinated RFAs, RFA Response No. 49 (Mylan admitting that in 2013 it "announced co-pay assistance programs for EpiPen products."); *Id.* at No. 48 (Mylan unaware of whether it offered co-pay assistance prior to 2013); Graham 30(b)(6) Dep. at 240 ("Q. Mr. Graham, I want to turn to Mylan's co pay program.  The zero dollar co-pay program, in particular, when did that begin? A. I think we established yesterday the document we looked at was early 2013.").

[303] MYEP00756222 at 223.

[304] SAN-EPI-0376550; Whitaker Dep. at 108-09; Guenter Dep. at 156.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 7. Exclusionary restrictions in the EpiPen4Schools program

148.    Mylan's exclusionary strategy to further entrench EpiPen's market share and raise Sanofi's cost of countering Mylan's exclusionary discounting is also reflected in Mylan's EpiPen4Schools program. That program offers two two-packs of EpiPens to qualifying schools, in an effort to ensure that children have access to EAI devices in the event of a life-threatening allergic reaction.[305] Part of the motivation for launching the effort to get EpiPens in schools ████████████████████████████
████████████████████████████████    As with the co-pay coupon program, the timing of the EpiPen4Schools program was no coincidence.  Sanofi issued its press release announcing FDA approval of Auvi-Q on August 13, 2012.[307] The following day, Mylan rolled out the EpiPen4Schools program.[308] Mylan's effort got a boost from passage of the *School Access to Emergency Epinephrine Act*, which gives preferential federal funding to states that required or recommended that schools stock EAI devices, which nearly every state now does.[309] The EpiPen4Schools program also made additional pens available at a discounted rate to schools, but to get the lowest rate, the school had to sign a form certifying that it will not purchase any competitive EAI devices – including Auvi-Q – during the next twelve months.[310]

---

[305] See Mylan's description of the EpiPen4Schools program, available at https://www.epipen4schools.com/. Note that Mylan has similar programs with other places frequented by children. For example, Mylan and Walt Disney entered an agreement to make EpiPens available at Disney theme parks and cruise ships. See Mylan's press release, "Mylan Signs Strategic Alliance Agreement with Walt Disney Parks and Resorts to Enhance Access to EpiPen® (epinephrine) Auto-Injectors," Mylan.com (Nov. 7, 2014) available at http://investor.mylan.com/news-releases/news-release-details/mylan-signs-strategic-alliance-agreement-walt-disney-parks-and

[306] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ MYEP00454423

[307] Sanofi, "Sanofi Announces FDA Approval for Auvi-Q™, First Voice-guided Epinephrine Auto-injector for Patients with Life-threatening Allergies" (Aug. 13, 2012), http://www.news.sanofi.us/press-releases?item=131480.

[308] Mylan, "Mylan Specialty Offers Free EpiPen® (epinephrine) Auto-Injectors to Schools Nationwide" (Aug. 14, 2012), http://newsroom.mylan.com/press-releases?item=122583.  See also Graham 30(B)(6) Dep. at 107.

[309] See Jayne O'Donnell, "Family Matters: EpiPens Had High-Level Help Getting into Schools," *USA Today* (Sept. 21, 2016), http://www.usatoday.com/story/news/politics/2016/09/20/family-matters-had-help-getting-schools-manchin-bresch/90435218.

[310] Full House Committee on Oversight and Government Reform, *Hearing on Reviewing the Rising Price of EpiPens* (Sept. 21, 2016), https://www.govinfo.gov/content/pkg/CHRG-114hhrg24914/pdf/CHRG-114hhrg24914.pdf, at 47. See also MYEP0090087 at 89 ███████████████████████████████████████
███████████████████████); Graham 30(b)(6) Dep. at 119-20 ████████████████
████████████████████████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

149.     Access to schools is important given the spillover effects discussed earlier. Parents have an incentive to use the same EAI device that is available at schools to help ensure a rapid and effective response should their children have an allergic reaction while at school.[311] The same incentive applies to school officials, who know that many of their students have prescriptions for and are familiar with EpiPen, and have an incentive to ensure that EpiPens are available at their school. Mylan's own market research indicated that ███████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Mylan's own review of the EpiPen4Schools program described it as ███████████████████

█████████████████████████

150.     The EpiPen4Schools program could have facilitated stocking EpiPens (particularly for large schools needing more than the four free EpiPens provided as part of the EpiPen4Schools program) by making them available at a discounted rate without any restriction on purchases from competing brands. Mylan could also have incentivized purchasing additional EpiPens by offering a volume discount, in which the price per pen decreases as the school buys more pens. However, Mylan instead chose to use a contract that reference rivals, making the discounted price available

---

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

[311] MYEP00454423 at 424 ███████████████████████████████████████

███████████████████████████████████████████

[312] PFE_EPIPEN_AT00540538 at 542. ██████████████████████████████████████

                                                    PFE_EPIPEN_AT00540545 at slide 38.
[313] MYEP01193655 at slide 19 ██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

only if schools obtain 100% of their EAI requirements from Mylan.[314] This restriction furthered Mylan's goal of preventing Sanofi from expanding the footprint of Auvi-Q in the EAI market.[315]

### D. MYLAN'S ENTRENCHED SHARE OF THE EAI MARKET WAS BETWEEN ████ ████



151.    This array of exclusionary strategies by Mylan were effective in raising the entrenched share for EpiPen, making it prohibitively costly for Sanofi to expand its footprint in the EAI market. As discussed above, evidence from various sources indicates that in the 2013-2015 timeframe, while Sanofi was trying to expand its competitive presence, Mylan had an entrenched share in the range of ████ of the EAI market.

152.    As discussed in greater detail above, the 50-70% range is consistent with information in the record.  On the Medicaid/Medicare side, the evidence indicates that the entrenched share for EpiPen was at least ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ An entrenched share of at least ████ is also consistent with the view of a physician ███████████████████████████████████████████████████████████

Since Medicaid serves low income patients that will generally be more price sensitive than the overall commercially insured population, the entrenched share for commercial payers should be higher than it is for Medicaid customers.  Moreover, ███████████ range was based on Mylan's experience before it engaged in the above-discussed conduct aimed at further entrenching its market share.  As a result, the entrenched EpiPen share after this conduct took place must be higher than ████

153.    On the commercial side, the data from the few instances in which EpiPen was excluded from a small, highly managed formulary after Mylan engaged in the variety of tactics noted above to

---

[314] The exclusionary contract form chosen by Mylan is actually less effective than a volume discount program would be in inducing additional purchases of EpiPens. A volume discount lowers the marginal price for additional EpiPen purchases, whereas the exclusionary restriction used by Mylan only raises the marginal price for purchases of competing products.

[315] MYEP00219125 at 142 ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

[316] MYEP00254218 at 219. Note that, to the extent that the Medicaid population is more price sensitive than the commercially insured population, the entrenched share would tend to be larger for commercial plans.

[317] Brown Dep. Ex. 6 at 64 ███████████████████████████████████████

███████████████████████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

further entrench its market share indicate that the entrenched share is considerably more than
███ In the case of an ████████████████████████████████████████████████████
████████████████████████ An internal Mylan email ███████████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████████████ My own analysis of EpiPen's share at the
two CVS formularies███████████████████████████████████████████ shows that
the EpiPen share was even higher –█████████████████████████████████████████
████████████████████████████ Based on this evidence, I believe a reasonable range for the
EpiPen entrenched share for commercial payers is ████████

154.    In the next section, I demonstrate how the two aspects of Mylan's anticompetitive course of
conduct – its exclusionary rebates coupled with its entrenched market share – resulted in a
substantial burden on Sanofi and made it all but impossible for Sanofi to compete in the U.S. EAI
market.

## VIII. MYLAN SUCCESSFULLY FORECLOSED COMPETITION FROM AUVI-Q

### A. MYLAN OFFERED EXCLUSIONARY REBATES THAT SANOFI COULD NOT REALISTICALLY OVERCOME

155.    Because of the hurdle created by Mylan's entrenched share, in most cases Sanofi could not
overcome the rebates offered by Mylan that were conditional on restricting Auvi-Q's formulary
access.  To entice PBMs to reject Mylan's rebate proposal, Sanofi had to offer discounts on its own
limited share of the market███████████████████████████ Indeed, Sanofi even had to
go so far as to offer rebates on one of its most successful products –████████ – just to entice ESI to
remove it from its exclusion list.[322]  In short, Mylan's anticompetitive course of conduct aimed at
████████████████████████████ worked exactly as Mylan intended – it substantially limited Sanofi's
access to the EAI market before Sanofi was able to secure a meaningful share of that market.  As a

---

[318] MYEP01246195.
[319] MYEP00531461.
[320] May Dep. at 250-252.
[321] MYEP00000614███████████████████████████████████████████████
███████████████████ MYEP01278441 at 444.
[322] See SAN-EPI_A-0035816 (An internal Sanofi email states:████████████████████████
██████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

result, Mylan was able to eliminate the competitive threat posed by Auvi-Q before it got off the ground.

156.    That Mylan's exclusionary course of conduct would work was no surprise to Mylan, as it was well aware that Sanofi could not overcome Mylan's exclusionary discounts with its own discounts. A Mylan review of the EAI market landscape reports, ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ An internal Mylan email exchange ████ ████████████████████████████████████████████████████ And, as noted above, ██████ ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ In short, because of Mylan's entrenched share, there is simply nothing that Sanofi could do to overcome the exclusionary discounts offered by Mylan.

157.    Sanofi, for its part, after it began to recognize what Mylan was up to, did its own analysis of what level of rebate it would take for a PBM to benefit financially by accepting Sanofi's rebate offer instead of Mylan's, taking account of Mylan's entrenched market share.[326] The analysis and conclusion is reproduced below. ██████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████

---

[323] MYEP00245085 at 117. See also MYEP00213251 at 255 ██████████████████████████████

[324] MYEP00619261.

[325] Foster Dep. Ex. 4.

[326] PS0236464 at 471.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

158.     To illustrate how entrenched market share and rebates contingent on exclusivity offered by a monopolist impede rivals from competing, consider the following simplified example: suppose the list price for a two-pack of EAI devices is $500, and that demand for a particular plan is 1,000 EAI prescriptions per month.  EpiPen offers a package of rebates, fees, and price protection equivalent to a 30% discount off the list price, contingent on excluding all other rivals. Finally, assume that, if

---

[327] At the time this analysis was conducted (December, 2013), as shown earlier in the slide presentation, Auvi-Q had a national market share of less than 13%. PS0236464 at 467.

[328] This conclusion was confirmed by Bryan Downey, a former Sanofi vice president and brand leader of Auvi-Q.  I spoke with him to ensure that I understood Sanofi's assessment of its prospects in overcoming Mylan's exclusionary rebate offers.  He confirmed that because of Mylan's dominant share and the stickiness of the demand for EpiPens, there was no way for Sanofi to overcome Mylan's exclusive offers by offering higher Auvi-Q rebates (or price protection).  It was because of this realization than Sanofi began to explore offering rebates on Lantus just to get off exclusion lists.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the plan accepts the rebate offer, EpiPen will get a 100% share of EAI devices sold through the plan. If the plan accepts the rebate offer, the total discount off list price for EAI devices will be 30% × $500 × 1000 = $150,000.

159.    Suppose that Sanofi attempts to offer its own discount contingent on exclusivity. If the offer is accepted, assume that Auvi-Q will capture the entire contestable share of the market.[329] However, EpiPen will retain the non-contestable share.  If the contestable share is 50% of the market (implying a non-contestable share of 50% - a share at the bottom of the range noted above), Sanofi will sell 50% × 1000 = 500 prescriptions at its discounted price, while Mylan will sell the remaining 500 prescriptions at full price.  The plan will not accept Sanofi's offer unless its total cost for EAI devices stays the same or is lower than the cost it would incur from taking the EpiPen offer. This requires the total discount on Auvi-Q to be at least $150,000.[330] That requires a per pack discount of $150,000 / 500 = $300 per unit, or 60% off the list price.  Because of the entrenched market share for EpiPen that Sanofi cannot obtain in the first year of business, Sanofi has to offer double the discount (60% versus 30%) to compete for the plan's business.

160.    The example above assumed that EpiPen would capture 100% of EAI demand by excluding Auvi-Q.  In practice, Auvi-Q would capture some share even if excluded; documents indicate that Auvi-Q retained roughly 6% of EAI sales even after being excluded from formularies.[331] Suppose that EpiPen would capture 94% of the market, rather than 100%, if its 30% exclusionary rebate is adopted by the plan, but other assumptions are the same and a plan qualifies for the large discount at 94%.  Under Mylan's rebate, the total discount off list price for EAI devices will be 30% × $500 × 94% × 1000 = $141,000 (since the remaining 6% of Auvi-Q sales are made at no discount.).  To produce an equivalent discount across the 500 packs of Auvi-Q sold under an exclusive offer from Sanofi, the discount per unit would need to be $141,000 / 500 = $282, which is 56% off the $500 list price.  This demonstrates that, when the formulary exclusion of Auvi-Q is less effective at eliminating Auvi-Q sales, the burden on Sanofi to counteract the Mylan discount is not as large, although it is still very much present. Conversely, the more effective the restriction is in reducing Auvi-Q sales, the greater the burden on Sanofi and the more difficult to counteract the effect of the

---

[329] In reality, Auvi-Q would not secure the entirety of the contestable share.  Were this assumption relaxed, it would be even more difficult for Sanofi to overcome Mylan's exclusionary rebate offers.

[330] Matching the total discount typically would not be sufficient to win the plan's business, since, as discussed earlier, there will be an administrative cost to the PBM of switching patients who had been using EpiPen over to Auvi-Q.

[331] See, for example, PS0236464 at 467; SAN-EPI-0031115.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

exclusionary discount. This is consistent with Mylan trying to get prior authorization and step edits on Auvi-Q rather than simply placing Auvi-Q on a less preferred tier, and putting even more value on getting a complete block on Auvi-Q.[332]

161.     The two examples just computed are shown in the first two rows of Table 3. Both rows assume that Mylan offers a 30% discount for exclusivity and that the contestable share of the EAI market is 50%. The first row assumes that EpiPen captures 100% of the market if Auvi-Q is excluded. The rebate that Sanofi has to offer to give the buyer the same total discount is 60%.

**Table 3: Computing the Effective Entrant Burden**

| Incremental Exclusivity Discount | EAI Contestable Share | EpiPen Share when Auvi-Q is Excluded | Effective Entrant Burden |
|---|---|---|---|
| 30% | 50% | 100% | 60.0% |
| 30% | 50% | 94% | 56.4% |
| 30% | 30% | 100% | 100.0% |
| 30% | 30% | 94% | 94.0% |
| 20% | 50% | 100% | 40.0% |
| 20% | 50% | 94% | 37.6% |
| 20% | 30% | 100% | 66.7% |
| 20% | 30% | 94% | 62.7% |

Scott Morton and Abrahamson (2017) show that this rebate, which they refer to as the Effective Entrant Burden ("EEB"), is found by the formula:

$$EEB = \frac{(\text{exclusionary rebate \%}) \times (\text{share with exclusion})}{(\text{contestable share})}. [333]$$

162.     In the second row, the share with exclusion is 94%, and the EEB drops to 56%. The remainder of Table 3 shows the impact of changing the other two determinants of the EEB. First, a

---

[332] See, for example, MYEP00604924█████████████████████████████████████
████████████████ Jones Dep. at 273 ████████████████████████████
████████████████████ ; MYEP00362912 ██████████████████████████
█████████████████████████████████████████████████████████████
████████████████████ ; MYEP00000909 at 919 █████████████████
█████████████████████████████████████████████████

[333] Fiona M. Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework For Loyalty Rebates," 81 *Antitrust Law Journal* 777, 816-19 (2017).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

contestable share of 50% is consistent with an entrenched market share of 50%. As discussed above, the entrenched share for EpiPen is between 50% and 70%. If the entrenched share is 70%, the corresponding contestable share is 30%. The third and fourth rows of Table 3 show that with a 30% contestable share, the EEB increases to 100% when the share with exclusion is 100%, and to 94% when EpiPen's share with exclusion is 94%. Thus, at the high end of the range for EpiPen's entrenched market share, Sanofi would have to sell Auvi-Q at a price at or very close to zero (clearly not covering its costs) before the plan would consider replacing Mylan's exclusionary offer with an offer from Sanofi.

163.     The remaining rows of Table 3 show the impact of changing the other determinant of the EEB, which is the discount offered by Mylan. In many cases, the incremental discount for exclusivity offered by Mylan was about ███, but this discount does not account for the other benefits offered by Mylan, including, most notably, price protection.[334] Price protection typically capped the annual price increase at ███, whereas the list price normally increased by twice that much.[335]  Thus a ███ rebate, as assumed in the top four rows of the table, is a reasonable approximation of the total value of rebates, administration fees, and price protection. Nevertheless, the remainder of the table shows what the EEB would be if the exclusionary rebate was 20%. As one would expect, if Mylan reduces its discount offer, then Sanofi need not offer as large a discount to have its offer accepted by the plan.  By contrast, if Mylan increased its discount offer, then Sanofi would need to offer an even larger discount to have its offer accepted by the plan.

164.     These EEB calculations demonstrate that the exclusionary rebates used by Mylan could not be effectively countered by Sanofi by offering similarly sized rebates.  Rather, the conditional structure of the rebates and the substantial non-contestable share for EpiPen required Sanofi to offer much higher rebates just to try to forestall being excluded from PBM formularies.

165.     To see how this played out more concretely, consider, for example, the negotiations with Express Scripts Holding Company (ESI) – the largest PBM organization in the United States, with roughly 90 million covered lives during the period at issue.[336] The terms that Mylan negotiated with

---

[334] As discussed earlier, the all-or-nothing rebate offered to Express Scripts for 2014 was about 20%. As a second example, ████████████████████████████████████████ ███████████████. MYEP00494011. ██████████████████████████████████████ ████████████████████████████████████

[335] See, for example, MYEP00593648. ████████████████████████

[336] MYEP01143633 at slide 5.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

ESI in 2013 to take effect January 1, 2014 ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

166.     The EEB measure applied to the terms of this contract between Mylan and ESI indicates the extent to which Mylan exploited its entrenched monopoly power to distort competition with Sanofi to capture the ESI business. The discount offered for an exclusive position varied somewhat across the various ESI formularies, but was generally around ████ [338] In addition, Mylan offered price protection.  When combined with the rebate, the overall value of the Mylan discounts (rebate, plus price protection of ████ was approximately ████.[339]  With respect to non-contestable share, as noted above, ████████████████████████████████████████████████████

████[340] so it reasonable to assume that the non-contestable shares for other Express Scripts formularies (which will tend to have less ability to switch customers) are around ████, implying a contestable share of ████ Moreover, the average Auvi-Q share across all ESI formularies was around █████[341] so it is reasonable to assume that when excluded, Auvi-Q's share would be far less than ████ For ease of analysis, I conservatively assume that the Auvi-Q share when excluded would be 6%. With a Mylan discount of ████, a contestable share of ████, and an EpiPen share of ████ when Auvi-Q is excluded, the EEB, as shown in Table 3, is ████.  As a result, in order to make it in ESI's interest to not exclude Auvi-Q, Sanofi would have had to offer a discount of at least ████ – almost the entire value of the product – and a discount that is more than three times as high as that offered by Mylan.

167.     Given the above, it is no surprise that Mylan was, in fact, able to obtain the exclusive position it sought.  An internal Mylan email in September 2013 stated, ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████

---

[337] MYEP00000926, ████████████████████████████████████████████

████████ (Jan. 1, 2014).
[338] MYEP00000926 at 928-9.
[339] Id.
[340] MYEP00531461.
[341] SAN-EPI-0002512 at 518-19.
[342] MYEP00377967, ████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

168.    As a second real-world example, consider Mylan's negotiations with Aetna – a large national health insurer that, in the period at issue here, negotiated formulary coverage for EAI products directly with suppliers.  Mylan and Aetna negotiated an agreement effective January 1, 2014 that gave EpiPen exclusive coverage on the preferred brand tier.  Unlike the prior agreement with Aetna, this agreement ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████   ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████   ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  In other words, Mylan's exclusionary rebates coupled with its array of strategies to increase its entrenched share of the market meant that Sanofi would have to offer a discount of ████ to counter Mylan's discount of ████ to Aetna – or a discount more than three times as high as that offered by Mylan.

169.    Notice that if Mylan wished to use price as a competitive weapon against the entrant – something that would benefit consumers and would be a procompetitive response to competition – it could easily have done so by offering a ████ discount without reference to Auvi-Q.  Then Sanofi would have determined what discount they wanted to offer in response, and competition on this level playing field would generate both choice and low prices for consumers.

## B.  MYLAN'S ANTICOMPETITIVE COURSE OF CONDUCT WAS SUCCESSFUL

170.    As discussed previously, Mylan's overarching intent was to block competition from Auvi-Q, in order to maintain EpiPen's monopoly share and pricing.  One aspect of Mylan's conduct involved strategies, such as EpiPen4Schools, the $0 co-pay coupon, and messaging to HCPs, that would increase EpiPen's entrenched market share. The other was to take advantage of the entrenched market share in order to win formulary restrictions at individual PBMs. These wins not only contributed to EpiPen's overall sales, but also created spillover effects that further entrenched EpiPen's market share.

---

[343] MYEP00086244, Seventh Amendment to the Manufacturer's Discount Agreement Between Aetna and Mylan [FULLY EXECUTED] (Jan. 1, 2014) ███████████████████████████████████████████
████████████████████

[344] MYEP00086244.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

171.     While Mylan did not succeed at excluding Auvi-Q at every formulary, it did get exclusionary restrictions in a large share of the overall market, which allowed Mylan to preserve its market power and profits in the EAI market.  When Auvi-Q was first introduced, many PBMs did not manage the EAI class, while others had a normal practice of adding new products to their formularies on a high co-pay tier.[345]  Thus, with many PBMs, Mylan's first real opportunity to exclude Auvi-Q was in the negotiations that took place throughout 2013 for 2014 formulary status. In addition, in 2013, before many exclusionary contracts went into effect, Auvi-Q was performing well – exceeding Mylan's own projections of how well it would do, and eating into EpiPen's profits at a faster rate than expected.[346]  As a result, Mylan bolstered its efforts to secure exclusive agreements with PBMs to put a stop to Auvi-Q's growth.[347]  As described earlier, Mylan actively tracked the progress of these negotiations in excluding Auvi-Q from formularies, and trumpeted the growing share of covered lives whose formularies would not cover Auvi-Q in 2014.[348]



[345] Minton Dep. at 278-79 ███████████████████████████████
███████████████████████████████ Cunico Dep. at 24-25 ██████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████ Hall Dep. Ex. 7, Third Amendment to Mylan Contract dated Apr. 1, 2013 (MYEP0087486): ████████
███████████████████████████████████

[346] Bresch Dep. Ex. 41 ██████████████████████████████
████████████████████████ Bresch Dep. at 382-83 █████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

[347] Byrne Dep. Ex. 3 (PS0077861) ██████████████████████
██████████████████████
; Jones Dep. Ex. 23 ██████████████████
████████████████████ York 30(b)(1) Ex. 2 ████████████████████
██████████████████████████████████████████████████████████████
████████████████ Jordan 30(b)(1) Dep. Ex. 10 (HUM004351) (Jordan writing, ████████████████

[348] Graham 30(b)(1) Dep. Ex. 18 at MYEP00194705 ████████████
██████████████████████████ Arcara Dep. Ex. 18 ████████████████
██████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

172.    Figure 10 shows the share of covered lives in formularies that had Auvi-Q preferred, non-preferred, not covered, or not listed in the third quarter of 2013, 2014, and 2015.[349] In 2013, Auvi-Q was not covered in formularies representing about 29% of the covered population. That number jumped to 51%, or more than half of the covered population, in 2014.  Sanofi was able to reduce that figure somewhat in 2015, but Auvi-Q was still not covered for over 40% of the population.

**Figure 10: Formulary Status for Auvi-Q by Year**



Notes: "Preferred" includes Generic and Preferred formulary statuses. "Non-Preferred" includes Covered and Specialty formulary statuses. "Not Covered" includes formulary statuses designated as Not Covered and any formulary status indicating Step Therapy or Prior Authorization ("PA/ST").

