# Exhibit 51
# (Filed Under Seal)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION. USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | CASE No. 2:17-md-2785<br>CASE No. 2:17-cv 2452 |
| SANOFI AVENTIS US, LLC,<br><br>    *Plaintiff,*<br>v.<br><br>MYLAN INC.; and<br>MYLAN SPECIALTY, L.P.,<br><br>    *Defendants.* | |

## EXPERT REPORT OF
## GARY ZIEZIULA

Dated March 25, 2019

Signature: _Gary J. Zieziula_

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

## I.      Qualifications

1.      My name is Gary Zieziula.  I am a recently retired pharmaceutical executive with over 40 years of experience in the pharmaceutical industry, including experience at five different pharmaceutical companies: Merck & Co., Inc., Bristol-Myers Squibb, Roche Laboratories, Inc., AMAG Pharmaceuticals, Inc., and EMD Serono.

2.      I began my career as a pharmaceutical sales representative in 1977 after graduating from college. I started out my career primarily in sales and marketing roles for Merck and Bristol-Myers Squibb, taking positions of increasing responsibility including district sales manager, product manager, senior customer manager, senior director marketing, executive director business development, vice president sales and account management, vice president managed care sales and marketing.  In the several marketing roles that I have had over the years, it was my responsibility to set the strategy for brands on the market, and for the launch of new brands.

3.      In 2001, I joined Roche Laboratories and was elevated to the position of Head of Commercial Operations, Specialty Care.  I then became the Managing Director of Greece (expat).  I was the Chief Commercial Officer at AMAG Pharmaceuticals. In 2012, I started my own advising firm.  I spent the last five years of my career, from 2014-2018, as Chief Commercial Officer and then as President and Managing Director at EMD Serono, NA subsidiary of Merck KGaA of Darmstadt, Germany. In this capacity, I had full P&L responsibility.  For the last three years, I also represented EMD Serono on the Board of Directors of BIO, a trade organization for biotechnology-focused pharmaceutical companies.

4.      While in the various roles described above, I have launched or overseen the launch of nine different brands in multiple therapeutic areas.  It is one of the most time consuming and challenging responsibilities for a brand team and for members of the pharmaceutical company's leadership team.  You only get one chance to get it right, so any product that is in pre-launch phase gets significant attention throughout the organization.

5.      Attached as Appendix A is my current CV.  In the past four years, I have not testified as an expert witness at trial or in a deposition.

## II.     Scope of Assignment and Summary of Opinions

1.      I have been retained by the law firm Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP to provide my expert opinions on the sales, marketing and commercialization practices of Mylan and Sanofi as it relates to the launch and commercialization of Auvi-Q® ("Auvi-Q"), which competed directly with the EpiPen® Auto-Injector ("EpiPen"), Mylan's competing device. I have considered the deposition testimony of certain individuals at Sanofi and Mylan that relate to these sales, marketing, and commercialization practices, along with testimony and documents from certain payers.  I also have considered pre-launch market research,

2

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

marketing plans, long range operating plans and forecasts completed over time by the business analytics team at Sanofi working in tandem with the brand team for Auvi-Q, along with numerous other documents produced by the parties in this case. Attached as Appendix B is the list of documents and material I considered in preparing my report. I am being compensated at a rate of $350 per hour for my consultation and work preparing this report and $500 per hour for deposition and trial testimony in this matter. My compensation is not dependent on the opinions offered or the outcome of this matter.

2.   My opinions are based on the breadth of industry experience that I have had over the many years, in particular launching many brands in multiple therapeutic areas. My extensive experience in the pharmaceutical industry also provides me with a very good understanding of how the payer landscape was evolving in the 2012 through 2018 timeframe. My opinions are also based on my review and interpretation of business documents produced in this case, which are of the type I regularly reviewed, interpreted, and relied on in my role as an executive for a pharmaceutical company.

3.   First, it is my opinion that Sanofi's ability to effectively compete was impacted by ███████████████████████████████ Specifically, as described below, ███ ███████████████████████████████████ High costs create a hurdle in launching a new product, and the evidence I reviewed confirms that ███████████████████████████████████████████

4.   Second, I have reviewed the expert report of Professor Fiona M. Scott Morton, who bases her damages analysis on Sanofi's pre-launch forecast for Auvi-Q, and attributes Sanofi's failure to meet that forecast to Mylan's so-called "exclusionary course of conduct."[1] I disagree with her analysis and opinions for several reasons.

   a)   Pre-launch long range forecasts are not accurate predictors of actual performance in the pharmaceutical industry. It is not uncommon for companies to miss projections by a significant amount, as there are many factors that are difficult to predict prior to launch that impact the actual performance of a product.

   b)   Sanofi's very conservative contracting strategy for 2014 was Sanofi's biggest mistake with Auvi-Q. Based on the market research I reviewed, Sanofi leadership should not have been satisfied with a payer strategy that accepted such a high percentage of Tier 3 formulary placements in managed care in 2013 and 2014, and, more importantly, should not have assumed that it would obtain unrestricted access at Tier 2 or even Tier 3 at such low rebate levels.

      o   Sanofi's strategy failed to account for the fact that across the industry PBMs were moving in a direction to control more and more

---

[1] Scott Morton Report ¶ 197.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

therapeutic categories, a trend exemplified by the introduction of the CVS exclusion list in 2012 and the ESI exclusion list in 2014.  In my experience, pharmaceutical companies were aware of this trend and adjusted their rebating strategy in response to it.  Sanofi appears to have failed to take account of this trend in formulating its rebating strategy and did not respond as an effective competitor would have.

o   Sanofi incorrectly assumed that just because the EAI class had not been strongly managed prior to the launch of Auvi-Q that it would not be more strongly managed after Auvi-Q entered the class. In my experience, PBMs and payers take advantage of new competition in a class to drive higher rebates, and pharmaceutical companies understand this in their rebating strategy; but here, Sanofi failed to respond to it.

o   Sanofi did not formulate a contracting strategy likely to secure Tier 2 formulary status, but Mylan did, and thus Sanofi found itself not covered on many formularies.  As a result, in the 2014 contract cycle, ESI, Optum, United Healthcare, and Aetna (and others) chose to control the EAI category by having one EAI on formulary in a preferred status with all other EAIs not covered.

o   Sanofi's much improved Tier 2 formulary status in 2015, when it contracted much more aggressively, confirms in my opinion that Sanofi could have more effectively competed for Tier 2 coverage at and shortly after launch.

c)   Sanofi should have implemented a more robust marketing campaign to key decision makers.  Sanofi was well aware from its own market research that patients were satisfied with their current EAIs.  But Sanofi did not invest early enough in marketing.  Sanofi delayed investment in direct to consumer advertising, and that resulted in low levels of consumer awareness.

5.   Third, Sanofi experienced manufacturing challenges during 2015, and in discussions with the FDA implemented a complete product recall for Auvi-Q.  My experience in the industry, and the evidence I have reviewed, is inconsistent with the assumption of Professor Scott Morton that Sanofi returned the rights of Auvi-Q back to kaléo, the company that developed the Auvi-Q device, because of "exclusionary conduct" by Mylan.[2]  The evidence I reviewed indicates that the Auvi-Q recall drove Sanofi's decision.  I also disagree with Professor Scott Morton's reliance on pre-launch projections to calculate the market share Auvi-Q would have obtained upon re-launch after the product had been pulled from the market.  In my experience, pre-launch projections are rarely accurate predictors of performance and are even less relevant when evaluating a re-introduction of a product after a recall or some other adverse event.  Sanofi itself considered four

---

[2] Scott Morton Report ¶ 198.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

analogues at the time of the recall to attempt to predict the impact of the recall, and those analogues lost an average of 93% of prescriptions. In my opinion, Professor Scott Morton did not adequately consider the impact of Auvi-Q being taken off the market due to a product defect.

## III.   Analysis and Opinion

### A.   Sanofi's ability to compete was adversely impacted by its cost structure.

1.   Sanofi had a very challenging P&L with Auvi-Q. ███████████████



The Auvi-Q device was smaller than the EpiPen device, with audio cues to walk patients through the injection process, ███████████████

2.   Over the years I have had P&L responsibility for products with low costs and high margins, as well as products with higher costs and lower profit margins. There is no question that pharmaceutical companies are challenged in the high cost low margin scenario. In my experience, the Chief Financial Officer and the finance team for a pharmaceutical company likes to look at ratios and target percentages for products. If a product is an outlier in the profitability ratios, there is a lot of pressure to get it in line within targeted ranges. It follows that, ██████████████████ I discuss both of these missed opportunities below.

