# Exhibit 135
# (Filed Under Seal)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXPERT REBUTTAL REPORT OF STEVEN N. WIGGINS

**March 25, 2019**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

TABLE OF CONTENTS

I.    Qualifications and Assignment ............................................................................................. 1

II.   Summary of Conclusions ...................................................................................................... 4

III.  Background ............................................................................................................................ 5

   A.   EAI Industry ..................................................................................................................... 5

     1.   EpiPen® ...................................................................................................................... 5

     2.   Auvi-Q® ..................................................................................................................... 6

   B.   Summary of Mylan's Counterclaim Allegations ............................................................. 7

IV.  Dr. Varner's Damages Analysis and the Correct Approach to Claimed Damages ............... 7

   A.   A Summary of Dr. Varner's Damages Calculations ........................................................ 7

   B.   The Proper Approach to Claimed Damages in this Case ................................................. 9

V.   Benchmark: Sales Auvi-Q® Would Have Achieved But-For the Alleged Conduct ........... 11

   A.   Pre-launch Assessments of Auvi-Q® ............................................................................ 12

     1.   Mylan's Qualitative Assessments ............................................................................ 12

     2.   Sanofi's Qualitative Assessments ............................................................................ 16

   B.   Pre-launch Sales Forecasts ............................................................................................ 16

   C.   Assessment of Auvi-Q®, Post-launch ........................................................................... 17

     1.   Post-launch Assessments of Sales Drivers by Mylan .............................................. 17

     2.   Post-launch Assessments of Sales Drivers by Sanofi .............................................. 19

     3.   Post-launch Assessments of Sales Drivers by Third Parties .................................... 19

VI.  Analysis of Dr. Varner's Calculation of Unjust Enrichment ............................................. 20

   A.   Actual Auvi-Q® Performance Relative to Benchmark ................................................. 21

   B.   Analysis of Sanofi's Profits from the Sale of Auvi-Q® ................................................ 23

VII. Analysis of Dr. Varner's Lost Profits Calculation ............................................................ 24

   A.   There is No Evidence of Lost Profits to Mylan Because There Is No Evidence of Any Incremental Sales From the Alleged Conduct ............................................................................................ 24

   B.   Specific Errors in Dr. Varner's Lost Profits Calculation .............................................. 25

     1.   Specific Errors in Dr. Varner's Estimate of Lost Revenue ..................................... 25

     2.   Errors in Dr. Varner's Estimate of Mylan's Incremental Profit Margin ................. 29

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

I.     QUALIFICATIONS AND ASSIGNMENT

1.     My name is Steven N. Wiggins.  I am a Professor of Economics at Texas A&M University, where I have taught since 1979.  In my time at Texas A&M, I have served in chaired professorships, including serving as the George and Mary Jordan Professor of Economics and Public Policy from 1993 to 1999, and serving as the Rex B. Grey Professor of Economics at the Private Enterprise Research Center at Texas A&M from 1986 to 1989.  I have also served as a Visiting Lecturer at the University of the Saarlands and Johann Wolfgang Goethe University, both in Germany.  I received my Ph.D. in Economics from MIT in 1979.  My primary field in Economics is Industrial Organization.  In addition, I have areas of concentration in financial economics and econometrics—the latter being the branch of Economics concerned with statistics and measurement of economic data.  My Curriculum Vitae is attached as Exhibit A.

2.     Industrial Organization is the field of economics that involves competitive conditions in markets, antitrust, research and development, intellectual property, reputation and brand names, distribution, contracting, and the theory of the firm.  As a field, Industrial Organization focuses on developing general economic models of firm behavior.  Specifically, Industrial Organization economists develop theoretical and empirical methods designed to address issues regarding market power, competition, price and non-price strategies (such as advertising and promotion) to compete in markets, profitability, and the valuation of firms and property.  The methods developed apply both generally and to particular industries.

3.     I teach Ph.D. and undergraduate level classes in Industrial Organization.  These courses deal with a wide variety of economic models, analytical methods, and industries.  These courses deal specifically with antitrust, valuation, the economics of advertising and promotion, and intellectual property in addition to the broader topics discussed above.  I also teach graduate and undergraduate courses in Microeconomic Theory.

4.     I have authored or co-authored more than 35 scholarly articles in a variety of economic issues.  These articles have been published in leading journals in economics and law, including the *American Economic Review*, the *Journal of Political Economy*, the *Review of Economics and Statistics*, the *Journal of Legal Studies*, and others.  One particular focus of my research has been the economics of the pharmaceutical industry.  My dissertation research involved assessing the impact of quality regulation on innovation in the pharmaceutical industry.  Since that time, I

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

have published research on a number of different aspects of the pharmaceutical industry, including regulation and innovation, the role and effects of price competition between and among branded and generic pharmaceutical products, and inflation rates in the pharmaceutical industry, among other areas. I have also researched the role of advertising in markets where quality is unknown or unobservable to consumers. Beyond these issues, I have undertaken a variety of academic studies including both theoretical and empirical work applied to numerous industries designed to address a wide range of issues. That work has addressed topics in contracting, the theory of the firm, competition, pricing, intellectual property, regulation, research and development, and patents. I have directly applied these models in a wide variety of industries including, for example, pharmaceuticals, petroleum, natural gas, automobiles, airlines, microelectronics, computers, and motion pictures. I have also developed and published models that apply economy wide.

5.      My research has been supported by the United States federal government, including grants through the National Science Foundation, the Office of Technology Assessment, and the Federal Trade Commission. It has also been supported by the government of the State of Texas, the Federal Republic of Germany, and numerous private organizations and firms.

6.      I have lectured nationally and internationally regarding this research. These research presentations include seminars at prestigious public and private U.S. universities, such as Harvard, MIT, Yale, Chicago, Stanford, UCLA, Michigan, Wisconsin, and Northwestern, and including the law schools of Yale, Columbia, Chicago, and Stanford. I have also lectured at professional meetings in the United States and abroad. I have provided long-term lecture series twice in Germany and once in Italy, dealing with the economics of contracts and firms.

7.      As an economic expert, I have rendered opinions regarding a wide variety of issues related to Industrial Organization and antitrust, including numerous matters involving pharmaceuticals and the pharmaceutical industry. I have consulted extensively with firms throughout the United States, dealing with issues of competition, intellectual property, pricing, and acquisitions. I have also offered consulting services regarding the acquisition of products, intellectual property, and entire firms as well as damage analyses. A list of the cases in which I have provided deposition or trial testimony in the last four years is included in my Curriculum Vitae, which can be found in Exhibit A.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

8.      I have also been asked to testify and have testified extensively in the United States including federal courts such as Federal District Courts, the Court of Claims, and the Tax Court, as well as in State Courts in Texas.  My testimony has included a wide variety of analyses covering antitrust liability and damages related to group boycott, exclusionary conduct, price-fixing, predatory pricing, collusion, and monopolization.  I have also testified regarding a broad range of economic damages including antitrust, breach of contract, and intellectual property.

9.      I have been retained on behalf of Sanofi-Aventis U.S. LLC ("Sanofi") to review and assess the expert report and analyses therein of Dr. Thomas R. Varner on behalf of Mylan Inc., and Mylan Specialty, L.P. ("Mylan").[1]  Specifically, I have been asked to address Dr. Varner's calculations of what he claims to be Sanofi's unjust enrichment and Mylan's lost profits, which Dr. Varner assumes resulted from the alleged false and misleading claims described in Mylan's Counterclaims and its Experts' reports.  I have also been asked to address Dr. Varner's calculation of Sanofi's sales and profits of Auvi-Q®, and the role, if any, that the alleged conduct had on those sales.

10.      I am being compensated for my work at a rate of $850 per hour.  This compensation is not dependent in any way on the opinions I express or the outcome of this matter.  My work in this case has been supported by Charles River Associates ("CRA"), a consulting firm at which I am a Senior Consultant.  I also receive compensation from CRA based on CRA's staff billings on this case.

11.      In reaching the conclusions expressed below, I have considered numerous issues, including issues raised by Mylan and their experts.  I have also reviewed certain pleadings, depositions, and other materials including certain discovery materials.  I have also reviewed the expert reports and backup materials of Sanofi's experts Dr. Fiona Scott Morton and Dr. Mary Ann Michelis as well as Mylan's expert, Mr. Gary Zieziula.  Exhibit B provides a list of the materials I have considered in connection with forming an opinion in this matter.  In reaching the opinions set forth in this report, I also rely on my general training in economics, as well as my teaching and research background in Industrial Organization, Economic Theory, Antitrust Economics, and the economics of the pharmaceutical industry.

---

[1] Expert Report of Thomas R. Varner, Ph.D. ("Varner Report"), February 4, 2019.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

12.      I reserve the right to supplement or modify my opinion, should the Court allow, based on review of any additional discovery materials, expert reports, pleadings, and other material that might be exchanged between the parties in this matter.

II.      SUMMARY OF CONCLUSIONS

13.      Dr. Thomas Varner's damages analysis regarding both Sanofi's alleged unjust enrichment and Mylan's alleged lost profits is deeply flawed.  His analysis suffers from several fundamental errors, each of which, independent of the other, renders his analysis economically unreliable.

14.      First, Dr. Varner fails to provide any linkage between the alleged conduct by Sanofi and sales of Auvi-Q®.  Dr. Varner fails to link the alleged statements and/or advertising practices to physician prescribing decisions, consumer purchasing decisions, or ultimately to overall sales of Auvi-Q®.  This failure to link any alleged conduct to Auvi-Q® sales means that Dr. Varner's purported damages analysis does not measure harm, either in the form of unjust enrichment to Sanofi, or in the form of lost profits to Mylan.

15.      Second, Dr. Varner fails to determine any impact of the alleged conduct on Auvi-Q® sales.  Instead, Dr. Varner begins by calculating total Auvi-Q® sales, implicitly attributing ***all sales*** to the alleged statements, and also thereby implicitly assuming that Auvi-Q®'s but-for sales would have been zero.  Such an approach ignores that Auvi-Q® was a highly differentiated product that represented significant innovation in the market for epinephrine auto-injectors.  Auvi-Q® exhibited a compact size, voice instruction, a retractable needle, and other distinctive features, which both Mylan and Sanofi anticipated would generate high levels of market penetration and sales.  Dr. Varner ignored Auvi-Q®'s market potential, as well as all independent drivers of Auvi-Q® sales.  Instead of accounting for or subtracting Auvi-Q®'s anticipated sales, Dr. Varner calculated damages using all of Auvi-Q®'s actual sales, effectively determining that but-for the alleged conduct by Sanofi, Auvi-Q® sales would have been ***zero***.  Such a proposition contradicts Mylan's very own sales forecasts and research.

16.      My analysis uses as a benchmark the pre-launch market forecasts of Mylan and Sanofi.  Because Auvi-Q® represented a new and innovative device, both companies invested significant time and effort in measuring the expected impact of Auvi-Q® on the market.  Both companies also reached remarkably similar conclusions.  They concluded that Auvi-Q® was a highly

4

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

differentiated product that would meet substantial and otherwise unmet needs in the marketplace.
As a result, both companies concluded that Auvi-Q® would generate substantial sales and
market share. ████████████████████████████████████████████
████████████████████████████████████████

17.   ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

18.   ████████████████████████████████████████
████████████████████████████   Hence, the evidence contradicts the
proposition that Auvi-Q® sales were increased by any supposed conduct.  As a result, I conclude
that Auvi-Q® sales were not increased by the alleged Sanofi conduct.

19.   I conclude that Sanofi was not unjustly enriched by the alleged conduct and that the
associated damages are zero.  Sanofi was not unjustly enriched because the evidence does not
support a conclusion that Auvi-Q® sales were increased by any false or misleading practices.
Mylan fails to tie any Auvi-Q sales to this alleged conduct.  ████████████████████
████████████████████████████████████████████████████
████████

20.   Because Auvi-Q® sales were not increased due to the alleged Sanofi conduct, and
because Mylan may not have been able to even make additional EpiPen® sales given
manufacturing issues with its supplier, I also conclude that Mylan did not suffer any lost profits
as a result of the alleged practices.

