# Exhibit 146
# (Filed Under Seal)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | CASE No. 2:17-md-2785<br>CASE No. 2:17-cv-2452 |
| SANOFI-AVENTIS US, LLC,<br><br>   *Plaintiff*,<br>v.<br><br>MYLAN INC.; and<br>MYLAN SPECIALTY, L.P.,<br><br>   *Defendants*. | |

**REBUTTAL REPORT OF**

**GARY ZIEZIULA**

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

I.  **Introduction**

1.  I have reviewed the reports of Mr. Eduardo Schur and Dr. Mary Ann Michelis dated March 25, 2019, offered in response to my February 4, 2019 expert report ("February 4 Report") concerning the counterclaims asserted by Mylan Inc. and Mylan Specialty, L.P. ("Mylan") against Sanofi-Aventis US, LLC ("Sanofi"). This report provides a rebuttal to the opinions offered by Mr. Schur and Dr. Michelis. In preparing this rebuttal report, I considered the materials cited in Appendix A, as well as the materials I considered in preparing my February 4 Report and my report dated March 25, 2019.

II. **Rebuttal to Mr. Schur's Report**

   *Sanofi's Unsupported Comparative Marketing Claims*

2.  In my February 4 Report, I discussed Sanofi's communications with the FDA concerning the appropriate design and use of an Auvi-Q preference study in the promotion and marketing of Auvi-Q® ("Auvi-Q"). Mr. Schur does not dispute the key takeaway from those communications: The FDA expressly told Sanofi ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[1]

3.  Mr. Schur asserts in his summary of opinions that he believes Sanofi's "promotional materials . . . were appropriately tailored to the results of the study."[2] But my February 4 Report primarily addresses the promotional *messaging* deployed by Sanofi, not just Sanofi's written promotional materials. Mr. Schur largely ignores the evidence of that messaging.

4.  Mr. Schur states in his summary of opinions that "none of the alleged isolated incidents" described in my report "suggest a widespread practice of improper promotional claims."[3] But I did not see only isolated incidents of patient preference claims, rather, I was struck by the number of examples I saw of promotional claims not supported by the preference study – in particular the fact that there were examples not only at the representative and account manager level, but examples from senior leadership as well. I based my conclusion that Sanofi's practices were widespread on the numerous examples I saw in the documents of Sanofi deploying

---

[1] Parker Ex. 5 (Sanofi communication with FDA); Parker Ex. 9 (Sanofi Presentation: Auvi-Q Drug/Device & Adequate Evidence), Slide 19.

[2] Schur Report Paragraph 12.

[3] Schur Report Paragraph 9.

2

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

messages in its promotion of Auvi-Q that Auvi-Q was preferred by patients, and that it was easier to carry and easier to use.[4]

5. For example, in my February 4 Report, I expressed my concern that Sanofi's President of North America, Anne Whitaker, stated publicly at the time of Auvi-Q's launch that "Auvi-Q is more patient friendly than Mylan's rival product EpiPen"—an unsupported comparative claim. I explained based on my many years of experience as a pharmaceutical executive that, if a senior leader such as Ms. Whitaker failed to set the right tone at the top by making such a claim, it is not surprising to see such claims being made throughout the organization. I also explained why it is significant to see a catch phrase such as that patients "overwhelmingly prefer" Auvi-Q, being used throughout the organization. Mr. Schur completely ignores these discussions.

6. Rather than address my point about tone from the top, Mr. Schur, who does not have senior leadership experience at a pharmaceutical company, devotes a section of his report to Sanofi's formal legal and regulatory compliance policies and processes, which misses the point. I did not undertake a full review of Sanofi's compliance program, nor do I doubt that a large organization such as Sanofi had a compliance program and a promotional review process in place. But discussions outside of the formal compliance and regulatory review process – including in press quotes and at sales trainings and in day-to-day discussions with the brand team or leadership – play an extremely important part in setting the tone for marketing the brand. Sanofi's compliance program may have been robust, but comparative marketing messages were nonetheless frequently being made by leadership, account executives, and sales representatives alike, beyond isolated incidents.

