1

2                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
3

4   IN RE:  EPIPEN                      Docket No. 17-md-2785
    (Epinephrine Injection, USP)
5   Marketing, Sales Practices
    and Antitrust Litigation
6                                       Kansas City, Kansas
                                        Date:  6/11/2019
7
                                        **REDACTED**
8   . . . . . . . . . . . . . . . . . . . . . . . .

9               TRANSCRIPT OF MOTION HEARING
               CLASS CERTIFICATION - PHASE I
10
                            BEFORE
11
           THE HONORABLE DANIEL D. CRABTREE
12           UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Class Plaintiffs:

16   Ryan C. Hudson                    Warren Burns
     Rex A. Sharp, PA                  Spencer Cox
17   5301 W. 75th Street               Burns Charest, LLP
     Prairie Village, KS 66208         900 Jackson Street
18                                     Suite 500
     Matthew S. Tripolitsiotis         Dallas, TX 75202
19   Duane L. Loft
     Bois Schiller Flexner, LLP        Gretchen F. Cappio
20   575 Lexington Avenue              Keller Rohrback
     New York, NY 10022                1201 3rd Avenue
21                                     Suite 3200
                                       Seattle, WA 98101
22

23

24

25

```
 1    APPEARANCES (continued):

 2    For Sanofi-Aventis US, LLC Plaintiffs:

 3    Nathaniel D. White
      Weil, Gotshal & Manges, LLP
 4    767 Fifth Avenue
      New York, NY 10153
 5
      For Local 282 Welfare Trust Fund Plaintiffs:
 6
      Brian O. O'Mara - DC
 7    Robbins Geller Rudman & Dowd LLP
      120 East Palmetto Park Road
 8    Suite 500
      Boca Raton, FL 33432
 9
      For the Mylan Defendants:
10
      Adam K. Levin               Brian C. Fries
11    Kathryn Wellington          Lathrop & Gage, L.C.
      Hogan Lovells US LLP        2345 Grand Boulevard
12    555 Thirteenth Street, NW   Suite 2800
      Washington, DC 20004        Kansas City, MO 64108
13

14    For the King Pharmaceuticals, Inc., Meridian Medical
      Technologies, Inc. and Pfizer Defendants:
15
      Raj Gandesha               Joseph M. Rebein
16    White & Case LLP           Shook, Hardy & Bacon LLP
      1221 Avenue of the         2555 Grand Boulevard
17    Americas                   Kansas City, MO 64108
      New York, NY 10020
18

19

20

21

22

23

24

25
```

1                         I N D E X

2

    Plaintiffs' Witnesses:                                    Page
3
    MEREDITH ROSENTHAL, Ph.D.
4     Direct Examination By Mr. Loft                             9

5   EINER ELHAUGE, J.D.
      Direct Examination By Mr. Cox                             50
6

7   Defendants' Witnesses:                                    Page

8   JOHN JOHNSON, Ph.D.
      Direct Examination By Mr. Bernick                        87
9

10  Plaintiffs' Rebuttal Witnesses:

11  EINER ELHAUGE, J.D.
      Rebuttal Examination By Mr. Cox                          173
12
    MEREDITH ROSENTHAL, Ph.D.
13    Rebuttal Examination By Mr. Loft                         178

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    (Court called to order.)

 2              THE COURT:  All right.  We're here in Case

 3    No. 17-2785.  It's captioned In re:  EpiPen Marketing,

 4    Sales Practice and Antitrust Litigation.  This hearing,

 5    of course, pertains to the consumer class cases.

 6         So I want to hear your appearances, probably

 7    limiting those to those who occupy speaking roles today.

 8    So let me start over at the plaintiffs' table and please

 9    hear from the counsel who will be speaking today.

10              MR. BURNS:  Your Honor, Warren Burns with

11    Burns Charest for the plaintiffs.

12              MR. COX:  Good afternoon, Your Honor.

13    Spencer Cox with Burns Charest on behalf of class

14    plaintiffs.

15              THE COURT:  Good afternoon.

16              MR. LOFT:  Good afternoon, Your Honor.

17    Duane Loft from Bois Schiller Flexner on behalf of the

18    class plaintiffs.

19              THE COURT:  Good afternoon.  All right.

20    Then I'll move to the defendants' table starting with

21    the Mylan defendants.

22              MR. LEVIN:  Good afternoon, Your Honor.

23    Adam Levin from Hogan Lovells on behalf of the Mylan

24    defendants.

25              THE COURT:  Mr. Levin, good afternoon.
```

```
 1              MR. BERNICK:  Good afternoon, Your Honor.
 2  Justin Bernick also from Hogan Lovells on behalf of the
 3  Mylan defendants.
 4              THE COURT:  Good afternoon.
 5       All right.  And then are there -- the rest of you
 6  are from the Pfizer side of the family.
 7              MR. GANDESHA:  Raj Gandesha on behalf of
 8  Pfizer defendants.
 9              THE COURT:  Good afternoon, Mr. Gandesha.
10              MR. REBEIN:  Good afternoon, Your Honor.
11  Joe Rebein also on behalf of the Pfizer defendants.
12              THE COURT:  Good afternoon.  And the other
13  two don't plan speaking roles?
14              MR. FRIES:  Correct, Your Honor.  Brian
15  Fries from Lathrop & Gage.
16              THE COURT:  Good afternoon.  I read there's
17  an all-American living at your house.
18              MR. FRIES:  There is.  Thanks.
19              MS. WELLINGTON:  Katie Wellington with Hogan
20  Lovells.
21              THE COURT:  All right.  Good afternoon.
22       Just a couple of housekeeping items before we get
23  to the main work of the day.  I need to accelerate
24  tomorrow afternoon's hearing just slightly.  The Phase
25  II time I think was noticed originally for a 1:30.
```

```
 1    Unless it's going to cause a great deal of panic on
 2    either side of the caption, I'd like to start that at
 3    one o'clock.  That would allow me to handle an unrelated
 4    matter on the docket.  Does that cause profound problems
 5    for any of you?
 6              MR. BURNS:  No problems on the plaintiffs'
 7    side, Your Honor.
 8              MR. LEVIN:  No problems here either, Your
 9    Honor.
10              THE COURT:  All right.  So I'll turn now to
11    the presentations the parties have planned for the
12    afternoon.  Using the ground rules that I outlined in
13    the notice for this hearing, Document 1421, my
14    understanding is Ms. Garrett has briefed you on the use
15    of the scoreboard clock and she will be running that
16    clock.  It will display the time that is left to the
17    party who's in command of the lectern at that time.
18         Naturally, we'll need a break somewhere in this
19    four hours.  I'm sort of planning ahead, thinking
20    loosely that it might come at the end of the plaintiffs'
21    first segment around the 90-minute mark depending on
22    exactly how that goes.  But we'll adjust as we need to.
23    So unless somebody's got something else as a preliminary
24    matter --
25         Yes, Mr. Burns.
```

1              MR. BURNS:  Just briefly, Your Honor, and

2    then I'm going to shut up and let Mr. Loft and Mr. Cox

3    handle the lifting today and they will present Professor

4    Meredith Rosenthal first and followed by Professor Einer

5    Elhauge for the court's consideration.

6         I just want to call to the court's attention that

7    two of our class reps are in the courtroom today.

8    Mr. Bruce Levine from Local 282 general counsel.

9              THE COURT:  Good afternoon.

10             MR. BURNS:  And Shannon Clements, who is one

11   of our class representatives.

12             THE COURT:  Good afternoon.

13             MR. BURNS:  And I think we have a number of

14   plaintiffs on the phone as well.  Thank you, Your Honor,

15   for opening up that phone line.

16             THE COURT:  Thank you very much.  I should

17   have said, when I mentioned the accelerated start time

18   at 1:00 p.m. Central tomorrow, for those who plan to

19   participate tomorrow by phone, the call-in information

20   will remain unchanged, just opening 30 minutes earlier

21   as it were.  And I believe Ms. Garrett will enter an

22   amended notice for that portion of the hearing.

23        All right.  With that, plaintiffs, the time is

24   yours.

25             MR. LOFT:  Thank you, Your Honor.  Again,

```
 1   Duane Loft for the class plaintiffs.  We have Professor

 2   Rosenthal here in the courtroom.  She's ready to take

 3   the stand.

 4              THE COURT:  All right.  Please come forward

 5   and I'll ask you -- just hold on just a second while we

 6   do our clock management and then I'll ask you to take

 7   the oath, please.

 8              MEREDITH ROSENTHAL, Ph.D.,

 9   called as a witness on behalf of the Plaintiff, having

10   first been duly sworn, testified as follows:

11              THE COURT:  Please be seated and just move

12   things around so the microphone will pick up your voice.

13   Thank you very much.

14              MR. LOFT:  Thank you, Your Honor.  Just for

15   housekeeping, I have a book of exhibits.  May I pass

16   them up to the witness?

17              THE COURT:  You may.

18              MR. LOFT:  This is a book, Your Honor, that

19   has I believe been distributed to counsel.

20        Your Honor, I understand that this is supposed to

21   be a setting for you to ask questions as well.  Would

22   you like the witness turned slightly?

23              THE COURT:  You know, I kind of -- I'm going

24   to disappoint you all.  I kind of know what I know

25   already, and what I know principally is I have a lot to
```

1  learn.  I'm not going to be interrupting as much as you

2  hoped for.  If I do, I'll speak up and you just be

3  comfortable looking at whoever is talking or whoever you

4  want to look at.

5              MR. LOFT:  I see that we're on the clock, so

6  I'll jump right in.

7              THE COURT:  Go ahead.

8                    DIRECT EXAMINATION

9  BY MR. LOFT:

10     Q.   Good afternoon, Professor Rosenthal.

11     A.   Good afternoon.

12     Q.   What is your education?

13     A.   I have a bachelor's degree from Brown University

14  in international relations in the commerce track, and my

15  Ph.D. is from Harvard University in health policy also

16  in the economics track of that program.

17     Q.   Are you currently employed?

18     A.   I am currently appointed as a faculty member of

19  the Harvard T.H. Chan School of Public Health.

20     Q.   And what are you currently teaching, if anything,

21  at Harvard?

22     A.   In my almost 21 years at Harvard I've been

23  privileged to have the opportunity to teach

24  undergraduates, masters students and doctoral students.

25  My current class is called economics for health policy.

1      Q.   Are you a member of any professional societies?

2      A.   I am.  I am a member of the American Society of

3   Health Economists, the International Health Economics

4   Association.  And in 2014, I was elected to the

5   Institute of Medicine.

6      Q.   Have you served on any government or non-profit

7   boards?

8      A.   I have been the chair of a local non-profit board

9   dedicated to healthcare quality.  I also currently have

10  been appointed by the state auditor to serve on an

11  oversight council for the Center for Health Information

12  and Analysis, which is a government agency in

13  Massachusetts.  Prior to that I was appointed by the

14  governor to the state public health council.

15     Q.   Thank you.  What, if any, research do you

16  conduct?

17     A.   My research examines U.S. healthcare policy

18  issues.  And in particular I've been interested in

19  financial incentives for healthcare providers, often

20  physicians and hospitals, and also incentives that

21  consumers face in healthcare as well, such as through

22  benefit design.

23     Q.   Have you published in areas relevant to the

24  matters in this case?

25     A.   I've published more than a hundred peer-reviewed

1    articles in the area of health policy and health

2    economics.  Specifically relevant to this case, I've

3    undertaken a number of studies examining the impact of

4    formulary design for pharmaceuticals, the recent trends

5    in increasing prices among both generic and brand name

6    drugs, and I've also examined direct-to-consumer

7    advertising and other marketing of pharmaceuticals.

8        Q.   Have you ever testified before a governmental

9    body, a legislative body?

10       A.   I've testified both in Congress and in the

11   Massachusetts and California legislatures pertaining to

12   payment policy as well as direct-to-consumer

13   advertising.

14       Q.   Now, I understand you've testified before as an

15   expert witness in litigation as well in a number of

16   other pharmaceutical cases; is that right?

17       A.   I have.

18       Q.   In general, what types of cases are you

19   approached to take on as an expert witness?

20       A.   In general, I have been approached by plaintiffs,

21   both governmental and class plaintiffs, in a variety of

22   suits related to allegations about anti-competitive

23   conduct as well as the manipulation of prescription drug

24   prices and marketing materials.

25       Q.   And in general how do you choose which matters to

1    take on in that area?

2        A.   In general I choose matters that accord with the

3    heart of my expertise in health economics and also

4    typically I prefer to work on problems that have

5    important public health implications such as this case,

6    in my opinion, as well as the opioid litigation I'm

7    currently working on.

8        Q.   Have you been qualified to work as an expert

9    witness in other pharmaceutical litigations?

10       A.   I have.

11       Q.   In class actions?

12       A.   Yes.

13       Q.   At the class action certification stage?

14       A.   Yes.

15       Q.   Now, we're going to be walking through a set of

16   slides.  Okay.  Can you see this slide on your monitor?

17       A.   I can.

18       Q.   We're going to begin with the slide that's

19   labeled Pharmaceutical Industry Payment Flow Chart.  And

20   we'll start walking through some of the details, but

21   just at the high level kind of introduce this slide for

22   the court.

23       A.   Sure.  This is a schemata that shows the relevant

24   stakeholders in the market for pharmaceuticals, and in

25   the red and green lines it shows the flow of product and

17-md-2785    In re: EpiPen    6.11.19   *REDACTED*         13

1    payments.

2        Q.   Okay.  So let's start with the entities that are

3    represented by the boxes here.  Starting with the drug

4    maker or drug manufacturer as it's labeled, what are

5    those entities?

6        A.   The drug manufacturers include both brand and

7    generic manufacturers, including the defendants, Mylan,

8    Pfizer, Teva as an alternative generic manufacturer.  So

9    all of these companies are represented in that blue box.

10       Q.   And wholesalers, what are wholesalers?

11       A.   Wholesalers are entities that typically purchase

12   goods in bulk from manufacturers and distribute them to

13   pharmaceutical.

14       Q.   I think pharmacies may be more familiar to us.

15   What are pharmacies?

16       A.   Pharmacies are the retail outlets where people

17   purchase prescription drugs.

18            Then pharmaceutical benefits managers, or PBMs as

19   we commonly refer to them, those are specialized

20   entities that have been set up to manage pharmaceutical

21   networks.  So they have contracts with retail pharmacies

22   to make them available for contracting with third-party

23   payors.  They also develop formularies, which are lists

24   of covered drugs.  These formularies may include tiers

25   to which I referenced relative to my own work.  These

1    tiers designate different types of drugs with regard to

2    their availability to consumers for coverage as well as

3    the co-payment arrangements.

4        Q.   Thank you.  And third-party payors, what are

5    those entities?

6        A.   Third-party payors include what we typically

7    think of as health insurers.  So commercial insurers

8    like United, Aetna, Cigna, local commercial plans as

9    well.  They also include Taft-Hartley funds, funds that

10   serve union as well as multiple employer welfare funds.

11   They finally include self-insured employers.  So, for

12   example, Harvard University is insured -- self-insured.

13   They're at risk for the cost of everything they cover

14   under their health benefits and they hire an insurer to

15   act as third-party administrator.

16       Q.   Thank you.  Now, next we're going to go through

17   some of the lines and arrows on this chart which, as you

18   mentioned, are a flow of payments.  We'll just go

19   starting at the top clockwise through this chart.

20       So beginning with the drug manufacturer and the

21   wholesaler, can you explain the transaction that takes

22   place between those two entities?

23       A.   Sure.  So in this chart product flows down and

24   most of the payments flow up, although there are some

25   that go in the other direction.  So the manufacturer

1    sells product to the wholesaler and -- and there's a

2    payment from the wholesaler to the manufacturer for

3    that.

4         There are also payments that can go from the

5    manufacturer back to the wholesaler.  These are what are

6    known as charge-backs.  In certain cases the

7    manufacturer will negotiate a contract price with, for

8    example, a chain pharmacy that may be below the price

9    that the wholesaler has paid for the product and so the

10   charge-back makes the wholesaler whole for those

11   transactions.

12   Q.   And I think you started to talk about the

13   wholesaler/pharmacy dynamic.  It's labeled WAC-based

14   payment.  The arrow runs from the wholesaler down to the

15   pharmacy.  What does that mean?

16   A.   The WAC is the wholesale acquisition cost.  That

17   is a list price that is set by the manufacturer.

18   Manufacturers determine their list price, and then that

19   WAC price is used typically in the transactions between

20   the manufacturer and wholesaler as well as it -- it's

21   basically the benchmark off of which many of the sales

22   from the wholesaler to the pharmacy are made as well.

23        There's a second list price that we'll probably

24   come to later that is a mark-up of that wholesale

25   acquisition cost or average wholesale price or AWP.

1   Q.   With respect to the transaction that occurs

2   between the pharmacy and consumers or patients, can you

3   explain that transaction?

4   A.   Sure.   So when a patient goes to a pharmacy to

5   get a prescription drug, one of two things may happen.

6   If they do not have insurance coverage for the drug,

7   they may pay the full price of that drug.   That price is

8   set by the pharmacy for these uninsured patients and

9   that price is typically related to that other price I

10   mentioned, the average wholesale price, which is

11   formulaic based on the cash price.   So that's the cash

12   payor price.   And there's some notion of a usual and

13   customary price, that's also again typically based on

14   AWP.

15        Then for insured consumers, they go to the

16   pharmacy.   The pharmacy has the ability through the

17   relationship with the insurer or pharmacy benefit

18   manager to basically look up the insurance coverage for

19   that beneficiary and determine how much out-of-pocket

20   the patient must pay for a prescription.   So that could

21   be a fixed dollar co-payment or co-insurance amount,

22   which is a percentage of the negotiated price that the

23   insurer pays to the retail pharmacy.

24   Q.   With respect to those insured consumers, what are

25   the payments that relate to the third-party payors that

1    are depicted here?

2        A.   So the negotiated payments are -- go from the --

3    either directly the third-party payor to the pharmacy or

4    through the pharmacy benefit manager.  Those negotiated

5    payments are typically determined as a discount off of

6    the average wholesale price, the AWP.

7         So contracts between insurers and pharmacies or

8    between PBMs and pharmacies typically are written, for

9    example, for all brand name drugs.  The pharmacy will

10   receive AWP minus 15 percent plus a dispensing fee.

11       Q.   What is the role of the PBM in relation to these

12   patient flows?

13       A.   So the PBM is acting on behalf of the third-party

14   payor.  The PBM is -- it's the primary reason that PBMs

15   arose is that there are these economies of scale and the

16   ability to conduct a large number of electronic

17   transactions across a wide array of pharmacies.

18        Pharmacies adjudicate those electronic

19   transactions on behalf of third-party payors, ensuring

20   that the third-party payors' beneficiaries have access

21   to the drugs on their formulary and are charged

22   appropriate amounts at the pharmacy.

23       Q.   In the upper left quadrant of this picture we see

24   references to rebates.  What are rebates?

25       A.   So rebates are off-transaction payments.  They

1    are not incurred at the time a prescription is filled or

2    at the time prescription drugs move from the

3    manufacturer to the wholesaler but they happen after the

4    fact.   They're typically reconciled either quarterly or

5    annually and they arise in recognition of some

6    preference that is offered to a drug manufacturer.

7         So one type of preference might be to put a

8    prescription drug on the best tier of the formulary,

9    meaning that consumers will have the lowest

10   out-of-pocket costs.   Another kind of preference is to

11   put other policies in place that essentially drive

12   consumers to that drug and away from competitor drugs.

13      Q.   What relation, if any, do rebates have to the WAC

14   price?

15      A.   Rebates are typically negotiated off of WAC

16   price.   In contracts that I've seen, the WAC price is

17   often referred to as the basis for the percentage

18   rebate.

19           THE COURT:   Can I just interrupt here to try

20   to understand one thing?   So the typical rebate that

21   you've been talking about, is it tied to particular

22   prescriptions that have been filled or does it work as a

23   grosser scale than that?

24           THE WITNESS:   Thank you, Your Honor.   The

25   rebate arrangements that I have seen typically tie

1    rebates to an aggregate accounting.  So they could be,

2    for example, a dollar rebate just for putting the drug

3    on the best tier of the formulary.  They could also be

4    based on a market share.  So an additional rebate, for

5    example, based on having -- insuring that a particular

6    product is at least 50 percent of the other

7    prescriptions in that therapeutic area.

8         And, of course, we've seen other kinds of rebate

9    arrangements that are the subject of this matter that

10   are contingent but they are generally contingent in the

11   aggregate, not one prescription at a time.

12              THE COURT:  Thank you.

13              MR. LOFT:  Thank you.

14   BY MR. LOFT:

15   Q.   Next, I just want to discuss the class

16   definitions that have been proposed in this case.  In

17   your understanding, by reference to the diagram we've

18   been looking at, which are the entities that are within

19   the class as has been proposed in this case?

20   A.   In this diagram the entities that are in the

21   proposed class are the third-party payors in green and

22   the consumers also in green.

23   Q.   What about the pharmacy benefit managers, in your

24   understanding are they included in the class definition

25   that's been proposed in this case?

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*          20

1      A.   My understanding is that pharmacy benefit

2   managers are not covered by the class definition in this

3   case because they in effect act on behalf of third-party

4   payors in payment for claims.

5      Q.   And not in regards to consumers who are

6   ultimately consuming the device?

7      A.   That's correct.   Again, my understanding is

8   because they are acting on behalf of third-party payors

9   and not directly on behalf of their own beneficiaries

10  that they are not included in the class definition.

11     Q.   Thank you.   Okay.   We're just going to switch

12  gears a little bit.

13         I understand in your analysis you looked at

14  trends in the price of the EpiPen, the drug at issue in

15  this case, the device at issue in this case, over time.

16         We've put on the screen a slide that depicts a

17  study that you performed.   Can you, please, explain

18  what's depicted here?

19     A.   Sure.   These data come largely from a consulting

20  firm known as IQVIA that tracks pharmaceutical

21  transaction data, among other data sources.   And the

22  chart shows the average monthly transaction price at

23  retail for EpiPens, both the single-pack and the

24  two-pack.   The lines that I would direct your attention

25  to are the ones that extend the entire period.   So the

1    blue, gold, and orange lines.

2         The blue line is the wholesale acquisition cost.

3    That is the list price that is set by the manufacturer.

4    That's the lowest line.

5         The next line is the third-party payor price,

6    which is above that wholesale acquisition cost.

7         And above that is the cash payor price.

8         So the first thing to note about this chart is

9    that you can see with your own eyes that those lines

10   track one another very closely.  And I've noted on the

11   chart that I determined there was a 99.9 percent

12   correlation between the WAC and the TPP price and

13   99.8 percent correlation between the WAC and the cash

14   price.  This simply means that if you know the WAC

15   price, you can track exactly what happens with both of

16   those other prices.

17        The other thing to note about this chart is that

18   there was an acceleration in price increases for EpiPen

19   over this time period.  And in particular I computed

20   that during the class period EpiPen prices increased at

21   a compound annual growth rate at approximately

22   25 percent.  Bearing in mind that inflation generally in

23   prices was around 1 or 2 percent during this period,

24   that 25 percent is a fairly astounding growth rate.

25              THE COURT:  Having said I wasn't going to

```
1    interrupt, now of course I am.  But I read -- I remember
2    that reference in your report, and the 25 percent was
3    compared to what?  I was not clear about that.
4              THE WITNESS:  So the 25 percent is -- is the
5    rate at which EpiPen prices would have grown on an
6    annual basis over the whole period.
7              THE COURT:  I asked a terrible question.
8    Let me interrupt you.  Save you some mileage.
9         You talked about the comparison of that price
10   increase versus the market generally, and that's what I
11   was trying to ask about.  I didn't say that.
12             THE WITNESS:  Thank you, Your Honor, for
13   that clarification.  The comparison that I just made was
14   -- we know that all prices do increase over time as a
15   general motion in the economy.  One way to think about
16   that is by how much do these prices increase more
17   rapidly than, for example, the consumer price index
18   which at this time was roughly 1 to 2 percent a year
19   just to -- by way of comparison.
20        Even if we focus only on pharmaceuticals where
21   price increases have been more rapid than prices in the
22   economy as a whole, those average numbers range
23   typically around 5 to 7 percent.  So, again, in
24   comparison to the normal rate of growth of prices, these
25   numbers are fairly -- are many multiples above.
```

