1                   UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

3    IN RE:  EPIPEN                      Docket No. 17-md-2785
     (Epinephrine Injection, USP)
4    Marketing, Sales Practices
     and Antitrust Litigation
5                                        Kansas City, Kansas
                                         Date:  6/12/2019
6
                                         **REDACTED**
7    .........................

8

9               TRANSCRIPT OF MOTION HEARING
               CLASS CERTIFICATION - PHASE II
10
                          BEFORE
11
           THE HONORABLE DANIEL D. CRABTREE
12           UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Class Plaintiffs:

16   Rex Sharp                         Warren Burns
     Ryan C. Hudson                    Spencer Cox
17   Rex A. Sharp, PA                  Burns Charest, LLP
     5301 W. 75th Street               900 Jackson Street
18   Prairie Village, KS 66208         Suite 500
                                       Dallas, TX 75202
19   Matthew S. Tripolitsiotis
     Duane L. Loft                     Lynn Sarko
20   Bois Schiller Flexner, LLP        Gretchen F. Cappio
     575 Lexington Avenue              Keller Rohrback
21   New York, NY 10022                1201 3rd Avenue
                                       Suite 3200
22                                     Seattle, WA 98101

23

24

25

```
 1   APPEARANCES (continued):

 2   For Sanofi-Aventis US, LLC Plaintiffs:

 3   Nathaniel D. White
     Weil, Gotshal & Manges, LLP
 4   767 Fifth Avenue
     New York, NY 10153
 5
     For Local 282 Welfare Trust Fund Plaintiffs:
 6
     Brian O. O'Mara - DC
 7   Robbins Geller Rudman & Dowd LLP
     120 East Palmetto Park Road
 8   Suite 500
     Boca Raton, FL 33432
 9
     For the Mylan Defendants:
10
     Adam K. Levin              Brian C. Fries
11   Kathryn Wellington         Lathrop & Gage, L.C.
     Hogan Lovells US LLP       2345 Grand Boulevard
12   555 Thirteenth Street, NW  Suite 2800
     Washington, DC 20004       Kansas City, MO 64108
13

14   For the King Pharmaceuticals, Inc., Meridian Medical
     Technologies, Inc. and Pfizer Defendants:
15
     Raj Gandesha               Joseph M. Rebein
16   White & Case LLP           Shook, Hardy & Bacon LLP
     1221 Avenue of the         2555 Grand Boulevard
17   Americas                   Kansas City, MO 64108
     New York, NY 10020
18

19

20                     INDEX

21     Argument by Mr. Burns                          4

22     Argument by Mr. Levin                         59

23     Argument by Mr. Gandesha                     115

24     Argument by Mr. Sharp                        130

25
```

```
 1              (Court called to order.)
 2              THE COURT:  We're here in Case
 3   No. 17-md-2785, which is captioned In re:  EpiPen
 4   Marketing Sales Practice and Antitrust Litigation.  This
 5   hearing, of course, pertains to the consumer putative
 6   class cases.  This is noticed as a class certification
 7   hearing, Phase II of that process on the plaintiffs'
 8   motion for class certification.
 9              So I missed you all.  I suspect you found ways to
10   occupy yourself.  Let me begin with the same thing we
11   did yesterday, getting the appearances of the people who
12   will be starring in speaking roles today and then
13   trusting you to supplement that with clients -- other
14   things that you think I ought to know.  Starting on the
15   plaintiffs' side of the room.
16              MR. BURNS:  Warren Burns with Burns Charest
17   for the plaintiffs, Your Honor.
18              THE COURT:  Good afternoon, Mr. Burns.
19              MR. BURNS:  Good afternoon.
20              MR. SHARP:  Rex Sharp.
21              THE COURT:  Mr. Sharp.
22              MR. SARKO:  Lynn Sarko.
23              THE COURT:  Mr. Sarko, good afternoon.  Then
24   shifting to the defendants' side of the room.
25              MR. LEVIN:  Good afternoon, Your Honor.
```

1   Adam Levin.

2           THE COURT:  Good afternoon, Mr. Levin.

3           MR. GANDESHA:   Good afternoon, Your Honor,

4   Raj Gandesha.

5           THE COURT:  Good afternoon.  That's it.

6       All right.  I briefly referenced the ground rules

7   that were adopted in Document 14-21.  It's the 90-minute

8   per side approach with the plaintiffs having the last

9   word in this hearing, reserving no more than 20 minutes

10  for the rebuttal presentation.  We'll use the same

11  scoreboard clock that we used yesterday.  I trust that

12  was visible and workable for everyone.

13      All right.  Anything else we ought to take up

14  before we go to the main event?  Plaintiffs, it's all

15  yours.

16          MR. BURNS:  Thank you, Your Honor.  Your

17  Honor, may I approach to bring up some hard copies of

18  our PowerPoint presentation?

19          THE COURT:  You can.

20          MR. BURNS:  Thank you.  We couldn't help but

21  spill a little more ink this morning, Your Honor, so I

22  wanted to make sure you could take advantage of that.

23          THE COURT:  Are there trees surviving in the

24  Midwest after yesterday, but maybe we'll take care of it

25  today.  Please.

1          MR. BURNS:  Thank you, Your Honor.  To give

2     you a sense of how we're going to structure on our side,

3     Your Honor, I will obviously take the lead here to kick

4     us off.  Rex Sharp, my co-counsel, will be my relief.  I

5     saw him throw a 98-mile-per-hour fast ball earlier

6     today.  So he's ready, will stay warm.  But thank you.

7          Your Honor, I'll say this:  If you're like me,

8     your head's probably still spinning a little bit from

9     yesterday.  I had nightmares of complex statistical

10    formulas.  But more than anything, if the court wanted a

11    battle of the experts, it looks like we've delivered

12    one.  And I think that was well apparent yesterday given

13    the testimony of plaintiffs' experts and Dr. Johnson.

14         But I think in reality, Your Honor, there's an

15    effort made here to make this case a lot more complex

16    than it needs to be or it really is.  And so part of my

17    effort today, Your Honor, is to try to simplify this and

18    bring us back to basics and hopefully ground us in that

19    way.

20         Listening to Dr. Johnson and defense yesterday, I

21    was kind of thinking we probably had about 15 different

22    classes and they were incredibly fractured and

23    uncertifiable.  But I think in reality, when we get back

24    to those basics, you'll see this is a case where the

25    classes and the class definitions have been well-trodden

1    in numerous cases around the country, and it is a case

2    that should be certified.

3           So with Your Honor's permission, I'll go to the

4    next slide and just give you a little sense of a roadmap

5    for today and the issues that I was planning on

6    covering.  Did not intend to march through our reply

7    brief or our original brief but try to hit on some

8    issues that really came to the fore in the briefing and

9    yesterday.

10          So to ground us, I would like to begin with a

11   recitation of some of the facts that really underpin

12   this litigation.  There was some suggestion in the

13   defendants' papers that we really haven't -- haven't

14   discovered anything new, that we were relying simply on

15   the allegations and on our complaint, and that's simply

16   not the case.  This is a case obviously that's been

17   hard-fought and well-discovered, and I think that will

18   come through.

19          Next I intend to cover the collateral source rule

20   because I think it is -- it's certainly something that's

21   front and center in the court's resolution of that

22   argument, may impact some of the other issues that have

23   come -- come to fore, then move on to common impacts,

24   ascertainability, typicality, the allegation of some

25   type of intraclass conflict, which there isn't, and wrap

1    up with a suggestion to this court that the classes

2    should be certified and deal with any remaining

3    questions that have come up yesterday.

4          So, Your Honor, I would like to start with a clip

5    of the chairman of Mylan's board that was recorded in

6    2015 in California at USC Marshall's MBA school, and I

7    think it frames many of the issues that are present in

8    this case.  I think it frames Mylan's approach and its

9    desire to run from the facts and to put an alternate

10   reality in front of the court and in front of the public

11   and in front of our legislators and regulators.

12         So, Jason, if you don't mind, kick that off.

13               (Playing video clip of Robert Coury speech.)

14               MR. BURNS:  Speed that up, Your Honor.

15               (Resume playing video clip of Robert Coury

16   speech.)

17               MR. BURNS:  So, Your Honor, this is the

18   story that Mylan likes to tell, that it's an innovative

19   company that's come in, their focus, being largely a

20   generic company, is on providing low-cost medicines to

21   consumers.

22         The reality in this particular case is far

23   different.  It's far different for this particular

24   device, the EpiPen, which is something of a novelty for

25   Mylan, and I think it realized it once it acquired the

1      exclusive rights to market and distribute this product.

2          It's a -- it's a novelty in the sense that,

3      unlike the vast majority of Mylan's generic drugs,

4      EpiPen is a branded device.  And they were taking

5      advantage of what in essence was a monopoly held by both

6      the marketer and manufacturer in this case.

7          And what we know is that at the time that Mylan

8      comes into this position as the exclusive marketer, the

9      EpiPen had been around for 30 years and not much had

10     changed during that period, not much in its design, not

11     much in the delivery of the drug, epinephrine that's

12     within it, and certainly not in terms of the costs that

13     it takes to actually produce this device.

14         And there's evidence in this case that those

15     costs per pen are far below $10 and have remained fairly

16     constant over time.  It's not the type of device that's

17     subject to wild fluctuations in terms of its material

18     costs.

19         And as I said, when Mylan stepped into the role

20     of marketer and distributor, that was around the

21     mid-2000s.  A couple years later, Pfizer steps in

22     through an acquisition into its role as the exclusive

23     manufacturer of the device.  But from that point on, the

24     two companies are locked together in a dance with this

25     device.

1        And it's important to understand that it's not

2   simply a contract.  These are companies that share a lot

3   of information about the marketing.  They share a lot of

4   the information about the distribution of the drug.

5   They served on a Joint Commercial Committee together.

6   And Pfizer, even though it -- it has taken the position

7   that, you know, many of the -- of the decisions we

8   complained of were Mylan's decisions, in reality Pfizer

9   is there every step of the way.

10        So, Your Honor, turning to our next slide, and

11   this takes us to about the end of 2010, some years after

12   Mylan has stepped into the picture, and a new employee

13   comes into Mylan towards the end of 2010.  You'll see

14   there was an e-mail and a project deck attached to it

15   that's dated November 24th of 2010.

16        And this employee, Mr. Foster, has the idea that

17   Mylan can take great advantage of what -- of the gold

18   mine that's sitting in front of them, and that gold mine

19   is the EpiPen.  And so he posits that with a simple

20   change in the way the drug is distributed and marketed.

21        And up until that time the EpiPen had been

22   distributed in both single and two-pack products.  So a

23   consumer who went to a pharmacy could choose between a

24   single EpiPen or a two-pack product, a prescribing

25   physician could do the same.  And obviously there was

```
 1    choice in the market.

 2         So this new employee at Mylan comes up with the

 3    idea and says, hey, we don't have to do it that way.

 4    Why don't we look at moving to a distribution system

 5    where we market this only in a two-pack form.

 6    Tellingly, at this point in late 2010, when justifying

 7    the suggestion to his superiors, he posits the question:

 8    Eliminate the single EpiPen?  Why?

 9         And the answer, Your Honor, is telling.  It's not

10    medical necessity.  It's not that they've heard from a

11    supervising board of doctors and this is a

12    recommendation of -- of, you know, esteemed

13    professionals, no.  There are two reasons given.  One

14    relates to revenue and one relates to the competitive

15    position of the company itself.  Not a word about

16    medical necessity, not a word about the consumers who

17    are going to use this device.

18         Now, flash forward into the spring of 2011.

19    Marching up until that August of 2011 date we've become

20    familiar with, I'm sure the court's seen in the

21    briefing, Mylan recognizes that it has to come up with a

22    better reason for eliminating a single-pack EpiPen than

23    it's going to make them more money.  Realizes there will

24    be pushback on that, realizes that can't be the only

25    reason.
```

1    And so they -- they latch on to -- and you will

2  see this in their internal communications -- they latch

3  on to some recommendations from the NIAID that recommend

4  in certain circumstances that people with allergies

5  carry two EpiPen devices, two epinephrine auto-injector

6  devices.  And this becomes a rationale that they start

7  clinging to and incorporating into all their materials.

8    But I think it's telling, Your Honor, that their

9  own commercial partner, which is Pfizer -- we're on

10  page 7 now, Your Honor -- has serious questions about

11  the strategy that Mylan is developing.  And you see

12  these questions start to arise in the Pfizer documents.

13    And I've quoted one here where, when presented

14  with this justification and almost myopic focus on the

15  NIAID guidelines and another set of guidelines, Pfizer

16  begins to question whether that is the real

17  justification in this case.  And you'll see that quote

18  on this document, which I won't quote directly for you,

19  but you'll see that Pfizer was having these concerns.

20    Now, as the court's aware, we have alleged what

21  is an overarching conspiracy among Pfizer and Mylan to

22  perpetuate a pricing scheme that would allow them to

23  reap unlawful products under both the RICO statute and

24  under antitrust laws and various guises.

25    And so part and parcel of those allegations are

1   certainly this foundational lie, this foundational lie

2   that there is, you know, a third party that's dictating

3   this movement.  But there were other elements of the

4   scheme.  The court's certainly aware of those from our

5   papers.

6            I wanted to touch on a couple of them briefly.

7   One of the things that the defendants take aim at in

8   their papers is that they say, look, despite, you know,

9   hundreds of thousands of hours and documents and

10  numerous depositions, we just don't have a lot of

11  evidence yet and we haven't put that before the court.

12  And, of course, Your Honor, we're at class

13  certification, not summary judgment, but we haven't had

14  the opportunity to put that evidence before the court.

15  But I think it's telling that what we have obtained

16  fully supports these allegations.

17           Now, moving on to Slide No. 8, I'll touch on

18  another element of the pricing scheme that we've

19  alleged, and that is that Mylan used its position and

20  Pfizer's position as patent owners to try to exclude

21  competition and to manipulate settlements and enter into

22  unlawful settlements that tended to keep out generic

23  competition to the EpiPen.

24           Now, why?  Why the -- why would Mylan want to do

25  this?  There's plenty of evidence out there, you saw

1   this yesterday when our experts were speaking, that

2   Mylan knows what the effect of generic entry will be.

3   And you will recall there was testimony yesterday that,

4   you know, you have a drop-off leading to a -- to an

5   erosion of up to 95 percent of the market share of the

6   branded drug after the entry of generic competition.

7         And so what we see in this case is Mylan and

8   Pfizer working together to enter these unlawful

9   contracts with their erstwhile competitors and try to

10   delay that and push that process off.

11         And the one we pointed to in our complaint, the

12   discovery is beginning to bear out in those allegations,

13   is what in essence was a swap, what we've alleged was an

14   unlawful swap concerning two drugs and between Mylan and

15   Pfizer on the one hand and Teva on the other.  Those

16   drugs involved were the EpiPen -- the device involved is

17   the EpiPen as well as Nuvigil on Teva's side.  And

18   defendants, of course, have denied this and they have,

19   you know, repeated their assertions that there's no

20   "there" there with respect to this allegation, but it's

21   telling.

22         And I think the court should realize it's not

23   just us talking.  When you look at the documents the

24   defendants were producing at the time around those

25   settlements, one of the requirements of the law was

1   that, after seeing so much settlement abuse in the drug

2   space, companies were required to submit their

3   settlements for review by the DOJ and the FTC.

4        Mylan and Pfizer did this with respect to the

5   Nuvigil and Teva settlements.

6

7

8

9

10

11

12

13

14

15

16

17        Now, Your Honor has heard through our experts

18   about the substance behind our allegation with respect

19   to its efforts to keep out branded competition and

20   foreclosure competition through kickbacks to the PBM.

21   We, again, think those were largely successful and

22   impact -- impacted Auvi-Q's ability to come on the

23   market.

24        But the sum of all this activity, which you'll

25   see in Slide No. 9, is just a remarkable trend in the

1   price of the EpiPen beginning again back in the 2000s

2   after Mylan comes in and takes over the marketing and

3   distributing piece.  We see what turns up to be, as

4   you'll see in that middle column, EpiPen prices increase

5   at a compound annual growth rate of approximately

6   25 percent.  There's no parallel.  I think, in fact, you

7   heard that from Dr. Rosenthal yesterday.  There's really

8   no parallel in the industry for this type of activity.

9        Again, we're talking about a drug whose materials

10  costs haven't changed, that's easy to manufacture and

11  cheap to manufacture.  And yesterday we see what ends up

12  being a six-fold increase in its price from the

13  mid-2000s on up to 2016.  And particularly when you

14  focus on that trend from August 2011 on up to 2016,

15  you'll see that the price increases just compound and

16  become larger and larger and the slope of that trend

17  becomes steeper and steeper.

18       Now, also telling in this particular graph, and I

19  know you heard Dr. Rosenthal speak of this yesterday, so

20  we often terms -- we often tend to use the shorthand of

21  the WAC price to -- referring to pricing in this

22  industry.  But I think it's very important for the court

23  to understand that Dr. Rosenthal, doing her own work and

24  her own calculations in this case, was able to

25  demonstrate a direct correlation between WAC and other

1   prices that are charged for these drugs.  And that's

2   true when you roll in rebates, that's true when you roll

3   in individual negotiations.

4        And I can tell you from personal experience

5   having represented a wholesaler before that this price

6   matters.  It's the industry standard.  It is what drives

7   price in this market.

8        Another thing I wanted to stress to the court is

9   that from the beginning -- and I think this is -- this

10  flows through their conduct during the class period, it

11  flows through to their approach to this litigation and

12  the claims that have been brought against it -- how did

13  Mylan get away with this?  What was their thinking

14  behind it?  I think what we hear over and over from

15  Mylan and from Pfizer is that this is a victimless

16  crime.  It's victimless because they thought that it

17  would, in their words, fly under the radar.

18       Why?  There are a number of factors at play in

19  this particular industry.  Obviously we know that most

20  individual consumers have insurance so they don't

21  actually pay the full cost of a drug when they go to the

22  pharmacy.  Only cash payors tend to see that burden or

23  some form of that burden.

24       We know that a device like the EpiPen is included

25  in a formulary that includes thousands of drugs and

1   thousands of devices bundled together in a complex web

2   of transactions that are difficult to decipher.  They're

3   difficult to decipher all the way down the chain,

4   primarily from the PBM through the third-party payor on

5   to the consumer.

6          And as you'll see in this document, and this

7   document in itself is very telling, this is a document

8   that -- that Mylan produced actually to give to Pfizer

9   to discuss the switch to the two-pack and why they

10   should go ahead with it, included a slide that gave the

11   reasons away.  And the gist of that slide, again not

12   quoting it directly, is that Mylan's view was that this

13   would escape attention because no one would be paying

14   attention, in that complex web of thousands of drugs, to

15   the individual price of the EpiPen.

16          What we also know from public statements of

17   people like Mr. Coury, public statements of Mylan's CEO

18   Ms. Bresch, is that Mylan was willing to say just about

19   anything to avoid scrutiny on this issue.  Ms. Bresch

20   testified before Congress, got up in front of our

21   legislature and told Congress that, look, Mylan was

22   really only making about $50 in profit per pen and a

23   hundred dollars per two-pack.

24          In reality Mylan had to come back days later and

25   file a corrective statement with the SEC to clarify that

1   these numbers weren't exactly accurate.  They weren't

2   accurate because Ms. Bresch had baked into this

3   calculation a 37.5 percent tax rate that Mylan never

4   pays on EpiPen or any other drug.

5        I think it's also important to point out in this

6   particular picture to the court that despite all the --

7   all the dialogue and discourse on the WAC price, when

8   Mylan went before Congress and tried to describe how it

9   prices its product, the top line that Ms. Bresch used on

10  her slide was the WAC price for the EpiPen product.

11  Again, Your Honor, a 600-fold increase in the price of

12  EpiPen over a period of roughly a decade.

13       This impacted my clients.  It impacted consumers.

14  It impacted third-party payors.  And I know, and we will

15  return to this today because a lot of the disagreements

16  between the parties boil down to this, was there actual

17  impact in a legal sense to the consumers and the

18  third-party payors as a result of this activity?  And

19  the short answer, Your Honor, is yes, absolutely.

20       Now, we heard, and I will drill down on this in

21  detail in just a few minutes, that there was a certain

22  group of consumers with respect to this two-pack switch

23  that Mylan says weren't impacted at all.  And they'd

24  like to say that our experts, you know, are unable to

25  figure out damages for them, unable to figure out a

1   methodology that demonstrates their impact -- or that

2   common impact on that group.  Again, we'll return to

3   this.

4          But as a practical measure, everyone in the

5   class, including that sub-subgroup -- I hesitate to use

6   that term -- but including that group of consumers,

7   including the third-party payors, everyone in the class

8   was impacted by this behavior because they lost the

9   choice that they were previously able to make between

10  buying a single-pack and buying a two-pack.

11         Now, it seems rather simplistic, but I think what

12  you heard Professor Rosenthal testify to today -- and

13  this is in our papers and in our reply brief in

14  particular -- is that that loss of choice is not just --

15  it's not just words.  It's actually an economic concept

16  that has meaning.  Choice has meaning in economics.

17  Each one of our consumers, each one of the third-party

18  payors was impacted by that loss.

19         And I think you'll also see, and we'll detail --

20  and I'll detail shortly, is that the methodologies that

21  our economists and experts were to utilize and develop

22  certainly demonstrate common impact across the board.

23         So with that, Your Honor, I will get into what I

24  think are the heart of the disputed matters in this

25  case.  And, as I said, I'm not going to march sort of

1   mechanically down through our brief.  And I have a

2   sneaking suspicion that Your Honor probably knows more

3   about Rule 23 than I probably ever will.  But not -- in

4   this particular case not every element of Rule 23 is in

5   dispute, nor I think in reality is the approach that

6   each side says must be taken with respect to satisfying

7   those requirements.

