## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ

Hon. Daniel D. Crabtree

Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC,

　　　　　Plaintiff-Counterclaim
　　　　　Defendant,

　　v.

MYLAN Inc., *et al.*,

　　　　　Defendants-Counterclaim
　　　　　Plaintiffs.

**This Document Relates to the *Sanofi* Case**. | CASE NO.: 2:17-CV-02452-DDC-TJJ




*Document Filed Electronically* |

## PLAINTIFF SANOFI-AVENTIS U.S. LLC'S MEMORANDUM OF LAW IN OPPOSITION TO MYLAN'S MOTION TO EXCLUDE OPINION TESTIMONY OF FIONA M. SCOTT MORTON, Ph.D.

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ....................................................................................................................2

I.      Legal Standard ........................................................................................................2

II.     Dr. Scott Morton Is A Qualified Economic Expert Who Can Help The Jury ..................3

III.    Dr. Scott Morton's Damages Model Is Reasonable and Reliable .......................................4

       A.     Mylan Applies the Wrong Legal Test for Damages .................................................4

       B.     Dr. Scott Morton's Damages Methodology Is Sound................................................5

       C.     Dr. Scott Morton's Damages Model Isolates Mylan's Unfair Conduct ................10

IV.    Dr. Scott Morton's Damages Model Accounts for Future Events....................................14

       A.     5% Price Increase .................................................................................................14

       B.     Auvi-Q Relaunch and Generic EpiPen ................................................................15

V.     Dr. Scott Morton's Methodology Is Peer-Reviewed, Rigorous, and Scientific................16

       A.     Dr. Scott Morton's EEB model.............................................................................16

       B.     Entrenched Share ..................................................................................................20

             1.     Bruce Foster's Talking Points….....................................................20

             2.     ESI Data..........................................................................................21

             3.     CVS Data. ........................................................................................21

             4.     Magellan. .........................................................................................22

             5.     MedImpact. ......................................................................................22

VI.    Dr. Scott Morton Provides Economic Opinions, Not Fact Determinations......................22

CONCLUSION...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
817 F.3d 755 (Fed. Cir. 2016)................................................................4

*Apotex, Inc. v. Cephalon*,
321 F.R.D. 220 (E.D. Pa. 2017)...........................................................6, 10

*Arista Networks, Inc. v. Cisco Systems, Inc.*,
2018 WL 8949299 (N.D. Cal. June 15, 2018).....................................4, 6

*Aspen Skiing v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)...............................................................................24

*Autowest, Inc. v. Peugeot, Inc.*,
434 F.2d 556 (2d Cir. 1970)....................................................................6

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946).................................................................................4

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) .................................................................13

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) .................................................................18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................13

*Cochrane v. Schneider Nat'll Carriers, Inc.*,
980 F. Supp. 374 (D. Kan. 1997)...........................................................17

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*,
No. CV 15–9814 DSF, 2017 WL 6512223 (C.D. Cal. Oct. 16, 2017)....................................16

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ...............................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..............................................................................2, 3

*Eastman Kodak Co. of New York v. S. Photo Materials Co.*,
273 U.S. 359 (1927).................................................................................4

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
  2017 WL 3592775 (N.D. Ill. Aug. 21, 2017) ..........................................................9

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
  744 F. Supp. 2d 870 (E.D. Wis. 2010)....................................................................9

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  2019 WL 2206013 (N.D. Cal. May 21, 2019) ......................................................20

*First Sav. Bank, F.S.B. v. U.S. Bancorp*,
  117 F. Supp. 2d 1078 (D. Kan. 2000)................................................................1, 13

*In re Blood Reagents Antitrust Litig.*,
  2015 WL 6123211 (E.D. Pa. Oct. 19, 2015)...........................................................3

*In re Chocolate Confectionary Antitrust Litig.*,
  2013 WL 11305184 (M.D. Pa. May 10, 2013)........................................................6

*In re Linerboard Antitrust Litig.*,
  497 F. Supp. 2d 666 (E.D. Pa. 2007) ....................................................................13

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018)...............................................................3, 10

*In the Matter of Otto Bock Healthcare N. Am. Inc.*,
  F.T.C. Dkt. No. 9378 (May 6, 2019) ......................................................................4

*In re Processed Egg Products Antitrust Litig.*,
  81 F. Supp. 3d 412 (E.D. Pa. 2015) ......................................................................23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017)........................................................................23

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
  2008 WL 4382141 (D. Kan. Sept. 26, 2008)......................................................9, 13

*In re Urethane Antitrust Litig.*,
  166 F. Supp. 3d 501 (D.N.J. 2016) .........................................................................3

*In re Urethane Antitrust Litig.*,
  No. 04-1616-JWL, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) ..........................22

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  280 F. Supp. 3d 691 (D. Md. 2017).................................................................4, 16

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981)...........................................................................................5, 7

*Kieffer v. Weston Land, Inc.*,
  90 F.3d 1496 (10th Cir. 1996) ...................................................................................3

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...................................................................................................16

*Lehrman v. Gulf Oil Corp.*,
  500 F.2d 659 (5th Cir. 1974) ......................................................................................8

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003)...............................................................................4, 6, 10

*McCoy v. Whirlpool Corp.*,
  258 Fed. App'x 189 (10th Cir. Dec.5, 2007) ............................................................13

*Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*,
  850 F.2d 1286 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989)............7, 8

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000)........................................................................................3

*Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus
  Fin., N.A.*,
  858 F.3d 1324 (10th Cir. 2017) ...........................................................................24, 25

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
  2019 WL 1101385 (D. Del. Mar. 8, 2019) ................................................................3

*Spray-Rite Serv. Corp. v. Monsanto Co.*,
  684 F.2d 1226 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984) ....................................11

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.*,
  2016 WL 1377342 (D. Kan. Apr. 7, 2016), *aff'd*, 851 F.3d 1029 (10th Cir.
  2017) .........................................................................................................................18

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)...............................................................................19, 24

*Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*,
  267 F.R.D. 368 (D. Kan. 2010)...................................................................................3

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)....................................................................................................7

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)........................................................................................9

*ZF Meritor LLC v. Eaton Corp.*,
    2013 WL 6729509 (D. Del. Dec. 20, 2013)................................................................10

**Secondary Sources**

Fiona Scott Morton & Zachary Abrahamson, *A Unifying Analtyical Framework*
    *for Loyalty Rebates*, 81 Antitrust L.J. 777 (2017) ..................................................18

## PRELIMINARY STATEMENT

In 225 pages of detailed analysis based on a voluminous record and two days of deposition testimony spanning over 520 pages, Professor Fiona Scott Morton fully disclosed her expert opinion that: (i) Mylan had entrenched monopoly power over the U.S. EAI device market with the EpiPen; (ii) Mylan leveraged its monopoly power to block access to Auvi-Q, an innovative new product to compete with the EpiPen; (iii) Mylan hurt caregivers and patients of both EpiPen and Auvi-Q through its anticompetitive conduct; and (iv) Mylan damaged Sanofi.  Mylan does not challenge Dr. Scott Morton's qualifications as the former Deputy Assistant Attorney General for Economic Analysis with the Antitrust Division of the U.S. Department of Justice, as a chaired economics professor at Yale University, nor as a scholar in the economics of the pharmaceutical industry.  Importantly in this Sherman Act Section 2 case for analyzing Mylan's conduct and its effect, Mylan also does not challenge the admissibility of Dr. Scott Morton's opinion that Mylan had entrenched monopoly power over the U.S. EAI device market.

