**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ<br><br>Hon. Daniel D. Crabtree<br><br>Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC,<br><br>  Plaintiff-Counterclaim Defendant,<br><br>  v.<br><br>MYLAN Inc., *et al.*,<br><br>  Defendants-Counterclaim Plaintiffs.<br><br>**This Document Relates to the *Sanofi* Case**. | CASE NO.: 2:17-CV-02452-DDC-TJJ<br><br><br><br>*Document Filed Electronically* |

**PLAINTIFF/COUNTERCLAIM-DEFENDANT SANOFI-AVENTIS U.S. LLC'S
OPPOSITION TO MYLAN'S PARTIAL MOTION TO EXCLUDE OPINION
TESTIMONY OF EDUARDO SCHUR**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ...............................................................................1

    A.    Legal Standard ...................................................................1

    B.    Mr. Schur Is A Pharmaceutical Industry Expert Who Will Help The Jury ............2

    C.    Mr. Schur's Opinions Regarding Mylan's Rebating Practices Are Admissible ...........................................................................4

    D.    Mr. Schur Is Qualified To Provide Opinions Regarding The Voluntary Auvi-Q Recall & Relaunch ...................................................5

    E.    Mr. Schur Is Qualified To Opine As To Whether Sanofi's Marketing Practices Complied With FDA Standards ............................................7

    F.    Mr. Schur's Opinion That Sanofi Adequately Monitored Its Sales Representatives Neither Lacks Foundation Nor Is It Speculative .........................8

    G.    Mr. Schur's Opinion That Auvi-Q Was An Innovative New Epinephrine Auto-Injector Will Assist The Jury.......................................................9

    H.    Mr. Schur's Opinions Based On His Deep Pharmaceutical Industry Experience Are Admissible ...............................................................10

CONCLUSION....................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Ciba Specialty Chemicals Corp.*,
    No. CIV.A. 08-0068-WS-B, 2010 WL 779283 (S.D. Ala. Mar. 2, 2010) ..............................7

*Ambrosini v. Labarraque*,
    101 F.3d 129 (D.C. Cir. 1996) ...............................................................................................9

*Barefoot v. Estelle*,
    463 U.S. 880 (1983) ...............................................................................................................10

*In re Blood Reagents Antitrust Litig.*,
    No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ....................................................2

*Breidor v. Sears, Roebuck & Co.*,
    722 F.2d 1134 (3d Cir. 1983) .................................................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .......................................................................................................*passim*

*DiSalvatore v. Foretravel, Inc.*,
    No. 9:14-CV-00150, 2016 WL 7742824 (E.D. Tex. July 20, 2016)....................................4, 6

*Discover Fin. Servs. v. Visa U.S.A., Inc.*,
    582 F. Supp. 2d 501 (S.D.N.Y. 2008) ...................................................................................5

*Dodge v. Cotter Corp.*,
    328 F.3d 1212 (10th Cir. 2003).............................................................................................2

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) .............................................................................................7, 8

*In re DVI, Inc. Sec. Litig.*,
    No. 03-5336, 2014 WL 4634301 (E.D. Pa. Sept. 16, 2014)...................................................2

*ECD Inv'r Grp. v. Credit Suisse Int'l*,
    No. 14-CV-8486 (VM)(SN), 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017) ...........................7

*F.D.I.C. v. Castetter*,
    86 F.3d 1162 (9th Cir. 1996) .................................................................................................9

*Fisher v. Werner Enterprises, Inc.*,
    No. A:04-CV-1317-LJM-WTL, 2005 WL 6001584 (S.D. Ind. Aug. 25, 2005) .....................9

*Kieffer v. Weston Land, Inc.*,
  90 F.3d 1496 (10th Cir. 1996) ............................................................................................1

*Kipperman v. Onex Corp.*,
  411 B.R. 805 (N.D. Ga. 2009) ............................................................................................8

*Louderback v. Orkin Exterminating Co.*,
  26 F. Supp. 2d 1298 (D. Kan. 1998) ................................................................................10

*McCoy v. Whirlpool Corp.*,
  258 F. App'x 189 (10th Cir. 2007) (unpublished) ..............................................................6

