# Exhibit 1
# (Filed Under Seal)

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Rebuttal Expert Report of

J. Lawrence Stevens

April 13, 2019

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.     INTRODUCTION

1.      I, J. Lawrence Stevens, hereby submit this expert report on behalf of plaintiff SANOFI-AVENTIS US, LLC, versus defendant MYLAN INC. and MYLAN SPECIALTY, L.P., in connection with the EPIPEN (EPINEPHRINE INJECTION, USP) Marketing, Sales Practices and Antitrust Litigation.

2.      I have been retained by Sanofi to provide rebuttal expert opinions regarding the expert report of Karen M. Becker, Ph.D. dated March 25, 2019. Dr. Becker provided her opinion regarding the October 28, 2015 recall of Auvi-Q® ("Auvi-Q") and certain issues with respect to the manufacturing process for the Auvi-Q product.

3.      Specifically, this report provides my opinions regarding several of Dr. Becker's statements that I believe are inaccurate and/or misleading.

4.      The opinions expressed in this report are based on the specialized knowledge I obtained through my more than 21 years working at the U.S. Food and Drug Administration ("FDA") and serving as, among other things, a medical device specialist, my approximately 18 years of professional experience overseeing compliance with FDA regulatory requirements in the private sector, my experience with the regulatory requirements applicable to medical devices, and the materials I have reviewed to prepare this report.

5.      In addition to the materials cited in the text of this report, the list of materials that I reviewed is attached hereto as **Exhibit 1**.

## II.     QUALIFICATIONS

6.      I worked at FDA for more than 21 years. While at FDA, I was awarded both the FDA Special Achievement Award and the FDA Commendable Service Award by the FDA

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Office of Criminal Investigations.

7.      From 2000 to 2011, I served as a Supervisory Investigator in FDA's St. Louis Office (March 2009 – September 2011); the Acting Director of Compliance in FDA's Los Angeles District (September 2008 – March 2009); the Director of the Import Operations Branch in FDA's Los Angeles District (November 2003 – September 2008); a Compliance Officer in FDA's Los Angeles District (June 2002 - November 2003); and an Investigator (Medical Device Specialist) in FDA's Los Angeles District (November 2000 – June 2002).

8.      As a Supervisory Investigator, I directed all FDA operations at FDA's St. Louis, Missouri office. My work included overseeing FDA investigations, training FDA investigators, and reviewing inspection and investigation reports to ensure compliance with technical and legal requirements. I received an FDA commendation in recognition of my work developing newly-hired FDA investigators. I also trained on Incident Command Systems (ICS) so that I was qualified to serve as a leader when FDA needed to organize a multiagency response to national incidents.

9.      In my role as Acting Director of Compliance, I directed the activities of seven Compliance Officers; monitored all on-going projects; managed resources to assure a timely and accurate review of all violation inspections, investigations, and sample collections; negotiated with FDA Centers, FDA's Office of Chief Counsel, and FDA's Office of Enforcement regarding legal cases; and chaired meetings with regulated firms in order to address the requirements necessary to meet FDA legal requirements.

10.     As the Director of Import Operations, I was responsible for managing the operations of over 100 FDA employees located at offices in San Pedro, California, Carson,

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

California, Long Beach, California, Ontario, California, and Los Angeles International Airport. The employees I oversaw were responsible for reviewing all FDA-regulated products offered for entry and sale into the United States from foreign sources through the Ports of Long Beach and Los Angeles, and the Ontario and Los Angeles International Airports.

11.     As a Compliance Officer, I worked exclusively with complex medical devices and pharmaceutical inspections, which require both risk and legal assessments to formulate regulatory enforcement plans. I performed technical reviews of inspection reports and sample analyses to determine whether FDA action was warranted. In my first six months as a Compliance Officer, I authored six Warning Letters to pharmaceutical and medical device firms. The charges cited in those letters ranged from failure to comply with Quality System Regulations and current Good Manufacturing Practices, to the sale of unapproved new drugs and the failure to submit a 510(k) Premarket Notification. I also chaired meetings requested by companies to discuss their regulatory statuses.

12.     When I served as an FDA Investigator, I was a technical specialist for all aspects of Medical Device regulatory compliance. In that capacity, I performed both inspections of companies manufacturing high-risk medical devices in order to ensure regulatory compliance, in addition to clinical inspections for Investigational Device Exemption and Institutional Review Boards. I was certified in the Quality System Inspection Technique Approach and for knowledge of the Quality System Regulation. In 2002, I was selected to serve as the New Hire Training Coordinator for the Domestic Investigations Branch in FDA's Los Angeles, California office.

13.     My first decade at FDA spanned from 1972 to 1982, when I served as the Small

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Business Representative for FDA's Los Angeles, California office. In this role, I gained significant familiarity in all aspects of the Medical Device Amendments of 1976 and the accompanying regulations. I provided regulatory guidance to developers of new medical devices; performed on-site visits at manufacturing locations and advised on procedures necessary to meet current Good Manufacturing Practices and Investigational Device Exemption (IDE) requirements; met with Institutional Review Board representatives to advise them of regulatory requirements; served as an FDA spokesperson at government and industry meetings; presented on regulatory requirements before medical device manufacturers; established the first West Coast office in the Small Business Assistance program; and served as a representative of FDA's Center for Devices and Radiological Health, Division of Small Manufacturers Assistance.

14.     In addition to my experience at FDA, I have over eighteen years of private sector experience managing regulatory affairs for medical device and pharmaceutical companies. When I first left FDA in 1982, I joined the Heyer Schulte Division of American Hospital Supply Corporation as a Manager of Regulatory and Clinical Affairs. There, I was responsible for all regulatory and clinical programs related to the company's implantable silicone devices, which were utilized in neurology, cardiology, orthopedics, and plastic surgery.

15.     In 1984, I became the Manager of Regulatory Affairs at Unitek Corporation, a large fully integrated manufacturer of mechanical, electronic and chemical medical devices and pharmaceuticals, and a subsidiary of Bristol-Myers Company. I was responsible for compliance with all regulatory requirements and managed, among other things, the product

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

complaint department and the internal Good Manufacturing Practice Audit program.

