# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ<br><br>Hon. Daniel D. Crabtree<br><br>Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC,<br><br>        Plaintiff/<br>        Counterclaim-Defendant,<br><br>   v.<br><br>MYLAN Inc., et al.,<br><br>        Defendants/<br>        Counterclaim-Plaintiffs.<br><br>**This Document Relates to the *Sanofi* Case.** | CASE NO. 2:17-CV-02452-DDC-TJJ<br><br><br><br>*Document Filed Electronically* |

**PLAINTIFF SANOFI-AVENTIS U.S. LLC'S
OPPOSITION TO MYLAN'S MOTION TO EXCLUDE OPINION
TESTIMONY OF STEVEN N. WIGGINS, PH.D.**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................1
BACKGROUND ............................................................................................................................2
ARGUMENT ..................................................................................................................................2
I.      Legal Standard ....................................................................................................................2
II.     Dr. Wiggins is a Qualified Economic Expert Who Can Help the Jury ...............................3
III.    Mylan's Criticisms of Dr. Wiggins's Damages Analysis Are Unfounded and Bear on the Weight of his Testimony, Not its Admissibility .......................................................4
        A.      Dr. Wiggins Performed His Own Reliable Economic Analysis ..............................4
        B.      Dr. Wiggins Properly Accounted for Other Factors in His Analysis ......................7
        C.      Dr. Wiggins Properly Evaluated a Variety of Forecasts ..........................................9
        D.      Dr. Wiggins's Opinions Concerning the Highly Differentiated Nature of Auvi-Q Are Proper ................................................................................................10
        E.      Dr. Wiggins's Opinions Concerning EpiPen Manufacturing Problems Are Proper ......................................................................................................................12
        F.      Dr. Wiggins's Opinions Concerning Patient Choice are Proper............................13
CONCLUSION .............................................................................................................................14

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apotex, Inc. v. Cephalon, Inc.*,
  321 F.R.D. 220 (E.D. Pa. 2017) .................................................................................................6

*Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*,
  1996 WL 466673 (10th Cir. Aug. 16, 1996) ..............................................................................6

*Benedict v. United States*,
  822 F.2d 1426 (6th Cir.1987) ...................................................................................................12

*Bitler v. A.O. Smith Corp.*,
  400 F.3d 1227 (10th Cir. 2005) .................................................................................................5

*In re Blood Reagents Antitrust Litig.*,
  No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .......................................................3

*Brill v. Marandola*,
  540 F. Supp. 2d 563 (E.D. Pa. 2008) .........................................................................................4

*In re Chocolate Confectionary Antitrust Litig.*,
  No. 1935, 2013 WL 11305184 (M.D. Pa. May 10, 2013) .........................................................6

*Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*,
  No. 11-CV-0252-CVE-PJC, 2014 WL 693328 (N.D. Okla. Feb. 21, 2014) ...........................11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...............................................................................................................2, 3

*In re DVI, Inc. Sec. Litig.*,
  No. 03-5336, 2014 WL 4634301 (E.D. Pa. Sept. 16, 2014) ......................................................3

*Hammers v. Douglas Cty.*,
  No. 15-7994, 2016 WL 6804905 (D. Kan. Nov. 16, 2016) .....................................................12

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) .......................................................................................7

*Kieffer v. Weston Land, Inc.*,
  90 F.3d 1496 (10th Cir. 1996) ...................................................................................................2

*LePage's Inc. v. 3M*,
  324 F.3d 141, 166 (3d Cir. 2003) ..............................................................................................6

*LeClercq v. The Lockformer Co.*,
   No. 00-cv-7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005)................................................10

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   874 F. Supp. 2d 169 (S.D.N.Y. 2012).......................................................................................7

*Margolies v. McCleary, Inc.*,
   447 F.3d 1115 (8th Cir. 2006) .................................................................................................4

*McAlester v. United Air Lines, Inc.*,
   851 F.2d 1249 (10th Cir. 1988) ...............................................................................................9

*McCoy v. Whirlpool Corp.*,
   258 Fed. App'x 189 (10th Cir. Dec. 5, 2007)..........................................................................8

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018).......................................................................................3

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000).....................................................................................................2

*Pioneer Centres Holding Co. v. Alerus Fin., N.A.*,
   858 F.3d 1324 (10th Cir. 2017) .............................................................................................12

*In re Rezulin Products Liability Litigation*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004).......................................................................................7

