# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |
| SANOFI-AVENTIS U.S., LLC,<br><br>Plaintiff,<br>v.<br>MYLAN INC., et al.,<br><br>Defendants. | CASE NO. 2:17-CV-02452-DDC-TJJ<br><br>*Document Filed Electronically* |
| *This Document Relates to the* Sanofi *case.* | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO SANOFI'S MOTION TO EXCLUDE THE EXPERT
## REPORTS AND TESTIMONY OFFERED BY MYLAN'S EXPERT GARY ZIEZIULA

Philip A. Sechler
Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

   I.    Mr. Zieziula's Industry Experience And Qualifications ................................. 2

   II.    Mr. Zieziula's Expert Opinions ...................................................................... 4

        A.    Mr. Zieziula's Counterclaims Reports ................................................ 4

        B.    Mr. Zieziula's Antitrust Report ............................................................ 6

ARGUMENT .................................................................................................................. 8

   I.    Mr. Zieziula Is Qualified To Offer His Expert Opinions .................................. 8

        A.    Mr. Zieziula's Industry Experience Qualifies Him To Offer His Opinions .... 9

        B.    Mr. Zieziula's Opinions Are Not Unreliable Simply Because They Were Generated For The Purposes Of Litigation .................................................. 13

   II.    Mr. Zieziula's Opinions On Mylan's Counterclaims Are Reliable .......................... 15

        A.    Mr. Zieziula Does Not Opine That Sanofi's Advertisements Were Misleading ......................................................................................... 16

        B.    Mr. Zieziula's Opinions Concerning The Prevalence Of Sanofi's Messaging Are Reliable .................................................................... 17

        C.    Mr. Zieziula's Opinions Bearing On Causation Are Reliable ...................... 21

   III.    Mr. Zieziula's Opinions Will Be Helpful To The Trier Of Fact ................................ 22

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adidas Am., Inc. v. Payless Shoesource, Inc.,*
No. CV 01-1655-KI, 2008 WL 4279812 (D. Or. Sept. 12, 2008) ...........................................22

*Am. Tech. Res. v. United States,*
893 F.2d 651 (3d Cir. 1990) ...................................................................................................8

*Bitler v. A.O. Smith Corp.,*
400 F.3d 1227 (10th Cir. 2005) .............................................................................................8

*Black v. M & W Gear Co.,*
269 F.3d 1220 (10th Cir. 2001) ...........................................................................................24

*BoDeans Cone Co. v. Norse Dairy Sys., L.L.C.,*
678 F. Supp. 2d 883 (N.D. Iowa 2009)................................................................................18

*Bouygues Telecom, S.A. v. Tekelec,*
No. 4:05-CV-78-FL, 2007 WL 4699237 (E.D.N.C. Feb. 5, 2007)...................................17, 22

*Brighton Collectible, LLC v. Believe Prod., Inc.,*
No. 2:15-CV-00579-CAS, 2017 WL 440255 (C.D. Cal. Jan. 30, 2017)..........................21, 22

*Butler Nat'l Serv. Corp. v. Navegante Grp., Inc.,*
No. 09-2466-JWL, 2011 WL 4452505 (D. Kan. Sept. 26, 2011)...........................................13

*In re Commercial Fin. Servs., Inc.,*
350 B.R. 559 (Bankr. N.D. Okla. 2005) ................................................................................16

*Corr v. Terex USA, LLC,*
No. 08-1285-MLB, 2011 WL 976718 (D. Kan. Mar. 17, 2011) ............................................13

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir 1995) .................................................................................................14

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)...............................................................................................................8

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,*
618 F.3d 1025 (9th Cir. 2010) ..............................................................................................10

*Goldberg v. 401 North Wabash Venture LLC,*
No. 09 C 6455, 2013 WL 212912 (N.D. Ill. Jan. 18, 2013) ...................................................14

*Holt v. Wesley Med. Ctr., LLC.,*
    No. 00-1318-JAR, 2004 WL 1636571 (D. Kan. July 19, 2004) ........................................14, 15

*Inline Connection Corp. v. AOL Time Warner Inc.,*
    470 F. Supp. 2d 435 (D. Del. 2007) ......................................................................................19

*Innovation Ventures, LLC v. NVE, Inc.,*
    90 F. Supp. 3d 703 (E.D. Mich. 2015) ....................................................................................15

*John McClelland & Assocs., Inc. v. Med. Action Indus., Inc.,*
    No. 04-2545-CM-2006 WL 3333061 (D. Kan. Nov. 15, 2006) .............................................10

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) .................................................................................................1, 8, 15

*McLaughlin v. Am. Tobacco Co.,*
    522 F.3d 215 (2d Cir. 2008) ....................................................................................................14

*Merck Eprova AG v. Gnosis S.p.A.,*
    901 F. Supp. 2d 436 (S.D.N.Y. 2012) ......................................................................................10

*Merisant Co. v. McNeil Nutritionals, LLC,*
    515 F. Supp. 2d 509 (E.D. Pa. 2007) ......................................................................................11

*Schwab v. Philip Morris USA, Inc.,*
    449 F. Supp. 2d 992, 1152 (E.D.N.Y. 2006) ..........................................................................14

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.,*
    No. 13-2451, 2016 WL 5496340 (D. Minn. Sept. 28, 2016) ....................................................11

*Smith v. Ingersoll-Rand Co.,*
    214 F.3d 1235 (10th Cir. 2000) ...............................................................................................14

*Trace X Chem., Inc. v. Canadian Indus., Ltd.,*
    738 F.2d 261 (8th Cir. 1984) ...................................................................................................13

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.,*
    No. 2436, 2016 WL 807377 (E.D. Pa. Mar. 2, 2016) ....................................................11, 14, 21

*United States v. Gomez,*
    67 F.3d 1515 (10th Cir. 1995) ...................................................................................................8

*United States v. Johnson,*
    575 F.3d 1347 (5th Cir. 1978) ...................................................................................................8

*United States v. Schiff,*
    538 F. Supp. 2d 818 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010) ................................12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)............................................................................................................12

*Watson v. United States,*
    485 F.3d 1100 (10th Cir. 2007) ..............................................................9, 15, 16, 23

*Wheeler v. John Deere Co.,*
    935 F.2d 1090 (10th Cir. 1991) ....................................................................13, 15

**Other Authorities**

Brief of Appellees Sanofi-Aventis U.S. LLC and Sanofi US Services Inc.,
    *Eisai, Inc. v. Sanofi-Aventis U.S. LLC*, No. 14-2017 (3d Cir. Oct. 2, 2014) ..........................13

Fed. R. Evid. 702 .........................................................................................8, 15, 16, 17

Fed. R. Evid. 703 .........................................................................................................24

## INTRODUCTION

Gary Zieziula is the former President and Managing Director of a pharmaceutical company, with more than 40 years of industry experience in sales, marketing, and commercial operations. Sanofi's motion to exclude Mr. Zieziula's testimony focuses on the roles Mr. Zieziula has not held—he is not, for example, an economist or a regulatory lawyer—and ignores the expertise he brings to this case: decades of experience in pharmaceutical sales and marketing and the commercialization of branded pharmaceutical products. Each of Mr. Zieziula's opinions falls squarely within the scope of his industry and business expertise.

