UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |
| SANOFI-AVENTIS U.S., LLC,<br><br>                Plaintiff,<br>      v.<br>MYLAN INC., et al.,<br><br>                Defendants.<br><br>*This Document Relates to the* Sanofi *case.* | CASE NO. 2:17-CV-02452-DDC-TJJ<br><br>*Document Filed Electronically* |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO SANOFI'S MOTION TO EXCLUDE THE EXPERT
<u>REPORTS AND TESTIMONY OFFERED BY MYLAN'S EXPERT THOMAS VARNER</u>**

Philip A. Sechler
Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510

*Counsel for Defendant Mylan Inc. and
Defendant/Counterclaim Plaintiff Mylan
Specialty L.P.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.    Dr. Varner's Opinions Will Assist the Jury in Calculating Mylan's Recovery .................. 4

II.    Dr. Varner's Opinion About Mylan's Capacity to Supply Additional Devices Is Reliable and Will Assist the Jury ....................................................................................... 9

CONCLUSION .................................................................................................................. 12

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Banjo Buddies, Inc. v. Renosky*,
   399 F.3d 168 (3d Cir. 2005)..................................................................................................5

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) .......................................................................................9

*Brunswick Corp. v. Spinit Reel Co.*,
   832 F.2d 513 (10th Cir. 1987) ..............................................................................................6

*Caesars World, Inc. v. Venus Lounge, Inc.*,
   520 F.2d 269 (3d Cir. 1975)..................................................................................................6

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
   284 F.3d 302 (1st Cir. 2002) .................................................................................................4

*Cochrane v. Schneider Nat'l Carriers, Inc.*,
   980 F. Supp. 374 (D. Kan. 1997) ..........................................................................................9

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ................................................................................................9

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
   311 F. Supp. 3d 653 (S.D.N.Y. 2018)...................................................................................9

*First Sav. Bank, F.S.B. v. U.S. Bancorp*,
   117 F. Supp. 2d 1078 (D. Kan. 2000) ...................................................................................9

*Ford Motor Co. v. ThermoAnalytics, Inc.*,
   No. 14-cv-13992, 2016 WL 1465015 (E.D. Mich. Apr. 14, 2016) .....................................12

*Gaur v. City of Hope*,
   No. 11-cv-00651, 2012 WL 12919354 (C.D. Cal. Sept. 19, 2012) ......................................7

*Gen. Steel Domestic Sales, LLC v. Chumley*,
   627 F. App'x 682 (10th Cir. 2015) ...................................................................................2, 5

*Krys v. Aaron*,
   112 F. Supp. 3d 181 (D.N.J. 2015) .....................................................................................11

*Larson v. Wisconsin Cent. Ltd.*,
   No. 10-cv-446, 2012 WL 359665 (E.D. Wis. Feb. 2, 2012).................................................7

## TABLE OF AUTHORITIES—CONTINUED

**Page(s)**

*Marten Transp., Ltd. v. Plattform Advert., Inc*,
  No. 14-cv-2464, 2016 WL 4000927 (D. Kan. July 26, 2016) ..................................................6

*Pound v. Airosol Co.*,
  368 F. Supp. 2d 1210 (D. Kan. 2005) ........................................................................................2

*RMD, LLC v. Nitto Americas, Inc.*,
  No. 09-cv-2056, 2012 WL 5398345 (D. Kan. Nov. 5, 2012) .....................................................5

*Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*,
  No. 2:15-cv-512, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ...............................................5

*Sawyer v. Southwest Airlines Co.*,
  243 F. Supp. 2d 1257 (D. Kan. 2003) ........................................................................................3

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
  29 F.3d 137 (4th Cir. 1994) .......................................................................................................9

*United States v. Affleck*,
  776 F.2d 1451 (10th Cir. 1985) ...............................................................................................10

*United States v. Dentsply International, Inc.*,
  No. 99-cv-5, 2000 WL 654378 (D. Del. May 10, 2000) .........................................................11

