# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |
| SANOFI-AVENTIS U.S., LLC, <br><br> Plaintiff, <br> v. <br> MYLAN INC., et al., <br><br> Defendants. <br><br> *This Document Relates to the* Sanofi *case.* | CASE NO. 2:17-CV-02452-DDC-TJJ <br><br> *Document Filed Electronically* |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO SANOFI'S MOTION FOR SUMMARY JUDGMENT

Philip A. Sechler
Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510

*Counsel for Defendant Mylan Inc. and
Defendant/Counterclaim Plaintiff Mylan
Specialty L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

RESPONSE TO SANOFI'S STATEMENT OF MATERIAL FACTS ........................................ 2

I.      CASE BACKGROUND ........................................................................................... 2

II.     RELEVANT MARKET ............................................................................................ 3

        A.      Patients Use Devices Other Than EAIs To Treat Anaphylaxis ............................. 3

        B.      EpiPen Competes With Products Besides EAIs ................................................... 5

III.    MONOPOLY POWER .............................................................................................. 7

        A.      Share Of Prescriptions Of EAIs And Share Of A Relevant Antitrust Market
                Are Not The Same Thing ................................................................................ 7

        B.      Mylan Had Meaningful Competition .................................................................. 9

        C.      Mylan Operated In A Competitive Market And Lacked Unfettered Control
                Over Price ................................................................................................... 12

        D.      Mylan Faced Real Competition Before Auvi-Q And Did Not Implement A
                Scheme To Exclude It .................................................................................... 14

        E.      Mylan's Conduct After Auvi-Q's Recall Does Not Support A Finding of
                Monopoly Power ............................................................................................ 17

IV.     SANOFI'S MARKETING OF AUVI-Q ..................................................................... 19

        A.      Auvi-Q Did Not Fill an "Unmet Need" In the Anaphylaxis Treatment
                Market ....................................................................................................... 19

        B.      Auvi-Q's Anticipated Performance .................................................................. 23

        C.      Sanofi's Preference Study and Promotional Materials ......................................... 23

        D.      Mylan's Counterclaims Against Sanofi .............................................................. 27

MYLAN'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE .................. 30

I.      RELEVANT MARKET ............................................................................................ 30

# TABLE OF CONTENTS—Continued

Page

A. Prefilled Syringes Are Part Of The Relevant Market ............................................ 30

B. Other, Non-EAI Products Will Come To Market During Sanofi's Damages Period ............................................................................................................ 31

C. Certain Payors Operate Only In Certain Geographic Regions ............................ 32

II. MONOPOLY POWER ..................................................................................................... 32

A. Payors Were Significantly Larger And More Powerful Than Mylan .................. 32

B. Payors Imposed Price Protection On Mylan ...................................................... 33

C. Payors Frequently Excluded EpiPen, ███████████████████ ███████████████████ .................................................. 34

D. Sanofi ██████████████████████████████ ██ ..................................................................................................... 36

III. SANOFI'S MARKETING OF AUVI-Q ......................................................................... 36

A. Sanofi Falsely Claimed That Auvi-Q Was Easier To Use, Easier To Carry, More Likely To Be Carried, And Preferred By Patients ...................................... 36

B. Sanofi Falsely Marketed Auvi-Q As The Only EAI Device With Needlestick Protection ......................................................................................... 45

C. Sanofi Falsely Marketed Auvi-Q As The "New EpiPen" .................................... 46

D. Physicians ██████ ██████ ██████ Sanofi's False Advertising Affected Prescribing Behavior ......................................................................................... 49

ARGUMENT .......................................................................................................................... 51

I. SANOFI IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON MARKET DEFINITION ................................................................................................. 52

A. Sanofi Bears The Burden Of Proof ..................................................................... 52

B. Sanofi Has Failed To Show That Benadryl, Prefilled Syringes, And Other Epinephrine Products Are Not Reasonably Interchangeable With EAIs .............. 53

C. Sanofi's Proposed Hypothetical-Monopolist Test Does Not Resolve The Issue Of Market Definition, And In Any Event Sanofi Conducted It Incorrectly ......................................................................................................... 56

**TABLE OF CONTENTS—Continued**

Page

D. A Jury Could Find That Each Payor Was An Individual Market, Meaning That Sanofi's Market Definition Is Too Broad .................................................... 58

II. SANOFI IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON MARKET POWER ............................................................................................. 60

A. Sanofi's "Direct" Evidence Of Mylan's Supposed Ability To Control Price And Exclude Competition Shows The Opposite ................................................... 61

1. Mylan Was Unable To Raise EpiPen's Price Above The Competitive Level .................................................................................................................. 61

2. Mylan Did Not Successfully Exclude Competition ....................................... 64

B. Sanofi's Indirect Evidence Of Mylan's Monopoly Power Is Insufficient ........... 68

1. Sanofi's Evidence of Market Share Is Misleading And Should Be Rejected As Proof Of Monopoly Power .......................................................... 68

2. Sanofi's Examination Of Factors Besides Market Share Is Inadequate .......... 72

III. SANOFI IS NOT ENTITLED TO SUMMARY JUDGMENT ON MYLAN'S LANHAM ACT CLAIM ............................................................................... 76

A. Admissible Evidence Shows That Sanofi Made The Challenged Statements ..................................................................................................................... 77

B. Sanofi's Promotional Claims Were False and Misleading .................................. 81

1. Sanofi's Claims Were Literally False ........................................................... 81

2. Sanofi's Claims Were Misleading ................................................................. 86

C. Sanofi's Promotional Claims Were Widely Disseminated And Constituted Commercial Advertising ..................................................................................... 88

D. Mylan Was Injured By Sanofi's False Advertising ............................................. 93

IV. SANOFI IS NOT ENTITLED TO SUMMARY JUDGMENT ON MYLAN'S COMMON LAW UNFAIR COMPETITION CLAIM .................................... 98

CONCLUSION .......................................................................................................... 99

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.,*
    185 F.3d 606 (6th Cir. 1999) ...................................................................................68

*Am. Home Mortg. Corp. v. Am. Home Mortg. Corp.,*
    357 N.J. Super. 273 (App. Div. 2003) ...................................................................99

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986).................................................................................................51

*Avis Rent A Car Sys., Inc. v. Hertz Corp.,*
    782 F.2d 381 (2d Cir. 1986).....................................................................................87

*Bailey v. Allgas, Inc.,*
    284 F.3d 1237 (11th Cir. 2002) ..............................................................................54

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.,*
    784 F.2d 1325 (7th Cir. 1986) ................................................................................62

*BASF Corp. v. Old World Trading Co.,*
    41 F.3d 1081 (7th Cir. 1994) ..................................................................................98

*Bennett v. Schmidt,*
    153 F.3d 516 (7th Cir. 1998) ..................................................................................76

*Black v. M & W Gear Co.,*
    269 F.3d 1220 (10th Cir. 2001) ..............................................................................92

*BoDeans Cone Co. v. Norse Dairy Sys., L.L.C.,*
    678 F. Supp. 2d 883 (N.D. Iowa 2009)...............................................78, 79, 87, 92

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.,*
    627 F. Supp. 2d 384 (D.N.J. 2009) ..........................................................82, 83, 95

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007)....................................................................................61

*Brunswick Corp. v. Spinit Reel Co.,*
    832 F.2d 513 (10th Cir. 1987) ................................................................................98

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.,*
    846 F.3d 1297 (10th Cir. 2017) ..............................................................................53

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*C5 Med. Werks, LLC v. CeramTec GmbH,*
No. 14-cv-00643, 2016 WL 4092955 (D. Colo. June 10, 2016) ............................................97

*Campfield v. State Farm Mut. Auto. Ins. Co.,*
532 F.3d 1111 (10th Cir. 2008) ....................................................................................52

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,*
284 F.3d 302 (1st Cir. 2002) .......................................................................................95

*Castrol Inc. v. Pennzoil Co.,*
987 F.2d 939 (3d Cir. 1993) ...................................................................................84, 85

*Defiance Hospital, Inc. v. Fauster-Cameron, Inc.,*
344 F. Supp. 2d 1097 (N.D. Ohio 2004) ......................................................................75

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) ...................................................................................................65

*Feesers, Inc. v. Michael Foods, Inc.,*
591 F.3d 191 (3d Cir. 2010) ........................................................................................70

*FTC v. AbbVie Inc.,*
329 F. Supp. 3d 98 (E.D. Pa. 2018) .................................................................57, 58, 73

*FTC v. Sysco Corp.,*
113 F. Supp. 3d 1 (D.D.C. 2015) ...........................................................................58, 59

*FTC v. Whole Foods Mkt., Inc.,*
548 F.3d 1028 (D.C. Cir. 2008) .......................................................................56, 58, 59

*Gen. Steel Domestic Sales, LLC v. Chumley,*
627 F. App'x 682 (10th Cir. 2015) ....................................................................82, 94, 98

*Gen. Steel Domestic Sales, LLC v. Chumley,*
No. 10-cv-01398, 2013 WL 1900562 (D. Colo. May 7, 2013) .......................................93, 94

*Gennie Shifter, LLC v. Lokar, Inc.,*
No. 07-cv-01121, 2010 WL 126181 (D. Colo. Jan. 12, 2010) ...............................................81

*Grubbs v. Sheakley Grp., Inc.,*
807 F.3d 785 (6th Cir. 2015) .......................................................................................89

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,*
No. 08-cv-1101, 2011 WL 1336473 (D.N.M. Mar. 31, 2011) .........................................82, 83

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,*
  700 F. App'x 251 (4th Cir. 2017) ....................................................................89, 93

*Hendricks v. Physicians Skin & Weight Ctrs., Inc.,*
  No. 12-cv-2169, 2014 WL 12561621 (C.D. Cal. Feb. 24, 2014) ...........................95

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.,*
  258 F. Supp. 2d 1197 (D. Kan. 2003)....................................................................87

*Hillman Grp., Inc. v. Minute Key Inc.,*
  No. 1:13-cv-00707, 2016 WL 3654437 (S.D. Ohio July 8, 2016) ........................91

*HipSaver Co. v. J.T. Posey Co.,*
  497 F. Supp. 2d 96 (D. Mass. 2007) ......................................................................94

*Hutchinson v. Pfeil,*
  211 F.3d 515 (10th Cir. 2000) .........................................................................93, 94

*Iams Co. v. Nutro Prods., Inc.,*
  No. 3:00-cv-566, 2004 WL 5779999 (S.D. Ohio July 6, 2004) ...........................94

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.,*
  864 F.2d 1409 (7th Cir. 1989) ...............................................................................69

*In re Indep. Serv. Orgs. Antitrust Litig.,*
  168 F.R.D. 651 (D. Kan. 1996)..............................................................................95

*In re Syngenta AG MIR 162 Corn Litigation,*
  249 F. Supp. 3d 1224 (D. Kan. 2017)...............................................................95, 96

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.,*
  638 F. App'x 778 (10th Cir. 2016) ........................................................................84

*J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.,*
  No. 95-cv-2179, 1997 WL 83766 (E.D. Pa. Feb. 19, 1997)...................................97

*Johnson & Johnson v. SmithKline Beecham Corp.,*
  960 F.2d 294 (2d Cir. 1992)...................................................................................87

*Kaiser Aluminum & Chem. Corp. v. FTC,*
  652 F.2d 1324 (7th Cir. 1981) .........................................................................53, 55

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.,*
  114 F. Supp. 3d 852 (N.D. Cal. 2015) ...................................................................81

## TABLE OF AUTHORITIES—Continued

Page(s)

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,*
    762 F.3d 1114 (10th Cir. 2014) ........................................52

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) (en banc).................................65

*Long v. Fairbank Farms, Inc.,*
    No. 1:09-cv-592, 2011 WL 2516378 (D. Me. May 31, 2011)................................85

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)........................................52

*Max Daetwyler Corp. v. Input Graphics, Inc.,*
    608 F. Supp. 1549 (E.D. Pa. 1985) ........................................87

*Merck Eprova AG v. Gnosis S.p.A.,*
    760 F.3d 247 (2d Cir. 2014)........................................85

*Merck Eprova AG v. Gnosis S.p.A.,*
    901 F. Supp. 2d 436 (S.D.N.Y. 2012).....................................87, 88, 95

*Methodist Health Servs. v. OSF Healthcare Sys.,*
    859 F.3d 408 (7th Cir. 2017) ........................................66

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.,*
    838 F.3d 421 (3d Cir. 2016)..................................57, 60, 61, 62

*New Jersey Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc.,*
    144 N.J. Super. 411 (Ch. Div. 1976) ........................................99

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.*
    *Co.,*
    290 F.3d 578 (3d Cir. 2002)........................................82

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) ........................................53, 61

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.,*
    838 F.2d 360 (9th Cir. 1988) ........................................69, 74

*Outdoor Optics, Inc. v. Wolf Peak Int'l Inc.,*
    No. 1:02-cv-160, 2003 WL 23142197 (D. Utah Dec. 23, 2003) ............................94

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,*
    227 F.3d 489 (5th Cir. 2000) ........................................84

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Pound v. Airosol Co.,*
    368 F. Supp. 2d 1210 (D. Kan. 2005) ...................................................................98

*Procter & Gamble Co. v. Haugen,*
    627 F. Supp. 2d 1287 (D. Utah 2008) .................................................................89

*Proctor & Gamble Co. v. Haugen,*
    222 F.3d 1262 (10th Cir. 2000) ..........................................................................88

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.,*
    899 F.2d 951 (10th Cir. 1990) ....................................................................... *passim*

*Rebel Oil Co. v. Atl. Richfield Co.,*
    51 F. 3d 1421 (9th Cir. 1995) .......................................................................62, 74

*Red Devil Tools v. Tip Top Brush Co.,*
    50 N.J. 563 (1967) ..............................................................................................99

*Sawyer v. Sw. Airlines Co.,*
    243 F. Supp. 2d 1257 (D. Kan. 2003) ...............................................................85

*Schering Corp. v. Pfizer Inc.,*
    189 F.3d 218 (2d Cir. 1999) .......................................................................... *passim*

*Schering Corp. v. Pfizer, Inc.,*
    No. 98-cv-7000, 2000 WL 718449 (S.D.N.Y. June 5, 2000) ..............................79

*Scotts Co. v. United Indus. Corp.,*
    315 F.3d 264 (4th Cir 2002) ........................................................................81, 87

*Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.,*
    783 F.2d 159 (10th Cir. 1986) ...........................................................................60

*Smart Vent, Inc. v. Crawl Space Door Sys. Inc.,*
    No. 13-cv-5691, 2017 WL 4948063 (D.N.J. Nov. 1, 2017) ................................85

*Sports Unlimited, Inc. v. Lankford Enters.,*
    275 F.3d 996 (10th Cir. 2002) .....................................................................88, 89

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.,*
    427 F. Supp. 2d 1032 (D. Kan. 2006) ...........................................................93, 94

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.,*
    No. 12-cv-2760, 2016 WL 1377342 (D. Kan. Apr. 7, 2016) ...............................72

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,*
  305 F.3d 1124 (10th Cir. 2002) ............................................55

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.,*
  648 F. App'x 609 (9th Cir. 2016) ...................................93, 94

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
  497 F.3d 144 (2d Cir. 2007)..................................................94

*Tops Mkts., Inc. v. Quality Mkts., Inc.,*
  142 F.3d 90 (2d Cir. 1998)....................................................69

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
  959 F.2d 468 (3d Cir. 1992) (en banc)..................................58

*TrafficSchool.com, Inc. v. Edriver Inc.,*
  653 F.3d 820 (9th Cir. 2011) ...........................................97, 98

*United States v. Archer-Daniels-Midland Co.,*
  781 F. Supp. 1400 (S.D. Iowa 1991) ....................................71

*United States v. Baker Hughes Inc.,*
  908 F.2d 981 (D.C. Cir. 1990)...................................69, 71, 72

*United States v. Dentsply Int'l, Inc.,*
  399 F.3d 181 (3d Cir. 2005)..................................................65

*United States v. Gen. Dynamics Corp.,*
  415 U.S. 488 (1974)..............................................................69

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966)........................................................52, 69

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) (en banc)......................53, 61, 62

*Vapco, Inc. v. Perfecta Prods., Inc.,*
  No. 8:10-cv-399, 2010 WL 11507810 (M.D. Fla. Apr. 27, 2010) ........................................82

*Verisign, Inc. v. XYZ.com LLC,*
  848 F.3d 292 (4th Cir. 2017) ................................................95

*Vincent v. Utah Plastic Surgery Society,*
  621 F. App'x 546 (10th Cir. 2015) ........................................86

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Vivint, Inc. v. NorthStar Alarm Servs., LLC,*
No. 16-cv-106, 2019 WL 1098986 (D. Utah Mar. 8, 2019) ....................................89

*Walker v. City of Orem,*
451 F.3d 1139 (10th Cir. 2006) .............................................76

*Woodsmith Publ'g. Co. v. Meredith Corp.,*
904 F.2d 1244 (8th Cir. 1990) .............................................87

*Zeneca Inc. v. Eli Lilly & Co.,*
No. 99-cv-1452, 1999 WL 509471 (S.D.N.Y. July 19, 1999)................................83

**Statutes and Rules**

Fed. R. Evid. 801(d)(2) ...........................................78, 79

Fed. R. Evid. 803(6)................................................78, 79

Fed. R. Evid. 807 ..................................................78

N.J.S.A. § 56:4-1...................................................99

**Other Authorities**

1 ABA Section on Antitrust Law, *Antitrust Law Developments* § 6F-3 (8th ed. 2018) ........................................53

6 McCarthy on Trademarks and Unfair Competition § 32:195 (5th ed.) ....................................87

Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1.1 (Aug. 19, 2010) .......................................56, 58, 59

FTC & DOJ, *Quantitative Approaches to Competitive Effects in Bid Market Merger Investigations (Contribution to a Roundtable on Competition in Bidding Markets)* (Oct. 13, 2006), http://bit.ly/2M4yIJw.......................................70

James A. Langenfeld, "The Merger Guidelines As Applied," *The Economics of the Antitrust Process* 51 (1996) ...........................................70

Philip B. Nelson, *Bid Markets: Factors to Consider When Only Some Firms Are Allowed to Bid*, Economists Ink (Fall 2000), http://bit.ly/2KxdFvD ....................................70

Donna E. Patterson & Carl Shapiro, *Transatlantic Divergence in GE/Honeywell: Causes and Lessons*, 16 Antitrust 18 (2001) ...........................................70

## TABLE OF AUTHORITIES—Continued

**Page(s)**

David Wirth, *To Bid or Not to Bid, That is the Question: The Assessment of
  Bidding Markets in Merger Control*, Harvard Law School Forum on
  Corporate Governance and Financial Regulation (2016),
  http://bit.ly/2KvVqXK ............................................................................................71

## INTRODUCTION

Sanofi offers only very weak arguments regarding the relevant product market and monopoly power. Despite this, it complains inexplicably that it has been "forced" to move for summary judgment because Mylan will not concede these supposedly incontrovertible points. Sanofi has not met its burden of showing the absence of a genuine issue of material fact regarding the relevant product market because, among other things, it excludes from its proposed market substitutes for epinephrine auto-injectors used by consumers; it incorrectly performs the hypothetical-monopolist test; and it ignores evidence that Mylan's prices were negotiated individually with customers. There are ample grounds on which a jury could reject Sanofi's proposed market definition. Sanofi also has not come close to showing that there is no genuine issue of material fact on monopoly power. Sanofi relies on the long-discredited theory that market power is conclusively proved by market share alone. Sanofi disregards the well-established and directly applicable concepts of "bid markets" and "power buyers" that Mylan faces in selling the EpiPen® Auto-Injector ("EpiPen"). Sanofi rehashes its merits arguments about exclusionary conduct—which, as Mylan has shown in its summary judgment motion, do not even present triable issues, let alone justify summary judgment *for Sanofi*. And Sanofi ignores Mylan's repeated alterations to its pricing strategy in response to pressure from its customers, facts that contradict any claim that Mylan enjoyed unfettered control over price. The Court need not reach *any* of these issues if it grants Mylan's motion for summary judgment, because the grounds warranting summary judgment in Mylan's favor do not depend on the absence of monopoly power. But, if the Court does reach these issues, it should reject Sanofi's arguments.

The Court should also deny Sanofi's motion for summary judgment on Mylan's counter-claims. Sanofi asks this Court to turn a blind eye to its false advertising because Mylan outsold Sanofi. Sanofi suggests that, because it never "gain[ed] a foothold in the market," this Court need

1

not trouble itself with "the potential impact of a few Auvi-Q advertisements." Sanofi Br. 59.[1] But new competitors do not get a pass from the Lanham Act's prohibition on false advertising. Sanofi—with all its resources and experience in this industry—*could* have competed lawfully, but instead Sanofi used false messaging to convert EpiPen users to Auvi-Q®. Sanofi all but ignores the record evidence supporting Mylan's Lanham Act claim, not even acknowledging that a jury could rely on its *own market research surveys* to find that Sanofi's sales force promoted Auvi-Q by falsely claiming that (i) patients found Auvi-Q easier to use and easier to carry, (ii) patients found Auvi-Q's instructions easier to follow, (iii) patients would be more likely to carry Auvi-Q than EpiPen, and (iv) Auvi-Q had better needlestick protection. Sanofi likewise ignores evidence showing widespread dissemination by its sales force of false "new EpiPen" messaging. A reasonable jury could conclude that Sanofi violated the Lanham Act by making these false and misleading statements in commercial advertising and thereby caused harm to Mylan. So, too, could a jury fairly conclude that Sanofi violated New Jersey's unfair competition law by misappropriating the "EpiPen" name for its own benefit.

### RESPONSE TO SANOFI'S STATEMENT OF MATERIAL FACTS

Mylan respectfully submits that the following facts in Sanofi's memorandum are genuinely in dispute. The paragraph numbers below correspond to Sanofi's paragraph numbers to indicate the disputed facts.

