# Exhibit 46
# (Filed Under Seal)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION** | CASE No. 2:17-md-2785<br>CASE No. 2:17-cv-2452 |
| _____ | |
| **SANOFI-AVENTIS US, LLC,**<br>                         **Plaintiff** | |
| **v.** | |
| **MYLAN INC., et al.,**<br>                         **Defendants.** | |

# EXPERT REPORT OF ROBERT WILLIG, PH.D.

March 25, 2019

**HIGHLY CONFIDENTIAL**

I.     Introduction ................................................................................................... 1
    I.A.     Qualifications ...................................................................................... 1
    I.B.     Plaintiff's allegations ......................................................................... 2
    I.C.     Assignment .......................................................................................... 2
II.    Summary of Opinions ................................................................................... 3
III.   Pharmaceutical Industry Background ......................................................... 14
    III.A.    Anaphylaxis ...................................................................................... 14
    III.B.    Epinephrine auto injectors ............................................................... 14
        III.B.1.    Mylan, Pfizer, and EpiPen ...................................................... 14
        III.B.2.    Sanofi and Auvi-Q .................................................................. 15
        III.B.3.    Other EAI Device Manufacturers ........................................... 15
    III.C.    Distribution of and payment for prescription drugs........................ 17
IV.    Professor Scott Morton's opinions and plaintiff's allegations.................. 19
    IV.A.    Overview ........................................................................................... 19
    IV.B.    Professor Scott Morton does not offer the opinion that any particular element
    of Mylan's conduct was anticompetitive ..................................................... 20
V.     Sanofi's initial lack of success was the result of its own failure to compete ........... 21
    V.A.     EpiPen's success was driven by strong brand recognition and appeal to
    physicians and patients ................................................................................ 21
    V.B.     Sanofi initially chose not to compete aggressively on price......................... 22
    V.C.     For plan-year 2015, Sanofi had success when it attempted to compete
    aggressively on price..................................................................................... 27
    V.D.     Sanofi's complete product recall halted its momentum........................... 28
VI.    Mylan's PBM rebates were procompetitive ............................................... 30
    VI.A.    Branded manufacturer rebates to PBMs for preferred formulary placement
    are a critical driver of price competition in the industry............................... 30
        VI.A.1.    PBMs widely use preferred formulary placement and restrictions to
        move market share and negotiate lower prices ............................................... 31
        VI.A.2.    PBMs are increasingly using formulary exclusions to drive higher
        rebates from manufacturers and lower prices for payors.............................. 34
        VI.A.3.    Rebates for preferred and exclusive formulary placement are widely
        used by drug manufacturers, including by Sanofi ...................................... 40
        VI.A.4.    EAI rebates were driven by PBMs................................................ 44
    VI.B.    Mylan's PBM rebates lowered net prices ...................................... 47
        VI.B.1.    Prices received by Mylan......................................................... 47
        VI.B.2.    Prices paid by end payors ........................................................ 49
    VI.C.    Mylan's rebates increased output................................................... 50
    VI.D.    Consumers were not harmed by lack of choice .............................. 50
VII.   Mylan's conduct did not exclude Auvi-Q ................................................. 52
    VII.A.   Mylan's EpiPen prices were above cost ......................................... 52
        VII.A.1.   PBMs generally viewed EpiPen and Auvi-Q as therapeutically
        interchangeable ............................................................................................. 52
        VII.A.2.   Mylan's prices net of rebates were above cost...................... 55
    VII.B.   Mylan's agreements with PBMs did not foreclose Sanofi........................... 57
VIII.  Irrespective of any non-contestability, Mylan and Sanofi competed on a level
playing field for contestable demand ................................................................. 58

VIII.A.    Non-contestable demand does not impose a "tax" on the entrant ................ 58

VIII.B.    An appropriate framework to evaluate Mylan's conduct is to compare the incremental revenue with the incremental cost from winning the contestable sales under the contract ........................................................................................................... 61

VIII.C.    Professor Scott Morton's EEB framework is flawed and misleading .......... 62

    VIII.C.1.    To the extent Professor Scott Morton is advocating an incremental cost test, Professor Scott Morton uses the wrong measure of cost .................................. 63

    VIII.C.2.    Professor Scott Morton provides no evidence that her theory of "artificial" discounts applies here ............................................................................. 65

    VIII.C.3.    Sanofi had large resources and used them to compete for formulary placement    ............................................................................................................. 66

VIII.D.    Professor Scott Morton's application of her framework to the facts of this case is substantially flawed ........................................................................................... 68

    VIII.D.1.    Demand for EAI products was highly contestable ............................... 68

    VIII.D.2.    The few Mylan contracts analyzed by Professor Scott Morton are not representative of Mylan's broader rebate agreements ............................................... 79

VIII.E.    An equally efficient competitor could have profitably competed with Mylan's rebates ................................................................................................................. 80

    VIII.E.1.    The incremental revenue from each agreement exceeded Mylan's incremental cost ........................................................................................................... 80

    VIII.E.2.    Sanofi was a less efficient competitor ................................................. 82

IX.   Sanofi was not foreclosed from a substantial share of EAI sales ............................ 84

IX.A.    Sanofi had equal access to formulary status ex ante ..................................... 85

IX.B.    Contracts with PBMs allow substantial flexibility ....................................... 85

IX.C.    Professor Scott Morton substantially overstates the extent to which Sanofi was not covered ........................................................................................................... 90

    IX.C.1.    Sanofi's ex-post formulary status is the result of competition ............. 90

    IX.C.2.    The extent to which Sanofi was not covered is not necessarily the result of Mylan's challenged conduct .................................................................................. 91

    IX.C.3.    Professor Scott Morton fails to distinguish exclusion/prior authorization/step therapy .......................................................................................... 94

    IX.C.4.    Rebates for preferred formulary placement do not foreclose Sanofi .... 96

    IX.C.5.    Sanofi's formulary coverage was much higher on commercial plans .. 97

    IX.C.6.    Only a small share of the lives were covered by Mylan's challenged conduct    ............................................................................................................. 99

IX.D.    The impact of any alleged foreclosure on Sanofi's sales is even smaller..... 99

IX.E.    There is no evidence that this small share sales affected by Mylan's challenged conduct substantially diminished Sanofi's ability to compete ................. 101

X.   The other Mylan conduct challenged by Sanofi is also procompetitive ................. 102

X.A.    Mylan's alleged exploitation of the spillover effects to increase its shares 103

    X.A.1.    Spillover itself is not anticompetitive ................................................. 103

    X.A.2.    Professor Scott Morton's "spillover" mechanism would enhance the benefit to both Mylan and Sanofi of winning PBM contracts ................................. 104

    X.A.3.    Professor Scott Morton has failed to demonstrate that the predicate for her "spillover" theory is true. .................................................................................. 104

X.A.4.        Professor Scott Morton's empirical analysis of the spillover effect is fatally flawed ........................................................................................................... 105
X.B.        Mylan's detailing to physicians was procompetitive.................................. 106
X.C.        Mylan's use of copay coupons was procompetitive ................................... 108
X.D.        Mylan's EpiPen4Schools program is procompetitive..................................110
XI.   Professor Scott Morton's opinions on market power are flawed............................114
XI.A.        Professor Scott Morton's Opinions............................................................114
XI.B.        Competition is customer specific................................................................114
XI.C.        After Auvi-Q's entry, EpiPen did not have market power in the EAI device market        ....................................................................................................................115
XI.C.1.        Ex-post market shares are not reliable measures of market power where, as here, there is "competition for the contract".......................................................115
XI.C.2.        PBMs have significant buyer power by pulling together downstream demand to negotiate rebates from manufacturers ....................................................118
XI.C.3.        Mylan lowered prices substantially in response to competition from Auvi-Q        119
XI.C.4.        EpiPen faced competition from generic versions .............................. 120
XI.D.        Mylan's challenged conduct, considered as a whole, did not substantially foreclose Sanofi ...................................................................................................... 121

# I.  INTRODUCTION

## I.A.  Qualifications

1.      My name is Robert D. Willig. I am Professor of Economics and Public Affairs Emeritus at Princeton University where I held a joint appointment in the Economics Department and at the Woodrow Wilson School of Public and International Affairs from 1978 to 2016, and continue to teach the graduate course "Legal and Regulatory Policy Toward Markets." My teaching and research have specialized in the fields of industrial organization, government-business relations, and social welfare theory. I served as Deputy Assistant Attorney General for Economics in the Antitrust Division of the United States Department of Justice from 1989 to 1991, and in that capacity served as the Division's Chief Economist.

2.      I have authored some 80 articles in the economics literature and am the author of *Welfare Analysis of Policies Affecting Prices and Products* and *Contestable Markets and the Theory of Industry Structure* (with W. Baumol and J. Panzar). I am a co-editor of *The Handbook of Industrial Organization*, which summarizes the state of economic thinking on the structure of industries and the nature of competition among firms, and have served on the editorial boards of the *American Economic Review*, the *Journal of Industrial Economics* and the MIT Press Series on Regulation. I am an elected Fellow of the Econometric Society and was an associate of The Center for International Studies.

3.      I have appeared as an expert witness before Congress, federal and state courts, federal administrative agencies, and state public utility commissions on subjects involving competition, regulation, intellectual property rights, and antitrust. I have also served as a consultant to the Federal Trade Commission ("FTC"), the United States Department of Justice, the Organization for Economic Co-operation and Development (OECD), the World Bank, the Inter-American Development Bank and many leading corporations on antitrust, regulation and policy issues arising in a wide variety of industries in the United States and around the world.

4.      My curriculum vitae, including a list of my publications, is included as Attachment 1. A list of cases in which I have testified over the last four years is included as Attachment 2.

5.      Compass Lexecon bills at the hourly rate of $1,450 for my work on this matter. I

have a financial stake in Compass Lexecon's financial performance and in its collected staff billings for its support of me in this and other matters. Neither my compensation in this matter nor my financial stake in Compass Lexecon is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

## I.B.    Plaintiff's allegations

6.      Sanofi-Aventis U.S. LLC ("Sanofi") alleges that Mylan Inc. and Mylan Specialty, L.P. (collectively, "Mylan") possessed market power in "the U.S. EAI drug device market."[1] Sanofi alleges that Mylan engaged in the following allegedly anticompetitive conduct:

- Mylan offered rebates to pharmacy benefit managers (PBMs) conditional "on drug formulary exclusivity."[2]
- Mylan "required schools to agree to exclusively stock EpiPens to participate in Mylan's discounted EpiPen program."[3]
- Mylan engaged in "deceptive conduct aimed at spreading disinformation about the safety and efficacy of Auvi-Q."[4]

7.      Sanofi claims that this allegedly anticompetitive conduct by Mylan kept Sanofi's sales of Auvi-Q substantially depressed and, eventually, too unprofitable for Sanofi to reenter the market after it withdrew the product in 2015. Accordingly, Sanofi claims that it suffered antitrust injury due to its lost sales from the time it did enter the market in 2013 until the expiration of the last Auvi-Q patent in 2029.

## I.C.    Assignment

8.      I have been asked by counsel for Mylan to offer opinions on the competitive effects of the Mylan conduct challenged by Sanofi. I have also been asked to evaluate the opinions on these topics offered by the expert economist retained by Sanofi, Professor Fiona Scott Morton.[5]

9.      A list of materials I have considered in forming my opinions is included as

---

[1]    Complaint, April 24, 2017 (hereafter "Sanofi Complaint"), ¶ 136.
[2]    Sanofi Complaint, ¶ 136.
[3]    Sanofi Complaint, ¶ 142.
[4]    Sanofi Complaint, ¶ 139.
[5]    Expert Report of Dr. Fiona M. Scott Morton, February 4, 2019 (hereafter "Scott Morton Report"); Deposition of Fiona Margaret Scott Morton, Ph.D., March 12, 2019 (hereafter "Scott Morton Deposition").

Attachment 3.

## II.   SUMMARY OF OPINIONS

10.   ***Sanofi's initial lack of success was the result of its own failure to compete***. An important component in evaluating the competitive effects of particular conduct is to distinguish between a competitor's inability to compete due to anticompetitive conduct and a competitor having competed but lost. The record demonstrates that Sanofi had the ability to compete against Mylan's rebates but that much of its lack of success was due to its own failure to compete effectively.

11.   The EpiPen® Auto-Injector ("EpiPen") was launched nearly 40 years ago and in the intervening four decades has developed substantial brand awareness and trust by consumers, physicians, insurers, and PBMs as a product that patients are familiar with and that reliably delivers life-saving medicine. Auvi-Q was launched in 2013 as a product that delivers the same medicine using substantially the same mechanism. But it has a modestly different set of features that Sanofi argues are more convenient for customers.

12.   The competitive challenges of launching a substantially similar product decades after the first EAI device were considerable. But even then, Sanofi initially failed to compete aggressively. Sanofi underestimated both the extent to which Mylan would compete and the extent to which large PBMs would manage the category to drive lower costs. ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████ Moreover, Sanofi did not compete aggressively on net price, offering only modest rebates to PBMs and being unwilling to offer the protection from price increases sought by PBMs. This continued into 2014.

13.   Once it understood the intensity of competition for formulary placement, Sanofi changed its strategy in acknowledgment that it had not been competing sufficiently aggressively on price and began offering higher rebates and, in many cases, price protection. It had substantial success and, in 2015, the formularies on which Auvi-Q was not covered represented only 13% of commercial lives (23.5% of commercial lives if one conservatively includes both formularies where Auvi-Q was not covered and where it was covered only after prior authorization and/or step therapy). As a fraction of the broader

universe of all lives (including Medicare, Medicaid, and uninsured), the commercial formularies where Auvi-Q was not covered represented only 9.7% of all lives (16.2% of all lives if one conservatively includes both formularies where Auvi-Q was not covered and where it was covered only after prior authorization and/or step therapy) during the relevant period. It was making plans to increase competitive efforts even further and, in the words of Sanofi's former head of global commercial operations, was "getting more and more traction with the brand," was "getting market share," and "had good access."

14.     Then, in October 2015, due to substantial manufacturing issues that created the potential for the device to inaccurately deliver the appropriate dose of epinephrine, Sanofi was forced to issue a complete voluntary recall, taking all Auvi-Q off the market. Shortly after the recall it returned its rights to Auvi-Q back to the owner, kaléo. kaléo relaunched Auvi-Q in February 2017 and continues to sell the product (with no further involvement from Sanofi).

15.     ***Professor Scott Morton does not offer the opinion that any particular aspect of Mylan's conduct is anticompetitive.*** Professor Scott Morton identifies a variety of elements of Mylan's conduct she asserts is anticompetitive in combination, but is not willing to say that any particular part of the challenged conduct was, in her view, anticompetitive. She has not put forward any economic framework which can reliably be used to assess whether this conduct is procompetitive or anticompetitive. In fact, when properly analyzed against an appropriate standard, all of the Mylan conduct challenged by Sanofi is seen to be procompetitive.

16.     ***Rebates for preferred formulary placement are an essential tool for negotiating lower branded prescription drug prices***. The pharmaceutical industry is unusual in that the person making the product choice (the doctor) is generally not the same as the entity or person paying for the product (the insurer, and to a lesser extent, the patient). Pharmacy benefit managers arose to address this issue. PBMs design drug formularies that influence drug choice by patients and doctors. This ability to shift shares between drug manufacturers of clinical substitutes gives PBMs substantial leverage to negotiate lower prices through rebates for favorable formulary placement. Rebates for preferred formulary placement are ubiquitous in the industry – used by all major PBMs with all major manufacturers, across a broad range of drugs and therapeutic categories. Professor

Scott Morton, in her own academic writings and in her report and testimony in this case, has described how rebates for preferred formulary placement can drive lower prices. While the arrangements between PBMs and their health plan clients vary considerably, a substantial portion of these rebates is often passed on to customers.

17.     Moreover, since 2011, PBMs have increasingly used formulary exclusions to increase their leverage and to drive higher rebates from manufacturers and lower branded drug costs for customers. For example, CVS had 38 drugs on its exclusion list in 2012, growing to 124 drugs in 2016. This idea of formulary exclusions was not developed by Mylan to exclude Auvi-Q; quite the opposite, rebates for formulary exclusion were developed by PBMs to increase their ability to move share (in part in response to manufacturers' increasing use of copay coupons) and to drive lower prices. PBMs have sought rebates for formulary exclusion exactly where competition is most intense – where there are two or more products they view as therapeutically interchangeable, that are all medically appropriate, and therefore where a PBM can credibly threaten to use a single product to fulfill the needs of its patients. Again, Professor Scott Morton has explained in her own academic writings how formulary exclusion can lower drug prices by increasing PBMs' negotiation leverage with manufacturers.

18.     Sanofi, one of the largest branded drug manufacturers in the world, has used rebates for preferred or exclusive formulary placement extensively, both for Auvi-Q and for its other drugs. In 2018, Sanofi paid rebates equal to 55% of its total gross sales across all of its products, including $4.5 billion in mandatory rebates and $7.3 billion in discretionary  rebates. ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

19.     ***Mylan's rebates resulted in lower prices.*** Rebates for preferred and exclusive formulary placement are tools developed and used by PBMs precisely for the purpose of driving prices down. Professor Scott Morton contends that Mylan's rebates did not lower prices, asserting that the entry of Auvi-Q did not increase price competition. This is belied by a wide range of evidence. Witnesses from major PBMs testified that they were

able to negotiate lower prices for their customers as a result of the EpiPen rebates Mylan offered for preferred or exclusive formulary placement. Auvi-Q's competition with Mylan, particularly after Sanofi began competing more aggressively, drove prices lower than they would have been had Mylan not been permitted to offer rebates conditional on more favorable formulary placement.

20.     ***Mylan's EpiPen prices were above cost.*** As a threshold matter, I understand that courts generally apply a "price-cost" test to evaluate single product discounts where price is the principal means of exclusion. There is not a segment of demand for EAI devices that can be clearly identified as non-contestable, i.e., for which Sanofi's Auvi-Q is unable to compete for. For a variety of reasons described in this report, price is the principal means by which EpiPen was preferred or exclusive on PBM formularies. Therefore the relevant inquiry should be whether Mylan sets prices above applicable cost. I conducted a price- cost test of the ability of an equally efficient competitor to compete profitably with Mylan's rebates. I analyzed Mylan's contracts for the 2013 to 2015 period with the seven PBMs analyzed by Professor Scott Morton . As described by Professor Scott Morton, these PBMs represented 86% of covered commercial lives in January 2015.  I conclude that Mylan's prices, taking full account of rebates and price protection, were above an appropriate measure of its cost for every one of these contracts. Professor Scott Morton has done no analysis (or pointed to any other evidence) to demonstrate that Mylan priced below its costs.

21.     ***Sanofi was not foreclosed from a substantial share of sales by Mylan's conduct.*** Professor Scott Morton does not offer an opinion on the extent, if any, of the market that was foreclosed by Mylan's conduct. As I describe above, Sanofi could have competed profitably for all of the contestable business ex ante, and any non-contestable business was non-contestable due to consumer preferences or Sanofi's incapabilities, not because of Mylan's tactics. Mylan's rebate agreements were procompetitive and did not anticompetitively foreclose Sanofi. Moreover, Professor Scott Morton has not demonstrated that Mylan's challenged conduct foreclosed Sanofi from a substantial share of sales. Competition has not been harmed, as claimed here, without substantial foreclosure that has been caused by anticompetitive conduct. Professor Scott Morton has shown neither that there was substantial foreclosure due to the challenged conduct, nor

that the challenged conduct was anticompetitive.

22.     In particular, the fact that ex post there was a particular formulary on which Sanofi was not covered is not evidence that Sanofi was foreclosed from competing – it is evidence that Sanofi competed and lost. Moreover, once a PBM entered into a rebate agreement with Mylan, the PBM and its customers retained substantial flexibility. Mylan's contracts with PBMs were of relatively short duration and could be renegotiated during their terms. Mylan's contracts only specified the amount of rebates that would be paid if EpiPen (and, sometimes, its competitors) were placed in specific formulary positions; they did not bind a PBM or payor to make or maintain those formulary placements. PBMs could choose to exclude a manufacturer at any time. Moreover, most of Mylan's agreements that included a rebate for exclusive formulary placement also included other rebates that did not require exclusivity. PBMs and payors had substantial flexibility under the rebate agreements to choose the combination of product choice and price – even to customize formularies according to their preferences.

23.     Mylan's contracts that provided rebates if EpiPen had exclusive formulary status covered a relatively small portion of the overall market. As noted above, Sanofi failed to aggressively compete for formulary placement in 2013 and 2014, and only in 2015 did it start to understand the extent to which customers were looking for lower prices. In 2015, Sanofi itself acknowledged that it was covered on formularies accounting for 80% of commercial EAI volume; the data relied upon by Professor Scott Morton are consistent with this. Even assuming Professor Scott Morton has defined the relevant market accurately as that for EAI devices, the commercial formularies where Auvi-Q was not covered represented only 9.7% of all lives (16.2% of all lives if one conservatively includes both formularies where Auvi-Q was not covered and where it was covered only after prior authorization and/or step therapy), with no reason to think that as a result Sanofi was deprived of the scale necessary to compete.

24.     Moreover, the share of the market covered by Mylan's exclusive rebate offers substantially overstates any foreclosing effects of Mylan's conduct for several reasons. First, Mylan's rebate agreements cannot validly be presumed to have led a PBM to have excluded Auvi-Q; indeed Professor Scott Morton's analysis shows some plans where Auvi-Q was not covered but where Mylan did not even offer a rebate conditional on

formulary exclusion. Second, Professor Scott Morton's theory relies upon the existence of substantial non-contestable demand. But Mylan's rebate agreements did not foreclose Sanofi from competing for non-contestable demand – by Professor Scott Morton's own assumption, those customers would never have chosen Auvi-Q regardless. There is no indication that Mylan's conduct deprived Sanofi of a sufficient volume of sales to deny it any economic scale efficiencies.

25.     ***Sanofi was able to compete on a level playing field for formulary placement irrespective of any non-contestable demand.*** Professor Scott Morton in effect alleges that, because of EpiPen's long history of market success, it had "entrenched" (aka non-contestable) demand for which Sanofi was not able to compete. She alleges that Mylan was able to leverage this non-contestable demand to create an unlevel playing field on which Sanofi was unable to compete with Mylan with rebates for exclusive formulary placement. Both her theory and her application of that theory to the specific facts of this case are fatally flawed.

26.     Most fundamentally, her conclusion that the playing field is not level is simply incorrect. Mylan's conduct does not impose a "tax" on Auvi-Q that does not apply to EpiPen. Even in the presence of a non-contestable portion of demand, there is nonetheless a level playing field for competition over the contestable portion. To the extent any demand is non-contestable, Mylan would be able to effect those sales without making any concessions on their price. Thus, if Mylan is offering rebates to a customer, these are concessions it is offering to win the contestable demand. To win that contestable demand, Sanofi just needs to bid $1 more in concessions than Mylan does (provided their list prices are the same).

27.     In any case, an appropriate way to evaluate whether Mylan's rebates are anticompetitive is to determine whether an equally efficient rival could have competed profitably against Mylan's rebates to win that contestable business. That is, calculate the incremental revenue that Mylan would earn from winning the contestable sales on a given contract (i.e., incremental to the revenue it would earn from effecting only the non-contestable sales without any rebates), and compare that to the incremental costs associated with winning that contract. If Mylan's incremental revenues are above its incremental costs, then the contract that secures the contestable units is profitable for

Mylan, and it would be profitable for an equally efficient competitor.

28.     The core of Professor Scott Morton's Effective Entrant Burden ("EEB") framework rests on the same basic calculation, but it suffers from at least two fundamental flaws that turn the results of the incremental cost test on its head. First, her "effective entrant burden" label implies that there is a tax on the entrant that the incumbent does not have to face. But as I just described, this is incorrect. The entrant and the incumbent face the same "burden" in bidding for contestable demand. If Mylan is able to compete profitably with a given rebate, so is an equally efficient competitor. Second, she uses the wrong measure of cost. Had she used the incremental cost of competing for the contract, instead of the long-run average incremental cost that she proposes, her EEB framework would essentially yield the same conclusions as the more appropriate test I put forward in the previous paragraph.

29.     Regardless of how small the incumbent's exclusive rebates and the non-contestable shares are, Professor Scott Morton's EEB test would always find a "burden" on the entrant. Given her definition of "non-contestable" as any demand that can't be satisfied by the entrant immediately upon entry, her measure finds a burden on the entrant any time an incumbent that has developed brand loyalty offers a rebate conditional on receiving better formulary placement than its competitor. This is not a meaningful test for anticompetitive effect. Professor Scott Morton has not offered an opinion as to how large the EEB needs to be before it raises antitrust concerns.

30.     In addition to these conceptual flaws inherent in her framework for evaluating loyalty rebates, her application of this theory to Mylan's conduct is flawed for two key reasons. First, she greatly overestimates the extent of non-contestable demand. She has not reliably demonstrated the existence of any non-contestable demand. To the extent that some segment of demand was non-contestable, evidence produced in this case strongly supports the conclusion that PBMs, as well as Mylan and Sanofi, viewed a large majority of demand for EAI devices – on the order of 90% – as contestable, and used this fact to generate intense competition for rebates between Mylan and Sanofi. Specifically:

- The evidence is clear that all major PBMs determined that EpiPen and Auvi-Q were clinically interchangeable, and therefore they could and did use

competition for rebates to move a large majority of share between manufacturers.

- The testimony, and the internal analyses, of Mylan, Sanofi, and the PBMs all show that they believed that PBMs could move shares substantially. There are examples where PBMs have successfully used formulary exclusion of market-leading products, including EpiPen, to shift share to competitors and drive substantially lower prices.

- When analyzed correctly, even the specific evidence that Professor Scott Morton relies upon for her conclusion that the non-contestable share is large actually supports a small non-contestable share. First, she misinterprets a Mylan analysis evaluating a single ESI formulary that actually shows little non-contestable demand when interpreted properly. Second, Professor Scott Morton points to a CVS formulary for which even her own analysis shows that it saw EpiPen's share decline to less than 20% soon after being excluded. She also cites to minutes from a Florida Medicaid meeting while ignoring the deposition testimony that suggests that state Medicaid plans understood that they could switch at least 90% share to Auvi-Q. Finally, she uses an estimate by a Mylan employee that was based on the share EpiPen retained against Adrenaclick (a weak competitor) on a Medicaid formulary that says nothing about what share EpiPen would retain if it were blocked and Auvi-Q were placed on the formulary. When the details of each of Professor Scott Morton's examples are evaluated properly, it is clear that each is actually consistent with a contestable share on the order of 90% or more.

31.    Second, she selectively analyzes only a limited number of Mylan's rebate offers or agreements with only two PBMs, leaving the misleading impression that Mylan offered substantial rebates for exclusive formulary placement throughout the market. In fact, a more comprehensive evaluation of Mylan's contracts with PBMs demonstrates that Mylan did not always offer rebates conditional on formulary exclusivity, and when it did, it often offered rebates for exclusivity that were smaller than those analyzed by Professor Scott Morton.

32.    I conducted a more comprehensive incremental cost test of the ability of an

equally efficient competitor to compete profitably with Mylan's rebates, even under the assumption that some demand is non-contestable, and found that Mylan's rebate agreements all pass the test. This test compares Mylan's incremental revenues to its incremental costs, factoring in both Mylan's rebates and admin fees, and finds that an equally efficient competitor could have profitably competed for all of these contracts under a more reasonable measure of contestable share of 90%. Indeed, even if only 53% of EAI demand were contestable, every one of Mylan's contracts I analyzed passes the test. As a robustness check, I also performed a variation of this test that accounts for price protection as well as rebates and admin fees earned by PBMs. After making this modification, I once again find that an equally efficient competitor could have profitably competed for all of these contracts under the more reasonable measure of contestable share of 90%. Even when price protection is included based on realized WAC prices, if only 62% of EAI demand were contestable, every one of Mylan's contracts I analyzed passes this test.

33.     ***Professor Scott Morton provides no evidence to support her conclusion that Mylan's rebates for preferred (but not exclusive) formulary placement were anticompetitive***. While Professor Scott Morton spends most of her report focused on her claimed competitive effects of rebates for exclusive formulary placement, she also contends that Mylan's rebates conditioned on being the only preferred brand (where other brands would still be on formulary but with non-preferred status) also reference rivals and therefore are anticompetitive. She provides no analysis to support this conclusion. She does not describe how her EEB methodology would be applied to these rebates nor does she conduct an analysis to evaluate whether Sanofi was disadvantaged. Moreover, her report argues that a non-preferred brand can overcome that status by providing copay coupons to consumers, which undermines her conclusion that rebates for preferred status can substantially foreclose a competitor. ███████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████ Nothing in Professor Scott Morton's report supports a conclusion that Sanofi was anticompetitively disadvantaged or otherwise unable to compete for preferred formulary status, or that it was foreclosed in any meaningful way by these rebates offered by Mylan.

**HIGHLY CONFIDENTIAL**                                                                Page 11

34.     ***All of the other Mylan conduct that Professor Scott Morton challenges is also procompetitive***. In addition to Mylan's rebates for preferred or exclusive formulary placement, Professor Scott Morton challenges several other aspects of Mylan's conduct. These are in fact all procompetitive elements of Mylan's conduct.

35.     *Spillover*. Professor Scott Morton asserts that Auvi-Q's limited access to formularies affected doctors' tendency to prescribe Auvi-Q generally. But EpiPen's broader formulary coverage resulted from, among other things, Mylan's strong brand loyalty and competitive efforts. She concedes that she does not distinguish between such spillover resulting from the challenged conduct and from Mylan's procompetitive efforts. In any case, Professor Scott Morton fails to demonstrate the existence of any spillover. She proffers a regression analysis to support her assertion that the spillover effect is substantial, but her regression suffers from several flaws. It is inconsistent with the mechanism for spillover that she details, and she fails to control for numerous potential confounding factors. Even if the spillover effects do exist, they work to strengthen the manufacturers' economic incentive to compete more aggressively for better formulary positions, knowing that they are competing not only for the lives covered in the targeted formulary but also potentially for doctors' prescriptions for lives covered by other formularies.

36.     *Marketing efforts*. Professor Scott Morton also criticizes Mylan's marketing activities, including its efforts to inform physicians of formulary status. Physician detailing is another important dimension of competition in the prescription drug industry. Providing physicians with information about formulary coverage helps them make informed prescribing decisions. Both Mylan and Sanofi had the ability to compete on this dimension. Despite being a substantially similar product with substantially lower brand recognition, Sanofi spent even less than Mylan did on physician detailing and direct-to-consumer marketing. While Professor Scott Morton makes brief reference to certain activities of Mylan that were allegedly deceptive, she provides no clear theory or supporting information as to why they were deceptive, the extent to which physicians heard these messages, or their effect on Auvi-Q's ability to compete.

37.     *Copay coupons*. As Professor Scott Morton herself notes, copay coupon programs are widely used by pharmaceutical manufacturers to lower prices to patients. These serve

as another dimension of competition for manufacturers after rebate competition has determined placement of their drugs. The manufacturer of a drug on a nonpreferred tier can provide a copay coupon to make its out-of-pocket costs equal to those of a drug on a preferred tier. This lowers the out-of-pocket costs of prescription drugs for consumers.

38.     *EpiPen4Schools*. Mylan's EpiPen4Schools program is procompetitive. Mylan provided hundreds of thousands of EpiPens to schools at no cost, and with no strings attached. Accepting free EpiPens did not prevent a school from also accepting free EAI devices from Sanofi, but Sanofi chose not to offer free Auvi-Q to schools. Mylan was at the forefront of creating a program whereby schools could have these devices on hand for students without a specific prescription. Professor Scott Morton appears to concede that this free program has important benefits and is not anticompetitive. Mylan also had a limited school discount program where schools wishing to purchase extra EpiPens, beyond those received for free, could get a substantially lower price if they agree to use only EpiPens for 12 months. However, very few schools utilized this discount program: these pens accounted for less than 7% of EpiPen units in the EpiPen4Schools program and only 0.1% of EpiPen units overall from 2013 to 2015. Professor Scott Morton has provided no evidence that these conditional discounts had any alleged spillover effect into other segments of the market or otherwise foreclosed Sanofi.

39.     ***Professor Scott Morton's conclusions regarding market definition and market power are flawed***. Professor Scott Morton's conclusion that Mylan had monopoly power throughout the period in which Auvi-Q was on the market is fundamentally flawed. Ex-post market shares are not reliable measures of market power where, as here, there is "competition for the contracts" at PBMs. She fails to properly consider the substantial buying power that PBMs and other large customers could and did employ to negotiate lower prices from manufacturers. As discussed above, these PBMs are each differently situated on numerous dimensions including the number of lives they represent and the extent to which they were willing to use exclusive formulary position and other instruments to negotiate lower prices. When faced with competition from Auvi-Q, and subsequently from generic EAI devices after Auvi-Q's recall, Mylan lowered EpiPen prices substantially in response to competition. This is evidence that Mylan lacked monopoly power.

### III.   PHARMACEUTICAL INDUSTRY BACKGROUND

### III.A.   Anaphylaxis

40.     Anaphylaxis is a severe allergic reaction that is rapid in onset and potentially fatal. Exposure to allergens such as food, insects, medication, and latex can trigger an anaphylactic reaction.[6] The onset of anaphylaxis and its symptoms – including itching, rashes, swelling, shortness of breath, dizziness, and stomach pains[7] – requires immediate medical attention.[8]

41.     Epinephrine is considered the first line treatment for anaphylaxis, and its prompt administration is associated with positive outcomes for those affected.[9] The recommended route of administration is intramuscular injection in the thigh, as this results in the fastest rise in blood levels of epinephrine.[10] Epinephrine can be delivered through a variety of mechanisms, including EAI devices, prefilled syringes, and other means.

### III.B.   Epinephrine auto injectors

#### III.B.1.       Mylan, Pfizer, and EpiPen

42.     The EpiPen® Auto-Injector ("EpiPen") was launched in 1980[11] and since 2007 has been marketed by Mylan.[12] Mylan markets the EpiPen product through an agreement with Pfizer whereby Pfizer manufacturers and supplies the EpiPen product for Mylan.[13] The EpiPen is sold in two forms: EpiPen (with a 0.3mg dose of epinephrine) for patients weighing at least 30kg, and EpiPen Jr (with a 0.15mg dose of epinephrine) for patients

---

6    A. Sheikh, Y. A. Shehata, S. G. A. Brown, & F. E. R. Simons, "Adrenaline for the treatment of anaphylaxis: Cochrane systematic review," Allergy, 64 (2009): 204-212 at 204.

7    "ANAPHYLAXIS: A Severe Allergic Reaction," Asthma and Allergy Foundation of America, available at <https://www.aafa.org/anaphylaxis-severe-allergic-reaction/>.

8    "Anaphylaxis," American Academy of Allergy Asthma & Immunology, available at <https://www.aaaai.org/conditions-and-treatments/allergies/anaphylaxis>.

9    Joshua A. Boyce et. Al, Guidelines for Diagnosis and Management of Food Allergy in the United States: Report of the NIAID-Sponsored Expert Panel, J Allery Clin Immunol, 2010 December, 126 (6 0) 1–135 at 75. ("Epinephrine is the first-line treatment in all cases of anaphylaxis.") (Italics in original.)

10   "Appropriate Route of Administration of Epinephrine," American Academy of Allergy Asthma & Immunology, available at <https://www.aaaai.org/ask-the-expert/administration-of-epinephrine>.

11   "Form 10-K," Mylan N.V., February 29, 2008, p. 7. ("EpiPen… has been sold in the United States since 1980….")

12   Sanofi Complaint, ¶ 38. ("The EpiPen® was originally launched in 1980. Mylan has marketed the EpiPen® in the United States since 2007.")

13   "Form 10-K," Mylan N.V., February 28, 2018, p. 6. ("Mylan markets the EpiPen® Auto-Injector, which is supplied to Mylan by a wholly owned subsidiary of Pfizer.")

---

**HIGHLY CONFIDENTIAL**                                                         Page 14

weighing between 15kg and 30kg.[14]

43.    Mylan launched an authorized generic version of EpiPen in December 2016.[15]

### III.B.2.        Sanofi and Auvi-Q

44.    Auvi-Q was developed by Intelliject. In 2009, Sanofi obtained a license to Auvi-Q from Intelliject, and it launched the product in January 2013.[16]

45.    In October 2015, Sanofi undertook a voluntary recall of all Auvi-Q then on the market "due to potential inaccurate dosage delivery" after receiving 26 reports of suspected device malfunctions in the US and Canada.[17]

46.    Rather than relaunching the product, Sanofi returned the rights to Auvi-Q to kaléo, Inc. in February 2016.[18] Auvi-Q was reintroduced to the market by kaléo in February 2017.[19]

### III.B.3.        Other EAI Device Manufacturers

47.    In addition to EpiPen and Auvi-Q, other EAI devices were sold during the relevant period. Twinject, which is an EAI device containing two doses of epinephrine,[20]

---

14    "Dosage and Administration," EpiPen, Table 1, available at <https://www.epipen.com/hcp/about-epipen-and-generic/dosage-and-administration>.

15    "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized    Generic,"    Mylan,    December    16,    2016,    available    at <http://www.mylan.com/en/news/feature-stories/mylan-launches-authorized-generic-epipen>.

16    Sanofi Complaint, ¶¶ 44, 50.

17    "UPDATED: Sanofi US Issues Voluntary Nationwide Recall of **All Auvi-Q®** Due to Potential Inaccurate Dosage Delivery," Sanofi, October 30, 2015, available at <http://www.news.sanofi.us/2015-10-28-Sanofi-US-Issues-Voluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery>. ("Sanofi US is voluntarily recalling **all Auvi-Q®**…. The products have been found to potentially have inaccurate dosage delivery, which may include failure to deliver drug…. As of October 26, 2015, Sanofi has received 26 reports of suspected device malfunctions in the US and Canada.") (Bold in original.)

18    "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo," Sanofi, February 23, 2016, available at <http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o>. ("Sanofi announced today that the license and development agreement between Sanofi and kaléo, formerly Intelliject Inc., the developer of Auvi-Q®… will terminate later this year.")

19    "Kaléo Announces U.S. Availability and Pricing to Patients of Auvi-Q® (Epinephrine Injection, USP) Auto-Injector, For Life-Threatening Allergic Reactions," kaléo, January 19, 2017, available at <https://kaleo.com/press-release/kaleo-announces-u-s-availability-and-pricing-to-patients-of-auvi-q-epinephrine-injection-usp-auto-injector-for-life-threatening-allergic-reactions/>. ("Auvi-Q will be available by prescription nationwide on February 14, 2017.")

20    "Application Number: 20-800 Approved Labeling," Center for Drug Evaluation and Research, May, 28,    2003,    available    at    <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2003/20-800_Twinject_prntlbl.pdf>.

---

was launched in August 2005 by Verus Pharmaceuticals.[21] In 2008, this device was acquired by Sciele Pharma,[22] which subsequently brought another EAI device – Adrenaclick – into the market in January 2010.[23] An authorized generic for Adrenaclick was launched in 2010 by Pfizer's generic pharmaceutical subsidiary, Greenstone LLC.[24]

48.   Twinject and Adrenaclick were discontinued in March 2012,[25,26] but both branded Adrenaclick and its authorized generic re-launched in June 2013 through Amedra Pharmaceuticals and Lineage Therapeutics respectively.[27] Adrenaclick and its authorized generic were acquired by Impax in 2015.[28]

49.   Teva received approval for a generic version of EpiPen in August 2018[29]  and launched with limited quantities in November 2018 with plans for an expanded launch in

---

[21]   "Verus Pharmaceuticals Announces U.S. Launch of Twinject for Anaphylaxis," Verus Pharmaceuticals, Inc., August 16, 2005, available at <https://web.archive.org/web/20051222104426/http://www.veruspharm.com/news_releases_08_16_2005.htm>.

[22]   "Sciele Pharma Acquires Twinject® Epinephrine Auto-Injector from Verus Pharmaceuticals," Sciele Pharma, Inc., March 13, 2008, available at <https://www.businesswire.com/news/home/20080313005131/en/Sciele-Pharma-Acquires-Twinject-Epinephrine-Auto-Injector-Verus>.

[23]   "Sciele Introduces Adrenaclick™ (epinephrine injection, USP) Auto-Injector for the Emergency Treatment of Anaphylaxis," Shionogi & Co., Ltd., January 7, 2010, available at <http://ir.sciele.com/phoenix.zhtml?c=120763&p=irol-newsArticle&ID=1372723&highlight=>.

[24]   "Specialty Pharmaceuticals and Novel Biotechnology Programs," Adamis Pharmaceuticals Corporations, October 25, 2011, available at <http://www.adamispharmaceuticals.com/pdf/ADMP_EIO_10-25-2011_S.pdf>.

[25]   "Keeping It Simple: One Startup's Plan to Upend The Epinephrine Delivery Market," Med Device Online, March 29, 2016, available at <https://www meddeviceonline.com/doc/one-start-up-s-plan-to-upend-the-epinephrine-delivery-market-0001>.

[26]   "Adrenaclick Auto-Injector Available Again for Anaphylaxis," MPR, June 17, 2013, available at <https://www.empr.com/home/news/adrenaclick-auto-injector-available-again-for-anaphylaxis/>.

[27]   "Amedra Pharmaceuticals Markets Adrenaclick® Auto-Injector," Amedra Pharmaceuticals LLC, June 14, 2013, available at <https://www.prnewswire.com/news-releases/amedra-pharmaceuticals-markets-adrenaclick-auto-injector-211586831 html>; "Lineage Therapeutics Markets Authorized Generic Epinephrine Auto-Injector," Lineage Therapeutics Inc., June 14, 2013, available at <https://www.prnewswire.com/news-releases/lineage-therapeutics-markets-authorized-generic-epinephrine-auto-injector-211585371.html>.

[28]   "Why the Lone EpiPen Competitor Hasn't Taken Off," The New York Times, November 1, 2016, available at <https://www.nytimes.com/2016/11/02/business/also-ran-to-epipen-reaches-for-a-closing-window-of-opportunity html>. ("Impax inherited the Adrenaclick, along with its generic version, in 2015 as part of a larger acquisition.")

[29]   "Statement: United States Food and Drug Administration Approves Teva's Generic Epinephrine Injection Auto-Injector," Teva Pharmaceutical Industries Ltd., August 16, 2018, available at <http://news.tevausa.com/mobile.view?c=251945&v=203&d=1&id=2363944>.

---

2019.[30]

### III.C.  Distribution of and payment for prescription drugs

50.     Pharmaceutical manufacturers do not sell products directly to patients; instead, they rely on other entities to store their products and distribute them to end users. Manufacturers primarily rely on wholesalers as intermediaries to distribute products to retailers. Products are sold to wholesalers at list prices – otherwise known as wholesale acquisition cost (WAC) – net of discounts negotiated by the wholesaler.[31]

51.     Wholesalers next sell products to pharmacies, which stock a range of prescription drugs for final sale to patients. Drug purchases are made by pharmacies at a product's list price minus a discount, the size of which varies based on the purchasing power of the pharmacy.[32] The pharmacy dispenses medications to patients carrying prescriptions and ensures the accuracy and safety of the patient's drug regimen.[33]

52.     The extent to which the retail pharmacy is compensated by the patient at the point of sale depends on the patient's insurance coverage. Most private and public health insurance plans include prescription drug coverage. Depending on the patient's health coverage, they may pay the pharmacy for the full amount of the drug, make a copayment (fixed dollar amount), or make a coinsurance payment (a percentage of the medicine's full price).[34]

53.     After patients pay for their share of the price for their prescription drugs, pharmacies make claims for the remaining shares. Typically, these claims are made to health plans' PBMs.[35] Aside from claims processing, PBMs serve a critical role in controlling drug costs for their plan sponsors and for patients. PBMs consolidate the buying power of their many downstream beneficiaries to negotiate substantial discounts

---

[30] "Teva's generic Version of EpiPen® (Epinephrine Injection, USP) Auto-Injector 0.3 mg Now Available in Limited Quantity in the United States," Teva Pharmaceutical Industries Ltd., November 27, 2018, available at <http://news.tevausa.com/mobile.view?c=251945&v=203&d=1&id=2378367>.

[31] "Follow the Dollar: Understanding How the Pharmaceutical Distribution and Payment System Shapes the Prices of Brand Medicines," PhRMA, November 2017, (hereafter "PhRMA Report"), p. 3.

[32] See PhRMA report, p. 3.

[33] "Exploring Pharmacists' Role in a Changing Healthcare Environment," Avalere Health LLC, May 2014, p. 3.

[34] PhRMA report, p. 5.

[35] PhRMA report, p. 4.

and rebates for prescription drugs.[36] These rebates are provided to PBMs by manufacturers and subsequently shared with their health plan clients through various mechanisms and in varying degrees.[37] These savings may ultimately benefit consumers in the form of reduced premiums.[38]

54.     PBMs control costs and extract manufacturer rebates by using formularies that encourage patients to purchase drugs that provide better value to the health plan.[39] Rebates are commonly negotiated in competitive therapeutic drug classes where there are interchangeable products.[40] Formularies usually fall into three categories: open formularies, closed formularies, and tiered (or controlled) formularies. For example, ESI explains that, in an open formulary, the patient's plan pays a portion of the costs for all drugs; closed formularies only cover drugs listed on the formulary; and tiered formularies offer different copays or other financial incentives to encourage participants to use preferred formulary drugs but will still pay a portion of the cost of the non-preferred drug.[41]

55.     PBMs are typically able to negotiate greater discounts when they apply greater levels of control to a formulary, as manufacturers offer rebates in order to incentivize PBMs to place a manufacturer's product in a preferred formulary position.[42] Rebates for open formularies will usually be lower than rebates offered for closed formularies, which limit members' access to certain drugs.[43] Thus, PBMs and plans must decide how to

---

[36]   PhRMA report, p. 1.

[37]   "Prescription Drug Pricing," Health Affairs, Health Policy Brief Series, September 2017, p. 1.

[38]   Gabriela Dieguez, Maggie Alston, Samantha Tomicki, "A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices," Milliman, May 2018, available at <http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf>, p. 2.

[39]   "How We Build a Formulary," Express Scripts, November 12, 2018, available at <http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary>.

[40]   Gabriela Dieguez, Maggie Alston, Samantha Tomicki, "A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices," Milliman, May 2018, available at <http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf>, p. 1.

[41]   "How We Build a Formulary," Express Scripts, November 12, 2018, available at <http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary>.

[42]   "Study of the Pharmacy Chain of Supply," Health Management Associates, Office of the Insurance Commissioner of Washington State, available at <https://www.insurance.wa.gov/sites/default/files/2017-06/pharmacy-supply-chain-study_0.pdf>, p. 27.

[43]   "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain," Prepared for The Kaiser Family Foundation by: The Health Strategies Consultancy LLC, March 2005, available at <https://avalere.com/research/docs/Follow_the_Pill.pdf>, p. 22.

balance their desire for controlling costs with patient choice and access.[44] As I will explain in detail below, PBMs are increasingly limiting formulary coverage to a single drug and using competition for this exclusive position to drive substantially higher rebates.

## IV.   PROFESSOR SCOTT MORTON'S OPINIONS AND PLAINTIFF'S ALLEGATIONS

### IV.A.   Overview

56.   Professor Scott Morton offers the following summary of her opinions:

> Mylan successfully engaged in exclusionary anticompetitive conduct so as to maintain its monopoly in the EAI market. In doing so, Mylan ensured that Sanofi's competing product – Auvi-Q – would never have a chance to gain a foothold in the U.S. EAI market, thereby preventing it from obtaining significant market share and placing a meaningful competitive constraint on the EpiPen. As a result of its actions, Mylan harmed consumers, the competitive process, and Sanofi. Consumers were harmed by being deprived of choice between differentiated EAI devices and by being deprived of innovation that likely would have occurred but for Mylan's conduct. Sanofi was harmed, as Auvi-Q was never able to become the significant player in the $1 billion annual EAI market that everyone – including Mylan before it designed its anticompetitive course of conduct – believe [sic] it would be.[45]

57.   She concludes that the relevant antitrust market is the U.S. market for EAI devices and that Mylan had monopoly power in that market throughout "the relevant time period," including during the period that EpiPen was competing with Auvi-Q and even after generic versions of EpiPen entered the market.[46]

58.   She alleges that a substantial portion of demand for EAI devices is "non-contestable" as a result of EpiPen's long tenure in the market, consumer familiarity with the product, and other factors.[47] She alleges that this non-contestable demand gave EpiPen an unfair advantage and that, understanding this, Mylan attempted to "leverag[e]" this non-contestable demand in negotiating contracts with PBMs for exclusive formulary placement, which, she contends, "were intentionally structured to ensure both that PBMs had little choice but to accept Mylan's exclusionary offers and to ensure that it would be

---

[44]   "HMO-PPO Digest: 2016," Sanofi, available at <https://www.managedcaredigest.com/pdf/HMO-PPO.pdf>, p. 25.
[45]   Scott Morton Report, ¶ 10.
[46]   Scott Morton Report, ¶¶ 10a-b, 71.
[47]   Scott Morton Report, ¶¶ 10c, 76.

prohibitively expensive for Sanofi to overcome them."[48]

59.     She alleges that, to strengthen the effect of this conduct, Mylan undertook numerous efforts to increase the share of non-contestable demand, including: (1) marketing to doctors that informed doctors of the relative formulary positions of EpiPen and Auvi-Q (some unspecified portion of which marketing she contends was "deceptive"), (2) using copay coupons that reduced the cost of prescriptions to consumers at retail, and (3) giving free, and in some cases discounted, EpiPens to schools under the EpiPen4Schools program.

60.     As discussed in detail in the rest of this report, Professor Scott Morton's opinions are flawed and unreliable. Each of these elements of conduct that she alleges were anticompetitive was in fact Mylan competing aggressively on the merits with Sanofi for formulary placement with PBMs, for prescriptions from doctors, and for purchases by consumers.

### IV.B.   Professor Scott Morton does not offer the opinion that any particular element of Mylan's conduct was anticompetitive

61.     Professor Scott Morton identifies a variety of Mylan's business practices that she claims were potentially anticompetitive, but she is not willing to go so far as to say that any particular part of the challenged conduct was, in her view, anticompetitive. In her deposition, she expressly testified that she was not asked to address what conduct is permitted in the but-for world:[49]

> Q: What behavior is permitted in your but-for world with respect to rebates?

> A: You know, that's not – a lot. That's not something that I was asked to address in this report, a list of what conduct is allowed in rebates.

62.     She has not put forward any economic framework under which she asserts any of the conduct at issue should be evaluated for a reliable assessment of whether the conduct is procompetitive or anticompetitive. In fact, when properly analyzed against an appropriate standard, all of the Mylan conduct challenged by Sanofi is procompetitive.

---

[48]   Scott Morton Report, ¶ 10f.
[49]   Scott Morton Deposition, pp. 257-258.

## V. SANOFI'S INITIAL LACK OF SUCCESS WAS THE RESULT OF ITS OWN FAILURE TO COMPETE

### V.A. EpiPen's success was driven by strong brand recognition and appeal to physicians and patients

63.    EpiPen was the first EAI device, having been launched in 1980.[50] Professor Scott Morton observes that because EpiPen was the leading EAI device on the market for many years (indeed the only device on the market for many years) patients became familiar with the product and were trained in its use. Similarly, doctors had "familiarity and comfort" with the product.[51]

64.    Over the many years EpiPen has been on the market, it has earned a reputation as a safe and trusted product. Sanofi recognized that ███████████████████████

████[2] In contrast, Auvi-Q was launched in 2013 as a product that delivers the same medicine using substantially the same mechanism. But it has a modestly different set of features that Sanofi argues are more convenient for customers. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

65.    Mylan spent years prior to Auvi-Q's launch investing in increasing awareness of anaphylaxis and establishing EpiPen as a trusted EAI device.[54] When Mylan first acquired EpiPen, it found that ████████████████████████

████████████████████████████████████████████████

---

[50]   "Form 10-K," Mylan N.V., February 29, 2008, p. 7.
[51]   Scott Morton Report, ¶ 77.
[52]   ████████████████████████████████████████████
       ██████████ August 24, 2015, SAN-EPI-0027555, slide 3.
[53]   ███████████ Sanofi, June 20, 2013, SAN-EPI-0160017, slide 22. See also slide 8.
       ████████████████████████████████████████████
       ████████████████████████████████████████████
[54]   See, e.g., Deposition of Scott Sussman (National Account Director at Mylan), September 13, 2018
       (hereafter "Sussman (Mylan) Deposition"), p. 44. ██████████████████████
       ████████████████████████████████████████████
       ████████████████████████████████████████████

HIGHLY CONFIDENTIAL

█████████████████████████ This understanding drove Mylan to invest
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████

66.     As a result, healthcare professionals and patients were very familiar with EpiPen,
which gave the device a substantial first-mover advantage over Auvi-Q. Sanofi
recognized that, ██████████████████████████████████████████████████████



███████████████ ████████████████████████████████████████████████
███████████████████████████████████████████████████████████ ████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████ [60]

67.     Sanofi also had difficulty gaining awareness among patients. ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████

### V.B.   Sanofi initially chose not to compete aggressively on price

68.     Sanofi's initial reluctance to compete on price with Mylan on multiple fronts is an
important factor as to why it failed to achieve the level of success it expected. In what
follows, I show that (1) Sanofi adopted a premium WAC and net price strategy that was

---

[55]   Letter from Mylan to Chairman Charles E. Grassley, Senate Committee on the Judiciary, September 8, 2016, MYEP00180751-58 at 53.
[56]   Letter from Mylan to Chairman Charles E. Grassley, Senate Committee on the Judiciary, September 8, 2016, MYEP00180751-58 at 53.
[57]   ███████████████████████████ Sanofi, June 20, 2013, SAN-EPI-0160017, slide 8. ████
█     ██████████████████████████████████████████████████████████████████
       Sanofi, June 20, 2013, SAN-EPI-0160017, slide 9.
[59]   ███████████████████████████ Sanofi, June 20, 2013, SAN-EPI-0160017, slide 15.
[60]   ██████████████████████████████████████████████████████████████████
       ██ SAN-EPI-0225642, slide 4. ██████████████████████████████████████
[61]   ███████████████████████████ Sanofi, June 20, 2013, SAN-EPI-0160017, slide 16.
[62]   Attachment to email from ████████████████████████████████████████████████
       ████████████, SAN-EPI-0084805, slide 21.

"opportunistic;" (2) Sanofi chose not to offer large rebates or lower net prices because it underestimated Mylan's response to competition and miscalculated the extent to which PBMs would be willing to place tighter controls on the EAI category and even use formulary exclusivity to negotiate lower prices; and (3) Sanofi decided not to offer the price protection that PBMs were looking for. All these factors contributed to Auvi-Q's lackluster performance following its launch in 2013.

69.    **WAC Prices**: Sanofi ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████[64]

As shown in Exhibit 1, ███████████████████████████████████████████



70.    Sanofi's perception that Auvi-Q was a product with premium features that justified a higher price was not necessarily shared by PBMs and payors. Barbara Minton, staff vice president of pharmaceutical contracting strategies at Anthem (a payor), testified that ██████████████████████████████████████████████████████████████
██████████████[68] The large Auvi-Q price increases soon after launch ██████████████

---

[63]    See e.g., 30(b)(6) Deposition of Herve Hubert (former Director of U.S. Strategic Pricing and Market Access at Sanofi), September 11, 2018 (hereafter "30(b)(6) Hubert (Sanofi) Deposition"), p. 228.

[64]    See e.g., attachment to email from ████████████████
PS103247.001-015 at 002.

[65]    Attachment to email from ███████████████, SAN-EPI-0225642, slide 4. See also: 30(b)(6) Deposition of Bryan Downey (former Vice President of Allergy Operations at Sanofi), July 31, 2018, (hereafter "30(b)(6) Downey (Sanofi) Deposition"), pp. 216-217 █████████████████████████████████████████████████████████
██████████████████████████████████

[66]    30(b)(6) Downey (Sanofi) Deposition, pp. 217-218 ████████████████████

[67]    ██████████████████████████████ SAN-EPI-0980887-89, slide 2. Also see 30(b)(6) Downey (Sanofi) Deposition, p. 216.

[68]    30(b)(6) Deposition of Barbara Minton (Staff Vice President of Pharmaceutical Contracting Strategies at Anthem), October 30, 2018 (hereafter "30(b)(6) Minton (Anthem) Deposition"), p. 132.
██████████████████████████████ See e.g., Deposition of Patrick Byrne (Vice President of Account Services at Payer Sciences), October 16, 2018

71.    **Net Prices**: ████████████████████████████████████████████

████████   Net price is one important factor PBMs and payors consider in making their formulary decisions. The net price is determined by both the WAC and the rebates made available to payors.[71]

72.    In fact, Professor Scott Morton's Figure 8 shows that Auvi-Q maintained a net price premium over EpiPen in the first one and a half years after its launch.[72] In addition, because her Figure 8 only shows the effect of contractual rebates accepted, not where Sanofi did not win, it is likely that the net prices Sanofi offered were even higher.

73.    Professor Scott Morton fails to consider whether PBM's chose to exclude Auvi-Q simply because Sanofi offered too high of a price. As shown in Exhibit 2, for four prominent PBM negotiations where PBMs chose to "exclude" Auvi-Q in favor of EpiPen, Mylan offered a better per-unit price than did Sanofi. In other words, regardless of whether there exists any non-contestable demand, Mylan's per unit price was lower than what Sanofi offered, and therefore Auvi-Q's exclusion by these PBMs/payors is consistent with them choosing to purchase the lowest priced offering. These PBMs/payors did not choose a higher-priced incumbent over a lower-priced entrant; they chose a lower-priced incumbent over a higher-priced entrant. As of Q3 2014, these PBMs/payors accounted for 89.7% of the commercial lives covered by plans that put Auvi-Q on "PA/ST" or "Not Covered" status.[73] Moreover, at her deposition, Professor Scott Morton did not identify a single instance where Sanofi offered a lower net price per

---

(hereafter "Byrne (Payer Sciences) Deposition"), pp. 150-151 ████████████████████ ███████████████████████████████

[69]  30(b)(6) Minton (Anthem) Deposition, p. 91 ███████████████████████████████████ ███████████████████████

[70]  30(b)(6) Downey (Sanofi) Deposition, pp. 167-168.
[71]  30(b)(6) Downey (Sanofi) Deposition, p. 70 ("Q. And how is the net price that managed care organization would pay calculated. A. It's your WAC price minus your rebate.")
[72]  Scott Morton Report, Figure 8. In Professor Scott Morton's Figure 8, she analyzes list and net prices for Auvi-Q and EpiPen over time. While she limits her calculation of EpiPen's prices to seven PBMs, she does not limit the Auvi-Q data to the same subset of PBMs, but instead calculates Auvi-Q prices for all PBMs that appear in Sanofi's Managed Care commercial transactional data.
[73]  I used the MMIT data to estimate this share. These four PBMs/payors (Aetna, ESI, MedImpact, and UnitedHealth) accounted for 84.9% and 70% of the commercial lives covered by plans that restricted Auvi-Q ("PA/ST" or "Not Covered") in Q3 2013 and Q3 2015, respectively.

unit and Auvi-Q was excluded, step-edited, or placed on prior authorization.[74]

74.    **Rebates**: Sanofi underestimated the competitive rebate that was required to win business for preferred formulary placement. 

75.    Sanofi

Mr. Viehbacher, the CEO of Sanofi at the time, testified that

Mr. Viehbacher would go on to explain that

76.    Sanofi

---

[74]   Scott Morton Deposition, pp. 148-150.
[75]   Deposition of Sandy Loreaux (former Vice President of the Accounts Team at Sanofi), September 6, 2018 (hereafter "Loreaux (Sanofi) Deposition"), pp. 15-16 ("Q. At the time Auvi-Q was launched, do you recall whether there were any guidelines in place for rebates on Auvi-Q? A. Yes, I know that we – I know that we did have guidelines in place for Auvi-Q.")
[76]   30(b)(1) Deposition of Bryan Downey (Sanofi), August 1, 2018 (hereafter "30(b)(1) Downey (Sanofi) Deposition"), p. 13

See also, 30(b)(6) Hubert (Sanofi) Deposition, pp. 59-60.
[77]   Email from                                                                              , SAN-EPI-0305905-08 at 05.
[78]                                                              Sanofi, February 19, 2013, SAN-EPI-0377132, slide 6
[79]   Loreaux (Sanofi) Deposition, p. 34

[80]   Deposition of Christopher Viehbacher (former CEO of Sanofi), October 16, 2018 (hereafter "Viehbacher (Sanofi) Deposition"), pp. 119-121

See also, 30(b)(1) Downey (Sanofi) Deposition, p. 42

[81]   Viehbacher (Sanofi) Deposition, pp. 119-121.



In fact, Bryan Downey testified ███████████ ███████████████ and that Sanofi █████████ ████████████

77.    **Price Protection**: In addition to rebates, at the time of Auvi-Q's launch PBMs were also increasingly seeking manufacturers to give "price protection," whereby they would rebate back to the PBM any increase in the product's WAC price above a particular rate.[85] Price protection can be cumulative, which applies a price increase threshold to the entire life of a contract, or non-cumulative (also called "resetting"), where the WAC or other price metrics reset each year and the protection is only against a certain level of price increase within each year of a contract.[86]

78.    Sanofi, however, ██████████████████████████████ ██████████████████████ An executive summary prepared by one PBM, Prime Therapeutics, reported ████████████████████████████████ █████████████ Even in instances where Sanofi did offer price protection, Sanofi typically did not offer the same extent of price protection that Mylan offered. ████████

████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ In contrast,

---

82    30(b)(1) Downey (Sanofi) Deposition, p. 9 ███████████████████████████

83    30(b)(1) Downey (Sanofi) Deposition, p. 94.

84    30(b)(1) Downey (Sanofi) Deposition, p. 8.

85    See, e.g., ███████████████████████████████, MYEP00260323-31 at 27.

86    30(b)(6) Deposition of ████████████
████████████████████████████████ pp. 274-276.
████████████████████████████████████████████████████
███████████████████████████ Deposition, pp. 277-278).

87    30(b)(6) Deposition of Joe Denney (former Head of Payer Marketing for Cardiovascular and Specialty Products at Sanofi), July 17, 2018 (hereafter "30(b)(6) Denney (Sanofi) Deposition"), pp.113-114.

88    "Prime Executive Summary - Sanofi," Prime, 2013, PRIME_0007885-86 at 85.

89    "Second Amendment to the Rebate Agreement," July 1, 2013, EAI 00221815-823 at 819-820.



In comparing offers with price protection from Mylan and Sanofi that OptumRx received in 2013, OptumRx executive Kent Rogers stated that

### V.C.    For plan-year 2015, Sanofi had success when it attempted to compete aggressively on price

79.    Once it better understood the extent to which PBMs were managing the category and the intensity of competition by Mylan for formulary placement, Sanofi used rebates to compete more aggressively for formulary placement and began to consistently offer price protection. As explained by Peter Guenter, former head of global commercial operations at Sanofi,

80.    This more aggressive pricing strategy resulted in Auvi-Q gaining coverage in major PBM plans. For example,

81.    After Sanofi offered more aggressive rebates, it was able to gain parity status with EpiPen at Tier 2 on CVS's Performance Drug List, which covered a majority of CVS's commercial lives. Sanofi was also able to achieve exclusive status for CVS's Advanced

---

90   Attachment to email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SAN-EPI-0764724-726 at 726.

91   30(b)(6) Rogers (Optum) Deposition, p. 331.

92   Deposition of Peter Guenter (former Executive Vice President and Head of Global Commercial Operations at Sanofi), October 3, 2018 (hereafter "Guenter (Sanofi) Deposition"), pp. 192-193.

93   Attachment to email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ April 9, 2015, SAN-EPI-0225642, slide 1.

Control and Value Formularies, which mostly covered CVS employees.[94] At Express
Scripts, Auvi-Q was not just taken off the exclusion list on the national formulary but was
also made the exclusive EAI drug on its High Performance formulary.[95] Sanofi ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Similarly, effective January 2015,
Auvi-Q managed to gain co-preferred tier 2 status with EpiPen on Aetna's high-control,
and national formularies.[97]

82.     As a result of its new pricing strategies, █████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ Exhibit 3 shows that by 2015, the most
common tier status for Auvi-Q, as measured by the number of applicable lives, at CVS,
ESI, Prime, Cigna, and Aetna was either preferred or covered.

## V.D.   Sanofi's complete product recall halted its momentum

83.     As discussed above, when Sanofi started competing aggressively, it was able to
gain formulary coverage for the great majority of commercial covered lives by 2015, and
sometimes even exclusive formulary coverage. But Sanofi's success stopped when it had
to recall its Auvi-Q devices for reasons entirely unrelated to Mylan's alleged conduct.

---

94  ███████████████████████████████████████████████████████████████
    MYEP00360084-85; 30(b)(6) Deposition of Joseph Anderson (CVS), December 20, 2018 (hereafter
    "30(b)(6) Anderson (CVS) Deposition"), pp. 134-137.
95  Email from █████████████████████████ SAN-EPI-0126029-030 at 029.
96  Attachment to email from █████████████████, April 9, 2015, SAN-EPI-0225642, slide
    1; email from Edward John Adamcik (ESI) to Everett Neville (ESI), June 10, 2014, ES_0010507-08 at
    07.
97  Email from █████████████████████████████ SAN-EPI-0249152-153; email from
    Patrick Jones (Mylan) to colleagues, ██████████████████ September 9, 2014,
    MYEP00491870-73; ████████████████████████████████████████████████
    ███████████████████████████████████ SAN-EPI_A-0007657-668 at 662.
98  Attachment to email from █████████████████, April 9, 2015, SAN-EPI-0225642, slide
    3.
99  Professor Scott Morton's Figure 10 shows that in Q3 2015 Auvi-Q was restricted on formularies
    representing 40.5% of the population. Scott Morton Report, ¶ 172. However, her analysis is not limited
    to commercial access and included Medicare/Medicaid plans. When limited to the commercial
    segment, Professor Scott Morton's analysis would show that as of Q3 2015, only 23.5% of commercial
    lives were on plans that had Auvi-Q restricted.

84. In 2015 Sanofi began  ███████

███████████████████████████████████████████

███████████████.[101] If a patient experiencing anaphylaxis did

not receive the intended dose, there could be significant health consequences including

death.[102] As a result, in October 2015, Sanofi issued a complete recall of its Auvi-Q

devices.[103] Professor Scott Morton does not allege that this recall was the result of

Mylan's conduct.[104]

85. The recall reversed the course of Auvi-Q's upward-trending success and ████

███████████████████████████████████████████

███████████████████████ ██████████████████

████████ and disrupted the plans by PBMs that were prepared to transition to Auvi-Q. In

addition to discontinuing all manufacturing and distribution of Auvi-Q products, Sanofi

███████████████████████████████████████████

---

[100] "Auvi-Q (epinephrine injection, USP) Recall," Sanofi release, available at <https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall/>, (accessed on January 25, 2019).

[101] 30(b)(6) Deposition of Philip Huang Ph.D. (Vice President of Medical Affairs at Sanofi), September 25, 2018 (hereafter "30(b)(6) Huang (Sanofi) Deposition"), pp. 43-44 ██████

██████████████████████████████████████████

*Id*, pp. 26-27

██████████████████████████████████████████

██████████████████████████████████████████

[102] "Auvi-Q (epinephrine injection, USP) Recall," Sanofi release, available at <https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall/>, (accessed on January 25, 2019).

[103] 30(b)(1) Deposition of Patrick Barry (former Head of General Medicines and Established Products, North America at Sanofi), July 13, 2018 (hereafter "30(b)(1) Barry (Sanofi) Deposition"), pp. 336-337.

[104] She assumes that Sanofi issues a voluntary recall of its product in the world but for Mylan's conduct (see, e.g., Scott Morton Report, ¶ 216 ("Having concluded that, but for Mylan's conduct Sanofi would have relaunched Auvi-Q…"). See also Scott Morton Deposition, pp. 264-265.

[105] Guenter (Sanofi) Deposition, pp. 317-318.

[106] 30(b)(6) Deposition of Thomas Jeffrey White (Staff Vice President of Clinical Pharmacy Services at Anthem), October 31, 2018 (hereafter "30(b)(6) White (Anthem) Deposition"), pp. 72-73 ███

███████████████████████████████████████████

███████████████████████████████████████████

---



86.   Up until the recall, ███████████████████

87.   Sanofi later decided to return Auvi-Q's rights to kaléo, ███████

## VI.  MYLAN'S PBM REBATES WERE PROCOMPETITIVE

### VI.A.  Branded manufacturer rebates to PBMs for preferred formulary placement are a critical driver of price competition in the industry

88.   Unlike a typical industry where customers make informed choices between competing products based on their prices and features, the pharmaceutical industry is unique in that many drugs require a patient to obtain a prescription from a doctor before they can be purchased. Because the person that makes the drug choice (i.e., the doctor) is not the payor (i.e., the patient/insurer), there exists a well-recognized "price disconnect" phenomenon: the doctor who focuses primarily on the therapeutic benefits of a drug does

---

107  ████████████████████████████████████████████████
      ███████████████████████████████ SAN-EPI-0382315-322 at 315-318.
108  ██ ██████████████ SAN-EPI-0382315-322 at 320.
109  Guenter (Sanofi) Deposition, pp. 317-318.
110  Guenter (Sanofi) Deposition, pp. 269-270, 318.
111  Mr. Guenter testifies that ████████████████████████████████████
      ████████████████████████████████████████████████ (Guenter
      (Sanofi) Deposition,  pp. 326-327.) ████████████████████████
      ████████████████████████████████████████████████
      ████████████████████████████████████████
      (Guenter (Sanofi) Deposition, pp. 338-339.)

not fully consider the costs of the drug to the patient/insurer.[112] The health insurer, which often pays the bulk of the cost, does not have a direct hand in the choice of the product. The patient often pays only a fraction of the cost and therefore does not fully internalize it.

89.     PBMs have played an important role in mitigating this "price disconnect" problem. PBMs design drug formularies that can influence the drug choice by patients (e.g., through imposition of copays) and doctors (e.g., through requirements for prior authorization or step edits). On the other hand, because of the ability to shift shares between drug manufacturers, PBMs intensify price competition between therapeutically similar branded drugs through rebates for favorable formulary placement.

90.     In what follows, I will first explain how PBMs widely use formulary placement to move market share between competing branded (and generic) drugs and, as a result, to negotiate substantial rebates from manufacturers for preferred formulary placement. I then describe the industry-wide move by PBMs to increasingly use formulary exclusions to drive higher rebates from manufacturers and lower branded prices for payors. Finally, I explain that Sanofi, as a large branded pharmaceutical manufacturer, pays substantial rebates for preferred and in some cases exclusive formulary placement, including on its market-leading product Lantus.

### VI.A.1.     PBMs widely use preferred formulary placement and restrictions to move market share and negotiate lower prices

91.     PBMs leverage their ability to manage drug utilization to obtain the lowest possible net cost from drug manufacturers. They achieve this by negotiating discounts in the form of rebates and price protection.[113] Utilization management can drive down costs

---

[112]   See, e.g., G. Michael Allan, Joel Lexchin & Natasha Wiebe, "Physician Awareness of Drug Cost: A Systematic Review," 4 *PLoS Medicine* Vol. 4, Issue 9 (September 2007) 1486-1496 at 1486.

[113]   30(b)(6) Deposition of Deborah Kronberg (Cigna), October 19, 2018 (hereafter "30(b)(6) Kronberg (Cigna) Deposition"), p. 64. ██████████████████████████████████████████████████ 30(b)(6) ██████████████████████████████████████████ Anderson (CVS) Deposition, p. 211. ███████████████████████████████████████████████████████████████████████████ 30(b)(6) Deposition of Adam Kautzner (ESI), December 18, 2018 (hereafter "30(b)(6) Kautzner (ESI) Deposition"), pp. 29-30 █████████

through two separate mechanisms. First, controls or restrictions on formulary placement provide PBMs with leverage to negotiate lower prices from manufacturers. Second, formulary placement incentivizes member utilization towards the lower cost product through lower copayments and other mechanisms.[114]

92.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

93.     When a new drug enters a class, PBMs will typically use the competition created by the new entrant to drive additional rebates from the manufacturers in order to reduce net cost.[116] PBMs try to ████████████████████████████████████
███████████████████████████████████████ which allows them to obtain the lowest possible net cost.[117]



---

[114] 30(b)(6) Deposition of Lida Etemad (UnitedHealth), November 29, 2018 (hereafter "30(b)(6) Etemad (UnitedHealth) Deposition"), p. 27.

[115] SAN-EPI-0532758-78 at 59.

See also, Byrne (Payer Sciences) Deposition pp. 45-48.
[116] 30(b)(6) Kronberg (Cigna) Deposition, pp. 66-68.

[117] 30(b)(6) Kautzner (ESI) Deposition, pp. 208-210.

HIGHLY CONFIDENTIAL

94.    Indeed, Professor Scott Morton's own report and her academic publications all recognize the importance of preferred formulary placement as a mechanism by which PBMs can extract lower prices from manufacturers.

95.    In describing competition in pharmaceutical markets in her report, she explains:[118]

> PBMs are able to create at least some degree of price competition among drug manufacturers through the creation of tiered formularies, which are lists of covered drugs that are available to end consumers, typically with different tiers corresponding to different levels of end-consumer co-payments. A PBM can influence choices among treatments by only including some treatments on the formulary or by putting different treatment options on different tiers…. In the case where there is a generic drug, a preferred brand drug, and a second, non-preferred brand drug on the formulary, the end consumer will have the option of paying a relatively low (or, in some cases, no) co-pay for the generic drug, a higher co-pay for the preferred brand, and a still higher co-pay for the non-preferred brand drug. Under these circumstances, all three treatments will be available to the end consumer, but the PBM creates incentives to the end consumers in the form of differences in co-pays to steer the end consumer to the PBM's preferred option. The larger the share of patients who change drugs in response to the incentives created by the PBM, the larger the incentive is for a manufacturer to offer a lower price to be included on a favorable tier.

96.    This is consistent with her academic research, where she also highlights the importance of formulary placement as a mechanism for PBMs to negotiate lower prices:[119]

> The process of identifying "preferred brands" is where the formulary is most useful in creating bargaining power for the insurer. This dynamic is nicely summarized in Berndt et al. (2011). Suppose there are four branded cholesterol-lowering drugs, none of which faces generic competition, and the insurer has decided they are very similar. An insurer can offer to prefer



[118]   Scott Morton Report, ¶ 40.
[119]   Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," *Handbook of Health Economics*, Vol. 2, Chapter 12 (2012) 763-823 at 810-811".

the manufacturer's product with its group of customers in exchange for a lower contract price—or a higher rebate. "Preferring" the product means the insurer will increase its market share by using tools such as its formulary and financial incentives. The manufacturer decides how much of a discount it is willing to offer for the business of the group which, because it represents lots of volume and is elastic across therapeutic substitutes, has more bargaining power than any individual consumer. The insurer holds what one can think of as an auction for access to its customers, and comes away with a preferred brand and a low price. Naturally, the more differentiated are the brands, the more difficult it is for the insurer to threaten to put all but one on a high tier and discourage their use.

### VI.A.2.      PBMs are increasingly using formulary exclusions to drive higher rebates from manufacturers and lower prices for payors

#### VI.A.2.a)  Formulary exclusions can maximize PBMs' ability to negotiate lower prices and move market share

97.     Where two drugs have very similar clinical profiles, there are relatively fewer benefits from retaining the ability to choose among these products. In these circumstances, PBMs are increasingly limiting formulary coverage to a single drug and using competition for this exclusive position to drive substantially higher rebates. The use of drug removal lists increased the negotiating power of the PBMs, because compared to step edits and prior authorizations, the exclusion lists provided greater ability to move share, and were utilized by a larger number of clients and thus could have a greater effect on the product's market share.[120]

#### VI.A.2.b)  Since 2011, PBMs have increasingly been using formulary exclusions

98.     For these reasons, PBMs have been increasingly using formulary exclusions.[121]

---

[120]   30(b)(6) Kautzner (ESI) Deposition, pp. 189-190.



See also, a

SAN-EPI-1202786-95 at 91.

[121]   30(b)(6) Anderson (CVS) Deposition, p. 194.

In the years before the launch of Auvi-Q, PBMs began exerting more influence and control over prescribing decisions and patient choice.

99.     PBMs further increased their use of tighter formulary controls in 2012, when CVS published its Formulary Drug Removal List, which contained a list of products that were completely excluded from its formulary. CVS called this "a precisely targeted approach" that could be used to "drive utilization to lower cost formulary brands and generics" and would provide another option for CVS's clients in managing drug costs.[122] CVS found that its drug removal list was a successful strategy, and expected other PBMs to follow suit.[123]

100.    Following CVS's lead, major PBMs have increasingly used formulary exclusion for larger numbers of drugs. For example, as shown in Exhibit 4, CVS had 38 drugs on its exclusion list in 2012, growing to 124 drugs in 2016. ESI implemented its own exclusion list in 2014[124] and, similar to CVS, found that these exclusion lists were successful and

---

[122] "Formulary Innovation Helps Payors Address New Market Challenges," CVS/Caremark, PS0077861-67 at 65. ("Historically, health plans have implemented custom formularies that exclude certain brand products in categories with ample generic and/or preferred brand options. This precisely targeted approach focuses on specific products and helps drive utilization to lower cost formulary brands and generics. To help clients manage their drug spend, CVS Caremark adopted a similar strategy and removed 34 brand drugs from its standard formulary effective January 1, 2012. Factors taken into consideration for this decision included the plans' ability to obtain the lowest price for formulary products, high product price inflation, the availability of viable lower cost alternatives, and pharma copay cards and discount coupons.") 30(b)(6) Anderson (CVS) Deposition, p. 192.

See also, Byrne (Payer Sciences) Deposition, p. 65. ("Q. Was it your understanding, when you heard that Caremark was moving towards an exclusion list, that controlling rising healthcare costs was one of the reasons that they were making that change?... A. Yes.")

[123] "Formulary Innovation Helps Payors Address New Market Challenges," CVS/Caremark, PS0077861-67 at 67. ("The pharmaceutical market is shifting rapidly, and to continue to offer cost-effective benefits in such a market, plans require strategic support based on sound insights and analysis. As a pharmacy innovation company, CVS Caremark provided leadership in addressing the effects of these market place challenges. Other PBMs are expected to follow a similar formulary strategy.") 30(b)(6) Anderson (CVS) Deposition, pp. 194-195.

[124] Byrne (Payer Sciences) Deposition, pp. 68-69. ("Q. And other PBMs have followed suit since then, haven't they? A. I mean, there is really only two big PBMs. Q. What is the other one; ESI? A. ESI. Q.

---

led to ▮▮▮▮▮▮▮▮▮▮▮▮▮ Similarly, the number of drugs in ESI's exclusion lists increased from 48 in 2014 to 80 in 2016. UnitedHealthcare also

▮▮▮▮▮▮▮ One 2014 UnitedHealthcare assessment of the ESI exclusion list

▮▮▮▮▮▮ OptumRx also has an extensive formulary exclusion list, including 74 drugs in 2016.



101.    Importantly, formularies with drug exclusions are being extensively used by health plans. According to one survey conducted by the Pharmacy Benefit Management Institute (PBMI), in 2016, 82 percent of employers used formulary exclusions, 94 percent used prior authorizations, and 83 percent used step therapy.[129] PBMI explained that formulary exclusions are "frequently used" and are a tool "to manage drug costs, provide leverage for price concessions or higher rebates, and support clinical decisions."[130]

102.    Collectively, drug exclusions lead to huge savings in drug costs. CVS estimates that "exclusions and other formulary management tactics will lead to more than $6.4

---

And Express Scripts implemented an exclusion list for numerous drugs – A. Similar, yes. Q. – in 2014? A. 2014. Q. So CVS was 2012, ESI was 2014? A. Correct. Q. And between them, each of them excluded a number of products across a number of classes of drugs from their formularies, right?... A. Yea. I don't know specific classes, but yes.") 30(b)(6) Kautzner (ESI) Deposition, pp. 101-102.

[125] 30(b)(6) Kautzner (ESI) Deposition, pp. 216-217.

[126] Email from Lida Etemad (UnitedHealthcare) to colleagues, ▮▮▮ October 18, 2013, EAI 00058608-10 at 08.
[127] Email from Lida Etemad (UnitedHealthcare) to Peter Probst (UnitedHealthcare), ▮▮▮ " November 26, 2014, EAI 00068417-25 at 17.
[128] ▮▮▮ SAN-EPI-0002512-21 at 17.
[129] "PBMI Research Report: Trends in Drug Benefit Design," PBMI, 2016, pp. 28 and 44.
[130] "2017 Trends in Drug Benefit Design," PBMI, 2017, p. 25.

billion in savings from 2012 through 2016."[131]

### VI.A.2.c)  PBM use of formulary exclusion arose in part as a reaction to copay coupons

103.   One motivation for PBMs' move to formulary exclusion lists is to regain greater control over their ability to move market share. As discussed above, PBMs used formulary status to create incentives for consumers to choose lower-cost drugs by assigning lower out-of-pocket costs for lower formulary tiers. Manufacturers, however, have increasingly been using copayment coupons to reduce or eliminate these copayment differences and reduce the PBMs' ability to move market share. By giving a consumer a coupon that reduces her copayment by $20, a manufacturer can place a Tier 3 drug with a $30 copayment on an equal footing with a Tier 2 competitor with a $10 copayment, thus reducing the PBMs' ability to move share (where the total cost of the Tier 2 drug is lower). A white paper published by CVS in 2012 explains that manufacturers offering copay coupons directly to consumers were reducing their incentive to use lower-cost products.[132,133]

---

[131]   "Formulary exclusions set up contentious environment for pharma companies," September 27, 2016, available at <https://decisionresourcesgroup.com/drg-blog/market-access/formulary-exclusions-set-contentious-environment-pharma-companies/>.

[132]   "Formulary Innovation Helps Payors Address New Market Challenges," CVS/Caremark, PS0077864-67 at 65. ("In addition to price inflation, manufacturers have invested $4 billion annually for the last two years to preserve market share and margin by going outside the standard supply chain. Significantly, manufacturers have reached out to consumers directly with copay cards and coupons for more than 500 products. Copay coupons reduce or eliminate member copays for branded drugs, potentially reducing the member's incentive to use lower-cost alternatives such as generics and preferred formulary brand products.")

[133]   Byrne (Payer Sciences) Deposition, pp. 46-49. ("Q. How does – how do co-pay cards dull those co-pay differential programs?... A. Well, if you have a co-pay card, the patient – depending on that co-pay card program – could be – set a cap at 25-dollar co-pay or even a zero-dollar co-pay, the patient is not going to realize that differential. Q. So the patient loses the incentive to go with the tier two drug versus the tier three drug because the co-pay is being covered through some other program? A. Correct. Q. So if the payer is trying to use the co-pay differential to encourage use of the drug with the lower co-pay, that purpose is defeated in some part by the co-pay programs? A. Correct…. That's not the – well, I don't know whether it is the reason why a pharmaceutical company would do that or not, you know whether they do it to – I don't know whether they would do it to circumvent a formulary positioning or simply just give the patient relief of a co-pay. Q. But your understanding is that that was one of the – one of the underlying reasons for PBMs moving towards exclusion lists?... A. Correct. Q. So that they could have just the one drug that was covered and not have to deal as much with the co-pay? A. Exclusion, yes.") Deposition of T. Spencer Williamson, IV (CEO of kaléo), September 28, 2018 (hereafter "Williamson (kaléo) Deposition"), pp. 188-189. ("Q. What about indirect conversations? Did you have any indirect conversations that led you to believe that payers didn't like copay programs?... A. It's pretty well understood payers don't like copay programs. Q. And who is it understood by? A. I think it's understood by pharmaceutical manufacturers and payers. Q. And why

104.    As Professor Scott Morton explains in one paper (citing to kaléo's copay coupon strategy after it relaunched Auvi-Q):[134]

> Pharmaceutical manufacturers have devised a clever strategy to combat the price competition induced by tiering. They issue "coupon cards" that can be swiped at the pharmacy and pay exactly the difference between either the generic and the brand ($15 in our example above) or the preferred and non-preferred brands ($30 in our example above), depending upon which product's out of pocket price the brand wants to match. The card leaves the consumer paying the lower out of pocket price that belongs to the inexpensive drug the PBM favors – even if she consumes the expensive drug. This scheme completely undoes the financial incentive created by the PBM to incentivize consumption of the cheaper product. While the manufacturer of the expensive product pays the difference in patient co-pay through the coupon card, that is usually much smaller than the difference in the full costs of the competing products. Thus, the insurer ends up paying much more, the consumer's payment is unchanged, and the manufacturer comes out ahead. The practice blocks the ability of the PBM to create price competition among drugs in return for shifting share, which therefore raises negotiated prices and the cost of prescription drug insurance.

105.    PBMs turned to formulary exclusion in part to regain their ability to shift share through preferred formulary placement and lower cost to consumers.

### VI.A.2.d)  PBMs can and do exclude market-leading drugs from formularies

106.    PBMs' use of formulary exclusion has even extended to market-leading drugs. ESI has used its drug removal list to exclude popular products with high market shares, including Advair and Sovaldi, and



Similarly, CVS's witness testified that

don't payers like copay programs? A. Because payers have a couple tools they use to direct what product a patient gets, and one of those tools is the out-of-pocket cost to the patient. And so when a manufacturer steps in and covers that, then it takes away that one tool that the payer has to use.")

[134]  Fiona Scott Morton and Lysle T. Boller, "Enabling Competition in Pharmaceutical Markets," Center for Health Policy at Brookings, Hutchins Center Working Paper 30 (May 2017) 1-53 at 27.

[135]  30(b)(6) Kautzner (ESI) Deposition, pp. 191-193.

[REDACTED]

Product exclusions were common with United as well, [REDACTED]

[REDACTED]

107.    Sanofi appears to have understood that. [REDACTED]

[REDACTED]

108.    Again, Professor Scott Morton's own report, her academic publications, and her testimony in front of Congress all recognize the importance of PBMs using exclusion lists to move shares and drive down drug prices. In her prepared Congressional testimony before the Senate Finance Committee she explained the procompetitive benefits of formulary exclusion very clearly, drawing comparisons to shopping for toilet paper at Costco:[141]



[136]  30(b)(6) Anderson (CVS) Deposition, pp. 200-201;
[REDACTED] June 25, 2015, CVSCM_EPI_000000412-446 at 446.
[137]  Etemad (UnitedHealth) Deposition, pp. 28-33.
[138]  [REDACTED] SAN-EPI_A0040974-79 at 74.
[139]  [REDACTED] SAN-EPI_A0040974-79, at 74.
[140]  [REDACTED] SAN-EPI_A0040974-79, at 74-75.
[141]  Fiona Scott Morton, Testimony for the Senate Finance Committee, "Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit" January 11, 2007, available at <https://www.finance.senate.gov/imo/media/doc/011107fmtest.pdf>.

In the pharmaceutical industry, the ability to exclude a drug or "move market share," is the most effective way to get a low price.

Volume and the ability to walk away from a transaction are two determinants of acquisition price. In a simpler market, such as that of a consumer purchasing toilet paper at CostCo, one can see these two factors at work. CostCo is a large buyer and can extract a discount for that reason. However, CostCo also typically only offers a couple of brands of toilet paper. One is the store brand (or generic), and there might be one or two others. Let's imagine the other brand is Scott's. You would not see on the CostCo shelves all the many brands of toilet paper that you might see on the supermarket shelves. CostCo can extract a low price from Scott's because it can promise Scott's that it will "move market share." A significant fraction of CostCo customers who like Charmin but who cannot find it at CostCo will buy Scott's instead. In this way Scott's gains market share vis a vis Charmin and 'pays' for that gain by charging CostCo a relatively low price. When CostCo was negotiating with Scott's over the purchase price of the toilet paper, CostCo could walk away at any time and open a negotiation with Charmin instead. CostCo considers the different brands of toilet paper to be substitutes and can exclude one or more very easily

In the pharmaceutical industry the situation is analogous. HMOs and PBMs have committees of physicians and pharmacists that meet to consider which drugs are therapeutic substitutes (cure the same diseases). When two or more drugs are found to be close substitutes, the plan considers which one is less costly. The manufacturers of those drugs essentially bid for the business of the buyer, with the lowest priced drug winning. The winner gains market share at the expense of its substitutes because the HMO makes the winner the default choice [of] its physicians and consumers (Typically, the competing drugs are only available to patients when there is medical need as argued by a physician.) The more market share the buyer can "move", the more valuable a manufacturer finds a contract with that buyer.

109.   As explained in more detail in Section VII.A below, ███████████████ ██████████████████████

### VI.A.3.   Rebates for preferred and exclusive formulary placement are widely used by drug manufacturers, including by Sanofi

110.   Sanofi has acknowledged that rebates are widely offered by drug manufacturers and that rebates benefit patients. In his testimony before the United States Senate Finance Committee in February 2019, Sanofi CEO Olivier Brandicourt stated that Sanofi offers "high rebates" to PBMs and payors in order to secure "preferred position" for its drugs on

their formularies.[142] Mr. Brandicourt explained the widespread use of rebates by drug manufacturers, and Sanofi in particular, and noted that rebates can lead to a decline in average net price.[143]

> In the current system, manufacturers pay significant rebates as a percentage of the list price to both government and private payers, as well as other intermediaries, in an effort to improve access for patients. In 2018, 55 percent of Sanofi's gross sales were given back to payers as rebates, including $4.5 billion in mandatory rebates to government payers and $7.3 billion in discretionary rebates. As described later in my testimony, due to these rebates, the average aggregate net price of our products, including our insulin products, actually has declined over the last number of years.

111. Indeed, Sanofi has frequently offered rebates conditional on preferred formulary status or even formulary exclusivity to many PBMs on many of its drugs; these are the exact types of rebates that it is objecting to Mylan using for EpiPen.



Lantus was Sanofi's largest product, with U.S. sales volume of €3.7 billion in 2013 and €4.2 billion in 2014.[144] According to Sanofi's former CEO, Christopher Viehbacher,

Some of these agreements or

---

[142] "Drug Pricing in America: A Prescription for Change, Part II," Testimony of Olivier Brandicourt, M.D., Chief Executive Officer, Sanofi, Before the Senate Committee on Finance, February 26, 2019, available at <https://www.finance.senate.gov/hearings/drug-pricing-in-america-a-prescription-for-change-part-ii> at 3:20:10.

[143] "Testimony of Olivier Brandicourt, M.D., Chief Executive Officer, Sanofi, Before the Senate Committee on Finance," February 26, 2019, available at <https://www.finance.senate.gov/imo/media/doc/26FEB2019BRANDICOURT-SANOFI.pdf>, pp. 2-3.

[144] Viehbacher (Sanofi) Deposition, pp. 130-132.

[145] Viehbacher (Sanofi) Deposition, pp. 135-139.

[146] Viehbacher (Sanofi) Deposition, p. 159.

[147] ████████████████████████████████████ January 1, 2014, SAN-EPI-0363626-639 at 636;

offers ███████████████████████████████████████████████
██████████████

112.   Sanofi's efforts to exclude its competitors were not limited to Lantus alone. For example, in 2013, Sanofi ██████████████████████████████████████████
██████████████████████ In Sanofi's July 2014 agreement with CVS, █████████
██████████████████████████████████████████████████████████████
█████████████ It made that offer for additional drugs in 2015, with its July 2015 agreement ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████ Moreover, these incremental rebates would sometimes be conditional on excluding specific competitor products. For example, ██
██████████████████████████████████████████████████████████████



────────────────────────────────

July 24, 2015, SAN-EPI-0077732-37 at 35; 30(b)(6) Kautzner (ESI) Deposition, pp. 233-234.

[148] ████████████████████████████████████████ November 25, 2014, SAN-EPI-A-0094608-615 at 611.

[149] ██████████████████████████████████████████, April 1, 2015, CIGNA_00499-532 at 524-525.

[150] █████████████████████████████████████ July 1, 2015, EAI 00230199-231 at 214-216, 230.

[151] █████████████████████████████████████████ SAN-EPI-A-0051392-399 at 394-395.

[152] 30(b)(6) Rogers (Optum) Deposition, p. 357.

[153] 30(b)(6) Kautzner (ESI) Deposition, pp. 214-215.

[154] "Second Amendment to the Rebate Agreement," July 1, 2014, CVSCM_EPI_000000072-98 at 76, 79, 80-82. Indeed, ██████████████████████████████████████████

[155] "Fourth Amendment to the Rebate Agreement," Caremark and Sanofi, July 1, 2015, CVSCM_EPI_000000101-125 at 102, 104, 106-110.



113.    Not only did Sanofi employ exclusive rebates for its other products, it also offered rebates for Auvi-Q conditional on exclusivity. ████████████████████████ ███████████████████████████████████████████ In another example, Sanofi ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

114.    Manufacturers of other EAI devices also proposed or entered into contracts for exclusive rebates ████████████████████████████████████ ████████████████████████████████████████████████ And in 2008, ███████████████████████████████████████ ████████████████████████

115.    Professor Scott Morton in her report claims that "[m]any (if not all) of the pro-competitive aspects of contractual restrictions can be achieved through contracts that do not reference rivals such as volume discounts."[162] However, basing the discounts a buyer receives on the seller's share of the buyer's purchases is likely to be more efficient than

---

[156]  See "Fourth Amendment to the Rebate Agreement," Caremark and Sanofi, July 1, 2015, CVSCM EPI 000000101-125 at 108.

[157]  ███████████████████████████████, March 18, 2013, SAN-EPI-0434385-86 at 86.

[158]  30(b)(6) Deposition of Louanne Cunico (Vice President of Clinical Operations and Pharmacy at Presbyterian), October 17, 2018 ("hereafter 30(b)(6) Cunico (Presbyterian) Deposition"), p. 45. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ See also "Eight (8th) Amendment to Presbyterian Health Plan, Inc. And Presbyterian Insurance Company, Inc. Rebate Agreement #A13312", March 2014, PHP 0000385–87 at 86.

[159]  ███████████████████████████████████████ June 19, 2014, SAN-EPI-0002477-80 at 77.

[160]  ███████████████████████████████████████ January 17, 2014, ANTH-EPI 00112-14 at 12.

[161]  Email ████████████████████████████ February 15, 2008, EAI 00034440-41 at 40; 30(b)(6) Etemad Deposition, pp. 62-63.

[162]  Scott Morton Report, ¶ 111.

---

basing the discounts on the volume of purchases the buyer makes from the seller, particularly when customer sizes vary and demand is changing over time.[163] As Klein and Lerner note, it is often easier for the seller to estimate the share of its customers' purchases than the volume of purchases, particularly when its customers vary in size and the total volume of purchases made by each customer varies over time.[164] These conditions are present here. There are substantial uncertainties in EAI demand and the presence of many formularies makes it difficult for a manufacturer to estimate future usage of EAI devices at the plan level. A share-based discount substantially reduces such uncertainties, thereby generating pro-consumer efficiencies that cannot be achieved by a standard volume discount. The fact that Sanofi, which is not alleged to possess monopoly power in the EAI market, also employs share-based discounts for Auvi-Q (in particular, discounts conditioned on exclusive formulary placement) rather than volume-based discounts is further evidence that share-based discounts are more efficient than volume-based discounts in the present context.

### VI.A.4.     EAI rebates were driven by PBMs

116.    The EAI rebates were driven by the PBMs, not Mylan. PBMs typically solicited offers from both Mylan and Sanofi.[165,166] For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[163] Benjamin Klein and Andres V. Lerner, "Price-Cost Tests in Antitrust Analysis of Single Product Loyalty Contracts," *Antitrust Law Journal*, Vol. 80, No. 3, (2016): pp. 631-679 at 652. See, also, David Spector, 2005, "Loyalty Rebates: An Assessment of Competition Concerns and a Proposed Structured Rule of Reason," *CPI Journal, Competition Policy International*, vol. 1, which explains that discounts based on market shares may be more efficient than discounts based on volumes when customers' demand is uncertain.

[164] Benjamin Klein and Andres V. Lerner, "Price-Cost Tests in Antitrust Analysis of Single Product Loyalty Contracts," *Antitrust Law Journal*, Vol. 80, No. 3, (2016): pp. 631-679 at 652.

[165] See, e.g., 30(b)(6) Anderson (CVS) Deposition, pp. 220-221. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See, e.g., ▮
▮▮▮▮▮▮▮▮▮▮ June 19, 2014, SAN-EPI-0002477-80 at 77. ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[166] Professor Scott Morton argues that Mylan often brought up exclusivity or increased restrictions on Auvi-Q of its own accord (Scott Morton Report ¶ 124). She ignores, however, that such a restriction



████████████████████████████████████ Thus, *ex ante* Sanofi had ample opportunities to respond to such solicited offers.

117.   For example, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ CVS would ████████████████████████

████████████████████████████████████████████████████

████████████████ CVS has stated that, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

118.   In November 2012, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

was not a viable option unless the payor or PBM agreed to it.  Her mention of Mylan's interactions with Prime Therapeutics shows this.  She accuses Mylan of "encourag[ing] [Prime] to place a restriction on Auvi-Q in exchange for higher rebates."  (Scott Morton Report ¶ 124).  She ignores, however, that Prime kept Auvi-Q on Tier 3 and did not choose to accept the higher rebates Mylan offered to restrict Auvi-Q. See Exhibit 3.

167   ████████████████ Deposition, pp. 87-88.

████████████████████████████████████

168   ████████████████████████████ SAN-EPI-0447662-68 at 64.

169   30(b)(6) Anderson (CVS) Deposition, pp. 219-220.

████████████████████████████████████

170   30(b)(6) Anderson (CVS) Deposition, pp. 272-273.

████████████████████████████████████

171   ████████████████████, SAN-EPI-0447662-68.



119.   In response to PBMs' bid requests, Mylan and other manufacturers increased their rebates in order to compete for preferred, sometimes even exclusive, formulary placement at PBMs. For example, in January 2013, Cigna made a request to Mylan ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After Mylan sent its initial offer, Cigna ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

120.   MedImpact also asked Mylan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. MedImpact's witness stated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Similarly, during negotiations with OptumRx in 2013, Mylan was informed ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As a result of this demand, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

121.   CVS leveraged its ability to exclude EpiPen in order to drive more competitive offers from both Mylan and Sanofi. In 2015, Mylan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[172] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, November 15, 2012, SAN-EPI-0447662-68 at 64.

[173] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, November 15, 2012, SAN-EPI-0447662-68 at 64.

[174] Email from Rose Mongillo (Cigna) to Pat Jones (Mylan), "Re: meeting," January 21, 2013, MYEP00623274-291 at 282. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[175] Email from Rose Mongillo (Cigna) to Pat Jones (Mylan), "RE: meeting," May 9, 2013, MYEP00623274-291 at 279-280. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Letter from Jennifer Conroy (Mylan) to Rosemarie Mongillo (Cigna), June 3, 2013, MYEP00623274-291 at 290-291.

[176] Deposition of James Ayers (former Vice President of Industry Relations at MedImpact), September 26, 2018 (hereafter "Ayers (MedImpact) Deposition"), pp. 171-173.

[177] Email from Bruce Foster (Mylan) to Federic R. Curtiss (OptumRx) and colleagues, "EpiPen at OptumRx and UHC," May 17, 2013, MYEP00081290-91.

[178] Email from Bruce Foster (Mylan) to Federic R. Curtiss (OptumRx) and colleagues, "EpiPen at OptumRx and UHC," May 17, 2013, MYEP00081290-91.

[REDACTED]

## VI.B.   Mylan's PBM rebates lowered net prices

### VI.B.1.        Prices received by Mylan

122.    The increased rebates that PBMs were able to extract from manufacturers served to lower Mylan's net prices. Professor Scott Morton contends that Mylan's rebates did not lower prices, asserting that the entry of Auvi-Q did not increase price competition, and therefore that Mylan's challenged conduct led to higher prices. She admits that she did not attempt to estimate what but-for prices would have been, but rather:

> The extent to which I talk about the but-for world is really directional. We know from a long economics literature that when a competitor enters, prices decline relative to the monopoly price. The competitive price is lower than the monopoly price. And, therefore, I would expect to see prices in the but-for world to be lower than they are in the actual world. I did not calculate a but-for price.[181]

123.     In fact, a variety of evidence demonstrates that prices were substantially lower as a result of Auvi-Q's entry than the price that would have existed but-for Auvi-Q's entry.

124.    PBMs testified that they were able to negotiate lower prices for their customers as a result of Mylan and Sanofi's rebates for formulary placement, even exclusive formulary placement. For example, Adam Kautzner of Express Scripts testified [REDACTED]



---

[179]   Email from Nicole Willing (Mylan) to Patrick Zinn (Mylan), [REDACTED] March 5, 2015, MYEP00514631-32.

[180]   Email from James Cichowski (CVS) to Nicole Willing (Mylan), [REDACTED] May 12, 2015, MYEP00079145-146.

[181]   Scott Morton Deposition, pp. 224-225.

[182]   30(b)(6) Kautzner (ESI) Deposition, pp. 82-83.

████████████████████████

125.    Louanne Cunico, Vice President of Clinical Operations and Pharmacy at Presbyterian Health, explained that Presbyterian is able to obtain greater rebates and thus lower its costs through its use of preferred formulary positioning and exclusions.[183]

> Q. And in addition to NDC block, another way that Presbyterian may manage costs is formulary position; is that right?
>
> A. Correct.
>
> Q. Okay. And so you may – one particular drug may have preferred position on a formulary?
>
> A. Correct.
>
> Q. And would – would you expect greater rebates in order to put a drug in preferred position?
>
> A. Generally, yes.
>
> Q. And you would expect that that would reduce your costs, all things being equal?
>
> A. Yes.

126.    In a recent briefing, CVS specifically stated that "[t]hrough discounts, rebates, and price protection, we helped clients mitigate the impact of EpiPen price increases."[184]

127.    My analysis confirms that if Mylan had been forbidden to compete by offering rebates conditional on preferred and/or exclusive formulary placement, net prices would have been higher. First, Professor Scott Morton does not allege that EpiPen's WAC price was higher as a result of Auvi-Q's entry. Indeed, an analysis of EpiPen WAC pricing demonstrates that, as shown in Exhibit 5, the growth rate of WAC prices was effectively the same before and after Auvi-Q's entry in January 2013.[185]

128.    Second, as shown in Exhibit 6, ████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████

---

[183]  30(b)(6) Cunico (Presbyterian) Deposition, pp. 160-161.
[184]  CVS Health Payor Solutions, "Why the Time Is Right for a New Pricing Model," (March 19, 2019).
[185]  The EpiPen WAC price grew at an average annual growth rate of 26% prior to Auvi-Q's entry and an average annual growth rate of 26% from Auvi-Q's entry in Q1 2013 through Auvi-Q's recall in Q3 2015.

129.   Without additional competition, Mylan would not have had a strong incentive to increase its rebates to PBMs and payors above the modest rebates it was providing prior to Auvi-Q entry. The hashed red line in Exhibit 5 represents the Mylan net price that would have existed had Auvi-Q not entered and had Mylan continued to pay the 8% rebates it was paying in 2011 and 2012. The hashed blue line in Exhibit 5 shows the average net price for EpiPen after these rebates are accounted for. The difference between these two dotted lines represents the reduction in the EpiPen net price as a result of competition between EpiPen and Auvi-Q. By Q3 2015, EpiPen's actual net price was 32% lower than it would have been but-for Auvi-Q's entry.

130.   That competition from Auvi-Q caused Mylan to substantially reduce its price can also be seen from Mylan's financial statements. Mylan's gross profits on EpiPen ████

████████████████████████████████████████████████████████████████

████████████████

### VI.B.2.        Prices paid by end payors

131.   PBMs often pass on the rebates they obtain from manufacturers to the third-party payors. Although individual plan sponsors' rebate agreements with PBMs vary, a significant percentage of manufacturer rebates are passed on to these end payors. While the specific mechanics of how and to what extent these savings were realized by end payors varied substantially across PBMs and health plans, the savings are often substantial. For example, one report estimates that on average 90% of total rebate dollars are passed on from PBMs to employers.[187] As the witness of Express Script explains:[188]



---

[186]   Mylan's EpiPen P&L (MYEP01362752).

[187]   "Solving the Mystery of Employer-PBM Rebate Pass-Through (rerun)," Drug Channels Institute, May 3, 2016, available at <https://www.drugchannels.net/2016/05/solving-mystery-of-employer-pbm-rebate.html>.

[188]   30(b)(6) Kautzner (ESI) Deposition, pp. 84-85.

[REDACTED]

132.    These cost savings experienced by insurers/payors may be passed on to patients, e.g., through lower premiums.[189]

### VI.C.   Mylan's rebates increased output

133.    As explained above, Mylan's rebates were procompetitive and lowered prices for downstream customers. Mylan has also invested heavily in increasing awareness of anaphylaxis and establishing EpiPen as a trusted EAI device. Economic theory teaches that lower prices would stimulate demand and expand EAI output. In fact, consistent with this, sales of EAI devices increased steadily during the period between 2012 and 2015, as shown in Professor Scott Morton's Figure 2.[190]

134.    Despite the fact that output of EAI devices increased during the period of Mylan's challenged rebates, Professor Scott Morton concludes that output was lower as a result of Mylan's conduct. She, however, points to no evidence and conducted no analysis to demonstrate that this is the case. She asserts that she knows that "directionally" output would have been higher in the but-for world than it was in the actual world, because anticompetitive conduct lowers output.[191] But this circular logic just assumes its conclusion.

### VI.D.   Consumers were not harmed by lack of choice

135.    Professor Scott Morton alleges that consumers are deprived of the opportunity to choose an alternative to EpiPen that many viewed as a superior option.[192] As I explained above, Auvi-Q delivers the same medicine using substantially the same mechanism. But it has a modestly different set of features that Sanofi argues are more convenient for some

---

[189]    Deposition of Bethanie Stein (Vice President of Trade Relations at Humana), October 11, 2018 (hereafter "Stein (Humana) Deposition"), pp. 27-28. [REDACTED]

[REDACTED] 210:1-8
team to be able to offer preferred formulary [REDACTED]

[REDACTED]

[190]    Scott Morton Report, Figure 2, p. 21.
[191]    Scott Morton Deposition, pp. 243-244.
[192]    Scott Morton Report, ¶ 190.

customers. ████████████████████████████████████████████

████████████████ Barbara Minton of Anthem testified that ██████████████████

██████████████████████████████████

136.     To the extent that Auvi-Q and EpiPen were slightly differentiated products, and that some consumers preferred Auvi-Q, it does not follow that those consumers were harmed by the lack of choice. Critically, PBMs recognize that in excluding a product from their formularies they are in some sense limiting choice. But as discussed above, it is precisely these restrictions that allow the PBM to negotiate substantially lower prices. Plans that choose these more restricted but lower cost formularies do so because they believe that they are better off sacrificing some choice for lower prices.

137.     In her testimony for the Senate Finance Committee in 2007, Professor Scott Morton herself explained why the exclusion of a therapeutically similar drug from one formulary does not deprive consumers of choice.[194]

> A single [prescription drug plan] on the other hand, can have a preferred brand which it offers to enrollees at a preferred price. Thus plans are well situated to bargain for low prices with manufacturers in cases where a drug has one or more good therapeutic substitutes. Patients that prefer the omitted brand can choose to join a plan that includes their preferred brand and omits a different one. Therefore, in classes in which drugs have therapeutic substitutes, patients do not provide an economic monopoly; rather, plans identify substitutes and use those substitutes to create price competition which lowers prices.

138.     Moreover, neither Plaintiff nor Professor Scott Morton allege that Auvi-Q left the market as a result of Mylan's challenged conduct. Sanofi voluntarily recalled Auvi-Q in October 2015 as a result of a serious product defect, which Sanofi does not allege was Mylan's fault. While Sanofi never relaunched Auvi-Q, kaléo did in January 2017, and since that point Auvi-Q has been available to doctors and patients.[195]

---

[193]   30(b)(6) Minton (Anthem) Deposition, p. 132. ████████████████████████
████████████████████, See for e.g., Byrne (Payer Sciences) Deposition, pp.
150-151 ████████████████████

[194]   Fiona M. Scott Morton, Testimony for the Senate Finance Committee, "Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit" January 11, 2007, available at <https://www.finance.senate.gov/imo/media/doc/011107fmtest.pdf>.

[195]   Professor Scott Morton does not allege that Auvi-Q would have been relaunched any earlier in a world but-for Mylan's conduct (Professor Scott Morton Report, ¶ 224.)

## VII.   MYLAN'S CONDUCT DID NOT EXCLUDE AUVI-Q

139.    For the reasons set forth above, Mylan's PBM rebates were procompetitive (Section VI) and Auvi-Q's failure was the direct result of Sanofi's own conduct (Section V).  Nevertheless, Sanofi alleges that Mylan's agreements with PBMs foreclosed Sanofi from competing for the sale of EAI devices.  However, neither the evidence in the record nor Professor Scott Morton's analysis demonstrates that the economic prerequisites for establishing exclusionary conduct are satisfied here.

### VII.A. Mylan's EpiPen prices were above cost

140.    As a threshold matter, I understand that courts generally apply a "price-cost" test to evaluate single product discounts where price is the "clearly predominant" means of exclusion.[196] Here, price is the principal means by which EpiPen was preferred or exclusive on PBM formularies. Sanofi's allegations, and Professor Scott Morton's theory, revolve around the rebates that Mylan paid to PBMs and the potential threat of losing those rebates. The rebate contracts between PBMs and Mylan did not lock PBMs into a given formulary structure. Instead, they just laid out an agreed-upon menu of rebates based on the PBM placing EpiPen in certain formulary positions from which the PBM and its customers could choose. The sole cost that PBMs or payors would bear if they did not meet the condition associated with a rebate was the loss of a discount; as I explain further below, there was no threat, for example, to cut off the supply of EpiPens.  Price therefore was the "clearly predominant" method by which the contested sales of EpiPens were preferred or exclusive on PBM and payor formularies, and therefore the relevant inquiry should be whether, analyzed appropriately, Mylan priced above cost.

### VII.A.1.       PBMs generally viewed EpiPen and Auvi-Q as therapeutically interchangeable

141.    Auvi-Q is significantly similar to EpiPen. It contains the same active ingredient (epinephrine), delivers this medicine in a similar way (autoinjector device) and is

---

[196]   *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d. Cir. 2012) ("However, when price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects."); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices, and Antitrust Litig.*, No.17-md-2785-DDC-TJJ, 2017 WL 6524839, at *6-*7 (D. Kan Dec. 21, 2017) (applying the *ZF Meritor* test).

indicated for the same condition (anaphylaxis).[197] While Sanofi believed that Auvi-Q had differentiating features that made it more attractive to certain populations (e.g., its shape and its auditory guidance feature), Sanofi and Mylan did not market their products to different segments of patients.

142.   There is not a segment of demand for EAI devices that can be clearly identified as non-contestable, i.e., for which Sanofi's Auvi-Q is unable to compete for. This is not a case where a multiproduct competitor is accused of bundling two products, one of which is not sold by a single-product entrant. It is not a case where one product had a broader range of medical indications than another product, and therefore where only one of the two products was a viable solution for a segment of consumers. These are two significantly similar products competing head to head for all customers.

143.   Consistent with this, ███████████████████████████████
███████████████████████████████████████ As shown in the following table, ████████
████████████████████████████████████████████████████████
████████████████████

---

[197]   See "Prime National P&T Committee Meeting Minutes", Prime P&T Meeting Minutes, April 10, 2013, PRIME_0000291–316 at 302; "Initiative Feasibility Summary-Commercial", Aetna Document, May 21, 2013, Aetna00022722–23 at 22.

[198]   While different PBMs may use slightly different terminology for this determination, the meaning is generally the same.

[199]   Professor Scott Morton also analyzes Medco in her Figure 8. I do not include Medco, as ESI's acquisition of Medco was completed  in mid-2012. See 30(b)(6) Kautzner (ESI) Deposition, p. 33.

**HIGHLY CONFIDENTIAL**

**PBMs and Insurers Viewed Auvi-Q and EpiPen as**

**Therapeutically Interchangeable**



144.    This is true not only for these seven PBMs but others as well. For example,

 Presbyterian also made similar determinations

_____

200  30(b)(6) Cunico (Presbyterian) Deposition, p. 34. ("Q: … [T]he committee placed Auvi-Q on formulary, correct? A: Correct. Q: Okay. And in making that decision, did the committee necessarily conclude that Auvi-Q was therapeutically equivalent to EpiPen? A: Correct. Epinephrine is epinephrine in the minds of physicians.") ████████████ Deposition,

### VII.A.2.   Mylan's prices net of rebates were above cost

145.   Professor Scott Morton would agree that under her theory, if all demand is contestable, there is no "burden" on the entrant.[201] In that case, the price-cost test is the appropriate standard.

146.   I have conducted a price-cost test, and conclude that Mylan's prices were above an appropriate measure of its cost for every PBM contract analyzed.

147.   I performed a comprehensive analysis of Mylan's contracts with the seven PBMs analyzed by Professor Scott Morton, covering their plans' purchases from January 2013 through October 2015. These, according to Professor Scott Morton, represent a broad set of PBMs covering a 86% of commercial covered lives in January 2015.[202]

148.   For the present purpose, the appropriate measure of Mylan's price includes Mylan's WAC, net of the rebate percentage specified in each PBM's rebate agreement with Mylan.  To be conservative, I use the rebate offered by Mylan that Professor Scott Morton describes as "restricted" – the rebate associated with placing a prior authorization or step edit on Auvi-Q or excluding it from the formulary. If Mylan's contracts pass the price-cost test using this rebate, it follows that contracts will also pass with respect to the smaller rebates offered for other formulary placement.

149.   To be conservative, I include not only the rebate itself but also any administrative fees paid to the PBM under the contract. These are fees that are paid to the PBM as compensation for ███████████████████████████ flowing from the rebate agreements.[203] In addition to the rebate and the administrative fee, some contracts include price protection. Price protection provides a limit on how much a manufacturer can increase price over the term of the rebate agreement. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

██████████████████████  See also, ████████████████
███████████████  ANTH-EPI 05023–40 at 31.

[201] This follows from the EEB formula Professor Scott Morton presented in her report: if the contestable share is 100% and the share of exclusion is 100%, then the percentage rebate required from the entrant will be the same as the incumbent's. See Scott Morton Report, ¶ 161.

[202] Scott Morton Report, Table 2.

[203] See, e.g., "Rebate Agreement (EpiPen)," by and between Caremark PCS Health, L.L.C. and Mylan Specialty L.P., July 1, 2013, MYEP00000538-559 at 541. These administrative fees may be more properly thought of as a cost to Mylan for services received rather than a rebate to the PBM.

**HIGHLY CONFIDENTIAL**

███████████████████████████████ For example, if the PBM has an 8% price protection set to a $100 WAC, and the manufacturer increases price to $110, the manufacturer would provide a $2 ($110-$100*1.08) per unit price protection payment back to the PBM.

150.    Because future changes in WAC prices are unknown, the value of a specific level of price protection is not known with certainty ex ante, i.e., at the time an agreement is entered (the time at which the negotiating parties would be analyzing this value). Moreover,  the ex ante valuations of the manufacturer and the PBM may be different. Thus, valuing the price protection requires making assumptions about the expectations of the negotiating parties. If the realized price increases are lower than the level of the price protection agreed to, then the price protection will not be triggered, and the PBM will not receive any additional rebates as a result. If the realized price increases are higher, then the PBM will receive some additional rebates according to the terms of the price protection. As a robustness check, I use the rebates generated using EpiPen's realized WAC prices, to value the price protection.

151.    The relevant measure of Mylan's cost is the incremental cost associated with winning the additional business under the contract. Mylan's EpiPen P&L includes four broad categories of costs: cost of goods sold, marketing, medical affairs, general and administrative (G&A).  I estimate Mylan's (unit) incremental cost by taking its reported cost of goods sold from its P&L and dividing it by its total EpiPen volume to arrive at a per-unit cost measure.[205] The other three categories of costs are unlikely to be incremental to winning an additional PBM contract. Doctors do not treat patients of only one PBM and therefore winning or losing a contract would not alter the set of doctors that Mylan's field force needs to cover. Similarly, the activities of a medical affairs group are broader and not focused on particular customers. Finally, general and administrative costs are costs allocated to running the EpiPen program generally are not significantly related to the impact of winning a particular contract.

152.    As shown in Exhibit 7a, Mylan's price net of rebates and admin fees is above

---

[204]   See, e.g., 30(b)(6) Deposition of Jason Hall (Senior Director of Pharmaceutical Trade Relations at Prime), December 21, 2018 (hereafter "30(b)(6) Hall (Prime) Deposition"), pp. 55-56; Also see, 30(b)(6) Kautzner (ESI) Deposition, p. 58.

[205]   This yields annual per-unit incremental costs ranging from $54.78 in 2013 to $61.49 in 2015.

cost, indeed substantially above cost, for every PBM contract I evaluated. As an alternative, I also run this analysis including value from price protection based on the actual WAC price growth for EpiPen and arrive at the same conclusion. As shown in Exhibit 7b, Mylan's net price is again well above its incremental cost.

## VII.B. Mylan's agreements with PBMs did not foreclose Sanofi

153.    Where demand is contestable, the fact that Mylan's EpiPen prices were above cost should end the inquiry; any equally efficient competitor would have been able to compete with Mylan's above-cost prices.  Only inefficient competitors (or competitors with inferior products) would be unable to compete for position on PBM formularies because they would be unable to match Mylan's low prices as a result of their higher cost structure.

154.    In addition, I have conducted other analyses beyond the price-cost test that confirm my conclusion that Mylan's rebate contracts with PBMs are not exclusionary.

155.    First, I have reviewed the nature of the contracts at issue and determined that they do not foreclose rivals.  As discussed in greater detail in Section IX, PBM contracts are of short duration, easily terminated by PBMs and payors, very common in the industry as a tool to lower price, and permit both PBMs and the PBMs' customers to renegotiate rebates and/or change formularies at any time in response to competitive alternatives. Moreover, even assuming Professor Scott Morton has defined the relevant market accurately as that for EAI devices, EpiPen is in an exclusive position for, at most, only 16.2% of covered lives during the relevant period in this putative market, well below the percentage that would be required to deprive Sanofi of the scale necessary to compete. These facts and analyses provide independent grounds to reject the notion that Mylan's PBM contracts are somehow anticompetitively exclusionary.

156.    Professor Scott Morton fails to properly evaluate either of these issues, and instead presents a model based on her theory that some portion of EpiPen demand is non-contestable, and points to evidence which she argues demonstrates that 50% to 70% of demand for EAI devices is non-contestable.[206]  Based on this non-contestable demand, she argues that Sanofi was disadvantaged and required to offer rebates larger than the

---

[206]  Scott Morton Report, § VII.D.

rebates offered by Mylan.  Professor Scott Morton applies the wrong test.

157.     As discussed below, a relevant inquiry, assuming non-contestable demand, would be to evaluate whether an equally efficient competitor could compete for the contestable portion of demand.  Here, that requires analyzing whether Mylan's incremental prices are above its incremental cost for the contestable portion of demand, attributing all rebates offered in exchange for exclusivity to that contestable portion.  As I explain below, she has substantially underestimated the share of demand that is contestable; a variety of evidence demonstrates that roughly 90% of demand is contestable under her definition. As I demonstrate below, conducting this analysis correctly shows that none of Mylan's PBM contracts could have foreclosed Sanofi where contestable shares were at least 53%, when price protection is not included, or at least 62% when valuing price protection using the actual ex-post pattern of WAC prices as a robustness check.  Thus, given the actual share of contestable demand of roughly 90%, Mylan's contracts all pass these tests. For all of these reasons, Mylan's PBM contracts did not anticompetitively exclude Sanofi.

## VIII.   IRRESPECTIVE OF ANY NON-CONTESTABILITY, MYLAN AND SANOFI COMPETED ON A LEVEL PLAYING FIELD FOR CONTESTABLE DEMAND

### VIII.A.          Non-contestable demand does not impose a "tax" on the entrant

158.     Professor Scott Morton in effect alleges that, because of EpiPen's long history of market success, it had "entrenched" (aka non-contestable) demand that Sanofi was not able to compete for.  She alleges that Mylan was able to leverage this non-contestable demand to create an unlevel playing field such that Sanofi was unable to compete with Mylan with rebates for exclusive formulary placement. She asserts that there is a "tax" on a PBM for deciding to accept an exclusive offer from Auvi-Q, which the PBM does not need to pay if it accepts an offer from Mylan. She alleges that this tax "dramatically tilts the playing field against Sanofi, preventing competition on the relative merits."[207] Both her theory and her application of that theory to the specific facts of this case are fatally flawed.

159.     Most fundamentally, her conclusion that the playing field is not level is just incorrect.  Mylan's conduct does not impose a "tax" on Auvi-Q that does not apply to

---

[207]   Scott Morton Report, ¶ 177.

EpiPen. Even in the presence of a non-contestable portion of demand, there is nonetheless a level playing field for competition over the contestable portion. To the extent any demand is non-contestable, Mylan would be able to make those sales without making any price concessions. Thus, if Mylan is offering rebates to a customer these are rebates it is offering to pay to win the contestable demand. To win that contestable demand, Sanofi just needs to bid $1 more in rebates than Mylan does (provided their list prices are equal).

160. This is best illustrated with a simple example. Consider the example that Professor Scott Morton uses in paragraphs 158-159 of her report (and which becomes the first row of her Table 3 (her "EEB" calculations).[208]

161. Here, there are 1000 units of demand, with 500 of them non-contestable (i.e., consumers will not purchase those units from Sanofi, so Mylan will win their sales no matter what). The list prices of both Mylan and Sanofi are $500.  Mylan offers a rebate of 30%, conditional on exclusive formulary placement. Professor Scott Morton concludes that in order to win the contestable 500 units, Sanofi must offer a discount of at least 60%, and this higher needed percentage rebate is a "tax" that prevents Sanofi from competing on a level playing field.

162. This is an incorrect characterization of the example. Exhibit 8 explains. At the 30% offer of an exclusivity rebate Mylan is offering to accept 70% of the $500 list price for the supply of 1000 units, or $350x1000 = $350,000. In the face of competition from Sanofi, if Mylan offered no rebate, Mylan would win only the non-contestable 500 units at the list price of $500, for a total of $500x500 = $250,000. So, with its 30% exclusivity rebate, Mylan is willing to accept an additional $350,000 - $250,000 = $100,000 for the 500 contestable units.  Otherwise it gets to sell the non-contestable units at list price anyway, so the rebate is just to win the contestable units.  Thus, Mylan is offering to accept $100,000 for the 500 units, or a unit price of $100,000/500 = $200, which is the same 60% off list price that Sanofi has to offer to be competitive for the contestable units. Both Mylan and Sanofi offer equivalent deals to the PBM that would earn them the same $100,000 to supply the contestable 500 units. Each of these deals costs the PBM the same

---

[208]   Scott Morton Report, ¶¶ 158-159, Table 3.

to obtain the supply of the 500 contestable units. This is a completely level playing field.

163.    Professor Scott Morton's EEB calculations, as expressed in Table 3 of her report, are highly misleading. They suggest that in order to be competitive, Sanofi must offer a 60% rebate to counter Mylan's rebate of just 30%. But Sanofi's 60% rebate applies to just the contestable 500 units, while the 30% rebate of Mylan applies not only to the contestable units but also to the non-contestable units that need no rebate in order to sell – and that is why both are equivalent in that both Mylan and Sanofi are offering to accept the same $100,000 to effect the supply of the contestable 500 units.

164.    She implies that because Mylan is getting to sell the 500 non-contestable units at the list price, that is a big advantage over Sanofi. But this ignores that, according to the viewpoint of Professor Scott Morton, those units would be sold by Mylan regardless of any competition from Sanofi, which is why they are regarded as "non-contestable." That status stems from the high value some consumers place on EpiPen due to its effectiveness, reputation, reliability, sound history and the fact that Auvi-Q only entered the market recently. These reasons are all the result of EpiPen's early innovations and competitive successes.

165.    A little algebra shows that the example used by Professor Scott Morton and depicted in Exhibit 8 can be generalized to broader circumstances.  Say Mylan has $Q^{NC}$ units of non-contestable sales and $Q^C$ units of contestable sales.  Mylan offers an exclusivity rebate of $R^M$ off the list price of L for all the units ($Q^{NC}+Q^C$).  That is, Mylan is offering to supply all the units (i.e., the sum of contestable and non-contestable units) for $L*(1-R^M) *(Q^{NC}+Q^C)$. Because $Q^{NC}$ units are non-contestable, even without any rebates, the PBM would still pay Mylan $L*Q^{NC}$ for the non-contestable units. Thus Mylan is effectively offering the difference for the contestable units. That is:  $L*(1-R^M) *(Q^{NC}+Q^C) - L*Q^{NC} = L*(1-R^M) *Q^C - L*R^M*Q^{NC}$.

166.    To match this offer and supply the contestable units of $Q^C$, Sanofi must offer a rebate of $R^S$, where $L*(1-R^S)*Q^C = L*(1-R^M) *Q^C - L*R^M*Q^{NC}$. Rearranging gives

$$R^S = R^M*(1 + Q^{NC}/Q^C) > R^M$$

as long as there exists some non-contestable demand (i.e., $Q^{NC}/Q^C>0$).  Thus, under Professor Scott Morton's theory, Sanofi always faces a "tax" because $R^S>R^M$, despite the fact that the amounts of money asked for to supply units $Q^C$ are the same.

**HIGHLY CONFIDENTIAL**                                                    Page 60

167.    The point for Professor Scott Morton is that this rebate percentage of $R^S$ for Sanofi to match the offer of Mylan is bigger than the rebate percentage of $R^M$ offered by Mylan due to the non-contestable portion of the demand for the EAI.  She asserts that this relationship means the playing field is tilted against Sanofi and that it is as if Sanofi is subjected to a competitively disadvantaging tax. However, this is a total mischaracterization because of its focus on the sizes of the percentage rebates, when the percentage rebates are applied to totally different amounts of sales. Mylan's rebate is applied to the non-contestable portion of the demand as well as to the contestable portion, so it amounts to more money for each percentage point, and the rebate applied to the non-contestable portion is unnecessary for Mylan to make those sales due to Professor Scott Morton's concession that those non-contestable sales would be made regardless.  In fact, the amount of money that each company asks for from the PBM in order to supply the contestable units is the same, regardless of the confusing fact that the percentage rebate numbers are different.

### VIII.B.    An appropriate framework to evaluate Mylan's conduct is to compare the incremental revenue with the incremental cost from winning the contestable sales under the contract

168.    As a matter of economics, an appropriate framework for evaluating whether Mylan's rebates are anticompetitive is to determine whether an equally efficient rival could have competed profitably against Mylan's rebates to win that business. The test's focus on "an equally efficient rival" is under the reasoning that "a firm should not be penalized for having lower costs than its rivals and pricing accordingly."[209] For example, if a firm achieves lower costs by competition on the merits, then such efficiency should be encouraged. Thus, a price "is predatory only if it is reasonably calculated to exclude a rival who is at least as efficient as the defendant."[210]

169.    Assuming that some significant portion of demand is non-contestable, this test would calculate the incremental revenue that Mylan would earn from winning the contestable sales on a given contract (i.e., attributing all of the discounts or rebates it is

---

[209]   Herbert Hovenkamp, *Exclusion and Sherman Act*, 72, University of Chicago Law Review, 147-164, 2005, pp.153-154.
[210]   Herbert Hovenkamp, *Exclusion and Sherman Act*, 72, University of Chicago Law Review, 147-164, 2005, p.154.

offering to the contestable portion of demand), and would compare that to the incremental costs associated with winning the contestable portion of demand under that contract. If Mylan's incremental revenues are above its incremental costs, then winning the contestable portion of demand under the contract is profitable for Mylan and it would be profitable for an equally efficient competitor. [211, 212]

### VIII.C.    Professor Scott Morton's EEB framework is flawed and misleading

170.    As described above, Professor Scott Morton's framing of the EEB statistic as an *entrant-specific* burden is misleading. In fact, when properly considered, the burdens faced by an incumbent and the entrant (in terms of the incremental dollar discount they need to offer to win the contestable units) are identical, and the playing field is level. Professor Scott Morton does not offer an operational test that can be applied to evaluate whether Mylan's conduct was anticompetitive.

171.    Moreover, Professor Scott Morton's EEB framework suffers from other flaws. First, she does not provide clear guidance in her report as to the implications of her EEB statistic as applied to this case. At deposition she testified:[213]

> Q: When you derive an EEB from your calculation, is there then a test that you use to determine whether or not it reflects an anticompetitive situation?

---

[211]   This is sometimes referred to in the literature as the discount attribution test. See, for example Benjamin Klein and Andres V. Lerner, "Price-Cost Tests in Antitrust Analysis of Single Product Loyalty Contracts," Antitrust Law Journal, Vol. 80, No. 3 (2016), pp. 631-679. See also, Sean Durkin, "The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test," *Antitrust Law Journal*, Vol. 81 (2017), pp. 475-506; Barry Nalebuff, "Exclusionary Bundling," Antitrust Bulletin, Vol. 50, No. 3. (2005), pp. 321-370; Assaf Eilat, David Gilo, and Guy Sagi, "Loyalty Discounts, Exclusive Dealing and Bundling: Rule of Reason, Quasi Per Se, Price-Cost Test or Something in Between," Journal of Antitrust Enforcement, Vol. 4, No. 2 (October 2016), pp. 345-380; Erik Hovenkamp and Herbert Hovenkamp, "Exclusionary Bundled Discounts and the Antitrust Modernization Commission," Antitrust Bulletin, Vol. 53, No. 3 (Fall 2008), pp. 517-553; Carl Shapiro, "Exclusionary Conduct," Testimony before the Antitrust Modernization Commission, September 29, 2005.; *Cascade Health Solutions v PeaceHealth*, 515 F.3d 883 (9th Cir 2008), and *Ortho Diagnostic Sys, Inc v Abbott Labs, Inc*, 920 F Supp 455 (SDNY 1996); European Commission, "Communication from the Commission - Guidance on the Commission's Enforcement Priorities in Applying Article 82 of the EC Treaty to Abusive Exclusionary Conduct by Dominant Undertakings," *Official Journal of the European Union*, OJ C 45, February 24, 2009, pp. 7-20.

[212]   See Sean Durkin, "The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test," *Antitrust Law Journal*, Vol. 81, No. 2, (2017) pp. 475-506, at p. 479 ("[P]laintiffs and their experts often claim that competing by charging a single price represents competition on the merits, while competing through loyalty discounts is not competition on the merits. This analysis shows that this claim is incorrect. . . . [L]oyalty discounts cannot exclude an equally efficient competitor unless a seller offering loyalty discounts fails the discount attribution test.").

[213]   Scott Morton Deposition, p.183.

> A: I would say [the EEB is] informative about the impact of the contract on the entrant. A higher EEB is worse in terms of the burden on the entrant. I have not myself established a cutoff.

172. Regardless of how small the incumbent's exclusive rebates and the non-contestable shares are, Professor Scott Morton's EEB test would always find a "burden" on the entrant. She defines as non-contestable any demand that can't be satisfied by the entrant immediately upon entry. Her theory is that even where such demand is the result of procompetitive conduct prior to entry, its later presence is anticompetitive. As a result, her EEB measure would find a burden to the entrant any time an incumbent (i.e., almost any branded drug) offers a rebate for contestable sales. It would therefore appear to condemn the widespread practice of PBMs using formulary exclusion to negotiate lower prices across a wide range of drugs, and condemn this practice exactly where it may have the most competitive benefit – when using the credible threat of exclusion to leverage substantial price decreases from a manufacturer that allegedly has monopoly power. This policy error carries the destructive prospect of substantially chilling price competition across the pharmaceutical industry.

### VIII.C.1.    To the extent Professor Scott Morton is advocating an incremental cost test, Professor Scott Morton uses the wrong measure of cost

173. Professor Scott Morton introduced the EEB measure in a paper she co-authored with Zachary Abrahamson in 2017. Scott Morton and Abrahamson do not offer clear guidance as to how the EEB statistic aids in the determination of whether a loyalty reward is anticompetitively exclusionary, although they do state the following:

> Using a model with these three elements—contestable share, threshold, and rebate—and measures of the actual prices set by the incumbent, it is possible to carry out a simple as-efficient competitor test. The metric we describe above measures the burden relative to [long-run average incremental cost (LRAIC)] that the loyalty-rebate contract places on the entrant. The share of buyers covered by such contracts and their purchases over time are among other empirical facts needed to evaluate competitive effects.[214]

174. This appears to suggest that they are proposing that a loyalty reward is unlikely to be exclusionary if $P_L(1 - EEB) \geq LRAIC_e$, but could be exclusionary if $P_L(1 - EEB) <$

---

[214] Fiona Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," *Antitrust Law Journal*, Vol. 81 (2017), 777-836 (hereafter "Scott Morton and Abrahamson (2017)") at 823.

$LRAIC_e$, where $P_L$ is the incumbent's list price and $LRAIC_e$ is the entrant's long-run average incremental cost.

175.    Professor Scott Morton does not undertake this or any other analysis taking account of costs in her EpiPen report of whether the EEB faced by Sanofi implies that Mylan's loyalty rewards for EpiPen were exclusionary.

176.    In any case, the test Professor Scott Morton has proposed in her academic writing focuses on the wrong cost for purposes of this case. Professor Scott Morton explains in her article her justification for using LRAIC:

> In a setting where competition for the "marginal unit" requires significant expansion or entry into a new version of the product, the marginal cost of competing for non-contestable [sic] demand must include the set-up costs required to make and sell the product at reasonable scale. If one were to contemplate using a price-cost test, the test should at least use a measure of marginal cost appropriate to the competitive tactic under scrutiny. Specifically, any price-cost test should focus on the cost of the entrant's expansion effort into the incremental product. This expansion cost, known as long-run average incremental cost (LRAIC), includes not only variable cost, but also the fixed cost of developing and launching a new version of the product.[215]

177.    The "marginal unit" here is the PBM contract that Mylan and Sanofi are competing for, not – as Professor Scott Morton describes in her general article – the "product." Sanofi is not "expanding" into an incremental product. Professor Scott Morton appears to agree that the marginal unit in this case  is the contract.[216]

178.    There is no credible allegation that Mylan's conduct drove Auvi-Q out of the market here or even, as discussed below, that it deprived Sanofi of scale.[217] At the time of Sanofi's decision to bid for an incremental contract, the entry costs of researching and developing Auvi-Q were already expended and sunk. Rather, as discussed above, the appropriate measure of costs are those that are incremental to the contract.

---

[215]   Scott Morton and Abrahamson, pp. 796-797.

[216]   Scott Morton Deposition, pp. 164-165 ("So it's not about a pen at the margin. It's about a contract at the margin. Am I going to go with the exclusive contract or not?").

[217]   To be clear, because antitrust economics focuses on competition, not competitors, the relevant question is whether the product, Auvi-Q, left the market, not Sanofi. The fact that Sanofi no longer markets the product is not relevant – it gave the rights back to kaléo, which has continued to offer the product to consumers. The only time that Auvi-Q was off the market was the result of the recall, which Professor Scott Morton is not alleging to be the fault of Mylan.

### VIII.C.2.    Professor Scott Morton provides no evidence that her theory of "artificial" discounts applies here

179.    Professor Scott Morton's EEB theory relies upon the assumption that the discounts being provided by the alleged monopolist on the non-contestable demand are "artificial," that is that the firm with monopoly power on the non-contestable units raises its list price above the monopoly price and then discounts back to the monopoly price, such that the net price is no lower as a result of the rebate.[218] As she testified at her deposition, she is assuming not only that there is substantial non-contestable demand, but also that the alleged monopolist increases its list price to offset the rebate.[219]

180.    It is important to recognize that this theory does not demonstrate that an equally efficient competitor cannot compete for the contestable units, despite needing to use "costly" dollars. That is the relevant question.  The incremental cost test described above evaluates whether the competitor can profitably win the business with "costly" dollars – and does not depend upon whether the rebate dollars offered by the incumbent are "costly" or "artificial". Moreover, Professor Scott Morton has failed to demonstrate that the assumptions required for this theory hold in this case.

181.    In her expert report, Professor Scott Morton offers no opinion about the WAC price that Mylan offered, and whether that price would be different in the but-for world. In fact, she testified that:

> The pattern of WAC price increases is not the main place that I've really been focused on in this report... So I think I just can't answer your question because I really have not been focused on the list price.[220]

182.    In fact, as I demonstrate in Exhibit 5 above, the evidence suggests that Mylan did not increase its list prices to create "artificial" discounts; rather Mylan's discounts were real and procompetitive. The rate of Mylan's WAC price increase was roughly the same prior to Auvi-Q's entry as it was after entry, during the period when it was offering large rebates. These rebates weren't costless to Mylan. Rather, it was paying real dollars to win the contestable demand in a head-to-head competition with Sanofi.  EpiPen's net prices were lower than they would have been but-for competition from Auvi-Q, and fell on

---

[218]   Scott Morton and Abrahamson, p. 797; Scott Morton Deposition, pp. 373-376.
[219]   Scott Morton Deposition, p. 376 ("Q. So your theory assumes not just non-contestable share, but some markup of list price? A. That's the way in which the incumbent can do this for free.")
[220]   Scott Morton Deposition, pp. 281-282.

**HIGHLY CONFIDENTIAL**

average from 2014 to 2015. And EAI output expanded.

### VIII.C.3.    Sanofi had large resources and used them to compete for formulary placement

183.    The value to Mylan of current sales of any non-contestable units does not provide the company with some financial advantage over Sanofi that tilts the playing field. As discussed in more detail below, Sanofi's overall revenues and profits and sales force were much bigger than Mylan's, and its largest product, Lantus, was far bigger financially than EpiPen. Indeed, as explained below, ███████████████████████████████████ ████████████████████████████████████████████████████████

184.    Thus, if overall financial resources are thought to be the issue in comparing the EAI opportunities of Sanofi and Mylan, the tilt is markedly in favor of Sanofi, not Mylan. But the fact is that regardless of the amount of demand for EAI that is non-contestable, there has been a level playing field between Sanofi and Mylan for the contestable sales.

185.    This isn't a case of a large deep-pocketed incumbent competing against a small cash-strapped entrant. Sanofi is a large and sophisticated company with the size, resources, and experience to compete in the pharmaceutical industry. In 2013, the year that Sanofi launched Auvi-Q in the U.S., it was one of the largest pharmaceutical companies in the world, with over $36 billion in net pharmaceutical sales and a market capitalization of more than $100 billion.[221]   In the same year, Mylan reported much smaller revenues of less than $7 billion.[222] Additionally, Sanofi reported profits in 2013 that were more than six times greater than profits reported by Mylan, and employed a U.S.-based sales force of over 4,700 representatives, compared to the roughly 370 sales employees representing Mylan Specialty.[223] Professor Scott Morton has provided no evidence that Mylan's conduct has somehow deprived Sanofi of necessary resources to fund R&D efforts or otherwise successfully compete.

186.    Far from a new entrant in pharmaceuticals, Sanofi launched Auvi-Q as just one

---

[221]   "Form 20-F 2013," Sanofi, p. 18. See also, Viehbacher (Sanofi) Deposition, pp. 10-12. "Sanofi Market Cap 2006-2018: SNY," macrotrends, available at <https://www.macrotrends.net/stocks/charts/SNY/sanofi/market-cap>, accessed March 22, 2019. Note, Sanofi's net pharmaceutical sales are converted to dollars using the average U.S. dollar per euro exchange rate found in Sanofi's financial report. ("Form 20-F 2013," Sanofi, p. 3)

[222]   "Form 10-K," Mylan Inc., 2014, p. 60. ("For the year ended December 31, 2013, Mylan reported total revenues of $6.91 billion….")

[223]   "Form 10-K," Mylan Inc., 2014, pp. 20, 50; "Form 20-F 2013," Sanofi, pp. 50, 96.

product in a large portfolio of pharmaceutical products it was already selling. In 2013, Sanofi sold 29 pharmaceutical products in a range of therapeutic areas including diabetes, rare diseases, multiple sclerosis and oncology. Three of these products had net sales of over \$1 billion in 2013.[224] Lantus (Sanofi's largest product) alone had \$7.6 billion in net sales.[225] In fact, Lantus is such a large product that, according to former Sanofi employees, █████████████████████████████████████

187.    Sanofi also had significant experience managing payors. In fact, according to testimony from Spencer Williamson, CEO of kaléo. ███████████████████████████████



188.    Sanofi has also successfully bundled rebates with its other product offerings.██████ ███████████████████████████████████████████████████ For example, ████████████████████████████████████████████

---

[224] "Form 20-F 2013," Sanofi, pp. 21–23. These three products are Lantus, Plavix, and Lovenox.

[225] "Form 20-F 2013," Sanofi, p. 22; Viehbacher (Sanofi) Deposition, pp. 130–132. Note, Sanofi's net sales from Lantus are converted to dollars using the average U.S. dollar per euro exchange rate found in Sanofi's financial report. ("Form 20-F 2013," Sanofi, p. 3.)

[226] Deposition of Anne Whitaker (former President of North America at Sanofi), October 18, 2018 (hereafter "Whitaker (Sanofi) Deposition"), pp. 148–151; Viehbacher (Sanofi) Deposition, pp. 132–133.

[227] Williamson (kaléo) Deposition, p. 169.

[228] Professor Scott Morton characterizes one Mylan contract as offering "[b]undled discounts across plans" (Scott Morton Report, ¶ 131) but as with all of Mylan's other contracts at issue, there is no allegation that Mylan bundled discounts across different products.

MYEP00620009-11). In any case, Professor Scott Morton has conducted no analysis of the value of the discounts offered by Mylan or the extent to which Sanofi could compete for those discounts.

[229] Whitaker (Sanofi) Deposition, pp. 234-235. (

See also Email from



### VIII.D.     Professor Scott Morton's application of her framework to the facts of this case is substantially flawed

189.    Apart from the fundamental flaws in Professor Scott Morton's framework for evaluating loyalty rebates, her application of her framework to the facts of this case is also flawed for two key reasons. First, she markedly overestimates the extent of non-contestable demand. The evidence produced in this case shows that PBMs viewed the great majority of demand for EAI devices as contestable and used this fact to generate intense competition for rebates between Mylan and Sanofi. Second, she selectively analyzes only a limited number of Mylan's rebate agreements with PBMs, leaving the misleading impression that Mylan offered substantial rebates for exclusive formulary placement throughout the market. In fact, an evaluation of Mylan's contracts with PBMs demonstrates that Mylan's rebates for exclusivity were often lower than the ones she analyzes.

### VIII.D.1.     Demand for EAI products was highly contestable

190.    Professor Scott Morton defines non-contestable demand as "the portion of the market that – even in the face of entry of an alternative – will not switch away from the incumbent's product, at least in the shorter term."[231] She concedes that the extent of non-contestability will tend to erode over time, but she has not evaluated how long that would take in this case.[232] To be clear, in the context of the framework I put forward above, and in the context of Professor Scott Morton's EEB framework as she applies it to this case, non-contestability is measured as the share of consumers that would choose to purchase EpiPen, even if Auvi-Q were put on preferred formulary placement, and EpiPen were not

---

[230]   Email from ███████ ███████████████████████████████████ August 4, 2014, SAN-EPI-1154019-26 at 19-20.
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████ Whitaker (Sanofi) Deposition, pp. 150-151, 187-190.

[231]   Scott Morton Report, ¶ 76. At her deposition she defined it as "demand that the entrant cannot satisfy immediately upon entering the market" (Scott Morton Deposition, p. 70).

[232]   Scott Morton Deposition, pp. 70-71.

covered under the formulary (in which case the price difference facing the consumer may be substantial).

191.    Professor Scott Morton does not reliably demonstrate that any share of EAI demand is non-contestable. Citing to only four pieces of evidence, she concludes that the non-contestable share of demand (which she often labels Mylan's "entrenched share") "was between 50% and 70%."[233]

192.    Contrary to Professor Scott Morton's conclusion, the evidence produced in this case strongly supports the view that ███████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ Specifically:



- ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ .

- As discussed previously, ██████████████████████████████

████████████████████████████████████████████

████████████ . There are examples where PBMs have successfully used formulary exclusion of other market-leading products to shift share to smaller competitors and drive substantially lower prices.

- A broad range of evidence demonstrates that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

- Even the specific evidence that Professor Scott Morton relies upon, when analyzed correctly, actually supports a small non-contestable share.

193.    There is not a clear segment of demand for EAI devices that can be clearly identified as non-contestable, i.e., which Sanofi's Auvi-Q is unable to compete for.  To the extent that some segment of demand was non-contestable, evidence produced in this case strongly supports the conclusion that ████████████████████████████████

---

[233] Scott Morton Report, § VII.D, ¶ 153.

███████████████████████████████████████████████████████

### VIII.D.1.a)    PBMs expected they could, and indeed were able to, move the large majority of share to Auvi-Q

194.    PBMs' ability to exclude EpiPen and/or Auvi-Q – and make insurance coverage of them unavailable to members  – shows that PBMs believe that EAI shares are contestable.[234]

195.    PBMs have indicated that they are able to use formulary utilization to move significant shares from a market leader to a new entrant with a lower market share. For example, MedImpact estimated that if it applied step therapy to either EpiPen or Auvi-Q,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

196.    PBMs have been able to shift significant market share from other market-leading drugs through the use of formulary exclusions. When Mylan was told by ESI that it was considering excluding EpiPen, ████████████████████████████████████████

████████████████████████████████████████████ For example, Advair, a market-leading drug,

████████████████████████████████████████ after being excluded.[238] MedImpact also

chose to restrict Advair, resulting in Advair's market share being driven down

---

[234] As I explain below, ████████████████████████████████████████████████████
████████████████████████████████████████████████ These facts
also suggest that PBMs can move shares quickly between products, and were able to use this share-shifting ability to frequently negotiate better offers from manufacturers.

[235] Email from Jim Ayers (MedImpact) to colleagues, ████ ████ April 25, 2013, MedImpact_0008312-13 at 12.

[236] ████████████████████████████████████████ June 19, 2014, SAN-EPI-0002477-80 at 77-78.

[237] Deposition of Patrick Jones (Senior Director of Pharmaceutical Trade Relations at Mylan), September 7, 2018 (hereafter "Jones (Mylan) Deposition"), pp. 330-331.

[238] Jones (Mylan) Deposition, p. 332.



### VIII.D.1.b)  Both Sanofi's and Mylan's internal analyses show that they believed that PBMs could move shares substantially

197.  There is also a broad range of evidence showing that both Mylan and Sanofi believed that EAI demand is highly contestable and PBMs have the ability to move significant shares.

198.  For example, recognizing Sanofi's increasing aggressiveness in discounting Auvi-Q, one Mylan internal presentation in July 2014  In response to ESI's request for bid enhancement in 2014 for its national formulary, Mylan

199.  Similarly, in a 2013 internal Mylan evaluation

200.  This is the same document Professor Scott Morton cites to perform her "profit sacrifice test."[244] This Mylan document

---

[239]  Deposition of Bruce Foster (Senior Director of National Accounts at Mylan), June 14, 2018 (hereafter "Foster (Mylan) Deposition"), pp. 137-138.

[240]  Sanofi, SAN-EPI-1151887-96, attachment to Email from SAN-EPI-1151885-96 at 89.

[241]  Mylan, July 1, 2014, MYEP00527619, slide 3.

[242]  Mylan, MYEP00000614, slide 8.

[243]  Mylan, June 12, 2013, MYEP01143633, slide 6.

[244]  Scott Morton Report, ¶¶ 185-189.

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

████████ was lower than the non-exclusionary proposal ($56.4 million under the "baseline" scenario), Professor Scott Morton concludes that "[t]his willingness to accept lower revenues only makes sense for Mylan if it takes into account the exclusionary effect that the closed formulary offer would have on Sanofi's competitiveness in the broader market." Importantly, Professor Scott Morton has failed to consider the relevant alternative that if ESI preferred an exclusive offer, and Mylan failed to offer one, ESI could then have chosen to go exclusive with Sanofi if the offer from Mylan was insufficient. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ Clearly, Mylan would prefer ████████ in net sales with Auvi-Q exclusion over being excluded and receiving no sales at all. Mylan's exclusionary bid was "competition on the merits": the competitive threat of losing all of its revenues at ESI, Mylan's largest PBM customer with about 90 million lives at the time, explains why Mylan was willing to put forward an exclusive bid with a larger rebate. Mylan did not sacrifice any profits by making the exclusive offer: with no such aggressive rebate offers for exclusivity, EpiPen may have been excluded at ESI and earned Mylan zero revenue.

201.  Sanofi, too, understood that ████████████████████████████████
████████████████████████████████████ ███████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████ ██████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

---

[245] █████████████████████████████████████████████████████ SAN-EPI-1202786-95 at 91-92.

[246] █████████████████████████████████████████ SAN-EPI-0798403, slides 2 and 3.

███████████████████

### VIII.D.1.c) The specific evidence that Professor Scott Morton relies upon for her conclusion that the non-contestable share is large, when analyzed correctly, actually supports a small non-contestable share

202.   As noted above, each of the four pieces of evidence cited by Professor Scott Morton for her conclusion, when evaluated more reliably, is consistent with all of the other evidence above that any non-contestable share is small.

203.   ***Express Scripts (ESI)***. In 2015, EpiPen was excluded from ESI's High Performance Formulary. Professor Scott Morton reviews internal Mylan emails and analyses and concludes that, even when EpiPen was excluded ████████████████ ███████[248] Professor Scott Morton, however, misunderstands the internal Mylan evidence.[249] ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ This exact point is explained in a follow up email by Mylan's Scott Sussman, in a later reply to the email chain, ██████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

---

[247]  ████████████████████████████████████████ SAN-EPI-1202786-95 at 94-95.

[248]  Scott Morton Report, ¶ 153 citing MYEP01246195 and MYEP00531461.

[249]  ████████████████████████████████████████████ ██████████████ MYEP01046442-446 at 42-45).

[250]  Scott Morton Report, ¶ 153 citing ██████████. For Express Scripts, Professor Scott Morton cites ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Scott Morton Report ¶ 153, citing email August 10, 2015, MYEP00531461-65.

[251]  Scott Morton Report, ¶ 153.

████████████████████

204.     A plan-by-plan analysis of these data demonstrates that, in fact, where EpiPen was excluded from the formulary, it lost most of its share. As shown in Exhibit 9a, taking the Mylan analysis cited by Professor Scott Morton and calculating EpiPen's share separately for those plans with a closed formulary ███████████████████████████ ████████████████████████████████ On average across these six closed formulary plans that actually excluded EpiPen, ██████████████████ █████████████████████████████████

205.     At her deposition, Professor Scott Morton contended that EpiPen's average 65% share on this formulary was the correct measure, because non-contestable demand could manifest itself either through non-zero sales after EpiPen was excluded from a formulary, or from plans customizing a version of the formulary where EpiPen was not excluded. In both cases, she asserts, Auvi-Q is unable to win the business. But her logic is flawed. First, even where a plan has a customized version of the formulary with EpiPen excluded, she has pointed to no evidence that the specific desire to keep EpiPen was the reason for the custom formulary. Rather, plans may be making decisions based on broader preferences for the combination of cost and control (e.g., formularies with more options but higher cost, or formularies with fewer options but lower cost). Moreover, she also misses the fact that if EpiPen remains on formulary in these plans, Mylan would still owe rebates to the PBM. This is unlike the situation where EpiPen would be excluded from formulary and the PBM would lose rebates associated with those prescriptions.

206.     **CVS.** █████████████████████████████████████████████ ████████████████████████████████████ Professor Scott Morton conducts a flawed analysis and claims that it shows that the EpiPen was able to maintain a 66% share after being excluded. First, to calculate the degree to which EpiPen's share changes when it is excluded from formulary, Professor Scott Morton relies on her many-

---

252   Email from Scott Sussman (Mylan) to colleagues, █████████████████████ ███████████████ August 10, 2015, MYEP01046442-446 at 42.
253   To identify closed formularies that had a formulary exclusion on EpiPen, I look for those plans in the file that did not qualify for any rebates. Exhibit 9b shows the results for each of these six individual plans.
254   MYEP01246195. Figures for 2015 are through July.
255   30(b)(6) Anderson (CVS) Deposition, pp. 136-137.

to-many merge of the IMS data (that provides information on EAI prescriptions) and the MMIT data (that contains information on EpiPen's and Auvi-Q's formulary status).[256] However, for the CVS Value Formulary, the mechanics of this merge cause Professor Scott Morton to assign a large number of prescriptions made on plans where EpiPen was covered to the CVS Value Formulary, which she labels as excluding EpiPen. This methodological choice, which does not provide an accurate estimate of the EAI volume subject to exclusivity, undermines the reliability of her analysis of EpiPen's share on the CVS Value Formulary.

207.    Second, even her own analysis shows that EpiPen's share on the ACF, one of two CVS formularies where EpiPen was excluded, fell to less than 20% by July 2015.[257] Professor Scott Morton ignores documentary evidence that not only directly contradicts her assertions regarding EpiPen's share following its exclusion, but that both CVS and Mylan believed that the results of EpiPen's exclusion on these two formularies were evidence of just how well CVS could shift share away from EpiPen.

208.    In fact, the evidence shows that



Because CVS had not received

At the time,

[256]    Scott Morton Report, fn. 424. ("A single MMIT plan may map to multiple IQVIA plans and vice versa. To resolve the many-to-many matches, I do the following. First, I compute the national lives for the Org ID. Where one MMIT plan ("Org ID") maps to multiple IMS Plan IDs, I allocate the Org ID's national lives to each Org ID – Plan ID pair based on the relative proportions of EAI sales for each matched Plan ID candidate out of the total EAI prescriptions across all matching Plan IDs. Then for each IQVIA Plan ID, I assign formulary characteristics of the matched MMIT Org ID with the largest number of allocated plan lives. The crosswalks are at the national level, the sales are at the state level, and the plans are assigned at the state level.")

[257]    Scott Morton Report, backup to paragraph 153.

[258]    30(b)(6) Anderson (CVS) Deposition, pp. 136-137; email from James Cichowski (CVS) to Nicole Willing (Mylan), ▮▮▮▮▮▮▮ May 12, 2015, MYEP00079145-46 at 46. ▮▮▮▮▮▮▮▮▮▮▮

[259]    Email from James Cichowski (CVS) to Nicole Willing (Mylan), ▮▮▮▮▮▮▮ May 12, 2015, MYEP00079145-46.

[260]    Email from James Cichowski (CVS) to Nicole Willing (Mylan), ▮▮▮▮▮▮▮ May 12, 2015, MYEP00079145-46 at 46; 30(b)(6) Anderson (CVS) Deposition, pp. 266-267.



Nicole Willing, National Account Manager at Mylan,

Mylan itself

Thus, while Professor Scott Morton asserts that EpiPen was excluded from "a small, highly managed formulary," she does not acknowledge the dramatic shift in market share away from EpiPen on this formulary nor the understanding of both CVS and Mylan that this provided actionable evidence that CVS could successfully exclude



[261] Deposition of Nicole Willing (National Account Manager at Mylan), May 31, 2018 (hereafter "Willing (Mylan) Deposition"), pp. 316-317.

[262] Email from Nicole Willing (Mylan) to colleagues, June 19, 2015, MYEP00077097-99 at 98; Willing (Mylan) Deposition, pp. 318-319.

[263] , March 11, 2015 (MYEP01145040), Slides 9-10. Mylan also noted

EpiPen on its national formularies.[264]

209.    ***Magellan.***[265] Professor Scott Morton also cites to the deposition of Douglas Brown, Vice President of Account Management and Pharmacy Pricing for Magellan, claiming that "[a]n entrenched share of at least 

However, Mr. Brown testified that,

As a result, within a year of the meeting relied upon by Professor Scott Morton,

Professor Scott Morton ignores that Mr. Brown, when asked about the specific pages of the Florida Medicaid minutes that Professor Scott Morton cites to, agrees that it

In fact, Mr. Brown notes that

Mr. Brown also testified with respect to EAI devices:

[1] Professor Scott Morton's evidence pertaining to Medicare in fact is consistent with little if any "entrenched share."

210.    ***Foster.*** Professor Scott Morton cites to email statements that

---

264   Scott Morton Report, ¶ 153.
265   Magellan is a PBM focused on Medicaid plans (see 30(b)(6) Brown (Magellan) Deposition, pp. 20-21). I understand that Sanofi's claims involving Mylan's rebates to Medicaid plans have been dismissed. Professor Scott Morton, however, attempts to use the Magellan experience to support a measure of the extent of non-contestable demand in the commercial sector. As a result, I address her description of the Magellan experience here.
266   Scott Morton Report, ¶ 152 citing Brown (Magellan) Deposition exhibit 6.
267   30(b)(6) Brown (Magellan) Deposition, pp. 193-194, 348-350.
268   30(b)(6) Brown (Magellan) deposition, pp. 348-350; Email from Arlene Elliott (AHCA) to Christopher Andrews (Magellan), "EpiPen," July 1, 2015, EPI-FL-0513254-55 at 54.
269   30(b)(6) Brown (Magellan) deposition, pp. 350-351.
270   30(b)(6) Brown (Magellan) deposition, pp. 194-195.
271   30(b)(6) Brown (Magellan) deposition, pp. 360-362.

███████████████ and concludes that it is evidence that EpiPen had an "entrenched share of at least ███" at state Medicaid plans.[273] However, Bruce Foster is not describing past experience of blocking EpiPen with a step-edit in favor of Auvi-Q, but in favor of the Adrenaclick AG and therefore the example she provides says nothing about what share EpiPen would retain if it is blocked and Auvi-Q is placed on formulary.[274] Bruce Foster testified ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ and that he was in fact ████████████

████████████████████████████████████████████

██████████████ Bruce Foster also notes in his email ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ Furthermore, an internal analysis performed by MedImpact

████████████████████████████████████████████

████████████████████████████████████████████

████████

---

[272]  Scott Morton Report, ¶ 152 citing Email from Bruce Foster (Mylan) to colleagues, ████████████████████ April 30, 2013, MYEP00254218-220. The email included, among other things, a ████████████████████████████████

[273]  Scott Morton Report, ¶ 152.

[274]  Email from Bruce Foster (Mylan) to colleagues, ████████████████████ April 30, 2013, MYEP00254218-220 at 219. With respect to Mr. Foster's email, Professor Scott Morton ████████████████████████████████████████████████████████████████████████████████████████ (Scott Morton Deposition, pp. 80-81). However, Bruce Foster confirmed in his deposition ████████████████████████████████████████ (Foster (Mylan) Deposition, pp. 182-183).

[275]  Email from Rich Lieblich (MedImpact) to Nadine Starks (MedImpact), Email from Bruce Foster (Mylan) to colleagues, ████████████ April 25, 2013, MedImpact_0053294. See also, Foster (Mylan) Deposition, pp. 182-186.

[276]  Foster (Mylan) Deposition, pp. 190-195.

[277]  Email from Bruce Foster (Mylan) to colleagues, ████████████████ April 30, 2013, MYEP00254218-220 at 219.

[278]  Email from Jim Ayers (MedImpact) to colleagues, ████ ████ April 25, 2013, MedImpact_0008312-13 at 12.

### VIII.D.2.      The few Mylan contracts analyzed by Professor Scott Morton are not representative of Mylan's broader rebate agreements

211.    In her hypothetical EEB calculation in her Table 3, Professor Scott Morton models Mylan's "incremental exclusivity discount" to be either 20% or 30%.[279] However, the inputs used in her hypothetical do not accurately represent the incremental rebates paid by Mylan for formulary exclusivity.

212.    Professor Scott Morton selectively analyzes only a limited number of Mylan's rebate offers and agreements with two PBMs, leaving the misleading impression that Mylan offered substantial rebates for exclusive formulary placement to all PBMs. In particular, she points to only Mylan's offerings of a ███████████████████████ ███ to ESI and a ███████████████████████████ to Aetna as her basis for the hypothetical 20%-30% incremental rebates she uses in her EEB analysis.[280] However, focusing on Mylan's offers to only two PBMs fails to depict the full picture of the rebate offers made by Mylan in its negotiations with many other PBMs.

213.    A more comprehensive evaluation of Mylan's contracts with the seven major PBMs (the same seven PBMs underlying Professor Scott Morton's Figure 8 analysis) demonstrates that Mylan often offered rebates lower than 20-30%. For example, as shown in Exhibit 10, Mylan's rebates for formulary exclusivity to CVS prior to 2015 were ███████. In addition, for at least some of the rebate agreements it signed with Cigna, Aetna, Prime, and MedImpact during the relevant period, Mylan did not provide rebates that reference exclusive formulary position. Professor Scott Morton's EEB analysis ignores these Mylan rebates that are smaller in size and the rebates that do not even reference exclusivity and, as such, can't provide an accurate representation of the "burden" Sanofi faced. (And of course, as I explain above, to the extent that it was a "burden" to Sanofi, it was also a burden to Mylan for the contestable demand.)

214.    Moreover, Mylan's incremental rebates for exclusivity over and above the rebate offered for parity (i.e,. where the offer would allow Auvi-Q to be put in equal position) were often small. For example, CVS's July 2015 contract with Mylan ███████████████ ████████████████████████████████████████████████████

---

[279]    Scott Morton Report, Table 3.
[280]    Scott Morton Report, ¶¶166-168.

████████████████████████ Prime's May 2015 contract with Mylan █████
████████████████████████████████████

## VIII.E.    An equally efficient competitor could have profitably competed with Mylan's rebates

### VIII.E.1.    The incremental revenue from each agreement exceeded Mylan's incremental cost

215.    Because, as I detail above, Professor Scott Morton's test is fundamentally flawed, I conducted a more comprehensive test than she did of the ability of an equally efficient competitor to compete profitably with Mylan's rebates. I analyzed Mylan's contracts with seven PBMs covering their plans' purchases from January 2013 through October 2015. These, according to Professor Scott Morton, represent a broad set of PBMs covering 86% of commercial covered lives in January 2015.[283] This test relies on the same measures of price and cost described in the context of the price-cost test above. I then calculated the discount dollars offered and attributed all of them to the contestable volume to calculate an effective price on the contestable volume, which I can compare to Mylan's incremental cost associated with winning that business. Because I am testing whether an equally efficient competitor could profitably compete with an exclusive offer of their own, I use the full rebate offered by Mylan for what Professor Scott Morton describes as "restricted" – the rebate associated with placing a prior authorization or step edit (PA/ST) on Auvi-Q or excluding it from the formulary.

216.    First, as I explain above, PBMs considered these products to be clinically interchangeable in that regard all demand can be considered to be contestable. If all of the demand is contestable, then, even under Professor Scott Morton's theory, there is no "burden" on the entrant and, unless Mylan is engaged in predatory pricing (where the incremental price it receives for a unit is below an appropriate measure of its cost), then Mylan's conduct is clearly procompetitive. As I describe above in Section VII and in Exhibits 7a and 7b, Mylan's pricing under all of these contracts passes this test.

217.    Even allowing for non-contestable demand, Mylan's contracts pass the

---

[281]    Mylan Rebate Agreement with Caremark, July 2015 (CVSCM_EPI_000000001-30).
[282]    Fifth Amendment to the Rebate and Administrative Fee Agreement Between Prime Therapeutics LLC and Mylan Specialty L.P., May 2015 (MYEP00087473).
[283]    Scott Morton Report, Table 2.

incremental cost test. Exhibit 11a reports the results of this test including Mylan's rebates conditional on exclusive formulary placement and conservatively including admin fees.[284] Because, as I detail above, Professor Scott Morton's test is substantially flawed, I conducted a more comprehensive test than she did of the ability of an equally efficient competitor to compete profitably with Mylan's rebates.  I find that Mylan's rebate agreements all pass the test – Mylan's incremental revenue exceeded its incremental costs. This test demonstrates that when all of Mylan's rebates and admin fees are attributed to the contestable share, an equally efficient competitor could have profitably competed for all of these contracts under a measure of contestable share of 90%, which is consistent with the wide variety of evidence presented above. Indeed, if only 53% of EAI demand were contestable, every one of Mylan's contracts I analyzed passes the test.

218.    I also performed a robustness check on my conclusions. Exhibit 11b shows that, even including price protection using the realized EpiPen WAC prices, an equally efficient competitor could have profitably competed for all of these contracts under the more reasonable measure of contestable share of 90%.[285] Even when admin fees and price protection are included, if only 62% of EAI demand were contestable, every one of Mylan's contracts I analyzed passes the test.

219.    Moreover, my analysis is conservative to the extent that Professor Scott Morton was correct with respect to her claim that there was a "spillover" effect. If successfully winning preferred formulary placement increased sales not only on that formulary in the year the rebate was offered but also increased sales in future periods on that formulary and others, then Sanofi could profitably offer even higher rebates after accounting for those additional incremental spillover sales.

220.    Finally, with respect to certain PBM contracts, the rebate that Mylan offered for a formulary position that excluded Auvi-Q (e.g., "1 of 1" position) was an additional incremental rebate above a rebate that Mylan offered for a formulary position that did not exclude Auvi-Q (e.g., "1 of 2" position).   My analysis is based on Professor Scott Morton's allegations that Mylan's conduct was aimed at excluding Auvi-Q, not just

---

[284]   To the extent admin fees are a payment for a service provided, then the admin fees paid on the non-contestable demand should not be allocated to the contestable demand when conducting the incremental cost test.

[285]   As above, price protection is valued using the ex-post increases in EpiPen WAC price.

seeking parity – and therefore considers Mylan's entire rebate offer (including the portion offered merely for parity) to be a loyalty discount in the analysis. My analysis could change to the extent that, for example, it focused on the rebates that Mylan offered for a formulary position that did not allegedly exclude Auvi-Q but that instead would just assure parity placement on the formulary.

### VIII.E.2.     Sanofi was a less efficient competitor

221.    As discussed above, the appropriate measure of incremental cost in the test is that of Mylan, as a proxy for the incremental cost that would be faced by an equally efficient competitor. Professor Scott Morton's EEB framework does not appear to be concerned with the efficiency of rivals.[286] She has offered no evidence about the relevant relative efficiency of Mylan and Sanofi, and has not addressed this question in her report or her deposition testimony. She testified that "I don't see any reason why we would automatically label one of these two firms as inefficient" and testified that she has not compared the cost structures of Mylan and Sanofi.[287]

222.    In fact,



Sanofi's Bryan Downey testified that

Sanofi recognized that

For example, Bryan Downey explained

. As Bryan Downey explained,

---

[286]    Scott Morton & Abrahamson (2017), p. 796.
[287]    Scott Morton Deposition, pp. 178-181.
[288]
                              KALEO-00042499-2630,

[289]    30(b)(6) Downey (Sanofi) Deposition, p. 184.
[290]                                                      SAN-EPI-
0171340-347 at 340.

 In light of these

issues ████████████████████████████████████████████

████████████████████████████████████ ████ ████████████

████████████████████████████████████████████████████

████████████████

223.    Mylan did not face these same cost issues and was a more efficient competitor

than was Sanofi. Mylan's agreement with Pfizer ████████████████████████████

████████████ ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████  In

contrast, the corresponding cost per two pack faced by Mylan was ██████████████

████████████

224.    In addition, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  Beginning in

2014,  Sanofi ████████████████████████████████████████

████████████████████████████████████████████████████

---

291  Email from ████████████████████████████████████  SAN-EPI-
0171340-347 at 343.

292  Deposition of Jez Moulding (former Chair of Sanofi North America), October 23, 2018 (hereafter
"Moulding (Sanofi) Deposition"), pp. 107-108.

293  Amended and Restated Supply Agreement by and between Meridian Medical Technologies, Inc. and
Dey Pharma, L. P., May 21, 2010, MYEP00047084-156, Section 5.a and Exhibit D. While the prices
were fixed each year, the contract ████████████████████  However, ███████
████████████
(PFE_EPIPEN_AT00452221-258 at 242 and 249).

294  ████████████████████████  SAN-EPI-1201145.

295  MYEP01362752; MYEP01362498. This is calculated by taking the EpiPen cost of goods sold from
Mylan's P&L and dividing by the total EpiPen devices from Mylan's sales data.

296  30(b)(6) Huang (Sanofi) Deposition, pp. 17-18. ("Q. Just for the record, the Allerject device that was
marketed in Canada and the Auvi-Q device that was marketed in the United States, that is the identical
device, correct? A. That is correct. Q. And they both – that device, whether sold in Canada or the
United States, was manufactured at Medivative during the time Sanofi marketed the products, correct?
A. That is correct."); ████████████████████████  Sanofi, February 10, 2015,
SAN-EPI-0713740, slide 21 ████████████
Email from ██████████
January 23, 2015, SAN-EPI-0232313-15 at 14. █████████████████████
████████████████████████████████████████████

---

███████████████████ ██ █████████████████████████████████████████
█████████████████████████

## IX. SANOFI WAS NOT FORECLOSED FROM A SUBSTANTIAL SHARE OF EAI SALES

225.    Anticompetitive conduct is a necessary but not sufficient condition to show harm to competition.  Unless economically meaningful foreclosure exists, there has been no harm to competition – even if there has been harm to a competitor.

226.    Professor Scott Morton alleges that "Mylan successfully foreclosed competition from Auvi-Q."[299] In her view, Mylan's conduct, she asserts, was able to "effectively foreclose Sanofi as an effective competitor."[300] Her analysis suffers from numerous flaws and is not a reliable basis to assess the existence or extent of foreclosure, if any, as a result of Mylan's challenged rebating practices. Specifically:

- She ignores that, as described in the previous section, Sanofi was able to compete with Mylan ex ante for formulary placement on an equal playing field;

- She ignores that Mylan's rebate contracts with PBMs allow substantial flexibility and do not lock PBMs or health plans into including or excluding drugs on their formularies;

- Her analysis of Sanofi's formulary coverage substantially overstates the extent to which Sanofi was not covered, particularly in the commercial segment that is relevant to the case;

---

[297]  Email from ███████████████████████████████████ April 21, 2014, SAN-EPI-0260070-73 at 71.

█████████ Email from █████████████████████████████████████████ April 17, 2014, SAN-EPI-0260070-73 at 71.

[298]  Email from ████████████████████████████████████████████████████ February 08, 2015, SAN-EPI-0230527-28 and attachment, SAN-EPI-0230529.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████

[299]  Scott Morton Report, § VIII.

[300]  Scott Morton Report, ¶ 114.

**HIGHLY CONFIDENTIAL**

- Her analysis fails to demonstrate that, where Auvi-Q was not covered, it was the result of Mylan's allegedly anticompetitive leveraging of rebates as opposed to Mylan simply offering a better unit price for the contestable demand or other factors that might have led the PBM to make such a decision;

- She fails to analyze the impact of the alleged foreclosure on the volume of Auvi-Q prescriptions; and

- She fails to evaluate whether the extent to which Sanofi's sales were reduced was sufficient to deprive it of economies of scale.

227.    In what follows I address each of these points in detail and explain why her analysis of foreclosure is substantially deficient and why, in fact, the evidence strongly suggests that the extent of any such foreclosure is small. In 2015, the formularies on which Auvi-Q was not covered represented only 13% of commercial lives (23.5% of commercial lives if one conservatively includes both formularies where Auvi-Q was not covered and where it was covered only after prior authorization and/or step therapy). As a fraction of the broader universe of all lives (including Medicare, Medicaid, and uninsured), the commercial formularies where Auvi-Q was not covered represented only 9.7% of all lives (16.2% of all lives if one conservatively includes both formularies where Auvi-Q was not covered and where it was covered only after prior authorization and/or step therapy) during the relevant period.

**IX.A.   Sanofi had equal access to formulary status ex ante**

228.    As an initial matter, the rebate agreements between manufacturers and PBMs and the formulary status associated with those rebates are the outcome of ex ante competition between Mylan and Sanofi for formulary placement with that PBM. As I demonstrated in the previous section, despite any non-contestable demand, Mylan and Sanofi compete on a level playing field for that formulary placement, and an equally efficient competitor would have been able to profitably compete with Mylan for these contracts. Thus, the extent to which Sanofi was not covered on a particular formulary is not evidence that Sanofi was foreclosed from competing, but rather that Sanofi competed and lost.

**IX.B.   Contracts with PBMs allow substantial flexibility**

229.    Mylan's rebate agreements with PBMs typically had ███████████████

██████████████████████████████████ Moreover, ██████████████████████
██████████████████████ This was not, in other words, a situation where Sanofi was looking to enter a market where ████████████████████████████████
████████████████████████

230. Even during the term in which they are effective, the rebate agreements between Mylan and PBMs offer substantial flexibility to both the PBMs and their customers. First,

████████████████████████████████████████████████████████████
██████████████████████ Rather, █████████████████████████████████████

---



301  30(b)(6) Hall (Prime) Deposition,   p. 50 ████████████████████████████████
████████████ Id., p. 135 ███████████████████████████████████████████████
█████████████████████████████████████████████████ See also e.g., the rebate agreement between Mylan and Caremark effective July 1, 2013, ██████████████
████████████ (see Rebate Agreement (Epipen) between CaremarkPCS and Mylan, July 1, 2013, MYEP00000538-559 at 547; First Amendment to Rebate Agreement (Epipen) between CaremarkPCS and Mylan, July 1, 2014, MYEP00000524-529 at 524, Second Amendment to Rebate Agreement (Epipen) between CaremarkPCS and Mylan, January 1, 2015, MYEP00000530-537 at 530, and Rebate Agreement between CaremarkPCS and Mylan, July 1, 2015, CVSCM_EPI_00000001-030 at 001, respectively). Similarly, the rebate agreement between Mylan and Humana effective January 1, 2013 ████████████████████████████ (see Humana Trade Relations Contract Summary between Humana and Mylan, December 16, 2012, HUM004251-269 at 258, HUM004270-272 at 270, Amendment to Pharmaceutical Rebate Agreement between Humana and Mylan, January 1, 2014, HUM004277-279 at 277, and Amendment to Pharmaceutical Rebate Agreement between Humana and Mylan, January 1, 2014, HUM004280-283 at 280, respectively).
302  30(b)(6) Kautzner (ESI) Deposition, pp. 200-201 ████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████ 30(b)(6) Deposition of Harry Vargo (Director of Manufacturing Relations and Head of Value-Based Contracting at Aetna), December 13, 2018 (hereafter "30(b)(6) Vargo (Aetna) Deposition"), pp. 115-116 ██████████████████████████████████████████████████████████
████████████ Amendment to THE Preferred Savings Grid Rebate Program Agreement between Mylan and ESI, January 1, 2014, MYEP00251967-983 at 970 ████████████████████████████████
███████████████████████████████████████
303  See, e.g., Rebate agreement between Mylan and CaremarkPCS, July 1, 2015, MYEP00000471-500 at 482. ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL**



In this way, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Instead, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

231.   Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

232.   As Exhibit 12 shows, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

233.   Despite her mischaracterization referring to Mylan's "all-or-nothing" offers to PBMs, Professor Scott Morton does not identify a single PBM contract where the only rebate bid was for exclusive formulary placement.[306]

---

[304]  Rebate agreement between Mylan and Caremark, July 1, 2015, MYEP00000471-500 at 493. ▮▮▮▮▮▮

[305]  For example, OptumRx has stated that it offers a set of formulary products but clients customize those offerings and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (30(b)(6) Rogers (Optum) Deposition, pp. 36-37, 41-42.)

[306]  Professor Scott Morton points to a contract with Express Scripts in which she alleges that "the only options Express Script had were to agree to make EpiPen exclusive or to buy EpiPens at the full list price" (Scott Morton Report, ¶ 129). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Fourteenth Amendment to the Pharmaceutical Rebate Agreement," between Express Scripts and Mylan, June 12, 2006, ▮▮▮▮▮▮-929 at 928). At her deposition, Professor Scott Morton agreed that this was not literally an all-or-nothing offer (Scott Morton Deposition, pp. 123-129).

234.    Furthermore, the health plans that contract with PBMs are not limited to the general formularies developed by the PBM. PBMs create national template formularies and benefit designs after negotiating rebates with manufacturers. While many clients adopt the standard PBM formularies, it is common for many clients, especially health plans and insurers, to develop custom formularies or modify a PBM's national formulary, depending on their preferences. This is particularly common among clients that have their own pharmacy and therapeutics ("P&T") committees and clinical guidelines that they use to make decisions. Although the client would control its own formulary, it could still access the manufacturer rebates negotiated by the PBM, providing the client's formulary met the rebate eligibility requirements as specified by the agreement. A client for which broad choice for its members was important might choose an open formulary with relatively few restrictions and would pay a relatively higher cost for that. In contrast, a client for which cost was important might choose a more restricted formulary and receive the benefit of higher rebates associated with that.[307] As one example,, ███████████

████████████████████████████████████████

235.    Consistent with this extensive use of custom formularies, there are circumstances

---



[307]  See, e.g., 30(b)(6) Kautzner (ESI) Deposition, pp. 180-181. ████████████████

[308]  For example, ESI clients that have their own P&T committees and do their own clinical work will usually have custom formularies and ESI estimates that approximately half of the lives covered by ESI are covered by custom formularies. See 30(b)(6) Kautzner (ESI) Deposition, pp. 178-179.

where, even though Auvi-Q may have been subject to restrictions on a PBM's national formulary, individual plans chose a custom formulary that was less restrictive towards Auvi-Q. For example, James Ayers of MedImpact testified that ███████████████ ████████████████████████████████████████████████████ ███████████████████████ ██████████████████████████ ████████████████████████████████████████████ Several of MedImpact's clients, including the University of Michigan, decided to forego the exclusive rebate negotiated between Mylan and MedImpact and instead place Auvi-Q on Tier 2, unrestricted.[311] Horizon Blue Cross Blue Shield of New Jersey contracts with Prime to manage its pharmacy benefit and, while Horizon uses Prime's national formulary for its Medicare business, it makes its own formulary decision for its commercial segment.[312] Horizon's commercial formulary is open, and it is not

---

[309] See, e.g., Ayers (MedImpact) Deposition, pp. 193-195.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

[310] Ayers (MedImpact) Deposition, September 26, 2018, pp. 120-121.
[311] Email from ██████████████████████████████████████
████████████ October 28, 2013, SAN-EPI-0277064-66 at 64.
[312] 30(b)(6) Deposition of Saira Jan (Director of Strategy and Clinical Integration at Horizon), November 30, 2018 (hereafter "30(b)(6) Jan (Horizon) Deposition"), pp. 34-35, 40-41. ("Q. So Horizon uses a PBM to manage its pharmacy benefit today; is that right? A. Yes. Q. What PBM does Horizon use? We use Prime." "Q. Does Horizon make decisions about on what tier to place drugs on its formularies or does Prime? A. So Horizon has their own pharmacy and therapeutics committee for commercial, and we have delegated the Medicare formulary decision-making process to Prime. But I sit on the national P&T committee, so I have a voice in the P&T decision-making process for the Medicare population. And for commercial we manage our own formulary and Horizon P&T committee, where the physicians are not Horizon employees, are independent physicians, make the decision where the drug would be placed, on what tier. Q. So Horizon doesn't follow Prime's national formulary for its commercial book of business? A. That's correct.")

---

uncommon for this formulary to list some drugs as preferred that Prime does not.[313] Horizon placed Auvi-Q as co-preferred with EpiPen throughout the duration of Auvi-Q's time on the market.[314]

### IX.C.   Professor Scott Morton substantially overstates the extent to which Sanofi was not covered

236.    Professor Scott Morton does not put forward a specific measure of the extent to which Sanofi was foreclosed. The closest she comes is her Figure 10, which depicts Auvi-Q's formulary status in Q3 2013, Q3 2014, and Q3 2015.[315] Her figure purports to show that Auvi-Q was not covered on 29% of formularies in Q3 2013, 51% of formularies in Q3 2014, and 41% of formularies in Q3 2015. But, as I discuss further below, Professor Scott Morton's measurement, such as it is, is extremely flawed, does not measure the effects of Mylan's conduct on Sanofi's ability to compete, and cannot be relied upon as a measure of foreclosure.

### IX.C.1.        Sanofi's ex-post formulary status is the result of competition

237.    Mylan's and Sanofi's ex-post formulary status is the result of ex-ante competition for the contract. Figure 10 is consistent with Sanofi's initial failure to compete on the

---

[313]  30(b)(6) Jan (Horizon) Deposition, pp. 44-46. ("Q. Does Horizon often deviate in its commercial formulary from the national Prime formulary?... A. Depends on the therapeutic classes and depends on the different years. We – I would say from a clinical perspective there's not much of a deviation, but we may have some drugs in New Jersey that we have preferred that the national formulary may not. But from a clinical perspective, there's not much of a deviation. Remember, we have an open formulary. So that may be certain changes, differences, between the national formulary and different Prime clients when they take their formulary versus what Horizon has in terms of the coverage of different drugs. Q. So you said there may be some things that are in New Jersey that are different. What did you mean by that? A. It might be certain therapeutic classes that we have worked over the years and have had a very significant market share that we would like to keep preferred that happened maybe in some of the other clients also for Prime. Not many classes. That's where we may deviate from them, where the national formulary may have a certain drug in a preferred status but we feel that it is where we would deviate and have that drug on a formulary as preferred. But it is only in classes where there are more of a me-too drugs where they have the same clinical efficacy…. Q. You said that Horizon has an open formulary; is that right? A. That is right. Q. And was that true in 2013 as well, that Horizon had an open formulary? A. That is true. So commercial formulary is open. Medicare is closed.")

[314]  30(b)(6) Jan (Horizon) Deposition, pp. 57-58, 62. ("Q. On what tier did… Horizon place Auvi-Q when it launched in January 2013? A. It was on the preferred tier. Q. And what tier was EpiPen on at that time? A. In 2013 – I will have to look at the formulary, but I think it was also on the preferred tier…. Auvi-Q was preferred at a certain time, and then they were co-preferred with the epinephrine – with the Mylan product. Q. EpiPen. A. EpiPen, sorry, yes." "Q. [D]id Auvi-Q and EpiPen remain preferred in 2014? A. Auvi-Q was preferred all the way till it was pulled from the market. Q. Was EpiPen also preferred? A. Yes. They were both co-preferred.")

[315]  Scott Morton Report, ¶ 172, Figure 10.

merits until it had been on the market for a substantial period of time.

238.    As discussed above, Sanofi's initial lack of success was the result of its own failure to compete. For example, 

This is consistent with competition, not foreclosure.

### IX.C.2.        The extent to which Sanofi was not covered is not necessarily the result of Mylan's challenged conduct

239.    Importantly, Professor Scott Morton's Figure 10 does not consider whether Auvi-Q's formulary status was caused by Mylan's contracting terms. Rather, it just reports the formulary choice made by the plan, which was not necessarily the result of Mylan's challenged rebates. In fact, several pieces of evidence demonstrate that this formulary status was often unrelated to Mylan's challenged rebates.

240.    First, even Professor Scott Morton concedes that PBMs often have a particular process for handling new products. After Sanofi launched, its 2013 formulary status was importantly affected by these processes and was not necessarily driven by Mylan's rebates. As she explains:

> When Auvi-Q was first introduced, many PBMs did not manage the EAI class, while others had a normal practice of adding new products to their formularies on a high co-pay tier. Thus, with many PBMs, Mylan's first real opportunity to exclude Auvi-Q was in the negotiations that took place throughout 2013 for 2014 formulary status. In addition, in 2013, before many exclusionary contracts went into effect, Auvi-Q was performing well – exceeding Mylan's own projections of how well it would do, and eating into EpiPen's profits at a faster rate than expected.[318]

---

[316]   30(b)(1) Downey (Sanofi) Deposition, p. 13 ███████████████████████████████████
███████████████████████████ See, Hubert (Sanofi) Deposition, pp. 59-60.

[317]   See, e.g., Email from ███████ ███████, SAN-EPI-0084805 and attachment █████████ , p. 31; ███████████████████████████████████████ SAN-EPI-0029787, p. 11.

[318]   Scott Morton Report, ¶ 171. She also justifies her analysis of third-quarter formulary status in each year in part by noting that it "is not impacted by the ramp-up period in the first half of 2013 following the entry of Auvi-Q in the beginning of year" (Scott Morton Report, fn. 349).

241.    This is supported by Sanofi documents and testimony from Sanofi's witnesses. Bryan Downey, Vice President of Auvi-Q at Sanofi at the time of the product's launch,



Additionally, ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

242.    Second, Auvi-Q's tier status may simply reflect a PBM's unilateral choice irrespective of Mylan's rebates.

243.    For example, Kaiser is included in Professor Scott Morton's figure 10, which depicts the percentage of lives where Auvi-Q was "not covered." However, Kaiser is very different from a typical plan. First, Kaiser is a fully integrated closed model HMO that runs its own insurance plan, doctors' offices, hospitals, and pharmacies. As a result, Kaiser typically negotiates its own contracts directly with manufacturers. Moreover, because Kaiser runs its own pharmacies, it does not need to negotiate rebates based on claims, but instead negotiates for a direct purchase price with the manufacturer.[321]

Moreover, ████████████████████████████████████████

█████████████    As Kaiser testified, ██████████████████████████

████████████████████████████████████████████████████

---

[319]   Email from ███████████████████████████ November 4, 2012, SAN-EPI-0171340-347 at 340.

[320]   ████████████████████████████ July 1, 2013, SAN-EPI-0285080, slide 33.

[321]   See, e.g., "Amendment to Agreement," Kaiser June 2012 purchasing agreement with Mylan, June 15, 2012,  MYEP01202343-44 ██████████████████████████████████████████

██████████████████████████████████████████████

KFHP_0708-11; █████████████████████████████████████████

██████████████████████████ KFHP_0703-07; See also, Deposition of Macy Shia (Director of National Pharmaceutical Contracting at Kaiser), November 9, 2018 (hereafter "Shia (Kaiser) Deposition"), pp. 35-36.

[322]   ████████████████████████████████████████, KFHP_0574-599;

██████████ MYEP01202343-44; ██████████████████████████████████

████████████████  KFHP_0703-07; ████████████

██████████████████████ KFHP_0708-11.

██████████████  In fact, Kaiser does not use step edits and does not have an exclusion list, but patients can receive any product prescribed by their physician and ████████

████████████████████████████████████████████████████

██████████████  As such, not only is its situation unique, but its contracts are not touched by the challenged conduct: rebate offers for exclusive EpiPen formulary position.[325] Despite this, Professor Scott Morton includes Kaiser plans that did not include Auvi-Q on its formulary as "not covered" in her Figure 10. In fact, about 5% of the lives she considered as "not covered" in 2014 and 2015 were attributable to Kaiser.[326] ████████

████████████████████████████████████████████████████

████████████████████████

244.   As another example, in 2013, ████████████████████████████

████████████████████████████████████████████████████

██████████████████████  Mylan signed an agreement with Cigna ████████

████████████████████  ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

---

[323] Shia (Kaiser) deposition, pp. 58-59. Also see, Shia (Kaiser) deposition, p. 135.

[324] Shia (Kaiser) deposition, pp. 31, 43-44, 49.

[325] Note that where two interchangeable products are available, ████████████████████████

████████  (Shia (Kaiser) deposition, pp. 38-39, 41-47). This practice is Kaiser's general practice across its entire business and not tied to the challenged conduct in this case. Moreover, as previously mentioned, patients typically face the same cost for a non-formulary product prescribed by their doctor.

[326] Scott Morton Report, backup to figure 10.

[327] ████████████████████████████████████████

KFHP-0013–24 at 17–18.

████████████████████████████████████████

████████████████████████████████████████

[328] Email from Rose Mongillo (Cigna) to Pat Jones (Mylan), "Re: meeting," January 21, 2013, MYEP00623274-91 at 82.

████████████████████████████████████████

Letter from Jennifer Conroy (Mylan) to Rosemarie Mongillo (Cigna), ████████  June 3, 2013, MYEP00623274-91 at 90-91.

[329] "First Amendment to Rebate Agreement," January 1, 2014, MYEP00086849-54 at 51.

[330] Kronberg (Cigna) Deposition, pp. 114-115; CIGNA_01052-53.

---

**HIGHLY CONFIDENTIAL**

245.    More generally, Auvi-Q's not covered status may have been a choice made by the PBM and not the result of a rebate offered by Mylan. Even where Mylan did not offer a rebate conditional on formulary exclusion, if the rebate was sufficiently more generous than that of Auvi-Q, a plan or PBM could unilaterally determine to exclude Auvi-Q from its formulary to move share to the lower-priced EpiPen. Or there could have been other reasons besides a Mylan rebate offer conditioned on exclusivity, for the plan or PBM to make such a decision.

246.    An analysis of the data underlying Professor Scott Morton's Figure 10 demonstrates that this was a reality, not merely a possibility. The MMIT data report that in Q3 2015, at least some plans managed through Aetna and Cigna had Auvi-Q "not covered" on their formularies.[331] Yet Mylan's rebate agreements in effect with these PBMs at this time ███████████████████████████████████████████ However, Professor Scott Morton includes in her analysis plans managed through each of these PBMs that had Auvi-Q as "not covered." Her analysis suffers from similar issues in 2013 and 2014.[333]

### IX.C.3.    Professor Scott Morton fails to distinguish exclusion/prior authorization/step therapy

247.    As discussed above, PBMs employ an array of techniques to control utilization of products and to steer patients to preferred drugs in order to reduce costs. These techniques include prior authorization, step therapy, and formulary exclusion, all of which have different levels of restriction and, consequently, ability to move share.

248.    Professor Scott Morton ignores such differences and combines both "Not Covered" and "PA/ST" – which are tracked separately in the MMIT data she relies upon

---

[331]  Scott Morton Report, backup to figure 10.

[332]  Eighth Amendment to the Manufacturer's Discount Agreement Between Aetna Health management, LLC and Mylan Specialty L.P. f/k/a Dey Pharma, L.P., July 1, 2014, MYEP00086249-252; "Rebate Agreement by and between Cigna Health and Life Insurance Company and Mylan Specialty, L.P.," April 1, 2015, CIGNA_01375-390.

[333]  The MMIT data report that in 2013-Q3, some plans managed through Prime, Aetna, and Cigna all had Auvi-Q "not covered" on their formularies (Scott Morton Report, backup to figure 10). Yet Mylan's rebate agreements in effect with these PBMs at this time ████████████ (Prime Contract (MYEP00087486-MYEP00087495); Aetna Contract (MYEP00086241-MYEP00086243); Cigna Contract (CIGNA_00533-CIGNA_00548)). Similarly, Professor Scott Morton includes plans managed by Cigna as "not covered" in 2014-Q3 ████████ (MYEP00086849-MYEP00086854).

– into a single category in her Figure 10. If instead one acknowledges the differences in potential restriction and treats these categories separately, it shows that a much smaller share of covered lives were in fact truly "Not Covered" according to MMIT. For example, as shown in Exhibit 13a, out of the 51% of lives for which Professor Scott Morton alleges Auvi-Q was "not covered" in 2014, the majority of this portion (26% of total covered lives) represents a prior authorization or step edits, whereas only for 25% of lives was Auvi-Q excluded. Similarly, the share not covered by the formulary was 18% in both 2013 and 2015.

249.    The evidence supports the view that prior authorizations and step edits are substantially less restrictive than formulary exclusion. The vast majority of instances where Auvi-Q's formulary status was noted as "PA/ST" was in fact a prior authorization, and not a step edit. For example, over 90% of the 22.1% of lives for which Auvi-Q's formulary status was "PA/ST" in Q3 2015 did not have a step edit.[334] In a prior authorization,  the doctor communicates with the patient's insurance company, which will review the doctor's recommendation and, in some cases, will ask for more information from the doctor before making a decision.[335] However, this does not prevent a patient from getting a drug covered through insurance; rather, it introduces additional step(s) to the process for the doctor and/or the patient. But many patients are successful in gaining prior authorization, at which point the drug is treated as either preferred or covered on the formulary, and the patient would pay the requisite copayment, not the full cost of the drug as he would if the product were not covered.

250.    A variety of evidence supports the ability for drugs to successfully navigate the prior authorization process. PBMs testified that successful prior authorizations are common.[336] Sanofi itself had a program ("Patient Connection") to help facilitate the prior

---

[334]   Of the 22.1% if lives for which Auvi-Q's formulary status was noted as PA/ST, 21% of lives were on plans where Auvi-Q was subject to a PA only, 0.5% of lives were on plans where Auvi-Q was subject to a ST, and 0.7% of lives were on plans where Auvi-Q was subject to both.

[335]   See, e.g., "What is Prior Authorization and How Does the Process Work?", Cigna, available at <https://www.cigna.com/individuals-families/understanding-insurance/what-is-prior-authorization>.

[336]   Deborah Kronberg of Cigna agreed that patients "get access all the time." (30(b)(6) Kronberg (Cigna) Deposition, p. 61); similarly, when asked if a patient can obtain a step-edited product, Barbara Minton of Anthem ████████████████████████████████████ (30(b)(6) Minton (Anthem) Deposition, pp. 59-60).

authorization process and medical exception processes for Auvi-Q.[337] Sanofi



251.    By failing to distinguish between substantially different levels of restriction, Professor Scott Morton's analysis substantially overstates any foreclosure.

### IX.C.4.        Rebates for preferred formulary placement do not foreclose Sanofi

252.    Professor Scott Morton provides no evidence to support her conclusion that Mylan's rebates for preferred (but not exclusive) formulary placement were anticompetitive. While Professor Scott Morton spends most of her report focused on the competitive effects of rebates for exclusive formulary placement, she also contends that Mylan's rebates conditional on being the only preferred brand (where other brands would still be on formulary but with non-preferred status) also reference rivals and therefore are anticompetitive. She provides no analysis to support this conclusion. She does not describe how her EEB methodology could be applied to these rebates nor does she conduct an analysis to evaluate whether Sanofi was disadvantaged. Moreover, her report argues that a non-preferred brand can overcome non-preferred status by providing copay coupons to consumers. Thus, according to Professor Scott Morton's own assertions, even Sanofi had the ability to overcome any non-preferred formulary status.

253.    Finally, Sanofi's documents and testimony demonstrate that



For example,                                                    Nothing in Professor Scott Morton's report supports a conclusion that Sanofi was inappropriately disadvantaged or otherwise unable to compete for preferred formulary status, or that it was foreclosed by these rebates offered by Mylan.

---

[337]  30(b)(1) Deposition of Lorine Harr (former Senior Director of Anaphylaxis Marketing at Sanofi), August 14, 2018 (hereafter 30(b)(1) Harr (Sanofi) Deposition), pp. 268-269.

[338]  Attachment to email from ███████████████, June 17, 2014, "Auvi-Q Review," SAN-EPI_A-0088536, slide 20.

[339]  ████████████████████  SAN-EPI-1235127.

[340]  30(b)(1) Downey (Sanofi) Deposition, p. 8; see also, 30(b)(1) Deposition of Patrick Barry, pp. 180-181

### IX.C.5.        Sanofi's formulary coverage was much higher on commercial plans

254.    I understand that Mylan's contracts regarding Medicare Part D and state Medicaid are not the subject of Sanofi's claims. I understand that the Court dismissed Sanofi's claims regarding Mylan's rebates for exclusive formulary placement to state Medicaid agencies.[341] When asked about the court's opinion on Medicaid, Professor Scott Morton testified that she was aware of the dispute and did not assert that she was challenging Mylan's conduct in the Medicaid channel.[342]

255.    Professor Scott Morton's report largely focuses on Mylan's contracts with commercial plans. Professor Scott Morton generally does not focus on rebates to Medicaid or Medicare Part D plans in her analysis. She excluded them from her analysis of net prices.[343] The incremental rebates that she describes in the context of her hypothetical EEB examples are drawn from commercial rebate offers.[344] In her analysis of formulary coverage, however, she includes all covered lives including commercial, Medicare Part D, and Medicaid.

256.    In any case, Sanofi's pre-launch forecasts –including the same materials she relies on as untainted by the effects of Mylan's conduct for purposes of calculating damages – demonstrate that Sanofi did not intend to meaningfully compete for formulary placement in these segments.

257.    ██████████████████████████████████████████████████████████
███████████████████████████████████

- Bryan Downey, the former director in charge of Auvi-Q and allergy operations in the U.S. for Sanofi, ████████████████████████████████████

---

[341] Memorandum and Order re: Mylan's Motion to Dismiss the Sanofi Complaint, p. 23 ("Instead, the conduct that Sanofi alleges to have violated the antitrust laws was Mylan's petitioning of federal and state governments to exclude Auvi-Q® from the drug formularies in exchange for rebates. As already noted, the *Noerr-Pennington* doctrine immunizes such conduct. The court thus dismisses Sanofi's exclusive dealing claims based on discounts or rebates provided to state-based Medicaid agencies because they are barred by the *Noerr-Pennington* doctrine. These claims fail to state a plausible claim for relief.")

[342] Scott Morton Deposition, pp. 299-300. Rather she highlighted that there is spillover from the Medicaid channel that could affect the commercial channel (just as she alleges there is a variety of other Mylan conduct not being challenged as anticompetitive that could create spillover effects).

[343] Scott Morton Report, Figure 8.

[344] Scott Morton Report, ¶¶ 166-168.

[345] ████████████████████████████   Sanofi, SAN-EPI-0171591-96 at 92.



- Sanofi ██████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████

- Sanofi described ████████████████████████████████████
  ████████████

Instead, ████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████

258.    Focusing on the commercial channel which Sanofi planned to target, and in fact did target, shows that Sanofi's formulary coverage was substantially broader than it was when including these other channels. As shown in Exhibit 13b, Sanofi was "not covered" on only 16% of commercial formularies in 2013, 26% in 2014, and 13% in 2015. Even broadening to include formularies where it was covered, but had a prior authorization or step edit, Sanofi was "not covered" or restricted on only 20% of commercial formularies in 2013, 44% in 2014, and 23.5% in 2015. This is consistent with Sanofi's internal evaluations of its success in gaining formulary coverage. For example, ████████████
██████████████████████████████████████████████████████
████████████████████████████████

259.    Even in 2013 and 2014, when Sanofi did not compete aggressively on price, Sanofi had many wins (for superior and parity access). For example, ████████████
██████████████████████████████████████████████

---

[346] Email from ████████████████████████████████ November 4, 2012, SAN-EPI-0171340-347 at 340.
[347] Attachment to email from ████████████████████████████████████████
████████████████████████████████ SAN-EPI-0171340-347 at 342.
[348] ███████████████████████████ Sanofi, SAN-EPI-0419546, slide 51.
[349] ████████████████████████████████████ Sanofi, SAN-EPI A-0063798, slide 10; Attachment to email from ████████████████ November 4, 2012, ████████████
████████████████████ SAN-EPI-0171340-347 at 342.
[350] See, e.g., Email from ████████████████████████████████████████████████
████████ slide. 31; ████████████████████████ Sanofi, December 3, 2014, SAN-EPI-0029787, slide 11.

Sanofi also improved its coverage on a number of accounts in 2014. For example, ███

### IX.C.6.      Only a small share of the lives were covered by Mylan's challenged conduct

260.     For all of these reasons, Professor Scott Morton has not presented any meaningful measure of foreclosure. Her analysis of Sanofi's formulary coverage fails to demonstrate that Mylan's challenged contracts covered a substantial share of the relevant market.

261.     In fact, as shown in Exhibit 13c, out of the lives in the commercial, Medicaid, Medicare, and uninsured channels, which are the channels analyzed in Professor Scott Morton's Figure 3,[353] only 9.7% of those lives were on *commercial* plans that placed Auvi-Q on "Not Covered" status during the period from January 2013 to October 2015. Even when both "PA/ST" and "Not Covered" are treated as restrictions, only 16.2% of those lives were restricted in the same period.

262.     As I explained above, even these figures overstate the extent of foreclosure, because Auvi-Q's observed formulary status does not necessarily result from Mylan's challenged conduct.

### IX.D.   The impact of any alleged foreclosure on Sanofi's sales is even smaller

263.     Because Mylan's challenged contracts covered only a small share of lives, the potential impact on Sanofi's ability to compete is small. As a matter of economics, the relevant measure of the impact of any alleged foreclosure (if the conduct is found to be anticompetitive) is not the fraction of lives covered by the challenged conduct, but rather the incremental share that Sanofi was deprived of as a result of the alleged conduct. Thus, the analysis described above will substantially overstate the impact of alleged foreclosure as a result of Mylan's rebate contracts.

---

[351] ███ July 1, 2013, SAN-EPI-0285080, slide 33.

[352] ███ SAN-EPI-0072289-291 at 289.

[353] There are a modest number of patients that are uninsured and therefore whose prices would not be affected by these alleged contracts with PBMs. According to Professor Scott Morton, these uninsured patients account for 6% of the total EAI prescriptions as of January 2014. (Scott Morton Report, Figure 4.) Data on the number of lives for these uninsured patients come from Kaiser Family Foundation website, the same source Professor Scott Morton used for her Figure 3.

264.    Most notably, Professor Scott Morton's entire theory of the anticompetitive effect of Mylan's PBM rebates is built upon the premise that there is a substantial share of EAI device purchasers who will only purchase an EpiPen and will not consider Auvi-Q, even where the price difference is substantial. As I explain in the previous section, her contention that there is substantial non-contestable demand, and her theory about the competitive implications of that demand, are flawed, and Sanofi can nonetheless compete and is not foreclosed by these contracts. But if one credits her conclusion that there is foreclosure, it necessarily must be the case that a substantial fraction of customers would not purchase Auvi-Q. Auvi-Q was not foreclosed from these sales by Mylan's conduct – under Professor Scott Morton's theory Sanofi would never have been able to compete for these sales. For example, if Mylan's contracts were shown to have caused Auvi-Q to be not covered on contracts representing 20% of EAI demand, and assuming 50% of sales under those contracts are non-contestable, then no more than 10% of EAI sales could have even potentially been foreclosed by Mylan's conduct.

265.    Moreover, even for the contestable demand, Sanofi would not have won 100% of that business. Rather, the difference between Sanofi's actual and but-for sales is the proper measure of foreclosure.

266.    Professor Scott Morton's own regression analysis demonstrates that PA/ST or not-covered status at a plan had a relatively small effect on Auvi-Q's share. In particular, relative to when EpiPen and Auvi-Q have the same formulary status, Professor Scott Morton finds that "[w]hen Auvi-Q is restricted (i.e., subject to step therapy or prior authorization), the estimated Auvi-Q share decreases by 4 percentage points. And when Auvi-Q is not covered by the formulary at all, the estimated Auvi-Q share decreases by more than 5 percentage points."[354] Relative to when Auvi-Q is on the formulary but in a non-preferred position to Epi-Pen, Auvi-Q's share decreases by only 2.8 percentage points when it is subject to PA/ST; and by 4 percentage points when it is not covered.[355]

---

[354]   Scott Morton Report, ¶ 243.
[355]   These figures are calculated using the specification in column 1 of Professor Scott Morton's summary table of her regression results and are calculated by taking the difference between the coefficients on the "Auvi-Q Restricted" and "Auvi-Q Not Covered" variables, respectively, and the coefficient on the "EpiPen Preferred" variable in Professor Scott Morton's regression. See Table A.2 of Scott Morton Report.

**HIGHLY CONFIDENTIAL**

**IX.E.   There is no evidence that this small share sales affected by Mylan's challenged conduct substantially diminished Sanofi's ability to compete**

267.   Where the potential foreclosure is low, as is the case here, clearly competition is not harmed. Even if the foreclosure is substantial, the analysis must proceed further to examine whether it is of sufficient magnitude to drive a rival from the market or raise its costs. If the rival firm does not enjoy economies of scale (e.g., its average costs do not decline with increasing sales), then even absent any foreclosure, the rival would unlikely be able to reduce its costs, offer better prices, or increase its ability to compete.

268.   Professor Scott Morton does not allege, nor has she done any analysis to show, that Mylan's conduct deprived Sanofi of economies of scale or other efficiencies such that any Sanofi inability to compete for some contracts would have deprived it of the ability to profitably compete for other contracts.[356] She has not analyzed Sanofi's manufacturing and/or other costs, nor evaluated any efficiency that would have come from greater scale.

269.   

---

[356] Scott Morton Deposition pp. 180-181. Professor Scott Morton testified that she "did not need to know anything about the cost structures of these two companies other than to know that there really is a cost in innovating and that we want to protect the innovator" (Scott Morton Deposition, p. 181). Moreover, Professor Scott Morton stated she has "not examined Auvi-Q for signs of economies of scale" (Scott Morton Deposition, p. 181).

[357] ███████████████████████████████████████████████████ March 27, 2012, SAN-EPI-1165930-6022 (hereafter, "Sanofi-Medivative Manufacturing Agreement").

[358] ███████████████████████████████████████████████████

[359] ███████████████████████████████████████████████████



Professor Scott Morton provides no explanation how this small cost difference would have meaningfully affected Sanofi's ability to compete.

270. █████████████████████████████████████████████████████████████

As such, to the extent that Auvi-Q's would have gained more sales but-for the challenged conduct, this dimension of its variable costs could only increase, not decline.

## X.  THE OTHER MYLAN CONDUCT CHALLENGED BY SANOFI IS ALSO PROCOMPETITIVE

271.    Professor Scott Morton alleges that Mylan "implemented numerous strategies to

---

[360] While prices may vary based on batch sizes, Professor Scott Morton provides no evidence that Sanofi was not purchasing in large batches in the actual world, nor does she provide a rationale for why Sanofi would be likely to order in larger batches in the world absent the challenged conduct.

[361]

[362] ████████████████████████████████
November 20, 2009, KALEO-00042499-2630,

[363] ████████████████████████████████
November 20, 2009, KALEO-00042499-2630,

block Auvi-Q by increasing the share of non-contestable demand."[364] These include (1) exploiting spillover effects (from commercial and government contracts), (2) marketing to physicians, (3) copay coupons, and (4) the EpiPen4Schools program.[365] In every instance, Professor Scott Morton is in fact identifying procompetitive activities that provided information to the marketplace, provided access to EAI devices to populations that may not have otherwise had it, and lowered price. She highlights in some cases that Mylan did not use these strategies before the launch of Auvi-Q, implying that the intent of some of them was to disadvantage Auvi-Q. But this is simply a competitive response to the entry of a rival.

### X.A.   Mylan's alleged exploitation of the spillover effects to increase its shares

272.    Professor Scott Morton alleges that "Mylan exploited spillover effects to increase its entrenched market share,"[366] and asserts that "Mylan was able to leverage the exclusionary restrictions it secured at some of the largest PBMs and use them to foreclose patients that used other PBMs in the same geographic region from procuring an Auvi-Q."[367] But her analysis of spillover is fundamentally flawed.

### X.A.1. Spillover itself is not anticompetitive

273.    First, spillover itself, even if it exists, is not anticompetitive. As I explain above, EpiPen's broader formulary coverage resulted from, among other things, its reputation as a safe and trusted product, strong brand loyalty, and competitive efforts. Professor Scott Morton concedes that because EpiPen has been the only device on the market for many years, patients and caregivers are familiar with the device and confident to administer it for a life-threatening situation.[368] Doctors are also better trained and more familiar with EpiPen.[369] She also acknowledges the benefit for patients from using an EAI device with a large share.[370] This type of first-mover advantage is common, unrelated to the alleged conduct, and not anticompetitive.

274.    To the extent that there is spillover stemming from Mylan's first-mover advantage

---

[364]   Scott Morton Report, § VII.C.
[365]   Scott Morton Report, ¶ 197.
[366]   Scott Morton Report, § VII.C.1.
[367]   Scott Morton Report, ¶ 134.
[368]   Scott Morton Report, ¶ 77.
[369]   Scott Morton Report, ¶ 77.
[370]   Scott Morton Report, ¶ 78.

such as familiarity with EpiPen by patients, doctors, and caregivers, it is legitimate and not anticompetitive. But Professor Scott Morton makes no attempt to examine or quantify this portion of spillover.

### X.A.2. Professor Scott Morton's "spillover" mechanism would enhance the benefit to both Mylan and Sanofi of winning PBM contracts

275.     Furthermore, Professor Scott Morton does not distinguish between spillover resulting from the challenged conduct, or from Mylan's other procompetitive efforts. To the extent that the spillover effects do exist, that works to strengthen the manufacturers' economic incentive to compete more aggressively for better formulary positions, knowing that they are competing not only for the lives covered in the targeted formulary but also potentially lives in other formularies.

276.     Professor Scott Morton asserts that signing a large PBM "tends to get the attention of physicians" and that "[t]he awareness that large payors have agreed to advantaged positioning for EpiPen also helped Mylan negotiate favorable formulary status at other plans in the region."[371, 372]

277.     Yet these so-called spillover effects would exist not just for EpiPen; they would also exist if Auvi-Q were to win exclusive formulary placement at large PBMs. If spillover effects are important, they would enhance Auvi-Q's ability to translate wins at key PBMs into broader market success. This would increase the incremental revenue generated by winning a particular PBM contract, making the comparison of incremental revenue and incremental cost performed in Section VIII.E.1 above quite conservative.

### X.A.3. Professor Scott Morton has failed to demonstrate that the predicate for her "spillover" theory is true.

278.     Professor Scott Morton hypothesizes that "HCPs write prescriptions based in part on what products they know are available to all of their patients," and "tend to prescribe EpiPen to other patients in the region, even if the health plans for those patients provide equal or even preferred access to Auvi-Q."[373] However, Professor Scott Morton fails to demonstrate that doctors have substantially incomplete information on formulary

---

[371]   Scott Morton Report, ¶ 137.
[372]   Professor Scott Morton further alleges that "to the extent that Auvi-Q was not available for Medicaid and Medicare enrollees, that would make HCPs less likely to prescribe Auvi-Q for all their patients, and in particular for commercial patients." (Scott Morton Report, ¶ 144.)
[373]   Scott Morton Report, ¶ 135.

coverage and therefore that the coverage of EpiPen on one formulary can substantially affect demand for Auvi-Q on a different formulary.

279.    Indeed, the other expert who submitted a report on behalf of Sanofi, Dr. Mary Ann Michelis, a medical doctor, explained that:

> I see patients who are covered by various insurance companies, and plans within insurance companies vary as well. Due to the importance of cost to my patients and the time required to manage insurance claims, I found it necessary to have an employee who is responsible for managing insurance issues for my practice, which increases my operating costs accordingly.[374]

280.    Dr. Michelis goes on to imply that she assesses each plan's insurance benefits individually when steering her patients to the EAI device she believes is best.[375]

281.    Professor Scott Morton ignores this and makes no attempt to account for the effect of physician awareness of and attention to insurance coverage on the alleged spillover.

### X.A.4. Professor Scott Morton's empirical analysis of the spillover effect is fatally flawed

282.    Professor Scott Morton performed a regression analysis purporting to support that the spillover effect is substantial, but her regression suffers from several fatal flaws that render it unreliable. In particular, Professor Scott Morton's regression analysis is inconsistent with the alleged mechanism for the spillover effects, and she fails to control for numerous potential confounding factors.

283.    Professor Scott Morton's spillover regression correlates Auvi-Q's prescription share at an individual plan with the statewide Auvi-Q prescription share in that plan's state in the previous month. There are many reasons to expect these shares to be correlated for reasons unrelated to any alleged spillover mechanism. For example, patients' preference at a given plan in a given state may well be correlated with the general preferences of patients in that state. So it is not at all surprising to observe that in a state where Auvi-Q's aggregate share is low in the previous month, the individual plan's Auvi-Q share is also low. But this need not have anything to do with the alleged spillover effects.

---

[374]    Michelis Report, p. 17.
[375]    Michelis Report, p. 17.

284.    Professor Scott Morton's spillover regression is also incapable of showing how much of the alleged spillover effects (even if they exist) was a result of the alleged foreclosure to formulary access. For example, as I explained above, ███████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████    When Sanofi did compete, it won at some formularies and lost at some others. So the resulting Auvi-Q access to formularies, as well as the shares it gained, were outcomes of the competitive process, not foreclosure. Professor Scott Morton's regression cannot isolate the spillover effects, even if they exist, due to Mylan's challenged conduct.

### X.B.    Mylan's detailing to physicians was procompetitive

285.    Professor Scott Morton alleges that ████████████████████████████████

████████████████████████████    increases the non-contestable demand.[376] First, it is important to distinguish two different types of marketing activities that Professor Scott Morton alleges that Mylan undertook.

286.    First, Professor Scott Morton appears to conclude that some of Mylan's marketing activities were "false[]" and/or "deceptive."[377]    She alleges that ████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

287.    Professor Scott Morton cites largely to internal Mylan documents discussing actual or potential messaging but points to little to no evidence of actual marketing messages to customers that she contends were in fact deceptive.[379] She offers no evidence

---

[376]   Scott Morton Report, ¶ 139.
[377]   Scott Morton Report, ¶ 143.
[378]   Scott Morton Report, ¶ 143.
[379]   For example, Professor Scott Morton cites to an internal Mylan communication that discusses potential messaging to doctors (Scott Morton Report, fn. 290, citing Email from Harry Jordan (Mylan) to colleagues, "Re: Thank You!," MYEP00253140-42 at 40). However, not only has she not identified what is actually misleading in Mylan's marketing approach, but internal Mylan emails in which employees discuss potential marketing strategies are not evidence that any deceptive marketing took place. Moreover, the email to which she cites is one in which ██████████████████████████████
████████████████████████████████████████████████
MYEP00253140-42).

of the extent to which physicians were in fact misled by any such materials. Finally, she does not make any attempt to measure the effect of any deceptive marketing on Mylan's (or Sanofi's) sales. In sum, she puts forward no analysis or other evidence to demonstrate that Mylan's marketing was in fact deceptive or that it had any effect on Sanofi's ability to compete for Auvi-Q, let alone that it somehow affected a meaningful volume of Auvi-Q business.

288.   Setting that aside, most of the marketing activities Professor Scott Morton describes she does not contend were anticompetitive in and of themselves, but rather argues that they were part of Mylan's efforts to "increase non-contestable demand."  She contends that, "[a]s part of its efforts to increase non-contestable demand,… ███████

████████████████████████████████████████████████

████████████████████████

289.   As an initial matter, to the extent that her contention is that this procompetitive conduct somehow increased the non-contestable demand, which made it more difficult for Auvi-Q to compete on rebates, I have already addressed that opinion above. I presented a wide range of evidence demonstrating that PBMs, Mylan, and Sanofi all perceived that the level of non-contestable demand was small. The effects of Mylan's marketing conduct are already reflected in the measured contestable and non-contestable demand.

290.   Moreover, as with the other Mylan conduct she is challenging, this conduct is another example of Mylan competing head-to-head with Sanofi. An important dimension of competition between branded pharmaceutical products is detailing and other marketing activities to physicians. Both Mylan and Sanofi had sales forces that were actively detailing physicians about the differentiating factors of their products, including formulary coverage. Indeed, informing physicians of formulary coverage for drugs can be a particularly important form of competition where a an entrant in the same therapeutic class like Auvi-Q is trying to enter. It would allow Sanofi to inform physicians of its wins.

---

[380]   Scott Morton Report, ¶ 139.

**X.C.   Mylan's use of copay coupons was procompetitive**

291.    As Professor Scott Morton herself notes, copay coupon programs are widely used by pharmaceutical manufacturers to lower prices to patients. The patient redeems a coupon when he fills his prescription, which lowers his copayment to the pharmacy, and then the manufacturer reimburses the pharmacist for the difference. These serve as another dimension of competition for manufacturers after rebate competition has determined placement of their drugs. The manufacturer of a drug on a nonpreferred tier can provide a copay coupon to equal the out of pocket cost of a drug on a preferred tier. If a PBM put Drug A on Tier 2, with a $20 copay, and Drug B on Tier 3 with a $50 copay, the manufacturer of Drug B could offer a $30 copay coupon to reduce the patient's out of pocket cost down to $20, the same as if the drug had been a preferred brand. This lowers the out-of-pocket costs of prescription drugs for consumers.

292.    Mylan began to offer its copay coupons for EpiPen in February 2013.[381] Mylan's coupons reimbursed a patient up to $100 per two pack of EpiPen purchased.[382] An eligible patient whose total copay was no more than $100 could therefore purchase a two pack of EpiPen at $0 out of pocket cost. In August 2016, Mylan further increased the value of its copay coupons to provide up to $300 in savings for each two pack of EpiPen.[383]

293.    There is no dispute that these copay coupons lowered the out of pocket cost of an EpiPen for patients that used them. As explained in one Mylan document Professor Scott Morton cites to in her discussion: ███████████████████████████████████
████████████████████████████████████████████████████████████████
Mylan's copay coupon data shows that from 2013 to 2015, Mylan provided ████████████ in total to offset the required copayments by patients.

294.    Professor Scott Morton, however, mischaracterizes Mylan's copay coupons as one tool to "further entrench EpiPen's market share."[385] In particular, she cites to a Mylan document ████████████████████████████████████████████████████

---

[381]   Mylan coupon data.
[382]   Mylan coupon data.
[383]   Mylan coupon data.
[384]   "Pricing Committee Review," Mylan, October 24, 2012, MYEP00624286 at slide 5.
[385]   Scott Morton Report, ¶ 146.

███████████████████████████████████████████████████ She

then portrays Mylan's zero-copay coupons as a strategy that "allows a manufacturer to defeat the PBM's attempts to create price competition with a rival treatment"[386] because,

████████████████████████████████████████████████████████

██████████████████████████████████ But this is belied by the same Mylan

document she cites to, which clearly shows that █████████████████████████

████████████████████████. The Mylan document states that ███████████

██████████████████████████████ In response, Mylan made a

"bold move" to outplay its competitor. Thus, this is entirely consistent with Mylan making price concessions (in the form of zero copay coupons) to compete with a rival for a large customer. This is response to competition, not defeating "PBMs' attempt to create price competition" as she claims.

295.     Professor Scott Morton further alleges that Mylan's $0 copay coupon raised Sanofi's costs (when Sanofi offers its own $0 copay coupon) given Mylan's success in getting preferred formulary positioning for EpiPen. A copay coupon does not, of course, raise Sanofi's costs. Rather, it lowers the price paid by the consumer. And it puts pressure on Sanofi to similarly lower its price to the consumer. But that is competition. In fact, that is exactly how Sanofi reacted to Mylan's copay coupons. At launch, Sanofi offered a program that reimbursed up to $60 to cap a patient's copay at $25 (cash paying patients would be reimbursed $60).[388]  Mylan offered a coupon up to $100. Thus, for many patients their out-of-pocket costs for EpiPen after Mylan's copay coupons would be zero. In response to this competition, Sanofi launched its own zero copay program shortly after June, 2013.[389] The end result is that consumers benefited from paying zero copays for both EAI products.

---

[386] Scott Morton Report, ¶ 146.

[387] ██████████████████████████ Mylan, MYEP00756222-24 at 23.

[388] "Services Agreement," between Sanofi and PSKW, September 19, 2012, SAN-EPI-1166597-623 at 618.

███████████████████████████████████████████████████████████████

████████████████ 30(b)(1) Barry (Sanofi) Deposition, p. 241. ████████████████

██████████████████████████████████████████████

[389] 30(b)(1) Downey (Sanofi) Deposition, p. 100.

296.    Moreover, Professor Scott Morton argues that a $0 copay coupon program was more expensive for Sanofi than for Mylan because Sanofi was generally on a less-preferred tier and therefore would have had a higher differential to get the consumer copayment down to $0. This ignores, however, that rebates for preferred formulary status are typically higher than rebates for non-preferred formulary status, so Mylan would have had to pay higher rebates to achieve a preferred tier in the first place.

### X.D.    Mylan's EpiPen4Schools program is procompetitive

297.    Mylan launched the EpiPen4Schools program in August 2012.[390] The program helps "improve access to epinephrine in the event a person experiences a life-threatening allergic reaction… in the school setting."[391] Importantly, as the provided devices were not assigned to a particular student, the program made EpiPen devices available to not only students who are known to be at risk for anaphylaxis but also those who could experience anaphylaxis for the first time at school.[392] The importance of this access is demonstrated by the fact that in the 2015-2016 school year, nearly one-third of individuals who experienced anaphylaxis had no previously known allergies.[393] During the course of the program, federal and state law evolved and accepted the importance of epinephrine accessibility at schools. In November 2013, the School Access to Emergency Epinephrine Act was passed to encourage schools to plan for severe allergic reactions.[394] By May 2016, 47 U.S. states had enacted legislation to either allow or require the stocking of EAI

---

[390] Mylan partners with BioRidge Pharma to certify and fulfill orders through the program. See "EpiPen4Schools - About Us," Mylan, available at <https://www.epipen4schools.com/About/> (accessed on March 17, 2019).

[391] "Frequently Asked Questions," EpiPen4Schools, available at <https://www.epipen4schools.com/Faq/> (accessed on March 17, 2019).

[392] "EpiPen4Schools Internal Q&A", December 23, 2013, BEACHELL-01730-742 at 730; see also, Deposition of Ron Graybill (former VP of Managed Markets at Mylan), September 21, 2018 (hereafter "Graybill (Mylan) Deposition"), p. 168.

[393] "Mylan's EpiPen4Schools Program Surpasses One Million Free Epinephrine Auto-Injector Donations to U.S. Schools," Mylan Press Release, October 27, 2017, MYEP00001449-452 at 449.

[394] "President Obama Signs New EpiPen Law to Protect Children with Asthma and Severe Allergies, And Help Their Families to Breathe Easier," White House Archives, November 13, 2013, available at <https://obamawhitehouse.archives.gov/blog/2013/11/13/president-obama-signs-new-epipen-law-protect-children-asthma-and-severe-allergies-an> (accessed March 17, 2019). In particular, the act authorized "the Department of Health and Human Services to give funding preferences to states for asthma-treatment grants if they: maintain an emergency supply of epinephrine (EpiPens), if they permit trained personnel of the school to administer epinephrine, and if they develop a plan for ensuring trained personnel are available to administer epinephrine during all hours of the school day."

---

**HIGHLY CONFIDENTIAL**                                                      Page 110

devices at schools whereas in 2010 only eight states had such legislation.[395]

298.    Through the EpiPen4Schools program, Mylan offers free EpiPens to qualifying public and private elementary, middle, and high schools in the United States.[396] Specifically, under the program Mylan offers four free EpiPens, training materials, and a unit to store the devices.[397] Mylan will also replenish EpiPens used to respond to an anaphylactic episode for free.[398] Mylan has never attached any obligations to the schools in exchange for providing free product.[399] Between 2012 and 2016, Mylan provided more than 700,000 free EpiPens to more than 66,000 schools, roughly half of all U.S. schools.[400] Such activities are clearly procompetitive and benefit the thousands of schools that have received free EpiPens through the program.

299.    Professor Scott Morton appears to agree that this is conduct is clearly procompetitive. At deposition, she testified:

> I think if the idea is to allow schools to be able to serve their kids who might have allergic reaction, it's a great idea. And for that reason, you would want Sanofi to be able to do it too and for schools to be able to buy the Sanofi product if they wanted to.[401]

300.    Mylan's program to provide free EpiPens to schools provided no restrictions on Sanofi also providing free pens, or selling pens, to those same schools. While Sanofi chose not to offer a similar program to give free pens to schools, I understand that it did have a program under which schools could purchase pens at a discount.[402]

---

[395]  "EpiPen4Schools Program," May 10, 2016, PFE_EPIPEN_AT00517991, slide 3.

[396]  "Frequently Asked Questions," EpiPen4Schools, available at <https://www.epipen4schools.com/Faq/.> (accessed March 21, 2019). A schools ability to stock epinephrine depends upon state laws. Some states require schools to stock it, and many states allow schools to stock it (see, e.g., "School Access to Epinephrine Map," available at <https://www.foodallergy.org/education-awareness/advocacy-resources/advocacy-priorities/school-access-to-epinephrine-map> (accessed March 21, 2019)).

[397]  "Frequently Asked Questions," EpiPen4Schools, available at <https://www.epipen4schools.com/Faq/> (accessed March 21, 2019). See also, Mylan letter to U.S. Senators, September 12, 2016, MYEP00226976-987 at 982.

[398]  "Frequently Asked Questions," EpiPen4Schools, available at <https://www.epipen4schools.com/Faq/.>, (accessed March 21, 2019). See also, Mylan letter to U.S. Senators, September 12, 2016, MYEP00226976-987 at 982.

[399]  Mylan letter to U.S. Senators, September 12, 2016, MYEP00226976-987 at 983; Graybill (Mylan) Deposition, p. 177.

[400]  Mylan letter to U.S. Senators, September 12, 2016, MYEP00226976-987 at 982.

[401]  Scott Morton Deposition, p. 192.

[402]  See e.g., SAN-EPI-0343489-490 at 490. kaléo launched a similar program offering free pens in August 2017 called "Q Your School," which offered eight free auto-injectors per year to all public elementary

---

**HIGHLY CONFIDENTIAL**                                                    Page 111

301.    Professor Scott Morton also alleges that the program "made additional pens available at a discounted rate to schools, but to get the lowest rate, the school had to sign a form certifying that it will not purchase any competitive EAI devices – including Auvi-Q – during the next twelve months."[403] She further states that access to schools is important given the spillover effects because parents and school officials have an incentive to use the same EAI device used at school.[404] But she provides no discussion of the scope of this program in her expert report, and when asked about the program at her deposition, was unaware of even the order of magnitude of the program, or the relative shares of free and discounted pens.[405]

302.    Mylan did have a small program in which Mylan provided participating schools with discounted EpiPens should they need more than the four free devices provided by Mylan. As Professor Scott Morton appears to understand,[406] there were, until July 2016, two different discounts available: an unconditional discount, and a larger discount conditional on the school agreeing not to purchase a competing EAI device in the next 12 months.[407] The larger discount was conditional only on a school agreeing not to *purchase* other EAI devices, and did not prevent the school from receiving *free* EAI devices.[408]

303.    However, the discount program was rarely used.[409] From 2012 through August 2016, over 680,000 EpiPen devices in the EpiPens4Schools program were provided for free while under 50,000 devices were acquired through the discount program.[410] Additionally during the same period, free pens reached over 65,000 different schools

---

schools in the United States (kaléo press release, August 7, 2017, available at <https://kaleo.com/press-release/kaleo-announces-auvi-q-epinephrine-injection-usp-charitable-donation-program-for-all-public-elementary-schools-in-the-united-states/>).

[403] Scott Morton Report, ¶ 148.

[404] Scott Morton Report, ¶ 149.

[405] Scott Morton Report; Scott Morton Deposition, pp. 192-193.

[406] Scott Morton Deposition, pp. 193-194 ("I think there was a smaller discount that did not require exclusivity.")

[407] See, e.g., "Services Agreement," by and between Dey Pharma, L.P. and BioRidge Pharma, LLC, August 1, 2011, BIO-KS00247321-387 at 336-337; Graybill (Mylan) Deposition, pp. 177-178; Mylan letter to U.S. Senators, September 12, 2016, MYEP00226976-987 at 983.

[408] 30(b)(6) Deposition of Roger Graham (Head of Rx Business and New Product Portfolio Development at Mylan), August 30, 2018 (hereafter "30(b)(6) Graham (Mylan) Deposition"), p. 118.

[409] See, e.g., Deposition of Heather Bresch (Mylan), October 9, 2018 (hereafter "Bresch (Mylan) Deposition"), pp. 131-132.

[410] MYEP00006385 (see also Bresch (Mylan) Deposition, pp. 131-132.).

while only 2,196 schools ever received discounted devices.[411] Exhibit 14 demonstrates the negligible share of total EpiPens that the discount program accounted for during the time period that Sanofi marketed Auvi-Q. Even this overstates the impact of the conditional discounts that Professor Scott Morton alleges were anticompetitive because it includes both unconditional and conditional discounts. Mylan discontinued its conditional discount program in July 2016.[412]

304.    In any case, Professor Scott Morton fails to demonstrate that Mylan's conditional discount program had any meaningful effect on Sanofi. As described above, Sanofi was not restricted from offering free EpiPens to U.S. schools in competition with Mylan, but it chose not to do so.

305.    Professor Scott Morton cites broadly to materials about the timing and effect of the EpiPen4Schools program to infer anticompetitive intent and effect.[413] Professor Scott Morton alleges that the timing of the EpiPen4Schools program, launched right before Auvi-Q's entry, was an effort to limit Auvi-Q sales.[414] She cites to market research performed by Mylan in 2013 that shows a small reduction in Auvi-Q shares in 34 ZIP code areas with schools that opted into the program (relative to zip code areas with schools without EpiPen4Schools enrollment).[415] Professor Scott Morton makes no attempt however to show that any schools in these areas purchased EpiPen through Mylan's conditional discount program rather than the likelier scenario that these schools just received unconditional, free EpiPens. She cannot therefore conclude that Mylan's conditional discount program had a material impact on Auvi-Q's share and ability to compete.

306.    In sum, Professor Scott Morton fails to reliably distinguish procompetitive from anticompetitive conduct. She agrees that Mylan's program "is a great idea" as long as

---

[411]   MYEP00006385. The NCES School ID was used to identify distinct schools.
[412]   30(b)(6) Graham (Mylan) Deposition, pp. 336-342; "Services Agreement," by and between Dey Pharma, L.P. and BioRidge Pharma, LLC, August 1, 2011, BIO-KS00247321-387 at 380-386.
[413]   Scott Morton Report, ¶ 148 ("The timing of the EpiPen4Schools program was no coincidence…"), ¶ 149 ("Mylan's own review of the EpiPen4Schools program described it as ███████████████████.
[414]   Scott Morton Report, ¶ 149.
[415]   Scott Morton Report, ¶ 149. Details of the study Professor Scott Morton cites to are discussed in a Pfizer presentation (see "EpiPen Joint Commercial Committee," March 20, 2014, PFE_EPIPEN_AT00540546, slide 34).

Sanofi can also give away or sell pens to schools. This is exactly how Mylan's program worked. That Mylan rolled out the program before Auvi-Q's launch and thought that the program helped it compete for share with Sanofi is evidence of competition.

## XI.   PROFESSOR SCOTT MORTON'S OPINIONS ON MARKET POWER ARE FLAWED

### XI.A.   Professor Scott Morton's Opinions

307.   Professor Scott Morton concludes that "the market for EAI devices constitutes a relevant antitrust market"[416] because: (1) Mylan has imposed numerous EpiPen price increases without turning consumers to other non-EAI products;[417] (2) Mylan changed its rebate practice only in the presence of competition from EAI devices but not other non-EAI products;[418] (3) Mylan's and industry participants' view confirms an EAI-device only market;[419] (4) other non-EAI options (Benadryl, vial or syringe products, trips to emergency room/urgent care centers) are not viable substitutes.[420]

308.   Professor Scott Morton concludes that the relevant geographic market is the United States.[421]

### XI.B.   Competition is customer specific

309.   Large PBMs play an important role in stimulating competition between branded drug manufacturers within a therapeutic category. The size, strategy, and negotiating power of these PBMs differ substantially and therefore the rebates paid by manufacturers are negotiated individually with each PBM, and vary substantially. Therefore, to understand the extent of Mylan's market power and the competitive impacts of its actions, it is critical to evaluate this competition at the PBM level.

310.   The Horizontal Merger Guidelines recognize that "if prices are negotiated individually with customers, the hypothetical monopolist test may suggest relevant markets that are as narrow as individual customers."[422]

311.   EAI manufacturers do not set a single price for end payors. While they generally

---

[416]   Scott Morton Report, ¶ 57.
[417]   Scott Morton Report, ¶ 58 and Figure 6.
[418]   Scott Morton Report, ¶ 59.
[419]   Scott Morton Report, ¶¶ 60-62.
[420]   Scott Morton Report, ¶¶ 63-67.
[421]   Scott Morton Report, ¶¶ 68-69.
[422]   "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, § 4.1.4.

**HIGHLY CONFIDENTIAL**

sell to the retail channel through pharmaceutical wholesalers at WAC price, net prices are substantially influenced by rebates and other discounts individually negotiated in PBM contracts.

312.　In this way, manufacturers, including Mylan and Sanofi, can price discriminate between PBMs/end payors. For example, ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

313.　Thus focusing on aggregate shares in the EAI market across PBMs, like what Professor Scott Morton does here, would not provide an accurate view of how competition at different PBMs unfolded. As the numerous examples I discussed previously show, Mylan made competitive offers with large rebates in response to PBMs' requests for competition for contracts.

**XI.C.　After Auvi-Q's entry, EpiPen did not have market power in the EAI device market**

314.　Professor Scott Morton opines that "Mylan had monopoly power in the sale of EAI devices in the US both before and during the entire period when Sanofi was selling Auvi-Q" and "continued to have monopoly power" after Auvi-Q's recall.[424]

**XI.C.1.　Ex-post market shares are not reliable measures of market power where, as here, there is "competition for the contract"**

315.　Professor Scott Morton appears to rely in part for her monopoly-power conclusions on her claim that "Mylan maintained a dominant market share."[425] However, a high market share does not create a presumption of monopoly power or even antitrust

---

[423]　"EpiPen Payer Landscape – 2014," MYEP01228274.

[424]　Scott Morton Report, ¶ 71. Professor Scott Morton makes several assertions in support of this: (1) both data and Mylan's statements and internal documents show that Mylan had high market shares in the relevant period; (2) Mylan had "a committed customer base that would not easily switch away from the EpiPen" due to EAI characteristics (training, familiarity, and crisis use);　(3) barriers to entry were high; (4) Mylan increased its prices dramatically during the relevant period, and the increases in both list and net prices are direct evidence of Mylan's market power; and (5) Mylan rescinded its rebates and increased prices on EpiPen following Auvi-Q's recall from the market. (Scott Morton Report, § V.B.)

[425]　Scott Morton Report, ¶ 10b. ("All throughout the relevant time-period, Mylan had monopoly power in the U.S. EAI market. Mylan maintained a dominant market share and was able to control and raise prices and exclude competitors, all without losing meaningful market share.")

market power more generally.[426] Questions of market power generally, and monopoly power in particular, are ones which quantifying market share cannot fully answer.[427]

316. First, as I explain earlier, following Auvi-Q's launch, PBMs solicited bids from both Mylan and Sanofi for formulary placement. There is ample competition ex-ante. Thus, ex-post shares reflect the outcome of ex-ante competition for PBM contracts.

317. The economic literature teaches that market share as one indicator of market power can a poor proxy. This is particularly true in bidding markets, where even the dominant firm can face effective competition from firms with very low market shares. As explained in Langenfeld (1996):[428]

> In markets characterized by bidding behavior, competitive effects analysis highlights a tension in measuring the competitive impact of industry participants. It is often argued that in a bidding market, each firm should be given the same market share because the past is a poor predictor of future market shares. In effect, each firm has a chance to win new contracts, so any attempt by one or more firms to raise price above the competitive level will allow firms that have won relatively few bids to expand their sales significantly and defeat the attempted price increase.

318. Thus, ex-post market shares are not a reliable indicator of market power where, as here, Mylan and Sanofi engaged in competition for the contracts at PBMs.

319. Second, as a general matter, market power refers to the ability of a firm to restrict output in order to elevate price.[429] Market share is a retrospective quantification of a firm's output relative to the collective output of the other firms in the relevant market. Questions of market power are, in contrast, prospective and hypothetical/counterfactual in nature. By themselves, market-share metrics do not inform the question of whether that firm could profitably restrict industry-wide output. For example, as Professor Dennis

---

[426] "[M]arket share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share." (*American Council, Certified Podiatric Physicians v. American Board Podiatric Surg.*, 185 F.3d 606, 623 (6th Cir. 1999) at *623.)

[427] For example: "Market shares do not constitute answers to questions about market power…. The two are related, but each measures a different type of phenomenon." (Louis Kaplow (2011) "Market share thresholds: on the conflation of empirical assessments and legal policy judgments," *Journal of Competition Law & Economics*, 7(2), 243–276 at 244.

[428] James A. Langenfeld, "The Merger Guidelines As Applied," *The Economics of the Antitrust Process*, Boston, MA: Springer US (1996), 41–64 at 51.

[429] For example: "Market power generally is defined as the power of a firm to restrict output and thereby increase the selling price of its goods in the market." (*Ryko Mfg. Co. v. Eden Services*, 823 F. 2d 1215 - Court of Appeals, 8th Circuit 1987, at *1232.)

Carlton explains:[430]

> [T]he definition of a market and the use of market shares and changes in market shares are at best crude first steps to begin an analysis. I would use them to eliminate frivolous antitrust cases when shares are low, but would use them cautiously for anything else. Their usefulness in Section 2 cases is especially weak.

320.    The question of whether Mylan has monopoly power is equivalent to asking: Is Mylan competitively undisciplined by other firms? Mylan's market share at any point in time does not answer this question.

321.    The insufficiency of market share to inform questions of market power is amplified when the question is one of monopoly power. The relevant question is not how large a market share Mylan had at any time but rather whether Mylan could maintain its market share (a) when confronted with an attractively priced competing product and (b) without making significant concessions as responses to this competition.[431]

322.    A high market share does not reliably inform whether rivals, actual or potential, would increase supply in response to an exercise of market power or monopoly power.

323.    Whether other firms have the ability to increase output depends on whether those firms have the *capacity* to produce. Market share only indicates what part of those firms' capacities each *actually used* in a given time period.

324.    Because increases in supply can come from other incumbents and not just from new entrants, a demonstration of monopoly requires not just establishing barriers to entry; it requires as well establishing barriers to *expansion*.[432]

325.    Professor Scott Morton offers no evidence demonstrating the lack of potential for supply increases by existing firms and for that reason her market-power/monopoly-power analysis is incomplete and therefore unreliable. Indeed, Professor Scott Morton opines

---

[430]  Dennis W. Carlton, "Market Definition: Use and Abuse," *Competition Policy International*, Vol. 3, No. 1 (Spring 2007), 3-27 at 3.

[431]  For example: "In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share." (*US v. Syufy Enterprises*, 903 F. 2d 659 - Court of Appeals, 9th Circuit 1990, at *665–666; italics in original.)

[432]  For example, see *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F. 3d 1421 - Court of Appeals, 9th Circuit 1995 at *1439. "We next address the final factors in market power analysis: barriers to entry and barriers to expansion. A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and *show that existing competitors lack the capacity to expand their output to challenge the predator's high price*." (Italics added.)

that, but for Mylan's conduct, Sanofi would have secured "substantial market share."[433] This necessarily implies that Sanofi had access to sufficient production capacity to supply that "substantial market share."

### XI.C.2. PBMs have significant buyer power by pulling together downstream demand to negotiate rebates from manufacturers

326. PBMs have substantial buyer power. There is a high degree of concentration among PBMs. The PBM industry has also seen a growing consolidation over time. In January 2014, Sanofi noted that,



327. Exhibit 15 shows that from January 2013 to October 2015, the period during which Auvi-Q was sold by Sanofi, the top five PBMs (ESI, CVS, OptumRx, Prime, and MedImpact) accounted for more than 75% of lives covered by commercial plans. ESI alone covered roughly 85-90 million lives in 2017.[436] Professor Scott Morton's Table 2 confirms the size of these large PBMs.

328. Professor Scott Morton agrees that PBMs have large "countervailing buyer power," stating:[437]

> PBMs negotiate with pharmaceutical firms on behalf of insurers and government agencies, taking advantage of the scale of large buyers to exert leverage on prices for pharmaceuticals. PBMs also can take advantage of their informational advantage about product prices and

---

[433] Scott Morton Report, ¶ 197. ("While I elaborate on the harm suffered by Sanofi below… that harm stems from the fact that, as a result of Mylan's anticompetitive behavior, Sanofi was unable to secure the substantial market share that both it and Mylan forecasted it would.")

[434] Email from ███████████████████████████ January 17, 2014, SAN-EPI-1151885-96 at 85.

[435] Viehbacher (Sanofi) Deposition, pp. 164-166.

[436] 30(b)(6) Kautzner (ESI) Deposition, p. 31. ("Q. Let's – let's start it with as of 2017? How many lives did ESI cover? A. So Express Scripts roughly covered, at the time, a range of 85 to 90 million members.")

[437] Scott Morton Report, ¶ 14.

> alternatives to influence choices made by less well informed HCPs and patients. One important tool used by PBMs to influence patient choice and mitigate supplier bargaining power is the creation of formularies.

329.    In addition, as I describe in Section VI.A, Professor Scott Morton's own report, her academic publications, and her testimony in front of Congress all recognize the importance of PBMs using formularies and exclusion lists to move shares and drive down drug prices. I have also provided numerous examples to illustrate how PBMs negotiated with Mylan and Sanofi to retrieve large rebates and drive down EAI device prices. Testimony from PBMs also supports that they lowered net prices for their clients as a result of aggressive utilization management.

330.    In sum, it is beyond dispute that the presence of PBMs provides a powerful constraint on drug manufacturers' prices in general and Mylan's pricing of EpiPen in particular.

### XI.C.3.        Mylan lowered prices substantially in response to competition from Auvi-Q

331.    Professor Scott Morton points to "net price increases" by Mylan after Auvi-Q's entry as direct evidence that Mylan had monopoly power. In particular, she alleges that Mylan was able to "charge higher net prices to PBMs while Auvi-Q was on the market than it was prior to Auvi-Q."[438] In her Figure 8, ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ Professor Scott Morton's analysis is flawed for a number of reasons.

332.    First, she inappropriately looks to the price Mylan charged in Q1 2013 as a benchmark for evaluating the effect of competition from Auvi-Q.

333.    Instead, the appropriate benchmark should be the net price that Mylan would have charged but-for Auvi-Q's entry. As I have shown previously in Exhibit 6, because Mylan increased its rebates substantially in response to Auvi-Q's competition, EpiPen's net prices following Auvi-Q's entry are actually lower, rather than higher, than EpiPen's net

---

[438]    Scott Morton Report, ¶ 87.
[439]    Scott Morton Report, ¶ 87 and Figure 8.

prices without Auvi-Q entry, █████████████████████████████. In addition, the rate of increase of EpiPen's net price following Auvi-Q's entry was lower than that prior to the entry. These facts belie the allegation that Mylan had monopoly power with the presence of Auvi-Q as a competitor.

334.   Second, as I explained above, rebate negotiations are PBM-specific. Mylan's net prices and rebates could vary from PBM to PBM. Therefore, looking at average net prices across PBMs would not allow one to accurately assess what occurred at each individual PBM. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

335.   Professor Scott Morton also pointed to an isolated instance where she alleges that █████████████████████████████████████████. This, even if true, suggests that Sanofi was a substantial competitive constraint when it was on the market. On the other hand, according to Professor Scott Morton's own data (shown in Figure 8), ██████████████████████████████████████

336.   Notably, Mylan did not exclude competition from Auvi-Q. Auvi-Q continues to be sold by kaléo today. The only time Auvi-Q was off of the market was due to Sanofi itself, as a result of the complete recall in 2015, which Professor Scott Morton does not allege to be the result of Mylan's challenged conduct.

### XI.C.4.        EpiPen faced competition from generic versions

337.   Professor Scott Morton also alleges that "Mylan continued to have monopoly power after Auvi-Q was voluntarily recalled from the market."[440] She points to the relatively high market share of EpiPen following Auvi-Q's entry. But she acknowledges that Mylan's volume share dropped below 80% by the end of 2017.[441]

338.   Mylan also launched its generic EpiPen in December 2016 at a price more than 50% lower than its branded EpiPen product. My analysis of the IMS data shows that the weighted average EpiPen price dropped following Mylan AG's launch, suggesting a significant share of patients benefited from the lower prices.

---

[440]   Scott Morton Report, ¶ 71.
[441]   Scott Morton Report, Figure 7B.

339.     In addition, Mylan continues to face competition from other generic products. For example, Impax reached a deal in January 2017 to offer its Adrenaclick AG at all CVS pharmacies at a significantly discounted price (as well as a coupon program).[442] One Mylan executive acknowledged at the time that Mylan lost about 15% market share in the first 2-3 weeks following the Impax-CVS deal due to CVS aggressively switching patients to the Adrenaclick AG product.[443] Thus, the presence of generic EAI devices, even if they are not AB-rated to Mylan's EpiPen, can still provide PBMs the leverage to switch shares away from EpiPen. I note that Professor Scott Morton, in her damages analysis, assumes that ███████████████████████████████████████ ███████████████████ This undermines her opinion that the relevant market is all EAI devices (including EpiPen generics and Auvi-Q).

**XI.D.  Mylan's challenged conduct, considered as a whole, did not substantially foreclose Sanofi**

340.     Professor Scott Morton contends that it is not sufficient to look separately at each individual piece of conduct that is challenged, but rather one has to evaluate whether the conduct taken together foreclosed competition.

341.     I have evaluated this, and for all the reasons stated above, it did not.

---

[442]   See, e.g., "CVS Health Offers Patients Lowest Cash Price in the Market for Generic Epinephrine Auto-injector to Treat Allergic Reactions," CVS Health News Release, January 12, 2017, available at <https://cvshealth.com/newsroom/press-releases/cvs-health-offers-patients-lowest-cash-price-market-generic-epinephrine-auto>, (accessed March 20, 2019).

[443]   Email from Bruce Foster (Mylan) to Heather Dibblee (Optum), et al., "RE: Can we set up time to meet next week," February 17, 2017, MYEP00082319.

[444]   Scott Morton Report, ¶ 220.

Robert D. Willig

March 25, 2019

HIGHLY CONFIDENTIAL



| Exhibit 2: Mylan's Contract Prices Were Lower than Sanofi's Offered Prices for Large PBMs | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PBM/Payor | Mylan Contract | | | | | | Sanofi Offer | | | | | | Comparison Period | |
| | Contract Date | WAC | Rebate | Admin Fee | Price Protection | Net Price | Contract Date | WAC | Rebate | Admin Fee | Price Protection | Net Price | Start | End |
| Aetna | 1/1/2014 | $346 | 15% | 0% | 12% | $282 | 1/1/2014 | $381 | 10% | 0.00% | 0% | $343 | 1/1/2014 | 12/1/2014 |
| ESI | 1/1/2014 | $345 | 18.625% | 4.375% | 10% | $251 | 1/1/2014 | $379 | 25.625% | 4.375% | 0% | $266 | 1/1/2014 | 12/1/2014 |
| MedImpact | 7/1/2013 | $294 | 20% | 0% | 0% | $235 | 7/1/2013 | $309 | 15.0% | 1.00% | 0% | $260 | 7/1/2013 | 6/1/2014 |
| UnitedHealth | 7/1/2013 | $302 | 20% | 3% | 8% | $201 | 8/1/2013 | $324 | 19.7% | 3.00% | 5% | $244 | 8/1/2013 | 7/1/2014 |

**Notes:** Average contract/offer values are calculated based on the first year of overlap between the Mylan contract and Sanofi offer. For each Mylan contract the rebate and price protection associated with placing a prior authorization or step edit on Auvi-Q or excluding it from the formulary is used. For each Sanofi offer the highest rebate and price protection terms are used.
**Sources:** MYEP00086244, MYEP00000926, MedImpact_00044, MYEP00260323, SAN-EPI_A-0100045, SAN-EPI-0434020, SAN-EPI_A-0168416, SAN-EPI-0764725, EAI 00041402 Optum Rx, Backup to the Scott Morton Report, SAN-EPI-0002167, and IMS Xponent data.

| Exhibit 3: Auvi-Q Had Coverage at Largest Commercial PBMs | | | |
|---|---|---|---|
| **PBM** | **Auvi-Q Status** | | |
| | **2013 Q3** | **2014 Q3** | **2015 Q3** |
| CVS | Covered | **Preferred** | **Preferred** |
| Prime | Covered | Covered | Covered |
| CIGNA | Covered | Covered | Covered |
| ESI | Covered | Not Covered | **Preferred** |
| Aetna | | Covered (PA/ST) | **Preferred** |
| OptumRx (Including United Healthcare) | Not Covered | Not Covered | Not Covered |
| MedImpact | Not Listed | Not Covered | Not Covered |

Notes: Commercial plans include entries where the channel is "Commercial" or "Health Exchange." The PBMs listed above are those analyzed by Professor Scott Morton in Figure 8 of her report. The listed Auvi-Q status is the most common status for each PBM by lives covered in the third quarter of each year. Aetna's Auvi-Q status for 2013 is left blank due to lack of information from the MMIT data.

Source: MMIT data.



Exhibit 4: CVS, Express Scripts, and OptumRx Have Extensively Used Formulary Exclusion Lists

**Sources:** CVS exclusion lists, 2012-2017; Express Scripts exclusion lists, 2014-2017; OptumRx exclusion lists, 2016-2017.
**Note:** Express Scripts did not have exclusion lists in 2012 or 2013. OptumRx did not have exclusion lists for any standard formulary prior to 2016.

Highly Confidential



Exhibit 5: EpiPen's Net Price Was Substantially Lower As a Result of Auvi-Q's Entry

**Sources:** EAI WAC data (SAN-EPI-0002167); Mylan managed care data (MYEP01385719).
**Notes:** (1) But-for net price is calculated by applying the average rebate percentage in the pre-entry period to WAC in the post-entry period. (2) Actual net price is calculated as WAC price minus the quantity weighted discount for the quarter. (3) Consistent with Professor Scott Morton's Figure 8, net prices are calculated for commercial plans only. (4) Actual net prices are the average WAC per pen net of any rebates, price protection, or admin fees paid to PBMs or payers. (5) The CAGR of EpiPen's WAC before and after Auvi-Q's launch was 26%. (6) Quarterly WAC prices are an average of the daily WAC prices within that quarter.

Highly Confidential



**Exhibit 6: EpiPen Rebates to PBMs Increased Substantially After Auvi-Q's Entry**

January 2013:
Auvi-Q Entry

EpiPen's Rebates:
2013: **10%**
2014: **17%**
2015: **36%**

EpiPen's Rebates:
2011: **8%**
2012: **8%**

Average Discount from WAC (y-axis: 0% to 40%)

x-axis: 2011Q3, 2011Q4, 2012Q1, 2012Q2, 2012Q3, 2012Q4, 2013Q1, 2013Q2, 2013Q3, 2013Q4, 2014Q1, 2014Q2, 2014Q3, 2014Q4, 2015Q1, 2015Q2, 2015Q3

■ Average Rebate

**Sources:** EAI WAC data (SAN-EPI-0002167); Mylan managed care data (MYEP01385719).
**Notes:** (1) EpiPen rebates include any rebates, price protection, or admin fees paid to PBMs or payers. (2) Average rebates are quantity weighted. (3) EpiPen WACs are calculated using EAI WAC data. (4) Average rebates are for commercial plans only.

Highly Confidential

**Exhibit 7a: Price-Cost Test for PBM Contracts Offering Rebates for Exclusive Formulary Position**
**(January 2013 - October 2015)**

| | PBM | First Month of Contract Period Used | Last Month of Contract Period Used | EAI Doses Through PBM in Period | Average EpiPen WAC | Discount off WAC | Net Price | Average Mylan COGS | Priced Above Cost? |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Aetna | 1/1/2014 | 6/1/2014 | 94,033 | $323 | 15% | $274 | $57.32 | **YES** |
| 2 | Aetna | 7/1/2014 | 12/1/2014 | 147,593 | $362 | 15% | $307 | $57.32 | **YES** |
| 3 | CVS | 1/1/2013 | 6/1/2013 | 536,571 | $241 | 9% | $219 | $54.78 | **YES** |
| 4 | CVS | 7/1/2013 | 6/1/2014 | 1,309,309 | $294 | 14% | $253 | $55.85 | **YES** |
| 5 | CVS | 7/1/2014 | 12/1/2014 | 834,156 | $361 | 14% | $311 | $57.32 | **YES** |
| 6 | CVS | 1/1/2015 | 6/1/2015 | 643,779 | $426 | 43% | $243 | $61.49 | **YES** |
| 7 | CVS | 7/1/2015 | 10/1/2015 | 697,059 | $461 | 43% | $263 | $61.49 | **YES** |
| 8 | ESI | 1/1/2013 | 12/1/2013 | 1,560,249 | $260 | 10% | $234 | $54.78 | **YES** |
| 9 | ESI | 1/1/2014 | 12/1/2014 | 1,555,903 | $345 | 23% | $266 | $57.32 | **YES** |
| 10 | ESI | 1/1/2015 | 10/1/2015 | 1,437,258 | $444 | 45% | $244 | $61.49 | **YES** |
| 11 | MedImpact | 7/1/2013 | 10/1/2015 | 433,841 | $365 | 20% | $292 | $58.26 | **YES** |
| 12 | OptumRx | 1/1/2013 | 6/1/2013 | 295,564 | $241 | 8% | $221 | $54.78 | **YES** |
| 13 | OptumRx | 7/1/2013 | 12/1/2013 | 421,925 | $274 | 23% | $211 | $54.78 | **YES** |
| 14 | OptumRx | 1/1/2014 | 6/1/2015 | 1,112,389 | $371 | 23% | $286 | $58.66 | **YES** |
| 15 | OptumRx | 7/1/2015 | 10/1/2015 | 381,259 | $461 | 23% | $355 | $61.49 | **YES** |
| 16 | Prime | 4/1/2014 | 4/1/2015 | 542,510 | $366 | 20% | $293 | $58.35 | **YES** |
| 17 | Prime | 5/1/2015 | 10/1/2015 | 332,227 | $461 | 20% | $369 | $61.49 | **YES** |
| 18 | Aetna | 1/1/2014 | 12/1/2014 | 218,440 | | | | | |
| 19 | Aetna | 1/1/2015 | 10/1/2015 | 218,953 | | | | | |
| 20 | Cigna | 1/1/2013 | 12/1/2013 | 1,829 | | | | | |
| 21 | Cigna | 1/1/2014 | 3/1/2015 | 1,900 | **Did Not Offer Rebates Conditional On Exclusive Position** | | | | |
| 22 | Cigna | 4/1/2015 | 10/1/2015 | 991 | | | | | |
| 23 | MedImpact | 1/1/2013 | 6/1/2013 | 73,241 | | | | | |
| 24 | Prime | 1/1/2013 | 3/1/2013 | 73,427 | | | | | |
| 25 | Prime | 4/1/2013 | 3/1/2014 | 431,275 | | | | | |

Notes: "Discount off WAC" includes discounts for rebates and admin fees.
Sources: PBM Contracts; IMS Xponent data; Mylan P&L; WAC data; Mylan Sales data; Scott Morton Report backup.

**Exhibit 7b: Price-Cost Test for PBM Contracts Offering Rebates for Exclusive Formulary Position**
**(January 2013 - October 2015) - Including Price Protection**

| | PBM | First Month of Contract Period Used | Last Month of Contract Period Used | EAI Doses Through PBM in Period | Average EpiPen WAC | Discount off WAC | Net Price | Average Mylan COGS | Priced Above Cost? |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Aetna | 1/1/2014 | 6/1/2014 | 94,033 | $323 | 16% | $270 | $57.32 | YES |
| 2 | Aetna | 7/1/2014 | 12/1/2014 | 147,593 | $362 | 20% | $289 | $57.32 | YES |
| 3 | CVS | 1/1/2013 | 6/1/2013 | 536,571 | $241 | 9% | $219 | $54.78 | YES |
| 4 | CVS | 7/1/2013 | 6/1/2014 | 1,309,309 | $294 | 14% | $253 | $55.85 | YES |
| 5 | CVS | 7/1/2014 | 12/1/2014 | 834,156 | $361 | 14% | $311 | $57.32 | YES |
| 6 | CVS | 1/1/2015 | 6/1/2015 | 643,779 | $426 | 49% | $217 | $61.49 | YES |
| 7 | CVS | 7/1/2015 | 10/1/2015 | 697,059 | $461 | 53% | $216 | $61.49 | YES |
| 8 | ESI | 1/1/2013 | 12/1/2013 | 1,560,249 | $260 | 10% | $234 | $54.78 | YES |
| 9 | ESI | 1/1/2014 | 12/1/2014 | 1,555,903 | $345 | 27% | $251 | $57.32 | YES |
| 10 | ESI | 1/1/2015 | 10/1/2015 | 1,437,258 | $444 | 47% | $236 | $61.49 | YES |
| 11 | MedImpact | 7/1/2013 | 10/1/2015 | 433,841 | $365 | 20% | $292 | $58.26 | YES |
| 12 | OptumRx | 1/1/2013 | 6/1/2013 | 295,564 | $241 | 8% | $221 | $54.78 | YES |
| 13 | OptumRx | 7/1/2013 | 12/1/2013 | 421,925 | $274 | 27% | $200 | $54.78 | YES |
| 14 | OptumRx | 1/1/2014 | 6/1/2015 | 1,112,389 | $371 | 44% | $209 | $58.66 | YES |
| 15 | OptumRx | 7/1/2015 | 10/1/2015 | 381,259 | $461 | 28% | $333 | $61.49 | YES |
| 16 | Prime | 4/1/2014 | 4/1/2015 | 542,510 | $366 | 25% | $274 | $58.35 | YES |
| 17 | Prime | 5/1/2015 | 10/1/2015 | 332,227 | $461 | 25% | $344 | $61.49 | YES |
| 18 | Aetna | 1/1/2013 | 12/1/2013 | 218,440 | | | | | |
| 19 | Aetna | 1/1/2015 | 10/1/2015 | 218,953 | | | | | |
| 20 | Cigna | 1/1/2013 | 12/1/2013 | 1,829 | | Did Not Offer Rebates Conditional On Exclusive Position | | | |
| 21 | Cigna | 1/1/2014 | 3/1/2015 | 1,900 | | | | | |
| 22 | Cigna | 4/1/2015 | 10/1/2015 | 991 | | | | | |
| 23 | MedImpact | 1/1/2013 | 6/1/2013 | 73,241 | | | | | |
| 24 | Prime | 1/1/2013 | 3/1/2013 | 73,427 | | | | | |
| 25 | Prime | 4/1/2013 | 3/1/2014 | 431,275 | | | | | |

Notes: "Discount off WAC" includes discounts for rebates, admin fees, and price protection.
Sources: PBM Contracts; IMS Xponent data; Mylan P&L; WAC data; Mylan Sales data; Scott Morton Report backup.

| Exhibit 8: There Was a Level Playing Field for Contestable Units | | | | |
|---|---|---|---|---|
| | **Mylan** | | | **Sanofi** |
| | **Offers No Rebate** | **Offers 30% Rebate** | **Effective Incremental Offer for Contestable Demand** | **Offer for Contestable Demand** |
| Market Units | 1,000 | 1,000 | **1,000** | **1,000** |
| Contestable Units | 500 | 500 | **500** | **500** |
| List Price | $500 | $500 | **$500** | **$500** |
| Offered Rebate % | 0% | 30% | **60%** | **60%** |
| Contestable Units Won | 0 | 500 | **500** | **500** |
| Non-Contestable Units Won | 500 | 500 | **0** | **0** |
| Net Price | $500 | $350 | **$200** | **$200** |
| Gross Sales | $250,000 | $500,000 | **$250,000** | **$250,000** |
| Total Rebate | $0 | $150,000 | **$150,000** | **$150,000** |
| Net Sales | $250,000 | $350,000 | **$100,000** | **$100,000** |



Exhibit 9a: Properly Analyzed, the Data Show That ESI's High Performance Formulary's Exclusion of EpiPen Shifted Almost All Share Away From EpiPen

Jan. 2015 - EpiPen placed on exclusion list of ESI High Performance formulary.

Notes: The plotted lines represent volume weighted averages across plans in the ESI High Performance Formulary using EpiPen shares and EAI volume from MYEP00531470. Closed plans were identified as plans that did not trigger rebates from Mylan in 2015 as per MYEP01246195.
Sources: MYEP00531470, MYEP01246195.

Highly Confidential



Notes: The plotted open/controlled line represents volume weighted averages across plans in the ESI High Performance Formulary using EpiPen shares and EAI volume from MYEP00531470. Closed plans were identified as plans that did not trigger rebates from Mylan in 2015 as per MYEP01246195 and are represented by dashed lines.
Sources: MYEP00531470, MYEP01246195.



**Exhibit 10: The Few Mylan Contracts Analyzed by FSM Are Not Representative of Mylan's Broader Rebate Agreements**

Notes: Analysis looks at Mylan rebate contracts in effect from January 2013 through October 2015 for Aetna, Cigna, CVS, ESI, MedImpact, Optum and Prime. Does not include Admin Fees, or value from Price Protection.

Sources: Mylan PBM rebate agreements.

**Exhibit 11a: Incremental Cost Test for PBM Contracts Offering Rebates for Exclusive Formulary Position**
**(January 2013 - October 2015)**

| | PBM | First Month of Contract Period Used | Last Month of Contract Period Used | EAI Doses Through PBM in Period | Average EpiPen WAC | Discount off WAC | Net Price for Contestable Units | Average Mylan COGS | Priced Above Cost? |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Aetna | 1/1/2014 | 6/1/2014 | 94,033 | $323 | 15% | $269 | $57.32 | **YES** |
| 2 | Aetna | 7/1/2014 | 12/1/2014 | 147,593 | $362 | 15% | $301 | $57.32 | **YES** |
| 3 | CVS | 1/1/2013 | 6/1/2013 | 536,571 | $241 | 9% | $217 | $54.78 | **YES** |
| 4 | CVS | 7/1/2013 | 6/1/2014 | 1,309,309 | $294 | 14% | $248 | $55.85 | **YES** |
| 5 | CVS | 7/1/2014 | 12/1/2014 | 834,156 | $361 | 14% | $305 | $57.32 | **YES** |
| 6 | CVS | 1/1/2015 | 6/1/2015 | 643,779 | $426 | 43% | $222 | $61.49 | **YES** |
| 7 | CVS | 7/1/2015 | 10/1/2015 | 697,059 | $461 | 43% | $241 | $61.49 | **YES** |
| 8 | ESI | 1/1/2013 | 12/1/2013 | 1,560,249 | $260 | 10% | $231 | $54.78 | **YES** |
| 9 | ESI | 1/1/2014 | 12/1/2014 | 1,555,903 | $345 | 23% | $257 | $57.32 | **YES** |
| 10 | ESI | 1/1/2015 | 10/1/2015 | 1,437,258 | $444 | 45% | $222 | $61.49 | **YES** |
| 11 | MedImpact | 7/1/2013 | 10/1/2015 | 433,841 | $365 | 20% | $284 | $58.26 | **YES** |
| 12 | OptumRx | 1/1/2013 | 6/1/2013 | 295,564 | $241 | 8% | $219 | $54.78 | **YES** |
| 13 | OptumRx | 7/1/2013 | 12/1/2013 | 421,925 | $274 | 23% | $204 | $54.78 | **YES** |
| 14 | OptumRx | 1/1/2014 | 6/1/2015 | 1,112,389 | $371 | 23% | $276 | $58.66 | **YES** |
| 15 | OptumRx | 7/1/2015 | 10/1/2015 | 381,259 | $461 | 23% | $343 | $61.49 | **YES** |
| 16 | Prime | 4/1/2014 | 4/1/2015 | 542,510 | $366 | 20% | $285 | $58.35 | **YES** |
| 17 | Prime | 5/1/2015 | 10/1/2015 | 332,227 | $461 | 20% | $359 | $61.49 | **YES** |
| 18 | Aetna | 1/1/2013 | 12/1/2013 | 218,440 | | | | | |
| 19 | Aetna | 1/1/2015 | 10/1/2015 | 218,953 | | | | | |
| 20 | Cigna | 1/1/2013 | 12/1/2013 | 1,829 | | | | | |
| 21 | Cigna | 1/1/2014 | 3/1/2015 | 1,900 | **Did Not Offer Rebates Conditional On Exclusive Position** | | | | |
| 22 | Cigna | 4/1/2015 | 10/1/2015 | 991 | | | | | |
| 23 | MedImpact | 1/1/2013 | 6/1/2013 | 73,241 | | | | | |
| 24 | Prime | 1/1/2013 | 3/1/2014 | 73,427 | | | | | |
| 25 | Prime | 4/1/2013 | 3/1/2014 | 431,275 | | | | | |

Notes: Assumes 90% contestable share. "Discount off WAC" includes discounts for rebates and admin fees.
Sources: PBM Contracts; IMS Xponent data; Mylan P&L; WAC data; Mylan Sales data; Scott Morton Report backup.

**Exhibit 11b: Incremental Cost Test for PBM Contracts Offering Rebates for Exclusive Formulary Position
(January 2013 - October 2015) - Including Price Protection**

| | PBM | First Month of Contract Period Used | Last Month of Contract Period Used | EAI Doses Through PBM in Period | Average EpiPen WAC | Discount off WAC | Net Price for Contestable Units | Average Mylan COGS | Priced Above Cost? |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Aetna | 1/1/2014 | 6/1/2014 | 94,033 | $323 | 16% | $265 | $57.32 | YES |
| 2 | Aetna | 7/1/2014 | 12/1/2014 | 147,593 | $362 | 20% | $281 | $57.32 | YES |
| 3 | CVS | 1/1/2013 | 6/1/2013 | 536,571 | $241 | 9% | $217 | $54.78 | YES |
| 4 | CVS | 7/1/2013 | 6/1/2014 | 1,309,309 | $294 | 14% | $248 | $55.85 | YES |
| 5 | CVS | 7/1/2014 | 12/1/2014 | 834,156 | $361 | 14% | $305 | $57.32 | YES |
| 6 | CVS | 1/1/2015 | 6/1/2015 | 643,779 | $426 | 49% | $194 | $61.49 | YES |
| 7 | CVS | 7/1/2015 | 10/1/2015 | 697,059 | $461 | 53% | $189 | $61.49 | YES |
| 8 | ESI | 1/1/2013 | 12/1/2013 | 1,560,249 | $260 | 10% | $231 | $54.78 | YES |
| 9 | ESI | 1/1/2014 | 12/1/2014 | 1,555,903 | $345 | 27% | $241 | $57.32 | YES |
| 10 | ESI | 1/1/2015 | 10/1/2015 | 1,437,258 | $444 | 47% | $213 | $61.49 | YES |
| 11 | MedImpact | 7/1/2013 | 10/1/2015 | 433,841 | $365 | 20% | $284 | $58.26 | YES |
| 12 | OptumRx | 1/1/2013 | 6/1/2013 | 295,564 | $241 | 8% | $219 | $54.78 | YES |
| 13 | OptumRx | 7/1/2013 | 12/1/2013 | 421,925 | $274 | 27% | $191 | $54.78 | YES |
| 14 | OptumRx | 1/1/2014 | 6/1/2015 | 1,112,389 | $371 | 44% | $191 | $58.66 | YES |
| 15 | OptumRx | 7/1/2015 | 10/1/2015 | 381,259 | $461 | 28% | $319 | $61.49 | YES |
| 16 | Prime | 4/1/2014 | 4/1/2015 | 542,510 | $366 | 25% | $264 | $58.35 | YES |
| 17 | Prime | 5/1/2015 | 10/1/2015 | 332,227 | $461 | 25% | $331 | $61.49 | YES |
| 18 | Aetna | 1/1/2013 | 12/1/2013 | 218,440 | | | | | |
| 19 | Aetna | 1/1/2015 | 10/1/2015 | 218,953 | | | | | |
| 20 | Cigna | 1/1/2013 | 12/1/2013 | 1,829 | | Did Not Offer Rebates Conditional On Exclusive Position | | | |
| 21 | Cigna | 1/1/2014 | 3/1/2015 | 1,900 | | | | | |
| 22 | Cigna | 4/1/2015 | 10/1/2015 | 991 | | | | | |
| 23 | MedImpact | 1/1/2013 | 6/1/2013 | 73,241 | | | | | |
| 24 | Prime | 1/1/2013 | 3/1/2014 | 73,427 | | | | | |
| 25 | Prime | 4/1/2013 | 3/1/2014 | 431,275 | | | | | |

Notes: Assumes 90% contestable share. "Discount off WAC" includes discounts for rebates, admin fees, and price protection.
Sources: PBM Contracts; IMS Xponent data; Mylan P&L; WAC data; Mylan Sales data; Scott Morton Report backup.

## Exhibit 12: Sample PBM Bid Grid

**Express Scripts, Inc.**

*Rebate Matrix Issued for 2014-2015 PSG Rebate Program Cycle*

Company hereby offers for acceptance by Express Scripts pursuant to the terms of the Agreement, the Rebate amounts specified in this bid offer sheet for utilization of Company's Products.
If accepted by Express Scripts, such rebate offers shall be effective as of the effective date of the Amendment and shall be incorporated by the Amendment as a new Attachment A-1 to Exhibit A of the Agreement.

| Program: | Commercial |
|---|---|
| Manufacturer: | Sanofi-Aventis |
| CPC: | |
| Product: | |
| Effective Date: | 1/1/2014 |
| Price Protection Percentage [1] : | |
| Non-Preferred Access Rate - Restricted [2]: | |
| Non-Preferred Access Rate - Unrestricted [2]: | |



### Retail Pharmacy

| Benefit Control [3] | Rebates - Stated as % of WAC | | | |
|---|---|---|---|---|
| | 1 of many | 1 of 3 | 1 of 2 | Exclusive |
| Open | | | | |
| Controlled | | | | |
| Closed | | | | |
| PST [5] | | | | |

| Additive Enhancements [4] | 1 of many | 1 of 3 | 1 of 2 | Exclusive |
|---|---|---|---|---|
| Unrestricted [5] | | | | |

### Home Delivery / Specialty Pharmacy

| Benefit Control [3] | Rebates - Stated as % of WAC | | | |
|---|---|---|---|---|
| | 1 of many | 1 of 3 | 1 of 2 | Exclusive |
| Open | | | | |
| Controlled | | | | |
| Closed | | | | |
| PST [5] | | | | |

| Additive Enhancements [4] | 1 of many | 1 of 3 | 1 of 2 | Exclusive |
|---|---|---|---|---|
| Unrestricted [5] | | | | |

*Note: Highlighted cells notate Home Delivery/Specialty Pharmacy rates different than Retail Pharmacy rates, for each corresponding cell on the grid.*

1.) This % will establish the annual Price Protection Allowed Net WAC.

2.) Rebate offered for products covered at the tier with the highest co-pay or coinsurance for branded products.

3.) Base Rebates to which Additive Enhancements, if any, will apply.

4.) Additive Enhancements will be in addition to Base Rebates.

5.) Unrestricted Additive Enhancement is not applicable to PST Base Rebates.

Source: SAN-EPI-0435404

**Exhibit 13a: Professor Scott Morton Improperly Combines "Not Covered" and Prior Authorization/Step Therapy**



**Notes:** Includes plans from all channels. The formulary statuses reported are based on the "Universal" statuses in the MMIT data. "Preferred" includes lives on plans where Auvi-Q's formulary status was "Generic (Preferred)" or "Preferred". "Covered" includes lives on plans where Auvi-Q's formulary status was "Covered" or "Specialty". "Not Covered" includes lives on plans where Auvi-Q's formulary status was "Not Covered". "PA/ST" includes lives on plans where Auvi-Q's formulary status was "Preferred (PA/ST)", "Covered (PA/ST)", or "Specialty (PA/ST)." The set of PA/ST plans therefore indicates plans where Auvi-Q was subject to just a prior authorization requirement, just a step therapy requirement, or subject to both. "Not Listed" includes lives on plans where Auvi-Q's formulary status was "Not Listed".
**Source:** MMIT data.

Highly Confidential

**Exhibit 13b: Auvi-Q Had Extensive Coverage on Commercial Formularies Throughout the Period**



Notes: The commercial channel includes "Commercial" and "Health Exchange" plans. The formulary statuses reported are based on the "Universal" statuses in the MMIT data. "Preferred" includes lives on plans where Auvi-Q's formulary status was "Generic (Preferred)" or "Preferred". "Covered" includes lives on plans where Auvi-Q's formulary status was "Covered" or "Specialty". "Not Covered" includes lives on plans where Auvi-Q's formulary status was "Not Covered".  "PA/ST" includes lives on plans where Auvi-Q's formulary status was "Preferred (PA/ST)", "Covered (PA/ST)", or "Specialty (PA/ST)." The set of PA/ST plans therefore indicates plans where Auvi-Q was subject to just a prior authorization requirement, just a step therapy requirement, or subject to both. "Not Listed" includes lives on plans where Auvi-Q's formulary status was "Not Listed".
Source: MMIT data.

Highly Confidential



**Exhibit 13c: Any Foreclosure Caused by the Challenged Conduct Was Small
Jan. 2013 - Oct. 2015, All Channels**

Commercial PA/ST, 6.5%

Commercial Not Covered, 9.7%

All Other Lives, 83.8%

Notes: The percentages in the chart represent the share of covered and uninsured lives from January 2013 to October 2015. Includes plans from all channels. Commercial includes plans where the channel was either "Commercial" or "Health Exchange." The "all other lives" section includes all uninsured lives, all lives under Medicare and Medicaid plans, as well as lives in the commercial sector on plans where the Auvi-Q status was "Generic (Preferred)", "Preferred", "Covered", "Specialty", or "Not Listed."
Sources: MMIT data; "Health Insurance Coverage of the Total Population," Henry J Kaiser Family Foundation, available at <https://www.kff.org/other/state-indicator/total-population/?dataView=1&currentTimeframe=2&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D> (accessed March 23, 2019).

Highly Confidential



**Exhibit 14: EpiPen4Schools Program Accounted For A Small Portion of Total EpiPens Sold**
**Jan. 2013 – Oct. 2015**

Total Non-School EpiPens
97.9%

Total EpiPen4School
Doses
2.1%

School EpiPens (Free) - No
Conditions
2.0%

School EpiPens (Discounted) -
Could Have Conditions
0.1%

■ Total Non-School EpiPens      ■ School EpiPens (Free)      ■ School EpiPens (Discounted)

Notes: Total EpiPen doses exclude "Mylan Free of Charge" transactions that were not charitable donations. Doses that were given out as a part of the EpiPen4Schools data were deducted from total EpiPen sales to avoid double counting.
Sources: MYEP01362498; MYEP00006385.

Highly Confidential



**Exhibit 15: The Top 5 PBMs Accounted for Over 75% of Lives Covered by Commercial Plans
Jan. 2013 - Oct. 2015**

Unknown
7,094,200
4%

Other
33,039,993
20%

MedImpact
10,274,365
6%

Prime Therapeutics
13,077,768
8%

OptumRx
17,307,104
10%

CVS Caremark,
25,031,756,
15%

Express Scripts
62,393,636
37%

Notes: Commercial plans includes entries whose channel is "Commercial" or "Health Exchange". The figures in the text boxes represent the average number of lives covered by the PBM/collection of PBMs in each month of the time period and each PBM's share of the total lives covered over the time period.
Source: MMIT data.



**Exhibit 16a: Professor Scott Morton's Figure 8: Aetna EpiPen and Auvi-Q List Prices and Net Prices per Pen Over Time - Commercial Plans**

**Sources:** Sanofi managed care transaction data (SANOFI0_10659_00002872.xlsx); Aetna invoice data; Graham 30(b)(6) Deposition Exhibit 22, p. 3.
**Notes:** (1) List prices are calculated using Sanofi managed care transaction data (for Auvi-Q) and Aetna invoice data (for EpiPen). If list prices were unavailable from PBM data, the list prices from Graham 30(b)(6) Deposition Exhibit 22, p. 3 were used. (2) Net prices are the average list price per pen net of any rebates, administrative fees, and price protection. (3) Average prices are quantity weighted. (4) Data on rebates paid from Sanofi to Aetna were available from Q2 2014 to Q3 2015.

Highly Confidential



**Exhibit 16b: Professor Scott Morton's Figure 8: CVS/Caremark EpiPen and Auvi-Q List Prices and Net Prices per Pen Over Time - Commercial Plans**

**Sources:** Sanofi managed care transaction data (SANOFI0_10659_00002872.xlsx); CVS/Caremark invoice data; Graham 30(b)(6) Deposition Exhibit 22, p. 3.
**Notes:** (1) List prices are calculated using Sanofi managed care transaction data (for Auvi-Q) and CVS/Caremark invoice data (for EpiPen). If list prices were unavailable from PBM data, the list prices from Graham 30(b)(6) Deposition Exhibit 22, p. 3 were used. (2) Net prices are the average list price per pen net of any rebates, administrative fees, and price protection. (3) Average prices are quantity weighted. (4) Data on commercial rebates paid from Sanofi to CVS/Caremark were available from Q1 2014 to Q3 2015. (5) Auvi-Q's net price in Q2 2014 is higher than its list price due to negative total quantity and sales dollars but positive rebates. The negative transactions in this quarter do not have any rebates associated with them, but the positive transactions do. The net price calculation is as follows: (Total Sales (-667.6) - Total Rebates (300.42))/Total Quantity (-4) = 242.01. Q2 2014 net price calculated for positive transactions only is as follows: (Total Sales (95,967.5) - Total Rebates (300.42))/Total Quantity (575) = 166.38.

Highly Confidential



**Exhibit 16c: Professor Scott Morton's Figure 8: ESI EpiPen and Auvi-Q List Prices and Net Prices per Pen Over Time - Commercial Plans**

**Sources:** Sanofi managed care transaction data (SANOFI0_10659_00002872.xlsx); ESI invoice data; Graham 30(b)(6) Deposition Exhibit 22, p. 3.
**Notes:** (1) List prices are calculated using Sanofi managed care transaction data (for Auvi-Q) and ESI invoice data (for EpiPen). If list prices were unavailable from PBM data, the list prices from Graham 30(b)(6) Deposition Exhibit 22, p. 3 were used. (2) Net prices are the average list price per pen net of any rebates, administrative fees, and price protection. (3) Average prices are quantity weighted. (4) Data on rebates paid from Sanofi to ESI were available from Q3 2013 to Q3 2015.

Highly Confidential

# Attachment A

March 25, 2019

## Curriculum Vitae

**Name**:                     **Robert D. Willig**

**Address**:                 220 Ridgeview Road, Princeton, New Jersey  08540

**Birth**:                     1/16/47; Brooklyn, New York

**Marital Status**:         Married, four children

**Education**:      Ph.D.   Economics, Stanford University, 1973
                            Dissertation:  Welfare Analysis of Policies
                                            Affecting Prices and Products.
                            Advisor:  James Rosse

                    M.S.    Operations Research, Stanford University, 1968.

                    A.B.    Mathematics, Harvard University, 1967.


**Professional Positions**:

Lecturer with the rank of Professor, Woodrow Wilson School of Public and International Affairs, 2/2017 – 6/2019.

Professor of Economics and Public Affairs, Emeritus, Princeton University, 7/2016 –

Professor of Economics and Public Affairs, Princeton University, 7/1978 - 6/2016.

Principal External Advisor, Infrastructure Program, Inter-American Development Bank, 6/97-8/98.

Deputy Assistant Attorney General, U.S. Department of Justice, l989-1991.

Supervisor, Economics Research Department, Bell Laboratories, 1977-1978.

Visiting Lecturer (with rank of Associate Professor), Department of Economics and Woodrow Wilson School, Princeton University, 1977-78 (part time).

Economics Research Department, Bell Laboratories, 1973-77.

Lecturer, Economics Department, Stanford University, 1971-73.

**Other Professional Activities**

ABA Section of Antitrust Law Economics Task Force, 2010-2012

Advisory Committee, Compass Lexecon 2010 -

OECD Advisory Council for Mexican Economic Reform, 2008 - 2009

Senior Consultant, Compass Lexecon, 2008 -

Director, Competition Policy Associates, Inc., 2003-2005

Advisory Bd., <u>Electronic Journal of I.O. and Regulation Abstracts,</u> 1996-2008.

Advisory Board, <u>Journal of Network Industries,</u> 2004-2010.

Visiting Faculty Member (occasional), International Program on Privatization and Regulatory Reform, Harvard Institute for International Development, 1996-2000.

Member, National Research Council Highway Cost Allocation Study Review Committee, 1995-98.

Member, Defense Science Board Task Force on the Antitrust Aspects of Defense Industry Consolidation, 1993-94.

Editorial Board, <u>Utilities Policy,</u> 1990-2001.

Leif Johanson Lecturer, University of Oslo, November 1988.

Member, New Jersey Governor's Task Force on Market-Based Pricing of Electricity, 1987-89.

Co-editor, <u>Handbook of Industrial Organization,</u> 1984-89.

Associate Editor, <u>Journal of Industrial Economics,</u> 1984-89.

Director, Consultants in Industry Economics, Inc., 1983-89, 1991-94.

Fellow, Econometric Society, 1981-.

Organizing Committee, Carnegie-Mellon-N.S.F. Conference on Regulation, 1985.

Board of Editors, <u>American Economic Review,</u> 1980-83.

A-2

Nominating Committee, American Economic Association, 1980-1981.

Research Advisory Committee, American Enterprise Institute, 1980-1986.

Editorial Board, M.I.T. Press Series on Government Regulation of Economic Activity, 1979-93.

Program Committee, 1980 World Congress of the Econometric Society.

Program Committee, Econometric Society, 1979, 1981, 1985.

Organizer, American Economic Association Meetings: 1980, 1982.

American Bar Association Section 7 Clayton Act Committee, 198l.

Principal Investigator, NSF grant SOC79-0327, 1979-80; NSF grant 285-6041, 1980-82; NSF grant SES-8038866, 1983-84, 1985-86.

Aspen Task Force on the Future of the Postal Service, 1978-80.

Organizing Committee of Sixth Annual Telecommunications Policy Research Conference, 1977-78.

Visiting Fellow, University of Warwick, July 1977.

Institute for Mathematical Studies in the Social Sciences, Stanford University, 1975.

**Published Articles and Book Chapters**:

"Is Professor Salop Right That Judge Leon Bungled United States v. AT&T?" (with Janusz Ordover and J. Gregory Sidak), The Criterion Journal on Innovation, v. 3, 249-263, 2018.

"The Role of the Circle Principle in Market Definition," (with Bryan Keating and Jonathan Orszag), The Antitrust Source, April 2018, 1-6.

"Economy-wide and Sectoral Impacts on Workers of Brazil's Internet Rollout" (with Mark A. Dutz, Lucas Ferreira Mation, and Stephen D. O'Connell), Forum for Social Economics, 46:2, 160-177, 2017.

"Two-Sided Market Definition and Competitive Effects for Credit Cards After United States v. American Express" (with J. Gregory Sidak), The Criterion Journal on Innovation, v. 1, 1301, 2016.

"Unilateral Competitive Effects" (with Bryan Keating), in The Oxford Handbook on

A-3

International Antitrust Economics, (Roger D. Blair and D. Daniel Sokol, eds.), Oxford University Press, 2014.

"Activating Actavis: A More Complete Story" (with Barry C. Harris, Kevin M. Murphy, and Matthew B. Wright), Antitrust, vol. 28, No. 2 (Spring), 2014.

"'Reverse Payments' in Settlements of Patent Litigation: Split Opinions on Schering-Plough's K-Dur (2005 and 2012)" (with John P. Bigelow), in The Antitrust Revolution (Sixth Edition),  (J. Kwoka and Laurence White, eds.), Oxford University Press, 2013.

"The Delta-Northwest Merger: Consumer Benefits from Airline Network Effects (2008)" (with Mark Israel, Bryan Keating and Daniel Rubinfeld), in The Antitrust Revolution (Sixth Edition),  (J. Kwoka and Laurence White, eds.), Oxford University Press, 2013.

"Airline Network Effects and Consumer Welfare" (with Bryan Keating, Mark Israel and Daniel Rubinfeld), Review of Network Economics, published online November 2013.

"The Liftoff of Consumer Benefits from the Broadband Revolution" (with Mark Dutz and Jon Orszag), Review of Network Economics (2012) vol. 11, issue 4, article 2.

"Competition and innovation-driven inclusive growth" (with Mark Dutz, Ioannis Kessides and Stephen O'Connell), in Promoting Inclusive Growth: Challenges and Policies,  Luiz de Mello and Mark Dutz (eds.),  OECD, 2011.

"Unilateral Competitive Effects of Mergers: Upward Pricing Pressure, Product Quality, and Other Extensions," Review of Industrial Organization  (2011) 39:19–38.

"Antitrust and Patent Settlements: The Pharmaceutical Cases," (with John Bigelow) in The Antitrust Revolution (Fifth Edition), John Kwoka and Lawrence White (eds.), 2009.

 "The 1982 Department of Justice Merger Guidelines: An Economic Assessment," (with J. Ordover) reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro)  reprinted in Economics of Antitrust Law, Benjamin Klein (ed.), Edward Elgar, 2008.

 "Consumer's Surplus Without Apology," reprinted in Applied Welfare Economics, Richard Just, Darrel Hueth and Andrew Schmitz (eds.), Edward Elgar, 2008; reprinted in  Readings in Social Welfare: Theory and Policy, Robert E. Kuenne (ed.), Blackwell, 2000, pp. 86-97; reprinted in  Readings in Microeconomic Theory, M. M. La Manna (ed.), Dryden Press, 1997, pp. 201-212.

"The Risk of Contagion from Multi-Market Contact," (with Charles Thomas), The International Journal of Industrial Organization, Vol. 24, Issue 6 (Nov. 2006), pp 1157 – 1184.

"Pareto-Superior Nonlinear Outlay Schedules," reprinted in The Economics of Public Utilities,

Ray Rees (ed.), Edward Elgar, 2006; reprinted in The Economics of Price Discrimination, G. Norman, (ed.), Edward Elgar, 1999.

"Economic Effects of Antidumping Policy," reprinted in The WTO and Anti-Dumping, Douglas Nelson (ed.), Edward Elgar, 2005.

"Merger Analysis, Industrial Organization Theory and the Merger Guidelines," reprinted in Antitrust and Competition Policy, Andrew Kleit (ed.) Edward Elgar, 2005

"Antitrust Policy Towards Agreements That Settle Patent Litigation,"  (with John Bigelow), Antitrust Bulletin, Fall 2004, pp. 655-698.

"Economies of Scope," (with John Panzar), reprinted in The Economics of Business Strategy, John Kay (ed.), Edward Elgar, 2003.

"Panel on Substantive Standards for Mergers and the Role of Efficiencies," in International Antitrust Law & Policy, Barry E. Hawk (ed.), Juris Publishing, 2003.

 "Practical Rules for Pricing Access in Telecommunications," (with J. Ordover) in Second Generation Reforms in Infrastructure Services , F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

"Comments on Antitrust Policy in the Clinton Administration," in American Economic Policy in the 1990s, J. Frankel and P. Orszag (eds.), MIT Press, 2002.

"Entrepreneurship, Access Policy and Economic Development: Lessons from Industrial Organization," (with M. Dutz and J. Ordover), European Economic Review, (44)4-6 (2000), pp. 739-747.

"Public Versus Regulated Private Enterprise," reprinted in Privatization in Developing Countries, P. Cook and C. Kirkpatrick (eds.), Edward Elgar, 2000.

"Deregulation v. the Legal Culture: Panel Discussion," in Is the Telecommunications Act of 1996 Broken?, G. Sidak (ed.), AEI Press, 1999.

"Economic Principles to Guide Post-Privatization Governance,"  in Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

"Access and Bundling in High-Technology Markets," (with J. A. Ordover), in Competition, Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace, J. A. Eisenach and T. Lenard (eds.), Kluwer, 1999.

"Competitive Rail Regulation Rules: Should Price Ceilings Constrain Final Products or Inputs?," (With W. J. Baumol),  Journal of Transport Economics and Policy, Vol. 33, Part 1, pp. 1-11.

"Economic Effects of Antidumping Policy," <u>Brookings Trade Forum: 1998,</u> 19-41.

"Interview With Economist Robert D. Willig," <u>Antitrust</u> , Vol. 11, No. 2, Spring 1997, pp.11-15.

"Parity Pricing and its Critics: A Necessary Condition for Efficiency in Provision of Bottleneck Services to Competitors," (with W. J. Baumol and J. A. Ordover), <u>Yale Journal on Regulation,</u> Vol. 14, No. 1, Winter 1997, pp. 145-164.

"Restructuring Regulation of the Rail Industry,"  (with Ioannis Kessides), in <u>Private Sector,</u> Quarterly No. 4, September 1995, pp. 5 - 8.  Reprinted in <u>Viewpoint,</u>  October, 1995, The World Bank.  Reprinted in <u>Private Sector, *special edition*: Infrastructure,</u> June 1996.

"Competition and Regulation in the Railroad Industry," (with Ioannis Kessides), in <u>Regulatory Policies and Reform: A Comparative Perspective,</u> C. Frischtak (ed.), World Bank, 1996.

"Economic Rationales for the Scope of Privatization," (with Carl Shapiro), reprinted in <u>The Political Economy of Privatization and Deregulation,</u> E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 95-130.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), reprinted in <u>The Political Economy of Privatization and Deregulation,</u> E. E. Bailey and J. R. Pack (eds.), The International Library of Critical Writings in Economics, Edward Elgar Publishing Co., 1995, pp. 245-260.

"Economists' View: The Department of Justice Draft Guidelines for the Licensing and Acquisition of Intellectual Property," (with J. Ordover), <u>Antitrust,</u> V. 9, No. 2 (spring 1995), 29-36.

"Public Versus Regulated Private Enterprise," in <u>Proceedings of the World Bank Annual Conference on Development Economics 1993,</u> L. Summers (ed.), The World Bank, 1994.

"Economics and the 1992 Merger Guidelines: A Brief Survey," (with J. Ordover), <u>Review of Industrial Organization,</u> V. 8, No. 2, (1993), pp. 139-150.

"The Role of Sunk Costs in the 1992 Guidelines' Entry Analysis," <u>Antitrust,</u> V. 6, No. 3 (summer 1992).

"Antitrust Lessons from the Airlines Industry:  The DOJ Experience," <u>Antitrust Law Journal,</u> V. 60, No. 2 (1992).

"William J. Baumol," (with E. E. Bailey), in <u>New Horizons in Economic Thought:  Appraisals of Leading Economists,</u> W. J. Samuels (ed.), Edward Elgar, 1992.

"Anti-Monopoly Policies and Institutions," in <u>The Emergence of Market Economies in Eastern</u>

Europe, Christopher Clague and Gordon Rausser (eds.), Basil Blackwell, 1992.

"Economics and the 1992 Merger Guidelines," (with Janusz Ordover), in Collaborations Among Competitors:  Antitrust Policy and Economics, Eleanor Fox and James Halverson (eds.), American Bar Association, 1992.

"On the Antitrust Treatment of Production Joint Ventures," (with Carl Shapiro), reprinted in Collaborations Among Competitors:  Antitrust Policy and Economics, Eleanor Fox and James Halverson (eds), American Bar Association, 1992.

"Merger Analysis, Industrial Organization Theory, and Merger Guidelines," Brookings Papers on Economic Activity -- Microeconomics 1991, pp. 281-332.

"On the Antitrust Treatment of Production Joint Ventures," (with C. Shapiro), Journal of Economic Perspectives, Vol. 4, No. 3, Summer 1990, pp. 113-130.

 "Economic Rationales for the Scope of Privatization," (with Carl Shapiro), in The Political Economy of Public Sector Reform and Privatization, E.N. Suleiman and J. Waterbury (eds.), Westview Press, Inc., 1990, pp. 55-87.

"Contestable Market Theory and Regulatory Reform," in Telecommunications Deregulation: Market Power and Cost Allocation, J.R. Allison and D.L. Thomas (eds.), Ballinger, 1990.

"Address To The Section," Antitrust Law Section Symposium, New York State Bar Association, 1990.

"Price Caps:  A Rational Means to Protect Telecommunications Consumers and Competition," (with W. Baumol), Review of Business, Vol. 10, No. 4, Spring 1989, pp. 3-8.

"U.S.-Japanese VER:  A Case Study from a Competition Policy Perspective," (with M. Dutz) in The Costs of Restricting Imports, The Automobile Industry.  OECD, 1988.

"Contestable Markets," in The New Palgrave:  A Dictionary of Economics, J. Eatwell, M. Milgate, and P. Newman (eds.), 1987.


"Do Entry Conditions Vary Across Markets:  Comments," Brookings Papers on Economic Activity, 3 - 1987, pp. 872-877.

"Railroad Deregulation:  Using Competition as a Guide," (with W. Baumol), Regulation, January/February 1987, Vol. 11, No. 1, pp. 28-36.

"How Arbitrary is 'Arbitrary'? - or, Toward the Deserved Demise of Full Cost Allocation," (with W. Baumol and M. Koehn), Public Utilities Fortnightly, September 1987, Vol. 120, No. 5, pp. 16-22.

"Contestability:  Developments Since the Book," (with W. Baumol), <u>Oxford Economic Papers,</u> December 1986, pp. 9-36.

"The Changing Economic Environment in Telecommunications:  Technological Change and Deregulation," in <u>Proceedings from the Telecommunications</u> <u>Deregulation Forum</u>; Karl Eller Center; 1986.

"Perspectives on Mergers and World Competition," (with J. Ordover), in  <u>Antitrust and Regulation,</u> R.E. Grieson (ed.), Lexington, 1986.

"On the Theory of Perfectly Contestable Markets," (with J. Panzar and W. Baumol), in <u>New Developments in The Analysis of Market Structure,</u> J. Stiglitz and F. Mathewson (eds.), MIT Press, 1986.

"InterLATA Capacity Growth and Market Competition," (with C. Shapiro), in <u>Telecommunications and Equity:  Policy Research Issues,</u> J. Miller (ed.), North Holland, 1986.

"Corporate Governance and Market Structure," in <u>Economic Policy in Theory</u> <u>and Practice,</u> A. Razin and E. Sadka (eds.), Macmillan Press, 1986.

"Antitrust for High-Technology Industries:  Assessing Research Joint Ventures and Mergers," (with J. Ordover), <u>Journal of Law and Economics,</u> Vol 28(2), May 1985, pp. 311-334.

"Non-Price Anticompetitive Behavior by Dominant Firms Toward the Producers of Complementary Products," (with J. Ordover and A. Sykes), in <u>Antitrust and Regulation,</u> F.M. Fisher (ed.), MIT Press, 1985.

"Telephones and Computers:  The Costs of Artificial Separation," (with W. Baumol), <u>Regulation,</u> March/April 1985.

"Transfer Principles in Income Redistribution," (with P. Fishburn), <u>Journal of Public Economics,</u> 25 (1984), pp. 1-6.

"Market Structure and Government Intervention in Access Markets," in <u>Telecommunications Access and Public Policy,</u> A. Baughcam and G. Faulhaber (eds.), 1984.

"Pricing Issues in the Deregulation of Railroad Rates," (with W. Baumol), in  <u>Economic Analysis of Regulated Markets:  European and U. S. Perspectives,</u> J. Finsinger (ed.), 1983.

"Local Telephone Pricing in a Competitive Environment," (with J. Ordover), in <u>Telecommunications Regulation Today and Tomorrow,</u> E. Noam (ed.), Harcourt Brace Jovanovich, 1983.

"Economics and Postal Pricing Policy," (with B. Owen), in <u>The Future of the</u> <u>Postal Service,</u> J. Fleishman (ed.), Praeger, 1983.

A-8

"Selected Aspects of the Welfare Economics of Postal Pricing," in <u>Telecommunications Policy Annual,</u> Praeger, 1987.

"The Case for Freeing AT&T" (with M. Katz), <u>Regulation,</u> July-Aug. 1983, pp. 43-52.

"Predatory Systems Rivalry:  A Reply" (with J. Ordover and A. Sykes), <u>Columbia Law Review,</u> Vol. 83, June 1983, pp. 1150-1166.  Reprinted in <u>Corporate Counsel's Handbook - 1984.</u>

"Sector Differentiated Capital Taxation with Imperfect Competition and Interindustry Flows," <u>Journal of Public Economics,</u> Vol. 21, 1983.

"Contestable Markets:  An Uprising in the Theory of Industry Structure: Reply," (with W.J. Baumol and J.C. Panzar), <u>American Economic Review,</u> Vol. 73, No. 3, June 1983, pp. 491-496.

"The 1982 Department of Justice Merger Guidelines:  An Economic Assessment," (with J. Ordover), <u>California Law Review,</u> Vol. 71, No. 2, March 1983, pp. 535-574.  Reprinted in <u>Antitrust Policy in Transition: The Convergence of Law and Economics,</u> E.M. Fox and J.T. Halverson (eds.), 1984.

"Intertemporal Failures of the Invisible Hand:  Theory and Implications for International Market Dominance," (with W.J. Baumol), <u>Indian Economic Review,</u> Vol. XVI, Nos. 1 and 2, January-June 1981, pp. 1-12.

"Unfair International Trade Practices," (with J. Ordover and A. Sykes), <u>Journal of International Law and Politics,</u> Vol. 15, No. 2, winter 1983, pp. 323-337.

"Journals as Shared Goods:  Reply," (with J. Ordover), <u>American Economic</u> <u>Review,</u> V. 72, No. 3, June 1982, pp. 603-607.

"Herfindahl Concentration, Rivalry, and Mergers," (with J. Ordover and A. Sykes), <u>Harvard Law Review,</u> V. 95, No. 8, June 1982, pp. 1857-l875.

"An Economic Definition of Predation:  Pricing and Product Innovation," (with J. Ordover), <u>Yale Law Journal,</u> Vol. 90: 473, December 1981, pp. 1-44.

"Fixed Costs, Sunk Costs, Entry Barriers, and the Sustainability of Monopoly," (with W. Baumol), <u>Quarterly Journal of Economics,</u> Vol. 96, No. 3, August 1981, pp. 405-432.

"Social Welfare Dominance," <u>American Economic Review,</u> Vol. 71, No. 2, May 1981, pp. 200-204.

"Economies of Scope," (with J. Panzar), <u>American Economic Review,</u> Vol. 72, No. 2, May 1981, pp. 268-272.

"Income-Distribution Concerns in Regulatory Policymaking," (with E.E. Bailey) in <u>Studies in Public Regulation</u> (G. Fromm, ed.), MIT Press, Cambridge, 1981, pp. 79-118.

"An Economic Definition of Predatory Product Innovation," (with J. Ordover), in <u>Strategic Predation and Antitrust Analysis,</u> S. Salop (ed.), 1981.

"What Can Markets Control?" in <u>Perspectives on Postal Service Issues,</u> R. Sherman (ed.), American Enterprise Institute, 1980.

"Pricing Decisions and the Regulatory Process," in <u>Proceedings of the 1979 Rate Symposium on Problems of Regulated Industries,</u> University of Missouri-Columbia Extension Publications, 1980, pp. 379-388.

"The Theory of Network Access Pricing," in <u>Issues in Public Utility Regulation,</u> H.M. Trebing (ed.), MSU Public Utilities Papers, 1979.

"Customer Equity and Local Measured Service," in <u>Perspectives on Local Measured Service,</u> J. Baude, etal. (ed.), 1979, pp. 71-80.

"The Role of Information in Designing Social Policy Towards Externalities," (with J. Ordover), <u>Journal of Public Economics,</u> V. 12, 1979, pp. 271-299.

"Economies of Scale and the Profitability of Marginal-Cost Pricing:  Reply," (with J. Panzar), <u>Quarterly Journal of Economics,</u> Vol. 93, No. 4, Novmber 1979, pp. 743-4.

"Theoretical Determinants of the Industrial Demand for Electricity by Time of Day," (with J. Panzar) <u>Journal of Econometrics,</u> V. 9, 1979, pp. 193-207.

"Industry Performance Gradient Indexes," (with R. Dansby), <u>American Economic Review,</u> V. 69, No. 3, June 1979, pp. 249-260.

"The Economic Gradient Method," (with E. Bailey), <u>American Economic Review,</u> Vol. 69, No. 2, May 1979, pp. 96-101.

"Multiproduct Technology and Market Structure," <u>American Economic Review,</u> Vol. 69, No. 2, May 1979, pp. 346-351.

"Consumer's Surplus Without Apology:  Reply," <u>American Economic Review,</u> Vol.     69, No. 3, June 1979, pp. 469-474.

"Decisions with Estimation Uncertainty," (with R. Klein, D. Sibley, and L. Rafsky), <u>Econometrica,</u> V. 46, No. 6, November 1978, pp. 1363-1388.

"Incremental Consumer's Surplus and Hedonic Price Adjustment," <u>Journal of Economic Theory,</u> V. 17, No. 2, April 1978, pp. 227-253.

"Recent Theoretical Developments in Financial Theory:  Discussion, "<u>The Journal of Finance,</u> V. 33, No. 3, June 1978, pp. 792-794.

"The Optimal Provision of Journals Qua Sometimes Shared Goods," (with J. Ordover), American Economic Review, V. 68, No. 3, June 1978, pp. 324-338.

"On the Comparative Statics of a Competitive Industry With Infra-marginal Firms," (with J. Panzar), American Economic Review, V. 68, No. 3, June 1978, pp. 474-478.

"Pareto Superior Nonlinear Outlay Schedules," Bell Journal of Economics, Vol. 9, No. 1, Spring 1978, pp. 56-69.

"Predatoriness and Discriminatory Pricing," in The Economics of Anti-Trust: Course of Study Materials, American Law Institute-American Bar Association, 1978.

"Economies of Scale in Multi-Output Production," (with J. Panzar), Quarterly Journal of Economics, V. 91, No. 3, August 1977, pp. 481-494.

"Weak Invisible Hand Theorems on the Sustainability of Multi-product Natural Monopoly," (with W. Baumol and E. Bailey), American Economic Review, V. 67, No. 3, June 1977, pp. 350-365.

"Free Entry and the Sustainability of Natural Monopoly," (with J. Panzar), Bell Journal of Economics, Spring 1977, pp. 1-22.

"Risk Invariance and Ordinally Additive Utility Functions," Econometrica, V. 45, No. 3, April 1977, pp. 621-640.

"Ramsey-Optimal Pricing of Long Distance Telephone Services," (with E. Bailey), in Pricing in Regulated Industries, Theory and Application, J. Wenders (ed.), Mountain State Telephone and Telegraph Co., 1977, pp. 68-97.

"Network Externalities and Optimal Telecommunications Pricing:  A Preliminary Sketch," (with R. Klein), in Proceedings of Fifth Annual Telecommunications Policy Research Conference, Volume II, NTIS, 1977, pp. 475-505.

"Otsenka ekonomicheskoi effektivnosti proizvodstvennoi informatsii" ["The Evaluation of the Economic Benefits of Productive Information"] in Doklady Sovetskikh i Amerikanskikh Spetsialistov Predstavlennye na Pervyi Sovetsko-Amerikanskii Simpozium po Ekonomicheskoi Effektivnosti Informat sionnogo Obsluzhivaniia [Papers of Soviet and American Specialists Presented at the First Soviet- American Symposium on Costs and Benefits of Information Services], All Soviet Scientific Technical Information Center, Moscow, 1976.

"Vindication of a 'Common Mistake' in Welfare Economics," (with J. Panzar), Journal of Political Economy, V. 84, No. 6, December 1976, pp. 1361-1364.

"Consumer's Surplus Without Apology," American Economic Review, V. 66, No. 4, September 1976, pp. 589-597.

**Books**

Second Generation Reforms in Infrastructure Services,  F. Basanes and R. Willig (eds.), Johns Hopkins Press, 2002.

Can Privatization Deliver? Infrastructure for Latin America, R. Willig co-editor, Johns Hopkins Press, 1999.

Handbook of Industrial Organization, (edited with R. Schmalensee), North Holland Press, Volumes 1 and 2, 1989.

Contestable Markets and the Theory of Industry Structure, (with W.J. Baumol and J.C. Panzar), Harcourt Brace Jovanovich, 1982. Second Edition, 1989.

Welfare Analysis of Policies Affecting Prices and Products, Garland Press, 1980.


**Unpublished Papers and Reports**:

"Economic Foundations for 21st Century Freight Rail Rate Regulation," (with John W. Mayo), Georgetown Center for Business and Public Policy, Policy Paper, 2018. Forthcoming in U.S. Freight Rail Economics and Policy: Are We on the Right Track?; Macher, J.T. and J.W. Mayo (eds.); Routledge.

"Brief Amici Curiae of 37 Economists, Antitrust Scholars, and Former Government Antitrust Officials In Support of Appellees and Supporting Affirmance," In the United States Court of Appeals for the District of Columbia Circuit; USCA Case #18-5214; United States of America, Plaintiff-Appellant, v. AT&T, Inc.; DirecTV Group Holdings, LLC; and TimeWarner Inc., Defendants-Appellees; On appeal from a final judgment of the U.S. District Court for the District of Columbia, Hon. Richard J. Leon, No. 1:17-cv-2511; 9/26/2018.

"Brief for Amici Curiae J. Gregory Sidak and Robert D. Willig in Support of Respondents," In the Supreme Court of the United States; In the Supreme Court of the United States; State of Ohio, et al., v. American Express Company, et al., On Writ Of Certiorari To The United States Court Of Appeals For The Second Circuit; No. 16-1454; January 23, 2018.

"Brief of Leading Economists as Amici Curiae in Support of Respondents," In the Supreme Court of the United States; Douglas R. M. Nazarian, et al, v. PPL Energyplus, LLC, et al. and CPV Maryland, LLC, v. PPL Energyplus, LLC, et al.; On Writ of Certiorari to the US Court of Appeals for the Fourth Circuit; Nos. 14-614, 14-623; January 19, 2016.

"Technological change and labor market segmentation in the developing world: Evidence from Brazil," (with Dutz, Mark, Lucas Ferreira-Mation, and Stephen O'Connell), 2015 Background

Paper for the 2016 World Bank's World Development Report.

"Brief for Amici Curiae J. Gregory Sidak, Robert D. Willig, David J. Teece, and Keith N. Hylton, Scholars and Experts in Antitrust Economics in Support of Defendants-Appellants and Supporting Reversal," 15-1672 In the United States Court of Appeals for the Second Circuit; United States of America, et al., v. American Express Company, et al., 8/10/2015.

"Commentary on Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets" (with Nauman Ilias, Bryan Keating, and Paolo Ramezzana), 2016.

"Recommendations for Excessive-Share Limits in the Surfclam and Ocean Quahog Fisheries" (with Glenn Mitchell and Steven Peterson),  Report to National Marine Fisheries Service and the Mid-Atlantic Fishery Management Council, 5/23/2011.

"Public  Comments on the 2010 Draft Horizontal Merger Guidelines," paper posted to Federal Trade Commission website, 6/4/2010

"An Economic Perspective on the Antitrust Case Against Intel," (with Jon Orszag and Gilad Levin), 2009.

"An Econometric Analysis of the Matching Between Football Student-Athletes and Colleges," (with Yair Eilat, Bryan Keating and Jon Orszag)

Supreme Court Amicus Brief Regarding Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County, Washington, (co-authored), AEI-Brookings Joint Center Brief No. 07-02, 12/2/07

"(Allegedly) Monopolizing Tying Via Product Innovation," statement before the Department of Justice/Federal Trade Commission Section 2 Hearings, November 1, 2006.

"Assessment of U.S. Merger Enforcement Policy," statement before the Antitrust Modernization Commission, 11/17/05.

"Investment is Appropriately Stimulated by TELRIC," in Pricing Based on Economic Cost, 12/2003.

"Brief of Amici Curiae Economics Professors, re Verizon v. Trinko, In the Supreme Court of the U.S.," (with W.J. Baumol, J.O. Ordover and F.R. Warren-Boulton), 7/25/2003.

"Stimulating Investment and the Telecommunications Act of 1996," (with J. Bigelow, W. Lehr and S. Levinson), 2002.

"An Economic Analysis of Spectrum Allocation and Advanced Wireless Services," (with Martin N. Baily, Peter R. Orszag, and Jonathan M. Orszag), 2002

"Effective Deregulation of Residential Electric Service," 2001

"Anticompetitive Forced Rail Access" (with W. J. Baumol), 2000

"The Scope of Competition in Telecommunications" (with B. Douglas Bernheim), 1998 "Why Do Christie and Schultz Infer Collusion From Their Data? (with Alan Kleidon), 1995.

"Demonopolization," (with Sally Van Siclen), OECD Vienna Seminar Paper, 1993.

"Economic Analysis of Section 337: The Balance Between Intellectual Property Protection and Protectionism," (with J. Ordover) 1990.

"The Effects of Capped NTS Charges on Long Distance Competition," (with  M. Katz).

"Discussion of Regulatory Mechanism Design in the Presence of Research Innovation, and Spillover Effects," 1987.

"Industry Economic Analysis in the Legal Arena," 1987.

"Deregulation of Long Distance Telephone Services: A Public Interest Assessment," (with M. Katz).

"Competition-Related Trade Issues," report prepared for OECD.

"Herfindahl Concentration Index," (with J. Ordover), Memorandum for ABA Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, March 1981.

"Market Power and Market Definition," (with J. Ordover), Memorandum for ABA  Section 7 Clayton Act Committee, Project on Revising the Merger Guidelines, May 1981.

"The Continuing Need for and National Benefits Derived from the REA Telephone Loan Programs - An Economic Assessment," 1981.

"The Economics of Equipment Leasing:  Costing and Pricing," 1980.

"Rail Deregulation and the Financial Problems of the U.S. Railroad Industry," (with W.J. Baumol), report prepared under contract to Conrail, 1979.

"Price Indexes and Intertemporal Welfare," Bell Laboratories Economics Discussion Paper, 1974.

"Consumer's Surplus:  A Rigorous Cookbook," Technical Report #98, Economics Series, I.M.S.S.S., Stanford University, l973.

"An Economic-Demographic Model of the Housing Sector," (with B. Hickman and M. Hinz), Center for Research in Economic Growth, Stanford University, 1973.

A-14

**Invited Conference Presentations**:

FTC Competition and Consumer Protection Hearings
    "The State of US Antitrust Law"                            2018

Portuguese Competition Authority Public Seminar Series
    "Ups and Downs of Horizontal and Vertical Mergers"    2017

World Bank Workshop on Digital Technology Adoption, Skills, Productivity and Jobs in Latin America
    "Discussion of Models of Firm Heterogeneity"        2016

George Mason Law Review Annual Antitrust Symposium: Antitrust in an Interconnected World
    "GUPPI and the Safe Harbor"                   2016

Competition Law & Policy Institute of New Zealand Annual Workshop
    "Merger Analysis Keynote"                     2015

Economic Studies at Brookings: Railroads, Policy and the Economy
    "The Industry Perspective"                     2015

Georgetown University McDonough School of Business Railroad Economics Symposium
    "The Role of Economic Theory in the 'Deregulated' Rail Industry"    2015

Brazilian School of Economics and Finance (FGV EPGE) Seminario
    "Public Interest Regulation: Lessons from Railroads"    2015

NYU School of Law Conference on the Fiftieth Anniversary of United States v. Philadelphia National Bank: The Past, Present and Future of Merger Law
    "Discussion with Agency Economists"            2013

Brookings Institution Conference on The Economics of the Airline Industry
    "Airline Network Effects and Consumer Welfare"    2012

AGEP Public Policy Conference on Pharmaceutical Industry Economics, Regulation and Legal Issues; Law and Economics Center, George Mason University School of Law
    "Pharmaceutical Brand-Generic Disputes"        2012

U.S.-EU Alliance Study Peer Review Conferences
    "Review of Cooperative Agreements in Transatlantic Airline Markets"    2012
    "The Research Agenda Ahead"                    2012

Antitrust in the High Tech Sector Conference
  "Developments in Merger Enforcement"      2012

Georgetown Center for Business and Public Policy, Conference on the Evolution of Regulation
  "Reflections on Regulation"      2011

Antitrust Forum, New York State Bar Association
  "Upward Price Pressure, Market Definition and Supply Mobility"      2011

American Bar Association, Antitrust Section, Annual Convention
  "The New Merger Guidelines' Analytic Highlights"      2011

OECD and World Bank Conference on Challenges and Policies for Promoting Inclusive Growth
  "Inclusive Growth From Competition and Innovation"      2011

Villanova School of Business Executive MBA Conference
  "Airline Network Effects, Competition and Consumer Welfare"      2011

NYU School of Law Conference on Critical Directions in Antitrust
  "Unilateral Competitive Effects"      2010

Conf. on the State of European Competition Law and Enforcement in a Transatlantic Context
  "Recent Developments in Merger Control"      2010

Center on Regulation and Competition, Universidad  de Chile Law School
  "Economic Regulation and the Limits of Antitrust Law"      2010

Center on Regulation and Competition, Universidad  de Chile Law School
"Merger Policy and Guidelines Revision"      2010

Faculty of Economics, Universidad de Chile
  "Network Effects in Airlines Markets"      2010

Georgetown Law Global Antitrust Enforcement Symposium
  "New US Merger Guidelines"      2010

FTI London Financial Services Conference
  "Competition and Regulatory Reform"      2010

NY State Bar Association Annual Antitrust Conference
  "New Media Competition Policy"      2009

Antitrust Law Spring Meeting of the ABA
  "Antitrust and the Failing Economy Defense"      2009

Georgetown Law Global Antitrust Enforcement Symposium
 "Mergers: New Enforcement Attitudes in a Time of Economic Challenge"                    2009

Phoenix Center US Telecoms Symposium
 "Assessment of Competition in the Wireless Industry"                    2009

FTC and DOJ Horizontal Merger Guidelines Workshop
 "Direct Evidence is No Magic Bullet"                    2009

Northwestern Law Research Symposium: Antitrust Economics and Competition Policy
 "Discussion of Antitrust Evaluation of Horizontal Mergers"                    2008

Inside Counsel Super-Conference
 "Navigating Mixed Signals under Section 2 of the Sherman Act"                    2008

Federal Trade Commission Workshop on Unilateral Effects in Mergers
 "Best Evidence and Market Definition"                    2008

European Policy Forum, Rules for Growth: Telecommunications Regulatory Reform
 "What Kind of Regulation For Business Services?"                    2007

Japanese Competition Policy Research Center, Symposium on M&A and Competition Policy
 "Merger Policy Going Forward With Economics and the Economy"                    2007

Federal Trade Commission and Department of Justice Section 2 Hearings
 "Section 2 Policy and Economic Analytic Methodologies"                    2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE
 "The Economics of Resale Price Maintenance and Class Certification"                    2007

Pennsylvania Bar Institute, Antitrust Law Committee CLE
 "Antitrust Class Certification – An Economist's Perspective"                    2007

Fordham Competition Law Institute, International  Competition Economics Training Seminar
 "Monopolization and Abuse of Dominance"                    2007

Canadian Bar Association Annual Fall Conference on Competition Law
 "Economic Tools for the Competition Lawyer"                    2007

Conference on Managing Litigation and Business Risk in Multi-jurisdiction Antitrust Matters
 "Economic Analysis in Multi-jurisdictional Merger Control"                    2007

World Bank Conference on Structuring Regulatory Frameworks for Dynamic and Competitive
South Eastern European Markets
 "The Roles of Government Regulation in a Dynamic Economy"                    2006

Department of Justice/Federal Trade Commission Section 2 Hearings
 "(Allegedly) Monopolizing Tying Via Product Innovation"                2006

Fordham Competition Law Institute,  Competition Law Seminar
 "Monopolization and Abuse of Dominance"                               2006

Practicing Law Institute on Intellectual Property Antitrust
 "Relevant Markets for Intellectual Property Antitrust"                2006

PLI Annual Antitrust Law Institute
 "Cutting Edge Issues in Economics"                                    2006

World Bank's Knowledge Economy Forum V
 "Innovation, Growth and Competition"                                  2006

Charles University Seminar Series
 "The Dangers of Over-Ambitious Antitrust Regulation"                 2006

NY State Bar Association Antitrust Law Section Annual Meeting
"Efficient Integration or Illegal Monopolization?"                    2006

World Bank Seminar
 "The Dangers of Over-Ambitious Regulation"                           2005

ABA Section of Antitrust Law 2005 Fall Forum
 "Is There a Gap Between the Guidelines and Agency Practice?"         2005

Hearing of Antitrust Modernization Commission
 "Assessment of U.S. Merger Enforcement Policy"                       2005

LEAR Conference on Advances in the Economics of Competition Law
 "Exclusionary Pricing Practices"                                     2005

 Annual Antitrust Law Institute
            "Cutting Edge Issues in Economics"                         2005

 PRIOR Symposium on States and Stem Cells
            "Assessing the Economics of State Stem Cell Programs"       2005

 ABA Section of Antitrust Law – AALS Scholars Showcase
            "Distinguishing Anticompetitive Conduct"                    2005

 Allied Social Science Associations National Convention
            "Antitrust in the New Economy"                              2005

ABA Section of Antitrust Law 2004 Fall Forum
      "Advances in Economic Analysis of Antitrust"          2004

Phoenix Center State Regulator Retreat
      "Regulatory Policy for the Telecommunications Revolution"      2004

OECD Competition Committee
      "Use of Economic Evidence in Merger Control"      2004

Justice Department/Federal Trade Commission Joint Workshop
      "Merger Enforcement"      2004

Phoenix Center Annual U.S. Telecoms Symposium
      "Incumbent Market Power"      2003

Center for Economic Policy Studies Symposium on Troubled Industries
      "What Role for Government in Telecommunications?"      2003

Princeton Workshop on Price Risk and the Future of the Electric Markets
      "The Structure of the Electricity Markets"      2003

2003 Antitrust Conference
      "International Competition Policy and Trade Policy"      2003

International Industrial Organization Conference
      "Intellectual Property System Reform"      2003

ABA Section of Antitrust Law 2002 Fall Forum
      "Competition, Regulation and Pharmaceuticals"      2002

Fordham Conference on International Antitrust Law and Policy
        "Substantive Standards for Mergers and the Role of Efficiencies"     2002

Department of Justice Telecom Workshop
        "Stimulating Investment and the Telecommunications Act of 1996"     2002

Department of Commerce Conference on the State of the Telecom Sector
        "Stimulating Investment and the Telecommunications Act of 1996"     2002

Law and Public Affairs Conference on the Future of  Internet Regulation
        "Open Access and Competition Policy Principles"     2002
Center for Economic Policy Studies Symposium on Energy Policy
        "The Future of Power Supply"     2002

The Conference Board: Antitrust Issues in Today's Economy
        "The 1982 Merger Guidelines at 20"     2002

Federal Energy Regulatory Commission Workshop
        "Effective Deregulation of Residential Electric Service"     2001

IPEA International Seminar on Regulation and Competition
        "Electricity Markets: Deregulation of Residential Service"     2001
        "Lessons for Brazil from Abroad"     2001

ABA Antitrust Law Section Task Force Conference
        "Time, Change, and Materiality for Monopolization Analyses"     2001

Harvard University Conference on American Economic Policy in the 1990s
        "Comments on Antitrust Policy in the Clinton Administration"     2001

Tel-Aviv Workshop on Industrial Organization and Anti-Trust
        "The Risk of Contagion from Multimarket Contact"     2001

2001 Antitrust Conference
        "Collusion Cases: Cutting Edge or Over the Edge?"     2001
        "Dys-regulation of California Electricity"     2001

FTC Public Workshop on Competition Policy for E-Commerce
        "Necessary Conditions for Cooperation to be Problematic"     2001

HIID International Workshop on Infrastructure Policy
        "Infrastructure Privatization and Regulation"     2000

Villa Mondragone International Economic Seminar
        "Competition Policy for Network and Internet Markets"     2000

New Developments in Railroad Economics: Infrastructure Investment and Access Policies
        "Railroad Access, Regulation, and Market Structure"      2000

The Multilateral Trading System at the Millennium
        "Efficiency Gains From Further Liberalization"      2000

Singapore – World Bank Symposium on Competition Law and Policy
        "Policy Towards Cartels and Collusion"      2000

CEPS: Is It a New World?: Economic Surprises of the Last Decade
        "The Internet and E-Commerce"      2000

Cutting Edge Antitrust: Issues and Enforcement Policies
        "The Direction of Antitrust Entering the New Millennium"      2000

The Conference Board: Antitrust Issues in Today's Economy
        "Antitrust Analysis of Industries With Network Effects"      1999

CEPS: New Directions in Antitrust
        "Antitrust in a High-Tech World"      1999

World Bank Meeting on Competition and Regulatory Policies for Development
        "Economic Principles to Guide Post-Privatization Governance"      1999

1999 Antitrust Conference
        "Antitrust and the Pace of Technological Development"      1999
        "Restructuring the Electric Utility Industry"      1999

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
        "Privatization and Post-Privatization Regulation of Natural Monopolies"      1999

The Federalist Society: Telecommunications Deregulation: Promises Made,
Potential Lost?
        "Grading the Regulators"      1999

Inter-American Development Bank: Second Generation Issues In the Reform
Of Public Services
        "Post-Privatization Governance"      1999
        "Issues Surrounding Access Arrangements"      1999

Economic Development Institute of the World Bank -- Program on Competition Policy
        "Policy Towards Horizontal Mergers"      1998

Twenty-fifth Anniversary Seminar for the Economic Analysis Group of the Department of

Justice
> "Market Definition in Antitrust Analysis"                                    1998

HIID International Workshop on Privatization, Regulatory Reform and Corporate Governance
> "Infrastructure Architecture and Regulation: Railroads"                     1998

EU Committee Competition Conference – Market Power
> "US/EC Perspective on Market Definition"                                    1998

Federal Trade Commission Roundtable
> "Antitrust Policy for Joint Ventures"                                       1998

1998 Antitrust Conference
> "Communications Mergers"                                                    1998

The Progress and Freedom Foundation Conference on Competition, Convergence, and the Microsoft Monopoly
> Access and Bundling in High-Technology Markets                             1998

FTC Program on The Effective Integration of Economic Analysis into Antitrust Litigation
> The Role of Economic Evidence and Testimony                                1997

FTC Hearings on Classical Market Power in Joint Ventures
> Microeconomic Analysis and Guideline                                       1997

World Bank Economists --Week IV Keynote
> Making Markets More Effective With Competition Policy                       1997

Brookings Trade Policy Forum
> Competition Policy and Antidumping: The Economic Effects                    1997

University of Malaya and Harvard University Conference on The Impact of Globalisation and Privatisation on Malaysia and Asia in the Year 2020
> Microeconomics, Privatization, and Vertical Integration                    1997

ABA Section of Antitrust Law Conference on The Telecommunications Industry
> Current Economic Issues in Telecommunications                              1997

Antitrust 1998: The Annual Briefing
> The Re-Emergence of Distribution Issues                                    1997

Inter-American Development Bank Conference on Private Investment, Infrastructure Reform and Governance in Latin America & the Caribbean
> Economic Principles to Guide Post-Privatization Governance                 1997

Harvard Forum on Regulatory Reform and Privatization of Telecommunications in the Middle East
    Privatization: Methods and Pricing Issues                    1997

American Enterprise Institute for Public Policy Research Conference
    Discussion of Local Competition and Legal Culture              1997

Harvard Program on Global Reform and Privatization of Public Enterprises
    "Infrastructure Privatization and Regulation: Freight"            1997

World Bank Competition Policy Workshop
    "Competition Policy for Entrepreneurship and Growth"           1997

Eastern Economics Association Paul Samuelson Lecture
    "Bottleneck Access in Regulation and Competition Policy"          1997

ABA Annual Meeting, Section of Antitrust Law
    "Antitrust in the 21st Century: The Efficiencies Guidelines"        1997

Peruvian Ministry of Energy and Mines Conference on Regulation of Public Utilities
    "Regulation: Theoretical Context and Advantages vs. Disadvantages"    1997

The FCC: New Priorities and Future Directions
    "Competition in the Telecommunications Industry"                1997

American Enterprise Institute Studies in Telecommunications Deregulation
    "The Scope of Competition in Telecommunications"               1996

George Mason Law Review Symposium on Antitrust in the Information Revolution
    "Introduction to the Economic Theory of Antitrust and Information"     1996

Korean Telecommunications Public Lecture
    "Market Opening and Fair Competition"                         1996

Korea Telecommunications Forum
    "Desirable Interconnection Policy in a Competitive Market"        1996

European Association for Research in Industrial Economics Annual Conference
    "Bottleneck Access: Regulation and Competition Policy"           1996

Harvard Program on Global Reform and Privatization of Public Enterprises
    "Railroad and Other Infrastructure Privatization"                1996

FCC Forum on Antitrust and Economic Issues Involved with InterLATA Entry
     "The Scope of Telecommunications Competition"                     1996

Citizens for a Sound Economy Policy Watch on Telecommunications Interconnection
     "The Economics of Interconnection"                       1996


World Bank Seminar on Experiences with Corporatization
     "Strategic Directions of Privatization"                     1996

FCC Economic Forum on the Economics of Interconnection
     Lessons from Other Industries                         1996

ABA Annual Meeting, Section of Antitrust Law
     The Integration, Disintegration, and Reintegration
     of the Entertainment Industry                      1996

Conference Board: 1996 Antitrust Conference
     How Economics Influences Antitrust and Vice Versa       1996

Antitrust 1996: A Special Briefing
     Joint Ventures and Strategic Alliances                 1996

New York State Bar Association Section of Antitrust Law Winter Meeting
     Commentary on Horizontal Effects Issues               1996

FTC Hearings on the Changing Nature of Competition in a Global and Innovation-Driven Age
     Vertical Issues for Networks and Standards             1995

Wharton Seminar on Applied Microeconomics
     Access Policies with Imperfect Regulation              1995

Antitrust 1996, Washington D.C.
     Assessing Joint Ventures for Diminution of Competition    1995

ABA Annual Meeting, Section of Antitrust Law
     Refusals to Deal -- Economic Tests for Competitive Harm   1995

FTC Seminar on Antitrust Enforcement Analysis
     Diagnosing Collusion Possibilities                    1995

Philadelphia Bar Education Center: Antitrust Fundamentals
     Antitrust--The Underlying Economics                  1995

Vanderbilt University Conference on Financial Markets

Why Do Christie and Schultz Infer Collusion From Their Data?                    1995

ABA Section of Antitrust Law Chair=s Showcase Program
        Discussion of Telecommunications Competition Policy                    1995

Conference Board: 1995 Antitrust Conference
        Analysis of Mergers and Joint Ventures                                 1995

ABA Conference on The New Antitrust: Policy of the '90s
        Antitrust on the Super Highways/Super Airways                          1994

ITC Hearings on The Economic Effects of Outstanding Title VII Orders
        "The Economic Impacts of Antidumping Policies"                         1994

OECD Working Conference on Trade and Competition Policy
        "Empirical Evidence on The Nature of Anti-dumping Actions"             1994

Antitrust 1995, Washington D.C.
        "Rigorous Antitrust Standards for Distribution Arrangements"          1994

ABA -- Georgetown Law Center: Post Chicago-Economics: New Theories
- New Cases?
        "Economic Foundations for Vertical Merger Guidelines"                 1994

Conference Board: Antitrust Issues in Today's Economy
        "New Democrats, Old Agencies: Competition Law and Policy"             1994

Federal Reserve Board Distinguished Economist Series
        "Regulated Private Enterprise Versus Public Enterprise"               1994

Institut d'Etudes Politiques de Paris
        "Lectures on Competition Policy and Privatization"                    1993

Canadian Bureau of Competition Policy Academic Seminar Series, Toronto.
        "Public Versus Regulated Private Enterprise"                          1993

CEPS Symposium on The Clinton Administration: A Preliminary Report Card
        "Policy Towards Business"                                             1993

Columbia Institute for Tele-Information Conference on Competition in Network Industries, New
York, NY
        "Discussion of Deregulation of Networks: What Has Worked and What Hasn't"
                                                                              1993
World Bank Annual Conference on Development Economics
        "Public Versus Regulated Private Enterprise"                         1993

Center for Public Utilities Conference on Current Issues Challenging the Regulatory Process
    "The Economics of Current Issues in Telecommunications Regulation"     1992
    "The Role of Markets in Presently Regulated Industries"     1992

The Conference Board's Conference on Antitrust Issues in Today's Economy, New York, NY
    "Antitrust in the Global Economy"     1992
    "Monopoly Issues for the '90s"     1993

Columbia University Seminar on Applied Economic Theory, New York, NY
    "Economic Rationales for the Scope of Privatization"     1992

Howrey & Simon Conference on Antitrust Developments, Washington, DC
    "Competitive Effects of Concern in the Merger Guidelines"     1992

Arnold & Porter Colloquium on Merger Enforcement, Washington, DC
    "The Economic Foundations of the Merger Guidelines"     1992

American Bar Association, Section on Antitrust Law Leadership Council Conference, Monterey, CA
    "Applying the 1992 Merger Guidelines"     1992

OECD Competition Policy Meeting, Paris, France
    "The Economic Impacts of Antidumping Policy"     1992

Center for Public Choice Lecture Series, George Mason University Arlington, VA
    "The Economic Impacts of Antidumping Policy"     1992

Brookings Institution Microeconomics Panel, Washington, DC,
    "Discussion of the Evolution of Industry Structure"     1992

AT&T Conference on Antitrust Essentials
    "Antitrust Standards for Mergers and Joint Ventures"     1991

ABA Institute on The Cutting Edge of Antitrust: Market Power
    "Assessing and Proving Market Power: Barriers to Entry"     1991

Second Annual Workshop of the Competition Law and Policy Institute of New Zealand
    "Merger Analysis, Industrial Organization Theory, and Merger Guidelines"     1991
    "Exclusive Dealing and the Fisher & Paykel Case"     1991

Special Seminar of the New Zealand Treasury
    "Strategic Behavior, Antitrust, and The Regulation of Natural Monopoly"     1991

Public Seminar of the Australian Trade Practices Commission
    "Antitrust Issues of the 1990's"    1991

National Association of Attorneys General Antitrust Seminar
    "Antitrust Economics"    1991

District of Columbia Bar's 1991 Annual Convention
    "Administrative and Judicial Trends in Federal Antitrust Enforcement"    1991

ABA Spring Meeting
    "Antitrust Lessons From the Airline Industry"    1991

Conference on The Transition to a Market Economy - Institutional Aspects
    "Anti-Monopoly Policies and Institutions"    1991

Conference Board's Thirtieth Antitrust Conference
    "Antitrust Issues in Today's Economy"    1991

American Association for the Advancement of Science Annual Meeting
    "Methodologies for Economic Analysis of Mergers"    1991

General Seminar, Johns Hopkins University
    "Economic Rationales for the Scope of Privatization"    1991

Capitol Economics Speakers Series
    "Economics of Merger Guidelines"    1991

CRA Conference on Antitrust Issues in Regulated Industries
    "Enforcement Priorities and Economic Principles"    1990

Pepper Hamilton & Scheetz Anniversary Colloquium
    "New Developments in Antitrust Economics"    1990

PLI Program on Federal Antitrust Enforcement in the 90's
    "The Antitrust Agenda of the 90's"    1990

FTC Distinguished Speakers Seminar
    "The Evolving Merger Guidelines"    1990

The World Bank Speakers Series
    "The Role of Antitrust Policy in an Open Economy"    1990

Seminar of the Secretary of Commerce and Industrial Development of Mexico
    "Transitions to a Market Economy"    1990

Southern Economics Association
    "Entry in Antitrust Analysis of Mergers"    1990
    "Discussion of Strategic Investment and Timing of Entry"    1990

American Enterprise Institute Conference on Policy Approaches to the
Deregulation of Network Industries
    "Discussion of Network Problems and Solutions"    1990

American Enterprise Institute Conference on Innovation, Intellectual Property, and World
Competition
    "Law and Economics Framework for Analysis"    1990

Banco Nacional de Desenvolvimento Economico Social Lecture
    "Competition Policy:  Harnessing Private Interests for the Public Interest"    1990

Western Economics Association Annual Meetings
    "New Directions in Antitrust from a New Administration"    1990
    "New Directions in Merger Enforcement: The View from Washington"    1990

Woodrow Wilson School Alumni Colloquium
    "Microeconomic Policy Analysis and Antitrust--Washington 1990"    1990

Arnold & Porter Lecture Series
    "Advocating Competition"    1991
    "Antitrust Enforcement"    1990

ABA Antitrust Section Convention
    "Recent Developments in Market Definition and Merger Analysis"    1990

Federal Bar Association
    "Joint Production Legislation: Competitive Necessity or Cartel Shield?"    1990

Pew Charitable Trusts Conference
    "Economics and National Security"    1990

ABA Antitrust Section Midwinter Council Meeting
    "Fine-tuning the Merger Guidelines"    1990
    "The State of the Antitrust Division"    1991

International Telecommunications Society Conference
    "Discussion of the Impact of Telecommunications in the UK"    1989

The Economists of New Jersey Conference
    "Recent Perspectives on Regulation"    1989

A-28

Conference on Current Issues Challenging the Regulatory Process
    "Innovative Pricing and Regulatory Reform"            1989
    "Competitive Wheeling"            1989

Conference Board: Antitrust Issues in Today's Economy
    "Foreign Trade Issues and Antitrust"            1989

McKinsey & Co. Mini-MBA Conference
    "Economic Analysis of Pricing, Costing, and Strategic Business Behavior"            1989
           1994

Olin Conference on Regulatory Mechanism Design
    "Revolutions in Regulatory Theory and Practice: Exploring The Gap"            1989

University of Dundee Conference on Industrial Organization and Strategic Behavior
    "Mergers in Differentiated Product Industries"            1988

Leif Johanson Lectures at the University of Oslo
    "Normative Issues in Industrial Organization"            1988

Mergers and Competitiveness: Spain Facing the EEC
    "Merger Policy"            1988
    "R&D Joint Ventures"            1988

New Dimensions in Pricing Electricity
    "Competitive Pricing and Regulatory Reform"            1988

Program for Integrating Economics and National Security: Second Annual Colloquium
    "Arming Decisions Under Asymmetric Information"            1988

European Association for Research in Industrial Economics
    "U.S. Railroad Deregulation and the Public Interest"            1987
    "Economic Rationales for the Scope of Privatization"            1989
    "Discussion of Licensing of Innovations"            1990

Annenberg Conference on Rate of Return Regulation in the Presence of Rapid Technical Change
    "Discussion of Regulatory Mechanism Design in the Presence
     of Research, Innovation, and Spillover Effects"            1987

Special Brookings Papers Meeting
    "Discussion of Empirical Approaches to Strategic Behavior"            1987
    "New Merger Guidelines"            1990

Deregulation or Regulation for Telecommunications in the 1990's
    "How Effective are State and Federal Regulations?"            1987

Conference Board Roundtable on Antitrust
    "Research and Production Joint Ventures"           1990
    "Intellectual Property and Antitrust"              1987

Current Issues in Telephone Regulation
    "Economic Approaches to Market Dominance:  Applicability of
     Contestable Markets"             1987

Harvard Business School Forum on Telecommunications
    "Regulation of Information Services"           1987

The Fowler Challenge:  Deregulation and Competition in The Local Telecommunications Market
    "Why Reinvent the Wheel?"           1986

World Bank Seminar on Frontiers of Economics
    "What Every Economist Should Know About Contestable Markets"    1986
Bell Communications Research Conference on Regulation and Information
    "Fuzzy Regulatory Rules"           1986

Karl Eller Center Forum on Telecommunications
    "The Changing Economic Environment in Telecommunications:
     Technological Change and Deregulation"        1986

Railroad Accounting Principles Board Colloquium
    "Contestable Market Theory and ICC Regulation        1986

Canadian Embassy Conference on Current Issues in Canadian -- U.S. Trade and Investment
    "Regulatory Revolution in the Infrastructure Industries"    1985

Eagleton Institute Conference on Telecommunications in Transition
    "Industry in Transition:  Economic and Public Policy Overview"    1985

Brown University Citicorp Lecture
    "Logic of Regulation and Deregulation"        1985

Columbia University Communications Research Forum
    "Long Distance Competition Policy"         1985

American Enterprise Institute Public Policy Week
    "The Political Economy of Regulatory Reform"      1984

MIT Communications Forum
    "Deregulation of AT&T Communications"       1984

Bureau of Census Longitudinal Establishment Data File and Diversification Study Conference
"Potential Uses of The File"                                                                                  1984

Federal Bar Association Symposium on Joint Ventures
"The Economics of Joint Venture Assessment"                                              1984

Hoover Institute Conference on Antitrust
"Antitrust for High-Technology Industries"                                                   1984

NSF Workshop on Predation and Industrial Targeting
"Current Economic Analysis of Predatory Practices"                                    1983

The Institute for Study of Regulation Symposium:  Pricing Electric, Gas, and Telecommunications Services Today and for the Future
"Contestability As A Guide for Regulation and Deregulation"                     1984

University of Pennsylvania Economics Day Symposium
"Contestability and Competition: Guides for Regulation and Deregulation"   1984

Pinhas Sapir Conference on Economic Policy in Theory and Practice
"Corporate Governance and Market Structure"                                             1984

Centre of Planning and Economic Research of Greece
"Issues About Industrial Deregulation"                                                        1984
"Contestability:  New Research Agenda"                                                      1984

Hebrew and Tel Aviv Universities Conference on Public Economics
"Social Welfare Dominance Extended and Applied to Excise Taxation"        1983

NBER Conference on Industrial Organization and International Trade
"Perspectives on Horizontal Mergers in World Markets"                             1983

Workshop on Local Access:  Strategies for Public Policy
"Market Structure and Government Intervention in Access Markets"           1982

NBER Conference on Strategic Behavior and International Trade
"Industrial Strategy with Committed Firms:  Discussion"                           1982

Columbia University Graduate School of Business, Conference on Regulation and New Telecommunication Networks
"Local Pricing in a Competitive Environment"                                             1982

International Economic Association Roundtable Conference on New Developments in the Theory of Market Structure

"Theory of Contestability"                                          1982
"Product Dev., Investment, and the Evolution of Market Structures"  1982

N.Y.U. Conference on Competition and World Markets: Law and Economics
"Competition and Trade Policy--International Predation"             1982

CNRS-ISPE-NBER Conference on the Taxation of Capital
"Welfare Effects of Investment Under Imperfect Competition"        1982

Internationales Institut fur Management und Verwalturg Regulation Conference
"Welfare, Regulatory Boundaries, and the Sustainability of Oligopolies"   1981
NBER-Kellogg Graduate School of Management Conference on the
Econometrics of Market Models with Imperfect Competition
"Discussion of Measurement of Monopoly Behavior:  An
Application to the Cigarette Industry"                          1981

The Peterkin Lecture at Rice University
"Deregulation:  Ideology or Logic?"                                1981

FTC Seminar on Antitrust Analysis
"Viewpoints on Horizontal Mergers"                                 1982
"Predation as a Tactical Inducement for Exit"                      1980

NBER Conference on Industrial Organization and Public Policy
"An Economic Definition of Predation"                              1980

The Center for Advanced Studies in Managerial Economics Conference on The Economics of
Telecommunication
"Pricing Local Service as an Input"                                1980

Aspen Institute Conference on the Future of the Postal Service
"Welfare Economics of Postal Pricing"                              1979

Department of Justice Antitrust Seminar
"The Industry Performance Gradient Index"                          1979

Eastern Economic Association Convention
"The Social Performance of Deregulated Markets for Telecom Services"
1979

Industry Workshop Association Convention
"Customer Equity and Local Measured Service"                       1979

Symposium on Ratemaking Problems of Regulated Industries
"Pricing Decisions and the Regulatory Process"                     1979

Woodrow Wilson School Alumni Conference
    "The Push for Deregulation"          1979

NBER Conference on Industrial Organization
    "Intertemporal Sustainability"          1979

World Congress of the Econometric Society
    "Theoretical Industrial Organization"          1980
Institute of Public Utilities Conference on Current Issues in Public Utilities Regulation
    "Network Access Pricing"          1978

ALI-ABA Conference on the Economics of Antitrust
    "Predatoriness and Discriminatory Pricing"          1978

AEI Conference on Postal Service Issues
    "What Can Markets Control?"          1978

University of Virginia Conference on the Economics of Regulation
    "Public Interest Pricing"          1978

DRI Utility Conference
    "Marginal Cost Pricing in the Utility Industry: Impact and Analysis"          1978

International Meeting of the Institute of Management Sciences
    "The Envelope Theorem"          1977

University of Warwick Workshop on Oligopoly
    "Industry Performance Gradient Indexes"          1977

North American Econometric Society Convention
    "Intertemporal Sustainability"          1979
    "Social Welfare Dominance"          1978
    "Economies of Scope, DAIC, and Markets with Joint Production"          1977

Telecommunications Policy Research Conference
    "Transition to Competitive Markets"          1986
    "InterLATA Capacity Growth, Capped NTS Charges and Long
     Distance Competition"          1985
    "Market Power in The Telecommunications Industry"          1984
    "FCC Policy on Local Access Pricing"          1983
    "Do We Need a Regulatory Safety Net in Telecommunications?"          1982
    "Anticompetitive Vertical Conduct"          1981
    "Electronic Mail and Postal Pricing"          1980
    "Monopoly, Competition and Efficiency":  Chairman          1979

"A Common Carrier Research Agenda" 1978
"Empirical Views of Ramsey Optimal Telephone Pricing" 1977
"Recent Research on Regulated Market Structure" 1976
"Some General Equilibrium Views of Optimal Pricing" 1975

National Bureau of Economic Research Conference on Theoretical Industrial Organization
"Compensating Variation as a Measure of Welfare Change" 1976
Conference on Pricing in Regulated Industries: Theory & Application
"Ramsey Optimal Pricing of Long Distance Telephone Services" 1977

NBER Conference on Public Regulation
"Income Distributional Concerns in Regulatory Policy-Making" 1977

Allied Social Science Associations National Convention
"Merger Guidelines and Economic Theory" 1990
Discussion of "Competitive Rules for Joint Ventures" 1989
"New Schools in Industrial Organization" 1988
"Industry Economic Analysis in the Legal Arena" 1987
"Transportation Deregulation" 1984
Discussion of "Pricing and Costing of Telecommunications Services" 1983
Discussion of "An Exact Welfare Measure" 1982
"Optimal Deregulation of Telephone Services" 1982
"Sector Differentiated Capital Taxes" 1981
"Economies of Scope" 1980
"Social Welfare Dominance" 1980
"The Economic Definition of Predation" 1979
Discussion of "Lifeline Rates, Succor or Snare?" 1979
"Multiproduct Technology and Market Structure" 1978
"The Economic Gradient Method" 1978
"Methods for Public Interest Pricing" 1977
Discussion of "The Welfare Implications of New Financial Instruments" 1976
"Welfare Theory of Concentration Indices" 1976
Discussion of "Developments in Monopolistic Competition Theory" 1976
"Hedonic Price Adjustments" 1975
"Public Good Attributes of Information and its Optimal Pricing" 1975
"Risk Invariance and Ordinally Additive Utility Functions" 1974
"Consumer's Surplus:  A Rigorous Cookbook" 1974

University of Chicago Symposium on the Economics of Regulated Public Utilities
"Optimal Prices for Public Purposes" 1976

American Society for Information Science
"The Social Value of Information:  An Economist's View" 1975

Institute for Mathematical Studies in the Social Sciences Summer Seminar

| "The Sustainability of Natural Monopoly" | 1975 |

U.S.-U.S.S.R. Symposium on Estimating Costs and Benefits of Information Services
    "The Evaluation of the Economic Benefits of Productive Information"    1975

NYU-Columbia Symposium on Regulated Industries
    "Ramsey Optimal Public Utility Pricing"    1975

**Research Seminars**:

| | |
|---|---|
| Bell Communications Research (2) | University of California, San Diego |
| Bell Laboratories (numerous) | University of Chicago |
| Department of Justice (3) | University of Delaware |
| Electric Power Research Institute | University of Florida |
| Federal Reserve Board | University of Illinois |
| Federal Trade Commission (4) | University of Iowa (2) |
| Mathematica | Universite Laval |
| Rand | University of Maryland |
| World Bank (4) | University of Michigan |
| Carleton University | University of Minnesota |
| Carnegie-Mellon University | University of Oslo |
| Columbia University (4) | University of Pennsylvania (3) |
| Cornell University (2) | University of Toronto |
| Georgetown University | University of Virginia |
| Harvard University (2) | University of Wisconsin |
| Hebrew University | University of Wyoming |
| Johns Hopkins University (2) | Vanderbilt University |
| M. I. T. (4) | Yale University (2) |
| New York University (4) | Princeton University (many) |
| Northwestern University (2) | Rice University |
| Norwegian School of Economics and | Stanford University (5) |
|   Business Administration |   S.U.N.Y. Albany |

# Attachment B

# Expert Testimony of Robert Willig

## March 1, 2015 to March 24, 2019

In re: Domestic Drywall Antitrust Litigation, In the United States District Court for the Eastern District of Pennsylvania, MDL No. 2437 13-MD-2437, Expert Report 03/13/15; Deposition 4/9/15, 4/10/15; Expert Report 01/26/18; Expert Report 02/26/18; Deposition 05/31/18.

The Valspar Corporation, and Valspar Sourcing, Inc. v. Millennium Inorganic Chemicals, Inc., Court File No. 13-3214-RHK-LIB; The Valspar Corporation, and Valspar Sourcing, Inc. v. E.I. DuPont De Nemours and Company, Case No. 14-527-RGA; and The Valspar Corporation, and Valspar Sourcing, Inc. v. Huntsman International, LLC, and Kronos Worldwide, Inc., Expert Report 6/12/2015; Deposition 7/16/2015.

Methodist Health Services Corporation v. OSF Healthcare System, In the United States District Court for the Central District of Illinois, Peoria Division, Case No.: 13-cv-1054, Expert Report 8/14/2015, Deposition 10/8/2015, Reply Report, 9/2016.

Application of the National Railroad Passenger Corporation Under 49 U.S.C. § 24308(a) – Canadian National Railway Company; Before the Surface Transportation Board, Docket No. FD 35743; Verified Statement, 9/4/2015; Rebuttal Verified Statement, 9/14/2017.

BRFHH Shreveport, LLC d/b/a University Health Shreveport and Vantage Health Plan, Inc. v. Willis-Knighton Medical Center, d/b/a Willis-Knighton Health System, In the United States District Court for the Western District of Louisiana, Shreveport Division, Case No.: 5:15-CV-02057, Joint Declaration of Margaret E. Guerin-Calvert and Robert D. Willig 9/8/2015, Expert Report 3/23/2017, Deposition 5/12/2017.

Australian Consumer and Competition Commission v. Informed Sources Pty Ltd & Ors, Before the Federal Court of Australia, Victoria Registry, File number VID450/2014, Expert Report 11/24/15.

Clark R. Huffman, Brandi K. Winters, Patricia L. Grantham, and Linda M. Pace, Individually and on behalf of all others similarly situated vs. The Prudential Insurance Company of America, In the United States District Court for the Eastern District of Pennsylvania, Civ. No. 2:10-cv-05135-EL, Expert Report 2/25/16, Deposition 4/5/16.

Maxon Hyundai Mazda, et al., vs. Carfax Inc., In the United States District Court for the Southern District of New York, Case No.: 13 CV 2680 (AJN) (RLE), Expert Report 2/26/16, Deposition 4/21/16.

Federal Trade Commission and Commonwealth of Pennsylvania vs. Penn State Hershey Medical Center and Pinnacle Health System, In the United States District Court for the Middle District of Pennsylvania, Civil Action No. 1:15-cv-02362, Expert Report 3/7/16, Deposition 3/25/16, Trial Testimony 4/15/16.

In the Matter of Business Data Services in an Internet Protocol Environment; Special Access for Price Cap Local Exchange Carriers; AT&T Corporation Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services; Before the FCC; WC Docket No. 16-143; WC Docket No. 05-25; RM-10593; Declaration 8/8/16.

United States et al. v. Anthem Inc. and Cigna Corp., In the United States District Court for the District of Columbia, Civil Action No. 16-cv-01493 (ABJ), Expert Report 10/7/16, Rebuttal and Supplemental Expert Report 10/28/16, Deposition 11/9/2016, Trial Testimony 12/2/16 and 1/3/17.

In the Matter of: Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III), Before the United States Copyright Royalty Judges, Washington, D.C., Docket No. 16-CRB-0001 SR/PSSR (2018-2022), Written Direct Testimony 10/19/16, Written Rebuttal Testimony 2/13/2017, Deposition 03/31/17, Trial Testimony 05/02/17 and 05/04/17.

Petition for Rulemaking to Adopt Revised Competitive Switching Rules, Before the Surface Transportation Board, Docket Number EP 711 (Sub-No. 1), Verified Statement 10/26/16.

In re: Evanston Northwestern Healthcare Corporation Antitrust Litigation, In the United States District Court Northern District of Illinois Eastern Division, Master File No. 07-CV-4446, Expert Report 10/26/16, Deposition 1/12/17.

Independent Power Producers of New York v. New York Independent System Operator, Before the Federal Energy Regulatory Commission, Docket No. EL13-62-002, Declaration 1/26/17.

Calpine Corporation et. al. v. PJM Interconnection, L.L.C., Before the Federal Energy Regulatory Commission, Docket No. EL16-49-000, Declaration 1/30/17.

In re: LIBOR-Based Financial Instruments Antitrust Litigation, Mayor and City Council of Baltimore, et. al. v. Credit Suisse Group AG, et. al., in the United States District Court Southern District of New York, MDL No. 2262, Master File No. 1:11-md-2262-NRB, 11-cv-5450 (NRB), Expert Report 4/3/17, Deposition 5/19/17.

In re: LIBOR-Based Financial Instruments Antitrust Litigation, Metzler Investment GmbH, et. al. v. Credit Suisse Group AG, et. al., in the United States District Court Southern District of New York, MDL 2262, 11 Civ. 2613, Master File No. 1:11-md-2262-NRB, 11-cv-5450 (NRB), Expert Report 4/3/17, Deposition 6/8/17.

In re: LIBOR-Based Financial Instruments Antitrust Litigation, Berkshire Bank, Government Development Bank v. Bank of America Corp., et. al., in the United States District Court Southern District of New York, MDL No. 2613, Master File No. 1:11-md-2262-NRB, 12-cv-5723-NRB, Expert Report 4/3/17, Deposition 4/21/17.

The Coca-Cola Company & Subs. v. Commissioner of Internal Revenue, in the United States Tax Court, Docket No. 31183-15, Expert Report 6/29/2017, Rebuttal Report 9/28/17, Deposition 12/19/17, Trial Testimony 4/5/18 and 4/6/18.

In re: Automotive parts antitrust litigation -- Bearings Cases; in the United States District Court for the Eastern District of Michigan Southern Division, Master File No. 12-md-02311; 2:12-cv-00501-MOB-MKM; Declaration in Support of Defendants' Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, 7/26/2017, Deposition 10/13/2017; Declaration in Support of Defendants' Reply in Support of Defendants' Joint Motion to Exclude the Proposed Expert Reports and Testimony of Drs. McClave and Langenfeld, 12/14/17.

In re: General Motors LLC Ignition Switch Litigation, in the U.S. District Court for the Southern District of New York, No. 14-MD-2543 (JMF), Expert Report 2/23/2018, Expert Report 4/20/2018, Supplemental Tables, 5/7/2018, Deposition 5/8/2018 and 5/9/2018.

CPV Power Holdings et. al. v. PJM Interconnection, L.L.C., Before the Federal Energy Regulatory Commission, Docket No. EL18-169-000, Declaration 06/20/18.

In Re Thalomid and Revlimid Antitrust Litigation, in the U.S, District Court for the District of New Jersey, Civil No. 14-6997 (MCA) (MAH), Expert Report 08/27/18, Deposition 10/25/2018.

In Re Djeneba Sidibe et al, v. Sutter Health, Case No. 3: 12-cv-4854-LB, in the U.S. District Court for the Northern District of California, Expert Declaration 9/21/2018, Deposition 11/8/2018, Sur-Reply Declaration 1/7/2019.

In Re UFCW & Employers Benefit Trust, et al v. Sutter Health, et al., Case No. CGC-14-538451, Consolidated with Case No. CGC-18-565398, People of the State of California, ex rel. et al v. Sutter Health, before the Superior Court of the State of California for the City and County of San Francisco, Expert Report 10/29/2018, Deposition 12/17-18/2018.

In Re Christopher Dicesare et al v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System, in the General Court of Justice State of North Carolina Superior Court Division County of Mecklenburg, Case No. 16-CVS-16404, Expert Report 12/7/2018, Deposition 3/8/2019.

# Attachment C

## Attachment C: List of Materials Considered
## Expert Report of Robert D. Willig, Ph.D., March 25, 2019

| Bates Stamp/Title | Date |
|---|---|
| ***Depositions and Exhibits*** | |
| ***Mylan*** | |
| Bhatt, Minaksi (Vice President and Assistant Global General Counsel for Patent Litigation) | 19-Oct-18 |
| Bresch, Heather (Chief Executive Officer) | 9-Oct-18 |
| Coury, Robert (Chairman) | 24-Oct-18 |
| Foster, Bruce (Senior Director, National Accounts | 14-Jun-18 |
| Graham, Roger (Head, Rx Business and New Product Portfolio Development) | 29-Aug-18 |
| Graham, Roger 30(b)(6) (Head, Rx Business and New Product Portfolio Development) | 30-Aug-18 |
| Graybill, Ron (Former Vice President, Managed Markets) | 21-Sep-18 |
| Hadley, Thomas (Former Executive Director of Global Marketing for EpiPen) | 3-Oct-18 |
| Jones, Patrick (Former Director of National Accounts) | 7-Sep-18 |
| Jordan, Harry (Senior Director, National Accounts Managed Care/RAM Team) | 26-Oct-18 |
| Korczynski, Sherry (Former Vice President of EpiPen Marketing) | 22-Aug-18 |
| May, Jeff (Head of Market Access and Managed Markets and former Vice President of North America Strategy) | 21-Sep-18 |
| Patel, Pranay (Senior Director, Branded Marketing and former Senior Director, Health Care Professional Marketing, EpiPen) | 17-Jul-18 |
| Sussman, Scott (National Account Director and former Regional Sales Director) | 13-Sep-18 |
| Willing, Nicole (National Account Manager and former Regional Account Manager) | 31-May-18 |
| York, Jay (National Sales Director, South and former Regional Sales Director, Southeast) | 1-Aug-18 |
| Zinn, Patrick (CFO; former Head of Commercial Finance, North America; former Senior Director of Finance at Mylan Specialty) | 22-Aug-18 |
| Zinn, Patrick 30(b)(6) (CFO; former Head of Commercial Finance, North America; former Senior Director of Finance at Mylan Specialty) | 22-Aug-18 |
| | |
| ***Sanofi*** | |
| Barry, Patrick (Former GM and Head of General Medicines and Established Products, North America) | 13-Jul-18 |
| Barry, Patrick 30(b)(6) (Former GM and Head of General Medicines and Established Products, North America) | 13-Jul-18 |
| Borneman, James (Former Vice President of Strategic Pricing and Contracts) | 28-Jun-18 |
| Borneman, James 30(b)(6) (Former Vice President of Strategic Pricing and Contracts) | 28-Jun-18 |
| Denney, Joe 30(b)(6) (Former Senior Director of Payer Marketing) | 17-Jul-18 |
| Downey, Bryan 30(b)(6) (Former Vice President & Head of Cardiovascular and Allergy) | 31-Jul-18 |
| Downey, Bryan (Former Vice President & Head of Cardiovascular and Allergy) | 1-Aug-18 |
| Eaton, Robert (National Accounts Director) | 12-Oct-18 |
| Fairest, Jonathan (Head of General Medicines and Emerging Markets, Africa) | 19-Oct-18 |
| Guenter, Peter (Former Executive Vice President and Head of Global Commercial Operations) | 3-Oct-18 |
| Harr, Lorine (Former Senior Director, Anaphylaxis Marketing) | 14-Aug-18 |
| Harr, Lorine 30(b)(6) (Former Senior Director, Anaphylaxis Marketing) | 15-Aug-18 |
| Huang, Philip 30(b)(6) (Vice President of Medical Affairs) | 25-Sep-18 |
| Hubert, Herve (Former Director of US Strategic Pricing and Market Access) | 11-Sep-18 |
| Loreaux, Sandy (Vice President of Account Management, US Managed Markets) | 6-Sep-18 |
| Moulding, Jez (Former President, North America Pharmaceuticals) | 23-Oct-18 |
| Parker, James (Senior Director, U.S. Regulatory) | 30-Oct-18 |
| Pasckiewicz, Suzanne 30(b)(6) (Director of Sales and Marketing, General Medicines Portfolio) | 21-Sep-18 |
| Siragusa, Carrie 30(b)(6) (Head of Commercial Operations, Chief of Staff) | 27-Sep-18 |
| Viehbacher, Christopher (Chief Executive Officer) | 16-Oct-18 |
| Wade, Keith (National Account Director) | 30-Oct-18 |
| Whitaker, Anne (Former President, North America Pharmaceuticals) | 18-Oct-18 |
| | |
| ***Third Parties*** | |
| Anderson, Joseph 30(b)(6) (Senior Director, Trade Relations at CVS) | 20-Dec-18 |
| Arcara, Michael (Consultant at Strategic Partners Consulting) | 14-Aug-18 |

| | | |
|---|---|---|
| | Ayers, James (Former Vice President of Industry Relations at MedImpact) | 26-Sep-18 |
| | Brodeur, Michael 30(b)(6) (Director of Clinical Drug Assessment at Aetna) | 12-Dec-18 |
| | Brown, Douglas 30(b)(6) (Vice President of Account Management and Pharmacy Pricing at Magellan) | 25-Oct-18 |
| | Byrne, Patrick (Consultant at Payer Sciences) | 16-Oct-18 |
| | Cunico, Louanne (Vice President of Clinical Operations and Pharmacy, Fluent Health at Presbyterian Health) | 17-Oct-18 |
| | Etemad, Lida (Vice President, Pharmacy Management Strategies at UnitedHealth) | 29-Nov-18 |
| | Hall, Jason 30(b)(6) (Senior Director of Pharmaceutical Trade Relations at Prime Therapeutics) | 21-Dec-18 |
| | Handel, Thomas (General Manager and President at Meridian) | 17-Oct-18 |
| | Jan, Saira 30(b)(6) (Director of Strategy and Clinical Integration at Horizon) | 30-Nov-18 |
| | Kautzner, Adam 30(b)(6) (Vice President of Supply Chain Product and Strategy at Express Scripts) | 18-Dec-18 |
| | Kronberg, Deborah 30(b)(6) (Business Finance Officer, Cigna Pharmacy at Cigna) | 19-Oct-18 |
| | Minton, Barbara 30(b)(6) (Staff Vice President of Pharmaceutical Contracting Strategies at Anthem) | 30-Oct-18 |
| | Rocheleau, Sylvain (Business Unit Director, Pfizer Essential Health and former Director of Marketing, Pfizer Essential Health at Pfizer Canada) | 26-Sep-18 |
| | Rogers, Kent David 30(b)(6) (Senior Vice President of Industry Relations at OptumRx) | 19-Dec-18 |
| | Scott Morton, Fiona (Expert) | 12-Mar-19 |
| | Shia, Macy (Director of National Pharmaceutical Contracting at Kaiser) | 9-Nov-18 |
| | Stein, Bethanie (Vice President of Trade Relations at Humana) | 11-Oct-18 |
| | Vargo, Harry (Director of Manufacturing Relations and Head of Value-Based Contracting at Aetna) | 13-Dec-18 |
| | Williamson, T. Spencer (Chief Executive Officer at kaléo) | 28-Sep-18 |
| | White, Thomas Jeffrey 30(b)(6) (Staff Vice President of Clinical Pharmacy Services at Anthem) | 31-Oct-18 |
| | Works, Justin (Manager at Analysis Group) | 17-Jan-19 |
| | | |
| ***Expert Reports*** | | |
| | Expert Report of Dr. Fiona M. Scott Morton and Appendices and backup relevant to her liability opinion | 4-Feb-19 |
| | Expert Report of Dr. Mary Ann Michelis | 2-Feb-19 |
| | | |
| ***Testimony*** | | |
| | Carl Shapiro, "Exclusionary Conduct," Testimony before the Antitrust Modernization Commission, September 29, 2005 | 29-Sep-05 |
| | Fiona M. Scott Morton, Testimony for the Senate Finance Committee, "Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit" January 11, 2007, available at <https://www finance.senate.gov/imo/media/doc/011107fmtest.pdf>, accessed March 19, 2019 | 11-Jan-07 |
| | "Drug Pricing in America: A Prescription for Change, Part II," Testimony of Olivier Brandicourt, M.D., Chief Executive Officer, Sanofi, Before the Senate Committee on Finance, February 26, 2019, available at <https://www finance.senate.gov/hearings/watch?hearingid=460E19F3-5056-A066-602B-23C8DE94DCF1>, accessed March 25, 2019 | 26-Feb-19 |
| | "Testimony of Olivier Brandicourt, M.D., Chief Executive Officer, Sanofi, Before the Senate Committee on Finance," February 26, 2019, available at <https://www finance.senate.gov/imo/media/doc/26FEB2019BRANDICOURT-SANOFI.pdf>, accessed March 19, 2019 | 26-Feb-19 |
| | | |
| ***Legal*** | | |
| | Complaint | 24-Apr-17 |
| | Memorandum and Order | 21-Dec-17 |
| | | |
| ***Caselaw*** | | |
| | *Am. Council of Certified Podiatric Physicians v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 623 (6th Cir. 1999) | |
| | *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) | |
| | *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016) | |
| | *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices, and Antitrust Litig.*, No.17-md-2785-DDC-TJJ, 2017 WL 6524839 (D. Kan Dec. 21, 2017) | |
| | *King Pharmaceuticals, Inc. and Meridian Medical Technologies, Inc. v. Intelliject, Inc.*, Case 1:11-cv-00065-UNA, (D. Del. Jan. 19, 2011) | |
| | *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc) | |

| | | |
|---|---|---|
| | *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.* , 920 F. Supp. 455 (S.D.N.Y. 1996) | |
| | *Rebel Oil Co. v. Atlantic Richfield Co.* , 51 F. 3d 1421 (9th Cir. 1995) | |
| | *Ryko Mfg. Co. v. Eden Servs.* , 823 F. 2d 1215 (8th Cir. 1987) | |
| | *United States v. E.I. du Pont de Nemours & Co* ., 351 U.S. 377 (1956) | |
| | *United States v. Grinnell Corp* ., 384 U.S. 563, 570-71 (1966) | |
| | *United States v. Syufy Enters.* , 903 F. 2d 659 (9th Cir. 1990) | |
| | *ZF Meritor, LLC v. Eaton Corp.* , 696 F.3d 254 (3d Cir. 2012) | |
| | | |
| ***Correspondence*** | | |
| | Letter from Sen. Susan Collins (R-ME) to the Hon. Alex M. Azar II, Secretary, U.S. Dep't of Health and Human Servs., January 9, 2019, available at <https://www.collins.senate.gov/sites/default/files/Letter%20to%20Sec.%20Azar.pdf>, accessed March 25, 2019 | |
| | | |
| ***Industry Studies*** | | |
| | "2017 Trends in Drug Benefit Design," PBMI, 2017 | |
| | "PBMI Research Report: Trends in Drug Benefit Design," PBMI, 2016 | |
| | "Exploring Pharmacists' Role in a Changing Healthcare Environment," Avalere Health LLC, May 2014 | |
| | "Follow the Dollar: Understanding How the Pharmaceutical Distribution and Payment System Shapes the Prices of Brand Medicines," PhRMA, November 2017 | |
| | "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain," Prepared for The Kaiser Family Foundation by: The Health Strategies Consultancy LLC, March 2005, https://avalere.com/research/docs/Follow_the_Pill.pdf | |
| | "Prescription Drug Pricing," Health Affairs, Health Policy Brief Series, September 2017 | |
| | "Study of the Pharmacy Chain of Supply," Health Management Associates, Office of the Insurance Commissioner of Washington State, https://www.insurance.wa.gov/sites/default/files/2017-06/pharmacy-supply-chain-study_0.pdf | |
| | Gabriela Dieguez, Maggie Alston, and Samantha Tomicki, "A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices," Milliman, May 2018, available at <http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf>, accessed March 19, 2019 | |
| | U.S. Dep't of Health and Human Servs., "American Patients First: The Trump Administration's Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs," May 2018, available at <https://www.hhs.gov/sites/default/files/AmericanPatientsFirst.pdf>, accessed March 25, 2019 | |
| | | |
| ***Academic Texts and Articles*** | | |
| | "Anaphylaxis and Insect Stings and Bites," 318 *Journal of the American Medical Association* 86 (2017) | |
| | A. Douglas Melamed, "Exclusive Dealing Agreements and Other Exclusionary Conduct—Are There Unifying Principles?" 73 *Antitrust Law Journal* 375 (2006) | |
| | A. Sheikh, Y.A. Shehata, S.G.A. Brown, and F.E.R. Simons, "Adrenaline for the treatment of anaphylaxis: Cochrane systematic review," 64 *Allergy* (2009), pp. 204–212 | |
| | Alfred I. Neugut, Anita T. Ghatak, and Rachel L. Miller, "Anaphylaxis in the United States: An Investigation Into Its Epidemiology," 161 *Archives of Internal Medicine* 15 (2001) | |
| | Assaf Eilat, David Gilo, and Guy Sagi, "Loyalty Discounts, Exclusive Dealing and Bundling: Rule of Reason, Quasi Per Se, Price-Cost Test or Something in Between," *Journal of Antitrust Enforcement* , Vol. 4, No. 2 (October 2016), pp. 345-380 | |
| | B. Douglas Bernheim and Randal Heeb, (2014). "Framework for the economic analysis of exclusionary conduct," in *The Oxford Handbook of International Antitrust Economics* (R. D. Blair & D. D. Sokol eds.), Oxford University Press (2014) | |
| | Barry Nalebuff, "Exclusionary Bundling," 50 *Antitrust Bulletin* 321, 321, 327 (2005) | |
| | Benjamin Klein and Andres V. Lerner, "Price-Cost Tests in Antitrust Analysis of Single Product Loyalty Contracts," *Antitrust Law Journal* , Vol. 80, No. 3 (2016), pp. 631–679 | |
| | David B. Ridley, "Payments, Promotion and the Purple Pill," 24 *Health Economics* 86 (2015) | |
| | David Spector, "Loyalty Rebates: An Assessment of Competition Concerns and a Proposed Structured Rule of Reason," *CPI Journal, Competition Policy International* , vol. 1 (2005) | |
| | Dennis Carlton (2007) "Market definition: Use and abuse," *Competition Policy International* , 3(1(Spring)), 3–27 | |
| | Erik Hovenkamp and Herbert Hovenkamp, "Exclusionary Bundled Discounts and the Antitrust Modernization Commission," *Antitrust Bulletin,* Vol. 53, No. 3 (Fall 2008), pp. 517-553 | |

Ernst R. Berndt, Thomas G. McGuire, and Joseph P. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," National Bureau of Economic Research Working Paper No. 16879 (2011)

F. Estelle R. Simons, "Anaphylaxis: Recent Advances in Assessment and Treatment," 124 *The Journal of Allergy and Clinical Immunology* 625 (2009)

Fiona Scott Morton and Lyse T. Boller, "Enabling Competition in Pharmaceutical Markets," Hutchins Center Working Paper #30, May 2017

Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products," Chapter 12 in *Handbook of Health Economics*, Vol. 2, Elsevier (2012), pp. 763–823

Fiona Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," *Antitrust Law Journal*, Vol. 81 (2017), pp. 777–836

Fiona M. Scott Morton, "Contracts that Reference Rivals," 27 *Antitrust* 72 (2013)

Frank Limbrock, "Pecuniary and Non-Pecuniary Incentives in Prescription Pharmaceuticals: The Case of Statins," 11 *The B.E. Journal of Economic Analysis & Policy* (Advances), (2011)

G. Michael Allan, Joel Lexchin & Natasha Wiebe, *Physician Awareness of Drug Cost: A Systematic Review*, 4 PLoS Medicine, 1486 (September 2007)

George A. Hay, "Market Power in Antitrust," 60 *Antitrust Law Journal* 807 (1991)

Gregory J. Werden, "Identifying Exclusionary Conduct under Section 2: The 'No Economic Sense' Test," 73 *Antitrust Law Journal* 413 (2006)

Gregory J. Werden, "The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm," 71 *Antitrust Law Journal* 253, 254 (2003)

Herbert Hovenkamp, Exclusion and Sherman Act, 72, *University of Chicago Law Review,* 147-164 (2005)

James A. Langenfeld, "The Merger Guidelines As Applied," In *The Economics of the Antitrust Process*, Boston, MA: Springer US (1996), pp. 41–64

Jean Tirole, *The Theory of Industrial Organization*, MIT Press (1988)

Jonathan B. Baker and Timothy F. Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power" in *Handbook of Antitrust Economics* (Paolo Buccirossi ed.), The MIT Press (2008)

Jonathan B. Baker, "Exclusion as a Core Competition Concern," 78 *Antitrust Law Journal* 527 (2013)

Jonathan B. Baker, "Market Definition: An Analytical Overview," 74 *Antitrust Law Journal* 129 (2007)

Jonathan M. Jacobson & Daniel P. Weick, "Contracts that Reference Rivals as an Antitrust Category," *The Antitrust Source* (April 2012)

Joseph A. DiMasi and Henry G. Grabowski, "The Cost of Biopharmaceutical R&D: Is Biotech Different?," 28 *Managerial and Decision Sciences* 469 (2007)

Joseph Farrell, Janis K. Pappalardo and Howard Shelanski, "Economics at the FTC: Mergers, Dominant-Firm Conduct, and Consumer Behavior," 37 *Review of Industrial Organization* 263, 267-68 (2010)

Joshua A. Boyce et. al, "Guidelines for the Diagnosis and Management of Food Allergy in the United States: Report of the NIAID-Sponsored Expert Panel Report," *The Journal of Allergy and Clinical Immunology*, 2010 December 126(60)

Judith K. Hellerstein, "The Importance of the Physician in the Generic versus Trade-Name Prescription Decision," 29 *The RAND Journal of Economics* 108, 111 (1998)

Larry S. Posner and Carlos A. Camargo, Jr, "Update on the Usage and Safety of Epinephrine Auto-Injectors, 2017," 9 *Drug, Healthcare and Patient Safety* 9, 15 (2017)

Louis Kaplow (2011) "Market share thresholds: on the conflation of empirical assessments and legal policy judgments," *Journal of Competition Law & Economics*, 7(2), 243–276

Marc-André Gagnon and Joel Lexchin, "The Cost of Pushing Pills: A New Estimate of Pharmaceutical Promotion Expenditures in the United States," 5 *PLoS Medicine* 29 (2008)

Margaret Kyle, "Pharmaceutical Price Controls and Entry Strategies," 89 *The Review of Economics and Statistics* 88 (2007)

Michael L. Katz, "Vertical Contractual Relations," in *Handbook of Industrial Organization*, Volume I (Richard Schmalensee and Robert D. Willig, eds.), Elsevier Ltd. (1989)

Nicholas Economides, "Loyalty/Requirement Rebates and the Antitrust Modernization Commission: What is the Appropriate Liability Standard?," 54 *Antitrust Bulletin* 259 (2009)

Patrick DeGraba, "Naked Exclusion by a Dominant Supplier: Exclusive Contracting and Loyalty Discounts," 31 *International Journal of Industrial Organization* 516 (2013)

| | |
|---|---|
| Paul A. Greenberger, Dana V. Wallace, Phillip L. Lieberman, and Sean M. Gregory, "Contemporary Issues in Anaphylaxis and the Evolution of Epinephrine Autoinjectors," 119 *Annals of Allergy, Asthma, & Immunology* 333, 336 (Table 1) (2017) | |
| Paul L. Joskow, "Vertical Integration," in ABA Section of Antitrust Law, *Issues in Competition Law and Policy*, Volume I (W. Dale Collins, ed.), American Bar Association (2008) | |
| Phil Lieberman, et al., "Epidemiology of Anaphylaxis: Findings of the American College of Allergy, Asthma and Immunology Epidemiology of Anaphylaxis Working Group," 97 *Annals of Allergy, Asthma & Immunology* 596 (November 2006) | |
| Philippe Aghion and Patrick Bolton, "Contracts as a Barrier to Entry," 77 *American Economic Review* 388 (1987) | |
| Richard G. Frank and David S. Salkever, "Generic Entry and the Pricing of Pharmaceuticals," 6 *Journal of Economics & Management Strategy* 75 (1997) | |
| Sara Fisher Ellison and Christopher M. Snyder, "Countervailing Power in Wholesale Pharmaceuticals," 58 *The Journal of Industrial Economics* 32 (2010) | |
| Scott H. Podolsky and Jeremy A. Greene, "A Historical Perspective of Pharmaceutical Promotion and Physician Education," 300 *JAMA: The Journal of the American Medical Association* 831 (2008) | |
| Sean Durkin, "The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test," *Antitrust Law Journal*, Vol. 81 (2017), pp. 475–506 | |
| Stephen D. Lockey, Sr, "A New Method of Administering Aqueous Epinephrine: The EpiPen, an Automatic Syringe," 17 *The Journal of Asthma Research* 153 (1980) | |
| Stephen F. Kemp and Richard F. Lockey, "Anaphylaxis: A Review of Causes and Mechanisms," 110 *The Journal of Allergy and Clinical Immunology* 341, 346 (2002) | |
| Steven C. Salop, "Exclusionary Conduct, Effect on Consumers, and the Flawed Profit Sacrifice Standard," 73 *Antitrust Law Journal* 311 (2006) | |
| T.T. Song, M. Worm, and P. Lieberman, "Anaphylaxis Treatment: Current Barriers to Adrenaline AutoInjector Use," 69 *Allergy* 983 (2014) | |
| Thomas G. Krattenmaker and Steven C. Salop, "Anticompetitive Exclusion: Raising Rivals' Costs To Achieve Power Over Price," 96 *Yale Law Journal* 209 (1986) | |
| Toshiaka Iizuka & Ginger Z. Jin, "The Effects of Prescription Drug Advertising on Doctor Visits," 14 *Journal of Economics and Management Strategy* 701 (2005) | |
| | |
| ***Public Documents*** | |
| "Supply Agreement between Meridian Medical Technologies and Dey (Jan. 1, 2001)," Securities and Exchange Commission Exhibit 10.42, available at <https://www.sec.gov/Archives/edgar/containers/fix071/95676/000095013301501482/w49983ex10-42.txt> | |
| European Commission, "Communication from the Commission - Guidance on the Commission's Enforcement Priorities in Applying Article 82 of the EC Treaty to Abusive Exclusionary Conduct by Dominant Undertakings," Official Journal of the European Union, OJ C 45, February 24, 2009, pp. 7-20 | |
| CVS/Caremark, "Formulary Exclusions," January 2012 | |
| CVS/Caremark, "Formulary Drug Removals," January 2013 | |
| CVS/Caremark, "Formulary Drug Removals," January 2014 | |
| CVS/Caremark, "Formulary Drug Removals," January 2015 | |
| CVS/Caremark, "Formulary Drug Removals," January 2016 | |
| CVS/Caremark, "Formulary Drug Removals," January 2017 | |
| Express Scripts, "2014 Preferred Drug List Exclusions" | |
| Express Scripts, "2015 Preferred Drug List Exclusions" | |
| Express Scripts, "2016 Preferred Drug List Exclusions" | |
| Express Scripts, "2017 Preferred Drug List Exclusions" | |
| Mylan Inc., "Form 10-K/A," FYE 2007, March 7, 2008 | |
| Mylan Inc., "Form 10-K," FYE 2014, March 2, 2012 | |
| Mylan N.V., "Form 10-K," FYE 2007, February 29, 2008 | |
| Mylan N.V., "Form 10-K," FYE 2011, February 21, 2012 | |
| Mylan N.V., "Form 10-K," FYE 2017, February 28, 2018 | |
| OptumRx, "2016 Premium PDL Exclusions," August 25, 2015 | |
| OptumRx, "1.1.2017 Premium Formulary Exclusions," December 31, 2016 | |
| Sanofi, "Form 20-F," 2013 | |

| | | Accessed |
|---|---|---|
| | U.S. DOJ and FTC, "Horizontal Merger Guidelines," August 2010 | |
| | | |
| ***News, Press and Websites*** | | ***Accessed*** |
| | "2019 Medicare Advantage Plan Benefit Details for the Medi-Pak Advantage (HMO)," Q1medicare.com, available at <https://q1medicare.com/MedicareAdvantage-PartCMedicareHealthPlanBenefits.php?state=AR&source=2016MAText&ZIP=&countyCode=5131&contractId=H9699&planId=004&segmentId=1&plan=MediPak%20Advantage%20(HMO)&utm_source=partd&utm_medium=matext&utm_campaign=detailsicon> | 2-Feb-19 |
| | "About Auvi-Q," Auvi-Q, available at <https://www.auvi-q.com/about-auvi-q> | 2-Feb-19 |
| | "About," EpiPen4Schools, available at <https://www.epipen4schools.com/About/> | 25-Feb-19 |
| | "Adrenaclick Auto-Injector Available Again for Anaphylaxis," MPR, June 17, 2013, available at <http://www.empr.com/news/adrenaclick-auto-injector-available-again-for-anaphylaxis/article/298979/> | 2-Feb-19 |
| | "Adrenaclick Auto-Injector Available Again for Anaphylaxis," MPR, June 17, 2013, <https://www.empr.com/home/news/adrenaclick-auto-injector-available-again-for-anaphylaxis/> | 20-Mar-19 |
| | "Adrenaclick Auto-injector launched for anaphylaxis," MPR, January 7, 2010, available at <https://www.empr.com/news/adrenaclick-auto-injector-launched-for-anaphylaxis/article/160817/> | 2-Feb-19 |
| | "Amedra Pharmaceuticals Markets Adrenaclick® Auto-Injector," Amedra Pharmaceuticals LLC Press Release, June 14, 2013, available at <https://www.prnewswire.com/news-releases/amedrapharmaceuticals-markets-adrenaclick-auto-injector-211586831.html> | 2-Feb-19 |
| | "Amedra Pharmaceuticals Markets Adrenaclick® Auto-Injector," Amedra Pharmaceuticals LLC, June 14, 2013, <https://www.prnewswire.com/news-releases/amedra-pharmaceuticals-markets-adrenaclick-auto-injector-211586831.html> | 20-Mar-19 |
| | "Anaphylaxis," American College of Allergy, Asthma & Immunology, January 29, 2018, available at <https://acaai.org/allergies/anaphylaxis> | 2-Feb-19 |
| | "Anaphylaxis," Mylan, 2014, available at <https://www.mylan.com/-/media/mylancom/files/patientmaterials/myguide_anaphylaxis.pdf> | 2-Feb-19 |
| | "ANAPHYLAXIS: A Severe Allergic Reaction," Asthma and Allergy Foundation of America, <https://www.aafa.org/anaphylaxis-severe-allergic-reaction/> | 20-Mar-19 |
| | "Anaphylaxis," American Academy of Allergy Asthma & Immunology, <https://www.aaaai.org/conditions-and-treatments/allergies/anaphylaxis> | 20-Mar-19 |
| | "Application Number: 20-800 Approved Labeling," Center for Drug Evaluation and Research, May, 28, 2003, <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2003/20-800_Twinject_prntlbl.pdf> | 20-Mar-19 |
| | "Appropriate Route of Administration of Epinephrine," American Academy of Allergy Asthma & Immunology, <https://www.aaaai.org/ask-the-expert/administration-of-epinephrine> | 20-Mar-19 |
| | "Approval Package for Application Number: 019430Orig1s001," Center for Drug Evaluation and Research, available at <https://www.accessdata.fda.gov/drugsatfda_docs/nda/pre96/019430Orig1s001.pdf> | 2-Feb-19 |
| | "Approval Package for Application Number: 201739Orig1s000," Center for Drug Evaluation and Research, available at <https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/201739Orig1s000Approv.pdf> | 2-Feb-19 |
| | "AUVI-Q (epinephrine injection, USP) Available in Canada Starting September 7," kaléo, August 29, 2018, available at <https://kaleo.com/press-release/auvi-q-epinephrine-injection-usp-available-in-canada-starting-september-7> | 2-Feb-19 |
| | "Auvi-Q (epinephrine injection, USP) Recall," Sanofi release, available at https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall/, accessed January 25, 2019 | 20-Mar-19 |
| | "Auvi-Q (epinephrine injection, USP) Recall," Sanofi, available at <https://www.sanofi.us/en/products-and-resources/Auvi-Q-epinephrine-injection-USP-Recall> | 2-Feb-19 |
| | "Care Oregon Advantage," Careoregonadvantage.org, available at <https://www.careoregonadvantage.org/docs/default-source/2018-membermaterial/coa_star_2018_summary_of_benefits.pdf?sfvrsn=2> | 2-Feb-19 |
| | "Children's Health Insurance Program (CHIP)," Medicaid.gov, available at <https://www.medicaid.gov/chip/index.html> | 2-Feb-19 |
| | "CVS Health Offers Patients Lowest Cash Price in the Market for Generic Epinephrine Auto-injector to Treat Allergic Reactions," CVS Health, January 12, 2017, available at <https://cvshealth.com/newsroom/press-releases/cvs-health-offers-patients-lowest-cash-price-market-generic-epinephrine-auto> | 19-Mar-19 |
| | "Dosage and Administration," EpiPen, Table 1, <https://www.epipen.com/hcp/about-epipen-and-generic/dosage-and-administration> | 20-Mar-19 |
| | "Drug coverage (Part D)," Medicare.gov, available at <https://www.medicare.gov/drug-coverage-part-d> | 2-Feb-19 |

| | | |
|---|---|---|
| "Epinephrine Autoinjector," American College of Allergy, Asthma & Immunology, February 1, 2018, available at <https://acaai.org/allergies/allergy-treatment/epinephrine-auto-injector> | 2-Feb-19 |
| "Epinephrine Choices in 2017; So Many, And What To Do?," Consultants in Allergy & Asthma Care, June 30, 2017, available at <https://allergyasthmacare-doctor.com/epinephrine-choices-in-2017-so-many-and-what-to-do> | 2-Feb-19 |
| "EPINEPHRINE injection [Greenstone LLC]," NIH, available at <https://web.archive.org/web/20100516130646/http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=16934> | 2-Feb-19 |
| "EpiPen Supply Information," EpiPen, available at <https://www.epipen.com/about-epipen-and-generic/supplyinformation> | 2-Feb-19 |
| "EpiPen4Schools," Mylan, available at <https://www.epipen4schools.com/> | 2-Feb-19 |
| "FDA approves first generic version of EpiPen," FDA, August 16, 2018, available at <https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm617173.htm> | 2-Feb-19 |
| "FDA List of Authorized Generic Drugs," FDA, December 27, 2018, available at <https://www.fda.gov/drugs/developmentapprovalprocess/howdrugsaredevelopedandapproved/approvalapplications/abbreviatednewdrugapplicationandagenerics/ucm126389.htm> | 2-Feb-19 |
| "Formulary exclusions set up contentious environment for pharma companies," Decision Resources Group, September 27, 2016, available at <https://decisionresourcesgroup.com/drg-blog/market-access/formulary-exclusions-set-contentious-environment-pharma-companies/> | 20-Mar-19 |
| "Frequently Asked Questions," EpiPen4Schools, available at <https://www.epipen4schools.com/Faq/> | 17-Mar-19 |
| "Frequently Asked Questions: What are the symptoms of anaphylaxis?," EpiPen, available at <https://www.epipen.com/about-epipen-and-generic/faq> | 2-Feb-19 |
| "Full House Committee on Oversight and Government Reform, Hearing on Reviewing the Rising Price of EpiPens," GovInfo, September 21, 2016, available at <https://www.govinfo.gov/content/pkg/CHRG-114hhrg24914/pdf/CHRG114hhrg24914.pdf> | 2-Feb-19 |
| "Generic Adrenaclick Availability," Drugs.com, available at <https://www.drugs.com/availability/generic-adrenaclick html> | 2-Feb-19 |
| "Generic EpiPen®; EPIsnap®; Adrenaclick®; Auvi-Q®; Epinephrinesnap-v®; EpiPen 2-Pak®; EpiPen Jr 2-Pak®; EPIsnap® Alpha- and Beta-Adrenergic Agonist Epinephrine 0.15 mg Injection Auto-Injector 0.15 mL,"Mckesson.com, available at <https://mms mckesson.com/product/1053683/Impax-Pharmaceuticals-115169549> | 2-Feb-19 |
| "Health Insurance Coverage of the Total Population." The Henry J. Kaiser Family Foundation, available at <https://www.kff.org/other/state-indicator/totalpopulation/?dataView=1&currentTimeframe=3&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D> | 23-Mar-19 |
| "HMO-PPO Digest: 2016," Sanofi, https://www managedcaredigest.com/pdf/HMO-PPO.pdf | 20-Mar-19 |
| "How We Build a Formulary," Express Scripts, November 12, 2018, <http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary> | 20-Mar-19 |
| "iCare Medicare Plan," ICarehealthplan.org, available at <https://www.icarehealthplan.org/Plans/MedicareSNP.aspx> | 2-Feb-19 |
| "Intelliject, Inc. announces name change to kaléo," kaléo, January 6, 2014, <https://kaleo.com/press-release/intelliject-inc-announces-name-change-to-kaleo/> | 20-Mar-19 |
| "Kaléo Announces AUVI-Q® (epinephrine injection, USP) Charitable Donation Program for All Public Elementary Schools in the United States.pdf," kaléo press release, August 7, 2017, available at <https://kaleo.com/press-release/kaleo-announces-auvi-q-epinephrine-injection-usp-charitable-donation-program-for-all-public-elementary-schools-in-the-united-states/> | 20-Mar-19 |
| "Kaléo Announces U.S. Availability and Pricing to Patients of Auvi-Q® (Epinephrine Injection, USP) Auto-Injector, For Life-Threatening Allergic Reactions," kaléo, January 19, 2017, <https://kaleo.com/press-release/kaleo-announces-u-s-availability-and-pricing-to-patients-of-auvi-q-epinephrine-injection-usp-auto-injector-for-life-threatening-allergic-reactions/> | 20-Mar-19 |
| "Kaléo Announces U.S. Availability and Pricing to Patients of Auvi-Q® (Epinephrine Injection, USP) Auto-Injector, For Life-Threatening Allergic Reactions," kaléo, January 19, 2017, <https://kaleo.com/pressrelease/kaleo-announces-u-s-availability-and-pricing-to-patients-of-auvi-q-epinephrine-injection-usp-autoinjector-for-life-threatening-allergic-reactions/> | 2-Feb-19 |
| "Kaléo Confirms U.S. Availability of AUVI-Q (epinephrine injection, USP) Auto-injector for Back-to-School Season," kaléo, August 14, 2018, available at <https://kaleo.com/press-release/kaleo-confirms-u-s-availability-of-auvi-q-epinephrineinjection-usp-auto-injector-for-back-to-school-season/> | 2-Feb-19 |
| "Keeping It Simple: One Startup's Plan to Upend The Epinephrine Delivery Market," Med Device Online, March 29, 2016, <https://www.meddeviceonline.com/doc/one-start-up-s-plan-to-upend-the-epinephrine-delivery-market-0001> | 20-Mar-19 |

| | | |
|---|---|---|
| | "Lineage Therapeutics Markets Authorized Generic Epinephrine Auto-Injector," Lineage Therapeutics Inc. Press Release, June 14, 2013, available at <https://www.prnewswire.com/news-releases/lineagetherapeutics-markets-authorized-generic-epinephrine-auto-injector-211585371.html> | 2-Feb-19 |
| | "Lineage Therapeutics Markets Authorized Generic Epinephrine Auto-Injector," Lineage Therapeutics Inc., June 14, 2013, <https://www.prnewswire.com/news-releases/lineage-therapeutics-markets-authorized-generic-epinephrine-auto-injector-211585371.html> | 20-Mar-19 |
| | "Medicaid Program Names," Aspe hhs.gov, available at <https://aspe hhs.gov/dataset/medicaid-program-names> | 2-Feb-19 |
| | "MEDI-CAL (For People with Medicare)," Cahealthadvocates.org, available at <https://cahealthadvocates.org/lowincome-help/medi-cal-for-people-with-medicare/> | 2-Feb-19 |
| | "Meridian Announces Launch of New EpiPen 2-PAK," PeanutAllergy.com, April 3, 2001, available at <https://www.peanutallergy.com/boards/meridian-announces-launch-of-new-epipen-2-pak> | 2-Feb-19 |
| | "Mylan and Pfizer Announce Epinephrine Auto-injector Settlement Agreement with Teva," Mylan, April 26, 2012, available at <http://newsroom.mylan.com/press-releases?item=123144> | 2-Feb-19 |
| | "Mylan Launches the First Generic for EpiPen® (epinephrine injection, USP) Auto-Injector as an Authorized Generic," Mylan, December 16, 2016, <http://www mylan.com/en/news/feature-stories/mylan-launches-authorized-generic-epipen> | 20-Mar-19 |
| | "Mylan On Location," Mylan, available at <http://www.mylan.com/en/mylan-on-location-featuring-epipen> | 2-Feb-19 |
| | "Mylan Signs Strategic Alliance Agreement with Walt Disney Parks and Resorts to Enhance Access to EpiPen® (epinephrine) Auto-Injectors," Mylan Press Release, November 7, 2014, available at <http://investor mylan.com/news-releases/news-release-details/mylan-signs-strategic-alliance-agreementwalt-disney-parks-and> | 2-Feb-19 |
| | "Mylan Specialty L.P. Announces 25th Anniversary Celebration of EpiPen® (epinephrine) AutoInjector," Mylan, April 25, 2013, available at <http://newsroom.mylan.com/press-releases?item=122761> | 2-Feb-19 |
| | "Mylan Specialty Offers Free EpiPen® (epinephrine) Auto-Injectors to Schools Nationwide," Mylan, August 14, 2012, available at <http://newsroom mylan.com/press-releases?item=122583> | 2-Feb-19 |
| | "Mylan to Launch First Generic to EpiPen® Auto-Injector at a List Price of $300 per Two-Pack Carton, a More than 50% Discount to the Brand Product," Mylan, August 29, 2016, available at <http://newsroom mylan.com/2016-08-29-Mylan-to-Launch-First-Generic-to-EpiPen-Auto-Injector-at-aList-Price-of-300-per-Two-Pack-Carton-a-More-than-50-Discount-to-the-Brand-Product> | 2-Feb-19 |
| | "NDA 019430, Drugs@FDA: FDA Approved Drug Products," FDA, available at <https://www.accessdatalda.gov/scripts/cder/daf/index.cfm?event=overview.process&AppINo=019430> (click on Approval Date(s) and History, Letters, Labels, Reviews for NDA 019430) (accessed Jan.11, 2019) | 2-Feb-19 |
| | "NDA 020800 0.15 Epinephrine 1 MG/ML Auto Injector," Bioportal.biontology.org, available at <http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870225> | 2-Feb-19 |
| | "NDA 020800 0.3 ML Epinephrine 1 MG/ML Auto-Injector," Bioportal.biontology.org, available at <http://bioportal.bioontology.org/ontologies/RXNORM?p=classes&conceptid=1870230> | 2-Feb-19 |
| | "North Dakota Medicaid Generics Preferred List," Hidesigns.com, available at <http://hidesigns.com/assets/files/ndmedicaid/2017/North_Dakota_Authorized_Generics_Preferred_List_1 0102017.pdf> | 2-Feb-19 |
| | "October 2018 Medicaid & CHIP Enrollment Data Highlights," Medicaid.gov, available at <https://www medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/reporthighlights/index html> | 2-Feb-19 |
| | "Ohio Passes Law Allowing EpiPen Alternatives," FDAnews, January 14, 2019, available at <https://www fdanews.com/articles/189849-ohio-passes-law-allowingepipen-alternatives> | 2-Feb-19 |
| | "Optima Medicare HMO - Plan Information," Optimahealth.com, available at <https://www.optimahealth.com/plans/medicare/coverage/planinformation> | 2-Feb-19 |
| | "Part 538-Federal Supply Schedule Contracting," available at https://www.acquisition.gov/gsam/current/html/Part538 html (accessed March 17, 2019) | 20-Mar-19 |
| | "Pfizer Completes Acquisition of King Pharmaceuticals, Inc.," Pfizer, March 1, 2011, available at <https://archive.is/20130630050306/http://www.pfizer.com/news/press_releases/pfizer_press_release_archive.jsp?guid=20110301006102en&source=2011&page=14> | 2-Feb-19 |
| | "Pharmaceutical Manufacturer Copayment Coupons," Office of Inspector General, Department of Health and Human Services, September 2014, available at <https://oig hhs.gov/fraud/docs/alertsandbulletins/2014/sab_copayment_coupons.pdf> | 2-Feb-19 |

| | | |
|---|---|---|
| | "President Obama Signs New EpiPen Law to Protect Children with Asthma and Severe Allergies, And Help Their Families to Breathe Easier," White House Archives, November 13, 2013, available at <https://obamawhitehouse.archives.gov/blog/2013/11/13/president-obama-signs-new-epipen-law-protect-children-asthma-and-severe-allergies-an> (accessed March 17, 2019) | 20-Mar-19 |
| | "Private Fee for Service Plans (PFFS)," Medicare.gov, available at <https://www.medicare.gov/sign-up-changeplans/types-of-medicare-health-plans/private-fee-for-service-pffs-plans> | 2-Feb-19 |
| | "Programs for Children, Families and Pregnant Women," Medicaid.gov.ohio.gov, available at <https://www.medicaid.ohio.gov/FOROHIOANS/Programs/Children-Families-and-Women> | 2-Feb-19 |
| | "Research Support," IQVIA, available at <https://www.iqvia.com/institute/research-support> | 2-Feb-19 |
| | "Sanofi Announces Auvi-Q™, the First and Only Voice-Guided Epinephrine Auto-Injector, is Now Available in the U.S.," Sanofi Press Release, January 28, 2013, available at https://www.prnewswire.com/newsreleases/ sanofi-announces-auvi-q-the-first-and-only-voice-guided-epinephrine-auto-injector-is-now-available-in-the-us-188651061.html | 2-Feb-19 |
| | "Sanofi Announces FDA Approval for Auvi-Q™, First Voice-guided Epinephrine Auto-injector for Patients with Life-threatening Allergies," Sanofi, August 13, 2012, available at <http://www.news.sanofi.us/pressreleases?item=131480> | 2-Feb-19 |
| | "Sanofi Market Cap 2006-2018: SNY," macrotrends, available at <https://www macrotrends net/stocks/charts/SNY/sanofi/market-cap> | 22-Mar-19 |
| | "Sanofi US to Return Auvi-Q® (epinephrine injection, USP) Rights to kaléo," Sanofi, February 23, 2016, available at <http://www.news.sanofi.us/2016-02-23-Sanofi-US-to-Return-Auvi-Q-epinephrine-injection-USP-Rights-to-kal-o> | 20-Mar-19 |
| | "School Access to Epinephrine Map," Food Allergy Research and Education, July 6, 2016, available at <https://www foodallergy.org/education-awareness/advocacy-resources/advocacy-priorities/school-access-to-epinephrine-map> | 20-Mar-19 |
| | "Sciele Introduces Adrenaclick™ (epinephrine injection, USP) Auto-Injector for the Emergency Treatment of Anaphylaxis," Shionogi & Co., Ltd., January 7, 2010, <http://ir.sciele.com/phoenix.zhtml?c=120763&p=irol-newsArticle&ID=1372723&highlight=> | 20-Mar-19 |
| | "Sciele Pharma Acquires Twinject® Epinephrine Auto-Injector from Verus Pharmaceuticals," Sciele Pharma, Inc., March 13, 2008, < https://www.businesswire.com/news/home/20080313005131/en/Sciele-Pharma-Acquires-Twinject-Epinephrine-Auto-Injector-Verus> | 20-Mar-19 |
| | "Solving the Mystery of Employer-PBM Rebate Pass-Through (rerun)," Drug Channels Institute, May 3, 2016, available at <https://www.drugchannels net/2016/05/solving-mystery-of-employer-pbm-rebate.html | 20-Mar-19 |
| | "Special Needs Plans (SNP)," Medicare.gov, available at <https://www.medicare.gov/sign-up-change-plans/types-ofmedicare-health-plans/special-needs-plans-snp> | 2-Feb-19 |
| | "Specialty Pharmaceuticals and Novel Biotechnology Programs," Adamis, October 25, 2011, <http://www.adamispharmaceuticals.com/pdf/ADMP_EIO_10-25-2011_S.pdf> | 20-Mar-19 |
| | "STAR Medicaid Managed Care Program," Hhs.texas.gov, available at <https://hhs.texas.gov/services/health/medicaidchip/programs/star-medicaid-managed-care-program> | 2-Feb-19 |
| | "Statement: United States Food and Drug Administration Approves Teva's Generic Epinephrine Injection Auto-Injector," Teva, August 16, 2018, available at <http://news.tevausa.com/mobile.view?c=251945&v=203&d=1&id=2363944> | 20-Mar-19 |
| | "Symjepi Epinephrine Syringe Launched in U.S. Clinics," *Allergic Living*, January 17, 2019, available at <https://www.allergicliving.com/2019/01/17/symjepi-epinephrine-syringe-launched-in-u-s-clinics> | 20-Mar-19 |
| | "Teva's generic Version of EpiPen® (Epinephrine Injection, USP) Auto-Injector 0.3 mg Now Available in Limited Quantity in the United States," Teva, November 27, 2018, <http://news.tevausa.com/mobile.view?c=251945&v=203&d=1&id=2378367> | 20-Mar-19 |
| | "U.S. EpiPen Profitability Analysis," U.S. Securities and Exchange Commission, available at <https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d265624dex991 htm> | 2-Feb-19 |
| | "Update on Launch Plans for Symjepi (epinephrine) in the US," Sandoz: A Novartis Division, December 6, 2018, available at <https://www.us.sandoz.com/news/media-releases/update-launch-plans-symjepi-epinephrine-us> | 20-Mar-19 |
| | "UPDATED: Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q® Due to Potential Inaccurate Dosage Delivery," Sanofi News Release, October 30, 2015, available at <http://www.news.sanofi.us/2015-10-28-Sanofi-US-IssuesVoluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery> | 20-Mar-19 |
| | "UPDATED: Sanofi US Issues Voluntary Nationwide Recall of All Auvi-Q® Due to Potential Inaccurate Dosage Delivery," Sanofi, October 30, 2015, <http://www.news.sanofi.us/2015-10-28-Sanofi-US-Issues-Voluntary-Nationwide-Recall-of-Auvi-Q-Due-to-Potential-Inaccurate-Dosage-Delivery> | 20-Mar-19 |

| | |
|---|---|
| "Verus Pharmaceuticals Announces U.S. Launch of Twinject for Anaphylaxis," Verus Pharmaceuticals, Inc., August 16, 2005, available at <https://web.archive.org/web/20051222104426/http://www.veruspharm.com/news_releases_08_16_2005.htm> | 20-Mar-19 |
| "What is Medicare PDP and an MAPD," Q1medicare.com, available at <https://q1medicare.com/q1group/MedicareAdvantagePartDQA/FAQ.php?faq=What-is-a-Medicare-PDPand-an-MAPD-&faq_id=616&category_id=146> | 2-Feb-19 |
| "Why the Lone EpiPen Competitor Hasn't Taken Off," *The New York Times*, November 1, 2016, available at <https://www nytimes.com/2016/11/02/business/also-ran-to-epipen-reaches-for-a-closing-window-of-opportunity html> | 20-Mar-19 |
| "Why the Time is Right for a New Pricing Model," CVS Health, March 19, 2019, available at <https://payorsolutions.cvshealth.com/insights/why-the-time-is-right-for-a-new-pricing-model> | 20-Mar-19 |
| "What is Prior Authorization and How Does the Process Work?" Cigna, available at <https://www.cigna.com/individuals-families/understanding-insurance/what-is-prior-authorization> | 20-Mar-19 |
| Brice Labruzzo Mohundro and Michael Marlan Mohundro, "Important Considerations When Dispensing Epinephrine Auto-Injector Devices," *Pharmacy Times*, September 22, 2010, available at <https://www.pharmacytimes.com/p2p/p2pepinephrine-0910> | 2-Feb-19 |
| Colin Kellaher, "Teva Releases Generic EpiPen in Limited Doses in the U.S.," *Wall Street Journal*, November 27, 2018, available at <https://www.wsj.com/articles/teva-releases-generic-epipen-in-limited-doses-in-the-u-s1543336473> | 20-Mar-19 |
| Dailymed nlm.gov, available at <https://dailymed nlm nih.gov/dailymed/drugInfo.cfm?setid=9a010290-186a-4182-a6bd-c6ae75b3cbeb> | 2-Feb-19 |
| Doug Roe, Med Device Online, "Keeping it Simple: One Startup's Plan To Upend The Epinephrine Delivery Market," Med Device Online, March 29, 2016, available at <https://www meddeviceonline.com/doc/one-start-up-s-plan-toupend-the-epinephrine-delivery-market-0001> | 2-Feb-19 |
| E.B. Solomont, "Express Scripts, Medco complete $29 billion merger," *St. Louis Business Journal*, April 2, 2012, available at <https://www.bizjournals.com/stlouis/blog/2012/04/express-scripts-medco-complete-29.html> | 2-Feb-19 |
| Ed Silverman, "How Mylan tried to keep Teva from selling a generic EpiPen," *Pharmalot*, August 31, 2016, available at <https://www.statnews.com/pharmalot/2016/08/31/mylan-teva-generic-epipen/> | 2-Feb-19 |
| Janet Goldman, "Syringe & Vial or Epi-Pen?," Allergy Advocacy Association, September 7, 2016, available at <https://allergyadvocacyassociation.org/index.php/in-the-news/470-syringe-vial-or-epi-pen-2-itn> | 2-Feb-19 |
| Jayne O'Donnell, "Family Matters: EpiPens Had High-Level Help Getting into Schools," *USA Today*, September 21, 2016, available at <http://www.usatoday.com/story/news/politics/2016/09/20/family-matters-epipens-had-helpgetting-schools-manchin-bresch/90435218> | 2-Feb-19 |
| John Reid Blackwell, "Medical products maker Intelliject changes name to Kaleo," *Richmond Times-Dispatch*, January 7, 2014, available at <https://www richmond.com/business/medical-products-makerintelliject-changes-name-to-kaleo/article_1133fd4a-c6b2-5a76-b867-ccb0aafecbdc.html> | 2-Feb-19 |
| Jonathan D. Rockoff, Louise Radnofsky, and Daniela Hernandez, "Mylan CEO Faces Tough Questioning in Congressional EpiPen Hearing," *Wall Street Journal,* September 22, 2016, available at <https://www.wsj.com/articles/mylan-ceo-to-shift-blame-on-epipen-pricing-at-house-hearing1474466910> | 2-Feb-19 |
| Joshua D. Wright, "Simple but Wrong or Complex but More Accurate? The Case for an Exclusive Dealing-Based Approach to Evaluating Loyalty Discounts," Remarks at the Bates White 10th Annual Antitrust Conference, June 3, 2013, available at <https://www.ftc.gov/sites/default/files/documents/public_statements/simple-wrong-orcomplex-more-accurate-case-exclusive-dealing-based-approach-evaluating-loyalty/130603bateswhite.pdf> | 2-Feb-19 |
| Katie Thomas, "Brothers Develop New Device to Halt Allergy Attacks," *New York Times,* February 1, 2013, available at <https://nytimes.com/2013/02/02/business/auvi-q-challenges-epipen-with-a-new-shape-andsize.html> | 2-Feb-19 |
| Keith T. Reed, "Meridian Medical Technologies sold," *Baltimore Business Journal*, January 9, 2003, available at <https://www.bizjournals.com/baltimore/stories/2003/01/06/daily35 html> | 2-Feb-19 |
| Krista Maier and Meghan Riley, "Public Policy Statement: Improving Insulin Access and Affordability," American Diabetes Association, May 2018, available at <http://www.diabetes.org/assets/pdfs/advocacy/improving-insulin-access-and.pdf> | 25-Mar-19 |
| Linette Lopez and Lydia Ramsey, "'YOU ASKED FOR IT' – Congress railed on the maker of EpiPen," *Business Insider*, September 21, 2016, available at <https://www.businessinsider.com/mylan-ceo-heather-bresch-house-oversight-committee-hearingepipen-2016-9> | 2-Feb-19 |
| Mayo Clinic Staff, "Anaphylaxis: Overview," Mayo Clinic, January 5, 2018, available at <https://www mayoclinic.org/diseasesconditions/anaphylaxis/symptoms-causes/syc-20351468> | 2-Feb-19 |

| | | |
|---|---|---|
| | Phi Publications, available at <http://www.phipublications.com/About_Data.html> | 2-Feb-19 |
| | Tammie Smith, "Richmond-based Kaleo's Auvi-Q epinephrine injector returning to market Feb. 14," *Richmond Times-Dispatch* , January 19, 2017, available at <https://www.richmond.com/business/local/richmond-based-kaleo-s-auvi-q-epinephrine-injectorreturning-to/article_04442c78-220d-53bd-ac2e-fb4a222889e3.html> | 2-Feb-19 |
| | | |
| ***Bates Documents*** | | |
| | Aetna00022722 | |
| | AG00000800 | |
| | ANTH-EPI 00112 | |
| | ANTH-EPI 05023 | |
| | BEACHELL-01730 | |
| | BIO-KS00247321 | |
| | CIGNA_00499 | |
| | CIGNA_00533 | |
| | CIGNA_01052 | |
| | CIGNA_01375 | |
| | CIGNA_01462 | |
| | CIGNA_01532 | |
| | CVCSM_EPI_000000001 | |
| | CVCSM_EPI_000000072 | |
| | CVCSM_EPI_000000101 | |
| | CVSCM_EPI_000000412 | |
| | CVSCM_EPI_000027860 | |
| | EAI 00033037 | |
| | EAI 00034440 | |
| | EAI 00041402 | |
| | EAI 00058608 | |
| | EAI 00068417 | |
| | EAI 00221815 | |
| | EAI 00230199 | |
| | EPI-FL-0322016 | |
| | EPI-FL-0513254 | |
| | EPI-TX-0000091 | |
| | ES_0010507 | |
| | HUM001702 | |
| | HUM004251 | |
| | HUM004270 | |
| | HUM004277 | |
| | HUM004280 | |
| | HUM004351 | |
| | HUM006208 | |
| | Humana004351 | |
| | KALEO-00042499 | |
| | KFHP_0574 | |
| | KFHP_0703 | |
| | KFHP_0708 | |
| | KFHP-0013 | |
| | MedImpact_00044 | |
| | MedImpact_0008312 | |
| | MedImpact_00121 | |
| | MedImpact_00269 | |
| | MedImpact_0053294 | |
| | MedImpact_0379505 | |
| | MedImpact_0386779 | |

| | |
|---|---|
| MYEP00000310 | |
| MYEP00000471 | |
| MYEP00000524 | |
| MYEP00000530 | |
| MYEP00000538 | |
| MYEP00000614 | |
| MYEP00000721 | |
| MYEP00000761 | |
| MYEP00000881 | |
| MYEP00000909 | |
| MYEP00000926 | |
| MYEP00000930 | |
| MYEP00001424 | |
| MYEP00001449 | |
| MYEP00006385 | |
| MYEP00047084 | |
| MYEP00074543 | |
| MYEP00077097 | |
| MYEP00079145 | |
| MYEP00081290 | |
| MYEP00082319 | |
| MYEP00082769 | |
| MYEP00086241 | |
| MYEP00086244 | |
| MYEP00086249 | |
| MYEP00086849 | |
| MYEP00087473 | |
| MYEP00087486 | |
| MYEP00087496 | |
| MYEP00088189 | |
| MYEP00093725 | |
| MYEP00100131 | |
| MYEP00118416 | |
| MYEP00119242 | |
| MYEP00140812 | |
| MYEP00142246 | |
| MYEP00162485 | |
| MYEP00167182 | |
| MYEP00180751 | |
| MYEP00193044 | |
| MYEP00193064 | |
| MYEP00194704 | |
| MYEP00194705 | |
| MYEP00213251 | |
| MYEP00213255 | |
| MYEP00214360 | |
| MYEP00219125 | |
| MYEP00219825 | |
| MYEP00226976 | |
| MYEP00232912 | |
| MYEP00239355 | |
| MYEP00244409 | |
| MYEP00245085 | |
| MYEP00249596 | |
| MYEP00251958 | |

| | |
|---|---|
| MYEP00251967 | |
| MYEP00252719 | |
| MYEP00253140 | |
| MYEP00254218 | |
| MYEP00256575 | |
| MYEP00257151 | |
| MYEP00260323 | |
| MYEP00262009 | |
| MYEP00264796 | |
| MYEP00269481 | |
| MYEP00271605 | |
| MYEP00275501 | |
| MYEP00275852 | |
| MYEP00304665 | |
| MYEP00304697 | |
| MYEP00305511 | |
| MYEP00360084 | |
| MYEP00362749 | |
| MYEP00362912 | |
| MYEP00367121 | |
| MYEP00377967 | |
| MYEP00402298 | |
| MYEP00412405 | |
| MYEP00435396 | |
| MYEP00450839 | |
| MYEP00451143 | |
| MYEP00454423 | |
| MYEP00454425 | |
| MYEP00459230 | |
| MYEP00459611 | |
| MYEP00463728 | |
| MYEP00464046 | |
| MYEP00481178 | |
| MYEP00483117 | |
| MYEP00485119 | |
| MYEP00487195 | |
| MYEP00491274 | |
| MYEP00494011 | |
| MYEP00495211 | |
| MYEP00497152 | |
| MYEP00514631 | |
| MYEP00527619 | |
| MYEP00531461 | |
| MYEP00531470 | |
| MYEP00548252 | |
| MYEP00551696 | |
| MYEP00593648 | |
| MYEP00602480 | |
| MYEP00603647 | |
| MYEP00603858 | |
| MYEP00604317 | |
| MYEP00604738 | |
| MYEP00604924 | |
| MYEP00610781 | |
| MYEP00611547 | |

| | | |
|---|---|---|
| MYEP00613820 | | |
| MYEP00619261 | | |
| MYEP00620009 | | |
| MYEP00623274 | | |
| MYEP00623587 | | |
| MYEP00624286 | | |
| MYEP00624305 | | |
| MYEP00667337 | | |
| MYEP00720503 | | |
| MYEP00723398 | | |
| MYEP00723729 | | |
| MYEP00723817 | | |
| MYEP00723818 | | |
| MYEP00734988 | | |
| MYEP00740408 | | |
| MYEP00756222 | | |
| MYEP00825394 | | |
| MYEP00835717 | | |
| MYEP0087486 | | |
| MYEP00882371 | | |
| MYEP00892874 | | |
| MYEP00892918 | | |
| MYEP0090087 | | |
| MYEP01032076 | | |
| MYEP01033504 | | |
| MYEP01033592 | | |
| MYEP01046442 | | |
| MYEP01068002 | | |
| MYEP01099685 | | |
| MYEP01131507 | | |
| MYEP01143633 | | |
| MYEP01145040 | | |
| MYEP01193655 | | |
| MYEP01198247 | | |
| MYEP01202343 | | |
| MYEP01206017 | | |
| MYEP01208377 | | |
| MYEP01209503 | | |
| MYEP01209505 | | |
| MYEP01227891 | | |
| MYEP01228274 | | |
| MYEP01228536 | | |
| MYEP01228538 | | |
| MYEP01246195 | | |
| MYEP01246315 | | |
| MYEP01250453 | | |
| MYEP01278441 | | |
| MYEP01325857 | | |
| MYEP01336372 | | |
| MYEP01362498 | | |
| MYEP01362752 | | |
| MYEP01385719 | | |
| PFE_EPIPEN_AT00011059 | | |
| PFE_EPIPEN_AT00011449 | | |
| PFE_EPIPEN_AT00452221 | | |

| | |
|---|---|
| PFE_EPIPEN_AT00517991 | |
| PFE_EPIPEN_AT00540538 | |
| PFE_EPIPEN_AT00540545 | |
| PFE_EPIPEN_AT00546952 | |
| PFE_EPIPEN_AT00611245 | |
| PFE_EPIPEN_AT00648955 | |
| PFE_EPIPEN_AT01091675 | |
| PHP 0000385 | |
| PHP 0001498 | |
| PRIME_0000291 | |
| PRIME_0007885 | |
| PS0077861 | |
| PS0077863 | |
| PS0077864 | |
| PS0236464 | |
| PS103247.001-015 | |
| SAN-EPI_A-0035816 | |
| SAN-EPI_A-0040974 | |
| SAN-EPI_A-0041389 | |
| SAN-EPI_A-0051392 | |
| SAN-EPI_A-0063798 | |
| SAN-EPI_A-0088536 | |
| SAN-EPI_A-0094608 | |
| SAN-EPI_A-0100045 | |
| SAN-EPI_A-0168416 | |
| SAN-EPI-0002167 | |
| SAN-EPI-0002477 | |
| SAN-EPI-0002512 | |
| SAN-EPI-0013253 | |
| SAN-EPI-0027555 | |
| SAN-EPI-0029787 | |
| SAN-EPI-0031115 | |
| SAN-EPI-0072289 | |
| SAN-EPI-0077732 | |
| SAN-EPI-0084805 | |
| SAN-EPI-0123524 | |
| SAN-EPI-0126029 | |
| SAN-EPI-0160017 | |
| SAN-EPI-0171340 | |
| SAN-EPI-0171591 | |
| SAN-EPI-0225642 | |
| SAN-EPI-0230527 | |
| SAN-EPI-0230529 | |
| SAN-EPI-0232313 | |
| SAN-EPI-0232314 | |
| SAN-EPI-0241420 | |
| SAN-EPI-0243813 | |
| SAN-EPI-0243951 | |
| SAN-EPI-0249152 | |
| SAN-EPI-0260070 | |
| SAN-EPI-0260072 | |
| SAN-EPI-0277064 | |
| SAN-EPI-0285080 | |
| SAN-EPI-0305905 | |
| SAN-EPI-0309042 | |

| | | |
|---|---|---|
| | SAN-EPI-0326335 | |
| | SAN-EPI-0343489 | |
| | SAN-EPI-0363626 | |
| | SAN-EPI-0375524 | |
| | SAN-EPI-0376550 | |
| | SAN-EPI-0377132 | |
| | SAN-EPI-0382315 | |
| | SAN-EPI-0419546 | |
| | SAN-EPI-0434385 | |
| | SAN-EPI-0435404 | |
| | SAN-EPI-0447662 | |
| | SAN-EPI-0525843 | |
| | SAN-EPI-0532758 | |
| | SAN-EPI-0545367 | |
| | SAN-EPI-0713740 | |
| | SAN-EPI-0764724 | |
| | SAN-EPI-0764725 | |
| | SAN-EPI-0766016 | |
| | SAN-EPI-0798403 | |
| | SAN-EPI-0878200 | |
| | SAN-EPI-0888990 | |
| | SAN-EPI-0929321 | |
| | SAN-EPI-0980887 | |
| | SAN-EPI-1093101 | |
| | SAN-EPI-1101566 | |
| | SAN-EPI-1148855 | |
| | SAN-EPI-1151876 | |
| | SAN-EPI-1151885 | |
| | SAN-EPI-1154019 | |
| | SAN-EPI-1165930 | |
| | SAN-EPI-1166597 | |
| | SAN-EPI-1201145 | |
| | SAN-EPI-1202786 | |
| | SAN-EPI-1235127 | |
| | TXSTATE_00000065 | |
| | | |
| ***Data*** | | |
| | IMS NSP Data | |
| | | |
| | ***IMS-MMIT Bridge Files – Sanofi*** | |
| | IQVIA Bridge File 201403 - 201512 xlsx | |
| | IQVIA Bridge File 201601 - 201612 xlsx | |
| | IQVIA Bridge File 201701 - 201712 xlsx | |
| | IQVIA Bridge File 201801 - 201811 xlsx | |
| | | |
| | ***IOVIA NSP*** | |
| | QVIA NSP\Burns 082918.xlsx | |
| | QVIA NSP\Highly Confidential_NSP_ Jan 2008 - July 2012.xlsx | |
| | | |
| | ***IOVIA Xponent Plantrak*** | |
| | ZWMH.TPRICE.CLIENT.OUTPUT.Y18.CSV | |
| | ZWMH.TPRICE.CLIENT.OUTPUT.Y0809.CSV | |
| | ZWMH.TPRICE.CLIENT.OUTPUT.Y1011.CSV | |
| | ZWMH.TPRICE.CLIENT.OUTPUT.Y1213.CSV | |
| | ZWMH.TPRICE.CLIENT.OUTPUT.Y1415.CSV | |

| | | |
|---|---|---|
| | ZWMH.TPRICE.CLIENT.OUTPUT.Y1617.CSV | |
| | | |
| | ***MMITDataFeed2.0_06_19_2018*** | |
| | DataFeedDocumentation.pdf | |
| | DRUGS.txt | |
| | IQVIA_Bridge.txt | |
| | Medispan_Bridge.txt | |
| | MMIT_Analytics_UniversalvsRaw_Status Definitions w Advanced Breakout (La....pdf | |
| | NDC_Bridge.txt | |
| | PLANSCONTROLLER.txt | |
| | RESTRICTIONS.txt | |
| | STATES.txt | |
| | STATUSES.txt | |
| | | |
| | ***Coupon Data - Mylan*** | |
| | Coupons 01.16.-08.16 xlsx (MYEP01362490) | |
| | Coupons 02.13-06.15.xlsx (MYEP01362491) | |
| | Coupons 07.15-12.15.xlsx (MYEP01362492) | |
| | | |
| | ***Transaction Data - Mylan*** | |
| | MYEP030A | |
| | | |
| | ***Transaction Data - Mylan/Aetna*** | |
| | 13371313410101-DEY_ACOM_Q0113_S1_V1 xlsx | |
| | 13371313420101-DEY ACOM Q0213 S1 V1.pdf | |
| | 13371313420101-DEY_ACOM_Q0213_S1_V1.CSV | |
| | 13371313430101-DEY ACOM Q0313 S1 V1.pdf | |
| | 13371313430101-DEY_ACOM_Q0313_S1_V1.CSV | |
| | 13371313440101-DEY ACOM Q0413 S1 V1.pdf | |
| | 13371313440101-DEY_ACOM_Q0413_S1_V1.CSV | |
| | 13371314410101-DEY ACOM Q0114 S1 V1_PP_V4.01 xlsx | |
| | 13371314420101-DEY ACOM Q0214 S1 V1.pdf | |
| | 13371314420101-DEY_ACOM_Q0214_S1_V1.CSV | |
| | 13371314430101-DEY ACOM Q0314 S1 V1.pdf | |
| | 13371314430101-DEY_ACOM_Q0314_S1_V1.CSV | |
| | 13371314440101-DEY ACOM Q0414 S1 V1.pdf | |
| | 13371314440101-DEY_ACOM_Q0414_S1_V1.CSV | |
| | 13371315410101-DEY ACOM Q0115 S1 V1.pdf | |
| | 13371315410101-DEY_ACOM_Q0115_S1_V1.CSV | |
| | 13371315430101-DEY_ACOM_Q0315_S1_V1.CSV | |
| | 13371315430101-DEY_ACOM_Q0315_S1_V1[1].pdf | |
| | 13371315440101-DEY_ACOM_Q0415_S1_V1.CSV | |
| | 13371315440101-DEY_ACOM_Q0415_S1_V1[1].pdf | |
| | 13371316410102-DEY_ACOM_Q0116__S1_V2.CSV | |
| | 13371316410102-DEY_ACOM_Q0116__S1_V2[1].pdf | |
| | 13371316420101-DEY_ACOM_Q0216_S1_V1.CSV | |
| | 13371316420101-DEY_ACOM_Q0216_S1_V1[1].pdf | |
| | 13371316430101-DEY_ACOM_Q0316_S1_V1.CSV | |
| | 13371316430101-DEY_ACOM_Q0316_S1_V1[1].pdf | |
| | 13371316440101-DEY_ACOM_Q0416_S1_V1.CSV | |
| | 13371316440101-DEY_ACOM_Q0416_S1_V1[1].pdf | |
| | Aetna 2Q2015 commer Myl Sp xlsx | |
| | | |
| | ***Transaction Data - Mylan/CIGNA*** | |
| | CIGNA 1Q2015 IFP Myl Sp xlsx | |

| | |
|---|---|
| CIGNA 1Q2016 Comm Myl Sp CC xlsx | |
| CIGNA 2Q2015 Commer Myl Sp xlsx | |
| CIGNA 2Q2016 Comm Myl Sp CC xlsx | |
| CIGNA 3Q2015 Commer Myl Sp xlsx | |
| CIGNA 4Q 2016 Comm Myl Sp CC xlsx | |
| CIGNA 4Q2014 IFP Commer Myl Sp xlsx | |
| CIGNA 4Q2015 Commer Myl Sp xlsx | |
| CIGNA Q3 2016 Comm Myl Sp CC xlsx | |
| Dey (Mylan)_2013Q01_ScriptFile.xlsx | |
| Dey (Mylan)_2013Q02_ScriptFile.xlsx | |
| Dey (Mylan)_2013Q03_ScriptFile.xlsx | |
| Dey (Mylan)_2013Q04_ScriptFile.xlsx | |
| max-utilv4_COMMERCIAL_CG49502_201403 xlsx | |
| max-utilv4_COMMERCIAL_CG49502_201406 xlsx | |
| max-utilv4_COMMERCIAL_CG49502_201409 xlsx | |
| | |
| ***Transaction Data - Mylan/CVS*** | |
| 4Q2013 true up Myl Spec 0101-DEY LABS CPCS Q0413 S1 V1_PP_V4 xlsx | |
| 00970213410101-DEY LABS CPCS Q0113 S1 V1_PP_V4 xlsx | |
| 00970213430101-DEY LABS CPCS Q0313 S1 V1_PP_V4 xlsx | |
| 00970214420101-DEY LABS CPCS Q0214 S1 V1_PP_V4 xlsx | |
| 00970214430101-DEY LABS CPCS Q0314 S1 V1_PP_V4 xlsx | |
| Caremark 1Q2015 Comm Myl Sp Original Data copy AS.xlsx | |
| Caremark 1Q2016 Comm Myl Sp CC xlsx | |
| Caremark 2Q2015 Commer Myl Sp.xlsx | |
| Caremark 2Q2016 Comm Myl Sp CC xlsx | |
| Caremark 3Q15 Commercial Myl Sp xlsx | |
| Caremark 3Q2016 Comm Myl Sp CC xlsx | |
| Caremark 4Q2016 Comm Myl Sp CC xlsx | |
| Caremark PCS 4Q2014 Commer Myl sp xlsx | |
| Caremark PCS Myl Spec 2Q13 Commer xlsx | |
| DEY CPCS qryInvoiceSummarybyRebateID xlsx | |
| InvoiceSummarybyClientTradeID xlsx | |
| | |
| ***Transaction Data - Mylan/Express Scripts*** | |
| ESI Apr 2016 Comm Myl Sp 2015 Contract CC.xlsx | |
| ESI April 2014 Commercial Data files xlsx | |
| ESI April 2015 Commer Myl Sp.xlsx | |
| ESI Aug 2014 Commer data file xlsx | |
| ESI August 2015 Commercial Myl Sp.xlsx | |
| ESI Dec 2014 Commer Myl Sp xlsx | |
| ESI Dec 2016 Comm Myl Sp CC.xlsx | |
| ESI Feb 2014 Commercial Data file.xlsx | |
| ESI Feb 2015 Commer Myl Sp.xlsx | |
| ESI Jan 2014 Commercail data file.xlsx | |
| ESI Jan 2015 Commer Myl Sp.xlsx | |
| ESI July 2014 Commercial data file xlsx | |
| ESI July 2016 Comm Myl Sp CC.xlsx | |
| ESI June 2014 Commercial Data file xlsx | |
| ESI June 2015 Commercial Myl Sp xlsx | |
| ESI Mar 2016 Comm Myl Sp 2015 Contract CC xlsx | |
| ESI March 2014 commercial Data file xlsx | |
| ESI March 2015 Commer Myl Sp xlsx | |
| ESI May 2014 Commercial data file.xlsx | |
| ESI May 2015 Commer Myl Sp.xlsx | |

| | |
|---|---|
| ESI May 2016 Comm Myl Sp 2015 Contract CC xlsx | |
| ESI Nov 2014 Commer Myl Sp.xlsx | |
| ESI NOv 2015 Commer Myl Sp xlsx | |
| ESI Nov 2016 Comm Myl Sp CC xlsx | |
| ESI Oct 2016 Comm Myl Sp CC xlsx | |
| ESI Sep 2016 Comm Myl Sp CC.xlsx | |
| ESI Sept 2015 Commer 2015 Claims only Myl Sp xlsx | |
| Express Scripts Aug 2016 Commer Myl Sp CC.xlsx | |
| Express Scripts Comm Feb 2016 Myl Sp CC.xlsx | |
| Express Scripts December 2015 Commer Myl Sp.xlsx | |
| Express Scripts Jan 2016 Comm Myl Sp xlsx | |
| Express Scripts July 2015 Commer Myl Sp Revised CC xlsx | |
| Express Scripts Jun 2016 Comm Myl Sp CC.xlsx | |
| Express Scripts October 2015 Commer Myl Sp xlsx | |
| MFG49502.ESI.D130201.xlsx | |
| MFG49502.ESI.D130401.xlsx | |
| MFG49502.ESI.D130501.xlsx | |
| MFG49502.ESI.D130601.xlsx | |
| MFG49502.ESI.D130701.xlsx | |
| MFG49502.ESI.D130801.xlsx | |
| MFG49502.ESI.D130901.xlsx | |
| MFG49502.ESI.D131001.xlsx | |
| MFG49502.ESI.D131101.xlsx | |
| MFG49502.ESI.D131201.xlsx | |
| MFG49502.ESI.D140101.xlsx | |
| MFG49502_ESI_D130301 xlsx | |
| Oct 2014 Commer Mylan Sp ESI xlsx | |
| Sept revised Commercial 2014 Myl Sp ESI.xlsx | |
| | |
| *Transaction Data - Mylan/MedCo* | |
| FRP31539.xlsx | |
| FRP32224.xlsx | |
| FRP33180.xlsx | |
| FRP33763.xlsx | |
| 1Q2014 Commer Supplemental Myl Sp.xlsx | |
| | |
| *Transaction Data - Mylan/MedImpact* | |
| 2013Q1\260ncpdp xlsx | |
| 2013Q2\260ncpdp xlsx | |
| 2013Q3260ncpdp.xlsx | |
| 2013Q4\2027ncpdp xlsx | |
| 2014Q1\260ncpdp xlsx | |
| 2014Q2\medImpact 2Q2014 260 Myl Sp xlsx | |
| 2014Q3\MedImpact 3Q2014 260 Commer Myl sp.xlsx | |
| 2014Q4\MedImpact 4Q2014 260 Commer Myl Sp xlsx | |
| 2015Q1\MedIMpact 1Q2015 260 Commer Myl Sp xlsm | |
| 2015Q2\MedImpact 2Q2015 260 Commercial Myl Sp.xlsx | |
| 2015Q3\MedImpact 3Q2015 Commer 260 Myl Sp xlsx | |
| 2015Q4\MedImpact 4Q2015 Comm 260 Myl Sp CC.xlsx | |
| 2016Q1\MedImpact 1Q2016 Comm Myl Sp CC xlsx | |
| 2016Q2\MedImpact 2Q2016 Comm Myl Sp CC xlsx | |
| 2016Q3\MedImpact 3Q2016 Comm Myl Sp CC xlsx | |
| 2016Q4\MedIpmact 4Q2016 Comm Myl Sp CC xlsx | |
| | |
| *Transaction Data - Mylan/PBM* | |

| | | |
|---|---|---|
| | Aetna 1Q2015 Commer Myl Sp.xlsx | |
| | BCBSAZ 1Q2015 Commer Myl Sp xlsx | |
| | BSCA 1Q2015 commer Myl Sp xlsx | |
| | Caremark 1Q2015 Comm Myl Sp Original Data copy AS.xlsx | |
| | CIGNA 1Q2015 IFP Myl Sp xlsx | |
| | Envision 2015Q1 Commercial Myl Sp.xlsx | |
| | Harvard Pilgrim 1Q2015 Commer Myl Sp xlsx | |
| | HealthNet 1Q2015 Commer Myl Sp.xlsx | |
| | HealthPartners 1Q2015 Commer Myl Sp xlsx | |
| | Healthplus 1q2015 Comemr Myl Sp.xlsx | |
| | Highmark 1Q2015 Commer Myl Sp.xlsx | |
| | Humana 1Q2015 Commer Myl Sp.xlsx | |
| | MedIMpact 1Q2015 260 Commer Myl Sp.xlsx | |
| | Navitus 1Q2015 Commer Myl Sp xlsx | |
| | P Plus 1Q2015 Commer Myl Sp xlsx | |
| | Prime Ther 1Q2015 Commer Myl Sp.xlsx | |
| | Procare EPC 1Q2015 Commer Myl Sp xlsx | |
| | Select Health 1Q2015 Commer Myl Sp.xlsx | |
| | Sentara 1Q2015 Commer Myl Sp xlsx | |
| | Unity 1Q2015 Commer Myl Sp xlsx | |
| | UPMC 1Q2015 Commer Myl Sp.xlsx | |
| | Ventegra 1Q2015 Commer Myl Sp xlsx | |
| | Wellcare 1Q2015 Commer Myl Sp xlsx | |
| | | |
| | ***Transaction Data - Mylan/OptumRx*** | |
| | July 2014 Commercial OpturmRx Myl Sp xlsx | |
| | June OptumRx Mylan Commercial xlsx | |
| | March 2014 Commer OptumRx_RXSOLUTIONS_DEY_201403 xlsx | |
| | max1332c_DEY.xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201301 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201303 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201304 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201305 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201306 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201310 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201311 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201312 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201401 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201402 xlsx | |
| | max-utilv4_RXSOLUTIONS_DEY_201405 xlsx | |
| | MAX-UTILV4_RXSOLUTIONS_DEY_201408.xlsx | |
| | MAX-UTILV4_RXSOLUTIONS_DEY_201409.xlsx | |
| | non qrpdp-utilv4_RXSOLUTIONS_DEY_201404.xlsx | |
| | Optum Rx Apr 2016 Comm Myl Sp CC xlsx | |
| | Optum Rx Aug 2016 Comm Myl Sp CC.xlsx | |
| | Optum Rx Dec 2016 Comm Myl Sp CC Final.xlsx | |
| | Optum Rx Feb 2016 Commercial Myl Sp CC.xlsx | |
| | Optum Rx Jan 2016 Comm Myl Sp CC xlsx | |
| | Optum Rx July 2016 Comm Myl Sp CC xlsx | |
| | Optum Rx June 2016 Comm Myl SP CC.xlsx | |
| | Optum Rx Mar 2016 Comm Myl Sp CC xlsx | |
| | OPtum Rx May 2015 Commer Myl Sp.xlsx | |
| | Optum Rx May 2016 Comm Myl Sp CC.xlsx | |
| | Optum Rx Myl Spec Sept 13 Commer xlsx | |
| | Optum Rx Myl Specialty Aug 2013 Commer xlsx | |

| | | |
|---|---|---|
| | Optum Rx Nov 2016 Comm Myl Sp CC Final xlsx | |
| | Optum Rx Oct 2016 Comm Myl Sp CC Final xlsx | |
| | Optum Rx Sep 2016 Comm Myl Sp CC Final.xlsx | |
| | OPtumrx April 2015 Commer Myl Sp xlsx | |
| | OptumRx August 2015 Commerfcial Myl Sp Revised xlsx | |
| | OptumRx Dec 2014 commer Standard Myl Sp.xlsx | |
| | OptumRx Dec 2015 Commer Std Myl Sp xlsx | |
| | OPtumRx Feb 2015 Commer Myl Sp xlsx | |
| | OptumRx Jan 2015 Std Commer Myl Sp xlsx | |
| | OPtumRx July 2013 Commercial with zip.xlsx | |
| | OptumRx July Commer Myl Sp xlsx | |
| | OptumRx Nov 2014 Commer Std Myl Sp.xlsx | |
| | OptumRx Nov 2015 Commer Myl Sp.xlsx | |
| | OptumRx Oct 2014 Commer Myl Sp xlsx | |
| | OptumRx Oct 2015 Commer Myl Sp xlsx | |
| | OptumRx Sept 2015 commer Myl Sp.xlsx | |
| | OptumRx Std June 2015 Commer Myl Sp xlsx | |
| | OPtumRx Std March 2015 Commer Myl Sp.xlsx | |
| | | |
| | ***Transaction Data - Mylan/Prime Therapeutics*** | |
| | Invoice_Summary_Mylan_1Q2015_14303151564634524148695277717903 xlsx | |
| | Invoice_Summary_Mylan_1Q2016_14618947593944720724727597849985 xls | |
| | Invoice_Summary_Mylan_2Q2015_14377200367614924414989675757981 xlsx | |
| | Invoice_Summary_Mylan_2Q2016_14692194071388849313849056733969 xls | |
| | Invoice_Summary_Mylan_3Q2014_14159572880671912985254249866377 xlsx | |
| | Invoice_Summary_Mylan_3Q2015_14461290711064504943072978143130 xls | |
| | Invoice_Summary_Mylan_3Q2016_14773207751176179815862601325252 xls | |
| | Invoice_Summary_Mylan_4Q2014_14223320636547086487923672347990.xlsx | |
| | Invoice_Summary_Mylan_4Q2015_Comm.xls | |
| | Invoice_Summary_Mylan_4Q2016_14850208120035393359679411102981 xls | |
| | md0553.v4.01.primemn.q142.Mylan_Specialty_Comm.xlsx | |
| | md0554.primemn.q131.Mylan_Specialty_Comm.agr244.mfg_detail_rpt.xlsx | |
| | md0554.primemn.q132.Mylan_Specialty_Comm.agr244.mfg_detail_rpt.xlsx | |
| | md0554.primemn.q133.Mylan_Specialty_Comm.agr244.mfg_detail_rpt.xlsx | |
| | md0554.primemn.q134.Mylan_Specialty_Comm.agr244.mfg_detail_rpt.xlsx | |
| | md0554.primemn.q141.Mylan_Specialty_Comm.agr244.mfg_detail_rpt.xlsx | |
| | | |
| | ***Transaction Data - Sanofi*** | |
| | SANOFI0_10659_00002872 xlsx | |
| | | |
| | ***WAC Prices*** | |
| | WAC Prices.xlsx | |