## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>*This Document Relates to Class Cases* | Case No. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE <u>EXPERT OPINIONS OF PROFESSOR MEREDITH ROSENTHAL</u>

## INDEX OF EXHIBITS

**Exhibit A** – Declaration of Dr. James W. Hughes in Support of Defendants' Motion to Exclude Expert Opinions of Professor Meredith Rosenthal

**Exhibit B** – Declaration of Dr. John H. Johnson, IV in Support of Defendants' Motion to Exclude Expert Opinions of Professor Meredith Rosenthal

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD........................................................................................................... 2

ARGUMENT ....................................................................................................................... 4

I.      PROFESSOR ROSENTHAL'S TWO-PACK METHODOLOGY FAILS. ...................... 4

II.     PROFESSOR ROSENTHAL'S PROBABILITY AND ASCERTAINABILITY
       METHODOLOGIES SHOULD BE EXCLUDED. ........................................................ 8

      A.     Professor Rosenthal's Ascertainability Opinion Is Unreliable. ............................. 8

      B.     Professor Rosenthal's Probability Methodology Is Unreliable. ........................... 11

            1.     The probability methodology is rooted in unsupported assumptions. ...... 12

            2.     The probability methodology is unsupported by economic literature
                and has never been accepted to support class certification. ..................... 15

            3.     The probability methodology is unreliable for assessing classwide
                impact........................................................................................................ 17

      C.     The New Ascertainability and Probability Opinions Should Be Excluded As
          Improper Rebuttal Testimony. ............................................................................. 18

III.     ANY OPINIONS DEPENDENT ON PROFESSOR ELHAUGE'S EXCLUDED
       TESTIMONY ALSO SHOULD BE EXCLUDED. ....................................................... 20

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Phosphide Antitrust Litig.*,
  893 F. Supp. 1497 (D. Kan. 1995) ............................................................................15

*Anderson v. Seven Falls Co.*,
  No. 12-cv-01490-RM-CBS, 2013 WL 3771300 (D. Colo. July 18, 2013)............................19

*In re Asacol Antitrust Litig.*,
  No. 1:15-cv-12730-DJC (D. Mass. Apr. 11, 2019), Dkt. 772 .................................17

*Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*,
  565 F.3d 769 (10th Cir. 2009) ................................................................................17

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015)....................................................................................3

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014).....................................................................................7

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
  915 F.3d 1 (1st Cir. 2019)......................................................................................17

*Cochrane v. Schneider Nat. Carriers, Inc.*,
  980 F. Supp. 374 (D. Kan. 1997).................................................................8, 12, 17

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................................................................18

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)........................................................................................ *passim*

*Dodge v. Cotter Corp.*,
  328 F.3d 1212 (10th Cir. 2003) ...............................................................................3

*Foster v. USIC Locating Servs., LLC*,
  No. 16-2174-CM, 2018 WL 4003354 (D. Kan. Aug. 17, 2018) ............................19

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...........................................................................................8, 12

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008)............................................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................................6

*Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*,
  No. CIV.A. 05-2164-MLB, 2007 WL 6215929 (D. Kan. Dec. 19, 2007)................................7

*B.H. ex rel. Holder v. Gold Fields Mining Corp.*,
  No. 04-CV-0564-CVE-PJC, 2007 WL 188130 (N.D. Okla. Jan. 22, 2007)............................17

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)......................................................................................................3

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .......................................................................................3, 4

*Miller v. Pfizer, Inc.*,
  356 F.3d 1326 (10th Cir. 2004) .....................................................................................15

*Sec. & Exch. Comm'n v. Goldstone*,
  No. CIV 12-0257 JB/LFG, 2016 WL 3135651 (D.N.M. May 10, 2016) ................................6

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
  806 F.3d 71 (2d Cir. 2015).............................................................................................7

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
  No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) (unpublished)..............................2

*SIL-FLO, Inc. v. SFHC, Inc.*,
  917 F.2d 1507 (10th Cir. 1990) .....................................................................................19

*Tanberg v. Sholtis*,
  401 F.3d 1151 (10th Cir. 2005) .......................................................................................4

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
  No. 2545, 2018 WL 3586182 (N.D. Ill. Jul. 26, 2018)........................................................2

*Timber Pines Plaza, LLC v. Kinsale Ins. Co.*,
  192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016)..................................................................19

*Truck Ins. Exch. v. MagneTek, Inc.*,
  360 F.3d 1206 (10th Cir. 2004) .......................................................................................3

*United States v. Orr*,
  692 F.3d 1079 (10th Cir. 2012) .....................................................................................16

*United States v. Rice*,
  52 F.3d 843 (10th Cir. 1995) .......................................................................................13

*In re Wellbutrin XL Antitrust Litig.*,
  308 F.R.D. 134 (E.D. Pa. 2015)................................................................1, 10, 11

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007)................................................................6

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ................................................................6

**Other Authorities**

A.C. MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature
  1 (1997) ................................................................6

Fed. R. Civ. P. 23................................................................3, 4

Fed. R. Civ. P. 26................................................................4

Fed. R. of Evidence 702................................................................3, 20

## INTRODUCTION

Plaintiffs offer Professor Meredith Rosenthal's testimony as the primary—and often the only—evidence of alleged classwide impact and injury.  But despite assurances to the contrary, Prof. Rosenthal's opinions are not rooted in any proven methodologies or validated assumptions.  Rather, her methodologies are dependent on assumptions that Prof. Rosenthal believes to be reasonable merely because, it seems, she says so—even if contradicted by the undisputed factual record.  A number of Prof. Rosenthal's opinions should be excluded for the following reasons.

