# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>*This Document Relates to Class Cases* | Case No. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO <u>EXCLUDE THE EXPERT OPINIONS OF PROFESSOR EINER ELHAUGE</u>

## INDEX OF EXHIBITS

**Exhibit A** – Deposition Transcript Excerpts of Expert Prof. Einer Elhauge

**Exhibit B** – Deposition Transcript Excerpts of Humana, Inc., 30(b)(6) Witness Bethanie Stein

**Exhibit C** – E-mail from R. Hudson dated May 14, 2019

**Exhibit D** – MYEP00180922

**Exhibit E** – February 15, 2019 Letter from Counsel for Mylan Defendants

**Exhibit F** – February 22, 2019 Letter from Counsel for Plaintiffs

**Exhibit G** – March 5, 2019 Letter from Counsel for Mylan Defendants

**Exhibit H** – Deposition Transcript Excerpts of Sanofi 30(b)(1) Witness Sandy Loreaux

**Exhibit I** – Deposition Transcript Excerpts of Sanofi 30(b)(1) Witness Patrick Barry

**Exhibit J** – Deposition Transcript Excerpts of MedImpact 30(b)(6) Witness James Ayers

**Exhibit K** – Declaration of Dr. John H. Johnson, IV in Support of Defendants' Motion to Exclude the Expert Opinions of Prof. Einer Elhauge

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD......................................................................................................... 4

ARGUMENT ..................................................................................................................... 6

I.      PROF. ELHAUGE IS NOT QUALIFIED AS AN ECONOMETRICIAN....................... 6

II.     THE ANALYSES IN PROF. ELHAUGE'S INITIAL EXPERT REPORT ARE
UNRELIABLE. ......................................................................................................... 8

     A.     Prof. Elhauge's Auvi-Q Foreclosure Regression Analysis is Unreliable. .............. 8

     B.     Prof. Elhauge's EpiPen4Schools Program Analysis is Unreliable. ..................... 10

     C.     Prof. Elhauge's Model of Generic Entry is Unreliable and Has No Probative
Value. ........................................................................................................... 11

III.    PROF. ELHAUGE'S ATTEMPTS TO REMEDY HIS INITIAL ANALYSES ARE
IMPROPER REBUTTAL TESTIMONY AND CONTAIN NEW FLAWS THAT
MAKE THEM UNRELIABLE. ................................................................................. 13

     A.     The New Analyses in Prof. Elhauge's Reply Report Should be Excluded as
Improper Rebuttal Testimony. .............................................................................. 14

     B.     Professor Elhauge's New Regression is Unreliable............................................. 15

          1.     The New Regression Model Improperly Removes Price As a
Variable.................................................................................................. 16

          2.     The New Regression Model Uses an Improper Standard for Statistical
Significance............................................................................................. 17

          3.     The New Regression Model Uses an Improper Test for Statistical
Significance............................................................................................. 18

CONCLUSION................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Phosphide Antitrust Litig.*,
893 F. Supp. 1497 (D. Kan. 1995) ...................................................................................11, 13

*Anderson v. Seven Falls Co.*,
No. 12-cv-01490-RM-CBS, 2013 WL 3771300 (D. Colo. July 18, 2013) ..............................6

*Apsley v. Boeing Co.*,
691 F.3d 1184 (10th Cir. 2012) ..............................................................................................18

*ATA Airlines, Inc. v. Fed. Exp. Corp.*,
665 F.3d 882 (7th Cir. 2011) .....................................................................................................8

*In re Blood Reagents Antitrust Litig.*,
783 F.3d 183 (3d Cir. 2015)........................................................................................................5

*Braun v. Lorillard Inc.*,
84 F.3d 230 (7th Cir. 1996) ......................................................................................................15

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
158 F.3d 548 (11th Cir. 1998) ...................................................................................................8

*Cochrane v. Schneider Nat. Carriers, Inc.*,
980 F. Supp. 374 (D. Kan. 1997) .............................................................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...................................................................................................5, 6, 11, 13

*Dodge v. Cotter Corp.*,
328 F.3d 1212 (10th Cir. 2003) ................................................................................................4

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ..............................................................................................6, 7

*Fertik v. Stevenson*,
No. CV 12-10795-PBS, 2016 WL 4148193 (D. Mass. Aug. 4, 2016) ...................................11

*Foster v. USIC Locating Servs., LLC*,
No. 16-2174-CM, 2018 WL 4003354 (D. Kan. Aug. 17, 2018) .........................................5, 14

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008).............................................................................................6

*Hall v. Flannery*,
   840 F.3d 922 (7th Cir. 2016) ..................................................................................6

*It's My Party, Inc. v. Live Nat., Inc.*,
   88 F. Supp. 3d 475, 485 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) ..........................7

*Jones v. City of Bos.*,
   752 F.3d 38 (1st Cir. 2014)..................................................................................18

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
   No. 2:06-CV-1797, 2015 WL 12645766 (E.D. Pa. Dec. 22, 2015)...........................................7

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................4, 11

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)..................................................................17

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
   No. CV 02-4770 MRP, 2004 WL 7094930 (C.D. Cal. May 28, 2004)...................................7

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ..................................................................................5

*Moore v. Summers*,
   113 F. Supp. 2d 5 (D.D.C. 2000) ..........................................................................18

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ...................................................7

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152, 172 (S.D.N.Y. 2018)..............................................................7

*Natchitoches Parish Hosp. v. Tyco*,
   No. 05-12024, 2009 WL 3053855 (D. Mass Sept. 21, 2009)................................................1, 7

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)..................................................................2, 6, 7, 10

*Palmer v. Schultz*,
   815 F.2d 84 (D.C. Cir. 1987) ..................................................................................18

*Pinal Creek Grp. v. Newmont Mining Corp.*,
   352 F. Supp. 2d 1037 (D. Ariz. 2005) ....................................................................7

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
   49 F. Supp. 3d 385, 401–07 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir.
   2016) ..................................................................................8, 16, 17

