# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |
| SANOFI-AVENTIS U.S., LLC, Plaintiff, v. MYLAN INC., et al., Defendants. *This Document Relates to the* Sanofi *case.* | CASE NO. 2:17-CV-02452-DDC-TJJ *Document Filed Electronically* |

## REPLY IN SUPPORT OF MYLAN'S MOTION TO EXCLUDE
## <u>OPINION TESTIMONY OF FIONA M. SCOTT MORTON, Ph.D.</u>

Philip A. Sechler
Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

ARGUMENT ............................................................................................................ 2

I.    Dr. Scott Morton's Damages Opinions Are Unreliable and Speculative ........... 2

      A.    Pre-Recall Damages .............................................................................. 3

      B.    Post-Recall Damages ............................................................................. 8

II.   Dr. Scott Morton's Effective Entrant Burden ("EEB") Calculations Are
      Unreliable ............................................................................................... 10

III.  Dr. Scott Morton's Calculation of Entrenched Share Is Not Supported By
      The Record .............................................................................................. 12

IV.   Dr. Scott Morton's Factual Narratives and State-of-Mind Opinions Are
      Inadmissible ........................................................................................... 14

CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apotex, Inc. v. Cephalon, Inc.*,
  321 F.R.D. 220 (E.D. Pa. 2017).............................................................................5

*Arista Networks, Inc. v. Cisco Systems, Inc.*,
  2018 WL 8949299 (N.D. Cal. June 15, 2018) ......................................................5

*Autowest, Inc. v. Peugeot, Inc.*,
  434 F.2d 556 (2d Cir. 1970)..................................................................................5

*BCBS United of Wis. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ................................................................................8

*Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*,
  1996 WL 466673 (10th Cir. 1996) .......................................................................4

*Boyar v. Korean Air Lines Co.*,
  954 F. Supp. 4 (D.D.C. 1996)..............................................................................14

*Carbo Ceramics Inc. v. Keefe*,
  166 F. App'x 714 (5th Cir. 2006) .........................................................................4

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  2009 WL 10672256 (W.D. Okla. Feb. 25, 2009) .................................................3

*Cochrane v. Schneider National Carriers*,
  980 F. Supp. 374 (D. Kan. 1997)........................................................................11

*Complete Entertainment v. Live Nation*,
  2017 WL 6512223 (C.D. Cal. Oct. 16, 2017).....................................................11

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) .........................................................................3, 8

*Daubert v. Merrell Dow Pharma., Inc.*,
  509 U.S. 579 (1993)..............................................................................................1

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
  2017 WL 3592775 (N.D. Ill. Aug. 21, 2017) ...................................................4, 5

*First Savings Bank v. U.S. Bancorp*,
  117 F. Supp. 2d 1078 (D. Kan. 2000)...................................................................8

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Fisher v. Ciba Specialty Chems. Corp.*,
238 F.R.D. 273 (S.D. Ala. 2006) ............................................................15

*Highland Capital Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005)......................................................15

*In re Aluminum Phosphide*,
893 F. Supp. 1497 (D. Kan. 1995)........................................................3, 7

*In re Chocolate Confectionary*,
2013 WL 11305184 (M.D. Pa. May 10, 2013).........................................5

*In re Namenda*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)........................................................5

*In re Neurontin*,
612 F. Supp. 2d 116 (D. Mass. 2009) ........................................................1

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
280 F. Supp. 3d 691 (D. Md. 2017)..........................................................11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)................................................................................1, 3

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).................................................................................11

*Lehrman v. Gulf Oil Corp.*,
500 F.2d 659 (5th Cir. 1974) .....................................................................6

*LePage's, Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003)........................................................................5

*Nat'l Farmers' Org. v. Associated Milk Producers, Inc.*,
850 F.2d 1286 (8th Cir. 1988) ...................................................................6

*Pioneer Centres Hold. Co. v. Alerus Fin., N.A.*,
858 F.3d 1324 (10th Cir. 2017) ....................................................12, 14, 15

*TK-7 Corp. v. Estate of Barbouti*,
993 F.2d 722 (10th Cir. 1993) ...................................................................4

*United States v. Glynn*,
578 F. Supp. 2d 567 (S.D.N.Y. 2008).........................................................1

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Zenith Electronics Corp. v. WH-TV Broadcasting*,
    395 F.3d 416 (7th Cir. 2005) ...................................................................4

*Zenith Radio Corp. v Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)..................................................................................6

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..............................................................3, 5

**Rules**

Fed. R. Evid. 702 .....................................................................................1, 2, 3

