# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ<br><br>Hon. Daniel D. Crabtree<br><br>Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC,<br><br>        Plaintiff and<br>        Counterclaim-Defendant,<br><br>v.<br><br>MYLAN Inc., *et al.*,<br><br>        Defendants and<br>        Counterclaim-Plaintiffs.<br><br>**This Document Relates to the *Sanofi* Case.** | CASE NO.: 2:17-CV-02452-DDC-TJJ<br><br>*Document Filed Electronically* |

## SANOFI-AVENTIS U.S. LLC'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF THOMAS VARNER

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT...................................................................................................................................2

I.    DR. VARNER'S UNRELIABLE DAMAGES CALCULATION IS STILL PREMISED ON AN UNSCIENTIFIC CAUSATION ASSUMPTION .............................2

II.   MYLAN RELIES ON THE JURY AND SANOFI'S ECONOMIC EXPERTS TO FILL IN THE CRITICAL GAPS IN DR. VARNER'S ANALYSIS ................................7

III.  DR VARNER'S OPINION ON EPIPEN MANUFACTURING CAPACITY IS UNRELIABLE AND SHOULD BE EXCLUDED ...........................................................8

CONCLUSION................................................................................................................................11

# **TABLE OF AUTHORITIES**
**Page(s)**

**Cases**

*Brunswick Corp. v. Spinit Reel Co.*,
    832 F.2d 513 (10th Cir. 1987) ................................................................................................6

*Cochrane v. Schneider Nat'l Carriers, Inc.*,
    980 F. Supp. 374 (D. Kan. 1997) ............................................................................................3

*Dependable Sales & Serv., Inc. v. Truecar Inc.*,
    311 F. Supp. 3d 653 (S.D.N.Y. 2018) .....................................................................................7

*First Sav. Bank, F.S.B. v. U.S. Bancorp*,
    117 F. Supp. 2d 1078 (D. Kan. 2000) .....................................................................................7

*Ford Motor Co. v. Thermoanalytics, Inc.*,
    No. 14-13992, 2016 WL 1465015 (E.D. Mich. Apr. 14, 2016) ..................................... 10, 11

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................................................................6

*Marten Transp., Ltd. v. Plattform Advert., Inc.*,
    No. 14-2464, 2016 WL 4000927 (D. Kan. July 26, 2016) ......................................................6

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2005) ...............................................................................................5

*Paliwoda v. Showman*,
    No. 12-2740, 2014 WL 3925508 (D. Kan. Aug. 12, 2014) ......................................................3

*PBM Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ................................................................................................5, 6

*Rollins v. Cargill, Inc.*,
    No. 11-1147, 2012 WL 3644927 (D. Kan. Aug. 24, 2012) ...................................................11

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
    29 F.3d 137 (4th Cir. 1994) .....................................................................................................3

*United States v. Affleck*,
    776 F.2d 1451 (10th Cir. 1985) .............................................................................................10

*Verisign, Inc. v. XYZ.Com LLC*,
    848 F.3d 292 (4th Cir. 2017) ................................................................................................5, 7

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) ............................................................................................5, 6

*Werth v. Makita Elec. Works, Ltd.*,
    950 F.2d 643 (10th Cir. 1991) ..............................................................................................7

*Zimmer, Inc. v. Stryker Corp.*,
    No. 14-152, 2018 WL 276324 (N.D. Ind. Jan. 3, 2018) ........................................................4

**Other Authorities**

Fed. R. Civ. P. 26(a)(1)(A) ................................................................................................. 10, 11

Fed. R. Civ. P. 26(e) .................................................................................................................3

Fed. R. Civ. P. 37(e) ...............................................................................................................11

Fed R. Evid. 702 ......................................................................................................................7

*What's Behind the Persistent Shortage of Lifesaving EpiPens*, BLOOMBERG (Aug.
    23, 2019), https://www.bloomberg.com/news/articles/2019-08-23/what-s-
    behind-the-persistent-shortage-of-lifesaving-epipens ............................................................9

