# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ<br><br>Hon. Daniel D. Crabtree<br><br>Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC,<br><br>    Plaintiff and<br>    Counterclaim Defendant,<br><br>  v.<br><br>MYLAN Inc., *et al.*,<br><br>    Defendants and<br>    Counterclaim-Plaintiffs.<br><br>**This Document Relates to the *Sanofi* Case.** | CASE NO.: 2:17-CV-02452-DDC-TJJ<br><br><br>*Document Filed Electronically* |

## PLAINTIFF/COUNTERCLAIM DEFENDANT SANOFI-AVENTIS U.S. LLC'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

RESPONSE TO MYLAN'S STATEMENT OF  ADDITIONAL ALLEGEDLY
MATERIAL FACTS IN DISPUTE..............................................................................2

I.     RELEVANT MARKET ....................................................................................3

    A.     Prefilled Syringes Are Not Part of the Relevant Market.........................3

    B.     Hypothetical Future Non-EAI Products are Not Part of the Relevant
        Market ......................................................................................................4

    C.     The Regions in Which Payors Operate Have No Bearing on the Relevant
        Geographic Market .................................................................................5

II.    MONOPOLY POWER.....................................................................................6

    A.     Payors' Size Relative to Mylan is Immaterial .......................................6

    B.     Payors Did Not "Impose Price Protection" on Mylan ...........................7

    C.     Payors Did Not Seriously Threaten to Exclude EpiPen.........................7

    D.     Sanofi Did Not Change its Auvi-Q Contracting Strategy in 2015 ........8

III.   SANOFI'S MARKETING OF AUVI-Q ...........................................................9

    A.     Sanofi's Truthful Advertising...............................................................9

    B.     It is True That Auvi-Q is The Only EAI Device With Needlestick
        Protection...............................................................................................17

    C.     After So Many Years As A Monopolist, Mylan Cannot Complain That Its
        EpiPen Became Synonymous With the U.S. EAI Market ...................17

    D.     The Success of Sanofi's Truthful Advertising Is Not Actionable Even If
        Sanofi's Success Was At the Expense of Mylan's Market Share ........20

SANOFI DISPUTES MYLAN'S RESPONSES TO SANOFI'S STATEMENT OF
MATERIAL FACTS..............................................................................................22

SANOFI'S MOTION FOR SUMMARY JUDGMENT..........................................25

I.     THE RELEVANT MARKET IS INDISPUTABLY U.S. EAI DRUG DEVICES ..........25

    A.     A Different Drug that Could Lead to Death is Not a Reasonable Substitute........25

    B.     Vials or Syringes Are Impractical and Inappropriate for Children and
        Adults ....................................................................................................26

    C.     Mylan Does Not Like the Results of the Hypothetical Monopolist Test..............28

    D.     Mylan's Proposed "Other" Non-EAI Pipeline Products Do Not Compete...........29

    E.     No Court or Agency Has Applied Mylan's Customer-Specific Definition ..........30

II.     THERE IS NO GENUINE MATERIAL DISPUTE ON MONOPOLY POWER ...........30

        A.      Sanofi Provided Irrefutable Indirect Evidence of Mylan's Monopoly
                Power.........................................................................................................31

        B.      Sanofi Also Provided Irrefutable Direct Evidence of Mylan's Monopoly
                Power.........................................................................................................35

III.    MYLAN'S UNFAIR COMPETITION CLAIM FAILS AS A MATTER OF LAW .......37

IV.     MYLAN LACKS EVIDENCE TO PROVE ITS LANHAM ACT CLAIM...................38

        A.      Only a Few of Mylan's Allegations Are Still At Issue .......................................38

        B.      Mylan Lacks Evidence to Prove the Remaining Allegations...............................38

                1.      Mylan Improperly Implies That Comparative Claims are
                        False Advertising .........................................................................39

                2.      Mylan Cannot Rely on Internal Sanofi Presentations to
                        Support its Claim .........................................................................39

                3.      Mylan Failed to Adduce Any New Evidence in Discovery ..........41

        C.      Mylan Cannot Show it Was Harmed by Any Allegedly False Advertising..........42

        D.      Mylan Cannot Show the Challenged Statements Were False or Misleading........43

                1.      Mylan Cannot Show the Challenged Statements Were
                        Literally False ..............................................................................44

                2.      Mylan Cannot Show the Statements Were False by
                        Necessary Implication...................................................................45

                3.      Mylan Cannot Show that the Challenged Statements Were
                        Misleading ...................................................................................46

        E.      Mylan Cannot Show that the Challenged Statements Were Widely
                Disseminated and Constituted Commercial Advertising ....................................47

CONCLUSION.................................................................................................................48

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*,
   432 F.Supp.2d 1319 (S.D. Fla. 2006), *aff'd*, 294 F.App'x 501 (11th Cir. 2008) ...............5, 29

*BoDeans Cone Co. v. Norse Dairy Sys., L.L.C.*,
   678 F.Supp.2d 883 (N.D. Iowa 2009) ...................................................................................41

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F.Supp.2d 384 (D.N.J. 2009) .........................................................................................40

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ..............................................................................................................37

*Ethypharm S. A. France v. Abbott Labs.*,
   707 F.3d 223 (3d Cir. 2013) .................................................................................................29

*F.T.C. v. Lundbeck, Inc.*,
   650 F.3d 1236 (8th Cir. 2011) ..............................................................................................27

*FTC v. AbbVie*,
   329 F.Supp.3d 98 (E.D. Pa. 2018) ........................................................................ 26–29, 33

*Gen. Steel Domestic Sales, LLC v. Chumley*,
   129 F.Supp. 3d 1158 (D. Colo. 2015) ..................................................................................47

*Gen. Steel Domestic Sales, LLC v. Chumley*,
   627 F.App'x 682 (10th Cir. 2015) .........................................................................................44

*Gen. Steel Domestic Sales, LLC v. Chumley*,
   No. 10-01398, 2013 WL 1900562 (D. Colo. May 7, 2013),
   *aff'd*, 627 F.App'x 682 (10th Cir. 2015) ...............................................................................43

*Geneva Pharm. Tech. Corp. v. Barr Lab Inc.*,
   386 F.3d 485 (2d Cir. 2004) .................................................................................................27

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
   638 F.App'x 778 (10th Cir. 2016) ...............................................................................45, 46

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer*
   *Pharm., Inc.*, 19 F.3d 125 (3d Cir. 1994) ............................................................................41

*Law Co. v. Mohawk Constr. & Supply Co.*,
   577 F.3d 1164 (10th Cir. 2009) ............................................................................................40

iii

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .................................................................................................43

*Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016) ...................................................................................*passim*

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
  290 F.3d 578 (3d Cir. 2002) ..............................................................................44, 46

*Oahu Gas Serv., Inc. v. Pac. Res. Inc.*,
  838 F.2d 360 (9th Cir. 1988) ...................................................................................32

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
  227 F.3d 489 (5th Cir. 2000) ...................................................................................45

*Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*,
  899 F.2d 951 (10th Cir. 1990) ..............................................................................32-34

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...................................................................................34

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
  902 F.2d 222 (3d Cir. 1990) ..............................................................................41, 45

*Smart Vent, Inc. v. Crawl Space Door Sys. Inc.*,
  2017 WL 4948063 (D.N.J. Nov. 1, 2017) ...............................................................38

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978)...................................................................................27

*Estate of Larsen ex rel. Sturdivan v. Murr*,
  511 F.3d 1255 (10th Cir. 2008)..................................................................................2

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998) ......................................................................................32

*United Food & Comm. Workers Local 1776 v. Teikoku Pharma USA*,
  296 F.Supp.3d 1142 (N.D. Cal. 2017)....................................................................26

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ..............................................................................36, 37

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc)...............................................................25, 31

*Verisign, Inc. v. XYZ.COM LLC*,
  848 F.3d 292 (4th Cir. 2017) ...................................................................................42

*Vincent v. Utah Plastic Surgery Soc.*,
    621 F.App'x 546 (10th 2015) ............................................................................................47

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ............................................................................................37

*Zoller Labs., LLC. v. NBTY, Inc.*,
    111 F.App'x 978 (10th Cir. 2004) ........................................................................ 39, 44, 45

## PRELIMINARY STATEMENT

Mylan's Opposition to Sanofi's Motion for partial summary judgment puts a blind eye to thousands of contemporaneous documents in its own files and the testimony of its own witnesses that compel the conclusion that Mylan possessed monopoly power in the U.S. EAI market. Mylan makes desperate arguments that are unsupported by the record and unfounded in U.S. antitrust law. Specifically, Mylan claims that: (1) Benadryl and syringes of epinephrine are substitutes for EAIs despite the fact that they are ineffective and/or impractical treatments for anaphylaxis; and (2) EpiPen's dominant market share is a "misleading" indicator of monopoly power because its $600 EpiPen was a "competitive price." Mylan Opp. at 61-62. All of Mylan's made-for-litigation arguments are undermined by one undisputed public statement from its CFO: "***We are the market for anaphylactic shock with over 98% market share***." Sanofi 56.1 Stmt. ¶ 31. The jury in this case should not be distracted by arguments with no basis in antitrust law, the factual record, or science. There is no genuine dispute that Mylan possessed monopoly power in the U.S. EAI drug device market, and partial summary judgment is warranted on this element of Sanofi's claims.

Mylan's Counterclaims do not fare better. Mylan complains that Sanofi's marketing strategy was to ██████████████████ Mylan Opp. ¶ 130; this is just a monopolist griping about losing a small fraction of its nearly 100% share of the EAI market. Mylan claims it is entitled to recover damages for all of Sanofi's sales of Auvi-Q, even though Mylan has conceded that the vast majority of Sanofi's marketing—its pre-printed ads—are "beside the point" and that its Counterclaims are "based on Sanofi's oral statements disseminated by its sales force and account executives, not its printed materials." Mylan Opp. at 80. Mylan also has no evidence—expert or fact—that raise a genuine issue of material fact on causation. Mylan's damages expert admitted he cannot "quantify the portion of damages attributable to Sanofi's conduct," Varner Opp. at 3 n.2 [ECF 1804], and its marketing expert does not and cannot offer an opinion on "whether Sanofi's

promotional messages were actually false or misleading." Zieziula Opp. at 16 [ECF 1803].

In sum, Mylan has failed to show any genuine issues of material fact that preclude summary judgment on its counterclaims. Mylan now admits that its unfair competition claim falls under New Jersey law, which does not recognize unfair competition claims for false advertising. And fact discovery has shown that Mylan's Lanham Act story was pure fiction; indeed, in its Opposition, Mylan explicitly drops two of its allegations against Sanofi, admitting that "discovery has not shown [them] to be widespread practices," Mylan Opp. at 77 n.320, and implicitly drops another claim by omitting it from its legal brief entirely. As for Mylan's remaining four allegations, Mylan fails to come forward with admissible evidence creating a genuine issue of material fact from which a reasonable jury could find in Mylan's favor. This Court should not waste any more time on Mylan's baseless claims and should grant Sanofi's motion for summary judgment.

## RESPONSE TO MYLAN'S STATEMENT OF ADDITIONAL ALLEGEDLY MATERIAL FACTS IN DISPUTE

Mylan offers additional facts that it claims are material and in genuine dispute, but none of the purported facts meet that standard for the Court's consideration. *See Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 (10th Cir. 2008) ("[T]he 'mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'") (emphasis in original) (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)). The following paragraphs in Mylan's Statement of Additional Material Facts are Undisputed: 167-168, 170, 176.[1]

---

[1] Unless otherwise noted, emphasis is added to cited documents and testimony throughout Sanofi's Reply. "Sanofi MSJ" refers to Sanofi's Memorandum of Law in support of its Motion for Summary Judgment [ECF No. 1692]. "Sanofi 56.1 Stmt." refers to the section in Sanofi's MSJ titled "Statement of Undisputed Material Facts." "Mylan Opp." refers to Mylan's Opposition to Sanofi's MSJ [ECF No. 1813]. "Sanofi Opp." refers to Sanofi's Opposition to Mylan's Motion for Summary Judgment [ECF No. 1814]. "Sanofi Opp. ASMF" refers to the section in Sanofi's Opp. titled "Additional Statement of Material Facts that Mylan Ignores." "Sanofi Opp. RSMF" refers to the section in Sanofi's Opp. titled "Response to Mylan's Statement of Material Facts." "Sanofi Reply" refers to this brief. Unless otherwise stated, "Ex. __" refers to the exhibits appended to the Declaration of Yehudah Buchweitz, dated August 30, 2019, in support of Sanofi's MSJ.

