# Exhibit 164

**EXPERT REPORT OF DR. MARY ANN MICHELIS**

**RESPONDING TO GARY ZIEZIULA'S EXPERT REPORT**

**March 25, 2019**

**CONFIDENTIAL**

# I.   INTRODUCTION

## A.   ASSIGNMENT

1.      Plaintiff, Sanofi-Aventis U.S. LLC ("Sanofi") has requested that I review and respond to certain portions of Gary Zieziula's February 4, 2019 report, submitted on behalf of Mylan Inc. and Mylan Specialty, L.P. (together, "Mylan").  Specifically, I have been asked to provide my opinion on the following limited topics: (1) the impact of sales representatives on prescribers and medical staff; (2) whether certain marketing statements about the Auvi-Q device would have been confusing to doctors; and (3) what the medical literature has shown regarding patients carrying their epinephrine auto-injector ("EAI") device as directed.  I have been asked to assume, for purposes of this report, that Sanofi has engaged in the conduct that Mr. Zieziula describes in his report.

## B.   QUALIFICATIONS AND SCOPE OF ANALYSIS

2.      As discussed in my affirmative expert report, dated February 2, 2019, I am the Chief of Allergy and Immunology for the Division of Internal Medicine and Pediatrics at Hackensack University Medical Center in New Jersey (the "Hospital"). In my capacity as chief of a division, I interact with other doctors regularly and have a supervisory role over other physicians and physicians-in-training. Please refer to that report for my full list of qualifications, curriculum vitae, and my experience, which forms the basis for my analysis in this responsive report. *See* Expert Report of Dr. Mary Ann Michelis (February 2, 2019) at ¶¶ 2-6.

3.      My work on this matter is ongoing, and I will supplement this report if information that alters any of my opinions comes to my attention after this report is submitted. A list of the materials I reviewed in preparation of this report is attached as Appendix A. If there is a response to my report, I reserve the right to respond to it.

4.      I am compensated at a rate of $500 per hour for time I incur responding to Gary Zieziula on this matter. Payment is not contingent on my findings or on the outcome of this case.

## C.   SUMMARY OF OPINIONS

5.      Doctors are trained to, and do, consider multiple factors to determine which EAI device is most suitable for each individual anaphylaxis patient.  Pharmaceutical sales representatives play a role in that process depending on the information they have to offer, but that role is secondary to the published science on the product, product efficacy or safety considerations, patient preference, the cost of the product, and the doctor's own years of medical training and experience treating patients.

6.      The term "new EpiPen," if in fact used by a sales representative, would still not lead a reasonable physician to believe that the EpiPen was being taken off the market.  There are several other, more reliable sources for such information.

7.      Finally, it is well-documented that patients do not always carry their EAI device as recommended.

### D.   EFFECT OF SALES REPRESENTATIVES ON PRESCRIBERS AND MEDICAL STAFF

8.      Gary Zieziula, a retired pharmaceutical marketing professional, offers the opinion that some Sanofi's sales representatives made unsubstantiated claims comparing the Auvi-Q to Mylan's EpiPen.  He states his opinion that "comparative and preference claims can have a significant impact on how physicians, payers and patients make decisions on which products to use."  Expert Report of Gary Zieziula, Page 4.  He also is of the view that, based on his experience as a pharmaceutical marketer, "sales representatives delivering product features and benefits messages has been the most effective way to convince physicians to prescribe a product." *Id.* at 7.  But Mr. Zieziula does not provide any medical (or other) basis for such statements, nor does he indicate that he has surveyed any physicians, payers or patients to evaluate whether or not his assessment of the impact is correct. And, based on his curriculum vitae, he is not a medical professional and has not worked with doctors who treat anaphylaxis.

9.      Doctors are trained how to prescribe medication to their patients.  During medical school, internship, and residency, young doctors receive training in pharmacology, which educates doctors about best practices and relevant scientific background required for prescribing medications. Further, physicians practicing at hospitals attend grand rounds, where other physicians give presentations on new drugs to inform other practitioners about new treatment options.  Physicians also routinely turn to medical journals to educate themselves on newer treatments for various medical ailments.

