# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>*This Document Relates to Class Cases* | Case No. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO CLASS
PLAINTIFFS' MOTION TO STRIKE THE TESTIMONY OF PROF. JAMES HUGHES**

## INDEX OF EXHIBITS

**Exhibit A –** Deposition Transcript Excerpts of Expert Professor James Hughes

**Exhibit B –** Deposition Transcript Excerpts of Expert of Professor Meredith Rosenthal

**Exhibit C –** Deposition Transcript Excerpts of Plaintiff Witness Landon Ipson

**Exhibit D –** Deposition Transcript Excerpts of Local 282 Witness Mario Bulding

**Exhibit E –** SEGAL_EPIPEN_018391

# TABLE OF CONTENTS

Page

BACKGROUND ........................................................................................................... 3

LEGAL STANDARD .................................................................................................... 6

ARGUMENT ................................................................................................................. 6

    I.        DR. HUGHES IS QUALIFIED. ....................................................................... 6

    II.      DR. HUGHES'S TESTIMONY AND OPINIONS ARE RELIABLE. ................. 8

          A.      Dr. Hughes's Testimony on the Pharmaceutical Industry is Reliable. ....... 8

              1.     Dr. Hughes's testimony on the pharmaceutical industry applies to EpiPen product and payment flows. ............................................... 8

              2.     Dr. Hughes's testimony on particular TPPs is based on decades of industry experience and review of the record in this case. ........... 10

              3.     Plaintiffs' disagreement with Dr. Hughes's testimony on Local 282 is not a valid basis for a *Daubert* challenge. ................................. 12

          B.      Dr. Hughes's Opinions On Ascertainability Are Reliable. ...................... 13

              1.     Dr. Hughes does not offer legal opinions or make legal conclusions.................................................................................... 14

              2.     Dr. Hughes's opinions on ascertainability are the products of careful analysis of the relevant data produced in this case. .......... 15

              3.     Dr. Hughes engages with the data produced in discovery far more diligently than does Plaintiffs' own expert, Professor Rosenthal. 18

    CONCLUSION............................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Equifax Info. Servs., LLC*,
   No. 2:16-CV-2038, 2018 WL 1542322 (D. Kan. Mar. 29, 2018) ............................................9

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ...............................................................................................19

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013).................................................................................................15

*Cochrane v. Schneider Nat. Carriers, Inc.*,
   980 F. Supp. 374 (D. Kan. 1997).........................................................................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..........................................................................................6, 7, 12, 18

*Dodge v. Cotter Corp.*,
   328 F.3d 1212 (10th Cir. 2003) ............................................................................6, 9, 12, 17

*Fenwick v. Ranbaxy Pharm., Inc.*,
   No. 3:12-cv-07354 (PGS)(DEA), 2018 WL 5994473 (D.N.J. Nov. 13, 2018) .....................14

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)...........................................................................................................6, 9

*Leone v. Owsley*,
   810 F.3d 1149 (10th Cir. 2015) ...........................................................................................15

*Luviano v. MultiCable, Inc.*
   No. CV1505592BROFFM, 2017 WL 3017195, at *10 (C.D. Cal. Jan. 3, 2017)...................14

*In re Lidoderm Antitrust Litig.*,
   No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)........................7, 8, 14

*Milam v. Ranger Ins. Co.*,
   No. CIV-04-1749-HE, 2006 WL 5347771 (W.D. Okla. June 13, 2006)................................10

*In re Nexium Antitrust Litig.*,
   297 F.R.D. 168 (D. Mass. 2013)........................................................................................7, 8

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)....................................................................................................14

*Rikos v. Procter & Gamble Co.*,
  799 F.3d 497 (6th Cir. 2015) ...................................................................................14

*In re Skelaxin (Metaxalone) Antitrust Litig.*
  299 F.R.D. 555 (E.D.Tenn. 2014)..................................................................2, 11, 14

*In re Thalomid & Revlimid Antitrust Litig.*,
  No. 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) ...................................11, 14

*In re Titanium Dioxide Antitrust Litig.*,
  No. CIV.A. RDB-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013) ...................10

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008).................................................................................19

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
  No. 2:06-cv-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015).................................. *passim*

*In re Wellbutrin Antitrust Litig.*,
  308 F.R.D. 134 (E.D. Pa. 2015)........................................................................14, 18

**Rules**

Fed. R. Civ. P. 26..........................................................................................................15

Fed. R. Evid. 702 ................................................................................................ *passim*

The reason Plaintiffs have moved to exclude Defendants' expert witness, Dr. James W. Hughes, is not because he is unqualified or because his opinions and testimony are unreliable.  It is because Plaintiffs failed to carry their burden on ascertainability and were caught blindsided when they reviewed Dr. Hughes's Report.  Indeed, Plaintiffs did not reference ascertainability once in their motion for class certification, not one of their experts opined on that subject, and they did not attempt to obtain data during discovery that (even if it existed and could feasibly be obtained, which appears unlikely) would be necessary to identify putative class members. Instead, Plaintiffs enlisted their expert, Professor Meredith Rosenthal, to belatedly attest that she is able to match up anonymous Mylan coupon data with pharmacy benefit manager ("PBM") data for a single EpiPen® ("EpiPen") Auto-Injector purchase, and Plaintiffs have moved to strike Dr. Hughes's Report on that basis.  The Court should reject this effort, for several reasons.

