# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO.: 2:17-MD-02785-DDC-TJJ <br><br> Hon. Daniel D. Crabtree <br><br> Hon. Teresa J. James |
| SANOFI-AVENTIS U.S. LLC, <br><br>               Plaintiff and <br>               Counterclaim-Defendant, <br><br>    v. <br><br> MYLAN Inc., *et al.*, <br><br>               Defendants and <br>               Counterclaim-Plaintiffs. <br><br> **This Document Relates to the *Sanofi* Case**. | CASE NO.: 2:17-CV-02452-DDC-TJJ <br><br><br> *Document Filed Electronically* |

## SANOFI-AVENTIS U.S. LLC'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF GARY ZIEZIULA

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| ARGUMENT | | 2 |
| I. | Mylan Fails To Show That Mr. Zieziula Is Qualified To Offer His Opinions | 2 |
| II. | Mylan Fails To Show that Mr. Zieziula's Remaining Opinions Are Reliable | 5 |
| | A. Mr. Zieziula's Opinions Concerning The Prevalence Of Allegedly Misleading Messages In Sanofi Advertisements Are Still Not Reliable Or Scientifically Sound | 6 |
| | B. Mr. Zieziula's Observations That Sanofi's Claims "Can Have" An Impact On How Consumers And Physicians Make Decisions Are Not Reliable Opinions On Causation | 10 |
| III. | Mylan Fails to Show that Mr. Zieziula's Opinions Will Assist The Trier Of Fact | 11 |
| CONCLUSION | | 13 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ................................................................................*passim*

*Brighton Collectible, LLC v. Believe Prod., Inc.*,
  No. 15-00579, 2017 WL 440255 (C.D. Cal. Jan. 30, 2017)...................................................11

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) .......................................................................................12

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ........................................................................................ 1, 5, 6

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
  960 F.2d 294 (2d Cir. 1992) ....................................................................................................6

*Major Mart, Inc. v. Mitchell Distrib. Co.*,
  46 F. Supp. 3d 639 (S.D. Miss. 2014) ...................................................................................11

*Merisant Co. v. McNeil Nutritionals, LLC*,
  515 F. Supp. 2d 509 (E.D. Pa. 2007).......................................................................................3

*Parker v. Wal-Mart Stores, Inc.*,
  267 F.R.D. 373 (D. Kan. 2010)..............................................................................................13

*Proctor & Gamble Co. v. Haugen*,
  222 F.3d 1262 (10th Cir. 2000)......................................................................................... 6, 10

*Ralston v. Smith & Nephew Richards, Inc.*,
  275 F.3d 965 (10th Cir. 2001) .................................................................................................5

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
  902 F.2d 222 (3d Cir. 1990) ..................................................................................................10

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
  No. 13-2451, 2016 WL 5496340 (D. Minn. Sept. 28, 2016)..............................................3, 4

*Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*,
  275 F.3d 996 (10th Cir. 2002) .................................................................................................9

*In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*,
  No. 2436, 2016 WL 807377 (E.D. Pa. Mar. 2, 2016) .............................................................3

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ..............................................................................................10

*Wheeler v. John Deere Co.*,
    935 F.2d 1090 (10th Cir. 2011)............................................................................................5

*Zoller Labs., LLC v. NBTY, Inc.*,
    111 F. App'x. 978 (10th Cir. 2004).......................................................................................7

**Other Authorities**

Fed. R. Evid**.** 702 ................................................................................................................13

**PRELIMINARY STATEMENT**

In its opening brief, Sanofi pointed out that its motion to exclude Mr. Zieziula asks this Court to do nothing more than take Mr. Zieziula at his word. Mr. Zieziula has admitted that he is not a regulatory expert. Mr. Zieziula has admitted that he is not an antitrust expert. Mr. Zieziula has admitted that he never conducted a consumer survey, and Mr. Zieziula has admitted that he has never published a paper on marketing, or held a marketing job since 1998. At bottom, Mr. Zieziula is, as he stated, an "expert on the facts," and an "expert on the facts" is no expert at all.

