# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | CASE NO. 2:17-MD-02785-DDC-TJJ (MDL No. 2785) |
| | |
| SANOFI-AVENTIS U.S., LLC, | CASE NO. 2:17-CV-02452-DDC-TJJ |
| Plaintiff, | *Document Filed Electronically* |
| v. | |
| MYLAN INC., et al., | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |
| *This Document Relates to the* Sanofi *case.* | |

# REPLY MEMORANDUM OF POINTS AND AUTHORITIES
# IN SUPPORT OF MYLAN'S MOTION FOR SUMMARY JUDGMENT

Philip A. Sechler
Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................ 1

REPLY TO SANOFI'S RESPONSE TO MYLAN'S STATEMENT OF MATERIAL
FACTS NOT IN GENUINE DISPUTE ...................................................................................... 3

I.      Responses To Facts Concerning Industry Practices And Trends ...................................... 3

II.     Responses To Facts Concerning Rebate Agreements and Payors ..................................... 7

III.    Nonresponsive And Argumentative Responses ................................................................. 8

IV.     Objections To "Incomplete" Facts .................................................................................. 10

V.      Other Responses .............................................................................................................. 10

RESPONSE TO SANOFI'S ADDITIONAL STATEMENT OF FACTS ................................. 13

I.      Sanofi's Assertions About Anaphylaxis Treatment Options and Auvi-Q's Features....... 13

II.     Sanofi's Assertions Concerning Mylan's Rebating Practices ......................................... 14

III.    Sanofi's Assertions Concerning Mylan's Marketing Practices ....................................... 18

IV.     Sanofi's Other Immaterial Assertions Concerning Mylan's Conduct ............................. 21

V.      Sanofi's Assertions Concerning Auvi-Q's Lost Sales and Recall ................................... 23

ARGUMENT .............................................................................................................................. 24

I.      Mylan's Dealings With Payors Were Not Illegal ........................................................... 24

        A.      Price Operated As The Clearly Predominant Mechanism Of "Exclusion" .......... 24

        B.      Sanofi's Broader Arguments Also Fail ................................................................ 27

        C.      Sanofi's Incontestable-Share Theory Cannot Salvage Its Case ........................... 34

        D.      "Intent" Evidence Does Not Create A Jury Question Here ................................. 38

II.     Mylan's Other Conduct Did Not Violate The Sherman Act............................................ 39

III.    Sanofi Cannot Demonstrate Antitrust Injury ................................................................. 42

IV.     Sanofi's Damages Arguments Are Unavailing............................................................... 44

CONCLUSION ........................................................................................................................... 46

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,* 108 F. 3d 1147 (9th Cir. 1997) ..........................................................................41

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985) ..................................................................................................2, 38

*Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328 (1990) ......................................................................................................32

*Avaya, Inc., RP v. Telecom Labs., Inc.,* 838 F.3d 354 (3d Cir. 2016) .........................................................................................40

*Aventis Envtl. Sci. USA LP v. Scotts Co.,* 383 F. Supp. 2d 488 (S.D.N.Y. 2005 ) .........................................................................44

*Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227 (1st Cir. 1983) ...................................................................................39, 40

*Berkey Photo, Inc. v. Eastman Kodak. Co.,* 603 F.2d 263 (2d Cir.1979) .....................................................................................42, 43

*Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297 (3d Cir. 2007) .........................................................................................44

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993) ..........................................................................................27, 35, 44

*Bruner-McMahon v. Hinshaw,* 846 F. Supp. 2d 1177 (D. Kan. 2012) ..........................................................................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977) ......................................................................................................44

*Cal. Comput. Prods., Inc. v. IBM Corp.,* 613 F.2d 727 (9th Cir. 1979) ........................................................................................42

*Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338 (3d Cir. 1975) .......................................................................................45

*Conaway v. Smith,* 853 F.2d 789 (10th Cir. 1988) ..................................................................................4, 26

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962) ........................................................................................................1

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Conwood Co. v. U.S. Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002) .....................................................45

*Dial Corp. v. News Corp.,*
165 F. Supp. 3d 25 (S.D.N.Y. 2016)..............................................33, 38

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
821 F.3d 394 (3d Cir. 2016).................................................... *passim*

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC,*
2014 WL 1343254 (D.N.J. Mar. 28, 2014)....................................26, 30

*Gardenhire v. Manville,*
2017 WL 445506 (D. Kan. Feb. 2, 2017) ...........................................3

*Great W. Directories, Inc. v. Sw. Bell Tel. Co.,*
74 F.3d 613 (5th Cir. 1996) .....................................................46

*Indeck Energy Servs., Inc. v. Consumers Energy Co.,*
250 F.3d 972 (6th Cir. 2000) .................................................44, 45

*In re Indep. Serv. Orgs. Antitrust Litig.,*
85 F. Supp. 2d 1130 (D. Kan. 2000).............................................43

*In re Remicade Antitrust Litig.,*
345 F. Supp. 3d 566 (E.D. Pa. 2018) ...........................................36

*Lenox McLaren Surgical Corp. v. Medtronic, Inc.,*
762 F.3d 1114 (10th Cir. 2014) ...........................................40, 41, 42

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003) (en banc)..........................................2, 28

*Lorain Journal Co. v. United States,*
342 U.S. 143 (1951).............................................................44

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)..............................................................2

*McDonald v. Raytheon Aircraft Corp.,*
959 F. Supp. 1415 (D. Kan. 1997)................................................3

*MCI Commc'ns Corp. v. AT&T, Co.,*
708 F.2d 1081 (7th Cir. 1983) ..................................................45

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*McWane, Inc. v. FTC,*
    783 F.3d 814 (11th Cir. 2015) ...................................................................28, 33, 34

*Minn. Mining & Mfg. Co. v. Appleton Papers Inc.,*
    35 F. Supp. 2d 1138 (D. Minn. 1999)..............................................................32, 33

*Mondaine v. Am. Drug Stores, Inc.,*
    408 F. Supp. 2d 1169 (D. Kan. 2006)...................................................................10

*Newport Controls, LLC v. Balboa Instrums., Inc.,*
    2010 WL 11509295 (C.D. Cal. Sept. 27, 2010) ....................................................33

*NicSand, Inc. v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007) (en banc) ................................................................44

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.,*
    103 F.3d 42 (7th Cir. 1996) ..................................................................................30

*Pfizer Inc. v. Johnson & Johnson,*
    333 F. Supp. 3d 494 (E.D. Pa. 2018) ....................................................................36

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,*
    614 F.3d 57 (3d Cir. 2010)..........................................................................30, 38, 44

*Roxul USA, Inc. v. Armstrong World Indus., Inc.,*
    2019 WL 1109868 (D. Del. Mar. 8, 2019) ............................................................31

*SCFC ILC, Inc. v. VISA USA, Inc.,*
    36 F.3d 958 (10th Cir. 1994) ................................................................................39

*Spray-Rite Serv. Corp. v. Monsanto Co.,*
    684 F.2d 1226 (7th Cir. 1982) ..............................................................................45

*Sterling Merch., Inc. v. Nestlé, S.A.,*
    656 F.3d 112 (1st Cir. 2011)..................................................................................43

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.,*
    2016 WL 1377342 (D. Kan. Apr. 7, 2016)..............................................................1

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961)..............................................................................................27

*TCA Bldg. Co. v. Nw. Res. Co.,*
    873 F. Supp. 29 (S.D. Tex. 1995) .........................................................................33

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,*
305 F.3d 1124 (10th Cir. 2002) ....................................................46

*Trace X Chem., Inc. v. Canadian Indus., Ltd.,*
738 F.2d 261 (8th Cir. 1984) ......................................................31

*United States v. AMR Corp.,*
140 F. Supp. 2d 1141 (D. Kan. 2001) ..........................................42

*United States v. Dentsply Int'l, Inc.,*
399 F.3d 181 (3d Cir. 2005).........................................................28

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) (en banc) .......................................34

*United States v. Visa U.S.A., Inc.,*
344 F.3d 229 (2d Cir. 2003).........................................................44

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004).......................................................................2

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
257 F.3d 256 (2d Cir. 2001)..........................................................31

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,*
513 F. Supp. 1100 (E.D. Pa. 1981) ..............................................43

*ZF Meritor, LLC v. Eaton Corp.,*
696 F.3d 254 (3d Cir. 2012).............................................25, 27, 28, 29

**Other Authorities**

PHILLIP E. AREEDA & HERBERT HOVENKAMP, *Antitrust Law* (2018) ......................................33, 40

Edward D. Cavanagh, Matsushita *At Thirty: Has the Pendulum Swung Too Far in Favor of Summary Judgment?*, 82 ANTITRUST L.J. 81 (2018) .................................................2

Sean Durkin, *The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test*, 81 ANTITRUST L.J. 475 (2017)...........................................................................................37, 38

Derek W. Moore & Joshua D. Wright, *Conditional Discounts and the Law of Exclusive Dealing*, 22 GEO. MASON L. REV. 1205 (2015)......................................................30

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Fiona M. Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 ANTITRUST L.J. 777 (2017) ...........................................30

Edward A. Snyder & Thomas E. Kauper, *Misuses of the Antitrust Laws: The Competitor Plaintiff*, 90 MICH. L. REV. 551 (1991) ...................................................................2

Richard M. Steuer, *Musthavedness*, 81 ANTITRUST L.J. 447 (2017) ...........................................36

# INTRODUCTION

In its Opposition, Sanofi *does not dispute the single most central fact in this case:* Auvi-Q® was never excluded from or restricted on formulary when Sanofi offered a lower per-unit net price than Mylan offered on the EpiPen® Auto-Injector ("EpiPen"). That is, Payors favored EpiPen and restricted or excluded Auvi-Q ███████████████████████████. And Sanofi was able to reverse Payor decisions to restrict or exclude Auvi-Q ███████████████████████.

This case, therefore, is about *price competition* via rebates to obtain exclusive deals or favorable contract terms. Vigorous price competition, of course, meant that Payors and the consumers they serve could get EAI devices for lower prices. But Sanofi argues that Mylan should *not* have offered substantial rebates or price protection. Instead, Sanofi should have been able to obtain formulary placement by offering minimal rebates off a high list price, ███████████████████ ██████████████████. That is a pro-corporate-profits theory, not a procompetitive theory. Punishing Mylan for competing against Sanofi via discounted prices would pervert the antitrust laws.[1]

Sanofi attempts to contrive factual disputes, but they are nonexistent or immaterial. And Sanofi misdirects; when it cannot dispute Mylan's statement of facts, it writes (over and over) "disputed in part" and says Mylan should have mentioned some irrelevant detail.

Sanofi's treatment of the law is just as egregious. Instead of meaningfully confronting the substantial case law on price competition and exclusive dealing, Sanofi argues that *any* amount of exclusive dealing plus "bad" intent equals a question of liability for the jury. Among its principal authorities for that proposition—which is decidedly *not* the law—are *Cont'l Ore Co. v. Union*

---

[1] "Defendants ... didn't like losing ... market share to Suture Express, so they did what motiv[at]ed competitors do. They fought back with their own pricing innovation .... The next move in this competitive saga belongs to the market's participants .... But the Court can find nothing in our antitrust laws that assigns a role, on these summary judgment facts, to the courts." *Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, 2016 WL 1377342, at *35-36 (D. Kan. Apr. 7, 2016), *aff'd*, 851 F.3d 1029 (10th Cir. 2017).

*Carbide & Carbon Corp.*, 370 U.S. 690 (1962), *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc).

