IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>*This Document Relates to Class Cases* | Case No. 2:17-MD-02785-DDC-TJJ<br>(MDL No. 2785) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER
IMPLEMENTING STAGE ONE OF CLASS NOTICE PLAN**

**INTRODUCTION**

Starting more than 14 months ago, during the class certification briefing process, Defendants repeatedly stated that Plaintiffs did not have the necessary information to identify class members and exclude non-class members. More than four months of merits discovery remained at that time. Yet, rather than take steps to try to address these deficiencies, Plaintiffs made vague assurances about their ability to readily identify class members. At class certification, the Court accepted the testimony of Plaintiffs' expert "on the current record" to conclude that Plaintiffs had "identified a viable method for identifying members of the classes." Mem. & Order at 25-26 & n.15, Dkt. No. 2018. In so doing, the Court recognized that "merits discovery" might disprove the Court's initial conclusion. *Id.*

Despite being on notice, Plaintiffs chose not to address any deficiencies in the data they collected during merits discovery. Instead, they waited until after (i) the Court ruled on class certification; (ii) briefing was complete on Defendants' Rule 23(f) Petition; and (iii) they successfully opposed a stay of this case pending resolution of the Rule 23(f) Petition, to ask the Court to launch a new round of discovery—ten months after discovery closed—in a bid to obtain the information that Defendants (correctly) told them over a year ago they did not have.

1

Indeed, through their Motion for "Stage One" of a class notice plan, Plaintiffs propose to gather a potentially massive amount of data: information about EpiPen® ("EpiPen") device prescriptions for the last nine years under seven categories comprising more than 22 sub-categories. Class Pls.' Motion, Dkt. No. 2058 ("Mot."), Ex. B at Ex. 1. They want everything from co-pay amounts to net amounts paid by third-party payors to the co-pay or co-insurance structure for every transaction. Such massive additional discovery is most certainly *not* "routine[]" at the class-notice stage in a case like this, as Plaintiffs assert. Mot. at 3. The parties in this case conducted extensive third-party discovery on some of these very same issues, and Plaintiffs are not merely seeking a list of class members or working to effectuate a settlement. They are seeking a do-over of third-party merits discovery by another name.

Plaintiffs freely admit that this discovery, which they refer to as "Stage One of [their] Class Notice Plan," will take "several months." *Id.* at 1. But that may be one of the great understatements of this case. In 2017 and 2018, the parties served data subpoenas seeking some of the very same data from the very same pharmacy benefit managers ("PBMs") that Plaintiffs seek now. The parties obtained over *five million* pages of third-party document productions in response to over 100 third-party subpoenas to PBMs and others—a process that took *sixteen months* from start to finish. There is no reason to think this go-around will be much faster. To the contrary, as Plaintiffs recognize, it is almost certain to be slower "in light of the ongoing coronavirus crisis." *Id.*

Thus, make no mistake: this is not a class notice plan. It is an effort to extend the discovery deadline by months, so that Plaintiffs can try to obtain information that they failed to obtain in nearly two years of merits discovery. As a result, Plaintiffs' Motion runs headfirst into two problems that they cannot solve. *First*, because merits discovery ended many months ago,

Plaintiffs must show "good cause" to pursue the information they seek in their Motion. Fed. R. Civ. P. 16(b)(4). Plaintiffs do not even attempt to satisfy this burden, and do not explain their failure to obtain the information at issue during merits discovery. Nor could they. The parties spent the better part of two years serving subpoenas on PBMs, negotiating with PBMs over the scope of those subpoenas, collecting and reviewing documents, and deposing PBMs and others. If Plaintiffs thought anything was missing, the time to raise that issue was then—not a few months before summary judgment under the guise of a plan to serve class notice.

