UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | ) ) ) ) | Civil Action No. 2:17-md-02785-DDC-TJJ (MDL No: 2785) |
| This Document Relates To: | ) ) | CLASS PLAINTIFFS' MOTION TO ALLOW LIVE TRIAL TESTIMONY VIA CONTEMPORANEOUS TRANSMISSION |
| CONSUMER CLASS CASES. | ) ) ) ) ) | FOR WITNESSES THAT DEFENDANTS WILL NOT VOLUNTARILY PRODUCE IN PERSON OR WHO CANNOT OTHERWISE BE COMPELLED TO ATTEND TRIAL |

## <u>TABLE OF CONTENTS</u>

I.   Contemporaneous transmission is necessary and appropriate for Defendants' current and former employees who they refuse to bring to trial or who later become unavailable.............................................................................................................4

    A.   The complex, multi-party, and multi-state nature of this litigation weighs in favor of Rule 43 testimony. .................................................................................4

    B.   Because of the importance of Defendants' documents and testimony of Defendants' current and former employees to Class Plaintiffs' case, Defendants may seek tactical advantage by refusing to bring witnesses despite their control over their current and former employees. ............................5

        1.   A review of the role of Defendants' current and former employees demonstrates the risk that Defendants will seek a tactical advantage. ...................................................................................................6

        2.   Live testimony of Defendants' current and former employees should be preferred. ...............................................................................12

    C.   Defendants control their former and current employees........................................13

    D.   Defendants will not suffer "true" prejudice from the requested order..................13

    E.   The flexibility needed to manage this litigation favors contemporaneous transmission. ..........................................................................................................14

II.  Contemporaneous transmission is supported here by "good cause in compelling circumstances and with appropriate safeguards.".............................................................17

    A.   There are compelling circumstances.....................................................................17

    B.   Past experience shows that appropriate safeguards can be put in place to ensure the fairness and success of contemporaneous transmission. ......................19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
 No. 12-CV-00064, 2014 WL 107153 (W.D. La. Jan. 8, 2014) ....................................3, 12, 16

*Adams Commc'n & Eng'g Tech., Inc. v. Aerovation, Inc.*,
 No. PWG 19-CV-3131, 2020 WL 3469664 (D. Md. June 25, 2020)......................................18

*Amtrust N. Am., Inc. v. KF&B, Inc.*,
 No. 17-CV-5340 (LJL), 2020 WL 4365280 (S.D.N.Y. July 29, 2020)..................................17

*Arnstein v. Porter*,
 154 F.2d 464 (2d Cir. 1946)..................................................................................................12

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*,
 No. 3:11-MD-2244-K, 2016 WL 9776572 (N.D. Tex. Sept. 20, 2016) .......................4, 12, 13

*Flores v. Town of Islip*,
 No. 18-CV-3549 (GRB)(ST), 2020 WL 5211052 (E.D.N.Y. Sept. 1, 2020) .........................17

*Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n*,
 No. 17-11130, 2020 WL 3717792 (E.D. Mich. June 30, 2020) .............................................18

*Guardant Health, Inc. v. Found. Med., Inc.*,
 No. CV 17-1616-LPS-CJB, 2020 WL 6120186 (D. Del. Oct. 16, 2020) ...............................17

*Gulf Oil Corp. v. Gilbert*,
 330 U.S. 501 (1947)................................................................................................................2

*Mullins v. Ethicon, Inc.*,
 No. 2:12-CV-02952, 2015 WL 8275744 (S.D.W. Va. Dec. 7, 2015) ..............................12, 16

*In re RFC & ResCap Liquidating Trust*,
 No. 013CV3451SRNHB, 2020 WL 1280931 (D. Minn. Mar. 13, 2020).........................16, 18

*Sentry Select Ins. Co. v. Maybank Law Firm, LLC*,
 No. 5:15-CV-04984-JMC, 2020 WL 5441305 (D.S.C. Sept. 10, 2020) ................................18

*Sonrai Sys., LLC v. Romano*,
 No. 16 CV 3371, 2020 WL 3960441 (N.D. Ill. July 13, 2020) .............................................18

*Sutphin v. Ethicon, Inc.*,
 No. 2:14-CV-01379, 2020 WL 5229448 (S.D. W. Va. Sept. 1, 2020)...................................18

*In re Vioxx Prod. Liab. Litig.*,
    439 F. Supp. 2d 640 (E.D. La. 2006) ........................................................2, 4, 5, 12, 13, 14, 16

*Vitamins Online, Inc. v. HeartWise, Inc.*,
    No. 2:13-CV-00982-DAK, 2020 WL 3452872 (D. Utah June 24, 2020) ..............................18

*In re Wash. Public Power Supply Sys. Sec. Litig.*,
    MDL No. 551, 1988 WL 525314 (W.D. Wash. Aug. 9, 1988) .................................................2

*In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*,
    No. MDL 2592, 2017 WL 2311719 (E.D. La. May 26, 2017) ................................................12

**Other Authorities**

Fed. R. Civ. P. 43 .............................................................................................1, 2, 4, 12, 15, 16, 17

Fed. R. Civ. P. 45 .............................................................................................................19, 20

Kan. Amend. Admin. Ord. No. 2020-11 .........................................................................................3

Manual for Complex Litig. at 2 (4th ed. 2020) ............................................................................3

*On COVID-19 vaccine, 'get as many shots in arms as possible, right away': ex-FDA chief Q&A*, USA Today (Dec. 7. 2020) ......................................................................14

