# Exhibit D
# REDACTED

# EXPERT REPLY REPORT OF DR. FIONA M. SCOTT MORTON

April 18, 2019

# TABLE OF CONTENTS


I. Introduction ..... 1

A. Qualifications and assignment ..... 1

B. Materials considered ..... 1

C. Summary of main conclusions ..... 1

II. Mylan has Entrenched Monopoly Power that it Exploited to Harm Competition ..... 4

A. Relevant market ..... 4

B. Mylan, by exploiting its monopoly power, harmed consumers and the competitive process ..... 6

C. Competition and consumers were harmed by the elimination of choice ..... 9

D. Mylan's conduct raised prices ..... 12

E. Mylan's market share ..... 21

III. Auvi-Q Did Not Fail Due to Deficiencies in Sanofi's Own Efforts ..... 23

IV. Professor Willig's Repeated Efforts to Point to Other Markets and Other Products to Defend Mylan's Conduct in the EAI Market Are Insufficient and Misplaced ..... 28

A. Comparisons to other markets are misplaced ..... 29

B. Professor Willig fails to establish that the competitive contexts for the other products are analogous to that of Mylan's conduct in the EAI market ..... 29

V. Entrenched Share ..... 33

A. Mylan's leveraging of EpiPen's entrenched share was part of its anticompetitive, exclusionary strategy ..... 33

B. Professor Willig's reliance on therapeutic equivalence ignores evidence establishing EpiPen's entrenched share ..... 34

C. Professor Willig's empirical assessment of non-contestable demand fails to refute that EpiPen has a significant entrenched share ..... 36

VI. Foreclosure ..... 42

A. Mylan deliberately intended to foreclose Sanofi ..... 42

B. Measuring foreclosure ..... 45

C. Other exclusionary conduct ..... 50

D. Tests for foreclosure ..... 55

E. Price was not Mylan's "clearly predominant" method of exclusion ..... 69

VII. Damages ..... 70

A. Sanofi would have re-entered the EAI market ........ 70
B. Damages 2013-2015 ........ 77
1. The damages model uses a reliable benchmark for Sanofi profits in the absence of Mylan's exclusionary conduct ........ 77
2. My methodology for computing lost profits is appropriate ........ 82
3. Additional costs impacting the but-for profits ........ 83
C. Damages 2017-2029 ........ 85
D. Revised damages ........ 90

# I. INTRODUCTION

## A. QUALIFICATIONS AND ASSIGNMENT

1. My name is Fiona Scott Morton. I previously provided an expert report in this matter on February 4, 2019 (hereinafter my "Initial Report"). My background and qualifications are summarized in my Initial Report, and a copy of my CV is attached to that report as Exhibit 1.

2. I have been asked by counsel for Sanofi-Aventis U.S. LLC ("Sanofi") to review and, where appropriate, respond to certain of the expert reports submitted by Mylan in this matter, including the Expert Report of Robert Willig, Ph.D., dated March 25, 2019 ("Willig Report"), the Expert Report of Dr. Janusz A. Ordover, dated March 25, 2019 ("Ordover Report"), and the Expert Report of Dr. Robert P. Navarro, dated March 25, 2019 ("Navarro Report").

## B. MATERIALS CONSIDERED

3. In undertaking my assignment, I and those under my direct supervision have reviewed court filings, case law, deposition testimony, documents and data produced in this proceeding (to which we had complete access), publicly available documents and data, the relevant economic literature, and the expert reports submitted by Mylan in this matter. In addition, I had conversations with a current and former Sanofi employee and my staff had an additional conversation with a Sanofi employee.[1] My work in this matter is ongoing. I understand that expert discovery is not complete. As new information warrants, I may update my conclusions. A listing of the materials that I have considered since the time I completed my Initial Report is attached as Exhibit 1.

## C. SUMMARY OF MAIN CONCLUSIONS

4. Based on my review of the evidence in this case developed through discovery, my understanding of the pharmaceutical industry, my economic expertise, and my review and assessment of the expert reports submitted by Mylan, I continue to be of the opinion that Mylan successfully engaged in an overall anticompetitive exclusionary course of conduct so as to maintain its monopoly in the EAI market. In doing so, Mylan ensured that Sanofi's competing product, Auvi-Q, would never have a chance to gain a foothold in the U.S. EAI market, thereby preventing it from

[1] Specifically, my staff spoke with Carrie Siragusa on April 17, 2019.

obtaining significant market share and placing a meaningful competitive constraint on EpiPen. As a result of its actions, Mylan harmed consumers, the competitive process, and Sanofi.

5. Professor Willig takes issue with my conclusion that Mylan engaged in an overall anticompetitive course of conduct to foreclose Auvi-Q from the market, and instead concludes that Mylan's actions were procompetitive. He reaches this conclusion by making several fundamental mistakes.

6. First, Professor Willig takes issue with my conclusion that Mylan had entrenched monopoly power. Notably, he does not take issue with EAIs being the relevant product market for purposes of assessing Mylan's conduct and its monopoly power. Moreover, as I demonstrate below, Professor Willig only disagrees with my conclusion by resorting to a series of flawed analyses that, when corrected, plainly demonstrate that Mylan had entrenched monopoly power in the EAI market. Additionally, Professor Willig simply ignores significant portions of my market power analysis, particularly the admissions from Mylan itself that it had entrenched monopoly power over the relevant period of time.

7. Second, Professor Willig assesses the activity of Mylan as if the issue at hand was whether Mylan engaged in predatory pricing. By using this framework, it comes as no surprise that Professor Willig concludes that Mylan's actions were not anticompetitive, but that is not because Mylan's actions were procompetitive; it is only because he is testing for the wrong issue. No one has suggested that Mylan engaged in predatory pricing. The allegation here, and what I evaluated, is whether Mylan engaged in foreclosure. The price-cost tests that Professor Willig uses are uninformative to this issue based on the exclusionary conduct engaged in by Mylan, and the economic literature explains why this rigid test is not properly applied to analyze the type of behavior Mylan engaged in because it can and does lead to "false negatives" of missing clearly anticompetitive conduct.

8. Third, Professor Willig reaches his conclusion that Mylan's actions were procompetitive by analyzing each action individually and then articulating how that action, taken in isolation, could be viewed as procompetitive. Again, Professor Willig's assessment is irrelevant to the actual issue—whether Mylan's overall course of conduct was anticompetitive. That certain aspects of its conduct can, under different circumstances, and involving economic actors who are not monopolists, be procompetitive tells us nothing about whether Mylan's overall course of conduct was anticompetitive. In my Initial Report, I evaluated the entirety of Mylan's course of conduct and

demonstrated that, when viewed collectively, it was plainly anticompetitive. Professor Willig has offered nothing that calls that fundamental conclusion into question.

9. Fourth, Professor Willig attempts to shift the blame from Mylan to Sanofi by claiming that the reason that Auvi-Q did not perform as forecasted was because of shortcomings on the part of Sanofi. This is simply incorrect. Rather than underperforming, Auvi-Q was initially exceeding expectations, as Mylan itself recognized. It was only after Mylan's overall exclusionary course of conduct began to meaningfully take hold that Auvi-Q started to fall well short of expectations. Rather than attempt to address this evidence, Professor Willig simply ignores it.

10. Fifth, Professor Willig attempts to suggest that Mylan's behavior is common practice in the pharmaceutical industry, and that Sanofi used the same types of contracts that it complains of here. Once again, Professor Willig tries to sidestep the issues at hand. What Sanofi allegedly did (or did not do) in other markets is irrelevant to whether Mylan's actions that are being evaluated here were anticompetitive. Moreover, Professor Willig has not done the necessary work to assess whether the alleged actions taken by Sanofi elsewhere come close to the actions taken by Mylan here. As I set out in my Initial Report, to determine whether a course of conduct is anticompetitive requires a multi-step and complex analysis. I performed that analysis to evaluate Mylan's conduct in the U.S. EAI market. Professor Willig has provided no such analysis in his evaluation of other drug products in different markets with different competitive conditions.

11. Finally, Professor Willig reaches his conclusions by engaging in a very selective review of my analysis; he simply ignores critical aspects of my Initial Report. Perhaps most significantly, Professor Willig ignores all of the evidence of Mylan's anticompetitive intent—evidence that plainly demonstrates that Mylan's goal was not to compete on the merits, but to engage in an overall course of conduct explicitly aimed at [redacted] Along similar lines, Professor Willig ignores that Mylan only turned to its exclusionary strategy once it became clear that Mylan would not be able to license the rights to Auvi-Q or purchase it outright and only after it became clear that Mylan would not be able to innovate in time to bring a new product to market that could compete with Auvi-Q on the merits.

12. For these reasons, and the others set forth more fully below, Professor Willig's report has not caused me to change my opinions regarding the anticompetitive nature of Mylan's actions in any way.

13. With respect to my damages assessment—an area addressed by Professor Ordover—I continue to be of the view that Mylan's actions resulted in significant harm to Sanofi and that the

economic evidence demonstrates that Mylan's actions—actions taken by a dominant firm attempting to marginalize a new entrant—were a substantial factor in Sanofi's decision to return the rights to Auvi-Q to kaléo. Had Mylan not engaged in its anticompetitive exclusionary course of conduct, Sanofi would have earned significant profits prior to the voluntary recall, would have relaunched Auvi-Q shortly after the voluntary recall, and would have continued to earn significant profits through the life of the Auvi-Q patent.

14. After giving careful consideration to Professor Ordover's evaluation of my damages model, I have updated my calculations to make two corrections to account for issues appropriately raised by Professor Ordover, and to make another two adjustments to account for information that the Mylan expert reports brought to light. My updated damages analysis reveals that the damages incurred by Sanofi as a result of Mylan's anticompetitive course of conduct amount to $3.93 billion.

# II. MYLAN HAS ENTRENCHED MONOPOLY POWER THAT IT EXPLOITED TO HARM COMPETITION

## A. RELEVANT MARKET

15. As I detail in my Initial Report, the appropriate first step in determining whether a firm has engaged in anticompetitive behavior is to assess the relevant market at issue and whether the firm has monopoly power in that relevant market. I undertook such an analysis in my Initial Report and, based on the overwhelming evidence, concluded that: (1) the relevant market here is the market for EAI devices in the United States; and (2) Mylan had entrenched monopoly power in the U.S. EAI market during the relevant time period.[2] Professor Willig, on the other hand, gives short shrift to these issues, only touching on them at the end of his Report. As to the relevant market, he does not appear to take issue with EAI devices being the only set of products that a consumer could turn to in the face of a price increase by Mylan. While he does not state it explicitly, he appears to be suggesting that a more narrowly defined market may be appropriate since there are individual negotiations between pharmacy benefit managers and other third-party payers (collectively, "PBMs") and pharmaceutical firms and the results of those negotiations can vary.[3] Quite notably, however, while Professor Willig makes this claim about individualized negotiations, he does not

[2] Scott Morton Initial Report at ¶¶ 53-89.
[3] Willig Report at ¶¶ 307-313.

ultimately challenge my conclusions about the relevant product and geographic market or otherwise offer his own alternative definition of the relevant market.

16. Nevertheless, because Professor Willig has raised this issue, I briefly respond. As an initial matter, the fact that there are individualized negotiations between sellers and buyers does not suggest that each of those individual seller/buyer pairs constitutes its own relevant market. That dynamic is ubiquitous in the economy. Surely Professor Willig is not suggesting that Mylan (or any other seller) would need to negotiate with more than one PBM (or more than one buyer) in the same room or collectively for the market to be broader than an individual Mylan/PBM pair or seller/buyer pair. Now, while as Professor Willig notes, the Horizontal Merger Guidelines contemplate the theoretical possibility of markets focused on a subset of targeted customers for a buyer, to definitively conclude that such a narrow relevant market is appropriate requires extensive analysis—analysis that Professor Willig has not done.[4] Moreover, as I demonstrate in my Initial Report, there is overwhelming evidence that supports my definition of the relevant market, including, among other things, that consumers are not turning to alternatives to EAI devices when prices rise, that Mylan's rebating practices have only changed in the presence of potential competition from other EAI devices, and that Mylan as well as others in the pharmaceutical industry view the relevant market as I have defined it.[5] Professor Willig has not taken issue with any of this overwhelming evidence, and has not even attempted to show that any of this assessment would change if one were to look PBM by PBM instead of market-wide. And I do not see why it would, since, among other things, the contracts that Mylan negotiated with PBMs defined the therapeutic class for purposes of Mylan's conditional rebate offers as EAI devices[6], and Mylan negotiators went out of their way to tell a given PBM what the market share and coverage situation was for both EpiPen and Auvi-Q at other PBMs.[7] For these reasons, and for those set forth more

[4] Willig Report at ¶¶ 309-312.

[5] Scott Morton Initial Report at ¶¶ 57-62. Mylan's other experts also recognize the market as limited to EAI devices. See, for example, Expert Report of Dr. Michael Blaiss (March 25, 2019), at 14-18 (discounting anti-histamines and pre-filled syringes as substitute treatments for EAI devices: "[T]reatment with antihistamines does not relieve or prevent all of the pathophysiological symptoms of anaphylaxis, including the more serious complications such as airway obstruction, hypotension, and shock." [. . .] "It is not practical or recommended for a patient to self-administer epinephrine using vials and syringes during anaphylaxis."); Navarro Report at ¶¶ 10, 116, 117 (repeatedly referring to the "EAI class"); Expert Report of Dr. Thomas Varner (February 4, 2019), at ¶ 35 (assuming "Auvi-Q® sales that Sanofi would not have made in the but-for scenario would have been allocated to all remaining firms selling FDA approved EAI products").

[6] Scott Morton Initial Report at ¶ 62.

[7] Scott Morton Initial Report at ¶ 50.

fully in my Initial Report, I continue to be of the view that the relevant market is the U.S. market for EAI devices.

17. As to Mylan's entrenched monopoly power, Professor Willig opines that: (1) Mylan's high market share is not a reliable measure of monopoly power due to "competition for the contract"; and (2) Mylan lowered prices in response to competition from Auvi-Q, indicating a lack of monopoly power.[8] As I explain in the following sub-sections, I disagree with Professor Willig and continue to be of the view that Mylan had monopoly power throughout the relevant time period.

18. Before turning to Professor Willig's specific criticisms of my assessment of Mylan's monopoly power, it is notable that Professor Willig simply ignores significant portions of my analysis that demonstrate that Mylan had monopoly power. Perhaps most notably, Professor Willig ignores that Mylan was able to continuously raise both net and WAC EpiPen prices for years without any meaningful negative impact on its sales or market share. This is direct evidence of Mylan's monopoly power. Moreover, Professor Willig ignores the many Mylan internal and public statements confirming that it had monopoly power during the relevant period that I detail in my Initial Report.[9] Finally, while Professor Willig briefly touches on it, he all but ignores my analysis of barriers to entry.

### B. MYLAN, BY EXPLOITING ITS MONOPOLY POWER, HARMED CONSUMERS AND THE COMPETITIVE PROCESS

19. Throughout his report, Professor Willig assesses a variety of Mylan's actions and attempts to determine whether they were procompetitive or anticompetitive. Notably, however, Professor Willig completely ignores the context of competitive innovation that led Mylan to formulate and implement its overall strategy to exclude Auvi-Q. Professor Willig's analysis misses the anticompetitive effects of Mylan's conduct in part because he chose to exclude from his analysis Mylan's own failure to innovate and its strategy to not compete on the merits against Auvi-Q. This was economic behavior that was harmful to competition in the EAI market and harmful to consumers.

20. As detailed in my Initial Report, there is no question that Mylan recognized the advantageous features of Auvi-Q when it was first developed, including its smaller profile and built-

---

[8] Willig Report at Section XI.C.1 and Section XI.C.3.

[9] Scott Morton Initial Report at ¶¶ 74-75.

in audio instructions.[10] In fact, Mylan's own consumer research [redacted][11] Mylan's consumer research in 2012 [redacted][12] [redacted][13] [redacted][14] In fact, the EAI market had seen little to no innovation in the years leading up to the launch of Auvi-Q. And as Mylan's expert, Mr. Gary Zieziula, acknowledges in his report, there was no meaningful competition in the EAI market before Sanofi introduced Auvi-Q.[15]

21. Unable to innovate and compete on the merits with Auvi-Q, Mylan chose instead to engage in a strategy to block Auvi-Q from the market by leveraging its entrenched market share to secure exclusionary contracts with PBMs, in addition to a host of other anticompetitive conduct. This phenomenon—a firm with a monopoly maintaining that position via anticompetitive conduct, as opposed to via innovation—is well known in the economic literature.[16] As detailed in my Initial Report, Mylan also undertook numerous efforts to increase its entrenched market share, including: (i) concentrating its marketing efforts to HCPs on the difficulties of obtaining Auvi-Q; (ii) engaging in a deceptive marketing campaign that falsely implied that PBMs excluded Auvi-Q due to concerns about Auvi-Q's efficacy or safety; (iii) using co-pay coupons to further entrench Mylan's market share by increasing the cost to PBMs of rejecting an exclusionary offer from Mylan; and (iv) offering exclusionary contracts to schools as part of its EpiPen4Schools program.[17]

---

[10] Scott Morton Initial Report at ¶ 90.
[11] Scott Morton Initial Report at ¶ 90.
[12] Graham 30(b)(6) Dep. Ex. 29.
[13] Scott Morton Initial Report at ¶ 96.
[14] Scott Morton Initial Report at ¶ 96.
[15] Expert Report of Gary Zieziula (March 25, 2019), at p. 8.
[16] See, for example, Franklin M. Fisher, "Antitrust and Innovative Industries," 68 *Antitrust Law Journal* 559 (2000); Dennis W. Carlton and Michael Waldman, "The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries," 333 *The RAND Journal of Economics* 194 (2002).
[17] Scott Morton Initial Report at ¶¶ 10g, 80-89.

22. Professor Willig does not attempt to refute my conclusion that Mylan's strategic decision to engage in exclusionary behavior to block Auvi-Q—rather than innovate and compete against Auvi-Q—harmed consumers by the lack of choice and hurt competition in the EAI market. As noted, Mylan has not innovated or improved upon the EpiPen in any meaningful way to date.

23. Mylan's decisions to block Auvi-Q and protect its market share can be understood by examining the underlying managerial incentives. The organizational economics literature sheds light on the incentives of top-level managers to do whatever it takes to preserve market share and profits. First, Mylan's CEO would want to protect profits, because CEO compensation is positively linked to firm performance.[18] Furthermore, Mylan has been raising prices of EpiPen for years, resulting in a remarkable increase in EpiPen's profitability and in Mylan's stock price.[19] If that growth were to slow, top executives' compensation or job security would be at risk. Indeed, economic studies have shown that top managers are significantly more likely to be dismissed from their jobs for poor firm performance.[20] The evidence of Mylan's conduct to prevent competition with the EpiPen is entirely consistent with this economic theory. Mylan's branded EpiPen was the [redacted].[21] Thus, Mylan's top executives had significant economic incentives to protect EpiPen profits and growth rates for as long as possible, to the extent of engaging in unethical or anticompetitive conduct to achieve those profit outcomes.[22] Moreover, Mylan's financial statements and earnings guidance

---

[18] See Michael C. Jensen and Kevin J. Murphy, "Performance Pay and Top-Management Incentives," 98 *Journal of Political Economy* 225 (April 1990). As part of the compensation package, Mylan's executives, including CEO Heather Bresch, received bonuses and [redacted] tied to the company's performance. See Bresch 30(b)(1) Dep. at 44:7-10 [redacted] *id.* at 44:24–45:7 [redacted]

[19] See Scott Morton Initial Report at ¶ 87, citing U.S. Securities and Exchange Commission, U.S. EpiPen Profitability Analysis, https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d265624dex991.htm (exhibit from Heather Bresch's Congressional testimony); Mylan Stock Information, http://investor.mylan.com/stock-information.

[20] See Dirk Jenter and Katharina Lewellen, "Performance-induced CEO turnover," (CEPR Discussion Paper No. DP12274. 2017), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1570635; Steven N. Kaplan, "Executive Compensation and Corporate Governance in the U.S.: Perceptions, Facts and Challenges," (National Bureau of Economic Research Working Paper No. 18395, 2012), available at https://www.nber.org/papers/w18395.pdf, at 21-23.

[21] Scott Morton Initial Report at ¶ 22.

[22] See Maurice E. Schweitzer, Lisa Ordonez, and Bambi Douma, "Goal Setting as a Motivator of Unethical Behavior," 47 *Academy of Management Journal* (November 2017). For example, Mylan misclassified the EpiPen, claiming it was a generic drug, so as to avoid paying rebates owed primarily to Medicaid. U.S.

from the time Mylan chose to launch its own generic EpiPen to the present underscore how critical Mylan's branded EpiPen was in propping up the rest of Mylan's business.[23]

### C. COMPETITION AND CONSUMERS WERE HARMED BY THE ELIMINATION OF CHOICE

24. Despite the fact that at least some consumers preferred Auvi-Q over EpiPen, a fact that Mylan was well aware of, Professor Willig nevertheless argues that it does not necessarily follow that those consumers were harmed by the lack of choice when Mylan incentivized PBMs to exclude Auvi-Q.[24] His opinion—that PBMs were willing to sacrifice consumer choice for lower prices and that consumers were not harmed by this lack of choice—is directly contrary to the position that Mylan has taken in other litigation where it has emphasized the importance of equal access to life-saving EAI devices.[25] As explained in my Initial Report, in objecting to the decision of the West Virginia Department of Health and Human Resources to exclude EpiPen from the West Virginia Medicaid formulary, Mylan stated that "because these [EAI] devices require unique training and have both technical and aesthetic differences, we support patients having equal access to all of these devices."[26] Professor Willig simply ignores Mylan's own statements that refute his opinion.

25. Moreover, access to a life-saving EAI device of the consumer's choice is important for the obvious reason that EAI devices are not interchangeable. As I explained in my Initial Report, the market for EAI devices is not one in which there are multiple equally effective substitute products where excluding one or more from a formulary will not have a significant detrimental effect on

---

Department of Justice, "Mylan Agrees to Pay $465 Million to Resolve False Claims Act Liability for Underpaying EpiPen Rebates, https://www.justice.gov/opa/pr/mylan-agrees-pay-465-million-resolve-false-claims-act-liability-underpaying-epipen-rebates; MYEP00082769 [redacted] Brown Dep. Ex. 19 ("Every data point we have suggest the Epipen is a brand (because it is); however; they have been paying federal rebates at 13% of AMP as if it was a generic. I know a few states have been in contact with CMS on the issue and the response from CMS was that they intend to pursue the issue. If CMS requires Mylan to recalculate their rebates to reflect a branded status as we are expecting, the federal rebate has the potential to increase drastically. We'll have to see how that plays out.").

[23] See Mylan, "Mylan Reports Fourth Quarter and Full Year 2018 Results and Provides 2019 Guidance" (Feb. 26, 2019), http://newsroom.mylan.com/2019-02-26-Mylan-Reports-Fourth-Quarter-and-Full-Year-2018-Results-and-Provides-2019-Guidance (reporting that net sales in North America were down 18% in 2018 due to lower volumes on existing products, including the EpiPen); Riley Griffin, "Mylan Drops Most in Three Years Despite Vow of Shift" (Feb. 26, 2019), https://www.bloomberg.com/news/articles/2019-02-26/mylan-plunges-as-drugmaker-predicts-its-2019-profits-will-suffer.

[24] Willig Report at ¶ 136.

[25] Scott Morton Initial Report at ¶ 193.

[26] Scott Morton Initial Report at ¶ 193.

users. Even Mylan recognized this very fact when objecting to West Virginia's decision to exclude EpiPen. Mylan stated the following: "EAIs are not typical drug devices. They are emergency use products and, the distinct EAIs currently on the market are not the same, and they are not interchangeable. EAIs are emergency use products that differ in important ways, including in their design, administration, and in the instructions for their safe and effective use. Any confusion on how to administer an unfamiliar EAI during an emergency could result in negative health outcomes."[27] Mylan also recognized this fact when [redacted].[28] There are numerous examples of the FTC opposing such transactions and forcing divestitures to ensure that actual and potential competition from a rival firm is realized for the benefit of consumers, without the risk of a buyer acquiring a product to shelve it or having diminished incentives to promote the acquired product.[29]

26. Relatedly, there are also a number of examples of enforcement actions by the FTC aimed at preserving consumer choice in the pharmaceutical industry, the elimination of which it found to be a clear harm to competition.[30]

27. As noted in my Initial Report, competition can lead to different treatments being offered at different co-pay levels. Patients (or caregivers) and HCPs are guided not just by differences in co-

---

[27] Bresch Dep. Ex. 47 (Memorandum p. 3).

