# EXHIBIT 1

**In The Matter Of:**

*In Re -*

*EpiPen Marketing*

---

*Thomas Varner, Ph.D.*

*May 29, 2019*

*Highly Confidential - For Attorneys Eyes Only*

---

LEXITAS™

*Min-U-Script® with Word Index*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

---------------------------- )
IN RE EPIPEN (EPINEPHRINE )CIVIL ACTION NO.
INJECTION USP) MARKETING, )2:17-md-02785-DDC-TJJ
SALES PRACTICES AND )MDL NO. 2785
ANTITRUST LITIGATION, )
---------------------------- )

DEPOSITION OF THOMAS VARNER, Ph.D.
Washington, D.C.
May 29, 2019

REPORTED BY: Tina Alfaro, RPR, CRR, RMR

Videotaped deposition of THOMAS VARNER, Ph.D., held at the offices of:

Robbins Russell Orseck Untereiner & Sauber
2000 K Street, NW
Washington, D.C. 20006

Taken pursuant to notice before Tina M. Alfaro, a Notary Public within and for the District of Columbia.

APPEARANCES:

ON BEHALF OF THE CLASS PLAINTIFFS:

ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER & SAUBER, LLP

BY: RALPH MAYRELL, ESQ.
LEE FRIEDMAN, ESQ.
2000 K Street, NW, 4th Floor
Washington, D.C. 20006
(202) 775-4526

ON BEHALF OF THE SANOFI DEFENDANTS:

WEIL GOTSHAL & MANGES, LLP

BY: LISA MADALONE, ESQ.
ROBERT TAYLOR, ESQ.
767 Fifth Avenue
New York, New York 10153
(212) 310-8315

ALSO PRESENT: Bradley Matta (Mylan)
Glen Fortner (videographer)

BY THE WITNESS:
A. Excuse me. I was just refreshing my memory what those were because I know I wrote about them.
Q. Sure. Take your time.
A. The counterclaim allegations.
(Witness reviewing document.)
BY THE WITNESS:
A. So I found where I wrote about it. It was in my first report, paragraph 28. This was my understanding and this comes from the Mylan countercomplaint. Okay. I've refreshed my memory. So please go ahead and ask the question again.
Q. Is it your opinion that the statement that patients overwhelmingly prefer AUVI-Q could have caused a physician to prescribe an AUVI-Q?
MR. MAYRELL: Objection, outside the scope.
BY THE WITNESS:
A. It could.
Q. Do you know either way?
MR. MAYRELL: Same objection.
BY THE WITNESS:
A. Again, I think my opinions are expressed in the report.
Q. So do you have an opinion either way whether the statement that patients overwhelmingly

prefer AUVI-Q could have caused a physician to prescribe an AUVI-Q?

MR. MAYRELL: Same objection.

BY THE WITNESS:

A. I've outlined my opinion on damages and that reflects all of the allegations here.

Q. I'll ask again. Do you have an opinion on whether the statement that patients overwhelmingly prefer AUVI-Q could have caused a physician to prescribe an AUVI-Q?

MR. MAYRELL: Same objection.

BY THE WITNESS:

A. I think it's very possible they could have based on the evidence and the testimony that I've seen. I haven't gone beyond that.

Q. And do you think it's possible that they could not have based on the evidence and testimony that you've seen?

MR. MAYRELL: Same objection.

BY THE WITNESS:

A. I think the same -- the same opinion applies.

Q. So is your opinion that it's possible that a physician could have prescribed an AUVI-Q in response to the statement that patients

overwhelmingly prefer AUVI-Q?
A. Based on the evidence, yes.
Q. But you're not offering an opinion yes or no either way, correct?
A. I'm not quantifying the percentage, I haven't quantified that.
Q. So is it your opinion that the statement that AUVI-Q is a talking EpiPen could have caused a physician to prescribe an AUVI-Q?
A. It could have.
Q. And what's your basis for that?
A. My review of the -- the evidence and testimony in this matter.
Q. Is it your opinion that the statement that AUVI-Q was a talking EpiPen could have not caused a physician to prescribe an AUVI-Q as well?
A. Again, it's the same answer as before.
Q. And what was that answer?
A. The answer is that it may have caused it, it may have caused additional sales of the AUVI-Q product.
Q. But you're not testifying that it would have caused additional sales of the AUVI-Q product, right?
A. I'm not quantifying any numbers.

Q. I'll ask again. But you're not testifying that it would have caused additional sales of the AUVI-Q product, right?
MR. MAYRELL: Objection, form.
BY THE WITNESS:
A. Well, I -- I think that it would have. Looking at the total body of evidence, I think that certainly other people thought that the information would have and I think it's -- it's reasonable to say that it could have. That's the basis for this.
Q. And what's your basis for thinking it would have caused a physician to prescribe an AUVI-Q?
A. If you -- first the documents themselves talk about that, and then Mr. Ziezula's opinion, he talks about the standards and practices and -- and the widespread nature of the false representations.
Q. So you're relying on Mr. Ziezula's reports for the opinion that these statements could have caused physicians to prescribe an AUVI-Q?
A. In part.
Q. What's the other part?
MR. MAYRELL: Objection, form.
BY THE WITNESS:
A. Just the body of -- of documents and other testimony in this matter.

