# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | CASE No. 2:17-md-2785<br>CASE No. 2:17-cv-2452 |

SANOFI-AVENTIS US, LLC,

   *Plaintiff*,

v.

MYLAN INC.; and
MYLAN SPECIALTY, L.P.,

   *Defendants*.

**EXPERT REPORT OF DR. ROBERT P.  NAVARRO**

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

**<u>TABLE OF CONTENTS</u>**

<div align="right">

**Page**

</div>

I.     INTRODUCTION ...............................................................................................1

     A.     Credentials and Qualifications ...............................................................1

     B.     Allegations .............................................................................................2

     C.     Assignment ............................................................................................2

     D.     Summary of Opinions ............................................................................2

II.     OVERVIEW OF PRESCRIPTION DRUG BENEFIT MANAGEMENT ........4

     A.     Overview of Managed Care ...................................................................4

     B.     Overview of Pharmacy Benefit Managers and Health Plans..................5

III.     HEALTH PLANS AND PBMS EMPLOY SEVERAL STRATEGIES TO MANAGE CUSTOMER COSTS .....................................................................7

IV.     HEALTH PLANS AND PBMS OFFER SEVERAL DIFFERENT INSURANCE BENEFIT DESIGNS TO MEET CUSTOMER NEEDS ..................................10

     A.     Health Plans and PBMs Use Benefit Design Options To Achieve Customer Cost Management and Benefit Needs..................................................10

     B.     Health Plans Offer Fully Insured and Self-Funded Insurance Contracts..............11

V.     PBMs and Health Plans Manage Drug Formularies to Control Drug Costs.....................12

     A.     Formularies are Important Pharmacy Benefit Management Tools to Control Drug Costs for Purchasers and Insured Consumers................................12

     B.     PBMs and Health Plans Develop Several Standard Formularies and Custom Formularies to Satisfy Customer Cost and Benefit Needs.....................14

     C.     Health Plans and PBMs Undertake Comprehensive and Rigorous Scientific Analyses When Evaluating Drugs for Inclusion on Formularies .........................18

     D.     PBMs and Health Plans Make Clinical and Financial Determinations When Deciding Whether to Add A New Drug to The Formulary ...................20

VI.     PBMS NEGOTIATIATE PRICE CONCESSIONS FROM MANUFACTURERS TO REDUCE DRUG COSTS ............................................................................21

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

    A.     The Published List Price (WAC) is not a Retail Price Paid by Insured Consumers .................................................................................................21

    B.     Rebates Reduce the Net Prescription Costs and Overall Pharmacy Program Costs to Payors and Insured Consumers ...............................................22

    C.     Rebate Negotiations to Achieve the Lowest Net Prescription Cost are a Critical Component of Formulary Coverage Decisions .........................................25

    D.     PBMs Rebate Agreements with Manufacturers and Bid Grids ............................28

VII.   PBMS HAVE THE POWER TO EXTRACT MANUFACTURER REBATES AND IMPACT MANUFACTURER MARKET SHARE AND SALES .........................35

VIII.  GENERIC DRUGS PLAY AN IMPORTANT ROLE IN COST MANAGEMENT ........................................................................................................39

IX.    SPECIFIC RESPONSES TO SANOFI'S ALLEGATIONS AND PROFESSOR SCOTT MORTON'S EXPERT REPORT .........................................................................40

    A.     Mylan Followed Common Business Practices Employed By Sanofi And Other Manufacturers .................................................................................40

    B.     PBMs Made Independent Coverage Determinations and Could Have Moved Against EpiPen In Favor Of Auvi-Q .......................................................45

    C.     Professor Scott Morton Fails To Consider Potential Impact of Generic EAI Device on Auvi-Q Share .....................................................................................50

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

## I.   INTRODUCTION

### A.  Credentials and Qualifications

1.   I am a Clinical Professor and a full-time professional and graduate faculty member in the Department of Pharmaceutical Outcomes & Policy at the University of Florida College of Pharmacy in Gainesville, FL. In addition, I am President of Navarro Pharma, LLC, a managed care pharmacy consultancy serving the managed care and pharmaceutical industries and legal profession.

2.   I earned my BS in Biology from St. John's University and my BS in Pharmacy and Doctor of Pharmacy degree at the College of Pharmacy at the University of Minnesota.

3.   For over 35 years, I have developed, managed, and consulted on managed prescription drug programs for healthcare organizations and pharmaceutical manufacturers. Through my positions as Pharmacy Director at UnitedHealthcare (now the largest insurer in the United States) and Physicians Health Plan of Minnesota (now named Medica Health Plan), Associate Vice President of Provider Services at Health Net of California, and Vice President of Pharmacy and Therapeutics at Express Scripts, Inc. (now one of the largest pharmacy benefit managers ("PBMs") in the United States), I have developed and managed prescription drug benefits, interacted with pharmaceutical manufacturers, evaluated scientific data and marketing material for pharmaceuticals, served on Pharmacy & Therapeutics Committees, and managed drug formularies. Through Navarro Pharma, LLC, I have provided consulting services to pharmaceutical manufacturers for over 20 years relating to drug pricing, contracting, value assessment, and marketing strategies. I have been engaged as an expert witness relating to managed care and prescription drugs in over 22 legal cases.

4.   I have authored or co-authored dozens of peer-reviewed publications, book chapters, and textbooks regarding managed care pharmacy benefit programs, contracts, drug access and reimbursement, patent issues, and other areas. These publications have appeared in journals including the *Journal of Managed Care and Specialty Pharmacy*, the *American Journal of Managed Care*, and *Managed Care Interface.* I am also a co-founder of the Academy of Managed Care Pharmacy, a professional association whose mission is to increase patient access to affordable medicines and improve health outcomes via evidence- and value-based strategies. I served as the Academy's first President and have also served as the Assistant Editor for its peer-reviewed journal, the *Journal of Managed Care and Specialty Pharmacy*.

5.   My curriculum vitae, which also lists the proceedings in which I have testified as an expert or have presented an expert declaration in the last four years, is included as Appendix A.

1

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**B. Allegations**

6.   The Sanofi Complaint in this matter alleges that "Mylan engaged in illegal conduct"[1] that harmed Sanofi and U.S. consumers through various activities, including "unprecedented rebates to commercial insurance companies, pharmaceutical [sic] benefit managers and state-based Medicaid agencies (collectively "third-party payors") *conditioned exclusively* [sic] on Auvi-Q not being an EAI drug device that those payors would reimburse for use by U.S. consumers."[2]

**C. Assignment**

7.   I have been asked by counsel for Mylan to provide an overview of the prescription drug benefit system in the United States, with a focus on the role that PBMs, health plans, and drug manufacturers play in determining pricing/coverage for prescription drugs.  I have also been asked to evaluate whether the conduct at issue in the *Sanofi* case is consistent with common practices in the industry.

8.   In forming my opinions, I have relied on my own research and experience, relevant literature, documents, data made available to me through the discovery process, and publicly available information. A list of the materials I considered in forming my opinions is contained in Appendix B.

9.   I am being compensated at a rate of $700 per hour for time spent on this matter. My compensation is neither contingent upon the outcome of this action nor the opinions I express. All opinions expressed in this report are my own.

**D. Summary of Opinions**

10.  Based upon my analysis of the facts in this case and my experience, I offer the following opinions relevant to Sanofi's allegations:

   a.   PBMs and health plans use various benefit designs and formulary controls to lower pharmacy program costs for their customers.  They seek out rebate offers from manufacturers that align with their benefit designs and formulary control goals, including rebates conditioned on a brand drugs' preferred or exclusive placement on formulary.

   b.   PBMs and health plans consider numerous factors and make independent drug coverage decisions for their customers that vary from plan to plan based on specific plan membership needs.

---

[1] Sanofi-Aventis U.S. LLC v. Mylan Inc. and Mylan Specialty. L.P. Compl., filed April 24, 2017, ¶1

[2] Id. ¶6.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

c.  PBMs and health plans have the power to drive lower rebates and make their own decisions to lower costs, including requesting specific rebate levels from manufacturers, or rejecting rebate offers.

d.  PBMs and health plans have the power to drive market share away from market leaders to clinically equivalent products.

e.  PBMs and health plans identify opportunities to negotiate higher rebates from drug manufacturers and offer preferred or exclusive formulary status in exchange for those rebates.

f.  The launch of a competitive product provides PBMs and health plans the opportunity and leverage to negotiate higher rebates for existing products.

g.  Health plans and custom clients typically do not select their benefit design, formulary, or level of formulary control, based upon EAI drug formulary coverage.

h.  PBMs and health plans compare comparable clinical products on the basis of unit net price, or net price per prescription.

i.  Mylan's contracting and rebating activity was not "unprecedented," as Sanofi alleges, but in fact was consistent with traditional and common contracting and rebating practices for over three decades. It has been common practice for manufacturers of new products, existing products, and market leading products to offer higher rebates in exchange for preferred formulary placements (such as being one of several products in a therapeutic class on the preferred formulary tier, the only product on the preferred formulary tier, or the only product on formulary).

j.  Sanofi's own rebate offers and agreements, including on both EAI products and insulin products, are evidence of these common contracting practices.

k.  PBMs and health plans would expect that Mylan would increase rebates in response to market competition, which would provide PBMs the opportunity to negotiate larger rebates.

l.  For the EAI class, PBMs and health plans solicited rebate offers from Mylan for various coverage options, and Mylan gave the PBMs and health plans rebate contract choices.  PBMs and health plans were able to make various coverage choices depending on the needs and demands of their clients. Clients could also create customized formularies.

m.  Sanofi's claim that PBMs would never choose to sacrifice a rebate offered by Mylan on a large market share in favor of a comparable Sanofi rebate on a smaller market share is incorrect.  PBMs have ability to move market share from an established product with a large market share to a new entrant through utilization management (if it makes sense to do so from a clinical

3

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

and cost perspective), and the testimony and evidence I reviewed shows they either did or could have done so here. PBMs have demonstrated their ability to prefer a drug other than the market leader, and transfer the market share away from the incumbent.

n.   Professor Scott Morton's assumption that the launch of an AB-rated generic to the EpiPen® Auto-Injector ("EpiPen") would have no effect on Auvi-Q® ("Auvi-Q") sales is wrong. The availability of a lower-cost generic EAI would be expected to take market share from all branded EAI devices, including Auvi-Q.

## II.   OVERVIEW OF PRESCRIPTION DRUG BENEFIT MANAGEMENT

### A.  Overview of Managed Care

11.   The Health Maintenance Organization (HMO) Act of 1973 caused the development and expansion of managed health care delivery insurance companies. Since then, all health insurance programs have included similar managed care principles and strategies to manage the cost and use of covered benefits and services to achieve desired patient care and economic outcomes. Pharmacy Benefit Managers ("PBMs"), and state and federal government health insurance agencies offer "managed" medical and pharmacy insurance benefits through various insurance products, for individuals, private commercial employer groups, private and government health and welfare benefit trusts, state Medicaid programs, federal Medicare, and state and federal Health Insurance Marketplace medical programs.[3,4]

12.   "Managed care" describes subscription medical and/or pharmacy benefit insurance programs with financial and structural similarities, including insurance contracts with explicitly defined covered and excluded benefits, defined costs (e.g., monthly premium, and cost share when covered benefits are utilized), financial risk-sharing among all participants, coordinated care and centralized claims processing, health promotion and wellness programs, and preventative healthy life-style programs. The cost and utilization of all drugs, devices, procedures, and diagnostics are managed or controlled to meet the specific cost and benefit coverage objectives of purchasers and their insured consumers. As a result of highly customized and evolving insurance program benefits, the costs to purchasers and insured individuals are highly variable and change over time to meet customer objectives. All individuals and corporate entities involved in managed care insurance programs (which

---

[3] For an overview of managed care, see Fox PD, Kongstvedt R., Introduction to Health Insurance and Managed Care. Kongstvedt PR (Ed); *Essentials of Managed Health Care*. 2013, Sudbury, MA. Jones & Bartlett Learning. Part I.

[4] For an overview of managed prescription drug benefits, see Navarro RP, Stern CS, Hailey R. Prescription Drug Benefits in Managed Care. Kongstvedt PR (Ed). *Essentials of Managed Health Care*. 2013, Sudbury, MA. Jones & Bartlett Learning. Chapter 11, pages 257-279.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

include private commercial groups, Medicaid, the Health Insurance Marketplace, and Medicare) contract to follow insurance benefit and cost control policies. Figure 1, below, provides an example of how the business and financial relationships and flow of money between the various entities often work for pharmacy benefits.

**Figure 1: Full-Risk Commercial Managed Care Relationships and Flow of Money**



Source: Robert Navarro, 2019

## B. Overview of Pharmacy Benefit Managers and Health Plans

13.   PBMs are companies that develop and manage prescription drug benefits for insured consumers enrolled in commercial healthplans, self-funded employers, health & welfare benefit plans, government employee insurance, Medicare, and Medicaid programs.[5,6,7] Full-service PBMs began with Diversified Pharmaceutical Services (DPS), a PBM born out of United Health Care in 1987. DPS was purchased by the PBM Express Scripts, Inc. (ESI) in 1999. At

---

[5] What is a PBM? PCMA website, available at https://www.pcmanet.org/our-industry/.

[6] *See* Navarro, Robert P., et al., "Pharmacy Benefit Management Companies," Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice*, 2nd Edition, Sudbury, MA, Jones and Bartlett Publishers, 2009, Chapter 4.

[7] Anderson BN, Cosway R. Effective Contracting with Pharmacy Benefit Managers, *Health Watch*. February 2010, pages 22-27, available at http://www.milliman.com/uploadedFiles/insight/health-published/effective-contracting-with-pharmacy.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

that time, two other companies, PCS and Medco Containment, offered limited pharmacy cost management services. PCS evolved into CVS Caremark (now the PBM of CVS Health), and Medco was purchased by ESI in 2012. Today, ESI and CVS Caremark are the two largest PBMs, with a combined membership of over 170 million members, about one-half of the U.S. population.[8],[9]  Unless otherwise stated, I use the term health plan to refer not only to commercial healthplans, self-funded employers, and union and government sponsored programs, but also to commercial insurance carriers with whom health plans often contract for insurance or administrative services.

14.  PBMs control formulary access for about 90% of the U.S. population, and the three largest PBMs, CVS Caremark, ESI, and OptumRx provide more than 80% of the market with pharmacy benefits.[10],[11] PBMs control the drug access from an insurance coverage perspective to millions of insured consumers (also called "members" or "lives") and this power enables PBMs to extract price concessions (rebates and discounts) from pharmaceutical manufacturers that reduce the cost of prescription drug benefits for PBM purchasers and insured consumers. In 2018, the PBM CVS Caremark estimated that it negotiated $15 billion in rebates and passed 98% back to customers to reduce prescription drug benefit costs.[12]  Rebate pass-through guarantees, whether a guaranteed percent or a guaranteed dollar amount, are a common PBM performance guarantee in purchaser contracts.[13]

15.  PBMs design highly customized prescription drug insurance programs to meet specific cost and benefit richness objectives for each customer. As a result, there is similarity in the type of management tools employed, but the tools are applied differently to meet unique customer objectives. This results in high variability of costs for corporate purchasers and insured consumers that change over time within and among programs.

---

[8] Out Opportunity to Be Better Together, ESI website, August 2, 2018, available at http://lab.express-scripts.com/lab/insights/drug-options/our-opportunity-to-be-better-together.

[9] CVS Health 2017 Corporate Social Responsibility Report, page 3, available at https://cvshealth.com/sites/default/files/2017-csr-full-report.pdf.

[10] Visante, Inc., "Pharmacy Benefit Managers (PBMs): Generating Savings for purchasers and Consumers," February 2016, page 3,  https://www.pcmanet.org/wp-content/uploads/2016/08/visante-pbm-savings-feb-2016.pdf220.

[11] State of Competition in the Pharmacy Benefits Managers and Pharmacy Marketplace. Subcommittee on Regulatory Reform, Commercial and Antitrust Law, November 17, 2015, 114 Congress House Hearing, available at https://www.govinfo.gov/content/pkg/CHRG-114hhrg97631/html/CHRG-114hhrg97631.htm.

[12] New Disclosures Show CVS and Express Scripts Can Survive in a World Without Rebates. Are Plan Sponsors Now the Real Barrier to Disruption? Drug Channels website, August 14, 2018, available at https://www.drugchannels.net/2018/08/new-disclosures-show-cvs-and-express.html.

[13] Staying competitive in pharmacy benefits manager selection process. Milliman White Paper, September 2016, page 2, available at http://www.milliman.com/uploadedFiles/insight/2016/PBM-RFP.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

16.   PBMs provide full-service and complete prescription drug benefit programs for commercial employer groups, health & welfare trusts, and unions, as well as Medicaid, and Medicare programs. PBMs also sell specific prescription drug benefit management components to health plans that have internal pharmacy departments that develop and manage their own prescription drug benefit programs. Such health plans contract with PBMs for specific services, such as custom pharmacy network development and management, pharmacy point-of-service (POS) claims adjudication and reporting, clinical pharmacy services, and pharmaceutical manufacturer contracting. As a result, PBMs often develop several standard formularies, which may have or be implemented with varying levels of controls, and also allow health plans and large employers to customize their specific drug formulary coverage and exclusions.[14,15,16]

## III.   HEALTH PLANS AND PBMS EMPLOY SEVERAL STRATEGIES TO MANAGE CUSTOMER COSTS

17.   PBMs vigorously compete to win and maintain prescription drug benefit contracts with commercial health plans, self-funded employer groups and unions, and government payors. Private and public payors select a PBM on many factors, including program cost, formulary coverage, member satisfaction, benefit richness, pharmacy provider network, and other clinical and service considerations. However, benefit costs are often of paramount importance to purchasers. PBMs reduce overall program costs by focusing on reducing the cost of each prescription. The major PBMs publish performance reports (see ¶19) emphasizing success in reducing overall pharmacy program costs, but also in two specific cost trend components: 1) cost per prescription, and, 2) prescription utilization rate.  Total drug costs are a product of the cost of each prescription and the number of prescriptions reimbursed. PBMs seek to control those prescription costs and also to ensure clinically appropriate and cost effective utilization of prescription drugs.

18.   The ESI 2018 Drug Trend Report states that the PBM "saved clients $45 billion in 2018 [and] delivered a 25-year record low drug trend [meaning annual increase in drug spending] of just 0.4% across employer-sponsored plans . . . ."[17] The Prime Therapeutics Focus on Trend Commercial, Sprin 2018 report reports a -3.4% unit cost trend and a 3.2% utilization rate, for a total

---

[14] Joseph Anderson (CVS) Deposition at 212-215.

[15] Jason Hall (Prime Therapeutics) Deposition at 102-104.

[16] Adam Kautzner (ESI) Deposition at 130, 161, 176-179.

[17] 2018 Drug Trend Report, page 2, ESI website, available at http://lab.express-scripts.com/lab/drug-trend-report/2018-drug-trend-report.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

cost trend of -0.2%, and more than $1.6 billion in savings for customers.[18] CVS Health reported a 0.2% drug price growth trend in 2017, when the consumer price index for medical care services increased 2.4%.[19]

19.  Customers of health plans and PBMs are cost-sensitive and thus health plans and PBMs are driven to contain customer and insured consumer costs. It is well-recognized in the industry that selecting the right PBM can lead to considerable cost savings.[20]

20.  To keep costs down, PBMs and health plans use a variety of cost and utilization management tools, deploying them to customize benefit designs, including the following:[21,22]

   a.  **Prescription drug benefit design development.** Customers select the specific insurance product (e.g., HMO, PPO, POS), and how benefit features will be applied, including the deductible amount, formulary drug deviations, formulary tier cost share type and amount (e.g., fixed dollar copayment and/or percent coinsurance), rebate pass-through payment method, out-of-pocket maximum amounts.  Benefit designs are discussed in detail below in Section IV.

   b.  **Drug formularies, Preferred Drug Lists, and Drug Exclusion Lists.** PBMs and health plans develop formularies that list drugs eligible for reimbursement or excluded from coverage for the insured consumers of each purchaser. Drugs may be covered with others, preferred, excluded, or have exclusive coverage depending upon customer coverage and cost management desires. PBMs and health plans develop standard formularies, which may have or be implemented with varying levels of

---

[18] Prime Therapeutics Focus on Trend Commercial Spring 2018, available at https://www.primetherapeutics.com/content/dam/corporate/Documents/Newsroom/Pressreleases/2018/document-commercial-trend-spring-2018.pdf.

