# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION** | CASE No. 2:17-md-2785<br>CASE No. 2:17-cv-2452 |
| **SANOFI-AVENTIS US, LLC,**<br>                              **Plaintiff,**<br><br>**v.**<br><br>**MYLAN INC., et al.,**<br>                              **Defendants.** | |

## EXPERT REPORT OF DR. JANUSZ A. ORDOVER

March 25, 2019

## HIGHLY CONFIDENTIAL

I.    Introduction ........................................................................................................... 1
   I.A.    Qualifications ............................................................................................... 1
   I.B.    Assignment .................................................................................................. 2
II.   Summary of Opinions ........................................................................................... 2
III.  Professor Scott Morton's damages methodology is fatally flawed ...................... 10
   III.A.   Summary of Professor Scott Morton's Damages Opinions ......................... 10
   III.B.   Professor Scott Morton fails to construct a but-for world free of the challenged
           conduct........................................................................................................ 11
   III.C.   Professor Scott Morton has not measured damages attributable to specific
           components of Mylan's conduct that are being challenged ......................... 11
   III.D.   Professor Scott Morton's but-for world relies entirely upon Sanofi's own
           forecast without testing its reliability......................................................... 12
   III.E.   Professor Scott Morton's damages model demonstrates that purchasers would
           see little to no benefit in the form of lower prices in her but-for world ......... 14
IV.   Specific Flaws in Professor Scott Morton's Pre-Recall Damages ......................... 15
   IV.A.   Professor Scott Morton's pre-recall damages are driven entirely by the
           difference between Sanofi's forecasted and actual profits............................. 15
   IV.A.1.   Professor Scott Morton fails to properly vet the forecast and the
             assumptions it relies upon ................................................................. 15
   IV.A.2.   Professor Scott Morton ignores forecasts used by Sanofi that project
             substantially lower sales.................................................................... 16
   IV.A.3.   Professor Scott Morton makes no attempt to disentangle the effects of the
             challenged conduct from other factors that led Sanofi to fall short of its
             forecast .............................................................................................. 16
   IV.B.   Professor Scott Morton's "corroborations" of her but-for market share
           assumption are fundamentally flawed .......................................................... 19
   IV.B.1.   Mylan's pre-entry forecasts ................................................................ 19
   IV.B.2.   Canada is not a reliable benchmark .................................................... 21
   IV.B.3.   Professor Scott Morton's two selected formularies are not reliable
             benchmarks for the rest of the market ............................................... 24
   IV.B.4.   Professor Scott Morton's own regression suggests substantially lower but-
             for shares ........................................................................................... 26
   IV.C.   Professor Scott Morton underestimates the substantial costs of recalling Auvi-
           Q in the but-for world ................................................................................. 27
   IV.D.   Other flaws in pre-recall damages ............................................................... 31
   IV.D.1.   Royalty milestone payments ............................................................... 31
   IV.D.2.   Lantus ................................................................................................ 32
   IV.D.3.   Other costs ......................................................................................... 34
   IV.D.4.   Prejudgment interest ........................................................................... 35
V.    Professor Scott Morton's Post-Recall Damages are speculative and unreliable ....... 36
   V.A.    Professor Scott Morton's conclusion that Sanofi would have retained Auvi-Q
           rights but for the challenged conduct is speculative ..................................... 37
   V.B.    Professor Scott Morton's use of Sanofi's 2012 pre-launch forecast to estimate
           post-recall profits is speculative and unreliable............................................ 40
   V.C.    Professor Scott Morton overestimates Sanofi's ability to recover from the
           recall and relaunch ..................................................................................... 41

