# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

In re EPIPEN (EPINEPHRINE
INJECTION, USP) MARKETING, SALES
PRACTICES AND ANTITRUST
LITIGATION

CASE No. 2:17-md-2785
CASE No. 2:17-cv-2452

SANOFI-AVENTIS US, LLC,

   *Plaintiff*,

v.

MYLAN INC.; and
MYLAN SPECIALTY L.P.,

   *Defendants*.

**EXPERT REBUTTAL REPORT OF**

**THOMAS R. VARNER, PH.D.**

**HIGHLY CONFIDENTIAL**

## I.     INTRODUCTION

1.     I previously submitted an expert report in this matter on February 4, 2019 (*Varner Expert Report*) in which I offered my opinions on damages related to Mylan's counterclaim allegations that Sanofi made false and misleading representations about the EpiPen® Auto-Injector ("EpiPen") and Auvi-Q® products.

2.     I have since received the Expert Reports of Dr. Steven N. Wiggins and Mr. Eduardo Schur, both dated March 25, 2019 (*Wiggins Expert Report* and *Schur Expert Report*, respectively).

3.     I provided a summary of my background and assignment in this matter in *Varner Expert Report*.  My hourly billing rate is $825, and my compensation is not dependent on the outcome of this matter in any way.  Appendix A is a copy of my current CV and Appendix B is a list of documents, reports, and testimony I have considered since I submitted *Varner Expert Report*.

## II.    SUMMARY OF OPINIONS

4.     Dr. Wiggins' opinion of damages due to Sanofi's allegedly false and misleading representations about EpiPen® and Auvi-Q® is based on comparing pre-launch forecasts of Auvi-Q®'s market shares[1] with Auvi-Q®'s actual market shares.  Dr. Wiggins assumes these forecasts can serve as the basis for a but-for scenario in which there was no wrongful conduct by Sanofi.  Dr. Wiggins then observes that Auvi-Q®'s actual market shares were lower than his

---

[1] Dr. Wiggins appears to use the term "market shares" and "shares" in the context of Auvi-Q®'s share of EAI device sales; however, nowhere in Dr. Wiggins' expert report does he analyze or define a relevant market.  Throughout this report I use the term "market shares" in response to Dr. Wiggins' opinions and not in relation to defining a relevant market for the devices at issue.

**HIGHLY CONFIDENTIAL**

selected benchmark forecasts and argues that this means that Sanofi's misconduct could not have resulted in any damages.

5.    Dr. Wiggins' forecast-as-benchmark damages methodology is deeply flawed for a number or reasons including:

- Dr. Wiggins' methodology is premised upon the assumption that Sanofi's forecasts did not envision Sanofi engaging in the alleged false and misleading representations; however, Dr. Wiggins offers no support for this assumption.

- Dr. Wiggins fails to control for other factors that may explain why Auvi-Q®'s actual shares are lower than Mylan's and Sanofi's forecasts.  Without controlling for other variables that went into, or otherwise would have affected, these forecasts (including Auvi-Q® prices, Sanofi's sales and marketing execution problems, strength of Sanofi's sales force devoted to Auvi-Q®, and user, physician, and PBM acceptance of Auvi-Q®), Dr. Wiggins' damages opinions are unfounded.

- Dr. Wiggins' damages methodology relies on Mylan forecasts developed as rough scenario planning tools that relied primarily on the experience of a few follow-on drugs outside of the therapeutic area of epinephrine auto-injectors ("EAIs") as the basis for his damages analysis and not on forecasts based on the features and factors specific to Auvi-Q®.

- Dr. Wiggins mischaracterizes documents he cites supporting his contention that Mylan believed that Auvi-Q would address previously unmet needs, when those documents instead show that Mylan had limited information about Auvi-Q®'s features and the basis for consumer demand.

**HIGHLY CONFIDENTIAL**

3

- Dr. Wiggins fails to reconcile his damages theory with the damages theory of Sanofi's damages expert Prof. Fiona Scott Morton who offered an opinion in support of Sanofi's claims of anticompetitive conduct by Mylan.

- Dr. Wiggins relies on selected Auvi-Q® forecasts in reaching his damages opinions in this matter without considering other Auvi-Q® forecasts that could change those opinions.

6.      In rebutting my opinions in *Varner Expert Report*, Dr. Wiggins fails to provide any basis to apportion damages (which I understand is the burden of the defendant to prove under the Lanham Act).  There are a number of documents produced by Sanofi showing the importance it placed on physicians recalling Sanofi's comparative statements between EpiPen® and Auvi-Q® in driving sales of the Auvi-Q® product.  The full extent of the impact of these statements is ultimately a question for the jury to make but based on these documents that impact would not be zero as Dr. Wiggins appears to contend.

7.      Furthermore, in rebutting *Varner Expert Report*, Dr. Wiggins: ignores evidence from Sanofi showing there was less demand for Auvi-Q®'s features than Sanofi planning documents had forecast; overstates the impacts of EpiPen manufacturing issues on Mylan's ability to make additional sales; and confounds average costs with incremental costs in calculating Mylan's lost profits.

8.      Mr. Schur criticizes Mr. Zieziula for citing data from a Sanofi report because that data is not based on a "significant sample [] size"; however, Mr. Schur provides no basis for that opinion, and in fact his own confidence interval calculations confirm that a statistically significant percentage of allergists and pediatricians recalled receiving Sanofi's alleged false and misleading messages.

**HIGHLY CONFIDENTIAL**

4

### III.   REBUTTAL TO DR. WIGGINS' FORECAST-AS-BENCHMARK DAMAGES THEORY

#### A.   Dr. Wiggins's forecast-as-benchmark damages theory assumes without evidence that Sanofi's forecasts did not envision the alleged false and misleading representations

9.      Dr. Wiggins' opinion is that damages can be calculated by looking at the difference between Auvi-Q®'s actual sales *with* the accused false and misleading representations made by Sanofi, and Auvi-Q®'s but-for sales *without* the accused false and misleading representations.  Since the accused false and misleading representations by Sanofi occurred over the entire Auvi-Q® sales period, Dr. Wiggins asserts that he could not determine a but-for scenario using actual sales data.  Instead, Dr. Wiggins uses sales forecasts made by Mylan and Sanofi prior to Auvi-Q®'s launch to serve as the but-for, or "benchmark," sales that Sanofi would have made in the absence of the advertising practices at issue.  Wiggins Expert Report states:

> Mylan considered Auvi-Q®'s product characteristics and the anticipated high level of promotion to develop pre-launch forecasts of Auvi-Q® sales and market share.  Since these forecasts were developed before any of Mylan's alleged claims were made, they provide a valuable benchmark with which to assess Auvi-Q® sales in the absence of any of these claims.[2]

███████████████████████████████████████████████
██████████████████████[3]████████████████████████
████████████████████

---

[2] *Wiggins Expert Report*, 3/25/19, ¶ 57, p. 16.

[3] *Wiggins Expert Report*, 3/25/19, ¶ 79, p. 22.

**HIGHLY CONFIDENTIAL**

10.     Dr. Wiggins then compares Auvi-Q®'s forecasted market shares, from both Mylan and Sanofi, in his Figure 1 to Auvi-Q®'s actual market shares. ██████████████

████████████████████████████████████████████████████

██████████████████████████████████████[4]

11.     Dr. Wiggins' forecast-as-benchmark damages theory rests on the assumption that the sales and marketing practices at issue in this case were not envisioned by Sanofi when it prepared its forecasts for Auvi-Q®'s market shares.  Dr. Wiggins does not appear to have done any analysis to show if this assumption is accurate, nor has he pointed to any other evidence to support it.  In fact, Sanofi claims that it did not make any false and misleading representations, so it is possible that Sanofi thought such representations were legal and envisioned them as part of its forecasts.[5]  Thus, Dr. Wiggins has no basis to believe one way or the other whether Sanofi envisioned the representations when it prepared its prelaunch forecasts of Auvi-Q®.  If Sanofi envisioned before Auvi-Q® launched that the alleged false and misleading representations would be part of its marketing strategy, even if they did not believe the representations were false and misleading, then the basic premise of Dr. Wiggins' forecast-as-benchmark damages theory would be wrong because Sanofi's forecasts would have included the anticipated effects of the false and misleading representations.  Thus, Dr. Wiggins has not provided a basis to even assert a forecast-as-benchmark damages theory, and his opinions on damages in this matter are unfounded.

---

[4] *Wiggins Expert Report*, 3/25/19, ¶ 77, p. 21.

[5] *Sanofi-Aventis U.S. LLC's Answer to Mylan Specialty L.P.'s Counterclaims*, 2/6/18, *e.g.*, ¶¶ 25-56, pp. 6-9.

**HIGHLY CONFIDENTIAL**

**B. Dr. Wiggins fails to control for other factors that may explain why** ███ ███████████████████████████████████████ **and thus Dr. Wiggins' damages opinions are unfounded**

12.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

13.    Dr. Wiggins' implicit assumption is that all of the factors that went into Auvi-Q®'s forecasted market shares actually occurred as forecasted after the Auvi-Q® launch, with the exception of the accused false and misleading representations made by Sanofi about EpiPen® and Auvi-Q®.  This assumption is unsupported.  Dr. Wiggins did not determine if the forecast models' assumptions actually turned out to be true after Auvi-Q® launched in 2013.  In other words, Dr. Wiggins' analysis did not control for the effects of differences between *any* of the numerous variables in the forecast models (or any other variables that should have been included in the models but were not included) and what occurred in the actual world.  Dr. Wiggins also apparently did not consider the possibility that if the effects of these other variables

**HIGHLY CONFIDENTIAL**

were controlled for, the alleged false and misleading representations could still have increased actual demand above a level of demand without the wrongful representations.  Without such analyses, the but-for methodology Dr. Wiggins' uses is meaningless and his damages opinions are unfounded because of the effects these uncontrolled variables could have on the outcomes.

14.  ███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████. I analyze some of these factors and show that the actual outcomes of each one of these factors had a negative impact relative to the assumptions in the forecasts on Auvi-Q®'s sales and market shares.

       **i.  Dr. Wiggins' forecast-as-benchmark theory did not control for Auvi-Q®'s actual WAC prices being higher than forecasted**

15.  ███████████████████████████

████████████████████████████████

█████████.[6]  Mylan documents also show that EAI prices have an effect on market shares.  A Mylan document prepared in July 2012 ████████████████████

████████████████████████████████

████████████████████████████████



---

[6] ████████████████████████████████ [SAN-EPI-0171268].
████████████████████████████████
████████████████████████ [SAN-EPI-0171340-47]

██████ .[7]  This document states, ████████████████████████████████

████████████████████████████████████████ [8]

16.   ████████████████████████████████████████

████████████████████████████ [9] however, Exhibit 8.1 to my February 4, 2019 Expert Report shows that Auvi-Q® actually sold at an average WAC price premium to EpiPen®. Dr. Wiggins does not examine whether Auvi-Q®'s price premium could explain some, or all, of the lower than forecasted Auvi-Q® market shares seen in the actual world. ████████████

████████████████████████████████████████████

████████████████ , then Dr. Wiggins, using his own forecast-as-benchmark damages theory, could not conclude that there were no effects from the false and misleading representations on Auvi-Q®'s sales. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████ , consequently, his damages theory is unsupported and speculative.

---

[7] ████████████████████████████████ , slide 5, [MYEP00629734].

[8] ████████████████████████████ , slide 29.  [MYEP00629734].

[9] ████████████████████████ [SAN-EPI-0171591-96, at 93].

**HIGHLY CONFIDENTIAL**

9



ii. ███████████████████████████

17. ████████████████████████████

████████████████████████████████

███████████████████████████ █ [10]

- ████████████████████████████████
- ████████████████████████████████
- ████████████████████████████████

18. ████████████████████████████

██████████████████

- ████████████████████████████████
- ████████████████████████████████

19. ████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████ [11] ████████████████████

---

[10] ████████████████████████████████ dated 7/24/14 [SAN-EPI-1154043-47].

