# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | CASE No. 2:17-md-2785<br>CASE No. 2:17-cv-2452 |
| SANOFI-AVENTIS US, LLC,<br><br>    *Plaintiff,*<br>v.<br><br>MYLAN INC.; and<br>MYLAN SPECIALTY, L.P.,<br><br>    *Defendants.* | |

**EXPERT REPORT OF**

**GARY ZIEZIULA**

Dated February 4, 2019

Signature: _____

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

**Table of Contents**

A.  Qualifications ....................................................................................................................... 3

B.  Scope of Assignment and Summary of Opinions ................................................................ 3

C.  Analysis and Opinions ........................................................................................................ 4

   i.     Unsupported Comparative Claims About Patient Preference ............................................. 4

   ii.    Other Comparative Claims .................................................................................................. 8

   iii.  Improper Promotion of Auvi-Q as the New EpiPen ......................................................... 10

   iv.  Unfair Competitive Conduct in the Form of Kickbacks .................................................... 12

Appendix A: Curriculum Vitae

Appendix B: List of Documents Considered

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

## A.  Qualifications

My name is Gary Zieziula.  I am a recently retired pharmaceutical executive with over
40 years of experience in the pharmaceutical industry.  I began my career as a pharmaceutical
sales representative in 1977 after graduating from college.

I advanced my career in the 1980s and 1990s, taking positions of increasing responsibility
including district sales manager, product manager, senior customer manager, senior director
marketing, executive director business development, vice president sales and account
management, vice president managed care sales and marketing.  As a district sales manager I
was responsible for ensuring that the sales representatives within my geography were abiding by
the rules and regulations that govern promotional practices, and that they were properly
executing the marketing strategy by delivering precise approved messaging to targeted
physicians.  In the several marketing roles that I have had over the years, it was my responsibility
to set the strategy for brands on the market, and for the launch of new brands.  While in the
marketing roles listed above, I have launched nine different brands in multiple therapeutic areas.
It is one of the most time consuming and challenging responsibilities for a brand team and for
members of the pharmaceutical company's leadership team.  You only get one chance to get it
right, so any product that is in pre-launch phase gets significant attention throughout the
organization.

In 2001, I joined Roche Laboratories and was elevated to the position of Head of Commercial
Operations, Specialty Care.  I then became the Managing Director of Greece (expat).  I have
been at EMD Serono for the last five years, the first two as Chief Commercial Officer and the
last three as President and Managing Director.  In this capacity, I had full P&L responsibility.  I
was also responsible for ensuring that sales and marketing personnel were adhering to the rules
and regulations governing promotional practices and for ensuring an effective compliance
program.   As the President and Managing Director, I also felt that it was my responsibility, as it
is for senior leadership at all pharmaceutical companies, to set the right tone from the top on
matters related to promotional practices and the culture of the organization.

Attached as Appendix A is my current CV.  In the past four years, I have not testified as an
expert witness at trial or in a deposition.

## B.  Scope of Assignment and Summary of Opinions

I have been retained by the law firm Robbins, Russell, Englert, Orseck, Untereiner & Sauber,
LLP, counsel for Mylan, in the lawsuit brought by Sanofi against Mylan concerning Mylan's
marketing and sale of the EpiPen® Auto-injector ("EpiPen") and Sanofi's marketing and sale of
its competing product Auvi-Q® ("Auvi-Q").  I have reviewed Sanofi's complaint, Mylan's
Answer and Counterclaims against Sanofi, and numerous other documents produced by the
parties.  A full list of the documents considered in preparing my report is attached as
Appendix B.

3

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

At this stage, I have been asked by counsel for Mylan to offer my opinion, based on my experience in the industry generally, and in pharmaceutical sales and marketing in particular, concerning the promotional and marketing efforts undertaken by Sanofi when it introduced Auvi-Q into the U.S. market.  My opinions are based on my review of the materials provided to me by counsel, and on my training and 40 years of experience in the pharmaceutical industry.   I am being compensated at a rate of $350 per hour for my consultation and report-writing work and $500 per hour for deposition and trial testimony in this matter.  My compensation is not dependent on the opinions offered or the outcome of this matter.

In summary, it is my opinion, as explained in this report, that Sanofi made promotional claims to payers, physicians, and consumers when marketing Auvi-Q that would not be consistent with industry best practices, lack the substantiation required by regulatory standards, and are at odds with the data that Sanofi actually possessed.  These marketing messages compared Auvi-Q to Mylan's EpiPen product, suggested that Auvi-Q was the new EpiPen, and that Auvi-Q was a better device which patients preferred.  In my experience, the use of these types of misleading comparative messages in pharmaceutical advertising can have a significant impact on payers, prescribing physicians, and consumers' purchasing decisions.  In addition, the prevalence of these advertising messages demonstrates that they were widespread in the marketplace, and that they were either approved by Sanofi, or at least that Sanofi failed to put proper controls in place to prevent them.

