**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | Civil Action No. 2:17-md-02785-DDC-TJJ (MDL No: 2785) |
| This Document Relates to:<br>CONSUMER CLASS CASES | MEMORANDUM OF LAW IN FURTHER SUPPORT OF CLASS PLAINTIFFS' MOTION TO STRIKE IN PART THE TESTIMONY OF DR. JOHN H. JOHNSON IV |

## TABLE OF CONTENTS


INTRODUCTION ..........1

ARGUMENT..........3

I. JOHNSON'S OPINIONS REGARDING THE ASSUMED GENERIC PENETRATION RATE SHOULD BE EXCLUDED..........3

A. Johnson does not apply any specialized skill or expertise to his reading of documents containing other generic penetration rates. ..........4

B. Defendants mischaracterize Johnson's baseless opinions concerning the Mylan 1 curve.. 6

C. Defendants' defense of Johnson's inconsistency critique is unavailing. ..........8

II. JOHNSON'S REMAINING OPINIONS ARE UNRELIABLE, WOULD NOT ASSIST THE JURY, AND ARE MISLEADING ..........9

A. Defendants' arguments against excluding Johnson's 2-Pak trend line analysis fail. ......... 9

B. Defendants' argument against excluding Johnson's opinions criticizing Prof. Rosenthal's but-for generic price fail. ..........11

C. Defendants' arguments against excluding Johnson's opinions criticizing the but-for generic entry date fail. ..........13

CONCLUSION..........15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aircraft Fueling Sys., Inc. v. Sw. Airlines Co.*,
No. 08-CV-414-GKF-FHM, 2011 WL 6122627 (N.D. Okla. Dec. 8, 2011) ........................ 15

*Clinton v. Mentor Worldwide LLC*,
No. 4:16-CV-00319 (CEJ), 2016 WL 7491861 (E.D. Mo. Dec. 30, 2016) ............................ 4

*Dodge v. Cotter Corp.*,
328 F.3d 1212 (10th Cir. 2003) ........................................................................................ 8

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
No. 12-2591-JWL, 2016 WL 7373857 (D. Kan. Dec. 20, 2016) ........................................ 14

*In re Prempro Prods. Liab. Litig.*,
586 F.3d 547 (8th Cir. 2009) ............................................................................................ 4

*Robinson v. Newell Window Furnishings, Inc.*,
No. 4:lOCVl 176 (JCH), 2012 WL 3043014 (E.D. Mo. July 25, 2012) ................................ 4

*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................................ 8

*In re Syngenta AG MIR 162 Corn Litig.*,
No. 14-MD-2591-JWL, 2017 WL 1738014 (D. Kan. May 4, 2017) .................................... 14

*TAMKO Bldg. Prods., Inc. v. Factual Mut. Ins. Co.*,
890 F.Supp.2d 1129 (E.D. Mo. 2012) ................................................................................ 9

*United States v. Williams*,
No. 1:12-CR-194-17, 2015 WL 1400782 (M.D. Pa. Mar. 26, 2015), *aff'd*, 669 F. App'x 81 (3d Cir. 2016) ................................................................................................ 7

*Wilson v. Muckala*,
303 F.3d 1207 (10th Cir. 2002) ........................................................................................ 7

## INTRODUCTION

The Court confronts two contrasting views of the *Daubert* process: Defendants, on the one hand, apply a "kitchen sink" approach—filing six motions and seeking broad exclusion of Plaintiffs' experts in each of those motions. Conversely, Plaintiffs offer a single motion narrowly focused on a single expert's specific opinions that are "so devoid of scientific methodology and reliability, or so untethered from the facts of this case, that they should be excluded and kept from the jury in the Court's exercise of its gatekeeping function."[1]

In response to Plaintiffs' targeted arguments, Defendants now claim all of Plaintiffs' complaints "go to the weight the jury should afford" the challenged testimony, "not its admissibility," and that such "criticisms are not a proper basis to exclude" testimony.[2] While Defendants look past these maxims with regard to their own motions against Plaintiffs' experts, they similarly fail to recognize that these maxims do not apply to the narrow, specific opinions that Plaintiffs challenge. Indeed, the opinions Plaintiffs challenge are so fundamentally flawed that they should be kept from the jury by the Court in exercise of its gatekeeping function.[3]

Rather than respond directly to Plaintiffs' arguments, Defendants mischaracterize Johnson's opinions and the grounds on which Plaintiffs seek their exclusion.

- *First*, Johnson does not merely "point[] out, a number of less aggressive generic forecasts" that were "also available," as Defendants argue. Def. Br. 1. Instead, he incorrectly claims, without applying any specialized expertise and contrary to the evidentiary record, that "**only**" these less aggressive forecasts "were actually used by the company to assess the financial effects of generic entry."[4] Moreover, he provides no other expert basis for criticizing the use of the Mylan 1 generic curve.

