# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation | MDL No. 2785 |
| | Case No. 17-md-2785-DDC-TJJ |
| This Document Relates to: Class Cases | |

**REBUTTAL EXPERT REPORT OF JAMES BRUNO**

**February 7, 2020**

# TABLE OF CONTENTS

I.     PROFESSIONAL QUALIFICATIONS ........................................................... 1

     A.    Professional Background ................................................................... 1

     B.    Education and Professional Activities .............................................. 2

     C.    Prior Expert Testimony and Compensation ..................................... 3

II.    SCOPE OF OPINIONS ................................................................................ 3

III.   SUMMARY OF OPINIONS ........................................................................ 4

IV.   ANALYSIS .................................................................................................. 5

     A.    During the Settlement Time Period, Teva Did Not Treat Its
Generic EAI Device as a Priority. ................................................... 5

          1.    The Documents Cited by Dr. Weisman Demonstrate that
Teva Did Not Treat Its Generic EAI Device as a Priority
During the Settlement Time Period....................................... 6

          2.    Teva's Own Meeting Minutes Demonstrate that it Did Not
Treat the EAI Project as a Priority During the Settlement
Time Period........................................................................... 9

     B.    During the Settlement Time Period, Teva Did Not Employ
"Reasonable Commercial Efforts" or Follow Standard Practices. .................... 12

          1.    Dr. Weisman's View of "Reasonable Commercial Efforts"
Is Premised on the Incorrect Notion that Teva's Generic
EAI Device Was a Uniquely Challenging Product. ............................. 12

          2.    Teva's Handling of ███████████████
███████████████  During the Settlement Time
Period Was Not Consistent with "Reasonable Commercial
Efforts" or Standard Practices. ............................................. 13

     C.    During the Settlement Time Period, Dr. Weisman Failed to
Consider Aspects of the Record Demonstrating that Teva Did Not
Treat Its Generic EAI Device as a Priority and Did Not Employ
Reasonable Commercial Efforts. ..................................................... 21

          1.    Teva's Status as an Experienced and Sophisticated
Pharmaceutical Company Confirms that Teva Did Not

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page ii

Devote Reasonable Commercial Efforts During the
Settlement Time Period. ..................................................................... 21

2.  Mylan and Pfizer's Projected Entry Dates Likewise
Demonstrate that Teva's Efforts During the Settlement
Time Period Were Not Consistent with Reasonable
Commercial Efforts. ........................................................................... 22

3.  Dr. Weisman Failed to Account for Teva's Own
Acknowledgement of Its Lack of Effort During the
Settlement Time Period. ..................................................................... 24

V.     CONCLUSION ........................................................................................................ 26

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential"
and/or "Highly Confidential"**

Page 1

# I.  PROFESSIONAL QUALIFICATIONS

1.      My name is James R. Bruno.  I have been retained by Class Plaintiffs to opine on certain matters raised in the Expert Report of Steven M. Weisman, Ph.D., dated December 23, 2019.  My full CV is attached as Appendix A to this report.

## A.      Professional Background

2.      I am currently the Managing Director of Chemical and Pharmaceutical Solutions, Inc. ("CAP Solutions"), a pharmaceutical consulting company I founded in 2002.  In this role, I am primarily responsible for offering executive-level consulting to pharmaceutical companies and contract manufacturers on matters of manufacturing, supply, and development of pharmaceutical products.

3.      I work with my clients to develop long-term supply lines, including troubleshooting issues, for both active pharmaceutical ingredients ("APIs") and finished ("Dosage") pharmaceutical products; I also work with my clients to establish long-term supply agreements.  I am involved in every aspect of the manufacturing contract process, including manufacturer selection, financial and technical diligence, contract negotiation, execution, and quality agreements.  Currently, my primary focus is on assisting emerging pharmaceutical companies with the development and commercialization of API and Dosage products.  I also provide consulting services to larger, established pharmaceutical companies such as UCB (Belgium) and Pfizer (USA), as well as to contract manufacturing organizations.

4.      Before establishing CAP Solutions, I worked in the pharmaceutical manufacturing industry for approximately 30 years. I began my career in 1973 as a Technical Service Manager at NL Industries, where I was responsible for developing new formulations for excipients used in pharmaceutical and cosmetic products.  After leaving NL Industries in 1978, I took on increasing responsibility at various pharmaceutical manufacturing companies.  From 1978 until 1982, I was a Project Manager at Ganes Chemical, which was a major supplier of DEA-controlled drugs.  I was responsible for developing a custom manufacturing business and worked extensively with large pharmaceutical companies.

5.      From 1982 to 1994, I was a Director at Sipsy Chemical, a French-based manufacturer that supplied APIs to North American pharmaceutical companies.  I was responsible for developing a new API manufacturing business, which included working with branded pharmaceutical companies to execute long-term supply agreements for both branded and generic drugs.  I also assisted in the development and licensing of new technologies and acted as an FDA agent for the company.

6.      From 1994 to 1996, I was a Director at Aerojet, a contract manufacturer that supplies APIs to pharmaceutical companies around the globe, specializing in the long-term supply of custom products.  My responsibilities included negotiating supply agreements with client pharmaceutical companies and managing the research and development group.

7.      In 1996, I took a position as Vice President of Sales and Marketing at Vinchem, a trading company that represents suppliers of pharmaceutical products located outside the U.S. My role was to develop new markets for the member suppliers and broaden Vinchem's reach

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 2

into custom manufacturing.  Among other responsibilities in this role, I performed audits and technical assessments for contract manufacturers around the globe.

8.      In 1999, I became Global Business Manager at Honeywell, a contract manufacturer that develops intermediates and APIs for pharmaceutical companies around the world. I led a group focused on the development of new compounds, and was responsible for all business aspects of that work, including negotiating and executing long-term supply agreements. I worked with both large and small pharmaceutical companies, as well as suppliers of finished pharmaceutical products. I left Honeywell in 2002 to found CAP Solutions.

9.      During my career, I have worked on various submissions, including Investigational New Drugs (INDs), New Drug Applications (NDAs), Abbreviated New Drug Applications (ANDAs), and 505(2)(b)s for both simple and complex pharmaceuticals.  This work included the preparation and review of the CMC (Chemistry, Manufacturing, and Control). I have interacted with the FDA on behalf of clients and have acted as the FDA agent for several foreign manufacturing companies.[1]  I have reviewed and prepared Drug Master Files (DMFs) and audited plants, among other activities. I have worked on various dosage types, including solid oral dosages (tablets and capsules), solutions, injectables (including prefilled syringes), liquids, creams, and lotions.  I have worked on several emergency use products such as Pralidoxime, which is used for nerve gas and insecticide poisoning and is supplied in a prefilled syringe. I also have experience with the development of Epinephrine products.

10.     As further detailed below, I have served as an expert for the Federal Trade Commission on issues relating to manufacturing and contracts of both dosage and API, including for *In re Androgel Antitrust Litigation*, 1:09-md-2084 (N.D. Ga.).

**B.      Education and Professional Activities**

11.     I received a Bachelor of Science degree from Rider University in 1973, a Master of Science degree from St. Joseph's University in 1978, and an MBA from Rider University in 1982.

12.     I am actively involved with several professional organizations, including the Drug, Chemical & Associated Technologies Association, of which I was previously President, the Society of Chemical Manufacturers & Affiliates, and the American Chemical Society and BioNJ.  I have also served as the Chairman of the Scientific Advisory Executive Committee at Rider University, which worked to develop new programs to assist the university, as well as develop mentoring and internship opportunities.

13.     I have been involved with chemical manufacturing trade publications, including PharmaChem, of which I am a member of the Editorial Committee, and Organic Process Research & Development, for which I am a reviewer.  I have published numerous articles in trade publications on pharmaceutical manufacturing and given numerous training and seminars on pharmaceutical manufacturing over the last 15 years.

---

[1] Foreign corporations must have a U.S. agent pursuant to FDA regulations, and I have acted in this role.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 3

## C.    Prior Expert Testimony and Compensation

14.    I have given testimony as an expert in the following matters:

A.    I submitted an expert report and rebuttal report in *In re Namenda Direct Purchaser Antitrust Litigation*, 1:15-cv-07488 (S.D.N.Y.), an antitrust case involving the drug Namenda. I was deposed in that case.

B.    I submitted an expert report and rebuttal report in *In re Niaspan Antitrust Litigation*, 2:13-md-2460 (E.D. Pa.), an antitrust case involving the drug Niaspan. I was deposed in that case.

C.    I submitted an expert report and rebuttal report in *In re Androgel Antitrust Litigation*, 1:09-md-2084 (N.D. Ga.), an antitrust case involving the drug Androgel.  I was deposed in that case.

D.    In 2015-2016, I served as an expert in a patent infringement case, *APR, LLC v. John Lomans*; *John Lomans v. Cameron Reid, Dr. Reddy's Laboratories Limited, Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories New York, Inc.*; *Dr. Reddy's Laboratories Limited, Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories New York, Inc. v. Nirmal Mulye, Nostrum Pharmaceuticals, LLC, Nostrum Technologies, LLC, Nostrum Laboratories, Inc., Sarang Sewatkar, Kymera, LLC*; and *Cameron Reid v. John Lomans*, Consolidated Docket No. BER-L-5000-12 (New Jersey Superior Court, Law Division, Bergen County). I was deposed in that case.

15.    Since being retained by counsel for the Class Plaintiffs in 2019, I have been compensated at my customary rate of $325 per hour.  No part of my compensation is contingent on the outcome of this litigation.

