# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

)
)
)
)
IN RE: EpiPen (Epinephrine Injection, USP) )
Marketing Sales Practices and Antitrust    )   Case No. 17-md-2785-DDC-TJJ
Litigation                                 )
)
)
)
)

**Reply Expert Report of**

**Professor Einer Elhauge**

February 12, 2020

**HIGHLY CONFIDENTIAL:  SUBJECT TO PROTECTIVE ORDER**

Highly Confidential: Subject to Protective Order

## Contents

Executive Summary ...................................................................................... 1

I. Market Definition and Monopoly Power .............................................. 7

  A. Market Definition ................................................................................ 7

  B. Monopoly Power ............................................................................... 10

II. The Nuvigil Settlement Created a Large and Unexplained Reverse Payment that Delayed the Allowed Entry Date in the EpiPen Settlement ................................... 15

  A. As a Matter of Economics, a Reverse Payment Can Be Large and Unexplained in a Way that Produces Anticompetitive Entry Delay Regardless of Whether it is Explicit or in the EpiPen Settlement .................................... 15

  B. The Nuvigil Settlement Created a Large Reverse Payment and Delay in Allowed Entry Even with the Computational Corrections .................................. 17

  C. The Nuvigil Settlement Created a Large Reverse Payment and Delay of Allowed Entry Even with Varying Estimates of Nuvigil Patent Strength .......... 23

  D. Higher Estimated Expected Damages Would Not Alter the Fact that the Nuvigil Settlement Created a Large Reverse Payment and Delay in Allowed Entry ................................................................................................... 28

III. The EpiPen and Nuvigil Settlements Were Economically Linked and Driven by Mylan's Incentives ................................................................... 34

  A. The EpiPen and Nuvigil Settlements Were Economically Linked ................ 34

  B. As Between Mylan and Pfizer, Mylan's Incentives Drove the Negotiations . 35

IV. Mr. Orszag's Critiques of My Input Estimates Are Misguided and Ignore the Fact that My Findings Are Robust to Different Input Estimates ............................ 41

  A. Patent Strength Estimates .................................................................. 41

  B. Expected Entry Date Absent Settlement .............................................. 50

  C. The Parties Expected to Enter at Risk .................................................. 56

  D. Market Prices, Costs, Size, Quantities, and Discount Rate ....................... 59

  E. Litigation Costs and Uncertainty Costs ................................................ 65

  F. Combinations of Inputs ..................................................................... 67

V. Mr. Orszag Fails to Demonstrate Any Valid Procompetitive Justifications for the Reverse Payment .................................................................................. 70

VI. Foreclosure Share ............................................................................ 74

ii

Highly Confidential: Subject to Protective Order

A. Data Updates .................................................................................74

   1.   Uninsured Patients.....................................................................74

   2.   Updated Formulary Coverage Data ........................................75

B. Causal Connection Between Mylan's Contracting Terms and Restrictive Formulary Statuses.................................................................77

  1. Prof. Willig Claims PBMs Put All New Products on Restrictive Formulary Tiers Until they are Sufficiently Evaluated ...................................80

  2. Prof. Willig Claims Some PBMs Did Not Have Rebates Conditional on Formulary Exclusivity at Some Times for their Commercial Plans...............81

  3. Prof. Willig's Claim that Kaiser Was Not Foreclosed Contradicts the Evidence......................................................................83

  4. Whether Plans Would Have Bought Auvi-Q But-for Foreclosure Is Not Relevant to Calculation of Foreclosure Share ...................................84

C. Prior Authorization and Step Therapy Are Restrictive ...................................84

  1. Step Therapy is Restrictive .........................................................85

  2. Prior Authorization is Restrictive .................................................86

  3. Statistical Analysis Confirms Prior Authorization and Step Edits are Restrictive .................................................................88

D. Mylan's Foreclosure Was Not Limited to Commercial Plans.......................90

  1. Both Commercial and Non-Commercial Plans Were Affected by Mylan's Foreclosing Conduct ........................................................90

  2. Sanofi Did Compete in the Non-Commercial Segment ..............................93

  3. Commercial Channel was Significantly Foreclosed...................................95

VII. Foreclosure Share Impact.................................................................96

A. Using Updated Data Reinforces My Foreclosure Regression Results ..........97

B. Matching IQVIA to Formulary Restriction Data .........................................100

  1. Bridge Files Begin in March 2014, Partway Through Regression Period 100

  2. Bridge Files Sometimes Match Multiple MMIT Plan IDs to a Single IQVIA Plan ID, or Vice Versa ......................................................104

  3. Sample of Matched Plans is Representative of EAI Market .....................106

C. Prices ...............................................................................108

  1. Dr. Johnson Wrongly Introduces Endogenous Sample Selection Bias by Dropping All Observations with Zero Auvi-Q Purchases.............................109

Highly Confidential: Subject to Protective Order

2. PBM-Level Prices are the Best Price Data Available, and Obtaining Plan-Level Price Data Would Be Unlikely to Change Results. ............................110

3. PBM Price Matching.................................................................................112

4. Realized vs. Offered Prices......................................................................114

5. Price Protection Clause ...........................................................................115

6. Patient Prices...........................................................................................115

7. Using Plan-Level Price Difference Instead of Ratio ...............................117

D. Causal Relationship Between Mylan's Conduct and Formulary Restrictions ................................................................................................................118

E. Regression Specification to Be Used in Overcharge Model .........................121

VIII. Foreclosure Overcharge ................................................................................121

A. Exclusion of State Medicaid .......................................................................123

B. Updated Estimate of Foreclosure Effect on Quantity Demanded Intercept .123

C. Market Responsiveness of Demand .............................................................126

D. Cross-Price Responsiveness of Demand......................................................126

1. Calculating Cross-Price Responsiveness on a Monthly Basis..................126

2. Source for Measure of Cross-Price Responsiveness ...............................128

E. Accounting for Competition from Auvi-Q...................................................132

1. My Initial Model Did Account for Competition from Auvi-Q ................132

2. The EAI Market Characteristics Indicate Differentiated Bertrand Competition Rather than Price Coordination ...............................................133

3. Foreclosure Overcharges if One Includes Auvi-Q's Price in a Model of Differentiated Bertrand Competition, But Still Assumes Foreclosure Only Affects the Intercepts of EpiPen's and Auvi-Q's Demand Functions...........140

F. Shape of Quantity Demanded Functions ......................................................144

1. Linear Demand Function Fits the Evidence and Can Approximate Non-Linear Functions ..........................................................................................144

2. The Evidence Affirmatively Indicates that the Foreclosure Upwardly Shifted the Intercept of EpiPen's Demand Function..................................................144

3. Evidence Affirmatively Contradicts Prof. Willig's Speculation that the Foreclosure May have Increased EpiPen's Demand by a "Constant Percentage" ................................................................................................................145

Highly Confidential: Subject to Protective Order

4. Following Prof. Willig's Suggestion that One Should Allow the Foreclosure to Alter the Slope of EpiPen's Linear Demand Function Significantly Increases the Estimated Overcharge ...................................................................146

5. Evidence Affirmatively Contradicts Prof. Willig's Speculation That Mylan Has an Iso-Elastic Residual demand function. ...............................................157

G. Deterred Re-Entry .................................................................................158

1. Updated Deterred Re-Entry Overcharges ...................................................158

2. Evidence Relevant to Whether Foreclosure Deterred Re-Entry...............160

IX. Percentage of Class Members Harmed.............................................................161

A. Regression Estimating Effect of Exclusive Formulary Positions on Mylan's Rebates .....................................................................................................162

B. Combining Average Net Price Change and Rebate Change to Determine Whether Individual Plans Were Harmed ...........................................................165

1. Detailed Classwide Impact Calculations ...................................................168

2. Summarized Classwide Impact Results for All Overcharge Models ........172

3. Responses to Defense Expert Claims About the Percentage of Class Members Harmed...............................................................................................174

C. Apportioning Damages to Class Members ...................................................180

1. Plans (i.e., TPPs).......................................................................................180

2. Cash Payors................................................................................................182

3. Insured Consumers.....................................................................................183

4. Appendix A (State Antitrust and Consumer Protection Law) Overcharges ...................................................................................................................185

X. Conditioning Rebates on Rival Exclusion Is Not Reasonably Necessary to Achieving Any Procompetitive Efficiency ...........................................................193

A.    The Usage of Formulary Restrictions by PBMs Does Not Show They Were Procompetitive ...................................................................................................193

B. Increasing Use of Formulary Exclusions by PBMs Over Time Does Not Show Procompetitive Effects.........................................................................................197

C. Procompetitive Efficiencies Are Disproven, Not Proven, By the Very Rare Usage of Rebate-Induced Restrictions on EpiPens ...........................................200

D. Given the Lack of Procompetitive Efficiencies, the Alleged Lack of Less Restrictive Alternatives Is Irrelevant .................................................................202

Highly Confidential: Subject to Protective Order

XI. Prof. Willig's Summary Statistics Do Not Show that Mylan's Foreclosure Lowered Prices or Raised Output .................................................................205

A. The Relevant Question is How the Challenged Conduct Affected Net Prices, Not Rebates in Isolation .....................................................................................206

B. Net Prices Would be Higher If Mylan Were Not Allowed to Condition Rebates on Formulary Restrictions..................................................................................208

C. EAI Market Output Would be Higher if Mylan Were Not Allowed to Condition Rebates on Formulary Restrictions......................................................................210

    1. Evidence Prof. Willig Cites Does Not Support His Claim that the Challenged Conduct Increased EAI Market Output .........................................................211

    2. My Overcharge Model Affirmatively Indicates that Mylan's Foreclosure Reduced EAI Market Output Relative to But-for Levels .............................212

D. Consumers Were Harmed by a Lack of Choice ..........................................213

XII. The Restraints Here Are Exclusionary Agreements That Should Not Be Assessed Under Any Price-Cost Test and Would Violate That Test Even If They Were ..............................................................................................................215

A. These Were Exclusionary Agreements, Not Loyalty Discounts .................215

B. The Price-Cost Test Does Not Accurately Measure Anticompetitive Effect Here ..................................................................................................................220

    1. Externality or Collective Action Problems Mean Price is not the Predominant Means of Exclusion................................................................................221

    2. The Bundling of Contestable and Incontestable Demand Also Shows That Price Is the Not Predominant Means of Exclusion .......................................226

    3. Economic Literature Shows Agreements that Pass the Discount Attribution Test Can Still Cause Anticompetitive Harm ................................................228

C. Many or Most of Mylan's Agreements Violate the Discount Attribution Test ........................................................................................................................229

    1. Cost Measure....................................................................................230

    2. Incontestable Demand.......................................................................234

    3. Price Protection Clauses ...................................................................238

    4. Correcting These Errors Shows that Many or Most of Mylan's Agreements Fail the Discount Attribution Test ...............................................................238

Highly Confidential: Subject to Protective Order

5. Similar "Rival Tax" Test Shows that Bundling of Contestable and Incontestable Demand, Not Price, is the Predominant Method of Exclusion ...............................................................................................................243

6. Issues Related to the Price-Cost Test.........................................................245

EXHIBIT A...........................................................................................................248

Highly Confidential: Subject to Protective Order

**EXECUTIVE SUMMARY**

1.      ***The Relevant Market Is U.S. EAIs and Mylan Had Monopoly Power in that Market.***  Prof. Willig argues that the relevant market may be broader than EAIs, but he fails to show that competition with the only product he identifies as potentially belonging in the relevant market (which was launched long after the end of the relevant time period) could constrain EAI pricing.  Nor does he provide any evidence to support his vague claim that maybe each PBM is its own market.

2.      Prof. Willig falsely asserts that I based my conclusion of monopoly power only on Mylan's 87-99.7% market shares, but I reached that conclusion based on a combination of those market shares and evidence of barriers to entry and expansion.  Prof. Willig does not respond to any of the evidence on barriers to entry and expansion, other than to argue that one of the barriers resulted from procompetitive efforts, which is irrelevant to whether the barrier existed and helped give Mylan monopoly power.  His claim that bid markets can render market shares unstable is undermined by the very stability of Mylan's high market share.  He provides no evidence for his claim that Mylan's pricing power was restrained by PBM buyer market power, and his claim conflicts with both the fact that each PBM had a market share far smaller than Mylan's and with direct evidence that Mylan exercised a power to raise prices despite PBMs.  He also argues that the presence of Auvi-Q had some effect on EpiPen pricing by lowering the rate of EpiPen price increases during the time that Auvi-Q was on the market.  This simply confirms that the presence of Auvi-Q did impose some constraint on EpiPen pricing.  It does not at all show that the presence of Auvi-Q was remotely sufficient to constrain EpiPen pricing down to competitive levels.  Finally, his only response to my point that, if accepted, the evidence that Mylan was able to anticompetitively foreclose Auvi-Q would demonstrate a power to exclude is that he wrongly rejects the relevance of the power to exclude test of monopoly power.

3.      ***The Nuvigil Settlement Created a Large and Unjustified Reverse Payment that Delayed the Allowed Entry Date for Generic EpiPen.***  Mr. Orszag's argument that there was no reverse payment because it was not explicit in the EpiPen settlement conflicts with basic economics and his own scholarship, which demonstrates how side agreements, such as the Nuvigil settlement in this case, can be used as transfer payments to delay entry.  He is also incorrect that correction of computational errors demonstrate that the Nuvigil settlement did not create a large reverse payment that delayed the allowed entry date for generic EpiPen.  Correcting

1

Highly Confidential: Subject to Protective Order

these computational errors changes the predicted allowed no-payment settlement entry date 11 days, from March 3, 2014 to March 14, 2014.  The corrected figures continue to show that the EpiPen settlement was not rational for Teva on a standalone basis, that Teva was significantly overcompensated in the Nuvigil settlement, and that Mylan was significantly undercompensated in the Nuvigil settlement relative to a but-for world where the two settlements were separate from each other.  These findings persist even if one considers varying patent strengths or arbitrarily increases expected damages, as Mr. Orszag wrongly suggests.

4.     Mr. Orszag's claims that the two settlements were completely separate also flies in the face of the economic evidence that the EpiPen settlement was not rational for Teva to accept on a standalone basis and the documentary evidence that Teva negotiated the EpiPen and Nuvigil settlements simultaneously with Mylan. Similarly, his argument that Mylan was not involved in negotiating the EpiPen settlement conflicts with the language of Mylan's supply agreement with Pfizer, the fact that Mylan did sign the settlement, as well as Teva documents showing it negotiated both the EpiPen and Nuvigil settlements with Mylan.  His argument that the settlements were entirely driven by Pfizer's incentives also conflicts not only with the evidence, but with his own description of Pfizer's incentives, which confirms that Pfizer has incentives to accept any Mylan decision about the reverse payment that Mylan was willing to offer to delay generic EpiPen entry.

5.     Mr. Orszag also critiques several of the estimated inputs to my analysis. His critiques of those input estimates are mistaken, and his claim that changing those inputs alters my conclusion is false.  In fact, as I showed in my initial report and demonstrate further in this reply report, although changing those inputs can alter the precise estimate of the entry delay, it does not alter the conclusion that the reverse payment significantly delayed the allowed entry to date in the EpiPen settlement. This is true for all the unjustified changes to inputs that Mr. Orszag proposes, including changing estimates of the expected patent strength, generic entry date without settlement, likelihood of at risk entry, discount rates, litigation length, or litigation costs.

6.     Finally, Mr. Orszag makes a false claim that I ignored the possibility of procompetitive justifications for reverse payments, when I in fact devoted an entire section of my original report to that topic, which he ignores.  He does not consider any evidence specific to this case relating to the two general potential justifications that he mentions, and I show in this report that those justifications do not apply in this case.

Highly Confidential: Subject to Protective Order

7.    ***Foreclosure.*** All of my ultimate conclusions about the anticompetitive effects of Mylan's exclusionary agreements remain true, or become even stronger, after addressing all of the critiques made by Dr. Johnson and Prof. Willig.

8.    ***Foreclosure Shares.*** Mylan foreclosed a significant share of the EAI market (up to 46%), even if one assumes that there was no foreclosure of every plan-month that Prof. Willig claims was not offered rebates conditioned on formulary restrictions.   Although Prof. Willig claims that plans often restrict Auvi-Q's formulary position for reasons other than Mylan's exclusionary agreements, the data shows that: (a) plans that were subject to Mylan agreements that conditioned rebates on formulary restrictions were 10 times more likely to restrict Auvi-Q's formulary position; and (b) plans rarely restricted Auvi-Q's formulary position when they were not subject to Mylan's exclusionary agreements.   Prof. Willig claims that subjecting Auvi-Q to Prior Authorization and/or Step Therapy is "Less Restrictive" than excluding Auvi-Q completely from a formulary, but regression analysis shows all three types of restrictions have a restraining impact and that those restraining impacts are comparable in size and not statistically different from each other.   Prof. Willig asserts that Mylan's foreclosure was limited to the commercial segment of the market, but Mylan's own strategic documents show that it specifically planned to foreclose private plans in the non-commercial segment of the market too, Mylan's non-commercial agreements confirm that Mylan entered into exclusionary agreements that restricted those non-commercial plans, and statistical analysis confirms that the resulting non-commercial formulary restrictions reduced Auvi-Q's market share.

9.    ***Foreclosure Share Impact Regression***.   After addressing every single defense expert critique of this regression, my foreclosure share impact regression indicates that Auvi-Q's share was 4.6 percentage points lower at plans that restricted its formulary position, even after controlling for EpiPen and Auvi-Q's prices.   This estimated 4.6 percentage point effect is similar to my initial estimate of the share effect (5.2 percentage points), and remains highly statistically significant (p-value <0.01%), despite the fact that I have made all of the following methodological changes that defense experts proposed: (a) used "month-by-month" matching of the IQVIA data to the MMIT data; (b) controlled for plan-level prices; (c) used MMIT data, instead of IQVIA data, to identify each plan's PBM affiliation in each month; and (d) controlled for patient prices.

10.    ***Foreclosure Overcharge***.   My initial report rigorously modeled the effect of the foreclosure on EpiPen prices, relying on quantitative estimates of the key determinants of EpiPen's profit-maximizing prices, such EpiPen's cross-price

Highly Confidential: Subject to Protective Order

responsiveness of demand with Auvi-Q.  That model showed that the foreclosure anticompetitively increased EpiPen prices, resulting in over $100 million in state antitrust and consumer protection damages.  Neither Dr. Johnson nor Prof. Willig attempted to present any alternative model; instead, they repeatedly make methodological critiques without attempting any modifications to address them.  If one modifies my model to simultaneously address *all* of the defense experts' methodological critiques, the resulting model shows even ***higher*** overcharges (20-28% of EpiPen's actual net price) and even ***higher*** damages ($408 million in state antitrust damages and $334 million in state consumer protection damages).  Even if one implements only the subset of the defense experts' methodological proposals that decrease damages, total state antitrust damages are still over $110 million and total state consumer protection damages are still over $120 million.

11.     ***Percentage of Class Members Harmed by Foreclosure***.  The foreclosure overcharge model presented in my opening merits report indicated that at least 98.3% of plans, and at least 99.9% of class members (the several-thousand plans plus approximately 130,000 cash payors), paid anticompetitively inflated EpiPen prices in at least one month. If one modifies my model to simultaneously address ***all*** of the defense experts' methodological critiques, then the overcharge is high enough that 100% of class members were harmed in every month in which they purchased.  Even if one implements only the subset of the defense experts' proposed methodological changes that reduce the overcharge, over 99% of class members were harmed by the foreclosure in at least one month, and over 99% of class members were harmed by the foreclosure on average across all months.

12.     ***Mylan's Exclusionary Agreements Were Not Reasonably Necessary to Achieve Any Procompetitive Efficiency***. Prof. Willig claims that Mylan's agreements must be procompetitive based on his premise that PBMs asked for rebates conditioned on formulary restrictions.  But whether PBMs requested the agreements is irrelevant because PBMs have economic incentives to enter into agreements that anticompetitively inflate prices.  PBMs buy no EAIs, and therefore bear none of the burden of higher net prices.  Further, PBMs' rebates are calculated as a percentage of their members' gross sales, so PBMs' profits will increase if foreclosure causes Mylan's WAC price to increase. PBMs thus will profit from helping dominant manufacturers like Mylan anticompetitively foreclose rivals and increase prices.  Consequently, evidence that the PBMs played some active role in the creation or spread of Mylan's exclusionary agreements would not suggest that these agreements were procompetitive.  Prof. Willig also claims that conditioning rebates to obtain formulary restrictions on rival sales must be procompetitive based on his assertion that such agreements are also used by smaller firms without market

Highly Confidential: Subject to Protective Order

power, such as Sanofi in the EAI market.  But the data actually shows that Sanofi succeeded in obtaining such formulary restrictions favoring Auvi-Q only 1% of the time.  This confirms that buyers rarely want to accept exclusivity from EAI sellers without market power, which indicates that such exclusivity must be inefficient, because any efficiency would apply equally to sellers with or without market power. The fact that buyers generally accept such exclusivity offers only when the seller has market power indicates that market power, rather than the efficiency of exclusivity, must be driving buyer decisions.

13. ***Prof. Willig's Summary Statistics Do Not Show That Mylan's Foreclosure Lowered Prices or Raised Output***.  Prof. Willig claims that Mylan's agreements lowered prices and increased output.  However, Prof. Willig does not perform ***any*** rigorous economic analysis to support those claims.  He instead relies on irrelevant summary statistics.  He relies on an increase in rebates, which is irrelevant because what matters is the increase in net prices, which shows that gross prices rose more than any increase in rebates.  He also relies on a decrease in the rate of price increases after Auvi-Q entry, which is irrelevant because: (a) what matters is not the effect of Auvi-Q entry on price, but rather the effect of Mylan's formulary restrictions on price; and (b) what matters is whether prices were higher than they would have been but for Mylan's formulary restrictions (as the evidence proves), not whether the price trend from past levels persisted.  Likewise, he relies on an increase in output from past levels, which is irrelevant because what matters is whether output was lower than but-for levels.  In contrast, my rigorous foreclosure overcharge models show that Mylan's net price was higher, and total market output was lower, than they would have been but for Mylan's formulary restrictions.

14. ***The Price-Cost Test Is Not the Relevant Economic Test Because These Are Exclusionary Agreements, Not Loyalty Discounts, and Their Predominant Mechanism of Exclusion Is Not Price, and Anyway Mylan's Agreements Violate the Price-Cost Test***.  Prof. Willig claims that Mylan's restrictions are loyalty discounts, that they should be judged under a price-cost test because price is their predominant mechanism of exclusion, and that they do not violate that test.  All three of his claims are mistaken.  First, his premise that Mylan's restrictions are loyalty discounts is wrong because Mylan's restrictions do not simply confer rebates on plans that actually bought all or a high share of EAIs from Mylan.  Rather, Mylan's restrictions are exclusionary agreements that require plans to agree to formulary restrictions that restrain the ability of doctors and patients to choose rival EAIs.  Further, Mylan's restrictions do not give loyalty discounts from but-for prices, but rather impose disloyalty penalties by raising the disloyal price way above but-for levels.  Second, he provides no support for his conclusion that

Highly Confidential: Subject to Protective Order

price is the predominant mechanism of exclusion, and that conclusion is disproven by the facts that: (a) Mylan's restrictions take advantage of externalities and collective action problems to coerce plans to accept exclusion, (b) Mylan's restrictions bundle contestable and incontestable demand, (c) even using his own definition of incontestable demand, Mylan's restrictions impose up to a 61% tax on rival sales, over and above any effect of the rebates themselves; and (d) my regression directly proves that price was not the mechanism of exclusion by showing that, controlling for price, the restrictions still have a separate anticompetitive impact. Third, many of Mylan's challenged contracts violate the price-cost test even if one uses his own highly-conservative definition of how to measure EpiPen's incontestable share, and the vast majority violate that test under a more reasonable definition of incontestable share.

Highly Confidential: Subject to Protective Order

## I. Market Definition and Monopoly Power

15.     In my opening merits report, I demonstrated that the relevant market in this case is the market for epinephrine auto-injectors ("EAIs") in the United States.[1] Applying the hypothetical monopolist test shows that the domestic EAI market is sufficiently broad.  This is demonstrated by Mylan's ability to raise prices above the 5% threshold upon Auvi-Q's exit and it is also confirmed by evidence regarding functional interchangeability, price trends, and internal business assessments.[2]  I also determined that Mylan possessed and exercised market power and monopoly power, as shown by its high market shares, high barriers to entry, power to price over competitive levels, and demonstrated ability to exclude rivals.[3]

### A. Market Definition

16.     **a. Existence of More Distant Substitutes, Such as Symjepi, Does Not Refute EAI Market Definition**.  Although Prof. Willig never opines that the market is broader than the U.S. EAI market, he does vaguely speculate that "for **some** patients, especially those in the hospital setting, the relevant set of products **may** be broader than EAI devices."[4]  The only source he cites for that speculation is Part III of his report, and the only statement therein that is relevant to this speculation is his statement there that: "Particularly in the hospital setting, where epinephrine may be administered by skilled nurses and doctors rather than self-administered, syringes, for example, can be a viable substitute."[5]  And the only support he cites for that statement is a reference to Sandoz's Symjepi epinephrine syringe, which he notes was launched in 2019.[6]

17.     His speculation is flawed for several reasons.  First, even if one thought that the only product he cites as a possible substitute, the Symjepi syringe, was a substitute, it is irrelevant because it was not released until 2019, after the challenged conduct had ended.[7]  Thus, even if one incorrectly concluded that the product market should be broadened to include Symjepi, that would not affect any of the market

---

[1] *See* Elhauge Merits Report Part I.A.
[2] *Id.*
[3] *Id* at I.B.
[4] Willig Report ¶ 255 (emphasis added.)
[5] Willig Report ¶ 31.
[6] Willig Report ¶ 31 & n.13.
[7] *Id.* at n.13; Elhauge Merits Report at n.13.

Highly Confidential: Subject to Protective Order

shares or inferences of market power during the relevant time period.  Second, as he himself has acknowledged in his writing, a relevant market should be defined to be the smallest set of the closest substitutes to the relevant product that passes the Hypothetical Monopolist test.[8]  Given that Prof. Willig neither disputes my evidence that EAIs pass the hypothetical monopolist test nor claims that Symjepi is a closer substitute for EpiPen than other EAIs, this means that his own writings support the conclusion that Symjepi (and any other epinephrine syringe) should not be in the relevant market.  Third, Prof. Willig never even claims that the relevant market *is* broader than EAIs for any patients, he just claims it *may* be so for *some* patients, which hardly suffices to dispute my market definition.  Fourth, even if he showed Symjepi *were* (not just "may" be) a reasonable substitute for *some* patients, the antitrust guidelines affirmatively state that such evidence is not enough to defeat market definition because "properly defined antitrust markets often exclude some substitutes to which some customers might turn."[9]  Instead, to include Symjepi in the product market even after its 2019 introduction, Prof. Willig would have to present evidence that in response to a 5% price increase for EAIs, a high enough percentage of all customers in the EAI market would switch to Symjepi to make that 5% price increase unprofitable.[10]  He never provides such evidence, and my evidence on the hypothetical monopolist test proves the contrary.[11]

18.   **b. Professor Willig Provides No Evidence to Show that Each PBM Is Its Own Market.**  In addition to vaguely speculating that the market might be broader than the U.S. EAI market, Prof. Willig also vaguely suggests that it might be narrower.  He asserts that because EAI manufacturers negotiate with individual PBMs and the prices they negotiate vary, "competition does not occur in one large national market. Rather, competition differs importantly across PBMs…. Therefore, to understand the extent of Mylan's market power and the competitive impacts of its actions, it is critical to evaluate this competition at the PBM level."[12]  He adds that "[t]he Horizontal Merger Guidelines recognize that '[i]f prices are negotiated

---

[8] Keating, Orszag, Willig. "*The of the Circle Principle in Market Definition*", The Antitrust Source Vol. 17 (2018) ("The principle of adding products… to a candidate market in order of closeness of substitution is referred to…as the 'circle principle' …In this article, we show that are a compelling reason based on product and economic analysis, for continued adherence to the circle principle in market definition.")

[9] Elhauge Merits Report ¶10 & n.3 (citing (DOJ/FTC Horizontal Merger Guidelines §4 (2010)).

[10] Elhauge Merits Report ¶ 11.

[11] Elhauge Merits Report ¶ 12-18.

[12] Willig Report ¶¶ 256-259.

Highly Confidential: Subject to Protective Order

individually with customers, the hypothetical monopolist test may suggest relevant markets that are as narrow as individual customers.'"[13]

19.    In short, while vaguely hinting that sales of EAIs to each PBM might be its own relevant market, Prof. Willig never actually so opines.  And for good reason.  He has not remotely met the standards for proving a relevant market for each PBM.  His point that competition differs across PBMs merely shows that the market is differentiated, and the fact that a market is differentiated does not suffice to treat every differentiated portion of it as a separate market.  Nor does the mere fact that prices are individually negotiated suffice to show that each buyer is a separate market.  Otherwise almost every product market would be broken down into a buyer-specific market, and for most of those buyer-specific markets, some seller would be a monopolist with 100% market share.  Neither the fact that PBMs differ nor the fact that manufacturers negotiate individually with them provide any indication that a hypothetical monopolist would find it profitable to raise prices to individual PBMs by more than 5% without being constrained by the fact that those individual PBMs could switch to negotiating with other EAI sellers or that their members could switch to other PBMs or sources for the EAIs.

20.    The Guidelines do indicate that price discrimination markets could theoretically be defined as narrowly as individual customers, or targeted sets of customers, but only if the hypothetical monopolist test supports that definition.[14]  To show that, Prof. Willig would have to show not only that prices vary across customers, but that this reflects a durable price discrimination to persistently charge some set of customers at least 5% over the competitive price level without them switching to rival EAIs or sources for EAIs.[15]  Prof. Willig provides no evidence to support such a showing.  He simply cherry picks by selectively highlighting the greatest possible difference in maximum possible rebates between two large PBM's in one year, without showing that the PBM (Caremark) getting the lower maximum rebate actually paid significantly higher net prices than the average market price or that any net price difference persisted over the years and was not explicable by efficiency differences.[16]  And he simply disregards the fact that three of the top five PBM's are within one percentage point of each other in terms of rebates.[17]  As for his insinuations that there may be regional geographic markets, he ignores the fact

---

[13] Willig Report ¶ 258 (quoting DOJ/FTC Horizontal Merger Guidelines §4.1.4 (2010).

[14] DOJ/FTC Horizontal Merger Guidelines §4.1.4 (2010).

[15] DOJ/FTC Horizontal Merger Guidelines §4.14 (2010).

[16] Willig Report ¶ 260.

[17] MYEP01228274

Highly Confidential: Subject to Protective Order

that many larger PBM's have nationwide geographic reach and negotiate on the national level for their national formularies,[18] which would make a national geographic market appropriate.

21.     Further, the antitrust agencies make clear that they "identify price discrimination markets only where they believe there is a realistic prospect of an adverse competitive effect on a group of targeted customers."[19]  That is not the case here because the anticompetitive effects flow from the foreclosure of rivals, who without foreclosure could turn to selling to any customers in the market.  The agencies also make clear that even when narrower price discrimination markets could be defined, they instead often "rely on aggregated market shares that can be more helpful in predicting the competitive effects."[20]  Here, that is the case because aggregated market shares are more relevant to whether Mylan had the requisite marketwide power to foreclose a large enough share of the market to have exclusionary effects that would hamper rival competition and raise market prices.

### B. Monopoly Power

22.     **a. High Market Shares Coupled with High Barriers to Entry and Expansion**.  Prof. Willig falsely asserts regarding my conclusion that Mylan had monopoly power, "Professor Elhauge's first basis of support is the fact that Mylan had high market share."[21]  That is not at all what I said.  I stated, "A high market share indicates that a firm has significant market power when the market *also* exhibits high barriers to the entry of new rivals and the expansion of existing rivals."[22]  Prof. Willig attacks a straw man by omitting the rest of my test.  Likewise, while Prof. Willig claims that in my class certification deposition I "concede[d]" that high market share was not enough, in fact I said precisely the same thing, that one has to couple high market share with proof of high "barriers to entry" and that the combination was "still the most commonly used method for inferring market power."[23]  Most of the rest of his critique simply points out that low barriers to entry or expansion *could* undermine an inference of monopoly power, without responding

---

[18] "MREPLY87 top pbms have nationwide reach.xlsx" (showing that the top 10 PBMs constituting 92% of the market all have plans in all 50 states).

[19] DOJ/FTC Horizontal Merger Guidelines §4.14 (2010).

[20] DOJ/FTC Horizontal Merger Guidelines §4.14 (2010).

[21] Willig Report ¶ 62.

[22] Elhauge Merits Report ¶ 34.

[23] Elhauge Class Depo. 119.

Highly Confidential: Subject to Protective Order

to my showing that they were high in this market with any evidence that they were actually low in this market.[24]

23.    The only barrier that he responds to at all is to the point that familiarity and risk aversion creates barriers to expansion, and his only response is to argue that Mylan acquired those advantages through procompetitive conduct and not that these barriers are low.[25]   But whether a firm has monopoly power that is protected by barriers to entry or expansion has nothing to do with whether a firm acquired that power or those barriers anticompetitively.   For example, a firm that creates an innovative patent that gives it absolute monopoly power over some market certainly has monopoly power, even though it achieved the barrier to entry (i.e., the patent) through procompetitive conduct.   That does not alter the fact that if it then coupled that monopoly power with some form of anticompetitive exclusionary agreement, the latter would be anticompetitive.   Prof. Willig here is making the fundamental mistake of conflating the existence of power and barriers with the existence of anticompetitive conduct, when they are separate inquiries.

24.    The only other argument he offers on market shares is that they can be unreliable in bid markets, and that here EAI makers bid for the business of PBMs.[26] But the very literature that he cites stresses that market shares should not be used in bid markets when "'the past is a poor predictor of future market shares.'"[27]   The basic notion is that in a bid market, market shares can swing wildly from year to year, even when the bidders are equally effective competitors, if some firms win more bids in some year.   But that has nothing to do with this market, where Mylan maintained a persistently high market share ranging from 87-99.7% for five years.[28] Nor is it the case in this market that "'each firm has a chance to win new contracts, so any attempt by one or more firms to raise price above the competitive level will allow firms that have won relatively few bids to expand their sales significantly and defeat the attempted price increase.'"[29]   Instead, here Mylan was able to consistently raise the EpiPen price more and more over the competitive level, and rivals were never able to expand their sales significantly and defeat those price increases.[30]

---

[24] Willig Report ¶¶ 268-273; Elhauge Merits Report ¶ 35.

[25] Willig Report ¶ 272.

[26] Willig Report ¶ 265.

[27] Willig Report ¶ 265 (quoting James A. Langenfeld, *The Merger Guidelines As Applied*, THE ECONOMICS OF THE ANTITRUST PROCESS 41, 51 (1996)).

[28] Elhauge Merits Report Figure 1.

[29] Willig Report ¶ 265 (quoting James A. Langenfeld, *The Merger Guidelines As Applied*, THE ECONOMICS OF THE ANTITRUST PROCESS 41, 51 (1996)).

[30] Elhauge Merits Report ¶¶ 34-39.

Highly Confidential: Subject to Protective Order

25.    **b. Power Over Price.**  (i) PBMs' Alleged Buyer Market Power.  Prof. Willig argues that Mylan could not have had any power over price because PBMs are sufficiently concentrated to have buyer market power.[31]  But other than pointing to the fact that the largest PBMs have buyer market shares of 6-37%, Prof. Willig does not point to any evidence that these PBMs exercised a buyer market power that constrained EpiPen pricing.  His willingness to infer buyer market power from shares of 6-37% is more than a little ironic given that he claimed Mylan's market shares of 87-99.7% did not suffice to infer it had market power.[32]  He points to no evidence that there are large barriers to entry or expansion among PBMs or that buyers with such market shares exercised a power over price.  Indeed, the last seems inconsistent with his observation that ███████████████████████████ ██████████████████████████████████████████████████████████████[33]  Nor does he point to any evidence that these PBMs were able to constrain Mylan's EpiPen price increases, which is affirmatively disproven by the fact that Mylan's profit margin started high and it was able to continually increase prices faster than costs to make its profit margin even higher.[34]  Nor does Prof. Willig address the issue that, even if one otherwise thought firms with 6-37% share had market power, here any such buyer power would be countervailed by the fact that they face a monopolist seller of EpiPens with 87-99.7% market share.

26.    Even if one thought that Prof. Willig had established that PBMs had buyer market power relative to Mylan in the EAI market, his assertion that this suffices to negate seller market power and anticompetitive effects runs contrary to the U.S. agency guidelines.   The U.S. agency guidelines state:

> Powerful buyers are often able to negotiate favorable terms with their suppliers. Such terms…can reflect price discrimination in their favor… [Th]e Agencies do not presume that the presence of powerful buyers alone forestalls adverse competitive effects flowing from the merger. Even buyers that can negotiate favorable terms may be harmed by an increase in market power… Furthermore, even if some powerful buyers could protect themselves, the agencies also consider whether market power can be exercises against other buyers.[35]

---

[31] Willig Report ¶ 273-276.
[32] Willig Report ¶ 263.
[33] Willig Report ¶ 260 & Figure 14.
[34] Elhauge Merits Report ¶ 36-37.
[35] DOJ/FTC Horizontal Merger Guidelines §8 (2010)

Highly Confidential: Subject to Protective Order

In short, even if the most powerful PBMs can get additional rebates that price discriminate in their favor, that does not mean they are not harmed by Mylan's monopoly power, which can increase market prices by more than their discriminatory advantage.  Nor does it mean that their ability to secure lower market prices for themselves protects other buyers and the market at large.

27.    ii) Direct Evidence of Power Over Price.  I showed that there was direct evidence that Mylan exercised a power over price because, even starting with a price way above cost, it was able to continue to increase prices faster than costs year after year during the relevant period.[36]  Prof. Willig does nothing to rebut this showing. Instead, he offers two irrelevant responses.

28.    First, he argues that, although EpiPen net prices continued to rise after Auvi-Q's entry, the rate of increase in EpiPen prices did slow down after Auvi-Q entry.[37]   But this evidence actually cuts the other way.   In this case, we had substantial entry by a well-established firm like Sanofi into a market where the incumbent had a 99.7% pre-entry market share and was earning high monopoly profits.[38]  Basic economic theory predicts that, absent an anticompetitive restraint, Sanofi's entry into such a monopoly should have lowered prices *at least somewhat* below pre-entry levels under any plausible economic model of this market.[39]  True, even if entry should reduce prices below the levels that would have existed without entry, prices might rise above past levels if the price-reducing effects of entry were offset by large increases in costs.   But here the evidence showed that the price increases far outstripped any increase in costs.[40]  The fact that here instead EpiPen prices continued to rise faster than costs *after* such entry actually indicates a remarkable degree of monopoly power and the existence of enormous anticompetitive restraints.

29.    Prof. Willig argues that Mylan could not have monopoly power because Mylan increased its prices faster before Auvi-Q's entry and after Auvi-Q's exit than it did during periods when Mylan faced no competition from Auvi-Q.[41]  That is

---

[36] Elhauge Merits Report ¶ 36-37.
[37] Willig Report ¶ 278 & Figure 11.
[38] Elhauge Merits Report ¶ 36 & Figure 1.
[39] The transition from monopoly to a duopoly reduces prices whether one uses a model of price competition (Bertrand) or quantity competition (Cournot) without collusion.  *See* Walter Nicholson & Christopher Snyder, INTERMEDIATE MICROECONOMICS AND ITS APPLICATION Ch. 12 (11th ed., Cengage Learning: 2009).
[40] Elhauge Merits Report ¶ 36-37.
[41] Willig Report ¶ 277-280.

13

Highly Confidential: Subject to Protective Order

economic nonsense.  All it shows is that Auvi-Q imposed **some** competitive restraint—*i.e.,* that Auvi-Q and EpiPen were in the same market, so that, without Auvi-Q, Mylan could act like a 100% monopolist and raise EpiPen prices even faster.  It does not at all show that Auvi-Q imposed a **sufficient** competitive constraint to prevent Mylan from raising prices over competitive levels, and price-cost evidence indicates the opposite.  It is certainly the case that the competitive constraint imposed by Auvi-Q matters; that is precisely why the anticompetitive foreclosure of Auvi-Q competition anticompetitively raised prices.  But the fact that the existence of competitors matters does not in any way mean that a dominant firm has no market power.

30.  **c. Power to Exclude.**  As I showed, Mylan exercised a power to exclude because it was able to impose inefficient exclusionary agreements that foreclosed a substantial share of the market and restrained Auvi-Q sales.[42]  Prof. Willig does not really respond to these points, but rather rejects the test explicitly and then implicitly.  He rejects the test explicitly by stating that it is circular because one needs evidence of monopoly power to determine whether there has been anticompetitive foreclosure.[43]  There is no circularity because traditional antitrust analysis points out that the purpose of finding market power is to infer whether anticompetitive effects are likely, so that direct proof of anticompetitive effects obviates the need to prove market power in other ways.  Absent monopoly power, Mylan would not have been able to impose such vast inefficient foreclosure across such a wide swathe of the market, so we can infer from the fact that it did so that it must have had monopoly power.  He then rejects the test implicitly by saying Mylan did not exercise a power to exclude because the Auvi-Q product continues to be sold by kaleo today.[44]  This is an implicit rejection because the power to exclude test has never demanded evidence that the monopolist literally drove every rival completely out of the market.  If that were the test, it would be limited to cases where firms literally have 100% market share, and clearly monopoly power can be found with less than 100% market share.

---

[42] Elhauge Merits Report ¶ 39.
[43] Willig Report ¶ 281.
[44] Willig Report ¶ 282.

Highly Confidential: Subject to Protective Order

## II. THE NUVIGIL SETTLEMENT CREATED A LARGE AND UNEXPLAINED REVERSE PAYMENT THAT DELAYED THE ALLOWED ENTRY DATE IN THE EPIPEN SETTLEMENT

### A. As a Matter of Economics, a Reverse Payment Can Be Large and Unexplained in a Way that Produces Anticompetitive Entry Delay Regardless of Whether it is Explicit or in the EpiPen Settlement

31.    Mr. Orszag falsely asserts that my approach is "very different" from showing there "was a 'reverse' payment and that it was both large and unexplained by reasons unrelated to an anticompetitive delay in entry."[45]   In fact, my approach showed precisely that.   I showed that the Nuvigil settlement created a large reverse payment from Mylan to Teva, that this reverse payment resulted in an anticompetitive delay in the allowed entry date, and that the EpiPen settlement and this reverse payment would have been unexplained, and indeed economically irrational, but for the fact that the Nuvigil reverse payment was given in exchange for the anticompetitive delay in the allowed entry date in the EpiPen settlement.[46]

32.    Mr. Orszag's claim about my approach being "very different" from this approach is based solely on his observation that there was no "explicit reverse payment within the EpiPen settlement itself."[47]    But Mr. Orszag offers no explanation for why, as a matter of economics, it would matter whether the reverse payment was explicitly acknowledged, in cash, or contained in the EpiPen settlement itself rather than given in exchange for it.[48]   Even if it is neither explicit nor in the settlement that sets the generic entry date, if a collateral business deal overcompensates the generic or undercompensates the patent holder, and that business deal is exchanged for that settlement, such a business deal has precisely the same economic effect as an explicit cash payment in the settlement itself.   Mr. Orzag's distinctions are thus economically irrelevant and unsupported by any

---

[45] Orszag Report ¶ 17.

[46] Elhauge Merits Report ¶¶ 85-107.

[47] Orszag Report ¶ 18.   Likewise, he based his claim about my approach on his observations that "there was no explicit payment at all in the EpiPen settlement", that "the EpiPen settlement does not contain any payment from Pfizer to Teva", and "Prof. Elhauge acknowledged in his merits deposition that if the EpiPen settlement is viewed by itself, there is no reverse payment."  Orszag Report ¶ 17-19.

[48] While ignoring the relevant economics, Mr. Orszag does offer the legal opinion that the Supreme Court decision in *Actavis* requires an explicit reverse payment that is contained in the EpiPen settlement itself.   Orszag Report ¶ 17.   Unlike Mr. Orszag, I am not offering any legal opinions, and thus I do not opine on whether his interpretation of the law is correct.

Highly Confidential: Subject to Protective Order

economic literature. In fact, the economic literature indicates precisely the opposite.[49]

33. Indeed, Mr. Orszag's own scholarship indicates precisely the opposite of the position he takes in this case. In his scholarship, he states:

> "[R]everse payment" settlements have generated extensive debate in recent years. In these settlements, *the parties settle* the patent litigation and the brand-name manufacturer *allows the generic manufacturer to enter at or after a particular date* in the future (prior to the expiration of the patent) and *pays some form of compensation* to the generic manufacturer. That *compensation can be in the form of cash payments* **or** *through a payment associated with some other business transaction* (e.g., a cross-licensing agreement) *where the brand-name manufacturer might allegedly "overpay" the generic manufacturer* **or** *the generic manufacturer might allegedly "underpay" the brand-name manufacturer*....

> Evaluating the competitive implications of settlements with collateral business arrangements . . . requires an evaluation of the collateral business transaction to determine a reasonable assessment of the market value of the transaction. *To the extent that* it is clear from the evidence that *the generic was over-compensated* **or** *the brand was under-compensated, the difference between the payment and the arms-length value of the transaction can be thought of in the same way as a "reverse payment."*[50]

Thus, his own scholarship indicates that a reverse payment settlement exists as long as: (1) there is a settlement that sets the generic entry date; (2) the brand pays the generic "some form of compensation," whether explicitly in cash and in the settlement or instead in some "collateral business arrangements" in which either "the generic was over-compensated or the brand was under-compensated."[51]

---

[49] *See, e.g.,* Aaron Edlin, Scott Hemphill, Herbert Hovenkamp & Carl Shapiro, *Actavis and Error Costs: A Reply to Critics,* ANTITRUST SOURCE, Oct. 2014, at 1 n.7 ("The competitive, business, and economic effects of cash and in-kind payments are identical so it seems evident to us that they should be treated identically.")

[50] Bret Dickey, Jonathan Orszag & Laura Tyson, *An Economic Assessment of Patent Settlements in the Pharmaceutical Industry*, 19 ANNALS HEALTH L. 367, 387, 397 (2010) (emphasis added).

[51] *Id.*

16

Highly Confidential: Subject to Protective Order

34.    The approach taken in the economics literature and in Mr. Orszag's own scholarship is precisely the approach I took in this case.  As I pointed out in my report, reverse-payment settlements simply "involve an agreement to divide a market over time in exchange for a transfer payment," and "[a] transfer payment is a transfer of value from one entity to another."[52]

> While transfer payments are often in cash, they can also take many noncash forms. . . . The amount of a transfer payment equals the net value of what is transferred to the entrant: that is, the value of any goods, services, business agreements, or cash payments given to the entrant minus the value of any goods, services, business agreements, or cash payments (such as royalties) the entrant provides in return.[53]

I then showed that the Nuvigil settlement was a reverse payment for the EpiPen settlement because it overcompensated (i.e., transferred net value to) Teva, as well as undercompensated Mylan.[54]

### B. The Nuvigil Settlement Created a Large Reverse Payment and Delay in Allowed Entry Even with the Computational Corrections

35.    Mr. Orszag argues that when various computational errors in my backup materials are corrected, the Nuvigil settlement left Mylan better off than it would have been had it continued the Nuvigil patent litigation.[55]  He asserts that this factual conclusion means that: (a) "there was no reverse payment"; (b) "[t]he Nuvigil settlement was beneficial to Mylan"; and (c) "the EpiPen settlement was necessarily procompetitive."[56]  He is correct that my backup materials contained various computational errors.  I was unaware of these computational errors, which did not correctly implement my methodology, so I adopt his corrections of them throughout

---

[52] Elhauge Merits Report ¶ 40.
[53] Elhauge Merits Report n.52.
[54] Elhauge Merits Report ¶ 103.
[55] Orszag Report ¶¶ 20-29.
[56] Orszag Report ¶ 20.  *See also id.* at ¶ 29 (stating that this fact means that standing alone the Nuvigil settlement "was economically rational for Mylan.  Therefore, Prof. Elhauge's own model shows that there was no "reverse payment" for the EpiPen settlement through the Nuvigil settlement because Mylan did not accept a loss from the Nuvigil settlement.")

Highly Confidential: Subject to Protective Order

this reply report.[57]  However, Mr. Orszag is incorrect in the three inferences he draws from these corrections, none of which he supports with any reasoning.

36.     First, Mr. Orszag's conclusion that, unless the Nuvigil patent settlement was costly to Mylan, it cannot constitute a reverse payment conflicts with his own scholarly conclusion that a collateral business deal can constitute a reverse payment if "the generic was over-compensated *or* the brand was under-compensated" by the deal.[58]  His scholarly conclusion makes economic sense because if the generic is overcompensated, the collateral business deal can induce it to accept a settlement with a later generic entry date, whether or not the side deal also undercompensates the brand.  Here, adopting all his corrections still results in the conclusion that the Nuvigil settlement benefited Teva by $547.1 million relative to continued Nuvigil litigation.[59]  Thus, even with his corrections, the Nuvigil settlement clearly produced a large overcompensation to the EpiPen generic, Teva.  That suffices to make it a large reverse payment under Mr. Orszag's own approach in his scholarship.

37.     Second, Mr. Orszag is wrong in his assertion that, unless a side business deal affirmatively harms the relevant brand, it cannot be anticompetitive but instead is "necessarily procompetitive."[60]  Such a conclusion again conflicts with his scholarship, which acknowledges that if "the generic was over-compensated *or* the brand was under-compensated . . . collateral business transactions, just like reverse payments, can be anticompetitive."[61]  Here, even with all his corrections, the entry date in the EpiPen settlement left Teva $30.8 million worse off than Teva would have been with continued EpiPen litigation.[62]  Teva thus would not have accepted such a delayed entry date in the EpiPen settlement unless Teva received a large reverse payment.  Accordingly, the large reverse payment to Teva from the Nuvigil settlement was necessary to induce Teva to accept the anticompetitvely delayed entry date in the EpiPen settlement.

---

[57] I also correct another computational error he found in my backup materials that had miscalculated Teva's expected damages from at risk launch of an EpiPen generic. *Id.* ¶57.

[58] Bret Dickey, Jonathan Orszag & Laura Tyson, *supra* note, at 397 (emphasis added); *see also id.* at 387 (noting that a reverse payment can consist of "a payment associated with some other business transaction (e.g., a cross-licensing agreement) where the brand-name manufacturer might allegedly "overpay" the generic manufacturer *or* the generic manufacturer might allegedly "underpay" the brand-name manufacturer.")(emphasis added).

[59] Rev Pmt Model Merits Reply.xlsm (Tab "Teva Nuvigil Payoff Calcs" Cell C35).

[60] Orszag Report ¶ 20.

[61] Bret Dickey, Jonathan Orszag & Laura Tyson, *supra* note, at 397 (emphasis added).

[62] *See infra* Revised Table 1.

Highly Confidential: Subject to Protective Order

38.     Indeed, correcting all the computational errors that Mr. Orszag identifies has only a small impact on the anticompetitive delay in the entry date in the EpiPens settlement.  Implementing all his corrections but otherwise following precisely the same methodology as in my initial report, the allowed entry date that the parties would have rationally agreed to in a no-payment standalone EpiPens settlement is March 14, 2013.[63]  This is only 11 days later than the date I found in my initial merits report, prior to implementing these corrections, and only slightly reduces the delay in allowed entry from 15.6 to 15.3 months.

39.     Third, Mr. Orszag is wrong that if the Nuvigil settlement left Mylan better off than continued Nuvigil litigation, that means that the Nuvigil settlement was beneficial to Mylan.  Continued Nuvigil litigation is not the right but-for baseline against which to measure the net effects of the actual Nuvigil settlement because without that settlement Mylan would not have continued to litigate, but rather would have entered into a standalone no-payment Nuvigil settlement that would have left both parties better off than with continued litigation.  Indeed, Mr. Orszag's own scholarly work indicates that whether a side business deal "under-compensated" the brand turns on whether it gives the brand less than "the market value of the transaction," which here means less than the brand could have gotten in the Nuvigil settlement if it were a standalone arms-length business deal.[64]  Implementing all Mr. Orszag's corrections, Mylan would have received a settlement payoff of $224.6 million in such a but-for Nuvigil settlement, given the Mylan bargaining power revealed by the actual combined settlement.[65]  In contrast, Mylan's actual settlement payoff from the Nuvigil settlement was $170.2 million, $54.5 million less than it would have gotten in a standalone no-payment Nuvigil settlement.  Thus, the actual Nuvigil settlement did not benefit Mylan, but rather undercompensated Mylan by $54.5 million.  Accordingly, the actual Nuvigil settlement imposed a $54.5 million reverse payment cost on Mylan relative to the but-for transaction Mylan otherwise would have negotiated.

40.     The following revises Table 1 from my initial report in order to illustrate these points.  The first three rows of Revised Table 1 report how correcting the computational errors alters the settlement payoffs, litigation payoffs, and gains

---

[63] Rev Pmt Model Merits Reply.xlsm (Tab "No Pmt Entry Dates" Cell G1").
[64] Bret Dickey, Jonathan Orszag & Laura Tyson, *supra* note, at 397.
[65] *See* Rev Pmt Model Merits Reply.xlsm (Tab "Nuvigil No Pmt Stlmt" Cell C13).

Highly Confidential: Subject to Protective Order

relative to continued patent litigation for Mylan and Teva.[66]   Because it clearly would have been economically irrational for Teva to have agreed to the EpiPen settlement absent a linkage to the Nuvigil settlement, the two settlements were clearly linked as a matter of economics,[67] and thus each party's bargaining power equals its share of the joint gains from both settlements, which is 47.3% for Mylan and 52.7% for Teva.  Without the linkage, it would likewise have been economically irrational for Mylan to have agreed to the actual Nuvigil settlement because it conferred only $17 million of Nuvigil settlement gains on Mylan, far below the $71.5 million it could have obtained given its actual bargaining power.

---

[66] Rev Pmt Model Merits Reply.xlsm (Tab "Teva Payoff Calcs" Cells C14, C34, C36; Tab "Mylan Payoff Calcs" Cells C24, C37, C38; Tab "Teva Nuvigil Payoff Calcs" Cells C21, C35, C36; Tab "Mylan Nuvigil Payoff Calcs" Cells C16, C37, C38).  The computational corrections do not change any of the Nuvigil litigation payoffs reported in Elhauge Merits Report ¶¶ 100-102, but they change the Nuvigil settlement payoffs (and thus the difference between those settlement payoffs and the Nuvigil litigation payoffs) to the figures reported in the second and third rows of Revised Table 1.  Correcting the computational error about Teva's expected damages from at risk launch of an EpiPen generic, *see* Orszag Report ¶57, changes Teva's EpiPen litigation payoff to the figure reported in the second row of Revised Table 1.  The computational corrections do not change Mylan's EpiPen litigation payoff or either party's EpiPen settlement payoff.

[67] *See infra* Part III.A.

Highly Confidential: Subject to Protective Order

| Revised Table 1: Gains from Standalone and Combined Settlements | | | | | | |
|---|---|---|---|---|---|---|
| | EpiPen | | Nuvigil | | Combined | |
| | Mylan | Teva | Mylan | Teva | Mylan | Teva |
| **Actual Settlement Payoff ($M)** | 1,012.8 | 239.4 | 170.2 | 1,178.1 | 1,183.0 | 1,417.5 |
| **Expected Litigation Payoff ($M)** | 566.1 | 270.2 | 153.2 | 631.0 | 719.3 | 901.2 |
| **Gains (Losses) from Actual Settlement Relative to Litigation ($M)** | 446.7 | (30.8) | 17.0 | 547.1 | 463.7 | 516.3 |
| **But-For Settlement Payoff ($M)** | 584.0 | 289.5 | 224.6 | 710.9 | 808.6 | 1,000.4 |
| **Gains from But-For Settlements Relative to Litigation** | 17.9 | 19.3 | 71.5 | 79.8 | 89.4 | 99.2 |
| **Gains (Losses) from Actual Settlement Relative to But-For Settlement ($M)** | 428.8 | (50.1) | (54.4) | 467.2 | 374.4 | 417.1 |

41.     The but-for standalone no-payment settlements for EpiPen and Nuvigil would thus be the settlements that for each separate settlement conferred 47.3% of the gains of each settlement on Mylan and 52.7% on Teva.  The but-for standalone no-payment Nuvigil settlement that comes closest to that bargaining power has an allowed generic entry date of May 9, 2014, 24.8 months earlier than the entry date allowed under the actual settlement.[68]  Likewise, the but-for standalone no-payment EpiPen settlement that comes closest to that bargaining power has an allowed generic entry date of March 14, 2013, 15.3 months earlier than the entry date allowed under the actual settlement.[69]  The fourth row reports the but-for settlement payoffs with those but-for allowed entry dates, and the fifth row reports the gains relative to

---

[68] *See* Rev Pmt Model Merits Reply.xlsm (Tab "Nuvigil No Pmt Stlmt" showing payoffs and bargaining power from a no-payment Nuvigil settlement having a May 9, 2014 date).  Because differences in entry dates come in whole days that confer large profit changes per day, the split of gains with this date are not exactly 47.3%/52.7%, but rather 47.4%/52.6%, because that is as close as one can come with any but-for allowed entry date.

[69] *See* Rev Pmt Model Merits Reply.xlsm (Tab "No Pmt Entry Dates" Cell G1").

Highly Confidential: Subject to Protective Order

continued litigation for each party from those but-for standalone no-payment settlements.[70]

42.    The sixth row reports the gains and losses to each party from the actual settlement relative to the standalone settlements they would have reached in arms-length negotiations in the but-for world.  This but-for baseline is the relevant comparison because standalone no-payment settlements on both EpiPen and Nuvigil would have been profitable relative to continued litigation on either, as the fifth row shows.  Thus, the actual Nuvigil settlement cost Mylan $54.4 million relative to the but-for Nuvigil settlement that Mylan would have obtained without any linkage. Accordingly, the actual Nuvigil settlement imposed a reverse payment cost of $54.4 million on Mylan, not a benefit.  It also conferred a reverse payment value of $467.2 to Teva relative to the but-for Nuvigil settlement.  These are clearly large reverse payment costs and values.

43.    Further, the result of linking the Nuvigil settlement to the EpiPen settlement not only makes the former a reverse payment for the latter, but also delays the allowed generic entry date for EpiPen by 15.3 months, which is clearly an anticompetitive effect, not a procompetitive one.  Likewise, the linkage delays the allowed generic entry date for Nuvigil by 24.8 months.  As the fifth row reports, in these standalone no-payment settlements would confer a gain of $89.4 million on Mylan and $99.2 million on Teva, for total joint settlement gains of $188.5 million. This is much less than the $978.0 million in joint gains the parties generated by combining the two settlements and agreeing to delayed entry in each market.  This indicates that the parties expected that they would anticompetitively gain $789.5 million by combining the two settlements, and that $789.5 million difference in settlement gains comes directly at the expense of consumers.  This disproves Mr. Orszag's unsupported assertion that it is somehow not possible for Mylan and Teva to profit at consumers' expense unless each settlement on a standalone basis harmed one party relative to continued litigation.

44.    In short, even if the Nuvigil settlement conferred benefits on Mylan relative to continued Nuvigil litigation, the Nuvigil settlement made Mylan worse off than it would have been with a but-for standalone Nuvigil settlement given Mylan's bargaining power.  The Nuvigil settlement was thus a large costly reverse payment from Mylan.  Further, even if Mylan had received a benefit from the Nuvigil settlement, the Nuvigil settlement was still a large and valuable reverse

---

[70] *See* Rev Pmt Model Merits Reply.xlsm (Tab "No Pmt Stlmt Payoffs" Cells C14 and C36 for EpiPen payoffs and Tab "Nuvigil No Pmt Stlmt" Cells C13 and C34 for Nuvigil payoffs).

Highly Confidential: Subject to Protective Order

payment to Teva that was necessary to get Teva to agree to an EpiPen settlement that anticompetitively delayed the allowed entry date.  Mr. Orszag's corrections thus do not alter the fact that the Nuvigil settlement was a large reverse payment and that the EpiPen settlement was anticompetitive, not procompetitive.

### C. The Nuvigil Settlement Created a Large Reverse Payment and Delay of Allowed Entry Even with Varying Estimates of Nuvigil Patent Strength

45.     Because Prof. Torrance opined that any estimated patent strength between 10-30% was equally possible in the Nuvigil case, his opinion generates an overall expected patent strength of 20% that I used in my base case estimates.[71]  But I also did a sensitivity analysis that showed how the results would vary for any estimate of Nuvigil patent strength the parties could have had that was consistent with Mylan's plans to launch at risk, which was any Nuvigil patent strength estimate from 0% to 40.1%.[72]  Corrected for the computational errors, Revised Figure 22 below shows this effect.

**Revised Figure 22. Effect of Nuvigil Patent Strength on Delay in Allowed Generic EpiPen Entry Caused by the Reverse Payment[73]**



---

[71] Elhauge Report ¶ 96.

[72] Elhauge Report ¶ 133 & Figure 22.

[73] Rev Pmt Model Merits Reply.xlsm (Tab "Nuvigil Patent Strengths").

Highly Confidential: Subject to Protective Order

46.    Ignoring my sensitivity analysis, Mr. Orszag argues that, if one assumes the Nuvigil patent strength was 25.7% or higher without the computational corrections or 17.7% or higher with the computational corrections, the Nuvigil settlement was profitable to Mylan relative to continued litigation, which he claims means that at those patent strength estimates the Nuvigil settlement could not be a reverse payment.[74]  His argument is incorrect for several reasons.

47.    First, as detailed in the preceding Section II.B, Mr. Orszag's unsupported premise that there is no reverse payment if the Nuvigil settlement was profitable is incorrect as a matter of economics and conflicts with his own scholarship.  As his own scholarship indicates, a reverse payment exists if the Nuvigil settlement either overcompensated Teva *or* undercompensated Mylan relative to a but-for standalone settlement.  Given the combination of overcompensation and undercompensation, one can then predict what the economically rational but-for EpiPen settlement entry date would have been without that overcompensation and undercompensation.  One should not ignore overcompensation or undercompensation to one of the parties, because both affect the delay in the allowed entry date.

48.    Second, because of his mistaken premise, Mr. Orszag performs the wrong sensitivity analysis.  He does not ask whether changing the Nuvigil patent strength changes the conclusion that the Nuvigil settlement created an anticompetitive delay in the allowed EpiPen entry date.  He asks only whether changing the Nuvigil patent strength means that one of the parties, Mylan, was not undercompensated by the Nuvigil settlement relative to a continued litigation baseline.  One reason this is flawed is that he is not using the correct but-for baseline.  But even if we used his incorrect but-for baseline, his approach would be incorrect because if, at a given patent strength estimate, the Nuvigil settlement's overcompensated Teva sufficiently to delay EpiPen entry under Mr. Orszag's baseline, then we have the relevant effect even if Nuvigil settlement did not also undercompensate Mylan relative to his baseline.  The correct sensitivity analysis would accordingly investigate how varying estimates of the Nuvigil patent strength change the combination of overcompensation to Teva and undercompensation to Mylan and whether those combined changes alter the estimated delay in the allowed entry date.  That is precisely the sensitivity analysis that I performed in Revised Figure 22 above, which Mr. Orszag ignores.

---

[74] Orszag Report ¶¶ 30-33.

24

Highly Confidential: Subject to Protective Order

49.     Third, Mr. Orszag's own attempted sensitivity analysis fails to correctly identify the plausible Nuvigil patent strength levels that could eliminate any reverse payment cost to Mylan, for two additional reasons.  To begin with, he incorrectly used continued Nuvigil litigation as his but-for benchmark to determine whether the actual Nuvigil settlement conferred gains or losses on Mylan relative to the but-for world.  Because the but-for result (without the linkage to the EpiPen settlement) would have been a standalone Nuvigil settlement, he should instead have used that as his but-for benchmark to determine whether the Nuvigil settlement imposed a reverse payment cost on Mylan.  Further, Mr. Orszag's sensitivity analysis errs by allowing the Nuvigil patent strength to vary from 0% to 100%.[75]  Most of this is above even the top of the 10-30% range estimated by Professor Torrance.  Moreover, most of it is also above the highest Nuvigil patent strengths that we can infer Mylan could have perceived ██████████████████████ and that Teva could have perceived (given that it accepted the actual joint settlement), assuming they are economically rational.  Most of Mr. Orszag's range thus assumes that the parties perceived patent strength levels that are economically inconsistent with their other decisions, which is not sound economic analysis.

50.



51.     Teva also believed that ████████████████████████ and filed a preliminary injunction in an attempt to prevent Mylan from doing so.[78]  This means that Teva must have believed that Mylan did not perceive the Nuvigil patent strength

---

[75] Orszag Report Figures 1-2.
[76] Elhauge Merits Report ¶ 93 (citing MYEP01378720 at 26-27).
[77] Elhauge Merits Report ¶ 131.
[78] Teva_EPI_MDL00006545.

Highly Confidential: Subject to Protective Order

to be greater than 40.1%.  Even if we thought that Teva's perception of the Nuvigil patent strength was higher than Mylan's, it is not reasonable to assume, as Mr. Orszag does, that Teva's perceived patent strength was as high as 100%.  This is because Teva's acceptance of the actual combined settlement provides a bound on the patent strength it could have perceived in the Nuvigil settlement.  If Teva believed the Nuvigil patent strength were greater than 42.7%, Teva would have expected to lose money on the actual combined EpiPen-Nuvigil settlement.[79]  This means that we know from the actual settlement that Teva did not believe the Nuvigil patent strength to be greater than 42.7% if it was acting rationally when accepting that settlement.

52.    In short, given economic rationality, the highest perception of Nuvigil patent strength that the parties could have had is 40.1% for Mylan and 42.7% for Teva.  Neither upper bound depends on the firms holding the same patent strength as each other.  Mr. Orszag is thus simply wrong when he asserts that, if the parties may have held different views of on Nuvigil patent strength, then all possible patent strength levels remain relevant.[80]

53.    In Figure 100 below, I correct both of these flaws in Mr. Orszag's Figure 2 and illustrate both the value of the reverse payment to Teva and its cost to Mylan across the entire range of patent strengths from 10% (the lower end of Professor Torrance's range) to the maximum of 40.1% for Mylan and 42.7% for Teva.  To obtain these values I calculate, at each patent strength level, the rational entry date in a but-for standalone no-payment Nuvigil settlement and the but-for settlement payoffs for each of Mylan and Teva at that date.[81]  I then calculate the actual Nuvigil settlement's reverse payment cost to Mylan and value to Teva as the difference between their actual settlement payoffs and their but-for settlement payoffs.[82]  As with all the analysis in this reply report, this chart corrects all the computational errors in my backup that were identified by Mr. Orszag.

**Figure 100: Nuvigil Settlement's Reverse Payment Value to Teva and Cost to Mylan Across Range of Nuvigil Patent Strengths[83]**

---

[79] Rev Pmt Model Merits Reply.xlsm (Tab "Teva Nuvigil Payoff Calcs" Cell C35 showing Teva's gains from the combined settlement to be $1.5 million when Nuvigil patent strength is set to 42.7% and negative $0.8 million when Nuvigil patent strength is set to 42.8%).

[80] Orszag Report ¶ 34.

[81] Rev Pmt Model Merits Reply.xlsm (Tab "Nuv Pat Str Sens").

[82] Rev Pmt Model Merits Reply.xlsm (Tab "Nuv Pat Str Sens").

[83] Rev Pmt Model Merits Reply.xlsm (Tab "Nuv Pat Str Sens").

Highly Confidential: Subject to Protective Order



54.     As Figure 100 shows, across all Nuvigil patent strength levels up to the maximum of 40.1% that Mylan could have perceived, the Nuvigil settlement inflicted a reverse payment cost to Mylan.  This disproves Mr. Orszag's claim that (with the computational corrections) any Nuvigil patent strength level above 17.7% proves there was no undercompensation (i.e., reverse payment cost) to Mylan.[84] Moreover, across all Nuvigil patent strength levels up to the 42.7% maximum that Teva could have perceived, Figure 100 shows that the Nuvigil settlement conferred a large reverse payment value on Teva, which Mr. Orszag ignores in his analysis. Further, Figure 100 shows that even if one assumes that Mylan and Teva had different perceptions of Nuvigil patent strength, for any combination of perceived patent strengths they could have rationally had, Mylan suffered a reverse payment cost and Teva gained a reverse payment value.  This disproves Mr. Orszag's claim that the reverse payment can be eliminated by simply assuming the parties had different perceptions of Nuvigil patent strength.[85]

55.     Finally, my analysis also considered the possibility that the parties' estimates of expected patent strength might vary from the midpoint of the ranges that Prof. Torrance opined was possible for both patents.[86] Correcting the computational errors, Revised Table 4 below shows the months of delay in allowed entry date caused by the reverse payment for combinations of patent strength perceptions for the EpiPen and Nuvigil settlements within Professor Torrance's

---

[84] Orszag Report ¶ 33 & Figure 2.
[85] Orszag Report ¶ 34.
[86] Elhauge Report ¶ 134 & Table 4.

Highly Confidential: Subject to Protective Order

estimated ranges.[87]   As it shows, the delay in allowed entry is substantial for any combination of Nuvigil and EpiPen patent strength estimates within Professor Torrance's estimated ranges.

| Revised Table 4: Months of Delay in Allowed Entry at Various EpiPen and Nuvigil Patent Strengths | | | | | |
|---|---|---|---|---|---|
| Perceived Nuvigil Patent Strength | Perceived EpiPen Patent Strength | | | | |
| | 5% | 10% | 15% | 20% | 25% |
| 10% | 25.0 | 20.3 | 15.5 | 10.6 | 5.6 |
| 15% | 24.9 | 20.2 | 15.4 | 10.5 | 5.5 |
| 20% | 24.9 | 20.1 | 15.3 | 10.3 | 5.3 |
| 25% | 24.7 | 19.9 | 15.1 | 10.2 | 5.2 |
| 30% | 24.5 | 19.7 | 14.8 | 9.8 | 4.9 |

### D. Higher Estimated Expected Damages Would Not Alter the Fact that the Nuvigil Settlement Created a Large Reverse Payment and Delay in Allowed Entry

56.     Mr. Orszag claims that increasing Mylan's expected damages for launching a Nuvigil generic by an arbitrary 33% (either by assuming a willful infringement multiplier or ongoing price erosion) can sufficiently lower Mylan's Nuvigil litigation payoff to generate the result that the Nuvigil settlement was net profitable for Mylan relative to continued Nuvigil litigation, which he claims means there is no reverse payment.[88]   As detailed above in Sections II.B-C, he is wrong that there is no reverse payment or anticompetitive effect if the Nuvigil settlement was net profitable for Mylan relative to continued Nuvigil litigation.   The correct approach is to consider the amount by which the Nuvigil settlement overcompensated Teva or undercompensated Mylan as compared to a but-for standalone settlement, and then to assess anticompetitive effects by estimating the effect of such overcompensation or undercompensation on the delay in the allowed EpiPen entry date.

57.     Even if one accepts Mr. Orszag's arbitrary assumption that Mylan may have expected damages for launching Nuvigil generic to be 33% than that which I calculated, the Nuvigil settlement continues to contain a transfer of value from Mylan to Teva.   Mylan's expected damages from entering at risk and then losing the

---

[87] Rev Pmt Model Merits Reply.xlsm (Tab "Nuvigil Patent Strengths").
[88] Orszag Report ¶¶ 38-41.

Highly Confidential: Subject to Protective Order

patent litigation were $376.7 million.[89]   Increasing these by 33% would increase damages by $124.3 million.   With a 20% chance of losing the Nuvigil patent litigation, this means that increasing Mylan's expected damages by 33% would reduce its expected litigation payoff by 20% * $124.3 million = $24.9 million.  While this reduction in expected litigation payoff increases the benefit of settlement relative to continued litigation, it does little to alter the cost of the reverse payment to Mylan or its value to Teva, because both a no-payment settlement and a reverse payment settlement eliminate any risk of paying damages.   The only way that increased expected damages affect the cost of the reverse payment is through a change in the bargaining power revealed by the actual settlement.   Increasing Mylan's expected Nuvigil damages by 33% has the effect of increasing Mylan's bargaining power as revealed by the actual settlement, from 47.3% to 48.3%.[90]  This increase in Mylan bargaining power pushes the no-payment Nuvigil settlement entry date that would be most consistent with settlement one month later, to June 9, 2014. Under such a settlement, Mylan would expect profits of $222.2 million, as compared to $170.2 million under the actual settlement.[91]   Teva would expect profits of $731.5 million, as compared to $1,178.1 million under the actual settlement.[92]  This means that, even under Mr. Orszag's assumption of expected damages arbitrarily inflated by 33%, the reverse payment cost Mylan $52.0 million and provided value of $446.4 million to Teva, which is only slightly below the reverse payment cost to Mylan of $54.4 million and value to Teva of $467.2 million without any enhancement of damages.[93]

58.     Thus, not only is Mr. Orszag wrong that assuming 33% higher expected damages would eliminate the reverse payment, but such an assumption would not even significantly change its magnitude.   Moreover, Mr. Orszag also provides no sound basis for believing that Mylan expected damages to be higher than my merits report estimated, much less 33% higher.   He offers two reasons why he thinks expected damages might be 33% higher: (1) ongoing price erosion and (2) the risk that a finding of willful infringement might lead to enhanced damages.[94]  Neither are persuasive.

---

[89] Rev Pmt Model Merits Reply.xlsm (Tab "Mylan Nuvigil Payoff Calcs" Cell C13).

[90] Rev Pmt Model Merits Reply 33 pct inc dmgs.xlsm (Tab "Mylan Nuvigil Payoff Calcs" Cell C40).

[91] Rev Pmt Model Merits Reply 33 pct inc dmgs.xlsm (Tab "Nuvigil No Pmt Stlmt").

[92] Rev Pmt Model Merits Reply 33 pct inc dmgs.xlsm (Tab "Nuvigil No Pmt Stlmt").

[93] Section II.A Revised Table 1.

[94] Orszag Report ¶38.

Highly Confidential: Subject to Protective Order

59.   First, Mr. Orszag's argument that Mylan would expect that it might have to pay Teva damages to compensate Teva for ongoing price erosion conflicts with ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Mr. Orszag acknowledges that I made this point in my deposition, but he provides no response to it.[97]

60.   Second, Mr. Orszag offers no sound basis for concluding that Mylan would expect that the risk of enhanced damages would increase its expected damages by 33%.[98]   While he acknowledges my deposition testimony that such damages are unlikely in this case,[99] he does not engage in any analysis of his own to rebut that testimony, but instead he arbitrarily assumes that expected damages to Mylan from a Teva launch of generic Nuvigil could be 33 percent higher than I calculated.[100]   He cites no evidence specific to this case to suggest that a finding of



[95] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

[96] Frank & Salkever, *Generic Entry and the Pricing of Pharmaceuticals*, 6 JOURNAL OF ECONOMICS & MANAGEMENT STRATEGY 75, 75. (Spring 1997) ("Our results provide strong evidence that brand-name prices increase after generic entry"); Tori Marsh, *Prices for Brand Drugs Spike Before a Generic is Released: Here's Why,* GOODRX (July 27, 2018), https://www.goodrx.com/blog/prices-for-brand-drugs-spike-before-a-generic-is-released-heres-why/.

[97] Orszag Report ¶39 & n.47; *see also* Elhauge Merits Deposition 159 (in response to a question about whether "ongoing price erosion damages . . . could continue after infringement is found by a court? " , answering "I don't see how in this case because they didn't expect that the branded price would go down.  So with generics, there wouldn't be an erosion of their branded price. If there was such a thing, I don't think it would apply to the projections in this case.")

[98] Orszag Report ¶¶ 38-40.

[99] Orszag Report ¶39.

[100] Orszag Report ¶40.  He does claim that this 33% increase lies within the range of divergent opinions between Mylan and Teva on expected damages from generic entry in the EpiPen litigation.   Orszag Report ¶40.  This claim fails for two reasons.

First, it is based on the uncorrected figures.  Implementing the corrections that he identifies, Mylan expected Teva's damages from a Teva launch of an EpiPen generic were $130.7 million

Highly Confidential: Subject to Protective Order

willful infringement was at all plausible.  Nor does he even offer any general statistics about the likelihood of findings of willful infringement that might suggest a finding of willful infringement could be sufficiently likely to change any of my results.  Indeed, he ignores both case-specific evidence that the patent issues made willful infringement implausible and general evidence indicating willful infringement was especially unlikely in Paragraph IV cases like this one, as detailed below.

61.    His claim that willful infringement could increase Teva's expected damages from a Teva launch of generic Nuvigil by 33%[101] necessarily assumes that there would be significant (at least 11%, even if damages were trebled) odds that a court would find willful infringement, even in a case where the generic position was so reasonable that a reasonable patent attorney would expect that there were 70%-90% odds that the generic would not be found to infringe a valid patent at all.[102]  He offers no explanation for how he could possibly think that those two odds could simultaneously hold.  He also ignores copious case-specific and general evidence that a finding of willful infringement was particularly *unlikely* in this case and in Paragraph IV cases generally.

62.    The case-specific evidence indicating that a finding of willful infringement was particularly unlikely in this case is manifold.  First, Mr. Orszag ignores ███████████████████████████████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ Second, Teva would only rationally accept the actual settlement if it believed its chances of winning the Nuvigil litigation to be less than 42.8%.[104] A finding of willful infringement seems particularly unlikely when even the patent

---

and Teva expected its damages to be $143.1 million.  Rev Pmt Model Merits Reply.xlsm (Tab "Mylan Payoff Calcs" Cell C22 and Tab "Teva Payoff Calcs" Cell C22).  Teva's expected damages from a launch of an EpiPen generic are therefore only 10% higher than Mylan's, which is less than the 33% enhanced damages from a Nuvigil generic launch that he conjures from thin air.

Second, Mr. Orszag provides no basis for why divergent opinions on expected damages for an entirely different product (EpiPen) are remotely relevant to any likelihood of enhanced damages for Nuvigil.  In fact, both Mylan's and Teva's expected damages for EpiPen generic entry were calculated without any expectation of enhanced damages, and therefore the difference between them cannot be explained by any expectation of enhanced damages for EpiPen generic entry, let alone for Nuvigil generic entry.

[101] Orszag Report ¶ 40.
[102] Elhauge Merits Report ¶ 96.
[103] *See supra* Part II.C.
[104] *See supra* Part II.C.

Highly Confidential: Subject to Protective Order

holder thought it was more than 57.2% to lose.  Third, Professor Torrance found that a reasonable, competent patent attorney would estimate the odds of a court finding infringement of a valid EpiPen patent were 10% to 30%.[105]

63.    Mr. Orszag also ignores copious evidence that a finding of willful infringement was particularly unlikely in Paragraph IV cases like this one.  The very nature of Paragraph IV litigation makes a finding of willful infringement exceptionally unlikely because, unlike ordinary patent cases, the alleged infringer must give notice to the patent holder and litigate the patent for at least 30 months following such notice before having the opportunity to launch the product (assuming the patent holder sues within 45 days of receiving the generic's notice).  For this reason, the parties are likely to know if the patent is exceptionally strong prior to having the opportunity to launch at risk, since court proceedings already would have progressed substantially.  Professor Torrance notes that the generic companies complied with FDA rules including the 30-month stay, demonstrating objective carefulness, rather than the demanding "objective recklessness" required for enhanced damages due to willful infringement under patent law.[106]  Consequently he opines that the odds of enhanced damages being awarded in these cases are negligible.[107]  In fact, Mr. Orszag does not cite a single case in which a Paragraph IV entrant has been found liable for treble damages due to willful infringement following an at-risk launch after the end of the 30-month stay, and I am unaware of any such case.  In Greene and Steadman's analysis of Paragraph IV filings, they list seven cases in which a generic launched at risk in a Paragraph IV case, and none of them was found to have willfully infringed the brand's patent.[108]

64.    Even if willful infringement were found, treble damages would not always be imposed, since they are not automatic upon a finding of willful infringement.  Instead trebling represents the maximum amount by which a judge may increase damages if willful infringement is found, but judges also have the option of not increasing damages at all, or of increasing them by some amount less than trebling.  Further, the empirical evidence shows that most of the time that willful infringement is found, damages are not trebled.[109]

---

[105] Merits Expert Report of Andrew Torrance ¶ 5a.

[106] Merits Reply Expert Report of Andrew Torrance ¶ 8.

[107] Merits Reply Expert Report of Andrew Torrance ¶ 8.

[108] Adam Greene & D. Dewey Steadman, RBC Capital Mkts., *Pharmaceuticals: Analyzing Litigation Success Rates 1* (2010), available at: http://amlawdaily.typepad.com/pharmareport.pdf

[109] Kimberly A. Moore, *Empirical Statistics on Willful Patent Infringement*, 14 FED. CIR. B.J. 227, 238 (2005) (Figure 10).

Highly Confidential: Subject to Protective Order

65.  Likewise, if to be consistent we adopted the same 33% inflation of damages for generic entry into the EpiPen market, then Teva would enter only if its $24.3 million business profit from at risk entry exceeded the patent strength times 133% of my initial $54.1 million estimate of its expected damages (i.e., $72.0 million).[112] With those expected damages, Teva's plan to enter at risk means it must have thought $24.3 million > (EpiPen patent strength)*($72.0 million), which it would only do if Teva thought the EpiPen patent strength were less than 33.8%. Mr. Orszag does not take into account that the damage inflation that he posits would also narrow the range of patent strength estimates that the parties could have had.

66. Finally, Mr. Orszag never investigates what his arbitrary assumption of 33% higher expected damages would actually do to the delay in allowed entry. It turns out that even if one increased the estimate of expected damages by 33% in both the EpiPen and Nuvigil litigations, it would have only a small impact on the but-for allowed no-payment settlement entry date, making it March 21, 2014, which is only one week later than without the arbitrary 33% enhancement to expected damages.[113]

---

[110] Elhauge Merits Report ¶ 100.
[111] Elhauge Merits Report ¶ 100.
[112] Elhauge Merits Report ¶ 98.
[113] Rev Pmt Model Merits Reply 33 pct inc dmgs.xlsm (Tab "No Pmt Entry Dates" Cell G1).

Highly Confidential: Subject to Protective Order

## III. The EpiPen and Nuvigil Settlements Were Economically Linked and Driven by Mylan's Incentives

### A. The EpiPen and Nuvigil Settlements Were Economically Linked

67.     Mr. Orszag argues "There Was No Quid Pro Quo," i.e., that the EpiPen and Nuvigil settlement were not linked, because certain witnesses from defendants Pfizer and Mylan said they were not linked.[114]  In reaching his conclusion, he never addresses my point that "economic evidence indicates that the simultaneous settlements were linked together, because otherwise each settlement would have been economically irrational for one of the parties."[115]  Nor does he address "documentary evidence indicating that the EpiPen and Nuvigil settlements were discussed together as a package" and signed on the same date or the fact that ███████ ███████████████████████████████████████████████████  Instead, he simply assumes that this self-interested testimony of defense witnesses should be credited despite their conflict with the economics and documents when reaching his affirmative conclusion that "There Was No Quid Pro Quo."  He offers no economic basis for reaching such a conclusion.

68.     In contrast to Mr. Orszag, my conclusion about linkage is not an opinion about witness credibility, but rather a conclusion of economics.  I stressed that I could only offer "an economic opinion that they were linked."[117]  When asked, "And so you have an opinion as a matter of fact that they were actually linked?", I answered "Well, it's a matter of economics that they were linked because they would have been economically irrational separately."[118]  I thus declined to opine on the ultimate issue of whether the settlements were actually linked, wh█ I leave to the factfinder, but rather I opine only on the fact that they were linked as a matter of economics because otherwise the combination of settlements would have been economically irrational.

69.     Ignoring his own reliance solely on witness credibility, Mr. Orszag falsely accuses me of basing my own conclusion solely on a claim that I "had a 'hard

---

[114] *See* Orszag Report ¶ 42-44.
[115] Elhauge Merits Report ¶ 86; Elhauge Merits Deposition 118.
[116] Elhauge Merits Report ¶ 86; Elhauge Merits Deposition 118.
[117] Elhauge Merits Deposition 118.
[118] Elhauge Merits Deposition 118.

Highly Confidential: Subject to Protective Order

time believing' the negotiators' testimony" about separate negotiations.[119]  In fact, in the quoted portion of my deposition, what I actually said, in response to defense counsel's claim that "Pfizer's not even aware of Nuvigil," was: "I have a hard time believing that a pharmaceutical company like Pfizer would be unaware that Nuvigil exists."[120]  I was right to have a hard time believing that statement because defense counsel's claim that the deposition testimony showed that no one at Pfizer was even aware of the existence of the drug Nuvigil was false.  Some persons at Pfizer testified that they personally were not aware of the Mylan-Teva settlement negotiations regarding Nuvigil, but that is entirely different from no one at Pfizer being aware of the existence of Nuvigil.  I went on to make precisely that point in the deposition. After being shown the relevant Pfizer testimony, I stated:

> [Y]ou said Pfizer was unaware of Nuvigil, and I still find it hard to believe that any pharmaceutical company would not be aware of a drug like Nuvigil. . . .  [H]e says he doesn't know about it. I don't think that that means nobody at Pfizer ever knew about it. . . .  nobody asked him the question, "Did anybody at Pfizer know about this?". . . He just says that he was not aware of that. . . .  [H]e may not have been but that doesn't mean nobody at Pfizer knew about it.[121]

Anyway, Pfizer's awareness of Nuvigil or the Nuvigil negotiations is irrelevant because, as discussed below in the next section, the settlement negotiations were driven by Mylan's incentives, not Pfizer's.

### B. As Between Mylan and Pfizer, Mylan's Incentives Drove the Negotiations

70.    Mr. Orszag's entire critique of my analysis of Pfizer's role in the negotiations is based on his false premise that "Pfizer was, according to Prof. Elhauge but contrary to the testimony of the actual negotiators, negotiating the

---

[119] Orszag Report ¶ 44.

[120] Elhauge Merits Deposition 111.

[121] Elhauge Merits Deposition 112-113.  Defense counsel stressed that the witness was a 30(b)(6) witness.  *Id.* at 113.  But defense counsel omitted the fact that the witness was also testifying in his personal capacity.  *See* Myers Depo at 23:5-8 ("Q: Mr. Myers, you also understand that you have been subpoenaed here to provide personal testimony today, correct?  A: That's my understanding.").  His testimony that "I've never heard of Nuvigil prior to this litigation," *id.* at 164, was a statement of what he personally knew, not a statement that no one at Pfizer had heard of Nuvigil.

Highly Confidential: Subject to Protective Order

EpiPen settlement on behalf of both itself and Mylan."[122]  Given his false premise, Mr. Orszag argues that Pfizer would have incentives to exercise this supposed unilateral negotiating power to make excessive concessions, since the costs of any higher reverse payment offered by making concessions in the Nuvigil settlement would be borne by Mylan, not Pfizer.[123]

71.    Mr. Orzag does not cite anything to support his false premise.  Nor is there anything he could cite.  Nowhere in my report or testimony do I ever claim that Mylan delegated to Pfizer the power to negotiate on behalf of both Pfizer and Mylan. To the contrary, both my report and deposition expressly stated the opposite.  My report stated:

> Under [their] supply agreement, Mylan had to agree to any decision about how to prosecute or settle the EpiPen patent litigation, and Mylan in fact signed off on and publicly announced the EpiPen settlement when it was completed. Because Mylan was the party that (via the Nuvigil settlement) made the reverse payment, Mylan was the firm that controlled bargaining over how high a reverse payment to offer for how much of delay in Teva's settlement entry date.[124]

Likewise, in deposition, I reiterated the same points.[125]  Further, when asked about Pfizer's incentive to settle, I stressed, "I don't think they have the power to settle it themselves. They had to get Mylan to agree."[126]  Indeed, when I was expressly asked about the defense theory that Pfizer had incentives to make concessions because it could externalize the costs of those concessions on to Mylan, I answered, "Well, no, because Pfizer had no unilateral power to make that concession. They had to get Mylan to agree. . . .  I think they both had a formal veto right.  But since Mylan is the one actually making the reverse payment, they're the ones driving the show."[127] When asked again about the theory, I answered that Pfizer "might be willing to make more concessions" but "they can't make unilateral concessions."[128]

72.    The rest of Mr. Orzag's critique of my analysis of Pfizer's role goes on to argue that, if his false premise were true, Pfizer would have incentives to give

---

[122] Orszag Report ¶47.
[123] Orszag Report ¶¶ 47-49.
[124] Elhauge Merits Report ¶ 81.
[125] Elhauge Merits Deposition 94-95.
[126] Elhauge Merits Deposition 97.
[127] Elhauge Merits Deposition 99.
[128] Elhauge Merits Deposition

Highly Confidential: Subject to Protective Order

excessive concessions.[129]  This is true, but because his premise is false, Pfizer could not actually act on those incentives because it could not unilaterally make concessions.  Indeed, given the reality that Mylan's consent was required for the settlements, Mr. Orzag's observation that Pfizer had incentives to agree to excessive concessions actually makes my point.  Because Pfizer has incentives to agree to even excessive concessions, Pfizer necessarily has incentives to agree to any concessions that Mylan was willing to make, and Mylan only had incentives to agree to concessions that furthered its interests.  This means that Pfizer's incentives were not a binding constraint.  Instead, the settlement would thus turn solely on what concessions (i.e. reverse payment) Mylan was willing to offer and thus would turn on Mylan's incentives, not Pfizer's.  That is precisely the point I repeatedly made.[130]  In short, given the reality that Mylan did not delegate negotiating authority to Pfizer but rather Mylan had to agree to the settlement, all of Mr. Orszag's observations about Pfizer's incentives to agree to excessive concessions just support my point that Mylan's incentives would drive the negotiation results.

73.    Remarkably, having at first (a) falsely attributed to me the position that Pfizer was negotiating on behalf of itself and Mylan, and (b) stated that this was contrary to the testimony of the actual negotiators, Mr. Orszag later makes precisely the opposite claims on both points.  In his paragraph 47, he states, "Pfizer was, according to Prof. Elhauge but contrary to the testimony of the actual negotiators, negotiating the EpiPen settlement on behalf of both itself and Mylan."[131]  But in paragraph 68 he makes precisely the opposite claim, stating:

> On the EpiPen side, Pfizer's payoff should be more relevant than Mylan's, because Pfizer is the one actually negotiating the settlement. Prof. Elhauge claimed in his deposition that Mylan had a veto over any settlement and that Pfizer "had to get Mylan to agree" to any concessions. That statement is factually incorrect: The Pfizer/Mylan supply agreement does not provide a veto to Mylan over the settlement negotiations. Deposition testimony also contradicts Prof. Elhauge's unsubstantiated claim.[132]

Thus, a mere 21 paragraphs after the first statement, he switches to acknowledging that (a) I testified that Pfizer was not in control of the negotiations because Mylan

---

[129] Orszag Report ¶¶ 47-49.
[130] Elhauge Merits Report ¶ 82; Elhauge Merits Deposition 95-101.
[131] Orszag Report ¶47.
[132] Orszag Report ¶68.

Highly Confidential: Subject to Protective Order

had a veto ; and (b) claiming that this opposite position was also somehow contrary to the evidence and deposition testimony.

74.     Leaving Mr. Orszag's internal inconsistency aside, he is simply wrong that Mylan delegated unfettered control over the EpiPen settlement to Pfizer.  As I pointed out,

---

133 Elhauge Merits Report ¶ 81.
134 MYEP00474084 at 109 (Supply Agreement §11.b) (emphasis added); Orszag Report n.104 (citing this very passage).
135 Orszag Report ¶68 (emphasis in original).
136 Elhauge Merits Report ¶ 81.
137 Elhauge Merits Deposition at 94-95.

38

Highly Confidential: Subject to Protective Order



76.     Teva's documents confirm that it negotiated both the EpiPen and Nuvigil settlement with Mylan.  In one Teva email, Teva's David Stark asked Teva's Stacie Julie, "Bill got a call from Heather *at Mylan.*  What exactly did we propose *re epi and nuvigil*?"[139]  The answer was "2014 for epi and 2018 for nuvigil."[140]  This clearly indicates that Teva was negotiating entry dates for both EpiPen and Nuvigil with Mylan.  Other documents likewise indicate that Teva was negotiating the EpiPen and Nuvigil deals together, which would only make sense if Mylan was involved.[141]

77.     Moreover, as Mr. Orszag admits, if Mylan did delegate negotiating authority to Pfizer, it would create perverse economic incentives.[142]  As a matter of economics, it would have been economically irrational for Mylan to have delegated negotiating authority to Pfizer when those perverse economic incentives would

---

[138] PFE_EPIPEN_AT00007925 at 28 §7(b).
[139] Teva_EPI_MDL00462587 (emphasis added).
[140] *Id.*
[141] Teva_EPI_MDL00073293; Teva_EPI_MDL00462609.
[142] Orszag Report ¶¶ 47-49.

Highly Confidential: Subject to Protective Order

cause Pfizer to negotiate in ways harmful to Mylan.  One should thus not assume Mylan acted in an economically irrational way.

78.     Further, as shown above, it would have been economically irrational for Teva to have agreed to the EpiPen settlement unless Teva got a reverse payment through the Nuvigil settlement.[143]  There is no dispute that Mylan's consent was required for the Nuvigil settlement agreement, and no evidence that Mylan delegated to Pfizer its power to negotiate the Nuvigil settlement.  Thus, Teva's signature on the EpiPen settlement could not have rationally been obtained until Teva got Mylan's consent to the Nuvigil settlement.

79.     Finally, Mr. Orszag loosely argues that, since Pfizer got some profits on sales resulting from the EpiPen's settlement, that must alter the calculated bargaining power.[144]  His analysis fails because his hypothetical illustrations just arbitrarily assume fixed dollar amounts of gains that have nothing to do with the actual bargaining incentives or profits streams.[145]  The actual situation is as follows:  Teva loses profits from any delay in generic EpiPen entry, and gains profits from any delay in generic Nuvigil entry.  Thus, Teva has incentives to agree to a delay in generic EpiPen entry only if it receives offsetting profits from a delay in Nuvigil generic entry.  Mylan is the only party with the power to offer a delay in Nuvigil generic entry, and Mylan has incentives to offer it only if it receives offsetting profits from a delay in generic EpiPen entry.  Anything Mylan is willing to offer in terms of delayed Nuvigil generic entry can only delay EpiPen generic entry, which increases EpiPen profits in a way that can only benefit Pfizer (because its only relevant profit stream comes from royalties on EpiPen sales) and cannot cost Pfizer any profits (because it gets no profit stream from Nuvigil).  Thus, Mylan's incentives will solely determine how much generic Nuvigil entry delay is offered in exchange for how much generic EpiPen entry delay, and Pfizer will have incentives to agree to anything Mylan is willing to offer in generic Nuvigil entry delay to get generic EpiPen entry delay, because it can only benefit from any such offer.  Therefore, Mylan's incentives will entirely dictate what bargain is struck with Teva, and Pfizer's incentives are irrelevant.[146]  This means the bargain will turn entirely on the bargaining power between Mylan and Teva.  The fact that Pfizer gets some share of the EpiPen profits is fully taken into account because those royalties are subtracted from the Mylan litigation and settlement payoffs.

---

[143] *See supra* Section II.B and Revised Table 1.
[144] Orszag Report ¶¶ 74-77.
[145] Orszag Report ¶¶ 74-77.
[146] Elhauge Merits Report ¶ 82.

Highly Confidential: Subject to Protective Order

## IV. MR. ORSZAG'S CRITIQUES OF MY INPUT ESTIMATES ARE MISGUIDED AND IGNORE THE FACT THAT MY FINDINGS ARE ROBUST TO DIFFERENT INPUT ESTIMATES

### A. Patent Strength Estimates

80.     Mr. Orszag makes several unfounded criticisms of my use of Professor Torrance's estimates of the patent strengths in this case.  First, he argues that I am required "to show that the negotiators at Mylan and Teva specifically believed" a particular patent strength to use it in my model.[147]  It is my understanding, as I noted in my deposition, that Mylan and Teva asserted attorney-client privilege protecting disclosure of the very subjective beliefs of patent strength that he is arguing I should use.[148]  Given this suppression of evidence on subjective beliefs of patent strength, the best available evidence of the parties' likely estimates of patent strength is an objective estimate of patent strength by an independent expert, which Prof. Torrance provided by opining as to what reasonable patent attorneys would have advised the parties at the time of settlement on the patent strength.[149]  Mr. Orszag instead asserts that subjective evidence of patent strength is always required, which amounts to an assertion that defendants can avoid potential liability for any reverse-payment settlements so long as they assert attorney-client privilege with respect to their subjective beliefs on patent strength.  I offer no opinion on whether he is correct in his legal conclusion that defendants can always legally immunize their reverse-payment settlements by asserting attorney-client privilege with respect to their subjective beliefs on patent strength.  But as a matter of economics, Mr. Orszag's assertion has the same effect as assuming that the true patent strength is 100% whenever defendants assert attorney-client privilege with respect to their subjective beliefs on patent strength.  Given that generics frequently win drug patent litigations and the patent issues detailed by Prof. Torrance,[150] an assumption of 100% patent strength is clearly less likely to be close to the parties' actual subjective beliefs than an objective assessment of patent strength by an independent expert.  Such an inaccurate assumption would also, as a matter of economics, fail to provide any

---

[147] Orszag Report ¶ 35.

[148] Elhauge Merits Deposition 24, 75, 95-96, 164.

[149] Elhauge Merits Deposition 164.

[150] Elhauge Merits Report ¶ 52 (noting FTC study finding generics won 73% of drug patent litigations); Torrance Merits Report ¶¶ 66-126 (laying out legal issues with respect to both the EpiPen and Nuvigil patent litigations).

Highly Confidential: Subject to Protective Order

economic   deterrence   to   firms   using   reverse-payment   settlements   to anticompetitively delay entry.

81.   Second, Mr. Orszag falsely asserts that: "In Prof. Elhauge's model, he makes the highly restrictive assumption that both parties hold the same belief as to the patent's strength."[151]  He then critiques this supposed assumption because there is no reason why the two settling parties' beliefs about the patent strength need to be the same, and it would in fact be surprising if the two firms made identical assumptions about the strength of the Nuvigil patents, particularly in light of their different beliefs in other respects."[152]   His assertion about my approach is false because in fact I analyzed at length the possibility that parties might have different estimates of patent strength, showing how that would affect the odds of a no-payment settlement and the delay in allowed entry date from a reverse payment settlement.[153]

82.   Updating my analysis to correct the computational errors, I find that if the parties might hold different beliefs as to the patent strength, a no-payment settlement was feasible for 87.9% of all possible combinations of patent strength perceptions and that the reverse payment delayed allowed entry across all such patent strength perceptions.[154]   Below is a revised version of Figure 18 from my original report, correcting for computational errors, showing the range of possible perceived patent strength combinations for which a no-payment settlement would have been feasible.[155]

---

[151] Orszag Report ¶ 34

[152] *Id.*

[153] Elhauge Merits Report ¶¶ 121-123.

[154] Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths" Cell K1, updated after correcting for computational errors and following methology in Elhauge Merits Report ¶¶121-123.)

[155] Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths").

Highly Confidential: Subject to Protective Order

**Revised Figure 18. Range of Feasible No-Payment EpiPen Settlements[156]**



83.     For the combinations of EpiPen patent strength perceptions where a no-payment EpiPen settlement would be feasible, I also calculated the difference in the allowed entry date specified under the actual settlement and the no-payment settlement. Corrected for the computational errors, Figure 101 shows the months of delay in allowed entry date between the actual and but-for EpiPen settlements for any combination of Teva and Mylan estimates of EpiPen patent strength in the 5-25% range estimated by Prof. Torrance.

---

[156] Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths").

Highly Confidential: Subject to Protective Order

**Figure 101: Delay in Allowed Entry Caused by Reverse Payment with Differing Perceptions of EpiPen Patent Strength[157]**



84.     Mr. Orszag's argument that the parties might have differing patent strength perceptions is also misplaced because, given the fact that the defendants have asserted attorney-client privilege to bar disclosure of their subjective beliefs of patent strength, the only basis for inferring their beliefs about patent strength are objective estimates of what a reasonable attorney would advise, and such objective estimates are necessarily common to both parties.   Moreover, Mr. Orszag's conclusion here that it is unreasonable to assume that the parties shared the same expectations about patent strength (even when we lack any evidence that they differed) directly conflicts with his assertion later in his report that it is unreasonable to conclude that the parties had different expectations about price, quantity, and margins (even when we have affirmative evidence that their expectations on those topics differed).[158]   In combination, he offers the absurd mix of positions that it is unreasonable ***not*** to assume that the parties had different expectations on patent strength—even when there is (and can be) no evidence to indicate they had different expectations on that topic—but also unreasonable to conclude that the parties ***did*** have different expectations on price, quantity, and margins—even when their forecasts clearly indicate they had different expectations on those topics.[159]

---

[157] Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths").

[158] Orszag Report ¶ 88; *infra* Part IV.C.

[159] Orszag Report ¶ 34 ("[T]here is no reason why the two settling parties' beliefs about the patent strength need to be the same, and it would in fact be surprising if the two firms made identical assumptions about the strength of the Nuvigil patents, particularly in light of their

Highly Confidential: Subject to Protective Order

85.     Third, Mr. Orszag argues that the fact that, after the settlement, Teva was willing to litigate its Nuvigil patent against other generics to a trial court conclusion and won at the district court level means that Teva must have believed its Nuvigil patent was stronger than Prof. Torrance estimated.[160]  Mr. Orszag is wrong that a higher patent strength can be inferred from Teva's willingness to litigate.  Teva expected profits if it won the Nuvigil litigation were $2,450.1 million versus $182.2 million if it lost the litigation, a difference of $2,267.9 million.  Thus, Teva had incentives to litigate as long as its expected gains (its patent strength times $2,267.9 million) exceeded its litigation costs.  Even if we assume a high $10 million estimate of litigation costs,[161] this means Teva had incentives to litigate the Nuvigil patent as long as it thought the Nuvigil patent strength were greater than $10 million/$2,267.9 million = 0.4%.  Since this patent strength is well below the bottom of the 10-30% range estimated by Prof. Torrance, Teva's willingness to litigate the Nuvigil settlement against other generics provides no evidence that the patent strength was stronger than Prof. Torrance estimated.

86.     Mr. Orszag is also wrong that a higher patent strength at the time of settlement can be inferred by the fact that Teva later won at the trial court level against other generics.[162]  To begin with, the lion's share of generic profits go to the first-filer (here Mylan) because it gets 180 days of generic exclusivity, whereas follow on generics get far less because of generic competition.[163]  Mylan thus had far higher incentives to invest in defending against the Nuvigil patent litigation than any follow-on generics would have, which would predictably give Mylan higher odds of winning the Nuvigil patent litigation than those other generics.  Further, Mr. Orszag's claim that "there is fundamental tension" between Professor Torrance's estimated patent strength and subsequent Teva victory in patent litigation is incorrect and amounts to Monday morning quarterbacking.  There is no more fundamental tension between these two facts than there would be tension between noting prior to

---

different beliefs in other respects."); *id.* ¶ 54 ("[H]e assumes that both parties hold the same belief as to expected entry dates should Teva prevail in the EpiPen patent litigation.72 Such an assumption, again, as discussed above, is unfounded.").

[160] Orszag Report ¶37.

[161] Elhauge Merits Report ¶ 135.

[162] Orszag Report ¶37.

[163] For example, using industry estimates from Reiffen and Ward for price discounting and reduced share resulting from additional generics, Mylan would expect to earn profits 4.75 larger during the first six months following entry compared to after those first six months.  Elhauge Merits Report ¶ 95 (citing David Reiffen & Michael R. Ward, *Generic Drug Industry Dynamics*, 87 REV. ECON. & STAT. 37, 43 (2005); Rev Pmt Model Merits Reply.xlsm (Tab "Inputs" Cell Y7).

Highly Confidential: Subject to Protective Order

a dice roll that there was only a 1 in 6 chance that a 6 would be rolled and a subsequent dice roll in fact being a 6.

87.    Fourth, Mr. Orszag argues that my model is invalid because it does not consider EpiPen patents that were not yet the subject of the EpiPen patent litigation.[164] Only one of these patents, the '035 patent, had even issued as of the time of settlement, and was the only one mentioned in the settlement agreement.[165] I understand that Professor Torrance will opine that the other patent, the '827 patent, was similar to the '035 in that it added almost nothing that is patentably or technically new in comparison to the '012, '432, or '035 patents.  Moreover, Mr. Orszag ignores the fact that the evidence indicates that the parties' pre-settlement expectation was that, absent any settlement, Teva would launch an EpiPen generic by January 1, 2013.[166] As I explained in my deposition, this fact means that at the time of settlement the parties must not have put any significant odds on those additional patents blocking or deterring Teva's launch of a generic EpiPen past January 1, 2013.[167] The parties thus must not have put any significant odds on the possibility, stressed by Mr. Orszag that, even if Teva won the EpiPen litigation, the '035 or '827 patents "might" have blocked Teva's launch or triggered fresh 30 month stays.[168] In fact, patents listed in the Orange Book after an ANDA filing, like the '827 patent which was listed in the Orange Book on November 30, 2014,[169] do not provide brand companies an opportunity for a second 30-month stay.[170]

88.    Relatedly, Mr. Orszag also misunderstands the import of Professor Torrance's opinion that any invalidation of the two litigated patents would also invalidate the '035 patent.[171] Mr. Orszag selectively quotes Professor Torrance for the opinion that the '035 patent "added almost nothing that is patentable or technically new in comparison to the '012 or '432 patents."[172]   Mr. Orszag

---

[164] Orszag Report ¶¶ 78-81.

[165] Orszag Report ¶ 79.

[166] Elhauge Merits Report ¶ 87.

[167] Elhauge Merits Deposition 101-102.

[168] Orszag Report ¶ 80.

[169] FDA Orange Book Patent and Exclusivity for N019340, available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=002&Appl_No=019430&Appl_type=N

[170] Boerschlein and Cyr, "Intricacies of the 30-Month Stay in Pharmaceutical Patent Cases", American Pharmaceutical Review, March 25, 2018, available at https://www.americanpharmaceuticalreview.com/Featured-Articles/348913-Intricacies-of-the-30-Month-Stay-in-Pharmaceutical-Patent-Cases/

[171] Torrance Report ¶ 128.

[172] Orszag Report n. 118.

Highly Confidential: Subject to Protective Order

misinterprets this to mean that Professor Torrance claimed that the '035 patent had 0% patent strength because "there was nothing patentably new in the '035 patent," which Mr. Orszag says conflicts with the fact that the patent office issued the '035 patent.[173] But that is not what Professor Torrance opined. Rather, he opined that the '035 patent was a "continuation-in-part" patent, in which: "***Most*** of the claims of the '035 patent are similar to those in the '012 and '432 patents. However, ***claims 19 to 23 are notably different***…"[174] He was thus not opining that the '035 patent had nothing new or had zero patent strength. Rather, his opinion was that because of the overlap in claims, any invalidation of the '012 and '432 patents would also invalidate the '035 patent. He stated:

> With the exception of claims 19-23, the claims of the unasserted '035 patent, like its specification, are also similar to the claims-in-suit of the '432 patent, and would be similarly vulnerable to being found invalid and not infringed, by the Teva and Intelliject devices, for reasons already discussed with respect to the '432 patent. In fact, any of its claims that derive their support from new matter added to the specification would be vulnerable to more recent prior art than would any claims of the '012 or '432 patents.[175]

Thus, Professor Torrance was not saying that the '035 patent added nothing patentably new or had 0% chance of being upheld. Rather, he was stating that, given the overlap, the '035 patent added no significantly new patent issues that would make it any less prone to invalidation than the two litigated patents.

89.     Given Professor Torrance's analysis, if the EpiPen patent litigation had 85% odds of invalidating the litigated patents, then it would also have 85% odds of effectively invalidating the '035 patent at the same time. This does not imply any opinion that the '035 patent had 0% patent strength. To the contrary, it implies that the '035 patent had the same 5-25% patent strength as the litigated patents. However, because of the issue overlap, those odds are not independent and add nothing incrementally to the patent strength of the litigated patents. In the 75-95% of cases when the litigated patents would be invalidated, then the '035 patent would also be invalidated, so the '035 patent adds nothing to the patent strength estimated based on the two litigated patents. As I explained in my deposition, additional patents would matter only if:

---

[173] Orszag Report n. 118.
[174] Torrance Report ¶ 128 (emphasis added).
[175] Torrance Report ¶ 128 (emphasis added).

Highly Confidential: Subject to Protective Order

> [T]here were significant odds that they would be enforceable in that time frame *and* that that somehow differs from the patent strength estimate that they already have, that they're *independent*, I guess, of the patent issues relative to these particular patents.   So *if you're talking about follow-on patents, it is frequently the case that if the original patent is invalid, then the follow-on patents are also going to be invalid for similar reasons.*[176]

Mr. Orszag is thus simply mistaken when he asserts "By definition, if Pfizer had *any* chance of success in enforcing the '035 or '827 patents, then Prof. Elhauge's estimate of patent strength is too low," and that unless "the patent strength of the '035 patent was literally *zero*, then Prof. Elhauge's omission of the patent from his analysis is an error."[177]   He assertion indicates that he has failed to understand the important economic difference between dependent and independent odds.

90.     Professor Torrance's analysis likewise indicates that if the EpiPen litigation invalidated the litigated patents after an expected litigation length of 16.5 months,[178] that judgment would also effectively invalidate the '035 patent at the same time.   Thus, the effective litigation length was the same for the '035 patent as for the other patents, contrary to Mr. Orszag's claim.[179]   Likewise, the fact that there was no meaningful difference in patent issues means that the '035 patent would not entail incurring any additional litigation costs.   Whether Mylan/Pfizer won or lost the EpiPen patent litigation after incurring the litigation costs of doing so, the result would effectively dictate the expected validity of the '035 patent.   Thus, Mr. Orszag is also wrong when he claims that the existence of the '035 patent would add incremental litigation costs.[180]

91.     In any event, even if one though that consideration of the '035 or '827 patents should change the patent strength estimate from the one that Prof. Torrance estimated, my sensitivity analysis already accounted for any such adjustment in perceived patent strength.   Corrected for the computational errors, Revised Figure 16 below shows how adjusting the perceived EpiPen patent strength would change the estimated delay in allowed entry caused by the reverse payment.

---

[176] Elhauge Merits Deposition 103 (emphasis added).
[177] Orszag Report . ¶ 80 & n. 118.
[178] Elhauge Merits Report ¶ 97.
[179] Orszag Report ¶ 80.
[180] Orszag Report ¶ 80.

Highly Confidential: Subject to Protective Order

**Revised Figure 16. Effect of Varying the Perceived EpiPen Patent Strength on the Delay in Allowed Entry Caused by the Reverse Payment**[181]



92.     Likewise, to the extent one believes these additional patents were sufficiently different to meaningfully increase the expected litigation length or costs, I have demonstrated precisely how any changes in those inputs would impact the allowed entry date in a no-payment settlement.  Corrected for the computational errors, Revised Figure 23 below shows the effect of varying the estimate of the EpiPen patent litigation length on delay in allowed entry date caused by the reverse payment, after correcting for computational errors. As to litigation costs, even if one assumes the additional patents would result in triple the conservative $10 million upper bound for litigation costs, i.e., a litigation cost of $30 million, it changes the allowed entry date by only 2 days.[182]

---

[181] Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths").
[182] Rev Pmt Model Merits Reply.xlsm (Tab "Lit Costs").

Highly Confidential: Subject to Protective Order

**Revised Figure 23. Effect on Months of Delay in Allowed Entry Due from Reverse Payment at Varying Expected End Dates for the EpiPen Patent Litigation[183]**



### B. Expected Entry Date Absent Settlement

93.     In my initial merits report, I observed that Teva's detailed financial models about a launching an EpiPen generic and the expectations of stock market analysts at the time of settlement indicated that the parties expected that without a settlement Teva would have launched a generic EpiPen on January 1, 2013.[184]  I also noted that while other pre-settlement documents indicate that without a settlement Teva would not be able to launch until either June 2013-June 2014 or March-September of 2014, they were documents that generally tracked many products with minimal detail regarding EpiPen.[185]  I further pointed out that my analysis accounted for the possibility that the factfinder might credit the latter documents over the former by showing how that would change the delay in allowed entry date caused by the reverse payment.[186]

94.     Rather than leave the matter to the factfinder, Mr. Orszag asserts that one must credit the documents that generally tracked many products with minimal

---

[183] Rev Pmt Model Merits Reply.xlsm ("Lit Length" tab).
[184] Elhauge Merits Report ¶¶ 87, 124.
[185] Elhauge Merits Report ¶ 124.
[186] Elhauge Merits Report Figure 20 and Table 3.

Highly Confidential: Subject to Protective Order

detail regarding EpiPen over Teva's detailed financial models about a launching an EpiPen generic and the expectations of stock market analysts at the time of settlement.[187]   I still think the resolution of such matters should be left to the factfinder.  Mr. Orszag also asserts that the entry dates mentioned in the documents were not expected entry dates, but rather hopeful target dates, so that the true expected dates were later.[188]   However, Mr. Orszag cites nothing that supports that assertion, which conflicts with the fact that the financial documents and securities analysts were trying to make financial decisions that would turn on expected values that would turn on expected dates.  Mr. Orszag does cite documents that indicate that Teva and various securities analysts considered possible delays, but those documents do not show that those possible delays had not already have been impounded into the expected no-settlement entry date that Teva projected in the various documents.[189]

95.    Mr. Orszag also falsely asserts that while I acknowledged the existence of the documents with June 2013-Sept. 2014 dates, "Prof. Elhauge claims the choice of date does not matter to his results."[190]   I made no such claim.  To the contrary, I showed that the choice of no-settlement entry date *did* alter the resulting delay in allowed entry date that was caused by the reverse payment, and my Figure 20 showed precisely how that altered the results.[191]  I simply pointed out correctly that, assuming the base estimate of 15% EpiPen patent strength, "for any expected non-settlement entry date in this range [from January 2013 to the latest date that would be consistent with Mylan having rationally accepted the actual settlement] the reverse payment resulted in a significant delay in the allowed entry date for Teva's EpiPen generic"[192]   Below is a revised version of Figure 20, correcting computational errors, which still shows that the reverse payment delayed the allowed entry date in the settlement across the entire range of expected Teva entry dates.

---

[187] Orszag Report ¶¶ 53, 62-64.
[188] Orszag Report ¶¶ 60-61.
[189] Orszag Report ¶¶ 60-63.
[190] Orszag Report ¶ 53.
[191] Elhauge Merits Figure 20.   A version corrected for computational errors appear following this paragraph.
[192] Elhauge Merits ¶ 125.

Highly Confidential: Subject to Protective Order

**Revised Figure 20. Effect of Expected Teva Generic Entry Date without Settlement on the Delay in Allowed Entry Caused by Reverse Payment[193]**



96.     Mr. Orszag claims to falsify these showings, but actually does not address them.  Instead, he purports to show that that there are some no-settlement entry dates between May 2014 and September 2014 for which the EpiPen settlement would have been profitable for Teva relative to expected litigation.[194]  But this analysis assumes the patent strength is 15% and thus ignores the reality that if the patent strength were 15%, then Mylan would not have agreed to the actual settlement if it thought the no-settlement entry date was between June 17, 2014 and September 2014 because then its litigation payoff would exceed its settlement payoff given the reverse payment.[195]

97.     Mr. Orszag complains that my analysis assumes the parties shared the same expectation about the no-settlement entry date, which he says is an unfounded assumption.[196]  But we have no evidence to indicate that the parties had any different expectation about the no-settlement entry date, so there is no basis for a contrary conclusion.  And his assertion here once again conflicts with his assertion later that one must assume the parties have the same expectations about price, quantity, and margins even when we have evidence that those expectations differed.[197]  In any

---

[193] Rev Pmt Model Merits Reply.xlsm (Tab "Entry Timing").
[194] Orszag Report Figure 3.
[195] Rev Pmt Model Merits Reply.xlsm (Tab "Entry Timing").
[196] Orszag Report ¶ 54.
[197] Orszag Report ¶ 88; *infra* Part IV.C.

Highly Confidential: Subject to Protective Order

event, he is incorrect in his assertion that my analysis depends on an assumption of a common estimate of the no-settlement entry date. In Table 100 below, I show the number of months of delayed entry caused by the reverse payment for different combinations of Teva and Mylan expectations as to when Teva would be able to enter absent settlement.[198] In the Table, cells filled with an "X" indicate that a no-payment settlement would not have been possible given such combinations of expected entry dates. All combinations of entry date expectations for which a no-payment settlement would have been feasible show that the reverse payment delayed allowed entry.

| Table 100: Months of Delay in Allowed Entry from the Reverse Payment, at Various Mylan and Teva Perceptions of the Expected No-Settlement Entry Date | | | | | | |
|---|---|---|---|---|---|---|
| Teva Expected No-Settlement Entry Date | Mylan Expected No-Settlement Entry Date | | | | | |
| | 1/1/2013 | 4/1/2013 | 7/1/2013 | 10/1/2013 | 1/1/2014 | 4/1/2014 |
| 1/1/2013 | 15.3 | 12.8 | 10.2 | X | X | X |
| 4/1/2013 | 15.2 | 12.7 | 10.2 | X | X | X |
| 7/1/2013 | 15.1 | 12.6 | 10.1 | X | X | X |
| 10/1/2013 | 15.0 | 12.6 | 10.0 | 7.3 | X | X |
| 1/1/2014 | 14.8 | 12.4 | 9.8 | 7.2 | 4.5 | X |
| 4/1/2014 | 14.6 | 12.2 | 9.7 | 7.1 | 4.4 | 1.7 |

98.     Mr. Orszag concludes that even if one assumes the parties shared the same estimate of the no-settlement entry date, "according to Prof. Elhauge's model and assumed input estimates, any estimated Teva entry date between April 20, 2014 and May 27, 2014 is consistent with both Mylan and Teva viewing the actual EpiPen settlement as economically rational on its own merits."[199] However, Mr. Orszag is here wrongly assuming that, if a no-payment settlement with an entry date that matched the actual settlement entry date made both parties better off than litigating, that is what would have happened but-for the reverse payment. This assumption is incorrect for the reasons I outlined in my initial report, including that (a) it incorrectly assumes that parties in the but-for world would have a different bargaining power than they actually had; (2) it magically assumes that Teva's bargaining power would drop from its level close to 50% in the actual world down to close to 0% in the but-for world; and (3) it assumes that the patent holder

_____

[198] Rev Pmt Model Merits Reply diff entry timing.xlsm. (Tab "Entry Timing").
[199] Orszag Report ¶ 54.

Highly Confidential: Subject to Protective Order

irrationally gave away a large reverse payment for nothing because it would have gotten the same entry date without the reverse payment.[200]

99.   Likewise, Mr. Orszag concludes that if the parties expected a no-settlement entry date of January 1, 2013 and thought that the patent strength was between 26.0-30.2%, or expected a no-settlement entry date of June 1, 2013 and thought that the patent strength was between 24.3-26.1%, they both would have found the actual settlement economically rational.[201]  He is incorrect because he is again implicitly assuming that, if a no-payment settlement with an entry date that matched the actual settlement entry date made both parties better off than litigating, that is what would have happened but-for the reverse payment, ignoring the fact that Teva did not have 0% bargaining power and that Mylan would not have rationally paid the reverse payment if it thought it could get the same entry date without it.[202]

100.   Finally, Mr. Orszag stresses that it was not until 2018 that FDA approved Teva's EpiPen generic and it actually launched it.[203]  I had already acknowledged this in my report.[204]  As I pointed out, "the effect of the reverse payment on the allowed entry date in the settlement (which is what I calculate) could only be affected by expectations at the time of settlement, not by subsequent events."[205]  As noted above, the pre-settlement  documents indicated that Teva was expected to enter in January 2013 or at worst (if one relies on the defense-favored documents) June 2013-September 2014.   "There is thus no support for the proposition that the parties at the time expected Teva generic entry would not occur until 2018."[206]  There is thus no economic basis for assuming that those subsequent facts would have altered the effect of the reverse payment on the allowed entry date in the settlement.

101.   Mr. Orszag asserts, "Prof. Elhauge is putting blinders on and ignoring economically critical issues."[207]  I am not.  I am simply staying within my assignment by calculating the extent to which the reverse payment delayed the allowed entry date in the settlement.  Other experts are opining on whether that delay in the allowed entry date resulted in a delay in actual entry given other obstacles to entry.  There is

---

[200] Elhauge Merits Report ¶ 120.
[201] Orszag Report ¶ 55 & nn. 74-75.
[202] Elhauge Merits Report ¶ 120.
[203] Orszag Report ¶ 58.
[204] Elhauge Merits Report ¶ 126.
[205] Elhauge Merits Report ¶ 126.
[206] Elhauge Merits Report ¶ 126.
[207] Orszag Report ¶ 59.

Highly Confidential: Subject to Protective Order

no reason why one expert must opine on all issues relevant to proving anticompetitive damages. Such tasks are divided between experts in antitrust cases all the time.

102. Mr. Orszag incorrectly asserts that because actual FDA approval was not until 2018 and thus after the allowed entry date in the actual settlement, "it is clear that the allowed entry date under the settlement was not the binding constraint on entry, *i.e.,* that there was no actual delay in entry as a result of the settlement."[208] Mr. Orszag's statement is incorrect as a matter of logic and economics because he is ignoring the possibility that the delay in the allowed entry date *itself* might have delayed actual FDA approval. Suppose, for example, the following facts are true:

> (i) Because actual settlement delayed the allowed entry date from March 2014 to June 22, 2015, Teva slowed down its efforts to pursue FDA approval of its generic since there was no rush.[209] (ii) In June 2014, the FDA adopted stricter review standards.[210] (iii) Had Teva kept up efforts to get FDA approval, it would have entered in March 2014, avoiding the additional delay caused by the tougher FDA standards that were adopted in June 2014. (iv) Because the settlement caused Teva to slow down efforts to get FDA approval, it got caught by the tougher FDA standards that were adopted in June 2014, which resulted in so much additional delay that Teva did not get FDA approval until 2018.

---

[208] Orszag Report ¶ 58.

[209] It would be economically rational to slow down efforts to obtain FDA approval after a settlement delayed the allowed entry date. Elhauge Merits Deposition 124 ("I think it's economically rational to not rush approval during a period where you can't enter anyway under your settlement. So I think it would be economically rational that if you have delayed the time when you could enter, you would delay your efforts to seek launch readiness."). This inference from economic rationally is confirmed by evidence that Teva did slow down its efforts to pursue FDA approval after the settlement. *See* Peck Report ¶¶ 21, 54-62; Elhauge Merits Deposition 123 ("I believe that's what Dr. Peck found: that they made a lot less effort to get the generic on EpiPens ready after the settlement."); *id.* at 124-125 ("So I'm opining on the economic rationality, and I note that it's consistent with the evidence Dr. Peck provides, or his opinions, that in fact Teva did not vigorously pursue seeking an ANDA after the settlement. . . . So I would just say what he finds is consistent with economic rationality, and my opinion is on economic rationality.") (as corrected in deposition corrections).

[210] There was evidence that the FDA adopted stricter review standards in June 2014. *See* Peck Report ¶ 37, 54; Elhauge Merits Deposition 139 ("the regulatory standards changed in June 2014 and made it much harder to get approval. That's the gist of what I got from [Peck].")

Highly Confidential: Subject to Protective Order

As this hypothetical shows, the fact that FDA approval was not obtained until 2018 is consistent with the conclusion that the entire delay from March 2014 to 2018 was caused by the reverse payment.  I am not opining that these hypothesized facts are true; rather, I am showing the faulty logic in Mr. Orszag's contrary claim.

103.   Indeed, even if without the delay in the allowed entry date, FDA approval would not have been obtained until after the actual settlement entry date, that would not disprove anticompetitive injury.  Suppose, for example, that without the delay in the allowed entry date Teva would have pursued FDA approval with more alacrity.  Suppose further that Teva would still have run into unanticipated problems with getting FDA approval, but because of its greater alacrity Teva would have faced and overcome those problems earlier.  Suppose that because of this, Teva would have resolved those problems earlier and obtained FDA approval and entered in July 2015.  That would be just after the actual allowed settlement entry date of June 22, 2015.  However, it would be well before the actual entry date of November 2018.[211]  Because the delay in the allowed entry date would thus have delayed actual entry from July 2015 to November 2018, the reverse payment would still have caused over a three year delay in actual entry in this case.  As this hypothetical shows, even if the but-for entry date were later than the actual allowed settlement entry date, that would remain consistent with anticompetitive harm if the delay in the allowed settlement entry date delayed actual entry until after the but-for entry date.  Again, I am not opining that these hypothesized facts are true; rather, I am showing the faulty logic in Mr. Orszag's contrary claim.

### C. The Parties Expected to Enter at Risk

104.



---

[211] Orszag Report ¶ 58.
[212] Elhauge Merits Report ¶¶ 87, 93.
[213] Orszag Report ¶82-84.
[214] Orszag Report ¶¶83-84.

Highly Confidential: Subject to Protective Order

105.



[215] Orszag Report ¶83.

[216] Orszag Report ¶84 (citing Elhauge Merits Deposition 132: 3-6).

[217] Elhauge Merits Deposition 132, 137.

Highly Confidential: Subject to Protective Order

In short, as I clearly testified and economics clearly indicates, whether or not a generic entrant would expect to enter at risk depends on the facts of each case, including the patent strength and expected damages.  It does not mean, as Mr. Orszag implies, that there is some abstract general percentage likelihood that a firm would enter at risk in any case regardless of the economics of that specific case.[218]  Nor does Mr. Orszag offer any plausible methodology for determining what the abstract percentage would be.

107.   In any event, no matter what arbitrary assumption we adopted about the probability that Teva would enter at risk, it would not alter the fact that the EpiPen settlement standing alone was unprofitable to Teva and thus Teva would not have agreed to it unless it got a reverse payment through the Nuvigil settlement.  Even if we assume Teva had 0% odds of entering at risk (despite the evidence that it planned to do so), then its expected EpiPen litigation payoff would be $264.4 million, which would still be $25.0 million less than its EpiPen settlement payoff of $239.4.[219]  If we instead assumed some positive probability that Teva would enter at risk, it must be because Teva thought the profits from at risk entry exceeded the expected damages, so that would make its expected EpiPen litigation payoff something greater than $264.4 million, and thus make its losses from the EpiPen settlement standing alone something greater than $25.0 million.  Thus, $25.0 million is the minimum loss Teva that could expect from the EpiPen settlement standing alone, regardless of whether it entered at risk.

108.   Nor would changing the assumption about at-risk entry alter the ultimate conclusion that the reverse payment substantially delayed the allowed entry date.  Even if one assumes 0% odds that Teva would enter at risk, its expected no-settlement entry date would simply be at the end of the litigation.  Under this assumption, the but-for allowed no payment settlement entry date would be September 25, 2014, which is still 8.9 months prior to the actual allowed settlement entry date.[220]  If one assumes that the parties expected 0% odds of at risk entry in either the EpiPen or Nuvigil litigations, then the but-for allowed no payment

---

[218] Orszag Report ¶¶83-84.

[219] Rev Pmt Model Merits Reply.xlsm (Tab "Teva Payoffs Calc" Cell C24 showing Teva's expected EpiPEn litigation payoff, if waited to enter until after the end of the EpiPen patent litigation, was $264.4 million, which is $25.0 million greater than Teva's expected profits from actual settlement of $239.4 million, found in Cell C34).

[220] Rev Pmt Model Merits Reply No Epi at risk entry.xlsm (Tab "No Pmt Entry Dates" Cell G1).

Highly Confidential: Subject to Protective Order

settlement entry date would be October 5, 2014, which is still 8.5 months prior to the actual allowed settlement entry date.[221]

### D. Market Prices, Costs, Size, Quantities, and Discount Rate

109.    Without pointing to any evidence he considers to be better evidence as to the parties' expected beliefs at the time of settlement, Mr. Orszag criticizes my use of forecasts that the parties made regarding the EpiPen and Nuvigil markets.[222] None of his criticisms are valid, and in general his criticisms fail to understand that any but-for settlement would be affected by the parties' actual expectations at the time, not by Mr. Orszag's views about whether their expectations were correct or plausible.

110.  First, Mr. Orszag criticizes me for assuming that the price for generic EpiPen would remain "literally unchanged for years" at $36.13.[223]  But I make no such assumption.  Rather, I conclude, based on Teva's own internal forecast, that **Teva forecast** that the **expected** price for generic EpiPen would remain constant at $36.13, which is what it explicitly projected for three years.[224]  My analysis is based on Teva's forecasts, not on my own assumptions about pricing.  Nor, contrary to Mr. Orszag's  mischaracterization, does such a Teva forecast unreasonably assume that prices "would remain literally unchanged for years."[225]  Rather, such a projection can reflect the reasonable view that prices are as likely to rise as fall from $36.13, so that the **expected** price would not change over time.  Such a projection does not imply any view that pricing will remain rigidly unchanged to the penny.  Indeed, in my deposition, I expressly pointed out that my use of party projections of a constant expected result **did not** imply any sort of assumption that there would be no year-to-year variation.  I stated:

> I think there's **always a year-by-year variation**. The question is whether you have any directionality to your expectation. It could be reasonable to expect that it could go up, could go down, but there's no particular reason to think it's different from the current projection.[226]

---

[221] Rev Pmt Model Merits Reply No Epi or Nuvigil at risk entry.xlsm (Tab "No Pmt Entry Dates" Cell G1).
[222] Orszag Report ¶¶86-89.
[223] Orszag Report ¶ 86.
[224] Elhauge Merits Report ¶ 91; Teva-Epi_002003.
[225] Orszag Report ¶ 86.
[226] Elhauge Merits Deposition 140 (emphasis added).

Highly Confidential: Subject to Protective Order

But ignoring what I actually said, Mr. Orszag again attacks a straw man by falsely claiming that I have assumed there will be no year-to-year variation.

111.   Mr. Orszag also claims that Teva's forecast of constant expected generic prices conflicts with evidence that branded EpiPen pricing rose prior to and after the settlement.[227]   But there is no reason to think that branded and generic pricing have to track each other.  Mr. Orszag further claims it is unreasonable not to expect generic prices to rise with general inflation rates.[228]  But, as noted below, the parties did not think that expected incremental costs for these products would rise. Unless they expected incremental costs for these particular products to rise, there is no reason they would expect that generic prices would rise unless they expected generic market power to increase over time, which is unlikely because generic markets are highly competitive and neither Mylan nor Teva projected generic exit. Thus, Mr. Orszag's arguments for claiming that Teva's generic price projections are mistaken all rest on his own economically flawed or straw man assumptions.  In any event, the predicted but-for settlement turns on what the parties expected at the time, not on whether Mr. Orszag thinks their expectations are correct or plausible, and he points to no evidence that Teva had any different pre-settlement expectations regarding generic pricing.

112.   To be sure, Teva's pre-settlement forecast does not specify expectations for generic pricing after the first three years.  In my opinion it is more consistent with the Teva expectations demonstrated for those first three years to assume that Teva thought expected generic pricing would remain constant thereafter as well, rather than make an arbitrary assumption that Teva thought that expected generic pricing would be constant for precisely the length of their forecast, but then increase thereafter.  This interpretation especially makes sense because, as pointed out above, the parties did not think expected costs or generic market power would increase over time.   Nevertheless, even if I were to make an unfounded assumption that Teva thought that expected generic pricing would increase by 5% per year, either immediately or after the first three years corresponding to the timeframe of Teva's projection, it would have the effect of slightly *increasing* the delay in allowed entry caused by the reverse payment.[229]

---

[227] Orszag Report ¶ 86.

[228] Orszag Report ¶ 86.

[229] Rev Pmt Model Merits Reply gen p inc.xlsm (Tab "No Pmt Entry Dates" Cell G1 showing the no payment settlement entry date to be February 24, 2014) Rev Pmt Model Merits Reply gen p inc after 3yrs.xlsm (Tab "No Pmt Entry Dates" Cell G1 showing the no payment settlement entry date to be February 24, 2014).

Highly Confidential: Subject to Protective Order

113.   Mr. Orszag likewise claims that it is unreasonable for me to assume "that the firms' costs would remain literally unchanged for years."[230]  Again, I make no such assumption.   Rather, I concluded, based on the parties' own internal forecasts, that *the parties forecast* that *expected* incremental costs would remain constant or a constant percentage of branded prices.   Teva assumed its expected generic EpiPen costs would remain constant.[231]  The parties assumed that expected incremental costs would be a constant percentage of branded prices for branded EpiPen and Nuvigil and for generic Nuvigil.[232]  So, again, my analysis is based on the parties' forecasts, not on my own assumptions.   Nor, contrary to Mr. Orszag's mischaracterization, do such forecasts unreasonably assume that incremental "costs would remain literally unchanged for years."[233]  Rather, such a projection can reflect the reasonable view that incremental costs are as likely to rise as fall, so that the *expected* incremental cost would not change over time.   Such a projection does not imply any view that incremental costs will remain rigidly unchanged to the penny year after year, and attacking that view is once again an attack on a straw man.

114.   Mr. Orszag argues that the party projections of constant expected incremental costs cannot be right for Mylan's projection of constant EpiPen costs because such costs turn partly on royalties that vary with price levels.[234] ███████████████████████████████████████████████████████████████████████████████████████████████   This is entirely consistent with the point that its incremental royalty per unit would increase with increased prices.   So Mr. Orszag's arguments for claiming that the parties' cost projections are mistaken all rest on his own economically flawed or straw man assumptions.   In any event, the predicted but-for settlement turns on what the parties expected at the time, not on whether Mr. Orszag thinks their expectations are correct or plausible, and he points to no evidence that the parties had any different pre-settlement expectations regarding how incremental costs might change over time.

---

[230] Orszag Report ¶87.

[231] Elhauge Merits Report ¶ 91; Teva-Epi_002003.

[232]   *See*   Elhauge   Merits   Report   ¶¶   90,   92-93;   MYEP00266842   at   slide   8; Teva_EPI_MDL00006874 at 94; MYEP01378720.

[233] Orszag Report ¶ 87.

[234] Orszag Report ¶ 87.

[235] MYEP01207989 (showing expected brand pricing to increase from 2011 to 2013); Elhauge Merits Report ¶ 90 (detailing reasons for modeling Mylan COGS at 30.1% of revenue).

Highly Confidential: Subject to Protective Order

115.    Second, Mr. Orszag argues that it is unreasonable for me to use "different estimates for expectations for price, quantity, and margins for Mylan and Teva in the EpiPen modeling."[236] But I use different estimates for Mylan and Teva only when Mylan and Teva's own projections show that they actually had different expectations on such matters.  Parties often (indeed usually) reach agreements when they have different expectations about matters, and the parties' but-for settlement could only reflect the actual expectations that they had at the time.  If those expectations varied from each other, then the but-for settlement would reflect those varied expectations, and it would be unreasonable to assume that they held expectations different from those that they actually held.[237]  Mr. Orszag provides no economic reasoning or literature to support his claim that parties must have the same expectations about market facts before they reach an agreement.

116.    Indeed, Mr. Orszag's assertion that I should assume that the parties had the same expectations directly conflicts with his assertion elsewhere in his report that "there is no reason why the two parties need to have the same expectations."[238] In combination, he offers the absurd mix of positions that it is unreasonable for me to conclude that the parties had different expectations on price, quantity, and margins—even when their forecasts clearly indicate they had different expectations on those topics—but unreasonable for me *not* to assume that the parties had different expectations on patent strength or the expected no-settlement entry date—even when there is no evidence to indicate they had different expectations on that topic.[239]  Nor does he provide any method for figuring out which constant assumption about those market facts to impose when the evidence indicates that the parties actually had varying expectations.

117.    Mr. Orszag argues that my use of differing party estimates on market prices, quantity, and margins is unreasonable based on his assertion that I did not

---

[236] Orszag Report ¶ 88.

[237] Each party's expected settlement and litigation payoffs would reflect its own expectations on such matters, and each party's settlement gains (and share of joint gains) would be calculated relative to its own perception of settlement and litigation payoffs.  Elhauge Merits Report ¶¶ 71, 76-77.

[238] Orszag Report ¶ 94.

[239] Orszag Report ¶ 34 ("[T]here is no reason why the two settling parties' beliefs about the patent strength need to be the same, and it would in fact be surprising if the two firms made identical assumptions about the strength of the Nuvigil patents, particularly in light of their different beliefs in other respects."); *id.* ¶ 54 ("[H]e assumes that both parties hold the same belief as to expected entry dates should Teva prevail in the EpiPen patent litigation.  Such an assumption, again, as discussed above, is unfounded.").

Highly Confidential: Subject to Protective Order

actually use the parties' projections for market quantity.[240]  But Mr. Orszag does not explain why my use of party projections on prices and margins would be undermined by a claim that I did not use party projections on market quantity.  Moreover, his claims that I did not use party projections on market quantity are all false.  First, he falsely claims that "Prof. Elhauge did not identify the source of his Mylan EpiPen market size estimate in his report."[241]

Second, Mr. Orszag complains, "Prof. Elhauge's source for Teva's forecast of the EpiPen market size is a 2012 document forecasting Teva's sales through December 2015, which is a much shorter time period than forecasts through 2025 that Prof. Elhauge creates for his model."[243]  But if Teva had a constant forecast of expected market size for three years, it makes more sense to assume that that constant expected market size would continue after three years than to arbitrarily assume the market size would increase after those three years.[244]  Also, the fact that the parties both projected that expected EpiPen market size would remain constant over time indicates a consistency about growth assumptions, which conflicts with Mr. Orszag's claim that these examples support his claim that I assumed the parties had varying projections.  Third, Mr. Orszag complains that I concluded, based on a 2012 declaration by Teva's subsidiary Cephalon, that Teva projected expected Nuvigil market size would grow by "two percent per year."[245]  Mr. Orszag claims that, "In fact, the declaration only projects an increase in demand of 'approximately 2% *in the next year*.'"[246]  Thus, he claims that "the Cephalon forecast only extends to 2013" and it was erroneous for me to extend it past 2013 through 2024.[247]  But his reading of the declaration is mistaken because it also states "Cephalon estimates that demand for NUVIGIL will increase

---

[240] Orszag Report ¶89.

[241] Orszag Report ¶89.

[242] Elhauge Merits Report ¶90 (citing MYEP00266842 at slide 8.).  Mylan's projection showed an essentially flat market size with units growing 0.25% from 5.727 million to 5.741 million units from 2011 to 2015.  MYEP00262837.

[243] Orszag Report ¶89.

[244] *Cf. supra* at Section IV.D (making same point for Teva expectations about generic EpiPen prices).  Defense counsel also argued that Teva's projection of a constant EpiPen annual market size of 5,386,000 units is inconsistent with the fact that my spreadsheet indicated a constant market size of 448,833 units.  *See* Elhauge Merits Deposition 141-142.  However, the latter is a monthly figure, so simply 1/12th the annual projection.

[245] Orszag Report ¶89.

[246] Orszag Report ¶89 (citing Teva_EPI_MDL00006545 at 58(emphasis added).

[247] Orszag Report ¶89.

Highly Confidential: Subject to Protective Order

by approximately 2% in 2012.  ***Sales of NUVIGIL are also expected to continue to grow further in the future***."[248]   Mr. Orszag offers no explanation why I should ignore the part of the forecast that extends the expectation of market growth to future years.  Nor does he offer any evidence that the parties had different pre-settlement projections of expected growth in market size or any explanation for how to estimate party projections of market size in future years other than relying on these projections continuing into the future.

118.   Finally, Mr. Orszag criticizes my use of a 10% discount rate used by Mylan in an



---

[248] Teva_EPI_MDL00006545 at 49 (emphasis added).

[249] Orszag Report n. 132; Elhauge  Merits Report ¶90 (citing MYEP01036549 at 53).

[250] MYEP01036549 at 53; Elhauge Merits Depo 149.

[251]   https://www.reuters.com/article/us-mylan-epipen-pfizer/pfizer-unit-meridian-under-civil-investigation-by-u-s-attorney-idUSKCN1QI3DJ;
https://www.empr.com/manufacture/mylan-specialty-l-p/                                                    ;
https://www.bloomberg.com/profile/company/0133223D:US .

[252]

[253] Rev Pmt Model Merits Reply 5 pct disc.xlsm and Rev Pmt Model Merits Reply 20 pct disc.xlsm.

Highly Confidential: Subject to Protective Order

### E. Litigation Costs and Uncertainty Costs

119.    Mr. Orszag falsely claims that I believe litigation costs are irrelevant.[254] In fact, they are an express input to my model, and I included a sensitivity test specifically addressing the impact of alternative estimates of litigation costs in my report.[255]  What I actually noted was that if a settlement could be reached without a reverse payment, then avoidance of any litigation costs cannot be a *justification* for the reverse payment.[256]  In fact, if litigation costs were higher than I estimated, that would actually make it even easier to reach a no-payment settlement by lowering the litigation payoffs of both parties and thus making a range of no-payment settlement entry dates more likely and wider, which would make a reverse payment even less necessary to achieve a settlement and avoid litigation costs.

120.    Mr. Orszag turns this logic upside down by asserting the false premise that here litigation costs were high enough that the actual settlement entry dates were economically rational for both parties without any reverse payment, and then claiming that given his premise one should simply ignore any evidence of a payment, and instead just assume that the actual settlement must not have contained a payment.[257]  He offers no basis for his false premise, which conflicts with the data. The actual EpiPen settlement entry date was unprofitable to Teva relative to continued litigation by $30.8 million, and thus could not be explained unless Teva received a reverse payment from the Nuvigil settlement.[258]   Further, the actual Nuvigil settlement entry date would not have been economically rational for Mylan without a reverse payment because it undercompensated Mylan by $54.4 million relative to the no-payment settlement it could have gotten given its actual bargaining power.[259]  Moreover, the leap from his premise to his conclusion is a complete non sequitur.  The argument that there is no anticompetitive entry delay without a reverse payment if a settlement with the same entry date would leave both parties better off than with continued litigation fails because (1) it incorrectly assumes that parties in the but-for world would have a different bargaining power than they actually had; (2) it magically assumes that this but-for bargaining power would be 0% for the generic; and (3) it assumes that the patent holder irrationally gave away a large

---

[254] Orszag Report ¶92.
[255] Elhauge Merits Report ¶¶ 97-99, 101-102, 135.
[256] Elhauge Merits Report ¶ 139.
[257] Orszag Report ¶92.
[258] *See supra* Part II.B & Revised Table 1.
[259] *See supra* Part II.B & Revised Table 1.

Highly Confidential: Subject to Protective Order

reverse payment for nothing because it would have gotten the same entry date without the reverse payment.[260]

121.    Mr. Orszag also argues for an expansive definition of litigation costs, suggesting that they ought to include time spent by executives on litigation.[261] However, as with direct litigation costs, this cost of executive time would also be equally avoided by a no-payment settlement.  Further, in this case, it is implausible that the litigation would have consumed significant additional executive time given that the trial had already been completed,[262] and managerial involvement in the appeal process would likely be substantially less than the lawyers' involvement, and the cost of the lawyers' time is fully included already.  Mr. Orszag fails to identify which managers, if any, expected to spend significant amounts of their time on the litigation in this post-trial period.  Even if the cost of any managerial time on appeal was as expensive as the cost of the lawyers' time already accounted for in Professor Torrance's litigation cost estimate, the total litigation cost, including indirect costs, would be less than $10 million.[263]  As I noted in my initial report, even increasing total litigation costs to this amount has the effect of only decreasing the delay in allowed entry date by a single day.[264]

122.    Mr. Orszag also argues that I should have included a cost of uncertainty in my calculation.  Again, as with his other purported litigation costs, this uncertainty cost would be equally avoided by a no-payment settlement.[265]  Further, he provides no support for this uncertainty cost other than his unsupported statement that "[b]usiness people commonly discuss how important certainty is to them."[266]  He identifies no evidence specific to this case that the parties ascribed any value to certainty in this case.  Further, my analysis of risk aversion covers the possibility that managers, to the detriment of their shareholders, might place additional value on certain outcomes, and discount the potential upside of any uncertain outcomes that could exceed the value of the certain minimum account.  As I showed in my initial report, and Mr. Orszag does nothing to rebut, the parties here were large publicly traded corporations that were unlikely to be risk averse, and even extreme

---

[260] Elhauge Merits Report ¶ 120.

[261] Orszag Report ¶90.

[262] Elhauge Merits Report ¶ 83.

[263] Elhauge Merits Report ¶135.

[264] Elhauge Merits Report ¶135.  Mr. Orszag's also argues that avoided litigation costs were higher because of the additional patents included in the settlement, Orszag Report ¶91, but that argument was already rebutted above in Part IV.A.

[265] Elhauge Merits Report ¶ 145.

[266] Orszag Report ¶90.

Highly Confidential: Subject to Protective Order

levels of risk aversion do little to change the result that the reverse payment significantly delayed the allowed entry date.[267]   Below is a revised version of Figure 24, correcting for the computational errors, showing the delay in allowed entry caused by the reverse payment for all levels of risk aversion between α=0, signifying maximal risk aversion, and α=1, signifying risk neutrality.   This figure shows that no matter the risk aversion (α = 100%), the delay in allowed entry changes only barely from 15.24 to 15.28 months. This is because risk aversion applies equally to both the EpiPen and Nuvigil settlements, with offsetting effects on the parties' overall bargaining power implied by the actual settlement.

**Revised Figure 24. Delay in Allowed Generic EpiPen Entry Caused by the Reverse Payment at Various Levels of Risk Aversion[268]**



### F. Combinations of Inputs

123.   In his discussion of "combination of inputs" Mr. Orszag again adopts the necessary but baseless magical assumption, that if the actual settlement entry date were within the range of no payment settlement entry dates that would give each party some gains relative to continued litigation, then the reverse payment caused no

---

[267] Elhauge Merits Report ¶¶ 143-144, 148-149.
[268] Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths").

Highly Confidential: Subject to Protective Order

delay.[269]  This is incorrect for the reasons I outlined in my initial report, including that (1) it incorrectly assumes that parties in the but-for world would have a different bargaining power than they actually had; (2) it magically assumes that Teva's bargaining power would drop from its level close to 50% in the actual world down to close to 0% in the but-for world; and (3) it assumes that the patent holder irrationally gave away a large reverse payment for nothing because it would have gotten the same entry date without the reverse payment.[270]

124.    Further, Mr. Orszag also makes an error in his Figure 5 by assuming that Teva would expect to launch an EpiPen generic at risk even when it would be irrational for it to do so.  To illustrate, suppose Teva believed that the patent strength was 22%.  According to Mr. Orszag's Figure 5, Teva's expected litigation payoff would exceed its settlement payoff if it expected to enter in August 2013, but not if it expected to enter in January 2013.  That means he is assuming that Teva expected to make less money by launching at risk in January 2013 than waiting until the end of the litigation in August 2013.  If that were the case, then Teva would rationally not launch at risk and would instead wait until August 2013 to launch.  Correcting this error significantly reduces the size of the blue area in his Figure 5.  Further, Mr. Orszag includes with no justification, patent strengths outside the range estimated by Professor Torrance of 5% to 25%, as well as expected entry timings later than any date that has ever been argued for by him or any other defense expert at any stage of this case.  If one corrects his Figure 5 and 6 (by assuming only rational at-risk entry, restricting the relevant patent strengths to between 5% and 25%, and restricting the no-settlement entry dates to between 1/1/2013 and 6/1/2014), the size of the blue and reds area in his Figures 5 and 6 diminishes significantly, as shown below in Corrected Orszag Figures 5 and 6.  In the corrected figures the darker shaded areas are outside of Professor Torrance's patent strength range and/or outside the plausible range of no-settlement entry dates.

---

[269] Orszag Report ¶ 94 ("if the parties did have the same expectations, there is a range of inputs for which both parties will find the settlement to be economically rational on a standalone basis, and hence no indication of a reverse payment or "pay-for-delay."")

[270] Elhauge Merits Report ¶ 120.

Highly Confidential: Subject to Protective Order

**Corrected Orszag Figure 5. Parameter Values for Which the Settlement Entry Date Would Be Acceptable to Teva Without Any Reverse Payment[271]**



**Corrected Orszag Figure 6. Parameter Values for Which the Settlement Entry Date Would Be Acceptable to Mylan Without Any Reverse Payment[272]**

---

[271] Rev Pmt Model Merits Reply.xlsm (Tab "Revised Figures 5 and 6").  The light blue area represents combinations of Teva perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *more* profitable for Teva than continued litigation and (b) *are* within Professor Torrance's patent strength range and the plausible range of expected no-settlement entry dates.  The dark blue area represents combinations of Teva perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *more* profitable for Teva than continued litigation but (b) *are not* within Professor Torrance's patent strength range and/or the plausible range of expected no-settlement entry dates.  The light gray area represents combinations of Teva perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *less* profitable for Teva than continued litigation and (b) *are* within Professor Torrance's patent strength range and the plausible range of expected no-settlement entry dates.  The dark blue area represents combinations of Teva perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *less* profitable for Teva than continued litigation but (b) *are not* within Professor Torrance's patent strength range and/or the plausible range of expected no-settlement entry dates.

[272] Rev Pmt Model Merits Reply.xlsm (Tab "Revised Figures 5 and 6").  The light red area represents combinations of Mylan perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *more* profitable for Mylan than continued litigation and (b) *are* within Professor Torrance's patent

Highly Confidential: Subject to Protective Order



## V. MR. ORSZAG FAILS TO DEMONSTRATE ANY VALID PROCOMPETITIVE JUSTIFICATIONS FOR THE REVERSE PAYMENT

125.   Mr. Orszag erroneously claims that I "ignore entirely the fact that reverse payment settlements can have procompetitive benefits."[273]   In doing so he completely ignores an entire section of my initial report devoted precisely to the evaluation of whether the reverse payment in this case might have any valid procompetitive justifications.[274]   His discussion of the issue amounts simply to a

---

strength range and the plausible range of expected no-settlement entry dates.  The dark red area represents combinations of Mylan perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *more* profitable for Mylan than continued litigation but (b) *are not* within Professor Torrance's patent strength range and/or the plausible range of expected no-settlement entry dates.  The light gray area represents combinations of Mylan perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *less* profitable for Mylan than continued litigation and (b) *are* within Professor Torrance's patent strength range and the plausible range of expected no-settlement entry dates.  The dark red area represents combinations of Mylan perceptions of patent strengths and expected no-settlement entry dates that (a) would make a no-payment settlement having the actual settlement entry date *less* profitable for Mylan than continued litigation but (b) *are not* within Professor Torrance's patent strength range and/or the plausible range of expected no-settlement entry dates.

[273] Orszag Report ¶ 96.

[274] Elhauge Merits Report Part VI.

Highly Confidential: Subject to Protective Order

recitation of literature outlining how reverse payment settlements could be procompetitive in some cases.[275] He follows this discussion with a single conclusory paragraph that simply states that in his opinion the Nuvigil and EpiPen settlements at issue in this case were in fact procompetitive, without providing any factual support or economic analysis to show that the actual settlements at issue in this case conferred any procompetitive effects.[276]

126.    Mr. Orszag falsely asserts that I ignore the possibility that the payment in this case was needed in order to reach a settlement.[277] In doing so, he completely ignores my extensive analysis of the very question of whether a mutually beneficial settlement could have been reached in this case without a reverse payment.[278] In this analysis, I showed that a reverse payment was not required in order for the parties to reach a mutually beneficial settlement for any commonly held patent strength perception that they had, and that even if the parties held differing patent strength perceptions, more than 87.9% of all possible such combinations resulted in a settlement being feasible without the need to resort to a reverse payment.[279] Indeed, Mr. Orszag provides zero evidence that a reverse payment was necessary to settle the EpiPen patent litigation, and thus he provides no basis to think that this purported procompetitive justification applies. Moreover, even for the minority of cases in which a reverse payment were necessary in order to reach a settlement (i.e., even when a no-payment settlement would not be the but-for outcome), Mr. Orszag is wrong to assume this means the reverse payment is procompetitive.[280] Such a reverse-payment settlement can still anticompetitively delay entry relative to the expected result from continued litigation, which would be the but-for baseline in such cases.[281]

127.    Mr. Orszag identifies two benefits he believes were achieved by the settlement in this case: (a) entry prior to patent expiration, and (b) avoided litigation costs.[282] His claim that an entry date prior to patent expiration is a procompetitive benefit necessarily means he is using the end of patent term as his but-for baseline of how long competition would have been excluded without the reverse payment.

---

[275] Orszag Report ¶¶ 97-99.

[276] Orszag Report ¶ 101.

[277] Orszag Report ¶ 98.

[278] Elhauge Merits Report ¶¶ 112-123.

[279] Part IV.A.

[280] Orszag Report ¶ 98.

[281] Einer Elhauge & Alex Krueger, *Solving the Patent Settlement Puzzle*, 91 TEX. L. REV. 283, 303-04 (2012)

[282] Orszag Report ¶ 101.

Highly Confidential: Subject to Protective Order

But for this to be the correct but-for baseline, one would have to assume that without the reverse payment: (a) the parties would not have settled; and (b) Mylan would have been 100% likely to win the EpiPens litigation on the patent merits. Both assumptions are mistaken. First, as just noted, a no-payment settlement was feasible for any commonly-shared patent strength perception and the lion's share of divergent patent strength perceptions. If a no-payment settlement were feasible, then adding a reverse payment can only delay entry since no patent holder would rationally add a payment unless it obtained a delay of entry in exchange. Second, Mr. Orszag provides no evidence or basis to possibly support a claim that the EpiPen patent strength was actually 100%, Such an assumption is not only unfounded but clearly false because such a belief is inconsistent with the fact that in the actual settlement Mylan not only allowed Teva to enter years prior to patent expiration, but also linked the settlement to the Nuvigil settlement and agreed to a lopsided settlement in Nuvigil as a result. Indeed, Mylan would not have agreed to the actual settlement unless it thought the EpiPen patent strength were less than 30.8%.[283] In effect, he has simply assumed without basis that competitive effects should be measured using the nominal scope of the patent test that the economic literature has proven to be mistaken.[284]

128.   Mr. Orszag's other purported justification, avoided litigation costs, including both private and public costs, could not justify any significant entry delay. As I noted in my initial report, and Mr. Orszag completely ignored, this argument fails for at least three reasons. First, no reverse payment was necessary in order for the parties to be able to rationally reach a no-payment EpiPen settlement.[285] Such a no-payment EpiPen settlement is a less-restrictive alternative because it can equally avoid litigation costs, while resulting in a shorter settlement exclusion period and thus less harm to competition than a reverse-payment settlement. Second, even if the reverse payment were necessary to avoid the patent litigation costs in this case, these avoided litigation costs would need to be passed on to consumers in order to constitute a cognizable procompetitive justification for using a reverse payment.

---

[283] *See* "Rev Pmt Model Merits Reply.xlsm (Tab "Patent Strengths*")*. Moreover, because his argument presupposes that in the but-for world, entry would not have occurred until the patent expired, this is not a procompetitive justification that could possibly justify any anticompetitive effects that a factfinder found, since its explicit premise is that there was no anticompetitive delay to begin with.

[284] *See, e.g.,* Elhauge & Krueger, *supra* note 281, at 284, 289-290, 299; Aaron Edlin et al., Activating Actavis, ANTITRUST, Fall 2013, at 21 (concluding that "payments made to delay competition" are anticompetitive "even if the claimed infringer has only agreed to abstain from competition during a portion of the patent period.").

[285] Elhauge Merits Report ¶ 139.

Highly Confidential: Subject to Protective Order

Because avoiding litigation costs lowers a fixed cost rather than a marginal cost, it is unlikely to lower prices in a way that gets passed on to consumers at all.[286] Further, because the reverse payment amount here far exceeds the Mylan's avoided litigation costs of $3.1 million, the reverse-payment settlement actually raises, rather than lowers its fixed costs.[287]  Therefore, even if these costs were passed through to customers, the combined effect of the cost of the reverse payment and the avoided litigation costs would be in fact to raise, rather than lower, the EpiPen prices that consumers paid.  Third, even if the avoided litigation costs were passed through to consumers in a way that (considered in isolation) lowered the prices paid by those consumers, such a pass through would have to be large enough to offset the total overcharge that results from delaying entry.  Given the small amount of avoided litigation costs ($3.1 million over 1.4 years[288]) as a percentage of EpiPens revenue (projected at $49 million per month[289]), even a very small overcharge over a short period of time could not possibly be offset by any lowered prices resulting from saved litigation costs passed through to customers.

129.   Mr. Orszag's inclusion of public resources in his assessment of avoided litigation costs does nothing to support his contention that avoided litigation costs justified this settlement.  As just noted, without a reverse payment, a no-payment settlement would almost certainly have occurred, and such a no-payment settlement would have equally preserved judicial resources without precluding competition for as long, and thus would be a clear less restrictive alternative for advancing this purported procompetitive justification.  Nor does he explain how any fixed-cost savings to the judiciary could possibly be passed through to consumers in the EpiPen market, and there is no plausible way in which they could be.  Even if we ignore these fatal flaws, he also provides no estimate of how much the judicial system saved as a result of these settlements.  Even if the judicial system saved as much as the parties did, those savings would be at most $3.1 million, which is miniscule in comparison to the size of the anticompetitive effects in this case, as noted above.

---

[286] Elhauge Merits Report ¶ 140.
[287] Elhauge Merits Report ¶ 140.
[288] Merits Expert Report of Andrew Torrance.
[289] *See* Teva-Epi_002003 (showing monthly market units of .3mg product of 315,917, monthly markets units of .15mg product of 132,917, and a brand WAC of $109.49. (315,917+132,917)*$109.49 = $49.1 million).

Highly Confidential: Subject to Protective Order

## VI. FORECLOSURE SHARE

130.   In my opening merits report, I showed that Mylan entered into exclusionary agreements with PBMs that required PBMs to restrict insurance coverage of rival EAIs like Auvi-Q in their formularies in order to receive the highest rebates.[290]  Prof. Willig is the only defense expert that has criticized my foreclosure share calculation.[291]  I address each of his critiques in the sections below.

### A. Data Updates

131.   Before addressing Prof. Willig's critiques of my foreclosure share calculations, here I note two updates to the data used to calculate foreclosure shares that affect my foreclosure share calculations: (1) data on the number of uninsured patients; and (2) a more comprehensive formulary coverage dataset.[292]

#### 1. Uninsured Patients

132.   The foreclosure share calculations in my opening merits report are of the share of formulary lives foreclosed and thus do not include uninsured customers in the denominator.  The total foreclosure share calculations in this reply report add uninsured customers in the denominator, which reduces the foreclosure shares somewhat.

133.   Prof. Willig accounts for uninsured customers in his foreclosure share calculations based on data indicating the number of uninsured people in each year.[293]

---

[290] Elhauge Merits Report ¶¶150-158 & Figure 25.

[291] Willig Merits Report Part VII.

[292] Prof. Willig also notes that the programming code used to calculate the foreclosure shares in my opening merits reports accidentally did not include lives under the formulary status "Specialty (PA/ST)" as restricted. Willig Merits Report n. 276.  Whether one considers "Specialty (PA/ST)" as restricted has essentially no practical effect because plans with that status constitute only 0.05% of covered lives. "MREPLY65 specialty PA ST as pct of covered lives 201301-201510.xlsx".  Nonetheless, all statistics in this reply report now consider that formulary status as restricted.

[293] Willig Merits report n. 279 ("There are a modest number of patients that are uninsured and therefore could not have been foreclosed by the challenged conduct. Data on the number of lives for these uninsured patients come from the Kaiser Family Foundation Website.")  The website Prof. Willig is referring to is www.kff.org/other/state-indicator/total-population.  This data indicates that there were 44,845,800 uninsured lives in 2013, 36,342,200 in 2014, and 29,143,100 in 2015.

Highly Confidential: Subject to Protective Order

However, Prof. Willig's methodology overstates the relative importance of the uninsured population because it does not account for the fact that uninsured people are on average much less likely to buy EAIs than insured people. From January 2013 to October 2015, on average 2.6 doses of EAIs were sold per month for every 1,000 insured people, whereas only 0.8 doses of EAIs were sold per month for every 1,000 uninsured people.[294]   Consequently, IQVIA data that indicates the total number of EAIs purchased with cash by uninsured people more accurately indicates the relative importance of uninsured people in the EAI market. One can easily adjust my foreclosure shares to account for uninsured people by multiplying the share of the insured market that is foreclosed by $i/(i+c)$, where $i$ is the total number of EAI doses sold to insured patients and $c$ is the total number of EAI doses sold to cash (uninsured) payors. This multiplier ranged from 94-96% from January 2013 to October 2015.[295]

## 2. Updated Formulary Coverage Data

134.   When I submitted my merits report, the most comprehensive formulary coverage data available to me was SAN-EPI-0002613, which is data that Sanofi obtained from MMIT (a third-party data aggregator), used in its normal course of business, and produced as part of discovery in this case. In his merits report, Prof. Willig identifies an alternative source of formulary coverage data, which appears to be a more comprehensive version of SAN-EPI-0002613.[296]   This more comprehensive MMIT formulary coverage data was apparently made available to Professor Fiona Scott-Morton (the economic expert Sanofi has retained), but was not previously made available to me until Prof. Willig included it in his merits report backup. For brevity, I will refer to the original dataset I relied upon (SAN-EPI-0002613) as the "Sanofi MMIT data," and will in contrast refer to the MMIT data made available to Professor Scott-Morton as the "complete MMIT data."

135.   **a. Newly Available Complete MMIT Data Contains Information on More Plans**. Comparing the two dataset shows that the Sanofi MMIT data contains a subset of the complete MMIT data. From January 2013 to October 2015 (the relevant time period for all analysis performed using MMIT data), the Sanofi MMIT data contains 56% of the observations in the complete MMIT data,[297] which account

---

[294] "MREPLY11 doses per life per month, insured vs uninsured.xlsx"
[295] "MREPLY11 range of uninsured multiplier.txt".
[296] Willig Merits Report n. 242.
[297] "MREPLY07 merge of sanofi and complete mmit data.txt."

*Highly Confidential: Subject to Protective Order*

for 81% of the total covered lives in the complete MMIT data.[298]  For the 56% of plan-months that are in both the Sanofi MMIT data and the complete MMIT data, the two datasets provide identical information about Auvi-Q's coverage status and the number of covered lives.[299]  I cannot find any apparent pattern that determines why some observations are included in both datasets and others are included only in the complete MMIT data; the plan-months that are in the complete MMIT data but not the Sanofi MMIT data comprise many different plans, PBMs, formularies, and channels.

136.   Although it is unclear precisely why the Sanofi and complete MMIT datasets differ, it is clear that the complete MMIT data is more comprehensive. Therefore, for all of the statistics that I calculated based in part on the Sanofi MMIT data in my opening merits report, I recalculate them here based on the more comprehensive complete MMIT data.

137.   **b. Newly Available Complete MMIT Data Provides Information about Formulary Restrictions on EpiPen**. The newly available complete MMIT data is superior also because it includes additional information about each formulary that was not in the Sanofi MMIT data.  Most importantly, whereas the Sanofi MMIT data only includes information about Auvi-Q's formulary position, the complete MMIT data also includes information about the EpiPen's formulary position. Because the Sanofi MMIT data available to me in my opening merits report did not include the EpiPen's formulary position, I previously based my definition of whether Auvi-Q's formulary position was restricted solely on Auvi-Q's formulary status.  In contrast, now that I also have information on the EpiPen's formulary position, I consider Auvi-Q restricted only if: (1) Auvi-Q is subject to a formulary restriction; and (2) EpiPen is ***not*** subject to a formulary restriction.  I do this because the evidence indicates that Mylan does not give conditional rebates on EpiPen when EpiPen is restricted, so its conditioned rebates are unlikely to have caused those Auvi-Q restrictions.  Overall, 10% of formularies that restricted Auvi-Q also restricted the EpiPen (weighted by covered lives).[300]

---

[298] Willig Merits Report n. 242. My own calculations confirm this figure. "MREPLY07 pct covered lives in sanofi vs complete mmit data.csv".

[299] "MREPLY07 life and status match mmit data.txt".

[300] "MREPLY65 pct of plans restricting both Auvi and Epi, of All Plans that Restrict Auvi". Calculated over the time period ranging from January 2013 to October 2015.  I treated EpiPen as unrestricted when either the EpiPen or EpiPen Jr. is unrestricted because the evidence indicates that Mylan, as long as one of them is unrestricted, Mylan gives conditioned rebates on that product for formulary restrictions that restrict rivals.  *See, e.g.*, MYEP00000538 at MYEP00000555.

Highly Confidential: Subject to Protective Order

138.   Figure 102 below shows how the foreclosure shares presented in my opening merits report (Figure 25) differ if one makes the following changes: (1) use the complete MMIT data instead of the Sanofi MMIT data, (2) include uninsured people in the denominator, and (3) consider Auvi-Q restricted at a given formulary only if Auvi-Q's formulary position is restricted and the EpiPen's is not.[301]

**Figure 102: Foreclosure Share, Updated to Account for Uninsured Population and More Comprehensive MMIT Data[302]**



### B. Causal Connection Between Mylan's Contracting Terms and Restrictive Formulary Statuses

139.   Prof. Willig argues that some of the formulary restrictions on Auvi-Q may have been caused by reasons other than Mylan's contracting terms.[303] Ultimately, the plans that Prof. Willig claims imposed formulary restrictions on

---

[301] Prof. Willig reports different foreclosure shares, but as I show in Section D, his calculations are wrong because he wrongly assumes that all "non-commercial" plans were either unforeclosed, thus excluding them from the numerator, Willig Report ¶125, or not in the market, thus excluding them from both the numerator and denominator, *id.* ¶169.

[302] "MREPLY65 pRestricted Updated vs Old.xlsx".

[303] Willig Merits Report ¶¶156-58.

Highly Confidential: Subject to Protective Order

Auvi-Q without being offered rebates conditioned on formulary restrictions constitute only 0.8% of the covered lives that were restricted.[304]

140.   Prof. Willig's speculation about alternative causes of the formulary restrictions on Auvi-Q ignores the copious evidence showing that Mylan explicitly strategized to restrict Auvi-Q's formulary position.



---

[304] "MREPLY66 pct Kaiser 159, new restricted def.xlsx" (the plan-months that Willig Report ¶159 claim were not offered rebates conditioned on restrictions constitute only 0.8% of the plans that restricted Auvi-Q's formulary position but not EpiPen's (weighted by covered lives). Prof. Willig relatedly claims that Kaiser could not have been foreclosed based on the way it negotiates, but the evidence indicates that it was subject to an agreement with rebates conditioned on formulary restrictions and that a Mylan employee expressed the belief that Mylan had successful excluded Auvi-Q at Kaiser.  *See infra* Section B.3.  In any event, treating all Kaiser plans as unrestricted would not meaningfully change the results.  *Id.*

[305]

Highly Confidential: Subject to Protective Order

Below, I address Prof. Willig's specific claims about plans that he claims Mylan did not foreclose.

141.   Further, contract data from Prof. Willig's own backup contradicts his claim that plans often restricted Auvi-Q's formulary status for reasons other than Mylan's exclusionary agreements.   Prof. Willig's backup includes a contract index that shows, for each month and eight PBMs,[308] whether their commercial[309] agreement with Mylan included rebates conditioned on restricting Auvi-Q's formulary status.[310]   Combining Prof. Willig's contract index with the MMIT formulary restriction data allows one to directly measure whether plans that were offered rebates conditioned on restricting Auvi-Q's formulary position were more likely to restrict Auvi-Q's formulary position.   Figure 103 below compares the percentage of covered lives restricted between: (a) the plans that were offered rebates conditioned on restricting Auvi-Q (according to Prof. Willig); versus (b) the plans that were *not* offered rebates conditioned on restricting Auvi-Q (according to Prof. Willig).   It shows that, in every month from January 2013-October 2015, plans that were offered rebates conditioned on restricting Auvi-Q did so for a much larger share of their covered lives.

---

[308] The eight PBMs included in Prof. Willig's contract index are CVS/Caremark, Aetna, Cigna, MedImpact, OptumRx, Prime, Express Scripts, and Envision.

[309] Commercial here defined as the "commercial" or "health exchange" channels, consistent with Prof. Willig's backup.

[310] "input Figures 5a, 5b, 6a and 6b.xlsx", tab "rebate", from Prof. Willig's merits backup.

Highly Confidential: Subject to Protective Order

**Figure 103: Restricted Shares Among Commercial Plans That Prof. Willig's Backup Identified as Being Either Offered Rebates Conditioned on Formulary Restrictions or Not[311]**



*1. Prof. Willig Claims PBMs Put All New Products on Restrictive Formulary Tiers Until they are Sufficiently Evaluated*

142.   Prof. Willig argues that some of the formulary restrictions placed on Auvi-Q were not due to Mylan's conditional rebating based on his premise that some PBMs purportedly have a habit of putting new products on restrictive formulary tiers "until they have been sufficiently evaluated by the PBM and the market."[312]   The formulary coverage data directly contradicts the premise of Prof. Willig's argument. If Prof. Willig were correct, one would expect Auvi-Q's formulary coverage to be most restricted when it first entered the market.   But to the contrary, Auvi-Q's formulary coverage was ***least*** restricted when it first entered.   Figure 102 above shows that the share of the EAI market with restricted Auvi-Q coverage began at only 12% when Auvi-Q first entered in January 2013, and did not reach its peak at

---

[311] "MREPLY67 pRestricted, offered condition rebates vs not.xlsx"
[312] Willig Merits Report ¶157.

Highly Confidential: Subject to Protective Order

47% until June 2014.[313]   Indeed, one of the documents that Prof. Willig cites on this point acknowledges that most plans will have already made a decision about formulary placement within 6 months of product launch,[314] which would make it implausible that the peak 47% restricted share in June 2014 (18 months after Auvi-Q's launch) could be due to plans waiting to evaluate Auvi-Q.

### 2. Prof. Willig Claims Some PBMs Did Not Have Rebates Conditional on Formulary Exclusivity at Some Times for their Commercial Plans

143.   Prof. Willig claims that I overstated the foreclosed share based on the premises that: (1) five particular PBMs (Aetna, Cigna, Envision, MedImpact, and Prime) did not have commercial[315] EpiPen agreements with rebates conditioned on imposing formulary restrictions on Auvi-Q at some points in time from January 2013 to October 2015;[316] and (2) my foreclosure share calculations consider some of these plans' covered lives as restricted in some of these time periods.

144.   Prof. Willig's assertion has little practical significance because the covered lives that he claims were not subject to conditional rebates altogether constitute only 0.8% of the covered lives that I identified as foreclosed.[317]   These PBMs' commercial plans constitute a tiny share of restricted lives, despite constituting a significant share of all covered lives (8%),[318] because these PBMs' commercial plans restricted Auvi-Q's formulary position for only 3% of their

---

[313] "MREPLY65 pRestricted Updated vs. Old".

[314] Willig Merits Report n. 244, citing SAN-EPI-0171340.

[315] Although Prof. Willig does not explicitly restrict his claims regarding these PBMs to the commercial segment of the market, his backup programs consistently identify these PBMs as being not offered conditional rebates only for their commercial plans. Prof. Willig identifies "commercial" plans as those with "Channel" equal to "Commercial" or "Health Exchange" in the formulary coverage data. The other Channels in the data are "Managed Medicaid", "Medicare", and "State Medicaid". See line 13 of "Auvi-Q classified as Not Covered at PBMs with no conditional Mylan Rebate offer.do" and lines 81-85 of "Running Elhauge's regression on data without rebates conditional on restrictive placement.do", both from Prof. Willig's backup.

[316] Willig Merits Report ¶159; id. n. 300. These time periods are:
Aetna: January 2013 – December 2013 & January 2015 – October 2015
Cigna: January 2013 – October 2015
Envision: January 2013 – October 2015
MedImpact: January 2013 - June 2013
Prime: January 2013 – March 2014.

[317] "MREPLY66 pct Kaiser 159, new restricted def.xlsx".

[318] "MREPLY66 willig para 159 plan-months as pct of all covered lives.xlsx".

Highly Confidential: Subject to Protective Order

covered lives during the time periods when Prof. Willig claims Mylan did not offer them rebates conditioned on formulary restrictions.[319]  The fact that these plans so rarely restricted Auvi-Q's formulary status when they were not subject to exclusionary agreements directly refutes Prof. Willig's claim that plans were often restricting Auvi-Q's formulary status for reasons other than Mylan's exclusionary agreements.  If one assumes that commercial plans at PBMs that that Prof. Willig claims did not have rebates conditioned on formulary restrictions during certain time periods were not foreclosed during those time periods, it barely alters the foreclosure shares, as the following figure shows.  For the remainder of my analysis, I will use the slightly lower foreclosure figures that treat these commercial plans during these times as unrestricted.

**Figure 104: Foreclosure Shares, Depending on Whether One Adjusts Them to Assume that Commercial Plans at PBMs That Prof. Willig Claims Did Not Have Rebates Conditioned on Formulary Restrictions During Certain Time Periods Were Not Foreclosed During Those Time Periods[320]**



---

[319] "MREPLY67 pRestricted, offered condition rebates vs not (201301-201510)".

[320] "MREPLY66 forc share no 159.xlsx." This figure uses updated MMIT data, accounts for uninsured patients, and uses the updated definition of when Auvi-Q is restricted.

Highly Confidential: Subject to Protective Order

### 3. Prof. Willig's Claim that Kaiser Was Not Foreclosed Contradicts the Evidence

145.   Prof. Willig asserts, based on the deposition of one of Kaiser's employees, that the way Kaiser negotiates agreements prevents it from being subjected to foreclosing conduct.[321]



Even if one credited Prof. Willig's claim that all Kaiser plans were unforeclosed, it would barely affect the restricted shares (which would be on average only 1% lower[325]) or the regression results (which would still have the same coefficient and statistical significance).[326]

---

[321] Willig Merits Report ¶158, citing Shia (Kaiser) deposition.

[325] "MREPLY66 forc share no 159 no kaiser.xlsx".  This reflects the fact that I only treat Kaiser plans as restricted if they restricted Auvi-Q but not EpiPen, and such plans constituted a small share of covered lives.

[326] If one modifies my main foreclosure regression specification (which uses Johnson extended back matching, updating complete MMIT data, estimated plan-level prices, MMIT data to define PBM, and estimates the effect of the difference between Auvi-Q and EpiPen's net price (instead of the ratio), then the share impact coefficient is still the same (-4.6%) and is still highly statistically significant, with a p-value less than 0.1% using standard errors clustered on the plan. MREPLY71 forc reg, jeb, plan price diff,  mmit pbm, kaiser un.xlsx".

Highly Confidential: Subject to Protective Order

### 4. Whether Plans Would Have Bought Auvi-Q But-for Foreclosure Is Not Relevant to Calculation of Foreclosure Share

146.   Prof. Willig argues that, even if Mylan's rebates were conditioned on exclusivity, there is no foreclosure if the plan would not have covered Auvi-Q in the but-for world either.[327]  Prof. Willig's position contradicts the standard methodology for calculating foreclosure shares, which treats all sales made under the foreclosing agreements as foreclosed, regardless of whether customers would have purchased the rival product but for the foreclosure.[328]

## C. Prior Authorization and Step Therapy Are Restrictive

147.   In my opening merits report, I showed, citing multiple types of evidence, that excluding Auvi-Q from a formulary or subjecting Auvi-Q to a "prior authorization" or "step therapy" protocol would significantly restrict Auvi-Q.[329]  As Figure 105 below shows, from January 2013 to October 2015 more than half of the foreclosure (19% of the market) was from Auvi-Q being completely excluded from the formulary ("Not Covered"), with Prior Authorization being the second most-common form of formulary restriction, and Step Therapy being the least common.

### Figure 105: Breakdown of Restricted Lives by Type of Restriction, January 2013- October 2015[330]

---

[327] Willig Merits Report ¶159.

[328] 10 AREEDA & HOVENKAMP, ANTITRUST LAW ¶1753c, at 302-304 (3d Ed. 2011) ("A tying agreement is not defeated by evidence that a buyer would have purchased the defendants tied product anyway.... Thus, once the requisite agreement or conditioned sale appears, whether the agreement or condition *caused* buyers to purchase the defendants tied product rather than a rival's is not in issue" (emphasis in original)); 9 AREEDA & HOVENKAMP, ANTITRUST LAW ¶¶1709a, at 89 (3d ed. 2011) ("the foreclosure includes all sales that are, as a practical matter, covered by the defendant's tie-ins, even if the defendant previously sold the tied product to the same customers without a tie."); *id.* ¶1709d, at 98 ("all purchases covered by the tie should be counted as foreclosed even when many of the defendant's customers had voluntarily purchased the same volume of the second product from it before there was any tie-in.  Although the tie has not increased the defendant's sales of the tied product to those customers or the market share represented by them, it has suppressed their previous freedom to transfer their business to competing suppliers during the life of the tying agreement.").

[329] Elhauge Merits Report ¶¶154-155.

[330] "MREPLY68 pLives by restrict type.xlsx." This figure was calculated using the comprehensive complete MMIT dataset, accounts for the uninsured population, and uses the updated definition of when Auvi-Q is restricted.  This figure also assumes that the commercial plans that Prof. Willig claims were unforeclosed during certain time periods were unforeclosed

Highly Confidential: Subject to Protective Order



148. Prof. Willig does not appear to dispute that excluding Auvi-Q from a plan's formulary will substantially reduce the amount of Auvi-Q obtained by that plan's subscribers.[331] Nor does Prof. Willig appear to dispute that subjecting Auvi-Q coverage to "Prior Authorization" or "Step Therapy" protocols is also "restrictive."[332] Prof. Willig's claim is instead merely that "Prior Authorization" and "Step Therapy" are "less restrictive than formulary exclusion,"[333] which is hardly saying much given how restrictive formulary exclusion is. The following sections address the sections of Prof. Willig's report that downplay the restrictive effects of Prior Authorization and Step Therapy.

### 1. Step Therapy is Restrictive

149. Step therapy coverage for Auvi-Q means that the insurer will not cover Auvi-Q unless the subscriber has already purchased and tried an alternative EAI.[334] This functionally prohibits a subscriber from getting insurance coverage for Auvi-Q at the very least until the subscriber has the opportunity to "try" an alternative EAI (i.e., until the subscriber has an anaphylactic reaction that requires administration of an EAI). Indeed, the newly available, more comprehensive MMIT data included in

---

during those time periods. Where a plan subjects Auvi-Q to both prior authorization and step therapy, this chart identifies it as subject to step therapy.

[331] Willig Merits Report ¶193 ("That formulary restrictions reduce Auvi-Q's share is neither surprising not controversial").

[332] Willig Report ¶162 ("prior authorizations and step edits are substantially less restrictive formulary exclusion.").

[333] *Id.*

[334] Elhauge Merits Report ¶154.

Highly Confidential: Subject to Protective Order

Prof. Willig's backup confirms that many formularies subjecting Auvi-Q to step therapy would cover Auvi-Q only if the subscriber had experienced "prior failure" with the EpiPen.[335]  And even if the subscriber suffers an anaphylactic reaction and tries another EAI, its plan still may not cover Auvi-Q under a step-therapy protocol unless the subscriber and/or its doctors convinces the insurer that the alternative EAI failed in some way that can be remedied by Auvi-Q.  Step therapy is therefore extremely restrictive.

150.   Prof. Willig does not appear to really dispute that step therapy is restrictive, but rather only notes that it is theoretically possible for a patient to obtain coverage under step therapy.[336]  But the relevant issue for economic analysis is the actual, *practical effect* of step therapy on Auvi-Q, not unlikely theoretical possibilities.  On this point, Prof. Willig cites no evidence to refute that step therapy significantly restricts Auvi-Q. As I explained in my opening report, ███████ ████████████████████████████████████.  Further, the statistical analysis I present below in section 3 shows directly that step therapy significantly reduces Auvi-Q's share.

### 2. Prior Authorization is Restrictive

151.   "'Prior Authorization' ('PA') coverage for Auvi-Q means that the insurer will not cover Auvi-Q unless the patient's physician explains to the insurer that the patient needs the Auvi-Q instead of an EAI product with unrestricted formulary coverage (such as the EpiPen) and the insurer agrees."[338]  In my opening merits report, I cited multiple types of evidence showing that Prior Authorization coverage was restrictive:

- ███████████████████████████████████

---

[335] "MREPLY80 auvi-q PA ST restrictions with failure required.xlsx" (providing a list of example formulary restrictions on Auvi-Q that required some sort of "failure" of an alternative EAI. Such examples include "prior failure or contraindication with preferred EpiPen" and "treatment failure with preferred drugs").

[336] Willig Report n. 260, n. 255.

[337] Elhauge Merits Report ¶155, citing MYEP00527619 at slides 3-4.

[338] Elhauge Merits Report ¶154.  Prof. Willig does not appear to dispute this definition. Willig Report ¶162.

[339] Elhauge Merits Report ¶155, citing MYEP00527619 at slides 3-4.

Highly Confidential: Subject to Protective Order

- A Sanofi presentation showing that Auvi-Q's share in late 2013 was only 6% at plans where Auvi-Q was not covered or subject to prior authorization, as compared to 16% at unrestricted formularies.[340]
- A peer-reviewed academic article acknowledging that "many physicians are exasperated by the time dedicated to PA paperwork," and that consequently some physicians will "refuse to fill out any PA forms because of the time burden."[341]

152.   Prof. Willig does not cite anything that refutes this evidence that prior authorization coverage significantly reduces Auvi-Q's share.  His only critique of the evidence I cited in my opening merits report is that I cited only one academic article about the restrictive effects of prior authorization,[342] but other articles likewise acknowledge that prior authorization coverage regularly deters doctors from prescribing a drug.[343]

153.   Prof. Willig cites only a single deposition for his claim that "PBMs testified that successful prior authorizations are common,"[344] but the other evidence he cites actually indicates that successful prior authorizations are extremely rare largely because doctors rarely request authorization.  For example, Prof. Willig notes that Sanofi's "Patient Connection" program, which was designed to "help facilitate the prior authorization process" received only 4,249 prior authorization requests and approved 3,524 of those requests in 2014.[345]  That means this program obtained prior

---

[340] Elhauge Merits Report ¶155, citing PS0236464 at PS0236467.

[341] Elhauge Merits Report ¶154, quoting MacKinnon & Kumar, *Prior Authorization Programs: A Critical Review of the Literature*, 7 Journal of Managed Care Pharmacy 297 (July/August 2001).

[342] Willig Report ¶164.

[343] *See, e.g.* American Medical Association 2018 "Prior Authorization (PA) Physician Survey, available at /www.ama-assn.org/system/files/2019-02/prior-auth-2018.pdf (91% of surveyed doctors reported that Prior Authorization requirements "delay access to necessary care," and 75% of surveyed physicians reporting that Prior Authorization requirements "can lead to treatment abandonment." 86% of surveyed physicians described the "burden associated with PA" as "high or extremely high". This was based on a sample of "1000 practicing physicians");  Law et al., *Effect of Prior Authorization of Second-Generation Antipsychotic Agents on Pharmacy Utilization and Reimbursements*, 59 PSYCHIATRIC SERVICES 540, 542-543 (May 2008) ("After implementation of prior authorization, there was an immediate drop of 3.5% . . . in market share and a subsequent drop of 1.3% . . .  per quarter.  This led to an estimated market share reduction of 13.8% . . . two years after imitation of prior authorization.").

[344] Willig Report ¶163, n. 260, citing (30(b)(6) Kronberg (Cigna) Deposition, p. 61).  The other deposition excerpt he cites for this proposition is about step-therapy.

[345] Willig Report ¶163, citing SAN-EPI-1235127.

Highly Confidential: Subject to Protective Order

authorization approvals for only 3,524 doses of Auvi-Q in 2014, which constitute only 0.09% of the EAI market and 1% of total Auvi-Q doses in 2014.[346]  That hardly supports Prof. Willig's claim that Prior Authorizations for Auvi-Q were "common."

154.   Further, the statistical analysis I present below in section 3 (the next section) shows directly that prior authorization significantly reduces Auvi-Q's share.

### 3. Statistical Analysis Confirms Prior Authorization and Step Edits are Restrictive

155.   Modifying my foreclosure regression so that it can separately estimate the restrictive effects of the three different types of restrictive formulary coverage (Not Covered, Step Therapy, and Prior Authorization) confirms that all three types significantly reduced Auvi-Q's market share.   This regression has the same specification as my original foreclosure regression, *except* that I replaced the single "percent of Lives Restricted" with three variables, one for each type of restriction: (a) "percent of Lives Restricted by Formulary Exclusion", (b) "percent of Lives Restricted by Prior Authorization," and (c) "percent of Lives Restricted by Step Therapy."[347]  Table 101 below shows the results of this regression.  It indicates that: (a) excluding Auvi-Q from a formulary reduces its share by 4.5 percentage points; (b) subjecting Auvi-Q to prior authorization reduces its share by 5.1 percentage points; and (c) subjecting Auvi-Q to step therapy reduces its share by 3.9 percentage points.

---

[346] "MREPLY09 PA auth relative to EAI market size.csv".

[347] Where Auvi-Q is subject to both prior authorization and step therapy according to the MMIT data, I categorize it as subject to step therapy.  The estimated coefficient for the "percent of lives restricted by prior authorization" variable will therefore measure the effect of prior authorization clauses that are unaccompanied by step therapy.

Highly Confidential: Subject to Protective Order

| Table 101: Foreclosure Regression Separately Estimated Effects of Formulary Exclusion, Step Therapy, and Prior Authorization[348] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **p-value** |
| % restricted by Formulary Exclusion | -4.5% | 0.004 | 0.0% |
| % restricted by Prior Authorization | -5.0% | 0.006 | 0.0% |
| % restricted by Step Therapy | -3.8% | 0.004 | 0.0% |
| Estimated Plan-Level Price Ratio | -2.5% | 0.009 | 0.4% |

156.    For each of the three restrictions, the estimated share impact is different from zero with a high degree of statistical significance, confirming that each type of restriction significantly suppresses Auvi-Q's share.  But these regression results contradict Prof. Willig's claim that Step Therapy and Prior Authorization are significantly less restrictive than Formulary Exclusion.  The share impact coefficient from prior authorization actually exceeds that from formulary exclusion, and they are all in a similar range of 3.8% to 5.1%.  Further, none of these estimated share impacts are statistically significantly different from each other; the p-value with respect to a null hypothesis that the effects of formulary exclusion, prior authorization, and step therapy are all equal to each other is 19%.[349]  Thus, one cannot reject the null hypothesis that all three restrictions have the same share impact at standard levels of statistical significance.

157.    Further, here there is no valid economic reason to separately estimate the effects of these three types of formulary restrictions because the anticompetitive effects turn on the aggregate impact of the three types of restrictions combined.[350]  Specifically, the increase in Mylan's gross-price caused by the foreclosure turns on the marketwide foreclosure created by all of the restrictions, rather than the individual foreclosure effects of each type of restriction.  My share impact regression already calculates that aggregate effect while accounting for any variation between no coverage versus prior authorization versus step therapy because it is estimated using weighted least squares, weighted by dosage, and thus gives a weighted average of the effects of all three types of restrictions.

---

[348] "MREPLY71 forc reg, jeb, plan price ratio,  mmit pbm, separate effects.xlsx"
[349] "MREPLY71 test null hyp that effects of NC, ST, PA the same.txt".
[350] Elhauge Class Reply Report ¶62.

Highly Confidential: Subject to Protective Order

### D. Mylan's Foreclosure Was Not Limited to Commercial Plans

158.   Prof. Willig calculates foreclosure shares assuming Mylan's conduct did not foreclose any "non-commercial" plans.[351]  But Prof. Willig narrowly defines "commercial" plans to be only those that are explicitly referred to as "Commercial" or "Health Exchange" plans.[352]  He thus defines "non-commercial" plans to include all "State Medicaid", "Managed Medicaid", and "Medicare" plans, even though many of the latter are actually administered by private entities, in particular "Managed Medicaid" plans, Medicare Advantage Plans, and Medicare Part D plans. Because Mylan often foreclosed private administrators of "Managed Medicaid" plans, Medicare Advantage Plans, and Medicare Part D plans, Prof. Willig's method understates the foreclosure share.

### 1. Both Commercial and Non-Commercial Plans Were Affected by Mylan's Foreclosing Conduct

159.   Prof. Willig's report asserts that he is assuming that "Plaintiffs are not challenging conduct with respect to Medicare Part D plans,"[353] and proceeds to calculate foreclosure shares under the assumption that Mylan did not foreclose any Medicare Part D plans.[354]  He bases this assumption on his unsupported assertion that "Professor Elhauge does not specifically challenge any Mylan rebate agreements for Medicare Part D business."[355]  Nowhere in my opening merits report did I indicate that the foreclosure caused by Mylan's conditional rebate agreements was in any way limited to the commercial portion of the market or that the foreclosure of Medicare Part D plans was not relevant. To the contrary, my calculations of foreclosure shares have always included foreclosed Medicare Part D plans.  Indeed, in my deposition I explicitly pointed out that my foreclosure analysis included Medicare and Medicaid plans that were administered by private entities.[356]

---

[351] Willig Merits Report Figure 9c.

[352] See Willig Merits Report n. 228 ("Commercial plans include entries where the channel is 'Commercial' or 'Health Exchange.'").

[353] Willig Report n. 269.

[354] Willig Report Figure 9c.

[355] Willig Report ¶167.

[356] Elhauge Merits Depo 208-09 with corrections ("Medicare and Medicaid often sell through various insurance administrators or HMOs so to -- well, to the extent that they count as TPPs in the data, they would be included"); id at 287 & Exhibits 13-14. ("So this does include Medicare. You talked before about excluding Medicare, but they're included here obviously," noting that the foreclosure analysis included for example "AARP MedicareComplete").

Highly Confidential: Subject to Protective Order

160.   Although Prof. Willig's report does not discuss whether he treats Managed Medicaid and Medicare Advantage Plans as foreclosed, his backup reveals that he also deemed them all unforeclosed.[357]  He provides no explanation for this decision.  In contrast, the only "non-commercial" plans that I excluded from my foreclosure calculations were "State Medicaid" plans, which are specifically the Medicaid plans that are administered by the States themselves, in contrast to "Managed Medicaid" plans, which are administered by private insurers and PBMs.[358]  I excluded "State Medicaid" plans from my calculations based on the instruction of counsel that the Court had ruled that the defendants are legally immune from damages related to the foreclosure of "state-based Medicaid agencies."[359]  In contrast, I did not exclude "Managed Medicaid" plans,[360] Medicare Part D, or Medicare Advantage plans, which are all administered by private entities.[361]

---

[357] *See* lines 78-80 of "Figures 9a-c.do" from Prof. Willig's merits backup.

[358] *See* "EPIMERITS02 import restriction data.do", line 133 (program from Elhauge Opening Merits Backup, excluding from foreclosure calculations plans with Channel == "State Medicaid").  In the IQVIA data, state-run Medicaid plans are identified with all of the "method of payment" variable set equal to "MEDICAID".  See "IQVIA Plan Model Type Listing_Final.xlsx", cell C16 ("Scripts reported under these plans [with method of payment equal to "MEDICAID"] are for Medicaid prescription benefits controlled by the State and not by managed care organizations.").

[359] August 20, 2018 Memorandum and Order to Dismiss, *In re EpiPen* Consumer Class Cases, at 28-29.

[360] "EPIMERITS02 import restriction data.do" (program from Elhauge opening merits backup, not excluding observations with the Channel variable in the MMIT formulary coverage data equal to "Managed Medicaid", which are administered by private companies).

[361] Unlike for some State Medicaid plans, the government-administered Medicare plan (sometimes called "Original Medicare Part A and B") does not cover EAIs for outpatient use. *See* www.medicare.gov/coverage/prescription-drugs-outpatient ("injectable ... drugs: Medicare covers most of these *when given by a licensed medical provider*) (emphasis added); www.medicare.org/articles/does-medicare-cover-EpiPens/ ("Original Medicare benefits through Part A or Part B do not cover prescription medication when taken at home. In the event you are given an injection with an EpiPen in a hospital or doctor's office, Part A or Part B coverage may apply"). In contrast, some privately-administered Medicare plans do cover the EpiPen. *See* www.kff.org/medicare/issue-brief/how-much-has-medicare-spent-on-the-EpiPen-since-2007/ (tracking historical Medicare Part D spending on the EpiPen).  All Medicare Part D plans are administered by private entities. *See* www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/ ("Medicare Part D is a voluntary outpatient prescription drug benefit for people with Medicare, provided through private plans approved by the federal government."). Thus, the only Medicare plans whose EAI sales could be foreclosed are privately administered.

Highly Confidential: Subject to Protective Order

161.   Prof. Willig's assumption—that Mylan's practice of conditioning rebates on restricting Auvi-Q's formulary position was limited to commercial plans—is directly contradicted by the evidence.



362



Highly Confidential: Subject to Protective Order

███████████████████████████████████████████████

### 2. Sanofi Did Compete in the Non-Commercial Segment

162.    Prof. Willig alternatively argues that any foreclosure of the non-commercial segment was irrelevant based on his claim that Sanofi "did not intend to meaningfully compete" for these segments.[367]   The data directly refutes Prof. Willig's factual premise, and the document that he cites does not support his claim.

163.    The data disproves Prof. Willig's claim that Sanofi did not compete in the non-commercial segment of the market.   Figure 106 below shows that Auvi-Q's share of EAI doses grew significantly faster at plans where it did not face formulary restrictions among both commercial and non-commercial plans.   For example, by September 2015 Auvi-Q had obtained an 11% share among unrestricted non-commercial plans, compared to only a 2% share among restricted non-commercial plans.[368]   This directly refutes Prof. Willig's claim that Sanofi "did not compete" for the non-commercial portion of the market.   It also provides affirmative evidence that Auvi-Q would have had more success in the noncommercial segment but-for Mylan's conduct, which is the evidence that Prof. Willig claimed was lacking.[369]   Adding an interaction term to my foreclosure regression, equal to the percentage of lives restricted multiplied by a binary variable equal to 1 if the plan is commercial and 0 if it is non-commercial, confirms that the formulary restrictions reduced Auvi-Q's share at non-commercial plans by a statistically significant amount (p-value < 0.1%), albeit with a smaller share impact (-2.1%) than for commercial plans (-5.2%).[370]

---

███████████████████████████████████████████████

[367] Willig Report ¶¶167-168.

[368] "MREPLY71 auviq share, comm vs non-comm, res vs un.xlsx". This statistic excludes State Medicaid plans.

[369]   "MREPLY71   auviq   share,   comm   vs   non-comm,   res   vs   un.xlsx".   "Restricted" defined as plan-months with more than 90% of covered lives restricted, "Unrestricted" defined as plan-months where less than 10% of covered lives are restricted (plan-months with more than 10% but less than 90% of covered lives restricted are excluded from this chart). Commercial defined as Channel equal to "Commercial" or "Health Exchange," and "Non-Commercial" defined as Channel equal to "Managed Medicaid" or "Medicare".   State-run Medicaid is excluded.

[370] "MREPLY71 forc reg, jeb, plan price diff,  mmit pbm, comm interaction.xlsx". Like the main specification of my foreclosure regression, this regression uses the Johnson extended

Highly Confidential: Subject to Protective Order

**Figure 106: Auvi-Q EAI Shares, Commercial vs. Non-Commercial and Restricted vs. Unrestricted**[371]



164.    Nor do the documents Prof. Willig cites show that Sanofi ceded the non-commercial segment of the market.    Indeed, one of the documents he cites explicitly states that Sanofi's plan at launch was to ███████████████████ ███████████████████████████████████    Further, the documents Prof. Willig cites

---

back matching methodology, updated complete MMIT data, MMIT data to define PBM affiliation, and estimates plan-level price differences.

[371] "MREPLY71 auviq share, comm vs non-comm, res vs un.xlsx". "Restricted" defined as plan-months with more than 90% of covered lives restricted, "Unrestricted" defined as plan-months where less than 10% of covered lives are restricted (plan-months with more than 10% but less than 90% of covered lives restricted are excluded from this chart). Commercial defined as Channel equal to "Commercial" or "Health Exchange," and "Non-Commercial" defined as Channel equal to "Managed Medicaid" or "Medicare".   State-run Medicaid is excluded.

[372] SAN-EPI-0419546 at slide 51, notes. Cited by Willig Report ¶168, n. 273.

Highly Confidential: Subject to Protective Order

on this point all predate the actual launch of Auvi-Q,[373] and thus are less relevant because Sanofi updated its strategies shortly after launch.[374]

165.   In sum, the evidence refutes Prof. Willig's assumption that Mylan did not foreclose the non-commercial segment of the market.  There is therefore no valid justification for Prof. Willig to calculate foreclosure shares based on the assumption that the non-commercial segment was not foreclosed, as he does in Figure 9c of his report.

### 3. Commercial Channel was Significantly Foreclosed

166.   Prof. Willig claims that Auvi-Q had better formulary coverage on commercial plans than on other types of plans (such as Medicare and Medicaid),[375] but the data shows that Auvi-Q's formulary position was restricted on a significant share of commercial plans.  Figure 107 below shows that up to 42% of the commercial segment of the market was foreclosed.

---

[373] Willig Report n. 271-272 (acknowledging that cited documents were from November 2012, several months before Auvi-Q's launch in 2013). The metadata of SAN-EPI-0419546 indicates that it was written in September 2012.

[374] Downey 30(b)(6) Deposition 2018-07-31 at 191 ███████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
██████████████████████████████

[375] Willig Report ¶169.

Highly Confidential: Subject to Protective Order

**Figure 107: Share of Commercial Segment Foreclosed**[376]



## VII. Foreclosure Share Impact

167.   In my opening merits report, I presented a regression that estimates how much the formulary restrictions reduced Auvi-Q's share of the EAI market, while controlling for Auvi-Q and EpiPen's relative price and using fixed effects to control for any other factors that varied over time or between insurance plans.[377] For brevity, I will refer to this regression as the "foreclosure regression."  The results of this regression indicated that Auvi-Q's share of the EAI market was 5.2 percentage points lower for plans with restrictive formulary conditions on Auvi-Q.[378]  This estimated effect was both practically significant and statistically significant, with a p-value of less than 0.1%.[379]

168.   After incorporating newly available data into my regression and modifying it in several ways to address certain claims by Dr. Johnson and Prof.

---

[376] "MREPLY66 forc share no 159, comm only."  I define "commercial plans" as plans with their "channel" equal to "Commercial" or "Health Exchange" in the MMIT data, just as Prof. Willig does. These foreclosure shares assume that all plan-months that Willig Merits Report ¶159 asserts were not offered conditional rebates were unforeclosed. All other plan-months are considered foreclosed only if they restricted Auvi-Q's formulary position but not EpiPen's.

[377] Elhauge Merits Report ¶¶167-170.

[378] Elhauge Merits Report Table 6.

[379] *Id.*

Highly Confidential: Subject to Protective Order

Willig, the most accurate form of my foreclosure regression now indicates that restricting Auvi-Q's formulary position at a plan reduces Auvi-Q's EAI share at that plan by 4.6 percentage points.[380]   This finding remains highly statistically significant, with a p-value less than 0.1%.[381]

### A. Using Updated Data Reinforces My Foreclosure Regression Results

169.   **a. Complete MMIT Data Includes Information on More Plans**. As described more above in Part VI.A.2, I now have access to a more comprehensive dataset on formulary coverage status (the complete MMIT data) than I did when I submitted my opening merits report.   This increases the sample size of my foreclosure regression, holding all else equal.[382]

170.   **b. Complete MMIT Data Now Indicates Whether a Plan Restricted EpiPen, So I Now Consider Plan-Months Unrestricted Only If They Also Did Not Restrict EpiPen.**  The complete MMIT also includes additional information about each plan, such as whether the plan placed formulary restrictions on EpiPen. As discussed above,[383] given this new data, I treat a plan-month as restricted only if the newly available complete MMIT data indicates that a plan restricted Auvi-Q, but did not restrict EpiPen, since the evidence indicates Mylan did not give conditional rebates to plans that restricted EpiPen.  This is the same methodology I use when calculating foreclosure shares above in Part VI.

171.   **c. Prof. Willig Has Provided a Dataset Indicating That Certain PBMs' Commercial Plans Were Not Offered Conditional Rebates in Certain Time Periods, So I Now Consider All of Those Plans Unrestricted in Those Time Periods.**   As described more above in Part VI.B.2, Prof. Willig has provided a dataset that identifies some commercial plans that were not offered rebates conditioned on formulary restrictions at certain time periods.   I therefore now consider all such plans unforeclosed during those time periods, which is the same methodology I used for calculating foreclosure shares.  This actually does not alter

---

[380] "MREPLY71 forc reg updated, jeb, estimated plan price diff with mmit defined pbm.xlsx". This regression uses updated complete MMIT data, the Johnson extended back methodology for matching, estimates plan-level prices, uses MMIT data to determine PBM affiliation, and its price control is the difference between Auvi-Q and EpiPen plan-level prices.

[381] *Id.*

[382] The precise sample size of the regression depends also on which methodology one uses for matching the IQVIA data to the MMIT data. *See infra* Part VII.B.

[383] *See supra* Part VI.A.2.

Highly Confidential: Subject to Protective Order

the regression dataset significantly because almost all of the plan-months that Prof. Willig identified as not being offered rebates conditioned on formulary restrictions did not actually restrict Auvi-Q's formulary position according to the MMIT data, as explained above at VI.B.2 and below in Part VII.D.

172.   Table 102 below shows the results of re-running my main foreclosure regression (Elhauge Merits Report Table 6) with these updates, but no other changes. These changes result in a slight increase in the magnitude of the share impact coefficient from -5.2% to -5.4%, which remains highly statistically significant.  The price ratio coefficient also increases in size and becomes even more statistically significant than in my initial merits report, now with a p-value of 0.2%. Accordingly, using the updated data only reinforces the foreclosure regression results from my initial merits report.  Every foreclosure regression presented in this section will rely on the more comprehensive MMIT dataset that is now available to me.

| Table 102: Foreclosure Regression from Elhauge Merits Report Table 6, But: (a) Using Updated MMIT Data (b) Classifying Plan-Months that Restricted Auvi-Q as Restricted Only If They Did Not Restrict EpiPen and; (c) Classifying Plan-Months as Unrestricted If Willig Merits ¶159 Identified Them as Not Subject to Conditional Rebates[384] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **1-sided p-value** |
| Share Impact | -5.4% | 0.003 | 0.0% |
| Price Ratio | -2.7% | 0.009 | 0.2% |

173.   In the remaining sections of this Part, I respond to critiques of the foreclosure regression contained in the defense experts' merits reports.  These critiques are in Parts VII.B.1-2 of Dr. Johnson's report and Part VIII.C of Prof. Willig's report.  Because many of Dr. Johnson's and Prof. Willig's critiques overlap, the remaining sections are organized by subject matter.

---

[384] "MREPLY71 forc reg updated.xlsx".  This regression has 89,586 observations.  This regression uses the same IQVIA-MMIT matching methodology that I used in my opening merits report, and also relies on IQVIA data to determine each plan's PBM affiliation, just as I did in my opening merits report.  Throughout this report, I calculate one-sided p-values for the share impact and relative price coefficients because they are more econometrically appropriate.  *See* Elhauge Merits Report n.201.  Even if one incorrectly used a two-sided p-value, the p-value on the share impact variable would still be less than 0.1% and thus remain highly statistically significant.

Highly Confidential: Subject to Protective Order

174. Before addressing each individual critique of my foreclosure regression, it is worth noting one overarching point: the only alternative regression estimating the effect of the formulary restrictions on Auvi-Q share that any of the defense experts put forth was by Dr. Johnson, which indicates that the restrictions reduced Auvi-Q's market share by 3.4 percentage points at restricted plans, an estimated effect that was still highly statistically significant.[385]   Further, while defense expert Prof. Willig did not present any such alternative regression, he admits: "That formulary restrictions reduce Auvi-Q's share is neither surprising nor controversial."[386]   He has thus conceded that the foreclosing formulary restrictions have a share impact, notwithstanding the efforts of him and his fellow defense expert to elsewhere try to deny the very share impact that he admits is actually not "surprising or controversial."

175. Given his admission of a share impact from the formulary restrictions, Prof. Willig's argument boils down to his claim that *some* plans' formulary restrictions were not induced by Mylan's conditioned rebates.[387]   But Prof. Willig repeatedly admits that Mylan's rebates *did* generally induce plans to adopt formulary restrictions.[388]   In other words, Prof. Willig acknowledges both that Mylan's conditioned rebates do generally induce plans to agree to greater formulary restrictions *and* that greater formulary restrictions adversely affect the share of Auvi-Q.   Those two admissions suffice to establish the anticompetitive effect.   At most what Prof. Willig shows is that *sometimes* plans adopt formulary restrictions even without conditioned rebates.   But, as I show below, that does not at all negate the anticompetitive impact.[389]   His argument is like admitting both that firm X created pollution that increased the lead levels in people's blood and that higher lead levels cause harm, and then erroneously claiming that, because some persons get similarly high lead levels from sources other than firm X and also suffer harm, this somehow means that firm X did not cause any harm.

---

[385] Johnson Merits Report ¶127.

[386] Willig Report ¶ 193.

[387] *Id.* ¶¶ 192, 194.

[388] *Id.* ¶ 196 ("manufacturer rebates (and net drug prices) are key factors in a PBM's determination of formulary placement for a given drug, including whether to 'restrict' that drug's formulary placement."); *id.* ¶ 197 ("the reality of the industry is that manufacturers are willing to pay higher rebates for favorable formulary placement"); *id.* ¶ 200 ("by the nature of competition for PBM business, rebates will be higher and net prices will be lower on plans that chose to impose a greater degree of restrictions."); *id.* ¶ 214 ("Mylan paid substantial rebates to PBMs for preferred and 'restrictive' formulary placement").

[389] *Infra* Part VII.D.

Highly Confidential: Subject to Protective Order

## B. Matching IQVIA to Formulary Restriction Data

176.   In my foreclosure regression, the dependent variable is Auvi-Q's share of EAI doses sold at each insurance plan in each month, and the independent variable of interest is the percentage of covered lives subject to Auvi-Q formulary restrictions on that plan in that month.[390]  The data about plan-level shares comes from IQVIA's xponent dataset, while data about plan-level coverage restrictions comes from MMIT data (purchased by Sanofi) that tracks the number of lives on each plan that were subject to coverage restrictions.[391]   I therefore had to combine these two datasets to run the foreclosure regression, which necessitates "matching" each plan in the IQVIA data to the corresponding plan in the formulary restriction data.[392]  In this context, "matching" simply means identifying, for any portion of data in the IQVIA share data, what portion of the formulary restriction data is about the same insurance plan.

177.   To perform this matching, I relied on "bridge" files provided by Sanofi that indicate, for any given "IQVIA plan id" (an identification number that uniquely identifies each plan in the IQVIA data), the "MMIT Plan id" (an identification number that uniquely identifies each plan in MMIT data) that corresponds to the same insurance plan.[393]  Where the bridge file indicates that one IQVIA plan id corresponds to multiple MMIT plan ids, I defined the restricted share for that IQVIA plan id as the weighted average of the restricted shares of the matched MMIT plan ids (weighted by covered lives).

178.   The sections below respond to Prof. Willig and Dr. Johnson's criticisms of my matching methodology.

### 1. Bridge Files Begin in March 2014, Partway Through Regression Period

179.   My foreclosure regression focuses on the time period during which Auvi-Q first entered the EAI market: January 2013 to October 2015.[394]  The bridge files, which list MMIT plan ids that correspond to each IQVIA plan id, include

---

[390] Elhauge Merits Report ¶167.

[391] Elhauge Merits Report ¶¶165-166.

[392] Elhauge Merits Report ¶166.

[393] In the bridge files, such as "IQVIA Bridge File 201403 – 201512", the "OrgID" column indicates the "MMIT plan id" and the "IMSPayerPlanId" column indicates the "IQVIA plan id." Prof. Willig's backup indicates that MMIT created these bridge files and sold them to Sanofi. *See* "DataFeedDocumentation.pdf".

[394] Elhauge Merits Report ¶165.

Highly Confidential: Subject to Protective Order

slightly different lists for each month from March 2014 to November 2018. The bridge files thus begin only in March 2014. Nonetheless, because the point of these bridge files is simply to identify the matching IQVIA and MMIT plan ids that correspond to the same plan, it is reasonable to expect that, if a given pair of IQVIA and MMIT plan ids correspond to the same plan in one time period, they should also correspond to the same plan in another time period. Therefore, if a given pair of IQVIA and MMIT plan ids were identified as a "match" in any month in the bridge files, then the programming code that created my regression dataset would deem that pair of ids to be a match for the regression analysis.

180.    Dr. Johnson and Professor Willig criticize this methodology based on speculation that it could sometimes identify purported matches "during periods for which [I] cannot be certain of the match."[395] These defense experts focus specifically on January 2013-February 2014, which is the portion of the regression period that precedes the first month in the bridge files. Notably, neither Professor Willig nor Dr. Johnson claims that my matching methodology *actually* resulted in erroneous matching, but rather only speculate that it *could* possibly lead to erroneous matching.

181.    This speculative criticism of my matching methodology is contradicted by the data, which shows that the fact that a pair of IQVIA and MMIT plan ids are identified as a match in one month in a bridge file strongly indicates that that pair was also a match in prior months. To make this defense expert critique concrete, they are speculating, for example, that the fact that a pair of IQVIA and MMIT plan ids are identified as a match from March 2014-November 2018 may not necessarily indicate that those plan ids both correspond to the same insurance plan in January 2013, the first month of my regression period, which is 14 months earlier than the beginning of the bridge file. We can test this speculation by analyzing the bridge files to determine whether the MMIT plan id that is identified as a match to an IQVIA plan id in month *m* is the same MMIT plan id that is identified as a match to that IQVIA plan id in month *m*-14 (fourteen months earlier). Of the IQVIA plan ids that the bridge data shows correspond to a single MMIT plan id in March 2014 (first month with bridge data) and May 2015 (14 months later), 99.9% are matched to the exact same MMIT plan id in both time periods.[396] This directly shows that the bridge

---

[395] Johnson Report ¶124; Willig Report ¶208 (making same argument).

[396] "MREPLY01 pct of one-to-one matches with same mmit_plan_id 201403-20505.txt". For this analysis, I limited the bridge files to IQVIA and MMIT plan ids that were relevant to the regression results, which are the IQVIA plan ids that had some EAI purchases during the regression period and MMIT Plan Ids that have some data on formulary status during the regression period.

Highly Confidential: Subject to Protective Order

files identifying matches in a given time period are extremely accurate indicators of which IQVIA and MMIT plan ids correspond to the same plan in earlier time periods, just as one would expect.

182.   Nonetheless, based on his disproven speculation about my matching methodology, Dr. Johnson re-runs my foreclosure regression based on an alternative matching methodology that reduces the sample size by more than 50%.[397] Specifically, Dr. Johnson will include a given IQVIA plan id and month in his regression dataset only if that particular IQVIA plan id is contained in the bridge file corresponding to that particular month.[398]   Because the bridge files only begin in March 2014, the primary effect of Dr. Johnson's alternative matching methodology is to throw out all of the data from January 2013-February 2014.   Because Dr. Johnson's alternative matching methodology unnecessarily throws out so much data, it necessarily has the negative side effect of significantly reducing the statistical power and precision of the resulting regression.[399]   Table 103 below shows the results of my foreclosure regression if one uses Dr. Johnson's matching methodology but makes no other changes.   Even with his misguided matching methodology, the share impact remains -4.2% and highly statistically significant.[400]

| Table 103: Updated Foreclosure Regression if One Uses Dr. Johnson's Alternative Matching Methodology but Makes No Other Changes[401] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **1-sided p-value** |
| Share Impact | -4.2% | 0.004 | 0.0% |
| Price Ratio | 0.5% | 0.009 | 30.9% |

[397] Johnson Report ¶124 (describing methodology change that reduces regression dataset "from 68,982 observations to 33,533").

[398] *Id.*

[399] The regression results confirm that Dr. Johnson has significantly reduced the precision of the regression by reducing its sample size; the standard error on the coefficient estimate for the pLivesRestricted variable is about 1.3 times larger using Dr. Johnson's matching methodology instead of my matching methodology (0.004 vs. 0.003).

[400] This share impact is greater than the -3.4% share impact from Dr. Johnson report ¶127 because there he combines his matching methodology with a dropping of plans whenever they bought no EpiPen or no Auvi-Q in any given months, which creates affirmative statistical bias for reasons discussed below.

[401] "MREPLY71 updated forc reg with Johnson matching.xlsx." This regression has 44,530 observations.  This regression uses the same methodology for classifying plan-months as restricted or unrestricted as all other regressions in this reply report. This regression uses IQVIA data to

Highly Confidential: Subject to Protective Order

183.   I tested the sensitivity of Dr. Johnson's regression results by modifying his matching methodology so that it did not drop all observations from January 2013 to February 2014.  To do so, I followed Dr. Johnson's exact matching methodology, *except* that I made the matches identified in March 2014 (the first month in the bridge files) apply to the months that preceded the bridge files (January 2013 to February 2014).  Table 104 below shows the results of running my updated foreclosure regression on this adjusted dataset.  It shows that, if one follows Dr. Johnson's "month-by-month" matching methodology but extends the first bridge file back to January 2013 to avoid throwing out all of the observations from January 2013 to February 2014, then the estimated share impact is slightly *larger* in magnitude (-5.6 market share percentage points) than when one uses my original matching methodology (-5.4 market share percentage points[402]).  This indicates that Dr. Johnson's matching methodology results in a smaller foreclosure effect estimate primarily because it unnecessarily discards 14 months of data, rather than because it is superior in some way to my original matching methodology.

| Table 104: Updated Foreclosure Regression if One Modifies Dr. Johnson's Matching Methodology Not to Drop Jan. 2013-Feb. 2014 Observations[403] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **1-sided p-value** |
| Share Impact | -5.6% | 0.004 | 0.0% |
| Price Ratio | -2.6% | 0.010 | 0.5% |

184.   In the remainder of this foreclosure regression section, and for the overcharge calculations I calculate below in Part VIII, all regressions use Dr. Johnson's "month-by-month" matching methodology, but with the bridge files extended back to January 2013 to avoid unnecessarily dropping observations.

---

identify each plan's PBM affiliation and Dr. Johnson's methodology for matching the IQVIA data to the MMIT data. Even if one incorrectly used a two-sided hypothesis test, the p-value on the share impact variable would still be less than 0.1% and therefore highly statistically significant.

[402] *Supra* Table 102.

[403] "MREPLY71 updated forc reg with Johnson extended back matching.xlsx." This regression has 65,886 observations.  Like the regression presented at the beginning of this part, this regression uses the updated complete MMIT data, classifies plan-months as restricted or unrestricted based on the updated methodology described in my foreclosure shares section, and uses IQVIA data to identify each plan's PBM affiliation.  However, this regression uses Dr. Johnson's methodology for matching the IQVIA data to the MMIT data, but with the most recent bridge data extended backwards to avoid dropping all data from January 2013 to February 2014. Even if one incorrectly used a two-sided hypothesis test, the p-value on the share impact variable would still be less than 0.1% and therefore highly statistically significant.

Highly Confidential: Subject to Protective Order

Although neither Dr. Johnson nor Prof. Willig has actually identified any errors caused by my matching methodology, switching to a "month-by-month" matching methodology eliminates one disagreement between the defense experts and myself without having any practically significant effect on the regression results.

185.   Dr. Johnson and Prof. Willig also omit that any random errors in the matching, whether due to underlying imperfections in the bridge files or any purported errors in matching methodology, will bias the foreclosure regression results towards finding **no** effect (or a smaller effect) of the foreclosure.  To the extent there were random errors in the bridge data or matching methodology, they would affect the foreclosure regression by introducing random "measurement error" in the independent variable of interest, the percent of lives restricted on a given plan, because it would result in some observations where the "restricted share" independent variable equals the restricted share of some random plan rather than of the plan in the IQVIA dataset that is used to calculate the dependent variable, Auvi-Q's market share.  Such random measurement error in the independent variable causes an "attenuation bias" that causes the regression to underestimate not only the size of the effect but its statistical significance.[404]  Consequently, to the extent one credits Dr. Johnson and Prof. Willig's arguments that the matching between the IQVIA data and the MMIT data is sometimes imperfect, that actually provides a reason to believe that my foreclosure regression **under**estimates the actual foreclosure effect.

## 2. Bridge Files Sometimes Match Multiple MMIT Plan IDs to a Single IQVIA Plan ID, or Vice Versa

186.   Dr. Johnson and Prof. Willig both observe that the bridge files indicate that multiple MMIT plan ids are sometimes matched to a single IQVIA plan ID, or vice versa.[405]  However, neither of them allege that this phenomenon will cause any econometric bias. And indeed, there is no reason to believe that this phenomenon will cause any econometric biases.  It is unsurprising that some MMIT plan ids are matched to multiple IQVIA plan ids (or vice versa) because IQVIA sometimes breaks the plans down into smaller unique units than MMIT, and vice versa.  For example, the MMIT formulary coverage assigns a single unique MMIT id number (MMIT id 108) to United Health Care's "Commercial 3 Tier HMO" plan, whereas IQVIA assigns separate distinct IQVIA id numbers for each state covered by this

---

[404] WOOLDRIDGE, INTRODUCTORY ECONOMETRICS 320-322 (5th ed. 2013); STOCK & WATSON, INTRODUCTION TO ECONOMETRICS 2ND at 320-321.

[405] Johnson Report ¶124; Willig Report ¶¶210-212.

Highly Confidential: Subject to Protective Order

plan (e.g., IQVIA id 200021 for sales under this plan in North Carolina, and IQVIA id 200030 for sales in Mississippi).

187. **a. Matching Methodology Has No Impact on Each Plan's "Importance" or Weight in the Regression**. Prof. Willig incorrectly asserts that the "importance" of a given plan in the MMIT data can be "greatly magnified" if it is matched to multiple IQVIA plan ids.[406] This criticism appears to be based on the mistaken assumption that I "double-count" the "covered lives" of that MMIT plan (as indicated by the MMIT data) when an MMIT plan id correspond to two IQVIA plan ids.  However, I explained in my report that the foreclosure regression is weighted by EAI doses (as measured by the IQVIA data), not "covered lives."[407] Thus, in the example given above about United Health Care's "Commercial 3 Tier HMO" plan, the weight in the regression of each IQVIA plan id is proportional to the number of EAI doses purchased under that plan, just as it should be (e.g., the weight of IQVIA plan id that corresponds to purchases under this plan in Mississippi would equal the total EAI doses purchased under that plan in Mississippi).

188. **b. Fractional Restricted Shares Are Not Problematic, And Regression Results are the Same if One Excludes Fractional Restricted Shares**. Prof. Willig notes that this phenomenon may sometimes result in a plan having a "fractional share of restriction" (e.g., 50% instead of 100% or 0%),[408] but does not claim that fractional shares present any econometric problem.  Further, in my regression dataset only 11% of the restricted shares are "fractional,"[409] and the regression results are essentially the same if one excludes all observations with a "fractional share of restriction."[410]

189. **c. Situations Where One IQVIA plan id is Matched to Multiple MMIT Plan Ids That Have Different PBMs According to the MMIT Data**.  Dr.

---

[406] Willig Report ¶212.

[407] Elhauge Merits Report ¶167 ("The regression finds the coefficients that minimize the weighted sum of residuals, that is, those that minimize [the sum of the residuals multiplied by" the number of EAI doses sold").

[408] Willig Report ¶211.

[409] "MREPLY71 pct of reg dataset with fractional shares.txt".

[410] "MREPLY71 forc reg updated, no fractional shares.xlsx".  If one drops observations with "fractional" shares (i.e., shares between 1% and 99%), the share impact estimate is 5.5%, and still has a p-value of less than 0.1%.  This regression uses the updated complete MMIT data, uses IQVIA data to identify each plan's PBM affiliation, uses the "Johnson extended back" matching methodology, and classifies plan-months as restricted on unrestricted using the same updated methodology described above in VI.

Highly Confidential: Subject to Protective Order

Johnson also argues that "there are instances in which a plan in the [MMIT] dataset matches to different plans in the IQVIA dataset in different time periods.  In some cases, those IQVIA plans belong to different PBMs, and using a match in one time period to extrapolate outside that time period results in the same plan being mapped to multiple PBMs, which cannot be correct."[411]  This critique appears to be based on the mistaken impression that the foreclosure regression presented in my opening merits report relied on MMIT data to determine each plan's PBM; the foreclosure regression in my opening merits report used IQVIA data to determine each plan's PBM.  Each observation in the foreclosure regression is a unique combination of IQVIA plan id and month.  Consequently, if one defines each IQVIA plan id's PBM based on IQVIA data, the matching methodology one uses has no effect on the determination of each IQVIA plan id's PBM.

190.  Dr. Johnson's critique about my matching methodology is relevant only if one defines each IQVIA plan id's PBM based on the MMIT data because that requires matching.  Although I never defined PBM status that way in my opening merits report regressions, below in section VII.C.3 I do define each IQVIA plan id's PBM based on the MMIT data in response to a different argument by Prof. Willig.  However, even if one defines each IQVIA plan id's PBM based on the MMIT data, the phenomenon of one IQVIA plan id's being associated with multiple PBMs according to the MMIT data exists regardless of the matching methodology one uses.  For example, even if one uses the matching methodology proposed by Dr. Johnson, there are 265 IQVIA plan ids (out of 4,247 total) that are associated with multiple PBMs in a given time period according to the MMIT data.[412]  This occurs sometimes, regardless of the matching methodology one uses, because the bridge files sometimes indicate that one IQVIA plan id matches two (or more) MMIT plan ids that have different PBMs in some months according to the MMIT data.  For the regressions in which I define each IQVIA plan id's PBM based on MMIT data, I resolve these situations by defining each the IQVIA plan id's PBM in a given month as the PBM with the most total covered lives among the MMIT plan ids that are matched to that IQVIA plan id in that month.

### 3. Sample of Matched Plans is Representative of EAI Market

191.  Because the bridge files do not contain matching MMIT plan ids for every single IQVIA plan id, the regression sample does not include every single

---

[411] Johnson Report ¶124.

[412] "MREPLY01 iqvia_plan_id mapped to multiple mmit_pbms, johnson method.txt".

Highly Confidential: Subject to Protective Order

IQVIA plan id.[413]  Prof. Willig incorrectly asserts that I did not "evaluate how [my] sample compares to the universe of plans."[414]  I actually explicitly analyzed the representativeness of the regression sample and showed thoroughly that it was representative of the EAI market as a whole.  In particular, I showed that Auvi-Q's share of EAI sales in the regression sample explains over 98% of the variation in Auvi-Q's overall market share, and presented a figure confirming visually that Auvi-Q's regression sample share closely tracks Auvi-Q's overall share.[415]  This remains true with the more comprehensive MMIT formulary coverage data.  My updated regression dataset (which uses the more comprehensive dataset), accounts for 60% of all EAI doses,[416] and Auvi-Q's share among this sample explains 98% of the variation in Auvi-Q's overall share.[417]  Figure 108 below confirms visually that Auvi-Q's share in the regression sample closely tracks its overall share.

---

[413] Elhauge Merits Report ¶168, Table 5.

[414] Willig Report ¶209.

[415] Elhauge Merits Report ¶169, Figure 26.

[416] "MREPLY71 pct EAI doses included in plan-level regression sample (johnson extended back).csv". This uses the regression dataset that relies on Dr. Johnson's matching methodology measured backwards because that is the methodology I rely on when for calculating aggregate harm and classwide impact. If one uses my original matching methodology instead, there are more observations in the regression dataset and it consequently constitutes 66% of the EAI market. "MREPLY71 pct EAI doses included in plan-level regression sample (orig).csv."  Johnson's proposed matching methodology (without modification) results in by far the smallest sample size, and consequently that regression dataset only constitutes 41% of the EAI market.  "MREPLY71 pct EAI doses included in plan-level regression sample (johnson).csv." As with all other regressions presented in this reply report, I rely on the more comprehensive complete MMIT data.

[417] "MREPLY71 predicting overall auvi-q share using sample shares (Johnson extended back).txt" (showing that the $R^2$ of a regression measuring how well Auvi-Q's share among the regression sample predicts Auvi-Q's overall share is 98%).

Highly Confidential: Subject to Protective Order

**Figure 108: Auvi-Q Overall EAI Share is Extremely Similar to Auvi-Q's Share in Updated Regression Sample that uses Complete MMIT Data.[418]**



### C. Prices

192.   My foreclosure regression explicitly controls for price by including an independent variable equal to the ratio of Auvi-Q's net price to the EpiPen's net price.[419]   These net prices are calculated at the PBM level because the rebate data produced is not sufficiently detailed to directly calculate the rebates received at each individual plan and thus does not allow calculation of net prices at each plan. Further, if one tried to run a regression that combined plan-specific gross prices with PBM-level rebates, that make the regression results biased because it would exclude all plans that bought 100% EpiPen and thus had no Auvi-Q gross price to allow calculation of the relative price.[420]   This would selectively omit from the sample all plans that had a 0% Auvi-Q share, and because the Auvi-Q share is the dependent variable, this would create a severe endogenous sample selection bias.[421]   None of the defense experts provide any alternative dataset on prices to use, confirming that

---

[418] "MREPLY71 Auvi-Q shares inc vs exc (Johnson extended back).xlsx".
[419] Elhauge Merits Report ¶167.
[420] Elhauge Merits Depo 27-28, 255.
[421] WOOLDRIDGE, INTRODUCTORY ECONOMETRICS 325 (5th ed. 2012).

Highly Confidential: Subject to Protective Order

the price data use in the regression is the best price data available.  Nonetheless, Dr. Johnson and Prof. Willig each make several related critiques of the price ratio variable in my foreclosure regression, which I address below.

### 1. Dr. Johnson Wrongly Introduces Endogenous Sample Selection Bias by Dropping All Observations with Zero Auvi-Q Purchases

193.   Under the guise of a purported "correction" to my price variable, Dr. Johnson introduces a significant econometric bias by dropping every observation (plan-month combination) in which the plan purchased either zero units of Auvi-Q or zero units of the EpiPen.[422]  Dr. Johnson claims that he did this to "correct" the fact that my price variable is determined at the PBM level instead of the plan level,[423] but dropping all observations with zero Auvi-Q or zero EpiPen purchases does not alter the fact that the price variable is still determined at the PBM level.  In other words, Dr. Johnson does not provide any logically sound justification for dropping all of the plan-months with zero Auvi-Q or EpiPen purchases.

194.   Putting aside Dr. Johnson's purported justification for dropping all observations with zero Auvi-Q or zero EpiPen purchases, his adjustment causes a severe endogenous sample selection bias.  "Sample selection based on the dependent variable" occurs when the choice to exclude or include an observation is based "on the [value of the] dependent variable."[424]  Here, Dr. Johnson engages in sample selection based on the dependent variable by dropping all plan-months with zero Auvi-Q purchases, which means dropping all plan-months where the dependent variable (Auvi-Q's share), equals zero.[425]  When one engages in such "endogenous sample selection . . . , bias always occurs."[426]  And here, one would expect the bias to be large because Dr. Johnson's endogenous sample selection methodology drops over half of the observations in the regression dataset.[427]  This significant endogenous sample selection bias makes the results presented in paragraph 127 of Dr. Johnson's report unreliable.

---

[422] Johnson Merits Report ¶¶126-127.

[423] Johnson Merits Report ¶126.

[424] WOOLDRIDGE, INTRODUCTORY ECONOMETRICS 325 (5th ed. 2012).

[425] I explained that this would be a problem with a regression based on direct observation of plan-level prices in my deposition. Elhauge Merits Deposition 27-28, 255.

[426] WOOLDRIDGE, INTRODUCTORY ECONOMETRICS 325 (5th ed. 2012).

[427] Johnson Report n. 273 (regression dataset contains only 15,088 observations if one both uses Johnson's matching methodology and drops any observations with zero Auvi-Q or EpiPen sales); id. ¶124 (regression dataset contains 33,533 observations if one uses Johnson's matching methodology but does not drop observations with zero Auvi-Q or EpiPen sales).

Highly Confidential: Subject to Protective Order

195.    Moreover, even if one both uses Dr. Johnson's biased method of dropping observations with zero Auvi-Q or zero EpiPen purchases and his misguided matching methodology that drops all observations from Jan. 2013-Feb. 2014, his regression still finds a share impact of -3.4% with a p-value of less than 0.1%.[428]   Thus, even his misguided methodologies still confirm an adverse share impact.

### 2. PBM-Level Prices are the Best Price Data Available, and Obtaining Plan-Level Price Data Would Be Unlikely to Change Results.

196.    Dr. Johnson and Prof. Willig both criticize me for using PBM-level prices rather than plan-level prices for the price-ratio control variable in my foreclosure regression.[429]   Their criticisms fail principally because they do not dispute that it is not possible to directly calculate plan-level prices with available data; neither expert identifies any sources of plan-level data that I should have used or offers any methodology for estimating plan-level prices with available data.

197.    Further, Dr. Johnson and Prof. Willig's speculation that using PBM-level prices instead of plan-level prices may significantly alter the results can be disproven by first estimating plan-level prices based on the defense experts' claims about the relationship between the foreclosure and price, and then re-running the foreclosure regression using those estimated plan-level prices.  Prof. Willig asserts, for example, that "rebates will be higher and net prices will be lower on plans that chose to impose a greater degree of restriction."[430]   If one assumes that the average percentage difference in price in the actual world between a completely restricted plan and a completely unrestricted plan is equal to some percentage $d$, then one can translate the EpiPen's PBM-level prices into an estimate of plan-level EpiPen prices based on the following three equations:

$$(1) \qquad p_{pbm}^{r} = (1-d)\big(p_{pbm}^{u}\big)$$

$$(2) \qquad p_{pbm}^{A} = R_{pbm}^{A} \, p_{pbm}^{r} + (1 - R_{pbm}^{A})p_{pbm}^{u}$$

---

[428] Johnson Merits Report ¶127; "Para 127, Fn 273.txt" from Johnson backup.  The p-value is less than 0.1% whether one uses a one-sided or two-sided test.

[429] Johnson Merits Report ¶¶125; Willig Report ¶¶199-200.

[430] Willig Merits Report ¶200.

Highly Confidential: Subject to Protective Order

$$(3) \qquad p_{plan} = p_{pbm}^r \, R_{plan} + p_{pbm}^u (1 - R_{plan})$$

198.   These equations assume that plans on a given PBM pay an unrestricted EpiPen price ($p_{pbm}^u$) if they do not agree to Mylan's requested formulary restrictions, and a lower restricted EpiPen price ($p_{pbm}^r$) if they agree to Mylan's formulary restrictions.  Equation (1) reflects the fact that restricted plans receive lower prices on EpiPen than unrestricted plans in the actual world.  Equation (2) reflects that the average price paid at a given PBM ($p_{pbm}^A$) is the average of the price restricted plans pay at that PBM ($p_{pbm}^r$) and unrestricted plans pay at that PBM ($p_{pbm}^u$), weighted by the percentage of that PBM's covered lives that have formulary restrictions ($R_{pbm}^A$).  Equation (3) reflects that a given plan's EpiPen price ($p_{plan}$) equals the average of its PBM's restricted and unrestricted prices, weighted by the percentage of that *plan's* covered lives that have formulary restrictions ($R_{plan}$).  We have data allowing us to directly observe all of the variables in these formulas except for three: $p_{plan}$, $p_{pbm}^r$, and $p_{pbm}^u$.[431]   With three linearly independent equations and three unknown variables, one can solve for values of all three unknown variables, with the most important being p$_{plan}$, the estimated price paid by each individual plan.[432]   This estimated plan-level price will vary within a given time period not only across PBMs (because each PBM has a different average net price in each time period) but also across plans within a given PBM (because the share of covered lives restricted varies by plan).

199.   After calculating these estimated plan-level EpiPen prices, I re-ran my foreclosure regression using those estimated plan-level EpiPen prices instead of PBM-level EpiPen prices when calculating the price ratio variable.[433]   Here, the best available estimate of *d* is 7.5%, which is the amount by which my rebate regression

---

[431] In my opening merits report, I previously estimated the percentage difference between actual restricted and unrestricted EpiPen prices (*d*) to be 2.7%, *see* Elhauge Merits Report ¶183, but below in Part IX.A, I re-run this regression with updated data and find *d* to be 7.5%.  Average PBM prices ($p_{pbm}^A$) come from my preexisting regression dataset and are calculated as gross prices minus rebates.  Restricted shares at the PBM level (R$_{pbm}$) and plan-level (R$_{plan}$) are both calculated as the percentage of covered lives restricted, using MMIT formulary coverage data.

[432] These estimated plan-level prices are calculated in "MREPLY71 updated forc reg.do", provided as part of the backup to this report.

[433] Auvi-Q prices remained at the PBM level. No defense expert has claim that Auvi-Q's prices being PBM-level causes any econometric problems; rather, the defense experts' claims focus on plan-level EpiPen prices based on the premise that Mylan provided larger rebates to more restricted plans in the actual world.  Willig Merits Report ¶200.

Highly Confidential: Subject to Protective Order

indicates the challenged conduct increased Mylan's rebates to restricted customers relative to the but-for world.[434]

200.   As Table 105 below shows, using estimated plan-level prices does not significantly change the results of the share impact regression; the regression still indicates that the formulary restrictions reduced Auvi-Q's share by a statistically significant and practically significant amount.

| Table 105: Foreclosure Regression Using Estimated Plan-Level Prices[435] | | | |
|---|---|---|---|
| **Variable** | **Coefficient Estimate** | **Clustered Standard Error** | **p-value** |
| share impact | -5.4% | 0.004 | 0.0% |
| estimated plan-level price ratio | -2.6% | 0.011 | 0.9% |

### 3. PBM Price Matching

201.   To determine the relevant price ratio that applied to each plan in each month, I first identified each plan's PBM, and then used that PBM's net Auvi-Q and EpiPen prices in that month to calculate the price ratio variable.[436]   To identify each plan's PBM, my initial merits report relied on the same IQVIA data that I used to calculate Auvi-Q's share of EAI purchases at each plan.   Prof. Willig criticizes me for relying on IQVIA data to determine each plan's PBM because some plans switch PBMs and he concludes that the IQVIA data fails to track such changes in plan PBMs over time.[437]   In contrast, the MMIT formulary coverage data tracks plans' historical PBM affiliations and indicates that some plans did switch PBMs during the regression period.

---

[434] *See infra* Part IX.A.

[435] "MREPLY71 forc reg updated, jeb, estimated plan prices.xlsx". This regression uses the updated complete data, Johnson extended back matching methodology, and IQVIA-defined PBM.

[436] Elhauge Merits Report ¶166.  As explained in my opening merits report, I was able to obtain rebate data for both the Auvi-Q and EpiPen at six PBMs representing 70% of the market: Express Scripts, Caremark, Prime Therapeutics, Aetna, Medimpact/Medcare, and Envision/Rx opt.

[437] Willig Report ¶213; *id.* at n.311 ("IQVIA data do not reflect historical PBM affiliations (but rather assign them based on a more current snapshot)").

Highly Confidential: Subject to Protective Order

202.   Although some plans do switch PBMs, the MMIT formulary coverage data shows that this is relatively rare.  During the regression period (from January 2013 to October 2015), 86% of plans that ever used one of the six PBMs for which we have net price data never switched PBMs.[438]  Thus, IQVIA data indicating a single PBM for a plan across an extended time period will accurately reflect reality in the vast majority of cases.

203.   Nonetheless, one way to address Prof. Willig's criticism is to define each plan's PBM based on the MMIT formulary coverage data instead of the IQVIA data.  To do this, I first used Dr. Johnson's matching methodology but extended the March 2014 bridge data back to the beginning of the regression period in January 2013, as discussed above in section VII.B.1.  I then used the MMIT data to determine each IQVIA plan's PBM in each month, which in turn determines the value of the price ratio variable.[439]  Table 106 below shows the results of re-running my foreclosure regression using this alternative dataset.  Even with this change, the regression still indicates that the foreclosure reduced Auvi-Q's EAI share by 4.7 percentage points.  This result is once again highly statistically significant, with a p-value less than 0.1%.

| Table 106: Foreclosure Regression Results If One Determines Plan's PBM Based on MMIT Data instead of IQVIA Data[440] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **p-value** |
| Share Impact | -4.7% | 0.003 | 0.0% |
| MMIT-defined PBM Price Ratio | -2.3% | 0.010 | 1.0% |

204.   Similarly, Table 107 below shows that if one not only uses MMIT data to define each plan's PBM, but also estimates plan-level prices using the same methodology described above in section VII.C.2, then the regression still indicates

---

[438] "MREPLY01 prevalence of relevant pbm switches, complete.txt".

[439] Where an IQVIA plan id is matched to multiple MMIT plan ids in a given month with multiple MMIT PBMs, the programming code assigns the MMIT PBM with the most covered lives associated with that plan in that month as the IQVIA plan id's MMIT PBM.

[440] "MREPLY71 forc reg updated, jeb, mmit defined pbm prices.xlsx". This regression uses the updated complete MMIT data and the Johnson extended back matching methodology.

Highly Confidential: Subject to Protective Order

a market share impact of -4.5 percentage points.   This result remains highly statistically significant, with a p-value less than 0.1%.

| Table 107: Foreclosure Regression Results If One Determines Plan's PBM Based on MMIT Data And Estimates Plan-Level Prices[441] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **p-value** |
| Share Impact | -4.5% | 0.003 | 0.0% |
| Plan Price Ratio with MMIT-defined PBM | -2.5% | 0.009 | 0.4% |

### 4. Realized vs. Offered Prices

205.   Prof. Willig asserts that I should have defined my price control based on the prices Mylan **_offered_** PBMs rather than on the prices Mylan actually charged plans at those PBMs under the relevant formularies.[442]   He is mistaken.   The share of Auvi-Q versus EpiPen sales at each plan will depend on what choices patients, physicians, and plans make given the actual prices and formulary restrictions that they face.   Patients and physicians will not even be aware of the prices offered to PBMs, and plan efforts to encourage buying one brand will be based on their actual prices, not on offered prices that they are not paying.   Thus, my regression correctly controls for actual prices, rather than for offered prices, in order to isolate the effect of the formulary restrictions.   Prof. Willig's argument for using offered prices is not really an argument about the effects of the formulary restrictions, but rather a variant of his argument (discussed below in Part VII.D) that I need to consider the extent to which offered rebates induced plans to adopt formulary restrictions.   Moreover, because actual prices did vary with the rebates offered for formulary restrictions, the actual prices used in my regression already control for the fact that the restricted plans who accepted the higher rebate offers received lower prices than the plans who did not.

---

[441] "MREPLY71 forc reg updated, jeb, estimated plan prices with mmit defined pbm.xlsx" This regression uses the updated complete MMIT data and the Johnson extended back matching methodology.

[442] Willig Report ¶203.

Highly Confidential: Subject to Protective Order

206.   Further, Prof. Willig does not identify any available dataset of offered prices, nor am I aware of any such data.  The alternative regression specification he proposes is thus not possible.

### 5. Price Protection Clause

207.   Prof. Willig incorrectly argues that my price variable is deficient based on the premise that the "price protection" clauses in Mylan's agreement increase plans' uncertainty about future prices.[443]   The entire premise of Prof. Willig's argument is wrong: price protection clauses *reduce* plans' uncertainty about future prices, not increase it.  In this particular case, the price protection clauses require Mylan to provide rebates to a PBM or plan if its WAC price increases above a certain threshold.[444]  This by definition provides more certainty about the ***net*** price (WAC minus rebate) that the plan or PBM pays by ensuring that this net price will not increase above a certain value.  Prof. Willig confuses this logic by instead wrongly focusing on the fact that this price protection clause makes the future ***rebate size*** more uncertain to the plan, given that it makes the rebate depend not only on the formulary restriction the plan chooses, but also on how much Mylan raises the WAC price of the EpiPen.  Because the relevant price to the plan's decision-making is the ***net price***, rather than the rebate in isolation, this increase in the uncertainty of the rebate is not relevant to the plan's decisionmaking.

208.   In any event, the effect of the price protection clauses is simply to keep actual net prices at a certain level.  This effect on actual net prices is already taken into account by my regression since it takes into account actual net prices at each PBM at each moment in time.

### 6. Patient Prices

209.   Prof. Willig argues that my foreclosure regression should control for patient prices (i.e., co-pays) in addition to PBM/plan prices.[445]  To begin with, my foreclosure regression does effectively control for differences in copays because it already includes two independent variables that largely determine the size of a patient's copay: (a) the existence of formulary restrictions, which at a minimum make a plan more likely to put Auvi-Q on a higher copay tier and usually result in a patient's "copay" for Auvi-Q equaling the entire cost of the drug because the

---

[443] Willig Report ¶204.
[444] Willig Report ¶204.
[445] Willig Report ¶205.

Highly Confidential: Subject to Protective Order

insurance will not cover it; and (b) the price of Auvi-Q relative to EpiPen for PBMs/plans, both because those prices reflect rebates that in part are determined by copay tiers and because a higher relative price directly incentivizes the PBMs/plans to place Auvi-Q on a higher co-pay tier.[446]

210.   Consistent with the above, adding a control for patient copays does not significantly change the regression results. I controlled for patient copays by adding an independent variable to my foreclosure regression, $CopayDiff_{it}$, which equals Auvi-Q's average copay minus EpiPen's average copay at plan $i$'s PBM in month $t$.[447]   Table 108 below shows the results of running this regression. To address as many of the defense critiques of my foreclosure regression as possible, this regression also: (a) uses the "Johnson extended back" matching methodology, (b) uses MMIT data to define each IQVIA plan id's PBM, and (c) estimates plan-level prices. As the Table below shows, the copay difference variable does not have a statistically significant effect on Auvi-Q's share in this regression, and adding the copay difference variable does not change the share impact estimate.

---

[446] For example, if the cost to the insurer of a patient purchasing the Auvi-Q is much higher than the cost to the insurer of the patient purchasing the EpiPen, then the insurer (or its PBM) is directly incentivized to set the patient copay on Auvi-Q higher than the copay on EpiPen in order to encourage patients to use EpiPens.

[447] Copay data comes from IQVIA xponent data, but I define each IQVIA plan id's PBM using MMIT data for the reasons described above in section VII.C.3. I use the difference in copays in this regression rather than the ratio of copays because EpiPen's copay is sometimes zero, which can make the ratio mathematically undefined. I define copays at the PBM level, rather than the plan-level, because defining copays at the plan level would introduce endogenous sample selection bias, given that it would necessitate dropping all observations of plan-months that did not buy Auvi-Q (due to lacking copay data), and thus drop all observations where the dependent variable, Auvi-Q's share, equals 0.

Highly Confidential: Subject to Protective Order

| Table 108: Foreclosure Regression Results If One Adds *CopayDiff* Variable[448] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **p-value** |
| Share Impact | -4.5% | 0.003 | 0.0% |
| Estimated Plan-Level Price Ratio | -2.5% | 0.009 | 0.4% |
| Copay Difference | 0.000007 | 0.0002 | 48.6% |

### 7. Using Plan-Level Price Difference Instead of Ratio

211.   Prof. Willig criticizes my damages model for relying on a preexisting pricing study of cross-price responsiveness instead of my own independent analysis of the price data in this case.[449]   In response to that critique, I use my foreclosure regression to directly estimate the cross-price responsiveness of demand below in Part VIII.D.2.  Incorporating my foreclosure regression's estimate of the cross-price responsiveness requires making my plan-level price variable equal to the *difference* in Auvi-Q and EpiPen prices, instead of the *ratio* of Auvi-Q price to EpiPen price.[450] Switching from a price-*ratio* variable to a price-*difference* variable has no practically significant effect on the results; the share impact changes from -4.5 percentage points to -4.6 percentage points, and is still highly statistically significant with a p-value less than 0.1%.

---

[448] "MREPLY71 forc reg updated, jeb, plan-level prices, mmit pbm, copay_diff.xlsx". This regression has 62,599 observations.  The copay control variable is still not even remotely close to being statistically significant (one-sided p-value of 38%) if you define it as the ratio of copays instead of the difference in copays. "MREPLY71 forc reg updated, jeb, plan-level prices, mmit pbm, copay_ratio.xlsx".

[449] Willig Merits Report ¶251.

[450] *See infra* Part VIII.D.2.

Highly Confidential: Subject to Protective Order

| Table 109: Main Foreclosure Regression Specification: Johnson Extended Back Matching MMIT-Defined PBM Estimated Plan-Level Price *Difference*[451] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **p-value** |
| Share Impact | -4.6% | 0.0035 | 0.0% |
| Estimated Plan-Level Price Difference | -0.014% | 0.0001 | 2.5% |

### D. Causal Relationship Between Mylan's Conduct and Formulary Restrictions

212.   **a. Plans That Were Not Offered Conditional Rebates Rarely Restricted Auvi-Q's Formulary Position**.  Prof. Willig asserts that my foreclosure regression is "incapable of distinguishing formulary restrictions allegedly caused by Mylan's conduct from those that were unilateral decisions of PBMs or plans.[452]  Prof. Willig's claim rests entirely on his argument that Mylan did not offer rebates conditioned on formulary restrictions through some PBMs during some time periods, but that some plans at those PBMs during those times nonetheless adopted formulary restrictions that restrained sales of Auvi-Q.[453]

213.   This phenomenon is incredibly rare: of the plans that Prof. Willig claims were not offered conditional rebates through their PBMs during certain time periods, only 3% (weighted by covered lives) restricted Auvi-Q's formulary position.[454]   Thus, Prof. Willig's criticism is essentially that the foreclosure regression datasets used in my opening merits report only assumed that 97% of these plan-months were unrestricted when it should have indicated that 100% of the plan-months were unrestricted.  For this reply report, I have updated my definition of foreclosure to now consider every plan-month that Prof. Willig claims was not

---

[451] "MREPLY71 forc reg updated, jeb, estimated plan price diff with mmit defined pbm.xlsx". This regression has 62,657 observations. This regression uses updated complete MMIT data, the Johnson extended back methodology for matching, estimates plan-level prices, uses MMIT data to determine PBM affiliation, and its price control is the difference between Auvi-Q and EpiPen plan-level prices.

[452] Willig Merits Report ¶192.

[453] Willig Report ¶¶ 192, 194.

[454] "MREPLY67 pRestricted, offered condition rebates vs not (201301-201510).xlsx"

Highly Confidential: Subject to Protective Order

offered conditional rebates as unforeclosed, as explained above in Part VI.B.2. Consequently, my foreclosure regression dataset's classification of which plan-months were restricted by Mylan now perfectly matches Prof. Willig's assertions about which plan-months were restricted by Mylan.

214. **b. My Foreclosure Regression Has No "False Positive" Problem**. Prof. Willig relatedly makes the fallacious claim that my regression has a "false positive problem." In his initial Merits report, Prof. Willig based this argument on his finding that formulary restrictions that were *not* caused by Mylan's conditional rebates also had a statistically significant negative effect on Auvi-Q's share.[455] In a recent Supplemental Report, Prof. Willig tries to further support the same argument with a finding that there is no statistically significant difference between: (a) the effect on Auvi-Q's share of formulary restrictions that were *not* caused by Mylan's conditional rebates; and (b) the effect on Auvi-Q's share of formulary restrictions that *were* caused by Mylan's conditional rebates.[456]

215. However, the inference that Prof. Willig draws from these findings is flawed. The fact that formulary restrictions reduce Auvi-Q's share regardless of whether Mylan caused them is neither surprising nor indicative of any flaw in my methodology. Formulary restrictions on Auvi-Q should reduce Auvi-Q's share regardless of whether they were induced by Mylan's rebates or adopted by the plan for other reasons. Consequently, one should expect the regression to indicate that Auvi-Q's share is lower among plans that have formulary restrictions on Auvi-Q, even if one limits the regression to the subset of plans that Prof. Willig claims chose to place those formulary restrictions unilaterally.

216. As an analogy, suppose one ran a regression showing that serving someone unpasteurized milk made them more likely to be sick. An alternative regression that was limited to the subsample of the population that purposefully chose to drink unpasteurized milk would also show that drinking unpasteurized milk made them more likely to get sick, because unpasteurized milk has more bacteria in it regardless of whether the drinker purposefully decided to drink the milk. Likewise, here a formulary restriction on Auvi-Q limits the ability of patients to obtain Auvi-Q regardless of whether the plan's decision to restrict Auvi-Q was motivated by Mylan's rebates or some other reason.

---

[455] Willig Merits Report ¶¶193-194.
[456] Willig Merits Report Supplement (February 3, 2020).

Highly Confidential: Subject to Protective Order

217.   Prof. Willig's regression thus has no bearing on the extent to which formulary restrictions reduce Auvi-Q's share, and Prof. Willig elsewhere admits that the fact "[t]hat formulary restrictions reduce Auvi-Q's share is neither surprising nor controversial."[457]   His regression at most shows that formulary restrictions reduce Auvi-Q's share regardless of whether they are induced by Mylan's rebates.

218.   Nor does Prof. Willig's regression have any bearing on the extent to which Mylan's rebates generally induced plans to adopt formulary restrictions, and Prof. Willig elsewhere admits that Mylan's rebates **did** generally induce plans to adopt formulary restrictions.[458]   His analysis at most shows that **a very small share** of plans' formulary restrictions were not induced by Mylan's conditioned rebates. An approach that would test the extent to which Mylan's rebates induced formulary restrictions would be to compare (1) the share of covered lives that were restricted at plans that were offered unconditional Mylan rebates through their PBM during certain time periods, with (2) the share of covered lives under plans that were restricted at plans that were offered Mylan conditional rebates through their PBM.[459] I performed this analysis above in the previous part, showing that while the percentage was only 3% without Mylan's conditioned rebates, the percentage was 30% with Mylan's conditioned rebates.[460]   This clearly shows that Mylan's conditioned rebates were the main driver of plans adopting formulary restrictions.

219.   In any event, to be conservative, the foreclosure shares and foreclosure regressions that I rely on for calculating damages and classwide impact all assume that all of the plan-months that Prof. Willig claims were not offered conditional rebates were not foreclosed.  Consequently, **none** of the overcharges that I calculate below stem from formulary restrictions on Auvi-Q that were imposed by the plan-months that Prof. Willig claims were not offered rebates conditioned on restricting Auvi-Q.

---

[457] Willig Report ¶ 193.

[458] *Id.* ¶ 196 ("manufacturer rebates (and net drug prices) are key factors in a PBM's determination of formulary placement for a given drug, including whether to 'restrict' that drug's formulary placement."); *id.* ¶ 197 ("the reality of the industry is that manufacturers are willing to pay higher rebates for favorable formulary placement"); *id.* ¶ 200 ("by the nature of competition for PBM business, rebates will be higher and net prices will be lower on plans that chose to impose a greater degree of restrictions."); *id.* ¶ 214 ("Mylan paid substantial rebates to PBMs for preferred and 'restrictive' formulary placement").

[459] To be clear, here I am referring to whether Mylan offered rebates conditioned on rivals' formulary positions being restricted.

[460] "MREPLY67 pRestricted, offered condition rebates vs not (201301-201510).xlsx".

Highly Confidential: Subject to Protective Order

### *E. Regression Specification to Be Used in Overcharge Model*

220.   The sections above present various minor alterations to my foreclosure regression made in response to critiques by Dr. Johnson and Prof. Willig. Ultimately, the regression specifications that simultaneously respond to the most defense critiques are the ones that use estimated plan-level prices and define PBM affiliation based on the MMIT data, which are the regressions presented above in Sections C.3 (which uses the plan-level price ***ratio***) and C.7 (which uses the plan-level price ***difference***).[461]   In the next section of my report, which addresses the defense experts' critiques of my overcharge model, I will always rely on the foreclosure regression presented above in Section C.7 (which uses the plan-level price ***difference***) because its use of a plan-level price-difference independent variable allows one to directly apply its estimates of the cross-price responsiveness to my overcharge model, but does not otherwise have any significant practical effect on the regression results.

## VIII. FORECLOSURE OVERCHARGE

221.   In my opening merits report, I calculated the amount by which the foreclosure increased EpiPen's price by formally modeling how the foreclosure effect indicated by the foreclosure regression alters EpiPen's profit-maximizing price.[462]  Prof. Willig and Dr. Johnson are the only defense experts that criticize this section of my report.[463]  Here, I respond to those criticisms.

222.   Dr. Johnson and Prof. Willig proposed numerous alternative methodologies one could use, but rarely implemented them. For example, Dr. Johnson and Prof. Willig both asserted that I should have solved for equilibrium EpiPen and Auvi-Q prices, but neither expert showed how doing so would change the results.   Similarly, Prof. Willig asserted that I should have considered the possibility that the foreclosure affected the slope (rather than just the intercept) of the quantity demanded functions, but Prof. Willig does not show how doing so would change the results.  Consequently, most of this section is simply implementing

---

[461]  All of these regressions use the "Johnson extended back" matching methodology. Neither of these regressions includes the copay variable, which has no practical influence on the regression results, see *supra* section C.6.

[462]  Elhauge Merits Report ¶¶171-181.

[463]  This section of my report is discussed in Part IX.E of Prof. Willig's Report and Part VII of Dr. Johnson's report.

Highly Confidential: Subject to Protective Order

the methodological changes that Dr. Johnson and Prof. Willig proposed, but that they did not actually implement.

223.   Ultimately, the model I present below in Section F.4 simultaneously addresses all of Dr. Johnson and Prof. Willig's critiques of my methodology for estimating the net EpiPen price overcharge caused by the foreclosure.  In particular, this model simultaneously addresses all of the following critiques of my overcharge methodology (in addition to addressing the critiques of my foreclosure regression and foreclosure share methodologies, discussed above):

- Excludes all state-run Medicaid plans (*infra* Section A).
- Updates market responsiveness of demand based on Dr. Johnson pointing out the correct measure of Mylan's marginal cost in 2012 (*infra* Section C).
- Allow the cross-price responsiveness of demand to increase over time in proportion to the trend in increasing EAI market size, in response to Dr. Johnson's critique that I previously assumed that the cross-price responsiveness of demand was the same in all months (*infra* Section D.1).
- Uses my foreclosure regression to estimate the actual cross-price responsiveness of demand, in response to Prof. Willig's criticism that I relied on the Analysis Group study for actual cross-price responsiveness of demand (*infra* Section D.2).
- Solves for EpiPen and Auvi-Q equilibrium prices in a differentiated Bertrand model, in response to Dr. Johnson and Prof. Willig's critiques that I did not explicitly include Auvi-Q's price in my model of EpiPen's but-for price (*infra* Section E.3).
- Allowed the foreclosure to affect not only the intercept, but also the slope, of the demand functions, in response to Prof. Willig's criticism that I did not consider the possibility that the foreclosure also affected the slope of the demand functions. (*infra* Section F.4).

224.  This model that addresses all of the defense expert critiques simultaneously indicates that the overcharge on EpiPen due to the foreclosure was 20-28% of EpiPen's actual net price (depending on the month).[464]   Total state antitrust damages and consumer protection damages resulting from this model are $408 million and $334 million, respectively, as compared to $121 million in antitrust damages and $219 million in consumer protection damages presented in my opening

---

[464] "MREPLY14 pct_overcharge range, x bertrand.txt".

Highly Confidential: Subject to Protective Order

merits report.[465]   Some of the methodological changes that the defense experts proposed increased damages, while others decreased damages.  The methodological change that is the primary cause of the increase in damages is Prof. Willig's proposal to allow the foreclosure to affect not only the intercept of the demand functions, but also their slopes.[466]  Prof. Willig used hypothetical, made up numbers to show that foreclosure could theoretically decrease EpiPen's profit-maximizing price, even if it increased its quantity, by altering the slope of EpiPen's demand function in a specific way.[467]  Implementing Prof. Willig's proposal by obtaining an estimate of how the foreclosure actually affected the slope of the quantity demanded functions shows that the foreclosure significantly reduced the cross-price-responsiveness of demand in the EAI market, and consequently significantly increased profit-maximizing prices above but-for levels.[468]

## A. Exclusion of State Medicaid

225.   Dr. Johnson points out that some of the programming code used to calculate my foreclosure damages incorrectly included sales to state-run Medicaid agencies.[469]   All updated damages figures in this report correctly exclude state Medicaid sales.[470]

## B. Updated Estimate of Foreclosure Effect on Quantity Demanded Intercept

226.   A key input to my foreclosure overcharge calculations is the amount by which the foreclosure shifted the intercept of Mylan's quantity demanded function

---

[465] "MREPLY25 damages by model summary.xlsx"; Elhauge Merits Report Appendix A. Both of these figures include damages both for the initial January 2013-October 2015 period and the deterred re-entry period in November-December 2016.

[466] *Infra* Section F.4.

[467] Willig Merits Report ¶249, Figure 13c.

[468] *Infra* Section F.4.

[469] Johnson Report ¶121.  As noted above in Part VI.D, I have never excluded  EAI sales to Medicaid or Medicare plans that were administered by private entities, such as "Managed Medicaid" plans, Medicare Part D plans, and Medicare Advantage plans.  No defense experts have asserted that I should have excluded such private entities, though Prof. Willig does exclude them based on his false assertion that I had excluded them.  *See supra* Part VI.D.

[470] Following the convention used in Dr. Johnson's backup code, I exclude all observations in the IQVIA dataset where the method of payment equals "MEDICAID".  This corresponds to the Medicaid plans run by state agencies.  See "IQVIA Plan Model Type Listing_Final.xlsx", cell C16 ("Scripts reported under these plans [with method of payment equal to "MEDICAID"] are for Medicaid prescription benefits controlled by the State and not by managed care organizations.").

Highly Confidential: Subject to Protective Order

upwards, denoted $f$ in my opening merits report.[471]  The value of $f_t$ in a given month is $f_t = -\alpha r_t Q_t$, where $\alpha$ is the share impact coefficient as estimated by my foreclosure regression, $r_t$ is the share of the EAI market restricted in month $t$, and $Q_t$ is the EAI market quantity in month $t$.[472]  All three of these values have changed slightly in my reply report in response to newly available data  and defense critiques, so here I present updated estimates of $f$ in each month:

---

[471] Elhauge Merits Report ¶171.

[472] Elhauge Merits Report ¶171.  Below in Section D.1., I explain that, in response to a critique by Dr. Johnson, I now calculate all quantities as 12-month moving averages when calculating the overcharge per dose.  Otherwise, this equation remains unchanged.

Highly Confidential: Subject to Protective Order

| Table 110: Shift in Intercept of Mylan's Quantity Demanded Function Due to Foreclosure[473] | | | | |
|---|---|---|---|---|
| Year | Month | Market Quantity Sold[474] $Q_t$ (000s) | Percentage of Lives Restricted $r_t$ | Shift in Intercept due to Foreclosure $f_t = -\alpha r_t Q_t$ (000s) |
| 2013 | 1 | 495.0 | 11% | 2.6 |
| | 2 | 513.7 | 12% | 2.8 |
| | 3 | 530.3 | 12% | 2.9 |
| | 4 | 543.4 | 11% | 2.9 |
| | 5 | 552.6 | 14% | 3.6 |
| | 6 | 561.0 | 27% | 6.9 |
| | 7 | 562.1 | 26% | 6.7 |
| | 8 | 565.2 | 26% | 6.8 |
| | 9 | 570.2 | 25% | 6.6 |
| | 10 | 577.0 | 25% | 6.6 |
| | 11 | 582.9 | 25% | 6.8 |
| | 12 | 594.2 | 26% | 7.2 |
| 2014 | 1 | 605.6 | 34% | 9.4 |
| | 2 | 617.9 | 31% | 9.0 |
| | 3 | 627.2 | 32% | 9.2 |
| | 4 | 631.3 | 41% | 12.0 |
| | 5 | 632.7 | 43% | 12.4 |
| | 6 | 639.6 | 45% | 13.1 |
| | 7 | 644.5 | 44% | 12.9 |
| | 8 | 648.9 | 44% | 13.0 |
| | 9 | 657.3 | 46% | 14.0 |
| | 10 | 663.5 | 43% | 13.3 |
| | 11 | 667.7 | 44% | 13.4 |
| | 12 | 675.4 | 44% | 13.5 |
| 2015 | 1 | 680.2 | 31% | 9.8 |
| | 2 | 679.0 | 32% | 9.9 |
| | 3 | 678.2 | 32% | 10.0 |
| | 4 | 687.6 | 32% | 10.0 |
| | 5 | 714.6 | 32% | 10.6 |
| | 6 | 718.2 | 32% | 10.6 |
| | 7 | 718.3 | 32% | 10.5 |
| | 8 | 721.8 | 32% | 10.5 |
| | 9 | 723.3 | 31% | 10.3 |
| | 10 | 720.5 | 25% | 8.2 |

---

[473] "MREPLY14 updated f table.xlsx".

[474] This value is different from the values in Table 8 of my opening merits report for two reasons: (1) it excludes purchases by state-run Medicaid plans; and (2) it is a 12-month moving

125

Highly Confidential: Subject to Protective Order

## C. Market Responsiveness of Demand

227.   One input to my foreclosure overcharge calculation is the EAI market responsiveness to demand, $B$, which indicates the extent to which the EAI market quantity demanded contracts when the average EAI market price increases.[475]   In my opening merits report, I showed how one could solve for this overall market responsiveness of demand based on the EpiPen's actual price, marginal cost, and quantities in 2012, when the EpiPen was the only EAI in the market.[476]   My original calculation of this figure incorrectly relied on an estimate of Mylan's costs from 2010, rather than from 2012.[477]   I have therefore updated all of my foreclosure overcharge calculations in this report so that it uses the correct cost figure for 2012 ($26.76/pen).  This changes makes B = 5,865 (instead of the old value of 5,395).

## D. Cross-Price Responsiveness of Demand

228.   As described in my opening merits report, another input to my foreclosure overcharge calculations is an estimate of cross-price responsiveness of demand between Auvi-Q and the EpiPen, which I refer to as $b_x$ for short.[478]

### 1. Calculating Cross-Price Responsiveness on a Monthly Basis

229.   In my opening merits report, I calculated the cross-price responsiveness of demand by multiplying the percentage point market share change in response to a one-dollar change in EpiPen's price relative to Auvi-Q's price times the number of EAI pens sold in 2012.[479]   Dr. Johnson criticizes this calculation because it does not produce a different cross-price responsiveness for each month, and proposes instead multiplying the market share change by the total EAI doses in a given month.[480]

230.   Although Dr. Johnson is right that the cross-price responsiveness of demand should increase over time because the EAI market has been growing over

---

average of the quantity in that month rather than the raw quantity in that month. *See infra* Section VIII.D.1.

[475] Elhauge Merits Report ¶175.
[476] Elhauge Merits Report ¶176.
[477] Johnson Merits Report ¶131.
[478] Elhauge Merits Report ¶¶173-174.
[479] Elhauge Merits Report ¶174.
[480] Johnson Report ¶130.

Highly Confidential: Subject to Protective Order

time due to increased demand, his proposal of estimating the coefficients in this model monthly based on actual EAI doses in that month would cause the values of these coefficients, and consequently the predicted but-for prices, to be excessively volatile. Figure 109 below shows that EpiPen's and Auvi-Q's actual quantities sold (solid red and blue lines) have significant seasonal variation because a large percentage of EAIs are purchased every August right before the beginning of the school year. In contrast, none of the price data presented by myself or any of the defense experts has shown prices varying seasonally in such a manner.[481] This indicates that Mylan and Sanofi update their prices in response to the general trend in overall quantity demanded, rather than in response to predictable seasonal spikes in demand. Therefore, when calculating the overcharge per dose caused by Mylan's foreclosure, I use 12-month moving average quantities, which Figure 109 below shows removes the seasonal variation.[482] I follow this methodology for all damages calculations presented in this reply report.

---

[481] *See, e.g.*, Willig Merits Figure 7b (Auvi-Q and EpiPen net prices are commercial customers).

[482] The 12-month moving average in month $t$ equals the average of quantities in months $t$-5 to $t$+6. Although I use 12-month moving average quantities to estimate the EpiPen overcharge per dose in each month, I multiply that overcharge per dose by actual quantities to determine the total overcharges in that month. This is because the change in the profit-maximizing EpiPen price from month to month is determined by the general trend EAI market growth over time, but the total overcharge by definition equals the overcharge per dose multiplied by the number of EpiPen doses actually purchased that month.

Highly Confidential: Subject to Protective Order

**Figure 109: EpiPen and Auvi-Q Quantities: Actual vs. 12-Month Moving Averages (Centered on Current Month)[483]**



### 2. Source for Measure of Cross-Price Responsiveness

231.    In my opening merits report, I relied upon an Analysis Group pricing study in order to estimate that the cross-price-responsiveness $b_x = 3,358$.[484] Although Prof. Willig asserts that this pricing study is "unreliable," he does not actually provide any reason to believe it would be unreliable—he does not identify any errors in the study's methodology, nor does he offer any alternative estimate of the cross-price responsiveness of demand.[485] Moreover, using this pricing study as an estimate of the actual cross-price responsiveness of demand is ***conservative*** because it is based on pre-entry estimates of price responsiveness that assumed there would not be significant foreclosure.[486] In contrast, in the actual world Mylan foreclosed 11-46% of the EAI market, depending on the month.[487] "Such a high foreclosure share

---

[483] "MREPLY14 actual vs 12month ma quantities.xlsx".
[484] Elhauge Merits Report ¶174.
[485] Willig Merits Report ¶251.
[486] *See* Elhauge Class Report ¶ 95.
[487] "MREPLY66 forc share no 159.xlsx." See discussion *supra* Part VI.B.2.

128

Highly Confidential: Subject to Protective Order

naturally reduces the extent to which Auvi-Q could gain market share at any given price level."[488]   Thus, "my use of the Analysis Group estimate conservatively underestimates the price impact of foreclosure relative to estimating the price responsiveness from the actual period when Auvi-Q was on the market."[489]  Further, my approach "conservatively ignores ... other anticompetitive effects of the foreclosure, such as reduced rival aggressiveness," i.e., the additional harm that comes from the fact that foreclosure reduces price responsiveness.[490]

232.   Because Prof. Willig criticizes me for not undertaking an "independent analysis of EpiPen's price responsiveness,"[491] and because my use of the Analysis Group calculation is unduly conservative, here I estimate what, given the actual foreclosure, the cross-price responsiveness of demand was.   The foreclosure regression I ran in my opening merits report, and discuss in this report extensively in Part VII, directly estimates the extent to which Auvi-Q's market share decreases as the ratio of its price to the EpiPen's price increases.  In order to use the foreclosure regression results to estimate the cross-price responsiveness of demand, I need only make the trivial change of changing the price variable from a price ratio (Auvi-Q / EpiPen − 1) to a price difference (Auvi-Q − EpiPen).   Making this minor specification change to the price variable never alters the foreclosure regression's estimate of foreclosure share impact α (based on the estimated coefficient for the percentage of lives restricted variable), but allows me to directly translate the regression results into an estimate of the cross-price responsiveness of demand. Table 111 shows the results.

---

[488] *See* Elhauge Class Report ¶ 95.
[489] Elhauge Class Report ¶ 96; *see also* id. ("if one uses the actual results after Sanofi's entry, they would indicate a lower price responsiveness, which would increase the estimated overcharge.")
[490] Elhauge Merits Report ¶ 160; *see also* Elhauge Class Report ¶ 96 ("if one uses the actual results after Sanofi's entry, they would indicate a lower price responsiveness, which would increase the estimated overcharge.")
[491] Willig Merits Report ¶251.

Highly Confidential: Subject to Protective Order

| Table 111: Main Foreclosure Regression Specification: Johnson Extended Back Matching MMIT-Defined PBM Estimated Plan-Level Price *Difference*[492] | | | |
|---|---|---|---|
| **Variable** | **Coefficient** | **Clustered Standard Error** | **p-value** |
| Share Impact | -4.6% | 0.0035 | 0.0% |
| Estimated Plan-Level Price Difference | -0.014% | 0.0001 | 2.5% |

233.   This coefficient estimate indicates that the value of $b_x$ equals 0.014% multiplied by the total market doses in that month.  So for example, the 12-month moving average of EAI market doses was 494,969 in January 2013, so $b_x$ would equal $(0.014\%)(494,969) = 68$ in January 2013.  This estimate of $b_x$ is much smaller than the estimate of $b_x$ that was based on the Analysis Group estimate of price responsiveness, reflecting the fact that former was suppressed by substantial foreclosure, unlike the latter.   Using this lower estimate of $b_x$ increases the overcharge from the impact of foreclosure on Auvi-Q share (which raises the intercept for the EpiPen-specific demand function) more than does using the Analysis Group pricing study to estimate $b_x$,[493] as Table 112 below shows

---

[492]  "MREPLY71 forc reg updated, jeb, estimated plan price diff with mmit defined pbm.xlsx". This regression has 62,657 observations. This regression uses updated, complete MMIT data, the Johnson extended back methodology for matching, estimates plan-level prices, uses MMIT data to determine PBM affiliation, and its price control is the difference between Auvi-Q and EpiPen plan-level prices.

[493]  The overcharges per dose for my initial model are lower than the overcharges per dose presented in my opening merits because of several changes made in response to defense critiques noted elsewhere in this section: (A) excluding sales to state-run Medicaid agencies; (B) updating the estimate of the foreclosure's effect on the intercept of EpiPen's demand function due to the slightly reduced estimate of the foreclosure regression share impact; (C) updating the market responsiveness of demand to account for corrected Mylan cost data in 2012; and (D) allowing the cross-price responsiveness to increase in proportion to the increase size of the EAI market, rather than keeping it fixed in proportion to the size of the EAI market in 2012.

Highly Confidential: Subject to Protective Order

| Table 112: Initial Model Overcharge Per Dose, Depending on Source One Uses for Cross-Price Responsiveness $b_x$[494] | | | |
|---|---|---|---|
| | | Source for $b_x$ | |
| Year | Month | Analysis Group | Foreclosure Regression |
| 2013 | 1 | $0.14 | $0.22 |
| | 2 | $0.15 | $0.25 |
| | 3 | $0.16 | $0.27 |
| | 4 | $0.15 | $0.26 |
| | 5 | $0.19 | $0.33 |
| | 6 | $0.37 | $0.64 |
| | 7 | $0.36 | $0.63 |
| | 8 | $0.37 | $0.64 |
| | 9 | $0.35 | $0.62 |
| | 10 | $0.35 | $0.63 |
| | 11 | $0.36 | $0.65 |
| | 12 | $0.38 | $0.68 |
| 2014 | 1 | $0.50 | $0.90 |
| | 2 | $0.47 | $0.85 |
| | 3 | $0.48 | $0.87 |
| | 4 | $0.62 | $1.14 |
| | 5 | $0.64 | $1.18 |
| | 6 | $0.67 | $1.24 |
| | 7 | $0.66 | $1.23 |
| | 8 | $0.66 | $1.24 |
| | 9 | $0.71 | $1.34 |
| | 10 | $0.67 | $1.27 |
| | 11 | $0.68 | $1.29 |
| | 12 | $0.68 | $1.31 |
| 2015 | 1 | $0.49 | $0.95 |
| | 2 | $0.50 | $0.97 |
| | 3 | $0.51 | $0.98 |
| | 4 | $0.50 | $0.98 |
| | 5 | $0.52 | $1.04 |
| | 6 | $0.52 | $1.02 |
| | 7 | $0.51 | $1.01 |
| | 8 | $0.51 | $1.01 |
| | 9 | $0.50 | $0.98 |
| | 10 | $0.40 | $0.77 |

[494] "MREPLY14 initial model, bx source oc perdose.xlsx".

Highly Confidential: Subject to Protective Order

### *E. Accounting for Competition from Auvi-Q*

#### *1. My Initial Model Did Account for Competition from Auvi-Q*

234.    Dr. Johnson and Prof. Willig both claim that my foreclosure overcharge model is deficient based on the premise that it does not account for Auvi-Q's price.[495] They are wrong because my initial model *did* account for Auvi-Q's price.  The key input of the model—the effect of the foreclosure on EpiPen's quantity—is based on the output of my foreclosure regression, which explicitly controls for Auvi-Q's price.[496]   Further, my model explicitly includes a particular coefficient ($b_x$), that accounts for the extent to which customers substitute from the EpiPen to the Auvi-Q when the EpiPen's price increases.[497]

235.    Dr. Johnson and Prof. Willig both focus on the fact that, in my model of the profit-maximizing EpiPen price, EpiPen's quantity depends on EpiPen's price but not Auvi-Q's price.[498] This just reflects the fact that my model focuses on the *residual demand function* for the EpiPen, which is the function that indicates the demand for EpiPen at any given EpiPen price, after accounting for customers demand for other EAIs.[499]

236.    Nonetheless, in order to respond to the defense expert critique that my overcharge model should have accounted for Auvi-Q pricing as well as EpiPen pricing,[500] I below will present a modification of my initial damages model that

---

[495] Johnson Merits Report ¶103; Willig Merits Report ¶246.

[496] Elhauge Merits Report ¶171 (explaining that the effect of the foreclosure on EpiPen's quantity is based directly on α, the share impact estimated by the foreclosure regression); Elhauge Merits Report ¶167 (foreclosure regression specification, showing that it explicitly controls for the ratio of Auvi-Q's price to EpiPen's price).

[497] Elhauge Merits Report ¶174.

[498] Johnson Merits Report ¶103; Willig Merits Report ¶246

[499] Elhauge Merits Depo. 258-259 ("A . . . I modeled the pricing considering competition from Sanofi. So I did take into account the fact that that affected the price responsiveness. So even in a duopoly though each firm has their own firm-specific demand curve, but that doesn't mean it's a monopoly").  *See also* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 2 (3d ed. 2018) ("More typical is what economists call a dominant firm, which is a firm that is much larger than the other firms because it has lower costs or a better product. A dominant firm also has incentives to price above cost, but is somewhat constrained by the ability of the other firms to offer the product at their costs. The dominant firm faces what is called the residual demand that results when one subtracts from total market demand the output that the other less efficient firms provide at any given price").

[500] Johnson Merits Report ¶103; Willig Merits Report ¶246.

Highly Confidential: Subject to Protective Order

simultaneously determines equilibrium Auvi-Q and EpiPen prices (rather than just focusing on the effect of the foreclosure on EpiPen's price). To implement this modification, one must first determine whether firms in the EAI market are engaged in price coordination or in differentiated Bertrand competition. For the reasons that follow, I conclude the answer is the latter.

### 2. The EAI Market Characteristics Indicate Differentiated Bertrand Competition Rather than Price Coordination

237. Dr. Johnson (but not Prof. Willig) appears to argue that one should assume Mylan and Sanofi are engaged in some form of price coordination in the EAI market.[501] Dr. Johnson specifically makes this argument when he asserts that Mylan's profit-maximizing price depends not just on Sanofi's current price, but on Mylan's expectations about how Sanofi will respond to a change in Mylan's price.[502] What Dr. Johnson is describing is a model of competition called "differentiated price competition with conjectures," which empirical economists sometimes use to model markets with price coordination.[503] In contrast, the "differentiated Bertrand" model of competition is used to model markets without any price coordination.[504]

238. Dr. Johnson's argument—that one should use a model that assumes price coordination—is wrong because the evidence shows both that: (a) there are multiple characteristics of the EAI market that make price coordination implausible; and (b) evidence regarding actual prices directly shows that Mylan and Sanofi were not engaged in price coordination. This evidence makes my model, which does not assume any price coordination, the correct one to apply to the EAI market.

239. **a. Characteristics of EAI Market that Make Price Coordination Implausible**. Antitrust law prohibits horizontal competitors, such as Sanofi and Mylan in the EAI market, from agreeing with each other on what prices to charge.

---

[501] Johnson Report ¶104 ("the profit-maximizing price for Mylan is not just a function of its own quantity, but also a function of its competitors' price and quantity responses.")

[502] Johnson Report ¶104, n. 227.

[503] Brander & Spencer, *Tacit Collusion, Free Entry, and Welfare*, 33 JOURNAL OF INDUSTRIAL ECONOMICS at 278 (March 1985) ("the value of the conjectural variation, which is associated with a particular price and industry output given the number of firms, is interpreted as a proxy for or a representation of the level of tacit (or explicit) collusion in the industry.").

[504] Werden, *Demand Elasticities in Antitrust Analysis* 66 ANTITRUST L.J. 363, 371 (1998) ("Sellers of differentiated products are most commonly assumed by economists to engage in Bertrand competition. Firms engaged in Bertrand competition choose prices **non-cooperatively** to maximize their profits.").

Highly Confidential: Subject to Protective Order

This prohibition alone makes it difficult for firms to (legally) coordinate on price. Without a concrete agreement, neither firm can be sure that the other is attempting to follow a coordination strategy, and this uncertainty can cause firms to abandon a coordination strategy.[505]  Further, the EAI market has numerous characteristics that make price coordination without any concrete agreement implausible: (1) the EAI market is differentiated; (2) Sanofi and Mylan do not know each other's costs; (3) Sanofi and Mylan's costs are asymmetric; and (4) net prices are not transparent in the EAI market.

240.   *a.1. The EAI Market is Differentiated.*  A market is "differentiated" if customers do not view different brands of the product as identical, fungible substitutes.  Here, the EAI market is differentiated because customers do not view the EpiPen and the Auvi-Q as identical or interchangeable.  Although both the EpiPen and Auvi-Q contain the same active ingredient (epinephrine), they are differentiated in numerous ways:

i.   *Shape.*  Auvi-Q is shaped like a pack of cards, whereas the EpiPen is shaped like a syringe.  Some patients have stated that Auvi-Q's distinct shape makes it easier to carry and have on them at all times.[506]

ii.   *Patient Familiarity.*  Because the EpiPen has been on the market for much longer than the Auvi-Q, patients who have already purchased and potentially even used an EpiPen typically have a preference for the EpiPen because they already know how to use it.[507]

---

[505] Kai-Uwe Kuhn, *The Coordinated Effects of* Mergers, in HANDBOOK OF ANTITRUST ECONOMICS at 105, 125-126 (Buccirossi ed. 2008) ("from experimental evidence we know that in the absence of communication (i.e., in the absence of explicit bargaining over outcomes) coordination games are often inefficiently resolved (*see* Van Huyck, Battalio, and Beil 1990 and the discussion of its implication for communication in collusion in Kuhn 2011). As this evidence shows, considerations of risk dominance often result in the selection of very inefficient outcomes from the point of view of the firms. This is because gambling on others to play a collusive strategy depends on the reasoning of others, so a firm risks losing a lot of money if the reasoning of other firms is different. Setting lower prices will guarantee positive sales revenues in a larger set of circumstances. In the absence of explicit negotiation there is therefore no reason to expect that firms play an equilibrium on the Pareto frontier of the value set.").

[506] ███████████████████████████████████████████████████████████

[507] Elhauge Merits Report ¶35; Willig Merits Report ¶135.

Highly Confidential: Subject to Protective Order

iii. *Voice Instructions.*   The Auvi-Q includes voice instructions that instruct whoever must administer it how to use it, while the EpiPen does not.[508]

iv. *Administration Process.*   The Auvi-Q is "placed against the thigh," whereas one must "swing and firmly push" the EpiPen.  ██████████████████████ ████████████████████████████████████████████████ [509]

241.   The firms' prices and profit margins in this case also confirm that the EAI market is differentiated.   In **un**differentiated price competition, customers purchase exclusively from the sellers who offer the lowest price in the market, and thus all sellers that compete in the market offer the exact same price.[510]   That clearly does not describe the EAI market, in which Auvi-Q and EpiPen have both made sales despite having different prices.   Further, in the absence of price coordination or horizontal price fixing, firms' prices in an **un**differentiated market will equal their marginal costs.[511]   That again clearly does not describe the EAI market, in which the EpiPen and Auvi-Q were both priced far above their incremental costs.[512]   There therefore cannot be any real dispute that the EAI market is a differentiated market rather than an undifferentiated market.

242.   When a market is differentiated, economists almost always use a model of competition that assumes no price coordination because product differentiation makes price coordination extremely difficult.[513]   Product differentiation makes price coordination difficult because it causes the profit-maximizing prices of the products to differ, meaning that there is no single price for the firms to coordinate on.[514]

---

[508] MYEP00275501 ("█████ █████████████████████████████████ ████████

[510] Carlton & Perloff, Modern Industrial Organization 57-58 (4th ed. 2005).

[511] *Id.*

[512] For example, Prof. Willig's own Figure 5a indicates that the EpiPen's net price was always far above its incremental cost, so there can be little dispute as to this fact.

[513] ABA Section of Antitrust Law, Econometrics 273 (2d ed. 2014) ("The workhorse model for differentiated product markets is Bertrand competition," which assumes no price coordination); Crooke et al, *Effects of Assumed Demand Form on Simulated Postmerger Equilibria*, 15 Review of Industrial Organization 205, 206 (1999) ("The conventional assumption for differentiated products industries is **noncooperative price-setting** in a one-shot game, which is commonly termed "Bertrand competition."); Werden, *Demand Elasticities in Antitrust Analysis,* 66 Antitrust L.J. 363, 371 (1998) ("Sellers of differentiated products are most commonly assumed by economists to engage in Bertrand competition.  Firms engaged in Bertrand competition choose prices **non-cooperatively** to maximize their profits.").

[514] Louis Kaplow, Competition Policy and Price Fixing 269 (2013) ("[W]hen products are differentiated, there is no single price (and no single marginal cost), but rather one for each product.  In these instances, however, oligopolistic coordination is more difficult and hence less

Highly Confidential: Subject to Protective Order

243.   *a.2. Sanofi and Mylan Do Not Know Each Other's Marginal Costs*. Coordination is also more difficult in markets where firms do not know each other's marginal costs.[515]  This is because uncertainty about the other firm's marginal costs can make it hard to determine whether the other firms are following a coordination strategy.  One textbook explains this with the following example:

> Suppose, for example, that cost differences or different beliefs about demand lead one firm to conclude that cooperation means charging $50 while a second firm thinks it means $40. If the second firm charges $40, the first firm might view that as a grab for market share and respond in tit-for-tat fashion with a $35 price. A price war could then develop.[516]

Here, Sanofi and Mylan do not know each other's costs, and there is no dispute about that fact.[517]

244.   *a.3. Sanofi and Mylan's Costs Are Asymmetric*.   The economic literature is also clear that price coordination is more difficult when the firms' marginal costs differ from each other.[518]  Differing costs make coordination difficult

---

likely"); NICHOLSON & SNYDER INTERMEDIATE MICROECONOMICS AND ITS APPLICATION 429 (11th ed., Cengage Learning: 2009) ("Tacit collusion is easier if prices are transparent and goods are relatively standardized, for then it is easier for firms to have a common understanding about which prices are acceptable and which are so unacceptably low that should be punished with a price war."); TIROLE, THE THEORY OF INDUSTRIAL ORGANIZATION 240 (1988) ("starting with Chamberlin [a work published in 1929], several authors felt that repeated interaction between oligopolists should facilitate collusion. They also identified some factors that may hinder it. . . . As Chamberlin recognized, there are factors that may hinder collusion.  We distinguish two such factors: detection lags and asymmetries between firms."); DOJ/FTC HORIZONTAL MERGER GUIDELINES §7.2 ("A market is typically more vulnerable to coordinated conduct if . . . products in the relevant market are relatively homogeneous.").

[515] PINDYCK & RUBINFELD, MICROECONOMICS 500 (8th ed. 2012) ("More often, failure to cooperate is the result of rapidly shifting demand or cost conditions. Uncertainties about demand or costs make it difficult for firms to reach an implicit understanding of what cooperation should entail."); DOJ/FTC COMMENTARY ON HORIZONTAL MERGER GUIDELINES 17 (2006) ("Concluding that 'the market for cigarettes is subject to many complexities, continual changes, and uncertainties that would severely complicate the task of reaching and monitoring a consensus,' the Commission closed the investigation without challenging the merger.").

[516] PINDYCK & RUBINFELD, MICROECONOMICS 500 (8th ed. 2012)

[517] The Third Amended Stipulated Protective Order in this case, §2.2, provides that "Highly Confidential" data includes "costs".  If the costs of EpiPen and Auvi-Q were public, such cost data would not be "highly" confidential.

[518] TIROLE, THE THEORY OF INDUSTRIAL ORGANIZATION 240(1988) ("heterogeneity in both costs and products may make coordination on a given price difficult"); ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 661 (3d ed. 2018) ("With such varying products and costs, the market price

Highly Confidential: Subject to Protective Order

because they mean the firms also have different profit-maximizing prices, which makes it difficult to coordinate on a common price. Here there is no dispute that EpiPen and Auvi-Q had different cost structures; Prof. Willig explicitly acknowledges it.[519]

245.   *a.4. Net Prices are Not Transparent in the EAI Market*. The economic literature is also clear that it is harder to coordinate on prices when firms cannot easily observe each other's prices.[520]   First, it is harder to determine whether the other firms are following a coordination strategy when they cannot easily observe the other firm's prices.[521]   Second, when prices are not transparent each firm has a stronger incentive to "cheat" by charging less than the coordinated price because it knows that other firms will have a difficult time detecting and punishing it for cheating on the coordinated price.[522]   Here, the net prices of EpiPen and Auvi-Q are

---

that maximizes profits will vary for different firms, so they will find it harder to settle on a common price. Varying product features or delivery costs can also make it harder to detect whether firms are undercutting the oligopoly price or are instead making an adjustment that accurately reflects the differences in product features or transportation costs. Such variation also makes it harder to punish defections, because any deviating firm will have more attraction to the set of consumers who have product preferences or geographical locations closer to the product features or location of the deviating firm.")

[519] Willig Merits Report ¶110 ("A substantial portion of its incremental cost was the royalty ███████████████████████████ Sanofi conceded that ████████████ and put it at a competitive disadvantage vis-à-vis Mylan. ███████████████ citing SAN-EPI-0171341 at SAN-EPI-01713343.

[520] DOJ/FTC HORIZONTAL MERGER GUIDELINES § 7.2 (2010) ("A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently identified by that firm's rivals.  This is more likely to be the case if the terms offered to customers are relatively transparent.  Price transparency can be great for relatively homogeneous goods."); NICHOLSON & SNYDER INTERMEDIATE MICROECONOMICS AND ITS APPLICATION at 429 (11th ed., Cengage Learning: 2009) ("Tacit collusion is easier if prices are transparent."); ABA SECTION OF ANTITRUST LAW, ECONOMETRICS 286 (2d ed. 2014) (one of the "three general characteristics of competitive environments that facilitate collusion" is "prices must be *transparent*, so that firms may monitor each other's behavior").

[521] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 661 (3d ed. 2018) ("oligopolistic coordination will be easier if the market involves transparent pricing for incremental sales that can be adjusted daily in response to the prices of others. But suppose instead purchases in the market involve secret discounts and/or simultaneous bidding for large contracts. Then it will be harder for the oligopolists to detect each other's defections or respond to them in time.")

[522] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 661-62 (3d ed. 2018) ("Secret discounts and large contracts also create higher incentives to defect by undercutting the oligopoly price,

Highly Confidential: Subject to Protective Order

not transparent because Sanofi and Mylan do not have access to data on the size of each other's rebates.[523]

246.   **b. EAI Price Data Inconsistent with Price Coordination**.   Data on actual prices in the EAI market confirm that Mylan and Sanofi coordinate neither on price parity nor on a particular price differential.   Figure 110 below is a histogram that shows the percentage of combinations of PBM and month in which the difference between the Auvi-Q price and the EpiPen price is any given value.   Auvi-Q and EpiPen clearly were not coordinating on "parity" pricing; Figure 110 shows that the Auvi-Q and EpiPen net prices were within $1 of each other less than 1% of the time.[524]   Auvi-Q and EpiPen also clearly were not coordinating on any particular difference between their prices; the most common Auvi-Q price premium ($6) occurred less than 7 percent of the time.

---

because such defections are less likely to be detected and because defections that lock in large contracts may produce large enough gains to offset any penalty for defection").

[523] Here, I was able to determine the net prices of Auvi-Q and the EpiPen only by combining publicly-available information on gross prices with private information on rebates.

[524] Prof. Willig also appears to acknowledge that Mylan and Sanofi did not coordinate on price parity. Willig Merits Report ¶183 ("From launch through the first half of 2014, Sanofi maintained a net price premium over EpiPen that reached 15% in the second quarter of 2014 before Sanofi decided to compete more aggressively. Sanofi lowered prices by 18% from Q2 2014 to Q1 2015."); *id.* ¶139 ("First, rather than matching EpiPen's WAC price, Sanofi adopted a premium WAC price strategy").

Highly Confidential: Subject to Protective Order



247.   In sum, the evidence indicates both that price coordination would be implausible in the EAI market and that Sanofi and Mylan did not actually coordinate on prices.  Dr. Johnson is therefore wrong to argue that one should assume some degree of price coordination in modeling Mylan's but-for prices.

248.   Indeed, none of the documents that Dr. Johnson cites on this point actually indicate that Sanofi and Mylan were coordinating on price. Instead, they show only that Mylan priced in response to Sanofi's ***actual*** prices.[526]  But pricing in response to a rival's actual prices is equally consistent with differentiated Bertrand competition (which assumes no price coordination) and conjectural variation models (which assume price coordination).

---

[525] "MREPLY21 price diff histogram.png".
[526] Johnson Merits Report ¶104.

Highly Confidential: Subject to Protective Order

### 3. Foreclosure Overcharges if One Includes Auvi-Q's Price in a Model of Differentiated Bertrand Competition, But Still Assumes Foreclosure Only Affects the Intercepts of EpiPen's and Auvi-Q's Demand Functions

249.   For the reasons noted above, I find that firms in the EAI market are engaged in differentiated Bertrand competition, not price coordination.  Thus, to respond to the defense critique that my damages model should have accounted for Auvi-Q pricing as well as EpiPen pricing,[527] I modify my damages model here to simultaneously determine equilibrium Auvi-Q and EpiPen prices using a differentiated Bertrand competition.  In this section, I assume, like I did in my opening merits report, that the foreclosure only affects the intercept of EpiPen and Auvi-Q's demand functions.[528]

250.   In this model, EpiPen's and Auvi-Q's quantity demanded functions are:
$$q_e = k + f - b_{me}(p_e) - b_x(p_e - p_a)$$
$$q_a = l - f - b_{ma}(p_a) - b_x(p_a - p_e)$$

251.   These are fundamentally the same demand functions as used in my original merits report, except that these functions allow the rival's price to vary instead of assuming that it remains fixed.  The variables $q_e$ and $q_a$ represent the quantity demanded of EpiPen and Auvi-Q respectively, given their prices $p_e$ and $p_a$.  As in my opening model, $f$ is the "quantity effect of foreclosure" that adjusts the intercept on EpiPen's and Auvi-Q's demand functions and is equal to $-\alpha r_t Q_t$, where $\alpha$ is share impact of the foreclosure as estimated by my foreclosure regression, $Q_t$ is the actual EAI market quantity in time $t$, and $r_t$ is the share of the market restricted in time $t$.[529]  The coefficient $b_x$ also has the same meaning;  it indicates the cross-price responsiveness of demand, and thus indicates the extent to which customers substitute between EpiPen and Auvi-Q in response to their relative prices.[530] The coefficient $b_{me}$ in this model is the same as the coefficient $b_m$ in my opening merits report – it indicates the "market responsiveness of demand" for EpiPen, i.e., the extent to which customers exit the EAI market in response to an EpiPen price

---

[527] Johnson Merits Report ¶103; Willig Merits Report ¶246.

[528] In this particular differentiated Bertrand model, I assume that the foreclosure only affects the intercept of the firms' quantity demanded functions, just as in my initial model. Below in section F.4, I present a more complex differentiated Bertrand model that allows the foreclosure to affect the slope of the demand functions, in response to Prof. Willig's criticism that I did not consider the possibility that the foreclosure might have also affected the slope of the demand functions.

[529] Elhauge Merits Report ¶171 ("$f_t = -\alpha r_t Q_t$").

[530] Elhauge Merits Report ¶173.

Highly Confidential: Subject to Protective Order

increase.[531]  EpiPen and Auvi-Q have distinct market responsiveness of demand, so I denote EpiPen's $b_{me}$ and denote Auvi-Q's $b_{ma}$ for clarity.  Following the same equation in my opening merits report, EpiPen's market responsiveness of demand $b_{me}$ equals $B$ (the slope of the marketwide demand function) multiplied by EpiPen's market actual share, $s_e$.[532]  Likewise, Auvi-Q's market responsiveness of demand $b_{ma}$ equals $B$ multiplied by Auvi-Q's actual market share, $s_a$.  The coefficients $k$ and $l$ are the intercepts of EpiPen's and Auvi-Q's demand functions, respectively.[533]

252.    Given these quantity functions, EpiPen and Auvi-Q's profit functions are as follows:

$$\pi_e = (p_e - c_e)q_e = (p_e - c_e)(k + f - b_{me}(p_e) - b_x(p_e - p_a))$$
$$\pi_a = (p_a - c_a)q_a = (p_a - c_a)(l - f - b_{ma}(p_a) - b_x(p_a - p_e))$$

253.    One solves for EpiPen's and Auvi-Q's profit-maximizing prices by first taking the partial derivatives of their profit functions with respect to own price.  Setting these partial derivatives equal to zero are the first-order conditions for EpiPen and Auvi-Q:[534]

$$\frac{\delta\pi_e}{\delta p_e} = f + k - b_{me}p_e - (b_{me} + b_x)(p_e - c_e) - b_x(p_e - p_a) = 0$$
$$\frac{\delta\pi_a}{\delta p_e} = -f + l - b_{ma}p_a - (b_{ma} + b_x)(p_a - c_a) - b_x(p_a - p_e) = 0$$

254.    Solving the combinations of $p_a$ and $p_e$ that simultaneously satisfy both first order conditions produces the differentiated Bertrand equilibrium $(p_e^*, p_a^*)$:

$$p_e^* = -\frac{b_x(-f + l - (-b_{ma} - b_x)c_a) - (-2b_{ma} - 2b_x)(f + k - (-b_{me} - b_x)c_e)}{-4b_{ma}b_{me} - 4b_{ma}b_x - 4b_{me}b_x - 3b_x^2}$$

---

[531] Elhauge Merits Report ¶173.

[532] Elhauge Merits Report ¶¶175-176.

[533] Note that $k$ in this EpiPen quantity does not equal $a$ (the intercept in the EpiPen quantity function used in my opening merits report) because the coefficient $b_x$ is multiplied just by $p_e$ in the original quantity function but by $p_e - p_a$ in the updated quantity function, resulting in a different intercept.

[534] See "Bertrand with constant quantity slope (Subscripted).nb" The second order conditions for EpiPen and Auvi-Q are $-2\,b_{me} - 2b_x$ and $-2\,b_{ma} - 2b_x$, respectively. These are necessarily negative because $b_{me}, b_{ma}$, and $b_x$ are all positive values. This confirms that the first order conditions identify maxima instead of minima.

141

Highly Confidential: Subject to Protective Order

$$p_a^* = -\frac{2fb_{me} - 2lb_{me} + fb_x - kb_x - 2lb_x - 2b_{ma}b_{me}c_a - 2b_{ma}b_xc_a - 2b_{me}b_xc_a - 2b_x^2c_a - b_{me}b_xc_e - b_x^2c_e}{4b_{ma}b_{me} + 4b_{ma}b_x + 4b_{me}b_x + 3b_x^2}$$

255.   The marginal effect of the quantity impact of foreclosure $f$ on EpiPen's profit-maximizing price is the derivative of EpiPen's profit-maximizing price $p_e^*$ with respect to $f$.   Likewise, the marginal effect of $f$ on Auvi-Q's profit-maximizing price is the derivative of Auvi-Q's profit-maximizing price $p_a^*$:

$$\frac{\delta p_e^*}{\delta f} = -\frac{2b_{ma} + b_x}{-4b_{ma}b_{me} - 4b_{ma}b_x - 4b_{me}b_x - 3b_x^2}$$

$$\frac{\delta p_a^*}{\delta f} = -\frac{2b_{me} + b_x}{4b_{ma}b_{me} + 4b_{ma}b_x + 4b_{me}b_x + 3b_x^2}$$

256.   As one can see, in this model there is no need to obtain estimates of the coefficients $k$ and $l$ (the intercepts of EpiPen's and Auvi-Q's quantity functions in the but-for world, respectively), because they are not in the equations for the marginal effect of $f$ on equilibrium prices.   The exact overcharges predicted by this model depend on the value of $b_x$ that one uses.   In my opening merits report, I relied on Analysis Group's pricing study to estimate $b_x$, but I showed above in Part VIII.D.2 (in response to Prof. Willig) that one could alternatively use my foreclosure regression output to estimate $b_x$.   Table 113 below shows the EpiPen overcharges per dose if one uses a differentiated Bertrand model of competition and only allows the foreclosure to affect the intercept of the quantity functions, depending on the source one uses to estimate $b_x$.

Highly Confidential: Subject to Protective Order

| | | Source for $b_x$ | |
|---|---|---|---|
| **Table 113: Overcharge Per Dose, Bertrand Model only allowing Foreclosure to Affect Intercept of Quantity Functions Depending on Source One Uses for Cross-Price Responsiveness $b_x$[535]** | | | |
| **Year** | **Month** | **Analysis Group** | **Foreclosure Regression** |
| 2013 | 1 | $0.08 | $0.20 |
| | 2 | $0.09 | $0.23 |
| | 3 | $0.10 | $0.25 |
| | 4 | $0.09 | $0.24 |
| | 5 | $0.12 | $0.31 |
| | 6 | $0.22 | $0.59 |
| | 7 | $0.22 | $0.58 |
| | 8 | $0.23 | $0.60 |
| | 9 | $0.22 | $0.58 |
| | 10 | $0.22 | $0.58 |
| | 11 | $0.22 | $0.60 |
| | 12 | $0.23 | $0.64 |
| 2014 | 1 | $0.31 | $0.84 |
| | 2 | $0.29 | $0.80 |
| | 3 | $0.29 | $0.81 |
| | 4 | $0.38 | $1.06 |
| | 5 | $0.39 | $1.09 |
| | 6 | $0.41 | $1.15 |
| | 7 | $0.41 | $1.14 |
| | 8 | $0.41 | $1.15 |
| | 9 | $0.44 | $1.24 |
| | 10 | $0.42 | $1.18 |
| | 11 | $0.42 | $1.20 |
| | 12 | $0.43 | $1.22 |
| 2015 | 1 | $0.31 | $0.89 |
| | 2 | $0.32 | $0.91 |
| | 3 | $0.32 | $0.92 |
| | 4 | $0.32 | $0.92 |
| | 5 | $0.33 | $0.97 |
| | 6 | $0.33 | $0.96 |
| | 7 | $0.32 | $0.95 |
| | 8 | $0.32 | $0.95 |
| | 9 | $0.32 | $0.93 |
| | 10 | $0.25 | $0.73 |

Highly Confidential: Subject to Protective Order

## F. *Shape of Quantity Demanded Functions*

257.   In my opening merits report, I modeled the EpiPen's residual demand function as the linear function $q = a - bp$, where $p$ is EpiPen's price.[536]  This section addresses Prof. Willig's arguments about the shape of this demand function.

### *1. Linear Demand Function Fits the Evidence and Can Approximate Non-Linear Functions*

258.   First, Prof. Willig criticizes me for using a linear demand function instead of a nonlinear demand function.[537]  Prof. Willig does not identify any alternative demand function shape that he believes would be more appropriate in this market, but rather only points out that other shapes of demand functions exist.

259.   Here, a linear demand function is the most appropriate for three reasons. First, ███████████████████████████████████████████████ ███████████████████████████████████████████████ Second, a linear demand function matches the specification of my foreclosure share regression, which indicates that the foreclosure has shifted the intercept of EpiPen's market share function (and therefore also its quantity demanded function) upwards in direct linear proportion to the percentage of lives restricted.  Third, even if the demand function is non-linear over a large range of prices, over reasonably small price ranges a linear function will closely approximate other non-linear demand functions.[539]

### *2. The Evidence Affirmatively Indicates that the Foreclosure Upwardly Shifted the Intercept of EpiPen's Demand Function*

260.   Prof. Willig also takes issue with the functional form I used to model the effect of the foreclosure on Auvi-Q's quantity.  In my model, the foreclosure increases EpiPen's quantity demanded by $f_t = -\alpha r_t Q_t$, where $\alpha$ is the coefficient on the "percent of lives restricted" variable in my foreclosure regression, $r_t$ is the share of the market restricted by Mylan in month $t$, and $Q_t$ is the EAI market quantity in

---

[535] "MREPLY14 bertrand model with constant slope, bx source oc perdose.xlsx".

[536] Elhauge Merits Report ¶172.

[537] Willig Report ¶¶ 244, 250.

[538] Elhauge Merits Report ¶174; Elhauge Merits Depo. 257.

[539] Elhauge Merits Depo. 257 ("even for a curved demand over the – over small price changes, they could be approximated as linear. And this is a relative small price change of 5 percent. So it made sense to pick a linear model").

month *t*.[540]  In other words, my model indicates that Mylan's foreclosure shifts the intercept of EpiPen's demand function upwards in direct proportion to the share of the market foreclosed and the size of the share impact estimated by my foreclosure regression.  This shift in the intercept of EpiPen's demand function flows directly from my foreclosure regression results, which indicate that the foreclosure increases EpiPen's quantity (and therefore its market share) in proportion to the percentage of lives restricted at any given plan.

261.   Notably, Prof. Willig does not actually assert that the foreclosure did ***not*** upwardly shift the intercept of EpiPen's demand function this way. Instead, Prof. Willig merely argues that my model should have transformed EpiPen's demand function in additional and/or different ways.  For example, Prof. Willig asserts that I should have considered the possibility that the foreclosure also altered the ***slope*** of the demand function,[541] and/or that I should have instead assumed that the demand function took on some non-linear shape, such as an iso-elastic demand function.[542] In the following sections, I address the transformations to the demand function that Prof. Willig claims I should have considered.

### 3. Evidence Affirmatively Contradicts Prof. Willig's Speculation that the Foreclosure May have Increased EpiPen's Demand by a "Constant Percentage"

262.   Prof. Willig notes that one could alternatively model the foreclosure as increasing the EpiPen's quantity demanded by "a constant percentage."[543] Mathematically, Prof. Willig describes this alternative model as $q = \beta(a\text{-}bp)$, where $\beta$ equals one plus the percentage by which the foreclosure increases EpiPen's quantity.[544]  If one expands Prof. Willig's proposed alternative EpiPen's quantity function, it is $q = a + (\beta\text{-}1)a - \beta bp$, which makes clear that his alternative functional form would imply that the foreclosure has two effects on EpiPen's quantity function: (i) increasing EpiPen's quantity by a fixed amount equal to $(\beta\text{-}1)a$, no matter the EpiPen's price; and (ii) increasing the extent to which customers substitute away from the EpiPen in response to an EpiPen price increase by a factor of $\beta$.  As a theoretical matter, implication (ii) does not make sense or fit the facts of this case. Foreclosure ***reduces*** the extent to which customers can substitute to rival products

---

[540] Elhauge Merits Report ¶171.

[541] Willig Merits Report ¶249.

[542] Willig Merits Report ¶250.

[543] Willig Merits Report ¶247, n. 339.

[544] Willig Merits Report n. 339. Prof. Willig uses "alpha" instead of the symbol β. For clarity, I use the β symbol in Prof. Willig's proposed "constant percentage" model to distinguish that posited coefficient from the α in my model.

Highly Confidential: Subject to Protective Order

in response to an EpiPen price increase, yet Prof. Willig's alternative model assumes the exact opposite—that foreclosure *increases* the ability of customers to substitute to rival products. Prof. Willig provides no basis in fact or theory for his assumption. Further, his assumption conflicts with the fact that, as I show in the next section (VIII.F.4), the evidence indicates that Mylan's foreclosure did in fact significantly reduce the cross-price responsiveness of demand, which in turn significantly increased Mylan's profit-maximizing price.

### 4. Following Prof. Willig's Suggestion that One Should Allow the Foreclosure to Alter the Slope of EpiPen's Linear Demand Function Significantly Increases the Estimated Overcharge

263.  Prof. Willig criticizes the damages model in my opening merits report because it indicates only that the foreclosure has shifted the intercept of EpiPen's demand function, and does not account for any effect that the foreclosure may have on the *slope* of EpiPen's demand function.[545] In other words, Prof. Willig criticizes me for not accounting for the effect of the foreclosure on how quickly EpiPen's quantity demanded decreases in response to an increase in the EpiPen price.

264.  Although Prof. Willig criticizes me for not accounting for the effect of the foreclosure on the slope of EpiPen's demand function, he did not attempt to quantify the effect of the foreclosure on the slope of EpiPen's demand function. Instead, Prof. Willig only presented a single hypothetical in which the foreclosure transforms Mylan's demand function from "q=25-0.5p" to "q=45-p."[546] The coefficients in his hypothetical are completely made up; they have no relationship to any evidence in this case. Nonetheless, Prof. Willig uses this hypothetical to illustrate that "the profit-maximizing EpiPen price could . . . decrease, rather than increase" due to a transformation of EpiPen's demand function that increases its quantity.[547] In his hypothetical, the profit-maximizing price of the EpiPen is $35 if its quantity function is "q=25-0.5p", versus a profit-maximizing price of $32.50 if the foreclosure (or anything else) transforms its quantity function into "q=45-p."[548] The key reason the foreclosure reduces EpiPen's profit-maximizing price in Prof. Willig's hypothetical is that it increases the magnitude of the slope of EpiPen's

---

[545] Willig Merits Report ¶249 (modeling how foreclosure could hypothetically transform EpiPen's demand function from "q= 25-0.5p" to "q=45-p", i.e., an upward shift in the intercept form 25 to 45 and an increase in the magnitude of the price responsiveness from 0.5 to 1.0).

[546] Willig Merits Report ¶249.

[547] Willig Merits Report ¶249.

[548] Willig Merits Report ¶249.

Highly Confidential: Subject to Protective Order

demand function (the absolute value of the coefficient in front of the variable $p$) from 0.5 to 1.0. In contrast, if the foreclosure **decreases** the magnitude of the slope of EpiPen's demand function, it will **increase** EpiPen's profit-maximizing price, holding all else equal. Prof. Willig does not provide any reasoning why he believes the foreclosure would increase the magnitude of the slope of EpiPen's demand function, nor does he attempt to estimate how the foreclosure altered the slope of EpiPen's demand function.

265. There is no need to rely on hypotheticals with made up numbers, as Prof. Willig does, because one can use the evidence in this case to directly estimate the extent to which the foreclosure has altered the slope of EpiPen's demand function. One can do this by comparing an estimate of the actual slope of EpiPen's demand function to an estimate of what this slope would be but-for the foreclosure.

266. As explained in my prior reports, the slope of EpiPen's demand function is composed of two parts: "(1) higher prices causing patients to switch from EpiPen to Auvi-Q", called the "cross-price responsiveness of demand" and signified with the coefficient $b_x$); and "(2) higher prices causing patients to drop out of the market altogether," which is called the "market responsiveness of demand" and is signified with the coefficient $b_m$.[549] Here, I know of no reason to believe that the foreclosure would alter the "market responsiveness of demand"—there is no allegation that Mylan's contracts prevented customers from switching from the EpiPen to some more distant substitute outside the EAI market (or nothing at all). In contrast, it is plausible that the foreclosure has reduced the cross-price-responsiveness of demand by restricting the ability of customers to substitute between the EpiPen and Auvi-Q in response to relative price changes. Consequently, to determine how the foreclosure altered the slope of EpiPen's demand function, one must compare an estimate of EpiPen's but-for cross-price responsiveness of demand to its actual cross-price responsiveness of demand.

267. Here, the best available estimate of the **actual** cross-price responsiveness of demand with the foreclosure comes from my foreclosure regression, which includes a relative price control variable that directly measures how much customers substitute between Auvi-Q and EpiPen in response to relative price changes. As I explained above in Part VIII.D.2, my foreclosure regression includes an independent variable that measures the relative price between Auvi-Q and EpiPen, and therefore the coefficient on that variable indicates the extent to which customers actually substituted between Auvi-Q and EpiPen in response to

---

[549] Elhauge Merits Report ¶173.

Highly Confidential: Subject to Protective Order

relative price changes.  According to the foreclosure regression specification that I use to calculate damages (which uses Johnson extended back matching, MMIT-defined PBMs, and estimated plan-level prices), in the actual world with the foreclosure, Auvi-Q gained 0.014 percentage points of market share for every $1 decrease in Auvi-Q's price relative to EpiPen's price.[550]  Put another way, my foreclosure regression indicates that, given the foreclosure in the actual world, if Auvi-Q dropped its price by $21 relative to EpiPen's price, then Auvi-Q's market share would increase by only 0.3 percentage points.

268.  In contrast, the best available estimate of the ***but-for*** cross-price responsiveness is the Analysis Group pricing study commissioned by Sanofi in 2012.[551]  The Analysis Group pricing study indicates the expected but-for cross-price responsiveness because it predates Auvi-Q's entry and thus did not account for the foreclosure's effect on the cross-price responsiveness in the EAI market.  Indeed,

[52]  As noted in my Opening Merits Report,

269.  In sum, the evidence indicates that the foreclosure actually significantly ***reduced*** the magnitude of the cross-price responsiveness of demand, and therefore ***reduced*** the magnitude of the slope of EpiPen's demand function.  In the but-for world, EpiPen would lose 1.9 percentage points of market share for every $1 increase in EpiPen's relative price, whereas in the actual world EpiPen lost only 0.014 percentage points of market share for every $1 increase in EpiPen's relative price.  Consequently, this reduction in the magnitude of the slope of EpiPen's demand function will ***increase*** EpiPen's profit-maximizing price (the opposite of Prof.

---

[550] *See supra* Table 109.
[551] SAN-EPI-0326335 at slide 19 (relied on in Elhauge Merits Report ¶175).
[552] SAN-EPI-0326335 at slide 45 (slide titled "Summary of Findings

[553] Elhauge Merits Report ¶174.

Highly Confidential: Subject to Protective Order

Willig's made up hypothetical, in which he assumed that the foreclosure decreased the magnitude of the slope of Mylan's demand function).

270.   One can mathematically model precisely how much this reduction in cross-price responsiveness caused by the foreclosure increased EpiPen's profit-maximizing price by adjusting EpiPen's and Auvi-Q's demanded functions as follows:[554]

$$q_e = m + fC - b_{me}(p_e) - (b_x - xC)(p_e - p_a)$$
$$q_a = n - fC - b_{ma}(p_a) - (b_x - xC)(p_a - p_e)$$

271.   These quantity demand functions are exactly the same as the quantity demanded functions in the differentiated Bertrand model presented above in Section E.3, except:

- The but-for intercept terms are now labeled *m* and *n* instead of *k* and *l* to make clear that they have different values in this model.
- The coefficient *x* has been added.
  - *x* equals the but-for price responsiveness ($b_x$, estimated based on the Analysis Group pricing study), minus the actual price responsiveness (estimated using my foreclosure price difference regression).
  - *x* thus indicates the extent to which the foreclosure has reduced the cross-price responsiveness in the EAI market.
- The binary variable $C$ has been added.
  - $C$ takes the value 1 if the challenged conduct is present and 0 otherwise (not to be confused with $c_e$ and $c_a$, EpiPen's and Auvi-Q's marginal costs)
  - $C$ is multiplied by *f* (the impact of the foreclosure on the intercepts of the quantity functions) and *x* (the impact of the foreclosure on the slope of the quantity functions).
  - Consequently, when the conduct is present ($C = 1$), EpiPen's quantity demanded is increased by *f*, Auvi-Q's quantity is decreased by *f*, and the cross-price responsiveness is decreased by *x*.

272.   Given these quantity functions, the firms' profit functions are:

$$\pi_e = (p_e - c_e)q_e = (p_e - c_e)(m + fC - b_{me}(p_e) - (b_x - xC)(p_e - p_a))$$
$$\pi_a = (p_a - c_a)q_a = (p_a - c_a)(n - fC - b_{ma}(p_a) - (b_x - xC)(p_a - p_e))$$

---

[554] This model calculates a complete differentiated Bertrand equilibrium so that it also addresses Dr. Johnson's and Prof. Willig's critiques that I should have done so. See *supra* Part VIII.E.3.

Highly Confidential: Subject to Protective Order

273.   One determines the differentiated Bertrand equilibrium prices in this model by first taking the partial derivatives of each firm's profit function with respect to own price and setting them both equal to zero (each firm's first-order conditions). The firms' first order conditions in this model are as follows:[555]

$$\frac{\delta \pi_e}{\delta p_e} = Cf + m - b_{me}p_e + (Cx - b_{me} - b_x)(-c_e + p_e)$$
$$- (-Cx + b_x)(-p_a + p_e) = 0$$

$$\frac{\delta \pi_a}{\delta p_a} = -Cf + n - b_{ma}p_a + (Cx - b_{ma} - b_x)(-c_a + p_a)$$
$$- (-Cx + b_x)(p_a - p_e) = 0$$

274.   The differentiated Bertrand equilibrium is the combination of EpiPen and Auvi-Q prices $(p_e^*, p_a^*)$ at which both first-order conditions are simultaneously satisfied.[556]

$$p_e^* = -\frac{(-Cx + b_x)(-Cf + n + (-Cx + b_{ma} + b_x)c_a) - (2Cx - 2b_{ma} - 2b_x)(Cf + m + (-Cx + b_{me} + b_x)c_e)}{-4(Cx - b_{ma} - b_x)(Cx - b_{me} - b_x) + (-Cx + b_x)^2}$$

$$p_a^* = \frac{(Cx - b_x)(Cf - m - 2n + 2(Cx - b_{ma} - b_x)c_a + (Cx - b_x)c_e) + b_{me}(-2Cf + 2n + 2(-Cx + b_{ma} + b_x)c_a + (-Cx + b_x)c_e)}{((3Cx - 4b_{me} - 3b_x)(Cx - b_x) + 4b_{ma}(-Cx + b_{me} + b_x))}$$

275.   These formulas predict prices with the challenged conduct if $C = 1$, and predict prices without the challenged conduct if $C = 0$. Therefore, the increase in EpiPen's price due to the foreclosure equals the difference in equilibrium EpiPen prices with versus without the foreclosure, i.e., $p_e^*(C = 1) - p_e^*(C = 0)$.   This difference does not simplify to a clean formula (because the denominator of $p_e^*(C = 1)$ is different from the denominator of $p_e^*(C = 0)$), so I present those two formulas separately:

$$p_e^*(C = 1) = -\frac{(-x + b_x)(-f + n + (-x + b_{ma} + b_x)c_a) - 2(x - b_{ma} - b_x)(f + m + (-x + b_{me} + b_x)c_e)}{(x - b_x)^2 - 4(x - b_{ma} - b_x)(x - b_{me} - b_x)}$$

$$p_e^*(C = 0) - \frac{b_x(n + (b_{ma} + b_x)c_a) + 2(b_{ma} + b_x)(m + b_{me}c_e + b_x c_e)}{b_x^2 - 4(b_{ma} + b_x)(b_{me} + b_x)}$$

---

[555] *See* "Bertrand with foreclosure affecting quantity slope (subscripted).nb".

[556] The second-order conditions for EpiPen and Auvi-Q are $2Cx - 2b_{me} - 2b_x$, and $2Cx - 2b_{ma} - 2b_x$, respectively. Both are necessarily negative because $x$ is necessarily less than $b_x$, and $b_x$, $b_{me}$, and $b_{ma}$ are necessarily positive.

Highly Confidential: Subject to Protective Order

276. Likewise, the change Auvi-Q's price due to the foreclosure equals $p_a^*(C = 1) - p_a^*(C = 0)$. Again, this difference between predicted Auvi-Q prices with versus without the conduct does not simplify to a clean formula because the denominators are different, so I present each formula separately:

$$p_a^*(C = 1)$$
$$= \frac{(x - b_x)(f - m - 2n + 2(x - b_{ma} - b_x)c_a + (x - b_x)c_e) + b_{me}(-2f + 2n + 2(-x + b_{ma} + b_x)c_a + (-x + b_x)c_e)}{(3x - 4b_{me} - 3b_x)(x - b_x) + 4b_{ma}(-x + b_{me} + b_x)}$$

$$p_a^*(C = 0) = \frac{b_{me}(2n + 2b_{ma}c_a + b_x(2c_a + c_e)) + b_x(m + 2n + 2b_{ma}c_a + b_x(2c_a + c_e))}{4b_{ma}(b_{me} + b_x) + b_x(4b_{me} + 3b_x)}$$

277. As these formulas show, the change in EpiPen and Auvi-Q prices caused by the foreclosure in this model depends on three coefficients that have not been previously estimated:

- $c_a$ : Auvi-Q's marginal cost
- $m$ : the intercept of EpiPen's quantity demanded but-for the conduct
- $n$ : the intercept of Auvi-Q's quantity demanded but-for the conduct

278. **$c_a$: Auvi-Q's Marginal Cost**.



[557]

[558] SAN-EPI-1148855.
[559] "MREPLY14 auviq mc per dose.xlsx."

Highly Confidential: Subject to Protective Order

279. ***m* and *n* :**   Given observations about EpiPen's actual quantity, EpiPen's actual net price, Auvi-Q's actual net price, and estimates for all of the other coefficients in EpiPen's quantity demanded function (previously estimated), one can solve for *m* in EpiPen's actual quantity function $q_e(C = 1)$.   Likewise, given observations about Auvi-Q's actual quantity and net prices, and estimates for all of the other coefficients in Auvi-Q's quantity demanded function (already estimated) one can solve for the *n* in Auvi-Q's actual quantity function $q_a(C = 1)$.   (Their exact values will vary from month to month): Their equations are given below:

$$m = -f + xp_a - b_xp_a - xp_e + b_{me}p_e + b_xp_e + q_e$$

$$n = f - xp_a + b_{ma}p_a + b_xp_a + xp_e - b_xp_e + q_a$$

280. **Predicted Prices**. Figure 111 below compares EpiPen's actual average net price in each month (solid red line) to the price this model predicts Mylan would charge for the EpiPen with the challenged conduct (dashed red line) and the price this model predicts Mylan would charge for the EpiPen without the challenged conduct (greed dotted line).   The prices this model predicts Mylan would charge with the challenged conduct closely track Mylan's actual prices, confirming that this model is well calibrated.[560]   This model predicts that, but-for Mylan's challenged foreclosing conduct, Auvi-Q's entry in January 2013 would have caused the EpiPen's profit-maximizing price to decrease to $93 per pen.   This $93 per pen but-for price in January 2013 is very similar to the $92 per pen average net price Mylan was charging just thirteen months earlier, in December 2012.   In other words, this model predicts that increased competition with Auvi-Q in the but-for world would have forced Mylan to lose about one year's worth of price gains.

---

[560] Because the predicted prices with the conduct are slightly lower than Mylan's actual prices, I calculate the net price overcharge in each month as the predicted price with the conduct minus the predicted price but-for the conduct. This is conservative relative to a methodology of calculating the overcharge as the actual EpiPen price minus the predicted but-for price.

Highly Confidential: Subject to Protective Order

**Figure 111: Price Per EpiPen: Actual World vs. Predicted With Conduct vs. Predicted But-for Conduct, Differentiated Bertrand Model with Foreclosure Affecting Both Intercept and Slope of Demand Functions[561]**



281.   Table 114 below shows the exact values of EpiPen's actual price, predicted price with the foreclosure (Predicted, $C = 1$), predicted price without the foreclosure (Predicted, $C = 0$) and overcharge per dose, in each month.

---

[561] "MREPLY14 x bertrand model EpiPen price chart.xlsx".

Highly Confidential: Subject to Protective Order

| Table 114: EpiPen Prices Per Dose, Actual vs. Predicted in Differentiated Bertrand Model with Foreclosure Altering Slope of Demand Function[562] | | | | | |
|---|---|---|---|---|---|
| Year | Month | Actual Price | Predicted, $C=1$ | Predicted, $C=0$ | Overcharge/dose |
| 2013 | 1 | $122.81 | $116.77 | $92.66 | $24.11 |
| | 2 | $122.81 | $118.34 | $93.08 | $25.26 |
| | 3 | $122.81 | $119.72 | $93.34 | $26.39 |
| | 4 | $122.50 | $120.66 | $93.37 | $27.29 |
| | 5 | $122.50 | $121.42 | $93.39 | $28.04 |
| | 6 | $122.50 | $122.11 | $93.30 | $28.82 |
| | 7 | $130.40 | $126.11 | $95.91 | $30.20 |
| | 8 | $130.40 | $126.36 | $95.92 | $30.44 |
| | 9 | $130.40 | $126.78 | $95.97 | $30.81 |
| | 10 | $139.02 | $131.62 | $98.80 | $32.83 |
| | 11 | $139.02 | $132.12 | $98.80 | $33.31 |
| | 12 | $139.02 | $133.05 | $98.91 | $34.14 |
| 2014 | 1 | $145.99 | $138.06 | $103.05 | $35.01 |
| | 2 | $145.99 | $139.08 | $103.23 | $35.85 |
| | 3 | $145.99 | $139.85 | $103.35 | $36.49 |
| | 4 | $156.62 | $145.45 | $106.64 | $38.81 |
| | 5 | $156.62 | $145.57 | $106.64 | $38.93 |
| | 6 | $156.62 | $146.15 | $106.69 | $39.46 |
| | 7 | $162.70 | $149.62 | $108.49 | $41.13 |
| | 8 | $162.70 | $149.97 | $108.52 | $41.46 |
| | 9 | $162.70 | $150.67 | $108.56 | $42.11 |
| | 10 | $168.17 | $153.89 | $110.30 | $43.59 |
| | 11 | $168.17 | $154.24 | $110.30 | $43.94 |
| | 12 | $168.17 | $154.87 | $110.35 | $44.52 |
| 2015 | 1 | $165.53 | $154.95 | $110.04 | $44.92 |
| | 2 | $165.53 | $154.85 | $109.96 | $44.89 |
| | 3 | $165.53 | $154.78 | $109.89 | $44.90 |
| | 4 | $176.24 | $160.91 | $113.00 | $47.91 |
| | 5 | $176.24 | $163.15 | $113.47 | $49.68 |
| | 6 | $176.24 | $163.46 | $113.79 | $49.68 |
| | 7 | $181.89 | $166.29 | $115.68 | $50.61 |
| | 8 | $181.89 | $166.59 | $116.02 | $50.57 |
| | 9 | $181.89 | $166.73 | $116.38 | $50.35 |
| | 10 | $181.38 | $166.21 | $116.81 | $49.40 |

282.   Figure 112 shows that this model also accurately predicts Auvi-Q's actual prices with the conduct, again confirming that it is well-calibrated. Figure 112

---

[562] "MREPLY14 x bertrand price table.xlsx".

Highly Confidential: Subject to Protective Order

also shows that Auvi-Q also would have prices lower in the but-for world according to this model, which makes sense given that Auvi-Q would be able to win larger shares of the market with price cuts in the but-for world than it was able to in the actual world.

**Figure 112: Price Per Auvi-Q Dose: Actual World vs. Predicted With Conduct vs. Predicted But-for Conduct, Differentiated Bertrand Model with** [563]



283.   Figure 113 below shows that this model also accurately predicts EpiPen's and Auvi-Q's actual shares with the conduct, which further confirms that it is well-calibrated.   This model indicates that EpiPen's share would be approximately 8-10% lower but-for the foreclosure in any given month.

**Figure 113: Differentiated Bertrand Model That Accounts for Foreclosure's Effect on Slope of Demand Functions Accurately Predicts Actual Shares With**

---

[563] "MREPLY14 x bertrand model auviq price chart.xlsx".

Highly Confidential: Subject to Protective Order

**the Conduct, and Indicates That EpiPen's Share Would Have Been Slightly Lower But-for the Conduct**[564]



284.  Lastly, Figure 114 below shows the effect of the foreclosure on Mylan's and Sanofi's marginal profits according to this model (with marginal profits defined as quantity multiplied by the difference between price and marginal cost).  This model indicates that the foreclosure significantly increased Mylan's marginal profits (by a total of $460 million from January 2013-October 2015), which indicates that Mylan's decision to foreclose the EAI market using rebates conditioned on formulary restrictions was economically rational.

---

[564] "MREPLY48 auvi epi shares moving average, actual vs butfor (x bertrand).xlsx". These share are all calculated as twelve-month moving averages.

Highly Confidential: Subject to Protective Order

**Figure 114: Effect of Foreclosure on EpiPen and Auvi-Q Marginal Profits, Differentiated Bertrand Model Accounting for Effect of Foreclosure on Slope**[565]



*5. Evidence Affirmatively Contradicts Prof. Willig's Speculation That Mylan Has an Iso-Elastic Residual demand function.*

285.   Lastly, Prof. Willig asserts that foreclosure will not affect EpiPen's price if one assumes that the EpiPen's demand function is $q=kp^{(-e)}$ and the foreclosure only affects the parameter $k$.[566] Yet again, Prof. Willig neither cites any evidence in support of this alternative demand function, nor provides any economic theory about why one would expect EpiPen's demand function to take this particular form and the foreclosure to affect EpiPen's demand in this one particular way.  In contrast, my model's functional form and coefficient estimates are directly fitted to the facts of this case; a pricing study commissioned by Sanofi and performed by Analysis Group found that the cross-price responsiveness of demand was linear,[567] and a linear demand function matches the specification of my foreclosure share regression, which indicates that the foreclosure has shifted the intercept of Mylan's

---

[565] "MREPLY48 effect of forc on marginal profits, x Bertrand.xlsx".
[566] Willig Report ¶250.
[567] Elhauge Merits Report ¶174; Elhauge Merits Depo. 257.

Highly Confidential: Subject to Protective Order

market share function (and therefore also its quantity demanded function) upwards in direct linear proportion to the percentage of lives restricted.

$$***$$

286.   Stepping back, Prof. Willig's practice of pointing out the existence of alternative mathematical formulas that would produce a different result tells one nothing about the actual price effect of the foreclosure in this case.  Indeed, while Prof. Willig focuses solely on the alternative functional forms that would result in **lower** overcharges, he ignores that there are numerous alternative functional forms that would result in **higher** overcharges.  And in fact, I showed above in section 4, that if one implements Prof. Willig's proposal to allow the foreclosure to adjust not only the intercept, but also the slope, of Mylan's demand function, then the resulting overcharges are significantly **higher**.

## G. Deterred Re-Entry

287.   As explained in my opening merits report, Plaintiffs' counsel has instructed me to calculate foreclosure damages based on the assumption that Sanofi would have re-entered the EAI market in November-December 2016 but-for Mylan's foreclosure.[568]  Section 1 below provides updated versions of the deterred re-entry tables in my opening merits report, based on newly available data and responses to defense expert's critiques of my original methodology.  Section 2 notes some evidence in my report that may be relevant to the question of whether the foreclosure deterred re-entry.

### 1. Updated Deterred Re-Entry Overcharges

288.   The deterred re-entry overcharges must be updated to account for the following methodological and data updates presented elsewhere in this report:

289.   **a. Updated Value of $f_t$.** The quantity impact of foreclosure $f_t = -\alpha r_t Q_t$ has been adjusted for updated regression results, foreclosure shares, and using moving average quantities instead of actual quantities, as discussed above in

---

[568] Elhauge Merits Report ¶179.

Highly Confidential: Subject to Protective Order

Section B. Consequently, updated Sanofi but-for volumes are shown in Table 115 below.[569]

| Table 115: SANOFI BUT-FOR VOLUMES POST-RELAUNCH (NOVEMBER – DECEMBER 2016)[570] | | | | |
|---|---|---|---|---|
| **Month** | **Sanofi Projected Market Share** | **But-For Market Share** | **Market Quantity** | **But-For Sanofi Volume** |
| Nov. 2016 | █ | 1.12% | 497,579 | 5,051 |
| Dec. 2016 | █ | 1.62% | 579,644 | 8,594 |

290.  **b. Updated Values of $b_x$ and $b_m$.** The change in EpiPen's price due to the foreclosure equals $f/(2(b_x + b_m))$ under my original price formula,[571] and therefore also depends on $b_x$ (the cross-price responsiveness of demand) and $b_m$ (the market responsiveness of demand).  I have updated my estimate of $b_x$ in two ways: (1) allowing the cross-price responsiveness to increase over time in proportion to the size of the EAI market,[572] and  presenting an alternative estimate of the effect, as indicated by the foreclosure regression results (as opposed to the Analysis Group pricing study).[573]   I have also updated my estimate of $b_m$ based on more accurate Mylan cost data pointed out by Dr. Johnson.[574]  Table 116 below shows the EpiPen overcharge per dose for my initial model during the deterred re-entry period, depending on which source one uses to estimate $b_x$.

| Table 116: Initial Model Overcharge Per Dose During Deterred Re-Entry Period Depending on Source One Uses for Cross-Price Responsiveness $b_x$[575] | | | |
|---|---|---|---|
| | | Source for $b_x$ | |
| **Year** | **Month** | **Analysis Group** | **Foreclosure Regression** |
| 2016 | 11 | $0.32 | $0.47 |
| | 12 | $0.51 | $0.79 |

---

[569] These but-for volumes are calculated using the exact same formula as in my opening merits report, and therefore only account for the foreclosure shifting the intercept of EpiPen's and Auvi-Q's quantity demanded functions.

[570] "MREPLY14 sanofi but-for volumes relaunch.xlsx".

[571] Elhauge Merits Report ¶181.

[572] *Supra* Part VIII.D.1.

[573] *Supra* Part VIII.D.2.

[574] *Supra* Part VIII.C.

[575] "MREPLY14 initial model, bx source oc perdose, deterred reentry.xlsx".

Highly Confidential: Subject to Protective Order

291.   **c. Updated Price Effect Formula for Differentiated Bertrand Model**.  In response to Dr. Johnson and Prof. Willig's critique that my original model of EpiPen's but-for price did not explicitly include Auvi-Q's price, I presented a differentiated Bertrand model above in Part VIII.E.3.  This differentiated Bertrand model has a different formula for the effect of the foreclosure on EpiPen's price, reproduced below:[576]

$$\Delta p_e = f \frac{\delta p_e^*}{\delta f} = -\frac{f(2b_{ma} + b_x)}{-4b_{ma}b_{me} - 4b_{ma}b_x - 4b_{me}b_x - 3b_x^2}$$

292.   Table 117 below shows the overcharges per dose for the differentiated Bertrand models during the deterred re-entry period, depending on which source one uses to estimate $b_x$.

| | | Source for $b_x$ | |
|---|---|---|---|
| **Year** | **Month** | **Analysis Group** | **Foreclosure Regression** |
| 2016 | 11 | $0.18 | $0.34 |
| | 12 | $0.29 | $0.60 |

**Table 117: Bertrand Model Overcharge Per Dose During Deterred Re-Entry Period Depending on Source One Uses for Cross-Price Responsiveness $b_x$[577]**

### 2. Evidence Relevant to Whether Foreclosure Deterred Re-Entry

293.   Dr. Johnson asserts that Mylan's foreclosure could not have plausibly deterred Sanofi's re-entry into the EAI market based on the premise that my foreclosure regression and origin model indicate that there would only be a "small" increase in Auvi-Q's share in the but-for world.[578]  Because counsel has instructed me to assume that Sanofi would have re-entered the EAI market but-for the foreclosure, I do not take a position about whether the foreclosure did in fact deter Sanofi's re-entry.  Nonetheless, here I note several statistics based on other sections

---

[576] The deterred re-entry price effect formula is the same for all Bertrand models presented in this report because Auvi-Q was not competing at all in the actual world during the deterred re-entry period, so any adjustment to the slope of the slope of the quantity demanded functions caused by the foreclosure has no effect in the deterred re-entry period.

[577] "MREPLY14 bertrand model, bx source oc perdose, deterred reentry.xlsx".

[578] Johnson Report ¶119.

Highly Confidential: Subject to Protective Order

of my report that may be relevant to the question of whether Mylan's foreclosure deterred Sanofi's re-entry.

294.   **a. Correcting Prof. Willig's Discount Attribution Test Shows that Many of Mylan's Agreements Failed the Discount Attribution Test**.  As shown below in Part XII.C.4, correcting errors in Prof. Willig's implementation of the Discount Attribution Test shows that many of Mylan's agreements failed the Discount Attribution Test.  This indicates that Mylan's agreements had the ability to force an equally efficient rival to exit the market and/or deter an equally efficient rival from entering.

295.



## IX. PERCENTAGE OF CLASS MEMBERS HARMED

296.   In Part VII.C of my opening merits reports, I translated the estimated increase in the EpiPen's net price due to the foreclosure into an estimate of the percentage of class members who suffered an overcharge due to the foreclosure.[581] I ultimately found that 99.9% of class members were injured by Mylan's foreclosing conduct.[582]   This Part of my report addresses Dr. Johnson's and Prof. Willig's criticism of my classwide impact methodology.

---

[579] SAN-EPI-1148855 (

[580] *Id.*

[581] My classwide impact analysis includes Managed Medicare plans but excludes State Medicaid. Elhauge Merits Depo. 287.

[582] Elhauge Merits Report ¶187.

Highly Confidential: Subject to Protective Order

## A. *Regression Estimating Effect of Exclusive Formulary Positions on Mylan's Rebates*

297.   Because Mylan would not be able to condition its rebates on exclusive formulary positions in the but-for world, I had to estimate the effect of the exclusive formulary positions obtained on Mylan's rebate. To do that, I ran the following regression:[583]

$$rebdiff_{i,t} = \alpha * r_{i,t} + \sum_{j=1}^{34} \beta_j D_{j,t} + \sum_{k=1}^{6} \gamma_k D_{k,i} + \varepsilon_{i,t}$$

The estimated coefficient on the coefficient α was 0.027, indicating that for every 1 percentage point increase in the restricted share, the difference between EpiPen and Auvi-Q rebates increases by 2.7 percentage points.[584]

298.   Because I have updated my foreclosure share calculations in response to newly available data and Prof. Willig's claims that certain plans were not offered conditional rebates,[585] I have re-run this regression with the updated calculations of foreclosure share by PBM and month (the values of all other variables in this regression remain the same).[586] With this updated data, the estimated coefficient α increases from 2.7 percentage points to 7.5 percentage points, but it is still not statistically significantly different from zero at conventional levels of significance, with a one-sided p-value of 14.1% using standard errors clustered by PBM.[587]   This is more statistically significant than the regression in my initial report because its one-sided p-value with clustered standard errors was 28%,[588] but the following quote from my opening merits report still applies:

> the odds that the regression would have this finding if the foreclosure did not increase rebate levels is 14.1%, indicating that the level of

---

[583] Elhauge Merits Report ¶183.

[584] Elhauge Merits Report ¶183.

[585] *See supra* Part VI.

[586] The old regression dataset used to generate the 2.7 percentage point estimate also filled in missing restricted share values for Aetna in January through May of 2013 as 100% restricted. Dr. Johnson argued that it is incorrect to fill those Aetna values in his Class Report. Johnson Class Report n. 264. To eliminate this potential source of disagreement, I do not fill in the missing Aetna restricted share values in the updated rebate regression dataset.

[587] "MREPLY95 updated rebate regression.xlsx".

[588] Elhauge Merits Report n.214.

Highly Confidential: Subject to Protective Order

statistical confidence is 85.9%, which is not enough under conventional statistical thresholds to conclusively reject the null hypothesis that the rebates were not increased by foreclosure. If we accepted that null hypothesis, then that would mean that all plans and cash end-payors would pay the same overcharge because actual and but-for rebates would be the same. Thus, in this case, the conservative (i.e., pro-defendant) choice is to use this unbiased estimate from the regression, despite the fact that its statistical confidence level of 85.9% does not satisfy traditional tests of statistical significance.[589]

299.   **a. Direction of Causation.**   Prof. Willig argues that: "Professor Elhauge's regression specification assumes the incorrect causal relationship. It is not PBM restrictions that affected Mylan's rebates; rather PBMs negotiate rebates from Mylan and Sanofi, and in the face of those rebate offers, health plans make decisions about formulary status, including the nature of any 'restrictions.' Competition for rebates determines formulary restrictions, not the other way around."[590]   He is thus here admitting that conditioned rebates caused formulary restrictions, which is just what fellow defense expert Dr. Johnson denies.[591]   But he is wrong that there is no causal relationship in the other direction because, given the existence of conditioned rebates, it is the plan's agreement to the formulary condition that causes it to get the additional rebates. It is not like a plan just gets some amount of rebates and the receipt of that amount of rebates then somehow causes the plans to adopt formulary restrictions. The additional rebates are exchanged for the agreement to the formulary restriction. Thus, as with any bilateral contract, the causation runs in both directions. One side's consideration is the cause of the other side providing its consideration, and vice versa. In any event, regardless of how one characterizes the causal relationship, it remains the case that this regression accurately reveals the extent to which those who agree to the formulary restrictions have higher rebates than those who do not, which is the relevant question, because I am using this analysis to try to determine the extent to which plans that agreed to the formulary restrictions got lower prices than other EpiPen purchasers.

300.   **b. Using the Difference between EpiPen Rebate and Auvi-Q Rebate Controls for Competition from Auvi-Q**.   Prof. Willig also claims that my rebate regression "is not in fact comparing Mylan's actual vs. but-for rebate percentage"

---

[589] Elhauge Merits Report ¶183.
[590] Willig Merits Report ¶253.
[591] Johnson Merits Report ¶113.

Highly Confidential: Subject to Protective Order

but rather instead is an estimate of the "how the difference between EpiPen and Auvi-Q rebates changes based on Auvi-Q's restrictive formulary status."[592]   Dr. Johnson makes a similar argument.[593]   Their argument misses the key theoretical point that estimating the effect of formulary restrictions on the difference between EpiPen and Auvi-Q rebates **does** measure the marginal effect of the formulary restrictions because it directly shows the extent to which PBMs received higher rebates on EpiPen when they had formulary restrictions, after controlling for rebate competition from Auvi-Q that would also exist in the but-for world.   As I explained in my deposition, Mylan would have to compete against Sanofi in the but-for world too, so one must adjust for the fact that some of the increase in Mylan's rebates from past levels that followed Auvi-Q's entry was due to competition from Auvi-Q, rather than from Mylan's introduction of exclusionary agreements with rebates conditioned on restricting Auvi-Q.[594]   Further, because Auvi-Q would likely offer even larger rebates in the but-for world because of the increase in competition, my measure's assumption that Auvi-Q's rebates would be the same in the actual and but-for worlds conservatively overstates the extent to which the EpiPen's actual rebates exceeded its but-for rebates and thus understates the foreclosure overcharge to those customers who got restriction-based rebates.[595]

301.   **c. Accepting the Null Hypothesis that Formulary Restrictions Did Not Increase EpiPen Rebate Percentage Above But-for Levels Would Not Undermine Theory of Anticompetitive Harm**.  As noted above, the one-sided p-

---

[592] Willig Merits Report ¶253.

[593] Johnson Merits Report  n.251.

[594] Elhauge Merits Depo. 269 ("Q: Why do you use the difference between EpiPen and Auvi-Q rebates as the dependent variable rather than the EpiPen rebate percentage itself? A: Well, because, you know, with more competition just by itself, you expect there to be higher rebates than in the past. And the question is whether there's a bigger difference where EpiPen is offering beyond competitive rebates in order to get the exclusive position or not.").

[595] Elhauge Merits Depo. 270 ("Are you assuming that the Auvi-Q rebates stay unchanged in the actual and but-for world? A: No. I don't think so. Q: So you go on to estimate that EpiPen rebates were higher than but-for rebates by 2.5 percent – sorry 2.7 percent? A: With a low level of statistical confidence, yes."). *id*. at 271 ("Q: So you are assuming that Auvi-Q's rebates stay the same in the actual and but-for worlds? A: Well, I think I'm assuming that they're at least no worse than in the but-for world. It may be in the but-for world they'd be even lower, in which case there's even less of a benefit relative to but-for rebates. But this does conservatively assume that the Auvi-Q rebates are basically the same in the actual and but-for world. Q: But you haven't done any analysis to actually test that? A: No. It's just a conservative pro-defendant assumption. . . .If Auvi-Q is offering higher rebates in the but-for world, then EpiPen would have to compete with the higher Auvi-Q rebates. And therefore, there would be less of a difference between actual and but-for rebates."); *id*. at 272-273.

Highly Confidential: Subject to Protective Order

value with respect to a null hypothesis that the restrictions did not increase rebates was 14.1%, which is above the maximum p-value at which one would conclusively reject the null hypothesis under conventional statistical thresholds.[596]  If given this finding, one accepted the null hypothesis, that would mean concluding that Mylan's rebates would have been just as high in the but-for world: *i.e.,* if Mylan were not allowed to condition those rebates on restricting Auvi-Q's formulary position.  As I explained in my deposition, this would imply that Mylan was providing the same size rebates that it would have but-for the formulary restrictions, "but attaching more exclusionary conditions to them."[597]

## B. Combining Average Net Price Change and Rebate Change to Determine Whether Individual Plans Were Harmed

302.  After estimating the extent to which the formulary restrictions increased the EpiPen's rebates, I determined whether each plan was harmed by the foreclosure in each month.  I did this by comparing: (1) the gross price increase due to the foreclosure in each month, with: (2) the EpiPen rebate increase due to the foreclosure.[598]

303.  As noted above and in my opening merits report, if one accepts the null hypothesis on the effect of restrictions on rebates, given that my initial rebate regression did not find effects that were statistically significant at the 90% level, that would mean concluding that Mylan's rebates would be no lower in the but-for world.

---

[596] Elhauge Merits Report ¶183.

[597] "Elhauge Merits Depo. 268-269 ("Q: So doesn't the statistical significance that you just walked through [about the rebate regression] imply that you can't infer any causal relationship between the restriction of Auvi-Q and the relative difference in rebates to PBMs between Mylan and Sanofi. A: Yeah. I think it suggests that the adoption, as you said earlier – it goes the other way – the adoption of the restriction has not led to statistically significant increase in rebates. They're just using the same old rebates but attaching more exclusionary conditions to them.").

[598] Prof. Willig notes that my methodology implicitly assumes that PBMs pass on 100% of the rebates to plans. Willig Merits Report ¶216, and that a study he cited that was based on PBM Institute data indicates that PBMs actually only pass 90% of their rebates on to plans.  *Id*. However, assuming 100% pass-through is conservative because it can only increase the extra rebate received by foreclosed plans and thus can only increase the chance that some might not suffer any net harm from the combination of increased gross prices and increased rebates.  In any event, in fact assuming 90% pass-through instead of 100% pass-through has no practical relevance in this case; the percentage of class members harmed assuming 90% pass-through is always within 1 percentage point of the percentage of class members harmed assuming 100% pass-through. "MREPLY23 classwide impact diff, 90pt vs 100pt.txt".  I therefore continue to conservatively assume that PBMs pass 100% of their rebates onto plans in all of my classwide impact calculations.

Highly Confidential: Subject to Protective Order

In that case, 100% of class members in every month are harmed because the net price increase due to the foreclosure is not offset by any rebates that would be lost but-for the foreclosure for any class members.[599]

304.   Nonetheless, in my initial report I also alternatively calculated the percentage of the class harmed by the foreclosure under the conservative assumption that (despite the lack of statistical significance) formulary exclusions increased the EpiPen's rebates by 2.7 percentage points at completely restricted plans.[600]   Given the results of the rebate regression with updated data, I can alternatively calculate the percentage of the class harmed by the foreclosure under the conservative assumption that (despite the continuing lack of statistical significance), formulary restrictions increased EpiPen's rebates by 7.5 percentage points at restricted plans. Under this conservative assumption, the average per-unit increase in rebate dollars in a given month due to the foreclosure among plans would be $\text{AverageRebateIncrease}_m = (7.5\%)(r_m)(g_m)$, where $r_m$ is the average restricted share among plans in month $m$, and $g_m$ is the actual gross price of EpiPen in that month.[601]

---

[599] Elhauge Merits Report ¶183 ("If we accepted that null hypothesis, then that would mean that all plans and cash end-payors would pay the same overcharge because actual and but-for rebates would be the same.").

[600] Elhauge Merits Report ¶184.

[601] Elhauge Merits Report ¶184, Table 15.

Highly Confidential: Subject to Protective Order

| | | Table 118: Increased Rebates with Foreclosure Among Plans (Assuming Restricted Plans Got 7.5% Higher Rebate)[602] | | |
|---|---|---|---|---|
| Year | Month | % of Lives Restricted Among Plans | Average % Increase in Rebates | Per Unit Increase in Rebates |
| 2013 | 1 | 12% | 0.9% | $1.18 |
| | 2 | 13% | 0.9% | $1.23 |
| | 3 | 13% | 0.9% | $1.24 |
| | 4 | 12% | 0.9% | $1.17 |
| | 5 | 15% | 1.1% | $1.46 |
| | 6 | 28% | 2.1% | $2.74 |
| | 7 | 27% | 2.1% | $2.79 |
| | 8 | 28% | 2.1% | $2.97 |
| | 9 | 26% | 2.0% | $2.84 |
| | 10 | 26% | 2.0% | $2.81 |
| | 11 | 27% | 2.0% | $3.11 |
| | 12 | 27% | 2.0% | $3.32 |
| 2014 | 1 | 36% | 2.7% | $4.39 |
| | 2 | 33% | 2.5% | $4.03 |
| | 3 | 33% | 2.5% | $4.03 |
| | 4 | 43% | 3.3% | $5.28 |
| | 5 | 45% | 3.4% | $6.15 |
| | 6 | 47% | 3.5% | $6.49 |
| | 7 | 46% | 3.4% | $6.34 |
| | 8 | 46% | 3.4% | $6.35 |
| | 9 | 48% | 3.6% | $6.70 |
| | 10 | 46% | 3.4% | $6.31 |
| | 11 | 45% | 3.4% | $7.02 |
| | 12 | 45% | 3.4% | $7.19 |
| 2015 | 1 | 33% | 2.5% | $5.37 |
| | 2 | 33% | 2.5% | $5.44 |
| | 3 | 34% | 2.5% | $5.45 |
| | 4 | 33% | 2.5% | $5.36 |
| | 5 | 34% | 2.5% | $6.21 |
| | 6 | 33% | 2.5% | $6.20 |
| | 7 | 33% | 2.5% | $6.19 |
| | 8 | 33% | 2.5% | $6.17 |
| | 9 | 32% | 2.4% | $6.02 |
| | 10 | 26% | 1.9% | $4.79 |

[602] "MREPLY26 increased rebates with foreclosure, assuming d=.075.xlsx".

Highly Confidential: Subject to Protective Order

### 1. Detailed Classwide Impact Calculations

305.   From this point forward in my classwide impact methodology, the exact figures depend on the overcharge model (and resulting average net price increase predicted) that one uses.  In this section, I focus on the differentiated Bertrand model that accounts for the foreclosure's effect on the cross-price responsiveness in the market because that model simultaneously addresses all of Dr. Johnson's and Prof. Willig's critiques of my overcharge methodology.[603]  In the next section, I show the results under the other overcharge models.

306.   The average increase in gross prices due to the foreclosure is $GrossPriceChange_m = AverageNetPriceChange_m + AverageRebateIncrease_m (1-PercentCash_m)$, where $AverageNetPriceChange_m$ is the average increase in net EpiPen price in a month, as indicated by my foreclosure damages analysis, and $PercentCash_m$ is the percent of EpiPen doses sold in that month that were to cash payers.[604]

---

[603] *See supra* Part VIII.F.4.
[604] Elhauge Merits Report ¶186.  In this reply report, this calculation always excludes state Medicaid.

Highly Confidential: Subject to Protective Order

| Year | Month | Proportion of Cash End-Payors | Per Unit Increase in Rebates | Per Unit Increase in Gross Price |
|---|---|---|---|---|
| **Table 119: Increase in Gross Price from But-for Levels**<br>**Differentiated Bertrand Model That Allows Foreclosure to Affect Both Intercept and Slope of Quantity Demanded Functions**<br>**(Assuming Restricted Plans Got 7.5% Higher Rebate)[605]** | | | | |
| 2013 | 1 | 6% | $1.18 | $25.22 |
| | 2 | 5% | $1.23 | $26.43 |
| | 3 | 5% | $1.24 | $27.57 |
| | 4 | 4% | $1.17 | $28.41 |
| | 5 | 5% | $1.46 | $29.43 |
| | 6 | 5% | $2.74 | $31.41 |
| | 7 | 5% | $2.79 | $32.84 |
| | 8 | 5% | $2.97 | $33.25 |
| | 9 | 5% | $2.84 | $33.50 |
| | 10 | 5% | $2.81 | $35.48 |
| | 11 | 5% | $3.11 | $36.27 |
| | 12 | 4% | $3.32 | $37.32 |
| 2014 | 1 | 6% | $4.39 | $39.14 |
| | 2 | 5% | $4.03 | $39.67 |
| | 3 | 5% | $4.03 | $40.34 |
| | 4 | 5% | $5.28 | $43.84 |
| | 5 | 5% | $6.15 | $44.79 |
| | 6 | 5% | $6.49 | $45.65 |
| | 7 | 5% | $6.34 | $47.18 |
| | 8 | 5% | $6.35 | $47.50 |
| | 9 | 5% | $6.70 | $48.51 |
| | 10 | 5% | $6.31 | $49.61 |
| | 11 | 4% | $7.02 | $50.67 |
| | 12 | 4% | $7.19 | $51.44 |
| 2015 | 1 | 6% | $5.37 | $49.98 |
| | 2 | 5% | $5.44 | $50.05 |
| | 3 | 5% | $5.45 | $50.10 |
| | 4 | 5% | $5.36 | $53.02 |
| | 5 | 4% | $6.21 | $55.63 |
| | 6 | 4% | $6.20 | $55.61 |
| | 7 | 5% | $6.19 | $56.52 |
| | 8 | 4% | $6.17 | $56.47 |
| | 9 | 4% | $6.02 | $56.10 |
| | 10 | 5% | $4.79 | $53.97 |

Highly Confidential: Subject to Protective Order

307.   A particular plan is harmed by the foreclosure in a particular month if the decrease in the gross price in the but-for world would exceed the amount of rebates the plan would lose in that month.  Under the conservative assumption that the formulary restrictions increased EpiPen's rebates by 7.5% at restricted plans, this means a particular plan $p$ is harmed by the foreclosure in month $m$ if $GrossPriceChange_m > (7.5\%)(r_{pm})(g_m)$, where $r_{pm}$ is the share of plan $p$'s covered lives that are restricted in month $m$.[606]   Table 120 below compares the gross price increase per dose due to the foreclosure to the rebate per dose increase for restricted plans due to the foreclosure, under the conservation assumption that the foreclosure increased restricted plans' rebates by 7.5%, and using the differentiated Bertrand model that allows the foreclosure to affect both the intercept and the slope of the quantity demanded functions.  It shows that, for this overcharge model, the gross price increase per dose is greater than the restricted plans' increased rebates per dose in every month.  This means that, for this overcharge model, both restricted and unrestricted plans are harmed by the foreclosure in every month.

---

[605] "MREPLY26 increase in gross price, x bertrand.xlsx".

[606] In the dataset used to calculate common impact, every plan-month has either 0% of its lives restricted or 100% of its lives restricted.

Highly Confidential: Subject to Protective Order

| Table 120: Increase in Gross EpiPen Price, Compared to Increased Rebate Due to Foreclosure For Restricted Plans (Assuming Restricted Plans Received 7.5% Higher Rebate Because of Foreclosure) (Differentiated Bertrand Model with Foreclosure Altering $b_x$)[607] | | | |
|---|---|---|---|
| Year | Month | Increase in Gross Price per Unit | Increase in Rebates |
| 2013 | 1 | $25.22 | $9.84 |
| | 2 | $26.43 | $9.81 |
| | 3 | $27.57 | $9.79 |
| | 4 | $28.41 | $9.76 |
| | 5 | $29.43 | $9.77 |
| | 6 | $31.41 | $9.75 |
| | 7 | $32.84 | $10.17 |
| | 8 | $33.25 | $10.74 |
| | 9 | $33.50 | $10.75 |
| | 10 | $35.48 | $10.69 |
| | 11 | $36.27 | $11.71 |
| | 12 | $37.32 | $12.16 |
| 2014 | 1 | $39.14 | $12.22 |
| | 2 | $39.67 | $12.15 |
| | 3 | $40.34 | $12.13 |
| | 4 | $43.84 | $12.16 |
| | 5 | $44.79 | $13.76 |
| | 6 | $45.65 | $13.93 |
| | 7 | $47.18 | $13.90 |
| | 8 | $47.50 | $13.90 |
| | 9 | $48.51 | $13.84 |
| | 10 | $49.61 | $13.86 |
| | 11 | $50.67 | $15.46 |
| | 12 | $51.44 | $15.88 |
| 2015 | 1 | $49.98 | $16.19 |
| | 2 | $50.05 | $16.25 |
| | 3 | $50.10 | $16.25 |
| | 4 | $53.02 | $16.23 |
| | 5 | $55.63 | $18.36 |
| | 6 | $55.61 | $18.57 |
| | 7 | $56.52 | $18.59 |
| | 8 | $56.47 | $18.61 |
| | 9 | $56.10 | $18.54 |
| | 10 | $53.97 | $18.51 |

---

[607] "MREPLY26 increase in gross price compared to restricted plans' lost rebate, x bertrand.xlsx".

Highly Confidential: Subject to Protective Order

308.   Note also that, even with the conservative assumption that the foreclosure increased restricted plan's rebates by 7.5% while Auvi-Q was present in the market (January 2013-October 2015), in the deterred re-entry period (November-December 2016) every active plan was harmed because Mylan did not offer any rebates conditioned on excluding Auvi-Q during that time period, so the overcharge for all customers in the deterred re-entry period simply equals the net price increase. Prof. Willig criticizes me for not explaining "what a formulary status for Auvi-Q would mean during" the deterred re-entry period,[608] but the harm class members during the deterred re-entry period is not due to Auvi-Q's formulary status in that period, but rather because Mylan's prior conduct had deterred Auvi-Q from re-entering the market at all.  Deterred Auvi-Q's re-entry thus has essentially the same anticompetitive effect in late 2016 as prohibiting coverage of Auvi-Q at every single plan would have had.

### 2. Summarized Classwide Impact Results for All Overcharge Models

309.   The percentage of plans and class members harmed given the updated overcharge estimates in this reply report depend on which model of overcharges one uses.   Table 121 below shows the percentage of *plans* that ever suffered a net overcharge in any month, depending on the overcharge model one uses.  As one can see, for the differentiated Bertrand model that accounts for the foreclosure's effect on $b_x$, 100% of plans were harmed.   For all other models, 96.2% plans were ever harmed if one includes the deterred re-entry period, and 87.8% of plans were harmed if one excludes the deterred re-entry period.

---

[608] Willig Merits Report n. 338.

Highly Confidential: Subject to Protective Order

| Table 121: Percentage of *Plans* Harmed, Conservatively Assuming That Restricted Plans Would Receive 7.5% Smaller Rebate in But-for World [609] | | |
|---|---|---|
| **Overcharge Model, Estimate of bx** | **Ever Harmed, Including From Deterred Re-Entry** | **Ever Harmed, Excluding From Deterred Re-entry** |
| Initial, Analysis Group $b_x$ | 96.2% | 87.8% |
| Initial, Foreclosure Regression $b_x$ | 96.2% | 87.8% |
| Bertrand, Analysis Group $b_x$ | 96.2% | 87.8% |
| Bertrand, Foreclosure Regression $b_x$ | 96.2% | 87.8% |
| Bertrand, accounting for foreclosure's effect on $b_x$ | 100.0% | 100.0% |

310.   Similarly, Table 122 below shows the percentage of *class members* (plans plus cash payors) harmed, depending on the overcharge model one uses.  As one can see, regardless of the overcharge model one uses, at least 99.4% of class members were harmed in at least one month from January 2013-October 2015.  This is because cash payor class members far outnumber plan class members and every cash payor was harmed, given that all suffered the higher gross prices and none received the increased rebates.

---

[609] "MREPLY23 foreclosure pPlansEverHarmed Summary.xlsx"

Highly Confidential: Subject to Protective Order

| Table 122: Percentage of *Class* Harmed, Conservatively Assuming That Restricted Plans Would Receive 7.5% Smaller Rebate in But-for World [610] | | |
|---|---|---|
| **Overcharge Model, Estimate of $b_x$** | **Ever Harmed, Including From Deterred Re-Entry** | **Ever Harmed, Excluding From Deterred Re-entry** |
| Initial, Analysis Group $b_x$ | 99.8% | 99.4% |
| Initial, Foreclosure Regression $b_x$ | 99.8% | 99.4% |
| Bertrand, Analysis Group $b_x$ | 99.8% | 99.4% |
| Bertrand, Foreclosure Regression $b_x$ | 99.8% | 99.4% |
| Bertrand, accounting for foreclosure's effect on $b_x$ | 100.0% | 100.0% |

### 3. Responses to Defense Expert Claims About the Percentage of Class Members Harmed

311.   Below, I respond to Dr. Johnson's and Prof. Willig's claims regarding this common impact methodology.

312.   **<u>My Methodology is Not "Tautological."</u>**   Dr. Johnson asserts that the methodology I use to determine but-for gross prices, rebates, and net prices is "tautological."[611]  Besides making the conclusory claim that each input to the methodology is "flawed," Dr. Johnson provides no reasoning why he believes my methodology is "tautological."[612]   Objectively, my methodology for determining whether each class member was harmed is not tautological.   A tautological methodology would necessarily conclude that each class member was harmed or not harmed regardless of the facts specific to that class member.   In contrast, my methodology leads to different conclusions about whether a class member is harmed based on empirical estimates of the key determinants of but-for prices, such as: (1)

---

[610] "MREPLY23 foreclosure pClassEverHarmed Summary.xlsx"
[611] Johnson Report ¶114.
[612] *Id.*

Highly Confidential: Subject to Protective Order

the effect of the foreclosure on EpiPen's and Auvi-Q's market shares, as estimated by my foreclosure regression; (2) the extent to which customers exit the market in response to an EpiPen price increase, which I inferred based on EpiPen's price-cost margin right before Auvi-Q entered the market; (3) the extent to which customers substitute from EpiPen to Auvi-Q in response to an EpiPen price increase, which I determined alternatively based on a pricing study that Sanofi commissioned or the results of my foreclosure regression; (4) the extent to which Mylan would provide fewer rebates in the but-for world, which I estimated using my rebate regression; (5) the proportion of class members that pay with cash; and (6) whether the plan was restricted.  Consequently, my conclusions about which class members were harmed depend not on any logical "tautologies" that assume harm to some class members, but instead on whether these empirical estimates ultimately indicate that the class member's but-for price would be lower than the actual price they paid.  Indeed, as Dr. Johnson points out elsewhere in his report,[613] if one conservatively assumes that the formulary restrictions increased EpiPen rebates by 2.7% at restricted plans, then my classwide impact methodology indicates that some class members were not harmed based on my initial overcharge model.  That would not be true if my methodology were a mere "tautology" that functionally assumed harm for all class members.

313.   **All or Nearly All Class Members are Harmed by the Foreclosure In at Least One Month Even if One Ignores the Anticompetitive Harm During the Deterred Re-entry period (November-December 2016)**.  Dr. Johnson asserts that if one ignores anticompetitive harm during the deterred re-entry period, the percentage of class members that were harmed by the foreclosure in at least one month is only 57.8%.[614]  As noted above and in my opening merits report, the percentage of class members that was ever harmed is 100% if one accepts the null hypothesis of my rebate regression (that the formulary restrictions did not increase EpiPen's rebates).  Thus, given the regression results of my initial merits report, Dr. Johnson's claim is true only if one conservatively assumes that the formulary restrictions increased EpiPen's rebates by 2.7% at restricted plans.  Further, even with this conservative assumption, his 57.8% calculation is wrong for two reasons.  First, he fails to use the updated MMIT data, which is incorrect and conflicts with the opinions of his fellow defense expert Prof. Willig.[615]  Second, in his denominator, he includes plans that were active only during the deterred re-entry.[616]  Given that

---

[613] Johnson Merits Report ¶115.
[614] Johnson Merits Report ¶115.
[615] *See supra* Part VI.A.2; Willig Report n.242.
[616] *See* "Para 115.do" from Johnson Merits backup (program calculating this statistic).

Highly Confidential: Subject to Protective Order

he is ignoring this period, his denominator should have considered only plans that were active from January 2013 to October 2015.

314.   If one corrects those flaws with Dr. Johnson's approach, then given my initial report's calculation of the increase in net price, and it's conservative assumption that the restrictions increased EpiPen rebates by 2.7%, the result is that 83.1% of plans are harmed at least once from January 2013-October 2015 due to the foreclosure.[617]   As Table 121 above shows, for the differentiated Bertrand model that accounts for the foreclosure's effect on $b_x$, 100% of plans were harmed.   For all other models, 96.2% plans were ever harmed by the foreclosure if one includes the deterred re-entry period, and 87.8% of plans were harmed by the foreclosure if one excludes the deterred re-entry period

315.   **Percentage of Class That Were Harmed "On Average".**   Prof. Willig asserts that I should have calculated the percentage of the class that "paid higher prices on average" instead of the percentage of the class that paid an anticompetitively inflated price in at least one month.[618]   Which percentage is the relevant one is ultimately a legal question.[619]   Nonetheless, to the extent the Court determines that the relevant legal question is the percentage of the class that was harmed "on average," I present those figures here.

316.   As noted above, the percentage of class members harmed on average is 100% if one does ***not*** make the conservative assumption that the formulary restrictions increased EpiPen's rebates by 7.5% at restricted plans.   If one ***does*** make the conservative assumption that the formulary restrictions increased EpiPen's rebates by 7.5%, then one can determine which class members were harmed by the foreclosure "on average" by calculating the weighted average of each plan's overcharges in each month, weighted by the number of covered lives in each month. Plans with a positive weighted-average overcharge are harmed "on average," whereas plans with a zero or negative weighted overcharge are not.   Additionally, all cash payor class members are harmed on average because they did not receive any rebates to offset the gross price increase.   Table 123 below shows that, for the differentiated Bertrand model that accounts for the foreclosure's effect on $b_x$, 100% of ***plans*** were harmed "on average", regardless of whether one includes or excludes

---

[617] "MREPLY115 pHarmed initial.xlsx" ("Corrected" tab).   This is an apples-for-apples comparison to Dr. Johnson's statistic, using the exact same underlying dataset.

[618] Willig Merits Report n. 338.   Dr. Johnson makes a similar assertion that TPPs (i.e., plans) are uninjured if the higher prices they paid in some months were offset by lower prices in other months.   Johnson Merits Report ¶145.

[619] Elhauge Merits Depo. 294-295.

Highly Confidential: Subject to Protective Order

the deterred re-entry period.  For all other models, 75.3-77.9% of plans are harmed on average, with the exact percentage depending slightly on the particular model and whether one includes the deterred re-entry period.

| Table 123: Percentage of *Plans* Harmed On Average, Conservatively Assuming That Restricted Plans Would Receive 7.5% Smaller Rebate in But-for World [620] | | |
| --- | --- | --- |
| Overcharge Model, Estimate of bx | Harmed on Average, Including From Deterred Re-Entry | Harmed on Average, Excluding From Deterred Re-entry |
| Initial, Analysis Group $b_x$ | 77.5% | 75.5% |
| Initial, Foreclosure Regression $b_x$ | 77.9% | 76.0% |
| Bertrand, Analysis Group $b_x$ | 77.2% | 75.3% |
| Bertrand, Foreclosure Regression $b_x$ | 77.9% | 76.0% |
| Bertrand, accounting for foreclosure's effect on $b_x$ | 100.0% | 100.0% |

317.   Similarly, Table 124 below shows the percentage of *class members* that were harmed on average if one conservatively assumes that restricted plans would receive a 7.5% smaller rebate in the but-for world.

---

[620] "MREPLY23 foreclosed pPlansHarmedOnAvg Summary.xlsx",

Highly Confidential: Subject to Protective Order

| Table 124: Percentage of *Class Members* Harmed On Average, Conservatively Assuming That Restricted Plans Would Receive 7.5% Smaller Rebate in But-for World [621] | | |
|---|---|---|
| **Overcharge Model, Estimate of bx** | **Harmed on Average, Including From Deterred Re-Entry** | **Harmed on Average, Excluding From Deterred Re-entry** |
| Initial, Analysis Group $b_x$ | 98.8% | 98.7% |
| Initial, Foreclosure Regression $b_x$ | 98.8% | 98.8% |
| Bertrand, Analysis Group $b_x$ | 98.7% | 98.7% |
| Bertrand, Foreclosure Regression $b_x$ | 98.8% | 98.8% |
| Bertrand, accounting for foreclosure's effect on $b_x$ | 100.0% | 100.0% |

318. **Extent of Harm to Plans in Months Where They Were Restricted**. Dr. Johnson and Prof. Willig both assert that my analysis indicates that "a large fraction of health plans benefited from Mylan's rebates in the form of lower net prices," and that in particular that plans are always "better off in the actual world" in months when they are restricted.[622] Both Dr. Johnson and Prof. Willig ignore the fact that, given the figures calculated in my initial merits report, plans were better off in the actual world in months where they are restricted **only** if one makes the conservative assumption that the formulary restrictions increased EpiPen's rebates by 2.7%; if one doesn't make that conservative assumption, every plan is harmed in every month, even if it was restricted.  If one does make that conservative assumption, then it is true that, according to my opening merits reports calculations, every plan's but-for price was higher than its actual price in months where the plan was restricted.  In this report, that remains true for the four models that do not account for the foreclosure's effect on the slope of the demand functions. However, the differentiated Bertrand model that accounts for the foreclosure's effect on the slope of the demand functions predicts significantly larger overcharges, and therefore for that model, every plan was harmed in every month, even if it was

---

[621] "MREPLY23 foreclosed pClassHarmedOnAvg Summary.xlsx",
[622] Willig Merits Report ¶231, ¶234. Johnson Merits Report ¶116.

Highly Confidential: Subject to Protective Order

restricted and one assumes that restricted plans would receive 7.5% smaller rebates in the but-for world.[623]

319. **Extent to Which Class Members Could "Mitigate" The Foreclosure Overcharge By Choosing to Be Restricted**. Dr. Johnson and Prof. Willig both argue that plans could have "chosen" to "mitigate" the foreclosure overcharge by choosing to be restricted, based on the premise that they would not suffer a foreclosure overcharge if they were restricted.[624] Importantly, the premise of their argument is necessarily false if, given the statistically insignificant results for my rebate difference regression, one does not conservatively assume that the formulary restrictions increased EpiPen's rebates at restricted plans.

320. Moreover, even if the formulary restrictions did increase rebates to foreclosed plans, their premise is mistaken for four reasons. First, plans could not have avoided damages by accepting the restrictions if one uses the differentiated Bertrand model that accounts for the foreclosure's effect on the slope of the demand functions, because, under that model, the gross price increase exceeded the rebate increase for restricted plans even if one assumes that the foreclosure increased rebates to restricted plans by 7.5%.[625] Second, even for the other overcharge models where restricted plans may have received rebates that exceeded the gross price increase, the defense experts' premise ignores the fact that the actual state of affairs existed only because the plans that agreed to the restrictions to get rebates were able to externalize most of the resulting marketwide increase in gross prices onto the other customers that did not get any offsetting rebate.[626] If, as defense experts hypothesize, all plans tried to agree to the restrictions, then there would be no one left on which to externalize the higher market prices, and they would all suffer a

---

[623] *See supra* Table 120.

[624] Johnson Merits Report ¶117 ("Because plans have the option to mitigate the alleged injury by choosing their formulary design (and therefore receiving lower net pricing), Prof. Elhauge has failed to show that proposed class members faced overcharges resulting from the alleged conduct and, consequently, has not provided any evidence of damages."); Willig Merits Report ¶178 ("the only harm he alleges is to plans that did not receive rebates for "restrictive" formulary placement. Yet many of these plans had the ability to choose such a rebate from the bid grid (and in other cases the PBM discussed or could have discussed such an offer with Mylan). It was only as a result of their choice not to accept the rebate that they paid a higher price."); *id* ¶235 ("Notably, even for many of the plans that Professor Elhauge alleges were injured, Mylan offered increased rebates for 'restrictive' formulary status but those plans chose not to accept them. Professor Elhauge's conclusion is thus that those plans which chose not to accept Mylan's rebates paid inflated prices as a result of the challenged conduct.");

[625] *See supra* Table 120.

[626] Elhauge Merits Depo. 285-86.

price increase.[627]   So it is not the case that all the unrestricted plans could have mitigated by accepting the foreclosure.  Third, even under the defense expert theory, the only way to avoid harm is to agree to be foreclosed, which is coercive and exploits the very collective action problem that are solved by antitrust prohibitions on anticompetitive foreclosing agreements.  Fourth, even if defense experts' premise were correct, whether that would exclude such plaintiffs from the right to recover damages is a legal issue, especially given what I understand (from plaintiff attorney instructions) is the availability of statutory damages based on the number of prescriptions.[628]

### C. Apportioning Damages to Class Members

#### 1. Plans (i.e., TPPs)

321.   Dr. Johnson mischaracterizes my deposition testimony when he claims that in it: "Professor Elhauge admits that the damages vary across TPPs but he has no method to assess how different they are and to quantify individual TPP damages."[629]   To the contrary, I testified to precisely the opposite in the very deposition testimony that Dr. Johnson cites:

> **Q:** So how do you determine based on what's in Table 107 and 108 how much you should pay 7-eleven?
> **A**: Well, I guess it would depend upon what you do with the statistically insignificant regression analysis on rebate increase. If you conclude, as one would if one used the defense expert approach, that there was no increase in rebates, then every TPP is just like a cash payer. They suffered a gross price increase and you'd use that same formula. If you, despite statistical insignificance, think they also had increased rebates and you use this method to try to figure – estimate how much increased rebates each of them received, you would then conclude for every month in which they suffered a gross price that exceeded their increase in rebate that they should be entitled to that difference times the number of units that they bought plus statutory damages times their number of prescriptions."[630]

---

[627] Elhauge Merits Depo. 297-98.
[628] Elhauge Merits Depo. 292-94.
[629] Johnson Merits Report ¶141.
[630] Elhauge Merits Depo. 303-304.

Highly Confidential: Subject to Protective Order

322.   Consistent with my deposition testimony, my opening merits report already lays out the methodology for calculating the EpiPen overcharge per dose for each class member.   For plan class members, their overcharge damages simply equal their EpiPen overcharge per dose in each month multiplied by their total EpiPen doses purchased in that month.   Each plan's overcharge per dose in each month equals the increase in gross prices that month minus any increased rebates that plan received in that month.[631]   In some states, class members may in addition or instead be entitled to statutory damages per prescription.[632]

323.   If, given the statistically insignificant results in my initial merit report, one assumes that Mylan's rebates were no higher because of the foreclosure, then the overcharge per dose to each plan just equals the same increase in gross prices that cash payors paid, which I calculated in my initial merits report in Table 16 and update here in Table 119.[633]   If, despite the statistically insignificant results in my initial merit report, one conservatively assumes that Mylan's rebates were 7.5 percentage points higher because of the foreclosure, then each plan's overcharge per dose in each month equals the increase in gross prices for that month minus (for the restricted plans) any increased rebates that plan received in that month.   In either case, the overcharge damages for each plan for each month then equal the plan's overcharge per dose for that month multiplied by the number of EpiPen doses that plan purchased in that month.[634]

324.   I calculated each plan's total EpiPen doses in each month based on a combination of IQVIA data (which indicates EpiPen doses) and MMIT coverage data (which indicates the number of covered lives for each plan and whether that plan was restricted in each month).   Specifically, I first calculate the average number of EpiPen doses per covered life in each month.[635]   Second, I calculate each plan's total EpiPen doses in a given month as the plan's covered lives in that month

---

[631] Elhauge Merits Report ¶¶183, 187.

[632] Elhauge Merits Report Appendix A; Elhauge Merits Depo. 292-94.

[633] Table 119 specifically presents these figures for the differentiated Bertrand model that allows the foreclosure to affect the slope of the demand functions.   My backup includes these same tables for all of the other overcharge models presented in this report.   *See* "MREPLY26 increase in gross price initial, ag bx.xlsx"; "MREPLY26 increase in gross price, initial, regress bx.xlsx"; "MREPLY26 increase in gross price, bertrand, ag bx.xlsx"; "MREPLY26 increase in gross price, bertrand, regress bx.xlsx".

[634] This follows the same formula already laid out in Elhauge Merits Report ¶187.

[635] Both calculations of covered lives and EpiPen doses exclude state Medicaid purchases and cash purchases.

Highly Confidential: Subject to Protective Order

multiplied by the number of doses per covered life in that month.  The plan's overcharge damages in a given month equal its total EpiPen doses in that month multiplied by its per dose EpiPen overcharge in that month.[636]

### *2. Cash Payors*

325.   Dr. Johnson again mischaracterizes my report and testimony when he claims that in it I provided no methodology to allocate damages to cash payors.[637] In my initial merits report, I explained, "Because cash end-payors do not receive rebates, the price increase to them is the same as this increase in gross prices,"[638] which I calculated.  I reiterated the same in my deposition, stating "For cash payers, they're all harmed because they all suffer a higher gross price increase… for them [damages are] just the increase in gross price times however many units they bought that particular month."[639]  In some states, cash payors may in addition or instead be entitled to statutory damages per prescription.[640]

326.   Each cash payors' damages in each month thus equal the monthly increase in gross prices per dose times the number of EpiPen doses they purchased that month.  Given my initial reports' calculation of the monthly increase in net price, I already calculated the monthly increase in gross prices in my opening merits report.[641]  Given the updated data and analysis in this report, I calculated the monthly increase in gross prices above in Table 119.[642]

---

[636] I use this methodology instead of matching the IQVIA data to the MMIT data at the plan level because the "bridge" files do not cover every plan, and therefore using IQVIA-to-MMIT plan-level matching would incorrectly exclude from the damages calculations any plans that were not in the bridge files.  I, or claims administrator, could also determine damages based on exact number of purchases based on plan-provided data.

[637] Johnson Merits Report ¶141.

[638] Elhauge Merits Report ¶185.

[639] Elhauge Merits Depo. 280-81 (with deposition corrections of Jan. 15, 2020); *see also id.* at 301 ("Q: Where in your report is a methodology for separating out the cash payer damages that are incorporated in these charts? A. In Table 16").

[640] Elhauge Merits Report Appendix A; Elhauge Merits Depo. 292-94; Elhauge Merits Depo. 301 ("Q: …Appendix A does not contain – or does it? An assessment of the damages that should be paid to cash payers? A: Well, it includes them, that they should get their overcharge damages, which is the number of prescriptions that they bought times the increase in gross price plus the statutory damages times the number of prescriptions.").

[641] Elhauge Merits Report ¶186, Table 16. Elhauge Merits Depo. 301 ("Q: Where in your report is a methodology for separating out the cash payer damages that are incorporated in these charts? A. In Table 16").

[642] Table 119 specifically presents these figures for the differentiated Bertrand model that allows the foreclosure to affect the slope of the demand functions.  My backup includes these same

Highly Confidential: Subject to Protective Order

327.   To be sure, while we currently have aggregate data on the total number of EpiPens purchased by cash payors, we do not yet have data on precisely how many EpiPens each individual cash payor purchased.   Therefore, I can currently calculate the EpiPen overcharge per dose for cash payors, and the total EpiPen overcharges for cash payors, but I cannot yet calculate the overcharge for each individual cash payor.   But that hardly means I have not provided a methodology for doing so.   If, in the future, data on the number of EpiPens each cash payor purchased in each month becomes available or is created as a condition of obtaining class relief, then I (or a class administrator) can easily calculate each cash payor's EpiPen overcharge by multiplying that number times the increase in EpiPen gross prices for that month that I have calculated.[643]

### 3. Insured Consumers

328.   Dr. Johnson claims that in my deposition testimony I admitted I had no method for determining what share of TPP damages should be allocated or deemed passed through to their insured customers.[644]   Instead, what I testified was that I did not undertake such calculations because I understood there were legal issues about whether or when such intra-class damages allocations should be made that were beyond the scope of my economics testimony.[645]

329.   Dr. Johnson relatedly makes the false claim that I testified in my class deposition that there was no injury to class members if they were "insured consumers who paid a copayment."[646]   In fact, the testimony he cites was the following:

---

tables for all of the other overcharge models presented in this report.   *See* "MREPLY26 increase in gross price initial, ag bx.xlsx"; "MREPLY26 increase in gross price, initial, regress bx.xlsx"; "MREPLY26 increase in gross price, bertrand, ag bx.xlsx"; "MREPLY26 increase in gross price, bertrand, regress bx.xlsx".

[643] Elhauge Merits Depo. 280-81 (Q: . . . Where in your report do you identify the damages that should be paid to each cash payer? A: Oh, for them it's just an increase in gross price times however many units they bought that particular month. Q: And where is that? A: I didn't separately calculate that. You could do that at the class stage, but this shows how much it would be. Q: When would that analysis be done? A: I guess it would be done at the point of awarding damages perhaps by a class administrator. You just need to know the units for every cash payer."); *id.* at 281 ("A: IQVIA data does not, I don't think, give us per cash payer units. So I guess presumably they would have to supply that as a condition of getting the class relief").

[644] Johnson Merits Report ¶141.

[645] Elhauge Merits Depo. 286-287, 306-07.

[646] Johnson Merits Report ¶142 & n.294.

Highly Confidential: Subject to Protective Order

> **Q**. Are you excluding from your damages calculations and damages model any co-payments or co-insurance paid by subscribers?
>
> **A.** I'm not excluding it. I didn't find any basis for concluding that there was a higher fixed co-pay paid by fully insured consumers. I think to the extent they're -- to the extent that the insured consumers are paying a co-insurance percentage, then they would be injured by the fact that the net price went up. But to the extent they're paying a fixed dollar co-pay, I didn't see any evidence that the foreclosure would result in more of them paying a fixed co-pay versus not.
>
> I gather it's different for the reverse-payment part, where there's generics, and that alters the kind of co-pays that are paid. But I didn't see any evidence that the brand-on-brand foreclosure would change the co-pays paid by insured patients.[647]

Thus, in that cited testimony, I never said that all insured consumers who paid a co-pay were uninjured. All I said was that I did not see evidence that the foreclosure increased the co-pay amounts paid by insured consumers. I explicitly indicated that they might be injured by higher co-pays given the reverse-payment settlement. I also explicitly indicated that even if insured consumers sometimes paid an unaltered copay, they could be injured if they also sometimes had co-insurance. Dr. Johnson also ignores the fact that I further explained in my merits deposition that, given the collateral source rule, even insureds who paid no higher coinsurance or copayments could be deemed injured by the increased EpiPen prices, but that this allocation of the higher prices between TPPs and their insured consumers was a legal issue beyond the scope of my economics testimony.[648] If full-insured consumers could recover for higher prices paid by their plans, then they would be injured to the extent their plans were injured, and since (as show above) 100% of their plans were injured by higher EpiPen prices, they would be injured as well.[649] Finally, Dr. Johnson ignores the fact that the class definition already excludes any insured consumers who paid a single flat co-pay.[650]

---

[647] Elhauge Class Depo. 94-95.

[648] Elhauge Merits Depo. 286-287, 306-07.

[649] Elhauge Merits Depo. 299-300 ("Q: … you say 99.9 percent of class members. So does that mean you're excluding insured consumers from the class with respect to the foreclosure damages? A: No. I'm including them within their plans. They're injured to the extent their plans are injured.").

[650] *See* Class Plaintiffs' Motion for Class Certification at 3 (Dec. 7, 2018).

Highly Confidential: Subject to Protective Order

### 4. Appendix A (State Antitrust and Consumer Protection Law) Overcharges

330.   In response to Dr. Johnson's assertions that I cannot apportion overcharge or statutory damages from the foreclosure,[651] I here also apportion those by state, plan, and month.

331.   To apportion these statutory damages, I first calculate the overcharge per dose for each class member in each month and each state, using the methodology just described above in the prior sections.[652]   As explained in the above sections, I calculated these overcharges per dose under the alternative assumptions that: (a) the foreclosure increased Mylan's rebates to restricted plans by 7.5%, and (b) the foreclosure did not increase Mylan's rebates to restricted plans relative to the but-for world.   Then, for each class member, month, and state, I calculate their damages under state Antitrust and Consumer protection laws, pursuant to the instructions and formulas provided to me by counsel.   These formulas for calculating state Antitrust and Consumer Protection damages have been updated below.[653]

---

[651] Johnson Merits Report ¶144.

[652] Because I do not yet have data on the identities of each individual cash payor, these apportionment calculations treat all cash payors in a given state in a given month as a single "class member."   Consequently, whenever data on cash payor identities becomes available, it will be easy to apportion these damages among them.

[653] If a state is not listed in this chart, that indicates counsel has instructed me that they do not have applicable State Antitrust or Consumer Protection laws. Based on updated instructions from counsel, I now also take into account that West Virginia's statutory damages are the maximum of either: (a) actual overcharges, or (b) $200 multiplied by the number of prescriptions. I also correct the fact that the spreadsheet that calculated state consumer protection damages for DC in my opening merits report incorrectly used the formula $1,500 * overcharge instead of $1,500 * Rxs.

Highly Confidential: Subject to Protective Order

| Table 125: State Antitrust and Consumer Protection Damage Formulas | | |
|---|---|---|
| **State** | **State Antitrust Damage Formula** | **State Consumer Protection Damages Formula** |
| AL | overcharge + ($500 * Rx) | -- |
| AK | -- | max (3 * overcharge, $500 * Rx) |
| AZ | overcharge | -- |
| CA | overcharge | overcharge |
| CT | -- | overcharge |
| DC | overcharge | max (3 * overcharge, $1,500 * Rx) |
| FL | overcharge | overcharge |
| HI | overcharge | overcharge |
| IL | overcharge | overcharge |
| IA | overcharge | -- |
| KS | overcharge | -- |
| ME | overcharge | overcharge |
| MA | -- | max (overcharge, $25 * Rx) |
| MI | overcharge | -- |
| MO | -- | overcharge |
| MN | overcharge | -- |
| MS | overcharge + ($500 * Rx) | -- |
| MT | -- | max (overcharge, $500 * Rx) |
| NE | overcharge | overcharge |
| NV | overcharge | overcharge |
| NH | max (overcharge, $1,000 * Rx) | max (overcharge, $1,000 * Rx) |
| NM | overcharge | max (overcharge, $100 * Rx) |
| NY | overcharge | -- |
| NC | overcharge | overcharge |
| ND | overcharge | -- |
| OK | -- | overcharge |
| OR | overcharge | -- |
| RI | overcharge | max (overcharge, $200 * Rx) |
| SD | overcharge | -- |
| TN | overcharge | -- |
| UT | overcharge | -- |
| VT | overcharge | overcharge |
| WA | -- | overcharge |
| WV | overcharge | max (overcharge, $200 * Rx) |
| WI | overcharge | -- |

186

Highly Confidential: Subject to Protective Order

332.    The backup submitted in conjunction with this report includes a file that indicates the state antitrust and consumer protection damages, apportioned by class member, state, and month.[654] Table 126, Table 127, Table 128, Table 129, and Table 130 below summarize total antitrust and consumer protection damages by state and time period (initial period of January 2013-October 2015 versus deterred re-entry period of November-December 2016).  Each overcharge model has its own table.

---

[654] "MREPLY25 state antitrust and cp, apportioned by plan,cash, month state (all models)" shows the state antitrust and consumer damages apportioned by plan, month, and state; each model has its own tab. Cash payors are identified as plan name = "CASH".

Highly Confidential: Subject to Protective Order

| Table 126: Total State Law Foreclosure Damages Initial Model, Using Analysis Group Estimate of $b_x$ [655] | | | | |
|---|---|---|---|---|
| | Initial Period | | Deterred Re-Entry | |
| State | Antitrust | Consumer Protection | Antitrust | Consumer Protection |
| AK | - | $7,300,406 | - | $323,289 |
| AL | $38,265,612 | - | $1,880,568 | - |
| AZ | $132,889 | - | $6,614 | - |
| CA | $540,558 | $540,558 | $26,593 | $26,593 |
| CT | - | $152,141 | - | $6,670 |
| DC | $25,635 | $35,306,506 | $1,221 | $1,846,304 |
| FL | $336,189 | $336,189 | $17,988 | $17,988 |
| HI | $20,684 | $20,684 | $837 | $837 |
| IA | $53,269 | - | $2,403 | - |
| IL | $301,870 | $301,870 | $16,131 | $16,131 |
| KS | $56,287 | - | $2,829 | - |
| MA | - | $8,619,513 | - | $384,927 |
| ME | $43,100 | $43,100 | $1,475 | $1,475 |
| MI | $271,781 | - | $11,487 | - |
| MN | $163,838 | - | $7,290 | - |
| MO | - | $134,440 | - | $6,420 |
| MS | $20,939,608 | - | $1,072,804 | - |
| MT | - | $7,794,401 | - | $259,020 |
| NC | $290,299 | $290,299 | $13,210 | $13,210 |
| ND | $15,598 | - | $534 | - |
| NE | $35,377 | $35,377 | $1,971 | $1,971 |
| NH | $49,660,620 | $49,660,620 | $1,963,708 | $1,963,708 |
| NM | $30,778 | $3,025,752 | $1,428 | $157,946 |
| NV | $47,338 | $47,338 | $2,128 | $2,128 |
| NY | $539,302 | - | $23,544 | - |
| OK | - | $72,864 | - | $3,177 |
| OR | $71,614 | - | $2,550 | - |
| RI | $45,444 | $8,495,062 | $1,595 | $334,472 |
| SD | $15,416 | - | $647 | - |
| TN | $157,933 | - | $7,519 | - |
| UT | $54,786 | - | $2,747 | - |
| VT | $17,192 | $17,192 | $648 | $648 |
| WA | - | $163,017 | - | $6,492 |
| WI | $149,462 | - | $6,458 | - |
| WV | $38,434 | $7,538,100 | $1,300 | $286,545 |
| **Total** | **$112,320,914** | **$129,895,431** | **$5,078,228** | **$5,659,950** |

---

[655] "MREPLY25 cp antitrust by state period (all models)" ("initial, ag bx" tab).

Highly Confidential: Subject to Protective Order

| State | Initial Period | | Deterred Re-Entry | |
|---|---|---|---|---|
| | Antitrust | Consumer Protection | Antitrust | Consumer Protection |
| AK | - | 7,300,405 | - | 323,289 |
| AL | 38,335,083 | - | 1,882,362 | - |
| AZ | 248,785 | - | 10,048 | - |
| CA | 1,010,105 | 1,010,105 | 40,373 | 40,373 |
| CT | - | 284,117 | - | 10,141 |
| DC | 47,832 | 35,306,507 | 1,854 | 1,846,304 |
| FL | 629,214 | 629,214 | 27,317 | 27,317 |
| HI | 38,698 | 38,698 | 1,271 | 1,271 |
| IA | 99,542 | - | 3,655 | - |
| IL | 564,843 | 564,843 | 24,536 | 24,536 |
| KS | 105,169 | - | 4,299 | - |
| MA | - | 8,619,513 | - | 384,927 |
| ME | 80,439 | 80,439 | 2,242 | 2,242 |
| MI | 507,407 | - | 17,462 | - |
| MN | 305,488 | - | 11,093 | - |
| MO | - | 251,613 | - | 9,759 |
| MS | 20,977,078 | - | 1,073,798 | - |
| MT | - | 7,794,401 | - | 259,020 |
| NC | 542,917 | 542,917 | 20,062 | 20,062 |
| ND | 29,097 | - | 811 | - |
| NE | 66,164 | 66,164 | 3,001 | 3,001 |
| NH | 49,660,620 | 49,660,620 | 1,963,708 | 1,963,708 |
| NM | 57,508 | 3,025,752 | 2,164 | 157,946 |
| NV | 88,542 | 88,542 | 3,232 | 3,232 |
| NY | 1,007,362 | - | 35,746 | - |
| OK | - | 136,203 | - | 4,824 |
| OR | 133,611 | - | 3,872 | - |
| RI | 84,722 | 8,495,062 | 2,424 | 334,472 |
| SD | 28,784 | - | 983 | - |
| TN | 295,493 | - | 11,425 | - |
| UT | 102,295 | - | 4,177 | - |
| VT | 32,078 | 32,078 | 985 | 985 |
| WA | - | 304,183 | - | 9,852 |
| WI | 279,445 | - | 9,821 | - |
| WV | 71,751 | 7,538,100 | 1,974 | 286,545 |
| **Total** | **115,430,073** | **131,769,476** | **5,164,695** | **5,713,804** |

Table 127: Total State Law Foreclosure Damages
Initial Model, Using Foreclosure Regression Estimate of $b_X$[656]

---

[656] "MREPLY25 cp antitrust by state period (all models)" ("initial, regress bx" tab).

Highly Confidential: Subject to Protective Order

| | Initial Period | | Deterred Re-Entry | |
|---|---|---|---|---|
| **State** | **Antitrust** | **Consumer Protection** | **Antitrust** | **Consumer Protection** |
| AK | - | $7,300,405 | - | $323,289 |
| AL | $38,235,316 | - | $1,879,040 | - |
| AZ | $82,434 | - | $3,707 | - |
| CA | $335,221 | $335,221 | $14,902 | $14,902 |
| CT | - | $94,309 | - | $3,739 |
| DC | $15,889 | $35,306,506 | $684 | $1,846,304 |
| FL | $208,509 | $208,509 | $10,081 | $10,081 |
| HI | $12,828 | $12,828 | $469 | $469 |
| IA | $33,027 | - | $1,347 | - |
| IL | $187,279 | $187,279 | $9,044 | $9,044 |
| KS | $34,897 | - | $1,585 | - |
| MA | - | $8,619,513 | - | $384,927 |
| ME | $26,707 | $26,707 | $827 | $827 |
| MI | $168,483 | - | $6,439 | - |
| MN | $101,546 | - | $4,088 | - |
| MO | - | $83,380 | - | $3,599 |
| MS | $20,923,292 | - | $1,071,962 | - |
| MT | - | $7,794,401 | - | $259,020 |
| NC | $180,015 | $180,015 | $7,403 | $7,403 |
| ND | $9,666 | - | $299 | - |
| NE | $21,942 | $21,942 | $1,105 | $1,105 |
| NH | $49,660,620 | $49,660,620 | $1,963,708 | $1,963,708 |
| NM | $19,087 | $3,025,752 | $800 | $157,946 |
| NV | $29,360 | $29,360 | $1,193 | $1,193 |
| NY | $334,355 | - | $13,193 | - |
| OK | - | $45,172 | - | $1,780 |
| OR | $44,390 | - | $1,429 | - |
| RI | $28,155 | $8,495,062 | $894 | $334,472 |
| SD | $9,556 | - | $363 | - |
| TN | $97,948 | - | $4,214 | - |
| UT | $33,960 | - | $1,540 | - |
| VT | $10,652 | $10,652 | $363 | $363 |
| WA | - | $101,061 | - | $3,637 |
| WI | $92,685 | - | $3,621 | - |
| WV | $23,817 | $7,538,100 | $729 | $286,545 |
| **Total** | **$110,961,636** | **$129,076,795** | **$5,005,030** | **$5,614,352** |

**Table 128: Total State Law Foreclosure Damages Bertrand Model with Foreclosure Only Affecting Intercept of Demand Functions, Analysis Group Estimate of $b_x$**[657]

---

[657] "MREPLY25 cp antitrust by state period (all models)" ("Bertrand, ag bx" tab).

Highly Confidential: Subject to Protective Order

| | Initial Period | | Deterred Re-Entry | |
|---|---|---|---|---|
| **State** | **Antitrust** | **Consumer Protection** | **Antitrust** | **Consumer Protection** |
| AK | - | $7,300,406 | - | $323,289 |
| AL | $38,325,013 | - | $1,881,032 | - |
| AZ | $232,016 | - | $7,523 | - |
| CA | $941,968 | $941,968 | $30,211 | $30,211 |
| CT | - | $264,878 | - | $7,596 |
| DC | $44,594 | $35,306,507 | $1,387 | $1,846,304 |
| FL | $586,727 | $586,727 | $20,445 | $20,445 |
| HI | $36,086 | $36,086 | $952 | $952 |
| IA | $92,813 | - | $2,739 | - |
| IL | $526,826 | $526,826 | $18,386 | $18,386 |
| KS | $98,057 | - | $3,219 | - |
| MA | - | $8,619,513 | - | $384,927 |
| ME | $74,978 | $74,978 | $1,678 | $1,678 |
| MI | $473,089 | - | $13,078 | - |
| MN | $284,823 | - | $8,315 | - |
| MO | - | $234,619 | - | $7,309 |
| MS | $20,971,651 | - | $1,073,066 | - |
| MT | - | $7,794,401 | - | $259,020 |
| NC | $506,221 | $506,221 | $15,016 | $15,016 |
| ND | $27,124 | - | $607 | - |
| NE | $61,702 | $61,702 | $2,250 | $2,250 |
| NH | $49,660,620 | $49,660,620 | $1,963,708 | $1,963,708 |
| NM | $53,630 | $3,025,752 | $1,617 | $157,946 |
| NV | $82,570 | $82,570 | $2,420 | $2,420 |
| NY | $939,239 | - | $26,750 | - |
| OK | - | $126,981 | - | $3,610 |
| OR | $124,574 | - | $2,898 | - |
| RI | $78,965 | $8,495,062 | $1,815 | $334,472 |
| SD | $26,835 | - | $736 | - |
| TN | $275,543 | - | $8,555 | - |
| UT | $95,369 | - | $3,128 | - |
| VT | $29,900 | $29,900 | $738 | $738 |
| WA | - | $283,637 | - | $7,369 |
| WI | $260,577 | - | $7,358 | - |
| WV | $66,879 | $7,538,100 | $1,477 | $286,545 |
| **Total** | **$114,978,388** | **$131,497,451** | **$5,101,103** | **$5,674,188** |

Table 129: Total State Law Foreclosure Damages
Bertrand Model with Foreclosure Only Affecting Intercept of Demand Functions,
Foreclosure Regression Estimate of $b_x$[658]

---

[658] "MREPLY25 cp antitrust by state period (all models)" ("Bertrand, regress bx" tab).

Highly Confidential: Subject to Protective Order

| Table 130: Total State Law Foreclosure Damages Bertrand Model Accounting for Foreclosure's Effect on the Slope of Demand Functions[659] | | | | |
|---|---|---|---|---|
| | Initial Period | | Deterred Re-Entry | |
| State | Antitrust | Consumer Protection | Antitrust | Consumer Protection |
| AK | - | $7,300,405 | - | $323,289 |
| AL | $44,765,405 | - | $1,881,032 | - |
| AZ | $10,952,617 | - | $7,523 | - |
| CA | $44,663,962 | $44,663,962 | $30,211 | $30,211 |
| CT | - | $12,460,189 | - | $7,596 |
| DC | $2,118,178 | $35,306,507 | $1,387 | $1,846,304 |
| FL | $27,630,069 | $27,630,069 | $20,445 | $20,445 |
| HI | $1,703,372 | $1,703,372 | $952 | $952 |
| IA | $4,369,291 | - | $2,739 | - |
| IL | $24,959,645 | $24,959,645 | $18,386 | $18,386 |
| KS | $4,631,697 | - | $3,219 | - |
| MA | - | $31,825,570 | - | $384,927 |
| ME | $3,534,761 | $3,534,761 | $1,678 | $1,678 |
| MI | $22,371,077 | - | $13,078 | - |
| MN | $13,468,312 | - | $8,315 | - |
| MO | - | $10,997,675 | - | $7,309 |
| MS | $24,426,280 | - | $1,073,066 | - |
| MT | - | $7,794,401 | - | $259,020 |
| NC | $23,802,638 | $23,802,638 | $15,016 | $15,016 |
| ND | $1,278,711 | - | $607 | - |
| NE | $2,914,822 | $2,914,822 | $2,250 | $2,250 |
| NH | $49,660,620 | $49,660,620 | $1,963,708 | $1,963,708 |
| NM | $2,562,991 | $3,086,617 | $1,617 | $157,946 |
| NV | $3,903,238 | $3,903,238 | $2,420 | $2,420 |
| NY | $44,378,748 | - | $26,750 | - |
| OK | - | $5,960,234 | - | $3,610 |
| OR | $5,934,165 | - | $2,898 | - |
| RI | $3,712,246 | $8,495,062 | $1,815 | $334,472 |
| SD | $1,257,563 | - | $736 | - |
| TN | $12,987,974 | - | $8,555 | - |
| UT | $4,506,939 | - | $3,128 | - |
| VT | $1,416,734 | $1,416,734 | $738 | $738 |
| WA | - | $13,500,273 | - | $7,369 |
| WI | $12,273,536 | - | $7,358 | - |
| WV | $3,142,161 | $7,538,100 | $1,477 | $286,545 |
| Total | $403,327,751 | $328,454,893 | $5,101,103 | $5,674,188 |

[659] "MREPLY25 cp antitrust by state period (all models)" ("x bertrand" tab).

Highly Confidential: Subject to Protective Order

## X. CONDITIONING REBATES ON RIVAL EXCLUSION IS NOT REASONABLY NECESSARY TO ACHIEVING ANY PROCOMPETITIVE EFFICIENCY

333.   In this Part, I respond to Section V of Professor Willig's report in which he contends that conditioning PBM rebates on excluding EpiPen rivals from formulary is "an essential tool for driving lower branded drug prices."[660]  None of Professor Willig's claims are valid.  First, as I showed in Part VII of my opening merits report, and again in Part VIII, marketwide prices in the EAI device market were inflated by Mylan's use of these exclusionary conditions.  Where the claimed efficiency is that conduct leads to "lower branded drug prices,"[661] the fact that branded drug prices were actually elevated by the conduct necessarily means no such procompetitive outcome was achieved.  Second, as I explain in this Part X, all of the rationales that Professor Willig provides in Section V of his Report for why conditioning rebates on exclusive formulary placement is an "essential tool" for manufacturers are irrelevant or wrong.

### A. The Usage of Formulary Restrictions by PBMs Does Not Show They Were Procompetitive

334.   Professor Willig argues that PBMs "use preferred formulary placement and restrictions to move volume and negotiate lower prices."[662]  There are several flaws with the claim that this shows that Mylan's formulary restrictions were procompetitive.

335.   To begin with, Prof. Willig's argument repeatedly conflates unilateral PBM conduct with PBM agreements that were induced by a dominant manufacturer. Plaintiffs are **not** challenging PBMs' unilateral decisions to restrict certain drugs' formulary positions, but instead are specifically challenging the **Mylan agreements** that **condition** rebates on the PBMs' plans restricting rivals' formulary positions. Yet nothing in Prof. Willig's Part V shows that Mylan's rebates would be any lower if Mylan were **not** allowed to condition rebates on formulary restrictions, but instead only had to offer unconditional rebates.  Every single one of the arguments Prof. Willig makes in support of the proposition that PBMs can lower prices when they

---

[660] Willig Report Section V.
[661] *See* Willig Report Section V.
[662] Willig Report Heading V.A.

193

Highly Confidential: Subject to Protective Order

unilaterally decide to restrict a rival's formulary position, despite the absence of Mylan agreements conditioning rebates on restrictions, are thus irrelevant to Plaintiffs' allegations.

336.    Prof. Willing also ignores the fact that, even if they are perfect agents for their member plans, PBMs have a collective action problem that can cause each of them to offer formulary exclusivity in exchange for **relative** discounts from supracompetitive prices, even though the collective effect is to raise marketwide prices and harm all buyers.  As I have summarized the economic literature:

> [E]xternality problems give buyers an incentive to agree to anticompetitive foreclosing agreements that produce large marketwide price increases in exchange for a nominal individual discount, even if the result of all of them agreeing is that the monopolist's rivals are impaired and the buyers then pay higher prices than they otherwise would have paid. For example, if there are 10,000 buyers of a product, any individual buyer's agreement to an exclusionary commitment that contributes to a marketwide price increase externalizes 99.99% of the harm caused by that buyer's contribution to the market price increase. Each buyer would thus agree in exchange for any individual discount (or avoided price penalty) that exceeded 0.01% of that buyer's contribution to the marketwide price increase….
>
> It does not matter if bundled discount contracts periodically come up for termination because the same externalities that give buyers incentives to agree (despite the collective marketwide harm) also give buyers incentives not to terminate the contracts. Nor does it matter whether buyers agreed to the bundled discounts voluntarily — or even initiated a request for a bundled discount contract — because agreeing to anticompetitive bundled discounts is individually profit maximizing for buyers even though it collectively harms all buyers in the market. Buyers face a collective action problem that requires a collective action solution through antitrust law.[663]

---

[663] Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 456-457 (2009) (collecting economic literature).  *See also* Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253, 340 (2003) ("it should be irrelevant that buyers initiated an exclusionary agreement with a monopolist. The same underlying collective action and seller-buyer collusion problems that make it individually profitable for buyers to agree to anticompetitive exclusionary agreements in exchange for discounts or side payments also make it profitable for buyers to initiate such an agreement."); ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 381 (3d ed. 2018) ("To consider an analogy: it is

Highly Confidential: Subject to Protective Order

337. The externality problems are even worse for PBMs because they are intermediaries rather than the ultimate buyers. As I have pointed out previously, the economic literature shows:

> The externality problems are even worse when the relevant buyers are not consumers, but intermediaries who resell to others. Such intermediate buyers externalize an even higher percentage of the harm by passing much or all of the price increase on to downstream buyers. Intermediate buyers are thus even more likely to agree to anticompetitive foreclosing commitments.[664]

Indeed, the incentives of PBMs are even worse than the typical intermediary because they do not even buy the relevant product, and thus have no incentive to restrain increases in its price. In fact, because PBM's rebates in Mylan's agreements are calculated as a percentage of EpiPen's WAC price, PBMs are incentivized to help

---

well known that a collective action problem can lead each individual to initiate polluting for individual benefits, even if they are all worse off if everyone pollutes."); *id.* at 467 ("in cases where buyer decisions are driven by the above externality problem, then even the most sophisticated individual buyer has incentives to initiate a request for an anticompetitive loyalty discount, because each buyer individually benefits from receiving one given that most of the cost of its individual loyalty commitment is externalized onto others, even though the collective effect of all of them initiating a request for loyalty discounts is that all buyers are harmed. Where buyer decisions are driven by the externality problem, the fact that buyers initiate a request for loyalty discounts is similar to the fact that (before the adoption of laws that banned littering) individuals often initiated littering, even though the collective result of all of them doing so was to harm everyone.")

[664] Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 456 (2009) (collecting economic literature). *See also* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 467 (3d ed. 2018) ("externality problems can be worsened when the relevant buyers are not consumers, but intermediaries who resell to others. Such intermediate buyers might be able to externalize an even higher percentage of the harm by passing much or all of the price increase on to downstream buyers. Thus, some economic literature indicates that intermediate buyers are even more likely to agree to loyalty commitments that lead to a substantial foreclosure share that has anticompetitive effects on rival competitiveness."); Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253, 288 (2003) ("The reality that monopolists often sell to intermediate buyers means that those buyers can also have strong incentives to agree to exclusionary arrangements even when buyers do not face collective action problems because they have market power (or can collectively be organized to have market power). The reason is that such intermediate buyers have incentives to collude with upstream sellers in ways that create supracompetitive profits for the sellers and intermediate buyers and pass on the anticompetitive costs to downstream buyers.")

Highly Confidential: Subject to Protective Order

Mylan anticompetitively inflate EpiPen's WAC price, regardless of who initiates the agreement.[665]

338.   In this case, the evidence indicates that PBMs and their member plans received a price reduction relative to other buyers (consisting of 7.5% higher rebates than those other buyers) in exchange for agreeing to the anticompetitive restrictions, even though the marketwide impact of those anticompetitive restrictions was to increase gross prices by far more than they received in higher relative rebates.[666] PBMs and their plans had every incentive to agree to such restrictions because their decision to agree would 100% determine whether they got the 7.5% relative discount, while the contribution that their agreement made to the increase in marketwide prices would be almost entirely externalized onto other PBMs or downstream to plans or insureds.

339.   Professor Willig claims that my deposition testimony supports his claim that: "Professor Elhauge concedes that the rebates offered by Mylan for placement on a preferred formulary tier are not anticompetitive."[667]  But I never said anything of the kind.  All I stated in the cited deposition pages was "I'm not challenging the rebates just to get, you know, the patients a lower co-pay," and that "preferred tiering is less restrictive on consumers [than the restrictions challenged here] because they still get covered. They just pay a higher co-pay."[668]

340.   Referring to Section IX.E.1 of his Report, Professor Willig then claims that my regression analysis "confirms that PBMs successfully lowered the net price for EpiPen paid by a large fraction of plans."[669]  However, my rigorous overcharge model has shown that the Mylan's agreements with PBMs have actually *increased* prices above but-for levels.  This is not surprising, given that Mylan and the PBMs both have incentives to reach agreements that anticompetitively inflate EpiPen prices; Mylan would earn higher sales profits due to EpiPen's anticompetitively inflated price, and PBMs would earner higher rebates in particular if the conduct inflates the WAC price (which as I show below in Part IX.B, it did).

---

[665] *See infra* Part XII.B.1.
[666] *See* Parts VIII-IX.
[667] Willig Report ¶58, citing Elhauge Merits Dep. at 203-204.
[668] Elhauge Merits Dep. at 203-204.
[669] Willig Report ¶59.

Highly Confidential: Subject to Protective Order

## B. Increasing Use of Formulary Exclusions by PBMs Over Time Does Not Show Procompetitive Effects

341.    Prof. Willig next contends that PBMs have increased their use of formulary exclusions over time to "drive higher rebates from manufacturers and lower prices for payors."[670]  However, this does not demonstrate any procompetitive effects from either formulary restrictions generally or the particular formulary restrictions in this case.  To begin with, greater PBM usage of formulary exclusions across drug markets need not be the result of unilateral PBM conduct.  Increased usage of formulary exclusions could result from dominant manufacturers such as Mylan adding rebates that were conditioned on restricting rivals' formulary positions.  PBMs can be forced to abide by these terms because the penalty pricing on their incontestable demand for the dominant manufacturer's drug is too high.[671]  Moreover, PBMs might agree or even initiate such exclusionary restrictions in exchange for *relative* price cuts from an inflated monopoly level, because of problems of self-interest, externalities, or collective action, as detailed in Part A.

342.    Even if the increased usage of formulary exclusions over time was the result of unilateral conduct by PBMs, this would at best be irrelevant to Professor Willig's other arguments.  As I already explained in X.A, PBMs unilaterally excluding drugs from formularies is not being challenged in this litigation.  It is instead Mylan's agreements with PBMs that condition rebates on rival exclusion that is being challenged.  Indeed, even if the PBM use of formulary exclusion to achieve procompetitive effects were increasing unilaterally, it would just demonstrate that there is no procompetitive reason for manufacturer rebates based on rival exclusion.  Given this premise, PBMs would exclude some firms anyway in order to minimize their costs, so the only purpose in requiring such exclusion would be in cases where the relevant exclusion does not minimize PBM costs.  Manufacturers could achieve this simply by offering PBMs a better price than their rivals.  Professor Willig's entire discussion here is thus either irrelevant or evidence of the anticompetitive nature of Mylan's exclusionary pricing.

343.    In any event, the evidence shows that plans for which Mylan's rebates were conditioned on formulary restrictions on average restricted Auvi-Q 30% of the time, whereas plans that Mylan did not offer rebates conditioned on formulary restrictions to only restricted Auvi-Q 3% of the time.[672]  This directly shows that

---

[670] Willig Report, Heading to Section V.B.

[671] *See infra* Parts XII.B.2, XII.C.2, XII.C.4-5.

[672] "MREPLY67 pRestricted, offered condition rebates vs not (201301-201510)".

Highly Confidential: Subject to Protective Order

Mylan's agreements, not unilateral PBM decisions, drove the restrictions on rivals in the EAI market.

344.   Even if one accepts Professor Willig's assertions that unilateral PBM use of formulary exclusions reduced the branded drug prices their members paid,[673] such a discount from the prices paid by other buyers would not show a discount from but-for levels, let alone establish that a dominant manufacturer conditioning rebates on formulary restrictions reduces prices below but-for levels.   Purported "savings" are often naively calculated to include all "rebates" or "discounts" from industry list (or WAC) prices.   As an economic matter, this is not the proper analysis: the savings from any unilateral PBM usage of formulary exclusions is the difference between the actual net prices and what those prices would have been but-for the exclusions, not compared to the past or to list prices.   As I have shown, in this case, the PBMs and plans who agreed to Mylan's restrictions received greater rebates relative to other buyers, but they paid higher net prices than they would have in the but for world.[674]

345.   The same sort of analysis would need to be performed (as I did)[675] to determine whether, in situations where PBM use of formulary exclusions was not unilateral, marketwide net drug prices actually decreased.   Indeed, in this case the evidence demonstrates that Mylan's WAC and net price both continued to increase well after Auvi-Q's entry,[676] suggesting that Mylan continued to increase EpiPen WAC prices more than they increased EpiPen rebates so that they could simultaneously increase net prices and the intra-product bundled disloyalty penalty.

346.   Next, Professor Willig contends that PBMs have excluded market-leading drugs from their formularies in other product markets.[677]   However, this is a red herring: Formulary coverage data shows that plans that restricted EpiPen's formulary coverage but not Auvi-Q's constituted only 1% of the market (weighted by covered lives).[678]   Given that the market-leading EpiPen was essentially never excluded in the EAI device market, what happened in other product markets is

---

[673] *See* Willig Report ¶65 ("Collectively, drug exclusions lead to huge savings in branded drug costs.").

[674] *See* Part IX.B.1.

[675] *Supra* Part VIII.

[676] *See* Willig Report Figure 11 (showing that Mylan's EpiPen WAC Price increased steadily from Q3 2011 through Q3 2015, and that its Actual Net Price continued to rise through Q4 2014 despite Auvi-Q's entry in January 2013).

[677] See Willig Report Section V.B.3.

[678] *See* "MREPLY38 pct of EAI market lives with epi restricted and auvi not.xlsx"

Highly Confidential: Subject to Protective Order

ultimately irrelevant.  Perhaps because the data on the relevant market in this case (the EAI market) so clearly contradicts his premise, Prof. Willig focuses on other, irrelevant markets when trying to support his claim that PBMs are able to exclude "market-leading" drugs like the EpiPen.[679]

347.   Professor Willig also states that "Sanofi has acknowledged that rebates are widely offered by drug manufacturers and [] benefit patients," but this is economically unsound because it conflates the but-for and the actual world. Lower net prices benefit patients, but the simple fact of an ostensible "rebate" or "discount" from a list or WAC price does not mean a that net prices are actually lower than in a but-for world where a particular "rebate" or "discount" is not offered.  For conditional rebates, the relevant question is not whether the rebate is higher if the plan accepts the condition than if they reject it—that is just the definition of the conditional rebate.  Instead, the relevant question is how the net prices with conditional rebates compare to the net prices that would prevail if the manufacturer were not allowed to condition rebates on excluding rivals from formularies.  If such conditioned rebates were disallowed, the manufacturer may have to provide lower gross prices or even larger rebates, given that they could no longer impose an intra-product bundled penalty on plans' incontestable demand or use exclusionary agreements to exploit collective action and externality problems among PBMs and plans.

348.   Next, Professor Willig cites my deposition to support his claim that "where a competitive action … is widely employed by firms without monopoly power, it represents strong evidence that the action is efficient and procompetitive," which he asserts was the case here.[680]  But that is not what I said.  Instead, in the portion of the deposition that he cites, I said that "if [rebates conditioned on exclusivity] were efficient, you would think everybody who buys from Sanofi would also take up exclusivity.  Ah, the fact that they're only taken up to a significant extent when a firm with market power imposes exclusivity indicates that the profits are anticompetitive, that they're not flowing from an efficiency associated with it."[681]  I was thus pointing out that the fact that PBMs had ***not*** widely agreed to rebates based on exclusivity from Sanofi indicated that such exclusivity was ***not*** efficient.

---

[679] *See* Willig Report ¶67.
[680] *See* Willig Report ¶66, citing Elhauge Merits Dep. at 235-236.
[681] Elhauge Merits Dep. at 235-236 (as corrected in deposition corrections).

Highly Confidential: Subject to Protective Order

349.   Moreover, Professor Willig simply ignores the fact that Mylan began providing exclusivity rebates only after it was threatened with Auvi-Q entry.[682]  If exclusivity offered some inherent efficiency advantage, Mylan would have had economic incentives to provide exclusivity incentives when it did not face the prospect of competition from Auvi-Q.  The fact that Mylan did not indicates that it must not have found any inherent efficiency in such exclusivity, but rather adopted it only after it could have an anticompetitive effect on rival sales.

350.   Professor Willig then concludes this section by quoting congressional testimony of Prof. Scott-Morton.  Prof. Scott-Morton testified that "the ability to exclude a drug or 'move market share,' is the most effective way to get a low price."[683]  This is once again, at best, irrelevant to Professor Willig's analysis, as the issue is not unilateral PBM conduct but Mylan's conditioning rebates on excluding rivals from formularies.  Moreover, given externality and collective action problems, the fact that the ability to exclude a drug is the best way to get a low price relative to other buyers does not at all show that it leads to prices for either the market or for restricted prices that are lower than but-for prices.

### C. Procompetitive Efficiencies Are Disproven, Not Proven, By the Very Rare Usage of Rebate-Induced Restrictions on EpiPens

351.   Professor Willig claims that EpiPen and Auvi-Q were very similar, that "[t]he evidence does not reveal any segment of demand for EAI devices that is non-contestable," and that PBMs generally concluded that the two products are therapeutically equivalent.[684]  I address Professor Willig's mistaken claim regarding non-contestability elsewhere in XII.C.2, but his claim as to therapeutic equivalence is far less significant than he attempts to indicate: it simply means that they both contain the same drug, epinephrine.[685]  It does not mean that the two products are

---

[682] Elhauge Merits Report ¶150.

[683] *See* Willig Report ¶70, citing Professor Fiona Scott Morton.

[684] *See* Willig Report ¶¶71-74.

[685] The evidence Prof. Willig cites on therapeutic equivalence makes clear that it merely means both Auvi-Q and EpiPen contain epinephrine.  *See* Willig Merits Report n. 95, citing 30(b)(6) Cunico (Presbyterian) Depo. 34 ("Q: . . . did the committee necessarily conclude that Auvi-Q was therapeutically equivalent to EpiPen? A: Correct. Epinephrine is epinephrine in the minds of physicians.").

Highly Confidential: Subject to Protective Order

not differentiated in other ways, such as by Auvi-Q's smaller form factor and voice instructions.[686]

352.    According to Professor Willig, the upshot of the therapeutic interchangeability of EpiPens and Auvi-Q was that the "EAI category was one where rebates for formulary exclusions could be used by PBMs to move share and lower costs."[687]    Once again, Prof. Willig makes the mistake of concluding that the ability of PBMs to negotiate lower prices by threatening restricted formulary prices is a procompetitive justification for Mylan's practice of **conditioning** rebates on formulary restrictions.    After all, PBMs could continue to "move share and lower costs" by threatening manufacturers with formulary restrictions even if neither Mylan nor PBMs were allowed to condition rebates on formulary restrictions.    For example, in a but-for world where Mylan were not allowed to condition rebates on formulary restrictions, PBMs could still negotiate lower prices by: (a) threatening to restrict EpiPen's formulary position if its price was too high relative to rivals' price; and/or (b) try to entice Mylan to reduce its prices by arguing that the PBM is more likely to unilaterally exclude rivals' formulary positions if EpiPen's **unconditioned** price offer to the PBM was sufficiently low.    Prof. Willig also ignores the reality that problems of self-interest, externalities, or collective action can drive PBMs to "move share and lower costs" by demanding relative discounts in exchange for formulary restrictions, even though the collective result of many of them doing so is to raise marketwide prices.

353.    Professor Willig then cites three instances where Sanofi proposed Auvi-Q rebates contingent on formulary exclusion, and examples of two other EAI manufacturers doing the same.[688]   But the data shows that Auvi-Q's offers ████████████████████████████████████████████[689]    This confirms that buyers rarely want to accept exclusivity from EAI sellers without market power, which indicates that such exclusivity must be inefficient, because any efficiency would apply equally to sellers with or without market power.    The fact that buyers generally accept such exclusivity offers only when the seller has market power indicates that market power, rather than the efficiency of exclusivity, must be driving buyer decisions.

---

[686] *See supra* Part VIII.E.2 (describing the product differentiation in the EAI market that makes price coordination unlikely).
[687] *See* Willig Report ¶75.
[688] *See* Willig Report ¶¶76-77.
[689] "MREPLY38 pct of EAI market lives with epi restricted and auvi not.xlsx"

Highly Confidential: Subject to Protective Order

354.   Professor Willig next repeats his claim that Mylan's rebates conditioned on formulary restrictions must be procompetitive based on the premise that the PBMs, rather than Mylan, instigated them.[690]   As a matter of economics, Prof. Willig is wrong because, even if you accepted his premise that PBMs instigated the rebates conditioned on formulary restrictions, that would not show that the rebates were procompetitive, given that problems of self-interest, externalities, or collective action can drive PBMs to initiate offers of anticompetitive restrictions in exchange for relative discounts from an inflated monopoly price, as discussed in Part A.

### D. Given the Lack of Procompetitive Efficiencies, the Alleged Lack of Less Restrictive Alternatives Is Irrelevant

355.   Professor Willig argues that "[n]either less 'restrictive' rebates paid to PBMs nor other pricing structures such as volume discounts would be as effective at lowering prescription drug costs as are Mylan's rebates for exclusive formulary placement."[691]   However, arguments dismissing less restrictive alternatives are relevant only if the actual restrictions have some procompetitive effect that might be achieved through the less restrictive alternative.  Professor Willig fails to establish that the restrictions that Mylan induced actually lowered prices, and as I show in Part VIII, Mylan's exclusionary agreements actually significantly raised marketwide net EpiPen prices above but-for levels.  He contends that because "PBMs were asking for manufacturers to submit bids conditional on exclusive formulary placement as a way to drive competition," this supports his claim that non-restrictive rebates (based on volume or otherwise) would not be as effective as exclusion-based rebates.[692]  But as noted repeatedly above, he ignores the economic reality that collective action and externality problems could drive PBMs to initiate offers of anticompetitive restrictions in exchange for relative discounts from an inflated monopoly price.  Moreover, if PBMs could and would propose rebates for efficient procompetitive exclusivity, there would be no efficiency gain from having Mylan instead condition rebates on exclusivity.

356.   The first alternative to the restrictive rebates that Professor Willig discusses are "rebates for preferred formulary placement."[693]  As I already explained,

---

[690] *See* Willig Report ¶¶78-83.
[691] Willig Report ¶84.
[692] Willig Report ¶84.
[693] Willig Report ¶¶85-86.

Highly Confidential: Subject to Protective Order

there is not even a need for a less restrictive alternative here because Professor Willig has not established any procompetitive benefit from Mylan's exclusion-based rebates. Even if he could establish such benefits, he has made no attempt to quantify them. But even his attempt to establish that rebates based on preferred formulary tier placement cannot function as a less restrictive alternative to exclusion-based rebates is hopelessly confused and conflated. He conflates PBM and manufacturer conduct by providing an extensive justification for why PBMs moved to formulary exclusions instead of relying on formulary tier placement.[694] But that is simply irrelevant. That "[f]ormulary exclusions … eliminate manufacturers' ability to frustrate the effect of PBMs' formulary controls" provides no justification for Mylan's conduct.[695] At best, it provides a justification *for* PBMs **unilaterally** adopting formulary restrictions.

357.   The second alternative to the restrictive rebates that Professor Willig discusses are volume discounts.[696] As I have already explained, there is no need for a less restrictive alternative here because Professor Willig has not established any procompetitive benefit from Mylan's exclusion-based rebates, and even if he could establish such benefits, he has made no attempt to quantify them. But even his attempt to reject volume discounts is based on nonsense. He claims that because of the "structure and flow of payments in this industry," volume discounts are not efficient tools, and that volume discounts offered by manufacturers "cannot encourage increased volume because volume is ultimately determined indirectly through prescriber and patient choice," not PBMs or wholesalers, and "prescribers and patients have no means of internalizing any potential price benefit from the volume discount."[697] This claim is convoluted and wrong. Volume discounts are widely used in the pharmaceutical industry. The claim that volume is determined by providers and patients, not PBMs, runs counter to all of Professor Willig's arguments for why PBMs have used formulary exclusions to drive volume. Indeed, in the paragraph immediately prior, while Professor Willig attempts to initially frame the issue as PBMs using formulary exclusion to "regain greater control over their ability to move market share," he concludes the paragraph by saying that "PBMs have shifted to exclusions as a mechanism to counter copay coupons and increase PBMs' power to move volume and drive lower prices."[698] Earlier in Section V of his Report, Professor Willig similarly says that "PBMs widely use formulary

---

[694] *See* Willig Report ¶86.
[695] *See* Willig Report ¶86.
[696] Willig Report ¶¶87-88.
[697] Willig Report ¶87.
[698] Willig Report ¶86.

Highly Confidential: Subject to Protective Order

placement to move volume between competing branded (and generic) drugs."[699]  It is thus so obvious that PBMs can shift and influence the volume of drugs purchased that Professor Willig mistakenly conceded as much, even while attempting to frame the issue to his client's benefit as one of moving "market share."  The issue is really quite simple: Mylan could have offered rebates based on PBMs achieving certain volume thresholds rather than based on excluding rivals from formulary.  It could also have offered lower up-front prices based on anticipated volume.  Nothing about the "structure and flow of payments" in this industry makes it necessary to condition rebates on exclusion.

358.   Professor Willig then concludes his discussion of volume rebates, and this section, by claiming that "basing the discounts a buyer receives on the seller's share of the buyer's purchases is likely to be more efficient" than volume, "particularly when customer sizes vary and demand is changing over time."[700] Based on this claim, he then offers his only claimed procompetitive efficiency that would apply to Mylan rather than to PBMs: "Because it is easier to estimate shares than volumes in this context, a share-based discount substantially reduces such [EAI-demand related] uncertainties, thereby generating pro-consumer efficiencies that cannot be achieved by a standard volume discount."[701]  But he does not even attempt to explain what these efficiencies are, what they involve, or to quantify them; he simply claims that demand uncertainties mean that share-based (here, functionally 100% share) pricing will produce some kind of unspecified, unquantified efficiency.

359.   The lack of actual evidence of any efficiencies is an overarching problem with Professor Willig's claims of procompetitive efficiencies.  A clear less restrictive to offering rebates in exchange for exclusionary restrictions would be to simply lower prices to compete for more business without any exclusivity conditions.[702]  Offering rebates for exclusion would be a more efficient strategy only if that exclusion created cost reductions that allowed greater price reductions than would otherwise be offered.  But if that were the case, "one would expect to see Mylan's contemporaneous business documents discuss and quantify those efficiencies in order to decide what level of rebate to offer for the exclusionary conditions."[703]  I have not found any such discussion and quantification in Mylan's contemporaneous business documents.  Nor apparently has Prof. Willig, who has the

---

[699] Willig Report ¶54.
[700] Willig Report ¶88.
[701] Willig Report ¶88.
[702] Elhauge Merits Report ¶164.
[703] Elhauge Merits Report ¶163.

Highly Confidential: Subject to Protective Order

advantage of working for the firm who would know whether any such contemporaneous business documents existed, yet cited none in his report █████████████

███████          Simply offering unconditioned price cuts would clearly be a less restrictive alternative because my regression analysis shows that "the effect on rival sales from the exclusionary conditions was over and above the effect on rival sales from the net prices after rebates."[705]

## XI. PROF. WILLIG'S SUMMARY STATISTICS DO NOT SHOW THAT MYLAN'S FORECLOSURE LOWERED PRICES OR RAISED OUTPUT

360.   In Parts IX.A-D of his merits report, Prof. Willig presents a slew of summary statistics that, according to him, show that Mylan's challenged agreements "lowered prices and increased output."[706]  Unlike my reports, Prof. Willig's reports do not contain any sort of model of Mylan's profit-maximizing prices that would be even potentially capable of discerning whether Mylan's prices in the actual world were higher or lower than the but-for prices it would charge if it were not allowed to condition rebates (or discounts) on formulary restrictions.  Instead, Prof. Willig commits several clear economic errors in assessing the effects of the foreclosure on prices and output.  First, he mistakenly focuses on rebates in isolation, rather than on net prices.  The net price is what class members pay, and given that the foreclosure increased gross prices more than it increased rebates, they are harmed notwithstanding the increase in rebates.  Indeed, the rebates are the anticompetitive mechanism that induces PBMs and plans to agree to anticompetitive exclusionary

---

[704] ████████████████████████████████████████████████

[705] Elhauge Merits Report ¶164; *see supra* Part VII (addressing critiques of the foreclosure share impact regression).

[706] Willig Merits Report Part IX (titled "Mylan's Rebates Lowered Prices and Increased Output").

Highly Confidential: Subject to Protective Order

agreements that inflate marketwide gross prices more than they increase rebates. Second, he mistakenly focuses on how prices and output changed relative to past levels, when the correct approach asks how they changed relative to but-for levels, i.e., the levels that would have prevailed but for the foreclosure.  Third, when he does look at but-for baselines, he commits two other errors.  He mistakenly focuses on whether Auvi-Q's entry lowered prices from but-for levels, which is irrelevant since no one is claiming Auvi-Q's entry was anticompetitive.  Further, he literally just *assumes*, without any analysis whatsoever, that Mylan's WAC price would stay exactly the same in the but-for world, but that almost all of Mylan's rebates (even the ones not conditioned on formulary restrictions) would disappear if Mylan were no longer able to condition rebates on formulary restriction.  This bald assumption conflicts not only with my rigorous modeling of how the foreclosure has altered Mylan's profit-maximizing price, but also numerous other pieces of evidence in this case that Prof. Willig ignores.  Finally, Prof. Willig makes various arguments why the foreclosure did not harm consumer choice, all of which are contradicted by the evidence.

## A. The Relevant Question is How the Challenged Conduct Affected Net Prices, Not Rebates in Isolation

361.   Prof. Willig's header to Part IX.A asserts "There is no disagreement that Mylan's rebates to PBMs were higher as a result of the challenged conduct." But the ultimate relevant question here is not whether Mylan's challenged conduct increased *rebates* in isolation, but how challenged conduct affected *net prices*.  As I explain in the next section, the evidence affirmatively shows that Mylan's net-prices would have been significantly lower if Mylan had not been allowed to condition rebates on formulary restrictions.   Indeed, above in Part IX.B, I showed that Mylan's foreclosure has caused net prices to increase for all class members in every month, even if one conservatively assumes that Mylan's foreclosure did in fact increase rebates above but-for levels.

362.   In fact, the increase in rebates that Prof. Willig observes is actually consistent with Mylan and the PBMs entering into a Coasian bargain in which the PBMs help Mylan anticompetitively increase net prices in exchange for a share of Mylan's resulting supracompetitive profits.[707]  As Prof. Willig acknowledges, PBMs

---

[707] Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253, 288 (2003) ("The reality that monopolists often sell to intermediate buyers means that those buyers can also have strong incentives to agree to exclusionary arrangements even when buyers do not

Highly Confidential: Subject to Protective Order

do not pass all of the rebates they receive from manufacturers on to plans; a study he cites that was based on PBM Institute data states that PBMs retain 10% of the rebates they receive.[708]  Because PBMs do not actually purchase any EAIs, but retain at least 10% of the rebates received from manufacturers based on their plans' purchases of EAIs, PBMs are in a perfect position to participate in, and profit from, an anticompetitive Coasian bargain in which the PBMs agree to help a dominant manufacturer (such as Mylan) foreclose rivals in exchange for a share of the supracompetitive profits the dominant manufacturer earns as a result.[709]  Because PBMs do not buy any EAIs, they bear ***none*** of the cost of an anticompetitive increase in the net price, and in fact earn higher rebates if Mylan anticompetitively increases prices because the PBMs' rebates are defined as a percentage of Mylan's WAC in Mylan's agreements.[710]  Indeed, Mylan and the PBMs have set up their agreements so that the PBMs' rebates and profits will automatically increase if the PBMs assist Mylan in anticompetitively increasing prices.  Thus, even if one were to credit Prof. Willig's factual claims with respect to the initiation of rebates in the EAI market,[711] that would not support Prof. Willig's assertion that the formulary restrictions were procompetitive; the PBMs could be entering into these agreements precisely ***because*** they are anticompetitive and the PBMs profit from helping Mylan anticompetitively increase prices.

363.   Even if PBMs were acting as perfect agents for their plans, PBMs and plans would have incentives to agree to exclusionary agreements whose aggregate effect is to anticompetitively raise marketwide gross prices more than they raise rebates because they get 100% of the rebates that flow from their agreement, but they externalize the lion's share (indeed, 100% minus their market share) onto other

---

face collective action problems because they have market power (or can collectively be organized to have market power). The reason is that such intermediate buyers have incentives to collude with upstream sellers in ways that create supracompetitive profits for the sellers and intermediate buyers and pass on the anticompetitive costs to downstream buyers. In particular, intermediate buyers have incentives to agree to arrangements that preserve or enhance seller market power (by excluding or impairing the efficiency of the seller's rivals) in exchange for either (1) side payments that split the seller's supracompetitive profits or (2) special discounts that give the participating buyers market advantages over other buyers and thus enhance the participating buyers' downstream market power.").

[708] Willig Merits Report ¶216, citing "Solving the Mystery of Employer-PBM Rebate Pass-Through (rerun)," Drug Channels Institute, May 3, 2016, www.drugchannels.net/2016/05/solving-mystery-of-employer-pbm-rebate.html

[709] *Supra* note 707.

[710] *See supra* Part X.A.

[711] *See, e.g.* Willig Merits Report ¶78 ("The EAI rebates were solicited from both Mylan and Sanofi and were driven by the PBMs, not Mylan").

Highly Confidential: Subject to Protective Order

PBMs and plans of their agreement's contribution to the marketwide increase in gross prices.[712] This can create collective action problems that give each PBM and plan incentives to accept or initiate exclusionary agreements in exchange for a relative discount (i.e., higher rebates) from the inflated marketwide gross prices.[713] Such anticompetitive effects are perfectly consistent with PBMs and plans who agree to the foreclosure receiving higher rebates than they used to or than other PBMs and plans do. Indeed, the fact that rebates confer a discount relative to inflated marketwide prices is precisely the causal mechanism by which the externality and collective action problem of PBMs and plans are exploited. The effect remains anticompetitive because the foreclosure inflates gross prices more than it inflates rebates and thus net prices increase.

364. Finally, even if PBMs and plans did not have any externality or collective action problems, they have would incentives to agree to the anticompetitive formulary restrictions that raise net prices in exchange for rebates because those rebates bundle contestable and incontestable demand.[714] They would have incentives to agree even though the gross price increase exceeded the rebates because the penalty of losing the rebates on their incontestable demand for EpiPen (and thus having to pay the penalty of higher gross prices) makes it unprofitable to make their contestable purchases from Auvi-Q even though they would otherwise want to do so. Again, increased rebates are not at all inconsistent with this anticompetitive effect. The rebates are rather again the mechanism, here by bundling contestable and incontestable demand in a way that restrict competition for their contestable purchases.

## B. Net Prices Would be Higher If Mylan Were Not Allowed to Condition Rebates on Formulary Restrictions

365. Prof. Willig's header to Part IX.B asserts that "Mylan's rebates resulted in lower net prices." Plaintiffs are not challenging "Mylan's rebates" —Mylan would still be free to provide rebates in the but-for world. Plaintiffs are instead challenging Mylan's practice of *conditioning* rebates on formulary restrictions, and the evidence affirmatively shows that net prices would have been significantly lower but-for this challenged conduct. I showed above in Part VIII that, after incorporating numerous methodological proposals from Dr. Johnson and Prof. Willig into my

---

[712] *See supra* Part X.A
[713] *See supra* Part X.A.
[714] *See* Parts XII.B.2, C.2, C.4-5.

Highly Confidential: Subject to Protective Order

overcharge model, the model indicates that the foreclosure increased Mylan's net prices by even more than my opening merits report indicated. In contrast, Part IX.B of Prof. Willig's merits report does not include a reference to *any* regression analysis or *any* attempt to model the effect of the foreclosure on Mylan's profit-maximizing price. For all intents and purposes, Prof. Willig literally just assumes that Mylan's challenged conduct reduced prices.

366.   The *only* statistic that Prof. Willig presents in this entire section purporting to show that the foreclosure reduced net prices (Willig Merits Figure 11) is irrelevant according to Prof. Willig's own description of that figure. Prof. Willig titles his Figure 11: "EpiPen's Net Price Was Substantially Lower As a Result of Competition with Auvi-Q." Thus, the conclusion Prof. Willig apparently draws from Figure 11 is that Mylan's price in the actual world was lower than if Auvi-Q had never entered the market. But the relevant question is not whether prices would have been higher or lower *but-for Auvi-Q's entry* (which is what Willig Merits Figure 11 purports to answer), but instead the completely different question of whether prices would have been higher or lower *but-for Mylan's conditioning of rebates on formulary restrictions*.

367.   Further, Prof. Willig's Figures 10 and 11 misleadingly groups all of Mylan's commercial rebates together, regardless of whether they were conditioned on formulary restrictions or not.



368.   Prof. Willig relatedly argues that one should assume that: (1) EpiPen's WAC will grow at roughly 8% a year regardless of the intensity of competition in the market; (2) Mylan would have continued to provide on average only an 8% rebate if Auvi-Q had not entered the market, and (3) any rebate provided in excess of 8% in the actual world was "driven by competition with Auvi-Q."[716] Once again, Prof. Willig cites statistics that, on their face, do not even answer the right question.

---

[715]

[716] Willig Merits Report ¶222

Highly Confidential: Subject to Protective Order

He is yet again analyzing statistics with the goal of determining whether ***Auvi-Q's entry*** reduced prices relative to a hypothetical world where Auvi-Q never entered, when the relevant question instead is whether Mylan's practice of conditioning rebates on formulary restrictions increased or decreased prices relative to a hypothetical world where Mylan was not allowed to condition its rebates on formulary restrictions.

369.   Indeed, to the extent Prof. Willig's Figure 11 is relevant to any of the issues in this case, it is because it cleanly illustrates how the difference between the prices Mylan charges when a plan accepts the restriction and the price Mylan charges when a plan rejects the restriction reflects a penalty, rather than a true discount.  Prof. Willig's Figure 11 shows that Mylan increased the difference between the maximum price it would charge (its WAC) and the minimum price it would charge (WAC minus its largest rebates), not by reducing its minimum price (Mylan's actual net price grew relative to the past in every single quarter but one), but instead by repeatedly increasing its WAC price.  By doing so, Mylan was able to artificially increase the penalty for rejecting a restriction over time without actually providing lower prices to the customers who accepted the restriction.

370.   Prof. Willig also notes that "Mylan's gross profits on EpiPen declined by 7% in 2015, despite increased EpiPen unit volume **as a result of competition between EpiPen and Auvi-Q**."[717] Yet again, he incorrectly focuses on whether prices would be higher ***but-for Auvi-Q's entry,*** when the relevant question is instead whether prices would be lower but-for Mylan's practice of conditioning rebates on formulary restrictions.

### *C. EAI Market Output Would be Higher if Mylan Were Not Allowed to Condition Rebates on Formulary Restrictions*

371.   Prof. Willig's Part IX.C asserts that "Mylan's rebates increased output."  Again, Plaintiffs are not challenging "Mylan's rebates" generally, but rather Mylan's practice of conditioning rebates on formulary restrictions; in the but-for world, Mylan would still be free to provide as many rebates as it wanted, so long as it did not condition those rebates on formulary restrictions.

---

[717] Willig Merits Report ¶223 (emphasis added).

Highly Confidential: Subject to Protective Order

### 1. Evidence Prof. Willig Cites Does Not Support His Claim that the Challenged Conduct Increased EAI Market Output

372.   Even assuming Prof. Willig meant to argue that Mylan's challenged conduct—conditioning rebates on formulary restrictions—"increased output," the evidence he cites does not establish that point either.  The only statistic Prof. Willig cites in support of his claim is that "sales of EAI devices increased steadily during the period between 2013 and 2015."[718]   Prof. Willig notes that "economic theory teaches that lower prices would stimulate demand and expand EAI output,"[719] but that clearly was not why EAI market output increased over time because Prof. Willig's own Figure 11 showed that Mylan's net price increased in every quarter but one from January 2013 to October 2015.  Given that net EAI prices increased over time, it is obvious that total EAI market output increased over time simply because total demand for EAIs has increased over time as more and more people have come to realize that they have allergies that could possibly induce anaphylaxis.  Although Prof. Willig asserts (without any citation) that "Mylan has . . . invested heavily in increasing awareness of anaphylaxis and establishing EpiPen as a trusted EAI device,"[720] he does not even allege that Mylan's challenged conduct (conditioning rebates on formulary restrictions) was necessary to induce that investment, and therefore he does not even allege that this is a consequence of, or a procompetitive justification for, Mylan's challenged conduct.

373.   Further, Prof. Willig is making the fundamental mistake of comparing a more recent time period with the challenged conduct to a more distant time period with the foreclosing conduct, rather than comparing actual prices in a given time to but-for prices in that same time period.[721]  Prof. Willig's fallacious logic is analogous

---

[718] Willig Merits Report ¶224.

[719] Willig Merits Report ¶224.

[720] Willig Merits Report ¶224.

[721] Einer R. Elhauge, *Defining Better Monopolization Standards*, 56 Stan. L. Rev. 253, 338 (2003) ("[T]he correct baseline to determine whether exclusionary conduct causes an increase in monopoly power is *not* how high prices, profits, or shares were in the *past*.  Instead, the correct baseline compares the actual extent of monopoly power to the degree of power the defendant would have had *without* the exclusionary conduct.")(emphasis added); AREEDA & HOVENKAMP, IIA ANTITRUST LAW ¶ 394 (3d ed. 2007) (to determine injury, "the plaintiff's actual profits are compared to what they would have been *but for* the antitrust violation")(emphasis added); Areeda & Hovenkamp, XI ANTITRUST LAW ¶1802c (3d ed. 2011) ("suppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival.  A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or

Highly Confidential: Subject to Protective Order

to concluding that poisoning a child from infancy to adulthood "increased the child's height" because the child was taller as an adult than as an infant.  To determine the effect of the challenged conduct on EAI market output, one must instead compare actual EAI market output in each time period to EAI market but-for Mylan's challenged conduct in that exact same time period.   I do so in the next section.

### 2. My Overcharge Model Affirmatively Indicates that Mylan's Foreclosure Reduced EAI Market Output Relative to But-for Levels

374.   Comparing actual EAI market output in each time period to my overcharge model's estimate of but-for output in each output shows that the net price increase caused by Mylan's conduct has caused fewer people to purchase EAIs than they would have but-for the conduct.   The exact amount by which Mylan's foreclosing conduct has reduced output depends on the overcharge model one uses. Table 131 below shows that every overcharge model indicates that the increase in prices caused by Mylan's foreclosing conduct caused thousands of people not to buy EAIs when they otherwise would have.

| Table 131: Number of EAI Doses and EAI Two-Packs That Were Not Purchased Because Prices Were Too High Due to the Foreclosure (January 2013 – October 2015)[722] | | |
|---|---|---|
| **Overcharge Model, Estimate of $b_x$** | **Doses** | **Two-Packs** |
| Initial, Analysis Group $b_x$ | 81,310 | 40,655 |
| Initial, Foreclosure Regression $b_x$ | 151,473 | 75,736 |
| Bertrand, Analysis Group $b_x$ | 35,996 | 17,998 |
| Bertrand, Foreclosure Regression $b_x$ | 9,225 | 4,612 |
| Bertrand, | 8,063,292 | 4,031,646 |

more expensive outlets.  Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.").

[722] "MREPLY48 effect of forc on output, all models 201301-201510.xlsx". These figures are calculated as the predicted difference in total Auvi-Q and EpiPen doses, with versus without the challenged foreclosing conduct. From January 2013 – October 2015, Auvi-Q and EpiPen constituted 97% of all EAI doses sold, so total EpiPen plus Auvi-Q doses closely approximates total EAI market doses during this time period. "MREPLY48 actual auvi and epi q of market.xlsx".

Highly Confidential: Subject to Protective Order

| | | |
|---|---|---|
| accounting for foreclosure's effect on $b_x$ | | |

375.   This is consistent with other academic literature, which concludes that EAIs are "prohibitively expensive for many patients," and that this has deterred many patients from buying EAIs.[723]   And it is concerning because, as Mylan's own press releases explain, "Anaphylaxis is a public health problem and a major safety issue", causing "approximately 1,500 deaths annually," with "children and adolescents . . . "most at risk."[724]

### D. Consumers Were Harmed by a Lack of Choice

376.   Prof. Willig's Part IX.D asserts that "consumers were not harmed by lack of choice" for several reasons.  Every one of his arguments is contradicted by the evidence in this case.

377.   **a. Mylan Internally Acknowledged That Auvi-Q Had Unique Features that Patients Valued**.  First, Prof. Willig attempts to downplay Auvi-Q's unique qualities.  Prof. Willig claims, without citing any sources, that "Auvi-Q [uses] substantially the same mechanism" to deliver epinephrine.[725]   But Prof. Willig's unsupported claim that Auvi-Q's and EpiPen's administration methods are "substantially the same" conflicts with ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████  Prof. Willig similarly asserts, again without any citation, that Auvi-Q has a "modestly different set of features that Sanofi argues are more convenient

---

[723] Prince et al., Underuse of epinephrine for the treatment of anaphylaxis: missed opportunities. Journal of Asthma and Allergy 2018:11 143-151, at 143 ("Epinephrine is the only effective treatment for anaphylaxis but studies routinely show underutilization. This is especially troubling given the fact that fatal anaphylaxis has been associated with delayed administration of epinephrine. . . . EAIs may be prohibitively expensive for many patients without health insurance/prescription coverage or for patients with high deductible insurance plans.  Patient assistance programs have been put in place to attempt to reduce the burden of purchasing injectable epinephrine, but cost still remains a significant concern for many patients. The high cost has resulted in consideration of sub-optimal modes of epinephrine delivery, such as the use of pre-filled syringes or expired auto-injectors.").

[724] MYEP00000294 (August 14, 2012 Mylan Press Release).

[725] Willig Merits Report ¶225.

[726] MYEP00723818 at slide 11.

for some customers,"[727] but  Nor does Prof. Willig address the fact that Auvi-Q has automated voice instructions that instruct whoever must administer it how to use it, while the EpiPen is not.[730]

378.   **b. Consumer Harm from Loss of Choice Not Offset by Lower Prices**.  Prof. Willig next argues in the alternative that, assuming consumers were harmed by lack of choice, they were still better off with the challenged conduct based on the premise that the challenged conduct reduced prices.[731]  This claim fails because my rigorous overcharge models show that Mylan's challenged conduct *increased* net prices, not decreased them.  Thus, here the price effects of Mylan's challenged conduct exacerbate, rather than offset, the consumer harm from loss of choice.

379.   **c. Consumers Switching Insurance Plans to Obtain the Their Preferred EAI Is Not Plausible**.  Lastly, Prof. Willig argues that the foreclosure did not harm consumer choice based on the premise that consumers who preferred Auvi-Q but were on plans that did not cover Auvi-Q could "choose to join a plan that includes" Auvi-Q instead.[732]  The only source Prof. Willig cites for this proposition is the congressional testimony of Prof. Scott-Morton.[733]  Prof. Willig's claim conflicts with the fact that, in reality, having to completely switch insurance plans in order to get coverage for one's preferred EAI is an enormous switching cost that few patients will be willing to overcome.  In the United States, 49% of the insured population obtains health insurance through their employer as part of their employee benefits,[734] meaning that for about half of the population, a customer

---

[727] Willig Merits Report ¶225.
[728] MYEP00140813 at MYEP00140814.
[729] *Id.*
[730] ████████████████████████████████████
[731] Willig Merits Report ¶226.
[732] Willig Merits Report ¶227, quoting Congressional Testimony by Prof. Scott-Morton.
[733] *Id.*
[734] *See* Kaiser Foundation Data on Health Insurance Coverage, available at www.kff.org/other/state-indicator/total-

Highly Confidential: Subject to Protective Order

would have to forego its employer health plan or purchase supplemental health insurance in order to gain coverage of additional EAI products, which would likely cost more than simply buying Auvi-Q at full price.

## XII. The Restraints Here Are Exclusionary Agreements That Should Not Be Assessed Under Any Price-Cost Test and Would Violate That Test Even If They Were

380.  In Part VI of his merits report, Prof. Willig makes three incorrect assertions.  First, he claims that the formulary restrictions here were not exclusionary agreements, but rather loyalty discounts.[735]  Second, he asserts that because they are loyalty discounts, their anticompetitive effects should be assessed under a price-cost test.[736]  Third, he claims that Mylan's restraints here pass a price-cost test.[737]  All three of his claims are inaccurate.  As shown in Part A, the agreements to adopt formulary restrictions in this case were clearly exclusionary agreements, not loyalty discounts.    Even if they were loyalty discounts, Part B shows that their anticompetitive effects are not accurately measured by a price-cost test.  Third, even if they were assessed under a price-cost test, Part C shows that they fail that test given the extent of incontestable demand, even if one uses Prof. Willig's own narrow definition of incontestable demand.

### A. These Were Exclusionary Agreements, Not Loyalty Discounts

381.  All of Part VI of Prof. Willig's report depends on his false premise this case involved "single-product discounts," not "exclusionary agreements."[738]  His only basis for his mistaken conclusion is the fact that the "rebate contracts between PBMs and Mylan did not lock PBMs into a given formulary structure," but rather offered rebates through those PBMs to plans who agreed to accept the formulary restrictions.[739]    But the PBMs are not the ones who were restrained by the exclusionary agreements here.  The ones who were restrained were: (a) the plans

---

population/?currentTimeframe=0&selectedDistributions=employer&sortModel={"colId":"Location","sort":"asc"}.

[735] Willig Merits Report ¶89.

[736] Willig Merits Report ¶89.

[737] Willig Merits Report ¶¶90-121.

[738] Willig Merits Report ¶89.

[739] Willig Merits Report ¶89.

Highly Confidential: Subject to Protective Order

who, to get those rebates, agreed to abide by formulary restrictions; and (b) the patients and doctors whose ability to choose a rival EAI was restrained by the formulary restrictions.   Nor does the fact that rebates were given in return for exclusionary restraints make those restraints loyalty discounts.   Every exclusionary agreement, including outright exclusive dealing, is induced by a discount.   Indeed, buyers would have no incentive to ever agree to an exclusionary restraint on their purchasing freedom unless they got some discount from the price that would otherwise be offered.[740]   And in all the classic exclusive dealing cases, the buyers were in fact induced to agree to the exclusive dealing in exchange for a discount.

382.   The crucial distinction, which Prof. Willig misses, is that in a loyalty discount the buyer does not agree to abide by any exclusionary restraint.   Instead, in a loyalty discount, it is the seller who has made a commitment: namely a commitment to provide a discount if it turns out the buyer is loyal.[741]   The buyer has not committed to any restraint, but if the buyer turns out to purchase all or a high share of the product from the seller rather than from the seller's rival, then the buyer will get a discount for its loyalty.[742]   Thus, in a loyalty discount, the buyer does not

---

[740] Elhauge & Wickelgren, *Robust Exclusion and Market Division Through Loyalty Discounts*, 43 INT'L J. INDUS. ORG. 111, 112 (2015) ("[W]ith general exclusive dealing contracts, buyers must receive some upfront compensation in order to agree to these contracts"); MICHAEL D. WHINSTON, LECTURES ON ANTITRUST ECONOMICS 144–47, 166 (2006) (modeling the anticompetitive effects when a buyer receives a discount for agreeing to exclusive dealing); Joseph Farrell, *Deconstructing Chicago on Exclusive Dealing*, 50 ANTITRUST BULL. 465, 476 (2005) (same); Louis Kaplow & Carl Shapiro, *Antitrust, in* 2 HANDBOOK OF LAW & ECONOMICS 1073, 1203–10 (A. Mitchell Polinsky & Steven Shavell eds., 2007) (same).

[741] Elhauge & Wickelgren, *supra* note 740, at 111 ("In a single-product loyalty discount contract, a seller commits to charge loyal buyers (those who buy all or a high percentage of the product from that seller) less than other buyers"); *id*. at 112 ("in loyalty discounts, prices are conditioned on buying a certain share from the seller"); Elhauge, U.S. ANTITRUST LAW & ECONOMICS 463 (3d ed. 2018) ("Loyalty discounts are agreements where by a seller gives buyers a price discount if buyers remain loyal to the seller by buying all, or some high percentage, of the relevant product from the seller."); Scott Morton & Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates,* 81 ANTITRUST LAW JOURNAL 777, 778 (2017) ("'Loyalty-rebate' contracts provide lump-sum, all-units rebates to buyers that purchase at least a designated share of their requirements from the seller. For example, at the end of a year, an engine manufacturer might award a boat builder a 5 percent discount on all engines purchased from the manufacturer, provided that these purchases account for at least 75 percent of all engines that the boat builder purchased.").

[742] *See* Elhauge, U.S. ANTITRUST LAW & ECONOMICS 464 (3d ed. 2018) ("Loyalty discounts and rebates can differ in form from traditional exclusive dealing agreements in two ways. First, many loyalty discounts or rebates do not impose an absolute obligation to avoid dealing with rivals, but rather only condition the receipt of discounts or rebates on buyers restricting their purchases from rivals. When loyalty discounts and rebates do not require an affirmative buyer

Highly Confidential: Subject to Protective Order

agree to abide by any exclusionary restraint that restricts the buyer's ability to buy from the seller's rival. In a loyalty discount, it is the seller who has made a commitment: namely, a commitment to provide a discount (or rebate) if the uncommitted buyer turns out to buy in a loyal way.[743]

383.   The distinction matters.  Because loyalty discounts without any buyer commitment do not involve any buyer agreement to abided by exclusionary restraints, their economic effects are less likely to be anticompetitive than are the effects of exclusionary agreements.[744]  Moreover, for loyalty discounts, some think that the economic effects of loyalty discounts can often be appropriately assessed by using a price-cost test.  In contrast, traditional antitrust economics has never assessed the economic effects of exclusive dealing and other exclusionary agreements by using a price-cost test.

384.   This case plainly involves exclusionary agreements, not loyalty discounts.  To get rebates, a plan must agree to a formulary restriction that restrains the ability of doctors and patients to choose rival EAIs.

---

commitment, they are less absolute in form than exclusive dealing because they permit buyers a continual choice between complying with the loyalty condition and forgoing the discounts or rebates.")

[743] Elhauge & Wickelgren, *supra* note 740, at 112 ("loyalty discounts involve a seller commitment to charge loyal buyers less than disloyal buyers.").

[744] *See* Elhauge, U.S. ANTITRUST LAW & ECONOMICS 464 (3d ed. 2018) ("The discouragement to price competition is worse . . .  the stronger the buyer loyalty commitment"); Elhauge & Wickelgren, *supra* note , at 112 (noting that loyalty contracts "with buyer commitment [are] especially effective at excluding rivals", whereas while "loyalty discounts without buyer commitment [can] soften competition and increase prices above competitive levels, ... they cannot exclude a more efficient entrant from more than half the market."); Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189, 219 (2009) ("For any given discount and foreclosure level, loyalty discounts without buyer commitments result in somewhat lower prices than those with buyer commitments."); Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 459-460 nn.175 & 177 (2009)(describing economic literature showing that without buyer commitments anticompetitive effects are less likely and smaller).

[745]

Highly Confidential: Subject to Protective Order



385.   Moreover, even if one thought that the formulary restrictions here were not exclusionary agreements, they would still not qualify as loyalty **_discounts_**.  A true loyalty discount necessarily involves a discount: that is, a price that is below the but-for price that would have been charged without the loyalty program.  If a firm gives no discount from but-for prices, but rather just raises the price charged to buyers who refuse to abide by exclusionary restrictions above but-for levels, that is

---

[746] *See supra* Part VI.C.

[747] Elhauge Merits Depo. 217 ("in this case, we have exclusionary agreements, not loyalty discounts"); *id.* at 221("not a loyalty discount that's an outright agreement"); Elhauge Class Depo 38-39 ("here it's exclusion of rival products from the formulary and imposing -- you know, actually, excluding from coverage altogether or imposing a prior authorization or step authorization process on selling to the rivals. And it's not a -- it's not just a loyalty discount; it's an agreement to do so. So one of the distinctions that the Eisai court drew is between -- that the Eisai -- that's  E-i-s-a-i -- court drew was between whether or not they made some -- whether some sort of exclusivity commitment had been made or whether it was just an ongoing condition where you could get a lower price the more loyal you are. In that case there was no commitment; it was just a condition that meant you could get lower prices if you were loyal, bought a certain percentage of Lovenox -- of a certain product you bought from Lovenox (sic) rather than the rival product. So both in terms of -- the commitment is different I think both in form and the fact that it's not just a price condition in this case."); *id* at 40 ("this does involve exclusionary commitments, like in Meritor, not like in the Eisai case.").

[748] *See* Elhauge Merits Depo. 28 ("where you have actual exclusive agreements like this, we don't have to do that sort of [price-cost] analysis"); Elhauge Merits Depo. 241 (price cost test does not apply here "Because the price-cost test is not the right test to figure out whether an exclusive agreement is anticompetitive or not…. here we have -- it's not a loyalty discount; it's an exclusive agreement.").

Highly Confidential: Subject to Protective Order

not a loyalty discount, that is a disloyalty **_penalty_**.[749]   That is precisely what occurred here.  As Prof. Willig's own Figure 11 shows, in response to Auvi-Q prices, Mylan did not lower prices, as would typically occur when a major competitor entered a monopoly market.  Instead, Mylan continued to raise its WAC price—the penalty price that Mylan imposed on plans who refused to agree to exclusionary restrictions—**_and_** its average net price.[750]   As my analysis shows, both Mylan's gross price and its net price were inflated way above but-for levels.[751]   Thus, although Mylan increased its rebates during this period, the nominal "discount" those rebates provided were from a disloyal price that had been inflated so high that the average net price was above both past and but-for levels.  Indeed, Mylan increased not only the average net price, but also the net price charged to plans who agreed to

---

[749] Elhauge, U.S. ANTITRUST LAW & ECONOMICS 465-466 (3d ed. 2018) ("while loyalty discounts may sometimes involve real discounts, there may also be cases where the noncompliant price exceeds the but-for price that would be charged without any loyalty program, in which case the loyalty discount is really a disloyalty penalty, which makes the coercive effect quite similar to the coercive threat under exclusive dealing. Indeed, one can think of exclusive dealing as simply a special case of loyalty discounts where the disloyal price is set at infinity. But a disloyal price of less than infinity can have the same economic effect. For example, suppose a firm with market power, which sells a product for $100 without any loyalty condition, decides to raise the noncompliant price to $150 with a 'discount' of $50, bringing the price back to $100, for any buyer who agrees to take 100% of the product from the firm. For buyers who do not value any units of the product more than $150, such a loyalty 'discount' has precisely the same economic impact as absolute exclusive dealing because the threat is to deprive them of all the consumer surplus they would enjoy from buying that firm's product for $100, unless they agree to loyalty condition. Such examples do not mean all loyalty discounts reflect disloyalty penalties, but they mean that some could. Whether actual loyalty discounts reflect disloyalty penalties depends on whether the actual prices charged to disloyal buyers exceed but-for levels.     In those cases where loyalty discounts are really disloyalty penalties, the coercive effect can be smaller in degree than exclusive dealing for some buyers, but is similar in kind. In the above example, for buyers who value at least some units of the product more than $150, the threatened loss of consumer surplus is somewhat less with the loyalty discount than with exclusive dealing because such buyers could retain some of that consumer surplus by rejecting the loyalty discount and buying some units at $150, whereas they would get none of it if they rejected exclusive dealing. However, the threatened loss of consumer surplus is similar in kind, and can create the same externality problem. To avoid such an individual penalty, each buyer can have incentives to agree to a loyalty condition that (when many buyers agree) impairs rival competitiveness and raises prices, because most of the harm of each individual agreement is externalized onto the rest of the market (other than for an individual buyer that has more than a 50% market share).

[750] _See supra_ Part X; Parts XI.B-C.

[751] _See supra_ Part VIII (net price increase), Part IX.B (gross price increase); Part XI.B (Prof. Willig's own figures show that Mylan's gross and net prices both continued to increase after Auvi-Q's entry).

exclusivity, to levels that were above but-for prices.[752]   Thus, unlike in loyalty discount cases, in this case any seeming loyalty discount has been shown to actually be a disloyalty penalty.[753]   Because true loyalty discounts actually lower prices, they are often thought to merit a presumption that they are procompetitive.   Because disloyalty penalties like the one here raise prices rather than lower them, they do not merit any such economic presumption that they are beneficial to consumers.

## B. The Price-Cost Test Does Not Accurately Measure Anticompetitive Effect Here

386.   Prof. Willig asserts that one should "apply a 'price-cost' test to evaluate single-product discounts ***where*** price is the 'clearly predominant' means of exclusion."[754]   Even if one assumes he is right that this is the correct test, it necessarily implies that loyalty discounts should ***sometimes*** be judged under a price-cost test and sometimes should not, with the decision turning on whether price was the "clearly predominant" means of exclusion for that particular loyalty discount. But Prof. Willig provides no analysis to indicate that, for the restrictions at issue in this case, price was the predominant mechanism of exclusion.   He merely asserts that because the "sole cost" for not agreeing to the restrictions was losing the rebates, rather than a threat to "cut off the supply of EpiPens" entirely, price must have been predominant mechanism of exclusion.[755]   This is incorrect for several reasons.

387.   To begin with, as noted above in Part A, even if the sole cost for not agreeing to an exclusionary restraint is the loss of a discount, that agreement remains an exclusionary agreement, rather than a loyalty discount.   It is clear that "price is not the predominant mechanism of exclusion . . . when, as with classic exclusive dealing, the buyer commits to being loyal to the defendant."[756]   Moreover, as also noted in Part A, the cost of losing the rebates here was not the loss of a discount from but-for levels, but rather the imposition of a penalty price way above but for levels. When a program involves such disloyalty penalties rather than true loyalty discounts, lower prices are not the predominant mechanism of exclusion; instead the

---

[752] *See supra* Part IX.B.1.
[753] Elhauge Merits Depo. 214 ("So really they imposed penalty prices on those who would not agree to the restricted formularies.")
[754] Willig Merits Report ¶89 (emphasis added).
[755] Willig Merits Report ¶89.
[756] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 511 (3d ed. 2018).

Highly Confidential: Subject to Protective Order

predominant mechanism is the coercive imposition of penalty prices on those who will not abide by exclusion.[757]

388.   But even if one wrongly thought the formulary restrictions here were loyalty discounts, Prof. Willig's own "clearly predominant mechanism" test explicitly indicates that some loyalty discounts predominantly exclude via price and others do not.  Yet Prof. Willig provides no reason to think that the arrangement here predominantly excluded via price.  Instead, he assumes that if it is a loyalty discount, it should always be assessed with price-cost test, a methodology that conflicts with his own predominant mechanism test.

389.   As a matter of economics, the question is whether a price-cost test would accurately assess whether the challenged agreements could create anticompetitive effects.  Below I show there are three reasons to think not.    First, in this case, the evidence shows that externalities and collective action problems, not price, were the predominant method of exclusion. Second, in this case, the bundling of contestable and incontestable demand also shows that price is not the predominant means of exclusion. Third, the economic literature shows that Mylan's agreements need not fail a "price-cost" test to cause anticompetitive harm.

### 1. Externality or Collective Action Problems Mean Price is not the Predominant Means of Exclusion

390.   Here, the predominant method of exclusion was not Mylan's price, but rather the problems of self-interest, externalities, or collective action that drive PBMs and plans to accept these restrictions despite their anticompetitive harm.

391.   **a. PBMs Can Not Only Externalize, But Also Profit from, An Anticompetitive Price Increase**.  Externalities make PBMs especially likely to enter into agreements that anticompetitively restrict rival manufacturers and raise prices for three reasons.  *First*, PBMs bear ***none*** of the net price increase caused by anticompetitive foreclosure because PBMs do not actually buy any EAIs.  PBMs thus can externalize 100% of the anticompetitive price increase downstream to cash

---

[757] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 511 (3d ed. 2018) ("price is not the predominant mechanism of exclusion . . . when . . . failing to meet a loyalty condition would result in 'penalties.'", which would be true in "cases where the disloyal price was a penalty because it was set above but-for levels.)".

Highly Confidential: Subject to Protective Order

payors and indirect purchaser plans.[758]



*Third*,

even if one assumes that PBMs are acting as perfect agents, and therefore are trying to minimize their plan members' costs as opposed to maximizing their own profits, PBMs would face the same collective action problem that drives plans to enter into restrictive agreements that ultimately make all plans worse off, as described next.[762]

392.   **b. Plans Face a Collective Action Problem that Can Cause Them to Enter into Restrictive Agreements Whose Collective Effect Is to Increase the**

---

[758] *See supra* Part IX.A; Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 456 (2009) ("The externality problems are even worse when the relevant buyers are not consumers, but intermediaries who resell to others. Such intermediate buyers externalize an even higher percentage of the harm by passing much or all of the price increase on to downstream buyers. Intermediate buyers are thus even more likely to agree to anticompetitive foreclosing commitments."), citing Abito & Wright, *Exclusive Dealing with Imperfect Downstream Competition*, 26 INT'L J. INDUS. ORG. 227 (2008); Simpson & Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305, 1306 (2007); Stefanidis, *Selective Contracts, Foreclosure, and the Chicago School View*, 41 J.L. & ECON. 429 (1998).

[759] Prof. Willig cites a study stating that PBMs pass only 90% of their rebates onto plans, meaning that PBMs retain 10% of the rebates for themselves. Willig Merits Report ¶216.

[760] *See, e.g.,*

[761] *See supra* Part IX.A; Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253, 340 (2003) ("it should be irrelevant that buyers initiated an exclusionary agreement with a monopolist. The same underlying collective action and seller-buyer collusion problems that make it individually profitable for buyers to agree to anticompetitive exclusionary agreements in exchange for discounts or side payments also make it profitable for buyers to initiate such an agreement.")

[762] *See supra* Part IX.A.

Highly Confidential: Subject to Protective Order

**Prices They Pay.** Unlike PBMs, who do not actually buy any EAIs, plans must bear the burden of a net price increased caused by anticompetitive foreclosure. Nonetheless, individual plans will predictably enter into restrictive agreements that cumulatively foreclose enough of the market to anticompetitively inflate prices and harm all plans because each plan faces a collective action problem.[763] Plans in the EAI market faced a collective action problem that resulted in all of them paying supracompetitive prices because the following six premises are were all true:

    i.    Each individual plan's decision about whether restrict Auvi-Q's formulary position in exchange for a larger percentage rebate from EpiPen had a 100% effect on the probability that the plan receives a larger percentage rebate from Mylan.  If the plan agreed to restrict Auvi-Q, it got the rebate 100% of the time, and if the plan rejected the restrictive agreement, it got the rebate 0% of the time.

    ii.    If enough plans cumulatively agreed to restrict Auvi-Q's formulary position, the EAI market would become foreclosed and Mylan's gross price would increase by more than the rebate per dose that any individual plan would receive in exchange restricting Auvi-Q's formulary position.

    iii.    However, each individual plan was so small that that its individual decision about whether to restrict Auvi-Q's formulary position in exchange for a larger percentage rebate from Mylan had only a trivial effect on the probability that Mylan's agreements would cumulatively foreclose enough of the market to anticompetitively inflate prices. MMIT data shows that the average plan constituted only 0.01% of the

---

[763] Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397, 456 (2009) ("externality problems give buyers an incentive to agree to anticompetitive foreclosing agreements that produce large marketwide price increases in exchange for a nominal individual discount, even if the result of all of them agreeing is that the monopolist's rivals are impaired and the buyers then pay higher prices than they would otherwise have paid. For example, if there are 10,000 buyers of a product, any individual buyer's agreement to an exclusionary commitment that contributes to a marketwide price increase externalizes 99.99% of the harm caused by a buyer's contribution to the marketwide price increase. Each buyer would thus agree in exchange for any individual discount (or avoided price penalty) that exceeded 0.01% of that buyer's contribution to the marketwide price increase."); citing WHINSTON, LECTURES ON ANTITRUST ECONOMICS 144-47, 166 (2006); Joseph Farrell, *Deconstructing Chicago on Exclusive Dealing*, 50 ANTITRUST BULL. 465, 476 (2005); Louis Kaplow & Carl Shapiro, *Antitrust*, in HANDBOOK OF LAW & ECONOMICS 1073, 1203-10 (A Mitchell Polinsky & Steven Shavell eds. 2007); Segal & Whinston, Comment, *Naked Exclusion*, 90 AM. ECON. REV. 296 (2000).

Highly Confidential: Subject to Protective Order

            EAI market,[764] and that even the largest plan constituted only 2% of the EAI market.[765]

    iv.    The extent any individual plan's agreement to exclusion made a marginal contribution to the marketwide foreclosure that raised marketwide prices, the vast bulk of that marketwide price increase would be externalized onto other buyers. Given that the average plan was only 0.01% of the EAI market, 99.99% of its contribution to an increase in marketwide prices would be inflicted on other buyers in the market. Even for the largest single plan, 98% of the harm would be externalized onto other buyers in the market.

    v.    Thus, when deciding whether to individually agree to an exclusion that would both increase its rebate and marginally contribute to a marketwide price increase, each individual plan's choice reflected the fact that agreeing would get it 100% of the rebate gain, while externalizing 99.99% of the harm for the average plan (and 98% of harm even for the biggest plan).

    vi.    Plans could not solve these externality and collective action problems by all agreeing with each other not to accept the restrictive terms because U.S. antitrust law prohibits such agreements between horizontal competitors.

    393.    The collective action problem will become obvious if you put yourself in the shoes of a plan. Suppose the following:

    i.    Your PBM enters into an agreement with Mylan under which you receive a 7.5% rebate of your gross EpiPen purchases if you agree to restrict Auvi-Q's formulary position, that the PBM will pass on the rebate to you, and you will receive no rebate on your EpiPen purchases if you do not restrict Auvi-Q's formulary position.

    ii.    You know that, if enough plans agree to restrict Auvi-Q's formulary position, competition in the EAI market will become restricted, which will make EpiPen's gross price $133 per pen. If enough plans do not agree to restrict Auvi-Q's formulary position, EpiPen's price will not be anticompetitively inflated and its gross price will be only $108 per pen. This means your 7.5% rebate would be worth $10 per pen if gross prices are anticompetitively inflated and worth $8 pen otherwise.

    iii.    However, because you only constitute 0.01% of the EAI market, your decision about whether to agree to restrict Auvi-Q's formulary position

---

[764] "MREPLY88 average plan size as pct of whole EAI market.xlsx".

[765] "MREPLY88 plans as pct of whole EAI market.xlsx".

Highly Confidential: Subject to Protective Order

has only a trivial effect on the probability that the EAI market becomes cumulatively restricted enough to anticompetitively inflate prices.

iv.   You cannot reach an agreement with other plans not to restrict Auvi-Q's formulary position in order to avoid the anticompetitive gross price increase, doing so would expose you to significant antitrust liability and the possibility of going to prison for entering into an agreement with your competitors.

394.   Given these premises, Table 132 below would be your "payoff matrix," which shows what your net EpiPen price will be for any given combination of: (A) your own decision about whether to restrict Auvi-Q (blue); and (B) whether enough of the other plans that constitute 99.9% of the market chose to restrict Auvi-Q to anticompetitively increase prices (red).

| Table 132: EpiPen Net Price Matrix for an Individual Plan | | |
|---|---|---|
| | **Cumulative Decisions of All Other Plans, Which Constitute 99.9% of the Market** | |
| **Your decision** | **Restrict Auvi-Q Enough to Raise Prices** | **Do *Not* Restrict Auvi-Q Enough to Raise Prices** |
| **Restrict Auvi-Q** | **$123** ($133 gross - $10 rebate) | **$100** ($108 gross - $8 rebate) |
| **Cover Auvi-Q** | **$133** ($133 gross - $0 rebate) | **$108** ($108 gross - $0 rebate) |

395.   As this payoff matrix makes clear, your best option is to restrict Auvi-Q no matter what the other plans in the market do. If enough of the other plans restrict Auvi-Q to anticompetitively inflate prices, then you would pay less if you choose to restrict Auvi-Q ($123 per pen) than if you chose to cover Auvi-Q ($133 per pen). If an insufficient portion of the other plans restrict Auvi-Q to anticompetitively increase prices, then you would still pay less if you decide to restrict Auvi-Q ($100 per pen) than if you cover Auvi-Q ($108 per pen). However, even though your best strategy is to restrict Auvi-Q, if every plan faces this same

Highly Confidential: Subject to Protective Order

dilemma and makes the same individually rational decision to restrict Auvi-Q, then the market will be foreclosed, the gross price will anticompetitive increase, and ***every plan*** will pay a higher price (at least $123 pen) than if none of them agreed to the restriction (at most $108 per pen). Mylan's conditional rebates have thus created a classic "Prisoner's Dilemma" in which each individual plan's rational decision is to restrict Auvi-Q, even though the cumulative effect of most or all plans making that individually rational decision is to cause prices to be higher for all plans, even the ones that chose to restrict Auvi-Q and got a rebate.[766]

396.    These are not made up numbers; this is precisely the collective action problem that the overcharge model that simultaneously addresses all of the defense experts' critiques indicates actually happened in the market.[767] This collective action problem, not Mylan's "price," is the same regardless of who initiates the exclusionary conduct and is the predominant method of exclusion in this case.

### 2. The Bundling of Contestable and Incontestable Demand Also Shows That Price Is the Not Predominant Means of Exclusion

397.    Prof. Willig's simplistic assumption that all loyalty discounts must predominantly exclude via price also ignores two other reasons why price was not the predominant method of exclusion here: (a) Mylan's agreements foreclose rivals principally by bundling contestable demand in the EAI market with incontestable demand for the EpiPen; and (b) my foreclosure regression statistically proves that

---

[766] PINDYCK & RUBINFELD, MICROECONOMICS 495-96 (8th ed. 2013) ("What is the Nash equilibrium for the prisoner's dilemma? . . . The ideal outcome is one in which neither prisoner confesses, so that both get two years in prison. Confessing, however, is a dominant strategy for each prisoner – it yields a higher payoff regardless of the strategy of the other prisoner. . . Therefore, the outcome in which both prisoners confess is both a Nash equilibrium and a maximin solution. Thus, in a very strong sense, it is rational for each prisoner to confess." ); ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 381 (3d ed. 2018) ("To consider an analogy: it is well known that a collective action problem can lead each individual to initiate polluting for individual benefits, even if they are all worse off if everyone pollutes."); *id.* at 467 ("in cases where buyer decisions are driven by the above externality problem, then even the most sophisticated individual buyer has incentives to initiate a request for an anticompetitive loyalty discount, because each buyer individually benefits from receiving one given that most of the cost of its individual loyalty commitment is externalized onto others, even though the collective effect of all of them initiating a request for loyalty discounts is that all buyers are harmed. Where buyer decisions are driven by the externality problem, the fact that buyers initiate a request for loyalty discounts is similar to the fact that (before the adoption of laws that banned littering) individuals often initiated littering, even though the collective result of all of them doing so was to harm everyone.").

[767] *See* Table 120

Highly Confidential: Subject to Protective Order

Mylan's exclusionary conditions had a restrictive effect, even after controlling for Mylan's price.

398.   **a. Bundling Contestable and Incontestable Demand Was the Predominant Means of Exclusion**.  Prof. Willig appears to acknowledge the fact that Mylan's agreements would bundle contestable and incontestable demand for the EpiPen if there *were* incontestable demand for the EpiPen, but incorrectly concludes there is not incontestable demand here.[768]  As explained below in Part XII.C.2, the data here shows that at least 60% of the EAI market is incontestable.  Consequently, Mylan's conditional rebate agreements can foreclose rivals in part by bundling the contestable demand with the incontestable demand, in particular by increasing the price PBMs/payors must pay for the incontestable demand if the PBM switches the contestable portion of its demand to a rival EAI product.  In this sense, Mylan's "intra-product" bundling of contestable and incontestable demand in the EAI market is analogous to multi-product bundling where the defendants bundles products in two markets and the rival only competes in one of them.  Indeed, some authors, including former Deputy Assistant Attorney General for Economics at the Antitrust Division, Prof. Scott-Morton, have analogized the intra-product bundled penalty to a "tax" on buying from the rival, and have shown that contracts that impose such a "tax" can harm competition even when the contracts do not fail the discount attribution test.[769]  Accordingly, there is good reason to conclude that "that pricing does not predominate when a single-product loyalty discount bundles contestable and incontestable demand,"[770] and that thus "a price-cost test should not be applied to loyalty discounts that bundle contestable and incontestable demand."[771]

399.   **b. Foreclosure Regression Shows that Mylan's Restrictive Conditions Have an Exclusionary Effect, Even After Controlling for Mylan's Prices**.  Prof. Willig also ignores that, as I explained in my deposition, my foreclosure regression directly shows that Mylan's restrictive agreements "have an effect over and above any price effect."[772]  My foreclosure regression explicitly controls for relative EpiPen and Auvi-Q prices, and therefore will only indicate an

---

[768] Willig Merits Report ¶72 ("The evidence does not reveal any segment of demand for EAI devices that is non-contestable; i.e. For which Sanofi's Auvi-Q is unable to compete."); *id.* Appendix A (providing a hypothetical example where Mylan bundles contestable and incontestable demand).

[769] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 510 (3d ed. 2018); Scott Morton & Abrahamson, *supra* note , at 783, 786-87.

[770] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 512 (3d ed. 2018).

[771] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 510 (3d ed. 2018).

[772] Elhauge Merits Depo. 217.

Highly Confidential: Subject to Protective Order

independent foreclosing effect of formulary restrictions if the formulary restrictions reduce Auvi-Q's share in a way that is not explained by the relative prices of the Auvi-Q and EpiPen.[773]   My foreclosure regression ultimately finds that the formulary restrictions on Auvi-Q reduced Auvi-Q's share at restricted plans by 4.6 percentage points, even after controlling for relative prices.   In contrast, if prices were Mylan's predominant method of exclusion, then my foreclosure regression would fail to find a foreclosing effect after controlling for price.[774]

400.   As I have noted, "pricing is not the predominant mechanism of exclusion for the conduct being challenged whenever a plaintiff makes clear that it raises no challenge to the pricing itself, only to the loyalty condition attached to that pricing. In such a case, the plaintiff acknowledges that the defendant could lawfully charge the discounted price without any loyalty condition. The plaintiff's harm would thus flow only from the incremental effects of attaching a loyalty condition to those price discounts, which is necessarily an effect that is not predominantly created by the pricing itself."[775]   This is precisely such a case because my share impact regression separates the incremental effect of the restriction (the share impact) from the effect of the pricing and rebates, which is fully controlled for by my price variable.   Thus, the predominant mechanism for the harm for which plaintiffs seek relief comes only from the formulary restrictions, not from the pricing or rebates.

### 3. Economic Literature Shows Agreements that Pass the Discount Attribution Test Can Still Cause Anticompetitive Harm

401.   In those cases in which a loyalty discount is assessed under a price-cost test, the standard test applied is the "Discount Attribution Test" ("DAT"), which is designed to indicate whether a loyalty discount could exclude an equally efficient rival.[776]   This basic definition of the DAT makes clear why failing the DAT is not a necessary condition for anticompetitive harm; the DAT asks only whether the contracts have the potential to cause one particular type of anticompetitive harm: forcing the rival to completely exit the market.   Thus, the DAT does not indicate whether Mylan's rebates conditioned on restricting rivals' formulary positions

[773] Elhauge Merits Report ¶167.
[774] Elhauge Merits Depo. 230.
[775] ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 513 (3d ed. 2018).
[776] Willig Merits Report ¶104 ("If Mylan's incremental revenues are above its incremental costs, then winning the contestable portion of demand under the contract is profitable for Mylan and it would be profitable for an equally efficient competitor"); *id.* n.146 ("This is sometimes referred to in the literature as the discount attribution test.").

Highly Confidential: Subject to Protective Order

harmed competition in other ways, such as raising rivals' costs, softening price competition, effectively dividing the market, or imposing a "tax" on purchases of rival EAIs.[777]   The economic literature acknowledges this simple point.[778]   As one article puts it, "passing the [discount attribution] test does not rule out anticompetitive exclusion and failing the test does not prove anticompetitive exclusion."[779]

### C. Many or Most of Mylan's Agreements Violate the Discount Attribution Test

402.   Here, the evidence shows that many of Mylan's conditional rebate agreements fail the Discount Attribution Test, which shows that they have the potential to force an equally efficient rival to exit the market.   Prof. Willig wrongly concludes that none of Mylan's agreements fail the Discount Attribution Test because he: (1) incorrectly excludes non-marginal recurring costs from his measure of cost; (2) incorrectly concludes that there is little-to-no incontestable demand in the market; and (3) ███████████████████████████████████████████████ ███████████████      I show in section (4) below that, if one corrects these errors, then

---

[777] Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harvard Law Review 397, 456 (2009); ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW AND ECONOMICS 637–638 (2d ed. 2011); Greenlee, Reitman, & Sibley, *An Antitrust Analysis of Bundled Loyalty Discounts*, 26 INTERNATIONAL J. INDUSTRIAL ORG. 1132, 1149 (2008); Brennan, *Bundled Rebates as Exclusion Rather than Predation*, 4 J. COMP. L. & ECON. 335, 353-59, 371 (2008).   Indeed, the same proposition is true even for single-product loyalty conditions. *See* Farrell, *Deconstructing Chicago on Exclusive Dealing*, 50 ANTITRUST BULLETIN 465, 476 (2005); Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 284-92 (2003); Segal & Whinston, *Naked Exclusion: Comment*, 90 AM. ECON. REV. 296 (2000); MICHAEL D. WHINSTON, LECTURES ON ANTITRUST ECONOMICS 144-47, 166 (2006); Kaplow & Shapiro, *Antitrust*, in 2 HANDBOOK OF LAW & ECONOMICS 1073, 1203-1210 (eds. Polinsky & Shavell, 2007); Rasmusen, et al., *Naked Exclusion*, 81 AM. ECON. REV. 1137 (1991); Gavil, *Exclusionary Distribution Strategies by Dominant Firms*, 72 ANTITRUST L.J. 3, 56-61 (2004); Spector, *Loyalty Rebates*, 1(2) COMPETITION POLICY INT'L 89, 108-09 (Autumn 2005); ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 406-410 (2d ed. 2011); Scott Morton, Fiona M. and Abrahamson, Zachary G, *A Unifying Analytical Framework for Loyalty Rebates* (September 1, 2016), https://ssrn.com/abstract=2833563 (published in Antitrust Law Journal in 2017).

[778] *See* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 466-469, 510-513 (3d ed. 2018); Scott Morton & Abrahamson*, supra* note 741; Spector, *Loyalty Rebates*, 1(2) COMPETITION POLICY INT'L 89, 108-09 (Autumn 2005); Elhauge & Wickelgren, *supra* note 740; Elhauge, *supra* note 777.

[779] Stephen Salop, *The Flawed Incremental Price Test*, 81 ANTITRUST LAW JOURNAL 371, 405 (Issue 2, 2017).

Highly Confidential: Subject to Protective Order

many or most of Mylan's agreements did in fact fail the discount attribution test by resulting in below-cost incremental prices.

### 1. Cost Measure

403.   One of the main reasons why Prof. Willig incorrectly concludes that Mylan's contracts do not fail the Discount Attribution Test is that Prof. Willig ignores all of Mylan's costs besides its marginal cost of obtaining additional EpiPens (its "cost of goods sold").[780]  The other four broad categories of recurring costs that Prof. Willig excludes from his Discount Attribution test are: (a) sales force, (b) "marketing," (c) "medical affairs,"[781] and (d) "general and administrative" costs.[782] Table 133 below shows that Prof. Willig's implementation of the Discount Attribution test ignores 42-45% of Mylan's recurring costs of competing in the EAI market, depending on the year.

---

[780] Willig Merits Report ¶95 ("I estimate Mylan's incremental cost per two-pack by taking its reported cost of goods sold from its P&L and dividing it by its total EpiPen volume to arrive at a per-unit cost measure.").

[781]

[782] MYEP01362752 (EpiPen annual P&L data).

Highly Confidential: Subject to Protective Order



404.    Prof. Willig is wrong that one should compare incremental prices to marginal costs of good sold to determine whether Mylan's conditional rebating can exclude an equally efficient competitor.  The basic, intuitive point is that an equally efficient rival will exit the market if it cannot generate enough revenue to cover **all** of the costs it would have to repeatedly incur to stay in the market.[784]  In other words, an equally efficient competitor would lose money by staying in the market if its forward-looking revenue were lower than its forward-looking costs of staying in the market.  Thus, for an equally efficient rival to stay in the market, it must cover not only its **marginal** costs of producing additional units of the product it sells, but also the recurring non-marginal costs that it must continually expend to compete in the market, such as general and administrative costs, marketing costs, and sales force costs.  Rebates conditioned on exclusivity can therefore force an equally efficient

---

[783] MYEP01362752.

[784] Technically, an equally efficient rival would have to not only cover all of its costs of remaining in the market, but also earn enough profits to make the return on investment in continuing to stay in the market exceed the return on investments of other alternative investments (such as other product markets).  *See* PINDYCK & RUBINFELD, MICROECONOMICS 569-570 (8th ed. 2013) (firms should make investments only if the net present value is greater than zero, after accounting for the opportunity cost of capital).

Highly Confidential: Subject to Protective Order

rival to exit the market if it results in incremental prices below the defendant's forward-looking cost per unit of staying in the market.[785]

405.   Here, an equally efficient competitor would have to cover its recurring sales force costs, marketing costs, medical affairs costs, and general and administrative costs to compete effectively in the EAI market.  Any firm competing in the EAI market needs a sales force to communicate and negotiate with PBMs and health plans, marketing to make the both medical professionals and the public aware of its product, lawyers to negotiate agreements, and administrative staff to process purchase orders.   Indeed, the simple fact that Mylan decided to repeatedly incur these costs every year directly shows that even dominant firms that already have significant market power must repeatedly incur these expenses to remain in the market.

406.   By excluding non-marginal recurring costs from his implementation of the Discount Attribution Test, Prof. Willig is essentially assuming that an equally efficient rival could meaningfully compete against Mylan as a bare-bones company with no sales force, no marketing, no medical affairs team, and no legal or administrative budget.  This hypothetical "bare bones" rival would not be able to enter into any agreements with health plans and insurers because it would not have sales staff or attorneys. Nor would hardly any of the public be aware of this hypothetical rival's product, given that it would not have spent any money on marketing.  Consequently, such a rival would make hardly any sales, regardless of its price, and therefore would not meaningfully constrain Mylan's market power in the EAI market. ██████████████████

---

[785] The academic literature echoes this logic that to determine whether bundling (either of multiple products or of contestable and incontestable demand) or predatory pricing would drive an equally efficient competitor out of the market, the relevant measure of cost is those that are variable during the period of the alleged misconduct. PHILLIP AREEDA, ANTITRUST ANALYSIS 199-200 (3d ed. 1981); 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 740d1, at 432 (2d ed. 2002); William J. Baumol, *Predation and the Logic of the Average Variable Cost Test*, 39 J.L. & ECON. 49, 61-62 (1996); Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs,* 112 YALE LAW JOURNAL 681, 707-711 (2003); EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 411 (2d ed. 2011) ("The proper cost measure used in a cost-based test must take account of the fact that bundled and loyalty discounts can often last a long period because, unlike predatory pricing, they are profitable for the defendant. Because the relevant measure of cost includes all cost that are variable over the period of the alleged violation, . . ., if that period lasts a long time that may include something close to what is typically considered average total costs.").

Highly Confidential: Subject to Protective Order

███████████████████████████████████████████

407. If one accounts for the fact that an equally efficient rival has to repeatedly incur sales force, marketing, medical affairs, and G&A every year to remain in the market, then the relevant measure of cost is 1.7-1.8 times higher than Prof. Willig assumed, depending on the year. Below, in section C.4, I show that using this corrected cost measure shows that the majority of the Mylan agreements Prof. Willig analyzed violate the Discount Attribution Test.

| Table 134: Cost Per EpiPen for Implementing Discount Attribution Test[787] | | |
|---|---|---|
| **Year** | **Willig Cost (just COGS)** | **Corrected Cost (including recurring non-marginal costs)** |
| 2013 | $27.39 | $49.85 |
| 2014 | $28.66 | $52.73 |
| 2015 | $30.74 | $52.57 |

408. Prof. Willig notes that I also define Mylan's ***marginal*** costs as its cost of goods sold when estimating profit-maximizing prices.[788] However, that does not mean one should ignore non-marginal costs when implementing the Discount Attribution Test. I only considered Mylan's marginal costs when calculating the effect of the foreclosure on Mylan's profit-maximizing price because basic economics shows that only marginal costs affect firms' profit-maximizing prices, ***if one holds entry and exit into the market constant.*** In contrast, the whole point of the Discount Attribution Test is to determine whether the defendant's contracts may force a rival to exit the market (or deter potential rivals from entering). To determine the effect on rival exit or entry, one must also consider the non-marginal costs that firms must repeatedly incur every year to stay in the market and compete effectively, because a rival will exit the market if it cannot at least cover those costs.

---

[786] MYEP00603647 at MYEP00603648.
[787] "MREPLY30 willig vs correct cost per EpiPen.xlsx".
[788] Willig Merits Report ¶95.

Highly Confidential: Subject to Protective Order

## *2. Incontestable Demand*

409.   The extent to which Mylan's conditional rebate agreements violate the Discount Attribution Test depends in large part on the share of the market that is incontestable, as Prof. Willig acknowledges.[789]  Prof. Willig does not appear to take any position on exactly what EpiPen's incontestable share is; the most specificity he provides is his claim that the contestable share is no higher than 38.6%.[790]  However, the data in this case shows that the EpiPen's incontestable share is at least 60%, even under Prof. Willig's own definition of how to measure the EpiPen's incontestable (or "non-contestable") share.   Under a more accurate definition of incontestable share, the data indicates that the incontestable share for the EpiPen is closer to 80%.

410.   **a. Definition of Incontestable Share.**   Prof. Willig defines the EpiPen's incontestable share as "the share of consumers that would choose to purchase EpiPen, even if Auvi-Q were put on preferred formulary placement, and EpiPen were not covered under the formulary (in which case the price difference facing the consumer may be substantial").[791]  Prof. Willig's definition provides an extremely conservative definition of incontestable demand; it is the share the EpiPen would achieve at a plan even if the plan tried actively to deter subscribers from using the EpiPen by not covering the EpiPen ***at all*** (not even if the patient went through step therapy or obtained prior authorization).   A more accurate measure of the EpiPen's incontestable share would be the share that EpiPen earns at plans that restrict the formulary coverage of neither the EpiPen nor Auvi-Q.   Nonetheless, the incontestable share of the market is high (at least 60%) under either definition of the incontestable share.

411.   **b. Data on Incontestable Share**.   Here, there is systematic data that allows us to directly calculate the share of the EAI market that is incontestable according to Prof. Willig's own definition.   The newly available, more comprehensive MMIT formulary coverage data produced as part of Prof. Willig's backup contains information not only about formulary restrictions on Auvi-Q (like the Sanofi MMIT data I relied upon in my opening merits report), but also about the formulary restrictions on the EpiPen (which was not in the MMIT data available to

---

[789] Willig Merits Report ¶107.

[790] Willig Merits Report ¶107 (asserting that all of Mylan's contracts would pass his version of the Discount Attribution Test so long as the contestable demand was at least 61.4% of the market (i.e., that the incontestable demand was no more than 38.6% of the market); *id*. ¶108 (asserting that the evidence indicates that the non-contestable demand is "well within the range at which all of Mylan's rebate agreements would pass the incremental cost test.").

[791] Willig Merits Report ¶112.

Highly Confidential: Subject to Protective Order

me when I submitted my opening merits report).  Consequently, by combining the IQVIA plan-level EAI share data with the new MMIT formulary coverage data, one can directly measure EpiPen's share at plans that did not cover the EpiPen but did not restrict Auvi-Q's formulary position.[792]  Figure 115 below shows that EpiPen's share bottomed-out at around 60% among plans that did not cover the EpiPen and did not restrict Auvi-Q's formulary position.[793]  In other words, the share of the EAI market that is incontestable is at least 60%, even according to Prof. Willig's own extremely conservative definition of how to measure the incontestable share.  If one instead measures the EpiPen's EAI incontestable share as its share among plans that restricted neither the EpiPen or Auvi-Q, then the incontestable share is closer to 80%.

---

[792] For this analysis, I use the methodology for matching the IQVIA data to the MMIT data proposed by Dr. Johnson, but with the bridge data extended back to January 2013. See *supra* Part VII.B.1.  Note importantly that extending the bridge data back to January 2013 has no effect on the EAI shares in 2015 (because the bridge data begins in 2014).

[793] I consider a plan to restrict a product's formulary coverage if it does not cover that product or subjects that product to step therapy or prior authorization. This follows the same definition of restrictive formulary conditions used in my foreclosure share and foreclosure regression calculations.

Highly Confidential: Subject to Protective Order

**Figure 115: EpiPen's EAI Share at Plans that Indicate the Incontestable Share for the EpiPen**[794]



412.  Curiously, Prof. Willig did not attempt to use this systematic data to directly calculate the share of the market that was incontestable. Instead, he cites a hodgepodge of documents tangentially related to the point. As Prof. Willig acknowledges, most of the documents that he relies on describe "assumptions" about what might happen (rather than actual data on what happened).[795] And some of the evidence Prof. Willig relies upon for this point isn't even about the EAI market at all, but about entirely different product markets.[796]  Given that we have systematic data that directly allows us to determine precisely what share the EpiPen achieved

---

[794] "MREPLY40 EpiPen Incontestable Share Stats.xlsx".

[795] See, e.g. Willig Merits Report ¶115 ("Mylan . . . **assumed** that EpiPen's share would drop"); *id*. ¶116 ("This is just one piece among a wide range of evidence in the record that demonstrates that PBMs have the ability to move substantial EAI volume away from EpiPen. For example, … Mylan **assumed**"); *id*. ¶117 ("Sanofi **assumed** . . ."); *id*. ¶119 ("MedImpact **estimated that if** it applied step therapy to either EpiPen or Auvi-Q…").

[796] Willig Merits Report ¶120 ("Mylan and Sanofi were all aware of PBM's success at excluding **other market leading products**").

Highly Confidential: Subject to Protective Order

when its formulary coverage was restricted, there is no need to rely on "assumptions" about what might have happened.

413.   Further, it is worth noting that Prof. Willig is cherry-picking the handful



but to point out that, given the millions of documents that have been produced in this case, one can easily find some documents that suggest lower incontestable shares and others that suggest higher incontestable shares, which underscores why one should rely on the systematic data, rather than documents about "assumptions" or "estimates," when such data is available.

414.   Prof. Willig also asserts that there was little incontestable demand for the EpiPen based on his claim that "[w]here PBMs did exclude EpiPen, they were able to move the large majority of share to Auvi-Q."[798]  Prof. Willig bases this claim on two documents and one deposition that he says show EpiPen's share dropping significantly at plans that excluded Auvi-Q from the formulary.[799]  To begin with, it is not clear that the EpiPen shares that Prof. Willig cites in support of this point are even accurately calculated; one of the documents he cites explicitly states that it is providing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Nevertheless, even if one assumes that these documents accurately reflect EpiPen's shares at these particular handful of plans, they clearly do not accurately reflect EpiPen's overall average share at plans that restrict EpiPen but not Auvi-Q, which the IQVIA and MMIT data show to be at least 60%.  In other words, the handful of plans that Prof. Willig focuses on to support his claim that EpiPen's share decreased sharply at plans that restricted the EpiPen are unrepresentative outliers.

---

[797] MYEP00254218 at 219 (April 30, 2013 internal Mylan email written by Mylan's "Director, National Accounts West", Bruce Foster. Regarding a plan that is considering trying to switch patients from EpiPen to Auvi-Q, Mr. Foster writes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[798] Willig Merits Part VI.B.4.b, ¶121.
[799] Willig Merits Report ¶121, citing MYEP01246195 (ESI High Performance formulary plans); MYEP00079145-46 (CVS Advanced Controlled Formulary); 30(b)(6) Douglas Brown Deposition.
[800] MYEP00079145-46.
[801] MYEP01246195, "ESI HPF" tab.

Highly Confidential: Subject to Protective Order

### 3. Price Protection Clauses

415. Prof. Willig implements his Discount Attribution Test under two alternative assumptions: (1) ignoring price protection clauses in Mylan's agreements (Figure 6a); and (2) accounting for the fact that some plans had price-protection clauses that provided larger rebates if EpiPen's WAC increased too quickly (Figure 6b). Despite implementing his Discount Attribution Test these two alternative ways, Prof. Willig provides no valid reason for ignoring rebates provided under the price protection clauses. If a plan was provided rebates under a price protection clause, then its incremental price is lower as a result, and Prof. Willig provides no reason to ignore that.

416. The only purported justification Prof. Willig provides for ignoring price protection rebates is his claim that the precise value of a price protection clause is not known "with certainty ex ante, i.e., at the time an agreement is entered."[802] Even accepting Prof. Willig's premise that the exact value of price protection rebates is uncertain when the agreement is signed, Prof. Willig provides no justification for *assuming* that the value is $0, which is what he does by ignoring the price protection rebates altogether in his Figure 6a. Further, even if one believed that the "ex ante" value of the price protection clauses was the relevant figure, the actual amount of price protection rebates provided should be a reasonably precise, unbiased estimator of the expected value of the price protection rebates ex ante, given the relative uncontroversial premise that the parties to the contracts are competent at their jobs and therefore have reasonably accurate predictions about how prices will change in the future.

### 4. Correcting These Errors Shows that Many or Most of Mylan's Agreements Fail the Discount Attribution Test

417. Prof. Willig implements the Discount Attribution Test not by directly calculating the relevant measures of incremental price and cost given an assumed level of contestable demand, but rather instead by calculating the "breakeven" minimum level of contestable demand under which each contract would pass the DAT.[803]

418. Here, the data indicates that the contestable share of demand (which equals 100% minus the incontestable share of demand) is 40% according to Prof.

---

[802] Willig Merits Report ¶94.
[803] Willig Merits Report Figure 61.

Highly Confidential: Subject to Protective Order

Willig's definition (the share of all non-EpiPen EAIs at plans that restrict EpiPen's formulary position) and 20% according to a more accurate definition (the share of all non-EpiPen EAIs at plans that restricted neither Auvi-Q nor the EpiPen).[804]   That means if the "minimum contestable share" for a given contract is above 20%, then the plan fails the Discount Attribution Test according to my definition of incontestable share, and if the "minimum contestable share" is above 40%, then it also fails the Discount Attribution Test according to Prof. Willig's definition of incontestable share.

419.   **a. Many or Most of Mylan's Agreements Fail the DAT According to Prof. Willig's Own Implementation of the DAT, which Improperly Ignores Non-Marginal Recurring Costs**. Table 135 shows that, even of one does not change *anything* about Prof. Willig's implementation of the Discount Attribution test, 11 out of the 17 agreements included in Prof. Willig's analysis fail the DAT if one assumes that the contestable share is only 20% (as is indicated by the data under my definition).  Even if one both uses Prof. Willig's own calculation of the minimum contestable share to pass *and* what the data shows is the contestable share under his own definition (40%), then 3 of Mylan's agreements fail the DAT.  Table 135 uses Prof. Willig's own calculations of the minimum contestable share to pass the Discount Attribution test if one includes price protection clauses, given that Prof. Willig has not provided any valid reason to ignore those clauses.

---

[804] *Supra* section B.2.

Highly Confidential: Subject to Protective Order



420.   **b. Even More of Mylan's Agreements Fail the Discount Attribution Test if One Properly Accounts for Mylan's Marginal Non-Recurring Marginal Costs.**  I explained above in section C.1 that Prof. Willig improperly implemented the Discount Attribution Test because he ignored the non-marginal recurring costs that an equally efficient rival would have to repeatedly incur to remain in the market. If one properly accounts for Mylan's non-marginal recurring costs, then Mylan's total relevant cost per unit for implementing the Discount Attribution test is 1.7-1.8

---

[805] The minimum contestable shares in this table are exactly the same as in Prof. Willig's Figure 6b.

Highly Confidential: Subject to Protective Order

times higher than the cost he assumed.[806]  By mathematical definition, if the relevant measure of cost is higher, then the "minimum contestable share" at which any given agreement passes the DAT increases, and therefore all agreements become less likely to pass the DAT, holding all else equal.

421.   Table 136 below shows the "minimum contestable share" at which each agreement passes the Discount Attribution Test if one accounts for Mylan's non-marginal recurring costs but leaves every other aspect of Prof. Willig's DAT methodology unchanged.  It shows that, if one uses the correct cost measure, then 13 out of the 17 agreement that Prof. Willig analyzed fail the DAT if one assumes the actual contestable share is 20% (my definition) and 5 of the agreements fail the DAT if one assumes the contestable share is 40% (what the data shows is the contestable share according to Prof. Willig's definition).

---

[806] *Supra*  section C.1.



422.   In sum, the vast majority (13 out of 17, or 76%) of the Mylan agreements that Prof. Willig analyzed fail the Discount Attribution Test if one uses the correct measure of cost (including non-marginal recurring costs) and the correct measure of the contestable share of demand (20%).  This indicates that Mylan's agreements had the potential to force an equally efficient rival to completely exit the market, and/or to deter an equally efficient rival from entering the market.

---

[807] "MREPLY30 modified figures 5a,5b,6a and 6b.xlsx".

Highly Confidential: Subject to Protective Order

*5. Similar "Rival Tax" Test Shows that Bundling of Contestable and Incontestable Demand, Not Price, is the Predominant Method of Exclusion*

423.   Prof. Willig asserts that "in the presence of non-contestable demand" the Discount Attribution Test is an "appropriate framework to evaluate Mylan's conduct."[808]   Prof. Willig provides no explanation why he ignores other economic tests designed to evaluate the potential anticompetitive effects in the presence of incontestable demand. For example, Prof. Scott-Morton and her co-author have published an economic test in the Antitrust Law Journal that quantifies the effective "tax" on rival sales imposed by contracts that condition rebates or discounts on restricting rivals' in some way.[809] The goal of this "tax" test is to determine the effective "tax" that is being imposed by the restrictive condition itself, separate from the effect of the rebate or discount provided to customers who accept the restriction. The formula for isolating the "tax" on rival purchases caused by the restrictive condition (here, restricting rival's formulary position) is calculated as follows:

$$Tax\ on\ Rival\ Price\ from\ Restrictive\ Condition = \frac{(share_{\Delta}^{r})(\%rebate)}{\%contestable} - \%rebate$$

424.   In this formula, $share_{\Delta}^{r}$ is the share of sales the defendant makes if the customer abides by the restriction.  Prof. Willig has functionally assumed that this share is 100% for EpiPen's formulary restrictions, so I use that same figure here for calculating the tax on rivals.   The variable $\%rebate$ equals the rebate that is conditioned on the restriction; I rely on the contract index Prof. Willig created and used to implement his Discount Attribution Test for the values of this this variable. Lastly, the variable $\%contestable$ equals the share of the market that is contestable. As shown above in Section B.2, the contestable share is 40% under Prof. Willig's

---

[808] Willig Merits Report Part VI.B.2 title, ¶104.

[809] Scott Morton & Abrahamson, *supra* note ; ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 510 (3d ed. 510) (Professor Fiona Scott Morton and Zachary Abrahamson show that a loyalty discount means that, to compete for all contestable demand, a rival cannot simply match the loyal price, but rather must charge a price that is discounted from the defendant's disloyal price by the **loyalty threshold times the loyalty discount divided by the contestable share of demand**. The difference between that figure and the loyalty discount tell us the tax on rival sales that the loyalty condition is imposing beyond any effect of the loyalty pricing itself. For example, suppose the threshold for receiving a loyalty discount is 90% of purchases, the loyalty discount is 20%, and 30% of demand is contestable. Then the rival cannot compete by discounting its price to match the loyalty discount of 20%, but rather would have to charge a price that reflects a (.9)(.2)/.3 = 60% discount from the defendant's disloyal price. The difference between 60% and 20% indicates that a 40% tax on rival sales is being imposed by the loyalty condition itself, separate from the effect of the loyal pricing.").

Highly Confidential: Subject to Protective Order

definition and 20% under my definition. Table 137 below shows that Mylan's restrictive conditions effectively imposed significant taxes on rival EAIs' prices, even if one conservatively uses Prof. Willig's definition of incontestable share, his own contract index, and his own assumption about the share EpiPen would achieve if the customer accepted the restriction.[810]



425.   For all Mylan's contracts that involved rebates conditioned on formulary restrictions, the tax was quite high.  Under my definition of contestable share, the tax ranges from 20-163%.  Under Willig's definition of contestable share, the tax ranges from 8-61%.  "Given that standard market definition methodology deems a 5% price difference significant enough to define an entirely different market, . . . any tax above 5% would seem significant because it requires the a rival

---

[810] These taxes are also significant (up to 142%) if one conservatively assumes that Mylan would only have a 90% share if the customer accepted the restriction. *See* "MREPLY45 tax on rivals.xlsx'" (sharedr90 tab).

[811] "MREPLY45 tax on rivals.xlsx'" (sharedr100 tab).

Highly Confidential: Subject to Protective Order

to price more than 5% below the defendant's loyal price to compete for all contestable sales."[812]  Proof of such a tax directly shows that the loyalty condition, not price, is the predominant mechanism of exclusion because "in such cases the loyalty condition imposes a restraining tax on purchases from the rival over and above the effect of the loyal pricing itself, so that the mechanism of exclusion for that tax is clearly the loyalty condition rather than the price."[813]

### 6. Issues Related to the Price-Cost Test

426.  **a. Prof. Willig is Wrong that Mylan and Sanofi are on a "Level Playing Field" When Mylan Bundles Contestable and Incontestable Demand**. In his Appendix A, Prof. Willig presents a hypothetical that purports to show that Mylan and Sanofi are "on a level playing field" even when Mylan conditions rebates on exclusivity in the presence of incontestable demand.  Boiled down, Prof. Willig's bases his conclusion that "Mylan and Sanofi are on a level playing field" on the premise that: (a) the incremental revenue Mylan earns if the PBM is exclusive, divided by the additional quantity Mylan sells if the PBM is exclusive, equals (b) the maximum price at which the PBM chooses to rejected exclusivity.

427.  Although this premise is true by mathematical definition, the conclusion that "Mylan and Sanofi are on a level playing field", i.e., that no harm to competition has been done, does not follow from that premise.  Prof. Willig's Appendix A has at least two major flaws: (a) it completely ignores the potential anticompetitive effects of bundling contestable and incontestable demand; and (b) it assumes that Mylan is providing a real discount for exclusivity, rather than conditioning old prices on exclusivity, as was the case here.

428.  **b. Prof. Willig's Appendix A Ignores the Potential Anticompetitive Effects of Bundling Contestable and Incontestable Demand**.  Prof. Willig's Appendix A fails to show that conditioning rebates on exclusivity in the presence of incontestable demand does not harm competition for the simple reason that it does not even consider the potential ways in which conditioning rebates on exclusivity can harm competition.  Conditioning rebates on exclusivity in the presence of incontestable demand can harm competition by: (i) forcing the rival to exit the market; (ii) raising the rivals costs, and (iii) reducing the intensity of competition between the defendant and the rival.[814]  Prof. Willig's Appendix A does not even

---

[812] *See* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 510-511 (3d ed. 2018),
[813] *See* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 512 (3d ed. 2018).
[814] *See supra* note 777.

Highly Confidential: Subject to Protective Order

consider Mylan or Sanofi's costs, and therefore is not relevant to whether conditional rebates can harm competition by raising a rivals' costs or forcing its exit.

429.   If one merely adds the existence of costs to Prof. Willig's model, then it shows that conditioning rebates on exclusivity in the presence of incontestable demand can cause the worst possible anticompetitive harm from foreclosure (forced rival exit) without making other changes.   In Prof. Willig's Appendix A example, with the conditional rebates, Sanofi makes no sales unless it offers the PBM less than $200/unit, in which case it sells 500 units to the contestable portion of the market, thus earning total revenue of $100,000.[815]   Consequently, if it would cost Sanofi more than $100,000 to stay in the market and sell those 500 units, then in Prof. Willig's example the conditional rebates would force Sanofi to exit the market entirely, thus allowing Mylan to charge the 100% monopoly price.   For example, suppose that Mylan's marginal cost is $100/unit and that it costs Mylan an additional $50,000 each year in overhead to stay in the market (for example from marketing, sending sales reps to physicians, and general and administrative expenses). Then the cost of an equally efficient rival staying in the market would be $50,000 + ($100 * 500 units) = $100,000, which is just as high as the maximum revenue a rival could earn in the market with Mylan's conditional rebating scheme ($100,000). Therefore, with this cost structure, Mylan's conditional rebating scheme in Willig Appendix A would force rival exit and thus allow Mylan to continue charging 100% monopoly prices, just like if Sanofi had never entered the market.

430.   Indeed, Prof. Willig's Appendix A absurdly implies that Mylan is economically irrational **unless** Mylan's conditional rebate offer is sufficient to force Sanofi's exit, increase Sanofi's costs, or reduce the intensity of competition.   In the absence of those anticompetitive effects, the profit-maximizing strategy for Sanofi, given Mylan's offer, would be to price at $199 and earn all of the contestable demand, leaving Mylan to sell only to the incontestable portion of the market.   Thus, absent those anticompetitive effects, Mylan's conditional rebate offer would not increase Mylan's profits at all, relative to simply pricing as a 100% monopolist to the incontestable portion of the market.   The fact that Prof. Willig's hypothetical conditional rebate is ineffectual (in the absence of anticompetitive effects) is not only economically irrational (why offer it if it has no effect?), but also contrary to the facts of this case, which undisputedly show that Mylan's conditional rebates were regularly effective at inducing PBMs and plans to exclude Auvi-Q from formulary coverage.

---

[815] Willig Merits Report Appendix A, Figure 15.

Highly Confidential: Subject to Protective Order

431.   **c. Prof. Willig's Appendix A Absurdly Implies that Mylan's Profit-Maximizing Strategy Is Simply to Charge Incontestable Buyers an Infinite Price and Cede the Entire Contestable Portion of the Market to Sanofi**.  Prof. Willig's Appendix A is irrelevant also because its assumptions lead to absurd conclusions about the firms' profit-maximizing strategy that have essentially no relevance to this case.  Because Prof. Willig assumes that the non-contestable portion of Mylan's demand is perfectly inelastic (in Prof. Willig's words, that "Mylan will win [the non-contestable consumer's] sales no matter what,"[816]), the equilibrium strategy in his Appendix A hypothetical is for Mylan to simply charge an infinite price to the non-contestable portion of demand (thus earning infinite profits) and cede the entire contestable portion of demand to Sanofi.  Obviously, in the real world, Mylan did not set an infinite price, nor did it cede all of the contestable demand to Sanofi.

---

[816] Willig Merits Report ¶284.

Highly Confidential: Subject to Protective Order

# EXHIBIT A

## DOCUMENTS RELIED UPON

## Academic and Industry Literature:

Edlin, Aaron; Hemphill, C. Scott; Hovenkamp, Herbert J.; and Shapiro, Carl, *Activating Actavis*, *Faculty Scholarship at Penn Law*. 184 (2013)

Aaron Edlin, Scott Hemphill, Herbert Hovenkamp & Carl Shapiro, *Actavis and Error Costs: A Reply to Critics,* ANTITRUST SOURCE, Oct. 2014

ABA SECTION OF ANTITRUST LAW, ECONOMETRICS 273 (2d ed. 2014)

Adam Greene & D. Dewey Steadman, RBC Capital Mkts., *Pharmaceuticals: Analyzing Litigation Success Rates 1* (2010)

American Medical Association 2018 "Prior Authorization (PA) Physician Survey, available at /www.ama-assn.org/system/files/2019-02/prior-auth-2018.pdf

AREEDA & HOVENKAMP, *ANTITRUST LAW* ¶1753c (3d Ed. 2011)

Boerschlein and Cyr, *Intricacies of the 30-Month Stay in Pharmaceutical Patent Cases*, American Pharmaceutical Review, March 25, 2018

Brander & Spencer, *Tacit Collusion, Free Entry, and Welfare*, 33 JOURNAL OF INDUSTRIAL ECONOMICS (March 1985)

Brennan, *Bundled Rebates as Exclusion Rather than Predation*, 4 J. COMP. L. & ECON. 335 (2008)

Bret Dickey, Jonathan Orszag & Laura Tyson, *An Economic Assessment of Patent Settlements in the Pharmaceutical Industry*, 19 ANNALS HEALTH L. 367 (2010)

Crooke et al*, Effects of Assumed Demand Form on Simulated Postmerger Equilibria*, 15 REVIEW OF INDUSTRIAL ORGANIZATION 205 (1999)

David Reiffen & Michael R. Ward, *Generic Drug Industry Dynamics*, 87 REV. ECON. & STAT. 37 (2005)

Highly Confidential: Subject to Protective Order

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEX. L. REV. 283 (2012)

Elhauge & Wickelgren, *Robust Exclusion and Market Division Through Loyalty Discounts*, 43 INT'L J. INDUS. ORG. 111 (2015)

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009)

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397 (2009)

Elhauge, U.S. ANTITRUST LAW & ECONOMICS 2 (3d ed. 2018)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs,* 112 YALE LAW JOURNAL 681 (2003)

Farrell, *Deconstructing Chicago on Exclusive Dealing*, 50 ANTITRUST BULLETIN 465 (2005)

Frank & Salkever, *Generic Entry and the Pricing of Pharmaceuticals*, 6 JOURNAL OF ECONOMICS & MANAGEMENT STRATEGY 75. (Spring 1997)

Gavil, *Exclusionary Distribution Strategies by Dominant Firms*, 72 ANTITRUST L.J. 3 (2004)

Greenlee, Reitman, & Sibley, *An Antitrust Analysis of Bundled Loyalty Discounts*, 26 INTERNATIONAL J. INDUSTRIAL ORG. 1132 (2008);

James A. Langenfeld, *The Merger Guidelines As Applied*, THE ECONOMICS OF THE ANTITRUST PROCESS

Joseph Farrell, *Deconstructing Chicago on  Exclusive Dealing*, 50 ANTITRUST BULL. 465 (2005)

Highly Confidential: Subject to Protective Order

Kai-Uwe Kuhn, *The Coordinated Effects of* Mergers, in HANDBOOK OF ANTITRUST ECONOMICS at 105

Kaplow & Shapiro, *Antitrust*, in 2 HANDBOOK OF LAW & ECONOMICS 1073, 1203-1210

Keating, Orszag, Willig. "*The Circle Principle in Market Definition*", The Antitrust Source Vol. 17 (2018)

Kimberly A. Moore, *Empirical Statistics on Willful Patent Infringement*, 14 FED. CIR. B.J. 227 (2005)

Law et al*; Effect of Prior Authorization of Second-Generation Antipsychotic Agents on Pharmacy Utilization and Reimbursements*, 59 PSYCHIATRIC SERVICES 540 (May 2008)

Louis Kaplow & Carl Shapiro, *Antitrust*, *in* 2 HANDBOOK OF LAW & ECONOMICS 1073

LOUIS KAPLOW, COMPETITION POLICY AND PRICE FIXING 269 (2013)

MacKinnon & Kumar, *Prior Authorization Programs: A Critical Review of the Literature*, 7 Journal of Managed Care Pharmacy 297

MICHAEL D. WHINSTON, *LECTURES ON ANTITRUST ECONOMICS* 144-47 (2006)

NICHOLSON & SNYDER, *INTERMEDIATE MICROECONOMICS AND ITS APPLICATION* 429 (11th ed., Cengage Learning: 2009)

PHILLIP AREEDA, ANTITRUST ANALYSIS 199-200 (3d ed. 1981)

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 740d1 (2d ed. 2002)

PINDYCK & RUBINFELD, *MICROECONOMICS* 500 (8th ed. 2012)

Prince et al., *Underuse of epinephrine for the treatment of anaphylaxis: missed opportunities*. Journal of Asthma and Allergy 2018

Rasmusen, et al., *Naked Exclusion*, 81 AM. ECON. REV. 1137 (1991)

Highly Confidential: Subject to Protective Order

Scott Morton & Abrahamson   *A Unifying Analytical Framework for Loyalty Rebates,*  81 ANTITRUST LAW JOURNAL 777 (2017)

Scott Morton, Fiona M. and Abrahamson, Zachary G, *A Unifying Analytical Framework for Loyalty Rebates* (September 1, 2016)

Segal & Whinston, *Naked Exclusion: Comment*, 90 AM. ECON. REV. 296 (2000)

Simpson & Wickelgren, *Naked Exclusion, Efficient Breach, and Downstream Competition*, 97 AM. ECON. REV. 1305 (2007)

Spector, *Loyalty Rebates*, 1(2) COMPETITION POLICY INT'L 89 (Autumn 2005)

Stefanidis, *Selective Contracts, Foreclosure, and the Chicago School View*, 41 J.L. & ECON. 429 (1998)

Stephen Salop, *The Flawed Incremental Price Test*, 81 ANTITRUST LAW JOURNAL 371 (Issue 2, 2017)

STOCK & WATSON, *INTRODUCTION TO ECONOMETRICS* 2ND EDITION

Tirole, *THE THEORY OF INDUSTRIAL ORGANIZATION* 240 (1988)

Tori Marsh, *Prices for Brand Drugs Spike Before a Generic is Released: Here's Why,* GOODRX (July 27, 2018)

Walter Nicholson & Christopher Snyder, *INTERMEDIATE MICROECONOMICS AND ITS APPLICATION* (11TH ED., CENGAGE LEARNING: 2009).

Werden, *Demand Elasticities in Antitrust Analysis* 66 ANTITRUST L.J. 363 (1998)

WHINSTON, LECTURES ON ANTITRUST ECONOMICS 144-47, 166 (2006)

William J. Baumol, *Predation and the Logic of the Average Variable Cost Test*, 39 J.L. & ECON. 49 (1996)

WOOLDRIDGE, *INTRODUCTORY ECONOMETRICS* 320-322 (5th ed. 2013)

Highly Confidential: Subject to Protective Order

## Depositions:

Brown Deposition
Elhauge Merits Deposition
Kronberg Deposition
Shia (Kaiser) Deposition

## Expert Reports:

Elhauge Merits Report
Johnson Merits Report
Orszag Report
Peck Report
Torrance Merits Report
Willig Merits Report Supplement
Willig Report

## Bates Numbered Documents:

CVSCM_EPI_000000001
KALEO-00042499
MYEP00000294
MYEP00000530
MYEP00000538
MYEP00000614
MYEP00000661
MYEP00000678
MYEP00000681
MYEP00079145
MYEP00086249
MYEP00087339
MYEP00087364
MYEP00088189
MYEP00093239
MYEP00140813
MYEP00140814
MYEP00142246
MYEP00251967

Highly Confidential: Subject to Protective Order

MYEP00254218
MYEP00260323
MYEP00260328
MYEP00262837
MYEP00266842
MYEP00275501
MYEP00454644
MYEP00474084
MYEP00527619
MYEP00603647
MYEP00624286
MYEP00664101
MYEP00723398
MYEP00723720
MYEP00723721
MYEP00723818
MYEP01036549
MYEP01207989
MYEP01228274
MYEP01246195
MYEP01362752
MYEP01378720
MYEP01378726
PFE_EPIPEN_AT00007925
SAN-EPI-0171340
SAN-EPI-0171341
SAN-EPI-0326335
SAN-EPI-0419546
SAN-EPI-1148855
SAN-EPI-1235127
Teva_EPI_MDL00006545
Teva_EPI_MDL00006558
Teva_EPI_MDL00006874
Teva_EPI_MDL00073293
Teva_EPI_MDL00462587
Teva_EPI_MDL00462609
Teva-Epi_002003

**Misc:**

Highly Confidential: Subject to Protective Order

An Overview of the Medicare Part D Prescription Drug Benefit." *The Henry J. Kaiser Family Foundation*, 18 Nov. 2019, www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit. Published: Nov 13, 2019.

August 20, 2018 Memorandum and Order to Dismiss, *In re EpiPen* Consumer Class Cases

Class Plaintiffs' Motion for Class Certification at 3 (Dec. 7, 2018).

DOJ/FTC Horizontal Merger Guidelines
"Does Medicare Cover EpiPens?" *Medicare & Medicare Advantage Info, Help and Enrollment*, www.medicare.org/articles/does-medicare-cover-EpiPens.

FDA Orange Book Patent and Exclusivity for N019340

"Health Insurance Coverage of the Total Population" www.kff.org/other/state-indicator/total-population

IQVIA Bridge File 201403 – 201512

Juliette Cubanski, et al. "How Much Has Medicare Spent on the EpiPen Since 2007?" *The Henry J. Kaiser Family Foundation*, 21 Sept. 2016, www.kff.org/medicare/issue-brief/how-much-has-medicare-spent-on-the-EpiPen-since-2007.

Kaiser Foundation Data on Health Insurance Coverage, available at www.kff.org/other/state-indicator/total-population/?currentTimeframe=0&selectedDistributions=employer&sortModel={"colId":"Location","sort":"asc"}.

"Mylan Specialty LP" https://www.bloomberg.com/profile/company/0133223D:US

"Mylan Specialty LP"https://www.empr.com/manufacture/mylan-specialty-l-p/

https://www.reuters.com/article/us-mylan-epipen-pfizer/pfizer-unit-meridian-under-civil-investigation-by-u-s-attorney-idUSKCN1QI3DJ

"Prescription Drugs (Outpatient)." *Prescription Drug Coverage*, www.medicare.gov/coverage/prescription-drugs-outpatient.

Highly Confidential: Subject to Protective Order

Solving the Mystery of Employer-PBM Rebate Pass-Through (rerun)," Drug Channels Institute, May 3, 2016, www.drugchannels.net/2016/05/solving-mystery-of-employer-pbm-rebate.html