IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION<br><br>*This Document Relates to Class Cases* | Case No. 2:17-MD-02785-DDC-TJJ<br>(MDL No. 2785) |

**THE MYLAN DEFENDANTS' RESPONSE TO PLAINTIFFS' BRIEF REGARDING CERTAIN EVIDENTIARY ISSUES**

The evidence at issue should be excluded because it is irrelevant and unfairly prejudicial and would result in a trial untethered to the remaining claim. That Plaintiffs spend half of their short brief reciting cases discussing general principles about the rules of evidence and antitrust claims—without ever actually tying the specific evidence they seek to admit back to those principles—demonstrates well the flaws in Plaintiffs' arguments for admission.

## I. THE EVIDENCE IS IRRELEVANT AND UNDULY PREJUDICIAL.

**WAC Increases**. Plaintiffs say they should be permitted to "lay[] out facts that are undisputed (like the fact and amount of Mylan's price increases)" so their experts can opine on topics like market definition, market/monopoly power, and damages. Br. 7-8. Mylan is not seeking to exclude information concerning the "fact and amount" of the WAC. *See* Dkt. 2515 at 1, 6. Indeed, the parties already stipulated to these figures, Dkt. 2169 ¶¶ 57-63, which Plaintiffs can introduce through their damages expert(s).

But Plaintiffs should not be able to argue to the jury that there was anything improper about the WAC price or the WAC price increases themselves. *See, e.g.*, Br. 7 (characterizing price increases as "massive[]"). Plaintiffs' exhibit list leaves little doubt that this is precisely what they intend to do; it is replete with documents that have titles such as "Mylan Billion Dollar Dru[g]" (Pls.' Ex. 242), "EpiPen hits Billion Dollard [sic] Second Year" (Pls.' Ex. 243), and "Bresch admits prices unconscionable" (Pls.' Ex. 245). These and other pretrial designations underscore how dangerous it would be to let Plaintiffs introduce anything like this to the jury and to do anything other than state the fact and amount of WAC.

The enormous prejudice Mylan would suffer from this evidence underscores this conclusion. *See* Dkt. 2515 at 8-9. This is a highly emotional issue, which was the subject of intense, prolonged, and often inaccurate media coverage—a fact Plaintiffs plainly hope to leverage

1

with the jury. That makes this the archetypal Rule 403 issue—one that would create "an undue tendency to suggest decision on an improper basis[.]" Fed. R. Evid. 403 advisory committee note.

And given how highly prejudicial this evidence is, it can only be admitted under Rule 403 if it is highly probative. But Plaintiffs barely make any relevance argument at all. Plaintiffs appear to say that WAC pricing is relevant to intent, stating that "WAC pricing is what Defendants could and did set to intentionally abuse their monopoly power." Br. 1. According to Plaintiffs' own argument, however, higher prices are the *result* of alleged monopolization, not evidence of *intent* to monopolize by keeping Teva's generic EAI off the market. Indeed, Plaintiffs' pricing arguments have nothing to do with the alleged delayed entry of Teva's generic at all. For this reason, none of Plaintiffs' case law, Br. 4-5, is on point. The question for the Court is not whether evidence of intent is ever relevant in an antitrust case, but whether the evidence *here* is so highly probative of Plaintiffs' generic delay claims that it outweighs the prejudicial effect. It is not.

**Two-Packs**. For the first time in the 5+ year history of this case—and less than two months before trial—Plaintiffs try to resurrect their two-pack theory by arguing that Mylan sold two-packs to "grow[] the market to a size harder for a generic to enter." Br. 7, 6. The Court should reject this effort for a host of reasons. First, this has *never* been the basis for Plaintiffs' antitrust claim, and it is not in the Pretrial Order, which is dispositive. *See* Dkt. 2515 at 5-6, 8.[1]

Second, Plaintiffs' newfound theory is completely disconnected from what remains in the case. *Plaintiffs offer no evidence—or even any argument—to explain why discontinuing single-packs had anything to do with purportedly delaying Teva's generic*. Indeed, tossing around terms like "barriers to entry" does not make the two-pack issue any more relevant or the theory any more sensical. Nothing about the size of a market makes it harder for a generic to enter; a larger market

---

[1] The only antitrust argument Plaintiffs ever alleged about two-packs was their abandoned tying claim. They otherwise pled two-packs only in connection with RICO (dismissed) and consumer protection/unjust enrichment (abandoned).

