# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN RE: EpiPen (Epinephrine
      Injection, USP) Marketing,
      Sales Practices and Antitrust
      Litigation

(This Document Applies to Consumer
Class Cases)

MDL No:  2785

Case No. 17-md-2785-DDC-TJJ

## MEMORANDUM AND ORDER

In February 2020, the court certified a Rule 23(b)(3) class action brought by consumer

and third-party payors of the EpiPen—an epinephrine auto-injector ("EAI") used to treat

anaphylaxis—who allege state antitrust violations premised on a generic delay theory.  Doc.

2018-1 at 126–28; *see also* Doc. 2169 at 42 (Pretrial Order ¶ 4.a.).  Generally, the class plaintiffs

allege that the Mylan Defendants[1]—who marketed and sold the EpiPen—violated certain state

antitrust laws by entering an unlawful reverse payment settlement that delayed generic entry of a

competing generic EAI and stifled competition in the EAI market.  *See* Doc. 2169 at 15–17, 42,

44–45 (Pretrial Order ¶¶ 3.a.1.b., 4.a., 4.d.).

The Mylan Defendants now ask the court to decertify the state law antitrust class.  *See*

Doc. 2389 (Mylan Defendants' Motion to Decertify the State Antitrust Class With Respect to

Plaintiffs' Generic Delay Claim).  They argue that a recent Supreme Court decision requires the

court to decertify the state antirust class because "[e]very class member must have Article III

standing in order to recover individual damages."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

---

[1]      The Mylan Defendants include Mylan N.V., Mylan Specialty L.P., Mylan Pharmaceuticals Inc., and Heather Bresch.  Doc. 2169 at 1.  This Order refers to these four defendants collectively as "the Mylan Defendants" or "Mylan."

2208 (2021). Here, the Mylan Defendants argue, some class members are brand loyalists— meaning they would have purchased EpiPen even if a generic was available on the EAI market. So, according to the Mylan Defendants, the brand loyalist class members have sustained no injuries from any generic delay (even if it occurred). As a consequence, the Mylan Defendants argue the court should decertify the state law antitrust class action because the class includes uninjured class members who lack standing.

The class plaintiffs filed an Opposition to the Motion to Decertify (Doc. 2404). The Mylan Defendants filed a Reply (Doc. 2424; *see also* Doc. 2423-1 (sealed version)). Then, the class plaintiffs filed a Motion for Leave to File a Surreply (Doc. 2437). And, the Mylan Defendants filed a Response, opposing the class plaintiffs' Motion for Leave to File a Surreply (Doc. 2447). The matter thus is fully briefed, and the court now is prepared to rule.[2]

For reasons explained below, the court grants in part the Mylan Defendants' Motion to Decertify the State Antitrust Class (Doc. 2389) and denies the motion in part. The court grants the motion in just two respects: (1) The court grants Mylan's motion to decertify the portion of the state law antitrust class action asserting claims under the laws of Nevada and North Carolina because no named plaintiff purchased an EpiPen in those two states after the alleged but-for generic entry date, and thus, no named plaintiff sustained injury under the antitrust laws of either state based on any generic delay; and (2) the court grants Mylan's unopposed request to dismiss plaintiff Anastasia Johnston's claims because she sustained no financial injury. The court denies Mylan's motion in all other respects.

---

[2] The Mylan Defendants' motion asks the court to set the matter for oral argument "if the Court believes that would be helpful." Doc. 2389 at 2. Our local rule, D. Kan. Rule 7.2, gives the court discretion to "set any motion for oral argument or hearing at the request of a party or on its own initiative." The court finds here that the parties' extensive papers adequately argue the issues raised by the Mylan Defendants' Motion to Decertify. Oral argument isn't necessary or consistent with Fed. R. Civ. P. 1. So, the court declines to set oral argument on this motion.

Also, the court grants the class plaintiffs' Motion for Leave to File a Surreply (Doc. 2437). The court begins with the Surreply issue.

## I.     Class Plaintiffs' Motion for Leave to File a Surreply

The class plaintiffs ask the court for leave to file a Surreply. They assert that Mylan's Reply "raise[s] *four* new, unfounded issues that warrant a short response." Doc. 2437 at 2. Mylan opposes the request for leave to file a Surreply, arguing that (1) plaintiffs could have raised the Surreply's arguments earlier in the briefing, and (2) Mylan's Reply didn't raise new arguments improperly but, instead, simply responded to arguments presented by plaintiffs' Opposition to the Motion to Decertify.

Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply. D. Kan. Rule 7.1(a) & (c). Surreplies typically are not allowed. *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006). Instead, surreplies are permitted only with leave of court and under "rare circumstances." *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998) (citations omitted). As an example, when a moving party raises new material for the first time in a reply, the court should give the nonmoving party an opportunity to respond to that new material (which includes both new evidence and new legal arguments) in a surreply. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003). The rules governing filing of surreplies "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." *Humphries*, 1998 WL 982903, at *1 (citation omitted).

Here, the court disagrees with plaintiffs that the Reply asserts four new arguments. Each argument responds directly to something that class plaintiffs assert in their Opposition. So, the arguments aren't necessarily "new." Yet, the court recognizes, the specific arguments don't surface in the briefing until Mylan's Reply. And, Mylan has submitted new factual material to support the arguments. *See* Doc. 2423-1 at 14, 21 (citing Ex. 2); *see also id.* at 30 (citing Exs. 3 & 4). On these facts, the court finds, this case presents the "rare circumstances" where a surreply is permitted. *Humphries*, 1998 WL 982903, at *1 (citation omitted). The questions raised by the pending motion confront difficult issues about a certified class scheduled to try its state law antitrust claims to a jury less than two months from now. The class plaintiffs' proposed Surreply helps the court to consider the important questions presented by Mylan's Motion to Decertify. So, exercising its discretion, the court grants plaintiffs' request for leave to file a Surreply (Doc. 2437). Also, the court grants Mylan's request to file a Response to plaintiffs' Surreply. Doc. 2447 at 2. As explained in this Order's last section (Part III), the court directs the parties to file both sealed and unsealed versions of class plaintiffs' proposed Surreply (Doc. 2438-1) and Mylan's proposed Response to the Surreply (Doc. 2446-1) as separate docket entries.

## II.    The Mylan Defendants' Motion to Decertify the State Antitrust Class

Next, the court addresses the merits of the Mylan Defendants' Motion to Decertify. The court begins with the legal standard governing decertification of a class action.

### A.  Legal Standard

Federal Rule of Civil Procedure 23(c)(1)(C) provides that an "order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C); *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) (explaining that district court "possesses the discretion under Rule 23(c)(1)(C) to amend its

certification order to reflect its findings or decertify the class altogether prior to final judgment"). Citing this Rule, the Supreme Court has explained that a certification order "is inherently tentative" because even "after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (citing Fed. R. Civ. P. 23(c)(1)).

When moving to decertify a class, "'defendant must logically provide some reason for the court to change its conclusion.'" *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1014 (D. Kan. 2018) (quoting *Schell v. OXY USA Inc.*, No. 07-1258-JTM, 2013 WL 4857686, at *3 (D. Kan. Sept. 11, 2013)). "'Yet, it remains the plaintiff's burden to prove that the requirements of Rule 23 are met.'" *Id.* (quoting *Arkalon Grazing Ass'n v. Chesapeake Operating, Inc.*, No. 09-1394-CM, 2014 WL 3089556, at *1 (D. Kan. July 7, 2014)); *see also Sibley v. Sprint Nextel Corp.*, 315 F.R.D. 642, 651 (D. Kan. 2016) ("When faced with a motion to decertify—that is, even after the Court has granted a motion for class certification—the party seeking certification continues to bear the burden of meeting the requirements of Rule 23." (citation omitted)). *Cf. Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832 (8th Cir. 2016) (requiring defendant to "provide good reason before the district court revisits the [class certification] issue").

The decision whether to certify a class action "belongs within the discretion of the trial court." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227 (10th Cir. 2013) (citation and internal quotation marks omitted). But when exercising this discretion, district courts must conduct a "rigorous analysis" and decide whether the putative class satisfies all the requirements of Federal Rule of Civil Procedure 23. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotation marks omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

To certify a class action, Rule 23(a) requires (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation, plus one of the requirements established by Rule 23(b)(1), (b)(2), or (b)(3).  Fed. R. Civ. P. 23(a)–(b).  Here, the court certified the state law antitrust class action under Rule 23(b)(3).  Doc. 2018-1 at 126.  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The court applies this governing standard to Mylan's Motion to Decertify, below.

