**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE: EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION

*(This Document Relates to Class Cases)*

Case No. 2:17-MD-02785-DDC-TJJ

MDL No. 2785

**THE MYLAN DEFENDANTS' MOTION FOR RECONSIDERATION**

The Mylan Defendants ("Mylan") respectfully submit this motion under Fed R. Civ. P. 23(c)(1)(C), Fed. R. Civ. P. 60(a), and D. Kan. Rule 7.3 for reconsideration of the Court's December 15, 2021 Memorandum and Order.  *See* Mem. & Order re Decertification, Dkt. 2531 ("Decert. Order").  Mylan recognizes and appreciates the Court's work in connection with decertification and does not file for reconsideration lightly.  There is, however, one crucial and dispositive issue in the Decertification Order that must be addressed prior to trial on January 24, 2022.

Mylan respectfully submits that the Court misapprehended the scope of the class exclusion for "single flat co-pay" consumers and, as a result, misapprehended the parties' arguments on a fundamental issue:  the presence in the class of uninjured consumers with a flat brand co-pay.  *See* Decert. Order at 20; *Rezac Livestock Comm'n Co. v. Pinnacle Bank*, No. 15-cv-04958, 2017 WL 86190, at *2 (D. Kan. Jan. 10, 2017) (motion for reconsideration is appropriate "where the court has misapprehended the facts" or "a party's position").  As explained below, the single flat co-pay exclusion concerns people who pay the same insurance co-pay (e.g., $10) regardless of whether they purchase a brand or generic product.  By contrast, the subject of Mylan's motion to decertify and the present motion are people who would otherwise pay different insurance co-pays (e.g., $10 vs. $20) depending on whether they purchase a brand or generic product, but who are brand loyalists and so end up paying the same branded co-pay all the time.

The "single flat co-pay" exclusion on which the Court relied does not apply to this latter group. As a result, hundreds of thousands or more of these consumers are *in the class* but *could not have been injured*:  even under Plaintiffs' theory of the case, they would continue to buy branded EpiPens and so would continue to pay the exact same branded co-pay regardless of any changes in EpiPen's price.  These class members pay, e.g., $20 for branded EpiPens now, and they

would pay the same $20 for branded EpiPens in Plaintiffs' but-for world.

Plaintiffs have admitted that such brand loyalists are in the class, but after five years of litigation, they still have no methodology for identifying them on a classwide basis and no answer for this fatal problem other than the collateral source rule—which is wrong. Thus, as a matter of law, there is nothing left to be tried, and this is not a question for a jury to decide. The class cannot remain certified, because the "single flat co-pay" exclusion does not apply to these class members, and Plaintiffs have no "way—at this stage of the litigation, anyway—to show that each member sustained concrete harm from Mylan's alleged conduct." Decert. Order at 12.

Alternatively, if the parties are incorrect about the meaning of the "single flat co-pay" exclusion, then that has material consequences too. If the exclusion *does* apply to brand-loyal insured consumers with a co-pay, then nine of the remaining named plaintiffs must be dismissed because the exclusion would apply to them. And, in that event, Plaintiffs' claims in six states must be dismissed for lack of a class representative.

## Background

In July 2021, Mylan filed a motion for decertification arguing that the presence of uninjured brand loyalists (among others) in the class prevented certification. *See* Defs.' Mot. to Decertify at 7-14, Dkt. 2390. In response, Plaintiffs relied on a new analysis from Prof. Rosenthal to argue for the first time that even brand loyalists were injured, because the price of branded EpiPen devices would have been lower absent the alleged anticompetitive conduct. *See* Pls.' Opp. to Defs.' Mot. to Decertify at 9, Dkt. 2404.[1] Mylan, in turn, responded that Plaintiffs' new theory of "injured

---

[1] As the Court is aware, brand loyalists are class members who bought branded EpiPen products in the real world and who would have continued to buy branded EpiPen products in a but-for world where Teva's generic was on the market earlier. Prof. Rosenthal's new analysis terms this a "brand-brand" issue. As discussed below, the single flat co-pay exclusion addresses something different: consumers who bought the brand in the real world but who would have purportedly bought a *generic* in the but-for world. Prof. Rosenthal calls this a "brand-generic" issue.

brand loyalists" did not apply to most consumers: Most consumers have insurance, and up to 89% of consumers with insurance pay only a flat co-pay for branded products like EpiPen that does not change if the price of a branded product goes up or down. *See* Defs.' Reply in Supp. of Mot. to Decertify at 21, Dkt. 2424 ("Defs.' Reply"); Defs.' Resp. to Pls.' Sur-Reply at 2-3 & n.3, Dkt. 2446-1 ("Defs.' Sur-Reply Response"). Mylan thus explained that these flat co-pay consumers are "uninjured because they paid the same out-of-pocket co-pay regardless of the EpiPen's price." Decert. Order at 19. In a sur-reply, Plaintiffs raised a single argument in response: They contended that these "insured consumers still sustained an injury because the collateral source rule bars evidence of insurance payments." *Id.* Mylan then responded that the collateral source rule does not apply in this case or create Article III injury, noting further that "this is Plaintiffs' only argument for this group of consumers, so if Plaintiffs are wrong about the collateral source rule, then they have offered *nothing* to satisfy *TransUnion* for these uninjured class members." Defs.' Sur-Reply Response at 3.

