UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re EPIPEN (EPINEPHRINE INJECTION, USP) MARKETING, SALES PRACTICES AND ANTITRUST LITIGATION | Civil Action No. 2:17-md-02785-DDC-TJJ (MDL No: 2785) |
| This Document Relates to:<br><br>CLASS CASES | |

**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MYLAN DEFENDANTS' MOTION FOR RECONSIDERATION**

In a few weeks, Mylan faces trial in this multidistrict litigation. Mylan's Motion for Reconsideration, Doc. 2535 ("Mot."), is its latest of many attempts to derail the upcoming trial.

In its motion, Mylan argues, yet again, that the presence of consumers in the class who pay the same co-pay for all of their ***branded*** prescriptions—even though they pay a different co-pay for ***generic*** prescriptions—defeats certification. But as already detailed in this case, and as summarized below, this argument fails for two independent reasons: (1) Mylan's assertion that brand loyalists exist in the class has been successfully rebutted by expert testimony; and independently (2) the collateral source rule requires that insurance coverage not be considered at trial. Further, Mylan already challenged the class definition at the time of class certification and Rule 23(f) review was denied by the Tenth Circuit. For these reasons and those that follow, Mylan's reconsideration motion should be denied in its entirety.

**BACKGROUND**

In certifying the State Antitrust Class nearly two years ago, the Court found that Plaintiffs "made a plausible showing that each named plaintiff—***even if*** he or she purchased the branded EpiPen in the real world after the launch of the EpiPen AG—sustained injury from the delayed generic entry." Doc. 2018, Class Certification Order ("Class Cert. Order") at 38.[1] The Court's class certification decision withstood Defendants' application for appellate review, with the Tenth Circuit noting that this Court's "conclusions [were] well-supported." Doc. 2071, Order at 3.

After the Court denied Mylan's motion seeking summary adjudication of Plaintiffs' generic delay antitrust claims,[2] Mylan moved to decertify the antitrust class.[3] In their briefs on this issue, the parties advanced arguments about the presence of purported "brand loyalists" in the class and

---

[1] Unless otherwise stated, all quotations and citations omitted and all emphasis added.

[2] *See* Doc. 2381, Sum. J. Mem. & Order.

[3] *See* Doc. 2390, Mem. Law Supp. Mot. Decertify ("Decertification Mot.").

- 1 -

the collateral source rule.[4] Having carefully reviewed those papers, the Court just recently denied Mylan's motion to decertify.[5]

Mylan is now asking the Court to revisit its holding for a third time with regard to the limited issue of class members who pay the same co-pay for all branded medications and a different co-pay for generic medications. Mot. at 1. Mylan's motion focuses on the fact that the Court reads the "single flat co-pay" exception broadly. *Id.* at 2. However, accounting for the narrower scope of the exception does not change the fact that these individuals were damaged, as detailed by Prof. Rosenthal, because they would have switched to a generic and, independently, their insurance is irrelevant as a matter of law under the collateral source rule.

## ARGUMENT

As this Court recently explained, it enjoys wide discretion on whether to grant reconsideration. Doc. 2497, Mem. & Order at 5 (citing *Hancock v. City of Okla. City*, 857 F.2d 1394, 1395 (10th Cir. 1988)). The Tenth Circuit defers to the lower court's discretion unless the "district court's decision . . . was arbitrary, capricious, whimsical, or manifestly unreasonable." *Id*. This requires "direct, obvious, and observable error." *Id*. No such error exists in the Court's refusal to decertify the class for two independent reasons.

### I. THE EVIDENCE REBUTS MYLAN'S ASSERTIONS THAT "BRAND LOYALISTS" NECESSARILY EXIST IN THE CLASS.

Mylan's Motion for Reconsideration rests entirely on the premise that so-called "brand loyalists" exist in the class. *See* Mot. at 1 (indicating that "the subject of Mylan's motion to decertify and the present motion" are people who "are brand loyalists"). A hypothetical, purported

---

[4] *Compare* Decertification Mot. at 7, *with* Doc. 2404 ("Decertification Opp'n") at 5-9, 14-15; *compare* Doc. 2438 ("Decertification Sur-Reply") at 4-5, *with* Doc. 2446 ("Decertification Sur-Reply Resp.") at 2-4.