Source: MMIT Data

173.    Although Sanofi was able to procure better formulary coverage in 2015, both in terms of getting covered by the formularies and moving onto a preferred tier, and net prices for the EpiPen dropped for the first time (although they still remained above early 2013 levels),[350] in many ways the damage had already been done: Mylan successfully used its panoply of exclusionary strategies to entrench its market share so that, even when Auvi-Q's formulary status improved, it was difficult to make meaningful inroads into the market.  For example, HCPs had been trained not to prescribe Auvi-Q in 2014 because of the callbacks those prescriptions would generate, and many did not



Graham 30(b)(1) Dep. Ex. 5, slides 12-21

Graham 30(b)(1) Dep. Ex. 18, slide 3

[349] There are several reasons to compare only the third quarter of each year, rather than the full year: the comparison is not impacted by the ramp-up period in the first half of 2013 following the entry of Auvi-Q in the beginning of year; it is also not impacted by the withdrawal of Auvi-Q in the fourth quarter of 2015; and it is unaffected by the seasonal variation in EAI demand over the course of the year.

[350] See Figure 8.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

immediately change their prescribing behavior in 2015.[351]  Meanwhile, many schools that had been deterred by exclusionary contracts from stocking Auvi-Q continued to buy EpiPen, as did their students who opted to buy EpiPen because of availability at their schools.[352]  In short, ███████  ███████████████████████████████████████████████████  Auvi-Q never stood a chance of succeeding in the market, even after Sanofi went to extreme lengths that resulted in some, albeit still limited, favorable formulary positions.

## IX.  MYLAN'S CONDUCT IS NOT COMPETITION ON THE MERITS

### A. EXPLOITING ENTRENCHED MARKET SHARE THROUGH EXCLUSIONARY REBATES

174.    The range of exclusionary strategies employed by Mylan were effective in putting up artificial barriers to Auvi-Q market-wide. Mylan took actions that increased its entrenched share of the EAI market, and used its entrenched share along with the enticement of rebates and price protection to extract formulary restrictions at PBMs that made it increasingly difficult for Sanofi to compete for customers across the U.S.  That Mylan adopted this anticompetitive strategy of using its monopoly power to foreclose Auvi-Q from the marketplace is particularly surprising given that its senior executives ████████████████████████████████████████████



[351] Korczynski Dep. Ex. 23, Slide 5 ██████████████████████████ Patel Dep. Ex. 19 at MYEP00551696 ████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████

[352] Hadley Dep. Ex. 22, Slide 5 █████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████ Zinn 30(b)(1) Dep. Ex. 5, Slide 34 ██████████ Graham 30(b)(6) Dep. Ex. 15 at MYEP00454425 ██████████████████████████ Foster Dep. Ex. 4 ████████████████ ████████████████████████

[353] Graybill Dep. at 79 ████████████████████ ██████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

175.     Despite this apparent agreement from Mylan that its actions do constitute violations of the antitrust laws, I have nevertheless considered whether Mylan's actions could be considered as pro-competitive competition on the merits.  For the reasons I now discuss, they cannot.  Perhaps most critically, the rebates offered to PBMs by Mylan cannot be viewed as competition on the merits because, as shown above, Mylan's choice of contract type leveraged its entrenched share to make it prohibitively costly for Sanofi to offer pricing to PBMs that would overcome the financial benefit to PBMs from agreeing to exclude Auvi-Q.  As discussed by antitrust commentators and enforcers, conditional rebates used by firms with monopoly power can function as a tax on the output of smaller competitors.[354] To understand why this is so, consider the following: Suppose that in some market there was a substantial sales tax that customers had to pay on sales of an entrant, but not on sales by incumbent firms.  In order to make it worthwhile for a customer to buy the entrant's product, the entrant has to charge a commensurately lower price than the incumbent's price, so that the customer's total cost of the entrant's product is not higher than the customer's total cost of products of established firms. This is the mechanism of exclusion in the loyalty rebate used by Mylan. Because the entrant is effectively forced to charge a lower price, it is disadvantaged relative to established firms and does not compete on a level playing field.

176.     Of course, Mylan was free to lower price to its customers, and in that way benefit them, even if that conduct harmed Sanofi, provided it did so in a way that did not tilt the market in its favor. Mylan could have done so, but it chose not to.  For example, Mylan could have offered larger discounts on its product in an effort to compete without requiring exclusion of Auvi-Q.  Had it done so, the discount it offered on EpiPen purchases could be matched by Sanofi, or not, as dictated by the normal forces of competition playing out in a competitive market.  Moreover, such

_____

██████████████████████████████████████████████████████
██████████████████████████████
MYEP00232912 at 915 (Mylan Fair Competition Policy) ████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

[354] Joseph Farrell, Janis K. Pappalardo and Howard Shelanski, "Economics at the FTC: Mergers, Dominant-Firm Conduct, and Consumer Behavior," 37 *Review of Industrial Organization* 263, 267-68 (2010); Joshua D. Wright, "Simple but Wrong or Complex but More Accurate? The Case for an Exclusive Dealing-Based Approach to Evaluating Loyalty Discounts," Remarks at the Bates White 10th Annual Antitrust Conference (June 3, 2013) at 8 (n. 11), available at https://www.ftc.gov/sites/default/files/documents/public_statements/simple-wrong-or-complex-more-accurate-case-exclusive-dealing-based-approach-evaluating-loyalty/130603bateswhite.pdf; Scott Morton and Abrahamson (2017) at 786-87; Fiona M. Scott Morton, "Contracts that Reference Rivals," 27 *Antitrust* 72, 74 (2013).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

unconditioned discounts would have been attractive to a PBM regardless of EpiPen's entrenched market share. Had Mylan engaged in such a strategy, it would have been pro-competitive and not exclusionary.

177.    However, because of Mylan's exclusionary rebates, there is a cost to PBMs that want to give their customers access to Auvi-Q – they lose the rebate offered by Mylan on all EpiPen sales. Just as in the example above, this additional cost to buying Auvi-Q means that Sanofi must offer considerably lower prices (by offering much higher rebates) just to make it worthwhile to the PBM to even consider not excluding Auvi-Q. Because of EpiPen's entrenched market share, the situation is not symmetrical: there is a far smaller cost to PBMs if they forego an exclusionary offer from Sanofi and include EpiPen on the formulary. The "tax" imposed by Mylan's exclusionary rebates dramatically tilts the playing field against Sanofi, preventing competition on the relative merits of EpiPen and Auvi-Q. As indicated by the EEB calculations in the previous section, this tax impact on Sanofi as a result of Mylan's actions was substantial.

178.    As a result (and for all of the reasons discussed above), the actions of Mylan were plainly not procompetitive – to the contrary, they were clearly anticompetitive. Moreover, if actions along these lines were permitted, there is potential for significant harm to the competitive process in the pharmaceutical industry. Any entrenched monopolist would be able to pursue a strategy like that taken by Mylan here to ensure that innovative products that pose a meaningful challenge to their monopoly position are never able to gain a foothold in the market.[355] As a result, consumers would be deprived of choice, the benefits of innovation, and the benefits of actual competition between competing manufacturers.

## B. MYLAN'S CONDUCT DID NOT RESULT IN LOWER PRICES

179.    While the economics literature is filled with analyses of how price competition operates in different markets and situations, there are several general properties of markets characterized by price competition that are common throughout this literature. One is that if customers have better opportunities to switch between products, that leads to more intense competition and lower

---

[355] See, for example, Whitaker Dep. at 236-237 ("Q. And what's a new entrant with an innovative product supposed to do if they don't have a Lantus, faced with the [conduct like that taken by Mylan here]? A. They're in trouble. You take a little company, like the one that I lead today, if we come into the market and there's a product on the market that is – has an  exclusive position and we have nothing – we have no leverage, so we would be dead even before we started.").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

prices.[356] If firms compete for sales by bidding in a bargaining environment, then when buyers have more attractive alternatives, that puts buyers in a stronger bargaining position and leads to lower bids and lower prices.[357] In addition, prices are "strategic complements," meaning that if one firm lowers its price, other competitors generally have an incentive to lower their prices as well, while higher prices for one firm generally leads competitors to raise their prices.[358]

180.    When Auvi-Q entered the market, it should have given buyers a strong alternative to substitute for EpiPen. Under competition on the merits, that should have led to greater competition and lower prices. All else equal, the ability of PBMs to give Auvi-Q a preferred formulary position should increase the bargaining power of PBMs relative to Mylan and lead Mylan to offer lower net prices. Finally, the downward pressure when Mylan lowers the price on EpiPen should lead Sanofi to lower the price of Auvi-Q, and vice versa: under competition on the merits, lower prices for Auvi-Q should induce lower prices for EpiPen.

181.    However, because of the exclusionary rebates and other exclusionary strategies employed by Mylan, these benefits of price competition that should have been triggered by the entry of a significant competitor like Auvi-Q did not materialize. Customers had fewer opportunities to switch between EpiPen and Auvi-Q because of the actions Mylan undertook to limit formulary access to Auvi-Q and to increase the stickiness of EpiPen's installed base. Consequently, the entry of Auvi-Q did not trigger increased price competition, and, as shown in Figure 8, Mylan was able to keep its prices elevated above the level at the beginning of 2013 when Auvi-Q entered the market.

182.    When bargaining with PBMs, Mylan used its exclusionary rebates to limit the ability of PBMs to threaten to switch to Auvi-Q. As just discussed, the exclusionary rebates effectively imposed a tax on Auvi-Q, so that PBMs could not switch sales to Auvi-Q through their formularies without losing substantial rebates on EpiPen. Thus, despite the presence of a strong alternative product in the marketplace, PBMs could not exploit that alternative to increase their bargaining power with Mylan. Across the market overall, Mylan was not forced to lower its net price due to competition from Auvi-Q – net price never dropped below its 2013 level, despite the entry of Auvi-Q.[359]

---

[356] Jean Tirole, *The Theory of Industrial Organization* (MIT Press 1988) at 278-80.
[357] *Id.* at 24-25.
[358] *Id.* at 207-208, 326-27.
[359] Figure 8; see also MYEP00483117 at slide 7 █████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

183.  

As just discussed, under competition on the merits, one would expect to see evidence that prices function as strategic complements: when Auvi-Q's price falls, EpiPen should have an incentive to lower its prices as well.

. Because of EpiPen's entrenched market share, augmented by the range of strategies used by Mylan to increase the stickiness of customer choices, Mylan often did not have to match to Sanofi's price reductions and lower its own prices. Once again, this is evidence that the EAI market was not characterized by competition on the merits as a result of Mylan's exclusionary strategies.

184.    The bottom line is that, while Mylan used the inducements of conditional discounts and price protection to exclude Auvi-Q from formularies, because Mylan continued to raise its list price, the net price it ultimately offered did not actually drop, as would be expected in a competitive market, once a new innovative product – Auvi-Q – came onto the market.  This is evidence that the EAI market was not characterized by competition on the merits as a result of Mylan's exclusionary strategies.

## C.  SACRIFICING PROFITS FOR EXCLUSIVE FORMULARY STATUS

185.    An additional indicator of exclusionary conduct that has been proposed by some commentators is a "profit sacrifice" or "no economic sense" test.[360] This test compares the profits earned by the dominant firm under a non-exclusionary strategy with the profits earned under an exclusionary strategy, and asks whether the exclusionary strategy is more profitable only because of the exclusionary effect on rival firms. If a firm chooses a strategy that would be less profitable without the additional exclusionary impact on rival firms, that suggests that the motivation for the choice of strategy was exclusionary rather than based on pro-competitive considerations. Under competition on the merits, with no exclusionary motive, firms should pursue their most profitable strategies.  While exclusionary conduct does not necessarily involve profit sacrifice, profit sacrifice can be an indicator that the monopolist is engaged in exclusionary conduct.[361]

---

[360] See, for example, A. Douglas Melamed, "Exclusive Dealing Agreements and Other Exclusionary Conduct—Are There Unifying Principles?" 73 *Antitrust Law Journal* 375 (2006); Gregory J. Werden, "Identifying Exclusionary Conduct under Section 2: The 'No Economic Sense' Test," 73 *Antitrust Law Journal* 413 (2006).

[361] Steven C. Salop, "Exclusionary Conduct, Effect on Consumers, and the Flawed Profit Sacrifice Standard," 73 *Antitrust Law Journal* 311 (2006) at 313 (Rejecting the profit sacrifice test as a general rule for exclusionary

186.    The profit sacrifice test highlights one aspect of the implementation of the "competition on the merits" standard, which is to look at whether the monopolist's conduct is geared toward winning that customer's business, or whether there is a larger exclusionary agenda at play in which the monopolist is no longer competing for each customer based on the relative merits of its product, but is instead pursuing strategies that are intended to exclude competitors from the market as a whole. Competing aggressively for an individual customer is generally pro-competitive, but competing with a goal of not only winning a particular customer but also making it difficult or impossible for entrants to compete for all customers can cross the line into anticompetitive conduct.

187.    Mylan executives have testified ████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████ However, the contemporaneous profit/loss modeling done by Mylan when negotiating with at least Express Scripts (ESI) – the largest PBM – indicates that the contract terms associated with formulary restrictions on competing products generated lower profits to Mylan than a contract offer for equal access. In other words, Mylan's own modeling shows that Mylan lost money when ESI agreed to the exclusionary rebate offer. It is only by taking account of the exclusionary effect on Auvi-Q because of spillover effects on the rest of Auvi-Q's business that Mylan was willing to accept this reduction in profits as a cost of their exclusionary strategy.

188.    Specifically, the contract negotiated between Mylan and Express Scripts in the summer of 2013 ████████████████████████████████████████
████████ ██ ██████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████



conduct, while noting, "The profit-sacrifice test may be useful, for example, as one type of evidence of anticompetitive purpose.").

[362] Foster Dep. at 236-37. █████████████████████████████████
█████████████████████████████████████████

[363] MYEP01143633 Mylan Pricing Committee Review (June 12, 2013).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████ This willingness to accept lower revenues only makes sense for Mylan if it takes into account the exclusionary effect that the closed formulary offer would have on Sanofi's competitiveness in the broader market.[365]

189.    To be sure, Mylan generally did not need to go so far as to lose profits (as compared to those it would have earned with a non-exclusive offer for a 1 of 2 position) to secure an exclusive position.  Because of its ability to significantly tilt the playing field to its advantage, Mylan did not need to adopt such a strategy, as even without such conduct, it was still able to leave PBMs with little choice but to accept its exclusive offer.[366]

## X.    EFFECTS OF MYLAN'S EXCLUSIONARY CONDUCT ON CONSUMERS AND THE COMPETITIVE PROCESS

190.    Further evidence that Mylan's overall course of conduct was anticompetitive is the harm that resulted to consumers due to its actions.  Consumers were made worse off as a result of Mylan's exclusionary conduct in at least three ways.  First, many customers were effectively deprived of the opportunity to choose an alternative to EpiPen that many viewed as a superior option. Mylan's own marketing research ██████████████████████████████████ ████████████████████████████████████████████████.[367] Mylan's market research also found that, ██████████████████████████████████████████████████████ ██████████████ Yet the centerpiece of Mylan's exclusionary strategy was to keep Auvi-Q off formularies or to force it onto a formulary tier with higher co-pays.  Either way, many customers who would have preferred Auvi-Q under conditions of equal access were deterred from buying it due to lack of availability or a higher out-of-pocket cost.[369]

---

[364] See May Dep. at 132-133.

[365] Note that Mylan typically reports net sales rather than net profits in its presentations. In this case, since the exclusive formulary offer would result in more units sold, and therefore higher costs to Mylan, the cost in net profit from implementing the exclusive formulary offer would be even larger than the cost in net sales.

[366] See Barry Nalebuff, "Exclusionary Bundling," 50 *Antitrust Bulletin* 321, 321, 327 (2005); Scott Morton and Abrahamson (2017) at 799.

[367] See, for example, MYEP00093725 at 735 █████████████████████████████████████████

[368] MYEP00193044 at 063.

[369] See, for example, Clements Dep. at 35-36 ("Q. What kind of harm did you allegedly suffer because of defendant's conduct? A. Lack of options available to me and incremental costs. Over the duration and the period."); Sumner Dep. at 57 (Q. Okay. And I don't mean to misstate you, but just to summarize then, the

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

191.    Mylan not only blocked or raised the cost of access to Auvi-Q when the product was first introduced, but actively worked to exclude Auvi-Q from formularies throughout the time Auvi-Q was sold by Sanofi.[370] This was most apparent in January of 2014, when the national Auvi-Q market share fell precipitously by more than a third as formulary exclusions sought by Mylan went into effect at the beginning of the year.[371] By excluding patients that formerly had access to Auvi-Q, Mylan created switching costs that harmed PBMs, HCPs, and patients. Evidence for these switching costs was discussed previously; as noted before, Mylan itself has argued that there are significant switching costs for patients that are forced to use a different EAI device from what they are familiar with: "as distinct products with distinct user operating principles, switching a patient from one EAI to another risks confusing ingrained behaviors in the product's administration and places the patient at risk during emergency situations."[372]

192.    An exclusionary strategy that imposes step therapy restrictions on competing products is all the more costly to consumers because, as discussed above, and as recognized by industry participants, EAI devices do not lend themselves to that therapeutic approach.[373] Yet, ▮▮▮▮

---

harm that you believe you suffered was paying too much for EpiPens; is that correct? A. That's – yeah, that's a little bit simplified way of – it wasn't just that I paid too much. It was that there was no other options like – because I would go to CVS, and I would ask, okay. When they say, well, it's $400, and I would say, wow, is there something cheaper; is there like a generic or just another brand, and they would always just say, this is all we have. I had no other option."); Bowersock Dep. at 57-58 ("[Defendants] took away my choice for my daughter to use the Adrenaclick or to use the AUVI-Q, because everybody is trained on the EpiPens, and my doctor's office will only write for the EpiPens, because everybody is trained on the EpiPens.  So when it comes down to saving my child's life, he would rather prescribe what everybody is trained on and what everybody is used to versus something that not everybody is trained on and not everybody is used to."); Wemple Dep. at 157 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[370] See, for example, Willing Dep. at 108-109 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ HUM001702 at 04 ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[371] See MYEP00497152 at slides 1-2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ MYEP00487195 at slide 51. ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ MYEP00487195 at slide 61.

[372] Bresch Dep. Ex. 47 (Graham Affidavit at ¶16).

[373] See SAN-EPI-0545367 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████ Without first showing "failure" (for a product where failure would be life threatening) customers would be unable to choose Auvi-Q.

193.    More generally, an exclusionary strategy for EAI devices is undesirable from a welfare perspective because it deprives customers of a choice between differentiated products, in which some patients or PBMs may prefer one product and some the other.  In other words, this is not a pharmaceutical class in which there are multiple equally effective products where excluding one or more from a formulary will not have a significant detrimental effect on users.  In fact, Mylan made this point itself when objecting to the decision of the West Virginia Department of Health and Human Resources to exclude EpiPen from the West Virginia Medicaid formulary: "Food Allergy Research and Education ('FARE'), the leading national organization supporting individuals with food allergies, likewise contacted DHHR to state its position that 'because these [EAI] devices require unique training and have both technical and aesthetic differences, we support patients have equal access to all of these devices.'"[375] This is particularly true to the extent that excluding Auvi-Q would eliminate a device that many people in the marketplace viewed as superior to the EpiPen. For example, Mylan's Senior Director of National and Regional Accounts, ██████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ Nevertheless, ██████████████████████████████████████

██████████████████████████████████████████████████████

194.    A second component of the harm to consumers from Mylan's exclusionary strategy against Auvi-Q is that Mylan did not need to follow through on ████████████████████████

---

[374] See, for example, MYEP00604924 ████████████████████████████████████

███████████████████ MYEP00362912 ████████████████████████

██████████████ MYEP00000909 at 919 ████████████████████████████

[375] Bresch Dep. Ex. 47 (Memorandum p. 5).
[376] MYEP01068002.
[377] See, for example, MYEP00723729 at 30 ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ MYEP00485119 ██████████████████████████████████

████████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████ By not letting Auvi-Q expand its footprint in the market, Mylan was able to reduce its R&D expenditures and other costs associated with introducing an improved version of the EpiPen to compete against Auvi-Q.[379]  This failure to innovate directly harmed customers, who did not get the benefit of an improved EpiPen EAI device.

195.    Third, Mylan's exclusionary strategy allowed it to raise net prices. ███████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████ PBMs also recognized that they would have less bargaining leverage over prices with Auvi-Q out of the market.[382] Consequently, toward the end of 2015 through the first part of 2016, ████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████ As communicated to one payer (Cigna), ████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████

196.    ████████████████████████████████████████████████████
████████████████████████ And, as discussed above, testimony from Mylan's National Accounts

---

[378] MYEP00219125 at 195.
[379] See MYEP00000310 at 314 ████████████████████████████████
████████████████████████████
[380] At the same time, ██████████████████████████████████████ Foster Dep. at 76-78.
[381] Korczynski Dep. at 314.
[382] See Stein Dep. at 190 ████████████████████████████
████████████████████████████████████
[383] MYEP00167182 at 183.
[384] CIGNA_01532.  Mylan's talking points for a meeting with Express Scripts ██████████████████
████████████████████████████████████████████████
████████████████████ MYEP00269481.
[385] Willing Dep. at 243 ████████████████████████████ Foster Dep. at 378-79
████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Director ███████████████████████████[386] For example, in November 2015, ████████

██████████████████████████████████████████████████████

████[7] A similar letter rescinding an offer for the Texas Medicaid program elicited this

commentary from the PBM, Magellan Health: ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

## XI.   ESTIMATING THE ANTITRUST INJURY SUFFERED BY SANOFI

197.    Having concluded that Mylan has monopoly power and that it engaged in an

anticompetitive exclusionary course of conduct designed to maintain that monopoly power, I now

assess the degree to which Mylan's anticompetitive behavior harmed Sanofi.  While I elaborate on

the harm suffered by Sanofi below, to briefly summarize, that harm stems from the fact that, as a

result of Mylan's anticompetitive behavior, Sanofi was unable to secure the substantial market

share that both it and Mylan forecasted it would.  As noted above, Mylan was able to protect its

monopoly position by engaging in a two-part course of conduct that dramatically tilted the playing

field in its favor.  It reinforced its significant entrenched market share through: (i) exploiting

spillover effects (both from commercial plans and Medicare/Medicaid plans); (ii) engaging in a

marketing campaign with HCPs to reinforce these spillover effects; (iii) engaging in a deceptive

marketing campaign; (iv) launching a co-pay coupon program at the time of Auvi-Q's launch; and

(v) launching the EpiPen4Schools program, also right at the time of Auvi-Q's launch.  At the same

time, Mylan leveraged its substantial entrenched market share by offering rebates that were

contingent on excluding Auvi-Q that PBMs could not refuse, thereby leaving Sanofi with no

meaningful ability to secure a foothold in the market.   As a result, rather than securing the

substantial market share that both Sanofi and Mylan believed it would if competition on the merits

were allowed to play out, Mylan instead was able to ██████████████████████

---

███████████████████████████████████████████████████

███████████████████████████████████████████████████

[386] Foster Dep. at 385 ██████████████████████████████████

████████████████████████████████████████████████████████

[387] MYEP01228536.

[388] EPI-TX-0000091.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

198.    Because it was not able to obtain the significant market share that it would have with a more level playing field, Sanofi did not earn the substantial profits from the sale of Auvi-Q that should have and would have been earned, but for Mylan's conduct.  In addition, faced with the prospect of continued exclusionary conduct by Mylan, Sanofi chose not to reintroduce Auvi-Q to the market after the product was voluntarily recalled, and instead returned the rights to the patent holder, Kaléo. Were it not for Mylan's exclusionary conduct, Sanofi would have relaunched the product, and would have continued to earn substantial profits for years to come.

199.    In order to quantify the damages incurred by Sanofi as a result of Mylan's anticompetitive behavior, it is necessary to construct a "but-for" world – one in which Mylan, instead of relying on its exclusionary strategy, competed on the merits.  While it is always the case that constructing a but-for world requires making certain assumptions and, by necessity, is an imperfect science, in this case, we have information from a variety of sources that all points in the same direction, providing me with confidence that the but-for world I set out below is both reasonable and reliable.  First, we have forecasts prepared by both Mylan and Sanofi of what such a world would look like.  In the case of Sanofi, this modeling was done over time, including right before Auvi-Q launched.  Mylan did such forecasting as well, albeit when it was still contemplating competing with Sanofi on the merits, and before it adopted its exclusionary strategy.  These two sets of forecasts are remarkably similar – providing me with confidence that the but-for world I set out below is reasonable.  These forecasts are further reinforced by real world experience.  In places where Mylan was not able to take full advantage of its anticompetitive conduct, Auvi-Q's share is right in line with what both Mylan and Sanofi predicted, providing me with even more confidence in my but-for world.