3.   I have reviewed evidence confirming that the ██████████████

---

[3] Spencer Williamson (kaléo) Depo. Ex. 14 ████████████████

[4] Justin Works (Analysis Group) Depo. Ex. 11 ████████████████

[5] Bryan Downey 30(b)(1) Depo. Tr. 119 ████████ Bryan Downey 30(b)(6) Depo. Tr. 184 ████████; Jez Moulding Depo. Tr. 66-67 ████████ Herve Hubert Depo. Tr. 158 ████████; James Borneman 30(b)(1) Depo. Tr. 115 and 148 ████████

[6] I do not intend to offer an opinion on the "relevant market" for the purposes of an antitrust analysis.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

[REDACTED] The terms agreed to in the original agreement, [REDACTED]

**B.**   **Numerous factors contributed to Sanofi's failure to achieve its projected market share for Auvi-Q.**

1.   I have reviewed the damages analysis of Professor Scott Morton.  I disagree with several of her assumptions.  First, Professor Scott Morton used pre-launch revenue and market share assumptions and assumed that they were correct.[11]  Pre-launch projections are not reliable predictors of actual performance. In all of my years of experience, including launching approximately ten brands, I have seen actual product performance miss projections by a significant amount.  Many factors contribute to overall product success, and until real data points become available after launch, such as formulary coverage and consumer response, it is very challenging to predict how a product will perform.  Sanofi's former President of North America, Anne Whitaker, [REDACTED]

---

[7] See, e.g. Bryan Downey 30(b)(1) Depo. Ex. 46, at Slide 43 [REDACTED] Patrick Barry 30(b)(6) Depo Tr. 31-32; Patrick Barry 30(b)(1) Depo Tr. 257-259; Peter Guenter Depo Tr. 161-162 & Ex. 14; Patrick Byrne (Payer Sciences) Depo Tr. 204-205; Brian Downey 30(b)(1) Depo Tr. 118-121, 167-168; Bryan Downey 30(b)(6) Depo. Ex. 15 [REDACTED]; Jez Moulding Depo. Tr. at 66-68; Chris Viehbacher Depo Tr. 21-22, 104-105.

[8] See, e.g., Jez Moulding Depo. Ex. 5, Ex. 6 & Ex. 7; Patrick Barry 30(b)(6) Depo. Ex. 4, Ex. 5 & Ex. 6; Peter Guenter Depo Tr. 230-231.

[9] E.g., Jon Fairest Depo. Ex. 11 [REDACTED]

[10] Spencer Williamson (kaléo) Depo. Ex. 14 (License and Development Agreement by and between Intelliject, Inc. and Sanofi-Aventis U.S. LLC).

[11] Scott Morton Report ¶ 201.

[12] Anne Whitaker Depo. Tr. 88.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

2.    Second, to support her reliance on pre-launch assumptions, Professor Scott Morton cites Horizon Blue Cross Blue Shield of NJ and the University of Michigan as two analogues, where she says Sanofi had a level playing field versus Mylan.[13]  In my view these two payers—a closed university system and a small regional payer—are not representative of the entire managed care universe.  She cites the experience in Canada, which is a single payer system very different than the very complex multi-payer system that exists in the U.S., and also does not provide a good analogy.[14]

3.    As explained in this section, there are many potential explanations for Sanofi's failure to achieve its pre-launch ambitions for Auvi-Q that are based on Sanofi's own conduct and decision-making, which ran counter to industry best practices for a successful product launch, and not on any anti-competitive conduct that Professor Scott Morton attributes to Mylan.

4.    As I mentioned above, the launch period for a new product is a critical one for any pharmaceutical company, because you only get one chance to get it right and set the trajectory for the brand's performance.  It is common knowledge in the pharmaceutical industry that the first 6 to 12 months of a product launch sets the trajectory for the brand's full life cycle.  As I explained further below, it is my opinion that Sanofi made critical missteps during the first 6 to 12 months of Auvi-Q's launch.

*Sanofi Ignored Evolving Market Access Environment*

5.    In the several years leading up to the launch of Auvi-Q, the EpiPen auto-injector had established itself as the market leader in the EAI category.[15]  There were other EAI products like Adrenaclick and Twinject, but no other product achieved significant market share.  EpiPen has been on the market for over thirty years, and over that timeframe EpiPen has built tremendous brand equity.  Physicians, patients, and payers alike were familiar with the EpiPen brand and were confident it would work in the event of an anaphylactic reaction.[16]

6.    Although Mylan paid rebates to many payers prior to Auvi-Q's launch, the EAI class had not been aggressively managed by many PBMs and insurers up to this point in time.  The market access team at Sanofi assumed that this would continue

---

[13] Scott Morton Report ¶¶ 204-205.

[14] Scott Morton Report ¶ 203.

[15] Patrick Barry 30(b)(1) Depo. Tr. 26 ("as we entered into the Epinephrine auto-injector market from a competitive set perspective, the market leader at the time would have been EpiPen.").

[16] Patrick Barry 30(b)(1) Depo. Tr. 29-30 ("[Patients] were satisfied in that certainly EpiPen was perceived to be a device that was well established in the marketplace, that had been out in the market for some time, and it has the history of -- of saving lives, like an auto-injector should do"); Justin Works (Analysis Group) Depo. Ex. 8, PDF p.18 ██████████████████████████████ Justin Works (Analysis Group) Depo. Ex. 10, Slide 14 ██████████████████████████

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

to be the case.[17]   At this time, however, it was common knowledge in the pharmaceutical industry that payers would aggressively manage most classes in which there was meaningful competition—as there was in the EAI class once a major player like Sanofi introduced Auvi-Q.  For example, █████████████

███████████████████████████████

██ By September 2013, ███████████

███████████████████████████

7.      In my experience, where there are two key players in a therapeutic class and the same molecular entity, that is to say, little or no clinical differentiation in the medication itself, only the delivery device, it is very common for the PBMs to pit one company against the other and extract deep discounts/rebates.  I experienced this first hand in the Fertility segment, as the President and Managing Director of EMD Serono. EMD Serono's fertility product, Gonal-f, a follicle stimulating hormone, was competing against Merck & Co.'s Follistim.  The two products were chemically the same, but the chemical was delivered through different devices.  In 2012, the PBMs and payers began to increasingly force competition between the two companies for rebates.  And in 2014, several PBMs and payers (including ESI) decided they wanted to go with an exclusive product in this class on formulary. EMD Serono and Merck & Co. had to compete through significant rebate offers to be the single product on formulary.  EMD Serono ultimately secured favorable formulary coverage, but only in exchange for deep rebates.

8.      In the 2010, 2011, and 2012 timeframe, Sanofi conducted market research on payers, physicians, and patients and caregivers to help inform decision making on pricing, contracting strategy, and positioning of Auvi-Q within the EAI category. Working from this research, ███████████████████████████

████████████████████████████.[20] In my experience, Sanofi's reliance on this research to reach its formulary placement projections was misplaced for two reasons.  First, this market research does not appear to take account of the changing payer landscape described above, but Sanofi did not challenge the conclusions from the market research given how the managed care landscape was evolving at that time.  Second, in my experience, for payer research to be meaningful, it would have to include major PBMs.  I would have asked the team if ESI and CVS were included in the studies, and how did they respond.  The

---

[17] Sandy Loreaux Depo Tr. 46. ████████████████████████

[18] Patrick Byrne (Payer Sciences) Depo. Ex. 3 ███████████████████

███████████████

[19] Anne Whitaker Depo. Ex. 2.

[20] Justin Works (Analysis Group) Depo. Ex. 11, Slide 58 ████████████████

████████████; SAN-EPI-0171591 █████████████████████

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

two PBM's account for approximately 100 million lives.  My review of the record indicates ███████████████████████████ making the results, in my opinion, completely unreliable.[21]

9.    In light of this widely recognized changing payer landscape, any major industry participant like Sanofi should have realized that its launch of a competitive product in the EAI category would incentivize PBMs to manage the EAI class.  Once the EAI class was aggressively managed, Sanofi would not be able to gain formulary access—on T2 and even T3—without competing on price.