III.   BACKGROUND

    A.  EAI INDUSTRY

        1. EpiPen®

21.   Epinephrine, also commonly known as adrenaline, is approved by the U.S. Food and
Drug Administration ("FDA") to be used in life-threatening emergency situations induced by
anaphylaxis as a result of allergenic exposure.[2]  EpiPen® was introduced as the first epinephrine

_____

[2] U.S. Food & Drug Administration, Epinephrine, Important Prescribing Information, "Subject: New Formulation of

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

auto-injector ("EAI") device in 1987.[3]  Mylan acquired the marketing and distribution rights to EpiPen® in 2007 and continues to sell and distribute EpiPen® today.[4]  EpiPen® is manufactured by Meridian Medical Technologies ("Meridian"), now a Pfizer company.[5]  Mylan has a dominant share of the EAI market through sales of EpiPen®.[6]  Mylan also launched the first authorized generic EpiPen® in 2016, which is similarly manufactured by Meridian.[7]  Other competitors in the EAI market include Adrenaclick® (launched in 2010 and again in 2013)[8] and Auvi-Q®, which became available in early 2013.[9]

### 2. Auvi-Q®

22.     Auvi-Q® differs significantly from EpiPen® and includes many distinctive features. Auvi-Q® is smaller and more compact, and has both audio instructions, and a retractable needle.[10]  Auvi-Q® was invented by twin brothers, Evan and Eric Edwards, after founding the company Intelliject, Inc. in 2004 (which later changed its name to kaléo).  Intelliject licensed Sanofi in 2009 to market Auvi-Q® in the U.S. and Canada.  Sanofi is a multinational

Adrenalin® (epinephrine) Injection 1-mL Single-use Vials," https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM564405.pdf.

[3] U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=019430 (accessed Mar. 22, 2019) (click on Approval Date(s) and History, Letters, Labels, Reviews for NDA 019430).

[4] Mylan Inc., Transition Report (Form 10-K/A) (March 7, 2008), at 3, 50.

[5] U.S. Food & Drug Administration, "FDA Approved Epinephrine Auto-Injectors," June 15, 2017, https://www fda.gov/downloads/drugs/informationondrugs/ucm520800.pdf.

[6] See Mylan's Second Amended Responses and Objections to All Plaintiffs' First Set of Coordinated Requests for Admission, No. 17-md-2785-DDC-TJJ, Apr. 20, 2018, RFA No. 16 (admitting that "pursuant to Mylan's understanding of IMS data, that EpiPen and EpiPen Jr products accounted for at least 90% of epinephrine auto-injector prescriptions in the United States for each year between 2007 and 2012").

[7] Mylan, "Mylan Launches the First Generic for EpiPen (epinephrine injection, USP), Auto-Injector as an Authorized Generic," Dec. 16, 2016, http://newsroom.mylan.com/2016-12-16-Mylan-Launches-the-First-Generic-for-EpiPen-epinephrine-injection-USP-Auto-Injector-as-an-Authorized-Generic.

[8] MPR, "Adrenaclick Auto-injector Launched for Anaphylaxis," Jan. 7, 2010, https://www.empr.com/news/adrenaclick-auto-injector-launched-foranaphylaxis/article/160817/; MPR, "Adrenaclick Auto-Injector Available Again for Anaphylaxis," June 17, 2013, http://www.empr.com/news/adrenaclick-auto-injector-available-again-foranaphylaxis/article/298979/.

[9] Sanofi, "Sanofi Announces Auvi-Q™, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.," PR Newswire, Jan. 28, 2013, available at https://www.prnewswire.com/newsreleases/sanofi- announces-auvi-q-the-first-and-only-voice-guided-epinephrine-auto-injector-is-nowavailable-in-the-us-188651061.html.

[10] Thomas Handel Deposition ("Handel Dep."), Oct. 17, 2018, at pp. 30-32.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

pharmaceutical company headquartered in Paris, France.  Sanofi returned the rights to Auvi-Q®
back to kaléo in early 2016 following a voluntary product recall.  Kaléo now manufactures and
markets Auvi-Q®.[11]  From very early in the pre-launch stage, Auvi-Q® has been considered an
innovative device with a promising profile that could meet unmet needs in the EAI market.

      B.  SUMMARY OF MYLAN'S COUNTERCLAIM ALLEGATIONS

23.     Mylan, in its counterclaims, alleges several Lanham Act violations by Sanofi.  Mylan
alleges that certain false and misleading statements were communicated to physicians through
Sanofi sales representatives and through written promotional materials.[12]  Mylan alleges that
Sanofi made false and/or misleading statements about EpiPen® as well as Auvi-Q®, including
that Auvi-Q® is bioequivalent and therapeutically equivalent to EpiPen®, that Auvi-Q® was the
"new EpiPen®," that Auvi-Q® is more patient friendly than EpiPen®, and that Auvi-Q® is the
only EAI device with a retractable needle.[13]  Mylan also alleges that Auvi-Q® wrongfully made
claims regarding patient preference.  Mr. Gary Zieziula, Plaintiffs' pharmaceutical expert,
provides a discussion of these statements and claims allegedly made by Sanofi.[14]  Dr. Varner
does not assess the validity of each of these allegations in calculating damages allegedly suffered
by Mylan as a result of these statements.  Similarly, I also assume for the purposes of a damages
calculation that these allegations made by Mylan and described by Mr. Zieziula are true.

IV.   DR. VARNER'S DAMAGES ANALYSIS AND THE CORRECT APPROACH TO CLAIMED
     DAMAGES

      A.  A SUMMARY OF DR. VARNER'S DAMAGES CALCULATIONS

24.     Dr. Varner provides two damages analyses, one covering Sanofi's alleged unjust
enrichment and the second covering Mylan's alleged lost profits.[15]  In those analyses, he simply

---

[11] Sanofi, "October 28, 2015 Auvi-Q (epinephrine injection, USP) Recall FAQs," https://www.sanofi.us/en/
products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall/Auvi-Q-epinephrine-injection-USP-Recall-
FAQs; Sanofi, "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo," Feb. 23, 2016,
http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o.

[12] *See* Answer, Affirmative Defenses, and Counterclaims of Mylan Inc. and Mylan Specialty L.P. ("Mylan
Counterclaims"), No. 2:17-cv-2785, Dkt. 112, Jan. 16, 2018, ¶ 68.

[13] Mylan Counterclaims, ¶¶ 25-26, 36, and 42.

[14] Expert Report of Gary Zieziula ("Zieziula Report"), Feb. 4, 2019.

[15] Varner Report, ¶ 12.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

provides calculations covering all sales and all profits of Auvi-Q®.

25.    He assumes (at
least implicitly) that all product sales made by Sanofi over the entire course of Auvi-Q®'s time
on the market were the result of certain alleged statements made by Sanofi.[18]

26.

Because the lost profits were based off of Sanofi's total gross sales, Dr. Varner thus again
assumes (at least implicitly) that all Auvi-Q® sales were caused by certain alleged statements.[20]

27.   Dr. Varner makes this assumption despite the fact that he provides no linkage between
the alleged conduct and *any* Auvi-Q® sales.  Dr. Varner provides no analysis, does not review
any evidence in the record, and provides no linkage of any kind between Auvi-Q® sales in the
marketplace and the supposed conduct.[21]

28.   Dr. Varner takes these positions while ignoring the highly differentiated nature of Auvi-
Q® and its anticipated sales.  The market potential of Auvi-Q® has long been acknowledged by
both Mylan and Sanofi, and both expected that the innovative features of Auvi-Q® would
generate high sales—regardless of certain alleged practices.  Both companies independently
determined that Auvi-Q®'s compact size, voice instructions, and other characteristics would
drive sales because the product would address previously unmet needs.  Dr. Varner ignores these
pertinent facts about Auvi-Q®.

29.   In this context, it is inappropriate to simply assume, as Dr. Varner does, that "all of
Sanofi's Auvi-Q® sales [we]re sold as a result of [allegedly] false and misleading

---

[16] Varner Report, ¶ 12.

[17] Varner Report, ¶ 32.

[18] Varner Report, ¶ 11.

[19] Varner Report, ¶ 12.

[20] Varner Report, ¶ 11.

[21] Similarly, Mr. Zieziula also fails to offer any evidence, statistical or otherwise, that the alleged practices he
details, had any impact on physician prescribing decisions or on any portion of Auvi-Q®'s overall sales.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

representations."[22]  Dr. Varner's approach effectively assumes away the inherent sales potential of Auvi-Q® as a new and unique product.  Instead of accounting for Auvi-Q®'s independent sales potential, he simply attributes all Auvi-Q® sales to the alleged conduct.  Hence, Dr. Varner ignores the clear evidence of Auvi-Q®'s sales potential, while arbitrarily attributing all Auvi-Q® sales to these alleged representations without any evidence to support such an attribution.

30.     In his lost profits analysis, Dr. Varner also assumes that all Auvi-Q® sales were made at the expense of EpiPen®.  As with his unjust enrichment calculation, he makes this assumption without 1) investigating the potential market-expanding nature of Auvi-Q® or 2) considering the manufacturing issues that plagued Mylan's supplier at the time (and for the following years), ultimately leading to an EpiPen® recall.[23]

31.     First, because Auvi-Q® represented a newer, more compact device and featured voice instruction, it addressed previously unmet needs in the marketplace, quite possibly expanding total EAI market sales.  Dr. Varner ignores these effects and instead of evaluating the impact of Auvi-Q® on total market sales, simply assumes that Mylan would have garnered nearly all sales made by Sanofi of Auvi-Q®.

32.     Second, Dr. Varner fails to address whether Mylan could have made these additional EpiPen® sales given the well-documented issues that its manufacturer had with EpiPen® throughout this period.  Dr. Varner ignores the potential effect that millions of additional units may have had on already existing manufacturing problems and whether such additional production would have exacerbated them, temporarily slowing production or resulting sooner in the current EpiPen® shortage.[24]

        B.  THE PROPER APPROACH TO CLAIMED DAMAGES IN THIS CASE

33.     It is both necessary and proper to assume that the conduct alleged by Mylan is true in estimating damages.  However, it is not proper or appropriate to assume that the alleged conduct impacted Sanofi's sales in the marketplace or that the alleged conduct was the sole reason for Auvi-Q® sales.  Hence, the first central question in any proper damages analysis in this case is to

---

[22] Varner Report, ¶ 34.

[23] *See* infra Section VII.B.1; Handel Dep. Exhibit 28.

[24] *See* infra Section VII.B.1; Handel Dep. Exhibit 28.

determine the effect of the alleged practices on physician prescribing decisions, consumer purchasing decisions, and ultimately on overall sales of Auvi-Q®. To properly calculate damages, one must use the incremental sales caused by the alleged statements, and *only* such sales. These incremental sales form the economically appropriate basis of harm in both unjust enrichment damages and lost profits.

34. The typical economic approach to determine incremental sales is to measure such sales using either a before-and-after approach or a benchmark approach. The purpose of both approaches, in contrast to Dr. Varner's approach, is to determine the sales Auvi-Q® actually made and then determine the sales Auvi-Q® would have made but-for the alleged conduct. Either before-and-after sales or benchmark sales can and often are used to separate sales into actual sales and sales that would have been made but-for the alleged conduct. These approaches then generate a measure of incremental sales attributable to the alleged conduct.

35. As a starting point, the lack of information surrounding Mylan's claims preclude a more precise approach to identify or apportion incremental sales potentially attributable to the alleged conduct. Mylan's sparse claims regarding a supposed handful of isolated incidents hamper the ability to calculate even an outer-bounds percentage of sales resulting from the alleged conduct.

36. The sweeping nature of Mylan's allegations in this case further limits the choice of an appropriate method. Mylan simply alleges that the conduct was prevalent, beginning from the very launch of Auvi-Q® and then continuing the entire time that Sanofi marketed Auvi-Q®.[25] Mylan also alleges that this conduct was imbedded in the culture of Sanofi's promotion of Auvi-Q® so that it was not limited to any particular market segment or geographical area. This alleged pervasiveness across time and regions rules out a before-and-after approach.

37. Given the dearth of information provided by Mylan regarding Sanofi's alleged sales practices and Dr. Varner's failure to even attempt to calculate incremental sales attributable to these alleged practices, it is appropriate in this case to use a benchmark approach. One can use information from prior to Auvi-Q®'s launch to construct a benchmark regarding the expected sales of Auvi-Q® at that time. Prior to launch, the alleged statements had not been made and so they could not influence expected sales as forecast by either Mylan or Sanofi.

---

[25] Zieziula Report, pp. 6-7.

10

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

38.     This particular benchmark is quite strong. ████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████

39.     ████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

40.     I use these pre-launch sales forecasts below as the benchmark of sales that Auvi-Q®
would have achieved but-for the alleged statements and practices.  This benchmark can then be
compared to actual sales to assess the impact of the alleged conduct on Auvi-Q® sales.  I now
turn my attention to this benchmark.