7. Mr. Schur criticizes my discussion of ATU studies and message recall trackers.[5] I understand that ATUs and message recall trackers are different instruments, but they go hand-in-hand in the pharmaceutical industry, and both are relied upon by companies to assess what's happening in the field. Mr. Schur does not dispute that "message recall" trackers are regularly relied upon by pharmaceutical companies to determine what messages the sales force is deploying in the field, and to assess whether those messages are impacting physician and/or consumer choices. Sanofi itself acknowledges as much in its own documents. Sanofi's message recall reports state that the "key objectives" of the message recall surveys include "determin[ing] the messages that physicians are hearing from Sanofi representatives about Auvi-

---

[4] See, for example, paragraphs 8-10 and footnotes 8-20, below, footnotes 8-18 of my February 4 Report, and documents MYEP01318668 ████████ ; MYEP01318688 ████████ ; MYEP00872996 ████████

[5] Schur Report Paragraphs 32-24.

3

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

Q" and "monitor[ing] the impact of these messages on brand perceptions and prescribing intent."[6]

8. Mr. Schur asserts that I formed my opinions based on a "single survey."[7] That is incorrect. I reviewed numerous message recall trackers, ATU reports, and other market research in Sanofi's documents and formed my opinions about Sanofi's widespread promotional practices based on the totality of information I reviewed. References to comparative sales messaging appeared constantly in these documents. For example, I reviewed two waves of Auvi-Q message recall tracking surveys undertaken by Sanofi in 2013, in April and October.[8] ███████████████████████████████████████████████████████████████ As discussed in my report, the aided recall of comparative claims reported in Wave 1 is even higher. For the Wave 2 report, I was able to review the actual verbatim responses from physicians, which are chock full of comparative claims.[10] Indeed, in nearly every document I reviewed that included direct verbatim responses from physicians memorializing the messages they recalled from the Sanofi sales force, comparative claims appeared.[11] I also reviewed several Brand Impact studies, which also contained message recall analysis that showed physicians recalled messaging about the preference study.[12] Once again, these are just examples of the references I saw to comparative claims in the documents I considered, which taken together led me

---

[6] SAN-EPI-0095078 (Sanofi Auvi-Q Message Recall Tracker Report (W1 2013)) (April 2013); SAN-EPI-0032713 (Sanofi Auvi-Q Message Recall Tracker Report (W2 2013)) (October 2013).

[7] Schur Report Paragraph 31(C).

[8] SAN-EPI-0095078 (Sanofi Auvi-Q Message Recall Tracker Report (W1 2013)) (April 2013); SAN-EPI-0032713 (Sanofi Auvi-Q Message Recall Tracker Report (W2 2013)) (October 2013).

[9] SAN-EPI-0095078 (Sanofi Auvi-Q Message Recall Tracker Report (W1 2013)) (April 2013) at Slide 13.

[10] SAN-EPI-0277608 (Auvi-Q Message Recall Study W2'13 - Raw verbatim data for open-ended questions); see also SAN-EPI-0032713 (Sanofi Auvi-Q Message Recall Tracker Report (W2 2013) at Slide 27 ███████████████████████████████████████

[11] SAN-EPI-0083095 (Auvi-Q Brand Impact Analysis March 2015), Slide 13 (Unaided Message Recall) ████████████████████████████████████████, and ████████████████████████████████ SAN-EPI-0220969 (Sanofi Auvi-Q R3M_Dec14 to R3M_Mar15.xlsx) ████████████████████

[12] SAN-EPI-0468859 (Auvi-Q Brand Impact Analysis December 2014); SAN-EPI-0083095 (Auvi-Q Brand Impact Analysis March 2015); SAN-EPI-0081008 (Auvi-Q Brand Impact Analysis May 2015); SAN-EPI-0080704 (Auvi-Q Brand Impact Analysis June 2015); SAN-EPI-0078858 (Auvi-Q Brand Impact Analysis August 2015).

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

to conclude that the specific use of these promotional claims that we see in the field were not isolated incidents.