```
 1                  THE COURT:  Thank you.
 2   BY MR. LOFT:
 3       Q.  And just to be clear, which of these lines, if
 4   any, represents the price line of the prices that Mylan
 5   itself actually sets?
 6       A.  The blue line is the price that is set by Mylan.
 7       Q.  Do these prices that you've depicted here
 8   incorporate the rebates that we discussed earlier?
 9       A.  No, they do not.  These are the retail
10   transaction prices only.
11       Q.  Now, to switch gears we put up a slide that said
12   Alternative Brand and Generic EAIs.  You understand the
13   term EAI in this case?
14       A.  I do.
15       Q.  By reference to this chart, I just want to ask
16   you to explain for the court how prescription drugs and
17   devices compete in the marketplace.
18       A.  Sure.  So prescription drugs and devices can
19   compete either by price factors or non-price factors.
20   And typically when we talk about non-price factors,
21   competition is based on effectiveness and safety.  So
22   when a drug is launched on the market, it is trying to
23   find a niche in the market by differentiating from
24   existing brands that are accompanied by marketing
25   activities.
```

1        The price dimension relates to both the price

2   that is set by the manufacturer and any discounts and

3   rebates off of that price that negotiates as well.

4        What's important to bear in mind in the

5   prescription drug market is that there's really two

6   different kinds of competition.  One is between

7   therapeutic alternatives, which primarily but not solely

8   compete on the basis of their attributes, and in part

9   that's because a physician must ultimately make the

10  decision about which therapy to write a prescription

11  for.

12       So, for example, if I were to get an EpiPen

13  prescription from my physician and go to the pharmacy,

14  the pharmacist could choose to fill it today with any

15  one of the three products depicted in the top row.  So

16  the brand name EpiPen -- and in most states I would note

17  there are some slight differences in substitution rules

18  across states -- but the brand name and the authorized

19  generic are the identical product, and so the pharmacist

20  could fill the prescription with either of those

21  products.

22       And as long as there's an AB-rating for a generic

23  that basically suggests that the FDA believes the

24  generic is bioequivalent to the brand in most states,

25  the pharmacist can freely substitute that generic.

1          The ability of pharmacists to substitute across

2    generic alternatives that are AB-rated for a brand means

3    that pharmacies have an incentive to choose a low-cost

4    alternative.  Their reimbursement is typically fixed

5    regardless of what product they use to fill the

6    prescription.  And there are often incentives for them

7    to use generics that are explicit as well.

8          In contrast, the therapeutic alternative EAIs

9    that are shown in the bottom row here, they're not the

10   same product.  They are not AB-rated for EpiPen.  And if

11   I go to the pharmacy with a prescription for EpiPen, the

12   pharmacist cannot use one of these products to fill my

13   prescription.

14   Q.   The authorized generic I think you just described

15   is a situation where the brand manufacturer has

16   authorized a generic to come onto the market; is that

17   right?

18   A.   That's correct.  The authorized generic is being

19   marketed under the original new drug application that

20   was approved by the FDA for that product.

21   Q.   Why would a brand manufacturer authorize a

22   generic to come into the market and compete with the

23   brand?

24   A.   In the last several decades we've seen the use of

25   authorized generics as a strategy, really a longer run

1    strategy on the part of brand name manufacturers to try

2    to dampen some enthusiasm for generic competition.  It's

3    a strategy that can result in lower profits for a

4    potential generic entrant and then perhaps result in

5    less generic entry.

6         It's also a way, of course, for the manufacturer

7    to retain some of the units of sales that it would

8    typically lose when a generic enters and captures market

9    share.

10   Q.   In this case Mylan essentially authorized itself,

11   released its own version of the EpiPen as an authorized

12   generic.  Is that typical in your experience?

13   A.   In my experience, I have -- can't think of

14   another case where I've seen the manufacturer launch an

15   authorized generic when there was no AB-rated generic on

16   the market or about to launch on the market.  So I don't

17   know that it's never happened before but it seems quite

18   atypical.  As I mentioned, the reasons for which a brand

19   manufacturer might license or launch an authorized

20   generic of its own are really about competing with

21   existing independent generics.

22   Q.   Just switching to the next slide that's titled

23   Brand Erosion from Generic Entry, what does the academic

24   literature tell us about the effect of generic entry

25   upon competition in the marketplace?

1    A.   The academic literature over the last 30 years

2   shows generic entry causes a rapid erosion of the

3   brand's market share and the generic's essentially

4   reduced the price to the end payors.  And that's the

5   reason why end payors then switch to the generic is

6   because of the availability of a lower cost alternative.

7    Q.   This chart is showing several different lines.

8   What are those lines depicting?

9    A.   This chart is a retrospective.  It's from a

10   retrospective paper that looks at how generic

11   competition has changed over the last roughly 20 years,

12   and each line represents a different era, with the

13   lowest line representing the most recent data from the

14   article for 2013 and 2014.  And so the chart shows that

15   generic competition has been increasing in terms of the

16   erosion to the brand that happens upon generic entry.

17        And then just to be clear, the chart shows the

18   market share erosion from the launch of the generic at

19   month zero all the way to 12 months after launch.

20    Q.   In this case you were asked to analyze damages

21   and impact arising from the allegations that the

22   defendants had delayed and prevented the entry of a

23   generic, the Teva generic.  What in general at a high

24   level was your assignment in undertaking that exercise?

25    A.   My assignment was to examine the economic impact

1    of the alleged foreclosure of generic entry, to identify

2    a methodology for estimating damages that ensued from

3    the alleged misconduct, and to implement that

4    methodology to show that it could be implemented using

5    available data.

6        Q.   You refer to the damages that you estimate as

7    aggregate damages.  What does that mean?

8        A.   Yes, I was asked to quantify aggregate damages

9    for the class as a whole rather than for any individual

10   class member.

11       Q.   With respect to the damages and impact that you

12   analyzed from the generic delay allegations, can you

13   briefly just explain the methodology that you used to

14   construct that model?

15       A.   Yes.  I use a standard yardstick approach for

16   quantifying damages.  And in doing so, I attempt to

17   recreate an economy where the generic had, in fact,

18   entered earlier.  And so I use yardsticks that allow me

19   to examine what the prices of the generic would have

20   been and how much substitution from the brand to the

21   generic we would have seen over the class period.

22       Q.   With respect to -- I'll take those in turn.

23            With respect to the price aspect of this, what

24   would -- what would the prices have been, what sources

25   did you use to analyze that issue?

1       A.   To examine the price effects, I used data from

2   the actual authorized generic launch.  Those data were

3   the best available data for me to have a sense of what a

4   generic launch price would have been.

5       Q.   And with respect to the substitution rate or I

6   guess it's referred in other places the penetration

7   rate, what source did you use?

8       A.   For the generic substitution rate, I used Mylan's

9   own forecast of the effect of an actual Teva generic

10  launch.

11      Q.   I put up the slide, slide 4, Mylan's Forecast to

12  Generic Penetration.  What's this slide?

13      A.   This slide comes from a strategic document that

14  was produced in discovery.  It shows what is referred to

15  as a set of analogs here.  These are the same as the

16  yardsticks that I use.  And there are three curves here,

17  they're labeled Mylan 1, Mylan 2 and Mylan 3.  And it's

18  noted on the chart that Mylan 1 is Mylan's standard

19  generic capture curve.

20      Q.   And which one of these did you select for your

21  yardstick?

22      A.   I used Mylan 1, the one that is labeled their

23  standard generic capture curve.

24      Q.   Was there anything else other than this slide

25  that got you comfortable in relying on Mylan 1 as the

1    yardstick that you would adopt for your methodology?

2       A.   Yes.  According to the documents, Mylan 1 is the

3    generic curve that Mylan used itself to forecast what

4    effect Teva's launch would have.

5       Q.   Okay.  Please turn in your book to PX126.  We're

6    going to refer to this document in hard copy because

7    parts of it are redacted.  We can't put the entirety on

8    the screen.

9            PX126 is a set of slides, and this would be

10   slide 5 of that set.  So do you see it's the other chart

11   we looked at plus on the right-hand side another -- an

12   excerpt from another document?

13      A.   Yes, I see that.  And at the top it says,

14   "Generic Erosion Curve - Mylan 1."

15      Q.   I think we just have to be careful about quoting

16   from the document because it may have been confidential.

17   But maybe you could just describe at a high level how it

18   is that this redacted material got you comfortable

19   relying on the Mylan 1 line of the chart?

20      A.   The document itself is a simulation model very

21   similar to the one that I conduct in my analysis, and it

22   has inputs to it that include the yardstick that I used,

23   again, for the same purposes of examining the effect

24   that generic entry would have on Mylan's profitability.

25      Q.   Now, the next slide I want to show you is

1   actually a slide from the slide materials prepared for

2   Dr. Johnson's testimony, the defendants' expert, where

3   he indicates a dotted line at the top of this chart

4   called "Professor Rosenthal's Yardstick."  What is that

5   line?

6       A.   That line is Mylan 1.

7       Q.   Now, ultimately what is the erosion rate, the

8   penetration rate that you extract from the Mylan 1

9   study?

10      A.   The penetration rate that I use from Mylan's

11  strategic documents is essentially this curve here.  So

12  each point on it represents a quarter after launch and

13  the percentage of the market that Mylan conceded to the

14  generic.

15      Q.   What's the ultimate percentage that's conceded to

16  the generic in Mylan 1?

17      A.   Ultimately, the percentage is 95 percent.

18      Q.   Now, you used for price yardstick the experience

19  of the Mylan authorized generic.  Why didn't you use the

20  substitution rate of the Mylan authorized generic for

21  substitution yardstick purposes?

22      A.   Because in constructing a but-for scenario for

23  damages purposes, I was trying to replicate what would

24  have happened with independent competitive generic

25  entry, and that is not what happened in the actual

1   world.  I -- there was not a generic price yardstick

2   that I could use from a similar forecast.  So I used the

3   actual price yardstick.

4        But, in my opinion, the Mylan 1 yardstick better

5   represents what would have occurred with competitive

6   generic entry.

7        Q.   Competitive generic entry from another company's

8   generic like Teva; right?

9        A.   Yes, from another company's generic.  That -- the

10  notion that a company can compete with itself, sorry,

11  doesn't resonate with me.

12       Q.   And Teva now has actually been authorized to

13  offer their generic version of the EpiPen as of 2008,

14  late 2008.  Why didn't you look at the substitution

15  that's occurred now that Teva has been authorized to

16  offer a generic?

17       A.   I think you meant 2018, yes.

18       Q.   2018.  Thank you.

19       A.   Yes.  Well, first and most importantly, the

20  subsequent entry of Teva after that considerable time

21  after the authorized generic was on the market, the

22  conditions are not the same as they are -- as they would

23  have been in the but-for scenario where the generic

24  would have launched as early as 2014.  So the

25  conditions, again, are not parallel and therefore that

1  yardstick is not going to be as effective in terms of

2  creating the but-for scenario.

3      Q.   The last input to your model, as I understand it,

4  is a but-for entry date, the date but-for the conduct

5  generic would have entered the market.  How did you

6  arrive at those dates for purposes of your calculations?

7      A.   For purposes of my calculations in this report, I

8  took a -- one hypothetical entry date from Professor

9  Elhauge's analysis where he -- he undertakes an analysis

10  to examine what a competitive settlement might have

11  looked like and has one alternative date.

12         I understand that discovery is ongoing and so

13  that may not be the final entry date that plaintiffs

14  intend to prove would have occurred absent the

15  misconduct.

16         And then to show that my methodology can adapt to

17  other dates, I also used a later entry date that I was

18  instructed to use by counsel for the purpose of that

19  illustration.

20      Q.   Thank you.  Now, just moving to the next slide,

21  Actual Prices versus But-For Prices, what is this

22  depicting about the conclusions that you reached in your

23  yardstick analysis?

24      A.   This chart shows a set of calculations that are

25  very similar to Mylan's own calculations where I examine

1   the -- the actual prices paid by consumers and

2   third-party payors over time and apply the yardsticks

3   that we've just discussed to calculate but-for prices as

4   well as market shares.

5          And so what is shown in this slide is the -- are

6   those average actual and but-for prices and co-payments.

7   And you can see that the difference between the actual

8   and but-for price is substantial and grows over time.

9   Q.   And then lastly, Table 18 here, Overcharges and

10   Statutory Damages by Claim for the Generic Delay

11   Damages, what are these numbers?

12   A.   These are the aggregate damages numbers that I

13   calculated for specific subclasses, subgroups of class

14   members, third-party payors, insured consumers, cash

15   payors across different kinds of claims that vary based

16   on -- based on legal concerns, so the RICO, antitrust

17   and consumer protection classes.

18          I show aggregate damages here, and I note these

19   aggregate damages calculation, they come from the

20   spreadsheets that you just saw.  And those spreadsheets

21   make adjustments for rebates paid as well as coupons

22   used by consumers.

23   Q.   Just to be specific, what adjustment do you make

24   for rebates?

25   A.   I assume that all rebates are passed on to class

1   members, and so they are deducted in full from damages

2   to third-party payors.

3       Q.   And how do you account for coupon usage?

4       A.   Coupons, again, I net out of total consumer

5   overcharges.

6       Q.   Thank you.  Now, just to switch gears, in your

7   original assignment, were you asked to do any analysis

8   of what proportion, if any, there might be in the class

9   of so-called uninjured or unaffected class members?

10      A.   No, I was not.

11      Q.   Do you remember being asked some questions to

12  confirm that in your deposition?

13      A.   Yes, I do.

14      Q.   Ultimately, were you asked to conduct any such

15  analysis?

16      A.   I was asked to respond to questions and

17  statements made by defendants' experts and to examine

18  this question around uninjured consumers or class

19  members.

20      Q.   One of those questions has to do with -- with

21  what the defendants have labeled "brand loyalists."  Are

22  you familiar with that term?

23      A.   Yes.  The notion of brand loyalty relates to a

24  preference, a choice by a consumer to use a brand even

25  when a generic is available.  And so that statement

1    could be made, for example, just about a transaction or

2    about a series of transactions where a consumer

3    continues to express the preference for the brand.

4       Q.   Now, this slide labeled Probability Analysis for

5    Alleged Brand Loyalists, please explain for the court

6    what conclusions you reach by reference to this slide

7    about the percentage, if any, of likely brand loyalists

8    within the class?

9       A.   So I use a simple probability analysis to examine

10   whether -- how likely it was that the third-party payor

11   who covered transactions for a certain number of

12   patients would have been brand loyal, given that these

13   patients all make independent decisions.

14         And what I found was that even at just three

15   patients that for whom the third-party payor paid for a

16   transaction, we would have less than .1 percent chance

17   that that third-party payor would have reimbursed for no

18   generic transactions during the class period.  That's

19   assuming the earlier launch in March of 2014.  And with

20   the later launch, I still get to that less than

21   .1 percent with only four independent patients.

22      Q.   Now, the defendants' experts do some exercises

23   where they categorize certain types of transactions with

24   certain characteristics.  Accumulating transactions and

25   looking at transactions within the data set, is that a

1   meaningful analysis to you in examining whether there
2   might be so-called unaffected consumers?
3       A.   In my opinion, no.  Those transactions, they may
4   -- they may suggest that some percentage of units are --
5   are brand loyal in that first sense that I just
6   described.  But over time and given that the -- the
7   class period is relatively long, patients will have a
8   second opportunity to fill a prescription.  And we see
9   from the data that those erosion curves increase.  And
10  so clearly patients who continue to purchase have an
11  increase in likelihood of using a generic over time.
12      Q.   Now, as we're going to get to, there are other
13  allegations of misconduct, not just the generic delay
14  allegations we've just been talking about.
15           The fact that there are these multiple
16  potentially overlapping categories of allegations, how,
17  if at all, is that relevant to this question of whether
18  there are unaffected class members?
19      A.   To the extent that these multiple allegations
20  occur over a time period where class members are
21  purchasing EpiPen, they may be affected by one set of
22  allegations and not by another.  So, for example, they
23  may have wanted to purchase a single EpiPen but they may
24  have been brand loyal.
25           To the extent that there are patients who are

1    affected by one of those mechanisms and not the other,

2    that means the individual percentages that I show here

3    are at most the upper bound.

4        Q.   The upper bound.  They might go down but they

5    wouldn't go up?

6        A.   They would go down but they wouldn't go up.

7        Q.   Now, to switch gears, we'll talk about the

8    withdrawal of the single-pack that you just alluded to.

9    In general, what is your understanding of the

10   allegations that relate to the withdrawal of the

11   single-pack?

12       A.   My understanding is that plaintiffs intend to

13   prove that the defendants unlawfully removed the option

14   for consumers and class members to obtain a single

15   EpiPen.

16       Q.   And how did you analyze impact in damages

17   relating to that allegation?

18       A.   To examine the impact and to quantify damages

19   associated with the withdrawal of the single EpiPen, I

20   used a very straightforward event study, essentially a

21   pre/post examination of the number of pens per

22   prescription before and after the August 2011 withdrawal

23   of the single-pack.

24       Q.   And what is an event study?

25       A.   An event study is a type of economic study that

1    relies on the timing of a particular event to ascertain

2    causation.  An event study -- they're very commonly used

3    in more complex cases where, for example, new

4    information has come to the marketplace that affects the

5    stock value of a company.

6         In this case, the event, the withdrawal of the

7    single-pack, is a mechanistic one.  It affects all

8    purchasers at the same time; the single-pack simply

9    became unavailable.  So that's what makes it really

10   ideal as an event study.  There's no gradual adaptation.

11   Q.   The relevant event here, the withdrawal of the

12   single-pack as depicted on the slide, occurred around

13   August 2011.  In your event study, did you attempt to

14   control for other events that may have occurred around

15   that time that contributed to any change in the trend of

16   purchases?

17   A.   I considered such events.  And like Dr. Johnson,

18   I first observed that the -- in the year before the

19   single-pack was removed, that there was no change in the

20   rate of two-pack usage.

21        I also understand from clinical experts and from

22   the documents that there were some reports that were

23   released at the end of 2010 and the very beginning of

24   2011 from government and professional organizations that

25   promoted the notion that certain patients needed to have

1   two epinephrine auto-injectors because of the nature of

2   their specific allergies.

3          I understand plaintiffs' expert, Dr. Portnoy, is

4   of the opinion that those conclusions that were promoted

5   in those reports had been widely understood and

6   disseminated and, in fact, there were public documents

7   available earlier in 2010 that were commented on and

8   essentially formed the -- the basis for the final

9   reports.

10         You can see that, again, there -- there is no

11  gradual change over 2011 that's occurring.  So I

12  concluded that, to the extent that those reports had any

13  effect, that had already been incorporated, as

14  Dr. Portnoy suggested, in prior discussions.

15  Q.   What did you ultimately conclude about the impact

16  of the withdrawal from the single -- what did you

17  conclude about the impact of the withdrawal of the

18  single-pack from the market as a result of your event

19  study?

20  A.   I concluded that the withdrawal of the

21  single-pack essentially increased the average number of

22  pens per pack by about a half an EpiPen.

23  Q.   And then how did you estimate damages from that

24  finding?

25  A.   I estimated damages using the same underlying

1  data that I've been talking about, the data from IQVIA

2  that track prices and quantities.  And I was essentially

3  able to -- to look at the average price per pen at a

4  relevant time period and quantify that, and that is

5  aggregated in the category here labeled TPPs and insured

6  consumers and also for cash payors separately.

7     Q.   Now, this slide shows both generic delay damages

8  totals and the single-pack totals.  Did you do any

9  exercise to avoid double-counting as between those two

10  sets of damages?

11    A.   I have not done so.  Both models are essentially

12  based on recreating a world that did not happen.  And so

13  one could imagine a but-for scenario in which there was

14  both generic entry and the availability of a

15  single-pack.  That would be straightforward to undertake

16  using the same data, the same methodology.

17    Q.   Now, there could be, couldn't there, individual

18  consumers who bought the two-pack at all times prior to

19  the hard switch, the withdrawal of the single-pack, and

20  then continued to buy the two-pack after the switch.

21  How would the existence of those consumers be relevant

22  to your analysis, if at all?

23    A.   The data I used to quantify damages here reflect

24  the underlying patterns of purchases both before and

25  after.  So those patterns essentially diminished the

1   calculations that I do.  They reduced the amount of

2   effect.  I don't just assume everyone would have

3   purchased the single-pack.  I take as a given the actual

4   patterns of consumption.

5   Q.   And there may be some consumers, insured

6   consumers, who would have had the same exact co-pay for

7   the single-pack as they had for the two-pack.  How is

8   that relevant to your analysis?

9   A.   I understand that is the case and I have not at

10   this time allocated damages between third-party payors

11   and insured consumers.

12   Q.   If called upon, could you do that?

13   A.   Yes, I could.

14   Q.   We're going to switch now to the category of

15   unjust enrichment damages.  Just at a high level, what

16   is your understanding of unjust enrichment as a theory

17   of damages in this case?

18   A.   My general understanding of unjust enrichment is

19   that it assigns profitability to those -- the result of

20   the alleged misconduct either in the form of additional

21   sales or higher prices.

22   Q.   We've put up on the screen here a slide labeled

23   "Mylan Profit and Loss Statement."  How is this data

24   relevant to your analysis of unjust enrichment?

25   A.   To quantify Mylan's profitability from the, for

1   example, additional units sold through the single-pack

2   withdrawal, I used Mylan's own profit and loss

3   statements at the product level, such as this one here

4   that shows profit and losses from 2012 to 2016.  The

5   statement shows both revenues and net revenues as well

6   as expenses and costs that are relevant to the

7   calculation of profits.

8       Q.  And you mentioned as an example the withdrawal of

9   the single-pack for unjust enrichment.  Just to complete

10  the picture, how did you calculate unjust enrichment for

11  the other categories of alleged misconduct?

12      A.  The unjust enrichment for the other categories,

13  again, follow from the same set of yardsticks that allow

14  me to examine how many additional units of EpiPens were

15  sold that would not have been in -- had the alleged

16  misconduct not occurred.  And I make appropriate

17  adjustments for other economic costs that would not have

18  been realized in a but-for scenario.  Most specifically,

19  I assume that Mylan would have stopped promoting EpiPen

20  once the generic entered, and so I credit back those

21  promotional expenditures.

22      Q.  Now, lastly the category of damages that's

23  labeled Alternative RICO Calculation, and we put on the

24  screen here a chart.  Can you just explain for the court

25  what your understanding is of the alternative RICO

1    calculation as a theory of damages?

2       A.   I understand that the alternative RICO

3    calculation essentially represents the idea that

4    collectively all of the allegations permitted Mylan to

5    raise prices above their prior levels.

6            And so in this chart you can see the -- in the

7    red line, a projection of the average price increases

8    prior to the alleged misconduct.  So essentially,

9    assuming that Mylan would have used the same pricing

10   strategy that they used prior to the alleged misconduct,

11   prices would have increased according to the red line

12   but, in fact, increased as noted earlier at a much

13   higher rate according to the blue line.

14           These are the prices per pen.  And so I can

15   essentially take the area between these two curves to

16   calculate RICO damages.

17      Q.   And is that the process to arrive at the numbers

18   that are depicted on this chart, classwide damages

19   estimates?

20      A.   That's correct.  These aggregate damages are

21   shown in Table 4.

22      Q.   Just lastly, were you asked in this case to

23   conduct any exercise to identify specific potential

24   class members?

25      A.   I was not.

1    Q.  If called upon to do that type of exercise, are

2    you aware of data and methodologies that would allow you

3    to conduct that?

4    A.  Yes.  Both in my research and in discovery

5    documents in this matter as well as my litigation

6    experience, I have seen such data sources.

7         So to begin, on the slide we show PBM testimony

8    that I understand has become part of the record here as

9    well, and those PBMs acknowledge that they collect a

10   large amount of electronic data that makes it possible

11   to identify consumers and what their benefits were.

12        This is simply a result of the structure of this

13   industry prescription drug purchases are existent of

14   highly regulated context and a context in which the

15   contractual relationships we talked about at the

16   beginning of our conversation today require that PBMs

17   both have the information to ascertain exactly how much

18   patients need to contribute to their prescription and

19   also to be able to demonstrate that they have paid for a

20   certain number of prescriptions on behalf of third-party

21   payors.

22        These electronic data then, for example, are the

23   basis for the IQVIA data that I use in my analysis and

24   also databases that I've used in my previous research.

25   Q.  Okay.  Now before we close, there's one item I

1    think I skipped over.  I'm just going to go back to a

2    slide where we set out actual prices versus but-for

3    prices.  This is back in the generic delay context.

4            Can you just talk a little bit about what the use

5    of averages is in the context of your analysis?

6        A.   Sure.  Because my goal was to quantify aggregate

7    damages, I appropriately summarized both actual and

8    but-for prices as the total dollars spent divided by the

9    number of transactions.  It's a mathematical identity

10   that if you take the average and multiply by the number

11   of transactions, you will get the total, which is the

12   goal of an aggregate damages analysis.  And that average

13   reflects some variation in the underlying prices but it

14   appropriately captures the variation in order to

15   establish the total aggregate overcharge.

16       Q.   In a scenario where the average generic co-pay is

17   actually higher than what a particular class member may

18   have paid for the branded EpiPen, does that tell you

19   anything about whether that class member has damages or

20   has been affected by the misconduct?

21       A.   It does not.  As a thought experiment, it is --

22   has no meaning.  So each of the averages that I use have

23   an underlying distribution.  One could compare the

24   underlying distributions or one could take the

25   yardsticks, for example, that prices would decrease by

```
 1   30 percent, and show what affect they would have at an
 2   individual level.
 3        But to compare an individual co-payment to the
 4   average yardstick makes no sense to me.
 5             MR. LOFT:  Thank you.  That's all we have at
 6   this time.  We're going to now transition to our other
 7   expert for the remainder of our --
 8             THE COURT:  Let me ask the deputy clerk to
 9   shut down your time because this is my question.
10             MR. LOFT:  Thank you.
11             THE COURT:  You just -- early in your
12   discussion today you referenced another term "average
13   wholesale price."  I recognize the term.  I don't
14   understand its relationship, if any, to WAC.
15             THE WITNESS:  Sure.  So the average
16   wholesale price, as you probably recognize from AWP
17   litigation, and it has -- it comes from historical
18   patterns of mark-ups on the part of wholesalers.
19   Originally it was an average price that wholesalers sold
20   the product for but it has been established as a
21   formulaic relative to the WAC.
22        So for certain manufacturers, their AWP is
23   30 percent higher than the WAC for all of their drugs.
24   For all the other manufacturers, it's 25 percent.
25        It translates -- just like I showed you the lines
```

1  that track together between the transaction price and

2  the WAC price, AWP, it's higher than WAC but always by

3  the same amount.  And so they track.  And that's exactly

4  why the retail transaction prices follow the WAC is

5  because they are calculated off of AWP, which is always

6  exactly the same markup over the WAC.  It's a historical

7  decent, I would say.

8          THE COURT:  All right.  And then this is my

9  last question and this references Figure 1 in your

10  rebuttal report.  This is the figure that characterizes

11  market share and -- you know what I'm talking about.

12          THE WITNESS:  I can picture it.  Depending

13  on your question, I'll pull it up.

14          THE COURT:  Well, my question was the way

15  you combined things there.  The -- the -- you only show

16  the market share at -- I think at 20 percent increments.

17  I'm interested, does your report contain the data that's

18  behind that figure at a more granular level and I just

19  missed it?

20          THE WITNESS:  Yes, Your Honor.  The data

21  that underlie that chart should be in all the backup

22  materials.

23          THE COURT:  Including the market share

24  information?

25          THE WITNESS:  Yes, it should be.  I just

1    want to make sure I understand your question.  Because

2    the market share that's -- I know that chart's redacted

3    so I'll -- I'm doing this from memory.

4              MR. LOFT:  It's slide 7 out of 15 and PX126.

5              THE WITNESS:  So that market share adds up

6    all the Mylan products as a percentage of all the -- the

7    auto-injectors.  So it's -- it's an exact percentage,

8    that black line.

9              THE COURT:  This graph there?

10             THE WITNESS:  That's grafted there.  I don't

11   graph the lines for each of the other manufacturers.

12   But you can see that the number is very close to the top

13   of the chart which leaves very little room for any other

14   kinds of products.  And indeed early in the period,

15   prior to the class period, the other products are --

16   they're really quite de minimis in terms of how much

17   they contribute to the auto-injector market.

18             THE COURT:  Thank you very much.  That's all

19   my questions for this witness.

20             MR. LOFT:  Thank you, Your Honor.

21             THE COURT:  Thank you.

22             THE WITNESS:  Thank you.

23             MR. LOFT:  Leave that book up there.

24             THE COURT:  Sir, can I just ask you to

25   accept the oath before you're seated.