8            So certainly this court must engage in a rigorous

9   analysis.  That's not a burden of proof issue but it is

10  reality.  That under Supreme Court and Tenth Circuit

11  precedent, this court has to take a careful look at all

12  the factors in Rule 23.  I think in this case numerosity

13  is undisputed, so no one's going to spend any time on

14  that.

15            THE COURT:  That's one down.

16            MR. BURNS:  There you go.

17            We do have arguments on typicality.  We'll get to

18  those later.  I think those are pretty easily

19  dispatched.

20            In terms of the commonality of the facts that are

21  present in this case, they apply across the board, and I

22  think that commonality of those facts just can't be

23  challenged here.

24            And adequacy, to the extent it's tied in with the

25  typicality argument, is again one that we'll deal with.

1          So that we're left with Rule 23(b)(3) for all but

2    our injunctive class.  And I think at the end of the day

3    the court will appreciate, with respect to predominance

4    of the issues that are facing this class, there are no

5    individualized issues that should defeat certification.

6    And, in fact, the class action in this case is superior

7    to any other method of adjudicating.

8          So turning to the first real heavy issue that I

9    think this court certainly has to grapple with and that

10   the parties are grappling with is that we believe, and

11   we think the law supports us firmly, that the collateral

12   source rule should be applied in this case.

13         I think many of us are familiar from it -- or are

14   familiar with the collateral source rule at least in

15   other contexts, but it is has not been fully explored in

16   either the RICO or antitrust space.  But on balance, the

17   courts that have explored it tend to come out in our

18   favor, particularly on an issue like that present in

19   this case.

20         Now, the first argument that defendants have

21   raised is whether the plaintiffs have waived this

22   argument.  And obviously this is an argument that we

23   first fully briefed in the reply brief and there's no

24   doubt about that.  But --

25              THE COURT:  It sounds like they get to file

1   their surreply.

2            MR. BURNS:  What's that, Your Honor?

3            THE COURT:  It sounds like they get to file

4   their surreply.

5            MR. BURNS:  And you'll notice we didn't

6   oppose that, Your Honor, and we filed a brief

7   sur-surreply, I guess is the proper term.

8            THE COURT:  I missed that.  I'm sorry.

9            MR. BURNS:  Only because we wanted to

10  preserve the final word.  In essence we didn't oppose

11  their surreply, and understand that they have filed it.

12  I'll deal with the arguments that they've raised there.

13  But that's essentially the point:  We raised this in

14  response to their arguments and they have an opportunity

15  to brief it and move forward with it.

16            So turning to the collateral source rule, why

17  does it matter in this case?  I mean, in essence in this

18  case the defendants are making arguments that certain of

19  our plaintiffs, primarily our consumers, should not be

20  able to proceed as a class and realistically recover for

21  their injuries because they made the decision,

22  oftentimes along with their employers, to obtain

23  insurance, health insurance.  And this is a classic

24  example where the collateral source rule should come to

25  bear.

1        Historically and in -- and in general, as I put
2    up here -- and this comes from *Friedland,* which is
3    actually one of the cases the defendants cite in their
4    brief, the only one coming out of the Tenth Circuit.
5    The collateral source rule historically was designed to
6    prevent the defendant from receiving credit for the
7    compensation that had previously been provided to the
8    plaintiff for the same injury.
9        And there are a host of public policy reasons
10   that come into -- come into play in this application.
11   First, of course, is the idea that if anyone's going to
12   benefit from a reasonable choice to obtain insurance, it
13   should be the plaintiff who is seeking to recover for
14   injuries he's suffered at the hands of a wrongdoer.
15       So as *Friedland* points out, and this is the
16   reason why *Friedland* actually comes out against the
17   implication of the collateral source rule in that case,
18   is that it's primarily an equitable tool that's used to
19   make sure that the person who committed the tort,
20   committed the wrong does not benefit from the other
21   parties' decision to obtain the insurance.
22       Second, of course, public policy argument, and
23   one that makes sense in this case, is that we want to
24   encourage people to go out and obtain health insurance,
25   be they individuals, be they employees.  We don't want

 1   to force on them what is in essence an injustice when

 2   they come to sue for injuries that have been caused to

 3   them by others; to essentially just bear it because they

 4   made the good decision to obtain insurance.

 5        And the effect of not using it in this particular

 6   case, at least if you accept the defendants' arguments,

 7   is that in similar pharmaceutical cases defendants would

 8   get a free ride with respect to harm that they've caused

 9   to individuals unless the collateral source rule is

10   invoked.

11        So on balance, given the policy considerations,

12   we think the collateral source rule should apply in this

13   case and that the court should essentially follow the

14   lead of the *Norvir* case, which came out of the Northern

15   District of California, and I briefly summarized that

16   here, Your Honor.  Importantly, *Norvir* is an antitrust

17   case.  And we've cited both RICO and antitrust cases in

18   our papers.

19        The issue arose at class certification.  The

20   court surveyed the law, much as we have, in finding

21   cases that dealt with the issue.  And considering all

22   these policy applications decided that it should apply

23   the collateral source rule in that case.  And here the

24   issue was whether the plaintiffs who had paid flat

25   co-pays for the drugs in question should be permitted to

1   participate in the class, and the court said

2   unequivocally that they should.  And the collateral

3   source rule barred the defendants' -- the defendants'

4   arguments they weren't harmed and shouldn't be included

5   in the case.

6        And I think importantly, because there is another

7   case which is called *K-Dur* and we cited in our papers,

8   Your Honor, and the defendant cited it in theirs, I

9   think the important distinction here is both cases

10  purport to take a hard look at -- at the field and see

11  how other courts have dealt with this issue.

12       I think that once -- once Your Honor sort of digs

13  into *K-Dur*, you'll see some of the assumptions the court

14  there made, it was a special master's decision, really

15  don't match the reality of the cases it was reviewing.

16       So certainly there are cases out there that

17  really just raise the issue and don't dig into it very

18  deeply, but there are others like *Goda versus Abbott*

19  *Labs*, which is a D.C. Superior Court case that actually

20  do.  *Norvir* is another.  And I think you will find that

21  *K-Dur* gives pretty short shrift to the actual analysis

22  and states some of the holdings, particularly in *Goda*.

23  So we would urge Your Honor to take a hard look at

24  *Norvir*.  We think it's directly on point and the

25  collateral source rule in this case should be applied.

1        So with that in mind, Your Honor, we come to a

2    question of what's in and what's out of the classes at

3    this point.  And as Your Honor knows, we have alleged

4    both RICO, antitrust, consumer protection statutes,

5    unjust enrichment and injunctive relief class.  I'm

6    focusing here on RICO and antitrust because I think

7    that's where the interplay of the collateral source rule

8    is most easily seen.

9        I'll touch on some of those other classes as we

10   get further along.  But in this particular case, in our

11   opening papers, we essentially argue that there should

12   be certain exclusions from the class and one of those

13   was for single flat pay-co [sic] consumers.  It's our

14   belief and our view that if the collateral source rule

15   is applied, then the flat pay-co consumer -- excuse me,

16   Your Honor, then the flat co-pay consumers -- it's

17   actually harder to get out of my mouth than I thought it

18   would be -- should not be excluded from the plan -- or

19   from the class definition.  And that is, in fact, how

20   *Norvir* treated that group.

21       And so that leaves us, Your Honor, with two

22   principal conclusions.

23       One, fully insured health plans:  They're a

24   unique -- somewhat unique structure or entity within the

25   system, and we think those should still be excluded from

1    the class because they are not like self-insured plans

2    or other plans that fall into the third-party bucket.

3    And we think also PBMs should be excluded.

4        This is not an expressing exclusion in our

5    papers, but it was certainly our intention, and I think

6    the class definitions captured -- capture this.  This is

7    one of the issues defendants have raised, and I can

8    touch on that a little bit later, Your Honor.  But as

9    you'll see in the class definition, what we had intended

10   to really capture on the third-party payor side were

11   entities that were actually paying some of -- some or

12   all of the bill for the consumers.

13            THE COURT:  So what do you do with the

14   sophisticated people at the top of the food chain on --

15   I guess, third-party payors who in effect run their own

16   PBMs?

17            MR. BURNS:  Sure.  Well, Your Honor, it's

18   actually a remarkably small issue, notwithstanding the

19   ink that's been spilled on both sides about it.

20       So I'm aware of two that jump to mind.  Humana is

21   one, CVS is another, that have separate entities that

22   fill the PBM role.

23            THE COURT:  They're captive entities of --

24   am I right about that?

25            MR. BURNS:  Well, they're separate legal

1   entities as we understand it, Your Honor, separate

2   management, separate boards, separate governance.  And I

3   think in essence they should still be excluded from the

4   class.  There's no reason they should not.

5         And the reason is that:  One, it's a small

6   problem.  There are only a couple of these -- these

7   entities.  But we -- our allegations, obviously in what

8   we've seen in discovery, lead those PBMs to have a

9   different relationship even within those environments

10  where they're a part of --

11              THE COURT:  You lost me.  Those -- you're

12  talking about now CVS and -- what was the other one --

13  Humana?  They should be excluded?

14              MR. BURNS:  Their PBMs should be.

15              THE COURT:  They should be but third-party

16  payors should not?

17              MR. BURNS:  Right.  Third-party payors

18  should not.

19              THE COURT:  Can I ask you about another

20  aspect of the class definition?  This shows up I think

21  in all of the proposed definitions.  It bothers me, just

22  to be blunt about it.  It's the way they ended "until

23  the effects of the defendants' unlawful conduct ceases."

24              MR. BURNS:  Right.

25              THE COURT:  I don't know when that is even

17-md-2785   In re: EpiPen   6.12.19   *REDACTED*   29

1   if you win.

2           MR. BURNS:  It's a fair question, Your

3   Honor, and unfortunately just to be direct with you --

4           THE COURT:  I was with you.

5           MR. BURNS:  Fair enough.  It may vary a bit

6   between some of our damage theories in essence and

7   here's why.

8           Two-pack is still being sold exclusively as a

9   two-pack.  And so we argue, and I think it's right, that

10  with respect to those two-pack damages that we're --

11  we're focusing on, the class is continuing and, you

12  know, until that changes, you're still having the same

13  injury and the same effect.

14          Where it becomes problematic, and there's no

15  escaping that, is with respect to generic entry because

16  we now have a generic that has entered into the market,

17  and that was Teva which entered the market earlier this

18  year.

19          So I think if there's a narrowing of the class,

20  it would probably be with respect to the generic entry

21  class.  But on the two-pack side, class definition would

22  still continue.

23          Now, the other way to deal with that obviously,

24  Your Honor, is to -- which Your Honor may be thinking

25  about, is to put a hard end date, be that at the time of

1    trial or the time of certification, that will create --

2    on the one hand it's simple and clean and it's one way

3    to do it because it caps it and becomes easy to

4    conceptualize and to deal with.  I think it will create

5    some uncertainties in that instance for both the parties

6    in actions that occur afterwards.  So that's how I view

7    it.

8         So, Your Honor, I laid out -- and I think that

9    issues cuts across, as does the issue of the single flat

10   co-pay consumers, as I said, with respect to the RICO

11   and state antitrust classes, and I've included those

12   slides with the definitions for you.

13        Now, I'd like to move on to common impact, Your

14   Honor, which the court, especially when it -- when it

15   heard from both sets of experts yesterday, obviously

16   this is an area where there is a lot of dispute and I

17   think we want to be careful as we address these issues.

18        So I think the first place to start is obviously

19   the law that governs in this particular case, which is

20   not *Asacol*, it's the standard that was expressed in

21   *Syngenta* and I think is consistent with Tenth Circuit

22   law.  And what we're really fighting about is whether

23   the class has been defined so broadly as -- as to

24   include a great number of members who couldn't have been

25   harmed by the defendants' action.

1            THE COURT:  Yeah, I was going to ask you

2    specifically what you just mentioned.  I know what

3    Judge Lungstrum said in the *Syngenta* case.  The places

4    he goes for support of that conclusion don't say Tenth

5    Circuit.

6            MR. BURNS:  Yep, Seventh Circuit cases, Your

7    Honor.

8            THE COURT:  I just want to know.  If this an

9    open question, sir, that's fine.

10           MR. BURNS:  I think it is, Your Honor.  I

11   think that Judge Lungstrum, looking at those cases,

12   obviously he was encouraged in *Syngenta* to adopt a much

13   harder standard and did not want to go that far and

14   thought the Seventh Circuit probably had it right when

15   it took a more refined and nuanced approach to this

16   particular issue, and we'll argue the same.

17           The problem is, Your Honor, I don't think there

18   is -- and even in the cases that are much more

19   stringent, if you will, there's no magic number in any

20   particular case.

21           THE COURT:  Well, there is for some

22   circuits.  If you don't have standing, you're out.

23           MR. BURNS:  That's right.  That's right.

24           THE COURT:  Right?

25           MR. BURNS:  That's right.  Well, I mean, but

 1   whether you call it a "great number of members," you

 2   know, trying to put a percentage on it I think is

 3   problematic.

 4        But, you know, we have long-standing law from the

 5   Supreme Court on down through the circuits and district

 6   courts establishing that, look, if there are some

 7   uninjured members of the class, that shouldn't defeat

 8   class certification as a whole.  So I think to take it

 9   to the extreme goes too far.

10        At the same time, and I think this is the balance

11   Judge Lungstrum was trying to strike, is you obviously

12   don't want a class where, as he says, a great number or

13   very, very significant percentage of the class

14   objectively looks to be uninjured by the activity.

15        So striking that balance I think is something

16   that has to be done on a case-by-case basis.  I think

17   that in actuality in this case, when we drill down on

18   the particular issue, it's one that's not as complicated

19   as -- as is made out, and I think that's true for at

20   least two reasons, Your Honor.

21        So, first of all, as -- as you'll see in sort of

22   setting the stage, we aren't blind to this issue on the

23   plaintiffs' side and nor do we want to define the class

24   so broadly that we create problems for the court or, you

25   know, if the -- if the decision is ultimately appealed.

1          So it's something that we are sensitive to and

2     want to make sure we get right, and that's why we asked

3     our experts to take a very hard look at this issue and

4     come back to us and tell us is there a different way to

5     look at this?  Is there a way to drill down more

6     significantly to see if we have something that

7     approaches, you know, that great number issue?  However

8     you want to phrase that.

9          And this is what you heard about yesterday from

10    Dr. Rosenthal when she did this probabilistic analysis

11    to determine, you know, how does the picture really

12    look.  And as Dr. Rosenthal told you yesterday with

13    respect to third-party payors, there's over a 99 percent

14    probability that those third-party payors are injured

15    across the different damage theories that have been

16    expressed in the class.

17          Now, with respect to the consumers, Dr. Rosenthal

18    reached a conclusion that consumers who purchased past

19    the date of generic entry would have been -- or that

20    there would have been about a 95 percent probability

21    that those consumers were -- suffered common impact and

22    injury in those cases.

23          And I'm going to drill down on that particular

24    issue for you, this sort of post generic entry issue.

25               THE COURT:  That would be great.

1          MR. BURNS:  Okay.  Good.

2          But I do just want to -- want to note that, as we

3  do in our papers, that in *Celexa* and *Lexapro*, the First

4  Circuit seems to -- and the First Circuit is obviously

5  one of the circuits that takes a different view from --

6  from Judge Lungstrum.  But the First Circuit in that

7  case, in *Celexa*, seems to accept that -- this type of

8  probabilistic measure, the same one that Dr. Rosenthal

9  did.  And she told you about this particular case is one

10  that could satisfy plaintiffs' burden.

11          So I'll get back to that in a second, but I

12  thought it might be useful to put this graph up on the

13  -- or this slide up on the screen for you.  So this was

14  taken from Professor Rosenthal's report.  I modified it

15  a bit, put a big yellow circle or egg in the middle of

16  it.  But when it comes down to this dispute that we're

17  having with the defendants as to common impact and

18  injury amongst the consumers, what we're really talking

19  about is that yellow egg.

20          And it's bounded on two sides, one by the August

21  24th, 2011 date, which is the switch to the two-pack,

22  and on the other side by the Sanofi launch actually.

23  And the reason that is is because obviously those

24  consumers cut across both the RICO and antitrust claims.

25  The Sanofi foreclosure claim is part of both as well.

1        But there is this period in between those two

2   dates where defendants have argued that there's no way

3   to tell who's injured or who's suffered common impact

4   during that period amongst the consumers.  A host of

5   reasons why, all of which I think sort of fall apart

6   when you dig into them a little.

7        But the basis of it is this:  What the defendants

8   like to argue is that if you purchased a two-pack before

9   August of 2011, then you don't have any damages because

10  you were a two-pack purchaser.  And so when we switched

11  to the two-pack, you haven't suffered any type of

12  injury; our actions haven't impacted you at all.  Okay.

13       And so they like to say that there is some small

14  percentage of individuals that they say we can't figure

15  out who were single purchasers before August of 2011 who

16  arguably could have been impacted post that period.

17       Now, I'm using the term "impacted" specifically

18  here because I think there's a lot of confusion we get

19  into, particularly with Dr. Johnson's opinions, which

20  seem to conflate impact and damages in this context.

21       But really at class certification what we're

22  talking about in this particular area is impact.  And I

23  think that holistically, as we look at the RICO class,

24  there are a couple answers why these particular

25  consumers are -- should and probably are within the

1   class.

2        The first is that, I mentioned it a little bit

3   before, we'll get into it as well in just a moment,

4   there is this economic concept that's been recognized by

5   certain courts and discussed of the loss of choice.

6   Now, what damages look like for that particular group

7   down the road is a separate question.

8        But with respect to common impact of what the

9   defendants' alleged activities resulted in for that

10  group, there's common impact because they have lost that

11  opportunity to choose between the two-pack and the

12  single-pack.

13       And in reality, Your Honor, and we have probably

14  fallen into this trap a little bit ourselves, is that

15  the dichotomy between a two-pack purchaser and

16  single-pack purchaser is probably a little bit too

17  narrow.  Because in reality you could have two-pack

18  purchasers who have purchased six EpiPens already who go

19  to the pharmacy one day and say, you know what, I need

20  one more, all right, for whatever reason.

21       You can also have single-pack purchasers who just

22  want to purchase another single pen.

23       You could also -- and here's, you know, the

24  principal choice issue:  What if you have a two-pack

25  purchaser who has gone out, purchased a two-pack of

1   EpiPens but uses one, doesn't use them both, and just

2   wants to come up to the two level because they want to

3   keep that two-pack of EpiPens with them?  They've been

4   denied the ability to go out and purchase a single

5   EpiPen themselves.

6         So that finite distinction between two-pack and

7   one -- and single purchasers is not as fine as it

8   probably should -- or as it seems.  But the overarching

9   point here is that wherever you fall in those

10   categories, you no longer have a choice to purchase a

11   single-pack post August of 2011.  From an economics

12   perspective, as we heard Dr. Rosenthal testify

13   yesterday, that is an injury.

14         And turning to our next slide, Your Honor, I

15   direct you to this *Blue Shield Virginia* case.  We also

16   cited a Law Review article in our reply brief.  But

17   these cases kind of hit on this particular issue.  And,

18   yes, you'll see from this quote, "Energy conversion

19   points us to case law saying that a reduction in

20   consumer choice can show anti-competitive harm."  This

21   was an antitrust case.

22         And that's essentially our argument in legal

23   terms is that, once you remove that choice, those

24   individuals, whether they be in the yellow egg or not,

25   have still suffered common impact.

17-md-2785   In re: EpiPen   6.12.19   *REDACTED*                    38

1        Now, separately within our -- within our RICO

2   class, and we'll spend some time on this later,

3   obviously we have given the court alternative damage

4   numbers or methodologies that we could pursue under our

5   RICO theory of liability.

6        But the court will recall that there's an

7   overarching RICO theory in this case which I refer to as

8   the RICO pricing scheme, and I think that's a term the

9   court used in the motion -- in its order on the motion

10  to dismiss.  I think Dr. Rosenthal at times has referred

11  to it as the alternative RICO damages.

12       But in reality, it's a measure of the damage from

13  RICO that spreads from August of 2011 until that end

14  date that doesn't have quite the definition that your

15  court -- that Your Honor had mentioned.

16       But the yellow egg consumers within that period

17  who have purchased within that period are still part of

18  our RICO class.  And under that theory of damages, they

19  have overpaid for the EpiPen because of the actions of

20  the defendants that allowed them to hike up that price

21  across the period.  So that is the yellow egg.

22       Now, I'll tell you this, Your Honor:  If you're

23  not persuaded by any of those arguments -- I hope you

24  are because I think they make sense after you look at

25  them -- but the answer here is to not throw out the

17-md-2785   In re: EpiPen   6.12.19   *REDACTED*   39

1   entire case or throw out the entire class.

2        So, as we mentioned in our reply papers, you know

3   one alternative is to actually exclude this particular

4   group of consumers in the yellow egg and to put that --

5   put that cutoff date farther on down premised on generic

6   entry or arguably on the -- the Auvi-Q date.

7        And what Professor Rosenthal has also, I believe,

8   testified to about this yesterday is that she has that

9   ability -- certainly in her reply report at 22, she has

10  the ability to segregate out those consumers for

11  purposes of determining the aggregate damages during

12  that period.

13       And just briefly, Your Honor, this, at Slide 28,

14  is the additional alternative exclusion that I just

15  mentioned which was individual consumers who did not

16  purchase an EpiPen after March 13th of 2014.

17       All right.  Your Honor, if I may, I'll move on

18  to --

19            THE COURT:  You may.

20            MR. BURNS:  -- the next area, which

21  obviously the defendants have raised what is in essence

22  an ascertainability argument.  We think that the -- that

23  particular -- the particular form that they are

24  advocating for is one that this court has rejected in

25  *Nieberding*.  It's one that Judge Lungstrum rejected in

1    *Syngenta*.