Instead, Mylan presents a handful of disagreements with Dr. Scott Morton's analysis that do not bear on her methodology.  A jury can consider the weight of Mylan's arguments based on the tried method of cross examination and Mylan's examination of the five experts (including two economists) it retained to respond to Dr. Scott Morton.  For the reasons set forth below, none of Mylan's issues with Dr. Scott Morton's opinions are a legitimate reason to deprive the jury from hearing her full testimony on the economic perspective of Mylan's conduct.

*First*, Mylan's attack on Dr. Scott Morton's damages analysis ignores black letter law that the wrongdoer cannot escape liability by demanding mathematical certainty.  Having applied the wrong legal test for calculating antitrust damages, Mylan's arguments about Dr. Scott Morton's damages model can be rejected on this basis alone.  In any event, Dr. Scott Morton properly

grounded her damages analysis in Sanofi's closest-in-time 2012 pre-launch Auvi-Q forecast. She then validated her use of Sanofi's business projections with Mylan's own forecasts, actual real-world examples free of Mylan's anticompetitive conduct in the United States and Canada, and speaking with relevant Sanofi personnel. A fair examination of Dr. Scott Morton's damages model shows that it is reasonable, reliable, and helpful for a jury to consider.

*Second*, Mylan criticizes Dr. Scott Morton's liability opinions by mischaracterizing her analyses. Dr. Scott Morton's analysis of Mylan's leveraging of its monopoly power is grounded in classic economic principles. There is nothing "novel" about a monopolist using its power to maintain its control of the market by leveraging non-contestable demand for its product to exclude a new product from reaching consumers. Dr. Scott Morton's peer-reviewed Effective Entrant Burden ("EEB") calculation builds on decades of economic research to construct a helpful, non-outcome-determinative tool for a fact-finder in deciding whether a monopolist's conduct is anticompetitive by imposing a substantial tax on a new company to enter a market to compete.

*Third*, Mylan misstates Dr. Scott Morton's testimony as usurping the jury's role. To the contrary, Dr. Scott Morton shows how Mylan's company-wide scheme to exclude Auvi-Q and ultimately drive it out of the U.S. EAI market is consistent with economic theories of profit-maximizing monopolists. Economic experts have always been permitted to testify about how conduct is consistent with anticompetitive behavior without invading the province of the jury.

Thus, Sanofi respectfully submits that a jury should hear Dr. Scott Morton's full testimony.

## ARGUMENT

### I.   Legal Standard

Expert testimony is admissible if it is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). An expert's method need not be the "best" method. Rather, "the test is whether the particular opinion is based on valid reasoning and reliable

methodology." *In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 504 (D.N.J. 2016) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000)).  *See Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) ("An expert opinion must be based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required.") (alteration in original) (internal quotation marks omitted); *Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 267 F.R.D. 368, 372 (D. Kan. 2010) (same).

Mylan's motion "is nothing more than a 'we do not agree with [an expert's] opinion so it is junk science' motion." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018).  "[C]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" for challenging evidence.  *Daubert*, 509 U.S. at 596; *see Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1101385, at *8 (D. Del. Mar. 8, 2019) ("We do not view *Daubert* analysis as the time to decide who is right or which theory we would adopt.").  Perceived "weaknesses in the factual basis of an expert witness' opinion…bear on the weight of the evidence rather than on its admissibility." *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *14 (E.D. Pa. Oct. 19, 2015).

## II.    Dr. Scott Morton Is A Qualified Economic Expert Who Can Help The Jury

Mylan does not dispute that Dr. Scott Morton is qualified to offer her opinions regarding market definition, monopoly power, exclusionary conduct, harm to competition, and damages.  Dr. Scott Morton is the Theodore Nierenberg Professor of Economics at the Yale School of Management.  From 2011 to 2012, she served as the Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice.  Mem. Ex.1 at ¶¶ 2-3.  Dr. Scott Morton has testified before Congress on economic issues related to the pharmaceutical and technology industries, and is a frequent consultant to the U.S. Federal Trade

Commission. *Id.* at ¶¶ 4-5. She also has authored or co-authored nearly 50 peer-reviewed articles, many on the economics of the pharmaceutical industry. *Id.* at ¶ 2.

Several courts have deemed Dr. Scott Morton qualified to serve as an economics expert and they have credited her work. *See, e.g.*, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691, 699 (D. Md. 2017) ("Capital One argues, through its highly credentialed and impressive economic expert, Professor Fiona Scott Morton of Yale University, that IV possesses monopoly power in connection with its large financial services patent portfolio"); *Arista Networks, Inc. v. Cisco Systems, Inc.*, 2018 WL 8949299 (N.D. Cal. June 15, 2018) (Dr. Scott Morton's damages forecast was reliable); *In the Matter of Otto Bock Healthcare N. Am. Inc.*, F.T.C. Dkt. No. 9378 (May 6, 2019) (Dr. Scott Morton 's hypothetical monopolist test correctly defined the market); *c.f. Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 761 (Fed. Cir. 2016) (citing Dr. Scott Morton's article "Entry Decisions in the Generic Pharmaceutical Industry").

In sum, Dr. Scott Morton is well-qualified to help the jury understand Mylan's conduct as a monopolist in the U.S. EAI market. As shown below, Mylan's few criticisms are unfounded, go to the weight of her opinions, and do not support the severe remedy of exclusion.

## III.   Dr. Scott Morton's Damages Model Is Reasonable and Reliable

### A.   Mylan Applies the Wrong Legal Test for Damages

Mylan's motion ignores almost a century of antitrust precedent holding that a plaintiff who is excluded from the relevant market only needs to make a "just and reasonable estimate" of lost profits, because "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)). Indeed, antitrust plaintiffs "are given some latitude in calculating damages, so long as their theory is not wholly speculative." *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003); *see also Eastman Kodak Co. of New York v. S. Photo*

*Materials Co.*, 273 U.S. 359, 379 (1927) ("Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."); *accord* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, 304 (Am. Bar. Ass'n 2016) ("[Y]ou are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation."); American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, 3d. ed. 2017, at 88 (stating a jury is allowed to make a "just and reasonable" estimate of damages based on inferential proof, "because the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation") (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981)).