*McGreevy v. Stroup*,
  No. 1:CV-01-1461, 2003 WL 27374140 (M.D. Pa. June 17, 2003)......................................5

*Medina v. United Christian Evangelistic Ass'n*,
  No. 08-22111-CIV, 2009 WL 4030454 (S.D. Fla. Nov. 20, 2009) ......................................10

*In re Mirena IUD Prod. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................................................................8, 11

*In re Namenda Direct Purchaser Antitrust Litig.*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018) ................................................................................2

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*,
  No. 13-CIV-80371, 2015 WL 11251759 (S.D. Fla. July 6, 2015) ......................................10

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000) ..............................................................................................1

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ................................................................................................4

*Robinson v. GEICO Gen. Ins. Co.*,
  447 F.3d 1096 (8th Cir. 2006) ............................................................................................6

*Stephenson v. Honeywell Int'l, Inc.*,
  703 F. Supp. 2d 1250 (D. Kan. 2010) ................................................................................8

*Summers v. Missouri Pac. R.R. Sys.*,
  132 F.3d 599 (10th Cir. 1997) ..........................................................................................10

*Talley v. Time, Inc.*,
  No. CIV-14-853-D, 2018 WL 1101489 (W.D. Okla. Feb. 28, 2018)....................................12

*Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Grp., Inc.*,
  No. CIV 05-3362 GEB, 2007 WL 1659056 (D.N.J. June 5, 2007)........................................7

*United States v. Kobagaya*,
    No. CRIM.A. 09-10005-01, 2011 WL 1559540, at *2 (D. Kan. Apr. 25, 2011) ....................4

*In re Urethane Antitrust Litig.*,
    166 F. Supp. 3d 501 (D.N.J. 2016) ........................................................................................1

*Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*,
    267 F.R.D. 368 (D. Kan. 2010)..............................................................................................2

*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*,
    No. SA16CA00485FBESC, 2017 WL 1133506 (W.D. Tex. Mar. 24, 2017) .....................4, 6

*Wright v. Sumter Cty. Bd. of Elections & Registration*,
    No. 1:14-CV-42 (WLS), 2017 WL 10845104 (M.D. Ga. Oct. 26, 2017)..............................10

## PRELIMINARY STATEMENT

Eduardo Schur is Sanofi's pharmaceutical industry expert, and Mylan's partial *Daubert* motion concedes that Mr. Schur is qualified to—and will—provide helpful expert rebuttal testimony at trial. Specifically, Mr. Schur is both qualified and prepared to opine that: (1) Sanofi's Auvi-Q marketing activities were consistent with both standard industry practices and FDA guidance; (2) Sanofi's internal review procedures were robust and consistent with widely-accepted practices of the pharmaceutical industry; (3) Mylan's scheme to systematically block Auvi-Q from the U.S. EAI drug device market was inconsistent with common industry practices; and (4) Auvi-Q's voluntary recall would not have hampered Sanofi's ability to successfully relaunch Auvi-Q.

Each of these opinions stems directly from Mr. Schur's careful review of the documentary evidence, and his vast experience in the pharmaceutical industry. None is subject to exclusion pursuant to *Daubert*, and this Court should not credit Mylan's motion to exclude only those opinions with which it most strenuously disagrees. Because Mr. Schur is qualified to render all of the opinions that Mylan challenges, and because each of Mr. Schur's opinions will assist the jury in resolving what are still genuine disputes of material fact, Mylan's partial motion to exclude some (but not all) of Mr. Schur's opinions should be denied.

## ARGUMENT

### A.    Legal Standard

Expert testimony is admissible if it is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). An expert's method need not be the "best" method. Rather, "the test is whether the particular opinion is based on valid reasoning and reliable methodology." *In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 504 (D.N.J. 2016) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000)); *see also Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) ("An expert opinion must be based on facts that enable the

expert to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required.") (alteration in original) (internal quotations omitted); *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2014 WL 4634301, at *5 (E.D. Pa. Sept. 16, 2014) ("Proponents of expert testimony do not have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."); *Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 267 F.R.D. 368, 372 (D. Kan. 2010) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)) ("While expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required.'") (alteration and ellipses in original).