16.    From 1986-2000, I worked for both start-ups and large corporations, including Baxter Healthcare Corporation and Cordis Webster, Inc., a division of Johnson & Johnson, in both managerial and executive roles involving major responsibility and oversight. In these positions, I interacted with staff in all departments, including clinical departments staffed with physicians and surgeons. I personally directed the clinical development of medical devices, pre-clinical research, and quality assurance programs. I also prepared regulatory submissions and drafted 510(k) and IDE submissions to FDA.

17.    After I retired from FDA in 2011, I founded the regulatory consulting company, One Way Consultants. Through One Way Consultants, either directly or by contract with larger consulting companies, I provide consulting services to FDA-regulated businesses in areas including but not limited to: regulatory guidance on 510(k), IDE and premarket approval submissions; planning, creating, and auditing quality systems to ensure compliance with U.S. and international standards; and clinical plans, protocol development, case report form development, and implementing and managing clinical trials. I have also represented clients at FDA meetings.

18.    Over the course of my private sector career, I have personally designed quality systems, prepared regulatory submissions (510(k), IDE, and premarket approval), and managed 7 multi-center clinical trials for class 3 medical devices.

19.    I have given over 250 public presentations to audiences ranging from senior executives, physicians, technical personnel, other medical personnel, major media, and the general public.  I also regularly hold webinars on FDA Issues.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

20.     I have previously served as an expert witness in the area of FDA regulation of medical devices.

21.     I am certified in Regulatory Affairs by the Regulatory Affairs Professionals Society.

22.     I am an active member of the Regulatory Affairs Professionals Society, the American Society for Quality, and the FDA Alumni Association.

23.     I obtained a Bachelor of Arts in Biological Sciences from California State University in 1970 and completed one-year of the MBA Program at Golden Gate University.

24.     A summary of my education, experience, publications, awards, honors, and presentations are set forth in my *curriculum vitae*, a copy of which is attached hereto as **Exhibit 2.**

III.    **COMPENSATION**

25.     Sanofi has engaged me as an expert in this matter. My hourly rate is $600 per hour for my work on this case.

26.     My opinions are objective, and my compensation is not in any way contingent upon the opinions I offer or the outcome of this litigation.

IV.    **PRIOR EXERT TESTIMONY**

27.     In the previous four years, I have been deposed in two cases: *Nevro Corp. v. Boston Scientific Corp.*, No. 16-cv-6830 (N.D. Cal.), and *Republic Technologies (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16-cv-3401 (N.D. Ill.). I was deposed once in each matter. I have not testified at trial in the last four years.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## V.   OPINIONS

### A.   Sanofi's Decision to Issue a Voluntary Class I Recall of a Life-Saving Combination Product is Not Highly Unusual

28.   The medical device component of a combination drug device is defined as an instrument used to deliver a drug where the drug itself is not a part of the instrument.[1] Prescription drugs, on the other hand, are defined as substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease that can only be purchased at a pharmacy with a valid prescription issued by a doctor.[2]

29.   FDA considers Auvi-Q and other epinephrine auto-injector ("EAI") devices to be combination products (as opposed to medical devices or prescription drugs) because EAI devices contain both a drug (*i.e.*, epinephrine) and a medical device component (*i.e.*, the auto-injector).[3]

30.   Dr. Becker states that Auvi-Q's recall was highly unusual because "complete Class-I recalls of prescription drug products are very rare,"[4] and only ten percent (10%) or 188 of 1,822 drug product recalls in 2015 were Class I recalls.[5]

31.   I disagree with Dr. Becker's characterization of the Auvi-Q recall as a prescription drug recall because, as noted above, FDA does not consider Auvi-Q to be a drug product but rather a combination product. Dr. Becker acknowledges that Auvi-Q is a

---

[1] *See* 21 U.S.C. § 321(h) (defining a medical device).
[2] *See* Prescription Drugs and Over-the-Counter (OTC) Drugs: Questions and Answers, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100101.htm (last updated Nov. 13, 2017).
[3] *See* Auvi-Q Approval Package: Labeling (Aug. 10, 2012) (describing Auvi-Q as an "auto injector and a combination product containing drug and device components"), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000Lbl.pdf.
[4] Becker Report ¶ 31.
[5] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

combination product[6] and acknowledges that Auvi-Q's voluntary recall was prompted by concerns over the technical components of the device,[7] yet she still uses a comparison to prescription drug products as though it were an apples-to-apples comparison. It is not.

32.     If Dr. Becker wanted to make an apples-to-apples comparison, she should have compared the Auvi-Q recall to Class I recalls of medical devices or combination products. Had Dr. Becker considered combination products or medical device recalls in her analysis, she would have discovered that there were at least 32 Class I recalls of medical devices in 2015, 60 Class I recalls of medical devices in 2014, and 62 Class I recalls of medical devices in 2013.[8]

33.     In my experience, this number of recalls is commonplace for complex medical devices and combination products used to treat life threatening medical conditions. Complex medical devices or combination products like Auvi-Q often have multiple components sourced from multiple suppliers. ███████████████████████████████████

████████ which is actually on the low end for a complex medical device or combination product[9]; throughout my career, I have seen medical devices that had as many as 35 major components. Because of the complexity of these devices, it is therefore not uncommon for combination products or medical devices like Auvi-Q to encounter quality issues warranting

---

[6] *Id.* ¶ 21.
[7] *See id.* ¶ 32.
[8] *See* 2015 Medical Device Recalls, U.S. FOOD & DRUG ADMIN., http://wayback.archive-it.org/7993/20170111083449/http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm429489.htm (last updated Jan. 5, 2016); 2014 Medical Device Recalls, U.S. FOOD & DRUG ADMIN., http://wayback.archive-it.org/7993/20170111083450/http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm384921.htm (last updated March 5, 2015); 2013 Medical Device Recalls, U.S. FOOD & DRUG ADMIN., http://wayback.archive-it.org/7993/20170111091451/http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm384618.htm (last updated July 9, 2015).
[9] Becker Report ¶ 21.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a recall.