*Tagatz v. Marquette University*,
   861 F.2d 1040 (7th Cir. 1988) .................................................................................................8

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
   No. 02-MD-1468-JWL, 2008 WL 4382141 (D. Kan. Sept. 26, 2008)......................................8

*In re Urethane Antitrust Litig.*,
   166 F. Supp. 3d 501 (D.N.J. 2016) ..........................................................................................2

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ........................................................................................8, 10

*Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*,
   267 F.R.D. 368 (D. Kan. 2010)................................................................................................3

**PRELIMINARY STATEMENT**

Mylan seeks to exclude parts of Dr. Wiggins's expert damages opinion testimony, but does not offer a single argument that actually bears on the admissibility of his testimony. Instead, Mylan offers only a handful of quibbles with Dr. Wiggins's opinions that all go to the *weight* of his opinions, not their admissibility. Dr. Wiggins is Sanofi's rebuttal damages expert for Mylan's counterclaims. Using an economic benchmark analysis, he demonstrated that any allegedly false statements by Sanofi had no measurable impact on Auvi-Q's sales, and Mylan is therefore not entitled to any damages. He also showed that the methodology of Mylan's counterclaims damages expert, Dr. Thomas Varner, is so fundamentally flawed that it is useless and inadmissible. Since nothing in Mylan's Motion calls into question Dr. Wiggins's qualifications or the methodology or the reliability or relevance of his testimony, and given that Mylan agrees Dr. Wiggins is qualified to testify, this court need not delineate which testimony is appropriate for trial and should, therefore, deny Mylan's partial motion to exclude Dr. Wiggins's testimony.

Moreover, it may not be necessary for the Court to consider Mylan's Motion. Neither party cited Dr. Wiggins's opinions or testimony in its summary judgment motion. And the opinions of Mylan's Dr. Varner and Sanofi's Dr. Wiggins relate only to Mylan's counterclaims, so if the Court grants Sanofi's Motion for Summary Judgment as to Mylan's counterclaims, this Motion and Sanofi's Motion to Exclude the Expert Reports and Testimony Offered by Thomas Varner will both be moot. Therefore, to the extent Mylan's counterclaims do survive Sanofi's Motion for Summary Judgment, the question of how much of Dr. Wiggins's testimony should be presented to the jury is a question best left for a later date.

1

**BACKGROUND**

In support of its advertising counterclaims, Mylan offered the testimony of Dr. Thomas Varner, who filed an expert damages report concluding that Mylan was entitled to *all* of Sanofi's revenues from Auvi-Q. *See* Mem. Ex. 1 ¶¶ 24-32. Dr. Wiggins used an economic benchmark analysis to show that even if Sanofi had made any allegedly false statements they did not have any measurable impact on Auvi-Q's sales, *id.* ¶¶ 76-81, and Mylan's Dr. Varner failed to offer any of his own analysis in response. Dr. Varner himself essentially conceded the inadequacy of his opinions by partially recanting them and admitting that they were based on erroneous legal advice from Mylan's counsel. *See* Ex. B. Furthermore, Mylan has conceded that "Dr. Varner does not . . . opine on what portion of Mylan's lost profits were in fact the result of Sanofi's misleading conduct." Mot. at 2.

After its counterclaim damages expert recanted critical parts of his testimony, Mylan filed this Motion in an apparent attempt to make rebuttal arguments to Dr. Wiggins's testimony. But a *Daubert* motion is no place for rebuttal testimony in the inadmissible form of lawyer argument, and the Court cannot exclude Dr. Wiggins's testimony merely because Mylan disagrees with it. Mylan's Motion must be denied.

**ARGUMENT**

**I.      Legal Standard**

Expert testimony is admissible if it is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). An expert's method need not be the "best" method. Rather, "the test is whether the particular opinion is based on valid reasoning and reliable methodology." *In re Urethane Antitrust Litig.*, 166 F. Supp. 3d 501, 504 (D.N.J. 2016) (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3d Cir. 2000)). *See Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) ("An expert opinion must be based on facts that enable the expert

2

to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required.") (alteration in original) (internal quotation marks omitted); *Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 267 F.R.D. 368, 372 (D. Kan. 2010) (same); *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2014 WL 4634301, at *5 (E.D. Pa. Sept. 16, 2014) ("Proponents of expert testimony do not have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.").