Sanofi's arguments about the reliability of Mr. Zieziula's opinions similarly miss the mark. Sanofi argues that Mr. Zieziula's opinions are unreliable because he did not perform a statistical analysis or conduct a survey. These arguments ignore the well-established rule "that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Mr. Zieziula's extensive experience provides a sufficient basis for his opinions, and he reliably applies his experience to the facts of this case—*precisely* the methodology demanded of an experience-based expert.

Sanofi's motion attacks discrete aspects of Mr. Zieziula's reports and argues that supposed flaws with certain of his opinions should invalidate *all* of Mr. Zieziula's testimony. For instance, Sanofi argues that deposition testimony about a single input into one of the three opinions offered in only one of Mr. Zieziula's three reports provides a basis to exclude all the testimony that Mr. Zieziula would offer in this case. Sanofi should not be permitted to transform isolated critiques of certain opinions into the wholesale exclusion of Mr. Zieziula's testimony. In any event, Sanofi's individual critiques are flawed and contrary to well-established legal principles. Sanofi's motion should be denied.

1

# BACKGROUND

## I.   Mr. Zieziula's Industry Experience And Qualifications

Gary Zieziula has more than 40 years' experience in the pharmaceutical industry. Sanofi Br. Ex. 2 at 3 & Appendix A; Sanofi Br. Ex. 3 at 2.[1] He took his first job out of college in 1977 as a pharmaceutical sales representative. Over the course of his career, he has held various roles of increasing responsibility in sales and marketing, commercial operations, and executive leadership. *Id.* He has worked at five major pharmaceutical companies—Merck & Co, Bristol-Myers Squibb, Roche Laboratories, AMAG Pharmaceuticals, and EMD Serono—serving most recently as President and Managing Director of EMD Serono, a North American subsidiary of Merck KGaA, from January 2014 until his retirement in January 2019. *Id.*

Mr. Zieziula spent the first 20 years of his career in pharmaceutical sales and marketing. Over the course of his 15-year career at Merck, he was promoted from Sales Representative to Senior Customer Manager to District Manager to Senior Director, Marketing Planning, to Vice President & Executive Director of Sales & Operations. *Id.* His responsibilities included ensuring that sales representatives properly executed Merck's marketing strategies, delivered the company message, and did so in accordance with the rules and regulations governing promotional practices. *Id.* He continued in sales and marketing at Bristol-Myers Squibb, where he spent three years as Vice President, Managed Health Care Sales & Marketing, overseeing a team of 225 people. *Id.* He was then recruited by Roche Laboratories in 2001 to lead a team of vice presidents in

---

[1] Mr. Zieziula prepared three reports in this case: (1) a report dated February 4, 2019 summarizing his opinions related to Mylan's false advertising counterclaims ("Countercl. Rep.") (Sanofi Br. Ex. 2); (2) a reply report on the counterclaims dated April 18, 2019 ("Countercl. Reply Rep.") (Sanofi Br. Ex. 4); and (3) a report dated March 25, 2019 summarizing his opinions related to Sanofi's claim for damages under Section 2 of the Sherman Act ("Antitrust Rep.") (Sanofi Br. Ex. 3). Mr. Zieziula's CV is Appendix A to the Counterclaims Report.

overseeing the company's Specialty Care sales and marketing teams. During his time in sales and marketing, he helped launch nine different branded pharmaceutical products. *Id.*

Over the last 15 years, Mr. Zieziula has held executive-level roles overseeing not only sales and marketing, but also commercial operations. *Id.* As Vice President, Sales & Marketing at Roche Laboratories his responsibilities included oversight of the market access team responsible for rebate negotiations with Pharmacy Benefit Managers (PBMs) and other payors; when he transitioned there to Vice President of Commercial Operations for Specialty Care, he focused on all strategic aspects of commercializing pharmaceutical drug products, including sales and marketing and overall strategy. As Executive Vice President and Chief Commercial Officer of AMAG Pharmaceuticals, he redesigned the company's corporate strategy for several drug markets, increasing profitability within 12 months. Countercl. Rep. Appendix A. Most recently, as President and Managing Director of EMD Serono, he had full responsibility for the company's branded oncology, neurology/immunology, fertility, and endocrinology products, and he helped the company reverse declining market shares for numerous products. *Id.* His responsibilities included "oversight of the full commercialization process"—i.e., the process of bringing a branded pharmaceutical product to market—which covers "sales, marketing, market access, legal, liaison with regulatory affairs, human resources, and finance." Sanofi Br. Ex. 1 (Zieziula Dep.) at 71-72. He also oversaw the market access team responsible for PBM and payor negotiations. Antitrust. Rep. 12.

Mr. Zieziula started his own pharmaceutical advising firm in 2012. Countercl. Rep. Appendix A. He has sat on boards of directors of industry organizations, including Biotechnology Innovation Organization (BIO), a trade organization for biotechnology-focused pharmaceutical companies, and was the CEO of Roundtable on Cancer. *Id.* He recently joined the Board of

Directors of pharmaceutical company Kyowa Kirin, Inc.–U.S., and the Advisory Board for Tellic, which provides artificial intelligence technology to pharmaceutical companies. Sanofi Br. Ex. 1 (Zieziula Dep.) at 73.

## II.     Mr. Zieziula's Expert Opinions

Mr. Zieziula offers expert opinions related both to Mylan's false advertising counterclaims and Sanofi's antitrust claims. Sanofi mischaracterizes numerous opinions in Mr. Zieziula's reports, and thus Mylan provides below a brief overview of his primary opinions.