*Verisign, Inc. v. XYZ.COM LLC*,
  848 F.3d 292 (4th Cir. 2017) .....................................................................................................9

**Statutes**

15 U.S.C. § 1117(a) ...........................................................................................................1, 2, 5

**Rules**

Fed. R. Civ. P. 26 ......................................................................................................................3, 11

Fed. R. Evid. 702 ........................................................................................................................1, 5, 6

## INTRODUCTION

Sanofi's motion to exclude Mylan's counterclaim damages expert, economist Thomas Varner, boils down to one principal argument: That a damages expert who does not opine on causation or quantify damages is necessarily unreliable and unhelpful to the jury. Sanofi Mem. in Supp. of Mot. to Exclude Expert Rep. and Testimony Offered by Thomas Varner 1-2, 5-11 (June 28, 2019), ECF No. 1677 ("Mot."). Sanofi is wrong. For one thing, an expert need not opine on *causation* to "help the trier of fact" calculate *damages*. Fed. R. Evid. 702. Nor must an expert provide his own calculation of damages attributable to a defendant's conduct. Instead, a damages expert may help the jury by providing a tool with which it can calculate damages based on its own factual determinations. That is precisely what Dr. Varner has done here: He has provided the jury with upper ranges on Sanofi's sales (from which Mylan seeks to disgorge Sanofi's profits) and Mylan's lost profits (which Mylan seeks as damages). And he has it left to the jury to determine—as it is solely the jury's province to do—what percentage of those upper ranges is attributable to Sanofi's conduct. His opinion easily satisfies the standard for admissible expert testimony under *Daubert* and Rule 702.

## BACKGROUND

Mylan's counterclaims for violations of the Lanham Act and common law unfair competition allege that Sanofi engaged in false and misleading advertising and unfair business practices, targeted at EpiPen® Auto-Injector ("EpiPen"), and that this conduct injured Mylan. Mylan Answer & Counterclaims 33-54 (Jan. 16, 2018), ECF No. 112. The Lanham Act provides several measures of recovery for plaintiffs, including the "defendant's profits," the plaintiff's "damages," and the plaintiff's "costs of the action." 15 U.S.C. § 1117(a). "In assessing [defendant's] profits" for disgorgement, "the plaintiff shall be required to prove defendant's sales

only; defendant must prove all elements of cost or deduction claimed." *Id.* Courts interpret this as creating a "burden-shifting framework" for disgorgement of defendant's profits that "requires [plaintiffs] to prove [defendants'] gross profits during the period in question and [defendants] to prove which portion of those profits wasn't attributable to its Lanham Act violations." *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 686 (10th Cir. 2015) (Gorsuch, J.) (affirming). In determining plaintiff's lost profits, however, the burden is reversed. To recover lost profits, a plaintiff makes "a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation, and, furthermore, that evidence of the amount of damages may be circumstantial and inerrant." *Pound v. Airosol Co.*, 368 F. Supp. 2d 1210, 1216 (D. Kan. 2005).

Dr. Varner's opinions relate to Mylan's claim for (1) disgorgement of any profits Sanofi earned on Auvi-Q, and (2) damages sustained in the form of Mylan's lost profits on EpiPen. Dr. Varner offers two tools to assist the jury in calculating these two measures of recovery: First, in connection with disgorgement of Sanofi's profits, Dr. Varner calculates Sanofi's total gross sales from Auvi-Q. Mot., Ex. 1 ¶ 32; *see* 15 U.S.C. § 1117(a) (requiring that plaintiff seeking disgorgement "prove defendant's sales only"). As the Lanham Act provides, he leaves for Sanofi to "prove all elements of cost or deduction claimed" from those sales and to "prove which portion of those profits wasn't attributable to its Lanham Act violations." *See* 15 U.S.C. § 1117(a); *Gen. Steel*, 627 F. App'x at 686.