### I.   CASE BACKGROUND

4.      Mylan disputes that its experts "devoted virtually no attention" to questions of

---

[1] Sanofi's memorandum in support of its motion for summary judgment is referred to as "Sanofi Br.," its asserted facts as "SMF ¶ X," and attached exhibits as "Sanofi MSJ Ex. X." Mylan's responses in this opposition to Sanofi's statement of material facts and Mylan's statement of additional material facts are referred to as "Resp. to SMF ¶ X" and "SAMF ¶ X," respectively. Mylan's motion for summary judgment filed on June 28, 2019 is referred to as "Mylan MSJ Br.," the included statement of facts as "Mylan MSJ SMF ¶ X," and attached exhibits as "Mylan MSJ Ex. X."

market definition and monopoly power. Professor Robert Willig, Ph.D., who serves as Mylan's antitrust liability expert, and is logically the only expert that would have devoted any time to the subjects, spent a substantial portion of his Expert Report—some eight pages—on them.[2]

## II.   RELEVANT MARKET

### A.   Patients Use Devices Other Than EAIs To Treat Anaphylaxis

8.      Mylan admits that nothing *should be substituted* for epinephrine to treat anaphylaxis, but disputes any implication that patients and physicians do not use substitutes.

9.      Mylan admits that Benadryl® and other antihistamines are not approved treatments for anaphylaxis. However, Mylan disputes the implication that patients and doctors do not use and have not used Benadryl and other antihistamines as treatments for anaphylaxis, regardless of whether they should be doing so. ███████████

███████████

███████████

███████████

███.[4] Sanofi, too, frequently noted that patients used Benadryl in lieu of EAIs; ██████

███████████

███████████®.[5]

10.     Mylan admits that Heather Bresch testified in that manner, but disputes the implication that she was suggesting that Mylan competed only against other EAIs. In fact, her testimony makes clear that Mylan "knew many allergists were prescribing Benadryl" for people at risk for anaphylactic shock irrespective of whether they should have, and that Mylan viewed Benadryl as a competitor because of this.[6]

11.     Mylan admits that the active ingredient in EAIs is epinephrine, but it objects to any implication that Auvi-Q and EpiPen delivered epinephrine identically. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[7]

12.     Mylan disputes that doctors exclusively prescribe EAIs to patients at risk for anaphylaxis. As described above, both Mylan and Sanofi were aware that doctors frequently prescribed Benadryl and other antihistamines for the same conditions.[8] Dr. Blaiss himself stated flatly in his report that "[u]nfortunately, there is still use of antihistamines and corticosteroids in the initial treatment of [anaphylaxis]" and stated that a study from Denmark showing that antihistamines were administered more than three times as often as epinephrine was "consistent with [his] experience in the United States."[9]

13.     Mylan disputes that *all* doctors recommend patients carry EAIs at *all* times. As discussed above, ██████████████████████████████████████████████

████████████████████████████████████.[10]

14.     Mylan disputes that prefilled vials and syringes are not preferred in all situations.

---

[6] Sanofi MSJ Ex. 13 at 245-46.
[7] Ex. 40 at -672.
[8] *See* Resp. to SMF ¶ 9.
[9] Ex. 24 (Blaiss Mar. 25 Rep.) at § 5.4.
[10] *See* Resp. to SMF ¶ 9.

Dr. Blaiss noted that "physicians and other medical professionals routinely treat patients for anaphylaxis using vials and syringes in medical offices, hospitals, or other institutional settings."[11] Dr. Michelis admitted that epinephrine syringes and vials can be used as well, stating that "epinephrine may be administered without an EAI device, including through pre-filled syringes of epinephrine or vials and syringes."[12] Both EpiPen and syringes were used in hospitals.[13]

15.     Mylan admits that syringes and vials may be less practical to *self*-administer but disputes the implication that syringes and vials are not practical at all. As discussed above, there are certain situations in which syringes and vials are eminently practical—medical offices, hospitals, and other institutional settings.[14]

B.     **EpiPen Competes With Products Besides EAIs**

17.     Mylan admits that some of its internal business documents refer to the "U.S. EAI Market" or the "U.S. Auto-Injector Market." However, that is not a full appraisal of the universe of Mylan documents evaluating competitors in the anaphylaxis space; as discussed above, multiple Mylan documents

---

[11] Ex. 24 (Blaiss Mar. 25 Rep.) at § 5.2.3.
[12] Sanofi MSJ Ex. 16 ¶ 24.
[13] Ex. 41
[14] Resp. to SMF ¶ 14.
[15] Resp. to SMF ¶ 9.
[16] *See* Ex. 42 at -030; Ex. 43 at Slides 3-4.
[17] *See* Ex. 44.
[18] *See* Ex. 45 at -436-37.



18.    Mylan admits that its internal evaluations of EpiPen performance sometimes referred to ███████████████████████ However, where those evaluations disclosed their source, ███████████████████████████████.[21] Internal Mylan documents reveal that ██████████████████████████████ ████████████████████████████████████████.[22] The data are therefore incomplete because the data do not track the dispensing of over-the-counter medications like Benadryl, as well as the use of syringes and vials.

19.    Mylan admits that it considered the price of other EAIs, but it disputes the implication that Mylan considered nothing else. As described above, Mylan's strategy and planning documents ███████████████████████.[23] Moreover, ███████████ ████████████████████████████████████████████████ █████████████████[24] And Mylan ████████████████████████████ ██████████████████████.[25]

20.    Mylan disputes that this was all the relevant testimony Ron Graybill gave. Graybill's *entire response* to the question "What market did EpiPen compete in?" was "It was the epinephrine auto injector market. *More broadly it was for the treatment of anaphylaxis*."[26] Sanofi's

---

[19] *See* Ex. 46 at Slide 4; Ex. 47 at Slide 3; *see also* Ex. 48 ██████████████████████ █████████████████████

[20] Ex. 46 at Slide 21 (emphasis added); *see also id.* ███████████████████████████ ██████

[21] *See* Sanofi MSJ Ex. 24 at -767; Sanofi MSJ Ex. 26 at -426.

[22] *See* Ex. 49 at -604; Ex. 50 at -476.

[23] Resp. to SMF ¶¶ 9, 17.

[24] *See* Ex. 51 at -604 & Slides 18, 20, 23-24.

[25] Ex. 35 at -701.

[26] Sanofi MSJ Ex. 33 at 63-64 (emphasis added).

omission of the remainder of Graybill's answer is misleading.

21.    Mylan admits that Jordan testified as Sanofi reports. But Mylan disputes that this was all the relevant testimony Mylan employees gave on this subject. Head of Marketing Sherry Korczynski identified ████████████████████████████████████ as EpiPen competition.[27] President of Mylan Specialty L.P. Roger Graham testified that ████████ ████████████████████████████████████████████████████ ████████ ████ ████[28] ████████████████████████████████████ ████████████████████████[29] And Head of Finance Patrick Zinn testified that he had ████████████████████████████████████████████████ ████████████████████████████████[30] Mylan witnesses also repeatedly mentioned prefilled syringes or vials of epinephrine as being competition; in addition to ████████████████████████████████████████ ████████████[31] ████████████████████████████████ ████████████[32] ████████████████████████████████████.[33]

## III.    MONOPOLY POWER

### A.    Share Of Prescriptions Of EAIs And Share Of A Relevant Antitrust Market Are Not The Same Thing

30.    Mylan admits the accuracy of the quotations from its documents. However, and as discussed above, the numbers being related are not true market share, but rather the share of EAI

---

[27] Ex. 12 (Korczynski Dep.) at 36.
[28] Ex. 7 (Graham 30(b)(1) Dep.) at 31.
[29] Ex. 7 (Graham 30(b)(1) Dep.) at 134-35.
[30] Ex. 23 (Zinn (30(b)(6) Dep.) at 20.
[31] Ex. 8 (Graham 30(b)(6) Dep.) at 153.
[32] Ex. 3 (Coury Dep.) at 181.
[33] Ex. 14 (Patel Dep.) at 21-22.

prescriptions that were filled with EpiPen.[34]

31.     Mylan disputes that EpiPen's market share was 98%. EpiPen filled a certain share of EAI prescriptions, but that is not equivalent to a market share in a relevant antitrust market.[35]

32.     Mylan disputes that Dr. Willig acknowledged that "EpiPen had an overall market share exceeding 80% or 90%." Dr. Willig specifically disagreed with the proposition that the data with which he was presented referred to market share, instead stating that "it's not about market share. It's just about the counter prescriptions."[36]

33.     Mylan disputes that it "maintained market share near or at 90% of the EAI drug device market." EpiPen filled a certain share of EAI prescriptions, but that is not equivalent to a market share in a relevant antitrust market.[37]

34.     Mylan disputes that the percentage of EAI prescriptions it maintained is equivalent to a "dominant share in the U.S. EAI drug device market," as market share cannot be extrapolated from the percentage of EAI prescriptions for which EpiPen was dispensed. Additionally, Sanofi cites only a few documents from early in Auvi-Q's lifespan; notably, the latest document it cites is from early January 2014,[38] while even Sanofi's own purported "market share" numbers have ██████████████████████████████████████ ████████ [39]

35.     Mylan admits that Sanofi quotes Graham's testimony accurately. However, Sanofi's characterization of Graham's testimony is inaccurate; as even its own quote shows, Graham correctly referred not to market share but to the ██████████████████████████

---

[34] Resp. to SMF ¶ 18.
[35] *See* Resp. to SMF ¶ 18.
[36] Sanofi MSJ Ex. 37 at 123.
[37] *See* Resp. to SMF ¶ 18.
[38] Sanofi MSJ Ex. 56.
[39] Sanofi MSJ Ex. 42 at Fig. 7.



[40] Moreover, portraying Graham and Patel as referring to market share in the EAI market is inaccurate; both Graham and Patel ███████████████████████████████████████████████████████████████████ ■ Defining market share as EpiPen's share of dispensed EAI prescriptions also ignores the relevant context of ████████████████████████████████████████████

### B.     Mylan Had Meaningful Competition

36.     Mylan disputes that it lacked meaningful competition before Sanofi's launch of Auvi-Q. As discussed above, limiting the market to EAIs omits several other meaningful competit- ors, including Benadryl and epinephrine vials and syringes.[43] Moreover, EpiPen suffered setbacks before Auvi-Q's entry; ████████████████████████████████ ███████████ [44] and had a prior authorization placed on it in favor of Adrenaclick on WellCare's formulary.[45] This contin- ued after Sanofi's exit: ████████████████████████████ ████████████████████████████████████ ████████ [46] ██████ ████████████████████████████████████ .[47]

37.     Mylan admits that the need for FDA approval *can* constitute a barrier to entry, but it is incomplete to discuss the requirement for FDA approval without mentioning those devices that have been approved. They include not just EpiPen and Auvi-Q (launched in 2013), but also Twinject, launched in 2005,[48] Adrenaclick, launched in 2010,[49] the Adrenaclick AG, also launched

---

[40] SMF ¶ 35.
[41] Resp. to SMF ¶ 21.
[42] Resp. to SMF ¶ 21.
[43] Resp. to SMF ¶¶ 9-15.
[44] Mylan MSJ SMF ¶ 85.
[45] Ex. 31 (Willig Rep.) ¶ 210 n.274.
[46] Ex. 52 at -986-87.
[47] Ex. 53.
[48] Ex. 31 (Willig Rep.) ¶ 47.
[49] Ex. 31 (Willig Rep.) ¶ 47.

in 2010,[50] Mylan's authorized generic of the EpiPen, launched in 2016,[51] and Teva's generic EpiPen, launched in 2018.[52] Sanofi also ignores Benadryl,[53] first available for sale in 1946,[54] and Symjepi's receipt of FDA approval in late 2018 and its launch in early 2019.[55]

38.    Mylan disputes that there are "significant hurdles" in obtaining formulary placement from Payors. Shortly after launch, Sanofi ██████████████████████████████ ██████████████████████████[56] ██████████████████████████████████████ ██████. Moreover, the highest percentage of alleged "foreclosure" that Sanofi provides—that is, the highest percentage of lives covered by formularies on which it lacked coverage— ██████ ████████████████████████████████████████.[57] Even Adrenaclick, which Sanofi derides as a "weak … competitor[],"[58] ████████████████████████████ ██████ ██████[59] In short, other EAIs gained significant formulary coverage.

39.    Mylan disputes that Payors were concerned about replacing EpiPen on formulary. Multiple large Payors testified that ████████████████████████████████ ██████████████████████████.[60] Sanofi's Vice President for U.S. Managed Markets, Sandy Loreaux, ████████████████████████████████████ ██████████████████████.[61] Moreover, CVS excluded EpiPen from its Advanced



---

[50] Ex. 31 (Willig Rep.) ¶ 47.
[51] Ex. 31 (Willig Rep.) ¶ 43.
[52] Ex. 31 (Willig Rep.) ¶ 49.
[53] Resp. to SMF ¶¶ 9-15.
[54] James Ritchie, *UC prof, Benadryl inventor dies*, Cincinnati Business Courier (Sep. 27, 2007, 7:46 PM), http://bit.ly/2KsVCqG (noting Benadryl first available in 1946).
[55] Ex. 24 (Blaiss Mar. 25 Rep.) at § 5.2.2.
[56] Ex. 54 ████████████████████████████████ ██████████
[57] SMF ¶ 63.
[58] Sanofi Br. 50.
[59] Ex. 56.
[60] Mylan MSJ SMF ¶ 127.
[61] Mylan MSJ SMF ¶ 129.

Control and Value Formularies; shortly after EpiPen was excluded from the Advanced Control

Formulary, its business on that formulary was ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████"[62] ESI, too, excluded EpiPen from its High Performance Formulary, with those plans

following the Formulary that excluded EpiPen ████████████████████████████████████

     40.     Mylan disputes that competitors would find it difficult to take prescriptions from

EpiPen. ████████████████████████████████████████████████████████████████████████████

█████████████████████████████████ Moreover, Mylan demonstrated in its summary judgment motion

that Dr. Scott Morton's calculation of "non-contestable share" is wrong; *no* portion of demand for

EpiPen was non-contestable,[65] and when EpiPen was excluded on health plans ███████████████████

██████████████████████████

     41.     Mylan disputes that competitors never gained a large share of the relevant market.

As an initial matter, that statement presupposes a market definition—EAIs only—that Mylan con-

tests. Sanofi's facts say nothing about whether Adrenalick and Twinject gained much traction or

share in the anaphylaxis market, let alone saying anything about how Benadryl or vials and

syringes performed in that market. Additionally, both Adrenaclick and Twinject had success;

Adrenaclick was favored on WellCare's formulary before Auvi-Q's entry and also was able to take

███████ of prescriptions dispensed from EpiPen after its deal with CVS,[67] while ████████████████

█████████████████████████████████████.[68]

---

[62] Mylan MSJ SMF ¶ 130.
[63] Mylan MSJ SMF ¶ 131.
[64] Sanofi MSJ Ex. 42 at Fig. 7.
[65] Mylan MSJ Br. 77-80.
[66] Resp. to SMF ¶ 39.
[67] Resp. to SMF ¶ 36.
[68] Resp. to SMF ¶ 36.

42.     Mylan disputes any implication that the "patient safety concerns [that] arise when substituting a new EAI" for another branded EAI are impossible to manage in the context of brand-to-brand competition. Sanofi's own medical expert, Dr. Mary Ann Michelis, wrote that "[t]raining patients takes minutes, and as long as they are trained properly, switching devices is not too disruptive."[69]

### C.     Mylan Operated In A Competitive Market And Lacked Unfettered Control Over Price

43.     Mylan disputes that it "raised the price of EpiPen by over 500%" from 2009 to 2016. That refers to EpiPen's WAC, or list, price, not its net price; as Sanofi's own data show, EpiPen's net price did not increase by 500%.[70]

44.     Mylan disputes that cost increases of ███████████ constitute "minimal[]" increases.

45.     Mylan disputes that it "strategically raised the price of EpiPen several times in anti-cipation of Sanofi's launch of Auvi-Q." The evidence Sanofi cites does not support that proposi-tion. Sanofi's evidence consists of (i) two charts depicting the WAC price history of EpiPen,[71] which say nothing about why the WAC price rose; (ii) a news article that *does not mention* Auvi-Q[72]; and (iii) an excerpt of Zinn's deposition testimony where he agrees only that Mylan raised WAC price "before Sanofi entered."[73] Zinn's testimony is the only one of those exhibits that discusses price increases before Sanofi began marketing Auvi-Q with any specificity. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[69] Ex. 26 (Michelis Rebuttal Rep.) ¶ 19.
[70] Sanofi MSJ Ex. 42 at Fig. 8.
[71] SMF ¶ 45 (citing Sanofi MSJ Exs. 70, 72).
[72] SMF ¶ 45 (citing Sanofi MSJ Ex. 71).
[73] SMF ¶ 45 (citing Sanofi MSJ Ex. 73).

███████████████████████████ That the WAC price increased before Auvi-Q's entry is not evidence that the WAC price was "strategically raised … in anticipation" of it.

46.     Mylan disputes that its net price to PBMs and payors rose from 2013 through 2015. First of all, ███████████████████████████████████████████████████ ████████████████ ████[75] Moreover, the data Sanofi uses ██████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████[76] ████████████████████████████████████████████ ███████[77]

47.     Mylan admits that it increased EpiPen's WAC price at one point after it negotiated an agreement with ESI, but it disputes that ESI "could not escape Mylan's price increases." ESI avoided price increases ███████████████████████████████████████████ ███████████████████████████.[78] Moreover, ESI excluded EpiPen from its Advanced Control Formulary for 2015[79]—another way of avoiding price increases. Indeed, ESI's representative testified that ████████████████████████████████████████[80]

49.     Mylan disputes that Sanofi can make any authoritative statement about what "[t]hird party payors" thought while only citing one document, and disputes that any concerns were expressed regarding Mylan's lack of innovation.[81]

51.     Mylan disputes that "EpiPen sales and revenues increased from 2009 through

---

[74] Sanofi MSJ Ex. 73 at 54.
[75] Sanofi MSJ Ex. 42 at Fig. 8.
[76] Ex. 31 (Willig Rep.) at Exs. 16a-c.
[77] Ex. 31 (Willig Rep.) at Ex. 16c.
[78] Resp. to SMF ¶ 46; *see also* Ex. 57 ██████████████████████████████████ ██████████████████████████
[79] Resp. to SMF ¶ 39.
[80] Mylan MSJ SMF ¶ 117.
[81] Sanofi MSJ Ex. 76.

2015." In fact, Mylan's internal accounting records ███████████████████████████

█████████████ █████[82] Those same records also show that ███████████████████████

███████████████████.[83] Both of those declines occurred even though Mylan sold more

EpiPens in the U.S. in 2015 (8.3 million) than 2014 (7.9 million).[84]

52.     Mylan disputes that its gross profit margins on EpiPen rose from 2010 to 2015. As

Sanofi's own evidence shows, the gross profit margin fell from 2014 (76%) to 2015 (72%).[85]

53.     Mylan disputes that its profitability "increased substantially from 2013 to 2015

while Auvi-Q was in the market." Instead, and as related above, Mylan's profitability rose in 2013

and 2014 before falling in 2015.[86]

55.     Mylan admits Bruce Foster wrote that sentence but notes Sanofi has misleadingly

omitted related material, including that ██████████████████████████████████████

███████████████████████████████████████████████████████[87]

### D.     Mylan Faced Real Competition Before Auvi-Q And Did Not Implement A Scheme To Exclude It

56.     Mylan disputes that it "offered only very small rebates on EpiPen pricing" before

Auvi-Q's entry. Mylan notes that Sanofi has not quoted or referenced any of Mylan's actual rebate

agreements with Payors for this point, all of which are in Sanofi's possession. Several of those

rebate agreements ████████████████████████████████████████████████████████

---

[82] Ex. 58 ████████████████████████████████████████████████████████

Ex. 59 ██████████████████████████████████████████ *see also* Sanofi MSJ Ex. 80 ████

██████████████████████████████).

[83] Ex. 58 ████████████████████████████████████████████████████████

Ex. 59 ██████████████████████████████████ *see also* Sanofi MSJ Ex. 80 (

████████████████████████████████

[84] Sanofi MSJ Ex. 80.

[85] Sanofi MSJ Ex. 80.

[86] Resp. to SMF ¶¶ 51-52.

[87] Sanofi MSJ Ex. 83 at -597.

███████████████████, [88] ████████████████████████████████████████

██████, [89] ████████████, [90] ███████████████████████████████ [91] all before Auvi-Q's entry.

57.     Mylan disputes that Coury instructed Mylan employees ██████████████████

The document in question reads as Sanofi reports, but at his deposition Coury made clear that he

disagreed with the author's characterization of his comments and that he had told employees to

████████████████ [92]

58.     Mylan disputes that Auvi-Q represented ████████████████████████

████████████ the document Sanofi quotes to support that notion refers to Auvi-Q ██████

████████████████████████ [93] This also presupposes a market limited to EAIs, which

Mylan contests. Mylan documents show that ████████████████████████████████

████████████████████████. [94] Adrenaclick and Twinject also represented threats. [95]

59.     Mylan disputes that it altered its contracting strategy to seek to disadvantage

Auvi-Q for all Payors. ████████████████████████████████████████

██████████████████████████ ███████████████████████████████████

██████████████████████  Those solicitations were made without regard to any contracting

strategy Mylan may have had.

60.     Mylan admits the quoted language. With regard to Sanofi MSJ Ex. 87, however,

Sanofi ignores relevant deposition testimony from Harry Jordan, who testified that ████████████

---

[88] Ex. 60 at -234.
[89] Ex. 61 at -049.
[90] Ex. 62 at -542.
[91] Ex. 63 at -857.
[92] Ex. 3 (Coury Dep.) at 216-17.
[93] Sanofi MSJ Ex. 84 at -648 (emphasis added).
[94] Resp. to SMF ¶¶ 9-15.
[95] Resp. to SMF ¶¶ 36, 58.
[96] Mylan MSJ SMF ¶¶ 61-63, 67, 101, 113.
[97] Mylan MSJ SMF ¶¶ 76, 82.