*First*, Prof. Rosenthal's two-pack damages methodology is an invalid and unreliable model for measuring classwide injury.  Prof. Rosenthal's opinion is clear:  she has assumed, without confirming, that the discontinuation of the single-pack was the sole cause of Plaintiffs' alleged injuries.  Expert Rep. of Dr. Meredith Rosenthal in Supp. of Class Cert. ¶ 54, Dkt. 1342-4, ("Rosenthal Rep.").  She neglected to account for any competing factors that may have influenced individuals' decisions to purchase two-packs, and now seeks to rationalize that decision by characterizing her methodology as an "event study."  Reply Expert Rep. of Dr. Meredith Rosenthal in Supp. of Class Cert. ¶ 15, Dkt. 1554-3 ("Rosenthal Reply").  But her opinion is not, in fact, an event study and bears no resemblance to the event studies on which courts rely.

*Second*, Prof. Rosenthal's ascertainability opinion is flawed.  Her views on this issue ignore the record and "consist[] mainly of conclusory statements . . . that records exist that could be used to ascertain the class," and thus suffer from the same flaws that led another court to disregard a substantially similar opinion offered by Prof. Rosenthal.  *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 151 (E.D. Pa. 2015).  And because Prof. Rosenthal failed to include this opinion in her opening Report, it also constitutes improper rebuttal testimony.

*Third*, Prof. Rosenthal's newfound "probability analysis" does not—and cannot—reliably estimate or identify uninjured class members. This "coin toss" methodology depends on a series of assumptions that are belied by the record and undermine Prof. Rosenthal's calculations. No court has relied on Prof. Rosenthal's probability methodology to support class certification. Nor should the Court do so here, where her methodology is entirely unreliable for assessing injury. Moreover, like her ascertainability opinions, Prof. Rosenthal's probability methodology is improper rebuttal testimony introduced only to advance issues related to Plaintiffs' case-in-chief.

*Fourth*, Prof. Rosenthal's generic delay and Auvi-Q foreclosure methodologies are fatally dependent on Professor Einer Elhauge's unreliable opinions, and therefore cannot stand if Defendants' pending motion to exclude Prof. Elhauge's testimony is granted.

Prof. Rosenthal has been criticized and had her opinions excluded by several courts as unreliable.[1] This Court should reach the same result and exclude Prof. Rosenthal's opinions, found at paragraphs 54, 58-73 and 75-80 of her Report, paragraphs 14-21, 26, 36 and 44-60 of her Reply, and in the accompanying damages calculations in the Attachments to her Reports,[2] as unreliable for assessing whether Plaintiffs have met their burden to show classwide injury.

## LEGAL STANDARD

"[B]efore granting or denying class certification based on expert evidence, a court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a

---

[1] *See, e.g.*, *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 2545, 2018 WL 3586182, at *10 (N.D. Ill. Jul. 26, 2018) (denying class certification after rejecting Rosenthal's conclusion that causation could be inferred, because her methodology failed to account for several key causal "layers"); *In re Wellbutrin*, 308 F.R.D. at 146-50; *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. 04-5898, 2010 WL 3855552, at *20, *25 (E.D. Pa. Sept. 30, 2010) (unpublished) (rejecting Rosenthal's damages model and denying certification where she "ask[ed] [the] court to accept, without evidence" presumptions in support of common impact).

[2] Defendants strongly disagree with all of the opinions that Prof. Rosenthal advances in her reports and maintain that they cannot support class certification. But solely for the purposes of this *Daubert* motion, Defendants are only seeking to exclude the opinions discussed herein.

matter of law."  Mem. and Order Granting Mot. to Amend Sched. Order at 4-5, Dkt. 1532 ("Mem. and Order") (quotation omitted).  Federal Rule of Evidence 702 imposes a "gatekeeper obligation" on district courts to determine admissibility by assessing "the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).  Plaintiffs accordingly have the burden to show the reliability of their proffered expert opinions by showing that their experts' methods are "scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."  *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) (citation omitted).  Where an expert's testimony's "factual basis, data, principles, methods, or their application" are called into question, the court "must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (internal quotation marks and citation omitted).

In addition, "the role and scope of the *Daubert* analysis increases in step with the importance of the expert opinion to plaintiff's showing of Rule 23(a)'s requirements."  Mem. and Order at 5.  Greater scrutiny is required where, as here, "a plaintiff relies entirely on expert evidence to satisfy a Rule 23(a) requirement for certification."  *Id.*  This makes good sense: expert testimony that is "insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied."  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (requiring assessment of "expert's qualifications or submissions" before ruling on motion

for class certification where expert's testimony is "critical to class certification"). This Court therefore has recognized the importance of assessing an expert's reliability as part of the "rigorous analysis" needed to assess Plaintiffs' compliance with the class certification criteria of Rule 23. *See* Mem. and Order at 3-5.

Rule 26 also requires that an expert's initial report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Expert rebuttal is permitted, but it must be limited to evidence that is "intended solely to contradict or rebut evidence on the same subject matter" identified by the opposing party. Fed. R. Civ. P. 26(a)(2)(D)(ii). *See also Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) (rebuttal evidence is "evidence which attempts to 'disprove or contradict' the evidence to which it is contrasted") (citations omitted).

## ARGUMENT

The Court has stated that its *Daubert* analysis for class certification "will focus primarily on: (1) the knowledge, training, experience, and qualifications of the expert; and (2) the methodology relied on by the expert in formulating the challenged opinion." Mem. and Order at 6. The focus of this Motion is on the latter. Prof. Rosenthal's two-pack damages calculations, probability analysis, ascertainability opinions, and calculations dependent on Prof. Elhauge's report should be excluded because Prof. Rosenthal's methodologies are unreliable. And because Prof. Rosenthal wrongly introduced her probability and ascertainability opinions for the first time in her Reply, they should also be excluded as improper rebuttal testimony.