*SIL-FLO, Inc. v. SFHC, Inc.*,
 917 F.2d 1507 (10th Cir. 1990) ................................................................6, 14

*Smith v. City of Bos.*,
 144 F. Supp. 3d 177, 196 (D. Mass. 2015) ...................................................18

*Tanberg v. Sholtis*,
 401 F.3d 1151 (10th Cir. 2005) ......................................................................5

*Timber Pines Plaza, LLC v. Kinsale Ins. Co.*,
 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016).................................................6

*Truck Ins. Exch. v. MagneTek, Inc.*,
 360 F.3d 1206 (10th Cir. 2004) ...............................................................4, 18

*United States v. Valdivia*,
 680 F.3d 33 (1st Cir. 2012)............................................................................13

**Other Authorities**

Fed. R. Civ. P. 23 ...................................................................................................5, 15

Fed. R. Civ. P. 26 ........................................................................................................5

Fed. R. Evid. 702 ..........................................................................................3, 4, 6, 20

D. Kan. L. R. 23.1(d) .................................................................................................13

ABA, *Econometrics: Legal, Practical, and Technical Issues* (2005)...........................18

FDA, *FDA Approves First Generic Version of EpiPen* (Aug. 16, 2018),
 https://www.fda.gov/news-events/press-announcements/fda-approves-first-
 generic-version-epipen (announcing August 16, 2018 FDA approval of Teva
 generic product) ............................................................................................12

Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* (3d ed. 2011),
 *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf .............8, 9, 17, 18

Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (4th ed.
 2009) .............................................................................................................18

Plaintiffs' expert "economist" Professor Einer Elhauge is a lawyer—not an economist. He admitted at his deposition that "I'm not an expert in econometrics writ large" and that he is not qualified to design econometric models. Ex. A (Elhauge Dep. 29:15-22). At least one other court agrees. *See Natchitoches Parish Hosp. v. Tyco*, No. 05-12024, 2009 WL 3053855 at *3 (D. Mass Sept. 21, 2009) (finding that Prof. Elhauge "is not qualified as an expert in economics generally speaking or econometrics"). Nevertheless, Plaintiffs rely on him for just that—to design an econometric model to analyze whether Mylan's contracts with PBMs for EpiPen reduced Auvi-Q's market share. The models that Prof. Elhauge designed are flawed, and his testimony should be excluded for the following reasons.

**First**, **Prof. Elhauge is not qualified as an econometrician**. Prof. Elhauge purports to develop econometric models to support the analyses in his reports, but he is neither an economist nor an econometrician (an economist with highly specialized training in mathematics and statistics who builds economic models). Instead, he has a B.A. in Biochemical Sciences and a J.D., and he currently teaches antitrust law—not economics. While various courts have permitted Prof. Elhauge to testify on issues touching on economic issues, Prof. Elhauge concedes that he is not qualified to create econometric models. Ex. A (Elhauge Dep. 29:15-17). In contrast, Mylan's expert econometrician, Dr. John Johnson, has a Ph.D. in economics from the Massachusetts Institute of Technology, specializes in econometrics, and has taught graduate level courses in economics and econometrics. The Court should exercise its "gatekeeper" role to exclude unreliable econometric opinions from a layperson who lacks the requisite expertise.[1]

---

[1] The opinions that should be excluded on this basis are contained in paragraphs 3, 110-120, and 123-125 (and the tables contained therein) and the unnumbered tables on pages 74-75 of his Report (as well as the changes made to these paragraphs and tables in Prof. Elhauge's errata dated February 4, 2019) and paragraphs 6-8, 54-102, 104-115 (and the tables and figures contained therein); and tables 16A-D and 17A-D of his Reply Report. Defendants move to strike portions of Prof. Elhauge's analysis of alleged Auvi-Q deterred re-entry because that analysis depends on the results of Prof. Elhauge's faulty alleged Auvi-Q foreclosure regression analysis as an input.

*Second*, **the econometric analyses in Prof. Elhauge's initial report are inherently unreliable and abandoned in part.**  Prof. Elhauge's initial regression model suffered from a fatal econometric flaw.  Specifically, he failed to account for "serial correlation," or the fact that there is a correlation between the values of Auvi-Q's market share within each PBM over time.  As Dr. Johnson found, the results of Prof. Elhauge's initial regression model are not statistically significant when this serial correlation is properly addressed.   Expert Report of Dr. John H. Johnson, IV in Supp. of Defs' Opp. to Mot. for Class Cert. (Mar. 18, 2019) ¶ 102, Dkt. 1503-4 ("Johnson Report").  Prof. Elhauge therefore created a *new* purported econometric model, introduced for the first time in his Reply Report, which he claims "address[es]" the issue.  Expert Reply Report of Prof. Einer Elhauge in Supp. of Class Cert. (Apr. 29, 2019) ¶ 70, Dkt. 1554-4 (hereinafter "Elhauge Reply Report").  The Court should exclude Prof. Elhauge's opinions based on his initial model both because it is unreliable and has, as a result, subsequently been abandoned by Prof. Elhauge in favor of an entirely new purported econometric model.[2]

Prof. Elhauge's initial model also purported to measure the effects of Mylan's EpiPen4Schools® ("EpiPen4Schools") program, but that analysis should be excluded because he ignored the fact that 96 percent of schools in the program were subject to no exclusivity provision whatsoever.  MYEP00006385; *see also* Johnson Report, Exs. 19-20.  Moreover, Plaintiffs have since abandoned this theory as a result of that error, and therefore Prof. Elhauge's EpiPen4Schools opinions should be excluded.[3]

---

[2] The opinions that should be excluded on this basis are contained in paragraphs 3, 110-113, 120, and 123-125 (and the tables contained therein) and the unnumbered tables on pages 74-75 of his Report (as well as the changes made to these paragraphs and tables in Prof. Elhauge's errata).

[3] The opinions that should be excluded on this basis are contained in paragraphs 3, 108, and 121-122 (and the tables contained therein)  and the unnumbered tables on pages 74-75 of his Report (as well as the changes made to these paragraphs and tables in Prof. Elhauge's errata).