**Other Authority**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2018) ...............................................3, 6

iv

Far from "present[ing] a handful of disagreements with Dr. Scott Morton's analysis," Sanofi's Opp. to Mylan's Mot. to Exclude Testimony of Fiona Scott Morton, Ph.D. ("Opp.") at 1, ECF No. 1796-1, Mylan seeks to exclude as utterly unreliable and unfounded the core of Dr. Scott Morton's proposed expert testimony, including her (i) damages model, (ii) effective entrant burden ("EEB") measure, (iii) entrenched share calculations, and (iv) plans to discuss and make judgments about the parties' intent. Sanofi argues that Mylan's challenges should be set aside because Dr. Scott Morton is "well-qualified" and can be cross-examined. Opp. 3-4. That is not the law. "The Court's vigilant exercise of [its] gatekeeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background and approach." *In re Neurontin*, 612 F. Supp. 2d 116, 131 (D. Mass. 2009). Courts should exclude opinions that fail Rule 702's reliability requirements even if they "d[o] not doubt" the expert's qualifications. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999). Indeed, "the explicit premise of *Daubert* and *Kumho Tire* is that, when it comes to expert testimony, cross-examination is inherently handicapped … so that the Court must play a greater role." *United States v. Glynn*, 578 F. Supp. 2d 567, 574 (S.D.N.Y. 2008). Here, Mylan has established that Dr. Scott Morton's opinions lack a "reliable basis in the knowledge and experience of [her] discipline." *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 592 (1993).

Rather than engage on the merits, Sanofi misdirects and evades. In response to Mylan's challenge to Dr. Scott Morton's blind adoption of one Sanofi forecast as her damages model, Sanofi never claims Dr. Scott Morton knew how the forecast was made and cites cases unrelated to expert testimony. In response to Mylan's argument that Dr. Scott Morton's damages model fails to control for lawful conduct and external factors affecting Auvi-Q's financial results, Sanofi cites

cases about disaggregation of damages attributable to different acts of unlawful conduct, an issue not presented here. Sanofi's attempts at deflection continue in its defense of EEB, a theory that has not been empirically tested and is contradicted by the facts. Sanofi concedes that one payor chose to cover Auvi-Q when EEB said it should not have, ignores its own contemporaneous documents that are flatly inconsistent with EEB, and cites academic research that proves nothing about EEB. Sanofi also offers no evidence to support Dr. Scott Morton's entrenched share figures. Finally, in response to Mylan's argument challenging Dr. Scott Morton's opinions on the parties' intent, Sanofi says intent is relevant, which of course says nothing about whether an expert is permitted to opine on it. And Sanofi offers no justification in offering Dr. Scott Morton to testify about why it chose to return its rights to Auvi-Q to the inventors. In short, Sanofi's Opposition confirms that the challenged opinions lack the reliability and foundation that Rule 702 requires.

## ARGUMENT

### I.    Dr. Scott Morton's Damages Opinions Are Unreliable and Speculative

Sanofi does not dispute the accuracy of Table 1 in Mylan's opening brief, which shows the ▋▋▋▋ that Dr. Scott Morton claims as damages, the ▋▋▋▋ correction in Pre-Recall Damages she was forced to make to her initial damages calculation, and her simultaneous decision to add ▋▋▋▋ more in Post-Recall Damages so that now 95% of Sanofi's alleged damages comes from the period after Auvi-Q was totally recalled due to a potentially fatal product defect and Sanofi returned the product to its inventors. In response to Mylan's argument that Dr. Scott Morton's damages model is unreliable and speculative, Sanofi claims that Mylan expects "perfection" in damages calculations. Opp. 5. But Mylan here expects only one thing—that any damages opinion be legally admissible. Mylan's challenge arises under Rule 702 and *Daubert,* which require that Dr. Scott Morton's damages opinions be "based on sufficient facts or data" and the "product of reliable … methods" and that she "reliably applied the … methods to the facts."

Mylan Mot. to Exclude Testimony of Fiona Scott Morton, Ph.D. ("Mot.") at 1-2, ECF No. 1680-2. Sanofi seeks to lower the bar, calling Mylan's standard—*i.e.*, Rule 702 and *Daubert*—"the wrong legal test" because courts allow parties some flexibility in proving the amount of damages. Opp. 4-5. Sanofi is wrong. First, "there is a difference between inference [in calculating a damages amount], which is permitted, and speculation, which is not." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 392 (2018) ("Areeda & Hovenkamp"). Second, *Daubert* applies to "all expert testimony," *Kumho Tire*, 526 U.S. at 147, and courts routinely exclude unreliable damages opinions in antitrust cases.[1] None of Sanofi's cases address that issue. Under the correct standard—Rule 702 and *Daubert*—Dr. Scott Morton's damages opinions are inadmissible.