**PRELIMINARY STATEMENT**

In its opening brief, Sanofi explained that Dr. Thomas Varner cannot provide any economic opinion in support of Mylan's counterclaims that would help the jury. In its opposition, Mylan concedes that it is not offering Dr. Varner as an expert on causation, but nonetheless insists that "a damages expert may help the jury by providing a scientific tool with which it can calculate damages." Opp. at 1.[1] But that is neither here nor there because Dr. Varner has not even attempted to provide the jury with any kind of tool. Instead, what Mylan characterizes as "provid[ing] the jury with upper ranges on Sanofi's sales (from which Mylan seeks to disgorge Sanofi's profits)" (Opp. at 1) consists solely of reviewing Sanofi profit and loss statements and reporting on Sanofi's gross sales for Auvi-Q® ("Auvi-Q") from the period January 18, 2013 to October 22, 2015 (Mot. Ex. 1 at ¶ 32). In other words, his "opinion" is that Mylan may not recover more than 100% of Sanofi's gross sales for Auvi-Q. The jury does not need an expert to tell them that. And what Mylan characterizes as providing the jury with "Mylan's lost profits" (Opp. at 1) consists solely of taking the number of Auvi-Q units sold for that same period, deciding that Mylan should have made nearly all of them, multiplying that number by Mylan's profit margin (Mot. Ex. 1 at ¶¶ 33-44), and explaining that the lost profits number is somewhere between that and zero. Dr. Varner's "opinion"—in his own words—is that "it's probably not a hundred percent of their sales…that would not have occurred, but…it's not zero percent either." Opp. Ex. 1 at 105:20-24.

For the foregoing reasons, and set forth in Dr. Varner's "supplemental" report, Dr. Varner's

---

[1] "Mot." refers to Sanofi's June 28, 2019 Memorandum in Support of Its Motion to Exclude the Expert Reports and Testimony Offered by Mylan's Expert Thomas Varner (ECF No. 1677) and the exhibits cited therein. "Sanofi MSJ" refers to Sanofi's June 28, 2019 Memorandum of Law in Support of Its Motion for Summary Judgment. "Opp." refers to Mylan's August 9, 2019 Memorandum of Points and Authorities in Opposition to Sanofi's Motion to Exclude the Expert Reports and Testimony Offered by Mylan's Expert Thomas Varner (ECF No. 1804) and the exhibits cited therein.

opinions fail under *Daubert*. *First*, recognizing the incurable flaws in Dr. Varner's opinions, Mylan admitted on the eve of this Court's *Daubert* motion deadline that it provided Dr. Varner with the wrong legal instruction for Mylan's lost profits. *See* Mot. Ex. 10 at ¶ 3. This is a fatal concession that Dr. Varner's opinions were flawed from the start, which Mylan's opposition fails to address. Further, noting that damages are neither zero percent nor one hundred percent is not helpful to the jury, nor is it proper expert testimony. *Second*, Mylan insists that Dr. Varner can look to other sources, including the jury and Sanofi's experts, to fill in critical gaps that he missed during the Court-ordered period for merits expert discovery in the *Sanofi* case. Opp. at 8. This is a clear acknowledgment by Mylan that the jury could not rely on Dr. Varner's opinion as it stands. *Lastly*, Mylan fails to demonstrate that Dr. Varner's opinion that Meridian, the manufacturer of EpiPen® ("EpiPen"), could adequately supply defect-free EpiPen devices in 2013-2015, is reliable.

## ARGUMENT

### I. DR. VARNER'S UNRELIABLE DAMAGES CALCULATION IS STILL PREMISED ON AN UNSCIENTIFIC CAUSATION ASSUMPTION

Mylan fully admits that Dr. Varner "does not offer an affirmative opinion on causation." Opp. at 3. In fact, Mylan goes so far to state that, "[t]o the extent any of Dr. Varner's testimony or reports could be read to offer an affirmative opinion on causation or quantify the portion of damages attributable to Sanofi's conduct, Mylan represents that Dr. Varner will not offer such an opinion at trial." *Id.* at 3 n.2.