## I.    RELEVANT MARKET

### A.    Prefilled Syringes Are Not Part of the Relevant Market

114.    **Disputed.** Mylan is wrong that Sanofi did not discuss Symjepi in its Motion, since Sanofi addressed pre-filled syringes, and Symjepi is merely one example of a pre-filled syringe.[2] *See* Sanofi 56.1 Stmt. ¶¶ 14-15, 19; Sanofi MSJ at 40-41; *see also* Mylan Opp. Ex. 95 at 1 ("Symjepi is not an EAI."). All of the fact and medical expert testimony makes clear that syringes are not part of the relevant market because they are much harder to administer by caregivers and patients and, thus, are poor substitutes for EAI devices. *See* Sanofi 56.1 Stmt. ¶¶ 14-15, 19. Mylan's contemporaneous documents and testimony show there is neither a genuine nor a material dispute on a pre-filled syringe being a substitute for an EAI from a competition, let alone a medical, standpoint. Mylan's own research concluded that payors believe Symjepi ███████████ ████████ Ex. 153 at slide 4; *Id.* at slides 5-6 ████████████████████ ████████████████████████████████████████ As Mylan's then-President said of the product that ultimately became Symjepi: ████████ ████████████████████████████████ Ex. 154 at -876; *see also* Ex. 153 at slide 3 ████████████████████████ ████████████████████████████ Even Mylan's then-Vice President of Managed Markets explained that it is a ████████████████████████████ ████████████████████████████████████ ████████████ Ex. 155 at -142. Mylan's exhibits are consistent with this view, predicting that ████████████████████████████████ Mylan Opp. Ex. 43. Mylan also misleadingly quotes an internal presentation to claim that ████████████████████████

---

[2] https://www.sandoz.com/news/media-releases/sandoz-extends-symjepi-epinephrine-injection-launch-us-pharmacies-help-improve (press release describing Symjepi as a "single-dose, pre-filled syringe…")



██████████████ Mylan Opp. ¶ 17. The full quote shows that ██████████████████████████ Mylan Opp. Ex. 44. In response to ████████████████████████████████ ██████████ Ex. 156. Mylan's then-Vice President of EpiPen Marketing agreed that the ██████ ████████████████████████ *Id.*

115.    **Disputed.** Mylan's statements about how Symjepi's manufacturer Sandoz "views Symjepi" and the exhibits it cites in support are irrelevant and inadmissible. Moreover, the Sandoz website Mylan cites characterizes Symjepi as a "single-dose, pre-filled syringe," and as discussed above, pre-filled syringes are not part of the U.S. EAI market. *See supra* ¶ 114.[3]

116.    **Disputed.** Mylan's characterization of the cited statement is misleading. Dr. Blaiss admitted in the very next paragraph of his report (which Mylan omitted), "***[I]t is not practical or recommended for a patient to self-administer epinephrine using vials or syringes during anaphylaxis***." *See* Sanofi MSJ Ex. 10 § 5.2.3. Dr. Blaiss also admitted at his deposition that he would only prescribe Symjepi for "select patients" for whom "the risk of having anaphylaxis is . . . virtually zero," and that "patients . . . should have their epinephrine auto-injector with them at all times." *See* Ex. 157 at 157:9-18, 239:18-21.

B.    **Hypothetical Future Non-EAI Products are Not Part of the Relevant Market**

117.    **Disputed.** Any hypothetical, future products that may come to market at a later date have no bearing on the relevant product market in this case, and Mylan has no basis whatsoever to state that any of the products described here "will come to market." Indeed, Mylan knows quite well that hypothetical, planned pharmaceutical products often do not come to fruition, since ██████

████████████████████████████████████████████████████████

████████████████████████████████████     *See* Sanofi 56.1 Stmt. ¶¶ 81-83. And

---

[3] https://www.sandoz.com/news/media-releases/sandoz-extends-symjepi-epinephrine-injection-launch-us-pharmacies-help-improve.

there are other indications that the hypothetical future products Mylan discusses, in particular, will never come to market. The Sanofi document Mylan cites that refers to "intranasal epinephrine" as being in the "preclinical/proof-of-concept" stage of development is from November 2010—nearly nine years ago—yet there is still no intranasal epinephrine on the market. *See* Mylan Opp. Ex. 47 at slides 1, 3. The October 2014 Mylan document ████████████████████████████████ ████████████████████████████████ *See* Mylan Opp. Ex. 96 at slides 1, 8; *see also Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F.Supp.2d 1319, 1345 (S.D. Fla. 2006), *aff'd*, 294 F.App'x 501 (11th Cir. 2008) (noting that "in the drug development and approval process, only one in five thousand compounds that enter preclinical testing make it to human testing, and then only one in five are [sic] approved"). Notably, Mylan does not and cannot cite any internal Sanofi or Mylan business documents that show either party making pricing decisions based on these hypothetical future products, or any evidence that any of these hypothetical, future products created pricing constraints for either Auvi-Q or EpiPen.

118.    **Disputed.** *See supra* ¶ 117.

119.    **Disputed in part.** Sanofi does not dispute that its damages run through 2029. However, Mylan's damages expert Dr. Ordover has no basis to conclude that any hypothetical products will come to market in the future. In fact, Dr. Ordover's sole basis for his opinions regarding hypothetical future products is a couple of website articles. *See* Ex. 158 at 41:16-43:3. Dr. Ordover admitted that he did not speak to anyone at Mylan to corroborate the two sources. *Id.* at 47:7-11, 14-15. Moreover, any opinion concerning hypothetical products that might someday compete with Auvi-Q or other EAI devices has no bearing on the relevant market in this case.

**C.    The Regions in Which Payors Operate Have No Bearing on the Relevant Geographic Market**

120.    **Disputed in part.** While some relatively small payors may operate only in certain

regions of the United States, that is not a genuine issue of material fact that could defeat Sanofi's motion for partial summary judgment. Mylan does not and cannot dispute the overwhelming evidence Sanofi has put forth showing that the United States is the relevant geographic market. *See* Sanofi 56.1 Stmt. ¶ 26-27; Sanofi MSJ at 44-45. Indeed, Mylan explicitly admitted that the relevant geographic market is the United States. *See* Mylan Opp. at 60 n.318. Mylan discusses small regional payors only to make vague and extraneous arguments that "geographic distinctions between Payors cannot be ignored." *Id.* But because Mylan admits that the relevant geographic market is the United States, any facts related to regions in which certain payors operate have no bearing on Sanofi's entitlement to partial summary judgment. *See Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 n.57 (3d Cir. 2016) ("Defendants do not contest Mylan's expert's conclusion that the relevant geographic market is the United States. We therefore focus solely on the product component.").

## II.     MONOPOLY POWER

### A.     Payors' Size Relative to Mylan is Immaterial

121.     **Disputed in part.** The facts regarding payors' and Mylan's size and revenue are immaterial to any claim or defense. Mylan negotiated with payors on a drug-category by drug-category basis, and Mylan derived substantial bargaining power in its EpiPen negotiations with Payors from the lack of competition in the EAI device category. *See* Sanofi MSJ Ex. 57 at 378:16-22 (Mylan national account director Bruce Foster testifying: ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████ ).

122.     **Disputed in part.** It is not clear what Mylan means by the vague and unsupported statement that "Payors in general are highly consolidated."

## B. Payors Did Not "Impose Price Protection" on Mylan

123.    **Disputed in part.** Mylan's generalized assertion that "many Payors" negotiated with Mylan for price protection is misleading and fails to account for the unique U.S. EAI market and Mylan's monopoly power therein. *See* Sanofi Opp. RSMF ¶ 32; Sanofi MSJ Ex. 42 ¶ 125 (citing evidence that ██████████████████████

████████████████████████████████████████████████); Sanofi Opp. Ex. 141 at slide 5; Sanofi Opp. Ex. 14 at 91:16-92:21, 233:1-234:21; Sanofi Opp. Ex. 142 at -481.

124.    **Disputed in part.** Sanofi does not dispute that payors value price protection especially where Mylan significantly increased the WAC price of EpiPen repeatedly before, during, and after Auvi-Q's launch. *See* Sanofi Opp. RSMF ¶ 51; ASMF ¶¶ 19-20; Sanofi MSJ Ex. 42 ¶ 125. However, Mylan mischaracterizes the evidence cited. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████ Sanofi Opp. RSMF ¶ 63.

125.    **Disputed in part.** The evidence shows that █████████████████████████

██████████████████████████████ *See* MSJ Ex. 42 ¶ 165; Sanofi Opp. Ex. 142 at -481 ████

████████████████████████████████████████████████

████████████████████████████; *see also* Ex. 159 at 246:3-9 ████████████████

████████████████████████████████████████████████

████████████████████████████████.

## C. Payors Did Not Seriously Threaten to Exclude EpiPen

126.    **Disputed in part.** Mylan's assertions regarding Auvi-Q securing exclusive coverage on a few formularies are misleading. Mylan omits important context of Mylan having excluded Auvi-Q from critical access to the U.S. EAI market during 2013 and 2014, and contrary evidence demonstrating Mylan's deep exclusionary rebates undermined payors' ability to cover



Auvi-Q despite payors believing Auvi-Q was the best EAI drug device for its members. *See, e.g.*, Sanofi MSJ Ex. 151 ¶¶ 79-81 ███████████████████████████████████████ ████████████████████████████ Sanofi Opp. RSMF ¶ 131.

127.   **Disputed in part.** Mylan's assertion regarding various negotiations with Payors is unsupported by the evidence cited. For example, Sanofi disputes that ████████████████ ████████████████████████████████████████████ The record provides other evidence of MedImpact's decision, including that it told Sanofi that its decision was based on "the potential for disruption" and "observation of market adoption rates." *See* Sanofi Opp. RSMF ¶ 104; Sanofi Opp. Ex. 174 at -551.

128.   **Disputed in part.** Mylan mischaracterizes the evidence cited to support its statement that ████████████████████████████████████████████ *See supra* ¶ 124; *see* Sanofi Opp. RSMF ¶ 63. Mylan omits that while ██████████████ ████████████████████████████████████████████████ ██████████ Sanofi Opp. RSMF ¶ 130. Mylan also omits that CVS's ACF and Value formularies were "very small," and together comprised only about 5 percent of the lives that CVS covered. *See* Ex. 160 at 324:4-7, 327:17-328:6; *see* Sanofi MSJ Ex. 151 ¶¶ 82-87.

**D.   Sanofi Did Not Change its Auvi-Q Contracting Strategy in 2015**

129.   **Disputed in part.** Mylan's assertion that Sanofi "changed tactics" is misleading. Sanofi's plan for Auvi-Q was always to secure insurance coverage with the largest payors in the United States. *See* Sanofi Opp. Ex. 184. Mylan also ignores evidence demonstrating it increased Sanofi's costs by offering deep, unprecedented rebates to payors conditioned on their exclusion of Auvi-Q from insurance coverage. *See, e.g.*, Sanofi Opp. Ex. 185 at -009. Mylan understood that its EpiPen market share and volume meant payors could not forego the exorbitant rebate dollars that Mylan was offering to exclude Auvi-Q from formulary. *See* Sanofi Opp. RSMF ¶ 114; Sanofi

MSJ Ex. 42 ¶¶ 76-82; Sanofi Opp. Ex. 183 at 64-66 

. Further, Mylan's assertion that Auvi-Q was not excluded when Sanofi offered a lower per-unit price for Auvi-Q than Mylan did for EpiPen is misleading. As explained by Dr. Scott Morton, given EpiPen's entrenched demand,

Sanofi Opp. RSMF ¶ 69; Sanofi Opp. Ex. 137 at 154; Sanofi MSJ Ex. 42 ¶ 118. Instead, PBMs and payors considered their total cost for purchasing across all of their EAI drug device volume. *See* Sanofi Opp. at 68. Moreover, there are several instances in the record where, compared with Mylan, Sanofi offered ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, and Auvi-Q still remained disadvantaged. Sanofi Opp. at 68-69.