10.     In addition, doctors often develop their own checklists for treating patients and prescribing medications.[1] First, doctors evaluate and clearly define the patient's problem.  Madelyn Pollock, M.D., et al., *Appropriate Prescribing of Medications: An Eight Step Approach*, 75(2) AM. FAM. PHYSICIAN, 231, 231-236 (2007).  Second, the physician specifies the therapeutic objective of the

---

[1] The lists of steps may differ from one doctor to another. However, the steps outlined here, which were propounded by the World Health Organization, are some of the typical procedures doctors follow.

treatment (here, stopping anaphylaxis).  *Id.* at 232.  In the third step, the physician selects the appropriate drug therapy for that patient, which includes developing a list of trusted, well-tolerated medications to pull from (here, EAI devices are generally preferred).  *See id.*  Fourth, the doctor initiates therapy with the selected medication, which includes training the patient how to use the prescribed EAI device.  *See id.* at 233.  The fifth step is educating the patient about the intended use, expected outcomes, and potential side effects of the drug.  *Id.* at 234.  Sixth, the physician systemically monitors the patient at each visit, including revisiting the diagnosis, evaluating potential side effects, and ceasing administration of unnecessary medications.  *Id.*  Seventh, doctors consider the cost of the medication to the patient.  *Id.* at 234-35.  Finally, it is also recommended that doctors take advantage of technology to track treatment and reduce prescribing errors.  *Id.* at 235.

11.     Many factors are evaluated to determine which EAI device to prescribe to each patient. Claims made by pharmaceutical companies are one of several factors, but much more important considerations include the efficacy and safety of the product or patient's choice of the EAI device.

12.     Pharmaceutical sales representatives can also be helpful to inform doctors when a drug is available and, to the best of their knowledge, the cost and insurance coverage.  During the relevant period, an important piece of information that EAI device sales representatives would provide pertained to insurance coverage and costs.

13.     In addition to cost considerations, pharmaceutical companies (typically through their sales representatives) can help doctors to stay current on the new drugs and devices that are available. Prescription drug insurance formulary coverage availability provided or published by pharmaceutical companies, which often contain cost and clinical information, is useful for doctors. But doctors do not rely on sales representatives for important information regarding efficacy, safety and preference claims.  Doctors rely on medical journals, national conferences and symposiums, published materials, conversations with their colleagues, and their own experience to inform their decisions about which product to prescribe.  Therefore, a statement from a sales representative that Auvi-Q could withstand the Texas summer heat better than EpiPen would not be persuasive to doctors, who would look to the scientific data to evaluate such a claim.  *See* Expert Report of Dr. Gary Zieziula, Page 10.  Further, preference is individual, and therefore discussions with each patient about which device they are more likely to ultimately carry are of utmost importance.

14.     Doctors are the authorized medical professionals who write prescriptions for patients and are ultimately responsible for any medication that the patient receives. Receptionists, nurses, and other people working in the doctors' office are not.  Therefore, information that pharmaceutical sales representatives share with those staff members are very unlikely to have impact on the physician's prescribing behavior.

### E.   ALLEGEDLY MISLEADING MARKETING

15.     Mr. Zieziula also put forth the opinion that he has seen "several examples of Sanofi sales representatives either telling medical office staff or leaving hand written messages that Auvi-Q is the 'new EpiPen' and suggesting that EpiPen would no longer be available."  Expert Report of Gary Zieziula, Page 11  which he claims caused confusion and suggested to staff in some doctors' offices that Mylan's EpiPen was going off the market.  *Id.* at 10-11.  I have never heard of Auvi-Q being referred to as the ▮▮▮▮▮▮ but even if I had, that terminology would not have been confusing to doctors. Because EpiPen has been virtually the only EAI device since its inception in 1987, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The term would convey to doctors that the sales representative was referring to a competitor in that category.