**First,** Dr. Hughes is qualified.  Plaintiffs do not actually contest this.  Although they pepper their brief with *ad hominem* attacks emphasizing, for example, that Dr. Hughes teaches at a liberal arts college, they do not make any legal argument that Dr. Hughes should be excluded based on lack of qualification.[1]  Nor could they.  Dr. Hughes has repeatedly been lauded by courts for his "convincing" analysis "[b]ased upon [his] experience and training" and for his utilization of "reliable data."  *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 WL 3623005, at *19 (E.D. Pa. June 10, 2015).  It is easy to see why.  Unlike Professor Rosenthal, Dr. Hughes has a Ph.D. in economics, he has opined in more than 30 pharmaceutical cases over the past 20+ years, and his opinions have never been excluded by any court.

**Second**, Dr. Hughes's opinions and testimony are reliable: He formulated hypotheses, empirically tested them against the data produced in this litigation, and cross-checked his

---

[1] Needless to say, the fact that Dr. Hughes teaches at Bates College has no bearing on whether he is qualified under Rule 702—if anything, it is an accolade.

conclusions against other record evidence.  Plaintiffs nonetheless make the straw-man argument that Dr. Hughes's "opinions" about the flow of products and payments in the pharmaceutical industry should be excluded because he did not review certain sources of evidence before forming his opinions.  *See* Class Plaintiffs' Motion to Strike the Testimony of Prof. James Hughes at 14, Dkt. 1587-1 ("Mot.").  As a threshold matter, this argument is a red herring: Dr. Hughes does not offer any *opinions* on the flow of products and payments in the pharmaceutical industry in this case.[2]  Rather, he provides "an *explanation* of the flow of products and payments in the prescription drug space . . . to assist the Court in understanding the commercial context of this case."  Expert Report of James W. Hughes in Supp. of Defs.' Opp. ¶ 7, Dkt. 1503-6 ("Hughes Rep.") (emphasis added).  Dr. Hughes has offered testimony on this very topic many times before, and courts have accepted it, without exception.  *See, e.g.*, *Vista Healthplan*, 2015 WL 3623005; *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 564-66 (E.D. Tenn. 2014).  Plaintiffs' criticisms of Dr. Hughes's pharmaceutical industry testimony betray a misunderstanding of the purpose of this testimony and of the role of an expert witness.  *See* Fed. R. Evid. 702(a) (allowing experts to testify "in the form of an opinion or otherwise" if the expert's specialized knowledge will help "to understand the evidence or to determine a fact in issue").  More fundamentally, Plaintiffs do not argue that Dr. Hughes's testimony on pharmaceutical product and payment flows is in any way incorrect.

As for Dr. Hughes's opinions on ascertainability, Plaintiffs argue they should be excluded because they are impermissible legal conclusions.  That is wrong.  Dr. Hughes's opinion is that Plaintiffs have not provided an adequate means of identifying the members of the putative class, and that they could not do so based on the data produced during discovery.  Hughes Rep. ¶ 63.

---

[2] In any event, Dr. Hughes is qualified to offer opinions on the economics of the pharmaceutical industry; he has an M.A. and a Ph.D. in Economics.

That is squarely within the purview of an expert like Dr. Hughes, and courts routinely accept expert testimony on this very subject. *See infra* at n.12.

Plaintiffs further contend that Dr. Hughes's ascertainability opinions should be excluded because he did not consider Plaintiffs' expert reports. But there was nothing there for him to consider because Plaintiffs' expert reports ***never mentioned the subject of ascertainability***. Plaintiffs also wrongly assert that Dr. Hughes did not review data produced by third party payors ("TPPs"). In fact, Dr. Hughes devotes 22 paragraphs of his Report to analysis of these data, *see infra* at 4, including two tables analyzing data provided in discovery by TPPs. Plaintiffs' claim that Dr. Hughes did not consider TPP data is based on cherry-picked quotes from Dr. Hughes's deposition that mischaracterize the record.

Plaintiffs' objections to Dr. Hughes are a meritless attempt to distract from their own failure to proffer any argument—let alone evidence or expert testimony—to carry their burden of demonstrating ascertainability, as is required for class certification. The Court should deny Plaintiffs' Motion.

## BACKGROUND

Dr. Hughes addresses two limited topics in his Report. First, "to assist the Court in understanding the commercial context of this case, [he] . . . provide[s] . . . an explanation of the flow of products and payments in the prescription drug space and the role that various actors . . . play in the pharmaceutical supply and payment chain." Hughes Rep. ¶ 7. Second, Dr. Hughes analyzes whether Plaintiffs proposed any methodology to determine which consumers are part of the class as defined and which are not, and "whether the data produced in this case include information sufficient to perform this task." *Id.* ¶ 8.

Dr. Hughes, the Thomas Sowell Professor of Economics at Bates College, is a leading expert on the marketplace for pharmaceutical products, having received a Ph.D. in Economics

from the University of Michigan and having served as a testifying expert economist on the subject since 1998. *Id.* ¶ 2. In particular, Dr. Hughes has served as an expert witness on class ascertainability many times, and no court has ever excluded any portion of his testimony on this or any other topic.

Dr. Hughes has the economics background necessary to conduct a rigorous analysis of large data sets, and he did that here, "examin[ing] in detail much of the data provided in discovery in this matter, covering millions of lives and transactions." *Id.* ¶ 13; *see also* Ex. A (Hughes Dep. 72:19-73:5). He reviewed relevant data produced by PBMs and TPPs; Mylan coupon data; deposition testimony of PBMs, Local 282, and individual named Plaintiffs; Plaintiff fact sheets; and numerous academic publications, websites, articles, and other information. *See* Hughes Rep. App'x C; Ex. A (Hughes Dep. 69:4-17). Dr. Hughes further offered to review any additional data that Plaintiffs' counsel might be aware of or that they might later procure. *See* Ex. A (Hughes Dep. 73:5-6). Plaintiffs neither asked him to do so nor have they produced any additional data.