In response, after spending seven pages repeating Mr. Zieziula's opinions and his curriculum vitae—from which jobs and experience as a regulatory expert, an antitrust expert, a consumer survey expert or a marketing expert are conspicuously absent—Mylan concedes that: (1) Mr. Zieziula is not offering an opinion on whether Sanofi's advertising was actually false or misleading, Opp. at 16; and (2) Mr. Zieziula did not conduct any analysis to quantify the harm suffered by Mylan, but rather is simply opining that Sanofi's claims "can have" an impact. *Id*. at 21. But no expert testimony is needed for the proposition that something "can" have an effect. And in its summary judgment opposition, Mylan has also conceded that there are no issues with Sanofi's written promotional materials: "its pre-printed advertising is beside the point, as Mylan's counterclaims are for the most part based on Sanofi's oral statements disseminated by its sales force and account executives, not its printed materials." *See* ECF No. 1813 at 80. In the absence of any evidence that Sanofi made any false or misleading claims, or that any alleged claims actually had an effect on Mylan's sales, and for the reasons stated in Sanofi's motion and the arguments set forth below, this Court should exclude Mr. Zieziula's proposed testimony pursuant to *Daubert*.

**ARGUMENT**

**I.    Mylan Fails To Show That Mr. Zieziula Is Qualified To Offer His Opinions**

To sidestep Mr. Zieziula's conceded lack of qualifications to opine on regulatory issues—in Mr. Zieziula's own words, how Sanofi's claims allegedly "lack the substantiation required by regulatory standards," *see* Mot. Ex. 2 at 4—Mylan states that Mr. Zieziula's opinions are really "about commercialization" and not "regulatory law." *See* Opp. at 9–10. This argument does not pass the red face test because Mr. Zieziula's opinions repeatedly and expressly relate to regulatory standards. *See* Mot. Ex. 2 at 5 ("***DDMAC is the division within the FDA that has oversight of pharmaceutical marketing, advertising, and communications***. There is a well-described process with DDMAC to determine that promotional materials meet the rules and regulations of accepted promotional practices.") (emphasis added); *id.* ("***In my experience, it is standard practice for pharmaceutical companies to come to an agreement with the FDA*** on matters associated with clinical trials before beginning the trial, including protocol design[.]") (emphasis added); *id.* at 6 (opining whether Sanofi ensured compliance with "***all legal and regulatory requirements***") (emphasis added); Mot. Ex. 4 at 2 ("***In my February 4 Report, I discussed Sanofi's communications with the FDA*** concerning the appropriate design and use of an Auvi-Q preference study in the promotion and marketing of Auvi-Q.") (emphasis added). Because both Mylan and Mr. Zieziula himself concede that he is not a regulatory expert, Mr. Zieziula is not qualified to opine about FDA regulatory standards and he should be precluded from doing so.

To sidestep Mr. Zieziula's conceded lack of qualifications to opine on physician prescribing decisions and consumer and payor purchasing decisions—in Mr. Zieziula's own words, the "impact" of Sanofi's advertisements "on pay[o]rs, prescribing physicians, and consumers' purchasing decisions," *see* Mot. Ex. 2 at 4—Mylan argues that Mr. Zieziula's expertise spans marketing too, and as such, he is qualified to opine on the potential impact that comparative

2

or promotional claims may have on the purchasing decisions of physicians, patients, or payers. *See* Opp. at 10–11. While some courts have permitted tenured professors of marketing and marketing experts with doctorate degrees to opine on brand strategies and the importance of sales people in Lanham Act cases, *see id.* at 11 (citing *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, No. 13-2451, 2016 WL 5496340, at *17 (D. Minn. Sept. 28, 2016); *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 541 (E.D. Pa. 2007)),[1] that is not what Mr. Zieziula is tasked with doing here. Rather, Mr. Zieziula seeks to offer his personal opinion about what the marketing messages "suggested" to physicians, patients and payors (populations that he concededly is not part of). *See* Mot. Ex. 2 at 4. Courts preclude such personal opinion testimony. *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 440 (D.N.J. 2009) (Wolfson, J.) (holding that an expert's "opinion or personal belief about alleged implicit messages or customers' expectations is legally irrelevant" in Lanham Act cases because, among other reasons, the expert "is not a member of the relevant purchasing group").