It is telling that Sanofi relies on some of the most discredited precedents in antitrust law. Sanofi cites *Continental Ore* for the proposition that summary judgment is disfavored in antitrust cases, Opp. 52, but the opposite has been true since *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "The Supreme Court's ruling in *Matsushita* … marked the end of judicial hostility to Rule 56 motions and effectively legitimized the use of summary judgment in antitrust cases." Edward D. Cavanagh, Matsushita *At Thirty: Has the Pendulum Swung Too Far in Favor of Summary Judgment?*, 82 ANTITRUST L.J. 81, 81 (2018).[2]

Sanofi cites *Aspen* for its treatment of "intent" evidence, Opp. 59, but the Supreme Court has rejected attempts to apply *Aspen* outside its own context (discontinuation of a cooperative arrangement). "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004).

Sanofi cites *LePage's* "*passim*," but "*LePage's* ... has been the subject of much criticism." *Eisai, Inc. v. Sanofi Aventis U.S.*, *LLC,* 821 F.3d 394, 405 n.35 (3d Cir. 2016). The Third Circuit was unwilling "to extend the rationale of *LePage's*" from the bundled-rebate context to "the facts presented [in *Eisai*]," which involved single-product loyalty rebates and alleged "incontestable demand"—elements that Sanofi defended there and complains of here. *Id*. at 406-07.

"In several cases, it is clear that the plaintiffs object to actions that represent increases in competition." Edward A. Snyder & Thomas E. Kauper, *Misuses of the Antitrust Laws: The Competitor Plaintiff*, 90 MICH. L. REV. 551, 576 (1991). This is such a case. The time has come for this ill-conceived lawsuit to end.

---

[2] All internal quotation marks, citations, and footnotes are omitted unless otherwise noted.

**REPLY TO SANOFI'S RESPONSE TO MYLAN'S STATEMENT
OF MATERIAL FACTS NOT IN GENUINE DISPUTE[3]**

Sanofi fails to refute the material facts established by Mylan's motion, resorting instead to improper or unsupported responses. The material facts should be deemed undisputed.

**I.   Responses To Facts Concerning Industry Practices And Trends**

Mylan's SMF ¶¶ 12-44 describe how branded pharmaceutical drug products are priced and covered by commercial health plans, addressing the role of pharmacy benefit managers ("PBMs"), formulary development, utilization management ("UM") tools, and rebate negotiations and agreements. Sanofi offers no evidence to dispute that these paragraphs accurately describe standard industry practices. Instead, Sanofi lodges nonresponsive objections, addressed in detail below, including that these facts are inapplicable to epinephrine auto-injectors ("EAIs"). For example, SMF ¶ 27 explains what it means for a drug to be "excluded" from formulary coverage, including that "[p]atients can often still purchase excluded drugs, but generally they must pursue a medical exception approval to gain coverage, or else pay out-of-pocket." Sanofi purports to dispute this fact but offers no evidence to refute the definition or effect of what it means to be excluded from formulary coverage. This fact and the others describing industry practices are supported by record evidence and should be deemed undisputed.[4]

---

[3] For ease of reference, "MSJ" refers to Mylan's Mem. in Supp. of Its Mot. for Summary Judgment, ECF No. 1660-2. "SMF" refers to Mylan's Statement of Material Facts Not In Genuine Dispute, *see* MSJ 4-54. "Opp." refers to Sanofi's Mem. in Opp. to Mylan's Mot. for Summary Judgment, ECF No. 1820-1. "San. Resp. to SMF" refers to Sanofi' responses to Mylan's SMF paragraphs, Opp. 25-52. "ASMF" refers to Sanofi's Additional Statement of Material Facts, Opp. 2-25. "Resp. to ASMF" refers to Mylan's responses to those additional facts, *infra* pp. 13-24. Mylan's exhibits are referred to as "Ex." and Sanofi's exhibits as "San. Ex. "

[4] *McDonald v. Raytheon Aircraft Corp.*, 959 F. Supp. 1415, 1416 n.1 (D. Kan. 1997) (deeming facts uncontroverted where nonmovant offered nonresponsive "additional facts and/or legal arguments and conclusions" rather than evidence showing actual dispute); *Gardenhire v. Manville*, 2017 WL 445506, at *9 (D. Kan. Feb. 2, 2017) (Crabtree, J.) (rejecting plaintiff's attempts to "sidestep[] the obligation it owes as the party opposing summary judgment to 'bring to the district court's attention some affirmative indication that his version of relevant events' is more than 'fanciful'") (quoting *Conaway v. Smith*, 853 F.2d

Mylan's SMF ¶¶ 45-51, 80 and 128-29 describe the payor environment at the time of Auvi-Q's launch and the industry trend towards more restrictive formularies and price protection to reduce branded prescription drug costs. Sanofi does not dispute the uncontroverted evidence of this industry trend, but instead asserts nonresponsive facts and arguments. For example, SMF ¶ 46 states that "[e]xclusion lists ... were becoming prominent in the industry" when Auvi-Q launched and cites CVS's whitepaper announcing its exclusion list, which Sanofi's Peter Guenter viewed at the time as ████████████████████████████████████ Sanofi's response that CVS never excluded Auvi-Q or EpiPen does not refute the asserted fact. Likewise, Sanofi responds to SMF ¶ 48, which excerpts a Sanofi whitepaper from April 2014 listing the reasons for the industry's ████████████████████████ by arguing it was written before Sanofi knew "Mylan was using anticompetitive business practices." That is both nonresponsive and false: Sanofi—represented by the same counsel representing Sanofi here—████████████████████ ████████████████████████ months before circulating the whitepaper. Ex. 262 (████████████████████). And Sanofi responds to SMF ¶ 51, which states that Payors were focused at this time on obtaining price protection across all therapeutic classes, by arguing that Mylan "push[ed] for price protection." This response, too, fails to dispute the asserted fact of an industry trend. SMF ¶¶ 45-51. It is also false: Sanofi ignores unrefuted evidence that ████████████████████.[5] ████████████████████ ████████████████[6]—consistent with the industry trend—████████████████ ████████████████████████████████████.

*E.g.*, SMF ¶¶ 78, 87, 123; San. Ex. 142. The asserted facts should be deemed undisputed.

---

789, 794 (10th Cir. 1988) ("The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party.")).

[5] *E.g.*, Exs. 94, 95, 111 at - 264, 130 at -949.

[6] *E.g.*, SMF ¶¶ 62, 63, 78, 95; Exs. 23, 101, 117, 119, 127-29, 134.

Sanofi also "disputes" facts regarding industry practice on the ground that Mylan "fail[s] to account for the unique characteristics of the U.S. EAI market." San. Resp. to SMF ¶¶ 19, 20, 22-36, 38-40, 42-44, 46-47, 49-50, 72, 80, 128-29 & 137-41. Sanofi sets forth in response to SMF ¶ 19 the basis for its "Unique EAI Market" objection, which consists of vague deposition quotes taken out of context in which witnesses referred generally to differences between therapeutic drug classes and unique features of EAI devices (e.g., they are life-saving drugs prescribed once a year). The cited testimony does not show that the overarching practices and policies of Payors are different for EAIs, or that Payors negotiate rebates or make coverage determinations differently for the EAI drug class than for others. To the contrary, Mylan's SMF establishes that Payors acted consistent with industry practice when they solicited and negotiated EAI rebates, made EAI formulary decisions, and applied common UM tools to the EAI class after Auvi-Q's launch. SMF ¶¶ 61-125.

Sanofi repeatedly lodges its Unique EAI Market objection to asserted facts without citing *any evidence* to support its objection. For example, SMF ¶ 33 asserts that "Payors solicit from brand manufacturers rebates that align with their benefit design goals," often requesting a "menu of rebates to offer clients a variety of formulary options." Sanofi lodges its objection but cites no evidence that Payors acted differently for the EAI class; to the contrary, the undisputed facts show that Payors solicited a variety of rebates from EAI manufacturers. *E.g.,* SMF ¶¶ 62, 63, 67, 76, 82, 85, 96, 100, 111, 113 & n. 247, ¶¶ 121, 123. Sanofi makes the same objection to SMF ¶ 42, which explains—███████████████████████████████—that, when there are therapeutic alternatives within a drug class, Payors treat the products as "may add" drugs, optional to cover on formulary, and it becomes a "financial decision" which product(s) to cover. Sanofi cites no evidence to dispute that Payors undertook this calculus in making formulary decisions for

the EAI class, and extensive record evidence establishes that they did and determined ███████

███████████████████████. SMF ¶¶ 61-63. Sanofi similarly cites no evidence to

support its Unique EAI Market objection to SMF ¶¶ 20, 23-24, 27, 33-34, 42, 80, 128-29 and

137-41.

Where Sanofi cites evidence in an attempt to support its Unique EAI Market objection, that

evidence fails to refute that the asserted industry practice applies to EAIs. For example, SMF ¶ 28

asserts—citing testimony from two Sanofi witnesses—that Payors use UM tools to give health

plan clients more restrictive but less costly formulary options. Sanofi lodges its Unique EAI

Market objection and points to evidence of Payors who elected not to manage the EAI class *before*

*Auvi-Q's launch*. That some Payors chose not to manage the class before a new competitor entered

does not dispute how Payors would react to a new competitor; to the contrary, the record

demonstrates that Payors saw an opportunity to do so after Auvi-Q's launch. *See, e.g.*, SMF ¶¶ 61-

64, 99, 107, 117, 133. Indeed, Mylan showed that "Payors view competition in a therapeutic class

as an opportunity to encourage manufacturers to compete on price to obtain desirable formulary

coverage." SMF ¶ 43 (citing testimony from seven Payors). Sanofi also cites Professor Scott

Morton's opinion that prices did not decrease while Auvi-Q was on the market, but that opinion

does not refute that Payors viewed competition in the EAI class as an opportunity to encourage

competitive pricing. *See, e.g.*, SMF ¶ 43 & nn.77-78, ¶ 61 & nn.112-122 (collecting payor

testimony). The evidence cited by Sanofi to support its Unique EAI Market objection to SMF

¶¶ 19, 22, 25-26, 28-30, 32, 35-36, 38-40, 43-44, 46-47 and 49-50 similarly fails to refute that the

asserted industry practices apply to the EAI class. Sanofi's Unique EAI Market objection should

be disregarded.

Sanofi objects to SMF ¶¶ 137-141, which assert facts describing Sanofi's rebating practices

for its market-leading product Lantus and other branded drugs, and to SMF ¶ 31, which quotes Sanofi's public statements defending those rebating practices as "how the entire branded pharmaceutical industry functions." Sanofi lodges its Unique EAI Market objection and objects to these paragraphs as misleading and immaterial but cites no evidence to refute the asserted facts, which should be deemed undisputed.

## II. Responses To Facts Concerning Rebate Agreements and Payors

Sanofi disputes SMF ¶¶ 36-41, which describe certain key terms of rebate agreements generally and of EAI rebate agreements specifically. Sanofi objects to these facts as unsupported and overly general, even though Mylan's exhibits include *three dozen EAI rebate agreements* that support the asserted facts, among them Mylan's and Sanofi's EAI rebate agreements with the largest commercial Payors for 2014 (the year Sanofi claims to have been foreclosed from the commercial market).[7] Sanofi quibbles with Mylan's use of terms like "typical," "most," "often," and "generally," stating that each contract speaks for itself, but Sanofi does not cite *a single rebate agreement* to refute these factual paragraphs. These facts should be deemed undisputed.