*Second*, the length and complexity of what Plaintiffs propose risks violating the one-way intervention doctrine for class notice and Due Process rights for both Defendants and the class. Under that doctrine, absent class members may not be bound by any summary judgment ruling in Defendants' favor unless they are first notified of the class action and have the opportunity to opt out. *See, e.g.*, *Faber v. Ciox Health LLC*, 944 F.3d 593, 602-03 (6th Cir. 2019); *see also, e.g.*, *In re Motor Fuel Temperature Sales Practices Litig*, MDL No. 1840, 2013 WL 4411092, at *4 (D. Kan. Aug. 14, 2013). Therefore, it is critical that class notice occur and that the opt-out deadline expire before the summary judgment process is complete. But that will be virtually impossible under Plaintiffs' proposal. The time needed to serve subpoenas, address or litigate any objections, obtain responses, process data, move for Court approval of "Stage Two" of class notice, issue class notice, and allow sufficient time for class members to opt-out will easily extend beyond the time when summary judgment would otherwise be fully briefed and decided. It bears repeating: when the parties went through a similar exercise earlier in the case, it took sixteen months. Thus, Plaintiffs' plan would even imperil the trial date, which just a few weeks ago Plaintiffs said would cause substantial prejudice to them and to the class, *see* Class Pls.'

Opp, Dkt. No. 2046—a point the Court credited when it denied Defendants' request for a stay without prejudice. Mem. & Order at 7-8, Dkt. No. 2055.

Plaintiffs' requested relief is a bridge too far. Plaintiffs should not be allowed to redo merits discovery in the name of class notice, especially when doing so will not only require great burden, time, and expense, but also will also risk irreparable prejudice to Defendants' rights. The Court should deny Plaintiffs' Motion.

## BACKGROUND

### A. Prior Third-Party Discovery

Merits discovery was open for twenty months for all purposes, from November 2017 until July 2019, which the Court later extended for limited purposes unrelated to this Motion through October 2019. During the merits phase, the parties took extensive third-party discovery, including serving more than 100 third party subpoenas.

In December 2017, Plaintiffs served identical subpoenas on Aetna, Inc., CVS Health Corp., Express Scripts Holding Co., Humana, Inc., MedImpact Healthcare Systems, Inc., OptumRx, Inc., and UnitedHealthcare Services, Inc. *See* Exs. A-G.[1] Several months later, in May 2018, Plaintiffs served the same subpoena on Prime Therapeutics, LLC. *See* Certificate of Service, Dkt. No. 566; Return of Service, Dkt No. 570; Ex H. Each subpoena requested broad swaths of information, including, for example: "Documents sufficient to identify each customer [or] consumer" that the PBMs "transacted business" with relating to any EAIs and "[a]ll

---

[1] *See* Pls.' Notices of Return of Subpoena, Dkt. No. 126 (Aetna, Inc.); Dkt. No. 162 (CVS Health Corp.); Dkt. No. 163 (Express Scripts Holding Co.); Dkt. No. 151 (Humana, Inc.); Dkt. No. 167 (MedImpact Healthcare Systems, Inc.); Dkt. No. 168 (OptumRx, Inc.), Dkt. No. 169 (UnitedHealthcare Services, Inc.).

4

Documents or other data concerning actual or potential . . . pricing, sales, [or] rebates . . . paid or received" relating to EAIs.  *See* Exs. A-H at Requests 8, 10.

Likewise, in February 2018, Defendants served third-party subpoenas on the same entities seeking data regarding each transaction in which an EpiPen product was sold.  *See* Exs. I-Q.[2]  The subpoenas sought more than 50 fields of data, including the following:  device identifier and name, quantity, manufacturer, health plan identifier and name, group identifier and name, subscriber identification, patient identification, patient zip code, prescriber identifier, date prescription filled, pharmacy identifier and name, pharmacy type, pharmacy zip code, amount billed by the pharmacy, amount patient is responsible (including deductible, coinsurance, copayment, health reimbursement accounts), and payments made to the pharmacies by the health plans or otherwise.  *Id.*

A lengthy negotiations process ensued.[3]   And, as the Court may recall, where negotiations alone were not enough, Plaintiffs filed motions to compel against some of the PBMs, the briefing for which documented the lengthy and time-consuming process for many of the subpoena responses.  *See* Dkt. No. 429 (CVS Health Corp.); Dkt. No. 430 (Express Scripts Holding Corp.); Dkt. No. 282 (Humana, Inc.); Dkt. No. 276 (MedImpact Healthcare Systems,

---

[2] *See* Defendants' Notices of Subpoena, Dkt. No. 212 (Aetna, Inc.); Dkt. No. 223 (CVS Health Corp.); Dkt. No. 195 (Express Scripts Holding Co.); Dkt. No. 196 (Humana Pharmacy Solutions, Inc.); Dkt. No. 197 (Humana, Inc.); Dkt. No. 235 (MedImpact Healthcare Systems, Inc.); Dkt. No. 236 (OptumRx, Inc.); Dkt. No. 237 (United Healthcare Services, Inc.); Dkt. No. 205 (Prime Therapeutics, LLC).