In an important multidistrict litigation ("MDL") with a certified class of millions of defrauded class members across the United States, Defendants should not be able to seek tactical advantage by refusing to bring their current or former employees to trial for live testimony. The Federal Rules of Civil Procedure allow this Court to authorize contemporaneous video testimony that would be far superior to the dated deposition designations available for those witnesses. If the COVID-19 pandemic vaccinations and seasonality in April 2021 have not sufficiently abated, this commonly deployed mechanism under Rule 43 also ensures the trial will proceed effectively, expeditiously and safely. Given both [1] proven experience using Rule 43 to allow video testimony in large MDLs and [2] this Court's Orders requiring flexible and novel measures to handle cases during the pandemic, Class Plaintiffs request that this Court allow contemporaneous transmission of the testimony of any of Defendants' current and former employees that they do not make available in-person at trial. While Defendants have agreed to work out a protocol for presenting contemporaneous video trial testimony, they insist on the Court considering Rule 43 testimony for each witness on an *ad hoc* basis. Such an *ad hoc* approach is unworkable here given Defendants' professed "uncertainty" on witnesses and the likelihood of using unavailability for strategic advantage. This wait and see approach benefits only them. Instead, just as is common in MDLs of this nature, the Court should now authorize contemporaneous trial testimony from locations outside Kansas for witnesses whom Defendants will not voluntarily produce in Kansas City, Kansas, or cannot otherwise be compelled to attend the trial in person.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, this Court has the authority to issue trial subpoenas to individuals anywhere in the United States and have them testify at trial by contemporaneous transmission. Fed. R. Civ. P. 43 & 45. Contemporaneous transmission of

testimony in open court is available when a party shows it is "for good cause in compelling circumstances and with appropriate safeguards." Fed. R. Civ. P. 43(a).

Testimony via contemporaneous transmission provides many of the benefits conferred by live, in-person testimony that are lost in depositions, even video depositions. Live, in-person testimony has long been considered the gold standard during trial, as it permits a jury to more accurately evaluate the witness's truthfulness while the courtroom setting exerts pressure for honesty. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511 (1947) (locating a trial where litigants may be forced to try their cases on deposition "is to create a condition not satisfactory to court, jury or most litigants"); *In re Vioxx Prod. Liab. Litig.*, 439 F. Supp. 2d 640, 644 (E.D. La. 2006) (calling live in-person testimony "optimal for trial testimony"); *In re Wash. Public Power Supply Sys. Sec. Litig.*, MDL No. 551, 1988 WL 525314, at *2 (W.D. Wash. Aug. 9, 1988) ("Presentation of witnesses under Court-controlled visual electronic methods provides a better basis for jurors to judge credibility and content than does use of written depositions"); Fed. R. Civ. P. 43 advisory committee's note (1996 amendment) ("The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling."). Testimony via contemporaneous transmission likewise permits a jury to "see the live witness along with his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration." *Vioxx*, 439 F. Supp. 2d at 644.

Here, the Court must decide if it is appropriate to use this beneficial trial technique. One widely used formulation for considering whether compelling circumstances exist for the use of contemporaneous transmission in an MDL was pioneered by Judge Fallon in *Vioxx*, 439 F. Supp. 2d at 643. It weighs five factors:

(1) the complex, multi-party, multi-state nature of the litigation;

(2) the apparent tactical advantage, as opposed to any real inconvenience to the witness, that the defendant is seeking by not producing the witness voluntarily;

(3) the control exerted over the witness by the defendant;

(4) the lack of any true prejudice to the defendant; and

(5) the flexibility needed to manage a complex multi-district litigation.

As discussed below, each of these factors supports this motion.

The existence of multiple witnesses from states outside the subpoena power of the district court trying the case has become "quite commonplace" in the multidistrict litigation context (even if it is less common for non-MDL civil cases). *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 107153, at *2 (W.D. La. Jan. 8, 2014). Because of the differences between MDL and non-MDL civil cases, "the challenge for the Courts and parties engaged within a multidistrict litigation proceeding is to fashion the most efficient, judiciously sound and fair manner to perform the tasks assigned by Congress." *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 107153, at *2 (W.D. La. Jan. 8, 2014); *accord* MANUAL FOR COMPLEX LITIG. at 2 (4th ed. 2020) ("Practices and principles that served in the past may not be adequate, their adaptation may be difficult and controversial, and novel and innovative ways may have to be found.").

This spirit of flexibility that already guides MDL trial practice is similarly emphasized in this Court's Administrative Orders in response to the coronavirus pandemic. Chief Judge Robinson has advised that "[t]he presiding judge has the discretion to determine what reasonable measures should be taken, giving due consideration to the health and safety of all persons in the courtroom and the recommendation of the Facility Security."[1]

---

[1] D. Kan. Amend. Admin. Ord. No. 2020-11, http://ksd.uscourts.gov/wp-content/uploads/2020/07/Administrative-Order-2020-11.pdf (last visited Nov. 20, 2020).

## ARGUMENT

I.  **Contemporaneous transmission is necessary and appropriate for Defendants' current and former employees who they refuse to bring to trial or who later become unavailable.**

The factors outlined by Judge Fallon in *Vioxx*, 439 F. Supp. 2d at 643, which are discussed in turn below, combine to support an order permitting contemporaneous transmission.

        A.  **The complex, multi-party, and multi-state nature of this litigation weighs in favor of Rule 43 testimony.**

The first factor—"the complex, multi-party, multi-state nature of the litigation"—favors permitting contemporaneous transmission of testimony. *Vioxx*, 439 F. Supp. 2d at 643. The effects of Defendants' racketeering activity and antitrust violations reach into every one of the fifty states—and so too does this Court's power to compel Defendants' current and former employees to testify concerning Defendants' illicit behavior for the jury.