[28] MYEP01147786 [redacted]

[29] See *FTC v. Mallinckrodt ARD Inc.*, No. 1:17-cv-120 EGS (Filed Jan. 25, 2017) (buying a nascent competitor of a treatment for infantile spasms to maintain a monopoly in the U.S. market for adrenocorticotropic hormone drugs is anticompetitive); *In the Matter of Mylan N.V.*, Dkt. No. C-4590 (Filed July 26, 2016) (challenging Mylan's acquisition of Meda as anticompetitive because there were only two companies selling generic carisoprodol tablets and Mylan was the next likely entrant with an approved drug product); *In the Matter of Mylan N.V.*, Dkt. No. C-4557 (Filed Nov. 2, 2015) (challenging Mylan's acquisition of Perrigo as anticompetitive and requiring divestiture of multiple drug products, including for generic clindamycin phosphate/benzoyl peroxide gel where Mylan was the only supplier and Perrigo was poised to enter with recent FDA approval); *In the Matter of Mylan Inc., Aglia Specialties Global Pte. Limited, Agila Specialties Private Limited, and Strides Arcolab Limited*, Dkt. No. C-4413 (Filed Sept. 26, 2013) (challenging Mylan's acquisition of Agila as anticompetitive and requiring divestiture of 11 generic drug products where Mylan and Agila were two of only a limited number of current or potential future competitors).

[30] See *In re Glaxo Wellcome plc and SmithKline Beecham plc*, No. C-3990 (FTC January 30, 2001) (challenging pharmaceutical merger that would "result[] in less product innovation, fewer choices, and higher prices for consumers"); *In re Merck & Co. and Merck-Medco Managed Care, LLC,* No. C-3853 (FTC Feb. 18, 1999) (finding that competition could be harmed where competitor products were foreclosed from Medco's formularies); Press Release, "FTC Gives Final Approval to Lilly Order; Pledges Continued Monitoring for Anticompetitive Practices" (July 31, 1995) (challenging Eli Lilly's acquisition of McKesson Corporation's PBM business and requiring that the newly acquired PBM maintain an "open formulary" and "accept[] all discounts, rebates or other concessions offered by Lilly's competitors for drugs on the open formulary").

pays, but also by differences in their personal preferences for treatment.[31] Therefore, consumers can face significant harm when two or more treatments are unavailable on a formulary, because patients (or caregivers) and HCPs are unable to play a meaningful role in determining which treatment will ultimately be selected.

28. In sum, Professor Willig's opinion that consumers were not harmed by the lack of choice in life-saving EAI devices directly contradicts that of Mylan's own position that these devices are not interchangeable and that equal access to all devices is important.

29. Professor Willig attempts to bolster his opinion that consumers were not harmed by the lack of choice that resulted from Mylan's conduct by pointing to the fact that kaléo relaunched Auvi-Q in early 2017 following Sanofi's voluntary recall, and that Auvi-Q has subsequently been available to doctors and patients.[32] Professor Willig, however, ignores that Auvi-Q has now been relegated to an expensive niche product that is not widely prescribed or used in the mainstream. kaléo knew from Sanofi that Mylan was engaging in an anticompetitive strategy to block Auvi-Q,[33] so it is consistent with economic literature for a firm to enter a market controlled by a large, low cost supplier to try to increase its profits by deliberately adopting a niche strategy that limits its potential sales in order to induce an accommodating response from the incumbent firm. Otherwise, if the entrant tries to compete head-to-head with the incumbent, it will provoke an aggressive response that reduces the entrant's profits.[34] I take no position on the merits of kaléo's strategy other than to note that it is consistent with economic theory on how a monopolist (like Mylan) can eliminate competition in a market and is fundamentally different from Sanofi's strategy. Notably, kaléo sells Auvi-Q at a list price of $4500,[35] and data through the second quarter of 2018 show that its market share has remained miniscule.[36] While Auvi-Q is available in the market, it clearly is less accessible to most customers than when Sanofi marketed Auvi-Q, and customers have been harmed

[31] Scott Morton Initial Report at ¶ 48.
[32] Willig Report at ¶ 138.
[33] SAN-EPI-0232437 (Nov. 2013 Sanofi and Kaleo Joint Steering Committee Presentation informing kaleo, on slide 15, of Mylan's rebate strategy to restrict Auvi-Q).
[34] See Judith R. Gelman and Steven C. Salop, "Judo Economics: Capacity Limitation and Coupon Competition," 14 *Bell Journal of Economics* 315 (1983).
[35] Tammie Smith, "Richmond-based Kaleo's Auvi-Q epinephrine injector returning to market Feb. 14," Richmond Times-Dispatch, Jan. 19, 2017, available at https://www.richmond.com/business/local/richmond-based-kaleo-s-auvi-q-epinephrine-injector-returning-to/article_04442c78-220d-53bd-ac2e-fb4a222889e3.html.
[36] Calculation on file.

by Mylan's actions, which (as discussed later in this Report as well as in my Initial Report) caused Sanofi to return the rights to Auvi-Q back to kaléo.

### D. MYLAN'S CONDUCT RAISED PRICES

30. Another key element of harm to consumers is higher prices to consumers. There is no debate that [redacted]—Professor Willig agrees with as much.[37] Consequently, because Mylan successfully prevented Sanofi from gaining a foothold in the EAI market, Sanofi's entry did not benefit consumers through lower prices for EpiPens. As shown in Figure 8 in my Initial Report, EpiPen's net price rose after Auvi-Q entered the market, and though the price dropped somewhat in 2015, it always remained higher than when Auvi-Q first entered the market in 2013. Professor Willig attempts to say that [redacted][38] If one compares EpiPen's net price before Auvi-Q entered with the net prices charged while Auvi-Q was in the market, the average [redacted] This is shown in Figures 1.A through 1.C below. The bottom line is that Mylan was able to suppress effective price competition through its exclusionary strategy, to the detriment of competition and of consumers.

[37] Willig Report Ex. 5.
[38] Willig Report at ¶ 334.

Figure 1.A: Aetna – EpiPen and Auvi-Q List Prices and Net Prices Over Time

Commercial Plans, 2012-2016

[redacted]

Notes: Calculations use Professor Willig's data and methodology in Exhibit 16a of his report, with extensions to 2012 for EpiPen's Net Price and List price using MYEP01385719 for Aetna commercial plans. Aetna commercial transactions are identified as those with soldtoname = "Aetna Health Management" and Rebate Type = "Commercial."

Sources: Sanofi managed care transaction data (SANOFI0_10659_00002872.xlsx); Mylan invoice data for Aetna (see Scott Morton Initial Report, Figure 8); Graham 30(b)(6) Deposition Exhibit 22, page 3; Professor Willig's data from Exhibit 5 of his report (MYEP01385719).

Figure 1.B: CVS/Caremark – EpiPen and Auvi-Q List Prices and Net Prices Over Time

Commercial Plans, 2012-2016

[redacted]

Notes: Calculations use Professor Willig's data and methodology in Exhibit 16b of his report, with extensions to 2012 for EpiPen's Net Price and List price using Mylan invoice data for CVS commercial plans.

Sources: Sanofi managed care transaction data (SANOFI0_10659_00002872.xlsx); Mylan invoice data for CVS/Caremark (MYEP030A); Graham 30(b)(6) Deposition Exhibit 22, page 3.

Figure1.C: ESI – EpiPen and Auvi-Q List Prices and Net Prices Over Time

Commercial Plans, 2012-2016

[redacted]

Notes: Calculations use Professor Willig's data and methodology in Exhibit 16c of his report, with the following changes: (1) data are extended to 2012 for EpiPen's Net Price and List price using Mylan managed care transaction data for Express Scripts commercial plans. Express Scripts commercial transactions are identified as those with soldtoname = "Express Scripts" or "Medco Health Solutions, Inc." and Rebate Type = "Commercial." (2) List prices for 2012 EpiPens are calculated using the list prices from Graham 30(b)(6) Deposition Exhibit 22, page 3; list prices in Mylan's managed care transaction data for Express Scripts were not available.

Sources: Sanofi managed care transaction data (SANOFI0_10659_00002872.xlsx); Mylan invoice data for ESI; Graham 30(b)(6) Deposition Exhibit 22, page 3.; Professor Willig's data from Exhibit 5 of his report (Mylan managed care transaction data, MYEP01385719).

31. Professor Willig asserts that the right comparison is not to look at what happened to actual prices in the market, but rather how the actual EpiPen net price compares to what the price would

have been in the absence of competition.[39] This computation, even supposing it is relevant for the purposes of assessing market power and competitive harm, obviously depends on the assumption made about what prices Mylan would have charged without entry by Auvi-Q.

32. Professor Willig makes the incorrect assumption that there would have been no difference in WAC (list) price changes with or without Auvi-Q entry and the conditional discounts adopted by Mylan to combat Auvi-Q.[40] He also states in his report that I do not assert that WAC prices were affected by Auvi-Q's entry and Mylan's response.[41] But he later contradicts himself, writing that "Professor Scott Morton's EEB theory relies upon the assumption that the discounts being provided by the alleged monopolist on the non-contestable demand are 'artificial,' that is that the firm with monopoly power on the non-contestable units raises its list price above the monopoly price and then discounts back to the monopoly price, such that the net price is no lower as a result of the rebate."[42] As discussed in my Initial Report, [redacted][43]

33. Table 1 shows the history of Mylan WAC price increases from 2007, when it first acquired the rights to EpiPen, through 2016 after the voluntary recall of Auvi-Q. Several observations are apparent from the Table. By 2010 Mylan had settled into a regular pattern of twice annual 9.9% price increases. The only time Mylan ever took a third price increase in one year was at the end of 2012, just before Auvi-Q entered the market in the beginning of 2013. Mylan then reverted to twice annual increases, but the second increase in 2013 was set at 14.9%, not 9.9%, and occurred just before the additional rebates and price protection associated with the exclusionary contracts went into effect on January 1, 2014.[44] Mylan then continued taking 14.9% rather than 9.9% price increases for its semi-annual price changes as long as Auvi-Q was on the market.

[39] Note that this proposed test actually presumes that Mylan had monopoly power and would have continued to exploit its market power by raising prices every year at a rate that exceeded changes in costs or inflation.
[40] Willig Report at ¶ 333.
[41] Willig Report at ¶ 127.
[42] Willig Report at ¶ 179.
[43] Scott Morton Initial Report at ¶ 86.
[44] Scott Morton Initial Report at ¶ 86; Kautzner Dep. Ex. 18.

Table 1: Mylan WAC Price Increases – Annual Summary

| Year | Number of Price Increases | First Increase (%) | Second Increase (%) | Third Increase (%) | Annual Increase (%) |
|---|---|---|---|---|---|
| 2007 | 1 | 4.0% | - | - | 4.0% |
| 2008 | 1 | 5.0% | - | - | 5.0% |
| 2009 | 2 | 5.0% | 20.1% | - | 26.1% |
| 2010 | 2 | 9.9% | 9.9% | - | 20.8% |
| 2011 | 2 | 9.9% | 9.9% | - | 20.8% |
| 2012 | 3 | 9.9% | 9.9% | 9.9% | 32.7% |
| 2013 | 2 | 9.9% | 14.9% | - | 26.3% |
| 2014 | 2 | 14.9% | 14.9% | - | 32.0% |
| 2015 | 2 | 14.9% | 14.9% | - | 32.0% |
| 2016 | 1 | 14.9% | - | - | 14.9% |

Sources: Graham 30(b)(6) Dep. Ex. 22 at page 3; Kautzner Dep. Ex. 18.

34. While there cannot be any certainty about what Mylan's price increases would have been in the absence of Sanofi's entry, the pattern of price increases suggests that Mylan did raise list prices in anticipation of offering higher discounts. Moreover, Mylan's own consultants advised Mylan to increase EpiPen's price in anticipation of and in response to Auvi-Q's launch:

> "We recommend an immediate price increase on EpiPen, the size of the increase should depend on the launch timing of e cue:
>
> - **e cue launch 4Q12:** Take an immediate 15% increase then begin regular and aggressive (15% to 25%) increases in 2013.
> - **e cue launch 1Q13:** Take an immediate 9.9% increase and another 9.9% increase in November or December and aggressive (15% to 25%) increases in 2013."[45]

The history certainly provides no basis for Professor Willig's assumption that WAC prices would have been identical in a but-for world without Sanofi's entry and Mylan's response.[46]

35. Based on my review of Mylan's history of WAC price increases, a more reasonable assumption about the but-for world is that Sanofi's entry and Mylan's response of additional

[45] MME-EpiPen 006955.

[46] Professor Willig claims that the EpiPen WAC price grew at the same rate before and after Auvi-Q entry. But this ignores that Mylan raised prices just before entry in anticipation of Auvi-Q's entry, and also depends on careful selection of before and after periods. As Table 1 shows, from 2007 through 2011, Mylan's annual WAC price increase ranged from 4% to a maximum of 26.1% (averaging 15.3% over those five years). From Table 1: 15.3% = (4.0% + 5.0% + 26.1% + 20.8% + 20.8%)/5. Starting with the year before Auvi-Q entered and for the three years Auvi-Q was sold by Sanofi, the annual EpiPen WAC price increase was never less than 26.3%, and was over 30% in three of the four years (averaging 30.8% across those four years).

conditional rebates had two impacts on WAC price changes: (1) Mylan took a third price increase at the end of 2012 that it would not have taken in the absence of Auvi-Q's entry; and (2) Mylan switched from semi-annual 9.9% price increases to semi-annual 14.9% price increases.

36. I have re-done Professor Willig's calculation of actual and but-for net prices, shown in his Exhibit 5, making these two changes to the but-for list price. The results are shown in Figure 2. The but-for list price is the solid red line, which begins to diverge from the actual list price (solid blue line) at the end of 2012 and continues to further diverge from the actual price path over time. Following Professor Willig, I assume that the but-for net price reflects an [redacted] discount off list price, with the percentage discount constant over time.[47] The but-for net price is shown as the dotted red line, while the actual net price, which is the same as in Professor Willig's Exhibit 5, is shown as the dotted blue line.

[47] Willig Report at ¶ 129.

[redacted]

Sources: EAI WAC data (SAN-EPI-0002167); Mylan managed care data (MYEP01385719).

37. Figure 2 shows that the actual net price was above the but-for net price throughout 2013 and 2014, only dipping below the but-for net price in 2015. Across the entire period when Auvi-Q was in the market, [redacted] while the average but-for net price was lower, at [redacted] Hence there is no basis for saying that EpiPen's net price was lower than it would have been but-for Auvi-Q's entry and Mylan's response. In fact, even with Auvi-Q in the market and Mylan offering conditional rebates (including price protection) in exchange for exclusivity, the average EpiPen net price was above what it would have been without Auvi-Q's entry. This not only shows that Mylan had monopoly power, so that it could control prices even in

the face of entry from a meaningful competitive threat, and that PBMs could not counter Mylan's monopoly power through countervailing bargaining power, as Professor Willig asserts, but also that Mylan's exclusionary conduct caused harm to competition and to consumers through higher prices.[48]

38. Moreover, prices continued to rise following Auvi-Q's exit. In response, Professor Willig focuses on refuting the example of one PBM while ignoring the evidence of market-wide pricing in my Initial Report.[49] As demonstrated in my Initial Report, when Auvi-Q exited the EAI market, Mylan reduced discounts, thereby further raising net prices, again despite the presence of the more distant potential substitutes.[50] Mylan began a concerted effort to reduce its discounts and further raise the net price for EpiPen. Mylan raised the price of EpiPen by 14.9% in November 2015 shortly after the voluntary Auvi-Q recall, raising the WAC price per pen to $264.85.[51]

39. In an effort to support his claim that Mylan lowered its price as a result of competition from Auvi-Q, Professor Willig points to a [redacted][52] [redacted] showing that competition did not erode profits. It is undisputed that Mylan successfully increased EpiPen profits while Sanofi was selling Auvi-Q. In 2012, the last year before Auvi-Q entered when Mylan had more than a 99% share of the EAI market, Mylan earned [redacted]. From 2013 to 2015, while Auvi-Q was in the market, Mylan earned [redacted][53] Across these three years, annual profits increased by [redacted] Mylan's ability to substantially increase its profitability despite the entry of Auvi-Q is evidence of Mylan's monopoly power, contrary to what Professor Willig asserts.

40. Professor Willig also briefly challenges the conclusion in my Initial Report that output of EAI devices in the U.S. EAI market was reduced as a result of Mylan's conduct, and goes so far as to assert that Mylan's rebating activity actually increased output.[54] As I acknowledged in my Initial Report and in my deposition, total output did increase in the U.S. EAI market from 2008 through

---

[48] Willig Report at ¶¶ 326-330.
[49] Willig Report at ¶ 335.
[50] Scott Morton Initial Report at ¶ 59.
[51] Scott Morton Initial Report at ¶ 195.
[52] Willig Report at ¶ 130.
[53] U.S. Securities and Exchange Commission, U.S. EpiPen Profitability Analysis, https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d265624dex991.htm.
[54] Willig Report at ¶¶ 133-134.

2015. But Professor Willig cites no evidence, and I have seen no evidence, that indicates that this increase was driven by any procompetitive behavior by Mylan. It is a clearly established principle in the economic literature that, when a differentiated product enters the market, particularly one that will depress prices, and creates a more competitive environment, output will increase. Accordingly, my opinion has not changed that, in a but-for world where Mylan had not engaged in the anticompetitive conduct described in my Initial Report, output would have been higher than it was in the actual world. In fact, as described above, the evidence indicates that Mylan was able to increase prices at the same time output was increasing, which only further demonstrates Mylan's monopoly power.

### E. Mylan's market share

41. As noted above, one of Professor Willig's criticisms of my assessment of Mylan's monopoly power is his claim that market shares are not reliable measures of market power. As an initial matter, while Professor Willig attempts to downplay the importance of EpiPen's high market share, the relevant authorities—including the literature and case law citations in Professor Willig's Report—all expressly recognize that market share matters.[55] Professor Willig does not dispute the fact that EpiPen's market share was over 98% prior to Auvi-Q's launch in 2013; never dipped below 83% during the period when Auvi-Q was on the market; jumped backed to 95% in 2016; or that it remained around 80% in 2017, even after Mylan's introduction of an authorized generic in December 2016.[56] This undisputed evidence is unquestionably relevant to the inquiry of whether Mylan had monopoly power, and Professor Willig's suggestion to the contrary is misplaced.[57]

42. As noted above, Professor Willig suggests that the relevant market under consideration should be an individual PBM, so that the overall market share does not matter. But even if there

[55] See George A. Hay, "Market Power in Antitrust," 60 *Antitrust Law Journal* 807 (1992) at 825-826 ("As a general rule, a significant market share is necessary for a firm to have the kind of market power with which the antitrust laws are concerned."); Einer Elhauge, "Defining Better Monopolization Standards," 56 *Stanford Law Review* 253 (2003), at 336 ("Rather, a high market share also has independent economic relevance because it bears on the ability of the defendant to persuade buyers to agree to exclusionary schemes, the likelihood that those schemes will impair rival efficiency, the profitability to the defendant of impairing rival efficiency, and the relevance of any economies of share the defendant may enjoy from the scheme. Thus, on economic as well as legal grounds, monopoly power should not be deemed to exist unless the exclusionary conduct contributes to the acquisition or maintenance of not only a power to raise marketwide prices or produce marketwide foreclosure but also a defendant market share of over 50%.").

[56] Scott Morton Initial Report at ¶ 73.

[57] The persistent high shares are also evidence that there were substantial barriers to expansion, contrary to what Professor Willig asserts. If barriers to expansion were low, then competitor expansion would have eroded Mylan's market share. Willig Report at ¶¶ 322-324.

was some merit to this argument, it fails as a matter of basic arithmetic: high market share nationally means that most EpiPens are sold through PBMs with high EpiPen market shares. Thus the overall market share is relevant even if one were to adopt a PBM -level market definition.

43. Professor Willig goes on to argue that Mylan's dominant market shares are not a reliable indicator of monopoly power because they are the result of ex ante competition between Mylan and Sanofi for the contracts at PBMs. But this conclusion rests on the faulty assumption that Mylan and Sanofi were competing for the entire volume of demand—i.e., that all of the demand was contestable. And as discussed in more detail in Section V.C below, there is little evidence that Mylan and Sanofi competed for a contract. As explained in detail in my Initial Report, Sanofi could not compete for the entire demand at PBMs—much of that demand was non-contestable. Moreover, other than with respect to a few small, new, high control formularies, PBMs did not view the available options as limited to either granting an exclusive contract to Mylan or an exclusive contract to Sanofi. Except in these rare circumstances, PBMs did not exclude EpiPen. And when PBMs did not exclude Auvi-Q, they generally put both EpiPen and Auvi-Q on formulary. Therefore, Mylan's high market shares reliably indicate monopoly power that is not the result of ex ante competition.[58]

44. Professor Willig further argues that Mylan did not have monopoly power after the voluntary Auvi-Q recall in October 2015 due to competition from generics. But Professor Willig acknowledges that Mylan continued to have a large market share of nearly 80% after its generic launched in December 2016. With respect to the Teva generic, prior to its launch, Mylan had already successfully marginalized Sanofi's Auvi-Q and the economic evidence indicates that Mylan's actions were the primary reason that Sanofi did not bring the product back after its voluntary recall. As a result, with Sanofi already out of the market by the time of Teva's launch, it is not clear what relevance there is to assessing whether Mylan will continue to have monopoly power after Teva's generic is fully on the market.

45. All told, Professor Willig has not offered any analysis or economic logic that in any way refutes my showing that Mylan had monopoly power throughout the relevant time period in the U.S. EAI market, and that it exploited that monopoly power to the detriment of the competitive process and consumers. With no analysis (affirmative or rebuttal) of the relevant market and

[58] Moreover, as I discuss elsewhere in this Report, and as I discuss at length in my Initial Report, this ex ante competition that Professor Willig focuses on was not occurring on a level playing field. Mylan's overall course of anticompetitive conduct resulted in a significant tax on Sanofi that tilted the playing field heavily in Mylan's favor. The ability to do so is also highly probative evidence of Mylan's monopoly power.

Mylan's monopoly power in that market, Professor Willig cannot properly analyze Mylan's conduct and its competitive effects.

## III. AUVI-Q DID NOT FAIL DUE TO DEFICIENCIES IN SANOFI'S OWN EFFORTS

46. Professor Willig tries to shift the focus from Mylan's anticompetitive conduct to Sanofi by claiming that Auvi-Q's "initial lack of success was the result of its own failure to compete."[59] Professor Willig attributes Auvi-Q's failure to various strategic decisions by Sanofi, including that Sanofi supposedly priced Auvi-Q too high, offered PBMs rebates that were too low, and refused to provide price protection. Professor Willig's claims, however, are belied by the factual and financial evidence in this case. Sanofi tried to compete vigorously by offering aggressive rebates, negotiating price protection, and launching a substantial marketing campaign for Auvi-Q. Sanofi's efforts, however, were not enough to overcome Mylan's exclusionary behavior. I address each of these points in turn.

47. As a starting point, Professor Willig's claim that Auvi-Q experienced an "initial lack of success" is mistaken.[60] Sanofi's efforts and the marketplace's early acceptance of this new EAI device placed Auvi-Q on track to achieve even more success than originally forecasted. Following its launch, Auvi-Q was [redacted][61] In fact, [redacted]"[62] as [redacted][63] [redacted].[64] [redacted][65]

---

[59] Willig Report at Section V.
[60] Willig Report at ¶ 238.
[61] MYEP00217675 (April 2013), at p. 422.
[62] Zinn 30(b)(1) Dep. Ex. 10. See also MYEP00069046 [redacted]
[63] MYEP00148006 (July 24, 2013), at slide 13.
[64] Bresch Dep. Ex. 39, at slides 34-35 [redacted] Bresch 30(b)(1) Dep. 383:12-17 [redacted]
[65] Bresch Dep. Ex. 40 [redacted]

48. Patients and healthcare providers' [redacted].[66] Professor Willig's assertion that Sanofi experienced an initial lack of success is also contradicted by testimony of Sanofi officials, as described by Mylan's expert Professor Ordover in his report, that "Auvi-Q was penetrating the market well, and not underperforming in the first year after launch."[67]

49. Sanofi's initial success only halted when Mylan's exclusionary agreements went into effect.[68] As the President of Mylan Specialty stated, [redacted][69] Mylan accomplished this through the range of exclusionary conduct described in my Initial Report, which pushed PBMs to exclude Auvi-Q.[70] As of mid-2013, Sanofi was gaining formulary access, momentum, and market share.[71] By early 2014, Auvi-Q's formulary coverage—and consequently its market share—dropped dramatically due to Mylan's exclusionary contracts with PBMs.[72] As of March 2014, Mylan's anticompetitive efforts had [redacted].[73] [redacted]"[74]

---

[66] MYEP00151620 (June 25, 2013), at slide 4 [redacted]

[67] Ordover Report at ¶ 42, referring to the 30(b)(1) Deposition of Patrick Barry (Sanofi), July 13, 2018.