Q. Is physician marketing an area of your expertise?
A. As it relates to general economic questions it would be, but I don't have specific expertise in, I'll call it, the technical side of physician marketing.
Q. Are you qualified to testify about physician prescribing behavior?
MR. MAYRELL: Objection, form.
BY THE WITNESS:
A. Only as it relates to general economic questions that I've addressed in my report.
Q. Are you qualified to testify about the types of statements that could convince -- convince a physician to prescribe a drug product?
A. Not specifically. Again, I'm not a medical practitioner, I'm not a physician. So I can't get in the heads of physicians, but as it relates to general economic questions, I do have an expertise in -- in that area.
Q. Is it your opinion that the statement that AUVI-Q is the first and only device with a retractable needle could have caused a physician to prescribe an AUVI-Q?
A. Based on the documents and testimony it --

MR. MAYRELL: Objection, form.
BY THE WITNESS:
A. You can get the number based on the NPA data from IMS.
Q. What economic expertise did you provide in showing a sales number for AUVI-Q that's available from third-party data?
A. It's more than just collecting the data. There's the market share apportionment, there's understanding which products are at issue here. It's not just copying a number from a third-party data vendor.
Q. And what did you mean by "the market share apportionment"? What are you referring to?
A. That's my exhibit -- I haven't memorized them off the top of my head. I believe it's 6.3 maybe in my first report. Yes, I got it right. Exhibit 6.3 in my February 4th report, that's the market share apportionment I did looking at the but-for world in which AUVI-Q is not in the market. Again, the assumption here for the purposes of this initial report is a hundred percent of AUVI-Q is removed from the market.
Q. So in this exhibit you reapportioned all --
A. Excuse me. I said that incorrectly. It's

really the assumption that the false and misleading representations resulted in the AUVI-Q sales, and absent the false and misleading representations the assumption is for the initial report the burden of the Plaintiff is only to show those sales.

Q. Is it your testimony that if Sanofi had not made the alleged false and misleading statements it would not have sold a single unit of AUVI-Q?

A. It's my opinion that it is the burden of the Plaintiff to only show that those sales occurred and then the burden of the Defendant under the Lanham Act to make any deductions that are attributable to the wrongful acts.

MS. MADALONE: Objection, nonresponsive, move to strike the answer.

MR. MAYRELL: Disagree with your objection.

BY MS. MADALONE:

Q. Is it your testimony that if Sanofi had not made the alleged false and misleading statements it would not have sold a single unit of AUVI-Q?

A. I don't know that to be true. That was the basis for the assumption in this report, this opening report.

Q. So it's not your testimony, then, if Sanofi had not made the alleged false and misleading

statements it would not have sold a single unit of AUVI-Q?

MR. MAYRELL: Objection, form.

BY THE WITNESS:

A. It's my understanding I just have to show sales. Normally in a Lanham Act case the Defendant would submit their report with another opinion of what the apportionment should be, and then I would reply to that. In this case Dr. Wiggins didn't do that.

MS. MADALONE: Objection, move to strike as nonresponsive.

MR. MAYRELL: We disagree with your objection.

BY MS. MADALONE:

Q. Dr. Varner, did you come to the opinion or the conclusion that if Sanofi had not made the alleged false and misleading statements that it would not have sold a single unit of AUVI-Q?

A. I believe I said earlier that it's probably not a hundred percent -- it's probably not a hundred percent of their sales that would be -- that would not have occurred, but as I say in my second report, it's not zero percent either.

Q. So you do believe that it's likely Sanofi

made at least some sales that were unrelated to the alleged conduct?

MR. MAYRELL: Objection, form.

BY THE WITNESS:

A. Could you say that one more time, please.

Q. Sure. So your opinion is that it's likely Sanofi made at least some sales that were unrelated to the alleged false and misleading statements?

MR. MAYRELL: Objection, form.

BY THE WITNESS:

A. Yes, I think that's possible.

Q. Okay. But you didn't calculate that portion, correct?

A. Correct.

Q. Is it your testimony that the claim that AUVI-Q was the first and only voice-guided EAI device wouldn't be a basis for even a single AUVI-Q sale?

MR. MAYRELL: Objection, form.

BY THE WITNESS:

A. So we're just talking about one feature of the AUVI-Q; is that what you're getting at?

Q. Sure.

A. Okay.

MR. MAYRELL: Objection, form.

BY THE WITNESS:
A. If you could please ask that again.
Q. Is it your testimony the claim that AUVI-Q was the first and only voice-guided EA device wouldn't be a basis for a single AUVI-Q sale?
MR. MAYRELL: Same objection.
BY THE WITNESS:
A. I didn't analyze that.
Q. You reviewed forecasts and a number of research documents prepared by Mylan and Sanofi in this case, right?
A. What exactly do you mean by research documents?
Q. Strike that. I'll ask it in a different way.
You reviewed forecasts prepared by Mylan and Sanofi in this case, right?
A. Yes.
Q. Having reviewed those forecasts, do you think it was accurate to assume that Sanofi made zero sales unrelated to the alleged statements?
MR. MAYRELL: Objection, form.
BY THE WITNESS:
A. So I'm having trouble connecting the two parts of your question. So the second part was --