[19] Annual growth rate of consumer price index for medical care services in U.S. urban areas from 2007 to 2018. The Statista Portal website, available at https://www.statista.com/statistics/498802/cpi-prices-us-medical-care-services-annual-growth-rate-urban/.

[20] Staying Competitive in the pharmacy benefit manager selection process. September 7, 2016, Milliman website, available at http://www.milliman.com/insight/2016/Staying-competitive-in-the-pharmacy-benefits-manager-selection-process/.

[21] Wallack SS, Weinberg, DB, and Thomas CP. Health Plans' Strategies to Control Prescription Drug Spending. *Health Affairs*, available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.23.6.141.

[22] Navarro RP, Hailey R. Chapter 2, Overview of Prescription Drug Benefits in Managed Care, and, Chapter 4, Pharmacy Benefit Management Companies, In Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice*, 2nd Edition, Sudbury, MA, Jones and Bartlett Publishers, 2009.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

control, and also permit customization. Formularies are discussed in detail below in Section V.

c.  **Pharmaceutical manufacturer rebate contracting.** PBMs and health plans control the drug use of and access to millions of insured consumers. As a result, they are able to leverage their covered lives and negotiate price concessions (e.g., discounts and rebates) from pharmaceutical manufacturers in exchange for preferred formulary access for contracted drugs. Approximately 90% of negotiated rebate value is returned to purchasers and insured consumers as lower pharmacy program costs and lower consumer cost share. It is estimated that in 2016, PBMs passed back $31 billion to commercial customers.[23] Rebates are discussed in detail below in Section VI.

d.  **Generic drug incentives.** Promotion of generic drugs is a significant cost-management tool used by PBMs and health plans. Benefits and formularies include financial incentives for prescribers and consumers to use generic drugs when clinically appropriate. See Section VIII.

e.  **Pharmacy provider network development and contracting**. PBMs design a community, mail, and specialty pharmacy distribution network to meet specific customer geographic, service, and cost objectives. Pharmacy providers are required to dispense drugs according to customer-specific formularies.

f.  **Pharmacy point-of-service claims adjudication.** PBMs develop claims adjudications systems using NCPDP[24] data standards that interact with contracted pharmacy practice management systems. Pharmacists must adjudicate claims in real-time using the point-of-service (POS) computer system. The POS system automatically informs pharmacists of specific patient cost share to be paid, if any, and enforces the customer-specific drug formulary.

g.  **Member engagement services.** PBMs and health plans provide many member-focused services including member fulfillment (i.e., enrollment, I.D. card and benefit information), customer service phone lines, health lifestyle education, quality assurance

---

[23] Roehrig C. Rebates, Coupons, PBMs, and the Cost of the Prescription Drug Benefit. *Health Affairs Blog*. 2018, April 16, 2018, available at https://www.healthaffairs.org/do/10.1377/hblog20180424.17957/full/.

[24] National Council on Prescription Drug Programs website, available at https://ncpdp.org/home.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

programs (e.g., new member fulfillment, quality assurance, member help phone line, benefit information distribution).[25]

h. **Clinical pharmacy and adherence program management.** PBMs and health plans provide member disease management programs, Medication Therapy Management, adherence enhancement, disease education, healthy lifestyle counseling, and other disease-specific programs.[26]

## IV.   HEALTH PLANS AND PBMS OFFER SEVERAL DIFFERENT INSURANCE BENEFIT DESIGNS TO MEET CUSTOMER NEEDS

### A.  Health Plans and PBMs Use Benefit Design Options to Achieve Customer Cost Management and Benefit Needs.

21.   As described above, health care insurance is a highly competitive business. Health plans and PBMs compete on benefit design offerings and cost to meet the business, patient care, and financial objectives of purchasers.

22.   Purchasers of health insurance, such as employers, unions, or government payors, make health insurance purchase decisions based upon program costs and the comprehensiveness of benefits to satisfy the medical needs and expectations of their insureds.  Health plans and PBMs compete to win the business of purchasers by developing innovative and customized insurance benefit programs that meet the cost, benefit richness, and service needs of customers. Meeting corporate purchaser and consumer costs and program satisfaction have been, and remain, primary PBM performance criteria.[27]

23.   PBMs and health plans often recommend pharmacy benefit plans to their clients based upon their expressed cost and benefit richness goals. This process of benefit and cost customization concludes with the purchaser approving the benefit coverage and cost elements of the contract. The benefits and cost vary widely among the various insurance products available to corporate purchasers, including health maintenance organizations (HMOs), preferred provider organizations (PPOs), and point-of-service (POS) plans. Ultimately,

---

[25] OptumRx Pharmacy Care Services, Optum website, available at
https://www.optum.com/solutions/optumrx.html.

[26] PBMs Provide Clinical Value to Patients, Doctors and Other Healthcare Providers. PCMA website, available
at https://www.pcmanet.org/wp-content/uploads/2017/04/PBMs-Provide-Clinical-Value-to-Patients-
Doctors-and-Other-Healthcare-Providers_whitepaper_final.pdf.

[27] Express Scripts, Inc., webpage, September 19, 2018, pages 2-6, available at
https://expressscriptsholdingco.gcs-web.com/news-releases/news-release-details/express-scripts-earns-
highest-overall-customer-satisfaction.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

the purchaser decides what covered program benefits, covered drugs, and patient programs will be purchased on behalf of insured individuals.[28]

24.    Typically, covered and excluded benefits are explicitly defined by a contract between the purchaser and the health plans, PBMs, or health care providers or venders that provide the purchased medical and/or prescription drug benefits to insured consumers. "Benefit Design" is a general term for a description of the covered and excluded benefits, benefit access rules, and costs to be paid for insurance coverage.

**B.  Health Plans Offer Fully Insured and Self-Funded Insurance Contracts.**

25.    Health plans provide comprehensive health insurance benefits to employer group purchasers under two basic financial risk arrangements.

a.  **Fully Insured (Full Risk)** insurance contracts exist when a small employer (without financial reserves to quality for self-insured status) purchases health insurance on behalf of employee and pays a monthly premium through an annual contract. The employer is buying "fully insured" coverage. The insured employer purchaser and insured employees each pay a portion of the total monthly premium, and insured employees pay a cost share when they access covered benefits. The purchaser has no further financial obligations or risk other than paying the monthly premium. If the insured consumers experience catastrophic events that incur higher medical expenses than expected, the additional costs must be borne by the health plan, not the purchaser.  The health plan thus holds the financial risks.

b.  **Self-Insured** insurance purchasers generally are larger employers with adequate financial reserves to qualify for "self-insured" (or self-funded) status and hold the financial risk themselves.[29] Self-insured groups operate under federal ERISA laws which allow greater benefit coverage flexibility and customization.[30] Self-funded groups may specify particular benefits to be included, including specific drugs to be included or excluded in their drug formulary.

---

[28] 2018 Employer Health Benefit Survey, Kaiser Family Foundation website, Section 4, available at https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-4-types-of-plans-offered/.

[29] Self-Insured Group Health Plans, self-Insurance Institute of America, Inc., website, available at https://www.siia.org/i4a/pages/Index.cfm?pageID=4546.

[30] Health Plans & Benefits: ERISA, U.S. Department of Labor website, available at https://www.dol.gov/general/topic/health-plans/erisa.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

## V.    PBMS AND HEALTH PLANS MANAGE DRUG FORMULARIES TO CONTROL DRUG COSTS

### A.    Formularies are Important Pharmacy Benefit Management Tools to Control Drug Costs For Purchasers and Insured Consumers.

26.    PBMs and health plans explicitly select drugs and publish lists of drugs eligible for coverage for insured consumers through their insurance benefit. These drug lists are called "drug formularies" or "preferred drug lists" or other similar names. PBMs and health plans produce standard template formularies, which may have or be implemented with varying levels of control, and customized drug formularies that are developed specifically to meet unique membership needs. Health plans and PBM clinical pharmacists and physicians conduct evidence-based analyses and drug comparisons when they select or prefer drugs for coverage or exclude drugs from coverage.

27.    Formularies are dynamic lists of drugs that change as new drugs enter or leave the market, and new drug data are made available. Formularies are designed to include a selection of medicines to satisfy the acute and chronic medical needs of insured consumers and contain prescription drug benefits costs. Health plans and PBMs make independent drug coverage decisions based upon clinical data and net prescription cost.

28.    Formularies are organized by therapeutic category or other clinical taxonomy, and also by specific relative cost and cost share tiers.  Within each therapeutic class, tiers and cost shares are designed to incentivize the use of the lowest cost drugs possible that are clinically acceptable for a specific patient medical need.[31] Tiering helps to reduce program costs, and cost share dollar or percent amounts can be customized by customers.

29.    Health plans and PBMs often require consumers to pay a portion of the total prescription cost (called a cost share, which may be a fixed dollar copayment or percent coinsurance) when they obtain a covered prescription. Some plans used copayment and others use coinsurance. Some use copayment for Tiers 1 and 2 and coinsurance for Tiers 3 and 4. Cost shares are paid for up to a 30-day prescription supply.[32] The most common commercial formularies have

---

[31] Formulary Management, AMCP website, available at
    http://www.amcp.org/workarea/downloadasset.aspx?id=9298.

[32] Some benefits offer a financial incentive for consumers if they order a 90-day supply of a maintenance medicine through retail or mail by charging one or two cost shares, rather than three. *See* Impact of 2 Copay Waivers in a Generic Incentive Program. *American Health & Drug Benefits*. 2010;3(3), available at http://www.ahdbonline.com/issues/2010/may-june-2010-vol-3-no-3/38-article-38.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

four cost share tiers with the following average cost shares.[33]  There is a wide variety in commercial formularies, but the following list illustrates a tier structure that is similar to the structure that many formularies employ:

a.   **Tier 1 generic drugs** with lowest cost share (e.g., $11 copayment or 19% coinsurance for up to a 30-day supply).

b.   **Tier 2 preferred brand drugs** with a higher cost and cost share (e.g., $33 copayment or 25% coinsurance per 30-day prescription). As discussed further below, brand drug manufacturers frequently offer price concessions (a discount or rebate) to PBMs to win shared or exclusive placement on tier 2. Price concessions reduce net drug costs to payors. Insured consumers benefit by paying a lower cost share for tier 2 rather than a drug in a higher cost share tier.

c.   **Tier 3 non-preferred branded drugs** have a higher relative drug cost and a higher cost share (*e.g.*, $59 copayment or 36% coinsurance per 30-day prescription). As discussed further below, tier 3 drugs are often associated with lower price concessions from the drug manufacuterer, or none at all.

d.   **Tier 4 drugs** are either very expensive drugs (e.g., $1,000 or more per month) or specialty pharmaceuticals (drugs that require special handling, storage, or require patient monitoring) are often placed in the highest tier and have the highest cost share (e.g., $105 copayment (or 31% coinsurance).

e.   Although four-tier formularies are the most common tier structure, some health plans and PBMs have formularies with 5, 6, or 7 tiers to accommodate specific customer and cost management objectives, and formularies may define the various tiers differently.

30.   PBMs and health plans use tiering to drive utilization to lower cost, preferred drugs.  Cost shares create the financial incentives to encourage physicians and insured consumers to use lower tier drugs (e.g., tier 1 generics when possible or tier 2 preferred rebated brands), rather than higher copayment non-contracted brands. The amount of the copayment differential between preferred and non-preferred tiers must be a great enough to incentivize most insured consumers to request the lower cost share drug.

---

[33] 2018 Employer Health Benefits Survey, Kaiser Family Foundation, Section 9, available at https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-9-prescription-drug-benefits/.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

B. **PBMs and Health Plans Develop Several Standard Formularies and Custom Formularies to Satisfy Customer Cost and Benefit Needs.**

31. Formularies are designed to include a selection of medicines to satisfy the acute and chronic medical needs of insured consumers and also contain prescription drug benefits costs.

32. PBMs develop and manage several drug formulary templates for specific types of pharmacy programs and members. As an example, ESI develops and manages a National Preferred Formulary, National Preferred Formulary with Advantage Package, High Performance Formulary, National Preferred Flex Formulary,[34] and others.

33. The difference between the formulary options offered by PBMs and health plans often turns on the variety in the covered drugs, and the co-pay price differential between them. Drug formularies must contain clinically necessary medicines appropriate for program members, but health plans, PBMs, and purchasers are not required to cover and reimburse for all drugs on the US market. Formularies can be designed or implemented with "low controls," meaning a wide choice of covered drugs, or "high controls," meaning more restrictions to facilitate cost savings, or something in between. PBMs and health plans may use different terms to describe these levels of control, but the commonly used terms are **closed, controlled,** or **open**.

a. **Open Formularies.** "Open" formularies may cover all or most available drug options on the market. Some PBMs or health plans employ tiering on their open plans,[35] meaning covered drugs will be available at different co-pays; others do not.[36] Open formularies tend to come at a higher cost to purchasers because they provide more options.

b. **Closed Formularies.** Many therapeutic categories include two or more (often several) therapeutic alternatives that are expected to have similar effectiveness and safety outcomes. On closed formularies, only one or some of the therapeutic options might be covered, and the health plan will not

---

[34] Express Scripts drug formulary examples available at http://www.mympcbenefits.com/Documents/MPC-2019-Express-Scripts-Preferred-Brand-Drugs-List.pdf, https://www.bluekc.com/consumer/pdfs/HPF.pdf, http://www.egtrust.org/wp-content/uploads/2017/08/2017-express-scripts.pdf , https://hr.harvard.edu/files/humanresources/files/national_preferred_alpha_prmt.pdf, https://expressscriptsholdingco.gcs-web.com/news-releases/news-release-details/express-scripts-introduces-novel-formulary-built-evolution-drug.

[35] 2016 Aetna Pharmacy Drug Guide for the Five Tier Open Aetna Commercial Plan, Aetna00006487.

[36] The "ESI How We Build a Formulary" web article explains the three basic types of formulary controls, with "open formulary" and "tiered formulary."

cover non-formulary drugs. Rebates are often offered for drugs that are preferred on closed formularies.

c. **Controlled Formularies.** This term often refers to formularies implemented with moderate levels of control, such as tiering, step edit requirements, and prior authorization requirements. Purchasers can select closed or controlled formulary options to save costs in exchange for fewer options.

34. Health plans and PBMs also use various utilization management (UM) tools to control drug costs and the prescription utilization rate, including the following:

a. **Exclusions/NDC Blocks.** Increasingly, PBMs have been excluding drugs from their formularies to obtain greater rebates to reduce customer costs. Health plans, PBMs, and purchasers may exclude or "block" coverage of a medication without seeking external approval. Although the precise meaning of any particular formulary control depends on the governing contractual language for the plan at issue, this generally means that the National Drug Code (NDC) of a non-covered drug is not eligible for reimbursement by a specific insurance program. If a pharmacist attempts to submit a reimbursement claim for a "blocked" drug, it will be rejected by the insurance program. This is termed an "NDC block." If a patient desires a drug with an NDC block, the patient generally must pay out-of-pocket for this uninsured transaction, or the prescriber may pursue a medical exception approval, which would allow for the drug to be covered in spite of the NDC block. Since 2012, large PBMs, such as ESI[37] and CVS Caremark[38] have published formulary and preferred drug list exclusion lists. Pharmaceutical manufacturers submit aggressive rebate bids to avoid coverage exclusion.

b. **Quantity and Duration Limits.** Prescriptions are most commonly dispensed with a maximum quantity of up to a 30-day supply of medication from community pharmacies, or up to a 90-day supply (usually generic) through retail or mail home delivery. PBMs can impose a quantity limit edit that limits the number of milligrams or dosage units that may be dispensed during a prescription period (up to 30 or 90 days).

c. **"Step Edits."** Many health plans and PBMs use "step edits" or "step therapy" requirements. Again, the precise meaning of a "step edit" or "step therapy" requirement will depend on the language governing the health plan

---

[37] 2014 Preferred Drug List Exclusions, Express Scripts, Inc., website, available at http://static1.1.sqspcdn.com/static/f/854323/24139682/1388679250987/2014-ESI-Preferred-Drug-List-Exclusions.pdf?token=YYX8fJdpezYRZeHHxpTAGM%2FBbzY%3D.

[38] January 2013 Formulary Drug Removals, October 9, 2012, CVS Caremark website, available at https://myteamcare.org/media/31429/TC_Caremark_Formulary_Exclusions_2013.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

at issue.  Most commonly, this will require an insured consumer to use (and fail on) a lower cost drug before a therapeutically equivalent or similar branded drug is eligible for reimbursement.  A Step Edit might require, for example, a Tier 1 generic or a Tier 2 preferred branded drug to be used before a Tier 3 non-preferred drug is approved for coverage.  Alternatively, a step edit may only require that the patient have filled a prescription for a covered product within a specified period of time.[39]

d. **Prior Authorization or Pre-Certification.** Drugs on higher tiers (*e.g.*, Tier 3, Tier 4) may not be eligible for coverage unless the consumer's physician submits a formal request to the health plan and PBM to approve coverage for a specific patient for a defined use and for a certain period of time. Many formularies apply Prior Authorization ("PA") control use of certain brand or expensive medications. Health plans and PBMs determine criteria that must be satisfied for a PA to be approved. Generally, a patient's physician must communicate with the PBM or health plan to discuss why the PA should be approved, and to confirm the criteria are satisfied (e.g., patient intolerability to the preferred drug, failure on the preferred drug), at which point the patient will pay the cost share for the tier on which the drug with the PA is listed. Because of the extra cost and effort required to overcome a PA, they can be effective at incentivizing preferred drug use, as they can be and are overcome by patients.

35.   Health plans and PBMs use these formulary tools to incentivize the use of lower net cost drugs.  The formulary structure displays preferred and non-preferred drugs, and utilization management controls.  For example, ████████████

---

[39] Bruce Foster (Mylan) Deposition at 271; Nicole Willing (Mylan) Deposition at 63, 249.

[40] ████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

Figure 2:  2015 Aetna Pharmacy Drug Guide, EAI Class



36.

37.   In addition to offering standard formularies with varying controls, PBMs also allow customers to customize drug formularies.[41] ESI's High Performance Formulary, for example, may be implemented as an open, controlled, or closed formulary.  Or, large ESI customers can customize their own drug formulary to meet specific needs, or to include or exclude specific drugs.[42,43] CVS Caremark similarly states that, "Clients may choose to utilize CVS Caremark formularies for their plans or use them as the foundation for custom formularies."[44]  In some circumstances, health plan customers of PBMs conduct their own drug reviews and have their own P&T Committees and may

---

[41] Formulary Development and Management at CVS Caremark web article, page 3, states "Clients may choose to utilize CVS Caremark formularies for their plans or use them as the foundation for custom formularies." Available at https://www.caremark.com/portal/asset/FormDevMgmt.pdf.

[42] White Paper: Formulary Development at Express Scripts, Express Scripts website, page 3, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=2ahUKEwjoj4Xq0_zgAh UPXa0KHcKSCoIQFjABegQICBAC&url=https%3A%2F%2Flab.express-scripts.com%2Fabout%2F~ %2Fmedia2Ffb7c116a462a46fa95a5213e0af4bfc3.ashx&usg=AOvVaw1C7jO6JsrwXpVkcwCyeLR9.

[43] The "ESI How We Build a Formulary" web article states that "Express Scripts' clients often adopt Express Scripts-developed formularies or use them as the foundation for their own custom formularies, which are governed by their own P&T Committee. This allows plan sponsors to build a formulary that best meets the needs of their patient community within their healthcare budget." How We Build a Formulary, ESI website, available at http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary.

[44] Formulary Development and Management at CVS Caremark, CVS Caremark website, page 3, available at https://www.caremark.com/portal/asset/FormDevMgmt.pdf.

17

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

make different clinical determinations than the PBMs by therapeutic class concerning the products they wish to cover, and customize accordingly. Large employers that customize their formularies are most likely to do so based on the overall type of plan they desire (i.e. more controls for more cost savings, or less controls or options for more choice). In my experience, corporate clients do not typically make formulary selections or customizations based on coverage for a specific drug class (i.e. based on whether EpiPen is covered) unless it is a high cost category, which EAIs are not.

### C. Health Plans and PBMs Undertake Comprehensive and Rigorous Scientific Analyses When Evaluating Drugs for Inclusion on Formularies.[45]

38.    PBMs and health plans undertake a rigorous process when determining whether to cover a new prescription drug and, if so, what coverage to provide (e.g. what tier, with or without restrictions, etc.).