V.C.1.    Professor Scott Morton's assumption is at odds with kaléo's limited success
41
V.C.2.    Professor Scott Morton underestimates the reputational impacts of a
complete product recall ............................................................................... 42
V.D.   Professor Scott Morton fails to properly consider the impact of competition
from generic EpiPen ...................................................................................... 46
V.D.1.    Professor Scott Morton concedes that, in general, generic drugs can
successfully compete for significant share from non-AB rated brands...... 47
V.D.2.    Professor Scott Morton fails to account for evidence which demonstrates
generic EAI devices compete with non-AB rated branded products ......... 48
V.E.    Professor Scott Morton fails to properly consider future competition from
other epinephrine products............................................................................ 52
V.E.1.    Branded epinephrine products.................................................................... 52
V.E.2.    Generic Auvi-Q ........................................................................................... 55
VI.  Correcting only some flaws in Professor Scott Morton's damages calculation
substantially reduces her estimate of damages......................................................... 56

Highly Confidential

## I.    INTRODUCTION

### I.A.    Qualifications

1.      My name is Janusz A. Ordover. Here, I summarize my educational background, career history, publications, and other relevant qualifications.  My full curriculum vitae is attached as Exhibit A.

2.      *Educational Background*. I received my Bachelor of Arts (equiv.) degree in Economics from Warsaw University in 1966 and my Ph.D. (with the highest distinction) in Economics from Columbia University in 1973.

3.      *Career History*. I am an Emeritus Professor of Economics at New York University, where I began teaching in 1973 and have been a full Professor since 1982.  I have consulted to governmental agencies on antitrust matters both in the U.S. and abroad. I served as a Deputy Assistant Attorney General for Economics (Chief Economist) at the Antitrust Division, U.S. Department of Justice in 1991-1992 where I co-drafted the 1992 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines.  In February 2011, I was the recipient of Global Competition Review's Economist of the Year award.  In 2014, 2015, and 2016, I was awarded the Who's Who Legal Competition Economist Award, which is awarded to one economist each year and is the organization's top economist award.

4.      *Publications*. I have published scores of papers in academic journals and book chapters on various topics in antitrust, including on the economics of volume discounts and loyalty rebates. I have lectured on these issues and other topics dealing with pricing and exclusionary conduct to the American Bar Association, Federal Trade Commission, the European Commission, and the World Bank.  A complete list of my publications is contained in my curriculum vitae, included as Attachment A.

5.      *Testifying Experience*. I have deep familiarity with pharmaceutical and healthcare industries. For example, I testified on behalf of Tyco, Johnson & Johnson's Ortho division, American Home Products, Upsher Smith, and other companies in connection with marketing of pharmaceutical products, including branded drugs and generics, as well as medical devices, such as pulse oximetry products and sharps disposals. Attachment B lists the matters in which I have testified as an expert at trial or by deposition in the last four years.

6.       I am being compensated at a rate of $1,200 per hour in this matter. My compensation does not depend on the outcome of this litigation.

**I.B.    Assignment**

7.       I have been asked by counsel for Mylan to evaluate the opinions offered by Professor Fiona Scott Morton regarding the damages suffered by Sanofi as a result of the challenged conduct.[1] A list of materials I considered is included as Attachment C.

8.       Professor Scott Morton contends that:

> Mylan successfully engaged in exclusionary anticompetitive conduct so as to maintain its monopoly in the EAI market. In doing so, Mylan ensured that Sanofi's competing product – Auvi-Q – would never have a chance to gain a foothold in the U.S. EAI market, thereby preventing it from obtaining significant market share and placing a meaningful competitive constraint on the EpiPen. As a result of its actions, Mylan harmed consumers, the competitive process, and Sanofi. Consumers were harmed by being deprived of choice between differentiated EAI devices and by being deprived of innovation that likely would have occurred but for Mylan's conduct. Sanofi was harmed, as Auvi-Q was never able to become the significant player in the $1 billion annual EAI market that everyone – including Mylan before it designed its anticompetitive course of conduct – believe it would be. As a result of Mylan's actions, Sanofi incurred damages of between $2.9 billion and $3.6 billion.[2]