[11] ██████████████████████████, 4/9/15 with attachment (see slide 4) [SAN-EPI-0225642].

**HIGHLY CONFIDENTIAL**

10



████████████████████████████████████████

████████████████████████████████████ ”[12] ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ .[13] ████████████████████████

████████████████████████████████████

████████████████████████████████████████

████

**iii.** ████████████████████████████████
████████████████████

20.   As part of Mylan's assessment of Auvi-Q®'s future sales and market share it made assumptions about the number of Sanofi sales representatives who would be involved with Auvi-Q®.  A Mylan ████████████████████████████

████████████████████████████████ [14]  Another

Mylan planning document ████████████████████████████

---

[12] ████████████████████████████████, 8/18/15, with attachment (see slide 11) [SAN-EPI-0027555].
████████████████████████████████████████
████████████████████

[13] ████████████████████████████ 8/18/15, with attachment (see slide 30) [SAN-EPI-0027555].

[14] ████████████████████████████ [PFE_EPIPEN_AT00011449-766 at 562, slide 114].

**HIGHLY CONFIDENTIAL**

11

[17] Dr. Wiggins did not control for Auvi-Q®'s actual sales force being lower than forecasted in his forecast-as-benchmark theory nor did he analyze the effect of such lower staff on Auvi-Q®'s market shares.

**iv.** ████████████████████████████████████████████

21.    Dr. Wiggins cites to a number of Mylan documents that he purports to show that Mylan viewed the Auvi-Q® device as meeting an unmet need in the market.[18]  In section III.D below I show that the documents Dr. Wiggins cites do not support this conclusion.  In addition, there are documents Dr. Wiggins does not cite that show lower user, physician, and PBM acceptance of the Auvi-Q® device than forecasted. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ "[19] ████████████████████████████████████████████

---

[15] Mylan PowerPoint slides, ████████████████████████████, [MYEP00323642 at slide 1 of 4].

[16] ████████████████████████████████ [SAN-EPI-0171268].

[17] ████████████████████████, 4/9/15 with attachment (see slide 4) [SAN-EPI-0225642].

[18] *Wiggins Expert Report*, 3/25/19, ¶ 45, p. 12, "Mylan's assessment of high sales potential was driven by Auvi-Q®'s innovative characteristics and how those characteristics differentiated the product from EpiPen® to satisfy."

[19] ██████████████████████████████████████ [SAN-EPI-1155596-601 at 598-599].

**HIGHLY CONFIDENTIAL**

[17] Dr. Wiggins did not control for Auvi-Q®'s actual sales force being lower than forecasted in his forecast-as-benchmark theory nor did he analyze the effect of such lower staff on Auvi-Q®'s market shares.

**iv.** ████████████████████████████████████████████

21.    Dr. Wiggins cites to a number of Mylan documents that he purports to show that Mylan viewed the Auvi-Q® device as meeting an unmet need in the market.[18]  In section III.D below I show that the documents Dr. Wiggins cites do not support this conclusion.  In addition, there are documents Dr. Wiggins does not cite that show lower user, physician, and PBM acceptance of the Auvi-Q® device than forecasted. ███████████████████████████████████████████████████████████████████████████████████████████████████████████ "[19] ████████████████████████████████████████

---

[15] Mylan PowerPoint slides, ████████████████████████████, [MYEP00323642 at slide 1 of 4].

[16] ████████████████████████████████ [SAN-EPI-0171268].

[17] ████████████████████████, 4/9/15 with attachment (see slide 4) [SAN-EPI-0225642].

[18] *Wiggins Expert Report*, 3/25/19, ¶ 45, p. 12, "Mylan's assessment of high sales potential was driven by Auvi-Q®'s innovative characteristics and how those characteristics differentiated the product from EpiPen® to satisfy."

[19] ██████████████████████████████████████ [SAN-EPI-1155596-601 at 598-599].

**HIGHLY CONFIDENTIAL**

12



Regardless of Sanofi's or Mylan's supposed initial assessment of Auvi-Q's features to meet

consumer demand, there are a number of documents indicating that PBMs did not view the Auvi-

Q product as being very different from EpiPen.[22] ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

      **C.**  **Mylan forecasts used by Dr. Wiggins as the basis for his forecast-as-benchmark damages theory were used by Mylan as rough planning tools to understand different scenarios**

    22.    Dr. Wiggins states, "both Mylan and Sanofi concluded that [Auvi-Q®] was a

unique, highly valuable product that would address significant unmet needs in the

marketplace."[23]  However, compared to Sanofi, Mylan had limited information about Auvi-Q®

---

[20] ████████████████████████████████ slides 4, 5 and 10 [SAN-EPI-0279259].

[21] ████████████████████████████ dated October 2011, attached to an email dated 10/18/11, Exhibit 8 to Works deposition, slide 8 [SAN-EPI-0102966].

[22] See for example: ████████████████████████████ p. 132; ████████████████████████████████████████ Dr. Wiggins also did not examine if Auvi-Q®'s placement on PBMs' formularies met the goals that Sanofi had for Auvi-Q®'s placement or its impact on actual market shares.

[23] *Wiggins Expert Report*, 3/25/19, ¶ 60, p. 17.

**HIGHLY CONFIDENTIAL**

13

prior to its launch, so Mylan's assessment of Auvi-Q® when it made its forecasts was also

limited.  The 2010 Mylan forecast that Dr. Wiggins relies on for his analysis states that Mylan



,[26]

.[29]  The level of information that Mylan had about

Auvi-Q® when it prepared this forecast does not support Dr. Wiggins' statement that Mylan

"concluded that [Auvi-Q®] was a unique, highly valuable product that would address significant

unmet needs in the marketplace."  Thus, Dr. Wiggins' forecast-as-benchmark damages theory, to

the extent that it relies on Mylan having detailed information about Auvi-Q® in preparing its

forecast, is unfounded.

---

[24] Zoloft: "Sertraline (marketed as Zoloft) Information," U.S. FDA, available at
<https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm
053351.htm>, accessed April 16, 2019.

[25] Prozac: "Fluoxetine (marketed as Prozac) Information," U.S. FDA, available at
<https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm
109352.htm>, accessed April 16, 2019.

[26] Ditropan: "Highlights of Prescribing Information," U.S. FDA, available at
<https://www.accessdata fda.gov/drugsatfda_docs/label/2016/020897s035lbl.pdf>, accessed April 16, 2019.

[27] Lunesta: "Sleep Disorder (Sedative-Hypnotic) Drug Information," U.S. FDA, available at
<https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm
101557.htm>, accessed April 16, 2019.

[28] Ambien: "Sleep Disorder (Sedative-Hypnotic) Drug Information," U.S. FDA, available at
<https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm
101557.htm>, accessed April 16, 2019.

[29]                                                                          [MYEP01209503].

**HIGHLY CONFIDENTIAL**

23.     The Mylan documents Dr. Wiggins cited as a benchmark for his but-for damages analysis were used by Mylan as planning tools to understand how the market might react to different EAI entrants and not as the basis for the most likely market share outcome. █

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ This is further indication that this document was used as a rough planning tool to consider a wide range of possible outcomes, and not as a detailed forecast of how Mylan expected Auvi-Q® to perform.

### D.  Dr. Wiggins mischaracterizes Mylan documents that he used as support for his forecast-as-benchmark damages theory

24.     Dr. Wiggins states that the first step in his forecast-as-benchmark methodology is "to consider how these features were expected to impact sales and market share during the period prior to Auvi-Q®'s launch."[30]  Dr. Wiggins states, "Both companies independently determined that Auvi-Q®'s compact size, voice instructions, and other characteristics would drive sales because the product would address previously unmet needs."[31]

25.     However, many of the documents that Dr. Wiggins cites do not support his contention that Mylan believed there would be demand for Auvi-Q®'s product features.  Dr.

---

[30] *Wiggins Expert Report*, 3/25/19, ¶ 43, p. 12.

[31] *Wiggins Expert Report*, 3/25/19, ¶ 28, p. 8.

**HIGHLY CONFIDENTIAL**

Wiggins states, "Mylan's assessment of high sales potential was driven by Auvi-Q®'s innovative characteristics and how those characteristics differentiated the product from EpiPen® to satisfy unmet needs in the market."[32]  As basis for this statement, Dr. Wiggins quotes a Mylan presentation ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████[33]  There is no mention of "Auvi-Q®'s innovative characteristics," "how those characteristics differentiated the product from EpiPen," or that these characteristics satisfied "unmet needs in the market."  Dr.  Wiggins fails to note that these "weaknesses" are not in comparison to Auvi-Q®.  Dr. Wiggins also fails to mention the EpiPen® Strengths in this presentation, which include ████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████

26.     Dr. Wiggins then cites to a 2008 Mylan email that ████████████████████████

██████████████████████"[34]  However, Dr. Wiggins failed to include the sentence that preceded his quote in the 2008 Mylan email, that is, ████████████████████████████████

██████████████████████████"[35]  (Underline in original.)  The email also noted that the Auvi-Q® (then called EpiCard) design ██████████████████████████████████████

██████████████████████  Thus, Mylan's knowledge about the Auvi-Q® device was limited at

---

[32] *Wiggins Expert Report*, 3/25/19, ¶ 45, p. 12.

[33] ██████████████████████████████████████ at slide 17 [MYUEP00118416].

[34] *Wiggins Expert Report*, 3/25/19, ¶ 45, p. 12.

[35] Mylan email, ██████████████████████ [PFE_EPIPEN_AT00648955].

**HIGHLY CONFIDENTIAL**

this early stage of its development, and Dr. Wiggins' characterization that "Mylan's assessment of high sales potential was driven by Auvi-Q®'s innovative characteristics" is not supported by these documents.

27.     Dr. Wiggins states,  [36] A document Dr. Wiggins cites to support this characterization, a Mylan presentation dated May 30, 2013, (MYEP00107916) at slide 49, refers to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

28.     These documents do not support Dr. Wiggins' characterizations of Mylan's assessments of Auvi-Q®.  To the extent that Dr. Wiggins' forecast-as-benchmark damages theory depends on his characterization that Mylan believed that the Auvi-Q® device would "address previously unmet needs," his damages opinion is unsupported.

       **E.  Dr. Wiggins' forecast-as-benchmark damages theory cannot be reconciled with Professor Scott Morton's forecast-as-benchmark damages theory related to Mylan's alleged anticompetitive conduct**

29.     Dr. Wiggins asserts that Sanofi's and Mylan's forecasts are an accurate benchmark of Auvi-Q®'s market shares but-for Sanofi's accused false and misleading representations. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sanofi's economics expert addressing its antitrust claims

---

[36] *Wiggins Expert Report*, 3/25/19, ¶ 46, pp. 12-13.

**HIGHLY CONFIDENTIAL**

against Mylan (Prof. Fiona M. Scott Morton) relies on a similar damages theory.[37]  Prof. Scott Morton contends that Sanofi's and Mylan's forecasts are an accurate benchmark of Auvi-Q®'s market shares, but-for Mylan's alleged wrongful anticompetitive conduct. ███████████████ ████████████████████████, and that Prof. Scott Morton contends that Mylan's alleged conduct caused the entire difference between the actual and forecasted shares, and that the entire difference between forecasted and actual share is an accurate measure of Sanofi's claimed antitrust damages.