## C.  Analysis and Opinions

### i.      Unsupported Comparative Claims About Patient Preference

I believe that Sanofi's field personnel have made comparative claims and preference claims on Sanofi's Auvi-Q versus Mylan's EpiPen without the appropriate data to substantiate those claims.  My experience over the years is that these types of comparative and preference claims can have a significant impact on how physicians, payers and patients make decisions on which products to use.  For that reason, pharmaceutical companies are required to complete well controlled, substantial head to head studies, comparing one product versus another to make comparative claims.  These requirements help to ensure that consumers are not mislead or confused by unsupported claims about a product.  Over the years I have been involved in the decision-making process of determining if a head to head trial was the right strategy for a product in Phase III development.

I have reviewed the testimony of James Parker, Senior Director of Regulatory Affairs at Sanofi from 2010 through 2015, and corresponding exhibits.  Mr. Parker explained that the company was exploring in 2011 what evidence it needed to justify making comparative preference claims

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

about Auvi-Q (then known as EpiCard) along the lines of "easier to use," "easier to use correctly," "easier to carry," "easier to train," "convenient," and "overall preference claim."[1]

Mr. Parker received some initial feedback from Elaine Cunningham, Director Regulatory and Evidence Review Expert at the FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC"), about the type of evidence that would be required to make comparative claims. DDMAC is the division within the FDA that has oversight of pharmaceutical marketing, advertising, and communications.  There is a well described process with DDMAC to determine that promotional materials meet the rules and regulations of accepted promotional practices.  Mr. Parker reviewed with Ms. Cunningham a proposed protocol for a patient study that compared Auvi-Q to the EpiPen.  Mr. Parker asked Ms. Cunningham whether the proposed study would support promotional claims that patients found Auvi-Q easier to use, easier to carry, easier to follow, and preferred in size and shape than the EpiPen auto-injector, and whether it would support general claims of patient preference.[2] Ms. Cunningham advised Mr. Parker that the protocol should to be amended to reflect real world experience.  She advised that Sanofi should change the design of the study from a simulation to a complete injection, with placebo injected into study participants rather than active drug.[3]  In one of the exhibits that summarized a telephone exchange between Mr. Parker and Ms. Cunningham, she stated that for Sanofi to use the results of the study in promotional materials and cite a preference difference between Auvi-Q versus EpiPen, Sanofi would need to change the design of the trial as Ms. Cunningham had stated.[4]

In my experience, it is standard practice for pharmaceutical companies to come to an agreement with the FDA on matters associated with clinical trials before beginning the trial, including protocol design, which it does not appear Sanofi did here. Sanofi did make one change to the protocol; however, based on my experience in launching products and being involved in the development of clinical studies, that change was not meaningful.  Sanofi added an option requested by the FDA to allow patients to say they preferred neither EpiPen nor Auvi-Q on various measures.[5]  But the preference study conducted by Sanofi did not require patients to actually complete an injection, or carry the device in a real-world situation, or dispose of the device after injection—all things the FDA directly said were needed to support claims of patient preference.[6]

My review of the record indicates that, despite Sanofi's failure to conduct a study that the FDA would permit to be used to support broad claims of patient preference, Sanofi's sales

---

[1] Deposition of James Parker, Tr. 46-49; Parker Ex. 2 (Sanofi communication with FDA).

[2] Parker Ex. 3 (Sanofi communication with FDA).

[3] Parker Ex. 4 (Sanofi communication with FDA).

[4] Parker Ex. 5 (Sanofi communication with FDA).

[5] Parker Ex. 5;  SAN-EPI-0227361, at -0227372-81 (Published Study Results, Camargo Jr. CA, Auvi-Q Versus EpiPen: Preference of Adults, Caregivers, and Children).

[6] Camargo, Published Study Results; Parker Ex. 4 (Sanofi communication with FDA).

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

representatives, account executives, and senior executives made patient preference claims on multiple occasions.  The numerous instances that I saw of these claims in the documents I reviewed suggest a widespread practice.  As discussed in more detail below, in my opinion, the frequency and similarity of these claims also indicates to me a failure of Sanofi management to set the right tone at the top and put adequate measures in place to ensure compliance with industry best practices and all legal and regulatory requirements.

First,



[7]   Another example is found in the testimony of Sanofi account manager Keith Wade.