[1] Class Plaintiffs' Motion to Strike In Part the Testimony of Dr. John H. Johnson IV ("Pl. Br.") at 1. Unless otherwise noted, all emphasis added and internal citations/quotations omitted.

[2] Defendants' Opposition to Class Plaintiffs' Motion to Strike In Part the Testimony of Dr. John H. Johnson IV ("Def. Br.") at 4.

[3] *See* Pl. Br. 1-2 (challenging only select opinions while recognizing that cross-examination is the proper means to challenge the balance of opinions and show them meritless).

[4] Ex. A (Johnson Merits Rep.) ¶ 58. "Ex. __" used herein refers to the exhibits attached to the Declaration of Matthew S. Tripolitsiotis In Support of Class Plaintiffs' Motion to Strike In Part the Testimony of Dr. John H. Johnson IV, dated July 15, 2020 [D.E. 2132].

- *Second*, Johnson ignores Prof. Rosenthal's data calculations showing that the ratio of two-pack to one-pack sales did not materially change over time prior to the withdrawal of the single pack, and instead incorrectly offers an opinion that is untethered to data that there was a steady increase in the share of two-pack prescriptions during this time.[5]

- *Third*, Johnson's "copayment analysis" does not just "conflict" with Prof. Rosenthal's opinion; it measures something completely different and then uses that measurement in a misleading comparison. *See* Def. Br. 2.

- And, *fourth*, Johnson does not opine "as a matter of economics" that Prof. Rosenthal uses an incorrect but-for allowed generic entry date. *Id*. Rather, he simply adds the time it took Teva to obtain FDA approval in the real world, which was tainted by the illegal agreements, and faults Prof. Rosenthal for not doing the same. No "economics" expertise is required to do that math. He also asserts, without any qualification, analysis, or relevant expertise, that Teva would not have obtained approval by the but-for entry date, even though he is not an expert in FDA approval times. This is rhetorical junk science, not economics.

Finally, Defendants' attempt to bolster Johnson's credentials reveals his lack of relevant expertise in health economics.[6] Defendants concede that Johnson has no formal training or education in health economics, and they do not dispute that Johnson's purported "expertise in the pharmaceutical industry" derives only through his work as a litigation expert. Def. Br. 1, 4. Johnson's lack of expertise is evident in his opinions. For example, he fails to understand and apply fundamental principles familiar to health economics experts, such as the fact that an authorized generic marketed by a branded drug manufacturer does not have the same economic incentives to compete with the branded product, as would an independent generic. *See* Section I.C. This gap in his economic training is fatal to his ability to render certain opinions that satisfy the *Daubert* standard. For this, and the other reasons identified, his challenged opinions should be excluded.

---

[5] *See* Ex. D (Rosenthal Merits Rep.) ¶ 72.

[6] Defendants' selective quotation of an attorney's question at a deposition, in which the attorney states that Johnson is "highly credentialed," does not concede Johnson's expertise. *See* Def. Br. 1. If anything, it undermines it: when the full testimony is considered, it is clear that Plaintiffs' counsel is incredulous about Johnson's purported lack of opinion on issues such as the period that would be sufficient to analyze the effects of the withdrawal of the single pack, given his purported wealth of expertise. *See* Declaration of Matthew S. Tripolitsiotis in Further Support of Class Plaintiffs' Motion to Strike In Part the Testimony of Dr. John H. Johnson IV, filed contemporaneously herewith, ("Tripolitsiotis Reply Decl.") Ex. A (Johnson Class Cert. Dep.) 46:11-49:6.

## ARGUMENT

### I. JOHNSON'S OPINIONS REGARDING THE ASSUMED GENERIC PENETRATION RATE SHOULD BE EXCLUDED

Defendants begin their argument with a diversion: They reference Johnson's opinion that "Prof. Rosenthal's damages estimates are sensitive to 'aggressive assumptions about the extent and speed of generic substitution.'" Def. Br. 4. However, Plaintiffs do not dispute the general proposition that different generic penetration rates affect damages. And, indeed, that opinion is neither cited in Plaintiffs' opening brief, nor the subject of Plaintiffs' motion. *Compare id*. (citing Johnson Rep. ¶ 82) *with* Pl. Br. 8-11. Changes to the generic penetration rate necessarily affect the amount of damages, because it is one of the inputs to the damages model. That is not the relevant issue here. Instead, the focus of Plaintiffs' motion is whether Johnson offers a reliable expert opinion regarding the ***appropriate*** generic penetration rate. This narrowly tailored challenge is proper under *Daubert*, and does not merely go to the weight of the evidence.