## II.  SCOPE OF OPINIONS

16.    I have been retained to opine on certain matters raised by Dr. Weisman in his rebuttal to Dr. Carl Peck's Expert Report, dated October 31, 2019. The Report of Dr. Steven Weisman, dated December 23, 2019 (hereinafter "Weisman Report"), concludes, *inter alia*, that "the Teva generic epinephrine auto-injector (EAI) was an incredibly challenging product to develop," that "Teva faced multiple developmental complications," and that "the approval timeline of Teva's generic EAI was reflective of consistent and reasonable commercial efforts."[2] In the course of rendering his opinions, Dr. Weisman opines that Teva treated its generic EAI device as a priority project and made reasonable commercial efforts to bring it to market throughout the entire time period of its development.[3]  Dr. Weisman also introduces a number of issues relating to the manufacturing process and development process.[4] I have been asked to review and opine upon Dr. Weisman's report to the extent it introduces issues relating to the

---

[2] Weisman Report ¶ 13, 17.
[3] *See, e.g.* Weisman Report ¶¶ 15, 64, 108; Deposition of Dr. Steven Weisman, January 24, 2020 ("Weisman Dep.") at 39:23-40:18 & 48:7-17.
[4] *See, e.g.*, Weisman Report ¶¶ 14.b, 69-72, 74-82, Figure 3.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

manufacturing and commercial development of Teva's generic EAI device that are beyond the scope of Dr. Peck's report.

17.     With respect to time period, the focus on my opinions is on that period in which Dr. Peck concludes that Teva "dropped the ball" with respect to its prosecution of the EAI ANDA.  That period generally coincides with the first evidence seen of settlement discussions with the relevant Defendants in 2011 and eventual settlement with the relevant Defendants in April 2012, and runs through the end of 2014. For ease of reference, I shall refer to this as the "settlement time period." For the sake of completeness, although I have focused my examination on the period from the beginning of settlement discussions 2011 through the end of 2014, I have also considered certain matters (such as FDA deficiency letters) from the 2010 time period as relevant to the scope of my inquiry.

18.     In preparing my opinions on these issues, I began with the factual record cited and relied upon by Dr. Weisman. In addition to those materials relied upon by Dr. Weisman, I have also looked to Teva's meeting minutes surrounding this project (a number of which do not seem to have been analyzed by Dr. Weisman) and other documents ignored by Dr. Weisman.  I have had access to the full database of materials produced by Teva, Mylan, and Pfizer. The materials I have relied upon are set forth in Appendix B.

19.     My opinions are based on the information currently available to me.  I reserve the right to amend my analyses and my conclusions if any new information becomes available.

### III. SUMMARY OF OPINIONS

20.     In the time period following Teva's 2012 settlement with the relevant Defendants and extending throughout 2014, Teva neither treated its generic EAI device as a priority nor made reasonable commercial efforts to develop the product to bring it to market in the United States. To the extent Dr. Weisman seeks to rebut Dr. Peck's opinions through the introduction of manufacturing concerns and other commercial considerations, I disagree with Dr. Weisman's view that Teva prioritized its EAI project and exercised reasonable commercial efforts in the settlement time period.  Contrary to Dr. Weisman's assertions, I conclude that Teva did not display reasonable commercial efforts or follow standard practices in pursuit of its generic EAI device during the settlement time period.  The documentary record, viewed in light of my manufacturing experience, leads me to conclude that Teva devoted inadequate resources to the EAI project, failed to address development issues in a timely fashion, and failed to prioritize the project, among other issues.

21.     With respect to the specific manufacturing concerns cited by Dr. Weisman, it is my opinion that the manufacturing issues experienced by Teva were by no means unique or complicated. The issues were, viewed objectively, of the type often experienced in drug development and could have been resolved far more rapidly had Teva displayed reasonable commercial effort. But rather than treating the project as a priority, the documentary record, viewed with a background and experience in manufacturing and development, demonstrates that Teva did not devote adequate resources or attention to the EAI project during the settlement time period.  All of the issues recited by Dr. Weisman as impediments to Teva's EAI ANDA could have been resolved far more quickly had Teva followed standard practices.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

22.     The fact that Teva did not take a commercially reasonable approach to the project in the time period following settlement could help explain why the development history of Teva's generic EpiPen is such an outlier in the pharmaceutical industry in general and for Teva in particular. Teva is a large, sophisticated, and very successful pharmaceutical company with extensive experience in ANDA applications and injectable products. Mylan and Pfizer's pre-settlement projections show that they believed Teva would be able to bring its generic EAI device to market far more quickly than it did as well.  Teva's internal documents, however, establish that it took its proverbial "foot off the gas" during the settlement time period, only to recommence normal commercial efforts as the potential June 2015 entry date approached.

# IV. ANALYSIS

23.     I will begin by assessing Dr. Weisman's contention that Teva treated its generic EAI device project as a priority at all times during its development.  I then turn to assessing the various manufacturing issues during the relevant timeframe—*i.e.*, the settlement time period—that Dr. Weisman cites as impediments to Teva's obtaining approval of its EAI device. Finally, I note other considerations that reinforce my conclusions with respect to Teva's pursuit of its EAI ANDA.

## A.     During the Settlement Time Period, Teva Did Not Treat Its Generic EAI Device as a Priority.

24.     As noted above, Dr. Weisman has opined that Teva treated the development of its generic EAI device as a priority at all times, including before commencement of settlement discussions with Defendants, after the commencement of discussions with Defendants, and following its settlement with Defendants.[5]  I do not agree with Dr. Weisman's opinion that Teva treated its EAI device as a priority after commencing settlement discussions with the relevant Defendants and, in particular, following the settlement with the relevant Defendants. The documentary record does not support the notion that Teva treated its generic EAI device as a priority during the settlement time period.  In fact, quite the opposite: the documentary record demonstrates that the product was not prioritized by Teva. In short: simply labeling something as "priority," "high priority," or "HP," does not make it so.[6]

---

[5] Weisman Dep., 39:23-40:18.

[6] Dr. Weisman cites Teva_EPI_MDL00122044 in support of the assertion that "from 2011-2014, the project was consistently referred to as 'HP' or high priority." Weisman Report ¶ 64 n. 75. But Dr. Weisman admitted during his deposition merely labeling a project as a priority does not make it so. Weisman Dep., 85:21-86:10. In addition, despite the label, Teva_EPI_MDL00122044 does not show that the product was treated a high priority. Next, Dr. Weisman cites Teva_EPI_MDL00076337 to suggest the EAI project was high priority within Teva. Weisman Report ¶ 64 n. 75.  The cited document is a May 2012 meeting invitation, with an attached slide deck, Teva_EPI_MDL00076338. ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ As set forth in Section IV.B.2, *infra*, these are all issues that can be resolved rather quickly when sophisticated companies take reasonable efforts; instead, it took Teva years to resolve these issues. Weisman cites a similar document to support his argument that Teva prioritized the project based on its supposed efforts to "obtain approval" from the FDA. Weisman Report ¶ 64 n.74 (citing Teva_EPI_MDL00073885 [Nov. 1, 2011 email stating "[e]pinephrine is a top priority project."]). For the same reasons I now mention, this document also does not necessarily show prioritization.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 6

25.     I will first address the email and other communications cited by Dr. Weisman; I will then turn to an analysis of Teva's meeting minutes regarding this project during the settlement time period.

### 1.     The Documents Cited by Dr. Weisman Demonstrate that Teva Did Not Treat Its Generic EAI Device as a Priority During the Settlement Time Period.

26.     Generally speaking, the documents recited by Dr. Weisman do not support the contention that Teva treated its generic EAI device as a priority during the settlement time period.  In this section, I will discuss several examples that I believe merit detailed attention.  My failure to specifically discuss any document cited by Dr. Weisman should not be taken as agreement with the notion that a document supports the "priority" contention.[7]

27.     For example, Dr. Weisman cites Teva_EPI_MDL00073885 to support the notion that there is "no question . . . that this product was a high priority for Teva."[8]  This document does not support the notion that the project was a high priority for Teva following its settlement with the relevant Defendants. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ <467>.

A.     By way of background, manufacturers use solvents in API production to solubilize drugs or to purify the product.[9]  The FDA classifies solvents by toxicity and sets very strict limits.  The FDA describes these limits in various FDA documents. In its March 2010 deficiency letter, FDA requested information about the toxicity of the solvents used by Teva in the API for its EAI device and requested that Teva confirm the method used to test the toxicity of those solvents complied with USP <467>. This is a standard request; indeed, anyone that develops and produces drugs would know the specific limit for each solvent and have the appropriate equipment and methods in place to be able to conduct the necessary tests.[10] Teva would have been well aware of the requirements and testing for solvents. A GC system—which Teva already had—is necessary to conduct these tests. This is a standard USP test and any generic company that does USP testing and would have the equipment.

---

[7] For example, in support of his argument that Teva prioritized the project based on the supposed work Teva did to "obtain approval" from the FDA, Dr. Weisman cites a document that does not show prioritization. Weisman Report ¶ 70, nn. 88 & 89. Teva_EPI_MDL00076251 is a March 2011 email thread in which the team is requesting additional regulatory assistance. This suggests that they did not have enough regulatory assistance as of March 2011.

[8] Weisman Report ¶ 64 n.74.

[9] In the manufacturing of APIs, producers used to solubilize the reactants to perform a chemical transformation. They are also used to purify the compounds, and in the production of dosage such as an injectable, solvents are used often to solubilize the drug.

[10] Companies like Teva would run this method on a routine basis.  The solutions required would be available nearly on demand.  An operator would prepare the samples directly injected into the GC or use an autosampler.  For most solvents, the average retention time (the actual time in the GC) would elute in less than 10 minutes.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

B.      Access to a GC system for this project should not have been difficult to obtain and, indeed, the system would only be needed for a limited period of time. In my experience, this problem is inconsistent with the notion that it was a priority project because a priority project should not require permission to use necessary equipment. But,



oes not demonstrate that the project was afforded priority status within Teva, but the opposite.[11]

28.      Dr. Weisman quotes Teva_EPI_MDL00185009 for the statement that "nothing at [Teva] is more important than epinephrine this week, so please closely monitor staff activity ...".[12] Dr. Weisman also cites the same document to argue that "in November 2011, internal correspondence discussed how to make available additional employees so that more of them could work on the ANDA."[13]

A.      This document, viewed from the perspective of my experience in manufacturing, demonstrates that the project was not afforded priority status. One of the project's core team members, David Feigelson, had to specifically ask who he needed to email to make sure that the project was not interrupted by training. This document thus cuts against Dr. Weisman's premise: if the Teva EAI team had to seek additional personnel, the suggestion is that the team lacked sufficient staffing (and that understaffed team was being interrupted), undercutting the notion that it was treated as a priority within Teva.