2

is more attractive because the generic has the opportunity to make more money.

The single document (Pls.' Ex. 3) on which Plaintiffs now rely for the first time does not suggest otherwise. The "potential generic defense" that Plaintiffs cite (slide 2) has nothing to do with delay of Teva's EAI—as shown by slide 4 (titled "Generic EpiPen Defense"), which Plaintiffs ignore. As slide 4 states, two-packs were a potential strategic reaction to the *launch* (not delay) of a generic, because Mylan could offer two-packs and simultaneously "launch a coupon program" to maintain loyalty to the brand. In other words, the referenced "generic defense" assumes the *opposite* of Plaintiffs' claim for trial—i.e., that Mylan would *compete* with generics by lowering out-of-pocket costs—not prevent generic entry.[2] This is not a factual dispute for the jury. It is a question of gatekeeping. Plaintiffs' mischaracterization of a document cannot possibly be enough to open the door to a separate issue based on a theory Plaintiffs never raised, never took discovery on, and did not include in the Pretrial Order (and thus waived). *See* Dkt. 2515 at 5-6, 8.[3]

Plaintiffs' effort to lump in two-packs with their WAC argument is equally specious. Plaintiffs now claim—yet again for the first time—that they somehow need two-pack evidence to show that Mylan had the power to raise EpiPen's price. But that has never been their antitrust theory; this, too, is not in the Pretrial Order; it is not what their experts opined; and it is wrong. The only "pricing" question for the jury (if any) will be whether a lower-priced generic would have been available sooner but-for generic delay. Allowing Plaintiffs to say that the class would

---

[2] By introducing a coupon program, Mylan could "guarantee[] [a] low co-pay for EpiPen," meaning that consumers could get two branded EpiPens for the same co-pay as a single generic. *See* Pls.' Ex. 3 at 4; *see also id*. at slide 5 (noting that two-packs and a savings card could be used to avoid losing business "to generic single dose").

[3] Plaintiffs deposed the author of this slide deck—including questioning him about the deck—but did not ask him *a single question* about the slide on which they now place so much weight. Plaintiffs also cite one 35-year old case that is, in turn, quoting a 1968 antitrust hornbook, to argue that "[p]roof of specific intent to engage in predation may be in the form of statements made by the officers or agents of the company . . ." Br. 5 (quoting *Reazin v. Blue Cross & Blue Shield of Kansas, Inc*., 635 F. Supp. 1287, 1332 (D. Kan. 1986)). But for all the reasons explained herein, the statement they are highlighting does not show "specific intent to engage in predation," but rather intent to compete with a generic product through coupons and two-packs.

have paid less but-for *two-packs* is an entirely different question.[4]  In fact, Plaintiffs' expert had a completely separate damages model for two-packs, distinct from generic delay.

In recent months, the Court has repeatedly shut down attempts to reinsert two-packs into this case.  It would be inappropriate, and highly and unfairly prejudicial, to now allow Plaintiffs to make their two-pack pricing and damages arguments to the jury anyway.  *See* Dkt. 2515 at 8-9.

**Provigil.**  Provigil does not appear in Plaintiffs' Complaint, has never been a claim in this case, and is absent from the Pretrial Order.  That should be the end of the matter.  *See* Dkt. 2515 at 8.  Indeed, that the parties are having to explain what the Provigil issue even is, two months before trial, should be proof enough that this issue is irrelevant and should not be tried.  And, needless to say, Plaintiffs' recitation of "the Provigil experience" (a settlement between Mylan and Cephalon, not Teva, six years before the EpiPen/Nuvigil settlements, and before Mylan even had the rights to EpiPen) is wildly off base; no court ever found that Mylan or Teva entered any pay-for-delay scheme.  *See* Dkt. 2515 at 4.