### B.  Analysis

As already recited, the Mylan Defendants move to decertify the state law antitrust class action.  They argue that the Supreme Court's recent *TransUnion* decision requires that "[e]very class member must have Article III standing in order to recover individual damages[,]" *TransUnion*, 141 S. Ct. at 2208, but some class members in this antitrust class action are uninjured, and thus, lack standing to sue.  In the alternative, Mylan argues that the court should decertify the state law antitrust generic delay claims for certain states that no longer have an adequate or typical class representative.  The court addresses both arguments, in turn, below.

### 1.    Motion to Decertify State Antitrust Class Action

Mylan's motion asserts that *TransUnion* requires the court to decertify the class because the certified state law antitrust class contains uninjured class members.  Plaintiffs respond, arguing that the court's prior class certification Order doesn't conflict with the Supreme Court's *TransUnion* decision.  Also, plaintiffs argue that the evidentiary record shows that Mylan is wrong that the class contains uninjured members.  The court addresses these arguments about the facts and the law in the following subsections, a. and b.  It starts with the governing law.

### a. *TransUnion*'s Effect on the Class Certification Order

In February 2020, the court certified an antitrust class action consisting of "[a]ll persons and entities in the Antitrust States[3] who paid or provided reimbursement for some or all of the purchase price of Branded EpiPens at any time" in the class period "for the purpose of consumption, and not resale, by themselves, their family member(s), insureds, plan participants, employees, or beneficiaries." Doc. 2018-1 at 126. In its class certification Order, the court rejected Mylan's argument that plaintiffs had failed to satisfy Rule 23(b)(3)'s predominance requirement because—according to Mylan's argument—plaintiffs cannot prove that all class members sustained injury. *See id.* at 58–79. Instead, the court applied "the standard artic[ulated] by the Seventh Circuit" and approved by our court in two of Judge Lungstrum's opinions. *Id.* at 67; *see also id.* at 62–67 (discussing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012), *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2013 WL 2097346, at *2 (D. Kan. May 15, 2013), and *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *4 (D. Kan. Sept. 26, 2016)). This standard precludes class certification when the putative class "'contains a great many persons who have suffered no injury at the hands of the defendant.'" *Messner*, 669 F.3d at 825.

Based on the evidence presented at class certification—including expert opinion from plaintiffs' expert, Professor Meredith Rosenthal—the court concluded "plaintiffs have shown, at least at the class certification stage, that the percentages of uninjured class members are small enough that they don't preclude class certification." *Id.* at 75. Also, it concluded that "any

---

[3] At class certification, the Antitrust States included: Alabama, California, Florida, Hawaii, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New York, North Carolina, Tennessee, and Utah. Doc. 2018-1 at 126 n.72. On summary judgment, however, the court dismissed the Tennessee antitrust claims without prejudice because no properly-named plaintiff resides in that state. Doc. 2381 at 163, 182. So, 16 Antitrust States currently remain part of the certified class action.

questions about the absence of injury for some class members don't overwhelm the common issues and defeat predominance on class certification." *Id.* at 76.  But, the court recognized that "'depending on the ultimate size of the class at issue here,' the factual record eventually may develop more fully and show that the number of uninjured class members is 'more significant' than it now appears." *Id.* at 75 (quoting *Messner*, 669 F.3d at 826).  The court noted that it "'is free to revisit this issue' if that, in fact, occurs." *Id.* (quoting *Messner*, 669 F.3d at 826); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").  So, at class certification, the court concluded that "the current record doesn't defeat the predominance requirement simply because the putative class definitions contain a percentage of uninjured class members." *Id.*

Also, the court declined to deny certification based on Mylan's argument that certifying a class with uninjured class members violates Article III's standing requirements. *Id.* at 76–77.  Relying on existing Tenth Circuit precedent, the court found that "the Article III standing requirement does not demand that plaintiffs establish each putative class member has sustained injury." *Id.* at 77 (citing *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214 (10th Cir. 2014)).  Instead, the court concluded under existing Circuit precedent, plaintiff had satisfied the Article III standing requirement "by showing that each named plaintiff has sustained injury sufficient to confer standing." *Id.*

More than a year after the court issued its certification Order, the Supreme Court issued its opinion in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).  *TransUnion* addressed the question whether every class member in that case's class action had satisfied the requirement of demonstrating "Article III standing in order to *recover individual damages*" in the class action. *Id.* at 2208 (emphasis added).  *TransUnion* involved a class of 8,185 individuals asserting Fair

Credit Reporting Act claims against a credit reporting agency because the class members'
internal TransUnion credit reports contained misleading information.  *Id.* at 2200.  But, for only
"1,853 of the class members, TransUnion provided misleading credit reports to third-party
businesses."  *Id.*  And, for "the other 6,332 class members[,]" their credit reports "were *not*
provided to third-party businesses during the relevant time period."  *Id.*  The Supreme Court thus
held that "the 6,332 class members whose internal TransUnion credit files were not disseminated
to third-party businesses did not suffer a concrete harm."  *Id.* at 2212.  As a consequence, those
6,332 class members lacked standing to assert Fair Credit Reporting Act claims against
TransUnion.  *Id.* at 2214.

     Mylan asserts that *TransUnion*'s holding requires the court to decertify the state antitrust
class action.  Mylan argues that the certified class contains brand loyalists—*i.e.*, consumers who
loyally purchased branded EAIs and who wouldn't have switched to purchasing a generic EAI
when one became available.  Mylan argues that these class members thus sustained no injury—
no concrete harm—from any generic delay.  As a consequence, Mylan asserts, the brand loyalists
who are class members lack standing to assert state antitrust claims against Mylan.  Also, Mylan
contends, it's impossible to identify these uninjured class members without conducting
individualized inquiries of each class member to determine who was and was not a brand
loyalist.  This individual inquiry, Mylan argues, will "overwhelm questions common to the
class."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  And, says Mylan, that individual
inquiry defeats Rule 23(b)(3)'s predominance requirement, thus requiring the court to decertify
the state antitrust class.

     Mylan recognizes that *TransUnion* never discussed Article III standing in the context of
certifying a class action.  Indeed, Mylan concedes that "the Supreme Court passed on the issue of

'whether every class member must demonstrate standing *before* a court certifies a class.'"  Doc. 2390 at 17 n.10 (quoting *TransUnion*, 141 S. Ct. at 2208 n.4).  But, Mylan argues, *TransUnion* explicitly recites that plaintiffs "must maintain their personal interest in the dispute *at all stages of litigation*."  *TransUnion*, 141 S. Ct. at 2208 (emphasis added).  And, it also recognizes that a "plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  Mylan argues that plaintiffs can't shoulder that burden here—where class certification already has occurred, and the court already has decided summary judgment.  Mylan asserts that a trial won't change the fact that plaintiffs can't demonstrate that all class members have sustained damages.  Thus, Mylan argues, not every class member in this case has "Article III standing[,]" and, under *TransUnion*, these class members can't "recover individual damages."  *Id.*  As a consequence, Mylan asserts, the court must decertify the class because there is no way to identify and remove from the class uninjured brand loyalists—which, according to Mylan, plaintiffs have conceded exist in the class—without conducting millions of individual inquiries.

Plaintiffs respond that they always have argued—and the data always has shown—that a low probability exists that the class includes brand loyalists who remained brand loyal throughout the entire class period.  Also, plaintiffs provide updated opinions from Prof. Rosenthal based on her analysis of updated pharmacy records.  According to plaintiffs, Prof. Rosenthal's updated analysis shows "that the probability that brand loyalists are in the Class is, at best, *de minimis*."  Doc. 2404 at 18.  But, plaintiffs argue, even if the class includes some brand loyalists, Prof. Rosenthal's updated analysis also shows that any purported brand loyalist nonetheless sustained injury in the form of paying overcharges for the EpiPen.  Using updated data, Prof. Rosenthal finds that the EpiPen price fell in the real world after a generic EAI entered

the market.  She opines that this same EpiPen price decline would have occurred in the but-for world where a generic would have entered the market sooner.  As a consequence, Prof. Rosenthal asserts, even brand loyalists have sustained damages from generic delay in the form of paying higher prices for EpiPens.  Thus, plaintiffs argue, even if certain class members never would have purchased a generic EAI over a branded EpiPen, all class members—including any purported brand loyalists—sustained injury because they paid overcharges on their EpiPen purchases.