The Court did not resolve this dispute. Instead, it concluded that "from the court's perspective, the certified class already excludes this group of consumers—*i.e.*, the single, flat co-pay consumers—who Mylan claims are uninjured, and thus lack standing." Decert. Order at 20. "Based on this exclusion," the Court held that it "can't find that Mylan's argument about insured consumers who paid flat co-pays provides a reason for the court to decertify the class." *Id.* The Court acknowledged, however, that "[n]one of the parties raise this point in the briefing." *Id.*

**Argument**

Mylan respectfully requests reconsideration of this aspect of the Court's ruling, which is not consistent with the class definition or the parties' briefing. The parties did not raise the single, flat co-pay exclusion because it does not apply in this situation, and because it is not an answer to

3

the problem that Plaintiffs face:  hundreds of thousands, if not millions, of consumers in the class *could not have been injured* because they would have paid the identical insurance co-pay even if Plaintiffs are right that the price of branded EpiPen would have declined in the but-for world.

The class definition excludes only "'*[s]ingle* flat co-pay' consumers who purchased EpiPens or generic EpiPens only via a fixed dollar co-payment that is the same for all covered devices, *whether brand or generic* (*e.g.*, $20 for all branded and generic devices)."  Class Cert. Mem. & Order at 127, Dkt. 2018-1 (emphases added).  In other words, the class excludes consumers whose insurance requires them to pay the same, single flat co-pay (say, $20) regardless of whether they buy a branded EpiPen device or a generic epinephrine auto-injector.  This is a common exclusion in generic delay class actions, because single flat co-pay consumers cannot possibly be impacted by generic delay; even if they would have purchased the generic product earlier, they still would have paid the same amount of money (the same $20 co-pay).[2]

The parties' decertification briefing did not address these single, flat co-pay consumers because it is the parties' understanding that these consumers have never been in the class.  The briefing instead addressed the millions of consumers who *are* in the class and who have *more than one* co-pay, i.e., consumers whose insurance requires them to pay one flat co-pay for branded products (e.g., $20 every time they buy a branded EpiPen) and a *different* co-pay for generic products (e.g., $10 every time they buy Teva's generic).  *See* M. Rosenthal Sur-Reply Decl. ¶ 8, Dkt. 2438-2 ("Rosenthal Decl.") (describing consumers with a "flat copayment for a brand drug" and a "lower *generic* copayment").  The following table illustrates the difference between these two groups:

---

[2] *See, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 37 n. 26 (1st Cir. 2015); *In re: Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 719 (E.D. Pa. 2020); *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *2 (D.N.J. Oct. 30, 2018).

| Insured consumer | Co-pay for branded products | Co-pay for generic products | In the class? |
|---|---|---|---|
| Consumer 1 | $20 | $20 | No.  Subject to the single flat co-pay exclusion.  Under the terms of their insurance, these consumers pay the same amount at the pharmacy whether they buy a branded or generic product. |
| Consumer 2 | $20 | $10 | Yes.  Not subject to the single flat co-pay exclusion.  Under the terms of their insurance, these consumers pay a lower amount at the pharmacy if they buy a generic product. |

According to Plaintiffs, this second group of consumers were harmed because they paid a higher co-pay to fill their prescriptions than they would have paid if Teva's generic had been on the market earlier (e.g., $20 each time for the EpiPen brand instead of $10 for the Teva generic). But this theory of harm does not apply to brand loyalists—if someone would have purchased a branded EpiPen anyway, then they would have paid the same branded co-pay no matter what (e.g., $20 every time).  That is why Plaintiffs raised a new theory of harm in the underlying briefing, arguing that brand loyalists actually were harmed because the price of branded EpiPen would have been lower in the but-for world.