[5] Doc. 2531, Mem. & Order ("Decertification Denial Order").

"brand loyalist" is a class member who, according to Mylan, would have continued to purchase branded EpiPen (and only the branded EpiPen) in the but-for world, despite the availability of a lower priced generic EpiPen, in each and every transaction throughout the class period, which spans more than 6.5 years.[6] If a class member would have purchased a generic EpiPen for even a single transaction in the but-for world, they are not "brand loyal" and would have paid less. As detailed below, there is a near 100% probability that any given class member would have made at least one generic purchase during the class period. Without such so-called "brand loyalists," Mylan's argument regarding fixed branded co-pay class members falls apart.

Plaintiffs have never conceded that so-called "brand loyalists" exist. *See, e.g.*, Decertification Opp'n at 5-9; *see also* Class Cert. Order at 68 ("[P]laintiffs contend that the number of uninjured class plaintiffs in each class, *if any*, is *de minimis*."). To the contrary, the evidence demonstrates an extremely high probability that class members would have switched to a generic for at least one purchase in the but-for world. Following Teva's entry, generic penetration ***surpassed*** the levels expected at the time of the merits expert reports. Through October 2020, EAI prescription data shows a generic penetration rate of 96.6%—even more than the 95% generic penetration rate projected in the Mylan 1 analog. *See* Doc. 2404-9 ("Rosenthal Decl.") at ¶ 7.[7] As an absolute number, in October 2020, only an average of 81 branded EpiPen two packs per state were sold. *Id*. at ¶ 6.

It also would be incorrect to assume that the miniscule number of EpiPens still sold in October 2020 was the result of "brand loyalists." Setting aside potential extraneous explanations

---

[6] Notably, in the real world, it has only been three years post-Teva entry. This means that another three-plus years of switching is yet to occur in the real world, compared to the but-for world.

[7] Branded EpiPen prescriptions dropped from a high of 1,041,216 pens in August 2016, to a mere 8,136 in October 2020. Rosenthal Decl. at ¶ 6.

for the relative handful of remaining branded sales in the data, it is important to recognize that these purchases were individual transactions—not necessarily the result of a few lone brand loyalists holding out. In fact, it is highly likely that these individual purchases were made by patients who had either previously purchased, or would in the future purchase, a generic EpiPen.[8] Moreover, with the ability to examine another 3.5 years of real-world data—so that the data set was as long as the class period—this handful of prescriptions would likely dwindle even further.

As explained before, any calculation of switching in the but-for world is "necessarily hypothetical and probabilistic" precisely *because* Mylan's alleged misconduct "prevented the but-for scenario from occurring." *See* Doc. 1497-3 ("Rosenthal Class Cert. Reply Report") ¶ 51; *see also* Rosenthal Decl. at ¶ 4 ("Because we are dealing with an inherently prospective but-for world, the tainted real-world data cannot be relied on to demonstrate brand loyalty of individual Class members."). In the two years following generic entry in the real world, the branded EpiPen retained only a negligible market share. *See id.* at Fig. 2. With such deep generic penetration in the real world, it is reasonable to conclude that the penetration would have been even greater in the hypothetical but-for world. For example, it is reasonable to expect that in the but-for world Teva would have achieved the same level of generic penetration in the same amount of time and that, by 2016, there would already be 96.6% of *transactions* (not people) that switched to the generic.[9]

---

[8] The few remaining brand purchases could have a variety of explanations. For example, someone that was newly diagnosed with anaphylaxis may have purchased an EpiPen for their first purchase before they researched the availability of generics, and they would later switch. Stocking and availability issues at pharmacies could also force consumers who preferred a generic to purchase an EpiPen during certain transactions, even if they would (or did) purchase a generic at other times.