200.    In what follows, I proceed to assess damages for two distinct time periods.  In Section XI.A, I set forth the damages for the period during which Sanofi sold Auvi-Q, up through the voluntary recall of Auvi-Q.  In Section XI.B, I set forth the damages for the 2017-2029 period – starting with the point in time at which Sanofi would have relaunched Auvi-Q were it not for Mylan's anticompetitive conduct, and going through the first half of 2029 – when the Auvi-Q patent was set to expire.[389]

## A.  DAMAGES FOR 2013-2015

201.    While, as noted above, constructing a but-for world is necessarily an imperfect science, in this case we have mutually reinforcing projections from both Mylan and Sanofi showing the

---

[389] Harr 30(b)(1) Dep. at 293-94.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

expected impact of Auvi-Q in an EAI market free of Mylan's anticompetitive behavior.  In Mylan's projections from April, 2010, before it formulated its exclusionary strategy, ███████████████ ████████████████████████████████████████████████████████████████████████

As of November, 2011 (before the series of meetings that crystallized the exclusionary strategy in December, 2011) ██████████████████████████████████████████████████████ ██████████████████████████████████████ These share projections ████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

202.    That Auvi-Q would reach a market share of at least 30% three years after launch in a market unencumbered by exclusionary conduct is corroborated by additional, real-world evidence.  In settings in which Auvi-Q and EpiPen competed on a relatively level playing field, Auvi-Q was able to obtain a market share of 30% or more within three years after launch.  The first piece of such evidence is Auvi-Q's share of the Canadian market.  Sanofi, in addition to offering Auvi-Q in the United States, also secured the rights to offer Auvi-Q in Canada under the brand name Allerject.  The other dominant EAI device in Canada is the same EpiPen that is offered by Mylan in the U.S., although in Canada EpiPen it is sold by Pfizer.  Figure 11 shows the EAI revenue shares of Allerject (Auvi-Q) in Canada from January 2013 through the time of the voluntary recall.  █████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████

---

[390] MYEP01209503.
[391] MYEP00088189 at 246, 248; MYEP00152753 at 800, 802.
[392] SAN-EPI-0171591 at 593. ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████
[393] Pfizer Canada documents show Allerject with a ██████ share in September, 2015.
   PFECAN_EPIPEN_AT00000168.

HIGHLIGHTLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 11:  EAI Market Shares of Allerject (Auvi-Q) by Prescription Units in Canada**



Notes: EAI products include Allerject, EpiPen, and Twinject.

Sources: SAN-EPI-0003187, QuintilesIMS Canada Geographic Prescription Monitor (GPM); Rocheleau Dep. at 81:5-84:5.

203.     While one must be careful when looking to other countries to assess what a market would look like in the United States, for the limited purpose of assessing the market share that Auvi-Q would have obtained in the United States absent Mylan's conduct, it is my view that it is reasonable to look to the Canadian experience.  In my view, Canada serves as a good guidepost for assessing market shares because, as noted above, the key players – Auvi-Q and EpiPen – are the same in both markets and neither Auvi-Q nor EpiPen substantially benefited from exclusionary conduct or other actions that would give one or the other an unwarranted competitive advantage.[394] Of course, there are differences between the U.S. and Canadian markets that make it difficult to draw conclusions regarding other aspects of the EAI market.  For example, pharmaceutical prices are vastly different

---

[394] Rocheleau Dep. at 74-75; 195-96.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

in the two countries, and there are a host of differences in governing laws regarding the marketing efforts of pharmaceutical firms.[395]  As a result, I look to the Canadian experience only for the limited purpose of assessing Auvi-Q's market share in the but-for world.

204.     In addition, to the Canadian experience, there is also real world U.S.-based evidence of how Auvi-Q would have performed in the but-for world.  Specifically, there are two formularies on which Auvi-Q secured equal treatment to EpiPen, and for which there is reason to believe that the spillover effects were not as strong as they were in other parts of the country.  First, I look to the market shares obtained by Auvi-Q on the Horizon Blue Cross Blue Shield formulary.  As a relatively large formulary in New Jersey, there is reason to believe that the spillover effects associated with exclusion from other formularies would not be as strong here as they were in other places.[396]  In Figure 12, I show the market share for Auvi-Q at Horizon BCBS up to the time of the voluntary recall.  As is shown there, Auvi-Q was able to reach a market share of about 34% in 2015 on the commercial formulary.

---

[395] See, for example, Rocheleau Dep. at 276-78.
[396] Jan Dep. at 28.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 12: Auvi-Q Shares by Prescription Volume in**

**Horizon BCBS of New Jersey Plans (Commercial)**



Notes: Horizon Commercial plans are defined as plans in the "Horizon BCBS of New Jersey" formulary or the "Horizon BCBS of New Jersey Advantage" formulary, which are commercial channels according to MMIT. Shares are based on the total prescriptions (TRx) filled of the EAI product. EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject. EAIs includes regular (0.3MG/0.3ML), junior or other dosages (0.15MG/0.15ML; 0.1MG/0.1ML), and two-packs as well as single packs. EAI products are identified by product names and NDC numbers.

Sources: IQVIA Xponent Plantrak; MMIT Data; Sanofi Bridge Files; see Appendix Part B notes

205.    As a second piece of U.S.-based real-world evidence of how Auvi-Q would perform but-for Mylan's conduct, I examined the market share Auvi-Q was able to obtain on the University of Michigan formulary. Like with Horizon, this formulary gave Auvi-Q and EpiPen equal treatment and, because it is a formulary that is used by a university population, with access to a university hospital, there is reason to believe that the spill-over effects would not be as strong as they were at other formularies. In Figure 13, I plot out the market share of Auvi-Q on this formulary over time. As is shown, by 2015, Auvi-Q obtained a share of 36%, fully consistent with the share obtained in Canada and the share obtained at Horizon BCBS.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 13: Auvi-Q Shares by Prescription Volume in the University of Michigan Formulary**



Notes:  University of Michigan formulary plans are identified with "University of Michigan" in the plan names in IQVIA data. Shares are based on the total prescriptions (TRx) filled of the EAI product.  EAI products include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenaclick Authorized Generic, and Twinject.  EAIs includes regular (0.3MG/0.3ML), junior or other dosages (0.15MG/0.15ML; 0.1MG/0.1ML), and two-packs as well as single packs. EAI products are identified by product names and NDC numbers.

Sources: IQVIA Xponent Plantrak; MMIT Data; Sanofi Bridge Files; see Appendix Part B notes

206.    Given all of the above-discussed consistent evidence of how Auvi-Q would have performed but-for Mylan's conduct, I have adopted the market shares contained in Sanofi's pre-launch forecast as the shares that Auvi-Q would obtain in the but-for world.  As noted, these shares are consistent with Mylan's own forecast, as well as the real world experience in Canada, Horizon BCBS, and the University of Michigan.  To demonstrate the similarity of these forecasts and real-world experiences, and to contrast them with the actual overall experience of Auvi-Q when hampered by Mylan's anticompetitive exclusionary conduct, in Figure 14, I show the various market shares over time.  As this Figure makes clear, all of the available evidence supports the market shares that I have adopted in the but-for world – a market share that differs significantly from that obtained by Auvi-Q in the face of Mylan's conduct.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 14: Auvi-Q Shares by Prescription Volume, Actual and Forecasts**



Notes:

The U.S., Michigan, and Horizon BCBS NJ shares for commercial plans are shown. "Canada" includes all sales in the Canadian dataset. EAI products in the U.S. include EpiPen, Auvi-Q, EpiPen Authorized Generic, Adrenaclick, Adrenalclick Authorized Generic, and Twinject, of various dosages and two-packs as well as single packs. EAI products from IQVIA data are identified by product names, NDC numbers, and MMIT classifications.  EAI products for Canada include Allerject, EpiPen, and Twinject. Sanofi's and Mylan's pre-launch forecasts are adjusted to start mid-year in 2013. Analysis of the U.S. includes U.S. territories.

Sources:

IQVIA Xponent Plantrak; MMIT Data; Sanofi Bridge Files; see Appendix Part B notes; SAN-EPI-0003187 (QuintilesIMS Canada Geographic Prescription Monitor (GPM)); Rocheleau Dep. at 81:5-84:5; SAN-EPI-0171591 at 593 (Sanofi Forecast for Auvi-Q from Table 2); MYEP01209505 at slide 13 (Mylan Forecast for "Intelliject" [Auvi-Q] from Base Case Scenario)

207.    While, due to the voluntary recall, there is no real world evidence demonstrating what Auvi-Qs market share would have been four years after launch, the available evidence demonstrates that the 40% market share that I have adopted is reasonable.  As already noted, Sanofi at launch projected that Auvi-Q's share would be ▮▮▮▮ in 2016, ▮▮▮▮▮▮▮▮▮▮▮▮ by the end of

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2017.[397] Mylan's own forecast ███████████████████████████████████ ████████████████████████ Pfizer Canada, for its part, also projected that Allerject would have captured about a ██████ share of the Canadian market.[399] Mr. Fairest – the former CEO of Sanofi's Canada affiliate – testified that Allerject was on pace to secure a ██████ market share by 2015.[400] Meanwhile, as noted above, Sanofi was able to capture about a 34% share on the commercial plans at Horizon BCBS and a share of 36% at University of Michigan, despite the impact of other exclusionary strategies adopted by Mylan, including exploiting spillover effects from other commercial plans and government payers, deceptive messaging to HCPs, and restrictions through the EpiPen4Schools program. Had Sanofi been able to compete without those other distortions to competition on the merits, it likely would have obtained an even greater share on these formularies.

208.     Having identified the market share that Auvi-Q would have obtained in the absence of Mylan's conduct, the next step in quantifying damages is to assess the size of the overall but-for market. For this, I once again rely on Sanofi's pre-launch forecast, which accounted for Sanofi's assessment of how competition on the merits would play out between competing EAI products, taking account of the price increases that EpiPen took – consistent with its past practice – prior to the launch of Auvi-Q.[401] This is the only forecast that I am aware of that accounts for marketplace developments up to the time of Auvi-Qs launch, but is not otherwise tainted by Mylan's exclusionary strategy. As a result, I adopt this forecast for purposes of assessing the overall size of the but-for market.

209.     The final step in calculating the profits that Sanofi would have earned but-for Mylan's conduct is to identify Sanofi's costs in the but-for world. Looking to Sanofi's actual costs would yield overstated damages, as, had Sanofi's market share grown consistent with expectations, its costs would have grown as well. To estimate Sanofi's costs in the but-for world, I use the fixed and variable cost estimates from Sanofi's projections – those that correspond to the market share levels that I have adopted. Since the Sanofi model reports only full year results for 2015, I impute what the revenues and costs would have been through October of 2015 prior to the voluntary recall of

---

[397] SAN-EPI-0171591 at 593.
[398] MYEP01209503.
[399] Rocheleau Dep. at 143-44; PFECAN_EPIPEN_AT00000489. Note that Allerject had more than a ██████ share of prescriptions written by Allergists, who tend to lead the market. Rocheleau Dep. at 147.
[400] Fairest Dep. at 24-26.  As Mr. Fairest explained, ██████████████████████████████████████ ███████████████████████████
[401] The overall size of the EAI market implied by the Sanofi projections is in line with the size of the actual EAI market in 2013 and 2014, the period before Sanofi was forced to take extreme measures just to secure some degree of access for Auvi-Q.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Auvi-Q.  Putting these three pieces together – the Auvi-Q market share, the overall size of the market, and Sanofi's costs – allows me to calculate the but-for profits that Sanofi would have earned through the date of the voluntary recall of Auvi-Q.  These lost profits amount to ███████.

210.    In the actual world, instead of obtaining these expected profits of ██████████, Sanofi in fact ███████████ on Auvi-Q sales.  This ██████████████ profit number accounts for, among other things: (i) the increased costs Sanofi incurred for additional co-pay assistance where Auvi-Q was placed at a disadvantage relative to the coverage tier for the EpiPen; (ii) increased costs required to rebut Mylan's misleading statements about Auvi-Q's safety and efficacy; (iii) additional rebates that Sanofi was forced to give to Third Party Payors just to secure access to formularies; and (iv) the increased costs Sanofi incurred from having to buy back Auvi-Q units that would have been sold but for Mylan's anticompetitive conduct.  The one cost that is not incorporated into this ████████ ██████ in profits is the cost that Sanofi incurred in 2015 when it provided points on a different product – ██████ – just to get Auvi-Q taken off of the ESI exclusion list.  This cost, which would have never been incurred but-for Mylan's conduct, amounted to approximately ██████████  When combined with the ███████████████████, the total loss profits Sanofi incurred during the 2013-2015 period amount to ██████████████.

211.    The difference between the but-for profits ████████████ and what Sanofi actually earned on sales of Auvi-Q in this period ██████████████ or ████████, are the damages Sanofi incurred during this period as a result of Mylan's conduct.  In present value terms, this ████████ in damages translates into ██████████[403]

## B. DAMAGES FOR 2017-2029

212.    The Auvi-Q voluntary recall occurred in October, 2015.  In February, 2016, Sanofi returned the Auvi-Q rights to Kaléo, which reintroduced Auvi-Q to the market in February, 2017. During this period Mylan began selling a generic version of EpiPen, and shortly thereafter, Teva introduced its own EpiPen generic in 2018.  Since Sanofi's decision to return the rights for Auvi-Q was a direct result of its expectation that Mylan would continue its exclusionary conduct, that conduct resulted

---

[402] ████████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████.  See SAN-EPI_A-0059425; SAN-EPI-0002512 at 515; SAN-EPI-0422838.
[403] For this conversion, I use a discount rate of ████ - the rate that Sanofi uses in its financial projections. SAN-EPI-0014223 at slide 3.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in further damage to Sanofi, as, because of Mylan's conduct, Sanofi received no profits from the reintroduction of Auvi-Q. If instead Sanofi had retained the Auvi-Q rights and reintroduced Auvi-Q to the market, it would have received profits on those sales.

213.    As an initial matter, it is clear that Sanofi would have reintroduced Auvi-Q to the market had Mylan not engaged in its anticompetitive conduct.  As Sanofi witnesses have made clear, Sanofi was convinced that had it relaunched the product, Mylan would have engaged in the same anticompetitive activity, hampering Sanofi's ability to compete and obtain the market share that it would secure but for Mylan's conduct.[404]  As discussed above, the burden imposed by the exclusionary contracts Mylan entered into acted as a tax on Sanofi's pricing, forcing Sanofi to offer rebates well above what Mylan offered, and making participation in the EAI market insufficiently profitable.   In short, because of Mylan's conduct, Auvi-Q would never have surpassed the profitability hurdle that Sanofi sets for its products.[405]  Rather than continue to fight Mylan on a drastically tilted playing field, Sanofi instead determined that it was in its best interest to return the rights to Kaléo.

214.    Of course, were it not for Mylan's conduct, Sanofi would have earned significant profits during the 2013-2015 period, along the lines calculated above, and it would have had every incentive to relaunch Auvi-Q provided that was a viable option.  Indeed, even with its conduct, Mylan still anticipated that Sanofi would relaunch Auvi-Q.  When asked directly whether Mylan

---

[404] See Barry 30(b)(6) Dep. at 37-38 ("Q. Why was the decision made to return the rights to Auvi-Q to Kaleo? ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Barry 30(b)(6) Dep. at 44 ██ ████████████████████████████████████████████████████████████ Guenter Dep. at 326-27 ████████████████████████████████████ ████████████████████████████ Guenter Dep. at 333 █████████████████████ ████████████████████████████████████████

[405] See id.; see also Guenter Dep. at 329 ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ Guenter Dep. at 335 █████████████████████████ ████████████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████ She went on to explain that ███████████████████████████████████████████ ████████

215.    The available evidence demonstrates that relaunching Auvi-Q was clearly viable.  Perhaps most compelling is the fact that Kaléo, despite its smaller size and its need to develop a sales team and incur substantial entry costs, nevertheless actually relaunched the product in early 2017.  It is difficult to see how, if the proper financial incentive were there (and it would have been but for Mylan's conduct), Sanofi, with a marketing team already in place, would not also be able to relaunch the product.  Moreover, it is my understanding that the concerns that gave rise to the recall were relatively minor and were easily addressed.[408]  Once again, that Kaléo in fact relaunched the product demonstrates the ease with which these hurdles could be surmounted.

216.    Having concluded that, but for Mylan's conduct, Sanofi would have relaunched Auvi-Q, the next step is assessing the level of profits that Sanofi would have earned in the but-for world.  To answer this question, a number of variables come into play.  Specifically, calculation of the post-recall damages requires assessing when that reintroduction would have occurred, what Auvi-Q's unit sales would have been in each year, and what the market pricing following Auvi-Q re-entry would be.  Before turning to these questions, I first address a gating issue: the role that generic versions of the EpiPen would play in the but-for world.

217.    As noted, during the post-recall period, two different generic versions of the EpiPen were launched.  First, there was the introduction of Mylan's own generic version of EpiPen in December, 2016, followed by the November, 2018 launch of the Teva generic.[409] While generic competition

---

[406] Willing Dep. at 233.

[407] Willing Dep. at 233.

[408] Conversation with Dr. Phillip Huang.  See also Barry 30(b)(6) Dep. at 44 ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ SAN-EPI-0052798, at slides 3-4 ████████████

[409] Mylan, "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized Generic" (Dec. 16, 2016), http://newsroom.mylan.com/2016-12-16-Mylan-Launches-the-First-Generic-for-EpiPen-epinephrine-injection-USP-Auto-Injector-as-an-Authorized-Generic; Teva, "Teva's Generic Version of EpiPen® (Epinephrine Injection, USP) Auto-Injector 0.3 mg Now Available in Limited Quantity in the United States" (Nov. 27, 2018),

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

generally has a dramatic impact on sales of the branded version of the same product, that is often not the case for other branded products in the same class of drugs.  Both effects are seen in the EAI market: introduction of the EpiPen authorized generic led to dramatic share shifts from branded EpiPen to Mylan's generic EpiPen.  However, prior to the introduction of the EpiPen authorized generic, competition from the Adrenaclick authorized generic (a generic version of a different EAI product in the same market) had minimal impact on branded EpiPen sales.

218.    ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ The forecast projects ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████ The budget presentation includes a slide that ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████[412]

219.    These assessments by Mylan of the impact of EpiPen generics on Auvi-Q are fully in line with the forecast that Mylan prepared prior to engaging in its anticompetitive course of conduct.  As noted above, in the "base case" version of that forecast – one that assumes no entry by a generic EpiPen – ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ In short, Mylan projected that the entry of a generic version of the EpiPen would have no impact whatsoever on Auvi-Q sales.



---

http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-newsArticle&ID=2378366 (accessed Dec. 19, 2018).
[410] MYEP00350217 at 221.
[411] MYEP00392152 at slide 5.
[412] MYEP00392152 at slide 6; see also Bresch Dep. at 367-68 (████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████.
[413] MYEP01209503.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

220.    Years later, Mylan projected the impact of both generic competition and Auvi-Q re-entry in its 2017 Budget Presentation.[414] Those projections reflect the introduction of Mylan's authorized generic EpiPen at the end of 2016 and the anticipated relaunch of Auvi-Q in June 2017.  Two things are notable about the forecasted shares through the end of 2017.  First, █████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████

221.    To assess Auvi-Qs unit sales in the but-for world, I look to this same 2017 Budget Presentation just discussed.  As noted, █████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████████ ██████████

222.    ██████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ Accordingly, I assume that Auvi-Q would have achieved unit sales corresponding to a 30% share of 2016 EAI unit sales after three years and a 40% share of 2016 EAI unit sales after four years, following the same trends discussed above.

223.    The 2017 Budget Presentation also indicates that ██████████████████████ █████████████████████████████████████████████████████████

---

[414] MYEP01362570 ██████████████████████████████████████████ at slide 51.

[415] ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████Teva's generic was also introduced at a WAC price that matches the EpiPen generic price.[416] Accordingly, I assume that the generic competition will not change the pricing for Auvi-Q, and that following a ramp up period, Sanofi would have earned the same margin on Auvi-Q sales as in its initial forecast for 2016.

224.     These above-discussed forecasts from Mylan and Sanofi motivate the following approach to estimating the but-for profits that Sanofi would have earned from the reintroduction of Auvi-Q:

    a.   Sanofi would have re-introduced Auvi-Q in early 2017, which was when Kaléo reintroduced Auvi-Q.  Given that Sanofi already had a marketing team in place, and would not have had to incur certain of the costs incurred by Kaléo associated with the relaunch, my assumption here is conservative, as it is quite plausible that Sanofi would have relaunched Auvi-Q months before Kaléo was able to do so.

    b.   After a ramp-up period, Auvi-Q would have sold 40% of the projected EAI units in Sanofi's forecast for 2016.

    c.   In my base case scenario, I have used a ramp up period of four years – consistent with the projections for Auvi-Q's growth at launch.  As an alternative, I consider an accelerated ramp-up period of two years, which reflects the faster Auvi-Q growth rate after reintroduction in Mylan's January 2017 forecast, and also reflects the faster growth rate exhibited by Auvi-Q in 2013 in Horizon BCBS, University of Michigan, and Canada when Auvi-Q received equal formulary placement with EpiPen.

    d.   Unit demand for Auvi-Q grows at a 0.7% annual rate, which is consistent with U.S. population growth.  This growth assumption is conservative in that it does not attempt to account for any growth in the share of the population that is at risk for anaphylaxis or for any increases in the overall awareness of anaphylaxis.

    e.   The pricing of Auvi-Q remains constant. As an alternative, I also compute but-for profits assuming prices grow at 3% per year.[417]

    f.   Sanofi earns profits until the expiration of the Auvi-Q patent at the end of the first half of 2029.[418]

    g.   As an alternative variation, I also calculate but for profits under a scenario in which Sanofi charges a ██████████████████████████

---

[416] Teva Press Release, "Teva's Generic Version of EpiPen® (Epinephrine Injection, USP) Auto-Injector 0.3 mg Now Available in Limited Quantity in the United States" (Nov. 27, 2018), available at http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-newsArticle&ID=2378366 (accessed Dec. 19, 2018); CNBC, "Teva prices EpiPen generic at $300, same price as Mylan generic," Nov. 27, 2018, available at https://www.cnbc.com/2018/11/27/teva-epipen-generic.html.

[417] Sanofi's original financial projections for Auvi-Q included a 3% annual price increase.  SAN-EPI-0766016 at 024.

[418] See SAN-EPI-0413166 at 168.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

 The projection follows Sanofi's forecast under this pricing assumption, and culminates with Auvi-Q selling ▉ of the projected EAI units – consistent with Sanofi's forecast for 2016 after the ramp-up period.

225.    Using the approach set forth above, I have calculated the profits that Sanofi would have earned on Auvi-Q sales in each year following reintroduction of the product. I then compute the present value of these lost profits using a discount rate of ▉, - a rate that Sanofi uses in its own financial projections.[419] The 2019 present discounted value of lost Auvi-Q profits is ▉. I then subtract estimated relaunch costs of ▉, which is consistent with financial projections made by Sanofi when it was planning to re-enter the EAI market.[420] That gives the net present value of lost profits, which is ▉. Sanofi lost out on these profits as a result of Mylan's exclusionary strategy.  Table 4 summarizes this calculation, as well as damages under the alternative scenarios described above.

### Table 4: Damages from Lost Profits ($ millions)

| | Base Model | 3% Price Growth | Accelerated Ramp-up | ▉ |
|---|---|---|---|---|
| | | Alternative Assumptions | | |
| ▉ | | | | |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | | | |
| ▉ | ▉ | | | |
| ▉ | | | | |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ |
| ▉ | ▉ | ▉ | ▉ | ▉ |

---

[419] See SAN-EPI-0014223 at slide 3.
[420] SAN-EPI-1234024; SAN-EPI-1234026 at slide 10.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### C. TOTAL DAMAGES

226.    The total damages suffered by Sanofi as a result of Mylan's exclusionary conduct are the present value of the sum of the actual damages incurred during the 2013-2015 period and the net present value of lost profits from retaining and reintroducing Auvi-Q. The total damages in my base case currently are ███████████.  When the alternative scenarios I have considered are accounted for, total damages range from ████████████████████.