### Sanofi's Conservative Rebate Strategy for 2014 Was Inconsistent with the Recognized Market Environment

10.   At the time of Auvi-Q's launch, it was understood in the industry that insurance coverage and co-pay amount was of paramount concern in patients' choice of medication.  In 2012, ████████████████████████████████████ ████ Sanofi's own market research ████████████████████ ████████████████████████ Although other pre-market research indicated that some consumers would have been willing to pay a higher co-pay for Auvi-Q, market research in my experience tends to be optimistic concerning patients' willingness to pay, as consumers responding to market research questions are not, at that moment, being asked to pay the higher co-pay and tend to give more favorable answers.  Notwithstanding this, Sanofi based its pricing and rebate strategy on the assumption that patients would be willing to pay a Tier 3 premium price for Auvi-Q.[24]  That was a risky strategy given that ████████████████████████████████

11.   Similarly, ████████████████████████████████████████████ Additionally, ██████████████████████████████████████████ ████████████████████████████████████████

---

[21] Justin Works (Analysis Group) Depo. Ex. 11, Slide 35 ████████████████████

[22] Patrick Byrne (Payer Sciences) Depo. Ex. 3 ████████████████████████

[23] Patrick Byrne (Payer Sciences) Depo. Ex. 10, Slide 7 ████████████████████ ████████████████████████████

[24] SAN-EPI-0171591 (Auvi-Q Pricing Strategy & Recommendation); Bryan Downey 30(b)(1) Depo. Ex. 37 ████████████████████████████████████████ ████████

[25] SAN-EPI-0642639 (EpiCard Consumer Segmentation Research Final Report), at Slide 8.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

Tier 3 positions mean that patients must pay a higher co-pay than if the product is listed on Tier 2. The fact that physician preference was so dependent on tier placement – *i.e.*, cost, further confirms my opinion that reducing customer out-of-pocket cost should have been a paramount focus of Sanofi in launching Auvi-Q.

12.     But the testimony and documents I reviewed suggest that, for the 2014 contracting cycle, Sanofi took a conservative approach to its rebate offers and was satisfied with obtaining mostly Tier 3 coverage.[27] If Auvi-Q were on Tier 3 and the EpiPen device were on Tier 2, patients would have to pay a higher co-pay for Auvi-Q. As explained above, in my experience, this was a risky strategy.

13.     Moreover, at the time of Auvi-Q's launch, the payer landscape was changing such that an unrestricted Tier 3 position was not available on all formularies. As I described above, PBMs had started to launch high control formularies on which multiple products in a class were excluded. One of the reasons PBMs did this was to counteract co-pay programs.[28] To explain: often, manufacturers who had products on Tier 3 would offer co-pay coupons that covered the difference between a consumer's Tier 2 co-pay and Tier 3 co-pay so that the consumer would be indifferent, from a cost perspective, between the Tier 2 and Tier 3 products. These co-pay coupons thwarted the PBMs attempts to control costs by driving usage away from Tier 3 products and towards Tier 2 products. At the time of Auvi-Q's launch, I understood and remember having conversations with the PBMs that they were launching formulary controls and exclusion lists to counteract co-pay coupons. This shift away from Tier 3 programs reinforces my view that Sanofi's strategy to accept Auvi-Q being covered on Tier 3 (and not Tier 2) was misguided.

14.     Moreover, Sanofi's rebating strategy was insufficiently designed to ensure coverage, whether on Tier 2 or Tier 3. Sanofi's contracting strategy for Auvi-Q was to achieve access in either a Tier 2 or Tier 3 status at low discount rates to

---

[26] Justin Works (Analysis Group) Depo. Ex. 11

[27] Bryan Downey 30(b)(1) Depo. Ex. 37; Patrick Barry 30(b)(1) Depo. Ex. 15, Slide 2
Patrick Barry 30(b)(1) Depo. Tr. 180:15-181:16

[28] Patrick Byrne (Payer Sciences) Depo. Ex. 3
Patrick Byrne (Payer Sciences) Depo Tr. 47-49, 66; Sandy Loreaux Depo. Ex. 13, at 5

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

preserve profitability[29] – because, as I described above, ██████████████
████████████   But, now that Sanofi had introduced a competitive product like Auvi-
Q into the market, payers and PBMs had the leverage to demand higher rebates
from both Sanofi and Mylan.  But Sanofi was, at first, only willing to pay small
rebates for Tier 2 and had no strategy at launch to pay for Tier 3. ████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

15.     Not only did Sanofi have a conservative rebate strategy at the time of launch, Sanofi
was slow to adjust in the first 6 months after launch to demands for rebates for Tier
3, higher rebates for Tier 2, cumulative price protection, and offers for exclusive
positions, and made tactical errors in negotiations.  For example, in March 2013,
United Healthcare and OptumRx ████████████████████████



████████████  Sanofi  ████████████████████████

Three months later, ██████████████████████████████

United and Optum ████████████████████████████████
██████████████████

---

[29] Lorine Harr 30(b)(1) Depo. Tr. 185 ("We decided to launch at price parity. So what I said was, in
effect, we, we were already launching with a rebate, a discount."); Patrick Barry 30(b)(1) Depo. Tr. 169
("we wanted a rebate for profitable access"); Jez Moulding Depo. Tr. 67-68 ████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████ James Borneman Depo. Tr. 146 ████████████████
██████████████████████████████████████

[30] SAN-EPI-0957050 (Auvi-Q launch pricing strategy).

[31] Kent Rogers (OptumRx) Depo. Ex. 35 ████████████████   Kent Rogers (OptumRx) Depo. Ex.
36 ██████████

[32] Kent Rogers (OptumRx) Depo. Ex. 41 ████████████████

[33] Kent Rogers (OptumRx) Depo. Ex. 42 ██████████████

[34] Kent Rogers (OptumRx) Depo. Ex. 44 ██████████████

[35] Kent Rogers (OptumRx) Depo. Ex. 46 ██████████████

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

██████████████████████████████████████████████ I have reviewed the
deposition transcript of the Sanofi account executive Keith Wade, ████████████
████████████████ Sanofi's senior leadership lacked flexibility to respond to payer
demands during the first round of critical negotiations for Auvi-Q was another
misstep.

16.   It also appears to me from the documents and depositions that I have read through
that the Sanofi senior management team was not heavily involved in discussions
with the market access team on how to respond to bid requests from some of the
big PBMs and the large national insurers. The top 15 customers account for most
of the business in the commercial segment of the business.  It is critical to ensure
these large payers know the face of the company and that they understand the
importance of newly launched products, and their apparent lack of involvement is
inconsistent with my industry experience. In my experience at EMD Serono as the
President and Managing Director, I would have made it a priority to be very
involved in final decision making for the top PBM's and national insurers, and was
directly involved in particular with negotiations with ESI, one of the largest PBMs.

17.   In my opinion, Sanofi's inadequate rebate offers and other missteps in payer
negotiations for the 2014 contract cycle resulted in Sanofi being excluded from
formulary or restricted on national formularies for ESI, Optum, Aetna, and United
HealthCare,[38] to name a few, when those PBMs and health plans decided it was not
in their best interest to keep Auvi-Q on T3.  Those decisions would have been made
in mid-2013 for the 2014 cycle.

18.   Auvi-Q's performance in 2015 – when Sanofi changed its contracting strategy –
shows that Sanofi could have obtained T2 access sooner had it been willing to
compete on price. The U.S. leadership team and the market access team for Sanofi
revised the contracting strategy for Auvi-Q for the 2015 contract cycle. █████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████[39] This revised contracting strategy for Sanofi proved to be successful
as it achieved co-preferred status for Auvi-Q at ESI, CVS Caremark, and Aetna.[40]

19.   In addition to the Sanofi and third-party documents I reviewed, I have reviewed
numerous Mylan document and deposition transcripts, and it is clear that Mylan

---

[36] Kent Rogers (OptumRx) Depo. Ex. 48 ████████████████████

[37] Keith Wade Depo. Ex. 21.

[38] Bryan Downey 30(b)(1) Depo. Ex. 62, Slide 76.

[39] SAN-EPI_A-0038086 (Twelfth Amendment to ESI Rebate Agreement)

[40] Sandy Loreaux Depo. Ex. 23 (Aetna); Sandy Loreaux Depo. Ex. 20 (ESI); Robert Eaton Depo. Ex. 15
(CVS).

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

was willing and able to quickly respond to requests from PBMs and insurers for deeper rebates on EpiPen in the 2014 contract cycle, whereas Sanofi was much more conservative. Mylan was also willing to provide important customers price protection as well.[41] Based on my experience in the pharmaceutical industry, I strongly disagree with Professor Scott Morton's opinion that Mylan's rebating strategies were "exclusionary anticompetitive conduct." Competing for formulary coverage is part of competing on the merits in the pharmaceutical industry, and Mylan's conduct is consistent with common practice in the industry and what would be expected from any competitor.