V.      BENCHMARK: SALES AUVI-Q® WOULD HAVE ACHIEVED BUT-FOR THE ALLEGED
        CONDUCT

41.     To develop this benchmark, I consider the assessments of Auvi-Q® by both Mylan and
Sanofi in the pre-launch era, prior to the alleged conduct.  I examine the qualitative product
assessments and sales forecasts both companies developed.  I also examine the qualitative
assessments that both companies made regarding how the market reacted to Auvi-Q® during the
post-launch era.  Together these market assessments provide a benchmark of expected Auvi-Q®
sales formed prior to the alleged conduct.

42.     Auvi-Q® exhibited a variety of favorable features that both Mylan and Sanofi expected
to drive high sales and generate significant market penetration.  These features included: 1)

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Auvi-Q®'s compact size, 2) its audio instructions, 3) its retractable needle, 4) its embodiment of "state-of-the-art technology," and 5) the heavy promotion by Sanofi anticipated for Auvi-Q® and its "share of voice" within the EAI market.  These features were expected to—and did—create the market perception that Auvi-Q® was easy to use, and together these factors drove sales.

43.     The first step is to consider how these features were expected to impact sales and market share during the period prior to Auvi-Q®'s launch.

  A.  PRE-LAUNCH ASSESSMENTS OF AUVI-Q®

    1. *Mylan's Qualitative Assessments*

44.     Prior to Auvi-Q®'s launch, Mylan and its manufacturing partner Meridian extensively researched Auvi-Q® and its potential impact on the EAI market.  In those analyses, Mylan and Meridian reviewed Auvi-Q®'s characteristics, how those characteristics would be received by doctors and patients, and Auvi-Q®'s sales potential.  Mylan concluded that Auvi-Q® would likely have a high market penetration rate and very substantial sales.

45.     Mylan's assessment of high sales potential was driven by Auvi-Q®'s innovative characteristics and how those characteristics differentiated the product from EpiPen® to satisfy unmet needs in the market.[26]  As early as 2008, Mylan and Meridian were aware that Auvi-Q® posed a threat to their EpiPen® business.



46.

---

[26] *Compare* MYEP00118416 (EpiPen® Commercial Team Meeting, May 21, 2012), at 17 (identifying EpiPen® "weaknesses:" "Size – Not convenient for some users;" "Timely and costly product innovations;" and "Potential perception of dated technology").

[27] PFE_EPIPEN_AT00648955

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



███████████████████████████████████████████ Other Mylan documents
████████████████████████████████████████████████.[29]

47.    Mylan's 2011 strategic plans for EpiPen® identified Auvi-Q® as a significant threat and formidable competitor, ███████████████████████████████████████████

██████ Bruce Foster, Senior Director of National Accounts, recalled in his deposition that Auvi-Q® was a "competitive threat" because ███████████████████████████████

████████████████████████████████████████████████████ and that "the size of the device was an advantage."[31]

48.    In the months just prior to Auvi-Q®'s 2013 launch, Mylan analyses ██████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ An internal Mylan email ████████████████ stated the following:

_____

[28] PFE_EPIPEN_AT00011449 ████████████████████████ at 97; Handel Dep. Exhibit 9;
MYEP00107916 ██████████████████████████████████ at 49.

[29] MYEP00107916 ████████████████████████████████ at 45, 49;
MYEP00723817 ████████████████████████████████ at 10-12.

[30] PFE_EPIPEN_AT00011449 ████████████████████ at 57; *see also*
MYEP0015273 ███████████████

[31] Bruce Foster Deposition, June 14, 2018, pp. 80 and 143.

[32] MYEP00140813 ████████████████████████████████████ at 2;
MYEP99149817 ████████████████████ at 8.

[33] MYEP01033505 ████████████████████████████████████ *see also*
MYEP00630921 ████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

49.    Similarly, Mylan research from October 2012 noted that ██████████

██████████████████████████"[34] Other pre-launch research by Mylan ████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

The same research ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

50.    Mylan's own efforts to ████████████ or work with its manufacturing partner

Meridian to ████████████ demonstrate that Mylan recognized the

substantial demand for Auvi-Q® in the marketplace. ████████████████

██████████████████████████████████████████████████

██████████████ ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████ ████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████ ████████████████████████████

██████████████████████████

[34] MYEP00140813 ████████████████████████████ at 2.

[35] MYEP00275852 ████████████████

[36] MYEP00140813 ████████████████████████ at 2.

[37] Handel Dep., pp. 69-71; *see also* Handel Dep. Ex. 3. ████████████████

████████ ; *see also* Roger Graham Dep., Aug. 29, 2018, pp. 236-37.

[38] Handel Dep., p. 71.

[39] Handel Dep., pp. 30-31.

[40] Handel Dep., pp. 56-57.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

51.     Both Mylan and Meridian recognized Auvi-Q®'s appeal to a previously untapped or unattainable patient population. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████   Mylan projected ████████████████████████████████

████████████████████████

52.     As an alternative to ████████████, Mylan also considered working with its manufacturing partner Meridian to ████████████████████████████████

████████████████████████   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

53.     ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████   ████████████████████████

████████████████████████████████████████████████

████████████████████████   ████████████████████████

████████████████████████████████████

████████████████████████████████████

54.     Mylan's recognition of the competitive threat of Auvi-Q®, ████████████████

---

[41] Handel Dep. Ex. 3, p. 9.

[42] MYEP01190101 ████████████████████████████████████████████

████████████████████████████████

[43] Auvi-Q®'s initial launch date of April 2012 was delayed until 2013 due to pending patent infringement litigation against Intelliject. *See* Handel Dep. Ex. 12, p. 3; Handel Dep., p. 112.

[44] PFE_EPIPEN_AT00611245 ████████████████████████████████████

[45] PFE_EPIPEN_AT00546951 ████████████████████████ at 8.

[46] PFE_EPIPEN_AT00546951 ████████████████████████ at 8.

[47] MYEP00332615 ████████████████████████████████████████ at 27; Thomas Hadley Deposition, Oct. 3, 2018, pp. 157-58.

15

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

████████████████ and their ████████████████████████████████████
████████████████ show that Mylan recognized the substantial market demand for Auvi-Q®.  These facts also show that Auvi-Q®'s unique features and product characteristics would be important drivers of significant product sales.

       *2. Sanofi's Qualitative Assessments*

55. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ These spending decisions reflect Sanofi's assessment of the market value and sales potential of Auvi-Q®.

56. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████

       B.  PRE-LAUNCH SALES FORECASTS

57.  Mylan considered Auvi-Q®'s product characteristics and the anticipated high level of promotion to develop pre-launch forecasts of Auvi-Q® sales and market share.  Since these forecasts were developed before any of Mylan's alleged claims were made, they provide a valuable benchmark with which to assess Auvi-Q® sales in the absence of any of these claims.

58.  Mylan projected ████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[48] *See, e.g.,* SAN-EPI-0013253 (Sanofi Auvi-Q Presentation), at 22; SAN-EPI-0525843█████████████████ SAN-EPI-0525845
████████████████

[49] *See, e.g.,* SAN-EPI-0013253 (Sanofi Auvi-Q Presentation), at 3 and 11 ████████████████████████
████████████ (emphasis in original).

[50] *See, e.g.,* SAN-EPI-0013253 (Sanofi Auvi-Q Presentation), at 3 █████████████████████
██████████ at 6 ████████████████████████████████████████

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Mylan also predicted ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ ▮▮ Subsequently, in 2011, Mylan forecast ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

59.    Sanofi also carried out a variety of assessments of Auvi-Q®'s market potential.

60.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ All of these forecasts predict a substantially different picture

than the 0% share and $0 sales Dr. Varner now attributes to Auvi-Q based upon its own merits.

61.    I now turn my attention to Auvi-Q®'s actual reception in the market, and the drivers of

sales as assessed by both Mylan and Sanofi post-launch.

   C.   ASSESSMENT OF AUVI-Q®, POST-LAUNCH

      *1. Post-launch Assessments of Sales Drivers by Mylan*

62.    Following Auvi-Q®'s launch, both Mylan and Sanofi began monitoring the factors that

were actually driving Auvi-Q®'s acceptance and sales.  These evaluations identified the same

factors as key sales drivers as identified in the companies' pre-launch market research.  These

---

[51] MYEP01209505 ▮▮▮▮▮▮▮▮▮▮▮, at 13.  Note: Intelliject was later renamed kaléo, who in turn, signed a licensing agreement with Sanofi for Auvi-Q® in the U.S. and Canada.

[52] MYEP01209505 ▮▮▮▮▮▮▮▮▮▮ at 13.

[53] MYEP01209503 ▮▮▮▮▮▮▮▮▮▮▮▮ Handel Dep. Exhibit 12, p. 3 ▮▮▮▮ ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Handel Dep., pp. 112-13.  See also an earlier 2010
forecast, MYEP01209505 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), at 13.

[54] SAN-EPI-0171591 (Auvi-Q® Pricing Strategy and Recommendation), at 1.

[55] SAN-EPI-0171591 (Auvi-Q® Pricing Strategy and Recommendation), at 3, table 2.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

post-launch studies confirm the validity of the pre-launch research.

63. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

64.   Mylan's own documents noted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

65.   Another significant factor driving Auvi-Q®'s market penetration and sales was Sanofi's promotional efforts and the commitment of Sanofi to acquaint physicians with the product.[60] Mylan concluded, for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

66.   All of these studies and research reflect independent reasons why customers would—and did—choose Auvi-Q®. These investigations by Mylan point to the same factors driving sales as had been anticipated in the pre-launch period. Mylan's post-launch research confirmed that these very factors were the primary drivers of sales following the launch of Auvi-Q®.

67.   In fact, Mylan found ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[56] MYEP00107916 ▮▮▮▮▮▮▮▮▮▮▮▮▮ at 39.
[57] MYEP00107916 ▮▮▮▮▮▮▮▮▮▮▮▮▮ at 39.
[58] MYEP00107916 ▮▮▮▮▮▮▮▮▮▮▮▮▮ at 40.
[59] MYEP00093726 ▮▮▮▮▮▮▮▮▮▮▮▮▮ at 10.
[60] *See, e.g.,* MYEP00107916 ▮▮▮▮▮▮▮▮▮▮▮
[61] MYEP00107916 ▮▮▮▮▮▮▮▮▮▮▮▮▮ at 52.
[62] *See, e.g.,* MYEP00093726 ▮▮▮▮▮▮▮▮▮▮ at 9
MYEP00562625 ▮▮▮▮

18

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

*2. Post-launch Assessments of Sales Drivers by Sanofi*

68.



*3. Post-launch Assessments of Sales Drivers by Third Parties*

69.     Third parties also provided assessments of Auvi-Q® post-launch, lauding its sales potential and distinctive features.[65] One survey of allergists, pediatricians, and primary care physicians "forecast Auvi-Q capturing 50% share by 2016, in aggregate, driven by a favorable view of Auvi-Q's profile."[66]

70.     The report of Dr. Mary Ann Michelis, Chief of Allergy and Immunology for the Division of Internal Medicine and Pediatrics at Hackensack University Medical Center, provides a perspective on allergist prescribing habits for EAI devices.[67] Dr. Michelis notes that it is important to give patients a choice because it "increases the likelihood that [her] patients will carry their EAI device consistently and have it readily accessible in the event of anaphylactic reaction."[68] She states that it is her practice to "put all EAI devices available to the patient on the table, allowing the patient to compare their options side by side."[69] Mylan's own documents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In such situations, the

---

[63] *See* SAN-EPI-0014223 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at 13-14; SAN-EPI-0604949 ▮▮▮▮▮▮▮▮▮, at 4; SAN-EPI-0088870 ▮▮▮▮▮ at 29 and 59.

[64] SAN-EPI-0088870 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at 31-33.

[65] *See, e.g.,* MYEP00460782 (Leerink Swann, Healthcare Equity Research, "EpiPen Survey Confirms Auvi-Q Threat").

[66] MYEP00460782 (Leerink Swann, Healthcare Equity Research, "EpiPen Survey Confirms Auvi-Q Threat") (discussing MEDACorp survey).

[67] Expert Report of Dr. Mary Ann Michelis, February, 2, 2019 ("Michelis Report").

[68] Michelis Report, ¶ 37.

[69] Michelis Report, ¶ 37.

[70] *See, e.g.,* MYEP00140817 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(emphasis in original).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

alleged statements by Sanofi are highly unlikely to impact sales because patients are choosing for themselves based on their own handling of the products in a physician's office.

71.     Dr. Michelis reports that in her experience many patients prefer Auvi-Q® when given the choice. She describes patients' preference for Auvi-Q®:

> Generally, patients find the Auvi-Q's sleek shape, compared to the EpiPen's bulky design, to be easier to carry. They also like the Auvi-Q's talking feature, which provides audio instructions that guide users through how to operate the device. This is particularly helpful during an anaphylactic reaction, which is a high stress, life-threatening situation.[71]

72.     Dr. Michelis's experience as an allergist who regularly prescribes EAI devices is notable in its focus on the same factors observed by both Mylan and Sanofi as critical drivers of Auvi-Q® sales.