9. Mr. Schur states that he found "no mention of comparative claims in recalled messages" when he conducted his own review of Sanofi's ATU reports.[13] This statement is misleading because several of the ATU studies that Mr. Schur cites are Consumer ATUs, i.e. surveys of caregivers and patients. Caregivers and patients are not detailed by sales reps and would not be on the receiving end of comparative messaging by Sanofi's sales force. The Physician ATUs that Mr. Schur reviewed, which are surveys of allergists, pediatricians, and primary care physicians, certainly do mention comparative claims. For example, Sanofi conducted two waves of Physician ATU Tracking Market Research in 2013, three waves in 2014, and three waves in 2015. As Mr. Schur point out, the ATU reports focus on numerous aspects of brand awareness and devote minimal attention to message recall, but even still comparative claims are directly referenced in most of the reports.

   a) The Wave 1 Physician ATU Report from May 2013 found not only that one of most recalled messages from Auvi-Q reps was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The Wave 2 Report from 2013 did not track message recall.[15]

   b) The Wave 1, 2, and 3 Physician ATU Reports from 2014 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A working draft of the Wave 3 Report provided examples of unaided "main message" verbatims including the message that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And the report concluded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[13] Schur Report Paragraph 13.

[14] SAN-EPI-0158511 (Physician ATU Research June 2013).

[15] SAN-EPI-1212218 (Physician ATU Research November 2013).

[16] SAN-EPI-0091515 (Physician ATU Research May 2014), Slide 40; SAN-EPI-0088510 (Physician ATU Research August 2014), Slide 15, SAN-EPI-0087111 (Physician ATU Research October 2014), Slide 15.

[17] SAN-EPI-0087325 (Physician ATU Research October 2014), Slide 20.

[18] SAN-EPI-0087325 (Physician ATU Research October 2014), Slide 40.

5

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

    c)    The Wave 2 and 3 Physician ATU Report from 2015 likewise included ███ as an aided message tested by Sanofi and recalled by physicians.[19]

10. Mylan's own ATU Reports also show physicians recalling comparative messaging by Sanofi sales representatives.[20]

11. Mr. Schur ignores the evidence showing that Sanofi representatives relied on the preference study to make broad preference claims. Instead of addressing this evidence, Mr. Schur engages in an irrelevant discussion of Key Performance Indicators (KPIs).[21] KPIs are used in various business units as a way to tangibly measure progress towards goals. In the marketing space, KPIs typically include measurable data points such as brand awareness and willingness or intent to prescribe — metrics that tend to indicate progress towards more sales. Pharmaceutical companies sometimes track specific message recall as a KPI but not always. I disagree with Mr. Schur's argument that Sanofi's decision not to include "brand message recall" as a KPI somehow evidences that Sanofi had no intent to deploy comparative messages in the field. That Sanofi deemed "brand message recall" an "additional" data point to be tracked, rather than a KPI, does not in my experience indicate anything one way or the other about Sanofi's use of or intention to use any particular promotional message in the field.

12. Mr. Schur comments that the recalled messages he reviewed did not compare Auvi-Q to the EpiPen® Auto-Injector ("EpiPen").[22] It is important to note, however, as discussed in more detail later in this report, that a comparative claim need not mention a competing product, which Sanofi's James Parker acknowledged at his deposition.[23]

13. Mr. Schur criticizes me for looking at "aided" message recall. While scholars may debate the appropriate use of aided recognition, brand teams and senior leadership at pharmaceutical companies regularly rely on both aided and unaided recall

---

[19] SAN-EPI-0200861 (Physician ATU Research August 2015), Slides 63, 64, 77; SAN-EPI-0197629 (Physician ATU Research October 2015), Slide 76.

[20] MYEP00647083 ███ ; MYEP00646681 ███ MYEP01046788 ███

[21] Schur Report Paragraph 34.

[22] Schur Report Paragraph 34.