```
1                    THE WITNESS:  Yes.

2                          EINER ELHAUGE, J.D.,

3    called as a witness on behalf of the Plaintiff, having

4    first been duly sworn, testified as follows:

5                    THE COURT:  Please.

6                    MR. COX:  Good afternoon, Your Honor.

7                    THE COURT:  Good afternoon.

8                    MR. COX:  Spencer Cox from Burns Charest on

9    behalf of class plaintiffs, and I'm happy to present

10   Professor Einer Elhauge.

11                   THE COURT:  All right.  Please proceed.

12                       DIRECT EXAMINATION

13   BY MR. COX:

14     Q.  Good afternoon, professor.

15     A.  Good afternoon.

16     Q.  Let's start if you could and just tell us where

17   you teach and what your academic focus is.

18     A.  I'm a professor at Harvard Law School where I

19   specialize in the economic analysis of antitrust and

20   healthcare issues.

21     Q.  And you've been offered here as an expert in

22   antitrust economics.  So just tell us, what is that?

23     A.  It's the application of economics to issues of

24   market competition.

25     Q.  Do you have a degree in economics?
```

1    A.   No.   But then again, eight Nobel Prize winners in

2    economics also don't have a degree in economics.   My

3    expertise is based upon actual knowledge, experience and

4    academic scholarship, not just the possession of a

5    degree.

6    Q.   Okay.   What is some of your relevant economic

7    scholarship?

8    A.   Well, I've written books on antitrust economics.

9    I'm the editor of the *Research Handbook on Antitrust*

10   *Economics*.   I've also written many articles on antitrust

11   economics, including ones on the two sorts of agreements

12   that I analyzed in this case, which are reverse-payment

13   settlement agreements and agreements to exclude rivals.

14   Q.   Have you been qualified to testify as an

15   economics expert in your cases?

16   A.   Yes.   In all 18 cases where a court ruled on my

17   qualifications, they ruled that I was qualified to

18   testify as an expert in economics.

19   Q.   Let's talk about this case.   At a high level,

20   just tell us very generally what are the three main

21   areas in which you opine on?

22   A.   Sure.   So first I'm opining on market definition

23   and market power.   Second, I analyzed the effects of the

24   Teva-Mylan reverse-payment settlement on the allowed

25   entry date in the settlement.   And third, I analyzed

1    Mylan's contracts with PBMs that excluded competition.

2       Q.   The first is market definition.  So what did you

3    conclude regarding the relevant product market and the

4    geographic market in this case?

5       A.   I concluded that the relevant product market is

6    epinephrine auto-injectors or EAIs for short, and the

7    relevant geographic market is the United States.

8       Q.   Okay.  What did you base those conclusions on?

9       A.   Well, I examined seven factors as indicated in

10   this slide, such as the hypothetical monopolist test,

11   functional interchangeability and the other five factors

12   here indicated.  And I found each and every one of them

13   supported the market definition that I mentioned.

14      Q.   Okay.  Now, did the defense experts dispute your

15   analysis of these factors?

16      A.   Only Dr. Johnson disputed the first one, the

17   application of the hypothetical monopolist test but does

18   not dispute any of the other six.

19      Q.   Okay.  Let's start with that one, if you could,

20   and just walk us through your hypothetical monopolist

21   test analysis.

22      A.   Sure.  So the hypothetical monopolist test asks

23   the question:  Could a 100 percent monopolist raise

24   prices by 5 percent or more above competitive price

25   levels?

1        Here we have a great natural experiment on the

2   issue because Auvi-Q exited right here at the end of

3   2015.  So this is the exit of Auvi-Q from the market.

4   And what we see in the quarter right after their exit

5   that the EpiPen price increased by 13 percent of that

6   quarter.  The next quarter it increased by 11.2 percent.

7        So in the very two quarters right after the exit

8   of Auvi-Q, prices rose by far more than 5 percent but

9   also more than 5 percent over the average price increase

10  in any quarters -- over the quarters in the preceding

11  three years.

12       So in short, we basically have evidence that in

13  this case a sub 100 percent monopolist was able to raise

14  prices by more than 5 percent after the exit of one

15  major rival.  That shows it's necessarily the case a

16  100 percent monopolist would be able to raise prices

17  more than 5 percent over competitive levels.

18     Q.   What did Dr. Johnson dispute about this analysis?

19     A.   So he disputed whether you could use this test.

20  So he asserted that the agency guidelines did not allow

21  one to use post-exit price increases in order to define

22  a market.  But, in fact, as this expert shows, the use

23  of post-exit price increases to define a market is

24  explicitly approved by the agency guidelines.

25     Q.   Thank you.  Let's move to some of the other

1   market definition factors.  What did you find

2   specifically on functional interchangeability and price

3   trends?

4       A.  So on functional interchangeability, the evidence

5   indicated that the different EAIs were medically

6   equivalent with each other but they were -- none of them

7   were medically equivalent with other alternatives

8   posited by Mylan such as Benadryl.

9       On price trends, what the evidence showed was the

10  price trend for the different EAIs was very parallel and

11  upward over the relevant period.  In contrast over the

12  same period, the price for Benadryl one of the posited

13  disputes was in fact, decreasing.

14      Q.  How did your market definition conclusions

15  compare with how Mylan thought of the market?

16      A.  So my conclusions were actually very much in

17  alignment with what Mylan's internal assessment was.

18  There's many documents, this is just one that I

19  excerpted, where Mylan called the market, the EAI

20  market, calculated its market share in an EAI market and

21  also as a business manager identified its key

22  competitors were the firms that made EAIs in the United

23  States.

24      Q.  So that's market definition.  And let's turn to

25  market power.  What is your analysis with market power

1    and what did you conclude?

2        A.   Well, I applied three standard tests of market

3    power, monopoly power, any one of which is sufficient to

4    establish such power, and I found all three tests did

5    support the existence of market power and monopoly

6    power.

7        The first test is the combination of high market

8    shares and high entry barriers.  And here there was very

9    high entry barriers but also the market share of EpiPens

10   during the relevant period ranged from 87 percent at the

11   low point to 99.7 percent at the high point.

12       I also looked at whether there was direct

13   evidence of a power over price, and found that there was

14   such a direct evidence.  That's the second test.  That

15   existed not only because of the evidence we already

16   looked at about the ability to raise prices after the

17   exit of Auvi-Q, but also because there was evidence that

18   from 2008 to 2014 the margins of -- the profit margins

19   for EpiPens increased very sharply, thus showing it had

20   a power to raise prices far faster than its costs went

21   up.

22       And, third, I showed that there was a direct

23   evidence of a power to exclude, as we'll talk about in

24   more detail when we talk about the foreclosing

25   agreements with PBMs.

1    Q.   Moving on then to the next main topic in your --

2    in your analysis, the Mylan-Teva reverse-payment.  So

3    generally speaking, how can reverse-payment settlements

4    harm consumers?

5    A.   Well, so if a patent holder pays a

6    reverse-payment in the settlement that exceeds the

7    litigation costs that they would have incurred in

8    litigation, it must be getting a settlement exclusion

9    period that exceeds the expected exclusion period from

10   litigation.  So we know from that that using such a

11   settlement, they're basically preventing competition for

12   a longer period than the patent merits.

13        We also know that a payment of that size, a

14   reverse-payment, must be producing a settlement

15   exclusion period that exceeds the settlement exclusion

16   period we would have in a no-payment settlement because

17   otherwise it would be economically irrational to make

18   such a payment.

19   Q.   So to be clear then, what you're doing is trying

20   to compare how much extra settlement exclusion is -- can

21   be attributed to the reverse-payment; is that right?

22   A.   Precisely, yes.

23   Q.   So how do you determine that amount?

24   A.   Well, first what I do is, based on various

25   inputs, I calculate the litigation payoffs and

 1    settlement payoffs of the parties.  Using those payoffs,

 2    I calculate the share of settlement gains that each

 3    party has which tells us its actual bargaining power as

 4    revealed by the actual settlement.  And third, I apply

 5    that bargaining power to the but-for settlement to

 6    arrive at the allowed entry date and no-payment

 7    settlement that would be economically rational given

 8    their bargaining power.

 9        Q.   Have you done this kind of an analysis in any

10    prior cases?

11        A.   Yes.  I did precisely the same sort of analysis

12    -- same methodology in three prior cases, the *Namenda*

13    case, the *Lidoderm* case and *AndroGel* case.  And in all

14    three cases the court approved the methodology as

15    reliable and approved my qualifications to apply it.

16        Q.   Okay.  With that background, and let's walk

17    through specifics with regard to this case, and I think

18    it makes -- start to talk about some of the key dates

19    that went into your analysis.

20        A.   Okay.  So the first date mentioned here is simply

21    the date on which they actually agreed to settlement,

22    which was April 26th, 2012.

23        The next date is what the presettlement

24    expectations of what the parties were when Teva would

25    have entered had there been no settlement at all.  And

1   we have internal documents, the -- the presettlement

2   forecast of Teva and the market analysts indicates that

3   that date was January 1st, 2013.

4        The third relevant date is when the parties would

5   have expected the patent litigation to have ended had

6   there been no settlement.  Based upon the analysis of

7   Professor Torrance, I estimate that date is July 12th,

8   2013.

9        The fourth date is what the allowed entry date

10  would have been in a no-payment settlement.  This is

11  really the outcome of my analysis that we're going to

12  talk about.  In the base case, adopt certain base case

13  inputs, I find that date is March 13th, 2014.

14       The next date, what the allowed entry date was in

15  the actual reverse-payment settlement, which was June

16  22nd, 2015.

17       And then the last date is the patent expiration

18  date, which is September 11th, 2025.

19  Q.   There's no -- there's no date up here for the

20  actual entry date for Teva's generic in the real world,

21  so does that factor into your analysis?

22  A.   No, because my assignment was limited to figuring

23  out the impact of the reverse-payment on the allowed

24  entry date in the settlement.  So in terms of the impact

25  on the settlement, it could only be impacted by

1   expectations at the time of settlement, not future

2   events that were not expected at the time.

3        And given the documents mentioned previously, the

4   parties expected Teva to enter January 1st, 2013, so

5   that they must have expected that Teva would be able to

6   get FDA approval by that date.  Although Teva, in fact,

7   has not gotten FDA approval until 2018, I understand the

8   plaintiffs have other evidence and arguments to support

9   the claim that the delay in the allowed entry date in

10  the settlement delayed the efforts of Teva to procure

11  FDA approval.  That's outside the scope of my

12  assignment.  My assignment is just establishing the

13  delay in the allowed entry date itself.

14  Q.   We talked about dates, let's talk about some of

15  the other inputs that go -- go into the analysis.  Can

16  you walk us through the ones we see here?

17  A.   Yeah.  So basically using the parties' own

18  presettlement projections, I calculated what the present

19  value was of their respective profit schemes with and

20  without generic entry at any possible date.

21       Second, I calculated what patent strength was,

22  which is simply the parties' expectations about the

23  likelihood that Mylan would have been able to win the

24  patent litigation.  Professor Torrance estimated that

25  that patent strength was anywhere between zero to

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*   60

1   30 percent.  Because I'm trying to figure out what the

2   expected result is, I did the expected patent strength

3   estimated to be the midpoint, which would be 15 percent.

4        In terms of the reverse-payment amount, the -- at

5   least one source of that is the Nuvigil settlement.  So

6   unfortunately, though, non-coordinated discovery about

7   that issue lagged behind the timing of these class

8   reports, so I didn't have the evidence to directly

9   estimate the reverse-payment created by the Nuvigil

10  settlement.

11       However, what I was able to do was to determine,

12  given the inputs in on the EpiPen settlement, what's the

13  minimum reverse-payment that Teva would have had to have

14  received in order to have agreed to the actual

15  settlement, and I calculated that was $47.9 million.

16       Then I calculated what the rational allowed

17  but-for entry date would have been for any

18  reverse-payment amount from that minimum of 47.9 million

19  up to the maximum of 446 -- 446 million that would be

20  consistent with the fact that Mylan agreed to the actual

21  settlement.

22       And then depicts one number within that range for

23  illustrative purposes, I used $100 million in my base

24  case.

25       Q.   To reorient a bit, those are all our inputs?

1    A.   One more.  I forgot saved litigation costs, which

2    I have estimated was 2.8 million based upon the analysis

3    of Professor Torrance.

4    Q.   Okay.  So those are the inputs.  How do you put

5    all of those together to estimate the rational allowed

6    entry date in a no-payment settlement for this case?

7    A.   So using those inputs, you can basically

8    calculate each parties' payoff from the actual

9    settlement and its expected litigation payoff had they

10   continued to litigate.  And by payoffs, I simply mean

11   the amount of money the parties expected to make under

12   any of these scenarios.

13        The difference between those tells you the

14   settlement gains of each party, which was 346.4 million

15   for Mylan and 52.1 million for Teva.

16        From that you can calculate the share of

17   settlement gains that Mylan received, which is

18   86.9 percent.  That tells you the relative bargaining

19   power actually manifested in the actual settlement that

20   they reached.

21        And then, in order to estimate the no-payment

22   settlement entry dates, I take into account they would

23   have had the same bargaining power in a but-for

24   settlement to do the same, parties talking about the

25   same EpiPens patents with the same estimates, bargaining

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*                    62

1    strengths and weaknesses.  So they would have the same

2    bargaining power in that settlement.

3           And so then I basically just calculate for every

4    possible entry date for a no-payment settlement what

5    would the split of gains have been.  The ones -- the

6    split of gains, 86.9 percent, consistent with the same

7    bargaining power can be March 13th, 2014, assuming these

8    base case estimates for the inputs.

9           THE COURT:  Excuse me for interjecting.  I

10   just want to make sure the March 13 date that's used and

11   shown here.  That uses the $100 million assumption?

12          THE WITNESS:  That does.  I do show how it

13   changed the hundred million dollars.

14          THE COURT:  Down to 47 --

15          THE WITNESS:  Down to 47.9, yes.

16          THE COURT:  Thank you.

17   BY MR. COX:

18   Q.   Why are you focusing on Mylan and not Pfizer?

19   A.   Well, Mylan's incentives negotiated were the

20   decisive ones because Mylan was the one making the

21   reverse-payment.  So it thus controlled the bargaining

22   about how much of a reverse-payment to offer for how

23   much of a delay in allowed -- the allowed entry date of

24   Teva.

25          Pfizer and its subsidiaries would profit from any

1    delay in the allowed entry date that Mylan was willing

2    to pay for.  So it would be economically rational for

3    Pfizer to have agreed to any reverse-payment settlement

4    Mylan was willing to pay for to delay entry.

5        Q.   Now, I think the judge just asked you about the

6    different payment sizes and how that affects the

7    analysis.  So is that what we're looking at here on this

8    screen?

9        A.   Yes.  So here we're looking at what the results

10   would be for any reverse-payment amount in the possible

11   range with the bottom being 47.9 million, which again is

12   the minimum amount that's consistent with the fact that

13   Teva was willing to agree up to a maximum of 446

14   million, which is the maximum that would be consistent

15   with the fact that Mylan was also willing to agree to

16   the settlement.

17             So if you go along the curve, you can figure out

18   what would the allowed but-for entry date have been for

19   any payments.  So it's in April 2014.  If it's the 47.9

20   figure, it goes down.  100 million is the March figure

21   we mentioned if you go down further if they paid a

22   larger reverse-payment.

23             So what this shows is for any payment within the

24   range, the allowed but-for entry date would have been

25   earlier than the actual allowed entry date in the

1    settlement, which shows that my method is robust to

2    alternative estimates of the reverse-payment amount.

3      Q.   Did you do something similar for the range of

4    patent strengths?

5      A.   Yes.  So I also calculated here in Figure 13 what

6    the effect would be on the allowed entry date if you

7    varied the patent strength from the 15 percent that we

8    mentioned.  I considered every patent strength from the

9    minimum of 1 percent, which is the lowest patent

10   strength, that would be consistent with the fact that

11   Teva was willing to agree to the actual settlement, up

12   to 26 percent, which is the maximum consistent with the

13   fact that Mylan was willing to agree to the actual

14   settlement given the other inputs that have been used.

15        So this, again, shows that the methodology is

16   robust here, robust to different estimates of patent

17   strength.

18     Q.   Did you consider what happens if you change both

19   the reverse-payment amount and the patent strength at

20   the same time?

21     A.   Yes, I did.  So there's certain combinations of

22   patent strength and reverse-payment amount that simply

23   wouldn't be consistent with the fact they agreed to the

24   actual settlement because it would be unprofitable for

25   one or the other parties to have done so.

1        But there are a variety of combinations that

2    would be consistent with the actual settlement.  For

3    example, if you increased the patent strength to

4    29 percent but decreased the reverse-payment amount to

5    $10 million, that would be consistent with the actual

6    settlement and it would produce a but-for allowed entry

7    date of May 25th, 2015.

8        So still about a month before the actual allowed

9    entry date.  And I also showed basically for any

10   combination of reverse-payment amount and patent

11   strength that was consistent with the actual settlement,

12   the allowed but-for entry date would have been earlier

13   than the actual allowed but-for entry date unless you

14   made the reverse-payment zero, in which case of course

15   the but-for settlement is the same as the actual

16   settlement.  So for any positive reverse-payment,

17   there's always a delay in allowed entry date.

18   Q.   All right.  Then -- and I understand the -- in

19   addition to these, the last analysis that you have is

20   varying the effect on the expected entry date without

21   settlement; is that right?

22   A.   Yes.  I also took into account that there was

23   some controversy about that as well and I calculated

24   what the effect would be of changing one's estimate

25   about when the parties expected Teva would have entered

1  without any settlement.  And I do so for the entire

2  range from the January 1st, 2013 date I estimated, which

3  comes from presettlement forecasts about EpiPens in

4  particular.  Excuse me.  Some water.

5       So I do so from the minimum of -- from the

6  presettlement forecast of Teva and the market analyst

7  from January 1st, 2013 and then I go all the way up to

8  the latest date suggested by Dr. Johnson based upon

9  other documents.

10       And basically for any of those dates, you still

11  get an allowed entry date that's earlier than the actual

12  allowed entry date.

13  Q.  And two questions before we move on from this

14  topic:  First, I understand that your analysis here is

15  all common to the class; is that right?

16  A.  That's right.  So using any of these different

17  estimates, I'm always using a classwide methodology,

18  classwide evidence in order to produce a conclusion

19  about when the but-for allowed entry date would be that

20  is common to the class.

21  Q.  And aside and apart from these calculations and

22  analysis we've been discussing, did you consider at all

23  whether there might be pro-competitive justifications

24  for reverse-payment settlement?

25  A.  I did.  So I considered the issue at length in my

1   reports, finding that there was no such pro-competitive

2   justification in this case and -- but the defense

3   experts did not respond to it and have ignored the issue

4   that there's no pro-competitive justification for the

5   reverse-payment settlement in this case.

6       Q.   We covered market definition, market power, and

7   that was the reverse-payment settlement.  So let's turn

8   with our remaining time to the PBM foreclosure analysis.

9           At a high level, what were you looking to do?

10      A.   So here I'm analyzing the contracts that Mylan

11  had with PBMs that foreclosed users from getting

12  insurance coverage for EAI and devices.

13          Basically three steps to the analysis.  First I

14  figured out what's the foreclosure share in the market.

15  Second, I figured out what's the effect of that

16  foreclosure market share on the quantity and Auvi-Q was

17  able to sell in competition with the defendant.  And,

18  third, I then calculated what's the impact of that

19  reduced Auvi-Q share on EpiPen's prices.

20      Q.   Let's start with your conclusions on how much of

21  the market was foreclosed.

22      A.   So as this indicates, I found that once fully

23  implemented, the share of all formulary analysis lives

24  foreclosed by EpiPen contracts with PBMs ranged from

25  40 percent to 16 percent.

1    Q.  And in doing this, what did you consider was a,

2    you know -- what made a formulary life foreclosed?  In

3    other words, what restrictions did you consider?

4    A.  So I considered a formulary life foreclosed if it

5    had any one of three restrictions.

6        One was restriction to simply denied coverage

7    altogether to rivals of EpiPen.

8        The second was restriction that required prior

9    authorization, that is that the physician would have to

10   get prior authorization from the plan to prescribe an

11   EAI other than EpiPen.

12       And the third was step therapy which denied

13   insurance coverage unless the patient first tried

14   EpiPens and it was proven to be ineffective.

15       And the documents in this case indicate that all

16   three types of restrictions had very similar foreclosing

17   effects.

18   Q.  Now, why did you calculate a market-wide

19   foreclosure share as opposed to doing a separate

20   foreclosure share for each PBM?

21   A.  Well, because market-wide foreclosure is what

22   drives the anti-competitive effect.  So, first,

23   market-wide foreclosure is what raises Sanofi's costs

24   because Sanofi's costs turn on economies of scale that,

25   in turn, turn on market-wide volume.

1          Second, market-wide foreclosure is what changes

2     the residual demand for Mylan in the way that affects

3     Mylan's prices.

4          So it's more relevant to the anti-competitive

5     effects but also the reality is, in this case purchase

6     decisions are made by patients, not by PBMs.  So how

7     patients respond to these restrictions is what

8     determines the impact of the foreclosure on their

9     decisions.  And you wouldn't expect the responsiveness

10    of patients to restrictions to vary by different PBMs.

11    Q.   So does it matter then who initiates the

12    exclusionary conduct, whether that's the manufacturer or

13    the PBM?

14    A.   No, it doesn't really matter who initiates it.

15    Again, the patient's making a decision.  They may have

16    been reduced by restrictions and prices, but they're not

17    affected by who initiated the arrangement and their

18    decisions.

19         Further, even if one thought the PBMs were

20    initiating these contracts, that doesn't mean that they

21    were reducing net prices.  And the reason is that PBMs

22    have a classic collective action problem.  And what that

23    does is give them incentives to individually seek

24    rebates in exchange for exclusionary conditions, even if

25    the aggregate effect of the exclusionary restrictions is

1  creating market-wide foreclosure that increases net

2  prices and thus harms all PBMs collectively.

3        Third, to the extent there's any impact on net

4  prices, I actually directly took that into account in my

5  regression.  So it's already accounted for.

6        And, last, I would say just there is actual

7  evidence in this case that Mylan initiated this

8  arrangement.  Although it is the case that the PBMs set

9  out bid grids as emphasized by the defense, it's Mylan

10 who developed a conscious strategy of trying to surprise

11 EAI rivals by filling in these bid grids that offered

12 higher rebates in exchange for exclusionary restrictions

13 by simultaneously increasing the gross price in a way

14 that assured there was no net discount.

15 Q.  So back to the numbers here.  Once we have the --

16 the percentage of lives foreclosed, what are some of the

17 possible sources you could use to estimate the impact of

18 that foreclosure on Auvi-Q's market share?

19 A.  Yeah, so there's a variety of possible sources.

20 One source would be to look at Mylan's own internal

21 analysis.  So Mylan projected that without foreclosure,

22 Sanofi would have a ⫽ percent share.  But that when it

23 was foreclosed, that Sanofi's Auvi-Q would have a zero

24 percent market share.  So that projection could indicate

25 the net impact was negative ⫽ percent.

1        Sanofi had an internal analysis of how it was

2   actually doing after it entered from October to December

3   2013 and with that estimate showed -- well, that --

4   those numbers showed actually from the actual sales was

5   that the share impact for Sanofi during that period was

6   negative 10 percent.

7        Or you could divide it, which was to run a

8   regression analysis to try to figure out what is the

9   impact of foreclosure on Sanofi's share.  I did such a

10  regression and found a share impact of negative

11  3.36 percent, which is much lower than the internal

12  analysis and I think thus consistent with the fact that

13  my regression approach is actually quite conservative.

14  Q.   So to be clear, how do you translate that share

15  impact into an actual effect on Auvi-Q share?

16  A.   Okay.  So you multiply the share impact by the

17  actual foreclosure share in order to figure out what the

18  impact on the Auvi-Q share would be.

19  Q.   So you ran Option 3, right, you did your own

20  regression analysis in this case; is that correct?

21  A.   I did, yes.

22  Q.   Have you done regression analyses in other cases?

23  A.   I have, yes, many other cases.  And in all five

24  cases ruled on my qualifications to do so, they ruled

25  that I was qualified to do the regression and approved

1    the methodology that I used in that regression.  So no

2    prior court has excluded any regression analysis.

3       Q.  Okay.  So what -- let's do then with the

4    remaining time is try to walk through some of the steps

5    and explain as best we can what went into that analysis.

6           So first, if you could, briefly walk us through

7    this regression.

8       A.  Okay.  Sure.  So here's the actual regression

9    equation and it looks really complicated but actually

10   relatively straightforward.  It's the standard

11   regression that asks what are the effects of the

12   independent variables, which are the ones here on the

13   right, on the dependent variable, which is the one here

14   on the left.

15          So the dependent variable here is basically just

16   Auvi-Q's share at each PBM in each month.

17          The independent variable of interest is -- and

18   this expression here, that is what -- the percentage of

19   lives that were restricted at each PBM in each month.

20   And that's one that's of interest because we're trying

21   to figure out what impact does that foreclosure share

22   have on a dependent variable, which is Auvi-Qs share.

23          The next expression here is simply a control for

24   the percentage net price premium between Auvi-Q and the

25   EpiPen.

1        This next expression are -- are time effects.

2   What these basically do is control for anything other

3   than the foreclosure share or the price premium that

4   might effect how Auvi-Q is doing from a month-to-month

5   over time.

6        And the last expression is just the residuals

7   from the regression, which is basically just whatever is

8   unexplained by the regression.

9   Q.   Ultimately what were your results here?

10  A.   Clear these away.   Okay.

11       So ultimately my results were that the shared

12  impact was, as I mentioned before, an amount of negative

13  3.36 percent and P value less than 0.001 percent.

14  Q.   You understand Dr. Johnson estimates different

15  impacts to different PBMs, some are negative, some are

16  positive.   Again, why didn't you do it this way?

17  A.   First, again, the anti-competitive effects turn

18  on market-wide foreclosure, not for foreclosure effects

19  on any particular PBM.   So it's not relevant to the

20  relevant anti-competitive effects.

21       Second, again, decisions on what to purchase are

22  made by patients.   Other PBMs don't make these

23  purchases.   So the effect of restrictions on patient

24  choices are what mattered.   And there's no particular

25  reason to think that patients differ in a responsiveness

1    to restrictions from one PBM to another.

2          So if you're adding this in, you're basically

3    adding an irrelevant variable.  And the economic

4    literature is clear if you add enough irrelevant

5    variables, you can basically ruin any regression.

6          Here, in particular, creates a problem.  It makes

7    a regression a lot less accurate.  And the reason it

8    does so, if you're separately estimating the impact for

9    each particular PBM, you're ignoring all the information

10   you get from the fact the foreclosure share between

11   different PBMs varies in a way that's relevant to the

12   share Auvi-Q had with different PBMs.

13         If you only do it within PBMs, all you're getting

14   is variation of foreclosure share over time with PBMs.

15   As Dr. Johnson acknowledged within his report, there's

16   very little variation between PBMs and market

17   foreclosure share over time.  There's no variation if

18   you use that method.

19         Because of those various problems, I think that's

20   why Dr. Johnson's regressions lead to what I would call

21   spurious and quite illogical results.  In particular,

22   that he finds that somehow increasing a foreclosure of

23   Auvi-Q at some PBMs increases sales of Auvi-Q, for which

24   there's no logical causal theory.

25      Q.   Okay.  So let's go to the next slide, and I think

1    this is going to show what we know, which is it's

2    correct that you weren't able to use all PBMs in your

3    data set; isn't that right?

4        A.   That's right.  Just due to data limitations.  So

5    to do this test, you need four sources of data.  You

6    need to know the restricted share at the PBM.  You need

7    to know the -- both parties' share of sales.  You need

8    to know both parties' gross prices and both parties'

9    rebates at that PBM.  And that data was only available

10   for six of the PBMs.

11       Q.   But you were still able to cover two-thirds of

12   the market; is that right?

13       A.   Yes, covered two-thirds of the market.  And as

14   this figure shows, the Auvi-Q share at the PBMs included

15   in the regression very closely tracked changes in the

16   excluded PBMs, thus showing they were driven by the same

17   factors.

18            And, in fact, to the extent there's a difference,

19   the difference is that the Auvi-Q share is lower at the

20   PBMs that were excluded from the regression, which would

21   be consistent with the possibility that maybe the share

22   impact was greater at the excluded PBMs, which would

23   make my analysis conservative.

24       Q.   Okay.  Walk us through then how you use this

25   information to determine the actual overcharges that

1    result from foreclosure.

2       A.   Okay.   So there's basically three steps.   First,

3    I calculated the quantity impact, and that's basically

4    the amount of -- by which Auvi-Q sales went down.   And

5    that's done using the method indicated in the first four

6    lines here.

7          Then I calculated the total price responsiveness

8    of Mylan.   So what that is basically is the degree to

9    which Mylan would lose sales if it raised prices.   And I

10   have calculated that using the method indicated in the

11   next four lines.

12         So then given that quantity impact and given that

13   price responsiveness, I figured out what the impact on

14   Mylan's prices would be using the method indicated in

15   this third from the bottom line.   And this just

16   conservatively assumes that the only impact is we took

17   some quantity out of the market that Auvi-Q otherwise

18   would have sold and thus increased the residual demand

19   for Mylan's products.

20         So it's conservative because it's ignoring the

21   fact that foreclosure also raises Sanofi's costs.   It

22   also directly reduces the price responsiveness of Mylan

23   and it's excluding rivals other than Auvi-Q as well.

24         And the last was basically just multiply that

25   price impact between Mylan was selling the particular

1    point in order to get the total overcharge.

2        Q.   I understand you did something similar, right,

3    for the deterred Auvi-Q re-entry aspect?

4        A.   Yes.  Yes.  So it's very similar except that for

5    the deterred re-entry theory, the quantity impact is

6    basically just the quantity that Sanofi would have sold

7    of Auvi-Q had it re-entered the market.

8             So to calculate that quantity, I used Sanofi's

9    projections of how much it would have sold in the market

10   had it re-entered, which were based upon its pre-recall

11   market share.  So I had to adjust it for the fact

12   without the PBM foreclosure, the premarket share also

13   would have been higher.  And with the adjustment I get

14   the market quantity impact and then I follow that

15   through to get the overcharge utilization.  The same

16   kind of method.

17       Q.   So ultimately what overcharges did you estimate?

18       A.   Well, so using my initial regression and the

19   initial estimate of the share impact, I calculate that

20   the damages from PBM foreclosure from 2013 to 2015 were

21   around $13 million and the damages from deterred

22   re-entry in 2016 were about $1 million.

23            Now, these figures reflect the fact that since my

24   initial report I corrected two things.  One, I dropped

25   the damages from the EpiPen4Schools program because the

1   plaintiffs have dropped that claim; and, two, I

2   corrected a computational error that resulted from the

3   fact that my staff interpreted one of the data fields in

4   the data to be the quantity of two-packs being sold and

5   actually it was the quantity of pens being sold.

6       Q.   Now, you understand there's an opposing argument

7   that your initial regression basically suffers from

8   what's called serial correlation.  How do you respond to

9   that argument?

10      A.   Well, the first thing to note is that serial

11  correlation does not mean there's any bias in

12  regression, doesn't change the coefficient estimates.

13  But what it can do is change the way you calculate

14  statistical significants.

15          So one way, as Dr. Johnson noted, is to use

16  clustered standard errors, which since a serial

17  correlation here is within PBMs, cluster standard errors

18  would effectively group observations within PBMs to the

19  extent they're correlated with each other.

20          However, it's also well-known that cluster

21  standard errors can create unduly conservative

22  statistical significance.  And one way to adjust for

23  that is basically to add a fixed effects.

24          So what I did in my reply report is I added a

25  cluster standard errors but also added PBM fixed

1   effects.   And I found, when you did that, the shared

2   impact remains negative and results remained

3   statistically significant.

4      Q.   What about the critique -- I think there's a rule

5   here on this.   What about the critique is price variable

6   and you should have filled in the Aetna restricted share

7   information a little differently than what you did?

8      A.   Well, I think both critiques are wrong for

9   reasons I detailed in my reply report, but I also showed

10  even if you thought they were right, if you drop the --

11  in addition to the changes in the other lines, if you

12  also dropped the price variable and also just dropped

13  the missing months of Aetna, rather than filling them in

14  through extrapolation, you would still get negative

15  share impact and it would still be statistically

16  significant.

17        If you also dropped the PBM effects, you would

18  need a larger share impact with an even smaller P value

19  that's more statistically significant.

20     Q.   With the time that we have left, I think I want

21  to give you a chance to respond to a couple of similar

22  critiques that have been raised while you're here.

23        So one of those is that your regression should be

24  rejected because you used a 10 percent level for

25  statistical significance as opposed to 5 percent.

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*                 80

1   What's your response to that?

2       A.   Well, first of all, it's only relevant to this

3   regression in the second line because all the other P

4   values are lower than 5 percent.  So it would meet

5   either test.

6           But, second, the econometric literature is clear

7   that you can use either a 10 percent test or 5 percent

8   test of statistical significance, and that 10 percent

9   test is particularly appropriate in cases where you're

10  estimating antitrust overcharges.  After all, a P value

11  of 7.5 percent basically means that there's only a

12  7.5 percent chance that the foreclosure is not having

13  this negative impact on Auvi-Q's share; that is, there's

14  a 92.5 percent level of confidence that it is having

15  this anticompetitive impact.

16      Q.   What about the critique that you should have used

17  a two-tailed test versus what's called a one-tailed

18  test?

19      A.   Well, again, the issue is only relevant to this

20  regression in the second line.  If you use a two-tailed

21  test, you basically double the P values and all the

22  other regressions would have P values below the

23  5 percent, even the 5 percent test, even if you used a

24  two-tailed test.  But also the econometric literature is

25  clear that when you would expect some factor to impact

1  outcomes only in one direction, you should use a

2  one-tailed test as I did.

3       So here, you would only expect foreclosure if it

4  has an impact on Sanofi sales at all.  The impact would

5  be negative, not positive.  So given that, it's

6  appropriate to use a one-tailed test.

7       Q.   Okay.  And then we can go to the next slide if

8  you like.  But last question:  Do you have the ability

9  to distinguish between damages to third-party payors and

10  cash end payors as far as PBM foreclosure?

11       A.   I did.  Using data that was produced after my

12  initial report and after my deposition, I was able to

13  calculate the effect on rebates of the foreclosure and I

14  was able to combine that with the net price increase to

15  basically figure out what is the effect on rebates

16  relative to the but-for world, what's the effect on

17  gross prices.  Then I adopted the highly conservative

18  assumption that PBMs passed on all the extra rebates to

19  TPPs.

20       And even with that conservative assumption, I

21  found in every single month TPPs were injured by the

22  combination of gross price increase and increased their

23  rebates.  And cash end payors were clearly injured

24  because they got no rebates, they suffered the increased

25  gross price.  And this tells us the numbers of the total

1   damages during this period.

2       Q.   Well, thank you, professor.

3               MR. COX:   And pending any questions from

4   you, Your Honor, I think we'll reserve the rest of our

5   time for rebuttal.

6               THE COURT:   Let me just borrow a little bit

7   on my own time.   You can go ahead and turn their time

8   off.

9       So give me the -- give me the hypothesis of why

10  the third-party payors would let their PBMs do that to

11  them.

12              THE WITNESS:   Well, they get the rebates as

13  well.   And plans have an even bigger collective action

14  problem because they -- if they choose to elect a rebate

15  in exchange for an exclusionary condition, they get a

16  hundred percent of that rebate from that individual

17  choice but they're contributing to a collective

18  market-wide foreclosure that's creating a collective

19  market-wide anti-competitive effect.

20      It's classic.   Sort of tragic of the commons.

21  It's people bring goats to the commons, all the goats

22  overeat and all the goats die.   It's a classic case way

23  back in Boston from colonial times.   Eventually

24  everybody's got an incentive to bring their goat.

25  Either their goat ate the grass or didn't eat the grass.

1  The relative effect is externality on everything else.

2  If you eat all the grass, all the goats die.

3        Same thing here.  If you get the rebates -- you

4  get some of the effect of increased -- effect of

5  increased prices but you're sharing with the entire

6  market.  So that's -- they suffer even more from that

7  collective action problem because there are way more

8  plans than there are PBMs.

9        THE COURT:  Let me just confirm with you --

10  I don't have to worry about EpiPen4Schools anymore?

11        MR. COX:  That's correct, Your Honor.

12        THE COURT:  That's all I have.

13        THE WITNESS:  Thank you.

14        THE COURT:  Thanks very much.  Mr. Burns,

15  I'll look to you as the ringmaster on that side.  Does

16  that conclude the presentation of -- at least in the

17  first segment of the time from the class plaintiffs?

18        MR. BURNS:  That's correct, Your Honor.

19        THE COURT:  All right.  Probably a decent

20  time to take an afternoon recess.  That leaves us -- I

21  think there's 23 minutes left.  Twenty-three minutes

22  left on your clock.  So we've got another 2 hours and

23  20.  If we need a quick break, we'll take a quick

24  turnaround.  Let's go 10 minutes from here, I'll be

25  ready to come back in.

17-md-2785   In re: EpiPen   6.11.19  *REDACTED*          84

1              (Recess.)

2              THE COURT:  Mr. Levin, we'll turn to your

3    side of the courtroom with the plaintiffs' -- with the

4    defendants' time.  And I assume you and Pfizer have

5    sorted things agreeably, peaceably between you two?

6              MR. LEVIN:  As always, Your Honor, we have.

7              THE COURT:  Very well.  The time is yours.

8              MR. LEVIN:  Sure.  I'm going to play the

9    role of ringmaster for the defendants' side.

10             THE COURT:  I didn't mean to call either

11   side a circus.

12             MR. LEVIN:  No, no, I think Mr. Burns and I

13   wear that with a badge of honor.  So we're good.

14        Initially, Your Honor, we would also like to

15   introduce our client representative who are here today

16   in the courtroom.  From Mylan, Doug Miner and Brian

17   Cuthbertson is here.

18             THE COURT:  Gentlemen, good afternoon.

19             MR. GANDESHA:  Your Honor, for Pfizer

20   defendants, Amanda Solis.

21             THE COURT:  Good afternoon.

22             MS. SOLIS:  Good afternoon, Your Honor.

23             MR. LEVIN:  Judge, I would take a couple

24   minutes, give an overview of what we, the defense side,

25   see today as the presentations.  We do see them matching

1   and going hand-in-hand.

2        Today we'll be offering the testimony of our

3   class certification expert, Dr. John Johnson.  He's an

4   antitrust economist.  As you will hear, Dr. Johnson is

5   going to testify primarily about two topics.  First, the

6   methodologies and models of the plaintiffs' experts that

7   you just heard about, and in particular whether those

8   models can show common impact on a classwide basis in a

9   way that satisfies the requirements of Rule 23.

10                THE COURT:  A theme of your papers.

11                MR. LEVIN:  Comes through as hopefully it

12   should.

13        And, second, whether there are uninjured members

14   of the class and whether those same models can identify

15   who those uninjured members are and pick them out of the

16   class, again to satisfy the requirements of Rule 23.

17        That will be today.  We're then going to come

18   back tomorrow and put that and what you heard today and

19   what you have before you, all the evidence in the

20   record, into the legal context and construct of Rule 23.

21        Mr. Gandesha and I will present legal argument

22   tomorrow on those issues.  And when all is said and

23   done, Your Honor, it is our sincere belief and our

24   sincere hope the court is going to find what we say in

25   our papers, which is those models cannot satisfy the

1  plaintiffs' burden of proving the elements for class

2  certification.

3        Before we officially kick things off, I would be

4  remiss if I didn't thank Your Honor for taking the time

5  today, for setting aside the time for today and tomorrow

6  for all these important issues.  Of course thank you for

7  all your courtroom staff who have helped us set up the

8  technology, so far so good with that, your chambers

9  staff, your law clerks.  We killed a lot of trees, we

10  may have strained a couple backs along the way, but it

11  is our sincere hope that what's going to happen today

12  and tomorrow is to summarize all of the voluminous

13  materials that Your Honor has before you in a way that

14  assists the court in ultimately reaching its decision.

15        And so with that, I'd like to introduce my

16  partner today, Justin Bernick, who will be conducting

17  the examination of Dr. Johnson.  But I don't believe you

18  had the pleasure of meeting Mr. Bernick.  But it takes a

19  village and Mr. Bernick has been in the village along

20  the entire way.  Antitrust litigation partner at our law

21  firm and he will be conducting the examination of

22  Dr. Johnson.

23              THE COURT:  All right.

24              MR. LEVIN:  So Justin.

25              THE COURT:  Thank you, Mr. Levin.