2               THE COURT:  Is there any hint in the

3    circuit -- from circuit's precedent on whether they

4    think Judge Lungstrum is right?

5               MR. BURNS:  Well, Your Honor, that's a good

6    question.  I mean, ultimately, I don't think there's

7    been a final determination by the Tenth Circuit.  There

8    is that reference -- and I'm sorry the case name is

9    escaping me -- to ascertainability in a Tenth Circuit

10   case.  But, in terms of drilling down on what that

11   standard looks like, this is pretty much what we --

12              THE COURT:  Are you talking about the 20 --

13   the (b)(2) class case?

14              MR. BURNS:  I believe that's right, Your

15   Honor, which obviously the (b)(2) class we have

16   different -- different concerns and elements there.

17          But in *Syngenta*, what we get is a pretty standard

18   definition for how classes should be defined.  I think

19   it's easily met here.  The class definition must not be

20   too vague.  The class must not be defined by subjective

21   criteria.  And the class must not be defined in terms of

22   success on the merits.

23          Obviously with respect to the third argument,

24   there's no -- there's no contention by the defendants

25   that this is a fail-safe class by any means.  And the

1   objective criteria by which it is defined really comes

2   down to whether, as we have up here in the class

3   definition, whether -- it essentially hinges on purchase

4   and the conveyance of price, whether some or all, by

5   either consumer or third-party payor.

6          And is there objective criteria?  I don't think

7   there's any subjective element to this, nor do I think

8   there's an argument that this particular definition is

9   in any way vague.

10          All right.  Catch up with myself, Your Honor.

11          Now, the defendants have also argued that there's

12   a typicality issue in this case.  Again, this is one

13   that I don't think is an argument that has a lot of legs

14   behind it.  And I point the court again to the *Urethane*

15   case.  And in essence it is correct and it's correct in

16   practically every case that class representatives may be

17   differently situated on the facts.

18          But in this case they've all brought the same

19   claims and they're all depending on the same theory of

20   the case.  And so nuanced positions, whether they're a

21   -- you know, what type of plan they necessarily have or

22   when they purchased, are all things that shouldn't

23   defeat class certification in this case because in

24   essence we're looking at the common claims and common

25   facts that apply to these individuals, and they are not

1    unique across the class.

2         Now, particularly as we get into consideration of

3    the collateral source rule as well as just the general

4    situation of our classes, our classes are made up of the

5    full gambit of indirect purchasers.  In this particular

6    case, we have both the end-payors and consumers as well

7    as third-party payors.  And defendants have alleged that

8    an intraparty or intraclass conflict arises when you

9    represent these two groups in the same proceeding.

10        Now, first of all, Your Honor, there are a host

11   of decisions and courts that we've referenced in our

12   papers and that we have referenced in this particular

13   deck that deal with this issue and that have certified

14   classes that include both third-party payors and

15   consumers.

16        So particularly at the class certification stage,

17   the essence of these cases is that there's no conflict

18   at class certification.  Everyone's interests are

19   aligned.  The class certification, while there may be a

20   conflict at a period later on the -- down in the game

21   when you're dealing with allocations issues or damages

22   issues as you address those, at the class certification

23   stage that hasn't arisen.  And so there's no particular

24   conflict between the different classes at this stage.

25        And I think that makes a lot of sense.  And

1   having -- having prosecuted a number of these indirect

2   purchasers cases over the years in different contexts,

3   you know, practice bears that out.  There's no real

4   conflict between the classes until you get to the point

5   that, you know, there's something to fight about, which

6   is money.  And we're not at that point yet.  We have

7   developed methodologies to identify aggregate damages.

8   And, you know, I think as we get farther down the line,

9   we can deal with allocation issues and any particular

10   issues that arise at that point.

11            THE COURT:  I was -- I was looking at a part

12   of your brief last night on this and it caught my eye,

13   because there's a place in a footnote where you

14   reference I think it's a communication with Anthem

15   where, at least according to the way your brief quotes

16   it, a Mylan representative solicited Anthem's help to

17   manage the competition.  And it sounds like, tell me if

18   I'm wrong, that this sort of "helping manage the

19   competition" is something that you all complain about.

20            Am I wrong?  Isn't Anthem one of your putative

21   class members?

22            MR. BURNS:  So, Your Honor, this is a good

23   question; and the answer is yes.  And that's not in the

24   context -- I'd have to look at that particular footnote

25   to refresh my recollection on it.

```
 1                 THE COURT:  It's -- it's note 52 in your

 2     opening brief.

 3                 MR. BURNS:  Okay.  Let me just --

 4                 THE COURT:  You don't have to look this

 5     moment.  Maybe come back to it.

 6                 MR. BURNS:  We'll come back to it, Your

 7     Honor.

 8                 THE COURT:  It caught my eye.  It is of

 9     concern to me.

10                 MR. BURNS:  Okay.  We will certainly address

11     that, Your Honor.  And if I don't get to it, then

12     Mr. Sharp has time to look at that over the next few

13     minutes.  But I have to refresh my recollection just on

14     those facts, Your Honor.  I just can't recall right now

15     what the exact circumstances were.

16          Now, was the court tying that in with respect to

17     the -- the intraclass --

18                 THE COURT:  Well, sure --

19                 MR. BURNS:  -- conflict?

20                 THE COURT:  -- if one of the people you are

21     asking to represent is being accused of being a

22     participant in the conduct that you say is illegal, that

23     strikes me as a concern --

24                 MR. BURNS:  I understand, Your Honor --

25                 THE COURT:  -- on several levels.
```

1          MR. BURNS:  -- and I think that is correct.

2    So but we have no allegations in our complaint, and I'm

3    not really aware of any facts that bear this out, with

4    respect to third-party payors as a class or a subclass

5    that bear out -- I mean, we haven't alleged that Mylan

6    or Pfizer have in any way entered into any type of

7    agreements or have colluded with those entities to cause

8    harm to consumers or in a way that really impacts this

9    particular class.

10         And I'd have to again look at that quote.  I

11   mean, my sense is that it's something that's short of

12   that and not the type of collusion that we allege with

13   respect to the PBMs in particular.  In there we have --

14   it's a different type of conduct because there it's much

15   more directed at the harm that ultimately was caused by

16   this activity.  But, Your Honor, we'll refer back to

17   that.

18         I do just want to touch on briefly, Your Honor,

19   what I -- I just recently referred to as the RICO

20   pricing scheme, because it's important in my mind to

21   point out a couple of things for the court that the

22   defendants don't seem to take too much issue with with

23   respect to the law and -- and our central allegations

24   here.

25         So, again, Your Honor, this scheme that we have

1    alleged and that I think the facts bear out is that

2    Mylan and Pfizer have colluded to be able to reap as

3    much profit, hike the prices as much as they can, and

4    they've utilized a number of means to do that, which in

5    our RICO claim constitute many of the predicate acts

6    that we have alleged in this case.

7        I think that -- and we really haven't heard the

8    defendants argue against this -- that the law on these

9    particular issues, the cases that we cite in our brief

10    are rock solid on this point that the damages to the

11    class can be different than those individual damages

12    that might inure from a particular predicate act.

13        And there's no requirement in the law that when

14    you look at individual predicate acts and you try to

15    figure out what the damages are for those individuals

16    that you add them all up to get to the damages for the

17    scheme.

18        So I think when you look at particularly *Sedima*

19    and *Bridge* and some of these other cases that we cite in

20    our brief, there's a recognition on the part of the

21    Supreme Court and other courts that damages for the

22    scheme as a whole can be separate or distinct from

23    individual predicate act damages.  And that's where we

24    are in this particular case.  And we've alleged and laid

25    out in some detail how those acts fit together to permit

1   Mylan and Pfizer to raise the prices we've indicated.

2   But that particular legal construct is one the

3   defendants haven't really taken any issue with.

4         Now, yesterday Dr. Johnson addressed this, I

5   think what he referred to, as the alternative model

6   borrowing on Dr. Rosenthal's words.  And I was a little

7   confused by his particular argument.  Certainly he

8   didn't much like the claim and perhaps thought that

9   determining damages in it was maybe too simplistic,

10  although I think it perfectly matches the facts in that

11  case.

12        But the only thing I really heard in substance

13  was the fact that we had dropped the EpiPen4Schools

14  allegations between our opening brief and our reply, and

15  the damages for this particular claim, the RICO pricing

16  scheme, didn't change as a measurable result.  I just

17  want to touch on that briefly, Your Honor.

18        It's absolutely right we have dropped the

19  EpiPen4Schools claims and for good reason.  Facts

20  developed and it didn't -- you know, we're not going to,

21  you know, chase something that is not factually accurate

22  or doesn't fit into our legal theory.

23        As a practical matter, if you look back at the

24  damages that -- the aggregate damages that Dr. Rosenthal

25  was calculating at the time of the -- of the initial

1  brief, the EpiPen4School case was relatively small and

2  subsumed by a much larger individual predicate act

3  elements.

4      Now, this makes sense in the context of the

5  pricing scheme because really, you know, going back to

6  that -- that original document I showed you, the

7  Project X2 document where the two pillars of the scheme

8  really are increasing revenue and bettering their

9  competitive position, those are the pillars of the

10  scheme and those are what hold through with respect to

11  the Auvi-Q foreclosure, with respect to generic

12  foreclosure, with respect to the implementation of the

13  two-pack and with respect to the price increases we see

14  across this time.

15      So I don't think there's an issue with

16  EpiPens4Schools dropping out because it factually

17  doesn't fit, but it was also a relatively small part of

18  our overall damages, doesn't impact the whole.

19      Now, what Dr. Rosenthal also testified to, I

20  believe in her deposition and I think that the

21  defendants may have played a clip of this yesterday, is

22  that, look, if we got down the road and we got to a

23  factual determination of, you know, whether generic

24  foreclosure falls out or Auvi-Q foreclosure, that there

25  may be a way to determine whether there is significant

1   impact on the pricing scheme damages as a whole.  That

2   was her testimony.

3        But we're not at that point now and that's, you

4   know, a factual determination that can be made down the

5   road.  Certainly one she's aware of and one we would be

6   prepared to deal with but we're not quite there yet.

7        So, Your Honor, if I can just briefly the next

8   few minutes touch on some of the issues that came up

9   with respect to our experts yesterday just while they're

10   fresh on our mind.

11             THE COURT:  Where are you about?

12             MR. BURNS:  Page 44, Your Honor --

13             THE COURT:  Thank you.

14             MR. BURNS:  -- and moving into 45.

15        I just wanted to point out a few things with

16   respect to Professor Elhauge, because I think here we

17   really have a classic battle of the experts.  And when

18   you look and drill down on the particular facts, I think

19   that's really what it boils down to.

20        So there's no real dispute with respect to market

21   power.  Mylan and Pfizer have kind of taken swings at

22   that, Mylan personally.  But their experts don't dispute

23   it because, when you look at it from an economic

24   perspective, it's pretty clear.

25             THE COURT:  It seems like a steep hill.

1              MR. BURNS:  Yes, I think that's right.

2          Now, when you look at -- so we heard a lot of

3     discussion yesterday about the reverse-settlement

4     methodology that Professor Elhauge had utilized in this

5     case.  I think it's important to consider that in

6     essence it's the same methodology that he has used in a

7     number of antitrust cases that have been certified and

8     reports have dealt with that particular methodology.

9     It's not really surprising, Your Honor, because his

10    inputs are tied to the facts in this case.

11         So it is not something where he's taken inputs

12    with no factual basis and trying to fit them into the

13    model.  He's trying to fit the model to the facts of

14    this case and be careful about that.

15         You heard much yesterday about the -- you will

16    remember the graph where -- where Professor Elhauge

17    looked at various inputs in terms of date and times of

18    settlements, strengths of settlements, and there were

19    certain circumstances where there would be no damages

20    under that -- under those certain circumstances.

21         But in reality, as he has testified, fitting the

22    facts of this case, there aren't any factual

23    circumstances he's aware of in this case where those

24    eventualities would actually occur.

25         So while his model properly identifies those

 1   circumstances, they're not ones that really fit the

 2   facts.

 3          As I said, I just had to throw this up here.

 4              THE COURT:  Thanks so much.  I've been

 5   working on that overnight.

 6              MR. BURNS:  Yeah, I know.  I didn't get much

 7   past the equals sign.  It scares the hell out of me, so

 8   I thought I'd throw it in for everyone's entertainment.

 9          In reality, Your Honor, here's what this comes

10   down to:  Professor Elhauge has made certain choices in

11   constructing his model.  Dr. Johnson makes certain

12   choices in critiquing that model.  Dr. Johnson really

13   hasn't put his own model together.  Bear in mind he's

14   critiquing Professor Elhauge's opinion.  But in reality,

15   many of these choices are ones that are referenced in

16   the manual as acceptable choices that an expert might

17   make.

18          And so when you look at this statistical

19   significance issue, the manual itself recognizes that

20   it's not an axiomatic 95 percent.  And that in some

21   cases a lower percentage may be perfectly fine and

22   acceptable.

23          Similarly, when you look at -- you'll remember

24   the whole one-tail, two-tail test argument.  Again, the

25   manual looking at that says, look, when you use a

1    one-tailed test, that tells us what the expert is

2    thinking about the case.  And the expert is in effect

3    stating that prior to looking at data, it would be very

4    surprising if the data pointed in the direct opposite

5    direction.

6            So these are acceptable choices that Dr. -- or

7    Professor Elhauge has made.  They're not outside the

8    norm and they certainly don't compromise his overall

9    opinion.

10           With respect to Professor Rosenthal, I think

11   we're now at 56.  And, again, I just want to point out

12   that when you're looking at the reliability of her

13   models and what she has done, you may quibble about

14   whether -- the defendants will certainly quibble whether

15   it's too aggressive, you know, just designed to -- to

16   bulk up damages.  But in reality, pretty much everything

17   she has done has been pegged to some factual basis in

18   this case.

19           And so you'll remember when she was looking at

20   this standard generic capture curve, and you'll recall

21   this was discussed yesterday, that she actually used a

22   curve that was referenced in Mylan's own documents.  And

23   so it's bounded factually to what we have in front of us

24   in this case.

25           Similarly, you heard a lot yesterday about brand

 1   loyalists and how that might defeat class certification

 2   here.  And I just kind of want to ground us in her

 3   actual -- actual work, the probabilistic work she did

 4   here.

 5        Number one, you'll remember, Your Honor knows

 6   well, we're dealing with a but-for world here.  And of

 7   course a probabilistic assessment is what you used in a

 8   but-for world because we really don't have that precise

 9   world to look at.

10        And what she found is that, when you look at the

11   third-party payors, if the -- if that third-party payor

12   only had one patient who used an EpiPen or who purchased

13   an EpiPen, the highest percent chance you would have

14   that that particular patient is a brand loyal patient is

15   about 8.39 percent.  And it just falls away quickly

16   after you get more to reality where you see numbers of

17   patients.

18        In reality, these numbers are so small.  I mean,

19   most third-party plans involve thousands of particular

20   consumers.  And the idea that you would only have one,

21   two, three, four, five EpiPen purchasers, especially

22   given the prevalence of allergies today, is certainly

23   not tenable.

24        But importantly I think what this also shows is

25   the flaw in Dr. Johnson's analysis that

1   Professor Rosenthal spoke about yesterday.

2   Dr. Johnson's analysis included a -- a real-world

3   analysis, if you will, of the Mylan authorized generic.

4   The reason that Dr. Rosenthal didn't engage in this is;

5   one, it's inappropriate, as she testified yesterday, to

6   look at this real-world example versus the but-for

7   world.  You can't kind of mix apples and oranges there;

8   but, two, when you look at this particular real-world

9   example, the court will recall that Mylan's authorized

10  generic --

11       Number one, it's a Mylan authorized generic, it's

12  not a third-party competitor they're competing in the

13  market for; number two, it arises at a time when Mylan

14  is under a huge amount of scrutiny as a result of its

15  pricing practices and they throw this authorized generic

16  in there to try to compensate for it.

17       Okay.  It's not really a measure you should be

18  looking at in this case.  And some of the flaws in

19  Dr. Johnson's analysis are he looked at data from

20  third-party payors with respect to this authorized

21  generic.  And I took his deposition and I remember this

22  quite well.  When he looked at some of these third-party

23  payors, there were some with only one transaction.  That

24  filters into his analysis and tends to overstate the

25  issue that he has addressed.

```
 1          So ultimately our position is that sort of
 2   cherry-picking between real world but not a great
 3   exemplar and the but-for world that is consistent with
 4   economic theory and -- and, you know, what
 5   Professor Rosenthal has been doing for 20 years is not
 6   something you should do and in no way undermines her
 7   opinions.
 8          So with that, Your Honor, unless there are
 9   further questions, I am going to reserve the rest of the
10   time.
11              THE COURT:  Why don't we hit the clock here
12   and let me look at my questions and see if there's any.
13              Just so I'm clear, the motion papers refer to --
14   -- the motion papers refer to who class counsel is but
15   doesn't say who you're asking to appoint.  Are you
16   asking for the lead counsel group or are you asking for
17   the steering committee?  Has the steering committee
18   approached that subject?
19              MR. BURNS:  We would ask for the same group
20   you appointed in interim cases be appointed as leads in
21   the case.
22              THE COURT:  Yeah, I'm missing something
23   because I didn't see in Document 40 an appointment of
24   interim class.  So --
25              MR. BURNS:  Well, and, Your Honor, as I'm
```

1   thinking about this, that's a good question and I'm

2   wondering if I'm misremembering something

3   Judge Lungstrum might have done before the MDL.

4               THE COURT:  He touched on this stuff before

5   the panel got its hands on it.  The only appointment

6   order I'm aware of is Document 40, and I don't believe

7   it appoints anyone in that interim.  That was proposed

8   but I wasn't of a mind to do it then.

9               MR. BURNS:  You're right.

10              THE COURT:  You might add that to a list of

11  things you're keeping score on that I'm asking about.

12              MR. BURNS:  Your Honor, I can tell you that

13  certainly we have discussed it and what we would be

14  asking is appointment of the current group as class

15  counsel.

16              THE COURT:  Let me ask:  In terms of -- in

17  terms of the consumer cases, it strikes me as a tall

18  order to suggest the court should certify a class to

19  assert state law claims from states where you don't have

20  plaintiffs.  Do you agree?

21              MR. BURNS:  Your Honor, we're certainly

22  aware of your opinion on that and your view on that.

23  And to be honest with you, Your Honor, just to let you

24  know, we're -- we're coming out on where we have viewed

25  that issue.

1          We have been engaged by a handful of other

2    plaintiffs but not able to reach an agreement with the

3    defendants that would not slow this process down for

4    class certification.  So we're aware of that particular

5    issue and we're sensitive to it and we want to make sure

6    that we're zealously representing these folks right.  So

7    maybe something we come back to.

8               THE COURT:  Let me ask one last question,

9    then we'll take a recess and turn the table here.

10         Obviously a RICO class can be certified.  The

11   circuit thinks so.  *Colorado Golf Club* case establishes

12   that.  That's a one-state RICO class.  You asking for 50

13   states and a district?

14              MR. BURNS:  That's right.

15              THE COURT:  Has that been done before?

16              MR. BURNS:  There have been nationwide RICO

17   classes, yes, sir.

18              THE COURT:  It may be in your brief.  I read

19   so much in the last two weeks, I may have missed it

20   but...

21              MR. BURNS:  I will say this, Your Honor:  I

22   don't know if we ever -- it may have been just kind of

23   obvious from our practice and experience that we

24   probably didn't spell it out so completely.  But I know

25   we have a firm suspicion that we have cited cases in

 1   there that are indeed nationwide cases.

 2             THE COURT:  Why don't you put that on my

 3   shopping list, because I'm curious about just it in my

 4   class experience, both in practice and on this job --

 5             MR. BURNS:  Certainly.

 6             THE COURT:  -- not RICO.  So it's a new --

 7   it's a new frontier for me.  All right.  Thank you very

 8   much.

 9             MR. BURNS:  Thank you, Your Honor.

10             THE COURT:  Mr. Levin, take a recess.  Just

11   -- are you doing the only presentation from the

12   defendants' side today?

13             MR. LEVIN:  No.  We are dividing the

14   presentation.  I'll be doing about 70 minutes,

15   Mr. Gandesha will be doing about 20 minutes.

16             THE COURT:  And I can trust you two to

17   divide that time or do you want us to put 70 up?

18             MR. LEVIN:  You don't have to put 70 up.

19   You can put 90 up and we'll keep track.  We'll arm

20   wrestle if I'm over 70.

21             THE COURT:  All right.  Fair enough.  Let's

22   take 10.  I'm planning to go straight through until the

23   end.  I think we can make that.  All right.

24             (Recess.)

25             THE COURT:  All right.  Back on the record

1   in the presence of counsel, ready to hear from the

2   defendants' side of the caption.  Mr. Levin.

3          MR. LEVIN:  Thank you, Your Honor.  Your

4   Honor, we recognize how much material we have given

5   chambers and your staff and you in connection with this

6   and we realize it is a ton to absorb.

7          Again, we are grateful for the court's time and

8   I'm hopefully here to help, along with Mr. Gandesha, to

9   show you down the path, over the next 90 minutes, why it

10  is that there really is only one clear result that can

11  come out of this process, and that is that a class

12  should be denied in this case.

13         It is not an exaggeration, Your Honor, to say

14  that no court has ever certified a case like the case

15  that the plaintiffs are seeking to certify here.

16         As we're going to summarize over the next

17  90 minutes, this is a case with hundreds of thousands of

18  conceded uninjured plaintiffs, people who could not have

19  suffered harm.

20         It is a case with no model, literally none to

21  pick out who those uninjured members of the class are

22  without individualized inquiries.

23         It is a case with no model, literally none, to

24  show impact or injury for two of the three plaintiffs'

25  primary theories.