To quantify Sanofi's damages, Dr. Scott Morton constructed a "but-for" world, *i.e.*, a market free of Mylan's monopolization. *See* Mem. Ex.1 at ¶¶ 198-99. To do that, Dr. Scott Morton started with a profit and loss statement forecast prepared by the Sanofi Auvi-Q Brand Team in 2012 just before Auvi-Q's launch. That forecast projected Auvi-Q's share (34.9% by 2015 and 40.2% by 2017), along with its costs and profits. *Id.* at ¶ 201 (citing SAN-EPI-0171591).

Tellingly, Mylan argues that Dr. Scott Morton's analysis is "unreliable" because she "assumes that the Sanofi 2012 Forecast ***perfectly*** predicted sales, costs, and profits for 2013 to 2015." Mem. at 10 (emphasis added). This is a fatal statement because the test for *admissibility* is not perfection. On this threshold basis, Mylan's attack on Dr. Scott Morton's damages model fails.

### B.    Dr. Scott Morton's Damages Methodology Is Sound

Mylan goes on to claim that Dr. Scott Morton knew "next to nothing about" the Sanofi 2012 forecast. Mem. at 4-8. Mylan is wrong and misrepresents Dr. Scott Morton's testimony.

Dr. Scott Morton testified at both days of her deposition that (i) the 2012 forecast was prepared for the purposes of launching Auvi-Q, (ii) the forecast reflected the extensive payor research conducted by Sanofi in advance of Auvi-Q's launch, (iii) the forecast was prepared by, and based on the expertise of, the Auvi-Q Brand Team, and (iv) the forecast had conservative assumptions. *See* Declaration of Eric Hochstadt ("Hochstadt Decl.") Ex. 1 at 273:17-274:13; *id.* at 276:9-276:19; *id.* at 290:19-292:15; *id.* at 415:22-419:9; *id.* at 485:23-490:14.   She testified further that she considered the forecast reliable because it took into account Sanofi's business judgment and represented "Sanofi's best estimate of the demand curve" of EAI devices, including "their inclusion of assumptions in this forecast of normal operating procedure."  *Id.* at 280:3-280:9; *see also id.* at 282:12-283:20.

The case law requires nothing more.  *See Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970) (damages testimony admissible based on projections that "were the product of deliberation by experienced businessmen charting their future course"); *Apotex, Inc. v. Cephalon*, 321 F.R.D. 220, 233 (E.D. Pa. 2017) (admitting expert's opinion because he "considered the reliability of the [] projections, [] understood how they were created, and was able to provide detailed explanations as to why he found their use appropriate"); *In re Chocolate Confectionary Antitrust Litig.*, 2013 WL 11305184, at *4 (M.D. Pa. May 10, 2013) (damages expert's opinions were "far from speculative" and based on data relied on by business executives) (citing *LePage's*, 324 F.3d at 166); *Arista*, 2018 WL 8949299 at *10 ("Because Dr. Scott Morton considers evidence and conducts an analysis to support her discount of the effects of Cisco's ITC actions, the Court concludes that her opinions are based on an adequate foundation and a reliable methodology.").

Nevertheless, Dr. Scott Morton took several additional steps to validate her use of the 2012 Sanofi forecast.  She spoke with Bryan Downey, the Sanofi Auvi-Q Brand Lead in charge of Auvi-

Q from 2010 through late 2014, who informed her that this was the "best and most reliable" forecast for how Auvi-Q was expected to perform at the time of launch and before Sanofi learned of Mylan's conduct.  Mem. Ex.3 at ¶ 175.  (Neither of Mylan's economic experts spoke to a single Mylan employee.)  Dr. Scott Morton also assessed the reliability of Sanofi's forecast by comparing it to a "remarkably similar" forecast *prepared by Mylan* in November 2011 (before Mylan adopted its exclusionary strategy) which projected Auvi-Q achieving about the *same* market share over the same period of time, *i.e.*, 30% by 2015 and 40% by 2017.  *See* Mem. Ex.1 at ¶¶ 199-201.  Mylan's criticism that Sanofi's own forecasts were rosy does not explain why Mylan itself projected the same share for Auvi-Q.  *See* Mem. at 7.

Dr. Scott Morton further corroborated the parties' projections with real world experiences untainted by Mylan's conduct, using data from Canada and formularies where Auvi-Q and EpiPen were treated equally.  Mem. Ex.1 at ¶¶ 202-206.  Mylan argues that a comparison to Canada is unreliable because it is a different market (Mem. at 8), but Dr. Scott Morton recognized those differences and looked to the Canadian experience "only for the limited purpose of assessing Auvi-Q's market share in the but-for world."  Mem. Ex.1 at ¶¶ 202-03, 206-07; Mem. Ex.3 at ¶ 203; Hochstadt Decl. Ex. 1 at 377:4-385:11 (explaining why Canada is a "data point that's useful to consider").  Courts have accepted the use of other markets as "yardsticks" to measure antitrust damages.  *See, e.g.*, *J. Truett*, 451 U.S. at 567 (a sufficient basis for damages would exists if, "for example, plaintiff compared its sales in Canada, where it was subject to a violation, with its sales in the United States, where it was not" like in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).); *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1295 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989) (allowing test market comparisons for damages, despite the data being "not perfect").  Whether another market is an appropriate

comparison is a question for the jury. *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974) (yardstick comparison is "the traditional responsibility of the jury").

Dr. Scott Morton also looked to data when Auvi-Q and EpiPen were co-preferred on the Blue Cross Blue Shield Horizon New Jersey and University of Michigan plans, and showed Auvi-Q achieved 34% and 36% share, respectively. *See* Mem. Ex.1 at ¶¶ 204-205. While Mylan claims that Dr. Scott Morton "arbitrarily" selected these plans because other plans covered Auvi-Q equally but had lower shares (Mem. at 8), Dr. Scott Morton explained in her report that these two plans were selected because they were less likely to be affected from spillover effects resulting from Mylan's exclusionary conduct. Mem. Ex.1 at ¶¶ 204-205; Mem. Ex.3 at ¶ 180. The University of Michigan formulary would have lower spillover effects because it is used by a university population serviced by a university hospital. *Id.* As for Horizon, being one of the larger formularies in New Jersey, spillover effects associated with exclusion from other formularies would not be as strong. *Id.* Mylan, of course, ignores this reasoning. *See Nat'l Farmers' Org.*, 850 F.2d at 1296 (dismissing criticism of choice of test market because "it cannot be presumed that the appellees' unlawful conduct elsewhere would have had no spillover effect…").