Mylan's motion "like so many such motions, is nothing more than a 'we do not agree with [an expert's] opinion so it is junk science' motion." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018). "[C]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of challenging admissible evidence. *Daubert*, 509 U.S. at 596. Questions regarding alleged "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *14 (E.D. Pa. Oct. 19, 2015).

## B.    Mr. Schur Is A Pharmaceutical Industry Expert Who Will Help The Jury

Mr. Schur is a highly-credentialed former marketing executive with nearly thirty years of experience in the pharmaceutical industry. Over the course of his career, Mr. Schur has served as a Product Manager and District Manager at Janssen Pharmaceutica, a division of Johnson & Johnson ("J&J"), New Products Director at McNeil Consumer Healthcare and Group Product

Director at Ortho-McNeil Pharmaceutical, two other divisions of J&J, and Vice President of Marketing at Bristol Myers Squibb. In these roles, Mr. Schur has developed and executed marketing plans, consumer campaigns, and market research for a host of different pharmaceutical products (including allergy products) both domestically and internationally; supervised sales representatives; fostered and optimized customer relationships with managed care organizations and hospitals; led the launches of a number of pharmaceutical products, including Sporanox, Ortho TriCyclen, and Plavix (a blockbuster blood thinner that became one of the most successful products in the pharmaceutical market); developed long-term strategy plans and forecasts; and participated in licensing and acquisition activities.

Today, Mr. Schur serves as a Managing Director at Navigant Consulting, Inc. ("Navigant") and as Global Practice Leader of Navigant's Life Sciences Consulting Practice. Mr. Schur has significant client facing responsibilities where he routinely lends his expertise and offers insights and advice to pharmaceutical companies facing strategy, regulatory, compliance, and market access issues. Mr. Schur is also a current faculty member at Rutgers University's Edward J. Bloustein School of Planning and Public Policy, where he teaches course on healthcare and life sciences strategy, as well as marketing.

Sanofi has proffered Mr. Schur as a rebuttal expert to Mylan's significantly less-qualified pharmaceutical industry expert, Gary Zieziula. Mr. Zieziula is a former pharmaceutical executive who has not had a marketing job since 1998. He has never worked at FDA, and he admits that he is "not qualified" to comment on the nature of anticompetitive behavior. Nonetheless, Mr. Zieziula has authored three expert reports in this case, in which he renders opinions regarding Sanofi's Auvi-Q marketing practices, the supposedly "competitive" nature of Mylan's EpiPen contracting activity in 2012-2015, and the alleged motivations behind Sanofi's decision to return Auvi-Q's

licensing rights to kaléo in 2015.

In response, Mr. Schur reviewed much (if not all) of the same evidence as Mr. Zieziula and came to different conclusions. Mr. Schur's opinions are based, in part, on his review of the documentary evidence, and in part on his nearly thirty year career guiding teams and clients through product launches and relaunches and developing successful—and compliant—pharmaceutical marketing campaigns. All of Mr. Schur's opinions relate to the standard operating and marketing procedures employed by pharmaceutical companies, and they are opinions that Mr. Schur is undoubtedly qualified to give.

As this Court has recognized, the *Daubert* standard favors admissibility, and views "exclusion [as] the exception, not the rule." *United States v. Kobagaya*, No. CRIM.A. 09-10005-01, 2011 WL 1559540, at *2 (D. Kan. Apr. 25, 2011). Mylan's invocation of a more rigorous standard has no basis in law and should be rejected. At the same time, and in part for the same reason, Mylan's motion to exclude some of Mr. Schur's opinions should be denied.

**C.    Mr. Schur's Opinions Regarding Mylan's Rebating Practices Are Admissible**

Mylan is wrong that "Mr. Schur's opinions about Mylan's rebating practices are inadmissible." *See* Motion at 4.  As an initial matter, contrary to Mylan's assertion that Mr. Schur has only "marginal familiarity" with PBM and Payor contracting, *see id.*, Mr. Schur has more than satisfied *Daubert*'s "low threshold" for qualifications. *Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, No. SA16CA00485FBESC, 2017 WL 1133506, at *4 (W.D. Tex. Mar. 24, 2017) (quoting *DiSalvatore v. Foretravel, Inc.*, No. 9:14-CV-00150, 2016 WL 7742824, at *10 (E.D. Tex. July 20, 2016)); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("eschew[ing]" the "impos[ition]" of "overly rigorous requirements" to meet *Daubert*'s threshold for "qualifications"). As Mr. Schur testified at deposition, he regularly consults with clients on market access and contracting issues, including issues related to tier placement. *See* Mem. Ex. 3