34.     Moreover, the voluntary Class I recall of Auvi-Q was not uncommon because Auvi-Q is a life-saving combination product. FDA describes Class I recalls as "[a] situation where there is a reasonable chance that a product will cause serious health problems or death."[10] This classification, however, is not indicative of the immediate risk of the defect, but rather the potential impact the defect may have on the patient population. Recalls of products that have a lower potential impact on the patient population may be classified as Class II or Class III recalls.[11]

35.     Both EpiPen and Auvi-Q are life-saving products used in acute situations for otherwise healthy patients (as opposed to, for example, drugs or devices used to administer pain relief to chronically ill patients). As such, the actual malfunction of an epinephrine auto-injector could result in a failure to administer life-saving treatment.

36.     As Dr. Becker notes, at the time of Auvi-Q's voluntary recall, there were only 26 reported cases of potential malfunctions from the approximately 1 million Auvi-Q devices in circulation.[12] There were no reports of injuries in any of those cases.[13] In my experience, given the complexity of medical devices, this is a very small number. Nevertheless, despite the small number of potential malfunctions, it appears that Sanofi was not willing to tolerate the risk, however slight, that a device may malfunction and put an otherwise healthy patient population at risk. ████████████████████████████

---

[10] What is a Medical Device Recall?, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/medicaldevices/safety/list ofrecalls/ucm329946.htm (last updated Sept. 26, 2018).
[11] *See id.*
[12] *See* Becker Report ¶¶ 32, 34.
[13] *See id.* ¶ 32.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████[14]

37.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Sanofi chose a conservative course of action and decided to initiate a voluntary Class I recall of the product. Even Dr. Becker acknowledges that Sanofi took the prudent course, stating that "[r]emoving all product from the market was the only way to protect patients from a . . . product defect."[15]

38.   Because Auvi-Q is a life-saving product, in my experience, a prudent and conservative pharmaceutical company would (as Sanofi did) initiate a voluntary Class I recall *before* any harm to patients occur.

### B.   Mylan's EpiPen Has Also Been the Subject of a Class I Recall

39.   Given that Class I recalls of life-saving combination products are not uncommon, it is not surprising that EpiPen has also been the subject of a Class I recall. Most recently, in March 2017, Meridian Medical Technologies, Inc. ("Meridian"), Mylan's manufacturer, initiated a voluntary worldwide Class I recall of over 1 million units of the EpiPen and EpiPen Jr.[16] based on reports that the devices failed to activate and dispense medication to patients.[17]

---

[14] *See* Huang Dep. at 42:22–43:03.
[15] Becker Report ¶ 36.
[16] *See* Handel Dep. at 277:03–11.
[17] *See* Enforcement Report: EpiPen 2-Pak Recall, U.S. Food & Drug Admin., https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=154185 (last accessed Apr. 12, 2019); Enforcement Report: EpiPen Jr. 2-Pak Recall, U.S. Food & Drug Admin., https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=154467

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

40.     Several months later, on September 5, 2017, Meridian received an FDA Warning Letter due to, among other reasons, its failure to "thoroughly investigate multiple serious component and product failures for [its] EpiPen products, including failures associated with patient deaths and severe illness."[18] In my experience, receiving an FDA Warning Letter is far more serious[19] than receiving an FDA Form 483, which the FDA issues more frequently.[20] FDA reserves the use of Warning Letters for those situations in which FDA feels that the firm and its management are not responding appropriately to FDA's concerns. Under these circumstances and as Warning Letters state, FDA is willing to take legal action against the firm and its management.

41.     In its Warning Letter to Meridian, FDA stated that Meridian's own data showed that it "received hundreds of complaints that [its] EpiPen products failed to operate during life-threatening emergencies, including some situations in which patients subsequently died."[21]

42.     Specifically, FDA cited Meridian's failure to thoroughly investigate a customer complaint related to an EpiPen that failed to activate.[22]  Meridian opened an investigation and confirmed that the product failed to activate, and determined that the root cause was a deformed component in the Power Pak component of the auto-injector.[23]  Despite the fact that Meridian had previously identified the same type of manufacturing defect in February

---

(last accessed Apr. 12, 2019).
[18] Handel Dep., Ex. 28 at 2 (FDA Warning Letter to Mylan).
[19] *See* Handel Dep. at 232:01–233:19 (acknowledging that an FDA Warning Letter is "more serious" than a Form 483).
[20] In fact, it is my understanding that FDA issued a Form 483 to Meridian in 2013 in connection with the manufacturing of EpiPen. *See* Handel Dep., Ex. 29 at 4.
[21] Handel Dep., Ex. 28 at 2.
[22] *Id.* at 3.
[23] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2016, Meridian concluded that the defect was infrequent and closed its investigation.[24] It determined that "no market action would be taken."[25]

43.     In my experience, a prudent pharmaceutical company would have stopped the manufacturing and distribution of the product to allow itself time to conduct a thorough investigation, and would have initiated a voluntary recall of the affected devices to ensure patient safety.[26] According to FDA's Warning Letter, Meridian did not conduct a thorough investigation into the potential defects, and although Meridian ultimately recalled 13 lots of EpiPen containing the potentially deformed components in the United States,[27] FDA noted that Meridian "did so only after [FDA] inspection closed and after multiple discussions with FDA."[28]

44.     That being said, neither the Class I recall of EpiPen nor the Class I recall of Auvi-Q was highly unusual.

### C.     Sanofi Made an Independent Decision to Recall Auvi-Q and Worked Closely with FDA to Protect Patient Safety

45.     When an FDA-regulated product is either potentially defective or potentially harmful, the most effective way to protect the public is to recall the product.[29] Most recalls are done voluntarily. In some instances, a company discovers a problem and voluntarily recalls the product on its own. In other instances, a company voluntarily recalls a product

---

[24] *Id.*

[25] *Id.*

[26] Based on my review of the deposition of Thomas Handel, Meridian's President and General Manager, it is my understanding that Mylan ███████████████████████████████ *See* Handel Dep. at 243:21–245:14.

[27] Handel Dep., Ex. 28 at 3.