Mylan's Motion "like so many such motions, is nothing more than a 'we do not agree with [an expert's] opinion so it is junk science' motion." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018). "[C]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of challenging admissible evidence. *Daubert*, 509 U.S. at 596. Questions regarding alleged "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *14 (E.D. Pa. Oct. 19, 2015).

## II. Dr. Wiggins is a Qualified Economic Expert Who Can Help the Jury

Mylan does not and could not dispute that Dr. Wiggins is qualified to offer his opinions regarding Mylan's alleged counterclaim damages. Dr. Wiggins has been a professor of economics at Texas A&M University since 1979, where he teaches undergraduate and graduate-level courses in industrial organization and microeconomic theory. He holds a Ph.D. in economics from MIT, he has authored or co-authored more than 35 scholarly articles, and he has rendered expert economic opinions on a variety of issues related to industrial organization and antitrust, including in matters involving the pharmaceutical industry. There is no question that Dr. Wiggins is qualified

3

to help the jury understand how Mylan the monopolist was not damaged by any of the alleged conduct asserted in its counterclaims.

### III. Mylan's Criticisms of Dr. Wiggins's Damages Analysis Are Unfounded and Bear on the Weight of his Testimony, Not its Admissibility

Dr. Wiggins used reliable economic analysis to determine that any allegedly false or misleading statements by Sanofi had no measurable impact on Auvi-Q's sales. *See* Ex. A at 7-8, 11 ("I concluded . . . that the impact of the alleged false and misleading statements was zero."). Notably, Mylan does not argue that Dr. Wiggins's method of calculating economic damages is unreliable; Mylan only quibbles with his conclusions or the factual bases on which he relies. While Mylan is free to disagree with the conclusions Dr. Wiggins reached, Mylan's disagreement is not a basis to exclude his testimony. *See Brill v. Marandola*, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008) ("Experts are expected to make inferences and state opinions and they are granted wide latitude in determining what data is needed to reach a conclusion. Questions as to the sufficiency of an expert's factual basis are generally left to the jury."); *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120–21 (8th Cir. 2006) ("[E]ach point takes issue with assumptions [the expert] wove into his damages estimate. In other words, [defendant] challenges the factual basis for [the expert's] report on damages. Time and again, we have noted that the factual basis of an expert's opinion generally relates to the weight a jury ought to accord that opinion.").

#### A. Dr. Wiggins Performed His Own Reliable Economic Analysis

Mylan's accusation that Dr. Wiggins relies entirely on the expertise of others is simply wrong; Dr. Wiggins used some of the same sales forecasts for his analysis that Dr. Fiona Scott Morton, another Sanofi expert, used for hers, but that is not a basis for exclusion. Mot. at 7-9. Dr. Wiggins testified that he relied on the same 2012 Sanofi prelaunch forecast that Dr. Scott Morton relied on because, after he reviewed and analyzed the evidence, he determined that the forecast

4

was reasonable, *see* Ex. A at 21, and appropriate for his own analysis—in part because they were developed before any of the alleged conduct giving rise this case took place, and were therefore valuable benchmarks to evaluate Sanofi's forecasted sales in the absence of that alleged conduct. *See* Mem. Ex. 1 ¶ 57; Ex. A at 93, 108-12.  Dr. Wiggins conducted his own economic analysis, using that forecast and others, to compare Auvi-Q's forecasted sales with its actual sales. Based on that analysis, he determined that Sanofi's alleged conduct had no measurable impact on Auvi-Q sales.  *See* Mem. Ex. 1 ¶¶ 76-81; Ex. A at 11, 24-25.

Dr. Wiggins reinforced his conclusion by conducting an independent economic analysis comparing the parties' forecasted Auvi-Q sales with sales at two specific real-world examples where Mylan's alleged anticompetitive conduct had minimal impact—the University of Michigan formulary and Horizon Blue Cross Blue Shield of New Jersey.  *See* Mem. Ex. 1 ¶¶ 17, 80; Ex. A at 24-25.  The fact Dr. Scott Morton originally suggested those two health plans as ones where Mylan's alleged conduct had minimal impact has no bearing on the reliability of Dr. Wiggins's own analysis based on those plans.  As he explained at his deposition, Dr. Wiggins believed they were good examples of plans where Mylan's alleged conduct would have had minimal impact, *see* Ex. A at 24-26, and he conducted his own statistical analysis to confirm that Sanofi's alleged conduct had no measurable impact at those plans.  *See id.* at 25-32.  Dr. Wiggins reinforced his conclusion with an independent qualitative analysis of the other factors that *did* drive Auvi-Q sales. *See* Mem. Ex. 1 ¶¶ 44-74.