### A.     Mr. Zieziula's Counterclaims Reports

Mylan asserts counterclaims for violations of the Lanham Act and common law unfair competition, alleging that Sanofi engaged in false and misleading advertising and unfair business practices targeted at EpiPen, and that this conduct injured Mylan. Mylan Answer & Counterclaims pp. 33-54 (Jan. 16, 2018), ECF No. 112. Sanofi insinuates that Mylan's complaints arose only after Sanofi filed its antitrust claims (Sanofi Br. 2), but Mylan raised its concerns about Sanofi's sales and marketing of Auvi-Q with the FDA within months of Auvi-Q's launch, and reiterated those concerns in 2015.[2] The evidence produced in discovery shows that Sanofi made false and misleading advertising claims in its promotion of Auvi-Q, disseminated primarily through its sales representatives' in-person detailing of physicians. *See* Mylan Opp. to Sanofi Mot. for Summary Judgment ("Mylan MSJ Opposition Br.") at 76. In particular, Sanofi's sales force promoted Auvi-Q by claiming that: patients found it easier to use and to carry, patients found its instructions easier to follow, patients would be more likely to carry Auvi-Q than EpiPen, Auvi-Q had better needlestick protection, and Auvi-Q was the "new EpiPen." *Id.* Mylan alleges that these

---

[2] Ex. 1 (Mar. 28, 2013 Ltr. from C. Shepard to R. Szydlo); Ex. 2 (Apr. 29, 2015 Ltr. from B. Stone to R. Szydlo).

promotional claims constitute false and misleading commercial advertising that harmed Mylan. *Id.* at 76-99.

Mr. Zieziula summarized his opinions related to Mylan's counterclaims in his Counterclaim Report dated February 4, 2019. To prepare that report, Mr. Zieziula reviewed record evidence concerning the promotional messages used by Sanofi's sales force. Based on his decades of experience in pharmaceutical sales and marketing and commercial operations, he offered three main opinions:

*First,* Mr. Zieziula explains, based on his experience, that the types of comparative claims made by Sanofi have a significant impact on how physicians, payors, and patients determine which branded pharmaceutical products to prescribe and purchase. Countercl. Rep. 4, 7. For that reason, it is standard industry practice for pharmaceutical companies to substantiate comparative claims through clinical studies and to reach agreement with the FDA on study design, which helps to ensure consumers are not misled or confused. *Id.* at 4-5. Sanofi developed a patient preference study designed to substantiate several of the comparative claims at issue in Mylan's counterclaims, such as the claims that Auvi-Q is easier to use and more likely to be carried than the EpiPen, and that patients overall prefer Auvi-Q to EpiPen. *Id.* ███████████████████████████ ██████████████████████████████████████████████ ████. *Id.* Sanofi nonetheless conducted the study and made the claims. *Id.* Mr. Zieziula opines that Sanofi failed to comply with those industry standards here when it made promotional claims that ██████████████████████████████. *Id.* at 4-8.

*Second,* Mr. Zieziula opines that Sanofi's use of the challenged advertising claims was a widespread practice that Sanofi either "approved" or "did not put the proper procedures in place to prevent." *Id.* at 10. Mr. Zieziula based this opinion on numerous pieces of evidence in the

record, which he explains is the type of data and information he regularly relied upon as a pharmaceutical executive to evaluate the use of a marketing message in the field. For example, based on his leadership experience, Mr. Zieziula describes the importance of setting the correct "tone from the top" at a pharmaceutical company, including how marketing statements by senior executives (like the ones Sanofi executives made here) trickle down through the organization to the sales force in the field. *Id.* at 3, 7. He explains that pharmaceutical companies rely on various pieces of market research, including message recall studies, Awareness Trial and Usage (ATU) studies, and intelligence from the field force, to evaluate what messages are recalled by and resonating with physicians, and to determine the content and extent of a competitor's messaging campaign. *Id.* at 6, 11. And he explains why the repeated use of particular marketing language in, for example, internal communications, workbooks of potential messages, emails, handwritten notes in the field, and search terms attracting consumers to a product's website, suggests the language is well-known and widely used by the team marketing the product, even when those phrases are not found in formal marketing materials. *Id.* at 7-8, 12.

*Third,* Mr. Zieziula opines, based on his experience overseeing the launch of and setting the strategy for branded pharmaceutical products, that Sanofi's promotion of Auvi-Q as the "new EpiPen" would be harmful to the brand equity that Mylan built over many years marketing EpiPen, which plays a significant role in physicians' willingness to prescribe EpiPen. *Id.* at 10.[3]

### B.     Mr. Zieziula's Antitrust Report

Mr. Zieziula prepared a separate report dated March 25, 2019 summarizing his opinions related to Sanofi's Sherman Act claims against Mylan. As with his Counterclaims Report, the

---

[3] Sanofi's retained marketing expert, Eduardo Schur, responded to Mr. Zieziula's opinions in a report dated March 25, 2019 ("Schur Rep."). Mr. Ziezula in turn prepared his Counterclaim Reply Report dated April 18, 2019, addressing Mr. Schur's opinions.

opinions set forth in the Antitrust Report are based on Mr. Zieziula's decades of experience in the pharmaceutical industry. He again offers three main opinions:

*First*, Mr. Zieziula opines that Sanofi's ability to compete effectively with Mylan was limited by ███████████████████████████████ Mr. Zieziula explains how, in his experience, "high costs create a hurdle in launching a new product," and that his review of Sanofi's documents █████████████████████████████████████ █████████████ Antitrust Rep. 3.

*Second,* Mr. Zieziula identifies flaws in the damages analysis presented by Sanofi's expert economist expert, Fiona Scott Morton, Ph.D. Dr. Scott Morton bases her damages analysis on Sanofi's failure to meet its pre-launch forecast for Auvi-Q and attributes Sanofi's failure to meet that forecast entirely to Mylan. Mr. Zieziula opines based on his experience that "[p]re-launch long range forecasts are not accurate predictors of actual performance in the pharmaceutical industry." *Id.* He also opines that Dr. Scott Morton's opinion fails to account for the numerous factors within Sanofi's control that contributed to Auvi-Q's failure to achieve its projected market share: Sanofi's conservative rebating strategy; its failure to recognize the industry trend towards increased formulary management; its failure to expect that the launch of a new product would cause payors to manage the therapeutic class; a lack of involvement by Sanofi senior leadership in key payor negotiations; and missed opportunities for direct-to-consumer advertising and effective marketing to key decision-makers. *Id.* at 6-15.