Second, in connection with Mylan's claim for lost profits, Dr. Varner calculates Mylan's lost profits on EpiPen. Mot., Ex. 1 ¶¶ 33-44. He starts from an assumption that all sales of Auvi-Q were the result of Sanofi's false and misleading marketing, and that, had Sanofi not made those sales, physicians would have prescribed a different epinephrine auto-injector ("EAI"). *Id.* ¶ 34. He

2

then apportions Auvi-Q sales between EpiPen and other EAIs in proportion to their share of EAI prescriptions over time (*id.* ¶¶ 35-37) and uses a regression model to calculate Mylan's incremental and total lost profits for the units he apportions to EpiPen. *Id.* ¶ 43. Dr. Varner further confirms that Mylan had the capacity to supply all the units apportioned to EpiPen based on a quantitative analysis of historical EpiPen sales volumes, the fact that Mylan supplied EpiPen devices to replace defective Auvi-Q devices after the recall, a review of internal Mylan and Meridian[1] documents, and discussions with a Mylan employee responsible for EpiPen supply. *Id.* ¶¶ 38-42.

Dr. Varner does not offer an affirmative opinion on causation, but he does challenge the reliability of the opinion offered by Sanofi's damages expert, Steven Wiggins, that Sanofi's conduct had ▓▓▓▓▓▓▓▓▓▓▓▓ on Auvi-Q sales. Ex. 5 (Wiggins Dep.) Tr. 11.[2] Dr. Varner also does not quantify what portion of Mylan's lost profits were caused by Sanofi's misleading conduct. Mot., Ex. 2 ¶ 37; Ex. 1, Tr. 64 ("I'm not quantifying the percentage" of damages attributable to Sanofi's conduct); *id.* at Tr. 105 ("[I]t's probably not a hundred percent of their sales … that would not have occurred, but … it's not zero percent either."). He expressly stated in his Rebuttal Report that "[t]he full extent of this impact is ultimately a question for the jury to make…." Mot., Ex. 2 ¶ 37. He reiterated this position in a supplemental disclosure served after his deposition. Mot., Ex. 10.[3]

---

[1] Meridian is the division of Pfizer that manufactures the EpiPen.

[2] To the extent any of Dr. Varner's testimony or reports could be read to offer an affirmative opinion on causation or quantify the portion of damages attributable to Sanofi's conduct, Mylan represents that Dr. Varner will not offer such an opinion at trial.

[3] Sanofi also asks the Court to strike Dr. Varner's supplemental disclosure. Mot. 4 n.2. Dr. Varner's supplemental disclosure was required under Rule 26(e). Fed. R. Civ. P. 26(e)(2) ("the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition"). It reflects a correction to counsel's instruction to Dr. Varner about the law, and, as his supplement makes clear, does not revise or supplement his opinion in any way. Mot., Ex. 10. Dr. Varner will not testify about the correct interpretation of the Lanham Act. *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1268-69 (D. Kan. 2003) ("[O]pinions which merely give legal conclusions or allow the witness to tell the jury what result to reach are not permitted."). Sanofi's request should be denied.

3

**ARGUMENT**

Sanofi moves to exclude Dr. Varner's calculation of Sanofi's revenues and his calculation of Mylan's lost profits. To do so, Sanofi casts Dr. Varner as a causation expert and then complains that he does not opine on causation. But Dr. Varner does not purport to opine on causation. Rather, he provides a useful analysis to assist in a damages calculation. He supplies the jury with the upper ranges of Sanofi's revenues and Mylan's lost profits, as if 100% of Auvi-Q sales were caused by Sanofi's conduct. The jury can then multiply those numbers by the percentage of sales it finds were caused by Sanofi's conduct. Sanofi also moves to exclude Dr. Varner's opinion about Mylan's and Meridian's capacity to supply additional devices, arguing that he is not an expert on manufacturing and relies on limited or inadmissible evidence. Here, too, Sanofi misconstrues Dr. Varner's opinion as being based only on his review of a few documents and his conversation with a Mylan employee, when in fact it is supported by his quantitative analysis of sales data, the type of data typically relied on by an expert performing such a calculation.[4]