[98] With regard to Sanofi MSJ Ex. 88, Sanofi tries to portray that document as referencing exclusive formulary position—that is, Auvi-Q being subject to benefit exclusion—but what the document actually refers to is ███████████ ████████████████████████████████████████████████████████████████.[99]

61.    Mylan disputes that its share of EAI prescriptions gave it "significant negotiating leverage." Payors achieve savings by using utilization management techniques to drive down price,[100] and both Payors[101] and Sanofi's own personnel and consultants[102] testified that ██████ ████████████████████████████████████ Moreover, no Payor testified that EpiPen's share of EAI prescriptions prevented it from adding Auvi-Q to its formulary or disadvantaging or even excluding EpiPen.[103]

62.    Mylan disputes Sanofi's characterization of Auvi-Q's formulary disadvantages as the result of *Mylan's* "careful[] negotiat[ing.]" As discussed above, ███████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████

63.    Mylan disputes that documents discussing Auvi-Q's formulary coverage are evidence of a "company-wide scheme to exclude Auvi-Q from the EAI drug device market." "Scheme" (in American English) is a pejorative term that Sanofi misuses as part of its attempt throughout this case to blur the distinction between aggressive competition that furthers the funda-

---

[98] Ex. 11 (Jordan Dep.) at 84-85.
[99] Sanofi MSJ Ex. 88 at -194, -228 (emphasis added).
[100] Mylan MSJ SMF ¶¶ 23-28, 30-31, 42-44.
[101] Mylan MSJ SMF ¶¶ 127-28.
[102] Mylan MSJ SMF ¶ 129.
[103] Mylan MSJ SMF ¶ 126.
[104] Resp. to SMF ¶ 59.

mental, procompetitive purpose of the Sherman Act and the use of improper, consumer-welfare-decreasing means to harm competition itself by excluding a competitor. Tracking a competitor's performance—including observing when it is performing poorly—is not evidence of a plan to exclude that competitor by unlawful means.

64.     Mylan admits that one internal document ████████████████████████ ████████████████ but disputes that was Mylan's general prediction. Other documents differed; one internal document ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████[105] and another document ████████████████████████████████████[106]



65.     Mylan disputes that Dr. Scott Morton's speculation provides any basis for assuming that output would have been higher but for Mylan's pricing strategy. Indeed, Dr. Scott Morton denied quantifying—or even attempting to quantify—what output would have been but for Mylan's actions, instead stating that she "did not quantify it except for directionally" because differentiated products cause increases in output.[107] In fact, total output of EAIs substantially increased while Sanofi marketed Auvi-Q, from 3.3 million EAI prescriptions filled in 2013 to approximately 4.0 million in 2015—a fact that Dr. Scott Morton's report demonstrates.[108] Thus, the percentage increase in EAI output over that two-year period was 21%—████████████ ████████████[109]

### E.     Mylan's Conduct After Auvi-Q's Recall Does Not Support A Finding of Monopoly Power

66.     Mylan admits that it increased the WAC price of EpiPen after Auvi-Q's complete

---

[105] Ex. 64.
[106] Ex. 65 at -856.
[107] Sanofi MSJ Ex. 98 at 243-44.
[108] Sanofi MSJ Ex. 42 at Fig. 2.
[109] Resp. to SMF ¶ 64.

recall, but ██████████████████████████████████,[110] so Sanofi's suggestion that Mylan

implemented the price increase to take advantage of its exit is false. ████████████████

████████████████████████████ ██[111] ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████[112]

    67.    Mylan disputes that it ████████████████████████████████

█████████████████████████ before the recall. ██████████████████████

████████████████████████████"[113] ████████████████████████████ .

With regard to Mylan's ██████████████████████████████████████████

██████████████████████████,[114] ████████████████████████████████

████████████████████.[115] Moreover, ██████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████,[116] ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████,[117] ██████████████████████

███ ,[118] ███ ,[119] ██████████ [120] █████████████████████████████

---

[110] Ex. 66 ████████████████████████████████████████████████████
████████████

[111] Ex. 68.

[112] Ex. 67 at -825.01.

[113] Sanofi MSJ Ex. 99 at -183.

[114] Sanofi MSJ Ex. 101 at -481.

[115] Ex. 15 (Sussman Dep.) at 461-62.

[116] Ex. 69 at -641.

[117] Ex. 70 at -478.

[118] *Compare* Ex. 71 at -031 (prescribing ████████████████████████████████
*with* Ex. 72 at -032 (prescribing ████████████████████

[119] Ex. 15 (Sussman Dep.) at 461-62.

[120] *See* Ex. 73 ████████████████████████████████████████████████████
████████████████████████████

68.    Mylan disputes that saying it ████████████████ rebates to Payors fol-

lowing Auvi-Q's complete recall is a fair characterization of the evidence, as even Sanofi's cited

documents show. ████████████████████████████████████

████████████████████████████████████[121] ███████████

████████████████████████████████████████████

████████████████████████████████"[122] ████████

████████████████████████████████████████████

████████████████████████████████████[123]___

████████████████████████████. Finally, and as discussed

above, Mylan in fact ████████████████████████████.[124]

69.    Mylan disputes that it ██████████████ Mylan continued to

negotiate with Payors surrounding rebates to be paid for EpiPen even after Auvi-Q's recall.[125]

## IV.    SANOFI'S MARKETING OF AUVI-Q

### A.    Auvi-Q Did Not Fill an "Unmet Need" In the Anaphylaxis Treatment Market

76.    Mylan disputes that when Auvi-Q launched in 2013 there was a significant "unmet

need in the treatment of anaphylaxis," as pre-launch market research suggested otherwise.[126]

Mylan admits that Heather Bresch's testimony that there was an "unmet need" and "lack of aware-

ness around anaphylaxis" is accurately quoted, but her testimony discussed an "unmet need" "after

---

[121] Sanofi MSJ Ex. 103 at -070.
[122] Sanofi MSJ Ex. 104 (emphasis added).
[123] Sanofi MSJ Ex. 105 at -075-76.
[124] Resp. to SMF ¶ 67.
[125] Resp. to SMF ¶¶ 67-68.
[126] *See* Sanofi MSJ Ex. 118 ████████████████████████
Ex. 74 ██████████████████████████████ Ex. 75 ███████████
████████████████████████████████

Mylan acquired the [EpiPen]" in 2007—*six years before Auvi-Q's launch*.[127] Mylan disputes that

such needs remained unmet in 2013. Between 2007 and 2013, Mylan invested substantial resources

to increase awareness of anaphylaxis risk and enhance access to EAI devices, through Mylan's

EpiPen4Schools® program and other means.[128] ███████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[129] Mylan

admits that the testimony of a Sanofi quality department employee that Auvi-Q satisfied an ███████

██████████████████████████████████ is accurately quoted. However, that is only

one person's opinion at a deposition in 2018. Sanofi cites no clinical data to support this assertion.

77.     Mylan disputes that, "[p]rior to the introduction of Auvi-Q, there was virtually no

innovation in the EAI drug device market." In 2009, after ████████████████████████

███████████ Mylan released a redesigned EpiPen designed to improve safety and usability.[130]

Mylan also disputes that the 2009 EpiPen re-design included only a "needle cover and a smoother

shape." The re-design also included an improved carrying case, instructions, and brightly colored

safety and needle caps.[131] As Sanofi acknowledges in its Statement of Material Facts, ████████

██████████████████████████████████████████████████████████████████

████████████████████ ████.[132]

78.     Mylan admits that ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

---

[127] Sanofi MSJ Ex. 13 at 124.
[128] Ex. 2 (Bresch Dep.) at 123-27; Ex. 8 (Graham 30(b)(6) Dep.) at 25-27, 128.
[129] Ex. 76 at Slide 13.
[130] Ex. 77 at Slides 2 (speaker notes), 6-20.
[131] Ex. 77 at Slides 2 (speaker notes), 6.
[132] SMF ¶¶ 77, 81-82.

20

████████████████████████████████████████[133]████████████████████

████████████████████████████████████████████████████████████████

████████.[134]

79.     Mylan disputes that the quoted portion of an internal Meridian email, characterizing

Auvi-Q as ████████████████████████ reflects the full opinion of the author of

the email. In the same email, the Meridian employee wrote that ████████████████

████████████████████"[135] Mylan also disputes that Auvi-Q was a "significant threat"

to EpiPen "[e]ven if at a higher cost" than EpiPen. ████████████████████████████

████████████████████████████████.[136]

80.     Mylan disputes that ████████████████████████████████████████

████████████████████████[137]

81.     Mylan disputes that Sanofi's launch of Auvi-Q was the reason it considered ████

████████████████████████████████████████████████████████████████

████████████████.[138] ████████████████████████████████████████████

████████████████████████████████████.[139]

82.     Mylan disputes that it was ████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[133] Ex. 78 at -340.

[134] Ex. 79 at -374-75.

[135] Sanofi MSJ Ex. 110 (emphasis in original); *see also* Ex. 78 at -340 ████████████████

[136] Ex. 80 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

    Ex. 81 at Slides 6, 46 ████████████████████████████████████████

████████████████████████████████████████████████████████████████

[137] Ex. 82 at -632, -638.

[138] Ex. 9 (Hadley Dep.) at 155-56; Ex. 83 at Slide 6.

[139] Sanofi MSJ Ex. 78 (Handel (Meridian) Dep.) at 104-08.

▬▬▬▬▬▬▬▬▬▬.[140] To support its asserted fact, Sanofi quotes the deposition testimony of Meridian's Thomas Handel, but the quoted testimony does not support Sanofi's assertion that the ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[141] Mylan disputes ▬▬▬▬▬▬▬▬▬▬▬▬ To support this asserted fact, Sanofi quotes a presentation written by a third-party consulting firm based on feedback from a single ▬▬▬▬▬▬▬▬▬.[142]

▬▬▬▬▬▬▬▬▬▬▬▬[143] ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬.[144]

83.    Mylan admits that it has not sold a ▬▬▬▬▬▬▬▬▬, but disputes the suggestion that it stopped ▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬.[145] ▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬[146] ▬▬▬▬

▬▬▬▬▬▬▬▬.[147] ▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬."[148]

---

[140] Ex. 84 at -491.
[141] Sanofi MSJ Ex. 78 (Handel (Meridian) Dep.) at 94-98.
[142] Sanofi MSJ Ex. 113, at 951-52.
[143] *See* Resp. to SMF ¶ 81.
[144] Ex. 9 (Hadley (Mylan) Dep.) at 155-56; Ex. 83 at Slide 6.
[145] Ex. 85.
[146] Ex. 86 at Slides 16-22.
[147] Ex. 87 at Slides 7, 9.
[148] Ex. 88 at -977; *see also* Ex. 87 at Slides 7, 9.

## B.    Auvi-Q's Anticipated Performance

84.    Mylan disputes that it projected that Auvi-Q would ███████████
█████████████████. The quoted Mylan projection is from a document prepared more than a year before Auvi-Q's launch.[149] A forecast by a Mylan consultant prepared closer to Auvi-Q's launch estimated ████████████████████████████████████████████
████████████████[150] Mylan also disputes the reliability of the cited Sanofi forecast. For example, Sanofi's forecast assumed ██████████████████████████████████████
███████████████████████████████████████.[151] Auvi-Q brand lead Bryan Downey testified that █████████████████████████[152] Sanofi's North American President Anne Whitaker testified that, ███████████████████████████
████████████████████████[153] And forecasts by Sanofi's consultants predicted ████████████████████████████.[154]

## C.    Sanofi's Preference Study and Promotional Materials

85.    Mylan disputes that Auvi-Q ██████████████████████████████████
█████████.[155]

86.    Mylan disputes that the Auvi-Q "features" highlighted in Sanofi's printed advertisements were █████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████.[156] Mylan also disputes the suggestion that Sanofi's marketing campaign highlighted only

---

[149] Sanofi MSJ Ex. 117.
[150] Ex. 81 at Slides 28-29.
[151] Sanofi MSJ Ex. 114, at -593 tbl. 2 ███████████████████ Mylan MSJ SMF ¶¶ 52-53.
[152] Ex. 5 (Downey 30(b)(1) Dep.) at 158-59; Ex. 6 (Downey 30(b)(6) Dep.) at 126-27.
[153] Ex. 18 (Whitaker Dep.) at 87-88.
[154] Ex. 89 at -037-38.
[155] *See* Resp. to SMF ¶ 76.
[156] *See* Resp. to SMF ¶ 76.

Auvi-Q features, as Mylan's Statement of Additional Material Facts ¶¶ 130-51 describes the false

and misleading marketing claims made by Sanofi's sales force that compared Auvi-Q to EpiPen.

91.    Mylan disputes that Sanofi "revised the design of [its patient preference] study



.[157]

[158] As illustrated by the chart below reporting data from the final

study,

:

[157] Ex. 90 at Slide 19; *see also id.*

[158] Ex. 91; Ex. 92.



Sanofi knew that each of the four "secondary objectives" ███████ Moreover, Sanofi never even submitted the second primary objective—"Device Most Prefer to Carry With You"—to the FDA for approval.

92.   Mylan disputes that Sanofi ████████████████████████████ ████████████████████████ *See* Resp. to SMF ¶ 91. Mylan further disputes that Dr. Blaiss acknowledged that such a study would not be possible "due to ethical constraints." Dr. Blaiss's report states that a study in which a placebo was given to a patient suffering from anaphylaxis would not be possible due to ethical constraints, but he would have no concern about a study testing participants' preference for Auvi-Q over EpiPen with an actual needle injection using a placebo.[159]

93.   Mylan disputes that Sanofi limited its comparative marketing and preference claims in promotion of Auvi-Q to the three claims supported by its study (method of instruction, preferred size, preferred shape). Mylan's Statement of Additional Material Facts ¶¶ 130-51 describes

---

[159] *See* Ex. 93 (Decl. of Dr. Michael Blaiss).

Sanofi's comparative claims that went far beyond those purportedly substantiated by the study.

94.     Mylan disputes that Sanofi took adequate steps to ensure its sales representatives did not make unsubstantiated claims. Although the single training presentation cited by Sanofi in this paragraph states ████████████████████████████████████████

████████████████████████████████████ Mylan's Statement of Additional Material Facts ¶¶ 130-51 describes the widespread, comparative claims made by Sanofi's sales force that went beyond those substantiated by the preference study and details the lack of any evidence that Sanofi monitored its sales force's compliance with those instructions.

95.     Mylan disputes that ████████████████████████████████████████

████████ James Parker, a Senior Director in Sanofi's U.S. Regulatory Group and member of the Review Committee, testified that ████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████.[160]

96-99.  Although Mylan admits the assertions in Paragraphs 96-99 concerning Sanofi's Review Committee insofar as those assertions pertain to written promotional materials, Mylan disputes that the Review Committee ██████████████████████████████████████

████████████████████████ *See* Resp. to SMF ¶ 95.[161]

100.    Mylan disputes that Sanofi ██████████████████████████████████████

████████████████████████████████████████ The evidence cited does not support this assertion; it shows only that Sanofi ██████████████████████████

██████████████████████████████████████████████████████.

Sanofi referred only to the ████████████████████████████████████████

---

[160] Ex. 13 (Parker Dep.) at 29-30.
[161] *See also* Ex. 13 (Parker Dep.) at 29-30.



*See* SAMF ¶ 148.

101.    Mylan disputes that Sanofi "voluntarily recalled Auvi-Q" ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[162]

102. Mylan disputes that Sanofi "did not make a profit from Auvi-Q at any point." ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓.[163] These profits are subject to disgorgement

under the Lanham Act. 15 U.S.C. § 1117(a).

**D.    Mylan's Counterclaims Against Sanofi**

103.    Mylan disputes that there is no documentary evidence to support its counterclaims.

Mylan's Statement of Additional Material Facts ¶¶ 130-76 describes the evidence that shows

Sanofi violated the Lanham Act and engaged in unfair competition.

104.    Mylan disputes Sanofi's characterization of the evidence supporting Mylan's

allegation that Sanofi advertised Auvi-Q as the "new Epipen," "new talking EpiPen" and

"replacement EpiPen" as arising from only a single Sanofi business card, two declarations by

employees at an allergy clinic, and statements by individuals not employed by Sanofi. Statement

of Additional Material Facts ¶¶ 156-65 describes additional evidence supporting this allegation.

105.    Mylan disputes Sanofi's statement that there is "no documentary evidence"

supporting Mylan's allegation that Sanofi marketed EpiPen and Auvi-Q as interchangeable or

---

[162] Mylan MSJ SMF ¶¶ 142-45.
[163] Ex. 94 (monthly Auvi-Q P&L).

therapeutically equivalent. Mylan's Statement of Additional Material Facts ¶ 164 describes the evidence supporting this allegation. Mylan further disputes Sanofi's characterization of Dr. Blaiss's and Mr. Zieziula's testimony as "admit[ting] that [Auvi-Q and EpiPen] are equivalent." The quoted testimony did not refer to therapeutic equivalence.

106.     Mylan disputes Sanofi's characterization of the evidence supporting Mylan's allegation that Sanofi made improper claims about patient preference for Auvi-Q as being limited to one handwritten note and one Sanofi email. Mylan's Statement of Additional Material Facts ¶¶ 130-51 describes the evidence supporting this allegation. Mylan does not dispute that Sanofi accurately quotes its internal policy ████████████████████████, but that policy does not address ████████████████████████████████████████ ████████████████████████████████.

107.     Mylan disputes that its counterclaims are based on Sanofi's statement that "patients did not carry and/or know how to use their epinephrine auto-injectors." Sanofi not only advertised that some patients did not carry or know how to use their EAI devices, it advertised that *most* patients did not carry them as instructed, and falsely advertised that Auvi-Q was easier to carry, easier to use, and that patients would be more likely to carry it than EpiPen. Mylan's Statement of Additional Material Facts ¶¶ 130-51 describes the evidence showing Sanofi's use and dissemination of these false and misleading messages.

108.     Mylan admits that the statement Auvi-Q is the "first and only EAI … with a retract-able needle mechanism designed to help prevent accidental needle sticks" may by true on its face but asserts that such a statement is false by necessary implication when considered in its entirety because it conveys that other EAI devices are not designed to prevent accidental needle sticks.[164]

---

[164] Ex. 13 (Parker Dep.) at 34 ████████████████████████████████████████ ████████████████████████ *see* Resp. to SMF ¶ 77 ████████████████████████

110.    Mylan disputes Sanofi's characterization of the evidence because Jay York did not

testify that ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[165]

111.    Mylan disputes Sanofi's characterization of the deposition testimony of marketing

expert Gary Zieziula as expressing "no opinion[] about a causal relationship between Sanofi's

advertising and Mylan's alleged harm." Zieziula did not testify that Sanofi's promotional state-

ments "were not shown to be misleading by [a] survey of the relevant audience," only that *he* did

not personally conduct such a survey. Nor did he testify that Sanofi's messaging had no impact:

Zieziula testified that the "misleading messages and false advertising would have an effect" and

that he did not *quantify* that effect.[166] Zieziula also did not agree that the specific promotional

statements challenged by Mylan were literally true.[167]

Mylan also disputes the assertion that Jay York, Mylan's Rule 30(b)(6) designee on the

factual bases for its counterclaims, testified that Mylan "had no basis to claim [it] was harmed."

York explained that Mylan "learn[ed] that Sanofi's alleged conduct caused Mylan Specialty to

lose customers" when he received "widespread" reports from his managers and sales representa-

tives "across the nation" that physicians stated they had "switched the[ir] prescriptions" to Auvi-Q

because of confusion in the marketplace, namely Sanofi's marketing of the products as "inter-

changeable" and Sanofi's other "disparaging remarks" about EpiPen compared to Auvi-Q.[168]

---

[165] Ex. 21 (York 30(b)(6) Dep.) at 31-32.
[166] Ex. 22 (Zieziula Dep.) at 405.
[167] Ex. 22 (Zieziula Dep.) at 453-54 ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[168] Ex. 21 (York 30(b)(6) Dep.) at 10-12; *see also id.* at 19-20 (describing widespread "feedback from
medical staff and physicians stating that, hey, I wrote your new product, I wrote the new EpiPen, I've been
waiting for you to come in and see us, and then learning that it was not the new EpiPen"); *id.* at 34 (testifying
Mylan knew it was harmed "[b]ased on feedback from physicians and nursing staff and pharmacists").

Additionally, York's obligation as Mylan's corporate representative did not encompass summarizing evidence that *Sanofi* produced in discovery. Mylan's Statement of Additional Material Facts ¶¶ 166-76 describes additional evidence showing that Mylan was harmed by Sanofi's false advertising campaign.

113.    Mylan disputes that its counterclaims do not relate to Sanofi's "authorized promotional materials" and "widely disseminated approved messaging for Auvi-Q." Sanofi was responsible for its sales force messaging, and either condoned or turned a blind eye to the false messages widely disseminated by its sales force. *See* SAMF ¶¶ 130-32, 137-38.

## MYLAN'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE

Sanofi omits from its memorandum many critical facts that are in genuine dispute. The following paragraphs identify additional disputed material facts that merit consideration by the jury and are relevant to the issues raised by Sanofi's motion for summary judgment.

## I.    RELEVANT MARKET

### A.    Prefilled Syringes Are Part Of The Relevant Market

114.    Notably absent from Sanofi's discussion of non-EAIs is any mention of Novartis's Symjepi. Numerous industry and public sources have identified it as being a potential competitor against EAIs. CBS News, for example, referred to Symjepi as "an alternative to the EpiPen."[169] Business Insider called it "a cheaper EpiPen rival."[170] And FiercePharma termed it "Novartis and Adamis' EpiPen challenger."[171] Industry and public sources, in other words, view the market for treating anaphylaxis not as limited to EAIs but rather as encompassing products like Symjepi.