## I.    PROFESSOR ROSENTHAL'S TWO-PACK METHODOLOGY FAILS.

In response to medical guidance recommending that patients carry two epinephrine auto-injectors ("EAIs") at all times, Mylan stopped selling EpiPen products in single packages in August 2011 and began offering EpiPen Auto-Injector exclusively in two-packs. Although every

other EAI manufacturer since 2011 also has sold EAIs in packages of two, and although overwhelming medical guidance continues to support patients carrying two devices, Plaintiffs assert that Mylan's decision was improper, and they retained Prof. Rosenthal to construct a model supposedly showing classwide harm arising out of the two-pack issue.

Prof. Rosenthal's two-pack model advances what she calls an "event study," Rosenthal Reply ¶¶ 15-17, that purports to calculate classwide "overcharge damages due to the withdrawal of the single-pen" in August 2011.   Rosenthal Rep. ¶ 54.   More specifically, Prof. Rosenthal calculates the average number of pens per prescription in the two quarters immediately preceding August 2011; asserts that consumers would have continued to purchase single pens at the exact same rate *over the next seven years* as they did in those two quarters; and concludes that Mylan profited unlawfully by requiring all of those single pen purchasers to spend more money and buy two pens instead.   *Id.* ¶¶ 54, 69-73, 77-78.   She did not, however, "separately account[]" for any other factors that could influence consumers' two-pack preferences, Rosenthal Reply ¶ 16; she simply assumed that the same rate of single-pen purchases would continue after August 2011.

Prof. Rosenthal claims this method is reliable because it is (she says) an appropriate application of the "event study approach . . . widely employed in economic analysis."   *Id.* ¶ 15. But that is clearly and undeniably wrong.   What Prof. Rosenthal has done here is *not* an event study.   It is, in truth, an unreliable methodology that she made up and then termed an "event study" in a failed attempt to support Plaintiffs' motion for class certification.

Event studies are almost always used in securities and finance litigation—not consumer class actions—to estimate how prices of stocks or other investments react to announcements of economic events.   The point is to isolate the impact of the "event" at issue over a short period of time (e.g., a corporate earnings announcement), and to see if that event was the cause of the loss

in an investment's value.  *See In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1273 (N.D. Okla. 2007) (an event study is a "statistical regression analysis that examines the effect of an event on a dependent variable" by "isolat[ing]" the effects of purported misconduct to determine if there was a "causal connection"), aff'd sub nom. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Event studies can work in the securities context because they rely on a theory that financial markets are efficient, i.e., that all new, relevant information is immediately reflected in stock prices due to an efficient capital market.  *See* A.C. MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature 1, 13-39 (1997) (cited in Rosenthal Reply ¶ 15 & n.17) ("The usefulness of such a study comes from the fact that, given rationality in the marketplace, the effects of an event will be reflected immediately in security prices.").  But to be valid, an event study must study the potential impact of *multiple* competing effects in order to isolate and prove impact from the alleged misconduct.  *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014); *Sec. & Exch. Comm'n v. Goldstone*, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *45 (D.N.M. May 10, 2016).

The problem for Plaintiffs is that this is not a securities case, and Prof. Rosenthal's two-pack methodology does not measure competing possible effects.  It only studies the potential impact of a *single* effect—the withdrawal of the single-pack—on the number of consumers who would have continued buying single pens if that option were available after August 2011.  In fact, Prof. Rosenthal specifically ignores unrebutted record evidence demonstrating that additional factors—including widespread medical guidance issued *after* 2011—would have caused an increasing number of doctors and patients to prefer two-packs for reasons entirely independent of the single-pack's withdrawal.  *Compare* Defs.' Opp. to Pls.' Mot. for Class Cert.

at 26-28, Dkt. 1503-3 ("Defs.' Opp.") (discussing factors influencing two-pack preferences) *with* Rosenthal Reply ¶ 16 (claiming, without confirming through any statistical analysis, that the "effects of clinical recommendations are constant before and after" August 2011). A true events study would have assessed these other factors, ruled them out as possible effects on consumer purchases, and isolated the decision to stop selling single EpiPen packages as the sole reason why every member of the class bought more pens (and paid more money) than they otherwise would have.

By not studying any of this, Prof. Rosenthal cannot eliminate the probability that numerous class members would have continued buying the two-pack anyway for other reasons, even if a one-pack were available. Her model has no way to measure that, and thus, no reliable way to show injury on a classwide basis due to Mylan's decision to only sell EpiPen products in packages of two. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 93 (1st Cir. 2014) (rejecting event study that failed to isolate competing effects). *See also Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*, No. CIV.A. 05-2164-MLB, 2007 WL 6215929, at *7 (D. Kan. Dec. 19, 2007) (excluding testimony where expert's calculations were based on "but-for" world that failed to account for relevant factors).

What Prof. Rosenthal has done is not an event study or a valid regression; it is a model that she invented out of whole cloth and misapplied in an attempt to assert classwide harm. Prof. Rosenthal's failure to account for competing variables and causal effects has been criticized by other courts. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 95 (2d Cir. 2015) (discrediting Rosenthal's regression analysis where it failed to isolate competing causal effects). This Court should exclude Prof. Rosenthal's two-pack damages methodology for the same reasons.