Finally, Prof. Elhauge purports to model the date that Teva supposedly would have entered with a generic EpiPen, but his analysis is unreliable and should be excluded. Prof. Elhauge concedes that it is merely "illustrative," Ex. A (Elhauge Dep. 64:22-25), and based purely on his assumption that, among other things, Teva *could have* entered in 2013 even though it did not receive FDA approval until 2018. Prof. Elhauge's analysis is completely untethered to any actual "facts or data," Fed. R. Evid. 702(b), is based on an unreliable methodology without any precedent in the law, and would render class certification essentially "automatic" in every "pay for delay" case, regardless of the actual facts. His opinions should therefore be excluded.[4]

**Third**, **Prof. Elhauge relies upon improper and unreliable rebuttal testimony in a failed attempt to fix the defects in his initial analyses.** Prof. Elhauge improperly introduces two entirely new econometric analyses in his Reply Report. First, he introduces a new regression model purporting to measure whether Mylan's contracts with PBMs for EpiPen reduced Auvi-Q's market share. Second, he includes a new analysis that attempts to separate the damages calculations for third-party payors and cash payors. This second analysis had been completed at the time of his deposition, and yet counsel for Plaintiffs refused to disclose it, despite numerous requests. Plaintiffs are not permitted to introduce new analyses for the first time in a reply report, and therefore these opinions should be excluded.[5]

In addition, when Prof. Elhauge attempted to fix the flaws in his initial regression analysis by creating a new econometric model, he created three new flaws that render this subsequent model unreliable. First, his model ignores the relative price of EpiPen and Auvi-Q

---

[4] The opinions that should be excluded on this basis are contained in paragraphs 2 and 56-92 (and the figures contained therein) of his Report (as well as the changes made to these paragraphs and figures in Prof. Elhauge's errata) and paragraphs 4 and 33-53 (and the figure contained therein) of his Reply Report.

[5] The opinions that should be excluded on this basis are contained in paragraphs 6-8, 54-115 (and the tables and figures contained therein); and tables 16A-D, and 17A-D of his Reply Report.

entirely, meaning that he cannot determine whether his results stem from Mylan's PBM contracts or the higher price of Auvi-Q. Second, he employs the wrong econometric test for statistical significance. Third, the results of his analysis are not statistically significant. As a result, the Court should exclude Prof. Elhauge's opinions based on the model in his Reply Report, too.[6]

## LEGAL STANDARD

As the Court has held in this case, "before granting or denying class certification based on expert evidence, a court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law." Mem. and Order Granting Mot. to Amend Sched. Order at 4-5, Dkt. 1532 (hereinafter "Mem. and Order") (internal quotation marks and citation omitted). In order to be admissible, expert testimony must be "not only relevant, but reliable." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Federal Rule of Evidence 702 imposes a "gatekeeper obligation" on district courts to "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge*, 328 F.3d at 1221. Plaintiffs accordingly have the burden to show the reliability of their proffered expert opinions by showing that their experts' methods are "scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) (citation omitted). Where an expert's "factual basis, data, principles, methods, or their application" are called into question, the court "must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (internal quotation marks and citation omitted).

---

[6] The opinions that should be excluded on this basis are contained in paragraphs 6-8 and 54-102, and 115 (and the tables contained therein); and tables 16A-D and 17A-D of his Reply Report.

In addition, "the role and scope of the *Daubert* analysis increases in step with the importance of the expert opinion to plaintiff's showing of Rule 23(a)'s requirements." Mem. and Order at 5. Greater scrutiny is required where, as here, "a plaintiff relies entirely on expert evidence to satisfy a Rule 23(a) requirement for certification." *Id*. This makes good sense: expert testimony that is "insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (requiring assessment of "expert's qualifications or submissions" before ruling on motion for class certification where expert's testimony is "critical to class certification"). This Court has therefore recognized the importance of assessing an expert's reliability as part of the "rigorous analysis" needed to assess Plaintiffs' compliance with the class certification criteria of Rule 23. *See* Mem. and Order at 3-4.

Finally, Rule 26 requires that an expert's initial report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Expert rebuttal is permitted, but it must be limited to evidence that is "intended solely to contradict or rebut evidence on the same subject matter" identified by the opposing party. Fed. R. Civ. P. 26(a)(2)(D)(ii); *see also Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005) (rebuttal evidence is "evidence which attempts to 'disprove or contradict' the evidence to which it is contrasted" (citation omitted)). Therefore, parties are not permitted to use expert reply reports to "introduce evidence more properly a part of a party's case-in-chief," particularly if the testimony "is used to introduce new legal theories." *Foster v. USIC Locating Servs., LLC*, No. 16-2174-CM, 2018 WL 4003354, at *2 (D. Kan. Aug. 17, 2018) (citation

omitted).[7]  Rebuttal testimony should be excluded where it offers analyses that could have been

performed at the time the initial expert report was filed, *see In re Graphics Processing Units

Antitrust Litig.*, 253 F.R.D. 478, 501 (N.D. Cal. 2008), or otherwise seeks to "re-do" the expert's

opening report to "support[] an element of the plaintiff's prima facie case." *Timber Pines Plaza,

LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016).

## ARGUMENT

### I.    PROF. ELHAUGE IS NOT QUALIFIED AS AN ECONOMETRICIAN.

Prof. Elhauge is not qualified to testify regarding his econometric analyses because

designing such analyses is admittedly outside the scope of his expertise.  Rule 702 demands that

an expert's testimony be cabined to the expert's actual area of expertise.  *See, e.g.*, *Hall v.