### A.    Pre-Recall Damages

Dr. Scott Morton's ███████ in Pre-Recall Damages relies on a single Sanofi forecast ("Sanofi 2012 Forecast"), created by an unknown person using a method that Sanofi cannot claim she knows, and considers as damages all shortfalls from that forecast, including all losses arising from lawful conduct and factors unrelated to Mylan. Mot. 4-8. Both failures render Dr. Scott Morton's damages opinion inadmissible under cases that Sanofi ignores.

**1. No Validation of Sanofi 2012 Forecast.** Sanofi does not dispute that Dr. Scott Morton does not know how the Sanofi 2012 Forecast was prepared, *i.e.,* its variables, assumptions and methodology. Mot. 6-8. Although Sanofi lists facts that Dr. Scott Morton supposedly does know, including that the forecast was prepared for Auvi-Q's launch by the brand team, those are not

---

[1] *See, e.g.*, *In re Aluminum Phosphide*, 893 F. Supp. 1497, 1499, 1507 (D. Kan. 1995) (excluding economics consulting firm president's expert testimony about amount of damages in antitrust case); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291-95 (3d Cir. 2012) (excluding Ph.D. economist's expert testimony about amount of damages in antitrust case); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding Stanford economics professor's expert testimony about amount of damages in antitrust case); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 2009 WL 10672256, at *4 (W.D. Okla. Feb. 25, 2009) ("[T]he authorities do not suggest that the admissibility of evidence in an antitrust case is determined by different standards than those applicable to other cases.").

nearly enough under the law.[2] Sanofi says Dr. Scott Morton understands the forecast was "conservative" but not how she came to that understanding, Opp. 6; or how she reconciles such an understanding with evidence that Sanofi's forecasts were optimistic, Mot. 7-8. Sanofi claims she understands the forecast relied on "extensive payor research," Opp. 6, but that is not in the cited testimony and in any event the research ███████████. Ex. 1 at 148-50. Finally, Sanofi claims Dr. Scott Morton understands the forecast was "Sanofi's best estimate of the demand curve of EAI devices," Opp. 6, but quotes selectively from her testimony, the full text of which, Mot., Ex. 2 at 280, shows she does not know the ████████████████████ that went into the Sanofi 2012 Forecast's sales numbers and simply ██████████ that Sanofi based them on market information.

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

Sanofi does not acknowledge binding precedent excluding experts who "merely parrot the opinions of other experts," *Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*, 1996 WL 466673, at *7 (10th Cir. 1996), or have no "familiarity with the methods or reasoning used," *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 730-34 (10th Cir. 1993). Sanofi also ignores Judge Easterbrook's opinion in *Zenith Electronics Corp. v. WH-TV Broadcasting*, 395 F.3d 416, 420 (7th Cir. 2005), and the opinion in *Carbo Ceramics Inc. v. Keefe*, 166 F. App'x 714, 724 (5th Cir. 2006), which rejected damages models based on parties' forecasts. Sanofi does not explain the inconsistency between its defense of Dr. Scott Morton and its *Daubert* motion in *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.,* in which it sought to exclude an expert who blindly adopted a Sanofi

---

[2] ███████████████████████████████████████████████████
███████████████████████████████████████████████████. Mot., Ex. 2, at 277-78.

forecast. Mot. 6. Sanofi's purported distinction—that the expert speculated about "regulatory approval," Opp. 9—is disingenuous as the first reason the court cited in excluding the expert was his uncritical reliance on a Sanofi forecast. 2017 WL 3592775, at *14-15 (N.D. Ill. Aug. 21, 2017).

Instead, Sanofi tries to lower the bar, arguing that Dr. Scott Morton knew the purpose of the Sanofi 2012 Forecast and that is enough. The Third Circuit rejected this argument in *ZF Meritor*. Although that expert "was generally aware of the circumstances under which [a forecast] was created and the purposes for which it was used, he lacked critical information that would be necessary for [defendant] to effectively cross-examine him." 696 F.3d at 292. While he "knew that the [forecast] was presented to the Board by experienced management professionals," he did not "know who initially calculated the … figures," " the methodology used to create the [forecast,] or the assumptions on which [its] price and volume estimates were based," which "is especially important … when dealing with a …. brand new line of [product] that had never before been sold." *Id.* at 292. That is indistinguishable from this case. Sanofi responds that the *ZF Meritor* forecast was one page—a distinction without a difference—and notes the *ZF Meritor* expert submitted "alternate damages," omitting that the alternative was a statistical model, unlike here. *Id.* at 295.[3]