Worse still, Mylan admits that it provided Dr. Varner with incorrect legal instructions on which to base his expert opinion, a disabling error that Mylan glosses over in its opposition papers.[2]

---

[2] Despite the artificial label used by Mylan, Dr. Varner's *third* expert report was served unilaterally by Mylan in clear violation of the Court's scheduling order governing merits expert discovery in the *Sanofi* case. *See* ECF No. 1146. Mylan is mistaken that Rule 26(e)(2) saves its untimely disclosure from being stricken. *See* Opp. at 3 n.3. Mylan fails to address *Paliwoda v. Showman*, cited by Sanofi, which states that "[c]ourts have made clear that Rule 26(e)(2) does not permit a

2

Mot. Ex. 10 at ¶ 3. Mylan had initially advised Dr. Varner, wrongly, that it is Sanofi's burden to apportion Mylan's lost profits under the Lanham Act, but attempted to walk that back in its belated June 26, 2019 "supplement." *See id.*; *see also* Mot. at 4 n.2. Mylan's failed attempt to save Dr. Varner's report illustrates that his testimony was based on a false premise and should be excluded. Moreover, Dr. Varner's supplemental disclosure does not remedy the fatal issue in his damages opinion: Dr. Varner made no attempt to measure Mylan's lost profits attributable to the alleged conduct, but rather leaves this exercise for the jury to perform. Mot. Ex. 10 at ¶ 5 ("A jury, relying on evidence presented by counsel through fact witnesses at trial, can determine for itself what percentage of Mylan's lost profits are attributable to Sanofi's conduct[.]"). Dr. Varner's opinion is simply that damages fall between zero and one hundred percent, and the jury can decide the proper number by itself. *See* Opp. Ex. 1 at 105:20-24. The jury can decide this without a purported expert.

Mylan fails to address the cases cited by Sanofi showing that courts exclude expert opinions when they are "based on unjustified assumptions and therefore will not assist the trier of fact." Mot. at 5 (citing *Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F. Supp. 374, 378 (D. Kan. 1997); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.")). Dr. Varner's testimony is exactly that: speculative and unsupported.

As Mylan admits, Dr. Varner assumed, without doing any analysis, that Auvi-Q would have made zero sales if Sanofi did not engage in the alleged conduct. *See* Opp. at 4 ("[Dr. Varner] supplies the jury with the upper ranges of Sanofi's revenues and Mylan's lost profits, as if 100%

---

party to use the supplementing procedure to submit an amended or rebuttal report not based on new information…[and] Rule 26(e) may not be used to provide an extension of the expert report deadline or sandbag one's opponent with issues that should have included in the original report." No. 12-2740, 2014 WL 3925508, at *3 (D. Kan. Aug. 12, 2014) (internal citations omitted). Proper interpretation of the Lanham Act is not "new information." *See id.*

3

of Auvi-Q sales were caused by Sanofi's conduct. The jury can then multiply these numbers by the percentage of sales it finds were caused by Sanofi's conduct."). To justify this assumption, Mylan points to three Sanofi market research documents—none of which Dr. Varner relied on in his reports—which state that: (1) 15% of Auvi-Q sales were generated by the sales force, *see* Opp. Ex. 2 at Slide 3; (2) 28% of doctors surveyed recalled receiving a message from sales representatives about Auvi-Q's ease of use, *see* Opp. Ex. 3 at Slide 7; and (3) 83% of pediatricians surveyed rated "ease of use" as an influential reason why they prescribed Auvi-Q, *see* Opp. Ex. 4 at Slide 16. Opp. at 7.