## III. SANOFI'S MARKETING OF AUVI-Q

### A. Sanofi's Truthful Advertising

130. **Disputed.** Mylan's statement that Sanofi's goal was to "Steal Share From EpiPen" is belied by the very first document that it cites: Mylan's Exhibit 75, a Sanofi "EAI Brand Plan" created prior to Auvi-Q's launch, shows that Sanofi's "Strategic Goals" were to "Grow [the] Market" and to focus on "New Starts," or first-time EAI device patients. *See id.* at slide 38. Other "Pillars" of Sanofi's strategy included "[elevating] the level of knowledge and awareness about anaphylaxis among patients, caregivers and general public," and "[allowing] broader access to needed medication." *Id.* at slide 38-39. Mylan also mischaracterized its Exhibit 36, which identifies multiple sources of business, including new starts and market expansion. *See id.* at slide 33.

131.     **Disputed in part.** Sanofi does not dispute that it prepared a "Launch Readiness Review" presentation and an "EAI brand plan" prior to launching Auvi-Q. Sanofi also does not dispute that two large patient surveys suggested that "most patients do not carry their epinephrine auto-injectors as recommended" and that "63% of caregivers of children at risk worry that others will not know how to use their child's epinephrine auto-injectors." Mylan Opp. Ex. 76 at slide 9; *see also* Sanofi MSJ Ex. 15 at 419:7-12 (admitting that there was "data to support" the "true statement" that "patients don't always carry their EAI devices as recommended"). Indeed, Mylan Mylan admits that it "has not challenged" Dr. Michelis's opinion "that patients do not always carry their EAI devices." *See* Reply is Support of Motion to Exclude Opinion Testimony of Dr. Michelis [ECF No. 1865]. However, Sanofi disputes Mylan's contentions about Sanofi's intentions with respect to that information, which are purely speculative and unsupported by its cited exhibits.

132.     **Disputed in part.** Mylan's assertion that Anne Whitaker claimed Auvi-Q was more "patient-friendly" than EpiPen is incorrect. The Bloomberg article Mylan cites does not quote Ms. Whitaker, *see* Mylan Opp. Ex. 114; rather, as Mylan's purported pharmaceutical industry expert admitted, the "patient-friendly" quote in the article is a reporter's paraphrase or summary of an interview with Ms. Whitaker, and he has never seen any evidence that Ms. Whitaker made that statement. *See* Ex. 161 at 258:20-265:16. Mylan had Ms. Whitaker in a deposition and chose not to ask her about this. Sanofi does not dispute that its January 28, 2013 press release contains the quoted statements, but disputes Mylan's characterizations to the extent Mylan incorrectly suggests they are false and misleading.

133.     **Disputed in part.** Mylan's characterization of Sanofi's sales force visits as "critical to Auvi-Q's success" is immaterial to Mylan's claims.

134.     **Disputed in part.** Sanofi disputes Mylan's characterizations of that chart and the

Sanofi EAI Brand Plan slide deck as representing ████████ which Sanofi ████████ ████████████████████████████████████

135.    **Disputed in part.** Sanofi disputes Mylan's erroneous assertion that Sanofi's "study could not support [comparative] claims," since, contrary to Mylan's assertion, the preference study did suggest that Auvi-Q was "easier to use," "easier to carry," and that patients were "more likely to carry," and find it "easier to follow instructions" compared to EpiPen.

136.    **Disputed in part.** Contrary to Mylan's contention, at the time of Auvi-Q's launch, clinical data existed that showed Auvi-Q was easier to carry than EpiPen, easier to use, and/or that patients would be more likely to carry it, though the clinical data were not published until shortly after Auvi-Q's launch. *See* Sanofi MSJ Ex. 125; *see also see also* Sanofi Opp. Ex. 164 at slide 34. Furthermore, the anecdotal evidence that Mylan intends to offer through its allergist expert Dr. Blaiss, that Dr. Blaiss saw "just as many patients not carry their Auvi-Q to follow-up visits with [him] as any other epinephrine autoinjectors" cannot raise a genuine issue of material fact.

137.    **Disputed in part.** Mr. Parker testified that, in his opinion, ██████████ ████████████████████████████████████ ██████████████████████████████████ but he did not ████████████████████████████████████ ██████████ as Mylan wrongly asserts. *See* Mylan Opp. Ex. 13 at 65:11-19. Keith Wade, who is not a sales representative, testified that in his discussion with a payor he ████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████  *See* Mylan Opp. Ex. 17 at 72:10-73:3.

138.     **Disputed.** Sanofi disputes Mylan's contentions that its advertising campaign was in any way "false and misleading" or that its claims were "unsubstantiated"—which are legal conclusions, not factual allegations. There is no dispute that "at-risk patients do not always carry an epinephrine auto-injector," nor is there any dispute that Auvi-Q is a smaller size than the EpiPen.; Sanofi 56.1 Stmt. ¶¶ 71, 75; Ex. 162 at 14, 17-18 (undisputed). Sanofi also disputes Mylan's claim that Sanofi's sales force made any false or challenged statements, let alone on a "widespread basis," and the internal Sanofi message recall tracker studies that Mylan cites are not surveys prepared for litigation and are based on unreliable aided recall (*i.e.*, physicians are presented with a number of statements and asked which ones they recall a sales representative making) from unreliably small sample sizes. *See* Mylan Opp. Ex. 29 ¶¶ 35-40.

139.     **Disputed in part.** Sanofi disputes Mylan's characterization of its "Wave 2" message recall study in October 2013. The internal market research does not "reveal[] the extent of comparative claims recalled by physicians." This market research ████████████████ ████████████████, and Mylan exacerbates this issue by presenting only a small, cherry-picked and unrepresentative subset of the data. *See* Mylan Opp. Ex. 29 ¶¶ 35-40.

140.     **Disputed in part.** Mylan's characterization of ████████████████ ████████████████████████████████ is unsupported by its cited exhibit and immaterial to Mylan's claims.

141.     **Disputed in part.** Whether Sanofi considered message recall studies to be ████ ██████████ is immaterial to Mylan's claims.

142.     **Disputed in part.** Sanofi disputes Mylan's contention that ATU market research can be used to track "message recall from sales force visits" with any statistical reliability. As Sanofi's pharmaceutical industry expert Eduardo Schur explained, ATU studies are "more

directional in nature." *See* Mylan Opp. Ex. 29 ¶ 33. Pharmaceutical companies do not typically derive "clear conclusions" from them, and they do not "assist pharmaceutical companies in determining successful messaging for a product." *See id.*

143. **Disputed in part.** Sanofi disputes Mylan's characterization of the ATU Research Report presentation, which analyzes how physicians recalled that both Sanofi *and* Mylan sales representatives were marketing their respective EAI products. *See* Mylan Opp. Ex. 128 at slide 7. The presentation shows that, ███████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████ *Id.*



Likewise, Sanofi disputes Mylan's characterization and selective quotation of Auvi-Q brand lead Bryan Downey's statement, which in its entirety reads, ████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████ *See* Mylan Opp. Ex. 136 at slide 3. All the ATUs demonstrate is that a ███████████████████████████████

██████████████████████████████████████; they do not specify what type of comparison

13

made, nor that it was false.

144.   **Disputed in part.** Sanofi does not dispute that the 99-page June 18, 2014 physician ATU tracking market research Mylan cites contains the statements Mylan has selectively quoted, along with myriad other statements, including that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████ Mylan Opp. Ex. 130 at Slide 40. However, Sanofi disputes Mylan's contention that any of Sanofi's statements are false or misleading, as well as the contention that ATU tracking market research reports can raise a genuine issue of material fact, because the results of the ATUs cannot be extrapolated to present meaningful or statistically significant data regarding Sanofi's promotional practices at large and are mostly based on unreliable aided recall.

145.   **Disputed in part.** Sanofi does not dispute that the 2015 physician ATU tracking market research Mylan cites contains the statements Mylan has selectively quoted, along with myriad other statements, including that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████ *See* Mylan Opp. Ex. 138 at slide 77. However, Sanofi disputes Mylan's contention that any of Sanofi's statements are false or misleading, as well as the contention that ATU tracking market research reports can raise a genuine issue of material fact, because the results of the ATUs cannot be extrapolated to present meaningful or statistically significant data regarding Sanofi's promotional practices at large and they are mostly based on unreliable aided recall.

146.   **Disputed in part.** Sanofi does not dispute that the exhibits Mylan cites contain the statements Mylan has selectively quoted, along with myriad other statements, including ████████



Mylan Opp. Ex. 146. Sanofi disputes Mylan's contention that any of Sanofi's statements are false or misleading, as well as the contention that the Brand Impact reports can raise a genuine issue of material fact because the results of the Brand Impact market research cannot be extrapolated to present meaningful or statistically significant data on Sanofi's promotional practices at large and are mostly based on unreliable aided recall.

147. **Disputed in part.** Sanofi disputes that the ATU research cited ███████ ███████████████████ Sanofi disputes the materiality of each quoted statement. For example, the presentation that Mylan selectively excerpted to create its Ex. 113 shows that ██████████████████████████ *See* Ex. 163 at slide 60. This same deck also notes, ████████ ████████████ *Id.* at slide 51. Sanofi further disputes Mylan's contention that any of Sanofi's statements are false or misleading, as well as the contention that ATU market research reports can raise a genuine issue of material fact, because the results of the ATUs cannot be used to present meaningful or statistically significant data on Sanofi's promotional practices at large and they are mostly based on unreliable aided recall.

148. **Disputed in part.** Sanofi does not dispute that a single sales representative on one occasion left a handwritten note in a physician's office—without the knowledge or approval of Sanofi and in violation of Sanofi's company policy—stating that "[t]he overwhelming majority of patients…prefer Auvi-Q as evidenced by clinical experience and peer reviewed surveys." Sanofi also does not dispute that it ████████████████████

███████████████████████████████████████████████████████████

████████ Sanofi does dispute, and no evidence demonstrates, that there were any "similar notes" and that any of its sales representatives made "false representations," orally or otherwise.

149.    **Disputed in part.** Sanofi disputes Mylan's characterization of these quoted statements as "[v]ariations of the same phrase used on the handwritten note," that internal documents are in any way analogous to communications by sales reps to doctors, and that the phrases are false or misleading.

150.    **Disputed.** Sanofi disputes Mylan's characterization of statements by Sanofi sales representative as "false and improper comparative claims." Furthermore, even though Sanofi was unable to verify reports that Sanofi sales representatives left handwritten notes in medical offices, Sanofi ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████ *See* Sanofi MSJ Ex. 134 at -136. Sanofi █████████████████████████████

███████████████████████████████████████████████████████████

███████ *See* Mylan Opp. Ex. 29 ¶¶ 21-23; *see also* Sanofi MSJ Ex. 132 at -245.

151.    **Disputed in part.** Sanofi disputes the accuracy and admissibility of Mr. Zieziula's opinions and that Mr. Zieziula is qualified to testify as an expert in this case. *See* ECF No. 1669.

152.    **Disputed in part.** Sanofi disputes that Horizon made its decision to cover Auvi-Q as a preferred product "based on Sanofi's preference study." In fact, Horizon's corporate representative testified that █████████████████████████████████████████████

███████████████████████████████████████████████████████████

16

█████████ *See* Mylan Opp. Ex. 10 at 114. Sanofi further disputes that any elements of the preference study were unsupported or were "deemed unsupported" by FDA.

### B. It is True That Auvi-Q is The Only EAI Device With Needlestick Protection

153.    **Undisputed.** Sanofi does not dispute that its "'I talk' advertisement truthfully stated that Auvi-Q is the 'first and only EAI with…retractable needle mechanism designed to help prevent accidental needle sticks," or that Sanofi widely disseminated that advertisement.

154.    **Disputed in part.** Sanofi disputes Mylan's assertion that the "I talk" advertisement, which truthfully states that Auvi-Q is the "first and only EAI with…***retractable needle mechanism*** designed to help prevent accidental needle sticks" necessarily means that Auvi-Q is the only EAI device with "***needle stick protection***." The EpiPen does not have a retractable needle, though it does have a ***needle cover***. *See* Counterclaim Compl. ¶ 52; Ex. 162 at 16:19-17:21.

155.    **Disputed in part.** Whether Auvi-Q's retractable needle made accidental needlesticks or lacerations less likely than EpiPen's design is immaterial because Sanofi never made that claim, expressly or implicitly.