16.     Also, if a pharmaceutical product as significant as the EpiPen were going off the market, there would be many other ways to alert doctors of that news.  For example, the Hospital has procedures in place for alerting its doctors about medical recalls or shortages.  Further, if EpiPen, a lifesaving device and the preferred anaphylaxis treatment for more than 25 years, was going off the market or being recalled, there would likely be national news coverage and doctors would expect to receive calls from concerned patients.  Also, if a product like an EAI device were recalled or discontinued, doctors would receive email alerts from pharmacies, as well as associations such as The American Academy of Allergy, Asthma & Immunology or American College of Allergy, Asthma, and Immunology.  Marketing of a "new EpiPen" would not, therefore, suggest that the EpiPen itself was being discontinued.

### F.   FAILURE TO CARRY EAI DEVICE AS RECOMMENDED

17.     Mr. Zieziula offers the opinion that Sanofi misrepresented the results of consumer surveys, which, in part, assessed the frequency with which anaphylaxis patients carry their EAI devices.  But it is well known that patients do not always carry their EAI devices as recommended.  Susan

Waserman et al., *Epinephrine Autoinjectors: New Data, New Problems*, 5 J. ALLERGY & CLIN. IMMUNOL.: IN PRACTICE, 1180, 1189 (2017); Leonard Fromer, *Prevention of Anaphylaxis: The Role of the Epinephrine Auto-Injector*, 129 AM. J. OF MED. 1244, 1246 (2016); Nisha S. Patel, et al., *Epicare (Epinephrine Pen Investigation: Compliance and Recommendations)*, 133 J. ALLERGY & CLIN. IMMUNOL. AB26 (2014).  For example, I ask my patients at their appointments "where is your device?" and patients often tell me that their EAI device is at home or in their car.  Some patients have said that they do not have their device at all times because of its size, and some patients told me that Auvi-Q was easier to carry.

### G.   CONCLUSION

18.    Mr. Zieziula's report states that pharmaceutical sales representatives' discussions with doctors are the most effective way to persuade them to write prescriptions for that product, and that Sanofi's sales representatives improperly touted preference claims without the necessary support and suggested to doctors that EpiPen could be going off the market.  His analysis, performed without collecting data from physicians or conducting a survey of doctors of any kind, ignores that there are many other, more impactful factors that go into prescribing decisions, and that for some patients, Auvi-Q was the preferred product.

Dated: Hackensack, New Jersey
March 25, 2019

By: _____

## Appendix A: List of Materials Considered

1.  Carlos A. Camargo, Jr. et al., *Auvi-Q Versus EpiPen: Preferences of Adults, Caregivers, and Children*, 1 J. ALLERGY & CLIN. IMMUNOL: IN PRACTICE 266 (2013) (SAN-EPI-0921701)
2.  Declaration of Regina Garcia
3.  Expert Report of Gary Zieziula (March 4, 2019)
4.  Leonard Fromer, *Prevention of Anaphylaxis: The Role of the Epinephrine Auto-Injector*, 129 AM. J. OF MED. 1244, 1246 (2016)
5.  Madelyn Pollock, M.D., et al., *Appropriate Prescribing of Medications: An Eight Step Approach*, 75(2) AM. FAM. PHYSICIAN, 231-236 (2007)
6.  MYEP00127732
7.  MYEP00292998
8.  MYEP00567786
9.  MYEP00677384
10. MYEP00717963
11. MYEP01211794
12. Nisha S. Patel, et al., *Epicare (Epinephrine Pen Investigation: Compliance and Recommendations)*, 133 J. ALLERGY & CLIN. IMMUNOL. AB26 (2014)
13. SAN-EPI-0305836
14. SAN-EPI-1217191
15. Susan Waserman et al., *Epinephrine Autoinjectors: New Data, New Problems*, 5 J. ALLERGY & CLIN. IMMUNOL.: IN PRACTICE, 1180 (2017).