To form an opinion on whether the putative class is ascertainable, Dr. Hughes examined the relevant data and attempted to align the pertinent data fields to determine whether he could match individual consumers to their EpiPen purchases. *See, e.g.*, Hughes Rep. ¶¶ 64-68; Tables 1-2. This proved impossible, and he explains why in his Report. *See* Hughes Rep. ¶¶ 63-84.

In response to Dr. Hughes's Report, Plaintiffs submitted a rebuttal report by their expert, Professor Rosenthal. Although Professor Rosenthal did not opine on ascertainability in her opening report, in her Reply she now asserts that "a methodology exists to identify whether specific individuals meet the class definition." Reply Expert Rep. of Dr. Meredith Rosenthal in Supp. of Class Cert. ¶ 49, Dkt. 1568-3 ("Rosenthal Reply"). Her method involves examining IQVIA data to identify consumers who paid cash, but Professor Rosenthal admits that the IQVIA

data do not include any patient-identifying information—making them useless for identifying class members.[3] *See id.* ¶ 48. Her method also involves identifying consumers who used Mylan-issued coupons in their EpiPen transactions to reduce their payment to zero because those customers are explicitly excluded from the class. In order to identify these coupon users, Professor Rosenthal matches the coupon data (which does not contain any personally identifying information) for a single, hand-picked transaction to corresponding PBM claims data for that purchaser and claims that "[m]any examples like this can be observed in the merged data." *Id.* ¶ 33. But she does not point to any other examples, and she also does not explain how one can determine the purchaser's identity from the PBM claims data because that data produced in this litigation contains only member identification numbers and not actual names.

Dr. Hughes conducted a more thorough analysis and found that in fact fewer than 16% of the coupon transactions in the data can be matched to PBM data, even using the most liberal standard for "matching" transactions and after taking steps to maximize the number of matches. Decl. of Dr. James W. Hughes in Supp. of Defs.' Mot. to Exclude Expert Opinions of Prof. Meredith Rosenthal ¶ 20, Dkt. No. 1586-3 ("Hughes Decl."). This is a serious flaw in Plaintiffs' proposed methodology because 2,163,578 Mylan-issued coupons were used in EpiPen transactions, and 75.3% of the time, those coupons reduced the customers' payment to zero. Hughes Rep. ¶ 79 & n.125. Professor Rosenthal is only able to identify 16% of those, which means that the other 84% would remain in the class, even though they suffered no damages and are subject to a specific exclusion under the proposed class definitions. For all of these and other reasons, Defendants have moved to exclude portions of Professor Rosenthal's report, including

---

[3] IQVIA, formerly Quintiles and IMS Health, Inc., is a publicly traded company that, among other things, provides data and analytics services to the pharmaceutical industry. IQVIA aggregates prescription data, which provides very basic information about a prescription including the drug and the prescriber but not the purchase price or the patient identifiers, for example.

her ascertainability analysis.  *See* Defs.' Mem. in Support of Mot. to Exclude Expert Opinions of

Prof. Meredith Rosenthal, Dkt. 1586-2.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence affords trial courts broad leeway to admit

reliable evidence that is helpful to the trier of fact.  The "focus" of the *Daubert* inquiry "must be

solely on principles and methodology, not on the conclusions that they generate."  *Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993); *see also Dodge v. Cotter Corp.*, 328 F.3d

1212, 1222 (10th Cir. 2003) (same).  The question is not whether the expert's analysis is perfect,

or even correct, but whether it falls outside "the range where experts might reasonably differ."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).

On a *Daubert* motion at the class certification stage, the standard is lower except for

where "a plaintiff relies entirely on expert evidence to satisfy a Rule 23(a) requirement for

certification."  Mem. and Order Granting Mot. to Amend Sched. Order at 5, Dkt. 1532.  The

court must ensure "that the basis of the expert opinion is not so flawed that it would be

inadmissible as a matter of law."  *Id.* at 4-5.

## ARGUMENT

### I.      DR. HUGHES IS QUALIFIED.

To be clear, Plaintiffs do not move to exclude Dr. Hughes's testimony on the basis that he

is unqualified to proffer the opinions contained in his Report.  Nevertheless, because Plaintiffs

devote so much of their brief trying to undermine Dr. Hughes's qualifications and making

misleading claims that his testimony was rejected, Defendants briefly respond to those points

here.  Plaintiffs try to disparage Dr. Hughes by emphasizing, for example, that he teaches at a

liberal arts college, has research interests outside of the pharmaceutical industry, and has a

faculty website that has not been updated to reflect his experience in applied economic analysis

of the pharmaceutical industry.  *See* Mot. at 2.  None of these or any of the other gibes Plaintiffs make diminishes the fact that Dr. Hughes's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[4]  Fed. R. Evid. 702(a).  Indeed, Dr. Hughes's testimony on these very issues has been deemed helpful by courts across the United States for the past three decades.[5]

Plaintiffs also assert that Dr. Hughes's expert testimony has been "rejected" by courts. Mot. at 4.  That is false.  In the two cases Plaintiffs cite, Dr. Hughes's testimony was not excluded *or even subject to* a *Daubert* challenge.  *See In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017); *In re Nexium Antitrust Litig.*, 297 F.R.D. 168, 178-83 (D. Mass. 2013).  In fact, in *In re Lidoderm*, the court specifically found that "the concepts and designs of [Dr. Hughes's] models are solid."  2017 WL 679367, at *24-25. And in *In re Nexium*, the court "conclude[d] from Dr. Hughes' report that certain class members were not actually injured . . . ."  297 F.R.D. at 177-79.  Further, far from favoring Professor Rosenthal's testimony, as Plaintiffs suggest, the *In re Nexium* court described Dr. Hughes as "an equally adept expert," *id.* at 176, and went as far as to point out that "Dr. Rosenthal's methodology [wa]s not without flaws."[6]  *Id.* at 182.  In short, Dr. Hughes is eminently qualified.