In addition, both cases that Mylan cites to are distinguishable. In *Merisant*, the movant did not challenge the qualifications of the expert. 515 F. Supp. 2d at 539. And that was appropriate, as the expert in *Merisant*, Dr. James Fisher, was "a tenured professor of marketing with over 25 years of education and [marketing] experience" and was "published regularly in academic or peer-reviewed journals on issues such as marketing and business ethics, buyer behavior, marketing research and management, and consumer complaining behavior." *Id.* at 538 & n.16. Likewise, the expert in *Select Comfort*, Dr. Erich Joachimsthaler, was the "founder and Chief Executive Officer of . . . a strategic consulting firm with a focus on strategy, marketing, and innovation" and had

---

[1] *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 2436, 2016 WL 807377 (E.D. Pa. Mar. 2, 2016), is not a Lanham Act case.

"been a member of the American Marketing Association for 25 years." 2016 WL 5496340, at *16. Mr. Zieziula's qualifications are not remotely similar, as even he has admitted that has not held a marketing job since 1998. *See* Mot. Ex. 1 at 72:07–18.

To sidestep Mr. Zieziula's conceded lack of qualifications to opine on antitrust issues—in Mr. Zieziula's own words, "I disagree with [Dr. Fiona Scott Morton's] analysis and opinions," *see* Mot. Ex. 3 at 3—Mylan essentially argues that Mr. Zieziula's Antitrust Report does not opine on the impact of Mylan's alleged anticompetitive conduct, but rather is focused on "Sanofi's own conduct and business strategies [and how they] contributed to Auvi-Q's lack of success in 2014." *See* Opp. at 11–12. But Mr. Zieziula authored his Antitrust Report in order to rebut the expert report of Dr. Fiona Scott Morton, who Sanofi hired to opine on, among other things, the exclusionary nature of Mylan's conduct to protect its EpiPen monopoly and the impact of Mylan's anticompetitive conduct. *See* Mot. Ex. 3 at 4 (noting that Mr. Zieziula's opinion is "inconsistent" with that of Dr. Fiona Scott Morton as it relates to Mylan's "exclusionary conduct"). Any discussion in Mr. Zieziula's Antitrust Report regarding Sanofi's "conduct and business strategies" was ancillary to Mr. Zieziula's ultimate conclusion, which is: "[I]t is my opinion that Sanofi's failure to meet its pre-launch forecasts cannot be attributed to any 'exclusionary conduct' by Mylan." *See id*. at 18. Because both Mylan and Mr. Zieziula himself concede that he is not an antitrust expert, Mr. Zieziula is not qualified to opine on the impact of Mylan's anticompetitive conduct and he should be precluded from doing so.

To sidestep Mr. Zieziula's conceded lack of qualifications to opine on EAI devices or the EAI market—in Mr. Zieziula's own words, "the EAI category," *see id*. at 7—Mylan argues that Mr. Zieziula's previous experiences in "pharmaceutical sales and marketing, commercialization, and corporate leadership generally" render him able to opine on marketing in the EAI market. *See*

4

Opp. at 13. However, Mylan leaves out important details about the cases it uses to support its assertion that "a lack of specialization does not affect the admissibility of [an expert's] opinion." *Id*. (quoting and citing *Corr v. Terex USA, LLC*, No. 08-12815, 2011 WL 976718, at *4 (D. Kan. Mar. 17, 2011); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100–01 (10th Cir. 2011); *Butler Nat'l Serv. Corp. v. Navegante Grp., Inc.*, No. 09-2466, 2011 WL 4452505, at *3 (D. Kan. Sept. 26, 2011)). First, not one of these cases is a Lanham Act case. Second, the full quote from *Wheeler* reads: "*In a products liability action*, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Wheeler*, 935 F.2d at 1100 (emphasis added). Because both Mylan and Mr. Zieziula himself concede that Mr. Zieziula has no particular expertise with respect to EAI devices and because Mr. Zieziula does not have the qualifications of a typical marketing expert, Mr. Zieziula is not qualified to opine on the potential impact that comparative or promotional claims may have on the purchasing decisions of physicians, payors, or patients and he should be precluded from doing so.