Sanofi claims that all or portions of SMF ¶¶ 37, 38, 40, 61, 78, 79, 85, 100, 115, 126 and 136 are unsupported. But those facts are well supported by the record and should be deemed undisputed. For example, SMF ¶ 61 asserts that ███████████████████████████ ████████████████████████████████████████ but viewed Auvi-Q as an "████████████████ ████████████████████████████████████" thus presenting "████████████████ ████████████████████████████████" Sanofi disputes this paragraph in full, citing an example of a single payor (██████) that viewed Auvi-Q as a superior product and elected to cover

---

[7] *See* SMF ¶ 72 (chart of payors covering 86% of commercial lives); San. Resp. to SMF ¶ 72 (disputing chart color coding, not substance); *E.g.* Exs. 57-59, 61, 62, 103, 108, 153, 157, 158, 162 (EAI rebate agreements for 2014). Mylan also cites deposition testimony from a dozen Payors supporting SMF ¶¶ 36-41.

it on formulary alongside EpiPen. But Mylan cites testimony and evidence from 11 Payors—including ███████████████████████████████████████, *see supra* n.7—demonstrating that ███████████████████████████████████████████████████████. One Payor's alternative view does not create a genuine dispute of fact.

## III. Nonresponsive And Argumentative Responses

Sanofi's responses to SMF ¶¶ 1, 4, 5, 9, 22, 45, 47, 51, 54, 57, 59, 63, 64, 66, 71, 76, 113, 114, 116, 117, 121-23, 125, 126 and 142 consist of improper arguments and citations to nonresponsive evidence that do not refute the asserted facts. For example, Sanofi responds to SMF ¶ 45, which asserts that, "[a]t the time of Auvi-Q's launch, Payors were seeking opportunities to manage therapeutic classes to reduce costs for clients and patients" by citing pre-market research predicting that some Payors might not "heavily manage" the EAI class and insisting that Mylan "drove[] numerous PBMs and payors to exclude or disadvantage Auvi-Q." Sanofi's citation to pre-market research about what Payors *might do* is immaterial; the uncontroverted record shows that Payors *did* seize the opportunity to reduce costs by managing the EAI class. SMF ¶¶ 67-68, 113.

SMF ¶ 54 asserts that Sanofi "was not prepared to offer Payors deep discounts" "even when Payors planned to cover just one EAI device," and quotes the testimony of Sanofi's then-CEO Chris Viehbacher, who acknowledged that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████ Sanofi disputes this paragraph in its entirety by arguing that Mylan allegedly mis-classified EpiPen to facilitate its own deep discounting. Not only is Sanofi's accusation unsubstantiated, *see* Resp. to ASMF ¶¶ 40-41, but it has nothing to do with *Sanofi's* pricing strategy at launch. Indeed, the Court previously deemed Sanofi's allegations concerning Mylan's

classification of EpiPen irrelevant to Sanofi's Sherman Act claims.[8] Yet Sanofi lodges the same objection to other paragraphs to which it is equally nonresponsive (SMF ¶¶ 55, 57, 59). And Sanofi raises it again in response to SMF ¶ 71, which asserts that Mylan "never contracted to sell EpiPen at a price that was below its manufacturing costs," arguing that Mylan's alleged misclassification must be accounted for in analyzing whether Mylan priced the EpiPen below cost. But Sanofi offers *no evidence* tying Mylan's Medicaid rebates to any calculation of variable costs.

Sanofi's response to SMF ¶ 62 is pure argument. SMF ¶ 62 asserts that "Sanofi's internal emails reflect that many of the largest Payors told Sanofi ███████████████████████████████ ███████████████████████████████, citing examples. Sanofi does not cite any evidence disputing that these emails put Sanofi on notice of Payors' intent to ████████████████, yet Sanofi disputes this paragraph by repeating that Mylan "drove" Payors to exclude Auvi-Q. Sanofi cites pages 72-73 of its argument in support, but there Sanofi quotes documents related to Mylan's negotiations with eleven Payors—ESI, HealthPlus of Michigan, BSBC Tennessee, Humana, Prime Therapeutics, Aetna, Anthem, BCBS Illinois, CVS, Highmark and Unity Health Plans—only *three* of which (ESI, Aetna, and Anthem) excluded or restricted Auvi-Q.[9] Thus, not only does Sanofi's evidence fail to dispute the asserted fact that Sanofi was on notice of Payors' intent to ████████████ ███, it does not even support Sanofi's non-response that Mylan drove Payors to exclude Auvi-Q. Sanofi also accuses Mylan of "omitt[ing] that many payors were not looking to manage the EAI class," citing two examples: Horizon, which did not exclude Auvi-Q, SMF ¶ 98, and Anthem,

---

[8] 12/21/17 Mem. & Order, ECF No. 98 at 22-23 (granting motion to dismiss Sanofi's claims to the extent based on Medicaid rebates); 4/9/18 Discovery Order, ECF No. 455 at 5 (holding that Medicaid classification issue is not relevant to Sanofi's Sherman Act claims and denying discovery).

[9] ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████

whose witness testified that "

" San. Ex. 31 at 280. This evidence again fails to dispute the asserted fact that "many of the largest Payors" told Sanofi of their intent to ██████████.

Sanofi's responses to SMF ¶¶ 114-125, which describe Sanofi's formulary successes in 2015, likewise do not establish any genuine dispute of material fact. For example, SMF ¶ 116 asserts that Sanofi "won access on accounts that had restricted Auvi-Q" by making "██████ and that Sanofi executives concluded that "████████ In response, Sanofi argues that Mylan forced it to offer bigger rebates to secure access and claims that Auvi-Q remained unprofitable in 2015, but these "responses" do not dispute that Sanofi made ██████ that ████ through improved formulary coverage.

## IV. Objections To "Incomplete" Facts

Sanofi responds to numerous undisputed material facts concerning Auvi-Q and Sanofi's rebating strategy (SMF ¶¶ 7, 10, 57-58 & 115), payor negotiations (SMF ¶¶ 89-91, 95, 102, 106-08, 122-23 & 132), Mylan's EpiPen4Schools program (SMF ¶ 136) and Sanofi's return of rights (SMF ¶ 147) merely by challenging them as incomplete or misleading because they omit other facts that Sanofi prefers. "[A]rguing that [asserted facts] are incomplete" is "insufficient to contro-vert the alleged fact." *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1186 (D. Kan. 2012), *aff'd sub nom. Bruner-McMahon v. Jameson*, 566 F. App'x 628 (10th Cir. 2014); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1176 n.1 (D. Kan. 2006). These facts should be deemed undisputed.

## V. Other Responses

The evidence offered by Sanofi in response to SMF ¶¶ 6, 9, 16, 55, 67-70, 72, 78, 83, 88, 99, 104, 106, 127, 130, 131, 133-34 and 146 does not refute the asserted facts. For example, Sanofi

mischaracterizes the evidence it cites in response to SMF ¶ 68, which asserts that Mylan never threatened to cut off supply of EpiPen to Payors who did not exclude Auvi-Q. Sanofi claims that Mylan's own documents (San. Exs. 58 and 160) show that Mylan threatened to cut off supply, but San. Ex. 160 shows only that Mylan stated that it would stop ████████████████ (not cut off supply) ██████████████████ (not if it refused to exclude Auvi-Q). Likewise, San. Ex. 58 is an internal email of talking points showing that Mylan *considered* ████████ ████████████████████████████████████████ ██████████████████, and there is no evidence that Mylan ever delivered these talking points.[10]

Sanofi fails to refute SMF ¶¶ 69 and 70, which assert that Auvi-Q was never excluded from or restricted on formulary when Sanofi offered a lower per-unit net price on Auvi-Q than Mylan offered on EpiPen. Sanofi responds that Payors do not consider per-unit cost, citing Dr. Scott Morton, who conceded that she did not consider the Payors' internal analysis of Mylan's and Sanofi's bids in forming her opinions. Ex. 259 (Scott Morton Dep.) at 104-05. Sanofi also argues that Sanofi sometimes "remained disadvantaged" when it ██████████████ than Mylan, but its example (Prime Therapeutics, *see* Opp. 68) covered Auvi-Q on Tier 3 in an *unrestricted* position.[11] And Sanofi has conceded that it challenges only the rebates resulting in its exclusion from formulary coverage or restriction through a step edit or prior authorization, *not* unrestricted Tier 3 placement. SMF ¶ 74 (undisputed); *see also id.* ¶ 56.

---

[10] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

[11] Sanofi also cites its rebate offer to ESI for the 2015 contract cycle (Opp. 69) but ESI did not "disadvantage" Auvi-Q in 2015; it covered Auvi-Q and EpiPen as co-preferred. SMF ¶ 117.

Sanofi mischaracterizes Mylan's rebate offers to ESI in an attempt to refute SMF ¶ 78, which states that for 2014 ███████████████████████████████████████████ ██████████████████ Sanofi responds that, ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████ That is false. Mylan's contract with ESI reflects that Mylan offered a base rebate of ██████████████████████████████████████████.[12]

Finally, Sanofi disputes SMF ¶¶ 130 and 131, which assert that "[w]here payors did exclude EpiPen, patients shifted to Auvi-Q," citing evidence of ██████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████████████. Sanofi does not refute the evidence that Mylan's share on the CVS ACF was ████████████ after CVS excluded EpiPen and does not refute Mylan's analysis that EpiPen utilization ████████████████ ████████████ on closed plans adopting the CVS VBF. Sanofi attempts to refute the ESI data by citing Dr. Scott Morton's opinion that EpiPen maintained 60% market share on the ESI HPF, but Dr. Scott Morton conceded in her reply report that these data reflect the average EpiPen share on all plans on ESI's HPF, including those that excluded EpiPen and *those that did not*. San. Ex. 30 at ¶¶ 79-81. For those HPF plans that excluded EpiPen, the uncontested evidence shows that EpiPen lost nearly all of its share. *See* Ex. 39 (cited at SMF ¶ 131 n.305).



[12] ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████

**RESPONSE TO SANOFI'S ADDITIONAL STATEMENT OF FACTS**

Sanofi's ASMF does not identify any genuine dispute of material fact that would prevent entry of summary judgment for Mylan. The factual assertions made in Sanofi's ASMF are either wholly immaterial to the issues in Mylan's summary judgment motion or unsupported by the evidence that Sanofi cites, or both. The absence of any genuine dispute of material fact is demonstrated by Mylan's specific responses below.[13]

## I. Sanofi's Assertions About Anaphylaxis Treatment Options and Auvi-Q's Features

1-5. Sanofi's assertions in ASMF ¶¶ 1-5 about the treatment options for anaphylaxis are immaterial as Mylan has not moved for summary judgment on market definition. Furthermore, Sanofi's assertions in ¶ 1 are unsupported.[14]

6. Sanofi's assertions about the features of Auvi-Q are immaterial and unsupported.[15]

7-10. Sanofi's assertions in ASMF ¶¶ 7-10 are immaterial, and its assertions about Mylan's "views" or "beliefs" about Auvi-Q are unsupported.[16]

11-14. Mylan does not dispute the assertions in ASMF ¶¶ 11-14 that Mylan viewed Sanofi as a ███████████████ and Auvi-Q as a competitive threat. The assertion that Mylan viewed Auvi-Q as a threat "to its monopoly" (¶ 11) presupposes that Mylan had a monopoly, which is a legal issue on which Mylan has not moved for summary judgment.[17] The assertion that physician research uniformly showed a ██████████ in Auvi-Q (¶ 13) is immaterial and unsupported.[18]

---

[13] Because many of the assertions in Sanofi's ASMF come from the Statement of Undisputed Material Facts it included in its own Motion for Summary Judgment (ECF. No. 1686-1), Mylan here incorporates by reference certain paragraphs in its response to that statement ("RSMF"), included in its Memorandum in Opposition to Sanofi's Motion for Summary Judgment, ECF No. 1805-1 ("Mylan Opp.").

[14] *See* Mylan Opp. 3-7 (RSMF ¶¶ 8-21) (describing other products used to treat anaphylaxis).

[15] *See* Mylan Opp. 23-24 (RSMF ¶¶ 85-91) and 38-39 (SMF ¶¶ 135-36).