[3] Plaintiffs indicated in filings to the Court that they were negotiating with the PBMs in "good faith" regarding their subpoenas.  *See, e.g.,* Plaintiffs' Requests for Extension of Time to File Motion to Compel, Dkt. No. 119 (Aetna, Inc.); Dkt. No. 247 (CVS Health Corp.); Dkt. No. 244 (Express Scripts Holding Co.); Dkt. No. 253 (MedImpact Healthcare Systems, Inc.); Dkt. No. 793 (Prime Therapeutics LLC).  Ultimately, both Plaintiffs and Defendants received the data responsive to each party's subpoenas quoted above.

Inc.); Dkt. No. 198 (OptumRx, Inc.). Ultimately, the subpoenaed third parties produced extensive data, substantially complying with the terms of these requests. From start to finish, however, this process took sixteen months: the first PBM subpoenas were served in December 2017, and the last PBM production was on April 10, 2019. The subpoena issued to the last PBM to produce such data alone took fourteen months to resolve. And the average time from service of a subpoena to substantial completion ranged from 8.5 to 11.5 months each.

## B. Expert Testimony and Class Certification Briefing Concerning Class Member Identification

During the class certification process, Defendants served the expert report of Professor James Hughes, in which Professor Hughes opined that Plaintiffs had not obtained the data necessary to identify members of their proposed classes. In that report, submitted in March 2019 when more than four months of merits discovery remained, Professor Hughes opined that he was "not aware of any data produced in discovery" that included identifying information for potential class members. *See* Expert Report of J. Hughes ¶ 64, Dkt. No. 1503-6 ("Hughes Report"). For example, he noted that the available data did not include (i) names, addresses, or other contact information; (ii) information concerning cash paying customers and those who paid with a health savings account; and (iii) information on customers who paid with a "flat" copay. *Id.* ¶¶ 64-66, 69-70, 81-83. Professor Hughes further opined that, in any case, such data would be insufficient to "allow the parties or the Court to ascertain the identities of individual class members," and that Plaintiffs ultimately had failed to identify "any data that would be sufficient" to make necessary determinations such as "who actually paid for EpiPen products (and thus would be eligible for inclusion in a class) and who received EpiPen products but did not pay for them (and thus would fall outside Plaintiffs' class definitions)." *Id.* ¶ 68; *id.* ¶¶ 64–66 & Tbl. 1. Plaintiffs' expert, Dr. Meredith Rosenthal, speculated that data sufficient to identify class members "must

exist" based on her understanding of the use of PBM claims data in other cases. *See id.* ¶¶ 21–22, 26 ¶¶ 46–47; *but see* Ex. A to Defs.' Mem. in Support of Mot. to Exclude Expert Opinions of Prof. Rosenthal ¶¶ 9, 13, Dkt. No. 1850-1.  However, she did not point to any specific such data produced in this case.

When Plaintiffs deposed Professor Hughes about these topics in April 2019, he testified repeatedly that, based on the data that were produced in the case, it was not possible to identify who was in the class and who was excluded. *See, e.g.*, Hughes Dep. Tr. 110:22-113:5; 115:2-116:4; 117:12-118:17; 119:2-120:21, April 16, 2019.  Moreover, in their brief opposing Plaintiffs' class certification motion, which was filed more than four months before the close of discovery, Defendants highlighted that "Plaintiffs ha[d] not attempted to obtain (or even identify) any non-party data that could ascertain class members."  Defs.' Opp to Mot. for Class Certification at 48, Dkt. No. 1505-03.  Yet despite ongoing discovery of PBMs and others, Plaintiffs took no steps to try to obtain this information while discovery was open.

### C. The Court's Class Certification Decision and Denial of Defendants' Motion to Stay

In its class certification decision, the Court acknowledged that "merits discovery may establish" that the data the third parties produced in discovery "can't discharge the task Prof. Rosenthal assigns to them (specifically, identifying consumers who paid nothing for EpiPens, those who used a flat co-pay, or individuals who paid cash for their EpiPens)," and that, "[i]n the end," the results of "merits discovery may substantiate" Defendants' position that class members cannot be reliably identified.  Dkt. No. 2018 at 24-26; Mem. & Order at 36-37, Dkt. No. 2017. The Court further acknowledged that the "task of gathering pharmacy records may prove overwhelming" because "it requires collecting data from about 65,000 pharmacies, more than 23,000 of which are independent."  Dkt. No. 2017 at 36-37.