In this certified class action, the parties have agreed to have the Class claims tried in a single forum, the District of Kansas. *Cf. In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. 3:11-MD-2244-K, 2016 WL 9776572, at *2 (N.D. Tex. Sept. 20, 2016) ("In fact, had this MDL been consolidated in another district, the witnesses at issue may have been within subpoena range."). The jury will be asked to consider the billions of dollars in damages caused by Defendants throughout the United States. The complex nature of this case as well as its impact on millions of Class members around the nation weighs in favor of allowing contemporaneous transmission of all Defendants' current or past employees on witness lists who Defendants do not make available live.

**B.    Because of the importance of Defendants' documents and testimony of Defendants' current and former employees to Class Plaintiffs' case, Defendants may seek tactical advantage by refusing to bring witnesses despite their control over their current and former employees.**

The second factor looks to the "tactical advantage" that Defendants might seek to gain by refusing to produce a witness. *Vioxx*, 439 F. Supp. 2d at 643. The third factor looks to "the control exerted over the witness by the defendant." *Id.*   Both of these factors favor the requested order. The tactical advantage that Defendants may seek to gain by refusing to produce their current and former employees to present live testimony at trial is demonstrated by looking to the parties' summary judgment briefing. As Class Plaintiffs' opposition to summary judgment sets forth, approximately 20-30 current or former employees of Defendants are important to Class Plaintiffs' case, and over 150 of Defendants' documents were submitted to show disputes on material facts.[2] Without delving into trial strategy, it is no surprise that Class Plaintiffs' case will extensively utilize the testimony of Defendants' current and former employees and Defendants' business documents (which may depend on having those witnesses testify unless Defendants stipulate to admissibility and authenticity, which they have refused to do thus far). While the parties are still formulating their witness lists, the factual record regarding the current and former employees of Defendants illustrates both that the jury should see them testify live *and* that Defendants exercise control over these witnesses.[3] Defendants contend the parties should first provide their witness lists, but this is a hollow gesture. Indeed, Defendants refuse to commit to bringing any particular

---

[2] These do not include the hundreds of third-party documents and expert reliance materials that were used on summary judgment.

[3] The following list of witnesses is not exhaustive of the current and former employees Plaintiffs may need to call live, especially give the potential need for rebuttal and impeachment testimony.

witnesses to trial, in fact claiming that such a commitment is impossible. Delay might be a defense strategy, but it is not a reasoned approach to managing MDLs or trials.

> 1. **A review of the role of Defendants' current and former employees demonstrates the risk that Defendants will seek a tactical advantage.**

To set forth the good cause for ordering remote testimony, Class Plaintiffs provide the following detail regarding the current and former employees of Defendants:

***Heather Bresch***: Ms. Bresch, a named Defendant and Mylan's President and CEO during the time period in question, is a lynchpin figure in the fraud at the heart of this case. Bresch was paid tens of millions of dollars for orchestrating the EpiPen Pricing Enterprise, and she personally communicated in furtherance of the schemes to defraud. ECF No. 2190-1, Class Pls.' Summary Judgment Opp. ("MSJ Opp.") 119. Ms. Bresch has left Mylan because Mylan was absorbed by a new entity, Viatris, formed from the combination of Mylan and Upjohn, a division of Pfizer.

***Ivona Kopanja***: Ms. Kopanja was the Associate Project Manager – Special Projects and then Manager, Professional Affairs – EpiPen Marketing at Dey/Mylan during the time in question. Ms. Kopanja was tasked with implementing Mr. Foster's "genius" idea of removing the EpiPen single pack from the market by Mylan executive Lloyd Sanders. MSJ Opp. 20-21. As the effective head of Project X2 (cleverly titled because eliminating the single pack would double profits), Ms. Kopanja was in charge of coordinating meetings and creating the medical rationale for the hard switch several months after Mr. Foster pitched the idea to "double" revenue. *Id.* at 21-22. Ms. Kopanja also testified about the meeting with Pfizer and Mylan in which Pfizer approved the elimination of the single pack. *Id.* at 25. However, Mylan's head of regulatory affairs, emailed Ms. Kopanja and others and told them that, "we don't need to call/write FDA" because it "will raise more questions than we have answers." *Id.* at 26. Along with Ms. Kashtan, Ms. Kopanja worked to use the mails and wires to blanket the supply chain with the misleading information they

developed. Ms. Kopanja also sent an email to Mylan executives that exposed the Defendants' knowledge that the WAO (World Allergy Organization) guidelines do not support the hard switch, pointing out that the entire world uses the single EpiPen, not a 2-Pak.

While Ms. Kopanja is no longer employed by Mylan, Mylan paid for an attorney to represent her personally at the deposition and she prepared for her deposition with Mylan's outside counsel on three different occasions. Kopanja Dep. Tr. 14-16. Mylan also paid for an attorney to represent her personally at the deposition. *Id.* at 16.

*Lauren Kashtan*: Ms. Kashtan was the senior manager of specialty communications at Dey during the time in question. Ms. Kashtan developed the internal and external communications about Project X2 and the elimination of the EpiPen single pack. As she sought input for these messages, she emphasized to colleagues that they did not need to reveal the true answers to the questions they would likely get about eliminating the single pack. MSJ Opp. 26. She acknowledged in both documents and at her deposition that the NIAID Guidelines only relate to food allergies. *Id.* at 23. She helped devise and send false medical rationale messages over the mails and wires in furtherance of the 2-Pak hard switch scheme. *Id.* at 27-28. Ms. Kashtan also directly acknowledged the involvement and approval of Ms. Bresch and Pfizer in creating the "medical" rationale and messaging to the public regarding the elimination of the single EpiPen in the United States only. *Id.* at 27. However, Mylan's head of regulatory affairs, emailed Ms. Kashtan and others and told them that, "we don't need to call/write FDA" because it "will raise more questions than we have answers." *Id.* at 26. Ms. Kashtan was also involved in the coordinated efforts between Mylan and Pfizer on issuing the EpiPen settlement press release. *Id.* at 42-43. At the time of her March 2019 deposition, Ms. Kashtan the director of North America communications for Mylan.