[68] See, for example, MYEP00723729 [redacted] MYEP00604253 [redacted]

[69] Graham 30(b)(1) Dep. Ex. 7.

[70] Mylan developed its strategy early on to lock up exclusionary contracts in an effort to stop Auvi-Q® from gaining momentum. See Graham 30(b)(6) Dep Ex. 42, at slide 4 [redacted] Jones Dep. Ex. 10 (January 1, 2012) [redacted]

[71] See MYEP00420454 [redacted]

[72] MYEP00238586, at slide 2 [redacted] MYEP00131233, at p. 101 [redacted]

[73] PFE_EPIPEN_AT00540546, at slide 28 (emphasis added).

[74] MYEP00560488, at slide 2.

- [redacted]
- [redacted][75]

Absent Mylan's exclusionary dealing with PBMs (in addition to its deceptive marketing and other exclusionary tactics), Auvi-Q would have continued to increase its share and market presence.

50. Professor Willig also faults Sanofi's marketing strategy and Auvi-Q's share of voice.[76] Recognizing that "Sanofi is a large and sophisticated company with the size, resources, and experience to compete in the pharmaceutical industry,"[77] he contends that Sanofi failed to properly market Auvi-Q or even understand the competitive dynamics of the industry.[78] However, this contention is incorrect. As I document in Section VI, Sanofi invested heavily in sales and marketing activities, spending more than three times as much as Mylan on a per-device basis. Sanofi developed a targeted strategy, focusing on specialists, early adopters, and heavy prescribers of EAI devices, that efficiently utilized Sanofi's sales and marketing resources to build share.[79] Contrary to Professor Willig's assertions, Mylan's own documents [redacted][81] In response to this threat, Mylan launched its [redacted] and deceptive marketing campaign to stop Auvi-Q's progress.[82]

51. Next, Professor Willig plays down the distinctive and unique features of Auvi-Q in claiming that Sanofi priced the EAI device too high.[83] He cites a few limited examples but does not address the numerous Mylan and PBM documents discussing the enhanced value that HCPs and patients placed on Auvi-Q's new and innovative characteristics. As one Mylan executive explained, [redacted]

---

[75] MYEP00244410, at slide 7 (emphasis added).
[76] Willig Report at ¶ 66.
[77] Willig Report at ¶ 185.
[78] Willig Report at ¶ 66.
[79] MYEP00487195, at slides 16, 73-74.
[80] MYEP00190937, at p. 13 [redacted].
[81] MYEP00191073.
[82] Patel Dep. Ex. 3 [redacted]
[83] Willig Report at ¶¶ 69-70.

[redacted]"[84] [redacted][85] These very features that raised concerns for Mylan led Sanofi to price Auvi-Q at a similar or at times slight premium WAC price based upon extensive market research.[86]

52. As for the net price of Auvi-Q, higher prices resulted in part due to Auvi-Q's lower formulary placement. As discussed in detail in my Initial Report, Mylan typically [redacted][87] Excluding or restricting Auvi-Q (or placing Auvi-Q on a lower tier) meant that PBMs received lower rebates from Sanofi, which could ultimately result in a higher net price. Mylan's net price offered to plans with the highest levels of control (*i.e.*, step edit, prior authorization, exclusion) was lower because Mylan offered the highest level of rebates to incentivize them to exclude Auvi-Q.[88] Thus, Auvi-Q's net prices were in part the result of Mylan's exclusionary strategies and are a symptom of Sanofi's disadvantaged formulary position.

53. Relatedly, Professor Willig cites Sanofi's rebate offers as another reason for failure.[89] But Sanofi's rebates were consistent with its goal of gaining formulary access and increasing patients' ability to choose Auvi-Q. Sanofi's 2013 offers were [redacted].[90] And in mid-2013, Sanofi quickly increased its initial rebate offers for access based upon payer and PBM feedback.[91] Mylan, however, [redacted]"[92] As of May 2013, Mylan's pricing strategy was

---

[84] Graham 30(b)(6) Dep. Ex. 29 [redacted]

[85] See Scott Morton Initial Report, Sections VI.A and IV.B ("Mylan's efforts to license or Acquire Auvi-Q" and "Mylan's efforts to develop a smaller more innovative EpiPen.").

[86] Downey 30(b)(6) Dep. Ex. 16 ("The rationale for the Auvi-Q price premium recommendation was based on multiple rounds of research from payer, physician, and patient perspectives."); Harr. Dep. Tr. 185:5-9 ("When we did pre-launch research, payers told us that they would cover Auvi-Q even with price premium to EpiPen, and we decided to launch at price parity, which was, in effect, already giving payers a rebate when we launched.").

[87] MYEP00603858 [redacted]

[88] See Scott Morton Initial Report at ¶ 122.

[89] Willig Report at ¶¶ 74-76.

[90] MYEP00603858.

[91] See, for example, SAN-EPI_A-0093244 (increasing initial rebate offer from [redacted]% to [redacted]% (plus [redacted]% administrative fee based upon PBM feedback).

[92] Jones Dep. Ex. 33 (July 2014).

to offer [redacted][93] but to [redacted][94] Meanwhile, at the same time Professor Willig claims that "Sanofi was not prepared to compete for Tier 2 placement," he later contradicts himself and says that "as early as March 2013, Sanofi proposed rebates to PBMs" for formulary placement.[95] This inconsistency underscores that Sanofi did not misjudge the role of rebates in negotiating formulary placement.

54. Finally, Professor Willig attempts to distinguish Sanofi from Mylan as refusing to offer price protection.[96] But the strategy that Mylan brought to the EAI market in 2013 [redacted][97] [redacted] As Mylan itself explained in December 2013 to Prime Therapeutics (one PBM that refused to place restrictions on Auvi-Q): [redacted]"[98] Consistent with this exclusionary strategy, the 2013 Optum contract cited by Professor Willig [redacted] for the plans that agreed to place a benefit exclusion on Auvi-Q.[99] Any other Optum plans, even for preferred tier formulary placement, [redacted].[100]

55. As for Prime, Professor Willig's other example, [redacted][101] Mylan, on the other hand, [redacted][102] [redacted][103] [redacted]

[93] Graham 30(b)(1) Dep. Ex. 5.
[94] MYEP00624286.
[95] Willig Report at ¶¶ 76, 113.
[96] Willig Report at ¶ 68.
[97] Mylan's pricing strategy as of May 2013 was to offer [redacted]." Graham 30(b)(1) Ex. 5.
[98] MYEP00602480 (emphasis added).
[99] EAI00221815.
[100] EAI00221815.
[101] [redacted]
[102] MYEP00270995 [redacted] MYEP00744315 [redacted]
[103] [redacted]

[redacted][104]

56. Sanofi thus not only offered price protection, but did so for many PBMs on less restrictive terms than Mylan. Mylan in fact reported in 2014 that [redacted] on Auvi-Q.[105]

57. In summary, Professor Willig's contention that Auvi-Q failed due to deficiencies in Sanofi's efforts is belied by the economic evidence. Sanofi attempted to compete aggressively across the various dimensions raised by Professor Willig, and its overall strategy was initially successful in gaining awareness and share for Auvi-Q, but Sanofi's initial success could not withstand Mylan's exclusionary contracts and other anticompetitive strategies.

# IV. Professor Willig's Repeated Efforts to Point to Other Markets and Other Products to Defend Mylan's Conduct in the EAI Market Are Insufficient and Misplaced

58. Professor Willig asserts that Sanofi has "frequently offered rebates conditional on preferred formulary status or even formulary exclusivity to many PBMs on many of its drugs" and that "these are the exact types of rebates that [Sanofi] is objecting to Mylan using for EpiPen."[106] Professor Willig cites scattershot examples from several non-EAI Sanofi products where Sanofi purportedly [redacted].[107]

59. As I discuss below, Professor Willig does not take the first step in identifying the relevant markets in which those other products compete. Compounding this basic error, Professor Willig does not analyze the market shares of Sanofi and other pharmaceutical manufacturers who sell

[redacted]

[104] PRIME_0011993, at 994.
[105] MYEP00164555.
[106] Willig Report at ¶ 111.
[107] Willig Report at ¶ 112.

those other products, he conducts no analysis of the competitive conditions that led to the rebate offers he selects, and he does no analysis of the competitive effects of those rebate offers. Professor Willig does none of this work to provide any reliable study of these other products, and, based on the available evidence, he is incorrect when he asserts that the rebates Sanofi has offered on these other products are "the exact type of rebates" that Mylan offered on EpiPen to exclude Auvi-Q from the EAI market.[108]

### A. COMPARISONS TO OTHER MARKETS ARE MISPLACED

60. As an initial matter, what Sanofi has done with other products is irrelevant to the question of whether Mylan has engaged in an anticompetitive course of conduct to block Auvi-Q from gaining a meaningful foothold in the U.S. EAI market. The issue in this case is whether Mylan's actions in the U.S. EAI market amount to a violation of U.S. antitrust law. In my Initial Report, I conducted a detailed multi-step analysis to assess, from an economic perspective, whether Mylan's course of conduct in the U.S. EAI market was anticompetitive.[109] What Sanofi may or may not have done in other markets with other non-EAI products is irrelevant to that economic assessment.

### B. PROFESSOR WILLIG FAILS TO ESTABLISH THAT THE COMPETITIVE CONTEXTS FOR THE OTHER PRODUCTS ARE ANALOGOUS TO THAT OF MYLAN'S CONDUCT IN THE EAI MARKET

61. Despite the foregoing, because Professor Willig has placed such emphasis on these other products, I now address the fundamental shortcomings in his comparison of Sanofi's rebates for those products to Mylan's activity in the U.S. EAI market.

62. Importantly, Professor Willig provides no basis to show that Sanofi's competitive position for the non-EAI products that he cites was in any way comparable to Mylan's position as an entrenched monopolist when Mylan offered exclusive rebates. As I presented in my Initial Report, ample evidence shows that Mylan was a long-standing, entrenched monopolist in the U.S. EAI market, which, when faced with a new and innovative entrant into the market, devised and successfully carried out an intentional strategy to [redacted] to ensure that it

---

[108] For substantially the same reasons discussed in this section, Dr. Navarro's opinions regarding non-EAI products are also insufficient and misplaced, as he similarly fails to analyze the markets and competitive conditions for the other non-EAI products referenced in his report. Navarro Report at ¶¶ 47, 85, 88, 102-105. The same is true with respect to his broad and generalized opinions as to what are supposedly common rebating practices in the entire pharmaceutical industry. Navarro Report at Section IX.A.

[109] Scott Morton Initial Report at Section V.

would not be able to gain a foothold in the U.S. EAI market. Mylan's monopolist position, the unique characteristics of EAIs that lead to entrenched demand, and the totality of Mylan's conduct are critical to understand why exclusionary rebating, which may otherwise appear procompetitive in a competitive context, is anticompetitive here.

63. Professor Willig fails to consider any competitive context regarding these non-EAI products when assessing whether Sanofi's rebates on its non-EAI products were comparable to Mylan's for EpiPen. Factors affecting whether there is a comparable context include: the competitive conditions in an appropriately defined relevant antitrust market,[110] whether there is non-contestable demand for the products at issue,[111] whether Sanofi leveraged that non-contestable demand in an effort to exclude competitors, whether there was a strategy or intent[112] to exclude competitors, whether there was a history of entry or high barriers to entry, whether the rebating practices had an exclusionary effect or facilitated controlling prices, and what happened to prices, output, and innovation in these markets.[113] Understanding the competitive situation, as established by the totality of such behaviors, is necessary if one were to claim that Sanofi's rebates on non-EAI products offer any meaningful comparison to Mylan's rebates on EpiPen. Indeed, I testified at my deposition (which Professor Willig ignores) that in order to draw any attempted comparison between EAI and non-EAI products, one would first have to identify a set of factors similar to what we observe with Mylan's conduct to maintain its monopoly power in the EAI market. Then one would need to conduct the type of economic assessment of the commercial practices and effects in a properly defined market to even try to draw meaningful conclusions from that market to Mylan's behavior in the EAI market.[114] Without performing any of this analysis, it is impossible to determine whether the actions of Sanofi with respect to these non-EAI products are in any way comparable to the actions taken by Mylan in the U.S. EAI market. Without understanding whether the competitive contexts for these other drugs are comparable to that of Mylan's with EAIs, Professor Willig's repeated references to these other drugs are uninformative—they provide no insight into whether Sanofi's behavior was even remotely comparable to that of Mylan.

64. Furthermore, in justifying Mylan's conduct, Professor Willig relies on other markets as a basis for his opinions about Sanofi, yet he does not attempt any analysis of these other relevant markets. As I set forth in my Initial Report, a detailed multi-step analysis is required to determine

---

[110] Scott Morton Initial Report at ¶ 118.
[111] Scott Morton Initial Report at ¶¶ 76-82.
[112] Scott Morton Initial Report at ¶ 114.
[113] Scott Morton Initial Report at ¶ 106.
[114] Scott Morton Dep. at pp. 31-32.

whether the conduct of a firm in an appropriately defined relevant market constitutes anticompetitive behavior. In my Initial Report, I undertook that analysis as to Mylan's actions in the U.S. EAI market and concluded that Mylan's behavior was anticompetitive. While Professor Willig claims that Sanofi's rebates on its non-EAI products are "the exact types of rebates" that Mylan offered on EpiPen, he has undertaken virtually none of the analysis that I performed in my report required to support that claim.

65. For example, in the context of EAI devices, I first performed an extensive analysis to define the relevant antitrust market, which includes examining both the relevant product market and the relevant geographic market.[115] As set forth in my Initial Report, this requires identifying the smallest set of products that includes the product of interest that would satisfy the hypothetical monopolist test. Professor Willig has not engaged in this analysis or even attempted to define any relevant market with respect to the non-EAI products he references, which encompass different therapeutic areas ranging from diabetes to kidney and liver disease to pain management and come in the form of pills and combination drug devices.

66. I then assessed whether Mylan had entrenched monopoly power in the U.S. EAI market.[116] This required an examination of market share in the relevant market, whether there was non-contestable demand for the EpiPen, what barriers to entry existed, and direct evidence of Mylan's ability to exclude competitors and control prices.[117] Professor Willig does not undertake any of this analysis with respect to the non-EAI products he references. Without comment on the validity of Professor Willig's interpretation of how to assess market power, I note that Professor Willig's own report asserts that to understand market power, one should "evaluate this competition at the PBM level,"[118] and "demonstrat[e] the lack of potential for supply increases by existing firms."[119] However, his report does not even address these criteria with respect to the non-EAI products whose rebates he compares with EpiPen's.

[115] Scott Morton Initial Report at ¶ 54.
[116] Scott Morton Initial Report at ¶¶ 71-89.
[117] Scott Morton Initial Report
[118] Willig Report at ¶ 309.
[119] Willig Report at ¶ 325.

### A. THE COMPETITIVE ENVIRONMENT AND REBATING OF [redacted] ARE NOT COMPARABLE TO THAT OF EAIS

67. Of all of the non-EAI drugs Professor Willig points to, he appears to place particular emphasis on Sanofi's [redacted] with a focus on the particular rebates that Sanofi offered in 2014 and 2015 for [redacted][120] Given the significance that Professor Willig places on this particular drug, and the fact that there is some evidence in the record that allows for at least a cursory analysis of this product, I have given consideration to whether the actions of Sanofi with respect to [redacted] are comparable to those taken by Mylan in the U.S. EAI market. As I now discuss, they were not by any economic measure.

68. First and foremost, the competitive environment in which [redacted] operates appears to be fundamentally different from that of the U.S. EAI market. Unlike EpiPen, [redacted] does not appear to have been a longstanding monopolist in a relevant market facing, for the first time, a new significant competitor. Even assuming for the sake of argument that the relevant market were limited to [redacted] roughly [redacted] products competed with [redacted] and Sanofi's [redacted], and [redacted] had been on the market since 2006.[122] Moreover, it is not even clear that the appropriately defined relevant market for assessing Sanofi's actions with respect to [redacted] is limited to [redacted] products. Professor Willig has performed no analysis to determine whether other [redacted] products or [redacted] treatments might also fall within the relevant market, nor has he given any consideration to whether there is non-contestable demand [redacted] Additionally, Professor Willig does not address the testimony of Sanofi witnesses that suggest that, unlike Mylan, Sanofi's rebating strategy for [redacted] was not to achieve exclusive positions, but was one of "patient choice," whereby [redacted] and its major competitor, [redacted] would be co-preferred.[123] As an economic matter, there is no comparison between a contract for equal or non-disadvantaged treatment versus a contract for exclusivity that references rivals. The former has no anticompetitive potential whereas the latter has anticompetitive potential. In particular, when [redacted] launched in 2006, Sanofi did not pursue a strategy of exclusive contracts, and Sanofi's rebates on [redacted] remained lower than 10% until 2012.[124] As a result, it seems clear that, unlike Mylan's actions in the U.S. EAI market, Sanofi did not intend to [redacted] Professor Willig's analogy to Mylan's

---

[120] See, for example, Willig Report at ¶¶ 18, 111, 188.
[121] Borneman 30(b)(1) Dep. at 208-209.
[122] Borneman 30(b)(1) Dep. at 213.
[123] Borneman 30(b)(1) Dep. at 206.
[124] Borneman 30(b)(1) Dep. at 213.

behavior is flawed because the EAI market was not competitive—Mylan had a monopoly. By contrast, the market for treatment for [redacted] appears to reflect the forces of competition at work, with competition among and between multiple types of [redacted] and other products, a history of entry, and fundamentally different contracting practices by Sanofi.

69. In short, as Professor Willig recognizes, assessing whether the activity of a pharmaceutical manufacturer is anticompetitive requires a detailed analysis of the products at issue and the competitive environment in an appropriately defined relevant antitrust market.[125] The fact that rebates—even those conditioned on exclusivity—have been offered for certain pharmaceutical products in other markets does not, in and of itself, provide any insight into whether the actions taken by Sanofi with respect to a different product in a different market were anticompetitive.

# V. ENTRENCHED SHARE

## A. MYLAN'S LEVERAGING OF EPIPEN'S ENTRENCHED SHARE WAS PART OF ITS ANTICOMPETITIVE, EXCLUSIONARY STRATEGY

70. As noted throughout this Report, Professor Willig mischaracterizes a portion of my analysis in a variety of places in his report, and then based on that mischaracterization, attempts to refute what I have demonstrated. He does this again with my discussion of Mylan's entrenched market share. In his effort to characterize what I have done, Professor Willig inaccurately asserts that I say that EpiPen's entrenched share gives Mylan an "unfair advantage."[126] I do not claim that having entrenched share in and of itself gives a firm an unfair advantage, nor does it. If, for example, Mylan had engaged in competition on the merits without any effort to foreclose Auvi-Q from the market, having entrenched share would not be problematic. This would have been a perfectly fair advantage that Mylan would be entitled to benefit from.[127] But as I have discussed throughout my Initial Report, the key distinction is that Mylan exploited EpiPen's entrenched share to leverage its monopoly power as a deliberate exclusionary strategy. It did not engage in procompetitive

[125] Mylan expert Dr. Robert Navarro also recognizes in his report that rebates in the pharmaceutical industry "are offered strategically for certain drugs and are not offered for other drugs, *depending upon the market conditions and competitive analysis*." Navarro Report at ¶ 67 (emphasis added).

[126] Willig Report at ¶ 58.

[127] For example, the monopolization case brought by the U.S. Department of Justice against Microsoft did not challenge Microsoft's right to a monopoly or its entrenched share in personal computer operating systems, but instead challenged Microsoft's leveraging of that entrenched share to foreclose competition in the internet browser market, which could have eventually resulted in a threat to its operating system monopoly. See Dennis W. Carlton and Michael Waldman, "The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries," 333 *The RAND Journal of Economics* 194 (2002).

competition on the merits, but rather used its entrenched share as the lynchpin for securing exclusionary contracts from PBMs so as to exclude Auvi-Q from the U.S. EAI Market and maintain its monopoly.

### B. Professor Willig's reliance on therapeutic equivalence ignores evidence establishing EpiPen's entrenched share

71. In my Initial Report, I discussed several characteristics that are unique to EAI demand that explain Mylan's entrenched share. Professor Willig ignores these features and instead, he repeatedly states that PBMs treat EpiPen and Auvi-Q as "therapeutically interchangeable," "therapeutically equivalent," or "significantly similar," and in part based on this concludes that there is little non-contestable demand for EpiPen.[128] As an initial matter, Professor Willig's assertion that Auvi-Q and EpiPen are "therapeutically equivalent" and "substantially similar" are at odds with Mylan's other experts. Dr. Robert P. Navarro, in his report, explicitly states that Auvi-Q is "*not* therapeutically equivalent to EpiPen."[129] Dr. Michael Blaiss, in his report, explains "the different attributes with each device" as well as his different training techniques for EpiPen and Auvi-Q "because it is critically important that patients receive training on how to use their EAI devices."[130]

72. Even putting that to one side, Professor Willig's focus on "therapeutic equivalence" misses the mark. EpiPen has an entrenched share not because of some characteristic of the underlying drug, epinephrine, but because of the features, familiarity, training requirements, functionality, and other aspects of its delivery mechanism. As I detailed in my Initial Report, switching from one EAI device to another is very different from substituting between one pill and another—EAI devices are differentiated products.[131] As a result, substituting between one EAI device and another is about far more than just whether PBMs classify different EAI devices as therapeutically equivalent. By ignoring all of these other critical differences for a combination drug device product, Professor Willig's analysis is woefully incomplete and highly misleading.

73. Importantly, EAIs are distinguished by the emergency situations in which the devices are used to save lives. Unlike pills, EAI devices include not only the drug, but also have unique mechanisms to deliver the drug to the patient.[132] This means that training specific to an EAI device

---

[128] Willig Report at ¶¶ 135, 141, 143-144, 192.
[129] Navarro Report at ¶ 126 (emphasis added).
[130] Blaiss Report at pp. 9-11, 18.
[131] Scott Morton Initial Report at ¶ 49.
[132] Expert Report of Dr. Maryann Michelis (Feb. 2, 2019) ("Michelis Report") at ¶ 23.

is critical for patients and caregivers to properly use the EAIs as a first-line medical treatment during an anaphylactic episode when under duress.[133] Because training on EpiPen is different from training on using an Auvi-Q, demand for EpiPens is going to be "sticky" even in the presence of a new competitor like Auvi-Q. As such, some caregivers and patients will not readily switch away from EpiPen.[134]

74. EAI demand is further entrenched due to patient preferences that determine the likelihood of carrying a device regularly as a precaution.[135] Auvi-Q's size and smartphone shape[136] are considerably different from EpiPen's larger pen-like shape. Despite PBMs listing the EAIs as therapeutically equivalent, physical differences between EpiPen and Auvi-Q matter to patients in their decisions to carry one or the other daily. They also matter to HCPs who want to prescribe devices so that patients will be more likely to carry the device at all times.[137]

75. And, with its decades-long monopoly, EpiPen enjoys broad familiarity and comfort among caregivers, patients, and HCPs,[138] which further contributes to its entrenched share. Together with the fact that EAIs are used in emergency situations and under duress, some segment of the population will continue to demand EpiPens even if they think that Auvi-Q is therapeutically equivalent. Indeed, Mylan has asserted that EpiPen's high market share, widespread use, and physician loyalty make it difficult for payers to switch to a competitor.[139]

---

[133] Michelis Report at ¶¶ 19, 23.

[134] Michelis Report at ¶¶ 23, 38; Stein Dep. at 302 ("Q. So if it's a nonidentical EAI device, a non-identical EAI device to EpiPen, is there then inherently a concern on Humana's part that its members don't know how to use it? A. Yes. Q. And does that affect Humana's, specifically the P&T committee's decisions on whether to cover such a device on the formulary? A. It's one factor that we take into account, not the sole factor we take into account.")

[135] Michelis Report at ¶¶ 37-38.

[136] See Auvi-Q, "About Auvi-Q," https://www.auvi-q.com/about-auvi-q (accessed Feb. 2, 2019).

[137] Michelis Report at ¶¶ 22, 37-39.