39.    Evaluation of a new drug typically begins many months before a new drug is FDA-approved and brought to the market. The evaluation is repeated periodically as new drugs are approved by the FDA and become available. Clinical pharmacists within health plans and PBMs conduct an independent, evidence-based review of data and information on drugs being considered for coverage using a broad array of sources, including the following:

  a.  Peer reviewed published scientific literature

  b.  NIH ClinicalTrials.gov website[46]

  c.  Scientific meetings, posters, and abstracts

  d.  AMCP Format for Formulary Submissions[47]

  c.  Communications with medical specialists

---

[45] For a description of prescription drug benefit programs in managed care, see Navarro, Robert P., and Rusty Hailey, "Overview of Prescription Drug Benefits in Managed Care," In Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice*, 2nd Edition, Sudbury, MA, Jones and Bartlett Publishers, 2009, Chapter 2.

[46] NIH ClinicalTrials.gov website, available at https://www.clinicaltrials.gov.

[47] AMCP format for Formulary Submissions website, available at http://www.amcp.org/practice-resources/amcp-format-formulary-submissions/.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

    d.      Recognized drug compendia (e.g., MicroMedex DrugDex,[48] American Hospital Formulary Service-Drug Information,[49] National Comprehensive Cancer Network)

    e.      Specialty medical association guidelines

    f.      FDA-approved drug labeling

40. Drug clinical performance data (e.g., efficacy, safety, tolerability) are the most important decision criteria. Drug net prescription cost, rebate and discount offers, are an important secondary criterion. Other considerations include utilization rates and patient disruption, patent expiry, competitive pipeline, route of administration, and administration complexities. Although each health plan and PBM conducts their own independent review of the data, the drug evaluation process and data considered are common to all formulary development processes.[50,51]

41. Health plans' and PBMs' clinical pharmacists' new drug data collection, data analysis, and comparative assessment may occur over several months. After the process is complete, a drug formulary coverage recommendation is made to the Pharmacy & Therapeutics (P&T) Committee,[52,53] an independent group of community or academic physician specialists not employed by the health plans and PBM.[54] The Committee may include 10-15 individuals, mostly physicians representing various medical specialties, and may include pharmacists, pharmacoeconomists, and other individuals. The P&T Committee meets periodically (e.g., quarterly) to review the clinical and cost data collected and consider the drug formulary coverage recommendation made by the health plans and PBM clinical pharmacists. The P&T Committee's clinical decision is final.

---

[48] DRGDEX Detailed Drug Information, available at http://www.micromedexsolutions.com/micromedex2/4.85.0/WebHelp/Document_help/Drug_Eval_document.htm.

[49] American Hospital Formulary Service-Drug Information, available at http://www.ahfsdruginformation.com.

[50] How We Build a Formulary, Express Scripts, Inc., website, available at http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary.

[51] Formulary Development and Management at CVS Caremark, CVS Caremark website, available at https://www.caremark.com/portal/asset/FormDevMgmt.pdf.

[52] P&T Committee, AMCP website, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=9&ved=2ahUKEwipm5exhIXhAhXKxVQKHZjLDPEQFjAIegQIAhAC&url=http%3A%2F%2Famcp.org%2FWorkArea%2FDownloadAsset.aspx%3Fid%3D19132&usg=AOvVaw07ftyuzC62Gaf7mdKf-OhW.

[53] White Paper: Formulary Development at Express Scripts, available at https://www.express-scripts.com/aboutus/formularyinformation/development/formularyDevelopment.pdf.

[54] For a discussion of the drug evaluation process, see Navarro, Robert P., et al., "Pharmacy & Therapeutics Committees in Managed Care Organizations," In Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice*, 2nd Edition, Sudbury, MA, Jones and Bartlett Publishers, 2009, Chapter 13

19

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

### D. PBMs and Health Plans Make Clinical and Financial Determinations When Deciding Whether to Add A New Drug to The Formulary.

42. Decisions regarding drug coverage are based primarily on the clinical benefits and advantages of the drug under review, and secondarily, on the net prescription cost (after rebates or discounts).

43. Large PBMs and plans truncate the decision process in a three-part process. Using ESI as an example:  First, the internal ESI Therapeutic Assessment Committee (TAC) conducts a thorough analysis of medications considered for formulary inclusion.

44. Second, the ESI National P&T Committee reviews the clinical information and benefits of a drug being reviewed, and  makes one of three decisions without considering the drug cost or rebate: 1) **include** the drug on the formulary, 2) **exclude** the drug, or 3) **optional** to include the drug.[55] The "optional" designation means the drug is not therapeutically necessary, and there are other drugs on the formulary that are therapeutic alternatives.

45. Third, after the National P&T Committee renders an "include" or "optional" coverage decision, the drug is then reviewed by the Value Assessment Committee (VAC),[56] who then considers the net cost of drug to customers, including rebates offered from manufacturers. The net cost, after rebates or discounts, per prescription ("net prescription cost") can determine the drug formulary position. If the National P&T Committee renders an "optional" coverage decision, the health plan or PBMs' final coverage decision often turns on net prescription cost.  Thus, if the VAC determines the "optional" drug is more costly than therapeutic alternatives, the "optional" drug may be excluded from formulary coverage or restricted using a step edit or prior authorization requirement, or may be placed on a higher, non-preferred formulary tier with a higher consumer cost-share. PBMs will exclude drugs with higher net prescription costs if lower net prescription cost alternatives are available, often as a result of a higher rebate. PBMs determine net prescription cost by starting with the net drug unit costs (e.g., device pack, tablet, capsule), subtracting unit rebates, and calculating the comparative prescription cost against a therapeutic competitor.

46. The PBM CVS Caremark follows a similar formulary decision process that separates clinical benefit from drug cost impact.[57]  Other PBMs and health plans follow a similar decision process, but some will consider drug clinical

---

[55] White Paper: Formulary Development at Express Scripts, page 2.

[56] How We Build a Formulary, November 12, 2018, Express Scripts website, available at http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary.

[57] Formulary Development and Management at CVS Caremark, page 2-3.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

value, cost, and rebate contracts in one longer discussion, rather than through multiple committees.

47.     During this evaluation process, health plans and PBMs choose to prefer certain products, and disadvantage or exclude from coverage products considered to be not clinically necessary and/or more expensive (higher net prescription cost).   Examples of selective and limited drug formulary coverage within therapeutic categories with competitive drug options include diabetes medications (e.g., insulins, GLP-1 inhibitors, SGLT-2 inhibitors, DPP-4 inhibitors), anti-tumor necrosis factor drugs (used for rheumatoid arthritis, Crohn's disease, psoriasis), and drugs for hepatitis C virus, multiple sclerosis, asthma, COPD, cholesterol reduction, and other medical conditions.

## VI.   PBMS NEGOTIATIATE PRICE CONCESSIONS FROM MANUFACTURERS TO REDUCE DRUG COSTS

### A.   The Published List Price (WAC) is not a Retail Price Paid By Insured Consumers.

48.     Pharmaceutical manufacturers publish drug Wholesale Acquisition Costs ("WAC") through various drug pricing services, such as First Data Bank, MediSpan, or MicroMedex RedBook.[58]   The WAC is sometimes referred to as the "list price" of a prescription drug.

49.     WAC is not the drug price paid by payors or insured consumers. PBMs use list prices to calculate the discounted drug price paid to pharmacies based on the pharmacy provider contract with the PBM.[59] But each pharmacy provider negotiates a different drug reimbursement rate with PBMs, and this negotiated, discounted price is used to calculate the prescription cost for patients at a specific pharmacy or pharmacy chain.[60] Insured consumers pay only a portion of the calculated cost of the prescription by paying the pharmacy a cost-share (fixed dollar copayment or percent coinsurance) that is determined by the consumer's insurance contract and the drug's placement on formulary. This is the calculated prescription cost. The calculated cost for an identical prescription can be different among payors and insured consumers based upon the specific benefit design and pharmacy contract rate.

---

[58] FirstDataBank Drug Price Analysis available at https://www.fdbhealth.com/solutions/drug-pricing-analysis/; MediSpan Price Rx available at https://www.wolterskluwercdi.com/price-rx/; IBM MicroMedex RedBook available at https://www.ibm.com/us-en/marketplace/micromedex-red-book.

[59] Follow the Dollar, page 4, PhRMA website, available at http://phrma-docs.phrma.org/files/dmfile/Follow-the-Dollar-Report.pdf.

[60] Sterler LT, Stephens D. Pharmacy Distribution Systems and Network Management, in Navarro RP (Ed.) Managed Care Pharmacy Practice, 2nd Ed., Chapter 5.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

50.    However, the calculated prescription cost, less the consumer cost share paid, also is not the final net prescription cost to the health plans, PBMs, or self-insured payors.  Rebates and discounts are paid to PBMs or health plans and passed on to self-insured payors to reduce the overall prescription drug benefit costs.

**B.  Rebates Reduce the Net Prescription Costs and Overall Pharmacy Program Costs to Payors and Insured Consumers.**

51.    Manufacturers offer purchasers two types of price concessions: 1) **discounts**, reduction off the WAC when the drug is purchased, and, 2) **rebates**, a retrospective payment, generally a percentage of the WAC, and based upon amount of the drug reimbursed by a health plan or PBM.

52.    **Discounts** are percent reductions in the purchase price of a drug by an entity that <u>purchases and takes possession</u> of a drug. Hospitals, pharmacies, PBM mail service pharmacies, and closed model health plans with internal pharmacies (e.g., Kaiser Permanente Health Plan) all take possession of drug products and qualify for a discounted purchase price.

53.    **Rebates** are price concessions available to health plans and PBMs that do not purchase and do not take possession, but rather reimburse contract pharmacies that have dispensed drugs on behalf of insured consumers. Health plans and PBMs report to pharmaceutical manufacturers periodically the volume of contracted drugs that were dispensed, and manufacturers wire the health plans and PBMs funds (rebate payment), which the health plans and PBMs in turn share with their corporate purchasers and insured consumers according to contract terms.[61]

54.    A rebate is the return of part of the purchase price by the seller to the buyer. Rebates are common in many industries and markets, including the pharmaceutical industry.[62] Pharmaceutical manufacturer rebate contracts are common business arrangements between drug companies and private and public entities, such as health plans, PBMs, Medicaid, and Medicare, that provide prescription drug benefit insurance.

55.    **Price protection** is a common component in rebate contracts**.** Historically manufacturers increase the price of their products every year by taking one or more price increases throughout a calendar year.  Price protection terms in

---

[61] Navarro RP, Kenney JT, *et al.* Managed Care Contracts With Pharmaceutical Manufacturers, in, Navarro RP (Ed.) Managed Care Pharmacy Practice, 2nd Ed., pages 361-385. Sudbury, MA. Jones and Bartlett Publishers. 2009.

[62] A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices. Milliman White Paper May 2018, page 1-2, available at http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

rebate agreements do not prohibit the manufacturer from raising the list price, but they protect the PBM or health plan from the impacts of price increases by providing that an additional rebate will be paid by the manufacturer for anything above an agreed-upon price threshold, i.e. to negate all or some portion of the price increase. There are two general types of price protection, although variations exist:[63,64,65,66]

a. **Cumulative price protection** limits the price increase by an annual threshold percent (e.g., 5%). Some PBMs limit the drug price increase to the U.S. medical CPI percent. Cumulative price protection does not reset each year, so to describe by example using a $100 starting WAC price: assuming the price protection threshold is 5%, the max allowable price would be $100 plus 5% or $105 for the first year.  If the price were to increase to $110 per unit during the year, an additional $5 per unit would be rebated back to the manufacturer. The maximum allowable price for the second year would be the first year's max allowable price of $105 plus 5%, or $110.25.[67]

b. **Resetting price protection** resets the effective drug price to which the threshold percent increase is applied each year.  So, using the same example above, the maximum allowable price for year one might be $105 ($100 + 5%) but if the list price increased to $120 starting January 1 of year two, the maximum allowable price for year two would be $126 ($120 + 5%).[68]  As shown through this example, cumulative price protection terms offer the PBM or health plan more value.  A variant of price resetting is a re-negotiated annual price to be used as the annual price increase maximum.

56.    When weighing drug costs and making coverage determinations after drugs have been deemed clinically appropriate for coverage, PBMs and health plans

---

[63] What is Price Protection?, High Point website, available at http://blog.highpointsolutions.com/what-is-price-protection.

[64] Medicine Use and Spending in the U.S., A Review of 2017 and Outlook to 2022. IQVIA Institute, page 39, 41, available at https://www.iqvia.com/institute/reports/medicine-use-and-spending-in-the-us-review-of-2017-outlook-to-2022.

[65] 5 questions: Drug Pricing. OptumRx website, available at https://www.optum.com/resources/library/5-questions-kent-rogers.html.

[66] Pharmacy manufacturer rebate negotiation strategies: A common ground for a common purpose, November 17, 2015, Milliman website, available at http://www.milliman.com/insight/2015/Pharmacy-manufacturer-rebate-negotiation-strategies-A-common-ground-for-a-common-purpose/.

[67] What is Price Protection?, High Point website, available at http://blog.highpointsolutions.com/what-is-price-protection.

[68] What is Price Protection?, High Point website, available at http://blog.highpointsolutions.com/what-is-price-protection.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

primarily consider net prescription cost, after subtracting applicable per drug unit WAC rebates and discounts.[69,70]

57.    Formulary decision makers compare the net prescription costs of therapeutic alternatives which are reduced by subtracting rebates from the WAC. Manufacturer rebates are typically offered as a percent of drug WAC for a specific NDC that identifies a specific drug unit (e.g., device, tablet, capsule, vial) and package size. PBMs then use the unit rebates to calculate the net prescription cost.  By example, the following information is from the 2014 Sanofi Rebate Agreement with Aetna:[71]

**Figure 3: Sanofi Quarterly Rebate Schedule**



Source: constructed by the author based upon the Sanofi-Aetna Agreement.



**     

[69] Adam Kautzner (ESI) Deposition at 28 ("…net prescription cost is definitely a primary component."); *id.* at 83 ████████████████████████████ *id.* at 99-100 ("…we encourage the use of…products that are going to be at a lowest overall net prescription cost.").

[70] ████████ Deposition at 39 ████████████████ ; *id.* at 261 ████████

[71] Seventh (7th) Amendment to the Aetna Health Management, LLC, Rebate Agreement A13576, December 31, 2014. SAN-EPI_A-0007657-7668, at -7657, -7659, -7662, -7665.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

58.   Mylan also offered rebates on a per unit (per device) basis. The Mylan 2015 amendment to ▮▮▮▮ rebate contract includes the following rebate offer for 2015:[72]



59.   Formulary decision makers apply the rebate percent to the current effective WAC (with Price Predictability applied) to determine the rebate dollar amount and the net prescription cost (based upon the package size dispensed per copayment, such as a 2-device EAI package, or a bottle of 60 tablets). The post-rebate prescription cost of available products in a therapeutic class is then compared to determine the lowest net prescription cost drug among products that the PBMs or payors consider to be therapeutic alternatives. For oral dosage forms (such as Multaq in the rebate example above), the rebate dollar amount is calculated per tablet, and is subtracted from the WAC tablet price to determine the net tablet cost. The quantity dispensed per prescription (e.g., bottle of 60) is multiplied by the net unit cost (post-rebate tablet cost) to determine the net prescription cost. The PBMs and payors consider per prescription savings, and also may estimate the total number or prescriptions that may be dispensed and reimbursed in a period of time (e.g., month, year) to determine the total overall savings that might result from preferring a particular product over the other.

**C.   Rebate Negotiations to Achieve the Lowest Net Prescription Cost are a Crtical Component of Formulary Coverage Decisions**.

60.   Rebates for branded drugs are an important factor in reducing payer and consumer prescription drug benefit costs. In 2017, pharmaceutical manufacturers paid $89 billion in rebates to commercial plans ($23 billion), Medicare Part D plans ($31 billion), Medicaid ($32 billion), and other payors

---

[72] Eighth Amendment to the Manufacturer's Discount Agreement Between Aetna Health Management, LLC and Mylan Specialty L.P. f/k/a Dey Pharma, L.P., MYEP00086249-6252, at -6250.

($3 billion), reducing total drug spending by 21%.[73]  Price concessions are an important tool to reduce preferred brand drug costs.[74]

61.    Pharmaceutical manufactures often offer rebates on brand drugs in therapeutic categories that have two or more competitive drugs. PBMs and health plan formulary decision makers welcome new drug entrants because the competition forces manufacturers to compete on drug clinical value and net price, which can be reduced with rebates.[75,76] Health plans and PBMs negotiate price concession contracts (rebates or discounts) with pharmaceutical manufacturers on selected branded drugs in exchange for placing the contracted drugs on a preferred drug formulary position (*e.g.*, Tier 2 on a commercial formulary) and in exchange for exclusive positioning (e.g. sole product in Tier 2, or sole product on formulary).

62.    Rebate contracts were first used by health plans and PBMs in the 1980s and proliferated to include most brand pharmaceutical manufacturers. By 1987, UnitedHealthcare (UHC) had rebate contracts executed with over 30 pharmaceutical manufacturers that included hundreds of brand drugs.

63.    As the Academy of Managed Care Pharmacy describes them:

> *Rebates are the mechanism used by MCOs[77] to drive price concessions from manufacturers... Rebate agreements between MCOs and pharmaceutical manufacturers help drive down the costs of prescription drugs for consumers and payors* [78]

---

[73] The Impact of Prescription Drug Rebates on Health: Plans and Consumers Report, April 2018, Altarum website, available at https://altarum.org/sites/default/files/Altarum-Prescription-Drug-Rebate-Report_April-2018.pdf.

[74] Navarro RP, Kenney JT, *et al.* Managed Care Contracts With Pharmaceutical Manufacturers, in, Navarro RP (Ed.) Managed Care Pharmacy Practice, 2nd Ed., pages 361-385. Sudbury, MA. Jones and Bartlett Publishers. 2009.

[75] Jason Hall (Prime Therapeutics) Deposition at 56-57 ██████████████████████████████████ ████████████████████████ .

[76] Joseph Anderson (CVS) Deposition at 50-51 ("Q. "...what are those strategies and priorities [of CVS] that you were referring to?" A. "...trying to deliver the—the lowest net cost..."); *id.* at 130 ██████████████████████████████████

[77] MCO is an abbreviation of "Managed Care Organizations," a general term of art that refers to a health plan, PBM, or other entity that provide managed insurance products.

[78] Maintaining the Affordability of the Prescription Drug Benefit: How Managed Care Organizations Secure Price Concessions from Pharmaceutical Manufacturers, Academy of Managed Care Pharmacy website, page 4. Available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=9299.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

64.     Pharmaceutical manufacturer rebates are calculated as a percent of a drug's published WAC. Rebates can rise to more than 60% of the WAC depending upon competition in a drug category.[79] One source reported the average US manufacturer rebate was 34% in 2015.[80] Another source estimates average discounts of 42% to 51% off the list price of their brand drugs.[81]

65.     Rebates are paid by pharmaceutical manufacturers to health plans and PBMs in exchange for contracted brand drugs achieving improved or preferred formulary positions, including exclusive positions on formulary, that are expected to improve access to products.  Drug formulary decision makers in health plans and PBMs analyze and compare the competitive rebate contract offers they receive from pharmaceutical manufacturers.[82] Rebates reduce the net prescription costs to health plans and PBMs, and in turn, reduce prescription drug benefit costs for their customers and insured individuals.[83] Health plans and PBMs promote or prefer contracted drugs to prescribers and patients because the contracted drugs having a lower net prescription cost than competing brand drugs.

66.     In my experience, most of the rebate value (approximately 90%) paid to PBMs is transferred back to the purchaser or insured individual to reduce pharmacy costs.[84]  PBMs guarantee a portion of the rebate dollars received will be paid to their purchasers through their contract.  Insured consumers also experience reduced costs as a result of rebates through a reduced prescription cost share (e.g., copayment) for preferred contracted products.[85,86]

---

[79] A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices. Milliman White Paper May 2018, page 2, available at http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf.

[80] Global Pharmaceuticals Industry Overview/Analysis, Credit Suisse, May 17, 2016, pages 1-3.

[81] Payer Power: Why Eli Lilly, Janssen, and Merck Deeply Discount Their Drug Prices, Drug Channels, April 5, 2018, available at https://www.drugchannels.net/2018/04/payer-power-why-eli-lilly-janssen-and.html.

[82] Rebates, Coupons, PBMs, and the Cost of the Prescription Drug Benefit. Health Affairs Blog, April 26, 2018, available at https://www.healthaffairs.org/do/10.1377/hblog20180424.17957/full/.

[83] Maintaining the Affordability of the Prescription Drug Benefit: How Managed Care Organizations Secure Price Concessions from Pharmaceutical Manufacturers. Academy of Managed Care Pharmacy. Available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=9299.