**II.    SUMMARY OF OPINIONS**

9.       ***Professor Scott Morton's damages analysis is fatally flawed***. Professor Scott Morton's damages methodology is flawed in several important respects. The initial step in constructing a reliable damages methodology is to clearly identify the challenged conduct, and then to remove that conduct out of the actual world and construct the world that would exist but for that conduct (the "but-for world"). Professor Scott Morton fails to do so. She does not offer an opinion on which particular Mylan conduct is anticompetitive, and therefore fails to clearly define what competitive activities Mylan would be allowed to engage in in the but-for world, what competitive strategies Sanofi would take in response, or how PBMs would negotiate in a world where they are unable to employ one of their key tools for negotiating lower prices on prescription drugs,

---

[1]    Expert Report of Dr. Fiona M. Scott Morton, February 4, 2019 (hereafter "Scott Morton Report"); Deposition of Fiona Margaret Scott Morton, Ph.D., March 12, 2019 (hereafter "Scott Morton Deposition").

[2]    Scott Morton Report, ¶ 10.

### IV.B.3.   Professor Scott Morton's two selected formularies are not reliable benchmarks for the rest of the market

52.     Professor Scott Morton identifies two formularies that she deems appropriate benchmarks for the success that Auvi-Q would have realized market-wide in the but-for world. She chooses these formularies because Auvi-Q achieved equal formulary status with EpiPen and she contends that the purported "spillover effects" would be smaller than with other formularies.[66] The two formularies are Horizon Blue Cross Blue Shield New Jersey and the University of Michigan.

53.     She has not put forward a reliable methodology that led to her choice of these formularies. First, she has not explained why a plan where spillover effects are allegedly smaller than other plans (e.g., a plan with a large share of covered lives in a state) is an appropriate benchmark for all plans in the but-for world. Second, as I will discuss in detail in Section IV.B.4, not only does Professor Scott Morton's regression fail to demonstrate that these spillovers exist in the actual world, but its results suggest a relatively small impact to Auvi-Q's share when it is "restricted" (i.e., when it is not covered on the formulary or subject to a prior authorization or step edit) relative to when it is at parity with EpiPen. Third, as I will explain in this section, a comprehensive review of the many plans where Auvi-Q achieved parity formulary coverage shows that Auvi-Q's share was almost always below that of the two formularies that she chose.

54.     Professor Scott Morton's first example is a Horizon Blue Cross Blue Shield formulary in New Jersey which placed Auvi-Q on formulary parity with EpiPen. In explaining her decision to look at this formulary, she says "[a]s a relatively large formulary in New Jersey, there is reason to believe that the spillover effects associated with exclusion from other formularies would not be as strong here as they were in other places."[67] Her second example is the University of Michigan formulary. To explain this choice, she states that "this formulary gave Auvi-Q and EpiPen equal treatment and,

---

[66]   Scott Morton Report, ¶¶ 203-205. According to Professor Scott Morton, the "spillover effect" arises when physicians are more inclined to write prescriptions for a leading product because they don't know (or cannot be bothered to learn) whether the patient's insurance covers an alternative product. As such, coverage on formularies of large PBMs can allegedly influence how the prescriptions are written not only for patients covered by those PBMs, but also those not covered by those PBMs (Scott Morton Report ¶¶ 134-137).

[67]   Scott Morton Report, ¶ 204.

because it is a formulary that is used by a university population, with access to a university hospital, there is reason to believe that the spill-over effects would not be as strong as they were at other formularies."[68]

55.     But Professor Scott Morton's data allows for a comprehensive review of all formularies where Auvi-Q achieved parity formulary coverage. Exhibit 3 provides comprehensive evidence on Auvi-Q's share across all formularies where Auvi-Q achieved parity formulary status with EpiPen. As Exhibit 3 clearly demonstrates, Auvi-Q's share at parity formularies was almost always below its share at the two formularies that Professor Scott Morton chose as the appropriate benchmarks.  In fact, Horizon's Auvi-Q share is at least as high as 94% of the other formularies in every month from January 2013 to September 2015. Similarly, University of Michigan's Auvi-Q share is at least as high as 82% of the other formularies in every month during the period. Whereas Auvi-Q's peak share on these two formularies in 2015 was 34% and 36% respectively, the peak average Auvi-Q share across all formularies where Auvi-Q and EpiPen were at parity was 14%. Therefore, these two formularies do not serve as accurate benchmarks to evaluate Auvi-Q market-wide success in the but-for world.