30.     Dr. Wiggins and Prof. Scott Morton are relying on similar forecast-as-benchmark damages theories (both for claims by Sanofi against Mylan and counterclaims by Mylan against Sanofi), such that when one theory is viewed in relation to the other, their premises and findings are inconsistent with one another.  Dr. Wiggins fails to control for the impact of the alleged Mylan anticompetitive conduct, which Professor Scott Morton argues drove Auvi-Q®'s share down from the forecasted shares to the actual shares.  Dr. Wiggins' but-for world assumes that Professor Scott Morton and Sanofi are wrong, and that Mylan's alleged anticompetitive conduct had no impact on Sanofi's shares.  For Dr. Wiggins' analysis to be consistent with Professor Scott Morton's theory, he would need to account for Professor Scott Morton's measure of the impact of Mylan's alleged anticompetitive conduct.  This would involve Dr. Wiggins decreasing his benchmark shares by the magnitude of the alleged anticompetitive effect as measured by Professor Scott Morton to create a new estimate of but-for shares in a world without Sanofi's allegedly deceptive marketing practices but *with* Mylan's challenged antitrust conduct.  Then, under his damages theory, he would compare adjusted benchmark shares, now accounting for

---

[37] *Expert Report of Dr. Fiona M. Scott Morton*, 2/4/19, Section XI, Estimating the Antitrust Injury Suffered by Sanofi, pp. 112-128.

Professor Scott Morton's theory, to the actual world to determine whether Auvi-Q®'s actual shares were higher than its adjusted benchmark shares.

31.     However, Dr. Wiggins' damages cannot account for Professor Morton's damages methodology without rendering his damages theory illogical.  If Dr. Wiggins adjusts his benchmark to account for Professor Scott Morton's measure of the impact of Mylan's alleged anticompetitive conduct, that will drive his benchmark down to Auvi-Q's actual share (because Prof. Scott Morton measure of impact is exactly the difference between Auvi-Q®'s forecasted shares and the actual shares).  Then, following Dr. Wiggins' damages theory, he would compare the adjusted benchmark shares in the but-for world (which equals Auvi-Q®'s actual shares) to the real world shares that included Sanofi's alleged false and misleading representations.  Thus, accounting for Prof. Scott Morton's damages theory (and Sanofi's allegations of anticompetitive conduct against Mylan) in his damages model, Dr. Wiggins' damages theory is transformed into a meaningless tautology, where his analysis asks whether Auvi-Q®'s actual shares equals Auvi-Q®'s actual shares.

32.     Dr. Wiggins did not recognize or address this incompatibility of his damages theory with Prof. Scott Morton's damages theory.  Dr. Wiggins does not explain whether his but-for world accounts for the impacts of Sanofi's and Mylan's respective alleged conduct.  And Dr. Wiggins does not address how the two models could be reconciled by a judge or jury in the event that both Mylan and Sanofi are found liable for the respective claims against them and damages must be calculated for both claims.

HIGHLY CONFIDENTIAL

**F. Differences in Mylan and Sanofi forecasts of Auvi-Q®'s market share shows the unreliability of using these forecasts as the basis for a damages benchmark**

33. ; however, these are just two forecasts of Auvi-Q®'s sales and market shares among many forecasts made by Mylan and Sanofi. If, for example, Dr. Wiggins had relied instead on a different Mylan market share forecast[38] as the basis for his forecast-as-benchmark damages theory, he would have found that ████████████ ███████████████████████████ resulting in a finding, under Dr. Wiggins' theory, that the alleged false and misleading representations could have resulted in increased Auvi-Q® sales. Because Dr. Wiggins provides no reason for selecting one forecast over another or for focusing on market shares in later years, his analysis is arbitrary and his findings are unreliable.

## IV. REBUTTAL TO DR. WIGGINS' SPECIFIC CRITIQUES OF VARNER EXPERT REPORT

### A. Dr. Wiggins failed to provide any basis to apportion damages

34. Dr. Wiggins states, "Dr. Varner fails to determine any impact of the alleged conduct on Auvi-Q® sales. Instead, Dr. Varner begins by calculating total Auvi-Q® sales, implicitly attributing all sales to the alleged statements, and also thereby implicitly assuming that Auvi-Q®'s but-for sales would have been zero."[39]

35. I understand that the Lanham Act specifies that, "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." I understand from counsel that the plaintiff is responsible for showing

---

[38] *E.g.*, see "2013-2017 Budget," shows Auvi-Q® share of 3.7% [MYEP00392152 at slide 5].

[39] *Wiggins Expert Report*, 3/25/19, ¶ 15, p. 4.

**HIGHLY CONFIDENTIAL**

defendant's sales and it is the burden of the defendant to deduct any sales that were not attributable to the false advertising.  I showed sales of the Auvi-Q® product based on sales records produced by Sanofi; however, Dr. Wiggins provided no analysis, discussion, data, or any other basis, in which to reduce Auvi-Q® sales due to the alleged wrongful false advertising.

36.     Mr. Zieziula, in his expert report, discussed multiple documents produced by Sanofi in which Sanofi highlighted the importance of making comparative claims about patient preference.  Mr. Zieziula's opinion was "that Sanofi made promotional claims to payers, physicians, and consumers when marketing Auvi-Q that would not be consistent with industry best practices, lack the substantiation required by regulatory standards, and are at odds with the data that Sanofi actually possessed."  Among other false or misleading claims, Mr. Zieziula stated that Sanofi made unsupported comparative claims about patient preference.  Mr. Zieziula stated that there were "numerous instances" of misleading comparative claims by Sanofi in the documents he reviewed, which suggested Sanofi had "a widespread practice" of making false and misleading comparative statements.  Mr. Zieziula reviewed Sanofi presentations of the type that he said are regularly used to "assist pharmaceutical companies to determine which messages are working in the field" that showed the prevalence of false and misleading statements made by Sanofi.

37.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

**HIGHLY CONFIDENTIAL**

████████████████████████████████.40 ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ The full extent of this impact is ultimately a

question for the jury to make but based on these documents that impact would be not zero as Dr.

Wiggins appears to contend.

**B. Dr. Wiggins is wrong when he states that my calculation of Mylan's lost profits is incorrect because it omits Auvi-Q® returns**

38.     Dr. Wiggins states, █████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████41

39.     Exhibit 1 in *Varner Expert Report* shows Auvi-Q® gross sales in terms of dollars

for reference purposes only.  My calculation of Mylan's lost profits is based on doses of Auvi-

Q® sold, not on Auvi-Q®'s gross dollar sales.  I apportion to Mylan those Auvi-Q® doses sold

based on EpiPen®'s share of EAIs sold without Auvi-Q® and multiply that quantity by the

average net sales price of EpiPen®.  These average net sales for EpiPen® incorporates all

---

40 ██████████████████████████████████████████, 4/4/13, slides 11 and 29 [SAN-EPI-0095078].

41 *Wiggins Expert Report*, ¶ 88, p. 25.

**HIGHLY CONFIDENTIAL**

returns, rebates and discounts associated with EpiPen®'s sales.  Thus, my calculation of Mylan's

lost profits associated with Auvi-Q®'s sales properly incorporates returns, rebates and discounts

related to EpiPen, and Dr. Wiggins incorrectly states that Auvi-Q® returns should be included in

this calculation.

      40.     Dr. Wiggins also addresses EpiPen® sales after Auvi-Q® was recalled in October

2015.  ████████████████████████████████████████████████████████

████████████████[42]  Dr. Wiggins is arguing that Mylan cannot claim lost EpiPen® sales in the

but-for world when it made additional sales in that actual world after Auvi-Q® was recalled and

Auvi-Q® users switched to EpiPen®.  However, Dr. Wiggins argues on the very next page of his

report, "Such new customers would not have purchased EpiPen® even if Auvi-Q® was

unavailable and do not constitute lost sales opportunities for Mylan."[43]  Thus, Dr. Wiggins'

opinions are contradictory by stating that Auvi-Q® and EpiPen® are not substitutes (and Mylan

is not entitled to lost profits if Auvi-Q® was not sold in the but-for world) and that Mylan made

additional EpiPen® sales in the actual world after Auvi-Q® was recalled because Auvi-Q® users

switched to EpiPen®.

      41.     If I assume that Dr. Wiggins' opinion is that EpiPen® devices are substitutes for

Auvi-Q® devices, which is the basis for my lost profits market share apportionment analysis in

*Varner Expert Report*, then after Auvi-Q® was recalled at the end of October 2015 a portion of

Auvi-Q® users who received a refund may have purchased an EpiPen® device.  Dr. Wiggins

does not provide any analysis of how many Auvi-Q® users who received a refund would have

---

[42] *Wiggins Expert Report*, ¶ 88, p. 25.

[43] *Wiggins Expert Report*, ¶ 91, pp. 26-27.

**HIGHLY CONFIDENTIAL**

purchased another EAI device, or among these users, how many would have purchased an

EpiPen® device. ███████████████████████████████████████████

████████████████████████████████████████████.[44] ███

███████████████████████████████████████████████

██████████████████████████████████ This estimate would result in approximately

███████████ in incremental profit to Mylan.[45]  Using these assumptions, this amount of

incremental profit would be deducted from EpiPen®'s lost profits.

     **C.  Dr. Wiggins incorrectly relies on Auvi-Q®'s total profits rather than incremental profits to conclude that** ███████████████████████████
███████████████████████

   42.   Dr. Wiggins states, ███████████████████████████████████

████████████████████████████████████████[46] ███████████

████████████████████████████████████████████"[47] ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ Dr. Wiggins is correct in that I used 100 percent of Auvi-Q®

sales in my calculations in *Varner Expert Report* (*e.g.*, Exhibits 1 and 1.1); however, I presented

---

[44] ██████████████████ [SAN-EPI-0382315-322 at 316-317].

[45] ████████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████

[46] *Wiggins Expert Report*, ¶¶ 82-85, pp. 23-24.

[47] *Wiggins Expert Report*, Table 1, p. 23.

**HIGHLY CONFIDENTIAL**

the 100 percent amount based on the defendant's burden to reduce (or apportion) those sales attributable to the alleged false and misleading representations.

43.     Dr. Wiggins' calculation only applies to Sanofi's profits if all of the Auvi-Q® sales are due to the alleged false and misleading representations.  I agree with Dr. Wiggins that if 100 percent of Auvi-Q®'s sales are attributable to the accused false and misleading representations, then Sanofi's financial statements show that ███████████████████████████
████████████████████████████████████████████████████████████.  If the amount of Auvi-Q®'s sales that are attributable to the accused false and misleading representations is lower than 100 percent of its sales, then one needs to consider the incremental profit on those sales to calculate unjust enrichment damages.[48]  Dr. Wiggins did not calculate Sanofi's incremental profit on Auvi-Q®'s sales, and therefore, cannot conclude that there was no unjust enrichment.

### D.  Dr. Wiggins overstates the impacts of EpiPen manufacturing issues

44.     Dr. Wiggins cites to FDA letters to Mylan and Meridian regarding questions about EpiPen® inspections and safety issues, and then raises the possibility of these issues having a negative impact on Mylan's ability to meet the demand in the but-for scenario in which Sanofi did not make the alleged false and misleading representations.

45.     Many of the manufacturing issues raised by Dr. Wiggins relate to quality control questions and Dr. Wiggins does not provide any indication that these issues raised by the FDA

---

[48] Incremental profits and average profits are different if some costs are fixed.  For example, if a sales staff of 100 can sell an additional 1% of product without increasing staff, then the incremental profit on those additional 1% of sales would not include the expense of an additional salesperson.  That is, those expenses related to sales staff would be fixed in relation to an incremental increase in sales, and the incremental profit on those sales would be higher than the average profits on all sales.

**HIGHLY CONFIDENTIAL**

would have resulted in Meridian's inability to manufacture additional EpiPen® devices.