.[9]

Second, the documents I reviewed indicate that these misleading comparative statements were made in the field.  For example, I reviewed several Awareness Trial and Usage (ATU) studies, which are the standard industry practice of how pharmaceutical companies track awareness, trial and usage of launch brands, and message recall from physicians. ATU studies typically go out in waves over time, and Sanofi conducted waves of ATU studies concerning Auvi-Q.  I have found them to be extremely helpful in my career in knowing how physicians perceive your product, and if physicians are recalling messages delivered by sales representatives in line with the marketing strategy.  These reports assist pharmaceutical companies in determining which messages are working in the field.

In a message recall tracker report from April 2013, of 100 physicians surveyed, 11% unaided recalled Sanofi sales representatives making comparative claims, and 47% of physicians aided recalled Sanofi sales representatives making comparative claims.[10] Unaided message recall is asking physicians questions without any explanation or hints, aided message recall would provide some level of general direction on the message delivered.  Unaided message recall is always lower than aided recall in my experience.  The fact that 47% of physicians aided recall hearing Sanofi sales representatives make comparative claims for Auvi-Q versus EpiPen demonstrates that making these comparative claims for Auvi-Q versus EpiPen was a widespread practice among the Sanofi field force.  This document is just one example.  Other ATU reports

---

[7] Deposition of Saira Jan, Tr. 103-116; Jan Exs. 4-5 (Horizon P&T materials).

[8] Deposition of Keith Wade, 71-73; Wade Ex. 6 (K. Wade email to United).

[9] Works Ex. 10 (Slide 34) (Analysis Group, EAI Market Access Research).

[10] SAN-EPI-0095078 (Sanofi Auvi-Q Message Recall Tracker Report (W1 2013) (April 2013), at 13, 29.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

and message recall studies that I reviewed show that physicians recalled comparative messages from their interactions with Sanofi's sales representatives.[11]



[13] Over the many years that I have been in the pharmaceutical industry, sales representatives delivering product features and benefits messages has been the most effective way to convince physicians to prescribe a product, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

Third, the broad comparative claims for Sanofi's Auvi-Q as being preferred by patients to Mylan's EpiPen appear at all levels of the organization. Most notably, in a press quote at the time of the launch of Auvi-Q in the U.S., the President of North America Anne Whitaker included a comparative claim in the press quote saying that "Auvi-Q is more patient friendly than Mylan's rival product EpiPen."[14] In my experience, published quotes on the launch of a new product from the President of the pharmaceutical company typically get broad distribution throughout the company including to all field-based personnel. It is especially important that the most senior leader of any pharmaceutical company set the right tone and not make comparative claims when there is not sufficient data to support them. The press quote by the President of North America for Sanofi is likely a contributing factor as to why there were many examples of sales representatives and account managers throughout the organization who made comparative claims to physicians, payers and patients on Sanofi's Auvi-Q versus Mylan's EpiPen.

Fourth, it is significant to me that



---

[11] SAN-EPI-0032713 (Sanofi Auvi-Q Message Recall Tracker Report (W2 2013) (October 2013) at 27-28; SAN-EPI-0277608 (Auvi-Q Message Recall Study W2'13 - Raw verbatim data for open-ended questions); SAN-EPI-0220969 (Sanofi Auvi-Q R3M_Dec14 to R3M_Mar15.xlsx).

[12] SAN-EPI-0091515 (Physician ATU Tracking Market Research Final Report June 18, 2014) at 79.

[13] SAN-EPI-0468859 (Auvi-Q Brand Impact Analysis December 2014), at 15; SAN-EPI-0083095 (Auvi-Q Brand Impact Analysis March 2015), at 13-17.

[14] MYEP01268235 (January 28, 2013 Bloomberg Article).

[15] Wade Ex. 6 (K. Wade email to United).

[16] SAN-EPI-0075044 (Email re: WellPoint Auvi-Q Slides for meeting).

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

launch.[17]  And at least one Sanofi sales representative left a handwritten note at a physician's office in early 2013 stating that "The overwhelming majority of patients . . . prefer Auvi-Q as evidence by clinical experience and peer reviewed surveys."[18]

The fact that this phrase has come up multiple times with different customers and in a variety of settings indicates that it was well known by the brand team.  Whether or not this phrase was formally approved by the company as a message for field use, it worked its way to different parts of the company, which suggests it was being used in sales training meetings or informal discussions with the brand team about the product.  Such meetings and discussions are a vital part of setting the tone for marketing the brand.