The remaining defense of Johnson's opinion regarding the generic penetration rate also misses the point.[7] In their opposition, Defendants argue that Johnson's opinion is appropriate because he identifies other "forecasts in the record" with "less aggressive" generic penetration rates. Def. Br. 5. Defendants further contend that Plaintiffs' arguments in support of excluding Johnson's opinions are "wrong" because they "appear[] to be predicated on the false assertion that [Johnson's] criticisms" regarding the appropriate generic penetration rate are "based on his interpretation of a 'single document.'" *Id*. Plaintiffs do not take issue with the fact that documents containing other generic penetration rates exist. Rather, Plaintiffs seek to exclude Johnson's assertion that those other generic penetration rates are appropriate because Johnson's opinion is

[7] Defendants attempt to turn their opposition into an attack on Prof. Rosenthal's opinions, arguing that Plaintiffs need to "address" Johnson's criticisms of Prof. Rosenthal in this motion. Def. Br. 6. But, the validity of Prof. Rosenthal's opinions is not at issue here. Rather, this motion is about whether Johnson's opinions should be excluded. Even if Prof. Rosenthal's opinions were the focus of the inquiry, this Court expressly disagreed with Defendants' and Johnson's criticisms of Prof. Rosenthal's opinions when it certified the class and denied Defendants' *Daubert* motion. Indeed, in its class certification order, the Court noted that while it "recognizes that defendants' expert has criticized Prof. Rosenthal's assumptions and attacked her calculation of the generic penetration rate as flawed," it nevertheless "finds that Prof. Rosenthal has shown she used a reasonable method to reach her opinions." D.E. 2018 ("Class Cert. Decision") at n.21.

based only on his: (i) mere reading of other documents, (ii) unsupported conclusion that "only" other generic penetration rates (like Mylan 2 and Mylan 3) were used, and (iii) faulty critique that using the experience of Mylan's Authorized Generic ("Mylan AG") for the but-for price, but not the but-for generic penetration rate, is allegedly inconsistent.

### A. Johnson does not apply any specialized skill or expertise to his reading of documents containing other generic penetration rates.

Defendants argue that Johnson "examines" other documents with "less aggressive" generic penetration rates, and that this shows that the document Prof. Rosenthal relied on is "cherry-picked." *Id*. at 5-6. However, Johnson's examination is not based on any expertise or specialized knowledge—he is doing nothing more than simply reading the documents. Johnson does nothing to substantiate his conclusory assertion that those generic penetration rates are more appropriate than the rate Prof. Rosenthal relies on.

Defendants argue that Johnson's opinion is based on his "assess[ment]" of the documents in the record. *Id*. Their only support for this contention is the fact that (i) Johnson "points out" that the native version of the document Prof. Rosenthal relies on allegedly contains other "different forecast scenarios," and (ii) other documents contain projections with different generic penetration rates. These arguments can be dismissed for three reasons.

*First*, Johnson's assertion regarding the native version of the document does not constitute expert opinion because he is not bringing to bear any specialized knowledge to reviewing the document. Rather, he is simply looking at an alternative version of the document and describing its alleged contents. The jury would not be helped by his testimony, because he is merely doing something that can be done by a layperson.[8] Importantly, the document Defendants produced in discovery contains only the 95% generic penetration rate. In addition, other documents in the

[8] *See, e.g., In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 571 (8th Cir. 2009) (affirming exclusion of expert testimony because the expert "often ... simply read the contents of exhibits, thus undermining the asserted basis for expert testimony"); *Clinton v. Mentor Worldwide LLC*, No. 4:16-CV-00319 (CEJ), 2016 WL 7491861, at *11 (E.D. Mo. Dec. 30, 2016) ("Recitation of defendant's own corporate documents does not fall within the purview of expert testimony under Federal Rule of Evidence 702."); *Robinson v. Newell Window Furnishings, Inc.*, No. 4:lOCVl 176 (JCH), 2012 WL 3043014, at *9 (E.D. Mo. July 25, 2012) (because expert "simply regurgitated information found in deposition testimony and other literature and documentation[,] ... his conclusion does not assist the trier of fact, and must be excluded").

record indicate that Mylan abandoned the alternative forecasts. *See* pp. 5-6, below. Regardless, Johnson applies no expert methodology to support a lower generic penetration rate.

*Second*, Johnson's contention regarding other documents with less aggressive penetration rates is also inappropriate expert testimony. Defendants argue that Johnson "offers a helpful and relevant interpretation 'for the trier of fact' regarding the 'economics behind the forecast,' the assumptions 'underlying Mylan 1', and why Prof. Rosenthal was wrong to 'look at Mylan 1.'" Def. Br. 7. He does nothing of the sort. He does not "interpret" the documents or explain the "economics" or "assumptions" behind the forecasts. Johnson does nothing more than regurgitate the contents of those documents in his report, something a lawyer can do at trial (if the documents are admissible at all). Most importantly, he provides no reasoning or support for why those forecasts are more reliable than the one relied on by Prof. Rosenthal.