B.      This document undercuts Dr. Weisman's priority notion for another reason: it indicates that Epinephrine is a priority only "this week." This suggests that Epinephrine was not already a priority. At his deposition, Dr. Weisman was asked whether he had any knowledge or evidence regarding other priorities within Teva, including priorities for the preceding and following week.  In response, Dr. Weisman equivocated and could provide no specific information regarding other priorities within Teva.[14]  At best, Dr. Weisman offered generalities that, in my opinion, are contradicted by this document.

29.      [redacted]

Dr. Weisman cites this document to support his "priority" notion as well.

A.      By way of background, the FDA has set strict limits on the impurities in the API of a drug product.  These impurities can come from several places: they can be

---

[11] Also, I would note that the manufacturer of the API (Epinephrine) would have conducted similar tests; the results would be part of the COA (Certificate of Analysis), which would have arrived with the shipment.
[12] Weisman Report ¶ 64 n. 75.
[13] *Id.* at ¶ 64 n. 76.
[14] Weisman Dep. Dep., 128:24-132:22.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

the result of an unstable API or the interaction between the API and either the excipients or other materials that come in contact with the API.[15]  In the cited email, a Teva EAI team member, Rosario Lobrutto, requests that two of the requests be done "within a week," to which Steven Youngberg at AMRI says "I will start the process and get you something shortly."

B.   This email shows only that the particular requests from Mr. Lobrutto were "urgent"—the email does not show that Teva treated the EAI device as a priority. Based on the email, it appears that at least one of these impurities is new and could have required additional testing. Addressing this issue simply requires standard testing; the required tests are well-known and well-established, being set forth in regulations and documentation from FDA.

30.   Dr. Weisman also cites Teva_EPI_MDL00042007, which is an October 2013 email thread that lists Epinephrine as has having a "prioritization" of "1" at Teva.[16]  Dr. Weisman fails to mention that the subject line of the email thread is really a question presented to a broader Teva team. The subject line reads, "do we all agree to these priorities," and the email lists 12 other Teva projects, three of which received a prioritization of "1." Asking whether the prioritization was correct does not suggest that everyone knew what the prioritization *was* or agreed; rather, it suggests that the priority must not be very clear.

31.   Finally, Dr. Weisman cites Teva_EPI_MDL00034691 to support the statement that the EAI "is a very high priority project" for Teva.[17] But the document, a March and April 2014 email thread, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[18] This is a quick test to run—roughly 24 hours—and the information is critical for the formulation.  The amount of time taken to do this was longer than necessary, suggesting that the project was not a priority.[19]

32.   The documents cited by Dr. Weisman do not support the hypothesis that Teva prioritized its EAI project in the settlement time period; in fact, these documents suggest that

---

[15] Since the email cited is asking for the impurities to be characterized by CNMR or NMNR, one can assume that these are unknown impurities.  For an unknown impurity, the limit is normally in the range of 0.5% or less.  An analyst measures these impurities using some form of chromatography (HPLC).  A particular wavelength of light passes through a sample, and the interaction of the two is measured.  Due to the samples' ability to absorb light energy, it could give incorrect results.  A company will normally identify the impurity if possible and produce a small sample which is used as a standard to get an accurate reading.

[16] Weisman Report ¶ 64 n. 75

[17] Weisman Report ¶ 64 n. 75.

[18] If the material is hygroscopic, it could affect the amount of API in the final product and result in a formulation, which contains less drug than required.  Teva was trying to increase the amount of API, and hygroscopicity can have a negative impact on this amount. Hygroscopicity can also be of concern because products that pick up water often do not flow as well, and in a mixture, this could result in separation of the API from the excipient and reduce the uniformity of the mixture going into the product.

[19] The European Pharmacopeia defines the test for hygroscopicity.  The analyst places a sample of known weight into a tray and stores the material for 24 hours in a controlled temperature and humidity chamber (25C and 80% humidity).  The weight is recorded after 24 hours, and this indicates the amount of water if the sample absorbs any.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Teva was not prioritizing the project.  My opinions in this regard are further supported through my analysis of Teva's meeting minutes, analyzed in the next section.

**2.      Teva's Own Meeting Minutes Demonstrate that it Did Not Treat the EAI Project as a Priority During the Settlement Time Period.**

33.      At his deposition, Dr. Weisman testified that Teva's meeting minutes demonstrated priority treatment for this project and "a consistent record of activity around a variety of ongoing issues [in the meeting minutes] and what appeared to be appropriate activity around the issues and reasonable and expected timelines around these issues."[20] I disagree with Dr. Weisman's opinion regarding Teva's meeting minutes for several reasons: he relies upon generalities divorced from the minutes themselves, he has failed to analyze the lack of progress shown in relevant meeting minutes, and the meeting minutes confirm a lack of priority treatment. These meeting minutes also confirm that Teva consistently failed to follow up with the FDA during the settlement time period as well.

34.      There are a number of meeting minutes during the relevant settlement time period.  For purposes of illustration, I will highlight several features of these meeting minutes that confirm the lack of priority treatment.  Again, I would emphasize that absence of any particular set of minutes in the following discussion should not be construed as supporting the notion that such minutes show priority treatment.  Rather, I have analyzed the meeting minutes for the settlement time period as a whole, from the perspective of my professional background, and conclude that this documentary record demonstrates a lack of priority treatment.  The following discussion is intended to be illustrative.

35.      Teva's EAI project meeting minutes for the settlement time period demonstrate a lack of priority—as well as a lack of reasonable commercial efforts—for several reasons. Among other things, many simply have the same information "copied and pasted" with no, or only a few, updates reflecting little being done at the meetings. The minutes show deadlines frequently being missed, unexplained delays, and a consistent lack of follow through. Further, although Dr. Weisman claims that the meeting minutes generally support Teva's diligence in the settlement time period, Dr. Weisman fails to cite any meeting minutes for a roughly 9-month period during 2013 (from May until December).

36.      In addition, many of the meetings were only attended by a few team members rather than a robust team. For instance, there are a number of "Teva/Antares Epinephrine Autoinjector Meeting Minutes" from Teva Pharmaceuticals USA, from December 2009 until April 2013. The number of people listed as potentially attending these meetings varied but was often around 15 to 20 individuals. Approximately half of the meetings were attended by six or fewer team members and several of the meetings in 2012 and 2013 were only attended by two or three members. Teva_Epi_MDL00003071 (3 of 18 potential attendees were at the 5/1/2012 meeting); Teva_Epi_MDL00003056 (2 of 16 potential attendees were at the 6/12/12 meeting); Teva_Epi_MDL00258552 (3 of 16 potential attendees were at the 1/9/2013 meeting).

---

[20] Weisman Dep., 97:2-6.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

37.     The meeting minutes also show that Teva failed to follow up on agenda items in a timely manner, choosing to just copy and paste the same status with no update.  One critical example of this is delays and inaction with respect ████████████████████████████.  I address this issue in greater detail below, *infra* ¶¶ 59–60.  For these purposes, I note that Teva's meeting minutes for April 17, 2012 note an issue ██████████████████████████████████ ████ .[21] Seven months later, the meeting minutes for November 27, 2012 report the same problem without any update.[22] For a high priority project, I would have expected to see more updates between April and the month of November to correct this issue.

38.


39.     Another example of unacceptable lack of follow up is Teva's inattention to a ████ ██████████ .  I would expect such a plan to be treated as high importance in any commercially reasonable development effort, particularly for a "priority" project.  ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ .  Teva does not appear to be following up in the manner I would expect as standard practice—much less for a supposedly priority project.  Contrary to showing that this was a high priority project, Teva seems to be very relaxed about the timing and there is no reporting of follow up or explanation for these delays.  Based on my professional experience, I would think that if this project was a priority ████████ ████████████ would be important and that Teva would be intimately involved in the planning to avoid further delays.

---

[21] Teva_EPI_MDL00003076.
[22] Teva_EPI_MDL00015814.
[23] Teva_EPI_MDL00003076.
[24] Teva_EPI_MDL00003071.
[25] Teva_EPI_MDL00261447.
[26] *See, e.g.*, Teva_EPI_MDL00021892.
[27] Teva_EPI_MDL00261447.
[28] Teva_EPI_MDL00178477,
[29] Teva_EPI_MDL00015814.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 11

40.     Teva also did not act in a timely fashion ███████████████████
██████████████████████ In my experience, this document is prepared very early in the project and covers the development, as well as the commercial aspects, including all testing and releases. ███████████████████████████████████████████████



would be part of the ███████████████████████████

It would be required for all outsourced product, including component and API. This is important, ███████████████████████████████████████████████ should not have taken more than two years—in my professional experience, this is something that should take a few months, at most.

41.     The meeting minutes also confirm the existence of long delays between █████████ ████████████████████████████████ Dr. Weisman opines that Teva considered this program to be a high priority, but when companies establish a priority, it typically affects all of the divisions in the company. You cannot have one team considering this a high priority and another group not. Based upon Teva's documents, its internal working groups were not on the same page with respect to supposed company-wide priorities.

42.     In summary, I believe that the record does not support Dr. Weisman's contention that Teva treated the development of its generic EAI device as a priority following commencement of settlement negotiations with Mylan and Pfizer and following settlement. I

---

[30] Teva_EPI_MDL00261563.
[31] Teva_EPI_MDL00021877.
[32] Teva_EPI_MDL00003076.
[33] Teva_EPI_MDL00178477.
[34] Teva_EPI_MDL00258562.
[35] Teva_EPI_MDL00021892. This note is under the label BE Deficiency, not the next bullet point, Labeling Deficiency, but from context, it appears as though its placement is an error.
[36] Teva_EPI_MDL00021877. As indicated, the April 30, 2013 meeting minutes were the last minutes that I could locate until a new format of meeting minutes began to be used in December 2013.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

reach this conclusion based upon the materials considered by Dr. Weisman, Teva's meeting minutes during this time period, and my professional experience. The record indicates not only that Teva did not treat the EAI device as a priority in the settlement time period, but also that it did not display commercially reasonable efforts in bringing the product to market. I turn to the commercial reasonability of Teva's efforts in more detail—and the manufacturing issues it confronted—in the next section.