But Provigil should also be excluded because it is quintessential "prior bad act" evidence that Rule 404(b) expressly bars and that flunks Rule 403's balancing test.  *See* Dkt. 2515 at 10.  Plaintiffs want to inject Provigil to insinuate, without evidence, that Mylan allegedly participated in a pay-for-delay settlement before and so probably did so again.  That is exactly what Rule 404(b) forbids.  *See, e.g.*, *United States v. Castillo*, 140 F.3d 874, 882 (10th Cir. 1998) ("prior bad act" evidence inadmissible because "the jury may infer that the defendant is [a bad actor] inclined to violate the law"); *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 785 (5th Cir. 2018) (404(b) evidence inadmissible to show that defendant was a bad actor that acted in conformity with its bad character).  Plaintiffs claim they only want to show

---

[4] Footnote 1 in Plaintiffs' brief proves this point.  Being "forced to purchase 2-Paks at an exorbitant amount" when a plaintiff "only needed one," Br. 8 n.1, has *never* been Plaintiffs' generic delay damages theory.

4

"Mylan's knowledge, plan, and preparation in structuring the agreements so as to minimize regulatory scrutiny and civil liability." Br. 10. But that is, to put it charitably, a stretch. Plaintiffs do not need Provigil to argue that Mylan wanted to minimize scrutiny, *id.,* and the unfair prejudice of Provigil to Mylan would greatly outweigh whatever probative value it could have.[5]

## II.     HORSES AND BARNS (AND ZEBRAS).

At last, there is also the horse/barn problem. This fall, several zebras escaped from a farm. They were on the lam for weeks. Ultimately, the plan devised to catch them was . . . to release more zebras.[6] That is precisely what would happen here. There is no way to keep these topics narrowly cabined, and if Plaintiffs are allowed to open the door, Mylan would have no choice but to introduce its own evidence and witnesses on topics like the drug pricing system, coupon and patient assistance programs, PBM rebating, the medical necessity of two-packs, and the details of the decade-long Provigil litigation and ultimate settlement—thus creating distracting and unmanageable mini-trials on irrelevant topics. *See* Dkt. 2515 at 3-5. Thus, even if any of this evidence were relevant (it is not), and even if the risk of prejudice and confusion were insufficient to outweigh that relevance (it plainly is), this is an independent and sufficient basis to exclude it. *See, e.g.*, *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1194 (10th Cir. 1997); *BHC Dev., LC v. Bally Gaming, Inc.*, No. 12-2393, 2014 WL 524665, at *8 (D. Kan. Feb. 10, 2014) (similar).

---

[5] Plaintiffs cite *United States v. Suntar Roofing, Inc.*, 897 F.2d 469 (10th Cir. 1990), to argue that "similar acts" evidence can be admitted to prove intent to restrain trade. Br. 9-10. But there, the court found that the "similar acts" were "close in time to the offense charged," (unlike here) and that the evidence was properly offered to prove "lack of mistake" (a defense Mylan has not raised). 897 F.2d at 479. *Suntar Roofing* is, therefore, inapposite.

[6] https://www.washingtonian.com/2021/10/19/new-plan-for-catching-the-fugitive-maryland-zebras-more-zebras/.

Dated: December 2, 2021                                Respectfully submitted,

        /s/ Adam K. Levin
Adam K. Levin
David M. Foster
Carolyn A. DeLone
Kathryn M. Ali
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
adam.levin@hoganlovells.com

Brian C. Fries, #15889
James Moloney, #23786
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Telecopier: (816) 292-2001
bfries@lathropgpm.com
jmoloney@lathropgpm.com

*Counsel for the Mylan Defendants*