Based on this data, plaintiffs argue that *TransUnion* differs from this case.[4]  *See* Doc. 2404 at 20 (asserting that "each and every member of this Class was injured through paying higher prices for brand and generic EpiPens"); *see also id.* at 21 (arguing that "Mylan speculates that so-called 'brand loyalists' exist and have not suffered an injury," but plaintiffs have shown "all class members were impacted as a result of the delayed entry of an independent generic alternative for EpiPen" (citation and internal quotations omitted)).  Thus, plaintiffs assert, Mylan's reliance on *TransUnion* is misplaced because plaintiffs are capable of proving that all class members—even brand loyalists, if they exist—sustained damage from paying overcharges for EpiPen that Mylan's generic delay caused.

Mylan argues that the court can't consider Prof. Rosenthal's updated damages theory, and, even if it considers it, Mylan asserts that it doesn't support class certification.  The court addresses those arguments in subsection b.  And, as explained below, the court finds that

---

[4]     Plaintiffs assert four arguments why *TransUnion* doesn't require the court to decertify the class. Doc. 2404 at 20–22.  Also, plaintiffs argue that accepting Mylan's argument that the court must decertify the state antitrust class because it contains some number of uninjured class members "would be a potential death knell to generic delay claims—and many other types of class actions." *Id.* at 22–23. Because the court finds that plaintiffs have shown they are capable of presenting classwide evidence of generic delay damages sustained by every class member, thus satisfying Article III standing, the court need not address plaintiffs' other arguments.

plaintiffs have come forward with a method—in the form of Prof. Rosenthal's expert opinion—of proving classwide injury with evidence that is common to the class.[5]  Thus, plaintiffs have provided a way—at this stage of the litigation, anyway—to show that each member sustained concrete harm from Mylan's alleged conduct, thereby establishing that all class members have Article III standing.  So, the court declines to decertify the class based on the Supreme Court's *TransUnion* decision.

But—at the same time—the court recognizes the effect that *TransUnion*'s standing requirement has on this case where—Mylan argues—some class members sustained no injury. Although plaintiffs have come forward with a method for proving classwide injury for all EpiPen purchasers—brand loyal or not—a factfinder may not agree that the evidence shows what plaintiffs argue it does.  A jury may accept Prof. Rosenthal's opinions about classwide injury. But, a jury also might reject those opinions.  And, if a jury concludes that plaintiffs haven't shown classwide injury, then *TransUnion* holds that those class members who haven't sustained injury lack standing to recover damages.  To address this problem, the court predicts that it will require a specific jury finding addressing the brand loyalist argument.  The parties must confer and propose appropriate jury instructions and verdict form addressing whether each class member has sustained damage from the generic delay.  This approach would enable the factfinder to decide whether each class member has sustained injury, and thus has or doesn't have standing to recover antitrust damages.

---

[5]      As plaintiffs note, the court already concluded, when deciding defendants' Motion to Dismiss the Consolidated Class Action Complaint, that plaintiffs had "alleged economic loss sufficient to discharge the standing requirement" by alleging that "Mylan's conduct caused them to pay inflated prices for the EpiPen, and—but for Mylan's unlawful conduct—they would have purchased other versions of the EpiPen (both branded and generic) at lower cost."  Doc. 896 at 102–03 (citations omitted).  But, the court also recognizes, this ruling addressed plaintiffs' state consumer protection act claims, not the antitrust claims.  *See id.* at 99–104.

      **b.  Plaintiffs Have Shown a Method of Proving That All Class Members—Even Brand Loyalists—Sustained Damages.**

As already discussed, even if some small number of brand loyalists exist in the class, plaintiffs assert that updated data shows these class members still sustained injury from generic delay in the form of overcharges paid for branded EpiPens.  According to plaintiffs' expert, Prof. Meredith Rosenthal, she has received "updated IQVIA Xponent data" extending "through October 2020[,]" and her analysis of that updated data shows EpiPen prescriptions "fell precipitously with the entry of the Mylan authorized generic and Teva's generic."  Doc. 2412-2 at 4 (Rosenthal Decl. ¶ 6).  Prof. Rosenthal explains that this updated data allows one to "see the effect of actual competitive generic entry on EpiPen's price," and based on that data, she opines "with a high degree of certainty that the brand EpiPen price would have decreased after competitive generic entry had it occurred" in a but-for world with no without generic delay.  *Id.* at 9–10 (Rosenthal Decl. ¶ 13 & Fig. 3); *see also id.* ("[W]ith the longer span of data from the period after independent generic competition for EpiPen (*i.e.*, the Teva launch), it is now possible to infer with a high degree of certainty that brand EpiPen prices would also have declined but-for the alleged generic delay.").  This analysis, in turn, "supports" Prof. Rosenthal's "conclusion that there is a very low probability that any given Class member did not suffer a quantifiable overcharge in this matter" in the form of higher prices for branded EpiPens.  *Id.* Mylan asserts five arguments why plaintiffs' updated data nonetheless fails to permit class certification to continue.

*First*, Mylan argues that the court can't even consider the theory of injury to brand loyalists in the form of EpiPen overcharges because it's untimely.  Mylan asserts that the parties have litigated this case for four years and Mylan has argued since at least March 2019 that the class contains uninjured class members.  But, Mylan argues, plaintiffs never asserted their

argument that brand loyalists have sustained injury in the form of paying EpiPen overcharges until they filed their Opposition to the Motion to Decertify in August 2021.  Mylan argues that plaintiffs can't use untimely expert testimony to inject this new theory in the case at this late stage when they never included their overcharge damages theory in the Pretrial Order.  Also, Mylan contends, allowing plaintiffs to proceed with this new damages theory will prejudice Mylan because it has had no opportunity to conduct discovery on this topic, depose witnesses or experts about the overcharge damages, assert *Daubert* challenges to Prof. Rosenthal's opinions on this theory, or brief the issue on the merits to the court.  The court disagrees with Mylan's arguments.

Although plaintiffs didn't assert the overcharge damages theory until their Opposition to the Motion to Decertify, they have explained adequately why they couldn't have asserted it earlier—that is, they didn't have the data to support the theory until June 2021.  Prof. Rosenthal explains that the data available to her "at the time of [her] merits report were retail sales (IQVIA) data through June 2018, and Mylan's EpiPen rebate data through November 2018."  Doc. 2438-2 at 4 (Rosenthal Sur-Reply Decl. ¶ 3).  She explains that this data showed "a decreasing EpiPen price trend[,]" but "it was not yet clear if this was a trend that would continue after an independent generic manufacturer entered the market[.]"  *Id.*  Because Prof. Rosenthal only had data that "ended prior to Teva's actual launch[,]" she asserts "it was not possible . . . to reach a conclusion about the impact of Teva's launch on EpiPen prices and quantities[,]" and thus, she "was unable at the time to calculate overcharges for brand loyal purchases."  *Id.*  But, when Mylan produced additional rebate data on June 9, 2021, *see* Doc. 2437-3 at 2, Prof. Rosenthal found this new data made it "possible to conclude that the retail price of brand EpiPen, both gross and net of rebates, decreased after independent generic entry in the actual world."  Doc.