But as Mylan argued in response, this doesn't solve the problem either:  regardless of whether the price of EpiPen changed, consumers in the class with a flat brand co-pay would still pay that same co-pay if they continued to buy branded EpiPen devices in the but-for world (e.g., $20 every time).[3]  The parties have always understood that these consumers are in the class and

---

[3] A "flat" brand co-pay simply means that the co-pay is a fixed amount.  In the example above, for instance, it remains $20 no matter which branded product the consumer buys, whether an EAI or something else.  Almost every insurance co-pay is a fixed amount, and Plaintiffs never argued (and certainly could not now) that branded co-pays would fluctuate in line with decreases in EpiPen's branded price.  Indeed, this would be the epitome of an individualized inquiry, because it would require looking at each brand loyalist's insurance plan, ascertaining how the plan calculates branded co-pay amounts, and determining whether a hypothetical decrease in EpiPen's price would have affected the

are not covered by the single, flat co-pay exclusion; they have both a branded co-pay and a generic co-pay available to them, but they never pay the lower generic co-pay because they keep buying the branded product.  And these consumers cannot be affected by changing brand prices, because *they pay the same fixed amount for branded EpiPen devices regardless of changes in the branded EpiPen price*.  *See* Defs.' Sur-Reply Response at 2 (explaining that "hundreds of thousands or even millions" of consumers *in the class* fall into this category); *id.* at 3 (explaining that "a sizeable portion of the class—insured, brand-loyal consumers with a co-pay—suffered no concrete harm to begin with, because they would have paid the same co-pay after generic entry as they did before").  Expanding the table above illustrates this point:

| Insured consumer | Co-pay for branded products | Co-pay for generic products | In the class? | Could have suffered an alleged injury? |
|---|---|---|---|---|
| Consumer 1 | $20 | $20 | No.  Subject to the single flat co-pay exclusion. | N/A – not in the class. |
| Consumer 2 – a brand loyalist. Bought branded EpiPen and would continue buying branded EpiPen in the but-for world. | $20 | $10 | Yes.  Not subject to the single flat co-pay exclusion. | No – this person would have continued paying the same $20 branded co-pay in the but-for world, because they would have continued buying the branded product.  Even if the price of branded EpiPen declined, they still would have paid the same $20 at the pharmacy for their branded EpiPen. |

Prof. Rosenthal does not calculate any damages for class members like Consumer 2—brand-loyal consumers with a flat brand co-pay—because those class members could not possibly suffer any damages.  As shown in the table above, if Consumer 2 were required to pay a $20 co-

---

co-pay (which it almost certainly would not; insurance co-pays are calculated based on far more factors than the price of any one drug).

pay to fill a prescription under the terms of her insurance plan, then she would pay that same $20 every time she bought a branded EpiPen, regardless of whether the WAC, AWP, or other price of EpiPen was $600, $400, or anything else. Thus, if Consumer 2 were a brand loyalist, she would never suffer any damages and could never prove that she suffered an Article III injury: she paid $20 in the real world, and she would pay the same $20 even in Plaintiffs' but-for world.[4]

Accordingly, Plaintiffs cannot show injury to consumers with flat brand co-pays who would have continued to buy the branded EpiPen device.[5] And to be clear, this is not a small problem, affecting a small number of class members. This is hundreds of thousands or even millions of uninjured consumers—all of whom are included within the class definition. *See* Defs.' Sur-Reply Response at 2 & n.3.

In their briefs, Plaintiffs offered only one proposed solution to this fatal problem: the collateral source rule. Plaintiffs asserted that even though these consumers suffered no injury themselves, they could remain in the class because their *insurance company* suffered a financial injury. *See* Pls.' Sur-Reply to Defs.' Mot. to Dismiss Reply at 4-5, Dkt. 2438-1. As Mylan has explained, however, the collateral source rule does not apply for numerous reasons. The parties have repeatedly briefed their positions on the collateral source rule, including most recently in the

---

[4] This explains why Prof. Rosenthal calculates damages based on changing brand prices *only* for insured consumers who paid "coinsurance" or a "deductible" (not a flat co-pay) and who thus "share in the benefits of . . . decreasing [brand] prices." Rosenthal Decl. ¶¶ 7-8.

[5] This same analysis applies to consumers in the class with a flat brand co-pay who would have switched in the but-for world from the branded EpiPen device to the Auvi-Q or Adrenaclick generic. *See* Defs.' Reply at 15-17. Plaintiffs asserted that these consumers were injured by higher brand prices too. *See* Pls.' Decert. Sur-Reply at 6; Decert. Order at 22. But when these consumers bought branded EpiPen products, they paid a flat branded co-pay, so they are similarly not impacted by changes in brand price. This is as many as two million *additional* uninjured members of the class. Defs.' Reply at 17 & n.16. The Court stated that "Mylan's argument assumes that these consumers . . . never would have purchased a generic EAI in a but-for world," Decert. Order at 22, but that reverses the burden of proof. It is not Mylan's burden to show that these consumers never would have purchased a generic EAI; it is Plaintiffs' burden to show that they *would* have. And there is nothing in the record to support such a conclusion without asking every class member what they would have purchased in the but-for world. In fact, the only class-wide record evidence supports *Mylan*, demonstrating that millions of consumers switched to the Auvi-Q or Adrenaclick generic. *See* Defs.' Reply at 15-17; Defs.' Sur-Reply Response at 8-9.

motions in limine.  *See* Defs.' Response to Pls.' Mot. in Limine (filed December 20, 2021).  Mylan incorporates all of those arguments here.  Plaintiffs' argument is wrong and should be rejected.