[9] As Prof. Rosenthal explained in her reports, the Mylan AG was not a true generic competitor to the branded EpiPen. *See* Rosenthal Class Cert. Reply Report ¶ 29. Accordingly, the penetration rate of the Mylan AG is not indicative of the generic penetration rate that could have been achieved by Teva.

*See* Rosenthal Decl. ¶ 5 ("[I]n the but-for world, there would be even more time for erosion, further undermining Mylan's and Dr. Johnson's assertions.").[10]

Mylan argues that "consumers with flat brand co-pays" number in the "hundreds of thousands or even millions" and are uninjured. Mot. at 7; *see id*. at 4. But Mylan's portrayal of this issue as a major problem fails to acknowledge that for each transaction a class member makes, there is a greater than 96.6% chance that it will be for a generic. Rosenthal Decl. ¶ 7 & Fig. 2. This means that **for each purchase**, there is less than a 3.4% chance that the class member will purchase a branded EpiPen. And this does not even account for the fact that class members usually made multiple purchases throughout the class period, thereby increasing the likelihood that at least one such purchase would be for a generic.[11] Mylan's assertion that there are potentially hundreds of thousands of brand loyalists does not match the reality of the demonstrated generic penetration, which shows class members switching to generic devices on an ongoing, real-world basis.

In light of the extremely low probability that any class member's **single transaction** will be for a branded EpiPen by the end of the class period—compounded by the fact that most class members will engage in multiple transactions because the EpiPen generally expires a year after purchase and a new one is needed—it is exceedingly probable that no class member is brand loyal.[12] As a result, Mylan's motion fails.

---

[10] Prof. Rosenthal's damages calculation does not include damages for any hypothetical **transaction** where the Class member would not have switched.

[11] Mylan's own documents show that "roughly two thirds of patients had at least one refill within three years." Rosenthal Decl. at ¶ 11. Here, the class period is more than **double** that period. Indeed, as this Court is aware, Mylan's **own internal projections** of generic penetration (*i.e.*, "Mylan 1") assumed generic market share near what occurred in the real world. Rosenthal Decl. Figure 2. If "brand loyalty" were truly an issue, surely Mylan's own internal projections would have reflected it.

[12] Mylan's argument about Auvi-Q and Adrenaclick buyers, Mot. at 7 n.5, also fails to account for the but-for world. As the Court noted in the Decertification Denial Order, at 22, Mylan is incorrect to assume that these purchasers would not have switched to the generic in the but-for world for at least one transaction. If anything, their Auvi-Q and Adrenaclick purchases indicated a willingness to switch.

- 5 -

## II. THE COLLATERAL SOURCE RULE INDEPENDENTLY DEFEATS MYLAN'S ARGUMENTS

Mylan appropriately concedes that even if there are so-called "brand loyalists" in the class, application of the collateral source rule would defeat its motion. *See*, *e.g.*, Mot. at 3 (suggesting that if Plaintiffs are correct about the collateral source rule, Mylan's argument about uninjured class members would be moot); *id.* at 7 (referring to the collateral source rule as "one proposed solution" but arguing the rule does not apply). Indeed, the collateral source rule is dispositive: as a matter of law, it bars evidence of Plaintiffs' insurance, allowing for examination of Mylan's price hikes.[13]

The Tenth Circuit recognizes a "fundamental tenet" of the collateral source rule is that "a tortfeasor may not reap the benefit of any special payment arrangement involving a collateral source."[14] Yet that is exactly what Mylan seeks to do by asking the Court to reconsider and find class members uninjured because of the very existence of a "special payment arrangement" (*i.e.*, a prescription drug co-pay) with their insurance provider.

As this Court recognized in the Decertification Denial Order, precedent supports "applying the collateral source rule to a consumer class alleging antitrust injuries from paying overcharges for branded prescription drugs, even though consumers' insurance companies paid the overcharges, and finding no reason why a wrongdoer should gain because his target has paid for coverage either through his dollars or through his health care coverage." Decertification Denial Order at 19 (citing *Goda v. Abbott Labs.*, No. 01445-96, 1997 WL 156541, at *9 (D.C. Super. Ct.