Fiona Scott Morton

February 4, 2019

128

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Appendix

## A. Summary

227.    I investigate the impact of past prescribing volumes in states and the availability of Auvi-Q on insurance plan formularies on current Auvi-Q prescriptions on insurance plans.  This Appendix explains the methodology and results.  I combine data on prescription volumes of EAIs by plan with data on formulary statuses and restrictions on EAIs by plan, over a time period from January 2013 to October 2015.  Applying a regression analysis to the data, I estimate the role of past state-level Auvi-Q prescription volume shares of EAIs (Auvi-Q spillovers) and plan-level formulary statuses on current plan-level Auvi-Q prescription volume shares.

## B. Data

228.    Prescription volume data ("sales data") in the U.S. comes from IQVIA Xponent Plantrak ("Xponent"). Xponent provides broad coverage of prescriptions dispensed to the patient at retail, mail order, and long-term care pharmacies, by time period, location, product (NDC), and payer.[421] Payers include specific commercial plans, Medicare plans, Medicaid plans (State Medicaid and Managed Medicaid), and cash.[422] Xponent sales are available in prescription volumes; I use total prescriptions dispensed ("TRx"), which includes new and refill prescriptions dispensed.

---

[421] IQVIA, "Research Support," https://www.iqvia.com/institute/research-support (accessed Feb. 4, 2019); Phi Publications, http://www.phipublications.com/About_Data.html (accessed Feb. 4, 2019).

[422] I identify payer types by plan names and method of payment provided in Xponent data and by linking that dataset to MMIT data, which provides payer information. See Aspe.hhs.gov, "Medicaid Program Names," https://aspe.hhs.gov/dataset/medicaid-program-names (accessed January 25, 2019); Cahealthadvocates.org, "MEDI-CAL (For People with Medicare)," https://cahealthadvocates.org/low-income-help/medi-cal-for-people-with-medicare/ (accessed February 3, 2019); Careoregonadvantage.org, "Care Oregon Advantage," https://www.careoregonadvantage.org/docs/default-source/2018-member-material/coa_star_2018_summary_of_benefits.pdf?sfvrsn=2 (accessed February 3, 2019); Hhs.texas.gov, "STAR Medicaid Managed Care Program," https://hhs.texas.gov/services/health/medicaid-chip/programs/star-medicaid-managed-care-program (accessed February 3, 2019); ICarehealthplan.org, "iCare Medicare Plan," https://www.icarehealthplan.org/Plans/MedicareSNP.aspx (accessed February 3, 2019); Medicaid.gov, "Children's Health Insurance Program (CHIP)," https://www.medicaid.gov/chip/index.html (accessed February 3, 2019); Medicaid.gov.ohio.gov, "Programs for Children, Families and Pregnant Women," https://www.medicaid.ohio.gov/FOR-OHIOANS/Programs/Children-Families-and-Women (accessed February 3, 2019); Medicare.gov, "Drug coverage (Part D)," https://www.medicare.gov/drug-coverage-part-d (accessed February 3, 2019); Medicare.gov, "Private Fee for Service Plans (PFFS)," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/private-fee-for-service-pffs-plans (accessed February 3, 2019); Medicare.gov, "Special Needs Plans (SNP)," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/special-needs-plans-snp (accessed February 3, 2019); Optimahealth.com, "Optima Medicare HMO - Plan Information," https://www.optimahealth.com/plans/medicare/coverage/plan-

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

229.     I examine Xponent sales data on epinephrine auto injector (EAI) prescriptions.  From January 2013 to October 2015 (when Auvi-Q was launched to the time of its recall), EAIs in the data include EpiPens (2-Paks, Jr 2-Paks), Auvi-Q, Adrenaclick and Adrenaclick AG, and Twinject.[423]

230.     MMIT data provides the formulary status and restrictions for specific EAI products over time, as well as the number of plan lives by state.  I use Sanofi's monthly bridge files to link IQVIA sales data with MMIT formulary information for each EAI product. The bridge files provide a mapping between IQVIA's plan identifiers and MMIT's plan identifiers and are available starting in March 2014. For plans in January 2013-February 2014, I apply the earliest available crosswalk (March 2014).[424]  About 61% of all IQVIA plans match with MMIT formulary information from January 2013 to October 2015.[425]

---

[423] information (accessed February 3, 2019); Q1medicare.com, "2019 Medicare Advantage Plan Benefit Details for the Medi-Pak Advantage (HMO)," https://q1medicare.com/MedicareAdvantage-PartC-MedicareHealthPlanBenefits.php?state=AR&source=2016MAText&ZIP=&countyCode=5131&contractId=H9699&planId=004&segmentId=1&plan=Medi-Pak%20Advantage%20(HMO)&utm_source=partd&utm_medium=matext&utm_campaign=detailsicon (accessed February 3, 2019); Q1medicare.com, "What is Medicare PDP and an MAPD," https://q1medicare.com/q1group/MedicareAdvantagePartDQA/FAQ.php?faq=What-is-a-Medicare-PDP-and-an-MAPD-&faq_id=616&category_id=146 (accessed February 3, 2019).

[423] I identify EAIs by NDC numbers and product names in the IQVIA data for the U.S. I also use MMIT data, which provide product names corresponding to NDC numbers for branded EAIs. For identifying generic EAIs from NDC numbers, see Bioportal.bioontology.org, "NDA020800 0.15 Epinephrine 1 MG/ML Auto Injector," http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870225 (accessed February 3, 2019); Bioportal.bioontology.org, "NDA020800 0.3 ML Epinephrine 1 MG/ML Auto-Injector," http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870230 (accessed February 2, 2019); Dailymed.nlm.nih.gov, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=9a010290-186a-4182-a6bd-c6ae75b3cbeb (accessed February 3, 2019); Drugs.com, "Generic Adrenaclick Availability," https://www.drugs.com/availability/generic-adrenaclick.html (accessed February 3, 2019); Hidesigns.com, "North Dakota Medicaid Generics Preferred List," http://hidesigns.com/assets/files/ndmedicaid/2017/North_Dakota_Authorized_Generics_Preferred_List_10102017.pdf (accessed February 3, 2019); Mckesson.com, "Generic EpiPen®; EPIsnap®; Adrenaclick®; Auvi-Q®; Epinephrinesnap-v®; EpiPen 2-Pak®; EpiPen Jr 2-Pak®; EPIsnap® Alpha- and Beta-Adrenergic Agonist Epinephrine 0.15 mg Injection Auto-Injector 0.15 mL," https://mms.mckesson.com/product/1053683/Impax-Pharmaceuticals-115169549 (accessed February 3, 2019).

[424] A single MMIT plan may map to multiple IQVIA plans and vice versa. To resolve the many-to-many matches, I do the following. First, I compute the national lives for the Org ID. Where one MMIT plan ("Org ID") maps to multiple IMS Plan IDs, I allocate the Org ID's national lives to each Org ID – Plan ID pair based on the relative proportions of EAI sales for each matched Plan ID candidate out of the total EAI prescriptions across all matching Plan IDs. Then for each IQVIA Plan ID, I assign formulary characteristics of the matched MMIT Org ID with the largest number of allocated plan lives. The crosswalks are at the national level, the sales are at the state level, and the plans are assigned at the state level.

[425] Calculation on file.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## C. Model

231.   To statistically test for the Auvi-Q share effect of formulary tier designations, plan restrictions, and spillovers, I estimate the following regression model:

$$
\begin{aligned}
AuviQShare_{i,s,t} &= \beta_1\, AuviQSpillover(Commercial)_{s,t-1} \\
&+ \beta_2\, AuviQSpillover(Medicare/Medicaid)_{s,t-1} \\
&+ \gamma_1 EpiPenPreferred_{i,s,t} + \gamma_2 AuviQPreferred_{i,s,t} \\
&+ \delta_1 AuviQRestricted_{i,s,t} + \delta_2 EpiPenRestricted_{i,s,t} \\
&+ \delta_3 AuviQNotCovered_{i,s,t} + \delta_4 AuviQNotListed_{i,s,t} + \theta Miscellaneous_{i,s,t} \\
&+ PBM_p + State_s + Time_t + \varepsilon_{i,s,t}
\end{aligned}
$$

where an observation is a plan $i$ (and PBM $p$), state $s$, and year-month $t$.

232.   The dependent variable, *AuviQShare,* is the Auvi-Q share of total EAI prescription volume for a plan by state and time period (year-month).

233.   On the right hand side, *AuviQSpillover* is the statewide Auvi-Q prescription share of all EAIs, lagged by one month, and split by Commercial and Medicare-Medicaid channels.

234.   Regarding formulary preferences, *EpiPenPreferred* and *AuviQPreferred* are dummy variables to indicate if EpiPen is on a preferred tier to Auvi-Q or if Auvi-Q is preferred to EpiPen, based on MMIT's standardized formulary tier rankings for each plan.[426] *AuviQPreferred* equals one if the plan has EpiPen in its "Covered" tier and Auvi-Q in the "Generic (Preferred)," "Generic," or "Preferred" tier, and neither brand is restricted (similar definition for *EpiPenPreferred*). Plans where Auvi-Q and EpiPen have equal status comprise the reference (omitted) category. *AuviQEqual* equals one if both brands are "Generic (Preferred)," "Generic," "Preferred," Covered," "Not Listed," "Not Covered," or both are restricted. Thus the formulary dummy variables indicate the change in predicted Auvi-Q share due to differences in Auvi-Q's and EpiPen's formulary placement relative to both brands having equal formulary status.

235.   Restrictions are captured by indicator variables *AuviQRestricted* and *EpiPenRestricted*. *AuviQRestricted* equals one if the plan has a step edit or prior authorization on Auvi-Q in any tier, and EpiPen in the "Generic (Preferred)," "Generic," "Preferred," or "Covered" tier (similar definition for *EpiPenRestricted*).

---

[426] The tier categories are: Generic (Preferred), Generic, Preferred, Covered, Specialty, Not Listed, Unknown, Not Covered.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

236.     Similarly, *AuviQNotListed* equals one if the plan has Auvi-Q in its "Not Listed" tier and EpiPen is in the "Generic (Preferred)," "Generic," "Preferred," or "Covered" tier. *AuviQNotCovered* equals one if the plan has Auvi-Q in its "Not Covered" tier and EpiPen in "Generic (Preferred)," "Generic," "Preferred," or "Covered" tiers.

237.     *Miscellaneous* is a dummy that equals one if all the above formulary tier dummies equal zero, capturing all other combinations of formulary preference and restriction status of EAIs.[427] *Time* denotes fixed effects by year-month. As an alternative, I also model time fixed effects using year and month separately. *State* denotes fixed effects for states. *PBM* denotes fixed effects for PBMs.

238.     Observations with cash methods of payment are excluded from the regressions as they do not have any insurance plan information. However, their sales are included in the denominator while constructing the spillover variables.

239.     I analyze effects on commercial plans only. The regression model is weighted by covered lives in each plan.[428] As an alternative, I consider an estimate that uses EAI prescription volume to weight across plans. The final regression sample includes approximately 84% of all commercial MMIT lives in any month between January 2013 and October 2015.  Summary statistics for the variables in the model are shown in Table A.1.

---

[427] In case EpiPen and Auvi-Q are both restricted and have equal status, then only the dummy variable *Auvi-QEqual* equals one. In case both EAIs have equal status and only one EAI is restricted, then only the restriction dummy equals one.

[428] After matching the sales and formulary information datasets, I extend the methodology to estimate the number of covered lives by plan and state. Within each period, I calculate the total allocated lives for each IQVIA Plan ID. I sum the Plan ID's EAI sales across all states where it had sales, and I further allocate the lives to each state according to the proportion of sales for each state out of the Plan ID's national sales.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Table A.1:  Summary Statistics

Commercial Plans, Jan. 2013 – Oct. 2015

| Variables | Obs | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|---|
| Auvi-Q Share | 453,211 | 0.0807 | 0.1251 | 0.0000 | 1.0000 |
| Lagged Auvi-Q Spillover (Commercial) | 443,980 | 0.0483 | 0.0272 | 0.0000 | 0.1800 |
| Lagged Auvi-Q Spillover (Medicare/Medicaid) | 443,980 | 0.0078 | 0.0113 | 0.0000 | 0.1836 |
| EpiPen Preferred | 453,211 | 0.3389 | 0.4733 | 0.0000 | 1.0000 |
| Auvi-Q Preferred | 453,211 | 0.0073 | 0.0853 | 0.0000 | 1.0000 |
| Auvi-Q Equal | 453,211 | 0.2176 | 0.4126 | 0.0000 | 1.0000 |
| EpiPen Restricted | 453,211 | 0.0135 | 0.1153 | 0.0000 | 1.0000 |
| Auvi-Q Restricted | 453,211 | 0.0801 | 0.2714 | 0.0000 | 1.0000 |
| Auvi-Q Not Listed | 453,211 | 0.1572 | 0.3640 | 0.0000 | 1.0000 |
| Auvi-Q Not Covered | 453,211 | 0.1561 | 0.3629 | 0.0000 | 1.0000 |
| Miscellaneous | 453,211 | 0.0293 | 0.1686 | 0.0000 | 1.0000 |

**Notes:**

[1]    Observations are weighted by total plan lives. Observations are by plan and period (month).

[2]    Plans with missing formulary information and plans with missing EAI prescription volume data are
       excluded. Auvi-Q sales are assumed to be zero if Auvi-Q's TRx is missing and total EAI volume for the
       month and plan is nonzero.

**Sources:**

[a]    IQVIA Xponent Plantrak

[b]    MMIT Data

[c]    Sanofi Bridge Files

[d]    See Appendix Part B notes

## D. Results

240.    Table A.2 shows the estimates of state-level Auvi-Q spillovers, split by Commercial and
Medicare/Medicaid channels, on plan-level Auvi-Q shares for commercial plans between January
2013 and October 2015.

241.    As shown in the main specification (Column (1)) with observations weighted by total plan
lives, a 10 percentage point increase in the lagged Auvi-Q Commercial spillovers in the state
predicts a 5.8 percentage point increase in plan Auvi-Q shares. Similarly, a 10 percentage point
increase in lagged Auvi-Q Medicare/Medicaid spillovers predicts a 3.5 percentage point increase in
plan Auvi-Q shares. Column (2) estimates the same model, except that it controls separately for
year and month instead of using combined year by month fixed effects.  Both the commercial and
Medicare/Medicaid spillover effects are higher using this alternative specification.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

242.     Columns (3) and (4) present the same two specifications as columns (1) and (2), but differ only in that observations are weighted by total plan EAI prescriptions. The estimated commercial spillover effect is somewhat larger: a 10 percentage point increase in the lagged Auvi-Q Commercial spillovers in the state predicts between a 7.9 and 9.4 percentage point increase in plan Auvi-Q shares. Meanwhile, a 10 percentage point increase in lagged Auvi-Q Medicare/Medicaid spillovers predicts a 2.5 to 2.7 percentage point increase in plan Auvi-Q shares using the alternative weighting methodology. In all four variations considered, the estimated effect for both commercial and Medicare/Medicaid spillover effects is positive and statistically significant.

243.     Looking at the formulary status variables in Column (1), EpiPen being preferred to Auvi-Q on the formulary decreases the estimated Auvi-Q share by 1.3 percentage points relative to when EpiPen and Auvi-Q have the same formulary status. When Auvi-Q is restricted (i.e., subject to step therapy or prior authorization), the estimated Auvi-Q share decreases by 4 percentage points. And when Auvi-Q is not covered by the formulary at all, the estimated Auvi-Q share decreases by more than 5 percentage points. These effects vary somewhat across the different specifications, but are statistically significant in all of them, and indicate that greater restrictions on Auvi-Q lead to larger and larger reductions in Auvi-Q's share of plan prescriptions.

244.     Overall, the results indicate that the past prescribing habits of doctors throughout the state and the formulary positioning of EpiPen and Auvi-Q impact the current Auvi-Q share of EAI prescriptions on insurance plans.  The results demonstrate that in states where Mylan was able to restrict access to Auvi-Q at the leading PBMs in the state, the Auvi-Q share fell on average across PBMs in the state.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Table A.2:  Effect of State Auvi-Q Spillovers on Plan Auvi-Q Shares

Commercial Plans, Jan 2013 – Oct 2015

| Dependent Variable: Auvi-Q Share<br>Explanatory Variables | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Lagged Auvi-Q Spillover (Commercial) | 0.582*** | 0.836*** | 0.790*** | 0.937*** |
| | (0.0850) | (0.0682) | (0.0508) | (0.0489) |
| Lagged Auvi-Q Spillover (Medicare/Medicaid) | 0.350*** | 0.368*** | 0.252*** | 0.273*** |
| | (0.100) | (0.103) | (0.0931) | (0.0764) |
| EpiPen Preferred | -0.0127*** | -0.0111*** | -0.0109*** | -0.0105*** |
| | (0.00379) | (0.00363) | (0.00356) | (0.00346) |
| Auvi-Q Preferred | 0.168*** | 0.168*** | 0.184*** | 0.184*** |
| | (0.0306) | (0.0305) | (0.0342) | (0.0341) |
| EpiPen Restricted | 0.00775 | 0.0102 | -0.0124** | -0.0109** |
| | (0.0151) | (0.0151) | (0.00521) | (0.00518) |
| Auvi-Q Restricted | -0.0405*** | -0.0400*** | -0.0417*** | -0.0415*** |
| | (0.00514) | (0.00512) | (0.00579) | (0.00573) |
| Auvi-Q Not Covered | -0.0526*** | -0.0504*** | -0.0681*** | -0.0675*** |
| | (0.00637) | (0.00644) | (0.00418) | (0.00419) |
| Auvi-Q Not Listed | -0.0156*** | -0.0208*** | -0.0168*** | -0.0217*** |
| | (0.00555) | (0.00492) | (0.00469) | (0.00420) |
| Miscellaneous | 0.0233*** | 0.0235*** | 0.00650 | 0.00681 |
| | (0.00571) | (0.00581) | (0.00403) | (0.00409) |
| Observations | 443,980 | 443,980 | 488,946 | 488,946 |
| R-squared | 0.140 | 0.136 | 0.223 | 0.217 |
| Time Fixed Effects | Year by Month | Year and Month | Year by Month | Year and Month |
| PBM Fixed Effects | Yes | Yes | Yes | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes |

**Notes:**

[1]   Observations are weighted either by total plan lives (in Columns (1) and (2)) or EAI prescriptions (RX) (Columns (3) and (4)).

[2]   Standard errors (in parentheses) are clustered at the state-level. *** $p<0.01$, ** $p<0.05$, * $p<0.1$

[3]   Plans with missing formulary information and plans with missing EAI prescription volume data are excluded. Auvi-Q sales are assumed to be zero if Auvi-Q is missing and total EAI volume for the month and plan are nonzero.

**Sources:**

[a]   IQVIA Xponent Plantrak

[b]   MMIT Data

[c]   Sanofi Bridge Files

[d]   See Appendix Part B notes

**EXHIBIT 1**

**CRA** Charles River Associates

## Fiona M. Scott Morton
Senior Consultant

PhD, Economics
Massachusetts Institute of Technology

BA (magna cum laude), Economics
Yale University

Fiona M. Scott Morton is the Theodore Nierenberg Professor of Economics at the Yale School of Management. From May 2011 to December 2012, she was Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the US Department of Justice. Dr. Scott Morton ensured that the Division's economic team provided sound analysis in support of the DOJ's enforcement action and policy, particularly with its work related to analyzing the competitive effects of mergers as well as assessing the competitive implications of certain contractual practices of firms. While at the DOJ, she frequently spoke on antitrust enforcement in high-technology industries as well as patents and their portfolio acquisitions.

An expert in competitive strategy, Dr. Scott Morton's research focuses on empirical studies of competition among firms in areas such as pricing, entry, and product differentiation. She has served in an editing role on various academic economics journals and has published articles in the *American Economic Review*, the *RAND Journal of Economics*, the *Journal of Industrial Economics,* and the *Quarterly Journal of Economics*.

Her expertise and research area is the study of firms, markets, and competition. Her research and consulting work has involved a variety of industries such as merchant shipping, wineries, funeral homes, ecommerce, auto retailing, magazines, healthcare and a number of areas in the pharmaceutical industry including competition, generic entry, and procurement of pharmaceuticals for Medicaid and Medicare. Professor Scott Morton's research is widely disseminated in top scholarly publications and through frequent invited research seminars and conferences.

She has taught at the business schools of Stanford and the University of Chicago and served as Associate Dean for Faculty Development at Yale School of Management from 2006–2010. She won the school's teaching award in 2007 and 2016.

## Employment and affiliations

| | |
|---|---|
| 2014–Present | *Theodore Nierenberg Professor of Economics*, Yale School of Management |
| 2008–Present | *Visiting Professor*, University of Edinburgh Economics Department |
| 2013–Present | *Senior Consultant*, Charles River Associates |
| 2002–2014 | *Professor of Economics*, Yale School of Management |
| 2011–2012 | *Deputy Assistant Attorney General for Economic Analysis*, Antitrust Division, US Department of Justice |
| 2006–2011 | *Senior Consultant*, Charles River Associates |

| | |
|---|---|
| 2006–2010 | *Senior Associate Dean for Faculty Development*, Yale School of Management |
| 2005–2006 | *Adam Smith Visiting Fellow*, Department of Economics, University of Edinburgh, Scotland |
| 2000–2002 | *James L. Frank '32 Associate Professor of Private Enterprise and Management*, Yale School of Management |
| 1999–2000 | *Associate Professor of Economics and Strategy*, Yale School of Management |
| 1997–1999 | *Assistant Professor of Economics and Strategy*, Graduate School of Business, University of Chicago |
| 1994–1997 | *Assistant Professor of Strategic Management*, Graduate School of Business, Stanford University |
| 1991–1992 | *Instructor for Economics 10*, Prof. Martin Feldstein, Harvard University |

## Scholarly publications

"The Industrial Organization of the Biologics Industry: Theory, Empirics, and Policy Implications." With Scott Stern and Ariel Stern (forthcoming, *Review of Industrial Organization*).

"The antitrust case against platform MFNs." With Jonathan Baker. *Yale Law Journal*, May 2018.

"The antitrust case against horizontal shareholding." With Herbert Hovenkamp. *Yale Law Journal* May 2018.

"The Impact of Consumer Inattention on Insurer Pricing in the Medicare Part D Program." With Kate Ho and Joseph Hogan. *RAND Journal of Economics*, 48(4): 877–905, 2017.

"A Proposal to Limit the Anticompetitive Power of Institutional Investors." With Eric A. Posner and E. Glen Weyl.  *Antitrust Law Journal*, 81(3): 669–728, 2017.

"A Unifying Analytical Framework for Loyalty Rebates." With Zachary Abrahamson.  *Antitrust Law Journal*, 81(3):  777–836, 2017.

"Contracts that Reference Rivals."  Chapter 7, Antitrust Economics for Lawyers.  LexisNexis, 2017.

"Enabling Competition in Pharmaceutical Markets." With Lysle Boller. *Brookings Institution, Hutchins Center Paper # 30*, 2017.

"Out-of-Network Emergency-Physician Bills—An Unwelcome Surprise." With Zack Cooper. *New England Journal of Medicine,* 375(20): 1915–1918; Reprinted in *NEJM Catalyst,* December 2016.

"Market Size and Pharmaceutical Innovation." With Pierre Dubois, Olivier de Mouzon, and Paul Seabright. *RAND Journal of Economics,* 46(4): 844–871, 2015.

"Patent Assertions: Are We Any Closer to Aligning Reward to Contribution?" With Carl Shapiro. *NBER Innovation Policy and the Economy,* 2015.

"Strategic Patent Acquisitions." With Carl Shapiro. *Antitrust Law Journal,* 79(2): 463-499, 2014.

"Hospitals, Market Share, and Consolidation: How Should Policy React?" With David Cutler. *Journal of the American Medical Association,* 310(18), 1964-70, November 2013.

"Pay-for-Delay." *Competition Policy International,* 9(2), 2013.

"Research into biomarkers: How does drug procurement affect the design of clinical trials?" With Paul Seabright. *Health Management, Policy, and Innovation,* 1(3), 2013.

"Contracts that Reference Rivals." *Antitrust Magazine*, 72-79, Summer 2013.

"Developing an Administrable MFN Enforcement Policy." With Steven Salop. *Antitrust Magazine*, 65-73, Spring 2013.

"Standard Setting Organizations Can Help Solve the Standard Essential Patents Licensing Problem." With Kai-Uwe Kuhn and Howard Shelanski. *CPI Antitrust Chronicle,* March 2013.