*Sanofi should have implemented a more robust marketing campaign to key decision makers*

20. Market research available ███████████████████████████ ████████████████ EpiPen was delivering on its value proposition for all stakeholders. In a variety of market research studies, ██████████ ████████████████████████████████████████████████████ Sanofi was going to have a significant up-hill battle from a marketing perspective succeeding against EpiPen given EpiPen's brand equity.

21. 

---

[41] MYEP0000092█████████████████████████████████  Kent Rogers (OptumRx) Depo. Ex. 4 ████████████████████████ MYEP00086244 ████████████████████████████████████

[42] Justin Works (Analysis Group) Depo. Ex. 8, PDF p.18 ████████████ ████████████████████████████████████████████████).

[43] SAN-EPI-0060923 (Sanofi EAI Brand Plan attached to April 9, 2013 email).

[44] SAN-EPI-0060923 (Sanofi EAI Brand Plan attached to April 9, 2013 email), Slide 5.

[45] SAN-EPI-0060923 (Sanofi EAI Brand Plan attached to April 9, 2013 email), Slide 5.

[46] SAN-EPI-0060923 (Sanofi EAI Brand Plan attached to April 9, 2013 email), Slide 16.

[47] SAN-EPI-0060923 (Sanofi EAI Brand Plan attached to April 9, 2013 email), Slide 16.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

22.     In 2012 Sanofi



When we made changes over the years at EMD Serono to the device for our Fertility product, Gonal-f, we successfully highlighted the importance of those changes with physicians and patients, but only after getting FDA clearance for those promotional claims, or at least having discussed with the FDA anything they had concerns about.

23.

This I believe was a missed opportunity for Sanofi to drive patients to request Auvi-Q.

In my experience, when launching a new brand, companies typically focus on educating physicians and other health care professionals first.  But after six months of calling on physicians and other health care professionals, companies typically consider a DTC campaign that would be aimed at patients and caregivers – in this case it would have been with the goal of having patients and caregivers ask their physician for Auvi-Q.  Critically, the EAI market is highly seasonal, peaking in the back to school timeframe. I would also have implemented the DTC campaign six months post approval in the June timeframe in 2013 to meet the peak season for prescriptions for 2013, which was in August/September.[51]  When I had responsibility for commercial operations at Roche Laboratories in the 2004-2008 time period, we sold and marketed Tamiflu, a seasonal product for influenza, and prioritized DTC just before peak flu season.

---

[48] Justin Works (Analysis Group) Depo. Ex. 8, PDF p.18

[49] James Parker Depo. Exhibits 2-5; Camargo, Published Study Results.

[50] SAN-EPI-0265085, Slide 2.                SAN-EPI-0604949, Slide 8                           SAN-EPI-0238962, Slide 10 (                                    ; SAN-EPI-0083247

[51] Jez Moulding Depo. Tr. at 132 ("Q: Is the peak season for Auvi-Q and Allerject over the summer? A: It is, yes. Q:  That is the peak prescribing and sales season, correct.  A: It's the peak area, you get ebbs and flows but that is a strong peak area, the back to school time.").

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

24.



25.      Sanofi also should have focused more on marketing to pediatricians. Almost half
of the EAI volume is driven by Allergists and Pediatricians. Sanofi was able to
achieve a high TRx share in Allergists in the months after launch but lagged in
TRx's with Peds.[54]



It would
have been wise to have sales leadership ensure that the sales force was executing
the call plan effectively to ensure the sales team would get to the third or fourth call
earlier.  As I mentioned above, it is common knowledge in the pharmaceutical
industry that the first 6 to 12 months of a product launch sets the trajectory for the
brand's full life cycle, and it is critical to put a plan in place to make sure the sales
force executes in accordance with, and quickly responds to, market research.

---

[52] SAN-EPI-0379169, at 70 (Sanofi North America F1 2013).

[53] Chris Viehbacher Depo. Ex. 29.

[54] Anne Whitaker Depo. Ex. 6; Peter Guenter Depo. Ex. 12 ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮ .

[55] Peter Guenter Depo. Ex. 14 ("learnings with ALLEGRO indicates that Px starts to increase after 3 or 4
visits").

[56] SAN-EPI-0279259 (Physician ATU Research – Wave 1, June 2013), slide 23)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

      **C.**      **Sanofi's Expert Fails To Account For Negative Effects of Auvi-Q Recall**

1.      It is my opinion that Sanofi and its expert have failed to appropriately consider the negative impact of the complete recall of Auvi-Q and its withdrawal from the market.

2.      In the second and third quarters of 2015,



Sanofi implemented the total product recall on October 28, 2015.  By that time, as stated in Sanofi's public recall notice, Sanofi had received 26 reports of suspected device malfunctions.[58] In the days following the recall, a press release from Sanofi Paris estimated a negative impact of the recall at €100 million.[59]

3.



4.      All four of these products were taken off the market for either safety concerns or manufacturing issues, remained off the market for a year or more (as was predicted for Auvi-Q) and all four returned to the market at some point.  On average TRx volume dropped 93% versus pre-recall TRx volume.

---

[57] Philip Huang Depo. Tr. 42.

[58] Sanofi U.S. Issues Voluntary Nationwide Recall of All Auvi-Q Due to Potential Inaccurate Dosage Delivery, Sanofi (Oct. 28, 2015), http://www.news.sanofi.us/2015-10-28-Sanofi-US-Issues-Voluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery.

[59] Sanofi grew sales and business EPS in Q3 2015, Sanofi (Oct. 29, 2015), http://www.news.sanofi.us/press-releases?item=137141.

[60] SAN-EPI-1234026 (Auvi-Q 10 Year Sales Scenarios, Draft, December 5, 2015)

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

5.                     Adrenaclick was discontinued in March 2012 by Shionogi Pharma. Brand and AG were reintroduced to the market in June 2013 by Amedra Pharma. The combined brand and AG TRx reached only 4% by month twelve.

6.     These analogues painted a very bleak picture for Auvi-Q; and in

7.     Sanofi's expert, Professor Scott Morton, ignores these data points. Instead, she relied on a Long-Range Operating Plan from pre-launch of Auvi-Q to assume that Auvi-Q could get to a market share of 30% and growing to 40% after coming back on the market.[61] In my opinion Professor Scott Morton did not adequately consider the impact of Auvi-Q being taken off the market for defective needles. Total product recalls (as compared to the recall of one or several lots of a product) are extremely rare and, in my experience, pose significant challenges for pharmaceutical manufacturers to overcome in re-launching the recalled product. In my years of experience at five pharmaceutical companies, I do not recall ever experiencing a complete recall of a launched brand.

8.     Especially in a class that is a matter of life and death for children and adults, a full product recall for a potentially life-threatening defect would significantly impact consumer willingness to use the product in the future, and physician willingness to prescribe it. When I was at Roche Laboratories, I worked on a due diligence team evaluating the potential acquisition of Serono, which owned the MS product Tysabri that was recalled because it increased the risk of a serious and deadly brain infection (PML), one of the analogues Sanofi considered. That product faced a serious uphill battle recovering market share after being recalled for potentially fatal side effects. In the days following the Auvi-Q recall, press commentary noted the similar challenge Sanofi would face, with one analyst commenting in an online industry publication that "if the recall is not proven erroneous, it is very hard to see Auvi-Q returning to the market, as it will need to be redesigned and face uphill battle to recapture patient trust after the recall."[63]

---

[61] Scott Morton Report ¶ 222.

[62] Spencer Williamson (kaléo) Depo. Tr. at 25, 54.

[63] Sanofi's Auvi-Q recall puts Mylan's rival EpiPen in full control of blockbuster market, FiercePharma (Nov. 2, 2015), https://www.fiercepharma.com/marketing/sanofi-s-auvi-q-recall-puts-mylan-s-rival-epipen-full-control-of-blockbuster-market.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

9.    I also disagree with the assumption of Professor Scott Morton that Sanofi returned the rights of Auvi-Q back to kaléo, the company that developed the Auvi-Q device, because of "predatory pricing" by Mylan.  On this point, it is important to keep in mind as discussed above that Sanofi had changed its contracting strategy for Auvi-Q for the 2015 contracting cycle and made a bigger investment to secure coverage. The negotiations and bid grids for January 2015 would have been completed in mid-2014, with final formulary decisions being made in 4Q2014 for implementation January 2015.  We know that Sanofi achieved Tier 2 status in a large number of PBMs and health plans for 2015 and considered these formulary decisions to be big successes. ███████████████████████████████████████

███████████████████████████████████████████████████████

█ [65] In my experience, this conduct and increased investment in the brand shows that Sanofi had dedicated itself to making the product a success.  I have seen nothing in the record showing that Mylan's conduct changed after these 2015 successes. Instead, the only intervening event was the Auvi-Q recall, soon after which Sanofi returned the product to kaléo.