73.     

The sales forecasts by Mylan and Sanofi provide a benchmark regarding expected Auvi-Q® sales before certain alleged conduct. As one would expect, these forecasts are not identical. Instead, they do provide an economically reasonable range of expected Auvi-Q® sales.

74.     In sum, both parties recognized numerous independent bases for Auvi-Q® sales. Regardless of the actual percentage that Mylan (or Sanofi) forecast, these studies and figures show a vastly different picture from the 0% share and $0 sales that Dr. Varner now attributes to Auvi-Q® absent any supposed false or misleading conduct.

VI.     ANALYSIS OF DR. VARNER'S CALCULATION OF UNJUST ENRICHMENT

75.     A proper economic analysis, using an appropriate benchmark demonstrates that Sanofi has not enjoyed any unjust enrichment due to the alleged conduct. There are two reasons for this

---

[71] Michelis Report, ¶ 39. Dr. Michelis further notes that Auvi-Q® is highly preferred by teenage boys. "Teenagers, more than other demographics, do not like to look different from their peers, and, unlike teenage girls, teenage boys generally do not carry handbags. EpiPen, with its large, cylindrical shape, is not easily concealed on their person, and does little good in a teenager's book bag, which is often kept in a locker or otherwise not accessible during an anaphylactic event. Auvi-Q, however, can be slipped discreetly into boys' pockets, as its size and shape resemble a smartphone, making it more likely to be close at hand for this patient group." Michelis Report, ¶ 40.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

conclusion: 1) There is no evidence that Sanofi gained any sales it would not have otherwise made but-for the alleged conduct and 2) even if there were incremental sales due to the alleged conduct, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

A. ACTUAL AUVI-Q® PERFORMANCE RELATIVE TO BENCHMARK

76.    Figure 1 compares Auvi-Q®'s actual market shares to the benchmark shares forecasted by both Mylan and Sanofi.



77.    ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████

78.    ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

21

Case 2:17-md-02785-DDC-TJJ   Document 1695-29   Filed 06/28/19   Page 25 of 53

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



81.     Accordingly, there is no evidence of an increase in sales above the levels that both Mylan and Sanofi determined would be achieved simply by virtue of market preferences for Auvi-Q®'s characteristics. The implication is that a comparison of sales with benchmark sales does not support a finding of any sales increase associated with the alleged practices identified by Mr. Zieziula. Hence, there is no basis to conclude Mylan suffered any lost profits or that Sanofi was unjustly enriched.

---

[72] SAN-EPI-0171591             , at 3; MYEP01209505                             at 14.

[73] *See* Expert Report of Dr. Fiona M. Scott Morton Report ("Scott Morton Report"), Feb. 4, 2019, ¶¶ 203-07 and Figure 14.

[74] *See* Scott Morton Report, ¶¶ 203-07 and Figure 14.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

B. ANALYSIS OF SANOFI'S PROFITS FROM THE SALE OF AUVI-Q®

82. 

Dr. Varner provides a calculation of unjust enrichment, and he describes unjust enrichment as "the amount of profits earned by the defendant due to the alleged false and misleading representations."[75]  However, he states that it is his understanding that it is Sanofi's burden to prove all costs associated with his measured sales. Consequently,

[76]

83. 

84. 

_____

[75] Varner Report, ¶ 32.

[76] Varner Report, ¶ 32.

██████. Each of these cost categories are avoidable costs in the sense that they would not be incurred if Sanofi was not selling Auvi-Q®. It is appropriate to deduct all incremental costs from revenues in the calculation of unjust enrichment. Because Dr. Varner's unjust enrichment calculation applies to 100 percent of Auvi-Q® sales, all costs associated with those sales would have been avoided without the sales. Hence, all costs required to produce Auvi-Q® revenues are appropriately deducted from Dr. Varner's unjust enrichment.

85. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Hence after accounting for the costs borne by Sanofi, there was no unjust enrichment to Sanofi from the alleged conduct.

VII. ANALYSIS OF DR. VARNER'S LOST PROFITS CALCULATION

A. THERE IS NO EVIDENCE OF LOST PROFITS TO MYLAN BECAUSE THERE IS NO EVIDENCE OF ANY INCREMENTAL SALES FROM THE ALLEGED CONDUCT

86. Dr. Varner states that he calculates Mylan's alleged lost profits by beginning with the assumption that "all of Sanofi's Auvi-Q® sales were sold as a result of the alleged false and misleading representations made by Sanofi."[77] He explains that it is his understanding that "under the Lanham Act it is the burden of the defendant to identify and apportion those sales that are attributable to the false and misleading representations."[78] However, neither he nor Mr. Zieziula make any effort to establish any causal connection between the alleged wrongful acts and Sanofi's actual Auvi-Q® sales. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ and therefore there is no basis to conclude that the alleged wrongful acts led to any lost profits by Mylan or increased sales for Sanofi. Nevertheless, I address below specific errors in Dr. Varner's lost profits calculations and his unjust enrichment calculations.

[77] Varner Report, ¶ 33.

[78] Varner Report, ¶ 33.

24

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

    B.  SPECIFIC ERRORS IN DR. VARNER'S LOST PROFITS CALCULATION

        *1. Specific Errors in Dr. Varner's Estimate of Lost Revenue*

87.                                                            If patients

swapped out their recalled Auvi-Q® for an EpiPen®, Mylan would ultimately make the sale.
Similarly, if patients swapped out their Auvi-Q® for another EAI device or returned it without
getting a new device, there is no basis for concluding Mylan would have made the original sale
but-for the alleged conduct.

88.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

89.



Table 3

90.     Dr. Varner also assumes that 96 to 98 percent of Sanofi's Auvi-Q® sales would have been made by Mylan absent the alleged conduct.[80]  He bases this estimate on Mylan's share of the EAI market, excluding Auvi-Q®.[81]  This assumption is significantly flawed.

91.     Dr. Varner entirely ignores the possibility that Auvi-Q® brought in patients and customers who would not have purchased EpiPen®.



Mylan itself predicted                                                                     Such new customers

---

[80] Varner Report, ¶¶ 35-36, Exhibit 1.1 and 6.3.

[81] Varner Report, ¶ 35.

[82] See, e.g., Handel Dep. Ex. 3, at 9

MYEP00392152

[83] MYEP00481378                                                                     at 22.

would not have purchased EpiPen® even if Auvi-Q® was unavailable and do not constitute lost sales opportunities for Mylan.

92.     Dr. Varner also assesses Mylan's capacity to manufacture and distribute his estimated lost sales. Dr. Varner relies on an internal Mylan presentation and an undocumented interview with Chris Benson, Mylan's Head of Supply Chain for Biologics and Respiratory Products, to conclude that Meridian had the ability to manufacture between ▌ EpiPens® each month.[84] ▌

93.     Dr. Varner also ignores well-documented issues with Meridian's manufacturing of EpiPen® during the time when Sanofi marketed Auvi-Q®. FDA inspected Meridian's EpiPen® manufacturing facility from March 20, 2013, to April 29, 2013, and issued a notice to Meridian regarding unsatisfactory "testing and release" of EpiPens® for distribution, which did not result in a "determination of satisfactory conformance to the final specifications."[86] FDA also specified that "the 100 percent visual inspection used by [Meridian]…fails to identify critical defects."[87] Mr. Handel, Meridian's President and General Manager, stated that he had no reason to disagree with this statement in the FDA's notice.[88]

94.     On September 5, 2017, FDA also issued a warning letter to Mylan's supplier detailing a number of manufacturing problems dating back to at least 2014.[89] Among the issues cited, the FDA warning letter states that between 2014 and 2017, the company's "records show that [Meridian] received 171 complaint samples for products that failed to activate when the patient followed the proper sequence."[90] The FDA warning letter emphasized the seriousness of the activation failures, writing that "[Meridian's] own data show that [Meridian] received hundreds of complaints that [its] EpiPen products failed to operate during life-threatening emergencies,

---

[84] Varner Report, ¶ 40.

[85] Varner Report, Exhibit 10.1.

[86] Handel Dep., pp. 260:10-263:12; Handel Dep. Exhibit 29.

[87] Handel Dep. Exhibit 29.

[88] Handel Dep., pp. 262:7-10 and 264:6-18.

[89] Handel Dep. Exhibit 28.

[90] Handel Dep. Exhibit 28, p. 3.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

including some situations in which patients subsequently died."[91]  In a section of the warning letter titled "Repeat Violations," FDA wrote that in "a previous inspection of [the] facility from October 12 to November 25, 2014, FDA cited similar [Current Good Manufacturing Process] violations."[92]  FDA concluded that the "repeated failures demonstrate [that the] facility's oversight and control over the manufacture of these products is inadequate."[93]

95.     Disregarding these complaints, both Mylan and Meridian neglected to investigate EpiPen product failures or to take appropriate corrective action until FDA issued its warning letter nearly three years later in 2017.[94]  New processes put in place as a result of FDA's warning letter affected EpiPen®'s manufacturing capacity, resulting in a recall of EpiPen® in early 2017.  The 2017 recall involved more than 1 million units worldwide,[95] leading to significant and severe EpiPen® shortages, which are still ongoing.

96.     Despite these well-documented manufacturing issues, Dr. Varner concludes that Mylan could have sold all of his estimated         allegedly lost units.  Dr. Varner, however, has failed to consider whether Meridian's manufacturing issues related to product safety and activation, many of which were ongoing when Sanofi marketed Auvi-Q®, would have prevented Meridian from producing millions of additional units over and above existing EpiPen® manufacturing.  Dr. Varner's report fails to address whether production of these additional units could have, in fact, exacerbated Meridian's manufacturing issues, bringing about the EpiPen® shortage at an earlier time and/or creating an even larger EpiPen® recall or shortage than experienced.  Dr. Varner fails to take into account the dollar impact of any of these manufacturing issues (or the dollar impact of curing these manufacturing issues) when calculating Mylan's allegedly lost profits and ability to make additional sales.

---

[91] Handel Dep. Exhibit 28, p. 2.

[92] Handel Dep. Exhibit 28, p. 8.

[93] Handel Dep. Exhibit 28, p. 8.

[94] *See* Handel Dep., p. 245:4-18

; Handel Dep. Exhibit 28, pp. 2-3.

[95] Handel Dep., pp. 277:1-279:9.

28

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

*2. Errors in Dr. Varner's Estimate of Mylan's Incremental Profit Margin*

97.    Dr. Varner estimates an incremental profit margin for Mylan of ▇ percent.[96] He applies this amount to his allegedly lost sales to calculate lost profits. He states that he arrives at this estimate by using a "statistical regression methodology to compare the costs and expenses in Mylan's financial statement for the EpiPen® Auto-Injector with its net sales."[97]

98.    It is unclear why Dr. Varner does not simply rely on the profits and losses of U.S. EpiPen® sales reported by Heather Bresch, Mylan's CEO, in her congressional testimony. According to Ms. Bresch's congressional testimony, the profit margin earned on EpiPen® averaged ▇ percent during the damages period of 2013 through Q3 2015.[98] In fact, Dr. Varner's Exhibit 5.1 shows an identical profit margin of ▇ percent during this period.

99.    Dr. Varner's regression approach is problematic because it estimates Mylan's incremental profit margin using data as far back as 2010 as well as data for 2016, periods well before and after the alleged period of damages. Dr. Varner does not explain why he relies on financial data years prior to Auvi-Q®'s launch and one year after Auvi-Q® was removed from the market instead of relying on Mylan's financial profit and loss statements for U.S. EpiPen® sales provided to the United States Congress. Using his regression methodology instead of Mylan's financials from the contemporaneous time period inflates his estimated profit margin by nearly ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The result of this error alone in his calculation of lost profits is ▇▇▇▇▇▇▇ .

100.    There are additional issues with Dr. Varner's regression model itself. One issue is that because Dr. Varner relies on annual financial data from 2010 through 2016, he only estimates his incremental cost on seven observations, calling into question the reliability of his results. Secondly, Dr. Varner inexplicably includes COGS in his dependent variable. There is no reason to believe that COGS have any fixed component rather than being entirely variable. Allowing COGS to have a variable component is incorrect and results in the addition of unnecessary noise

---

[96] Varner Report, ¶ 43.

[97] Varner Report, ¶ 43.