[23] Parker Deposition Transcript pp. 32-34 and 99-100 ███

6

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

responses to determine what messages are being deployed in the field and what impact those messages are having. With regard to Mr. Schur's discussion of the statistical significance of one of the message recall studies that I cited in my report, he again ignores that it was the totality of the documentation I reviewed that led me to conclude that preference claims were being made by Sanofi on a widespread basis, not one particular statistic or aided message recall report. Moreover, even if Mr. Schur believes that only unaided recall statistics should be considered, which I do not agree with, he ignores that unaided message recall research likewise show a common practice of Sanofi making comparative claims.[24]

### *Other Comparative Claims*

14. Mr. Schur takes issue with my discussion of other comparative claims that Sanofi made in its promotion of Auvi-Q.[25] He mischaracterizes my report by insisting that my discussion is limited to "three isolated incidents." I discuss in Section C(ii) of my February 4 Report three additional *types* of comparative claims that Sanofi appears to have made on a regular basis, not three isolated incidents.

15. As to Mr. Schur's specific comments concerning each of the three types of comparative marketing claims: Mr. Schur first criticizes my reliance on a Mylan competitive intelligence report that reported that a Sanofi sales representative told a physician in Texas that Auvi-Q could withstand higher temperatures because, in Mr. Schur's opinion, "a competitive intelligence report by a rival company is not a reliable source for exact information about sales representatives' statements."[26] I disagree. Pharmaceutical companies routinely rely on competitive intelligence reports from their sales reps to determine what messages competitors are deploying in the field and to react accordingly. The field force is a pharmaceutical company's eyes and ears on the ground with the closest relationships to the physicians, and provides real-time data. Field force reports are especially helpful in identifying broad marketing messaging, because having feedback from reps from various regions in the country substantiating similar messages indicates that the same message is being spread and heard throughout the country.

16. Mr. Schur next suggests that Sanofi's marketing of Auvi-Q as the "first and only" EAI device with "a retractable needle mechanism designed to prevent accidental

---

[24] SAN-EPI-0091515 (Physician ATU Research May 2014), Slide 79 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; SAN-EPI-0087111 (Physician ATU Research October 2014), Slide 20 (Unaided Message Recalled: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); SAN-EPI-0083095 (Auvi-Q Brand Impact Analysis March 2015), Slide 13 (Unaided topics include comparative messages); SAN-EPI-0220969 (Sanofi Auvi-Q R3M_Dec14 to R3M_Mar15.xlsx) (unaided verbatims include comparative messages); SAN-EPI-0277608 (Auvi-Q Message Recall Study W2'13 - Raw verbatim data for open-ended questions) (same).

[25] Schur Report Paragraphs 41-44.

[26] Schur Report Paragraph 42.

7

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

needle sticks" is not a comparative claim because it "does not even mention EpiPen."[27] That is incorrect. A marketing claim does not need to directly reference a rival product to be considered a comparative claim. Sanofi's James Parker acknowledged this at his deposition: "you can make a comparative claim, by saying . . . the only one. . .. [T]hat implies that everybody else's doesn't, the implication there being it's a comparative claim."[28] Especially where Sanofi's sales representatives were telling physicians that EpiPen products cause accidental injections and lacerations,[29] Sanofi's claim that Auvi-Q was the "first and only" EAI device with a retractable needle would certainly imply that Auvi-Q was safer and less likely to cause needle sticks than EpiPen, which is a claim that, as far as I know, was not supported by scientific data.

17. Mr. Schur also claims that Sanofi's marketing of Auvi-Q "based on the fact that many patients do not carry their EAI device all of the time" would be consistent with industry standard practices, and the data available to Mylan and Sanofi.[30] First, as I mentioned in my report, the data that Sanofi relied on in promoting Auvi-Q would be more accurately summarized as demonstrating that the majority of patients carry their EAI device most of the time. Second, I am aware of no real-world evidence suggesting that patients would be prone to carry Auvi-Q more often than EpiPen, and the problem with the marketing claims deployed by Sanofi is that they suggest otherwise. Sanofi's James Parker acknowledged this at his deposition: When asked whether Sanofi sales reps could say that [REDACTED] And Sanofi's national account representative, Keith Wade, confirmed at his deposition that, by relying on the surveys that indicated that patients did not carry their EAI devices, he "absolutely" intended to imply that Auvi-Q would be used and carried more frequently than EpiPen.[32] Making a claim that patients would be more prone to carry Auvi-Q than EpiPen, without real-world data to back it up, would not be consistent with industry best practice.