```
 1            Mr. Bernick.
 2            MR. BERNICK:  Thank you, Your Honor.  At
 3    this time I would like to call our expert, Dr. John
 4    Johnson to the stand.
 5            THE COURT:  Sure.  Please come forward.
 6    Please if you will accept the oath, sir, before you're
 7    seated.
 8                  JOHN JOHNSON, Ph.D.,
 9    called as a witness on behalf of the Defendant, having
10    first been duly sworn, testified as follows:
11            THE COURT:  Sir, please be seated.  You've
12    seen the routine by now.  Feel free to move things
13    around so the microphone will amplify your voice.
14            THE WITNESS:  Thank you, Your Honor.
15                  DIRECT EXAMINATION
16    BY MR. BERNICK:
17     Q.  Dr. Johnson, if we could just start, please
18    introduce yourself to the court.
19     A.  Yes.  My name is John Johnson.  As introduced
20    earlier today, I an antitrust economist and statistician
21    from an economic consulting firm in Washington, D.C.,
22    where I've practiced as a professional economist for the
23    last two decades.
24            MR. BERNICK:  And, Your Honor, we have a
25    series of questions today to walk through with
```

1  Dr. Johnson to articulate his opinions in this matter.

2  But before we do, I want to make sure if you had any

3  questions that were burning on your mind to ask and

4  provide you an opportunity to do so.

5          THE COURT:  You know, I came to the

6  courtroom with a list for each witness, some were

7  answered and some I -- my notes didn't make sense to me

8  anymore and so I didn't ask them.  But I'll listen to

9  your presentation.  If I see a natural fit, I'll

10  interrupt.  If I have things left over and I can figure

11  out what my notes mean, I'll ask them at the end.

12          MR. BERNICK:  Please do.  Thank you, Your

13  Honor.

14  BY MR. BERNICK:

15     Q.   Dr. Johnson, where are you currently employed?

16     A.   I am currently employed at Edgeworth Economics,

17  which is an economic consulting firm.  I am the CEO and

18  co-founder in Washington, D.C.

19     Q.   Could you please tell us a little bit about your

20  educational background?

21     A.   Yes.  I have a bachelor's degree in economics

22  with a minor in English literature from the University

23  of Rochester in Rochester, New York.  And I have a Ph.D.

24  in economics with a specialization in econometrics from

25  the Massachusetts Institute of Technology.

1    Q.   Could you also please tell us a little bit about

2    your professional experience and background?

3    A.   I've been a professional economist for the last

4    two decades.  I started my career as assistant professor

5    at the University of Illinois.  I have spent time

6    teaching at both Illinois and Georgetown University.

7    However, earlier in my career I wanted to shift to doing

8    some practice real-world work and so I became a

9    professional consultant for most of my period of time

10   where I testified in a wide range of antitrust and class

11   action litigation as well as other consulting-type

12   matters.

13   Q.   Dr. Johnson, do you have experience testifying in

14   class certification proceedings like this one?

15   A.   Yes.  I have testified in over 40 class actions

16   during the course of my career.  I've also written

17   extensively sort of the academic literature on the

18   application of econometrics in class actions in that

19   intersection of the field called law and economics.

20   Q.   Do you have experience testifying on antitrust

21   issues relating to the pharmaceutical industry?

22   A.   Yes, I have testified in both antitrust class

23   actions in sort of a general sense, products like

24   drywall, pool product distribution, transmissions, but

25   also I have a fair amount of pharmaceutical antitrust,

1    including products such as Wellbutrin, Nexium, Solodyn

2    are three examples.

3        Q.   Just a moment ago you mentioned a term

4    "econometrics."  What does the term "econometrics" mean?

5        A.   So econometrics is the branch of economics that

6    has to do with matching economic science and theory with

7    statistics.  And during the course of my career

8    obviously computing power has expanded the amount of

9    data and the world has expanded, so we have an entire

10   discipline that focuses on how do we interpret large

11   data sets, how do we interpret empirical facts, and what

12   are the appropriate techniques one can apply to actually

13   understand the meaning of data in different real-world

14   contexts.

15       Q.   Do you consider yourself to be an expert in

16   econometrics?

17       A.   Yes, I -- well, I have a specialization in

18   econometrics at MIT which meant I had to take way more

19   semesters of calculus than I would have liked,

20   statistics classes at the graduate level, econometrics

21   classes at the graduate level.  I took a specialization

22   exam in econometrics.  I also wrote a dissertation on

23   econometrics.  For the last 20 years I've run

24   regressions almost every day of my life.  I consider it

25   a scenario I'm very well-versed in.

1    Q.   Do the types of analyses put forward by

2  plaintiffs' experts require some econometrics expertise?

3    A.   Yes, they do.

4    Q.   And why is that?

5    A.   Well, again, the -- the methodologies put

6  forward, particularly those by Professor Elhauge,

7  actually are relying on econometric techniques, the

8  actual bread and butter of the statistics in economic

9  specialization, but also Dr. Rosenthal's approach all

10  deal with large data sets and how do you interpret data.

11  It's a pretty overarching theme in this case, how and

12  what can we meaningfully understand the data to be

13  telling us and where are the potential shortcomings or

14  weaknesses in the interpretation.

15    Q.   Thank you.  Let's take a step back.  What was the

16  scope of your assignment in this matter?  What were you

17  engaged to do?

18    A.   So at a high level what I was asked to do was

19  perform an evaluation of the models of impact in damages

20  from the plaintiffs' experts, Professors Rosenthal and

21  Elhauge.  Essentially if I had been asked to peer review

22  their work, what would be my conclusions about

23  appropriateness particularly with respect to the issues

24  for class certification here.

25    Q.   Were you asked to offer any affirmative

1   assessment of a classwide method for assessing impact or

2   damages in this case?

3       A.   No.   My assignment was not to put forward an

4   affirmative methodology, it was to assess the work of

5   Professor Rosenthal and Professor Elhauge.

6       Q.   I see you put a slide up.  Can you give us an

7   overview of what we're planning to discuss today?

8       A.   Yes.  So this is just a general roadmap for where

9   I -- we'll cover it again as I said.  I think --

10              THE COURT:  See, things were going very well

11   until you commented on it.

12              THE WITNESS:  I can do the overview.

13              MR. BERNICK:  Very good.  Thank you.

14              THE COURT:  Well done.

15   BY MR. BERNICK:

16       Q.   I'll ask that question again.  If you can give us

17   an overview of the roadmap, what we're going to talk

18   about today.

19       A.   So what I would like to talk about and the way I

20   organized my presentation would be to start with

21   relevant pharmaceutical industry background,

22   particularly elements that are going to be important for

23   my assessment of the methodologies that were put forth.

24   And then I want to go through just systematically each

25   of the methods starting with two-pack, the generic

1   delay, Auvi-Q foreclosure, and finally alternative RICO.

2   Q.   So plaintiffs in this case, they put forward

3   models of impact or damages with respect to two-pack and

4   direct delay, Auvi-Q foreclosure and alternative RICO;

5   is that right?

6   A.   Yes.

7   Q.   And what did you do at a high level to evaluate

8   those methodologies?

9   A.   So when I prepared testimony of this nature, the

10   exercise that I go through is I start with the

11   plaintiffs' expert reports.   I review the reports

12   closely.   I get all of their turnover materials.   I

13   review all of the data, the programs.   I replicate all

14   of their results with my team.

15       I then also read a series of the documents, the

16   various depositions.   I conduct my own independent

17   assessment of the various issues in the case.   I read

18   countless other depositions and the like.   And then I

19   actually perform a -- various series of sensitivities,

20   evaluations that scientists and economists would do to

21   draw my conclusions, and I will issue my report.

22   Q.   We'll walk through each of the methodologies in

23   detail in a moment.   But at a high level can you give us

24   sort of your three take-away points, three big picture

25   conclusions about these methodologies?

1     A.   So at the highest possible level I think the

2  first point is neither Professor Rosenthal's approaches

3  or Professor Elhauge's approach actually addresses the

4  issue of common impact.   Neither methodologies, none of

5  the methodologies can actually accommodate the impact

6  question at all.

7     The second overarching opinion is that when I

8  look at their assessments, there are large sets of

9  potential uninjured class members and their

10  methodologies cannot account for them.

11     And then third, that's particularly more focused

12  on Professor Elhauge, there is a disconnect in Professor

13  Elhauge's approach about how the pharmaceutical industry

14  works, particularly the nature of PBM pricing.   And as a

15  result of that, he has misapplied the econometric

16  techniques in a way that is not consistent with economic

17  scientists and not consistent with my professional

18  expertise.

19     Q.   On this slide why is the EpiPen4Schools bullet

20  point crossed out?

21     A.   Well, in the original report from both experts

22  there were damage amounts and damage models put forth

23  for EpiPen4Schools, million of dollars in damages in

24  fact.   I did offer several critiques of those

25  methodologies and I understand as of now they are no

1   longer relevant -- no longer being pursued by the

2   plaintiffs.  They will be indicative of certain flaws of

3   the plaintiffs' methodologies, which I will talk about

4   later in the presentation.

5      Q.   So one of the starting points for evaluating

6   class certification is to look at the classes

7   themselves.  I believe you have a slide that sort of

8   walks through the classes.  Could you sort of explain

9   what those classes are?

10     A.   I will do my best.  This is a little bit

11  complicated, so I'll try to high level.

12          My understanding is there are actually five

13  classes, four that are -- relevant economic assessments

14  have been made of.  There's a nationwide RICO class.

15  There's a state antitrust class.  There's a consumer

16  protection class, and there's an unjust enrichment

17  class.  The fifth class is the injunctive relief class

18  which I do not believe any of the economic experts have

19  put forward any testimony about.

20     Q.   And each of those classes cut across the

21  different potential theories of harm at the top of your

22  chart?

23     A.   Yes.  So one of the things that is somewhat

24  unique about this case is that within these classes we

25  have these different courses of conduct; generic delay,

1   EpiPen two-pack, Auvi-Q foreclosure, and alternative

2   RICO.  And depending on which class definition, there is

3   different conduct that is relevant to different classes.

4      Q.  Which experts put forward the methodologies used

5   for which theories of harm?

6      A.  Well, you heard today the chart tries to capture

7   it.  Professor Rosenthal has put forth a generic delay,

8   the EpiPen two-pack and the alternative RICO estimates

9   for different classes.

10         Professor Elhauge has provided an input into the

11   generic delay in terms of the date.

12         And then Professor Elhauge's focus is the Auvi-Q

13   foreclosure but Professor Rosenthal also has one

14   scenario, the unjust enrichment scenario, for Auvi-Q

15   foreclosure.

16         Just to make it simple, the red boxes are the

17   buckets that Professor Elhauge is opining on and the

18   other pretty tan, green and purple boxes are Professor

19   Rosenthal.

20      Q.  Compared to the numerous other antitrust class

21   actions you testified in, is there anything in

22   particular that strikes you as unusual about the

23   structure of this case reflected on this chart?

24      A.  Yes, there's a few things that I think make this

25   particularly unique.  One is the damages periods will be

1   different based on the different courses of conduct.

2   Another is that because different conduct combines

3   different sets -- are combined in single classes, that

4   creates sort of an interesting set of issues with how

5   can they be separated out or what does it mean.

6       For example, if the court finds one course of

7   conduct, you know, was not in the trier of facts and

8   that's actually not an issue anymore, how does that

9   affect the classes.

10      And then there's the issue of there are different

11  class members and how do you separate out when you have

12  diverse sets of class members all defined within the

13  same classes?

14  Q.  We heard earlier today discussion of the types of

15  class members within each class; TPPs, insured consumers

16  and cash payors.  Could you walk us through how those

17  are designated on this chart?

18  A.  Yeah.  So the TPPs again are the third-party

19  payors, in this case that would be the -- potentially

20  insurance companies, that could be Local 282.  But the

21  TPPs are going to be the set of consumers that have

22  plans that have some liability for a portion of EpiPen

23  prices.

24      The insured consumers are the people that

25  actually get the EpiPens, who go into your pharmacy, who

1    have some kind of prescription insurance, in other words

2    they pay co-pays, deductibles, things like that.

3         The cash payors are also end payors.  They are

4    the people that pay at retail.  They pay cash for the

5    product, they don't have insurance.  So they go and pay

6    that without the insurance.

7    Q.   Your chart has a number of dashes and asterisks.

8    Can you explain to us what those mean?

9    A.   All right.  So the dashes are just simply

10   representing places where a certain course of conduct

11   has not been defined within a class by the plaintiffs.

12   So, for example, EpiPen two-pack is not within the state

13   antitrust class.

14        Then the asterisks right there are places where

15   the plaintiffs have put forward methodologies but have

16   not separated out third-party payors from insured end

17   payors in their approaches.  And there are several of

18   those in the chart.

19   Q.   So with respect to the dashes, those are

20   instances where the plaintiffs' experts have not put

21   forward a methodology for a particular theory of harm

22   for a particular class?

23   A.   Yes.

24   Q.   With respect to the asterisks, is it an issue

25   that the plaintiffs' experts have not proposed a type of

1  methodology for separating out the damages between the

2  third-party payors and the insured end payors?

3      A.   Yes, potentially it is.  First of all, if you

4  think about an end payor is someone who has -- in this

5  case an insured consumer, they would pay a co-pay,

6  they'd pay a deductible.

7          The third-party payor has another part of the

8  liability for that particular purchase.  Those two

9  things are directly in some respects at odds with each

10 other.  A dollar of damage to an end payor may well be

11 off-putting a dollar of damage to a third-party payor.

12 So there's this sort of inherent conflict about damages

13 to one versus damages to another.

14         There's no methodology that's been put forward to

15 disentangle that issue.  We heard the experts say they

16 could do it but they have not put forth a methodology to

17 do it at this point in time.

18     Q.   Is it your understanding the proposed class

19 includes purchasers of the EpiPen as well as the EpiPen

20 authorized generic?

21     A.   Yes, that is my understanding.

22     Q.   Do any of the plaintiffs' experts put forward a

23 methodology that includes the authorized generic in

24 their damages calculations?

25     A.   No.  There is -- I have not seen any of the

1   methodologies that include the authorized generic or, in

2   fact, within the calculations.  There is a scenario

3   where Professor Rosenthal relies on the experience of

4   the authorized generic for pricing but that's not the

5   same as saying she's actually trying to address

6   something special about purchasers of the authorized

7   generic.

8        Q.   I also want to take another step back.  We're now

9   a couple hours into this hearing today and haven't

10  really pinpointed what it means to conduct an economic

11  analysis of class certification.

12        So what is your understanding of what plaintiffs

13  must show as a matter of economics in order for a class

14  to be certified?

15       A.   Okay.  So the way I as an economist have always

16  sort of taught this over the course of my career, the

17  way I would like to start thinking about it is let's

18  just think about one individual first.  You had an

19  individual purchaser of an EpiPen and you wanted to know

20  what was the economic injury.

21        The way you have to think about that is you would

22  say what is the actual price that this particular

23  individual paid for that EpiPen.  And then you want to

24  know, well, absent all this conduct, what is the price

25  they would have paid otherwise.  That's the thought

1    experiment that we're trying to go through, and that's

2    called the but-for price.

3         So what happens for an individual, we want to

4    compare the actual price to the but-for price.  And if

5    we find they would have paid more for their EpiPen

6    absent the conduct, that individual is injured.  That's

7    the notion of impact to an economist.

8         Now, the question of class certification has to

9    do with common impact.  Can the plaintiffs'

10   methodologies that have been put forward assess impact,

11   assess actual and but-for prices without regards to

12   individualized evidence or individualized proof?

13        And so that's where the assessment comes in, can

14   the methodologies actually demonstrate common impact.

15        Impact is binary.  You're harmed or not.  So

16   that's the first part of the economic analysis.

17   Q.   And what's the second part of the economic

18   analysis?

19   A.   So then the second part has to do with the

20   calculation of damages, and that's basically quantifying

21   that difference and what is the difference in terms of

22   the elevation in the prices as a result of the conduct.

23   And can that be shown through common proof or are there

24   individualized factors that would have to be considered

25   to calculate damages accurately.

1    Q.  So let's start with the first part of that test.
2    Did Professors Rosenthal and Elhauge put forward
3    reliable classwide models to prove common impact?
4    A.  No, I think there's sort of two different issues.
5    I think Professor Rosenthal explained it today.  Her
6    assignment I believe was about aggregate damages, and we
7    actually have a clip from the deposition where I think
8    she's very clear about this.
9            (Played video deposition clip.)
10   BY MR. BERNICK:
11   Q.  Dr. Johnson, what is the significance of this
12   testimony to you?
13   A.  So -- so, Your Honor, when I'm explaining the
14   differences between Professor Rosenthal's assessment and
15   my assessment, a large part of my assessment is on the
16   common impact issue, the issue she said was not part of
17   her opinion.  The inability of the models to capture
18   individualized issues to demonstrate or figure out who
19   these uninjured class members were.
20          So we're approaching the issue but the common
21   impact issue is a part of my assignment as class
22   certification expert.
23   Q.  What about with respect to Professor Elhauge?
24   A.  Professor Elhauge, it's a slightly different
25   issue.  Professor Elhauge has put forward an average

1  statistical result he claims is classwide proof of

2  impact.  And we're going to talk about why there's an

3  assumption of impact built into his modeling and there's

4  other errors and issues that render it unreliable, but

5  it's a slightly different set of critiques of Professor

6  Elhauge.

7      Q.  So what about with respect to the second issue,

8  whether or not there's a classwide model to prove

9  aggregate damages?  Are Professor Rosenthal and

10  Elhauge's models reliable for that purpose?

11     A.  No.  Many of the same types of issues that

12  implicate the common impact questions also implicate

13  damages, and we'll talk about those.

14         But particularly the nature of the assumptions,

15  the nature of the types of evidence that one would have

16  to consider for these different types of class members

17  is inherently individualized.

18     Q.  Professor Rosenthal and Professor Elhauge

19  submitted a reply expert report; is that right?

20     A.  Yes, they did.

21     Q.  Did any of those reports change your opinions in

22  this matter?

23     A.  No, it did not.

24         MR. BERNICK:  Your Honor, next we would like

25  to talk about a few issues related to the industry

1    background.  We're going to try not to repeat the

2    discussion we talked about earlier today.  We do want to

3    highlight a few nuances or a few differences.

4    BY MR. BERNICK:

5        Q.  Dr. Johnson, your expert report does contain

6    extensive discussion about how the pharmaceutical

7    industry works, how pricing works.  Why is that

8    important for the class certification inquiry?

9        A.  So when we think about the role of the economist

10    again in the proceedings, what an economist does is we

11    take our expertise, our industry knowledge, and we bring

12    that to that question of how does pricing work, what are

13    the actual prices, what are the but-for prices.

14            And in this case, given the allegations about

15    potential foreclosure, about rebating policies, about

16    two-packs and what the prices would be in the actual

17    but-for world, understanding certain realities about the

18    pharmaceutical industry will critically inform the

19    analyses and in some respects are actually going to

20    render or point out reasons why methodologies are or

21    aren't reliable.

22        Q.  So in this chart, Dr. Johnson, I believe the

23    green boxes are supposed to designate the plaintiffs; is

24    that right?

25        A.  Yes.  The green boxes in this chart are the

1    putative class members.

2        Q.   And your chart is a little bit different with

3    respect to how it designates the TPPs from the chart we

4    looked at earlier today presented by Professor

5    Rosenthal; is that right?

6        A.   Yes.   This is -- a little blurry -- but this is

7    Professor Rosenthal's chart from earlier today.   And

8    we're trying to depict something similar, but there's a

9    certain level of nuance or detail.   I think we're kind

10   of at different levels, particularly with the

11   third-party payors which is Professor Rosenthal's chart,

12   this green box here.

13       But if you go to my slide, this is actually a

14   little bit more of a detailed breakdown of who's within

15   the group of third-party payors.   And that's going to be

16   critically important for thinking about the class

17   issues.

18       Q.   So Professor Rosenthal lumps together in one box

19   the commercial health plans, the self-insured plan

20   sponsors and the fully-insured plan sponsors; is that

21   right?

22       A.   Yes.   All three of those categories are

23   third-party payors.   I don't mean to imply that they're

24   -- the class definition, as I understand it, excludes

25   fully-insured plan sponsors, but they would be

1   third-party payors in a traditional sense.  And it

2   includes self-insured plan sponsors and the commercial

3   health plans that essentially have the liability or bear

4   the risk for the fully-insured plans.

5       Q.  Is it appropriate when talking about the industry

6   to lump together the commercial health plans like Cigna,

7   for example, and self-insured plan sponsors like

8   Local 282 in your example?

9       A.  No.  I think there's meaningful differences both

10  in terms of how they -- how -- the role they play and

11  particularly the pricing issues that could be very

12  important for this case in particular.

13          The self-insured plan sponsors, and in this case

14  that is who the named plaintiff is, Local 282, is a

15  large group of union that has -- is self-insuring all of

16  their members.  They have a large enough group of people

17  they can bear the risk.

18          Their relationship with a health insurance plan

19  is simply for administrative purposes but they actually

20  pay for -- that's any large employer that self-insures,

21  they're paying for all the risk.

22          The commercial health insurers are obviously

23  large companies, the Aetnas of the world, Humanas of the

24  world.  They are insurance companies that are actually

25  underwriting the insurance, bearing the risk for

1   fully-insured plans, but they're also -- and this is

2   particularly important here -- many of them also

3   function as PBMs where they actually do the role of

4   pharmacy benefit manager for themselves.

5        Now, particularly important here is the

6   self-insured plans.  And Local 282 as a named plaintiff

7   -- the testimony which I cite in my report speaks to the

8   fact that one of their arguments here is that the

9   rebating practices, the very practices of formulary

10  position in exchange for rebates that pharmacy benefit

11  managers negotiate, is actually harming them.  That's

12  their theory.

13       But the commercial health plan carriers it's not

14  as uniform.  In fact, there's testimony I cite from

15  Humana where they say, in fact, if this policy was to be

16  done away with, they would be worse off.

17       So there's a fundamental issue just from

18  starting, as you think about the allegations.  The

19  distinction between the commercial health plan carriers

20  and the self-insured plans can be very important for how

21  this class would hold together.

22  Q.  And why do these differing incentives between

23  health plans and self-insured plan sponsors matter for

24  class certification?

25  A.  Well, because again at the end of the day what

1    we're going to have to focus on is if we're thinking

2    about classwide models, classwide approaches, can they

3    -- can all of their actual but-for pricing -- can the

4    way they operate, can that all be in one class?  Is that

5    cohesive in a way that their economic incentives are

6    aligned?

7        Q.   We also talked a little bit earlier about PBMs

8    and how they're involved in pricing.  And just to make

9    sure that I understand, PBMs first will negotiate with

10   pharmaceutical manufacturers for rebates and formulary

11   placement; is that right?

12       A.   Yes.  So PBMs -- and we've heard a lot of --

13   pharmaceutical benefits managers, they're kind of these

14   in some respects middlemen.  And so they have a unique

15   role in the pharmaceutical industry where they negotiate

16   with the manufacturers.  And basically that's negotiated

17   rebates potentially in exchange for formulary placement.

18   So that's the first thing they negotiate, rebates with

19   the manufacturers.

20       Q.   And then the second thing they would negotiate is

21   price with the pharmacy for how much they'd reimburse

22   for a particular EpiPen device, for example?

23       A.   Yes.  So then the second negotiation we can think

24   about is how much are you going to reimburse the

25   pharmacy for the EpiPens in exchange for network

1    participation.  The idea is you want as many consumers

2    as possible grouped together, that gives you bargaining

3    power as a pharmaceutical benefits manager.

4        Q.  And so the price that's ultimately paid by the

5    TPPs in those green boxes, the commercial health plans,

6    the self-insured plan sponsors, that's dependent on

7    those negotiations that the PBMs have with the

8    manufacturers as well as the pharmacies?

9        A.  Yes, as well as other negotiations they have

10   directly then with the PBMs themselves.

11       Q.  So let's turn to EPPs.  How are prices for EPPs,

12   the insured consumers and cash payors, determined?

13       A.  The insured consumer is down here.  Insured

14   consumers are going to basically have prescription

15   health insurance.  They insured consumers pay

16   co-payments, they pay deductibles, sometimes

17   co-insurance.  How much they pay is a function of their

18   health insurance plan.

19            And also another overarching issue here is there

20   are also, for EpiPens, coupons which lower the co-pay

21   for certain insured end payors.

22            The cash payors, as I said, are the people who do

23   not have prescription health insurance.  Think of them

24   going into a pharmacy to get a prescription filled and

25   they're going to pay a cash price.  There isn't any

 1  single cash price across all pharmacies, they're going

 2  to pay a cash price.

 3      One thing that does affect the cash payors' price

 4  is the patient assistance programs which are aimed at

 5  lower-income individuals in terms of that comes directly

 6  from the manufacturers.

 7  Q.  We've heard a discussion earlier today about

 8  wholesale acquisition cost or WAC.  And also average

 9  wholesale price or AWP.  Do any of the putative class

10  members that are in those green buckets in your chart

11  actually pay the WAC or the AWP?

12  A.  It would only be by mere chance occurrence, no.

13      Third-party payors don't pay WAC.  Third-party

14  payors pay prices that are a negotiated function of that

15  negotiation between the manufacturer and the PBM, the

16  PBM and the pharmacy, the pharmacy, the PBM and the

17  insurance company, the insurance company and the plan.

18  So no, no one pays WAC.

19      Average wholesale price is also -- that's not

20  something people generally pay.  That is, as

21  Dr. Rosenthal described it, it is a price upstream.

22  That is not a price that the class members pay.

23      And so neither the WAC nor the retail prices --

24  and the IQVIA data reflect negotiated rebates or

25  discounts.  And yet the entire pricing supply chain

1   rebates and discounts are part of a critical negotiation

2   that occur all the way up and down the chain.

3        Q.   There was a chart presented earlier today that

4   showed that prices seem to move in line with WAC.  Isn't

5   it true that when WAC goes up or average wholesale price

6   goes up, all the other prices would move in tandem;

7   isn't that right?

8        A.   No.  I think that's a bit of an

9   over-simplification.  This is a chart Dr. Rosenthal

10  presented this morning and she talked -- this afternoon

11  now.  She talked about different correlations between

12  WAC and TPP retail prices or cash prices.  And whatever

13  these statistical correlations are, the important point

14  here is these prices, particularly the TPP retail

15  prices, don't account for any of the relevant rebates

16  that occur in the case.

17       So we know that one of the fundamental concepts

18  at issue here is the rebate.  There's no end payor

19  purchases in terms of the insured consumers in this

20  chart.  So this chart doesn't represent anything about

21  what an end payor's payment was either.

22       Q.   So to be clear, this chart doesn't tell us

23  anything about how much a TPP paid or how much an EPP

24  paid?

25       A.   That is correct.

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*                    112

1      Q.   And I believe -- so let's start with rebates.   So

2   what is the effect of rebates on that line in that

3   chart?   I believe you have a slide about this.

4      A.   I think the slide is redacted.   Okay.

5            MR. BERNICK:   Your Honor, if you could take

6   a look at slide 14.   I believe it's the next slide.   For

7   those in the courtroom that have hard copies, it's slide

8   14.

9            THE COURT:   Following the flow charts?

10           MR. BERNICK:   I'm sorry?

11           THE COURT:   You said the next slide.   Are

12   you talking about in your hard copy?

13           THE WITNESS:   Slide 14, Your Honor.

14           MR. BERNICK:   Yes, slide 14, Your Honor.

15           THE WITNESS:   Looks like spaghetti.

16           THE COURT:   I'm with you now.

17   BY MR. BERNICK:

18      Q.   So, Dr. Johnson, the -- the rebates on this chart

19   vary, but do they move in line with WAC or with AWP?

20      A.   No, these rebates are all over the place.   The

21   important point is that we see two things.   We see a

22   wide variation in rebate payments which reflect

23   differences in negotiating power and we see wide

24   variation in payments across different PBMs.   In other

25   words, the amounts of rebates vary.

1          So there could be some movement with WAC or not.

2    That's not the point.  The point is that there's wide

3    variation individualized to the PBMs based entirely on

4    the negotiations.  That's the critical point.

5          Q.   So Professor Rosenthal's chart had an average

6    price up there that did not take into account rebates

7    but the pricing for any particular plaintiff in the

8    putative class could vary based on these rebates and

9    other factors?

10         A.   Yes.

11         Q.   But there's one point I want to make sure I

12   understand.  Since there's variation in rebates in the

13   actual world but also in the but-for world, wouldn't a

14   change in WAC price have sort of a uniform effect on

15   prices paid by putative class members even if there was

16   this variation you're describing?

17         A.   No.  In fact, this case is very unique in this

18   context because what we have is a series of allegations

19   about the very rebating policies that induces the

20   variation.  Professor Elhauge has a but-for world where

21   the rebates are different, for example, and the WAC is

22   different.  So in the actual world you have the WAC and

23   the rebates.  And in the but-for world you have a

24   different WAC and you have different rebates than

25   Professor Elhauge's models, for example.

1      That variation is critical to be able to assess

2  in both places.  That's the very conduct in part that's

3  being alleged in this case.

4      Q.  So, in other words, back to your chart on slide

5  14, in the but-for world these rebates could be very

6  different and the differences between PBMs could also be

7  very different?

8      A.  Yes.

9      Q.  Is the WAC price at all relevant to any of the

10  models put forward by Professor Rosenthal and Professor

11  Elhauge?

12      A.  Well, if relevant means if you look at the

13  underlying models, do they use the WAC price of the

14  model?  Professor Rosenthal does not use the WAC price

15  in any of her damages calculations, it's not an input

16  into the calculations.

17      Professor Elhauge makes an assumption about WAC

18  and rebates in his calculation.  But for the two-pack,

19  the allegations are not about an elevation in WAC.  In

20  fact, kind of her approach that was put forward was

21  about a change in the number of pens.

22      For the generic entry, the damage theory is about

23  what is the difference between the price for the branded

24  and the price for the generic.  That's not about the

25  WAC.

1        For the foreclosure, Professor Elhauge said today

2   it's about what the net prices ultimately are and are

3   they higher or lower after alleged foreclosure.  So WAC

4   is not a part of any of their actual approaches despite

5   the chart we saw today.

6             MR. BERNICK:  Your Honor, I think now we'll

7   shift gears and walk through the different methodologies

8   in order.  We'll start with the two-pack allegations.

9   BY MR. BERNICK:

10   Q.  Dr. Johnson, who put forward plaintiffs' proposed

11   methodology with respect to two-pack?

12   A.  That was Professor Rosenthal.

13   Q.  And we heard a little bit about the methodology

14   earlier today.  Could you just sort of put it in your

15   own words what the proposed method is?

16   A.  So just at a high level, I don't want to be

17   repetitious but sort of try to put a fine point on it.

18   The basic idea here is that in August of 2011, Mylan is

19   alleged to no longer have sold EpiPens at singles.

20        And so Professor Rosenthal takes two quarters in

21   2011 before the discontinuation of the sale of the

22   single-pack and extrapolates that experience from those

23   two quarters forward for the next several years and said

24   that's what would have happened, the number of pens per

25   prescription if it were the case that Mylan had

1   continued to sell single EpiPens in addition to

2   two-packs.

3       Q.   And Professor Rosenthal earlier characterized

4   this analysis as an event study.  Is this a valid event

5   study in your opinion?

6       A.   I disagree with that consideration.  Event study

7   to an economist is about stock price movements.  It's in

8   the financial literature where I've seen event studies,

9   when I've conducted event studies, I'm looking at stock

10  prices and movements in stock prices in response to an

11  event where I can control for other factors.  This is

12  not about stock prices.

13       There's no controls for other factors in this

14  analysis.  It just doesn't fit into the box of what we

15  as economists call an event study and there's also no

16  known error rate in Professor Rosenthal's approach.

17  Whereas an event study we could precisely estimate the

18  statistical effects.  That's not consistent with the

19  literature on what an event study is, at least as I

20  understand it as a professional economist.

21       Q.   Does Professor Rosenthal actually put forward a

22  method for determining common impact to the putative

23  class members?

24       A.   No.  Again, I think this is -- we have a clip or

25  I think -- again, clear about what the nature of