1        And it is a case with complex class definitions

2   with three completely different factual theories being

3   rammed into five different class definitions that span

4   more than eight years.  Layered on top of that

5   typicality, conflicts, ascertainability, adequacy

6   problems and all the rest.

7        Look, we get it, this is EpiPen.  EpiPen and the

8   issue around EpiPen raise potentially important policy

9   issues about drug pricing in the United States.  In

10  fact, Mylan has been at the forefront of those policy

11  issues.  But not every case, no matter what the cause of

12  action may be, no matter how much press it may have

13  garnered, not every case is suitable for a class action.

14  And this case, Your Honor, is manifestly not suitable

15  for the class action device, at least not without doing

16  a disservice to the law.

17        And so this is the legal argument.  Let's start

18  with the law.

19            THE COURT:  Okay.

20            MR. LEVIN:  Rule 23, it's well-established

21  in this circuit, Your Honor, that the requirements of

22  Rule 23 are to be heavily scrutinized and strictly

23  enforced.  The court must do a rigorous analysis, as

24  Your Honor knows, as to whether each of those analyses

25  have been met, and the plaintiff has the strict burden

 1    of proof.  And under this court's local rule, that means

 2    they have to present an evidentiary basis of showing

 3    that the elements of Rule 23 have been met.  They must

 4    show and prove that the case is, in fact, a class

 5    action.

 6            Your Honor, I want to start today's slide deck

 7    presentation by just giving an overview and roadmap of

 8    the kinds of topics I hope to touch on.  We may not have

 9    time to get all of these, frankly, but I'd like to at

10    least get down to typicality and class conflicts.  If we

11    have time for ascertainability and the rest, we'll do

12    it.  If not, you certainly have a kajillion footnotes

13    and other pages of briefing that will help you guide

14    your way.

15            Just as a threshold, Your Honor, I do want to say

16    Mr. Burns probably spent 20 or 30 minutes of his

17    presentation on the merits, the core merits of the case.

18    Suffice it to say we disagree.  We disagree strongly.

19    I'm not going to walk through all of those.  It is our

20    position that we do not accept the facts that he said as

21    part of his presentation.  But I also think those facts

22    are completely and utterly irrelevant to this court

23    deciding the class certification issue.

24            We all agree that at some level the court has to

25    assume the merits to decide class certification.  So

1    we're beyond that.

2         Let's talk about the issues up on this slide, and

3    we start with predominance.  Your Honor, the Tenth

4    Circuit has recognized that predominance regularly

5    presents the greatest obstacle to class certification.

6    That is the *CGC* case from the Tenth Circuit.

7         And the Supreme Court said in *Wal-Mart,* a number

8    of years ago that, look, any competent lawyer can come

9    up with common questions of law or fact.  The decision

10   point on class certification is:  Can you answer those

11   questions with common proof in a classwide way and

12   without individualized inquiries?

13        The problem the plaintiffs have here is that they

14   cannot.  They cannot prove injury or impact with common

15   evidence and in a classwide way.  The proposed classes

16   here contain hundreds of thousands of uninjured members,

17   if not more, and no way to identify who they are and

18   remove them from the class without individualized

19   inquiries.

20        Your Honor, there's been a lot of brief -- a lot

21   of briefing about the law around uninjured class members

22   and how that applies to the overall predominance test.

23   But one thing we felt, I guess, was there really wasn't

24   a summary of where we are as the court looks at the

25   briefing.  I thought we should take 5 or 10 minutes and

 1   take some time on what is the state of law as to

 2   uninjured class members and predominance.

 3        And you see it summarized on this slide.  With

 4   one exception, every circuit in the country to have

 5   addressed this issue has held that the presence of

 6   uninjured class members defeats class certification,

 7   especially if there is no way to identify who those

 8   class members are and pick them out.  And you see that

 9   on the slide the First, the Second, the Third, the

10   Eighth, the DC, they all said it.

11        Now, some of those statements up there may look

12   pretty harsh.  Look, for example, at the Second

13   Circuit's quote, "No class may be certified that

14   contains members lacking Article III standing."  To be

15   clear, what you see in those blue bullets, those blue

16   items on the side, that is the defendants' position in

17   this case.  Our position is the court should adopt the

18   prevailing view of circuits across the country and find

19   the presence of uninjured members defeats class

20   certification.

21        But I stop because I want to make the court

22   understand that's not really as harsh as it seems.

23   Because if you have a way to identify who the uninjured

24   members are and pick them out, then what you're left

25   with is a class that's just all injured members of a

1    class, and that's just another way of saying what these

2    other circuits are saying.

3         You've got to have a method that identifies them

4    and picks them out.  Because if you don't, you've got

5    classes that we know have uninjured members.  And

6    whether it's under Article III, whether it's under

7    predominance, all these circuits say you cannot certify

8    the class.

9         The one outlier that I mentioned before is the

10   Seventh Circuit, and the plaintiffs pick up on this for

11   reasons we'll talk about in a second.  The Seventh

12   Circuit in the *Kohen* case, as amplified in the *Messner*

13   case in 2012, provides that you can certify the class so

14   long as there is not a "great many of uninjured class

15   members".

16        Again, our position is that that is not the great

17   weight of the law.  I think if Your Honor would just

18   pick up the *Asacol* case from the end of 2018, it goes

19   through the entire analysis, explains why in our view

20   that's a better read of the law.  But the Seventh

21   Circuit is out there.

22        What about the Tenth?  Your Honor asked this

23   question and Mr. Burns answered it correctly.  It is an

24   open question of law in this circuit as to what the

25   standard should be for uninjured class members.

1        Now, there have been three cases that have

2    touched on the *Kohen* standard that are mentioned in the

3    parties' briefs, and I just want to talk about those

4    three cases and in particular so the court has a full

5    understanding of what our view is of those three cases,

6    and that's the *Strickland*, *Syngenta* and *Urethane* cases.

7        But just before we get there, Your Honor, I want

8    to pause for a second before we -- before we leave this

9    analysis and just make -- well, just offer Your Honor

10   some good news.  The good news here is, in our view, you

11   actually don't need to decide ultimately which law

12   applies in order to decide this issue.  The reason I say

13   that is because, as we will see today, no matter which

14   legal test the court ultimately adopts, we win.

15       If the court adopts the prevailing view of the

16   law, we win.  It is conceded there are uninjured members

17   of the class.

18       If the court adopts the Seventh Circuit standard,

19   we win because, as you will hear, there are great -- a

20   great many of class members here who could not have

21   suffered harm.  I don't know what "great many" is.

22   Mr. Burns didn't know what it is.  The Seventh Circuit

23   doesn't know what it is in *Messner*.  They say we --

24   there's no precise measure for this.  But, Your Honor,

25   whatever it is, this is it.

1        And we win for a third reason, and that's because
2   whether it's a great number, a smaller number, a
3   *de minimis* number, there is no model to identify those
4   people and remove them.  So you'd be certifying a case
5   where you know there are -- there are uninjured class
6   members, and that's a violation of Article III.  It's a
7   violation of Rule 23.  It's a violation of due process.
8   It can't be done.

9        Now, let me turn back to those three cases that
10  they cite, *Strickland*, *Syngenta* and *Urethane*.  We can, I
11  think, dispose of *Strickland* pretty quickly.  That's a
12  Tenth Circuit case.  The reason *Strickland* is
13  distinguishable is it's not a Rule 23(b)(3) damages
14  case.  It's an injunction case.  And in the injunction
15  context, the predominance element isn't even an element.
16  It's not a thing.  The law on injunctions is different.
17  And so, yes, they mention *Kohen* from the Seventh
18  Circuit, but they do it in the context of the injunction
19  test.  So put *Strickland* to the side.

20       *Syngenta*:  Your Honor quickly picked up on the
21  legal issue in *Syngenta*, which is the court cites *Kohen*
22  as a Tenth Circuit case and as Tenth Circuit law but
23  it's not.  It's a Seventh Circuit case and Tenth Circuit
24  law is open.  But also, as a factual matter, there's a
25  very easy way to distinguish the *Syngenta* case from this

1    one.  If the court will look at the district court

2    opinion of page *9, what you will see is a statement

3    from Judge Lungstrum that in that case the defendant

4    there did not identify any class member that was

5    actually uninjured.

6        The court marches through the analysis and

7    they're talking about defendants whose gains would have

8    been completely offset, could have completely offset

9    certain damages.  And Lungstrum says nothing like that

10   in the record and he concludes, "There is no basis to

11   conclude that the necessary individual inquiries would

12   be so overwhelming as to defeat predominance in the

13   context of that case."

14       Suffice it to say, Your Honor, as we're about to

15   see, and we saw yesterday, this is not that case.  There

16   are plenty of uninjured class members, and it will be

17   overwhelming.

18       As for *Urethane,* another Judge Lungstrum case, a

19   couple things there.  First of all, *Urethane* as a matter

20   of law is an antitrust price-fixing case.  And as the

21   Tenth Circuit said in the appeal of *Urethane,* that

22   matters because the Tenth Circuit said that in a

23   price-fixing antitrust case, the court is allowed under

24   *Urethane* in this circuit to permit an inference of

25   classwide impact.

17-md-2785   In re: EpiPen   6.12.19   *REDACTED*

1       Needless to say, this is not a price-fixing case.
2   There is no inference that can apply.  There's no
3   presumption that can apply.  So as a matter of law, it
4   was much easier for the *Urethane* court to find classwide
5   impact.
6       As for facts, the predominance problem that we
7   have here is not even in the same universe as the
8   predominance problem Judge Lungstrum was faced with in
9   *Urethane*.  So in *Urethane*, Your Honor, the class there
10  was only 2,400 plaintiffs.  And you'll find this in the
11  record, and Judge Lungstrum said that the record there
12  showed that only "a few class members" could not have
13  been harmed.  That's the district court case at page *2.
14      So we were curious, Your Honor, what did he mean
15  when he said "only a few class members there were not
16  harmed"?  And so we looked and we found the answer in
17  the appeal briefs to the Tenth Circuit.  It turns out
18  that the number of uninjured class members in the
19  *Urethane* case was somewhere between 48 and 168.  And
20  you'll find that in the appellant's opening Tenth
21  Circuit brief at page 36, note 6 and the appellee's
22  response brief at page 39, note 8; 48 to 168.
23      In that context, Your Honor, of course it's easy
24  to find the *Kohen* standard has not been met.  Of course
25  it's easy to find that predominance has been satisfied.

1   That is not this case.  You're about to see statistics

2   that we're going to put up on these slides that show

3   that uninjured class members here may approach as many

4   as 1.5 million people in this class.  And, again, I

5   don't know what a "great number" is, but that's it.

6          Unless Your Honor has any questions about the

7   law, what I'd like to do now is turn to the facts and

8   apply it to the legal standard we just talked about.

9          Let's talk about first the slide Your Honor has

10   before you which is the experts and then we'll turn to

11   the actual facts based on named plaintiffs and others.

12          No model, no showing of predominance, no class

13   certification.

14          Your Honor, Professor Rosenthal has conceded in

15   this case that she is a damages expert.  You heard her

16   testimony yesterday from my deposition of her and she

17   amazingly doubled down on it in the hearing yesterday.

18   There's the quote from the transcript yesterday.  "My

19   goal was to quantify aggregate damages."

20          Here's the problem:  Damages is not the question

21   that this court needs to answer on class certification.

22   In fact, Mr. Burns just said it.  This is him talking,

23   "At class certification what we are talking about is

24   impact, not" -- he's right.  We should be talking about

25   impact.  But Professor Rosenthal isn't an impact or

 1   injury expert.  She is a damages expert.  That is all

 2   that she looked at.

 3        And there's a difference at class certification

 4   because impact is the fact of injury and, by the way, is

 5   an express element of antitrust and RICO claims that

 6   provide standing, whereas damages is the aggregate

 7   amount of that injury, assuming that it exists to begin

 8   with.  They have skipped that first step about injury.

 9   They don't have an expert to do it.

10        So, Your Honor, your first easy off-ramp is right

11   here in bold on this slide.  There literally is no

12   impact or injury model offered by the plaintiffs in this

13   case to show predominance for the plaintiffs' two-pack

14   or generic delay allegations at all.

15        As for Auvi-Q foreclosure, we heard lots of

16   testimony yesterday.  I'm not going to repeat it.  We'll

17   rely on Dr. Johnson's testimony and his opinions.

18   Professor Elhauge is the only one who tries to evaluate

19   impact for foreclosure, and that model is replete with

20   problems and fails to satisfy plaintiffs' burden.

21        Your Honor, there's one other note here that's

22   new.  It's not something that comes up in the briefing

23   because we noticed it based on the reply brief we talked

24   about.  There's also no model for persons who bought or

25   reimbursed the EpiPen authorized generic.

1          The way this goes down is they originally had a

2     class definition that says it's anybody who bought the

3     EpiPen brand or anybody who bought the AB-rated EpiPen,

4     right.  We come back and say that's weird.  That doesn't

5     make sense.  The AB-rated EpiPen is Teva.  That's what

6     that means.  You couldn't include Teva purchasers in the

7     class.

8          They come back, page 1, note 6 of the reply to

9     say, right, that was a mistake.  We didn't mean AB, we

10    meant AG.  So authorized generic purchasers of the

11    EpiPen are now apparently in the class.  The problem is

12    they're not in plaintiffs' models.

13         Professor Rosenthal specifically excluded EpiPen

14    authorized generic purchasers from two-pack and generic

15    delay models and so did Professor Elhauge.  Look at that

16    quote from his errata sheet from his first report.  "I

17    understand that purchasers of Mylan's authorized generic

18    are not included in the class."  Well, they are and his

19    model doesn't have anything for them.  It's yet another

20    reason why, Your Honor, as this slide says, no model, no

21    predominance, no certification.

22         And, Your Honor, plaintiffs' experts, despite all

23    this, agree that there are uninjured plaintiffs in this

24    case.  I won't walk through bullet point by bullet point

25    here, but these issues are all conceded.  I mean, these

1    are things they admit in their depositions.  The cites

2    are at the bottom of the slide are for Your Honor's use

3    later on.  But there are whole categories of people

4    where the deposition and other records shows they agree

5    these are going to be uninjured plaintiffs.  Yet,

6    despite this acknowledgement, they rely on averages and

7    they never look at those individual class members to try

8    and go find them and pick them out from the class.

9          You saw the deposition testimony clips we played

10   yesterday from Professor Rosenthal.  She admits it.

11   That's the quote that's up there.  They're relying on

12   averages and aggregate damages.

13         Let me pause here for one minute because

14   Professor Rosenthal says, yeah, that's fine.  This is a

15   but-for world.  It's all hypothetical.  We have to rely

16   on averages.  Your Honor, that's a fundamental

17   misunderstanding of applying these models to Rule 23.

18         First of all, maybe you can do that for aggregate

19   damages.  You can't do it for impact.  And because

20   Professor Rosenthal is a damages expert, she's missing

21   the step about impact that makes her model unable to use

22   averages or hypothetical prices to be able to show this

23   injury on some classwide basis through common proof.

24         Second of all, of course, while maybe you can use

25   averages or aggregate damages to certify a class, of

1    course you can only do it if the underlying theory of

2    the case would allow you to do so.  And the problem the

3    plaintiffs have here is the very nature of their claims

4    is individual.

5         Would you have bought a generic?  Would you have

6    bought a single pen?  You can't possibly answer those

7    questions on a classwide basis.  And so this is not a

8    case where averages and aggregate damages get it done.

9         Let's talk numbers.  Your Honor, the plaintiffs

10   allege in this case that the proposed classes contained

11   "millions of plaintiffs," that is their reply brief at

12   page 43.  Let's assume charitably the lowest multiple of

13   millions, which would be two.  If you have a class of

14   2 million plaintiffs, you'll see on this slide, if you

15   even have just 5 percent of the class that is uninjured,

16   you're talking about 100,000 people who will be getting

17   damages under the plaintiffs' models that we know are

18   not uninjured and that the plaintiffs have no way to

19   identify without individualized inquiries and many

20   trials.

21        Now, let's put these numbers to the test, sort of

22   keep these numbers in the back of your mind.  Let's walk

23   through each of the plaintiffs' three theories.  Let's

24   start with two-packs.

25        Seventy-six percent of EpiPen devices were sold

1   in two-packs even when a one-pack was available.

2   Professor Rosenthal testified yesterday she didn't count

3   these people as part of her aggregate damages

4   calculations.  But as Dr. Johnson noted, the people are

5   still in the class.  So these are people we know were

6   not damaged by the switch to the two-pack and yet

7   they're in the class and we have no way to pick them

8   out.

9        Seventy-four percent of consumers paid the exact

10   same amount to buy a one-pack or two-pack; i.e., they

11   could not have been injured.  Their theory is they would

12   have paid more money but we know they didn't.  And you

13   saw the evidence, and it's in the record and it's on the

14   bottom of the slide, where plaintiffs are admitting

15   those people aren't injured but they've got no way to

16   find them and pick them out.

17        And then, Your Honor, on the right we come to the

18   named plaintiffs.  Fifty-two percent of the named

19   plaintiffs who bought an EpiPen device prior to 2011

20   bought a two-pack even though the one-pack was

21   available, which means there are also two-pack people

22   who would not have been injured by the fact that Mylan

23   started selling the device as a one-pack.

24        Now, look, maybe there's another argument to

25   that, right.  Mr. Burns talks about this and says, well,

1   maybe they would have bought one later.  Maybe in 2013

2   they would have gone to the pharmacy and they would have

3   said, hey, give me a one-pack.  And they played that

4   clip actually yesterday in rebuttal, right, where she

5   says, oh, I would have gone to my pharmacist.  I asked

6   for the one-pack; oh, sorry, it's only sold in a

7   two-pack.

8          You know what that screams to me, Your Honor?

9   Trial.  We cross-examine the witness.  They offer that

10  in rebuttal and a jury decides.  And you absolutely, of

11  course, cannot do that on a classwide basis.  It is the

12  very epitome of an individualized mini trial inquiry

13  that defeats class certification.

14         By the way, before I leave this slide, during his

15  argument Mr. Burns was talking about ways to divide the

16  classes up and he talked about a two-pack class and a

17  generic delay class.  Just -- just to make the record

18  clear, of course, there is no two-pack class.  There is

19  no generic class.  The classes are defined by causes of

20  action, and that too is a problem.

21         Because, as we say in our brief, you've got these

22  three theories all crammed into these various causes of

23  action classes.  So if any one of these three -- any one

24  of these three theories fails, the entire class has to

25  go down because they're all in the class and the court

1    cannot possibly present any class trial theory of

2    damages or a theory of impact that we know cannot be

3    tried as a class action.

4              THE COURT:  I read that in your brief and I

5    was thinking about it.  It's an interesting point.  I

6    mean, I guess my reaction is Rule 23 provides enough

7    flexibility that if I thought one of these theories was

8    the third rail of class certification, that you could

9    certify and manage your way around it.  I got a hunch

10   you're going to go ahead and say they're all three

11   polluted; so I get it, it's just a discussion.  But I

12   think Rule 23 provides enough discretionary case

13   management to manage that problem if that were the

14   obstacle.

15             MR. LEVIN:  Yes.  And I won't say what you

16   have probably thought I would say, all three will fail,

17   but that's right.  If the court were to find two of the

18   three failed for example, yes, the plaintiffs would have

19   -- well, actually, what the court should do in that

20   instance is deny the motion for class certification

21   because as pled the classes that have been asserted

22   don't work.

23             Now, the plaintiffs can come back, I suppose, and

24   renew their motion as to the one that Your Honor may say

25   in the opinion could be certified as a class but that

1   would be up to them how they want to go forward in a

2   case.

3          As it stands right now, what the court has before

4   it is a class or are classes that have all three

5   theories of harm.  And if one of them fails, the class

6   can't go forward to a class trial and the motion for

7   class certification has to be denied.

8          That's two-packs.

9          Let's go to the next theory, which is Auvi-Q

10  foreclosure.  And again here the number, Your Honor --

11  the numbers, Your Honor, are staggering.

12  Ninety-four percent of EpiPen transactions involved

13  insured consumers, and most of them would have paid the

14  identical price for an Auvi-Q as they would have for an

15  EpiPen because they had a branded co-pay and, therefore,

16  would not have been injured by the conduct that the

17  plaintiffs allege.

18         Let me pause here, by the way, on the word

19  "transactions."  In her rebuttal testimony yesterday,

20  Professor Rosenthal tried to make something of the fact

21  that, when she talked about her 95 percent generic delay

22  switching piece -- I realize we're talking about

23  foreclosure, but generally her opinion was about

24  transactions, EpiPen transactions, scripts,

25  prescriptions as opposed to people.  And then you asked,

1  of course, Dr. Johnson what does that mean in terms of

2  people.

3         And the problem with Professor Rosenthal's answer

4  there is that while she was trying to draw a distinction

5  between transactions and people in her testimony

6  yesterday, that's not actually the way she does it in

7  her report.

8         And, Your Honor, I refer the court to look at

9  paragraph 53 and 54 of Professor Rosenthal's rebuttal

10 report where she makes very clear that she is making a

11 conservative, in her words, assumption that the number

12 of transactions is equal to the number of people in

13 terms of the way that she performs, in that instance,

14 her probability analysis that the plaintiffs now rely so

15 heavily on.

16        So she herself is using as a -- as a method the

17 number of transactions equaling the number of people.

18 And we agree if that's right, the numbers up here

19 clearly meet whatever legal test the court wants to

20 adopt.

21        And, you know, what if it's not right?  In a

22 world of 94 percent of transactions may involve

23 uninjured consumers or 99 percent are uninjured

24 transactions, the number of uninjured people, no matter

25 what it is, is certain to be a great number and certain

1   to meet the test of those prevailing circuits.