With respect to post-relaunch damages specifically, Dr. Scott Morton also validated the 2012 forecast with another of Mylan's own forecasts from 2017, which projected that Auvi-Q's shares would reach ██ by the end of 2017. *See* Mem. Ex.1 at ¶¶ 220-222. Dr. Scott Morton did not simply adopt Sanofi's 2012 forecast for post-relaunch damages. Rather, she adjusted the start date and conditions to 2017 when kaléo re-launched Auvi-Q, and projected the sales and profits through the expiration of Auvi-Q's patent in 2029. *See id.* at ¶ 221. Dr. Scott Morton also confirmed Sanofi's ability to relaunch Auvi-Q with an interview of Dr. Phillip Huang, Vice President, Head of North American Quality. *See id.* at ¶ 215, n. 408. Dr. Scott Morton then

assumed that Auvi-Q sales would grow after relaunch at the same rate that they would have after the initial launch of Auvi-Q in 2013 if Mylan had not engaged in its exclusionary conduct.  *See id.* at ¶ 222.  Mylan's disagreements with Dr. Scott Morton's post-relaunch damages should also be left to a jury.

The cases cited by Mylan for exclusion of expert testimony are far afield because Dr. Scott Morton validated her use of the 2012 Sanofi forecast multiple different ways.  *See, e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2008 WL 4382141, at *7 (D. Kan. Sept. 26, 2008) (expert merely relied on a single spreadsheet without more as the "sole basis for a damage calculation"); *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14-cv-1859, 2017 WL 3592775 at *14 (N.D. Ill. Aug. 21, 2017) (excluding expert opinion that was "not a permissible extrapolation from existing data" but rather only "the *ipse dixit* of the expert," such as merely assuming product would have gotten regulatory approval); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) (expert did not "independently verif[y]" data).

The projection at issue in *ZF Meritor* was one page, unlike the detailed white paper that Mylan takes issue with here.  *See* Hochstadt Decl. Ex. 2 (SAN-EPI-0171591).  Sanofi's white paper explains the rationale and the basis for the Auvi-Q Brand Team's projections, including "multiple rounds of research from payer, physician and patient perspectives."  *Id.*  The Third Circuit in *ZF Meritor* specifically stated that experts may rely on business projections if the expert "explain[s] why [s]he relied on such estimates and must demonstrate why [s]he believed the estimates were reliable."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012).  As demonstrated above, Dr. Scott Morton has easily met that criteria.  Mylan also conveniently neglects to mention that on remand in *ZF Meritor*, the district court admitted amended damages testimony, finding that (1) "disaggregation [is] unnecessary, if not impossible," (2) the expert's

future damages calculations had an adequate basis, and (3) whether the expert factored in every "potentially relevant variable" is "fodder for cross-examination at trial." *ZF Meritor LLC v. Eaton Corp.*, 2013 WL 6729509, at *5 (D. Del. Dec. 20, 2013).

Ultimately, Mylan's attacks on Dr. Scott Morton are for the jury to consider. *See Apotex*, 321 F.R.D. at 234 ("As with the initial market share projections, Defendants may have reason to believe that Dr. Singer could have based his re-entry market share assumption on "better" evidence. That, however, is not grounds for exclusion."); *In re Namenda*, 331 F. Supp. 3d at 182 (damages expert properly relied on business forecasts and "defendants may not hide behind the fact that forecasts are predictions, and by their very nature incorporate some uncertainty").

## C.     Dr. Scott Morton's Damages Model Isolates Mylan's Unfair Conduct

Mylan also critiques Dr. Scott Morton's analysis for failing to account for Mylan's lawful behavior. Mem. at 10. Here, too, Mylan is wrong.

First and foremost, Mylan continues to mischaracterize Sanofi's theory by pretending as if Sanofi is alleging a series of discrete actions that are each individually anticompetitive. Dr. Scott Morton's analysis examined Mylan's scheme to (i) leverage its monopoly power to secure exclusionary contracts with payors that restricted Auvi-Q's formulary coverage, (ii) leverage "spillover effects" to foreclose patients that use other payors from getting Auvi-Q, (iii) deceptively marketing to healthcare providers that Auvi-Q's poor formulary coverage was due to efficacy or safety issues, and (iv) use of co-pay coupons and the EpiPen4Schools program to entrench demand for the EpiPen so switching was difficult. Mem. Ex.1 at ¶ 10. Thus, Sanofi's theory is "that all the acts taken together showed a § 2 violation." *LePage's*, 324 F.3d at 166. If Mylan's actions, "taken as a whole, were found to violate § 2" then "the disaggregation that [Mylan] speaks of [would be] unnecessary, if not impossible." *Id.* In antitrust cases, where it is "impracticable to disaggregate" the damage caused by each business practice, and the jury finds liability, courts "will

not deprive [plaintiff] of this recovery merely because the jury may have found that [defendant] combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct." *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984); *see* Hochstadt Decl. Ex. 1 at 108:21-109:18 ("So it's the whole range of conduct together")

Even taken in isolation, Mylan's argument fails. Mylan's "disaggregation" argument is just an attempt to raise alternative, unsupported hypotheses that Sanofi underperformed due to other factors that affected Auvi-Q's sales. Mem. at 10-11. But as Dr. Scott Morton explains, Sanofi's initial performance in the market placed it on track to achieve *more* success than the pre-launch 2012 forecast. Mylan itself was concerned that Auvi-Q's share was ███████████████ ███████████████ which led Mylan to quickly ramp up its exclusionary strategy to halt Sanofi's success. Mem. Ex.3 at ¶¶ 47-48. As demonstrated above, Dr. Scott Morton validated Auvi-Q's shares in the but-for world on test cases—the Canada market, as well as formularies where Auvi-Q and EpiPen were treated equally. They showed that Sanofi's 2012 forecast was correct. Mem. Ex.1 at ¶¶ 206-207. Therefore, Mylan's criticisms regarding consumer awareness, sales force performance, marketing, and manufacturing costs fail to account for Sanofi's success when unencumbered by Mylan's exclusionary conduct. Dr. Scott Morton correctly attributes Sanofi's subsequent losses to Mylan's anticompetitive conduct.

Mylan disagrees with Dr. Scott Morton's $33 million in damages for 2013, believing 2013 is too early to measure any anticompetitive effects. *See* Mem. at 10. Mylan ignores that it began dramatically changing its commercial practices long *before* 2013 to exclude Auvi-Q in anticipation of its launch. Mem. Ex.3 ¶¶ 97-98. As Dr. Scott Morton points out, Mylan's internal documents from 2013 ████████████████████████████████████████████████████████

[black redaction bar]

[black redaction bar]

[black redaction bar] Mem. Ex.3 at ¶¶ 103-104, 106.