at 32:23–33:06. Indeed, Mr. Schur is responsible for the entire market access team at Navigant and conclusively understands the rebating process because, among other reasons, he has "been exposed to [the process] over and over" again throughout the course of his career. *See id.* at 35:09–20. Additionally, Mr. Schur continues to study and follow this dynamic field with increased importance in the pharmaceutical market. *See* Mem. Ex. 1 at ¶ 2.

"To the extent [that Mylan] ha[s] any questions about the weight or the sufficiency of the evidence upon which [Mr. Schur] relied, or the conclusions generated therefrom, those questions can be asked on cross-examination." *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [allegedly] shaky but admissible evidence." *Daubert*, 509 U.S. at 596. That Mr. Schur had not exhaustively reviewed thousands of pages of evidence from and relating to PBM and Payor contracting, *see* Motion at 4, is not a grounds for disqualification. "[D]eterminations regarding . . . the sufficiency of the evidence relied upon by [a] proffered expert are within the sole province of the jury," and do not implicate the limited gatekeeping function that this Court performs pursuant to *Daubert*. *McGreevy v. Stroup*, No. 1:CV-01-1461, 2003 WL 27374140, at *5 (M.D. Pa. June 17, 2003) (citing *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138 (3d Cir. 1983)).

## D.    Mr. Schur Is Qualified To Provide Opinions Regarding The Voluntary Auvi-Q Recall & Relaunch

Mr. Schur is qualified to provide opinions regarding the voluntary Auvi-Q Class I recall. As Mr. Schur testified at his deposition, he is both "trained on recalls" and has "work[ed] on . . . total voluntary [Class I] recalls." *See* Mem. Ex. 3 at 174:05–182:01. He has consulted with clients that were the subject of a voluntary Class I recall during his time at Navigant, and he was responsible for overseeing products that were the subject of a voluntary Class I recall during his

5

time at J&J. *See id.* at 175:14–19, 176:12–15. Based on this experience, Mr. Schur has met the "low threshold" that *Daubert* set for qualifications. *Wealthmark*, 2017 WL 1133506, at *4 (quoting *DiSalvatore*, 2016 WL 7742824, at *10). If Mylan takes issue with the substance of Mr. Schur's opinion regarding the voluntary Auvi-Q recall and wishes to expose alleged "gaps," it can attempt to do so at trial through cross-examination. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility.").

Next, Mylan asserts that Mr. Schur's opinion that Sanofi would have been able to relaunch Auvi-Q quicker than kaléo is inadmissible because it is "contradicted by [the facts in] the record." *See* Motion at 6. To be sure, a partial *Daubert* motion is not the proper venue for Mylan's arguments about the supposedly "undisputed" nature of the evidence. Moreover, and as discussed in Sanofi's opposition to Mylan's motion for summary judgment (which is the proper venue for such arguments), the evidence is hardly undisputed. *See* Sanofi MSJ Opp-SMF at ¶ 146. Indeed, Mr. Schur's opinion on this issue is the same as that of Mr. Stevens. *Compare* Ex. 1 at ¶¶ 62, 64 (Because kaleo "had to build a commercial and sales team from scratch, . . . it is my opinion that Sanofi clearly had the ability and the capacity to relaunch Auvi-Q [quicker] than kaleo."), *with* Mem Ex. 2 at ¶ 40 ("In my opinion, given Sanofi's preexisting Auvi-Q sales and marketing experience and resources, Sanofi would have been able to . . . relaunch Auvi-Q[]" quicker than kaleo.). Mr. Schur's opinion is certainly within the range of reasonableness, and it is for the trier of fact to determine the sufficiency of the evidence on which he relied. *See McCoy v. Whirlpool Corp.*, 258 F. App'x 189, 193 (10th Cir. 2007) (unpublished) (holding that the *Daubert* standard requires more than a simple finding that one expert failed to "adequately address[] a countering expert opinion"); *ECD Inv'r Grp. v. Credit Suisse Int'l*, No. 14-CV-8486 (VM)(SN), 2017 WL

3841872, at *11 (S.D.N.Y. Sept. 1, 2017) (holding that so long as "an expert's testimony falls within the range [of reasonableness], the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court").