[28] *Id.*

[29] FDA 101: Product Recalls, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049070.htm (last updated Sept. 10, 2018).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

after FDA raises concerns. Only in the rarest of cases will FDA order a company to involuntarily initiate a recall. And in every case, FDA's role is to oversee the recall process and ensure that it adequately protects consumers.[30]

46.     Dr. Becker's statement that Sanofi did not independently decide to recall Auvi-Q, but rather initiated the recall at the behest of FDA,[31] is not accurate. According to Dr. Becker, Sanofi would not have issued a recall of Auvi-Q "on its own" because it had only identified 26 cases of suspected malfunctions, had not identified any injuries, and did not have any new data or information on manufacturing or safety issues to prompt a recall at the time that the decision to issue the recall was made.[32] Dr. Becker further dismisses the three manufacturing issues Sanofi identified because two of the issues were resolved by the time that Sanofi initiated the recall, and the third was "reported *after* the decision" to initiate the recall was made.[33]

47.     Contrary to Dr. Becker's opinion, it is my understanding that Sanofi made the independent decision to voluntarily recall Auvi-Q based on three separate quality events that occurred within a four-month period. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[34] ████████████████

████████████████████████████████████████████████

████████████████████████[35]

---

[30] *See id.*
[31] *See* Becker Report ¶¶ 32, 34.
[32] *Id.* ¶ 32.
[33] *Id.* ¶ 32.
[34] SAN-EPI-0389155, at 57.
[35] *Id.* at 65.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

48.



49.     In the pharmaceutical industry, when issues like this arise, it is standard practice for a pharmaceutical company to report them to FDA by issuing a Field Alert Report ("FAR"), and that is precisely what Sanofi did.[40] In these reports, Sanofi stated the root cause of each of the issues, which it had identified following its own investigation, and described the corrective actions that it took to prevent reoccurrence of each of those issues.[41] Sanofi then undertook a more thorough investigation of each issue, and submitted final Field Alert Reports to FDA, each of which described Sanofi's findings in greater detail.[42] Based on my experience at FDA, these are precisely the kind of actions that FDA would expect a company like Sanofi to take, and in my opinion, Sanofi acted in compliance with FDA requirements.

---

[36] SAN-EPI-0388227, at 29.
[37] *Id.* at 37.
[38] SAN-EPI-0351626, at 29.
[39] SAN-EPI-1153382.
[40] *See, e.g.*, Huang Dep. at 20:01–16.
[41]
[42]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

50.     It is not at all surprising that Sanofi chose to issue a precautionary, voluntary Class I recall after three quality events occurred over a four-month period. This was, I believe, consistent with industry best practices, given that Auvi-Q is a life-saving product that is designed to save otherwise healthy patients from a potentially fatal allergic reaction.

51.     Even so, Dr. Becker claims that the Auvi-Q recall was not voluntary because [43] [44] and (iii) Sanofi was not prepared to conduct a recall at the time that FDA inspected its facilities.[45]

52.     Dr. Becker is wrong. In my experience, almost all recalls are voluntary, including Sanofi's recall of Auvi-Q.[46] FDA could have, but did not, order Sanofi to recall the product. Rather, it appears that Sanofi weighed the potential risk of a device component malfunction and concluded that the risk, however remote, was not tolerable because it might put otherwise healthy patients at risk.[47]

53.     ███████████████████████████████████████ ████████████████████ Firms take multiple considerations into account when preparing an HHE, including the expected malfunction of the device, the ability to detect the

---

[43] Becker Report ¶ 33. ████████████████████████████████████
████████████████████████████████ *Id.*
[44] *Id.* ¶ 35–36.
[45] *Id.* ¶ 34.
[46] *See* Huang Dep. at 55:11–24.
[47] *See id.* at 29:12–20.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

malfunction before a patient uses the device, and the potential for harm to patients, with a focus on those patients who may be at greater risk, such as children and the elderly. When new or additional information becomes available, a firm is required to reevaluate its decision and suggest modifications where appropriate. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[48]

54.     I also disagree with Dr. Becker's contention that Sanofi's recall should be considered involuntary simply because she is "not aware of any documents or testimony that reflect Sanofi preparing" for the recall.[49] Based on my experience in the medical device and combination products industry, I know that firms such as Sanofi have standard recall procedures in place and that they routinely conduct mock recalls to test their system. There is no basis for Dr. Becker to assume that a large pharmaceutical company like Sanofi did not have these procedures in place, nor is there any basis for Dr. Becker to assume that Sanofi was otherwise unprepared to conduct a voluntary recall.

55.     In sum, I disagree with Dr. Becker's conclusion that the voluntary Class I recall of Auvi-Q was highly unusual. If the voluntary Class I recall of Auvi-Q was highly unusual, then so too was the EpiPen Class I recall. I also disagree with Dr. Becker's statement that Sanofi's  recall  was  involuntary. ████████████████████████

████████████████████████████████████████████████████████

---

[48] ██████████████████████████████████████████████

██████████████████████████████████████

[49] Becker Report ¶ 34.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████ Sanofi apparently did so out of an abundance of caution to ensure patient safety.[50] Based on my experience, I believe that Sanofi acted prudently and responsibly in initiating the voluntary recall.

### D.   Sanofi Could Have Easily Overcome Any Challenges to the Recall to Relaunch Auvi-Q

56.     Dr. Becker claims that the voluntary Class I recall of Auvi-Q was a damaging event for Sanofi because FDA evinced a "high degree of concern" about Auvi-Q's manufacturing process.[51] I disagree with Dr. Becker's conclusion.

57.     I have not seen any documents to support Dr. Becker's claim that FDA was so concerned about Auvi-Q's manufacturing process that any challenges would have precluded a successful relaunch. Quite the contrary, the manufacturing and marketing history of the product and the extremely low incidence of the potential malfunction would indicate that the manufacturing process was in control.

58.     As a former FDA Investigator and FDA Compliance Officer and Supervisory Investigator, I have written and reviewed hundreds of Form 483s. ████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████[52] It did not discuss an inadequate or flawed manufacturing process.[53] In my opinion, FDA investigator was simply citing areas where Medivative could improve on its quality system compliance, but none of those citations would have merited FDA regulatory action. If FDA believed that the manufacturing process for Auvi-Q "was

---

[50] Huang Dep. at 44:06–13.
[51] Becker Report ¶ 33.
[52] SAN-EPI-0789885.
[53] *Id.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

completely inadequate" and that Medivative was producing devices that could result in danger to the public, it would have taken immediate action against Medivative. However, in this situation, FDA chose not to do so.