The law does not require an expert to consider and rule out every conceivable alternative forecast to come to a reliable, admissible opinion.  *Cf. Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1238 n.6 (10th Cir. 2005) (noting that an expert conducting a differential diagnosis is not required "to categorically exclude each and every possible alternative cause," and "to require otherwise

5

would mean that few experts would ever be able to testify.")  Mylan has not identified *any* better forecasts Dr. Wiggins could have used in his analysis, and in any event, the existence of alternative evidence is not grounds for exclusion of an expert's testimony.  *See Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 234 (E.D. Pa. 2017) ("Defendants may have reason to believe that Dr. Singer could have based his re-entry market share assumption on 'better' evidence. That, however, is not grounds for exclusion. . . . [T]o the extent that there are facts in dispute which [Dr. Singer] should or should not have relied upon . . . a jury will be given the opportunity to sort through these facts and apply their conclusions in assessing each of the parties' respective expert damages witnesses."); *see also In re Chocolate Confectionary Antitrust Litig.*, No. 1935, 2013 WL 11305184, at *4 (M.D. Pa. May 10, 2013) (holding that the damages expert's conclusions were "far from speculative" because they were based on data relied on by business executives) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003)).

None of the cases Mylan cites support its argument that if two experts rely on the same evidence, one expert's testimony must be excluded.  In *Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*, 1996 WL 466673 (10th Cir. Aug. 16, 1996), the court excluded an expert's business valuation that was merely an averaging of two concededly unreliable reports prepared by a business broker who did not testify.  1996 WL 466673, at *7.  The court noted that experts "may not merely parrot the opinions of other experts whose conclusions are not themselves in the record."  *Id.*  Here, Dr. Wiggins utilized some of the same data that Dr. Scott Morton used to conduct his own independent analysis. And the Sanofi forecasts in question were prepared under the supervision of former Sanofi Vice President and Auvi-Q Brand Lead Bryan Downey, whom Mylan deposed in this case and had ample opportunity to cross-examine.  *See* Ex. A at 16-17, 89-91.  Similarly, *Tk-7 Corp. v. Estate of Barbouti* is inapposite because the court excluded expert

6

testimony where the expert merely assumed that another expert's projections were valid and reliable and adopted them to form his own opinion, even though the expert himself had no expertise with regard to those projections, knew nothing of the methods or reasoning the other expert used to arrive at the projections, knew little or nothing at all about the other expert, and had done "next to nothing" to corroborate the projections. 993 F.2d 722, 732 (10th Cir. 1993). Here, by contrast, Dr. Wiggins was familiar with the data, and independently assessed and evaluated the data to determine that it was suitable for his analysis. *See* Ex. A at 21-32.

The cases Mylan cites here to support the proposition that an expert may not simply "rehash a factual narrative" of a case are likewise misplaced. *See* Mot. at 14-15. In *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005), the court excluded the "Facts" section of an expert's report because it offered "only factual narratives and interpretations of conduct or views as to the motivation of parties." Here, Dr. Wiggins explains what evidence he considered in conducting his economic analysis. As the court in *Highland Capital Management* noted, "an expert must of course rely on facts or data in formulating an expert opinion." *Id.* at 469 (citing Fed. R. Evid. 703). Unlike the expert in *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004), Dr. Wiggins is not simply "provid[ing] an historical commentary of what happened," nor is he "exhaustively recount[ing] all of the facts of the case." *Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 174 (S.D.N.Y. 2012).

**B.   Dr. Wiggins Properly Accounted for Other Factors in His Analysis**

One reason Dr. Wiggins relied on the Sanofi and Mylan forecasts in his benchmark analysis was because they were created at times when they would not been affected by the alleged conduct giving rise to this case. *See* Mem. Ex. 1 ¶ 57; Ex. A at 93, 108-12. In other words, the forecasts were developed by both parties before Sanofi made any marketing claims about Auvi-Q, so they are free from the impact of any marketing claims. *See* Mem. Ex. 1 ¶¶ 33-40; 72-73. The forecasts