*Third*, Mr. Zieziula opines that Dr. Scott Morton also did not adequately consider the impact of Auvi-Q's complete recall from the market. *Id.* at 16-18. Mr. Zieziula explains based on his experience the "uphill battle" a pharmaceutical company faces in relaunching a product after a recall, which Dr. Scott Morton failed to consider in projecting Sanofi's hypothetical future market

share. *Id.* Mr. Zieziula further opines that Sanofi's conduct in 2015, in particular its ███████

███████████████████████████████████████ is inconsistent with Dr. Scott

Morton's claim that Mylan's conduct is what caused Sanofi to return the rights to Auvi-Q to the

inventor. *Id.* at 18.

## ARGUMENT

### I.      Mr. Zieziula Is Qualified To Offer His Expert Opinions

As part of the *Daubert* gatekeeping function, a district court should conduct "a preliminary

inquiry into the expert's qualifications" to ensure that the proffered testimony "has 'a reliable basis

in the knowledge and experience of his [or her] discipline.'" *Bitler v. A.O. Smith Corp.*, 400 F.3d

1227, 1233 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592

(1993)); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). Federal Rule of Evidence

702 imposes a "liberal standard . . . regarding expert qualifications." *United States v. Gomez*, 67

F.3d 1515, 1526 (10th Cir. 1995); Fed. R. Evid. 702 advisory committee's note to 1972 proposed

rules ("[W]ithin the scope of the rule are not only experts in the strictest sense of the word, e.g.,

physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses,

such as bankers or landowners testifying to land values."); *see United States v. Johnson*, 575 F.2d

1347, 1360 (5th Cir. 1978) (finding no error in admitting expert testimony based solely on

experience with no special training or education). The basis of an expert's qualification "can be

practical experience as well as academic training and credentials." *Am. Tech. Res. v. United States*,

893 F.2d 651, 656 (3d Cir. 1990). Despite conceding that *Daubert* sets a "low threshold" for expert

qualification, *see* Sanofi Opp. to Mylan's Mot. to Exclude Testimony of Eduardo Schur, ECF No.

1797, at 4, Sanofi challenges Mr. Zieziula's qualifications to testify as an expert witness. But Mr.

Zieziula's decades of experience in pharmaceutical sales and marketing and product

commercialization at numerous pharmaceutical companies provides more than a sufficient basis to offer his opinions. Sanofi's arguments to the contrary lack merit.

### A.    Mr. Zieziula's Industry Experience Qualifies Him To Offer His Opinions

Sanofi vaguely asserts that Mr. Zieziula is "unqualified to offer a number of the opinions found in his expert report[s]," but identifies only three specific opinions that purportedly go beyond Mr. Zieziula's expertise. Sanofi Br. 8. *First,* Sanofi argues that Mr. Zieziula is not qualified to offer the opinion that "Sanofi made 'unsupported comparative claims . . . without the appropriate data to substantiate those claims'" because Mr. Zieziula is not a "regulatory expert." *Id.* at 9-10 (quoting Countercl. Rep. 4). But Sanofi is wrong to suggest that Mr. Zieziula's deposition testimony about the scope of his regulatory expertise is dispositive. Mr. Zieziula testified that he would defer to "regulatory experts" on the specific question of what constitutes a comparative marketing claim, *see* Sanofi Br. Ex. 1 (Zieziula Dep.) at 47, not the question whether Sanofi complied with industry standards in its development and use of the preference study and response to FDA feedback.  Sanofi seeks to use Mr. Zieziula's disclaimer of expertise on the former issue to exclude his opinion on the latter. "[As] tempting though it might be to supplement our traditional case- and fact-specific inquiry with [the] automatic rule that no witness who denies having the requisite expertise may testify," the Tenth Circuit has cautioned that "doing so would risk turning a substantive and serious examination by a district court judge about a proffered witness's suitability into a game of gotcha, allowing lawyers to set cross-examination traps for unwary individuals who do not make their living testifying in court but who nonetheless may have a very great deal to offer fact finders." *Watson v. United States*, 485 F.3d 1100, 1105–06 (10th Cir. 2007) (affirming admission of expert testimony).

Moreover, regulatory experience is not required to offer the opinion that Sanofi did not comply with industry standards in developing its patient preference study, ████████████████

██████████████, and improperly using the study to promote Auvi-Q. This is an opinion about commercialization, not regulatory law, and Mr. Zieziula bases it on his substantial experience bringing multiple new products to market, developing and overseeing marketing campaigns, participating in the decision whether to conduct a head-to-head study to support a marketing campaign, and overseeing regulatory departments to ensure adherence of sales and marketing personnel to FDA regulations. *John McClelland & Assocs., Inc. v. Med. Action Indus., Inc.*, No. 04-2545-CM-2006 WL 3333061, at *3 (D. Kan. Nov. 15, 2006) ("eighteen years experience in the healthcare-products industry," including oversight of sales representatives and consultant work, qualified expert to testify about "customs and practices in the health-care products industry").

Mr. Zieziula's opinion that Sanofi did not comply with industry standards when it made promotional claims ██████████████—an opinion he is qualified to offer based on his own years of experience launching new products and overseeing promotional campaigns—will assist the jury in determining whether Sanofi made false or misleading promotional claims, and whether it did so intentionally. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010) (district court was "plainly wrong" to preclude expert with "forty years of experience in the marketing and advertising industry" from testifying that basic investigation of use of trademark was standard industry practice, which was relevant to jury's determination of defendant's good faith); *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 455 (S.D.N.Y. 2012) (presumption of deception arises from deliberate conduct in Lanham Act cases).

*Second*, Sanofi argues that because Mr. Zieziula is not a physician, patient, or payor, he is not qualified to opine on whether Sanofi's promotional messages were likely to impact EAI

prescribing or purchasing decisions. Sanofi Br. 10. In making this claim, Sanofi is effectively arguing that marketing executives at pharmaceutical companies design promotional strategies without having any idea whether those promotions will impact prescriptions and sales. That argument defies logic, and indeed Sanofi cites no authority for the incredible assertion that only physicians or consumers are qualified to offer opinions about the likely impact of promotional messages in the pharmaceutical industry. To the contrary, courts frequently permit marketing experts to offer opinions about the importance of certain marketing strategies and the likely effects on its targets. *Merisant Co. v. McNeil Nutritionals, LLC,* 515 F. Supp. 2d 509, 541 (E.D. Pa. 2007) ("[W]hen an issue before the court pertains to the effect of a marketing and advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies.") (collecting cases and denying motion to exclude marketing expert); *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 2436, 2016 WL 807377, at *4-6 (E.D. Pa. Mar. 2, 2016) (marketing expert qualified to opine on defendant's efforts to build Tylenol brand and "how marketing to physicians affected their perception of Tylenol products"); *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, No. 13-2451 (DWF/SER), 2016 WL 5496340, at *17 (D. Minn. Sept. 28, 2016) (marketing expert permitted to opine about importance of sales people in consumer decision-making process in mattress industry). Mr. Zieziula's extensive pharmaceutical sales and marketing experience easily qualifies him to offer an opinion about the marketing strategies that tend to have an impact on branded drug prescriptions.