**I.  Dr. Varner's Opinions Will Assist the Jury in Calculating Mylan's Recovery**

Sanofi confuses Mylan's burden as a plaintiff, which is to establish that Sanofi caused it injury, with Dr. Varner's role as expert, which has nothing to do with causation. As Sanofi explains (Mot. 5), Mylan does have the burden to establish causation at trial, a burden Mylan can meet through the introduction of record evidence without relying on expert testimony. Mylan Opp. to Sanofi's Mot. for Summary Judgment 76-98 (Aug. 9, 2019) ("Mylan Opp. MSJ"); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 318 (1st Cir. 2002) (rejecting argument that plaintiff could not establish causation in Lanham Act case without expert testimony because

---

[4] Sanofi has not moved to exclude Dr. Varner's rebuttal to the opinion of Eduardo Schur regarding Sanofi's market research surveys (Mot., Ex. 2 ¶¶ 51-55), or his rebuttal opinions to Dr. Wiggins's opinions on damages and causation. Mot., Ex. 2 ¶¶ 9-33.

plaintiff could rely on "anecdotal statements from prospective customers" and factual testimony to establish causation). Damages experts are "permitted to presume causation, which is a prerequisite to recovery that will have to be established at trial by evidence other than [expert] testimony." *RMD, LLC v. Nitto Americas, Inc.*, No. 09-cv-2056, 2012 WL 5398345, at *10 (D. Kan. Nov. 5, 2012). "This principle has been expressed in numerous cases, and it is beyond serious challenge." *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-cv-512, 2017 WL 1319553, at *5 (E.D. Tex. Apr. 10, 2017) (collecting cases). Consistent with these principles, Dr. Varner has offered a narrow opinion that provides data points that will "help the trier of fact," Fed. R. Evid. 702, in quantifying Mylan's recovery by providing: (1) Sanofi's gross sales, the first step in calculating disgorgement of Sanofi's profits, and (2) an upper range on Mylan's lost profits, the first step in calculating Mylan's damages.

**1. Disgorgement of Sanofi's Profits.** Dr. Varner's calculation of Sanofi's revenue in support of disgorgement of Sanofi's profits follows the Lanham Act: Dr. Varner "prove[s] defendant's sales only," leaving to Sanofi to "prove all elements of cost or deduction claimed" and "which portion of those profits wasn't attributable to its Lanham Act violations." *See* 15 U.S.C. § 1117(a); *Gen. Steel*, 627 F. App'x at 686. Sanofi's complaint that Dr. Varner did not quantify the portion of Sanofi's profits attributable to Sanofi's false and misleading advertising is contrary to the plain text of the Lanham Act and Tenth Circuit precedent, which imposes a "burden-shifting framework" that "require[s] [plaintiff] to prove [defendant's] gross profits during the period in question and [defendant] to prove which portion of those profits wasn't attributable to its Lanham Act violations." *Gen. Steel*, 627 F. App'x at 686. The single opinion from a district court in the Third Circuit that Sanofi cites in favor of a different burden is contrary to Third Circuit precedent. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 176 (3d Cir. 2005) ("The District Court accepted

5

[a] report's figure for total sales of [the infringing product].... Thus, [plaintiff's] burden of proof was satisfied."); *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 273 (3d Cir. 1975) ("the defendant carried the burden of proving deductions from gross receipts"). Thus, Dr. Varner, by providing a calculation of Sanofi's revenues, has provided data sufficient to meet Mylan's burden to "prove defendant's sales only" in support of its claim for disgorgement of Sanofi's profits.