---

[169] CBS News, *Generic EpiPen alternative to hit the market in early 2019* (Dec. 7, 2018, 4:11 PM), https://cbsn.ws/2GL2ZIH.

[170] Emma Court, *Symjepi, a cheaper EpiPen rival, should hit the US in 2019*, Business Insider (Dec. 10, 2018, 4:20 PM), http://bit.ly/2M202YO.

[171] Angus Liu, *Novartis and Adamis' EpiPen challenger launches at a double-digit discount*, FiercePharma (Jan. 17, 2019, 10:20 AM), http://bit.ly/2YPpNBk.

115.    Symjepi's manufacturer Sandoz, too, views Symjepi as competing with EAIs. The website advertising Symjepi states that it "provides the same active ingredient as contained in the most widely used [EAIs]."[172] The website contrasts Symjepi's WAC against "currently available EAIs" and notes that Symjepi has a "thinner needle than that in the most widely used EAI."[173] And Sandoz's announcement that Symjepi will be available at retail calls it an "alternative to [EAIs]" and recommends that doctors write "epinephrine injection" for their prescriptions so that Symjepi can be dispensed in lieu of EAIs.[174]

116.    Dr. Blaiss also noted that Symjepi could substitute for EAIs, noting that there are "certain patients for whom the product might be appropriate to prescribe."[175]

## B.    Other, Non-EAI Products Will Come To Market During Sanofi's Damages Period

117.    Symjepi is not the only epinephrine product that Sanofi ignores. INSYS Therapeutics is developing a device for transmitting epinephrine intranasally; that project received fast-track status from the FDA in August 2018.[176] A second company, ARS Pharmaceuticals, also received fast-track status from the FDA for intranasal epinephrine in February 2019.[177] ██████████████

████████████████████████████████████████████████████████

████████.[178] ████████████████████████████████████████████

████████████████████.[179]

---

[172] Ex. 95 (Symjepi Website).
[173] Ex. 95 (Symjepi Website).
[174] Sandoz, *Sandoz extends SYMJEPI^TM (epinephrine) Injection launch to US pharmacies to help improve patient access to life-saving medicine* (July 9, 2019), http://bit.ly/2TerQtK.
[175] Ex. 24 (Blaiss Mar. 25 Rep.) at § 5.2.2.
[176] Ex. 24 (Blaiss Mar. 25 Rep.) at § 5.2.4.
[177] Ex. 1 (Blaiss Dep.) at 161-62; Cecilia Pessoa Gingerich, *FDA Fast Tracks Intranasal Epinephrine Spray*, MDMag (Feb. 20, 2019), http://bit.ly/2GTqXS9.
[178] Ex. 96 at Slide 8. ████████████████████████████████████████████████
████████████████████████████████ *Id.* at Slide 16.
[179] Ex. 47 at Slide 3; *see also* Ex. 46 at Slide 5.

118.    Other epinephrine products are also in development. One is sublingual epinephrine, meaning a tablet placed under the tongue that dissolves and releases epinephrine; such a tablet exists, and tests have shown it could create similar plasma epinephrine concentrations as epinephrine injected by an EAI into the thigh.[180] Another is a wearable epinephrine device that monitors for anaphylaxis and dispenses epinephrine as needed.[181]

119.    Sanofi's alleged "damages" in this case run through 2029.[182] Mylan's damages expert, Dr. Janusz Ordover, stated in his report that ███████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████.[183]

## C.    Certain Payors Operate Only In Certain Geographic Regions

120.    Many Payors operate nationwide. However, some other, smaller Payors operate in one state or region. Presbyterian Health, for example, operates almost exclusively in New Mexico.[184] And Horizon Blue Cross Blue Shield operates mostly in New Jersey.[185]

# II.    MONOPOLY POWER

## A.    Payors Were Significantly Larger And More Powerful Than Mylan

121.    Many Payors had revenues in the tens or hundreds of billions during the period in which Sanofi marketed Auvi-Q. As one example, ESI's annual revenue was $104 billion in 2013, $101 billion in 2014, and $102 billion in 2015.[186] Mylan's revenues pale in comparison. Its total

---

[180] Sanofi MSJ Ex. 10 at § 5.2.4.
[181] Sanofi MSJ Ex. 10 at § 5.2.4.
[182] *See* Sanofi MSJ Ex. 42 at Table 4.
[183] Ex. 28 (Ordover Rep.) ¶ 134.
[184] Ex. 4 (Cunico (Presbyterian) Dep.) at 23.
[185] Ex. 10 (Jan (Horizon) Dep.) at 49.
[186] Ex. 97 (excerpts from ESI 2015 10-K); *see also, e.g.*, Ex. 98 (excerpts from United 2015 10-K) (total revenue $110 billion in 2013, $115 billion in 2014, and $127 billion in 2015); Ex. 99 (excerpts from CVS Caremark 2015 10-K) (Pharmacy Services segment (which includes PBM services) made $76 billion in 2013, $88 billion in 2014, and $100 billion in 2015); Ex. 100 (excerpts from Aetna 2015 10-K) (total revenue of $47 billion in 2013, $58 billion in 2014, and $60 billion in 2015).

revenue was $7 billion in 2013, $8 billion in 2014, and $9 billion in 2015.[187]

122.   Payors in general are "highly consolidated,"[188] with the largest Payors managing tens of millions of lives. Dr. Scott Morton reported that the seven largest Payors managed prescription drug benefits and created formularies for 86% of commercial lives as of January 2015.[189]

### B.   Payors Imposed Price Protection On Mylan

123.   Many Payors negotiated with Mylan for price protection, which operated to protect Payors from WAC price increases. Price protection terms essentially put a cap on price increases; though under price protection Mylan would be permitted to raise EpiPen's WAC as it wished, any WAC increases above a certain point result in additional rebates to the Payor to offset the WAC increase.[190] Thus, if a contract had 8% price protection, any WAC price increase over 8% from the baseline WAC would result in additional rebates to the Payor.[191]

124.   Mylan



---

[187] Ex. 101 (excerpts from Mylan 2015 10-K).
[188] PhRMA, *Follow the Dollar* Report, Nov. 2017, https://onphr.ma/2MTiXWT.
[189] Sanofi MSJ Ex. 42 at ¶ 87 n.165 & Table 2.
[190] Mylan MSJ SMF ¶ 32.
[191] Mylan MSJ SMF ¶ 32.
[192] Ex. 102.
[193] Ex. 60 at -234.
[194] Ex. 103 at -699-700.



125.    By the time Sanofi recalled Auvi-Q, ████████████████████

███████████████████.[200]

████████████████[201]

**C.     Payors Frequently Excluded EpiPen,** ████████████████
████████████████████████

126.    Several Payors elected to exclude EpiPen from some or all of their formularies.

Geisinger Health Plan, for example, elected to make Auvi-Q the sole EAI in its main hospital.[202]

ESI excluded EpiPen from its High Performance Formulary.[203] CVS, too, excluded EpiPen from

both its Advanced Control and Value Formularies.[204]

---

[195] Ex. 104 at -726.
[196] Ex. 105 at -499.
[197] Ex. 106.
[198] Ex. 107 at -607-08.
[199] Ex. 108 at -327.
[200] SAMF ¶ 124; *see also* Ex. 71 at -533 (price protection for CVS effective 1/1/15); Ex. 109 at -928 (price protection for ESI and Anthem effective 1/1/14).
[201] *See* Ex. 110 at -309 (price protection for Humana effective 1/1/16); Ex. 111 at -090 (price protection for MedImpact effective 1/1/16); Ex. 112 at -364-65 (price protection for Cigna effective 1/17/17).
[202] Mylan MSJ SMF ¶ 113 n.248.
[203] Resp. to SMF ¶ 39.
[204] Resp. to SMF ¶ 39.

127.   Even more Payors decided to exclude EpiPen, only to change course at the last minute when Mylan made an improved offer. ████████████████████████████

████████████████████████████████,[205] ████████████████████████████████

████████████████████████████████████████████████████████████████████

██████[206] ████████████████████████████████████████████████████████████

████████████████████.[207] █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████,"[208] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████.[209] ██████████████████████████████████████████████████████████

██████,[210] ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

128.   Other Payors threatened to exclude EpiPen unless Mylan offered better rebates. As discussed above, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████.[211] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[205] Mylan MSJ SMF ¶¶ 100-01.
[206] Mylan MSJ SMF ¶ 103.
[207] Mylan MSJ SMF ¶ 117.
[208] Mylan MSJ SMF ¶ 117.
[209] Mylan MSJ SMF ¶ 118.
[210] Mylan MSJ SMF ¶ 118.
[211] SAMF ¶ 124.

██████████████████████████████████████████[212]

**D.     Sanofi** ████████████████████████████████████████

129.    ████████████████████████████████████████

████████████████████████████████████████████

██████████████.[213] ████████████████████████████

████████████████ ████████[214] ████████████████████

████████████████████████████████.[215] ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████.[216] ████████

████████████████████████████████████████████

████████████████████████████████████████.[217]

## III.    SANOFI'S MARKETING OF AUVI-Q

### A.     Sanofi Falsely Claimed That Auvi-Q Was Easier To Use, Easier To Carry, More Likely To Be Carried, And Preferred By Patients

130.    Sanofi's primary "Strategic Goal" for Auvi-Q at launch was to ████████████

████████████████████████████████████████████

████████████████████████████████.[218]

---

[212] Mylan MSJ SMF ¶ 130.
[213] Mylan MSJ SMF ¶ 114.
[214] SAMF ¶ 127.
[215] SAMF ¶ 126.
[216] Ex. 31 (Willig Rep.) at Ex. 2.
[217] Mylan MSJ SMF ¶¶ 119-23.
[218] Ex. 75 at Slides 38-39; Ex. 76 ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
                        Ex. 36 at Slide 33 ("████████████████████████
████████

131.    Before launch, Sanofi prepared a ███████████████████████



132.    Sanofi set the tone of its marketing campaign right out of the gate, with Bloomberg reporting on the day of Auvi-Q's launch that Sanofi's President of North America, Anne Whitaker, claimed that Auvi-Q was more "patient-friendly" than EpiPen.[223] As planned, Sanofi attempted to ████████████████████"[224] stating in its launch-day press release: "[T]wo large surveys ... show that two-thirds of patients and caregivers do not carry their epinephrine auto-injectors as recommended, and nearly half worry that others will not know how to use their or their child's epinephrine auto-injector correctly during an emergency. Multiple studies have found an association between delay in epinephrine administration and death from anaphylaxis."[225]

---

[219] Ex. 76 at Slide 8.
[220] Ex. 76 ████████████████████████████ see Ex. 32 (Zieziula Feb. 4 Rep.) at 8-9 (discussing Sanofi's two unpublished surveys); Sanofi MSJ Ex. 134 ████████████████
[221] Ex. 76 at Slide 9; see also Ex. 75 at Slides 40-41.
[222] Ex. 36 at Slide 87.
[223] Ex. 114.
[224] Ex. 76 ████████████████████
[225] Ex. 115 (Jan. 28, 2013 Auvi-Q Press Release).

133.    Sales force visits to healthcare providers (HCPs)—especially to allergists and pediatricians who write more than 40% of EAI device prescriptions—███████████████ ████████████████████████.[226] In particular, during peak prescription season for EAI devices, ███████████████████████████████[227]

134.    Sanofi needed ████████████████████████████████ ████████████████████████.[228] ████████████████████████████████████████ ████████████████████████████.[229]

135.    After Sanofi reviewed its proposed preference study with the FDA, Sanofi acknowledged internally that, ███████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████.[230] Sanofi did not generate "additional data" to support these comparative claims.[231]

136.    At the time of Auvi-Q's launch, no clinical data supported the claims that Auvi-Q was easier to carry than EpiPen, easier to use, or that patients would be more likely to carry it. Mylan's allergist expert, Dr. Blaiss, will testify that after Auvi-Q's launch he saw "just as many

---

[226] Ex. 75 at Slides 62-65; Ex. 116, ███████████████████████████████████ ████████████████████████████████████ Ex. 36 at Slide 55-57.

[227] Ex. 117 ████████████████████████████████ █████████████████████

[228] Ex. 75 at Slides 55-56.

[229] Ex. 75 ████████████████████████████████████ ███████████████████

[230] Ex. 90 at Slides 14, 16, 20-21; *see also* Ex. 118 ████████████████ ██████████████████

[231] Ex. 13 (Parker Dep.) at 47, 67, 70-75.

patients not carry their Auvi-Q to follow-up visits with [him] as any other epinephrine auto-injectors," and that "[a] high percentage of these devices are placed in a purse, diaper bag, or backpack so being rectangle versus tube shaped makes no difference in carrying it."[232]

137.    James Parker, a Senior Director in Sanofi's U.S. Regulatory Group and member of Sanofi's Review Committee while Auvi-Q was on the market, ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████.[233] Sanofi's national account representative Keith Wade ██████████████████ when he told large third-party payor United[234] ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████[235]

138.    Sanofi's sales force made unsubstantiated promotional claims in their face-to-face meetings with physicians, known as sales force "detailing," and they did so on a widespread basis. Sanofi's own market research studies reveal its false and misleading advertising campaign. For example, Sanofi ██████████████████████████████████████████████████

█████████████████████████████████████████[236] Auvi-Q's brand lead, Bryan Downey, ████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[232] Ex. 24 (Blaiss Mar. 25 Rep.) § 6.2.
[233] Ex. 13 (Parker Dep.) at 62-65.
[234] United provided commercial insurance for approximately 30 million consumers in 2013. *See* UnitedHealth Group 2013 Form 10-K, at 45 (Feb. 12, 2014), http://bit.ly/2MJPBIE.
[235] Ex. 119; Ex. 17 (Wade Dep.) at 70-73.
[236] Ex. 120; Ex. 121; Ex. 122 at Slide 9.

███████████████████████████████████████████████████████

█████[237]█████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████[238] Sanofi's pharmaceutical industry

expert conducted a statistical analysis on this same data, and concluded that ████████████

███████████████████████████████████████████████████████

█████████████████████████████████.[239]

139.   Sanofi conducted a █████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████.[240] ██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████.[241]

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[237] Ex. 121.
[238] Ex. 120 (April 2013) at Slide 30.
[239] Ex. 29 (Schur Mar. 25 Rep.) ¶ 38 & Appendix 3.
[240] Ex. 123 at Slide 27.
[241] Ex. 124.



140. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████.[242]

141. ███████████████████████████████████████████████████

██████████[243]█████████████████████████.[244] Sanofi tracked key metrics related

to Auvi-Q's launch in a weekly "launch tracker" circulated to Sanofi's leadership ███████

████████████████████████████████.[245]

142. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████.[246] █████████████████████

████████████████████,[247] ████████████████████████████

███████████████████████████████████████████████████

████████████████████.[248]

143. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[242] Ex. 123, at Slide 16.
[243] Ex. 122 at Slide 9.
[244] Ex. 125.
[245] Ex. 122 ████████████████████████████); Ex. 126
██████; Ex. 127 ████████████████████████████
[246] Ex. 128 ████████████████████████); Ex. 129 ████████
Ex. 130 (██████████████████████ Ex. 131 ███████████████████ Ex. 132
(████████████████████████); Ex. 32 (Zieziula Feb. 4 Rep.) at 6 ("Awareness Trial and Usage
(ATU) studies ... are the standard industry practice of how pharmaceutical companies track awareness, trial
and usage of launch brands, and message recall from physicians.").
[247] Ex. 133 ████████████████████████████████████████
[248] Ex. 134 at Slides 43-53; Ex. 135 at Slides 81-96; Ex. 136.



[249]

[250]

[251]

144.

[252]

[253] Sanofi

took these surveys into account when developing future business strategies for Auvi-Q. Based on

a 2014 ATU, for example,

[254]

145.

[255]

146.

---

[249] Ex. 128 at Slides 7, 11.
[250] Ex. 134 at Slide 49.
[251] Ex. 136 (Downey recommends "continued detailing" based on ATU results).
[252] Ex. 130 at Slide 13.
[253] Ex. 130 at Slides 39-40, 44 (24% of allergists recalled Sanofi rep making comparisons between Auvi-Q and EpiPen, 78% of whom listed "ease of use" as point of comparison), 66-67, 71 (53% of pediatricians recall Sanofi rep making comparisons between Auvi-Q and EpiPen, 85% of whom listed "ease of use" as point of comparison); Ex. 131 at Slides 13, 15; Ex. 132 at Slides 19-21, 29-30 (32% of allergists and 43% of pediatricians recalled direct comparisons between Auvi-Q and EpPen, most on ease of use).
[254] Ex. 137 at -122.
[255] Ex. 138 at Slide 63; Ex. 139 at Slide 76.



▆▆▆▆"[256] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.[257] The Brand Impact reports

further confirm that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆ ▆▆[258] Sample verbatim responses from physicians ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆;[259] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆;[260] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆[261] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[262] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆"[263] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[264] ▆▆▆▆▆▆

147.    Mylan conducted its own Physician ATU research to "▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆[265] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[256] Ex. 140.
[257] Ex. 141 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[258] Ex. 142 at Slides 15-17; Ex. 143 at Slides 15-16; Ex. 144 at Slides 13-15; Ex. 145 at Slides 4, 28.
[259] Ex. 145 at Slide 26.
[260] Ex. 145 at Slide 26.
[261] Ex. 144 at Slide 11.
[262] Ex. 142 at Slide 13.
[263] Ex. 142 at Slide 13.
[264] Ex. 146 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[265] Ex. 113 at Slide 4.



148.    Sanofi sales representatives went one step beyond making these false representations orally, sometimes putting them in writing on notes left at physician offices.[268] For example, a Sanofi sales representative wrote to one physician: "The overwhelming majority of patients given the choice by their clinician prefer … Auvi-Q as evidenced by clinical experience & peer reviewed surveys."[269]

"[270]

149.    Variations of the same phrase used on the handwritten note—that patients "overwhelmingly prefer" Auvi-Q—

.[271]

150.    There is no evidence in the record that Sanofi ever instructed its sales representatives to stop making these false and improper comparative claims in their face-to-face meetings with physicians and other healthcare professionals.

---

[266] Ex. 113 at Slide 61; *see also* Ex. 147 at Slide 20 (reflecting same message recalled in 2014).
[267] Ex. 148 (Mylan ATU Wave 8, 2015) at Slide 51.
[268] *E.g.*, Ex. 149 at -672 (note by Sanofi sales representative calling Auvi-Q "a more user-friendly epinephrine auto injector"); Ex. 150 (note asserting "Auvi-Q may improve appropriateness of epinephrine" "because many patients forget how to appropriately administer epinephrine").[268]
[269] Sanofi MSJ Ex. 141, at -390.
[270] Sanofi MSJ Ex. 134, at -135.
[271] *E.g.*, Ex. 119                Ex. 151                Ex. 153 (

151.    Zieziula concluded, based on his 40 years of industry experience—which includes oversight of sales representatives and other marketing roles—and his review of the parties' competitive intelligence reports and market research, that "Sanofi had widespread use of making claims that were unsubstantiated by data and the preference study," specifically the "easier to use, more likely to carry, [and] overwhelmingly preferred" claims.[272] He based this opinion in part on the fact that the "comparative claims … were being made by Sanofi in multiple places … in different areas of the company" such as by "account people, sales reps … [and] Anne Whitaker."[273] He further explained that the use of the same messages "multiple times with different customers and in a variety of settings" evidences that the messages were known by the brand team.[274]

152.    Horizon Blue Cross Blue Shield of New Jersey—a large insurer covering approximately one million commercial lives—determined based on Sanofi's preference study, ███████████████████████████████████████████, that Auvi-Q should be covered as a preferred product on Horizon's commercial formulary.[275] Horizon ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████"[276]

## B.    Sanofi Falsely Marketed Auvi-Q As The Only EAI Device With Needlestick Protection

153.    Sanofi's "I talk" advertisement stated that Auvi-Q is the "first and only EAI with ... retractable needle mechanism designed to help prevent accidental needle sticks."[277] This

---

[272] Ex. 22 (Zieziula Dep.) at 238; *see also* Ex. 183 (Zieziula Apr. 18 Rep.) at 2-7.
[273] Ex. 22 (Zieziula Dep.). at 251.
[274] Ex. 32 (Zieziula Feb. 4 Rep.) at 7-8; *see also* Ex. 183 (Zieziula Apr. 18 Rep.) at 7 (explaining why field force reports are "especially helpful in identifying broad marketing messaging").
[275] Exs. 154-155; Ex. 10 (Jan (Horizon) Dep.) at 103-116.
[276] Ex. 154 at -406.
[277] Ex. 156; *see also* Sanofi MSJ Ex. 121.

advertisement was widely disseminated by Sanofi to physicians and payors.[278]

154.   This claim necessarily implies that other EAI devices do not have needlestick protection, notwithstanding that EpiPen has had needlestick protection since 2009. SMF ¶ 77. Sanofi's James Parker conceded that ███████████████████████████████████████████
███████████████████████████████████████[279]

155.   Sanofi had no clinical data at the time of Auvi-Q's launch establishing that Auvi-Q's design made accidental needlesticks or lacerations less likely than EpiPen's design.

**C.    Sanofi Falsely Marketed Auvi-Q As The "New EpiPen"**

156.   Sanofi was aware from pre-launch research ███████████████████████
██████████████████████████.[280] Sanofi sales representatives nonetheless referred to Auvi-Q as the "new EpiPen" or "new talking EpiPen."

157.   Jhade Alcorn and Brynna Hartneck, both employees of an allergy clinic in Arizona, provided sworn declarations that a Sanofi sales representative stated Auvi-Q was going to replace the EpiPen and was the "new EpiPen." Alcorn therefore believed that EpiPen "was being phased out and that [the practice] would have to switch to the Auvi-Q" until the Mylan representative "informed [her] that the EpiPen was still going to be available."[281] Mylan listed both declarants on its initial disclosures,[282] but Sanofi did not depose either witness.