## II.   PROFESSOR ROSENTHAL'S PROBABILITY AND ASCERTAINABILITY METHODOLOGIES SHOULD BE EXCLUDED.

### A.   Professor Rosenthal's Ascertainability Opinion Is Unreliable.

Plaintiffs did not put forward any evidence in their opening brief or accompanying expert reports to carry their burden of demonstrating ascertainability.  They did not develop a record with data sufficient to identify consumers who (1) paid nothing for EpiPen products, (2) had flat copays, or (3) paid cash for EpiPen products.  *See* Defs.' Opp. at 47-50.  In her Reply, Prof. Rosenthal asserts that Plaintiffs can overcome these three defects because "a methodology exists to identify whether specific individuals meet the class definition."  Rosenthal Reply ¶ 49.  But, as explained below, Prof. Rosenthal's new ascertainability opinion is based on "unjustified assumptions," *Cochrane v. Schneider Nat. Carriers, Inc.*, 980 F. Supp. 374, 378 (D. Kan. 1997), and includes no methodology, let alone one that bridges the "analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**Consumers who paid nothing.**  Consumers used ▮▮▮▮▮▮ Mylan-issued coupons in EpiPen purchase transactions, and ▮▮▮▮ of the time these coupons reduced consumers' payments to zero.  *See* Expert Report of James W. Hughes in Supp. of Defs.' Opp. ¶ 79 & n.125, Dkt. 1503-6 ("Hughes Rep.").  Thus, these transactions would not qualify a consumer for class membership, and Plaintiffs must identify a methodology for excluding such consumers.  Prof. Rosenthal acknowledges that the Mylan coupon data do not contain individual-identifying information, but she asserts she can link fields from the coupon data, including Rx number, national drug code ("NDC") number, and fill date, to claims records produced by PBMs.  *See* Rosenthal Reply ¶ 33.  To demonstrate this, she identifies a single transaction for which she claims she can link Mylan's coupon data to CVS/Caremark claims data.  Prof. Rosenthal then

asserts that "[m]any examples like this can be observed in the merged data" and thus, "at the appropriate time – we can link coupons with pharmacy records." *Id.* ¶¶ 33, 49.

Simply put, Prof. Rosenthal is wrong.  Very few transactions can actually be linked in this fashion.  As explained in the attached Declaration of James Hughes, Professor Hughes, who is Defendants' ascertainability expert, *see* Hughes Rep., endeavored to match all the transactions listed in the PBM claims data produced in this case to Mylan's coupon data using Prof. Rosenthal's proposed approach.  Ex. A, Decl. of Dr. James W. Hughes in Supp. of Defs.' Mot. to Exclude Expert Opinions of Prof. Meredith Rosenthal ("Hughes Decl.").  The result:  Even after extensive manipulation to maximize the number of matches, ***less than 16%*** of the transactions listed in the Mylan coupon data can be linked to the PBM claims data.  *See id.* ¶ 20.  This means that Prof. Rosenthal's technique will fail to account for approximately ████████ coupon transactions, approximately ████████ of which would have likely resulted in a consumer paying nothing for EpiPen products and not qualifying for class membership.  *See id.* ¶ 21.  It is difficult to imagine a less reliable methodology for excluding class members who paid nothing.

**Single-Flat-Copay Consumers.**  Prof. Rosenthal likewise fails to identify any reliable methodology for identifying consumers who fall outside the proposed class definitions because they had single flat-copays—*i.e.*, the same copayment for both branded and generic products. Instead of analyzing the actual data in this case, which do not contain this information, Prof. Rosenthal cites to "[d]eclarations submitted by PBMs" in two *other* cases and assumes, based on these declarations, that "data must be available" and "can be provided if requested."  Rosenthal Reply ¶ 20.  Citing one such declaration, Prof. Rosenthal implies that PBMs keep their data in a "format created by the National Council for Prescription Drug Programs" ("NCPDP"), which includes a field for copayment structure.  *See id.*

This, too, is wrong.  Prof. Rosenthal does not discuss the actual contents of the PBM data produced *in this case.*  Instead, she asserts—with no explanation whatsoever—that the "PBM declarations" she cites from other cases are "entirely consistent with the data produced by multiple PBMs in this matter."  *See id.* ¶ 21.  That statement is misleading at best.  As Prof. Hughes has demonstrated, the PBM claims data produced in this case are not standardized, do not contain the information about copayment structure needed to determine if an individual had a flat copay, and do not contain information sufficient to identify the names or contact information of potential class members.  *See* Hughes Rep. ¶¶ 64, 82-84; Ex. A (Hughes Decl.) ¶¶ 22-27.

Prof. Rosenthal offered a similarly flawed opinion in the *Wellbutrin* case, in which she asserted that the court could rely on the existence of NCPDP standards and assume that PBMs keep sufficient data to identify flat-copay consumers.  There, the court rejected her assertions, reasoning that "[t]he NCPDP sets pharmaceutical data standards, but does not actively collect or store any pharmaceutical data" and that it is "not clear . . . that the players in the pharmaceutical industry utilize all of the fields set out in NCPDP standards."  *In re Wellbutrin Antitrust Litig.*, 308 F.R.D. at 145, 150.  The Court refused simply to assume that "such fields were utilized by members of the pharmaceutical industry, or that such records would be available to aid in the ascertainability inquiry."  *Id.* at 150.  Prof. Rosenthal has similarly failed to back up her assertions here, and the Court should follow the *Wellbutrin* court's lead and reject her opinion.