Flannery*, 840 F.3d 922, 929-30 (7th Cir. 2016) (collecting cases); *Nimely v. City of New York*,

414 F.3d 381, 399 n.13 (2d Cir. 2005) ("[B]ecause a witness qualifies as an expert with respect

to certain matters or areas of knowledge, it by no means follows that he or she is qualified to

express expert opinions as to other fields.").  "The *Daubert* test must be applied with due regard

for the specialization of modern science."  *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285

F.3d 609, 614 (7th Cir. 2002).  Even an "*economist*, however able, would not be allowed to

testify to the findings of an econometric study . . . if he lacked expertise in econometrics and the

study raised questions that only an econometrician could answer."  *Id.* (emphasis added).

Prof. Elhauge is no economist.  Nor is he an econometrician.  Prof. Elhauge is, rather, a

law professor.  He holds no degrees in economics, econometrics, statistics, or mathematics.  *See

Ex. A (Elhauge Dep. 14:20-15:2).  He has never taught economics, except to the extent the law

---

[7] *See also SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1515 (10th Cir. 1990) (affirming exclusion of expert's rebuttal testimony that "was really an attempt . . . to introduce or interpret exhibits more properly part of [the party's] case-in-chief"); *Anderson v. Seven Falls Co.*, No. 12-cv-01490-RM-CBS, 2013 WL 3771300, at *9 (D. Colo. July 18, 2013) (reiterating that parties may not use a reply report to cure oversights in their case-in-chief).

school courses he teaches touch on the subject. *Id.* at 17:22-18:25. He is thus not qualified to offer expert opinions about econometric models, which lie beyond the understanding of laypersons and are the province of qualified experts. *Natchitoches*, 2009 WL 3053855, at *3 (finding Prof. Elhauge qualified only "in the narrower field of antitrust economics"). Prof. Elhauge *admitted* as much at his deposition. *See* Ex. A (Elhauge Dep. 31:9–12) (conceding that he is not an expert in devising new econometric methods). Yet Prof. Elhauge proposes to testify about several econometric models of his own design. He cannot do so where "he himself lacks the necessary expertise to determine whether [his] techniques were appropriately chosen and applied." *Dura Auto. Sys. of Indiana*, 285 F.3d at 615.

Prof. Elhauge claims to be an expert in "[t]he application of economics to antitrust issues," which purportedly qualifies him to testify on such topics as market definition, market power, reverse payment settlements, and damages.[8] Ex. A (Elhauge Dep. 24:1-15). But "it by no means follows" that an expert qualified in antitrust economics is also qualified in designing multiple-regression models.[9] *Nimely*, 414 at 399 n.13; *see Dura Auto. Sys. of Indiana*, 285 F.3d at 614. Prof. Elhauge is not qualified to offer expert testimony on *that* topic, and his opinions regarding the econometric models should therefore be excluded. *See supra* at n.1.

---

[8] Several courts have found Prof. Elhauge qualified to opine on non-econometric topics. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 172 (S.D.N.Y. 2018) (reverse payment settlement); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2015 WL 12645766, at *4 (E.D. Pa. Dec. 22, 2015) (same); *It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 485 (D. Md. 2015) (market definition), *aff'd*, 811 F.3d 676 (4th Cir. 2016); *Natchitoches*, 2009 WL 3053855, at *3 (antitrust economics); *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1046 (D. Ariz. 2005) (corporate norms); *Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02-4770 MRP, 2004 WL 7094930, at *4 (C.D. Cal. May 28, 2004) (economic analysis of law).

[9] At least one district court has found Professor Elhauge "qualified to perform regression analysis in the antitrust context," *see In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *5 (E.D. Pa. July 29, 2015), but even then only begrudgingly. Relying on binding Third Circuit precedent, that court expressly found that Professor Elhauge's analysis, although admissible, was entitled to less weight because "he does not have the same educational background in econometrics that appears to be typical of experts admitted to conduct regressions in antitrust cases." *Id.*, at *5.

## II.  THE ANALYSES IN PROF. ELHAUGE'S INITIAL EXPERT REPORT ARE UNRELIABLE.

Prof. Elhauge's lack of econometrics expertise manifests itself in his flawed regression analysis for alleged Auvi-Q foreclosure and his analysis of the EpiPen4Schools program that he employs in his initial report.  Prof. Elhauge's model of delayed generic entry from the initial report also lacks a reliable methodology and is based purely on conjecture, unsupported by any facts or data.

### A.  Prof. Elhauge's Auvi-Q Foreclosure Regression Analysis is Unreliable.

The Court should exclude the econometric analysis from Prof. Elhauge's initial report regarding the purported effect of exclusion of Auvi-Q from PBM formularies on Auvi-Q's market share.  This analysis fails to account for what econometricians call "serial correlation," which renders it unreliable.  The model has no probative value and is not helpful to the Court.  Exclusion is the appropriate remedy.[10]

Prof. Elhauge opines that "Mylan's exclusionary contracts with PBMs . . . foreclose[ed] a part of the market to Auvi-Q."  Expert Report of Prof. Einer Elhauge in Supp. of Class Cert. (Dec. 7, 2018) ¶ 3, Dkt. 1342-3 (hereinafter "Elhauge Report").  His opinion is based on a regression analysis he designed that purports to measure the effect of exclusion of Auvi-Q from PBM formularies on Auvi-Q's market share.  A regression analysis is a tool for measuring correlation.  It "involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable."  Fed. Judicial Ctr., *Reference Manual on Scientific Evidence*, at 305 (3d ed. 2011), *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.  The goal is to

---

[10] *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 567 (11th Cir. 1998) (affirming in part the exclusion of a plaintiff's regression model); *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 401–07 (S.D.N.Y. 2014) (excluding expert witness from testifying about his flawed regression analysis), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).

determine whether changes in the explanatory variables actually cause changes in the dependent variable. Prof. Elhauge's model designates Auvi-Q's market share as the dependent variable, and he includes two explanatory variables: (1) the percentage of lives that supposedly faced PBM coverage restrictions on Auvi-Q, and (2) the price ratio of Auvi-Q and EpiPen. Elhauge Report ¶ 112. His model therefore tests whether Auvi-Q's market share (the dependent variable) was caused by either of these two factors (the explanatory variables).