Sanofi claims that Dr. Scott Morton corroborated the Sanofi 2012 Forecast, but it does not dispute that none of these "corroborat[ions]" addressed Auvi-Q sales volume, list price, rebates, costs, or profits. *See* Opp. 6-9. Because Dr. Scott Morton's damages model heavily relies on the Sanofi 2012 Forecast's sales volume, list price, rebates, costs and profits, corroboration of just one

---

[3] Sanofi's cases do not help its argument. In *Apotex, Inc. v. Cephalon, Inc.*, the expert "understood how [the forecasts] were created," 321 F.R.D. 220, 233 (E.D. Pa. 2017), as did the expert in *In re Namenda*, 331 F. Supp. 3d 152, 182 (S.D.N.Y. 2018). In *Autowest, Inc. v. Peugeot, Inc.*, the witnesses "set out at length the bases from which they derived their figures, and … [defendant] was able to cross-examine them." 434 F.2d 556, 566 (2d Cir. 1970). *In re Chocolate Confectionary* does not address an expert's knowledge of forecasts. 2013 WL 11305184, at *4 (M.D. Pa. May 10, 2013). The *LePage's, Inc. v. 3M* expert used a statistical model and did not adopt a forecast, 324 F.3d 141, 165 (3d Cir. 2003), as did Dr. Scott Morton in *Arista Networks, Inc. v. Cisco Systems, Inc.*, 2018 WL 8949299, at *9 (N.D. Cal. June 15, 2018).

factor—market share—is unavailing. Further, Sanofi does not dispute that Dr. Scott Morton knows

nothing about how the Mylan forecast that she used for corroboration was created. And Sanofi

mischaracterizes the Mylan forecast: it predicted Auvi-Q's market share would reach ████████

████████████████████████████████████████████████—hardly corroboration even for market share.

Mot., Ex. 1 ¶ 201 & n.391; Ex. 10 at -248; Ex. 11 at -802. Sanofi also offers nothing about the

other two purported corroborations not already addressed in Mylan's motion.[4]

 **2. Attributes All Auvi-Q Losses to Mylan.** Although Mylan's *Daubert* motion argues that

Dr. Scott Morton's damages model does not account for losses from lawful conduct or external

factors, Sanofi tries to sow confusion by citing cases that did not require a plaintiff to disaggregate

damages from *different acts of unlawful conduct.* Opp. 10-11. "The disaggregation requirement is

distinct from the requirement that the plaintiff's damage calculations must control for exogenous

factors that also have an adverse impact on the plaintiff's economic condition." Areeda &

Hovenkamp ¶ 392. Sanofi admits Dr. Scott Morton failed to disaggregate damages, which Mylan

argues is grounds for summary judgment, but that is not the basis of its *Daubert* motion. Rather,

what makes her method unsound is that she did nothing to "control for exogenous factors." *Id.*

 For example, as Mylan pointed out, Dr. Scott Morton explained her model counts Sanofi's

████████ increase in marketing costs as damages because ████████████████████████████████

████████████████████████████████████████████████ but she did no analysis to assess

---

[4] On Dr. Scott Morton's reliance on Canada, Sanofi ignores that it argued in another case that Canada was a poor comparator for estimating the share of its product because Canada "was not as nearly identical as possible to the relevant business." Sanofi Mot. to Exclude 5-6, 12, 18-21, No. 08-cv-4168 (D.N.J. June 6, 2013), ECF No. 266. Sanofi's cases do not show otherwise. *See Zenith Radio Corp. v Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969) (not deciding Canada is appropriate comparator to U.S.); *Nat'l Farmers' Org. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1294-95 (8th Cir. 1988) (same); *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974) (same). Regarding her comparison to two health plans, neither Dr. Scott Morton nor Sanofi describes *any* methodology as to how she determined that these plans were unaffected by spillover compared to the many other similarly situated plans where Auvi-Q performed poorly. Mot., Exs. 16-18.

whether that is what happened. Mot. 11 (citing Mot., Ex. 2 at 315-16). Dr. Scott Morton's explanation is essentially an admission that her model does not control for exogenous factors, a point Mylan made with respect to many other factors bearing on Auvi-Q's performance, including consumer awareness, sales force performance, manufacturing costs, and quality issues and returns. *See* Mot. 11-12. Remarkably, Sanofi does not engage on this issue, arguing baldly that "Dr. Scott Morton correctly attributes Sanofi's subsequent losses to Mylan's anticompetitive conduct," Opp. 11—the lack of citation confirming her failure to control for external factors is undisputed.