Dr. Varner does nothing, however, to link these market research documents to his limited damages opinion. By only calculating the "upper range" of damages, he is assuming that every marketing message made by Sanofi's sales force was deceptive, and therefore every sale by Sanofi's sales force was unlawful. *See* Sanofi MSJ at 72-75; *see also* Opp. at 6. Mylan does not and cannot justify this unscientific assumption on which its damages expert bases his opinion. Rather, Mylan ***admits*** that Dr. Varner's sole focus was calculating an "upper range" of damages and that he completely ignored other relevant factors. *See* Opp. at 9 (arguing that Dr. Varner need not "connect conduct to injury" and "'consider alternative' and 'lawful' reasons for defendant's sales" because he merely "offers a narrow[] opinion that does not address causation").

Expert testimony is routinely excluded on that basis. *See Zimmer, Inc. v. Stryker Corp.*, No. 14-152, 2018 WL 276324, at *4 (N.D. Ind. Jan. 3, 2018) (excluding damages expert's lost profits calculations because the expert solely attributed lost revenues and profits to the defendants' alleged wrongdoing without considering the possibility that the lost revenues and profits flowed from other events); *see also MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005) (affirming exclusion of expert report that "did not link a single loss to a specific

4

misconduct"); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (affirming exclusion of expert where opinion and information relied upon "lack[ed] foundation and reliability necessary to support expert testimony," as it would not be helpful to the jury). Dr. Varner's causation assumption, which taints his entire damages analysis, has no support in the record, and therefore his testimony should be excluded.

Recognizing the absurdity of assuming Sanofi would have made zero sales without violating the Lanham Act, Dr. Varner admitted that he did not believe his assumption, and at least some of Sanofi's sales were unrelated to the alleged false or misleading statements:

> **Q.** "It is your testimony that if Sanofi had not made the alleged false and misleading statements it would not have sold a single unit of Auvi-Q?"
>
> **A.** "I don't know that to be true." Mot. Ex. 3 at 104:18-21.
>
> **Q.** "So your opinion is that it's likely Sanofi made at least some sales that were unrelated to the alleged false and misleading statements?" […]
>
> **A.** "Yes, I think that's possible." *Id.* at 106: 6-8; 11-14.

*See* Mot. at 6. Mylan does not dispute Dr. Varner's testimony. Indeed, Mylan admits that Dr. Varner "d[id] not quantify what portion of Mylan's lost profits were caused by Sanofi's misleading conduct." Opp. at 3.

As Sanofi cited, and Mylan ignored, courts do not allow expert testimony where the expert simply "assumes rather than demonstrates that every [sale] during the relevant time period was the result of [the] allegedly false statements." *Id.* (citing *Verisign, Inc. v. XYZ.Com LLC,* 848 F.3d 292, 300-01 (4th Cir. 2017)); *see also PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 122 (4th Cir. 2011) (finding "fatal flaw" where expert assumed all sales were attributed to the alleged false statement). Further, Mylan cannot ask a jury to rely on assumptions that its expert does not himself believe. *See Viterbo*, 826 F.2d at 422 ("In some cases [] the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion.

5

Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict."); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (upholding exclusion of expert testimony where there was "simply too great an analytical gap between the data and the opinion proffered"). Dr. Varner's testimony should be excluded on this basis as well.

Mylan focuses its misguided defense of Varner on case law holding that a Lanham Act damages expert need not opine on causation, citing *Brunswick Corp. v. Spinit Reel Co.* for the proposition that a plaintiff can rely on statements from prospective customers and fact testimony to establish causation. 832 F.2d 513, 526 (10th Cir. 1987); Opp. at 4, 6. But *Brunswick* did not hold that a plaintiff only had to offer evidence of an upper range of estimated damages; rather, it found that on summary judgment, the district court could look to *other* evidence, such as comparing the decline in sales of plaintiff's other products to the one at issue. *Id.* This ***additional*** evidence is expressly acknowledged in *Marten Transp., Ltd. v. Plattform Advert., Inc.*, which Mylan also cites. No. 14-2464, 2016 WL 4000927, at *10 (D. Kan. July 26, 2016) ("The [*Brunswick*] court concluded that ***additional*** evidence concerning the decline in sales of the product provides 'the court with a broad basis from which it may arrive at a fair, if not precise, amount with which to compensate [the plaintiff] for wrongful infringement.'") (emphasis added).