### C. After So Many Years As A Monopolist, Mylan Cannot Complain That Its EpiPen Became Synonymous With the U.S. EAI Market

156.    **Disputed**. Mylan's Ex. 159 does not support its claims that ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

157.    **Disputed in part.** Sanofi does not dispute that Mylan listed Jhade Alcorn and Brynna Hartneck on its initial disclosures but does dispute Mylan's assertion that Hartneck's declaration stated that a Sanofi sales representative stated that Auvi-Q was the "new EpiPen," as Mylan neglects to provide the precise quotation: "the new ***up-and-coming*** EpiPen." Mylan Opp., Ex. 160 at -798. Mylan likewise selectively quotes from Alcorn's declaration concerning what the Sanofi sales representative stated, as the more accurate quotation reads, Auvi-Q "was going to be

*like the new* EpiPen." Mylan Opp. Ex. 160 at -800.

158. **Disputed in part.** Sanofi does not dispute that the opinions of Dr. Blaiss or Mr. Zieziula will, if not excluded as a result of Sanofi's *Daubert* motion, be as Mylan quotes them, but disputes the accuracy and admissibility of those opinions, and further disputes that Mr. Zieziula is qualified to testify as an expert on this point or in this case. *See* ECF No. 1669.

159. **Disputed.** Sanofi disputes that Mylan Brand Impact verbatims did or could

████████████████████████████████████████████████

████████████████████████ Mylan's Opp. Ex. 163 is a 5-page document with no indication of who authored it or the source for the list of statements under "field feedback." Mylan Opp. Ex. 163 provides no indication whatsoever that physicians recalled Sanofi sales representatives making these statements. Sanofi further disputes that any such statements are material or admissible.

160. **Disputed.** Sanofi disputes that its messaging and promotional efforts for Auvi-Q made any statements or suggested that Auvi-Q is the "new EpiPen" or the "talking EpiPen." None of the documents Mylan cites give any indication of the source for the statements and there is no evidence that the statements were made or that they were made by Sanofi sales representatives.

161. **Disputed.** Sanofi does not dispute that Mr. Zieziula's written opinions will, if not excluded as a result of Sanofi's *Daubert* motion, be as Mylan quotes them, but disputes that Sanofi had any messaging about the "new EpiPen" and that any alleged messaging was "widespread." Sanofi further disputes the materiality of those opinions, and that Mr. Zieziula is qualified to testify as an expert on those points or in this case. *See* ECF No. 1669.

162. **Disputed.** Sanofi does not dispute that Mr. Zieziula's written opinions will, if not excluded as a result of Sanofi's *Daubert* motion, be as Mylan quotes them, but disputes that "Sanofi was promoting Auvi-Q as the 'new EpiPen.'" The "widespread" reports that Mylan cites

consist of: Mylan corporate representative Jay York paraphrasing what an unnamed regional director or manager allegedly told him an unidentified Mylan sales rep allegedly heard an unnamed physician say (Mylan Opp. Ex. 20 at 161); declarations from employees of one clinic in Scottsdale, Arizona, describing what one unidentified Sanofi sales rep allegedly told them on a single occasion in January 2013 (Mylan Opp. Ex. 160 at -798-801); a business card allegedly left at a physician's office bearing the handwritten words "new epipen," although Mylan admitted that it doesn't know whether handwritten words were written by a Sanofi sales rep or someone at the physician's office (Mylan Opp. Ex. 160 at -803); a declaration from a nurse in California, which Mylan misquotes to claim that the nurse heard a "new EpiPen" message, when in fact the declaration describes a conversation the nurse allegedly had with a Sanofi sales rep, whom she was unable to name, who allegedly called Auvi-Q the "talking EpiPen" during a single conversation in April 2013 (Mylan Opp. Ex. 166); and a Mylan sales rep's email to her boss summarizing what a Sanofi sales rep allegedly told nurses at a meeting the Mylan sales rep did not attend (Mylan Opp. Ex. 167). Sanofi further disputes the accuracy, materiality, and admissibility of Mr. Zieziula's opinions, and that Mr. Zieziula is qualified to testify on these points or as an expert in this case. *See* ECF No. 1669.

163.    **Disputed in part.** Sanofi disputes any implication that its use of certain terms to trigger Auvi-Q search engine ads was in any way misleading or improper. Sanofi's pharmaceutical industry expert Eduardo Schur explained that the "use of key terms to fuel search engine optimization is extremely common in marketing within the pharmaceutical industry." Mylan Opp. Ex. 29 ¶¶ 26-30. Pharmaceutical companies use search terms to target advertising messages to consumers who would be interested in their products, and often use search terms that include the brand name of competitors to target the correct audience. *Id.* This advertising is common in the industry, and ███████████████████. *Id.* at 29. For example, ████████████████████████

████████████████████████████████████████   *Id.*

164.    **Disputed in part.** Sanofi disputes that it "suggest[ed] that the FDA had deemed the products 'therapeutic equivalents.'" The documents cited by Mylan do not include the term "therapeutic equivalence." In fact, Mylan has admitted that it has no documentary evidence to support its allegation that Sanofi made statements that "the EpiPen Auto-Injector and Auvi-Q are therapeutically equivalent or interchangeable." *See* Sanofi MSJ Ex. 137 at 9:17-25 ("Q. Are there any documents relating to Mylan's claims that Sanofi claimed that EpiPen and AUVI-Q are interchangeable? A. Not…to my knowledge. Q. …[D]oes Mylan have any e-mails or reporting forms reporting on these incidents? A. Specifically on the bioequivalence and therapeutic equivalence, not to my knowledge."). In any event, Mylan's medical and pharmaceutical industry experts testified that the products are equivalent. *See* Sanofi 56.1 Stmt. ¶ 105. Sanofi does not dispute that it made changes to Auvi-Q's website from time to time, but disputes that any changes were made as a result of a complaint Mylan made to FDA.

165.    **Disputed.** Sanofi disputes Mylan's contention that there was any need to instruct its sales force to stop doing something that there is no evidence the sales force ever did.

> **D.    The Success of Sanofi's Truthful Advertising Is Not Actionable Even If Sanofi's Success Was At the Expense of Mylan's Market Share**

166.    **Disputed.** Sanofi disputes that its "sales force detailing campaign" contained any "false and misleading messages" whatsoever.

169.    **Disputed in part.** Sanofi does not dispute that the 108-page August 12, 2013 Auvi-Q Launch Tracker document that Mylan cites contains the statements that Mylan has selectively quoted, along with myriad other statements. However, Sanofi disputes that these statements could establish a genuine issue of material fact in this case.

171.    **Disputed in part.** Sanofi does not dispute the quoted statement in Mylan Opp. Ex.

127 on slide 53 of an 83-slide deck, but disputes that any Auvi-Q messages are false or misleading.

172. **Disputed.** Sanofi disputes Mylan's reductive and erroneous mischaracterizations of Dr. Wiggins's opinions and testimony. Dr. Wiggins opined that a comparison between Sanofi's and Mylan's pre-launch Auvi-Q sales forecasts and Auvi-Q's actual sales indicated that any alleged conduct by Sanofi had no impact on Auvi-Q sales. *See* Mylan Opp. Ex. 30 ¶ 77. Dr. Wiggins did not opine that if Auvi-Q's actual share exceeded Sanofi's forecast, that would be evidence that Mylan was injured by Sanofi. Dr. Wiggins's deposition testimony flatly contradicts Mylan's assertion. *See* Mylan Opp. Ex. 19 at 32:24-33:7 ("Q. If there was a period of time where [Auvi-Q's] share…was higher than the share in the forecast, would that demonstrate that there had been an impact from Sanofi's -- alleged conduct by Sanofi?...A. There was a period of time, and no, it would not."). Sanofi further disputes that Mylan's interpretation of Sanofi's expert's opinions raises a genuine issue of material fact.

173. **Disputed.** Sanofi disputes Mylan's mischaracterization of Dr. Wiggin's testimony. Dr. Wiggins specifically rejected the notion that the period of time where Auvi-Q's share was higher than the parties forecasted was evidence that Sanofi's conduct injured Mylan. Dr. Wiggins testified that ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* Mylan Opp. Ex. 19 at 32-37. In Dr. Wiggins's opinion, this ██████████████████████████ is not evidence that Sanofi's alleged conduct had any impact on Auvi-Q's sales. *Id.* Sanofi further disputes that Mylan's interpretation of Sanofi's expert's opinions raises a genuine issue of material fact.

174. **Disputed.** Sanofi disputes Mylan's erroneous assertion that Dr. "Wiggins's methodology also shows that Sanofi's conduct injured Mylan because Auvi-Q's shares at Horizon

and Michigan…exceeded the forecasts by greater amounts and for longer periods than Auvi-Q's national share." Dr. Wiggins testified to the contrary: "us[ing] the University of Michigan and Horizon Blue Cross…, [] there is still no evidence that sales were increased as a result of the allegedly false and misleading statements." Mylan Opp. Ex. 19 at 106:10-15. Moreover, Mylan misapplies Dr. Wiggin's methodology by inappropriately relying on Auvi-Q's actual shares at individual plans, Horizon and Michigan, as opposed to its actual market share across all plans. It then compares these shares to Mylan's and Sanofi's pre-launch forecasts for Auvi-Q, even though Mylan has not, and cannot, represent that Dr. Wiggins advocated for this improper application of his methodology. Sanofi further disputes that Mylan's interpretation of Sanofi's expert's opinions can raise a genuine issue of material fact.

175.    **Disputed in part.** Sanofi does not dispute that the 2014 ATU reports Mylan cites contain the statements Mylan has selectively quoted, along with many others, including that

███████████████████████████████████████████████████

███████████████████████████████ Mylan Opp. Ex. 130 at 39-40. Sanofi disputes Mylan's contention that any of Sanofi's statements are false or misleading, as well as the contention that the cited ATU reports can raise a genuine issue of material fact, because the results of the ATU market research cannot be extrapolated to present meaningful or statistically significant data regarding Sanofi's promotional practices at large and are largely based on unreliable aided recall.

### SANOFI DISPUTES MYLAN'S RESPONSES TO SANOFI'S STATEMENT OF MATERIAL FACTS

Sanofi also disputes Mylan's responses to Sanofi's Statement of Material Facts.

9.    There is no genuine dispute that Benadryl is outside the relevant market. Benadryl and antihistamines are neither indicated nor approved to treat anaphylaxis, and there is no substitute for epinephrine to treat anaphylaxis. *See* Sanofi 56.1 Stmt. ¶¶ 8-9; Sanofi MSJ Ex. 2 at

No. 2  Sanofi MSJ Ex. 10 § 5.4.

36 and 41.     As Mylan's fact and expert witnesses admitted, several EAIs (besides Auvi-Q) launched over the years, but they never gained much traction or share of the EAI market. Sanofi 56.1 Stmt. ¶ 41; Sanofi MSJ Ex. 67 at -366 ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Sanofi MSJ Ex. 68 at 314:3-5 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Sanofi MSJ Ex. 10 § 5.1.7 ("I never prescribed the Twinject due to the fact that the second dose uses a syringe and needle, which I felt was too difficult for patients to use during a life-threatening anaphylactic reaction.").

38.     Mylan's statement that Sanofi's highest percentage of foreclosure was 31% is false. Sanofi Opp. at 78-79 ("***Sanofi was foreclosed from*** ▮▮▮▮—the percentage of EpiPen's non-contestable or entrenched demand.").

42.     There is no genuine dispute that patient safety concerns arise when EAI devices are substituted. Mylan Specialty President Roger Graham submitted a sworn statement to a court of law in support of a preliminary injunction by Mylan that Mylan would "experience harm to its reputation and loss of goodwill among patients and medical professionals" if EpiPen were removed from the 'preferred' category of EAI therapeutic class. Sanofi 56.1 Stmt. ¶ 25.

43.     There is no genuine dispute that Mylan raised the price of EpiPen by over 500%. Mylan's objections to using EpiPen's list price do not create a genuine dispute of fact.

45.     There is no genuine dispute that Mylan raised EpiPen's price in anticipation of Auvi-Q's launch so that Mylan could offer higher rebates to payors conditioned on excluding

Auvi-Q from their formularies. Mylan implemented three increases in 2012 when it had nearly 100% market share. *See Sanofi* 56.1 Stmt. ¶¶ 29-30, 45; Sanofi MSJ Ex. 72 at slide 6 (showing EpiPen's historical price increases); Sanofi MSJ Ex. 73 at 53:3–54:16 

46.     Mylan's use of ███████████████████████████████████ ████████████████████████ does not create a genuine dispute that Mylan's net price rose on average from 2013 to 2016. Similarly, Mylan's statement that net price varied from payor to payor does not create a genuine dispute that in aggregate, EpiPen's net price rose from 2013 to 2016, always remaining above pre-2013 levels. *See* Sanofi MSJ Ex. 42 ¶ 87.