---

[4] The date on which Dr. Hughes was retained also has no bearing on his admissibility, and Plaintiffs cite no authority to the contrary.  More relevant than the date of his retention, Dr. Hughes spent 50+ hours on this litigation prior to his deposition.  Ex. A (Hughes Dep. 35:5-9). This was more than enough time to formulate opinions and draft a report given his 20+ years of experience.

[5] Plaintiffs also note that Dr. Hughes has primarily been retained to testify on behalf of defendants.  This does not render him unqualified, and Plaintiffs do not contend otherwise.  And Plaintiffs' expert Professor Rosenthal has testified "between 30 and 40" times, and in all but one of those cases, she testified on behalf of the plaintiffs.  *See* Ex. B (Rosenthal Dep. 303:9-304:6).

[6] With respect to the *In re Lidoderm* case, Plaintiffs claim that "Prof. Hughes's opinions regarding possible barriers to class certification were . . . rejected."  Mot. at 4.  This is wrong. The court simply noted that "the issues Hughes attempts to identify as possibly occurring . . . are factors that can be accommodated by altering the inputs to the experts' models."  *In re Lidoderm*,

## II.     DR. HUGHES'S TESTIMONY AND OPINIONS ARE RELIABLE.

### A.     Dr. Hughes's Testimony on the Pharmaceutical Industry is Reliable.

As a threshold matter, Plaintiffs' arguments concerning Dr. Hughes's "opinions" on pharmaceutical product and payment flows are a distractor, because he offers no formal opinion on any particular issue in that section of his Report.  Rather, he provides important, relevant, and clarifying background information to assist the Court in understanding the highly technical operation of a complex industry.  *See* Hughes Rep. ¶ 17 ("I describe key economic features of the U.S. pharmaceutical supply and payment chains to facilitate the assessment of Class Plaintiffs' allegations and evidence in their proper economic context."); Ex. A (Hughes Dep. 54:6-13) ("[I] wouldn't classify that as an opinion.  That is . . . a description of the economics of the pharmaceutical payment system.").  That is in keeping with "the venerable practice of using expert testimony to educate the factfinder on general principles."  Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment.

### 1.     Dr. Hughes's testimony on the pharmaceutical industry applies to EpiPen product and payment flows.

Plaintiffs first argue that Dr. Hughes's "generalized testimony does not apply to the facts of the EpiPen's [sic] market."  Mot. at 12.  But it absolutely does.  That Dr. Hughes's testimony on pharmaceutical product and payment flows *also* applies to products other than EpiPen Auto-Injectors does not make that testimony unreliable, and Plaintiffs do not argue otherwise (nor could they).  Plaintiffs' assertion that "if an EpiPen purchaser class is unable to be certified on the basis of Prof. Hughes's testimony, then no pharmaceutical class could *ever* be certified,"

---

2017 WL 679367, at *24.  Plaintiffs claim that in the *In re Nexium* case, the court found that Dr. Hughes "failed" to quantify the amount of uninjured TPPs that were part of a subgroup.  Mot. at 4.  Actually, the court noted that while Dr. Hughes had not "establish[ed] the actual existence of uninjured TPP groups," he was "able to identify . . . three categories of TPPs that *potentially* could be uninjured members of the putative class."  *Id.* at 178-79.  In neither case were Dr. Hughes's opinions "rejected," Plaintiffs' representations to this Court notwithstanding.

Mot. at 11, fundamentally misunderstands the purpose of Dr. Hughes's testimony on this topic. Defendants do not offer this testimony as the basis for why the class should not be certified but rather to provide the Court with general background information needed to assess the Plaintiffs' motion within the appropriate framework.[7] *See, e.g.*, *Anderson v. Equifax Info. Servs., LLC*, No. 2:16-CV-2038, 2018 WL 1542322, at *3 (D. Kan. Mar. 29, 2018) ("[C]ourts allow generalized expert testimony to be admitted to explain general or background information.").

And for all that Plaintiffs make of Dr. Hughes's testimony on pharmaceutical product and payment flows, they do not actually dispute *any* of his descriptions.  For example, Plaintiffs do not contend, nor could they, that rebate payments flow from PBMs to pharmaceutical manufacturers rather than the other way around.  *See* Hughes Rep. Fig. 2.  And Dr. Johnson, another of Defendants' expert economists, included an almost identical flowchart and description of the flow of pharmaceutical payments and product flows in his own expert report, which Plaintiffs did not challenge.  *Compare* Hughes Rep. Figs. 1-2 *with* Expert Report of John H. Johnson, IV in Supp. of Defs.' Opp., Exs. 4-5, Dkt. 1503-1.