## II. Mylan Fails To Show That Mr. Zieziula's Remaining Opinions Are Reliable

In its opposition, Mylan abandons several of Mr. Zieziula's opinions, and commits to the position that "Mr. Zieziula does not offer an opinion in his reports regarding whether Sanofi's promotional messages were actually false or misleading under the Lanham Act, and he will not offer any such opinion at trial." Opp. at 16. And because Mr. Zieziula is unqualified to offer expert testimony there is no need for this Court to assess the reliability or relevance of his remaining opinions. *See, e.g.*, *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) ("Because we find that [the expert's] testimony was properly excluded on the ground that she was unqualified, we have no need to address the reliability of her conclusions under *Daubert*."). However, even beyond Mr. Zieziula's lack of qualifications, his opinions should be excluded

5

because they are unreliable.[2]

### A. Mr. Zieziula's Opinions Concerning The Prevalence Of Allegedly Misleading Messages In Sanofi Advertisements Are Still Not Reliable Or Scientifically Sound

In Lanham Act cases, a plaintiff must show that the defendant's challenged marketing materials were "disseminated sufficiently to the ***relevant purchasing public*** to constitute 'advertising' or 'promotion' within that industry." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000) (emphasis added). And if an expert fails to make such a showing, his testimony must be excluded pursuant to *Daubert. See Bracco,* 627 F. Supp. 2d at 439–40 (excluding a proposed expert because, among other reasons, he failed to "conduct or rely on any official customer survey for his opinions").

Mylan concedes that "Mr. Zieziula did not purport to conduct a scientific, statistical analysis of Sanofi's marketing statements." *See* Opp. at 17. That should be the end of the inquiry here. *See Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) (noting, in a Lanham Act case, that "where the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message"). Mylan instead asks the Court to accept Mr. Zieziula's opinion "based on his experience [and belief] that the record evidence shows widespread promotional practices." *See* Opp. at 17. But as Judge Wolfson noted in *Bracco*, "an expert's 'personal opinion is not the legal standard by which courts must determine whether

---

[2] Mylan moreover does not dispute that expert opinions rendered solely for purposes of litigation are subject to enhanced scrutiny. *See* Mot. at 11–13 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)). And while it is true that expert opinions rendered solely for purposes of litigation are not *always* unreliable, *see* Opp. at 13–15, Mr. Zieziula's opinions are unreliable *both* because of their origin, and for the reasons set forth in Section II.

6

customers were misled.'" *Bracco*, 627 F. Supp. 2d at 440 (quoting *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 136 (3d Cir. 1994)).

More importantly, Mylan's position on prevalence simply misses the point. There is no dispute that Sanofi advertised Auvi-Q widely and no dispute that "the record evidence shows widespread promotional practices." Opp. at 17. But what the record evidence most assuredly does not show—and what Mylan needs to prove—is any widespread promotion of any *false* claims. Mylan attempts to sidestep this failure by referring throughout its opposition to the "challenged" statements. *See, e.g.*, *id.* at 5, 17. Doing so allows Mylan to lump together a handful of anecdotal single incidents regarding various claims with Mr. Zieziula's contention that Sanofi's message recall trackers, ATU reports and other market research are "chock full of comparative claims." *See* Mot. Ex. 4 at 4. Both Mylan and Mr. Zieziula have made something of a mantra of the fact that Sanofi is allegedly making comparative claims, but that is of absolutely no legal import. Comparative claims are entirely legal. *See, e.g.*, *Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x. 978, 984 (10th Cir. 2004) (unpublished). Indeed, these same message recall trackers, ATU reports and other market research are also chock full of comparative claims made by Mylan. *See* Sanofi SJ Reply, Resp. to SMF at ¶¶ 143–44, 175 (Aug. 30, 2019).