[16] *See* Mylan Opp. 20-21 (RSMF ¶¶ 78-80).

[17] MSJ 62 n.346; Mylan Opp. 51-75.

[18] *See* Mylan Opp. 21 (RSMF ¶ 79 & n.136); San. Ex. 85 at -814.

15-18. Sanofi's assertions in ASMF ¶¶ 15-18 about Mylan's efforts to improve or redesign EpiPen are immaterial and unsupported.[19]

## II.  Sanofi's Assertions Concerning Mylan's Rebating Practices

Sanofi's assertions in ASMF ¶¶ 19-28 that Mylan implemented a "scheme" to exclude Auvi-Q are unsupported by the record and fail to create a genuine issue of material fact.

19. The evidence does not support Sanofi's assertion that Mylan "strategically inflated" EpiPen's WAC price "several times before Auvi-Q's launch." The uncontroverted evidence establishes that Mylan took predictable WAC price increases each year before Auvi-Q's entry.[20] Indeed, ██████████████████████████████████████████ ████.[21] Mylan considered the timing of Auvi-Q's expected launch in taking that price increase, but there is no evidence to suggest that it or any other price increase was part of a "scheme" to "proactively offer large rebates to [PBMs] and [Payors] who excluded Auvi-Q." *See* Resp. to ASMF ¶¶ 25-28, *infra*.

20. The evidence does not support Sanofi's assertion that Mylan's pricing activity was "directly tied" to Auvi-Q. Auvi-Q's launch was just one of many factors Mylan considered.[22] The uncontroverted evidence establishes that Mylan did not "hike" the price of EpiPen after the recall; that price increase was planned before the recall.[23]

22. Mylan does not dispute Sanofi's assertion that some payors "do not always go to the trouble" of managing every drug class. But neither the asserted fact nor the cited document refutes

---

[19] *See* Mylan Opp. 21-23 (RSMF ¶¶ 81-84).
[20] ██████████████████████████████████████████ ██████████████████████████
[21] Ex. 266 at -600.
[22] Ex. 267 at Slides 13-16; Ex. 268.
[23] Ex. 269 at -159.

the uncontroverted evidence that Payors *did* manage the EAI class both before and after Auvi-Q's launch.[24]

23. The evidence does not support Sanofi's assertion that, before Auvi-Q's launch, no Payor "heavily manage[d] the EAI drug device class."[25] Nor does the evidence support Sanofi's assertion that management of the EAI class "require[d] a patient to 'fail' on one device." To the contrary, a restriction on Auvi-Q could be overcome, for example, ███████████████████

███████████████████████████████████████████████████████████████.[26]

24. The terms of Mylan's rebate agreements—which Sanofi does not cite—refute Sanofi's assertion that "to get rebates on EpiPen, Payors had to exclude or restrict Auvi-Q."[27] Sanofi quotes internal Mylan documents that do not support Sanofi's assertion. San. Ex. 34, for example, makes no mention of excluding Auvi-Q. And with respect to San. Exs. 35-37, "exclusivity" in those documents means that EpiPen is the sole product on the lowest tier (*e.g.*, T2), with other products covered in an unrestricted position on higher formulary tiers (*e.g.*, T3)[28]—a formulary determination Sanofi does not challenge. SMF ¶ 74 & n.148 (undisputed).

25. The evidence does not support Sanofi's assertion that Mylan attempted to ██████████ ████████████████████  or that it had a strategy to █████████████████ to require Auvi-Q's exclusion. San Exs. 38 and 39 establish only the unremarkable, procompetitive fact that Mylan

---

[24] *E.g.*, SMF ¶¶ 61-64, 66, 72, 79, 85, 94, 99, 107, 113.
[25] United had previously excluded EpiPen from formulary in favor of Twinject. SMF ¶ 85 (undisputed). WellCare placed a prior authorization on EpiPen in favor of Adrenaclick. Ex. 39 (Willig Rep.) ¶ 210 n.274.
[26] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████
[27] SMF ¶¶ 34, 36, 67, 78, 83, 87, 95, 100, 102, 111, 113 (citing rebate agreements).
[28] *See* SMF ¶ 33 n.60 (undisputed); *Compare* San. Ex. 35 ████████████████████████████████████
████████████ with Ex. 64 (OptumRx contract) at -771 & -773.

leadership emphasized ████████████████████████████[29] San. Ex. 40 confirms that Mylan was concerned with avoiding ████████████ status *for EpiPen*, not with excluding Auvi-Q. And San. Ex. 41 discusses the possibility of ███████

████████████████████████████████████████

████████████████████████████████████████

████████████.[30]

26. Mylan does not dispute that it sometimes raised the issue of rebates tied to formulary restrictions or exclusions. SMF ¶ 67. But the evidence does not support Sanofi's assertion that Mylan ████████████████ Payors to ████████████████ or ████████████ ███████ Again, Sanofi fails to cite the actual negotiations or agreements with Payors, which conclusively show that Mylan offered Payors a variety of options, often in response to solicitations for exclusive offers. SMF ¶¶ 34, 36, 67, 78, 83, 87, 95, 100, 102, 111, 113. Sanofi quotes documents that do not refute the evidence of the actual negotiations, including draft discussion documents, San. Exs. 42 & 44; third-party presentations not reflective of Mylan's strategies, San. Ex. 13; documents discussing contract language for exclusive *preferred* coverage, not restrictions on Auvi-Q, San. Exs. 13 & 43; and documents discussing competition against Sanofi with no reference to excluding Auvi-Q, San. Exs. 13, 39, & 204. Sanofi cites only one document that references ████████████ to exclude Auvi-Q—San. Ex. 240, an internal email referring to negotiations for 2015 with ESI client Wellpoint.[31] But Mylan ultimately offered a menu of rebates to ESI in 2015, ████████████████████████████████████████ ████████.[32]

---

[29] San Ex. 39; *see* Mylan Opp. 15 (RSMF ¶ 57) (addressing San. Ex. 38).
[30] Ex. 273.
[31] *Compare* San. Ex. 240, *with* Ex. 274 (longer version of email thread).
[32] Ex. 275 at -932 ████████████████████████

27. Mylan does not dispute that its rebates increased on Auvi-Q's launch; indeed, the evidence overwhelmingly establishes that the entrant of a new competitor in a therapeutic class can—and did here—result in price competition and higher rebates. SMF ¶¶ 43-44, 61-64, 99, 121, 123, 134. But the evidence does not support Sanofi's assertion that Mylan engaged in an "exclusionary strategy" that "was a complete shift in the norm for EAI drug devices." EAI manufacturers offered significant rebates conditioned on preferred formulary coverage before and after Auvi-Q's launch.[33] So too did Mylan offer Payors a variety of rebate options conditioned on different coverage determinations, without requiring those Payors to "disadvantage[] competitors." SMF ¶¶ 36, 38-39 & n.68, ¶¶ 78, 83, 87, 95, 102.[34] ████████████████████████████

████████████████████████████"[35]

28. The evidence does not support Sanofi's assertion that Mylan "encouraged, and ultimately drove" numerous Payors, including those listed in Sanofi's chart, to "exclude or disadvantage Auvi-Q." Sanofi cites documents related to Mylan's rebate negotiations with six Payors (Prime, Humana, CVS, Kaiser, ESI/Anthem, and MedImpact), but only *three* of them (Kaiser, ESI/Anthem, and MedImpact) elected to exclude or disadvantage Auvi-Q in 2014. SMF ¶¶ 72, 113. And, for ESI, Auvi-Q was excluded from only ████ of commercial lives in 2014 and regained full coverage in 2015. SMF ¶¶ 81, 117. The undisputed evidence shows at least two of the three (Kaiser and MedImpact) █████████████████████████████████.[36] ██████████

████████████████████████████████████████████████████

---

[33] ████████████████████████████████████████████

[34] Exs. 278-80; Ex. 258 (Rogers (OptumRx) Dep.) at 303-05; Ex. 256 (Kronberg (Cigna) Dep.) at 89-99.
[35] San. Ex. 212; Ex. 270 (████████████████).
[36] SMF ¶ 62 n.124 & ¶ 113 n.247 (Kaiser); SMF ¶ 100 n.209 & ¶ 101 n.210 (MedImpact).

████████████████████████████████████████████████.[37] Mylan never "drove" Prime, Humana, or CVS to cover EpiPen as the exclusive EAI on formulary, as they each covered Auvi-Q on formulary the entire time Sanofi had it on the market. SMF ¶¶ 65, 72, 74, 113.

### III. Sanofi's Assertions Concerning Mylan's Marketing Practices

Sanofi's assertions in ASMF ¶¶ 29-39 concerning Mylan's marketing statements are unsupported by the record and fail to create a genuine issue of material fact.

29. The evidence does not support Sanofi's assertion that Mylan took "advantage" of any spillover effect; Sanofi cites only a single document in which a Mylan employee vaguely refers to ████████████████████████. Sanofi also cites the opinion of Dr. Scott Morton, which shows only that tracking coverage may present a "challenge," not that physicians are "unable" to do so. And Sanofi cites Dr. Blaiss's opinion that physicians tend to prescribe the lower cost EAI device, but Dr. Blaiss in no way indicated that cost cannot be evaluated on a patient-by-patient basis.

30. The evidence does not support Sanofi's assertion that Mylan "dissuade[d] doctors from prescribing Auvi-Q altogether." The cited document shows only that Mylan ███████████ ████████████████████████, not that it told physicians to cease writing Auvi-Q prescriptions. San. Ex. 60 █████████████████████████████████████████; San. Ex. 61 ██████████████████████████.

31. The evidence does not support Sanofi's assertion that Mylan "exploited" any spillover effect. The cited documents show only that Mylan told physicians ██████████████████████ ████████████████████████████████████████, not for *all* patients. ██████████████████████████████████ ███████████████████████████████████████████████

---

[37] *See also* San. Ex. 31 (Minton (Anthem) Dep.) at 280.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████

32. The evidence does not support Sanofi's assertion that BCBS of Illinois ████████

████████████████████████████████████████ Mylan could not ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████"[38]—a restriction Sanofi also faced when it ████████

████████████████████████████████████████████████████████████.[39]

33. The evidence does not support Sanofi's assertion that Mylan "false[ly]" "advertised that the payors' decision to not cover Auvi-Q was based on 'clinical recommendations.'" Sanofi cites Mylan marketing materials stating that ████████████████████████████████████████ ████████████████████████████████ (San. Ex. 80)—a true statement. SMF ¶ 42. The unrefuted evidence shows that Payors conducted a clinical evaluation of Auvi-Q and that their formulary decisions were based on their determination that ████████████████████████ ███████████████████. SMF ¶ 61. The cited testimony of Roger Graham, which Sanofi mischaracterizes, does not support Sanofi's assertion, as he testified that ████████████████ ████████████████████████████████████.[40]

---

[38] Ex. 281.
[39] Ex. 282.
[40] Ex. San. Ex. 81 (Graham Dep.) at 178-80.

34.  The evidence does not support Sanofi's assertion that Mylan told physicians the epinephrine in Auvi-Q was not bioequivalent to that in EpiPen. Sanofi cites no evidence of Mylan telling a single physician that the epinephrine in the two products was not bioequivalent. Sanofi cites only the study titled "Auvi-Q versus EpiPen Auto-Injectors: Failure to Demonstrate Bioequivalence of Epinephrine Delivery Based on Partial Area Under the Curve." As the title shows, that study addressed whether the *delivery* of epinephrine by the two devices was equivalent, not the epinephrine itself, and Sanofi presents no evidence challenging the results of the study or of the study's distribution to physicians beyond its presentation at a single conference.