7

Defendants have requested permission to appeal the Court's class certification decision. That petition remains pending as of the date of this filing. Defendants also moved to stay this litigation pending resolution of that appeal. In opposing Defendants' stay motion, Plaintiffs argued that they would face "significant harm" from a stay because they might "lose their trial date after years of litigation," and because the "[c]ourt's schedule . . . will evaporate." Class Pls.' Opp. to Mot. for Stay at 5-6, Dkt. No. 2046. The Court denied the stay motion without prejudice, emphasizing that, because a stay "will require the court to vacate the current schedule's deadlines, including the trial date," that would cause "significant harm to the plaintiffs" and the public interest. Dkt. No. 2055 at 7-8 (internal citation omitted).

### D.  Plaintiffs' "Stage One" Plan

In its March 20, 2020 order, the Court directed Plaintiffs to file a Rule 23(c)(2)(B) notice plan within "30 days after the Tenth Circuit resolves defendants' Rule 23(f) petition or appeal." Order Adopting Scheduling Order No. 12 at 2, Dkt. No. 2044. As of the date Plaintiffs filed their motion (April 21, 2020), the Tenth Circuit had not yet ruled. Plaintiffs say in their Motion that they filed this request now—before the Tenth Circuit's ruling—because they "anticipate" that "stage one" of their plan "will take several months," and they will not be "in a position to develop and submit stage two, to provide actual notice to the Classes consistent with Rule 23(c)(2)(B)," until after stage one is complete. Mot. at 1-2. Plaintiffs' Motion came as a surprise to Defendants, as Plaintiffs did not meet and confer with Defendants (or even notify them) before filing their Motion.

In any event, "stage one" of Plaintiffs' "class notice plan" is no such thing, and Plaintiffs admit in their Motion that they need to take "several months" of discovery to even obtain the basic information they need for class notice. *Id.* at 1. Plaintiffs therefore have asked the Court to

8

authorize them to serve subpoenas on several of the largest PBMs and pharmacies in the United States: (1) Caremark/Aetna, Express Scripts, Optum/UnitedHealth, Humana, MedImpact, and Prime Therapeutics; and (2) CVS, Walgreens, Cigna/Express Scripts, UnitedHealth Group, Walmart, Kroger, Rite Aid, Humana, Albertsons, and Diplomat. *Id.* at 1, 4–5. Each subpoena would seek the following seven categories of data:

> (a) customer information (including name, patient ID, residential address, email address, and any other contact information for the individual);
>
> (b) Prescription or RX number;
>
> (c) drug information (including NDC number, drug label name, drug strength/dosage, drug quantity);
>
> (d) fill date or dates of service;
>
> (e) pharmacy information (including pharmacy name and location);
>
> (f) payment information (including amount billed, amount paid by customer, co-pay amount (if applicable), co-insurance amount (if applicable), deductible amount (if applicable), amount paid by third party payor (net of co-pays and/or deductibles), and coupons used); and
>
> (g) insurance information (including plan or group name, plan or group FEIN, co-pay or co-insurance structure, deductible information, and client name).

*See* Ex. B-1.II to Mot., Dkt. No. 2058-3. The relevant time period for these requests is "August 2011 to present." *Id.* at Ex. B-1.I.D.

Plaintiffs' Motion also contains representations about their proposed claims administrator, A.B. Data, and A.B. Data's supposed capabilities. For example, Plaintiffs contend that A.B. Data has "working relationships with many of the PBMs and pharmacies Plaintiffs propose to subpoena," and that it "maintains a proprietary database of tens of thousands of third-party payors ("TPPs"), many of whom are Class members here." Mot. at 2-3. Because Plaintiffs did not meet and confer with Defendants before filing their Motion or provide any advance

9

notice of their intention to seek the appointment of A.B. Data, Defendants have not had any opportunity to engage with A.B. Data or to evaluate those representations.