*Thomas Handel*: Mr. Handel was the General Manager and President at Meridian during the time in question. Mr. Handel testified at two different depositions including as a corporate

representative. Mr. Handel also was involved in and testified about Defendants' multiple schemes. As to the elimination of the EpiPen single pack, Mr. Handel described concerns that he had about the hard switch because none of the medical guidelines justified mandatory packaging and sale of the two-pack only (as opposed to merely patients having access to multiple doses). MSJ Opp. 21. And Mr. Handel also acknowledged that the hard switch was projected to increase Pfizer's sales to Mylan, which would increase Pfizer's revenue due to both volume and royalty proceeds. *Id.* at 25. Mr. Handel was copied on numerous emails discussing Pfizer's role in the EpiPen schemes to defraud, and he served as a point person for Pfizer on the EpiPen—and closely coordinated with Mylan. Mr. Handel also received on behalf of Pfizer the 2017 letter from the FDA explaining its position that having the option of both single- and two-packs would give patients and caregivers greater options and access to care. Mr. Handel also testified that Pfizer had raised concerns about price increases and contested that any increases were due to product features or increased value. *Id.* at 37. At the time of his July 2019 deposition, he was still the general manager and president of Meridian.

**Paul Muma**: Mr. Muma testified as a Rule 30(b)(6) corporate representative for Pfizer Meridian, where he is CFO. He testified that only single EpiPens are sold outside of the United States and is expected to testify regarding the push-back received from Pfizer Canada's medical advisors against the hard switch in that country. MSJ Opp. 23-25. Muma also acknowledged that Pfizer's EpiPen revenue is driven mostly by volume with its growth in revenue coming from growth in units sold to Mylan. *Id.* at 25. He further discussed Pfizer's role in selling a generic autoinjector right around the time that Mylan launched the hard switch and that Pfizer abandoned that product. He further substantiated that Pfizer has reaped hundreds of millions of dollars on EpiPen revenue during the class period. *Id.* At the time of his 30(b)(6) deposition in September 2019, Mr. Muma was senior director of finance for Meridian.

**Robert Coury**: Mr. Coury was the CEO of Mylan before Ms. Bresch and became chair of the board. He, along with Ms. Bresch, directly approved the language in the exclusive 2-Pak press release. MSJ Opp. 27, 98. With respect to competitors like Auvi-Q, Mr. Coury instructed the contracting team while he was CEO to "pre-empt any new market entry" and "block competition." *Id.* at 32. Mr. Coury is now executive chairperson of Viatris, which absorbed Mylan.

**Bruce Foster**: Mr. Foster was Mylan's Senior Director, National Accounts during the time in question. Mr. Foster was central to at least two of the RICO schemes: (1) the elimination of the single EpiPen, and (2) using Mylan's market power to eliminate branded competition from Auvi-Q. On Nov. 24, 2010, Bruce Foster emailed Mylan executive Ron Graybill, proposing, for the first time, to eliminate the single EpiPen for two reasons: (1) "[d]ouble the revenue" and (2) "[s]trong potential generic defense." He mentioned no medical guidelines or patient safety. MSJ Opp. 20. Mr. Foster then worked on Project X2 to implement the plan. Mylan's head of regulatory affairs, emailed Mr. Foster and others and told them that, "we don't need to call/write FDA" because it "will raise more questions than we have answers." *Id.* at 26. Mr. Foster suggested to the sales team that the elimination of the single EpiPen be "packaged" within a bigger program to camouflage the fraud. *Id.* at 26. Because of Mr. Foster's proposal—and the tens of millions that this maneuver delivered in inflated to sales revenue and volume to Mylan and Pfizer—Foster was named the President's Circle Winner for 2011. *Id.* at 29. At the time of his deposition in 2018, Mr. Foster was still employed and had been employed by Mylan for almost eight years. Foster Dep. Tr. 18.

**Roger Graham, Jr.**: Mr. Graham was the President of Mylan Specialty during the time in question. As President of Mylan Specialty, Mr. Graham was in charge of its few branded products, like EpiPen. Mr. Graham testified at three different depositions including twice as Mylan's Rule 30(b)(6) corporate representative. He testified that after the elimination of the single pack, EpiPens could only be purchased in sets of two—or not at all—regardless of need, want, financial ability,

or the medical guidance of a doctor. MSJ Opp. 21, 24. And he acknowledged that no medical association ever required a 2-Pak packaging for the EpiPen. *Id.* at 21. As of July 2019, Mr. Graham was still employed by Mylan and was prepared for the deposition by Mylan's outside counsel. Graham Dep. (vol. III) 16:10-18:9, 20:14-17.