[138] Brown Dep. at 48-49 ("[P]hysicians are familiar with, with the product, EpiPen, because it had been in the market by Dey for at least in the late '90s. There is a lot of familiarity with the product. And because of familiarity, doctors are very comfortable with the product when they write for that. New products to the market, the Impax product, Auvi-Q, and others, they are a little different. And sometimes it is easier to just go with what you know than to, than to use a new product and train someone on a newer, on a newer device."); Shia Dep. at 97-98 ("Q. 'Patient comfort level with the EpiPen is high since it has been the standard for 25 years.' Is that an accurate statement of Kaiser's view at that time? A. Yes.").

[139] See, for example, [redacted] Jordan Dep. Ex. 13 (discussing that member and physician loyalty should be reasons for Humana to keep EpiPen as its preferred EAI device.); Jordan Dep. at 133 [redacted]

76. Finally, Professor Willig, in an effort to support his claim that EpiPen has little non-contestable demand, points to examples of PBMs shifting market share for non-EAI products.[140] This is entirely irrelevant to the question of whether there is significant non-contestable demand for EpiPen. An assessment of entrenched share is specific to the product and market being analyzed. What happens with a different product in a different market with different demand characteristics is uninformative. For these other products or markets to be instructive, Professor Willig would have had to demonstrate that there is reason to believe that the ability to shift share between these other products is analogous to the situation at hand. He has performed no such analysis and has not even attempted to explain why these other markets are instructive, beyond the mere fact that these other markets are also for pharmaceutical products.

### C. Professor Willig's Empirical Assessment of Non-Contestable Demand Fails to Refute That EpiPen Has a Significant Entrenched Share

77. Professor Willig takes issue with the empirical support that I point to in my Initial Report demonstrating that the portion of demand that is non-contestable is in the range of [redacted] As I explain below, his analysis is flawed and continues to sidestep how non-contestable demand arises, the relevance of looking at average shares across plans, and empirical evidence that fully supports that the [redacted] range I use is a valid and reliable estimate of non-contestable demand. As an initial matter, and like his assessment of the therapeutic equivalence between Auvi-Q and EpiPen, Professor Willig's analysis of non-contestable demand is at odds with evidence used by another Mylan expert. Professor Ordover, as part of his analysis, relied on a report prepared for Mylan by Trinity Partners.[141] According to this report cited by Professor Ordover, EpiPen would maintain its share upon Auvi-Q's entry, [redacted]"[142] This is entirely consistent with my assessment of non-contestable demand in the U.S. EAI market, and entirely at odds with Professor Willig's conclusion that non-contestable demand is small.

78. In what follows, I address the specifics of Professor Willig's empirical analysis of non-contestable demand. But before doing so, it is worth making the additional overarching comment that Professor Willig either fails to appreciate or chooses to ignore. As detailed in my Initial Report, there were very few formularies that ever attempted to exclude EpiPen, and the handful of

---

[redacted]

140 Willig Report at ¶¶ 192, 196, 210.
141 Ordover Report at ¶ 46.
142 MYEP00629734, at slide 28.

formularies that did tended to be quite small (at least as compared to the overall number of lives served by the PBM across all of its formularies).[143] As a result, the average entrenched share of these few formularies that did actually try to exclude EpiPen is likely to be a lower bound on the EpiPen entrenched share of EpiPen market-wide. This is due to selection bias. These formularies are the ones that thought they would be most successful in excluding EpiPen, given the characteristics and preferences of their covered populations, their degree of control, and other formulary dynamics. With that said, I now turn to the specifics of Professor Willig's empirical assessment.

*1. Express Scripts (ESI)*

79. ESI's High Performance Formulary is a formulary that excluded EpiPen, and Mylan records indicate that [redacted][144] Professor Willig points to variations in share among the formulary's individual plans, some of which he says still covered EpiPen; he notes that plans that contracted around the exclusion so as to maintain EpiPen coverage had higher EpiPen shares while other plans with EpiPen excluded had lower shares.[145]

80. What Professor Willig misses, and as I explained in my deposition (which Professor Willig seems to have reviewed, but at least with respect to this issue ignores), is that contracting by individual plans in the formulary to get around the exclusion of EpiPen is an expression of non-contestable demand.[146] A plan that changes its coverage of EpiPen has bargained to satisfy enrollees' preferences for EpiPen. Professor Willig notes that individual plans within a formulary could be making decisions according to their preferences based on cost and control.[147] As a general economic principle, preferences for cost and control and their effects on EpiPen coverage would reveal preferences and demand for EpiPen. Although ESI designed its High Performance Formulary to exclude EpiPen, the fact that individual plans negotiated around this exclusion so as to cover EpiPen within that formulary demonstrates entrenched demand; patients want to buy it, and the employer responds by bargaining for coverage. This is ultimately just a different mechanism used to enable patients to get an EpiPen and get around an exclusion.

81. Individual plans' contracting, as observed by Professor Willig, reinforces my point that the relevant measure of non-contestable share is the average EpiPen share overall for a formulary, such

---

[143] Scott Morton Initial Report at ¶¶ 152-153.
[144] Scott Morton Initial Report at ¶ 153; MYEP01246195; MYEP00531461.
[145] Willig Report at ¶¶ 203-205.
[146] Fiona Scott Morton Dep. (March 12, 2019), at p. 87:23–91:4.
[147] Willig Report at ¶ 205.

as ESI's High Performance Formulary, rather than individual shares for individual plans within the formulary. Groups of people within a formulary can differ in size, preferences, and bargaining power. Variation among plans in a formulary is normal and expected. Indeed, Mylan also indicated that [redacted][148] As a result, Professor Willig's criticisms of my use of the ESI High Performance formulary are misplaced. The experience on this formulary plainly demonstrates that there is significant non-contestable demand that is within the range I put forward in my Initial Report.

*2. CVS*

82. CVS had two formularies that excluded EpiPen for a period of time. In my Initial Report, I showed that the average EpiPen share of the two formularies falls within the [redacted] of non-contestable share.[149] This range holds for the CVS formularies, despite Professor Willig's flawed analysis of the data.

83. Professor Willig selectively looked at only the CVS Advanced Control Formulary (ACF) while completely disregarding data from the CVS Caremark Value Formulary.[150] In doing so, not only does he ignore a good portion of available data, but he also ignores data that undermine his conclusion. In contrast, I reviewed the available data across all CVS formularies that attempted to exclude EpiPen. Moreover, share estimates based solely on the ACF, which was presented as a trial, may not be representative of what happens when EpiPen is excluded more broadly. As such, it is important to look at the average EpiPen shares across both CVS formularies.

84. Further illustrating why evaluating shares across both formularies is important are Professor Willig's own cited documents, which suggest differences in EpiPen share between the two CVS formularies that excluded EpiPen. Professor Willig cites a CVS email to Mylan as saying that [redacted] regarding EpiPen share.[151] Yet in his citation, he conveniently skips over the beginning of his quoted sentence, which refers to the CVS Value Formulary and actually reads in full, [redacted][152] The document also shows CVS's own estimates of the Value Formulary [redacted] after excluding EpiPen.[153] Given the variation between the two formularies, to derive a meaningful overall assessment of non-contestable share, it is critical to examine the

[148] MYEP00531461-65.
[149] Scott Morton Initial Report at ¶ 153.
[150] Willig Report at ¶¶ 206-207.
[151] Willig Report at ¶ 207 and note 258.
[152] MYEP00079145, at 46.
[153] MYEP00079145, at 45-46.

average EpiPen share across both formularies—and not just selectively cherry-pick the subset of data that is most supportive of one's claim.

85. It is also noteworthy that Professor Willig's own citations about CVS are inconsistent with each other. He cites to a Mylan slide deck in early 2015 to say that EpiPen utilization in the CVS Value Formulary [redacted] but this directly contradicts his other cited document which present CVS's own observations about the Value Formulary [redacted][154] The underlying assumptions and validity of the CVS numbers in these documents are unclear. This is why it is more informative to independently examine data on the CVS formularies, as I have done.

86. Professor Willig goes on to assert that the data I assembled for the CVS Value Formulary include a number of prescriptions on plans in which he says EpiPen was covered, based on his tabulations against a preliminary version of the data before it was processed.[155] As is often the case when matching two different and complex datasets, in combining the two datasets necessary to perform my analysis—IQVIA prescription data and MMIT formulary coverage data—there are certain data discrepancies that need to be sorted out. My analysis carefully worked through these data issues as methodically and comprehensively as was possible under the circumstances. While Professor Willig takes issue with some of the data, tellingly, he offers no alternative approach for analyzing the CVS formulary data to avoid the data concerns he claims are problematic. Moreover, even though his own assessment of the CVS formulary data found no issues whatsoever with about 50% of the formulary's lives, he provides no assessment of this data. Had he looked at the portion of the data that he has no concern with, and without comment on the validity of Professor Willig's criticisms of the data, he would have found that EpiPen still had a share above [redacted] and one that is consistent with significant entrenched demand. But rather than perform any analysis along these lines, or make any effort to provide a revised dataset that addresses the concerns he claims are present, he instead dismisses the CVS Value Formulary entirely, despite the fact that the very documents he cites indicate that the CVS Value Formulary excluded EpiPen and, nevertheless, EpiPen still maintained a large share.[156]

87. Finally, even if one were to ignore the CVS Value Formulary and only focus on CVS's ACF, Professor Willig's analysis is still highly misleading. Rather than look at all of the available data for

---

[154] See MYEP00079145; MYEP01145040, at slide 9.
[155] Willig Report at ¶ 206.
[156] May Dep. at 250-252; Anderson Dep. at 264:3-13.

this formulary, Professor Willig selectively points to its EpiPen share based on a few months of data.[157] As it turns out, this formulary had six consecutive months (out of ten where EpiPen was excluded) where EpiPen's share was still between [redacted] While some of these shares are just under the range of non-contestable demand that I adopt, they are far more supportive of my assessment of significant non-contestable demand than they are of Professor Willig's view that there is very little non-contestable demand. This six month period with high EpiPen shares plainly demonstrates that significant portions of EpiPen demand is not moveable in the short term.

### *3. MedImpact*

88. As I discuss in my Initial Report, Bruce Foster's negotiations with MedImpact provide yet further evidence in support of my view that that Mylan's entrenched share of the EAI Market in the 2013-2015 timeframe was between [redacted] As my Initial Report discussed, while MedImpact represented during its negotiations with Mylan that it believed it could shift substantial market share away from EpiPen to Auvi-Q, Mr. Foster presented [redacted].[158]

89. Professor Willig argues that because Mr. Foster's statement refers to the prior effects of [redacted] This assertion is without merit for several reasons. First, and most obvious, Mr. Foster acknowledged in his deposition that [redacted][160] In other words, Mr. Foster's conclusion that [redacted] and was a relevant data point for MedImpact to consider in deciding whether it was in its financial best interest to do the same in 2013 in favor of Auvi-Q.

90. Second, the fact that Adrenaclick is more similar to EpiPen as a result of its comparable size, features, and instructions suggests that the non-contestable EpiPen share in the Adrenaclick

[157] Willig Report at ¶ 207; Willig backup to ¶ 207.
[158] Scott Morton Initial Report at ¶¶ 80-81; Ayers Dep Ex. 28 [redacted]
[159] Willig Report at ¶ 210.
[160] Foster Dep. at 186-187.

experience discussed in Mr. Foster's email would be *lower* than in a situation where the EpiPen was blocked with a step edit in favor of the Auvi-Q device with its much different shape, features, and instructions for usage.[161]

91. Third, Professor Willig completely ignores other evidence indicating that EpiPen's overall entrenched share in 2013-2015 was actually higher than the [redacted] Specifically, he ignores the fact that low income patients served by Medicaid will generally be more price sensitive than the overall commercially insured population, meaning that entrenched share for those with commercial plans should be higher than for those with Medicaid plans.[162]

92. Moreover, Professor Willig selectively cites one MedImpact document while ignoring others that provide a more complete story: [redacted] Furthermore, and as noted in my Initial Report, Mr. Foster's range was based on Mylan's experience before it engaged in anticompetitive conduct aimed at further entrenching its market share and eliminating competition from Auvi-Q.[164]

93. In sum, Professor Willig's evaluation of Bruce Foster's statements and his objections to MedImpact regarding EpiPen's entrenched share are misplaced.

94. Similarly, Professor Willig's selective citations to various other Mylan and Sanofi internal analyses that assumed higher levels of market share would shift away from EpiPen if it were excluded or non-preferred only further highlights that the documents show widely varying estimates, and do not invalidate the conclusions in my Initial Report based on the evidence.[165]

---

[161] Scott Morton Initial Report at ¶¶ 18-24.
[162] Scott Morton Initial Report at ¶ 152.
[163] Ayers Dep. Ex. 23.
[164] Scott Morton Initial Report at ¶ 152.
[165] Willig Report at ¶¶ 198-201. Professor Willig also ignores other documents supporting my opinions of EpiPen's high entrenched share, including a [redacted]

Indeed, a review of other Mylan internal analyses that Professor Willig ignored shows that Mylan's [redacted][166] Because the bases for these widely varying assumptions are unknown, the evidence cited above and in my Initial Report regarding actual experiences (like EpiPen's market share on ESI's High Performance formulary or on the two CVS formularies that excluded Auvi-Q) and documents that actually explain the basis for conclusions on entrenched share (like Mr. Foster's "talking points" email) are much more reliable and informative.

# VI. FORECLOSURE

## A. MYLAN DELIBERATELY INTENDED TO FORECLOSE SANOFI

95. Professor Willig contends that Auvi-Q's exclusion was driven by PBMs.[167] He claims that Mylan's substantial rebate offers contingent on excluding Auvi-Q were made in response to PBM requests, rather than as part of Mylan's overall anticompetitive scheme. But Mylan's own documents undermine this claim.

96. As discussed in my Initial Report, there is overwhelming evidence that Mylan implemented a deliberate strategy to foreclose Auvi-Q.[168] Mylan recognized that EpiPen faced a real competitor for the first time and that [redacted][169] In response, [redacted][170]

97. Mylan discussed its exclusionary strategy at a series of meetings and sessions as early as 2011 because [redacted]"[171] This

---

[redacted]

[redacted] [redacted] at slide 17 [redacted]

[167] Willig Report at ¶ 116.

[168] Scott Morton Initial Report at Section VI.C.

[169] MYEP00603648. One of Mylan's other experts, Mr. Zieziula, acknowledged that there was not "meaningful competition" in the "EAI class" until a "major player like Sanofi introduced Auvi-Q." Zieziula Report (March 25, 2019), at p. 8.

[170] MYEP00088189, [redacted]

[171] MYEP01033592, at 593.

was a [redacted][172] as even Mr. Robert Coury, Mylan's chairman, was [redacted][173] Fearing that it [redacted][174] Mylan enacted its plan early on to [redacted][175]

98. In furtherance of this plan, Mylan dramatically shifted its contracting strategy in anticipation of Auvi-Q. Prior to 2013, Mylan's PBM contracts rarely referenced rivals.[176] They generally [redacted].[177] That all changed with Auvi-Q as a looming competitive threat. As explained by Mylan: [redacted][178] Mylan proactively began [redacted][179] and to [redacted][180] The goal was to [redacted][181]

99. Mylan implemented its strategy by intentionally structuring PBM contracts to exclude Auvi-Q. With respect to Prime, one of the examples Professor Willig cites, [redacted][182] Mylan quickly added an [redacted].[183] Disadvantaging Auvi-Q's tier placement was

[172] MYEP01033592, at 593.
[173] Coury Dep. Ex. 21.
[174] MYEP00723398.
[175] MYEP00720503, at 504.
[176] As one example, [redacted]
[177] MYEP00491274, at slide 12 [redacted]
[178] MYEP00257559, at 562.
[179] MYEP01066159 [redacted]
[180] MYEP00088189, at 194, 228.
[181] Graybill Dep. Ex. 4.
[182] MYEP00512714 [redacted]
[183] MYEP00087486 [redacted]

not enough, though, and Mylan debuted an even more aggressive exclusionary offer that [redacted]."[184] [redacted][185]

100. In an effort to support his position, Professor Willig notes that Prime, for example, "did not . . . accept the higher rebates Mylan offered to restrict Auvi-Q."[186] But Prime serves as further evidence of Mylan's deliberate strategy. Even when Prime refused Mylan's offer because its plans did not have [redacted][187] Mylan still pushed for exclusivity. Prime explicitly told Mylan that it was not interested in exclusion.[188] Mylan's response was to try again [redacted][189] While Prime ultimately declined, it was not for lack of Mylan's efforts. As Bruce Foster, Mylan's National Account Director, put it, [redacted][190]

101. More generally, after Auvi-Q launched, it became Mylan's policy to place strict conditions on the treatment of Auvi-Q (and other EAI devices) in its contracts in order for PBMs to secure discounts. While Professor Willig tries to attribute Auvi-Q's exclusion to PBMs, these restrictive contracts were the result of Mylan's deliberate strategy.[191] Prime is just one example. When another PBM, Humana, requested [redacted] in 2014, Mylan responded instead with [redacted].[192] In negotiations with Express Scripts, Mylan explained that [redacted]

---

[184] MYEP00256126.
[185] MYEP00256126.
[186] Willig Report at ¶ 116 note 166.
[187] MYEP00500612.
[188] According to Prime: "I have explained to [Mylan] more than once that [redacted] was not viable for Prime's or the Client's business model." PRIME_0011303.
[189] MYEP00620009 (emphasis added).
[190] Graham 30(b)(1) Dep. Ex. 34.
[191] See, for example, Jordan 30(b)(1) Dep. Ex. 12 ("Am I wasting my time trying to get you to commit to an exclusive agreement for EpiPen?"); Anthem Dep. (Minton) at 280 ("Q. So that you – so Anthem was not just looking for [redacted] from drug manufacturers in the EAI class, is that right? A. I don't believe we were seeking out exclusive offers."); CVS Dep at 93-94 ("Q. In May 2013, was CVS only looking for [redacted] from EAI device manufacturers? A. CVS Caremark . . . would have been interested . . . [redacted]).
[192] HUM004351.

[redacted][193] As Bob Potter, Mylan's Senior Vice President for National Accounts, succinctly stated, [redacted][194]

102. In short, Mylan's plan was plainly to drive exclusion in its dealings with PBMs, and when a plan actually allowed Auvi-Q equal access, Mylan [redacted][195] [redacted][196] Professor Willig simply ignores this overwhelming evidence regarding Mylan's intent to foreclose Auvi-Q from the market.

## B. MEASURING FORECLOSURE

103. As discussed above and in greater detail in my Initial Report, Mylan embarked on an anticompetitive course of conduct aimed at foreclosing Auvi-Q from the market. As also detailed in my Initial Report, this plan was successful. Mylan was able to ensure that Auvi-Q was, as a practical matter, not available to significant percentages of the insured population. In response, Professor Willig claims that I failed to provide "a specific measure of the extent to which Sanofi was foreclosed" in my Initial Report.[197] He also contends that I failed to distinguish between formularies that excluded Auvi-Q altogether from those that placed a prior authorization or a step edit on Auvi-Q.[198] Finally, Professor Willig claims that the extent of Auvi-Q's foreclosure was significantly overstated and that it was [redacted] covered lives during the

193 Jones Dep Ex. 12 (emphasis added).
194 MYEP00412405.
195 Jordan Dep. Ex. 29 [redacted]
196 MYEP00142246 at 266 [redacted] MYEP00291173 [redacted]
197 Willig Report at ¶ 236.
198 Willig Report at Section IX.C.3

relevant period."[199] But Professor Willig's foreclosure estimate conflicts with Mylan's own internal estimates.

104. First, there is no need to devise a new foreclosure metric given that Mylan's ordinary course documents have already done this. Mylan regularly tracked its success in excluding Auvi-Q by computing the share of the U.S. population for which Auvi-Q was not covered or subject to step edit or prior authorization restrictions. Mylan management [redacted][200]

- In February 2013, [redacted].[201] Mylan's agreement [redacted][202] As recognized by Mylan, [redacted]"[203]
- In August 2013, [redacted].[204]
- By September 2013, [redacted][205] According to Mylan, [redacted][206] Mylan also identified [redacted].[207]
- In October 2013, [redacted][208]
- One month later, Mylan's [redacted]

[199] Willig Report at ¶¶ 155, 227.
[200] MYEP00892874 [redacted]
[201] MYEP00723720, at 21.
[202] MYEP00723720, at 21.
[203] MYEP00723720, at 21 (emphasis in original).
[204] MYEP00283244, at 262.
[205] MYEP00892874.
[206] MYEP00892874.
[207] MYEP00892874.
[208] MYEP00142246 (emphasis added).

[redacted]"[209] [redacted].[210]

- Later that month, Mylan [redacted]"[211] As summarized, [redacted]"[212] [redacted][213]
- By December 2013, the percentage of excluded or restricted Auvi-Q plans [redacted][214]
- [redacted][215]

[redacted] than Professor Willig's estimates of [redacted]

105. Notably, when assessing its success at hampering Auvi-Q, Mylan [redacted][216] All of these controls successfully curtailed patients' access to Auvi-Q [redacted] Thus, there was no need to individually track or measure foreclosure by each type of control.

106. While Professor Willig provides foreclosure estimates of [redacted] the fact that Mylan [redacted] in the ordinary course discredits his calculation. Mylan's own documents indicate that [redacted]

---

209 MYEP00560488 (emphasis added) [redacted] Dep. Ex. 11.
210 MYEP00560486.
211 MYEP00610727.
212 MYEP00610727.
213 MYEP00610727.
214 MYEP00216560 at 599.
215 PFE_EPIPEN_AT00540546.
216 Patel Dep. Ex. 11 [redacted]

[redacted][217]

107. Because Mylan itself defines, measures, tracks, and proclaims a foreclosure rate, I did not define a separate foreclosure rate in my Initial Report. Instead I reported the foreclosure rate that Mylan itself constructed.[218] I also adopted the definition of foreclosure that [redacted] in this foreclosure measure, which is that Auvi-Q was either [redacted]

108. Professor Willig goes on to assert, without any supporting citation, that I describe offering rebates for preferred formulary position as anticompetitive.[219] This mischaracterizes my testimony: nowhere do I claim that placing products on different formulary tiers is anticompetitive or exclusionary. Rather I consider Auvi-Q to be foreclosed in the same circumstances when Mylan considered Auvi-Q to be foreclosed—[redacted] Professor Willig also claims that I overstate the extent of foreclosure by not distinguishing between when Auvi-Q is not covered as a result of Mylan's exclusionary contracts and when it is restricted through step edits and prior authorizations.[220] But here again, I am following what [redacted] when formulating, implementing, and tracking the success of its exclusionary strategy. [redacted] So again, I am following the characterization of foreclosure that [redacted]

109. Rather than acknowledging the foreclosure measure that [redacted] and tracked, Professor Willig instead offers a lengthy discussion of why Figure 10 in my Initial Report is not an adequate foreclosure measure. Figure 10 does not define and was not presented as a foreclosure measure; instead, as stated in my Initial Report, it shows "the share of covered lives in formularies that had Auvi-Q preferred, non-preferred, not covered, or not listed in the third quarter of 2013,

[217] Arcara Dep. Ex. 18.
[218] Scott Morton Initial Report at ¶ 103.
[219] Willig Report at ¶ 252.
[220] Willig Report at ¶¶ 247-251.

2014, 2015."[221] The Figure was used principally to show the sharp increase in covered lives where Auvi-Q was excluded from formularies in 2014, and the only modest decline in exclusion in 2015.[222]

110. Professor Willig criticizes Figure 10 because it does not distinguish between commercial and non-commercial formularies, nor does it account for formularies where Auvi-Q may not have been covered for reasons other than Mylan's exclusionary conduct.[223] But for the purpose that the figure was intended, namely to show changes in coverage from year to year, these criticisms are irrelevant. If Kaiser, for example, or a non-commercial formulary does not cover Auvi-Q for reasons unrelated to Mylan's exclusionary conduct, then that will be true in each year in the figure. The *changes* in formulary status from year to year are reflective of Mylan's exclusionary conduct, and indicate the large increase in exclusion in 2014, followed by only modest reduction in 2015. Professor Willig's criticisms only arise from his false assertion that the size of the slices in the pie charts in Figure 10 are presented as a foreclosure measure.

111. Professor Willig goes on to claim that the foreclosure measure should be reduced by the extent to which covered lives are non-contestable.[224] According to Professor Willig, if half of lives were non-contestable and if Mylan excluded Sanofi from 20% of covered lives, he suggests that the foreclosure share should be 50% × 20% = 10%. This calculation makes no sense: if Sanofi is excluded from 20% of covered lives, then on average, it is excluded from 1/5th of the covered lives for which it could compete. Thus, the foreclosure share using Professor Willig's own method should be 20%. In short, there is no merit to this criticism, and there is no basis for adjusting Mylan's measure of foreclosure to account only for contestable demand.