[84] Employers are Extracting More of Their Rebate Dollars from PBMs, Drug Channels website, January 17, 2018, available at https://www.drugchannels.net/2018/01/employers-are-extracting-more-of-their.html.

[85] Navarro RP, Kenney JT, et al. Managed Care Contracts With Pharmaceutical Manufacturers, in, Navarro RP (Ed.) Managed Care Pharmacy Practice, 2nd Ed., pages 372-373. Sudbury, MA. Jones and Bartlett Publishers. 2009.

[86] A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices. Milliman White Paper May 2018, page 2, available at http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

67.     Manufacturers analytically establish a drug WAC with or without price concessions as part of an overall market access and sales strategy. Price concessions are offered strategically for certain drugs and are not offered for other drugs, depending upon the market conditions and competitive analysis.

68.     For example, if a manufacturer markets a unique drug (e.g., orphan drug) without meaningful competition, there may be no benefit to offering a price concession. The unmet medical need of consumers will establish the market size and health plans and PBMs will be obligated to cover an orphan drug for a rare disease. Price concessions will not generate more prescriptions; the market size and need are established by the unmet medical need and not the drug cost.

69.     By contrast, if a manufacturer launches a brand drug in a therapeutic category with other brand drug competitors, and the manufacturer's drug is considered to be therapeutically on par with (i.e., not superior) to existing drugs, then price concessions will reduce the net prescription cost, which may make the contracted drug more attractive to health plans and PBMs, and the contract may facilitate preferred formulary access.

**D.  PBMs Rebate Agreements with Manufacturers and Bid Grids**

70.     Pharmaceutical manufacturers offer rebates to obtain competitive sales advantages for contracted products within a defined therapeutic drug class on PBM and health plan formularies. Manufacturers understand that PBMs and health plans develop and manage several formularies for different types of clients, and the formularies are highly variable in the level of formulary control and the number of competing products that may be prescribed for insured consumers. Manufacturers tend to offer higher rebates for preferred coverage on more highly controlled formularies.

71.     PBMs and health plans are aware that formularies with greater sales opportunities will attract higher rebates, and over time, formularies have become more restrictive and controlled. By 2012, CVS Caremark, and ESI had begun using and publishing Formulary Exclusion Lists and Preferred Drug Lists with formulary exclusions, and other PBMs and health plans increasingly

28

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

began excluding drugs from coverage.[87,88,89]  Sanofi's own internal white paper from 2014 recognized that

[redacted][90]

72.     The increasing formulary exclusions and more strident formulary management also impacted rebating.  For example, prior to the introduction of exclusion lists, it was common for PBMs and health plans not to demand, and manufacturers not to offer, rebates for branded products placed in a non-preferred tier 3 position.  Increasingly, including in the 2013-2015 time period, PBMs and health plans started demanding, and manufacturers began offering, rebates for drugs to remain unrestricted on tier 3, rather than face exclusion from coverage or step edit or prior authorization requirements.

73.     These trends have continued in recent years, as concerns about rising healthcare costs have increased.  PBMs and health plans have increased formulary management to reduce costs for insured consumers with aggressive rebates, formulary exclusions, and more consumer cost sharing through deductibles and higher cost share levels.[91,92]

74.     During rebate negotiations, PBMs and health plans solicit multiple rebate offers from pharmaceutical companies, including different rebate offers for different levels of benefit control and formulary placement. Many do so through the use of "bid grids." During these negotiations, PBMs and health plans leverage manufacturers against each other where competition exists in a therapeutic class to force higher rebates.

75.     Typically, health plans and PBMs require brand name drug manufacturers to offer rebates for formulary inclusion (meaning not being excluded from coverage), to be "preferred" (e.g., Tier 2, sometimes with other competitive

---

[87] Lida Etemad (UnitedHealthcare) Deposition 31-33, 102-104, Ex. 1 (EAI 00058608); Ex. 2 (EAI 00068417).

[88] *See* United Healthcare Prescription Drug List, available at https://www.uhc.com/employer/pharmacy/total-cost-management/prescription-drug-list; CVS Caremark Formulary Drug Removals January 2013, available at https://myteamcare.org/media/31429/TC_Caremark_Formulary_Exclusions_2013.pdf; Express Scripts 2014 Preferred Drug List Exclusions, available at http://static1.1.sqspcdn.com/static/f/854323/24139682/1388679250987/2014-ESI-Preferred-Drug-List-Exclusions.pdf?token=YNFM1gPuajUpTXK8IbIClFjiok8%3D.

[89] PBMs Just Say No to Some Drugs—But Not to Others. *Managed Care*, April 5, 2015, available at https://www.managedcaremag.com/archives/2015/4/pbms-just-say-no-some-drugs-not-others.

[90] Fiona Scott Morton Deposition Ex. 7 [redacted]

[91] White Paper: Formulary Development at Express Scripts, revised 2016.

[92] Current and New Approaches to Making Drugs More Affordable, August 2018, CVS Health.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

products and with or without other restrictions), or to be "exclusive" ("1 of 1" in a therapeutic class). A PBM or health plan may solicit bids from manufacturers, such as by conveying that they would only like to cover one product in a particular class, and would like a rebate offer from the manufacturer for a "1 of 1" position.  Or, a PBM or health plan may demand additional rebates or discount from a brand manufacturer, and the manufacturer may, in turn, condition the greater rebate on its drug being either the exclusive (e.g., 1 of 1) or one of only a limited number (e.g., 1 of 2, 1 of 3) competing brands in the therapeutic category at the preferred (Tier 2) level. Alternatively, the brand may offer a higher rebate if competitor products are subject to additional restrictions (such as a step edit or prior authorization) or if they are excluded from formulary altogether (i.e. not covered on the T3 non-preferred tier).  It is common across all therapeutic classes for varying rebates to be offered in exchange for these varying levels of controls, and the final rebate offers are subject to extensive negotiation between payors and PBMs, on the one hand, and manufacturers, on the other.

76.   A "Bid Grid" is a general term used for a rebate contract approach that includes a number of cells, each of which represents a different level of formulary control and number of brands preferred and which correlates with a different rebate percent bid by pharmaceutical manufacturers. See Figure 5 below. The table allows manufacturers to submit a separate rebate bid in each cell. Each cell is associated with a specific expectation of use level of contracted drugs and a corresponding rebate percent bid. For example, in the figure below, Cell 1 represents a low control formulary (e.g. an "open" formulary) and there are at least 3 brand drugs in the therapeutic class (e.g., 3 EAI devices). Each of the 3 products in Cell 1 would have an equal chance of being prescribed, and thus the manufacturer of each may not rebate or offer a very low rebate bid. In contrast, Cell 9 represents a highly controlled formulary (e.g. a "closed" formulary) with only one product on formulary in the therapeutic class (e.g., only one EAI device reimbursable by the health plan or PBM.).  Typically, the manufacturer would submit higher bids for the cells that represent the greater opportunity for access for contracted products (e.g., Cell 9). This concept has been common among PBMs since the early 1990s.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**Figure 5: Example of Rebate Bid Matrix (or Grid)**

| | | Total Number of Brands in Competitive Product Category (CPC*) | | |
|---|---|---|---|---|
| | | **Limited**<br>(3 or more brand drugs in CPC) | **Preferred**<br>(2 brand drugs in CPC) | **Exclusive**<br>(1 brand drug in CPC) |
| **Level of Formulary Control** | **Low Control** | **Cell 1**<br>Lowest rebate percent | **Cell 2**<br>rebate percent | **Cell 3**<br>rebate percent |
| | **Moderate Control** | **Cell 4**<br>rebate percent | **Cell 5**<br>Medium rebate percent | **Cell 6**<br>rebate percent |
| | **High Control** | **Cell 7**<br>rebate percent | **Cell 8**<br>rebate percent | **Cell 9**<br>Highest rebate percent |

*CPC = includes brand drugs considered to be therapeutic alternatives
Source: RP Navarro, 2019, based on ███████████████████[93]

77.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████[94] See Figure 6.[95]

---

[93] Pharmaceutical Rebate Agreement, June 12, 2006, MYEP00000935.

[94] ████████████████████████████████████████████████████
████████████████████████████████████

[95] Preferred Savings Grid Rebate Program Agreement February 1, 2016, MYEP00252068-MYEP00252109 at - 252084

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**Figure 6: Performance Savings Grid ("Bid Grid") Example**



78. ██████████████████████████████████████████████. See Figure 7.[96]

---

[96] Preferred Savings Grid Rebate Program Agreement February 1, 2016, MYEP00252068-MYEP00252109 at - 252097.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**Figure 7: Expanded Performance Savings Grid ("Bid Grid") Example**



79.  ███████████ used a similarly complex Bid Grid structure with 26 rebate bid cells representing different levels of formulary control.[97]

80.  Not every PBM and health plan uses a formal "bid grid," but even when not using this template, they often solicit separate rebate offers from a manufacturer for different formulary placements.

81.  When a PBM or health plan and manufacturer enter a final rebate agreement after negotiations, the PBM or health plan does not select a single rebate offer from the various offers made by the manufacturer.  Rather, rebate agreements typically include the entire Bid Grid (or, for PBMs or health plans that don't use a formal grid during negotiations, they typically include a chart of rebate options, as shown in **Figure 8** below).  The rebate agreements do not obligate a PBM or its clients to make specific drug choices or formulary decisions.[98] The contract only binds the drug company to pay the rebate if the coverage is selected.   For  example,  Mylan's  2014  rebate  agreement  with  Prime Therapeutics ███████████████████████████████████████████

---

[97] First Amendment to Rebate Agreement, July 1, 2014, MYEP00000524-0529.

[98] Kent David Rogers (OptumRx) Deposition at 252 ███████████████████
████████████████████████████████████████████

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

█████████████████████████████████████.[99]  Based on this agreement, ████████████████████████████████████████████████████████████████████████████████

**Figure 8: Fourth Amendment To Prime/Mylan Rebate Agreement, EpiPen Rebate Product Schedule**



82.   Sanofi's contracts likewise incorporate ████████████████. For example, Sanofi's Tenth Amendment to its rebate agreement with ████████ contained the following base rebate table for Sanofi's ████████████████████:[100]

---

[99] Jason Hall (Prime Therapeutics) Deposition Ex. 23 (MYEP00087496-7499 at -7498).

[100] Jason Hall (Prime Therapeutics) Deposition Ex. 12 (SAN-EPI_A-0064342-4410 at -4389).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**Figure 9: Tenth Amendment To** ███████ **Rebate Agreement,** ███████ **Rebate Requirements**



## VII.   PBMS HAVE THE POWER TO EXTRACT MANUFACTURER REBATES AND IMPACT MANUFACTURER MARKET SHARE AND SALES

83.   As described above, PBMs and health plans independently develop their drug formularies to meet the clinical and cost objectives for their purchasers and insured consumers. PBMs and health plans' membership (often termed "lives") range in amount and can sometimes encompass several million individuals. The two largest PBMs, CVS Caremark and ESI each claim to manage over 80 million lives.  UHC, one of the largest health insurers, claims a membership over 40 million lives.  Other PBMs and health insurance plans have membership in the tens of millions. As a result, PBMs and health plans wield significant power in drug formulary composition and in rebate negotiations with manufacturers.  The formulary coverage decisions made by PBMs and health plans have significant impacts on prescription drug sales.

84.   The Pharmaceutical Research and Manufacturers of America (PhRMA), an organization that represents biopharmaceutical researchers and biotechnology companies reported that "PBMs that negotiate on behalf of health plan sponsors…are able to leverage their market power to obtain substantial discounts and rebates on brand medicines."[101]  The Eli Lilly 2017 Integrated Summary Report states that the company rebates and discounts increased from 30% to 51% from 2013 to 2017, and "…pharmaceutical manufacturers' increased competition and pharmacy benefit managers' (PBMs) increased negotiation leverage have resulted in consistently deeper discretionary discounting over the past several years."[102]

85.   The PBMs have power to control the drugs they decide to include for coverage and reimbursement for their customers.  This includes the power to exclude products from coverage, including market leading products.  For example,

---

[101] Follow the Dollar report November 2017, page 2, PhRMA website, available at http://phrma-docs.phrma.org/files/dmfile/Follow-the-Dollar-Report.pdf.

[102] Eli Lilly 2017 Integrated Summary Report, page 22.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

CVS Caremark announced in 2017 that it would exclude Sanofi's market leading basal insulin Lantus and its other basal insulin Toujeo from formulary coverage and replace it with the basal insulin competitors Basaglar, Levemir, and Tresiba.[103] Sanofi's former head of global marketing referred to ███ as a product that was ███

███"[104] Yet, notwithstanding the "███ number of patients that were using the drug, PBMs were able to exclude ███ in favor of competing products.[105]

86.    These financial stakes give drug manufacturers a strong incentive to compete to secure preferred (or at least to avoid Tier 3 non-preferred) status on health plan and PBM formularies compared with other branded drugs used for the same medical condition.[106] ESI explained their formulary management process and published a formulary development "white paper" on its website, that describes how formularies provide greater incentives to payors to use a preferred formulary to obtain higher rebates from a manufacturer.[107,108] CVS Caremark also published an explanation of their formulary management process to reduce costs, and allows customers to use a standard CVS Caremark formulary or use a CVS Caremark formulary as a foundation to customize their own formularies.[109]

87.    PBMs and health plans have demonstrated the ability to shift market share. Even for a drug that has a majority market share, PBMs and health plans are

---

[103] 2017 Standard Formulary List of Removals and Updates,  CVS Caremark website, available at https://cvshealth.com/sites/default/files/cvs-health-2017-standard-formulary-list.pdf; Drug Removals for Clients with Advanced Control Specialty Formulary, October 2018, CVS Caremark website, available at https://www.caremark.com/portal/asset/Formulary_Drug_Removals_JPMC.pdf; Formulary Drug Removals, January 2019, CVS Caremark website, available at https://www.caremark.com/portal/asset/Formulary_Exclusion_Drug_List.pdf;

[104] Peter Guenter (Sanofi) Deposition at 77-78.

[105] Peter Guenter (Sanofi) Deposition at 77-78.

[106] Express Scripts Rewards Low List-Priced Brands in 2019 Formulary, Retains Focus on Rebates. PharmaIntelligence website,  https://pharmaintelligence.informa.com/resources/product-content/express-scripts-rewards-low-list-priced-brands-in-2019-formulary. Accessed 8 December 2018.

[107] White Paper: How We Build a Formulary, Express Scripts website, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=2ahUKEwiwosfxo5zhAh UJYK0KHWTqDeoQFjAAegQIARAC&url=https%3A%2F%2Flab.express-scripts.com%2Fabout%2F~%2Fmedia%2Ffb7c116a462a46fa95a5213e0af4bfc3.ashx&usg=AOvVaw1C7 jO6JsrwXpVkcwCyeLR9.

[108] How We Build a Formulary, Express Scripts website,  http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary.

[109] CVS Caremark Formulary Development and Management at CVS Caremark, available at https://www.caremark.com/portal/asset/FormDevMgmt.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

able to shift large market share, and are willing to do so if it is in the interest of their membership.  A large market share does not protect, and will not guarantee, future formulary coverage.[110,111,112,113,114,115]

88.   PBMs make independent formulary decisions based upon their clinical and prescription net cost analysis, and can move their membership away from a market leading drug to reduce costs. PBM ability to prefer a drug other than the incumbent market leader, and disadvantage market leading drugs, has been seen in several diabetes drug categories, including the following:

    a.   Basal  insulins  ███████████████████████████████
████████)[123]

    b.   DPP-4 inhibitors (displaced Januvia in favor of Onglyzia or Tradjenta)[122]

    c.   Human analogues (displaced Lilly insulins in favor or Novo Nordisk insulins)[122,123]

    d.   SGLT-2 inhibitors (displaced Invokana in favor of Jardiance, Glyxambi, or Farxiga)[116,123]

    e.   GLP-1 inhibitors (displace Byetta in favor or Victoza, Trulicity, or Ozempic)[117]

    f.   Propon pump inhibitors  (displaced Prilosec in favor or Protonix, Aciphex, or Prevacid; displaced Nexium in favor or Dexilant)

    g.   Statins (displaced Zocor, Crestor, or Lipitor in favor of generics)

---

[110] Drug Removals for Clients with Advanced Control Specialty Formulary, Diabetes Category Drug Class, October 2018, CVS Caremark website, available at https://www.caremark.com/portal/asset/Formulary_Drug_Removals_JPMC.pdf.

[111] James Ayers (MedImpact) Deposition at 102-103

[112] Jason Hall (Prime Therapeutics) Deposition at 58.

[113] Kent David Rogers (OptumRx) Deposition at 97.

[114] Macy Shia (Kaiser Permanente) Deposition at 261 (Q. So your testimony is it wouldn't be difficult to move from one branded EAI device to another branded EAI device? A. Once our providers endorse it, it would not be difficult. It may require more education for a device, but once it's approved -- as you have noted, in Northern California was a 98 percent conversion.")

[115] Saira Jan (Horizon) Deposition at 78-79.

[116] 2019 Express Scripts National Preferred Formulary, available at http://www.mympcbenefits.com/Documents/MPC-2019-Express-Scripts-Preferred-Brand-Drugs-List.pdf.

[117] CVS Caremark Preferred Drug List January 2019, available at https://www.caremark.com/portal/asset/siemens_dl.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

     h.  Human growth hormone (displaced Omnitrope in favor or Humatrop, Genotropin, Saizen, or Notropin)[122]

89.    The demonstrated market power of PBMs and health plans causes manufacturers to compete not just on the clinical benefits of their products, but also on net prescription cost (after discounts or rebates). The PBM testimony in this case confirms that PBMs and health plans leverage their membership to prompt manufacturers to offer rebates on competitive drugs when two or more drugs are in the same therapeutic category. [118,119] As ▮▮▮▮▮ representative testified at her deposition in this case:[120]



90.    PBMs and health plans can use utilization management controls to disadvantage an incumbent market leader in favor of a new drug if they determine that it would be clinically appropriate to do so and that the net prescription cost reduction opportunity is worth the effort.[121] As described above, if two or more drugs are considered clinically interchangeable, the comparative net prescription cost (after rebates) becomes a pivotal formulary coverage decision criterion.[122] Manufacturers are aware of the importance of

---

[118] Deborah Kronberg (Cigna) Deposition at 147-149 (Q. "…has it happened that a product with a higher market share has been put at a less preferred tier than a lower market share product? A. Yes, it has happened. Q. And has it happened that Cigna has step-edited a product that previously had a higher market share in favor of a product that has a lower market share? A. Yes, that has happened. Q. And has Cigna done prior authorizations in the same circumstance? A. Yes. . .. Q. Does that mean that from Cigna's perspective, it could have moved market share from EpiPen to Auvi-Q? A. Yes. We would consider that a class where we would let them compete based on price.").

[119] Lida Etemad (UnitedHealthcare) Deposition at 123 ("Any time there is a potential for increased competition, that would be good from a leveraging to a lower price perspective." [sic]]); 215-217.

[120] Barbara Minton (Anthem) Deposition at 63-66.

[121] Barbara Minton (Anthem) Deposition at 65-69; Harry Vargo (Aetna) Deposition at 112-13; Adam Kautzner (ESI) Deposition at 191-93.

[122] Deborah Kronberg (Cigna) Deposition at 15; Jim Ayers (MedImpact) Deposition at 100-104; Jason Hall (Prime Therapeutics) Deposition at 27-29; Michael Brodeur (Aetna) Deposition at 130-31.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

net prescription cost when PBMs and health plans view two or more drug products as not clinically differentiated, and they know that PBMs or health plans may exclude one product, and frequently respond to rebate solicitations from PBMs and health plans.[123],[124]  The formulary development and bid submission process and cycle are well known.

## VIII.   GENERIC DRUGS PLAY AN IMPORTANT ROLE IN COST MANAGEMENT

91.   The preference and promotion of generic drugs in place of brand drugs are critical cost-containment components of health plan and PBM benefit design and drug formularies.[125]  Approximately 85-90% of prescriptions are dispensed with generic drugs,[126] and generic-dispensing ratio is a PBM performance metric.[127]  The American Academy for Accessible Medicines estimates that in 2017 generics generated a total of $265 billion in cost savings.[128]  Many health plans and PBMs also provide financial incentives to physicians to prescribe generic drugs whenever medically appropriate.[129],[130]

92.   When generic drugs are available and therapeutically equivalent to a branded drug (referred to as a Reference Listed Drug (RLD) to which generics are compared),[131] health plans and PBMs may set a maximum reimbursement amount ("maximum allowable cost" or MAC) which is often 70% or more lower than the RLD brand drug which makes it more likely that a generic drug will be dispensed.