56.     Replacing the shares she uses with the average Auvi-Q share across all formularies where Auvi-Q and EpiPen were at parity reduces her damages estimate by $204 million.

57.     Even limiting the analysis to those formularies which fit her criteria, her choice of Horizon and Michigan causes her to overstate but-for market share. She argues that the choice of the two benchmark formularies is warranted because they are characterized by limited spillover effects across prescribing physicians. However, from the set of plans that allegedly have low spillovers, she chooses two plans that have higher Auvi-Q market shares. This leads Professor Scott Morton to overstate damages. I have identified other examples of formularies that placed Auvi-Q and EpiPen in the same formulary tier for at least one year and had a higher share of covered lives in a given state than Horizon did in New Jersey.  Yet Auvi-Q's share at each of these formularies was considerably lower than

---

[68]     Scott Morton Report, ¶ 205.

the Auvi-Q share at Horizon.[69] Similarly, I used her data to identify three other university formularies that placed Auvi-Q and EpiPen at parity for an extended period of time. Again, Auvi-Q's share at these comparable formularies, that in Professor Scott Morton's view should be less affected by spillover effects, is much lower than the share at the University of Michigan formulary that Professor Scott Morton uses as a benchmark.[70]

### IV.B.4.  Professor Scott Morton's own regression suggests substantially lower but-for shares

58.     Professor Scott Morton proffers a regression analysis to support her assertion that the spillover effect is substantial.[71] This regression not only purports to measure the extent of spillover, but also reports the effect of EpiPen and Auvi-Q's relative formulary placement on Auvi-Q's share of prescriptions. The results of this regression suggest that the difference between Auvi-Q sales where it is exclusive and Auvi-Q sales where it is at parity is relatively small: i.e., that the challenged conduct had a relatively modest impact on Auvi-Q's shares relative to parity placement.

59.     Professor Scott Morton's analysis purports to show the existence of the spillover effects on Auvi-Q's performance in the commercial segment. To do so, she analyzes whether "the Auvi-Q shares for one plan in a state depend on the statewide Auvi-Q Commercial and Medicare/Medicaid prescription shares of all EAI prescriptions in the previous month."[72] Her regression predicts the effect that various formulary placements have on Auvi-Q's share and finds that moving Auvi-Q from restricted placement to parity would increase Auvi-Q's share by only 4.1 to 5.3 percentage points.[73]

---

[69]  Auvi-Q's average share while on parity with EpiPen in 2015 at the Wellmark Blue Rx Preferred 3 Tier with Specialty Formulary in Iowa, the CVS Caremark Performance formulary in Rhode Island, and the CVS Caremark Performance Formulary in Wisconsin were 9%, 11%, and 9% respectively. In contrast, the Auvi-Q share at Horizon in 2015 was 31%.

[70]  Auvi-Q's average share while on parity with EpiPen in 2015 at the University of Arkansas formulary and the Emory University formulary are 17% and 13% respectively. In contrast, Auvi-Q's average share at the University of Michigan formulary in 2015 is 32%. Similarly, the Auvi-Q share at the Indiana University Health Plan formulary in 2014 while on parity with EpiPen was 19% whereas Auvi-Q's share at the University of Michigan in 2014 was 27%.

[71]  Scott Morton Report, ¶¶ 138, 204-205.

[72]  Scott Morton Report, ¶ 138.