Dr. Wiggins cites to FDA inspection letters to Meridian in 2013 and 2017 referring to them as

showing ████████████████████████████████[49]  Meridian's

letters to the FDA ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████[50]  A Meridian memo in 2017 stated that ████████████

████████████████████████"[51]

46.      ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██.[52]

47.      Dr. Wiggins references a recall in 2017 of EpiPen® in which he states, "The 2017

recall involved more than 1 million units worldwide, leading to significant and severe EpiPen®

---

[49] *Wiggins Expert Report*, 3/25/19, ¶ 93, p. 27.

[50] Meridian letter to FDA [PFE_EPIPEN_AT01059972-015 at 972].

[51] Pfizer Letter [MYEP01041197-99 at 98].

[52] Phone interview with Mr. Chris Benson, Mylan Head of Supply Chain for Biologics and Respiratory Products, 3/28/19.

**HIGHLY CONFIDENTIAL**

shortages, which are still ongoing."[53]  This recall occurred in March 2017, 18 months after Auvi-Q® was recalled, so this particular recall would not have affected Mylan's ability to make additional sales prior to October 2015.  Thus, Dr. Wiggins' implication that increased manufacturing output is connected to increased inspection and safety issues is not supported by Mylan's and Meridian's actual manufacturing history or Mylan's ability to make product sales.

### E.  Dr. Wiggins's opinions regarding Mylan's incremental profit margin are unfounded or otherwise in error

48.      Dr. Wiggins makes a number of comments regarding my calculation of the incremental profit margin for EpiPen® that are either unfounded or are otherwise in error.  Dr. Wiggins states, "It is unclear why Dr. Varner does not simply rely on the profits and losses of U.S. EpiPen® sales reported by Heather Bresch, Mylan's CEO, in her congressional testimony."[54]  Dr. Wiggins appears to have confused *average* profit margins with *incremental* profit margins.  (Average profit margins are calculated using all fixed and variable expenses and incremental profit margins include only variable expenses, and as such, are by definition higher than average profit margins.)  The document Dr. Wiggins refers to in this comment, "U.S. EpiPen Profitability Analysis," presents the Sales, Gross Profit, Operating Product and Net Product Profitability, among other metrics, of EpiPen® over the years 2008 through 2015. Dividing gross profit and operating profits by total sales in this document results in the *average* gross profit margin and the *average* operating profit margin over those years, which I show in *Varner Expert Report* Exhibit 5.1.  Damages at issue in this matter should be calculated, as I

---

[53] *Wiggins Expert Report*, 3/25/19, ¶ 95, p. 28.

[54] *Wiggins Expert Report*, 3/25/19, ¶ 98, p. 29, citing to Exhibit 17 of Heather Bresch Deposition 10/9/18.

**HIGHLY CONFIDENTIAL**

have done in *Varner Expert Report*, as the *incremental* profits that Mylan would have made from its lost EpiPen® sales but-for Sanofi's alleged false and misleading representations.

49.     Dr. Wiggins states, "Dr. Varner's regression approach is problematic because it estimates Mylan's incremental profit margin using data as far back as 2010 as well as data for 2016, periods well before and after the alleged period of damages."  If I use data from years 2013 to 2015 as Dr. Wiggins suggests, then the incremental profit margin is ███████ which is *higher* than the incremental profit margin of 58.2% I calculated in *Varner Expert Report* Exhibit 5.3. Using data from 2010 to 2012, I calculate an incremental profit margin of ███████ which is *lower* than the incremental profit margin using data from 2013 to 2015.  While Dr. Wiggins appears to be arguing for an approach that would result in a higher incremental profit margin, I have taken a more conservative approach and have done the regression analysis using data over the period 2010 to 2016.

50.     Dr. Wiggins states, "Dr. Varner inexplicably includes COGS in his dependent variable.  There is no reason to believe that COGS have any fixed component rather than being entirely variable."[55]  Dr. Wiggins is apparently not aware that cost of goods sold (COGS) can comprise some fixed expenses.  COGS is comprised of several components including direct materials, direct labor, factory overhead and production supplies.[56]  Only direct materials is typically fully variable, the other components may comprise some elements of variable expenses and some elements of fixed expenses.  By including COGS in the dependent variable of the regression analysis I presented in *Varner Expert Report*, I am able to determine what portion of

---

[55] *Wiggins Expert Report*, 3/25/19, ¶ 100, p. 29.

[56] *E.g.*, see FASB, General, Cost Basis 330-10-30-08 and <https://www.irs.gov/businesses/small-businesses-self-employed/deducting-business-expenses#costs>, Cost of Goods Sold.

**HIGHLY CONFIDENTIAL**

all costs and expenses are variable and which are fixed.  If COGS is a fully variable expense as Dr. Wiggins contends, then the regression analysis will account for that in determining the model's fixed coefficient and the coefficient of the dependent variable.

## V.   REBUTTAL TO MR. SCHUR'S STATISTICAL ANALYSIS

51.     I have been asked to review and comment on the statistical analysis Mr. Schur made in his expert report dated 3/25/19 ("*Schur Expert Report*").  Mr. Schur challenges Mr. Zieziula's reliance in his February 4, 2019 expert report on Sanofi market research showing



[57]

[58]  Mr. Schur states that a sample size of 50 allergists and 50 pediatricians "is not a significant sample population size to represent the detailed allergists and pediatricians."  I assume that by "detailed allergists and pediatricians," Mr. Schur is referring to the population of allergists and pediatricians who were recipients of Sanofi's sales force messaging, and by "sample population size" Mr. Schur is referring to the sample size of the Sanofi recall study.  (Mr. Schur does not provide an analysis or opinion regarding the population size or any other statistic that relies on population size.)  Mr. Schur then proceeds to provide a calculation of the confidence intervals ("CIs") for allergists and pediatricians.[59]

---

[57] *Zieziula Expert Report*, 2/4/19, p. 6.

[58] *Schur Expert Report*, 3/25/19, Appendix 3.

[59] *Schur Expert Report*, 3/25/19, Appendix 3.

HIGHLY CONFIDENTIAL

52.    In statistical analysis samples are taken from a population of interest, metrics are calculated for the set of sampled data, and inferences are made about the characteristics of the population based on the metrics of the sample set.  One way this is done is to calculate confidence intervals or bands around those calculated metrics at a given level of confidence (*e.g.*, an analysis may find that a sample mean is 30% and that, with a 95% degree of confidence, the mean of the population that was sampled is estimated to fall between 40% and 20%).  The number of samples taken (the "size" of the sample) affect the width of the confidence intervals of the characteristics of the population estimated at the desired level of confidence.

53.    There are a number of problems with Mr. Schur's statistical analysis.  By focusing on just one survey that Mr. Zieziula examined, Mr. Schur ignores the other surveys that Mr. Zieziula considered in forming his opinion.  Mr. Schur states that the 100 physicians surveyed are not a "significant" sample size, but Mr. Schur does not provide any discussion or opinion about what "significant sample size" would be, or what he means by a size necessary "to represent the detailed allergists and pediatricians."  Mr. Schur provides no discussion or opinion about what confidence interval would be acceptable, or even what criteria he would use to decide what confidence level or interval would be acceptable.  If the sample size were doubled to 200 from 100 (and using the probabilities shown in Mr. Schur's Appendix 3), ████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████.[60]  Mr. Schur provides no opinion as to whether this would be sufficient to "represent" the population of allergists or physicians, or if an even larger sample size would be necessary.

---

[60] ███████████████████████████████████████

**HIGHLY CONFIDENTIAL**

54.     Furthermore, Mr. Schur's own confidence interval calculation confirms that the data points cited by Mr. Zieziula are significantly different from 0%, *i.e.*, they confirm that some non-zero percent of allergists and pediatricians received comparative claims from Sanofi Auvi-Q sales representatives. ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

55.     Mr. Schur also does not provide any discussion or opinion about what sample sizes are typically used in the pharmaceutical industry or what criteria is used to evaluate acceptable sample sizes. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████     Without a basis to state that a sample size of 100 is not "significant," or what criteria he would use to determine an appropriate sample size, Mr. Schur's opinions on this statistical analysis are incomplete and unfounded.

## VI.     SIGNATURE

I declare under penalty of perjury that the forgoing is true and correct.

Executed on April 18, 2019, in Oakland, California.

Thomas R. Varner, Ph.D.

**HIGHLY CONFIDENTIAL**

31



APPENDIX A
CURRICULUM VITAE

## Thomas R. Varner, Ph.D.

**OFFICE:**                    Compass Lexecon
                               1111 Broadway, Suite 1500
                               Oakland, CA 94607
                               510.285.1218 direct, 510.285.1245 fax
                               E-mail: tvarner@compasslexecon.com

## EDUCATION

1992 – 1997, *M.S. in Engineering-Economic Systems* and *Ph.D. in Engineering-Economic Systems & Operations Research*, Stanford University, Stanford, CA

1980 & 1987, *M.S. in Civil Engineering* and *MBA,* University of California, Berkeley, CA

1975 – 1979, *B.S. in Architecture with Honors,* California Polytechnic State University, San Luis Obispo, CA

## PROFESSIONAL EXPERIENCE

January 2016 – Present, *Executive Vice President*, Compass Lexecon, Oakland, CA

April 2010 – January 2016, *Senior Vice President*, Economists Incorporated, San Francisco, CA

January 2002 – April 2010, *Principal*, Cornerstone Research, Inc., San Francisco, CA

January 2004 – March 2005, *Lecturer (Economics and Finance)*, Economics Department, University of California, Davis, CA

April 2001 – November 2001, *Manager* (Financial Advisory Services), PricewaterhouseCoopers LLP, San Francisco, CA

September 1997 – April 2001, *Managing Director*, Investment & Risk Analytics, Inc., Lafayette, CA

September 1994 – September 1997, *Consulting Researcher (Valuation of Financial Instruments)*, Prof. Darrell Duffie, Graduate School of Business, Stanford University, Palo Alto, CA

September 1993 – September 1997, *Teaching Assistant and Research Assistant*, Department of Engineering-Economic Systems, Stanford University, Stanford, CA

June 1989 – September 1993, *Engineering Manager*, Dames & Moore, San Francisco, CA

June 1980 – June 1989, *Project Manager*, Forell/Elsesser, Rutherford & Chekene and Paul F. Fratessa & Assoc., San Francisco, CA

TESTIMONY

2019: *Sanofi-Aventis US, LLC, v. Mylan Inc., et al.*, 2:17-cv-02452-TJJ, U.S. District Court, District of Kansas.  Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC.  Retained by Mylan as testifying expert on damages in a false advertising matter under the Lanham Act involving medical devices.

2018: Confidential, Arbitration.  O'Melveny & Myers, Los Angeles.  Retained by client in entertainment industry to provide economic analysis of royalty terms for renewal of trademark license agreement.

2018-2019: *Boltex Mfg. Co. and Weldbend Corp. v. Ulma Forja, S. Coop. a/k/a Ulma Piping and Ulma Piping USA Corp.*, 14:17-cv-1400, U.S. District Court, Southern District of Texas. Dechert LLP, New York, NY.  Retained by defendants and counterclaim plaintiffs as damages expert in false designation of origin and false representation matter under the Lanham Act involving domestic and foreign carbon steel flanges.

2018: *Desktop Metal, Inc. v. Markforged, Inc., et al.*, 1:18-cv-10524-WGY, U.S. District Court, District of Massachusetts.  Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, CA. Retained by defendant and counterclaim plaintiff as testifying economics expert in patent infringement and misappropriation of trade secrets matter involving 3-D metal printers.

2017-2018: *Optrics Inc., v. Barracuda Networks, Inc., et al.*, 17-cv-04977-RS, U.S. District Court, Northern District of California.  Law Offices of Herbert L. Terreri.  Retained by plaintiff as testifying damages expert in breach of contract and trademark infringement matter involving software.

2016-2019: *SS&C Technologies, Inc. v. Bradley Rossa and Clearwater Analytics, LLC*, 2015-CH-15891, Circuit Court of Cook County, Illinois, County Department, Chancery Division. Kirkland & Ellis LLP, Chicago, IL.  Retained by defendants as damages expert in case involving alleged misappropriation of trade secrets.