Because these comparative claims that Sanofi made for Auvi-Q versus EpiPen were not supported by the kind of data the FDA requires to make such claims, they were not in line with industry best practices.  In my opinion Mr. Parker and the regulatory team at Sanofi should have communicated to senior management at Sanofi the FDA's position on not using the preference results in promotional material and put the correct oversight in place to ensure appropriate messaging by the Sanofi sales representatives and account managers.  The fact that patient preference messaging was broadly used indicates that the company did not set the tone at the top that, in my experience, is necessary to ensure employees to do not overstep the line and engage in impermissible and misleading marketing.

## ii.    Other Comparative Claims

The documents I reviewed show that Sanofi made other claims in its marketing of Auvi-Q that compared the product to EpiPen, either directly or by suggestion.

First, Sanofi made claims on its website that "2 Large Surveys Showed That Most At-Risk Patients Do Not Always Carry An EAI."[19]  It made the same claims in the official press release made at the time of Auvi-Q's launch: "two large surveys (n=600 and n=651) show that two-third of patients and caregivers do not carry their epinephrine auto-injectors as recommended."[20]

These claims were based on two unpublished surveys conducted by Sanofi, which I have reviewed.  The first, an online survey conducted in 2010, showed that while 63% of adults and children do not always carry their EpiPen, 72.2% of children and 68.6% of adults carry their EpiPen more than 75% of the time.[21]  The second, also an online survey conducted in 2011,

---

[17] SAN-EPI-0522279; PS0217604 ████████████████
████████.

[18] SAN-EPI-0227361, at -0227390; SAN-EPI-1207543, at -1207543, -1207548; SAN-EPI-1207556, at -1207556 (handwritten notes).

[19] SAN-EPI-1207543 (FDA letter to Sanofi).

[20] MedImpact_0007817 (January 28, 2013 Press Release).

[21] SAN-EPI-1207543 (FDA letter to Sanofi); SAN-EPI-1207552 (EAI Consumer Segmentation Research Final Report, November 2010).

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

found that 58% of adults and 71% of children do not carry their EpiPen all the time, but that 68% of adults and 58% of children carry their EpiPen more than 75% of the time.[22]  Results like this could be used to support a number of statements.  During my tenure in the industry, I often reviewed market research studies to assist in assessing the most appropriate take-away message. I would have interpreted the study as showing that while not 100% of patients carry their device 100% of the time (which is not surprising), a fairly high percentage of patients carry their device most of the time.  Sanofi used this study not only to say that most patients do not carry their EpiPen auto-injectors  as recommended, but also to suggest without supporting research that the Auvi-Q device would yield a better result.  For example, I reviewed a handwritten note left at a physician's office by a Sanofi sales representative stating: "Recent JACI survey showed 71% do not always carry Epi . . . and over half had usage challenges. Auvi-Q is easy to carry & easy to use."

And it appears based on the evidence I reviewed that Sanofi sales representatives used this interpretation as a core part of their messaging.   For example, Sanofi's ATUs show this message was widespread.  As noted above, ATUs are useful sources of information about the messages being conveyed by sales representatives in the field to physicians.  Sanofi ATUs show physicians recall Sanofi sales representatives conveying the message that patients do not carry EpiPen.  In one recall survey in April 2013, 69% of physicians recall discussing that "most at-risk patients do not always carry an epinephrine auto-injector."[23]  In October 2013, another survey of physicians recently visited by Sanofi sales representatives found messaging about the rate at which patients carry EpiPen devices to be the "top recalled message."[24]  And a "verbatim study" in October 2013 noted that physicians recalled being told by Sanofi sales representatives that Auvi-Q was "more likely to be carried by the patient" and was "easier to carry."[25]

<u>Second</u>, Sanofi disseminated an advertisement promoting Auvi-Q as the "first and only EAI device with . . . retractable needle mechanism designed to help prevent accidental needle sticks," and an ATU in April 2013 showed that 50% of physicians remembered a Sanofi sales representative messaging about Auvi-Q "retractable needle designed to help prevent accidental needle sticks."[26]  Mylan's field intelligence reports suggested Sanofi sales representatives were telling physicians that EpiPen products would injure them or their patients through accidental

---

[22] SAN-EPI-1207543 (FDA letter to Sanofi); SAN-EPI-1217191 (EAI Consumer Buying Process, July 2011).

[23] SAN-EPI-0095078 (Sanofi Auvi-Q Message Recall Tracker Report (W1 2013) (April 2013) at 7, 13-14.

[24] SAN-EPI-0032713 (Sanofi Auvi-Q Message Recall Tracker Report (W2 2013) (October 2013) at 11.

[25] SAN-EPI-0277608 (Auvi-Q Message Recall Study W2'13 - Raw verbatim data for open-ended questions).