Moreover, Johnson makes these broad claims about generic penetration rates without any specialized expertise and in the face of plain documentary evidence showing Mylan had switched from the other penetration rates before settlement. Although Mylan considered various alternatives to the Mylan 1 generic penetration rate forecast, it ultimately settled on the "standard" Mylan 1 generic penetration curve to assess the impact of Teva's generic entry. Pl. Br. 8. Mylan's own employee, Roger Graham, confirmed at his 30(b)(6) deposition that Mylan employees worked together to "refine[]" these forecasts. *Id.* at 9. And, a January 2011 Mylan document indicates that the forecasts initially developed in Project Olympus in the fall of 2010 were updated in 2011. *Id.* at 8-9. After this update, Mylan used the Mylan 1 curve exclusively in numerous documents to forecast the "Teva/EpiPen – [Market] Share and Price Erosion." *Id.* Mylan's Ivona Kopanja also confirmed that Mylan used the Mylan 1 penetration rate in these documents. *Id.* at 9. Defendants argue that this "misrepresent[s]" her testimony, but Kopanja definitively confirmed that she prepared this document in the "course of [her] employment at Mylan," and that it used the "generic erosion curve of 95 percent."[9] Finally, documents using the Mylan 1 curve were also circulated among Mylan's and Meridian's patent litigation counsel. Pl. Br. 9. As Plaintiffs summarize in their

[9] Tripolitsiotis Reply Decl. Ex. B (Kopanja Dep.) 156:12-15; 158:16-18.

opening brief, "[t]he evidence demonstrates that Mylan 1 was the forecast that Mylan settled on coming out of Project Olympus, and there is no evidence indicating that the Mylan 2 or 3 forecasts were used in any communications after Mylan refined its models in early 2011 and before defendants began settlement negotiations with Teva. Put simply, Mylan 1 was their best estimate." *Id*.

*Third*, Defendants argue that Johnson applies "economic expertise" to his opinions because he has a different view of the literature that Prof. Rosenthal cites, and because he conducted an "empirical analysis" of the generic penetration rate of the Mylan AG. Def. Br. 7-8. As to Defendants' first argument, Johnson misunderstands the purpose for which Prof. Rosenthal references the academic literature. As she explained, she merely relies on the academic literature to show that Mylan's own documents are "consistent with the literature."[10] As described above, Prof. Rosenthal's reliance on Mylan 1 is primarily based on Mylan's own use of documents containing the Mylan 1 curve. Defendants' argument with respect to Johnson's alleged "empirical analysis" of the Mylan AG is also unconvincing. Johnson's "empirical analysis" merely involves calculating the actual generic penetration rate of the Mylan AG. And, as described below, he does not conduct any analysis, empirical or otherwise, to determine *why* the generic penetration rate of the Mylan AG is more appropriate (or appropriate at all) than the Mylan 1 generic penetration rate. *See* Section I.C, below.

### B. Defendants mischaracterize Johnson's baseless opinions concerning the Mylan 1 curve.

In his report, Johnson unequivocally asserts that "***only*** the Mylan 2 and Mylan 3 forecasts were actually used by [Mylan] to assess the financial effects of generic entry." Pl. Br. 10. First, this is not an expert opinion, but a comment on the weight of evidence for the jury to decide. Second, the implication of the statement that Mylan 1, the generic penetration rate relied on by Prof. Rosenthal, was never used, obviously is wrong. Indeed, Defendants retreat from it, describing

[10] Ex. M (Rosenthal Merits Rebuttal Rep.) ¶ 12.

it as "a single sentence in Dr. Johnson's report." Def. Br. 6. Because it is not an expert opinion, this sentence should be stricken.

Moreover, Johnson's statement regarding Mylan's alleged use of Mylan 2 and Mylan 3 is nothing more than a baseless factual assertion. He articulated no colorable basis for this statement in his report, and conceded the absence of any such basis in his deposition. Defendants argue that Plaintiffs "significantly mischaracterize" Johnson's testimony because he "merely testified that he did not discuss this document with counsel or anyone else." *Id*. at n.6. This is a red herring. Defendants are correct that Johnson testified he does not recall ever asking counsel about these generic forecasts or their use within Mylan.[11] Nor, did he specifically ask his team (or anyone else) to investigate the factual issues surrounding the use of the forecasts—indeed, in response to a question about whether he thought this was an important factual point to determine, he testified that it was a "bit to the side."[12] However, Johnson made additional concessions at his deposition indicating that his statement was baseless and not founded on any specialized skill or knowledge. It is indisputable that Johnson testified that he is "not more [of an expert] than anyone else" at interpreting company documents and "can't speak" to whether anyone at Mylan ever used the generic penetration rates. Pl. Br. 11 (citing Ex. B (Johnson Merits Dep.) 98:20-25). Thus, Johnson is merely attempting to make a factual determination for the jury regarding which curves Mylan used without bringing to bear any expertise or specialized knowledge on this supposed fact.[13]

---

[11] Ex. B (Johnson Merits Dep.) 99:8-100:3.