**B.**     **During the Settlement Time Period, Teva Did Not Employ "Reasonable Commercial Efforts" or Follow Standard Practices.**

**1.**     **Dr. Weisman's View of "Reasonable Commercial Efforts" Is Premised on the Incorrect Notion that Teva's Generic EAI Device Was a Uniquely Challenging Product.**

43.     In his report, Dr. Weisman does not define reasonable commercial efforts, nor does he define what he considers to be reasonable "diligence" in the prosecution of an ANDA.[37] At his deposition, Dr. Weisman said that, in his opinion, reasonable commercial efforts include, among other things: "organization of a process that leads to answering a question in a timely manner, and so that would include team meetings, that would be appropriate staffing of teams, it would include appropriate expertise to make  meaningful decisions, it would include selection of appropriate vendors."[38]

44.     Dr. Weisman's definition of reasonable commercial efforts scratches the surface. For example, having team meetings is meaningless unless the meetings have purpose and move the ball forward. In my opinion, reasonable commercial efforts are the means by which a reasonable, experienced, and prudent company would meet its goals through budgeting, staffing, timelines, and prioritization. I disagree with Dr. Weisman's contention that Teva used "reasonable commercial efforts" for the approval of this product. Importantly, the more relevant touchstone for the assessment of Teva's efforts are the standard practices in the industry. This is a more objective touchstone based in published literature, guidance, and industry practices. From this perspective, it is indisputable that Teva's efforts fall short of standard practices and industry standards in the timeframe under examination.

45.     Critical to Dr. Weisman's opinion concerning the commercial reasonability of Teva's work is his view that it is difficult to compare projects and that Teva's EAI device was a uniquely difficult product to develop. For example, during his deposition, Dr. Weisman testified: "But the key point here is that drug development is really, really complicated and no two drugs are the same and so each one needs to be looked at separately and distinctly, and this was a really hard one."[39] Dr. Weisman continued to state that the delay and difficulties that Teva faced in the development of the generic EpiPen were the results of the fact that it was a uniquely difficult product.[40]

---

[37] *Cf.* Weisman Report ¶ 110.
[38] Weisman Dep., 46:11-20.
[39] Weisman Dep., 46:21-25.
[40] *See, e.g.*, Weisman Dep., 165:16-166:21.

46.     Dr. Weisman's notion that the Teva EAI was uniquely difficult and that no comparison can be made is flawed. Many companies face drug formulation issues and—if the product is a drug-device combination product—device issues similar to Teva's. Formulation problems are not unique in general, nor are they unique in the Epinephrine context; Epinephrine is not the only API ever formulated that has issues with stability. As for the device-side of the product, prefilled syringes and auto-injectors are not a new or unique technology. Nor are the problems they present.

47.     Dr. Weisman also asserts that EAIs are uniquely difficult products, and not comparable to other auto-injector products, because they are administered in a state of emergency. But EAIs are not the only auto-injector products that are administered in an emergency—or even self-administered when the patient is in physical and mental distress.  For example, Pralidoxime, is an auto-injector and is given to patients exposed to nerve gas or organophosphate poisoning (pesticides).  Exposure to organophosphates results in tremors and twitching, and the patient would likely be frightened and highly stressed. Dr. Weisman's argument that the Teva EAI was uniquely difficult and that no comparison can be made is not accurate in my experience.

48.     In a related vein, Dr. Weisman contends that an ANDA is more difficult than an NDA (or at least that this particular ANDA was more difficult than an NDA). This is contrary to my experience as well. While I agree that some ANDAs are difficult, ANDAs typically do not have to go through the same standards for safety and efficacy that NDAs do. An NDA requires developing a new product from scratch; products submitted as NDAs typically require years of testing in animals and humans. ANDAs and NDAs can be comparable because the testing required for stability and the formulation are similar for both applications. A company submitting an ANDA, however, has the advantage of knowing how the product should be administered as well as the proper dosage, and can rely on previous work in developing the NDA to understand what issues can arise.  At base, if Dr. Weisman's assessment regarding the comparative difficulty of ANDAs and NDAs were correct, generic products would, on average, likely take much longer to market.  That is simply not the case.

**2.     Teva's Handling of** ███████████████████████████████████
██████████████  **the Settlement Time Period Was Not Consistent with "Reasonable Commercial Efforts" or Standard Practices.**

49.     Dr. Weisman defends Teva's unusually long approval process by contending that, although Teva exercised reasonable commercial efforts, it faced significant problems in the development of its generic EAI device.   Dr. Weisman points to many problems that Teva faced in trying to ████████████████████████████████████████████████████████
█████████████████████  Dr. Weisman admitted at his deposition, however, that he did not conduct any analysis of whether the amount of time Teva took to resolve various issues was reasonable.[41] Dr. Weisman also admitted that he did not have experience dealing with many of

---

[41]Weisman Dep., 109:6-119:18.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

these issues.[42] Based on my experience and analysis of the documents for the 2011-2014 time frame, I conclude Teva did not approach the product development in a commercially reasonable fashion or in a manner consistent with standard practices or "reasonable commercial effort."

50.     Initially, I note that Dr. Weisman grossly underestimates Teva's wealth of information and experience. Teva was well-equipped to solve the problems it encountered with the EAI ANDA if it applied reasonable commercial efforts. If one closely examines the difficulties that Teva experienced in the 2011-2014 timeframe, it is readily apparent that Teva had the experience and knowledge base to address these issues promptly, had it wanted to do so.

A.      Teva has vast experience in the development of generic drugs. Teva is one of the largest generics companies in the world, with over 1,600 ANDA approvals.[43]

B.      Teva has vast experience in injectable products and prefilled syringes, in particular, and is therefore familiar with FDA requirements for injectables. *See, e.g.*, Peck Report Table 4. Furthermore, Teva has manufacturing experience producing prefilled syringes at its factory in Croatia.

C.      Teva has experience with Epinephrine. Teva had an Epinephrine product, which it began producing in roughly 1985.[44] Teva also had approval for an ANDA for an injectable product containing Norepinephrine and isomer of Epinephrine in 2003.[45]

D.      As discussed in more detail below, *see infra* ¶ 53, Teva had access to the label of the RLD (EpiPen), which gave the formulation.

E.      Teva, finally, had access to literature and studies related to Epinephrine stability, including studies that Teva contributed directly to, giving Teva additional insight into the API.

51.     Reviewing the various issues experienced by Teva during the settlement time period, I conclude that Teva could have resolved these issues far faster than it did. This is particularly so given Teva's status as a sophisticated pharmaceutical company with experience in generics, injectable products, and Epinephrine. Through the exercise of reasonable commercial efforts, I would have expected that these problems could have been resolved in one to two years at most. Teva's response to the manufacturing issues recited by Dr. Weisman shows that Teva failed to observe standard practices or apply reasonable commercial effort. Further, Teva's failure to commit the necessary personnel and resources to the program led to knock-on effects later on during the development.

---

[42] *See, e.g.*, Weisman Dep., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

[43] Teva's ANDAs are available in the Orange Book located here: https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm.

[44] Stepensky, Chorny, Dabour and Schumacher, "Long-Term Stability Study of L-Adrenaline Injections: Kinetics of Sulfonation and Racemization Pathways of Drug Degradation," Journal of Pharmaceutical Science at 970 (Vol. 93, No. 4, April 2004).

[45] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=040455.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

██      ████████████████████████████

52.    Weisman notes that, in late 2011, Teva decided that it would need to █████████
████████████ This formulation is not complicated and should not have been time consuming, for several reasons.

53. 

55.    Third, Teva was well aware of, and experienced with, the stability issues presented by Epinephrine.  As noted above, Teva had experience with Epinephrine, including an Epinephrine product and Norepinephrine product.[48] Teva would have tested the stability of their Epinephrine and would have had to develop a stable formulation.  Teva would have needed to examine the formulation and look for impurities, including developing and validating methods to determine the impurities.████████████████████████████████████████████████████████████████████████████████████████████████████████████████

56.    Finally, Teva also had access to a wealth of other information. For example, in 2003, Dr. David Stepensky authored the "Long-Term Stability Study of L-Adrenaline Injections: Kinetics of Sulfonation and Racemization Pathways of Drug Degradation" in the Journal of Pharmaceutical Science (Vol 93, No 4., April 2004).[49]  The Israeli army sponsored the study, and—crucially—*Teva supplied samples of their formulated Epinephrine product for the study*. The study identified various impurities and degradation pathways. It also discussed the use of

---

[46] *See, e.g.*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/019430s053lbl.pdf.

[47] Another issue Teva should have addressed in a more commercially reasonable fashion was an issue with the presence of oxygen in the formulation.  Epinephrine is oxygen sensitive.  During the manufacturing of the dosage, one needs to dissolve the ingredients in water.  To dissolve the ingredients, it requires mixing and, with mixing it can draw in oxygen.  The intake of oxygen into the samples increases the formation of the impurities, which resulted in adjustments in the manufacturing methods to minimize the intake of oxygen. The increased formation of impurities was already known, and Teva was using a Nitrogen blanket in the vessels (Nitrogen Blanket is defined as the addition of nitrogen to displace the oxygen and acts like a blanket over the top of the mixture).  Teva has the tools to solve a problem like this.

[48] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=040455.

[49] Adrenaline is another name for epinephrine.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 16

Sodium Metabisulfite and the removal of Oxygen to stabilize the formulation. This means that any later ███████████████████████████████████████████████████████████

57.     In short, Teva had the capacity to resolve ██████████████ promptly, had it desired to do so. Instead, it displayed a lack of urgency and attention towards ███████████ in the settlement time period.

**b.**     ████████████████████████

58.     Dr. Weisman also points to ████████ as an impediment to Teva's obtaining approval of its generic EAI device. The principal cause of the ████████████ identified by Dr. Weisman is ██████████████████████████████████████████████████████████.[51] Teva did not display reasonable commercial efforts in connection with this issue.  Far from it: this issue, which was noted in Teva's April 2012 meeting minutes, should have been resolved far sooner. Teva's records demonstrate delays and a lack of attention during the settlement time period that I deem unacceptable in my professional experience. Indeed, Teva could have begun ███████████████████████████████████████████████

59.     On April 17, 2012, Teva's meeting minutes reported the status of ██████████ ██████████████████████████████████████████████████████████████████████████████████████[53] Seven months later, the meeting minutes for November 27, 2012, report the *exact* same status.[54] I would have expected to see more updates between April and the month of November.  Also, prototypes using the ████████ should be available in 30-60 days, based on industry standards, and ███████████████████████████ much sooner.