14

2438-2 at 4 (Rosenthal Sur-Reply Decl. ¶ 3).  Thus, she explains, she is "able to demonstrate that Class members paid a higher price for brand EpiPen than they would have in the but-for scenario and calculate the associated damages for purchases of the brand using data subsequent to Teva's launch to compute an appropriate brand price yardstick."  *Id.*

Mylan contends that Prof. Rosenthal could have performed this analysis earlier had plaintiffs asserted their overcharge damages theory earlier and requested the data sooner.  But Mylan's argument doesn't challenge the fact that plaintiffs didn't receive Mylan's updated rebate data until June 2021.  And, Mylan never explains why the court should fault plaintiffs for failing to assert a damages theory that Mylan hasn't produced data to support.[6]

Also, plaintiffs argue that Prof. Rosenthal's updated damages opinion is timely because the parties agreed that her updated damages opinion was due on October 1, 2021—a deadline that still was in the future when Mylan filed the Motion to Decertify and the parties briefed its issues.  *See* Doc. 2415 at 2 (Scheduling Order No. 15 (Amended Trial Order)).  Mylan responds that Prof. Rosenthal's updated damages opinion was intended merely to provide an updated damages number using pre-existing damages theories that plaintiffs already had disclosed.  In contrast, Mylan argues, plaintiffs have asserted a new damages theory which, Mylan contends, is waived because plaintiffs never asserted it in the Pretrial Order.  *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]he pretrial order is the controlling document for trial[,]" and any "claims, issues, defenses, or theories of damages not included in the pretrial order are waived[.]" (citation and internal quotation marks omitted)).  But, our Circuit explicitly has recognized that "'while the pretrial order defines a lawsuit's boundaries in the trial court and on

---

[6]     Mylan also contends that its updated rebate data is only relevant to Prof. Rosenthal's opinions about net prices, not gross prices.  But, as Prof. Rosenthal explains, she used two sets of data—the IQVIA Xponent data and the Mylan rebate data—to conduct the updated pricing analysis.  Doc. 2438-2 at 4–5 & n.5 (Rosenthal Sur-Reply Decl. ¶¶ 3, 5 & Fig. 3).

appeal, total inflexibility is undesirable.'" *103 Invs. I, L.P. v. Square D Co.*, 372 F.3d 1213, 1217 (10th Cir. 2004) (quoting *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997)); *see also id.* (holding that the trial court abused its discretion by refusing to consider an expert rebuttal report as untimely).

Here, plaintiffs adequately have justified the reason they couldn't assert their overcharge damages theory earlier: because plaintiffs' expert didn't yet have the data to support the theory. Under these facts, precluding plaintiffs from asserting their damages theory would amount to "total inflexibility" and that approach is "undesirable" here. *103 Invs.*, 372 F.3d at 1217 (citation and internal quotation marks omitted). Also, the court disagrees with Mylan's argument that permitting plaintiffs to proceed with the overcharge damages theory will prejudice Mylan. As plaintiffs highlight, Mylan has responded to Prof. Rosenthal's updated damages opinion by submitting a 16-page Declaration from Mylan's own expert, John H. Johnson. Doc. 2423-2 (Johnson Decl.). Dr. Johnson uses the same two sets of data—the IQVIA Xponent data and the Mylan rebate data—and opines that the data refutes Prof. Rosenthal's opinion that brand loyalists have sustained injury in the form of paying overcharges for EpiPen. *Id.* at 3–4, 9–10 (Johnson Decl. ¶¶ 3–4, 10 & Fig. 2). Also, Mylan's Reply and its Response to the Sur-Reply devote more than 20 pages challenging the merits of Prof. Rosenthal's updated damages opinion.[7] *See* Doc. 2423-1 at 6–7, 14–15, 19–29; *see also* Doc. 2446-1 at 3–11. In this context, it is evident. Mylan has had ample opportunity to review Prof. Rosenthal's opinions since their disclosure, and it still has the capacity to challenge her opinions. Thus, the court finds Mylan isn't prejudiced here.

---

[7]   Mylan never applied to the court for permission to take Prof. Rosenthal's deposition about the opinions she's formed based on the updated data. When it comes to litigating aggressively, no one can accuse either side of the caption of shyness.

In sum, the court declines Mylan's invitation to exclude Prof. Rosenthal's updated damages opinions as untimely.

*Second*, Mylan argues that plaintiffs' updated damages opinion doesn't support class certification because plaintiffs never have identified any redressable injury for brand loyalists. *See California v. Texas*, 141 S. Ct. 2104, 2115–16 (2021) (explaining that the redressability requirement "to satisfy Article III standing" requires that plaintiffs seek a judicial "remedy that will redress the individual plaintiffs' injuries"). Here, Mylan argues, Prof. Rosenthal previously testified that brand loyalists' damages are zero. *See* Doc. 1636-6 at 18 (Rosenthal Dep. 172:9–18). But, plaintiffs explain, Prof. Rosenthal gave this deposition testimony in February 2019—more than two years before she received Mylan's updated damages data supporting her overcharge damages opinion. For the same reasons already outlined, the court concludes that plaintiffs' failure to assert a redressable injury for brand loyalists before Mylan produced the updated damages data supporting Prof. Rosenthal's analysis shouldn't preclude them from asserting their overcharge damages theory based on newly provided data. With the updated damages data, plaintiffs have identified a redressable injury in the form of alleged EpiPen overcharges.

Also, the court concludes, *TransUnion* doesn't require decertification. Mylan argues that *TransUnion* requires a plaintiff have standing "at all stages of litigation" and to "demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion*, 141 S. Ct. at 2208 (citations and internal quotation marks omitted). At this stage of the case, plaintiff's updated damages theory based on EpiPen overcharges satisfies this standing requirement.

*TransUnion* addressed the question whether every class member in that class action had satisfied the requirement of to demonstrate "Article III standing in order to *recover individual damages*" in the class action. *Id.* at 2208 (emphasis added). *TransUnion* held that "the 6,332 class members whose internal TransUnion credit files" contained misleading information "did not suffer a concrete harm" because their credit files "were not disseminated to third-party businesses." *Id.* at 2212. As a consequence, those 6,332 class members lacked standing to assert Fair Credit Reporting Act claims against TransUnion. *Id.* at 2214. Thus, *TransUnion* deals with the standing requirement in the context of a class member's ability to recover damages. *TransUnion* never holds or even implies that class certification requires every class member to demonstrate standing. To the contrary, the Supreme Court said explicitly that it wasn't addressing that question. *See id.* at 2208 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing *before* a court certifies a class."). In short, *TransUnion* provides no reason to disturb the court's class certification Order.

*Third*, Mylan contends that Prof. Rosenthal's analysis extends only to third party payors ("TPPs")—not individual consumers. *See* Doc. 2412-2 at 9–10 (Rosenthal Decl. ¶ 13 & Fig. 3) (analyzing "the TPP EpiPen price per prescription, both gross and net of rebates" and concluding that it "decreased after the Mylan AG entry and, more importantly, continued to do so after the Teva generic's entry"). Thus, Mylan argues, Prof. Rosenthal's overcharge damages theory can't support class certification for an entire class that includes TPPs as well as consumers. Prof. Rosenthal disagrees with Mylan's argument, explaining that her analysis shows the same results—*i.e.*, decreasing EpiPen prices after generic entry—for both cash payors and insured consumers as it shows for TPPs. Doc. 2438-2 at 4–8 (Rosenthal Sur-Reply Decl. ¶¶ 5–8 & Figs. 3–5). As plaintiffs argue, Prof. Rosenthal's opinion means that all consumers sustained injuries

in the real world where Mylan allegedly delayed generic entry.  Based on Prof. Rosenthal's explanation, the court concludes that plaintiffs have come forward with opinion evidence capable of supporting a finding of classwide harm based on generic delay damages.  Whether the finder of fact accredits that testimony is a separate question, but it's not one the court can decide on a pretrial motion.

But, Mylan also argues, Prof. Rosenthal's overcharge damages opinion isn't even plausible for insured consumers who paid a fixed co-pay.  Mylan asserts that these class members are uninjured because they paid the same out-of-pocket co-pay regardless of the EpiPen's price.  And so, Mylan argues, individualized inquiries are required to identify and exclude these uninjured insured consumers from the class.  Plaintiffs respond, arguing that insured consumers still sustained an injury because the collateral source rule bars evidence of insurance payments since those insurance payments are independent of Mylan's conduct.  According to plaintiffs, the collateral source doctrine permits insured consumers to assert their antitrust claims because they sustained injury even when the injury was reimbursed by insurance. *See, e.g.*, *Goda v. Abbott Labs.*, No. 01445-96, 1997 WL 156541, at *9 (D.C. Super. Ct. Feb. 3, 1997) (applying the collateral source rule to a consumer class alleging antitrust injuries from paying overcharges for branded prescription drugs, even though consumers' insurance companies paid the overcharges, and finding "no reason why a wrongdoer should gain because his target has paid for coverage either through his dollars or through his [health care coverage]").