So where does that leave us?  Given the presence of uninjured consumers with a flat brand co-pay in the class, the Court must address—and reject—Plaintiffs' collateral source rule argument and decertify the class before trial.  Even if the collateral source rule "is a legal issue that presents a common question that applies classwide," Decert. Order at 20 (internal quotation marks omitted), Mylan submits that the Court needs to address that issue and find that it does not apply, because it has become determinative of whether the class can be maintained as a matter of law.  There is no evidence or expert opinion in the record that shows injury to these class members, and there is thus nothing left to try as to them.  This is not a jury matter to be addressed through instructions or the verdict form.  It is not about dueling expert opinions or facts.  It is, as the Court acknowledges (*id.*), a legal question.  Plaintiffs' *only* theory for why these class members are injured is the collateral source rule.  Thus, if Mylan is right that the collateral source rule cannot create Article III standing for these class members, then Plaintiffs cannot show injury or recover damages for these class members—whether now, at trial, or ever.  For the same reason, whether any class member suffered an Article III injury is an individualized question that destroys predominance under Rule 23 (to determine, for example, whether someone is a brand loyalist to begin with).

In sum, Plaintiffs have *not* established "a way—at this stage of the litigation, anyway—to show that each member sustained concrete harm from Mylan's alleged conduct."  Decert. Order at 12.  And Plaintiffs have *not* "adduced evidence" for these plaintiffs "capable of supporting a finding that they sustained injury because they paid an inflated price caused by generic delay." *Id.* at 22.  Nor has Prof. Rosenthal shown that "named plaintiffs—even if brand loyalists—sustained injury in the form of paying overcharges for EpiPen." *Id.* at 29.  Plaintiffs have no way to

determine on a classwide basis which class members are uninjured brand loyalists (or Auvi-Q or Adrenaclick switchers), and nothing about that could ever change at trial:  Plaintiffs have not shown—and a jury could not find—"classwide injury."  *Id.* at 12.  The group of consumers at issue could not have been injured by the conduct that Plaintiffs allege, and Plaintiffs have no way to identify those consumers without conducting millions of individualized inquiries.  Mylan thus urges the Court to address this important issue, which impacts both the continued certification of the class and the trial itself.[6]

\*       \*       \*

In the alternative, Mylan recognizes the possibility that the parties have been misinterpreting the meaning of the single, flat co-pay exclusion.  In the Decertification Order, the Court appears to have interpreted the class definition to exclude all consumers who paid a flat co-pay for branded devices (regardless of whether they paid the same co-pay for brand and generic devices).  If that interpretation is correct, then it has a different, but still substantial, implication for the case:  all of the named plaintiffs who paid flat co-pays for all branded EpiPen transactions after Prof. Rosenthal's proposed March 2014 generic entry date must be dismissed because they are subject to the exclusion.[7]  *See* Rosenthal Decl. ¶ 7 n.6 (assuming that all consumers who paid a whole dollar amount paid a flat brand co-pay rather than coinsurance or a deductible); *see also* Ex. 1 to Defs.' Class Cert. Opp., Dkt. 1636-2 (J. Johnson Expert Report, Appendix D.1) (listing co-pays).  And dismissing these plaintiffs, in turn, would require the Court to dismiss the claims of all plaintiffs in Alabama, California, Hawaii, Maine, Michigan, and Nebraska, because there

---

[6] Mylan respectfully disagrees with this Court's interpretation of *TransUnion* and preserves the issues raised in its class certification briefing for further proceedings.

[7] This includes Kenneth Evans (Alabama), Suzanne Harwood (New York), Elizabeth Huelsman (California), Mark Kovarik (Nebraska), Nikitia Marshall (California), Lee Selzer (Florida), Annette Sutorik (Michigan), Linda Wagner (Hawaii), and Lorraine Wight (Maine).

would be no remaining class representative for those states.

Accordingly, Mylan respectfully requests that the Court either decertify the entire class for the reasons set forth above and in the underlying briefs, or dismiss the claims of these nine named plaintiffs and six states.

December 20, 2021

Respectfully submitted,

/s/ *Adam K. Levin*

Adam K. Levin
David M. Foster
Carolyn A. DeLone
Kathryn M. Ali
Katherine B. Wellington
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
adam.levin@hoganlovells.com

Brian C. Fries, #15889
James Moloney, #23786
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Telecopier: (816) 292-2001
bfries@lathropgpm.com
jmoloney@lathropgpm.com

*Counsel for the Mylan Defendants*