---

[13] *See* Decertification Sur-Reply at 4-5 (explaining contours of the collateral source rule). Like Mylan, Plaintiffs incorporate their previous arguments regarding the collateral source rule here. *See* Mot. at 8.

[14] *Prager v. Campbell Cty. Mem'l Hosp.*, 731 F.3d 1046, 1059 (10th Cir. 2013). The Tenth Circuit has stressed that a strong policy of encouraging "the maintenance of insurance" underlies the existence of the collateral source rule. *Green v. Denver & Rio Grande Western R. Co.*, 59 F.3d 1029, 1032 (10th Cir. 1995) (reversing defense verdict based on error re: collateral source rule).

Feb. 3, 1997)). As noted in the Decertification Sur-Reply, at 4 n.11, other courts have applied this rule in pharmaceutical antitrust class actions.[15] Outside of an antitrust context, other courts have applied the collateral source rule to find standing even where Medicare covered the cost of a plaintiff's stay at a nursing facility,[16] and where a non-insurance third-party payor covered the plaintiff's health care costs.[17]

Ignoring this law, Mylan argues that so-called "brand loyalists" are uninjured "regardless of whether the WAC, AWP, or other price of EpiPen was $600, $400, or anything else." Mot. at 7. But that is precisely why the collateral source rule makes sense. Without it, defendants would be free to increase the price indiscriminately but rely on plaintiffs' insurance as a defense to their actions. The collateral source rule forces a defendant to answer for the extent of the actual harm caused. *Cf. Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 161–62 (5th Cir. 2016) (explaining that the collateral source rule "embodies" the idea that someone with insurance is, nevertheless, harmed); *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1244 n. 21 (5th Cir. 1994) (explaining that plaintiffs would "derive no benefit from" their insurance if tortfeasors could "set off compensation available to plaintiffs through collateral sources" and "might be left exposed to other misfortunes once their insurance coverage was depleted by the tortfeasors' negligence").[18]

---

[15] *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 259 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) (explaining that if "fixed co-pay consumers were excluded altogether from the settlement, they could sue defendant for damages by invoking the 'collateral source' doctrine, thus continuing to expose defendant to lawsuits"); *accord In re Abbott Labs. Norvir Anti-Tr. Litig.*, No. C 04-1511 CW, 2007 WL 1689899, at *4 (N.D. Cal. June 11, 2007) (ruling that the collateral source rule may be applied in an antitrust case at class certification to stop a defendant from challenging payments).

[16] *See Johnson v. BLC Lexington, SNF, LLC*, No. 19-064-DCR, 2020 WL 3578342, at *2 (E.D. Ky. July 1, 2020) ("the collateral source rule provides support for the proposition that, even if insurance covered the cost of her stay, there would still be standing to sue").

[17] *See Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 163 (5th Cir. 2016) ("The existence of a third-party payor in the form of a trust created by a prior tortfeasor does not deprive T.R. of the injury that would otherwise exist.").

[18] As Mylan concedes, this Court recognized that "the collateral source rule 'is a legal issue that presents a common question that applies classwide.'" Mot. at 8 (quoting Decertification Denial Order at 20). Mylan

### III.     MYLAN'S ALTERNATE RELIEF IS UNWARRANTED.

Finally, Mylan argues that if the exclusion of class members with a single flat co-pay applies "to brand-loyal insured consumers with a [single branded] co-pay," then a number of class representatives fall within the exclusion and certain states require dismissal. Mot. at 2; *see id*. at 9-10. However, because the parties agree that the exclusion is limited to people with the same co-pay for both branded and generic prescriptions,[19] this argument is moot and the Court need not entertain Mylan's alternative request.

### CONCLUSION

For the above reasons and for the reasons already set forth in the Court's Orders granting class certification and denying decertification, Mylan's motion to reconsider the Court's denial of decertification should be denied.