"The Year in Review: Economics at the Antitrust Division: 2011." With W. Robert Majure. *Review of Industrial Organization*, 41(4): 321–331, 2012.

"What Matters in a Price Negotiation: Evidence from the US Auto Retailing Industry." With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics,* 9: 365–402, 2011.

"Data Impediments to Empirical Work in Health Insurance Markets." With Leemore Dafny, David Dranove, and Frank Limbrock. *BE Journal of Economic Analysis and Policy,* 11(2): Article 8, 2011.

"The Medium-Term Impact of Medicare Part D on Pharmaceutical Prices." With Mark Duggan. *American Economic Review Papers and Proceedings,* 101(3): 387–392, 2011.

"Pharmaceutical Markets." With Margaret Kyle. *Handbook of Health Economics*, vol. 2, ch. 12, pp. 763–823, Elsevier, 2011.

"State Franchise Laws, Dealer Terminations, and the Auto Crisis." With Francine Lafontaine. *Journal of Economic Perspectives,* 24(3): 233–50, 2010.

"The Effect of the Medicare Drug Benefit on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review,* 100(1): 590–607, 2010.

"Providing Prescription Drug Coverage to the Elderly: America's Experiment with Medicare Part D." With Mark Duggan and Patrick Healey. *Journal of Economic Perspectives,* 22(4): 69–92, 2008.

"State Casket Sales Restrictions: a Pointless Undertaking?" With Judith A. Chevalier. *The Journal of Law and Economics,* 51(1) 1–23, 2008.

"How the Internet Lowers Prices: Evidence from Matched Survey and Auto Transaction Data." with Florian Zettelmeyer and Jorge Silva-Risso. *Journal of Marketing Research,* 43(2): 168–181, 2006.

"The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing." With Mark Duggan. *The Quarterly Journal of Economics,* 121(1): 1–30, 2006.

"Behavioral Biases Meet the Market: The Case of Magazine Subscription Prices." With Sharon M. Oster. *The Berkeley Electronic Press: Advances in Economic Analysis & Policy,* 5(1) Article 1, 2005.

"Consumer Benefit from Use of the Internet" *NBER Innovation Policy and the Economy*, 6: 67-90, 2005.

"The Strategic Positioning of Store Brands in Retailer-Manufacturer Negotiations." With Florian Zettelmeyer. *Review of Industrial Organization,* 24(2): 161–194, 2004.

"Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Woman and Minorities?" With Florian Zettelmeyer and Jorge Silva-Risso. *Quantitative Marketing and Economics*, 1(1): 65–92, 2003.

"Love or Money? The Effects of Owner Motivation in the California Wine Industry." With Joel M. Podolny. *The Journal of Industrial Economics,* 50(4): 431–456, 2002.

"Horizontal Integration Between Brand and Generic Firms in the Pharmaceutical Industry." *Journal of Economics & Management Strategy,* 11(1): 135–168, 2002.

"Internet Car Retailing." With Florian Zettelmeyer and Jorge Silva-Risso. *The Journal of Industrial Economics,* 49(4): 501–519, 2001.

"Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry." *International Journal of Industrial Organization,* 18(7): 1085–1104, 2000.

"Social Status, Entry, and Predation: The Case of British Shipping Cartels 1879–1929." With Joel Podolny. *The Journal of Industrial Economics,* 47 (1): 41–67, 1999.

"Entry decisions in the generic pharmaceutical industry" *The RAND Journal of Economics,* 30(3): 421–440, 1999.

"Misclassification of the Dependent Variable in a Discrete-Response Setting." With J.A. Hausman and Jason Abrevaya. *Journal of Econometrics,* 87(2): 239–269, 1998.

"Entry and Predation: British Shipping Cartels 1879-1929." *Journal of Economics & Management Strategy,* 6(4): 679–724, 1997.

"The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored Customer Rules." *The RAND Journal of Economics,* 28(2): 269–290, 1997.

"The Interaction between a Most-Favored Customer Clause and Price Dispersion: An Empirical Examination of the Medicaid Rebate Rules of 1990 *Journal of Economics & Management Strategy,* 6(1): 151–174, 1997.

## Working papers

"Surprise! Out of Network Billing." With Zack Cooper and Nathan Shekita. 2018.

"A Model of Generic Drug Shortages: Supply Disruptions, Demand Substitution, and Price Control." With Kim Sang-Hyun. 2015.

"Referring Physicians Leave Money on the Table:  Where Is It?"  With Michael Chernew and Zack Cooper. 2017.

"Differentiated to Death." With Judith Chevalier and David Harrington. 2011.

"Scarcity Rents in Car Retailing: Evidence from Inventory Fluctuations at Dealerships." With Florian Zettelmeyer and Jorge Silva-Risso. NBER Working Paper No. 12177, 2006.

"Cowboys or Cowards: Why Are Internet Car Prices Lower?" With Florian Zettelmeyer and Jorge Silva-Risso. NBER Working Paper No. 8667, 2001.

## Research in progress

"Performances of Indexes that Do Not Hold Rivals."  With Will Goetzmann and Natalie Zhu.

"The Causes of High Pharmaceutical Prices."  With Craig Garthwaite.

"Common Ownership and Index Membership." With Lysle Boller.

"The Impact of Price Information on Search and Healthcare Spending." With Michael Chernew and Zack Cooper.

## Awards

| | |
|---|---|
| 2016 | Yale School of Management Alumni Association Elective Teaching Award: one of two teaching prizes awarded at Yale SOM for the academic year 2015–16 |
| 2014 | HEMA/KPPI Distinguished Visitor, Kellogg GSM, Northwestern University |
| 2011 | Health Care Research Award, National Institute for Health Care Management for "The Effect of Medicare Part D on Pharmaceutical Prices and Utilization." With Mark Duggan. *American Economic Review* 100(1): 590–607. |
| 2011 | National Science Foundation Research Grant 1064341 for "*The Industrial Organization of the Biologics Industry: Theory, Empirics and Policy.*" |
| 2011 | Excellence in Refereeing Award 2011, *American Economic Review* |
| 2010 | Excellence in Refereeing Award 2010, *American Economic Review* |
| 2007 | Yale School of Management Alumni Association Teaching Award, the only teaching prize awarded at Yale School of Management for the academic year 2006–2007 |
| 2007 | Green Award, *Journal of Marketing Research*, for the paper "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data." |
| 2005–2008 | National Science Foundation Research Grant 0518858 for "The Effect of Government Procurement of Pharmaceuticals." With Mark Duggan, University of Maryland. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0518858 |
| 2001–2003 | National Science Foundation Research Grant 0111885 for "The Effect of Internet Car Shopping on Prices and Discrimination." With Florian Zettelmeyer, UC-Berkeley. http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=0111885 |
| 1998–2002 | National Science Foundation Research Grant 9810178 for "Studies of Competition." http://www.nsf.gov/awardsearch/showAward.do?AwardNumber=9810178 |
| 1995 | Distinguished Teaching Commendation: One of three "second prizes" given by Stanford MBA students for excellence in teaching during the academic year 1994-95 |

1993–1994        Program on the Pharmaceutical Industry, MIT, grant for full tuition and stipend

## Courses taught

*Competition Economics and Policy*: Elective MBA course covering topics in competition enforcement such as cartels, horizontal mergers, monopolization, vertical restraints, exclusive dealing, MFNs, predatory pricing, and IP. The law is taught but the focus is on the economics and managerial implications.

*Competitive Strategy:* Elective MBA course covering topics in I.O. such as price and quantity competition, entry, and antitrust, as well as strategy concepts such as industry analysis, competitive advantage, and sustainability

*The Competitor Perspective*: One element of the core curriculum for first-year MBAs that provides introductory analysis of competition using tools from economics, marketing, accounting, and politics

## PhD students supervised (institution, year; first placement)

Andrea Coscelli (Stanford GSB, 1998; University College London)

Brian Viard (University of Chicago GSB, 2000; Stanford GSB)

Paris Cleanthous (Yale, 2003; NYU Stern)

Juan Esteban Carranza (Yale, 2004; Wisconsin-Madison)

Henry Schneider (Yale, 2006; Cornell Johnson School)

Fabian Duarte (Yale, 2010; RAND)

## Memberships and professional service

American Economic Association

NBER, Research Associate, Industrial Organization

First Western Bancorp Inc. (now Sky Bank, Bowling Green, Ohio), Board of Directors (1998–1999)

StreamSage.com, Advisory Board (2000–2004)

*Economic Policy*, Panel (2002–2004)

*Review of Industrial Organization*, Editorial Board (2002–2004)

*The Journal of Industrial Economics*, Associate Editor (2003–2006)

*International Journal of Industrial Organization*, Co-Editor (2005–2008)

*BE Journal of Economics Analysis and Policy*, Editor (2006–2010)

American Economic Association Committee on the Status of Women in the Economics Profession, Board (2007-2009)

*Journal of Economic Perspectives*, Associate Editor (2007–2010)

Scientific Committee, Center for European Economic Research (ZEW) ICT conference (2010)

Program Committee, American Economic Association Meetings (2010)

Scientific Committee, FTC microeconomics conference (2010)

*American Economic Review*, Board of Editors (2011–2013)

Research Advisory Board, CEFAGE, Portugal, member (2013- )

Wharton Business Economics and Public Policy Department, External Review Committee (2016)

AEA Committee on Government Relations (2017-2019)

## Invited research presentations

Dartmouth Econ, MIT Econ, Harvard Econ, Harvard Business School, Harvard School of Public Health, Boston University, Yale Econ, Yale Law, SUNY Stony Brook Econ, Columbia Econ, Columbia Business School, NYU Stern, U. Penn Wharton School, Univ. of Maryland Econ, Department of Justice, Federal Trade Commission, Univ. of Delaware Econ, Duke Econ, Univ. of Virginia Econ, Carnegie Mellon Heinz School, Northwestern Econ, Northwestern Kellogg GSM, Chicago Econ, Chicago GSB, Purdue Econ, Univ. of Michigan Business School, Washington Univ. St. Louis Olin School, Iowa State Econ, University of Tennessee Knoxville, Univ. of Rochester Business School, Cornell Econ, Univ. of Texas at Austin, Univ. of Arizona, Stanford GSB, UC Berkeley Econ, UC Berkeley Haas School, UCLA Econ, RAND, Univ. of Toronto Econ (Canada), Univ. of British Columbia (Canada), Victoria University (Canada), HEC Montreal (Canada), Queens University (Canada), Univ. of Munich (Germany), Univ. of Linz (Austria), DG Competition (Belgium), London School of Economics (England), Office of Fair Trading (England), Oxford University (England), Cambridge University (England), University of Warwick (England), Imperial College (England), UCL (England), Edinburgh University (Scotland), Stirling University (Scotland), European University Institute (Italy), IDEI Toulouse (France), University of Auckland (New Zealand)

## Conferences (presenter or discussant)

Bates White healthcare conference: 2018

Kaiser pharmaceutical pricing conference: 2018

Brookings Institute conference: pharmaceutical competition 2017, patient cost-sharing: 2018

MACCI conference, Mannheim, Germany 2018

Highland Health Economics Conference: 2017 (organizer)

Law, Competition & Markets Paris conference (Columbia University): 2017

EUI: Disruptive Innovation and Competition Policy: 2017

University of East Anglia, Centre for Competition Policy, pharmaceutical conference: 2017

Academic and Practitioner Symposium on Mutual Funds and ETFs (Darden): 2017

5th BRICS International Competition Conference (Brazil) 2017

Unlocking the Promise of Antitrust Enforcement, American University (2017)

Competition, Concentration and Antitrust conference, Stigler Center, Chicago Booth GSB: 2017 (keynote)

American Antitrust Institute Airline roundtable: 2016

Center for Equitable Growth antitrust conference: 2016

ICN Chief Economist Workshop at UBC: 2016

University of Montreal summer IO conference: 2016

Searle International Competition Economist meeting: 2016

Yale Conference on Problems with Global Antitrust Enforcement: 2016 (organizer)

FTC Auto Distribution workshop: 2016

Yale Conference on Healthcare Consolidation: 2015 (organizer)

CRESSE summer conference: 2015

FTC/DOJ Healthcare Conference: 2015

Silicon Flatirons conference, University of Colorado Law School: 2015, 2017

Utah Winter Business Economics Conference: 2014, 2017

NBER Economics of Health Insurance Exchanges: 2014

NBER Digitization Summer Institute: 2014

NBER Innovation Summer Institute: 2014, 2015

FTC/DOJ Conditional Pricing Practices: 2014

IDEI Toulouse TIGER Health conference: 2014

Northwestern Healthcare Markets Conference: 2014

Competition Policy Lecture, University of Toronto Rotman School, 2014

Kaiser Permanente Healthcare and IO conference: 2013 (organizer)

Barcelona GSE Summer Forum: 2013

ChIPs Women in IP Summit, 2013

Conference on Healthcare Reform, Baker Institute, Rice University, 2013

Landsdowne Lecture, University of Victoria, Canada, 2013

EARIE: 2012, 2013

ABA Spring Antitrust meeting: 2011, 2012, 2013

Milton Friedman Healthcare Conference, University of Chicago: 2011

Northwestern Law School Searle Antitrust Economics and Competition Policy: 2011 keynote, 2012 keynote, 2013 . 2014, 2015, 2016

Yale Marketing IO conference: 2011

FTC Microeconomics Conference: 2010 keynote

NBER Public Economics: spring meeting 2009

ASHE conference: 2008

NBER conference on intellectual property: 2006

UCL Behavioral IO conference, England: 2006

CEPR Applied IO conference: 2006

WZB Institute Behavioral IO conference, Berlin, Germany: 2005

Univ. of British Columbia IO conference: 2004

IDEI (Toulouse) pharmaceutical and healthcare conference: 2008

IDEI (Toulouse) e-commerce conference: 2001, 2003 (co-author presented), 2005

NBER conference on innovation policy: 2005

NBER conference on IO of healthcare: 1998

NBER conference on non-profits: 2002

NBER e-commerce group conferences: 2000, 2001

NBER IO Winter Meetings: 1995, 1996, 2000, 2004

NBER IO Summer Institute: 1998, 2001 (organizer and presenter), 2003, 2007 (organizer), 2008, 2010, 2013 (organizer)

American Economics Assn. Meetings: 2001, 2002, 2004, 2005, 2007, 2008, 2010

Economic Policy Conference: 2002 spring and fall, 2003 fall, 2004 fall

Harvard Business School Strategy Conference: 1999, 2004

Stanford Strategy Conference: 1996, 1997 (organizer), 1999, 2000

Boston University healthcare I.O. conference: 1995, 1999, 2004

## Other invited speaking engagements

SIEPR, 2018

DG Competition, series on effects-based analysis of unilateral conduct, 2017

Scotchmer Lecture, Toulouse IDEI, 2017

EC Roundtable, Regulatory Environment for Online Platforms, 2015

Digital Forum, IDEI, Paris, France, 2015

Inaugural *NEJM Exchange* debate, 2015

Competition Policy Lecture, University of Toronto Rotman School, 2014

Landsdowne Lecture, University of Victoria, Canada, 2013

Conference on Healthcare Reform, Baker Institute, Rice University, 2013

ChIPs Women in IP Summit, 2013

## Refereed publications

*Review of Economic Studies, Quarterly Journal of Economics, The RAND Journal of Economics, The Journal of Industrial Economics, Journal of Economics & Management Strategy, Journal of Health Economics, Review of Industrial Organization, International Journal of Industrial Organization, American Economic Review, National Science Foundation, Journal of Law and Economics, Journal of Political Economy, Journal of Law, Economics, and Organization, Marketing Science, Management Science, Strategic Management Journal, Review of Economics and Statistics, Journal of Econometrics, Econometrica, European Economic Review, Berkeley Electronic Journals, The American Journal of Managed Care, Contemporary Economic Policy.*

## Government testimony

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation," April 2016

House Oversight and Government Reform Committee Hearing, "*The Medicare Drug Benefit: Are Private Insurers Getting Good Discounts for the Taxpayer?*," July 2008

Senate Finance Committee Hearing, "*Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit*," January 2007

FTC hearings, "*Possible Anticompetitive Efforts to Restrict Competition on the Internet*," Auto Panel, October 2002

## Major media

*New York Times* "The Company Behind Many Surprise Emergency Room Bills" 24 July 2017

*Pro-Market blog,* Stigler Center, University of Chicago "The Trump Tax" Dec 7, 2016

*New York Times* op-ed "A Monopoly Donald Trump Can Pop" Dec 7, 2016

*New York Times* "Senator calls for inquiry into surprise medical bills" Dec 3, 2016

*New York Times* "Surprise! Insurance paid the ER but not the doctor" Nov 16, 2016 Upshot

*New York Times,* "Discipline for Airlines, Pain for Fliers" June 12, 2015

*New York Times,* "Seeking More Bookings, Airlines Limit Sites…" June 9, 2015

*The New Yorker,* "Shut up and deal" James Surowiecki, April 21, 2014

Planet Money, Episode 438: Mavericks, Monopolies and Beer: Feb 23, 2013

Planet Money, Why Buying a Car Never Changes: Feb 19, 2013

Various antitrust publications: 2011–2012

Marginal Revolution blog, March 31, 2010

*The Wall Street Journal*, January 7, 2010, A2

*The New York Times,* April 24, 2003: G:8: col 3

*BusinessWeek,* May 13, 2002: 3782: p. 32

CNN TV News, January 2002

*The New York Times*, December 6, 2001: C:2: col 1

*The Wall Street Journal*, January 6, 1999: B1

"The Problems of Price Controls" *Regulation*: 24(1) 50-54. 2001

"Why economics has been fruitful for strategy" *Financial Times*, Mastering Strategy Series, 26-31, 1999.

"Strategic complements and substitutes" *Financial Times*, Mastering Strategy Series, 57-64, 1999

## Testimony in Litigated Matters

Retained on behalf of Apple, Inc., and deposed in In re: Qualcomm Litigation, Case No. 3:17-CV-00108-GPC-MDD (consolidated with Case No. 3:17-CV-01010-GPC-MDD) deposed October 26, 2018.

Retained on behalf of Apple Inc., submitted expert report, expert reply report and supplemental expert report, deposed and testified at trial In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof (II), before the U.S. International Trade Commission (2018), 337-TA-1093.  Deposed July 31, 2018.  ITC hearing testimony September 21, 2018.

Retained on behalf of the US Federal Trade Commission, submitted expert reports, and deposed In the Matter of Otto Bock HealthCare North America, Inc., U.S. Federal Trade Commission, Docket. No. 9378.  Deposed June 15, 2018. Testified August 29-30, 2018.

Retained on behalf of ASUS Computer International and ASUStek Computer Incorporated, submitted expert reports and deposed in ASUS Computer International and ASUStek Computer Inc. v. Interdigital, Inc., Interdigital Communications, Inc., Interdigital Technology Corp., IPR Licensing, Inc., and Interdigital Patent Holdings, Inc., United States District Court, Northern District Of California, San Jose Division, Case No. 15-cv-1716 BLF. Deposed July 9, 2018.

Retained on behalf of Apple Inc., submitted expert report and expert reply report, deposed and testified at trial In the Matter of Certain Mobile Electronic Devices and Radio Frequency and Processing Components Thereof, before the U.S. International Trade Commission (2018), 337-TA-1065.  Deposed April 5, 2018.  ITC hearing testimony June 25, 2018.

Retained on behalf of Tesla, submitted expert report and expert reply report, and deposed in the matter of Tesla Motors, Inc. v. Ruth Johnson, in her official capacity as Secretary of State and Chief Motor Vehicle Administrator, Bill Shuette, in his official capacity as Attorney General, and Rick Snyder, in his official capacity as Governor. U.S. District Court, Western District of Michigan, Case No. 1:16-CV-01158-JTN-ESC (2017-2018). Deposed June 2018.

Retained on behalf of Honda Motor Co., Ltd., Honda North America, Inc., American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda Manufacturing of Alabama, LLC, and Honda R&D Americas, Inc., submitted expert report and direct witness statement, and deposed In the Matter of Certain Thermoplastic-Encapsulated Electric Motors, Components Thereof, and Products and Vehicles Containing Same II, International Trade Commission, Inv. No. 337-TA-1073 (2017-2018).

Retained on behalf of Arista Networks Inc., submitted expert report and deposed in Arista Networks Inc. v. Cisco Systems Inc., U.S. District Court for the Northern District of California, Case No. 5:16-cv-00923 (2017-2018).

Retained on behalf of Capital One Financial Corporation, submitted expert reports and declaration, and deposed in *Intellectual Ventures I LLC, et al.,* v. *Capital One Financial Corp., et al.,* v. *Intellectual Ventures Management, LLC, Invention Investment Fund I, L.P., and Invention Investment Fund II, LLC,* U.S. District Court for the District of Maryland, Southern District, Case No. 8:14-CV-00111-PWG (2017).

Retained on behalf of Microsoft Corporation, deposed in the matter of *Microsoft Corporation et al v. Evolved Wireless LLC*, U.S. District Court, District of Delaware, Case No. 1:15-cv-00547-UNA (2017).

Retained on behalf of SK hynix, deposed and testified at trial *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, International Trade Commission, Inv. No. 337-TA-1023 (2017).

Retained on behalf of Tesla, submitted expert report, and testified in Tesla Motors, Inc.'s application for New Motor Vehicle Dealer License before the Arizona Department of Transportation Executive Hearing Office (July 2016).

Retained on behalf of Tesla, submitted expert reports, and testified in formal evidentiary hearing pursuant to VA. Code §§ 46.2-1572(4) and 46.2-1573, before the Department of Motor Vehicles for the Commonwealth of Virginia (June 2016).

Retained on behalf of Tesla, submitted expert report, and testified in Tesla Motors, Inc.'s application for Motor Vehicle Dealer License before the North Carolina Wake County Division of Motor Vehicles, Hearing Section (May 2016).

House Committee on the Judiciary, Subcommittee on Courts, Intellectual Property, and the Internet, Hearing on "International Trade Commission (ITC) Patent Litigation" (April 2016).

Retained by Charter Communications, filed multiple statements with the FCC related to its proposed acquisition of Time Warner Cable and Bright House Networks (2015).

Retained on behalf of Tesla, submitted witness declaration, and testified in *Tesla Motors Utah, Inc. vs. Motor Vehicle Enforcement Division of the Utah State Tax Commission*, in a matter before the Utah State Tax Commission (August 2015).

Retained on behalf of Tesla and testified in *Georgia Automobile Dealers Association vs. Tesla Motors, Inc.*, in a matter before the Georgia Office of State Administrative Hearings (February 2015).

Retained on behalf of Microsoft Corporation and submitted expert report in *Surfcast, Inc. v. Microsoft Corporation*, U.S. District Court for the District of Maine, Case No. 2:12-CV-00333-JDL (June 2014).

Retained on behalf of Amgen, submitted expert report, and deposed in *United States of America et al. ex rel. Kassie Westmoreland v. Amgen Inc. et al.*, U.S. District Court of Massachusetts, Civil Action No. 06-10972-WGY (2011).

Retained on behalf of Johnson & Johnson and submitted expert report in Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al., Commonwealth Court of Pennsylvania, No. 212 M.D. 2004 (2010).

Retained on behalf of BMS, submitted expert report, and testified at trial in Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al., Commonwealth Court of Pennsylvania, No. 212 M.D. 2004 (2010).

Retained on behalf of Chrysler Group LLC, submitted expert report, and testified in selected arbitration hearings *in re Arbitrations Pursuant to Section 747 of H.R. 3288 between Chrysler Group LLC (New Chrysler) and "Covered Dealerships*," American Arbitration Association (2010).

Retained on behalf of Johnson & Johnson and deposed in *State of Wisconsin v. Abbott Laboratories, Inc., et al.*, Circuit Court for Dane County, Wisconsin, 04 CV 1709 (2009).

Retained on behalf of AstraZeneca and testified at trial in *Commonwealth of Kentucky v. Alpharma USPD, Inc., et al.*, Franklin Circuit Court–Div. I, Kentucky, Civil Action No. 04-CI-1487 (2009).

Retained on behalf of Sandoz and testified at trial in Commonwealth of *Kentucky v. Alpharma USPD, Inc., et al.*, Franklin Circuit Court–Div. I, Kentucky, Civil Action No. 04-CI-1487 (2009).

Retained on behalf of Boehringher Ingelheim, submitted expert report, and deposed in *United States of America ex rel. Ven-A-Care of the Florida Keys et al. v. Boehrinhger Ingelheim Corp. et al.*, US District Court of Massachusetts, Civil Action No. 00-10698-MEL (2009).