## IV.    Conclusion

1.    In conclusion, for the reasons explained in this report, it is my opinion that Sanofi's failure to meet its pre-launch forecasts cannot be attributed to any "exclusionary conduct" by Mylan.  Instead, the evidence shows competition between Mylan and Sanofi that is consistent with standard industry practices, with Sanofi undertaking to launch a product ███████████████████████ making numerous missteps at and shortly after launch, in particular for the 2014 contracting cycle, and ultimately abandoning the product after it was pulled from the market.

---

[64] SAN-EPI-0686246 ██████████████████████ SAN-EPI-0028304 ████████
████████████████████; SAN-EPI-0686125 ████████

[65]SAN-EPI-1148855 ████████████████

# APPENDIX A

# Gary Zieziula, MBA

**Mobile:**    +1-215-603-4476
**Email:**      garyzieziula@yahoo.com
**LinkedIn:**   http://www.linkedin.com/in/gary-zieziula-9225a96

## GLOBAL PHARMA & BIOTECH EXECUTIVE

**Global Pharmaceutical Executive** with 40 years of experience building and guiding strong, sustainable sales and operations organizations across Europe and North America for industry leaders like Merck & Co., Bristol-Myers Squibb, Roche, AMAG, and Merck KGaA/EMD Serono.

**Highly Ethical Leader** with proven success modeling integrity and committing to the highest standards to ensure that the company meets the stringent regulatory requirements in the U.S., European, and International markets.

**Dedicated Patient Advocate** with a passion for delivering products to market that improve patient outcomes and access, past member on the Board of BIO and the CEO Roundtable on Cancer.

## EXECUTIVE EXPERIENCE

**EMD Serono – Rockland, MA, USA**
*North American pharmaceutical company; subsidiary of Merck KGaA.*

**President & Managing Director | Chief Commercial Officer**, January 2014 – January 1, 2019 - Retired
Brought in as Chief Commercial Officer and U.S. Leadership Team Member to drive commercialization of oncology, neurology/immunology, fertility, and endocrinology products. Named President & Managing Director in January 2016.

- **Product Development:** Delivered novel new products to the product pipeline, which hadn't produced a commercial offering in nearly 10 years.
- **Market Share Growth:** Reversed declining market share for multiple products, fueling a growth trajectory and even regaining the market share leader role in the fertility segment of the gonadotropin market.
- **Governance:** Established a culture dedicated to regulatory and compliance fulfillment.

**Gary Zieziula Advising – USA | UK | Switzerland**
*Independent provider of executive advisory services to the pharma/biotech industry.*

**Pharma/Biotech Strategic Advisor**, December 2012 – January 2014
Advised venture capital firms and companies on M&A and product licensing opportunities in the global pharmaceutical and biotechnology market.

- **Specialty Market Viability:** Forecasted commercial viability of new immuno-oncology compounds.
- **Acquisition Analysis:** Recommended No-Go decision on M&A deal in the global IV iron market to a specialty pharmaceutical company based in Switzerland.

**AMAG Pharmaceuticals, Inc. – Lexington, MA, USA**
*NASDAQ-traded pharmaceutical developer specializing in iron deficiency products.*

**Executive Vice President | Chief Commercial Officer**, April 2010 – December 2012
Recruited to direct a complete commercial strategy reset for products in the dialysis and non-dialysis markets. Set focused vision that transformed an organization with flat sales and profit losses into one with a strong growth trajectory and profitability within 12 months.

- **Market Analyst Engagement:** Liaised with analysts to establish credibility and participated in earnings calls to re-calibrate expectations, communicate an effective narrative, and influence analyst recommendations.
- **M&A Integration:** Drove synergies as Integration Team Member for Allos Therapeutics merger.
- **Joint Venture Leadership:** Served on Joint Steering Committees for co-branded commercial ventures with Takeda and with 3S Bio in various international markets.

# GARY ZIEZIULA, MBA

**Roche Laboratories, Inc. – Nutley, NJ, USA | Maroussi, Greece**
*Leading global pharmaceutical and biotechnology company with CHF 47B in sales.*

**Managing Director, Pharmaceuticals – Roche Hellas S.A.**, January 2008 – April 2010
Hand-picked to transform highly siloed business with no cross-over between groups. Gained deep understanding of pharmaceutical operations and regulatory environment in the EU as a member of the European Management Team.

- **Culture Change:** Infused energy, collaboration, and best practice sharing into business culture.
- **Product Launch & Growth:** Led the development of a new strategy for Avastin, managed its launch for renal cell carcinoma indications, and achieved the #1 position in Europe for the product's rapid uptake.

**VP, Commercial Operations, Specialty Care – Roche Labs**, July 2003 – January 2008
**VP, Sales and Marketing Services – Roche Labs**, July 2002 – July 2003
**VP, Primary Care Sales – Roche Labs**, October 2001 – July 2002
Recruited by the President to lead a team of 5 VPs, overseeing executive sales and marketing teams to drive revenue and profit growth for Specialty Care in the U.S. Appointed to the North American Operating Committee.

- **Product Introduction:** Guided the launch of multiple products, including Pegasys and Fuzeon in 2003.
- **Sales Growth:** Captured >50% market share for hepatitis C with Pegasys in the first 12 months while launching a direct-to-consumer campaign that increased the number of patients diagnosed by 15%.

**Bristol-Myers Squibb – Plainsboro, NJ, USA**
*NYSE-traded American pharmaceutical manufacturer; S&P 500 component.*

**VP, Managed Health Care Sales & Marketing**, June 1998 – October 2001
Member of the Primary Care Operating Committee, setting the strategic direction and managing a team of 225 with a P&L that contributed $232M.

**Merck & Co., Inc. – West Point, PA, USA | Seattle, WA, USA | Buffalo, NY, USA**
*Global pharmaceutical giant with $39B in annual revenue.*

**VP / Executive Director, Sales & Operations – Vaccine**, November 1994 – June 1998
**Executive Director, Business Development & Planning – Vaccine**, September 1993 – November 1994
**Senior Director, Marketing Planning – Vaccine**, February 1992 – September 1993
**Senior Manager, Customer Marketing / District Manager – Human Health**, January 1988 – February 1992
**Region Training Manager / Hospital Sales Rep – Human Health**, January 1982 – January 1988

Hired as a Hospital Sales Representative and earned promotions to progressive roles in sales and marketing.

## BOARD EXPERIENCE

**BIO (Biotechnology Innovation Organization) – Washington, D.C.**

**Member, Board of Directors & Health Section Governing Board,** January 2016 – Present

**CEO Roundtable on Cancer – Cary, NC, USA**

**CEO Board,** January 2016 – Present

## EDUCATION

**Master of Business Administration (MBA)**
Canisius College – Buffalo, NY, USA

**Bachelor of Science (BS)**
State University of New York at Buffalo – Buffalo, NY, USA

# APPENDIX B

## MATERIALS CONSIDERED

**Deposition Transcripts and Exhibits**

Joseph Anderson Deposition Transcript (with Exhibits)

Patrick Barry 30(b)(1) and 30(b)(6) Deposition Transcripts (with Exhibits)

Patrick Barry Deposition Transcript (with Exhibits)

James Borneman 30(b)(1) and 30(b)(6) Deposition Transcripts (with Exhibits)

Patrick Byrne Deposition Transcript (with Exhibits)

Brian Downey 30(b)(1) and 30(b)(6) Deposition Transcripts (with Exhibits)

Robert Eaton Deposition Transcript (with Exhibits)

Jon Fairest Deposition Transcript (with Exhibits)

Bruce Foster Deposition Transcript (with Exhibits)

Peter Guenter Deposition Transcript (with Exhibits)

Jason Hall (Prime Therapeutics) Deposition Transcript (with Exhibits)

Lorine Harr 30(b)(1) and 30(b)(6) Deposition Transcripts (with Exhibits)

Herve Hubert Deposition Transcript (with Exhibits)