[98] Heather Bresch Dep., Oct. 9, 2018, Ex. 17 (U.S. Securities and Exchange Commission, U.S. EpiPen Profitability Analysis, September 28, 2018), *available at* https://www.sec.gov/Archives/edgar/data/1623613/00011931 2516719397/d265624dex991 htm. Costs deducted to arrive at this margin include COGS, direct selling, marketing, medical affairs, and R&D costs.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

to his statistical estimates. For illustrative purposes, I have rerun his statistical estimation by regressing only SG&A (selling, general, and administrative costs) on net revenues. This estimate results in estimated incremental SG&A costs of ▮ percent of net revenue. Mylan's EpiPen® COGS, according to Dr. Varner's Exhibit 5.3, are ▮ percent of net revenues. Including Dr. Varner's estimated ▮ percent cost for R&D results in an incremental profit margin of only ▮ percent, rather than his calculated ▮ percent, a difference of ▮ in his calculation.[99] These results are summarized in Table 4.

**Table 4**

**Correction to Dr. Varner's Regression**
*COGS 100% Variable*

| | |
|---|---|
| [1] **Incremental SG&A expenses** | ▮ |
| [2] **COGS as % of Revenues** | ▮ |
| [3] **R&D expense %** | ▮ |
| *Total Costs* | ▮ |
| **Incremental profit margin w/R&D** | ▮ |

*Note:*
[1] This number was calculated by
running a regression of SG&A
expenses on Net Revenues. See also,
Varner Report, exhibit 5.3.
[2] This number represents the sum of net
revenues from 2010 through 2016
being divided by the sum of cost of
goods sold from 2010 through 2016
(cogs/net revenues). See also, Varner
Report, exhibit 5.3.
[3] This is the average R&D expense
as a percent of Total Revenues for
2013 - 2015 according to Varner.
See also, Varner Report, exhibit 5.3.

---

[99] Dr. Varner estimates Mylan's lost net sales at ▮ million and an incremental profit margin of ▮ percent. Allowing COGS to be 100 percent variable and using Varner's regression methodology for estimating incremental costs, yields an incremental profit margin of ▮ percent. The reduction in incremental profit margins is ▮ percent ▮ and the resulting reduction in his calculated lost profits is $25.5 million ▮

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Steven N. Wiggins**

Dated: March 25, 2019

31

# EXHIBIT A

# STEVEN N. WIGGINS

## ADDRESS:

Department of Economics
Texas A&M University
TAMU 4228
College Station, TX 77843-4228

Telephone:   (979) 845-7383
swiggins@tamu.edu

## EDUCATION:

Massachusetts Institute of Technology, Ph.D., 1979
Oklahoma State University, B.A., 1975

## PROFESSIONAL EXPERIENCE:

Senior Consultant, Charles River Associates, 2000 - present
Senior Consultant, LECG, 1996 - 2000
Professor of Economics, Texas A&M University, 1991 - present
Associate Professor of Economics, Texas A&M University, 1984 - 1991
Assistant Professor of Economics, Texas A&M University, 1979 - 1984

## HONORS AND AWARDS:

Distinguished Achievement Award for Teaching, College Level, Association of Former Students, Texas A&M University, 2017.

Dr. Dennis Berthold Innovations in Teaching Endowment Award, College of Liberal Arts, Texas A&M University, 2017.

Jeff Edwardson Outstanding Undergraduate Teaching Award, Department of Economics, Texas A&M, 2016.

Thunderbird Award, Business Association of Latin American Studies, Barcelona, Spain, 2010.

George and Mary Jordan Professor of Economics and Public Policy, Texas A&M University, 1993 - 1998.

Rex B. Grey Professor, Private Enterprise Research Center, Texas A&M University, 1986 - 1989.

Visiting Distinguished Lecturer on American Economic Institutions, Johann Wolfgang Goethe University, Frankfurt am Main, May - July, 1988.

University Teacher/Scholar, Texas A&M Honors Program, 1986-87.

Visiting Distinguished Lecturer on Economic Institutions Professor, University of the Saarlands, Saarbrucken, West Germany, May - August 1984.

## DISSERTATION TITLE:

Product Quality Regulation and Innovation in the Pharmaceutical Industry

## RESEARCH INTERESTS:

Industrial Organization, Regulation, and Antitrust

**LAST FOUR YEARS OF DEPOSITION AND TRIAL TESTIMONY:**

2018        Academy of Allergy & Asthma in Primary Care and United Biologics, LLC D/B/A United Allergy Services. v. American Academy of Allergy, Asthma & Immunology; American College of Allergy, Asthma & Immunology; Dallas Allergy and Asthma Center, P.A.; Joint Council of Allergy, Asthma & Immunology; Lyndon E. Mansfield M.D., P.A, A Professional Association; PSF, PLLC; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; David Weldon, MD; Allergy and Asthma Network/Mothers of Asthmatics, Inc.; Tonya Winders, James Wallen & Phadia US Inc.; Atlanta Allergy & Asthma Clinic, P.A.; Stanley Fineman, MD, Civil Action No. 14-35, United States District Court for the Western District of Texas, San Antonio Division
*Trial Testimony*

2017        Academy of Allergy & Asthma in Primary Care and United Biologics, LLC D/B/A United Allergy Services. v. American Academy of Allergy, Asthma & Immunology; American College of Allergy, Asthma & Immunology; Dallas Allergy and Asthma Center, P.A.; Joint Council of Allergy, Asthma & Immunology; Lyndon E. Mansfield M.D., P.A, A Professional Association; PSF, PLLC; Donald Aaronson, MD; Gary Gross, MD; Lyndon Mansfield, MD; James Sublett, MD; David Weldon, MD; Allergy and Asthma Network/Mothers of Asthmatics, Inc.; Tonya Winders, James Wallen & Phadia US Inc.; Atlanta Allergy & Asthma Clinic, P.A.; Stanley Fineman, MD, Civil Action No. 14-35, United States District Court for the Western District of Texas, San Antonio Division
*Deposition*

**OTHER SELECTED CONSULTING EXPERIENCE:**

Prometheus Franchise Restaurant Holdings, LLC, Southeast QSR, LLC, Coastal QSR, LLC, South Beach QSR, LLC, Florida Bells, LLC, and Mid-South Bells, LLC

Valero Energy Corporation and Subsidiaries

MM Steel, LP vs. Reliance Steel & Aluminum Co., Chapel Steel Corp., American Alloy Steel, Inc., Arthur J. Moore, JSW Steel (USA) Inc., Nucor Corp. & SSAB Enterprises, LLC D/B/A SSAB Americas, Case No. 4:12-cv-01227, United States District Court for the Southern District of Texas, Houston Division

Mary Plubell and Ted Ivey, on behalf of themselves and all others similarly situated vs. Merck, & Co., Inc., Case No. 04CV235817, In the Circuit Court of Jackson County, Missouri at Independence

City of Clinton, Arkansas, vs. Pilgrim's Pride Corporation, and Shelia Adams and James Adams, et al., vs. Pilgrim's Pride Corporation, Action No. 4:09-CV-386-Y (Consolidated With 4:09-CV-387-Y)

April Krueger, Individually and on Behalf of All Others Similarly Situated vs. Wyeth, Inc. F/K/A American Home Products, A Pennsylvania Corporation; Wyeth Pharmaceuticals F/K/A Wyeth Ayerst Pharmaceuticals, A Pennsylvania Corporation; And Does 1 Through 100, Inclusive, Case No 03:03-CV-02496-JAH-AJB, United States District Court Southern District Of California

Shelia Adams and James Adams, et al. v. Pilgrim's Pride Corporation, Civil No. 2:09-CV-397 (TJW-CE), in the United States District Court for the Eastern District of Texas, Marshall Division

Jean Smith and Loria Ivie, on behalf of themselves and others similarly situated v. Barry Collinsworth, Thomas Pugh, United American Insurance Company, Heartland Alliance of America Association, Farm & Ranch Healthcare, Inc. and John Does 1-20, Civil Action No. CV2004-72-2, In the Circuit Court of Saline County, Arkansas

People's Electric Cooperative v. Western Farmers Electric Cooperative, CIV-09-1129-HE, In the United States District Court for the Western District of Oklahoma

Canadian Valley Electric Cooperative, Inc. v. Western Farmers Electric Cooperative, In the District Court of the 22nd Judicial District Sitting in and for Seminole County, Seminole Division, State of Oklahoma

State of Louisiana, ex rel. James D. Caldwell, Jr., Attorney General v. Merck & Co., Inc., MDL No. 1657, United States District Court, Eastern District of Louisiana

Michael H. Kirsch, D.D.S., individually and on behalf of all others similarly situated vs. Horizon Blue Cross Blue Shield of New Jersey, Inc., Superior Court of New Jersey Law Division – Essex County

Alcoa Inc., vs. Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, Luminant Energy Company LLC, and Energy Future Holdings Corp., In the District Court of Milam County, Texas, 20th Judicial District, No. 32,540

In Re:  Pilgrim's Pride Corporation, et al., Case No. 08-45664 (DML), In the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

Frank's Casing Crew and Rental Tools, Inc. and Frank's International, Inc. v. Tesco Corporation and Tesco Corporation (US), Civil Action No. 2:07-cv-15, In the United States District Court for the Eastern District of Texas, Marshall Division

Logan Farms v. Smithfield, et al; Case No. 05-0766. In the United States District Court for the Southern District of Texas, Houston Division

Alfred T. Giuliano, Trustee on Behalf of Debtors' Estate of Graham-Field Health Products v. Ernst & Young LLP; AAA Case No. 18 199 10398 02 - American Arbitration Association Professional Accounting and Related Services Arbitration Tribunal

The State of Texas v. Merck & Co., Inc., Cause No. GV 503021, In the District Court, Travis County, Texas, 345th Judicial District

Board of Regents, The University of Texas System, on behalf of The University of Texas at Austin and Hydro-Québec v. Nippon Telephone and Telegraph Corporation, Cause No. A 01 CA 47, In the Western District of Texas, Austin Division

ReedHycalog UK, Ltd., ReedHycalog, LP, and Grant PrideCo, Inc. vs. Baker Hughes Oilfield Operations, Halliburton Energy Services, Inc., US Synthetic Corporation, In the U.S. District Court for the Eastern District of Texas, Tyler Division; Civil Action No. 6:06-CV-222(LED)

Champagne Metals, an Oklahoma Limited Liability Company vs. Ken-Mac, Inc., an Ohio corporation; Samuel, Son & Co., Limited, an Ontario, Canada corporation, Samuel Specialty Metals, Inc., a New

Jersey corporation, Metal West, L.L.C., an Alabama limited liability company, Integris Metals, Inc., a New York corporation, Earle M. Jorgensen Company, a Delaware corporation, and Ryerson Tull, Inc., an Illinois corporation; in the U.S. Dist. Court for the Western District of Oklahoma; No. CIV-02-528-C.

Rick Love, M.D., et al., vs. Blue Cross and Blue Shield of Arizona, Inc., et al., in the U.S. District Court, Southern District of Florida, Miami Division; Case No. 03-21296-CIV-Moreno.