---

[27] Schur Report Paragraph 43.

[28] Parker Deposition Transcript p. 34.

[29] MYEP00677384 [REDACTED]

[30] Schur Report Paragraph 44.

[31] James Parker Deposition Transcript pp. 62-63.

[32] Keith Wade Deposition Transcript pp. 72-73.

8

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

*Sanofi's New EpiPen Marketing Claims*

18. In my report, I explained that I saw numerous instances of Sanofi promoting Auvi-Q as the "new EpiPen" and indications that Sanofi knew consumers would be predisposed to confuse the two products. Mr. Schur ignores most of this discussion. Instead, he mischaracterizes my opinion by stating that I seemed "particularly troubled" by Sanofi's use of search term optimization. I never suggested in my report that pharmaceutical companies do not use search term optimization or that there is anything inherently wrong with running advertisements in response to search terms linked to competitive products. But here, taken together with field intelligence reports and reports from physician's offices indicating that "New EpiPen" messages were being spread in numerous regions throughout the country, the fact that the brand team also knew that "New EpiPen" search term was a key term that could attract consumes indicates a concerted effort to capitalize on consumer confusion about this term.

*Unfair Competition in the Form of Kickbacks*

19. Mr. Schur asserts that "[a]fter reviewing a single email,"[33] I opined that Sanofi failed to terminate a Sanofi sales representative who offered a cash payment to a physician in exchange for Auvi-Q prescriptions. That is incorrect and mischaracterizes my opinion. I did review an email from a Mylan sales representative, but I also reviewed the deposition testimony of Mylan's National Sales Director, Jay York, who explained that ███████████████████████████████████████████████████████████████ It is my opinion, as explained in my report, that standard industry practice would have been to terminate any sales representative who engaged in this conduct, and that a company's failure to do so would reflect a poor culture of compliance.

### III. Rebuttal to Dr. Mary Ann Michelis's Report

20. In her report, Dr. Michelis takes issue with my statement that pharmaceutical sales representatives have a significant impact on convincing physicians to consider prescribing certain drugs as being the right therapy for patients with certain diseases.[35] Dr. Michelis says she uses scientific journals to learn about new pharmaceutical products, and that scientific data would be most important to her as a source of pharmaceutical information.[36] Although that may be true for Dr. Michelis personally, and perhaps for specialists like Dr. Michelis who are affiliated

---

[33] Schur Report Paragraph 45.

[34] Jay York 30(b)(6) Deposition Transcript at p. 30-31.

[35] Michelis Report Paragraph 8.

[36] Michelis Report Paragraph 5.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

with academic institutions and have teaching responsibilities, in my years of experience in the industry, physician detailing and persuasive messaging by pharmaceutical sales teams frequently results in increased prescriptions, especially by physicians who do not have regular access to grand rounds or journal clubs.

21. In addition, pharmaceutical executives would not spend millions of dollars on sales force detailing in my experience, including salary and benefits for sales force personnel, if we were not confident that it would make a difference. For example, Pew Charitable Trusts reports $27 billion being spent on drug promotion in 2012, $15 billion of which was spent on detailing.[37]

22. As to the impact of sales force calls on Auvi-Q prescriptions specifically, Sanofi's own research led Sanofi to conclude that sales force detailing had a positive impact on Auvi-Q market share. For example, Sanofi conducted a marketing mix study for the two-year period between August 2013 and July 2015 that ▮▮▮▮▮▮ Sanofi recommended employing ▮▮▮▮▮▮ In July 2015, Sanofi also charted Auvi-Q sales calls compared to target market share trends for the first six months of the year, concluding that ▮▮▮▮▮▮

23. Dr. Michelis also states in her report that it is "well known" that patients do not always carry their EAI device as recommended.[41] That may be true, but for the same reasons I state above in response to Mr. Schur's similar discussion, this misses the point of my report that the problem with Sanofi's marketing claims was in the suggestion that patients would be more likely to carry Auvi-Q.