```
1   Professor Rosenthal's assignment was.
2              (Played video deposition clip.)
3   BY MR. BERNICK:
4      Q.  So, Dr. Johnson, what is the significance of this
5   testimony to you?
6      A.  So if we go back to the issue of common impact,
7   the methodology has to be able to accommodate whether or
8   not putative class members were harmed by the conduct.
9   Professor Rosenthal and I agree that anyone who would
10  have bought a two-pack in the actual world and the
11  but-for world, the discontinuation of the single had no
12  effect for them.  They're not harmed by this conduct but
13  they're in this class.  And Professor Rosenthal doesn't
14  have a methodology to identify any of them.  So that's a
15  very big flaw in the methodology.
16     Q.  So, Dr. Johnson, how do you know that they're in
17  the class?
18     A.  Well, I looked at a wide range of evidence and I
19  started with the named plaintiffs.  There is data that
20  was turned over from the named plaintiffs.  What I found
21  is 11 out of the 21 named plaintiffs that bought
22  two-pack -- that bought EpiPens in the periods never
23  bought a single EpiPen when it was available.
24          I also looked at the deposition testimony of the
25  named plaintiffs and I have three examples, and this is
```

1   going to illustrate the nature of the individualized

2   inquiry that is required to identify these people's

3   preferences.

4                    (Played video deposition clip.)

5   BY MR. BERNICK:

6   Q.   So, Dr. Johnson, have these putative class

7   members actually been harmed by the two-pack theory in

8   this case?

9   A.   No.  These are all examples of the category of

10  people that would have bought two-packs and did buy

11  them, bought two-packs when the single was available or

12  if the single was discontinued.  They're all in the

13  class, they're all in the damages calculation but we

14  can't identify them with Professor Rosenthal's

15  methodology.

16  Q.   So this -- this tells us a little bit about the

17  named plaintiffs in the case.  But what about more

18  broadly, do we have any evidence that we could consider

19  about how many people would have purchased two-packs in

20  the actual and but-for world in a more aggregate level?

21  A.   Yes.  There were several different types of

22  estimates available.  One, we can at least look at the

23  number of transactions, how many data sets over time and

24  how many people were buying two-packs only.  We find

25  that about 71 percent in 2008 were buying two-packs

1    versus 29 percent buying singles.  That number increased

2    over time leading up to 2011.

3         The 2011 number is only for the first two

4    quarters of 2011.  So we have to be a little careful not

5    to misinterpret that.

6         In addition, there is documentary evidence and I

7    think this is also redacted.  This is actually a source

8    document Dr. Rosenthal cites which has the estimate in

9    the 60 -- I don't have it in front of me.

10   Q.  For the benefit of the court, this is on slide 19

11   of the hard copy.

12   A.  This has the estimate from this particular

13   document at 62 percent of patients, 3.4 million pens.

14   So I think it's -- it's consistent and widely accepted

15   that a large portion of individuals when the single were

16   available bought the two-pack.

17   Q.  And what would you have to do to be able to

18   identify those individuals who would have purchased a

19   two-pack anyway, even if the single-pack were available?

20   A.  Well, now you're dealing with preferences by

21   individuals and their prescribing physicians and that's

22   inherently individualized.  There's no way in Professor

23   Rosenthal's methodology to identify who these people

24   are.

25   Q.  Is there any data set from a PBM or otherwise

17-md-2785    In re: EpiPen    6.11.19    *REDACTED*                    120

1    that would tell you what someone's preferences were as

2    between a single-pack and two-pack?

3         A.    No.

4         Q.    So that covers I think the first category of

5    uninjured class members with respect to the two

6    allegations.  Is there a second category of uninjured

7    class members?

8         A.    There is, yes.  There is also evidence about

9    co-pays and how co-pays change when the single was

10   discontinued.  And this comes from the insurance

11   companies.  And there's information that indicates that

12   the co-pay that an insured consumer paid when they

13   shifted from -- when the single was no longer available

14   did not change.  In other words, if you bought single

15   EpiPen, you paid the exact same co-pay as for your two

16   EpiPens.  So that's another set of uninjured class

17   members.

18        And there's also no way for the methodology to

19   identify them.

20        The documentary evidence suggests this is a

21   fairly large number of insured end payors, it could be

22   over 70 percent based on the documents.  And the

23   third-party payor class members also offered testimony

24   there was no financial consequence of the change from or

25   the discontinuation of the single EpiPen for them as

1   well.

2        So for all the different types of class members,

3   we see evidence that this may not have had -- been a

4   meaningful change.  In any event, the methodology can't

5   identify any of these sets of uninjured class members.

6        Q.  So I want to make sure I'm clear.  Has Professor

7   Rosenthal put forward any methodology to identify this

8   over 70 percent of plaintiffs who are not injured?

9        A.  No.  In fact, today what Professor Rosenthal

10   testified is she said that -- she accounts for these

11   types of things in the pricing sort of roughly.  And so

12   that's not what I'm talking about.

13        It's not the idea that the way she derives

14   whatever her estimate is at half a price per pen isn't

15   based on some set of people that bought two pens or one.

16   It's about who are the uninjured class members.  The

17   class is defined as individuals who bought EpiPens.

18        And so right now Professor Rosenthal's damage

19   approach will give damages to all of these sets of

20   individuals who would not have bought a two-pack --

21   would have still bought a two-pack even when the single

22   is discontinued and when their co-pay hadn't changed.

23        Q.  Is Professor Rosenthal's expert opinion the sole

24   basis for plaintiffs' theory of impact and injury with

25   respect to the two-pack allegations?

1        A.   It's the sole basis at least from the economic

2   testimony, yes.

3        Q.   In your opinion, does Professor Rosenthal present

4   a reliable methodology for showing classwide impact?

5        A.   No, because of the failure to identify the

6   uninjured class members.   No, the methodology can't work

7   as a classwide method.

8              MR. BERNICK:   Your Honor, I would like to

9   shift gears and talk about the generic delay theory of

10  harm.

11  BY MR. BERNICK:

12       Q.   Dr. Johnson, and again just to keep it brief, but

13  I want to make sure we understand how plaintiffs'

14  experts attempt to measure classwide damages related to

15  the generic delay allegations.

16       A.   So the starting point is Professor Elhauge who

17  provided the model that determined the hypothetical or

18  illustrative date that entry would have occurred without

19  settlement, that's what Professor Elhauge's presentation

20  or part of his presentation was.

21            That date is critical input into Professor

22  Rosenthal's damages or aggregate damages method.   And,

23  in essence, what the aggregate damages method is doing

24  is it's trying to say there's some difference between --

25  from when a generic would have entered, there's a shift

1    from the branded to the generic, some shift, and there's

2    a price difference.   And that's basically what makes up

3    the aggregate damages.

4        Q.   So let's start with Professor Elhauge's analysis.

5    Does he actually calculate a date that Teva would have

6    entered but-for an alleged reverse-payment?

7        A.   No, I think he was very clear.   He was

8    illustrative.   This is just an illustration of an

9    approach.   I don't think there's been any testimony

10   about an actual date that I've seen.

11       Q.   And so the illustrative date that he calculates

12   is based on a series of assumptions.   We heard

13   Dr. Elhauge walk through those today; is that right?

14       A.   Yes.

15       Q.   And if you change those assumptions, it could

16   change the results of a model.   In fact, it could also

17   result in a date where the model predicts no delayed

18   entry at all; is that right?

19       A.   That's correct.   I mean, Professor Elhauge put up

20   some sensitivities, but there's assumptions and ranges

21   from Professor Torrance, in fact, that were not on his

22   chart that would give no settlement date at all or give

23   a settlement date that actually coincides with the

24   actual settlement dates.

25            And so a range of assumptions, as you change the

1    amount of the reverse-payment, as you change the patent

2    strength, you get very different results out of

3    Professor Elhauge's model.

4        Q.   I believe you have a slide that depicts some of

5    this?

6        A.   This is just a sensitivity I put in my report

7    that just showed a few things.  As you change the

8    reverse-payments over here, these amounts, and as you

9    change the patent strengths over here, you get different

10   dates.  So you can see some things are a little

11   peculiar.  Swinging the reverse-payment out by hundreds

12   of millions of dollars only moves the date by two or

13   three days.  That's a red flag something seems odd about

14   that.

15        There are patent strengths that are -- all of

16   these patent strengths -- Professor Torrance I believe

17   testified these are all equally likely outcomes,

18   anything between zero and 30.  One of the simple

19   identifying assumptions Professor Elhauge made, he

20   picked a midpoint of 15 percent.  There are certain

21   dates -- anything above 26 percent in fact, which

22   happens to be the cutoff on the slide he presented,

23   would give you June 22nd, 2015.  The actual date.

24        So the point is the model has a lot of built-in

25   assumptions.  But based on how it's calibrated and

1    sensitivity, you could get a very wide range of dates

2    and you could also generate dates or generate situations

3    where there's no settlement at all.  That's all the

4    dashes.

5        Q.   By the dash, that's a situation where Professor

6    Elhauge's model is not capable of generating an entry

7    date?

8        A.   Yes.  Professor Elhauge assumed that there would

9    have been a settlement and it would have been under any

10   circumstance, so therefore he just rules those out.  But

11   the model strictly applied actually will have dates that

12   can't generate an outcome.

13       Q.   So let's again take a step back.  Why is this

14   relevant to class cert?  There's a methodology out there

15   that relies on some assumptions.  But what implications

16   does this actually have on the class certification

17   inquiry?

18       A.   So the important implications of the generic

19   entry date is going to be that it's the critical input

20   into Professor Rosenthal's model.  Changing the date is

21   going to have some significant implications.  One is

22   it's going to change sets of injured or uninjured

23   transactions and potentially class members.

24            Second is it's going to change where and how the

25   other allegations that have dates that predate any

1    generic entry, since we've got dates as early as 2011 in

2    some of these classes, how does that change the class in

3    terms of the dynamics, in terms of who's getting

4    damages, who's in or out.

5         And it's also going to have implications for

6    who's injured in the class.  Because every time you

7    change the date, that will push forward the rate of

8    generic substitution, change the pricing ratio.

9    Everything changes in both directions.

10        So this date is a critical input.  And when it

11   changes, it actually does change the results,

12   particularly with respect to who's potentially injured

13   by the conduct.

14   Q.   And under some set of assumptions, just to be

15   clear, there's no injury at all?

16   A.   Yes.

17   Q.   Let's shift gears.  I want to focus on some

18   categories of potentially uninjured class members, some

19   of which we talked about earlier today.  First of all,

20   brand loyalists.  And I want to focus now on Professor

21   Rosenthal's model.  Does she actually claim that all

22   consumers would have purchased a generic device if one

23   were available?

24   A.   No.  I think she was very clear there are certain

25   people that are brand loyal.  I think the question is

1    about how many and how is that determined.  But, no,

2    brand loyalists are people that even if a generic

3    entered, they would continue to buy the branded product.

4    So they have their EpiPen, they're going to continue to

5    buy the Mylan branded EpiPen even with a generic

6    entrance.

7        Q.  Let's be clear about available data because

8    Professor Rosenthal testified that additional data might

9    make it easier to account for these uninjured class

10   members.  Is there any set of data that you can point to

11   that would allow you to determine whether or not someone

12   was loyal to a brand or not?

13       A.  I've not seen any data that would allow you to

14   get into preferences of the consumers and the

15   prescribing practices, no.

16       Q.  And I want to also be clear about what we're

17   talking about by brand loyalists.  We're talking about

18   someone who would be reluctant to shift from a branded

19   EpiPen to a generic EpiPen; right?

20       A.  Yes.  And the brand loyalists we're talking about

21   in the generic entry part is someone who have a branded

22   EpiPen, the generic becomes available.  But because of

23   -- for whatever particular reason, my preference is for

24   the product, my comfort level with the product, I don't

25   buy the generic, I don't want the generic.  I'm going to

1    stick with the branded one.

2      Q.   So we're not talking about someone who would be

3    reluctant to shift from one branded product to another

4    branded EpiPen auto-injector?

5      A.   No, that's something completely different.

6      Q.   Okay.  Why is it important Professor Rosenthal

7    put forward a methodology that could identify brand

8    loyalists?

9      A.   Once again, I think this comes back to a sort of

10   disconnect between Professor Rosenthal's assignment and

11   mine.  Professor Rosenthal is dealing with aggregate

12   damages.  I was asked to assess class certification with

13   respect to both common impact and damages.

14        So to identify uninjured class members -- if you

15   are brand loyal, you cannot be harmed and there is no

16   theory of damages in this case about harm to brand

17   loyalists.  So those are uninjured class members.

18        So the ability to identify them, the ability to

19   know who they are, that's going to be a critical part to

20   whether you have common impact across the class.

21     Q.   Professor Rosenthal does try to take into account

22   the percentage of customers that in the aggregate would

23   shift to the generic EpiPen.  Why is that not

24   sufficient?

25     A.   Well, the aggregate -- this is again back to I

1    think the disconnect.  The aggregate analysis, there's

2    some issues with the percentages.  But before we get to

3    that, just seeing the aggregate, some number of people

4    wouldn't switch, is not enough to identify who they are.

5         Even under the fairly aggressive forecasts that

6    Professor Rosenthal uses, and I will explain why I think

7    they're particularly not the right forecast for this

8    purpose, you still have 5 percent brand loyalists which

9    represents a pretty large number of end payors in a case

10   like this.

11        So -- but most important, it comes back to the

12   impact question.  How do you identify the individuals?

13   Because they're -- right now the way this is structured,

14   they will get damages under Professor Rosenthal's

15   aggregate methodology even though they're not harmed.

16        Q.  And so the 5 percent number that she comes up

17   with, that could still result potentially in thousands

18   of uninjured plaintiffs; is that right?

19        A.  Yes.  Even if I took Professor Rosenthal's

20   analysis exactly a hundred percent as given, we agree on

21   every assumption, I accept it as it is, there is still

22   uninjured class members that are unidentified even with

23   a 5 percent brand loyalist level.

24        Q.  So let's talk about the brand loyalist percentage

25   that Professor Rosenthal assumes.  Do you agree with her

1   that the percentage of consumers who would switch to

2   generic EpiPen is 95 percent?

3       A.   No.

4       Q.   What type of evidence have you looked at to

5   evaluate the portion of the putative class that might be

6   brand loyalists?

7       A.   I looked at a number of different types of

8   evidence.  One thing I did, I looked at deposition

9   testimony of named plaintiffs.  Here's Ms. Wagner.  You

10  have to start this.

11          (Played video deposition clip.)

12  BY MR. BERNICK:

13      Q.   What's the significance of this testimony to you,

14  Dr. Johnson?

15      A.   This is just one example of a named plaintiff,

16  someone who is supposed to be representative of the

17  class who says they wouldn't switch.  Here's -- this is

18  the face of a brand loyalist.  So how does the method

19  account for a brand loyalist?

20          Now, there are other brand loyalists.  And I

21  actually looked at the named plaintiff data and at the

22  time when the authorized generic entered, there were

23  still eight of 17 or nine of 17, I have the number in my

24  report, who only bought the brand.  So that's an

25  indication of brand loyalty.

1        I also looked and found in the IQVIA data sets of

2   third-party payor plans, about 10 percent, where they

3   never filled a branded prescription after the generic

4   was available.

5        Another piece of evidence I look at was

6   Local 282.  Local 282, when the generic -- they are

7   again the TPP named class representative.  75 percent of

8   their transactions were not filled with -- were brand

9   loyalists.

10       So the notion and the phenomenon of brand loyalty

11  is real.  You can see it.  And the methodology has to

12  not just accommodate it as an input into the model, it

13  has to accommodate it to determine who the uninjured

14  class members potentially are.

15  Q.   That analysis that you just referred to, that was

16  considering the experience of the EpiPen authorized

17  generic; is that right?

18  A.   Yes.

19  Q.   Is it appropriate to consider the authorized

20  generic when evaluating brand loyalty versus generic

21  substitution?

22  A.   I think it's appropriate for the purposes of

23  illustrating that there are brand loyalists.  Professor

24  Rosenthal talked about the AG at least and why she chose

25  to use it or not.  But I think that we both agree that

1    Professor Rosenthal did use the authorized generic

2    experience pricing in her analysis.  So we both are

3    trying to make use of it in different ways to see what

4    can be gleaned from it.

5         I think it is useful in this purpose, which is

6    simply to demonstrate that there are potentially

7    uninjured class members from this concept.  And without

8    a method to identifying them, that is going to be a

9    significant issue and it means there is a failure to

10   identify common impact for the class.

11   Q.   You mentioned your conclusion, again based on the

12   experience of the authorized generic, that 10 percent of

13   TPPs were uninjured.  Professor Rosenthal has suggested

14   that she disagrees with that analysis.

15        Is she right?

16   A.   I don't think she is.  I did read that in her

17   rebuttal report.  Let's just start with a little bit of

18   level setting.

19        In my initial report when I cited that number, I

20   actually pointed out that there are in the IQVIA data,

21   which is the data we're all relying upon, there's about

22   8,000 plans in that data in the world.  In the U.S.

23   there's about 2.2 million plans, all right.  So if we're

24   -- if we took Professor Rosenthal as right, 5 percent,

25   or I'm right, 10 percent, that's still an enormous

1    number of third-party plans in the universe of plans.

2         The other is -- relates to the differences in our

3    flow charts.  Professor Rosenthal treats all TPPs the

4    same and uses it and she's aggregating what is already

5    aggregate data when she recalculates by a percentage of

6    5 percent.  That's misleading.  Again, I'm not saying

7    she's intentionally doing it.  I'm saying we have a

8    difference of opinion clearly on how that data can be

9    used.  But what it does is it ignores differences

10   between fully-insured plans, self-insured plans and

11   commercial health insurers.  So the 5 percent number is

12   not correct.

13   Q.   So just to walk through that, could you, for

14   example, have a self-insured plan, Hogan Lovells big law

15   firm, and that would be rolled up into the level of the

16   health insurance company with which it contracted so you

17   wouldn't be separately identifying whether that

18   self-insured customer has been harmed; is that right?

19   A.   Exactly right.

20   Q.   Professor Rosenthal also earlier today discussed

21   literature on the percentage of consumers who would

22   switch to generic as being consistent with her

23   95 percent number.  I believe we have the chart up here.

24   How does her proposed 95 percent generic switch rate

25   compare to these brand erosion rates?

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*          134

1      A.   So I think there's two points that are important.

2   Her assumed forecast is the most aggressive of the

3   forecasts that are available and will place -- and even

4   in this, which is supposed to represent the current

5   range of academic literature, her forecast will be below

6   something like this, down here, well below anything in

7   the academic literature she cited.

8           Now, I'm not saying that when a generic product

9   enters there isn't substitution.   There is substitution

10  from the brand.   Everybody knows that.   The question

11  here, though, is in this context what would that look

12  like and what is the consequence for who's injured or

13  not by the conduct.

14          The more aggressive the assumption, the greater

15  the number of injured class members.   So this assumption

16  is critical to the entire assessment and the damages

17  approach.

18     Q.   So let's talk about the assumption regarding the

19  forecast that she used.   Earlier today we talked -- we

20  heard about how she relies upon Mylan 1, one of the

21  Mylan forecasts.   Do you believe that's a reliable

22  measure of generic substitution?

23     A.   I don't.   And I saw my chart today, which I

24  appreciated.   And so what we agree with is that this

25  line up here is Mylan 1 to this point.   Okay.

17-md-2785    In re: EpiPen    6.11.19  *REDACTED*        135

1   Thereafter this is an extrapolation that Professor

2   Rosenthal has made.

3       Now, this means this is the most aggressive of

4   the three scenarios in the Mylan document that she

5   cites.

6       Mylan 1 is derived from an oral solid.  Think

7   about it as Mylan is trying to forecast different

8   potential -- what would happen when a generic enters.

9   And one of the analogs they make use of is oral solids.

10  It's a pill that you would take every day, what would

11  that be?

12      The EpiPen is an injectable.  Mylan 2 is based on

13  -- try to clear this so I don't make a big mess.

14      Mylan 2 is based on an injectable product.  Okay.

15  That is the second analog.

16      Mylan 3, which is this line, is based on what's

17  called a narrow therapeutic index.  Those are drugs

18  where the difference between life or death really

19  depends on how you inject it or how you use it, okay.

20      Professor Rosenthal put up a slide -- sorry.  Put

21  up a slide which has a PowerPoint presentation which has

22  Mylan 1.  And we saw a box.  It said Mylan 1 is the

23  standard generic curve.

24      But the very next page of the presentation talks

25  about Mylan 2 is an injectable and then every forecast

1   thereafter relies on Mylan 2 and Mylan 3.  So the choice

2   of the most aggressive forecast I think is not supported

3   by the way these forecasts were put forward.

4        And it's important because every time you change

5   this substitution rate, it changes the number of brand

6   loyalists, it changes the damages, it changes who's

7   impacted, it changes the entire picture of the class

8   methodology.

9        Now, there's another set of forecasts Professor

10  Rosenthal didn't consider which were done later in time

11  in 2013, '14, and '15 in the strategic plans.  And those

12  are the ones down here, and all of these have even lower

13  generic substitution rates.

14       So this isn't just quibbling -- two economists

15  quibbling about which forecast.  The important point for

16  me is what are the implications for common impact and

17  formulaic damages.  Using the most aggressive forecast

18  necessarily creates the highest number of injured class

19  members.

20       Since brand loyalty is going to be so critical,

21  even if she used one of these other forecasts, that

22  would have changed the picture entirely with respect to

23  who's injured and who's not by the generic delay.

24  Q.  So let's put a fine point on it.  Why is that

25  relevant to class certification whether you have

1    5 percent brand loyalists, 10 percent, 15 percent, why

2    is that relevant to the class certification analysis?

3        A.   Well, it's the same issue with uninjured class

4    members.   Methodology can't accommodate uninjured class

5    members.   If there's a large percentage of brand

6    loyalists, that means they are unharmed, the method

7    can't separate them.   How do you have common impact in

8    that context?

9            MR. BERNICK:   Your Honor, this is one bucket

10   of potentially uninjured class members with respect to

11   generic delay allegations.   We would like to talk about

12   a few more.

13   BY MR. BERNICK:

14       Q.   In addition to brand loyalists, Dr. Johnson, what

15   other categories of uninjured putative class members are

16   there?

17       A.   The other would include those who would have a

18   co-pay that would have been higher for the generic than

19   for the branded, those who would have used a coupon and

20   either lowered the co-pay to zero or below the generic,

21   and those who bought after the entry date -- before the

22   entry date.

23       Q.   Let's start with the first example, the insured

24   consumers with co-pays below or but-for co-pays.   What

25   did your analysis reveal about those putative class

1    members?

2    A.   As you remember Professor Rosenthal put up a

3    chart of actual prices and but-for prices.  You can use

4    her model to derive what the aggregate of these prices

5    are, and that's going to drive all of comparisons.  One

6    of the points of disagreement that we have is those

7    but-for and actual prices actually have meaning to us as

8    economists; right?

9         In her deposition, Professor Rosenthal testified

10   that that but-for price, that single average price that

11   comes out, the average co-pay would be a good estimate

12   of what the prices were for any given individual.

13        So I put that to the test.  And I just looked at,

14   well, what does her model tell me in terms of here's

15   what she derives at the co-pay price in the generic

16   world and here's what we know the branded co-pays are,

17   who's above or below them.  And I find a significant

18   number where the branded co-pay would ultimately be

19   below the but-for generic co-pay.

20        So what does that mean to me as an economist?

21   Well, it means either her but-for pricing is completely

22   wrong, in which case the model's unreliable, or it means

23   there's large sets of uninjured insureds that she still

24   can't identify.

25        So to be clear these are transactions.  We go

1    transaction by transaction.  But that doesn't obviate

2    the problem.  There's still no way to identify who are

3    these people and were their purchases below or above the

4    co-pay implied by her model.

5        Q.   But, Dr. Johnson, earlier today we heard

6    Dr. Rosenthal testify your critique doesn't make sense

7    because there's a distribution of co-pays.  There would

8    be a distribution of co-pays.  In the actual world of

9    distribution of co-pays and the but-for world, why isn't

10   that a way to address this issue?

11       A.   Well, that was -- I was actually a little

12   surprised to hear.  It could well be true there's a

13   distribution of co-pays.  But there's a distribution of

14   co-pays, that means you need a model that models actual

15   and but-for prices at the different points in the

16   distribution.

17            What that's literally saying is the average

18   aggregate model that relies on a single co-pay cannot

19   capture what we need to study because the argument goes:

20   There's a distribution, people at the low end of the

21   distribution pay one co-pay.  Someone at the 25th

22   percentile pays a different co-pay.  Someone in the

23   middle pays a different co-pay.  So now you need a model

24   that can accommodate that.

25            There's no analysis of distribution at all in any

1   of Professor Rosenthal's approaches.  In fact, I found

2   it a little surprising because I thought her argument

3   was:  I can calculate a single average aggregate price

4   that will apply to everyone and that's good enough.

5   Those two things don't square in my mind as a matter of