2          And I guess I should adhere --

3          By the way, because Your Honor asked Dr. Johnson

4   do we know the number of uninjured people, I'm giving

5   the court a number of percentages.  But, of course, it's

6   not our burden.  It's not our burden to show people are

7   uninjured.  It's their burden to show the entire class

8   is injured, and they haven't met it.

9          We come to the last piece on this again, Your

10  Honor, the named plaintiffs.  Fifty percent of the named

11  plaintiffs we depose and whose documents we looked at

12  were uninjured.  At the bottom of the slide talks about

13  what Professor Elhauge's model flaws are.  And what

14  Dr. Johnson said yesterday, that model also fails and

15  does not show impact for the foreclosure allegations.

16         Generic delay:  Fifty-four percent of

17  transactions were shown in the record where insured

18  consumers paid less to buy a branded EpiPen device than

19  Professor Rosenthal said they would have.  In other

20  words, less than her but-for price.  By the way, she

21  recognizes, as Dr. Johnson said in his testimony, is a

22  good proxy for what somebody would have paid.

23         Seventy-nine percent of transactions where people

24  used a coupon meant people paid zero dollars below that

25  but-for price.

1          And, again, the named plaintiffs, 50 percent of

2     the named plaintiffs are uninjured for a variety of

3     reasons.  They never bought a generic.  They paid less

4     than the but-for price, whatever it is.  In a case where

5     you have 50 percent of the named plaintiffs themselves

6     being uninjured, it is a clear sign this is not a case

7     that merits classwide treatment.

8          And, Your Honor, I would point to two named

9     plaintiff examples in particular for this.  The first is

10    Plaintiff Buchta, B-u-c-h-t-a.  It's Exhibit 15 to our

11    opposition brief.  It's the deposition of that

12    plaintiff, page 189, where that plaintiff testifies that

13    he bought a branded EpiPen for zero dollars in 2016 but

14    had to pay $30 to buy the generic in 2018.  In other

15    words, a plaintiff who paid more money to buy the

16    generic than he did to buy the brand, that is a

17    plaintiff who was not injured.

18         And the only way we know that is because we took

19    the plaintiff's deposition.  We looked at the

20    plaintiff's medical records.  We looked at the

21    plaintiff's documents and we found that fact in the

22    record.  That is individualized inquiry.

23         My second example, Your Honor, yesterday is the

24    other video that the plaintiffs played in their

25    rebuttal.  And, Your Honor, if 30 seconds can

1   encapsulate everything we're talking about in these two

2   days, it was the 30 seconds played at the very end of

3   their presentation, the rebuttal video from the

4   plaintiff who was appearing by video talking about

5   whether she would have bought the brand or generic.

6         What do we have there?  We have us quoting her in

7   the deposition under oath saying she only buys the

8   brand.  What do they do in response?  They play a clip

9   where she says somewhere else in the deposition, well, I

10  would have bought the brand -- or the generic if it were

11  cheaper, if my doctor prescribed it, and if I could

12  afford it.

13        Those are individualized inquiries at a trial.

14  We would put that witness up on the stand and we would

15  cross-examine her about whether, in fact, for her it was

16  cheaper; whether, in fact, for her her doctor would have

17  prescribed it; whether, in fact, for her she could have

18  afforded it.

19        You can't try those kinds of claims on a

20  classwide basis and yet we have every right under the

21  law to do that because otherwise you're certifying a

22  class with people we know did not suffer injury.

23        Your Honor, there is obviously a lot of debate

24  yesterday about the 95 percent switching rate.  I'm

25  going to leave that where it was yesterday.  The court

1   has plenty of briefing, plenty of expert reports about

2   that.  I'm happy to answer any questions you have.

3       But I want to focus for today on one other thing

4   I feel like is getting lost in the briefing that goes to

5   that issue.  If we can put the next slide up.  There is

6   other evidence in the record about the brand and generic

7   switching rate that is completely inconsistent with what

8   Professor Rosenthal is saying, and the sources are there

9   on the slide.

10       At the time when the Teva generic was supposed to

11   launch, all these analysts went out and they did

12   analyses of how many brand loyalists there would be in

13   the market.  And the percentages here are 80, 85, 60,

14   75 percent.  Professor Rosenthal is down in the single

15   digits.  Professor Rosenthal for other drugs besides

16   EpiPen concedes in her opening report the usual brand

17   loyalty rate is 10 to 20 percent.

18       So why is she at 5 or 8 percent in her report,

19   especially for a product like EpiPen which our expert,

20   Dr. Blaiss, said -- notes in his reports is a product

21   where people get used to it, they're trained on it, and

22   if the option is go to another generic which, by the

23   way, doesn't work the same in a life-saving situation,

24   they're more likely to stay with the EpiPen as the

25   generic?  She didn't take that into account.  Where

1    she's at is 8.4 percent.  And I want to emphasize that

2    number by the way.

3         We keep talking about 5 percent because she has a

4    95 percent brand loyalty rate.  So two things about

5    that:  First of all, remember back to my number's slide,

6    5 percent, even if she's right, is still a hundred

7    thousand people.  Way more than will be required to deny

8    this motion for class certification.

9         Second of all, her number's are not 5 percent.

10   Your Honor, go back and read her reply report at

11   paragraphs 53 and 54.  What she says there is for the

12   quarters that she measured, and she measured I think 11

13   or 12 or so quarters, the brand loyalty rate is

14   8.4 percent.  And it's complicated.  It involves sort of

15   the curve of getting up to the ultimate 95 percent.  But

16   the bottom line is that's her number, 8.4 percent, for

17   brand loyalty.  You'll see it in the report.

18        Now go back to those numbers again.  8.4 percent

19   is somewhere north of now 160,000 people who are in the

20   class.  So, Your Honor, what do we have here?  It is

21   conceded, conceded that more than 160,000 people in the

22   class are uninjured.  If you look at the other slides

23   we're talking about, that number could grow as high as

24   1.5 million.

25        Let's pause for a minute and step back and ask I

1    think what is ultimately the question that we have to

2    think about on class cert.  What would a trial look like

3    in this case?  If we actually had to try this case as a

4    class, could we do it?  Right.  I mean, class cert's all

5    about manageability and superiority and predominance.

6    Could we do it?

7         So let's ask ourselves if we had a trial of

8    consumers, could we do it?  Your Honor, what you see

9    there on the slide are just some -- too many questions

10   we would be entitled to ask every single consumer,

11   everyone in the class as part of an individualized

12   inquiry as to whether or not they actually suffered

13   impact or injury.

14        I won't -- I won't go through every single

15   question on the slide.  We'll leave it there.  But it's

16   the basic questions you think about, right.  Would you

17   have bought the one-pack?  Would you have bought the

18   generic?  What was your co-pay arrangement?  All those

19   individualized things that affect whether or not there's

20   impact.

21        And importantly, Your Honor, it's not just the

22   questions.  It's, as the Supreme Court said in *Wal-Mart*,

23   it's the answers.  And the answers are all

24   individualized.  I mean, you got to read the first one

25   that's up on that slide on the two-pack allegation.  We

1   deposed named Plaintiff Michael Gill.  And what we do is

2   we find his Facebook post where he goes out there and he

3   says, hey, today I scored a double pack of EpiPens for

4   just 20 bucks; it even has a practice pen.

5          Now, again, think about how we would try this

6   case.  We put Mr. Gill up on the stand and we would have

7   the jury in the box and we would say, come on, ladies

8   and gentlemen, is this really somebody you think was

9   harmed because they couldn't get a one-pen single-pack?

10   Let the jury decide that.  It's the quintessential

11   individualized issue.

12          You see the others up here for other allegations,

13   foreclosure and generic delay.  There are -- the record

14   is replete with evidence from the named plaintiffs and

15   others that show the answers are individualized.

16          That's consumers.  What about payors?  Same

17   problem.  We'd be entitled to ask a number of sample

18   questions to each payor, third-party payor, whether they

19   had suffered any injury.  And there's some examples of

20   some of the questions up here again.  And, Your Honor,

21   again the answers to those questions would be

22   individualized.

23          So, for example, when you look at the two-pack

24   allegation, this is in the record at Exhibit 16 to our

25   brief, Optum's witness testified that the limitation of

1    a single pen had zero financial implication for Optum.

2    In fact, they liked it because their patients typically

3    want to have more than one EpiPen on hand.  We would

4    have the right to present that evidence at trial to show

5    that third-party payors like Optum were not harmed.  And

6    that's an individual issue.

7          Auvi-Q foreclosure.  Your Honor picked up on this

8    in your questions to Mr. Burns.  What I'm quoting there

9    -- up there from the Humana quote there is not a quote

10   from Humana.  It's a court -- it's a quote from this

11   court in this case, docket 1439, a ruling on costs in

12   this case.  The court recognized that Humana, a member

13   of the class, has a direct business interest in the

14   underlying claims in the litigation and has warned its

15   investors its profits, its margins will go down if the

16   rebate system goes away.

17         Presbyterian, another class member, testifies we

18   like large rebates because they reduce our costs.

19   Again, of course, we could put that testimony up at a

20   trial to try and convince the jury that for payors like

21   Humana and Presbyterian and others, there could not have

22   been impact.  You can't do that if you try this

23   classwide.

24         And on generic delay, you heard a lot about this

25   yesterday, 10 percent of health plans, according to

1   Dr. Johnson's analysis, are brand loyal plans.  And,

2   again, that too would require individual inquiry.  Even

3   Dr. Johnson used Local 282, the named plaintiff here, as

4   an example of that and show how they themselves didn't

5   have a lot of generic purchases they were reimbursing

6   for.

7          So, Your Honor, what would a trial look like?

8   Look, I love Kansas City, Your Honor.  I love being in

9   this court.  This has been a really fun case.  But you

10  better clear your docket for about six years if we're

11  going to have to try this case because we have the due

12  process right to cross-examine every single member of

13  the class.

14         We're going to look at all their evidence.  We're

15  going to have a verdict form that runs on a bazillion

16  pages for, you know, 21 different state laws.  We'll

17  talk about the class conflicts that you would have

18  throughout the trial.

19         And this last point is an important one.

20  Subclasses, Your Honor, would not solve the issue.  You

21  cannot just say let's have a subclass of generic delay

22  people or a subclass of two-pack people because a

23  subclass as a matter of law still must independently

24  meet the requirements of Rule 23(b)(3).  And for all the

25  reasons we're talking about these two days and in our

1    briefs, they don't.

2         So there is no solution to this.  They've pled

3    five separate classes with three different factual

4    theories that cannot be tried as a class action and have

5    literally no model to show otherwise.

6         Your Honor, before I leave predominance, I want

7    to talk about a couple -- I just sort of put them up on

8    the slide as a roadmap -- other issues, a couple of

9    which Mr. Burns focused pretty heavily on this morning

10   -- this afternoon -- early this afternoon.

11        Let's start with the probability analysis.  So

12   this comes up for the first time in their -- in

13   Professor Rosenthal's rebuttal report.  She talks about

14   the probability, right, 99 percent that a consumer or

15   third-party payor would have bought a single-pack or

16   would have bought the generic.

17        A couple problems with this.  First of all, just

18   as a matter of law, a probability analysis can never be

19   used to certify a class action.  And, in fact, contrary

20   to what Mr. Burns said and, frankly, what Professor

21   Rosenthal tried to give a legal opinion about yesterday

22   on the stand, we are not aware of a single court in the

23   United States that has ever certified a class action on

24   the basis of a probability analysis.

25        And, by the way, that's not surprising because

1    the *Wal-Mart* court, the Supreme Court law of the land is

2    you have to prove that the case, in fact, must be a

3    class action, not that there's a 99 percent chance you

4    were injured.  You've got to have a model that shows you

5    actually were injured or else there's no Article III

6    standing, there's no predominance, and probabilities

7    can't show that.

8            As Professor Rosenthal said in her report, she is

9    estimating the percentage of class members who "might

10   not have suffered an overcharge."  That's her reply

11   report at paragraph 50.

12           Your Honor, in no sense under governing Supreme

13   Court and Tenth Circuit law can the probability that

14   somebody might have suffered an overcharge be enough to

15   meet the evidentiary burden the plaintiffs have to carry

16   here to meet Rule 23.

17           That's the first fundamental problem, but there's

18   even a more basic sort of factual problem with the

19   probability analysis.  It doesn't show impact or injury.

20   What it shows is, if you believe it -- which, of course,

21   we think it's flawed.  But even if you believe it, what

22   it shows is there's a high likelihood you would have

23   bought a one-pack or there is a high likelihood you

24   would have bought a generic product, right.

25           The problem is that's not plaintiffs' theory of

17-md-2785   In re: EpiPen   6.12.19   *REDACTED*            90

 1   harm.  Their theory is not that you were harmed because

 2   you would have had one of those two things; it's because

 3   you would have paid more money.  There would have been

 4   an overcharge.  That's the injury that they're

 5   aggregating in Professor Rosenthal's aggregate damages

 6   model.

 7        But for all those reasons we just talked about,

 8   that's not necessarily true.  Take Plaintiff Buchta,

 9   right, there's an example of somebody who would have

10   bought the generic and paid more for it and so therefore

11   would not have had impact or injury to bring a claim.

12        Probabilities can't possibly tell you anything

13   about impact or injury under the plaintiffs' theories of

14   the case.  That's the relevant questions.  And it can't

15   get there.  It stops short because it says nothing about

16   pricing, nothing about, you know, insurance and

17   deductibles and co-insurance and all the rest.  It's not

18   what it measures.

19        Two other points:  First, the methodology is

20   flawed.  I don't want to leave that hanging.  I mean,

21   Dr. Johnson talked about this yesterday.  It's sort of

22   garbage in, garbage out.  She gets to her 99 percent

23   probability number because she assumes 95 percent

24   switching rate, for example.  That's wrong.  Then her

25   probability analysis means the numbers drop down as

1  well.

2      One last point, the legal issue:  The plaintiffs

3  keep citing the *Lexapro* case.  Before I get there, I

4  want to cite -- I don't want to skip over the one case

5  they keep ignoring, that's the *Asacol* case.  We know a

6  lot about the First Circuit decision, but *Asacol* gets

7  remanded after class cert is denied.  And what do the

8  plaintiffs try and do in that case?  They move to

9  certify a payor-only class.  And the sole evidentiary

10  basis they try to do that is a new report from

11  Professor Rosenthal using a probability analysis of

12  third-party payor harm.

13      It's basically, you know, identical to the one

14  she does here.  And they cite *Lexapro* and the court has

15  none of it.  Swats it away and says, look, you had your

16  chance to do it.  I'm not going to let you come back and

17  do this.  And then they move for reconsideration and the

18  *Asacol* district court again says, no, I'm not going to

19  allow you to certify a class on this basis.

20      Now, I will concede there's not a wealth of

21  analysis here.  There are minute orders and all the

22  rest.  But the bottom line is if the law were as clear

23  as they thought it was, especially when *Lexapro* was a

24  First Circuit case and *Asacol* is in the First Circuit,

25  if the law were really as clear as they thought it were,

1   then no doubt the *Asacol* court would have had to think

2   twice about that and consider that issue.  It didn't.

3   It denied trying to certify a class based on

4   Professor Rosenthal's model, and that is out there.

5        As for *Lexapro*, let's start with the obvious.

6   Class certification was denied in the *Lexapro* case not

7   granted.  It was denied on the grounds of statute of

8   limitations.  And the court's only reference to the

9   statistical analysis was in dicta.

10        Your Honor, I happened to be reading your motion

11   to dismiss ruling two or three nights ago and you

12   criticized a couple of the cases that we cited in that

13   motion to dismiss ruling because you said they're dicta

14   from other circuits and I'm not going to be bound by

15   that law.  Well, that's what *Lexapro* is, it's dicta from

16   other circuits.

17        The court did not rule on it.  It's one

18   throw-away sentence about statistical evidence where

19   class cert is denied.  It can't possibly overwhelm

20   *Asacol*, the First Circuit decision in *Asacol*, and all

21   the other things we're talking about here today.

22        One last point:  What *Lexapro* says is that in

23   that case in dicta there is statistical and clinical

24   evidence that could have perhaps been used to certify a

25   class.  And we say -- this in our surreply.  Won't go

1  into a lot of detail about it.  But, suffice it to say,

2  there is specific evidence in that case, like really

3  specific as to the named plaintiff itself, that there --

4  that there was conduct that affected that named

5  plaintiff.

6        There is nothing even close to that kind of

7  evidence here.  Where is the evidence that Local 282 was

8  personally deceived by Mylan or by Pfizer?  I mean,

9  that's the analogous situation to what happened in the

10  *Lexapro* case.  It just doesn't exist.  No court has ever

11  certified a case based on the probability analysis, Your

12  Honor.  This court clearly should not be the first.

13        Collateral source:  I have to say it's kind of

14  surprising, frankly, how much the plaintiffs are making

15  of this issue, given how they have litigated this case

16  from the very beginning.  It didn't even show up until

17  their reply brief.  There's no model about it at all and

18  it fails for a slew of reasons.

19        First of all, let's start with the fact that

20  their complaint alleges costs to each consumer as the

21  amount paid out-of-pocket after insurance.  Their

22  damages models from Professors Rosenthal and Elhauge

23  divide the damages between the consumers on the one hand

24  and third-party payors on the other.  So there is no

25  model, no evidence, no record evidence to suggest how

1   they're going to apply this if suddenly now they have a

2   collateral source theory in the case.

3         And there was a pretty rather surprising

4   development a couple of hours ago when Mr. Burns stopped

5   here and talked about this, Your Honor.  What he said

6   was -- he put up these slides and he said, okay, if

7   collateral source is right, then now all of a sudden the

8   single flat co-pay consumers are suddenly in the class.

9   They've been excluded from day one, mind you.  They're

10  excluded from all the experts' models, mind you.  But

11  today for the first time we hear "let them in."

12        We're going to talk about class conflicts in a

13  minute, Your Honor, but I can't leave this without

14  making the obvious point.  What you just heard the

15  plaintiffs' counsel do was kick the third-party payors

16  in their class to the curb.

17        They have a damages model that awards some

18  portion of the overcharged to the third-party payors and

19  some portion to the consumers.  And now what they did

20  was walk into court and say, forget about that.  Now

21  these single flat co-pay people can recover the entire

22  overcharged themselves; they should be in the class

23  because they have the right to get the entire thing, or

24  at the very least even if they don't have a right to the

25  entire thing, we're going to have a fight about it where

1   the jury is going to have to decide are they going to

2   allocate the money to the individual consumers or the

3   portion of the overcharged that goes to the third-party

4   payors.

5        It screams conflicts.  That's the reason they

6   probably didn't litigate this issue the way they did

7   from the complaint, and it's the reason why the court

8   with no model, no evidence, no discovery, no record

9   should allow the collateral source doctrine to suddenly

10   pop up for the first time in the reply brief in this

11   case.

12        Having said that, Mr. Burns spent a long time on

13   the collateral source rule, so I would be remiss if I

14   didn't give the court the benefit of our other reasons

15   why we think it doesn't apply.

16        First of all, if class certification -- if the

17   collateral source doctrine applies, Your Honor, class

18   certification has to be denied.  Let's start with the

19   most important thing.  First of all, he doesn't even

20   solve plaintiffs' problems.

21        If you wouldn't have bought the generic, or you

22   wouldn't have bought the one pen, then collateral source

23   doesn't do anything for you.  You still have those same

24   individualized issues we just spent the last 45 minutes

25   talking about.  You only have this collateral source

1   doctrine issue if you would have switched or would have

2   done this other conduct, and now we're talking about a

3   damages question.

4        But if you wouldn't have suffered impact or

5   injury to begin with, then collateral source doesn't get

6   you anywhere.  So it doesn't solve the fundamental

7   problems they have got with individualized issues in the

8   class.

9        Second, as we've talked about, there is no model

10  and no expert testimony to support collateral source.

11       Third, as we talked about, it would create

12  impossible conflicts between the third-party payors and

13  the consumers.

14       Fourth, it would create impossible state-by-state

15  predominance problems.  We talk about this in our

16  briefing.  The collateral source doctrine is a state

17  doctrine of common law.  In a number of states, it

18  doesn't even exist.  In some other states, it's

19  interpreted one way.  In some other states, it's

20  interpreted another way.

21       The plaintiffs' only comeback to that, Your

22  Honor, in their surreply reply is, well, we didn't -- we

23  didn't document all the cases that are out there.  We

24  didn't document all these different states.  Your Honor,

25  that's not our burden to go document all this.  It's

1    their burden to show that it's not going to be a

2    predominance problem.

3          And it's just a fact that the collateral source

4    doctrine differs in all these different states they're

5    seeking to certify and they have not given the court a

6    basis to show why that would not independently create a

7    predominance problem.

8          There's also legal problems, of course, Your

9    Honor.  We don't think the collateral source doctrine

10   applies at all.  And Mr. Burns, for example, relied

11   heavily this morning on the Tenth Circuit case, the

12   *Friedland* case.  He cited a portion of that case from

13   page 1206.

14         Your Honor, what I would urge the court to do is

15   to keep reading on page 1206.  Because right below that

16   portion that Mr. Burns read, the Tenth Circuit went on

17   to say the following, "Courts have applied the rule,"

18   meaning the collateral source doctrine, "when the

19   injured plaintiff has been compensated by, for example,

20   Social Security Disability payments or unemployment

21   compensation."  The injured plaintiff.

22         In other words, they're doing it again.  They're

23   skipping the injury and impact analysis and cutting

24   straight to damages.  Collateral source is an

25   evidentiary doctrine that prevents the jury from not

 1   awarding the proper amount of damages to a plaintiff who

 2   is injured on account of insurance payments or something

 3   else.  But this isn't a case of class certification

 4   about damages.  It's about injury and they still can't

 5   show that classwide.