Mylan also claims "Sanofi failed to anticipate the trend towards more aggressive Payor management." Mem. at 10-11.   This argument is nonsensical:  Sanofi had to pay higher rebates for Auvi-Q precisely *because of* Mylan's anticompetitive conduct.  As Dr. Scott Morton explains, payors were not managing the EAI drug device class before the launch of Auvi-Q, and, after Auvi-Q launched, Sanofi had to pay increasingly high rebates and offer points (*i.e.*, additional money to payors) on other products precisely to counter Mylan's astronomical rebates (which Mylan conveniently offset by its list price increases).  Mem. Ex.1 at ¶¶ 42-44, 210; Mem. Ex. 3 at ¶ 53.

The cases that Mylan cites requiring disaggregation are all inapposite.  In *Concord Boat*, the expert "failed to account for market events that both sides agreed were not related to anticompetitive conduct."  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).  Here, Dr. Scott Morton's analysis does not fail to consider conduct that both sides agree is not anticompetitive.  Also, the damages calculations in *Concord Boat* were based on a but-for world where "some other manufacturer's engine was viewed as equal in quality."  In *Concord Boat*, however, no such engine existed.  Here, Dr. Scott Morton is not inventing a hypothetical EAI.   Rather, contemporaneous evidence from both parties and their medical experts show

[black redaction bar]

[black redaction bar] *See* Mem. Ex.1 at ¶ 90 (citing MYEP00140813); Hochstadt Decl. Ex. 3 Expert Report of Dr. Mary Ann Michelis (Feb. 2, 2019) at ¶ 37; Hochstadt Decl. Ex. 4 ("Auvi-Q respondents were more likely to carry their epinephrine auto-injector all the time, rate device instructions as very clear, and adults had higher confidence in the device use versus EpiPen

respondents.").  It cannot fairly be said that Dr. Scott Morton's analysis is not based on "economic reality."

In *BCBS*, the proffered expert attributed 100% of the differences in sales prices to the challenged conduct.  *See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998).  Dr. Scott Morton's damages model, however, uses market share projections to take into account the full range of market forces (*e.g.*, cost, demand, price) that resulted in Sanofi's damages.  In *First Savings*, a trademark case, the expert merely assumed that the decline in market share was due to defendants' trademark infringement.  *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000).  Dr. Scott Morton made no such assumption, but instead grounded her opinion in the record evidence showing that Mylan engaged in a concerted effort to exclude Auvi-Q from the marketplace.  Mem Ex. 1 at ¶¶ 97-154.  Finally, the class action *Comcast* ruling is not applicable because that case addressed damages in the context of intra-class differences.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Mylan should not be allowed to exclude Dr. Scott Morton's reasoned and cogent opinion by suggesting alternative hypotheses that are inconsistent with the evidence.  "Merely pointing to economic conditions that may affect the [analysis] is not enough to call into question the reliability" of a model.  *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 683 (E.D. Pa. 2007); *see also McCoy v. Whirlpool Corp.*, 258 Fed. App'x 189, 196 (10th Cir. Dec.5, 2007) (expert testimony should not have been excluded for failure to address alternative arguments adequately; resolution of dispute between experts was properly within the province of the jury); *Universal Serv. Fund*, 2008 WL 4382141, at *9 ("This dispute among the experts concerning whether other events caused over-recoveries of USF charges must be left for the jury.").

IV.    **Dr. Scott Morton's Damages Model Accounts for Future Events**

A.    **5% Price Increase**

Mylan misleadingly states that Dr. Scott Morton's damages model in her original report contained no price increase.  Mem. at 13.  In fact, Dr. Scott Morton's original damages model factored in a 3% annual price increase.  Mem. Ex.1 at 127.  In her reply report, Dr. Scott Morton's revision used additional forecasts relied on by Mylan's economic expert on damages to adjust her model (including the 2015 Sanofi forecast that Mylan objects to her use of) because she "strive[s] to be accurate as much as [she] can" and when presented with "new information" that presents itself in such "a voluminous record," she will incorporate that information.  *See* Hochstadt Decl. Ex. 1 at 407:5-15.  By contrast, one of Mylan's economic experts refused to correct his report when he relied on a document that one of Mylan's business people and corporate designee said was unrealistic.  Hochstadt Decl. Ex. 5 at 231:14-239:7.

Mylan argues that Dr. Scott Morton has misread Mylan's document because the 5% annual price increase is before rebates. Mem. at 13.  But Dr. Scott Morton explained that in the but-for world, "the net price is going up by five percent also."  Hochstadt Decl. Ex. 1 at 443:21-23, 444:4-7.  Furthermore, she explained that a WAC price increase of 5% is on the low end of price increases for branded pharmaceutical products in the United States.  *Id.* at 432:18-22 (stating branded price increases in the United States are between four to fifteen percent).  Similarly, while Mylan points to the fact that EpiPen list prices have not increased recently, Mem. at 14, it ignores the years of 20%-30% annual price increases that Mylan had taken in the past, and the fact that but-for negative publicity surrounding Mylan's anticompetitive behavior, alleged fraud, and price fixing, it would have continued to do so.  Hochstadt Decl. Ex. 1 at 450:24–452:5.  Therefore, Mylan's current price increases do not provide a reliable basis to dispute Dr. Scott Morton's conservative assumption of U.S. EAI price increases in the but-for world.

### B.      Auvi-Q Relaunch and Generic EpiPen

Dr. Scott Morton did account for costs that would be associated with the recall and re-launch of the product.  *See* Mem. Ex.3 at ¶ 163.  Her model "has Sanofi effectively start[ing] over." *Id.*  She also bases her opinion that Sanofi would have relaunched Auvi-Q in the but-for world due to forecasted profits of $225 million during the 2013-2015 time period.  *Id.*  Therefore, Dr. Scott Morton concludes that there is "no economic reason why Sanofi would not have had every incentive" to retain the rights and relaunch Auvi-Q.  *Id.*  This is also corroborated by actual facts: after returning the rights, kaleo, a smaller company with fewer resources was able to relaunch Auvi-Q.  Mem. Ex. 3 at ¶ 215.  Further, a recall is not nearly as devastating to a pharmaceutical company's reputation as Mylan suggests.  Hochstadt Decl. Ex. 6 at ¶¶ 65-67.  Dr. Scott Morton relied on the opinion of former FDA official, Mr. J. Lawrence Stevens, that "Sanofi could have easily overcome any challenges to the recall to relaunch the Auvi-Q" because the manufacturing process was simple to fix and Sanofi already had a marketing team in place.  Mem. Ex. 3 at ¶ 164.  And, as Dr. Scott Morton points out, Mylan has continued to sell EpiPen despite the fact that it has been the subject of serious manufacturing issues resulting in an FDA warning letter and associated patient deaths.  Mem. Ex.3 (Reply Report) at ¶ 163.