**E.      Mr. Schur Is Qualified To Opine As To Whether Sanofi's Marketing Practices Complied With FDA Standards**

Contrary to Mylan's assertion, Mr. Schur is qualified to offer an opinion as to whether Sanofi's marketing practices complied with FDA standards. The fact that Mr. Schur's team assisted him in formulating that opinion makes no difference. *See* Motion at 7–8. "To be sure, '[a]n expert witness is *permitted* to use assistants in formulating his expert [report] . . . .'" *Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779283, at *4 (S.D. Ala. Mar. 2, 2010) (quoting *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)) (emphasis added); *see also Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Grp., Inc.*, No. CIV 05-3362 GEB, 2007 WL 1659056, at *3 (D.N.J. June 5, 2007) (quoting *Dura*, 285 F.3d at 612) (same). Moreover, Mr. Schur testified that he only relied on other experts to assist him in "reconstruct[ing] the *facts*" relevant to his report. Mem. Ex. 3 at 14:21–15:08 (emphasis added). When asked whether other "regulatory experts [within Navigant] explain[ed] to [him] what a robust process with the FDA looks like," Mr. Schur said, "No." *Id*. at 14:03–09. When asked whether other regulatory experts within Navigant helped "explain to [him] regulatory guidelines or processes that [he wasn't] otherwise familiar with," Mr. Schur said, "No." *See id*. at 14:17–24. In other words, "Mr. Schur's deposition [did not] demonstrate[] that" he utilized his assistants to formulate his opinions. *See* Motion at 7. The opinions in Mr. Schur's reports are his opinions, and they are based on his nearly thirty years of experience in the pharmaceutical industry.

Mr. Schur served as Vice President of Marketing at Bristol Meyers Squibb where he led the successful launch of Plavix, one of the all-time most successful products in the US

pharmaceutical market. Mem. Ex. 2 at ¶ 3. He currently teaches a marketing class at Rutgers University, *see id.* at ¶ 2, and he is rebutting an individual (Mr. Zieziula) who has not had a marketing job since 1998. Whatever input Mr. Schur received from other experts, the final conclusions contained in Mr. Schur's report are his and his alone. *See* Mem. Ex. 3 at 12:25–13:01. If Mylan wants to question whether Mr. Schur's "reliance on such assistants is standard practice," the proper vehicle is the effective use of cross-examination. *Stephenson v. Honeywell Int'l, Inc.*, 703 F. Supp. 2d 1250, 1255 (D. Kan. 2010) (citing *Dura*, 285 F.3d at 612–13).

Moreover, neither the plaintiff in *Kipperman v. Onex Corp.*, 411 B.R. 805, 842 (N.D. Ga. 2009) (challenging an expert's report on reliability and relevance grounds), nor the plaintiff in *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 462, 465 (S.D.N.Y. 2016) (holding that a doctor who is "board certified in Internal Medicine and has a Master's Degree in Public Health in epidemiology and biostatistics" is not qualified to opine on defects related to IUDs because he "has never prescribed or inserted an IUD, [and] does [not] have specialized training or expertise involving the uterus"), brought a *Daubert* motion challenging an expert's use of assistants. Accordingly, both are distinguishable.

## F.     Mr. Schur's Opinion That Sanofi Adequately Monitored Its Sales Representatives Neither Lacks Foundation Nor Is It Speculative