59.     Nor were there any significant findings by FDA investigators that would indicate a critical compliance situation at Sanofi.[54] The Form 483 issued to Sanofi was relatively typical of those issued to pharmaceutical companies, and Sanofi responded appropriately by taking corrective actions.[55] Indeed, the low rates of reported incidents in the two and half years leading up to the voluntary recall indicate to me that Sanofi and Medivative were in control of their manufacturing process.

60.     Dr. Becker also claims that because the manufacturing process for Auvi-Q was "fairly complex," "the effort and time required [of Sanofi] to complete the necessary design, manufacturing, and regulatory activities to return Auvi-Q to market would [have] be[en] substantial."[56] Based on my review of the documents and my experience in the industry, Auvi-Q's manufacturing process was not particularly complex, and it would not have prevented Sanofi from successfully relaunching the product.

61.     In my experience in the medical device industry, I gained considerable expertise in Design Control, a regulation that applies to combination products. As an FDA Investigator, I inspected the design control practices at many firms, thus I am familiar with the time and efforts needed to make changes to a product and the potential impact of the changes. It is my understanding that the issues that led to the voluntary Auvi-Q recall were

---

[54] KALEO-00006421.
[55] *Id.*
[56] Becker Report ¶¶ 21, 43.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the result of manufacturing issues and not a faulty design. Thus, the corrective actions that were required to bring Auvi-Q back to market were not significant from a design standpoint because they did not require any changes or modifications to the design of the product. One need only look at kaléo's relaunch of Auvi-Q as an example. It is my understanding that kaléo was able to fix the issues, obtain reapproval from FDA, and return Auvi-Q to the market in just 16 months.[57]

62.     Dr. Becker states that any Sanofi-driven relaunch would have taken a "substantial" amount of time, likely similar to the 16 months that it took kaléo to relaunch the product.[58] Based on my experience, both in the private sector and at FDA, I do not believe that it is appropriate to compare a potential Sanofi-driven relaunch to that of kaléo. At the time of the voluntary recall, Sanofi had been marketing and selling Auvi-Q for approximately 34 months. It had a manufacturing line in place and an experienced marketing team. Kaléo, on the other hand, had to build a commercial and sales team from scratch.[59]

63.     Dr. Becker also asserts that based on her experience, "undertaking" Sanofi's Contract Manufacturing Organizations ("CMO") Oversight Evaluation Master Plan would have taken "a year" to implement, and therefore, the Plan itself presented a major obstacle to any potential Sanofi-driven relaunch.[60] That is not consistent with my experience. In my experience, both in the private sector and at FDA, manufacturers routinely design corrective actions that may include a more robust oversight of their CMO to address any FDA concerns. Those corrective actions, however, would not necessarily implicate the timing of any Sanofi-

---

[57] Williamson Dep. at 72:14–23.
[58] Becker Report ¶ 43.
[59] *See* Williamson Dep. at 72:24–73:09.
[60] Becker Report ¶ 40.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

driven relaunch.

64.     Thus, it is my opinion that Sanofi clearly had the ability and the capacity to relaunch Auvi-Q, and certainly could have done it sooner than kaléo.

### E.     Sanofi's Voluntary Recall of Auvi-Q Demonstrated its Commitment to Patients and Strengthened its Reputation with FDA

65.     Dr. Becker asserts that "[p]atient adoption" posed another obstacle to a potential Sanofi relaunch.[61] In Dr. Becker's telling, "[i]f a life-saving drug is unavailable, patients and their doctors must turn to an alternative," and once they do, "it is disruptive to switch back, and difficult to find a motivation for them to do so."[62]

66.     In my opinion, Sanofi's handling of the voluntary Auvi-Q recall may have actually strengthened Sanofi's reputation with FDA. Sanofi's efforts to comply with all FDA requirements, its efforts to work closely with FDA during the process, and its decision to voluntarily and immediately recall the product are the hallmarks of a responsible and prudent pharmaceutical company.

67.     Based on my experience, both in the private sector and at FDA, it is not uncommon for a product (lifesaving or not) to undergo a recall, reenter the market, and recapture prior market share. In fact, based upon the documents and testimony that I have reviewed, kaléo appears to have successfully relaunched Auvi-Q in just 16 months, and the EpiPen continues to thrive despite the fact that it has undergone a Class I recall[63] and is

---

[61] *Id.* ¶ 45.
[62] *See id.*
[63] *See, e.g.*, Enforcement Report: EpiPen 2-Pak Recall, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=154185 (last accessed Apr. 12, 2019); Enforcement Report: EpiPen Jr. 2-Pak Recall, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=154467 (last accessed Apr. 12, 2019).

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

currently facing supply shortages.[64]  In this case, Sanofi voluntarily recalled Auvi-Q out of an abundance of caution. In my opinion, this is the behavior of a responsible combination product manufacturer most concerned with patient safety.

---

[64] *See* Handel Dep. at 220:14–221:13.