7

did reflect what Dr. Wiggins concluded, based on his economic analysis, and review of qualitative evidence in this case, were the key factors driving both parties' forecasts: Auvi-Q's unique, innovative features, such as its compact size, its audio instructions, its new technology, and its retractable needle. *See* Mem. Ex. 1 ¶¶ 39, 42, 54-56, 61-68, 86; Ex. A at 117-20.  Mylan is free to argue that Dr. Wiggins's analysis should have focused more on other factors, but that argument bears on the weight of Dr. Wiggins's testimony, not its admissibility. *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260 (10th Cir. 2014) (arguments concerning a statistical expert's alleged "variable shopping" and "benchmark shopping" went to the weight, not the admissibility of testimony); *McCoy v. Whirlpool Corp.*, 258 Fed. App'x 189, 196 (10th Cir. Dec. 5, 2007) (expert testimony should not have been excluded for failure to address alternative arguments adequately; resolution of dispute between experts was properly within the province of the jury); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 4382141, at *9 (D. Kan. Sept. 26, 2008) ("This dispute among the experts concerning whether other events caused over-recoveries of USF charges must be left for the jury.").

Mylan's cases on this point are inapposite. The expert in *Concord Boat Corp. v. Brunswick Corp* created a hypothetical market that was not grounded in economic reality where "some other manufacturer's engine was viewed as equal in quality." 207 F.3d 1039 (8th Cir. 2000).  Here, Dr. Wiggins did not invent a hypothetical market or a hypothetical product; he used actual Sanofi and Mylan forecasts created in the ordinary course, which he determined were reliable because "when a company has millions of dollars on the line and they do a forecast, then you pay attention to that forecast." Ex. A at 91.  *Tagatz v. Marquette University*, 861 F.2d 1040 (7th Cir. 1988), is also inapt. In that religious discrimination employment case, plaintiff testified as his own expert witness and presented a table that purported to show that the five Catholic faculty members in his

8

department had a higher salary than the five non-Catholic faculty members, but failed to control for differences in rank between the employees, differences in scholarly productivity, and teaching evaluations. *Id.* at 1044. Even though the expert's evidence was "weak and equivocal" and "essentially worthless," it was not excluded, but was considered at trial. *Id.* at 1042-45. The Court of Appeals noted that the sufficiency of the plaintiff's statistical evidence bears on its weight, not its admissibility, explaining that "the defendant can rebut it by casual statistical evidence of its own, by nonstatistical evidence, or by a combination of the two types. Then it is up to the district judge to decide whether the plaintiff has carried his burden of persuasion." *Id.* at 1040. Likewise, in this case, Mylan's quibbles over purported deficiencies in Dr. Wiggins's analysis bear on his testimony's weight, not its admissibility. *See McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1259 (10th Cir. 1988) ("We conclude that each of United's alleged flaws in the statistical evidence went to the weight of that evidence, not its admissibility.").

## C. Dr. Wiggins Properly Evaluated a Variety of Forecasts

Dr. Wiggins properly reviewed a number of available forecasts to draw his conclusions about Mylan's damages—or utter lack thereof. Ex. A at 22-23. Mylan's Motion sets up a convoluted strawman argument that appears to involve an attack on Dr. Wiggins for having the temerity to consider a variety of forecasts, including some by third parties, which Mylan characterizes as "textbook cherry-picking." Mot. at 11-12. Mylan's suggestion that Dr. Wiggins "cherry-picked" these two forecasts to conclude that Mylan suffered no damages in the period immediately after Auvi-Q's launch, and then discarded them for subsequent time periods, is a blatant mischaracterization of Dr. Wiggins's testimony. Dr. Wiggins did not say that two forecasts prepared by third party consultants were "better," but merely that they were other, different forecasts than the ones Sanofi created. *See* Ex. A at 32-34. He certainly did not conclude that "these two forecasts are more reliable for the launch period while the Mylan and Sanofi forecasts

9

are better in the long-run" and Mylan does not offer any support for that conclusory statement. Rather, he testified that Sanofi's and Mylan's forecasts "did a very good job of predicting where [Auvi-Q] was going to end up," and merely "underestimated the speed of penetration." *See* Ex. A at 36-37.  Once again, Mylan is free to disagree with this opinion, but any disagreement goes to the weight of his testimony, not its admissibility.  *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d at 1260-63 (claims that the expert engaged in "benchmark shopping" went to the weight and not the admissibility of the testimony).