*Third*, Sanofi argues that Mr. Zieziula is not qualified to offer any opinions about "lack of 'anticompetitive activity' by Mylan." Sanofi Br. 10-11. This argument—which relates to the Antitrust Report—mischaracterizes both Mr. Zieziula's opinions and his professed expertise. As described above, the main opinion offered in Mr. Zieziula's Antitrust Report—an opinion which

Sanofi barely acknowledges and does not move to exclude as unreliable or unhelpful—is that Sanofi's *own conduct* and business strategies contributed to Auvi-Q's lack of success in 2014. Antitrust Rep. 6-15. In explaining the basis for that opinion, Mr. Zieziula highlighted based on his review of the record that Mylan—unlike Sanofi—was more "willing and able to quickly respond to requests from PBMs and insurers for deeper rebates," which Mr. Zieziula explains is "part of competing on the merits in the pharmaceutical industry," and "consistent with common practice in the industry and what would be expected from any competitor." *Id.* at 12-13.

Mr. Zieziula offers this opinion not as an antitrust expert, as Sanofi suggests, but as an industry expert with personal experience launching new pharmaceutical products, responding to competition in the pharmaceutical industry, and negotiating rebates with payors. He describes the specific experiences on which he draws to reach his opinions, including his own negotiations with large PBMs and his attempts to secure favorable formulary coverage for EMD Serono's fertility product. *E.g.*, *id.* at 8 ("[I]t is very common for the PBMs to pit one company against the other and extract deep discounts/rebates. I experienced [competition between two companies for rebates] in the Fertility segment."); *id.* at 12 ("In my experience at EMD Serono as the President…I would have made it a priority to be very involved in final decision making for the top PBMs…and was directly involved in particular with negotiations with ESI, one of the largest PBMs."). "[C]ourts routinely admit testimony from industry experts related to the business practices in those industries." *United States v. Schiff*, 538 F. Supp. 2d 818, 846 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010). Moreover, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004), and "[a]cts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of

Section 2." *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984).[4]  Mr. Zieziula's opinion that Mylan's rebating negotiations with payors were "consistent with common practice in the industry and what would be expected from any competitor," Antitrust Rep. 13, fall within the scope of his expertise and will assist the trier of fact in evaluating Sanofi's claims.

Finally, that Mr. Zieziula is not an "expert in EAI devices," *see* Sanofi Br. 10, does not render him unqualified to offer expert opinions in a case involving EAI devices. Mr. Zieziula's opinions are based on his expertise in pharmaceutical sales and marketing, commercialization, and corporate leadership generally—including his involvement in the launch of at least nine different branded drug products—as applied to the facts of this case. Even if there were something unique about industry practices relating to anaphylaxis as compared to other disease states (and there is not), "[a] lack of specialization does not affect the admissibility of the opinion, but only its weight." *Corr v. Terex USA, LLC*, No. 08-1285-MLB, 2011 WL 976718, at *4 (D. Kan. Mar. 17, 2011) (rejecting argument in products-liability case that safety systems engineer needed prior experience with MS-3 paving machine to opine on defective design) (quoting *Wheeler v. John Deere Co*., 935 F.2d 1090, 1100–01 (10th Cir. 1991) (collecting cases); *Butler Nat'l Serv. Corp. v. Navegante Grp., Inc.,* No. 09-2466-JWL, 2011 WL 4452505, at *3 (D. Kan. Sept. 26, 2011) (rejecting argument that opinion based on practice of Nevada gaming companies could not apply to Kansas gaming companies where movant showed no differences between those gaming industries).

### B.      Mr. Zieziula's Opinions Are Not Unreliable Simply Because They Were Generated For The Purposes Of Litigation

As part of its argument that Mr. Zieziula is not a qualified expert, Sanofi argues that Mr. Zieziula's opinions are "inherently unreliable" because they "do not stem from his own

---

[4] *See also* Brief of Appellees Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. at 54, *Eisai, Inc. v. Sanofi-Aventis U.S. LLC*, No. 14-2017 (3d Cir. Oct. 2, 2014) (making same argument).

independent research" but instead "were generated solely for this litigation." Sanofi Br. 11-12

(citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir 1995)). But when an

expert applies his or her experiences to the facts of a particular case, he necessarily creates an

opinion solely for litigation, and courts regularly permit experts to offer such testimony. *E.g.*, *Smith*

*v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) (affirming district court's decision to

permit ergonomics expert and safety consultant to opine, based on experience and review of

depositions and discovery materials, that defendant did not conduct appropriate analyses for

developing and marketing milling machine); *Holt v. Wesley Med. Ctr., LLC.*, No. 00-1318-JAR,

2004 WL 1636571, at *4-5 (D. Kan. July 19, 2004) (allowing nurse to offer "non-scientific expert

testimony" based on experience and review of evidence); *Schwab v. Philip Morris USA, Inc.*, 449

F. Supp. 2d 992, 1152 (E.D.N.Y. 2006), *rev'd on other grounds McLaughlin v. Am. Tobacco Co.*,

522 F.3d 215 (2d Cir. 2008) (rejecting as "not convincing" argument that experienced marketing

expert's opinions should be excluded because they "were created for litigation," never "published

or peer-reviewed," and "not supported by any expert in the field").[5]  Indeed, Sanofi does not cite

a single case in which a non-scientific expert's testimony with 40 years' industry experience was

excluded for not having conducted "independent research" related to the topics of his testimony.

    Nor does Sanofi advance its cause by highlighting that Mr. Zieziula does not have a degree

in marketing and has not authored any papers on marketing. It is well-established law that "[e]xpert

opinion may be based entirely on experience," as Mr. Zieziula's marketing opinions are here.

---

[5] *See also In re Tylenol*, 2016 WL 807377, at *5 ("A marketing professional's review and analysis of
company documents to extrapolate marketing strategies, coupled with the expert's experience and
background may be enough to establish that the expert's methodology is reliable."); *Goldberg v. 401 North
Wabash Venture LLC,* No. 09 C 6455, 2013 WL 212912, at *5 (N.D. Ill. Jan. 18, 2013) ("Levin's analysis
is not inherently unsound because he draws upon his experience and industry knowledge rather than a
proven formula, surveys, or established data.").

*Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 724 (E.D. Mich. 2015) (rejecting argument that industry expert with 35 years' experience should be excluded from testifying "because he [was] not recently published" and listed no articles citing him as an expert); Fed. R. Evid. 702, advisory committee's notes to 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). And the fact that Mr. Zieziula has not held a position that "solely" focused on commercialization (as opposed to a leadership position with responsibilities for numerous departments including commercialization) "affect[s] the weight, not the admissibility of his testimony." *Wheeler*, 935 F.2d at 1101; *Holt*, 2004 WL 1636571, at *4 (holding that "alleged gap" in qualifications goes to weight, not admissibility).

Lastly, Sanofi's suggestion (Sanofi Br. 2) that Mr. Zieziula is somehow less qualified to offer opinions in this case because he has never testified as an expert before defies reason. As the Tenth Circuit counseled in *Watson*: "[I]t would hardly benefit the legal system to exclude from the stand self-deprecating individuals who rarely testify but have the expertise to do so in favor of those who are more extravagant and savvy to the legal system or who may make their living testifying in our courts." 485 F.3d at 1106.

## II.    Mr. Zieziula's Opinions On Mylan's Counterclaims Are Reliable

Sanofi next argues that certain opinions in Mr. Zieziula's Counterclaims Reports are unreliable.[6] The district court has "the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire*, 526 U.S. at 158. Where, as here, an expert's opinions are based on experience, not

---

[6] Sanofi does not challenge any specific opinions in the Antitrust Report as unreliable. Sanofi moves to exclude Mr. Zieziula's opinions in the Antitrust Report only on grounds that Mr. Zieziula is not an "antitrust expert," an argument that the Court should reject for the reasons explained above.

scientific or technical analysis, courts must consider whether the expert "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments; *see In re Commercial Fin. Servs., Inc.,* 350 B.R. 559, 567 (Bankr. N.D. Okla. 2005). Mr. Zieziula's opinions, which is based on his experience and tied to the facts of this case, easily satisfy this standard.

### A.     Mr. Zieziula Does Not Opine That Sanofi's Advertisements Were Misleading

Mr. Zieziula does not actually offer the first opinion that Sanofi claims to challenge. Sanofi suggests that Mylan is attempting to prove through Mr. Zieziula's testimony that Sanofi's advertisements were "misleading" under the Lanham Act. That is wrong. As set forth in Mylan's brief in opposition to Sanofi's Motion for Summary Judgment ("Opposition Brief"), because Sanofi's marketing statements were literally false, Mylan is not required to provide extrinsic evidence of consumer confusion through expert or fact testimony or other evidence. Mylan MSJ Opposition Br. 85. Moreover, as Mylan establishes in its Opposition Brief, consumer confusion need not be shown through a survey or in the form of a statistical analysis, but instead can be demonstrated through other extrinsic evidence in the record. *Id.* at 86-87. And in any event, survey evidence exists in the factual record, *see id.* at 86. Mr. Zieziula does not offer an opinion in his reports regarding whether Sanofi's promotional messages were actually false or misleading under the Lanham Act, and he will not offer any such opinion at trial.[7]

---

[7] Although Mr. Zieziula testified that he was asked to offer an opinion on falsity, *see* Sanofi Br. Ex. 1 (Zieziula Dep.) at 399-400, he offers no such opinion in his reports, which do not even include the word "false." *See Watson*, 485 F.3d at 1105–06 (deposition testimony not dispositive of scope of expert's opinion).

B.      **Mr. Zieziula's Opinions Concerning The Prevalence Of Sanofi's Messaging Are Reliable**

Sanofi next argues that Mr. Zieziula's opinion that Sanofi widely disseminated the challenged promotional statements is not "scientifically sound." Sanofi Br. 15. Sanofi again mischaracterizes Mr. Zieziula's opinion. Mr. Zieziula did not purport to conduct a scientific, statistical analysis of Sanofi's marketing statements, but rather opines based on his experience that the record evidence shows widespread promotional practices. His opinions are reliable because he "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Fed. R. Evid. 702, advisory committee notes to 2000 amendments; *Bouygues Telecom, S.A. v. Tekelec,* No. 4:05-CV-78-FL, 2007 WL 4699237, at *3 (E.D.N.C. Feb. 5, 2007) (expert may "appropriately examine[] what actually occurred in comparison with his experience in the field").

Mr. Zieziula explains based on his marketing and leadership experience how the record evidence demonstrates the widespread nature of Sanofi's unsupported comparative promotional campaign. *First,* he notes "based on [his] many years of experience as a pharmaceutical executive that because Sanofi's "senior leader . . . failed to set the right tone at the top" by publicly stating that Auvi-Q was more patient-friendly than EpiPen, "then it is not surprising to see such claims being made throughout the organization." Countercl. Reply Rep. 3. *Second,* he explains the significance of seeing the "catch phrase" "████████████████████████ appear in documents throughout different departments of the company, as that indicates an awareness of the phrase by the brand team, even if that phrase does not appear in formal marketing or training materials. Countercl. Reply Rep. 3; *see* Countercl. Rep. 7-8. *Third,* he describes his review of Mylan's competitive intelligence reports from its field force, explaining that he views the field force as "a pharmaceutical company's eyes and ears on the ground" and the best source of "real-

17

time data" from physicians. Countercl. Reply Rep. 7. He notes that "field force reports are especially helpful in identifying broad marketing messaging" and that "[p]harmaceutical companies routinely rely on competitive intelligence reports . . . to determine what messages competitors are deploying in the field." *Id.*

*Fourth,* Mr. Zieziula looks to Sanofi's own Awareness Trial and Usage studies (ATUs), which he explains are a specific kind of survey, conducted in several waves over time, commonly used by "pharmaceutical companies [to] track awareness, trial and usage of launch brands, and message recall from physicians." Countercl. Rep. 6. Sanofi takes issue with Mr. Zieziula's reliance on ATU studies to support his conclusions, arguing that the ATUs—which Sanofi commissioned,

███████████████████████████████████████████████████████████████████████

████████████████—are not a "trustworthy" source of data on which Mr. Zieziula can rely. Sanofi Br. at 17. This argument misses the mark for two reasons. *First*, it is "difficult … to take seriously 'trustworthiness' challenges to a survey made by the *very party that commissioned and used the survey in the first instance*." *BoDeans Cone Co. v. Norse Dairy Sys., L.L.C.*, 678 F. Supp. 2d 883, 904 (N.D. Iowa 2009) (emphasis added). *Second*, Mr. Zieziula relies on these surveys because they are precisely the type of document he routinely relied upon as an executive at a pharmaceutical company to assess sales force messaging. Countercl. Rep. 6; Countercl. Reply Rep. 3 (ATU studies and message recall tracker surveys are "relied upon by pharmaceutical companies" to "determine what messages the sales force is deploying in the field, and to assess whether those messages are impacting physician and/or consumer choices"). Indeed, Sanofi also relied on these surveys in the ordinary course of its business—████████████████████████████████████████████

████████████████. Mylan MSJ Opposition Br. 77-80 & SAMF ¶¶ 138, 141-44.