**2. Mylan's Damages Measured as Lost Profits.** With respect to damages based on Mylan's lost profits, Dr. Varner's calculation of an upper range of damages assuming all Auvi-Q sales resulted from Sanofi's false and misleading advertising also will "help the [jury]." Fed. R. Evid. 702. For example, the Tenth Circuit in *Brunswick Corp. v. Spinit Reel Co.* explained that a plaintiff had "base[d] its claim for damages on the theory that [it] lost one sale of [plaintiff's product] as a result of each [defendant product] sold." 832 F.2d 513, 526 (10th Cir. 1987). The court "d[id] not necessarily believe that each [defendant] sale resulted in a corresponding loss of sale by [plaintiff]," but accepted that "the theory provide[d] an upper range for an award of damages," allowing the fact-finder to rely on other evidence to find the appropriate amount below that upper range. *Id.* This Court, following *Brunswick*, likewise allowed a plaintiff to start its damages calculation from an assumption that the equivalent in that case of every sale by the defendant "sets an upper range for possible damages, which may be determined by approximation and some degree of speculation," and permitted a jury verdict based in part on that analysis to stand. *Marten Transp., Ltd. v. Plattform Advert., Inc*, No. 14-cv-2464, 2016 WL 4000927, at *10 (D. Kan. July 26, 2016).

Other courts have similarly allowed experts to provide jurors with "tables of potential losses that allow the jury to make a factual determination and thereafter use the table to approximate damages." *Gaur v. City of Hope*, No. 11-cv-00651, 2012 WL 12919354, at *7 (C.D.

6

Cal. Sept. 19, 2012). For instance, in a case where damages were measured as "losses resulting from future years of unemployment," the expert was allowed to provide the jury with "a table depicting damages resulting from unemployment over some number of years, which has been and must be proved by Plaintiff." *Id.* The court permitted this testimony, rejecting any concerns that this opinion "might mislead the jury": "[T]he Court is confident that appropriately tailored jury instructions will abate any danger that her testimony will mislead the jury." *Id.*; *see also Larson v. Wisconsin Cent. Ltd.*, No. 10-cv-446, 2012 WL 359665, at *4 (E.D. Wis. Feb. 2, 2012) (same).

Dr. Varner's measurement of Mylan's lost profits assuming 100% of Auvi-Q sales were the result of Sanofi's false and misleading marketing is precisely such an "upper range," from which a jury can derive a calculation of damages based on other record evidence. For instance, a jury could derive the percentage of sales affected by Sanofi's conduct from Sanofi's own market research, and then multiply that affected sale percentage by Dr. Varner's upper bound. For example, Sanofi's market research ▇▇▇▇ to its sales force's messaging. Ex. 2 at Slides 3, 5. Sanofi market research ▇▇▇▇ Ex. 3 at Slide 7. And October 2013 Sanofi research found ▇▇▇▇ Ex. 4 at Slide 16. A jury could use these figures to determine the percent of sales attributable to Sanofi's unfounded comparative ease of use claims. The jury would then multiply that percentage by Dr. Varner's baseline lost profits for 2013 (Mot., Ex. 1, at Exhibit 1.1) to derive a damages number for 2013. A similar method could be applied for other claims and time periods, and this is just one of many possible ways a jury could go about determining the impact of Sanofi's conduct from the record.

7

Although Mylan has moved to exclude opinions offered by Sanofi's damages expert, Dr. Wiggins, as unreliable, ECF No. 1685, it is notable that even his opinion could support a damages finding by a jury in combination with Dr. Varner's calculations—a fact that Sanofi ignores. If Dr. Wiggins's testimony were permitted despite its serious flaws, a jury could borrow Dr. Wiggins's methodology to measure the portion of sales attributable to Sanofi's conduct, and then multiply that by Dr. Varner's lost profits number. According to Dr. Wiggins, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Mot., Ex. 9 ¶¶ 37-40, 76-81; Ex. 5, Tr. 57, 103-12. However, if Auvi-Q's actual share exceeded Sanofi's forecast, ████████████████████████████████████████████ *See* Mot., Ex. 9 ¶ 77; Ex. 5, Tr. 57-59. ████████████████████████████████████████████████████████████████████████████████████████ Mot., Ex. 9 ¶ 80; Ex. 5, Tr. 103-12. ████████████████████████████████████████████████████████████████ Mylan Opp. MSJ, Stmt. of Add'l Material Facts ¶¶ 172-174. Under Dr. Wiggins's methodology, a jury could conclude that those sales ████████████████ were the result of Sanofi's improper conduct. The jury could then calculate what percentage of all Auvi-Q sales constituted sales ████████████████, and multiply that percentage by Dr. Varner's lost profits number to reach a damages number for 2013.