158.   Dr. Blaiss will testify that pharmaceutical sales representatives call on physicians' office staff, including physician assistants and nurses, and that "[d]etailing on staff can also affect

---

[278] Ex. 157 ███████████████████████████████████████████████
Ex.  158 ███████████████████████████████████████████████
████████████████████████████████
[279] Ex. 13 (Parker Dep.) at 34.
[280] Ex. 159 at Slide 12.
[281] Ex. 160 at -798 (Hartneck Decl.); *id.* at -800-01 (Alcorn Decl.).
[282] Ex. 161 at 4.

physicians' prescribing habits."[283] Zieiziula will also testify that Sanofi's marketing Auvi-Q as
"'new EpiPen" would be harmful to … the *brand* equity of EpiPen."[284]



161.    Zieziula will testify that he has frequently and reasonably relied in the ordinary
course of business "on reports from sales representatives of frequent occurrences of confusing
messaging, combined with documented evidence of those messages, to determine whether a
competitor's messaging campaign was widespread." Based on that experience, interviews, and
review of competitive intelligence reports, he will opine that Sanofi's "new EpiPen" messaging
was widespread.[287]

162.    Zieziula relied among other things on testimony of Mylan's corporate representa-
tive, Jay York. York testified that when Auvi-Q launched he received "widespread" reports from
"across the nation"—"from my regional director counterparts, from my managers, from repre-
sentatives"—that Sanofi was promoting Auvi-Q as the "new EpiPen," including that physicians
reported to Mylan's sales reps, "I wrote [a prescription for] your new product."[288] Zieziula also

---

[283] Ex. 25 (Blaiss Apr. 18 Rep.) at 4.
[284] Ex. 32 (Zieziula Feb. 4 Rep.) at 10.
[285] Ex. 162.
[286] Ex. 163 ████████████████████ Ex. 164 ████████████
████████████████████████████████ Ex. 165 ████████
████████████████ 
[287] Ex. 32 (Zieziula Feb. 4 Rep.) at 10-11.
[288] Ex. 20 (York 30(b)(1) Dep.) at 161.

relied on evidence of dissemination of these messages across numerous geographic areas, includ-

ing Arizona, California, Massachusetts, and Alabama.[289] He identified "repeated examples" of the

"same ['new EpiPen'] claims … being delivered to physicians in different regions," and concluded

"that this is just not a one- or two-person situation. That it's much more widespread."[290]

163.   Sanofi also launched a direct-to-consumer (DTC) campaign on YouTube where

Auvi-Q ads would run across the page if viewers used certain search terms. ███████

██████████████████████████████████████████████████████████

████████.[291] ████████████████████████████████████████████

████████████████████████████████[292]

164.   Sanofi reinforced its message that the products were interchangeable by falsely

suggesting that the FDA had deemed the products "therapeutic equivalents," a term with specific

clinical meaning.[293] The Auvi-Q website at launch stated that EpiPen and Auvi-Q were

bioequivalent without stating that the FDA had not listed the products as therapeutic equivalents.[294]

Sanofi added a disclaimer only after Mylan complained to the FDA.[295]

165.   There is no evidence in the record that Sanofi instructed its sales force to stop

describing Auvi-Q as the "new EpiPen," even after Mylan raised the issue with Sanofi.[296]

---

[289] Ex. 32 (Zieziula Feb. 4 Rep.) at 11, citing Ex. 160 at 803 (Sanofi's sale representative's business card left in Arizona clinic had "new epipen" written on it); Ex. 166 (declaration from nurse in California who heard "new EpiPen" message); Ex. 167 (report that Sanofi sales representative spoke to group of nurses in Alabama and called Auvi-Q the "new talking EpiPen.").
[290] Ex. 22 (Zieziula Dep.) at 254-55.
[291] Ex. 168.
[292] Ex. 169 at Slide 4; Ex. 170 ███████████████████ Ex. 171 (Auvi-Q Consumer July 2014 Report) at 7.
[293] Ex. 27 (Navarro Rep.) at ¶ 93.
[294] Ex. 172 (Auvi-Q web site dated February 4, 2013).
[295] Ex. 173 at -747-48 (Mylan letter to FDA, January 29, 2013) at 71-72; Ex. 174 (Auvi-Q web site dated July 12, 2013 from Internet Archive Waybackmachine, http://bit.ly/2OIxypb).
[296] Ex. 175 (Mylan letter to Sanofi, Feb. 8, 2013).

**D.    Physicians** ███████████████ **Sanofi's False Advertising Affected Prescribing Behavior**

166.    The sales force detailing campaign undertaken by Sanofi upon Auvi-Q's launch—of which the false and misleading messages described above were a key ████████████████

████████████████████████████████████████████████████.[297]

167.    Sanofi tracked ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████.[298]

168.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████.[299]

169.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.[301]

170.    In September 2013, ████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[297] *E.g.*, Ex. 127 at Slide 53; *see also* SAMF ¶¶ 167-76.
[298] Ex. 176; Ex. 177.
[299] Ex. 178 at -329 (tracker) at Slide 2.
[300] Ex. 179 (Auvi-Q Launch Tracker, August 12, 2013) at Slide 27.
[301] Ex. 179 at Slide 48.

████████████████████████████████████████████[302]

171.    In November 2013, Auvi-Q's brand lead, Bryan Downey, sent to the head of Sanofi's allergy division a ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████[303]

172.    According to Sanofi's damages expert, economics professor Steven Wiggins, the methodology for determining whether Sanofi's conduct injured Mylan starts with comparing Auvi-Q's actual share of EAI prescriptions to Mylan's and Sanofi's pre-launch forecasts for Auvi-Q. He opines that if Auvi-Q's actual share fell below the forecasts, that is evidence that Sanofi's conduct did not injure Mylan.[304] However, if Auvi-Q's actual share exceeded Sanofi's forecast, that is evidence that Mylan was injured by Sanofi.[305]

173.    Wiggins's methodology shows that Sanofi's conduct injured Mylan in 2013 because Wiggins testified that in ████████████████████████████████████

████████████████████████.[306]

174.    Wiggins's methodology also shows that Sanofi's conduct injured Mylan because Auvi-Q's shares at Horizon and Michigan—Wiggins's preferred measures of Auvi-Q's perform-ance[307]—exceeded the forecasts by greater amounts and for longer periods than Auvi-Q's national share. Auvi-Q's share at Horizon exceeded Mylan's forecast from launch until January 2014, and exceeded Sanofi's forecast until January 2015. Auvi-Q's share at Michigan exceeded both

---

[302] Ex. 180.
[303] Ex. 127 at Slide 53.
[304] Ex. 30 (Wiggins Rep.) ¶¶ 37-40, 76-81; Ex. 19 (Wiggins Dep.) at 57-58, 103-12.
[305] *See* Ex. 30 (Wiggins Rep.) ¶ 77; Ex. 19 (Wiggins Dep.) at 57-59.
[306] Ex. 19 (Wiggins Dep.) at 32-38.
[307] Ex. 19 (Wiggins Dep.) at 103-12.

forecasts from mid-2013 until the end of the year and exceeded Sanofi's forecast until mid-2014.[308]

175.    The impact of Sanofi's sales force messaging continued beyond Auvi-Q's launch year.



[309] In 2014, when Sanofi's overall share of EAI prescriptions declined, Sanofi concluded that

176.

## ARGUMENT

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute of material fact is "genuine … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

[308] Sanofi MSJ Ex. 42 ¶ 206 & Fig. 14.
[309] Ex. 130
[310] Ex. 181 at Slides 29-31.
[311] Ex. 131
[312] Ex. 131 at Slides 44-46.
[313] Ex. 131 at Slide 86.
[314] Ex. 182

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "on summary judgment the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[315]

Here, Sanofi cannot meet its burden to secure either partial summary judgment on market definition and monopoly power or summary judgment on Mylan's counterclaims. Its attempt to limit the market to just EAIs founders in the face of ample evidence that Sanofi, Mylan, and other industry sources considered Benadryl and vials and syringes of epinephrine to be competitors with EAIs. Its argument on monopoly power runs directly contrary to the evidence that Mylan had neither unfettered control over price nor the power to exclude competition. And its arguments challenging Mylan's counterclaims completely ignore its own survey research, testimony, and other record evidence confirming that Sanofi sales representative made literally false and misleading statements in commercial advertising that increased Auvi-Q prescriptions at Mylan's expense.

## I.   SANOFI IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON MARKET DEFINITION

### A.   Sanofi Bears The Burden Of Proof

"'The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power.'" *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1117 (10th Cir. 2008) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966)). "In assessing the existence of monopoly power, we must begin by identifying the relevant product market." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1119-20 (10th Cir. 2014). At the outset, it is crucial to note that "*[the plaintiff] bears the burden on*" proving the relevant product market. *Id.* at 1120 (emphasis added). At the summary judgment stage, it is not enough for Sanofi

---

[315] All internal quotation marks and citations are omitted unless otherwise noted.

to set out a *plausible* market definition; instead, Sanofi must lay out a market definition that no reasonable jury could reject. "[S]ummary judgment on market definition issues often is inappropriate because the pertinent facts are disputed." 1 ABA Section on Antitrust Law, *Antitrust Law Developments* § 6F-3 (8th ed. 2018). As set out below, it would indeed be inappropriate in this case.

### B.     Sanofi Has Failed To Show That Benadryl, Prefilled Syringes, And Other Epinephrine Products Are Not Reasonably Interchangeable With EAIs

"[T]he relevant market must include all products reasonably interchangeable by consumers for the same purposes." *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc); *see also, e.g., Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017) ("The relevant product market in any given case is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) (Gorsuch, J.). "The market need not be limited to products which are identical in nature. Instead, the test is loose and flexible." *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1330 (7th Cir. 1981).

There is ample evidence that Sanofi's market definition is too narrow. First, a jury could find that Benadryl and other antihistamines should be included in the product market. As detailed above, Mylan employees ███████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

53



███████████████████████████████████████ ██ [316]
███████████████████████████████████████████████

█████████████████████████ *Id.* And Dr. Blaiss, Mylan's allergist expert, will testify that "there is still use of antihistamines … in the initial treatment of [anaphylaxis]." Resp. to SMF ¶ 12.

Sanofi ignores all this evidence. It primarily argues that antihistamines like Benadryl are not part of the relevant product market based on their indications; in other words, Sanofi concludes that because the products *should not be* interchangeable they *were not* interchanged. Sanofi Br. 40-41. But the record is replete with evidence—from Mylan's internal documents, Sanofi's internal documents, and Mylan witness testimony—that this conclusion is mistaken. Sanofi and Mylan both treated Benadryl as something patients often choose in lieu of an EAI. Sanofi misleadingly quotes ████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ Resp. to SMF ¶ 20. Courts have frequently faulted plaintiffs for making only a "cursory assessment of reasonable substitutes" in attempting to define the product market, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1247 (11th Cir. 2002), and that is precisely what Sanofi has done; it has focused on what it believes patients and physicians should have done rather than what they actually did. A reasonable jury could certainly reject Sanofi's misleading quotations and incomplete reasoning in favor of the wealth of evidence that consumers did use Benadryl instead of EAIs, and that both Sanofi and Mylan were aware of it.

Second, a jury could find that the relevant product market also includes vials and syringes of epinephrine. ███████████████████████████████████████

████████████████████████████. Resp. to SMF ¶ 21. ███████████████████████

---

[316] Mylan is not asserting that Benadryl treats anaphylaxis—only that doctors and patients believed it did.

██████████████████████████████ SMF ¶ 17. Sanofi admits that "epinephrine can technically be administered through vials and syringes" but dismisses them because "[v]ials and syringes do not share the same qualities as EAI drug devices" and therefore "are not practical substitutes." Sanofi Br. 40. But "[r]easonable interchangeability does not depend upon product similarity." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002); *see also, e.g.*, *Kaiser Aluminum*, 652 F.2d at 1330. So Sanofi errs when it proclaims that vials and syringes cannot be substitutes because they do not have the same qualities. All agree that syringes and vials are used for the treatment of anaphylaxis in hospitals and other institutional settings; they therefore competed with EpiPen for treating anaphylaxis. Resp. to SMF ¶ 15.

One prefilled syringe, Novartis's Symjepi, has come to market specifically as a competitor to EpiPen and other EAIs. ████████████████████████████████████████

███████████████████. Resp. to SMF ¶ 17. Dr. Blaiss noted that there are "certain patients for whom [Symjepi] might be appropriate to prescribe." SAMF ¶ 116. ████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████," Ex. 26 ¶ 14, but of course this is completely inapplicable to Symjepi, which is a prefilled syringe and does not require any measurement of the amount of epinephrine to be injected. Novartis has realized it has a competitor to EAIs on its hands, SAMF ¶ 115, and it recently began offering Symjepi in pharmacies, competing in the market it defines as "epinephrine injection," *id.*[317] Industry and public sources, too, have suggested that Symjepi is an EpiPen "alternative," "rival," or "challenger." *Id.* ¶ 114.

---

[317] Sanofi may seek to dismiss Symjepi on the ground that it was not available when Sanofi marketed Auvi-Q. First, and as discussed above, it is clear that Mylan and Sanofi were aware of Symjepi as a potential competitor, and it influenced their actions accordingly. Second, evidence that Sanofi, Mylan, Novartis, and industry and public sources all concluded that a prefilled syringe competes with EpiPen is proof that syringes and vials are part of the relevant market. Third, and as discussed below, Sanofi's damages theory has *made* post-recall facts relevant, in that its "damages" claim depends on allegations about the future.

Given the wealth of evidence regarding competition with prefilled vials and syringes, a reasonable jury could find that those products should also be included in the relevant product market.

Third, Sanofi's failure to limit its market definition temporally means that the relevant market for damages purposes would also have to include other, non-EAI devices that will come on the market. Sanofi seeks "damages" through 2029, and its claim depends, among other things, on its assertion that Mylan would have maintained its alleged monopoly power through 2029. That alleged monopoly power, in turn, is only monopoly power over the alleged EAI market, as Sanofi does not allege monopoly power over anything but EAIs. Sanofi's "damages" claim thus depends on the alleged EAI market remaining the only relevant market through 2029. But a variety of competitor products are expected to enter the market before the Auvi-Q patent expires—nasal epinephrine, sublingual epinephrine, and wearable epinephrine injectors just for a start. SAMF ¶¶ 117-18. Again, any market definition that excludes those products is too narrow; Sanofi's limiting the market to EAIs ignores devices that will serve as competition during Sanofi's damages period. A reasonable jury could find that the relevant market must include those new devices.

### C.    Sanofi's Proposed Hypothetical-Monopolist Test Does Not Resolve The Issue Of Market Definition, And In Any Event Sanofi Conducted It Incorrectly

Sanofi's alleged real-world evidence of the relevant product market fares no better. Sanofi offers only one supposed confirmation of its product market definition that is based on actual data—the hypothetical-monopolist test ("HMT"). Sanofi Br. 41-42. The test asks whether "a hypothetical profit-maximizing firm … that was the only present and future seller of [all products in the proposed market] likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market." Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1.1 (Aug. 19, 2010) ("Merger Guidelines"); *see also, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (Op. of Brown, J.) ("In

the SSNIP method, one asks whether a hypothetical monopolist controlling all suppliers in the proposed market could profit from a small price increase."). If the hypothetical monopolist could impose an SSNIP on the alleged product market, then it is a relevant product market.

Sanofi ignores what its own cases say about the HMT and the pharmaceutical market. The pharmaceutical industry has a well-known price disconnect problem, with consumers being only vaguely aware of the true cost of the drugs or devices they buy. As the Third Circuit stated in a case Sanofi cites, "[i]n the prescription drug market … the doctor selects the drug, which creates a certain separation between the buyer and the manufacturer. Moreover, in most cases, a third-party, such as a health insurance company, pays for the drug. As a result, consumer buying behavior may have less of an impact on manufacturer pricing than it otherwise would in a traditional open market." *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 428 (3d Cir. 2016). This price disconnect led the court in *FTC v. AbbVie Inc.*—a case Sanofi cites—to reject the proposed application of the HMT entirely: "application of the HMT would result in a market limited to a brand-name drug and its AB-rated generic in almost every instance," and using it "may also lead to relatively narrow markets that would exclude some competing products when gross margins are high, which is the case in the pharmaceutical industry." 329 F. Supp. 3d 98, 130 & n.21 (E.D. Pa. 2018). The Court could conclude that Sanofi's proposed application of the HMT—which focuses exclusively on the relationship between price and consumer behavior—is a poor fit for this case.

Sanofi has also applied the HMT incorrectly; its application supports not an EAIs-only market but an EpiPen-only market, which is not the product market for which it argues. Sanofi suggests that there is no need to conduct a *hypothetical* monopolist test because Mylan itself imposed SSNIPs. Sanofi Br. 42. So Sanofi has not answered whether a hypothetical monopolist

controlling EAIs could impose a SSNIP, which is the relevant question both from an economic perspective and from case law. *See, e.g.*, *Whole Foods*, 548 F.3d at 1038. Instead, it has attempted to answer whether an accused monopolist controlling one EAI could impose a SSNIP for its product. Even taking Sanofi's evidence of price increases at face value (which this Court should not do, for the reasons explained below in § II.A.1), its application of the HMT would lead to the conclusion that the product market encompasses only EpiPen. The *AbbVie* court rejected application of the test for very similar reasons, *AbbVie*, 329 F. Supp. 3d at 130, and indeed "courts reject market definitions consisting of one supplier's products where other brands compete." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 480 (3d Cir. 1992) (en banc). Given the disconnect between the product market it advocates and the market that its application of the HMT would "prove," a reasonable jury could reject Sanofi's conclusion.

And that is all Sanofi has. It does not offer any measurement of actual consumer behavior beyond its flawed application of the HMT. Indeed, it does not otherwise try to measure consumer behavior *at all*. A reasonable jury could prefer the evidence of actual competition from Benadryl, prefilled syringes, and other new devices over Sanofi's incorrectly performed test.

## D.   A Jury Could Find That Each Payor Was An Individual Market, Meaning That Sanofi's Market Definition Is Too Broad

Alternatively, Sanofi's market definition is too broad. The Merger Guidelines note that, in attempting to define the relevant market, the FTC and DOJ "often consider markets for targeted customers when prices are individually negotiated"; "[i]f prices are negotiated individually with customers, the hypothetical monopolist test may suggest relevant markets that are as narrow as individual customers." Merger Guidelines § 4.1.4. Courts, too, have applied this teaching. For example, the court in *FTC v. Sysco Corp.* noted that "the evidence is clear that Defendants engage in individual negotiations with their national customers" and quoted the Merger Guidelines in the

course of deciding a relevant product market for a merger challenge. 113 F. Supp. 3d 1, 39 n.20, 46 (D.D.C. 2015). Sanofi contends in its brief that Payor-specific markets would be a "radical" market definition, Sanofi Br. 44, but the concept appears in the Merger Guidelines used by the two federal antitrust enforcers and has been applied in cases addressing those issues.

In this case, prices were negotiated individually, and a jury could find Payor-specific markets appropriate. Each Payor negotiated individually with Mylan and Sanofi, and the prices each Payor agreed to for EpiPen and Auvi-Q differed substantially. Mylan MSJ SMF ¶¶ 76-112. What is more, the means by which the prices were agreed differed widely; ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ *Id.* at ¶¶ 61-63, 67, 76, 82, 113. In other words, negotiations for formulary placement are a far cry from, for example, a decision by a grocery store to raise prices by a certain percentage, which the D.C. Circuit faced in *Whole Foods*. Sanofi's sole objection to the factual appropriateness of such a market definition is that "all PBMs and payors are subject to the same negotiation process with Mylan." Sanofi Br. 44. The Merger Guidelines, however, do not refer to whether negotiation processes differ between customers but rather to whether "prices are negotiated individually with customers." Merger Guidelines § 4.1.4. Whether the negotiation process differed between Payors is irrelevant. Moreover, as discussed above, the individual processes differed as well, and the course of negotiations—who first raised formulary restrictions, how the restrictions came about, etc.—differed radically from Payor to Payor.

Dr. Willig will testify as to why this distinction is important. In his opinion, ████████

██████████████████████████████████████████

██████████████████████████████████████████

Dr. Willig will explain, therefore, that, ██████████████████████████████
████████████████████████████████████████████████████████. *Id.*
Here, any overall rise in EAI prices is not attributable to a generalized decision by EAI
manufacturers to raise prices but resulted from tens or hundreds of individual negotiations—
especially because there was no opportunity for arbitrage by Payors, who could not secure one low
price for EpiPen from Mylan and then resell to competing Payors at a higher price. So it would be
impossible to evaluate why any hypothetical general rise in prices happened without understanding
individual negotiations. Sanofi's attempt to define the market broadly, while ignoring Payor-by-
Payor competition, provides an unreliable basis (and certainly not one a jury would *have to* accept)
for concluding that Mylan had monopoly power. Sanofi is simply wrong to assert that Mylan raised
prices by a given percentage, and customers had no choice but to stick with EAIs. For this reason
and the many others discussed above, Sanofi has not met its burden to prove that the relevant
product market consists of no more and no less than EAIs.[318]

## II.   SANOFI IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON MARKET POWER

In the Tenth Circuit, monopoly power "requires proof of *both* power to control prices and
power to exclude competition." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951,
966-67 (10th Cir. 1990); *see also, e.g.*, *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159,
164 (10th Cir. 1986) ("We hold, therefore, that monopoly power is correctly defined in this circuit
as the ability to control prices *and* exclude competition."). That proof can come "through direct or
indirect evidence." *Mylan*, 838 F.3d at 434. Here, Sanofi purports to offer both direct and indirect

---

[318] Mylan admits that the relevant geographic market is the United States. However, certain Payors only
operate in certain geographical areas; Horizon, for example, operates only in New Jersey, and Presbyterian
Health operates only in New Mexico. SAMF ¶ 120. Because a jury could conclude that competition is best
understood in this market on a Payor-by-Payor basis, relevant geographical distinctions between Payors
cannot be ignored.

evidence of monopoly power and contends that a reasonable jury would *have* to accept it. But, in truth, the record shows that Mylan had neither the power to control price nor the power to exclude competition, and therefore that it did not have monopoly power. Although Mylan has not moved for summary judgment on this issue, the record comes far closer to conclusively showing the *absence* of monopoly power than showing its presence beyond any genuine dispute of material fact.