**Consumers Who Paid Cash.**  Prof. Rosenthal's opinion with respect to cash-paying customers is equally threadbare.  As Prof. Hughes demonstrated, because PBMs do not maintain records on cash-paying consumers, to identify all cash-paying purchasers one would need to collect data covering approximately 65,000 retail pharmacies, over 23,000 of which are independent.  *See* Hughes Rep. ¶ 71.  Prof. Rosenthal does not dispute this.  Instead, she asserts

that Plaintiffs "have in fact produced a large sample of pharmacy records for cash payers in the form of the IQVIA Xponent data." Rosenthal Reply ¶ 48. Yet she admits that the IQVIA data do not include any patient-identifying information—making them useless for identifying class members. *See id.* She then states that "such identifiers do in fact exist at the dispensing pharmacies," that "presumably the Court could compel their production," and that therefore a "methodology exists" for using such data to ascertain class membership. *Id.* ¶¶ 48-49. Yet Prof. Rosenthal offers no details on this methodology, let alone on how it would be possible to collect and analyze the pharmacy-level data that such a methodology would require.

Once again, as in *Wellbutrin*, Prof. Rosenthal's "evidence on ascertainability barely goes further than repeated assurances that showing ascertainability in pharmaceutical cases is not difficult and that there are extensive purchase records in the pharmaceutical industry that could be used to ascertain whether individual consumers and PBMs are members of the class." *In re Wellbutrin Antitrust Litig.*, 308 F.R.D. at 150. And just like in *Wellbutrin*, Prof. Rosenthal "claim[s] that there are records at the retail pharmacy and PBM level that can be used to identify class members" but has not "examined or analyzed these pharmaceutical records . . . to show that they could be used to ascertain PBMs and individual consumers." *Id.* The *Wellbutrin* court was "not persuaded by [Prof. Rosenthal's] conclusory statements," *id.*, and this Court should likewise reject them.

**B.   Professor Rosenthal's Probability Methodology Is Unreliable.**

Prof. Rosenthal's Reply Report introduced a new "probability analysis" that purports to "estimate the percentage" of putative class members "who *might* not have suffered an overcharge" from the alleged misconduct. Rosenthal Reply ¶ 50 (emphasis added). Prof. Rosenthal applied this new methodology to Plaintiffs' generic delay and two-pack allegations. She estimates an individual consumer's probability of being "unaffected" because (i) their

"purchases consisted entirely of branded EpiPen" (an 8.39% probability, assuming generic entry of March 13, 2014), or (ii) they were not "forced" to buy two-packs (a 65% probability). *Id.* ¶¶ 53, 55, 60.[3]  She then applies these same percentages to each payor's hypothetical number of "patients" on the grounds that it is "reasonable" not to account for any payor variation.[4] *Id.* ¶¶ 54, 56.  And, lastly, while acknowledging that she "cannot observe the exact overlap" between the generic delay and two-pack allegations, Prof. Rosenthal nonetheless combines these calculations to assess the likelihood that a consumer was not affected by either one. *Id.* ¶ 58.

The Court should exclude this "hypothetical and probabilistic" methodology—one Prof. Rosenthal has likened to a "coin toss"—as fundamentally unreliable. *Id.* ¶¶ 51-52.  This simplistic methodology fails for three reasons: (1) it depends on unreasonable assumptions contradicted by the record; (2) it lacks any support in the relevant field or case law; and (3) it is incapable of measuring classwide injury.

### 1.   The probability methodology is rooted in unsupported assumptions.

Where "there is simply too great an analytical gap between the data and the opinion proffered," *Joiner*, 522 U.S. at 146, expert testimony dependent on "unjustified assumptions" cannot "assist the trier of fact" and should be excluded as unreliable. *Cochrane*, 980 F. Supp. at 378.  Here, Prof. Rosenthal's new probability analysis does nothing more than "speculate and hypothesize" about the mere probability of classwide effects without any connection to

---

[3] Prof. Rosenthal also makes reference to Plaintiffs' allegations related to alleged Auvi-Q foreclosure and RICO violations, Rosenthal Reply ¶¶ 57, 60, but her Reply Report contains no analysis of these issues at all.

[4] For example, Prof. Rosenthal claims that a payor with two patients would have a 0.70% probability of brand loyalty, which is the result of multiplying .0839 (i.e., 8.39%) x .0839. *Id.* ¶ 54.  She concludes that payors with five patients have a 0.0004% chance of reimbursing entirely brand-loyal transactions in her but-for world. *Id.*  As to the two-pack allegations, Prof. Rosenthal concludes that a payor's probability of not reimbursing for a "forced" purchase ranged from 42% (if it reimbursed 2 patients) to 0.02% (if it reimbursed 20 patients). *Id.* ¶ 56.

"established evidentiary facts." *United States v. Rice*, 52 F.3d 843, 847 (10th Cir. 1995). More specifically, she makes three key unsubstantiated assumptions that undermine her conclusions.

*First*, Prof. Rosenthal's payor calculations wrongly assume that every payor would have had the same odds of reimbursing a branded EpiPen or two-pack purchase. Rosenthal Reply ¶¶ 54, 56. As to generic delay, for example, she assumes that 8.39% of prescriptions in the but-for world where generic entry occurred on March 13, 2014, would be "brand loyal." *See id.* ¶ 54. She also assumes that this is not just an average across the population of payors but a consistent figure within each one. Thus, if a payor reimbursed 10,000 EpiPen purchases, she would say that 839 always would have been for "brand loyal" consumers and 9,161 of the payor's members would have preferred a generic device.