Prof. Elhauge's model relies on Auvi-Q market share data from six PBMs over thirty-four months, giving him 204 data points for his regression. But those 204 data points are not independent sample results; rather, the underlying data are themselves "serially correlated." This means that the data points are not independent. *See* Johnson Report ¶ 101; *see also Reference Manual on Scientific Evidence*, at 326 n.56 ("serial correlation" refers to the correlation of error values over time). This is a significant problem, because "[a]n important assumption in multiple regression analysis is that the error term and each of the explanatory variables are independent of each other." *Reference Manual on Scientific Evidence*, at 325. ███████████ ███████████████████████ *See, e.g.*, Ex. B (Stein Dep. 213:15-214:10). So if a particular PBM has chosen to restrict Auvi-Q in January, it has generally also chosen to restrict Auvi-Q for the rest of the year. However, Prof. Elhauge's model treats each PBM month as an *independent* data point, without controlling for the fact that PBMs generally do not adjust their formularies one month at a time. This makes the variables appear to be far more correlated than they actually are.

A proper econometric analysis would control for such serial correlation. Mylan's expert, Dr. Johnson, demonstrated that Prof. Elhauge's model is incapable of generating a statistically significant result if one accounts for serial correlation. Johnson Report ¶ 102. In other words,

because he fails to properly apply econometric principles, Prof. Elhauge's model cannot prove that formulary restrictions are correlated with Auvi-Q's market share. *Id.* In response to Dr. Johnson's critique, Prof. Elhauge effectively abandoned this model in favor of a *new* regression model (discussed *infra* Section III(B)), which he claims "address[es] Dr. Johnson's concerns about serial correlation." Elhauge Reply Report ¶ 70. The Court should exclude Prof. Elhauge's opinions based on his initial regression model because the model is unreliable and has, as a result, subsequently been abandoned in favor of an entirely new econometric model. *See supra* at n.2.

### B.      Prof. Elhauge's EpiPen4Schools Program Analysis is Unreliable.

Prof. Elhauge's analysis of the impact of Mylan's EpiPen4Schools program on Auvi-Q market share should also be excluded. This analysis is so flawed that Plaintiffs have now abandoned the claim entirely. In his initial report, Prof. Elhauge incorrectly assumed that "Mylan insisted on exclusivity provisions and agreements related to the provisions of free EpiPens to schools." Ex. A (Elhauge Dep. 151:6-10). That is false. The record shows that for *96 percent* of schools, devices provided under the EpiPen4Schools program from 2013 to 2015 were free and not subject to any exclusivity provision whatsoever. MYEP00006385; *see also* Johnson Report, Exs. 19-20.

Recognizing this, "Plaintiffs are abandoning any independent causally related damages based on the EpiPen4Schools program." Ex. C (E-mail from R. Hudson dated May 14, 2019). In his Reply Report, Prof. Elhauge also abandons his EpiPen4Schools analysis, stating, "I assume no foreclosing impact from the EpiPens4Schools [sic] program because I understand that plaintiffs have abandoned that claim." Elhauge Reply Report ¶ 90. The Court therefore should exclude Prof. Elhauge's EpiPen4Schools analysis for this independent reason. *See supra* at n.3;

*see also Fertik v. Stevenson*, No. CV 12-10795-PBS, 2016 WL 4148193, at *3 (D. Mass. Aug. 4, 2016) (excluding testimony about "now-abandoned" negligent-design theory that "the plaintiff has waived").

      **C.**    **Prof. Elhauge's Model of Generic Entry is Unreliable and Has No Probative Value.**

Plaintiffs have not met their burden to show that Prof. Elhauge's opinion on generic delay has a "reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co.*, 526 U.S. at 149. Prof. Elhauge purports to model the date that Teva supposedly would have entered with a generic version of EpiPen if Defendants had not entered into an alleged reverse payment settlement with Teva. Elhauge Report ¶ 2. In determining whether this testimony is reliable, however, the Court must focus on the principles and methodologies underlying the testimony and not merely the conclusions provided. *Daubert*, 509 U.S. at 594-95. The Court should determine whether the expert followed the prevailing standards of the particular discipline. *Kumho Tire Co.*, 526 U.S. at 149. Courts routinely exclude expert opinions where they feature "unjustified assumptions" that undermine the expert's conclusions. *See, e.g.*, *Cochrane v. Schneider Nat. Carriers, Inc.*, 980 F. Supp. 374 (D. Kan. 1997) (excluding testimony based on unjustified assumptions); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1507 (D. Kan. 1995) (same) (collecting cases).

Here, Prof. Elhauge's generic delay analysis has no probative value because he assumes the very conclusion that he is seeking to prove—namely, that Teva could have launched its generic version of EpiPen any earlier than it did. Indeed, Prof. Elhauge ignores the fact that Teva did not even have FDA approval for its generic version of EpiPen until August 16, 2018—

five years *after* Prof. Elhauge's purported entry date.[11]   In addition, Prof. Elhauge simply assumes that Defendants made a $100 million "reverse payment" to Teva, but again, has no factual basis for this assumption.

Prof. Elhauge testified that the *actual* entry date and *actual* alleged payment amount do not matter; they are instead (he says) just "illustrative" placeholders to show that his model can be applied to any set of facts.  Ex. A (Elhauge Dep. 64:22-25).  But this is wrong.  The actual date of entry in the Teva EpiPen settlement agreement was June 22, 2015.  Ex. D (MYEP00180922).  Thus, in order to demonstrate classwide harm, Prof. Elhauge's model must calculate an entry date before June 22, 2015 without the settlement.  If Teva's entry to the marketplace would have occurred later than June 22, 2015 anyway, then by definition, Defendants could not have caused any delay in Teva's generic entry.