As for Mylan's argument that Dr. Scott Morton attributes damages to Mylan's lawful conduct, Sanofi asserts—again, without support—that her "analysis does not fail to consider conduct that both sides agree is not anticompetitive." Opp. 12. But her model indisputably attributes damages to higher rebates Sanofi paid for preferred formulary position. Mot. 10-11. Sanofi responds with double talk by insisting that competition for preferred status was part of the anticompetitive scheme while admitting elsewhere that Mylan's competition for preferred status was lawful.[5] Her analysis also seeks damages for 2013, even though she and other Sanofi witnesses claim that in 2013 Auvi-Q was not affected by Mylan and was successful. Mot. 10. Indeed, Sanofi argues that Auvi-Q was "more success[ful] [at launch] than the pre-launch 2012 forecast." Opp. 11. Yet Sanofi tries to justify damages for 2013 by contradicting that testimony and its own brief and insisting it was injured in 2013, without explaining the inconsistency. Opp. 11-12.

This Court has excluded an expert for failing to use statistical methods to account for other factors affecting a plaintiff's sales because assuming "the [conduct] was the sole cause of the [injury]" is "not a scientifically valid assumption." *Aluminum Phosphide*, 893 F. Supp. at 1504.

---

[5] *Compare* Mylan Mem. in Support of MSJ, Stmt. Mat'l Facts ("SMF") ¶ 74 n.148, ECF No. 1660-2 ("Sanofi does not challenge as anticompetitive Mylan rebates that led to EpiPen being placed on Tier 2 with Auvi-Q on Tier 3") *with* Sanofi Opp. to Mylan MSJ at 40, ECF No. 1692 (not denying SMF ¶ 74).

Mylan cited other cases that confirm this rule. Mot. 8-9 & n.8. Sanofi dismisses *Concord Boat Corp. v. Brunswick*, 207 F.3d 1039 (8th Cir. 2000), on grounds that the damages expert criticized by the court there hypothesized a comparable engine that did not exist whereas Dr. Scott Morton did not make such a hypothesis. Opp. 12. But the *Concord Boat* expert failed *Daubert* not because of that hypothesis but because he ignored "inconvenient evidence" and failed to "separate lawful from unlawful conduct," 207 F.3d at 1056-57—precisely what Dr. Scott Morton does here. Sanofi tries to distinguish *BCBS United of Wis. v. Marshfield Clinic,* 152 F.3d 588 (7th Cir. 1998), on grounds that the damages expert whose opinions were deemed "worthless" by the Seventh Circuit had "attributed 100% of the differences in sales prices to the challenged conduct," Opp. 13, but Dr. Scott Morton does the same thing—indiscriminately attributing 100% of the difference between Sanofi's forecasted and actual results to the challenged conduct. And Sanofi's treatment of *First Savings Bank v. U.S. Bancorp*, 117 F. Supp. 2d 1078 (D. Kan. 2000), proves its relevance: there, "the expert merely assumed that [damage] was due to defendants' [misconduct]." Opp. 13. In trying to distinguish *First Savings,* Sanofi refers only to Dr. Scott Morton having "grounded her opinion in the record evidence showing that Mylan engaged in a concerted effort to exclude Auvi-Q," *id.*—notably, making no reference whatsoever to any analysis by Dr. Scott Morton that the alleged conduct *caused* any damages.

### B.   Post-Recall Damages

The ████████ in damages that Dr. Scott Morton computes for the period after Auvi-Q's recall relies on the same Sanofi 2012 Forecast and thus contains the weaknesses discussed above. But Dr. Scott Morton's Post-Recall Damages model moves from speculative to utterly groundless by (1) using the Sanofi 2012 Forecast to project "but for" profits through 2029; (2) including a 5% annual increase in net prices that no document supports; and (3) failing to account for the reputational effects of Auvi-Q's complete recall or the advent of generic and other competition.

Defending Dr. Scott Morton's post-deposition decision to add a 5% annual price increase through 2029 (which increased damages by ████████), Sanofi claims she assumed 3% in her Main Report. Opp. 14. That is not true. As she testified, her original damages model "ha[d] a base model where the net price does not change." Mot., Ex. 2 at 364. Although she presented a 3% price increase as an alternative, she testified she had not formed the opinion that net prices would have gone up by 3% per year. *Id.* at 365. Sanofi argues that her belated opinion that net prices would increase 5% per year was based on "new information," Opp. 14, but nowhere acknowledges that this "new information" ("Sanofi 2015 Forecast") was cited in her Main Report. Mot. 13-14. Nor does Sanofi reconcile her reliance on the Sanofi 2015 Forecast with her earlier harsh criticisms of it. Or show she knows anything about how it was created. Or justify her assumption that rebates would remain flat despite the fact that not a single document supports that assumption, including the very Sanofi 2015 Forecast on which she relies for the price increase. Dr. Scott Morton's 5% annual net price increase is groundless, as Sanofi's failure to address any of these points confirms.