Unlike in *Brunswick* and *Marten*, Dr. Varner does not have any such evidence to offer to support his unscientific opinion. *See supra* at 4-5. Further, Mylan ignores the fact that as "the ***plaintiff*[,]** [it] bears the burden of proving a causal link between the actual damages and [the defendant's] actions." Mot. at 5 (citing *Verisign*, 848 F.3d at 301 (emphasis added); *Dependable Sales & Serv., Inc. v. Truecar Inc.*, 311 F. Supp. 3d 653, 659 (S.D.N.Y. 2018)). Dr. Varner's damages analysis is untethered from the record, and should therefore be excluded.

6

## II. MYLAN RELIES ON THE JURY AND SANOFI'S ECONOMIC EXPERTS TO FILL IN THE CRITICAL GAPS IN DR. VARNER'S ANALYSIS

Incredibly, Mylan takes the position that the jury and Sanofi's experts will help Dr. Varner fill the gaping holes in his analysis. Opp. at 8. Specifically, Mylan would have the jury jump through hoops to keep Dr. Varner's testimony in this case:

- Step 1: "*[A] jury could borrow* Dr. Wiggins's methodology to measure the portion of sales attributable to Sanofi's conduct, and then multiply that by Dr. Varner's lost profits number." Opp. at 8 (emphasis added).

- Step 2: "[U]nder Dr. Wiggins's methodology," which relies upon Dr. Fiona Scott Morton's opinion that "Horizon Blue Cross Blue Shield of New Jersey [] and University of Michigan…were unaffected by Mylan's rebate contracts…*a jury could conclude* that those sales in excess of the forecasts were the result of Sanofi's improper conduct." *Id.* (emphasis added).

- Step 3: "*The jury could then calculate* what percentage of all Auvi-Q sales constituted sales in excess of [the] forecast[.]" *Id.* (emphasis added).

- Step 4: The jury could then "*multiply* that percentage by Dr. Varner's lost profits number to reach a damages number for 2013." *Id.* (emphasis added).

But the *expert* is supposed to help the jury, not vice versa. *See* Fed R. Evid. 702; *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1083 (D. Kan. 2000) ("The touchstone of admissibility is helpfulness to the trier of fact.") (quoting *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991)). As Mylan would have it, its expert can simply provide an "upper range of damages assuming all Auvi-Q sales resulted from Sanofi's [alleged conduct]" and then have the jury figure it out somehow. *See* Opp. at 6. But that is not helpful for the jury, and no expert is needed for such an exercise. The jury can easily get this number from Sanofi documents. Indeed, Mylan cites no case Lanham Act case where a jury was asked to mix and match opposing parties' experts and derive the outcome that way. By asking the jury to take on an expert's duties, Mylan acknowledges that Dr. Varner's opinion on its own remains unreliable after three reports.

Further, Mylan cannot have it both ways by arguing on the one hand that Sanofi's experts'

7

opinions are unreliable, and then weeks later claim that these same opinions are needed to alleviate weaknesses in its own expert's damages opinion. That is a blatant concession by Mylan that Dr. Wiggins and Dr. Scott Morton should testify in this case. Because Dr. Varner's opinion will not help the jury, his testimony should be excluded in its entirety.

## III. DR VARNER'S OPINION ON EPIPEN MANUFACTURING CAPACITY IS UNRELIABLE AND SHOULD BE EXCLUDED

Mylan cannot show that Dr. Varner's opinion that the EpiPen manufacturer, Meridian, could satisfy U.S. demand by manufacturing safe and effective EpiPens is reliable. Nor does Mylan dispute that Dr. Varner lacks any expertise in pharmaceutical manufacturing or that he relied on any disclosed fact or expert witnesses as a basis for his opinion. This is compounded by Dr. Varner basing his opinion on an interview that he conducted with Mr. Chris Benson, a fact witness who Mylan never disclosed to Sanofi. Dr. Varner's testimony should be excluded on this basis as well.