51.     Mylan's statement that its ███████████████████████████████ ██████ does not create a genuine dispute that its revenues and profits rose on average from 2009 to 2016. *See* Sanofi MSJ Ex. 80.

52.     Mylan's statement that its gross profit margins on EpiPen fell slightly in 2015 does not create a genuine dispute that its gross profit margins on EpiPen rose on average from 2010 to 2016. *See* Sanofi MSJ Ex. 80.

53.     Mylan's statement that its profitability fell slightly from in 2015 does not create a genuine dispute that its profitability increased on average from 2010 to 2016. Sanofi MSJ Ex. 80.

55.     Mylan has no evidence to support its claim that ██████████████████ ██████ other than Bruce Foster's email stating ████████████████████████ ██████████████████████████████████████████████████████ Sanofi MSJ Ex. 83 at -597. This document does not create a genuine dispute of material fact.

69.     By disputing that Mylan ████████████████████████ Mylan is disputing Bruce Foster, its own witness's testimony. Sanofi MSJ Ex. 57 at 75:15-78:17.

## SANOFI'S MOTION FOR SUMMARY JUDGMENT

I.   **THE RELEVANT MARKET IS INDISPUTABLY U.S. EAI DRUG DEVICES**

Mylan admits material undisputed facts (as it must) that compel this Court to define the relevant market as EAI drug devices in the United States. Mylan admits that:

1. Antihistamines do not treat anaphylaxis; only epinephrine does. Mylan Opp. ¶¶ 8-9.

2. Vials and pre-filled syringes of epinephrine are impractical and only appropriate in "certain situations" like "medical offices, hospitals, and other institutional settings." *Id.* ¶¶ 14-15.

3. Mylan considered the price of EAI drug devices in setting EpiPen's price and regularly measured and tracked EpiPen's market share of EAI drug devices only. *Id.* ¶¶ 18-19.

4. Mylan's internal business documents reference the "U.S. EAI Market," and its public filings reference the "defined auto-injector market." *Id.* ¶ 17; Sanofi 56.1 Stmt. ¶ 16.

5. "[T]he relevant geographic market is the United States." Mylan Opp. at 60 n.318.

Further, it is undisputed that "Mylan's economic expert, Professor Robert Willig, did not propose **an alternative relevant market definition** besides the U.S. EAI drug device market." Sanofi 56.1 Stmt. ¶ 23. Dr. Willig did not even contend in his expert report that Benadryl, vials, pre-filled syringes, or any supposed future products should be in the market.[4]

### A.   A Different Drug that Could Lead to Death is Not a Reasonable Substitute

Mylan's argument that Benadryl is in the relevant market flies in the face of any interpretation of a reasonably interchangeable substitute. Mylan concedes that products in the same market must be used "*for the same purposes*." Mylan Opp. at 53 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc)). But Benadryl is an over-the-counter antihistamine drug launched in 1946 for minor allergies. *Id.* ¶¶ 9, 37. It is undisputed that Benadryl **does not treat anaphylaxis**, which is the purpose of EAIs. Mylan's own medical expert, Dr. Blaiss, explained, ███████████████████████████████████████████████████████████

---

[4] Mylan wrongly suggests that Dr. Willig analyzed the relevant market in this case, Mylan Opp. at ¶ 4, but he merely summarized Dr. Scott Morton's analysis of why other products are not viable substitutes. *See* Mylan Opp. Ex. 31 ¶ 307. In the blocked Anthem/Cigna merger, the court criticized Dr. Willig's opinion as contrary to his client's internal business documents. *See* Sanofi MSJ at 48 n.5. Given that ruling and Mylan's own documents repeatedly referencing the U.S. EAI market, Dr. Willig could not contest the market definition here.

██████████████████████████████████████████████████████████

████████████████████████ Sanofi MSJ Ex. 10 § 5.4. That is why—as Mylan concedes—FDA has not approved Benadryl for anaphylaxis, Mylan Opp. at ¶ 9, and why the medical community crusades against its use. Mylan contends that Sanofi "has focused on what *it believes* patients and physicians should have done[.]" *Id.* at 54 (emphasis added). But Sanofi is not FDA or the medical community, and Sanofi did not draft the warning on Mylan's website on the dangers of using antihistamines to treat anaphylaxis. *See* Sanofi 56.1 Stmt. ¶ 9.

Mylan's argument that the market includes a drug that *may lead to death* if taken during anaphylaxis is unfounded. Mylan cites no case defining the market to include an ineffective drug because some uninformed individuals allegedly take it against medical advice. Instead, courts define the market by drugs "*approved by the FDA* as *safe and effective* for the treatment" of a condition. *FTC v. AbbVie,* 329 F.Supp.3d 98, 131 (E.D. Pa. 2018) (emphasis added); *see also Mylan,* 838 F.3d 421 at 436 (finding reasonable substitutes where each drug had "similar effectiveness" and the "FDA ha[d] approved virtually identical labeling"). Mylan admits that nothing—including Benadryl—"should be substituted for epinephrine to treat anaphylaxis" because there are no other effective treatments. Mylan Opp. ¶ 8. When asked, Mylan's CEO Heather Bresch, expressly agreed that ████████████████████████████████████████ ███████████████████ Sanofi MSJ Ex. 13 at 246:18-23. There is no genuine dispute that Benadryl has a different function than EAIs and is outside of the relevant market.

## B.     Vials or Syringes Are Impractical and Inappropriate for Children and Adults

Next, Mylan's attempt to include vials and pre-filled syringes in the market simply because they *can* treat anaphylaxis falls flat. Mylan Opp. at 54-55. "Consistent with the bulk of the case law, something *more* than mere therapeutic equivalency is required to define the relevant antitrust product market." *United Food & Comm. Workers Local 1776 v. Teikoku Pharma USA*, 296

F.Supp.3d 1142, 1171 (N.D. Cal. 2017). Mylan cites *Telecor Commcn's, Inc. v. Sw. Bell Tel. Co.*
to claim that products in the same market can have differences. Mylan Opp. at 55. But there, the
Tenth Circuit explained that "the relevant inquiry remains whether the differences in type render
the products ***poor substitutes***." 305 F.3d 1124, 1132, 37 (10th Cir. 2002) (emphasis added)
(excluding poor substitutes despite similar functions). Mylan's documents provide irrefutable
evidence that ████████████████████████████████████████

████████████████████████████████████████████

██████████████████ Ex. 153 at 6. ████████████████████

████████████████████████████████████ *Id.* at 4.

Indeed, Mylan concedes "that syringes and vials are used for the treatment of anaphylaxis
***in hospitals and other institutional settings***." Mylan Opp. at 55. But this is a tiny fraction of
EpiPen's customers. *See* Sanofi MSJ Ex. 10 § 5.2.3. EAIs are predominantly carried and used by
adults and children outside of a controlled medical setting. *See* Sanofi MSJ Ex. 16 ¶ 24. Similarly
with Symjepi, ████████████████████████████████████
████ —again, hospitals and clinics. Ex. 153 at 3. Mylan does not even argue that vials or pre-
filled syringes are appropriate for the majority of patients, including children, who carry EAIs.
Instead, Mylan's Vice President of Managed Markets recognized that payors ████████
████████████████████████████ Ex. 155 at -142.

In the pharmaceutical context, courts frequently exclude products from the same market
even though they treat the same condition.[5] The court in *AbbVie,* for example, excluded injectable
drugs that contained the same active ingredient and were FDA-approved to treat the same

---

[5] *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1064 (3d Cir. 1978) (finding a class of antibiotics to be a separate market despite some interchangeability); *F.T.C. v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) (affirming exclusion of two functionally similar drugs from relevant market); *Geneva Pharm. Tech. Corp. v. Barr Lab Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (bioequivalent, functionally-interchangeable drugs were in separate markets).

27

condition but had a different method of administration. 329 F.Supp.3d at 133. The court noted AbbVie's internal documents found these injectables to appeal to a different "patient type"—just as Symjepi and pre-filled syringes do here. The court highlighted that "AbbVie documents show that while the company tracked injectable sales, it did not consider injectables as direct competition." *Id.* Here, Mylan's documents explicitly conclude that ███████████████████ ███████████████████████████ Ex. 154 at -876. Given the uncontroverted evidence in Mylan's files showing that vials and pre-filled syringes (including Symjepi) are poor substitutes for EAIs, there can be no genuine dispute that they are in separate product markets.

### C.    Mylan Does Not Like the Results of the Hypothetical Monopolist Test

The results of the hypothetical monopolist test—or in this case the real-world monopolist test—show that Mylan profitably increased EpiPen's price by **_over 500%_** without losing sales to antihistamines, vials, or pre-filled syringes. *See* Sanofi MSJ at 41-42. Unhappy with the results confirming these products did not constrain EpiPen's price, Mylan now argues that the test should not apply or that it was wrongly applied. Mylan Opp. at 56-58. Both contentions are false.

First, Mylan relies on cases that rejected the test because it was applied incorrectly to a narrow market **_and_** because the low price of the generic copy distorted the results. Mylan Opp. at 57; *see Mylan*, 838 F.3d at 436 (rejecting Mylan's narrow market definition); *AbbVie*, 329 F.Supp.3d at 130 (same). Sanofi makes no such argument here, and Auvi-Q is not a generic.

Next, Mylan mischaracterizes Sanofi's application to claim that it was performed on an EpiPen-only market. Mylan Opp. at 59. That is false and reflects a basic misunderstanding of the test. The test "begins with a narrower set of products…and asks whether a hypothetical monopolist selling those products could impose a small but significant non-transitory increase in price… without losing too many sales to make the price increase unprofitable." *AbbVie*, 329 F.Supp.3d at 129. If not, because the price increase caused patients to turn to other substitutes, then the market

includes those substitutes. *Id.* Here, Sanofi's test assumed that all EAIs are the "narrower set of products"—not EpiPen as Mylan claims. Mylan Opp. at 57. Given that Mylan controls the EAI market through its dominant EpiPen share *and* Mylan indisputably took price increases well above the 5% proxy, Sanofi 56.1 Stmt. at ¶ 43, there was no need for a hypothetical. Despite Mylan's 20% to 30% price increases to fund significant rebates contingent on blocking Auvi-Q, there is no evidence that Mylan lost sales to antihistamines, vials, or syringes. Instead, Mylan's profitability increased substantially from 2010 through 2016. *See* Sanofi MSJ Ex. 80. The hypothetical monopolist test shows that antihistamines, vials, and syringes are outside the relevant market.

### D.     Mylan's Proposed "Other" Non-EAI Pipeline Products Do Not Compete

Mylan also tries to include in the market an array of *potential* future non-EAIs supposedly in development for anaphylaxis. Mylan Opp. at 56. But Mylan subpoenaed no information from these purported competitors and provides no evidence. Mylan instead cobbles together websites without the necessary information on development plans, indication, regulatory approval, physical qualities, price, patient appeal, or even launch dates. And it is uncertain whether these products will ever launch as "only a minuscule percentage of drugs in development ever reaches the commercial market." *Alphamed*, 432 F.Supp.2d at 1345. These non-EAIs cannot be in *any* market because they have not been developed or approved. According to Mylan's own expert, Dr. Ordover, *only* ██████████████████████████████ could they compete. Mylan Opp. Ex. 28 ¶ 134. This is consistent with antitrust law, which does not give standing to companies that lack regulatory approval and are unprepared to enter. *See Ethypharm S. A. France v. Abbott Labs.*, 707 F.3d 223, 236 (3d Cir. 2013) (without FDA approval, a drug product "is literally not a lawful competitor in the United States…and cannot be considered a competitor[.]").Thus, the record is uncontroverted that the launch of these products is purely theoretical and not something a jury could properly consider in the relevant market.

### E.     No Court or Agency Has Applied Mylan's Customer-Specific Definition

Mylan's arguments on customer-specific market definition are unfounded. Mylan admits that the geographic market is the United States. Mylan Opp. at 60 n.318. Mylan then cites the antitrust agencies' guidelines to argue that a relevant market *may* be narrowed to individual customers. *Id.* at 58. But Mylan cannot cite a single case or agency action in the pharmaceutical space that applied this definition. Although cited by Sanofi, Mylan conspicuously fails to address the numerous mergers involving PBMs (*e.g.,* Express Scripts/Medco, Caremark/ PCS) and drug manufacturers (notably Mylan's recent acquisition of Meda AB) where the FTC did not define the market by customer. Additionally, the fact that drug manufacturers individually negotiate with payors is not specific to Mylan or EAIs; it applies to all pharmaceutical markets. Yet no court has defined the market as hundreds of individual payors as Mylan advocates.