     **2.**     **Dr. Hughes's testimony on particular TPPs is based on decades of industry experience and review of the record in this case.**

Plaintiffs next posit, incorrectly, that Dr. Hughes's testimony is the product of an unreliable methodology.  An expert may base his testimony either "upon professional studies or personal experience."  *Kumho Tire Co*, 526 U.S. at 152; *see also Dodge*, 328 F.3d at 1222-23 (same).  Dr. Hughes did both when he described the differences among the various TPPs in the

---

[7] Plaintiffs specifically argue that Dr. Hughes was wrong to opine that he would not "expect a positive correlation" between the Wholesale Acquisition Cost ("WAC") and Usual and Customary price ("U&C") of EpiPen products.  *See* Mot. at 12.  This is a smoke screen.  Dr. Hughes does not opine on the relationship between WAC and U&C, nor do Plaintiffs cite anywhere where he purports to do so.  At his deposition, he did not opine on whether there is any relationship between WAC and U&C in the pharmaceutical industry *or* specifically with regard to EpiPen products.  Ex. A (Hughes Dep. 79:21-25).

putative class, including Local 282, Humana, Cigna, and others.  He did not selectively choose sources to review, as Plaintiffs assert, *see* Mot. at 14, but rather reviewed everything he found relevant to the subject.  This included discovery in this litigation, publicly available documents, and his own professional experience.  *See* Hughes Rep. App'x C; Ex. A (Hughes Dep. 69:4-17). The sections of his Report relating to particular TPPs are replete with citations to academic articles, deposition testimony, Local 282 documents, filings in this case, websites, and government statistics.[8]

Contrary to Plaintiffs' assertion, Mot. at 14, an expert need not have reviewed each line of millions of pages of documents and deposition testimony spanning a vast range of legal issues in order to offer a reliable opinion on a particular issue, so long as he or she reviews the relevant parts.  *See In re Titanium Dioxide Antitrust Litig.*, No. CIV.A. RDB-10-0318, 2013 WL 1855980, at *9 (D. Md. May 1, 2013) (noting that where there are millions of pages of documents in the record, "experts cannot be expected to review all of the materials. If important portions of the record were overlooked, then the Defendants may address that issue at trial"); *Milam v. Ranger Ins. Co.*, No. CIV-04-1749-HE, 2006 WL 5347771, at *3 n.9 (W.D. Okla. June 13, 2006) ("Contrary to defendants' suggestion, it is not necessary that an expert witness 'read all the depositions' and turn himself into some sort of 'super juror' in order to offer expert testimony on an issue, assuming other prerequisites to admissibility are met.").  That is what Dr. Hughes did.

---

[8] Plaintiffs fault Dr. Hughes for not listing some of the sources he reviewed in his Materials Considered list, but as he explained, there were a few sources that he simply forgot to list, and he did not list certain websites like those of Cigna and Humana "because the statements are supported by a reliable source, deposition testimony, and so that was the source that [he] ended up using."  Ex. A (Hughes Dep. 61:14-62:4).  Moreover, Plaintiffs never requested that Dr. Hughes revise his Materials Considered list.

Plaintiffs' accusation that Dr. Hughes searched for secondary sources only after he had formulated his opinions also is demonstrably false and based on citations to partial deposition excerpts that Plaintiffs take out of context. In fact, what Dr. Hughes actually testified to is that many of the articles he cited "were things that [he] found on [his] own through [his] own research." Ex. A (Hughes Dep. 46:3-6). Plaintiffs' counsel then asked, "How did you decide what to review?" *Id.* at 46:7. Dr. Hughes answered, "I looked at depositions from the named plaintiffs. I looked at fact depositions from PBM people, from Local 282, and the -- for example, section four of the report ['Economics of Prescription Drugs in the United States'] was penned based largely on my 20 years of experience in examining the pharmaceutical market." *Id.* at 46:8-14. After writing an initial draft *on this basis*, he then "went back to look for secondary sources" to confirm his Report. *Id.* at 46:14-21.

Further, to the extent Dr. Hughes relied on his own professional experience, he was well qualified to do so. Dr. Hughes is one of the foremost experts in the country on the economics of the pharmaceutical industry with his testimony never having been excluded in 20+ years of testifying. *See supra* at 6-7. Courts have regularly praised the breadth and depth of Dr. Hughes's knowledge of the industry and have excerpted his work in their opinions, yet these are the portions of Dr. Hughes's testimony that Plaintiffs complain he is not qualified to give. *See, e.g.*, *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *4-6 (D.N.J. Oct. 30, 2018) (excerpting a chart from Dr. Hughes's opinion demonstrating pharmaceutical product payment flows and relying on his testimony concerning the same); *Skelaxin*, 299 F.R.D. at 564-66 (same).[9] This Court should reach the same conclusion as these and other courts.

---

[9] *See also, e.g.*, *Vista Healthplan*, 2015 WL 3623005, at *11, 19 ("Dr. Hughes credibly testified that he was unaware of any administratively feasible approach that would allow Plaintiffs to distinguish class members from persons that fell within an exclusion . . . . I find Dr. Hughes' analysis on this issue convincing. . . . Based upon Dr. Hughes' experience and training and the

### 3.   Plaintiffs' disagreement with Dr. Hughes's testimony on Local 282 is not a valid basis for a *Daubert* challenge.

In addition to incorrectly framing Dr. Hughes's description of pharmaceutical product and payment flows as "opinions," Plaintiffs also attempt to discredit some of Dr. Hughes's actual opinions on specific TPP class members on the basis that they simply don't agree with some of his informed views.[10]  *See* Mot. at 13.  That is not a legitimate basis for a *Daubert* challenge.  *See Daubert*, 509 U.S. at 595 (the "focus" of the *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions that they generate"); *see also Dodge*, 328 F.3d at 1222 (same).  Specifically, Plaintiffs contend that employers' reimbursement of Local 282 for its prescription drug costs is similar to a commercial insurer raising premiums, which "does not affect whether insurers suffer antitrust injury at the time of reimbursement."  Mot. at 13.  In other words, Plaintiffs disagree with Dr. Hughes on the basis of a legal argument—not based on the principles or methodology he employed to form his opinions.