When the isolated incidents are separated out and not lumped together with a "challenged" label, it is clear that there is no basis for Mr. Zieziula's opinion that Sanofi made "widespread" false statements. The evidence Mylan cites is:

- Mr. Zieziula's opinion that Sanofi allegedly "failed to set the right tone at the top" because Anne Whitaker is quoted as saying that "Auvi-Q was more patient-friendly than EpiPen." Opp. at 17. First, Mylan has failed to show that this claim is false (it is unclear how Mylan could show that a non-quantifiable claim like "patient-friendly" is

7

false). Second, Ms. Whitaker is *not* quoted in the article, but paraphrased, and Mylan deliberately chose not to ask her about this distinction at her deposition in order to avoid hearing anything to the contrary. *See* Reply Ex. 6 at 258:20–265:14. Third, even if Ms. Whitaker had made the "challenged" statement, a single statement, even from the president of a company, is not evidence that a significant percentage of the relevant purchasing public holds the false belief allegedly communicated therein.

- Internal Sanofi documents that include the phrase "patients overwhelmingly prefer Auvi-Q." Opp. at 17. Mylan has failed to show that this is a claim (in an internal document, it may well be a simple observation that patients did overwhelmingly prefer Auvi-Q because of its size, shape and audio functions). And even if it is a claim, Mylan has failed to show that it is false. Moreover, internal documents are, by definition, not circulated to the relevant purchasing public. *See* Reply Ex. 7.

- Mr. Zieziula's review of "Mylan's competitive intelligence reports from its field force." Opp. at 17. Although Mylan does not specify which Sanofi claims are implicated in these "competitive intelligence reports," Mr. Zieziula's Counterclaims Report cites them in support of four observations, none of which Mylan has shown to be false. First, a "suggest[ion]" regarding accidental needle injections, which Mr. Zieziula acknowledges must be combined with the concededly true statement that Auvi-Q is the first and only EAI device with a retractable needle mechanism. *See* Mot. Ex. 2 at 9–10. Second, a single reference to a single alleged statement by a Sanofi representative (regarding temperature). *See id.* at 10. Third, a handful of references (including declarations from two staff members at the same allergy clinic in Arizona) to the "new EpiPen" or "new talking EpiPen," which Mylan has not shown to be false. *Id.* at 11,

8

    20. And finally, a single reference to an alleged kickback, which Mr. Zieziula includes in his report even though he admits that he "would be shocked if that is true." *Id.* at 12.

- Mr. Zieziula's review of various internal Sanofi market research documents that are supposedly "chock full" of unspecified comparative claims. Opp. at 19. The few specific messages that Mylan does mention include the message that "patients prefer Auvi-Q over EpiPen in studies," which is literally true, *see* Reply Ex. 8 at 1 ("Among all 693 participants combined, Auvi-Q was preferred over EpiPen on all study end points."); "ease of use" which is a true claim based on Auvi-Q's audio instructions, *see* Reply Ex. 6 at 203:11–17 ("Q. And it's also your expert opinion that the Auvi-Q had audio cues to walk patients through the injection process, right? [A.] Yes."); "easier to carry," which is a true claim based on Auvi-Q's smaller size and rectangular shape. *See id.* at 203:03–09 ("Q. It's your expert opinion the Auvi-Q device was smaller than the EpiPen device, right? [A.] Yes."). Mylan has not shown these claims to be false, and indeed, has specifically stated that Mr. Zieziula is not opining on their veracity. Opp. at 16.

When properly sorted by claim, it is clear that there is no basis for Mr. Zieziula's opinion that Sanofi made "widespread" false statements. *See Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, 275 F.3d 996, 1003–05 (10th Cir. 2002) (affirming the district court's grant of summary judgment and holding that the distribution of marketing materials "to at least two, and possibly as many as seven, recipients" does not constitute commercial advertising). Mr. Zieziula did not conduct any independent research to support his opinions, s*ee* Opp. at 17, and even if the Court is inclined to accept Mylan's argument that experts are owed substantial deference as it relates to the question of reliability, *see id.* at 18–21, substantial deference is simply insufficient to transform

9

these anecdotes into proof that the challenged marketing materials were "disseminated sufficiently to the relevant purchasing public" as required by the Lanham Act. *Proctor & Gamble*, 222 F.3d at 1274. For all of these reasons, Mr. Zieziula's testimony on the prevalence of Sanofi's marketing materials should be excluded. *See Bracco,* 627 F. Supp. 2d at 440.