36.  The evidence does not support Sanofi's assertion that Mylan's EpiPen4Schools program ███████████████████████████ or ████████████████ The quoted presentation has nothing to do with EpiPen4Schools.[41] Mylan does not dispute that the EpiPen4Schools program created an ███████ for the EpiPen brand vis-à-vis its competition. As Mylan's corporate representative explained, ████████████████████████



████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████ ██████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████"[43]

37.  The assertion that Mylan viewed marketing to schools or summer camps as "'pivotal'

[41] Ex. 283 (full version of Sanofi's Ex. 85) at Slides 13 & 18 ██████████████████████████
██████████████████████████████████
[42] Ex. 254 (Graham 30(b)(6) Dep.) at 127-29.
[43] *Id.*

to cementing its position in the 'U.S. EAI market'" presupposes that is the relevant market, which is a legal issue on which Mylan has not moved for summary judgment.[44]

38. Sanofi's description of Mylan's EpiPen4Schools program is false and unsupported. Sanofi's assertion that "any school seeking more than four devices" had to agree not to purchase competitive devices "in order to receive discounted EpiPens" is false; Mylan offered two discount levels for additional pens, only one of which had a certification requirement. SMF ¶ 136 (describing EpiPen4Schools program discounts). Sanofi's assertion that "[a]ny school that stocked Auvi-Q was forced to pay higher prices for EpiPen" is false; schools overwhelmingly obtained EpiPens for free with no strings attached,[45] could receive replacement pens for free, and could stock *free* Auvi-Q devices—which Sanofi chose not to provide—and still purchase EpiPens at the highest discount.[46]

## IV. Sanofi's Other Immaterial Assertions Concerning Mylan's Conduct

40-41. The asserted facts about Mylan's Medicaid pricing are immaterial and unsupported.[47] Sanofi cites no admissible evidence that Mylan misclassified EpiPen as a non-innovator drug to the Medicaid Drug Rebate Program. The DOJ Press Release cited by Sanofi states that "[t]he claims settled by this agreement are allegations only, and there has been no determination of liability."[48] Mylan relied on a written decision by a federal agency—the predecessor to CMS—that it was "entirely fitting and proper for [it] to report [EpiPen] to the Drug Rebate Program" as a "Non-innovator" drug "subject to the lowest rebate amount."[49] Furthermore,

---

[44] Mylan Opp. 51-75.

[45] Ex. 228 (by September 2016, Mylan had given away 700,000 pens and sold 45,000).

[46] San. Ex. 25 (Graham 30(b)(6) Dep.) at 118-19.

[47] *See supra* n.8 (citing Court's prior rulings dismissing claims based on Medicaid rebates and holding that alleged misclassification is not relevant to Sanofi's claims).

[48] San. Ex. 93 at p.3.

[49] Ex. 284.

Sanofi offers no competent evidence that Mylan's Medicaid pricing impacted its commercial discounts; the only document cited by Sanofi is █████████████████████████████████ ██████████████████████████████████████████.[50]

42. Sanofi's assertion that Mylan shared "competitively sensitive rebate information" is immaterial and unsupported. None of the cited documents discloses the terms and conditions of any confidential rebate agreement.

43. Sanofi's assertion that Mylan told "told payors that they would be at a competitive disadvantage" is immaterial and unsupported. Sanofi quotes a single Mylan email of potential talking points for █████████████████████████████████████████████ ███████—that makes no mention of a "competitive disadvantage."[51]

44-46. Sanofi's assertions that Mylan improperly pursued Sanofi's "confidential information" from Digitas Health, including through "breach of a confidentiality wall" are immaterial and unsupported. Sanofi cites a single presentation that alludes vaguely to competitive intelligence ██████████████████████ but it does not state how the ███████ obtained the information, whether Mylan sought it, or whether any firewalls had been breached. The other documents cited show only that Mylan asked Digitas Health to ████████████████████████ ████████████████████████████████████████████████████████████████████ Nor does Sanofi present any evidence that Mylan used confidential Sanofi information to compete, let alone assist anticompetitive conduct.

47. Sanofi's assertions that Mylan used WebMD to ██████████████████████████████ ███████ are immaterial and unsupported. The cited documents are merely third-party vendor

---

[50] Ex. 253 (Foster Dep.) at 396-97 (discussing San. Ex. 95).
[51] Ex. 253 (Foster Dep.) at 152; █████████████████████████████████████████████████████ ██████████████████████████████

proposals to Mylan that do not show Mylan's strategy or conduct.

## V. Sanofi's Assertions Concerning Auvi-Q's Lost Sales and Recall

Sanofi's assertions in ASMF ¶¶ 48-52 about Auvi-Q's lost sales and exit from the market do not create a genuine dispute of material fact preventing the entry of summary judgment.

48-49. These paragraphs accurately describe Dr. Scott Morton's damages opinions. Mylan challenges the reliability and admissibility of those opinions, but they are immaterial to the issues presented in Mylan's motion for summary judgment.[52] Sanofi's assertion that Mylan believed Auvi-Q would obtain more than ██████████ is immaterial and unsupported.[53]

51. Mylan does not dispute that Sanofi "considered . . . an early return of rights to Auvi-Q's inventors" or that it "attempt[ed] … to re-negotiate its royalty agreement," but there is no contemporaneous record support that alleged "anticompetitive conduct" prompted such considerations or attempts. Instead, the document Sanofi cites states that ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████."[54]

52. Sanofi's assertion that it "had no reason" to believe it "could overcome" Mylan's rebate offers if it were to relaunch Auvi-Q is unsupported by the record. The undisputed evidence shows that in 2015 Sanofi regained ██████████████████████ and that Sanofi's CEO ████████████████████████████████. SMF ¶ 124 (undisputed).[55] The

---

[52] MSJ 96-97; Mem. in support of Mot. to Exclude Dr. Scott Morton, ECF No. 1680-2.
[53] Sanofi ignores that a forecast by a Mylan consultant prepared closer to Auvi-Q's launch estimated Auvi-Q's share in a base case would be ████████████████████████ *See* Mylan Opp. 23 (RSFM ¶ 84).
[54] San. Ex. 119 at Slide 4.
[55] *See* Ex. 255 (Guenter Dep.) at 302-03.

slide deck that Sanofi prepared after Auvi-Q's recall to forecast relaunch scenarios makes no mention of Mylan's rebate agreements as a consideration.[56]

## ARGUMENT

The core conduct at issue is Mylan's discounts to EAI device purchasers. As discussed below, because Mylan's discounted EAI device prices remained above its costs, those discounts were lawful. The rationale is straightforward: only *inefficient* companies with *higher* prices or *higher* costs could be harmed by a competitor's above-cost pricing, and the antitrust laws protect competition, not such inefficient competitors. Here, Sanofi cannot identify one instance when Auvi-Q was restricted on a formulary after offering a better per-unit price for Auvi-Q than Mylan offered for EpiPen. That should end the matter. *See infra* Argument § I.A. But Sanofi tries to obscure the issue; its Preliminary Statement, Opp. 1-2, barely mentions rebates. When Sanofi does mention rebates, it often cites rebates for tier exclusivity or equal access even though it "does not blame Mylan for instances [where it] was placed on T3 without restrictions." SMF ¶ 74 (undisputed). Sanofi's efforts should not distract the Court from Mylan's procompetitive rebates and discounts, the absence of any evidence of coercion by Mylan, and the prevalence in the industry of the rebating conduct that Sanofi challenges. This Court should enter summary judgment for Mylan.

## I.  Mylan's Dealings With Payors Were Not Illegal

### A.  Price Operated As The Clearly Predominant Mechanism Of "Exclusion"

Price was the clearly predominant mechanism of Auvi-Q's "exclusion." *See* MSJ 55-60 (citing ECF No. 98, at 11-15, and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012)). Sanofi does not challenge that the *ZF Meritor* test applies or that, if price was the clearly predominant mechanism of exclusion, above-cost pricing ends the case. Instead, Sanofi relies on

---

[56] Ex. 243.

this Court's decision on Mylan's motion to dismiss. Opp. 81-82. But discovery has revealed—and Sanofi does not contest—that Auvi-Q was never excluded from or restricted on formulary where Sanofi offered the better per-unit price. SMF ¶¶ 69-70; San. Resp. to SMF ¶¶ 69-70. In deciding Mylan's motion to dismiss, the Court credited—as it must—Sanofi's allegations, *e.g.*, ECF No. 1 ¶ 52 ("Sanofi chose to be price-competitive with EpiPen and avoid formularies' incentive to provide preferential treatment to a lower-priced drug."). Now, the Court need not do so.

The key facts surrounding the four major exclusions of Auvi-Q are undisputed. For Med-Impact, for example, Sanofi cannot dispute that: ██████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

In an attempt to distract, Sanofi cites ████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ And Sanofi cites █████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████. The undisput-

ed facts concerning the three other major Payors who restricted Auvi-Q tell the same story.[57]

---

[57] Sanofi does not dispute that ███████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

Sanofi cites other "non-price" conduct, Opp. 82, but that alleged conduct is not linked to any decision by a Payor. There is no evidence that any Payor considered the "confidential information" that Mylan supposedly shared or the "false information" about Auvi-Q's safety. No Payor cited spillover effect or Mylan's messaging to HCPs as influencing coverage determinations. No evidence links knowledge of "commercially sensitive [Sanofi] information" to any Payor's decisions. "The litigant must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)

Sanofi's theory of leveraging incontestable demand also boils down to exclusion based on price—Payors, under Sanofi's theory, simply wanted to pay less for the incontestable portion of EpiPen's demand. *See* MSJ 59-60. Sanofi does not respond to that point *at all*. Sanofi also misleads the Court regarding the *Eisai* case by suggesting that the Third Circuit reversed the district court's holding that price was the clearly predominant mechanism of exclusion. *See Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *26-29 (D.N.J. Mar. 28, 2014). The appellate court did not reach the issue because "Eisai's claims [were] not substantiated and … fail[ed] a rule of reason analysis" regardless. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016).

Finally, Sanofi opines that Mylan's agreements with some Payors failed the price-cost test. Opp. 82-83. But Sanofi is referencing the discount attribution test, Opp. 82, which is not the *Brooke Group* price-cost test cited in *ZF Meritor*. 696 F.3d at 275. It also suggests that some contracts

▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ Nor does Sanofi dispute that ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐ And Sanofi does not dispute that ▐▐▐▐▐▐▐▐▐▐

26

might fail the price-cost test if the alleged misclassification of EpiPens for Medicaid reimburse-ment were accounted for, but Sanofi has no evidence that misclassification occurred or that it had any effect on variable costs. Resp. to ASMF ¶¶ 40-41. Sanofi bears the burden of demonstrating that Mylan priced below its costs. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993). Wild and unquantified speculation is insufficient.

### B.  Sanofi's Broader Arguments Also Fail

In its opening brief, MSJ 61-74, Mylan discussed the factors lower courts have developed since *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961), to assess exclusive dealing. Even if the Payor agreements were treated as pure exclusive dealing contracts, instead of the pro-competitive, price-cutting deals they are, they would easily pass muster under those factors. Sanofi tries to dispute Mylan's legal points about coercion, prevalent industry conduct, short duration and terminability, and extent of foreclosure, but Sanofi is wrong on each point. The factors governing analysis of exclusive dealing overwhelmingly favor summary judgment.

*Coercion:* Without any coercion of Mylan's customers, there is no basis for an inference that Mylan's agreements were exclusionary. MSJ 65-69. Sanofi argues that Mylan provided Payors with no choice but to accept its discounts, but the cases mean something different by "coercion."