Meanwhile, the rest of the schedule in the case continues to move forward. Dispositive motions and *Daubert* motions are due on July 15, 2020. Dkt. No. 2044. Trial is scheduled to begin April 13, 2021. *Id.*

## ARGUMENT

### I. "STAGE ONE" OF PLAINTIFFS' NOTICE PLAN IMPERMISSIBLY SEEKS TO REOPEN MERITS DISCOVERY WITHOUT GOOD CAUSE.

Plaintiffs do not show good cause for opening months of new discovery in the name of class notice that they failed to get during the merits phase of the case. Defendants repeatedly highlighted that Plaintiffs had not obtained the requisite information during discovery and class certification briefing. *See* Hughes Report ¶¶ 64-66, 69-70, 81-83; Dkt. No. 1505-03 at 48-49. Likewise, the Court recognized in its class certification ruling that "***merits discovery*** may establish" that Plaintiffs cannot "identify[] consumers who paid nothing for EpiPens, those who used a flat co-pay, or individuals who paid cash for their EpiPens." Dkt. No. 2018 at 25–26 & n.15 (emphasis added). That is precisely what happened, and now Plaintiffs are impermissibly seeking to re-open merits discovery without good cause.

To be sure, some courts have allowed post-certification subpoenas to obtain class notice-related information, such as names and addresses. In the two cases Plaintiffs cite in their brief, for example, the courts at issue permitted discovery aimed at "identify[ing] class members" and facilitating "issu[ance of] notice of the class action." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 73 (E.D. Pa. 2019); *see also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 64 (D. Mass. 2005) (in the context of a class settlement, permitting plaintiffs to subpoena approximately fifteen pharmacies "to obtain

10

electronic files of the names and addresses," of class members, as well as "information regarding" expenditures).

But Plaintiffs' request here is much different. For one thing, the parties and the Court have already been through an extensive third-party subpoena process. In the *Suboxone* case, by contrast, subpoenas served during discovery "were refused on HIPAA grounds," so there was no prior discovery process that had already been done. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 421 F. Supp. 3d at 72. And many of Plaintiffs' other cases involved class notice for settlement purposes, with no showing that the same kind of extensive discovery process had previously occurred. *See, e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. at 64 (settlement notice).[4] In a class settlement, the settling defendants often consent to the notice process and help to develop and implement it, which is very different from the burdensome situation here.

Moreover, Plaintiffs' proposed subpoenas seek far more than identification and contact information needed for class notice; instead, they seek exactly the kinds of complex information relevant to issues, like injury, that should have been obtained during "merits discovery." Dkt. No. 2018 at 25–26 n.15. For example, Plaintiffs' requests for "payment information" and "insurance information" from "August 2011 to present" are designed to determine how much, if anything, each class member paid for their EpiPen purchases. *See* Dkt. No. 2058-3 at Ex. B-1.I.D. & II(f)–(g) (requesting, among other things "amount billed," "co-pay amount," "amount

---

[4] *See also* Unopposed Mot. for Final Approval of Settlement, *Mahoney v. Endo Health Solutions, Inc. ("Fluoride Tablets")*, No. 1:15-cv-9841-DLC, ECF No. 101 at 8–13 (S.D.N.Y. May 5, 2017); Mem. in Support of Pls.' Motion for Final Approval of Proposed Settlements with All Defs., *Vista Healthplan, Inc. v. Cephalon, Inc.* ("Provigil"), No. 2:06-cv-1833-MSG, ECF No. 598-1 at 12–13 (E.D. Pa. Dec. 16, 2019) (cited in Paragraph 6 of A.B. Data's declaration as examples of cases where "counsel subpoenaed retail pharmacies and PBMs." It is Defendants' understanding that, in both instances, that process was done for purposes of settlement).

11

paid by third party payor," "co-pay or co-insurance structure," and "deductible information"). That has nothing to do with Plaintiffs' ability to contact and notify class members, but rather is directed at figuring out much more fundamental questions, such as whether each class member actually suffered an alleged injury and the amount of any purported damages that class members may pursue. That is discovery relevant to class certification and merits issues, not class notice.