**Ron Graybill, Jr.**: Mr. Graybill was the Vice President, Managed Markets at Mylan during the time in question. Mr. Graybill was involved in multiple schemes and supervised many of its primary participants. When Mr. Foster proposed the elimination of the single EpiPen, he took that proposal to Mr. Graybill who deemed it a great idea because it could "double" sales. MSJ Opp. 20. Mr. Graybill then directed the creation of Project X2. Mr. Graybill was also part of sending out training materials to sales representatives that deceptively and falsely listed the NIAID and WAO Guidelines as the "medical rationale" for the hard switch, and he encouraged employees to only raise this medical justification at the end of calls. *Id.* at 20, 27. Mylan's head of regulatory affairs, emailed Mr. Graybill and others and told them that, "we don't need to call/write FDA" because it "will raise more questions than we have answers." *Id.* at 26. Mr. Graybill also completed the employment reviews for Mr. Foster that acknowledged that Project X2 was Mr. Foster's idea and applauded the increase in sales of tens of millions of dollars every year due to the elimination of the single pack EpiPen in the United States market only. *Id.* at 29. Mr. Graybill was also part of the effort to implement a rebate scheme to push out Auvi-Q competition by seeking prior authorization and benefit exclusion. *Id.* at 32. While Mr. Graybill is a former employee, a Mylan attorney reached out to him prior to his deposition and offered to represent him at his deposition on behalf of Mylan. Graybill Dep. Tr. 11-13. Mylan also paid the fees for the attorney he hired to represent him at his deposition and prepared for the deposition with him and his counsel. *Id.* at 14-16.

**Patrick Jones**: As Director, National Accounts at Mylan during the time in question, Mr. Jones was part of the sales effort to use EpiPen's market dominance to eliminate branded competition. MSJ Opp. 34. While Mr. Jones is no longer employed by Mylan, Mylan also paid the fees for the attorney he hired to represent him at his deposition and prepared for the deposition with him and his counsel. *Id.* at 44, 46-47.

**Sherry Korczynski**: Ms. Korczynski was the Senior Director, Sales & Marketing and Vice President, EpiPen Marketing and was part of the effort to use EpiPen's market power to eliminate competition, through negotiating sole preferred PBM positions for EpiPen with no restrictions. MSJ Opp. 32. She was also part of the effort to encouraged employees to seek competitive intelligence from vendors even though Mylan knew that antitrust firewalls prohibited such sharing. *Id.* at 38. Ms. Korczynski is no longer employed by Mylan, but has agreed to testify on Mylan's behalf at trial, retained Mylan's outside counsel for her deposition (paid for by Mylan), and was paid by Mylan $450/hour for her time testifying. Korczynski Dep. Tr. 13-14, 17.

**Sylvain Rochelaeu**: Mr. Rocheleau testified as a corporate representative for Pfizer Canada. Mr. Rocheleau testified that when Defendants suggested that Pfizer Canada move to the exclusive 2-Pak, Pfizer Canada's medical advisors pushed back because they did not want to force patients to switch to a 2-Pak and saw no benefit to patients. MSJ Opp. 24. Mr. Rocheleau also testified about the pens per prescription average in Canada where only a single EpiPen pack is available, which Dr. Rosenthal testified is strong corroborating evidence that the hard switch increased the pens per prescription ratio by 0.5 in the United States. *Id.* at 29. Mr. Rocheleau also acknowledged Pfizer Canada documents that showed in Canada, where Auvi-Q had equal access, Auvi-Q reached at least a 30% market share three years after launch. *Id.* at 39. At the time of his

September 2018 corporate representative deposition, Mr. Rocheleau was a Business Unit Director at Pfizer Canada in the Essential Health business unit. Rocheleau Dep. Tr. 18.

**Nicole Willing**: Ms. Willing was a Senior Regional Sales Director at Mylan during the time in question. She testified about Mylan's negotiation strategy to encourage TPPs to require prior authorization for Auvi-Q and to explore exclusions. MSJ Opp. 32. While Ms. Willing is no longer employed by Mylan, she is represented by Mylan's attorneys and met with them twice for almost ten hours to prepare for her deposition. Willing Dep. Tr. 29, 38-39.

### 2. Live testimony of Defendants' current and former employees should be preferred.

The jury will be in the best position to evaluate the testimony of these, and other, witnesses if Defendants agree to bring them live and in-person to trial. But Defendants have much to gain tactically by denying Class Plaintiffs in-person testimony of these key witnesses. Because they "possess[] information highly-relevant to the plaintiff[s'] claims," Defendants likely prefer "to eliminate any unpredictability and limit [] trial testimony to [] 'canned' deposition testimony-a purely tactical reason." *Vioxx*, 439 F. Supp. 2d at 643. Canned deposition designations at the start of the case are no substitute for live testimony focused on the core issues being tried. *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 2311719 (E.D. La. May 26, 2017). As Judge Fallon emphasized, contemporaneous transmission avoids the short-comings of deposition testimony while allowing for the benefits of in-person trial testimony including allowing "the jury to see the live witness along with 'his hesitations, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration.'" *Id.* (quoting *Arnstein v. Porter*, 154 F.2d 464, 470 (2d Cir. 1946)). "Without this contemporaneous transmission to provide live testimony, the jury would be left with less reliable deposition transcripts and video. Plaintiffs' motion serves the inherent goal of Rule 43, which is to provide the jury with a more truthful witness." *Pinnacle Hip Implant*, 2016 WL 9776572, at *2.

In another MDL case, the district court early on made clear that the parties should make "significant efforts to produce witnesses for trial rather than relying on deposition testimony." *Actos*, 2014 WL 107153, at *3. Absent an admonition to Defendants to make every effort (with mere inconvenience not serving as an excuse), live contemporaneous testimony in open court is the best means to ensure this key testimony is as close to the ideal of in-person live testimony for the truth-telling and -finding functions of the jury trial.

### C.   Defendants control their former and current employees.

As demonstrated above, Defendants have sufficient control of the listed current and former employees. Other federal courts have recognized that parties retain "significant control" of their employees. *Vioxx*, 439 F. Supp. 2d at 643 (upper-level executive); *Mullins v. Ethicon, Inc.*, No. 2:12-CV-02952, 2015 WL 8275744, at *2 (S.D.W. Va. Dec. 7, 2015) ("relatively important and knowledgeable employees"). Throughout this case, Defendants have prepared even former employees for their depositions and in some cases those former employees were even represented at the deposition by counsel for Defendants. Having staked out that position when it benefited them, Defendants cannot now swing around and argue the opposite position simply to avoid truthful testimony from being presented to the jury.