112. Finally, Professor Willig asserts that Mylan's PBM contracts that offer rebates in exchange for exclusivity did not foreclose Sanofi because the contracts are of short duration, can be renegotiated, and offer PBMs flexibility.[225] This assertion defies economic logic. If Mylan and a PBM agree to an exclusionary contract with conditional rebates that Sanofi cannot match, then the fact that the contract is of short duration or renegotiable is of no economic significance. Even if the parties negotiate again shortly after they first reach agreement, if the circumstances have not

[221] Scott Morton Initial Report at ¶ 172.
[222] Figure 10 from the Scott Morton Initial Report notes that it combines non-covered and subject to prior authorization or step edit in a single category. As just discussed, this was done to be consistent with how Mylan chose to track its progress in excluding Auvi-Q.
[223] Willig Report at ¶¶ 236-246; 254-259.
[224] Willig Report at ¶¶ 263-266.
[225] Willig Report at ¶¶ 229-232.

changed, the outcome would continue to be that Mylan and the PBM agree to a contract that Sanofi cannot match. The duration of the contract itself has no bearing on the economic reality that Mylan offered discounts in exchange for exclusion that Sanofi could not match.[226] Similarly the fact that the contracts have provisions for flexibility has no bearing if the rebates and price protection offered in exchange for exclusivity are designed (as they were) to incentivize the PBM to choose exclusivity.

### C. OTHER EXCLUSIONARY CONDUCT

113. In my Initial Report, I identified a number of strategies that Mylan adopted along with conditional rebates in exchange for formulary exclusion in order to foreclose Auvi-Q from the EAI market.[227] In general, these other strategies were designed to exploit spillover effects that link patient choices at one PBM to patient choices through other PBMs. Mylan used these additional strategies to increase the entrenched (or non-contestable) share for EpiPen. The higher entrenched share made it more difficult for Sanofi to match the conditional rebates offered by Mylan for exclusivity, and thereby increased the foreclosure effect of the exclusionary contracts. The various components of Mylan's exclusionary conduct, working in concert to increase and exploit Mylan's entrenched share, enabled Mylan to foreclose Sanofi from the EAI market. This is consistent with economic theory of how a monopolist can raise its rivals' costs.[228]

114. Professor Willig adopts a divide-and-conquer approach, taking each of the elements of Mylan's collection of exclusionary strategies and asking whether each one, in isolation, would be sufficient to exclude Sanofi. But the answer to that question is irrelevant: even if the answer were "no," the combined effect of all of Mylan's strategies used in concert was sufficient to successfully exclude Sanofi.

---

[226] *See* Jones Dep. Ex. 11 [redacted] For example, [redacted] MYEP00000538 [redacted]

[227] Scott Morton Initial Report at ¶¶ 132-150.

[228] See Thomas G. Krattenmaker & Stephen C. Salop, "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price," 96 *Yale Law Journal* 209 (1986); Steven C. Salop & David T. Scheffman, "Raising Rivals' Costs," 73 *American Economic Review* 267 (1983); Derek W. Moore & Joshua D. Wright, "Conditional Discounts and the Law of Exclusive Dealing," 22 *George Mason Law Review* 1205 (2015).

115. As also discussed in my Initial Report, the various strategies to increase Mylan's entrenched share take advantage of spillovers in the marketplace. Spillovers reflect that HCPs and patients will be more likely to select a particular EAI device for a patient covered by one formulary if that device is sold more prevalently through other formularies. There are several reasons for this. It follows from the network effects for patient choices, given the training necessary to use specific EAI devices and the fact that a patient in an emergency may need to have the EAI device administered by, for example, a caregiver or school nurse.[229] It also results from HCPs preferring to use products that are widely available, as discussed in Mylan's documents and testimony.[230] As a result of spillovers, increased usage of one EAI device at PBMs in a geographic area will tend to increase usage of that device through other PBMs.

116. This spillover effect is simply a fact about EAI devices, given characteristics such as use during emergencies, the role of training, and patient preferences across attributes like shape and portability; Professor Willig and I agree that the existence of spillovers is not in itself anticompetitive.[231] However, after this is stated in his report, Professor Willig goes on to make a number of erroneous statements that either mischaracterize the evidence for spillovers or the role they play in my analysis.

117. First, Professor Willig criticizes me for not distinguishing between procompetitive and anticompetitive spillovers.[232] This makes no sense: again, spillovers themselves are not anticompetitive or procompetitive, but instead were exploited by Mylan to increase Mylan's entrenched share through a variety of exclusionary strategies. It is those strategies that are exclusionary, not some portion of spillovers.

118. Second, Professor Willig claims that the spillover effect described in my Initial Report is due to doctors having "substantially incomplete information on formulary coverage."[233] Not only does he miss the multiple factors underlying spillovers, but the one he identifies contradicts what I say in my report: "The spillover effect operates in part because formulary decisions are observed both by physicians and other PBMs."[234] That is, rather than relating spillovers to incomplete information

[229] Scott Morton Initial Report at ¶¶ 77-78.
[230] Scott Morton Initial Report at ¶¶ 135-137.
[231] Willig Report at ¶ 273.
[232] Willig Report at ¶¶ 275-277.
[233] Willig Report at ¶ 278.
[234] Scott Morton Initial Report at ¶ 137.

about formulary coverage, I describe doctors as being able to observe this information. This mischaracterization of the source of spillovers renders his discussion irrelevant.

119. Third, Professor Willig challenges the regression I use to confirm the presence of spillovers in the EAI market, but neither of the two criticisms of the regression that he offers are valid.[235] Professor Willig asserts that the measured effect may be capturing correlations unrelated to spillover due, for example, to patient preferences within a state, but fails to realize that the model controls for such correlations by including state fixed effects. The other criticism offered by Professor Willig of the regression is that it cannot distinguish between procompetitive and anticompetitive spillover effects. As just discussed, this is a misunderstanding of the role of spillovers in the marketplace and in my analysis.

120. Finally, Professor Willig does not address the evidence presented in my Initial Report from Mylan's own documents and testimony [redacted][236]

121. Turning to the particular strategies that Mylan used to increase its entrenched share as part of its overall exclusionary course of conduct, Professor Willig again adopts a divide-and-conquer approach, asking whether each element of Mylan's conduct, in isolation, would have an exclusionary effect. Thus his analysis fails to address the proper issue here, which is whether Mylan's conduct, taken as a whole, foreclosed Sanofi from the EAI market. Moreover, Professor Willig fails to recognize (or even consider) that these strategies can have an anticompetitive effect when enacted as part of a broader mix of exclusionary conduct.

122. With that overarching response to Professor Willig's discussion, I now turn to the specific assertions made by Professor Willig regarding these efforts on Mylan's part to increase non-contestable demand as part of its overall exclusionary course of conduct. As discussed in my Initial Report, a key element of Mylan's exclusionary strategy was, as stated in a Mylan document, to

---

[235] Willig Report at ¶¶ 282-283. Professor Ordover offers additional criticisms of my regression model; I will address those when replying to Professor Ordover's report in the next section.

[236] Scott Morton Initial Report at ¶¶ 135-137; Foster Dep. at 278 [redacted] MYEP00611547 [redacted]

[redacted]"[237] Mylan sales reps [redacted][238] Professor Willig defends this as being procompetitive marketing that touted the advantages of Mylan's product over Sanofi's.[239] However, there is a significant difference between a marketing message that explains the benefits of one's own product (including ubiquitous availability) and a message that warns HCPs not to prescribe a competitive product because of limited availability, especially when it is Mylan's own exclusionary contracts that drove the limited availability of Auvi-Q in the first place. This marketing message only served to reinforce the impact of Mylan's exclusionary conduct, and offered no procompetitive benefit.

123. Mylan also [redacted][240] Professor Willig does not attempt to say that such marketing would be procompetitive or to defend it in any way.[241] His only response is to question (without reference to any evidence) whether these deceptive tactics were actually used in the market or how much effect they had. This response falls back into the same divide-and-conquer fallacy discussed above; the appropriate analysis asks whether the collection of strategies used by Mylan collectively excluded Sanofi, rather than trying to assign an impact to each one taken separately. The entirety of Mylan's conduct, both through actions that increased entrenched share and the exclusionary contracts negotiated with PBMs, was sufficient to exclude Sanofi, and again Professor Willig does not even attempt to argue that there was any procompetitive justification for the deceptive messaging passed on from Mylan management to its sales team.

124. The next strategy used by Mylan as part of its overall exclusionary course of conduct was to offer $0 co-pay coupons. Professor Willig argues that such coupons are procompetitive, and I agree that they can, under certain circumstances, be procompetitive (although as I discuss in my Initial Report, the overall competitive benefits of using co-pay coupons is suspect, as they can be used to thwart the ability of a PBM to induce price competition). But like with many other exclusionary tactics used to maintain monopoly power, Mylan as a monopolist was able to take a strategy that

[237] Scott Morton Initial Report at ¶¶ 139-142, quoting MYEP00451143.
[238] MYEP00734988.
[239] Willig Report at ¶¶ 288-290.
[240] Scott Morton Initial Report at ¶ 143.
[241] Willig Report at ¶¶ 286-287.

could be procompetitive when used appropriately in a competitive market and use it as part of its overall exclusionary strategy. This use of the $0 co-pay coupon to thwart price competition, rather than as a form of procompetitive competition, [redacted][242]

125. In a communication to Mylan's sales force announcing Mylan's win in getting Auvi-Q excluded from the UnitedHealthcare formulary, Mylan [redacted] As Mylan put it, [redacted]"[243] Professor Willig challenges the inference that this shows that the $0 coupon is anticompetitive, asserting that it is instead evidence of competition because the same document says that a competitor (presumably Sanofi) [redacted][244] However, that statement is actually an example of the role of the additional exclusionary tactics in the overall exclusionary strategy used by Mylan. As I discuss in more detail below, Mylan's exclusionary contracts took advantage of Mylan's entrenched share to make it unprofitable for PBMs to reject Mylan's conditional discounts and instead accept an offer from Sanofi. In order to win the UnitedHealthcare exclusive, Mylan's negotiating team pointed out the size of Mylan's entrenched share, as augmented by Mylan's $0 co-pay coupons, to convince UnitedHealthcare how costly it would be to reject Mylan's exclusionary contract. Thus the $0 co-pay coupons, as opposed to being procompetitive, were key to making the overall exclusionary strategy work.[245]

126. One last exclusionary strategy discussed in my Initial Report was the nakedly exclusionary contract that schools could sign in order to buy additional EpiPens from Mylan at the greatest discounted price, which was part of Mylan's EpiPen4Schools program.[246] As with Mylan's deceptive marketing, Professor Willig does not attempt to provide any procompetitive justification for this

[242] Scott Morton Initial Report at ¶ 146, quoting MYEP00756222 at 223.
[243] MYEP00756222, at 223.
[244] Willig Report at ¶ 294, quoting MYEP00756222 at 223.
[245] Professor Willig also misunderstands the facts surrounding the $0 co-pay coupon program. He states that the program involved "price concessions (in the form of zero copay coupons) to compete with a rival for a large customer," not understanding that the $0 co-pay coupons were made available market wide, not as a price concession for a specific payer as part of negotiations. Willig Report at ¶ 294.
[246] Scott Morton Initial Report at ¶¶ 148-150.

aspect of the EpiPen4Schools program, saying only that the effect would have been small, given how many schools took advantage of it.[247] But once again, the point is not about the impact of this program in isolation, or whether Mylan did a poor job of pricing the program to induce more schools to agree to the exclusionary restrictions, but rather that this clearly anticompetitive conduct was part of Mylan's overall exclusionary strategy. Professor Willig does not deny that [redacted][248] It is telling that in defense of Mylan's conduct, Professor Willig mentions that the exclusionary offer to schools was discontinued in 2016, after Auvi-Q had been voluntarily recalled from the market and Sanofi had made the decision not to re-enter.[249] It is hardly a defense for an anticompetitive tactic that the monopolist stopped the tactic once the competitive threat had been eliminated—it only serves to reinforce that the program was intended to be part of an overall course of exclusionary conduct aimed at [redacted]"[250]

### D. Tests for Foreclosure

127. In an effort to assess Mylan's actions in the U.S. EAI market, Professor Willig presents two types of price-cost tests in his report, which he purports to use to evaluate whether the conditional discounts in Mylan's contracts with PBMs were procompetitive. However, that Professor Willig turns to these tests to evaluate Mylan's conduct demonstrates that he fundamentally misunderstands the conduct and theory of harm at issue in this proceeding. The tests presented in his report are based on a theory of predatory pricing, not foreclosure. As such, they are incapable of determining whether Mylan's conduct was anticompetitive or whether Mylan's conduct could have foreclosed Sanofi. For the same reasons, Professor Willig's criticisms of the Effective Entrant Burden ("EEB") analysis used in my Initial Report are without foundation.

128. There are two broad categories of anticompetitive monopolization strategies that a monopolist can engage in: predatory pricing and foreclosure.[251] Predatory pricing involves two

---

[247] Willig Report at ¶¶ 301-304.
[248] [redacted]
[249] Willig Report at ¶ 303.
[250] Foster Dep. Ex. 20.
[251] Steven C. Salop, "The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test," 81 *Antitrust Law Journal* 371 (2017) ("There are two overarching law and economics paradigms for analyzing exclusionary conduct in antitrust— predatory pricing and raising rivals' costs (RRC) foreclosure.").

distinct stages of conduct: the predatory stage when the monopolist prices below cost and sacrifices profit in order to exclude a competitor, and a subsequent recoupment stage when the monopolist recoups sacrificed profits by raising prices once competition has been curtailed. Foreclosure encompasses a range of exclusionary conduct that increase the monopolist's current (and future) profits, with no need for a subsequent recoupment phase.

129. The allegation here is that Mylan engaged in foreclosure—not predation. The various components of Mylan's exclusionary conduct were designed to prevent Sanofi from gaining a foothold with Auvi-Q in the U.S. EAI market, while, at the same time, increasing Mylan's current and future profits. As described above, Mylan's U.S. EpiPen profits increased dramatically while Sanofi was selling Auvi-Q, with annual profits in 2013-2015 increasing by 80% relative to 2012 before the launch of Auvi-Q.[252] Clearly there was no need for Mylan to recoup its "losses" during the period when Auvi-Q was on the market.

130. Despite the foregoing, Professor Willig resorts to using price-cost tests to evaluate Mylan's conduct. These price-cost tests presented by Professor Willig were designed to evaluate an allegation of predatory pricing. This is explicitly stated both in Professor Willig's report and in the sources he cites for the tests. To justify using costs of an "equally efficient rival" for the cost side of his price-cost tests, Professor Willig quotes a law review article to say that "[t]hus, a price 'is predatory only if it is reasonably calculated to exclude a rival who is at least as efficient as the defendant.'"[253] Professor Willig refers to or cites authorities describing predatory conduct in at least two other places in his report.[254] Since, as noted above, predatory pricing involves a first stage when the monopolist is pricing below cost to drive out a competitor, a price-cost test has been used to evaluate whether there has been below-cost pricing. But below-cost pricing plays no role in allegations of foreclosure, in which the monopolist is more profitable using foreclosure strategies than not using them. Thus, the price-cost tests presented by Professor Willig are completely uninformative about whether Mylan engaged in anticompetitive conduct by foreclosing Sanofi from the EAI market.

131. More specifically, the first price-cost test used by Professor Willig simply compares Mylan's net price with Mylan's incremental cost, and assesses whether the net price is above or below Mylan's incremental cost. This test entirely ignores the conditional nature of the discounts and, as

[252] Part of the increase in EpiPen profits may have been due to the misclassification of EpiPen with respect to government programs, as noted in my Initial Report. Scott Morton Initial Report at n. 294.
[253] Willig Report at ¶ 168.
[254] Willig Report at ¶ 216 and n. 432.

noted above, is irrelevant as an indicator of foreclosure; it is only informative in evaluating allegations of predatory pricing. The second test presented by Professor Willig is what is known as a discount attribution test. The discount attribution test takes into account Mylan's non-contestable share in computing the discounted price, and allocates the entirety of the discount offered to the contestable portion of demand. However, it is still a predatory pricing test: the only question it answers is whether Mylan was pricing below its costs, not whether the conditional discounts associated with Mylan's exclusionary contracts with PBMs would be able to foreclose Sanofi from the EAI market. I return to Professor Willig's discount attribution test at the end of this Section.

132. Because price-cost tests are, without modification, uninformative for purposes of evaluating foreclosure strategies adopted by monopolists, in my Initial Report, I used the Efficient Entrant Burden or "EEB" test to assess Mylan's conduct. As is evident from the title of the paper that introduced EEB, *A Unifying Analytical Framework for Loyalty Rebates*, the paper synthesizes many insights and approaches to assessing loyalty rebates that have been discussed in the literature (including, among others, papers proposing or evaluating variations of the discount attribution test used by Professor Willig here.). The paper was published in a peer-reviewed journal and built on well-established works.[255] The paper identifies the key determinants of the exclusionary potential of loyalty rebates (or conditional discounts) used by a dominant firm that emerge from this literature. It then incorporates these determinants into the EEB metric, which can be used to assess foreclosure, or the extent to which a dominant firm's conditional discounts disadvantage its competitors. The paper also discusses the relevance of price-cost tests, and shows that EEB can be interpreted as a variation of a price-cost test that is modified so that it can assess foreclosure. The key insight in modifying the price -cost test so that it allows for evaluation of foreclosure, and not just predation, is to use the appropriate measure of cost – long run average incremental cost ("LRAIC"). LRAIC incorporates all the incremental costs associated with the entrant competing against the incumbent firm, such as the costs associated with launching a competitive product.

133. As discussed in my Initial Report, I use EEB to show that Mylan's overall course of anticompetitive conduct imposed a burden on Sanofi that dramatically distorted competition, so that Sanofi could not viably compete in the EAI market. I also explained that Mylan's conduct effectively imposed a tax on sales of Auvi-Q, which again distorted competition and disadvantaged Sanofi. Professor Willig disputes both of these statements, arguing that conditional rebates cannot

[255] See the literature discussion in Fiona M. Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," 81 *Antitrust Law Journal* 777 (2017) at 789-802.

be used to limit the ability of an equally efficient entrant to compete. Professor Willig is incorrect. His analysis hinges on two assumptions, both of which are contrary to the evidence.[256]

134. The first faulty assumption that undergirds Professor Willig's conclusion is that Mylan did not raise the list price for EpiPen in anticipation of offering discounts conditional on excluding Auvi-Q. As I discussed above, Mylan accelerated WAC price increases for EpiPen beyond the rate of increase before Auvi-Q entered. In particular, Mylan raised its semi-annual price increases from 9.9% to 14.9% once Auvi-Q was in the market, and also took an extra, unprecedented third price increase at the end of 2012 just before Auvi-Q entered. These price increases gave Mylan the latitude to offer larger conditional "discounts" in exchange for excluding Auvi-Q. However, these discounts were illusory, since as shown earlier, the net price after all discounts (including rebates, admin fees and price protection) are accounted for never dropped below the level that prevailed prior to Auvi-Q entering the market. In fact, the discounted price was often higher than what the price would have been had Auvi-Q never entered and Mylan continued to offer, consistent with its past practice, lower, unconditional discounts.

135. Professor Willig's second faulty assumption is that Mylan and Sanofi were competing for the entire volume of contestable demand. In other words, he assumes that there are two, and only two, options: either the PBM will sign an exclusionary contract with Mylan, in which case Mylan will supply all of the demand—both contestable and non-contestable—or the PBM will sign an exclusive agreement with Sanofi, in which case Sanofi will supply the contestable demand while Mylan will still supply the non-contestable demand. Again, this is contrary to the evidence here. Other than a few small, high control formularies that were discussed earlier, PBMs did not attempt to exclude EpiPen; rather, if they did not exclude Auvi-Q, they put both EpiPen and Auvi-Q on the formulary (sometimes with Auvi-Q on Tier 3 and EpiPen on Tier 2, and other times with both products on Tier 2).[257] Indeed, there are some PBMs that were not interested in having an exclusive EAI device at all.

---

[256] There are other implicit assumptions that are necessary for Professor Willig's conclusions which I do not discuss here. For example, Professor Ordover has coauthored a paper showing that if building share in one period will tend to increase sales in the next period (which clearly is the case for EAI devices) then a firm with non-contestable share can use loyalty rebates to foreclose an equally efficient competitor. Janusz A. Ordover and Greg Shaffer, "Exclusionary discounts," 31 *International Journal of Industrial Organization* 569 (2013).

[257] See, for example, [redacted] MYEP00270934 [redacted] SAN-EPI-0545282 (Prime recommended placing Auvi-Q on Tier 3 with no restrictions.); MYEP00887472 [redacted]

Their preference was to include both EpiPen and Auvi-Q on formulary, so as to give their customers the choice between the two differentiated products, despite the strong inducements Mylan offered to exclude Auvi-Q.[258]

136. To show that Professor Willig's conclusions hinge on these two faulty assumptions, I turn again to the example that I used in my Initial Report to illustrate EEB, and which Professor Willig uses to suggest that exclusionary discounts cannot disadvantage efficient rivals.[259] In that example, the list price for a two-pack (one unit) of EAI devices is $500, and the plan under consideration has demand of 1000 units per month. Mylan offers a 30% discount off the list price (resulting in a $350 net price) contingent on excluding all other rivals. Consistent with Professor Willig's discussion, suppose that half the demand is non-contestable and the other half is contestable, so that if the plan agrees to an exclusive contract with Mylan, Mylan will get a 100% share, whereas if the plan signs an exclusive contract with Auvi-Q, Sanofi will supply all the contestable demand (500 units), but Mylan will continue to sell all the non-contestable demand (500 units) as patients in the non-contestable portion of demand continue to acquire EpiPens using such alternatives as prior authorization or Mylan co-pay coupons despite the exclusive formulary position negotiated by Sanofi.

137. Consider first Professor Willig's assumption that the only alternative to signing an exclusive contract with Mylan is to sign an exclusive contract with Sanofi, so that all contestable demand is sold either by one seller or the other (but Mylan continues to sell all of the non-contestable demand either way). As an initial matter, it is worth noting that this framework devised by Professor Willig is incomplete, as the PBM would be doing a disservice to itself by only considering competing exclusive offers, particularly when there is significant non-contestable demand. This is the case because, in the event it awards an exclusive to Sanofi, there will still be significant sales of EpiPen, for which the PBM would have to pay full price. A far more rational approach on the part of a PBM would be to seek a range of offers and allow for at least the possibility of having multiple EAI

[258] See, for example [redacted] SAN-EPI-0545282 ("T3 unrestricted access is the status that Auvi-Q has. None of our plans have expressed any interest [in] restricting these products.").

[259] Willig Report at ¶ 160-162; Scott Morton Initial Report at ¶¶ 158-159.

devices on formulary. As noted above, this approach is consistent with reality—whereas Professor Willig's approach of only allowing for exclusivity is not.

138. Even putting this to one side, consider what happens to Professor Willig's analysis when the PBM's alternative to an exclusive contract with Mylan is to place both products on formulary and to provide customers with the choice between the two differentiated products. Suppose that the result from equal placement of the formulary is that EpiPen and Auvi-Q each get half of the contestable demand. In that case, Mylan would supply 75% of all demand (500 units of non-contestable demand plus 250 units of contestable demand) while Sanofi would supply the remaining 25% of demand. If the plan had agreed to exclusivity with Mylan, it would have bought 1000 units from Mylan at $350 each, for a total of $350,000. If the plan rejects Mylan's exclusivity contract and puts both products on formulary, it will pay list price, or $500, for each of the 750 units of demand supplied by Mylan, for total payments to Mylan of $375,000. Thus, even if the plan gets Auvi-Q for free, it still has to pay more for EAI devices than it would under the exclusionary deal offered by Mylan. This clearly demonstrates that the rebates offered by Mylan can be exclusionary, since, in this example, the plan is forced to either pay more for EAI devices or give up the possibility of putting both products on its formulary. It also makes clear that exclusionary rebates function as a tax on buyer's purchases of the entrant's product and raises the total cost of purchases.[260] In this example, there is no positive price that Auvi-Q can offer to plans to induce them to put Auvi-Q alongside EpiPen on the formulary. In other words, the "tax" imposed on Sanofi is so large that Sanofi must pay PBMs to put Auvi-Q on formulary just to make the PBM whole. This illustrates the harm to consumers from Mylan's exclusionary contracts: consumers are forced to either pay more for EAI devices or give up the benefit of choice among competing alternatives.