---

[123] Peter Guenter (Sanofi) Deposition at 77-82;

[124] Bruce Foster (Mylan) Deposition at 54, 110, 265.

[125] AMCP Position Statement on Generic Drugs, revised February 2017, available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=19771.

[126] Association for Accessible Medicines website, available at https://accessiblemeds.org/sites/default/files/2018_aam_generic_drug_access_and_savings_report.pdf.

[127] Liberman JN, Roebuck MC. Prescription Drug Costs and the Generic Dispensing Ratio. *J Man Care Pharm.* 2010;16(7):502-06. Available at  https://www.jmcp.org/doi/pdf/10.18553/jmcp.2010.16.7.502.

[128] AAM 2018 Generic Drug Access & Savings Report, available at https://accessiblemeds.org/resources/blog/2018-generic-drug-access-and-savings-report

[129] *See e.g.*, Sarpatwari, Ameet, et al., "Paying Physicians to Prescribe Generic Drugs and Follow-On Biologics in the United States," *PLoS Medicine*, 2015, page 4-5.

[130] Kaiser Employer Health Benefits Annual Survey 2018, Exhibit 9.5, page 174, available at http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018.

[131] Reference List Drug (RLD) Access Inquiries, FDA website, available at https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/Approv alApplications/AbbreviatedNewDrugApplicationANDAGenerics/ucm607738.htm.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

93.   The FDA Approved Drug Products with Therapeutic Equivalence Evaluations[132] ("Orange Book") is a published reference that identifies approved drug products. It identifies generic drugs that are therapeutically equivalent to innovator branded drugs (RLD) as "AB-rated."  Health plan and PBM formularies often limit reimbursement to the approximate cost of FDA-approved therapeutic equivalent (e.g., AB rated) multi-source generics.  Some Board of Pharmacy state substitution laws encourage, and some require, pharmacists to dispense AB-rated generics when they are available if there will be cost savings to the consumer.[133]  Other states, known as "non-Orange book states," permit pharmacists to substitute a generic upon the patient's request even if it is not AB-rated, so long as it saves the patient money and is a pharmaceutically equivalent product, such that prescribing it would not put the patient at risk.[134]

94.   The availability of a generic does not only impact the prescribing of the AB-rated brand name drug, but also of other brand name drugs in the same therapeutic class. For example, generic alternatives with lower net prescription costs than branded options are typically covered on a lower formulary cost-share tier (e.g., tier 1) and may be preferred by PBMs and health plans, which would incentivize the use of generics over all competing brands.

## IX.   SPECIFIC RESPONSES TO SANOFI'S ALLEGATIONS AND PROFESSOR SCOTT MORTON'S EXPERT REPORT

95.   Against the preceding industry description, and based on my industry background, I have been asked to offer my opinions on Sanofi's allegations in this case, and the expert opinions of Professor Fiona M. Scott Morton.  I include those direct responses here.

### A.   Mylan Followed Common Business Practices Employed By Sanofi And Other Manufacturers.

96.   The Sanofi Complaint in this matter alleges that "Mylan engaged in illegal conduct"[135] that harmed Sanofi and U.S. consumers through various activities, including "unprecedented rebates to commercial insurance companies, pharmaceutical benefit managers and state-based Medicaid agencies . . .

---

[132] FDA Approved Drug Products with Therapeutic Equivalence Evaluations, available at https://www.accessdata.fda.gov/scripts/cder/ob/.

[133] Shrank WH, Choudhry NK, *et al*. State Generic Substitution Laws Can Lower Drug Outlays Under Medicaid. *Health Affairs*. July 2010, available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2009.0424.

[134] Vivian, JC. Generic-Substitution Laws. *US Pharmacist*. 2008;33(6): 30-34.

[135] Sanofi-Aventis U.S. LLC v. Mylan Inc.; and Mylan Specialty. L.P. Complaint, filed April 24, 2017, ¶1

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

*conditioned exclusively* [sic] on Auvi-Q not being an EAI drug device that those payors would reimburse for use by U.S. consumers."[136]

97.   There is nothing unprecedented about the contracting practices challenged by Sanofi in its Complaint or reflected in the documents and testimony I reviewed. As discussed above, pharmaceutical manufacturers have paid rebates to health plans and PBMs to gain drug formulary coverage preference for 35 years.  In fact, I was involved in the development of the first brand name rebate contract in 1984 at UHC, and rebates based on formulary coverage (including preferred or exclusive placement) have persisted since that time. Professor Scott Morton not only fails to accurately describe pharmaceutical rebate negotiations and the impact on EAI formulary coverage and access, she ignores that PBMs, health plans, and pharmaceutical manufacturers have been negotiating rebates to improve drug formulary coverage for several decades.

98.   As explained throughout this report, both high rebates and rebates based on improving the contracted drug formulary position and "conditioned" on reducing or eliminating the formulary coverage of competing drugs, are normal and customary in the managed prescription drug business.

99.   As described above, it is common business practice for pharmaceutical manufacturers to respond to competitive market opportunities by offering rebates associated with specific, desired formulary preferences, such as preferred brand status (i.e. to be one of several products on tier 2), exclusivity (i.e. to be "1 of 1" product on tier 2, or the only product on formulary), and to "contract away" UM controls, such as step edits and prior authorizations (i.e. to remain unrestricted on tier 2 or tier 3).  It is also common for rebates to depend on restrictions being placed on competitive products (i.e. on tier 2, with all competing products subject to prior authorization or step edit requirement). Deponents from several PBMs and health plans, as well as representatives of Sanofi and Mylan, confirmed the prevalence of rebating, including in connection with preferred, and even exclusive, formulary access.

100.  Indeed, the current political focus on pharmaceutical drug pricing has underscored that the rebating practices challenged by Sanofi are prevalent, industry-wide practices.  The Department of Health and Human Services (HHS) of the current administration, looking to lower drug prices, published a "Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs" in May 2018.[137] The HHS proposes to eliminate the Safe Harbor Protection for traditional rebates, and recommends a drug discount be provided to patients at

---

[136] Id. ¶6.

[137] American Patients First. The Trump Administration Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs, May 2018, Department of Health and Human Services, available at https://www.hhs.gov/sites/default/files/AmericanPatientsFirst.pdf.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

the point of care as they obtain a prescription.[138] More than 18,000 comments have been submitted,[139] and a common theme across them all is the prevalence of rebates conditioned on preferred formulary coverage. Numerous executives from the industry called before Congress to testify about drug prices have emphasized the pervasiveness of rebate negotiations, including Sanofi's own CEO, Olivier Brandicourt, who recently submitted a statement to Congress pointing out that "manufacturers pay significant rebates as a percentage of the list price to both government and private payors, as well as other intermediaries, in an effort to improve access for patients."[140] When asked about the reason for high list prices for pharmaceutical products, Brandicourt testified: "We're trying to get, Senator, we're trying to get formulary position with those list price, high list price, high rebates. It's a preferred position."[141]

101.  Professor Scott Morton's own testimony before Congress acknowledges both the prevalence *and* cost-saving benefits of the rebating practices she challenges. She testified that ". . . the way you get low prices in the pharmaceutical industry is by the ability to exclude drugs. What do I mean by that? You identify a few therapeutic substitutes and you essentially hold an auction. . . . Whoever gives me the best prices is that one I am going to buy from, and everybody else gets none of my business. When you can do that, you force price competition….you are going to force price competition among those drugs and that is how you get a low price. This is sometimes called moving market share."[142] This is exactly what PBMs and health plans are doing by leveraging their formulary control and large membership to present competitive opportunities for pharmaceutical manufacturers to lower net prescription costs through rebates for the benefit of insured consumers and payors. In fact, PBMs are excluding more drugs in recent years to reduce costs for insured consumers, which is what Dr. Scott Morton proposed. Indeed, just last week, CVS Health announced a new drug pricing approach, emphasizing that it uses its "proven cost management strategies" to lower net costs for clients. CVS expressly stated in particular that "[t]hrough discounts, rebates,

---

[138] 42 CFR Part 1001 Fraud and Abuse: Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals and Creation of New Safe Harbor Protection for Certain Point-of-Sale Reductions in Price on Prescription Pharmaceuticals and Certain Pharmacy Benefit Manager Service Fees, Office of Inspector General, Department of HHS, Federal Register. February 6, 2019;84(25), pages 2340 to 2363, available at https://www.govinfo.gov/content/pkg/FR-2019-02-06/pdf/2019-01026.pdf.

[139] Fraud and Abuse: Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals, Regulations.gov website, available at https://www.regulations.gov/docket?D=HHSIG-2019-0001.

[140] Written Testimony of Olivier Brandicourt, M.D., Before the Senate Committee on Finance, February 26, 2019. https://www.finance.senate.gov/download/02262019-brandicourt-testimony

[141] Drug Pricing in America: A Prescription for Change, Part II, Sen. Comm. on Fin., at 3:20:10 (Feb. 26, 2019) (live testimony of Oliver Brandicourt, M.D.), https://bit.ly/2ugiTV8.

[142] Prescription Drug Pricing and Negotiation: Overview and Economic Perspectives for the Medicare Prescription Drug Benefit, page 13.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

and price protection, we helped clients mitigate the impact of EpiPen price increases."[143]

102.   Professor Scott Morton fails to acknowledge that Sanofi has engaged in as much or more of the same alleged "exclusionary"[144] behavior of which she accuses Mylan.  Sanofi is a co-defendant (with other insulin manufacturers Eli Lilly and Novo Nordisk) in insulin pricing litigation, and in a motion to discuss argument, Sanofi, as a co-defendant, acknowledged that it "offers rebates to PBMs because it is competing against other defendants for inclusion and preferred placement of PBMs' formularies."[145]   Sanofi offered contracts for several products, including Auvi-Q, that conditioned significant rebates on the PBM or health plan placing restrictions on competing products.[146,147,148,149]

103.   For example, Sanofi offered ███████ rebate contracts, the same as it accuses Mylan of offering, to keep another competitor's drug off of the formulary of ███  There are two competing and therapeutically interchangeable drugs in the PCSK-9 lipid lowering drug category: Praluent and Repatha. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████[150]██████████████████████████████████ ████████████████████████████████████ But—just as with Mylan's rebate offers for EpiPen ████████████████ ████████████████████████████████████████████████ ████████████████████████████████.

104.   Sanofi has routinely offered ████████████ rebates to PBMs and health plans to obtain ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

[143] CVS Health, Why the Time is Right for a New Pricing Model, March 19, 2019, available at https://payorsolutions.cvshealth.com/insights/why-the-time-is-right-for-a-new-pricing-model

[144] Expert Report of Dr. Fiona M. Scott Morton, February 4, 2019, ¶ 91-92,95,103,104-108, 110, 114-122, other.

[145] Defendants' Memorandum of Law in Support of Motion to Dismiss the Consolidated Amended Class Action Complaint (Counts 1-6) In Re Insulin Pricing Litigation, Civil Action No. 17-699(BRM)(LHG), March 9, 2018, page 38-39.

[146] Louanne Cunico (Presbyterian Health Plan) Deposition Ex. 45 (PHP 0001824.

[147] Barbara Minton (Anthem) Deposition at 113-116; 151-153; Ex. 7 (SAN-EPI-0436556-65557); Ex.8 (SAN-EPI-0432718).

[148] Bethanie Stein (Humana) Deposition at 239-240.

[149] Adam Kautzner (ESI) Deposition at 230-235; Ex.16 (SAN-EPI-0363626-3639).

[150] Regeneron/Sanofi cut heart drug price to $4,500 - $6,000 for Express Scripts. Reuters Health News, May 1, 2018, available at https://www.reuters.com/article/us-regeneron-pharms-sanofi-fr-cholestero/regeneron-sanofi-cut-heart-drug-price-to-4500-6600-for-express-scripts-idUSKBN1I23FW.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

█████████████████████████████████████████
████████████████████████████████████[151]

105. Sanofi's rebates for its ███████ products included high rebates for █████████ exclusive tier coverage.  For example, Sanofi offered a █████████ to CVS Caremark in 2014 for █████████████████████████████████████ ████████████████████████████[152] Sanofi offered ███████ a ███████ for exclusive commercial coverage of █████████████████████[153] Sanofi submitted a rebate offer to ████████████████████████████[154] These are just a few examples.

106. Sanofi made ██████████ offers for Auvi-Q as well.  For example, Sanofi was asked by ████████ ,[155] ████████████████████████████████████████████████ █████████████████████████████[156] Sanofi U.S. Pricing Committee approved a ██████████████████████████████████████████████ and that offer was conveyed to ███████[157,158] █████████[159] ██████████████████████████████████████████[160] ████████████████████████████████████████████[161]



---

[151] Peter Guenter (Sanofi) Deposition, Ex. 7 (SAN-EPI-1144954).

[152] CVSCM_EPI_000000072 at - 000000076.

[153] Fifteenth Amendment to the Preferred Savings Grid Rebate Program, SAN-EPI-0887394

[154] Keith Wade (Sanofi) Deposition at 210; Ex. 42 (SAN-EPI-0758107 to -8109).

[155] UnitedHealthGroup (UHG) is the corporate "health and well-being company."  UnitedHealthcare (UHC), is the health benefits division of UHG and Optum is the health services division of UHG. OptumRx is the PBM of Optum. See UnitedHealthGroup website, https://www.unitedhealthgroup.com/businesses.html. The terms UHG, UHC, and Optum, and OptumRx may be used interchangeably in several documents in this matter.

[156] Keith Wade (Sanofi) Deposition at 274; Ex. 36.

[157] Keith Wade (Sanofi) Deposition at 146-47; Ex. 15.

[158] Keith Wade (Sanofi) Deposition Ex. 14 (SAN-EPI-0129956 to -9960).

[159] Fiona Scott Morton (Sanofi Expert) Deposition Ex. 10 (SAN-EPI-0434385).

[160] Robert Eaton Deposition at 47, 115, 119; Ex. 12 (SAN-EPI-0446009-6011).

[161] Louanne Cunico (Presbyterian Health) Deposition at 45; see also; Cunico Ex. 19 (PHP0000385-87).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

107.   Professor Scott Morton argues that Mylan's offering of the "additional financial inducement"[162] of price protection is an uncommon and nefarious action of Mylan created to block Auvi-Q formulary access. She states:

> *Thus price protection augmented the impact of Mylan's exclusionary rebates: the PBM would get an additional reduction in the total payments for EpiPen, but only if they agreed to formulary restrictions. Because Auvi-Q could not attract the non-contestable share of the EAI market, Sanofi could not effectively counter the financial inducement from Mylan's price protection offer with price protection of its own."[163]*

108.   This argument ignores the realities of PBM negotiations. As described above, price protection has been a common component of rebate contracts for several years.[164,165]  Price protection was neither unique to EpiPen rebates nor a component only of exclusive rebate offers. Price protection, or renegotiation of rebate levels, has been requested by PBMs and health plans for decades. PBMs are increasingly demanding price protection from manufacturers, and as discussed above have the power to exclude products when manufacturers fail to offer it.  Indeed, Professor Scott Morton fails to acknowledge that Sanofi too offered price protection ("Price Predictability") on its products, including Auvi-Q, in rebate contracts.[166,167,168,169,170,171,172]

**B.   PBMs Made Independent Coverage Determinations and Could Have Moved Against EpiPen In Favor Of Auvi-Q.**

109.   Sanofi alleges that PBMs and health plans had no choice but to include EpiPen on their formulary.  This statement conflicts with the realities of how the industry operates.  As described above in section VII, PBMs and health plans

---

[162] Dr. Fionna Scott Morton Report ¶125.

[163] Dr. Fiona Scott Morton Report ¶125.

[164] The Declining Value of Payer Access: How to Improve Rebate Efficiency. 2016, Amundsen Consulting, pagers 3, 7, 9, available at https://www.marketingweb.iqvia.com/rebate-efficiency-payer-access/.

[165] Follow the Dollar, November 2017, PhRMA report, page 8, available at http://phrma-docs.phrma.org/files/dmfile/Follow-the-Dollar-Report.pdf.

[166] Peter Guenter (Sanofi) Deposition at 80-81, Ex. 7 (SAN-EPI-1144954.002, -.006, -.007, -.011, -.014, -.017, Ex. 10 at SAN-EPI-1154146 to 1154185.

[167] Commercial Plan Business, Express Scripts, Inc., January 1, 2010, SAN-EPI-0873203.

[168] Rebate Agreement, January 1, 2013, OptumRx, EAI 00230080 at EAI 00230107 to -0112.

[169] Fourth Amendment to the Rebate Agreement, July 1, 2015, CaremarkPCS Health LLC, CVSC_EPI-000000101, at CVSCM_EPI_000000116 to -0119.

[170] Louanne Cunico (Presbyterian Health) Deposition, Ex. 182 (PHP 0001824).

[171] Adam Kautzner (ESI) Deposition Ex.16 at (SAN-EPI-0363636-3637).

[172] Barbara Minton (Anthem) Deposition Ex.8 (SAN-EPI-0432718).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

make formulary decisions, disadvantaging or excluding an incumbent with high market share such as EpiPen, if there is an opportunity to reduce prescription costs.

110.   As discussed in this report, health plans and PBMs must cover drugs needed to meet the medical needs of covered members.   However, when formulary decision makers have more than one drug option available that are considered therapeutic alternatives (i.e. same active ingredient and medical use), the clinical benefit, safety risks, and cost, and other considerations, of the available products are analyzed and compared.   Decision-makers then determine if more than one similar product is necessary for formulary coverage. If there is not a medical need for more than one product, and if there are cost-savings reasons to limit coverage to one product, some plans and PBMs may only reimburse for one product. Other Plans and PBMs may prefer one product with lower net costs, but cover one or more similar products at a higher, disadvantaged tier. This decision – to cover one or more product – is entirely the decision of the health plan and PBM based upon the clinical factors, cost savings, and other information being considered.

111.   Market competition presents an opportunity to PBMs and health plans to reduce costs by leveraging their membership to force price competition (through a lower WAC or rebates) among manufacturers of products with little to no clinical differentiation (e.g., EpiPen, Auvi-Q, generic EAI device). The launch of Auvi-Q and rebate offers from Sanofi to managed care organizations presented this competitive opportunity.

112.   When Auvi-Q was on the market, all EAI products contained the same active drug (epinephrine) and strength (either 0.3 mg/ml or 0.6 mg/ml), and there was no difference in the active drug component.   Health plans and PBMs needed to cover at least one EAI for their insured consumers with a history of, or potential to experience, anaphylaxis.   However, the evidence I reviewed suggest that PBMs and health plans thought it was therapeutically unnecessary to cover more than one EAI product.[173] More than one EAI would offer choice, but choice would become a secondary consideration if there was an opportunity to significantly reduce EAI product category costs. The net prescription cost (after rebates) would be an extremely important formulary decision factor in deciding which product to cover or whether to cover multiple products.[174]

113.   As explained above, PBMs and plans, representing millions of insured consumers, consider drug net prescription cost resulting from rebate offers,

---

[173] Kent Rogers (OptumRx) Deposition at 60-61.

[174] Deborah Kronberg (Cigna) Deposition at 148-150 ("for this particular class, that's how the decision would have been made. . .. It was drive by cost.").

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

among other data and information, when they decide to accept or reject a rebate offer and make changes to their drug formulary based upon net prescription cost and other factors. The evidence suggests they did that here. For example, in May 2013, ████████████████████████████████████████████████████████████████████████████████████████ [175]

114.   Professor Scott Morton's statement that "PBMs felt that they had no choice but to accept Mylan's exclusionary rebate offers"[176] and exclude or disadvantage Auvi-Q reflects either a total misunderstanding or mischaracterization of the realities of rebate negotiations and formulary decisions. As explained above, the health plans and PBMs had market power, not Mylan. If Mylan had not offered high rebates, it is my opinion that Mylan reasonably could have expected that EpiPen would have been excluded from formularies and suffered significantly reduced sales. If health plans and PBMs had the desire and financial incentive to stop coverage of Mylan's EpiPen, and instead prefer another brand of epinephrine auto-injector (EAI), they could easily do so, despite the market share of EpiPen—and while Auvi-Q was on the market, many of them did.[177]

115.   For decades, PBMs and health plans have demonstrated their ability to move share through utilization management techniques, including away from incumbent market-leading products. When I worked for UHC in the 1980s, we implemented a mandatory drug formulary with high prescriber conformance and were able to control market share of formulary products. In the mid-1980s, we pursued rebate contracts and made formulary changes to reduce the market share of dominant non-rebated brand drugs from 80 share to 20% within six months with utilization management, and, at the same time, increase the market share of a competing contracted brand from a 17% share to a 90% share in the same time.[178]   As described earlier in this report, PBMs and health plans have continued to exercise this power.