[73]  Scott Morton Report ¶¶ 231-244 and Table A.2. Specifically, she included two dummies, "Auvi-Q Restricted" and "Auvi-Q Not Covered" which are dummy variables that measure the average percentage point change in Auvi-Q's share when a plan goes from parity to restricting or not covering Auvi-Q. Depending on specification, her regression shows coefficients ranging from -.0400 to -.0417 for "Auvi-Q Restricted" and -.0504 to -.0681 for "Auvi-Q Not Covered."

version of Adrenaclick.[185] Generic Adrenaclick, which was AB-rated to branded Adrenaclick, but not AB-rated to EpiPen, had substantial success competing against EpiPen. After its launch in 2010, Greenstone's Adrenaclick AG quickly captured 9% of EAI prescriptions while decreasing EpiPen's share by roughly 7 percentage points from 97% to 90%.[186]

130.    In addition, in January 2017, CVS began selling generic Adrenaclick for roughly $110 per two pack, to both insured and cash-paying patients.[187] In announcing this program it specifically highlighted that this price was substantially cheaper than the price of EpiPen. Exhibit 8 shows the effect that this pricing program had on EpiPen's and generic Adrenaclick's EAI shares and that the non-AB rated generic was able to shift share and volume away from EpiPen and Mylan's authorized generic. Within the first month, the Adrenaclick generic saw its share of EAI volume more than double, and consistently capturing more than 20% of EAI volume compared to less than 10% prior to their agreement with CVS. This is further evidence of both the incentive and ability of market participants to encourage substitution of a generic version of one EAI device for other branded EAI devices.

### V.E.    Professor Scott Morton fails to properly consider future competition from other epinephrine products

#### V.E.1.    Branded epinephrine products

131.    Although Professor Scott Morton considers but (inappropriately) rejects the prospect of competition from generic EpiPen, she does not even mention potential competition from a variety of other branded EAI devices in her report. She testified that "to invent the drug and get it commercialized and launched through the FDA would take a significant amount of time. So I don't know of any branded product that would be coming on the market in that period."[188] As a result, she thought Sanofi would maintain a

---

[185]   IMS data; "Important Considerations When Dispensing Epinephrine Auto-Injector Devices," Pharmacy Times, September 22, 2010, available at <https://www.pharmacytimes.com/p2p/p2pepinephrine-0910> (accessed March 18, 2019).

[186]   IMS Xponent data.

[187]   See, e.g., "CVS Health Offers Patients Lowest Cash Price in the Market for Generic Epinephrine Auto-injector to Treat Allergic Reactions," CVS Health, January 12, 2017, available at <https://cvshealth.com/newsroom/press-releases/cvs-health-offers-patients-lowest-cash-price-market-generic-epinephrine-auto> (accessed March 19, 2019).

[188]   Scott Morton Deposition, pp. 356-357.



**Exhibit 3: The Formularies Chosen by Professor Scott Morton as Benchmarks are not Representative of Formularies Where Auvi-Q and EpiPen were at Parity**

Notes: The formularies plotted are those that Professor Scott Morton labels as being "equal auviq". Plans across all channels are included. The average share plotted is the EAI TRx weighted average Auvi-Q share across all plans that Professor Scott Morton labels as being "equal auviq" in each month.
Sources: IMS data; MMIT data; Scott Morton Report backup.



Exhibit 8: Generic Adrenaclick Took Share Away from EpiPen Despite not being AB-Rated to EpiPen

Total EAI Volume Remained Flat:

2016 Devices Prescribed = 8.9 Million
2017 Devices Prescribed = 8.3 Million

Jan. 12, 2017 - CVS signs agreement with Impax to offer lowest cash price in market for generic Adrenaclick

Share of EAI Devices Prescribed

2016     2017     2018

Adrenaclick Generic     EpiPen (Brand + Generic)     Other

Note: The "Other" category includes brand Adrenaclick, kaléo, Twinject, and repackagers of generic EAI devices.
Source: IMS data.

Highly Confidential