2016-2018: *In re: Lenovo Adware Litigation*, 5:15-md-02624-RMW, U.S. District Court, Northern District of California, K&L Gates LLP, Los Angeles, CA.  Economics expert on behalf of defendant in consumer class action matter involving alleged consumer fraud related to computers.

2016: *DNA Genotek Inc., v. Spectrum Solutions L.L.C., et al.*, 3:16-cv-01544-JLS-NLS, U.S. District Court, Southern District of California.  Simpson Thacher & Bartlett LLP, Palo Alto, CA. Retained by defendants as economics expert on patent infringement case involving medical devices.

2016: *Kaneka Corp. v. Zhejiang Medicine Co., Ltd., et al.*, CV 11-02389-MRP, U.S. District Court, Central District of California.  Mei and Mark, LLP, Washington, DC.  Retained by defendant as damages expert in patent infringement case involved pharmaceutical product.

2015-2016: *Alexander Stross v. Redfin Corp.*, 1:15-cv-223-SS, U.S. District Court, Western District of Texas.  Foster Pepper PLLC, Seattle, WA.  Retained by defendant as economics expert on copyright infringement case involving photographs on real estate broker website.

2

2015-2016: *DNA Genotek Inc., v. Ancestry.com DNA, LLC*, 15-0355-SLR, and *DNA Genotek Inc., v. Spectrum DNA*, et al., 15-cv-00661-SLR, U.S. District Court, District of Delaware. Fenwick & West, LLP, San Francisco, CA.  Retained by defendant as economics expert on patent infringement case involving medical devices.

2015-2016: Confidential.  Drinker Biddle & Reath LLP, Washington, DC.  Expert witness services on economic analysis of copyright licensing terms.

2015: *Changzhou Kaidi Electrical Co, Ltd., et al., v. Okin America, Inc., et al.*, U.S. District Court, District of Maryland, 1:13-cv-1798. Mayer Brown LLP, Washington, DC. Provided expert report, deposition testimony, and testified at trial on behalf of accused infringer in patent infringement matter involving mechanical actuators.

2015: *The Cat Ball, LLC v. FurHaven Pet Products, Inc.*, U.S. District Court, Western District of Washington, 2:14-CV-00292-MJP. Foster Pepper PLLC, Seattle, CA. Damages expert on behalf of defendant in false advertising and unfair competition matter involving pet products.

2014-2015: *Matthew Burnett, et al., v. Robert Bosch LLC USA, et al.*, U.S. District Court, Middle District of Florida, 8:14-CV-01361. K&L Gates LLP, San Francisco, CA. Economics expert on behalf of defendant in class certification matter involving alleged misrepresentation of selected spark plugs.

2014-2015: *Michigan State University v. Medlen & Carroll, LLP, et al.*, U.S. District Court, Western District of Michigan, 1:14-cv-00039. Fraser Trebilcock Davis & Dunlap, P.C., Detroit, MI. Damages expert on legal malpractice mater involving alleged failure to file foreign patents related agricultural biotechnology.

2014-2015: *Isola USA Corp. v. Taiwan Union Technology Corp.*, U.S. District Court, District of Arizona, 2:12-cv-01361-SLG. K&L Gates, San Francisco, CA. Damages expert on alleged infringement of patents related to laminates for multilayer printed circuit boards.

2013-2014: *Nxegen, LLC et al. v. Sensus USA, Inc.*, U.S. District Court, District of Connecticut, 3:11-cv-01197-WGY. Mayer Brown LLP, New York, NY. Damages expert on reasonable royalties in matter involving smart meter technology for utilities.

2013-2014: *In the Matter of: Certain Crawler Cranes and Components Thereof*, U.S. International Trade Commission, No. 337-TA-887. Morris, Manning & Martin, LLP, Atlanta, GA. Expert analysis of existence of domestic market for crawler crane technology.

2013-2014: *JS Products, Inc. v. Kabo Tool Company, et al.*, U.S. District Court, District of Nevada, 2:11-cv-01856-RCJ-GWF. K&L Gates, LLP, San Francisco, CA. Damages expert in patent infringement suit involving tool industry technology.

2013: *Lodsys Group LLC v. Brother International Corp., et al.*, U.S. District Court, Eastern District of Texas, 2:11-cv-00090 (JRG). Fenwick & West, LLP, San Francisco, CA. Retained by co-defendant, Symantec Corp., as damages expert on patent infringement suit involving software technology.

2013: *Magnate International Ltd. v. Costco Wholesale Corp.*, U.S. District Court, Central District of California, 12-cv-09208-GW. Foster Pepper, PLLC, Seattle, WA. Damages expert in patent infringement suit involving pump technology.

2012-2015: *QS Wholesale, Inc. v. World Marketing Inc.*, U.S. District Court, Central District of California, 8:12-cv-00451-DOC-RNB. Covington & Burling LLP, Washington, DC. Provided expert report, deposition testimony, and testified at trial in trademark infringement suit involving trademark in apparel industry.

2012-2014: *Hart Scott Rodino IP Rulemaking*, Project No. P989316—Notice of Proposed Rulemaking Regarding Certain Licensing Transactions in Pharmaceutical Industry. Baker Botts L.L.P., Washington, DC. Submitted declaration addressing economic basis for proposed premerger notification rules related to exclusive patent licensing.

2012-2015: *TransUnion Intelligence LLC, et al. v. Search America, Inc.*, U.S. District Court, District of Minnesota, 0:11-cv-01075-PJS-LFN. Baker Hostetler, Costa Mesa, CA. Economics expert in patent infringement suit involving software technology.

2012-2013: *Light Guard Systems, Inc. v. Spot Devices, Inc.*, U.S. District Court, District of Nevada, 3:10-cv-00737-LRH-WGC. Alston & Bird LLP, Menlo Park, CA. Economics expert in patent infringement suit involving transportation technology.

2012: *Intellectual Ventures I LLC v. Check Point Software Technologies Ltd., et al.*, U.S. District Court, Delaware, 1:10-cv-01067-LPS. Durie Tangri, San Francisco, CA. Economics and damages expert in patent infringement suit involving Internet technology.

2011-2016: *Arkema Inc., et al. v. Honeywell International, Inc.*, U.S. District Court, Eastern District of Pennsylvania, 2:10-cv-02886-WY. Kirkland & Ellis LLP, Washington, DC. Economics expert in patent suit (declaratory judgment and counterclaim patent infringement suit) involving chemical product.

2009-2010: *Angela Bates, et al. v. KB Home*, Superior Court of California, County of Alameda, RG-08- 384954. K&L Gates LLP, San Francisco, CA. Provided declaration addressing the validity of sampling and statistical analysis of escrow instructions performed by plaintiffs related to class certification of a set of home buyers in California.

2009: *In re Patent of Hee Young Yun, et al.*, U.S. Patent and Trademark Office, 90/008, 143, 145, 146, and 150. McKenna Long & Aldridge LLP, Washington, DC. Provided declaration addressing economic issues related to claimed commercial success of patents for liquid crystal display (LCD) modules as part of patent reexamination process.

2007-2008: *Quantum Systems Integrators, Inc. v. Sprint Nextel Corp.*, U.S. District Court, Eastern District of Virginia, 1:07-CV-00491. Crowell & Moring LLP, Washington, DC. Provided expert report, deposition testimony, and testified at trial on economic damages arising out of alleged infringement of copyrighted software.

2007: *Alvarado Hospital Medical Center, Inc. v. Alan Wittgrove, M.D.*, Superior Court of California, County of San Diego, GIC 827726. C. Matthew Didaleusky, Esq., Oakland, CA. Provided testimony at arbitration hearing on economic damages arising out of alleged breach of contract.

2007: *SCI California Funeral Services, Inc. v. Five Bridges Foundation*, Superior Court of California, County of San Mateo, CIV 432392. Shartsis Friese LLP, San Francisco, CA. Provided deposition testimony on economic issues related to valuation of provisions in real estate agreement.

4

2006-2007: *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, Superior Court of California, County of Santa Clara, 104CV031929. White & Case LLP, Palo Alto, CA. Provided deposition testimony on economic damages arising out of alleged breach of contract by licensee of proprietary DVD technology.

2005: Confidential Real Estate Co. v. Confidential Law Firm, private arbitration. Nixon Peabody LLP, San Francisco, CA. Provided expert report, deposition testimony, and testified at arbitration on economic damages related to valuation of multiple appraisals for real estate leasehold contract.

2005: *Poway RHF Housing, Inc. v. Irwin Pancake Architects, et al.*, Superior Court of California, County of Orange, 04CC09795. Hinshaw & Culbertson LLP, San Francisco, CA. Designated expert on economic damages arising out of alleged breach of contract and professional negligence against architect, and resulting in delayed opening of senior assisted living facility.

2003: *Eco-Steel Fabrication, Inc. v. Markol Iron, et al.*, Superior Court of California, County of Orange. Miller, Brown & Dannis, San Francisco, CA. Provided expert report and testified at mediation on economic damages resulting from delayed construction of luxury car dealership in southern California.


**NON-TESTIFYING ASSIGNMENTS**

2018-2019: *BlueRadios, Inc. v. Kopin Corporation, Inc.* U.S. District Court for the District of Colorado, 16-cv-02052-JLK.  Sheridan Ross P.C., Denver, CO.  Economic damages analysis of breach of contract and misappropriation of trade secret claims regarding filing and use of patents.

2015: Confidential. Cravath, Swaine & Moore LLP, New York, NY. Pre-litigation consulting related economic analysis of technology licensing terms.

2011-2012: *Thermal Design, Inc. v. American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc.* U.S. District Court, Eastern District of Wisconsin, 07-c-0765-WEC. Von Briesen & Roper, s.c., Milwaukee, WI. Economic analysis of competitive issues related to industry standards established for insulation used in non-residential, pre-engineered metal buildings.

2011-2012: *Warner Chilcott Laboratories Ireland, Ltd. et al. v. Mylan Pharmaceuticals Inc. et al.* U.S. District Court, District of New Jersey, 2:09-cv- 02073-WJM-MF. Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA. Analysis of economic issues related to the market for doxycycline hyclate delayed-release tablets and effects of proposed preliminary injunction.

2011-2012: *Abbott Laboratories et al. v. Impax Laboratories, Inc.* U.S. District Court, District of New Jersey, 210-cv-01322-DMC-JAD. Wilson, Sonsini, Goodrich & Rosati, San Diego, CA. Economic analysis of the commercial success of Abbott Laboratories' introduction and sale of TRILIPIX® (branded fenofibric acid delayed-release 45 mg and 135 mg capsules).

2011: Confidential. Hennigan Dorman LLP, Los Angeles, CA. Analyzed economic damages in patent infringement suit involving wireless communication technology.

5

2010: *Kenneth D. Klaas et al. v. Vestin Mortgage, Inc. et al.*, Eighth Judicial District Court In and For Clark County, State of Nevada, A528385. Gibson, Dunn & Crutcher LLP, Palo Alto, CA. Analyzed economic damages arising from merger of real estate investment funds into real estate investment trusts (REITs).

2010: *In Re: Outsidewall Tire*, U.S. District Court, Eastern District of Virginia, 1:09cv1217. Gilbert LLP, Washington, DC. Analyzed economic issues in misappropriate of trade secret, copyright infringement, and trademark infringement matter involving specialty tires.

2010: Confidential. Morgan, Lewis & Bockius LLP, Washington, DC. Retained on behalf of an international computer design firm to research and analyze Internet encryption technology license agreements.

2009-2010: Confidential, ICC International Court of Arbitration Proceeding. Morrison & Foerster LLP, San Francisco, CA. Analyzed fiduciary duties among co-investors in an Asia-based financial institution in relation to private equity industry customs and practices.