[26] MYEP01211794, at 01211808 (Auvi-Q "I Talk" advertisement); SAN-EPI-0095078 (Sanofi Auvi-Q Message Recall Tracker Report (W1 2013) (April 2013), at 15.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

injections and lacerations.[27]  These messages taken together would imply that Auvi-Q would result in fewer needle sticks than EpiPen, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[28]  I am not aware of any studies to support that comparative claim, and it would not be consistent with industry best practices to imply a safer product without concrete support.

<u>Third</u>, I saw in the documents a reference to a Sanofi representative in Texas telling a physician that Auvi-Q could withstand higher temperatures, and that it would be a better product to withstand the heat in Texas in the summer months.[29] I am not aware of any data to support this comparative claim either.  As with the other comparative claims discussed, it would not conform to industry guidelines or best practices to claim superior temperature control without concrete support.

Taken together, all these different instances of comparative advertising made by Sanofi's sales representatives without support indicate that Sanofi either approved this type of messaging for the Auvi-Q product or, at least, did not put the proper procedures in place to prevent it.  And it confirms to me that comparative messaging for the Auvi-Q product was widespread in the field.

### iii.    Improper Promotion of Auvi-Q as the New EpiPen

EpiPen products have strong brand name recognition and has become synonymous with the word epinephrine.  EpiPen auto-injectors have been on the market for over 20 years, and it is clear why a manufacturer of a rival product might want to capitalize on EpiPen's brand equity.  But the Auvi-Q and EpiPen are not the same, and a prescription for one cannot legally be filled with the other.  The degree to which Sanofi was able to create the impression that Auvi-Q is the "new EpiPen" would be harmful to Mylan and the brand equity of EpiPen and would have been very confusing to physicians and consumers.  Brand equity is built over time based on a brand delivering the desired results consistently with patients.  In my experience in the industry, the brand equity of a pharmaceutical product plays a big role in a physician's willingness to prescribe that product.  In my experience, it is not common practice for one pharmaceutical company to leverage the brand equity developed by a competitor to promote its own product.

I have seen evidence suggesting that Sanofi knew prior to launch that consumers might be predisposed to viewing Auvi-Q as the "new EpiPen" or "talking EpiPen."[30]  It appears from Mylan competitive field reports that Sanofi sales representatives fueled this confusion by

---

[27] MYEP000677384 (Mylan Competitive Intelligence Update (Week Ending 4-19-13), at 17; MYEP00717963 (Mylan Competitive Intelligence Update (Week Ending 8-23-13) at 8-9.

[28] SAN-EPI-1158291 ████████████████████████████████████████████████ ██████.

[29] MYEP000677384 (Mylan Competitive Intelligence Update (Week Ending 4-19-13) at 20.

[30] SAN-EPI-0305836 (E-Cue: In-Office Patient Promotional Material, Qualitative Evaluation - Report, Interviews on July 26-27, 2012) at 12.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION**

expressly promoting Auvi-Q as the "new EpiPen."[31]  I have seen several examples of Sanofi sales representatives either telling medical office staff or leaving hand written messages that Auvi-Q is "new EpiPen" and suggesting that EpiPen would no longer be available.[32]  The notes also included messages on ease of use, and preference to carry.  This occurred in an allergist practice in Arizona, where staff was expressly told that Auvi-Q was replacing the EpiPen, leading at least one medical assistant to mistakenly believe the EpiPen was being "phased out."[33]  It also occurred in Alabama, where a Sanofi sales representative spoke before a meeting of school nurses and called Auvi-Q the "new talking EpiPen."[34]  I reviewed another declaration from a nurse in California who heard similar messages, and I also spoke to two Mylan sales representatives who confirmed they heard the same "new EpiPen" or "talking EpiPen" messaging in the Boston area.[35]  Mylan field intelligence reports and message recall studies indicated this was a widespread message.[36] In my experience, I would have relied on reports from sales representatives of frequent occurrences of confusing messaging, combined with documented evidence of those messages, to determine whether a competitor's messaging campaign was widespread.

Other documents suggest to me that the Sanofi brand team knew that consumers were confusing the two products.



[37]  I also reviewed documents concerning

---

[31] MYEP000677384 (Mylan Competitive Intelligence Update (Week Ending 4-19-13) at 14-17; MYEP00717963 (Mylan Competitive Intelligence Update (Week Ending 8-23-13) at 20; MYEP00127732 (Competitive Claims/Messaging Summary 1-28-13).

[32] MYEP00292998 (email from North Carolina sales rep re: nurse referring to "new talking EpiPen"); MYEP01211794, at 01211798-01211803 (declarations from Scottsdale Allergy, Ear, Nose & Throat Center and handwritten "new epipen" note); MYEP00567786 (email re: Auvi-Q sales rep in North Alabama referring to "new talking EpiPen").