[12] Tripolitsiotis Reply Decl. Ex. C (Johnson Merits Dep.) 100:4-101:25.

[13] Defendants argue that *Wilson v. Muckala* does not "counsel" for the exclusion of Johnson's opinions because Johnson "is not opining on any fact witness's credibility." Def. Br. n.7. However, the reason to exclude is because Johnson purports to weigh facts for the jury which are "not so impenetrable as to require expert testimony." *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002). Defendants also hope to distinguish *United States v. Williams*, Def. Br. n.7, but that court held that testimony that does not "rely on scientific, specialized, or technical knowledge to help the jury understand" the evidence does not rise to the level of expert testimony. *United States v. Williams*, No. 1:12-CR-194-17, 2015 WL 1400782, at *4 (M.D. Pa. Mar. 26, 2015), *aff'd*, 669 F. App'x 81 (3d Cir. 2016).

Therefore, Johnson's opinion should be excluded under *Daubert*.[14]

**C. Defendants' defense of Johnson's inconsistency critique is unavailing.**

Defendants argue that Plaintiffs seek to exclude Johnson's opinions about the alleged "inconsistency" of using the price, but not the penetration rate, of the Mylan AG "simply because they do not agree with him." Def. Br. 9. Defendants are wrong. Plaintiffs seek to exclude Johnson's opinions because they are not based on, or supported by, reliable health economics principles or methodology that would require consistency between using the generic price and generic penetration rate. Pl. Br. 12-13. Thus, his opinion should be excluded under *Daubert* and Rule 702.[15]

*First*, Johnson has no practical experience in health economics to substantiate his conclusions. Indeed, Defendants admit that Johnson relies on his "economic expertise" in making this criticism, rather than any expertise in the specialized field of *health* economics. Def. Br. 8.

*Second*, Defendants admit that Johnson "did not study" whether "competition between Mylan's authorized generic and its branded EpiPen, occurred in exactly the same way as it would have occurred in competition with an alternative independent generic product[.]" *Id.* at n.6 (alteration in original).

*Third*, Defendants claim that Johnson examined the literature cited by Prof. Rosenthal in support of the general principle that the Mylan AG would "compete differently from a third-party generic EAI," and determined that there is "no reason to believe" that this would in fact be the case. *Id*. at 9. This is false. Defendants cite to ¶ 61 of Johnson's merits report, which contains no discussion of his purported analysis of any literature on this issue. They also cite to ¶ 164 of his class certification report, which only discusses literature cited by Prof. Rosenthal to "demonstrate[]

---

[14] *See e.g., S.E.C. v. Tourre,* 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Expert testimony may not usurp the province of the [fact finder] to . . . make factual determinations.").

[15] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) ("To be reliable under Daubert, an expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, not subjective belief or unsupported speculation ... In other words, an inference or assertion must be derived by the scientific method ... [and] must be supported by appropriate validation—i.e. good grounds, based on what is known.").

that generic drugs cost less than their branded counterparts and that nearly all prescriptions are quickly filled with the generic after it is launched, consistent with the forecast [Prof. Rosenthal] relies on."[16] The literature Defendants cite does not concern the lack of competition between an authorized generic marketed by the brand manufacturer and a truly independent generic. Thus, Johnson's review of this literature is not relevant to assessing the issue at hand and his conclusion is not based on any methodology, let alone a reliable one, and exclusion is appropriate.[17]

Conversely, as an expert in health economics, Prof. Rosenthal accounts for these nuances and chooses to use a more appropriate generic penetration rate—one that is more illustrative of the experience an independent generic, like Teva's generic EpiPen, would have had. Defendants argue that Prof. Rosenthal offers "no rational basis for her decision to exclude the AG from her analysis," but this is incorrect. Def. Br. 8. Prof. Rosenthal makes clear that she relied on Mylan's forecast for the generic penetration rate rather than the experience of the Mylan AG because, "most notably, [the Mylan AG] was not a competitor product; it was launched by Mylan," which is "highly unusual and not typically observed in the pharmaceutical market."[18] Therefore, "Mylan [did] not have the same incentives as a generic manufacturer to compete on price and obtain market share."[19]

## II. JOHNSON'S REMAINING OPINIONS ARE UNRELIABLE, WOULD NOT ASSIST THE JURY, AND ARE MISLEADING

### A. Defendants' arguments against excluding Johnson's 2-Pak trend line analysis fail.

Johnson's trend line is misleading because it obfuscates the variation in the underlying data. Pl. Br. 15-16. Defendants' only response to this argument is that "Plaintiffs are free to present an alternative depiction of the trend that Dr. Johnson observed." Def. Br. 10-11. Notably, they do

---

[16] Tripolitsiotis Reply Decl. Ex. D (Johnson Class Cert. Rep.) ¶ 164.