60.     Teva's lack of diligence extended to obtaining ██████████████████████ ███████ As described *supra* ¶¶ 37–38, the meeting minutes show that Teva did not act with a sense of urgency relating to ██████████████████████████. To recap: this issue is reflected in Teva's April 17, 2012 minutes, which note ████████████████████████ ████.[55]  This issue is again reflected in May 1, 2012 minutes,[56] minutes from September 18, 2012,[57] and continues into 2013, when Teva finally appeared to begin evaluation of ██████



[50] There are other examples.  To provide one: in 1994, Dr. Terry Grant published an article in the American Journal of Emergency Medicine (Vol 12, Issue 3, p 319-322, May 1, 1994) that demonstrated that with temperatures of either 5C or 70C, they saw 64% of the epinephrine had degraded in 12 weeks.  Environmental temperature variations cause degradation in epinephrine concentrations and biological activity.

[51] Weisman Report ¶ 76 n. 95.

[52] Cook is contract manufacturer for dosage.

[53] Teva_EPI_MDL00003076.

[54] Teva_EPI_MDL00015814.

[55] Teva_EPI_MDL00003076.

[56] Teva_EPI_MDL00003071.

[57] Teva_EPI_MDL00261447.

Page 17

███████████████████████████████████████████[58] Teva's handling of this issue is not reasonable for several reasons, in addition to the delays discussed above.

        A.      ███████████████ companies will look at their highest priority products and assess the risk of manufacturing the product. But there is no indication that Teva pursued a way to receive ███████ sooner than August. I would have expected Teva to at least research other suppliers, even if it did not have a backup supplier already lined up.

        B.      In addition, to avoid delays and interruptions, companies often have multiple suppliers for critical items.[59] For economic reasons as well as to avoid supply interruptions, companies will dual source critical materials and components, especially for high profile or priority projects.

        C.      Teva's actions and inactions are surprising for yet another reason: Teva regularly uses ██████████████████████████████. Throughout its long business experience with ████████████████ Teva would have built up relationships with suppliers. As Teva had an existing business using ██████████ I would expect, based on my experience, that Teva had a list of approved vendors who could have supplied ████████

61.     With respect to the ██████ specifically, Teva should have lists of approved suppliers. There are limited numbers of ██████████ manufactured for specific uses in the pharmaceutical context and locating acceptable ██████ is not complicated. The list of acceptable ██████ for a project like this would be known to FDA and pharmaceutical companies; often they are considered with excipients and are publicly available on FDA's excipient lists. It is not as though the ██████ is being newly invented or developed for the specific project.

62.     Again, this is an issue that could have been resolved far more promptly through the application of reasonable commercial efforts. This ████████████ issue, noted in the April 2012 minutes, was allowed to drag on for well over a year during the settlement time period. Teva had the capacity to resolve this issue—in a few months, if not weeks—but did not approach its resolution with any sense of urgency.

---

[58] *See, e.g.*, Teva_EPI_MDL00021892.

[59] A prudent company would want these companies listed in their submission. If these supplier companies are not part of the submission, then a company like Teva would need to submit a supplement to use these products in their formulation. A supplement can take two years for FDA review and approval. As mentioned above, companies do not want to be dependent on a single supplier for most items. Through the development program, Teva continued to move the manufacturing around as well as wait to develop an additional/new supplier. This was not commercially reasonable, particularly for a supposedly "priority" project.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**



Page 18

c.   ████████

63.    Weisman also raises an issue of ███████████████████████ Yet again, Teva had the experience and knowledge to fix this problem but did not address it with reasonable commercial effort during the settlement time period.

64.    As discussed above, Teva had experience working with Epinephrine. As such, Teva would have been aware that it had issues with stability and tested the concentrations of the potential buffers. Normally, a company will do compatibility studies with products that come into contact with the formulation. If this project were a priority, ████████████████████ ██████████████████████████████████████████████████

65.    The ██████████████ were ultimately corrected by ███████████ ██████████████████. This is not a complicated issue to resolve. Transferring to ███████████████████, and any improvements in the ██████████ would not have to be redone. The ████████████████████████ are the same/similar. Dr. Weisman nevertheless testified that this ██████████ was difficult to address.[61] From the perspective of someone experienced in manufacturing, I cannot agree. This issue is not a complicated one—it is a matter of ████████████ Contrary to Dr. Weisman's claim, it is not difficult to ████████████████████ especially for a company like Teva with established relationships ████████████████

d.   ████████

66.    Dr. Weisman also asserts that Teva experienced ████████████████ Dr. Weisman does not specify what sort of ████████████ is referring to. The documents he references include a December 2013 email that mentions, in passing, ████████ without detail, a meeting invitation, and some meeting minutes.[62] With regard to ████████ however, all injectables are ████████ Teva's experience with injectables means it could have easily and quickly resolved any ████████

67.    To the extent Dr. Weisman is referencing an issue ████████████ I cannot agree that this is a complicated issue to resolve. A company experienced in injectable products, such as Teva, would have knowledge respecting the development of ████████████████ Although the documents cited by Dr. Weisman do not give any indication of the type of ████████████ I do not believe ████████████ would have been used (although common, it requires high temperatures). ████████████ are two other acceptable methods used by companies ████████████ Once the unit is produced, it would be placed in a special unit ████████████ This is something that a company with experience in injectables, like Teva, would know how to develop and fix promptly.



---

[60] Weisman Report: ¶ 77, n. 98; Figure 3 (April 2013), n. 73, Figure 6 (July 2013), n. 102; Weisman Dep., 111:16-116:7; *see also* Teva_EPI_MDL00205447 (April 17, 2013 meeting invitation ████████████████ Teva_EPI_MDL00003296 (July 29, 2013 EAI Project Update); Teva_EPI_MDL00205454 (April 2013).

[61] *See* Weisman Dep., 102:16-103:2.

[62] Teva_EPI_MDL00205447; Teva_EPI_MDL00047321; Teva_EPI_MDL00115936.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 19

68.     To the extent that Dr. Weisman is referencing ██████████████████
for which an issue was apparently discovered in December 2013—I can see no major issue here
either.[63]  Companies that produce ████████████ understand the importance ████████  For a
product like Epinephrine, a manufacturer would prepare a solution.  Products like this
formulation of Epinephrine are ███████████████████████████████  Companies that
produce injectable drugs design these
████████████████.  While the process of developing these systems is labor-intensive, companies
that produce these types of products understand what is required.  Before doing any commercial
work, a company tests the various █████████████████████████.  Companies
that manufacture █████████ ████████████████████████ are aware of the various commercial systems and understand
the requirements and how to ████████████████████████████ also outlines the
requirements and test methods.  Companies will normally test several different ████
arrangements and test each one to determine which works the best and meet the FDA
requirements for ████████  All of this is known to a company like Teva.

      e.     █████████████████████████

69.     Dr. Weisman also points out that ████████████████████████████████
████████████████████  Teva elected to move to another manufacturing site.  Dr. Weisman's
implication is that, since ██████████████████████████  Teva needed to move from their
facility.

70.     However, as noted above, a reasonable company would have lined up second
suppliers for critical components, particularly for high profile or priority projects.  Dual sourcing
of critical components is standard in the industry—and best practices for a high profile or high
priority project.  This strategy would have allowed Teva to do any necessary testing side by side.
Teva was not acting reasonably by relying on one supplier for a priority project.[64]  Further,
reasonable companies that are sole-sourced on critical raw materials would audit the plant
annually following a warning letter.

71.     In addition to dual sourcing, there are many other strategies a reasonable company
could have pursued for a high profile or high priority project when one of their suppliers received
an FDA warning letter.  To begin with, Teva could have been more involved in the work at



---

[63]Teva_EPI_MDL00047321. Nelson Labs is a contract laboratory that routinely performs sterility testing on
  products.
[64] I note that Dr. Weisman fails to address the ████████████████████████████████████
████████████████████████████  While Teva did have some conversations with that supplier, Teva did not seek a
second supplier aggressively or with much urgency.  It was not until early 2014 that Teva started engaging in active
discussions with other suppliers.  Interestingly, one of those suppliers was ████████████████████

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential"
and/or "Highly Confidential"**

Page 20

### f.      Other Issues

72.      Finally, Dr. Weisman mentions ████████████████ that Teva experienced between 2011 and 2014, but does not provide comment or analysis of these issues.  These are included in Figure 3 of his report; others are mentioned in passing.  Looking at each item, however, I disagree with his assessment that these issues are uniquely difficult to resolve or that how Teva dealt with these issues constituted reasonable commercial efforts.  Again, I would also emphasize that Dr. Weisman failed to conduct an analysis of what would constitute a reasonable commercial effort and/or timeframe for resolution.



73.      ████████████████████████████████ ████████████ It is a common issue and easily resolved; for a company that makes prefilled syringe products (like Teva), this is particularly a non-issue and should not have delayed product development.  Companies that produce these types of products use sophisticated ████████ ██████████████████████████████████ are not unusual and are typically resolved by interaction with the ████████████████ Teva would have used various vendors who have specialized knowledge in their various fields and provided technical support.

74.      █████████████████████████████████ ████████████ Because this is an intramuscular injection, this is less of an issue.  This appeared to be easily resolved through physical adjustments.  I do not see evidence that this slowed development.  As noted in the previous paragraph, companies that manufacture the equipment to fill cartridges are aware of these problems and have solutions for this problem. Teva, as a producer of prefilled syringes and other injectables, would have been aware of this type of issue and would have had internal and external resources to correct this problem.

75.      ████████████████ March 2011, Teva discovered problems with █████████.  The placement of ████████ ████████████████████████.  If the ███████ is not placed properly, ████████████████ Also, the ████████ are in contact with the product and must be tested for ████████████ This was a minor ████████ issue that a company like Teva had the experience to easily resolve.