At class certification, the court addressed the parties' arguments about the collateral source doctrine.  It concluded "that it need not decide—as a matter of law—whether the collateral source rule applies to plaintiffs' claims" on the certification motion because "the question whether the collateral source doctrine applies to plaintiffs who used insurance to pay for

their EpiPen purchases is a legal issue that presents a common question that applies classwide." Doc. 2018-1 at 56.  Also, the court noted, plaintiffs "expressly" had excluded from the class definitions:  "'Single flat co-pay' consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is the same for all covered devices, whether branded or generic (*e.g.*, $20 for all branded and generic devices)."  *Id.* at 55; *see also id.* at 127 (excluding from the class definition "'Single flat co-pay' consumers").  None of the parties raise this point in the briefing on the current motion.  But, from the court's perspective, the certified class already excludes this group of consumers—*i.e.*, the single, flat co-pay consumers—who Mylan claims are uninjured, and thus lack standing.  Based on this exclusion, the court can't find that Mylan's argument about insured consumers who paid flat co-pays provides a reason for the court to decertify the class.

*Fourth*, Mylan argues that Prof. Rosenthal's updated data fails to show injury to all TPPs. Specifically, Mylan argues that brand-loyal TPPs didn't sustain injury from the alleged generic delay because the Wholesale Acquisition Cost (WAC) never changed after Teva launched its generic EAI.  Invoking opinions rendered by Mylan's own expert, Dr. Johnson, *see* Doc. 2423-2 at 13 & n.28 (Johnson Decl. ¶ 15), Mylan attacks Prof. Rosenthal's opinion that the branded EpiPen's price would have decreased in the but-for world for all TPPs because, Mylan argues, she bases that opinion on data showing the average third-party price *per prescription*.  But, Mylan argues, any number of factors may affect a TPP's price per prescription.  Those factors may include coverage changes, pharmacy discounts, or PBM policies—and not necessarily the entry of a generic competitor.  Mylan's arguments go to the weight of Prof. Rosenthal's opinions.  Plaintiffs have shown that her opinions are capable of proving injury to all TPPs based on her analysis of the decreasing price for branded EpiPen prescriptions.  Mylan can attack Prof.

Rosenthal's opinions through vigorous cross-examination or with contrary evidence—just as Mylan has done by offering Dr. Johnson's competing expert opinions supporting this Motion to Decertify. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also In re Syngenta AG MIR 162 Corn Litig.*, No. 14-md-2591-JWL, 2016 WL 5371856, at *10 (D. Kan. Sept. 26, 2016) (concluding that defendants' criticisms of plaintiffs' experts' methodologies failed to show that they "are so unreliable as to preclude certification" but instead, "[m]ore importantly for purposes of certification, these criticisms present common questions that do not undermine a finding of predominance"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2017 WL 4621777, at *10 (D. Mass. Oct. 16, 2017) (concluding, at class certification stage, "any disagreement [about expert's method of calculating damages] does not overcome the Plaintiffs' showing that damages will be substantially shown by common proof"). But, the conflicting expert opinions don't provide a reason for the court to decertify the state antitrust class. Instead, the conflicting opinions present a jury question whether all TPPs sustained injury from the alleged generic delay. And, this issue is one common to the class. Thus, Mylan's arguments on this fourth point don't require the court to decertify the class.

*Fifth*, Mylan argues that the updated data doesn't solve the problem of having uninjured class members in the certified class because the updated data reveals two additional categories of class members who are not injured. According to Mylan, the two additional categories consist of: (1) consumers who would have switched to the Auvi-Q or the Adrenaclick authorized generic; and (2) TPPs who paid more for the Teva generic than the branded EpiPen device.

For the first group—consumers who would have switched to the Auvi-Q or the Adrenaclick authorized generic—Mylan argues that these consumers (and their TPPs who reimbursed their purchases) weren't injured by the alleged delay of the Teva generic (the only claim remaining in the case) because they didn't switch to the Teva generic when it became available but, instead, switched to Auvi-Q or Adrenaclick's authorized generic.  But as plaintiffs explain, neither of Mylan's arguments establish that the class necessarily includes uninjured class members.  First, for consumers who purchased an EpiPen during the relevant class period, plaintiffs have adduced evidence capable of supporting a finding that they sustained injury because they paid an inflated price caused by generic delay.  This outcome—if accredited by the factfinder—establishes an injury even if these consumers later switched to Auvi-Q or Adrenaclick's EAI.[8]  Second, Mylan's argument assumes that these consumers—who switched from EpiPen to Auvi-Q or Adrenaclick in the actual world—never would have purchased a generic EAI in a but-for world where the generic EAI would have been available to purchase years earlier than in the real world.  In sum, plaintiffs have demonstrated that they can prove injuries common to class members consisting of consumers (and their TPPs who reimbursed their purchases) who switched from purchasing the EpiPen to purchasing the Auvi-Q or the Adrenaclick authorized generic.

For the second group—TPPs who paid more for Teva's generic than the branded EpiPen device—Mylan argues that these class members are uninjured because these TPPs actually paid less for EpiPens before a generic entered the EAI market.  Mylan asserts that Prof. Rosenthal's new data shows EpiPen prices paid by TPPs as well as the rebates Mylan paid to those TPPs.  But her data doesn't include any information about rebates Teva paid to TPPs—if it paid any at

---

[8]     The class only consists of consumers or TPPs who purchased EpiPens during the relevant class period.  Plaintiffs aren't asserting claims based on Auvi-Q or Adrenaclick purchases.

all.  Mylan's expert, Dr. Johnson, has analyzed Prof. Rosenthal's data, and he opines that it shows prices were "higher for TPPs whose members switched to the 'independent' Teva generic product than if they had stayed with the branded product."  Doc. 2423-2 at 9–10 (Johnson Decl. ¶ 10 & Fig. 2).  Mylan argues that the only way to determine whether TPPs paid more for EpiPen or the Teva generic is to conduct an individualized inquiry of each TPP's rebate arrangements with Mylan and Teva.  And, Mylan contends, these individual issues preclude Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]"  Fed. R. Civ. P. 23(b)(3); *see also CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (explaining that plaintiffs bear the burden under Rule 23(b)(3) to "show that common questions subject to generalized, classwide proof *predominate* over individual questions").

Plaintiffs respond, arguing that Dr. Johnson's comparison of actual-world, net EpiPen prices to actual-world, gross Teva generic prices is not the appropriate measurement to determine whether TPPs sustained injury.  Instead, plaintiffs explain through Prof. Rosenthal's opinions that the correct comparison compares the net price paid by TPPs for EpiPen in the real world with the price TPPs would have paid for Teva's generic in the but-for world.  Doc. 2438-2 at 9 (Rosenthal Sur-Reply Decl. ¶ 11).  Prof. Rosenthal calculates Teva's generic price on a per prescription basis, in the but-for world, at $163 per prescription.  Doc. 2132-7 at 97 (Rosenthal Merits Expert Report Attach. C.6.a).  And, she explains that the Teva generic's price in the but-for world is well below the prices Dr. Johnson provides in his analysis.  Doc. 2438-2 at 9–12 (Rosenthal Sur-Reply Decl. ¶¶ 10–14 & Figs. 6, 7, 8).

Mylan criticizes Prof. Rosenthal for relying on real-world data, in some instances, to show declining EpiPen prices after generic entry while also asserting that the but-for world

generic price is the correct comparison to show that TPPs sustained injury from alleged generic

delay.  Prof. Rosenthal's approach, Mylan contends, is inconsistent.  But, Prof. Rosenthal

provides an adequate explanation why she makes the actual and but-for world comparisons and

why her expert opinion shows that TPPs sustained injury from the alleged generic delay in the

form of paying more for EpiPen than the Teva generic.  *See* Doc. 2438-2 at 9–13 (Rosenthal Sur-

Reply Decl. ¶¶ 10–17 & Figs. 6, 7, 8).  Prof. Rosenthal's opinions provide plaintiffs a method for

proving classwide injury through common evidence.  Thus, the court declines to decertify the

class on this basis.[9]

## 2. Motion to Decertify Portions of the Class for States That Allegedly Have No Adequate or Typical Class Representative

As an alternative to decertifying the entire state law antitrust class, Mylan asks the court

to decertify certain portions of the class.  Mylan contends there are portions of the class that lack

an adequate and typical class representative who properly can assert state antitrust generic delay

claims on behalf of the class.