DATED:  December 30, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
STUART A. DAVIDSON
BRADLEY M. BEALL


/s/ *Stuart A. Davidson*
STUART A. DAVIDSON

---

incorrectly asserts, however, that the collateral source rule is "Plaintiffs' ***only*** theory for why these class members are injured." *Id*. As detailed above, the collateral source rule is not the only theory offered by Plaintiffs to demonstrate class members' injury. Rather, the rapid erosion of EpiPen sales caused by Teva's entry means that there is an extremely low possibility that any given transaction would be branded or that any class member would not switch to the generic for at least one transaction during the almost seven-year class period. *See supra* Section I. In short, this common legal issue cannot defeat certification—particularly where there is an alternate basis for the jury to find classwide injury.

[19] Mylan notes that this "is a common exclusion in generic delay class actions." Mot. at 4. As discussed at oral argument on Class Certification and in this Court's Order granting certification, Class Cert. Order at 55 n.29, this exclusion is unnecessary given the collateral source rule. Given the Court's previous ruling, Plaintiffs do not seek removal of this exclusion at this stage.

- 8 -

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN O. O'MARA
ARTHUR L. SHINGLER III
LEA MALANI BAYS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bomara@rgrdlaw.com
ashingler@rgrdlaw.com
lbays@rgrdlaw.com

KELLER ROHRBACK L.L.P.
LYNN LINCOLN SARKO
GRETCHEN FREEMAN CAPPIO
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone:  206/623-1900
206/623-3384 (fax)
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com

BURNS CHAREST LLP
WARREN T. BURNS
SPENCER COX
900 Jackson Street, Suite 500
Dallas, TX  75202
Telephone:  469/904-4550
469/444-5002 (fax)
wburns@burnscharest.com
scox@burnscharest.com

PRITZKER LEVINE LLP
ELIZABETH C. PRITZKER
JONATHAN K. LEVINE
1900 Powell Street, Suite 450
Emeryville, CA  94608
Telephone:  415/692-0772
415/366-6110 (fax)
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com

SHARP LAW LLP
REX A. SHARP
RYAN C. HUDSON
RUTH ANNE FRENCH-HODSON
4820 West 75th Street
Prairie Village, KS  66208
Telephone:  913/901-0505
913/901-0419 (fax)
rsharp@midwest-law.com
rhudson@midwest-law.com
rafrenchhodson@midwest-law.com

Co-Lead Counsel and Liaison Counsel for Class Plaintiffs

THE LANIER LAW FIRM
W. MARK LANIER
RACHEL LANIER
CRISTINA DELISE
10940 West Sam Houston Parkway North
Suite 100
Houston, TX  77064
Telephone:  713/659-5200
713/659-2204 (fax)
mark.lanier@lanierlawlirm.com
rachel.lanier@lanierlawfirm.com
cristina.delise@lanierlawfirm.com

Special Trial Counsel for Class Plaintiffs

BOIES SCHILLER FLEXNER LLP
MATTHEW S. TRIPOLITSIOTIS
DUANE L. LOFT
333 Main Street
Armonk, NY  10504
Telephone:  914/749-8200
mtripolitsiotis@bsfllp.com
dloft@bsfllp.com

Member of Plaintiffs' Steering Committee, On the Brief

- 11 -

- 1 -

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing **CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MYLAN DEFENDANTS' MOTION FOR RECONSIDERATION** was served upon the following as liaison counsel to all Defendants and Plaintiffs in this matter by email this 30th day of December, 2021:

| | |
|---|---|
| Brian C. Fries<br>LATHROP GPM, LLP<br>2345 Grand Boulevard<br>Suite 2200<br>Kansas City, MO 64108<br>brian.fries@lathropgpm.com | Rex A. Sharp<br>Ryan C. Hudson<br>SHARP LAW LLP<br>5301 West 75th Street<br>Prairie Village, KS 66208<br>rsharp@midwest-law.com<br>rhudson@midwest-law.com |

*/s/ Stuart A. Davidson*
STUART A. DAVIDSON

ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com