Retained on behalf of Sandoz, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2009).

Retained on behalf of Pfizer, deposed, and testified at trial in *State of Wisconsin v. Abbott Laboratories, Inc., et al.*, Circuit Court for Dane County, Wisconsin, 04 CV 1709 (2009).

Retained on behalf of Bristol-Myers Squibb and deposed in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Retained on behalf of GlaxoSmithKline and Novartis, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Prepared and delivered educational materials for the Court and examined at hearing in *Commonwealth of Massachusetts v. Mylan Laboratories, Inc., Ivax Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Co., and Roxane Laboratories, Inc.*, US District Court of Massachusetts, Civil Action No. 03-11865-PBS (2008).

Retained on behalf of defendants, submitted expert report, deposed, and testified at trial in *Commonwealth of Massachusetts v. Mylan Laboratories, Inc., Ivax Corporation, Warrick Pharmaceutical Corporation, Watson Pharmaceuticals, Inc., Schein Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., Par Pharmaceutical, Inc., Purepac Pharmaceutical Co., and Roxane Laboratories, Inc.*, US District Court of Massachusetts, Civil Action No. 03-11865-PBS (2008, 2010).

Retained on behalf of AstraZeneca, deposed, and testified at trial in *State of Alabama v. Abbott Laboratories, Inc., et al.*, Circuit Court of Montgomery County, Alabama, CV-2005-219 (2008).

Retained on behalf of MedStar Health and submitted expert report in *In re Hypodermic Products Antitrust Litigation*, MDL No. 1730, US District Court of the District of New Jersey, 05-CV-1602 (2007).

Retained on behalf of Schering-Plough, submitted expert report, and deposed in *In re Schering-Plough Corporation Securities Litigation*, US District Court of the District of New Jersey, 01-CV-0829 (2007).

Retained on behalf of Pfizer, submitted expert report, and deposed in *In re Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court of Massachusetts, MDL No MDL 1629 (2007).

Submitted expert report on behalf of fast-track defendants in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, US District Court of Massachusetts, MDL No. 1456, 01-CV-012257-PBS (2006).

Retained on behalf of Teva USA and submitted expert report in IP damages litigation *Abbott Laboratories v. Andrx Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. and Roxane Laboratories Inc.*, US District Court for the Northern District of Illinois Eastern Division, No. 05 C 1490 (2005).

## Other Submissions in Litigated Matters

Prepared and delivered educational materials for the Court in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, US District Court of Massachusetts, MDL No. 1456, 01-CV-012257-PBS (2004).

**EXHIBIT 2**

**LIST OF MATERIALS CONSIDERED**

**I.    Publications and Academic Articles**

1.   A. Douglas Melamed, "Exclusive Dealing Agreements and Other Exclusionary Conduct—Are There Unifying Principles," 73 Antitrust Law Journal 375 (2006)

2.   Alfred I. Neugut, Anita T. Ghatak, and Rachel L. Miller, "Anaphylaxis in the United States: An Investigation Into Its Epidemiology," 161 Archives of Internal Medicine 15 (2001)

3.   "Anaphylaxis and Insect Stings and Bites," 318 Journal of the American Medical Association 86 (2017)

4.   B. Douglas Bernheim and Randal Heeb, "Framework for the economic analysis of exclusionary conduct," in R. D. Blair & D. D. Sokol (Eds.), The Oxford Handbook of International Antitrust Economics,  Oxford: Oxford University Press (2014)

5.   Barry Nalebuff, "Exclusionary Bundling," 50 Antitrust Bulletin 321 (2005)

6.   David B. Ridley, "Payments, Promotion and the Purple Pill," 24 Health Economics 86 (2015)

7.   Ernst R. Berndt, Thomas G. McGuire, and Joseph P. Newhouse, *"*A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," (National Bureau of Economic Research Working Paper No. 16879) (2011)

8.   F. Estelle R. Simons, MD, "Anaphylaxis, Killer Allergy: Long-term Management in the Community," Journal Allergy and Clinical Immunology, 367 (2006)

9.   F. Estelle R. Simons, "Anaphylaxis: Recent Advances in Assessment and Treatment," 124 Journal of Allergy and Clinical Immunology 625 (2009).

10.  Fiona M. Scott Morton, "Contracts that Reference Rivals," in Antitrust Economics for Lawyers, 2017 Edition, (LexisNexis Antitrust Law & Strategy Series) (2017)

11.  Fiona M. Scott Morton, "Contracts that Reference Rivals," 27 Antitrust 72 (2013)

12.  Fiona M. Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," 81 Antitrust Law Journal 777 (2017)

13.  Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," in Handbook of Health Economics, Volume 2, (Mark Pauly, Thomas McGuire, and Pedro Barros, eds., Elsevier Science Publishers) (2012).

14. Frank Limbrock, "Pecuniary and Non-Pecuniary Incentives in Prescription Pharmaceuticals: The Case of Statins," 11 *B*.E. Journal of Economic Analysis & Policy (Advances) (2011)

15. George A. Hay, "Market Power in Antitrust," 60 Antitrust Law Journal 807 (1991)

16. Gregory J. Werden, "The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm," 71 Antitrust Law Journal 253 (2003)

17. Gregory J. Werden, "Identifying Exclusionary Conduct under Section 2: The 'No Economic Sense' Test," 73 Antitrust Law Journal 413 (2006)

18. Jean Tirole, The Theory of Industrial Organization, Cambridge, Mass: MIT Press (1988)

19. Jonathan B. Baker, "Market Definition: An Analytical Overview," 74 Antitrust Law Journal 129 (2007)

20. Jonathan B. Baker, "Exclusion as a Core Competition Concern," 78 Antitrust Law Journal 527 (2013)

21. Jonathan B. Baker and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," in Handbook of Antitrust Economics (Paolo Buccirossi ed., The MIT Press) (2008)

22. Jonathan M. Jacobson and Daniel P. Weick, "Contracts That Reference Rivals as an Antitrust Category," The Antitrust Source (2012)

23. Joseph A. DiMasi and Henry G. Grabowski, "The Cost of Biopharmaceutical R&D: Is Biotech Different?" 28 Managerial and Decision Sciences 469 (2007).

24. Joseph Farrell, Janis K. Pappalardo and Howard Shelanski, "Economics at the FTC: Mergers, Dominant-Firm Conduct, and Consumer Behavior," 37 Review of Industrial Organization 263 (2010)

25. Joshua A. Boyce, et al., "Guidelines for the Diagnosis and Management of Food Allergy in the United States: Report of the NIAID-Sponsored Expert Panel," 126 Journal of Allergy and Clinical Immunology S1 (2010).

26. Joshua D. Wright, "Simple but Wrong or Complex but More Accurate? The Case for an Exclusive Dealing-Based Approach to Evaluating Loyalty Discounts," Remarks at the Bates White 10th Annual Antitrust Conference (June 3, 2013), available at www.ftc.gov/sites/default/files/documents/ statements/-or-complex-more-accurate-case-exclusive-dealing-based-approach-evaluating-loyalty/130603bateswhite.pdf.

27. Judith Hellerstein, "The Importance of the Physician in the Generic versus Trade-name Prescription Decision," 29 RAND Journal of Economics 108 (1998)

28. Larry S. Posner and Carlos A. Camargo, Jr, "Update on the Usage and Safety of Epinephrine Auto-Injectors, 2017," 9 Drug, Healthcare and Patient Safety 9 (2017)

29. Marc-André Gagnon and Joel Lexchin, "The Cost of Pushing Pills: A New Estimate of Pharmaceutical Promotion Expenditures in the United States," 5 PLoS Medicine 29 (2008).

30. Margaret Kyle, "Pharmaceutical Price Controls and Entry Strategies," 89 Review of Economics and Statistics 88 (2007).

31. Michael L. Katz, "Vertical Contractual Relations," in Handbook of Industrial Organization, Volume I, (Richard Schmalensee and Robert D. Willig, eds., Elsevier Science Publishers) (1989)

32. Nicholas Economides, "Loyalty/Requirement Rebates and the Antitrust Modernization Commission: What is the Appropriate Liability Standard?," 54 Antitrust Bulletin 259 (2009)

33. Patrick DeGraba, "Naked Exclusion by a Dominant Supplier: Exclusive Contracting and Loyalty Discounts," 31 International Journal of Industrial Organization 516 (2013)

34. Paul A. Greenberger et al., "Contemporary issues in anaphylaxis and the evolution of epinephrine autoinjectors," 119 Annals of Allergy, Asthma, & Immunology 333 (2017), available at https://www.annallergy.org/article/S1081-1206(17)30597-5/pdf

35. Paul Joskow, "Vertical Integration," 1 American Bar Association, Section of Antitrust Law, Issues in Competition Law and Policy 271(W. Dale Collins, ed.) (2008)

36. Phil Lieberman, Carlos A. Camargo, Jr, Kari Bohlke, Hershel Jick, Rachel L. Miller, Aziz Sheikh, and F. Estelle R. Simons, "Epidemiology of Anaphylaxis: Findings of the American College of Allergy, Asthma and Immunology Epidemiology of Anaphylaxis Working Group," 97 Annals of Allergy, Asthma & Immunology 596 (2006)

37. Philippe Aghion and Patrick Bolton, "Contracts as a Barrier to Entry," 77 American Economic Review 388 (1987)

38. Ralph A. Winter, "Vertical Restraints and Antitrust Policy: A Reaction to Cooper, Froeb, O'Brien, and Vita," 1 Competition Policy International 75 (2005)

39. Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," 6 Journal of Economics & Management Strategy 75 (Spring 1997)

40. Sara Fisher Ellison and Christopher M. Snyder, "Countervailing Power in Wholesale Pharmaceuticals," 58 The Journal of Industrial Economics 32 (2010)

41. Scott Podolsky and Jeremy Greene, "A Historical Perspective of Pharmaceutical Promotion and Physician Education," 300 JAMA: The Journal of the American Medical Association 831 (2008)

42. Stephen F. Kemp and Richard F. Lockey, "Anaphylaxis: A review of causes and mechanisms," 110 Journal of Allergy and Clinical Immunology 341 (2002).

43. Stephen Lockey, "A New Method of Administering Aqueous Epinephrine: The EpiPen, an Automatic Syringe," 17 Journal of Asthma Research 153 (1980).

44. Steven C. Salop, "Exclusionary Conduct, Effect on Consumers, and the Flawed Profit Sacrifice Standard," 73 Antitrust Law Journal 311 (2006)

45. Taiil Song, et al., "Anaphylaxis Treatment: Current Barriers to Adrenaline Auto-Injector Use," 69 Allergy 983 (2014)

46. Thomas G. Krattenmaker and Steven C. Salop, "Anticompetitive Exclusion: Raising Rivals' Costs To Achieve Power Over Price," 96 Yale Law Journal 209 (1986)

47. Toshiaki Iizuka and Ginger Jin, "The Effects of Prescription Drug Advertising on Doctor Visits," 14 Journal of Economics and Management Strategy 701 (2005)

## II.   Depositions: (30(b)(1) & 30(b)(6))

1. Deposition of Joseph Anderson (with Exhibits)

2. Deposition of Michael Arcara (with Exhibits)

3. Deposition of James Ayers (with Exhibits)

4. Deposition of Patrick Barry (with Exhibits)

5. Deposition of Jim Borneman (with Exhibits)

6. Deposition of Carly Bowersock

7. Deposition of Heather Bresch (with Exhibits)

8. Deposition of Michael Brodeur (with Exhibits)

9. Deposition of Douglas Brown (with Exhibits)

4

10. Deposition of Patrick Bryne (with Exhibits)

11. Deposition of Shannon Clements

12. Deposition of Robert Coury (with Exhibits)

13. Deposition of Louanne Cunico (with Exhibits)

14. Deposition of Joseph Denney (with Exhibits)

15. Deposition of Bryan Downey (with Exhibits)

16. Deposition of Robert Eaton (with Exhibits)

17. Deposition of Lida Etemad (with Exhibits)

18. Deposition of Jon Fairest (with Exhibits)

19. Deposition of Bruce Foster (with Exhibits)

20. Deposition of Roger Graham (with Exhibits)

21. Deposition of Ron Graybill (with Exhibits)

22. Deposition of Peter Guenter (with Exhibits)

23. Deposition of Thomas Hadley (with Exhibits)

24. Deposition of Jason Hall (with Exhibits)

25. Deposition of Tom Handel (with Exhibits)

26. Deposition of Lorine Harr (with Exhibits)

27. Deposition of Phil Huang (with Exhibits)

28. Deposition of Herve Hubert (with Exhibits)

29. Deposition of Saira Jan (with Exhibits)

30. Deposition of Patrick Jones (with Exhibits)

31. Deposition of Harry Jordan (with Exhibits)

32. Deposition of Adam Kautzner (with Exhibits)

33. Deposition of Sherry Korczynski (with Exhibits)

34. Deposition of Deborah Kronberg (with Exhibits)

35. Deposition of Sandy Loreaux (with Exhibits)

36. Deposition of Jeff May (with Exhibits)

37. Deposition of Barbara Minton (with Exhibits)

38. Deposition of Jez Moulding (with Exhibits)

39. Deposition of James Parker (with Exhibits)

40. Deposition of Suzanne Paszkiewicz (with Exhibits)

41. Deposition of Pranay Patel (with Exhibits)

42. Deposition of Sylvain Rocheleau (with Exhibits)

43. Deposition of Kent Rogers (with Exhibits)

44. Deposition of Macy Shia (with Exhibits)

45. Deposition of Carrie Siragusa (with Exhibits)

46. Deposition of Bethanie Stein (with Exhibits)

47. Deposition of April Sumner

48. Deposition of Scott Sussman (with Exhibits)

49. Deposition of Lisa Templeton (with Exhibits)

50. Deposition of Harry Vargo (with Exhibits)

51. Deposition of Christopher Viehbacher (with Exhibits)

52. Deposition of Keith Wade (with Exhibits)

53. Deposition of Donna Wemple

54. Deposition of Anne Whitaker (with Exhibits)

55. Deposition of Jeff White (with Exhibits)

56. Deposition of Spencer Williamson (with Exhibits)

57. Deposition of Nicole Willing (with Exhibits)

58. Deposition of Justin Works (with Exhibits)

59. Deposition of Jay York (with Exhibits)

60. Deposition of Patrick Zinn (with Exhibits)

**III.  Interviews**

1. Call with Dr. Phillip Huang, 1/28/2019

2. Call with Bryan Downey, 1/30/2019

**IV.  Cases and Court Filings**

1. Complaint, 2:17-cv-2452 (4/24/2017)

2. Answer, Affirmative Defenses, and Counterclaims of Mylan Inc. and Mylan Specialty, Inc., 17-md-2785-DDC-TJJ (1/16/2018)

3. Memorandum and Order, IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation, Case No. 17-md-2785-DDC-TJJ (12/21/2017)

4. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377 (1956)

5. King Pharmaceuticals, Inc. and Meridian Medical Technologies, Inc. v. Intelliject, Inc. U.S. District of Delaware, Case 1:11-cv-00065-UNA (2011)

6. LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003)

7. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254 (3d Cir. 2012)

8. United States v. Grinnell Corp., 384 U.S. 563 (1966)

9. Mylan Defendants' Responses And Objections To All Plaintiffs' First Set of Coordinated Requests For Admission, 17-md-2785-DDC-TJJ (1/4/2018)

10. Mylan Defendants' Second Amended Responses and Objections to Plaintiffs' First Set of Coordinated Requests For Admission, 17-md-2785-DDC-TJJ (4/30/2018)

11. Mylan Defendants' Responses And Objections To All Plaintiffs' First Set of Coordinated Interrogatories, 17-md-2785-DDC-TJJ (1/4/2018)

12. Mylan Defendants' Responses And Objections To All Plaintiffs' First Set of Coordinated Requests For Production of Documents, 17-md-2785-DDC-TJJ (1/4/2018)

13. Mylan Defendants' Second Amended Responses And Objections To Class Plaintiffs' First Set of Interrogatories, 17-md-2785-DDC-TJJ (3/22/2018)

14. Mylan Defendants' Second Amended Responses And Objections To Class Plaintiffs' First Set of Requests For Production of Documents, 17-md-2785-DDC-TJJ (3/22/2018)

15. Mylan Defendants' Second Amended Responses And Objections To All Plaintiffs' First Set of Coordinated Interrogatories, 17-md-2785-DDC-TJJ (3/22/2018)

16. Mylan Defendants' Second Amended Responses And Objections To Class Plaintiffs' First Set of Requests For Production of Documents, 17-md-2785-DDC-TJJ (3/22/2018)

17. Mylan Defendants' Second Amended Responses And Objections To All Plaintiffs' First Set of Coordinated Interrogatories, 17-md-2785-DDC-TJJ (3/22/2018)

18. Exhibit 1 to Mylan Defendants' Second Amended Responses And Objections To All Plaintiffs' First Set of Coordinated Interrogatories, 17-md-2785-DDC-TJJ

19. Exhibit 2 to Mylan Defendants' Second Amended Responses And Objections To All Plaintiffs' First Set of Coordinated Interrogatories, 17-md-2785-DDC-TJJ

20. Exhibit 3 Mylan Defendants' Second Amended Responses And Objections To All Plaintiffs' First Set of Coordinated Interrogatories, 17-md-2785-DDC-TJJ

21. Expert Report of Dr. Maryann Michelis (Feb. 2, 2019)

## V.    Data

1. IQVIA National Sales Perspectives Data

2. IQVIA Xponent Plantrak

3. MMIT Data

4. Sanofi Bridge Files

5. Mylan Transactional Data

6. Sanofi Transactional Data

## VI.    Other Documents

1. All documents cited in report

2. Allergic Living, "Symjepi Epinephrine Syringe Luanched in U.S. Clinics" (Jan. 17, 2019) https://www.allergicliving.com/2019/01/17/symjepi-epinephrine-syringe-launched-in-u-s-clinics

3. Amedra Pharmaceuticals LLC, "Amedra Pharmaceuticals Markets Adrenaclick® Auto-Injector," PR Newswire, June 14, 2013, available at https://www.prnewswire.com/news-releases/amedra-pharmaceuticals-markets-adrenaclick-auto-injector-211586831.html

4. American College of Allergy, Asthma & Immunology, "Anaphylaxis" (Jan. 29, 2018), https://acaai.org/allergies/anaphylaxis

5. American College of Allergy, Asthma & Immunology, "Epinephrine Auto-injector" (Feb. 1, 2018), https://acaai.org/allergies/allergy-treatment/epinephrine-auto-injector

6. Aspe.hhs.gov, "Medicaid Program Names," https://aspe.hhs.gov/dataset/medicaid-program-names

7. Auvi-Q, "About Auvi-Q," https://www.auvi-q.com/about-auvi-q

8. Bioportal.bioontology.org, "NDA020800 0.3 ML Epinephrine 1 MG/ML Auto-Injector," http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870230

9. Bioportal.bioontology.org, "NDA020800 0.15 Epinephrine 1 MG/ML Auto Injector," http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870225

10. Bioportal.bioontology.org, "NDA020800 0.3 ML Epinephrine 1 MG/ML Auto-Injector," http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870230

11. Brice Labruzzo Mohundro and Michael Marlan Mohundro, "Important Considerations When Dispensing Epinephrine Auto-Injector Devices" (Sept. 22, 2010), https://www.pharmacytimes.com/p2p/p2pepinephrine-0910

12. Cahealthadvocates.org, "MEDI-CAL (For People with Medicare)," https://cahealthadvocates.org/low-income-help/medi-cal-for-people-with-medicare/

13. Careoregonadvantage.org, "Care Oregon Advantage," https://www.careoregonadvantage.org/docs/default-source/2018-member-material/coa_star_2018_summary_of_benefits.pdf?sfvrsn=2

14. Center for Drug Evaluation and Research, "Approval Package for Application Number: 019430Orig1s001," https://www.accessdata.fda.gov/drugsatfda_docs/nda/pre96/019430Orig1s001.pdf

15. Center for Drug Evaluation and Research, "Approval Package for Application Number: 201739Orig1s000," https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000Approv.pdf

16. CNBC, "Teva prices EpiPen generic at $300, same price as Mylan generic," Nov. 27, 2018, available at https://www.cnbc.com/2018/11/27/teva-epipen-generic.html

17. Colin Kellaher, "Teva Releases Generic EpiPen in Limited Doses in the U.S.," Wall Street Journal, Nov. 27, 2018, available at https://www.wsj.com/articles/teva-releases-generic-epipen-in-limited-doses-in-the-u-s-1543336473

18. Consultants in Allergy & Asthma Care, "Epinephrine Choices in 2017; So Many, And What To Do?" (June 30, 2017), https://allergyasthmacare-doctor.com/epinephrine-choices-in-2017-so-many-and-what-to-do

19. Dailymed.nlm.nih.gov, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=9a010290-186a-4182-a6bd-c6ae75b3cbeb

20. Doug Roe, Med Device Online, "Keeping it Simple: One Startup's Plan To Upend The Epinephrine Delivery Market" (March 29, 2016), https://www.meddeviceonline.com/doc/one-start-up-s-plan-to-upend-the-epinephrine-delivery-market-0001

21. Drugs.com, "Generic Adrenaclick Availability," https://www.drugs.com/availability/generic-adrenaclick.html

22. E.B. Solomont, St. Louis Business Journal, "Express Scripts, Medco complete $29 billion merger" (April 2, 2012), https://www.bizjournals.com/stlouis/blog/2012/04/express-scripts-medco-complete-29.html

23. Ed Silverman, Pharmalot "How Mylan tried to keep Teva from selling a generic EpiPen" (Aug. 31, 2016), https://www.statnews.com/pharmalot/2016/08/31/mylan-teva-generic-epipen/

24. EpiPen, "EpiPen Supply Information," https://www.epipen.com/about-epipen-and-generic/supply-information

25. EpiPen, "Frequently Asked Questions: What are the symptoms of anaphylaxis?," https://www.epipen.com/about-epipen-and-generic/faq

26. Mylan, "Anaphylaxis" (2014), https://www.mylan.com/-/media/mylancom/files/patient-materials/myguide_anaphylaxis.pdf

27. FDAnews, "Ohio Passes Law Allowing EpiPen Alternatives" (Jan. 14, 2019), https://www.fdanews.com/articles/189849-ohio-passes-law-allowing-epipen-alternatives.