Philip Huang 30(b)(6) Deposition Transcript

Saira Jan 30(b)(6) Deposition Transcript (with Exhibits 4 and 5)

Adam Kautzner (ESI) Deposition Transcript (with Exhibits)

Sandy Loreaux Deposition Transcript (with Exhibits)

Jez Moulding Deposition Transcript (with Exhibits)

James Parker Deposition Transcript (with Exhibits)

Kent Rogers (OptumRx) Deposition Transcript (with Exhibits)

Scott Sussman Deposition Transcript (with Exhibits)

Christopher Viehbacher Deposition Transcript (with Exhibits)

Keith Wade Deposition Transcript (with Exhibits)

Anne Whitaker Deposition Transcript (with Exhibits)

Spencer Williamson (kaléo) Deposition Transcript (with Exhibits)

Nicole Willing Deposition Transcript (with Exhibits)

Justin Works (Analysis Group) Deposition Transcript (with Exhibits)

Jay York 30(b)(6) Deposition Transcript

Lisa Templeton Deposition Exhibits 7 and 39

1

Heather Bresch Deposition Exhibit 47 (Memorandum of Law in Support of Plaintiff's Motion for a Status Quo Prelimiary Injunction, *Mylan Specialty L.P. v. Bowling*, No. 15-c-584, Circuit Court of Kanawha County W. Va.)

**Expert Reports**

Expert Report of Fiona Scott Morton

Expert Report of Mary Ann Michelis

**Pleadings**

Sanofi Complaint

Mylan's Opposition to Plaintiff Sanofi-Aventis U.S. LLC's Motion for a Protective Order, *In re: Epipen* (No. 2:17-MD-02785-DDC-TJJ, D. Kan.)

**Other**

http://products.sanofi.ca/en/anaphylaxis-survey.Pdf

Internet Archive - Frequently Asked Questions About Auvi-Q™ (epinephrine injection, USP)

FiercePharma, Nov. 2, 2015, Sanofi's Auvi-Q recall puts Mylan's rival EpiPen in full control of blockbuster market

**Bates-Stamped Documents**

| | | |
|---|---|---|
| AG00000001 | AG00000758 | CIGNA_00499 |
| AG00000043 | AG00000771 | CIGNA_00533 |
| AG00000087 | AG00000796 | CIGNA_00549 |
| AG00000092 | AG00000800 | CIGNA_01361 |
| AG00000167 | AG00000938 | CIGNA_01375 |
| AG00000175 | AG00001342 | CIGNA_01486 |
| AG00000176 | AG00001347 | CIGNA_01575 |
| AG00000178 | AG00001359 | CVSCM_EPI_000000001 |
| AG00000184 | AG00001362 | CVSCM_EPI_000000031 |
| AG00000189 | ANTH-EPI-00048 | CVSCM_EPI_000000042 |
| AG00000190 | ANTH-EPI-00707 | CVSCM_EPI_000000056 |
| AG00000281 | ANTH-EPI-03662 | CVSCM_EPI_000000072 |
| AG00000322 | CIGNA_00082 | CVSCM_EPI_000000099 |
| AG00000413 | CIGNA_00403 | CVSCM_EPI_000000101 |
| AG00000755 | CIGNA_00478 | CVSCM_EPI_000000126 |

2

| | | |
|---|---|---|
| CVSCM_EPI_000000152 | KALEO-00022744 | MYEP00000560 |
| CVSCM_EPI_000000162 | KALEO-00042499 | MYEP00000564 |
| CVSCM_EPI_000000201 | KFHP_0574 | MYEP00000569 |
| CVSCM_EPI_000000209 | KFHP_0696 | MYEP00000615 |
| CVSCM_EPI_000035097 | KFHP_0700 | MYEP00000617 |
| EAI 00027790 | KFHP_0703 | MYEP00000619 |
| EAI 00041402 | KFHP_0708 | MYEP00000622 |
| EAI 00230011 | KFHP_0717 | MYEP00000626 |
| EAI 00230080 | KFHP_0721 | MYEP00000638 |
| EAI 00230117 | KFHP_0724 | MYEP00000643 |
| EAI 00230143 | KFHP_0728 | MYEP00000654 |
| EAI 00230169 | KFHP_0731 | MYEP00000661 |
| EAI 00230173 | KFHP_0735 | MYEP00000713 |
| EAI 00230199 | KFHP_0738 | MYEP00000721 |
| EAI 00230232 | KFHP_0743 | MYEP00000733 |
| EPI_WELLCARE_00023689 | KFHP-005893 | MYEP00000736 |
| EPI_WELLCARE_00024430 | MedImpact_00044 | MYEP00000761 |
| EPI_WELLCARE_00024971 | MedImpact_00077 | MYEP00000854 |
| EPI_WELLCARE_00024972 | MedImpact_0007817 | MYEP00000860 |
| EPI_WELLCARE_00025138 | MedImpact_00084 | MYEP00000863 |
| EPI_WELLCARE_00028158 | MedImpact_00096 | MYEP00000879 |
| EPI_WELLCARE_00028173 | MedImpact_00118 | MYEP00000881 |
| EPI_WELLCARE_00028177 | MedImpact_00121 | MYEP00000926 |
| Horizon00009478 | MedImpact_00126 | MYEP00000930 |
| Horizon00013404 | MedImpact_00133 | MYEP00000934 |
| HUM004251 | MedImpact_0016615 | MYEP00000935 |
| HUM004270 | MedImpact_01050 | MYEP00000950 |
| HUM004277 | MedImpact_01103 | MYEP00000957 |
| HUM004280 | MedImpact_01141 | MYEP00000978 |
| HUM004305 | MedImpact_01150 | MYEP00000996 |
| HUM004315 | MYEP00000501 | MYEP00001010 |
| HUM004351 | MYEP00000524 | MYEP00001052 |
| kaleo 101808 | MYEP00000530 | MYEP00001063 |
| KALEO-00006989 | MYEP00000538 | MYEP00001084 |

| | | |
|---|---|---|
| MYEP00001093 | MYEP00086281 | MYEP00127714 |
| MYEP000677384 | MYEP00086319 | MYEP00127715 |
| MYEP00069007 | MYEP00086426 | MYEP00127716 |
| MYEP00069269 | MYEP00086447 | MYEP00127717 |
| MYEP00069297 | MYEP00086663 | MYEP00127718 |
| MYEP00069384 | MYEP00086682 | MYEP00127719 |
| MYEP00070058 | MYEP00086949 | MYEP00127720 |
| MYEP00070073 | MYEP00087263 | MYEP00127721 |
| MYEP00070090 | MYEP00087267 | MYEP00127722 |
| MYEP00071052 | MYEP00087278 | MYEP00127723 |
| MYEP00071875 | MYEP00087289 | MYEP00127724 |
| MYEP00072269 | MYEP00087292 | MYEP00127725 |
| MYEP00072601 | MYEP00087296 | MYEP00127726 |
| MYEP00072658 | MYEP00087301 | MYEP00127727 |
| MYEP00072708 | MYEP00087305 | MYEP00127728 |
| MYEP00073418 | MYEP00087473 | MYEP00127729 |
| MYEP00074543 | MYEP00087476 | MYEP00127730 |
| MYEP00074901 | MYEP00087486 | MYEP00127731 |
| MYEP00077760 | MYEP00087496 | MYEP00127732 |
| MYEP00078826 | MYEP00087500 | MYEP00127737 |
| MYEP00079052 | MYEP00088189 | MYEP00127738 |
| MYEP00079099 | MYEP00090087 | MYEP00127739 |
| MYEP00082635 | MYEP00100131 | MYEP00127740 |
| MYEP00082769 | MYEP00107915 | MYEP00140812 |
| MYEP00084633 | MYEP00107916 | MYEP00142246 |
| MYEP00084790 | MYEP00119242 | MYEP00162485 |
| MYEP00086231 | MYEP00127706 | MYEP00193044 |
| MYEP00086239 | MYEP00127707 | MYEP00194704 |
| MYEP00086241 | MYEP00127708 | MYEP00194705 |
| MYEP00086244 | MYEP00127709 | MYEP00219125 |
| MYEP00086249 | MYEP00127710 | MYEP00239355 |
| MYEP00086253 | MYEP00127711 | MYEP00244409 |
| MYEP00086274 | MYEP00127712 | MYEP00251958 |
| MYEP00086279 | MYEP00127713 | MYEP00251967 |