Century Martial Art Supply, Inc. v. Martial Arts Enterprises, Inc.; No. 03-1711-T; USDC WD Oklahoma; Arbitration Number 71 181 J 00407 05

Brazos River Authority v. Ionics, Incorporated; Civil Action No. W 03 CA 324, in the U.S. District Court of Texas, Waco Division

Parkade Center, Inc. v. Simon Property Group (Texas), L.P. and Simon Property Group (Delaware), Inc.; Cause No. C-2584-06-1, in the 398th Judicial District of Hidalgo County, Texas

Natalie M. Grider, M.D., et al.  v. Keystone Health Plan Central, Inc., et al.; In the U.S. District Court for the Eastern District of Pennsylvania

Milissa Boisseau v. 7-Eleven, Inc.; Cause No. 04-05250; In the 68th Judicial District Court, Dallas County, Texas

John Ivan Sutter, M.D., P.A. on behalf of himself and all others similarly situated vs. Horizon Blue Cross Blue Shield of New Jersey, Inc., Superior Court of New Jersey, Law Division Essex  County, Docket No. ESX-L-3685-02

EEMSO, Inc. v. Compex Technologies, Inc. f/k/a Rehabilicare, Inc. and Iomed, Inc.; Civil Action No. 3:CV-05-0897-P; In the United States District Court, Northern District of Texas, Dallas Division

Scruggs Management Services, Inc. d/b/a Scruggs Consulting v. Panasonic Communications & Systems Co., et al.; No. 01-0151; In the Supreme Court of Texas

Gary Shapiro and Rich Fitzgerald, individually and on behalf of all others similarly situated v. International Business Machines Corporation, Docket No. MID-L-007413-02;  Superior Court of New Jersey Law Division: Middlesex County

Crest Foods of Edmund, LLC v. Wal-Mart Stores, Inc., Cause No. CIV-00-1659-F; In the U.S. District Court, Western District of Oklahoma

Andrew Daugherity, et al., v. International Business Machines Corporation, Cause No. 23,162; In the District Court of Burleson County, Texas, 21st/335th Judicial District

Logan Farms, Inc. and James P. Logan, Jr. v. Honeybaked Ham, L.P., Mi., et al.,  Cause No. H-01-1611; In the U.S. District Court for the Southern District of Texas, Houston Division

Park Cities Hotel, L.P. v. Meristar Management Company, L.L.C. Cause No. 01-08447; In the District Court, Dallas County, Texas, B-44th Judicial District

Marion Crane, et al., v. International Paper Company and Canal Wood, LLC; Civil Action No.: 3-02-3352-17; In the United States District Court for the District of South Carolina, Columbia Division

Richard A. Lippe, et al. v. Bairnco Coporation, et al. Case No. 96-CV-7600, United States District Court For the Southern District of New York

Alcatel USA, Inc. v. Cisco Systems, Inc. Case No. 4:00cv199, United States District Court for the Eastern District of Texas Sherman Division

IMODCO Inc. v. FMC Corporation and SOFEC, Inc., Cause No. H-99-2174, United States District Court, Southern District of Texas, Houston Division

American Permanent Ware Company v. Emerson Electric Co., d/b/a Chromolax, Don Shuhart Company, and Maytag Corp. d/b/a Heatube, Maytag Clarence Component Parts,  Cause No. 00-07351; In the 298th Judicial District, Dallas County, Texas

Palacio del Rio, Ltd. v. Hilton Hotels Corporation, et al., Cause No. 2000-CI-13691; In the 407th Judicial District Court, Bexar County, Texas

Gilbert Moreno Enterprises, Inc. d/b/a La Monita, et al., v. Gruma Corporation, Individually and d/b/a Mission Foods Corporation, et al., Cause No. G-0-546; In the U.S. District Court for the Southern District of Texas, Galveston District

United States of America v. Moore Supply Co. et al., CR-H-94-17, United States District Court, Southern District of Texas, Houston Division

Brand Name Prescription Drug Antitrust Litigation, 94 C 897, MDL 997, United States District Court, Northern District

Manuel Arechiga, Sr. v. Chevron U.S.A., Inc. and G.E. Darby, No. C-93-00844-D1, District Court of Webb County, Texas 49th Judicial District

Acme Plumbing & Heating Co., Inc. and Bruce Brooks v. Morrison Supply Company, Inc., et al., No. 80534-B, District Court of Potter County, Texas 181st District Court

Todd E. Samuelson, M.D. and Todd E. Samuelson, M.D., P.A., Individually and On Behalf of All Other Persons Similarly Situated, Appellants V. United Healthcare of Texas, Inc. and United Healthcare Insurance Company, Appellees, No. 2-01-407-CV, Court of Appeals of Texas, Second District, Fort Worth

Humco Holding Group, Inc. v. The Dow Chemical Company; CV No.: 5:04-CV-287 (TJW); United States District Court for the Eastern District of Texas, Texarkana Division

Schlotzsky's, Ltd. v. Sterling Purchasing & National Distribution Co. and Commissary Operations, Inc. and The Sygma Network, Inc.; Civil Action No. A05CA195 SS, United States District Court for the Western District of Texas, Austin Division

Star Fuel Marts, LLC v. Murphy Oil USA, Inc., et al.; No. CIV-02-0202-F; United States District Court, Western District, Oklahoma

Bolick Distributors Corporation v. Armstrong Holdings, Inc., Armstrong Wood Products, Inc., Robbins Hardwood Floorings, Inc., Hartco Flooring Company; Civil Action No.: 3-03-CV-1386-N; In the U.S. District Court for the Northern District of Texas, Dallas Division

Port of Houston Authority v. GB Biosciences Corporation, GB Biosciences Holdings, Inc., ISK Magnetics, Inc., Occidental Chemical Corporation, John Stansbury, William Hutton, Zeneca Holdings, Inc., Zeneca Inc., Zeneca AG Products, Inc., Syngenta AG, Syngenta Corporation, Syngenta Crop Protection, Inc.; Cause No. 2001-07795, In the District Court of Harris County, Texas, 151st Judicial District

Biovail Pharmaceuticals, Inc. v. Eli Lilly Company; United States District Court, for the Eastern District of North Carolina, Western Division, Case No. 5 :01CV352-BO(3)

Ruhrpumpen, Inc. v. Flowserve Corporation et al, Civil Action No. 3:02-CV-01931, USDC, North District of Texas, Dallas Division

Esther Kiobel et al v. Royal Dutch Petroleum Company; Shell Transport and Trading Company, p.l.c.; Civil Action No. 02 CV 7618 (KMW), USDC Southern District of New York

BSA Enterprises, Inc. d/b/a BSA Provider Network v. Healthsmart Preferred Care II, L.P.; No. 91253-E - In the 108th District Court, Potter County, Texas

HomeTeam Pest Defense LLC v. Curtis Warren and OnDuty Security Systems, Inc.; Cause No. C-2004-32777; In the District Court, Harris County, Texas; 189th Judicial District

KCI Licensing, Inc., KCI USA, Inc., and Wake Forest University Health Sciences v. Bluesky Medical Corporation, Medela AG, Medela, Inc., and Patient Care Systems, Inc., In the United States District Court for the Western District of Texas, San Antonio Division; Civil Action No. SA-03-CA-0832-RF; Kinetic Concepts, Inc.

VAE Nortrak North America, Inc., Meridian Track Products Corp., and Meridian Rail Information Systems Corp. v. Progress Rail Services Corporation; Civil Action No. 03 CV 1480; In the United States District Court for the Northern District of Alabama, Middle Division

Brazos River Authority v. Ionics, Incorporated; Civil Action No. W 03 CA 324, in the U.S. District Court of Texas, Waco Division

In the Matter of the Arbitration Ordinance (Chapter 341 of the Laws of Hong Kong) and In the Matter of An Arbitration Between Brunswick Bowling & Billiard Corporation and Shanghai Zhonglu Industrial Company Limited and Chen Rong

## PUBLICATIONS:

"Nonlinear Pricing Strategies and Competitive Conditions in the Airline Industry," with Manuel A. Hernandez, *Economic Inquiry*, Vol. 52, No. 2, April 2014, 539–561.

"Airline Pricing, Price Dispersion, and Ticket Characteristics On and Off the Internet," with Anirban Sengupta, *American Economic Journal: Economic Policy,* 2014, vol. 6, issue 1, pages 272-307.

"The Impacts of Breakthrough Drug Classes on Total Healthcare Expenditures," with Zeynal Karaca, *Journal of Health Economics and Outcomes Research*, 2013;1(3):276-95.

"The Evolving Modern Theory of the Firm," with Rob Maness, in *Handbook of Managerial Economics*, Oxford University Press, July 2013.

"Comparing Price Dispersion On and Off the Internet Using Airline Transaction Data," with Anirban Sengupta, *Review of Network Economics*, Vol. 11, Issue 1, March 2012, pages 1-38.

"Examining the effect of low cost carriers on nonlinear pricing strategies of legacy airlines", with Manuel A. Hernandez and Anirban Sengupta, in *Pricing Behavior and Non-Price Characteristics in the Airlines Industry,* James Peoples, Editor, 2011.

"Identifying Market Power through Accounting Profits and Margins", *Market Power in Antitrust Law*, Philip Nelson, editor, American Bar Association, 2004.

"Price Competition in Pharmaceuticals: The Case of Anti-infectives," with Robert Maness, *Economic Inquiry*, vol. 42, no. 2, April 2004, 247-263.

"Demand Systems and the "True" Subindex of the Cost-of-Living for Pharmaceuticals," with Michael R. Baye and Robert Maness, *Applied Economics*, 1997, 29, 1179-1189.

"Competition or Compensation: Supplier Incentives under the American and Japanese Subcontracting System," with Curtis Taylor, *American Economic Review*, September, 1997.

"Intangible Capital, Hedonic Pricing and International Transfer Pricing," with David Raboy, *Public Finance Review,* Vol. 25, No. 4, July, 1997, pp. 347-365.

"Price Premia to Name-Brands:  An Empirical Analysis," with David Raboy, *Journal of Industrial Economics,* Vol. XLIV, NO. 4, December 1996, pp. 377-388.

"Entrepreneurial Enterprises, Endogenous Ownership, and the Limits to Firm Size," *Economic Inquiry*, Vol. XXXIII, No. 1, January 1995, pp. 54-69.

"Institutional Control and Large-Scale, Long-Term Hazards," with Al H. Ringleb, *Government and Risk Bearing*, Mark Sniderman, ed., Federal Reserve Bank, Cleveland, 1993.

"Adverse Selection, Liability, and Long Term Hazards," with Al Ringleb, *Journal of Legal Studies*, Vol. XXI, No. 1, January 1992, pp. 189-215.

"Takeover Raids:  Managerial Incompetence or Managerial Shirking," with James Griffin, *Economic Inquiry*, Vol. XXX, No. 2, April 1992, pp. 355-370.

"The Economics of Contracts and Firms: A Selective Survey," *Journal of Institutional and Theoretical Economics*, Vol. 147, No. 4, December 1991, pp. 603-661.

"The Comparative Advantage of Long Term Contracts and Firms," *Journal of Law, Economics, and Organization*, Vol. 6(1), Spring 1990, pp. 155-170.  Reprint in *The Theory of the Firm*, Mark Casson, Editor, Edward Elgar Publishing Limited, Cheltenham, United Kingdom, Winter of 1997.

"Liability and Large-Scale, Long Term Hazards," with Al Ringleb, *Journal of Political Economy*, 1990, Vol. 98(3), pp. 574-595.  Reprint in *Economics and Liability for Environmental Problems*, Kathleen Segerson, Editor, Burlington, VT: Ashgate, 2002.

"Social Control and Labor Relations in the American South Before 1950:  Comment,"*Journal of Institutional and Theoretical Economics*, 1988, Vol. 145(1), pp. 158-161.

"Firm Heterogeneities and Cartelization Efforts in Domestic Crude Oil," with G. Libecap, *Journal of Law, Economics and Organization*, Vol. 3(1). Spring 1987, pp. 1-25.

"Organizational Theory, Information Processing, and Short Run Dynamics:  Theory and Empirical Tests," *Journal of Institutional and Theoretical Economics*, Vol. 143(1), March 1987, pp. 204-21.

*The Cost of Developing a New Drug*, Pharmaceutical Manufacturers' Association, Washington, D.C., 1987, 28 pp.

"Innovation, Market Structure, and Market Dynamics: Comment," *Journal of Institutional and Theoretical Economics*, March 1986, pp. 200-203.

"The Influence of Private Contractual Failure on Regulation:  The Case of Oil Field Unitization," with G. Libecap, *Journal of Political Economy*, Vol. 93, No. 4, August 1985, pp. 690-714. Reprinted in *The International Library of the New Institutional Economics,* Claude Ménard, Editor, Edward Elgar Publishing Limited, Cheltenham, United Kingdom.

"Oil Field Unitization:  Contractual Failure in the Presence of Imperfect Information," with G. Libecap, *American Economic Review*, Vol. 75, No.3, June 1985, pp. 368-85.  Reprint in *Institutional Law and Economics*, Pablo T. Spiller, Editor, *Economic Approaches to Law* series, Francesco Parisi and Richard Posner, Series Editors, Edward Elgar Publishing Limited, Cheltenham, United Kingdom, 2010.

"Contractual Responses to the Common Pool:  Prorationing of Crude Oil Production," with G. Libecap, *American Economic Review*, Vol. 74, No. 1, March 1984, pp. 87-98.  Reprint in *The Foundations of Regulatory Economics,* Robert B. Ekelund, Jr., Edward H. Lowder and Catherine L. Lowder, Editors, Edward Elgar Publishing Limited, Cheltenham, United Kingdom.  Reprint in *Corporate Reorganization and Bankruptcy:  Legal and Financial Materials*, Mark J. Roe, Editor, Foundation Press, 2000.

"Plant Closings, Worker Reallocation Costs, and Efficiency Gains to Labor Representation on Boards of Directors," with E. Furubotn, *Journal of Institutional and Theoretical Economics*, Vol. 140, No.1, March 1984, pp. 176-92.

"The Effect of U.S. Pharmaceutical Regulation on New Introductions," *Pharmaceutical Economics*, Bjorn Lindgren, editor, 1984, pp. 191-206.