24. My opinions expressed herein are based on the material I reviewed to date. I reserve the right to modify, amend, or supplement my analysis and opinions if additional information becomes available to me.

---

[37] https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2013/11/11/persuading-the-prescribers-pharmaceutical-industry-marketing-and-its-influence-on-physicians-and-patients

[38] SAN-EPI-0068327 (Auvi-Q Marketing Mix Model, September 2015), Slide 10.

[39] SAN-EPI-0068327 (Auvi-Q Marketing Mix Model, September 2015), Slide 2.

[40] SAN-EPI-0214085 (Auvi-Q Calls vs. Target Share Trends YTD Ending 7/17/15).

[41] Michelis Report Paragraph 17.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

Dated April 18, 2019

Signature: _Gary J. Ziezuila_

# APPENDIX A

## ADDITIONAL MATERIALS CONSIDERED

Bates-Numbered Documents

| | | |
|---|---|---|
| IMP-0000977 | MYEP01050529 | SAN-EPI-0689486 |
| IMP-0001006 | MYEP01124214 | SAN-EPI-0689494 |
| IMP-0001038 | MYEP01180987 | SAN-EPI-0689809 |
| KALEO-00006134 | MYEP01318668 | SAN-EPI-0691534 |
| KALEO-00006135 | MYEP01319420 | SAN-EPI-0691536 |
| KALEO-00007551 | MYEP01319518 | SAN-EPI-0691569 |
| MYEP00095228 | MYEP01322673 | SAN-EPI-0697937 |
| MYEP00096557 | MYEP01322679 | SAN-EPI-0698010 |
| MYEP00118416 | SAN-EPI-0005146 | SAN-EPI-0698552 |
| MYEP00119242 | SAN-EPI-0068327 | SAN-EPI-0699296 |
| MYEP00119576 | SAN-EPI-0008510 | SAN-EPI-0765933 |
| MYEP00140812 | SAN-EPI-0012803 | SAN-EPI-0921400 |
| MYEP00140813 | SAN-EPI-0097951 | SAN-EPI-0954784 |
| MYEP00140817 | SAN-EPI-0144235 | SAN-EPI-0962121 |
| MYEP00457913 | SAN-EPI-0144239 | SAN-EPI-0962122 |
| MYEP00612335 | SAN-EPI-0198071 | SAN-EPI-1031103 |
| MYEP00612338 | SAN-EPI-0214085 | SAN-EPI-1204458 |
| MYEP00646681 | SAN-EPI-0233173 | SAN-EPI-1207543 |
| MYEP00647083 | SAN-EPI-0297235 | SAN-EPI-1207552 |
| MYEP00677384 | SAN-EPI-0311155 | SAN-EPI-1207556 |
| MYEP00717962 | SAN-EPI-0380296 | SAN-EPI-1224836 |
| MYEP00740408 | SAN-EPI-0380300 | |
| MYEP00872996 | SAN-EPI-0380305 | |
| MYEP01033504 | SAN-EPI-0380723 | |
| MYEP01046788 | SAN-EPI-0380724 | |
| MYEP01050522 | SAN-EPI-0591675 | |
| MYEP01050527 | SAN-EPI-0672067 | |
| MYEP01050528 | SAN-EPI-0688283 | |

<u>Other Material</u>

Pew Charitable Trusts, Fact Sheet, *Persuading the Prescribers: Pharmaceutical Industry Marketing and its Influence on Physicians and Patients*, November 11, 2013

Jenni Romaniuk et al., *Brand and Advertising Awareness: A Replication and Extension of a Known Empirical Generalisation*, Australasian Marketing Journal, vol. 12 no. 3 (2004)

Surendra N. Singh et al., *Recognition Versus Recall as Measures of Television Commercial Forgetting*, Journal of Marketing Research, vol. 25 no. 1 (1988)