6   economics.

7        Q.  Let's move to the third category of uninjured

8   class members who use coupons to reduce their price for

9   branded EpiPen.  What does your analysis reveal?

10       A.  Well, another phenomenon that occurred at the

11  time was Mylan actually issued coupon payments that

12  could lower co-pays.  A lot of them lowered the co-pays

13  effectively to zero.  The largest share lowered them to

14  zero.  Anybody whose co-pay went to zero would not be in

15  the class.  There's no way to identify who they are.

16       Then on top of that you have got another set of

17  people, a smaller percentage, 6 percent of the

18  transactions where I see the coupon lowered the co-pay

19  below what the implied generic co-pay was from Professor

20  Rosenthal's model.

21       So this is just another illustration of sets of

22  uninjured class members that a model cannot accommodate

23  because it can't accommodate individualized issues.

24       Q.  And about what proportion of transactions were

25  impacted under this analysis?

1   A.   There's the 73 percent that have -- are out of

2   the class and the 6 percent whose transactions drop

3   below the but-for co-pay.

4   Q.   Now, Dr. Johnson, Professor Rosenthal indicated

5   that her method excludes co-pay coupon redemptions.  So

6   why doesn't that address this issue?

7   A.   So the disconnect here, it comes from -- and it's

8   the same with the rebates and the coupons, it's the

9   exact same issue.  Professor Rosenthal after she does

10  all of her calculations of her average aggregate pricing

11  takes out in aggregate at the bottom all the rebates,

12  all the coupons.  That doesn't have any -- that means

13  she's not having any consequences of rebates for actual

14  prices or but-for provisos paid.  All she's doing is

15  taking it out of the pool; right?

16       But in terms of what matters, for impact

17  particularly, is what's the level of the price those

18  people would have paid.  So taking it out at the end

19  doesn't tell me anything about changes in prices.  It

20  just says, well, on lump sum I'm going to try to remove

21  some dollar volume at the end of the day.

22       But that's not getting at all to the

23  individualized issue.  It really comes back to the

24  disconnect between an aggregate damages model versus one

25  that could actually accommodate individual impact and

1   individual issues for consumers.

2      Q.   Does taking out the coupon payments in some way

3   allow you to identify the uninjured putative class

4   members?

5      A.   No.  I don't think so.  I don't think there's a

6   way to do it.

7      Q.   Let's move to the fourth category of uninjured

8   class members that you identified, those with purchases

9   before the but-for generic entry date.  How does the

10  but-for generic entry date affect her analysis?

11     A.   This is just simply the idea that the date that

12  comes from Professor Elhauge's model has real

13  consequences for class certification.

14          First, I think the hopefully simpler point is you

15  cannot have harm from generic delay if you purchased a

16  product before the generic would have entered under any

17  circumstances.  So there's just one simple point that,

18  look, if March 13, 2014 is the generic delay date,

19  39 percent of the transactions would have to be cut out

20  of the class.

21          But there's a problem here that's a little

22  different than a typical reverse-payment case.  This

23  isn't only a reverse-payment allegation, you also have

24  allegations about two-packs and other things where the

25  dates of these damages periods goes all the way back to

1    2011.  They go earlier.

2         Now you have a situation where you got sets of

3    uninjured class members from this method and how do you

4    rectify those with the other methodologies.  So it's a

5    little bit different.

6         The other issue is, it's not surprising but

7    important to keep in mind, as you move that date forward

8    you will get even larger sets of uninjured class members

9    given the way the class has been defined.

10        And then because the entire starting point for

11   Professor Rosenthal's methods, which is an erosion

12   curve, substitution, that begins on the date that it

13   comes out of the model.  So if June 22nd, 2015 is the

14   date, now you have even more uninjured class members

15   because you're starting later in the class.

16        So it creates a series of complexities that are

17   really based on the unique nature of this case.  The

18   simple point, well, of course if the date's later, you

19   take out everything before.  The harder point, what are

20   the consequences when you have other courses of conduct

21   and it has consequences for everyone thereafter?

22   Q.   But, Dr. Johnson, why can't we just take this

23   39 percent of unimpacted transactions and just exclude

24   them from the class?

25   A.   We did, first of all, because there's other

1   courses of conduct in the damages period that actually

2   span all the way back to 2011.  So depending on which

3   class, generic entry is in every one of the classes.

4   How do you disentangle that issue?

5       Also, as I said, it's not just excluding before,

6   it's what's the consequence?  The consequence is when

7   the switching occurs, how many people are brand loyal,

8   what the price erosion is, how many customers are

9   uninjured.  All of those things change every time you

10  move the date further into the future.  That's going to

11  mean different sets of uninjured class members.

12      So it comes back to the same fundamental failure.

13  The methodology can't accommodate common impact, can't

14  actually tell us who's injured or not.

15  Q.   So taking a step back.  We talked about four

16  categories of potentially uninjured putative class

17  members with respect to generic delay allegations.  What

18  is the significance, Dr. Johnson, of those categories

19  for the class certification inquiry?

20  A.   To the extent that the methods cannot accommodate

21  them, they cannot identify who these uninjured class

22  members are, that renders it incapable of demonstrating

23  common impact, which is impossible for class

24  certification.

25  Q.   Is Professor Rosenthal's expert opinion the sole

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*                    145

1    basis of plaintiffs' theory of impact of damages and

2    with respect to the generic delay allegations?

3        A.   My understanding is yes.   Professor Rosenthal

4    does put in the date.   I believe Professor Rosenthal is

5    the sole basis for damages.   And then there is the new

6    impact analysis but the initial report was just

7    aggregate damages.

8        Q.   In your opinion has Professor Rosenthal presented

9    a reliable methodology for showing classwide impact

10   damages?

11       A.   No.

12       Q.   We heard a discussion earlier today about a

13   probability analysis.   Have you reviewed Professor

14   Rosenthal's probability analysis which she used in her

15   report?

16       A.   I have.

17       Q.   Have you seen any probability analysis like that

18   ever used before to show classwide impact?

19       A.   I have never seen probability analysis used for

20   class certification to demonstrate common impact.

21   Impact is not probabilistic.   Impact is binary.   You're

22   harmed or you're not harmed.   I testified in a lot of

23   cases on class actions.   It's always about actual

24   injured class members, not a probability that some class

25   member is injured or uninjured.

1     Q.  With respect to generic delay, does her

2  probability analysis affect your conclusions regarding

3  whether the third-party payors were impacted or injured?

4     A.  No, because it can't accommodate.  I mean, we

5  have a situation where we actually have real evidence of

6  uninjured people.  We have 10 percent of the TPPs in the

7  IQVIA data who would have been uninjured because they

8  would have been brand loyal plans.  The probability

9  analysis can't address that.

10       She said if there's three customers, that means

11  it's .001 percent are impacted.  I identified 10 percent

12  of the plans that are potentially unimpacted.  When you

13  have real-world evidence and real-world people,

14  probability is just a statistical analysis but it

15  doesn't tell us anything about the relevant question of

16  impact.

17     Q.  And Professor Rosenthal also used this

18  probability analysis with respect to the two-pack theory

19  that we talked about previously; is that right?

20     A.  Yes.

21     Q.  Does that probability analysis change your

22  conclusions with respect to the two-pack theory of harm?

23     A.  No.  It's the exact same problem.  We showed the

24  videos of the actual people that are uninjured.  Her

25  probability analysis is trying to assign probability to

1   the people.  That's not common impact.  Common impact is

2   binary.  You're harmed or you're not.  And it doesn't

3   solve the issue of who these uninjured class members

4   are.

5      Q.   And I guess to wrap this up with respect to

6   generic delay, is there any set of data that you have

7   seen or that's been requested in this case that would

8   allow you to identify these particular individuals who

9   are uninjured in these four buckets?

10     A.   No.

11         MR. BERNICK:  Your Honor, next I would like

12  to shift to the Auvi-Q foreclosure theory of harm.

13  BY MR. BERNICK:

14     Q.   Dr. Johnson, we heard Professor Elhauge testify

15  about damages related to Auvi-Q foreclosure.  How has he

16  proposed to assess injury related to the foreclosure

17  allegations in this case?

18     A.   Okay.  So there's -- the way I think of it, and I

19  think this echoes what Professor Elhauge testified,

20  there are sort of two steps.  The first step has to do

21  with trying to find a relationship between formulary

22  restrictions and Auvi-Q's market share.  And that is

23  what Professor Elhauge uses or calls regression

24  analysis.

25         The second step is try to relate the market share

1    of Auvi-Q to EpiPen price changes.  And so those two

2    pieces together are what make up his Auvi-Q foreclosure

3    methodology.

4        Q.  You mentioned a phrase there, "regression."  I

5    want to make sure we're on the same page.  What do you

6    mean by a regression analysis?

7        A.  So regression analysis is an econometric

8    technique and what it does is it allows -- it's a way we

9    answer questions statistically.  You know, what are the

10   -- how are the sales of Coca-Cola affected by

11   advertising expenditures.  Economists want to ask

12   real-world questions and figure out the data.

13       So the regression is sort of one of our work

14   horse techniques that we use to try to figure out

15   statistical relationships.  It has to be applied

16   properly and consistent with the economic science.

17       Q.  When we heard from Professor Elhauge earlier, his

18   model had a negative coefficient of 3.36 percent.  Could

19   you put in layman terms what that actually means?

20       A.  I'll do my best.  I don't think -- all right.  So

21   Professor Elhauge put up an equation -- a slide that

22   looked a little complicated.  What he's trying to

23   measure or purporting to measure is some relationship

24   between changes in the formulary restrictions, the

25   percentage of lives that are restricted because of step

1    therapies or prior authorization, does that have an

2    affect on Auvi-Q's market share.  That's essentially

3    what the model is trying to do.

4         So when he talks about a coefficient, coefficient

5    is what we call a point estimate.  What's the number

6    that comes out of the model.  So the number was

7    3.36 percent.  So let me try to put that in perspective.

8    What that number means if it was taken at face value is

9    that if we change from a world where Auvi-Q had no

10   foreclosure at all, no -- no restrictions, to a world

11   where Auvi-Q was 100 percent restricted, their market

12   share would decline by 3.36 percent.  That's what that

13   literally means.

14        Now just as an initial matter, that estimate --

15   given the nature of the allegations -- that raised the

16   first red flag for me.  That doesn't seem like that

17   makes a lot of sense.  You're saying that you change

18   from zero to 100 percent restriction and the market

19   share only declines 3.36 percent.  Something didn't seem

20   right to me about the number.

21   Q.   So Professor Elhauge ran four different

22   regression models and I want to talk about the first

23   one, which we spent most of the time on this morning.

24   Do you believe his initial regression analysis is

25   reliable?

1      A.   No.

2      Q.   Why not?

3      A.   So there were several reasons why the regression

4    analysis is not reliable.  There are well-accepted

5    scientific principles that we apply as professional

6    econometricians when we do models.  Professor Elhauge

7    has violated those privileges.  His methodology yields

8    somewhat nonsensical results and also suffers from

9    fundamental technical flaws, which means it can't be

10   used to meaningfully estimate anything here.

11         So the first bucket is about the underlying

12   assumptions with respect to PBMs.  And the second bucket

13   has to do with the notions, a little more technical, of

14   statistical significance.  How do we determine whether a

15   model can tell us something is different than random

16   chance occurrence?

17     Q.   So let's focus on the first one of those buckets.

18   Did you conduct an analysis of what the results of his

19   regression predicted for individual PBMs?

20     A.   So Professor Elhauge talked about he has a

21   market-wide theory and that his market-wide theory is

22   such that there should be a uniform effect of PBMs on

23   the foreclosure such that that's what determines

24   Auvi-Q's market share.  Okay.  That's a theory and

25   that's an assumption that he made.  And the power of

1   statistics is we can put the assumptions to the test.

2        So I ran the statistical test.  I went in and

3   looked at the PBM data and I actually ran the test to

4   say his single average coefficient is minus

5   3.36 percent.  Textbook econometrics, Chapter 2, there's

6   something called the Chow test.  We'll get into it if --

7   but something we test to see if these things vary.

8   Turns out Professor Elhauge's effect is rejected by the

9   data.

10        I said that's kind of curious given his theory, I

11   should look deeper and see what's going on, and I did

12   look deeper.  I looked at the data, and I looked at what

13   the coefficient implied.  I found this really neat

14   result.

15        It turns out when you go under this model, under

16   the surface of the single 3.36 percent, you see really a

17   wide variation across PBMs in terms of things, including

18   things that are positive and statistically significant,

19   negative and statistically significant, some that are

20   not significant at all.  The point is they go all over

21   the place.

22        What does that mean as an econometrician?  That

23   is a huge red flag that there's something wrong with the

24   model.  You can't get these results unless there's

25   something wrong.  And he said it doesn't square with his

1   theory and he's right about that.  But he drew the wrong

2   conclusion.  The conclusion is the model is a bad model

3   not that, oh, it means you can assume all of his

4   variation away, ignore it.  That's not what we do as

5   scientists.

6       Q.  So as an economist if you see results like this

7   where you can't identify a causal theory for the

8   results, would that lead you to accept the analysis or

9   reject it?

10       A.  Oh, it would lead you to reject the analysis.

11   You don't just overlook the flaws and say, well, I have

12   a theory and so I'm just going to keep plowing forward

13   until I keep finding results that I like.  That's not

14   the way we do the scientific analysis.

15       Q.  So Professor Elhauge conducted three additional

16   regressions.  Did those additional regressions correct

17   this issue with respect to variation across PBMs?

18       A.  No, I raised three main critiques in my initial

19   report.  One had to do with this PBM issue, one had to

20   do with the treatment of prices, and one had to do with

21   statistical significance.

22           In response, Professor Elhauge ran three new

23   regressions and those three regressions don't solve the

24   problem, they make it actually much worse.

25       Q.  And let's focus now on just these particular

1    charts, a similar analyses that you did for the next

2    three regressions.  Did the additional three regressions

3    correct this issue of variation across PBMs?  I believe

4    you have some charts to walk us through that.

5        A.    I just took the models and I ran the same test.

6    Now I found something even more stark.  Here's model 2.

7    Model 2 Professor Elhauge has removed prices.  So this

8    is a model where he's assuming that market share is not

9    affected by prices at all, and I find the same pattern.

10   In fact, what's kind of interesting is the initial

11   model, which only included the first six, almost all of

12   those results are not significant.  I see them

13   continuing to go all over the place.

14       Then I go to model 3 and I get completely

15   different results.  CVS Caremark is positive and

16   statistically significant here.  It's negative in model

17   2.  ClearScript is a giant negative significant result

18   in model 2.  It's a huge positive result in model 3.

19       When I see this kind of inconsistency under the

20   surface, again it doesn't tell me to average -- I should

21   average everything together and just ignore it, it tells

22   me there's something wrong with the model.  And that's

23   exactly what the statistical testing confirms.

24       The testing confirms that it is inappropriate to

25   combine across PBMs the single effect, therefore, the

1   entire predicate of Professor Elhauge's model is wrong.

2       Q.  And so what is the significance of that for class

3   certification if these regression analyses are

4   unreliable?

5       A.  If the regressions are unreliable there is no

6   method for foreclosure.  This is a foundational issue in

7   Professor Elhauge's methodology.

8       Q.  So I believe earlier today we heard testimony

9   from Professor Elhauge that it doesn't really matter

10  whether there's a uniform effect across PBMs or not.

11  All that matters is whether the aggregate effect

12  permitted Mylan's increased price or something to that

13  effect.  What's your response to that argument?

14      A.  Once again, he's misinterpreted how econometric

15  analyses is supposed to be used.  He has a theory that

16  he's purporting.  He finds a result that he can't even

17  support.  But he doesn't do the hard work to see what's

18  actually driving the results.

19          What this tells me is not "I should use the

20  average," what this tells me is his model is not

21  actually measuring market share changes for Auvi-Q.

22  He's missing something.  And by failing to accurately

23  explain the PBM pricing, the model is unreliable for

24  class certification purposes.

25      Q.  Is this analysis that we've just walked through

1   dependent at all on the dispute in this case about

2   statistical significance, what the appropriate level of

3   significance is, anything like that?

4      A.  No.  This critique stands alone.  Professor

5   Elhauge could be right on every other econometric

6   technique and his model is still unreliable because of

7   this result.

8      Q.  So, Dr. Johnson, I'd like to next shift gears to

9   the statistical significance issue and -- and while I

10  don't want to get too far in the weeds on one-tail,

11  two-tailed statistical significance levels, what have

12  you, I do want to make sure I walk through your analysis

13  of the statistical significance of the first regression

14  that we talked about today.

15      What did you find when you looked at his first

16  regression with respect to statistical significance?

17     A.  So let me start by trying as simply as I can to

18  just describe the statistical significance because it is

19  late in the day.  Let's see what I can do.

20      So first as econometricians and statisticians we

21  need a standard.  We don't believe that we just run

22  results and say, okay, well, here they are, the number

23  is 3.36, that's good enough.  Doesn't matter if it's a

24  real effect or not.

25      So we have a standard called statistical

1   significance.  It's been accepted by econometricians,

2   statisticians, by courts.  It's the way we determine

3   whether or not the result is a chance occurrence or we

4   actually think it represents a true statistical effect.

5        It's a pretty foundational part of any

6   statistical analysis.  When papers get published in

7   peer-reviewed journals, they are statistically

8   significance or not.  That's one of the things they look

9   at.

10        Professor Elhauge in his initial report put

11   forward a model with -- talked about two-tailed test and

12   that he said was statistically significant.

13        In my rebuttal I made the observation that he had

14   not calculated a statistical significance correctly.

15   And I think, I'm not trying to put words in his mouth, I

16   believe he agreed with me that there was this notion of

17   what's called serial correlation, some relationship in

18   the prices you have to account for.

19        When you account for that, the results are no

20   longer statistically significant in the first

21   regression.

22        What that tells me is he cannot distinguish or

23   determine any relationship between Auvi-Q's market share

24   and restricted life.  The model is not capable of

25   demonstrating that.

1          So that's what it means.

2      Q.   So, Dr. Johnson, that's the first analysis.   But

3  I believe Professor Elhauge testified today that he

4  corrected that issue with respect to what's model 4 in

5  your chart above and ended up with results that were

6  statistically significant; is that right?

7      A.   Well, he testified he corrected it.   But he also

8  changed the standard in doing so because he changed from

9  the traditional two-tailed test now to a one-tailed test

10  and he changed the level of statistical significance

11  from 5 percent to 10 percent.

12          So when -- I as an econometrician look for

13  consistency in the work that I review.   So when I see an

14  analyst who puts forward one result and changes the

15  nature of the test, changes the nature of the

16  calculation, changes what the goal posts are, that's a

17  sign to me that something's wrong with the analysis.

18          That's exactly what Professor Elhauge did here is

19  he started with one type of test in his first report and

20  he changed it over and over and over.   And even at the

21  end of the day, he still doesn't get a statistically

22  significant result.

23          And so the important point is for the purposes of

24  serving as a classwide estimate, he can't determine if

25  this relationship is due to random chance occurrence or

1   anything else.  And that doesn't fit the science of

2   econometrics.

3       Q.  Earlier today I believe we heard testimony that

4   this is really just quibbling over the difference

5   between a 5 percent and 10 percent standard for

6   statistical significance.  But that's not quite right,

7   is it?

8       A.  No, that's not right at all.  Because, in fact,

9   he can only get below his 10 percent number by changing

10  to the one-tailed test.  But for a lot of these models

11  he's not statistically significant even at the

12  10 percent level.

13      So the point is the changing of the goal posts,

14  the changing of what -- it's not how we do accepted

15  econometric practice.  That's what they teach us in

16  school is how do you think about these issues.  That's

17  what the specialized training is that we think about all

18  the time.  That's how we draw these conclusions.

19      Q.  And so models 2 and 3 on your chart here do

20  generate statistically significant results but how is

21  that?

22      A.  Well, two things changed in models 2 and 3.  He

23  added new PBM data but he also took out the prices.

24  Now, in my first report I raised an issue in a footnote

25  about the fact that economists study the relationship

1  between market shares and prices all the time.  And it's

2  complicated and we actually -- there was a whole course

3  I took on how do you think about estimating market

4  shares with prices.  It's a really complicated issue and

5  I raised the issue.

6       There was some significant -- Professor Elhauge

7  just did it in a somewhat -- I don't mean to disparage,

8  but a somewhat naïve way for the way an economist would

9  think about it.  And there's an issue that gets induced

10  in your models when you do that.

11       His comeback was -- as opposed to using the

12  techniques that we usually use, he just took prices out

13  of the regression and reran it.  Well, that's not the

14  way you solve the problem.  So, again, another example

15  of what Professor Elhauge has done and he has changed

16  the model, he's changed the data, he's changed the

17  standard to get to a result.  But that's not sound

18  scientific approaches in econometrics.

19    Q.  Why -- I want to make sure I understand,

20  Dr. Johnson.  Why isn't it appropriate to remove the

21  price variable from these regressions?

22    A.  Look, let's just go to intuition.  Changes in

23  Auvi-Q's market share have to be affected by changes in

24  EpiPen and Auvi-Q prices.  Professor Elhauge has a model

25  where he says that's not the case.  He's taken it out

1   completely.  That's not -- that doesn't make sense as a

2   matter of the economics.  So something's wrong with

3   those models.

4        This is a classic example where I've raised a

5   critique and the purported solution is worse than the

6   original problem.  That's a big issue.

7   Q.  What is the significance for the class

8   certification inquiry, this statistical significance

9   issue?

10       A.  To the extent there are no statistically

11   significant results from any reliable model, there is no

12   basis for determining common impact and clearly no basis

13   for step one of Professor Elhauge's two-step process.

14   Q.  So we sort of set up two critiques of these

15   regressions.  First of all, they predict different

16   results for different PBMs.  Second, there's a

17   statistical significance issue.

18       Wrapping this all up, what does that tell you

19   about the utility of these regressions for the class

20   certification inquiry?

21       A.  Look, I run regression analyses every day.

22   That's what I do for a living.  But you have to be

23   careful about when you refer to regression.  Can it

24   actually be used meaningfully given the data you have,

25   given the approach you put forward.

1        Professor Elhauge has put forward a model that is

2   not capturing the relationship that he thinks it is and

3   it's not reliable because it doesn't meet the accepted

4   scientific practices for how we think about these things

5   as an econometrician.  So it's not reliable for class

6   certification.

7       Q.  So but there's another step in the analysis,

8   right?  Even if the regressions were correct, they

9   wouldn't really tell you whether a class member was

10  harmed or paid a higher price; is that right?

11      A.  No, they assume a single effect of foreclosure

12  across all class members.

13      Q.  So how does Professor Elhauge then determine

14  whether or not a putative class member actually would be

15  injured or impacted?

16      A.  He just assumes it.  And then he goes to -- he

17  tries to derive a pricing analysis as the second step in

18  the approach.

19      Q.  And what is that second step in the approach?

20      A.  Okay.  So the second step is a theoretical model.

21  There are a series of assumptions that were made.  And

22  so for Step 2 what Professor Elhauge is trying to do is

23  relate changes in Auvi-Q's market share to changes in

24  EpiPen pricing.

25      Q.  And does his theoretical model account for the

1    way that PBM pricing actually works in the industry?

2       A.   No, it does not.

3       Q.   Why not?

4       A.   Well, I mean, I heard Professor Elhauge say this

5    afternoon, you know, PBMs don't buy a product, patients

6    buy products.  But that just shows a disconnect within a

7    level of understanding of how this entire process works

8    and how the prices are actually determined for the end

9    patients.

10           In fact, the very process, the PBMs, the

11   challenged conduct here is about allegedly exclusionary

12   rebate payments in exchange for positions on

13   formularies.  The way that actually works is with bid

14   grids.

15           So I have a copy of a bid grid and CVS Caremark.

16   This bid grid shows you that CVS Caremark was soliciting

17   from various respiratory anaphylactic treatment agents,

18   in this case Adrenaclick, Auvi-Q, EpiPen, EpiPen Jr, how

19   much would be paid in rebates for different tier status

20   on a formulary and for different levels of restrictions

21   on a formulary.

22      Q.   And how do the PBMs use these bid grids to try to

23   solicit higher rebates from the manufacturers?

24      A.   What PBMs do is they try to lay the threat of

25   shifting share for the different manufacturers against

1   each other.

2        I cite a fair amount of testimony in my report

3   from the PBMs where they actually talk about the fact

4   that they -- they can use the threat of taking someone

5   on or off of a formulary position to extract a larger

6   rebate.

7        So there's one example from Express Scripts where

8   they talk about a situation, and I cite this testimony

9   in my report, where there was -- potentially Express

10  Scripts was going to have Auvi-Q in an exclusive