 6       The other thing you should keep on reading in

 7   that case, Your Honor, is the very next paragraph.  The

 8   court actually goes on to say, by the way, "It's also

 9   far from clear that this common law tort principle

10   applies to claims that are brought pursuant to CERCLA,"

11   C-E-R-C-L-A.  That's the statute that the court is

12   interpreting in the *Friedland* case.

13       And we agree the collateral source doctrine is a

14   tort doctrine.  This is not a tort case.  There is no

15   case law that they can cite other than D.C. Superior

16   Court decisions in *Norvir* to support their theory.

17       Your Honor, I would urge the court to look at the

18   *K-Dur*, D-U-R, court which walks through the entire case

19   law and finds that as a matter of law collateral source

20   doesn't apply.  And we also the urge the court to read

21   the *Gumwood Shopping Partners* case which also holds that

22   it doesn't apply in the antitrust context.

23       So if it doesn't apply as a matter of law, it

24   creates conflicts, it doesn't solve the individual

25   problems.  It's a hail Mary, Your Honor, and it doesn't

1  work.

2      Two other things:  WAC, they keep talking about

3  how the price of WAC is tied to the retail price and so

4  therefore somehow that had some effect on the -- on --

5  on the plaintiffs here.  Well, actually, Mr. Burns did

6  me a favor, because in his argument what he said was

7  consumers "don't actually pay the full price of the

8  drug."  Well, that's the WAC.  We agree they don't pay

9  the WAC.  They pay WAC less rebates and then you factor

10  in their insurance payments and their deductibles and

11  their coupons and their patient assistance programs.

12      So saying that the WAC price went up, that Mylan

13  had all these incredible WAC price increases doesn't get

14  them anywhere.  Because of the complexity of the drug

15  pricing system, as Mr. Burns said, they don't actually

16  pay the WAC, and that's the problem.

17      As for Professor Rosenthal's chart she put up

18  yesterday, Dr. Johnson rebutted that.  Tying the WAC to

19  retail price doesn't do it because that chart doesn't

20  include rebates, and rebates are a fundamental piece of

21  this case.  And as Mr. Burns said, people don't pay the

22  retail price anyway.  So it doesn't show you anything in

23  terms of what the plaintiffs are trying to show here.

24      One last thing:  I'm actually not really sure why

25  they keep talking about WAC because WAC isn't even part

1    of the models for the theories in the case.  If you look

2    at the two-pack and generic delay models that

3    Professor Rosenthal opines on, they don't depend on WAC

4    at all.  Dr. Johnson said that yesterday.  And if you

5    look at the Auvi-Q foreclosure model, that too doesn't

6    depend on WAC at all.

7         What Professor Elhauge is measuring is net prices

8    after rebates; in other words, not the WAC.  It's the

9    WAC minus the rebates.  So this theory that WAC is tied

10   to retail price in matters to this case, it fails, one,

11   because that's not true.  WAC is not tied to the price

12   and ignores the rates in the pricing system.  Number

13   two, it doesn't matter.  It's not the theory of their

14   case and it doesn't get them anywhere.

15        Last thing, Your Honor:  Mr. Burns made a big

16   point today about loss of choice, which I also find

17   confusing because loss of choice literally -- literally

18   is found in one sentence in their reply brief.  That's

19   the first time they ever assert it.  And the reason I

20   suspect they never assert it is because there is zero

21   support for it in the record.  It is not part of

22   Professor Rosenthal's models.  She's not asserting

23   damages -- or economic harm on behalf of loss of choice.

24   It is not part of Professor Elhauge's models.

25        And, in any event, Your Honor, if loss of choice

1   is really now their theory of harm, I mean, how much

2   more of an individualized inquiry do we have than loss

3   of choice?  Would you have chosen to buy the EpiPen

4   one-pack if it were available?  Would you have chosen to

5   buy the EpiPen-Teva generic if it were available?  I

6   mean, Dr. Portnoy, their own medical expert in this

7   case, says that the decision about whether to actually

8   have a two-pack or not is individualized.

9        You look at everybody's medical histories.  You

10  talk to their doctors.  Choice is inherently

11  individualized.  If that's their theory, it's just the

12  last nail in the coffin for predominance.

13       All right, Your Honor.  If I may, I'd like to

14  move to the next topic we've got here, which is RICO.

15  They make a big deal of RICO, this alternative RICO

16  analysis.

17       Your Honor, Mr. Burns said, as part of his

18  argument, that the damages to the class can be different

19  than the individual damages from predicate acts, and

20  that's sort of his whole basis for talking about why he

21  believes a class can be certified here, RICO class, on a

22  classwide basis.

23       If we can put the next slide up.

24       Your Honor, I want to be very clear about what

25  RICO law requires and let me make clear why I'm saying

1   this.  Mr. Burns is focused on damages.  We are focused

2   on causation.  The reason why the RICO class cannot be

3   certified is because they cannot show causation through

4   common proof on a classwide basis.  The Supreme Court

5   law is clear -- forget about damages to the class.  As

6   to causation, the causation has to be something that is

7   caused by the predicate act.  And, Your Honor, you said

8   it too, page 80 of your motion to dismiss ruling, "A

9   RICO plaintiff's damages must flow from the commission

10   of the predicate acts."  We agree.

11        So the question is:  Can they show that the

12   predicate acts caused damage -- or rather impact or

13   injury to the entire class through common proof?  No

14   way.

15        This is not only a RICO case, it's a RICO fraud

16   case, and that is really important.  Your Honor, it is

17   really hard to certify a RICO class action in federal

18   court and it is really, really hard to certify a RICO

19   fraud class action under the law of this circuit.  And

20   you see it there on the third bullet point in cases

21   arising from fraud.  If you're going to show causation,

22   that has to be predicated on reliance.  And as *CGC* held,

23   individualized issues of reliance will often preclude a

24   finding of predominance.  That's this case.

25        Don't be fooled by them saying that their RICO

1   predicate acts are things like the switch to the

2   two-pack or the patent litigation.  That's not it.  It's

3   a fraud case.  It's the communications.  The fraud claim

4   depends not on the switch to the two-pack but on the

5   two-pack press release that Mr. Burns put up, that Dey

6   press release, right.

7          So the relevant question here is:  Did that

8   predicate act, the issuance of a press release, cause

9   harm that can be shown through common proof on a

10  classwide basis?  Of course not.

11         Where is the evidence in the record to show on a

12  common basis that every payor and consumer in the class

13  suffered harm because Mylan issued a press release in

14  2011, or because Mylan and Pfizer issued press releases

15  around -- around the patent litigation in 2012, or

16  because Heather Bresch said something in an earnings

17  call in 2009?  It literally doesn't exist.  We asked

18  every named plaintiff did you rely on these fraudulent

19  misstatements?  Every one of them said no.

20         So under the Supreme Court's authority in *Bridge*,

21  they've got to find somebody else who relied on it in

22  the causal chain.  They don't have it.  There's no

23  evidence showing the doctors or payors or anybody else

24  relied or in any way found that these predicate acts

25  caused them to act in a different way, and there is

1    certainly no way to do that on a classwide basis.

2         I want to emphasize that I'm not making a summary

3    judgment argument.  I'm making a class cert argument.

4    Can you say that everybody relied on those predicate

5    acts and the harm was caused in a uniform way?  The

6    answer is absolutely not.

7         I mean, just take Heather Bresch's, for example,

8    September 2016 congressional statements, part of their

9    RICO predicate acts claim.  I mean, think of all the

10   people in the class that would have made purchases

11   before the statements were ever even made.  That

12   happened in September of 2016.  How are we showing on a

13   classwide basis that anything caused harm or not?

14        In that reply brief, Your Honor, they tried to

15   get around this by citing to their experts, and you will

16   see little bold headers in the reply brief that said

17   "Two-Pack Causation", you know, "Generic Delay

18   Causation."  They cite to their experts.

19        That's not going to work.  Their experts here are

20   not causation experts, period, full stop.  They're not.

21   There's no evidence in the reports about causation.

22   They are damages experts.

23        And you want the best example of that, Your

24   Honor?  The reason why the Teva generic was not sold

25   until 2018 -- you know our position on this -- is

1   because the FDA didn't approve it for sale until 2018.

2   If Professors Rosenthal and Elhauge were doing a

3   causation analysis, they would have looked at that and

4   they would have ruled it out.  They didn't.  They

5   assumed causation, they assumed liability, and they went

6   to calculate damages.  There is no evidence, no expert

7   evidence, no fact evidence to show causation.

8        So what are you left with?  The last hope of a

9   RICO plaintiff who's trying to certify a class action in

10   this circuit.  Can we infer reliance under the *CGC* test?

11   No way.  Under *CGC*, "inferences of reliance are not

12   appropriate in most class actions."  That's a quote.

13        In fact, quoting the Southern District of

14   California case, what *CGC* says is, the law of this

15   circuit, "You can only infer reliance when the behavior

16   of the class cannot be explained in any other way than

17   the alleged misconduct."  It would be a fundamental

18   error of law, Your Honor, to find that here given the

19   plaintiffs' allegations.

20        Can we explain the fact that a named plaintiff

21   purchased a two-pack for any other reason than Mylan

22   having issued a press release in 2011?  Of course we

23   can.  We deposed them and they told us.

24        Can we explain why they may have not decided to

25   purchase the Teva generic for reasons having nothing to

1   do with the patent litigation?  Of course we can.

2          You can't possibly infer that everybody did what

3   they say was wrong and -- and injured by because of the

4   conduct that was alleged in this case.  And they jump up

5   and down, Your Honor, and scream about the *Menocal* case.

6                  THE COURT:  It's not a RICO case.

7                  MR. LEVIN:  It's not a RICO case.  It's not

8   fraud.  It's a great example of how this case is.  I

9   mean, that's a case where you have detainees in an ICE

10  facility forced to do slave labor.  That's not this

11  case.

12         *Neurontin* they also scream about.  The key

13  distinguishing factor there, of course, is the expert

14  evidence there from Professor Rosenthal did go to

15  causation evidence.  Unlike here, there is no causation

16  evidence and no basis to certify the class.

17         All right.  Last case I got to touch on, not on

18  the slide, Mr. Burns talked about this alternative RICO

19  analysis.  First of all, let's make one thing very

20  clear.  Alternative RICO is still RICO.  So all the

21  things we just talked about means the alternative RICO

22  theory fails for all those exact same reasons.

23         And by the way, I should have even said at the

24  beginning, all the other reasons we've spent the last

25  hour or so talking about, that's not unique to the RICO

1   claim.  It's unique overall to the classes they're

2   trying to certify.

3       But the alternative RICO damages model fails for

4   another reason which is in a word *Comcast*.  It is the

5   law of the land that you must tie each theory of

6   liability to a calculation of damages.  They don't do

7   that.  I mean, we played that clip from Professor

8   Rosenthal yesterday.  And what does she say?  She says

9   it's sort of a hodgepodge, a kitchen sink of all the

10  theories in the case.  I can't really separate it out.

11  I mean, maybe I could use this model to help me do it,

12  maybe I could use that model to help me do it.  That

13  doesn't cut it in class certification.

14      It is their burden now, not a year from now, not

15  two, now to have a model that would show how if they

16  only win on one theory of liability they can take the

17  damages out for everything else, and they can't do it.

18      Dr. Johnson talked about that in EpiPen4Schools.

19  With all due respect to Mr. Burns' argument this

20  afternoon, maybe it's not a big number, but it's a

21  number, and the number didn't change.  Which means the

22  alternative RICO methodology can't adjust for changes in

23  the causes of action in the case.

24      And what Mr. Burns didn't talk about was the

25  other thing Dr. Johnson mentioned, which is if you just

1   do the math and you subtract out the two-pack damages in

2   the alternative RICO methodology, you get to a negative

3   number.

4        So by definition this is not a methodology that

5   can possibly pass the *Comcast* test.

6        All right.  My remaining eight minutes or so I

7   want to make sure I touch on typicality and the class

8   conflicts issue.  Your Honor has really touched on this

9   the last two days through your questions yesterday and

10  again with your questions to Mr. Burns.  And it is a

11  critically important issue because without Local 282, if

12  they have a conflict, the class goes down.

13       To be typical, the named plaintiff has to be a

14  class member, have no interest antagonistic to the class

15  and have suffered the same injury.  That is District of

16  Kansas law from the *Edgington* case 139 F.R.D. at 189.

17       Your Honor, I have to say it's actually fairly

18  remarkable the plaintiffs in this case have only one

19  named plaintiff third-party purchaser, and that third

20  party purchaser isn't a health insurer, isn't the kind

21  of payor that we've been talking about these last two

22  days.  It's a union welfare fund.

23       And the way that I think is easy to think about

24  this, Your Honor, is two-fold.  First, we have

25  individual defenses against Local 282 that we don't have

1    against other third-party payors.  And you see, for

2    example, the first row of that chart, Local 282 bears

3    the price risk of increased drug costs.  What does that

4    mean in plain English?  If their drug costs go up, they

5    go back to the members and say, hey, write me a bigger

6    check.  So they are never injured because they get

7    reimbursed for all the increased drug costs.

8         We would have every right at a trial to put

9    Local 282 on the stand and to try that claim and to try

10   that defense, and yet that may not be a defense we have

11   against other absent members of the class who are payors

12   who perhaps get reimbursed through different mechanisms,

13   premiums and competitive market, whatever it may be.

14   They operate differently.

15              THE COURT:  How is that different?  How is

16   what they do different from an increase in premiums?

17              MR. LEVIN:  Sure.  Because an increase in

18   premiums is no guarantee you cover your costs.  There's

19   no guarantee from the actuarial standpoint that if the

20   cost of EpiPen go up, Cigna is going to be able to

21   increase premiums to recoup that entire costs.

22        There are all sorts of other stuff going on, as

23   we saw from those crazy-filled charts yesterday, right.

24   Maybe they don't increase their premiums.  Maybe they

25   deal with it on the rebate end, or they deal with it in

1   fees when they're dealing with the PBMs or with their

2   own clients, or maybe they adjust levels of coverage or

3   other kinds of things.

4        There is nothing in the record that would suggest

5   that -- that the way Local 282 operates is identical in

6   a way to all the other payors in the class that at the

7   very least, whether I'm right or not, honestly, isn't

8   the question.  It's whether there is a question to be

9   asked at a trial of Local 282 that would not be asked at

10  the trial of other payors that makes them unique.

11       The other way to look at it, Your Honor, is flip

12  that.  We also may have individual defenses, defenses in

13  air quotes, and conflicts and issues that apply to other

14  payors that don't apply to Local 282.  And you see, for

15  example, some of those in the other rows up here in the

16  chart, Your Honor.  The other payors in the class

17  negotiate for drug prices, they own or control their

18  PBMs.  And here we get into the class conflicts issue.

19       Your Honor, after Professor Elhauge testified

20  that payors were harmed you asked a very interesting

21  question yesterday.  You said, "Why is it that

22  third-party payors would let the PBMs do this to them?"

23  Right?  "These are some of the most sophisticated

24  companies, healthcare companies in America."

25       The answer to that question, Your Honor, is

1   simple, because it is those payors' position that the

2   rebate system is good for them.  You saw that in the

3   order the court issued in February from Humana that I

4   put up before, and you see it here in the bottom of this

5   slide.  Multiple payors testified they like the rebates

6   and want them to be higher.

7        And the second bullet is something we pulled out

8   that post-dated our brief.  It's from Cigna's Senate

9   testimony -- of course the court can take judicial

10  notice of this -- in April of this year.  "Rebates are

11  not the cause of increased drug prices.  Rebates are

12  used to reduce healthcare costs for consumers."

13       Cigna is a class member, and their chief clinical

14  officer is telling the United States Senate that rebates

15  are good for us.  They're good for the system.  And yet

16  here's Local 282 coming into court and saying rebates

17  are the scourge of the drug pricing system, they're part

18  of a RICO conspiracy, they're part of an antitrust

19  conspiracy.

20       Your Honor, there is no way to certify a class in

21  the face of those kinds of fundamental conflicts in the

22  theories that Local 282 is pursuing and the other payors

23  in the class are not.

24       You know, to pick up Professor Elhauge's analogy,

25  these other companies are not just goats being led to

1    their demise in the commons.  These are sophisticated

2    companies who know what they're doing.  They know what

3    it does to their bottom line and they do not support the

4    kind of theories in their statements that Local 282 is

5    advocating here.

6          I would also note, by the way, that in response

7    to Mr. Burns' response to your question, for the first

8    time now they're asking the court to just exclude the

9    PBMs of entities that have both PBM and payor entities

10   combined.  I mean, that's impossible, right.  I mean,

11   it's one company.  Cigna and ESI merged.  It's one

12   company.  So trying to somehow separate out the PBM

13   portion of Cigna and ESI is impossible.

14         Humana is one company.  How are you going to

15   separate out their pharmaceutical benefits manager

16   transactions?  There's no model for that.  There's no

17   discovery on that.

18         How do you even define what a PBM is?  The range

19   of services that PBMs offer differ from year to year.

20         What Anthem is doing today may not be what it's

21   doing tomorrow, same for Humana and Cigna and all the

22   rest.  This is just some new way to get around, Your

23   Honor, what basically they have now conceded, which is

24   there is a conflict on the payor side of this class, and

25   the conclusion they're offering has no support in the

1   record and no model that would show that it can be done.

2        Your Honor, I have got two minutes left.  Before

3   I hand it over to Mr. Gandesha, I will just say two very

4   quick things, one as to ascertainability and the other

5   as to consumer protection and unjust enrichment.

6        As to ascertainability, I think it's all there.

7   It's all briefed.  Your Honor has the affidavit of

8   Dr. Hughes that's in the record talking about why what

9   Professor Rosenthal purports to do here is not right.

10        I just want to stick to the legal question.  Your

11   Honor is right, so is Mr. Burns, the Tenth Circuit has

12   never addressed what the legal standard should be for

13   ascertainability.  We respectfully submit the court

14   should adopt the Third Circuit and Eleventh Circuit

15   standard.  But I think the point I want to leave the

16   court with is we win even if you don't.

17        THE COURT:  We're back to the Seventh

18   Circuit discussion.

19        MR. LEVIN:  Well, no.  On ascertainability,

20   we're actually back to the Tenth Circuit discussion

21   about ascertainability.  And for that, Your Honor, I'd

22   refer you to the *Shook* case, Tenth Circuit 2004.  The

23   law of the Tenth Circuit is that, "The lack of

24   identifiability is a factor that may defeat the

25   Rule 23(b)(3) class certification."

1        And our argument here is you cannot identify who

2   is in the class.  And whether you apply the strict sense

3   or the weak sense of that, you still have to be able to

4   identify them, and for all the reasons in the record you

5   can't.

6        One last point, unjust enrichment and consumer

7   protection:  I guess all I would say here, Your Honor,

8   is the way that you categorized those claims and grouped

9   them into certain things for purposes of a 12(b)(6)

10  motion is very different from the way we have to

11  actually have to try them.

12       And so it's one thing to put them into these

13  buckets for 12(b)(6), but when you apply the cigarette

14  test or apply the substantial injury test, every state

15  is going to have their own standard about what that

16  means.  And we have a right at a trial to try those

17  claims under all 21 state laws the plaintiffs are

18  putting forth here.  So we believe predominance fails

19  for those claims as well.

20       At the end of the day, Your Honor, no court's

21  ever certified a case like this one.  Don't be the

22  first.

23            THE COURT:  Thank you very much, Mr. Levin.

24       Mr. Gandesha.

25            MR. GANDESHA:  Your Honor, you mind if we

 1    pause the clock while we swap.

 2             THE COURT:  Yeah, we'll turn the clock off,

 3    kind of a water break all around.  All set?

 4             MR. GANDESHA:  I'm ready.

 5             THE COURT:  You're on the clock.

 6             MR. GANDESHA:  Good afternoon, Your Honor,

 7    Raj Gandesha from Pfizer.  It's a pleasure to be at the

 8    podium finally in this case.  I'm going to spend what

 9    remains of our time talking about the generic delay

10    issues in the case.

11         The generic delay issues are particularly of

12    interest to Pfizer because we've heard about three

13    different factual theories; the two-pack foreclosure,

14    the two-pack issues, two-pack switch, the formulary

15    foreclosure issues, Auvi-Q foreclosure and generic

16    delay.

17             And notwithstanding Mr. Burns' general references

18    earlier today to the defendants' overarching scheme and

19    collusive activity, both in the complaint in the

20    plaintiffs' papers and in the expert reports, when the

21    plaintiffs actually mention any of the Pfizer entities

22    by name, they do so in relation to the generic delay

23    theory.  So I'm going to spend a few minutes talking

24    about reasons why the generic delay theory do not

25    support certification of a class.

1         And let me just begin by saying Pfizer absolutely

2    agrees with Mr. Levin's presentations.  We -- we agree

3    that for all the reasons he gave, the court should not

4    certify any class on a generic delay basis.  We're going

5    to talk about some additional issues that we think also

6    further underscore why certification is not warranted.

7         So let's begin talking about sort of the generic

8    delay theory.  And I'll try to do this very quickly,

9    mindful of where we are on the clock.

10        So the generic delay theory focuses on patent

11   litigation that Pfizer commenced in 2009 asserting

12   patents that expired in 2025 resulting in the April

13   26th, 2012 settlement agreement between Pfizer and Teva.

14   And that provided for an entry date in June of 2015, and

15   it's that entry date that the plaintiffs allege was a --

16   was a delayed entry date.  And their basic theory is

17   that there was a reverse-payment that induced Teva to

18   agree to a date that's later than the date it would have

19   agreed to.  Okay.