Regarding Professor Scott Morton's accounting for generic EpiPen entry, Mylan mischaracterizes her analysis. Dr. Scott Morton considers multiple Mylan forecasts, ████ ████████████████████████████████████████████████████ Mem. Ex. 1 at ¶¶ 216–23.  That makes sense because Mylan and Teva generics for EpiPen are *copies* of the EpiPen *not* Auvi-Q.  *See* Hochstadt Decl. Ex. 1 at 349:22-350:21.  However, Dr. Scott Morton built into her damages model growth in the overall U.S. EAI market—with the conservative assumption of declining Auvi-Q market share as a percentage of an expanding market—consistent with both parties' predictions.  Mem. Ex. 1 at ¶ 224; Ex.3 at ¶ 202.  Therefore, Dr. Scott Morton's damages

model properly accounts for the entry of EpiPen generics and other future products into the U.S. EAI market.  In sum, none of the factors Mylan faults Dr. Scott Morton for not considering warrant exclusion.

## V.   Dr. Scott Morton's Methodology Is Peer-Reviewed, Rigorous, and Scientific

### A.   Dr. Scott Morton's EEB model

In her report, Dr. Scott Morton calculates an "Effective Entrant Burden" (EEB) to demonstrate the percentage rebate that Sanofi would need to offer in order to give a PBM the same discount to match Mylan's exclusive rebates given Mylan's share of incontestable demand.  Mem. Ex. 1 at ¶ 166.  Mylan's main criticism of Dr. Scott Morton's EEB calculation is essentially that it is new.  Mem. at 16.  Even if Mylan's EEB characterization were accurate (and it is not), that is hardly a valid reason to exclude such important economic evidence.

Antitrust law has always been informed by developments in economics.  "Because the Sherman Act is treated as a common-law statute, its prohibition on 'restraint[s] of trade' evolves to meet the dynamics of present economic conditions."  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 879 (2007).  Indeed, as another court put it:

> [E]ven if no argument quite like this has been presented in litigation, the Court fails to see how this is an argument to grant summary judgment in favor of Defendant under a rule-of-reason analysis… Plaintiff's expert is an eminent economist specializing in the area of antitrust. He appears to cite relevant academic work and portions of the record in this case. Despite Defendants' adamant statements to the contrary, his argument is not absurd on its face. The Court is unaware of any legal rule that says that an antitrust defendant prevails in a rule-of-reason case if a plaintiff's legal theory of anticompetitive harm cannot neatly fit in a preexisting legal box.

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, No. CV 15–9814 DSF (AGRx), 2017 WL 6512223 at *3 (C.D. Cal. Oct. 16, 2017) (denying summary judgment); *see also Intellectual Ventures*, 280 F. Supp. 3d at 701 (rejecting plaintiff's argument that Dr. Scott Morton's market definition analysis was "far removed from commonly employed antitrust analysis").  It is no

wonder then that Mylan only cites to one case where a court excluded expert testimony in part due to the analysis being new and untested, an inapposite wrongful death product liability case.  Mem. at 19 (citing *Cochrane v. Schneider Nat'll Carriers, Inc.*, 980 F. Supp. 374 (D. Kan. 1997)).

Specifically, Mylan argues "no economist appears to have relied on EEB."  Mem. at 17.  To do this, Mylan cherry-picks a single quote by one economist (Roger Ware) from Queen's University in Ontario, Canada.  Mem. at 17.  Notably Mylan fails to mention that the same quote about "limited usefulness" of EEB applies equally to the price-cost test relied on by Mylan's own expert.  Moreover, Mylan omits Dr. Ware's next sentence after the language it quotes: "What is required is a full competitive effects analysis of the program in question, with consideration given to the role of contestable and uncontestable markets, and there do not appear to be any simple screens available that would avoid a full investigation in some cases."  Hochstadt Decl. Ex. 7 at 126.  Dr. Scott Morton's 225 pages of expert reports provides such a "full competitive effects analysis".  She does not claim her EEB calculation alone is dispositive.

Mylan also attacks the EEB calculation for generating "false positives." Mem. at 17.  Again this is premised on a mischaracterization of the EEB test as outcome-determinative.  Hochstadt Decl. Ex. 1 at 183:8-184:8.  Mylan also ignores 10 of the 13 cases cited in Dr. Scott Morton's article where the liability determination and the EEB test were aligned.  Mem. Ex.34 at 827.  Tellingly, Mylan's sole source for its critique, Dr. Ware, agreed with Dr. Scott Morton that "what these data suggest" is "'high' levels of the EEB statistic are likely to lead to legal findings of liability against the incumbent." Hochstadt Decl. Ex. 7 at 126.

Mylan's kitchen sink attack on the EEB test goes on to claim that it does not apply to single product cases, (Mem. at 17-18), that EEB has not been validated, (Mem. at 18-19), and that EEB is "contradicted" by anecdotal evidence. Mem. at 19-20.  Again, each argument lacks merit.  First,

Mylan is wrong in suggesting that Dr. Scott Morton's article in 2017 cannot take a position on single products.  Dr. Scott Morton's article specifically notes that "[a]n exception to this stance involves single products whose demand can be divided into contestable and non-contestable portions." Mem. Ex.34 at n.12.  The Ware article that Mylan cites also states that EEB applies to discounts on single products.  Hochstadt Decl. Ex. 7 at 125 (stating "the EEB statistic is primarily designed to apply to all units discount programs for single products.").

Mylan is also wrong that EEB is completely novel and lacks validation.  Dr. Scott Morton's article was peer-reviewed by the American Bar Association's Antitrust Law Journal.  Hochstadt Decl. Ex. 8.  Moreover, Dr. Scott Morton's EEB analysis builds on decades-long prior scholarship in the field.  Specifically, her paper builds on the seminal 1987 paper by Aghion and Bolton, establishing an empirical metric for barriers to new entrants, and a similar test developed by Giulio Federico, Head of Unit of the Chief Economists Team for the European Commission, among others.  Mem. Ex. 34 at 793 and 816.