Mylan is incorrect in its assertion that "Mr. Schur's opinion that Sanofi adequately monitored its sales representatives lacks foundation and is speculative." *See* Motion at 8. When asked how he concluded that "Sanofi took more than adequate investigative and corrective measures, including appropriate disciplinary actions whenever necessary, to enforce its company policies," Mr. Schur replied that he "looked into all [of] the materials." *See* Mem. Ex. 3 at 274:04–20. And even if one were to accept Mylan's position that Mr. Schur's review of the evidence omitted *some* of the materials, "[a]ny deficiency in [an expert's] sampling [of the evidence] goes

to the weight of the expert's opinion, not to its admissibility." *F.D.I.C. v. Castetter*, 86 F.3d 1162 (9th Cir. 1996) (citing *Daubert*, 509 U.S. at 595); *see also Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996) (holding that an expert's review of the literature and some, but not all, of the medical records "constituted a sufficient foundation for the admissibility of his testimony"). Indeed, Mr. Schur's alleged "failure to consider every conceivable piece of evidence" is immaterial for purposes of admissibility. *See Fisher v. Werner Enterprises, Inc.*, No. A:04-CV-1317-LJM-WTL, 2005 WL 6001584, at *2 (S.D. Ind. Aug. 25, 2005). Mylan remains free to challenge Mr. Schur's opinion that Sanofi adequately monitored its sales representatives "through vigorous cross-examination, presentation of contrary evidence, and argument of counsel." *See id.*

## G. Mr. Schur's Opinion That Auvi-Q Was An Innovative New Epinephrine Auto-Injector Will Assist The Jury

Mylan seeks to exclude Mr. Schur's opinion that "Auvi-Q was an innovative new epinephrine [auto-injector]" because it allegedly "usurps the jury's" role as the ultimate fact-finder. *See* Motion at 8–9. But Mr. Schur does not offer his opinion as a fact-finder. He offers his opinion as an expert who reviewed internal Mylan documents and concluded, based on his nearly thirty years of experience in the pharmaceutical industry, that Mylan knew, in December 2011, that there was an unmet need in the U.S. EAI market for a smaller device that allowed for ease of carrying and talked a patient or caregiver through the automated epinephrine injection process. *See* Mem. Ex. 2 at ¶ 13 (citing PFE_EPIPEN_AT00546951, Slide 8).

There can be no question that Mr. Schur is qualified to review a pharmaceutical company's research and proffer his opinion on it; that Mr. Schur needed to reference his report to remember which of the hundreds of documents he reviewed, Motion at 8, does not somehow put his testimony into question. *See Medina v. United Christian Evangelistic Ass'n*, No. 08-22111-CIV, 2009 WL 4030454, at *4 (S.D. Fla. Nov. 20, 2009) (holding that expert's inability to "recall, from memory,"

specific details throughout the course of a deposition "does not undermine the reliability" of his expert report); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC,* No. 13-CIV-80371, 2015 WL 11251759, at *14 (S.D. Fla. July 6, 2015) (same). Moreover, courts have long recognized that "[a]n expert's opinion may be derived from *any* evidence in the record," and questions of admissibility do not hinge on an expert's firsthand knowledge of the relevant facts. *Wright v. Sumter Cty. Bd. of Elections & Registration*, No. 1:14-CV-42 (WLS), 2017 WL 10845104, at *4 (M.D. Ga. Oct. 26, 2017) (citing *Barefoot v. Estelle*, 463 U.S. 880, 903 (1983)) (emphasis added); *see also Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). Mr. Schur's opinion regarding Sanofi's and Mylan's market research concerning Auvi-Q's innovative features is admissible, as it "will aid the jury in resolving a factual dispute." *Louderback v. Orkin Exterminating Co.*, 26 F. Supp. 2d 1298, 1303 (D. Kan. 1998) (citing *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599, 603 n.5 (10th Cir. 1997)).

**H.    Mr. Schur's Opinions Based On His Deep Pharmaceutical Industry Experience Are Admissible**

In seeking to exclude Mr. Schur's response to Mr. Zieziula's overbroad conclusions, Mylan once again mischaracterizes Mr. Schur's opinions.  Mylan contends that Mr. Schur opined "Mylan . . . *intended* to block Auvi-Q from the market." *See* Motion at 9 (emphasis added in Motion) (ellipses in Motion). In fact, Mr. Schur's opinion was:

> As Professor Scott Morton described in great detail, Mylan engaged in an anticompetitive course of exclusionary conduct designed to systematically foreclose Auvi-Q from the market.  From the evidence I have reviewed in the case, Professor Scott Morton is correct that Mylan engaged in exclusionary conduct intended to block Auvi-Q from the market. Based on my experience, it is not at all the "common practice" in the industry for a competitor with a product with market share as high as EpiPen to try to completely block a nascent competitor from the market, as Mylan tried to do here.