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Dated: April 13, 2019

J. Lawrence Stevens

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 1**

**LIST OF MATERIALS CONSIDERED**

**I.      Depositions: (30(b)(1) & (30(b)(6))**

1.   Deposition of Thomas Handel (with Exhibits 28 and 29)

2.   Deposition of Philip Huang (with Exhibits 2, 3, 4, 5, 6, 7, and 8)

3.   Deposition of Spencer Williamson

**II.     Bates-Stamped Documents**

1.   SAN-EPI-0082276

2.   SAN-EPI-0351626

3.   SAN-EPI-0351785

4.   SAN-EPI-0351983

5.   SAN-EPI-0351985

6.   SAN-EPI-0377405

7.   SAN-EPI-0377435

8.   SAN-EPI-0384351

9.   SAN-EPI-0384353

10. SAN-EPI-0384355

11. SAN-EPI-0384386

12. SAN-EPI-0384396

13. SAN-EPI-0386884

14. SAN-EPI-0388227

15. SAN-EPI-0389155

16. SAN-EPI-0389156

17. SAN-EPI-0391026

18. SAN-EPI-0391270

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

19. SAN-EPI-0391271

20. SAN-EPI-0789881

21. SAN-EPI-0789883

22. SAN-EPI-0789885

23. SAN-EPI-0789891

24. SAN-EPI-0918388

25. SAN-EPI-1153378

26. SAN-EPI-1153382

27. SAN-EPI-1153384

28. SAN-EPI-1234026

29. KALEO-00006237

30. KALEO-00006421

## III.    Other Documents

1. All documents cited in Dr. Becker's Report

2. 21 U.S.C. § 321(h)

3. Prescription Drugs and Over-the-Counter (OTC) Drugs: Questions and Answers, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100101.htm (last updated Nov. 13, 2017)

4. Auvi-Q Approval Package: Labeling (Aug. 10, 2012), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000Lbl.pdf

5. 2013 Medical Device Recalls, U.S. FOOD & DRUG ADMIN., http://wayback.archive-it.org/7993/20170111091451/http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm384618.htm (last updated July 9, 2015)

6. 2014 Medical Device Recalls, U.S. FOOD & DRUG ADMIN., http://wayback.archive-it.org/7993/20170111083450/http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm384921.htm (last updated March 5, 2015)

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

7. 2015 Medical Device Recalls, U.S. FOOD & DRUG ADMIN., http://wayback.archive-it.org/7993/20170111083449/http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm429489.htm (last updated Jan. 5, 2016)

8. What is a Medical Device Recall?, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/medicaldevices/safety/listofrecalls/ucm329946.htm (last updated Sept. 26, 2018)

9. Enforcement Report: EpiPen 2-Pak Recall, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=154185 (last accessed Apr. 12, 2019)

10. Enforcement Report: EpiPen Jr. 2-Pak Recall, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=154467 (last accessed Apr. 12, 2019)

11. FDA 101: Product Recalls, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm049070.htm (last updated Sept. 10, 2018)

## EXHIBIT 2



### J. Lawrence Stevens, RAC

### AREAS OF EXPERTISE

- **Medical Device Expert (21 years with FDA, 18 years in the device industry)**
- **Planning, implementing, and managing Quality Systems**
- **Regulatory Affairs Certified by the Regulatory Affairs Professionals Society (RAPS)**
- **Internal Medical Device Quality System Requirements**
- **Establishing Design Controls**
- **Establishing Quality Indicators for Management Review regulations**
- **Mock FDA pre-PMA Inspections**
- **Former Industry Representative, FDA Circulatory Systems Advisory Panel, FDA Center for Device and Radiological Health**
- **Training on FDA Requirements (QSR, IDF, IRB, Design Control)**
- **Clinical Protocol Development**
- **Mock FDA BIMO Audits**
- **Designing Clinical Studies**
- **Expert Witness for FDA Regulation of Medical Devices**
- **Webinar presenter on FDA Issues.**

## INTRODUCTION:

Mr. Stevens has over 20 years of FDA experience encompassing virtually all of the FDA field positions. He also has 18 years of industry experience as a mid-level manager and senior executive in clinical, regulatory, and quality in the medical device industry. He has personally designed quality systems, prepared regulatory submissions (510(k), IDE and PMA) and managed 7 multi-center clinical trials for class 3 medical devices. From 1989-1993, he was the Industry Representative on the FDA Circulatory Systems panel. Additionally, a seasoned educator/speaker with over 250 public presentations to audiences ranging from senior executives, physicians, technical personnel, other medical personnel, major media, and the general public. Holds regular Webinars on FDA Issues, and serves as an Expert Witness in the area of FDA regulation of medical devices.

## WORK EXPERIENCE:

**09/2011 – Present**
Industry Consultant
**Duties:**

- Services offered to FDA regulated businesses include regulatory guidance on 510(k), IDE and PMA submissions. Also planning, creating, and auditing quality systems to USA and international standards. Creation of clinical plans including protocol development, case report form development, implementing and managing clinical trials. Also, assistance with Design Control to meet FDA requirements and representing clients in FDA meetings. A professional public speaker who can train persons on all aspects of FDA requirements, and practical and successful solutions to FDA problems.

- Consulting work completed writing several 510(k)s. I also created an FDA "Pre Sub" IDE meeting request accepted by FDA for an in person meeting to finalize requirements for an IDE for a class III device. Currently serving as the FDA liaison for a foreign client on a pending IDE for a class III device.
- Successfully lead a company in resolving quality issues raised in an FDA Warning Letter. The project involved a review of the issues raised in the Warning Letter and a complete review of the company's organizational structure and resource allocations for Quality Systems. The final report will include a recommendation on reorganization needed to meet FDA QSR requirements.
- Regularly perform audits of quality systems performed upon request to assess compliance multiple International regulatory systems.
- Worked with a major medical device firm to perform RA/QA/CA due diligence for potential acquisition. This required more than an FDA audit as it involved detailed analysis of all international regulatory actions, as well as interviewing all key officials and reporting on their background relative to the roles they played in the firm.
- Completed a 3-month assignment at a major U. S. based, class 3 medical device manufacturer. Operating under an FDA supervised Voluntary Injunction. Assessed remediation plans, and audited progress. Met regularly with company management to apprise them of progress and advise on additional compliance issues.
- Performed vendor audits for a major manufacturer of a combination product as mock FDA PAI inspections. This included audits of facilities in England and Germany

**11/2000 – 09/2011**
United States Food & Drug Administration
    <u>Supervisory Investigator, FDA Saint Louis Office</u>, (04/2009 – 09/2011)
    **Duties:**
- Directed all of the FDA operations at the Saint Louis, MO office for FDA. This included work planning for investigators, training of investigators, reviewing inspection and investigation reports for technical and legal requirements. Received an FDA commendation for development of newly hired investigators. Trained on Incident Command Systems (ICS) to serve as a leader in multiagency response to national incidents.