Here, too, the cases Mylan cites to support this spurious argument are inapposite.  In *LeClercq v. The Lockformer Co.*, No. 00-cv-7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005), the expert was aware of but ignored 17 samples that contradicted his analysis of the presence of contaminants in groundwater.  Likewise, in *Rimbert v. Eli Lilly & Co.*, the expert was aware of, but ignored, "myriad" scientific studies that refuted her conclusion.  No. 06-cv-0874, 2009 WL 2208570, at *13 (D.N.M. July 21, 2009).  By contrast, Dr. Wiggins did not ignore any evidence that contradicted his conclusions.  He examined many different forecasts, he evaluated the forecasts Dr. Scott Morton relied on in her analysis, and he concurred with Dr. Scott Morton that the Sanofi forecast she relied on was the best one.  *See* Ex. A at 21-23.

> **D.     Dr. Wiggins's Opinions Concerning the Highly Differentiated Nature of Auvi-Q Are Proper**

Dr. Wiggins properly considered evidence from the record concerning Auvi-Q's unique, innovative features in formulating his expert opinions.  The evidence in the record showing that Auvi-Q is a highly differentiated product, while inconvenient for Mylan's theories, is relevant to Dr. Wiggins's analysis.

First, evidence of Auvi-Q's highly differentiated nature was relevant to Dr. Wiggins's analysis of the factors driving Auvi-Q's actual sales.  *See* Mem. Ex. 1 ¶¶ 15, 44-56.  Dr. Wiggins

10

analyzed whether Sanofi's alleged conduct had any impact on Auvi-Q's sales to rebut Dr. Varner's attribution of all Auvi-Q sales to Sanofi's alleged conduct. *Id.* ¶ 15. His conclusion that the alleged conduct did *not* impact Auvi-Q sales was based in part on his analysis of the other factors that *did* drive Auvi-Q sales. *Id.* ¶¶ 44-56. Dr. Wiggins made it clear that evaluating evidence from the record in this case was essential to his economic analysis. *See* Ex. A at 49 ("I'm using my background and experience as an econometrician to evaluate . . . why things are happening . . . . I evaluate qualitative evidence and publish that research in places like the American Economic Review, and I'm doing analysis. I am evaluating qualitative evidence. Economic, empirical analysis is more than simply running regressions.").

Evidence of Auvi-Q's highly differentiated nature was also relevant to the forecasts Dr. Wiggins selected as benchmarks for his analysis. *See* Ex. A at 142-43. Dr. Wiggins reviewed the qualitative product assessments and sales forecasts that Sanofi and Mylan developed, and this informed his opinion that both Mylan and Sanofi expected Auvi-Q's unique features to be its primary sales drivers, which in turn informed his opinion that the parties' pre-launch forecasts would be an appropriate benchmark for expected Auvi-Q sales. *See* Mem. Ex. 1 ¶¶ 33-43. Thus, Dr. Wiggins assessed and evaluated qualitative information about Auvi-Q as an integral part of his economic analysis. While Mylan would undoubtedly like to keep evidence of Auvi-Q's unique and innovative features out of this case, that desire is not a basis to exclude Dr. Wiggins's testimony. *Cf. Cyprus Amax Minerals Co. v. TCI Pac. Commc'ns, Inc.*, No. 11-CV-0252-CVE-PJC, 2014 WL 693328, at *7 (N.D. Okla. Feb. 21, 2014) (denying motion to exclude expert testimony and noting, "the mere fact that Dr. Burrows conducted historical research to reach his opinions does not mean that he was testifying outside of his expertise as an economist.").

11

Mylan cites *Pioneer Centres Holding Co. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017), for the unremarkable proposition that "reading the mind of a party is beyond the scope of any expert." Mot. at 14. In *Pioneer Centres*, the court excluded expert testimony predicting that a party would have approved a particular transaction, where even the party itself would not speculate as to whether it would have approved the transaction. 858 F.3d at 1333. That is not what Dr. Wiggins did at all. In this case, Dr. Wiggins considered Mylan's own market research and statements suggesting that Auvi-Q's unique features would have a major impact on its sales in reaching his conclusion that Auvi-Q's unique features had a major impact on its sales. *See* Ex. A at 117-20. Dr. Wiggins did not have to read Mylan's mind—only its contemporaneous documents—to ground his opinions.