Sanofi argues that the ATUs cited by Mr. Zieziula "do not [] show that Sanofi made misleading or false comparative statements to a single physician." Sanofi Br. 16. That misstates the record, as Mr. Zieziula provides specific examples of how Sanofi's own studies—including ATUs, message recalls surveys, and Brand Impact Analysis reports—led him to conclude that Sanofi's use of the challenged statements in its marketing campaign was widespread. *E.g.* Countercl. Reply Rep. 2-7 (summarizing key evidence supporting his opinions). For example, he explains that he reviewed verbatim responses from the surveys, which were "chock full of comparative claims," *id.* at 4, and provides examples of physicians recalling the very statements at issue in the counterclaims. *E.g.* Countercl. Rep. 9 (████████████████████████████

███████████████████████████     Countercl. Reply Rep. n.11 (██████████

████████████████████████████████████████████████████

███   ).[8] And in any event, such an attack is a topic for cross-examination, not grounds for excluding expert testimony. *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 442-43 (D. Del. 2007) (permitting expert to testify to opinions and inferences based on numerous sources of evidence and leaving for cross-examination questions about validity of those opinions).

Sanofi selectively quotes an excerpt from Mr. Zieziula's deposition where he agreed that two slides in a single message recall study did not specify *which* comparative claims Sanofi's sales representatives made. Sanofi Br. 16-17. But not only did Mr. Zieziula testify that he did not base his opinion concerning Sanofi's widespread use of the challenged statements on "just this single"

---

[8] *See also, e.g.,* Ex. 3 (Auvi-Q Brand Impact Analysis August 2015) at Slide 26 ██████

████████████     Ex. 4 (Auvi-Q Brand Impact Analysis March 2015) at Slide 13 ████

████████████████████████████████████████     ); Ex. 5

(Auvi-Q Brand Impact Analysis June 2015) at Slide 11 ████████████

█████████████████████████████████████████████████

survey, Sanofi Br. Ex. 1 (Zieziula Dep.) at 440, a different slide in the same report (which Mr.

Zieziula was not shown at his deposition) highlights that ███████████████████████

█████████████████████████████████. Ex. 6 (Sanofi Auvi-Q Message Recall

Tracker (W1 2013) (April 2013)) at Slide 30. The other message recall studies and ATUs cited by

Mr. Zieziula contain similar data. Ex. 7 (Physician ATU Research May 2014) at Slide 44 (█████

████████████████████████████████████████████████████████

███████████████████████) and Slide 71 (███████████████████████

████████████████████████████████████████████████████);

Ex. 8 (Sanofi Auvi-Q HCP Message Recall Tracker (W2 2013) (October 2013)) at Slide 16

(████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████).[9]



Sanofi also overlooks that the ATUs are only one of many sources of evidence on which

Mr. Zieziula bases his opinion. Mr. Zieziula testified several times that his "conclusions and

opinions" about Sanofi's widespread use of comparative promotional messages "were based on

the totality of information that [he] was able to gather from a variety of documents and feedback

from [Mylan's sales] reps and feedback from competitive intelligence reports." Sanofi Br. Ex. 1

(Zieziula Dep.) at 439-40; *see also id.* 251. In addition to the specific evidence discussed above,

Mr. Zieziula relied on interviews of two Mylan sales representatives and signed, sworn

declarations from staff at an allergy clinic reporting the use of "new EpiPen" messaging, the

deposition testimony of Mylan and Sanofi witnesses, and Sanofi's pre-market research. Mr.

Zieziula explained the significance of the extensive market research and competitive intelligence

---

[9] *See also, e.g.*, Ex. 9 (Physician ATU Research August 2014), Slides 41, 55; Ex. 10 (Physician ATU Research October 2014, Executive Summary), Slides 29-30.

evidence in the record and drew conclusions based on his decades of pharmaceutical marketing and leadership experience. His opinions satisfy *Daubert*'s reliability requirements. *See In re Tylenol*, 2016 WL 807377, at *5 (finding marketing expert's opinion reliable where based on "review[] and examin[ation] of defendants' own extensive market research and consumer surveys" and "synthesi[s]" of materials).

### C.     Mr. Zieziula's Opinions Bearing On Causation Are Reliable

Sanofi challenges Mr. Zieziula's "causation" opinions on the ground that Mr. Zieziula did not conduct an analysis to estimate the specific impact of Sanofi's promotional claims. Sanofi Br. 18-19. But although Mr. Zieziula did not conduct an analysis to *quantify* the harm suffered by Mylan, he does offer two opinions that will assist the jury in determining whether Sanofi's conduct caused Mylan harm. Both opinions are reliably grounded in his experience.

*First*, Mr. Zieziula opines in his Counterclaims Report that "comparative and preference claims" of the type made by Sanofi here "can have a significant impact on how physicians, payers, and patients make decisions on which products to use." Countercl. Rep. 4. He elaborated at his deposition that "misleading comparative messages can have an impact on payers, physicians, and consumers, in terms of their preference for one drug versus another," and "the documents [he] reviewed, and [his] experience," led him to conclude that Sanofi's advertisements would have had an effect, but that he had not estimated how much. Sanofi Br. Ex. 1 (Zieziula Dep.) at 403-05. "Courts regularly permit marketing experts to testify to the role of [marketing strategies]" and the "effects they would expect based upon the facts of any particular case." *Brighton Collectible, LLC v. Believe Prod., Inc.*, No. 2:15-CV-00579-CAS, 2017 WL 440255, at *9 (C.D. Cal. Jan. 30, 2017). In *Brighton,* the court held that a marketing expert's "application of her expertise to the facts of th[e] case would be [] relevant in helping the jury understand the possible effects that could follow from [defendant's marketing practices]" and that her "failure to conduct a consumer study" to

prove causation did "not undermine the reliability" of her opinion or render it irrelevant. *Id.* That Mr. Zieziula did not opine about the extent of the harm caused to Mylan by Sanofi's improper marketing claims—as opposed to the *fact* of the harm—similarly does not render his opinion unreliable.