Sanofi does not challenge the reliability of Dr. Varner's lost profits calculation if taken on its own terms, as one part in the damages analysis as described above. Instead, Sanofi raises the

8

sort of criticisms that are commonly levied at experts who opine on causation. Sanofi's cited cases all relate to experts who not only *assumed* 100% of sales were attributable to the defendants' conduct, but also *opined* that 100% of damages were *caused* by the conduct at issue, which Dr. Varner does not do. For example, the expert excluded in *Verisign, Inc. v. XYZ.COM LLC* "opined that [defendant's] statements sapped [plaintiff's] profits," i.e., causation. 848 F.3d 292, 299 (4th Cir. 2017) (Mot. 5-7). And the expert in *Dependable Sales & Serv., Inc. v. TrueCar, Inc.* opined on the "chain of causation." 311 F. Supp. 3d 653, 659-60 (S.D.N.Y. 2018) (Mot. 5, 10). The rulings in these cases and the others Sanofi cites[5]—which require causation experts to connect conduct to injury (Mot. 5-10) and "consider alternative" and "lawful" reasons for defendant's sales (Mot. 10-11)—apply only to experts who opine on whether and to what extent the challenged conduct caused the alleged injury. They are not relevant to the testimony of an expert who, like Dr. Varner, offers a narrower opinion that does not address causation.

## II. Dr. Varner's Opinion About Mylan's Capacity to Supply Additional Devices Is Reliable and Will Assist the Jury

Sanofi argues that the Court should exclude Dr. Varner's opinion that Mylan had the ability to sell additional devices because he is unqualified, his analysis is unreliable, and he relied on a conversation with an undisclosed witness. Mot. 11-12. None of these arguments withstands scrutiny.

---

[5] *E.g.*, *Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F. Supp. 374, 377 (D. Kan. 1997) (Mot. 5) (excluding opinion that damages were "*because of* [decedent's] death" (emphasis added)); *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000) (Mot. 11) (excluding expert "estimating the financial loss to First Bank *as a result* of the confusion" (emphasis added)); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 143 (4th Cir. 1994) (Mot. 5) (excluding opinion that "delays in construction were *caused by* a lack of, or inefficiencies in the production" (emphasis added)); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (Mot. 11) (excluding medical expert's causation opinion); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 444 (D.N.J. 2009) (Mot. 7-11) ("testimony *in connection with causation* is not admissible because he assumed causation"; "his 'analysis' *blames* false advertising for … 100% of the alleged drop-off in … sales" (emphasis added)).

First, Sanofi contends that Dr. Varner is unqualified and that his opinion is unreliable because his opinion about Meridian's manufacturing capabilities extends "beyond the scope of his expertise" and is "based upon his reading of a handful of documents and conversations with a Mylan fact witness." Mot. 10-12. This mischaracterizes Dr. Varner's opinion. As Sanofi points out, Dr. Varner does not claim to be an expert in pharmaceutical manufacturing. Mot. 11 (quoting Mot., Ex. 3, Tr. 260:23-262:3). Instead, he offers an opinion as an economist—grounded in a thorough analysis of data and documents—that Mylan and Meridian had demonstrated capacity to supply enough devices to meet the additional demand for EpiPen absent Sanofi's conduct. He finds support for his analysis in (1) Mylan's sales data, to determine what months had the highest sales volume, as a benchmark for Mylan's peak capacity (Mot., Ex. 1 ¶ 41); (2) Mylan's sales data reflecting the volume of devices supplied to meet the increased demand for EpiPen when Auvi-Q was recalled (*id.* ¶ 39); (3) documents about Meridian's manufacturing capacity (*id.* ¶ 40); and, (4) interviews with Chris Benson, a Mylan employee responsible for supply-chain logistics for EpiPen. *Id.* ¶¶ 38-40; Mot., Ex. 2 ¶ 46. His analysis of the quantitative sales data is the type of work an economist routinely conducts and constituted far more than "reading a handful of documents" as Sanofi suggests. *United States v. Affleck*, 776 F.2d 1451, 1457 (10th Cir. 1985) (recognizing that "experts commonly seek the … perceptions of others when forming their ultimate opinions," and permitting accountant to testify in part based on expert's interviews with other accountants and former company employees). Dr. Varner's review of Meridian documents and his interviews with Mr. Benson validated his quantitative findings.