### A.    Sanofi's "Direct" Evidence Of Mylan's Supposed Ability To Control Price And Exclude Competition Shows The Opposite

Sanofi attempts to provide direct evidence of Mylan's ability to control prices and its ability to exclude competition, though it does not mention its burden to prove both. But Sanofi cannot meet either point, let alone both. Its evidence only shows that Mylan did *not* have unfettered control over price and lacked the ability to exclude competitors from entering. Either point alone is enough for the Court to reject Sanofi's motion for partial summary judgment on monopoly power.

#### 1.    Mylan Was Unable To Raise EpiPen's Price Above The Competitive Level

It is important to understand the kind of price increases necessary to prove monopoly power, and why Sanofi's evidence falls so woefully short. A firm does not have monopoly power simply because it can raise prices without losing profits; "a firm is a monopolist [and therefore enjoys monopoly power] if it can profitably raise prices *substantially above the competitive level*." *Microsoft*, 253 F.3d at 51 (emphasis added); *accord, e.g.*, *Mylan*, 838 F.3d at 434 ("[T]he existence of monopoly power may be proven through direct evidence of supracompetitive prices and restricted output." (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007)); *Novell*, 731 F.3d at 1071 (stating that direct evidence of monopoly power requires "showing the defendant has actually raised prices substantially above a competitive level without sacrificing business"). Sanofi, however, makes no averment in its brief as to what the competitive price for EpiPen was, and indeed Dr. Scott Morton did not attempt to establish the competitive price in her

reports. Sanofi has therefore provided the Court with no basis to answer the question that *actually matters*—whether Mylan raised price "substantially above the competitive level." *Microsoft*, 253 F.3d at 51. Without such evidence, Sanofi cannot even prove as a fact that Mylan possessed monopoly power, much less show that it is entitled to judgment on the issue as a matter of law.

Sanofi has also failed to show Mylan's ability to restrict market-wide output, which is necessary in order to raise prices above the competitive level. "Market power comes from the ability to cut back the market's total output and so raise price." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986); *see also, e.g.*, *Mylan*, 838 F.3d at 434 (requiring proof of both "supracompetitive prices" and "restricted output" for direct evidence of monopoly power). Such restricted output must be across the entirety of the market; that is, Sanofi must show not just that Mylan restricted EpiPen output but "that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F. 3d 1421, 1439 (9th Cir. 1995). The reason is straightforward: If a supposed monopolist attempts to cut output to raise price and its rivals in the market can simply expand manufacturing to maintain output at current levels, then the price increase would be unprofitable because its rivals would simply sell more goods at a lower price and so take sales from the supposed monopolist. *Ball Mem'l*, 784 F.2d at 1335. Monopoly power as demonstrated by the ability to raise price therefore depends upon the inability of competitors to increase output. Sanofi has not attempted to show that it could not have increased output. Indeed, total output of EAIs, as well as total output of EpiPens, increased every year Auvi-Q was on the market. *See* Resp. to SMF ¶ 65. ███████████████████████████████████. Resp. to SMF ¶¶ 64-65. That Mylan was able to raise prices while output continually expanded is clear evidence that Mylan never priced above the competitive level. This failure of proof is also fatal.

Setting aside Sanofi's failures of proof—either of which is enough to show a lack of monopoly power on its own—a jury could absolutely find that Mylan could not raise prices without constraint. First, ███████████████████████████████████████████████████████ ████████████████████████████ *see* Mylan MSJ SMF ¶¶ 61-64, 76-112; it is difficult to see how Mylan's pricing was "unconstrained in a market with minimal competition," Sanofi Br. 54, █████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████" SAMF ¶ 124. Mylan could not simply set whatever price it wanted.

Moreover, Mylan's inability to raise prices without constraint is also established by what actually happened to the net price of EpiPen when Sanofi marketed Auvi-Q. Although ████████ ████████████████████████████████████████████████████████████████████████ ████████████. Resp. to SMF ¶ 46. ████████████████████████████████████████████ SAMF ¶ 129; *see also* Mylan MSJ SMF ¶¶ 69, 114-25. Moreover,████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████. Resp. to SMF ¶ 46. In other words, Sanofi paints with much too broad a brush; ████████████████████ ████████████████████████████████████████████████████████████████████████ reinforcing the point above that competition must be evaluated on a Payor-by-Payor basis.

ESI provides an especially illuminating example. Sanofi paints ████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████



Resp. to SMF ¶ 47. The full ESI story is dramatic evidence of Mylan's inability to control prices, and at a minimum puts the issue in genuine dispute.

Finally, Sanofi argues that Mylan reduced or retracted rebates after Sanofi recalled Auvi-Q. If true, such evidence would suggest that Mylan *gained* the ability to raise prices after Sanofi exited, meaning it could not do so when Sanofi was a rival. Setting that aside, █████████

██████████████████████████████████████████

██████████████████████ Resp. to SMF ¶ 67. ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████. *Id.*

In sum, Sanofi has provided no evidence on two crucial points, and it has ignored other relevant evidence showing that Mylan could not raise price above the competitive level. That is more than enough to deny Sanofi's request for summary judgment on the issue of monopoly power.

### 2. Mylan Did Not Successfully Exclude Competition

Sanofi appears to believe that Mylan "excluded competition" within the meaning of monopoly-power cases by winning exclusive formulary coverage (and, perhaps, where Auvi-Q had a step-edit or prior authorization placed on it). It cites no case law for that proposition, or for the broader proposition that winning exclusive contracts is itself proof of monopoly power. What Sanofi does not allege, because it cannot, is that Mylan's actions, either by preventing its entry or

64

forcing its departure, excluded it entirely from the relevant market. That is the type of exclusion from competition upon which the cases it cites focus. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477 (1992) (referring to Kodak's ability to "drive out competition in the aftermarkets"); *LePage's Inc. v. 3M,* 324 F.3d 141, 159 (3d Cir. 2003) (en banc) (discussing "foreclosure" of competitors "from the market"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) (noting that Dentsply's actions made competitors unable to enter market).

Here, by contrast, Sanofi entered the market even with its allegations that Mylan attempted to insert exclusivity provisions into all of its agreements with Payors. And Mylan's contracting strategy did not precipitate its exit. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ That recall, too, prompted only *Sanofi's* exit, not the exit of a competing *product*; Auvi-Q is still on the market and competing with EpiPen today, so the only time Auvi-Q has been absent from the market since launch was when Sanofi recalled it. A reasonable jury could surely find no exclusion from competition when the only time Auvi-Q has not been actively competing with Mylan since its launch was when it was recalled through no fault of Mylan's.

Setting its theory's failure aside, Sanofi also offers extremely weak evidence on Mylan's ability to exclude competition. Much of what it argues is a less-detailed rehash of its complaint; it posits that Mylan developed a plan to exclude Auvi-Q and successfully did so. For the reasons set forth in detail in Mylan's own motion for summary judgment, the evidence does not raise a triable fact on that point, let alone entitle Sanofi to judgment as a matter of law. Mylan MSJ Br. 55-88.

Much of Sanofi's evidence on the exclusion point is irrelevant. The Court is told that ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████ All of this has nothing to do with whether Mylan had monopoly power; even accepting Sanofi's portrayal of the documents as accurate, internal contracting strategy has nothing to do with whether Mylan's strategy would prevail over Payors' pushback.

Sanofi cites only a few pieces of evidence even marginally relevant to whether Mylan could exclude competition: ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████ Sanofi Br. 53. The implication here is that Mylan's ability to win an exclusive contract, or several exclusive contracts, is evidence of monopoly power. Taking that view to its logical conclusion, every company that wins an exclusive contract apparently would possess monopoly power; that is, after all, the kind of exclusion from competition Sanofi references here. "But what is more common than exclusive dealing?" *Methodist Health Servs. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017). No reasonable jury could take seriously, let alone be required to accept, a theory that would conclude an extraordinarily large swath of firms—from the company that wins an exclusive contract to supply concessions at a high-school football stadium to ████████████████████████, *see* Mylan MSJ Br. 70-71—possess monopoly power. Indeed, ████████████████████████ Resp. to SMF ¶ 39; surely that does not mean Sanofi too possessed monopoly power.

And the theory fares no better if Sanofi argues that Auvi-Q's being subject to utilization management controls on formularies covering 31% of lives is the exclusion from competition that demonstrates monopoly power. To begin, Mylan detailed in its own summary judgment memorandum how that "foreclosure" percentage falls short of the threshold for liability, *id.* at 71-72; a percentage of alleged exclusion that does not suffice to show anticompetitive foreclosure cannot provide such irrefutable evidence of monopoly power that a reasonable jury must accept it. And, even then, a proclamation that Sanofi was "foreclosed" from 31% of the market substantially overstates any foreclosure—or exclusion from competition—that Sanofi suffered; as detailed in Mylan's summary judgment memorandum, all the agreements that allegedly excluded Auvi-Q were easily terminable, short term, or both. *Id.* at 62-65. Sanofi's exclusion, in other words, was no exclusion at all; all Sanofi had to do to reverse it was offer Payors a better price.

Setting the sheer illogic of Sanofi's theory aside, the record demonstrates that Mylan frequently found itself on the receiving end of threats to exclude it from formularies;



. SAMF ¶ 127.

*Id.* ¶ 128. To stave off those exclusions or disadvantages,

*Id.* ¶ 127. That interaction and others like it, detailed above, show that it was the Payors, not Mylan, who determined whether a given device was to be excluded or subject to utilization management controls.

A reasonable jury could find, then, that Mylan lacked *both* control over price *and* the ability to exclude competition, even though the lack of only one is fatal. *Reazin*, 899 F.2d at 966-67. Instead, Payors could and did force Mylan to lower prices and they, not Mylan, had the power to exclude. The argument over monopoly power should end here; indirect evidence intended to show Mylan's ability to control price and exclude competition cannot counteract direct evidence of Mylan's inability to do so. Sanofi's motion for partial summary judgment should be denied.

### B.    Sanofi's Indirect Evidence Of Mylan's Monopoly Power Is Insufficient

Setting aside the direct evidence showing that Mylan had neither unfettered control on price nor the ability to exclude competition, Sanofi's indirect evidence is wholly ineffective. It relies on the long-discredited view that high market share is proof of monopoly power and, in so doing, ignores the way bidding for formulary placement actually functions. Sanofi's blinkered and outdated arguments on indirect proof of monopoly power should be rejected.

### 1.    Sanofi's Evidence of Market Share Is Misleading And Should Be Rejected As Proof Of Monopoly Power

Sanofi begins its monopoly-power argument with Mylan's "market share": "Mylan's monopoly power can be inferred through its durable share of 80% to 99% of the U.S. EAI drug device market." Sanofi Br. 46; *see also id.* ("There can be no genuine issue of material fact given that Mylan's employees, documents, and testimony have all confirmed EpiPen's dominance in the U.S. EAI drug device market."). Sanofi goes so far as to label "radical" Mylan's argument that market share, in certain circumstances, does not provide evidence of monopoly power. *Id.* at 48 n.5.

But the Tenth Circuit has explicitly recognized, for three decades, that market share "*may or may not* reflect *actual* power to control price or exclude competition." *Reazin*, 899 F.3d at 967. Other circuits agree. *See, e.g.*, *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 623 (6th Cir. 1999) ("[M]arket share is only a starting

point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share."); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("We cannot be blinded by market share figures and ignore marketplace realities."); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) ("Market share indicates market power only when sales reflect control of productive assets in the business, for only then does it reflect an ability to curtail total market output…. [M]arket share is at best an *indicator* of market power in *certain* cases."); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) (high market share "will not [prove monopoly power] in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors").

Sanofi's responds by citing *Grinnell*, a Supreme Court case that is more than 50 years old. *See* Sanofi Br. 48 n.5. But the Supreme Court, in a case that postdates *Grinnell*, concluded that "[e]vidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete," and therefore concluded that "other pertinent factors" suggested that the combined market shares of two merging firms substantially overstated their market power. *United States v. Gen. Dynamics Corp.*, 415 U.S. 488, 498, 501 (1974). As then-Judge Clarence Thomas, joined by then-Judge Ruth Bader Ginsburg, has pointed out, "*General Dynamics* began a line of decisions differing markedly in emphasis from the Court's antitrust cases of the 1960s. Instead of accepting a firm's market share as virtually conclusive proof of its market power, the Court carefully analyzed defendants' rebuttal evidence." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 990 (D.C. Cir. 1990). Sanofi ignores five decades of refinement in judicial and economic analysis of the issue on which it seeks summary judgment.

Here, several relevant factors render any supposed market share misleading. First, formu-

lary placement operates as what economists and enforcement agencies call a "bid market." In such a market, customers put a certain contract up for bid—for example, aircraft manufacturers solicit bids from aircraft engine manufacturers for a given aircraft. Donna E. Patterson & Carl Shapiro, *Transatlantic Divergence in GE/Honeywell: Causes and Lessons*, 16 Antitrust 18, 20 (2001). That is, essentially, how formulary placement functions in the pharmaceutical industry; Payors put formulary placement up for bid. *See* Mylan MSJ SMF ¶¶ 33-41. Bidding markets are widely recognized to function differently than traditional markets; for example, the Third Circuit has resolved a Robinson-Patman Act case in defendants' favor based entirely on the fundamental difference between competition in bid markets and competition in other kinds of markets. *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191 (3d Cir. 2010). More directly relevant to market power, the FTC and DOJ evaluate competition differently in bid markets than in others. *See* FTC & DOJ, *Quantitative Approaches to Competitive Effects in Bid Market Merger Investigations (Contribution to a Roundtable on Competition in Bidding Markets)* (Oct. 13, 2006), http://bit.ly/2M4yIJw.

One recognized difference is that shares of past sales—like the evidence Sanofi offers—are considered misleading in bid markets like these; each individual "bid" represents a new opportunity to win business, and sales can swing wildly based on which company wins an individual bid, so each individual bidder is "assign[ed] equal [market] shares"; any alleged past market share is meaningless. Philip B. Nelson, *Bid Markets: Factors to Consider When Only Some Firms Are Allowed to Bid*, Economists Ink at 1 (Fall 2000), http://bit.ly/2KxdFvD; *see also, e.g.*, James A. Langenfeld, "The Merger Guidelines As Applied," *The Economics of the Antitrust Process* 51 (1996) ("It is often argued that in a bidding market, each firm should be given the same market share because the past is a poor predictor of future market shares. In effect, each firm has a chance to win new contracts, so any attempt by one or more firms to raise price above the competitive

level will allow firms that have won relatively few bids to expand their sales significantly and defeat the attempted price increase."); David Wirth, *To Bid or Not to Bid, That is the Question: The Assessment of Bidding Markets in Merger Control,* Harvard Law School Forum on Corporate Governance and Financial Regulation (2016), http://bit.ly/2KvVqXK (quoting a European Commission decision to the effect that, "even where there is a small number of credible bidders, particularly intensive competition is to be expected if, in a bidding market, a large proportion of tenders is awarded in a few large transactions […] In this and similar cases, market shares would, in practice, provide very little information on the possible market power of a bidder."). Accordingly, Mylan's past share of EAI prescriptions had little to do with its power to maintain that share in the future. ████████████████████████████████████████████████ ████████████████████████████████████████. Mylan MSJ SMF ¶¶ 93-96, 111, 113, 117-20.

Another key factor that Sanofi disregards is the existence of "power buyers"—that is, large and sophisticated buyers capable of using countervailing market power to keep prices down. The existence of such buyers is "likely to promote competition even in a highly concentrated market." *Baker Hughes*, 908 F.2d at 986. Some courts have considered the existence of such buyers to be dispositive in deciding whether to permit mergers; "[t]he existence of large, powerful buyers … mitigates against the ability of sellers to raise prices." *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991). The logic here is obvious; large, powerful, and sophisticated buyers that "closely examine available options" and "insist on receiving multiple, confidential bids for each" formulary placement are a far cry from "small consumers who may possess imperfect information and limited bargaining power," and they therefore can use the confidential bidding process and their sophistication to resist seller power even in a concentrated

market. *Baker Hughes*, 908 F.2d at 986. Many of the cases applying that concept are merger cases, but there as here the question of market or monopoly power is relevant. *Id.* at 990-92 (discussing whether merged firm would have increased market power). This Court has acknowledged this economic reality; in *Suture Express*, it credited evidence that "consolidation has increased custo-mers' buying power and created a very competitive marketplace," which helped to "demonstrate[] that defendants lack[ed] the power to control prices." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, No. 12-cv-2760, 2016 WL 1377342, at *25 (D. Kan. Apr. 7, 2016).

Mylan undoubtedly faced such power buyers here. Companies such as ESI, CVS, United, and Aetna are far larger and more powerful than Mylan; their revenues during the relevant time period were many multiples of Mylan's, SAMF ¶ 121, and they controlled access to enormous numbers of customers, *id.* ¶ 122. As discussed above, these Payors exercised their power against both Mylan and Sanofi; they placed Mylan and Sanofi into a bid market and asked them to make more and more aggressive bids for more and more favorable formulary placement. ████████████ ████████████████████████████████████████████████████████ Resp. to SMF ¶ 46. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ SAMF ¶¶ 124-25. In other words, despite Mylan's share of EAI prescriptions, Payors felt free to use their countervailing buyer power to demand price concessions. That is not at all consistent with Mylan's having monopoly power.

### 2. Sanofi's Examination Of Factors Besides Market Share Is Inadequate

Apart from its market-share arguments, Sanofi addresses two other factors: (1) "the number of firms in the market" and "market trends," *Reazin*, 899 F.2d at 967; and (2) "[e]ntry barriers," including "high capital costs," "regulatory or legal requirements," and "entrenched buyer prefer-ences," *id.* at 968. But Sanofi's arguments that a jury would *have* to credit the evidence it cites as

proof of monopoly power are unavailing; indeed the courts in its primary cases supporting these arguments, *Reazin* and *AbbVie*, did not enter summary judgment in favor of the plaintiff. *Reazin*, 899 F.2d at 955 ("Given our standard of review, we uphold the jury's verdict because we find sufficient evidence supports it."); *AbbVie*, 329 F. Supp. 3d at 106 (noting that "court held an approximately three-week nonjury trial on the issue[] of … monopoly power"). Here, a jury could conclude that both extant and future competitors of Mylan operated as competitive constraints.

Sanofi's suggestion that Mylan "encountered few to no competitors for EAI drug devices" severely understates the evidence of competition in the anaphylaxis space. As discussed above, Sanofi ignores Benadryl, a widely successful product. Sanofi also underrates the competitiveness of Adrenaclick and Twinject. For example, ███████████████████████████████ ███████ Resp. to SMF ¶ 36. And EpiPen was subject to a prior authorization in favor of Adrenaclick on WellCare's formulary. *Id.* Adrenaclick remains a viable competitor; contrary to Sanofi's description of it as weak, CVS agreed to distribute Adrenaclick exclusively through its pharmacies in 2017, ██████████████████████████████████████████. *Id.* Finally, Sanofi ignores its own status as a heavyweight competitor. As Sanofi argues in its Complaint, Mylan adjusted its *entire competitive strategy* in response to Sanofi's entry; it "offered *new* and *unprecedented* rebates to [Payors]" because Auvi-Q entered. ECF No. 1 ¶ 6 (emphasis added). Sanofi itself is a global pharmaceutical giant—the "fourth largest pharmaceutical company" in the world, Ex. 16 (Viehbacher Dep.) at 11-12; the entry of such an exceptionally powerful competitor—to say nothing of the entrance of other competitors like Teva, Resp. to SMF ¶ 37, and Novartis, SAMF ¶ 114—is strong evidence *against* monopoly power.

That Sanofi's entry reduced whatever power Mylan had is evidenced by the decline of EpiPen's share of EAI prescriptions. "A declining market share may reflect an absence of market

power." *Oahu*, 838 F.2d at 367; *cf. Reazin*, 899 F.2d at 970, 972 (noting relevance of decline in

defendant's market share but, "bearing in mind our standard of review" in overturning jury's ver-

dict, declining to give it dispositive weight). Here, ██████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Resp. to SMF

¶ 40, Sanofi MSJ Ex. 42 at Fig. 7. Those are significant declines. When they are combined with

Sanofi's status as a gigantic and potent competitor and the success of Twinject and Adrenaclick, a

jury could easily conclude that Mylan did not have monopoly power.

Sanofi's argument on barriers to entry also flounders, as it ignores relevant parts of the

record and fails to include other necessary evidence. Mylan does not deny that there can be techni-

cal and regulatory barriers to entry in pharmaceutical markets. But a reasonable jury could con-

clude that there was enough entry or threatened entry to discipline Mylan competitively. Auvi-Q

entered and provided that discipline. Adrenaclick and Twinject were also present when Mylan

marketed EpiPen. Resp. to SMF ¶ 36. And multiple other EAIs—including Mylan's own generic

and the Teva generic—have entered as well. *Id.* ¶ 37. Those various entrants—along with other

epinephrine-delivering devices like Symjepi—appear repeatedly in Mylan's strategic planning

documents. *Id.* ¶ 17.

Sanofi also fails to analyze barriers to expansion. Evaluating barriers to entry while

ignoring whether existing competitors could expand capacity is incomplete; both new entry, and

new output from competitors already present, constrain an alleged monopolist's ability to raise

price by cutting back output. *Rebel Oil*, 51 F.3d at 1439. Sanofi has provided no evidence that it

could not have expanded output of Auvi-Q if Mylan reduced output. *See supra* § II.A.1.