Prof. Rosenthal assumes that these figures hold true for each payor, but the record shows that to be wrong. In fact, as many as 10% of payors, if not more, *only* reimbursed branded EpiPen devices during the relevant period, despite the availability of generic alternatives.[5] Expert Rep. of Dr. John H. Johnson, IV in Supp. of Defs.' Opp. ¶ 180, Dkt. 1503-4 ("Johnson Rep."). Indeed, payors exhibit a variety of differences that can make them just as "brand loyal" as consumers. *See id.* ¶¶ 176-183 (discussing payors' individualized factors that undermine Prof. Rosenthal's aggregate damages calculations). This includes variations in formularies, benefit design, negotiating power, and rebate payments, among others. *Id.* Prof. Rosenthal ignores these variations entirely, and ignores the significant percentage of payors—10% or more—who

---

[5] Prof. Rosenthal claims that Dr. Johnson's 10% calculations are flawed, but, if anything, Dr. Johnson's numbers are conservative. Prof. Rosenthal's criticisms ignore the fact that the IQVIA data she used—and that Dr. Johnson analyzed to estimate the number of "brand loyal" payors—is aggregated and incomplete, and therefore do "not identify all uninjured" payors. *See* Johnson Rep. ¶ 180 & n.498; *see also* Ex. B, Decl. of Dr. John H. Johnson, IV in Supp. of Defs.' Mot. to Exclude Expert Opinions of Prof. Meredith Rosenthal ¶ 13 & n.26 ("Johnson Decl.") (discussing flaws in IQVIA data). But even Prof. Rosenthal's adjusted calculations show that at least "5% of plans fall into" the "brand-loyal" category—far more than her estimate of 0.0004%.

never would have paid for a generic device or been injured.  Her methodology thus cannot predict what percentage of payors overall would have reimbursed a generic or single device, and is unreliable for assessing injury on a classwide basis.

*Second*, Prof. Rosenthal's methodology is fatally dependent on her arbitrary and unfounded estimate of consumers' generic conversion rates.  Echoing a theme from her original Report, Prof. Rosenthal again relies on a single Mylan document from 2011, years before Plaintiffs contend Teva would have even launched a generic EpiPen, to support her assumption that 95% of consumers would switch to a generic product.  *See* Rosenthal Reply ¶ 53 & n.59. She then uses this yardstick to estimate the percentage of transactions in her but-for world that would have shifted to a generic device—the only input that she relies on to conduct her "probability analysis" for the alleged generic delay.  *See id.* ¶ 53 & n.59; Attachment C.6.a.

Significant evidence, however, demonstrates that Prof. Rosenthal's 95% generic-conversion assumption is wrong.  *See* Defs.' Opp. at 37-39 (discussing competing generic conversion forecasts ignored by Prof. Rosenthal); Johnson Rep. ¶¶ 166-171 (same).  Indeed, just like the 95% figure did not support the analysis in Prof. Rosenthal's original Report, that same figure renders her new probability methodology unreliable.  The record is replete with evidence of lower generic switching rates, including real-world evidence of how Teva's generic is performing and forecasts showing that a conversion rate as low as 75% is far more reasonable. *See* Defs.' Opp. at 37-39.[6]   Prof. Rosenthal dismisses this evidence by claiming that her methodology "can accommodate a range of yardsticks."  Rosenthal Reply ¶ 27.  But this is wrong too:  any reduction in Prof. Rosenthal's 95% yardstick materially increases the probability

---

[6] Teva captured only 3% of the market in the first two months after its launch, and Teva's CEO has stated that he only expects Teva's generic to capture 50% of the market by the end of 2020.  Defs.' Opp. at 38-39 & Ex. 59.

that consumers (and thus, the payors reimbursing those consumers' purchases) would be brand loyalists, i.e., that they would have continued to buy branded EpiPen devices instead of generic products in the but-for world and thus would have suffered no injury from the alleged conduct. *See, e.g.*, Defs.' Opp. at 37-39.  Moreover, it is *undisputed* that individualized factors, such as patient or physician preference, affect whether putative class members would have been prescribed or purchased a generic device, *see, e.g.*, *id.* at 36 (citing unrebutted testimony of Dr. Blaiss)—none of which Prof. Rosenthal's probability analysis attempts to address.

*Third*, Prof. Rosenthal's two-pack probability calculations are unreliable.  Prof. Rosenthal uses a May 2010 slide deck to estimate that, at all times since then, 65% of patients would have preferred to purchase a two-pack.  Rosenthal Reply ¶ 55 & n.61.  But this assumption suffers from the same flaw as her two-pack "event study" discussed above:  it ignores all the evidence *after* May 2010 showing that more doctors and patients would have preferred the two-pack, and thus had a greater likelihood of being unaffected—and uninjured—by the single-pack's discontinuation.[7]

### 2. The probability methodology is unsupported by economic literature and has never been accepted to support class certification.

Prof. Rosenthal's hypothetical analysis is also unreliable because it is not "supported by appropriate validation," *Daubert*, 509 U.S. at 590, bears no indicia of "economic[] valid[ity]," *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1506 (D. Kan. 1995), and has not "attained general acceptance" in the field of economics.  *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1335 (10th Cir. 2004).  The Tenth Circuit has recognized that expert testimony is properly

---

[7] Prof. Rosenthal also inflates her probability calculations by relying on the 65% figure derived from the May 2010 slide deck, instead of the data relied on in her opening Report, which indicates that two-packs accounted for 76% of all EpiPen purchases in the first half of 2011.  Johnson Rep. ¶ 65 & Ex. 8.

excluded where it is "not only untested, but untestable." *United States v. Orr*, 692 F.3d 1079, 1093 (10th Cir. 2012). Both deficiencies exist here.