The fatal flaw is that Prof. Elhauge's model does not—and cannot—guarantee an entry date before June 22, 2015.  Instead, he cherry-picks assumptions to guarantee his desired results.  For example, he assumes a patent strength of 15%, meaning that Teva (who was challenging the patent) had an 85% chance of prevailing in the patent litigation with Pfizer and Mylan.  But Plaintiffs' own patent litigation expert, Dr. Torrance, finds a patent strength of up to 30%.  *See* Expert Report of Dr. Andrew W. Torrance in Supp. of Class Cert. (Dec. 7, 2018) ¶ 3, Dkt. 1342-5.  This is critical, because, "for any patent strength over 28 percent . . . Prof. Elhauge's own model shows that the but-for generic entry date would equal the *actual settlement date* of June 22, 2015 without any reverse payment."  Johnson Report ¶ 138.  In other words, Prof. Elhauge's

---

[11]   *See* FDA, *FDA Approves First Generic Version of EpiPen* (Aug. 16, 2018), https://www.fda.gov/news-events/press-announcements/fda-approves-first-generic-version-epipen (announcing August 16, 2018 FDA approval of Teva generic product).

model demonstrates *no* generic delay and *no* injury to putative class members under alternative assumptions that are at least equally plausible according to Plaintiffs' own experts.

The upshot of Prof. Elhauge's model is that a class should be certified in *every* pay-for-delay case simply because his "illustrative" model exists, regardless of the results of that model. That is obviously not the law.  To merit class certification, Plaintiffs have the evidentiary burden of proof to offer a model that shows injury classwide.  *See* D. Kan. L. R. 23.1(d) (Plaintiffs "bear[] the burden of presenting an evidentiary basis" to satisfy all of the elements of Federal Rule of Civil Procedure 23).  Prof. Elhauge's generic entry date model does not do that; it is unreliable and unsupported, and Plaintiffs thus have failed to meet their burden.  Given the "failsafe" nature of Prof. Elhauge's model, it is unsurprising that no court appears to have accepted or endorsed it, and the only source Prof. Elhauge cites as support for his model is an article written by him.  *See* Elhauge Report ¶ 55 n.37 (citing Einer Elhauge & Alex Krueger, *Solving the Patent Settlement Puzzle*, 91 Tex. L. Rev. 283 (2012)).  In other words, Prof. Elhauge's model is not "supported by appropriate validation," *Daubert*, 509 U.S. at 590, and bears no indicia of "economic[] valid[ity]."  *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1506 (D. Kan. 1995).  This Court should not admit testimony concerning an unproven model for measuring generic delay that is not grounded in any way to the facts of this case.[12]  *See supra* at n.4.

## III.   PROF. ELHAUGE'S ATTEMPTS TO REMEDY HIS INITIAL ANALYSES ARE IMPROPER REBUTTAL TESTIMONY AND CONTAIN NEW FLAWS THAT MAKE THEM UNRELIABLE.

Prof. Elhauge tacitly concedes the econometric flaws in his initial analyses discussed above by largely abandoning them.  In his Reply Report, Prof. Elhauge modifies his regression

---

[12] The flaws in Prof. Elhauge's analysis are amplified because Plaintiffs' expert Prof. Rosenthal treats the date Prof. Elhauge calculates as if it were a concrete (not illustrative) but-for generic entry date in her damages model.  *See, e.g.*, Rosenthal Report ¶ 2.

analysis to try to address Dr. Johnson's critiques. He also conducts a new analysis to separate damages for third-party payors ("TPPs") and cash end-payors. Both new analyses introduced for the first time in Prof. Elhauge's Reply Report should be excluded.

### A. The New Analyses in Prof. Elhauge's Reply Report Should be Excluded as Improper Rebuttal Testimony.

Prof. Elhauge includes in his Reply Report two new analyses that should have been disclosed in his initial Report. Disclosing them for the first time in rebuttal testimony is improper and prejudicial. *Foster v. USIC Locating Servs., LLC*, No. 16-2174-CM, 2018 WL 4003354, at *2 (D. Kan. Aug. 17, 2018) (courts "disallow the use of a rebuttal expert to introduce evidence . . . especially if the alleged rebuttal expert is used to introduce new legal theories" (internal quotation marks omitted)); *see, e.g.*, *SIL-FLO,* 917 F.2d at 1515 (same).

*First*, Prof. Elhauge introduces a new regression model that, among other things, purports to correct a variety of econometric errors with his initial regression model. In this new analysis, Prof. Elhauge (1) excludes the variable controlling for EpiPen and Auvi-Q prices, (2) increases the number of PBMs included in the regression, (3) omits formulary information for Aetna, (4) uses a PBM "fixed effects" variable, and (5) uses clustered standard errors (the issue discussed *supra* Part II). Elhauge Reply Report ¶ 70. These are substantive changes that result in entirely new damages figures depicted in a series of 24 new tables covering 20 pages. *See id.* ¶¶ 45-64. For example, one of those new regressions alone reduces Plaintiffs' damages by more than $46 million. It is well established that "[t]he plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case . . . must put in his evidence on the issue as part of his case in chief." *Braun v. Lorillard Inc.*, 84 F.3d 230, 237 (7th Cir. 1996). Plaintiffs did not do so. Therefore, the Court should strike these new analyses as improper expert rebuttal.

*Second*, Professor Elhauge also discloses for the first time in his Rebuttal Report entirely new regression analyses purporting to show separate damages calculations for TPPs and cash end-payors. Notably, his initial report made no attempt to separate damages among different types of plaintiffs, even though all the data he relied on to do so in his Reply Report had been produced before he filed his initial report. This violation of Rule 26 is particularly egregious because Professor Elhauge testified at his deposition that he had already conducted some version of these undisclosed analyses, yet Plaintiffs refused to produce them when requested. Ex. A (Elhauge Dep. 70:23-71:13, 213:4-214:12). Counsel for Mylan made "a request on the record that [Plaintiffs'] counsel provide us with those analyses." *Id.* 71:23-25. Mylan then followed up with a letter dated February 15, 2019, in which it asked that Plaintiffs "provide any documents, information, and analyses Professor Elhauge or his staff performed related to these calculations, as well as any documents and information on which they relied to make these calculations." Ex. E. Plaintiffs refused that request on February 22. Ex. F. Mylan then called Plaintiffs on March 1 and sent a letter on March 5 explaining that Mylan reserved "all rights related to Plaintiffs' failure to disclose Prof Elhauge's opinions and analyses . . . including but not limited to the right to object to any reference to these opinions and analyses in subsequent reports or in trial testimony." Ex. G. Plaintiffs never replied.