Sanofi's defense of Dr. Scott Morton's disregard of the reputational effects of the complete recall of Auvi-Q fares no better. Sanofi admits she assumes the same growth rate for Auvi-Q upon relaunch after the 2015 recall as she did for its initial 2013 launch—in other words, she dismisses the enormous decrease in share that other drugs experienced on relaunch after being completely recalled. Opp. 15. But Sanofi provides no basis for this dismissal. The Opposition does not even address ██████████████████████████████. *See* Mot. 15. Rather, Sanofi points to expert Larry Stevens, who opined that "Sanofi could have easily overcome any challenges to the recall to relaunch Auvi-Q." Opp., Ex. 6 at 17. But Stevens did not analyze the effect that a complete recall would have had on Auvi-Q sales. *See* Ex. 2 at 133. Dr. Scott Morton's assumption that Auvi-Q was immune from the reputational effects of a complete recall is completely unfounded.

Finally, Sanofi claims Dr. Scott Morton included a "conservative assumption of declining Auvi-Q market *share* as a percentage of an expanding market" to "properly account[] for the entry of EpiPen generics." Opp. 15. But as Mylan's motion explains, and Sanofi nowhere disputes, Dr. Scott Morton does not implement her "conservative assumption" using any recognized economic method. Mot. 15-16. Instead, she simply assumes that Auvi-Q sales would grow at the rate of the U.S. population, while the total EAI class would grow at a faster rate, and somehow the difference between the two reflects the impact generics would have on Auvi-Q, *id.*, a method Sanofi has not shown is grounded in any reliable methodology. Nor does Sanofi argue this "conservative assumption" accounts for the effect that new products, like needle-less epinephrine nasal sprays, would have had on Auvi-Q sales. Moreover, her model includes no "conservative assumption" about the *number of units* of Auvi-Q sold. Instead, she assumes the number of Auvi-Q devices sold would "increase at the rate of U.S. population growth, or 0.7% annually," Mot., Ex. 3 ¶ 196, *i.e.*, that generics and new products would have, as she said in her Main Report,

Mot., Ex. 1 ¶¶ 218, 220, 223. Mylan and Sanofi documents clearly contradict this and show that ＿＿, evidence that Sanofi ignores.[6]

## II.   Dr. Scott Morton's Effective Entrant Burden ("EEB") Calculations Are Unreliable

Sanofi admits that Dr. Scott Morton's EEB metric comes from her 2017 law review article. And Sanofi does not identify a single court or academic that has ever used EEB or found it reliable. *See* Opp. 18-19. Sanofi instead claims that EEB builds on earlier economic work. *Id.* But that is

---

[6] Mot., Ex. 32 ＿); Ex. 3 (＿ ); Mot., Ex. 33 (＿ ); *accord* Ex. 4 (＿ ); Ex. 5 at -357 (＿ ).

tenuous. Dr. Scott Morton's 2017 article references Aghion and Bolton only to note they discuss a similar "setting" and may be "analogous." Mot., Ex. 34, at 793, 819. Aghion and Bolton do not propose a metric like EEB; and they are concerned with conduct capable of excluding equally efficient rivals, Ex. 6, at 389, 396, 398, not less efficient ones like Auvi-Q, Ex. 9 ¶¶ 221-24. Dr. Scott Morton's article also notes that Federico's "test aims to protect only competitors that are as cost-efficient as the dominant undertaking," Ex. 7, at 4, unlike EEB. Mylan MSJ 83-84. An analogy to the discount attribution test is inapt for the same reason, Opp. 18-19, as it, too, tests if conduct can exclude equally efficient rivals. Mylan MSJ 82-84.

Unable to establish any acceptance of EEB, Sanofi argues that entirely novel economic theories are allowed. Opp. 16-17. But its cases relate to theories that had some adoption, unlike EEB. In *Complete Entertainment v. Live Nation*, the movant "admit[ted] that [the] theory may have viability in academic circles," 2017 WL 6512223, at *3 (C.D. Cal. Oct. 16, 2017), and the expert "cited a number of articles supporting his opinions" and "explained that his approach is consistent with the generally accepted policies applied [by the government]." Mem. in Opp. Summ. Judgment 44, No. 15-cv-9814 (C.D. Cal. June 26, 2017), ECF No. 230-1. And in *Intellectual Ventures I LLC v. Capital One Financial Corp.*, courts and academics had applied the approach. 280 F. Supp. 3d 691, 701 (D. Md. 2017); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007) ("[r]espected economic analysts" supported theory). By contrast, EEB, like the theory in *Cochrane v. Schneider National Carriers*, 980 F. Supp. 374 (D. Kan. 1997), has only one proponent in the field, Dr. Scott Morton, and one publication, her own.