First, Mylan's opposition does not undermine the fact that Dr. Varner's opinion on Meridian's manufacturing abilities is not only beyond the scope of his expertise, but is also belied by the factual record. Opp. at 9-11. It is undisputed that Dr. Varner is not an expert in pharmaceutical manufacturing. *Id.* at 10. Moreover, Mylan conspicuously omits any reference to the formal Warning Letter sent by FDA to Meridian that Dr. Varner failed to consider in forming his opinion. *See* Ex. 11 (FDA Warning Letter). In that Warning Letter, FDA detailed an alarming number of serious problems with the manufacturing of EpiPen, which requires some scientific basis for Dr. Varner to assume that Mylan could somehow provide a sufficient number of dependable EpiPens to satisfy 100% of the demand in the U.S. EAI market. *See id*. (FDA Warning Letter). For example, the Warning Letter stated that "[b]etween 2014 and 2017…[Meridian] received 171 complaint samples for products that failed to activate when the patient followed the proper sequence." *Id.* at 3. The Warning Letter also revealed that Meridian did not correct

8

violations FDA had flagged during a 2014 inspection, *i.e.*, during the time period Dr. Varner opines Meridian could have supplied devices to all U.S. anaphylaxis patients. *Id.* at 8 (explaining that Meridian's "repeated failures demonstrate that [Meridian's] oversight and control over the manufacture of these products is inadequate"). These problems have continued many years later into 2019. *See What's Behind the Persistent Shortage of Lifesaving EpiPens*, BLOOMBERG (Aug. 23, 2019)[3] (reporting that due in part to "inspectors [] noticing chips in the glass cartridges of the devices" and "bent or broken needles," the rate of supply was cut from a putting out one new batch "every day-and-a-half" to one "about every two to three days"). Dr. Varner discussed Meridian's manufacturing capacity with Mr. Benson, a fact witness improperly withheld from Mylan's initial disclosures, and yet Mylan shielded Dr. Varner from considering FDA's Warning Letter in forming his opinion on Meridian's manufacturing capacity. Nor did Dr. Varner even consider the testimony of Thomas Handel, General Manager and President of Meridian, who confirmed that Mylan also had the ability to "take market action" to effect an EpiPen recall, but chose not to despite the serious quality issues raised by FDA's Warning Letter. *See* Ex. 12 (Dep. Tr. of Thomas Handel at 244:16-245:22).

Additionally, Mylan did not even attempt to respond in its opposition to the fact that "Dr. Varner's own Exhibit 10.1 shows ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" *See* Mot. at 12 (citing Mot. Ex. 9 at ¶¶ 92–95). Instead, Mylan's opposition points to conclusory statements in Dr. Varner's report that gloss over this critical gap. *See* Opp. at 10 (citing Mot. Ex. 1 at ¶¶ 39-41). For example, Dr. Varner's report states that Meridian could have produced approximately ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in

---

[3] https://www.bloomberg.com/news/articles/2019-08-23/what-s-behind-the-persistent-shortage-of-lifesaving-epipens.

2014, but does not address that his own chart shows that combined EpiPen and Auvi-Q sales at that time exceeded ▇▇▇▇▇▇▇. *See* Mot. Ex. 1 at ¶ 40, Ex. 10.1 (showing combined sales of ▇▇▇▇▇▇▇▇▇▇▇ and ▇▇▇▇▇▇▇▇▇▇▇).

Mylan also relies on *United States v. Affleck* to support its flawed argument that the limited documents that Dr. Varner considered were sufficient. 776 F.2d 1451, 1457 (10th Cir. 1985); Opp. at 10. But *Affleck* does not state that quantitative sales data is the type of work an economist routinely conducts to support an opinion on manufacturing capacity, as Mylan suggests. Moreover, the court there found that a witness interview was the type of information reasonably relied on by an accountant; it did not concern sales data reviewed by an economist with no manufacturing expertise opining on pharmaceutical manufacturing capacity. *See* 776 F.2d at 1457.