In support of its radical market definition, Mylan offers a single inapposite case concerning food delivery. Mylan Opp. at 58. But in *F.T.C. v. Sysco Corp.*, the court found a separate market for national customers versus local customers because they had distinct requirements, specifically "geographically dispersed distribution and attendant services." 113 F.Supp.3d. 1, 45 (D.D.C. 2015). And even in *Sysco*, the court defined the market for *all* national customers—not individual national customers as Mylan suggests. Mylan makes no such argument here that national (or other) payors require different products, services, or distribution. Nor could it. Individual payor submarkets are inappropriate and unfounded here, and this Court should grant summary judgment on the uncontroverted market definition of all U.S. EAI drug devices.

## II.     THERE IS NO GENUINE MATERIAL DISPUTE ON MONOPOLY POWER

Turning next to monopoly power, Mylan misstates U.S. antitrust law, claiming that "indirect evidence intended to show Mylan's ability to control price and exclude competition cannot counteract" the absence of direct evidence. Mylan Opp. at 68. But as Mylan notes, proof of

monopoly power "can come 'through direct **_or indirect evidence_**.'" *Id.* at 60 (emphasis added). As explained by the D.C. Circuit when rejecting a similar argument, Mylan "cites no case, nor are we aware of one, requiring direct evidence to show monopoly power in any market." *Microsoft*, 253 F.3d at 51. Instead, "because such direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power." *Id.*

Regardless of Mylan's misunderstanding, this case is unique as Mylan's monopoly power is indisputable based on direct ***and*** indirect evidence. There is no genuine dispute that:

1. Mylan tracked its own ███████████ out of EAIs, reaching ███████████████ at times. Sanofi MSJ at ¶ 30. Mylan sent a letter to Sanofi stating that EpiPen ████████ ███████████████████████████████████ Sanofi 56.1 Stmt. ¶ 17.

2. FDA approval can be a barrier to entry, Mylan Opp. ¶ 37, and EAIs faced these "independent barriers prevent[ing them] from entering[.]" Sanofi 56.1 Stmt. ¶ 37.

3. Mylan raised EpiPen's list price by over 500% from 2009 to 2016. Sanofi MSJ at ¶ 43. Despite having 80+% to 90+% market share, Mylan increased EpiPen's price 20% to 30% each year from 2010 to 2016 at the same time that Mylan locked up exclusionary contracts with key large payors. *See* Sanofi 56.1 Stmt. ¶¶ 42, 47-78. As a result, EpiPen cost $98.57 in 2008, reaching $608.61 in 2016. *Id.* at ¶ 43.

4. Mylan's EpiPen revenues, profits, and profit margins generally increased on average from 2009 through 2016. Mylan Opp. ¶ 51; Sanofi MSJ Ex. 80.

### A.      Sanofi Provided Irrefutable Indirect Evidence of Mylan's Monopoly Power

Since Mylan cannot genuinely deny its EpiPen market share reaching nearly 100% at times, it mischaracterizes Sanofi's position as "rel[ying] on the long-discredited view that high market share is proof of monopoly power." Mylan Opp. at 68. But Sanofi provides uncontroverted evidence of Mylan's dominant market share ***in conjunction with*** all of the other market factors courts consider, including barriers to entry and the level of competition. In response, Mylan takes an unsupported and drastic position that market share is irrelevant to monopoly power.

First, it is black-letter law that monopoly power can be inferred from market share with other factors. *See* ANTIRUST LAW DEVS. (8th ed. 2017), Ch. 2 § B.2.a.1 (citing cases under "***Market Share as an Indicator of Monopoly Power***"). Thus it is no surprise that Mylan misinterprets its

own cases, which are actually consistent with Sanofi's position. In *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, the Second Circuit recognized that "courts often look to market share as a proxy for monopoly power" and ***granted partial summary judgment*** based on defendant's market share along with high prices and entry barriers. 185 F.3d 606, 622-23 (6th Cir. 1999). Mylan's other cases make similar findings.[6] The only Tenth Circuit case cited by Mylan notes "that market share percentages may give rise to presumptions," and while "market share alone is insufficient to establish market power," here Sanofi provides irrefutable evidence on all market factors. *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) (affirming jury finding on monopoly power).

Mylan's argument that a tiny dip in market share forecloses a finding of monopoly power is unavailing. First, it is undisputed that EpiPen's share always stayed above 83%. Mylan cites *Reazin* to claim that the Tenth Circuit considered declining market share persuasive, Mylan Opp. at 74, but the Tenth Circuit explicitly stated, "[t]he fact that the share may have declined somewhat does not persuade us" that the defendant lacked monopoly power. *Reazin*, 899 F.2d at 970. Mylan also selectively quotes *Oahu*, omitting part of the sentence that "[a] declining market share…does not foreclose a finding of such power." 838 F.2d at 366-67. Tellingly, the defendant's share in that case declined from 100% to 68%, yet the Court did not preclude a monopoly power finding. *Id.* Here it is undisputed that Mylan always maintained a durable 83% to 90%+ market share in a market with high barriers to entry.

Next, Mylan argues that its own estimates are "misleading" in a "bid market." Mylan Opp. at 70. But Mylan cannot cite a single case disregarding market share because companies bid for

---

[6] *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (Monopoly power "may be inferred from one firm's large percentage share of the relevant market[.]"); *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ("A high market share…may ordinarily raise an inference of monopoly power[.]").

contracts. Instead, Mylan cites a lone inapposite case outside of the pharmaceutical context **and the Sherman Act**. Mylan Opp. at 70. *Feesers, Inc. v. Michael Foods, Inc.* is a Robinson-Patman Act case analyzing whether a company could show injury for price discrimination. 591 F.3d 191 (3d Cir. 2010). The case does not even mention market shares or monopoly power. To the contrary, Mylan cannot dispute that courts and the antitrust agencies routinely consider market shares in the pharmaceutical space **and** for monopoly power.[7] *See, e.g., AbbVie*, 329 F.Supp.3d at 134-35 (analyzing market shares for monopoly power). Unsurprisingly, when Mylan is an antitrust plaintiff, it proffered market shares as evidence of monopoly power. *See Mylan*, 838 F.3d at 436 ("Here, Mylan argues that…Defendants allegedly maintained 100% of sales[.]"). Mylan provides no reason why its dominant and durable share—which it regularly tracked—is now "misleading."

Despite Mylan's mischaracterization, Sanofi also provides undisputed evidence on the other factors **besides market share**, including "existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in the market, and market trends." *Reazin*, 899 F.2d at 967; Sanofi MSJ at 45-51. With respect to market trends and the number of firms, Mylan rehashes its argument that Benadryl is somehow a competitor and notes the supposed "***success*** of Twinject and Adrenaclick." Mylan Opp. at 73-74 (emphasis added). But these claims do not create a genuine dispute. They are belied by Mylan's own documents discussing █████████████████████ in the EAI market and discrediting these "weak competitor[s]," as well as by Mylan's own experts discounting these products when it suited their analysis. Sanofi 56.1 Stmt. ¶ 41. Mylan admitted that neither product obtained more than ████████████, yet this now amounts to "success." *Id.* ¶ 28. The fact that Auvi-Q posed the first ██████████████████ is exactly why Mylan excluded Auvi-Q, again resulting in minimal competition in the EAI market. Sanofi Opp. ¶ 8.

---

[7] *See also* FTC, Overview of FTC Actions in Pharmaceutical Products and Distribution (June 2019), *available at* https://www.ftc.gov/system/files/attachments/competition-policy-guidance/overview_pharma_june_2019.pdf.

Likewise Mylan's half-hearted arguments on barriers to entry are meritless. Mylan disregards its own statement that "[i]t is nearly universally recognized that **pharmaceutical markets are characterized by high technical and regulatory barriers to entry**." Sanofi MSJ at 51 (quoting *Mylan Pharm. Inc. v. Warner Chilcott PLC*). And Mylan admitted that FDA approval can be a barrier here. Mylan Opp. at ¶ 37. Mylan claims Sanofi "ignores relevant parts of the record," but Mylan ignores its own Answer explaining that EAIs faced "independent barriers" in the regulatory process that hampered and delayed their entry. Sanofi 56.1 Stmt. ¶ 37. Moreover, the Tenth Circuit has rejected Mylan's argument that "entry barriers in the relevant market [a]re non-existent" merely because some firms have entered. *Reazin*, 899 F.2d at 971.[8] The Court stressed that "the fact remain[ed] that no other entrants remotely approached Blue Cross' dominance of the market." 899 F.2d at 971. That is the case here where the few entrants never came close to challenging EpiPen's dominance.[9] Additionally, entrenched patient preference is an entry barrier as Mylan cannot genuinely refute its own Senior Director's sworn statement that ██████████ ████████████████████████████████████ Sanofi MSJ Ex. 40 at 6.

Finally, Mylan claims that because payors are "powerful buyers" it could not have monopoly power. Mylan Opp. at 71-72. But under Mylan's logic, no pharmaceutical company could ever possess monopoly power simply because payors are big buyers. This contention is contradicted by the record and case law—which is why Mylan again fails to cite any comparable case. Mylan cites *Suture Express* to argue that large buyers can defeat a finding of monopoly power, but in *Suture Express*, the Court noted that "evidence of customer consolidation **in a competitive market** with **declining profits** also demonstrates that defendants lack the power to

---

[8] *See also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995) ("The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers.").

[9] While Mylan makes a passing reference to "barriers to expansion," Mylan Opp. at 74, it cites no Tenth Circuit or Third Circuit case requiring analysis of this factor for monopoly power.

control prices." *Id.* at \*25. Here however, it is undisputed that Mylan's own expert said there was no "meaningful competition" prior to Auvi-Q. Sanofi 56.1 Stmt. ¶ 36. And Mylan's profits were far from declining. *See* Sanofi MSJ Ex. 80. All of Mylan's arguments fail accordingly.

### B.  Sanofi Also Provided Irrefutable Direct Evidence of Mylan's Monopoly Power

As for direct proof of its monopoly power, Mylan incredibly argues that its price increases *exceeding 500%* were not supracompetitive and the **$600** EpiPen could be a "competitive price." Mylan Opp. at 61-62. Mylan is wrong on all accounts. First, it is undisputed that despite having market share hovering around 90%, Mylan raised EpiPen's price 20% to 30% each year, Sanofi 56.1 Stmt. ¶ 43, so that it could fund extremely high rebates conditioned on Auvi-Q's exclusion. Second, while Mylan mistakenly claims that Sanofi did not provide any way to determine that Mylan's prices were supracompetitive, Mylan Opp. at 62, Dr. Scott Morton calculated a *but-for EpiPen price* in a more competitive world. She calculated what EpiPen's net price would have been if Mylan continued taking its regular price increases instead of substantially inflating its price so that it could offer higher rebates to exclude Auvi-Q. Sanofi MSJ Ex. 151 ¶¶ 35-37. Dr. Scott Morton's analysis shows that Mylan's but-for price was lower. *Id.* at Fig. 2.

Relatedly, Mylan cites its increased rebates to payors to argue that "Mylan could not raise prices without constraint." Mylan Opp. at 63. But Mylan's "discounts" were illusory as the *net price* of EpiPen (list price minus rebates) also rose during this time. It is undisputed that Mylan ███████████████████████, a significant U.S. payor, at the same time that it signed an exclusive contract. Sanofi 56.1 Stmt. ¶ 48. And Mylan admits that it imposed a price increase ██ ████████████ after it signed an exclusive contract in 2013. Mylan Opp. ¶ 47.[10] Mylan also cannot genuinely dispute that EpiPen's net price to payors ████████████████████████████████████████

---

[10] Mylan's cite to one example where ████████████ was able to avoid some price increases, Mylan Opp. ¶ 47, falls short of creating a genuine dispute. Notwithstanding the resetting price protection in Mylan's rebate agreement, Mylan was still able to and did impose a ███████████████████████████.