In any event, Dr. Hughes's testimony on Local 282 is supported by substantial record evidence.  For example, Dr. Hughes's opinion that Local 282 does not bear ultimate financial responsibility for drugs dispensed to its insured members is supported by Local 282's own sworn testimony.  *See* Ex. D (Bulding Dep. 59:19-60:7) (if costs increase, Local 282 simply "go[es] back [to] the union . . . and negotiate[s] higher contribution rates to the welfare trust fund").  The

---

reliable data he reviewed, I credit his testimony regarding the numerous categories of uninjured consumers and the extensive individualized inquiries that would follow.").

[10] For example, Plaintiffs accuse Dr. Hughes of mischaracterizing the deposition testimony of a single named Plaintiff, Landon Ipson.  Mot. at 8.  Mr. Ipson testified that his insurance policy did not "utilize a copay system" and that he was not "offered a copay option."  Ex. C (Ipson Dep. 59:22-60:3).  On that basis, Dr. Hughes opined that Mr. Ipson "paid $0 copays."  Ex. A (Hughes Rep. ¶ 29).  Plaintiffs claim that not having a copay system or option is not the same as paying no copay.  This is a matter of interpretation and has nothing to do with Dr. Hughes's characterization of Mr. Ipson's deposition testimony, much less whether his expert testimony is admissible.

portions of Local 282's deposition that Plaintiffs cite, Mot. at 13-14, are taken out of context, and in any event reflect that Plaintiffs ultimately just don't like Dr. Hughes's opinions—not that those opinions are unreliable.[11]  Indeed, a disagreement as to Local 282's payment arrangements shows why Local 282 fails the typicality test under Rule 23, and why there are individualized issues for TPPs in this case that predominate—not that the expert raising those issues should be excluded.

### B.      Dr. Hughes's Opinions On Ascertainability Are Reliable.

Plaintiffs bear the burden to demonstrate ascertainability as a necessary condition to sustain class certification.  *See Vista Healthplan*, 2015 WL 3623005, at *10 ("Plaintiffs must, *at the time of class certification*, present a methodology to identify class members, and prove by a preponderance of the evidence that such methodology will be effective and will not require extensive individualized inquiry and mini-trials.").  Despite this, they failed to proffer an expert on that topic, and in fact did not address—let alone demonstrate—ascertainability anywhere in their class certification motion.  It is no wonder, then, that Plaintiffs are now trying so desperately to exclude Dr. Hughes's opinions on this topic.  But Plaintiffs' attacks are meritless, as (1) Dr. Hughes offers expert opinions—not legal conclusions, and (2) these opinions are the products of his careful analysis of *all* of the relevant data plaintiffs have produced in this case.

---

[11]  Plaintiffs claim that Local 282 does not bear ultimate financial responsibility for the pharmaceutical products purchased by its insured members because Local 282 testified that it "'pays for every prescription drug covered under its plans' and does not 'see[k] reimbursement for any part of that cost[.]'"  Mot. at 13-14.  In fact, that statement was made in the context of a discussion about whether *insurers* ultimately reimburse Local 282 for its costs.  *See, e.g.*, Ex. D (Bulding Dep. 198:10-13) (Q: "So no insurance company . . . pays any portion of the remaining cost?"  A: "That is correct.").  But Dr. Hughes explains that Local 282's "costs are paid in full by the *employers* that pay into it" – not by insurance companies.  Hughes Rep. ¶ 48 (emphasis added).  In any event, Local 282's representative's statement about reimbursement from insurers also appears to be false based on recently produced documents by the consulting company that negotiated with PBMs on Local 282's behalf.  *See, e.g.*, Ex. E (SEGAL_EPIPEN_018391) ("You are aware that the Fund has stop loss now to moderate any large claim . . . .").

In fact, Plaintiffs' arguments not only fail to undermine the reliability of Dr. Hughes's opinions – they actually support the exclusion of Plaintiffs' expert's testimony on ascertainability.

### 1.   Dr. Hughes does not offer legal opinions or make legal conclusions.

Plaintiffs' contention that Dr. Hughes's opinions constitute impermissible legal conclusions and are based on an incorrect legal standard, Mot. at 15-16, stem not from Dr. Hughes's actual opinions but rather from Plaintiffs' counsel's inaccurate framing of this issue during Dr. Hughes's deposition:

> Q:   Do you have a view as to whether your definition of ascertainability is consistent with the applicable legal standard?
>
> A:   No.
>
> Q:   . . . [D]o you have an understanding that the meaning of ascertainability may vary between the courts of the United States?
>
> A:   That's my understanding, yes.
>
> Q:   And which -- do you have an understanding as to which court's test you are applying?
>
> A:   No, I don't think I am applying any court's test because it's a legal standard. . . . [M]y assignment is very narrow, is that . . . is there a methodology to tell who is in the class and who is not in the class.   But I am not applying -- I am not applying a legal standard.   That would be outside my expertise.