### B. Mr. Zieziula's Observations That Sanofi's Claims "Can Have" An Impact On How Consumers And Physicians Make Decisions Are Not Reliable Opinions On Causation

In its opening brief, Sanofi explained that Mr. Zieziula's opinions on causation are unreliable because he did not do any analysis to quantify the supposed harm that Sanofi's statements caused Mylan. *See* Mot. at 18-19. In response, Mylan repeats hypotheticals from Mr. Zieziula's report: "'[C]omparative and preference claims' of the type made by Sanofi here '***can*** have a significant impact on how physicians, pay[o]rs, and patients make decisions on which products to use.'" *See* Opp. at 21 (quoting Mot. Ex. 2 at 4) (emphasis added). "'[M]isleading comparative messages ***can*** have an impact on pay[o]rs, physicians, and consumers, in terms of their preference for one drug versus another." *See* Opp. at 21 (quoting Mot. Ex. 1 at 403–405) (emphasis added). Mylan also argues that Sanofi's claims that the Auvi-Q was the "new EpiPen" would harm EpiPen's brand equity. *See* Opp. at 22. Observing that something "could" or "would" have an effect simply does not meet the requirements of the Lanham Act, as "[a] Lanham Act plaintiff . . . is not entitled to the luxury of deference to its judgment. . . . Hence, it cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react." *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir. 1990) (emphasis in original); *see also Bracco*, 627 F. Supp. 2d at 441 (Lanham Act plaintiffs must "undertake a systematic or scientific analysis of all factors to determine the specific effect of any particular piece of advertising."); *accord Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300–01 (4th Cir. 2017) (affirming exclusion of expert opinion because the expert's causation analysis "assume[d]

10

rather than demonstrate[d]" that lost sales were due to the alleged false statements, which was a "fatal flaw in calculating Lanham Act damages"). Without any analysis, Mr. Zieziula's observations are complete and unreliable speculation and should be excluded.

Mylan's reliance on *Brighton Collectible, LLC v. Believe Prod., Inc.*, No. 15-00579, 2017 WL 440255, at *9 (C.D. Cal. Jan. 30, 2017), for the proposition that marketing experts can sometimes testify without the need for a consumer survey is unavailing. *See* Opp. at 21-22. *Brighton* involved claims that defendant marketed and promoted its infringing jewelry by incorporating photographs of plaintiff's jewelry into the promotional materials for defendant's lower-quality jewelry. *Brighton,* 2017 WL 440255, at *2. The defendant in *Brighton* sought to exclude testimony from a marketing professor that when a competitor uses photographs of higher quality jewelry to sell confusingly similar, lower-priced and lower-quality products, it harms the higher quality jewelry producer. *Id.* at *3. In contrast, Mr. Zieziula is not a marketing professor, nor is he opining generally on "the anticipated effects of knockoffs or imitation products on an authentic brand." *Id.* Rather, Mr. Zieziula seeks to testify as to the effect of particular advertising claims "on pay[o]rs, physicians and consumers, in terms of their preference for one drug versus another." Opp. at 21.

As Mr. Zieziula is not and has never been a payor, physician or consumer of EAI devices, he has no expertise to bring to bear. He has not conducted any independent research or analysis, *see id*. at 17, and "[a]n expert is not allowed to give opinions based on speculation." *See Major Mart, Inc. v. Mitchell Distrib. Co.*, 46 F. Supp. 3d 639, 670 (S.D. Miss. 2014). Mr. Zieziula's unreliable opinions should be excluded.