A threat to cut off supply of a necessary good can "break the competitive mechanism and deprive customers of the ability to make a meaningful choice." *ZF Meritor*, 696 F.3d at 285. In *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190 (3d Cir. 2005), Dentsply repeatedly "threat-ened to sever access not only to its teeth, but to other dental products as well," and Dentsply did not offer a discount in exchange for exclusivity; instead, Dentsply simply imposed it. In *McWane, Inc. v. FTC*, 783 F.3d 814, 821 (11th Cir. 2015), too, "distributors who bought domestic fittings from [competitors] might lose their rebates or be cut off from purchasing McWane's domestic fittings for up to three months." Exclusivity was "unilaterally imposed by fiat upon all distrib-

utors," and "it resulted in no competition to become the exclusive supplier and no discount ... offered in exchange for exclusivity." *Id.* at 834. In *ZF Meritor*, too, the customers testified that "many of the terms of the [agreements] were unfavorable …, but that [they] agreed to such terms because without [the defendant]'s transmissions, [they] would be unable to satisfy customer demand." 696 F.3d at 285. The choice was to accede to exclusivity or receive no transmissions.

Sanofi tries to shoehorn Mylan's conduct into that paradigm. It alleges that Mylan threatened supply, San. Resp. to SMF ¶ 68, and cites only two documents to support its point—Sanofi Exs. 58 and 160. ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

Neither document mentions supply *at all*. And neither Payor testified it received such a threat.

Sanofi also cites *LePage's* for the point that "all-or-nothing discounts" can render any choice illusory. 324 F.3d 141, 158-59 (3d Cir. 2003) (en banc). But the Third Circuit has limited *LePage's* "to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines." *ZF Meritor*, 696 F.3d at 274 n.11. The *Eisai* court noted that single-product rebates like those at issue here "do[] not present the same antitrust concerns." *Eisai*, 821 F.3d at 405-06. Further, Sanofi's evidence of "all-or-nothing discounts" is poor. Apart from Sanofi Exs. 58 and 160, discussed above, Sanofi cites ████████████████████

████████████████████████████████

████████████████████████████████  Sanofi has

no evidence of any threat by Mylan to withhold rebates unless Auvi-Q were excluded or restricted.

Sanofi's other claims of "coercion" are unavailing. Sanofi's chart, Opp. 73-74, shows, at most, that ████████████████████████████████████████████████████████████ ████████████████████████████████. *There is nothing wrong with this*. No Sherman Act case condemns merely making an offer for exclusivity. Where the challenged exclusivity results from *above-cost* rebate or discount offers (rather than, for example, threats to cut off supply) there is no basis for antitrust liability. Sanofi has no evidence of that kind of pressure.

Moreover, Sanofi lists instances when ██████████████████████████████ but omits the *result* of the negotiations: often, a rejection of Mylan's offer. At Opp. 72-74, Sanofi quotes documents related to eleven Payors, only *three* of which chose to exclude or restrict Auvi-Q. *Supra* at 9. San. ASMF ¶ 28 quotes more documents, this time related to negotiations with six Payors, only *three* of which excluded or restricted Auvi-Q. Resp. to ASMF ¶ 28. Payors turned down exclusive offers as often as they accepted them. The evidence does not remotely suggest that Payors had no choice but to accept exclusivity ████████████████; indeed, ████████████ ████████████████████████████ confirms they were not coerced. SMF ¶¶ 61-63, 67, 101, 113.

The conduct Sanofi defended in *Eisai* was similar. Among the parallels between this case and *Eisai*, the only inducement to pick a given formulary status was loss of a discount. MSJ 68-69. Sanofi seeks to distinguish *Eisai* because it featured market-share discounts, not discounts for exclusivity. Opp. 61-62. But that is a distinction without a difference: the *point* of Dr. Scott Morton's paper and her effective entrant burden statistic is that all loyalty discounts should be evaluated the same way. *See* Fiona M. Scott Morton & Zachary Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 ANTITRUST L.J. 777 (2017). And there is no economic reason to distinguish a high market-share threshold for receiving the highest discount, as in *Eisai*,

*see* 2014 WL 1343254, at *4, from exclusivity in exchange for the highest discount. *See* Derek W. Moore & Joshua D. Wright, *Conditional Discounts and the Law of Exclusive Dealing*, 22 GEO. MASON L. REV. 1205, 1236 (2015) ("'[P]ure' exclusive dealing … is economically indistinguishable from the example in which the manufacturer offers a discount if the distributor buys 99 percent of its requirements from the manufacturer."). This case parallels *Eisai* in the ways that matter.

Finally, Sanofi misses the point when it states that "[n]either Mylan nor the payors it seeks to blame are entitled to special deference under the antitrust laws." Opp. 75. But the desires of Payors are important not because of "deference" but because they "ultimately decide[d] whether or not to enter into a contract with [the defendant supplier] requiring [exclusivity] … in their own best interest." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 78 (3d Cir. 2010). If antitrust law protects *competition*, not competitors, then offering the customer what it wants is procompetitive (a good thing) and has nothing to do with "blame" for a bad thing. And "[c]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996).

**Conduct in the industry:** That Mylan's rebates were consistent with *how the entire industry functions* also independently warrants summary judgment. MSJ 69-71. Mylan has cited voluminous evidence that its strategy was typical for the branded pharmaceutical industry. SMF ¶¶ 12-44. And Payors began to manage formularies more aggressively as Sanofi began marketing Auvi-Q. SMF ¶¶ 45-51. Sanofi meaningfully disputes none of this. San. Resp. to SMF ¶¶ 12-51. Instead, it argues that EAIs *should* have resisted industry-wide trends. *But see supra* at 5-7.

Sanofi cites *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2019 WL 1109868 (D. Del. Mar. 8, 2019), to suggest that this Court should disregard "other markets." Opp. 62. But *Armstrong* involved ceiling tiles, 2019 WL 1109868, at *1, and the court declined to consider evidence about

competition in the artificial tooth, anticoagulant, and truck transmission markets. *Id.* at \*11-13. Here, Mylan cites evidence from *this* industry and about a party in *this* case. "Acts which are ordinary business practices … do not constitute anti-competitive conduct violative of Section 2." *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984).

Sanofi also misconstrues Mylan's point regarding Lantus. Opp. 62-63. Mylan is not raising an *in pari delicto* defense. Mylan's point is that both it and Sanofi faced the same shifting landscape in 2013-14. Payors increased use of UM controls to reduce costs, and Sanofi and Mylan responded to this changing landscape in the same procompetitive manner: ██████████████████████████ ███████. "Rewarding customer loyalty promotes competition on the merits." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001). Sanofi suggests that Mylan has not offered a business justification, but the justification is all over the record: Mylan responded to the changing Payor environment by giving Payors what they demanded, which in turn gave Payors cost savings to pass along to their customers. ██████████████████████ and is in no position to complain that increased rebates for exclusivity lack business justification.[58]

***Duration and terminability:*** Sanofi does not contest that short and easily terminable contracts are of little antitrust concern. *See* MSJ 62-64. Instead, Sanofi insists that *this case* is different. Opp. 75-77. That is contradicted by the record, which shows that Payors could and did renegotiate their agreements frequently, and that Sanofi was always given a chance to bid.

For example, ██████████████████████████████; Auvi-Q was thus covered at

---

[58] Sanofi makes another point about Lantus: that because of Mylan's rebates it supposedly ████ ████████████████████████████████████████████████████████ ███████████████████████ Opp. 69 (all emphasis in original). Nothing could better demonstrate that accepting Sanofi's theory would protect competitors, not competition. Sanofi offers no explanation of how ███████████ could have hurt consumers. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 340 (1990).

launch, excluded in 2014, and covered at parity with EpiPen in 2015. SMF ¶ 72. For CVS, Auvi-Q was *never* excluded; it was covered the entire time Sanofi marketed it, *id.*, . Ex. 201 at -531, San. Ex. 55 at -021; *see* SMF ¶ 40 & n.8. Other Payors, when excluding or restricting Auvi-Q,

The cases Sanofi cites only emphasize Mylan's point. *McWane*, *Dentsply*, and *ZF Meritor* differ because of the threats to cut off supply; the courts in those cases concluded that termination provisions were meaningless—and therefore never exercised—because of those threats, but here early termination and renegotiation and formulary changes were frequent. *Minn. Mining & Mfg. Co. v. Appleton Papers Inc.* featured supply threats as well; customers had to "surrender[] Appleton as a supplier … if they desire[d] to distribute non-Appleton brands." 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999). *Dial Corp. v. News Corp.* is far afield. The average length of the exclusive contracts was 3.9 years, and the defendant staggered the end dates so that fewer than 25% came up for renewal each year. 165 F. Supp. 3d 25, 30-31 (S.D.N.Y. 2016). The defendant's competitors "*were not afforded the opportunity to compete for significant contracts*"—that is, the contracts were not put out for bid. *Id.* at 31 (emphasis added). All of those facts starkly contrast with this record.

**Extent of Foreclosure:** As Mylan explained in its opening brief, *any* static number over-states the extent of foreclosure because customers who can realistically terminate their contract,

like *all* Payors at issue here, are not foreclosed. MSJ 72 (citing PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1802g2 (2018)). But even Sanofi's overstated number is unimpressive: it was supposedly "foreclosed" from slightly fewer than one-third of formulary lives for a single year—2014. Opp. 79.[59] Sanofi does not dispute SMF ¶ 124, which establishes that in 2015 Sanofi ██████████████████████████████████████████████████████████

████████████████████

Those overstated numbers do not nearly meet the foreclosure threshold in the case law. *See TCA Bldg. Co. v. Nw. Res. Co.*, 873 F. Supp. 29, 39 (S.D. Tex. 1995) (dismissing exclusive dealing claim because plaintiff had "almost 70% of the … market open to it"); *Newport Controls, LLC v. Balboa Instrums., Inc.*, 2010 WL 11509295, at *8 (C.D. Cal. Sept. 27, 2010) (dismissing claim because of minimal foreclosure). Sanofi responds with *dicta* from *McWane* and *Microsoft*. In *McWane*, the competing pipe manufacturer was foreclosed from "the two largest distributors, who together controlled approximately 50-60% of distribution," as well as the third-largest distributor. 783 F.3d at 837. In *Microsoft*, the defendant had "exclusive deals with fourteen of the top fifteen access providers in North America." *United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (en banc). Those foreclosure levels are *substantially* higher than Sanofi alleges here.

Sanofi responds in several ineffectual ways. It misleadingly quotes Dr. Scott Morton's deposition to suggest she held to her belief that ████████████████████████████████ ████████████████████████████████████. But that deposition took place before her Reply Report, which stated that ██████████████████████████████████████████ ██████████████████████████████████████████████████████████

---

[59] Sanofi's evidence exaggerates the extent of foreclosure in other ways. The Mylan internal document that Sanofi cites has "Humana Part D" (5 million lives) and "FFS Medicaid" (9 million lives) as part of its "foreclosure" "calculat[ions]." Neither is a commercial formulary, which means both are irrelevant.

████████████████████████████████████████████████. San. Ex. 30 ¶ 104. She

also confirmed that ██████████████████████████████████████████ Ex.

26 (Scott Morton Dep.) at 513. Sanofi also contends that the "spillover effect" increased its share

of foreclosure but cites no definition in case law that would regard Sanofi as "foreclosed" from

plans where Auvi-Q was freely available to the plan's customers on Tiers 2 or 3 of their

formularies. Moreover, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████. Finally, and most stunningly, Sanofi tosses out a half-baked argument

that it was foreclosed from ██████ of the market because that was the percentage of EpiPen's

"entrenched" share. Opp. 78-79. That "foreclosure" is based simply on customer preference—

including customers whose formularies preferred Auvi-Q over EpiPen, formularies that covered

both products equally, and even formularies that restricted EpiPen. Sanofi thus claims foreclosure

without any tie to any rebate agreement between Mylan and a Payor. That radical approach shows

how disconnected Sanofi's position here is with the governing legal and economic principles.