Thus, because Plaintiffs seek merits discovery that they should have obtained during the discovery period, they must show good cause for their requests. Fed. R. Civ. P. 16(b)(4); Mem. & Order at 5, Dkt. No. 2059 ("A party seeking to reopen discovery after the expiration of a discovery cutoff must show good cause under Fed. R. Civ. P. 16(b)."); *Stonebarger v. Union Pac. Corp.*, No. 13-CV-2137-JAR, 2014 WL 5782385, at *2 (D. Kan. Nov. 6, 2014) (James, J.) (same). Indeed, as this Court recently recognized in denying Plaintiffs' untimely request for another do-over—relating to Teva witness deposition discovery—the fact that Plaintiffs "did not act on [their requests] until it was too late" prevented them from demonstrating good cause. Dkt. No. 2059 at 6-7.

Plaintiffs have not attempted to satisfy their burden to show good cause. Their own previous third-party subpoenas made broad requests for documents covering much of the information they now seek. *See* Exs. A-H. That leaves two possibilities as to any data that Plaintiffs do not have: They either (i) tried and failed to get the information they claim to need during merits discovery, in which case they fail to explain why they did not raise such issues until now or during the merits phase; or (ii) did not try to obtain the data at all, in which case they have only themselves to blame and cannot make the required showing of good cause. And to the extent Plaintiffs thought there was additional follow up they needed, the appropriate time to make such requests was during merits discovery, particularly given that Plaintiffs repeatedly

assured the third parties at issue that they were only going to have to identify and produce the data at issue once.  *See, e.g.*, Ex. 3 to Class Pls.' Mot. to Compel at 7, Dkt. No. 429-5 (correspondence dated Mar. 28, 2018 from Plaintiffs to counsel for CVS stating that Plaintiffs were agreeing to CVS's proposal concerning "additional data so that CVS is only required to run the claims data once"); Exhibit 3 to Class Pls.' Mot. to Compel at 5, Dkt. No. 430-5 (correspondence dated Mar. 22, 2018 from Plaintiffs to counsel for ESI stating that Plaintiffs were agreeing to ESI's proposal concerning "additional data so that Express Scripts is only required to run the claims data once").

And even if Plaintiffs somehow did not know initially what information they might need to identify their class members, class certification expert discovery and Defendants' class certification briefing—all of which was completed months before merits discovery closed—certainly should have educated them.  Plaintiffs thus have failed to demonstrate—and cannot demonstrate—the good cause required for the new, months-long round of broad discovery they now seek to launch.[5]

## II. PLAINTIFFS' PROPOSED PLAN RISKS IMPLICATING THE ONE-WAY INTERVENTION DOCTRINE AND VIOLATING DUE PROCESS, AND WOULD REQUIRE DELAYING BOTH SUMMARY JUDGMENT AND TRIAL.

"The purpose of Rule 23(c)(2) is to ensure that the plaintiff class receives notice of the action well *before* the merits of the case are adjudicated." *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) (emphasis in original); *see Wallace B. Roderick Revocable Living Tr. V. XTO Energy, Inc.*, No. 08-1330-JTM-KMH, 2015 WL 790081, at *1 (D. Kan. Feb. 25, 2015) ("Rule

---

[5] Plaintiffs' plan also contains significant gaps that mean their notice efforts may not even work. For example, Plaintiffs' plan does not include any proposal for obtaining data for at least 23,000 independent pharmacies, Dkt. No. 2017 at 36–37, which account for more than 35% of prescription fills in the United States.  Defendants reserve their objections on these issues until the appropriate time.

23 [] implies that entry of judgment should follow certification and notice."). Otherwise, the class would know the outcome of the case on the merits and could choose to intervene (or opt-in) only if the plaintiffs win. As one court in this District asked: "What rational class member would choose to remain in the [class] after the Court has granted summary judgment in favor of defendants?" *In re Motor Fuel Temperature Sales Practices Litig.*, 2013 WL 4411092, at *4.

To prevent this kind of gamesmanship and "one-way intervention," fundamental principles of Due Process and fairness thus require class notice to be issued and the opt-out process to be complete before the Court rules on summary judgment and before a trial occurs. As the Sixth Circuit recently held, "Rule 23(b)(3) class certification cannot bind a class without providing adequate notice as required by the Due Process Clause," and therefore "[c]ertification notice for class actions under Fed. R. Civ. P. Rule 23(c)(2) must be given before class members can be legally bound." *Faber*, 944 F.3d at 603.[6]