### D.   Defendants will not suffer "true" prejudice from the requested order.

Defendants will not be prejudiced by the requested order. *Cf. Vioxx*, 439 F. Supp. 2d at 643 (citing as a factor for consideration "the lack of any true prejudice to the defendant"). Indeed, allowing for contemporaneous transmission decreases the uncertainty and many of the worries Defendants raise about the potential for trial while COVID-19 could still affect some areas. Additionally, the only real "burden" on Defendants will be preparing these witnesses for cross examination—just as they would if the witness were testifying in person—and this does not amount to prejudice. *Pinnacle Hip Implant*, 2016 WL 9776572, at *2. Rather it is just the nature

of a complex, multi-party trial. Defendants are multi-billion dollar pharmaceutical companies who reaped even more billions from their fraud and antitrust violations; they can more than afford to pay for the preparation of their witnesses at trial.

In contrast to Defendants, Class Plaintiffs will be seriously prejudiced by the asymmetry that allows Defendants to refuse to commit to which witnesses will appear live and hedge their commitments—delaying Class Plaintiffs' ability to plan for how they will present their case. Defendants are in no position to complain if the Court provides certainty and predictability to the parties now. Increasing the costs, expenses, time, and burdens of this already-expansive MDL litigation does not serve the Court (or Class Plaintiffs or the interests of justice).  Defendants' strategy of delay benefits only them, and it is a poorly kept secret that their goal is to disrupt and avoid a trial from occurring.

> ### E. The flexibility needed to manage this litigation favors contemporaneous transmission.

The final factor—"the flexibility needed to manage a complex multi-district litigation"—particularly in light of the COVID-19 pandemic—firmly favors contemporaneous transmission. *Vioxx*, 439 F. Supp. 2d at 643. Class Plaintiffs seek only authorization for contemporaneous transmission for those current and former employees who Defendants refuse to bring in person to trial. Even for the witnesses whom Defendants intend to bring to trial in-person, the COVID-19 pandemic has increased the uncertainty for witness scheduling. While Defendants will need to state on their witness lists in January which witnesses they *intend* (but will not commit) to bring live, Defendants recently stated that, candidly, they cannot commit to which witnesses will be willing to attend trial in April—and that the calculus could change even on the eve of testifying. ECF 2244, Defs.' Mot. to Continue Trial 18 (Dec. 1, 2020) ("it simply is not possible to know at this time which witnesses will be willing to attend trial in April . . . .  But because of the pandemic, Defendants cannot say with any certainty which witnesses will be willing to travel to Kansas for a

trial in April . . . ."). Despite Pfizer board member and former FDA chair Dr. Scott Gottlieb's statement just days ago that the COVID virus will "largely collapse" by March 2021,[4] Class Plaintiffs acknowledge that there still could be some unpredictability for all witnesses depending on their location given changes in schooling, potential exposure and need for quarantine periods, and continuing health concerns due to individual witnesses' specific health status and comorbidities. This uncertainty necessitates an order allowing for the possibility of Rule 43 testimony for even those employees that Defendants suggest on their witness lists that they will bring in person.

Defendants suggest that all of this compounding uncertainty will require them to simply over-submit deposition designations and burden the Court and parties. Although major pharmaceutical companies might find this to be trivial, Class Plaintiffs (and, hopefully, the Court) do not. This is all the more true because contemporaneous transmission is a simpler mechanism and one that meets the flexibility encouraged by the case law on MDLs as well as this Court's administrative orders on handling court business during the COVID-19 pandemic. The Court has wide latitude to authorize the parties to call any witness designated as a "live witness" either through in-courtroom testimony or through contemporaneous transmission.

Defendants suggest that having witnesses appear by video would create due process and logistical issues. This bald assertion (and yet another contrived incantation of the phrase, due process) finds no support in either law or logic. To the contrary, as many MDL courts have recognized, the improvement in technology has made contemporaneous video transmission a much superior option to deposition designations:

---

[4] *On COVID-19 vaccine, 'get as many shots in arms as possible, right away': ex-FDA chief Q&A*, USA TODAY (Dec. 7, 2020), https://news.yahoo.com/covid-19-vaccine-many-shots-011224322.html (stating: "As we get into probably February and certainly into March, I think you're likely to see the virus largely collapse.").

> [A]llowing contemporaneous live transmission likely would be substantially less expensive, and faster, than use of video depositions when one considers not only the time and expense required to take the video depositions, but also the attorney time and expense inherent in identifying deposition excerpts, making objections to those excerpts, and the time required to make the necessary rulings by the Court on those objections, as well as the time and expense of editing by a videographer after the Rulings are made.
>
> . . .
>
> [C]ontemporaneous transmission of live witness testimony will better allow the jury to more realistically "see" the live witness along with "his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration," without editing or the unavoidable esthetic distance created by a video deposition and, thus, more fully and better satisfy the goals of live, in-person testimony, while avoiding the short-comings of either written or video deposition testimony perhaps recorded weeks or months earlier, prior to whatever developments might have occurred between the time the deposition was recorded and the time the testimony by video deposition is presented at trial. Furthermore, a trial, itself, is a dynamic, ever evolving process and the use of contemporaneous transmission of live testimony better allows for the witness and counsel to be responsive to the inevitable, unexpected developments and shifts that always occur during trial. In so doing, the jury is better and not less served as the witnesses—with the employment of Rules 43 and 45—will be able to contemporaneously and most relevantly comment on the newest developments in real time and unedited watching and judging the witnesses as the trial unfolds—a possibility unavailable with previously recorded testimony or earlier more limited technology. Further, use of "live" contemporaneous transmission grants the trier of fact—here, the jury—the added advantage inherent in observing testimony in open court that is truly contemporaneous and part of the whole trial experience, thus, better reflects the fluid dynamic of the trial they are experiencing, and, better serves the goal of "truth telling."