139. Now consider Professor Willig's second faulty assumption, which is that the list price for EpiPen would be the same whether Mylan engaged in exclusionary contracting or not. In fact, Mylan's concerted program of raising the EpiPen WAC price at a faster rate once Auvi-Q was poised to enter the EAI market led to a significant difference between the WAC price while Mylan was entering exclusionary contracts with PBMs and what the WAC price would likely have been without

---

[260] Note that even the paper that Professor Willig cites for the assertion that exclusivity rebates do not disadvantage an efficient rival recognizes that conditional rebates function as a tax on buyers. Sean Durkin, "The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test," 81 *Antitrust Law Journal* 475 (2017) at 495.

Auvi-Q entry.[261] Professor Willig's conclusions hinge on the assumption of the same list price with or without discounts for exclusivity.

140. To see this, suppose that the $500 list price in the example is an inflated list price to accommodate discounting, and that, in the absence of exclusionary discounts, the list price would have been $350 (the same as the net price with discounting).[262] Consider first the revenues that Mylan would have received if it had not engaged in exclusionary rebates, and had instead simply offered a price of $350 per unit. Under Professor Willig's assumption that the alternative to signing an exclusive contract with Mylan is for the PBM to sign an exclusive contract with Sanofi, Sanofi would then sell the entire contestable share of demand. Accordingly, Mylan would have sold only the 500 non-contestable units at $350 each, for total revenues of $175,000.[263]

141. If Mylan instead offered exclusionary rebates, it would have first raised the list price to $500, then offered a 30% discount to bring the net price down to $350. Under the exclusionary contract Mylan would sell all 1000 units at the $350 net price, for total revenues of $350,000.

142. Comparing the two outcomes, the additional revenues that Mylan earns by supplying the 500 contestable customers under an exclusionary contract are $350,000 - $175,000 = $175,000. In Professor Willig's analysis, the incremental revenues that Mylan earns on contestable customers are reduced because Mylan sacrifices revenues on non-contestable customers when it offers a rebate. But this sacrifice of non-contestable customer revenues is illusory once one takes account of the artificially inflated list price from which Mylan offered discounts. Mylan earns $175,000 in additional revenues on the 500 contestable customers, or $175,000/500 = $350 per customer—the same as the price offered with no exclusionary discounts. In other words, Mylan can engage in exclusionary contracting and capture all contestable demand without any reduction in the price earned per customer. Contrary to what Professor Willig claims, there is no sacrifice of non-contestable demand revenues, and Mylan's 30% discount is not equivalent to having given the PBM a 60% discount on contestable customers.

---

[261] [redacted]

[262] [redacted] *See* Scott Morton Initial Report at ¶¶ 165-166.

[263] Here I am addressing only one of Professor Willig's faulty assumptions at a time. The problems with his analysis are only compounded when both faulty assumptions are dropped.

143. Meanwhile, the analysis for Sanofi is the same as in the earlier reports. If the plan adopts Sanofi's offer, it will buy 500 units at $500 each from Mylan, for a total of $250,000, since it will no longer qualify for Mylan's exclusivity rebate. The plan could pay a total of $350,000 for all 1000 units if it accepts Mylan's loyalty program, so unless Sanofi sells its 500 units for a total payment of $350,000 – 250,000 = $100,000, the total cost to the plan for EAI devices will increase. That implies that Sanofi has to charge a per unit discounted price of no more than $100,000/500 = $200, or 60% off the list price. Sanofi has to counter Mylan's 30% discount with an actual discount of at least 60%, since otherwise the PBM would play less in total for EAI devices by agreeing to buy exclusively from Mylan.

144. Again, contrary to Professor Willig's claims, the revenues that Mylan and Sanofi earn on the contestable units are not equivalent, once the unjustified assumption of a constant list price is removed. While Professor Willig and I agree that in this example Sanofi earns $100,000 on contestable demand given its 60% discount, Mylan can make the PBM an equally attractive exclusionary discount offer and earn $175,000 on contestable demand, not the $100,000 that Professor Willig claims. The exclusionary contract, coupled with "artificial" increases in the list price, tilts the playing field in favor of Mylan.[264]

145. Professor Willig makes two other criticisms of the implementation of the EEB test in my Initial Report. The first is about the share of non-contestable demand in the EAI market. As discussed earlier, this criticism is without merit. The second is that the size of the discounts used in my EEB analysis (20% and 30%) are not representative of the discounts that Mylan actually offered.[265] His Exhibit 10 shows the discount range associated with 17 exclusionary contracts offered to large PBMs. The discount percentage in the Exhibit, however, only shows the rebate percentage, and does not include the value of administration fees and price protection. [redacted] To properly assess whether these two contracts are representative requires a comparison to the total value of rebates, administration fees, and price protection in other contracts.

---

[264] Note that Professor Willig appears to agree that when exclusionary contracts are accompanied by increases in the list price to accommodate discounting, my EEB analysis of the burden imposed on entrants is valid: "Professor Scott Morton's EEB theory relies upon the assumption that the discounts being provided by the alleged monopolist on the non-contestable demand are "artificial," that is that the firm with monopoly power on the non-contestable units raises its list price above the monopoly price and then discounts back to the monopoly price, such that the net price is no lower as a result of the rebate." Willig Report at ¶ 179.

[265] Willig Report at ¶ 213.

146. In one of his other exhibits (Exhibit 11b) Professor Willig provides the necessary information. He computes the total value of rebates, administration fees, and price protection for these same 17 contracts. Figure 3.A reproduces Professor Willig's Exhibit 10, but replaces the value of the rebate with the total value of all discounts and price protection from his Exhibit 11b. I have also added three lines to the Figure: two corresponding to the 20% and 30% discounts I used in my Initial Report, and a third line for the average discount across the 17 contracts, which is [redacted] As is clear from Figure 3.A, the contracts I selected were entirely representative of the broader group of contracts that Professor Willig considers.

[redacted]

147. Professor Willig offers one other overarching criticism of my EEB analysis, which is that it does not provide a bright line to distinguish procompetitive and anticompetitive discounts for exclusivity.[266] First, the question of what level of EEB constitutes anticompetitive conduct should be evaluated in a specific factual context, as I have done. Second, this claim once again reveals Professor Willig's fundamental misunderstanding of the allegations regarding Mylan's exclusionary conduct. Mylan engaged in a number of tactics that together were designed to prevent Sanofi from establishing a foothold in the EAI market. So the relevant question is whether these various tactics, evaluated together, were exclusionary. Professor Willig wants to pick apart the separate elements and ask whether each one individually, considered in isolation, would have been sufficient to

[266] Willig Report at ¶¶ 170-173.

foreclose Sanofi. But that is not the relevant question; even if one or another of the various tactics on its own was not sufficient for exclusion, the total impact of all of them was exclusionary.

148. Nevertheless, in order to evaluate the exclusionary potential of the rebates offered for formulary exclusivity, Professor Willig applies the discount attribution form of a price-cost test to the 17 contracts mentioned earlier, and finds that they all pass his test. As I now demonstrate, this is due to two flaws in Professor Willig's analysis. When corrected, these exclusionary contracts in fact fail Professor Willig's own test. First, Professor Willig's results are driven in large part, by his assumption that only [redacted] of EAI demand is non-contestable—an assumption that, as demonstrated above and in my Initial Report, is belied by the economic evidence. As discussed earlier, the correct share for non-contestable demand, taking into account the various exclusionary tactics that Mylan used to increase the non-contestable share, is in the [redacted]

149. Second, Professor Willig's results hinge on the use of a particular, limited measure of incremental cost. The cost measure that Professor Willig uses is the per-unit cost of goods sold.[267] His justification for using this particular incremental cost metric is that only those costs that are incremental to a PBM contract should be included in testing whether the rebates are procompetitive, and that if the discounted price (attributing all discounts to the contestable share of demand) is above these costs, than an efficient competitor would be able to profitably compete against Mylan.[268]

150. These assertions are in sharp contrast to Professor Willig's comments earlier in his report as well as Professor Ordover's analysis of Sanofi's market performance. Professor Willig refers to several documents indicating that Auvi-Q had low awareness among HCPs and patients, suggesting that Sanofi failed to compete effectively by doing more advertising and promotion.[269] Professor Ordover greatly expands on this point, explicitly tying the lack of awareness to underinvestment in direct-to-consumer marketing, and pointing to other documents suggesting that Sanofi should have done more marketing to be successful.[270] He later observes that Mylan forecasted that Sanofi would spend more on marketing than Sanofi actually spent, suggesting that this contributed to lower

---

[267] Willig Report at ¶ 151.
[268] Willig Report at ¶¶ 178, 217.
[269] Willig Report at ¶¶ 66-67.
[270] Ordover Report at ¶ 27.

Sanofi sales.[271] And he conjectures that there would have been significant marketing costs for Sanofi to re-enter the EAI market after the voluntary recall.[272]

151. In fact, Sanofi spent a great deal on marketing and sales, far more than it had originally forecast would be necessary, as Professor Ordover documents.[273] Sanofi spent more than three times as much on sales and marketing than it did on cost of goods sold. In contrast, Mylan spent less on sales and marketing than it did on cost of goods sold over this same period.[274] As a result, Sanofi's sales and marketing costs per unit sold over the three years it marketed Auvi-Q, which were $215.63 per two-pack, were considerably higher than Mylan's sales and marketing costs per unit sold over the same three year period, which [redacted]. Nevertheless, Professor Willig and Professor Ordover conclude that Sanofi would have had to spend even more on sales and marketing to be successful.

152. However, when it comes to implementing his price-cost test, Professor Willig disregards all costs associated with sales and marketing and incorporates only cost of goods sold. Again, he opines that as long as the rebates associated with Mylan's exclusionary contracts allowed Sanofi to price above cost of goods sold, it would have been able to compete in the market against Mylan. So even if prices were just sufficient to cover Sanofi's cost of goods sold, with nothing left over for sales and marketing, Sanofi should have been able to compete on a level playing field with Mylan. This inconsistent "heads-I-win, tails-you-lose" view of the market, where sales and marketing expenditures are at the same time critical to market success and irrelevant for determining whether an entrant can compete, exposes the inadequacy of Professor Willig's price-cost test to assess whether Mylan's exclusionary contracts could foreclose Sanofi from the EAI market.

153. My EEB paper discusses the role of costs in assessing conditional rebates, and concludes that price-cost tests analogous to predatory pricing tests based on marginal costs are not helpful in assessing such rebates.[275] As summarized in one article quoted in the EEB paper, "The seller's prices can remain well above cost on any measure while still excluding rivals and, in so doing, raising customer prices above competitive levels."[276] The EEB paper then proposes that long run average incremental cost (LRAIC) would be a more appropriate cost measure because it captures

[271] Ordover Report at ¶ 45.
[272] Ordover Report at ¶ 114.
[273] Ordover Report at ¶ 79.
[274] Calculations on file.
[275] Fiona M. Scott Morton and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," 81 *Antitrust Law Journal* 777 (2017), at 796.
[276] Jonathan M. Jacobson, "A Note on Loyalty Discounts," 1 *Antitrust Source* 7 (2010) at 5; quoted in Scott Morton and Abrahamson (2017) at 796.

all the incremental costs that the entrant needs to expend to enter a new market. The paper goes on to show, if one wants to consider foreclosure using a price-cost test framework, the EEB metric can be interpreted as measuring the burden placed on the entrant by the monopolist's conditional rebates relative to the LRAIC.

154. The importance of accounting for all costs needed to enter a market is particularly relevant in this proceeding because an important question is whether Sanofi would have been able to profitably re-enter the EAI market after its voluntary recall in 2015. As I discussed in my Initial Report (and will revisit in the next section) Sanofi evaluated the returns that it would get from re-entering, taking into account that Mylan would continue to use its mix of exclusionary tactics to prevent Sanofi from gaining a foothold in the market, and comparing that to the costs of re-entry, which primarily consist of starting up the Auvi-Q brand again from scratch with all the associated sales and marketing expenses. I concluded that, although Sanofi would have re-entered in the absence of Mylan's exclusionary conduct, that exclusionary conduct made the returns from selling Auvi-Q again insufficient to justify the costs of relaunching the product. These costs of relaunching are the components of LRAIC; the economic interpretation of Sanofi's decision was that net price (given Mylan's conditional exclusionary rebates) would not cover LRAIC. Therefore, to the extent that a price-cost test is informative, the test should use LRAIC, in addition to accounting for Mylan's discounts using some form of discount attribution.

155. I have rerun Professor Willig's incremental cost test, shown in Exhibit 11b of his report, making two changes. First, I change only the contestable share, replacing Professor Willig's contestable share of 90% with a contestable share of [redacted][277] Those results are shown in Figure 3.B. The result is that, even with Professor Willig's measure of costs (Mylan's COGS), several of the contracts fail the test, meaning that the price Sanofi would have had to charge to overcome the competitive burden of Mylan's conditional rebates would not have allowed it to cover even Mylan's COGS, let alone Sanofi's COGS and royalty costs.

---

[277] I use the version of Professor Willig's incremental cost test that includes price protection as part of the rebate, because, as discussed earlier and in my Initial Report, price protection was a significant part of the financial inducement that Mylan used to get Auvi-Q excluded from formularies.

Figure 3.B: Price-Cost Test for PBM Contracts Offering Rebates for Exclusive Formulary Position (January 2013-October 2015) – with Price Protection, Contestable Share 35%

[redacted]

Notes [redacted] share. "Discount off WAC" includes discounts for rebates, admin fees, and price protection.
Source: Willig Report Exhibit 11b.

156. Figure 3.C shows the results of Professor Willig's incremental cost test using a proper value for the contestable share and replacing his COGS cost measure with Sanofi's LRAIC. LRAIC is computed as Sanofi's per-unit operating costs, including sales and marketing costs, over the period when it was in the market. With these two corrections, all of the contracts that Professor Willig analyzes fail his own test. This confirms that not only were Mylan's actions exclusionary (using Professor Willig's own test), but also, given Mylan's exclusionary contracts, Sanofi would have been unable to recover its costs of re-entering the EAI market after the voluntary recall in 2015.

Figure 3.C: Price-Cost Test for PBM Contracts Offering Rebates for Exclusive Formulary Position (January 2013-October 2015) – with Price Protection, Contestable Share 90%

| [redacted] | Sanofi LRAIC | [redacted] |
|---|---|---|
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | $334.55 | [redacted] |
| [redacted] | | [redacted] |

Notes: Assumes [redacted] contestable share. "Discount off WAC" includes discounts for rebates, admin fees, and price protection.
Sources: Sanofi P&L; Willig Report Exhibit 11b.

## E. PRICE WAS NOT MYLAN'S "CLEARLY PREDOMINANT" METHOD OF EXCLUSION

157. Professor Willig also contends that "price is the principal means by which EpiPen was preferred or exclusive on PBM formularies," and thus the "clearly dominant method" by which Mylan excluded Auvi-Q.[278] This conclusion is flawed for several reasons.

158. First, Professor Willig improperly focuses on the rebate percentages to claim that Mylan's conduct centered on price. The problem with Mylan's exclusionary contracts, however, is not the rebate offered in and of itself, or whether the rebate itself was too high for Sanofi to match. Mylan achieved exclusion through the nature of its contracts that referenced rivals and required PBMs to take specific action as to competitive products. Mylan did not simply negotiate preferred formulary position for EpiPen, but instead negotiated exclusive EpiPen formulary status *with Auvi-Q not covered or restricted through step therapy or prior authorization*. Securing the contracted-for

[278] Willig Report at ¶140.

discount, regardless of the percentage, was contingent on the PBM excluding or restricting Auvi-Q and other EAI devices. To provide just one example, [redacted][279] Mylan's contracts succeeded in excluding Auvi-Q not through the actual discount or price offered, but through the conditions placed on that discount.

159. In addition, Professor Willig downplays all of Mylan's other exclusionary conduct independent of its contracting. In my Initial Report, I identified a host of other conduct that Mylan engaged in to foreclose Auvi-Q from the EAI market.[280] To recap, Mylan engaged in deceptive marketing and anticompetitive messaging to healthcare providers.[281] Mylan not only touted its superior formulary placement to physicians and healthcare providers, but also deceptively claimed that EpiPen secured this coverage through advantages [redacted] – rather than through Mylan's exclusionary contracting.[282] Mylan also strategically launched a $0 copay coupon that it leveraged in negotiations with PBMs and utilized to raise Sanofi's costs.[283] Mylan also generated spillover effects to commercial plans by misclassifying EpiPen and making it easier for it to obtain exclusive positions on Medicaid formularies.[284] Finally, Mylan included exclusionary restrictions in its EpiPen4Schools program. Mylan structured its contracts [redacted].[285]

160. The price offered for EpiPen was thus not the "principal" means of exclusion for any, let alone the majority, of Mylan's conduct.

# VII. DAMAGES

## A. SANOFI WOULD HAVE RE-ENTERED THE EAI MARKET

161. As set forth in my Initial Report, the economic evidence is consistent with Sanofi's returning the rights for Auvi-Q to kaléo due to Mylan's anticompetitive behavior, and Sanofi's expectation that

---

[279] May Dep. Ex. 19.
[280] Scott Morton Initial Report at ¶¶ 132-150.
[281] Scott Morton Initial Report at ¶¶ 139-143.
[282] MYEP00252719 [redacted]
[283] Scott Morton Initial Report at ¶¶ 146-47.
[284] Scott Morton Initial Report at ¶ 144, n. 294.
[285] MYEP00090087 at 89 [redacted]

this behavior would continue after a potential relaunch of the product. Absent Mylan's anticompetitive conduct in a but-for world where Auvi-Q was as successful as Sanofi and Mylan had predicted it would be, Sanofi would have had every incentive to reintroduce the product into the market post-voluntary recall. Professors Willig and Ordover offer several criticisms of these conclusions, but these criticisms are misguided for the reasons described below. Most fundamentally, the criticisms of Professors Willig and Ordover generally suffer from one fundamental flaw—they focus on actions or statements that occurred in the actual world, a world that was significantly distorted by Mylan's anticompetitive course of conduct, and from that, attempt to reach conclusions about whether Sanofi would have relaunched Auvi-Q in the but-for world, a world that is free of the anticompetitive conduct. They do this without making any effort to account for the anticompetitive conduct of Mylan and its impact on Sanofi's decision making process.

162. First, Professors Willig and Ordover point to certain testimony by Sanofi witness Peter Guenter in support of their claim that the October 2015 voluntary recall of Auvi-Q was [redacted][286] As an initial matter, as noted above, this ignores that Mr. Guenter's statement was about Sanofi's decision in the actual world infected by Mylan's anticompetitive conduct. Had Auvi-Q been more successful, as it would have been absent Mylan's anticompetitive conduct, Mr. Guenter's testimony explains how Sanofi's decision regarding the relaunch would have been very different. Moreover, Professor Willig and Ordover ignore the remainder of Mr. Guenter's testimony on this very point. As he explained: [redacted][287] Professors Willig and Ordover also simply ignore the testimony of Sanofi witness Patrick Barry, the Sanofi executive who made the recommendation to Mr. Guenter [redacted] and who also testified that Mylan's conduct—not the voluntary recall—[redacted][288] As the foregoing demonstrates, while the voluntary recall was clearly a factor in [redacted], the evidence is consistent with a but-for

[286] Willig Report at ¶ 87; Ordover Report at ¶ 88.
[287] Guenter Dep. at 359.
[288] Scott Morton Initial Report at ¶ 213, n. 404.

world where Auvi-Q would have enjoyed more success due to the absence of Mylan's anticompetitive conduct, the calculus would have been entirely different and Sanofi would have [redacted]

163. Second, Professors Willig and Ordover also cite Peter Guenter's testimony that [redacted].[289] There is no question that relaunching the product after a voluntary recall would have involved certain costs. My model, amended as described below, does exactly this. It accounts for these costs in estimating Auvi-Q's post-relaunch profits in the but-for world and has Sanofi effectively start over, by assuming that Auvi-Q would grow exactly as it was projected to have grown at launch in the but-for world. That said, I disagree with Professors Willig and Ordover to the extent they suggest that relaunch costs or the impact of the voluntary recall would have stopped Sanofi from reintroducing Auvi-Q in a but-for world where Auvi-Q had earned significantly more profits than it actually did. As explained in depth in my Initial Report, Auvi-Q's performance in the actual world in the 2013-2015 time period suffered as a result of Mylan's anticompetitive conduct. My model showed that instead of obtaining profits of $225 million on Auvi-Q in this period in a but-for world absent Mylan's conduct, in the actual world Sanofi lost $103 million.[290] In the but-for world, the additional profits Sanofi earned no doubt would have covered costs associated with the voluntary recall, and I see no economic reason why Sanofi would not have had every incentive in that situation to retain the rights to Auvi-Q and relaunch the product. Indeed, as noted in my Initial Report, even in the actual world Mylan assumed that Sanofi would relaunch Auvi-Q after the voluntary recall.[291]

164. Third, Professors Willig and Ordover's characterization of the costs or reputational impact of the voluntary recall as [redacted] is belied not only by the evidence discussed above, and as set forth more fully in my Initial Report, but also by the fact that EpiPen itself has been the subject of serious manufacturing issues, and yet Mylan has continued to sell EpiPen. As described at length in the contemporaneous report of J. Lawrence Stevens, EpiPen has undergone recalls, including a major worldwide recall of over 1 million units, and its manufacturer, Meridian Medical Technologies, Inc., has even received an FDA

---

[289] Willig Report at ¶ 87; Ordover Report at ¶ 89.
[290] Scott Morton Initial Report at ¶ 211.
[291] Scott Morton Initial Report at ¶ 214.

warning identifying critical manufacturing failures with, and responses to patient complaints from use of, EpiPen.[292] The FDA said these failures led to patient deaths.[293] There also have been significant and well-publicized shortages of EpiPen, requiring some patients to do without their EpiPen for extended periods while waiting for it to come back in stock.[294] Despite these recalls and shortages and the associated reputational harm, EpiPen has enjoyed continued marketability and continues to be prescribed by doctors and used by patients.[295]

165. Nor do the four non-EAI "re-launch analogs" that Sanofi studied prove, as Professor Ordover claims, that "post-recall, Auvi-Q could not have reasonably been expected to achieve anywhere near their pre recall share."[296] Professor Ordover does not consider to what extent those four products, and the competitive context in which they operate, offer any meaningful comparison that would predict the outcome of Auvi-Q's post-voluntary recall relaunch in the U.S. EAI market. As an initial matter, none of the four products are EAI devices, and as I describe earlier in this report—and as Professor Ordover acknowledges—analyzing competitive behavior by pharmaceutical manufacturers requires a detailed analysis of the environment in the particular drug market at issue, which Professor Ordover has not attempted here. In fact, a review of the Sanofi analysis Professor Ordover cites indicates that the four analogue products were recalled and relaunched in situations that differ significantly from Auvi-Q's. The Tysabri and Octagam comparisons, for example, involved an extremely small sample size of total prescriptions when compared with Auvi-Q, and both of those products were recalled due to actual reported clinical events, one of which involved a patient death.[297] Embeda, a Pfizer pain relief drug, had been recalled four times in the year leading up to its 2011 recall, and it was not reintroduced for four years. [298] And Levoxyl, a hypothyroidism drug that was recalled due to pharmacist and patient complaints, had prescriptions that were steadily declining in the five years leading up to its recall, unlike Auvi-Q, whose

[292] Stevens Rebuttal Report at ¶¶ 39-44; Expert Report of Dr. Mary Ann Michelis (Apr. 12, 2019) ("Michelis Rebuttal Report") at ¶ 16.
[293] Stevens Rebuttal Report at ¶ 40.
[294] Michelis Rebuttal Report at ¶ 16.
[295] Michelis Rebuttal Report at ¶ 19.
[296] Ordover Report at ¶ 112, Exhibits 7A and 7B.
[297] SAN-EPI-1234026 at slides 19, 22; "Will Tysabri make it back to market?", available at https://www.marketwatch.com/story/will-biogens-tysabri-make-it-back-to-market (May 12, 2005).
[298] "A Big Pain for Pfizer: Embeda Is Recalled", available at https://seekingalpha.com/article/258536-a-big-pain-for-pfizer-embeda-is-recalled (Mar. 16, 2011).

prescriptions had been increasing prior to its recall, and would have been increasing at an even faster rate in the but-for world absent Mylan's anticompetitive conduct.[299]

166. Fourth, Professors Willig and Ordover's overestimation of the importance of the October 2015 voluntary recall is also evidenced by the fact that kaléo relaunched the product in February 2017.[300] Professor Ordover asserts that kaléo's relaunch of Auvi-Q shows only that a relaunch was viable in the actual world, but that Sanofi nevertheless decided to relinquish the rights to kaléo.[301] I do not disagree that a relaunch by Sanofi was *possible* in the actual world, and nowhere in my Report do I assert otherwise. But the relevant point is—as multiple Sanofi witnesses testified—that while a relaunch may have been economically viable for kaléo given its different strategy and market position, a relaunch was not in the economic interests of Sanofi given Mylan's conduct in the marketplace. Indeed, Professor Ordover recognizes that under kaléo's relaunch, Auvi-Q is a "niche product" that has followed a deliberate high-price, low-volume strategy.[302] And, contrary to Professor Ordover's assertion, the economics literature provides a viable reason why this niche strategy would be a deliberate one: it has long been recognized that a firm entering a market controlled by a large, low-cost supplier may be able to increase profits by deliberately adopting a niche strategy that limits its potential sales in order to induce an accommodating response from the incumbent firm. Otherwise, if the entrant tries to compete head-to-head with the incumbent, it will provoke an aggressive response that reduces the entrant's profits.[303] In short, kaléo's relaunch of the product shows that it was possible to overcome the hurdles inherent in a recall and relaunch in a short time frame, but does not change my opinion that it was reasonable for Sanofi to conclude that a relaunch *by Sanofi*—a firm whose resources, marketing strategies, and opportunity costs differ vastly from kaléo's—would not have been economically successful given Mylan's anticompetitive conduct.