116.   As to the EAI class in particular, PBMs and health plan deponents testified in this case that the EAI class is not considered a sensitive class and that either EpiPen or Auvi-Q could have been preferred without significant member disruption. For example, Kaiser Permanente's representative testified that "Kaiser Permanente is actually known for moving product A to B when everything is equivalent," and that, for the EAI class in particular, "it would

---

[175] Lida Etemad (UnitedHealthcare) Deposition Ex. 13, EAI 00078985.

[176] Dr. Fiona Scott Morton Report ¶ 120.

[177] Lida Etemad (UnitedHealthcare) Deposition at 216-17; Deborah Kronberg (Cigna) Deposition at 148-49; Macy Shia (Kaiser Permanente) Deposition at 260-61; Saira Jan (Horizon) Deposition at 78.

[178] Navarro RP. Marketing Pharmaceuticals to Managed Care Systems. March 1988. Spectrum publications, Arthur D. Little Decision Resources, page 1-29 to 1-38.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

not be difficult" to move consumers from one branded device to another.[179]
UHC's representative explained at her deposition that it was possible to
exclude EpiPen:[180]

> Q. And at this time were you thinking it was a possibility to cover
> Auvi-Q®?
>  A. Yes
> Q. And at this time was it a possibility to exclude EpiPen®?
> A. Yes

117. Cigna's representative provided similar testimony.  She testified that Cigna did
not consider the EAI class to be sensitive, that the health insurance company
could have moved market share from EpiPen to Auvi-Q, and that the decision
to keep EpiPen was based on the fact that the net cost of Auvi-Q was higher
than EpiPen.[181]  Other documents and testimony I reviewed confirmed that if
Mylan had "withheld" rebates and discounts, health plans and PBMs may have
excluded EpiPen from coverage, or disadvantaged EpiPen at a higher
copayment formulary tier.

118. Pharmaceutical manufacturers are on notice that their drugs could become
"non-covered" (NDC blocked) if there are therapeutic competitors with a
lower net cost, and that rebates may improve price competition for their
products resulting in formulary coverage, or improved coverage.  The threat
of being excluded encourages manufacturers to offer aggressive rebates to
maintain coverage and/or coverage advantages over competing drugs. That
threat extends to popular and well-known products.  Mylan's Bruce Foster,
Director of National Accounts, who had responsibility for rebate negotiations
with certain PBMs, explained that he knew this was a real possibility for
EpiPen, and that Mylan offered competitive rebates with this risk in mind:[182]

> [T]here are some very, very strong branded players that ended up
> on those exclusion lists.  One example is Advair.  No one would have
> thought that [the PBM] would have placed a product with that
> strong brand recognition on an exclusion list. So, with that in mind,
> with that knowledge and understanding that it was ESI's pursuit to
> have a one-of-one position, it was very important that Mylan
> competed to make sure we had the one-of-one position to not be on
> that exclusion list because we knew that was a very real possibility.

---

[179] Macy Shia (Kaiser Permanente) Deposition at 260-61.

[180] Lida Etemad (UnitedHealthcare) Deposition at 115.

[181] Deborah Kronberg (Cigna) Deposition at 148-149.

[182] Bruce Foster (Mylan) Deposition at 108-109.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

119. PBMs and health plans expressly threatened to Mylan that they would exclude EpiPen, leveraging that threat into greater rebates.  For example,

"[183] In the 2014 and 2015 rebate negotiations,

[184]  PBMs and payors also solicited offers from Mylan for step edits and exclusivity.  For example,

[185]
.[186]

120. Sanofi should have been equally aware of PBM exclusion lists and the possibility of Auvi-Q coverage exclusion from PBM formularies—if not more so. Sanofi is a sophisticated global pharmaceutical manufacturer with a broad branded product portfolio and a history of successful drug product approvals in the U.S. and other countries.  The 2012 Sanofi Annual report noted €34.9 billion [appx. $46 billion in 2013 dollars] in global sales and a presence in 100 countries.[187]   As explained above, Sanofi offers rebates—including for exclusive positioning—on many of its branded products.  Mylan, by contrast, has primarily a *generics* portfolio, with far fewer branded drug products than Sanofi, and fewer rebate agreements for branded products.  Sanofi certainly had the industry experience and resources to compete.

121. Sanofi, like Mylan, could have competed on net cost to secure better formulary coverage, but it did not.  Auvi-Q® was launched after years of prep-launch strategy planning that including marketing to prescribers, consumers, and to managed markets payors.[188]   The Sanofi marketing team for Auvi-Q (then named E-CUE) was advised in October 2011 that managed care customers concerned about

.[189]

---

[183] Kent David Rogers (ESI) Deposition Ex. 5, at MYEP00081290-1291.

[184] Adam Kautzner (ESI) Deposition at 154-160; Ex. 20, 21.

[185] Jim Ayers (MedImpact) Deposition Ex. 42, at MYEP00719327.

[186] Deborah Kronberg (Cigna) Deposition Ex. 5, at MYEP00623282.

[187] Sanofi 2012 Annual Report, available at
http://annualreview2012.sanofi.com/pdf/sanofi_annual_report2012.pdf

[188] Patrick Byrne (PayerSciences) Deposition Ex. 2 at SAN-EPI-0532759 (and most Byrne Exhibits)

[189] Patrick Byrne (PayerSciences) Deposition Ex. 2 at SAN-EPI-0532760 and 32766 to 32771.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

122.   Lastly, Professor Scott Morton argues that "Sanofi was not able to compete head-to-head with Mylan" because the "large lump-sum loss that PBMs knew they would face if they included Auvi-Q on the formulary was too large."[190] She elaborated at her deposition that she believes the competition between Mylan and Auvi-Q for formulary coverage

> *wasn't about a per unit price. There was no per unit price. It was—price reduction. It was a lump sum reduction. So the per unit price is whatever the list price is. And then when you get to the end of the year, when you've been exclusive, you get that lump of rebates back. So because of the conditional nature of the payment, it's not a unit for unit, pen for pen rebate . . . . And what I'm trying to explain to you is that that net price is misleading. That's not what's being compared. What's being compared is the lump sum that will be given back to the PBM if they don't buy Auvi-Q. If they put Auvi-Q on the formulary, they lose that lump sum, okay? So that lump sum is exactly a payment to the plan to not take Auvi-Q. . . . This is not about this -- this -- asking me about the net price implies that the plan is making a choice between two products on the basis of net price. It's not."*[191]

123.   This is incorrect.  As I described above, PBMs and health plans absolutely make choices between two products on the basis of unit net price, or net price per prescription. Professor Scott Morton ignores the testimony in this case confirming what is commonly understood by all sophisticated players in the industry: that drug net cost per prescription, made more competitive with rebates, is the most important drug price considered in formulary coverage decisions.

### C.  Professor Scott Morton Fails To Consider This Potential Impact of Generic EAI Device on Auvi-Q Share.

124.   In developing her damages model, Professor Scott Morton also assumes that the launch of an AB-rated generic to EpiPen would have no effect on Auvi-Q sales.[192]  That is a fundamentally flawed assumption that wholly ignores the realities of the interaction between brand and generic drugs.  The availability of a lower-cost generic EAI would be expected to take market share from all branded EAI devices.

125.   First, as explained above, PBMs and health plans provide financial incentives to consumers to use lower-cost generics.  In fact, PBMs commonly have generic dispensing rates as a performance targets in payor contracts.  If a generic EAI with a lower net prescription cost became available, it could be

---

[190] Dr. Fiona Scott Morton Report ¶ 118.

[191] Dr. Fiona Scott Morton (Sanofi Expert) Deposition at 144-45.

[192] Dr. Fiona Scott Morton Report ¶¶ 216-220.

covered on a lower formulary cost-share tier and might be preferred by many PBMs and health plans. If that occurred, it would be expected to take market share from *all* branded EAI products, including both EpiPen and Auvi-Q.

126. Second, a check of the Orange Book revealed epinephrine "intramuscular, subcutaneous" injectable device products (e.g., EAI products), including Adrenaclick (a RLD, not therapeutically equivalent to EpiPen), a generic EAI from Teva Pharmaceuticals (therapeutically equivalent to EpiPen), EpiPen and EpiPen JR versions from Mylan (RLD), Auvi-Q from kaléo (RLD, not therapeutically equivalent to EpiPen), and Twinject from Impax Laboratories (RLD, not therapeutically equivalent to EpiPen).[193] Again, as described elsewhere in this report, and based upon variation in state requirements, it is likely that some pharmacists would choose to offer or substitute an alternative generic EAI such as the Teva generic in place of EpiPen *or* Auvi-Q if requested by the patient.

127. My opinions expressed herein are based on the material reviewed to date. I reserve the right to modify, amend, or supplement my analysis and opinions if additional information becomes available to me.

Dated: March 25, 2019
Signature: ______________________

[193] FDA Approved Drug Products with Therapeutic Equivalence Evaluations, epinephrine, accessed 4 March 2019, available at https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm.

# APPENDIX A

# Robert P. Navarro, PharmD
## Curriculum Vitae

### Current Professional Experience

- Clinical Professor, Department of Pharmaceutical Outcomes & Policy, University of Florida, College of Pharmacy, Gainesville, FL (2011 – present)
  - PharmD and graduate school faculty status and teaching responsibilities
  - Managed Care Pharmacy Systems Specialty Track Director and instructor, online MS Pharmacy program

- President, Navarro Pharma, LLC (1993 – present)
  - Consult to pharmaceutical manufacturers on managed care pharmacy access, reimbursement, pricing, and contracting, payer market research on existing and pipeline drugs
  - Legal expert witness on managed healthcare pharmacy and related matters
- Assistant Editor, *Journal of Managed Care & Specialty Pharmacy*

### Past Professional Experience

- Interim Editor, *Journal of Managed Care Pharmacy* (2012 - 2013)
- Executive Advisory Committee, Campbell Alliance, Raleigh, NC (2003 – 2007)
- Chairman, P & T Insight, Medicom International (1988 — 2008)
- Vice President, Pharmacy & Therapeutics, Express Scripts, Inc. (1996 – 1999)
- Group Vice President, Professional Services, Emron (division of IMS America) (1993 – 1996)
- Associate Vice President, Provider Services, Health Net, Los Angeles, CA (1988 - 1993)
- Director of Pharmacy Services, United HealthCare Corporation and Physicians Health Plan of Minnesota (1983 – 1988)
- Clinical Pharmacist, St. Mary's Hospital, Minneapolis (1980 – 1983)

25 March 2019

- Clinical Instructor, Department of Family Practice, School of Medicine, University of Minnesota, Minneapolis (1977 – 1981)
- Partner, Pharmaceutical Consultant Services, PA, St. Paul, MN (1977 – 1983)
- Co-Owner, Gallery Professional Pharmacy, St. Paul, MN (1977 – 1983)

## Education

- PharmD, College of Pharmacy, University of Minnesota, Minneapolis, MN
- BS, Pharmacy, College of Pharmacy, University of Minnesota, Minneapolis, MN
- BS, Biology, St. John's University, Collegeville, MN
- Certificate, Management Development Program in Health Care, University of Southern California, Los Angeles
- Certificate, Information Management Executive Course, University of Michigan, Ann Arbor

## Professional Affiliations

- Academy of Managed Care Pharmacy (co-founder and first president)
- Academy of Managed Care Pharmacy Foundation (co-founder and first director)
- Past interim editor, past assistant editor, and editorial advisory board member, *Journal of Managed Care & Specialty Pharmacy*
- Member, AMCP Past Presidents and Founders Council
- Periodic Member, National Council on Prescription Drug Programs
- Member, International Society for Pharmacoeconomics and Outcomes Research

## Professional Recognition

- 2009 recipient of the Foundation for Managed Care Pharmacy Steven G. Avey Award

25 March 2019

Legal Expert Witness Testimony

Recognized by the court as an expert in managed care prescription drug benefit programs, pharmaceutical contracting, and related matters. Litigations in which oral or written testimony has been provided are listed below:

1. 1994 – Brand Name Prescription Drug Antitrust Litigation. Master File No. 94 C 897; MDL No. 997. United States District Court Northern District of Illinois Eastern Division. Retained by Sidley Austin LLP on behalf of pharmaceutical company defendants.

2. 2004 – Pharmaceutical Industry Average Wholesale Price Litigation. MDL No. 1456; Civil Action: 01-CV-12257-PBS. United States District Court for the District of Massachusetts. Retained by White & Case on behalf of pharmaceutical company defendants.

3. 2005 - AdvancePCS Health, L.P. v. Takeda Pharmaceuticals America, Inc. Case No. 76 193 00202 04 JMLE. American Arbitration Association Commercial Arbitration Tribunal. Retained by Hogan & Hartson on behalf of Takeda Pharmaceuticals.

4. 2005 – Diversified Pharmaceutical Services, Inc. v. Medica Health Plans. American Arbitration Association. Retained by Merchant & Gould on behalf of Express Scripts, Inc.

5. 2006 – TRICOR Direct Purchaser Antitrust Litigation. Civil Action NO. 05-340 KAJ US District Court District of Delaware. Retained by Patterson Belknap on behalf of Abbott Laboratories.

6. 2006 – Commonwealth Care Alliance and others v. AstraZeneca Pharmaceuticals LP. Civil Action No. 05-0269 Massachusetts Superior Court; James Weiss and others vs. AstraZeneca Pharmaceuticals LP. Case No. BC323107 California Superior Court. Retained by Sidley Austin LLP on behalf of Astra Zeneca.

7. 2009: Southeastern Pennsylvania Transportation Authority v. Caremark PCS Health, L.P. (formally known as) AdvancePCS Health, L.P. Case no. 07-2919 United States District Court Eastern District of Pennsylvania. Retained by Foley & Lardner on behalf of Caremark.

8. 2010 – Warner-Lambert Co., et al. v. Purepac Pharmaceutical Co. et al., Civil Action No. 00-2931 (FSH) and Pfizer Inc., et al. v. Purepac Pharmaceutical Co. et al., Civil Action No. 00-3522; In re Gabapentin Patent Litigation, MDL No. 1384. Retained by Axinn Veltrop Harkrider.

25 March 2019

9. 2010 - A.F. OF L. – A.G.C. Building Trades Welfare Plan et al v. SmithKline Beecham Corporation D/B/A GlaxoSmithKline PLC (Flonase Antitrust Litigation). Case No 2:08-cv-3301. Retained by Ballard Spahr on behalf of GlaxoSmithKline PLC.

10. 2011 – Metoprolol Succinate End-Payer Antitrust Litigation. Civil Action No. 06-71-GMS. Retained by Sidley Austin LLP on behalf of AstraZeneca LP.

11. 2012 - Rx.Com, Inc, and Joe S. Rosson vs. John M. O'Quinn & Associates D/B/A The O'Quinn Law Firm, et al. District Court of Harris County, TX, Case NO. 2010-66863. Retained by Beck Redden & Secrest.

12. 2013 - Astrazeneca AB, Astrazeneca LP v. Hanmi USA, Inc., Hanmi Pharmaceutical Co. Ltd. US District Court for the District of New Jersey. Civil Action No. 3: 11-cv-00760_JAP-TJB. Retained by Covington Burling LLP  on behalf of AstraZeneca.

13. 2013 - Astrazeneca AB, Aktiebolaget Hassle, KBI-E Inc., and Astrazeneca, LPm v. Apotex Corp., Apotex., Inc. And Torpharm, Inc., In re Omeprazole Patent Litigation. US District Court Southern District of New York. Civil Action No. 01- CIV-9351 (DLC) and M-21-81 (DLC) MDL Docket No. 1291. Retained by Sidley Austin LLP  on behalf of AstraZeneca.

14. 2015 - Warner Chilcott Company, LLC, et alk., v. Teva Pharmaceuticals USA, Inc. Civil Action No. 11-6936 (SRC) (CLS). US District for New Jersey. Retained by Covington Burling LLP on behalf of Warner Chilcott Company.

15. 2015 - Astrazeneca AB, Aktiebolaget Hassle, Astrazeneca LP, KBI In c., and KBI-E Inc. v. Mylan Laboratories Limited and Mylan Inc. Civil Action No. 3:12-CV-01378-MLC-TJB. Retained by Covington Burling LLP on behalf of AstraZeneca.

16. 2015 - Monica Barba and Jonathan Reisman v. Shire US Inc. Case No. 1:13-21158-Civ-Lenard/Goodman. Retained by Frommer Lawrence on behalf of Shire US Inc.

17. 2015 - CIPRO Cases I & II. Hoechst Marrion Roussel, Inc., Watson Pharmaceuticals, Inc., The Rugby Group, Inc., and Barr Laboratories. Retained by Kirkland & Ellis LLP on behalf of defendants.

18. 2016 - Aggrenox Antitrust Litigation. US District District Court for Connecticut. Docket No. 3:14MD2516 (SRU). Teva Pharmaceuticals, USA, Inc., Barr Pharmaceuticals USA, Inc., Duramed Pharmaceuticals, Inc., Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim

International GmbH, and Boehringer Ingelheim Pharmaceuticals, Inc.20.
Retained by White & Case on behalf of defendants

19. 2016 - Painters and Allied Trades District Council 82 Health Care Fund v.
Forest Laboratories LLC, et al, No. 13-CV-13113 (NMG) (D.Mass). Retained
by Debevoise & Plimpton LLP on behalf of Forest Pharmaceuticals.

20. 2016 - Lidoderm Antitrust Litigation. MDL Docket No. 14-md-02521-WHO.
Retained by Arnold & Porter on behalf of Endo Pharmaceuticals, Teikoku
Pharma, and others.

21. 2016 - Rickitt Benckiser Pharmaceuticals Inc And Monosol Rx LLC v. Par
Pharmaceuticals Inc and Intelgenx Technologies Corp. CA No. 14-01573-
RGA. Retained by Covington Burling LLP on behalf of Rickitt Benckiser
Pharmaceuticals, Inc, and Indivior, PLC.

22. 2016 - Corcoron et al vs. CVS. Civil Action No. 15-CV-3404-YGR. Retained
by Stein Mitchell on behalf of Plaintiffs.

23. 2018 - Takeda Pharmaceuticals USA, Inc., v. West-Ward Pharmaceutical
Corporation, Hikma Americas, Inc., and Hikma Pharmaceuticals, PLC. US
District Court for the District of Delaware. Case No. 1:14-cv-01268-RGA-
SRF. Retained by Munger, Tolles & Olson LLP on behalf of Takeda
Pharmaceuticals.

## Publications, Posters, Abstracts[1]

1. Navarro RP Fundamentals of Managed Care Pharmacy 2nd Edition -
Professional Version, Modules 1, 3, 5, and 8. Academy of Managed Care
Pharmacy. 2019. Available at http://amcplearn.org/products/1564/the-
fundamentals-of-managed-care-pharmacy-certificate-program-2nd-edition-
professional-version.

2. Navarro RP. Introduction to Medicare and Medicaid. In: Whalen K and
Hardin HC ,eds. *Medication Therapy Management: A Comprehensive
Approach, 2nd ed.* New York, NT:  McGraw-Hill Education; 2018:1-54.
Available at https://accesspharmacy-mhmedical-com.lp.hscl.ufl.edu/
content.aspx?bookid=2319&sectionid=180046608.

3. Thomas R, Zhou L, and Navarro RP. Identification of Desirable and Non-
Desirable Drug and Disease State Characteristics in Outcomes-Based

---

[1] Ten years of *Managed Care Interface* published editorials (1990-2000) are not included.

25 March 2019

Contracts: A Review of Current Literature. AMCP NEXUS Meeting, Orlando, FL, 23-25 October 2018.

4. Navarro RP. Changing the Way We Pay for Health Care: Is Value the New Plastic? *J Man Care Pharm.* 2017;23(10):998-1002. Available at https://doi.org/10.18553/jmcp.2017.23.10.998.

5. Nazareth T, Ko JJ, Sasane R, Frois C, Carpenter S, Demean S, Vegesna A, Wu E, and Navarro RP. Outcomes-Based Contracting Experience: Findings from Research with US and European Stakeholders. *J Man Care Pharm.* 2017;23(10):1018-1026. Available at https://doi.org/10.18553/jmcp.2017.23.10.1018.

6. Goble JA, Ung A, von Boemmel-Wegmann S, Navarro RP, and Parece A. Performance-Based Risk-Sharing Arrangements: US Payer Experience and Insights. *J Man Care Pharm*. 2017;23(10):1042-1052. Available at https://doi.org/10.18553/jmcp.2017.23.10.1042.