2009: *Jasmine Networks, Inc. v. Marvell Semiconductor, Inc., et al.*, Superior Court of California, County of Santa Clara, No. CV801411. Latham & Watkins LLP, San Francisco, CA. Analyzed economic damages arising out of alleged misappropriation of trade secrets, breach of fiduciary duty, and breach of contract.

2009: *Fujitsu Limited et al. v. Netgear, Inc.*, U.S. District Court, Western District of Wisconsin, 3:07-CV- 00710-BBC, O'Melveny & Myers LLP, San Francisco, CA. Provided economic and licensing analysis for patent infringement suit involving wireless Internet products.

2009: Confidential. Carmody & Torrance LLP, New Haven, CT. Retained by manufacturing company in printing industry to examine economic issues and damages arising out of patent infringement suits and antitrust counterclaims.

2009: Confidential. Retained by developer of risk analysis software to analyze damages arising out of alleged breach of contract involving joint development agreement.

2009: *Mosaic Systems, Inc. v. Cisco Systems, et al. & Mosaic Systems, Inc. v. Andreas Bechtolsheim, et al.*, Superior Court of California, County of Santa Clara, Nos. 104CV016867 &106CV072920. Morgan, Lewis & Bockius LLP, San Francisco, CA. Analyzed performance of board members' fiduciary duties in relation to customs and practices for board members of high-tech startup companies.

2008: Confidential. Retained by electronics firm to examine industry-wide licensing practices related to fees, royalties, and other licensing terms for discrete electronic components.

2008: *Rambus, Inc. v. Samsung Electronics Co., Ltd., et al.*, U.S. District Court, Northern District of California, No. C0502298 RMW. Munger, Tolles & Olson LLP. Analyzed economic issues related to structure of licensing terms among agreements for semiconductor technology.

2008: *Verizon Services Corp., et al. v. Cox Fibernet Virginia, Inc., et al.*, U.S. District Court, Eastern District of Virginia, No. 2:08 CV20-JBF/TEM. Kilpatrick Stockton LLP, Washington, DC. Analyzed economic damages from alleged infringement of patents related to Voice over Internet Protocol (VoIP) technology.

6

2008: *Beal Bank, S.S.B, et al. v. WestPoint International, Inc.*, Court of Chancery of the State of Delaware in and for New Castle County, Civil Action No. 2617- CC. Hennigan, Bennett & Dorman LLP, Los Angeles, CA. Analyzed financial and economic effects on the bondholders of a series of actions taken by defendants related to issuance of preferred shares and changes in corporate governance.

2008: *Stamps.Com Inc., vs. Endicia Inc. and PSI Systems, Inc.*, U.S. District Court Central District of California, No. CV06-07499 ABC (CTx). Sheppard Mullin Richter & Hampton LLP, Los Angeles, CA. Analyzed economic damages from alleged infringement of patents related to automated postage systems.

2007-2008: *United States ex rel. J. Richard West et al. v. Timex Corp.,* U.S. District Court, District of Connecticut, No. 3:04-CV-212 (JBA). Carmody & Torrance LLP, New Haven, CT. Analyzed price of watch products sold to U.S. Service Exchanges in alleged violation of Civil False Claims Act.

2007-2008: *Ronald A. Katz Technology Licensing LP v. General Electric Capital Corp., et al.*, U.S. District Court, Eastern District of Texas, No. 9:06-CV-197- RHC. Hennigan, Bennett & Dorman LLP, Los Angeles, CA. Analyzed economic damages from alleged infringement of patent portfolio related to interactive call processing technology.

2007-2008: North Shore City Council, Auckland, New Zealand. Consulting engagement related to economic analysis of allocation between different constituencies of construction costs for capital expansion of public transportation system.

2007-2008: *BP Chemicals Ltd. v. Jiangsu SOPO Corporation (Group) Ltd., et al.*, United States District Court, Eastern District of Missouri, No. 4:99-CV-00323 CDP. Paul, Hastings, Janofsky & Walker LLP, San Francisco, CA. Analyzed economic damages from alleged misappropriation of trade secrets related to acetic acid manufacturing technology.

2007-2009: *Lawrence J. Torango v. Aristocrat Leisure Ltd., et al.*, U.S. District Court, District of Nevada, CV-N-03-0690-HDM-VPC. McDermott Will & Emery, Palo Alto, CA. Analyzed economic damages from alleged breach of contract, misappropriation of trade secrets and infringement of patent related to gaming machine technology.

2006-2007: *Asyst Technologies, Inc. v. Jenoptik AG, et al.*, U.S. District Court, Northern District of California, C98-20451 JF. Fenwick & West LLP, San Francisco, CA. Analyzed price erosion damages associated with alleged patent infringement of semiconductor manufacturing products and processes.

2006-2007: *In Re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, U.S. District Court, Southern District of New York, MDL 1358 (SAS) M21-88. Kirkland & Ellis LLP, Chicago, IL. Analyzed economic consequences to oil companies of switching from MTBE-based to Ethanol based oxygenated and reformulated gasoline over the period 1995 to 2003.

2006-2009: *MacSolutions, Inc. v. Apple Computer, Inc.*, Superior Court of California, County of Santa Clara, 1-06-CV-056547. Latham & Watkins LLP, San Francisco, CA. Analyzed economic damages related to alleged breach of contract and misappropriation of trade secrets, among other claims, between independent resellers of Apple products and Apple Computer.

2006: Fairchild Semiconductor, consulting engagement. Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA. Prepared opinion letter addressing potential damage award from pending patent infringement litigation related to the acquisition of a target company by Fairchild Semiconductor.

2006: *H&R Block Eastern Enterprises, Inc., et al. v. Intuit, Inc.*, U.S. District Court, Western District of Missouri, 06-0039-CV-W-SOW. Quinn Emanuel Urquhart Oliver & Hedges, LLP, Redwood City, CA. Analyzed economic damages in original claim and subsequent counterclaim from alleged trademark infringement, false advertising, and fraudulent and negligent misrepresentations related to tax preparation software advertisements.

2006: *In the Matter of: Certain Incremental Dental Positioning Adjustment Appliances and Methods of Producing Same*, U.S. International Trade Commission, 337-TA. Paul, Hastings, Janofsky & Walker LLP, Washington, DC. Analyzed existence of domestic market for clear orthodontic products on behalf of claimant under Section 337 of Tariff Act of 1930. Claimant alleged patent infringement and trade secret misappropriation.

2006: *Jinro Industries Co., Ltd., v. Obyan Beach Resorts Associates, L.P.*, Superior Court of California, County of San Mateo, CIV436382. Calvo & Clark LLP, San Francisco, CA. Analyzed economic damages from alleged breach of contract between partners in a resort in Saipan, CNMI.

2006: *CollegeNET, Inc. v. Xap Corp.*, U.S. District Court, District of Oregon, 03- 1229-BR. Fenwick & West LLP, Mountain View, CA. Analyzed economic damages from alleged infringement of patent related to on-line college application software.

2006: *The People of the State of California v. Union Bank of California, N.A.*, *et al.*, Superior Court of California, County of Sacramento, 04AS01296. Heller Ehrman LLP, San Francisco, CA. Analyzed economic damages from alleged submittal of false unclaimed property (escheatment) reports related to municipal bonds funds.

2005: *Trust Created Under the Will of Samuel Mills Damon, Deceased*, P. No. 6664 Equity No. 2816-A. John L. McDermott (attorney for Petitioner), Honolulu, HI. Evaluated strategic alternatives and disposition of California and Hawaii real estate assets of trust.

2005-2006: *TiVo, Inc. v. EchoStar Communications Corp.*, *et al.*, U.S. District Court, Eastern District of Texas, 2-04cv01 (DF). Morrison & Foerster LLP, San Francisco, CA. Analyzed economic damages from alleged infringement of patent related to digital video recorders.

2005-2006: *James and Lisa Camenson, et al., v. Milgard Manufacturing, Inc.*, *et al.*, Superior Court of California, County of Solano, FCS-021177. Sedgwick, Detert, Moran & Arnold LLP, and Heller Ehrman LLP, San Francisco, CA. Supported economics and marketing experts in opposition to class certification in alleged defective aluminum window litigation.

2005-2006: *LG. Philips LCD Co., Ltd. v. Tatung Co. of America, et al.*, U.S. District Court, Central District of California, 02-6775 CBM LTLx. Morgan, Lewis & Bockius LLP, Philadelphia, PA. Analyzed economic damages from alleged infringement of patents related to liquid crystal display panels.

8

2005: Consulting assignment for Perkins Coie LLP. Performed statistical analysis of patent case terminations in U.S. District Court, Eastern District of Texas.

2004-2005: *Medtronic Vascular, Inc., et al. v. Advanced Cardiovascular Systems, Inc., et al.*, U.S. District Court, District of Delaware, CIV 98-80-SLR. McDermott, Will & Emery, Irvine, CA. Analyzed economic damages from alleged theft of trade secrets and infringement of patents related to cardiovascular and peripheral stents.

2004-2005: *United States v. Arnold Bengis, et al.*, U.S. District Court, Southern District of New York, 03 Crim. 308 (LAK). Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, NY. Analyzed restitution damages to South African Government arising out of overcatches of South Coast and West Coast rock lobsters.

2004-2005: *Liveworld, Inc. v. SocialNet, Inc. and MatchNet PLC, et al.*, Superior Court of California, County of Santa Clara. Levy, Small & Lallas, Los Angeles, CA. Performed database valuation, domain name valuation, alter ego analysis, and lost profits analysis associated with breach of contract between two Internet dating companies.

2004: *Big West Oil Company, Travel Plaza LLC, and Flying J, Inc., v. ConocoPhillips Company, et al.*, American Arbitration Association, 77-198- 00303-03 VSS. Gibson, Dunn & Crutcher LLP, Denver, CO. Analyzed retail diesel fuel pricing strategies of truck plaza operators for company valuation.

2004: *United States v. Intangible Property Rights in 958 Acres (Yuma Mesa Irrigation and Drainage District)*, U.S. District Court, District of Arizona, CIV- 02-0560-PHX (SRB), U.S. Department of Justice, Washington, DC. Analyzed lost revenue from the federal government's acquisition of an irrigation district's land in Arizona.

2004: *Network Caching Technology, LLC v. Novell, Inc., et al.*, U.S. District Court, Northern District of California, CV-01-2079 (VRW). Jones Day, Los Angeles, CA. Analyzed economic damages due to alleged infringement of patent related to Internet caching network technology.

2004: *Software AG, et al. v. BEA Systems, Inc.*, U.S. District Court, District of Delaware. Morrison & Foerster LLP, San Francisco, CA. Analyzed economic damages due to alleged infringement of patent related to business integration software.

2003-2004: *MediaTek, Inc. v. Via Technologies, Inc., et al.*, U.S. District Court, Central District of California, 02-05016 DSF (RNBx). Fenwick & West LLP, Mountain View, CA. Analyzed economic damages due to alleged patent and copyright infringement, and misappropriation of trade secrets of technology related to optical disk drives.

2003-2004: *In re Cardizem CD Antitrust Litigation*, U.S. District Court, 6th Circuit. Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, San Francisco, CA. Analyzed economic damages due to alleged delayed market entry of generic pharmaceutical products.

2003: *Retail Services, Inc. and Freebie, Inc. v. Freebies Publishing, et al.*, U.S. District Court, Eastern District of Virginia, Civ. 02-1111-A. Gibson, Dunn & Crutcher LLP. Analyzed economic damages due to alleged infringement of trademark related to on-line and promotional literature.

2003: *MEIE Syndicate Analysis*, Australia Taxation Office and Owens Dixon, Sydney, NSW, Australia. Analyzed economic basis for series of licensing and funding agreements between investors of distributed multimedia computing technology.