[33] MYEP01211794, at -01211798 to -01211801 (declarations from Scottsdale Allergy, Ear, Nose & Throat Center).

[34] MYEP00567786 (email re: Auvi-Q sales rep in North Alabama referring to "new talking EpiPen").

[35] Declaration of Regina Garcia; Interviews with Mylan employees Tory White and Kelly Wilson, February 4, 2019.

[36] MYEP000677384 (Mylan Competitive Intelligence Update (Week Ending 4-19-13) at 14-17; MYEP00717963 (Mylan Competitive Intelligence Update (Week Ending 8-23-13) at 20; MYEP00127732 (Competitive Claims/Messaging Summary 1-28-13); MYEP00556700, at Slide 32

[37] SAN-EPI-0591672 (Auvi-Q YouTube Search submissions); SAN-EPI-0591675 (keyword list).

CONTAINS HIGHLY CONFIDENTIAL INFORMATION



       **iv.**     **Unfair Competitive Conduct in the Form of Kickbacks**

I have seen evidence of an additional serious matter, that a Sanofi representative in September 2012, was no longer allowed into North Alabama ENT offices after offering nurses $100 for 50 prescriptions for Auvi-Q.[40]  The office contacted Sanofi as well as Mylan regarding this matter. It is not known if this was an isolated case or if there was a broader effort to pay for prescriptions.  It was reported by the local Mylan representative that the Sanofi representative was transferred to an adjacent territory.  I would be shocked if that is true, and I believe that it would not be a good reflection on the culture that existed at Sanofi at that time.  In every company that I have worked for in a leadership role, any representative that was engaging in the behavior of paying for prescriptions would have been terminated, as these forms of kickbacks are clearly against the law and must be strongly discouraged.

---

[38] SAN-EPI-0607553 (2014 Auvi-Q Search Keyword Tiers); SAN-EPI-0607088 (2013 SEM Strategy and Goals).

[39] SAN-EPI-0584372 (Auvi-Q Consumer July 2014 Report) at 7.

[40] MYEP00798486 (email re: North AL ENT and Auvi-q).

# **Appendix A**

# Gary Zieziula, MBA

| | |
|---|---|
| **Mobile:** | **+1-215-603-4476** |
| **Email:** | garyzieziula@yahoo.com |
| **LinkedIn:** | **http://www.linkedin.com/in/gary-zieziula-9225a96** |

## GLOBAL PHARMA & BIOTECH EXECUTIVE

**Global Pharmaceutical Executive** with 30 years of experience building and guiding strong, sustainable sales and operations organizations across Europe and North America for industry leaders like Merck, Bristol-Myers Squibb, Roche, AMAG, and Merck/EMD Serono.

**Highly Ethical Leader** with proven success modeling integrity and committing to the highest standards to ensure that the company meets the stringent regulatory requirements in the U.S., European, and International markets.

**Dedicated Patient Advocate** with a passion for delivering products to market that improve patient outcomes and access, serving currently on the Board of BIO and the CEO Roundtable on Cancer.

## EXECUTIVE EXPERIENCE

**EMD Serono – Rockland, MA, USA**
*North American pharmaceutical company; subsidiary of Merck KGaA.*

**President & Managing Director | Chief Commercial Officer**, January 2014 – January 1, 2019
Brought in as Chief Commercial Officer and U.S. Leadership Team Member to drive commercialization of oncology, neurology/immunology, fertility, and endocrinology products. Named President & Managing Director in January 2016.

- **Product Development:** Delivered novel new products to the product pipeline, which hadn't produced a commercial offering in nearly 10 years.

- **Market Share Growth:** Reversed declining market share for multiple products, fueling a growth trajectory and even regaining the market share leader role in the fertility segment of the gonadotropin market.

- **Governance:** Established a culture dedicated to regulatory and compliance fulfillment.

**Gary Zieziula Advising – USA | UK | Switzerland**
*Independent provider of executive advisory services to the pharma/biotech industry.*

**Pharma/Biotech Strategic Advisor**, December 2012 – January 2014
Advised venture capital firms and companies on M&A and product licensing opportunities in the global pharmaceutical and biotechnology market.

- **Specialty Market Viability:** Forecasted commercial viability of new immuno-oncology compounds.

- **Acquisition Analysis:** Recommended No-Go decision on M&A deal in the global IV iron market to a specialty pharmaceutical company based in Switzerland.