[17] Defendants' reliance on *TAMKO Bldg. Prods., Inc. v. Factual Mut. Ins. Co.* is inapposite. *See* Def. Br. 9-10. In that out-of-circuit decision, the court declined to exclude expert testimony because each of the damages experts had a "reliable basis for his testimony." *TAMKO Bldg. Prods., Inc. v. Factual Mut. Ins. Co.*, 890 F.Supp.2d 1129, 1145 (E.D. Mo. 2012). Here, on the other hand, Johnson has no reliable methodology or basis to support his criticisms of Prof. Rosenthal's opinions.

[18] Ex. D (Rosenthal Merits Rep.) ¶ 67.

[19] *Id.*

not deny that Johnson's presentation of the underlying data could in fact mislead the jury. Rather, they claim that "Dr. Johnson's conclusion is the same no matter how the data is displayed to the jury." *Id*. at 11. But, this is precisely the crux of Plaintiffs' argument: Johnson's presentation of the data is important *precisely because* it can mislead the jury. Specifically, his "smoothing" of the data gives it the false appearance of a steady increase in the share of two-packs versus single packs, whereas plotting the actual underlying data points (without using the trend line feature) reveals that the share of two-packs and single packs was not constantly increasing, but instead remained relatively unchanged over time. *Compare* Pl. Br. 15 (Johnson's graph) *with* Pl. Br. 16 (graph plotting actual data points). As summarized in Plaintiffs' opening brief, "[f]or example, in Q1 2009 two-packs constituted 63.5% of sales and in Q1 2010 they constituted 64.6% of sales—essentially the same percentage." Pl. Br. 16. In addition, an analysis of the data shows that the ratio of two-packs to single packs was essentially stable prior to the hard switch. Although Prof. Rosenthal calls attention to this numerous times in her reports, both Johnson and Defendants ignore this fact and continue to maintain that there was an "increasing share of two-pack prescriptions in the period prior to the discontinuation of the single pack." Def. Br. 10. Johnson's failure to acknowledge the objective facts reflected in the data results in an analysis and conclusions that are unreliable and likely to mislead the jury.

Plaintiffs also challenge Johnson's opinion on the basis that it is unreliable, because his analysis provides no information about the effects of the withdrawal of the single pack because he measures prescriptions, not pens per prescription ("pens per Rx"). Pl. Br. 16-17. Plaintiffs maintain that pens per Rx is the appropriate unit of measurement because it accounts for multiple types of packaging purchased using the same prescription and is the same measure that Mylan itself used to track EpiPen purchases. Conversely, Johnson's approach of measuring prescriptions "provides no information about the effects of the withdrawal of the single pack" because had he continued his graph, the two-pack line would eventually go to 100% and the single pack line to 0% because doctors would no longer be able to prescribe single packs after the hard switch. *Id*. Defendants do

not respond to these arguments in their opposition.[20] Nor do they meaningfully engage with Prof. Rosenthal's chart showing a significant increase in the number of pens per Rx after the withdrawal of the single pack. This further evidences the fact that Johnson's methodology is unreliable and should be excluded because it would not assist the jury.

### B. Defendants' argument against excluding Johnson's opinions criticizing Prof. Rosenthal's but-for generic price fail.

*First*, Plaintiffs argue that Johnson's opinions regarding Prof. Rosenthal's but-for generic price should be excluded because they are not based on reliable scientific analysis. Rather they are nonsensical from a mathematical perspective because Johnson compares a distribution of multiple co-payments with a single average co-payment. Pl. Br. 18. Defendants respond by arguing that "despite claiming that Prof. Rosenthal calculated a price that 'would have been paid' by consumers in a but-for world . . . Plaintiffs argue that Dr. Johnson's criticisms are 'nonsensical' because Prof. Rosenthal's calculated but-for price would *not* be paid by consumers in a but-for world." Def. Br. n.8. They claim that this is somehow inconsistent. This distorts Plaintiffs' argument. In their opening brief, Plaintiffs make clear that Prof. Rosenthal is calculating "an average co-payment." Pl. Br. 17. Thus, when Plaintiffs say that this is the amount that "would have been paid by" class members, they mean the amount that would have been paid ***on average***. *Id*. This does not mean that every single class member would have paid this exact amount. Rather, an average necessarily implies that some class members would have paid below the average amount and others would have paid above it. *Id*. at 18. Hence, there is nothing internally inconsistent about Plaintiffs' argument. Defendants fail to otherwise meaningfully engage with this argument, and therefore provide no basis upon which to avoid its exclusion.