76.      █████████████████████████: Finally, Dr. Weisman points to Teva's decision to make a potentially ██████████████████████ in 2013-2014.[65]  The issue here was that, occasionally, ████████████████████████████████ in part likely due to an issue ████████████████████.  Such an issue is not a particularly complicated one to address, particularly considering the fact that Teva had a partner, Antares, that specialized in the production of auto-injector devices and was therefore intimately involved in the resolution of ████████████  I would also note, in this regard, an important comparison raised by Dr. Peck: Antares obtained approval of its generic ██████████████████████████████, a 60-month approval timeline. This suggests that Antares and Teva were more than capable of working together to bring ████████████ to market in less than 10 years.  The documents cited by

---

[65] Weisman Report ¶ 79, n. 105.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Dr. Weisman suggests, however, that the Teva team was not handling this issue in a timely fashion.[66]

**C.     During the Settlement Time Period, Dr. Weisman Failed to Consider Aspects of the Record Demonstrating that Teva Did Not Treat Its Generic EAI Device as a Priority and Did Not Employ Reasonable Commercial Efforts.**

77.     I would note three additional considerations, which I believe provide further confirmation that Teva did not exercise reasonable commercial efforts with respect to its generic EAI device during the time period of my examination.  The first consideration I would note is Teva's status, size, and sophistication as a pharmaceutical company, with particular experience in bringing both generic drugs and injectable drugs to market.  The second consideration is Mylan's projections for the likely entry of a generic EpiPen competitor. The third consideration is Teva's own documentation from late 2014 that confirms it needed to seriously re-orient this project following several years of neglect during the settlement time period.

**1.     Teva's Status as an Experienced and Sophisticated Pharmaceutical Company Confirms that Teva Did Not Devote Reasonable Commercial Efforts During the Settlement Time Period.**

78.     Experienced pharmaceutical companies like Teva can bring products to market in a commercially reasonable timeframe—even supposedly "complicated" products like autoinjectors—but Dr. Weisman completely ignores the depth of Teva's experience and resources.

79.     As shown by Table 4 of Dr. Peck's Report, when Teva makes reasonable commercial efforts, they can bring products to market in a far shorter period of time than  Teva took for its generic EAI device. I would note:

    A.     Teva is one of the largest generic pharmaceutical companies in the world, with extensive experience in the development of drugs and the ANDA drug approval process. The focus of Teva's business is on generic drugs, and over the years, they have gotten many FDA approvals in a reasonable time.  Teva knows what is required and what they need to do to get approval promptly. As Dr. Weisman admitted in his deposition, Teva is a large, sophisticated pharmaceutical company and is "skilled in the art" of bringing a drug to market.[67]

    B.     Teva also has experience manufacturing injectables. The generic EpiPen was not the first injectable product Teva developed.  In fact, Teva has developed over

---

[66] One of the documents cited by Dr. Weisman, Teva_EPI_MDL00114507, is a late 2013 to early 2014 email thread discussing the issue, the need to make the device modification, and the team's lack of stability data. ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

[67] Weisman Dep., 42:24-45:6.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

200 injectable drugs and has its own injectables facility producing prefilled syringes. Teva has the experience and knowledge to understand and address potential issues that can occur in the manufacturing of injectables.

C.      Finally, as mentioned above, Teva has experience with the relevant API, Epinephrine, in addition to a wealth of literature resources and information from the RLD (EpiPen), including its label explaining its formulation.

80.      In short, Teva is an experienced and knowledgable generics company with specific experience with injectables, auto-injectors, and Epinephrine. The problems that Teva experienced while seeking approval of its EAI device were foreseeable and entirely within Teva's knowledge base (or that of its partners).

81.      The lack of reasonable effort by Teva during the settlement time period is further confirmed by Tables 2 and 3 of Dr. Peck's Report, which list other EAI products and other auto-injectors, respectively.  From the perspective of manufacturing and product development, I disagree with Dr. Weisman's assessment that one cannot compare any of these products to Teva's product.  Each of these products have to address the same general issues as Teva's EAI. Each product needed ███████████████████████████████████████████████████████████ ████████████████ *etc.* In short, the basic process for all of these things is the same, and the requirements are not different for the API in Teva's generic EAI device.  The device side is not wholly unique either.  Auto-injector products are closely related to prefilled syringes, which Teva manufactures.  In addition, Teva's partner in this project, Antares, specialized in auto-injector products. Dr. Weisman claims that this product was uniquely difficult, but overlooks the fact that Teva and their partners had experience in the development and manufacturing of auto-injector products and experience with the API. In short, from the manufacturing perspective, other auto-injectors are comparable to Teva's generic EAI device. While, like every drug, there could be some issues that were unique to the EpiPen and its generic, these issues are not so unique that they preclude any comparisons.

82.      Notwithstanding his opinion that no other products are comparable, Dr. Weisman states that the delays experienced by Teva were "typical" for other drug-device combination products.[68]  Dr. Weisman does not cite a single comparative product to support the notion that Teva's delays were "typical" or "reasonable." After reviewing the record from my professional experience and background, the problem with this development process was not the magnitude or nature of the issues that Teva confronted, but rather the way that Teva dealt with those issues in the settlement time period.

### 2.      Mylan and Pfizer's Projected Entry Dates Likewise Demonstrate that Teva's Efforts During the Settlement Time Period Were Not Consistent with Reasonable Commercial Efforts.

83.      Further supporting the capacity of Teva to bring its generic EAI device to market—and the lack of diligence in doing so during the settlement time period—are the

---

[68] *See, e.g.*, Weisman Report ¶ 61(b).

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

projections of Mylan and Pfizer with respect to when they anticipated that Teva would be able to enter the market with an AB-rated generic competitor to the EpiPen.

84.      Although the EpiPen is a branded product, Mylan is principally known as a generics company.  Mylan is a sophisticated pharmaceutical company with extensive experience getting generics approved through the ANDA approval pathway.  Mylan is also, as Dr. Weisman has confirmed, knowledgeable about the EpiPen device and its competitors.  Dr. Weisman testified at his deposition that Mylan had more experience with, and was more knowledgeable about, Epinephrine auto-injector devices, and FDA approval of same, than any other party:

> Q    And you said that you think that Mylan has great knowledge of the product. What do you mean by that?
>
> A    Mylan being the marketer of the EpiPen product had detailed and specific information regarding how this product was used, how patients perceived the product would have been knowledgeable about all the concerns and issues related to the product, adverse events related to the product so I can't think of any party that would have known more about this sort of product than Mylan …
>
> …
>
> Q    When you say product, do you mean epinephrine auto-injectors generally, or what do you mean?
>
> …
>
> A    So I was really commenting about the Mylan EpiPen product, but thank you for broadening that for me because I do believe it's directly relevant to all products that might be used for the specific use in treating anaphylaxis, so I think they have very specific knowledge and experience with auto-injectors with epinephrine and probably where the one-party who could share meaningful information with the FDA regarding the approvability of a generic product.[69]

85.      Thus, Mylan's internal projections reflecting its views as to a reasonable and anticipated market entry date for Teva's generic EAI reflect a timeframe for approval of the project that would reflect reasonable commercial efforts.  Those projections show that, as of late 2011 and early 2012, Mylan believed that Teva's generic would be ready for approval and entering the market sometime in 2012 or 2013. As of October 2011, for example, Mylan estimated a 2012 entry date for the Teva generic:[70]

---

[69] Weisman Dep., 341:2-342:9. I note that Mylan did not, in fact, develop the EpiPen.
[70] MYEP00908612 at slide 34 (Oct. 23, 2011 Mylan presentation "EpiPen®Auto-Injector 2012-2016").

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**



86.     Likewise, in December 2011, a Mylan and Pfizer joint presentation estimated a 2013 entry date for the Teva product.[71] These projections and discussions show that, prior to the 2012 settlement, Mylan and Pfizer were estimating that Teva would come to market sometime in 2012-2013. This suggests that they believed that if Teva was prioritizing the project and making reasonable commercial efforts, it could quickly bring it to market.

87.     Mylan and Pfizer projections of entry dates for Teva's generic EAI device represent an assessment by knowledgeable parties of the time it would be reasonable in which to bring the generic EAI device to market, and these demonstrate a timeframe that would be consistent with reasonable commercial efforts.

### 3.     Dr. Weisman Failed to Account for Teva's Own Acknowledgement of Its Lack of Effort During the Settlement Time Period.

88.     Finally, Dr. Weisman fails to account for Teva's internal documents that reflect the lack of attention to the EAI device project. Consistent with this lack of attention, ████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

---

[71] MYEP00469618 at slides 3, 4, and 87 (Dec. 8, 2011 JCC presentation); *see also* MYEP01032651 at slide 14 (Nov. 28, 2011 Mylan presentation projecting a 2013 entry date for the Teva generic).
[72] At his deposition, Dr. Weisman conceded that he had no knowledge surrounding ████████████████ ████████████ and could not speak to its relevance to this matter. Weisman Dep., 90:16-92:18.

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 25



89.    As of May 2014, Rosario Lobrutto, who had been working on the generic EpiPen project for two years, was finally asked by his higher-ups at Teva whether Teva had ██████████ ██████████████████████████████ to the EpiPen project.[75]  Lobrutto responded tactfully that while the project

90.    According to Lobrutto

---

[73] Teva_EPI_MDL0017191

[74] *Id.* While there appear to be two Teva documents that referenc██████████████████████ ████████████████████████████████████████████████████████████████████████████ with five attendees, including Rosario Lobrutto) and Teva_EPI_MDL00021886 (same, but dated May 7, 2012, and without Rosario Lobrutto attending). The dates of these two earlier meeting minutes also appear to be incorrect. *See* Teva_EPI_MDL00021883 (May 7, 2013 email chain referring to Teva_EPI_MDL00021886 as a "revision for Yesterday's Meeting minutes").

[75] Teva_EPI_MDL00120361 (May 19, 2014 email thread among Teva employees); *see also* Teva_EPI_MDL00033302 (May 20, 2014 email thread among Teva employees, including Lobrutto, that begins with May 16 email).