Two of Rule 23(a)'s class certification requirements are that the representative class

members (1) must assert claims or defenses that "are typical of the claims or defenses of the

class" and (2) that they "will fairly and adequately protect the interest of the class."  Fed. R. Civ.

P. 23(a)(3)–(4).  Mylan asserts that two groups of named plaintiffs no longer satisfy Rule 23(a)'s

---

[9]        Plaintiffs' Opposition to the Motion to Decertify also argues that consumers sustained injury caused by the alleged generic delay through a "loss of choice" to purchase a generic EAI.  Doc. 2404 at 12.  As Mylan correctly argues, the court's summary judgment Order recognized that "those class members who chose to purchase branded EpiPen products over a generic sustained no loss of choice." Doc. 2381 at 179.  Also, plaintiffs conceded at summary judgment that "Prof. Rosenthal's 'loss of choice' opinion is not a measure of damages."  *Id.* (citing Doc. 2183-1 at 20).  So, Mylan argues, plaintiffs' loss of choice argument isn't evidence of classwide injury sufficient to support class certification of the state antitrust class.  Because the court already has determined that plaintiffs have come forward with evidence of classwide injury consisting of Prof. Rosenthal's overcharge theory of damages, the court need not further address plaintiffs' "loss of choice" argument.

typicality and adequacy requirements, and thus they can't serve as class representatives in this certified class action. *First*, Mylan argues that Local 282 isn't an adequate or typical class representative to represent third-party payors ("TPPs") in 14 of the 16 Antitrust States because it never reimbursed the purchase of an EpiPen in those states. *Second*, Mylan contends that the court should decertify the antitrust class in at least seven of the Antitrust States because those states lack an adequate or typical class representative to represent individual end-payor consumers. The court addresses the two arguments, separately, below. It begins with the argument about Local 282.

### a. Local 282

Mylan argues that Local 282 is no longer a typical or adequate class representative to represent TPPs because it never reimbursed the purchase of an EpiPen device in 14 of the 16 Antitrust States during the class period. Mylan asserts, correctly, that Local 282 is the only named plaintiff who is a TPP. And, Mylan argues, because Local 282 never reimbursed EpiPen purchases in 14 of the Antitrust States, it has no antitrust claim under these 14 states' laws. As a consequence, Mylan argues, Local 282 can serve as the class representative only for claims relying on New York and Florida law—the two states where it reimbursed EpiPen purchases during the class period. And, Mylan asks the court to decertify the TPP antitrust claims in the other 14 states where Local 282 made no EpiPen reimbursements during the class period.

Plaintiffs respond, arguing that Mylan bases its argument on the flawed premise that the court certified two separate antitrust classes—one for TPPs and one for individual consumers. As plaintiffs correctly explain, the court did no such thing. The TPPs are not a separate class. Instead, the court's class certification Order certified a state antitrust class action consisting of "[a]ll persons and entities in the Antitrust States who paid or provided reimbursement for some

or all of the purchase price of Branded EpiPens at any time" in the class period "for the purpose

of consumption, and not resale, by themselves, their family member(s), insureds, plan

participants, employees, or beneficiaries." Doc. 2018-1 at 126 (footnote omitted). Under this

definition, the certified class includes both TPPs and individual consumers—as long as they

made qualifying EpiPen purchases during the class period. And, because Local 282 is an

"entity" who reimbursed EpiPen purchases in two of the 16 Antitrust States during the class

period, it is an adequate and typical class representative to represent the interests of the class.

*See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) (finding that trial

court didn't err by including TPPs in the certified class because "TPPs, like individual

consumers, suffered direct economic harm when, as a result of [defendant's] alleged

misrepresentations, they paid supracompetitive prices for [a prescription drug] instead of

purchasing lower-priced generic warfarin sodium").

   For the other 14 states "where Local 282 does not have beneficiaries," plaintiffs argue

that "the individual consumer Class representatives can serve as the class representative" for

those states. Doc. 2404 at 27. The court generally agrees with plaintiffs' argument, but there's a

problem with their argument for two states: Nevada and North Carolina. Local 282 is the only

named plaintiff for Nevada[10] and North Carolina.[11] But, Local 282 reimbursed no EpiPen

purchases after March 14, 2014 (the alleged but-for generic entry date) in these two states. Thus,

---

[10]   Originally, the Consolidated Class Action Complaint named two plaintiffs who purchased EpiPens in Nevada: Local 282 and Miriam Clarke. Doc. 60 at 11, 19 (Compl. ¶¶ 10, 41). Ms. Clarke voluntarily dismissed her claims against Mylan on February 7, 2018. Doc. 139 at 1. Thus, Local 282 is the only remaining named plaintiff and class representative for Nevada EpiPen purchasers.

[11]   Likewise, the Consolidated Class Action Complaint named two plaintiffs who purchased EpiPens in North Carolina: Local 282 and Cassandra Cobb. Doc. 60 at 11, 20 (Compl. ¶¶ 10, 47). Ms. Cobb voluntarily dismissed her claims against Mylan on February 7, 2018. Doc. 139 at 1. Thus, Local 282 is the only remaining named plaintiff and class representative for North Carolina EpiPen purchasers.

Mylan argues, Local 282 did not sustain any injury in Nevada or North Carolina produced by Mylan's alleged generic delay.  And, as a consequence, Local 282 doesn't have standing to assert antitrust claims under the laws of Nevada and North Carolina.

Plaintiffs don't respond directly to Mylan's argument that Local 282's failure to reimburse EpiPen purchases after the but-for generic entry date in these two states makes it an inadequate and atypical class representative.  Based on plaintiffs' failure to respond and because the Pretrial Order doesn't include any other properly-named plaintiff who can serve as an adequate representative for claims under Nevada or North Carolina law, the court agrees with Mylan's argument.  Lacking an adequate representative to make these claims on the class's behalf, the court must decertify the portion of the state antitrust class action asserting claims under the antitrust laws of Nevada and North Carolina.  So, for this reason, the court grants Mylan's request to decertify the state antitrust classes for Nevada and North Carolina.

Also, Mylan's Reply raises two new arguments about TPPs in response to plaintiffs' proffer of Prof. Rosenthal's updated analysis.  *First*, Mylan argues that the court must exclude TPPs from the class because of a class conflict.  For support, Mylan again cites its own expert's opinion.  They rely on Dr. Johnson's analysis of Prof. Rosenthal's data which—he opines— shows that TPPs paid more for the Teva generic in the real world than they paid for the branded EpiPen device.  Thus, Mylan argues, TPPs have a conflict with individual consumers who— plaintiffs allege—would have paid less for a Teva generic than a branded EpiPen.  Prof. Rosenthal disagrees with Dr. Johnson's opinions.  She has come forward and explained adequately why she compared actual and but-for prices.  Prof. Rosenthal also explains how her comparison concluded that TPPs would have paid less for the Teva generic in the but-for world.  Thus, Prof. Rosenthal opines, TPPs sustained injuries from the alleged generic delay.  If the trier

of fact accepts Prof. Rosenthal's explanation, no class conflict exists between TPPs and individual consumers because, according to Prof. Rosenthal, both of these groups sustained injury from Mylan's alleged generic delay. Thus, based on the current record, the court declines to exclude TPPs from the class.

*Second*, Mylan argues that a conflict exists between TPPs and consumers because they each paid a portion of the EpiPen's price, and should plaintiffs prevail on their generic delay claims, each is entitled to recover a portion of the alleged overcharges. Mylan contends that this scenario pits TPPs and consumers against each other because each group will argue that they paid a higher portion of the alleged overcharge, and thus are entitled to a bigger share of the recovery. Mylan concedes that it already raised this argument at the class certification stage, and the court previously rejected it. *See* Doc. 2018-1 at 41–44; *see also id.* at 43 (explaining that "defendants don't persuade the court that the alleged conflict between consumers and third-party payors precludes class certification" because "the current record shows that consumers and third-party payors share" the same interest in that "they both seek to prove that defendants' illegal conduct caused them to sustain injuries in the form of overpaying for the EpiPen"). But, Mylan contends that the court should revisit this issue because—Mylan argues—there is no named plaintiff TPP for 14 of the 16 states. Thus, Mylan contends, no plaintiff exists who can represent TPPs' interests adequately in 14 of the 16 Antitrust States.