28. Full House Committee on Oversight and Government Reform, Hearing on Reviewing the Rising Price of EpiPens (Sept. 21, 2016), https://www.govinfo.gov/content/pkg/CHRG-114hhrg24914/pdf/CHRG-114hhrg24914.pdf

29. The Henry J. Kaiser Family Foundation, "Health Insurance Coverage of the Total Population," https://www.kff.org/other/state-indicator/total-population/?dataView=1&currentTimeframe=3&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

30. Hidesigns.com, "North Dakota Medicaid Generics Preferred List," http://hidesigns.com/assets/files/ndmedicaid/2017/North_Dakota_Authorized_Generics_Preferred_List_10102017.pdf

31. Hhs.texas.gov, "STAR Medicaid Managed Care Program," https://hhs.texas.gov/services/health/medicaid-chip/programs/star-medicaid-managed-care-program

32. ICarehealthplan.org, "iCare Medicare Plan," https://www.icarehealthplan.org/Plans/MedicareSNP.aspx

33. IQVIA, "Research Support," https://www.iqvia.com/institute/research-support

34. Mckesson.com, "Generic EpiPen®; EPIsnap®; Adrenaclick®; Auvi-Q®; Epinephrinesnap-v®; EpiPen 2-Pak®; EpiPen Jr 2-Pak®; EPIsnap® Alpha- and Beta-Adrenergic Agonist Epinephrine 0.15 mg Injection Auto-Injector 0.15 mL," https://mms.mckesson.com/product/1053683/Impax-Pharmaceuticals-115169549

35. Medicaid.gov, "Children's Health Insurance Program (CHIP)," https://www.medicaid.gov/chip/index.html

36. Medicaid.gov.ohio.gov, "Programs for Children, Families and Pregnant Women," https://www.medicaid.ohio.gov/FOR-OHIOANS/Programs/Children-Families-and-Women

37. Medicare.gov, "Drug coverage (Part D)," https://www.medicare.gov/drug-coverage-part-d

38. Medicare.gov, "Private Fee for Service Plans (PFFS)," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/private-fee-for-service-pffs-plans

39. Medicare.gov, "Special Needs Plans (SNP)," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/special-needs-plans-snp

40. Mylan's description of the EpiPen4Schools program, available at https://www.epipen4schools.com/

41. Janet Goldman, "Syringe & Vial or Epi-Pen?" (Sept. 7, 2016), https://allergyadvocacyassociation.org/index.php/in-the-news/470-syringe-vial-or-epi-pen-2-itn

42. Jayne O'Donnell, "Family Matters: EpiPens Had High-Level Help Getting into Schools," USA Today (Sept. 21, 2016), http://www.usatoday.com/story/news/politics/2016/09/20/family-matters-epipens-had-help-getting-schools-manchin-bresch/90435218

43. John Reid Blackwell, "Medical products maker Intelliject changes name to Kaleo," Richmond Times-Dispatch, Jan. 7, 2014, available at https://www.richmond.com/business/medical-products-maker-intelliject-changes-name-to-kaleo/article_1133fd4a-c6b2-5a76-b867-ccb0aafecbdc.html

44. Jonathan D. Rockoff, Louise Radnofsky and Daniela Hernandez, "Mylan CEO Faces Tough Questioning in Congressional EpiPen Hearing," Wall Street Journal, Sept. 22, 2016, https://www.wsj.com/articles/mylan-ceo-to-shift-blame-on-epipen-pricing-at-house-hearing-1474466910

45. Kaléo, "AUVI-Q (epinephrine injection, USP) Available in Canada Starting September 7" (Aug. 29, 2018), https://kaleo.com/press-release/auvi-q-epinephrine-injection-usp-available-in-canada-starting-september-7

46. Kaléo, "Kaléo Announces U.S. Availability and Pricing to Patients of Auvi-Q® (Epinephrine Injection, USP) Auto-Injector, For Life-Threatening Allergic Reactions" (Jan. 19, 2017), https://kaleo.com/press-release/kaleo-announces-u-s-availability-and-pricing-to-patients-of-auvi-q-epinephrine-injection-usp-auto-injector-for-life-threatening-allergic-reactions/

47. Kaléo, "Kaléo Confirms U.S. Availability of AUVI-Q (epinephrine injection, USP) Auto-injector for Back-to-School Season" (Aug. 14, 2018), https://kaleo.com/press-release/kaleo-confirms-u-s-availability-of-auvi-q-epinephrine-injection-usp-auto-injector-for-back-to-school-season

48. Katie Thomas, "Brothers Develop New Device to Halt Allergy Attacks," New York Times, Feb. 1, 2013, available at https://nytimes.com/2013/02/02/business/auvi-q-challenges-epipen-with-a-new-shape-and-size.html

49. Keith T. Reed, "Meridian Medical Technologies sold," Baltimore Business Journal, Jan. 9, 2003, available at https://www.bizjournals.com/baltimore/stories/2003/01/06/daily35.html

50. Lineage Therapeutics Inc., "Lineage Therapeutics Markets Authorized Generic Epinephrine Auto-Injector," PR Newswire, June 14, 2013, available at

https://www.prnewswire.com/news-releases/lineage-therapeutics-markets-authorized-generic-epinephrine-auto-injector-211585371.html

51. Linette Lopez and Lydia Ramsey, Business Insider, "'YOU ASKED FOR IT' – Congress railed on the maker of EpiPen" (Sept. 21, 2016), https://www.businessinsider.com/mylan-ceo-heather-bresch-house-oversight-committee-hearing-epipen-2016-9

52. Mayo Clinic Staff, "Anaphylaxis: Overview" (Jan. 5, 2018), https://www.mayoclinic.org/diseases-conditions/anaphylaxis/symptoms-causes/syc-20351468

53. Medicaid.gov, "October 2018 Medicaid & CHIP Enrollment Data Highlights," https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html

54. MPR, "Adrenaclick Auto-injector launched for anaphylaxis" (Jan. 7, 2010), https://www.empr.com/news/adrenaclick-auto-injector-launched-for-anaphylaxis/article/160817/

55. MPR, "Adrenaclick Auto-Injector Available Again for Anaphylaxis," (June 17, 2013) http://www.empr.com/news/adrenaclick-auto-injector-available-again-for-anaphylaxis/article/298979/

56. Mylan Inc. Q1 2009 Earnings Call Transcript (May 1, 2009)

57. Mylan Inc., Transition Report (Form 10-K/A) (March 7, 2008)

58. Mylan N.V., Annual Report (Form 10-K) (Feb. 15, 2016)

59. Mylan, "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized Generic" (Dec. 16, 2016), http://newsroom.mylan.com/2016-12-16-Mylan-Launches-the-First-Generic-for-EpiPen-epinephrine-injection-USP-Auto-Injector-as-an-Authorized-Generic

60. Mylan, "Anaphylaxis" (2014), https://www.mylan.com/-/media/mylancom/files/patient-materials/myguide_anaphylaxis.pdf

61. Mylan, "Mylan and Pfizer Announce Epinephrine Auto-injector Settlement Agreement with Teva" (April 26, 2012), http://newsroom.mylan.com/press-releases?item=123144

62. Mylan, "Mylan On Location," http://www.mylan.com/en/mylan-on-location-featuring-epipen

63. Mylan, "Mylan Specialty L.P. Announces 25th Anniversary Celebration of EpiPen® (epinephrine) Auto-Injector" (April 25, 2013), http://newsroom.mylan.com/press-releases?item=122761

64. Mylan, "Mylan Specialty Offers Free EpiPen® (epinephrine) Auto-Injectors to Schools Nationwide" (Aug. 14, 2012), http://newsroom.mylan.com/press-releases?item=122583

65. Mylan, "Mylan to Launch First Generic to EpiPen® Auto-Injector at a List Price of $300 per Two-Pack Carton, a More than 50% Discount to the Brand Product" (Aug. 29, 2016), http://newsroom.mylan.com/2016-08-29-Mylan-to-Launch-First-Generic-to-EpiPen-Auto-Injector-at-a-List-Price-of-300-per-Two-Pack-Carton-a-More-than-50-Discount-to-the-Brand-Product

66. Mylan, Annual Report (Form 10-K) (Feb. 21, 2012)

67. Mylan, Annual Report (Form 10-K) (Mar. 2, 2015)

68. Mylan , "Mylan Signs Strategic Alliance Agreement with Walt Disney Parks and Resorts to Enhance Access to EpiPen® (epinephrine) Auto-Injectors" (Nov. 7, 2014), http://investor.mylan.com/news-releases/news-release-details/mylan-signs-strategic-alliance-agreement-walt-disney-parks-and

69. NIH, "EPINEPHRINE injection [Greenstone LLC]," https://web.archive.org/web/20100516130646/http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=16934

70. Office of Inspector General, "Pharmaceutical Manufacturer Copayment Coupons," Department of Health and Human Services (September 2014), https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/sab_copayment_coupons.pdf

71. Optimahealth.com, "Optima Medicare HMO - Plan Information," https://www.optimahealth.com/plans/medicare/coverage/plan-information

72. PeanutAllergy.com, "Meridian Announces Launch of New EpiPen 2-PAK" (April 3, 2001), https://www.peanutallergy.com/boards/meridian-announces-launch-of-new-epipen-2-pak

73. Pfizer, "Pfizer Completes Acquisition of King Pharmaceuticals, Inc." (March 1, 2011), https://archive.is/20130630050306/http://www.pfizer.com/news/press_releases/pfizer_press_release_archive.jsp?guid=20110301006102en&source=2011&page=14

74. Phi Publications, http://www.phipublications.com/About_Data.html

75. Q1medicare.com, "2019 Medicare Advantage Plan Benefit Details for the Medi-Pak Advantage (HMO)," https://q1medicare.com/MedicareAdvantage-PartC-MedicareHealthPlanBenefits.php?state=AR&source=2016MAText&ZIP=&countyCode=5131&contractId=H9699&planId=004&segmentId=1&plan=Medi-

Pak%20Advantage%20(HMO)&utm_source=partd&utm_medium=matext&utm_campaign=detailsicon

76. Q1medicare.com, "What is Medicare PDP and an MAPD," https://q1medicare.com/q1group/MedicareAdvantagePartDQA/FAQ.php?faq=What-is-a-Medicare-PDP-and-an-MAPD-&faq_id=616&category_id=146

77. Sandoz: A Novartis Division, "Update on Launch Plans for Symjepi (epinephrine) in the US" (Dec. 6, 2018), https://www.us.sandoz.com/news/media-releases/update-launch-plans-symjepi-epinephrine-us

78. Sanofi, "Auvi-Q (epinephrine injection, USP) Recall", https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall

79. Sanofi, "Sanofi Announces Auvi-Q™, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.," PR Newswire, Jan. 28, 2013, available at https://www.prnewswire.com/news-releases/sanofi-announces-auvi-q-the-first-and-only-voice-guided-epinephrine-auto-injector-is-now-available-in-the-us-188651061.html

80. Sanofi, "Sanofi Announces FDA Approval for Auvi-Q™, First Voice-guided Epinephrine Auto-injector for Patients with Life-threatening Allergies" (Aug. 13, 2012), http://www.news.sanofi.us/press-releases?item=131480.

81. Sanofi, "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo" (Feb. 23, 2016), http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o

82. Sanofi, "UPDATED: Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q® Due to Potential Inaccurate Dosage Delivery" (Oct. 30, 2015), http://www.news.sanofi.us/2015-10-28-Sanofi-US-Issues-Voluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery

83. Supply Agreement between Meridian Medical Technologies and Dey (Jan. 1, 2001), Securities and Exchange Commission Exhibit 10.42, https://www.sec.gov/Archives/edgar/containers/fix071/95676/000095013301501482/w49983ex10-42.txt

84. Tammie Smith, "Richmond-based Kaleo's Auvi-Q epinephrine injector returning to market Feb. 14," Richmond Times-Dispatch, Jan. 19, 2017, available at https://www.richmond.com/business/local/richmond-based-kaleo-s-auvi-q-epinephrine-injector-returning-to/article_04442c78-220d-53bd-ac2e-fb4a222889e3.html

85. Teva Press Release, "Teva's Generic Version of EpiPen® (Epinephrine Injection, USP) Auto-Injector 0.3 mg Now Available in Limited Quantity in the United States" (Nov. 27, 2018), available at

http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-newsArticle&ID=2378366

86. Teva, "Teva's Generic Version of EpiPen® (Epinephrine Injection, USP) Auto-Injector 0.3 mg Now Available in Limited Quantity in the United States" (Nov. 27, 2018),  http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-newsArticle&ID=2378366

87. Transcript, Mylan Inc., Earnings Call (April 26, 2012)

88. U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines (Aug. 19, 2010)

89. U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=019430

90. U.S. Food & Drug Administration, "FDA approves first generic version of EpiPen" (Aug. 16, 2018), https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm617173.htm

91. U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo=019430

92. U.S. Food and Drug Administration, "FDA List of Authorized Generic Drugs" (Dec. 27, 2018), https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approvalapplications/abbreviatednewdrugapplicationandagenerics/ucm126389.htm

93. U.S. Securities and Exchange Commission, U.S. EpiPen Profitability Analysis, https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d265624dex991.htm.

94. Verus Pharamceuticals, "Verus Pharmaceuticals Announces U.S. Launch of Twinject for Anaphylaxis," (Aug. 16, 2005), https://web.archive.org/web/20051222104426/http://www.veruspharm.com/news_releases_08_16_2005.htm

## VII.   Bates-Stamped Documents

| | | |
|---|---|---|
| Aetna00000349 | Aetna00002719 | Aetna00018654 |
| Aetna00000653 | Aetna00006112 | AG00000001 |
| Aetna00001223 | Aetna00006487 | AG00000800 |

| | | |
|---|---|---|
| AHCA0076775 | DH0061145 | EPI_WELLCARE_00003126 |
| AHCA0078330 | DH0063462 | EPI_WELLCARE_00003687 |
| AHCA0079462 | DH0071872 | EPI_WELLCARE_00003776 |
| ANTH-EPI 00012 | DH0079609 | EPI_WELLCARE_00003777 |
| ANTH-EPI 00048 | DH0113035 | EPI_WELLCARE_00003840 |
| ANTH-EPI 00053 | DH0123504 | EPI_WELLCARE_00003844 |
| ANTH-EPI 00716 | DH0128009 | EPI_WELLCARE_00003845 |
| ARCARA_00020 | DH0132623 | EPI_WELLCARE_00019700 |
| BIO-KS00249135 | DH0132624 | EPI_WELLCARE_00020485 |
| BIO-KS00249141 | DH0134776 | EPI_WELLCARE_00020758 |
| BIO-KS00350614 | DH0138707 | EPI_WELLCARE_00020759 |
| BIO-KS00356099 | DH0163711 | EPI_WELLCARE_00020820 |
| CIGNA_00467 | DH0179622 | EPI_WELLCARE_00020891 |
| CIGNA_01461 | DH0179624 | EPI_WELLCARE_00022209 |
| CIGNA_01462 | EAI 00013370 | EPI_WELLCARE_00022211 |
| CIGNA_01532 | EAI 00013396 | EPI_WELLCARE_00023602 |
| CVSCM_EPI_000000365 | EAI 00023634 | EPI_WELLCARE_00023603 |
| CVSCM_EPI_000010575 | EAI 00033027 | EPI_WELLCARE_00023690 |
| DENNJOS_10659_00010955 | EAI 00033037 | EPI_WELLCARE_00023692 |
| DH0003234 | EAI 00041402 | EPI_WELLCARE_00023694 |
| DH0004192 | EAI 00041888 | EPI_WELLCARE_00023703 |
| DH0034881 | EAI 00052716 | EPI_WELLCARE_00023710 |
| DH0042842 | EAI 00078988 | EPI_WELLCARE_00023724 |
| DH0043266 | EAI 00081482 | EPI_WELLCARE_00023768 |
| DH0043654 | EAI 00081821 | EPI_WELLCARE_00023770 |
| DH0044772 | EAI 00111263 | EPI_WELLCARE_00023814 |
| DH0045511 | EAI 00165018 | EPI_WELLCARE_00024171 |
| DH0045512 | EAI 00168889 | EPI_WELLCARE_00024219 |
| DH0045819 | EAI 00168892 | EPI_WELLCARE_00024972 |
| DH0050165 | EAI 00188649 | EPI_WELLCARE_00025056 |
| DH0051496 | EAI 00190751 | EPI_WELLCARE_00025138 |
| DH0051655 | EAI 00212627 | EPI_WELLCARE_00025186 |
| DH0056085 | EPI_WELLCARE_00000537 | EPI_WELLCARE_00025189 |
| DH0058163 | EPI_WELLCARE_00001533 | EPI_WELLCARE_00026038 |
| DH0059508 | EPI_WELLCARE_00002226 | EPI_WELLCARE_00026039 |

| | | |
|---|---|---|
| EPI_WELLCARE_00026071 | ES_0000162 | ES_0001032 |
| EPI_WELLCARE_00027105 | ES_0000163 | ES_0001041 |
| EPI_WELLCARE_00027106 | ES_0000164 | ES_0001111 |
| EPI_WELLCARE_00028173 | ES_0000165 | ES_0001182 |
| EPI-TX-0000091 | ES_0000166 | ES_0001308 |
| ES_00000001 | ES_0000167 | ES_0001737 |
| ES_00000003 | ES_0000168 | ES_0003189 |
| ES_00000005 | ES_0000169 | ES_0003514 |
| ES_00000007 | ES_0000170 | ES_0003630 |
| ES_00000009 | ES_0000171 | ES_0003785 |
| ES_0000053 | ES_0000172 | ES_0004549 |
| ES_0000068 | ES_0000173 | ES_0004550 |
| ES_0000073 | ES_0000174 | ES_0004551 |
| ES_0000097 | ES_0000175 | ES_0005044 |
| ES_0000107 | ES_0000176 | ES_0005045 |
| ES_0000114 | ES_0000177 | ES_0005046 |
| ES_0000117 | ES_0000178 | ES_0006558 |
| ES_0000124 | ES_0000179 | ES_0007097 |
| ES_0000128 | ES_0000180 | ES_0007154 |
| ES_0000131 | ES_0000181 | ES_0007228 |
| ES_0000137 | ES_0000182 | ES_0007904 |
| ES_0000138 | ES_0000183 | ES_0008785 |
| ES_0000139 | ES_0000184 | ES_0009511 |
| ES_0000140 | ES_0000185 | ES_0010103 |
| ES_0000141 | ES_0000186 | ES_0010269 |
| ES_0000142 | ES_0000201 | ES_0010292 |
| ES_0000143 | ES_0000793 | ES_0010293 |
| ES_0000144 | ES_0000796 | ES_0010294 |
| ES_0000145 | ES_0000797 | ES_0010414 |
| ES_0000146 | ES_0000900 | FLSTATE00000001 |
| ES_0000147 | ES_0000901 | Horizon00000157 |
| ES_0000148 | ES_0000902 | Horizon00005339 |
| ES_0000149 | ES_0001011 | Horizon00009478 |
| ES_0000160 | ES_0001030 | Horizon00010707 |
| ES_0000161 | ES_0001031 | Horizon00013404 |

| | | |
|---|---|---|
| Horizon00013407 | MedImpact_0002569 | MedImpact_00290 |
| Horizon00013566 | MedImpact_0002664 | MedImpact_00296 |
| Horizon00013567 | MedImpact_0003078 | MedImpact_00303 |
| HUM001702 | MedImpact_0003087 | MedImpact_0051486 |
| HUM004251 | MedImpact_00037 | MedImpact_0051487 |
| HUM004280 | MedImpact_0003929 | MedImpact_0051490 |
| HUM004351 | MedImpact_0004031 | MedImpact_0051491 |
| HUM006208 | MedImpact_0004033 | MedImpact_0051492 |
| Humana004351 | MedImpact_0004035 | MedImpact_0051493 |
| MAG000003297 | MedImpact_0004040 | MedImpact_0051494 |
| MAG000003299 | MedImpact_00044 | MedImpact_0051496 |
| MAG000003310 | MedImpact_0005291 | MedImpact_0051517 |
| MAG000003330 | MedImpact_0007128 | MedImpact_0052231 |
| MAG000003345 | MedImpact_00077 | MedImpact_0052233 |
| MAG000003355 | MedImpact_0007791 | MedImpact_0052577 |
| MAG000003387 | MedImpact_0007809 | MedImpact_0052577 |
| MAG000003416 | MedImpact_0008050 | MedImpact_0052579 |
| MAG000003418 | MedImpact_0008173 | MedImpact_0053285 |
| MAG000004203 | MedImpact_0008228 | MedImpact_0053294 |
| MAG000004220 | MedImpact_00084 | MedImpact_0073068 |
| MAG000004375 | MedImpact_00096 | MedImpact_0073071 |
| MAG000004376 | MedImpact_00118 | MedImpact_0086054 |
| MAG000004859 | MedImpact_00121 | MedImpact_0096553 |
| MAG000004890 | MedImpact_00126 | MedImpact_01061 |
| MAG000025119 | MedImpact_00133 | MedImpact_01079 |
| MAG000025192 | MedImpact_00164 | MedImpact_01087 |
| MAG000025200 | MedImpact_00170 | MedImpact_01108 |
| MAG000025278 | MedImpact_0018067 | MedImpact_01109 |
| MAG000041604 | MedImpact_0018068 | MedImpact_01154 |
| MAG000041619 | MedImpact_00188 | MedImpact_01182 |
| MAG000041635 | MedImpact_00194 | MedImpact_01202 |
| MAG000041651 | MedImpact_00225 | MedImpact_01204 |
| MDHM 000216 | MedImpact_00230 | MedImpact_01280 |
| MedImpact_00003 | MedImpact_00242 | MedImpact_01313 |
| MedImpact_0002525 | MedImpact_00269 | MedImpact_01325 |

| | | |
|---|---|---|
| MedImpact_01370 | MYEP00000786 | MYEP00001143 |
| MYEP00000310 | MYEP00000798 | MYEP00001172 |
| MYEP00000460 | MYEP00000803 | MYEP00001175 |
| MYEP00000471 | MYEP00000808 | MYEP00002244 |
| MYEP00000501 | MYEP00000815 | MYEP00009883 |
| MYEP00000524 | MYEP00000823 | MYEP00062009 |
| MYEP00000530 | MYEP00000831 | MYEP00069005 |
| MYEP00000538 | MYEP00000832 | MYEP00069046 |
| MYEP00000560 | MYEP00000840 | MYEP00069234 |
| MYEP00000564 | MYEP00000848 | MYEP00070006 |
| MYEP00000569 | MYEP00000854 | MYEP00070544 |
| MYEP00000587 | MYEP00000860 | MYEP00072539 |
| MYEP00000589 | MYEP00000863 | MYEP00072668 |
| MYEP00000597 | MYEP00000879 | MYEP00074543 |
| MYEP00000607 | MYEP00000881 | MYEP00075609 |
| MYEP00000608 | MYEP00000886 | MYEP00076967 |
| MYEP00000610 | MYEP00000900 | MYEP00077236 |
| MYEP00000614 | MYEP00000909 | MYEP00077517 |
| MYEP00000615 | MYEP00000926 | MYEP00078895 |
| MYEP00000617 | MYEP00000930 | MYEP00080824 |
| MYEP00000619 | MYEP00000934 | MYEP00080825 |
| MYEP00000622 | MYEP00000935 | MYEP00081290 |
| MYEP00000626 | MYEP00000950 | MYEP00081468 |
| MYEP00000638 | MYEP00000957 | MYEP00081718 |
| MYEP00000643 | MYEP00000978 | MYEP00081870 |
| MYEP00000654 | MYEP00000996 | MYEP00082062 |
| MYEP00000661 | MYEP00001010 | MYEP00082087 |
| MYEP00000684 | MYEP00001052 | MYEP00082595 |
| MYEP00000713 | MYEP00001063 | MYEP00082614 |
| MYEP00000721 | MYEP00001084 | MYEP00082769 |
| MYEP00000733 | MYEP00001093 | MYEP00082878 |
| MYEP00000736 | MYEP00001101 | MYEP00083087 |
| MYEP00000745 | MYEP00001107 | MYEP00083362 |
| MYEP00000761 | MYEP00001115 | MYEP00083385 |
| MYEP00000777 | MYEP00001125 | MYEP00084697 |

| | | |
|---|---|---|
| MYEP00084727 | MYEP00118416 | MYEP00214363 |
| MYEP00085784 | MYEP00118416 | MYEP00219125 |
| MYEP00086231 | MYEP00119241 | MYEP00219824 |
| MYEP00086239 | MYEP00119242 | MYEP00219825 |
| MYEP00086241 | MYEP00131333 | MYEP00219828 |
| MYEP00086244 | MYEP00138915 | MYEP00221968 |
| MYEP00086249 | MYEP00140812 | MYEP00230296 |
| MYEP00086253 | MYEP00142246 | MYEP00232140 |
| MYEP00086274 | MYEP00148833 | MYEP00232912 |
| MYEP00086279 | MYEP00152753 | MYEP00238940 |
| MYEP00086281 | MYEP00156316 | MYEP00239355 |
| MYEP00086346 | MYEP00162485 | MYEP00240463 |
| MYEP00086552 | MYEP00164337 | MYEP00240464 |
| MYEP00086663 | MYEP00166109 | MYEP00240597 |
| MYEP00086682 | MYEP00167182 | MYEP0024409 |
| MYEP00087247 | MYEP00179225 | MYEP00244178 |
| MYEP00087486 | MYEP00179226 | MYEP00244409 |
| MYEP00087537 | MYEP00179228 | MYEP00244410 |
| MYEP00087845 | MYEP00179229 | MYEP00245085 |
| MYEP00088189 | MYEP00179233 | MYEP00249596 |
| MYEP00088195 | MYEP00179234 | MYEP00251958 |
| MYEP00088229 | MYEP00181560 | MYEP00252271 |
| MYEP00093048 | MYEP00181571 | MYEP00252719 |
| MYEP00093725 | MYEP00187104 | MYEP00253140 |
| MYEP00093726 | MYEP00193044 | MYEP00253551 |
| MYEP00093856 | MYEP00193064 | MYEP00253553 |
| MYEP00093939 | MYEP00194704 | MYEP00253554 |
| MYEP00095226 | MYEP00194705 | MYEP00254218 |
| MYEP00099883 | MYEP00194707 | MYEP00254516 |
| MYEP00100131 | MYEP00195932 | MYEP00255011 |
| MYEP00100132 | MYEP00211014 | MYEP00255523 |
| MYEP00100155 | MYEP00213251 | MYEP00255632 |
| MYEP00100156 | MYEP00213255 | MYEP00255842 |
| MYEP00102412 | MYEP00213368 | MYEP00256126 |
| MYEP00114633 | MYEP00214360 | MYEP00256560 |