| | | |
|---|---|---|
| MYEP00252719 | MYEP00501406 | MYEP00723729 |
| MYEP00253140 | MYEP00548252 | MYEP00723818 |
| MYEP00254218 | MYEP00550556 | MYEP00725787 |
| MYEP00256575 | MYEP00550557 | MYEP00734988 |
| MYEP00257151 | MYEP00567786 | MYEP00756222 |
| MYEP00260323 | MYEP00567788 | MYEP00798486 |
| MYEP00262009 | MYEP00602480 | MYEP00825389 |
| MYEP00264796 | MYEP00603647 | MYEP00825394 |
| MYEP00269308 | MYEP00603857 | MYEP00882371 |
| MYEP00275501 | MYEP00603858 | MYEP00892874 |
| MYEP00292998 | MYEP00604105 | MYEP00892918 |
| MYEP00304665 | MYEP00604317 | MYEP01032076 |
| MYEP00304697 | MYEP00604738 | MYEP01033592 |
| MYEP00305511 | MYEP00606339 | MYEP01064892 |
| MYEP00311728 | MYEP00610781 | MYEP01099685 |
| MYEP00322808 | MYEP00611547 | MYEP01121952 |
| MYEP00323845 | MYEP00613820 | MYEP01122696 |
| MYEP00323846 | MYEP00620009 | MYEP01146156 |
| MYEP00323856 | MYEP00623290 | MYEP01150883 |
| MYEP00323868 | MYEP00623587 | MYEP01186100 |
| MYEP00323869 | MYEP00624286 | MYEP01186102 |
| MYEP00333611 | MYEP00624305 | MYEP01193655 |
| MYEP00333614 | MYEP00624726 | MYEP01199016 |
| MYEP00367121 | MYEP00667337 | MYEP01202343 |
| MYEP00386443 | MYEP00686855 | MYEP01206017 |
| MYEP00402298 | MYEP00703284 | MYEP01208377 |
| MYEP00412405 | MYEP00717147 | MYEP01209503 |
| MYEP00450839 | MYEP00717152 | MYEP01209505 |
| MYEP00451143 | MYEP00717963 | MYEP01211788 |
| MYEP00454423 | MYEP00719641 | MYEP01211792 |
| MYEP00459230 | MYEP00720503 | MYEP01211794 |
| MYEP00464046 | MYEP00722354 | MYEP01211811 |
| MYEP00491274 | MYEP00722533 | MYEP01227891 |
| MYEP00495421 | MYEP00723398 | MYEP01230442 |

| | | |
|---|---|---|
| MYEP01230443 | PHP 0000469 | SAN-EPI_A-0038086 |
| MYEP01230447 | PHP 0000474 | SAN-EPI_A-0038409 |
| MYEP01230509 | PHP 0000479 | SAN-EPI_A-0038448 |
| MYEP01236176 | PHP 0000481 | SAN-EPI_A-0039701 |
| MYEP01238461 | PHP 0000483 | SAN-EPI_A-0039711 |
| MYEP01239810 | PHP 0000484 | SAN-EPI_A-0039738 |
| MYEP01239817 | PHP 0000505 | SAN-EPI_A-0039936 |
| MYEP01239819 | PHP 0000508 | SAN-EPI_A-0039974 |
| MYEP01239821 | PHP 0000524 | SAN-EPI_A-0040405 |
| MYEP01239822 | PHP 0001218 | SAN-EPI_A-0040512 |
| MYEP01240007 | PHP 0002048 | SAN-EPI_A-0041184 |
| MYEP01246239 | PHP 0002101 | SAN-EPI_A-0041202 |
| MYEP01246315 | PRIME_0008639 | SAN-EPI_A-0041409 |
| MYEP01246507 | PRIME_0011021 | SAN-EPI_A-0044047 |
| MYEP01250453 | PRIME_0011277 | SAN-EPI_A-0059702 |
| MYEP01268235 | PRIME_0011784 | SAN-EPI_A-0059705 |
| MYEP01319592 | PRIME_0011901 | SAN-EPI_A-0065385 |
| MYEP01336372 | PRIME_0012064 | SAN-EPI_A-0066763 |
| MYEP01362752 | PRIME_0012073 | SAN-EPI_A-0066770 |
| MYEP0199425 | PRIME_0013453 | SAN-EPI_A-0068565 |
| PFE_EPIPEN_AT00819613 | PS0063339 | SAN-EPI_A-0068735 |
| PHP 0000318 | PS0063340 | SAN-EPI_A-0068740 |
| PHP 0000346 | PS0186436 | SAN-EPI_A-0072251 |
| PHP 0000357 | PS0209703 | SAN-EPI_A-0072273 |
| PHP 0000385 | SAN-EPI_A-0000957 | SAN-EPI_A-0085822 |
| PHP 0000397 | SAN-EPI_A-0007657 | SAN-EPI_A-0093185 |
| PHP 0000402 | SAN-EPI_A-0011183 | SAN-EPI_A-0093244 |
| PHP 0000405 | SAN-EPI_A-0019791 | SAN-EPI_A-0093383 |
| PHP 0000436 | SAN-EPI_A-0032207 | SAN-EPI_A-0094607 |
| PHP 0000453 | SAN-EPI_A-0032590 | SAN-EPI_A-0094853 |
| PHP 0000458 | SAN-EPI_A-0033045 | SAN-EPI_A-0100045 |
| PHP 0000461 | SAN-EPI_A-0033104 | SAN-EPI_A-0126034 |
| PHP 0000464 | SAN-EPI_A-0037793 | SAN-EPI_A-0141213 |
| PHP 0000468 | SAN-EPI_A-0038078 | SAN-EPI_A-0143545 |

| | | |
|---|---|---|
| SAN-EPI_A-0146384 | SAN-EPI-0002510 | SAN-EPI-0062305 |
| SAN-EPI_A-0147696 | SAN-EPI-0002663 | SAN-EPI-0069127 |
| SAN-EPI_A-0150738 | SAN-EPI-0002670 | SAN-EPI-0071018 |
| SAN-EPI_A-0153613 | SAN-EPI-0002745 | SAN-EPI-0071658 |
| SAN-EPI_A-0155547 | SAN-EPI-0002755 | SAN-EPI-0072660 |
| SAN-EPI_A-0160978 | SAN-EPI-0003031 | SAN-EPI-0072663 |
| SAN-EPI_A-0168416 | SAN-EPI-0005309 | SAN-EPI-0077052 |
| SAN-EPI_A-0179909 | SAN-EPI-0005314 | SAN-EPI-0077991 |
| SAN-EPI_A-0179916 | SAN-EPI-0005316 | SAN-EPI-0078858 |
| SAN-EPI_A-0180548 | SAN-EPI-0005340 | SAN-EPI-0080704 |
| SAN-EPI_A-0181268 | SAN-EPI-0005341 | SAN-EPI-0081008 |
| SAN-EPI_A-0198411 | SAN-EPI-0005406 | SAN-EPI-0082989 |
| SAN-EPI_A-0228013 | SAN-EPI-0006854 | SAN-EPI-0083095 |
| SAN-EPI_A-0228689 | SAN-EPI-0006860 | SAN-EPI-0083237 |
| SAN-EPI_A-0230506 | SAN-EPI-0012879 | SAN-EPI-0083247 |
| SAN-EPI_A-0230511 | SAN-EPI-0012880 | SAN-EPI-0087111 |
| SAN-EPI_A-0243577 | SAN-EPI-0012902 | SAN-EPI-0087325 |
| SAN-EPI_A-0243588 | SAN-EPI-0013239 | SAN-EPI-0088510 |
| SAN-EPI_A-0247205 | SAN-EPI-0013241 | SAN-EPI-0089671 |
| SAN-EPI_A-0248461 | SAN-EPI-0013600 | SAN-EPI-0089673 |
| SAN-EPI_A-0249333 | SAN-EPI-0028304 | SAN-EPI-0091515 |
| SAN-EPI_A-0251503 | SAN-EPI-0032713 | SAN-EPI-0095078 |
| SAN-EPI_A-0252101 | SAN-EPI-0040003 | SAN-EPI-0096552 |
| SAN-EPI_A-0367023 | SAN-EPI-0041339 | SAN-EPI-0096553 |
| SAN-EPI_A-0544974 | SAN-EPI-0043164 | SAN-EPI-0102697 |
| SAN-EPI_A-0890259 | SAN-EPI-0054773 | SAN-EPI-0103491 |
| SAN-EPI-0000482 | SAN-EPI-0058548 | SAN-EPI-0124049 |
| SAN-EPI-0002409 | SAN-EPI-0058553 | SAN-EPI-0124579 |
| SAN-EPI-0002414 | SAN-EPI-0058969 | SAN-EPI-0130480 |
| SAN-EPI-0002429 | SAN-EPI-0058971 | SAN-EPI-0130845 |
| SAN-EPI-0002463 | SAN-EPI-0060922 | SAN-EPI-0131775 |
| SAN-EPI-0002468 | SAN-EPI-0060923 | SAN-EPI-0136576 |
| SAN-EPI-0002473 | SAN-EPI-0061827 | SAN-EPI-0136577 |
| SAN-EPI-0002477 | SAN-EPI-0062114 | SAN-EPI-0136697 |