"Is Regulation Really Necessary When Product Quality is Unknown?" in A. Shapiro, ed., *Management and Regulation*, The Basis for a Corporate Policy, Stevens Institute of Technology, 1984.

"Quality Uncertainty, Search, and Advertising," with W.J. Lane, *American Economic Review*, Vol. 73, No. 5, December 1983, pp. 881-94.

"The Impact of Regulation on Pharmaceutical Research Expenditures:  A Dynamic Approach," *Economic Inquiry*, Vol. XXI, January 1983, pp. 115-28.

"Product Quality Regulation and New Drug Introductions:  Some New Evidence From the 1970s," *Review of Economics and Statistics*, Vol. LXIII, No. 4, November 1981, pp. 615-19.

"A Theoretical Analysis of Conglomerate Mergers," in *The Conglomerate Corporation*, R.D. Blair and R.F. Lanzillotti, editors, Cambridge, Massachusetts, 1981, pp. 53-70.

"The Pharmaceutical Research and Development Decision Process," in *Drugs and Health: Economic Issues and Policy Objectives*, R. Helms, editor, American Enterprise Institute for Public Policy Research, 1981, pp. 55-83.

"Economic Factors Affecting Investment in Planned Birth Technologies," Congressional Office of Technology Assessment, 1980.

## PAPERS IN PROGRESS:

"Testing Theories of Price Dispersion and Scarcity Pricing in the Airline Industry," with Steven L. Puller and Anirban Sengupta.

"Pyramidal Ownership in Ecuadorian Business Groups," with Maria L. Granda.

## REVIEW RESPONSIBILITIES:

Editorial Board Member:

> *Journal of Regulatory Economics: 1989-1993*
> *Journal of Corporate Finance: 1994-2000.*

Referee for:

> *American Economic Review*
> *Applied Economics*
> *Bulletin of Economic Research*
> *Economic Inquiry*
> *Economic Journal*
> *International Economic Review*
> *Journal of Corporate Finance*
> *Journal of Economic Behavior and Organization*
> *Journal of Economics and Management Strategy*
> *Journal of Environmental Economics and Management*
> *Journal of Finance*
> *Journal of Health Economics*
> *Journal of Industrial Economics*
> *Journal of Institutional and Theoretical Economics*
> *Journal of Law and Economics*
> *Journal of Law, Economics, and Organization*
> *Journal of Political Economy*
> *Journal of Regulatory Economics*
> *Journal of the Japanese and International Economies*
> *Managerial and Decision Economics*
> *National Science Foundation*
> *Quarterly Review of Economics and Business*
> *RAND Journal of Economics*
> *Review of Economics and Statistics*
> *Southern Economic Journal*

## Ph.D. STUDENTS (YEAR OF COMPLETION) DISSERTATION TITLE:

Steve Hackett (1989), *Essays on the Economics of Contracting and Institutional Choice*

Andreas Ortmann (1991), *Essays on Quality Uncertainty, Information, and Institutional Choice*

Robert Maness (1992), *Essays on Organization, Form, and Pricing Behavior*

Hanne Meihuizen (1994), *Three Essays on Contracts*

Wenjie Shi (1997), *An Integrated Approach To The Choice Between Firms, Joint Ventures And Entrepreneurial Enterprises*

Jennifer Vanderhart (2000), *Quality Signals, Word-of-Mouth, and Star Power: The Determinants of Motion Picture Success*

Jun Byoung Oh (2002), *Southwest Airlines and Competition in the Airline Industry*

Ahmed Alwaked (2005), *Estimating Fare and Expenditure Elasticities of Demand for Air Travel in the U.S. Domestic Market*

Jong Ho Kim (2006), *Price Dispersion in The Airline Industry: The Effect Of Industry Elasticity And Cross-Price Elasticity*

Ivan Tasic (2006), *Impact Of Retailers Promotional Activities on Customer Traffic*

Zeynal Karaca (2007) *The Impacts of Break-Through Drug Classes on Total Health Expenditures: Empirical Evidence from the 1996-2001 Medical Expenditure Panel Survey*

Anirban Sengupta (2007) *Airline Pricing, Price Dispersion, and Ticket Characteristics On and Off the Internet*

Maria Granda Kuffo (2009) *Pyramidal Ownership in Ecuadorian Business Groups*

Manuel Hernandez (2009) *Nonlinear Pricing Strategies and Market Concentration in the Airline Industry*

Sung Ick Cho (2012) *Essays on a Monopolist's Product Choice and its Effect on Social Welfare*

Fan Ji (2012) *The Drivers of Mergers and Acquisitions in Pharmaceutical Industry*

José Pellerano (2013) *Search Costs in Airline Markets*

Xiaoyuan Wang (2014) *Essays on Consumer Behavior and Demand Analysis*

Jinkook Lee (2014) *Empirical Essays on the U.S. Airline Industry*

## CONFERENCE PRESENTATIONS:

*2018*

"Algorithmic Pricing and Antitrust," Dallas Bar Association, Dallas, TX.

*2010*

"Pyramidal Ownership in Ecuadorian Business Firms," Business Association of Latin American Studies, Barcelona, Spain.

*1997*

The Brookings Institution, Conference on Human Capital and the Theory of the Firm, Washington, D.C.

*1996*

National Bureau of Economic Research, Summer Institute, sessions on New Approaches to Supply and Demand Analysis and Aging, Health Care and Productivity, Cambridge, MA.

University of Chicago, ELO Workshop, "Information Cascades and Contractual Incompleteness in Natural Gas Contracting, Chicago, IL

University of Wisconsin-Madison, IO Workshop, "Information Cascades and Contractual Incompleteness in Natural Gas Contracting, Madison, WI

*1995*

National Bureau of Economic Research, Spring IO meetings, "Price Competition in Pharmaceutical Markets," Boston, MA.

*1994*

American Economic Association, "The Price of Pharmaceuticals," Boston, MA.

Southern Economic Association, "Pricing and Promotion of Pharmaceuticals," New Orleans, LA.

*1993*

National Bureau of Economic Research, "Cooperation, Coordination, and Collusion Among Firms," Boston, MA.
Harvard Conference on the Pharmaceutical Industry, Boston, MA.

*1992*

Tenth Annual Seminar on the New Institutional Economics, Wallerfangen, Germany.

Future of the Pharmaceutical Industry:  Developments in Market Structure and Technology, MIT.

Editors Conference for the Journal of Regulatory Economics, October 1992.

*1991*

Annual Meetings of the Pharmaceutical Manufacturers' Association, Session on Models of Pharmaceutical Competition.

Annual Meetings of Southern Economic Association, Session on the Pharmaceutical Industry.

*1990*

Annual Meetings of the American Economic Association, Session on Experimental Economics Unitization.

Eighth Annual Seminar on the New Institutional Economics, Wallerfangen, Germany.

*1989*

"Improving the Translation of Research Findings into Clinical Practice: The Changing Economics of Technological Innovation in Medicine" Sponsored by National Academy of Sciences, Washington, DC.

Carnegie-Mellon Conference on Political Economy.

Seventh Annual Conference on the New Institutional Economics in Saarbrucken, West Germany.

Econometric Society Summer Meetings, Ann Arbor, Michigan.

*1988*

Annual Meetings of the American Economic Association, Session on Endogenous Institutional Choice.

Annual Meetings of the Economic Science Association (Experimental), San Francisco, Sessions on Public Goods Experiments and Experiments on Institutional Choice.

Sixth Annual Conference on the New Institutional Economics, Saarbrucken, Germany

Second Annual Hayek Symposium on Knowledge, Information, and Competition, Freiburg, Germany.

*1987*

Fifth Annual Conference on the New Institutional Economics, Saarbrucken, Germany.

First Annual Hayek Symposium on Knowledge, Information, and Competition, Freiberg, Germany.
American Economic Association Meetings, Session on Regulation and Long Term Contracts, Chicago.

*1986*

Econometric Society Meetings, Winter Meetings, New Orleans, Session on Long Term Contracts.

NBER Summer Institute, Cambridge, MA.

Fourth Annual Conference on the New Institutional Economics, Saarbrucken, Germany.

Thirteenth Annual Interlaken Conference, Interlaken, Switzerland.

*1985*

American Economic Association, Session on Monopoly and Competition, New York.

Third Annual Conference on the New Institutional Economics, Saarbrucken, Germany.

Twelfth Annual Interlaken Conference, Interlaken, Switzerland.

*1984*

Conference on Management and Regulation: The Basis of a Corporate Policy, sponsored by Stevens
    Institute of Technology, Hoboken, New Jersey.

Conference on Economics and Philosophy, sponsored by Civitas, Munich.

Second Annual Conference on the New Institutional Economics, sponsored by the Saarlands,
    Mettlach, Germany.

Eleventh Annual Interlaken Conference, sponsored by the Universities of Bern and Rochester,
    Interlaken, Switzerland.

*1983*

Econometric Society Winter Meetings, Billboard Session.

First Annual Conference on the New Institutional Economics, sponsored by the University of the
    Saarlands, Mettlach, Germany.

*1982*

Arne Ryde Symposium on Pharmaceutical Economics, Helsingborg, Sweden.

Session on Problems of Industrial Policy, American Economic Association Annual Meeting,
    December.

*1981*

Western Economic Association Meetings, Session on Strategic Planning Models, Association

*1980*

Conference on The Conglomerate Corporation, sponsored by the University of Florida, Gainesville.

*1979*

Conference on Drugs and Health:  Economic Issues and Policy Objectives, American Enterprise
    Institute, Washington, D.C.

## WORKSHOP PRESENTATIONS:

*2010*

University of Washington, University of Texas at Arlington

*1996*

University of Wisconsin, University of Chicago, Rice University

*1995*

Rice University

*1994*

University of Chicago, UCLA

*1993*

Penn State, University of Houston, Louisiana State University

*1992*

Oklahoma State University, University of Pennsylvania
*1991*

Northwestern University, University of Chicago, Rice University

*1990*

University of Pennsylvania, Brown University

*1989*

Harvard, State University of New York-Albany, Massachusetts Institute of Technology, University of Chicago, University of Michigan, Boston University, Columbia University, Northwestern University, University of Indiana, Ohio State, UCLA

*1988*

University of Chicago, Stanford University, University of California-San Diego, University of Illinois, Washington University, University of Bonn, University of the Saarlands, University of Wurzburg, University of Washington

*1987*

Virginia Commonwealth University, University of New Orleans, University of Arizona, UCLA, Federal Trade Commission, George Mason University, University of Houston, University of Texas, University of Zurich

*1986*

Northwestern University, Carnegie Mellon, University of Rochester, Penn State, University of Michigan, University of California-San Diego

*1985*

Federal Reserve Bank of Dallas, Washington University-St. Louis, Yale University, University of Houston

*1984*

University of British Columbia, University of Washington, Northwestern University, University of Michigan, Duke University, Yale University

*1983*

University of Houston, University of Texas

*1982*

MIT

*1981*

Federal Trade Commission

## EXHIBIT B
## LIST OF MATERIALS CONSIDERED

**I.**   **Cases and Court Filings**
1. Complaint, No. 2:17-cv-2452 (April 24, 2017)
2. Answer, Affirmative Defenses, and Counterclaims of Mylan Inc. and Mylan Specialty, Inc., No. 17-md-2785 (January 16, 2018)
3. Mylan Defendants' Second Amended Responses and Objections to All Plaintiffs' First Set of Coordinated Requests for Admission, No. 17-md-2785 (April 30, 2018)
4. Sanofi's Second Amended Responses and Objections to Mylan's Second Set of Interrogatories to Sanofi-Aventis U.S. LLC, No. 17-md-02785 (June 22, 2018)

**II.**   **Depositions: (30(b)(1) and 30(b)(6))**
1. Deposition of Heather Bresch (with Exhibits)
2. Deposition of Jonathan Fairest (with Exhibits)
3. Deposition of Bruce Foster (with Exhibits)
4. Deposition of Roger Graham (with Exhibits)
5. Deposition of Thomas Hadley (with Exhibits)
6. Deposition of Thomas Handel (with Exhibits)
7. Deposition of Lorine Harr (with Exhibits)
8. Deposition of Saira Jan (with Exhibits)
9. Deposition of James Parker (with Exhibits)
10. Deposition of Keith Wade (with Exhibits)
11. Deposition of Jay York (with Exhibits)