11  position and then Mylan came up with more rebate money

12  and they put them both on the formulary side by side.

13  So that's one example.

14       There's other testimony I cite from other -- both

15  from Mylan that talks about similar situations with

16  other PBMs, such as MedImpact and Optum.  They're in my

17  report, I can't go through them all from memory.

18       The point is the threat of the shift is very

19  important to the PBMs in terms of how they extract

20  rebates.

21  Q.   And why is that different than Professor

22  Elhauge's model?

23  A.   Professor Elhauge's model is making the

24  assumption that the shift is entirely due to changes in

25  price.  So he is not accounting for any of the change in

17-md-2785    In re: EpiPen    6.11.19   *REDACTED*

1  auxiliary market share as a result of rebating

2  practices.  He's entirely assuming the only thing here

3  in the second part, in the theoretical model, is the

4  prices of EpiPen's move with Auvi-Q market share.

5      Q.   Are the prices that the PBMs negotiate actually

6  dependent on Auvi-Q's market share in the way that

7  Professor Elhauge's model assumes?

8      A.   No.

9      Q.   So we also walked through this morning a series

10  of assumptions that go into Professor Elhauge's pricing

11  model.  And I just want to talk about one of those, the

12  cross price elasticity assumption.  We don't need to

13  walk through all of these.

14      With respect to that particular cross price

15  elasticity issue, were there any problems with that

16  particular measure?

17      A.   Just as an initial matter, when someone puts

18  forth a theoretical model, the inputs matter a lot.  If

19  the inputs are wrong or demonstratively false, it's not

20  going to give you a valid result.

21      I think the cleanest example, the cross price

22  elasticity Professor Elhauge uses for his model, he

23  actually takes it from what he's supposed to be

24  measuring, what the change in monthly units would be for

25  changes in EpiPen prices.  So supposedly relating Auvi-Q

1   to EpiPen prices.

2        The document he relies upon is actually from a

3   study that was done by a group called The Analysis Group

4   where they were estimating, based on a forecast before

5   Auvi-Q entered, how would Auvi-Q prices change with

6   respect to Auvi-Q quantities.

7        So he takes a forecast document from a different

8   company for a different question and says, well, that's

9   the number I can use here because it's a duopoly model.

10  That doesn't make sense at all.  Market definition

11  includes epinephrine auto-injectors as an entire market.

12       So this is just a simple example of where even

13  one input that is so strained from the reality of what

14  it needs to measure undermines the validity of the

15  model.

16  Q.   So we talked for a while about the variety of

17  techniques for the model.  Just taking a step back,

18  what's your overall conclusion regarding Professor

19  Elhauge's Auvi-Q foreclosure analysis?

20  A.   So the foreclosure analyses are problematic

21  because each of the two prongs -- neither of them are

22  reliable.  The regression doesn't measure what it's

23  saying it measured and it's making an assumption with

24  respect to this PBM variation that is clearly

25  demonstratively false, so it can't be a valid classwide

1   method.

2        Now the theoretical model doesn't square with how

3   PBM pricing works, so that can't work.  So if even one

4   of them were wrong, there's no model.  I think they're

5   both wrong.  So this is just an unreliable methodology

6   with respect to foreclosure.

7        Q.  We heard a lot this morning, Dr. Johnson, about

8   market definition, market power.  Were you asked to

9   opine on market definition or market power in this case?

10       A.  No.

11       Q.  To what extent of the criticisms that we've

12   talked about either with respect to Professor Rosenthal

13   or Professor Elhauge's model dependent on a critique of

14   market power or market definition?

15       A.  They don't depend at all.  It does not affect my

16   analysis in any way on class certification.

17       Q.  Before I leave Professor Elhauge's analysis, I

18   want to touch on one additional regression he runs.  He

19   calls it I believe a but-for rebates regression.  Could

20   you explain to the court what Professor Elhauge did with

21   respect to that regression?

22       A.  Well, to finally calculate some type of damages

23   number, Professor Elhauge then ran one more regression

24   in his latest work and it was supposedly relating to

25   changes in the rebate payments by Mylan and Sanofi to

1    the formulary positions.  So another regression.

2         And if we think about this case, sort of the

3    allegations, the foreclosure allegations directly relate

4    to where PBMs paid more money to get better formulary

5    position.  That's the foundational issue here.

6         Professor Elhauge finds a really surprising

7    result that I was surprised he didn't speak about and I

8    was surprised he didn't seem to recognize, that he

9    doesn't find any statistically significant relationship

10   at all in his regression.  So what does that mean?

11        The foundational issue in the case for the

12   foreclosure piece, the story, his own statistical

13   analysis doesn't have a statistically significant

14   result.  He can't even identify a valid method to

15   determine that relationship.  That seems to be -- to

16   undermine the entirety of all his analyses.  And yet he

17   put that forward in his rebuttal report as sort of a

18   conservative analysis.  To me that undermines the

19   validity of the entire thing.

20   Q.  I just want to be clear on what relationship

21   you're talking about.  You're talking about the

22   relationship between Mylan payments of rebates and

23   restricted formulary position?

24   A.  Yes.

25   Q.  And this rebate is not able to measure a

1  statistically significant relationship between those two

2  things?

3      A.   Yes.  He tries to estimate how Mylan's rebate

4  payments and Sanofi's rebate payments relate to

5  formulary position, and he cannot find any statistically

6  significant effect by any standard, even the flexible

7  10 percent standard that he's put forward.

8      Q.   So there are two additional analyses that are

9  dependent on Professor Elhauge's regression analyses,

10 the deterred re-entry analysis and Professor Rosenthal's

11 unjust enrichment Auvi-Q damages methodology; is that

12 right?

13     A.   Yes.

14     Q.   Can those two methods survive even if Professor

15 Elhauge's underlying regressions are unreliable?

16     A.   No.  The deterred re-entry analysis is entirely

17 based on the regression.  I don't know how that would

18 survive.

19         And the critical input into Professor Rosenthal's

20 unjust enrichment is the estimate of the market shift,

21 how much of the share shifts.  But that creates another

22 problem for that estimate.

23     Q.   What's the other problem?

24     A.   Well, again, it comes back to aggregate damages

25 versus uninjured class members.  Given the percentages

1    that come from Professor Elhauge's approach, the

2    percentage of actual class members that would have

3    switched from Auvi-Q -- from EpiPen to Auvi-Q is less

4    than 1 percent of the third-party payors and the cash

5    payors, which means the aggregate model has got a whole

6    set of class members that are uninjured in it.

7         So, again, that's just another problem with any

8    kind of aggregate foreclosure analysis.

9         Q.   In your opinion has either Professor Elhauge or

10   Professor Rosenthal put forward a reliable method of

11   showing common impact or damages in this case?

12        A.   No.

13        Q.   And these expert opinions are the sole basis for

14   plaintiffs' theory of impact on damages with respect to

15   Auvi-Q foreclosure?

16        A.   At least with respect to economics, yes.

17        Q.   So I'd like to shift gears, Your Honor, if you

18   can bear with us, to the last category to walk through

19   today.  I know there's a lot to talk about, and that's

20   alternative RICO.

21        Dr. Johnson, what's your understanding of

22   Professor Rosenthal's alternative RICO methodology?

23        A.   Well, I thought Professor Rosenthal explained it

24   quite well.  It's literally taking a price before, you

25   know, from the period before any of the conduct occurs

1    and saying you can extrapolate that price forward on a

2    straight trend.  And that would represent what would be,

3    I believe, you know, a collective of all of the conduct

4    together in a single damages approach.

5        Q.    What flaws have you identified in Professor

6    Rosenthal's alternative RICO methodology?

7        A.    I think there's at least two.  One has to do with

8    causation and the other has to do with sort of what --

9    the consequences of the actual calculation.

10       Q.    Could you walk us through both of those?

11       A.    So I have a clip where I think you got

12   Dr. Rosenthal explaining the model because I think --

13             (Played video deposition clip.)

14   BY MR. BERNICK:

15       Q.    Dr. Johnson, did you consider that question?

16       A.    I did.  So there's sort of two things.  So first

17   if we go back to this chart there are two actual

18   opportunities to study that question.  The first was the

19   EpiPen4Schools program.  When Professor Rosenthal put it

20   in her first report, EpiPen4Schools was actually a part

21   of the case and calculated the alternative RICO damages.

22   That claim has now been dropped.  And in Professor

23   Rosenthal's new report, the alternative RICO damages for

24   the cash payors is the exact same amount.  So it's --

25   the damage number is invariant to the conduct.  That's a

1    big problem for causation.

2          Dr. Rosenthal -- let's assume the two-pack got

3    pulled out, let's do that exercise.  I looked at the

4    damages.  If I pulled the two-pack from the RICO,

5    damages go negative.  That shows the disconnect between

6    the alternative RICO, the "umbrella for everything" in

7    the alternative damages.  The damages are wrong,

8    alternative RICO is wrong, or the entire exercise is a

9    problem.

10     Q.   So, Dr. Johnson, we've been running strong here

11    for a while.  If you could again maybe wrap up,

12    summarize the high level points that we should take away

13    today with respect to plaintiffs' expert methodologies

14    and the class certification inquiry.

15     A.   Thank you for your patience, Your Honor.  So

16    three key issues I would leave you with.

17          First, none of the methodologies have actually

18    studied the common impact question in a way that gives

19    us any guidance as to whether class members are injured,

20    how do you accommodate uninjured class members.  So

21    common impact is very big failure of all of the models.

22          Second, large sets of potentially uninjured class

23    members for each of these claims and the methodologies

24    cannot accommodate them.  There's no way to identify

25    them.  And so right now in each of these models there's

1   large amounts of damages potentially going to uninjured

2   class members.  That's a big problem for the common

3   methodologies.

4        And third, this is mainly focused on Professor

5   Elhauge's approach, the statistical foundations for

6   Professor Elhauge's models are faulty.  He made

7   assumptions that are clearly rejected by the data and

8   don't square with the way the economics of the PBMs

9   works and so, therefore, they also are unreliable.

10  Thank you.

11       MR. BERNICK:  Your Honor, we don't have

12  anything further.

13       THE COURT:  All right.  Well, you've covered

14  a lot of ground and I think in light of the hour, I'm

15  going to forego any questions because I think I can

16  either figure out what my notes mean or if I decide

17  they're critical to this, I know where you guys live.

18  I'll go ahead and forego that and turn the time back to

19  the plaintiffs to close the presentations today.  Thank

20  you very much.

21       MR. BERNICK:  Thank you, Your Honor.

22       THE COURT:  Thank you.

23       MR. BURNS:  Your Honor, would it be possible

24  to have a short break?

25       THE COURT:  Yeah, it makes some sense to me.

1   I mean, we got to keep it short.  The scoreboard shows

2   about 23 minutes left.  Let's take 5 minutes.  You guys

3   call the plays you're going to call.  I'll come back

4   out.  I'll hear them.  It's kind of the lightning round

5   portion of the day.

6               (Recess.)

7               THE COURT:  So whose time is it?

8               MR. COX:  Your Honor, we're going to start

9   back with Professor Elhauge, what I think will be three

10  brief points and then we'll hand it back to Professor

11  Rosenthal.

12                      EINER ELHAUGE, J.D.,

13  Recalled as a witness on behalf of the plaintiffs,

14                    REBUTTAL EXAMINATION

15  BY MR. COX:

16     Q.  Professor Elhauge, while we're pulling up slides

17  here for our second and third topics, let's re-orient

18  back on reverse-payment methodology.

19     A.  Okay.

20     Q.  You saw a slide Dr. Johnson had on one hand -- on

21  one axis it had various patent strengths, on the other

22  axis had payments; right?

23     A.  Yes, right.

24     Q.  And there were dashes where somehow those didn't

25  work.  So my question for you is:  Are there possible

1  combinations of payment size and patent strengths that
2  would result in no delay in the allowed entry?
3     A.   Other than zero dollars, no.  What those blanks
4  are is something entirely different.  Those blanks are
5  cases where the combination of the reverse-payment
6  amount and the patent strength are inconsistent with the
7  agreement to the actual settlement.
8        So, for example, suppose you thought
9  reverse-payment was a trillion dollars.  It would always
10 be inconsistent with agreeing to the settlement.  So
11 that's all that is.  For anything that's consistent with
12 the actual settlement, any combination, any positive
13 reverse-payment causes injury.
14    Q.   Okay.  Thank you.  All right.  So let's turn back
15 to the foreclosure issue, the Auvi-Q foreclosure.  So
16 one of the -- the fundamental things that Dr. Johnson
17 says is wrong with your model is that it gives these
18 results all over the place when you look at it PBM by
19 PBM.  Again, so why is doing it that way wrong?
20    A.   Because there's no causal theory to link that to
21 the effect.  So this is similar to a problem in
22 statistics.  For example, you take a bunch of marbles,
23 you throw them up in the air, they will come down,
24 randomly come in particular areas.
25       If you use his method you would say, well, I

1    circled different areas, that means certain areas of the

2    floor magnetically attract more marbles than others.

3    That's what he's doing in PBM foreclosure.

4        Study of smoking causes cancer.  You look in

5    particular towns, you say, well, in that particular town

6    people smoked but didn't have elevated rates, therefore,

7    it must prove something about that town is preventing

8    cancer from smoking.

9        It's an entirely inappropriate method to just --

10   if you break things down randomly, you can always trade

11   spurious correlations.

12       The other problem with his method is he is

13   ignoring, as we mentioned, all differences between PBMs

14   and their foreclosure share and share.  But also he's

15   internally inconsistent in those individual PBM

16   regressions that he runs because he uses an aggregate

17   price coefficient but uses a separate foreclosure share

18   coefficient.  So he's not even internally consistent

19   with that whole methodology.

20   Q.   And then lastly, this may be where we go to the

21   slides.  I want slide 25, please.  He says you didn't

22   want to take into account rebates and, accordingly, you

23   weren't able to show or did not show common injury to

24   the class.

25   A.   Yeah.  So it's simply not true.  I don't know

1    what he's talking about.  I explicitly took into account

2    the fact they're exchanging rebates for the foreclosure

3    and the amount by which I estimated they would offer

4    increased rebates and took into account as well that

5    that would vary by particular plan.

6         Now, what I have calculated using a regression

7    was that the rebate -- the but-for -- the increase in

8    rebates from but-for levels, given the foreclosure,

9    would be 2.7 percent times whatever the foreclosure

10   share is for the relevant plan or PBM.  So that does

11   vary because their foreclosure share varies.

12        Now, he points out, which is true, that in the

13   regression that I ran to come to the 2.7 percent figure,

14   the statistical level of confidence is 85.9 percent.

15   That's not quite 90 percent.  But he does a totally

16   inappropriate thing that is incorrect under all

17   econometrics books in saying that, therefore, there is

18   no possible relationship that we can -- we know with

19   confidence that there's no effect.  That's just not

20   true.  We know what we have is an 85.9 percent

21   confidence level.  That's what it is.  It's either

22   sufficient or not sufficient.

23        The reason I use 2.7 percent, though, is it's

24   conservative from the plaintiffs' perspective because if

25   you really think there's no effect on rebates in the

1   foreclosure, then we have complete uniformity of effect.

2       So I adopted the conservative view that if you

3   thought the 85 percent level of confidence is enough,

4   you have this estimate and then you could figure out

5   just how much of rebates were -- exceeded but-for

6   rebates.

7       And if you go in a couple slides later, I also

8   show -- one more slide, please.

9       He also kept claiming that I did nothing to show

10   common impact.  That's just false.  For every share

11   impact from foreclosure that I looked at, I -- using the

12   very conservative assumption again that all the PBM

13   rebates were passed on to TPPs, I calculated the

14   percentage of TPPs that were injured in at least one

15   month during the relevant period on the assumption that

16   -- because some TPPs have higher foreclosure shares,

17   they're going to get a bigger rebate increase.

18       Even with that conservative assumption, I

19   calculated 98.4 percent of TPPs were, in fact, injured

20   in at least one month.  If you use the higher share

21   impacts, it's 92.2 to 99.9 percent.

22       And because all cash end payors don't get these

23   extra rebates, they are -- a hundred percent of them

24   were injured.

25           MR. COX:  Okay.  Thank you very much.  Hand

1    it over to Professor Rosenthal.

2            MR. LOFT:  Thank you, Your Honor.  I just

3    want to start with two questions that came actually from

4    the court earlier in our session.

5         The first had to do with the slide Professor

6    Rosenthal presented that showed market share over time

7    for the Mylan EpiPen.  And the question was whether we

8    have that data in any further granularity or backup.  We

9    do and we also have a native version of the PowerPoint

10   that allows you to put your mouse over and point and

11   actually see the backup.  If the court would like we can

12   provide that.

13           THE COURT:  That would be great.

14           MR. LOFT:  Will do, Your Honor.  Thank you.

15           MEREDITH ROSENTHAL, Ph.D.,

16   Recalled as a witness on behalf of the plaintiffs,

17                REBUTTAL EXAMINATION

18   BY MR. LOFT:

19   Q.   Secondly, the question was put to Dr. Elhauge,

20   Professor Rosenthal, I may butcher this, but essentially

21   I understood the question to be:  Why do the TPPs, the

22   third-party payors, put up with the rebate conduct?  If

23   that's a fair characterization of the question.  As a

24   healthcare economist, would you answer that question?

25   A.   Yes.  As -- as I explained earlier, pharmacy

1  benefit managers manage the retail pharmacy network.

2  They negotiate with manufacturers.  They possess all of

3  this electronic data that come from claims adjudication.

4  They have an asymmetric advantage in information when it

5  comes to their contractual relationship with third-party

6  payors.

7       As the court may know, there have been prior

8  cases involving non-disclosure of certain rebate

9  transactions between PBMs that have not flowed through

10 the third-party payors.  And so this asymmetric

11 information is always going to pose a challenge to

12 third-party payors to ascertain the arrangements that

13 the PBMs hold with manufacturers.

14      And that's particularly true at an individual

15 drug level.  There are 6,000 or so drugs that are

16 reimbursed by PBMs.  Third-party payors may not be

17 easily available to track rebate arrangements for each

18 and every drug.

19 Q.   Thank you.  I want to go to this theme of

20 so-called uninjured class members you heard a lot of in

21 Dr. Johnson's presentation.

22      Starting with the two-pack allegations, two

23 categories of so-called uninjured class members were

24 posited.  First, class members who would have continued

25 to buy or who would have always bought the pens in two

1   even when a single was on the market and, second, class

2   members whose -- who are insured class members

3   presumably whose co-pay would be the same whether

4   they're buying the pens in twos or in ones.

5        For an individual class member who falls in one

6   or either of those two buckets, does that necessarily

7   mean that class member is uninjured in your opinion?

8        A.   No, it does not.   For several reasons.   First,

9   individuals who may not have changed their behavior with

10  regard to the single-pack EpiPen could have been

11  affected by other conduct alleged in this matter and so

12  those -- those class members may, in fact, be injured.

13       Second, I understand that there is a legal theory

14  put forward that relates to whether individuals who paid

15  the same co-payment for the two-pack versus the

16  single-pack were injured or not from a legal

17  perspective.

18       Q.   And those two categories of so-called uninjured

19  two-pack customers are all individual class members,

20  that is human beings, not third-party payors, for

21  example; is that right?

22       A.   Yes, that's correct.

23       Q.   Did you hear anything in Dr. Johnson's

24  presentation about the extent to which, if any,

25  third-party payors would be so-called uninjured in

1    relation to the two-pack allegations?

2        A.   No, I did not.

3        Q.   And there was a point made about the timing of

4    the transactions in the class and about the percentage

5    of transactions that were prior to the generic entry

6    date.  If, in fact, the court were to exclude class

7    members whose only transactions were transactions prior

8    to that generic entry date, is data available for that?

9        A.   Yes, absolutely.  The same data that I described

10   earlier.

11       Q.   Now, switching to generic delay, there were

12   several points made around uninjured class members here

13   as well.

14            The "brand loyalist" term came up over and over

15   again.  The point was made by Dr. Johnson that even

16   under your analysis 5 percent of class members, of

17   individual class members, are brand loyalists; is that

18   correct?

19       A.   No.  The 5 percent refers to the percentage of

20   transactions that were filled with a brand name EpiPen.

21       Q.   A similar point was made with respect to

22   third-party payors that 5 percent of third-party payors

23   by your own admission are uninjured class members; is

24   that true?

25       A.   No.  Again, the 5 percent refers to the

1    percentage of transactions that would have been filled

2    with the brand name EpiPen had the generic launched

3    earlier.  So a third-party payor may have that 5 percent

4    number but that would not imply that they were

5    uninjured.  They would have 95 percent of the units that

6    would have been filled with a generic.

7        Q.  And just to be clear, what is your opinion about

8    the probability by which a third-party payor is likely

9    to be injured by the generic foreclosure allegations?

10       A.  It is my opinion that third-party payors are very

11   unlikely to have been uninjured by the generic

12   foreclosure.

13       Q.  And Dr. Johnson claimed never to have seen a

14   probability analysis like yours accepted.  Is that

15   consistent with your experience?

16       A.  No, it is not.  I have conducted a similar

17   analysis in previous matters and recently a court found

18   that that analysis in a case involving another drug,

19   Celexa and Lexapro, was a valid methodology for

20   establishing the likelihood of uninjured third-party

21   payors.

22       Q.  Just to be clear, Dr. Johnson is claiming in his

23   opinion you have not reliably calculated a methodology

24   to assess common impact from the generic delay

25   allegations in this case.  What's your reaction to that

1    criticism?

2       A.   I completely disagree with that characterization

3    of my analysis.  As I began the conversation today, I

4    noted the commonality of the way pricing and payments

5    flow in this industry.  And while Dr. Johnson has made

6    statements about the fact that the individual list

7    prices are not the precise price that were paid for in

8    some of these transactions, they are still the basis for

9    those prices.

10          So any impact here that works through pricing,

11   that is a common impact, a common mechanism, even if the

12   level of price difference varies across class members.

13   When the price -- the WAC price increases, everyone's

14   paid price increases, and that is what my chart shows.

15          And, moreover, it is evident that the absence of

16   generic availability, the absence of a single-pack

17   availability is a common event.  No class member had the

18   opportunity to purchase the single-pack after it was

19   withdrawn, no class member prior to Teva's recent launch

20   was able to purchase an independent generic.  Those are

21   universal facts.

22          The quantum of impact may vary but the impact

23   itself is common.

24      Q.   Thank you.  Now, just lastly, Your Honor, unless

25   the court has questions for Dr. Rosenthal, I'd like to

1  play depositions, the same depositions from class

2  representatives just to put them in their proper

3  context.

4         THE COURT:  That's fine.

5         MR. LOFT:  We have two of these clips.  What

6  we'll do is begin replaying the clip that defendants

7  played then we'll play some additional context.

8         (Playing video deposition clip.)

9         MR. LOFT:  That was what we heard from

10  defendants.

11         (Playing rebuttal video deposition.)

12         MR. LOFT:  Thanks.  That was the first one,

13  then we'll do the second one.

14         THE COURT:  I think the young people call

15  that a mash-up.

16         (Playing video deposition.)

17         MR. LOFT:  Thank you.  Five minutes.

18         THE COURT:  Stay put just a second.  Let me

19  just get -- and I just want to ask this of Dr. Johnson

20  -- Professor Rosenthal is still available to us.  If you

21  don't mind, you can stay there.

22    So this business about uninjured unaffected class

23  members, did you do any calculations of what proportion,

24  what percentage, what number were unaffected by any

25  particular kind of conduct?

1          DR. JOHNSON:  I think it depends on the

2    different courses of conduct.  For example, the TPPs,

3    the 10 percent I'm pointing to are 10 percent of plans

4    that have no branded -- only branded purchases.

5          THE COURT:  I have forgotten, is that No. 8

6    in your report?

7          DR. JOHNSON:  Yes.  That's actually in the

8    report.  Not consistent with the way, with all due

9    respect, Dr. Rosenthal described it.

10         With respect to the others, I think the important

11   point is, one of the points I've raised throughout is

12   the issue with identifying new class members is this

13   transaction level issue, because we observe

14   transactions.  So you have to do the inquiry to find out

15   who are class members on either side.

16         Professor Rosenthal can't accommodate the

17   transactions or get to the class members.  That's again

18   part of the common impact analysis.  That's why -- or

19   the heart of my critique of why you can't carve out

20   these people from any of her analyses.

21         So I just -- again, I think maybe we're talking

22   past each other a little bit on this point.  But

23   throughout my report there's a number of different

24   estimates of sets of -- some of them are sets of

25   transactions that are uninjured, some of them are

1    actually relying upon estimates from documents and other

2    things about sets of potential class members injured.

3         So does that answer your question?

4              THE COURT:  It is.  The plaintiffs have the

5    burden on this.  You get the last word on it.

6    BY MR. LOFT:

7    Q.  Thank you.  At the risk of being repetitive,

8    Dr. Rosenthal, is an analysis of transactions to assess

9    this inquiry into potentially uninjured class members a

10   relevant exercise?

11   A.  No, I don't believe it is.

12        And I would just like to respond to the

13   10 percent calculation that Dr. Johnson referenced.

14   That calculation examines the actual purchases from

15   roughly a year and a half of the authorized generic.

16   That is not the but-for scenario.  That is what happened

17   without an independent generic and it's a much shorter

18   time period than the class period.  For both of those

19   reasons that estimate is not a reliable indicator of the

20   percentage of third-party payors that would never have

21   reimbursed for a generic had the generic entered

22   earlier.

23        And as -- as a larger matter, this idea that the

24   but-for world didn't happen, of course, is inherent in

25   any allegation like this.