20        So the question in -- in the plaintiffs' generic

21   delay theory, the question it raises is what is the

22   entry date that should have occurred in the but-for

23   world?  Well, the date we have heard both yesterday and

24   earlier today is March 13th, 2014.  That's the date that

25   Professor Elhauge has identified.

1        But what's important about this, and these are

2    the two issues I want to focus on in my 17 minutes, is,

3    first of all, that date is simply an illustrative date,

4    okay.   It's an illustrative no-payment settlement entry

5    date, okay.   It's most emphatically not a but-for

6    generic entry date, okay.   Professor Elhauge, as we will

7    see momentarily, has disclaimed any notion that that is,

8    in fact, the date Teva would have entered the market

9    with -- with the generic, okay.

10        I also want to talk about the assumptions that go

11   into Professor Elhauge's model that arise at that date.

12   So to get at this, let's -- let's review for a moment or

13   two the interrelationship between the expert opinions

14   that we heard about both yesterday and earlier today.

15   Everything begins with Professor Torrance, which is the

16   plaintiffs' patent litigation expert.

17        And Professor Torrance offered an opinion that

18   Teva had an above 70 percent chance of success.   Okay.

19   Now, we'll talk about some issues as to why that's

20   unreliable input to the model, and the primary reason is

21   that it's not actually based on the actual trial record,

22   and we've offered a rebuttal opinion that addresses that

23   on -- by Judge Folsom.

24        So after Professor Torrance offers his opinion of

25   an above 70 percent chance of success, Professor Elhauge

1    uses that opinion as an input to his model.  He chooses

2    the midpoint of that -- that range, 85 percent as we

3    heard yesterday, and that he uses to derive the

4    no-payment settlement license entry date of March 13th,

5    2014.

6          And we heard yesterday, again, that Professor

7    Rosenthal then uses the March 13th, 2014 date as her

8    but-for generic entry date.  Okay.

9          Now, what's important here, however -- and I

10   think this picks up on a theme that Mr. Levin discussed

11   just a few moments ago, which was none of the

12   plaintiffs' experts, in fact, address the question of

13   when Teva would have entered the market in the but-for

14   world, right.  As Mr. Levin explained, none of these

15   experts is a causation expert, right.

16         Professor Elhauge provided an alternative

17   no-payment settlement entry date but disclaims any

18   notion that that is actually a but-for generic entry

19   date.

20         Professor Rosenthal uses the March 13th, 2014

21   date as a but-for generic entry date, which she doesn't

22   offer an opinion as to whether or not that is, in fact,

23   the date that would have occurred in the but-for world.

24         So why does this matter on class cert?  Well,

25   because it impacts the issue of whether or not the

1   plaintiffs have offered a model that can reliably show

2   common impact.

3        In the generic delay world, common impact occurs

4   from the point of which there would have been a generic

5   on the market.  In the but-for world, the plaintiffs

6   model does not identify that date, right.  Is it March

7   13th, 2014?  Well, we don't know.  Okay.  Is it January

8   1st, 2016?  Again, we don't know.

9        Now, interestingly, we heard Mr. Burns just a few

10  minutes ago say -- propose a way of excluding certain

11  potential members of the class who purchased EpiPen

12  prior to the but-for generic entry date and he says

13  that's a way of addressing the issue of the 39 percent

14  of transactions that we heard from Dr. Johnson were

15  conducted prior to March 13th, 2014.  The problem is we

16  still don't know from the plaintiffs what that but-for

17  generic entry date is.

18       So in addition to creating a common impact issue

19  because we don't know when the impact occurred,

20  Mr. Burns is now creating a definition issue, right,

21  because we don't know when the class is supposed to

22  begin, and that has a practical dimension.

23       If Your Honor is going to certify a class based

24  on a generic delay theory, Your Honor's going to have to

25  issue -- the court will have to issue notice to the

1   potential class members.  How do we know who should

2   receive notice?  Right.  We don't know that date because

3   the plaintiffs' model does not offer any methodology for

4   being able to identify it.

5        Now, I want to just skip ahead quickly just to

6   talk a little bit about why the but-for generic delay

7   issues are so critical in this case, right.  Now we

8   heard Mr. Burns say that the -- the plaintiffs' model

9   has been adopted and used in several generic delay

10  cases.  There's a critical difference between this case

11  and those cases, right.

12       In those cases, including the *Namenda* case in

13  which my firm represents defendants, the plaintiffs were

14  able to identify a but-for generic entry date.  Okay.

15  They offered expert opinions to support that and the

16  model was able to provide a calculation of that date.

17       The plaintiffs have not done that here.  Their

18  model doesn't actually accommodate what that would be,

19  okay.

20       But we do have a factual record.  We know, for

21  example, that Teva finally got approval of its product

22  on August 16th, 2018, right.  And it finally launched

23  its product on November 27th, 2018, okay.  So we know

24  that ultimately a Teva generic was able to get approval

25  and was able to enter, some three years after the

17-md-2785    In re: EpiPen    6.12.19   *REDACTED*         121

1   license entry date and some four years after the date

2   that Professor Elhauge has identified as an alternative

3   no-payment settlement date.

4        But what we don't know from the plaintiffs,

5   because the model has not identified it, is what that

6   date would have been in the but-for world.  And if such

7   a model were to fit the facts of the case, it would have

8   to contend with the factual record again that already

9   exists.

10       And what we've done here on this slide is

11  summarize the back and forth that Teva experienced with

12  the FDA, which is detailed in Teva's opposition to the

13  class plaintiffs' motion to compel certain discovery

14  from Teva in which Teva identified the -- the extensive

15  effort and amendments that it went through between May

16  2009 through November 2015 and beyond to -- in order to

17  try to get approval and be on the market as of June

18  2015.

19       And, interestingly, coming up to June 2015, the

20  record shows that Teva expressly asked for expedited

21  review from the FDA so that it would be ready to enter

22  the market.  The FDA agreed, granted that expedited

23  review but then, as the slide shows, continued to

24  identify deficiencies that Teva had to work diligently

25  at in order to overcome, which it finally did in 2018.

1         Now, in light of these facts, the plaintiffs have

2    to offer a model that's going to show how they will,

3    based on common evidence, show classwide impact, meaning

4    with respect to the generic delay theory, how Teva could

5    have gotten approval and entered the market prior to

6    2018.

7         Okay.  So that's a fundamental deficiency in the

8    model.  We would submit that's an additional reason to

9    those -- that Mr. Levin identified as to why plaintiffs'

10   generic delay theory does not support certification.

11        Let's go back now and look at some of the other

12   inputs.  As we heard yesterday, a critical input to

13   Professor Elhauge's delay model is the issue of patent

14   merits.  We saw a few minutes ago that Professor Elhauge

15   relies on the opinion of Dr. Torrance.  And

16   Dr. Torrance's opinion, to summarize it, is essentially

17   two-fold, right.  He said I think that Teva's generic

18   auto-injector had a relatively large probability of

19   infringing at least one claim of the "432" patent.

20        So his view was that Teva likely infringed the

21   patent but that there was a high likelihood that the

22   "432" and the "12" patents would be invalid, right, for

23   two reasons, right.  It would be invalid under the

24   doctrine of obviousness and under the doctrine of

25   inequitable conduct.

1          Based on those findings, Professor Torrance

2     concluded that there was a probability of above

3     70 percent that Teva would have prevailed in the patent

4     litigation.

5          Well, we engaged an expert, Judge Folsom, the

6     former chief judge of the Eastern District of Texas, one

7     of the busiest patent dockets in the country, to look at

8     Dr. Torrance's opinion and assess whether or not it was

9     reasonable and whether or not it fit the facts of the

10    case.  And what Judge Folsom identified was, first of

11    all, that Teva's primary litigation position in the case

12    was not invalidity.  It was, in fact, non-infringement

13    as Teva's trial counsel, in fact, said at trial.

14         Secondly, Teva did not raise obviousness or

15    inequitable conduct as defenses at trial.  Okay.

16         Now, this is a case that settled after the trial

17    had been completed, right.  The trial had been submitted

18    to Judge Sleet who was awaiting post trial briefing.

19         And really, the question that Professor Torrance

20    was asked to answer is:  What would you expect the

21    chance would be that Judge Sleet would rule in favor of

22    Teva?  That has to be "ruled in favor of Teva based on

23    the record that's before Judge Sleet."  And we see that

24    Torrance's opinion of above 70 percent is based

25    principally on defenses that were not asserted by Teva

1   at trial.

2       Now, Mr. Burns said that in a general way that

3   the plaintiffs' model of generic delay here is reliable

4   because it fits the facts of the case.  I would submit,

5   Your Honor, that that's not the case.  Professor

6   Torrance didn't consider adequately the actual trial

7   record that he was required to review for the purpose of

8   arriving at the opinion that he was asked to provide.

9       Now, Judge Folsom went on to note that after

10   Pfizer's completed its case in chief on the issue on

11   which they bore the burden of proof, namely

12   infringement, Teva moved for judgment as a matter of law

13   and said, Your Honor, Judge Sleet, we do not have a case

14   to answer here, the case is so strong in our favor.

15   Judge Sleet denied it, right.

16       And according to Judge Folsom, based on his

17   experience, he believed that that was a strong

18   indication that the court thought this was a close case

19   with Teva's likelihood of success being much lower than

20   the 70 percent that Dr. Torrance posits.

21       Okay.  So, again, we would take issue with

22   Mr. Burns' proposition that the model here fits this

23   case.  But there's a more fundamental reason why the

24   model does not fit the facts of this case, and that's

25   that it fails to analyze the actual settlement agreement

1    that's at issue here.  Okay.

2         And what we've put up here on Slide 31 is the

3    covenant not to sue from the settlement agreement.

4    Okay.  And the covenant not to sue says clearly that

5    Pfizer agrees not to sue Teva with respect to any and

6    all United States patents, whether currently issued or

7    to be issued at a later date.

8         Okay.  Now, why is this important?  Well, it's

9    important because both Professor Elhauge and Professor

10   Torrance focus on the patents there were asserted before

11   Judge Sleet, right, the "012" and the "432" patents.

12   And the opinion about 70 percent chance of success is

13   focused on those patents.  They don't consider the fact

14   that Pfizer obtained additional patents covering EpiPen

15   after the litigation had been commenced.  Okay.  There's

16   the "035" patent, which issued November 1st, 2011, okay,

17   before the settlement, but then the "827" patent, which

18   issued October 28th, 2014.

19        Okay.  Now, remember what Professor Elhauge's

20   model purports to do?  It purports to analyze the

21   expected payoff to Pfizer and Teva if on the one hand

22   Teva had agreed not -- or had not settled and had

23   launched.  And he risk adjusts that option using

24   Professor Torrance's opinion about patent merits.

25        But you cannot do that without taking into

1    account all of the patents that were listed in the

2    Orange Book, and that potentially would have been a bar

3    to Teva's entry.

4         Professor Elhauge simply ignored them.  Professor

5    Torrance wasn't aware of them.  He didn't even consider

6    them in his opinion.  So again, the model does not fit

7    the facts of the case and cannot reliably result in a

8    conclusion of impact.

9         Now, I'd like to address just one final point.

10   We heard some discussion yesterday about how robust

11   Professor Elhauge's model is because it tolerates

12   multiple different inputs.

13        If you'll bear with me, I'm just trying to find

14   the right slide.  Yes.  Okay.

15        So Professor Elhauge includes Figure 13 in his

16   report that shows under his model the various different

17   no-payment entry dates that are consistent with

18   different degrees of patent strength from Professor

19   Torrance's opinion.  And you can see that the line there

20   runs from 1 percent all the way to 26 percent.  He

21   happened to choose a midpoint of 15 percent, and that's

22   where that March 2014 date comes from.

23        What this chart doesn't do is it doesn't carry

24   the expected strengths all the way up to 29, right,

25   which would be consistent with Professor Torrance's

1    opinion.

2         So we did the calculation.  We plugged in a

3    72 percent chance, right.  So instead of using Teva

4    having an 85 percent chance of winning the patent case,

5    we plugged in 72 percent.  Now all the other numbers in

6    this chart are the numbers that Professor Elhauge uses

7    in his model.  Okay.

8         When you enter 72 percent chance of winning as

9    opposed to 85 percent, what you see is a result that

10   shows that the expected litigation payoff to Teva of

11   239.2 million, that's the option of choosing not to

12   settle and instead to launch, in fact, is less than the

13   expected settlement payoff of 239.4 million.  Okay.

14   Professor Elhauge's theory of delay is predicated on the

15   notion that it was economically irrational for Teva to

16   settle unless it received a reverse-payment.

17        What this chart shows is that if you happen to

18   choose a more conservative estimate of patent strength,

19   right, which is within Professor Torrance's range, you

20   actually result in an outcome where it was, in fact,

21   economically rational for Teva to settle without a

22   reverse-payment for the very entry date that it got.

23        So, again, the model cannot reliably show impact

24   because if it turns out that the parties did, in fact,

25   have an expectation of a 72 percent chance of winning,

 1    then there's no reverse-payment, there's no delay, and

 2    therefore by definition there's no anti-competitive

 3    impact on the class.

 4        Now, I believe we have two minutes remaining,

 5    Your Honor.  I think I'll just pause there to see if you

 6    have a question.  I think I've managed to speed through

 7    the points I wanted to cover.

 8            THE COURT:  Let me look.  I think I don't.

 9    I think I asked -- I came with some questions.

10    Mr. Levin has addressed some of them I asked him

11    specifically.  I don't have any left.

12            MR. GANDESHA:  I'll just -- as I do have one

13    more minute, I'll just make one final point and that's

14    to address a point that Mr. Burns made about the actual

15    theory of reverse-payment settlement here.

16        We heard a little bit about the *Nuvigil*

17    litigation.  That's the reverse-payment theory that's

18    alleged in the complaint.  Plaintiffs' theory is

19    basically that here the parties, Teva and Mylan and

20    Pfizer, exchanged delay, generic delay in one product

21    for generic delay with another product.

22        You know, I just want to make sure the record's

23    clear, we -- the defendants absolutely deny those

24    allegations.  But more importantly, I wanted to note

25    that, Your Honor, the plaintiffs have not identified

1    yet, even though we're more than a year through

2    discovery, any actual direct evidence of any kind of

3    quid pro quo between these two settlements.

4          The document Mr. Burns put up earlier was a

5    document in which a -- Mylan transmitted both

6    settlements to the -- to the FTC.  He mentioned Pfizer

7    as well.  I just want to note for the record that Pfizer

8    did not, in fact, submit both settlements.  There's a

9    reason for that that I'll mention in a moment.

10         But I think that document could also be shown to

11   show exactly why Mylan did not believe there was any

12   kind of connection between the two settlements.  It

13   states very clearly that Mylan rejects the notion that

14   the two are related.  And, if anything, that's

15   consistent with simply conservative antitrust practice

16   of wanting to be as compliant as possible.  It's,

17   frankly, not an admission of any kind of quid pro quo

18   between the settlements.

19         The final point I want to make, Your Honor, and

20   we state this in our briefing, is that Pfizer was not a

21   party to the *Nuvigil* litigation so obviously could not

22   have made any kind of payment with respect to that

23   litigation.  We couldn't have made any determination of

24   when generic entry could have occurred.  But most

25   importantly, what the record shows so far is that the

1   Pfizer witnesses who were involved in negotiating the

2   EpiPen settlement, this is testimony from Tom Handel, he

3   was the general manager of Meridian and part of the

4   negotiations of the EpiPen settlement, were not even

5   aware of Nuvigil, had not even heard of the drug before

6   -- before this litigation.  So any notion that Pfizer

7   was somehow consciously conspiring with Mylan and Teva

8   as part of a reverse-payment scheme simply is not

9   supported by the facts.  All right.  I think with that

10  I'll...

11              THE COURT:  Thank you very much.

12              MR. GANDESHA:  Thank you.

13              THE COURT:  So, Mr. Sharp, I think you a

14  fresh 20.

15              MR. SHARP:  Giving me an extra three

16  minutes?

17              THE COURT:  No, I'm giving you the 20 that

18  was always reserved.

19              MR. SHARP:  Fantastic, thank you, Your

20  Honor.  Let me begin by talking a little bit about what

21  this case is and this class certification is not about.

22  Of course it's not about all of the merits that we just

23  heard from Mr. Gandesha about pay-for-delay.

24              But I do appreciate the fact that his -- all of

25  his evidence that he suggested was either based on

1   experts or based on documents that were available from

2   third parties, which indicates exactly what we're

3   talking about here, evidence that will be common and

4   generalized to the class.

5         That's the same thing that Mr. Burns pointed out

6   when he addressed some of the merits part of our case is

7   that we have third-party documents, we have documents

8   from defendants that prove part of our case, including

9   the causation and impact part of our case as well as

10   damages.  So we don't just rely on experts, although we

11   could.

12         With respect to the allocation issue, I would

13   come back to that, but I want to go through each and

14   every one of the points that you had asked for us to

15   address.  I want to get through that first and then I'll

16   come back to it.

17         The first issue was is the -- on the collateral

18   source rule, and that certainly is an issue that's

19   similar to the allocation issue, it literally jumps

20   ahead where the class is not even certified yet.  We

21   haven't gotten to the merits and it jumps ahead all the

22   way to allocation.

23         Defendants don't have any interest in allocation.

24   They don't have any right to jump ahead and act as if

25   they were third-party beneficiaries of an insurance

1   policy which they have no part of.

2        Either the doctrine prevents that early jump

3   ahead or it does not.  And they have no case law that

4   suggests that if there's co-pays in the case that the

5   case can never be certified.  If that were the case, of

6   course, the simple solution would be to exclude the

7   co-pays from the class.  This court would be authorized

8   to do that when it's under -- under *Davoll vs. Webb*,

9   194 F.3rd, 1116 to -147 Tenth Circuit, 1999.

10       We don't think that's necessary to do so because

11  if you listen to everything that you heard from

12  Mr. Levin -- and it was a lengthy talk -- I think you

13  could boil it down to about five minutes if you take out

14  the concept of co-pay and the issue of whether that has

15  anybody damaged or, as he calls it, impacted or injured.

16  If you take that issue out, then you don't have much

17  left in their argument.

18       I would call that whole argument the big pharma

19  false third-party beneficiary immunity argument.  But

20  there's no case law for it, none cited anywhere, just an

21  argument that there's no impact because -- not because

22  they didn't cause the impact but because somebody else

23  insured against that impact and that damage.  That's

24  what the entire collateral source rule is all about and

25  that's also about allocation.  That insurance policy is

1   between the third-party beneficiaries and the consumers.

2   The insured consumers totally will be dealt with in the

3   allocation process.

4        So if there's somebody who is not injured, proven

5   that they are not injured, they're not going to get the

6   money.  The people who are the end-payors that were

7   injured will get the money.  That's the nature of an

8   allocation.  So we've jumped ahead, gotten ahead and

9   made it way more difficult than it's necessary to do.

10       The second question you asked is when will the

11  class end.  Well, we do have injunctive relief that

12  we've asked for and that's a (b)(2) class that almost

13  nobody mentioned.  So apparently there's no problem with

14  that.  But it goes at this point to the exclusive

15  two-pack because generics are now on the market,

16  Auvi-Q's now on the market.

17       Now, with respect to the class ending date, we

18  would suggest a date when the class notice is given,

19  Your Honor.  That is a certain date that the court will

20  set.  The reason we suggest the class notice date rather

21  than the class certification date is there may be a

22  lengthy time between the Rule 23(f) hearing -- goes up

23  and the Tenth Circuit ruling.  We do not anticipate that

24  will be the case.  We anticipate that this will follow,

25  much more like *Syngenta* did, where the court entered a

1    class certification order and in fairly short order the

2    Tenth Circuit -- the Tenth Circuit did issue an order on

3    that case.  I'm sure the court is aware of that.  The

4    Tenth Circuit said we're not taking that class

5    certification but we do find that it's well-reasoned and

6    well-researched.

7         It's unusual for the Tenth Circuit to do that.

8    But instead of just flat saying denied, they said it's

9    well-reasoned and well-researched.  We'll come back to

10   that because I think it's important with respect to the

11   next issue.

12        Uninjured class members:  I looked at the chart

13   that was presented here; the First, Second, Third,

14   Eighth, D.C. Circuit, Tenth Circuit, it's on page 4 of

15   Mr. Levin's Phase II argument.  If you'll look at that,

16   most of those cases cited really do not go to the

17   uninjured issue.  They go to other issues entirely.  But

18   here's the most important part, the Tenth Circuit.  This

19   court will never be reversed by the First Circuit, the

20   Second Circuit, the Third Circuit the Eighth Circuit.

21   The D.C. Circuit or the Seventh Circuit.  It could only

22   be reversed by the Tenth Circuit.

23        Look at all of the law; *Strickland*, *Syngenta*,

24   *Urethane*.  *Syngenta*, oh, great, that was only in front

25   of Judge Lungstrum, but the Tenth Circuit did find it

17-md-2785    In re: EpiPen    6.12.19   *REDACTED*    135

1   well-reasoned and researched.  Add to that list *Morris*

2   *versus DaVita Healthcare*, 308 F.R.D. 360 to 368,

3   District of Colorado, 2015, also interpreting the same

4   issue that there can be class members who are uninjured.

5   Of course that makes sense because otherwise you would

6   just have a defendant have -- make sure it does right by

7   one person and say, sorry, we know one person who's not

8   injured in your class; you can't have a class.  That

9   makes absolutely no sense.

10       This "great many" that they're talking about,

11   it's not a number.  It's a percentage, particularly when

12   you have a large class of this size.  What percentage

13   was it in *Asacol*?  It was 10 percent.

14       I think that's important because I don't know

15   whether that's the line that you would draw in the sand

16   at 10 percent that the First Circuit drew, but I want

17   you to remember in *Asacol*, both plaintiffs' experts and

18   defendants' experts agreed, there was no dispute, but

19   they agreed that there was 10 percent uninjured.