In addition, EEB is a similar concept as the "discount attribution standard," an accepted method of measuring the effects of bundled discounts.  *Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, 2016 WL 1377342, at *19 (D. Kan. Apr. 7, 2016), *aff'd*, 851 F.3d 1029 (10th Cir. 2017) (discussing discount attribution test and citing *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 907 (9th Cir. 2008)).  The discount attribution standard is a two-part test designed to detect exclusionary pricing.  It first requires applying a discount on all the products at issue, and then measuring the resulting discounted price against some form of cost of the product.  *Id.* However, discount attribution tests for predatory pricing based on marginal costs which are inappropriate for exclusionary rebates because exclusionary rebates can be effective at foreclosing rivals but still maintain above-cost pricing.  Mem. Ex. 3 at ¶153; *see* Hochstadt Decl. Ex. 1 at

147:14-157:14; 164:14-165:10; 371:24-376:15 (explaining how marginal cost is irrelevant and Mylan's entrenched share forecloses Auvi-Q from competing on price).  The EEB calculation is similar to the first part of the discount attribution test—it applies the offered discount to determine the discount that a new entrant would need to meet in order to compete for share of contestable demand—but does not measure marginal cost.

Finally, because Dr. Scott Morton's EEB calculation is a "unifying analytical framework" that is supposed to measure the burden an entrant faces market-wide, Mylan's isolated example where one individual PBM, Aetna, may have accepted a lower counteroffer from Sanofi in 2015 is specious at best.  Hochstadt Decl. Ex. 1 at 206:6-17; 303-04 ("A plan might decide that it was interested in serving its customers by giving them interesting, innovative, helpful treatments on the formulary and not just taking the monopolist's money to exclude the entrant… But I'm talking about Mylan creating a financial burden for the PBM that would cause them to want to exclude Auvi-Q.").  Mylan ignores the other examples in the record, such as the ESI example provided by Dr. Scott Morton, and when Prime turned down Sanofi's superior offer in favor of EpiPen.  *See* Mem. Ex.1 at ¶ 165-168; Hochstadt Decl. Exs. 14-16.  As Dr. Scott Morton explained, analysis of "any one is not as useful to uncovering the course of anticompetitive conduct as the market-wide statistics as a whole because those are showing the full impact of [Mylan's] behavior."  Hochstadt Decl. Ex. 1 at 303-04.

Far from being "novel," decades of antitrust enforcement have found that monopolists cannot use their entrenched share to harm competition by foreclosing key gateways to the market. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001) ("Microsoft's deals with the IAPs clearly have a significant effect in preserving its monopoly; they help keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat

to Microsoft's monopoly."); *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2019 WL 2206013, at *26 (N.D. Cal. May 21, 2019) (holding that Qualcomm used its entrenched monopoly power to coerce OEMs to sign exclusive contracts and license agreements). Dr. Scott Morton's EEB test presents a helpful measure for the jury to show the burden a monopolist imposes on a new entrant due to exclusionary conduct.

## B.   Entrenched Share

Mylan also takes issue with Dr. Scott Morton's calculation of entrenched share, believing it is too high.  Mem. at 21.  To be clear, Mylan does not dispute the methodology of calculating entrenched share.  In fact, Mylan's economic expert on liability, Dr. Robert Willig, has embraced the theory in his article "*An Economic Perspective on The Antitrust Case Against Intel*."  *See* Hochstadt Decl. Ex. 9 (acknowledging that non-contestable demand presents a threat of anticompetitive harm when leveraged by a monopolist).  Instead, Mylan points to irrelevant facts and cherry-picks anecdotal evidence to question the results.  Mem. at 20-23.  As shown below, none of these critiques is valid or merits exclusion of her testimony.

### 1.   Bruce Foster's Talking Points

Dr. Scott Morton cites Mr. Foster's email with his views about Mylan's negotiation with MedImpact because he provides a benchmark for assessing EpiPen's ▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬  Mem. Ex.1 at ¶ 80.  Mylan attempts to distinguish Mr. Foster's contemporaneous notes by pointing out that (1) ▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and (2) ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  Mem. at 21. However, both of these criticisms underscore that Dr. Scott Morton's use of Mr. Foster's analysis as a data point for her entrenched share analysis is conservative and reliable.  Adrenaclick is more similar to EpiPen.  Thus, the non-contestable EpiPen share relative to Adrenaclick would be *lower*

than in a situation where the EpiPen was blocked with a step edit in favor of Auvi-Q, a unique EAI drug device.  Mem. Ex.3 at ¶ 90 (emphasis in original).  Similarly, entrenched EpiPen share for Medicaid would be lower than for commercial plans, since low-income patients are more price-sensitive than the commercially-insured population.  *Id*. at ¶ 91.

### 2. ESI Data

Mylan argues that Dr. Scott Morton's interpretation of the ESI High Performance Formulary data is incorrect because she considered aggregate data that included plans where EpiPen was not restricted.  Mem. at 22, n. 19.  As Dr. Scott Morton explained, looking at the average solves for variability at the plan-level.  Hochstadt Decl. Ex. 1 at 84:15-85:16 ("I'm interested in the average… And on average, we see that EpiPen continues to get above a 60% share.  Despite the fact that there's variation across plans within the ESI plan.").  Moreover, as described by Dr. Scott Morton, that the fact that some of the individual plans *contracted around* the High Performance Formulary exclusion of EpiPen is an expression of EpiPen's noncontestable demand.  *See* Mem. Ex.3 at ¶ 80; Hochstadt Decl. Ex. 1 at 177:3-178:2 ("an employer can deviate from the formulary if the employer wants to in general and is willing to pay.  And that deviation is an expression of noncontestable share.").

### 3. CVS Data

Mylan selectively chooses data to say Dr. Scott Morton's non-contestable demand for EpiPen should be lower.  Mem. at 22-23.  But Dr. Scott Morton reviewed all CVS formularies that attempted to exclude EpiPen and it did not change her findings.  *See* Mem. Ex. 3 at ¶ 83.  As she explained, Mylan's own documents show variation of entrenched share between the two CVS formularies so that "to derive a meaningful overall assessment of non-contestable share, it is critical to examine the average EpiPen share across both formularies—and not just selectively

cherry-pick the subset of data that is most supportive of one's claim."  Mem. Ex. 3 at ¶¶ 83-84; *See* Hochstadt Decl. Ex. 1 at 93:16-94:2.

### 4.      Magellan

Mylan points to one 2015 example of Magellan's (an administrator for state Medicaid program) decision to exclude EpiPen to conclude there is no entrenched share.  Mem. at 23.  As Dr. Scott Morton points out, the Medicaid population is more price-sensitive than the commercially-insured population, so entrenched share within this population should be lower. Mem. Ex. 3 at ¶ 91.

### 5.      MedImpact

Mylan is incorrect that Dr. Scott Morton assumes a 50% shift in EpiPen market share for MedImpact based on one presentation.  Mem. at 23.  What Mylan ignores is that Dr. Scott Morton's MedImpact analysis is based on Mr. Foster's talking points and market conditions.  It is Mylan's *own* expert, Dr. Willig, who plucks a percentage from a MedImpact spreadsheet that he knows nothing about to demonstrate that entrenched share was lower.  *See* Hochstadt Decl. Ex. 10 at ¶ 210.  In her report, Dr. Scott Morton simply points out that the document contains other models with assumed percentages of entrenched share for EpiPen.