Mem. Ex. 2 at ¶ 32. Hardly the conclusory opinion Mylan claims. And certainly not, as Mylan

contends, "reading the mind of a party." Motion at 9–10.

Similarly, in misrepresenting Mr. Schur's opinion as "Sanofi intended to relaunch [Auvi-Q] following the [voluntary] recall," Motion at 9 (first alteration in Motion), Mylan misleadingly omits a critical part of the opinion: "*Additionally, my review of the materials demonstrate* that Sanofi intended to relaunch [Auvi-Q] following the [voluntary] recall." Mem. Ex. 2 at ¶ 35 (citing SAN-EPI-0377375) (emphasis added). Here, Mr. Schur is simply bringing his significant pharmaceutical experience to bear on his review of Mylan's contemporaneous records.

Finally, Mylan objects to Mr. Schur's opinion that Sanofi did not intend to measure or incorporate comparative claims. Motion at 9. Again, only after reviewing the relevant documents[1] did Mr. Schur conclude: "In my own review of the ATU studies conducted on behalf of Sanofi, . . . it is abundantly clear that both the KPIs and ATU studies established by Sanofi reveal no intention to measure or incorporate comparative claims by not including message tracking data." *See* Mem. Ex. 1 at ¶ 34.

Reaching opinions based on the evidence is comfortably within the purview of an expert's mandate. Where an expert "opines on the motives, intent or state of mind of an entity," and that opinion is based on the "documents [that he reviewed] or [is] grounded in specific, objectively knowable facts," *Mirena*, 169 F. Supp. at 479–80, that opinion ought to be admitted, as it does not call for speculation and is therefore not subject to exclusion pursuant to *Daubert*. *See Talley v. Time, Inc.*, No. CIV-14-853-D, 2018 WL 1101489, at *3 (W.D. Okla. Feb. 28, 2018).

---

[1] SAN-EPI-0069127, SAN-EPI-0082989, SAN-EPI-0083237, SAN-EPI-0083247, SAN-EPI-0087111, SAN-EPI-0087325, SAN-EPI-008510, SAN-EPI-0091515, SAN-EPI-0197629, SAN-EPI-0200861, SAN-EPI-0238962, SAN-EPI-0259092, SAN-EPI-0265085, SAN-EPI-0279259, SAN-EPI-0604949, SAN-EPI-0928169, SAN-EPI-1212218, SAN-EPI-0087111, Slide 15; SAN-EPI-008510, Slide 15; SAN-EPI-0158511, Slide 7; SANEPI-0197629, Slides 76–77; SAN-EPI-0238962, Slides 23–24; and SAN-EPI-0279259, Slide 25, SAN-EPI-0087111, Slide 15; SAN-EPI-008510, Slide 15; SAN-EPI-0158511, Slide 7; SAN-EPI-0197629, Slides 76–77; SAN-EPI-0279259, Slide 25.

## <u>CONCLUSION</u>

For the foregoing reasons, Mylan's partial motion to exclude the opinion testimony of Eduardo Schur should be denied.

DATED: August 9, 2019

Respectfully submitted,

/s/      *Eric S. Hochstadt*

**WEIL, GOTSHAL & MANGES LLP**
Diane L. Sullivan
diane.sullivan@weil.com
17 Hulfish St., Suite 201
Princeton, NJ 08542
T: (609) 986-1120
767 Fifth Avenue
F: (212) 310-8007

**WEIL, GOTSHAL & MANGES LLP**
Yehudah L. Buchweitz
yehudah.buchweitz@weil.com
Eric S. Hochstadt
eric.hochstadt@weil.com
Randi Singer
randi.singer@weil.com
New York, NY 10153
T: (212) 310-8000
F: (212) 310-8007

*Attorneys for Plaintiff and Counterclaim-Defendant Sanofi-Aventis U.S. LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2019, the foregoing was filed via CM-ECF and by e-mail to all counsel of record.

*/s/*     *Eric S. Hochstadt*
Eric S. Hochstadt