    <u>Acting Director of Compliance, FDA Los Angeles District</u>, (09/2008 – 03/2009)
    **Duties:**
- Directed the activities of 7 Compliance Officers. Monitored all on-going projects, and assured adequate resources to assure timely and accurate review of violative inspections, investigations, and sample collections. Negotiated with FDA Centers, Office of Chief Counsel, and Office of Enforcement regarding legal cases. Chaired meetings with regulated firms regarding requirements necessary to meet FDA legal requirements.

    <u>Director, Import Operations Branch, FDA Los Angeles District</u>, (11/2003 – 09/2008)
    **Duties:**
- Responsible for managing the operations of over 100 FDA employees located at offices in San Pedro, Carson, Long Beach, Ontario, and Los Angeles International Airport. It was the responsibility of these employees to review all FDA regulated products offered for entry and sale into the United States from foreign sources through the Ports of Long Beach and Los Angeles, and Ontario and Los Angeles International Airports. Successfully reorganized the branch to optimize personnel efficiencies, regularly chaired Import Broker meetings to gain feedback on their perception of FDA Import Operations. Received a special award from FDA's Office of Criminal Investigation for support the Import Branch provided for development of criminal cases. Acted as the FDA Los Angeles District Director, during the Director's absence.

<u>Compliance Officer, FDA Los Angeles District</u>, (06/2002 – 11/2003)
**Duties:**
- Perform technical reviews of inspection reports and sample analyses and determine the potential need for further regulatory action by FDA. Work assignments were almost exclusively complex medical device and pharmaceutical inspections and require both risk and legal assessments to formulate regulatory enforcement plans. In my first six months in this position, I authored six Warning Letters. The Warning Letters involved four pharmaceutical, and two medical device firms. Charges cited in the letters ranged from cGMP (QSR), to unapproved new drugs, failure to comply with an OTC Monograph, and failure to submit a 510(k) Premarket Notification.  Also chaired meetings requested by companies to discuss their regulatory status. The meetings involved both Corporate and Private Counsel and senior executives for major device firms.

<u>Investigator (Medical Device Specialist), FDA Los Angeles District</u>, (11/2000 – 06/2002)
**Duties:**
- Served as a technical specialist in the Los Angeles District for all aspects of Medical Device regulatory compliance. Performed inspections of manufacturers of high-risk medical device firms for both GMP/QSR compliance, as well as sponsor/monitor and clinical investigator inspections for IDE, IRB, and Informed Consent compliance. Certified in the QSIT Approach, and certified for knowledge of the Quality System Regulation. In a 15-month period had two warning letters issued for QSIT inspections, and one recall initiated as a result of a QSIT inspection. Served as a trainer for less experienced investigators for QSIT inspections, Bio-Research Monitoring inspections, food sampling, and recall initiation and monitoring.  Selected in January 2002, as the New Hire Training Coordinator for the Los Angeles District Domestic Investigations Branch.


## INDUSTRY EXPERIENCE

**03/1997 – 11/2000**
Medical Device Development Corporation, Fullerton, CA
<u>President/Founder</u>
**Duties:**
- Founded this consulting firm to advise medical device manufacturers of management responsibility, organizational structures, processes, procedures, and requirements to take a medical device concept to the market. Clients were primarily start-up companies who engaged the services of the firm to provide strategic guidance in the areas of clinical studies, design development, quality systems development, product liability issues, and government approvals (both U.S. and international). Successfully developed strategic plans, and designed and implemented program planning. Services also included preparation of complex regulatory submissions (IDE, 510(k), PMA, Product Dossiers, Product Technical Files). When requested represented the client before FDA, Notified Bodies, Physicians, Investors, Corporate Partners, and Boards of Directors.

**1995 – 1997**
Cordis Webster, Inc., a Johnson & Johnson Company, Baldwin Park, CA 91706
<u>Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance</u>
Duties:
- Joined the senior staff of the company shortly after the acquisition of Webster Laboratories by Cordis Corporation. Cordis Webster was a mature company manufacturing and developing Class 2 and 3

products for the cardiac electrophysiology market. Successfully reorganized the Clinical and regulatory departments, and developed systems to assure that all clinical studies and regulatory submissions efficiently met development schedules. Developed a strategic plan that allowed the company to amend a PMA to assure that FDA would approve it. Oversaw quality systems development and management that led to a successful FDA PMA inspection and to ISO-9001 certification and CE Marking. Designed and implemented an innovative clinical protocol that was used to support a PMA product that was approved for a $100-million-dollar market.

**1994 – 1995**
Cardima Corporation, Fremont, CA 94538
<u>Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance</u>
**Duties:**
- Key member of the senior staff of this early stage company developing products for the electrophysiology market. Utilizing team-building efforts, lead the company in a reassessment of priorities allowing for more focus and program accountability. Successfully negotiated with FDA over a complex IDE, to obtain an approval in 30 days. Set up all procedures and plans for a multi-center clinical study.  Interacted with venture capital company representatives in efforts to secure additional financing. Lead the company's ISO/GMP program, and development of management systems to assure efficient operations in an environment of total employee involvement.

**1993 – 1994**
Cardiac Pathways Corporation, Sunnyvale, CA 94086
<u>Vice President, Regulatory Affairs/Quality Assurance</u>
**Duties:**
- As member of the senior management team of this start-up company, developed strategic programs in the development of an integrated system for diagnosis and treatment of cardiac arrhythmias. Directed the implementation of a clinical program to comply with U.S. FDA and European Union requirements. Responsible for overseeing R&D efforts to assure adequate documentation of design control.  Prepared all regulatory submissions for both U.S. and international clinical evaluation and marketing approval of various cardiovascular catheters and diagnostic systems. Personally wrote one 510(k) and two IDE's.