### E. Dr. Wiggins's Opinions Concerning EpiPen Manufacturing Problems Are Proper

Dr. Wiggins discusses Mylan's EpiPen manufacturing problems in his report for the sole purpose of rebutting Dr. Varner's opinion that Mylan would have had enough supply to make *all* of the Auvi-Q sales he claims should have gone to EpiPen from 2013 to October 2015. *See* Mem. Ex. 1 ¶ 92-96. Dr. Wiggins's opinion that Dr. Varner failed to account for and ignored altogether the well-documented EpiPen manufacturing and safety issues when he concluded that Mylan could have manufactured and sold all of its allegedly lost units is proper rebuttal expert testimony. *See Hammers v. Douglas Cty.*, No. 15-7994, 2016 WL 6804905, at *2 (D. Kan. Nov. 16, 2016) ("[T]he proper function of rebuttal evidence is "to contradict, impeach or defuse the impact of the evidence offered by an adverse party."); *Benedict v. United States*, 822 F.2d 1426, 1429 (6th Cir.1987) (expert testimony which directly disproves accuracy of opposing expert methodology and data is proper rebuttal).

Mylan noted in its motion that it is not challenging Dr. Wiggins's analysis of certain of Dr. Varner's "specific errors."  *See* Mot. at 6 n.2.  This is merely one more "specific error" in Dr. Varner's report that Dr. Wiggins addressed. Dr. Wiggins observed that Dr. Varner has absolutely no basis for assuming that Mylan could have sold hundreds of thousands of more EpiPens without expediting or exacerbating the well-documented EpiPen failures in the United States that the FDA concluded were happening back to 2014, led to an FDA warning letter in 2017 and a worldwide recall of EpiPens, and now, persistent years of ongoing supply shortages.  *See* Mem. Ex. 1 ¶¶ 30, 32, 93-96; Ex. C at 3 (FDA noting that between 2014 and 2017, Mylan received 171 complaint samples for products that failed to activate when the patient followed the proper sequence, and some of these failures were "associated with patient deaths . . . ."). This FDA warning letter is not even listed in the materials Dr. Varner considered in his opening report.  *See* Mem. Ex. 3 App. B. Mylan would undoubtedly like to keep the evidence of its EpiPen manufacturing and ongoing supply problems from a jury of consumers, but Mylan opened the door to all of this testimony. Mylan's displeasure with the facts is not a permissible basis to exclude Dr. Wiggins's proper rebuttal testimony.

      **F.**     **Dr. Wiggins's Opinions Concerning Patient Choice are Proper**

Mylan is wrong that Dr. Wiggins's opinions concerning the role of patient choice is "not the product of economic expertise."  Mot. at 15.  As Dr. Wiggins explained during his deposition, analysis of consumer purchase behavior is an important component of economic analysis.  *See* Ex. A at 199 ("[E]conomists study purchase behavior of goods all the time. That's what we do."). Here, as with Dr. Wiggins's analysis concerning Auvi-Q's highly differentiated nature, his conclusion that Sanofi's alleged conduct did *not* impact Auvi-Q sales was based in part on his analysis of the other factors that *did* drive Auvi-Q sales, including patient choice. *See* Mem. Ex. 1 ¶ 70.  Dr. Wiggins explained that he employed this standard economic analysis in this case to

13

determine that "the alleged statements by Sanofi are highly unlikely to impact sales because patients are choosing for themselves based on their own handling of the products in a physician's office." *See id.*; Ex. A at 194-205. While Mylan is free to disagree with Dr. Wiggins's opinion, Dr. Wiggins's testimony on this matter is relevant and reliable, and therefore admissible.

## CONCLUSION

For the foregoing reasons, Mylan's Motion to Exclude Opinion Testimony of Steven N. Wiggins, Ph.D., must be denied.

Dated:  August 9, 2019

WEIL, GOTSHAL & MANGES LLP
Diane Sullivan
diane.sullivan@weil.com
17 Hulfish St., Suite 201
Princeton, NJ 08542
T: (609) 986-1120
F: (212) 310-8007

Respectfully submitted,

 */s/ Eric S. Hochstadt*

WEIL, GOTSHAL & MANGES LLP
Yehudah L. Buchweitz
yehudah.buchweitz@weil.com
Eric S. Hochstadt
eric.hochstadt@weil.com
767 Fifth Avenue
New York, NY 10153
T: (212) 310-8000
F: (212) 310-8007

**CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2019, the foregoing was filed via CM-ECF and by e-mail to all counsel of record.

                                            */s/ Eric S. Hochstadt*
                                            Eric Hochstadt