*Second*, and for the same reasons, Mr. Zieziula's opinion that Sanofi's claims that Auvi-Q was the "'new EpiPen' would be harmful to . . . the brand equity of EpiPen" is reliable.  Countercl. Rep. 10. Mr. Zieziula draws on years of experience "set[ting] the strategy for brands on the market, and [overseeing] the launch of new brands," *id.* at 3, to explain that "[b]rand equity is built over time based on a brand delivering the desired results consistently" and that "the brand equity of a pharmaceutical product plays a big role in a physician's willingness to prescribe that product." *Id.* at 10. Thus, he opines, Sanofi's marketing of Auvi-Q as the "new EpiPen," when "Auvi-Q and EpiPen are not the same," "would be harmful to Mylan."  *Id.* That Mr. Zieziula did not quantify the harm suffered by the brand does not render his opinion unreliable, *Brighton Collectible*s, 2017 WL 440255, at *9, as "[t]here is no requirement" that an expert offering an opinion about brand devaluation "quantify the harm suffered by the brand." *Adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 4279812, at *9 (D. Or. Sept. 12, 2008).[10]

## III.    Mr. Zieziula's Opinions Will Be Helpful To The Trier Of Fact

Sanofi's final argument—that Mr. Zieziula's opinions will not be helpful to the trier of fact—lacks merit. To set up the argument that Mr. Zieziula is a "self-identified 'expert on the facts,'" Sanofi Br. 20, Sanofi pulls a single quote from Mr. Zieziula's deposition out of context. The quoted testimony concerns only one input (out of many) to one opinion (out of three) in one

---

[10] *See also Bouygues Telecom,* 2007 WL 4699237, at *4 (rejecting motion to exclude expert whose "conclusions regarding harm to brand image. . . [were] not clearly linked to the number of lost customers" because "the translation of harm to brand image into monetary damages must necessarily rely on lost customers or some other quantitative measure").

report (the Antitrust Report—it did not relate to his Counterclaims Reports at all). Mr. Zieziula opined that "Sanofi's ability to effectively compete was impacted by the ████████████████ ████████████████████████. Antitrust Rep. 3. He based this opinion on his (1) review of documents showing ███████████████████; (2) experience managing products with high costs and low profit margins, which he explained affect a company's ability to successfully launch a product; and (3) review of documents and testimony indicating ████████████████ ████████████████. *Id.* at 5-6. When asked at his deposition whether he had an independent opinion beyond his review of the record regarding ████████████████████████ ████ he said he did not. Sanofi Br. Ex. 1 (Zieziula Dep.) at 193-97. That Mr. Zieziula tied his opinion to the record facts—as experts must do—does not make him only "an expert on the facts." Sanofi Br. 20; *see Watson*, 485 F.3d at 1105-06. His opinion that pharmaceutical companies are "challenged" in a "low margin scenario," and that budgetary "pressure[s]" impact the rebate negotiations and marketing efforts necessary to launch a successful product is not within a layperson's common knowledge and will assist the jury in evaluating why Sanofi struggled to succeed with its new product.

Not only does the testimony cited by Sanofi fail to undermine the above opinion, it has no bearing whatsoever on the numerous other opinions offered by Mr. Zieziula. Sanofi identifies no aspects of Mr. Zieziula's other five key opinions (two additional opinions in the Antitrust Report, and three opinions in the Counterclaims Reports) as merely reciting the facts, but nonetheless attempts to convert this piece of testimony about one factual issue into a global admission about the value of Mr. Zieziula's opinions. This Court should reject Sanofi's attempt to transform an isolated admission to the entirety of Mr. Zieziula's opinions.

Finally, Sanofi asserts that Mylan is attempting to use Mr. Zieziula's testimony as a conduit to introduce inadmissible evidence. Sanofi Br. 20-21. Sanofi fails to identify the specific evidence with which it takes issue, other than to refer generally to "hearsay and several unauthenticated handwritten notes." *Id.* at 21. Mylan addresses the admissibility of the evidence in support of its counterclaims in its Opposition Brief (at 77-80, 91-92), but to the extent that any portion of Mr. Zieziula's opinions are based in part on inadmissible testimony, Federal Rule of Evidence 703 permits such reliance so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see Black v. M & W Gear Co.*, 269 F.3d 1220, 1229 (10th Cir. 2001) (holding that trial court did not abuse discretion in permitting expert to testify based on inadmissible article on which he reasonably relied). Mr. Zieziula explains in his Counterclaims Reports that the various information he relied on—market research surveys, verbal and written competitive intelligence reports from Mylan's sales representatives in the field, conversations with Mylan sales representatives, and handwritten notes all containing the same promotional messages—are precisely the sort of information he relied on as a pharmaceutical executive "to determine whether a competitor's messaging campaign was widespread." Countercl. Rep. 11. Because industry experts—including Sanofi's own executives[11]—reasonably rely on this type of information in forming opinions about the content and scope of pharmaceutical marketing messages, Mr. Zieziula was entitled to rely on such evidence here.

---

[11] *See* Mylan Opposition Br. SAMF ¶¶ 138, 141-44 (citing evidence that Sanofi analyzed and drew inferences from survey research to evaluate effectiveness of promotional messaging for Auvi-Q).

## <u>CONCLUSION</u>

The Court should deny Sanofi's motion to exclude the expert reports and testimony offered by Gary Zieziula.

Dated: August 9, 2019

Respectfully submitted,

s/  *Philip A. Sechler*
Philip A. Sechler

Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510
psechler@robbinsrussell.com
kzecca@robbinsrussell.com
lfriedman@robbinsrussell.com
rmayrell@robbinsrussell.com
jettinger@robbinsrussell.com
jgoerlich@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and
Defendant/Counterclaim Plaintiff Mylan
Specialty L.P.*

## CERTIFICATE OF SERVICE

On this 9th day of August, 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each attorney registered for ECF notification to the counsel of record in this case.

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4492
Fax: (202) 775 4510
psechler@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and*
*Defendant/Counterclaim Plaintiff Mylan*
*Specialty L.P.*