Second, Sanofi challenges the reliability of Dr. Varner's opinion. Sanofi's points to Dr. Wiggins's critiques of Dr. Varner's analysis, ███████████████████████████

███████████████████████████████████████████████████████████

10

██████████████████████████████████████. Mot. 12. But Dr. Varner did consider this when he noted that ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Mot., Ex. 1, ¶ 41. Regardless, the significance of those few months to Dr. Varner's overall conclusion about Meridian's and Mylan's capacity is a factual issue to be weighed by the jury, not an issue for *Daubert*. *Krys v. Aaron*, 112 F. Supp. 3d 181, 195 n.15 (D.N.J. 2015) ("[A]n expert may base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion rests with the jury, and presents proper subject for cross-examination."). A disagreement among experts does not justify wholesale exclusion of Dr. Varner's opinion.

Finally, Sanofi complains that Mr. Benson was not included in Mylan's initial disclosures. However, Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure does not require a party to disclose the support for expert opinions in its initial disclosures. Rule 26(a)(2) separately governs expert disclosures.[6] For this reason, in *United States v. Dentsply International, Inc.*, the government was not required to disclose the participants in an expert's survey, or related documents, as part of its initial disclosures. No. 99-cv-5, 2000 WL 654378, at *2-7 (D. Del. May 10, 2000). Sanofi's case on this point addresses a different situation, where a party's expert relied on documents that were not produced, even though they were the subject of a discovery request. *Ford Motor Co. v. ThermoAnalytics, Inc.*, No. 14-cv-13992, 2016 WL 1465015, at *2 (E.D. Mich. Apr. 14, 2016). That is not Sanofi's complaint here and does not support exclusion of Dr. Varner's opinion.

---

[6] Dr. Varner's disclosures of his interviews with Mr. Benson in his Rule 26(a)(2) expert disclosures are also entirely consistent with Sanofi's disclosure of data called "bridge files" in the Rule 26(a)(2) expert disclosures of its antitrust expert, Fiona M. Scott Morton. When raised by Mylan, Sanofi did not dispute that it never disclosed these "bridge files" in its initial disclosures or in its responses to requests for production. Ltr. from E. Hochstadt to L. Friedman 2 (Feb. 19, 2019) (on file with counsel).

## CONCLUSION

Sanofi's motion to exclude Dr. Varner's expert testimony should be denied.

Dated: August 9, 2019

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510
psechler@robbinsrussell.com
kzecca@robbinsrussell.com
lfriedman@robbinsrussell.com
rmayrell@robbinsrussell.com
jettinger@robbinsrussell.com
jgoerlich@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*

## CERTIFICATE OF SERVICE

On this 9th day of August, 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each attorney registered for ECF notification to the counsel of record in this case.

        Respectfully submitted,

        s/ *Philip A. Sechler*
        Philip A. Sechler

        ROBBINS, RUSSELL, ENGLERT, ORSECK,
        UNTEREINER & SAUBER LLP
        2000 K St. NW, 4th Floor
        Washington, DC 20006
        Telephone: (202) 775 4492
        Fax: (202) 775 4510
        psechler@robbinsrussell.com

        *Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*