Finally, Sanofi stakes much of its entry barriers argument on supposed "[e]ntrenched cus-

tomer preference." Sanofi Br. 51. Mylan has already shown that patients were more than willing to switch from EpiPen to Auvi-Q, and that the data in this case show that EpiPen's share of prescriptions cratered when it was excluded from a given formulary. Mylan MSJ Br. 80. That is not any sort of entrenched customer preference. Moreover, Sanofi's case support for this proposition is not applicable. It cites *Defiance Hospital, Inc. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1113 (N.D. Ohio 2004), for the proposition that "control over customer access" is a "significant barrier to entry." Sanofi Br. 51. But the "control over customer access" there consisted of ironclad exclusive deals to use anesthesia services with all but one of the independent physicians in the community, which prevented plaintiffs from having access to enough patients to sustain their own comprehensive anesthesia service. *Defiance Hosp.*, 344 F. Supp. 2d at 1105, 1113. Here, neither Sanofi nor its experts has attempted to analyze economies of scale. MSJ Br. 73-74. Moreover, ███████████████████████████████████████████████████████████ ██████████████████████, *id.* at 62-65; Sanofi could continue selling Auvi-Q indefinitely and regain access to formularies at any time by offering a better deal. That was not an entry barrier at all.

* * *

This Court should reject Sanofi's monopoly-power arguments. A jury could easily and reasonably reject its direct evidence and find on this record that Mylan lacked the unfettered ability to control price and could not exclude competition. And Sanofi's indirect evidence, even evaluated alone, likewise might not (and should not) convince a jury; Sanofi's argument depends on ignoring numerous relevant factors—including the last 45 years of antitrust case law—and engaging in a simplistic equation of alleged market share with monopoly power, which case law, economics, and experience all condemn. Partial summary judgment on monopoly power should be denied.

## III.   SANOFI IS NOT ENTITLED TO SUMMARY JUDGMENT ON MYLAN'S LANHAM ACT CLAIM

Sanofi also seeks summary judgment on Mylan's Lanham Act and unfair competition counterclaims. Sanofi's argument focuses solely on the specific statements highlighted in Mylan's initial counterclaim pleading, but full discovery has revealed—and Mylan's experts have addressed—the full extent of Sanofi's impermissible and unsupported claims of patient preference for Auvi-Q and Auvi-Q's purported superiority over EpiPen.[319]  By focusing solely on what Mylan knew before discovery, Sanofi ignores clear evidence in the record—including its own surveys— that confirm Sanofi engaged in a widespread promotional campaign to increase Auvi-Q prescriptions by making false and misleading statements about the merits of Auvi-Q compared to EpiPen. Sanofi launched Auvi-Q in January 2013 with the goal of converting EpiPen users to Auvi-Q. SAMF ¶ 130. Sanofi did not intend to drive sales by growing the market through education about anaphylaxis; it was content to reap the benefits of Mylan's years of investment in increasing anaphylaxis awareness. SAMF ¶ 130. Notwithstanding pre-market research indicating ██████████████████████████████████████████████████ *see* Resp. to SMF ¶ 76, Sanofi set out to convince physicians that patients would find this "new EpiPen" easier to use and to carry, would find the instructions easier to follow, and would be more likely to carry Auvi-Q than EpiPen. SAMF ¶¶ 130-49, 156-65. But when Sanofi launched Auvi-Q it *did not have clinical data to substantiate this advertising campaign. Id.* Before Auvi-Q's launch, ████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████. *Id.*; Resp. to SMF ¶ 91. That did not stop Sanofi from

---

[319] *Walker v. City of Orem*, 451 F.3d 1139, 1152 (10th Cir. 2006) ("[I]n assessing the grant of summary judgment, we are not limited to the language of plaintiffs' complaint but must consider additional facts developed for purposes of summary judgment."); *Bennett v. Schmidt*, 153 F.3d 516, 519 (7th Cir. 1998) ("Litigants are entitled to discovery before being put to their proof, and treating the allegations of the complaint as a statement of the party's proof … defeats the function of Rule 8.").

disseminating these claims to physicians around the country. Sanofi's motion should be denied.

### A.  Admissible Evidence Shows That Sanofi Made The Challenged Statements

Sanofi's own market research surveys confirm that Sanofi's comparative promotional messages permeated its marketing campaign. The results of numerous Sanofi surveys███████ ███████ (SAMF ¶¶ 138-41), █████ (*id.* ¶¶ 142-45), and ████████████ (*id.* ¶¶ 146)—show that physicians recalled Sanofi's sales representatives making the statements that are the subject of the counterclaims: that Auvi-Q was easier to use and easier to carry than EpiPen, preferred by patients, that its instructions were easier to follow, and that patients would be more likely to carry Auvi-Q than EpiPen.



Sanofi simply ignores the import of its own surveys, failing to cite or even acknowledge a single one of them in its moving papers.[320] Sanofi's reports summarizing the survey results— which Sanofi commissioned, treated as critical business intelligence, regularly utilized for presentations to senior leadership, and used in its ongoing business planning—along with Sanofi's

---

[320] Sanofi devotes much of its brief to attacking two allegations in the Counterclaims—that Sanofi made misleading statements regarding Auvi-Q's heat tolerance (Countercl. ¶¶ 54-55) and offered kickbacks to increase sales of Auvi-Q (*id.* ¶¶ 59-61)—which discovery has not shown to be widespread practices. Sanofi ignores evidence of the promotional messaging that was the focus of the parties' expert reports.

internal analyses of those reports are admissible as business records under Federal Rule of Evidence 803(6), as party admissions under Rule 801(d)(2), and under Rule 807's residual hearsay exception. In *BoDeans Cone Co. v. Norse Dairy Sys., L.L.C.*, the court held that consumer survey results satisfied the "'regular course of conduct' and 'regular practice' requirements of Rule 803(6)" when the surveys were prepared as part of regularly conducted business, and it was "regular practice to make a memorandum, report, record, or data compilation of its survey results for presentation to the businesses." 678 F. Supp. 2d 883, 906 (N.D. Iowa 2009). And in *Schering Corp. v. Pfizer Inc.*, then-Judge Sotomayor engaged in an extensive analysis of the admissibility of physician surveys in a Lanham Act case, concluding Pfizer's surveys were admissible against Pfizer under Rule 801(d)(2). 189 F.3d 218, 238 (2d Cir. 1999). The court rejected a double-hearsay challenge to a survey that "contained hearsay in the form of physicians' out-of-court descriptions of detailings" where Pfizer analyzed and drew inferences from the responses, "thus manifest[ing] a belief in the trustworthiness of [the survey methods and statements] and conced[ing] the survey's reliability." *Id.* at 239. Here, too, Sanofi regularly performed physician surveys and drew inferences about Auvi-Q marketing messages from those surveys, namely that physicians were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SAMF ¶ 138 (emphasis added); *see also id.* ¶¶ 141-44 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Furthermore, both the *BoDeans Cone* and *Schering* courts held that consumer surveys also satisfied the residual hearsay exception, which allows admission of material, probative out-of-court statements with "circumstantial guarantees of trustworthiness," the admission of which would serve the interests of justice. *See BoDeans Cone*, 678 F. Supp. 2d at 905; *Schering*, 189 F.3d at 231-34. As the *BoDeans Cone* court explained, it is "difficult … to take seriously 'trustworthiness' challenges to a survey made by the very party that commissioned and used the

survey in the first instance," and "the fact that the interviewers did not know that the surveys could be used for purposes of … litigation supports the inference that the surveys are trustworthy." 678 F. Supp. 2d at 903-05. Mylan's surveys, which are admissible business records, *id.*, corroborate the results of Sanofi's surveys (*see* SAMF ¶¶ 147)—a reinforcing indicia of trustworthiness counseling in favor of admitting *both* companies' survey results under the residual hearsay rule. *Schering*, 189 F.3d at 231-36 (remanding for application of residual hearsay rule but highlighting that "all five surveys tended to corroborate one another, and one was produced at [defendant]'s request"). Mutually corroborating surveys of ███████ physicians conducted by competing companies in the ordinary course of business to identify which messages resonated with physicians are "more probative than the testimony of a very much smaller number of persons that a party could reasonably be expected to bring to court." *Schering Corp. v. Pfizer, Inc.*, No. 98-cv-7000, 2000 WL 718449, at *4 (S.D.N.Y. June 5, 2000) (physician surveys admissible on remand under residual hearsay exception). And Sanofi appears to concede the admissibility of market research surveys because it cites Mylan's surveys to support its facts. SMF ¶ 85; Sanofi Br. 61 n.8.

Rather than acknowledge these market research surveys, Sanofi asserts that Mylan's allegations of improper comparative advertising are based on nothing more than Sanofi internal communications (*see* Fed. R. Evid. 801(d)(2) ("opposing party's statement" not hearsay)), reports from Mylan's sales representatives in the field (*see* Fed. R. Evid. 803(6) (business records exception to hearsay)), and a handful of handwritten notes left at physician offices (*see* Fed. R. Evid. 801(d)(2)). Sanofi Br. 61-63. To be sure, because these documents contain the same messaging that Sanofi tracked in its own market research, they *reinforce* Sanofi's widespread dissemination of false and misleading promotional statements, *see, e.g.*, Sanofi MSJ Exs. 136, 138-39, but they are far from the sole basis for Mylan's claims.

The record contains other direct evidence—also ignored by Sanofi—of Sanofi's sales representatives making the challenged promotional claims. Such evidence includes Sanofi's official press release at launch that attempted to "create the need" for Auvi-Q by touting surveys about failure-to-carry rates and ease-of-use concerns; a public statement by Sanofi's North American President describing Auvi-Q as more "patient-friendly" than EpiPen; and at least one ██████████ handwritten note from a Sanofi sales representative to a physician's office conveying the same core message. SAMF ¶¶ 132, 148. It includes sworn declarations from two staff members of an allergy clinic in Scottsdale, Arizona who attested to hearing in January 2013 from Sanofi that "Auvi-Q was replacing the EpiPen, that the EpiPen was no more, and that the Auvi-Q was the new up-and-coming EpiPen" and that Auvi-Q was "what [they were] supposed to be giving … patients who carried the EpiPen." SAMF ¶ 157. Mylan identified both declarants in its initial disclosures, yet Sanofi chose not to depose them. *Id.* Sanofi makes the sweeping assertion that "[n]ot one of the over 65 witnesses deposed in this case testified on personal knowledge" that Sanofi's employees made the challenged statements (Sanofi Br. at 60), but Sanofi can make this assertion only because it chose not to depose witnesses with personal knowledge—and also because Sanofi fully ignores that ███████████████████████████████ ███████████████████████████████████████████████. SAMF ¶ 137.[321]

Rather than confront the substance of its promotional messages, Sanofi focuses on its written marketing materials (*e.g.*, Sanofi Br. at 61). But its pre-printed advertising is beside the point, as Mylan's counterclaims are for the most part based on Sanofi's oral statements disseminated by its sales force and account executives, not its printed materials.[322] That some

---

[321] Ex. 119; Ex. 17 (Wade Dep.) at 70-73.
[322] Sanofi admits that it approved printed promotional materials claiming Auvi-Q was the "first and only EAI" with a needlestick prevention mechanism. *See* SMF ¶¶ 97, 99; Sanofi Br. 61.

Sanofi marketing is unchallenged is irrelevant to Mylan's claims. *See L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 863 (N.D. Cal. 2015) ("Plaintiffs need not allege that every factual statement in Defendants' advertising materials is false in order to state a false advertising claim."). The Court should reject Sanofi's attempts to distract from the messages at issue.

### B.   Sanofi's Promotional Claims Were False and Misleading

Sanofi argues that Mylan's Lanham Act claim fails for lack of "extrinsic evidence of consumer deception." Sanofi Br. 68. But that argument misstates both the law and evidence. To prove falsity within the meaning of the Lanham Act, a plaintiff must show *either* (1) that the challenged statement was "literally false"—"either on its face or by necessary implication"; *or* (2) that the statement was "literally true but likely to mislead or confuse consumers." *Gennie Shifter, LLC v. Lokar, Inc.*, No. 07-cv-01121, 2010 WL 126181, at *16 (D. Colo. Jan. 12, 2010). If a jury finds that Sanofi's promotional claims were literally false, Mylan would be entitled to a presumption of customer confusion and would not be obligated to present extrinsic evidence that customers were confused. But, in any event, the record contains sufficient evidence to support a jury finding of consumer confusion, including Sanofi's own surveys, which it once again ignores.

### 1.   Sanofi's Claims Were Literally False

The record contains ample evidence on which a jury could conclude that Sanofi's claims were literally false. Sanofi's claims that Auvi-Q was the "new EpiPen," "new talking EpiPen," or "replacement for EpiPen" are all false "on [their] face" because Auvi-Q is undisputedly not a new model of EpiPen sold by Mylan. *Gennie*, 2010 WL 126181, at *16. Sanofi has not shown how "new EpiPen" could "reasonably be understood as conveying [a] different message[]" that is truthful. *See* Sanofi Br. 64 (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir 2002)). Instead, its "new EpiPen" marketing is indistinguishable from a Tenth Circuit case where a competitor to a company called "General Steel" marketed its own products as "general steel"

products, which then-Judge Gorsuch agreed was literally false because the defendant "wasn't licensed to (and didn't) sell its rival's products," and there was no evidence the advertising had any alternative meaning. *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 684-85 (10th Cir. 2015); *Vapco, Inc. v. Perfecta Prods., Inc.*, No. 8:10-cv-399, 2010 WL 11507810, at *4 (M.D. Fla. Apr. 27, 2010) (representation that "convey[ed] the false impression" that plaintiff was making its product under "a new name," i.e., the name of the defendant's product, was false representation as to origin of product) (granting preliminary injunction).

Sanofi's statements that Auvi-Q was easier to use and carry, more likely to be carried, and preferred by patients also were literally false because they were completely unsubstantiated "at the time they [were] made." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 464 (D.N.J. 2009). "[A] court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 590 (3d Cir. 2002) (Sanofi Br. 64). For example, a drug name including "Night Time Strength" was literally false because it "necessarily implied" the drug was a "special formulation for nighttime" despite defendant "not … present[ing] any evidence to show that [drug] was specifically formulated for night time." *Id.* at 589-90. Another court explained "a reasonable consumer might believe that [defendant] had engaged in some sort of testing before making statements that the [product] was 'safe' and 'safer.' That [it] performed no such testing … provides another way in which the jury could reasonably have concluded that [it] made false representations." *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. 08-cv-1101, 2011 WL 1336473, at *9 (D.N.M. Mar. 31, 2011).

Sanofi's claims about Auvi-Q's relative ease of carry, ease of use, patient preference, and likelihood of compliance compared to EpiPen necessarily implied that they have a scientific basis,

which they did not. To the contrary, Sanofi based its claims on a ████████████████

████████████████. Resp. to SMF ¶¶ 91-93; SAMF ¶¶ 134-36. *See Zeneca Inc. v. Eli Lilly*

*& Co.*, No. 99-cv-1452, 1999 WL 509471, at *33 (S.D.N.Y. July 19, 1999) (claim unsupported

where study "not sufficiently reliable to permit one to conclude with reasonable certainty that [it]

established the proposition for which [it was] cited" and "not designed to determine whether [drug]

could be efficacious") (granting injunction). "Courts have recognized that an ████ finding about

the strength and veracity of a study's conclusions about a pharmaceutical product to be persuasive

evidence and helpful in determining if those conclusions were also false under the standard

promulgated in the Lanham Act." *Bracco Diagnostics*, 627 F. Supp. 2d at 445. Sanofi's sales force

routinely flouted ██████████████████████████████████████████

████████████████████████████████████████████ (Resp.

to SMF ¶ 91; SAMF ¶¶ 138-50), which "provides another way in which the jury could reasonably

have concluded that [it] made false representations." *Dentsply*, 2011 WL 1336473, at *9.

      Sanofi argues that its claims that patients did not carry their EAI devices and that Auvi-Q

was the first EAI device with a retractable needle were truthful. Sanofi Br. 65. However, a literally

false message may be "conveyed by necessary implication when, considering the advertisement in

its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."

*Bracco Diagnostics*, 627 F. Supp. 2d at 465. As Sanofi's regulatory witness explained, ████████

████████████████████████████████████████████

████████ SAMF ¶ 137. When Sanofi *juxtaposed* statements about low EAI carry rates with a claim

that Auvi-Q was easy to carry, Sanofi necessarily implied that patients were more likely to carry

Auvi-Q than other EAI options—a false claim that lacked substantiation. SAMF ¶¶ 153-55.

████████████████████████████████████████████

███████████████████████████████████████████ SAMF ¶ 154. Thus, when Sanofi

promoted Auvi-Q as the "first and only" EAI with a retractable needle "to help prevent accidental

needlesticks" it implied that EpiPen lacked needlestick protection, a false claim. SAMF ¶ 153.

Sanofi cannot escape liability by claiming its promotional messages were "puffery." Sanofi

Br. 65-66. Claims that are specifically and objectively measurable are not puffery. For example,

in *Castrol Inc. v. Pennzoil Co.*, a manufacturer's claim that its "motor oil offered better protection

against engine wear" was not puffery. 987 F.2d 939, 945-46 (3d Cir. 1993) (Sanofi Br. 66). The

claim "involve[d] more than mere generality" because it was "both specific and measurable by

comparative research." *Id.* at 946. So too here: Sanofi compared Auvi-Q to EpiPen across metrics

that it commissioned a study to try to measure—albeit a study without adequate evidence to

support those claims. Specific claims about patient preference, ease of use, ease of carry, and

likelihood to carry are a far cry from general opinion statements. *See Pizza Hut, Inc. v. Papa John's

Int'l, Inc.*, 227 F.3d 489, 498 (5th Cir. 2000) (Sanofi Br. 65) ("Better Ingredients. Better Pizza."

was "a general statement of opinion regarding … superiority" and therefore puffery);

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 787 (10th

Cir. 2016) (Sanofi Br. 66) ("general advertising claims of best practices" were puffery).

Lastly, Mylan has nowhere conceded that Sanofi's claims were not literally false. Sanofi

Br. 65-67. Mylan's counterclaims repeatedly refer to Sanofi's claims as "false," not merely

"misleading." Counterclaim Compl. ¶¶ 21, 26 ("new EpiPen" claim was "false and misleading";

"Sanofi's comparative claims are necessarily baseless and unlawful"), ¶ 22 ("[S]uch claims must

be substantiated by clinical data.... Here, they were not."), ¶ 32 ("Sanofi's statements regarding

Auvi-Q's supposed equivalence with the EpiPen ... were false."), ¶¶ 40, 45-48 (patient preference

claims "are false" and "unsubstantiated"), ¶ 52 (retractable needle claim "false and misleading");

Mylan's marketing expert did not concede the truthfulness of the promotional claims at issue; in fact, he expressly disagreed that Sanofi's claims were supported by the data. *See* Resp. to SMF ¶ 111. In any event, Mylan's expert did not offer or purport to offer a legal opinion about whether Sanofi's marketing claims were literally false versus misleading under the Lanham Act, as such a legal opinion would be improper. Sanofi Br. 65-67 & n.12. *See Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1268-69 (D. Kan. 2003) ("[O]pinions which merely give legal conclusions or allow the witness to tell the jury what result to reach are not permitted."); *Long v. Fairbank Farms, Inc.*, No. 1:09-cv-592, 2011 WL 2516378, at *11 (D. Me. May 31, 2011) ("Courts have been reluctant to treat expert opinion as a binding judicial admission."). Sanofi's assertion that Mylan somehow conceded Sanofi's statements were literally true is simply wrong.

Sanofi argues that Mylan's claims must fail because Mylan has not shown that Sanofi's promotional messages caused consumer deception. Sanofi Br. 66-69. However, courts do not require a showing of actual confusion under the Lanham Act for literally false statements. *Castrol Inc.*, 987 F.2d at 943 ("[B]ecause the district court properly found that claims in this case were literally false, it did not err in ignoring [defendant's] superfluous evidence relating to the absence of consumer confusion."); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 256 (2d Cir. 2014) ("[W]here a defendant's advertising of products is literally false, a Lanham Act plaintiff need not provide evidence of actual consumer confusion by resort to witness testimony, consumer surveys, or other such evidence in order to establish entitlement to damages under the Lanham Act."); *Smart Vent, Inc. v. Crawl Space Door Sys. Inc.*, No. 13-cv-5691, 2017 WL 4948063, at *6 (D.N.J. Nov. 1, 2017). Because a jury could find that each of the challenged claims was literally false—either on its face or by necessary implication—and that finding would entitle Mylan to a presumption of confusion, there is a genuine issue of material fact about customer deception.

85

### 2. Sanofi's Claims Were Misleading

Although the Lanham Act does not require extrinsic evidence of confusion for literally false statements, abundant survey evidence in the record would permit a jury to find confusion. ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ SAMF

¶ 139. Sanofi's summary of that study ████████████████████████

████████████████████████████████████████████████.

SAMF ¶ 140. In other words, physicians ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.

SAMF ¶¶ 169-71. ████████████████████████████████████

████████████████████████ SAMF ¶ 147. This survey evidence is admissible to show the state of mind of the surveyed physicians, i.e., the messages they took away from their meetings with Sanofi's representatives. *Schering*, 189 F.3d at 227 (physician surveys admissible to establish actual confusion of physicians, as such surveys "poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions").

Sanofi's argument that Mylan was required to retain an expert to conduct a made-for-litigation survey to show physician confusion is without merit. Sanofi Br. 67-69. First, extrinsic evidence of confusion need not be in the form of a survey or statistical analysis. *Vincent v. Utah Plastic Surgery Society*, cited by Sanofi, says only that "[p]laintiffs *can* make [a] showing" of confusion through a survey—not *must,* as Sanofi contends. 621 F. App'x 546, 550 (10th Cir. 2015)

(emphasis added). None of the cases cited by Sanofi establish that survey evidence is required.[323]

*See also Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1553-54 (E.D. Pa. 1985) (concluding that consumer surveys are not required to establish consumer deception); *Woodsmith Publ'g. Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir. 1990) (collecting cases); 6 McCarthy on Trademarks and Unfair Competition § 32:195 (5th ed.) ("The Better View: Survey Evidence is Not Essential"). And they certainly do not establish that a Lanham Act plaintiff must commission a litigation survey where, as here, survey evidence already exists in the record. *BoDeans Cone*, 678 F. Supp. 2d at 899, 905-06 (relying on surveys conducted in ordinary course of business).