Prof. Rosenthal has not provided any support in the field of economics for using probabilities to model classwide harm. Nor are Defendants or their economic experts aware of any such authority that exists. Prof. Rosenthal cites two articles to support her view that "health economists routinely use probabilities to estimate the distribution of harms and benefits to populations." Rosenthal Reply ¶ 51 & n.57. That is not what these articles establish at all.

As discussed in the attached declaration from Dr. Johnson, the referenced articles discuss studies employing a "microsimulation analysis" that is distinguishable from Prof. Rosenthal's methodology for at least three reasons. Ex. B (Johnson Decl.) ¶ 15. First, the cited studies are based on "modeling at the individual level," and "use actual, individual observations" to "attempt to model the relationships between variables that explain individual behavior." *Id.* Prof. Rosenthal has conducted an "aggregate analysis," Rosenthal Reply ¶ 61, and expressly assumes that one event has no influence on another, such that all class members have the exact same characteristics (and that each class member faces the same probability of being injured by generic delay or two-pack issues). *See id.* ¶¶ 54, 56; Ex. B (Johnson Decl.) ¶ 15. Second, "[o]nce those relationships between variables are estimated using the individual observations, the articles also include sensitivity analyses to assess the range of possible outcomes." Ex. B (Johnson Decl.) ¶ 16. Prof. Rosenthal "makes only one assumption" (the likelihood of generic switching), and "runs one analysis" (the probability of brand loyalty). *Id.* ¶ 17. Third, the studies leverage these sensitivity analyses to "assess the robustness of their primary analysis," while Prof. Rosenthal makes no effort to "model *any* relationships between factors" that may affect class members' probabilities or otherwise test her methodology. *Id.* ¶¶ 17-18.

Prof. Rosenthal's probability methodology therefore has not been shown to have support in her field. Prof. Rosenthal has merely advanced a "novel . . . methodology" that Plaintiffs improperly seek to introduce "based solely on the assurance of the expert [herself]." *B.H. ex rel. Holder v. Gold Fields Mining Corp.*, No. 04-CV-0564-CVE-PJC, 2007 WL 188130, at *3 (N.D. Okla. Jan. 22, 2007) (excluding untested methodology where it was only supported by the expert's "testimony . . . regarding his confidence in his results"). That is enough to merit exclusion. *See Attorney Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 781 (10th Cir. 2009) (expert testimony unreliable where the district court's criticism "arose out of the novelty of" the methodology's "application to an entirely new area"); *Cochrane*, 980 F. Supp. at 379-80 (excluding testimony based on expert's own "theoretical" and untested methodology).[8]

### 3. The probability methodology is unreliable for assessing classwide impact.

Prof. Rosenthal's probability analysis fails for another reason: it is entirely unreliable for assessing whether Plaintiffs have met their burden to show harm on a classwide basis. Plaintiffs introduced Prof. Rosenthal's opinion in an attempt to meet their burden to show classwide injury, *see* Pls.' Reply Mem. in Supp. of Class Cert. at 7-10, Dkt. 1554-1—which Defendants maintain requires a showing of actual injury to all or substantially all class members. But as discussed in Defendants' proposed sur-reply, *see* Defs.' Sur-Reply at 6-9, Dkt. 1574-1, the probability analysis does not do that. Prof. Rosenthal only estimates the percentage of putative class members "who *might* not" have been injured. Rosenthal Reply ¶ 50 (emphasis added). She does

---

[8] No court has ever accepted Prof. Rosenthal's "probability analysis" to support class certification either. In fact, the plaintiffs in one recent case submitted Prof. Rosenthal's probability analysis as the leading piece of evidence that they argued warranted reconsideration of the First Circuit's denial of class certification. But the district court rejected the analysis and plaintiffs' motion. Electronic Order, *In re Asacol Antitrust Litig.*, No. 1:15-cv-12730-DJC (D. Mass. Apr. 11, 2019), Dkt. 772. And when the First Circuit previously considered Prof. Rosenthal's probability methodology in *Celexa & Lexapro*, it specifically noted that "there may be . . . potential bones to pick with the sufficiency" of it, particularly because the district court had not yet "conducted a *Daubert* analysis." *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 13 (1st Cir. 2019).

*not* assess the probability that individual class members paid or reimbursed any more for EpiPen products due to the alleged misconduct—the only form of damages that Rosenthal assesses, *see* Defs.' Opp. at Ex. 7, Dkt. 1503-14 (Rosenthal Dep. 99:2-24), and that Plaintiffs allege.  *See* Pls.' Mem. in Supp. of Mot. for Class Cert. at 47, 52, 69, 73, Dkt. 1342-1.  Prof. Rosenthal therefore falls short of developing a classwide model to show what percentage of the class was *in fact* injured, which is the relevant question for class certification.  *See* Johnson Decl. ¶¶ 6-13.

Furthermore, Prof. Rosenthal's probability model is entirely unreliable for assessing which class members, if any, were harmed by *each* of Plaintiffs' allegations.  Plaintiffs have an obligation to "tie each theory" of injury or impact "to a calculation of damages."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 37 (2013).  Prof. Rosenthal's new probability analysis, however, seeks to show "how combining multiple sources of impact reduces the probability of a class member remaining uninjured."  Rosenthal Reply ¶ 58.  To do so, Prof. Rosenthal advances a hypothetical illustration to calculate 5% as the "midpoint probability" that any individual consumer would never have purchased a generic or single device in the but-for world.  *Id.* ¶ 60.  This combined probability is irrelevant to whether—and if so, in what amount—all class members paid too much as a result of each of Plaintiffs' respective theories of liability.  And it tells the Court nothing about whether Plaintiffs have demonstrated injury—much less the ability to calculate classwide damages—with respect to each individual theory of liability.  It therefore fails *Comcast* and should be excluded for this reason as well.  *See* Defs.' Opp. at 57.