Yet now, Plaintiffs seek to introduce these analyses as part of Professor Elhauge's Rebuttal Report. Plaintiffs' introduction of these new, improper opinions at the eleventh hour is prejudicial and deprives Mylan of a meaningful opportunity to depose Professor Elhauge about them or to have Defendants' own experts rebut them. These analyses are improper rebuttal evidence and should be excluded from the Rebuttal Report. *See supra* at n.5.

**B.      Professor Elhauge's New Regression is Unreliable.**

In addition to being improper rebuttal testimony, the new regression analyses disclosed in Prof. Elhauge's Reply Report are unreliable for three independent reasons.  First, his model omits the relative price of EpiPen and Auvi-Q entirely, meaning that he now has no way to determine whether the effect he observes is a result of Mylan's PBM contracts or merely of the higher price of Auvi-Q.   Second, he employs the incorrect econometric test for statistical significance.  Third, the results of his analysis are not statistically significant.  *See supra* at n.6.

**1.      The new regression model improperly removes price as a variable.**

"[T]o be admissible, a regression analysis must control for the 'major factors' that might influence the dependent variable."  *Reed Const. Data*, 49 F. Supp. 3d at 400.  A significant issue in this case is how the price of EpiPen compared to Auvi-Q.  PBMs and payors often preferred EpiPen because Mylan simply offered lower prices.  Remarkably, however, Prof. Elhauge's new regression fails to control for EpiPen's price relative to Auvi-Q.   Indeed, Prof. Elhauge affirmatively removed the price variable that he used in his prior regression.  As a result, his model cannot determine whether the effect he observes on Auvi-Q's market share is a result of Mylan's PBM contracts or merely a result of price competition between the two products.

The relative price of EpiPen and Auvi-Q is obviously a major factor in the relative sales of Auvi-Q (and hence Auvi-Q market share).  Sanofi's Vice President of Account Management, Sandy Loreaux, and Executive Vice President & Chief Commercial Officer, Patrick Barry, agree. *See* Ex. H (Loreaux Dep. 22:6-19) ("[A] payer is going to look at what the net cost is . . . they will look at the price comparison relative to the competitor's."); Ex. I (Barry Dep. 160:2-9) (admitting that Auvi-Q's "market share did improve and [its] ability to cover lives did improve" as Sanofi "bec[ame] more aggressive" in lowering net price for PBMs).  PBMs agree as well.

*See, e.g.*, Ex. J (Ayers (MedImpact) Dep. 184:15-18) (agreeing that "the goal of [negotiating formulary placement with pharmaceutical manufacturers], from MedImpact's perspective, [is] to . . . get the lowest net price for its clients").

By dropping the price variable, Prof. Elhauge models a world in which the relative net prices of Auvi-Q and EpiPen are presumed to have zero effect on the quantity of Auvi-Q devices that are sold. But that presumption is contrary to the real world. As a result, Prof. Elhauge's new regression model is incorrect, unreliable, and thus inadmissible. *See Reed Const. Data*, 49 F. Supp. 3d at 403-04 (excluding a regression model that improperly omitted a major control variable); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 667 (S.D.N.Y. 2007) ("[A] reliable regression analysis requires the expert to consider more than a single factor.").

### 2. The new regression model uses an improper standard for statistical significance.

In his Reply Report, Prof. Elhauge uses 0.10 as a threshold for statistical significance. If a result is statistically significant at the 0.10 level (also known as a "*p*-value" of 0.10), that means the likelihood that a correlation exists is 90%. Here, Prof. Elhauge uses a 0.10 measure of statistical significance level to opine with 90% confidence that greater PBM formulary restrictions on Auvi-Q reduced Auvi-Q's market share. But "[i]n most scientific work, the level of statistical significance required to reject the null hypothesis [i.e., the odds that what is being observed is the result of a sampling or experimental error] . . . is set conventionally at 0.05, or 5%." *Reference Manual on Scientific Evidence*, at 320; *see* Ex. K, Decl. of Dr. John H. Johnson, IV in Supp. of Defts' Mot. to Exclude the Expert Opinions of Prof. Einer Elhauge ¶ 3 ("Johnson Decl.").[13] Courts also use a *p*-value of 0.05.[14] With a *p*-value of 0.05, one can be 95% confident

---

[13] *See also* Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* 129 (4th ed. 2009) ("We must first decide on a significance level . . . . For concreteness, suppose we have decided on a 5% significance level, as this is the most popular choice.").

in the results—not just 90% confident, as Prof. Elhauge is here.  By choosing a *p*-value of 0.10 rather than 0.05, Prof. Elhauge accepts *double* the risk that there is no actual relationship between Auvi-Q formulary placement and Auvi-Q market share.  Doing so conflicts with established scientific standards and case law, *see supra*, and thus is not "scientifically sound" and does not "satisfy Rule 702's reliability requirements."  *Truck Ins. Exch.*, 360 F.3d at 1210 (citation omitted).

### 3. The new regression model uses an improper test for statistical significance.

There are two potential tests for statistical significance at issue in Prof. Elhauge's analysis: a two-tailed test (which allows for the possibility that the effect on the dependent variable—here, Auvi-Q market share—could be either positive or negative) and a one-tailed test (which assumes that the effect on the dependent variable would only be in one direction).  A "two-tailed test, which allows for the effect to be either positive or negative, is usually appropriate."  *Reference Manual on Scientific Evidence*, at 321.  Courts also prefer two-tailed tests.[15]  One-tailed tests should only be used in those situations in which there is reason to believe that the alternative hypothesis is either positive or negative, but could not be both.