Sanofi also points to no empirical validation that EEB accurately measures what it purports to measure—"the percentage rebate [one] would need to offer in order to give a PBM the same discount to match [another's] exclusive rebates given [a] share of incontestable demand." Opp. 16.

Despite hundreds of thousands of documents produced by numerous non-party PBMs and the parties having taken 17 depositions of non-party payors, Sanofi points to nothing to show that Dr. Scott Morton's EEB theory bears any resemblance to reality.[7]

Sanofi does not dispute that Dr. Scott Morton applied EEB to only two real-life examples: Aetna and ESI. And it concedes that her calculations for one (Aetna) is inconsistent with the facts. Opp. 19 ("Aetna[] may have accepted a lower counteroffer from Sanofi in 2015."). Remarkably, Sanofi calls this an "isolated example," when it is one of only two she performed. *Id.* And as for ESI, Sanofi obtained coverage there in 2015 with rebates ███████ than EEB says would be required. Mylan MSJ, SMF ¶¶ 116-17.[8] Sanofi also cites Prime, but Prime always covered Auvi-Q, Mylan MSJ, SMF ¶ 74, despite Sanofi's offers being ███████ than what EEB says would have been required. *See* Opp., Ex. 15. And Sanofi ignores its contemporaneous documents, Mot. 19, in which it ██████████████████████████████████████████████

███████, which are inconsistent with EEB. Because "[i]ndisputable record facts contradict [and] … render … unreasonable" the application of EEB to the rebate negotiations here, EEB should be excluded. *Pioneer Centres Hold. Co. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017).

### III.   Dr. Scott Morton's Calculation of Entrenched Share Is Not Supported By The Record

Mylan moved to exclude Dr. Scott Morton's testimony on entrenched share, because "none of [her] five points provides any support for [her] claim that EpiPen had any entrenched share when Auvi-Q was on the market, much less a ███████ entrenched share." Mot. 23. Sanofi downplays the motion, arguing Mylan "does not dispute the methodology of calculating

---

[7] As a predictor of liability (not the purported use of EEB here), Sanofi notes EEB "only" reaches the wrong result in 3 out of the 13 cases cited in her article, *i.e.*, a nearly 25% false positive rate. Opp. 17.

[8] ████████████████████████████████████████████████

entrenched share" and believes Dr. Scott Morton's calculation is "too high." Opp. 20. But Mylan certainly does object to her methodology, as it noted the lack of "quantitative analysis" and the lack of data to "c[o]me up with a range." Mot. 21. Sanofi points to no evidence beyond the five items Mylan addressed, and the remaining four items (one disappeared)[9] do not remotely support a claim that "Mylan had an entrenched share in the range of ███████" Mot., Ex. 1 ¶¶ 151, 154.[10]

    1. On Foster's email, Sanofi concedes it consists of (i) ████████████████████ ████████████████████████████—a far cry from *data* about EpiPen's entrenched share on *commercial formularies* when restricted in favor of *Auvi-Q*. Sanofi cites no evidence these points were shared with anyone or based on reliable data. Sanofi dismisses the ███████████ as "conservative" on grounds that ████████████████████ ██████ but cites nothing to support the point (other than Dr. Scott Morton's *ipse dixit*). Opp. 20-21 (citing Mot., Ex. 1 ¶ 152). And Sanofi dismisses ████████████████ because ███████████████████████ *id.*, a claim that is totally inconsistent with the evidence, Dr. Scott Morton's expertise, and Sanofi's oft-repeated claim that patients preferred Auvi-Q *because* of its features.[11] Notably, Sanofi does not address the fact that Adrenaclick's supply problems are what caused EpiPen's utilization to increase. Mot. 21.

    2. On the ESI data, Sanofi does not dispute it shows that when EpiPen was excluded and Auvi-Q was on formulary, EpiPen's share ████████████████ Mot. 22. Far from supporting Dr. Scott Morton, this fact refutes her entrenched share opinion. Unable to escape the data, Sanofi claims that what matters is the average of all ESI formularies, including those that covered EpiPen.

---

[9] Sanofi concedes Dr. Scott Morton does not affirmatively rely on the MedImpact spreadsheet. Opp. 22.

[10] Nothing in Dr. Willig's article endorses Dr. Scott Morton's anecdotal approach. Opp. 20. To the contrary, Dr. Willig called for "rigorous empirical" analysis, Opp., Ex. 9, at 33, and has opined here that "[s]he has not reliably demonstrated the existence of *any* non-contestable demand." Ex. 9 ¶ 30.

[11] *See* Sanofi's Mem. in Supp. of Its Mot. for Summ. Judgment at 3, 27, 30-31, 58-61, ECF No. 1814; Sanofi's Opp. to Mylan MSJ 2-7, 92.