Second, Mylan is wrong that it did not need to disclose Mr. Benson as a witness under Federal Rule of Civil Procedure 26(1)(A)(i). Mylan, as the counterclaim-plaintiff, either knew when it filed its claim or certainly before expert discovery, that Mylan would need to rely on a manufacturing witness to claim any damages. Because Mylan attempted to "use [Mr. Benson] to support its [counter]claims," Mylan was required to disclose him as a witness. FED. R. CIV. P. 26(a)(1)(A); *see also Ford Motor Co. v. Thermoanalytics, Inc.*, No. 14-13992, 2016 WL 1465015, at *3 (E.D. Mich. Apr. 14, 2016) (documents relied upon by expert to prepare his report were used to support defendant's case in chief and were therefore required to be disclosed under Rule 26(a)). Mylan's decision to hide Mr. Benson prejudiced Sanofi.[4]

---

[4] Mylan once again in this case attempts to deflect from its wrongdoing by pointing the finger at Sanofi. Here, too, it fails. Specifically, Mylan's attempts to compare Sanofi allegedly not disclosing a data "bridge file" until merits expert discovery to Mylan failing to disclose the ***sole fact witness relied on*** by Dr. Varner for his EpiPen manufacturing opinion is specious. Opp. at 11, n.6. As previously explained to counsel for Mylan, the data "bridge file[]" was not subject to Rule 26(a) nor was it responsive to a request for production because it "is merely a 'bridge' to link two sources of publicly available data." Ex. 13 (Feb. 19, 2019 letter from E. Hochstadt to L. Friedman)

This Court has authority under Rule 37(e), and its inherent authority, to strike this portion of Dr. Varner's opinion. *See Ford Motor*, 2016 WL 1465015 at *2-4 (awarding costs and attorneys' fees for plaintiffs to depose defendant's witnesses regarding documents improperly withheld under Rule 26(a)(1)(A)); *see also Rollins v. Cargill, Inc.*, No. 11-1147, 2012 WL 3644927, at *4 (D. Kan. Aug. 24, 2012) ("Federal courts may also sanction litigants through their 'inherent authority to ensure that parties abide by the Federal Rules of Civil Procedure, protect the integrity of the judicial system, and prevent abuse of the judicial process.'"). Striking Dr. Varner's report is the appropriate remedy where, as here, Mylan's conduct violated the Court's Scheduling Order with fact and expert discovery being closed and further delay being prejudicial to the *Sanofi* case moving forward. *Cf.* ECF No. 1420 ("Any future argument that [Mylan is] devoting energy and attention to work in the consumer class cases is unlikely to justify postponement of work in the Sanofi case.").

## CONCLUSION

For these reasons, Sanofi respectfully requests that the Court grant its Motion to Exclude the Expert Reports and Testimony of Thomas Varner.

---

at 2. Nothing prevented Mylan's experts from putting together the same file if they chose to do so.

DATED:  August 30, 2019                              */s/ Yehudah L. Buchweitz*

Respectfully submitted,

| **WEIL, GOTSHAL & MANGES LLP** | **WEIL, GOTSHAL & MANGES LLP** |
|---|---|
| Diane Sullivan | Yehudah L. Buchweitz |
| diane.sullivan@weil.com | yehudah.buchweitz@weil.com |
| 17 Hulfish St., Suite 201 | Eric S. Hochstadt |
| Princeton, NJ 08542 | eric.hochstadt@weil.com |
| 609.986.1120 | Randi W. Singer |
| 212.310.8007 (Fax) | randi.singer@weil.com |
| | 767 Fifth Avenue |
| | New York, NY 10153 |
| | 212.310.8000 |
| | 212.310.8007 (Fax) |

*Counsel for Plaintiff and Counterclaim-Defendant Sanofi-Aventis U.S. LLC*

12

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, the foregoing was filed via CM-ECF and by e-mail to all counsel of record.

> */s/    Yehudah L. Buchweitz*
> Yehudah L. Buchweitz