███████████████████████████████████ *Id.* ¶ 46. Dr. Scott Morton's analysis clearly shows that EpiPen's net price not only increased, but remained far above Mylan's 2013 net price. Sanofi MSJ Ex. 42 ¶ 87 (showing EpiPen's ████████████████████████████████████

████████████████████). As Dr. Scott Morton explained, "because Mylan continued to raise its list price, the net price it ultimately offered did not actually drop, as would be expected in a *competitive* market[.]" Sanofi 56.1 Stmt. ¶ 46. Mylan has no response, making it unrefuted.

It is also irrefutable that EpiPen's revenues, profits, and margins substantially increased during its period of price increases from 2009 through 2016—despite the fact that they dipped in 2015 and shot back up in 2016. Mylan claims that Sanofi misrepresents its financials, citing 2015 as a drop, but Mylan's revenues and gross profits in 2015 were still *over 50% higher* than in 2012 (before Auvi-Q launched). According to Mylan's own financials submitted to Congress:

| EPIPEN | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016(E) |
|---|---|---|---|---|---|---|---|---|
| Revenues | $200M | $281M | $371M | $622M | $742M | $933M | $912M | $1.1B |
| Gross Profits | $114M | $158M | $232M | $427M | $540M | $709M | $657M | $825M |
| Gross Margins | 57% | 56.2% | 62.5% | 68.6% | 72.8% | 76% | 72% | 75% |

Sanofi MSJ Ex. 80. These figures along with Mylan's "reputation for aggressive price increases in the market" provide sufficient direct proof. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190-91 (3d Cir. 2005) (crediting pricing evidence and growing profit margins as direct proof); *Mylan*, 838 F.3d at 434 (discussing "high price-cost margins" as direct proof).

As for restricted output, Mylan cites no evidence to disprove Dr. Scott Morton's conclusion that EAI output *would have been higher* among the differentiated EAIs absent Mylan's anticompetitive conduct. *See* Sanofi MSJ ¶ 65. Mylan argues that Sanofi must prove barriers to its own capacity to show Mylan had monopoly power, Mylan Opp. at 62, but Mylan's lone out-of-circuit case is neither controlling nor applicable. Whether "rivals in the market can simply expand manufacturing to maintain output at current levels," *id.* at 62, is irrelevant when those rivals are

foreclosed from selling their products to patients. Sanofi did not have capacity constraints, but it was blocked from expansion *through* Mylan directly exercising its monopoly power.

Finally, Mylan conflates direct proof of monopoly power with the substantial foreclosure test for exclusive dealing, mischaracterizing Sanofi's position as claiming that any company's "ability to win an exclusive contract…is evidence of monopoly power." Mylan Opp. at 66-67. But as this Court recognized, "exclusive dealing arrangements are of special concern when imposed by a monopolist." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012). And as explained in Sanofi's Opposition to Mylan's summary judgment motion, Mylan did not merely "win" exclusive contracts; rather, Mylan leveraged its dominant share and monopoly power to *force* payors into exclusive contracts foreclosing Sanofi from *at least half* of the EAI market. *See* Sanofi Opp. at 70-75. The fact that Auvi-Q gained FDA approval and made some sales has no bearing on the irrefutable evidence of Mylan's "blocking of [Sanofi's] access to the key dealers." *Dentsply,* 399 F.3d at 189. And with no reason to believe Mylan's anticompetitive conduct would cease after Auvi-Q's relaunch, *see* Sanofi Opp. at 97-98, Sanofi exited the EAI market. This uncontroverted evidence that Mylan succeeded to "drive out competition." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 477 (1992), is precisely "the type of exclusion from competition" upon which courts focus in finding monopoly power. *See* Mylan Opp. at 65.

For all of these reasons and those cited in Sanofi's opening brief, this Court should grant partial summary judgment finding Mylan had monopoly power in the U.S. EAI market.

## III.    MYLAN'S UNFAIR COMPETITION CLAIM FAILS AS A MATTER OF LAW

Mylan now clarifies that its common law unfair competition based on Sanofi's alleged false advertising arises under New Jersey law. Mylan Opp. § IV; *see also id.* at 77 n.320 (admitting there was no proof of kickbacks as Mylan alleged). However, as explained in Sanofi's Motion, New Jersey law does not recognize a claim for unfair competition based on false advertising. *See*

Sanofi MSJ at 76-77 (citing *Tris Pharma, Inc. v. UCB Mfg., Inc.,* 2016 WL 4506129 (N.J. Super. Ct. App. Div. Aug. 29, 2016); *Smart Vent, Inc. v. Crawl Space Door Sys. Inc.*, 2017 WL 4948063, at *3 (D.N.J. Nov. 1, 2017). Therefore, summary judgment must be granted on this claim.

## IV.    MYLAN LACKS EVIDENCE TO PROVE ITS LANHAM ACT CLAIM

### A.    Only a Few of Mylan's Allegations Are Still At Issue

Mylan's Counterclaim alleged seven acts of wrongdoing by Sanofi. Countercl. ¶¶ 68, 77, 82. But buried in one of the hundreds of footnotes in Mylan's Opposition is its admission that two of those allegations have not panned out. Mylan Opp. at 77 n.320 ("Sanofi devotes much of its brief to attacking two allegations in the Counterclaims—that Sanofi made misleading statements regarding Auvi-Q's heat tolerance (Countercl. ¶¶ 54-55) and offered kickbacks to increase sales of Auvi-Q (*id.* ¶¶ 59-61)—*which discovery has not shown to be widespread practices*.") (emphasis added). Mylan abandons another allegation—that Sanofi marketed Auvi-Q as therapeutically equivalent to EpiPen—by omitting it from its Opposition except to quote its complaint. *See* Mylan Opp. at 84. Mylan's sheepish abandonment of these allegations confirms that Mylan has no evidence to support these three allegations, which should therefore be dismissed.

### B.    Mylan Lacks Evidence to Prove the Remaining Allegations

Mylan's four remaining allegations do not fare any better. Mylan claims that the record is replete with evidence that Sanofi's sales force launched a "proactive campaign to convert top EpiPen prescribers to Auvi-Q prescribers" and ████████████████████ Mylan Opp. at 89. But that has nothing to do with false advertising and everything to do with a monopolist's unwillingness to cede any market share to a competitor. ████████████ for a product is not false advertising; it is merely advertising. The mere act of promoting a product by ████████ ███ and driving demand is not actionable. Moreover, as described below, Mylan has failed to show that Sanofi made widespread claims regarding the four remaining claims.

### 1. Mylan Improperly Implies That Comparative Claims are False Advertising

Mylan argues that Sanofi's internal presentations show Sanofi made "comparative claims," suggesting that "comparative claims" are false advertising. But there is nothing nefarious about advertisements that draw *true* comparisons. *See Zoller Labs., LLC. v. NBTY, Inc.*, 111 F.App'x 978, 984 (10th Cir. 2004) (ad comparing the ingredients of two competitors was an accurate representation and not actionable). Mylan suggests that ███████████████████████ ████████████████████████████ implying that those statements were false, Mylan Opp. at 90, but then relies on a document that states, █████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ Mylan Opp. Ex. 120. There is no dispute that Auvi-Q is smaller than EpiPen and provides audio assistance. *See* Sanofi 56.1 Stmt. ¶ 71 (undisputed). Mylan treats all "comparative messages" as misleading when it is entirely plausible that all of Sanofi's allegedly comparative messages were *true* statements. Without any sort of consumer survey, Mylan has left this Court in the dark concerning which comparative claims doctors heard.

Moreover, the statements that Mylan deems "comparative" are not actually comparisons to EpiPen. The statement that Auvi-Q is "easier to carry" only implies Auvi-Q is easier to carry *than EpiPen* if one assumes that *all* statements about Auvi-Q are comparative to EpiPen. This is the crux of Mylan's argument: that all statements about EAI devices necessarily imply a comparison with EpiPen, which can only be true if Mylan had a monopoly over the EAI market. Mylan talks out of both sides of its mouth: in one half of its Opposition, it denies having a monopoly on the EAI market while in the second half, it uses that monopoly as a cudgel against Sanofi's advertising. This court should not sustain this hypocrisy.

### 2. Mylan Cannot Rely on Internal Sanofi Presentations to Support its Claim

The evidence Mylan offers in support of its Counterclaim is from internal Sanofi business

documents and presentations.[11] Even if these internal presentations were admissible—which they are not, Sanofi MSJ at 62—Mylan's reliance on them is misplaced. Internal Sanofi presentations are not consumer surveys. They are internal business presentations that describe ████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Mylan Opp. Ex. 31 at 33. They focus on whether sales and marketing goals were met, not what details sales reps shared about a product. This does not make the presentations inaccurate, nor does pointing this out mean Sanofi is running away from its market research. Rather, these presentations are designed for a different purpose than providing a record of what messages patients, prescribers, or payors received.

Mylan also misstates what the internal presentations actually say. According to Mylan, one document shows "Sanofi reps comparing Auvi-Q to EpiPen as 'easier to use'," Mylan Opp. at 77, but the presentation contains Sanofi's brand team assessment of the effectiveness of its marketing efforts, by comparing how Sanofi and Mylan salespeople were marketing their respective EAI products. In fact, the presentation shows that physicians recalled *both* Sanofi and Mylan salespeople describing their respective products as ██████████ The only arguably comparative message recalled by physicians appears on the EpiPen side – ████████████████████████ ███████████████████████████████████████ *See* Sanofi Reply ¶ 143. Mylan's other examples of internal Sanofi strategy statements—such as "increased compliance" or "smaller size"—are equally unavailing and should not be credited as supporting these claims.

Mylan suggests that physician's ██████████ responses to surveys show Sanofi made false or misleading statements, but ██████████ in this context does not refer to what sales representatives

---

[11] Mylan does not distinguish *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F.Supp.2d 384, 459 (D.N.J. 2009) (Wolfson, J.) (non-public internal documents not actionable under the Lanham Act) or *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (evidence must be authenticated on summary judgment).

said. Instead, they are physicians' responses to questions like ███████████████ ███████████████████████████████████████ Physicians are not required to record what was ***actually said*** to them, but rather what was important to them. While valuable for business purposes, these statements lack the requisite rigor to assess what statements sales representatives actually made. *See Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 133–34 (3d Cir. 1994) (responses to "open-ended questions" such as "what ideas did the advertiser try to get across" failed to show that "the advertising tends to deceive or mislead a substantial portion of the intended audience.") (internal quotations omitted).

Mylan's two cases regarding survey admissibility are inapposite. Ironically, one is an antitrust case in which a competitor sought to introduce survey evidence to show that "customers would like to switch suppliers, but believe that they cannot." *BoDeans Cone Co. v. Norse Dairy Sys., L.L.C.*, 678 F.Supp.2d 883, 902 (N.D. Iowa 2009). This is distinct from extrinsic survey evidence in a Lanham Act case, which needs to precisely record what statements consumers heard and if those statements deceived consumers. *See Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir. 1990) (A Lanham Act plaintiff "cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react."). In *Schering Corp. v. Pfizer Inc.*, multiple surveys were conducted during litigation—a far cry from the internal Sanofi documents that Mylan relies on. 189 F.3d 218, 223 (2d Cir. 1999). Mylan has not met its burden under the Lanham Act to survey the relevant audience. *See* Sanofi MSJ 66-69. The court should not permit Mylan to rely on Sanofi's internal surveys to jam a square peg into a round hole.

### 3.   Mylan Failed to Adduce Any New Evidence in Discovery

In the absence of discovered evidence, Mylan repeats the same statements it complained about to FDA in 2013 and 2015. The sum total of Mylan's evidence of allegedly false or misleading statements could fit on an index card: three handwritten notes, two declarations from employees

at the same practice in Arizona, and one news article. *See* Sanofi MSJ Ex. 136; Sanofi MSJ Ex. 141; Mylan Opp. Ex. 114. These isolated incidents do not raise a genuine dispute of material fact given the size of the EAI market—43 million people at risk for anaphylaxis and tens of thousands of prescribers. *See* Sanofi MSJ at 71-72 (citing cases where conduct did not amount to widespread dissemination involving 2 statements, 27 oral statements, or 216 incidents).

### C.   Mylan Cannot Show it Was Harmed by Any Allegedly False Advertising

Mylan claims that Sanofi "understates Mylan's evidence of causation," Mylan Opp. at 95, but continues to ignore the fact that there is not a shred of evidence that Sanofi ***actually caused any harm to Mylan***. *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299 (4th Cir. 2017) (a party must show that it "suffered an injury flowing directly from the challenged statements").