Ex. A (Hughes Dep. 108:15-109:13) (omitting form objections by counsel for Mylan).   Professor Hughes's testimony speaks for itself.   Far from opining on the applicable legal standard, Dr. Hughes simply considers whether Plaintiffs have proposed a reliable methodology to determine who is in the class and/or whether any such methodology exists, as experts do all the time in class certification proceedings.[12]

Plaintiffs' argument that the court in *Luviano v. MultiCable, Inc.* "held that the plaintiff expert's opinion that 'the [class members'] names and addresses are ascertainable' was an

---

[12] *See, e.g.*, *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015); *Fenwick v. Ranbaxy Pharm., Inc.*, No. 3:12-cv-07354 (PGS)(DEA), 2018 WL 5994473 (D.N.J. Nov. 13, 2018);   *In re Thalomid*, 2018 WL 6573118, at *22; *In re Lidoderm* 2017 WL 679367; *In re Wellbutrin Antitrust Litig.*, 308 F.R.D. 134 (E.D. Pa. 2015); *Vista Healthplan*, 2015 WL 3623005; *In re Skelaxin*, 299 F.R.D. 555.

inadmissible legal conclusion," Mot. at 15, distorts that court's actual holding. No. CV1505592BROFFM, 2017 WL 3017195, at *10 (C.D. Cal. Jan. 3, 2017).  That court struck portions of the expert's opinion because, rather than analyze a proposed methodology for determining inclusion and exclusion of class members, as Dr. Hughes did, the expert simply made the conclusory statement that the class was ascertainable.  *Id.*  Plaintiffs' failure to proffer expert testimony or any other evidence on this critical subject, which "mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit," *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013), does not mean that it cannot be done.  It can.  And it is, often.  In fact, apparently appreciating the damage Dr. Hughes's testimony does to their prospects of certifying a class in this matter, Plaintiffs have asked their own expert, Professor Rosenthal, to scrape something together on ascertainability as part of an improper eleventh-hour rebuttal report.  *See* Fed. R. Civ. P. 26(a)(2)(D)(ii).

### 2. Dr. Hughes's opinions on ascertainability are the products of careful analysis of the relevant data produced in this case.

Plaintiffs cannot use their own failure to obtain data to argue that Dr. Hughes should have considered more.  *See* Mot. at 16.  It is Plaintiffs' burden to demonstrate ascertainability, and it was therefore up to them to obtain the data and any other evidence necessary to enable them to meet that burden.  *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).  The data produced in this action are the data this Court has before it to evaluate whether Plaintiffs have met their burden.

Plaintiffs also repeatedly argue that Dr. Hughes reached his conclusions on ascertainability without reviewing Plaintiffs' initial expert reports of Professors Einer Elhauge and Rosenthal.  But those reports do not even mention—let alone analyze—ascertainability.  It

therefore is entirely unclear what Plaintiffs contend Dr. Hughes should have looked at in those reports that would have affected his ascertainability analysis in any way.

Dr. Hughes focused on what was actually produced that bears on the subject. He "examined in detail much of the data provided in discovery in this matter, covering millions of lives and transactions." Hughes Rep. ¶ 13; *see also* Ex. A (Hughes Dep. 72:19-73:5) ("I was looking for the PBM claims data that had been produced . . . covering millions and millions of lives, and so from those data it was my conclusion that you could not identify who should be in the class or who should be excluded from the class."). He further offered to review any additional data sets that Plaintiffs' counsel might be aware of or which they might later procure through discovery. *See* Ex. A (Hughes Dep. 73:5-11). Plaintiffs neither asked him to do so nor have they produced any additional relevant data. Based on his review of all the relevant data produced in this case, Professor Hughes attempted to align different data fields to determine whether he could match individual consumers to their EpiPen purchases. *See, e.g.*, Hughes Rep. ¶¶ 64-68; Tables 1-2 (reflecting analysis of PBM/TPP data). He could not do so, and he explains why in painstaking detail in his 22 paragraphs of analysis of this data contained in his Expert Report. *See* Hughes Rep. ¶¶ 63-84.

Nevertheless, Plaintiffs argue that Dr. Hughes's opinions on ascertainability are "not based on any analysis." Mot. at 17. This meritless argument appears to be based on a single self-described "brain cramp" during Dr. Hughes's deposition, which Dr. Hughes nearly immediately corrected. *See* Ex. A (Hughes Dep. 97:10-16) (stating "I had a brain cramp when you asked me before when we were talking about consumers" and correcting his prior testimony regarding TPPs). The Federal Rules of Evidence assign district court judges the gatekeeping role to test the reliability and helpfulness of expert testimony, not whether the expert makes an occasional misstatement during a day-long deposition. Even Plaintiffs evidently don't believe

their own assertion; they acknowledge earlier in their Motion that Dr. Hughes's "opinions on ascertainability [are based on] the data produced in this action thus far." Mot. at 16. In contrast, Plaintiffs' own expert, Professor Rosenthal, claimed that she could identify all consumers whose use of coupons reduced their EpiPen purchase price to nothing based on her review of a *single EpiPen purchase*. *See supra* at 4-5. This truly defines a lack of adequate analysis of the data, as Defendants have already demonstrated. *See* Defs.' Mem. in Support of Mot. to Exclude Expert Opinions of Prof. Meredith Rosenthal at 8-11, Dkt. 1586-2.

Moreover, while Dr. Hughes's consideration of all relevant data produced to date would be sufficient in and of itself, *Dodge*, 328 F.3d at 1222, he did not stop there. He also considered, based on his decades of experience examining the pharmaceutical industry, whether PBMs, TPPs, or pharmacies might *potentially* have the necessary data, and he determined that they likely would not. *See* Hughes Rep. ¶¶ 70-73, 80, 83. Moreover, Plaintiffs themselves do not even argue that they could obtain data on EpiPen purchasers who paid with cash or used a Mylan coupon, even if they actually tried to do so. Dr. Hughes cannot be held responsible for Plaintiffs' failure to so much as issue a subpoena to a single pharmacy or their failure to collect identifying information from a single PBM. Dr. Hughes's opinions on ascertainability are reliable and admissible.