### III.  Mylan Fails To Show That Mr. Zieziula's Opinions Will Assist The Trier Of Fact

In its opening brief, Sanofi explained that Mr. Zieziula's opinions should be excluded because Mr. Zieziula is simply either reciting facts that are available to the jury or serving as a

11

conduit for inadmissible evidence. *See* Mot. at 19–20. In response, Mylan tries to isolate this attack to Mr. Zieziula's admission that he is only "an expert on the facts" as it relates to Auvi-Q's alleged "high costs." *See* Opp. at 22–23. But the problem is not limited to that opinion. Mr. Zieziula's Counterclaims Report consists of a summary of correspondence between James Parker, the then-Senior Director of Regulatory Affairs at Sanofi, and Elaine Cunningham, a Regulatory Review Officer at FDA, *see* Mot. Ex. 2 at 4–5; a recitation of selected quotes from Sanofi's internal market research, *see id.* at 6–7; a selected quote from a Sanofi press release, *see id.* at 8; and recitations of selected quotes from Sanofi's website and two unpublished surveys. *Id.* at 8–9. Mr. Zieziula's "opinions" with respect to this evidence consist of summaries of what he reviewed and conclusions like "the documents I reviewed indicate that these misleading comparative statements were made in the field," *id.* at 6, and "the documents I reviewed show that Sanofi made other claims in its marketing of Auvi-Q that compared the product to EpiPen, either directly or by suggestion." *Id.* at 8. The "opinions" in the Counterclaims Report are simply recitations of the facts. A jury is perfectly capable of reviewing the same documents and coming to a conclusion about what they show. *See* Mot. at 20 (citing *iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*, No. 09-205, 2012 WL 3067597, at *3 (D. Utah July 27, 2012) (quoting *Bracco*, 627 F. Supp. 2d at 441); *SEC v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)).

Sanofi's opening brief also noted that Mylan was attempting to use Mr. Zieziula's testimony to introduce a slew of inadmissible evidence. *See* Mot. at 20–21. Mylan argues that experts are permitted to rely on hearsay. Opp. at 24. Once again, Mylan misses the point. Experts are permitted to rely on inadmissible evidence, but they are not permitted to simply report the contents of hearsay documents and opine that they are accurate. *See, e.g.*, *Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004). Instead, the expert must incorporate a hearsay document into

12

a scientific analysis, so that the expert is not usurping the jury's role and acting simply as a document reader. *See* FED. R. EVID. 702 (An expert "may testify in the form of opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence or to determine a fact in issue*.") (emphasis added); *see also Parker v. Wal-Mart Stores, Inc.*, 267 F.R.D. 373, 377 (D. Kan. 2010) (recognizing that an expert cannot "usurp the jury's function by asserting facts in the form of 'expert' opinion"). Here, Mr. Zieziula is simply reciting inadmissible hearsay evidence throughout his reports, and then blindly asserting that the hearsay is true. *See, e.g.*, Mot. Ex. 2 at 11 n.32 (citing Reply Ex. 9) ("███████████████████████████████████████████████████████████████").

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Sanofi's motion, Sanofi's motion to exclude the testimony and expert reports of Gary Zieziula should be granted.

DATED: August 30, 2019                                  Respectfully submitted,

                                                        /s/   *Yehudah L. Buchweitz*

**WEIL, GOTSHAL & MANGES LLP**                          **WEIL, GOTSHAL & MANGES LLP**
Diane L. Sullivan                                       Yehudah L. Buchweitz
diane.sullivan@weil.com                                 yehudah.buchweitz@weil.com
17 Hulfish St., Suite 201                               Eric S. Hochstadt
Princeton, NJ 08542                                     eric.hochstadt@weil.com
T: (609) 986-1120                                       Randi W. Singer
767 Fifth Avenue                                        randi.singer@weil.com
F: (212) 310-8007                                       New York, NY 10153
                                                        T: (212) 310-8000
                                                        F: (212) 310-8007

*Attorneys for Plaintiff and
Counterclaim-Defendant Sanofi-Aventis U.S. LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, the foregoing was filed via CM-ECF and by e-mail to all counsel of record.

/s/     *Yehudah L. Buchweitz*
Yehudah L. Buchweitz