Finally, in its opening brief, Mylan showed that, because Sanofi has not alleged that any

foreclosure hampered it from achieving minimum efficient scale, its claims cannot succeed. MSJ

73-74. Sanofi does not respond *at all*. Indeed, it cites an article by Dr. Willig stating that "[t]he

mere fact of rivals losing sales does not necessarily imply a harm to competition" but that "[i]t is

necessary to show that the loss of the foreclosed sales diminishes the rivals' ability to compete

more generally." San. Ex. 217, at 4. Only foreclosure that "prevent[s] rivals from achieving

sufficient economies of scale to compete effectively" is anticompetitive. *Id.*

C.      **Sanofi's Incontestable-Share Theory Cannot Salvage Its Case**

Because the methods used by courts to evaluate exclusive dealing do not support its argu-

ments, Sanofi instead focuses on Dr. Scott Morton's theory of incontestable share. But Sanofi cannot cite any record evidence showing Payors making decisions as Dr. Scott Morton theorized they did. No testimony, and no document produced by any Payor, suggests that they felt obligated to accept Mylan's offers because they would lose rebates on Mylan's incontestable share if they excluded Mylan. "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp.*, 509 U.S. at 242. All Sanofi has is Dr. Scott Morton's theory.

Dr. Scott Morton's view does not just contradict the record; it is also unsound theoretically. Sanofi appears to concede that customer preference cannot sustain a finding of an incontestable share, instead arguing that perceived safety concerns would make patients reluctant to switch. Opp. 63-64. But those perceived safety concerns are just another form of customer preference; they can be overcome, which Sanofi does not contest, as otherwise no patient would *ever* switch away from EpiPen once familiar with it. The contrast to *Eisai* is marked. There, Sanofi's drug had an indication that Eisai's drug did not; it was, literally, impossible to use Eisai's drug to treat all the conditions that Sanofi's drug treated. *Eisai*, 821 F.3d at 399. And still the plaintiff lost. Other examples of incontestability based on "indisputable necessity" are imaginable: "some patients can [only] be cured with a particular antibiotic[,] [and] [s]ome machines can [only] be repaired with a unique part." Richard M. Steuer, *Musthavedness*, 81 ANTITRUST L.J. 447, 460 (2017). The key difference is this: In *Eisai* and the examples in *Musthavedness*, the incontestable share was completely beyond the reach of the competitor; here, no one argues that it was. Sanofi identifies

███████████████████████████████████████████████████████

██████ Ex. 26 (Scott Morton Dep.) at 70 (emphasis added). Accepting such a low threshold for incontestability would guarantee holding defendants liable for procompetitive conduct.

Sanofi's citations to literature and case law are also flawed. It cites an article by Dr. Willig

that laid out some theoretical justifications for how leveraging incontestable share might lead to anticompetitive conduct; two of the requirements stated in that article for liability are that fore-closure prevents scale economies and that the contestable portion of demand is priced below cost as measured by the discount attribution test, neither of which Sanofi can show. San. Ex. 217, at 3-4. And in *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494 (E.D. Pa. 2018),[60] the court stated that the plaintiff had to show that it "offered more competitive pricing for [its drug]" and still could not compete, *id.* at 505—a standard Sanofi cannot meet. The plaintiff also alleged that the defendant offered multi-product bundles, which Sanofi does not allege here. *Id.* at 498.

Sanofi also cannot show that EpiPen had any incontestable share while it sold Auvi-Q. It does not seriously engage with the data Mylan cited showing that, . SMF ¶¶ 130-31. Instead, it unhelpfully refers to data . *See* Ex. 39 (Willig Rep.) at ¶¶ 203-208. It also relies on bits of testimony, the majority of which do not quanti-fy any share that EpiPen would retain if it were excluded. Opp. 64-65. The only "evidence" with numbers is a fact that confirms this evidence has no probative value whatsoever concerning any incontestable demand for EpiPen when Sanofi was marketing Auvi-Q. Sanofi also portrays EpiPen as keeping a majority share at United when it was excluded in favor of Twinject in 2008, but the cited evidence

---

[60] This case and the other case Sanofi cites, *In re Remicade Antitrust Litigaton*, address the same conduct. *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 574 (E.D. Pa. 2018) ("This case arises from essentially the same facts that have been described in detail in this Court's related decision denying Defendants J & J's motion to dismiss Pfizer's complaint alleging federal antitrust violations. *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494 (E.D. Pa. 2018).").

only features Sanofi's attorney at a deposition tossing out hypothetical shares that EpiPen might have retained. San. Ex. 161, at 161-164. None of that can stand against *actual data*.

Finally, Sanofi defends Dr. Scott Morton's effective entrant burden ("EEB") test weakly, arguing that it is "more appropriate because it allows for evaluation of foreclosure, and not just predation." Opp. 84. No explanation is proffered as to how it does so. And EEB contradicts the core principle that practices threaten competition only when they foreclose an equally efficient rival. MSJ 82-84. Applying EEB would require dominant firms to pull their competitive punches, helping their nascent competitor but hurting consumers. *See id.*; *see also* Sean Durkin, *The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test*, 81 ANTITRUST L.J. 475, 477 (2017) ("If the less preferred seller is equally or more efficient, then buyer costs are lower in a loyalty-discount equilibrium than in a single-price equilibrium. The equilibrium in which sellers can only offer a single, unconditional price is inefficient ....").

Even if the Court accepted a theory of incontestable share, applying the right test to it— the discount attribution test *Sanofi endorsed in a previous case*, MSJ 80-84—shows that Mylan never priced the contestable portion of demand below cost at any reasonable level of contestability. *Id.* at 81. Sanofi challenges that calculation, asserting that, "account[ing] for EpiPen's share of entrenched demand, several Mylan contracts fail[]." Opp. 82. But the entrenched-demand figure Sanofi uses is unsupported by the evidence, as discussed above, and Sanofi has not assessed what foreclosure it suffered from Mylan's supposed pricing below attributed cost. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████.[61]

---

██████████████████████████████████████████████

37

### D.     "Intent" Evidence Does Not Create A Jury Question Here

Sanofi cites evidence that, it says, shows Mylan intended to exclude Auvi-Q; in its view, that evidence overcomes all the adverse case law and suffices to send the case to a jury. Opp. 58-60. It cites cases that considered intent evidence, but none of those cases held that intent alone was enough to transform competitive conduct into anticompetitive conduct. In *Aspen Skiing*, the Court said only that "[i]mproper exclusion … is always deliberately intended." 472 U.S. at 603. The question here is what *constitutes* improper exclusion rather than competition on the merits. Using intent to *prove* the impropriety of the exclusion is question-begging. In *Race Tires*, the court granted summary judgment because the defendant's conduct—regardless of intent—was not anti-competitive. 614 F.3d at 73, 85. In *Dial Corp.*, what convinced the court to deny summary judg-ment was not the intent evidence but rather the anticompetitive nature of News Corp's contracts with retailers; the Court's holding was based on "the duration of the contracts, their staggered end dates," and other evidence of conduct, as opposed to intent. *Dial Corp.*, 165 F. Supp. 3d at 33.

By contrast, Mylan cited cases in its opening brief—including a Tenth Circuit case, *SCFC ILC, Inc. v. VISA USA, Inc.*, 36 F.3d 958 (10th Cir. 1994)—that reject the kind of evidence Sanofi offers here. In SCFC, the district court inferred that a given course of conduct was anticompetitive because a Visa board member approved it for anticompetitive reasons. *SCFC*, 36 F.3d at 970. But the district court erred in doing so; the Tenth Circuit held that the intent evidence was "irrelevant" and that "intent to harm a rival, protect and maximize profits, or do all the business if they can is neither actionable nor sanctioned by the antitrust laws." *Id.* at 969. That is all Sanofi offers here; even if Mylan "intended" to harm Sanofi, that is vigorous competition, not an antitrust violation.

Sanofi's attempt to distinguish *SCFC* is weak; it refers to the case as "unhelpful," Opp. 59, and states, without further elaboration, that it was a "joint venture case" where the "'central anti-trust question posed' under Section 1 is not intent but 'whether the alleged restraint is reasonably

related' to the conduct," *id.* at 59 n.4. That is true, but it makes no difference; the "central antitrust question posed" in a § 2 exclusive dealing case is not whether the defendant intended to exclude a rival but whether the defendant used anticompetitive means to do so, a question the cases answer by looking at coercion, contract duration and terminability, industry practice, and so on.

Sanofi also **ignores entirely** *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983), which is factually similar to this case. The defendant manufacturer was accused of offering "special 30 percent/25 percent price discounts" in exchange for an exclusive contract. *Id.* at 229. As the First Circuit speaking through then-Judge Breyer saw it, the court's task was to separate "the economically harmful price-cutting goats from the more ordinary price-cutting sheep." *Id.* at 232. The plaintiff offered evidence that "Pacific 'intended' to drive [it] from the market place," *id.*, which is precisely what Sanofi offers here. The court rejected that evidence because "intent to harm without more offer[ed] too vague a standard in a world where executives may think no further than 'Let's get more business.'" *Id.* The same is true here.

## II.  Mylan's Other Conduct Did Not Violate The Sherman Act

Sanofi argues that deceptive speech, the EpiPen4Schools program, and other allegations combine with the pricing conduct to create an actionable "scheme" that must be evaluated in its totality. But nothing Sanofi cites is nearly enough to perform such alchemy.

Sanofi contests application of the *de minimis* presumption for antitrust claims alleging deceptive speech, but it ignores the voluminous case law showing that courts use that presumption. *See* MSJ 85. This Court applied that presumption in its decision on Mylan's motion to dismiss. *See* ECF No. 98 at 26-27. Leading commentators unanimously dismiss the antitrust relevance of claims based on disparagement of competitors. *See* AREEDA & HOVENKAMP ¶ 782d (2018) ("We would go further and suggest that such claims should presumably be ignored."). Sanofi's case citations, too, are misleading. Its quotation from the *Avaya* case comes from a dissent. Opp. 85

(quoting *Avaya, Inc., RP v. Telecom Labs., Inc.*, 838 F.3d 354, 420 n.7 (3d Cir. 2016) (Hardiman, J., dissenting in part)). And Sanofi suggests falsely that its deceptive conduct claims are only part of its claim that Mylan's conduct was anticompetitive as a whole; in fact, its Complaint lists as its second individual claim for relief Mylan's "deceptive conduct to further its monopolization … in violation of Section 2 of the Sherman Act," ECF No. 1 at 64, so even on its own terms the *de minimis* presumption applies.

Sanofi resists application of the presumption and the six-factor test articulated in *Lenox* because it cannot satisfy that test. *See Lenox McLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014). To begin, none of Mylan's statements was clearly false. The study that Sanofi mentions was entitled "Auvi-Q versus EpiPen Auto-Injectors: Failure to Demonstrate Bioequivalence of Epinephrine *Delivery* Based on Partial Area Under the Curve." Resp. to ASMF ¶ 34. Contrary to Sanofi's statements, the study did not suggest that the epinephrine in Auvi-Q and EpiPen was not bioequivalent; instead, it suggested that the delivery was not bioequivalent, as the epinephrine from EpiPen was absorbed more quickly. *Id.* Sanofi has not challenged that suggestion. Sanofi also challenges ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████. Sanofi argues only that such statements "could be" false and misleading, Opp. 87, but the standard is "*clearly* false." *Lenox*, 762 F.3d at 1127 (emphasis added). Something that only "could be" false, by definition, is not clearly false.