Here, this means the Court cannot decide summary judgment—much less conduct a trial—until class notice has been sent and the opt-out deadline has expired. As a practical matter, however, that will be nearly impossible under Plaintiffs' plan. In order for Defendants to have a meaningful opportunity to seek summary judgment, Plaintiffs must not only have a workable class notice plan, but must also execute that plan, in time for a vendor to analyze applicable data, send out notice to millions of class members, and provide sufficient time for class members to opt out—all before this Court rules on dispositive motions, which are due to be filed in just two

---

[6] Some courts have held that, "[w]hen the defendant moves for and obtains summary judgment before the class has been properly notified, the defendant waives the right to have notice sent to the class, and the district court's decision binds only the named plaintiffs." *Faber*, 944 F.3d at 602. Defendants do not waive any such rights—and should not be forced to ever waive such rights—simply because Plaintiffs waited until the eleventh-hour to propose an onerous class notice discovery plan.

months.  Plaintiffs' current proposal contemplates several months just to negotiate initial subpoenas, plus additional time for later "stages," before even getting to the actual notice and opt-out procedures.  This is the exact reason the time-consuming discovery that Plaintiffs propose should have been completed during the nearly two-years-long merits phase of discovery and cannot be allowed now.[7]

If the Court were to adopt Plaintiffs' notice plan, the summary judgment deadline would need to be lifted or extended, and likely the trial date too.  That would be the only way to ensure that class notice could be finished in time to comport with the requirements of Rule 23 and Due Process.  And there would be no small irony in this result: just weeks ago, when opposing Defendants' motion to stay pending the Rule 23(f) Petition, Plaintiffs asserted that "[d]elay in this case . . . means the delay in providing justice to the millions of class members" and that "justice delayed is justice denied."  Dkt. No. 2046 at 5-6 (internal citations omitted).  But less than a week later, Plaintiffs returned to the Court seeking permission to launch a new, previously undisclosed, phase of discovery that, by their own admission, would take at least "several months"—and almost certainly far longer.  Mot. at 1, 6-7.

The Court should not allow Plaintiffs to have it both ways.  Instead of embarking on a whole new round of discovery that Plaintiffs have long been on notice they needed to take, the Court should deny Plaintiffs' motion and require them to submit an appropriately narrow plan for class notice within 30 days of a ruling on Defendants' 23(f) petition, just like the Court already

---

[7] In the event Plaintiffs (i) are permitted to pursue the expansive discovery they are seeking and (ii) actually receive additional merits-related information in response to their subpoenas, Defendants would be entitled to amend or supplement their summary judgment and *Daubert* briefing (which will almost certainly already have been filed by the time any such discovery is produced) to account for that information, thus requiring even further delay of the case.

ordered. And if Plaintiffs cannot do so, the Court should revisit its ruling on class certification, as it warned Plaintiffs it may do. *See* Dkt. No. 2018-1 at 25-26, n.15.[8]

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion should be denied.

Dated: May 5, 2020

Respectfully submitted,

/s/ Adam K. Levin

Adam K. Levin
David M. Foster
Carolyn A. DeLone
Kathryn M. Ali
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
adam.levin@hoganlovells.com
david.foster@hoganlovells.com
carrie.delone@hoganlovells.com
kathryn.ali@hoganlovells.com

Brian Fries (15889)
James Moloney (23786)
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Fax: (816) 292-2001
bfries@lathropgpm.com

---

[8] As noted above, Plaintiffs are also seeking permission to retain A.B. Data as their notice administrator. Defendants reserve the right to seek information from A.B. Data about matters such as the "proprietary TPP database of approximately 42,000 entities ('TPP database')" referenced in the declaration of Eric Schachter, Ex. A to Mot. at 2 ¶ 5 , Dkt. No. 2058-2. Without such information, Defendants are unable to assess the adequacy of A.B. Data as a claims administrator and thus also reserve all rights to object to the appointment of A.B. Data at an appropriate time.

jmoloney@lathropgpm.com

*Counsel for the Mylan Defendants*

/ s/ Raj S. Gandesha
Dimitrios T. Drivas
Robert A. Milne
Raj S. Gandesha
Edward Thrasher
Kathryn Swisher
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Fax: (212) 354-8113
ddrivas@whitecase.com
rmilne@whitecase.com
rgandesha@whitecase.com
ethrasher@whitecase.com
kathryn.swisher@whitecase.com

Joseph Rebein
Ashley Harrison
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
jrebein@shb.com
aharrison@shb.com

*Counsel for the Pfizer Defendants*