*In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 107153, at *7 (W.D. La. Jan. 8, 2014) (quoting *Vioxx*, 439 F. Supp. 2d at 644); *accord In re RFC & ResCap Liquidating Trust*, No. 013CV3451SRNHB, 2020 WL 1280931, at *1-3 (D. Minn. Mar. 13, 2020) (observing that "the speed and clarity of modern videoconferencing technology" allows this testimony to "satisf[y] the goals of live, in-person testimony and avoids the short-comings of deposition testimony") (quoting *Vioxx*, 439 F. Supp. 2d at 644)); *Mullins v. Ethicon, Inc.*, No. 2:12-CV-02952, 2015 WL 8275744, at *2 (S.D.W. Va. Dec. 7, 2015) ("Live video transmission will promote

coherency, especially when the alternative is spliced, edited, and recompiled clips of depositions that took place over multiple days.").

In the midst of the COVID pandemic in which Zoom and other video calls are a daily (and sometimes, hourly) occurrence for the parties and counsel and even the Court and its staff, the citation to old case law challenging video testimony falls flat. Whatever might be said about 2020, video testimony has become, in a matter of months, both radically better in quality and ever-present in quantity. Jurors will likewise be far more comfortable with video testimony after the necessity of video calls over the past year in every area of life.

## II. Contemporaneous transmission is supported here by "good cause in compelling circumstances and with appropriate safeguards."

### A. There are compelling circumstances.

As is demonstrated by the five-factor compelling circumstance test for MDLs, live testimony under Rule 43 is justified for Defendants' past and current employees who they refuse to bring to trial. This relief also makes practical sense and will avoid over-burdening the Court and the parties with witness-by-witness motions for live testimony via contemporaneous transmission. Given Defendants' implicit acknowledgment that their designations on the witness list may not be accurate given the current uncertainty, Class Plaintiffs likely will be forced to expend valuable trial preparation time filing motions to allow contemporaneous transmission through the eve of trial—or even during trial. Authorizing all parties up front to call any these witness via contemporaneous transmission would allow the Court and parties to be more flexible and to plan for these eventualities.

Contemporaneous transmission will also allow the trial to proceed as scheduled in the face of the uncertainties posed by the COVID-19 pandemic.  Numerous courts nationwide have ruled since the pandemic started that COVID-19 is good cause and compelling circumstances for the Court to permit remote live trial testimony. *See Guardant Health, Inc. v. Found. Med., Inc.*, No.

CV 17-1616-LPS-CJB, 2020 WL 6120186, at *3 (D. Del. Oct. 16, 2020) ("Courts, including this Court, are regularly determining that the ongoing COVID-19 pandemic constitutes good cause for remote testimony") (citing cases); *Flores v. Town of Islip*, No. 18-CV-3549 (GRB)(ST), 2020 WL 5211052, at *3 (E.D.N.Y. Sept. 1, 2020) (ordering trial to be conducted remotely by contemporaneous transmission and witnesses to testify remotely); *Amtrust N. Am., Inc. v. KF&B, Inc.*, No. 17-CV-5340 (LJL), 2020 WL 4365280, at *2 (S.D.N.Y. July 29, 2020) (finding "good cause in compelling circumstances exist . . . due to the COVID-19 pandemic" to permit "any witness called to testify at the trial shall testify by contemporaneous transmission from a different location than the Courtroom."); *Adams Commc'n & Eng'g Tech., Inc. v. Aerovation, Inc.*, No. PWG 19-CV-3131, 2020 WL 3469664, at *3 (D. Md. June 25, 2020) (court endorsed the practice of calling witnesses remotely, stating with respect to COVID-19 that, "should this case actually proceed to trial, inconvenience to witnesses located in other states may be mitigated by taking *de bene esse* depositions for use as trial testimony, or by having remote witnesses testify by contemporaneous transmission from different locations."); *Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n*, No. 17-11130, 2020 WL 3717792, at *3 (E.D. Mich. June 30, 2020) (citing *RFC* and holding that an entire bench trial could be properly conducted via video conference during COVID-19); *In re RFC & ResCap Liquidating Trust*, No. 013CV3451SRNHB, 2020 WL 1280931, at *1-3 (D. Minn. Mar. 13, 2020) ("COVID-19's unexpected nature, rapid spread, and potential risk establish[ed] good cause for remote testimony").[5]

---

[5] Other cases employing contemporaneous transmission to conduct trials during the COVIC-19 pandemic include: *Sentry Select Ins. Co. v. Maybank Law Firm, LLC*, No. 5:15-CV-04984-JMC, 2020 WL 5441305, at *1 (D.S.C. Sept. 10, 2020) (ordering that 66-year-old witness was at risk of contracting COVID-19 due to his age and may testify remotely); *Sutphin v. Ethicon, Inc.*, No. 2:14-CV-01379, 2020 WL 5229448 (S.D. W. Va. Sept. 1, 2020) (holding that doctors could testify remotely as it posed a risk for the doctors and their patients and the more people present in the courtroom posed a greater risk to persons in the courtroom and "[w]here an acceptable alternative to in-person testimony exists and allows for the benefits of live witness examination, the COVID-19 pandemic presents perhaps the most compelling reason yet to authorize its use."); *see also*

- 18 -

**B.  Past experience shows that appropriate safeguards can be put in place to ensure the fairness and success of contemporaneous transmission.**

Trial counsel for Class Plaintiffs has successfully utilized contemporaneous transmission in multiple trials through rigorous protocols, including several MDLs.[6] Based on those proven experiences, the attached proposed order entered in *Ingham* provides demonstrated safeguards and best practices for successfully using contemporaneous transmission. These orders outline the safeguards anticipated by that MDL court and include:

1. Testimony via secure video conferencing in a federal courthouse or alternate transmitting location as long as safeguards and requirements are met.