167. Fifth, Professors Willig and Ordover also assert that before the voluntary recall in 2015, Auvi-Q's performance was improving, that Sanofi personnel were "optimistic about the future of Auvi-Q," and that Sanofi had decided to invest more into the product.[304] Professor Ordover asserts that "[t]he only change between when these decisions were made, and when Sanofi chose to return

[299] SAN-EPI-1234026, at slide 21. See also Scott Morton Initial Report at Figure 14.
[300] Scott Morton Initial Report at ¶¶ 26 and 215.
[301] Ordover Report at ¶ 95.
[302] Ordover Report at ¶¶ 101-102.
[303] See Judith R. Gelman and Steven C. Salop, "Judo Economics: Capacity Limitation and Coupon Competition," 14 *Bell Journal of Economics* 315 (1983).
[304] Ordover Report at ¶¶ 90-91; Willig Report at ¶ 86.

the rights, was the recall, yet Professor Scott Morton still arrives at the conclusion that Mylan's allegedly anticompetitive conduct, which was present up until the recall, was the key driver in Sanofi returning rights to kaléo."[305] Professors Willig and Ordover's criticisms are incorrect on several counts.

168. Initially, it is not inconsistent to state on one hand that Sanofi felt optimistic about Auvi-Q and would have stayed in the market even despite Mylan's exclusionary conduct, and on the other hand that it would not be economically feasible for Sanofi to re-enter the market after a voluntary recall, knowing that Mylan's conduct would continue. As Professors Willig and Ordover acknowledge, relaunching the product after the voluntary recall would have involved ramp-up costs. While Sanofi may have still hoped in the actual world before the voluntary recall to eventually achieve profitability despite Mylan's conduct, [redacted].[306] However, as I note above, absent this conduct, Sanofi would have earned significant profits during the 2013-2015 period, and would have expected to earn profits after the relaunch more than sufficient to justify re-entry despite the associated costs.

169. Professors Willig and Ordover also overstate the purported success of Auvi-Q in the 2015 time frame. Notwithstanding statements by Sanofi personnel of optimism or a desire for the product to be successful, as noted in my Initial Report, in the actual world, Auvi-Q lost $103 million.[307] And Auvi-Q's improved formulary coverage in 2015 cited by Professor Willig came at an immense cost. Sanofi was forced to offer what Mylan employees [redacted][308] and Sanofi witnesses testified that access in 2015 came at the cost of "a significantly lower level of profitability given that our rebates having to be in the 30 to 60 percent range for the product."[309] And, as set forth in my Initial Report, Sanofi incurred a $[redacted] million cost by virtue of having to offer points on [redacted] to entice ESI to take Auvi-Q off of its exclusion list.[310]

---

[305] Ordover Report at ¶ 92.
[306] Scott Morton Initial Report at ¶ 213.
[307] Scott Morton Initial Report at ¶ 210.
[308] MYEP00000614 and MYEP00888019. See also Scott Morton Initial Report at ¶ 155.
[309] Denney Dep. at 110. See also Barry 30(b)(6) Dep. at 32 ("So what made sense at launch made less sense after the competitive response to exclude us from the marketplace, and what it required for us to claw back appropriate patient access made it challenging from a P&L perspective.").
[310] Scott Morton Initial Report at ¶ 210.

170. Professor Ordover points to a December 2015 Sanofi slide deck showing several hundred million dollars in discounted cash flow if Sanofi had chosen to relaunch Auvi-Q, which he uses to question whether Sanofi's decision not to relaunch was related to Mylan's anticompetitive conduct.[311] What Professor Ordover fails to mention is that the document is marked as a draft, and there is no evidence that this presentation was ever approved or factored into Sanofi's decision making. It is telling that the financial model in this presentation makes a couple of assumptions that Professor Ordover criticizes elsewhere in his report. One is that Professor Ordover elsewhere insists that the marketing costs for relaunch would have been at least as large as the initial costs when Auvi-Q first entered the market.[312] Sanofi spent $67 million on sales and marketing in 2013, $65 million in 2014, and $78 million in the first nine months of 2015 alone.[313] The December 2015 slides assume that Sanofi would spend $40 million per year on sales and marketing, rising to $43 million after eight years. If the forecast had projected that Sanofi would spend the same annual amount on sales and marketing that it did in 2013-2015, which Professor Ordover claims is the minimum they would need to do, that change alone would wipe out the projected cash flow over the next eight years. In addition, the financial projections in the slide deck do not account for the milestone royalty payments that Professor Ordover criticizes me for overlooking. Ultimately, it is clear that Sanofi did not rely on the projections in this slide deck since it chose not to reenter the EAI market.

171. Finally, my conclusion that the economic evidence is consistent with Sanofi finding it unprofitable to relaunch Auvi-Q given Mylan's exclusionary conduct, but choosing to relaunch in the absence of Mylan's exclusionary conduct, is consistent with the modeling in my Initial Report and this Report. That relaunching would not have been profitable given Mylan's exclusionary conduct is shown by the correction of Professor Willig's discount attribution test in the last section. Given Mylan's conditional rebates, the price that Sanofi could have earned on Auvi-Q was less than the incremental cost of relaunching and selling Auvi-Q. Meanwhile, the damages model from my Initial Report shows that, in the absence of Mylan's exclusionary conduct, there would have been significant profits from relaunching Auvi-Q.[314]

---

[311] Ordover Report at ¶ 96 (citing SAN-EPI-1234026).

[312] Ordover Report at ¶¶ 113-114. Note that this criticism is inapplicable to my damages model, as discussed later, because it is based on sales and marketing expenditures in the face of Mylan's exclusionary conduct rather than the but-for market. However, the criticism would apply to Sanofi's projection of relaunch profits, given that Sanofi anticipated that Mylan would continue to engage in its exclusionary strategy.

[313] SAN-EPI-1148855 (Sanofi's P&L).

[314] Scott Morton Initial Report at ¶ 225.

172. Given the above, it remains my opinion that the economic evidence is consistent with Mylan's anticompetitive conduct successfully hamstringing Auvi-Q's performance in the 2013-2015 time frame, and that, in a but-for world absent this conduct, Sanofi would have had every economic incentive to maintain the rights to Auvi-Q and to reintroduce the product after its voluntary recall.

## B. DAMAGES 2013-2015

173. In order to assess damages, I constructed a model of what Auvi-Q's profits would have been in the absence of Mylan's exclusionary conduct. Professor Ordover makes a number of criticisms of that model, though he offers no alternative basis for determining but-for profits. I have considered his criticisms and find that his criticisms of the model I use to calculate but-for profits are without merit.

### *1. The damages model uses a reliable benchmark for Sanofi profits in the absence of Mylan's exclusionary conduct*

174. To determine Sanofi's profits in the absence of Mylan's exclusionary conduct, I relied on Sanofi's pre-launch forecast of revenues, costs, and profits following entry. The forecast reflects Sanofi's formulation of its competitive strategy, including its pricing, marketing, and other strategic decisions, and projects the sales and profits that will result from those strategies given an anticipated procompetitive response from Mylan. That forecast was the basis for Sanofi's management decisions.[315]

175. As an initial matter, Professor Ordover criticizes my use of Sanofi's forecast as the basis for my damages model based in part on his own view of the testimony of Sanofi's Anne Whitaker.[316] Professor Ordover, however, ignores the fact that Whitaker brought 20+ years of experience to the table with respect to overseeing the Auvi-Q brand launch, including its projections and conducted extensive market research prior to launch, such as personally speaking

[315] Professor Ordover takes issue with the fact that I did not consider the spreadsheet that underlies the Sanofi pre-launch forecast that I relied on. It is not at all clear to me why this is relevant. The forecast that was presented to management for decision-making purposes is the one I reviewed and relied on, and there was nothing on the face of the forecast that gave me any pause or otherwise made me question the numbers presented. See SAN-EPI-0171590 (parent email showing the document I relied on being sent to Anne Whitaker and others); SAN-EPI-0041336 (later version of same document sent to Anne Whitaker). And Professor Ordover has not suggested that there is something in the underlying spreadsheet that would make one question the more summarized results that I relied on. Nevertheless, out of an abundance of caution, I have now reviewed this spreadsheet. As expected, it does not change my evaluation of the Sanofi forecast or any of my conclusions that rely on the forecast. It simply offers more detail that does not impact my analysis in any way.

[316] Ordover Report at ¶ 28.

to PBMs in developing Sanofi's forecasts.[317] Moreover, and as I noted in my Initial Report, to ensure that I was relying on the most reliable forecast prepared by Sanofi, I spoke to Bryan Downey, a former Sanofi vice president and Auvi-Q team leader. He confirmed that the forecast I used was Sanofi's best and most reliable forecast for how Auvi-Q was expected to perform at the time of launch.[318]

176. Professor Ordover claims that I did not consider alternative Sanofi forecasts.[319] However, the only other forecasts he mentions are two forecasts from an outside consulting firm, PBE. These forecasts are based on different assumptions about pricing and other competitive strategies, and did not form the basis for any decisions undertaken by Sanofi. The first PBE forecast was dated prior to the Sanofi forecast and, to the extent Sanofi found it informative, would have been taken into consideration by Sanofi when creating its own management forecast. The second PBE forecast followed the Sanofi forecast but does not contradict the Sanofi forecast: the PBE projections are consistent with some of the alternative projections in the Sanofi forecast based on strategic choices that Sanofi chose not to follow. Hence nothing in the alternative forecasts mentioned by Professor Ordover indicates that the alternatives, rather than the forecast that Sanofi actually used in its management decisions, should be the basis for computing damages.

177. One of the ways I corroborated the Sanofi forecast was to show that the projections of Sanofi's results were comparable to Mylan forecasts. Professor Ordover observes that there are many other Mylan forecasts in the record, but as discussed in my Initial Report, I deliberately chose Mylan forecasts from before it formulated its exclusionary strategy, since that strategy was intentionally designed to impede competition from Sanofi. The only alternative Mylan forecast that Professor Ordover discusses is one from 2012, well after Mylan had begun to formulate its exclusionary response to Sanofi's entry.[320] Professor Ordover also points out that the Mylan forecast assumed that Sanofi would spend more on marketing than in the Sanofi forecast.[321] However, as I discussed earlier, Sanofi actually performed better in 2013, before most of Mylan's exclusionary contracts with PBMs took effect, than Mylan had forecasted. This was despite Sanofi spending less on sales and marketing than Mylan had projected. Sanofi devised ways to market

[317] Whitaker Dep. at 16:5-19:16.
[318] Scott Morton Initial Report at note 392.
[319] Ordover Report at ¶ 36.
[320] Ordover Report at ¶ 46; Scott Morton Initial Report at ¶¶ 101-102.
[321] Ordover Report at ¶ 45.

more effectively and efficiently than Mylan had anticipated. Thus Mylan's estimate of Sanofi's sales and marketing expenditures is not relevant for evaluating the Sanofi forecast.

178. In my Initial Report I examined the Auvi-Q (Allerject) share in Canada as one way of corroborating the market share projections in the Sanofi forecast. The Canadian experience is relevant because it reflects competition between Auvi-Q and EpiPen without the exclusionary conduct used by Mylan in the U.S. I acknowledged in my Initial Report that the Canadian and U.S. market are different in various ways. Nevertheless, it is still informative about how legitimate competition between Auvi-Q and EpiPen would play out—it reflects competition on a level playing field, even though it is not the same playing field. Professor Ordover points out several differences between the U.S. and Canadian markets, but he does not attempt to provide any reason why those differences would bias competition in favor or against either EpiPen or Auvi-Q.

179. As purported evidence that the Canadian EAI market is not a valid benchmark for the U.S. EAI market under legitimate competition, Professor Ordover points to the 2% share for Twinject in the U.S., versus the 10% share for Twinject in Canada.[322] However, the data that Professor Ordover reports is highly misleading. Shionogi sold both Twinject and Adrenaclick in the U.S., and also licensed an authorized generic version of Adrenaclick. Meanwhile, Twinject was the only alternative product to EpiPen sold in Canada.[323] Professor Ordover himself notes elsewhere in his report that the U.S. share for Adrenaclick AG in 2010 reached 9%.[324] Thus the combined share for all of the Shionogi products in the U.S. was quite similar to its share in Canada. Accordingly, the Twinject/Adrenaclick sales experience, rather than invalidating the Canadian comparison, actually helps to validate it.

180. As an additional corroboration of the Sanofi forecast, I examined the Auvi-Q share at formularies that would be to some extent isolated from the impact of Mylan's exclusionary conduct. I had two criteria for suitable formularies for this comparison: the formulary had positioned Auvi-Q and EpiPen equally while Auvi-Q was on the market, and was relatively isolated from the spillover effect of exclusion from other formularies. That led to examining the shares at two formularies: Horizon BCBS, which is large enough within New Jersey to be less impacted by spillover effects from other formularies, and the University of Michigan formulary, which would tend to have lower

[322] Ordover Report at ¶ 51.
[323] That Twinject was the only alternative that gained measurable share in Canada is evident from the document that Professor Ordover cites for market shares: the Twinject and EpiPen shares add up to 100%. PFECAN_EPIPEN_AT00000168, at 170.
[324] Ordover Report at ¶ 129.

spillovers because of its focus on the university population and associated HCPs. Both of these formularies had Auvi-Q shares of over 30% by 2015, consistent with the Sanofi forecast.[325]

181. Professor Ordover first criticizes this comparison because I did not explain why formularies with smaller spillover effects are an appropriate benchmark for all plans.[326] This criticism is based on a misunderstanding of the criteria I used for selecting these formularies. The problem with looking at actual market shares when Auvi-Q was in the market is that those shares are all influenced to one degree or another by Mylan's exclusionary conduct. A plan with low spillovers is the best one can do, not because having low spillovers is representative of other plans, but because having low spillovers would lessen the impact on the plan of Mylan's exclusionary conduct throughout the marketplace. As such, the shares obtained would be more representative of shares obtained by other formularies in the but-for world, regardless of whether those formularies have relatively small or large spillovers. Similarly, because a new entrant necessarily builds share gradually, I was looking for plans where the brands were in equal position throughout the period to lessen the cumulative impact of Mylan's exclusionary conduct in prior years.

182. Professor Ordover then presents shares at a number of other formularies, arguing that they are lower than the shares at Horizon BCBS.[327] However, these comparisons miss one or the other criteria for a suitable benchmark. Exhibit 3 in his report shows shares at a number of other formularies where EpiPen and Auvi-Q have equal placement. However, he does not attempt to identify which of those plans would have relatively smaller impact from spillovers, nor does he only include plans where EpiPen and Auvi-Q have had equal position throughout the time when Auvi-Q was being sold. It is clear from Professor Ordover's Exhibit 3 that Auvi-Q shares vary widely across formularies, ranging from 0% to 100% in particular months. Without a further screen on spillover and equal placement criteria, the average share across all these plans is irrelevant as a benchmark for Auvi-Q's share in the but-for world. In addition, Professor Ordover points to other formularies that either had a larger statewide share than Horizon BCBS or were for University Health Plans. However, he only looks at whether the plans had equal formulary position in any year, ignoring the cumulative effect of Mylan's exclusionary conduct.[328] Thus, shares at these additional formularies are also not informative and do not invalidate the comparisons to the Horizon BCBS and University of Michigan formularies.

[325] Scott Morton Initial Report at ¶ 204, and note 392.
[326] Ordover Report at ¶ 53.
[327] Ordover Report at ¶ 55.
[328] Ordover Report at Exhibit 3.

183. Finally, Professor Ordover misses the point of looking at this real world experience. I do not, as he tries to do, use the real world experience of these two formularies to calculate but-for profits. It would be a mistake to do so because, as noted above, the real-world experience is still impacted by Mylan's anticompetitive conduct, at least to some degree. The purpose of looking at Auvi-Q share at these formularies was to check the reasonableness of Sanofi's pre-launch forecasts where there was reason to believe the impact of Mylan's anticompetitive conduct was somewhat limited. As noted in my Initial Report, the fact that Auvi-Q was able to secure shares in line with what was forecasted provides strong evidence that the Sanofi forecast is reasonable and provides a sound basis for constructing the but-for world.

184. Professor Ordover also claims that the regression model that I presented in my Initial Report contradicts the but-for Auvi-Q shares in my damages model.[329] However, the regression model was not designed to predict shares in the absence of Mylan's exclusionary conduct and cannot be used to do so. Professor Ordover observes that the model predicts that all else being equal, the Auvi-Q share at a plan with formulary restrictions is less than the share when Auvi-Q and EpiPen have equal formulary status by on average about 4 percentage points, while the comparison between being not covered and having equal status has an average share difference of about 5.3 percentage points.[330] He then uses this estimated effect to project the but-for Auvi-Q share. However, the computation only measures the immediate impact of giving Auvi-Q equal status on one formulary in one month; it does not adjust for the cumulative effect of having been off formulary in previous months, nor does it adjust for the spillover impact of other formularies still being restricted, nor does it adjust for the impact of all the other components of Mylan's exclusionary conduct. Therefore, the regression cannot be used as an estimate of Auvi-Q share in the absence of Mylan's exclusionary conduct.[331] Professor Ordover's attempt to do so is misguided.

---

[329] Ordover Report at ¶ 58.

[330] These share shifts vary somewhat in the different specifications of the model in my Initial Report. Note that these share shifts are significant given that the overall average share for Auvi-Q while it was sold by Sanofi was 8.2%, according to IMS data. Calculation on file. Scott Morton Initial Report at ¶ 243. See also Ordover Report at ¶ 59.

[331] Professor Ordover also presents an alternative regression that purports to use a different spillover measure and which he claims shows that there is no estimated spillover effect. However, his alternative spillover measure, the share of formularies that restricted Auvi-Q, makes no sense: spillover refers to the impact of choices of PBMs, HCPs, and patients due to the choices of other PBMs, HCPs, and patients; it is a characteristic of the market for EAI devices and not a function of Mylan's conduct, and it reflects the cumulative impact of many factors on patient choices. Hence, Professor Ordover's alternative regression is uninformative. Ordover Report at ¶61; Scott Morton Initial Report at ¶¶ 49, 77-78, 134-137.

### *2. My methodology for computing lost profits is appropriate*

185. In order to compute lost profits, I take the difference between what Sanofi would have earned based on its forecast and what it actually did earn in the marketplace when faced with Mylan's exclusionary conduct. Professor Ordover criticizes this approach because it does not isolate the impact of Mylan's conduct from other factors that may have impacted sales and profits.[332] Professor Ordover does not propose a methodology for doing what he criticizes me for not doing; rather he identifies several factors apart from Mylan's conduct (marketing and promotion, product acceptance, and pricing) that he asserts contributed to Sanofi's market outcome.

186. In making this criticism, Professor Ordover fails to recognize two key points. First, all of the particular strategic decisions that Sanofi actually made while it sold Auvi-Q were determined in the context of Mylan's exclusionary conduct; there is an endogeneity to all the choices made in the market that cannot be isolated from the competitive environment. Therefore it is meaningless to compare particular aspects of the strategy that Sanofi adopted, such as price or marketing expenditures, to what either Sanofi or Mylan had forecast that Sanofi would do in the market without Mylan's exclusionary conduct, and to claim that failure was due to not carrying out the plan. In the presence of an exclusionary strategy, the plan itself changes.

187. Second, as I have already explained, Sanofi did not underperform due to its own efforts. The combination of pricing, sales and marketing, and other strategies that Sanofi adopted once it entered the market, and the overall desirability of the Auvi-Q product itself, led to Auvi-Q outperforming forecasts when it was first on the market, before the full force of Mylan's exclusionary policies took effect.[333] Therefore, Sanofi did not fail to get established in the market due to any deficiency of either the Auvi-Q product or its sales strategies. As a result, it is reasonable to attribute all of the shortcomings in Auvi-Q's financial performance to Mylan's anticompetitive strategy.

188. This failure to recognize that Mylan's conduct impacted Sanofi's strategic decisions once it was in the market invalidates two other criticisms that Professor Ordover makes of my damages calculations. With regard to marketing expenditures, Professor Ordover observes that Sanofi actually spent far more on sales and marketing expenses than in its forecast, and complains that by comparing forecasted profits to actual profits, my damages model attributes the difference in sales

---

[332] Ordover Report at ¶¶ 37-42.

[333] Professor Ordover acknowledges that Sanofi's Auvi-Q was not underperforming in the first year. Ordover Report at ¶ 42.

and marketing expenses to Mylan's exclusionary conduct.[334] In fact, as I already described, Sanofi did spend heavily on sales and marketing, far more than Mylan on a per-unit basis.[335] It is entirely plausible that this increase from anticipated sales and marketing expenditures was due to counteracting Mylan's exclusionary conduct. Among other things, as described above and in my Initial Report, Mylan [redacted][336] Countering those messages would have required additional expenditures on sales and marketing. Professor Ordover also complains that the per-unit cost of goods sold in the forecast used to estimate but-for profits is lower than Sanofi's actual per-unit COGS, and that I have not explained why that difference in COGS should be attributed to Mylan's conduct. However, there is a simple explanation: the forecast assumes there are scale economies in COGS. Since actual Auvi-Q sales were lower due to Mylan's exclusionary conduct, the actual per-unit COGS is higher than what was forecast. It is completely appropriate to attribute that difference in costs to Mylan's conduct.

### 3. *Additional costs impacting the but-for profits*

189. Professor Ordover disputes my inclusion of $[redacted] million in damages based on [redacted] rebates that Sanofi paid to have Auvi-Q removed from ESI's exclusion list. As set forth below, none of the criticisms offered by Professor Ordover change my opinion that these damages were properly included.