7. Navarro R, Whangbo A, *et al.* An Assessment of the Persistence and Medication Possession Ratio of Adjunctive Treatments to Levodopa in Patients with Parkinson's Disease. AMCP NEXUS Meeting, Dallas, TX. 18 October 2017 (poster/abstract).

8. Navarro RP, Whangbo A, Pahwa R, Isaacson SH, *et al.* An Assessment of the Persistence and Medication Possession Ratio of Adjunctive Treatments to Levodopa in Patients with Parkinson's Disease (PD). International Society for Pharmaceutical Economics and Outcomes Research (ISPOR) meeting. Boston, MA, 23 May 2017 (poster/abstract).

9. Bolus CL, Kenney JT, Rice G, and Navarro R: Primary Biliary Cholangitis: Medical and Specialty Pharmacy Management Update. *J Man Care Pharm.* 2016;22(10-a-s); available at http://www.jmcp.org/doi/full/10.18553/jmcp.2016.22.10-a-s.s3.

10. Goble J, Ung B, Navarro R, von Boemmel-Wegmann S, and Parece A. Disease, Drug, Outcomes Data Requirements, and Contract Template Component Recommendations to Improve Performance-Based Risk-Sharing Arrangements. AMCP NEXUS Meeting, Washington, DC, October 2016 (poster/abstract).

11. Goble J, Ung B, Navarro R. Performance-Based Risk-Sharing Agreements with Drug Manufacturers. AMCP Annual Meeting, April 2016, San Francisco, CA (poster/abstract).

25 March 2019

12. Yoonyoung Choi and <u>RP Navarro</u>: Assessment of the Level of Satisfaction and Unmet Needs of Drug Formulary Decision Makers. *J Man Care Pharm* 2016;22(4):368-375e.

5. Nazareth T, Ko J, Frois C, Carpenter S, Demean S, Wu E, Sasane R, <u>Navarro R.</u> Outcomes-Based Pricing and Reimbursement Arrangements for Pharmaceutical Products in the U.S. and EU-5: Payer and Manufacturer Experience and Outlook. AMCP NEXUS, Orlando, FL,  October 2015 (poster/abstract).

6. Nazareth T, Ko J, Frois C, Carpenter S, Demean S, Wu E, Sasane R, <u>Navarro R.</u> Outcomes-Based Contracting for Pharmaceutical Products in the United States: Payer and Manufacturer Experience and Outlook. International Society of Pharmacoeconomics and Outcomes Research Annual Meeting, Philadelphia, PA, July 2015 (poster/abstract).

7. Nazareth T, Ko J, Frois C, Carpenter S, Demean S, Wu E, Sasane R, <u>Navarro R.</u> Outcomes-Based Contracting for Pharmaceutical Products in the United States: Payer and Manufacturer Experience and Outlook. AMCP NEXUS, Boston, MA, October 2014 (poster/abstract).

8. Yoonyoung Choi and RP Navarro. Assessment of the Level of Satisfaction and Unmet Needs of Drug Formulary Decision Makers. AMCP NEXUS, Boston, MA, October 2014; (poster/abstract)

9. Navarro RP (editor). *Managed Care Pharmacy Practice, 3rd ed.* (in progress). Jones & Bartlett Learning, Sudbury, MA. 2016 (est.).

10. Navarro RP (moderator). Translating Clinical Guidelines into Practice: The Effective and Appropriate Use of Human Growth Hormone. *American Journal of Managed Care*, in press, 2013.

11. Navarro RP and Tertocha PC. The Affordable Care Act: Implications for Pharmacists, Pharmacy Technicians, and Patients. Postgraduate Healthcare Education, LLC, 2013, available at http://www.powerpak.com/course/preamble/109309.

12. Navarro RP and Johnson KJ. Opportunities and Challenges of Specialty Pharmaceuticals (editorial). *JMCP* 19(1); 2013: 70-71.

13. Navarro RP (moderator). Considerations for the Optimal Use of Immunoglobulin. *Journal of Managed Care.* 2012*; 18(4S).*

14. Navarro RP (moderator). Quality Improvement Expert Roundtable. *American Journal of Managed Care* video web seminar.

25 March 2019

15. Navarro RP, Stern C, Hailey R. "Prescription Drug Benefits in Managed Care" in, Kongstvedt PR, ed. *Essentials of Managed Health Care, 6th Edition*, Jones & Bartlett Publishers, Sudbury, MA; 2012.

16. Navarro RP, moderator. Management Strategies for Atrial Fibrillation: Improving Outcomes in Managed Care. *American Journal of Managed Care* video web seminar. Published January 2010. Available at http://www.ajmc.com/AF_Roundtable.

17. Navarro RP, moderator. Contemporary Management Strategies for Fibromyalgia. *American Journal of Managed Care*. 2009;15(6): S197-S218.

18. Navarro RP: Tablet Splitting. Much Ado About Nothing? *Journal of Managed Care Pharmacy*. 2009; 15(3), April 2009

19. Navarro RP, ed. *Managed Care Pharmacy Practice, 2nd Edition*, Jones and Bartlett Publishers, Sudbury, MA; 2009.

20. Navarro RP, Rice GK, and Schaecher, KL. Asthma Management Guidelines: Updates, Advances, and New Options. *Journal of Managed Care Pharmacy*. 2007; 13(6):S1-S13.

21. Navarro RP, Mitrzyk BM, and Bramley TJ. Chronic Insomnia Treatment and Medicare Part D: implications for managed care organizations. American Journal of Managed Care. 2007;13:S121-S124

22. Navarro RP, Hailey R. "Prescription Drug Benefits in Managed Care" in, Kongstvedt PR (ed.): *Essentials of Managed Health Care, 5th Edition,* Jones & Bartlett Publishers, Sudbury, MA, 2007.

23. Navarro RP, Hailey R. "Evolution of the Management of US Health Care: Managing Cost to Care Management" in, *Handbook of Institutional Pharmacy Practice, 4th Edition*. American Society of Health-System Pharmacists, Bethesda, MD, 2005.

24. Navarro RP, Parasuraman B. "Cost Effectiveness of Asthma Controller Therapies: Influence of Disease Severity and Other Variables." *Managed Care Interface*, 2005; 18: 31-37.

25. Navarro RP, Morrow T, Baran R. Clinical and Pharmacoeconomic Outcomes in Oncology Using Oral Chemotherapy. *Managed Care Interface*, May, 2002

26. Navarro RP. "Prescription Drug Benefits in Managed Care" in, Kongstvedt PR, ed. *Essentials of Managed Health Care, 4th Edition,* Aspen Publications, Gaithersburg, MD, 2000.

25 March 2019

27. Navarro RP, ed. *Managed Care Pharmacy Practice*. Aspen Publications, Gaithersburg, MD, 1999.

28. Navarro RP, ed. P*harmacy Benefit Report*. Novartis, Summit, New Jersey, 1994 - 1999.

29. Parker A, Teitlebaum F, and <u>Navarro RP.</u> *The Drug Trend Report*. Express Scripts, Inc., St. Louis, 1997.

25 March 2019

# APPENDIX B

**MATERIALS CONSIDERED**

<u>**Pleadings**</u>

Sanofi Complaint

<u>**Expert Reports**</u>

Expert Report of Fiona Scott Mortons

<u>**Deposition Transcripts and Exhibits**</u>

Joseph Anderson Deposition Transcript (with Exhibits)

James Ayers Deposition Transcript (with Exhibits)

James Borneman Deposition Transcript (with Exhibits)

Michael Brodeur Deposition Transcript (with Exhibits)

Douglas Brown Deposition Transcript (with Exhibits)

Patrick Byrne Deposition Transcript (with Exhibits)

Louanne Cunico Deposition Transcript (with Exhibits)

Joseph Denney Deposition Transcript (with Exhibits)

Robert Eaton Deposition Transcript (with Exhibits)

Lida Etemad Deposition Transcript (with Exhibits)

Bruce Foster Deposition Transcript (with Exhibits)

Peter Guenter Deposition Transcript (with Exhibits 1-11)

Ron Graybill Deposition Transcript (with Exhibits)

Jason Hall Deposition Transcript (with Exhibits)

Saira Jan Deposition Transcript (with Exhibits)

Pat Jones Deposition Transcript (with Exhibits)

Harry Jordan Deposition Transcript (with Exhibits)

Adam Kautzner Deposition Transcript (with Exhibits)

Deborah Kronberg Deposition Transcript (with Exhibits)

Sandy Loreaux Deposition Transcript (with Exhibits)

Jeff May Deposition Transcript (with Exhibits)

Barbara Minton Deposition Transcript (with Exhibits)

Kent Rogers Deposition Transcript (with Exhibits)

Fiona Scott Morton Deposition Transcript (with Exhibits 7, 8, 10, 12)

Macy Shia Deposition Transcript (with Exhibits)

Bethanie Stein Deposition Transcript (with Exhibits)

Lisa Templeton Deposition Transcript (with Exhibits)

Harry Vargo, Jr. Deposition Transcript (with Exhibits)

Christopher Viehbacher Deposition Transcript (with Exhibits)

Keith Wade Deposition Transcript (with Exhibits)

Jeff White Deposition Transcript (with Exhibits)

Nicole Willing Deposition Transcript (with Exhibits)

Justin Works Deposition Transcript (with Exhibits)

Lisa Templeton Deposition Exhibits 7 and 39

**Bates-Stamped Documents**

| | |
|---|---|
| ANTH-EPI 00048 | CVSCM_EPI_000000201 |
| ANTH-EPI 00707 | CVSCM_EPI_000000209 |
| CIGNA_00082 | CVSCM_EPI_000035097 |
| CIGNA_00403 | EAI 00041402 |
| CIGNA_00499 | EAI 00230011 |
| CIGNA_00533 | EAI 00230080 |
| CIGNA_00549 | EAI 00230117 |
| CIGNA_01361 | EAI 00230143 |
| CIGNA_01375 | EAI 00230169 |
| CIGNA_01486 | EAI 00230173 |
| CIGNA_01575 | EAI 00230199 |
| CVSCM_EPI_000000001 | EAI 00230232 |
| CVSCM_EPI_000000031 | EPI_WELLCARE_00024430 |
| CVSCM_EPI_000000042 | EPI_WELLCARE_00024971 |
| CVSCM_EPI_000000056 | EPI_WELLCARE_00024972 |
| CVSCM_EPI_000000072 | EPI_WELLCARE_00025138 |
| CVSCM_EPI_000000099 | EPI_WELLCARE_00028158 |
| CVSCM_EPI_000000101 | EPI_WELLCARE_00028173 |
| CVSCM_EPI_000000126 | EPI_WELLCARE_00028177 |
| CVSCM_EPI_000000152 | EPI-WELLCARE_00023689 |
| CVSCM_EPI_000000162 | KFHP_0574 |

2

| | |
|---|---|
| KFHP_0696 | MYEP00000560 |
| KFHP_0700 | MYEP00000564 |
| KFHP_0703 | MYEP00000569 |
| KFHP_0708 | MYEP00000615 |
| KFHP_0712 | MYEP00000617 |
| KFHP_0717 | MYEP00000619 |
| KFHP_0721 | MYEP00000622 |
| KFHP_0724 | MYEP00000626 |
| KFHP_0728 | MYEP00000638 |
| KFHP_0731 | MYEP00000643 |
| KFHP_0735 | MYEP00000654 |
| KFHP_0738 | MYEP00000661 |
| KFHP_0743 | MYEP00000713 |
| MAG000001577 | MYEP00000721 |
| MedImpact_00044 | MYEP00000733 |
| MedImpact_00077 | MYEP00000736 |
| MedImpact_00084 | MYEP00000761 |
| MedImpact_00096 | MYEP00000854 |
| MedImpact_00118 | MYEP00000860 |
| MedImpact_00121 | MYEP00000863 |
| MedImpact_00126 | MYEP00000879 |
| MedImpact_00133 | MYEP00000881 |
| MedImpact_0016615 | MYEP00000926 |
| MedImpact_01050 | MYEP00000930 |
| MedImpact_01103 | MYEP00000934 |
| MedImpact_01141 | MYEP00000935 |
| MedImpact_01150 | MYEP00000950 |
| MYEP00000501 | MYEP00000957 |
| MYEP00000524 | MYEP00000978 |
| MYEP00000530 | MYEP00000996 |
| MYEP00000538 | MYEP00001010 |

| | |
|---|---|
| MYEP00001052 | MYEP01064892 |
| MYEP00001063 | MYEP01121952 |
| MYEP00001084 | MYEP01202343 |
| MYEP00001093 | MYEP01227891 |
| MYEP00069009 | MYEP01230509 |
| MYEP00082635 | MYEP01246239 |
| MYEP00084633 | MYEP01246315 |
| MYEP00084790 | MYEP0199425 |
| MYEP00086231 | PRIME_0008639 |
| MYEP00086239 | PRIME_0011021 |
| MYEP00086241 | PRIME_0011277 |
| MYEP00086244 | PRIME_0011784 |
| MYEP00086249 | PRIME_0011901 |
| MYEP00086274 | PRIME_0012064 |
| MYEP00086279 | PRIME_0012073 |
| MYEP00086849 | PRIME_0013453 |
| MYEP00087473 | SAN-EPI_A-0007657 |
| MYEP00087476 | SAN-EPI_A-0037793 |
| MYEP00087486 | SAN-EPI_A-0038078 |
| MYEP00087496 | SAN-EPI_A-0038086 |
| MYEP00087500 | SAN-EPI_A-0038409 |
| MYEP00251958 | SAN-EPI_A-0038448 |
| MYEP00251967 | SAN-EPI_A-0040512 |
| MYEP00260323 | SAN-EPI_A-0041184 |
| MYEP00311728 | SAN-EPI_A-0041202 |
| MYEP00322808 | SAN-EPI_A-0041409 |
| MYEP00603857 | SAN-EPI_A-0059702 |
| MYEP00604105 | SAN-EPI_A-0059705 |
| MYEP00604107 | SAN-EPI_A-0085822 |
| MYEP00606339 | SAN-EPI_A-0093185 |
| MYEP00719641 | SAN-EPI_A-0093244 |

4

SAN-EPI_A-0093383

SAN-EPI_A-0094607

SAN-EPI_A-0094853

SAN-EPI_A-0126034

SAN-EPI_A-0141213

SAN-EPI_A-0143545

SAN-EPI_A-0146384

SAN-EPI_A-0147696

SAN-EPI_A-0150738

SAN-EPI_A-0155547

SAN-EPI_A-0168416

SAN-EPI_A-0181268

SAN-EPI_A-0198411

SAN-EPI-0000482

SAN-EPI-0189632

SAN-EPI-0362562

SAN-EPI-0403083

SAN-EPI-0403443

SAN-EPI-0403700

SAN-EPI-0403750

SAN-EPI-0405882

SAN-EPI-0405915

SAN-EPI-0410072

SAN-EPI-0432334

SAN-EPI-0432718

SAN-EPI-0435405

SAN-EPI-0436556

SAN-EPI-0544641

SAN-EPI-0544974

SAN-EPI-0545576

SAN-EPI-0755825

SAN-EPI-0755962

SAN-EPI-0763907

SAN-EPI-0764724

SAN-EPI-0764881

SAN-EPI-0764970

SAN-EPI-0873203

SAN-EPI-0887394

SAN-EPI-0901252

SAN-EPI-0901258

SAN-EPI-0901269

SAN-EPI-0946459

SAN-EPI-0957050

SAN-EPI-0979543

SAN-EPI-1058488

SAN-EPI-1059922

SAN-EPI-1093101

SAN-EPI-1093112

SAN-EPI-1094715

## Additional Materials Cited

1. Fox PD, Kongstvedt R., Introduction to Health Insurance and Managed Care. Kongstvedt PR (Ed). *Essentials of Managed Health Care.* 2013, Sudbury, MA. Jones & Bartlett Learning. Part I.

2. Navarro RP, Stern CS, Hailey R. Prescription Drug Benefits in Managed Care. Kongstvedt PR (Ed). *Essentials of Managed Health Care*. 2013, Sudbury, MA. Jones & Bartlett Learning. Chapter 11.

3. What is a PBM? PCMA website, available at https://www.pcmanet.org/our-industry/.

4. Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice, 2nd Ed.,*, MA, Jones and Bartlett Publishers, 2009:

    i. Navarro RP, Hailey R. Chapter 2, Overview of Prescription Drug Benefits in Managed Care,

    ii. Navarro, Robert P. Chapter 4, Pharmacy Benefit Management Companies

    iii. Sterler Lowell T, Stephens D. Chapter 5, Pharmacy Distribution Systems and Network Management

    iv. Navarro, Robert P, et al., Chapter 13, Pharmacy & Therapeutics Committees in Managed Care Organizations

    v. Navarro RP, Kenney JT, *et al.* Chapter 15, Chapter Managed Care Contracts With Pharmaceutical Manufacturers

5. Anderson BN, Cosway R. Effective Contracting with Pharmacy Benefit Managers, Health Watch. February 2010, pages 22-27, available at http://www.milliman.com/uploadedFiles/insight/health-published/effective-contracting-with-pharmacy.pdf.

6. Our Opportunity to Be Better Together, ESI website, August 2, 2018, available at http://lab.express-scripts.com/lab/insights/drug-options/our-opportunity-to-be-better-together.

7. CVS Health 2017 Corporate Social Responsibility Report, page 3, available at https://cvshealth.com/sites/default/files/2017-csr-full-report.pdf.

8. Visante, Inc., "Pharmacy Benefit Managers (PBMs): Generating Savings for purchasers and Consumers," February 2016, p. 3, https://www.pcmanet.org/wp-content/uploads/2016/08/visante-pbm-savings-feb-2016.

9. State of Competition in the Pharmacy Benefits Managers and Pharmacy Marketplace. Subcommittee on Regulatory Reform, Commercial and Antitrust Law, November 17, 2015, 114 Congress House Hearing, available at https://www.govinfo.gov/content/pkg/CHRG-114hhrg97631/html/CHRG-114hhrg97631.htm.

10. New Disclosures Show CVS and Express Scripts Can Survive in a World Without Rebates. Are Plan Sponsors Now the Real Barrier to Disruption? Drug Channels

website, August 14, 2018, available at https://www.drugchannels.net/2018/08/new-disclosures-show-cvs-and-express.html.

11. Staying competitive in pharmacy benefits manager selection process. Milliman White Paper, September 2016, page 2, available at http://www.milliman.com/uploadedFiles/insight/2016/PBM-RFP.pdf.

12. 2018 Drug Trend Report, page 2, ESI website, available at http://lab.express-scripts.com/lab/drug-trend-report/2018-drug-trend-report.

13. Prime Therapeutics Focus on Trend Commercial Spring 2018, available at https://www.primetherapeutics.com/content/dam/corporate/Documents/Newsroom/Pressreleases/2018/document-commercial-trend-spring-2018.pdf.

14. Annual growth rate of consumer price index for medical care services in U.S. urban areas from 2007 to 2018. The Statista Portal website, available at https://www.statista.com/statistics/498802/cpi-prices-us-medical-care-services-annual-growth-rate-urban/.

15. Staying Competitive in the pharmacy benefit manager selection process. September 7, 2016, Milliman website, available at http://www.milliman.com/insight/2016/Staying-competitive-in-the-pharmacy-benefits-manager-selection-process/..

16. Wallack SS, Weinberg, DB, and Thomas CP. Health Plans' Strategies to Control Prescription Drug Spending. *Health Affairs*.2004;23(6), available athttps://www.healthaffairs.org/doi/full/10.1377/hlthaff.23.6.141.

17. Roehrig C. Rebates, Coupons, PBMs, and the Cost of the Prescription Drug Benefit. Health Affairs Blog. 2018; April 16, 2018, available at https://www.healthaffairs.org/do/10.1377/hblog20180424.17957/full/.

18. National Council on Prescription Drug Programs website, available at https://ncpdp.org/home.

19. OptumRx Pharmacy Care Services, Optum website, available at https://www.optum.com/solutions/optumrx.html.

20. PBMs Provide Clinical Value to Patients, Doctors and Other Healthcare Providers. PCMA website, available at https://www.pcmanet.org/wp-content/uploads/2017/04/PBMs-Provide-Clinical-Value-to-Patients-Doctors-and-Other-Healthcare-Providers_whitepaper_final.pdf.

21. Express Scripts, Inc., webpage, September 19, 2018, pages 2-6, available at https://expressscriptsholdingco.gcs-web.com/news-releases/news-release-details/express-scripts-earns-highest-overall-customer-satisfaction.

22. 2018 Employer Health Benefit Survey, Kaiser Family Foundation website, Section 4, available at https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-4-types-of-plans-offered/.