2003: *In re Timex Industries, Inc., et al.* U.S. Bankruptcy Court, Central District of California, 03- 16833-MJ, Chapter 11 Proceeding. Levy, Small & Lallas (attorney for creditor), Los Angeles, CA. Analyzed financial viability of building products company in bankruptcy proceeding.

2003: *Dan Gill, et al. v. ExxonMobil Corporation, Inc., et al.*, County Court 4 of Nueces County Texas, 03-60079-4. ExxonMobil in-house counsel, Houston, TX. Analyzed wholesale, DTT, and retail gasoline prices in selected Texas cities in response to alleged breach of contract regarding dealer price rebates.

2003: *Sun Life Assurance Company of Canada v. Golden Eagle Insurance Corporation, et al.*, Private arbitration. Milbank, Tweed, Hadley & McCoy LLP, Los Angeles, CA. Analyzed statistical sampling methodology employed in review of reinsurance treaties associated with a portfolio of Workers' Compensation insurance claims.

2002-2003: *Lawrence J. Knapp and Nicer Technologies, L.P. v. Raymond M. Galas so and Thompson & Knight LLP*, District Court of Tarrant County, Texas, 153-191270-02. Shannon, Grace, Ratliff & Miller LLP, Fort Worth, TX. Analyzed economic damages due to alleged negligence in prosecution of a patent related to testing equipment used to calibrate semiconductor manufacturing devices.

2002: *Macpherson's Inc., et al. v. Windermere Real Estate Services Company, et al.*, U.S. District Court, Western District of Washington, C01-1885P. Demco Law Firm, P.S., Seattle, WA. Assessed validity of plaintiffs' antitrust claims against a franchisor of residential real estate brokerage businesses.

2002: *Raman Froze d.b.a. Wizen Software v. EarthLink Network, Inc., et al.*, Superior Court of the State of California, City and County of San Francisco, 11889-01. Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, San Francisco, CA. Analyzed economic damages due to alleged breach of contract and misappropriation of software programming code.

2001-2002: *Business Objects, S.A. v. Congas, Inc., et al.*, U.S. District Court, Northern District of California, C 20503. Fenwick & West LLP, Mountain View, CA. Analyzed economic damages due to alleged infringement of patent related to relational database software.

**PUBLICATIONS**

Varner, Thomas R. & Hnath, G. M., "Patent Valuation Analysis—Patent Forward Citations and Patent Quality," retrieved from https://mp.weixin.qq.com/s/ShSYr8pOmX8igQucVcYriA, 2018, September 3.

Hnath, Gary, Jing Zhang and Thomas R. Varner, "Patent Forward Citations and Patent Quality," *Asia IP & TMT: Quarterly Review*, Second Quarter 2018.

Varner, Thomas R., "Federal Circuit Again Scrutinizes Reasonable Royalties in Patent Damages in *VirnetX v. Cisco Systems and Apple*," *The Economists Ink*, Winter 2015.

10

Varner, Thomas R., "Nash Bargaining May Not Be Right for Patent Damages," *Law360*, April 18, 2014.

Varner, Thomas R., "Empirical Data on 'Comparable Licenses' in Patent Infringement Suits," *The Economists Ink*, Fall 2012.

Varner, Thomas R., "An Economic Perspective on Patent Licensing Structure and Provisions," *Business Economics*, Vol. 46 (4), October 2011.

Varner, Thomas R., "*Uniloc* and the Demise of the 25 Percent Rule," *The Economists Ink*, Spring 2011.

Varner, Thomas R., "Technology Royalty Rates in SEC Filings," *les Nouvelles*, Journal of the Licensing Executives Society International, Vol. XLV, No. 3, September 2010, pp. 120-127.

Varner, Thomas R., "Reasonable Royalties and 'Comparable Licenses': Three Recent Court Rulings," *The Economists Ink*, Spring 2010.

## PROFESSIONAL AFFILIATIONS

Member, Licensing Executives Society, USA & Canada

Member, American Economics Association

Member, National Association of Business Economists

Member, American Society of Civil Engineers

Associate Member, American Bar Association (IP Law Section)

## OTHER

Speaker on economics, damages and technology licensing issues at Licensing Executives Society (LES), American Law Institute/American Bar Association (ALI/ABA) and Law Seminars International (LSI) seminars and conferences.

Licensed Civil Engineer and Licensed Structural Engineer (Inactive), State of California

Certificate in Hazardous Materials Management, University of California, Davis, 1990

Ph.D. Dissertation: *Strategic Investment Analysis: A Study of Indirect Effects in Optimal Portfolio Selection*, 1997

| Appendix B - List of Materials Considered<br>Expert Rebuttal Report of Thomas R. Varner, Ph.D., April 18, 2019 | | |
|---|---|---|
| | **Document Title / Bates Number** | **Date** |
| ***Legal*** | | |
| | Sanofi-Aventis U.S. LLC's Answer to Mylan Specialty L.P.'s Counterclaims | 6-Feb-18 |
| | | |
| ***Depositions and Exhibits*** | | |
| | Ayers, James (MedImpact) | 26-Sep-18 |
| *30(b)(6)* | Downey, Bryan (Sanofi) | 31-Jul-18 |
| | Handel, Thomas (Mylan) | 17-Oct-18 |
| *30(b)(6)* | Minton, Barbara (Anthem) | 30-Oct-18 |
| *30(b)(6)* | Rogers, Kent (OptumRx) | 19-Dec-18 |
| | | |
| ***Expert Reports*** | | |
| | Expert Rebuttal Report of Eduardo Schur | 25-Mar-19 |
| | Expert Rebuttal Report of Steven N. Wiggins | 25-Mar-19 |
| | Expert Report of Dr. Fiona M. Scott Morton | 4-Feb-19 |
| | Expert Report of Dr. Janusz A. Ordover | 25-Mar-19 |
| | Expert Report of Dr. Mary Ann Michelis Responding to Gary Zieziula's Expert Report | 25-Mar-19 |
| | Expert Report of Gary Zieziula | 4-Feb-19 |
| | Expert Report of Gary Zieziula | 25-Mar-19 |
| | | |
| ***FASB Document*** | | |
| | Financial Accounting Standards Board, "General, Cost Basis 330-10-30-08" | 9-Apr-19 |
| | | |
| ***Interviews*** | | |
| | Phone Interview with Mr. Chris Benson (Head of Supply Chain for Biologics and Respiratory Products at Mylan) | 28-Mar-19 |
| | | |
| ***News, Press, and Websites*** | | ***Date Accessed*** |
| | "Deducting Business Expenses: Cost of Goods Sold," IRS, available at <https://www.irs.gov/businesses/small-businesses-self-employed/deducting-business-expenses#costs> | 18-Apr-19 |
| | "Fluoxetine (marketed as Prozac) Information," U.S. FDA, last updated December 16, 2014, available at <https://www fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm109352 htm> | 16-Apr-19 |
| | "Highlights of Prescribing Information: Ditropan XL," U.S. FDA, *n.d.* , available at <https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020897s035lbl.pdf> | 16-Apr-19 |
| | "Sertraline (marketed as Zoloft) Information," U.S. FDA, last updated December 16, 2014, available at <https://www fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm053351 htm> | 16-Apr-19 |
| | "Sleep Disorder (Sedative-Hypnotic) Drug Information," U.S. FDA, last updated May 22, 2018, available at <https://www fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm101557 htm> | 16-Apr-19 |
| | | |
| ***Bates Documents*** | | |

| | |
|---|---|
| ANTH-EPI 03662 | |
| CIGNA_00478 | |
| DH0128824 | |
| DH0156755 | |
| EAI 00027790 | |
| EAI 00033532 | |
| Horizon00009478 | |
| Horizon00013404 | |
| IMP-0000977 | |
| IMP-0001006 | |
| IMP-0001038 | |
| kaleo 101809 | |
| KALEO-00006134 | |
| KALEO-00006135 | |
| KALEO-00006989 | |
| KALEO-00007551 | |
| KALEO-00022744 | |
| KALEO-00042499 | |
| kaleo101008 | |
| KFHP-005893 | |
| MedImpact_0007817 | |
| MYEP00047084 | |
| MYEP00047335 | |
| MYEP00088189 | |
| MYEP00093726 | |
| MYEP00095228 | |
| MYEP00096557 | |
| MYEP00107915 | |
| MYEP00107916 | |
| MYEP00118416 | |
| MYEP00119241 | |
| MYEP00119242 | |
| MYEP00119576 | |
| MYEP00127706 | |
| MYEP00127707 | |
| MYEP00127708 | |
| MYEP00127709 | |
| MYEP00127710 | |
| MYEP00127711 | |
| MYEP00127712 | |
| MYEP00127713 | |
| MYEP00127714 | |
| MYEP00127715 | |
| MYEP00127716 | |
| MYEP00127717 | |
| MYEP00127718 | |
| MYEP00127719 | |
| MYEP00127720 | |
| MYEP00127721 | |

| | | |
|---|---|---|
| | MYEP00127722 | |
| | MYEP00127723 | |
| | MYEP00127724 | |
| | MYEP00127725 | |
| | MYEP00127726 | |
| | MYEP00127727 | |
| | MYEP00127728 | |
| | MYEP00127729 | |
| | MYEP00127730 | |
| | MYEP00127731 | |
| | MYEP00127732 | |
| | MYEP00127737 | |
| | MYEP00127738 | |
| | MYEP00127739 | |
| | MYEP00127740 | |
| | MYEP00140812 | |
| | MYEP00140813 | |
| | MYEP00140817 | |
| | MYEP00152752 | |
| | MYEP00152753 | |
| | MYEP00162321 | |
| | MYEP00193044 | |
| | MYEP00239061 | |
| | MYEP00256469 | |
| | MYEP00258832 | |
| | MYEP00275501 | |
| | MYEP00275852 | |
| | MYEP00279997 | |
| | MYEP00292998 | |
| | MYEP00307545 | |
| | MYEP00307556 | |
| | MYEP00307933 | |
| | MYEP00323642 | |
| | MYEP00323845 | |
| | MYEP00323846 | |
| | MYEP00323856 | |
| | MYEP00323868 | |
| | MYEP00323869 | |
| | MYEP00324110 | |
| | MYEP00330670 | |
| | MYEP00330671 | |
| | MYEP00332613 | |
| | MYEP00332614 | |
| | MYEP00332615 | |
| | MYEP00392151 | |
| | MYEP00392152 | |
| | MYEP00457913 | |
| | MYEP00460782 | |
| | MYEP00474593 | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

| | | |
|---|---|---|
| | MYEP00481378 | |
| | MYEP00485295 | |
| | MYEP00485688 | |
| | MYEP00487177 | |
| | MYEP00487195 | |
| | MYEP00488646 | |
| | MYEP00488946 | |
| | MYEP00492591 | |
| | MYEP00492597 | |
| | MYEP00493241 | |
| | MYEP00513817 | |
| | MYEP00515665 | |
| | MYEP00517442 | |
| | MYEP00520168 | |
| | MYEP00520169 | |
| | MYEP00522910 | |
| | MYEP00524984 | |
| | MYEP00550556 | |
| | MYEP00550557 | |
| | MYEP00552533 | |
| | MYEP00556700 | |
| | MYEP00560585 | |
| | MYEP00560878 | |
| | MYEP00561078 | |
| | MYEP00561920 | |
| | MYEP00562623 | |
| | MYEP00562625 | |
| | MYEP00567786 | |
| | MYEP00567788 | |
| | MYEP00586588 | |
| | MYEP00606646 | |
| | MYEP00610641 | |
| | MYEP00611777 | |
| | MYEP00612335 | |
| | MYEP00612338 | |
| | MYEP00629734 | |
| | MYEP00630921 | |
| | MYEP00631669 | |
| | MYEP00631670 | |
| | MYEP00677384 | |
| | MYEP00716962 | |
| | MYEP00716966 | |
| | MYEP00717962 | |
| | MYEP00717963 | |
| | MYEP00723817 | |
| | MYEP00723818 | |
| | MYEP00740405 | |
| | MYEP00740408 | |
| | MYEP00752542 | |