**AMAG Pharmaceuticals, Inc. – Lexington, MA, USA**
*NASDAQ-traded pharmaceutical developer specializing in iron deficiency products.*

**Executive Vice President | Chief Commercial Officer**, April 2010 – December 2012
Recruited to direct a complete commercial strategy reset for products in the dialysis and non-dialysis markets. Set focused vision that transformed an organization with flat sales and profit losses into one with a strong growth trajectory and profitability within 12 months.

- **Market Analyst Engagement:** Liaised with analysts to establish credibility and participated in earnings calls to re-calibrate expectations, communicate an effective narrative, and influence analyst recommendations.

- **M&A Integration:** Drove synergies as Integration Team Member for Allos Therapeutics merger.

- **Joint Venture Leadership:** Served on Joint Steering Committees for co-branded commercial ventures with Takeda and with 3S Bio in various international markets.

# GARY ZIEZIULA, MBA

**Roche Laboratories, Inc. – Nutley, NJ, USA | Maroussi, Greece**
*Leading global pharmaceutical and biotechnology company with CHF 47B in sales.*

**Managing Director, Pharmaceuticals – Roche Hellas S.A.**, January 2008 – April 2010
Hand-picked to transform highly siloed business with no cross-over between groups. Gained deep understanding of pharmaceutical operations and regulatory environment in the EU as a member of the European Management Team.

- **Culture Change:** Infused energy, collaboration, and best practice sharing into business culture.
- **Product Launch & Growth:** Led the development of a new strategy for Avastin, managed its launch for renal cell carcinoma indications, and achieved the #1 position in Europe for the product's rapid uptake.

**VP, Commercial Operations, Specialty Care – Roche Labs**, July 2003 – January 2008
**VP, Sales and Marketing Services – Roche Labs**, July 2002 – July 2003
**VP, Primary Care Sales – Roche Labs**, October 2001 – July 2002
Recruited by the President to lead a team of 5 VPs, overseeing executive sales and marketing teams to drive revenue and profit growth for Specialty Care in the U.S. Appointed to the North American Operating Committee.

- **Product Introduction:** Guided the launch of multiple products, including Pegasys and Fuzeon in 2003.
- **Sales Growth:** Captured >50% market share for hepatitis C with Pegasys in the first 12 months while launching a direct-to-consumer campaign that increased the number of patients diagnosed by 15%.

**Bristol-Myers Squibb – Plainsboro, NJ, USA**
*NYSE-traded American pharmaceutical manufacturer; S&P 500 component.*

**VP, Managed Health Care Sales & Marketing**, June 1998 – October 2001
Member of the Primary Care Operating Committee, setting the strategic direction and managing a team of 225 with a P&L that contributed $232M.

**Merck & Co., Inc. – West Point, PA, USA | Seattle, WA, USA | Buffalo, NY, USA**
*Global pharmaceutical giant with $39B in annual revenue.*

**VP / Executive Director, Sales & Operations – Vaccine**, November 1994 – June 1998
**Executive Director, Business Development & Planning – Vaccine**, September 1993 – November 1994
**Senior Director, Marketing Planning – Vaccine**, February 1992 – September 1993
**Senior Manager, Customer Marketing / District Manager – Human Health**, January 1988 – February 1992
**Region Training Manager / Hospital Sales Rep – Human Health**, January 1982 – January 1988

Hired as a Hospital Sales Representative and earned promotions to progressive roles in sales and marketing.

## BOARD EXPERIENCE

**BIO (Biotechnology Innovation Organization) – Washington, D.C.**

**Member, Board of Directors & Health Section Governing Board,** January 2016 – Present

**CEO Roundtable on Cancer – Cary, NC, USA**

**CEO Board,** January 2016 – Present

## EDUCATION

**Master of Business Administration (MBA)**         **Bachelor of Science (BS)**
Canisius College – Buffalo, NY, USA       State University of New York at Buffalo – Buffalo, NY, USA

<u>**Appendix B**</u>
**Documents Considered During Preparation of Report**

<u>**Pleadings**</u>
Sanofi's Complaint
Mylan's Answer and Counterclaims

<u>**Deposition Transcripts and Exhibits**</u>
Transcript of 30(b)(6) Deposition of Jay York
Transcript of Deposition of James Parker and Exhibits 1-10
Transcript of 30(b)(6) Deposition of Lorine Harr
Transcript of 30(b)(6) Deposition of Saira Jan and Exhibits 4-5
Transcript of Deposition of Keith Wade and Exhibit 6
Etemad Ex. 30 (EAI 00027790)
Works Ex. 10 (SAN-EPI-0075161)