Defendants also argue that Plaintiffs mischaracterize Johnson's analysis "by suggesting that it is based on 'cherry pick[ed] examples of named plaintiffs.'" Def. Br. 12. They claim that

[20] Defendants argue that Plaintiffs "confuse the issues" when they fault Johnson's analysis for assessing only the purchasing trends *prior* to the withdrawal of the single pack. Def. Br. 11. But that is exactly the point. Johnson's metric of looking at the share of prescriptions cannot be helpful or meaningful: the only result it could ever show *after* the hard switch is that prescriptions of the single pack go to 0% because they are simply not available on the market due to Defendants' misconduct.

IQVIA data shows that 54% of branded co-payments were less than the estimated but-for generic copayment and, thus, those class members were uninjured. *Id*. But, this is the same criticism Defendants made at the class certification stage and which the court has already rejected. The Court found that Prof. Rosenthal's

> hypothetical is just that—an average of aggregate damages . . . Prof. Rosenthal asserts that when the time comes to determine individual damages for a named plaintiff, the relevant question will be what the Class member's generic copayments would have been at the same point in time as the brand purchase they made. So, Prof. Rosenthal credibly explains, her calculations don't suggest that any named plaintiffs escaped injury because of what they paid for their EpiPens. The court finds this explanation sufficient to establish that each plaintiff has a colorable claim of injury under the generic delay theory.

Class Cert. Decision at 39. This means that Johnson's analysis of individuals with branded co-pays that were lower than Prof. Rosenthal's average but-for generic co-pay is irrelevant, and would not help, but instead would mislead, the jury.

*Second*, Plaintiffs argue in their motion that Johnson's criticism ignores the well-established health economics principle that consumers generally pay more for branded products than for generic products. Pl. Br. 18. Defendants counter that Johnson's analysis is relevant because it "undermines Plaintiffs' conclusory reliance on [this] so-called well-established principle." Def. Br. 12. Defendants miss the point yet again. Prof. Rosenthal does not rely on this principle exclusively to arrive at her conclusions regarding class wide impact.[21] Rather, she simply cites it to corroborate her findings, which are based on the data, economics, and mathematic principles. Johnson's criticisms are therefore irrelevant and would only mislead, not assist, the jury.

*Third*, Plaintiffs argue that, if permitted, Johnson's testimony could mislead jurors to believe that a greater number of class members were uninjured than is actually the case. Pl. Br. 19. Defendants counter that Johnson's analysis does not present a risk of misleading jurors because it properly assesses "whether Prof. Rosenthal's 'aggregate damages model' is accompanied by any 'methodology for determining whether a particular class member was injured.'" Def. Br. 12-13.

[21] The fact that Prof. Rosenthal did not specifically examine whether this is true in this case is irrelevant. She was not asked to do so, and her opinions are not the subject of this motion. *See* Def. Br. 12.

But the court already determined that this criticism was flawed at the class certification stage and accepted Prof. Rosenthal's methodology. *See* p. 12, above. Because this issue has already been decided at the class certification stage, no further information has been provided, and it is irrelevant to the jury's considerations, the probative value of Johnson's opinion is greatly outweighed by the likelihood of prejudice.[22]

### C. Defendants' arguments against excluding Johnson's opinions criticizing the but-for generic entry date fail.

Finally, Plaintiffs argue that Johnson's opinion regarding the but-for allowed generic entry date lacks a reliable basis and is not based on any expert analysis. Pl. Br. 20. *First*, Defendants respond that Johnson "rightfully" takes issue with the fact that Prof. Rosenthal uses the licensed but-for date (the date on which Teva would have been allowed to enter the market, the "but-for allowed generic entry date") as an input to her model, because this date is different than the actual date on which Teva would have been able to launch its product. Def. Br. 14. Plaintiffs do not dispute that a difference exists between the actual and allowed entry. However, the collective opinion of Plaintiffs' experts is that the actual entry date and the but-for allowed generic entry date would have occurred around the same time because the FDA would have approved Teva's product before the exclusionary window closed. Therefore, the criticism Johnson makes is beside the point.

*Second*, Defendants argue—without basis—that the opinion Johnson offers regarding Teva's alleged inability to enter by 2014 is a "matter of economics." *Id*. at 15. Opinions about Teva's ability to obtain FDA approval are not a "matter of economics." Rather, this subject matter is within the purview of the FDA and drug manufacturing experts in this case—Dr. Carl Peck and Mr. James Bruno, respectively. These experts opine that Teva could have in fact obtained FDA approval within close proximity to the but-for allowed generic entry date. Johnson merely ignores their opinions, without any basis, and maintains "Teva could not have obtained FDA approval prior to the but-for world's allowed entry date." *Id*. Johnson's opinion should be excluded because

---

[22] Defendants' remaining arguments regarding Prof. Rosenthal's probability analysis and loss of choice are irrelevant because they are not the subject of this motion and go solely to class certification issues. *See* Def. Br. 13.

he is an economist, not an FDA nor drug manufacturing expert, and has no basis to make this assertion. At best, Johnson is merely stating a bare bones assumption and presenting it as fact. Johnson's critique is entirely outside his expertise and constitutes nothing more than junk science.