**Pursuant to Stipulated Protective Order, This Report Contains Information Designated "Confidential" and/or "Highly Confidential"**

Page 26

Teva's generic EpiPen project was not being prioritized by Teva. Instead, it did not have enough people to successfully address key issues in a timely fashion.[76]

91.    Similarly, Teva's "Launch Readiness" meeting minutes show that on December 3, 2013, Teva was considering whether it had devoted enough regulatory resources to the project and wondering whether ███████████ ██████ ████ ████ ████ ████ ████ ████ ████ ██████ ████████████ ███████ ████████ ████████ ████ ███████ ████ ████████ ████████ ████████ ██████ █████████ ████████.

92.    The timing of Teva's ████████ █ ████████ ██ ██ ██ ████ ██ ████ ████ ████ █████ is quite interesting—and telling.  That is, ██ ██ ██ ██ ██ ██ ████ ████ ████ ████ █ ████ in mid- to late-2014, with an eye to an entry date in June 2015.  The timing of ████ ████████ following years of inaction, reinforces the conclusion that Teva devoted a lack of commercial effort during the settlement time period.

## V.  CONCLUSION

93.    It is my opinion that Teva could have developed and launched its generic EAI device in far less time than the ten years that Teva took.  In particular, Teva did not use reasonable commercial efforts to develop and launch the product from around the time of settlement through 2014, did not treat the project as a priority, and did not address manufacturing issues in a timely fashion.

Respectfully submitted,

James R. Bruno
February 7, 2020



# APPENDIX A

## CURRICULUM VITAE
James R. Bruno

### PROFILE

- Over 35 years of industrial experience in the area of custom manufacturing and development of pharmaceutical intermediates and Active Pharmaceutical Ingredients
- Result oriented executive with experience in all aspects of the development and commercialization of pharmaceuticals
- Senior positions in various global organizations responsible for manufacturing, development, and marketing
- Assisted in the development and commercialization of various new technologies
- Experience in regulated markets and interface with the FDA

### EDUCATION

1982   **Master of Business Administration—Rider University**

1978   **Master of Science in Chemistry—St. Joseph's Univeristy**

1973   **Bachelor of Science in Chemistry—Rider University**

### PROFESSIONAL EXPERIENCE

2002-present   **Chemical and Pharmaceutical Solutions—Managing Director**
Service the emerging market and assist in the development of new products and technologies. My role includes the technical assessment of new products and processes and the development of long-term suppliers of both Drugs Substance as well as Drug Product. Assist emerging companies with the development of the Request for proposals, Quality, and Supply agreements for manufacturing.  Audited new facilities and suppliers from both a Quality and technical point of view. Assist larger contract manufacturers strategically for the development and focus their business working with smaller pharmaceutical companies.  My work includes the development and oversight of technology transfers as well as Quality and Supply Agreements.

1999-2002   **Honeywell—Global Business Manager**
Lead a group focused on the development of new compounds for a contract manufacturer company that develops intermediates and APIs for pharmaceutical companies around the world. Responsible for the innovator market with six manufacturing units.  Additional responsibilities included working with Chinese suppliers for the development of new products as well as lead outsourcing teams.  Also responsible for the development of long-term contracts with potential clients for new

products, including both large and small pharmaceutical companies, as well as new suppliers and subcontractors.

**1996-1999**  **Vinchem—Vice President of Sales and Marketing**
Developed new markets and suppliers for a trading organization that represents suppliers of pharmaceutical products and broadened their reach into custom manufacturing.  Developed new business in China and India.  Performed audits and technical assessments for potential new suppliers and contract manufacturers globally.

**1994-1996**  **Aerojet—Director**
Responsible for Development and Marketing for domestic manufacturing of API supplied to pharmaceutical companies around the globe.  From the commercial side of the business, my responsibilities included negotiation with suppliers and client long term supply agreements. Research and Development, as well as the Pilot and Development groups, reported to me as well.

**1982-1994**  **Sipsy Chemical—Director**
Responsible for the development of new business for the manufacturing of API, which was supplied to North American pharmaceutical companies.  Responsibilities included working with the company to establish long term research and supply agreements for both branded and generic drugs and auditing of new suppliers, as well as both quality and technical assessments of potential suppliers. Assisted in the development of new technologies and licensing of new technologies and acted as an FDA Agent for the company.

**1978-1982**  **Ganes Chemical—Project Manager, New Products**
Responsible for innovator and custom manufacturing projects. Worked extensively with large pharmaceutical companies.

**1973-1978**  **NL Industries—Technical Service Manager**
Responsible for the development of new formulations and products for excipients used in pharmaceutical and cosmetic products.  Additional responsibilities included the pilot plant operations.

**SEMINARS**

| Year | Title | Location |
|------|-------|----------|
| 2001 | *After Graduation* | Rider University Guest Lecture Series |
| 2001 | *M&A* | Chemical Marketing and Economics |
| 2001 | *The Good, the Bad and the Ugly* | Outsourcing 2001 |
| 2002 | *New technology and the FDA* | Chiral Chromatography |
| 2002 | *When the Outsourcers Outsource* | Outsourcing 2002 |
| 2002 | *SMB and the FDA* | Dynamic Synthesis Symposium |

| | | |
|---|---|---|
| 2002 | *FDA and Simulated Moving Bed* | Large Scale Chromatography |
| 2003 | *PEMA* | Fine Chemical market and where it is going |
| 2004 | *Chromatographic Separations* | Large Scale Separations |
| 2004 | *Chromatography and the FDA* | Strategic planning Meeting |
| 2005 | *Simulated Moving Bed* | MCC Users Meeting |
| 2006 | *Manufacturing in China* | SAPA |
| 2007 | *Miniaturization of Chemistry* | Mettler Process Seminar |
| 2007 | *The Market in China* | CpHI |
| 2008 | *Multi-Column Chromatography* | MCC Users Meeting |
| 2008 | *Microreactors and Continuous Flow* | AMRI Annual Technical Presentation |
| 2009 | *Generics and Chromatography* | MCC User Groups |
| 2009 | *Miniaturization of Chemistry* | Mettler Annual Meeting |
| 2012 | *Launching Innovative Technologies In a Regulated Environment* | Omnics GMP Conference |
| 2013 | *Continuous Flow Chemistry* | DCAT Annual Meeting |
| 2013 | *Implementing New Technologies* | Scientific Update |
| 2014 | *Continuous Processing and the FDA* | SK Continuous Process symposium |
| 2019 | *Update on Flow Chemistry* | Scientific Update |
| 2018 | *Phase Appropriate GMP* | OMINC |

I have also been a guest speaker at the Good Manufacturing Practices (GMP) Roundtable, which is an event for representatives from pharmaceutical companies to discuss a range of issues relating to good manufacturing practices relevant to drug development and manufacturing activities. I have also been a guest speaker at at events by both Scientific Update and the Catalyst Group.

**TRAININGS PRESENTED**

I have organized and presented trainings on the following topics:

*Strategic Selling*

*Working in a Regulated Environment*

*Strategic Planning for Sales and Marketing Groups*

*Launching New Technologies*

*Working with the DEA*

*How the Drug Development Process Works*

*Current Good Manufacturing Practices in the Outsourcing World*

*Technology and the FDA*

*Excipient Good Manfuacturing Practices*

*Continuous Manufacturing and the FDA*

*Chromatography and the FDA*

*Continuous Chiral Manufacturing*

*Emerging Pharmaceuticals Phase 1 to Phase 2*

*Implementing New Technologies and the FDA*

*Looking at Phase Appropriate Good Manufacturing Practices for Pre-clinical and Phase I Drug Development*

**PUBLICATIONS**

**Pharmaceutical Manufacturing International**:
*Keeping Up with Shifting Industry Dynamics*

**PharmaChem**:
*Mergers and Acquisitions and Their Effect on Outsourcing*
*When the Outsourcers Outsource*
*Chemoutsourcing 2015*
*Chemoutsourcing 2012*
*Chemoutsourcing 2010*
*Privilege Technologies Move West*
*Mergers and Acquisitions and Their Effect On Outsourcing*
*Chemistry by the Shore*
*Outsourcing—The Human Side of The Equation*
*Technology—Changing the Way We Do Things*