The court isn't persuaded by Mylan's argument. As it found at the class certification stage, the court concludes that Mylan's argument is "merely speculative" and it "has not shown that the composition of any class will create internal competition for damages shares." *Id.* at 41–42. So, the court again denies Mylan's request to exclude TPPs from the class based on this speculative conflict argument.

### b.  Consumer Named Plaintiffs

Next, Mylan argues that no named plaintiff in at least seven of the Antitrust States (Alabama, Florida, Hawaii, Maine, Minnesota, Nebraska, and New York) sustained damages from any alleged generic delay because either:  (a) the class representatives for those states testified that they were EpiPen brand loyalists; or (b) the purchasing records show that they only purchased branded devices.  Thus, Mylan argues, the class representatives for these seven states are uninjured, and so they can't serve as adequate or typical class representatives for the class members.

With this argument, Mylan asks to relitigate issues its already litigated and lost.  Mylan asserted this argument at class certification.  Doc. 2018-1 at 37–40.  Mylan's argument didn't persuade the court then, *id.* at 39–40, and it still doesn't convince the court now.  As plaintiffs explained on class certification, Prof. Rosenthal opines that the named plaintiffs' purchasing history isn't indicative of brand loyalty because the alleged generic delay affected consumer switching patterns.  *Id.* at 37.  Prof. Rosenthal opines that consumers would have switched to a generic earlier in the but-for world where a generic would have become available to purchase sooner than it was in the real world because of the alleged generic delay.  *Id.* at 38.  Prof. Rosenthal's opinion is capable of showing that named plaintiffs who purchased branded EAIs still sustained injury because they would have switched to a generic earlier in that but-for world.  Also, her updated opinion shows that these named plaintiffs—even if brand loyalists—sustained injury in the form of paying overcharges for EpiPen.  Thus, plaintiffs have demonstrated sufficiently that the named representative plaintiffs sustained an injury from Mylan's alleged anticompetitive conduct, thus making them typical and adequate class representatives to represent the interests of class members.

Also, Mylan argues that testimony by named class representatives establishes that they are brand loyalists who weren't injured by any generic delay.  Plaintiffs respond, arguing that Mylan misrepresents their testimony.  The court agrees that these seven class representatives' deposition testimony doesn't establish that they are uninjured brand loyalists who are atypical and inadequate class representatives.  Instead, the deposition testimony shows that these plaintiffs didn't know generic alternatives were available and, in fact, many of them testified that they likely would have purchased a generic had they known one was available or if it was cheaper than buying a branded EpiPen.  And, importantly, all seven of these plaintiffs were deposed before November 2018, when the Teva generic launched.  So, no AB-rated generic was available for purchase when these plaintiffs gave their deposition testimony.

For the Alabama claim, named representative plaintiff Kenneth James Evans's testimony shows that he didn't know a generic was available, and had he known about a generic, he testified he probably would have purchased one.  Doc. 2404-13 at 4 (Evans Dep. 106:8–15).  Thus, Mr. Evans's testimony shows that he was willing to purchase a generic, and thus wasn't brand loyal.

For Florida, named representative plaintiff Lee Seltzer testified that he didn't know a generic EAI was available.  Doc. 2404-15 at 7 (Seltzer Dep. 157:16–22).  Also, he testified that he purchased an Auvi-Q EAI—which is another branded product.  *Id.* at 4 (Seltzer Dep. 76:4–24).  But, it's not an EpiPen so his testimony shows he was not brand loyal to EpiPen.  None of Mr. Seltzer's testimony establishes that he was brand loyal and never would have purchased a generic.  To the contrary, his testimony shows that he was willing to buy devices other than EpiPen and that he didn't know a generic was available to purchase.

For Hawaii, named representative plaintiff Linda Wagner testified that she preferred the branded EpiPen because her doctor prescribed it for her, but she also testified that she would prefer a generic EAI if it was cheaper and her doctor prescribed it for her.  Doc. 2404-7 at 4 (Wagner Dep. 116:13–24).  Thus, Ms. Wagner's testimony fails to show that she was brand loyal and never would have purchased a generic.  To the contrary, Ms. Wagner testified that she was amenable to buying a generic.

For Maine, named representative plaintiff Lorraine Wight testified that she purchased generic EpiPens.  Doc. 2404-8 (Wight Dep. 150:13–20).  But, Mylan argues, Ms. Wight only made these generic purchases because there was a shortage of branded EpiPens in her area, and according to Mylan, Ms. Wight testified that EpiPen was the "only acceptable option."  Doc. 2390-4 at 6 (Wight Dep. 26:9–13).  But, in context, Ms. Wight testified that *her doctor* had told her that the EpiPen was her "only acceptable option" because other EAI devices weren't available on the market.  *Id.* at 5–6 (Wight Dep. 25:16–26:8).  And, Ms. Wight specifically testified that she was "asking about other alternatives" to EpiPen, thus showing that she wasn't brand loyal.  *Id.* at 5 (Wight Dep. 25:23).

For Minnesota, named representative plaintiff Heather Marie DeStefano testified that she didn't know other EAI devices were available because all she'd ever heard about was EpiPen. Doc. 2404-12 at 3–4 (DeStefano Dep. 127:17–128:6).  And for Nebraska, named representative plaintiff Mark Kovarik testified that he was unaware that a generic EpiPen was available.  Doc. 2404-14 at 4–5 (Kovarik Dep. 79:24–80:1).  So, neither Ms. DeStefano nor Mr. Kovarik testified that they are brand loyalists.  Instead, they testified that they didn't know other options were available to purchase.  This testimony doesn't show that either Ms. DeStefano or Mr. Kovarik lacks standing to assert generic delay claims.

Finally, for New York, named representative plaintiff Donna Wemple testified that she "would be more likely to purchase the generic" because it's priced lower. Doc. 2404-11 at 3–4 (Wemple Dep. 257:25–258:17). Thus, Ms. Wemple's testimony contradicts Mylan's argument that she's brand loyal. Instead, as Ms. Wemple testified, she says she's more likely to buy a generic.[12]

None of this testimony shows that these seven plaintiffs were brand loyal. To the contrary, it shows that these plaintiffs either were unaware of other buying options or that they likely would purchase a generic EAI if it was made available to them. Thus, plaintiffs have shown that these seven named plaintiffs have sustained injury from the alleged generic delay. And, the seven named plaintiffs thus are typical and adequate class representatives to represent the class members. The court refuses to decertify the state antitrust law claims for these seven Antitrust States based on Mylan's argument that they lack an injured named plaintiff to represent the class.

Last, Mylan argues that the court should dismiss plaintiff Anastasia Johnston's claims because her EpiPen purchase records show that she paid $0 for her EpiPen purchases. Doc. 2390-3 at 2 (citing Doc. 1636-2 at 192). Mylan argues that Ms. Johnston sustained no injuries and lacks standing to assert her antitrust generic delay claims under Michigan law. *See* Doc. 60 at 17 (Compl. ¶ 35) (alleging that Ms. Johnston is a resident and citizen of Michigan). Plaintiffs concede that Ms. Johnston doesn't satisfy the class definition and thus is not a proper class representative. Doc. 2404 at 26. And, they concede that her claims are subject to dismissal. *Id.*

---

[12]     Mylan makes similar arguments about named plaintiffs Teia Amell (Maryland) and Meredith Krimmel (Texas)—*i.e.*, that their deposition testimony establishes they are brand loyalists who sustained no injury. *See* Doc. 2423-1 at 32 n.20. But, these named plaintiffs aren't part of the state antitrust class action because Maryland and Texas aren't included in the 16 Antitrust States. In any event, the court agrees with plaintiffs. These two named plaintiffs' deposition testimony doesn't establish definitively that they are EpiPen brand loyalists.

But, as plaintiffs correctly assert, Ms. Johnston's dismissal doesn't require the court to decertify

the Michigan state law antitrust class action because another named plaintiff—Annette Sutorik—

purchased EpiPens in Michigan, and thus, she is a properly-named plaintiff who brings antitrust

claims under Michigan law.  *See* Doc. 60 at 18 (Compl. ¶ 36).

### III.    Motions for Leave to File Under Seal

Both sides of the caption have moved to file under seal certain portions of their briefs and

some exhibits supporting or opposing the Mylan Defendants' Motion to Decertify.  *See* Docs.

2423, 2438, 2439, 2446, 2460, 2461.  The court rules those motions in the following fashion,

after reciting the governing legal standard.