| | | |
|---|---|---|
| MYEP00256575 | MYEP00275501 | MYEP00350217 |
| MYEP00256946 | MYEP00275852 | MYEP00359953 |
| MYEP00257151 | MYEP00277786 | MYEP00359962 |
| MYEP00257619 | MYEP00277843 | MYEP00359963 |
| MYEP00259074 | MYEP00278898 | MYEP00360252 |
| MYEP00262009 | MYEP00282496 | MYEP00362445 |
| MYEP00262566 | MYEP00290263 | MYEP00362912 |
| MYEP00262836 | MYEP00291022 | MYEP00367121 |
| MYEP00263012 | MYEP00291027 | MYEP00367123 |
| MYEP00263202 | MYEP00304630 | MYEP00367124 |
| MYEP00263203 | MYEP00304665 | MYEP00373869 |
| MYEP00264661 | MYEP00304687 | MYEP00375569 |
| MYEP00264796 | MYEP00304697 | MYEP00375573 |
| MYEP00264797 | MYEP00304792 | MYEP00377967 |
| MYEP00266841 | MYEP00305194 | MYEP00380899 |
| MYEP00266842 | MYEP00305229 | MYEP00380901 |
| MYEP00269481 | MYEP00305287 | MYEP00392152 |
| MYEP00269584 | MYEP00305511 | MYEP00402298 |
| MYEP00269619 | MYEP00305714 | MYEP00411336 |
| MYEP00269674 | MYEP00311114 | MYEP00412405 |
| MYEP00269725 | MYEP00318523 | MYEP00435396 |
| MYEP00270253 | MYEP00319112 | MYEP00444119 |
| MYEP00270320 | MYEP00319114 | MYEP00450125 |
| MYEP00270382 | MYEP00319118 | MYEP00450839 |
| MYEP00270989 | MYEP00319120 | MYEP00451143 |
| MYEP00271151 | MYEP00319124 | MYEP00452610 |
| MYEP00271392 | MYEP00323333 | MYEP00454423 |
| MYEP00271602 | MYEP00323916 | MYEP00454425 |
| MYEP00271605 | MYEP00323918 | MYEP00459230 |
| MYEP00271963 | MYEP00323919 | MYEP00459611 |
| MYEP00272091 | MYEP00332420 | MYEP00463728 |
| MYEP00272133 | MYEP00332421 | MYEP00464046 |
| MYEP00272327 | MYEP00332615 | MYEP00464048 |
| MYEP00272447 | MYEP00335224 | MYEP00464049 |
| MYEP00272773 | MYEP00346694 | MYEP00464050 |

| | | |
|---|---|---|
| MYEP00464051 | MYEP00492577 | MYEP00510041 |
| MYEP00464052 | MYEP00492579 | MYEP00512001 |
| MYEP00464351 | MYEP00492647 | MYEP00514288 |
| MYEP00464746 | MYEP00492933 | MYEP00514631 |
| MYEP00465506 | MYEP00493543 | MYEP00516034 |
| MYEP00470294 | MYEP00494011 | MYEP00518501 |
| MYEP00470314 | MYEP00494092 | MYEP00518706 |
| MYEP00474075 | MYEP00495121 | MYEP00520927 |
| MYEP00481178 | MYEP00495211 | MYEP00520928 |
| MYEP00482235 | MYEP00495644 | MYEP00521573 |
| MYEP00483117 | MYEP00496155 | MYEP00521574 |
| MYEP00483989 | MYEP00496156 | MYEP00524463 |
| MYEP00484069 | MYEP00496306 | MYEP00524748 |
| MYEP00484108 | MYEP00496308 | MYEP00524755 |
| MYEP00484371 | MYEP00497152 | MYEP00524757 |
| MYEP00484374 | MYEP00497350 | MYEP00526897 |
| MYEP00484439 | MYEP00497353 | MYEP00527235 |
| MYEP00485119 | MYEP00497355 | MYEP00527586 |
| MYEP00485436 | MYEP00498944 | MYEP00527618 |
| MYEP00487179 | MYEP00498945 | MYEP00527619 |
| MYEP00487195 | MYEP00498946 | MYEP00528339 |
| MYEP00487733 | MYEP00500612 | MYEP00530641 |
| MYEP00488727 | MYEP00502424 | MYEP00531043 |
| MYEP00490080 | MYEP00502425 | MYEP00531069 |
| MYEP00490084 | MYEP00505630 | MYEP00531390 |
| MYEP00490398 | MYEP00505632 | MYEP00531457 |
| MYEP00490399 | MYEP00505633 | MYEP00531461 |
| MYEP00490801 | MYEP00505634 | MYEP00537813 |
| MYEP00491256 | MYEP00506708 | MYEP00538211 |
| MYEP00491274 | MYEP00506721 | MYEP00542223 |
| MYEP00491445 | MYEP00506724 | MYEP00542398 |
| MYEP00491729 | MYEP00506846 | MYEP00546242 |
| MYEP00491860 | MYEP00506848 | MYEP00548252 |
| MYEP00491883 | MYEP00507063 | MYEP00551696 |
| MYEP00491914 | MYEP00507064 | MYEP00552684 |

| | | |
|---|---|---|
| MYEP00552687 | MYEP00619261 | MYEP00672498 |
| MYEP00552688 | MYEP00620009 | MYEP00679529 |
| MYEP00589964 | MYEP00620182 | MYEP00679530 |
| MYEP00590566 | MYEP00620393 | MYEP00686782 |
| MYEP00593230 | MYEP00620574 | MYEP00686907 |
| MYEP00593648 | MYEP00620576 | MYEP00687914 |
| MYEP00593658 | MYEP00620596 | MYEP00695134 |
| MYEP00595578 | MYEP00623587 | MYEP00703463 |
| MYEP00598471 | MYEP00623607 | MYEP00705783 |
| MYEP00598528 | MYEP00624286 | MYEP00705815 |
| MYEP00602163 | MYEP00624305 | MYEP00706114 |
| MYEP00602480 | MYEP00624314 | MYEP00707277 |
| MYEP00603166 | MYEP00629079 | MYEP00707350 |
| MYEP00603647 | MYEP00632206 | MYEP00715127 |
| MYEP00603858 | MYEP00632209 | MYEP00716128 |
| MYEP00604253 | MYEP00632266 | MYEP00718184 |
| MYEP00604317 | MYEP00632267 | MYEP00718192 |
| MYEP00604738 | MYEP00634346 | MYEP00718428 |
| MYEP00604924 | MYEP00634404 | MYEP00718928 |
| MYEP00606497 | MYEP00634406 | MYEP00718929 |
| MYEP00607117 | MYEP00634978 | MYEP00719312 |
| MYEP00610781 | MYEP00635356 | MYEP00720241 |
| MYEP00611195 | MYEP00635370 | MYEP00720503 |
| MYEP00611547 | MYEP00642486 | MYEP00721012 |
| MYEP00611586 | MYEP00645799 | MYEP00722433 |
| MYEP00611946 | MYEP00645800 | MYEP00722465 |
| MYEP00612567 | MYEP00648545 | MYEP00723355 |
| MYEP00613820 | MYEP00648746 | MYEP00723398 |
| MYEP00616383 | MYEP00649933 | MYEP00723628 |
| MYEP00616447 | MYEP00650326 | MYEP00723720 |
| MYEP00617150 | MYEP00650327 | MYEP00723729 |
| MYEP00619088 | MYEP00661478 | MYEP00723817 |
| MYEP00619089 | MYEP00661480 | MYEP00723818 |
| MYEP00619091 | MYEP00667337 | MYEP00725415 |
| MYEP00619093 | MYEP00672221 | MYEP00726921 |

| | | |
|---|---|---|
| MYEP00734988 | MYEP00888770 | MYEP01122935 |
| MYEP00740408 | MYEP00889331 | MYEP01122970 |
| MYEP00742372 | MYEP00889398 | MYEP01123062 |
| MYEP00744315 | MYEP00889859 | MYEP01123084 |
| MYEP00744357 | MYEP00890293 | MYEP01123110 |
| MYEP00752986 | MYEP00891072 | MYEP01123112 |
| MYEP00754241 | MYEP00891130 | MYEP01123115 |
| MYEP00754467 | MYEP00891350 | MYEP01123120 |
| MYEP00756177 | MYEP00892458 | MYEP01123121 |
| MYEP00756222 | MYEP00892874 | MYEP01123123 |
| MYEP00756744 | MYEP00892918 | MYEP01123124 |
| MYEP00770367 | MYEP00893148 | MYEP01123129 |
| MYEP00771803 | MYEP00893652 | MYEP01123343 |
| MYEP00800183 | MYEP00894924 | MYEP01123345 |
| MYEP00805131 | MYEP0090087 | MYEP01123347 |
| MYEP00806721 | MYEP00909763 | MYEP01123609 |
| MYEP00808541 | MYEP01032076 | MYEP01123611 |
| MYEP00814368 | MYEP01032657 | MYEP01123615 |
| MYEP00814369 | MYEP01033504 | MYEP01123617 |
| MYEP00817895 | MYEP01033592 | MYEP01123654 |
| MYEP00819591 | MYEP01036547 | MYEP01123665 |
| MYEP00819656 | MYEP01036548 | MYEP01123666 |
| MYEP00821042 | MYEP01038419 | MYEP01123762 |
| MYEP00823293 | MYEP01040995 | MYEP01123774 |
| MYEP00823670 | MYEP01041784 | MYEP01131507 |
| MYEP00823925 | MYEP01041788 | MYEP01134753 |
| MYEP00824750 | MYEP01046464 | MYEP01134757 |
| MYEP00825394 | MYEP01050280 | MYEP01136177 |
| MYEP00835717 | MYEP01050302 | MYEP01136203 |
| MYEP00855746 | MYEP01068002 | MYEP01136800 |
| MYEP00087486 | MYEP01099685 | MYEP01136803 |
| MYEP00882371 | MYEP01101884 | MYEP01136804 |
| MYEP00887472 | MYEP01101885 | MYEP01136807 |
| MYEP00888019 | MYEP01101887 | MYEP01137113 |
| MYEP00888409 | MYEP01122061 | MYEP01137188 |

| | | |
|---|---|---|
| MYEP01142063 | MYEP01207987 | MYEP01344678 |
| MYEP01142066 | MYEP01207989 | MYEP01357951 |
| MYEP01143632 | MYEP01208377 | MYEP01361499 |
| MYEP01143633 | MYEP01209503 | MYEP01361844 |
| MYEP01143723 | MYEP01209505 | MYEP01361846 |
| MYEP01143725 | MYEP01228274 | MYEP01362490 |
| MYEP01143739 | MYEP01228277 | MYEP01362491 |
| MYEP01143740 | MYEP01228518 | MYEP01362492 |
| MYEP01150974 | MYEP01228536 | MYEP01362570 |
| MYEP01165600 | MYEP01228538 | MYEP01362752 |
| MYEP01165601 | MYEP01229349 | MYEP030 |
| MYEP01167133 | MYEP01229784 | MYEP030A |
| MYEP01167134 | MYEP01229799 | MYEP1228538 |
| MYEP01167591 | MYEP01235305 | PFE_EPI PEN_AT00546952 |
| MYEP01190206 | MYEP01239068 | PFE_EPIPEN_00011059 |
| MYEP01193655 | MYEP01241630 | PFE_EPIPEN_AT00007925 |
| MYEP01198247 | MYEP01241632 | PFE_EPIPEN_AT00011059 |
| MYEP01202288 | MYEP01243683 | PFE_EPIPEN_AT00011449 |
| MYEP01202289 | MYEP01246195 | PFE_EPIPEN_AT00011457 |
| MYEP01202293 | MYEP01247580 | PFE_EPIPEN_AT00011505 |
| MYEP01202296 | MYEP01250453 | PFE_EPIPEN_AT00011577 |
| MYEP01202298 | MYEP01265317 | PFE_EPIPEN_AT00114553 |
| MYEP01202325 | MYEP01278441 | PFE_EPIPEN_AT00540538 |
| MYEP01202327 | MYEP01278443 | PFE_EPIPEN_AT00540545 |
| MYEP01202330 | MYEP01311275 | PFE_EPIPEN_AT00540546 |
| MYEP01202331 | MYEP01311279 | PFE_EPIPEN_AT00540547 |
| MYEP01202334 | MYEP01325857 | PFE_EPIPEN_AT00546952 |
| MYEP01202338 | MYEP01327704 | PFE_EPIPEN_AT00611245 |
| MYEP01202343 | MYEP01328315 | PFE_EPIPEN_AT00648955 |
| MYEP01202345 | MYEP01335482 | PFE_EPIPEN_AT00686219 |
| MYEP01202346 | MYEP01336372 | PFE_EPIPEN_AT00788970 |
| MYEP01202348 | MYEP01337504 | PFE_EPIPEN_AT00788971 |
| MYEP01202350 | MYEP01337540 | PFE_EPIPEN_AT00788976 |
| MYEP01202351 | MYEP01337598 | PFECAN_EPIPEN_AT00000001 |
| MYEP01206017 | MYEP01337634 | PFECAN_EPIPEN_AT00000002 |

| | | |
|---|---|---|
| PFECAN_EPIPEN_AT0000 | PHP 0002406 | SAN-EPI_A-0059398 |
| 0168 | PHP 0002422 | SAN-EPI_A-0059425 |
| PFECAN_EPIPEN_AT0000 | PHP 0002423 | SAN-EPI_A-0061178 |
| 0489 | PHP 0002428 | SAN-EPI_A-0064272 |
| PHP 0000557 | PHP 0002436 | SAN-EPI_A-0090274 |
| PHP 0000705 | PHP 0002437 | SAN-EPI_A-0096396 |
| PHP 0000881 | PHP 0002458 | SAN-EPI_A-0100025 |
| PHP 0001012 | PHP 0002550 | SAN-EPI_A-0124006 |
| PHP 0001013 | PRIME_0008366 | SAN-EPI_A-0196676 |
| PHP 0001014 | PS0077861 | SAN-EPI_A-0206851 |
| PHP 0001018 | PS0077863 | SAN-EPI_A-0206853 |
| PHP 0001063 | PS0102961 | SAN-EPI_A-0245862 |
| PHP 0001064 | PS0108647 | SAN-EPI-0000145 |
| PHP 0001065 | PS0108650 | SAN-EPI-0000691 |
| PHP 0001105 | PS0108654 | SAN-EPI-0000796 |
| PHP 0001117 | PS0155563 | SAN-EPI-0001046 |
| PHP 0001143 | PS0236464 | SAN-EPI-0002384 |
| PHP 0001157 | SAN-EPI_A-0000560 | SAN-EPI-0002512 |
| PHP 0001219 | SAN-EPI_A-0010328 | SAN-EPI-0002613 |
| PHP 0001220 | SAN-EPI_A-0010882 | SAN-EPI-0002670 |
| PHP 0001221 | SAN-EPI_A-0029197 | SAN-EPI-0003187 |
| PHP 0001223 | SAN-EPI_A-0033902 | SAN-EPI-0003427 |
| PHP 0001229 | SAN-EPI_A-0034282 | SAN-EPI-0005309 |
| PHP 0001237 | SAN-EPI_A-0035816 | SAN-EPI-0005314 |
| PHP 0001249 | SAN-EPI_A-0035889 | SAN-EPI-0005660 |
| PHP 0001498 | SAN-EPI_A-0036222 | SAN-EPI-0013253 |
| PHP 0001668 | SAN-EPI_A-0036261 | SAN-EPI-0013610 |
| PHP 0001720 | SAN-EPI_A-0040426 | SAN-EPI-0014220 |
| PHP 0001724 | SAN-EPI_A-0040967 | SAN-EPI-0014223 |
| PHP 0001730 | SAN-EPI_A-0041389 | SAN-EPI-0014326 |
| PHP 0001763 | SAN-EPI_A-0048592 | SAN-EPI-0027970 |
| PHP 0001886 | SAN-EPI_A-0049690 | SAN-EPI-0031115 |
| PHP 0001964 | SAN-EPI_A-0049691 | SAN-EPI-0031477 |
| PHP 0002104 | SAN-EPI_A-0051496 | SAN-EPI-0032523 |
| PHP 0002365 | SAN-EPI_A-0056919 | SAN-EPI-0032712 |

| | | |
|---|---|---|
| SAN-EPI-0040567 | SAN-EPI-0123680 | SAN-EPI-0248891 |
| SAN-EPI-0042319 | SAN-EPI-0124482 | SAN-EPI-0249779 |
| SAN-EPI-0052798 | SAN-EPI-0124487 | SAN-EPI-0255535 |
| SAN-EPI-0054512 | SAN-EPI-0124713 | SAN-EPI-0259191 |
| SAN-EPI-0055543 | SAN-EPI-0126081 | SAN-EPI-0260490 |
| SAN-EPI-0057236 | SAN-EPI-0127127 | SAN-EPI-0261903 |
| SAN-EPI-0057353 | SAN-EPI-0129408 | SAN-EPI-0263655 |
| SAN-EPI-0059267 | SAN-EPI-0129684 | SAN-EPI-0266011 |
| SAN-EPI-0059347 | SAN-EPI-0129890 | SAN-EPI-0266176 |
| SAN-EPI-0059519 | SAN-EPI-0130132 | SAN-EPI-0267938 |
| SAN-EPI-0062137 | SAN-EPI-0130212 | SAN-EPI-0269194 |
| SAN-EPI-0068289 | SAN-EPI-0130689 | SAN-EPI-0269253 |
| SAN-EPI-0068297 | SAN-EPI-0130702 | SAN-EPI-0289592 |
| SAN-EPI-0068391 | SAN-EPI-0131207 | SAN-EPI-0305905 |
| SAN-EPI-0069855 | SAN-EPI-0131467 | SAN-EPI-0326334 |
| SAN-EPI-0070736 | SAN-EPI-0131652 | SAN-EPI-0326335 |
| SAN-EPI-0070867 | SAN-EPI-0131775 | SAN-EPI-0341833 |
| SAN-EPI-0071138 | SAN-EPI-0132111 | SAN-EPI-0358959 |
| SAN-EPI-0072586 | SAN-EPI-0133737 | SAN-EPI-0358961 |
| SAN-EPI-0072606 | SAN-EPI-0136770 | SAN-EPI-0359076 |
| SAN-EPI-0072996 | SAN-EPI-0140476 | SAN-EPI-0360806 |
| SAN-EPI-0072997 | SAN-EPI-0143504 | SAN-EPI-0360807 |
| SAN-EPI-0075694 | SAN-EPI-0144689 | SAN-EPI-0361664 |
| SAN-EPI-0075949 | SAN-EPI-0144945 | SAN-EPI-0361815 |
| SAN-EPI-0076342 | SAN-EPI-0146099 | SAN-EPI-0361841 |
| SAN-EPI-0076349 | SAN-EPI-0147056 | SAN-EPI-0361947 |
| SAN-EPI-0076694 | SAN-EPI-0171591 | SAN-EPI-0363626 |
| SAN-EPI-0077152 | SAN-EPI-0172294 | SAN-EPI-0363658 |
| SAN-EPI-0077733 | SAN-EPI-0189814 | SAN-EPI-0363715 |
| SAN-EPI-0077942 | SAN-EPI-0189816 | SAN-EPI-0365300 |
| SAN-EPI-0109515 | SAN-EPI-0201304 | SAN-EPI-0365696 |
| SAN-EPI-0110052 | SAN-EPI-0206530 | SAN-EPI-0365699 |
| SAN-EPI-0119672 | SAN-EPI-0213852 | SAN-EPI-0365702 |
| SAN-EPI-0120693 | SAN-EPI-0216183 | SAN-EPI-0365705 |
| SAN-EPI-0122919 | SAN-EPI-0222108 | SAN-EPI-0365804 |

| | | |
|---|---|---|
| SAN-EPI-0366176 | SAN-EPI-0418783 | SAN-EPI-0661280 |
| SAN-EPI-0366220 | SAN-EPI-0419514 | SAN-EPI-0661281 |
| SAN-EPI-0366235 | SAN-EPI-0422838 | SAN-EPI-0661940 |
| SAN-EPI-0366262 | SAN-EPI-0431568 | SAN-EPI-0686767 |
| SAN-EPI-0366448 | SAN-EPI-0432714 | SAN-EPI-0705846 |
| SAN-EPI-0366997 | SAN-EPI-0442836 | SAN-EPI-0723055 |
| SAN-EPI-0367037 | SAN-EPI-0444395 | SAN-EPI-0744572 |
| SAN-EPI-0373242 | SAN-EPI-0444925 | SAN-EPI-0744574 |
| SAN-EPI-0373283 | SAN-EPI-0445960 | SAN-EPI-0748471 |
| SAN-EPI-0373294 | SAN-EPI-0446009 | SAN-EPI-0748965 |
| SAN-EPI-0373362 | SAN-EPI-0447445 | SAN-EPI-0763936 |
| SAN-EPI-0373675 | SAN-EPI-0452157 | SAN-EPI-0764473 |
| SAN-EPI-0376550 | SAN-EPI-0456576 | SAN-EPI-0764474 |
| SAN-EPI-0377374 | SAN-EPI-0481588 | SAN-EPI-0764678 |
| SAN-EPI-0377375 | SAN-EPI-0488139 | SAN-EPI-0764689 |
| SAN-EPI-0377887 | SAN-EPI-0493326 | SAN-EPI-0764703 |
| SAN-EPI-0399852 | SAN-EPI-0493327 | SAN-EPI-0764776 |
| SAN-EPI-0402979 | SAN-EPI-0493376 | SAN-EPI-0764964 |
| SAN-EPI-0408542 | SAN-EPI-0493377 | SAN-EPI-0765087 |
| SAN-EPI-0408650 | SAN-EPI-0494930 | SAN-EPI-0765109 |
| SAN-EPI-0410032 | SAN-EPI-0494932 | SAN-EPI-0765117 |
| SAN-EPI-0410059 | SAN-EPI-0498708 | SAN-EPI-0765308 |
| SAN-EPI-0410072 | SAN-EPI-0502478 | SAN-EPI-0766016 |
| SAN-EPI-0410387 | SAN-EPI-0502480 | SAN-EPI-0766251 |
| SAN-EPI-0412201 | SAN-EPI-0505657 | SAN-EPI-0767261 |
| SAN-EPI-0413111 | SAN-EPI-0525843 | SAN-EPI-0767278 |
| SAN-EPI-0413153 | SAN-EPI-0544993 | SAN-EPI-0770810 |
| SAN-EPI-0413166 | SAN-EPI-0545325 | SAN-EPI-0770855 |
| SAN-EPI-0415806 | SAN-EPI-0545367 | SAN-EPI-0770857 |
| SAN-EPI-0416002 | SAN-EPI-0545883 | SAN-EPI-0770923 |
| SAN-EPI-0416012 | SAN-EPI-0545891 | SAN-EPI-0770933 |
| SAN-EPI-0416027 | SAN-EPI-0547907 | SAN-EPI-0771005 |
| SAN-EPI-0416102 | SAN-EPI-0549289 | SAN-EPI-0771041 |
| SAN-EPI-0416168 | SAN-EPI-0596594 | SAN-EPI-0771098 |
| SAN-EPI-0416308 | SAN-EPI-0661265 | SAN-EPI-0818066 |

| | | |
|---|---|---|
| SAN-EPI-0819967 | SAN-EPI-1093989 | SAN-EPI-1166768 |
| SAN-EPI-0819968 | SAN-EPI-1093991 | SAN-EPI-1166769 |
| SAN-EPI-0849163 | SAN-EPI-1093992 | SAN-EPI-1166771 |
| SAN-EPI-0889161 | SAN-EPI-1099426 | SAN-EPI-1234024 |
| SAN-EPI-0936634 | SAN-EPI-1099572 | SAN-EPI-1234026 |
| SAN-EPI-0936636 | SAN-EPI-1109909 | SANOFI0_10659_00001111 |
| SAN-EPI-0936641 | SAN-EPI-1166400 | Teva_Epi_000001 |
| SAN-EPI-0936644 | SAN-EPI-1166401 | Teva_Epi_000092 |
| SAN-EPI-0954135 | SAN-EPI-1166402 | Teva-Epi_002003 |
| SAN-EPI-1091319 | SAN-EPI-1166767 | TXSTATE_00000065 |