| | | |
|---|---|---|
| SAN-EPI-0136766 | SAN-EPI-0265085 | SAN-EPI-0432334 |
| SAN-EPI-0138094 | SAN-EPI-0272399 | SAN-EPI-0432718 |
| SAN-EPI-0145790 | SAN-EPI-0277215 | SAN-EPI-0433982 |
| SAN-EPI-0145793 | SAN-EPI-0279259 | SAN-EPI-0434020 |
| SAN-EPI-0145794 | SAN-EPI-0283110 | SAN-EPI-0434022 |
| SAN-EPI-0146381 | SAN-EPI-0283111 | SAN-EPI-0434323 |
| SAN-EPI-0148365 | SAN-EPI-0297041 | SAN-EPI-0434385 |
| SAN-EPI-0148375 | SAN-EPI-0297627 | SAN-EPI-0434386 |
| SAN-EPI-0148823 | SAN-EPI-0297628 | SAN-EPI-0434429 |
| SAN-EPI-0148827 | SAN-EPI-0297653 | SAN-EPI-0434437 |
| SAN-EPI-0155161 | SAN-EPI-0305836 | SAN-EPI-0434467 |
| SAN-EPI-0158511 | SAN-EPI-0331691 | SAN-EPI-0436556 |
| SAN-EPI-0169149 | SAN-EPI-0337115 | SAN-EPI-0445887 |
| SAN-EPI-0170524 | SAN-EPI-0337116 | SAN-EPI-0446009 |
| SAN-EPI-0170525 | SAN-EPI-0352004 | SAN-EPI-0456630 |
| SAN-EPI-0171423 | SAN-EPI-0360274 | SAN-EPI-0462557 |
| SAN-EPI-0171591 | SAN-EPI-0362184 | SAN-EPI-0462559 |
| SAN-EPI-0189632 | SAN-EPI-0362562 | SAN-EPI-0466222 |
| SAN-EPI-0193980 | SAN-EPI-0365409 | SAN-EPI-0467641 |
| SAN-EPI-0194007 | SAN-EPI-0365411 | SAN-EPI-0468859 |
| SAN-EPI-0194008 | SAN-EPI-0365685 | SAN-EPI-0474016 |
| SAN-EPI-0197629 | SAN-EPI-0366330 | SAN-EPI-0505029 |
| SAN-EPI-0200861 | SAN-EPI-0367098 | SAN-EPI-0505644 |
| SAN-EPI-0210391 | SAN-EPI-0367100 | SAN-EPI-0505645 |
| SAN-EPI-0210605 | SAN-EPI-0367828 | SAN-EPI-0505646 |
| SAN-EPI-0211693 | SAN-EPI-0377613 | SAN-EPI-0505648 |
| SAN-EPI-0213952 | SAN-EPI-0403083 | SAN-EPI-0536953 |
| SAN-EPI-0223635 | SAN-EPI-0403443 | SAN-EPI-0537213 |
| SAN-EPI-0227361 | SAN-EPI-0403700 | SAN-EPI-0537316 |
| SAN-EPI-0229590 | SAN-EPI-0403750 | SAN-EPI-0537317 |
| SAN-EPI-0229591 | SAN-EPI-0405882 | SAN-EPI-0537982 |
| SAN-EPI-0238962 | SAN-EPI-0405915 | SAN-EPI-0544641 |
| SAN-EPI-0255974 | SAN-EPI-0408666 | SAN-EPI-0545576 |
| SAN-EPI-0259092 | SAN-EPI-0410072 | SAN-EPI-0584372 |

| | | |
|---|---|---|
| SAN-EPI-0591672 | SAN-EPI-0764970 | SAN-EPI-0937200 |
| SAN-EPI-0604949 | SAN-EPI-0780155 | SAN-EPI-0937201 |
| SAN-EPI-0607088 | SAN-EPI-0788481 | SAN-EPI-0937202 |
| SAN-EPI-0607552 | SAN-EPI-0788575 | SAN-EPI-0942591 |
| SAN-EPI-0607553 | SAN-EPI-0788606 | SAN-EPI-0946459 |
| SAN-EPI-0607554 | SAN-EPI-0789435 | SAN-EPI-0946460 |
| SAN-EPI-0607555 | SAN-EPI-0792775 | SAN-EPI-0946468 |
| SAN-EPI-0607556 | SAN-EPI-0803705 | SAN-EPI-0946470 |
| SAN-EPI-0661153 | SAN-EPI-0832747 | SAN-EPI-0957050 |
| SAN-EPI-0661155 | SAN-EPI-0873202 | SAN-EPI-0959388 |
| SAN-EPI-0661172 | SAN-EPI-0878147 | SAN-EPI-0979543 |
| SAN-EPI-0661192 | SAN-EPI-0878171 | SAN-EPI-0981444 |
| SAN-EPI-0661193 | SAN-EPI-0878172 | SAN-EPI-0995519 |
| SAN-EPI-0661198 | SAN-EPI-0887394 | SAN-EPI-0995522 |
| SAN-EPI-0661228 | SAN-EPI-0890246 | SAN-EPI-1031769 |
| SAN-EPI-0661229 | SAN-EPI-0893766 | SAN-EPI-1035380 |
| SAN-EPI-0686125 | SAN-EPI-0899803 | SAN-EPI-1053129 |
| SAN-EPI-0686246 | SAN-EPI-0899804 | SAN-EPI-1054000 |
| SAN-EPI-0688814 | SAN-EPI-0900347 | SAN-EPI-1058488 |
| SAN-EPI-0705748 | SAN-EPI-0900351 | SAN-EPI-1059922 |
| SAN-EPI-0705846 | SAN-EPI-0901252 | SAN-EPI-1063509 |
| SAN-EPI-0723739 | SAN-EPI-0901258 | SAN-EPI-1093101 |
| SAN-EPI-0723797 | SAN-EPI-0901269 | SAN-EPI-1093112 |
| SAN-EPI-0724251 | SAN-EPI-0902345 | SAN-EPI-1093844 |
| SAN-EPI-0724280 | SAN-EPI-0902377 | SAN-EPI-1094715 |
| SAN-EPI-0725058 | SAN-EPI-0902398 | SAN-EPI-1132684 |
| SAN-EPI-0755825 | SAN-EPI-0902405 | SAN-EPI-1134711 |
| SAN-EPI-0755962 | SAN-EPI-0906458 | SAN-EPI-1136774 |
| SAN-EPI-0763907 | SAN-EPI-0922729 | SAN-EPI-1137199 |
| SAN-EPI-0764009 | SAN-EPI-0928169 | SAN-EPI-1148329 |
| SAN-EPI-0764574 | SAN-EPI-0937195 | SAN-EPI-1148855 |
| SAN-EPI-0764575 | SAN-EPI-0937197 | SAN-EPI-1151691 |
| SAN-EPI-0764724 | SAN-EPI-0937198 | SAN-EPI-1155103 |
| SAN-EPI-0764881 | SAN-EPI-0937199 | SAN-EPI-1155270 |

SAN-EPI-1155302

SAN-EPI-1155454

SAN-EPI-1155461

SAN-EPI-1155465

SAN-EPI-1155742

SAN-EPI-1156188

SAN-EPI-1156232

SAN-EPI-1158291

SAN-EPI-1165930

SAN-EPI-1166023

SAN-EPI-1201588

SAN-EPI-1207542

SAN-EPI-1207599

SAN-EPI-1212218

SAN-EPI-1214286

SAN-EPI-1214288

SAN-EPI-1214294

SAN-EPI-1214295

SAN-EPI-1214301

SAN-EPI-1217191

SAN-EPI-1221350

SAN-EPI-1221352

SAN-EPI-1223834

SAN-EPI-1223837

SAN-EPI-1223839

SAN-EPI-1234026