**III.**   **Data**
1. Auvi-Q Financials.xls
2. Sales_Returns (2013-2016).xlsx

**IV.**   **Other Documents**
1. All documents cited in report
2. Expert Report of Thomas R. Varner, Ph.D., February 4, 2019 (with Cited and Backup Materials)
3. Expert Report of Gary Zieziula, February 4, 2019 (with Cited and Backup Materials)
4. Expert Report of Dr. Fiona M. Scott Morton, February 4, 2019 (with Cited and Backup Materials)
5. Expert Report of Dr. Mary Ann Michelis, February 4, 2019 (with Cited and Backup Materials)
6. MPR, "Adrenaclick Auto-injector launched for anaphylaxis" (Jan. 7, 2010), https://www.empr.com/news/adrenaclick-auto-injector-launched-foranaphylaxis/article/160817/
7. MPR, "Adrenaclick Auto-Injector Available Again for Anaphylaxis," (June 17, 2013) http://www.empr.com/news/adrenaclick-auto-injector-available-again-foranaphylaxis/article/298979/
8. Mylan Inc., Transition Report (Form 10-K/A) (March 7, 2008)
9. Mylan Inc., "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized Generic" (Dec. 16, 2016),

http://newsroom.mylan.com/2016-12-16-Mylan-Launches-the-First-Generic-for-EpiPen-epinephrine-injection-USP-Auto-Injector-as-an-Authorized-Generic

10. Sanofi, "Sanofi Announces Auvi-Q™, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.," PR Newswire, Jan. 28, 2013, available at https://www.prnewswire.com/news-releases/sanofi-announcesauvi-q-the-first-and-only-voice-guided-epinephrine-auto-injector-is-nowavailable-in-the-us-188651061.html

11. Sanofi, "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo" (Feb. 23, 2016), http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o

12. Sanofi, "October 28, 2015 Auvi-Q (epinephrine injection, USP) recall FAQs," https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall/Auvi-Q-epinephrine-injection-USP-Recall-FAQs

13. U.S. Food & Drug Administration, Epinephrine, Important Prescribing Information, "Subject: New Formulation of Adrenalin® (epinephrine) Injection 1-mL Single-use Vials," https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafety InformationforPatientsandProviders/UCM564405.pdf.

14. U.S. Food & Drug Administration, "NDA 019430, Drugs@FDA: FDA Approved Drug Products," https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process& ApplNo=019430

15. U.S. Food & Drug Administration, "FDA Approved Epinephrine Auto-Injectors," https://www.fda.gov/downloads/drugs/informationondrugs/ucm520800.pdf

16. U.S. Food & Drug Administration, September 5, 2017, Letter to Meridian Medical Technologies, Inc., a Pfizer Company, https://www.fda.gov/iceci/enforcementactions/warningletters/2017/ucm574981.htm

17. U.S. Securities & Exchange Commission, U.S. EpiPen Profitability Analysis, https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d26562 4dex991.htm

## V.   Bates-Stamped Documents

| | | |
|---|---|---|
| ANTH-EPI 03662 | KALEO-00022744 | MYEP00127710 |
| CIGNA_00478 | KALEO-00042499 | MYEP00127711 |
| DH0128824 | KALEO-101808 | MYEP00127712 |
| DH0156755 | KFHP-005893 | MYEP00127713 |
| EAI 00027790 | MedImpact_0007817 | MYEP00127714 |
| EAI 00033532 | MYEP00047084 | MYEP00127715 |
| Horizon00009478 | MYEP00047335 | MYEP00127716 |
| Horizon00013404 | MYEP00088189 | MYEP00127717 |
| IMP-0000977 | MYEP00093726 | MYEP00127718 |
| IMP-0001006 | MYEP00107915 | MYEP00127719 |
| IMP-0001038 | MYEP00107916 | MYEP00127720 |
| KALEO 101809 | MYEP00118415 | MYEP00127721 |
| KALEO-00006134 | MYEP00118416 | MYEP00127722 |
| KALEO-00006135 | MYEP00119241 | MYEP00127723 |
| KALEO-00006989 | MYEP00127706 | MYEP00127724 |
| KALEO-00006994 | MYEP00127707 | MYEP00127725 |
| KALEO-00007001 | MYEP00127708 | MYEP00127726 |
| KALEO-00007551 | MYEP00127709 | MYEP00127727 |

| | | |
|---|---|---|
| MYEP00127728 | MYEP00561078 | PFE_EPIPEN_AT00648890 |
| MYEP00127729 | MYEP00561920 | PFE_EPIPEN_AT00648955 |
| MYEP00127730 | MYEP00562623 | PFE_EPIPEN_AT00655674 |
| MYEP00127731 | MYEP00562625 | PFECAN_EPIPEN_AT000001 |
| MYEP00127732 | MYEP00567786 | 68 |
| MYEP00127737 | MYEP00567788 | PFECAN_EPIPEN_AT000004 |
| MYEP00127738 | MYEP00586588 | 89 |
| MYEP00127739 | MYEP00606646 | PS0063339 |
| MYEP00127740 | MYEP00610641 | PS0063340 |
| MYEP00140812 | MYEP00611777 | PS0209703 |
| MYEP00140813 | MYEP00630921 | PS0217604 |
| MYEP00140817 | MYEP00677384 | SAN-EPI_A-0000956 |
| MYEP00152752 | MYEP00716962 | SAN-EPI_A-0011182 |
| MYEP00152753 | MYEP00716966 | SAN-EPI_A-0059425 |
| MYEP00162321 | MYEP00717962 | SAN-EPI_A-0088536 |
| MYEP00193044 | MYEP00717963 | SAN-EPI-0002167 |
| MYEP00239061 | MYEP00723817 | SAN-EPI-0002512 |
| MYEP00256469 | MYEP00723818 | SAN-EPI-0003187 |
| MYEP00258832 | MYEP00740405 | SAN-EPI-0003672 |
| MYEP00275501 | MYEP00740408 | SAN-EPI-0004073 |
| MYEP00275852 | MYEP00752542 | SAN-EPI-0004239 |
| MYEP00279997 | MYEP00798486 | SAN-EPI-0004304 |
| MYEP00292998 | MYEP01033504 | SAN-EPI-0004328 |
| MYEP00323845 | MYEP01033505 | SAN-EPI-0007054 |
| MYEP00323846 | MYEP01140256 | SAN-EPI-0012158 |
| MYEP00323856 | MYEP01146099 | SAN-EPI-0013235 |
| MYEP00323868 | MYEP01148131 | SAN-EPI-0013253 |
| MYEP00323869 | MYEP01180279 | SAN-EPI-0014220 |
| MYEP00330670 | MYEP01180282 | SAN-EPI-0014223 |
| MYEP00330671 | MYEP01186100 | SAN-EPI-0014347 |
| MYEP00332613 | MYEP01186102 | SAN-EPI-0027555 |
| MYEP00332614 | MYEP01190101 | SAN-EPI-0027555 |
| MYEP00332615 | MYEP01198247 | SAN-EPI-0031476 |
| MYEP00392151 | MYEP01209503 | SAN-EPI-0032713 |
| MYEP00460782 | MYEP01209505 | SAN-EPI-0033571 |
| MYEP00474593 | MYEP01211761 | SAN-EPI-0057752 |
| MYEP00481378 | MYEP01211762 | SAN-EPI-0058177 |
| MYEP00485295 | MYEP01211783 | SAN-EPI-0059445 |
| MYEP00485688 | MYEP01211788 | SAN-EPI-0060922 |
| MYEP00487177 | MYEP01211792 | SAN-EPI-0060923 |
| MYEP00487195 | MYEP01211794 | SAN-EPI-0062305 |
| MYEP00488646 | MYEP01211811 | SAN-EPI-0069127 |
| MYEP00488946 | MYEP01268235 | SAN-EPI-0075044 |
| MYEP00492591 | MYEP01319518 | SAN-EPI-0075161 |
| MYEP00492597 | MYEP01319592 | SAN-EPI-0078858 |
| MYEP00493241 | MYEP01322673 | SAN-EPI-0080307 |
| MYEP00513817 | PBE_00000391 | SAN-EPI-0080704 |
| MYEP00515665 | PFE_EPIPEN_AT00011447 | SAN-EPI-0081008 |
| MYEP00517442 | PFE_EPIPEN_AT00011449 | SAN-EPI-0082989 |
| MYEP00524984 | PFE_EPIPEN_AT00546951 | SAN-EPI-0083095 |
| MYEP00550556 | PFE_EPIPEN_AT00548494 | SAN-EPI-0083237 |
| MYEP00550557 | PFE_EPIPEN_AT00548495 | SAN-EPI-0083247 |
| MYEP00552533 | PFE_EPIPEN_AT00548500 | SAN-EPI-0087111 |
| MYEP00556700 | PFE_EPIPEN_AT00590186 | SAN-EPI-0087325 |
| MYEP00560585 | PFE_EPIPEN_AT00611245 | SAN-EPI-0088510 |
| MYEP00560878 | PFE_EPIPEN_AT00611490 | SAN-EPI-0088870 |

SAN-EPI-0091515
SAN-EPI-0095078
SAN-EPI-0102697
SAN-EPI-0106495
SAN-EPI-0146381
SAN-EPI-0147386
SAN-EPI-0148365
SAN-EPI-0148375
SAN-EPI-0158511
SAN-EPI-0161780
SAN-EPI-0171590
SAN-EPI-0171591
SAN-EPI-0171597
SAN-EPI-0194007
SAN-EPI-0197629
SAN-EPI-0199208
SAN-EPI-0200861
SAN-EPI-0210391
SAN-EPI-0210605
SAN-EPI-0211693
SAN-EPI-0213952
SAN-EPI-0216415
SAN-EPI-0220969
SAN-EPI-0225642
SAN-EPI-0227361
SAN-EPI-0238962
SAN-EPI-0243446
SAN-EPI-0246125
SAN-EPI-0259092
SAN-EPI-0265085
SAN-EPI-0272399
SAN-EPI-0274664
SAN-EPI-0277215
SAN-EPI-0277608
SAN-EPI-0279259
SAN-EPI-0285761
SAN-EPI-0297041
SAN-EPI-0297237
SAN-EPI-0302203
SAN-EPI-0305836
SAN-EPI-0309724
SAN-EPI-0310632
SAN-EPI-0331691
SAN-EPI-0349131

SAN-EPI-0377130
SAN-EPI-0419743
SAN-EPI-0419745
SAN-EPI-0422838
SAN-EPI-0467641
SAN-EPI-0468116
SAN-EPI-0468859
SAN-EPI-0474016
SAN-EPI-0481276
SAN-EPI-0505644
SAN-EPI-0505645
SAN-EPI-0505646
SAN-EPI-0505648
SAN-EPI-0522279
SAN-EPI-0525843
SAN-EPI-0560914
SAN-EPI-0562284
SAN-EPI-0563590
SAN-EPI-0584372
SAN-EPI-0591672
SAN-EPI-0591675
SAN-EPI-0604949
SAN-EPI-0607088
SAN-EPI-0607552
SAN-EPI-0607553
SAN-EPI-0607554
SAN-EPI-0607555
SAN-EPI-0607556
SAN-EPI-0613184
SAN-EPI-0622362
SAN-EPI-0661153
SAN-EPI-0661155
SAN-EPI-0661172
SAN-EPI-0661192
SAN-EPI-0661193
SAN-EPI-0661198
SAN-EPI-0661228
SAN-EPI-0661229
SAN-EPI-0688814
SAN-EPI-0691534
SAN-EPI-0698010
SAN-EPI-0699296
SAN-EPI-0705748
SAN-EPI-0764574

SAN-EPI-0764575
SAN-EPI-0780155
SAN-EPI-0788600
SAN-EPI-0806073
SAN-EPI-0900347
SAN-EPI-0928169
SAN-EPI-0937195
SAN-EPI-0937197
SAN-EPI-0937198
SAN-EPI-0937199
SAN-EPI-0937200
SAN-EPI-0937201
SAN-EPI-0937202
SAN-EPI-0942591
SAN-EPI-0946468
SAN-EPI-0953622
SAN-EPI-1003658
SAN-EPI-1031103
SAN-EPI-1031769
SAN-EPI-1148329
SAN-EPI-1148855
SAN-EPI-1148855
SAN-EPI-1158291
SAN-EPI-1166023
SAN-EPI-1207542
SAN-EPI-1207543
SAN-EPI-1207552
SAN-EPI-1207566
SAN-EPI-1207599
SAN-EPI-1209659
SAN-EPI-1212218
SAN-EPI-1214286
SAN-EPI-1214288
SAN-EPI-1214294
SAN-EPI-1214295
SAN-EPI-1214301
SAN-EPI-1217191
SAN-EPI-1221350
SAN-EPI-1221352
SAN-EPI-1223834
SAN-EPI-1223837
SAN-EPI-1223839