```
 1              THE COURT:  It's a pretend world.

 2              THE WITNESS:  It's a pretend world.  So the

 3    idea of using a probability analysis to try to examine

 4    what might have happened is entirely consistent with how

 5    an economist would consider that world.  Looking at the

 6    actual data for a very different world cannot tell us

 7    what would have happened.

 8              THE COURT:  Thank you very much.

 9              MR. LOFT:  Thank you.

10              THE COURT:  Congratulations.  Both sides had

11    time on the clock.  Well done.  Let me ask -- please --

12    a procedural question of sorts.  I was given a large

13    notebook from the plaintiffs.  I know I have the

14    presentation that was in spiral format.  I can't imagine

15    that no matter what I decide on this motion that someone

16    might want a circuit judge to look at it someday, and so

17    I'm just trying to make sure that your record on this

18    motion has everything in it that you want to be in it.

19         So we don't have to stay past closing time

20    tonight to sort that out.  We certainly can.  But if

21    there are things in the notebook that you haven't

22    offered, plaintiffs, that you want to make sure that are

23    part of the certification record, then we ought to take

24    that up tomorrow or take it up tonight if you want, if

25    you know the answer now.
```

1         Likewise, if you want to submit your sort of

2    workbook on these issues as part of the record so that

3    it's all there for somebody to see, I think that makes

4    some sense.

5         So tell me, counsel, you want to talk with one

6    another at the end of court today and kind of come

7    forward with a solution tomorrow, a practical one?

8              MR. BURNS:  I think that's a great idea,

9    Your Honor.

10             THE COURT:  All right.

11             MR. BURNS:  Thank you.

12             THE COURT:  All right.  On your end,

13   Mr. Levin?

14             MR. LEVIN:  Fine with us.

15             THE COURT:  All right.  Thanks very much.

16   There's a lot going on here.  One of the consistent

17   features of this job is that it's -- you drink from a

18   different fire hydrant every day and this one has quite

19   a few in it.

20        I just thought you would like to know just the

21   expert reports of the three people we heard from today,

22   992 footnotes.  So there's plenty of activity.

23        This is -- it's an interesting issue.  It's

24   probably the densest motion that I've encountered since

25   I've been here.

1          I just want to leave a couple of things for

2     people to think on overnight, talk among yourselves, and

3     then maybe we could get a conversation -- have a

4     conversation about it at some appropriate time tomorrow,

5     probably at the end of the day because I know you'll

6     come juiced to make your arguments.

7          For the plaintiffs, the cases -- the cases that

8     were transferred here by the JPML, where do they stand

9     on their lexicon remand rights?  My count is that there

10    were six cases sent here by the -- by the panel.  My

11    belief is that all six of those plaintiffs or those

12    collection of plaintiffs have joined in the consolidated

13    class action complaint.  But I know there's authority

14    out there that suggests that that in itself is not

15    necessarily sufficient to waive those remand rights.

16         And if I'm dealing here with a consolidated class

17    action complaint where somebody's going to stand up and

18    demand remand someday, I guess I'd like to know that.

19    And if they're waiving their lexicon remand rights, then

20    I think that needs to be formalized in the record.

21         I don't think it's my business to push on either

22    lever on that end but simply to identify this issue and

23    request to be informed about it.  If you can inform me

24    tomorrow about it, that's terrific.  If it's something

25    we need to take up a month from now, we will.

17-md-2785   In re: EpiPen   6.11.19   *REDACTED*

1           Make sense?

2               MR. BURNS:  Yes, Your Honor.  That flag

3      hasn't shown up on the field for us yet.

4               THE COURT:  Say that again.

5               MR. BURNS:  That flag hasn't shown up on the

6      field for us yet.  We need to make an inquiry.  Thank

7      you.

8               THE COURT:  And if the position is that they

9      haven't, they're not willing to, then I guess I'm trying

10     to figure out how the class I'm asked to certify fits

11     together with the right to stand up and say I'd like my

12     remand ticket now.

13              MR. BURNS:  Thank you, Your Honor.  We'll

14     let you know.

15              THE COURT:  I'm mindful of the many *Daubert*

16     motions that have come in and I'm also mindful of how

17     they spill into the certification issue.  I think I have

18     to rule those as part of this process.

19          As I understand the law, at least in this

20     circuit, maybe someone's got a different view from

21     another circuit, the court possesses the discretion to

22     decide those motions either based upon the submissions

23     or to conduct a hearing.  I haven't decided what I'm

24     going to do on that front.  I haven't even decided if

25     this will be the only hearing on certification.

1        As I said, there's plenty of traffic and I'm not

2   -- I guess I'm not willing to jump one way or another on

3   that, but -- and I'll just throw a third complication

4   in.  I'm aware of what the manual says about where class

5   certification really turns on resolving an organic

6   factual dispute, that it may be appropriate to conduct

7   what is really an evidentiary proceeding as opposed to

8   today's kind of listen and learn.

9        And so those things are all on my mind.  If

10  people want to ruminate about that and speak to them,

11  let's reserve that for the end of the day tomorrow and

12  let's try to do it in short order.  And if you need more

13  time to think about that.

14        And then the last thing, and I say this with more

15  than just a little trepidation, if when we part company

16  tomorrow you're going to ask or tell me you think you

17  need to submit additional papers on this, additional

18  footnotes, I'd like to be informed about that or to know

19  whether the motion can be deemed submitted.  And if

20  you're going to ask for additional filings how come and

21  when and how long.

22        All right.  So I'll leave you with those things

23  to think about overnight.  Thank you very much for your

24  presentations today.  They were helpful to me.

25        Call roll before we go.  From the plaintiffs'

17-md-2785    In re: EpiPen    6.11.19   *REDACTED*          192

1   table, anything else we ought to take up before we leave

2   for the day?

3           MR. BURNS:  Nothing further, Your Honor.

4           THE COURT:  On the defendants' side of the

5   caption?

6           MR. LEVIN:  Nothing further, Your Honor.

7           MR. GANDESHA:  Nothing further.

8           THE COURT:  All right.  Same routine

9   tomorrow.  Plans to start, open the record about five to

10  1:00.  Get the appearances made, go straight to four

11  o'clock.

12           (Proceedings adjourned to the following day,

13  June 12, 2019 at 1:00 p.m.)

14

15                     CERTIFICATE

16      I certify that the foregoing is a true and

17  correct transcript from the stenographically reported

18  proceedings in the above-entitled matter.

19      DATE:  June 11, 2019

20                /s/Kimberly R. Greiner
21                KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                  United States Court Reporter
22

23

24

25