20       First Circuit was uncomfortable with 10 percent

21   uninjured in the *Asacol* case and said no class, go back

22   to the district court.  Unfortunately, the district

23   court said you're one and done, I'm not going to hear it

24   again.  So Professor Rosenthal's probability theory

25   didn't get heard back there.  But, nonetheless, that was

1    the -- that was the 10 percent line in the sand that the

2    First Circuit drew.

3         We're not to that level.  We're not even close.

4    Let me address it.  First, I think you should follow the

5    Tenth Circuit law, not any of these other cases that

6    have been suggested here.

7         With respect to the -- the facts in this case,

8    everyone was injured.  Let me repeat that:  Everyone was

9    injured.  They -- everyone lost their choice.

10        The defendants' response was not to cite law like

11   we did.  Their response was you don't have a model to

12   prove that everybody lost their choice.

13        We don't need a model.  The absolute truth here

14   is that there are no one-packs on the market after

15   August 2011.  That's an absolute hundred percent loss of

16   choice by everybody who wanted a one-pack at that time

17   and everybody who wanted a one-pack for the next eight

18   years, wanted to try it, needed an extra, just for one

19   -- for some reason they wanted to buy one, not two.

20   Maybe their doctor wanted to say I want to give you one,

21   their pharmacy wanted to give them one, not two.

22   There's a whole myriad of reasons, but the choice was

23   gone.

24        How about Auvi-Q?  That -- that choice was gone,

25   too.  They pushed them off the market.

1        What about generics, pay-for-delay?  Kept the

2   generics off the market.

3        Absolutely no question that there was a loss of

4   choice.  In some cases, when you look at this issue on

5   choice and competitive choice being lost, there's a

6   question, a dispute of fact as to whether somebody lost

7   the choice to get that particular product or had some

8   other choices they could get.

9        This isn't another choice.  Nobody had a choice

10  to go get a one-pack.  Couldn't do it.  The loss of

11  choice is profound here and it's the law and there's no

12  case law on the other side of it.  That is impact.

13       Oh, but there's more, financial loss.  The impact

14  here is extraordinary.  Let's take a look at it.  You

15  have to remember that this is not as defendants would

16  like to divide and conquer.  This is not a case where

17  they only did one bad thing like in *Asacol*,

18  pay-for-delay.  No, no, they did all kinds of bad things

19  and they're one on top of another on top of another.

20       Let's start with the one that's so simple to look

21  at, pay-for-delay, similar to *Asacol*.  The difference is

22  here our expert says there's a 5 percent uninjured rate.

23  But not exactly a 5 percent uninjured rate because, as

24  our economist recognized, Dr. Rosenthal, that 5 percent

25  is 5 percent in the first year.  But this is a multiyear

1    class and those people who weren't going to switch over,

2    they were brand loyal in the first year, maybe they're

3    not brand loyal in the second year, and maybe other

4    people go back to the brand in the third or fourth year.

5          So the bottom line is those people might not have

6    been injured in year one but injured in year three or

7    year four.  That's the reason it's less than 5 percent.

8          Oh, but defendant has an argument their expert

9    says, well, it could be.  You could use that Mylan 2

10   instead of the Mylan 1.  Our expert thought Mylan 1 was

11   the best fit.  Their expert thought maybe Mylan 2 might

12   have been the best fit.  At this point you don't weigh

13   expert testimony.  They don't get the benefit of the

14   doubt.  They don't even have their efforts weighed at

15   all because this is a predominance elements contest

16   issue of whether *prima facie* evidence is the test.

17   *Prima facie* evidence is the plainest evidence.  It's not

18   anybody else's.  So our 5 percent reigns supreme that

19   meets the *Asacol* test.

20         Oh, but there's much better here.  There's much

21   better here because those brand loyalists that held that

22   5 percent, they got stuck with a -- they got stuck with

23   an exclusive two-pack.  Fifty percent of those people

24   wouldn't have wanted that under the evidence that's

25   before this court.  Fifty percent of the people bought a

1    one-pack.  Fifty percent bought a two-pack.

2        Now, if you do look at it how many pens were

3    bought, 75 percent of the pens were bought in the

4    two-pack because, of course, somebody buying a two-pack

5    buys twice as much.  That's why you see some of the

6    evidence in the pie charts at 75 versus 25.  But if you

7    look at the actual underlying evidence, it's a 50/50

8    deal.

9        You can take a look at that in the -- in one of

10    the slides that was recently put forward by I think

11    Dr. Johnson.  He indicates -- it's one of those highly

12    sealed slides, and it shows 89 percent of the people,

13    when they were going to a clinic or to a hospital, they

14    got a one-pack.  But it was a much bigger percentage,

15    about -- a much bigger percentage got -- got a two-pack

16    when they didn't go when they were just relying on the

17    retail advertising that Pfizer and Mylan put out.  But

18    if you combine those two, you end up with 50 percent.

19        Bottom line, 5 percent generic, really less.

20    Then you got 50 percent of those brand loyal who got

21    hammered by the exclusive two-pack.  Now you're down to

22    two and a half percent and you haven't even layered on

23    top of that the Auvi-Q foreclosure which raised the

24    price of everything.  It kept the price up of

25    everything; not just the Auvi-Q, but it kept the price

1    up of EpiPen when it should have been lower.  So

2    consequently you're talking about somewhere in the

3    neighborhood of 1 percent.

4         And is their argument now really -- or even less

5    than 1 percent is their argument now that -- and that's

6    just talking about consumers, Your Honor.  One percent

7    of consumers can't be certified?

8         Let's then talk about third-party payors which,

9    of course, as we know is going to be the bulk of where

10   the damages are.  You see it in this particular case

11   that one -- that third-party payors, they have the bulk

12   of the damages here.  Nobody ever disputes that.  It's

13   almost a hundred percent injured.  Nobody, no expert

14   took it on.  It's absolutely golden on every single

15   theory layered on top of one another on top of another.

16   They're just injured over and over again.

17        Let me address ascertainability.  Again here,

18   ascertainability, *Syngenta* followed the *Mullins* case.

19   It's a Seventh Circuit case, granted, but I couldn't

20   think of a better tour de force on ascertainability than

21   the *Mullins* decision.  I don't need to talk any more

22   about it.  If you read that, it's so compelling I think

23   the court will follow it.

24        But let's talk about ascertainability on the

25   facts.  Nobody disputes the third-party payors are

1   easily ascertainable.  What defendants didn't know, or

2   at least maybe their expert didn't know, was that the

3   consumers here are easily ascertainable too.  We just

4   have to get the data from the PBMs.  That's how they

5   know, when you go fill a prescription, they pull it up

6   on the computer and get all that information.  It's all

7   individualized.  All that information is available and

8   that's where the aggregate data comes for all of the

9   economists to make their aggregate decisions.

10        That's the same thing that Mylan uses to make

11   their aggregate decisions.  They use aggregate data.

12   They don't use the individualized stuff, but it can be

13   done, which is why somebody who has done that before,

14   gone all the way to a big pharma class certification

15   like Dr. Rosenthal has done, she knows that she can do

16   the allocation on the backside individually if she needs

17   to.

18        With respect to Question 5, the possible conflict

19   with Anthem in page 13, note 52, it looks like Mylan did

20   offer rebates to a third-party payor there but it does

21   not look like the third-party payor took the bait.  So

22   we don't believe we have any conflict there.

23        THE COURT:  Does it depend on whether they

24   did or whether they have that incentive?

25        MR. SHARP:  I think Mylan does have that

1   incentive.  Mylan will do absolutely anything to buy off

2   anybody.

3           THE COURT:  I'm sorry, whether Anthem did or

4   has that incentive.

5           MR. SHARP:  Yeah, they had it presented to

6   them.  Anthem had that presented to them.  Doesn't show

7   they ever bit off on it, just that it was presented to

8   them.

9           I'm not surprised that Mylan would try to buy off

10  just about anybody to try to have what they wanted.

11          Let me talk briefly -- it's out of school here a

12  little bit, but I want to talk about Local 282.  It

13  doesn't make money from the defendants' RICO scheme.

14  There's no way that anybody can claim that they actually

15  made money, which is the conflict with the class where

16  somebody makes money versus everybody else losing money.

17  They didn't make money.  Local 282 was at risk.  We

18  address that in spades in page 37 to 39 of our reply

19  brief, if the court has any questions about that.

20          All of our class representatives, they are

21  adequate.  They may not be perfect, but they're all

22  adequate.  None of them have been shown to have no

23  injury, not a single one.  Oh, sure, some of them might

24  have said I was happy with a two-pack; I'm still happy

25  with a two-pack.

1        Yeah, what about generics?  What about the Auvi-Q

2   issue?  What about the price going down?  None of that's

3   discussed.

4        They have to be uninjured on every single thing

5   layer upon layer upon layer.  This is not a divide and

6   conquer to try and say you're not injured on one aspect

7   but you're injured on the other two.  No, you have to be

8   completely uninjured.

9        And out of everybody that they came up with, not

10  a single one.  Instead the best they could do is say

11  exactly what the statistics show, that about 50 percent

12  of our class representatives wanted two in the first

13  place.  During the voluntarily period that's what they

14  bought.  But afterwards they had that choice completely

15  robbed from them.  They had no ability to go back to a

16  one-pack, switch back and forth.  And half of our class

17  always wanted the one-pack but they were forced to go to

18  the two-pack.

19       So we have people who are -- everybody's injured

20  here.  Third-party payors are injured.  Almost all of

21  the consumers are injured.  Not a single person, not one

22  have they come forward and said that one person was not

23  injured on any theory you brought up in the case.  They

24  didn't bring it forward.

25       No. 6, you said -- you were asking about

1   plaintiffs' experts.  We believe they were

2   well-qualified, used regular well-accepted methods.  I

3   think that was addressed from the witness stand

4   yesterday, not to mention, of course, that we're going

5   to brief that issue, I'm sorry, ad nauseam on the

6   *Daubert* side.

7           THE COURT:  Is this a question -- is this a

8   question I asked?

9           MR. SHARP:  Excuse me?

10          THE COURT:  Yesterday, is this a question I

11   asked yesterday?

12          MR. SHARP:  Yes.

13          THE COURT:  Okay.  The six and seven, you

14   lost me.

15          MR. SHARP:  No. 7, appoint co-leads as class

16   counsel.  Under Rule 23(g) our opening brief, pages

17   78-79 addresses that, Your Honor.

18          THE COURT:  What's the document number?

19          MR. SHARP:  I don't know what the document

20   number is.

21          THE COURT:  It's your opening brief?

22          MR. SHARP:  It's opening class certification

23   brief pages 78-79.

24     The eighth thing was can you have a -- can you

25   have a nationwide RICO class?  The answer is yes.  Of

1    course, *CGC Holdings* was a RICO case.  It is a federal
2    claim, RICO being a federal claim, so you would expect
3    it to be a nationwide class.  That was only 15 states
4    but it could have been that they only had 15 states that
5    they operated in.  *Schwab versus Philip Morris*, 446
6    [sic] F.Supp.2nd, 992, Eastern District New York, 2006,
7    nationwide class under RICO, *Klay versus Humana, Inc.*,
8    282 [sic], F.3rd, 1241, Eleventh Circuit 2004.  The next
9    one, *Cohen versus Trump University*, that case I don't
10   have the cite for it.  I think it's also a RICO case.
11                   THE COURT:  It's a nationwide case.
12                   MR. SHARP:  Yes.
13                   THE COURT:  Okay.
14                   MR. SHARP:  And then -- and then the -- the
15   issue finally on impact, I think I've addressed it.  It
16   really comes down to this issue of co-pay.  We've got
17   impact all day along.  The only question is can they
18   jump in as a third-party beneficiary and, as they
19   suggest, at trial literally ask questions to the jury
20   and say we want to see if this guy's actually got any
21   insurance and been benefited by any insurance.
22        That's the very essence of what collateral
23   estoppel prevents at a trial and the allocation that
24   takes place at the backside, not only in a personal
25   injury case but also in a class action case.

1          So for those reasons we'd ask that this court

2     certify the class -- all five of the classes as written

3     and we don't -- we don't have anything further.  If you

4     have any questions, we would be happy to answer.

5               THE COURT:  I asked myself out at the end of

6     Mr. Burns'.

7               MR. SHARP:  Thank you.

8               THE COURT:  Thanks very much.  You can kill

9     the clock.  We now go on my time.  So let me just turn

10    to a couple of what I would call record hygiene issues.

11         So I got big notebooks yesterday from both sides

12    of the caption with a bunch of exhibits in it.  I've

13    carried them but not read them because I don't know,

14    whether by agreement or some other mechanism, those are

15    or aren't a part of the record on this certification

16    motion.  I commissioned you all to talk about that.

17              MR. SARKO:  Your Honor, Lynn Sarko for the

18    plaintiffs.  We believe that those should be submitted

19    for the record, both sides.  We can make sure that that

20    happens.  And so the plaintiffs, both what we submitted

21    yesterday and what we submitted today.

22              THE COURT:  So when you say "submitted

23    today," you're talking about the demonstrative of

24    Mr. Burns?

25              MR. SARKO:  The notebooks but also what we

 1    handed up.

 2              THE COURT:  What do you, defendants, think

 3    of that?

 4              MR. LEVIN:  No objection to making them part

 5    of the record, Your Honor.  The only thing I would add

 6    is that I believe some portions of those documents have

 7    been highlighted for redaction, confidentiality

 8    purposes.  So if they do become part of the public

 9    record, we would have to go through the confidentiality

10    process to potentially seal those documents.

11              THE COURT:  I love that a lot.

12              MR. SARKO:  I would think that that would be

13    easy since we're --

14              MR. LEVIN:  Yes.

15              THE COURT:  I think I've -- I think I've

16    ruled darn near all of them, haven't I?

17              MR. LEVIN:  Yes.  My guess is, yes.  And if

18    you haven't, I -- you saw actually how the process

19    worked out leading up to today.  We agreed.  Had no

20    issues for the court.  I'm confident we can get there

21    again.

22              THE COURT:  Why don't I leave it to you to

23    figure out how to put in -- I just feel confident that

24    no matter how this turns out, somebody's going to seek

25    an appeal, if not now later and probably both now and

1   later.  And so I'd like to make sure that everything

2   that the parties have asked me to consider in making

3   this decision is available to the reviewing court.

4          So I'm going to commission you all to figure out

5   the logistics of that in conjunction with the clerk's

6   office.  If you can bind yourselves to a way you

7   represent that the thing you are asking to submit only

8   includes things I have ruled are properly sealable, then

9   I'll do so.

10          Remember, of course, that any sealing ruling is

11   subject to a revision if it becomes an instrumental part

12   of the court's justification and rationale.  But subject

13   to that, that solves that problem I think.

14          MR. SARKO:  We'll do it without any

15   footnotes.

16          THE COURT:  I think you've used a lifetime

17   of footnotes.  But I -- I did read some of them, I want

18   you to know.  So you all leave here today and you go

19   back to work on completing the non-coordinated fact

20   discovery in the case which I believe you run out of

21   time on July 31st.  Is that the state of play?  Okay.

22   And then expert discovery follows.

23          Here's what I want to tell you:  This -- I toyed

24   with the notion of saying at the end of today's hearing

25   that I'm ready to rule, but I didn't think that would be

```
 1   good for anybody's health.  So what -- obviously this is
 2   -- this is a work -- this is an order that requires a
 3   lot of homework.  This is not you will have this in a
 4   few weeks.  This is a month's order.  It's obviously
 5   important.  It deals with substantial rights.  And I
 6   want you to know I cannot today predict when you will
 7   get that order, but it will be in the month range, not
 8   in the week's range.
 9        Whether that will lead you to conclude anything
10   about what you're doing on the schedule and the like,
11   that's up to you.  The schedule stays in place for now.
12        I'm -- I'm planning -- I'm going to try to stay
13   out of your way until the end of July.  If you want to
14   stay out of the way of Judge James' way, that's fine
15   too.
16        But what I was thinking about doing was trying to
17   establish a time some time in the early first half of
18   August time frame to get together with you probably over
19   the phone for a signal check about where you are in your
20   work and where you're coming from a case management
21   standpoint and how the ruling on this motion, which you
22   won't yet have, spills into that.  But my guess is
23   you're probably a little worn out.  Let's postpone that
24   discussion.
25        I would like to commission you -- this probably
```

1  goes to the liaison counsel.  I don't know if

2  Mr. Sechler with us today.  I saw him yesterday.  I

3  don't think so.

4       But, in any event, if you can -- the method

5  you've used to communicate with the chambers account on

6  a suggested time I'll match with my availability and we

7  can try to get on the phone together.  And you've been

8  very good about submitting things in advance and telling

9  me what you'd like to discuss so I can read ahead.  But

10  that's what I kind of -- that's kind of what I'm looking

11  at in terms of keeping touch with you.

12       So now the last -- there are two things left.

13  They're both formidable.  Mr. Burns, lexicon.

14            MR. SARKO:  Your Honor, the plaintiffs'

15  position is as follows:  We started checking with

16  people.  Everyone we have contacted has -- will be

17  waiving.  If we have not contacted -- not been able to

18  get decisions by everyone.  We will undertake to do that

19  probably within a couple weeks.

20            THE COURT:  All right.

21            MR. SARKO:  We will document it in writing

22  so that for every case you have that they're waiving.

23            THE COURT:  That's fine.  I want to give you

24  right now a date.  I will tell you it's a malleable

25  date.  I'm not going to draw it around the two weeks you

1    proposed.  I think that's probably a little on the short

2    end of town.  How about July 15th for those either

3    waivers to be submitted or noticed that certain

4    plaintiffs are not waiving, and then I can take that

5    into account and think about that as we look forward to

6    the August conversation?  Does that seem fair?

7             MR. SARKO:  That does.  Thank you.

8             THE COURT:  I will memorialize that with an

9    order but that will be your operating deadline.

10        The last topic, the one I'm most scared of, do

11   you want to write anything else possibly ever in your

12   life?

13            MR. SARKO:  Your Honor, the plaintiffs'

14   position is no with the caveat that if the court would

15   find it helpful -- I've had cases where the court has

16   gone through its things and had a question and said we

17   would like -- I'd like an answer to this, can everyone

18   give me no more than four pages or five pages or

19   something.  So I don't want to preclude it.

20        But if it would be helpful to the court if

21   there's an issue that's unclear, sometimes it's easier

22   and faster to ask.  Other than that, we have no great

23   desire to kill more trees.

24            THE COURT:  Mr. Levin, Mr. Gandesha.

25            MR. LEVIN:  Completely agree.  That's what

 1  we were going to say.  Nothing further unless the court

 2  would like it.

 3           MR. GANDESHA:  Agreed, Your Honor.

 4           THE COURT:  You know, I'm not -- I'm not

 5  going to say no forever now.  I think I've had -- I have

 6  plenty for the short-term.  The issue that Mr. Sarko

 7  points, I may find myself into a quandary.  I may

 8  conclude that I want to see you again on this.  I may

 9  conclude that I'm going to have a *Daubert* hearing on one

10  or more experts.  I certainly know where you are and

11  I'll be in touch if I find that that kind of submission,

12  which I would outline and propose a schedule for before

13  sticking it on you, I think that's a better place to

14  leave it.  I commend you both for that discipline -- or

15  all three of you, I should say.

16           All right.  Subject to other comments for the

17  good of the country.

18           MR. SARKO:  I have one other issue.  I just

19  wanted the alert the court to we are planning to talk to

20  the defendants to raise the issue of asking the court to

21  appointment a settlement master in the case.  We found

22  -- at least I have found in large cases like this,

23  whether it's -- Judge Polster who has the opioid case

24  has appointed David Cohen.  We all know in the

25  *Volkswagen* case we had Robert Mueller who was able to

1    settle that case and go on to bigger and better things.

2    You know, but it is -- it is an issue.  In many cases

3    it's at the time of class certification when the hearing

4    happens and all the briefing's been done, everyone's

5    focused on it, the court is going to do whatever the

6    court's going to do.

7         But I do think, to the extent that the parties

8    want to discuss that issue, at least we believe it's

9    helpful to have it through the auspices of the court.

10   But I will be raising that with the defendants.  I

11   didn't want to surprise the court.

12        THE COURT:  All right.  Thanks for the

13   notice.  I will tell you sort of the way I thought about

14   the subject of settlement as a lawyer is that I think

15   lawyers are reasonably adept at settling cases and that

16   courts -- about the most effective thing that a court

17   can do is to promise a trial date that will hold.

18        I want you to know that that's not just me being

19   mean.  I think it's effective.  And, secondly, on the

20   other hand, if there are things that the court can do

21   that will assist efforts by the parties, I'm more than

22   happy to do it.  That crankiness that I expressed to

23   start that though doesn't mean to say I wouldn't yield

24   comfort and support if asked to, but I'm not going to

25   put myself in the middle of your business unless one or

1   more party asks me to.  That's the way I think about it.

2        You may think it's wrong.  You may think it's

3   stupid.  You won't be the first.  But that's what's in

4   my mind and at least you know.

5        So that conclude your matters?  Comments for the

6   good of the case, the good of the country, anything of

7   that nature?

8              MR. LEVIN:  Nothing further, Your Honor.

9   Again, thank you for all your time and effort and all

10  the time and effort you still have to go.

11             MR. GANDESHA:  Agreed.  I have nothing, Your

12  Honor.  Thank you.

13             THE COURT:  Well, they do pay me to do this,

14  so it's okay.  Thank you very much.  I know when lawyers

15  work very hard to try to take a very complex problem and

16  get it across the bench to someone who hasn't lived in

17  the case for two years.  I could discern how hard you

18  worked at that.  I feel grateful for it.  I'll go off to

19  do the work you asked me to do now.  Thank you.  Safe

20  travels everyone.

21             (Proceedings adjourned.)

22

23

24

25

1                    CERTIFICATE

2        I certify that the foregoing is a true and

3   correct transcript from the stenographically reported

4   proceedings in the above-entitled matter.

5        DATE:  June 14, 2019

6

7                 /s/Kimberly R. Greiner
               KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
8               United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25