In sum, all of Mylan's arguments regarding entrenched share go to cross examination and the weight of Dr. Scott Morton's opinion, not barring a jury from hearing it at all.

## VI.    Dr. Scott Morton Provides Economic Opinions, Not Fact Determinations

Mylan complains that Dr. Scott Morton should be precluded from offering opinions that invade the province of the jury or take into account intent evidence.  Mem. at 24-25.  Here, again, Mylan has mischaracterized Dr. Scott Morton's work.

Dr. Scott Morton properly opined that the economic evidence is *consistent with* Sanofi relaunching Auvi-Q in the "but for" world absent Mylan's monopolization of the U.S. EAI market.

*See* Hochstadt Decl., Ex. 1 at 326:7-11.  Experts are permitted to opine as to "whether defendants' behavior is consistent with" the alleged conduct. *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2012 WL 6681783, at *3 (D. Kan. Dec. 21, 2012) (allowing economic expert to testify "that certain conduct by the alleged conspirators is *consistent with* the existence of an agreement to fix prices") (emphasis added); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 52 (D.D.C. 2017) (declining to exclude expert that opined on whether defendant's conduct was "indicative of collusion"); *In re Processed Egg Products Antitrust Litig.*,  81 F. Supp. 3d 412, 424 (E.D. Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion or an entity or individual's self-interest, and, moreover, it is consistent with sound economic practice…).

Dr. Scott Morton grounded her opinion in multiple pieces of evidence: (i) Auvi-Q's forecasted performance in the "but for" world compared with its actual performance with Mylan continuing to engage in the challenged conduct (Mem. Ex.3 at ¶¶ 212-15); (ii) the testimony of Sanofi's former Head of Global Commercial Operations, Peter Guenter, a recipient of the email about Mylan's anticompetitive behavior, where he said that Sanofi "anticipate[d] that Mylan would of course be at least as aggressive in the second potential relaunch period as compared to the first period" (Hochstadt Decl. Ex. 11 at 359:9-12); (iii) the testimony of Pat Barry, Sanofi's former Vice President, Head of Specialty and Core Brands BU, where he stated that "[c]onsidering the market environment and considering the behaviors of the competitor, and assuming that there was a likelihood that they would continue to try to blunt our launch in terms of using their lion's share of the market inappropriately . . . we determined . . . that it would be best to put those investments somewhere else and then to then transition the product back to Kaleo" (Hochstadt Decl. Ex. 12 at 38:1-10); (iv) the interview of Dr. Huang, where he explained to Dr. Scott Morton that "the

concerns that gave rise to the recall were relatively minor and were easily addressed (Mem. Ex.1 at ¶ 215); (v) the expert opinion of Mr. Stevens, who concluded based on his FDA experience that "Sanofi clearly had the ability and the capacity to relaunch Auvi-Q, and certainly could have done it sooner than kaléo" (Hochstadt Decl. Ex. 6 at ¶ 64); (vi) the re-launch of Auvi-Q in 16 months by a substantially smaller pharmaceutical firm that also had to create a sales force (*id.* at ¶ 62); and (vii) Dr. Scott Morton's own analysis of Sanofi's post-relaunch profits in the but-for world without Mylan's exclusionary conduct (Mem. Ex. 1 at ¶¶ 224-225; Mem. Ex.3 at ¶¶ 161-172). Dr. Scott Morton has a proper economic opinion that is grounded in the record evidence.

As for Mylan's attempt to sanitize any discussion of its intent from Dr. Scott Morton's analysis, Mylan's position is contrary to well-established antitrust law. Courts have held that evidence of intent is relevant to an assessment of the *effect* of the challenged conduct. *See, e.g., Aspen Skiing v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) ("The question of intent is relevant to the offense of monopolization in determining whether the challenged conduct is fairly characterized as 'exclusionary,' 'anticompetitive,' or 'predatory'…. no monopolist monopolizes unconscious of what he is doing"); *Microsoft*, 253 F.3d at 59 (holding intent evidence is relevant to "understand the likely effect of the monopolist's conduct."). Although Mylan faults Dr. Scott Morton for stating in her section headings that "Mylan intended for its PBM contracts to be exclusionary," Mem. at 24, she analyzes and cites numerous pieces of contemporaneous evidence showing that was exactly the purpose and effect of Mylan's company-wide contracting strategy. *See* Mem. Ex. 3 at ¶¶ 95-102; 122-25. There is nothing improper at all with this aspect of Dr. Scott Morton's work to help inform the economic effect of Mylan's commercial practices.

All of the inapposite cases Mylan cites involve experts who assumed the defendant's intent with no independent work. Mem. at 24-25. Here, Dr. Scott Morton's 225 pages of expert reports

disclose in transparent detail the many independent ways in which she used economic science (*e.g.*, entrenched share, EEB analysis, spillover regression) to validate Mylan's stated intent ███████ ██████████ Hochstadt Decl. Ex. 13; Mem. Ex.1 at ¶ 102.  Mylan's reliance on *Pioneer*, for example, is unavailing because the expert in that case speculated about a party's decision-making without sufficient supporting facts.  *See Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017).

## CONCLUSION

A jury should not be denied the opportunity to hear from Professor Fiona Scott Morton in determining whether Mylan unlawfully maintained its monopoly in the U.S. EAI market.  Mylan's motion is based on the wrong legal standard, mischaracterizations of her work, and, ultimately, amounts to nothing more than mere disagreements with her opinions.  Each of Dr. Scott Morton's opinions is grounded in abundant evidence, her work in the economics of monopolization and specialization in the pharmaceutical and technology industries, and her conversations with Mr. Downey and Dr. Huang.  Her testimony easily meets the test for admissibility and will help lay jurors understand why Mylan's conduct is anti-competitive as a monopolist, how it harmed to competition, and how Sanofi was damaged.

DATED: August 8, 2019                          /s/ *Eric S. Hochstadt*

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP          WEIL, GOTSHAL & MANGES LLP
Diane Sullivan                                Yehudah L. Buchweitz
diane.sullivan@weil.com                       yehudah.buchweitz@weil.com
17 Hulfish St., Suite 201                     Eric S. Hochstadt
Princeton, NJ 08542                           eric.hochstadt@weil.com
609.986.1120                                  767 Fifth Avenue
212.310.8007 (Fax)                            New York, NY 10153
                                              212.310.8000
                                              212.310.8007 (Fax)

                                              *Counsel for Sanofi-Aventis U.S. LLC*