**1990 – 1993**
Baxter Healthcare Corporation, Edwards LIS Division, Irvine, CA 92714
<u>Vice President, Regulatory Affairs, Clinical Research, and Quality Assurance</u>
**Duties:**
- Senior management position responsible for directing all of the quality assurance programs, clinical evaluation programs, and preparation of government regulatory submissions required for marketing medical devices in the United States and throughout the world. Edwards LIS Division was a fully integrated manufacturer of medical devices for vascular surgery and interventional cardiology. Directed implementation of a preproduction quality assurance program significantly improving the product development cycle and product reliability. Effectively reorganized Quality, Regulatory, and Clinical departments to facilitate a company-wide Total Quality Assurance approach. Established an International RA function and established plans for obtaining the "CE" mark in Europe. Certified by Baxter Healthcare Corporation as an examiner for the Baldrige (Baxter) Quality Award.  Attended all FDA Circulatory Systems Advisory Panel meetings as the Industry Representative (four-year appointment by FDA 1989-1993)

**1986 – 1990**
Retroperfusion Systems, Inc., Costa Mesa, CA
<u>Vice President, Regulatory Affairs, Clinical Research and Quality Assurance</u>

**Duties:**

- Joined the start-up company team to develop an innovative electromechanical medical device to be utilized in interventional cardiology in the treatment of coronary artery disease. Interfaced with design engineers and physicians and oversaw pre-clinical research. Prepared the original Investigational Device Exemption (IDE) application that was approved by FDA in 30 days from the first submission. Set up the clinical evaluation program, implemented and managed an international multicenter clinical evaluation and prepared the Premarket Approval Application (PMA) which was accepted by FDA for filing in 45 days from the original submission. Obtained international approvals for export. Organized and staffed the Quality Assurance department, established pre-production QA functions and created procedures to meet Good Manufacturing Practices (GMP) regulations.

**1984 – 1986**
Unitek Corporation, Subsidiary of Bristol-Myers Company, Monrovia, CA
Manager, Regulatory Affairs
**Duties:**

- Responsible for all of the regulatory requirements for this large fully integrated manufacturer of mechanical, electronic and chemical medical devices and pharmaceuticals. Managed the company employee safety program, the environmental health program, product complaint department and internal GMP Audit program. Prepared all regulatory submissions (510(k), IDE, Product Registrations). Member of the strategic planning committee for the company and a key member of all product development teams.

**1982 – 1984**
Heyer Schulte Division, American Hospital Supply Corporation, Goleta, CA
Manager, Regulatory and Clinical Affairs
**Duties:**

- Responsible for the regulatory and clinical programs for this medium sized manufacturer of implantable silicone devices utilized in neurology, cardiology, orthopedics, and plastic surgery. A member of the project teams that successfully developed and introduced to the market new class II and class III products. Managed the clinical evaluation of two class III devices and the preparation of all regulatory submissions (510(k), IDE, PMA). Performed internal GMP audits and was the liaison with corporate GMP and GLP auditors, and state and federal inspectors.

**1972 – 1982**
U. S. Food and Drug Administration (FDA), Los Angeles, CA
Small Business Representative, (07/1979 – 03/1982)
**Duties:**

- Established the first West Coast office in the Small Business Assistance program, and served as a representative of the CDRH, Division of Small Manufacturers Assistance. Provided regulatory guidance to developers of new medical devices. Performed on-site visits at manufacturing locations and advised on procedures necessary to meet GMP and IDE requirements. Met with Institutional Review Board representatives to advise them of regulatory requirements. Served as an FDA spokesperson at numerous government and industry meetings, presenting regulatory requirements for medical device manufacturers.

Consumer Affairs Officer, (09/1975 – 06/1979)
**Duties:**

- Directed the consumer, industry, and press information programs for the Los Angeles District.
- Prepared and implemented professional education programs for teachers, health educators, nurses, and physicians. Primary public spokesperson in Los Angeles for all FDA related matters.

<u>Consumer Safety Officer (Investigator)</u>, (06/1972 – 08/1975)
**Duties:**
- Performed inspections and investigations of all product areas regulated by FDA. Specialties included sterilization and injury/illness investigations. Trained other investigators. Awarded the FDA Commendable Service Award in 1974 for outstanding performance as an investigator

## EDUCATION

**1982 – 1983**
Golden Gate University, Santa Barbara, CA
<u>MBA Program</u> – One year completed

**1970**
California State University, Fullerton, CA
<u>Bachelor of Arts</u> – Biological Sciences

## AWARDS

- FDA Commendable Service Award, 1974
- FDA Special Achievement Award, FDA Office of Criminal Investigations, 2009

## CERTIFICATIONS

- Certified in Regulatory Affairs (RAC) by the Regulatory Affairs Professionals Society, 1991

## APPOINTMENTS

**08/2011 – Present**
Member, Board of Directors, National Alliance on Medical Illness, Southern Illinois Division, a non-profit organization offering assistance to persons or families dealing with mental illness, and advocating on their behalf.

**06/1989 – 06/1993**
Industry Representative, FDA Circulatory Systems Advisory Panel, FDA Center for Devices and Radiological Health.

**1994 – 2000**
Instructor, Design Control Seminars, Noblitt & Rueland

## PUBLICATIONS

- "What to Expect When You Are Inspected", Endovascular Today Magazine, January 2004
- "Design Verification", Medical Devices and Diagnostics Industry. Vol. 16, No. 1, January, 1994
- "Practical Aspects of the Clinical Evaluation of a Medical Device", Medical Devices and Diagnostics Industry. Vol. 7, No. 4, April, 1985

**PRESENTATIONS**

- **"**Establishing Quality Indicators to Assure GMP/GCP Compliance" lecture, GMP-GCP 2012, GMP & GCP USA, Europe, Japan, Asia Pacific, OMICS Group Conferences, Philadelphia, PA December, 2012
- "Conducting Successful FDA Meetings" One Hour Webinar for Biopractice.com., May 2013
- "Using Quality Indicators for Successful FDA QSR Management Reviews" One Hour Webinar for Biopractice.com, September, 2014
- "Navigating FDA Import Requirements for all FDA Regulated Products" One Hour Webinar for Biopractice.com, July, 2015
- "Understanding the Mindset of an FDA Employee" One Hour Webinar for Biopractice.com, October, 2013

**AFFILIATIONS**

- 1982 – Present, Regulatory Affairs Professionals Society, Member
- 1985 – 1986, President, Western Section
- 1976 – Present, American Society for Quality, Member
- 2013 – Present FDA Alumni Association, Member