Other admissible evidence also shows Sanofi's messaging caused customer confusion. For example, an employee of an Arizona allergy practice, in a sworn declaration, stated that as a result of a Sanofi sales representatives claims that Auvi-Q was the "new EpiPen," she "believed that the EpiPen was being phased out and that [the practice] would have to switch to the Auvi-Q." SAMF ¶ 157. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ SAMF ¶ 152. Those are the very messages that the ████████████████████████.

Finally, if the jury concludes that Sanofi acted intentionally, Mylan could be entitled to a presumption of confusion because "where a plaintiff demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived." *Merck*

---

[323] *Johnson & Johnson v. SmithKline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) (non-survey evidence relevant to show confusion); *Scotts*, 315 F.3d at 276 ("full-blown consumer surveys … not an absolute prerequisite"); *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1211 (D. Kan. 2003) (noting evidence beside surveys relevant); *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir. 1986) (not deciding if surveys are required).

*Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 450 (S.D.N.Y. 2012). A jury could easily find that Sanofi acted intentionally: ███████████████████████████. SAMF ¶¶ 167-72, 176. ████████████████████████████████████

█████████████████ SMF ¶¶ 106; SAMF ¶¶ 138-49. ████████████████

████████████████████████████████████████████████

███████████████ *See* SMF ¶ 94. However, Sanofi's conduct continued. SAMF ¶¶ 150, 165. Sanofi's knowing indifference to its sales representatives' conduct is enough to create a genuine issue of fact about whether Sanofi acted intentionally. *Merck Eprova*, 901 F. Supp. 2d at 458 (finding intent where defendant "gave short shrift" to complaints about false advertising). And a finding that Sanofi acted intentionally would entitle Mylan to a presumption of deception.

### C.     Sanofi's Promotional Claims Were Widely Disseminated And Constituted Commercial Advertising

Sanofi next argues that its false messages were not sufficiently disseminated to have constituted "promotion within the industry." Sanofi Br. 70. The Lanham Act applies to statements made in "commercial advertising or promotion." *Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 1004-05 (10th Cir. 2002). Representations "need not be made in a classic advertising campaign" to fall within the Lanham Act's scope, "but may consist instead of more informal types of 'promotion,'" *id.*, provided the statements are "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000). Sanofi does not dispute that sales force detailing to physicians can constitute commercial advertising—nor could it, as courts frequently recognize that detailing is a "method [of promotion] that is common in the pharmaceutical industry," *Schering*, 189 F.3d at 222. Instead, Sanofi argues that the specific messages here were not sufficiently disseminated to constitute "promotion" of Auvi-Q.

Contrary to Sanofi's suggestion (Sanofi Br. 71), Mylan is not required to satisfy any particular statistical level of dissemination to prove that Sanofi's statements constituted advertising. The Tenth Circuit held in *Sports Unlimited* "that the extent of distribution necessary to constitute commercial advertising or promotion in a particular case may be an elastic factor, so that a relatively modest amount of activity may be sufficient in the context of a particular case." 275 F.3d at 1004-05. The purpose of the dissemination inquiry is to evaluate whether "the contested representations are part of an organized campaign to penetrate the relevant market." *Vivint, Inc. v. NorthStar Alarm Servs., LLC*, No. 16-cv-106, 2019 WL 1098986, at *8 (D. Utah Mar. 8, 2019) (Sanofi Br. 71). An organized campaign "may not necessarily entail widespread, market-wide dissemination of any given message," but rather "targeted promotion" to "discrete segments of a much larger existing or potential customer base [that] may find [the] specific messages most persuasive." *Grubbs v. Sheakley Grp., Inc*., 807 F.3d 785, 800-01 (6th Cir. 2015); *see also Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 262 (4th Cir. 2017) ("Widespread market distribution often demonstrates an organized campaign, but is not necessary."); *Procter & Gamble Co. v. Haugen*, 627 F. Supp. 2d 1287, 1296 (D. Utah 2008) ("[A]n individualized determination must be made which will vary from industry to industry and from case to case, and [dissemination] may be modest, but significant.").

The record is replete with evidence that would allow a reasonable jury to conclude that Sanofi's sales force detailing played a central role in Sanofi's proactive campaign to convert top EpiPen prescribers to Auvi-Q prescribers. Sanofi's own documents establish that detailing was a key form of promotion for Auvi-Q. SAMF ¶¶ 166-172, 176. ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

Sanofi asserts without support that the relevant audience for these promotional messages must include all physicians, payors, insurers, and consumers (Sanofi Br. 71), but the evidence would support a finding by the jury that Sanofi targeted allergists and pediatricians with its comparative messages, ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Taken together, this is hardly only "a few" sales representatives making "unsanctioned, off-book statements to a handful of healthcare professionals." Sanofi Br. 70. Sanofi not only failed to tell

its sales force to stop making these claims— ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ SAMF ¶ 144.

The jury could also conclude that Sanofi sufficiently disseminated its messages to Payors, as Sanofi ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ SAMF ¶ 152. *See Hillman Grp., Inc. v. Minute Key Inc.*, No. 1:13-cv-00707, 2016 WL 3654437, at *14-15 (S.D. Ohio July 8, 2016) (holding that whether distribution to "single customer," Wal-Mart, constituted dissemination to "substantial portion" of customer base was "question of material fact for the jury").

Nor is there evidence that Sanofi ever instructed its sales force to stop calling Auvi-Q the "new EpiPen" or "talking EpiPen," even after Mylan raised the issue in 2013. SAMF ¶ 165. Mylan's corporate representative testified—and its contemporaneous competitive intelligence reports reflect—that Mylan received reports from across the country when Auvi-Q launched that Sanofi sales reps were promoting Auvi-Q as the "new EpiPen," confusing physicians. SAMF ¶ 162. ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████. SAMF ¶ 160. All of this evidence would support a jury determination that this messaging was widespread.[324] And the jury

───────────────

[324] Sanofi suggests that Mylan field intelligence reports contain inadmissible hearsay (Sanofi Br. 62), but the reports themselves (like Mylan's physicians surveys) are admissible business records, and the statements of the physicians reflected in those reports are offered not for the truth of the matter asserted (i.e., that Auvi-Q *was* the New EpiPen) but rather to show the fact that this false message was being

could conclude that Sanofi not only failed to prevent this messaging but recognized its effectiveness and reaped its benefits, ███████████████████████████████████ ██████████████████████████████████. SAMF ¶ 163.

On top of that, Mylan's marketing expert, Gary Zieziula, will testify based on his experience that "repeated examples" of the "same ['new EpiPen'] claims … being delivered to physicians in different regions"—i.e. Massachusetts, Arizona, Alabama, and California— evidences "that this is just not a one- or two-person situation. That it's much more widespread." SAMF ¶ 162. Sanofi asserts that certain evidence on which Zieziula relied to form this opinion is hearsay. As explained above, research and competitive intelligence reports are not inadmissible hearsay, and in any event Federal Rule of Evidence 703 permits experts to rely on hearsay in forming opinions if it is of a type reasonably relied upon by experts in the field. *Black v. M & W Gear Co.*, 269 F.3d 1220, 1228-29 (10th Cir. 2001). In his career, Mr. Zieziula has "relied on reports from sales representatives of frequent occurrences of confusing messages, combined with documented evidence of those messages, to determine whether a competitor's messaging cam-paign was widespread." Ex. 32 (Zieziula Feb. 4 Rep.) at 11. Rule 703 permits him to do so here.

Sanofi cites a handful of cases (Sanofi Br. 71-72) on lack of sufficient dissemination, but none of them involved dozens of surveys and competitive intelligence reports, maintained and relied on by the parties in the ordinary course of business, showing that a significant portion of the targeted customer base consistently recalled sales force detailing that used the challenged messages. The plaintiffs in those cases could offer only isolated statements, without an overarching "organized campaign" to tie them together. Not a single piece of survey evidence was offered in these cases to show a concerted marketing campaign, let alone dozens of the defendant's own

---

distributed on a widespread basis. *BoDeans Cone*, 678 F. Supp. 2d at 905-06; *Schering*, 189 F.3d at 227.

market research documents. Here, by contrast, the jury could reasonably conclude that (1) Sanofi orchestrated an organized campaign to drive Auvi-Q sales by convincing physicians to convert from EpiPen to Auvi-Q; (2) the record contains examples of Sanofi representatives making false and misleading statements to targeted group of physicians; and (3) these examples—combined with survey evidence confirming the widespread use of those messages—establish that the claims were part of an organized campaign. *See Handsome Brook Farm*, 700 F. App'x at 262 (distribution to 36 retailers, including "some of the largest supermarket companies in the nation," sufficient, even though "many national and countless regional and local retailers" not included).

### D.      Mylan Was Injured By Sanofi's False Advertising

Finally, Sanofi claims Mylan cannot show that Sanofi's false messaging caused Mylan injury, but this argument fails for two reasons. First, Mylan is entitled to a presumption at summary judgment and trial that Sanofi's false and misleading comparative marketing caused it injury; that presumption alone satisfies Mylan's burden at summary judgment. Second, the record evidence— including Sanofi's own surveys, testimony, and the damages analysis of Sanofi's own expert— provides a sufficient basis on which a jury could find that Sanofi's false messaging injured Mylan.

Courts presume injury "when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product." *Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000). Courts grant this presumption "because, when competitors vie for the same customers, a misleading ad can upset their relative competitive positions and thereby cause injury." *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 615-16 (9th Cir. 2016) (reversing summary judgment because presumption created jury issue). This Court has applied the presumption of injury to literally false comparative claims against competitors. *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1061 (D. Kan. 2006) (denying summary judgment due to presumption of injury); *Gen. Steel Domestic*

*Sales, LLC v. Chumley*, No. 10-cv-01398, 2013 WL 1900562, at \*14-15 (D. Colo. May 7, 2013) (relying on presumption of injury at bench trial), *aff'd* 627 F. App'x 682 (10th Cir. 2015).[325]

Sanofi's false and misleading statements trigger this presumption of injury. As Sanofi acknowledges, it and Mylan were "obvious competitors." *See* Sanofi Br. 8-11. Indeed, Sanofi's stated marketing goal ████████████████████ SAMF ¶ 130. The record reflects Sanofi making direct and frequent comparisons between Auvi-Q and EpiPen. SAMF ¶¶ 132-35, 138-49, 153-65. Even when Sanofi's messages did not reference EpiPen by name, a reasonable jury could find that Sanofi was comparing its product to EpiPen. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007) ("[T]he fact that the commercial does not name plaintiff's product is not necessarily dispositive."). As discussed above, these comparisons were "literally false or demonstrably deceptive." *Hutchinson*, 211 F.3d at 522. These false comparisons with an obvious competitor, EpiPen, justify a presumption of injury.

Although not settled in the Tenth Circuit, "[s]ome courts have required a showing of intent or willful deception" as an additional requirement "to trigger a presumption of injury." *Gen. Steel*, 2013 WL 1900562, at \*14-15. *Compare Gen. Steel*, 627 F. App'x 682, 686 (discussing without deciding relevance of intent), *with Hutchinson*, 211 F.3d at 522 (not requiring intent), *and Sunlight Saunas*, 427 F. Supp. 2d at 1061 (same). The better rule would not require intent, as "direct competition" by itself "provides a causal link." *ThermoLife*, 648 F. App'x at 615-16. Regardless,

---

[325] *Accord HipSaver Co. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 106 (D. Mass. 2007) ("[I]n a two-firm market, where a competitor makes assertions of relative product superiority backed up by testing, a factfinder could reasonably conclude that the representations qualify as comparative advertisements.") (denying summary judgment based on presumption); *Iams Co. v. Nutro Prods., Inc.*, No. 3:00-cv-566, 2004 WL 5779999, at \*5 (S.D. Ohio July 6, 2004) ("In instances of comparative advertising, where the competitor's products are specifically targeted, a plaintiff is also entitled to a presumption of money damages.") (denying summary judgment based on presumption to extent not rebutted by defendant); *Outdoor Optics, Inc. v. Wolf Peak Int'l Inc.*, No. 1:02-cv-160, 2003 WL 23142197, at \*3 (D. Utah Dec. 23, 2003) ("Plaintiff has also shown that it is an obvious competitor to Defendant's product and therefore is entitled to a presumption of irreparable harm….") (granting injunction based on presumption).

the bar for showing intent is low. "'[W]illfulness' and 'bad faith' require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense." *Bracco*, 627 F. Supp. 2d at 483. Sanofi ignored that its sales force was making statements that Sanofi knew were untrue. *See supra* pp. 87-88. Thus, "a finding of willful [conduct] is appropriate," *Merck Eprova*, 901 F. Supp. 2d at 458, justifying a presumption of injury even if intent is required.

Even without the presumption, a jury could find Sanofi's conduct injured Mylan. Sanofi overstates both the degree of causation evidence required at summary judgment and understates Mylan's evidence of causation. Contrary to Sanofi's assertion (Sanofi Br. 73-74), expert testimony or survey data is not required to establish causation. *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 318 (1st Cir. 2002) (rejecting argument that plaintiff could not establish causation in Lanham Act case without expert testimony, as plaintiff may rely on "anecdotal statements from prospective customers" and factual testimony to establish causation). Rather, a party may establish causation with both direct and circumstantial evidence. *See, e.g.*, *Hendricks v. Physicians Skin & Weight Ctrs., Inc.*, No. 12-cv-2169, 2014 WL 12561621, at *3 (C.D. Cal. Feb. 24, 2014). Parties also are not "required to have counsel marshal all of its factual proof and prepare a witness to be able to testify on a given defense or counterclaim," as Sanofi suggests Mylan should have done with its corporate designee, Sanofi Br. 73-74. *In re Indep. Serv. Orgs. Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996). Here, Sanofi marketing research, testimony, and admissions of Sanofi's counterclaims damages expert show that Sanofi's marketing caused it to obtain sales it otherwise would not have—evidence sufficient to carry Mylan's burden of proof that Sanofi's conduct injured Mylan.[326]

---

[326] The two cases cited by Sanofi do not raise the evidentiary bar on summary judgment as Sanofi suggests. In *Verisign, Inc. v. XYZ.com LLC*, the plaintiff's only evidence of causation was an expert opinion that plaintiff's sales declined when the false advertising took place. 848 F.3d 292, 300-01 (4th Cir. 2017). And in *In re Syngenta AG MIR 162 Corn Litigation*, not only was there no evidence of causation, but substantial

Sanofi's own market research would allow a jury to find that Sanofi's conduct affected Auvi-Q's sales. As described above, Sanofi's survey evidence shows Sanofi's marketing claims were widespread. Those surveys also confirm that doctors considered Sanofi's messaging significant. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

Furthermore, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████. SAMF ¶ 152. Declarations from two employees at a clinic further substantiate the impact of Sanofi's misleading claims. SAMF ¶ 157. And both Mylan's corporate designee, Jay York, and pharmaceutical industry expert Zieziula testified that Sanofi's conduct injured Mylan. Mylan's corporate designee heard "widespread" reports from his managers and sales representatives "across the nation" that physicians started writing prescriptions for Auvi-Q because of the confusion in the marketplace. Resp. to SMF ¶ 111. Zieziula also testified the "misleading messages and false advertising would have an effect," and opined that calling Auvi-Q the "new EpiPen" harmed EpiPen's "brand equity." *Id.*; SAMF ¶ 158.  Sanofi addresses none of this testimony.

---

evidence existed—depositions of 100 customers—showing that the advertisement affirmatively had not affected purchasing decisions. 249 F. Supp. 3d 1224, 1230 (D. Kan. 2017).

Finally, Sanofi's own damages analysis provides evidence that a jury could rely on to find that Sanofi's conduct injured Mylan. Under Dr. Wiggins's damages methodology, evidence that Auvi-Q's share exceeded its forecasted share constitutes evidence that Sanofi's false and misleading marketing injured Mylan. SAMF ¶¶ 172-74. Dr. Wiggins's own data (reinforced by Sanofi's documents) show that Auvi-Q's national performance ███████████████████████ and that Auvi-Q's performance exceeded forecasts for most of 2013 on two formularies that both of Sanofi's damages experts claim are especially relevant for assessing damages in this case, Horizon Blue Cross Blue Shield of New Jersey and the University of Michigan. SAMF ¶ 174. Thus, if a jury were to accept the damages methodology proposed by Dr. Wiggins, that jury could also find—under that methodology—that Sanofi's conduct harmed Mylan in 2013.

With all this evidence, a reasonable jury could find causation. For example, in *J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.*, No. 95-cv-2179, 1997 WL 83766 (E.D. Pa. Feb. 19, 1997), the court denied summary judgment because the plaintiff had "demonstrated that [a feature] [was] important to purchasers of [the product]" and thus a reasonable jury could infer that misleading advertisements about that feature "would be influential to purchasers who are concerned with the quality of [the product]." *Id.* at *5. Another court identified factors relevant to injury such as whether "consumers chose [a product] because they believed [its features were better]," "consumers acquired that belief because of [defendant's] false statements," and "this [messaging] strengthened [defendant's] market position." *C5 Med. Werks, LLC v. CeramTec GmbH*, No. 14-cv-00643, 2016 WL 4092955, at *4 (D. Colo. June 10, 2016). And the Ninth Circuit reversed the entry of summary judgment against the plaintiff based on "testimonial and survey evidence that [the marketing claim] [was] an important factor in consumers' choice of [product]." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011). "It st[ood] to reason

that defendants [would] capture a larger share … if they mislead consumers into believing [marketing claims]." *Id.*

Sanofi suggests that Mylan must quantify damages to survive summary judgment. Sanofi Br. 73 (arguing that neither of Mylan's experts quantified damages). But "a Lanham Act plaintiff's failure to prove a precise *measure* of damages cannot be the basis for a finding that it sustained no damages." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1094 (7th Cir. 1994). That is because "a Lanham Act violation is of such a nature as to preclude exact ascertainment of the amount of damages, [a] plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation, and, furthermore, that evidence of the amount of damages may be circumstantial and inerrant." *Pound v. Airosol Co.*, 368 F. Supp. 2d 1210, 1216 (D. Kan. 2005) (quoting *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987)). Even an "admittedly weak estimation of damages nevertheless creates a genuine issue of material fact as to whether plaintiff suffered any damages, or the extent." *Pound*, 368 F. Supp. 2d at 1216. A jury could use Sanofi's market research and Dr. Varner's calculations to calculate damages. *See* Mylan Opp. to Varner *Daubert* Mot. 4-9 (citing cases).[327] Moreover, disgorgement of Sanofi's profits remains an alternative remedy. *Gen. Steel*, 627 F. App'x at 686-88.[328] In short, there is ample evidence from which a jury could calculate damages, even if that were required to avoid summary judgment—which it is not.

## IV.   SANOFI IS NOT ENTITLED TO SUMMARY JUDGMENT ON MYLAN'S COMMON LAW UNFAIR COMPETITION CLAIM

Mylan's common law unfair competition claim arises under the common law of New Jersey—where Sanofi is based—not, as Sanofi suggests, Kansas law or federal common law.

---

[327] Contrary to Sanofi's contention, the change in Dr. Varner's legal instruction was unrelated to causation.
[328] ███████████████████████████████████████████████████ to SMF ¶ 102.

Sanofi Br. 75-76. Under New Jersey law, "unfair competition is a business tort. Generally, it consists of the misappropriation of one's property by another—property which has some sort of commercial or pecuniary value." *New Jersey Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc.*, 144 N.J. Super. 411, 427 (Ch. Div. 1976); *see also* N.J.S.A. § 56:4-1 ("No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals."). "[W]hen an individual or entity has expended effort to create good will for a product associated with a name, that name has become a valuable commodity entitled in general to protection." *Am. Home Mortg. Corp. v. Am. Home Mortg. Corp*., 357 N.J. Super. 273, 279 (App. Div. 2003); *Red Devil Tools v. Tip Top Brush Co*., 50 N.J. 563, 567-68 (1967) (enumerating factors). A reasonable jury could conclude that Sanofi unfairly competed with Mylan by palming off Auvi-Q as a "new EpiPen," thereby misappropriating the EpiPen name for its own use, injuring Mylan. SAMF ¶¶ 156-65. As such, Sanofi's motion for summary judgment on this claim should be denied.

## CONCLUSION

For the foregoing reasons, Sanofi's motion for summary judgment should be denied.

Dated: August 9, 2019                    Respectfully submitted,


                                         s/  *Philip A. Sechler*
                                         Philip A. Sechler

                                         Roy T. Englert, Jr.
                                         Kathryn S. Zecca
                                         Lee Turner Friedman
                                         Ralph C. Mayrell
                                         Jessica Arden Ettinger
                                         John B. Goerlich

                                         ROBBINS, RUSSELL, ENGLERT, ORSECK,
                                         UNTEREINER & SAUBER LLP
                                         2000 K St. NW, 4th Floor
                                         Washington, DC 20006
                                         Telephone: (202) 775 4500
                                         Fax: (202) 775 4510
                                         psechler@robbinsrussell.com
                                         kzecca@robbinsrussell.com
                                         lfriedman@robbinsrussell.com
                                         rmayrell@robbinsrussell.com
                                         jettinger@robbinsrussell.com
                                         jgoerlich@robbinsrussell.com

                                         *Counsel for Defendant Mylan Inc. and*
                                         *Defendant/Counterclaim Plaintiff Mylan*
                                         *Specialty L.P.*

**CERTIFICATE OF SERVICE**

On this 9th day of August, 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each attorney registered for ECF notification to the counsel of record in this case.

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4492
Fax: (202) 775 4510
psechler@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*