C. **The New Ascertainability and Probability Opinions Should Be Excluded As Improper Rebuttal Testimony.**

Prof. Rosenthal's ascertainability and probability opinions are unreliable and should be excluded for all of the reasons above.  But they also should be excluded for the simple reason that they are new and thus represent improper rebuttal opinions.

It is well-established that parties are not permitted to use expert reply reports to "introduce evidence more properly a part of a party's case-in-chief," particularly if the testimony "is used to introduce new legal theories." *Foster v. USIC Locating Servs., LLC*, No. 16-2174-CM, 2018 WL 4003354, at *2 (D. Kan. Aug. 17, 2018). *See also SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1515 (10th Cir. 1990) (affirming exclusion of expert's rebuttal testimony that "was really an attempt . . . to introduce or interpret exhibits more properly part of [the party's] case-in-chief"); *Anderson v. Seven Falls Co.*, No. 12-cv-01490-RM-CBS, 2013 WL 3771300, at *9 (D. Colo. July 18, 2013) (reiterating that parties may not use a reply report to cure oversights in their case-in-chief). Rebuttal testimony should be excluded where it offers analyses that could have been performed at the time the initial report was filed, *see In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008), or otherwise seeks to "re-do" the expert's opening report to "support[] an element of the plaintiff's prima facie case." *Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016).

The ascertainability and probability opinions in Prof. Rosenthal's Reply Report fail these standards. It is Plaintiffs' burden to demonstrate that their proposed class is ascertainable. *See* Defs.' Opp. at 47. Thus, Plaintiffs had to offer any expert evidence regarding ascertainability with their opening reports. They did not. Trying to introduce new opinions on reply is improper and grounds for exclusion. *See SIL-FLO*, 917 F.2d at 1515; *Foster*, 2018 WL 4003354, at *2.

The same goes for Prof. Rosenthal's new probability methodology. Prof. Rosenthal's initial Report necessarily required that she assess and model for the possibility of uninjured class members. Rosenthal Rep. ¶ 47 (describing "analysis used to establish the existence and magnitude of the economic impact of the Defendants' alleged actions"). Prof. Rosenthal's new probability methodology therefore addresses the exact same subject matter as her initial Report,

using the exact same data that she initially used to "calculate[] the percentage of transactions that were affected."  Rosenthal Reply ¶ 50.  The only difference is that Plaintiffs invoke this revised methodology to support their new theory of the case—that there is a *de minimis* "likelihood" of uninjured class members—and in a manner that attempts to shield Prof. Rosenthal's new opinions from scrutiny through a deposition.  *See* Pls.' Reply Mem. in Supp. of Class Cert. at 7-10.  This is exactly the type of improper rebuttal testimony that the Federal Rules prohibit.

## III.   ANY OPINIONS DEPENDENT ON PROFESSOR ELHAUGE'S EXCLUDED TESTIMONY ALSO SHOULD BE EXCLUDED.

As explained in Defendants' Motion to Exclude Expert Testimony of Einer Elhauge, Defendants are seeking to exclude, among other opinions, Prof. Elhauge's calculation of a but-for generic entry date and purported reduction in Auvi-Q's market share.  If the Court excludes these opinions, it also should exclude Prof. Rosenthal's generic delay and Auvi-Q foreclosure damages methodologies and accompanying damages calculations as unreliable due to their reliance on Prof. Elhauge's calculations.  Rosenthal Rep. ¶¶ 58-68, 79-80.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court exclude Prof. Rosenthal's opinions under Rule 702 and *Daubert*, or as improper rebuttal testimony.[9]

Dated:  May 21, 2019                                      Respectfully submitted,

                                                         /s/ Adam K. Levin
                                                         _____

                                                         Adam K. Levin

---

[9] If the Court declines to exclude Prof. Rosenthal's new ascertainability and probability opinions as unreliable under Rule 702 or as improper rebuttal testimony, Defendants respectfully request that the Court grant Mylan an opportunity to depose Prof. Rosenthal about her new analyses, introduce additional expert rebuttal testimony, and submit supplemental briefing in opposition to Plaintiffs' motion for class certification.

David M. Foster
Benjamin F. Holt
Justin W. Bernick
Carolyn A. DeLone
Kathryn M. Ali
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
adam.levin@hoganlovells.com
david.foster@hoganlovells.com
benjamin.holt@hoganlovells.com
justin.bernick@hoganlovells.com
carolyn.delone@hoganlovells.com
kathryn.ali@hoganlovells.com

Brian Fries (15889)
James Moloney (23786)
LATHROP GAGE LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Fax: (816) 292-2001
bfries@lathropgage.com
jmoloney@lathropgage.com

*Counsel for the Mylan Defendants*

/s/ Joseph Rebein

Joseph Rebein (25912)
Ashley Harrison, D. Kan. (78667)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone:  (816) 474-6550
Fax: (816) 421-5547
jrebein@shb.com
aharrison@shb.com

Dimitrios T. Drivas
Robert A. Milne
Raj S. Gandesha
Edward Thrasher
Kathryn Swisher

21

WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Fax: (212) 354-8113
ddrivas@whitecase.com
rmilne@whitecase.com
rgandesha@whitecase.com
ethrasher@whitecase.com
kswisher@whitecase.com

*Counsel for Defendants Pfizer Inc., King Pharmaceuticals LLC, and Meridian Medical Technologies, Inc.*