Here, Prof. Elhauge claims that Auvi-Q market share would necessarily go down as the number of lives covered by formulary restrictions goes up.  *See* Elhauge Reply Report ¶ 82 n.146 ("[T]here is no plausible theory under which the formulary restrictions would increase Auvi-Q's share.").  That would be a negative effect (market share going down) on the dependent variable

---

[14] *See Apsley v. Boeing Co.*, 691 F.3d 1184, 1198 (10th Cir. 2012) ("The significance level is typically placed at 5%."); *see also Jones v. City of Bos.*, 752 F.3d 38, 46-47 & n.9 (1st Cir. 2014) (collecting cases and noting that "[m]ost federal courts have . . . settled on" 0.05 as a threshold in analyzing statistical significance); ABA, *Econometrics: Legal, Practical, and Technical Issues* 19 n.32 (2005).

[15] *See, e.g., Smith v. City of Bos.*, 144 F. Supp. 3d 177, 196 (D. Mass. 2015) ("The weight of the case law appears to favor two-tailed tests."), *on recons.*, 267 F. Supp. 3d 325 (D. Mass. 2017); *see also Palmer v. Schultz*, 815 F.2d 84, 95-96 (D.C. Cir. 1987) (holding that discrimination claims "require a two-tailed statistical analysis"); *Moore v. Summers*, 113 F. Supp. 2d 5, 20 (D.D.C. 2000) (specifying the preference for a two-tailed test).

(Auvi-Q's market share) that he is trying to measure.  He therefore employs a one-tailed test.  But as Dr. Johnson explains, the effect on Auvi-Q market share actually varies across PBMs, and for at least two major PBMs, Prof. Elhauge's regression in fact suggests the *opposite* effect—Auvi-Q market share went up with formulary restrictions.[16]  *See* Johnson Report ¶ 96, Ex. 16.  Thus, in this case, there is definitive evidence that the effect can be both positive and negative, making use of a two-tailed test for statistical significance essential and Prof. Elhauge's use of the one-tailed test inappropriate and unreliable.

Prof. Elhauge's use of a one-tailed test also produces confidence level *p*-values that are half the size of *p*-values using a two-tailed test.  Thus, by combining the one-tailed test with the increase in *p*-value to 0.10 discussed above, Prof. Elhauge has lowered his standard for statistical significance by a factor of four from what is generally accepted by both economists and courts; he doubled it by increasing the acceptable *p*-value from .05 to 0.10 and then effectively doubled it again by using a one-tailed test instead of a two-tailed test.  This is improper.  His decision to use a one-tailed test artificially allowed him to interpret his results as statistically significant.  If he had used a two-tailed test, "the p-value would have been 15 percent, which is not statistically significant at conventional levels."  Johnson Decl. ¶ 4.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court exclude Prof. Elhauge's opinions based on his lack of qualifications, unreliable methodology, and

---

[16] Auvi-Q's market share might be inversely correlated with the number of lives subject to Auvi-Q restrictions for any number of reasons.  Assume, for instance, that in a given month, PBMs added trivial restrictions on 100,000 covered lives that would have little effect on market share, while also removing cost-prohibitive restrictions on 50,000 covered lives that would have a large market share effect.  In that scenario, Auvi-Q's market share would be expected to rise despite the fact that, in absolute terms, the number of covered lives subject to restrictions had increased.  Professor Elhauge's model unreliably treats all restrictions as exactly the same and simply assumes that these or other scenarios did not occur.

improper and unreliable rebuttal testimony.   In particular, Defendants request that the Court

exclude the portions of his Report and Reply Report identified *supra* at footnotes 1-6.[17]


Dated:  May 21, 2019                              Respectfully submitted,

                                                  /s/ Adam K. Levin

                                                  Adam K. Levin
                                                  David M. Foster
                                                  Benjamin F. Holt
                                                  Justin W. Bernick
                                                  Carolyn A. DeLone
                                                  Kathryn M. Ali
                                                  Michael D. Gendall
                                                  Christopher D. Edelman
                                                  HOGAN LOVELLS US LLP
                                                  555 13th Street, NW
                                                  Washington, DC 20004
                                                  Telephone: (202) 637-5600
                                                  Fax: (202) 637-5910
                                                  adam.levin@hoganlovells.com
                                                  david.foster@hoganlovells.com
                                                  benjamin.holt@hoganlovells.com
                                                  justin.bernick@hoganlovells.com
                                                  carolyn.delone@hoganlovells.com
                                                  kathryn.ali@hoganlovells.com
                                                  michael.gendall@hoganlovells.com
                                                  christopher.edelman@hoganlovells.com

                                                  Brian Fries (15889)
                                                  James Moloney (23786)
                                                  LATHROP GAGE LLP
                                                  2345 Grand Boulevard, Suite 2200
                                                  Kansas City, Missouri  64108-2618
                                                  Telephone: (816) 292-2000
                                                  Fax: (816) 292-2001
                                                  bfries@lathropgage.com
                                                  jmoloney@lathropgage.com

---

[17] If the Court declines to exclude Prof. Elhauge's analysis as unreliable under Rule 702 or as improper rebuttal testimony, Defendants respectfully request that the Court grant them an opportunity to depose Prof. Elhauge about his new analysis, introduce additional expert rebuttal testimony, and submit supplemental briefing in opposition to Plaintiffs' motion for class certification.

*Counsel for the Mylan Defendants*

/s/ Joseph Rebein

Joseph Rebein  (25912)
Ashley Harrison, D. Kan (78667)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone:  (816) 474-6550
Fax:  (816) 421-5547
jrebein@shb.com
aharrison@shb.com

Dimitrios T. Drivas
Robert A. Milne
Raj S. Gandesha
Edward Thrasher
Kathryn Swisher
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Fax: (212) 354-8113
ddrivas@whitecase.com
rmilne@whitecase.com
rgandesha@whitecase.com
ethrasher@whitecase.com
kswisher@whitecase.com

*Counsel for Defendants Pfizer Inc., King
Pharmaceuticals LLC, and Meridian Medical
Technologies, Inc.*