Opp. 21. But that is *not* what Dr. Scott Morton considered. As she testified, we "have the actual data of what happens when EpiPen's excluded and Auvi-Q is on," and she believed that the data showed "EpiPen maintained over ███████ market share even when it was excluded." Mot., Ex. 2 at 80-81. Her testimony about "the average" was not about the average of all ESI plans regardless of whether EpiPen was covered, but "[w]hat happens in general when the Auvi-Q product is on the formulary and EpiPen is excluded, that's what I'm interested in." Opp., Ex. 1 at 85. Sanofi also repeats the claim that some plans switched their design just to cover EpiPen, again citing nothing but Dr. Scott Morton's *ipse dixit*. Opp. 21 (citing Mot., Ex. 3 ¶ 80). In fact, as Mylan's PBM expert explained, plans do not choose benefit design based on a single drug. Mot., Ex. 46.

3. On the CVS data, Sanofi does not dispute it includes formularies other than the two she claims to be evaluating and thus is useless. Mot. 22-23. Sanofi claims that Dr. Scott Morton found "variation" between the two formularies, Opp. 21, but that "variation" is between EpiPen ████████████████████████ on one hand and falling below ███████████ on the other. Mot. 22.

4. On Magellan (a Florida Medicaid plan), Sanofi simply claims that Medicaid is different. But evidence that Magellan believed it could ███████████████████████████████████ ███████, Mot. 22, proves nothing about EpiPen's entrenched share on commercial formularies, much less that its entrenched share was ███████ when Auvi-Q was on the market.

As with her EEB calculation, "the factual underpinning for [her]" entrenched share calculation "[is] clearly wrong," so it "should [be] excluded." *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 9 (D.D.C. 1996); *Pioneer Centres*, 858 F.3d at 1342 ("opinion[s] … not supported by sufficient facts to validate it in the eyes of the law … will be excluded").

**IV.    Dr. Scott Morton's Factual Narratives and State-of-Mind Opinions Are Inadmissible**

Sanofi makes clear that it plans to have Dr. Scott Morton support the counterfactual basis of its Post-Recall Damages claim—that it returned Auvi-Q because of Mylan rather than the

devastating effects of Auvi-Q having been completely recalled and withdrawn from the market. Before the recall, ████████████████████████████. Mylan MSJ, SMF ¶ 124. Weeks after the recall, ██████████████████. As Peter Guenter testified, ██████████ ████████████████████████ Mot., Ex. 48 at 327-28. Notably, not one contemporaneous document supports Sanofi's absurd litigation position that Mylan caused the return of rights. It would be improper for Sanofi to use Dr. Scott Morton to lend her weight to this wholly factual question by purporting to "read [Sanofi's] mind" using economics, *Pioneer Centres*, 858 F.3d at 1342, and "summariz[ing] … her advocacy-based interpretation" of the record, *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 280-81 (S.D. Ala. 2006).[12]

Sanofi also confirms that Dr. Scott Morton intends to testify about Mylan's supposed anticompetitive intent and its assessment of Auvi-Q, Opp. 24-25, in disregard of black-letter law barring experts from usurping the jury's role by summarizing facts and opining about the parties' intent. Sanofi cites two cases about the relevance of intent that say nothing about whether an expert may testify about intent. Sanofi also tries to distinguish Mylan's cases by emphasizing Dr. Scott Morton is going to summarize documents when she opines about Mylan's intent. Opp. 24-25. That is not a valid distinction, *e.g.*, *Pioneer Centres*, 858 F.3d at 1342 ("read[ing] the mind of [party]" is "beyond the scope of *any* expert"), and confirms she plans to violate the prohibition against experts "offer[ing] only factual narratives and interpretations of conduct," *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005), a rule that Sanofi ignores.

## CONCLUSION

For these reasons and the reasons stated in its opening memorandum, Mylan respectfully requests that the Court exclude the challenged opinion testimony of Fiona M. Scott Morton, Ph.D.

---

[12] Dr. Scott Morton's speculative opinion as to why Sanofi returned rights is not analogous to the cases that Sanofi cites, in which experts testified about whether past conduct was consistent with collusion. Opp. 23.

Dated: August 29, 2019

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510
psechler@robbinsrussell.com
kzecca@robbinsrussell.com
lfriedman@robbinsrussell.com
rmayrell@robbinsrussell.com
jettinger@robbinsrussell.com
jgoerlich@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and
Defendant/Counterclaim Plaintiff Mylan
Specialty L.P.*

## CERTIFICATE OF SERVICE

On this 29th day of August, 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each attorney registered for ECF notification to the counsel of record in this case.

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4492
Fax: (202) 775 4510
psechler@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*