First, Mylan cannot establish Sanofi caused any harm with respect to statements it is no longer challenging. For the remaining allegations, Mylan's only "evidence" is the same two statements from employees at the one allergy clinic and a single internal email from a payor about a peer-reviewed study in a medical journal, without any explanation of how these statements allegedly injured Mylan. Mylan Opp. at 96. And both Mylan's marketing expert and its corporate designee admitted Mylan had no basis to claim it was harmed by Sanofi. *See* Sanofi MSJ at 73-74.

Mylan also argues that it has been harmed by Sanofi because Auvi-Q exceeded its forecasts on certain formularies, but this is a huge leap unsupported by the factual record.[12] *See Verisign, Inc.*, 848 F.3d. at 301 (the "fatal flaw" in plaintiff's Lanham Act damages calculation was that "[i]t assume[d] rather than demonstrate[d] that every [sale] during the relevant time period was the result of [defendant's] allegedly false statements.").

---

[12] Mylan fails to link Auvi-Q sales and the challenged statements. Mylan implies that ███████████ but Horizon's representative testified that there are ███████████ Mylan Opp. Ex. 10 at 114-116. And Horizon's documents do not state that ███████████

42

Mylan's claim that it is entitled to a "presumption" of injury because Sanofi "explicitly compared" Auvi-Q and EpiPen, Mylan Opp. at 93-94, is preposterous. Mylan's only support for an explicit comparison relates to only one of the "claims"—one copy of a ███████████ ███████████████████████████████████ (which Mylan admits may not even have been written by a Sanofi employee) and the two statements by the allergy clinic employees again. Sanofi MSJ at 34. None of the other statements Mylan challenges even qualify for this presumption because "where the advertising at issue is not explicitly comparative, a presumption of injury is inappropriate." *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-01398, 2013 WL 1900562, at *15 (D. Colo. May 7, 2013), *aff'd*, 627 F.App'x 682 (10th Cir. 2015).

Finally, Mylan sidesteps the issue of causation and injury by stating—without proof—that a jury could find that Sanofi intended to deceive customers. As its only support, Mylan inaccurately claims Sanofi ignored that its sales force was making false statements. Mylan Opp. at 94. This could not be further from the truth. Contemporaneous documents show that Sanofi's employees received proper sales training and Sanofi enforced its policies and procedures. Sanofi MSJ at 70. And Mylan's own expert admitted that he did not undertake a full review of Sanofi's compliance program or training materials. Ex. 161 at 425:1-426:20 ("I did not study training materials.").

The failure to establish a causal link between Sanofi's challenged statements and actual harm to Mylan is fatal to Mylan's counterclaims. Mylan lacks the evidence necessary to prove "an injury to a commercial interest in sales of business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). Accordingly, Sanofi is entitled to summary judgment.

### D.    Mylan Cannot Show the Challenged Statements Were False or Misleading

Even if Mylan could show that any of the challenged claims were widespread, its Lanham Act claims still fail for the independent and fundamental reason that Mylan has not shown (and

cannot show) that any of the "challenged claims" are actually false. Although Mylan takes the

scattershot approach of arguing that the challenged statements are either false "on their face," false

"by necessary implication," or misleading, neither the law nor the record supports these arguments.

### 1.    Mylan Cannot Show the Challenged Statements Were Literally False

The only statement that Mylan argues is literally false is the supposed claim that Auvi-Q

is the "new EpiPen." Mylan Opp. at 81. This claim is meritless. As Sanofi explained in its opening

brief, "only an *unambiguous* message can be literally false." Sanofi MSJ at 64 (quoting *Novartis*

*Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 587

(3d Cir. 2002) (emphasis in original)); *Zoller,* 111 F.App'x at 984 (same). Mylan's contention that

"new EpiPen" can only mean that Auvi-Q is a new model of EpiPen sold by Mylan is wrong

because the record contains other interpretations. Mylan's own marketing expert admits that the

term ████████████ if used, ███████████████████████████████████████ and

not unambiguous. Sanofi MSJ Ex. 145 at 10. Dr. Michelis, the only physician asked how she would

interpret "new EpiPen," stated that because "█████████████████████████████████████

██████████████████████…[t]he term would convey to doctors that the sales representative

was referring to a competitor in that category." Ex. 164 ¶ 15.[13]

Mylan never claims that statements based on the study conducted by Sanofi comparing

Auvi-Q to EpiPen are false because they are not. Sanofi MSJ Ex. 125. Instead, Mylan tries to

muddy the waters by suggesting that "Sanofi's sales force routinely flouted ██████████" by

making statements based on the study. First, there is no evidence of such statements, nor is there

anything nefarious about true comparative marketing statements. *See* § IV.B.1. Second, the record

---

[13] Mylan relies on *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F.App'x 682, 684 (10th Cir. 2015), but there, there was "no credible evidence in the record" that the term "general steel" could be used to mean anything other than the brand name "General Steel." Also, unlike here, the *Gen. Steel* advertisements "included side-by-side comparisons between [defendant's] products and those offered by the General Steel [and] even used General Steel's logo."

is clear that Sanofi submitted a ███████████████████████████████████████

██. Sanofi MSJ Ex. 126. FDA's guidance to Sanofi explained that ██████████████

████████████████████████████████████████████████████████████████████

███████████. Following this guidance, the ██████████████████████████████

████████████████████████████████████████" *See* Ex. Sanofi MSJ Ex. 130. This

study was eventually published by a peer reviewed journal.  Finally, it is well-established that a

Lanham Act plaintiff cannot prevail by demonstrating that defendant's promotions "are

inadequately substantiated under FDA guidelines; the plaintiff must also show that the claims are

literally false or misleading to the public." *Sandoz Pharms.*, 902 F.2d at 229.

2.     Mylan Cannot Show the Statements Were False by Necessary Implication

For the first time in its Opposition, Mylan introduces a theory that Sanofi's claims were

false by necessary implication, but fails to meet the requirements. In the Tenth Circuit, where "a

plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must

demonstrate, by *extrinsic evidence*, that the challenged [advertisements] tend to mislead or

confuse consumers." *Zoller*, 111 F.App'x at 982 (alteration in original, emphasis added). As

discussed in Sanofi's Motion, Mylan failed to adduce any extrinsic evidence of consumer

confusion; therefore this newly introduced theory cannot save Mylan's claims. Sanofi MSJ 67-69.

Mylan is also wrong that claims about Auvi-Q's ease of use and carry "necessarily implied

that they have a scientific basis." Mylan Opp. at 82. Whether something is "easy to carry" or "easy

to use" is a personal opinion not actionable under the Lanham Act. *See Pizza Hut, Inc. v. Papa

John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) ("[G]eneral statements of opinion cannot form

the basis of Lanham Act liability."). The Tenth Circuit addressed this issue in *Intermountain Stroke

Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F.App'x 778, 787 (10th Cir. 2016), assessing a

hospital's ads that it follows "best medical practices" and provides the "best possible care." The

court held that these general claims about best practices and high-quality care "speak generically to the caliber of the [] brand" and "equate to puffery—which makes them legally non-objectionable." *Id.* at 787-789. Even if Mylan could show that Sanofi made claims that Auvi-Q is easy to use or carry, these statements would be nothing more than opinions about the high quality of the product, which are "classic puffery." *Intermountain*, 638 F.App'x at 788.

Mylan fails to show that the other challenged claims were false by necessary implication. For example, statements that "Auvi-Q is the first and only EAI with a retractable needle to help prevent accidental needlesticks" does not necessarily imply that "EpiPen lacked needlestick protection." If anything, it implies that EpiPen lacks a retractable needle, which Mylan admits is true. Counterclaim Compl. ¶ 52 ("The EpiPen Auto-Injector, however, also offers needlestick protection. It does so not by means of a retractable needle[.]"); *see* Sanofi MSJ at 65. "[W]hen a Court considers whether a message is necessarily implied from the product's name and advertising, it must determine whether the false message will ***necessarily and unavoidably*** be received by the consumer." *Novartis,* 290 F.3d at 588 (emphasis added).

### 3.    Mylan Cannot Show the Challenged Statements Were Misleading

Where statements are not literally false, courts require extrinsic evidence to show consumer confusion. In *Novartis*, for example, the Third Circuit held that because the district court erred in finding an advertisement false by necessary implication, the defendant "should have been required to prove through a consumer survey that the name and advertising actually misled or had a tendency to mislead consumers[.]" 290 F.3d at 588. Because none of the challenged statements are literally false, Mylan was required—but failed—to conduct a survey to show consumer deception.

None of Mylan's proposed rationales excuse this failure. Though it cites dicta to argue that it did not need to retain an expert to conduct a "made-for-litigation survey," Mylan fails to cite one successful Lanham Act claim based on misleading statements where a consumer survey was ***not***

submitted. Mylan Opp. at 86-87; *see Vincent v. Utah Plastic Surgery Soc.*, 621 F.App'x 546, 550 (10th Cir. 2015) (without a consumer survey, plaintiff's assertions of "public confusion are mere speculation"). And Mylan's argument that "survey evidence already exists in the record" is baseless. Mylan Opp. at 86. As discussed, internal Sanofi presentations are not "survey evidence." *See supra* § IV.B. These presentations provide no data on whether prescribers, customers or payors were *misled* or *confused* and do not even provide a record of what messages the audience received.

Further, Mylan glosses over that there is barely a shred of evidence in the record that any of Sanofi's claims *actually caused confusion*. Mylan again cites the two declarations from "staff members" from the allergy clinic and concludes that other prescribers, customers and payors were misled. Mylan Opp. at 80. And Mylan concedes that its marketing expert "does not offer an opinion in his reports regarding whether Sanofi's promotional messages were actually false or misleading under the Lanham Act, and he *will not offer any such opinion at trial.*" Zieziula *Daubert* Opp. at 16 [ECF No. 1803]. There is no genuine issue of material fact.

### E. Mylan Cannot Show that the Challenged Statements Were Widely Disseminated and Constituted Commercial Advertising

Mylan never claims that statements showing Auvi-Q was the "new EpiPen" or preferred by patients were widely disseminated to the relevant audience. Mylan disputes that the relevant audience consists of "all physicians, payors, insurers and consumers," Opp. at 90, but its own marketing expert was the one who opined that ████████████████████████████ ████████████████████████████████ and those statements were ████████████ ████████████ Mylan Opp. Ex. 32 at 4. Mylan does not argue that they are the *wrong* audience. Mylan simply lacks any evidence of what was said to these groups because it failed to conduct a survey. A Lanham Act claim requires a showing that the challenged statements "reach[ed] some numerically-significant quantity of actual or potential customers of the parties' products." *Gen.*

*Steel Domestic Sales, LLC v. Chumley*, 129 F.Supp. 3d 1158, 1175 (D. Colo. 2015) (citing *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1003–04 (10th Cir. 2002)); *see also* Sanofi MSJ at 70-71 (citing cases).[14] Mylan has not even attempted to show this, and its attempts to rely on Sanofi's internal presentations fall far short of satisfying its burden of proof.

## **CONCLUSION**

For the foregoing reasons, Sanofi's motion for summary judgment should be granted.

DATED: August 30, 2019                    */s/ Yehudah L. Buchweitz*

Respectfully submitted,

**WEIL, GOTSHAL & MANGES LLP**
Diane Sullivan
diane.sullivan@weil.com
17 Hulfish St., Suite 201
Princeton, NJ 08542
609.986.1120
212.310.8007 (Fax)

**WEIL, GOTSHAL & MANGES LLP**
Yehudah L. Buchweitz
yehudah.buchweitz@weil.com
Eric S. Hochstadt
eric.hochstadt@weil.com
Randi W. Singer
randi.singer@weil.com
767 Fifth Avenue
New York, NY 10153
212.310.8000
212.310.8007 (Fax)

*Counsel for Plaintiff and Counterclaim-
Defendant Sanofi-Aventis U.S. LLC*

---

[14] Mylan also claims that "statements" to two Payors constituted wide dissemination. One of the "statements" Mylan relies on is not a statement by Sanofi at all: it is an internal "Formulary Review Summary" document by Horizon Blue Cross Blue Shield's Pharmacy and Therapeutic's Committee assessing clinical data about Auvi-Q from a peer reviewed medical journal, and concluding based on that data that it was recommended to cover Auvi-Q.

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, the foregoing was filed via CM-ECF and by e-mail to all counsel of record.

*/s/ Yehudah L. Buchweitz*
Yehudah L. Buchweitz