### 3. Dr. Hughes engages with the data produced in discovery far more diligently than does Plaintiffs' own expert, Professor Rosenthal.

Plaintiffs' attacks on Dr. Hughes are further undermined by the fact that their own expert's new ascertainability opinion—contained for the first time in her rebuttal report—is based on "unjustified assumptions," *Cochrane v. Schneider Nat. Carriers, Inc.*, 980 F. Supp. 374, 378 (D. Kan. 1997), includes no methodology, and reveals her lack of experience in pure

17

economic analysis. In stark contrast to Dr. Hughes's Report and testimony, Professor Rosenthal's analysis suffers from two gaping flaws that render it unreliable.

*First*, to identify consumers who paid cash, Professor Rosenthal proposes examining IQVIA data, yet she admits that these data do not include any patient-identifying information—making them useless for identifying class members. Rosenthal Reply ¶ 48. To determine which consumers had single-flat-copays, she insists that PBMs must have that data and ignores the data actually produced *in this case*, none of which contains identifying information. *See id.* ¶ 20.

*Second*, whereas Dr. Hughes made a systematic – and ultimately futile – effort to match Mylan coupon data to the PBM claims data in the record, Professor Rosenthal endeavored to match only *one single transaction*. She then inappropriately extrapolated from this single example to the entire population of putative class members in the case and blindly asserts that "[m]any examples like this can be observed in the merged data" and thus, "at the appropriate time – we can link coupons with pharmacy records." *Id.* ¶¶ 33, 49. Dr. Hughes's systematic analysis debunked this, demonstrating that, even after extensive manipulation to maximize the number of matches, ***fewer than 16%*** of the transactions listed in the Mylan coupon data can be linked to the PBM claims data. Hughes Decl. ¶ 20. Moreover, well before Plaintiffs filed this *Daubert* motion, Dr. Hughes had analyzed PBM and TPP data for completeness, Hughes Rep. ¶¶ 69-71, 81-84, and analyzed the content and distributions of values of fields in the data files, *id.* ¶¶ 64, 66, 75. Under these circumstances, Plaintiffs' claim that Dr. Hughes "did not conduct any analysis," Mot. at 18, strains credulity. In contrast to Dr. Hughes's rigorous work, Professor Rosenthal asks the Court to rely on "conclusory statements . . . . that records exist that could be used to ascertain the class." *Wellbutrin*, 308 F.R.D. at 151. The *Wellbutrin* court was "not persuaded by [Professor Rosenthal's] conclusory statements," *id.*, and this Court should likewise reject them in favor of those of Dr. Hughes—a well-qualified economist who has done the hard

work of crunching the actual data in this case and has formulated his opinions on ascertainability on that basis.[13]

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Class Plaintiffs' Motion to Strike the Testimony of Professor James Hughes.

Dated:  June 7, 2019                                      Respectfully submitted,

                                                          /s/ Adam K. Levin

                                                          Adam K. Levin
                                                          David M. Foster
                                                          Benjamin F. Holt
                                                          Justin W. Bernick
                                                          Carolyn A. DeLone
                                                          Kathryn M. Ali
                                                          Christopher D. Edelman
                                                          HOGAN LOVELLS US LLP
                                                          555 13th Street, NW
                                                          Washington, DC 20004
                                                          Telephone: (202) 637-5600
                                                          Fax: (202) 637-5910
                                                          adam.levin@hoganlovells.com
                                                          david.foster@hoganlovells.com
                                                          benjamin.holt@hoganlovells.com
                                                          justin.bernick@hoganlovells.com
                                                          carolyn.delone@hoganlovells.com
                                                          kathryn.ali@hoganlovells.com
                                                          christopher.edelman@hoganlovells.com

---

[13] If anything, Plaintiffs' arguments go to weight, not admissibility.  *See In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 637 (D. Kan. 2008) ("The recent trend of authority is to permit the district court to compare the relative weight of expert opinions in ruling on a motion for class certification[.]"); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 569-70 (8th Cir. 2005) (affirming denial of class certification where the district court "considered all expert testimony offered by both sides in support of or in opposition to class certification and . . . afforded that testimony such weight as [the court] deemed appropriate").  Therefore, to the extent the Court gives *any* credence to any of Plaintiffs' arguments, it should do so in the context of deciding what weight to afford Dr. Hughes's opinions rather than whether to exclude them.

Brian Fries (15889)
James Moloney (23786)
LATHROP GAGE LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri  64108-2618
Telephone: (816) 292-2000
Fax: (816) 292-2001
bfries@lathropgage.com
jmoloney@lathropgage.com

*Counsel for the Mylan Defendants*

/s/ Joseph Rebein

Joseph Rebein  (25912)
Ashley Harrison, D. Kan (78667)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone:  (816) 474-6550
Fax:  (816) 421-5547
jrebein@shb.com
aharrison@shb.com

Dimitrios T. Drivas
Robert A. Milne
Raj S. Gandesha
Edward Thrasher
Kathryn Swisher
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Fax: (212) 354-8113
ddrivas@whitecase.com
rmilne@whitecase.com
rgandesha@whitecase.com
ethrasher@whitecase.com
kswisher@whitecase.com

*Counsel for Defendants Pfizer Inc., King Pharmaceuticals LLC, and Meridian Medical Technologies, Inc.*

20