Sanofi's arguments regarding the fifth and sixth factors—whether the disparagement was "continued for prolonged periods" and "not readily susceptible to neutralization or other offset by

rivals," *id.*—fall flat. For the fifth factor, Sanofi's sole argument is that "Mylan's arguments about the sufficiency of Sanofi's pleading on whether Mylan's deceptive speech continued for a prolonged period have already been rejected by this Court." Opp. 88 (citing ECF No. 98 at 28). This is an astonishing misrepresentation; what the Court held was that the fifth factor "require[s] factual development through the discovery process" and that evidence supporting it would "manifest—or not" during discovery. ECF No. 98 at 28. Sanofi's misstatement of that holding is an attempt to gloss over its lack of evidence for that factor, which alone requires summary judgment on the deceptive conduct claim. As to neutralization, Sanofi does not rebut Mylan's point that "the test refers to 'susceptible to neutralization' not 'successful in neutralization.'" *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F. 3d 1147, 1152 (9th Cir. 1997). Instead, Sanofi simply cites *Lenox* to argue that any question about neutralization is a fact dispute for the jury. A comparison to the conduct in *Lenox* is instructive. There, the alleged disparagement was that the defendant had falsely initiated a product recall and ensured that the falsely recalled product was placed on the FDA's recall website. 762 F.2d at 1117, 1127. Here, Sanofi complains about Mylan's advertising. When it comes to "neutralization," a false recall and false placement on the FDA's recall website holds no comparison to marketing material; unlike the *Lenox* plaintiff, all Sanofi had to do to counteract Mylan's marketing was market its product.

Sanofi argues that the challenged conduct must be reviewed collectively. Opp. 88-90. But the components of a case should be analyzed before examining any synergistic effect. *See, e.g.*, *Cal. Comput. Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 746 (9th Cir. 1979) ("The number of ... issues has required us to consider each instance of IBM's alleged monopolizing conduct separately for purposes of analytical clarity."). In any event, considering all of the challenged conduct together makes no difference. Courts routinely reject the idea that conduct that is not anticompeti-

tive becomes an unlawful collective course of action by considering individual instances together. "[W]here claims of anticompetitive conduct are individually shown in numerous critical respects to be utterly lacking the plaintiff's claims then collectively cannot have any synergistic effect rescuing their validity." *United States v. AMR Corp.*, 140 F. Supp. 2d 1141, 1218 n.28 (D. Kan. 2001), *aff'd*, 355 F.3d 1109 (10th Cir. 2003).

Here, no reasonable jury could find any portion of Mylan's conduct anticompetitive. Sanofi offers no theory of how Mylan's EpiPen4Schools program, alleged misclassification of the EpiPen for Medicaid rebate purposes, supposed "shar[ing] of competitively sensitive rebate information," or use of confidential information about Sanofi's marketing was anticompetitive. Opp. 88-90. "The Sherman Act is not a panacea for all evils that may infect business life." *Berkey Photo, Inc. v. Eastman Kodak. Co.*, 603 F.2d 263, 288 n.41 (2d Cir.1979). Lumping the conduct together does not produce an antitrust violation: "Nothing plus nothing times nothing still equals nothing." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1311 (E.D. Pa. 1981).

### III. Sanofi Cannot Demonstrate Antitrust Injury

Sanofi mischaracterizes its own expert's views on the effect of Mylan's conduct on price. Sanofi claims that Dr. Scott Morton "show[ed]" that "'but for' Mylan's anticompetitive scheme … EpiPen's … net price would have been *lower*." Opp. 91. That is incorrect. Sanofi's evidence for that point is San. Ex. 30 at ¶ 37, Fig. 2, which is Dr. Scott Morton's reply report. *Id.* Dr. Scott Morton explained at her second deposition that she was not trying to show what the price of EpiPen would have been but for Mylan's allegedly anticompetitive conduct; instead, she was modeling "the price without Auvi-Q's entry." Ex. 26 at 474-75. Those are very different concepts. And supposedly raising prices in anticipation of Auvi-Q cannot show antitrust injury. Raising price *helps* a new rival compete by allowing it to undercut an incumbent's price. "[H]igh prices, far from damaging competition, invite new competitors into the … market." *Berkey Photo*, 603 F.2d at 274

n.12; *accord In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1150 (D. Kan. 2000). Sanofi has not shown that any price increases "were the result of antitrust violations." *Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 123 (1st Cir. 2011).

Sanofi argues that output did not rise as much as it would have without the alleged conduct. Its sole support is unelaborated speculation by Dr. Scott Morton, *see* Opp. 93 (citing San. ASMF ¶ 132), and Mylan has already shown that Dr. Scott Morton performed no calculations to support this premise, *see* MSJ 89-90. Sanofi's new evidence is that ███████████████████ ████████████████, Opp. 93; in fact, per Dr. Scott Morton's own data, output grew by 21%, *see* San. Ex. 22 at Fig. 2. No reasonable jury could conclude that output did anything but rise; Sanofi's attempt to argue to the contrary is yet another attempt to substitute expert testimony for record facts in violation of *Brooke Group. See* 509 U.S. at 242.

Sanofi cites cases discussing lack of innovation, but those cases only confirm that a lack of innovation, standing alone, cannot support a finding of antitrust injury. The cases that actually discussed antitrust injury featured a harm to competition besides lack of innovation. *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241 (2d Cir. 2003) (output); *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 504 (S.D.N.Y. 2005 ) (increased prices).[62] As for a decline in product quality, Sanofi does not engage at all with Mylan's points that it has failed to provide a quality-adjusted price, that evidence of some consumers stating that they liked Auvi-Q is not evidence that it was a higher-quality product, or that Auvi-Q had to be recalled completely because it did not deliver epinephrine reliably. All of this shows the lack of evidence of any decline in product quality. MSJ 91-92. And as for loss of choice, the only time when Auvi-Q was unavailable

---

[62] Sanofi's other cases do not even discuss antitrust injury. *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), was decided before the Supreme Court first articulated the antitrust-injury requirement in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007), mentioned lack of innovation only as an allegation in the complaint.

to patients after it launched was when it was completely recalled due to a product defect. MSJ 92.

Sanofi leaves almost entirely unanswered the point that, "[w]hen one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 456 (6th Cir. 2007) (en banc). For that proposition Mylan cited *NicSand*, *Race Tires*, and *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000). Sanofi's sole response to *NicSand* is to state that the case involved the replacement of the plaintiff by the defendant, and it offers no reason that should make a difference. Opp. 92. It should not; competition is not harmed by the selection of an exclusive dealer in that selecting an exclusive dealer simply moves competition away from atomistic competition and into a competition for an exclusive contract; consumers benefit whether the incumbent or an entrant wins. Sanofi does not attempt to distinguish *Race Tires* in this regard. And, as to *Indeck*, Sanofi quotes the court's *conclusion* that "[n]o allegation in the complaint indicate[d] in any manner whatsoever how … customers in the energy market suffered," Opp. 94, as if it were the court's entire reasoning, but that conclusion followed from the plaintiff's inability to show that it was a lower-cost alternative. *Indeck*, 250 F.3d at 977-78. Sanofi cannot demonstrate antitrust injury just because a customer selected Mylan over Sanofi in a competition for the contract.

## IV. Sanofi's Damages Arguments Are Unavailing

***Disaggregation:*** Sanofi concedes that "Dr. Scott Morton's model does not disaggregate between allegedly pro- and anticompetitive conduct," Opp. 94, but it defends the model "because Mylan's conduct formed a package." *Id.* at 95. This argument fails for two reasons: <u>First</u>, there is a crucial distinction between (i) the need to prove "that damages were caused by illegal acts"; and (ii) disaggregation of "damages among those acts found to be unlawful." *MCI Commc'ns Corp. v.*

44

*AT&T, Co.*, 708 F.2d 1081, 1163 (7th Cir. 1983).[63] Sanofi's cases "[n]ot requiring strict disaggregation of damages among ... various unlawful acts," *id.* at 1161, do not justify treating losses from lawful competition as damages.[64] *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir. 1975) (vacating judgment where damages "may be substantially attributable to lawful competition"). <u>Second</u>, the requirement to disaggregate damages among unlawful acts is lifted only "[i]f the plaintiff shows that such proof is impracticable." *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir. 1982). Here, Sanofi offers no evidence that disaggregation was impractical. All it cites is testimony by Dr. Scott Morton that the alleged misconduct is "a package" and "part of the same strategy," San. Ex. 137 at 263-64, which does not suffice.

*Post-recall damages:* Sanofi's claim for post-recall damages is based on what it *anticipated Mylan would do in the future. See* ███████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████. But "in an antitrust case, future damages may [not] be recovered for ... future misconduct." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1143 (10th Cir. 2002). "Courts have refused to permit damages claims based on the fear of future illegal acts, recognizing that such acts may never occur." *Great W. Directories, Inc. v. Sw. Bell Tel. Co.*, 74 F.3d 613, 614 (5th Cir. 1996), *vacated per settlement*. In *Great Western*, the Fifth Circuit held that Great Western ("GW") could not obtain damages for its decision to withdraw from a market based on its anticipation of how Southwestern Bell ("SWB") would price Directory Listing Information ("DLI") in the future. Although the Fifth Circuit affirmed a jury finding that SWB violated § 2 of the Sherman

---

[63] In *MCI*, the Seventh Circuit vacated a $1.8 billion judgment and remanded for a new damages trial where the jury had "no way to adjust the amount of damages to reflect lawful competition." 708 F.2d at 1163.

[64] In contrast to Dr. Scott Morton, the damages expert in *Conwood Co. v. U.S. Tobacco Co.,* 290 F.3d 768 (6th Cir. 2002), used a regression model and two other measures to rule out the possibility that damages were caused by "plausible alternatives *for which he had data*" and *"all variables raised by [defendant's] own expert."* Id. at 794 (emphasis added).

Act in its pricing of DLI and an award of lost profits, the court held that GW could not recover lost profits from its decision not to compete in the market because "antitrust damages cannot be predicated on such future illegal acts." *Id.* That is indistinguishable from Sanofi's post-recall damages claim. Sanofi does not address this argument in its Opposition.

Sanofi also does not dispel the speculation inherent in claiming damages for what a defendant *might do* in future years. Indeed, its response to the testimony that █████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ Mylan and Pfizer agreed only "to discuss transfer of the Meridian/EpiPen business." San. Resp. to SMF ¶ 5. Likewise, Mylan's 2016 introduction of its authorized generic lessened its incentives to offer deep rebates on the branded product, so it is speculative for Sanofi to assume Mylan's rebating conduct would continue unaltered—a point Sanofi does not address. Sanofi argues that "courts give plaintiffs the benefit of the doubt in determining the amount," Opp. 96, but that argument does not support Sanofi's claim for ████████ in pre-trebled damages based on conjecture about what Mylan might do in the future.[65]

## CONCLUSION

For the foregoing reasons, Mylan's motion for summary judgment should be granted.

---

[65] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

Dated: August 30, 2019

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

Roy T. Englert, Jr.
Kathryn S. Zecca
Lee Turner Friedman
Ralph C. Mayrell
Jessica Arden Ettinger
John B. Goerlich

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4500
Fax: (202) 775 4510
psechler@robbinsrussell.com
kzecca@robbinsrussell.com
lfriedman@robbinsrussell.com
rmayrell@robbinsrussell.com
jettinger@robbinsrussell.com
jgoerlich@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and*
*Defendant/Counterclaim Plaintiff Mylan*
*Specialty L.P.*

## CERTIFICATE OF SERVICE

On this 30th day of August, 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which provides a notice of such filing on each attorney registered for ECF notification to the counsel of record in this case.

Respectfully submitted,

s/ *Philip A. Sechler*
Philip A. Sechler

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K St. NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775 4492
Fax: (202) 775 4510
psechler@robbinsrussell.com

*Counsel for Defendant Mylan Inc. and Defendant/Counterclaim Plaintiff Mylan Specialty L.P.*