2. The witness will be visible to the jury at all times while testifying via the witness screen.

3. The witness hears all objections unless instructed by the Court.

4. Whenever feasible, documents or evidence will be shown to the witness electronically; if not feasible, documents will be handed to the witness by the court reporter at the Court or counsel's instruction.

5. Other than a court reporter, spectators and counsel will not be allowed in the room where the witness testifies.

6. The court reporter present will certify that no counsel were present in the room while the witness was testifying and confirm the hard copy versions of exhibits used (if applicable).

If this Court allows the use of contemporaneous transmission, Class Plaintiffs are hopeful the parties can reach agreements where Defendants agree to produce requested witnesses at the

---

*Sonrai Sys., LLC v. Romano*, No. 16 CV 3371, 2020 WL 3960441, at *2 (N.D. Ill. July 13, 2020); *Vitamins Online, Inc. v. HeartWise, Inc.*, No. 2:13-CV-00982-DAK, 2020 WL 3452872, at *1 (D. Utah June 24, 2020).

[6] Ex. A (Actos Supplemental Order/Case Management Order: Protocol for Contemporaneous Transmission of Live Testimony); Ex. B (Actos Order/Case Management Order: Protocol for Contemporaneous Transmission of Live Testimony); Ex. C (Ingham Order Granting Leave and Issuing Protocol for Contemporaneous Transmission).

remote location. If agreements are not reached, Class Plaintiffs intend to serve Rule 45 subpoenas on the witnesses who reside outside Kansas. These subpoenas will command attendance at a location meeting the requirements of Rule 45(c)(1) (that is, within the state, or within 100 miles, of where each such witness lives or works), and the live testimony will be transmitted from that location to the courtroom in Kansas City, Kansas during trial.[7]

## CONCLUSION

For the forgoing reasons, Class Plaintiffs respectfully request that this Court allow live trial testimony via contemporaneous transmission from locations outside Kansas for whom Defendants will not voluntarily produce in Kansas City, Kansas or cannot otherwise be compelled to attend trial in Kansas. In the face of the ongoing uncertainty, a ruling from the Court on this issue would provide much needed certainty and clarity for all parties, counsel, and the Court on a critical issue. Class Plaintiffs seek all other relief to which they may be entitled.

---

[7] A witness so subpoenaed would still have a right to file a motion to quash the subpoena; such a motion is filed in the so-called "compliance court" - the district where compliance is commanded. *See* Fed. R. Civ. P. 45(d)(3). But such motions may, in appropriate circumstances, be transferred to this Court. *See* Fed. R. Civ. P. 45(f). As the Advisory Committee Notes explain, "transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion." Fed. R. Civ. P. 45, 2013 advisory committee notes. A subpoena issued to compel testimony already ordered by this Court would fall into this category. The advisory committee notes also state that consultation between the judge presiding over the case in the issuing court and the judge in the compliance district may be helpful. *Id.*

## <u>CERTIFICATE OF CONFERENCE</u>

On November 24 and December 2, 2020, Plaintiffs' undersigned counsel communicated with Defendants' counsel regarding the relief requested in this motion. Plaintiffs' counsel followed up by electronic communication on December 9 and 15, 2020. Defendants oppose Plaintiffs' requested relief of contemporaneous transmission through Rules 43 and 45 for Defendants' current and former employees that Defendants refuse to bring live.

DATED:  December 16, 2020

Respectfully submitted,

_____

SHARP LAW LLP
Rex A. Sharp
Ryan C. Hudson
5301 West 75th Street
Prairie Village, KS  66208
Telephone:  913/901-0505
913/901-0419 (fax)
rsharp@midwest-law.com
rhudson@midwest-law.com


ROBBINS GELLER RUDMAN
   & DOWD LLP
Paul Geller
Stuart Davidson
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com

KELLER ROHRBACK L.L.P.
LYNN LINCOLN SARKO
GRETCHEN FREEMAN CAPPIO
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone:  206/623-1900
206/623-3384 (fax)
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com

BURNS CHAREST LLP
WARREN T. BURNS
SPENCER COX
900 Jackson Street, Suite 500
Dallas, TX  75202
Telephone:  469/904-4550
469/444-5002 (fax)
wburns@burnscharest.com
scox@burnscharest.com

PRITZKER LEVINE LLP
ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
1900 Powell Street, Suite 450
Emeryville, CA  94608
Telephone:  415/692-0772
415/366-6110 (fax)
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com


Co-Lead Counsel and Liaison Counsel for Class
Plaintiffs

THE LANIER LAW FIRM
W. MARK LANIER
RACHEL LANIER
CRISTINA DELISE
6810 FM 1960 West
Houston, TX  77069
Telephone:  713/659-5200
Mark.Lanier@LanierLawFirm.com
Rachel.Lanier@LanierLawFirm.com
Cristina.Delise@LanierLawFirm.com

Special Trial Counsel for Class Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Memorandum in Support of Class Plaintiffs' Motion to Allow Live Trial Testimony via Contemporaneous Transmission for Witnesses that Defendants Will Not Voluntarily Produce in Person or Who Cannot Otherwise be Compelled to Attend Trial was served on the 16th day of December, 2020, by filing the document electronically with the Court, which delivered a copy to all counsel of record.

_____
Rex A. Sharp