190. First, Professor Ordover cites a single Sanofi email chain from May of 2014, which he states [redacted][337] As Professor Ordover acknowledges, this document does not speak directly to the issue at hand. There is, on the other hand, evidence that directly speaks to the issue—evidence that Professor Ordover ignores. Sanofi witness Anne Whitaker, for example, testified that she met with an ESI representative who said that Sanofi would have to "write a check" to get Auvi-Q back on formulary, and Ms. Whitaker stated that with respect to the additional [redacted] rebate, "my understanding was, in order to put Auvi-Q back on formulary,

[334] Ordover Report at ¶ 79.
[335] Scott Morton Reply Report at ¶ 151.
[336] Scott Morton Initial Report at ¶ 143.
[337] Ordover Report at ¶ 74.

that was what was going to be required."[338] And Sanofi witness Jim Borneman characterized the [redacted] but as "a very desperate move on behalf of the organization and the brand to secure incremental lives for Auvi-Q."[339]

191. Second, Professor Ordover claims that there is insufficient evidence that Sanofi's agreement with ESI required Sanofi to pay [redacted] after Auvi-Q was voluntarily recalled, or that Sanofi in fact made such post-recall payments. With respect to the first point, the very agreement Professor Ordover cites states that ESI is eligible for [redacted] "when Auvi-Q is included on Formulary as of 1/1/2015 and is covered on any tier with unrestricted access."[340] Contemporaneous communications between Sanofi and ESI show that both Sanofi and ESI understood this provision to mean that those formularies that covered Auvi-Q as of January 1, 2015 would be eligible for [redacted] even after Auvi-Q was voluntarily recalled. In November 2015, for example, shortly after the voluntary recall, Kelly Rhodus of ESI wrote to Max Downing of Sanofi, "I wanted to verify that the formularies currently earning [redacted] due to covering Auvi-Q on any tier with Unrestricted access on or before 1-1-15 will not revert to the lower rates due to the recall of Auvi-Q?"[341] Downing replied, "I don't see that this would be a problem, but I know you need confirmation so I will get verification."[342] Later Sanofi emails in 2016 also indicate that [redacted] was still being paid.[343] Given that data showing the actual rebates paid in the second half of 2015 and in 2016 was not available, as explained in my report, I then used the next best predictor—data from the first half of 2015—to estimate the impact over the two-year period, which was $[redacted] million.[344] In short, Professor Ordover does not dispute that the express terms of the Sanofi-ESI rebate agreement conditioned [redacted] on Auvi-Q being on formulary as of January 1, 2015, and does not cite evidence that indicates Sanofi did not pay these additional rebates through 2016. Despite all of this, out of an abundance of caution, I asked to speak with

---

338 Whitaker Dep. at 235-36.
339 Borneman 30(b)(1) Dep. at 139.
340 SAN-EPI_A-0146384-389, at 386.
341 SAN-EPI-0422937.
342 SAN-EPI-0422937.
343 SAN-EPI-0422838; SAN-EPI_A-0037206 (January 5, 2016 calendar invitation "to discuss most recent report and . . . to find out [redacted]); SAN-EPI_A-0141609 at -613 (January 17, 2016 email regarding offers to ESI and stating, "We assume the continuance of [redacted] for plans that had Auvi-q on form prior to recall.").
344 Scott Morton Initial Report at ¶ 210.

someone at Sanofi that is knowledgeable about the specifics regarding these additional [redacted] points. Carrie Siragusa confirmed that Sanofi in fact continued to pay [redacted] through the full 2015-2016 period, and that these additional rebates totalled approximately $[redacted] million. Accordingly, I have not revised my damages model to exclude these amounts.

192. Professor Ordover points out two other costs that would have impacted Sanofi's but-for profits and that were not included in my damages model. One is the contractual milestone royalty payments to kaléo triggered by hitting annual net sales targets.[345] [redacted] In addition, I did not account for any increase in the cost of the voluntary recall of Auvi-Q in the but-for profit projections. With higher sales in the absence of Mylan's exclusionary conduct, the recall costs also would have been higher.[346] With respect to these two issues, I agree with Professor Ordover that an adjustment to my model is warranted to account for these costs. I do so in the revised damages estimate at the end of this section.

## C. Damages 2017-2029

193. In order to project profits for Sanofi following its relaunch of Auvi-Q in the absence of Mylan's exclusionary conduct, I use the same forecast that informed the but-for profits during the 2013-2015 period, adjust the start date and conditions to 2017 when kaléo re-launched Auvi-Q, and project sales and profits through the expiration of the Auvi-Q patent in the first half of 2029.

194. Using the same forecast to reflect relaunch profits is consistent with statements by both Professor Willig and Professor Ordover that Sanofi would have had to "restart from scratch" if it relaunched Auvi-Q.[347] My assumption is that Auvi-Q sales would grow after relaunch at the same rate that they would have after the initial launch of Auvi-Q if Mylan had not engaged in its exclusionary conduct. Thus when Professor Ordover writes that "Professor Scott Morton points to

[345] Ordover Report at ¶ 72.

[346] The increase in recall costs depends on the relative amount of costs that are invariant to sales volume (such as some additional marketing costs to inform patients about the recall) and those that increase with sales volume (such as reimbursements). The but-for recall costs will increase if a larger proportion of the costs vary with volume. Professor Ordover makes the assumption that results in the highest possible but-for recall costs which is that all of the costs vary with volume. As I was unable to find documentation of the fixed versus variable cost breakdown of Sanofi's recall costs, I have adopted Professor Ordover's calculation in my revised damages estimate, which conservatively results in a lower bound for damages.

[347] Willig Report at ¶ 87; Ordover Report at ¶ 89.

no contemporaneous evidence or analyses that support her conclusion that Sanofi would have been able to quickly recover from a complete recall" he is criticizing a conclusion that I did not draw.[348]

195. As discussed in my Initial Report, the most significant difference between the pre-voluntary recall and post-voluntary recall competitive environments, both in actuality and in the but-for market absent Mylan's exclusionary conduct, is the post-voluntary recall presence of generic EpiPen products introduced by both Mylan and Teva. I previously discussed the impact of generic EpiPen competition in my Initial Report, which, as Professor Ordover notes, "cites extensively to Mylan forecasts" to support my conclusions.[349] Professor Ordover does not challenge my assessment of any of those Mylan forecasts.[350] Instead, he points to other forecasts from both Mylan and Sanofi that, he asserts, contradict my conclusions. However, Professor Ordover is incorrect: those documents do not invalidate the projections in my damages model.

196. Professor Ordover is in error for two reasons. The first is that he completely misunderstands my methodology for projecting Auvi-Q's post voluntary recall sales. As described in my Initial Report, the model has unit sales for Auvi-Q at the end of the launch period reach the same level as in Sanofi's launch forecast for 2016, which projected that Auvi-Q would achieve a 40% share in that year.[351] The model then projects Auvi-Q unit sales to increase at the rate of U.S. population growth, or 0.7% annually. I did not project the overall size of the EAI market, and therefore I did not project anything about Auvi-Q's market share. If the overall EAI market grows at a faster rate, then Auvi-Q's share would fall over time.

197. Professor Ordover misunderstands the model; he writes, "Professor Scott Morton assumes that in the but-for world, Sanofi maintains a 40% share of all EAI devices sold from 2021 until Auvi-Q's patent expires in 2029."[352] Again, I made no such assumption in my report. Projecting Auvi-Q's eventual share in 2029 requires an assumption about growth in unit demand for EAI devices, given entry of generic versions of EpiPen and other market developments, and I did not include an assumed rate of market growth in my damages model. Sanofi would maintain a 40% market share only if the overall EAI market also grew at the U.S. population growth rate.[353] As mentioned in my

---

[348] Ordover Report at ¶ 100.
[349] Ordover Report at ¶ 121.
[350] Dr. Navarro, who also criticizes my opinions regarding the impact of generics on Auvi-Q's share, completely ignores these Mylan forecasts that support my assessments. Navarro Report at ¶¶ 124-126.
[351] The launch period is four years in the base damages model, and two years in one of the variations I considered. Scott Morton Initial Report at ¶ 224.
[352] Ordover Report at ¶ 136.
[353] Scott Morton Initial Report at ¶ 224.

Initial Report, EAI unit growth is likely to be higher given continued increases in the population at risk for anaphylaxis and increases in the overall awareness of anaphylaxis.

198. To illustrate the impact of growth of the EAI market on Auvi-Q share, one of the Sanofi forecasts that Professor Ordover discusses in his report, which is a July 2013 long-range plan review for 2014-2018 that considers the impact of Teva's generic version of EpiPen, contains two scenarios for Auvi-Q's projected share.[354] In the first base scenario, the model contains an assumption that EAI units would grow by 8% per year.[355] Scenario #2 considers the impact of increased direct-to-consumer marketing by Sanofi in response to generic entry, and projects that EAI units would grow by 12% in 2014, with the rate of market growth gradually declining to 8% by 2018.[356] If I apply these market growth assumptions to my damages model, the eventual share for Auvi-Q in 2029 would be 16.1% using an 8% annual market growth, and the Auvi-Q share in 2029 would be 14.7% using the market growth trajectory in Scenario #2. Obviously these are far below the 40% share that Professor Ordover erroneously claims I assume.

199. The second error in Professor Ordover's analysis, which I have mentioned before, is that he refers to projections in these other documents that were made based on Mylan continuing to use the same exclusionary strategies. There is no basis to assume that the Auvi-Q share projections, for example, that were made in documents that reflect Mylan's ongoing anticompetitive conduct would still pertain to the market in the absence of those exclusionary strategies. Using share estimates in those forecasts assumes away damages because it projects the same exclusionary conduct in the actual and but-for world. There may be some value to reviewing those forecasts for underlying assumptions (which is how I used the Mylan forecasts referenced earlier in my Initial Report, and is also relevant for market growth projections with generics in the market) but those assumptions must then be applied to a projected marketplace without exclusionary conduct to be useful.

200. Professor Ordover refers to several Mylan and Sanofi forecasts to extract predictions about Auvi-Q share following entry. However, these forecasts all were made in the 2013-2015 period while Mylan was engaged in its exclusionary conduct, so all are share predictions against the backdrop of a marketplace where Mylan is actively working to foreclose Sanofi. The share levels in these forecasts cannot be transferred to the but-for world without exclusionary conduct. Doing so simply assumes the conclusion that Mylan's exclusionary conduct had no impact on Sanofi's sales. Moreover, as just discussed, a decline in Auvi-Q share following generic entry is consistent with my

[354] SAN-EPI-0008536, discussed in Ordover Report at ¶ 125.
[355] SAN-EPI-0008536, at slide 17.
[356] SAN-EPI-0008536, at slide 20.

damages model if the overall EAI market continues to grow at a rate faster than U.S. population growth.

201. Even taking these additional forecasts at face value, Professor Ordover distorts what they conclude about Auvi-Q's market share. For example, Professor Ordover refers to Sanofi's July 2013 long-range plan discussed above, but cites only the estimated demand risk to Auvi-Q's share as a result of generic entry in Scenario #1.[357] He fails to mention that, even with this demand risk, the forecast projects Auvi-Q's share increasing following entry by Teva.[358] If Sanofi were to pursue Scenario #2 (with increased direct-to-consumer marketing) the forecast predicts that Auvi-Q's share would grow faster, even with the Teva generic in the market.[359] Similarly, Professor Ordover refers to a forecast commissioned by Sanofi that projects lower long-term share due to generic entry, but only in the footnote does he mention that this long term share (taking into account Mylan's actual conduct) is between 30% and 33%.[360]

202. Professor Ordover discusses at some length the likelihood that new generic and branded products are likely to come onto the EAI market and take share from Auvi-Q.[361] We do not disagree on this point. As new products come into the market, the overall EAI market will grow and new products will take share away from Auvi-Q. Again, using the forecast EAI market growth from one of the forecasts referenced by Professor Ordover, Auvi-Q's market share would fall over time, ending at around 16% by 2029. These criticisms reflect Professor Ordover's incorrect assertion that my model forecasts an Auvi-Q share of 40% all the way through 2029, and so are misplaced.

203. Professor Ordover also criticizes the assumption that Sanofi would earn profits from sales of Auvi-Q through the expiration of kaléo's patent in 2029, asserting that I fail to consider the impact of a generic version of Auvi-Q. However, such a generic challenge is highly speculative, given the delay and uncertainty involved in such a challenge.[362] To the best of my knowledge, no company to date has challenged the Auvi-Q patent or applied to produce a generic version of Auvi-Q. Accordingly I believe it is far too speculative to try to account for a possible generic Auvi-Q entrant in my damages model.

---

[357] Ordover Report at ¶ 125.
[358] The projected Auvi-Q market share is 15.9% in 2015, the year Teva is assumed to enter, and 19.8% in 2018. SAN-EPI-0008536, at slide 17.
[359] In scenario #2, the projected Auvi-Q market share is 20.1% in 2015 and 26.8% in 2018. SAN-EPI-0008536, at slide 20.
[360] Ordover Report at ¶ 126, referring to SAN-EPI-0170356.
[361] Ordover Report at ¶¶ 115-120, 131-135.
[362] Ordover Report at ¶¶ 136-139.

204. The forecasts that Professor Ordover references in his report are useful for one other purpose. When constructing my damages model, I did not find evidence that was indicative of the projected EAI WAC and net price growth following generic entry. As a result, I presented two damages estimates in my Initial Report that assumed different rates of price growth: the base model had 0% price growth, while one variation assumed 3% price growth.[363]

205. Several of the forecasts that Professor Ordover discusses in his report have assumptions about the rate of WAC and net price growth following generic entry. Mylan's [redacted] document shows an assumption that, with generic competition, the WAC price would increase by [redacted].[364] Sanofi's draft December 2015 forecast, which takes into account generic entry, also projects price growth of 5% per year.[365] The July 2013 Sanofi long-range plan discussed above assumes that [redacted] Given this additional information that I was unaware of at the time I wrote my Initial Report, I have revised my damages model to reflect annual price growth of [redacted]

206. As discussed above, Professor Ordover also notes that there were certain milestone royalty payments that would be triggered that I did not account for in my damages model. I agree that these should be accounted for, and, as a result, I have reduced the profits earned in the 2017-2029 period to [redacted].[366]

207. Finally, another of Mylan's experts, Dr. Karen Becker, suggests that it would have taken longer than the fourteen-month period I used in my Initial Report for Sanofi to relaunch Auvi-Q.[367] I have reviewed her report, as well as that of Mr. Stevens—an FDA and recall expert retained by Sanofi who responds to Dr. Becker's report. According to Mr. Stevens, because at the time of the voluntary recall Sanofi had been marketing and selling Auvi-Q for approximately 34 months, had a manufacturing line in place, and had an experienced marketing team, it would have been able to re-launch Auvi-Q faster than kaléo was able to, as kaléo had to build a commercial and sales team from scratch.[368] This is consistent with the evidence I cited in my Initial Report and what I learned from my conversation with Dr. Huang. Given all of the above, I have revised my estimated time for the relaunch—reducing it from 14 months down to 12 months, consistent with Mr. Stevens' view that

[363] The 3% number came from Sanofi's original Auvi-Q forecast, and does not reflect generic entry.
[364] MYEP00513671, at slide 2.
[365] SAN-EPI-1234026, at slide 5.
[366] Ordover Report at ¶ 99.
[367] Becker Report at ¶ 44.
[368] Stevens Report at ¶¶ 62-64.

Sanofi would be able to relaunch faster than kaléo, and consistent with Sanofi's own expectations and those of Dr. Huang.

### D. REVISED DAMAGES

208. For the reasons discussed in this section, I have revised my estimate of damages from lost profits to reflect four changes:

- [redacted]
- Additional recall costs of [redacted]
- Annual price increase of 5% from 2017 to 2029.
- Relaunch of Auvi-Q in November 2016.

209. Factoring these changes into the damages calculations leads to a revised estimate of total damages of $5,878 million, and net present value of $3,931 million.[369]



Fiona Scott Morton

April 18, 2019

---

[369] Professor Ordover takes issue with applying the discount rate that Sanofi uses for future earnings when computing the net present value of damages already incurred. However, it is appropriate to use the same discount rate since it reflects the opportunity cost of lost earnings using Sanofi's overall weighted average cost of capital. Ordover Report at ¶¶ 81-85.

# EXHIBIT 1

## LIST OF ADDITIONAL MATERIALS CONSIDERED

### I. Publications and Academic Articles


1. Dennis W. Carlton and Michael Waldman, "The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries," 333 *The RAND Journal of Economics* 194 (2002)

2. Derek W. Moore & Joshua D. Wright, "Conditional Discounts and the Law of Exclusive Dealing," 22 *George Mason Law Review* 1205 (2015)

3. Dirk Jenter and Katharina Lewellen, "Performance-induced CEO turnover," (CEPR Discussion Paper No. DP12274. 2017), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1570635

4. Einer Elhauge, "Defining Better Monopolization Standards," 56 *Stanford Law Review* 253 (2003)

5. Fiona M. Scott and Zachary Abrahamson, "A Unifying Analytical Framework for Loyalty Rebates," 81 *Antitrust Law Journal* 777 (2017)

6. Franklin M. Fisher, "Antitrust and Innovative Industries," 68 *Antitrust Law Journal* 559 (2000)

7. George A. Hay, "Market Power in Antitrust," 60 *Antitrust Law Journal* 807 (1992)

8. Janusz A. Ordover and Greg Shaffer, "Exclusionary discounts," 31 *International Journal of Industrial Organization* 569 (2013)

9. Jonathan M. Jacobson, "A Note on Loyalty Discounts," 1 *Antitrust Source* 7 (2010)

10. Judith R. Gelman and Steven C. Salop, "Judo Economics: Capacity Limitation and Coupon Competition," 14 *Bell Journal of Economics* 315 (1983)

11. Maurice E. Schweitzer, Lisa Ordonez, and Bambi Douma, "Goal Setting as a Motivator of Unethical Behavior," 47 *Academy of Management Journal* (2017)

12. Michael C. Jensen and Kevin J. Murphy, "Performance Pay and Top-Management Incentives," 98 *Journal of Political Economy* 225 (1990)

13. Sean Durkin, "The Competitive Effects of Loyalty Discounts in a Model of Competition Implied by the Discount Attribution Test," 81 *Antitrust Law Journal* 475 (2017)

14. Steven C. Salop, "The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test," 81 *Antitrust Law Journal* 371 (2017)

15. Steven C. Salop & David T. Scheffman, "Raising Rivals' Costs," 73 *American Economic Review* 267 (1983)

16. Steven N. Kaplan, "Executive Compensation and Corporate Governance in the U.S.: Perceptions, Facts and Challenges," (National Bureau of Economic Research Working Paper No. 18395, 2012), available at https://www.nber.org/papers/w18395.pdf

17. Thomas G. Krattenmaker & Stephen C. Salop, "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price," 96 *Yale Law Journal* 209 (1986)

## II. Deposition

1. Deposition of Fiona Scott Morton (with Exhibits)

## III. Calls

1. Call with Carrie Siragusa, April 17, 2019

## IV. Expert Reports

1. Expert Report of Dr. Fiona M. Scott Morton, February 4, 2019 (and materials cited therein)

2. Expert Report of Dr. Janusz A. Ordover, March 25, 2019 (and materials cited therein)

3. Expert Report of Dr. Mary Ann Michelis, February 2, 2019

4. Expert Report of Dr. Thomas Varner, February 4, 2019 (and materials cited therein)

5. Expert Report of Gary Zieziula, March 25, 2019 (and materials cited therein)

6. Expert Report of Karen M. Becker, Ph.D., March 25, 2019 (and materials cited therein)

7. Expert Report of Michael S. Blaiss, M.D., March 25, 2019 (and materials cited therein)

8. Expert Report of Robert P. Navarro, March 25, 2019 (and materials cited therein)

9. Expert Report of Robert Willig, Ph.D., March 25, 2019 (and materials cited therein)

10. Rebuttal Expert Report of J. Lawrence Stevens, April 13, 2019 (and materials cited therein)

11. Rebuttal Expert Report of Dr. Mary Ann Michelis, April 12, 2019 (and materials cited therein)

## V. Data

1. Data and Materials accompanying Expert Report of Robert Willig, Ph.D

2. Data and Materials accompanying Expert Report of Dr. Janusz A. Ordover

## VI. Other Documents

1. All documents cited in report

2. "A Big Pain for Pfizer: Embeda Is Recalled", available at https://seekingalpha.com/article/258536-a-big-pain-for-pfizer-embeda-is-recalled (Mar. 16, 2011)

3. "FTC Gives Final Approval to Lilly Order; Pledges Continued Monitoring for Anticompetitive Practices" (July 31, 1995)

4. "Will Tysabri make it back to market?", available at https://www.marketwatch.com/story/will-biogens-tysabri-make-it-back-to-market (May 12, 2005)

5. Auvi-Q, "About Auvi-Q," https://www.auvi-q.com/about-auvi-q

6. FTC v. Mallinckrodt ARD Inc., No. 1:17-cv-120 EGS (Filed Jan. 25, 2017);

7. In re *Glaxo Wellcome plc and SmithKline Beecham plc*, Dkt. No. C-3990 (filed Jan. 30, 2001)

8. In re *Merck & Co. and Merck-Medco Managed Care, LLC*, Dkt. No. C-3853 (Filed Feb. 18, 1999)

9. In the Matter of Mylan Inc., Aglia Specialties Global Pte. Limited, Agila Specialties Private Limited, and Strides Arcolab Limited, Dkt. No. C-4413 (Filed Sept. 26, 2013)

10. In the Matter of Mylan N.V., Dkt. No. C-4557 (Filed Nov. 2, 2015);

11. In the Matter of Mylan N.V., Dkt. No. C-4590 (Filed July 26, 2016)

12. Mylan, "Mylan Reports Fourth Quarter and Full Year 2018 Results and Provides 2019 Guidance" (Feb. 26, 2019), http://newsroom.mylan.com/2019-02-26-Mylan-Reports-Fourth-Quarter-and-Full-Year-2018-Results-and-Provides-2019-Guidance

13. Mylan Stock Information, http://investor.mylan.com/stock-information

14. Riley Griffin, "Mylan Drops Most in Three Years Despite Vow of Shift" (Feb. 26, 2019), https://www.bloomberg.com/news/articles/2019-02-26/mylan-plunges-as-drugmaker-predicts-its-2019-profits-will-suffer

15. Tammie Smith, "Richmond-based Kaleo's Auvi-Q epinephrine injector returning to market Feb. 14," *Richmond Times-Dispatch*, Jan. 19, 2017, available at https://www.richmond.com/business/local/richmond-based-kaleo-s-auvi-q-epinephrine-injector-returning-to/article_04442c78-220d-53bd-ac2e-fb4a222889e3.html

16. U.S. Census Bureau, "National Population Totals and Components of Change: 2010-2018," https://www.census.gov/data/tables/time-series/demo/popest/2010s-national-total.html#par_textimage_2011805803

17. U.S. Department of Justice, "Mylan Agrees to Pay $465 Million to Resolve False Claims Act Liability for Underpaying EpiPen Rebates, https://www.justice.gov/opa/pr/mylan-agrees-pay-465-million-resolve-false-claims-act-liability-underpaying-epipen-rebates

18. U.S. Securities and Exchange Commission, U.S. EpiPen Profitability Analysis, https://www.sec.gov/Archives/edgar/data/1623613/000119312516719397/d265624dex991.htm

## VII. Bates-Stamped Documents

1. EAI00221815
2. HUM004351
3. MedImpact_00044
4. MME-EpiPen 006955
5. MYEP00000538
6. MYEP00000614
7. MYEP00069046
8. MYEP00079145
9. MYEP00082769
10. MYEP00086241
11. MYEP00086244
12. MYEP00087486
13. MYEP00088189
14. MYEP00090087
15. MYEP00131233
16. MYEP00142246
17. MYEP00148006
18. MYEP00151620

19. MYEP00164555
20. MYEP00190937
21. MYEP00191073
22. MYEP00213255
23. MYEP00216560
24. MYEP00217675
25. MYEP00238586
26. MYEP00244410
27. MYEP00252719
28. MYEP00256126
29. MYEP00257559
30. MYEP00270934
31. MYEP00270995
32. MYEP00283244
33. MYEP00291173
34. MYEP00377967
35. MYEP00412405
36. MYEP00420454
37. MYEP00451143
38. MYEP00487195
39. MYEP00491274
40. MYEP00500072
41. MYEP00500612
42. MYEP00512714
43. MYEP00513671
44. MYEP00531461
45. MYEP00560486
46. MYEP00560488
47. MYEP00602480
48. MYEP00603648
49. MYEP00603858
50. MYEP00604253
51. MYEP00610727
52. MYEP00611547
53. MYEP00620009
54. MYEP00623587
55. MYEP00624286
56. MYEP00624431
57. MYEP00629734
58. MYEP00720503
59. MYEP00723398
60. MYEP00723720
61. MYEP00723729
62. MYEP00734988
63. MYEP00744315
64. MYEP00756222
65. MYEP00887472
66. MYEP00888019
67. MYEP00892874
68. MYEP01032076

69. MYEP01033592
70. MYEP01050302
71. MYEP01066159
72. MYEP01123109
73. MYEP01145040
74. MYEP01147786
75. MYEP01246195
76. MYEP01385719
77. PFE_EPIPEN_AT00540539
78. PFE_EPIPEN_AT00540546
79. PFECAN_EPIPEN_AT0000 0168
80. PRIME_0011303
81. PRIME_0011993
82. PRIME_0013479
83. SAN-EPI_A-0037206
84. SAN-EPI_A-0059425
85. SAN-EPI_A-0093244
86. SAN-EPI_A-0141609
87. SAN-EPI_A-0146384
88. SAN-EPI-0000145
89. SAN-EPI-0002167
90. SAN-EPI-0002512
91. SAN-EPI-0008536
92. SAN-EPI-0014223
93. SAN-EPI-0041336
94. SAN-EPI-0052798
95. SAN-EPI-0170356
96. SAN-EPI-0171590
97. SAN-EPI-0171591
98. SAN-EPI-0232437
99. SAN-EPI-0422838
100. SAN-EPI-0422937
101. SAN-EPI-0544974
102. SAN-EPI-0545282
103. SAN-EPI-1148855
104. SAN-EPI-1234024
105. SAN-EPI-1234026
106. SANOFI0_10659_00 002872