23. Self-Insured Group Health Plans, self-Insurance Institute of America, Inc., website, available at https://www.siia.org/i4a/pages/Index.cfm?pageID=4546.

24. Health Plans & Benefits: ERISA, U.S. Department of Labor website, available at https://www.dol.gov/general/topic/health-plans/erisa.

25. Formulary Management, AMCP website, available at http://www.amcp.org/workarea/downloadasset.aspx?id=9298.

26. Impact of 2 Copay Waivers in a Generic Incentive Program. American Health & Drug Benefits. 2010;3(3), available at http://www.ahdbonline.com/issues/2010/may-june-2010-vol-3-no-3/38-article-38.

27. 2018 Employer Health Benefits Survey, Kaiser Family Foundation, Section 9, available at https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-9-prescription-drug-benefits/.

28. Express Scripts drug formulary examples available at http://www.mympcbenefits.com/Documents/MPC-2019-Express-Scripts-Preferred-Brand-Drugs-List.pdf, https://www.bluekc.com/consumer/pdfs/HPF.pdf, http://www.egtrust.org/wp-content/uploads/2017/08/2017-express-scripts.pdf; https://hr.harvard.edu/files/humanresources/files/national_preferred_alpha_prmt.pdf, https://expressscriptsholdingco.gcs-web.com/news-releases/news-release-details/express-scripts-introduces-novel-formulary-built-evolution-drug.

29. 2016 Aetna Pharmacy Drug Guide for the Five Tier Open Aetna Commercial Plan, Aetna00006487.

30. 2014 Preferred Drug List Exclusions, Express Scripts, Inc., website, available at http://static1.1.sqspcdn.com/static/f/854323/24139682/1388679250987/2014-ESI-Preferred-Drug-List-Exclusions.pdf?token=YYX8fJdpezYRZeHHxpTAGM%2FBbzY%3D.

31. January 2013 Formulary Drug Removals, October 9, 2012, CVS Caremark website, available at https://myteamcare.org/media/31429/TC_Caremark_Formulary_Exclusions_2013.pdf.

32. 2015 Aetna Pharmacy Drug Guide for the Five Tier Open Aetna Commercial Plan, p. 96-97, Aetna00006112.

33. Formulary Development and Management at CVS Caremark web article, available at https://www.caremark.com/portal/asset/FormDevMgmt.pdf.

34. White Paper: Formulary Development at Express Scripts, Express Scripts website, page 3, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=2ahUKEwjoj4Xq0_zgAhUPXa0KHcKSCoIQFjABegQICBAC&url=https%3A%2F%2Flab.express-scripts.com%2Fabout%2F~%2Fmedia2Ffb7c116a462a46fa95a5213e0af4bfc3.ashx&usg=AOvVaw1C7jO6JsrwXpVkcwCyeLR9.

35. How We Build a Formulary, ESI website, available at http://lab.express-scripts.com/lab/insights/drug-options/how-we-build-a-formulary.

36.   Navarro, Robert P., and Rusty Hailey, "Overview of Prescription Drug Benefits in Managed Care," In Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice, 2nd Ed.,* Sudbury, MA, Jones and Bartlett Publishers, 2009, Chapter 2.

37.   NIH ClinicalTrials.gov website, available at https://www.clinicaltrials.gov.

38.   AMCP format for Formulary Submissions website, available at http://www.amcp.org/practice-resources/amcp-format-formulary-submissions/.

39.   DRUGDEX Detailed Drug Information, available at http://www.micromedexsolutions.com/micromedex2/4.85.0/WebHelp/Document_help/Drug_Eval_document.htm.

40.   American Hospital Formulary Service-Drug Information, available at http://www.ahfsdruginformation.com.

41.   P&T Committee, AMCP website, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=9&ved=2ahUKEwipm5exhIXhAhXKxVQKHZjLDPEQFjAIegQIAhAC&url=http%3A%2F%2Famcp.org%2FWorkArea%2FDownloadAsset.aspx%3Fid%3D19132&usg=AOvVaw07ftyuzC62Gaf7mdKf-OhW.

42.   Navarro, Robert P., et al., "Pharmacy & Therapeutics Committees in Managed Care Organizations," In Navarro, Robert P. (ed.), *Managed Care Pharmacy Practice, 2nd Ed.,* Sudbury, MA, Jones and Bartlett Publishers, 2009, Chapter 13.

43.   FirstDataBank Drug Price Analysis available at https://www.fdbhealth.com/solutions/drug-pricing-analysis/; MediSpan Price Rx available at https://www.wolterskluwercdi.com/price-rx/; IBM MicroMedex RedBook available at https://www.ibm.com/us-en/marketplace/micromedex-red-book.

44.   Follow the Dollar, page 4, PhRMA website, available at http://phrma-docs.phrma.org/files/dmfile/Follow-the-Dollar-Report.pdf.

Insulin Access and Affordability Working Group - Conclusions and Recommendations. Diabetes Care. 2008;41:1299-1311, page 1304, available at http://care.diabetesjournals.org/content/41/6/1299.article-info.

45.   A primer **on** prescription drug rebates: Insights into why rebates are a target for reducing prices. Milliman White Paper May 2018, page 1-2, available at http://www.milliman.com/uploadedFiles/insight/2018/Prescription-drug-rebates.pdf.

46.   What is Price Protection?, High Point website, available at http://blog.highpointsolutions.com/what-is-price-protection.

47.   Medicine Use and Spending in the U.S. A Review of 2017 and Outlook to 2022. IQVia Institute, p. 39, 41, available at https://www.iqvia.com/institute/reports/medicine-use-and-spending-in-the-us-review-of-2017-outlook-to-2022.

48.   5 questions: Drug Pricing. OptumRx website, available at https://www.optum.com/resources/library/5-questions-kent-rogers.html.

49. Pharmacy manufacturer rebate negotiation strategies: A common ground for a common purpose, November 17, 2015, Milliman website, available at http://www.milliman.com/insight/2015/Pharmacy-manufacturer-rebate-negotiation-strategies-A-common-ground-for-a-common-purpose/.

50. What is Price Protection?, High Point website, available at http://blog.highpointsolutions.com/what-is-price-protection.

51. The Impact of Prescription Drug Rebates on Health :Plans and Consumers Report, April 2018, Altarum website, available https://altarum.org/sites/default/files/Altarum-Prescription-Drug-Rebate-Report_April-2018.pdf.

52. Maintaining the Affordability of the Prescription Drug Benefit: How Managed Care Organizations Secure Price Concessions from Pharmaceutical Manufacturers, Academy of Managed Care Pharmacy website, page 4. Available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=9299.

53. Global Pharmaceuticals Industry Overview/Analysis, Credit Suisse, May 17, 2016, pages 1-3.

54. Payer Power: Why Eli Lilly, Janssen, and Merck Deeply Discount Their Drug Prices, Drug Channels, April 5, 2018, available at https://www.drugchannels.net/2018/04/payer-power-why-eli-lilly-janssen-and.html.

55. Rebates, Coupons, PBMs, and the Cost of the Prescription Drug Benefit. *Health Affairs* Blog, April 26, 2018, available at https://www.healthaffairs.org/do/10.1377/hblog20180424.17957/full/.

56. Maintaining the Affordability of the Prescription Drug Benefit: How Managed Care Organizations Secure Price Concessions from Pharmaceutical Manufacturers. Academy of Managed Care Pharmacy. Available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=9299.

57. UnitedHealthcare Prescription Drug List, available at https://www.uhc.com/employer/pharmacy/total-cost-management/prescription-drug-list; CVS Caremark Formulary Drug Removals January 2013, available at https://myteamcare.org/media/31429/TC_Caremark_Formulary_Exclusions_2013.pdf ; Express Scripts 2014 Preferred Drug List Exclusions, available at http://static1.1.sqspcdn.com/static/f/854323/24139682/1388679250987/2014-ESI-Preferred-Drug-List-Exclusions.pdf?token=YNFM1gPuajUpTXK8IbIClFjiok8%3D.

58. PBMs Just Say No to Some Drugs—But Not to Others. *Managed Care*, April 5, 2015, available at https://www.managedcaremag.com/archives/2015/4/pbms-just-say-no-some-drugs-not-others.

59. Current and New Approaches to Making Drugs More Affordable, August 2018, CVS Health, available at https://cvshealth.com/sites/default/files/cvs-health-current-and-new-approaches-to-making-drugs-more-affordable.pdf.

60.     Eli Lilly 2017 Integrated Summary Report, page 22.

61.     2017 Standard Formulary List of Removals and Updates,  CVS Caremark website, available at https://cvshealth.com/sites/default/files/cvs-health-2017-standard-formulary-list.pdf;  Removals for Clients with Advanced Control Specialty Formulary, October 2018, CVS Caremark website, available at https://www.caremark.com/portal/asset/Formulary_Drug_Removals_JPMC.pdf; Formulary Drug Removals, January 2019, CVS Caremark website, available at https://www.caremark.com/portal/asset/Formulary_Exclusion_Drug_List.pdf;

62.     Express Scripts Rewards Low List-Priced Brands in 2019 Formulary, Retains Focus on Rebates. PharmaIntelligence website, https://pharmaintelligence.informa.com/resources/product-content/express-scripts-rewards-low-list-priced-brands-in-2019-formulary. Accessed 8 December 2018.

~~63.~~     Drug Removals for Clients with Advanced Control Specialty Formulary, Diabetes Category Drug Class, October 2018, CVS Caremark website, available at https://www.caremark.com/portal/asset/Formulary_Drug_Removals_JPMC.pdf.

64.     2019 Express Scripts National Preferred Formulary, available at http://www.mympcbenefits.com/Documents/MPC-2019-Express-Scripts-Preferred-Brand-Drugs-List.pdf.

65.     CVS Caremark Preferred Drug List January 2019, available at https://www.caremark.com/portal/asset/siemens_dl.pdf.

66.     AMCP Position Statement on Generic Drugs, revised February 2017, available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=19771.

67.     Association for Accessible Medicines website, available at https://accessiblemeds.org/sites/default/files/2018_aam_generic_drug_access_and_savings_report.pdf.

68.     Liberman JN, Roebuck MC. Prescription Drug Costs and the Generic Dispensing Ratio. *J Man Care Pharm.* 2010;16(7):502-06. Available at https://www.jmcp.org/doi/pdf/10.18553/jmcp.2010.16.7.502.

69.     AAM 2018 Generic Drug Access & Savings Report, https://accessiblemeds.org/resources/blog/2018-generic-drug-access-and-savings-report.

70.     Sarpatwari, Ameet, et al., "Paying Physicians to Prescribe Generic Drugs and Follow-On Biologics in the United States," *PLoS Medicine*, 2015, pp. 4-5.

71.     Reference List Drug (RLD) Access Inquiries, FDA website, available at https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/AbbreviatedNewDrugApplicationANDAGenerics/ucm607738.htm.

72.     FDA Approved Drug Products with Therapeutic Equivalence Evaluations,  available

at https://www.accessdata.fda.gov/scripts/cder/ob/.

73. Shrank WH, Choudhry NK, *et al*. State Generic Substitution Laws Can Lower Drug Outlays Under Medicaid. *Health Affairs*. July 2010, available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2009.0424.

74. Vivian, JC. Generic-Substitution Laws. *US Pharmacist*. 2008;33(6): 30-34.

75. American Patients First. The Trump Administration Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs, May 2018, Department of Health and Human Services, available at https://www.hhs.gov/sites/default/files/AmericanPatientsFirst.pdf.

76. 42 CFR Part 1001 Fraud and Abuse: Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals and Creation of New Safe Harbor Protection for Certain Point-of-Sale Reductions in Price on Prescription Pharmaceuticals and Certain Pharmacy Benefit Manager Service Fees, Office of Inspector General, Department of HHS, Federal Register. February 6, 2019;84(25), pages 2340 to 2363, available at https://www.govinfo.gov/content/pkg/FR-2019-02-06/pdf/2019-01026.pdf.

77. Fraud and Abuse: Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals, Regulations.gov website, available at https://www.regulations.gov/docket?D=HHSIG-2019-0001.

78. Testimony of Olivier Brandicourt, M.D., Before the Senate Committee on Finance, February 26, 2019.  https://www.finance.senate.gov/download/02262019-brandicourt-testimony.

79. Prescription Drug Pricing and Negotiation: Overview and Economic Perspectives for the Medicare Prescription Drug Benefit.

80. CVS Health, Why the Time is Right for a New Pricing Model, March 19, 2019, available at https://payorsolutions.cvshealth.com/insights/why-the-time-is-right-for-a-new-pricing-model.

81. Regeneron/Sanofi cut heart drug price to $4,500 - $6,000 for Express Scripts. Reuters Health News, May 1, 2018, available at https://www.reuters.com/article/us-regeneron-pharms-sanofi-fr-cholestero/regeneron-sanofi-cut-heart-drug-price-to-4500-6600-for-express-scripts-idUSKBN1I23FW.

82. The Declining Value of Payer Access: How to Improve Rebate Efficiency. 2016, Amundsen Consulting, pagers 3, 7, 9, available at https://www.marketingweb.iqvia.com/rebate-efficiency-payer-access/.

83. Navarro RP. Marketing Pharmaceuticals to Managed Care Systems. March 1988. Spectrum publications, Arthur D. Little Decision Resources, page 1-29 to 1-38.

**Additional Materials Considered**

84. CVS Health Standard Formulary List of Removals and Updates, available at https://cvshealth.com/sites/default/files/cvs-health-2017-standard-formulary-list.pdf.

85. CVS Caremark Drug Removals for clients with Advanced Control Specialty Formulary, October 2018, available at https://www.caremark.com/portal/asset/Formulary_Drug_Removals_JPMC.pdf.

86. CVS Caremark Formulary Drug Removals, January 2019, available at https://www.caremark.com/portal/asset/Formulary_Exclusion_Drug_List.pdf.

87. Pharmacy manufacturer rebate negotiation strategies: A common ground for a common purpose, November 17, 2015, Milliman website, available at http://www.milliman.com/insight/2015/Pharmacy-manufacturer-rebate-negotiation-strategies-A-common-ground-for-a-common-purpose/.

88. Determinants of HMO Formulary Adoption Decisions. Health Services Research.2003;38(1PT1):169-190, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1360880/.

89. Express Scripts 2017 Drug Trend Report, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=2ahUKEwj7jK26tp3hAhVERK0KHTLXBbQQFjABegQIABAC&url=http%3A%2F%2Flab.express-scripts.com%2Flab%2Fdrug-trend-report%2F~%2Fmedia%2F2b56ec26c9a04ec2bcca0e9bf1ea8ff1.ashx&usg=AOvVaw2xGIYqOWDWYYRAeDVfCzLJ.

90. Express Scripts Prescription Drug Pricing: A Public Policy Analysis February 2019, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=2ahUKEwjv4NXktp3hAhUB7qwKHavzANkQFjAAegQIAxAC&url=http%3A%2F%2Flab.express-scripts.com%2Flab%2Fpublications%2F~%2Fmedia%2Faa335e7b45134d18b8916dc15954f65b.ashx&usg=AOvVaw1FykVEYTkDHBlR305cQuZg.

91. Generic Competition in the US Pharmaceutical Industry. Int J Econ Bus.2006;13(1), available at https://www.tandfonline.com/doi/abs/10.1080/13571510500519905.

92. Health Plans' Strategies to Control Prescription Drug Spending. Health Affairs. November/December 2004, available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.23.6.141.

93. Mylan's Authorized Generic to EpiPen (epinephrine injection, USP) Auto-Injector available at https://www.mylan.com/-/media/mylancom/files/news/2-mylan-epinephrine-auto-injectors-ag-to-epipen-auto-injector.pdf.

94. 2018 Aetna Pharmacy Drug Guide, Aetna Commercial Plan (Fully Insured), available at https://fm.formularynavigator.com/FBO/41/fully_insured_pdf.pdf.

95. Enrollment Gains and Favorable Profits for Health https://www.markfarrah.com/uploaded/mfa-briefs/enrollment-gains-and-favorable-profits-for-health-insurance-leaders-in-2014.pdfurance Leaders in 2014, Healthcare

Business Strategy, May 15, 2015, available at https://www.markfarrah.com/uploaded/mfa-briefs/enrollment-gains-and-favorable-profits-for-health-insurance-leaders-in-2014.pdf.

96.   Impact of 2 Copay Waivers in a Generic Incentive Program. Am Health Drug Ben. 2010;3(3), available at http://www.ahdbonline.com/issues/2010/may-june-2010-vol-3-no-3/38-article-38.

97.   Insulin Access and Affordability Working Group - Conclusions and Recommendations. Diabetes Care. 2008;41:1299-1311, available at http://care.diabetesjournals.org/content/41/6/1299.article-info.

98.   Follow the Dollar, page 6, PhRMA website, available at http://phrma-docs.phrma.org/files/dmfile/Follow-the-Dollar-Report.pdf.

99.   Kaléo Announces U.S. Availability and Pricing to Patients of Auvi-Q® (Epinephrine Injection, USP) Auto-Injector, For Life-Threatening Allergic Reactions, January 19, 2017, available at https://kaleo.com/press-release/kaleo-announces-u-s-availability-and-pricing-to-patients-of-auvi-q-epinephrine-injection-usp-auto-injector-for-life-threatening-allergic-reactions/.

100.   Benefits of Formularies & Preferred Drug Lists, MedTrak, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=2ahUKEwibrLC5vZ3hAhUEQ6wKHYhtBfUQFjAAegQIABAC&url=https%3A%2F%2Fwww.medtrakrx.com%2Fstream_dl.aspx%3Ffilename%3DMedTrak_ClinicalReport_Formularies2015.pdf%26att_type%3Demail%26s_type%3Dpublic%26d_type%3Dpdf&usg=AOvVaw2vLtSzjHIrg--f1JKT_Ida.

101.   PBMs Just Say No to Some Drugs—But Not to Others. Managed Care. April 5, 2015, available at https://www.managedcaremag.com/archives/2015/4/pbms-just-say-no-some-drugs-not-others.

102.   UnitedHealthcare Prescription Drug List, available at https://www.uhc.com/employer/pharmacy/total-cost-management/prescription-drug-list.

103.   The Declining Value of Payer Access: How to Improve Rebate Efficiency, Amundsen Consulting, available at https://www.marketingweb.iqvia.com/rebate-efficiency-payer-access/.

104.   Recent Trends in Brand-Name and Generic Drug Competition. J Med Econ. 2013;17(3), available at https://www.ncbi.nlm.nih.gov/pubmed/24320785.

105.   State Generic Substitution Lass Can Lower Drug Outlays Under Medicaid. Health Affairs. 2010;29(7), available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2009.0424.

106.   Express Scripts 2014 Preferred Drug Exclusions, available at http://static1.1.sqspcdn.com/static/f/854323/24139682/1388679250987/2014-ESI-Preferred-Drug-List-Exclusions.pdf?token=YNFM1gPuajUpTXK8IbIClFjiok8%3D.

14

107. Generic Drugs, Academy of Managed Care Pharmacy, available at http://www.amcp.org/WorkArea/DownloadAsset.aspx?id=19771.

108. Sanofi 2012 Annual Report, available at http://annualreview2012.sanofi.com/pdf/sanofi_annual_report2012.pdf

109. FDA Approved Drug Products with Therapeutic Equivalence Evaluations, epinephrine, accessed 4 March 2019, available at https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm.

110. Consumer Report Survey: One in Four People Who Regularly Take Meds it with Sticker Shock at the Pharmacy, May16, 2017, available at https://www.consumerreports.org/media-room/press-releases/2017/05/consumer_reports_survey_one_in_four_people_who_regularly_take_meds_hit_with_sticker_shock_at_the_pharmacy/.

111. Millions of adults skip medications due to their high cost, January 30, 2015, Harvard Health Publishing, available at https://www.health.harvard.edu/blog/millions-skip-medications-due-to-their-high-cost-201501307673.

112. Strategies Use by Adults to Reduce Their Prescription Drug Costs: United States 2013, January 2015, National Center for Health Statistics, available at https://www.cdc.gov/nchs/data/databriefs/db184.htm.

113. Policy Prescriptions for High Drug Costs: Experts Weigh In, April 3, 2018, The Commonwealth Fund, available at https://www.commonwealthfund.org/blog/2018/policy-prescriptions-high-drug-costs-experts-weigh.

114. NeedyMeds website, available at https://www.needymeds.org.

115. Copay cards save patient money, but come at a cost. *Pharmacy Today* website, December 2016, available at https://www.pharmacytoday.org/article/S1042-0991(16)31400-1/fulltext.