| | |
|---|---|
| MYEP00798486 | |
| MYEP01033504 | |
| MYEP01041197 | |
| MYEP01050522 | |
| MYEP01050527 | |
| MYEP01050528 | |
| MYEP01050529 | |
| MYEP01124214 | |
| MYEP01140256 | |
| MYEP01146099 | |
| MYEP01148131 | |
| MYEP01180279 | |
| MYEP01180282 | |
| MYEP01180987 | |
| MYEP01186100 | |
| MYEP01186102 | |
| MYEP01190101 | |
| MYEP01198247 | |
| MYEP01209503 | |
| MYEP01209505 | |
| MYEP01211761 | |
| MYEP01211762 | |
| MYEP01211783 | |
| MYEP01211788 | |
| MYEP01211792 | |
| MYEP01211794 | |
| MYEP01211811 | |
| MYEP01268235 | |
| MYEP01319420 | |
| MYEP01319518 | |
| MYEP01319592 | |
| MYEP01322673 | |
| MYEP01322679 | |
| MYEP01362752 | |
| PBE_00000391 | |
| PBE_00000498 | |
| PBE_00000617 | |
| PFE_EPIPEN_AT00011447 | |
| PFE_EPIPEN_AT00011449 | |
| PFE_EPIPEN_AT00546951 | |
| PFE_EPIPEN_AT00548494 | |
| PFE_EPIPEN_AT00548495 | |
| PFE_EPIPEN_AT00548500 | |
| PFE_EPIPEN_AT00553188 | |
| PFE_EPIPEN_AT00568473 | |
| PFE_EPIPEN_AT00590186 | |
| PFE_EPIPEN_AT00611245 | |
| PFE_EPIPEN_AT00611490 | |
| PFE_EPIPEN_AT00648890 | |

| | |
|---|---|
| PFE_EPIPEN_AT00648955 | |
| PFE_EPIPEN_AT00655674 | |
| PFE_EPIPEN_AT01059972 | |
| PFE_EPIPEN_AT01368257 | |
| PFECAN_EPIPEN_AT00000168 | |
| PFECAN_EPIPEN_AT00000489 | |
| PS0063339 | |
| PS0063340 | |
| PS0209703 | |
| PS0217604 | |
| SAN-EPI_A-0000956 | |
| SAN-EPI_A-0011182 | |
| SAN-EPI_A-0040974 | |
| SAN-EPI_A-0059425 | |
| SAN-EPI_A-0088536 | |
| SAN-EPI-0002167 | |
| SAN-EPI-0002512 | |
| SAN-EPI-0003187 | |
| SAN-EPI-0003672 | |
| SAN-EPI-0004073 | |
| SAN-EPI-0004239 | |
| SAN-EPI-0004304 | |
| SAN-EPI-0004328 | |
| SAN-EPI-0005146 | |
| SAN-EPI-0007054 | |
| SAN-EPI-0008510 | |
| SAN-EPI-0012158 | |
| SAN-EPI-0012803 | |
| SAN-EPI-0013235 | |
| SAN-EPI-0013253 | |
| SAN-EPI-0014220 | |
| SAN-EPI-0014223 | |
| SAN-EPI-0014347 | |
| SAN-EPI-0027555 | |
| SAN-EPI-0031476 | |
| SAN-EPI-0032138 | |
| SAN-EPI-0032713 | |
| SAN-EPI-0033571 | |
| SAN-EPI-0041465 (Downey Exhibit 13) | |
| SAN-EPI-0057752 | |
| SAN-EPI-0058177 | |
| SAN-EPI-0059445 | |
| SAN-EPI-0060922 | |
| SAN-EPI-0060923 | |
| SAN-EPI-0062305 | |
| SAN-EPI-0069127 | |
| SAN-EPI-0075044 | |
| SAN-EPI-0075161 | |
| SAN-EPI-0078858 | |

| | |
|---|---|
| SAN-EPI-0080307 | |
| SAN-EPI-0080704 | |
| SAN-EPI-0081008 | |
| SAN-EPI-0082989 | |
| SAN-EPI-0083095 | |
| SAN-EPI-0083237 | |
| SAN-EPI-0083247 | |
| SAN-EPI-0084805 | |
| SAN-EPI-0087111 | |
| SAN-EPI-0087325 | |
| SAN-EPI-0088510 | |
| SAN-EPI-0088870 | |
| SAN-EPI-0089671 | |
| SAN-EPI-0091515 | |
| SAN-EPI-0095078 | |
| SAN-EPI-0097951 | |
| SAN-EPI-0102568 | |
| SAN-EPI-0102697 | |
| SAN-EPI-0102966 (Works Exhibit 8) | |
| SAN-EPI-0106495 | |
| SAN-EPI-0119877 | |
| SAN-EPI-0119878 | |
| SAN-EPI-0120568 | |
| SAN-EPI-0138659 | |
| SAN-EPI-0146381 | |
| SAN-EPI-0147386 | |
| SAN-EPI-0148365 | |
| SAN-EPI-0148375 | |
| SAN-EPI-0158511 | |
| SAN-EPI-0161780 | |
| SAN-EPI-0166174 | |
| SAN-EPI-0170356 | |
| SAN-EPI-0171268 | |
| SAN-EPI-0171340 | |
| SAN-EPI-0171340 (Downey Exhibit 15) | |
| SAN-EPI-0171590 | |
| SAN-EPI-0171591 | |
| SAN-EPI-0171597 | |
| SAN-EPI-0194007 | |
| SAN-EPI-0197629 | |
| SAN-EPI-0199208 | |
| SAN-EPI-0200861 | |
| SAN-EPI-0206698 | |
| SAN-EPI-0210391 | |
| SAN-EPI-0210605 | |
| SAN-EPI-0211693 | |
| SAN-EPI-0213952 | |
| SAN-EPI-0216415 | |
| SAN-EPI-0220969 | |

| | |
|---|---|
| SAN-EPI-0225642 | |
| SAN-EPI-0227361 | |
| SAN-EPI-0230556 | |
| SAN-EPI-0230700 | |
| SAN-EPI-0233173 | |
| SAN-EPI-0238962 | |
| SAN-EPI-0243446 | |
| SAN-EPI-0246125 | |
| SAN-EPI-0259092 | |
| SAN-EPI-0265085 | |
| SAN-EPI-0272399 | |
| SAN-EPI-0274664 | |
| SAN-EPI-0277215 | |
| SAN-EPI-0277608 | |
| SAN-EPI-0279259 | |
| SAN-EPI-0285761 | |
| SAN-EPI-0297041 | |
| SAN-EPI-0297235 | |
| SAN-EPI-0297237 | |
| SAN-EPI-0302203 | |
| SAN-EPI-0305836 | |
| SAN-EPI-0309724 | |
| SAN-EPI-0310632 | |
| SAN-EPI-0311155 | |
| SAN-EPI-0331691 | |
| SAN-EPI-0349131 | |
| SAN-EPI-0377130 | |
| SAN-EPI-0380296 | |
| SAN-EPI-0380300 | |
| SAN-EPI-0380305 | |
| SAN-EPI-0380723 | |
| SAN-EPI-0380724 | |
| SAN-EPI-0382315 | |
| SAN-EPI-0419743 | |
| SAN-EPI-0419745 | |
| SAN-EPI-0422838 | |
| SAN-EPI-0467641 | |
| SAN-EPI-0468116 | |
| SAN-EPI-0468859 | |
| SAN-EPI-0474016 | |
| SAN-EPI-0481276 | |
| SAN-EPI-0505644 | |
| SAN-EPI-0505645 | |
| SAN-EPI-0505646 | |
| SAN-EPI-0505648 | |
| SAN-EPI-0522279 | |
| SAN-EPI-0525843 | |
| SAN-EPI-0548257 | |
| SAN-EPI-0560914 | |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' AND EXPERTS' EYES ONLY

| | |
|---|---|
| SAN-EPI-0562284 | |
| SAN-EPI-0563590 | |
| SAN-EPI-0584372 | |
| SAN-EPI-0591672 | |
| SAN-EPI-0591675 | |
| SAN-EPI-0604949 | |
| SAN-EPI-0607088 | |
| SAN-EPI-0607552 | |
| SAN-EPI-0607553 | |
| SAN-EPI-0607554 | |
| SAN-EPI-0607555 | |
| SAN-EPI-0607556 | |
| SAN-EPI-0613184 | |
| SAN-EPI-0622362 | |
| SAN-EPI-0639333 | |
| SAN-EPI-0661153 | |
| SAN-EPI-0661155 | |
| SAN-EPI-0661172 | |
| SAN-EPI-0661192 | |
| SAN-EPI-0661193 | |
| SAN-EPI-0661198 | |
| SAN-EPI-0661228 | |
| SAN-EPI-0661229 | |
| SAN-EPI-0672067 | |
| SAN-EPI-0688283 | |
| SAN-EPI-0688814 | |
| SAN-EPI-0689486 | |
| SAN-EPI-0689494 | |
| SAN-EPI-0689809 | |
| SAN-EPI-0691534 | |
| SAN-EPI-0691536 | |
| SAN-EPI-0691569 | |
| SAN-EPI-0697937 | |
| SAN-EPI-0698010 | |
| SAN-EPI-0698552 | |
| SAN-EPI-0699296 | |
| SAN-EPI-0705748 | |
| SAN-EPI-0764574 | |
| SAN-EPI-0764575 | |
| SAN-EPI-0765933 | |
| SAN-EPI-0780155 | |
| SAN-EPI-0788600 | |
| SAN-EPI-0806073 | |
| SAN-EPI-0900347 | |
| SAN-EPI-0921400 | |
| SAN-EPI-0928169 | |
| SAN-EPI-0928170 | |
| SAN-EPI-0937195 | |
| SAN-EPI-0937197 | |

| | |
|---|---|
| SAN-EPI-0937198 | |
| SAN-EPI-0937199 | |
| SAN-EPI-0937200 | |
| SAN-EPI-0937201 | |
| SAN-EPI-0937202 | |
| SAN-EPI-0942591 | |
| SAN-EPI-0946468 | |
| SAN-EPI-0953622 | |
| SAN-EPI-0954784 | |
| SAN-EPI-0962121 | |
| SAN-EPI-0962122 | |
| SAN-EPI-1003658 | |
| SAN-EPI-1031103 | |
| SAN-EPI-1031769 | |
| SAN-EPI-1148329 | |
| SAN-EPI-1148855 | |
| SAN-EPI-1154043 | |
| SAN-EPI-1155596 (Downey Exhibit 49) | |
| SAN-EPI-1158291 | |
| SAN-EPI-1166023 | |
| SAN-EPI-1204458 | |
| SAN-EPI-1207542 | |
| SAN-EPI-1207543 | |
| SAN-EPI-1207552 | |
| SAN-EPI-1207556 | |
| SAN-EPI-1207566 | |
| SAN-EPI-1207599 | |
| SAN-EPI-1209659 | |
| SAN-EPI-1212218 | |
| SAN-EPI-1214286 | |
| SAN-EPI-1214288 | |
| SAN-EPI-1214294 | |
| SAN-EPI-1214295 | |
| SAN-EPI-1214301 | |
| SAN-EPI-1217191 | |
| SAN-EPI-1221350 | |
| SAN-EPI-1221352 | |
| SAN-EPI-1223834 | |
| SAN-EPI-1223837 | |
| SAN-EPI-1223839 | |
| SAN-EPI-1224836 | |