<u>**Bates Stamped Documents**</u>
ANTH-EPI03662
CIGNA_00478
Horizon00009478
Horizon00013404
KALEO-00006989
KALEO-00022744
KFHP-005893
MedImpact_0007817
MYEP000677384
MYEP00107915
MYEP00107916
MYEP00127706
MYEP00127707
MYEP00127708
MYEP00127709
MYEP00127710
MYEP00127711
MYEP00127712
MYEP00127713
MYEP00127714
MYEP00127715
MYEP00127716
MYEP00127717
MYEP00127718
MYEP00127719
MYEP00127720
MYEP00127721
MYEP00127722

MYEP00127723
MYEP00127724
MYEP00127725
MYEP00127726
MYEP00127727
MYEP00127728
MYEP00127729
MYEP00127730
MYEP00127731
MYEP00127732
MYEP00127737
MYEP00127738
MYEP00127739
MYEP00127740
MYEP00292998
MYEP00323845
MYEP00323846
MYEP00323856
MYEP00323868
MYEP00323869
MYEP00550556
MYEP00550557
MYEP00556700
MYEP00567786
MYEP00567788
MYEP00717963
MYEP00716962
MYEP00716966
MYEP00798486
MYEP01186100
MYEP01186102
MYEP01211788
MYEP01211792
MYEP01211794
MYEP01211794
MYEP01211811
MYEP01268235
MYEP01319592
PS0063339
PS0063340
PS0209703
PS0217604
SAN-EPI-0032713
SAN-EPI-0057752
SAN-EPI-0060922
SAN-EPI-0060923

SAN-EPI-0069127
SAN-EPI-0075044
SAN-EPI-0078858
SAN-EPI-0080704
SAN-EPI-0081008
SAN-EPI-0082989
SAN-EPI-0083095
SAN-EPI-0083237
SAN-EPI-0083247
SAN-EPI-0087111
SAN-EPI-0087325
SAN-EPI-0088510
SAN-EPI-0091515
SAN-EPI-0095078
SAN-EPI-0102697
SAN-EPI-0148365
SAN-EPI-0148375
SAN-EPI-0158511
SAN-EPI-0197629
SAN-EPI-0200861
SAN-EPI-0210391
SAN-EPI-0210605
SAN-EPI-0211693
SAN-EPI-0213952
SAN-EPI-0220969
SAN-EPI-0227361
SAN-EPI-0238962
SAN-EPI-0259092
SAN-EPI-0265085
SAN-EPI-0272399
SAN-EPI-0277215
SAN-EPI-0277608
SAN-EPI-0279259
SAN-EPI-0297041
SAN-EPI-0297237
SAN-EPI-0305836
SAN-EPI-0331691
SAN-EPI-0467641
SAN-EPI-0468859
SAN-EPI-0474016
SAN-EPI-0505644
SAN-EPI-0505645
SAN-EPI-0505646
SAN-EPI-0505648
SAN-EPI-0522279
SAN-EPI-0584372

SAN-EPI-0591672
SAN-EPI-0604949
SAN-EPI-0607088
SAN-EPI-0607552
SAN-EPI-0607553
SAN-EPI-0607553
SAN-EPI-0607554
SAN-EPI-0607555
SAN-EPI-0607556
SAN-EPI-0661153
SAN-EPI-0661155
SAN-EPI-0661172
SAN-EPI-0661192
SAN-EPI-0661193
SAN-EPI-0661198
SAN-EPI-0661228
SAN-EPI-0661229
SAN-EPI-0688814
SAN-EPI-0705748
SAN-EPI-0764574
SAN-EPI-0764575
SAN-EPI-0780155
SAN-EPI-0928169
SAN-EPI-0937195
SAN-EPI-0937197
SAN-EPI-0937198
SAN-EPI-0937199
SAN-EPI-0937200
SAN-EPI-0937201
SAN-EPI-0937202
SAN-EPI-0942591
SAN-EPI-1031769
SAN-EPI-1148329
SAN-EPI-1158291
SAN-EPI-1207542
SAN-EPI-1207599
SAN-EPI-1212218
SAN-EPI-1214286
SAN-EPI-1214288
SAN-EPI-1214294
SAN-EPI-1214295
SAN-EPI-1214301
SAN-EPI-1217191
SAN-EPI-1221350
SAN-EPI-1221352
SAN-EPI-1223834

SAN-EPI-1223837
SAN-EPI-1223839

**<u>Other</u>**
http://products.sanofi.ca/en/anaphylaxis-survey.Pdf
Internet Archive - Frequently Asked Questions About Auvi-Q™ (epinephrine injection, USP)
December 11, 2012 email from L. Garces re: Auvi-Q rep (Abilene)
Declaration of Regina Garcia