*Third*, as Plaintiffs point out in their opening brief, Johnson conducts ***no*** independent analysis to determine whether Teva would have required the 1,254 additional days to obtain FDA approval. Pl. Br. 21. Because Defendants have no basis to dispute Plaintiffs' argument, they resort to attacking the cases Plaintiffs rely on, claiming that they "do not help [Plaintiffs'] cause." Def. Br. 15-16. Defendants contend that in *In re Syngenta*, "the Court rejected Syngenta's similar arguments that 'an expert is not needed to perform' certain 'calculations[,]' finding that 'it would be helpful to the jury and efficient for the calculations to be performed by the expert' who examined the relevant data.'" *Id.* But the calculations that the quoted portion of the court's opinion refers to were based on the expert's "compil[ation] [of] relevant data and estimates."[23] Here, on the other hand, Johnson's addition of 1,254 days to the but-for allowed generic entry date has no basis; it is not founded on any independent analysis or in any data that he compiled or reviewed. Further, as Plaintiffs point out in their opening brief, the court in that case excluded portions of the expert's opinion that "lacked a sufficient basis" because the expert failed to "conduct any testing or analysis."[24] The holding of *In re Syngenta* indicates that Johnson's similar opinions in this case should be excluded. Defendants may make the 1,254-day argument to the jury, but they certainly may not do so through the guise of "expert" opinion or analysis.

Defendants also claim that the expert opinions excluded by the court in "*Nat'l Credit Union Admin. Bd. v. UBS Secs., LLC* bear [no] similarity to the opinion offered by Dr. Johnson here." Def. Br. 15. Again, Defendants are wrong. Both here and in *Nat'l Credit Union Admin. Bd.*, the opinions at issue had no "reliable basis" because the experts "did not conduct any analysis."[25] The

[23] *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL 1738014, at *13 (D. Kan. May 4, 2017).

[24] *Id.*

[25] *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, No. 12-2591-JWL, 2016 WL 7373857, at *13 (D. Kan. Dec. 20, 2016).

fact that the subject matter about which the experts in the two cases opine is different is immaterial and does not undermine the applicability of this holding to the current case. Finally, Defendants argue that the court in *Aircraft Fueling Systems Inc. v. Southwest Airlines Co.* excluded an expert's consequential damages calculation "only after finding that plaintiff was not entitled to consequential damages at all," and not due to the fact that the expert's calculations were "nothing more than simple 'arithmetic.'" Def. Br. 16. A close reading shows that the court in that case did not summarily exclude the expert's testimony as Defendants imply. Rather, it undertook a *Daubert* analysis, and determined that the expert's "methodology render[ed] his opinions unreliable."[26] Thus, Defendants' argument fails to undermine Plaintiffs' reliance on this case as well.

## CONCLUSION

For the reasons stated in Plaintiffs' opening memorandum and above, the specific opinions at issue in this motion should be excluded. The challenged opinions are *sui generis* in that they go beyond his other flawed opinions and fail to meet the requirements for expert testimony such that they should be kept from the jury in the Court's exercise of its gatekeeper function.

Dated: September 15, 2020

Respectfully submitted,

KELLER ROHRBACK L.L.P.

By: */s/ Lynn Sarko*
Lynn L. Sarko
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206/623-1900

SHARP LAW, LLP
Rex A. Sharp
5301 West 75th Street
Prairie Village, KS 66208
Telephone: 913/901-0505

ROBBINS GELLER RUDMAN & DOWD LLP
Paul J. Geller

[26] *Aircraft Fueling Sys., Inc. v. Sw. Airlines Co.*, No. 08-CV-414-GKF-FHM, 2011 WL 6122627, at *6 (N.D. Okla. Dec. 8, 2011).

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000

BURNS CHAREST LLP
Warren T. Burns
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: 469/904-4550

PRITZKER LEVINE LLP
Elizabeth C. Pritzker
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: 415/692-0772

***Co-Lead Class Counsel***

BOIES SCHILLER & FLEXNER LLP
Matthew S. Tripolitsiotis
333 Main Street
Armonk, NY 10504
Telephone: (914)749-8200

BOIES SCHILLER FLEXNER LLP
Duane L. Loft
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300

***Class Counsel***

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing MEMORANDUM OF LAW IN FURTHER SUPPORT OF CLASS PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF DR. JOHN H. JOHNSON IV was served upon the following as liaison counsel to all Defendants and Plaintiffs in this matter by email this 15th day of September, 2020:

Philip A. Sechler
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
psechler@robbinsrussell.com

Rex A. Sharp
SHARP LAW, LLP
5301 West 75th Street
Prairie Village, KS 66208
rsharp@midwest-law.com

KELLER ROHRBACK L.L.P.

By: *<u>/s/ Lynn Sarko</u>*
Lynn L. Sarko
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206/623-1900