**Chemical and Engineering News**:
*Guest Editorial*

**Chimica Oggi**:
*Economics of SMB*
*Panel Discussion Finished Dosage*

**Scrip**:
*US Fine Chemicals Fight a Losing Battle*

**American Pharmaceutical Review**:
*Improving Drug Bio-Availability Through Their Chemistry*

**Rider University Guest Lecture Series**:
*Development of a New Drug*

**EDITORIAL ROLE IN TRADE PUBLICATIONS**

**PharmaChem**—Editorial Committee

**Organic Process Research & Development**—Reviewer

**PROFESSIONAL SOCIETIES**

**Drug, Chemical & Associated Technologies Association (DCAT)**
Past President and Active Member

**Society of Chemical Manufacturers & Affiliates (SOCMA)**
At-large Informex Planning Committee and Active Member

**American Chemical Society (ACS)**
Chairperson of the Middle Atlantic Regional Meeting (MARM) and
Active Member

**Rider University, Scientific Advisory Executive Committee**
Chairman

# APPENDIX B

Page 1

## MATERIALS CONSIDERED

### I.    Documents Produced In Discovery

| | | |
|---|---|---|
| Teva_Epi_000053 | Teva_Epi_000394 | Teva_Epi_MDL00003081 |
| Teva_Epi_000064 | Teva_Epi_000467 | Teva_Epi_MDL00003087 |
| Teva_Epi_000092 | Teva_Epi_000509 | Teva_Epi_MDL00003183 |
| Teva_Epi_000095 | Teva_Epi_000519 | Teva_Epi_MDL00003296 |
| Teva_Epi_000098 | Teva_Epi_000527 | Teva_Epi_MDL00003420 |
| Teva_Epi_000101 | Teva_Epi_000603 | Teva_Epi_MDL00015586 |
| Teva_Epi_000109 | Teva_Epi_MDL00000302 | Teva_Epi_MDL00015654 |
| Teva_Epi_000114 | Teva_Epi_MDL00001426 | Teva_Epi_MDL00015746 |
| Teva_Epi_000132 | Teva_Epi_MDL00001930 | Teva_Epi_MDL00015814 |
| Teva_Epi_000137 | Teva_Epi_MDL00002080 | Teva_Epi_MDL00015844 |
| Teva_Epi_000142 | Teva_Epi_MDL00002088 | Teva_Epi_MDL00015855 |
| Teva_Epi_000146 | Teva_Epi_MDL00002856 | Teva_Epi_MDL00015945 |
| Teva_Epi_000147 | Teva_Epi_MDL00002858 | Teva_Epi_MDL00016006 |
| Teva_Epi_000153 | Teva_Epi_MDL00002971 | Teva_Epi_MDL00016052 |
| Teva_Epi_000169 | Teva_Epi_MDL00003047 | Teva_Epi_MDL00016098 |
| Teva_Epi_000200 | Teva_Epi_MDL00003051 | Teva_Epi_MDL00016320 |
| Teva_Epi_000207 | Teva_Epi_MDL00003056 | Teva_Epi_MDL00016669 |
| Teva_Epi_000276 | Teva_Epi_MDL00003061 | Teva_Epi_MDL00016699 |
| Teva_Epi_000296 | Teva_Epi_MDL00003066 | Teva_Epi_MDL00016834 |
| Teva_Epi_000350 | Teva_Epi_MDL00003071 | Teva_Epi_MDL00017038 |
| Teva_Epi_000362 | Teva_Epi_MDL00003076 | Teva_Epi_MDL00019384 |

Page 2

| | | |
|---|---|---|
| Teva_Epi_MDL00019521 | Teva_Epi_MDL00030155 | Teva_Epi_MDL00073885 |
| Teva_Epi_MDL00019547 | Teva_Epi_MDL00032091 | Teva_Epi_MDL00073908 |
| Teva_Epi_MDL00019725 | Teva_Epi_MDL00033302 | Teva_Epi_MDL00074017 |
| Teva_Epi_MDL00020487 | Teva_Epi_MDL00034691 | Teva_Epi_MDL00074030 |
| Teva_Epi_MDL00020909 | Teva_Epi_MDL00036229 | Teva_Epi_MDL00074049 |
| Teva_Epi_MDL00021363 | Teva_Epi_MDL00039044 | Teva_Epi_MDL00074086 |
| Teva_Epi_MDL00021877 | Teva_Epi_MDL00041862 | Teva_Epi_MDL00074127 |
| Teva_Epi_MDL00021883 | Teva_Epi_MDL00042007 | Teva_Epi_MDL00074156 |
| Teva_Epi_MDL00021886 | Teva_Epi_MDL00042716 | Teva_Epi_MDL00074235 |
| Teva_Epi_MDL00021892 | Teva_Epi_MDL00044948 | Teva_Epi_MDL00074293 |
| Teva_Epi_MDL00023541 | Teva_Epi_MDL00044967 | Teva_Epi_MDL00074301 |
| Teva_Epi_MDL00023595 | Teva_Epi_MDL00045613 | Teva_Epi_MDL00074463 |
| Teva_Epi_MDL00023695 | Teva_Epi_MDL00045636 | Teva_Epi_MDL00074482 |
| Teva_Epi_MDL00023758 | Teva_Epi_MDL00047321 | Teva_Epi_MDL00074536 |
| Teva_Epi_MDL00024215 | Teva_Epi_MDL00058499 | Teva_Epi_MDL00074560 |
| Teva_Epi_MDL00024927 | Teva_Epi_MDL00059329 | Teva_Epi_MDL00074573 |
| Teva_Epi_MDL00024944 | Teva_Epi_MDL00068541 | Teva_Epi_MDL00075980 |
| Teva_Epi_MDL00025167 | Teva_Epi_MDL00073629 | Teva_Epi_MDL00075989 |
| Teva_Epi_MDL00027653 | Teva_Epi_MDL00073639 | Teva_Epi_MDL00076017 |
| Teva_Epi_MDL00027751 | Teva_Epi_MDL00073652 | Teva_Epi_MDL00076024 |
| Teva_Epi_MDL00027757 | Teva_Epi_MDL00073679 | Teva_Epi_MDL00076029 |
| Teva_Epi_MDL00027929 | Teva_Epi_MDL00073866 | Teva_Epi_MDL00076041 |
| Teva_Epi_MDL00027976 | Teva_Epi_MDL00073877 | Teva_Epi_MDL00076050 |

Page 3

| | | |
|---|---|---|
| Teva_Epi_MDL00076059 | Teva_Epi_MDL00117206 | Teva_Epi_MDL00205447 |
| Teva_Epi_MDL00076063 | Teva_Epi_MDL00120361 | Teva_Epi_MDL00205449 |
| Teva_Epi_MDL00076099 | Teva_Epi_MDL00122044 | Teva_Epi_MDL00205454 |
| Teva_Epi_MDL00076175 | Teva_Epi_MDL00124639 | Teva_Epi_MDL00207335 |
| Teva_Epi_MDL00076181 | Teva_Epi_MDL00124641 | Teva_Epi_MDL00210009 |
| Teva_Epi_MDL00076189 | Teva_Epi_MDL00125075 | Teva_Epi_MDL00210021 |
| Teva_Epi_MDL00076197 | Teva_Epi_MDL00154397 | Teva_Epi_MDL00210040 |
| Teva_Epi_MDL00076201 | Teva_Epi_MDL00171910 | Teva_Epi_MDL00229795 |
| Teva_Epi_MDL00076208 | Teva_Epi_MDL00178295 | Teva_Epi_MDL00242979 |
| Teva_Epi_MDL00076251 | Teva_Epi_MDL00178477 | Teva_Epi_MDL00258552 |
| Teva_Epi_MDL00076279 | Teva_Epi_MDL00184750 | Teva_Epi_MDL00258557 |
| Teva_Epi_MDL00076300 | Teva_Epi_MDL00184921 | Teva_Epi_MDL00258562 |
| Teva_Epi_MDL00076301 | Teva_Epi_MDL00185009 | Teva_Epi_MDL00258567 |
| Teva_Epi_MDL00076337 | Teva_Epi_MDL00185032 | Teva_Epi_MDL00258572 |
| Teva_Epi_MDL00076338 | Teva_Epi_MDL00185200 | Teva_Epi_MDL00261447 |
| Teva_Epi_MDL00076471 | Teva_Epi_MDL00189697 | Teva_Epi_MDL00261452 |
| Teva_Epi_MDL00076482 | Teva_Epi_MDL00197380 | Teva_Epi_MDL00261507 |
| Teva_Epi_MDL00078352 | Teva_Epi_MDL00197426 | Teva_Epi_MDL00261512 |
| Teva_Epi_MDL00079012 | Teva_Epi_MDL00197437 | Teva_Epi_MDL00261517 |
| Teva_Epi_MDL00114507 | Teva_Epi_MDL00197606 | Teva_Epi_MDL00261522 |
| Teva_Epi_MDL00115497 | Teva_Epi_MDL00197769 | Teva_Epi_MDL00261527 |
| Teva_Epi_MDL00115498 | Teva_Epi_MDL00200442 | Teva_Epi_MDL00261532 |
| Teva_Epi_MDL00115936 | Teva_Epi_MDL00204172 | Teva_Epi_MDL00261537 |

Page 4

| | | |
|---|---|---|
| Teva_Epi_MDL00261542 | Teva_Epi_MDL00440070 | MYEP00181130 |
| Teva_Epi_MDL00261547 | Teva_Epi_MDL00440241 | MYEP00285878 |
| Teva_Epi_MDL00261552 | Teva_Epi_MDL00440290 | MYEP00346300 |
| Teva_Epi_MDL00261557 | Teva_Epi_MDL00440299 | MYEP00456698 |
| Teva_Epi_MDL00261563 | Teva_Epi_MDL00440613 | MYEP00469618 |
| Teva_Epi_MDL00273777 | Teva_Epi_MDL00440631 | MYEP00471062 |
| Teva_Epi_MDL00279466 | Teva_Epi_MDL00440723 | MYEP00824750 |
| Teva_Epi_MDL00284121 | Teva_Epi_MDL00440741 | MYEP00908612 |
| Teva_Epi_MDL00307596 | Teva_Epi_MDL00440774 | MYEP01028706 |
| Teva_Epi_MDL00316034 | Teva_Epi_MDL00440804 | MYEP01032651 |
| Teva_Epi_MDL00317348 | Teva_Epi_MDL00440829 | MYEP01038130 |
| Teva_Epi_MDL00317364 | Teva_Epi_MDL00440933 | MYEP01132991 |
| Teva_Epi_MDL00354892 | Teva_Epi_MDL00440937 | MYEP01133007 |
| Teva_Epi_MDL00382921 | Teva_Epi_MDL00474213 | MYEP01138470 |
| Teva_Epi_MDL00395257 | FOIA-FDA_006703 | MYEP01342132 |
| Teva_Epi_MDL00412519 | MYEP00000326 | MYEP01342196 |
| Teva_Epi_MDL00435692 | MYEP00000342 | PFE_EPIPEN_AT00452259 |
| Teva_Epi_MDL00436786 | MYEP00001505 | PFE_EPIPEN_AT00740105 |
| Teva_Epi_MDL00439374 | MYEP00021692 | |

## II.   Case Documents

*Expert Report of Steven M. Weisman dated December 23, 2019 and Materials Considered*

*Transcript of the Deposition of Dr. Steven Weisman dated January 24, 2019*

Page 5

*Expert Report of Carl Peck, M.D. dated October 31, 2019*

*Transcript of the Deposition of Dr. Carl Peck dated November 21, 2019*

## III.    Articles

David Stepensky et al., *Long-term stability study of L-adrenaline injections: Kinetics of sulfonation and racemization pathways of drug degradation*, Journal of Phamaceutical Science (Vol 93, No. 4, April 2004)

Terry Grant, M.D. et al. *Environmental temperature variations cause degradations in epinephrine concentration and biological activity*, American Journal of Emergency Medicine (Vol 12, No. 3, May 1994)