The Supreme Court recognizes a "general right to inspect and copy public records and

documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435

U.S 589, 597 (1978) (citations omitted).  Nevertheless, a party may rebut the presumption of

access to judicial records by demonstrating that "countervailing interests heavily outweigh the

public interests in access."  *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007) (citation

and internal quotation marks omitted).  The party seeking to deny access must shoulder the

burden to establish a sufficiently significant interest outweighing the presumption of access.  *Id.*

(citation and internal quotation marks omitted); *see also United States v. Bacon*, 950 F.3d 1286,

1293 (10th Cir. 2020) ("[T]he party seeking to keep records sealed bears the burden of justifying

that secrecy," and it must "articulate a sufficiently significant interest that will justify continuing

to override the presumption of public access[.]" (citation and internal quotation marks omitted)).

The decision whether a judicial record qualifies for sealing under this governing standard "is a

matter left to the sound discretion of the district court."  *Mann*, 477 F.3d at 1149 (citing *Nixon*,

435 U.S. at 599).

The parties' sealing requests fall into three categories.

*First*, Mylan moves for leave to file under seal preliminarily its Reply in Support of the Motion to Decertify. Doc. 2423. The motion seeks leave to file under seal Mylan's Reply and Exhibit 2 to the Reply which is the Declaration of Dr. John H. Johnson, IV. *Id.* at 2. Later, Mylan filed a renewed motion for leave to file under seal after conferring with plaintiffs and relevant third parties about the information they believe qualifies for sealing in these documents. Mylan's renewed motion seeks leave to file under seal certain portions of its Reply and certain portions of Exhibit 2 that Mylan, plaintiffs, or third party CVS asserts qualifies for sealing. Doc. 2439.

The court denies as moot the preliminary motion seeking leave to file under seal (Doc. 2423). And, the court grants the renewed motion seeking leave to file under seal (Doc. 2439). Mylan asks to redact limited portions of the Reply and Exhibit 2 to the Reply that contain commercially sensitive data including pricing and market share information. Mylan asserts that, if disclosed, this information could harm Mylan or third party CVS. Also, some of the proposed redactions contain IQVIA data that was produced to the parties under an agreement containing a confidentiality clause. Given these interests, the court finds that Mylan has shouldered its burden. It has established that the need to preserve the confidentiality of the specific and limited redactions they seek outweighs the public's right to access the material. The court thus grants its request for leave to file under seal certain portions of the Reply and Exhibit 2 to the Reply. The court directs Mylan to do two things: (1) file under seal the Reply and Exhibit 2, and (2) file publicly the Reply and Exhibit 2, redacting the limited information that Mylan has shown qualifies for sealing.

*Second*, plaintiffs filed an Unopposed Motion for Leave to Provisionally File Under Seal Their Sur-reply to Mylan's Motion to Decertify the State Antitrust Class.  Doc. 2438.  The motion seeks leave to file under seal plaintiffs' Surreply and Exhibit O to the Surreply which is Prof. Rosenthal's Surreply Declaration.  After the parties conferred about the information that may qualify for sealing in these documents, Mylan filed a Renewed Motion for Leave to File Under Seal Plaintiffs' Sur-reply to Motion to Decertify.  Doc. 2460.  It seeks the court's leave permitting plaintiffs to file under seal just certain portions of the Surreply and Exhibit O because they contain sensitive commercial information.

The court denies as moot plaintiffs' preliminary motion (Doc. 2438).  And, the court grants Mylan's renewed motion seeking leave for plaintiffs to file their Surreply and Exhibit O under seal (Doc. 2460).  As Mylan sufficiently explains, these narrow portions of the Surreply and Exhibit O that it seeks leave for plaintiffs to file under seal "reference conclusions drawn from IQVIA and rebate data regarding the pricing of EpiPen devices and competitor EAI devices."  Doc. 2460-1 at 2.  As already discussed, this data is commercially sensitive information that could harm Mylan if disclosed.  Also, the IQVIA data is highly confidential and was produced under an agreement with a confidentiality clause.  Applying the governing legal standard, the court finds that Mylan has established that the need to preserve the confidentiality of the specific and limited redactions they seek outweighs the public's right to access the material.  So, the court directs plaintiffs to file:  (1) their Surreply and Exhibit O under seal, and (2) their Surreply and Exhibit O publicly with the limited redactions Mylan has shown qualify for sealing.

*Third*,  Mylan has filed a Motion for Leave to Preliminarily File Under Seal Its Response to Plaintiffs' Sur-reply to Motion to Decertify.  Doc. 2446.  It seeks leave to file under seal Mylan's Response to plaintiffs' Surreply because, Mylan asserts, it contains confidential information.  After conferring with plaintiffs about its sealing requests, Mylan filed a Renewed

Motion for Leave to File Under Seal Its Proposed Response to Plaintiffs' Sur-reply to Motion to Decertify.  Doc. 2461.

The court denies as moot Mylan's preliminary motion seeking leave to file under seal (Doc. 2446).  And, the court grants Mylan's renewed motion for leave to file under seal (Doc. 2461).  Like the motions already discussed, Mylan seeks leave to file under seal portions of its Response to plaintiffs' Surreply that discuss IQVIA and rebate data.  For the same reasons already discussed, the court finds these limited portions qualify for sealing because the need to preserve the confidentiality of this information outweighs the public's right to access the material.  So, the court directs Mylan to:  (1) file under seal its Response to plaintiffs' Surreply, and (2) file publicly its Response to plaintiffs' Surreply with the limited redactions they have shown qualify for sealing.

## IV.     Conclusion

For reasons explained in this Order, the court grants the Mylan Defendants' Motion to Decertify the State Antitrust Class (Doc. 2389) in part and denies it in part.  Also, the court grants the class plaintiffs' Motion for Leave to File a Surreply (Doc. 2437).  And, the court rules the parties' Motions for Leave to File Under Seal (Docs. 2423, 2438, 2439, 2446, 2460 & 2461) consistent with the conclusions reached in this Order's Part III.

Also, as discussed above on page 12, the court directs the parties to confer and propose appropriate jury instructions and verdict form addressing whether each class member has sustained damage from the generic delay.  The parties should include these proposed instructions and verdict form with their submission of joint jury instructions, as the Amended Trial Order directs.  *See* Doc. 2415 at 3.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Mylan Defendants' Motion to Decertify the State Antitrust Class (Doc. 2389) is granted in part and denied in part. The court grants Mylan's motion to decertify the Nevada and North Carolina state law antitrust claims' class actions because no named plaintiff purchased an EpiPen in those two states after the alleged but-for generic entry date, and thus, no named plaintiff sustained injury under the antitrust laws of Nevada or North Carolina based on any generic delay. Also, the court grants Mylan's request to dismiss plaintiff Anastasia Johnston's claims because she sustained no financial injury. But, the court denies the motion in all other respects.

**IT IS FURTHER ORDERED THAT** the class plaintiffs' Motion for Leave to File a Surreply (Doc. 2437) is granted.

**IT IS FURTHER ORDERED THAT** Mylan's Motion for Leave to Preliminarily File Under Seal Its Reply in Support of the Motion to Decertify (Doc. 2423) is denied as moot.

**IT IS FURTHER ORDERED THAT** Mylan's Renewed Motion for Leave to File Under Seal its Reply in Support of the Motion to Decertify (Doc. 2439) is granted.

**IT IS FURTHER ORDERED THAT** Class Plaintiffs' Unopposed Motion for Leave to Provisionally File Under Seal Their Sur-reply to Mylan's Motion to Decertify the State Antitrust Class (Doc. 2438) is denied as moot.

**IT IS FURTHER ORDERED THAT** Mylan's Renewed Motion for Leave to File Under Seal Plaintiffs' Sur-reply to Motion to Decertify (Doc. 2460) is granted.

**IT IS FURTHER ORDERED THAT** Mylan's Motion for Leave to Preliminarily File Under Seal Its Response to Plaintiffs' Sur-reply to Motion to Decertify (Doc. 2446) is denied as moot.

**IT IS FURTHER ORDERED THAT** Mylan's Renewed Motion for Leave to File Under Seal Its Proposed Response to Plaintiffs' Sur-reply to Motion to Decertify (Doc. 2461) is granted.

**IT IS SO ORDERED.**

**Dated this 15th day of December, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
